UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: SEP 1 9 2016
```

United States of America,

–v–

Anthony R. Murgio, et al.,

Defendants.

15-cr-769 (AJN)

MEMORANDUM &
ORDER

ALISON J. NATHAN, District Judge:

Defendants Anthony Murgio ("Murgio"), Yuri Lebedev, Trevon Gross, and Michael Murgio—Anthony's father—are charged in a nine-count superseding indictment ("the Indictment"). *United States v. Murgio*, No. 15-CR-769 (AJN) (S.D.N.Y. Apr. 21, 2016) ("S3 Indictment"), Dkt. No. 87. The allegations in the Indictment stem from Murgio's alleged operation, with Lebedev's assistance, of Coin.mx, a website that the Government characterizes as an unlawful Bitcoin[1] exchange, and from an alleged scheme to bribe Gross, the chairman of the board of a federal credit union, in order to obscure the illegal nature of Coin.mx. *Id.* ¶¶ 3, 4, 10. Before the Court are various pre-trial motions brought by the Defendants. In broad terms, the motions challenge the sufficiency and wording of the Indictment, seek particulars from the Government, request disclosure of certain information in advance of trial, and, in one case, seek a severance. For the reasons that follow, the Court grants several of the requests for a bill of particulars, but otherwise denies the Defendants' motions.

---

[1] "Bitcoin," according to the complaint filed against Murgio, is "an anonymous, decentralized form of electronic currency that exist[s] entirely on the Internet and not in any physical form." *See* Complaint as to Anthony Murgio, *United States v. Murgio*, No. 15-CR-769 (AJN) (S.D.N.Y. July 17, 2015); *see also* Kevin V. Tu & Michael W. Meredith, *Rethinking Virtual Currency Regulation in the Bitcoin Age*, 90 Wash. L. Rev. 271, 277 (2015) (defining Bitcoin as "a type of virtual currency . . . that (1) is electronically created and stored, and (2) lacks the backing of a government authority, central bank, or a commodity like gold"). Bitcoin "can be used to purchase goods and services from any person that is willing to accept it as a form of payment," but it does not "have the status of legal tender." Tu & Meredith, *supra*, at 277-78. The Court uses "Bitcoin," with a capital "B," to refer to the concept of the virtual currency, and "bitcoins," with a lowercase "b," to refer to units of the virtual currency.

## I.      BACKGROUND

A grand jury returned the third superseding indictment in this case on April 14, 2016. *See* S3 Indictment at 22.  Murgio is charged in eight of the Indictment's nine counts.  The first two counts charge Murgio with operating, and conspiring to operate, Coin.mx as an unlicensed money transmitting business. *Id.* ¶¶ 11-15.  The Government alleges that Murgio and his co-conspirators attempted to shield the true nature of his Bitcoin exchange business by operating through several front companies, including one known as "Collectables Club," to convince financial institutions that Coin.mx was just a members-only association of individuals interested in collectable items, like stamps and sports memorabilia. *Id.* ¶ 5.  Counts Six and Seven of the Indictment charge Murgio with committing, and conspiring to commit, wire fraud by virtue of making material misrepresentations to the financial institutions he was allegedly attempting to deceive. *Id.* ¶¶ 24-28.  In Counts Eight and Nine, he is charged with engaging in, and conspiring to engage in, money laundering. *Id.* ¶¶ 29-33.

Counts Three through Five of the Indictment pertain to what the Government labels the "bribery scheme," an alleged effort to acquire control of HOPE FCU, a federal credit union in New Jersey with primarily low-income members. *Id.* ¶ 10.  Counts three and four charge Murgio, Lebedev, and Michael Murgio with bribing, and conspiring to bribe, Gross, the Chairman of the Board of HOPE FCU. *Id.* ¶¶ 16-21.  Count Five charges Gross with accepting those bribes. *Id.* ¶¶ 22-23.  All told, Murgio and his co-conspirators allegedly paid more than $150,000 to bank accounts under Gross's control. *Id.* ¶ 10.  In return, Gross allegedly assisted Murgio in installing co-conspirators, including Lebedev, on HOPE FCU's board and in transferring Coin.mx's banking operations to HOPE FCU. *Id.*

Three of the Defendants filed pre-trial motions.  First, Murgio filed a motion to dismiss Counts One and Two of the Indictment, as well as a series of omnibus pre-trial motions.  Dkt. Nos. 130, 132.  Second, Gross filed a motion to dismiss Count Five of the Indictment and a motion for a bill of particulars.  Dkt. No. 138.  And third, Lebedev filed a series of omnibus pre-

trial motions.[2] Dkt. No. 134. Michael Murgio did not separately file any motions, but he seeks leave to join several of the motions of his co-defendants—a request made by Murgio and Gross as well. Dkt. Nos. 141, 147, and 148. Those requests are granted.

## II.    MURGIO'S MOTION TO DISMISS COUNTS ONE AND TWO

Murgio moves to dismiss Counts One and Two of the Indictment, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B), on the grounds that those counts fail to state an offense. Because "federal crimes are solely creatures of statute, a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute." *United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012) (internal quotation marks and citations omitted). An indictment can also be challenged on the grounds that it lacks required specificity. Fed. R. Crim. P. 12(b)(3)(B)(iii). An indictment must contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). But in order "to satisfy the pleading requirements of Rule 7(c)(1), an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) (internal quotation marks and citation omitted). Put differently, "the indictment need only allege the 'core of criminality' the Government intends to prove at trial, since the indictment is 'read . . . to include facts which are necessarily implied by the specific allegations made.'" *United States v. Budovsky*, No. 13-CR-368 (DLC), 2015 WL 5602853, at *3 (S.D.N.Y. Sept. 23, 2015) (alteration in original) (quoting *United States v. Rigas*, 490 F.3d 208, 229 (2d Cir. 2007)). In

---

[2] The Court adopts the following labeling conventions for citations to the briefs on these various motions. "Murgio MTD Br." refers to the memorandum of law in support of Murgio's motion to dismiss Counts One and Two. *See* Dkt. No. 133. "Murgio Omni. Br." refers to the memorandum of law in support of Murgio's omnibus pre-trial motions. *See* Dkt. No. 131. "Gross Br." refers to the memorandum of law in support of Gross's motion to dismiss Count Three and motion for a bill of particulars. *See* Dkt. No. 140. And "Lebedev Br." refers to the memorandum of law in support of Lebedev's omnibus pre-trial motions. *See* Dkt. No. 135. The Government filed one opposition brief ("Opp. Br.") to all of the pending motions. *See* Dkt. No. 163. For reply briefs, the Court uses the same naming conventions as for the opening briefs, but with "Reply" added—i.e., "Murgio Omni. Reply Br."

evaluating a motion to dismiss, the Court "accept[s] as true all of the allegations of the indictment." *United States v. Goldberg*, 756 F.2d 949, 950 (2d Cir. 1985).

Count One of the Indictment charges Murgio with conspiring to commit an offense against the United States, in violation of 18 U.S.C. § 371. The object of that alleged conspiracy is the operation of an unlicensed money transmitting business, in violation of 18 U.S.C. § 1960. This underlying substantive offense, which Murgio is charged with in Count Two, is the focus of Murgio's motion to dismiss.

Section 1960 makes it a crime to "knowingly conduct[], control[], manage[], supervise[], direct[], or own[] all or part of an unlicensed money transmitting business." 18 U.S.C. § 1960(a). The key phrase in § 1960, for purposes of this motion, is "unlicensed money transmitting business." Breaking that phrase down into its component parts, first, the statute defines "money transmitting" to include "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier." *Id.* § 1960(b)(2). Whether Coin.mx handled "funds," and if so, whether it "transferr[ed]" them on behalf of the public, are key questions here.

Next, the statute does not provide a particularized definition of "business," other than to specify that a "money transmitting business" must "affect[] interstate or foreign commerce" in order to fall within § 1960. *Id.* § 1960(b)(1).

Finally, the statute lists three ways in which a "money transmitting business" can be deemed "unlicensed." First, a money transmitting business is unlicensed if it "is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony." *Id.* § 1960(b)(1)(A). Second, such a business is unlicensed if it fails to comply with federal "money transmitting business registration requirements." *Id.* § 1960(b)(1)(B). And third, a money transmitting business is unlicensed if it "involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity." *Id.* § 1960(b)(1)(C).

4

In sum, to qualify as an "unlicensed money transmitting business" under § 1960, a business must a) transfer, on behalf of the public, b) funds, and c) do so in violation of state or federal licensing and registration requirements, or with knowledge that the funds were derived from a criminal offense.

Murgio raises three principal arguments in support of dismissing Counts One and Two of the Indictment. First, he argues that bitcoins do not qualify as "funds" under § 1960. Second, he claims that the Indictment fails to allege that Coin.mx transferred funds so as to be a "money transmitting business" under § 1960. And third, he contends that the Indictment inadequately alleges that Coin.mx failed to comply with state and federal licensing and registration requirements. For the reasons that follow, the Court rejects each of these arguments.

## A.     Bitcoins Are "Funds" Under § 1960

Section 1960 does not specify what counts as "money" that is "transmitted," other than to note that it "includes . . . funds." 18 U.S.C. § 1960(b)(2). This raises the question of whether bitcoins are "funds" under the statute. The Court concludes that they are.

"When a term goes undefined in a statute," courts give the term "its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, 2002 (2012). The ordinary meaning of "funds," according to Webster's Dictionary, is "available pecuniary resources." Webster's Third New International Dictionary 921 (2002). "Pecuniary" is defined as "taking the form of or consisting of money." *Id.* at 1663. And "money," in turn, is defined as "something generally accepted as a medium of exchange, a measure of value, or a means of payment." *Id.* at 1458. This definition of "funds," and the corresponding definition of "money," have consistently been adopted by courts in this circuit. In *United States v. Faiella*, Judge Rakoff defined "funds," in the context of interpreting § 1960, as "'available money' or 'an amount of something that is available for use.'" 39 F. Supp. 3d 544, 545 (S.D.N.Y. 2014) (citation omitted). And as the Court does here, he also defined "money" as "something generally accepted as a medium of exchange, a measure of value, or a means of payment." *Id.* (citation omitted). Similarly, Judge Forrest has explained that "'[f]unds' are defined as 'money, often money for a specific

5

purpose,'" and that "'[m]oney' is an object used to buy things." *United States v. Ulbricht*, 31 F.

Supp. 3d 540, 570 (S.D.N.Y. 2014) (citation omitted).  Although Judge Forrest reached that

conclusion in a case involving a different statute—18 U.S.C. § 1956, which prohibits money

laundering—she did so by engaging in the same analysis the Court must perform here. *See id.*

(noting that "'[f]unds' is not defined in the statute and is therefore given its ordinary meaning").

In light of this consensus as to the term's ordinary meaning, the Court concludes that "funds," for

the purposes of § 1960, means pecuniary resources, which are generally accepted as a medium of

exchange or a means of payment.

     Applying that definition here, it is clear that bitcoins are funds within the plain meaning

of that term.  Bitcoins can be accepted "as a payment for goods and services" or bought "directly

from an exchange with [a] bank account." *Getting started with Bitcoin*, bitcoin,

https://bitcoin.org/en/getting-started (last visited Sept. 16, 2016).  They therefore function as

"pecuniary resources" and are "used as a medium of exchange" and "a means of payment."  As

Judge Rakoff explained, bitcoins "clearly qualif[y] as 'money' or 'funds'" under § 1960 because

they "can be easily purchased in exchange for ordinary currency, act[] as a denominator of value,

and [are] used to conduct financial transactions." 39 F. Supp. 3d at 545; *see also Ulbricht*, 31 F.

Supp. 3d at 570 (holding that bitcoins are "funds" because they "can be either used directly to

pay for certain things or can act as a medium of exchange and be converted into a currency

which can pay for things").  Courts considering other virtual currencies have reached the same

conclusion—those currencies also count as "funds" under § 1960. *See Budovsky*, 2015 WL

5602853, at *14 (relying on *Faiella* for the proposition that "LR," another virtual currency,

"qualifies as 'funds' for purposes of § 1960"); *see also United States v. E-Gold, Ltd.*, 550 F.

Supp. 2d 82, 88 (D.D.C. 2008) (noting that "[s]ection 1960 defines 'money transmitting' broadly

to include transferring 'funds,' not just currency, by 'any and all means'").

     The legislative history of § 1960 supports the conclusion that bitcoins fall within the

statute's purview.  Section 1960 was enacted to address the fact that "money launderers with

illicit profits ha[d] found new avenues of entry into the financial system." S. Rep. No. 101-460

(1990). From its inception then, § 1960 sought to prevent innovative ways of transmitting money illicitly. It appears that Congress "designed the statute to keep pace with . . . evolving threats," and this Court must accordingly give effect to the broad language Congress employed— namely, that § 1960 "appl[ies] to *any* business involved in transferring 'funds . . . by *any and all means*.'" *Faiella*, 39 F. Supp. 3d at 546 (emphases added) (quoting 18 U.S.C. § 1960(b)(2)). Dictionaries, courts, and the statute's legislative history all point to the same conclusion: bitcoins are funds.

Murgio, however, urges the Court to reject this straightforward conclusion. He asks the Court to adopt a more narrow definition of "funds," contending that the term should mean only "currency." Murgio MTD Br. 7. The path that leads him to that conclusion is as follows: First, he claims that Black's Law Dictionary defines "funds" as "[a] sum of money or other liquid assets established for a specific purpose." *Id.* (alteration in original) (quoting Black's Law Dictionary 788 (10th ed. 2014)). Second, he cites Black's definition of "money." *Id.* Black's defines "money" as "[a]ssets that can be easily converted to cash," and, more narrowly, as "the medium of exchange authorized or adopted by a government as part of its currency." Black's Law Dictionary, *supra*, at 1158. As Murgio notes, the narrower of the two definitions of "money" is taken from the Uniform Commercial Code ("UCC"). Murgio MTD Br. 7; *see also* U.C.C. § 1-201(b)(24) (Unif. Law Comm'n). Third, and finally, Murgio argues that "funds" must mean only "currency" because the other definition of "money" from Black's—i.e., assets easily converted to cash—would render § 1960 "meaningless and overly broad." MTD Br. 7. Each step in this chain of reasoning is flawed.

First, Murgio's resort to Black's—a legal dictionary—as the starting point for defining "funds" ignores the rule that an undefined term in a statute is given its *ordinary* meaning." *Taniguchi*, 132 S. Ct. at 2002 (emphasis added). The definitions of "money" and "funds" from Black's "would only be relevant if Congress intended that these terms be given special meaning as legal 'terms of art.'" *Faiella*, 39 F. Supp. 3d at 545 n.2. There is no evidence that Congress intended such a specialized meaning here.

Second, even if Black's were the right dictionary to consult, Murgio errs in three respects in consulting it. First, the definition of "funds" that he cites is actually the definition of "fund," singular. *See* Black's Law Dictionary, *supra*, at 788 ("A *sum* of money or other liquid assets established for a specific purpose." (emphasis added)). That definition is inapplicable here because "funds," as used in § 1960, clearly refers to the money or liquid assets themselves, rather than the kind of "fund" that is *comprised* of a sum of assets. *Compare* Black's Law Dictionary, *supra*, at 788 (providing example of "a fund reserved for unanticipated expenses"). And in fact, Black's provides a definition of the plural of "fund," defining "funds" as "[m]oney or other assets, such as stocks, bonds, or working capital, available to pay debts, expenses, and the like." *Id.* Murgio's second error is ignoring the second half of this definition—i.e., that "funds" includes "other assets." The examples of "other assets" that Black's provides—stocks, bonds, or working capital—are clearly broader than just "currency." Finally, even if the Court were to ignore half of the definition of "funds" and rely only on Black's definition of "money," it would reject the narrower of the two definitions of money that Black's provides. The narrower definition relies expressly on the UCC, which is evidence that "money" only has a restricted meaning in specialized contexts, like commercial law. *See* U.C.C. § 1-103 (Unif. Law Comm'n) (explaining that the UCC's purpose is to "modernize the law governing commercial transactions").

Third, Murgio's concern about overbreadth—i.e., that interpreting "funds" to mean more than just "currency" would render § 1960 overly broad—is meritless. Murgio argues that using the ordinary meaning of "funds," as outlined above, would require treating commodities like copper, hogs, or coffee as "funds," thereby bringing those commodities within the purview of the money transmitter statute. Murgio MTD Br. 8. But no one would consider coffee or hogs "pecuniary resources," and although such commodities are *traded* on exchanges, they do not themselves function as a "medium of exchange." *See* Webster's, *supra*, at 921, 1458. Murgio's concerns about absurd results are therefore unfounded.

Murgio attempts to buttress his argument in favor of a narrower definition of funds by relying on various government documents that discuss virtual currencies. None of those documents, however, address the meaning of "funds" in the context of § 1960. For instance Murgio cites the Department of Treasury's Financial Crimes Enforcement Network's ("FinCEN") guidance on virtual currencies. *See* Application of FinCEN'S Regulations to Persons Administering, Exchanging, or Using Virtual Currencies, FIN-2013-G001 (Mar. 18, 2013) ("FinCEN Guidance") (reproduced at Murgio MTD Br., Ex. B). That document defines "funds" for the limited purpose of explaining when a person has provided or sold "prepaid access," and concludes that prepaid access to "funds or the value of funds" is limited to "real currencies." *Id.* at 3 & n.18. But the FinCEN Guidance does not even mention § 1960, much less purport to interpret the statute's use of the word "funds." Similarly, the fact that the IRS treats virtual currency as "property," rather than "currency," for tax purposes is irrelevant to the inquiry here. *See* I.R.S. Notice 2014-21, *available at* http://www.irs.gov/pub/irs-drop/n-14-21.pdf. In fact, the IRS Notice that Murgio cites makes clear that it "addresses *only the U.S. federal tax consequences* of transactions in, or transactions that use, convertible virtual currency." *Id.* at 1 (emphasis added). The document does not speak to the definition of "funds" or have anything to do with § 1960. *See Budovsky*, 2015 WL 5602853, at *14 (rejecting both the FinCEN Guidance and the IRS Notice as "inapposite" because the documents "do not suggest that the term 'funds' should not be read to encompass virtual currencies"). Finally, Murgio's invocation of the fact that the Commodity Futures Trading Commission ("CFTC") has classified Bitcoin as a commodity is similarly unmoored from § 1960 and from the Court's responsibility to determine the plain meaning of "funds." *See* Murgio MTD Br. 11; *see also In re Coinflip, Inc.*, CFTC No. 15-29, 2015 WL 5535736 (Sept. 17, 2015) (reproduced at Murgio MTD Br., Ex. A). To the extent the CFTC's decision in *Coinflip* is relevant, it actually defines Bitcoin as "a digital representative of value that functions as a medium of exchange, a unit of account, and/or a store of value, but not does not have legal tender status." *Coinflip*, 2015 WL 5535736 at *1 n.2. That definition places bitcoins squarely within the plain meaning of § 1960's term "funds."

Finally, Murgio invokes the rule of lenity and the doctrine of constitutional avoidance. Murgio MTD Br. 11-12. Like the other federal courts to have considered the issue, this Court rejects the claim that applying the plain meaning of "funds" to encompass bitcoins runs afoul of the rule of lenity or the Constitution.[3] First, the rule of lenity is reserved "for those situations in which a reasonable doubt persists about a statute's intended scope even *after* resort to the language and structure, legislative history, and motivating policies of the statute." *Moskal v. United States*, 498 U.S. 103, 108 (1990) (emphasis in original) (internal quotation marks and citation omitted). Here, "[h]aving considered the text, purpose, and legislative history of § 1960, there is no ambiguity that would require resort to the rule of lenity." *Budovsky*, 2015 WL 5602853, at *14; *see also Faiella*, 39 F. Supp. 3d at 547 (finding no "irreconcilable ambiguity" in § 1960 that would require "resort to the rule of lenity"). Second, Murgio's invocation of the doctrine of constitutional avoidance presumably relies on the risk that interpreting "funds" in § 1960 to encompass bitcoins would constitute "an unforeseeable and retroactive judicial expansion of narrow and precise statutory language." *Bouie v. City of Columbia*, 378 U.S. 347, 352 (1964). But Murgio "does not point to any prior law that failed to apply § 1960 to virtual currencies," nor does he explain how its application here would constitute an unforeseeable statutory enlargement. *Budovsky*, 2015 WL 5602853, at *15. To the contrary, the analysis above reinforces that applying § 1960 to Bitcoin is consistent with the statute's plain meaning. Bitcoins are "funds," and treating them as such is constitutional.

**B.     The Indictment Alleges that Coin.mx was a "Money Transmitting Business" Within the Meaning of § 1960**

---

[3] A Florida trial court recently dismissed an information against a defendant accused of unlawfully selling bitcoins. *See Florida v. Espinoza*, No. F14-293 (Fla. Cir. Ct. July 22, 2016). In reaching that decision, the court expressed its view that "Bitcoin has a long way to go before it is the equivalent of money." *Id.* at 6. As explained *infra*, this Court disagrees with much of the *Espinoza* court's analysis, which in any event rests on an interpretation of state law and does not purport to apply the rule of lenity. Moreover, as the Supreme Court has explained, "a division of judicial authority" is not "sufficient to trigger lenity." *Moskal v. United States*, 498 U.S. 103, 108 (1990). If the rule were otherwise, then "one court's unduly narrow reading of a criminal statute would become binding on all other courts." *Id.*

In order for Murgio to be charged under § 1960, Coin.mx must qualify as a "money transmitting business." 18 U.S.C. § 1960(b). Murgio contends that Coin.mx does not fall within the statute's ambit because the Government has failed to allege that it *transmitted* money or funds. Instead, Murgio argues, the Government has alleged only that Coin.mx acted as a "seller of bitcoins." Murgio MTD Br. 15. The Court disagrees.

Murgio does not contest that the Indictment tracks the language of § 1960 and provides approximate dates and locations where the charged conduct took place. *Compare* 18 U.S.C. § 1960, *with* S3 Indictment ¶ 15. As relevant here, the Indictment alleges that Murgio operated a "money transmitting business," namely Coin.mx, and that he did so in violation of each of the three subsections of § 1960(b)(1). S3 Indictment ¶ 15. The Indictment therefore satisfies the pleading requirements of Rule 7(c)(1). *See Stringer*, 730 F.3d at 124. Murgio argues though that because the Indictment is a "speaking indictment," the fact that it does not include specific allegations about transmission is fatal. Murgio MTD Reply Br. 12. Murgio cites no authority for this enhanced pleading requirement. And "[a]n indictment must be read to include facts which are necessarily implied by the specific allegations made." *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (internal quotation marks and citation omitted). Accordingly, the Court holds that the Indictment is sufficient with respect to allegations that Coin.mx was a money transmitting business.

In any event, both parties acknowledge (putting aside the question of whether bitcoins are funds) that if the evidence at trial demonstrates that Coin.mx "transmitted bitcoins to another location or person for its customers," then that evidence would establish that Coin.mx was a money transmitting business. Murgio MTD Br. 15; *see also* Opp. Br. 23-24. Such evidence would also alleviate Murgio's concern that classifying Coin.mx's conduct as "money transmitting" under § 1960 would raises serious constitutional questions. *See* Murgio MTD Br. 19 (arguing that such questions would be raised if Coin.mx did not "transfer . . . bitcoins to a third-party or location"). To that end, the Government claims that its evidence will show "a

variety of different ways Coin.mx operated as a money transmitter" and that Coin.mx did more than just sell bitcoins "to customers in two-party transactions." Opp. Br. 23.

Finally, Murgio suggests that even if Coin.mx engaged in money transmitting, it does not qualify as a "business" under the statute because the Government does not allege that Coin.mx sold "money transmitting services to others *for a profit*." Murgio MTD Br. 14 (emphasis added). It is unclear from Murgio's brief whether he believes that the Government must allege a "profit" element in order to charge Murgio under § 1960. If that is in fact Murgio's position, it is unavailing. Murgio points to no authority suggesting that the Court must read a "profit" requirement into § 1960, and even if such a requirement existed, the allegation that Coin.mx "charg[ed] a fee for [its] service" would be sufficient. *See* S3 Indicmtent ¶ 3.

For the foregoing reasons, the Indictment sufficiently alleges that Coin.mx was a "money transmitting business" under § 1960.

### C.   The Indictment Alleges that Coin.mx was "Unlicensed" Within the Meaning of § 1960

As explained above, the Indictment provides three statutory bases for concluding that Murgio operated an *unlicensed* money transmitting business. *See* S3 Indictment ¶ 15. Murgio challenges the Indictment's sufficiency with respect to two of those bases—namely, the allegation that Murgio operated Coin.mx without a required state money transmitting license, in violation of 18 U.S.C. § 1960(b)(1)(A), and the allegation that Coin.mx failed to comply with federal money transmitting business registration requirements, in violation of 18 U.S.C. § 1960(b)(1)(B).[4] The Court concludes, however, that the S3 Indictment is sufficient in charging Murgio under those two subsections.

### 1.   The Indictment Sufficiently Alleges that Coin.mx Failed to Comply with Florida Licensing Requirements

---

[4] Murgio does not dispute, however, that the Indictment adequately alleges that he operated Coin.mx with knowledge that transmitted funds were "derived from a criminal offense or [were] intended to be used to promote or support unlawful activity." 18 U.S.C. § 1960(b)(1)(C).

A money transmitting business that operates "without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony" is "unlicensed." 18 U.S.C. § 1960(b)(1)(A). The state at issue here is Florida, and Florida law provides that "[a] person may not engage in the business of a money services business . . . in this state unless the person is licensed or exempted from licensure under this chapter." Fla. Stat. § 560.125(1). Chapter 560 defines a "money services business" as "any person" who "acts as a . . . money transmitter." *Id.* § 560.103(22). And the statute further defines "money transmitter" as an entity that "receives currency, monetary value, or payment instruments for the purpose of transmitting the same by any means, including transmission by wire, facsimile, electronic transfer, courier, the Internet, or through bill payment services." *Id.* § 560.103(23).

Murgio's arguments as to why these Florida provisions do not apply to the charged conduct principally mirror his claims about § 1960 more broadly. First, he contends that bitcoins are not covered by Florida's definition of "money transmitter" because, just as he argues that bitcoins are not "funds" under federal law, he contends that they are not "currency, monetary value, or payment instruments" under Florida law. Murgio MTD Br. 12-13. The Court disagrees. Florida defines "monetary value" as "a medium of exchange, whether or not redeemable in currency." Fla. Stat. § 560.103(21). Bitcoins, as explained previously, function as a "medium of exchange." They therefore fall within Chapter 560's express definition of "monetary value." Bitcoins also fall within the statute's express definition of "payment instruments." Chapter 560 defines "payment instrument" as "a check, draft, warrant, money order, travelers check, electronic instrument, *or other instrument*, payment of money, *or monetary value* whether or not negotiable." *Id.* § 560.103(29) (emphases added). Because bitcoins are "monetary value," they are also "payment instruments."

Murgio also invokes the rule of lenity to argue that the Court should not apply Chapter 560's definition of "monetary value" or "payment instrument" to bitcoins. *See* Murgio MTD Br. 13. But there is no "statutory ambiguity" here. *See Moskal*, 498 U.S. at 107. Again, bitcoins function as a medium of exchange, and they are therefore both monetary value and payment

13

instruments, as Florida defines those terms. Moreover, the rule of lenity is particularly inapt in the context of Chapter 560, given that Bitcoin's raison d'être is to serve as a form of payment. *See Getting started with Bitcoin*, bitcoin, https://bitcoin.org/en/getting-started (last visited Sept. 16, 2016) ("Using Bitcoin to pay and get paid is easy and accessible to everyone."); *see also* Kevin V. Tu & Michael W. Meredith, *Rethinking Virtual Currency Regulation in the Bitcoin Age*, 90 Wash. L. Rev. 271, 277 (2015) ("Like traditional currency, virtual currencies such as Bitcoin can be used to purchase goods and services from any person that is willing to accept it as a form of payment."). It does not raise the specter of unconstitutionality to apply a law that specifically mentions "payment instruments" to a virtual currency designed to serve as a form of payment.

Murgio's second challenge to applying Florida's Chapter 560 here is that, for the "same reasons" that Coin.mx is not a "money transmitting business" under § 1960, it is not a "money transmitter" under Chapter 560. Murgio MTD Br. 22. Murgio points to no reason that a "money transmitting business" under federal law is not a "money transmitter" under Florida law. And because the Indictment sufficiently alleges the former, the Court declines to hold that it is deficient with respect to the latter.

The one distinct argument that Murgio raises with respect to Florida law relates to a recently decided Florida case. While the pending pre-trial motions in this case were being briefed, a Florida trial court issued an opinion addressing the applicability of Chapter 560 to Bitcoin. *See Florida v. Espinoza*, No. F14-293 (Fla. Cir. Ct. July 22, 2016). The court in *Espinoza* dismissed the information, which charged the defendant with operating an unlicensed money services business because he sold bitcoins to an undercover officer. *Id.* at 2-3. Relying on many of the arguments that Murgio raises here, the Florida court held that bitcoins are not "payment instruments" under Florida law. *Id.* at 5. It also held that the defendant did not "transmit" bitcoins because he was only a seller of bitcoins, rather than a middleman, and therefore did not transmit bitcoins "from one person or place to another." *Id.* at 4 (internal quotation marks and citation omitted). The court explained that although "[t]he Florida

14

Legislature may choose to adopt statutes regulating virtual currency in the future," applying existing law regulating money services business to Bitcoin would be "like fitting a square peg in a round hole." *Id.* at 6. This Court respectfully disagrees.

To the Court's knowledge, the *Espinoza* court is the first Florida court to have considered the reach of Chapter 560 in the context of Bitcoin, and neither the state's Supreme Court nor the District Courts of Appeal have weighed in. This Court is therefore not bound by the decision in *Espoinoza*, though it owes the decision "proper regard." *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1190 (2d Cir. 1992) (quoting *C.I.R. v. Bosch's Estate*, 387 U.S. 456, 465 (1967)). After carefully considering the analysis in *Espinoza*, the Court determines that the Florida Supreme Court, if faced with the question, would hold that Murgio is properly charged with violating Chapter 560. As an initial matter, the Court finds that there is no plausible interpretation of "monetary value" or "payment instruments," as the terms are used in Chapter 560, that would place bitcoins outside the statute's ambit. With respect to "monetary value," the Court has already explained that Bitcoin plainly is "a medium of exchange, whether or not redeemable in currency" (though Bitcoin *is* in fact redeemable in currency). Fla. Stat. § 560.103(21). The *Espinoza* court did not contemplate the possibility that bitcoins qualify as "monetary value"—the court limited its discussion to "currency" and "payment instruments." *See Espinoza*, slip op. at 4-5. *Espinoza* therefore does not squarely address this Court's reasoning for holding that Chapter 560's definition of "money transmitter" applies to businesses that transmit bitcoins. Moreover, with respect to the meaning of "payment instrument," the only reason the *Espinoza* court cites for concluding that bitcoins are not "payment instruments" is that the IRS "has decided to treat virtual currency as property for federal tax purposes." *Id.* at 5. As an initial matter, this argument ignores the fact that Chapter 560 defines "payment instrument" as including "monetary value." Fla. Stat. § 560.103(29). But more to the point, the *Espinoza* court offers no explanation as to why a decision *by the IRS* is relevant to the question of whether bitcoins, which are used as (and designed to be) an instrument of payment, qualify as "payment instruments" under Florida law. The IRS's classification is divorced from the basic statutory

15

interpretation question at issue here. Accordingly, the Court remains persuaded that Chapter 560 regulates businesses that transmit bitcoins.

Additionally, the *Espinoza* court's holding that the defendant in that case did not "transmit" bitcoins because he was only a seller of bitcoins, rather than a middleman, does not alter this Court's conclusion that the Indictment sufficiently alleges a failure to comply with Chapter 560. *See Espinoza*, slip op. at 4. As explained above, the fact that the Indictment alleges that Coin.mx was a "money transmitting business" is sufficient to survive a motion to dismiss, and the Court therefore does not need to reach the question of whether the *Espinoza* court's "middleman" requirement is correct. Moreover, the evidence at trial may in fact show that Coin.mx "operate[d] much like a middleman in . . . financial transaction[s]," which would satisfy the standard set forth by *Espinoza* and advocated by Murgio. *Id.* Finally, there are key factual differences between this case and Murgio's that cast doubt on the applicability of the *Espinoza* court's holding. The defendant in *Espinoza* was an individual who did nothing more than sell bitcoins to one undercover officer on several occasions. *Id.* at 2-3. There were no allegations in that case about running a website, transfers between Bitcoin wallets, or processing credit card payments. In other words, it appears that the conduct charged in *Espinoza* is meaningfully different from the allegations against Murgio. In light of those considerations, the Court holds that the Indictment properly charges Murgio with failing to comply with Florida's licensing requirements for money transmitters.

### 2. The Indictment Sufficiently Alleges that Coin.mx Failed to Comply with Federal Registration Requirements for Money Transmitting Businesses

The Indictment alleges that Coin.mx "failed to comply with the money transmitting business registration requirements set forth in [31 U.S.C. § 5330] and the regulations prescribed thereunder," in violation of 18 U.S.C. § 1960(b)(1)(B). S3 Indictment ¶ 15. Section 5330 requires the owner of a money transmitting business to register with the Secretary of the Treasury, and one of the Treasury Department's implementing regulations outlines when a

16

business qualifies as a "money transmitter." *See* 31 C.F.R. § 1010.100(ff)(5).  Under that regulation, an entity is a "money transmitter" if it accepts "currency, funds, or other value that substitutes for currency from one person and [transmits] currency, funds, or other value that substitutes for currency to another location or person by any means." *Id.*  That regulation further provides that a "money transmitter" is also "[a]ny other person engaged in the transfer of funds." *Id.*  In other words, 31 C.F.R. § 1010.100(ff)(5) is at least as broad as 18 U.S.C. § 1960(b)(2), which (again) defines "money transmitting" as "transferring funds on behalf of the public by any and all means."  Accordingly, because the Indictment sufficiently alleges that Coin.mx was a money transmitting business under § 1960, it sufficiently alleges that Coin.mx failed to comply with the applicable federal regulations.

Murgio argues though that the Indictment's failure to provide a specific *mention* of 31 C.F.R. § 1010.100(ff)(5) is also grounds for dismissal. *See* Murgio MTD Br. 15 n.10.  Murgio declines to explain, however, why mentioning a particular implementing regulation is necessary, given that the Indictment tracks the statutory language. *Budovsky*, which held that "an indictment need only allege a violation of § 5330's implementing regulations to sufficiently allege a violation of 18 U.S.C. § 1960(b)(1)(B)," is not to the contrary.  2015 WL 5602853, at *8.

Because the Indictment sufficiently alleges a violation of each of § 1960's three subsections, Murgio's motion to dismiss Counts One and Two is denied.

## III.   GROSS'S MOTION TO DISMISS COUNT FIVE

Trevon Gross moves to dismiss Count Five of the Indictment, which charges him with receiving corrupt payments as an officer of a financial institution, in violation of 18 U.S.C. § 215(a)(2).  S3 Indictment ¶ 23.  Section 215 prohibits "an officer . . . of a financial institution" from "corruptly accept[ing] or agree[ing] to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business or transaction of such institution." 18 U.S.C. § 215(a)(2).  Gross contends that Count Five must be dismissed because it fails to state

an offense.  The Court evaluates Gross's motion under the same standard it applied to Murgio's motion to dismiss Counts One and Two.  For the reasons that follow, Gross's motion is denied.

The allegations in Count Five of the S3 Indictment closely "track the language of the statute," which is generally sufficient to survive a motion to dismiss.  *Stringer*, 730 F.3d at 124. As relevant here, the Indictment alleges that Gross (1) was "an officer, director, employee, agent [or] attorney"; of (2) "a financial institution"; that (3) he "accepted and agreed to accept . . . a sum of money greater than $1,000"; and (4) that he did so "corruptly" and "with the intent to be influenced and rewarded in connection with a . . . transaction of . . . HOPE FCU."  S3 Indictment ¶ 23.  Gross contends, however, that the Indictment must do more than track the language of § 215(a) because the meaning of the word "corruptly" is "sufficiently uncertain and ambiguous." Gross Br. 8.  The Court disagrees, for two principal reasons, discussed at greater length below. First, using the term "corruptly" does not render the Indictment deficiently ambiguous.  Second, even if "corruptly" were ambiguous in the abstract, the additional factual allegations pertaining to Count Five in the Indictment are more than sufficient to inform Gross of the nature of the accusations against him.

The Second Circuit has expressly held that "[t]he conduct prohibited by § 215(a), which is limited to acts that are done 'corruptly,' is described in sufficiently plain terms to permit an ordinary person to understand what conduct is prohibited."  *United States v. McElroy*, 910 F.2d 1016, 1021 (2d Cir. 1990).  That holding defeats Gross's charge that the Indictment fails to "fully, directly, and expressly" set forth the necessary elements of § 215(a).  Gross Br. 7 (quoting *Russell v. United States*, 369 U.S. 749, 765 (1962)).  To be sure, the Second Circuit reached its conclusion as to the plain meaning of § 215(a) in the context of an opinion that rejected a challenge to § 215 as unconstitutionally vague, not in the context of a challenge to an indictment's sufficiency.  *See McElroy*, 910 F.2d at 1022.  But the holding from *McElroy* applies with force here, given that the thrust of Gross's argument is that the tem "corruptly" is too vague

18

to stand on its own in the Indictment.[5]  Gross points to no case in this circuit where an indictment was deemed insufficient by virtue of using "corruptly" to describe the *mens rea* element of a § 215 bribery offense, and this Court has found none.

Despite the lack of on-point authority in favor of his position, Gross points to the alleged difficulty the Second Circuit has held in precisely defining "corruptly." No such difficulty has existed in the context of § 215, where the Second Circuit held in *McElroy* that "[t]he term 'corruptly' is ordinarily understood as referring to 'act[s] done voluntarily and intentionally and with the bad purpose of accomplishing either an unlawful end or result, or a lawful end or result by some unlawful method or means. The motive to act corruptly is ordinarily a hope or expectation of either financial gain or other benefit to oneself or some profit or benefit to another.'" 910 F.2d at 1021 (alteration in original) (quoting *United States v. Brunson*, 882 F.2d 151, 154 n. 2 (5th Cir.1989)). Gross does not challenge this definition—and in fact relies on it for one of his other arguments in favor of dismissing Count Five. Instead, he points to the Second Circuit's definition of "corruptly" in the context of a different statute, the Foreign Corrupt Practices Act (FCPA). In interpreting that statute, the Second Circuit has put forward a similar, albeit more focused, definition of "corruptly," holding that the term means "a bad or wrongful purpose and an intent to influence a foreign official to misuse his official position." *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 327 F.3d 173, 183 (2d Cir. 2003).

Gross does not claim that there is any tension between the definitions of "corruptly" in § 215 and the FCPA. Rather, he emphasizes the court's observation in *Stichting* that "[i]t is difficult to determine the meaning of the word 'corruptly' simply by reading it in context," and the fact that the court "look[ed] outside the text of the statute to determine its intended meaning." *Id.* at 181. This, Gross argues, is evidence that the word "corruptly" "does not fully express [an]

---

[5] Gross also argues that *McElroy* is inapposite because the court assessed § 215(a) after a trial, whereas here, Gross is challenging the sufficiency of the Indictment pre-trial. *See* Gross Reply Br. 4-5. But that procedural distinction did not bear on the *McElroy* court's interpretation of § 215(a), which rested on the text of the statute, not the fact that the challenge to the statute was brought after a trial. *See McElroy*, 910 F.2d at 1021.

element" of § 215—after all, if the Second Circuit did not know precisely what "corruptly"

means without resort to extra-textual tools of statutory interpretation, then how can we be

confident that the grand jury sufficiently understood the term when it indicted Gross? *See* Gross

Reply Br. 3-4. This argument proves too much. It suggests that every time a court resorts to

extra-textual tools of statutory interpretation when defining a particular term, any future

indictment that relies on that term must descend into additional specifics. But if that were so, it

would eviscerate the rule that "an indictment need do little more than to track the language of the

statute charged." *Stringer*, 730 F.3d at 124 (internal quotation marks and citation omitted).

Although courts may have cause to examine the nuances of a *mens rea* element like "corruptly,"

the fact that a court engages in such statutory interpretation does not change the fact that reciting

a *mens rea* element is generally sufficient to identify for the defendant "the 'core of criminality'

the Government intends to prove at trial." *Budovsky*, 2015 WL 5602853, at *3. That core of

criminality has been sufficiently alleged here.

   In addition to arguing that the term "corruptly" is itself ambiguous, Gross contends that

the Indictment is ambiguous because it fails to specify a particular law that Gross intended to

violate when he allegedly accepted a bribe in exchange for taking actions in his capacity as an

officer of HOPE FCU. *See* Gross Br. 9-10. This argument is meritless. As explained above, to

act "corruptly" in the context of § 215 means to act with "the bad purpose of accomplishing

either an unlawful end or result, or a lawful end or result by some unlawful method or means."

*McElroy*, 910 F.2d at 1021 (quoting *Brunson*, 882 F.2d at 154 n. 2). Seizing on this language,

Gross claims that § 215 is subject to the rule that "where an indictment charges a crime that

depends in turn on violation of another statute, the indictment must identify the underlying

offense." Gross Br. 9 (alteration omitted) (quoting *United States v. Pirro*, 212 F.3d 86, 93 (2d

Cir. 2000)). This argument conflates, without any justification, a *crime* that turns on violating

another statute and a *mental state* that requires an unlawful purpose. Gross's own wording

highlights this confusion—he claims that when "an unlawful *purpose* is an element of the statute,

the alleged unlawful *conduct* must be identified." Gross Br. 9 (emphases added). Here, the

Indictment specifies all of the allegedly unlawful conduct that Gross engaged in—namely, accepting a bribe in exchange for certain acts that Gross took as an officer of HOPE FCU. Because § 215 does not depend on the violation of another statute, the Indictment need not allege such a violation to be sufficient. *Compare United States v. Thompson*, 141 F. Supp. 3d 188, 195–96 (E.D.N.Y. 2015) (finding several counts of an indictment partially deficient because those counts all included the element that the defendant persuaded the victims to engage in "any sexual activity for which a person could be charged with a criminal offense," but failed to specify any particular such sexual activity).

Even if this Court had doubts as to whether it is sufficient for Count Five of the Indictment to track the language of § 215, the Indictment would nonetheless be sufficient in light of the additional allegations that pertain to the bribery scheme. The Indictment alleges that Gross, who was chairman of the board of HOPE FCU, a federal credit union, "allowed and assisted" Murgio, Michael Murgio, Lebedev, and their co-conspirators to "take control of HOPE FCU in exchange for bribes." S3 Indictment ¶ 10. Gross allegedly "directed" Murgio and Michael Murgio to pay those bribes "to bank accounts under Gross's control," and Gross allegedly proceeded to spend at least some of that money on "personal expenses." *Id.* The bribes allegedly totaled "over $150,000." *Id.* Following the payment of the bribes, Gross allegedly provided his "assistance" in installing Murgio's co-conspirators on the board of HOPE FCU and in "transferr[ing] Coin.mx's banking operations to HOPE FCU." *Id.* Additionally, Michael Murgio allegedly "executed an agreement on behalf of 'Collectables Club' with Trevon Gross," and the agreement provided "that individuals chosen by the 'Collectables Club' would be nominated for positions on the Board of HOPE FCU." *Id.* ¶ 19(b). Finally, Murgio, Michael Murgio, Lebedev, and others allegedly met with Gross in November 2014 "and discussed the payment of an additional $50,000 bribe to induce Gross to relinquish control of HOPE FCU." *Id.* ¶ 19(g).

These allegations leave no ambiguity as to the conduct that allegedly violated § 215: Gross is accused of accepting bribes in exchange for helping to place certain individuals on

21

HOPE FCU's board and for helping to transfer Coin.mx's banking operations to HOPE FCU.
Gross offers several red herrings to distract from these straightforward allegations. First, he
notes that there are no allegations that Gross knew that Murgio, Michael Murgio, and Lebedev
allegedly wanted to acquire HOPE FCU to facilitate the operation of an unlawful Bitcoin
exchange. Gross Br. 10. This is true but irrelevant. Gross need not have known the precise
reasons for the alleged conspirators' interest in HOPE FCU to have known that he was accepting
bribes in exchange for abusing his position as an officer of a federal credit union.

Second, Gross challenges the premise that the allegations amount to an abuse of his
position as an officer of HOPE FCU. He claims that there "is nothing *inherently* corrupt or
unlawful about placing the names of individuals in nomination for a position on the Board of
Directors of a credit union." Gross Br. 11 (emphasis added). Perhaps. But Gross is not charged
with nominating individuals to serve on HOPE FCU's board. He is charged with doing so *in
exchange for more than $150,000 in bribes*. Section 215 does not criminalize the actions that
Gross allegedly took in the abstract; it criminalizes them in the context of a *quid pro quo* bribery
arrangement. Gross in fact illustrates this point in his attempt to distinguish this case from the
facts of *Brunson*, where the Fifth Circuit rejected a claim that § 215 is unconstitutionally vague.
882 F.2d at 154; *see also* Reply Br. 5-6. As recounted by Gross, the Indictment in *Brunson*
charged that the director and attorney of a bank "corruptly solicited and demanded sexual favors
from his victim in exchange for influencing repayments of her overdrawn banking account."
Gross Reply Br. 6. The manner in which the defendant wielded this influence consisted of
"obtaining time for [the victim] to repay the overdrawn account" by "explain[ing] to the bank
officer that [the victim] was having marital problems which was the cause of the delay."
*Brunson*, 882 F.2d at 155. In other words, the defendant convinced the bank to be lenient and to
allow the victim more time to make required payments. That act may not be illegal in the
abstract, but the Fifth Circuit had little trouble concluding that "all of the requisite elements" of
§ 215 were met when the defendant's assistance was offered *in exchange* for sexual favors. *Id.*

at 154.  The same is true here, where Gross's assistance in placing conspirators on HOPE FCU's board was allegedly obtained in exchange for multiple bribes.

      Finally, Gross criticizes the Indictment's use of the term "bribes" because the Indictment does not specify any particular law or duty that Gross intended to violate.  Gross contends that the intent to violate such a law or duty is integral to any bribery claim.  Gross Br. 12; *see also U.S. ex rel. Sollazzo v. Esperdy*, 285 F.2d 341, 342 (2d Cir. 1961) ("Bribery in essence is an attempt to influence another to disregard his duty while continuing to appear devoted to it or to repay trust with disloyalty.").  Assuming that Gross is correct in his characterization of bribery law, his argument nonetheless fails.  As an initial matter, Gross again points to no authority holding that the Indictment must go further than alleging that he acted "corruptly," which, as explained above, constitutes an allegation that he acted with the intent of "accomplishing either an unlawful end or result, or a lawful end or result by some unlawful method or means." *McElroy*, 910 F.2d at 1021.  But even if alleging the intent to violate a *particular* law or duty were required, the allegations in the Indictment are sufficient because they plainly amount to a charge that Gross intentionally took actions that violated the duties he owed in his capacity as Chairman of the Board of HOPE FCU.  Every federal credit union director must "[c]arry out his or her duties as a director in good faith, in a manner such director reasonably believes to be in the best interests of the membership of the Federal credit union as a whole, and with the care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances." 12 C.F.R. § 701.4(b)(1).  The Indictment alleges that Gross accepted more than $150,000 bribes, at least some of which he spent on "personal expenses,"[6] and in return helped Murgio, Michael Murgio, and Lebedev take control of HOPE FCU.  S3 Indictment ¶ 10.  In other words, Gross allegedly helped individuals take over the credit union where he

---

[6] In his reply brief, Gross suggests that the allegations pertaining to the payments that the conspirators allegedly made to Gross are too vague to infer a violation of any fiduciary duty because the Indictment says only that the payments went to "accounts under Gross's control." S3 Indictment ¶ 10; *see also* Gross Reply Br. 9.  This argument is meritless in light of the additional allegation that Gross spent some of that money on personal expenses, "including payments on his personal credit cards." S3 Indictment ¶ 10.

served as chairman because they paid him money to do so, not because it was in the interests of the credit union's membership. Although the Indictment does not spell out the particular regulations that govern the duties of federal credit union directors, the Court is mindful that "common sense must control" in assessing the sufficiency of an indictment and that "[a]n indictment must be read to include facts which are necessarily implied by the specific allegations made." *Stavroulakis*, 952 F.2d at 693 (internal quotation marks and citation omitted). Bearing those principles in mind, it is obvious that the Indictment here sufficiently alerts Gross that he allegedly intended to take actions that breached his duties as Chairman of the Board of HOPE FCU. The Indictment is therefore sufficient.

## IV.    MOTIONS FOR BILLS OF PARTICULARS

Both Lebedev and Gross have moved for a bill of particulars. Gross has moved for a bill of particulars to ascertain the laws or duties he allegedly intended to violate and to understand the basis for the Government's venue allegations in Count Five. Lebedev has moved for a bill of particulars as to the identity of unindicted co-conspirators, the details of any bribes that he allegedly made to Gross, and the basis for the Government's venue allegations in Count Four.

Pursuant to Federal Rule of Criminal Procedure 7(f), a defendant may move for a bill of particulars "to identify with sufficient particularity the nature of the charge pending against him." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam). A bill of particulars is intended to "enable[] a defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93, 150 (2d Cir. 2008) (internal quotation marks and citation omitted). But a bill of particulars "is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004) (internal quotation marks and citation omitted). And the decision whether to order a bill of particulars

24

"rests within the sound discretion of the district court." *United States v. Bin Laden*, 92 F. Supp.

2d 225, 233 (S.D.N.Y. 2000), *aff'd sub nom. In re Terrorist Bombings*, 552 F.3d 93.

In deciding whether to exercise that discretion, a court must "examine the totality of the

information available to the defendant—through the indictment, affirmations, and general pre-

trial discovery—and determine whether, in light of the charges that the defendant is required to

answer, the filing of a bill of particulars is warranted." *Id.* A bill of particulars is not necessary

when "the government has made sufficient disclosures concerning its evidence and witnesses by

other means." *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999). "A bill of particulars is

not a general investigative tool, a discovery device or a means to compel the government to

disclose evidence or witnesses to be offered prior to trial." *United States v. D'Amico*, 734 F.

Supp. 2d 321, 335 (S.D.N.Y. 2010) (internal quotation marks and citation omitted).

Accordingly, "the proper test in deciding whether a bill of particulars should be required of the

Government is whether the bill of particulars is *necessary* for the defense, not whether it would

aid the defendant in his preparation." *United States v. Trippe*, 171 F. Supp. 2d 230, 240

(S.D.N.Y. 2001) (emphasis added).

For the reasons that follow, both defendants' requests for particulars are granted in part

and denied in part.

### A.    Gross's Motion for a Bill of Particulars

Gross seeks a bill of particulars to identify the laws or duties he intended to violate when

he allegedly accepted bribes and to identify the basis for the government's claim that venue is

proper in the Southern District of New York. Gross Br. 15-16. The Court considers each

category of particulars in turn.

First, the Court grants Gross's request to require the Government to produce a list of the

laws or duties he allegedly intended to violate. As the Court has already explained, the

Indictment's allegations that Gross attempted to place particular individuals on HOPE FCU's

board in exchange for bribes plainly implicate Gross's duties as Chairman of the Board of a

federal credit union. Such allegations are therefore sufficient to survive a motion to dismiss the

Indictment, but they leave open important questions as to which of those duties Gross allegedly violated. The Government attempts to minimize such questions, in light of communications it has had with Gross as to its theory of the case. Specifically, the Government has apparently told Gross that it "intends to establish at trial, among other things," that Gross violated National Credit Union Administration ("NCUA") regulations by allowing individuals not within HOPE FCU's "Field of Membership" to be installed on the board, by failing to disclose the charged *quid pro quo* arrangement to the NCUA, and by undermining the financial safety and soundness of HOPE FCU. Opp. Br. 48-49. But the Government declines to specify *which* NCUA regulations Gross may have violated, and its use of "among other things" leaves open the possibility that there are additional laws or duties that it may claim Gross violated. *See id.* Specifying any such laws or duties is necessary to enable Gross "to prepare for trial [and] to prevent surprise." *In re Terrorist Bombings*, 552 F.3d at 150. Accordingly, the Government is ordered to provide a bill of particulars with respect to those laws, regulations, and duties.

Second, the Court denies Gross's request for a bill of particulars with respect to venue. In his opening brief, Gross argued that a bill of particulars is necessary because the Indictment does not allege that he accepted or solicited bribes in the Southern District of New York and because Gross had not identified any materials produced in discovery suggesting that he had reached out to the Southern District in connection with the charged crimes. Gross Br. 16. The Government contends that this request is now moot because it has provided two reasons why venue lies in this district. First, the Government notes that the Indictment alleges that on May 9, 2014, Murgio "caused $15,000 to be transferred via wire through the Southern District of New York to a particular bank account . . . at the request of Gross." S3 Indictment ¶ 19(c). Relatedly, the Government claims that bank and wire transfer records produced in discovery further show that "many" of the alleged payments from Murgio to Gross were transferred through this district. Opp. Br. 50. Second, the Government proffers that the evidence at trial will show that "Gross communicated with Murgio about the takeover of HOPE FCU . . . while Gross was in this District." *Id.* at 51.

Gross shifts gears in his reply brief in response to this proffer. He principally argues that the allegations contained in the Government's proffer are insufficient to confer venue, and he should therefore be permitted to file a motion to dismiss the Indictment for lack of venue. Gross Reply Br. 14-16. This argument is unavailing at this stage. Although the Government must "demonstrate the propriety of the chosen venue by a preponderance of the evidence" at trial, courts apply a more liberal standard when assessing whether an indictment's venue allegations survive a pre-trial motion to dismiss. *United States v. Motz*, 652 F. Supp. 2d 284, 290 (E.D.N.Y. 2009). Generally, "the Government need only allege that criminal conduct occurred within the venue, even if phrased broadly and without a specific address or other information, in order to satisfy its burden with regard to pleading venue." *United States v. Ohle*, 678 F. Supp. 2d 215, 231 (S.D.N.Y. 2010) (internal quotation marks and citation omitted). The Indictment does so here, alleging that Gross accepted bribes "in the Southern District of New York and elsewhere." S3 Indictment ¶ 23. A pre-trial motion to dismiss the Indictment for lack of venue would therefore be futile.

Moreover, the arguments Gross advances as to why the Government's venue proffer is insufficient raise questions reserved for trial. Specifically, he claims that wire transfers through the Southern District of New York are insufficient to confer venue because the Government has failed to show that it would be reasonably foreseeable to Gross that the wire transfers would pass through this district—an argument that hinges on the factual question of what was, or was not, reasonably foreseeable to Gross. *See* Gross Reply Br. 14. Additionally, Gross downplays the significance of any communication from this district, noting that, so far, the Government has proffered only one email exchange between Murgio and Gross that allegedly concerns individuals who Gross arranged to have nominated to the HOPE FCU board. *Id.* at 15; *see also* Opp. Br. 51 n.16. In light of the Government's proffer though, it is premature to determine whether such communications are sufficient to confer venue. The Court therefore denies Gross's request for leave to file a pre-trial motion to dismiss for lack of venue. Similarly, the

Government's proffer as to venue, along with the discovery provided to Gross, render a bill of particulars unnecessary for Gross to prepare for trial.

### B.     Lebedev's Motion for a Bill of Particulars

Lebedev moves for a bill of particulars with respect to three categories of information. First, he asks the Government to identify the unindicted co-conspirators referenced in the Indictment, and more specifically, to indicate whether Lebedev is an unindicted co-conspirator in any of the counts in which he is not charged. Lebedev Br. 5. Second, Lebedev asks the Government to identify the dates, locations, and amounts of any bribes that he—as distinct from Murgio—made to Trevon Gross. *Id.* And third, Lebedev asks for particulars regarding the Government's claim that venue in this district is proper. *Id.* The Court considers each request in turn.

First, the Court denies Lebedev's request to identify unindicted co-conspirators throughout the Indictment. As this Court noted in a recent Memorandum and Order, courts in this circuit frequently exercise their discretion to deny requests to identify co-conspirators through a bill of particulars. Dkt. No. 184 at 6 (citing *United States v. Mahaffy*, 446 F. Supp. 2d 115, 120 (E.D.N.Y. 2006)). That is particularly true where, as here, the allegations in the indictment are specific and the Government has provided discovery that will enable a defendant to adequately prepare his defense. *See Mahaffy*, 446 F. Supp. 2d at 120.

Lebedev's argument on this point though is principally directed at whether the Government must identify *him* as a co-conspirator in any of the counts in which he is not charged. As Lebedev notes, the Indictment's preamble indicates that "Anthony R. Murgio and Yuri Lebedev . . . and *their* co-conspirators engaged in substantial efforts to evade detection of *their* unlawful Bitcoin exchange scheme." S3 Indictment ¶ 5 (emphases added). But of the Indictment's four conspiracy counts—which charge conspiracies to operate an unlicensed money transmitting business, commit wire fraud, launder money, and engage in bribery—Lebedev is charged only in the bribery conspiracy. Lebedev argues that failing to specify whether he is an unindicted co-conspirator in these other conspiracies leaves him "in the dark" and forces him "to

28

guess as to the nature of the *charges* against him." Lebedev Br. 5 (emphasis added).  But there is no ambiguity as to what Lebedev is *charged* with—he is indicted only for conspiring to bribe, and bribing, Trevon Gross.  S3 Indictment ¶¶ 16-21.  He cannot be convicted at trial for conspiring to operate an unlicensed money transmitting business, or for conspiring to engage in money laundering or wire fraud, because he does not stand accused of those crimes.  Put differently, the question of what Lebedev is charged with is distinct from the question of how the Government will prove those charges at trial.  And on the latter front, the Government acknowledges that it intends to introduce evidence of Lebedev's involvement in Coin.mx to provide background on the bribery scheme and to explain the allegedly criminal relationship between Lebedev and Murgio.  Opp. Br. 52.  The question of whether the Government considers Lebedev an unindicted co-conspirator is certainly relevant to the Government's theory as to the nature of Lebedev's relationship with Murgio, but "it is not the function of a bill of particulars to allow defendants to preview the Government's . . . theory of its case."  *United States v. Abakporo*, 959 F. Supp. 2d 382, 389 (S.D.N.Y. 2013).  Moreover, the Indictment clearly alleges that Murgio and Lebedev, along with co-conspirators, "engaged in substantial efforts to evade detection of their unlawful Bitcoin exchange scheme by," among other things, "operating through phony front companies."  S3 Indictment ¶ 5.  This allegation, and similar ones in the Indictment's preamble, give Lebedev enough information to prepare for trial.

Lebedev's final argument on this point is that he needs to know whether he is an unindicted co-conspirator so that he may object to the admission of co-conspirator statements that should not be admitted against him under Federal Rule of Evidence 801(d)(2)(E).  Lebedev Br. 6.  This argument misunderstands the hearsay exception for the statements of co-conspirators—an exception that is rooted in agency law and is not constrained by the text of an indictment.  *See United States v. Russo*, 302 F.3d 37, 45 (2d Cir. 2002).  In fact, the declarations of a co-conspirator are admissible even if the object of the conspiracy between the defendant and the co-conspirator is not "the crime charged in the indictment (or the objective of the conspiracy charged in the indictment)."  *Id.*; *see also United States v. Lyles*, 593 F.2d 182, 194 (2d Cir.),

*cert. denied*, 440 U.S. 972 (1979) ("It is settled law that the conspiracy which serves as the vehicle for the introduction of a vicarious admission by a co-conspirator need not be charged in the indictment.").[7]  If the Government is not even required to mention a conspiracy in the Indictment in order to introduce co-conspirator testimony against Lebedev, then Lebedev is not entitled to a bill of particulars with respect to a conspiracy that *is* mentioned.

Second, the Court grants Lebedev's request to order the Government to identify the dates, locations, and amounts of any bribes that he in particular paid to Trevon Gross.  Lebedev is charged with corruptly offering "a sum of money greater than $1,000" to Trevon Gross.  S3 Indictment ¶ 21.  He is charged under the statute that directly prohibits such conduct, 18 U.S.C. § 215(a)(1), as well as under 18 U.S.C. § 2, which permits Lebedev to be found guilty as a principal if he aided or abetted a violation of § 215(a)(1) or willfully caused another to violate § 215(a)(1).  The Indictment identifies five specific dates on which Murgio allegedly directed payments to bank accounts at the request of Gross.  S3 Indictment ¶¶ 19(c), (d), (e), (h), (j).  By contrast, the Indictment identifies no payments directly from Lebedev to Gross.  The Government's briefing suggests that this is because no such payments exist, as the Government characterizes the Indictment as already setting forth "the approximate dates and amounts of *the* bribes that were paid, or attempted to be paid, to Gross."  Opp. Br. 54 (emphasis added).  It therefore appears that the Government will not introduce evidence that Lebedev directly paid bribes to Gross, and that it will proceed primarily on an aider-and-abettor theory.[8]  In the event that characterization is inaccurate, however, Lebedev is entitled to know.  If the Government plans to introduce evidence of a bribe that is not already mentioned in the Indictment, then a bill of particulars as to such bribe(s) is appropriate to enable Lebedev to "prepare for trial [and]

---

[7] In his reply brief, Lebedev mistakes the Government's reliance on this line of cases as an argument that "any co-conspirator statement is admissible against Lebedev, regardless of whether he was involved in the particular conspiracy."  Lebedev Reply Br. 6.  The Government of course must prove that Lebedev is involved in a particular conspiracy in order to admit the testimony of a co-conspirator against him.  What it need not do is allege the existence of that conspiracy in the Indictment.

[8] Lebedev *is* mentioned in the Indictment in the context of what the Government may argue is an "attempted" bribe, whereby he allegedly offered Murgio $41,000 that was to be used to pay Gross.  *See* S3 Indictment ¶ 19(i).  No additional particulars are required as to that allegation.

prevent surprise." *In re Terrorist Bombings*, 552 F.3d at 150. The preparation necessary to defend against a claim that Lebedev aided and abetted a bribe looks very different from the preparation necessary to defend against a charge that he personally paid one. *See, e.g., United States v. Failla*, No. CR-93-00294 (CPS), 1993 WL 547419, at *7 (E.D.N.Y. Dec. 21, 1993) (ordering the government to provide particulars as to whether each defendant in a racketeering case was charged in each count "as (1) an aider and abettor or accomplice, (2) a principal, or (3) both"). Accordingly, the Government is ordered to provide the approximate date, location, and amount of any bribe that it alleges Lebedev paid. [9] Providing that information will also address Lebedev's third request for particulars, in which he asks the Government to "specify which substantive bribery offenses Lebedev participated in within this District." Lebedev Br. 8.

## V.   REMAINING MOTIONS

### A.   Lebedev's Motion to Strike Surplusage from the Indictment

Pursuant to Federal Rule of Criminal Procedure 7(d), Lebedev moves to strike several mentions of his name in the preamble of the Indictment as surplusage. "Motions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial." *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990) (internal quotation marks and citation omitted). Accordingly, so long as the "evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken." *Id.* (internal quotation marks and citation omitted). This standard "is an 'exacting' one," and "only rarely is alleged surplusage stricken from an indictment." *United States v. Smith*, 985 F. Supp. 2d 547, 610 (S.D.N.Y. 2014) (internal quotation marks and citation omitted).

---

[9] The Court's reasoning in granting Lebedev's request for particulars with respect to bribes that *he* allegedly paid applies with equal force to Michael Murgio, who has requested to join in Lebedev's demand for a bill of particulars. *See* Dkt. No. 148. The Government is therefore ordered to provide the same information (approximate date, location, and amount) about Michael Murgio's alleged bribes. Comparable information is not required for Anthony Murgio, as the Indictment clearly alleges facts that would make him liable as a principal.

Lebedev is charged only in Counts Three and Four, which allege that he conspired to bribe, and did bribe, Trevon Gross. Lebedev argues that the mentions of his name in the preamble of the Indictment should be struck because those mentions suggest he committed other crimes that he is not charged with. Lebedev Br. 8-9. The allegedly offending statements are as follows: First, that "Coin.mx was operated by Anthony R. Murgio . . . with the assistance of other individuals, including Yuri Lebedev." S3 Indictment ¶ 3. Second, that "[t]hrough Coin.mx, Anthony R. Murgio, Lebedev, and their co-conspirators enabled customers to exchange cash for Bitcoins, charging a fee for their service." *Id.* Third, that "Anthony R. Murgio and Yuri Lebedev . . . and their co-conspirators engaged in substantial efforts to evade detection of their unlawful Bitcoin exchange scheme by operating through phony front companies . . . and by maintaining corresponding phony websites for those companies." *Id.* ¶ 5. And fourth, that "Murgio, Lebedev, and their co-conspirators sough to trick the financial institutions through which Coin.mx operated and processed transactions into believing their unlawful Bitcoin exchange business was simply a members-only association of individuals" interested in collectables. *Id.*

Lebedev's request to strike his name from these portions of the Indictment is denied. Each of the above allegations is "relevant to the crime[s] charged," *Scarpa*, 913 F.2d at 1013, in that they provide background on how Lebedev allegedly came to enter into a conspiracy to bribe Gross. They also, if proven, constitute evidence of Lebedev's intent—it is more plausible that he bribed Gross to place particular individuals on the HOPE FCU board if doing so is consistent with other actions he took on behalf of Coin.mx. Thus, "regardless of how prejudicial" the allegations may be, Lebedev's name should not be stricken from the preamble at this time. *Id.* The Court therefore denies Lebedev's motion, but without prejudice to renewal.

### B.      Lebedev's Renewed Motion to Sever

Lebedev moves to sever his trial from the trial of his co-defendants or, in the alternative, to sever the trial of the bribery counts from the other counts in the Indictment. Lebedev made a similar motion, which this Court denied, prior to the filing of the S2 Indictment. *See* Dkt. Nos.

35, 72. Lebedev does not advance new grounds for severance. Instead, he reiterates his view that evidence of crimes for which he is not charged "will inflame the jury and make it difficult to compartmentalize the evidence." Lebedev Br. 10. But as the Court explained at a March 4, 2016 conference, the evidence that Lebedev cites as potentially prejudicial is relevant to proving the counts that he *is* charged with in the Indictment. Dkt. No. 72 at 13. If the Government would seek to establish the background of Lebedev's involvement with Coin.mx in a separate trial of Lebedev (or of the bribery counts), then there is no need for a severance. Accordingly, for the reasons explained orally at the March 4, 2016 conference, Lebedev's motion to sever is denied.

### C.      Murgio's Motion to Give Notice of Co-Defendants' Admissions or Confessions

Murgio asks the Court to order the Government to provide pre-trial notice of any post-arrest statements, admissions, or confessions from his co-defendants that the Government intends to introduce at trial. Murgio Omni. Br. 3. Murgio seeks the early disclosure of this information so that he can determine whether he has any motions to bring pursuant to *Bruton v. United States*, 391 U.S. 123 (1968). In *Bruton*, the Court held that it violates a defendant's rights under the Confrontation Clause to introduce, at a joint trial, the confession of a non-testifying co-defendant that links the defendant to the charged crime. *Id.* at 135-37. There is ample authority in this circuit, however, holding that *Bruton* and its progeny "do not mandate pretrial disclosure of such statements to the defense." *United States v. Stein*, 424 F. Supp. 2d 720, 727 (S.D.N.Y. 2006). Murgio does not address any of this authority. *See* Murgio Omni. Reply Br. 1 n.1. Accordingly, his motion to require the pre-trial production of co-defendant post-arrest statements, admissions, or confessions is denied. The Court notes though that it would be "wise" for the Government to adhere to its pledge "to produce such materials in sufficient time for issues regarding such statements to be resolved pre-trial." *United States v. Robles*, No. 04-CR-1036 (GEL), 2005 WL 957338, at *1 (S.D.N.Y. Apr. 22, 2005); *see also* Opp. Br. 58.

**D.     Murgio's Motion to Compel the Disclosure of Confidential Informants or Cooperating Co-Defendants**

Murgio "demands" that the Government disclose the "names and criminal histories of the confidential informants or cooperating co-defendants" that it has relied on. Murgio Omni. Br. 11. As the Government notes, it "generally enjoys a 'privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law.'" *United States v. Jackson*, 345 F.3d 59, 69 (2d Cir. 2003) (quoting *Roviaro v. United States*, 353 U.S. 53, 59 (1957)). That privilege "must give way" if, "absent such disclosure, [the defendant] will be deprived of his right to a fair trial." *United States v. Fields*, 113 F.3d 313, 324 (2d Cir. 1997). But it is the defendant who "bears the burden of showing the need for disclosure of an informant's identity." *Id.* And that burden can be met only if the defendant makes "a specific showing that 'the disclosure of an informant's identity . . . is relevant and helpful to the defense of an accused, or is essential to the fair determination of a cause.'" *United States v. Philippeaux*, No. 13-CR-277 (RWS), 2015 WL 405240, at *4 (S.D.N.Y. Jan. 30, 2015) (alteration in original) (quoting *United States v. Saa*, 859 F.2d 1067, 1073 (2d Cir. 1988)); *see also Saa*, 859 F.2d at 1073 ("[D]isclosure of the identity or address of a confidential informant is not required unless the informant's testimony is shown to be material to the defense.").

Murgio makes no attempt to put forward the showing required to compel the Government to disclose the identity of any informants or cooperating co-defendants. Rather, he asserts, without explanation, that "it strongly appears that informants or co-defendants were participants in critical events, and may be key witnesses against the defendant." Murgio Omni. Br. 12. This does not constitute a showing that he "will be deprived of his right to a fair trial" absent the requested disclosure. *Fields*, 113 F.3d at 324. That is particularly true in light of the Government's indication that it will "turn over Section 3500 and *Giglio* material for its witnesses," including any confidential informants or cooperating co-defendants, "sufficiently in

34

advance of trial to permit defense counsel adequate time to prepare." Opp. Br. 64. Accordingly, Murgio's motion is denied.

### E.     Requests for the Early Production of *Brady* and *Giglio* Material

Both Murgio and Lebedev move for the immediate disclosure of all material that falls within the ambit of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972). The material that must be provided under *Brady* and *Giglio* "is material, which, if not disclosed, creates a reasonable probability of altering the outcome" of trial. *United States v. Coppa*, 267 F.3d 132, 146 (2d Cir. 2001). But such material need not be disclosed immediately "upon request by a defendant," so long as it is disclosed "in time for its effective use at trial." *Id.*

The Government acknowledges its obligations under *Brady* and *Giglio* in its opposition brief, and it pledges to provide such materials in a timely manner. Opp. Br. 60. This Court generally will not compel the immediate or early production of *Brady* or *Giglio* material in the face of "the Government's 'good-faith representation to the court and defense counsel that it recognizes and has complied with its disclosure obligations under *Brady*'" and its progeny. *United States v. Thompson*, No. 13-CR-378 (AJN), 2013 WL 6246489, at *9 (S.D.N.Y. Dec. 3, 2013) (quoting *United States v. Perez*, 940 F. Supp. 540, 553 (S.D.N.Y. 1996)). There is no reason to depart from that practice here. The Court notes, however, consistent with both Lebedev's and Murgio's requests, that the Government "should resolve doubts as to the usefulness of evidence to the defense in favor of full disclosure," as failure to do so "risks the validity of any conviction." *Stein*, 424 F. Supp. 2d at 726 (internal quotation marks, alterations, and citation omitted).

### F.     Requests for Early Production of Rule 404(b) Evidence

The requests by Murgio and Lebedev for early production of evidence that the Government may seek to introduce pursuant to Federal Rule of Evidence 404(b) are moot in light of the deadline the Court has set for 404(b) motions and motions *in limine*. *See* Dkt. No. 156 (requiring such motions to be filed more than six weeks in advance of trial).

## VI.    CONCLUSION

For the foregoing reasons, the Court GRANTS in part and DENIES in part Gross's motion for a bill of particulars and Lebedev's motion for a bill of particulars. The Government shall supply the particulars described in this Memorandum and Order no later than September 26, 2016. The Court GRANTS the requests of Murgio, Michael Murgio, and Gross to join in the motions of their co-defendants. The Court DENIES the other pre-trial motions.

This resolves Docket Nos. 130, 132, 134, 138, 141, 147, and 148.

SO ORDERED.


Dated: September **19**, 2016
New York, New York

_____
ALISON J. NATHAN
United States District Judge