UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
:
UNITED STATES OF AMERICA
:     **PUBLIC REDACTED VERSION**
:
- v. -                                                     S3 15 Cr. 769 (AJN)
:
ANTHONY MURGIO, et al.
:
        Defendants.
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

# GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF
# MOTION REGARDING APPLICATION OF CRIME FRAUD EXCEPTION

                         PREET BHARARA
                         United States Attorney for the
                         Southern District of New York

Catherine E. Geddes
Assistant United States Attorney
*Of Counsel*

**TABLE OF CONTENTS**

| | |
|---|---|
| **TABLE OF AUTHORITIES**……………………………………………………………. | ii |
| **PRELIMINARY STATEMENT**……………………………………………………………. | 1 |
| **BACKGROUND**………………………………………………………………………… | 2 |
| A.      The Coin.mx Unlicensed Bitcoin Exchange……………………………………………. | 2 |
| B.      The Sham Companies………………………………………………………….…. | 3 |
| C.      The HOPE FCU Board Takeover……………………………………………………. | 4 |
| **LEGAL STANDARD FOR CRIME-FRAUD EXCEPTION**………………………………… | 5 |
| A.      Establishing Probable Cause of Crime or Fraud and that Communications Were in Furtherance of Crime or Fraud…………………………………………………………. | 7 |
| B.      *In Camera* Review and Compelling Disclosure……………………………………...…. | 8 |
| **ARGUMENT**……………………………………………………………………………….. | 9 |
| I.      Probable Cause Exists To Believe that a Crime or Fraud Was Committed and that The Challenged Communications Were In Furtherance of the Crime or Fraud…………... | 9 |
| II.      The Court Should Make a Factual Finding that the Challenged Communications Are Not Privileged…………………………………………………………………………….. | 13 |
| **CONCLUSION**……………………………………………………………………………… | 13 |

# **TABLE OF AUTHORITIES**

*A.I.A. Holdings, S.A. v. Lehman Brothers, Inc.*, 1999 WL 61442 (S.D.N.Y. Feb. 3, 1999) ........... 7

*In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d 1032 (2d Cir. 1984) ................................................................................................................................ 6, 8, 12

*In re Grand Jury Subpoenas Dated Mar. 2, 2015*, 628 F. App'x 13 (2d Cir. 2015) ...................... 6

*In re John Doe, Inc.*, 13 F.3d 633 (2d Cir. 1994) ...................................................................... 7, 8

*In re Omnicom Grp., Inc. Sec. Litig.*, 233 F.R.D. 400 (S.D.N.Y. 2006) ......................................... 7

*In re Richard Roe, Inc.*, 68 F.3d 38 (2d Cir. 1995) ..................................................................... 6, 7

*Kaley v. United States*, 134 S. Ct. 1090 (2014) ............................................................................ 8

*Lazare Kaplan Int'l, Inc., v. KBC Bank N.V.*, 2016 WL 4154274 (S.D.N.Y. July 21, 2016) ..... 7, 8

*United States v. Ceglia*, 2015 WL 1499194 (S.D.N.Y. Mar. 30, 2015) ................................. 1, 13

*United States v. Chervin*, 2011 WL 4424297 (S.D.N.Y. Sept. 21, 2011) ................................ 7, 12

*United States v. Gasparik*, 141 F. Supp. 2d 361 (S.D.N.Y. 2001) ................................................ 8

*United States v. Goldberger & Dubin*, 935 F.2d 501 (2d Cir. 1991) ............................................ 6

*United States v. Jacobs*, 117 F.3d 82 (2d Cir. 1997) ................................................................. 6, 7

*United States v. Kerik*, 531 F. Supp. 2d 610 (S.D.N.Y. 2008) ..................................................... 8

*United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961) .................................................................... 6

**PRELIMINARY STATEMENT**

The Government[1] respectfully submits this application for an order finding that the crime fraud exception applies to certain documents and communications (the "Challenged Communications") that are subject to a claim of privilege based on alleged attorney-client relationships between Anthony Murgio ("Murgio" or the "defendant") and various attorneys. Murgio communicated with these attorneys regarding an unlicensed Bitcoin exchange and sham companies he attempted to integrate into a federal credit union that he tried to gain control of through bribery. As set forth below, the crime-fraud exception to the privilege applies to all communications involving Murgio relating to "Coin.mx," "Collectables Club," "Currency Enthusiasts," and the Helping Other People Excel Federal Credit Union ("HOPE FCU" or the "Credit Union") because there is probable cause to believe those communications were intended to evade regulations, conceal the true nature of his unlicensed Bitcoin exchange, and maintain his grip on the Credit Union.[2]

---

[1] This motion has been prepared by the undersigned Assistant U.S. Attorney (the "Wall AUSA") who has reviewed the documents that are at issue here but is not a member of the prosecution team, which is "a common procedure for litigating asserted claims of privilege in this District." *United States v. Ceglia*, No. 12-CR-876 VSB, 2015 WL 1499194, at *1 (S.D.N.Y. Mar. 30, 2015) (noting that this procedure "enable[s] the walled-off AUSA to use [her] judgment and discretion to litigate over only those documents that may be genuinely useful to the Government and may fall within an exception to the privilege"). All documents subject to claims of privilege by any of the defendants continue to be withheld from the prosecution team. For this reason, portions of this motion discussing the content of potentially privileged documents have been redacted from the version appearing on ECF and available to the prosecution team.

[2] While the Challenged Communications represent the Government's current understanding of the documents that are subject to the crime-fraud exception, the Government reserves its right to challenge privilege claims over similar documents, should the Court agree the crime-fraud exception applies to this type of document, that may be uncovered after further review.

The Government therefore respectfully requests that the Court undertake an *in camera* review and determine that the crime-fraud exception applies to the Challenged Communications so they may not be withheld as privileged.[3]

## BACKGROUND

On April 21, 2016, a grand jury sitting in this District returned a nine-count Superseding Indictment (the "S3 Indictment") charging that from approximately 2013 through 2015, Murgio and several co-conspirators knowingly operated an unlicensed Bitcoin exchange in violation of federal anti-money laundering laws and regulations. As alleged in the S3 Indictment, Murgio perpetrated this scheme through the website Coin.mx and the sham companies Collectables Club and Currency Enthusiasts, as well as by illegally attempting to take control of the board of HOPE FCU, a New Jersey-based credit union, by bribing the board's Chairman.

### A. The Coin.mx Unlicensed Bitcoin Exchange

According to its website, Coin.mx was an "international . . . exchange that allow[ed] you to securely buy, use, and accept bitcoin and other digital currencies." (Complaint ¶ 15.)[4] Murgio "anticipated that Coin.mx would exchange 'every currency and every digital currency,' envisioning it as 'a worldwide payment system with immediate funds availability.'" (Complaint ¶ 14(b).) But Murgio never registered Coin.mx with the Department of the Treasury Financial Crimes Enforcement Network ("FinCEN") or state regulators, as he knew was required for money services businesses. (*See* S3 Indictment ¶¶ 4, 12; Complaint ¶¶ 13, 14(a)(i).)

---

[3] The Challenged Communications are attached as Exhibits 1 through 32, should the Court agree to undertake such a review. Due to a late decision that it was not necessary to challenge two previously-numbered exhibits in this motion, there is no Exhibit 24 or Exhibit 25.

[4] "Complaint" refers to the July 17, 2015 complaint against Anthony Murgio (15 Mag. 2508).

B.     The Sham Companies

In order to hide the true nature of Coin.mx's Bitcoin exchange, Murgio funneled the business through phony "front" companies he had established—complete with phony websites[5]—such as "Collectables Club" and "Currency Enthusiasts."  For example, an undercover agent who exchanged U.S. dollars for Bitcoins through Coin.mx was first asked to sign a "Collectables Club Membership Agreement" which stated that "Collectables Club" members "seek to help each other achieve information and education pertaining to collection and trading of memorabilia."  (Complaint ¶ 17.)   After electronically agreeing to abide by the agreement, the agent was able to exchange dollars into Bitcoins, and vice versa, with Coin.mx charging a fee for each exchange transaction.   Id.

The front companies were also used to persuade the financial institutions processing the transactions that the business was merely "a members-only association of individuals who discussed, bought, and sold collectable items, such as stamps and sports memorabilia."   (See S3 Indictment ¶ 5; Complaint ¶¶ 19, 24.)   Bank accounts were opened in the names of these front companies rather than the true company, and Murgio, who held himself out as the founder and President of Collectables Club, told the banks that "a small fee is charged for joining the club which is used to pay for meetings or retreat[s] the club would have on an annual basis. . . this account is use[d] to collect the membership dues and pay for gatherings."   (S3 Indictment ¶¶ 6,

---

[5] One Collectables Club website, http://collectpma.com, appeared on its face to be a members-only club that enabled members to buy and sell antiques, sports cards and memorabilia, coins and currency, and other items through an online auction process.   However, an undercover agent who attempted to sign up as a member was unable to do so, and observed that "the images and product descriptions of certain items purportedly offered for sale on the Collectables Club Website . . . were identical to items offered for sale on certain other online auction websites for which bidding had closed in or about late 2014."   (Complaint ¶ 24(a).)

7; Complaint ¶ 21(a).) Instead, the Collectables Club bank accounts were used solely to operate Coin.mx, processing over $1 million for Bitcoins between September 2013 and mid-2014. (Complaint ¶ 21(b).)

Murgio and his co-conspirators also miscoded transactions so as to appear to be from the front companies and instructed Coin.mx customers to conceal from the banks the fact that they were purchasing Bitcoins rather than collectables items. (*See* S3 Indictment ¶¶ 6, 8; Complaint ¶¶ 19, 21). For example, in November 2013, a customer told Murgio that he was wiring $100,000 to one of the Collectables Club bank accounts. Murgio responded:

> [C]an you see if you can put a stop to it? . . . You may wire 20k to [the bank], it will be credited immediately. The rest must go to bulgaria please. We hope you understand the concerns. If the US was not so damn screwed up about this stuff, we wouldn't have to deal with this.

(Complaint ¶ 22.) And when the customer mentioned that the wire to the bank would state it was for the benefit of "Collectables Club P.M.A." with the "nickname" of "Coin.mx," Murgio replied, "I would **not** put coin.mx in there. Put Collectpma.com." (Complaint ¶ 23 (emphasis in original).)

### C. The HOPE FCU Board Takeover

In addition to the above methods, in 2014, Murgio and his co-conspirators acquired control of the HOPE FCU board of directors by bribing the board Chairman, co-defendant Trevon Gross. Over $150,000 in bribes was transferred to bank accounts under Gross's control, and, in exchange, Gross assisted in installing Murgio's co-conspirators—individuals chosen by the "Collectables Club"—onto HOPE FCU's board.[6] (S3 Indictment ¶¶ 10, 19.)

---

[6] These individuals were not actually eligible for membership on the board because they did not meet the "Field of Membership" requirements, and they were later removed by Gross after concerns raised by the National Credit Union Administration ("NCUA"), the Credit Union's

As alleged in the S3 Indictment, Murgio and his co-conspirators then "operated HOPE FCU as a captive bank for their unlawful Bitcoin exchange until at least early 2015." (S3 Indictment ¶ 10.) Specifically, once they had control of the Credit Union, Murgio and a co-conspirator began to process Automated Clearing House ("ACH") transactions (*i.e.*, electronic credit and debit transactions) for Coin.mx through a payment processor, Kapcharge, which, with Murgio's assistance, opened an account at the Credit Union. (Complaint ¶ 27.) The Credit Union had traditionally handled the modest banking needs of primarily low-income clients and had little to no experience with ACH processing. But by October 2014, the payment processor was processing over $30 million per month in ACH transactions through its HOPE FCU account. (Complaint ¶ 28.) As Gross admitted to Murgio, he was worried about the "tap dancing" he and others were doing to avoid raising concern among federal regulators about the payment processing activity that Murgio and others were conducting through HOPE FCU, and acknowledged that "We can't certify that all the people we let [pass] money through this credit union. . . weren't doing something illegally with the money." (Complaint ¶ 27(c).)

## LEGAL STANDARD FOR CRIME-FRAUD EXCEPTION

The attorney-client privilege applies "(1) [w]here legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or the legal adviser, (8) except the protection be waived . . . ." *United*

---

regulator. The Government intends to introduce evidence at trial showing that Murgio and his co-conspirators attempted to get these members reinstated—including by making demands on the NCUA and false representations as to their presence within the "Field of Membership"—in order to continue their control of the Credit Union and not waste the money spent in bribes to Gross.

*States v. Kovel*, 296 F.2d 918, 921 (2d Cir. 1961) (internal quotation marks omitted). The privilege, however, is not absolute. "The privilege cannot stand in the face of countervailing law or strong public policy and should be strictly confined within the narrowest possible limits underlying its purpose." *United States v. Goldberger & Dubin*, 935 F.2d 501, 504 (2d Cir. 1991) (citations omitted).

Thus, it is "well-established that communications that otherwise would be protected by the attorney-client privilege . . . are not protected if they relate to client communications in furtherance of contemplated or ongoing criminal or fraudulent conduct." *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d 1032, 1038 (2d Cir. 1984); *see also In re Grand Jury Subpoenas Dated Mar. 2, 2015*, 628 F. App'x 13, 14 (2d Cir. 2015). This "crime-fraud exception" ensures "that the secrecy protecting the attorney-client relationship does not extend to communications or work product 'made for the purpose of getting advice for the commission of a fraud' or crime." *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995) (quoting *United States v. Zolin*, 491 U.S. 554, 563 (1989)). Such communications are not protected "even if the attorney is unaware that his advice is sought in furtherance of such an improper purpose." *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d at 1038.

"A party wishing to invoke the invoke the crime-fraud exception must demonstrate that there is a factual basis for a showing of probable cause to believe that a fraud or crime has been committed and that the communications in question were in furtherance of the fraud or crime." *United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997), *abrogated on other grounds by Loughrin v. United States*, 134 S. Ct. 2384 (2014). This is done through a two-step process. As described below in more detail, first, "the proposed factual basis must strike a prudent person as constituting

6

a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof." *Id.* (quoting *In re John Doe, Inc.*, 13 F.3d 633, 637 (2d Cir. 1994)) (internal quotation marks omitted). The burden of this probable-cause showing is on the party seeking to invoke the crime-fraud exception. *In re Richard Roe, Inc.*, 68 F.3d at 40. After such a showing, "the district court may, in its discretion, conduct an *in camera* review of the evidence." *Lazare Kaplan Int'l, Inc., v. KBC Bank N.V.*, No. 1:11-CV-09490 (ALC), 2016 WL 4154274, at *3 (S.D.N.Y. July 21, 2016). Second, "when there has been an *in camera* review, the district court exercises its discretion again to determine whether the facts are such that the exception applies." *Id.* (quoting *Jacobs*, 117 F.3d at 87).

### A. Establishing Probable Cause of Crime or Fraud and that Communications Were in Furtherance of Crime or Fraud

When assessing whether the crime-fraud exception applies to communications, "the controlling question is whether the communications at issue were undertaken to facilitate or conceal the commission of a crime or fraud." *In re Omnicom Grp., Inc. Sec. Litig.*, 233 F.R.D. 400, 404 (S.D.N.Y. 2006). The probable cause standard in this context is "not an overly demanding" one, *A.I.A. Holdings, S.A. v. Lehman Brothers, Inc.*, No. 97 Civ. 4978, 1999 WL 61442, at *5 (S.D.N.Y. Feb. 3, 1999), and "[t]he fraudulent objective of the scheme . . . 'need not be established definitively; there need only be presented a reasonable basis for believing that the objective was fraudulent.'" *United States v. Chervin*, No. 10 CR 918 RPP, 2011 WL 4424297, at *3 (S.D.N.Y. Sept. 21, 2011) (quoting *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d at 1039).

In a criminal case such as this, the fact of an indictment indicates that the grand jury has already found probable cause to believe the defendant committed the charged crimes. *See Kaley*

7

*v. United States*, 134 S. Ct. 1090, 1097–98 (2014) ("The grand jury gets to say—without any review, oversight, or second-guessing—whether probable cause exists to think that a person committed a crime."); *United States v. Kerik*, 531 F. Supp. 2d 610, 617-18 (S.D.N.Y. 2008) ("The Government in this case has demonstrated, largely by virtue of the indictment, that probable cause exists to show that the statements at issue were made to the Defendant's attorneys for the purpose of furthering and/or concealing criminal or fraudulent activity."); *United States v. Gasparik*, 141 F. Supp. 2d 361, 372 (S.D.N.Y. 2001) ("Probable cause to believe that the fraud occurred has already been found by reason of the indictment."). Thus, the key issue here is whether the Challenged Communications were made in *furtherance* of those crimes.

The crime or fraud need not have actually occurred for the exception to be applicable; it need only have been the objective of the client's communication. *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d at 1039. And the fraudulent nature of the objective need not be established definitively; there need only be presented a reasonable basis for believing that the objective was fraudulent. *Id.* For this reason, the probable cause inherent in the Grand Jury's return of the S3 Indictment is sufficient even though the allegations have not been established beyond a reasonable doubt by a trier of fact.

      B.    *In Camera* **Review and Compelling Disclosure**

Once the Government has provided a factual basis for moving forward, the Court may then move to the next steps in the process: undertaking an *in camera* review of the documents at issue, and, should the court determine the crime-fraud exception applies, ordering the production of the documents. *Lazare Kaplan Int'l, Inc.*, 2016 WL 4154274, at *3; *see also In re John Doe, Inc.*, 13

8

F.3d at 636 ("*in camera* proceedings may be used to determine whether the [crime-fraud] exception applies to particular communications").

## ARGUMENT

I. **Probable Cause Exists To Believe that a Crime or Fraud Was Committed and that the Challenged Communications Were in Furtherance of the Crime or Fraud**

On these facts, the Government satisfies its burden of showing that the defendant's communications with counsel were in furtherance of fraud and, accordingly, the crime-fraud exception applies. The Challenged Communications involve Coin.mx, Collectables Club, Currency Enthusiasts, and Murgio's machinations concerning the HOPE FCU board. These communications were made in furtherance of the crime or fraud, as Murgio set up sham companies and integrated them into the Bitcoin and Credit Union businesses in order to obscure the role of Coin.mx as an unlicensed Bitcoin exchange, all as charged in the Complaint and S3 Indictment.

Specifically, the table below explains how the Challenged Communications were made in furtherance of Murgio's charged crimes:

| EXHIBIT[7] | FURTHERANCE OF MURGIO'S CRIME OR FRAUD |
|---|---|
| 1, 2, 8, 13 | Discussion of contracts between HOPE FCU and Kapcharge, a payment processor to which Murgio served as a "consultant." |
| 3, 4, 5, 6, 21[8] | Continuing pretense of "Collectables Club" as something other than a sham entity in directing that a "Coin.mx letter" be put on Collectables Club letterhead and sending letter to counterparty stating that "every user of Coin.mx becomes an honorary member of the Collectables Club, which provides certain benefits, including access |

---

[7] The Exhibits constitute a representative set of the Challenged Communications—generally the latest version of an email chain, unless there were changes within a chain—but the Court's rulings on these documents will also resolve challenges against additional documents such as earlier or related versions of a particular chain. When an email in the chain included an attachment, that direct cover email and attachment are also included in the particular Exhibit.

[8] Due to the length of the attachment to this email, which is a 149-page spreadsheet printout, and because the Government does not believe its contents affect this motion, the attachment has not been included. However, it is available for the Court's review upon request.

| | |
|---|---|
| | to Coin.mx." Emails also address attempt to hold Coin.mx member to agreement after he exploited a technical glitch and withdrew too many Bitcoins, in furtherance of the unlicensed Bitcoin exchange. |
| 7 | Using attorneys to potentially set up Bitcoin company and HOPE FCU branch in Puerto Rico to get tax benefits. |
| 9 | "Exclusive Services Agreement" between HOPE FCU and Currency Enthusiasts in which HOPE "agrees to provide [Currency Enthusiasts] access to all of its financial services at its cost, for the entire term of this agreement [up to 80 years]" and "must allow [Currency Enthusiasts to resell [HOPE's] financial services at twenty (20) basis points above [HOPE's] costs for all financial services." |
| 10, 11 | "Exclusivity Agreement" between HOPE FCU and InstaEatz (of which Murgio is CEO, and which has the same Florida address as Currency Enthusiasts) for exclusive banking services agreement. |
| 12 | Request for "exclusive contract between me and the credit union" in which "credit union will furnish all banking rates at their cost to me." |
| 14 | ▮ |
| 15, 16 | Discussion of Currency Enthusiasts entering investment agreement with a Bitcoin-related company, Atombit. |
| 16, 17, 18, 28, 29, 30 | Attempts to retain control of the HOPE FCU Board after several members supported by Murgio were kicked off. One email from Gross forwarded to an attorney (Ex. 29, Bates 12364) indicates that as of May 12, 2014, "next steps" included "establishing presence in Lakewood," a requirement to be in the Credit Union's Field of Membership. (Elsewhere, in a non-privileged document due to the inclusion of a third party, a co-defendant represented to an attorney that a Lakewood presence had been established "[s]hortly after the beginning of 2014.") |
| 19 | ▮ |
| 20, 31 | Murgio's involvement in considering legal action against a payment processor for HOPE FCU (despite having no position on Board or role with Credit Union). |
| 22, 23 | Murgio considering the use of private membership associations in order to evade federal and state jurisdiction, "protect [him]self," and "operate outside the jurisdiction of FINCEN." |
| 26 | ▮ |
| 27 | Enlisting attorney's aid in Collectables Club plan to use Credit Union to provide members with "banking features that are crypto currency friendly," and allow Bitcoin businesses to operate under the credit union without needing to obtain money transmitter licenses in every state. |
| 32 | Murgio's involvement in hiring counsel for the HOPE FCU board. |

In some instances, attorneys are included on these communications in order to facilitate contractual or business negotiations with entities controlled by Murgio and related to the Bitcoin

10

exchange—such as the purchase of Atombit (Exhibit 15) or the contracts between HOPE FCU and various entities such as Currency Enthusiasts (Exhibit 9), "Instaeatz" (of which Murgio was the CEO) (Exhibit 11), or Murgio himself (Exhibit 12)—which permitted Murgio to hide his actions behind layers of companies while perpetrating the unlicensed Bitcoin exchange through the Credit Union (and otherwise taking advantage of having installed co-conspirators on the board through bribery).

In other instances, Murgio's use of attorneys appears to be an effort to create a paper trail of false information.  For example,  Emails sent to attorneys from Murgio's personal email (but routed through his Collectables Club email, "trustee@collectpma.com") were signed with his father's name, "Michael Murgio" and blind-copied to Michael Murgio's email address, in an apparent attempt to disguise Murgio's involvement (Exhibit 28, Bates 11634).  And attorneys were given information about Collectables Club's move to New Jersey that is contradicted by contemporaneous emails (Exhibit 29, Bates 12364).  In all of these instances, the communications were used to further Coin.mx's unlicensed Bitcoin exchange, sham companies designed to hide the true nature and control of the scheme, and Murgio's control of the HOPE FCU board.

The Challenged Communications do not merely provide evidence of the charged crime, but appear to have been exchanged in furtherance of it.  One way courts consider this distinction is whether "the desired [legal] advice refers not to *prior* wrongdoing, but to *future* wrongdoing."

11

*Chervin*, 2011 WL 4424297, at *2 (emphasis added). That is, is the client merely explaining past wrongdoing (which would not fall under the crime-fraud exception), or is he utilizing the attorney's services to continue the scheme? The Challenged Communications fall squarely in the latter category. For example, drafting contracts, including exclusive agreements with favorable terms for Murgio, between Murgio's various companies and the credit union allowed Murgio to continue to profit from his ill-gotten control of the board through bribery. The emails in which he kept up the pretense of Collectables Club were necessary to convince counterparties of the legitimacy of the enterprise; acknowledging Coin.mx, an unlicensed Bitcoin exchange, was actually the controlling entity would have attracted scrutiny. Lawyers were used to fight to regain control over the Credit Union after Murgio's co-conspirators were removed, and Murgio also attempted to use attorneys to set up overseas branches of the Credit Union and Bitcoin exchange to avoid taxes or regulatory authority. Thus, the Challenged Communications are not merely evidence of crime, but are themselves ongoing attempts to perpetrate criminal activity.

Accordingly, the Government has set forth sufficient evidence to allow "a prudent person [to] have a reasonable basis to suspect the perpetration of a crime or fraud, and that the communications were in furtherance thereof." *In re Grand Jury Subpoena Duces Tecum Dated September 15, 1983*, 731 F.2d at 1039.[9]

---

[9] The Government believes that all of the Challenged Communications are not privileged due to the crime-fraud exception. However, several of the Challenged Communications are also not privileged because, though he exercised control through bribery, Murgio was not a member of the HOPE FCU board or otherwise employed by the Credit Union, and is thus a third party not entitled to assert the privilege on the Credit Union board's behalf (Exhibits 20, 30, 31, 32). Furthermore, Exhibit 30 does not contain anything confidential—the only content in the email forwarded to an attorney is an underlying email attaching draft board minutes that were circulated among board members and Murgio, a non-board member.

**II.  The Court Should Make a Factual Finding that the Challenged Communications Are Not Privileged**

The Government has made a prima facie showing that the Challenged Communications were made in furtherance of a crime or fraud.  Therefore, the Court, in its discretion, may conduct an *in camera* review of the documents and make a factual finding as to whether the documents fall within the crime-fraud exception.  "There must be a 'purposeful nexus' between the communication or document and the fraudulent activity," but "[t]he communication or document 'need only reasonably relate' to the subject matter of the purported fraud."  *Ceglia*, 2015 WL 1499194, at *3 (internal citations omitted).  The Government respectfully submits that should the Court undertake such a review, it will conclude, for the reasons described in Part I above, that the Challenged Communications were made in furtherance of a crime or fraud and are therefore not protected by any attorney-client privilege that might otherwise apply.

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court issue an order finding that the crime fraud exception applies to the Challenged Communications, and authorize the undersigned to make these documents available to the prosecution team in this case.

Dated:  New York, New York
        August 19, 2016

                                Respectfully submitted,

                                PREET BHARARA
                                United States Attorney for the
                                Southern District of New York

                            By: _____
                                Catherine E. Geddes
                                Assistant United States Attorney

13