

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 5, 2017

**By ECF**

The Honorable Alison J. Nathan
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

> Re: **United States v. Yuri Lebedev & Trevon Gross**,
> S6 15 Cr. 769 (AJN)

Dear Judge Nathan:

The Government submits this letter in response to the Court's invitation for additional briefing on whether jury instructions on withdrawal and multiple conspiracies are warranted, and in response to the defendants' requests for limiting instructions on evidence post-dating the falling-out between defendant Trevon Gross and his co-conspirators affiliated with the Collectables Club, including Yuri Lebedev. As set forth in further detail below, the defendants' requested limiting instructions are too broad, but the Government agrees that a limiting instruction on the post-falling-out evidence should be given to the jury as proposed herein. In addition, and in light of the Government's proposed limiting instruction, the additional jury instructions on withdrawal and multiple conspiracies are not warranted.

### A. The Defendants' Proposed Limiting Instructions

Lebedev requests the following limiting instructions, arguing that the failure to give them would amount to a constructive amendment of the Indictment.

> [You] may not convict Lebedev of conspiracy under Count Three based on any
> false statements made to the NCUA concerning the efforts of individuals
> affiliated with the Collectables Club to take control over credit unions other than
> HOPE Federal Credit Union and to start a new credit union of their own.
>
> [You] may not convict Lebedev of conspiracy under Count Three based on any
> false statements made to the NCUA by individuals affiliated with HOPE Federal

Hon. Alison J. Nathan
March 5, 2017
Page 2

>Credit Union or with Kapcharge in connection with their efforts after November 24, 2014, to process Kapcharge's ACH transactions through Hope FCU.
>
>You have heard evidence that after November 22, 2014, individuals affiliated with Hope FCU and Kapcharge made statements and representations to the NCUA in connection with their efforts to have HOPE FCU continue to process ACH transactions. Such evidence is offered only against Trevon Gross and not against Yuri Lebedev.

Lebedev Letter Mot. at 1-2.

>Gross reiterates his request for the following limiting instruction:
>
>You have heard evidence that Michael Murgio, Anthony Murgio, Rico Hill, Jose Freundt, Rico Hill, Yuri Lebedev and others had discussions about making payments to Trevon Gross and took actions to gain control of the board of Hope FCU after Trevon Gross told them on November 24, 2014 that he no longer wanted to associate with them. You should disregard this evidence as against Mr. Gross, as it is not offered against him.

Gross Letter Mot. at 2. Gross subsequently stated in court that he joined Lebedev's constructive-amendment motion without providing any elaboration (Trial Tr. 2663), but he presumably argues that the failure to give the above instruction would amount to a constructive amendment of the Indictment.

### B. The Disputed Categories of Post-Falling-Out Evidence

Based on the defendants' proposed limiting instructions and various filings to date, it appears that the defendants dispute four categories of evidence. For the reasons discussed below, each category of evidence is admissible for certain purposes against each defendant. Therefore, the defendants' requested limiting instructions are too broad, and the Government proposes alternative instructions in the following section.

*First*, after the November 22 meeting at HOPE FCU in Jackson, New Jersey, the conspirators from the Collectables Club group discussed with each other how they might possibly reconcile with Gross, including by sending him a $6,000 "consulting" payment and the agreed-upon additional $50,000 corrupt payment in early December 2014. They also discussed strategies for re-taking control of HOPE FCU from Gross and the legacy board members, including by attempting to call a special meeting of the board of directors. Lebedev does not object to this evidence being considered against him.

Gross, however, objects to this evidence being considered against him. But these co-conspirator statements are admissible against him because they are direct evidence of the corrupt payments objects of the charged conspiracy. In these communications, the Collectables Club-

affiliated co-conspirators, including Lebedev, discussed, among other things, the very terms of the final criminal *quid pro quo* agreed to by Gross, Lebedev, and others on November 22, such as the $50,000 payment, the $6,000 "consulting" fees, the resignation of legacy board members, and the ongoing validity of the Collectables Club-affiliated co-conspirators' positions as board members, which Gross had propounded to the NCUA. Furthermore, these statements were made in furtherance of conspiratorial objectives, including to attempt to repair the relationship with Gross, to inform and update each other about the status of the conspiracy, and to plan next steps in the conspiracy. *See Mandell*, 752 F.3d at 552 (the "in furtherance" requirement is satisfied by a wide range of statements, including those that "provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy"). The fact that the statements were made after the November 22 meeting does not drain them of their conspiratorial nature. Accordingly, they are admissible against Gross.

*Second*, the conspirators from the Collectables Club group discussed with each other strategies for contacting the NCUA in an effort to re-take control of HOPE FCU from Gross and the legacy board members. To this end, Lebedev and others made false statements to the NCUA, including in a letter that falsely stated that Collectables Club was headquartered in Lakewood, New Jersey, which was signed by Lebedev and sent to the NCUA in January 2015. Lebedev does not object to this evidence being considered against him.

Gross objects to this evidence being considered against him. But these co-conspirator statements are admissible against Gross because they are direct evidence of the obstruction and false statements objects of the charged conspiracy. In these communications, the Collectables Club-affiliated co-conspirators discussed making (and ultimately did make) to the NCUA the same type of false statement that Gross and others made to the NCUA prior to November 22, *i.e.*, the false claim that the Collectables Club was based in Lakewood, New Jersey and that members of the Collectables Club were accordingly eligible to be members of the credit union and serve on its board. Even after the falling-out with the Collectables Club group, Gross continued to obfuscate and make false statements about the true nature of the Collectables Club in response to NCUA questions in order to cover up the bribery scheme.[1] The fact that even "rivals" continued to work toward achieving the objectives of the conspiracy—here, obstructing and making false statements to the NCUA about matters related to HOPE FCU, including the eligibility of

---

[1] For example, on December 2, 2014, when NCUA examiner Meg Flok asked Gross who Collectables Club was, Gross falsely replied that it was a company for which Kapcharge did "payroll" and "invoice payment." (GX 6026). Furthermore, on December 31, Gross emailed the credit union's appeal of the Documents of Resolution to the NCUA, which reasserted that the NCUA was wrong to have concluded the Collectables Club members were ineligible for membership. (GX 6028, at 6). Gross also repeatedly told variants of the false statements about the Collectables Club by claiming that Kapcharge (another entity with no presence in Lakewood, New Jersey) was eligible for membership at HOPE FCU.

Collectables Club—is "compelling evidence that the conspiracy [was] ongoing." *United States* v. *Mallay*, 712 F.3d at 106. Accordingly, the evidence is admissible against Gross.

    *Third*, after the falling out with Gross, the conspirators from the Collectables Club group discussed with each other the possibility of finding another credit union to take over, or starting a new credit union of their own (the "eCommerce PMA" federal credit union). The Government acknowledges that this category of evidence does not come within the scope of the conspiracy charged in Count Three, which charges in its first two objects the payment and receipt of corrupt payments to influence the decisionmaking of Gross in connection with the business of HOPE FCU, and in its third and fourth objects the obstruction of and making of false statements to the NCUA in connection with the NCUA's examinations of HOPE FCU. (Indictment ¶¶ 23-26). Such uncharged conduct is nevertheless admissible against Lebedev as direct evidence of the charged conspiracy. *See, e.g.*, *United States* v. *Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) ("[E]vidence of uncharged criminal activity is not considered other crimes evidence under Fed. R. Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." (internal quotation marks omitted)); *United States* v. *Thai*, 29 F.3d 785, 812 (2d Cir. 1994) ("When the indictment contains a conspiracy charge, uncharged acts may be admissible as direct evidence of the conspiracy itself."). The Government proposes that the jury be instructed that such evidence may be considered against Lebedev for the limited purpose of establishing whether the charged conspiracy existed and who its members were, but not whether Lebedev knowingly participated in that conspiracy. In addition, the Government agrees that the evidence should not be considered against Gross.

    *Fourth*, after the falling out between Gross and the Collectables Club group, Gross, co-conspirators from HOPE FCU (principally Charles Blue, whom Gross, with the assistance of Kapcharge, hired to serve as CEO of HOPE FCU in early December 2014), and co-conspirators from Kapcharge (principally Mark Francis and Shoula Cohen) discussed with each other the continued processing by HOPE FCU of ACH transactions for Kapcharge. They also discussed with each other the continued obstruction of, and making of false statements to, the NCUA, and made misrepresentations to third parties (including representatives of a member of Congress) that were related to such false statements to the NCUA. Gross does not object to this evidence being considered against him.

    Lebedev does, however, object to this evidence being considered against him. But these co-conspirator statements are admissible against him because they are direct evidence of the charged conspiracy. One of the chief parts of the *quid pro quo* agreement among Gross, the Collectables Club group, and Kapcharge was that Gross would help implement a plan to have HOPE FCU process tens of millions of dollars in ACH transactions for Kapcharge, the company that funded the bulk of the corrupt payments to Gross. As the evidence has shown, some of the ACH transactions that Kapcharge processed were Bitcoin-related transactions for Collectables Club/Coin.mx. The fact that Gross and Kapcharge continued to implement this aspect of the

Hon. Alison J. Nathan
March 5, 2017
Page 5

agreement, even after the falling out with the Collectables Club group, is powerful evidence of the existence and membership of the corrupt payments objects of the conspiracy prior to the falling-out. Furthermore, the fact that Gross and Kapcharge continued to discuss the making of, and in fact made, false statements to the NCUA about the Collectables Club, Kapcharge, and their relationship with HOPE FCU, even after the falling out with the Collectables Club group, is highly probative of the existence and membership of the obstruction and false statements objects of the conspiracy prior to the falling-out. Accordingly, the Government proposes that the jury be instructed that such evidence may be considered against Lebedev for the limited purpose of establishing whether the charged conspiracy existed and who its members were, but not whether Lebedev knowingly participated in that conspiracy.

### C. The Government's Proposed Limiting Instruction

The Government proposes a limiting instruction that will narrow the jury's consideration of certain evidence post-dating the falling-out between Gross and the Collectables Club in late November or December 2014 along the lines set forth above. The Government and the defendants disagree as to precisely when that falling-out occurred. Gross argues that it occurred on or about November 24, a position that Lebedev appears to adopt. The Government submits that based on evidence in the record, Gross continued to communicate with the Collectables Group about the conspiracy until early December, when Gross returned the final $50,000 wire transfer sent by the Collectables Club and locked out the Collectables Club members from the HOPE FCU system. The Government proposes that the jury should be instructed to resolve this particular factual question in the context of the proposed limiting instruction.

Accordingly, the Government proposes that the following instruction be given to the jury as part of the jury charge on Count Three:

> You have seen and heard evidence that sometime after a meeting involving Trevon Gross, Yuri Lebedev, and other members of the Collectables Club, held on or about November 22, 2014, there was a falling-out between Trevon Gross on one hand and the Collectables Club members on the other hand. It is up to you to determine, based on all the evidence, when precisely that falling-out occurred.
>
> You may consider, against both Yuri Lebedev and Trevon Gross, evidence of acts and statements by the defendants and individuals affiliated with HOPE FCU, the Collectables Club, and Kapcharge, that occurred <u>before</u> the date of the falling out between Gross and the Collectables Club. Evidence of acts and statements by various individuals that occurred <u>after</u> the date of the falling-out between Gross and the Collectables Club may be considered in the following ways:
>
> 1)      Acts and statements by the defendants and members of the Collectables Club regarding the November 22 meeting or the relationship between Gross and the Collectables Club, that occurred after the date of the falling-out between

Hon. Alison J. Nathan
March 5, 2017
Page 6

>Gross and the Collectables Club, may be considered against both Yuri Lebedev and Trevon Gross.
>
>2) Acts and statements by Yuri Lebedev and other members of the Collectables Club regarding contacting the NCUA about HOPE FCU, that occurred after the date of the falling-out between Gross and the Collectables Club, may be considered against both Yuri Lebedev and Trevon Gross.
>
>3) Acts and statements by Yuri Lebedev and other members of the Collectables Club regarding efforts to take control of credit unions other than HOPE Federal Credit Union and starting a new credit union of their own, including eCommerce PMA Federal Credit Union, that occurred after the date of the falling-out between Gross and the Collectables Club, (a) may be considered against Yuri Lebedev only for whether the conspiracy charged in Count Three existed and who its members were, but not for whether Lebedev knowingly participated in that conspiracy, and (b) may not be considered against Trevon Gross.
>
>4) Acts and statements by Trevon Gross; Charles Blue and other individuals affiliated with HOPE FCU; and Mark Francis, Shoula Cohen, and other individuals affiliated with Kapcharge, that occurred after the date of the falling-out between Gross and the Collectables Club (a) may be considered against Trevon Gross, and (b) may be considered against Yuri Lebedev only for whether the conspiracy charged in Count Three existed and who its members were, but not for whether Lebedev knowingly participated in that conspiracy.

### D. The Constructive-Amendment Claims Have No Merit

The defendants' constructive-amendment claims are meritless. But in any event, the Government's proposed limiting instruction alleviates any conceivable concerns about a constructive amendment.

An indictment has been constructively amended when the evidence or the jury charge "so alters an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." *United States* v. *Rigas*, 490 F.3d 208, 227 (2d Cir. 2007) (internal quotation marks omitted); *accord United States* v. *Ionia Mgmt.*, 555 F.3d 303, 310 (2d Cir. 2009) ("[A] constructive amendment occurs only when the trial evidence and jury instructions so modify the terms of an indictment that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." (internal quotation marks omitted)). The Second Circuit, however, has "consistently permitted significant flexibility in proof, provided that the defendant was given *notice* of the *core of criminality* to be proven at trial." *United States* v. *Rigas*, 490 F.3d at 228 (internal quotation marks and footnote omitted) (emphases in original). "In short, not all

Hon. Alison J. Nathan
March 5, 2017
Page 7

modifications constitute constructive amendments." *United States* v. *Salmonese*, 352 F.3d 608, 621 (2d Cir. 2003); *see also United States* v. *Heimann*, 705 F.2d 662, 666 (2d Cir. 1983) ("[P]roof at trial need not, indeed cannot, be a precise replica of the charges contained in an indictment.").

The "core of criminality" of the conspiracy charged in Count Three is an agreement among Lebedev, Gross, and their co-conspirators to make corrupt payments to Gross (and for Gross to receive such corrupt payments) in exchange for influencing the decisionmaking of Gross in connection with the business of HOPE FCU, and to obstruct and make false statements to the NCUA in connection with the NCUA's examinations of HOPE FCU. (Indictment ¶¶ 23-26). HOPE FCU's processing of ACH transactions for Kapcharge (including ACH transactions that Kapcharge processed for Coin.mx) is clearly encompassed within the core of criminality of Count Three, as it clearly is a decision of HOPE FCU's business and occurred only after the conspirators agreed to make the corrupt payments. *See United States* v. *Stitsky*, 536 F. App'x 98, 102, 103 n.3 (2d Cir. 2013) (fraudulent acts "not specifically identified in the indictment as overt acts in furtherance of the scheme" nevertheless "fall squarely within the charged scheme"—and thus are admissible as direct evidence of the conspiracy and do not give rise to constructive amendment (internal quotation marks and brackets omitted)); *United States* v. *Salmonese*, 352 F.3d at 621 (no constructive amendment where Government proved "unalleged overt acts" in furtherance of charged scheme)  Indeed, neither defendant has sought to preclude evidence regarding HOPE FCU's processing of ACH transactions for Kapcharge that pre-dates the falling-out between Gross and the Collectables Club group.

What remains of each defendant's complaint is that certain evidence post-dating the falling-out should not be considered against him. But the Indictment provided notice by defining the time period of Count Three through 2015. Furthermore, the limiting instructions proposed above mitigate the concerns raised by the defendants.

### E. A Withdrawal Instruction Is Not Warranted

The Government has discussed at length in its prior filings why there is no factual basis for the claim that Gross withdrew from the conspiracy at the time of the falling-out with his co-conspirators from the Collectables Club after the November 22 meeting. In short, Gross never cut ties with other co-conspirators, as he continued working with other co-conspirators from Kapcharge and HOPE FCU to further the goals of the conspiracy. Indeed, the evidence shows that Gross and the individuals from Kapcharge began conspiring well before the falling-out with the Collectables Club, and continued to conspire to achieve their original objectives until the NCUA conserved the credit union in October 2015. There is likewise no factual basis for any claim that Lebedev withdrew from the conspiracy. He never took any steps to affirmatively disavow the conspiracy. And even if the falling-out between Gross and the Collectables Club group could somehow be credited as an affirmative step by Lebedev, he nevertheless continued to work with his co-conspirators from the Collectables Club to further the goals of the conspiracy, including by signing a false letter sent to the NCUA in January 2015.

Hon. Alison J. Nathan
March 5, 2017
Page 8

Furthermore, even if the jury could conclude as a factual matter that Gross and Lebedev withdrew from the conspiracy as a result of the falling-out between Gross and the Collectables Club, the withdrawal instruction still would not be warranted here because withdrawal is not a defense to the conspiracy charge in these circumstances. The falling-out took place in late November or early December—months after Gross and Lebedev joined the conspiracy and after numerous overt acts in furtherance of the conspiracy. Therefore, it is simply not true under the law that withdrawal at the time of the November/December falling-out is a defense to the conspiracy charge. *See Smith* v. *United States*, 133 S. Ct. 714, 719 (2013) ("Withdrawal terminates the defendant's liability for postwithdrawal acts of his co-conspirators, but he remains guilty of conspiracy."). For withdrawal to serve as a defense to the conspiracy charge, Gross and Lebedev would each have to show that he withdrew from the conspiracy prior to the first overt act in furtherance of the conspiracy—something that neither defendant has ever claimed.[2]

Should the Court nevertheless decide to include a withdrawal instruction in the jury charge, the Government requests the edits and additions indicated in track changes in the attachment to this letter.

**F.     A Multiple Conspiracies Instruction Is Not Warranted**

Gross requests a multiple conspiracies charge. The Government opposes such a charge as unnecessary in light of the Government's proposed limiting instruction. Lebedev also opposes the multiple conspiracies charge.

Should the Court nevertheless decide to include a multiple conspiracies instruction in the jury charge, the Government requests that the Court use the version attached to this letter, which is adapted nearly verbatim from the standard instruction in Sand (Instruction 19-5). The version submitted by Gross, which also appears to be adapted from Sand, inexplicably deletes certain words and clauses, switches the order of certain paragraphs, and inserts unnecessary language.

---

[2] The exception to this general principle is if a mid-conspiracy withdrawal would permit the defendant to raise a statute of limitations defense. *See Smith* v. *United States*, 133 S. Ct. at 719 ("Withdrawal also starts the clock running on the time within which the defendant may be prosecuted, and provides a complete defense when the withdrawal occurs beyond the applicable statute-of-limitations period"). But that is not the case here.

## Conclusion

      For the foregoing reasons, the Court should reject the defendants' proposed limiting instructions and give the instructions proposed by the Government.

Respectfully submitted,

PREET BHARARA
United States Attorney

By:     _____/s/_____
     Eun Young Choi
     Daniel S. Noble
     Won S. Shin
     Assistant United States Attorneys
     Southern District of New York
     (212) 637-2187/2239/2226

Cc:     Kristen Santillo, Esq.
          Henry Klingeman, Esq.
              *Attorneys for Trevon Gross*

          Eric Creizman, Esq.
          Melissa Madrigal, Esq.
              *Attorneys for Yuri Lebedev*

Hon. Alison J. Nathan
March 5, 2017
Page 10

## Withdrawal

Page 40:

1  Instruction No. 27: Count Three: Withdrawal from the Conspiracy

2  The Defendant has raised the defense that he was not a member of the conspiracy

3  because he withdrew from the conspiracy prior to the commission of the first overt act in furtherance of the conspiracy.[3] Once a person joins a conspiracy, that person remains a member until he withdraws from it.[4] Any withdrawal must be complete and it must be done in good faith.[5] ~~I instruct you~~

4  ~~that~~ But it is a defense to the charge of conspiracy that a Defendant withdrew from the conspiracy

5  before the commission of ~~an~~ the first overt act in furtherance of the conspiracy. A person can withdraw from a conspiracy by taking some affirmative steps to terminate or abandon his participation in, and efforts to promote, the conspiracy.[6]  In order to withdraw from the conspiracy, the Defendant

6  must take some definite, decisive, and affirmative action to disavow himself from the conspiracy

7  or to defeat the goal or purpose of the conspiracy.

8  Merely stopping activities or cooperation with the conspiracy or merely being inactive for

9  a period of time is not sufficient to constitute the defense of withdrawal.

10  In deciding if a Defendant took a step to disavow or defeat the conspiracy, you may

11  consider whether he told others in the conspiracy that his participation had ended, whether the

12  Defendant took steps to correct prior assistance to the group, and whether he attempted to

13  remedy any past act or attempted to prevent any further progress of the conspiracy.

---

[3]  *See Smith* v. *United States*, 133 S. Ct. 714, 719 (2013) ("Withdrawal terminates the defendant's liability for postwithdrawal acts of his co-conspirators, but he remains guilty of conspiracy.").
[4]  *See* Sand, Modern Federal Jury Instructions—Criminal, Instr. 19-10; *Smith* v. *United States*, 133 S. Ct. at 719 ("Since conspiracy is a continuing offense, a defendant who has joined a conspiracy continues to violate the law through every moment of the conspiracy's existence, and he becomes responsible for the acts of his co-conspirators in pursuit of their common plot."); *United States* v. *Salmonese*, 352 F.3d 608, 615 (2d Cir. 2003) ("[A]bsent withdrawal, a conspirator's participation in a conspiracy is presumed to continue until the last overt act by any of the conspirators." (internal quotation marks omitted)).
[5]  *See* Sand, Modern Federal Jury Instructions—Criminal, Instr. 19-10.
[6]  *See* Sand, Modern Federal Jury Instructions—Criminal, Instr. 19-10.

Hon. Alison J. Nathan  
March 5, 2017  
Page 11

It is not sufficient to constitute the defense of withdrawal for a defendant to sever ties with some but not all members of the conspiracy.[7] Furthermore, the defendant must not take any subsequent acts to promote the conspiracy, such as steps to conceal the conspiracy, and must not receive any additional benefits from the conspiracy.[8]

14  The Defendant has the burden of proving that he withdrew from the conspiracy by a

15  preponderance of the evidence. To prove something by a preponderance of the evidence means

16  to prove that it is more likely true than not true. It is determined by considering all of the

17  evidence and deciding which evidence is more convincing. In determining whether the

18  Defendant has proven that he withdrew from the conspiracy, you may consider all relevant,

19  admissible evidence. If the evidence appears to be equally balanced, or if you cannot say upon

20  which side it weighs heavier, you must resolve this question against the Defendant. It is

Page 41:

1  important to remember, however, that the fact that the Defendant has raised this defense does not

2  relieve the Government of its burden of proving that there was an agreement, that the Defendant

3  knowingly and voluntarily joined the conspiracy, and that an overt act was committed in

4  furtherance of the conspiracy. Those are things that the Government still must prove beyond a

5  reasonable doubt in order for you to convict the Defendant of the crime of conspiracy.

---

[7]   *United States* v. *Berger*, 224 F.3d 107, 119 (2d Cir. 2000) ("*[T]otal severing* of ties with the enterprise may constitute withdrawal from the conspiracy." (emphasis added)); *United States* v. *Minicone*, 960 F.2d 1099, 1108 (2d Cir. 1992) (holding that although the defendant had a falling out with one co-conspirator, he nevertheless "maintained his connection with the conspiracy" and had not withdrawn, as evidenced by the defendant's ongoing work with other members of the conspiracy).

[8]   *United States* v. *Berger*, 224 F.3d at 118 ("[T]he defendant must not take any subsequent acts to promote the conspiracy, and must not receive any additional benefits from the conspiracy."); *United States* v. *Eisen*, 974 F.2d 246, 269 n.8 (2d Cir. 1992) ("acts or statements designed to conceal an ongoing conspiracy are in furtherance of that conspiracy").

Hon. Alison J. Nathan
March 5, 2017
Page 12

## Multiple Conspiracies

In this case, the defendants contend that, as to Count Three, the government's proof fails to show the existence of only one overall conspiracy. Rather, they claim that there were actually several separate and independent conspiracies with various groups of members.

Whether there existed a single unlawful agreement, or many such agreements, or indeed, no agreement at all, is a question of fact for you, the jury, to determine in accordance with the instructions I am about to give you.

When two or more people join together to further one common unlawful design or purpose, a single conspiracy exists. By way of contrast, multiple conspiracies exist when there are separate unlawful agreements to achieve distinct purposes.

Proof of several separate and independent conspiracies is not proof of the single, overall conspiracy charged in Count Three, unless one of the conspiracies proved happens to be the single conspiracy described in the indictment.)

You may find that there was a single conspiracy despite the fact that there were changes in personnel by additions of new members or loss of old members, or changes in activities, or both, so long as you find that some of the co-conspirators continued to act for the entire duration of the conspiracy for the purposes charged in the indictment. The fact that the members of a conspiracy are not always identical does not necessarily imply that separate conspiracies exist.

On the other hand, if you find that the conspiracy charged in Count Three did not exist, you cannot find any defendant guilty of the single conspiracy charged in Count Three. This is so even if you find that some conspiracy other than the one charged in Count Three existed, even though the purposes of both conspiracies may have been the same and even though there may have been some overlap in membership.

Similarly, if you find that a particular defendant was a member of another conspiracy, and not the one charged in Count Three, then you must acquit the defendant of the conspiracy charge in Count Three.

Therefore, what you must do is determine whether the conspiracy charged in Count Three existed. If it did, you then must determine the nature of the conspiracy and who were its members.