UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 15 Cr. 769 (AJN)

YURI LEBEDEV and TREVON GROSS,

Defendants. Jury Trial

------------------------------x

New York, N.Y.
February 22, 2017
9:04 a.m.

Before:

HON. ALISON J. NATHAN,

District Judge
And A Jury

APPEARANCES

PREET BHARARA
United States Attorney for the
Southern District of New York
BY: EUN YOUNG CHOI
DANIEL S. NOBLE
WON S. SHIN
MICHAEL CHANG-FRIEDEN, Paralegal
Assistant United States Attorneys

CREIZMAN, PLLC
Attorneys for Defendant Yuri Lebedev
BY: ERIC M. CREIZMAN
MELISSA MADRIGAL
JONATHAN MICHAELSON, Paralegal

KROVATIN KLINGEMAN, LLC
Attorneys for Defendant Trevon Gross
BY: KRISTEN M. SANTILLO
BY: HENRY E. KLINGEMAN

(Trial resumed; jury not present)

THE COURT: Preliminary matters to take up?

I did receive this morning an in limine on behalf of Mr. Gross and a response from the government. I have reviewed those.

Ms. Santillo, if you want to take a moment to respond to the government's opposition, I'm happy to hear you.

MS. SANTILLO: Sure. So I think the main objection we have is to the sort of prejudicial connotation of the term "payday loans". And I think if you look at the government's letter where they describe what a payday loan is, it says, "a payday loan is generally described as a short-term, extremely high interest loan that is typically due on the borrow's next payday." So within that phrase is "short-term", "extremely high interest", "typically due", and those are all subjective terms.

There are different laws in every jurisdiction with respect to what a payday loan is, and so my real concern is basically having this loaded term used during the examination. And if we were to call it "short-term loans" I think we would be fine. They would have to establish the terms of these loans in order to say why there's anything problematic about it. There's nothing illegal about it.

THE COURT: So your specific application would be to have the government and all of its witnesses use the phrase

"short-term loans" rather than "payday loans", is that the specific --

MS. SANTILLO: Yes. Or if there's another -- you know, what is it? Because it's not even clear to me exactly -- some of these companies do have a lot of different things. Like, for example, Kapcharge processes transactions for TransferWise, which is the vast majority of the ACH transactions that were processed at the credit union, and that has nothing to do with payday loans.

So some of these businesses are doing other things besides what the government will generally call payday loans, and they're going to say, 'Oh, do you know that Kapcharge was processing payday loans?' First of all, what does that mean? Second of all, what does that mean in the context of their business?

So I think if they have a specific issue with a particular practice at the company that was going through the credit union then we should talk about that in a granular way. So if "short-term" doesn't solve what they deem to be problematic about it --

THE COURT: What if the witness' factual testimony -- if that's a word that's used to describe certain categories of loan instruments?

MS. SANTILLO: Well, I think they would have to describe their basis for why they would use that connotation.

Because I don't think it's fair to say, for example, to members of the HOPE Credit Union, as they put in their letter, 'Have you ever heard about payday loans?' And they say, 'No,' and then someone says, 'Have you ever heard about check cashing places?' It's an umbrella term that applies to various things, and it has a lot of potential to be problematic if you use something that, you know, when the government's own definition is so loose.

THE COURT: Who will I hear from?

MR. NOBLE: Your Honor, the Court's exactly correct. Witnesses will use the term "payday loans" because that's how they referred to this type of financial product. The articles that Ms. Santillo cited to the Court generally refer to "payday loans". It's a term of art that's used in the financial industry. It describes a particular type of financial product that's generally tied to the lender's repayment of a loan on their payday. They take out loans in anticipation of a paycheck. They're high interest, short-term, typically low-dollar-amount loans. The industry generally refers to them as "payday loans". The witnesses will refer to them as "payday loans" because that's the type of business that they knew they were engaged in. Kapcharge itself, its employees, Anthony Murgio, everyone refers to them as "payday loans", or "PDL" for short. You'll see that term come up in emails, it comes up in other documents, and the witnesses -- it would be unnatural and

unfair and potentially confusing to the jury not to allow the witnesses to describe this particular type of financial product for what it is.

THE COURT: All right, thank you.

MR. NOBLE: There's nothing inherently evil about them, either, and the government is not going to be arguing that. It's just that, as we explained in our brief, there are certain other due diligence and policies and procedures that a credit union has to have in place if they're going to be engaged in processing for payday lenders.

THE COURT: I deny the motion, or overrule the defendant's motion on behalf of Mr. Gross.

The government's letter -- this was filed on ECF?

MR. NOBLE: We did file it on ECF.

THE COURT: I will ask, maybe because of the late hour you didn't have access to ECF, if you can please do ECF so it becomes part of the record. But I understand the timing issue. But if you would go back at some point this evening and file your letter on ECF, Ms. Santillo, so that it is part of the record on the docket.

But for the reasons stated in the government's letter dated February 22nd, 2017, there are three categories of arguments as to the relevance of evidence that may include discussion of payday loans. I do not find, based on the showing that's been made, that that relevant evidence is

outweighed by any unfair prejudice based on the term "payday loans". Certainly, defense can cross examine witnesses as to the meaning of the loans, but it is not unduly prejudicial, and I think it would be artificial and unfair and confusing to the jury to try to force witnesses to use some language other than the term of art that has been proffered is used and appears throughout the evidence and, in any event, I don't find the term unduly prejudicial, so I will deny that motion.

Other matters I could take up? Go ahead.

MS. SANTILLO: Your Honor, could I make a followup request which would be, you know, in the instructions to the jury, when they first came in, we had an instruction about how Bitcoin is not unlawful. I'd like to propose an instruction about how payday lending is not unlawful, and how this term has different meanings in different jurisdictions, because I wanted to just take the sting out of that. I mean, it's specifically an NCUA policy not to stop credit unions from working with these kinds of businesses, and I think that that's a legal definition in a lot of jurisdictions.

THE COURT: Mr. Noble.

MR. NOBLE: Judge, payday lending is not a legal definition, it requires no legal instruction, it's a factual matter, and I believe defense counsel can --

THE COURT: Ask on cross examine?

MR. NOBLE: -- ask on cross examine about this.

THE COURT: I agree with that. The reason for making the special instruction regarding the legality of Bitcoins, I think, is, given the potential for prejudice that does inhere in that term, the lack the familiarity with it as a general matter, and the centrality of that, particularly to the charge regarding unregulated money transfer and the like, I don't think it's comparable, and I see no reason why the same point can't effectively be made through cross examination. I don't understand the government to -- and certainly it would be a concern if there were evidence to -- suggest illegality of payday loans, so I will deny the followup request.

Other matters to take up?

MR. SHIN: Your Honor, just one other point. This is with respect to Ricardo Hill, who we expect will be testifying today.

THE COURT: Yes.

MR. SHIN: He has signed, pursuant to a cooperation agreement with the government, and one of the relevant conduct items in his cooperation agreement that he disclosed and that's covered by the agreement is payment via cocaine for some prostitutes. And we've reached agreement with defense counsel that the government does not plan to specifically elicit the fact that he was paying prostitutes as it was the general testimony that he was paying others with the cocaine, and they've agreed not to cross examine him on that particular

point in light of the potential for undue prejudice with the jury. I just wanted to note that agreement on the record, your Honor.

MR. KLINGEMAN: As I understand it, we are permitted to cross examine Mr. Hill to the effect that he used cocaine to pay others for services and not to mention "prostitutes", and that's what I hear from the government, that's what I certainly agreed to. I'm not going to mention prostitution or sex activity.

THE COURT: Okay. Is that consistent with the government's --

MR. SHIN: It is, your Honor.

THE COURT: All right. So basically, using "services" as a substitute for "prostitution".

MR. SHIN: Right. I think the way he has put it, and during our meetings, is that he paid people that he owed money to in cocaine on some occasions, which I think is consistent with what Mr. Klingeman is saying.

THE COURT: Okay.

Mr. Creizman, you agree with that?

MR. CREIZMAN: I agree. That's fine.

THE COURT: Okay.

MR. CREIZMAN: I didn't plan on even crossing on that, but that's fine, now I have that option.

THE COURT: All right.

What else can I take up?

Mr. Klingeman, did you have something? You looked, before Mr. Shin stood up, as though you had something.

MR. KLINGEMAN: No, your Honor.

THE COURT: Nothing else? All right.

Let me just say thank you for flagging that issue on the payday loan matter in advance. It helped me to be able to consider it before coming down, so I thank you for that. I know time is short. I appreciate it.

We will wait until we have our jury, and I'll see you in about 15 minutes. Thank you.

(Recess)

THE COURT: We have all our jurors. I continue to be impressed.

Mr. Klingeman.

MR. KLINGEMAN: For the benefit of juror number 4, are you planning to reread the instruction?

THE COURT: I will. I will just, after welcoming them, say, "Because of an indication that there was difficulty hearing the two limiting instructions given at the end of the day, I will repeat them," and then repeat them.

MR. KLINGEMAN: Thank you.

THE COURT: Thank you.

Other matters to take up?

There were a couple of scheduling questions posed to

Ms. Nuñez from a couple of the jurors. I have those. I want to bring them out on time. It's nothing pressing so I'll raise them with you either at the beginning or the end of the lunch break.

Please bring in the jurors. Our witness can return to the stand.

MR. NOBLE: There are no witnesses. We will be reading more emails.

THE COURT: But only for a very brief period of time. In seriousness, how long do you anticipate for the reading?

MR. NOBLE: We do have a number of emails that we'd like to read, so it probably will go about an hour and a half.

THE COURT: Really?

MR. NOBLE: They're good.

THE COURT: Well, I'm giving you room, but I really -- at some point I'm going to have to -- you've made an assessment as to their necessity for your case, but I'll be paying attention.

MR. NOBLE: We can represent these are very necessary to our case.

(Continued on next page)

(Jury present)

THE COURT: Good morning, members of the jury, and thank you again for your timeliness and your diligence. It's greatly appreciated.

I did receive an indication at the end of the day that there may have been some trouble hearing the limiting instructions I gave at the end of the day so we're going to begin with me just repeating those limiting instructions and then return to the government's direct case.

One limiting instruction with respect to Mr. Yuri Lebedev. You have heard testimony from the first two witnesses about alleged illegal activity not charged in the case, including internet gambling and securities fraud. This testimony has been presented to you solely as background relevant to prove the existence of relationships among certain individuals whom the government alleges were part of a broad conspiracy that the government alleges Mr. Lebedev joined. The evidence does not suggest Mr. Lebedev knew of or participated in internet gambling or securities fraud, and the government does not allege that he was. Therefore, I instruct you that you may consider this testimony against Mr. Lebedev only to determine whether a conspiracy existed and not whether he joined the conspiracy.

With respect to Mr. Gross. You have heard testimony from the first two witnesses about alleged illegal activity not

charged in this case, including internet gambling, securities fraud, and involving the so-called Darknet. This testimony has been presented to you as background. I instruct you that you may not consider this testimony against Trevon Gross as it is not offered against him.

With that, Mr. Noble, Ms. Choi, you may resume with reading of emails and chats. Go ahead

MR. NOBLE: Thank you, Judge. These are some of the emails that were admitted yesterday into evidence.

Can we bring up Government's Exhibit 1401, please? It's going to be Mr. Shin and myself who will be reading these emails.

THE COURT: Okay.

MR. NOBLE: Government's Exhibit 1041 is an email between Anthony Murgio and Michael Murgio. Beginning with the bottom portion, on Sunday, October 20th, 2013, Anthony Murgio wrote, "1, bankruptcy," and then he included a URL. "Speak to him about what it would take to get the bankruptcy cleared up. 3, we need to try and settle with creditors and clean my record. 2, setting up a credit union. Speak to them about consulting services. Don't speak too much. We have an association that provides services to our members. We are a collectibles and memorabilia club that wants to offer financial services to our members. 1," there's a URL. "2, see what it would cost to hire a consultant to help us get a credit union

set up. 3, we want a local credit union, not a federal credit union, I think. Love you, thanks."

On Sunday, October 20th, 2013, Anthony Murgio wrote, "You included a website whose domain name is www.cvcu.coop."

Then on October 20th, 2013, Anthony Murgio wrote, "We need check 21 services and ACH services," and then he included a URL.

Can you bring up Government's Exhibit 1044? This is another email chain between Michael Murgio and trustee at trustee@collectpma.com. On Saturday, November 30th, 2013, trustee wrote, "Dad. Can pay you 5K if you can find a distressed credit union our association can take over. Please let me know if you're interested. We need to find one in the next month by Jan 1."

MR. SHIN: On Sunday, December 1st, 2013, at 8:52 a.m., Michael Murgio wrote, "So you need me to search for a failing credit union that you can take over? Would the current people stay in their positions? That might be easier since you need someone who knows what they are doing."

MR. NOBLE: On Sunday, December 1st, 2013, trustee wrote, "Yes. And we need to take it over. We can pay them to replace their positions. We need our people in place of them. We need control. Can't invest without control."

MR. SHIN: On December 1st, 2013, Michael Murgio wrote, "Yes, you need your people in control, but it might make

it easier to keep some of their people in place that have the banking background that is required by law. I will begin searching. I think you need a federal credit union so you can operate in all states."

MR. NOBLE: Please bring up Government's Exhibit 1051-A. This is an email sent by Anthony Murgio to Mark Francis, mark@capitalinc.com, on April 2nd, 2014, with the Subject: Here. The body reads, "Credit union's spreadsheet."

Please bring up Government's Exhibit 1051-B, which is the attachment to this email. Just slowly scroll through this spreadsheet and pause when you come to line 41. Pause there. Can you highlight row 41?

Column A reads, "Could be amazing." Column B reads, "23265." Column C reads, "Helping Other People Excel." Column D reads, "New Jersey." Can you scroll over? Column G reads, "www.hope-fcu.com. Column H reads, "Wyatts, George." Column J reads, "106 $7,074."

You can take that down. Can you please bring up Government's Exhibit 1071? This is an email from Trustee Collectibles. Trustee at collectpma.com. Sent to info@hopecathedral.com on April 2, 2014. Subject: Partnership with HOPE FCU. "Hello. We are a memorabilia and financial education association with over 14,000 members. We are interested in joining a credit union that we can add value to. We have many members that are tech savvy and are interested in

adding many accounts in technology to a credit union. Please let us know who would be the best person in your organization to speak to. Regards, Mike Murgio."

Can you please bring up Government's Exhibit 1072-A? This is an email sent by Trustee Collectibles to tgross@hope-fcu.com. On April 2, 2014 with a Subject: HOPE Credit Union opportunity. The email reads, "Mr. Gross. My son Anthony reached out to you to discuss an opportunity with your credit union. We are interested in starting our own credit union or possibly bringing our business to an existing credit union. We started a memorabilia and financial guidance association about a year and a half ago. We have been able to attract many members, and now we're looking to provide a credit union for our members.

What we are looking to accomplish. Option 1, bringing our accounts and members to your existing credit union. We would be looking to be able to offer our members checking accounts, loans, debit cards, ACH, mobile banking, mobile wallets. Option 2. Paying you and other officers a nice monthly fee for a couple of years for the ability to take over the credit union. This will also take any liability off current officers. This option is because if we have more control over the credit union, we will then invest time and money into developing the technology and trying to grow the credit union. Your existing members and everyone else will

still have complete access to utilizing all services that are currently available, as well as utilizing new technology we will be implementing. Option 3, utilizing HOPE CU for a period of time while utilizing your knowledge and contacts to start our own credit union and pay a consulting fee for the help. We look forward to your response. Regards, Mike Murgio." And then there's a LinkedIn link.

Can you bring that down? Can you bring up 172-B? Just blow up the top portion, which is the reply.

MR. SHIN: On April 2nd, 2014, Trevon Gross, using the email address trevongross@me.com wrote to trustee@collectpma using the Subject line: HOPE Credit Union opportunity. "Hey Mike. Glad to hear from you. Option 3 is the most plausible as we just assumed this credit union two years ago and it is a part of our mission. We do have mobile banking and online banking. The only thing we do not have, but are about to introduce, is debit cards. We have checking, loans, ACH/wires, online bill pay and financial counseling. Let me know if this works for you. I am very willing to meet to discuss this further. Trevon Gross."

MR. NOBLE: Can you bring up Government's Exhibit 1072-D? Just blow up the top portion. This is an email sent from Trustee Collectibles to Trevon Gross on April 3rd, 2014 with the Subject: HOPE Credit Union opportunity. "Anthony here. It was great speaking with you

this afternoon. My father is out of town until next Thursday. I can fly from Montreal to New Jersey tomorrow until Sunday or Monday. I have some friends there and would like to meet with you, as well. Please let me know what works for you and I will make it work."

Can you please bring up Government's Exhibit 1074-B? Can we blow up the bottom portion first? This is an email sent on April 7th, 2014, by Michael Murgio to Trevon Gross. "Mr. Gross. I'm sorry I was unable to make the meeting last week. Anthony told me it went well and he enjoyed the opportunity to meet and discuss working together. I look forward to meeting you in the near future and creating a relationship that will benefit all parties."

MR. SHIN: At 10:33 p.m. the same day, Trevon Gross wrote, "Thanks so much. I believe it was productive and is the beginning of an innovative partnership. In order to finalize the MOU, I will need the organization's name and address. I should have a draft from our team by Wednesday, if not before. Thanks, Trevon Gross."

MR. NOBLE: Last email in the chain was sent by Trustee Collectibles, copying Michael Murgio, to Trevon Gross on April 8th, 2014. "Trevon. The organization's name is Collectables Club PMA. Address, 11618 River Chase Run, West Palm Beach, Florida, 33412."

Can you please bring up Government's Exhibit 174-D?

Just to orient the jury, this is an email exchange between Trevon Gross, Michael Murgio, and Trustee Collectibles, which is Anthony Murgio.

Can we please flip to the second page? This picks up where the last email left off. Sorry, go back to the first page, the bottom. This is an email sent on April 11th, 2014 by Trustee Collectibles, Anthony Murgio, which reads, "Mr. Gross. Hope all is well. We wanted to check in to see how the MOU was coming along. We are assessing various options right now and wanted to verify that this is something you are still interested in exploring. Regards."

MR. SHIN: On April 11th, Trevon Gross wrote to Trustee Collectibles with a copy to Michael Murgio. "Hey. Here is the draft of the agreement. Let me know your thoughts. We see this as only a starting point, and we have already gotten our examiner's clearance for this partnership. In reality, we have also not taken off the table to assuming leadership in this CU. It would be dependent upon the success of this partnership. Trevon Gross."

MR. NOBLE: Can we flip forward a few pages in this exhibit to the attachment? Stop there. Can you just blow up the top half? The document reads, "Memorandum of understanding. This memorandum of understanding (The Memorandum) is made on this, April 11th, 2014, by and between Helping Other People Excel FCU of the address in Jackson, New

Jersey, hereinafter referred to as HOPE FCU and Collectables Club PMA of West Palm Beach, Florida, herein after referred to as "The Club" for the purpose of achieving the various aims and objectives relating to the strategic partnership for mutual advancement (The Project). Whereas HOPE FC and The Club desire to enter into an agreement in which HOPE FCU and The Club will work together to complete the project. And whereas HOPE FCU and The Club are desirous to enter into a Memorandum of Understanding between them setting out the working arrangements that each of the partners agree and necessary to complete The Project."

Can we flip down to the section titled "Cooperation" and blow up that section? "Cooperation. The activities and services for The Project shall include, but not limited to:

A. Services to be rendered by HOPE FCU include representation on the board of directors to lead the development and deployment of new technologies, products, and programs to benefit its members. Access to all products, services, and technology for the smooth integration of The Club into HOPE FCU. Assist in the acquisition or establishment of a new credit union.

B. Services to be rendered by The Club include:

Place five names in nomination for positions on the directors. Assist in building product and service infrastructure to offer more benefits to all our members,

including debit cards, e-document services, and separate branch establishment, pilot and deploy within NCUA regulations new products, services, and technologies, including but not limited to peer-to-peer lending, grant non-exclusive use of any products, services, and technology developed under this partnership to HOPE FCU.

Under a separate agreement, the details of this will be enumerated."

Can we blow up the next section called "Resources? "Resources. The partners will endeavor to have final approval and secure any financing necessary to fulfill their individual financial contributions at the start of the planning for the development of The Project.

A. HOPE FCU agrees to provide the following financial material and labor resources in respect to the project:

HOPE FCU will provide the basic technological infrastructure upon which this partnership will be built, and will liaise with the appropriate NCUA officials concerning regulations.

B. The Club hereby agrees to provide the following financial material and labor resources in respect to the project:

The Club will provide all labor and technology in order to serve its members and assume all costs related to integration with existing systems. The Club will cover all

operating costs associated with implementing new products, services, and technologies. The Club will donate blank towards the establishment of a reserve fund for future development."

Can we please flip to the last page? Blow up section letter D. Letter D reads, "Nothing in this memorandum shall obligate any partner to the transfer of funds. Any endeavor involving reimbursement or contribution of funds between the partners of this memorandum will be handled in accordance with applicable laws, regulations, and procedures. Such endeavors will be outlined in separate agreements that shall be made in writing by representatives of the partners involved and shall be independently authorized by appropriate statutory authority. This memorandum does not provide such authority."

Zoom back out. Then there are signature lines on behalf of Helping Other People Excel FCU, by Trevon Gross as chairman, and on behalf of Collectables Club PMA by Michael Murgio, its president. The document is currently unsigned.

Can we please bring up Government's Exhibit 1074-E? This is just a forwarding of a previous email chain from Trustee Collectibles, that's Anthony Murgio, on April 11th, 2014 to test@coin.mx. The subject is: Forward meeting. The body of the email just reads, "Boom."

Take that down. Can you please bring up Government's Exhibit 1075?

MR. SHIN: This is an email from Trevon Gross sent on

April 14th, 2014 to Trustee Collectibles, Subject: Meeting. The body of the email is, "Here is the updated MOU. Trevon Gross."

MR. NOBLE: Can you zoom back out? Below that on April 14, 2014, Trustee Collectibles, Anthony Murgio, had written, "Everything looks go. We -- the only thing is switching my father's role to treasurer. We do not have a president."

Can we please bring up Government's Exhibit 1076? This is an email sent by Michael Murgio to Anthony Murgio with an attachment sig page, and Subject: Sig page, on April 15, 2014. Can we zoom out and flip to the attachment? Just blow up the bottom section. Thank you.

Take that down and please bring up Government's Exhibit 1078. This is an email exchange between Michael Murgio, Anthony Murgio, and Trevon Gross. Can we flip to the next page? Sorry. Go back to the first page. Starting with the bottom email.

MR. SHIN: On April 17th, 2014, Trevon Gross wrote from tgross@hopecathedral.com. "Hey Mike. Great to talk with you. Here is a copy of the original documents that are associated with the new account. On one of the forms it still has our old name. This will be corrected. We have not talked about the donation yet, and I would like to get a sense of how this will happen in addition to covering the operational costs

for some of the upgrades like debit cards. I should have the proposal for the debit cards tomorrow. It takes 90 days from signing of agreement to have program implemented. Trevon Gross."

MR. NOBLE: Go back to the first page. On April 18, 2014, Michael Murgio responded to Trevon Gross, copying Anthony Murgio, "Hi, Trevon. Thanks for taking the time to walk me through some of the procedures. It helped me gain a much better starting point for learning about the CU operations. Anthony will be able to work out the donation process and the handling of the upgrades and associated operational costs with you. I've attached the executed signature page from the documents that you sent me. Once you send me the routing number, I will fund my account. Regards, Mike Murgio."

Can you please bring up -- actually, flip forward to the signature page, the attachment. Can we just blow up the top portion, please? This is a HOPE FCU membership application for Michael Murgio located in West Palm Beach, Florida. Take that down. Flip to the next page. You can take that down.

Can we bring up Government's Exhibit 1079? This is an email exchange between Anthony Murgio and Michael Murgio. Can we flip to the next page? Beginning with the email on April 19, 2014, Michael Murgio wrote to Anthony Murgio, "Good news. We will be able to segregate the Collectables Club members from the rest of the CU members. We will be able to

set our own fees for services. There appears to be a lot of flexibility."

Mr. Shin, will you read the portion of Anthony Murgio?

MR. SHIN: Later that day Anthony Murgio wrote, "Great. Any news on ACH abilities?"

MR. NOBLE: Let's go back up to the first page. On April 19, 2014, Michael Murgio wrote, "Yes. Right now they do not charge anything for sending money via ACH. He said that is because they want to get people to use the CU. When I asked how much it costs the CU to do an ACH, he said that he was not sure but it was 10 or 20 cents. Regards."

MR. SHIN: Anthony Murgio replied, "Are we on ODFI? Can do debit and credit with the business account? Who facilitates NSF issues, et cetera? If we are on ODFI then we are in control with nobody over us. Thank you for doing all this. This is very important on so many fonts."

(Continued on next page)

MR. NOBLE: On April 19th, 2014 -- oh, sorry -- Michael Murgio wrote: "We can set up business accounts. Not sure if CU is an ODFI or whether the company that does their back-end processing is the ODFI. Does it make a difference since the cost is so low anyway? Not sure exactly how NSF is handled."

MR. SHIN: And at 8:58 a.m. on the same day, Anthony Murgio wrote to Michael Murgio: "Well, only diff is if ODFI, we don't need to answer to anyone. It is less of a cost issue and more of a control our own destiny."

MR. NOBLE: Take that down and please bring up Government Exhibit 1081D.

This is an email exchange between Trustee Collectables, Anthony Murgio, and Trevon Gross on April 2nd, 2014.

Can you please flip to the third page.

MR. SHIN: On April 19, 2014, Trevon Gross wrote: "Hey, Anthony, your dad and I had a great first session, and things are moving forward. I wanted to follow up with you concerning two points of our agreement, the donation and the investment and debit cards/operational upgrades. Have you given thoughts to this? We are ready to go with debit cards and will take a 12K investment to launch it. From signing a contract, it takes 90 days to implement. Let me know your thoughts. Trevon Gross."

MR. NOBLE: On April 20th, 2014, Anthony Murgio responded: "Trevon, I hope your weekend is going well. My dad mentioned that you guys have been spending some time together and that things are looking pretty flexible. He is starting to see the potential value this can have for our members. I appreciate your responsiveness and openness with our organization up to this point. As for the debit cards, I think we would want to proceed with this option, but we would need to know how well our association is integrated. The same premise would go for the donation. Our association would want to establish our role in the credit union prior to making this contribution. We truly appreciate all the time and hospitality you have shown and feel that this is going to benefit both parties greatly. We would like to hear the possible opportunities/roles our association will have access to. If our association can analyze various options that your organization proposes, I believe we can more accurately value the cost benefit of the relationship. Look forward to your response."

MR. SHIN: On April 21st, 2014, Trevon Gross wrote: "Yes, it's been a busy, but good weekend. I thought our MOU enumerated our roles. Were these unclear or unacceptable? I presented the agreement to our board. Please let me know what clarity you seek."

MR. NOBLE: On April 21st, 2014, Anthony Murgio

responded: "From what I gather, this is a memorandum of understanding. It says something in the agreement about the final contract. That being said, I would like to offer the debit card service after one month of operation. We will pay for this. This will be used for everyone. You will also be able to utilize all of the features that we will build out for your service. As far as a large donation, we would be willing to do this upon our ability to have full control of a CU. We will then donate a large amount for your guidance along the way. After one month of running an operation, we can also make a small donation to the church or organization of your choice. So to organize my thoughts:

"(1) Within one month of operation: One, debit card program paid; two, unlimited free use of banking service technology; three, small donation, approx. $10,000 to organization/group of your choice.

"(2) New credit union or take over existing credit, HOPE or another, union with full control. One, large donation of 150K to organization of your choice; two, unlimited free use of banking service technology.

"How does this sound?"

MR. SHIN: On April 22nd, 2014, Trevon Gross responded: "Hey, Anthony. Thanks for the response. Here are some things we need to clarify:

"(1) What does 'after one month of running and

operating' mean? From my perspective, we are in operations right now as I have requested system access for your father and you so you can begin to get training, et cetera.

"(2) I think that the smaller donation amount is too small and the larger donation is too large. I believe in being fair in all things. Based on our current memorandum of understanding, you all are really going to function as a separate financial institution within the CU. I have been spending time working with CU South to see if you can get your own branded CU based software for the debit card as well to bear your logo. You have complete independence in the operational affairs of your members and co-departments as it relates to policy. Since NCUA only sees us as one, we will have to make certain that our policies are in keeping with NCUA regulations. This is why I recommended that you all move towards setting up your own branch in Florida, so your members can contact you directly. Even if we have to use a digital number, so that when people call, it will say for Collectables Club PMA, please push 2, and it would ring in Florida. I can say more, but I think you will see that we are flexible to give you everything you want. What I think is fair is 15K dollars up front, and 45 days of operation, another 15K dollars, then once we find you a CU or take over ours, this is still on the table, then 120K dollars would made as a donation. I am using a great deal of time to bring this partnership together, and I

think this will fairly recognize the seriousness with which we have taken this partnership and the value of having your own affinity financial institution.

"(3) As to debit cards, I really think waiting 30 days makes the CU less attractive to your members since they will not have a way to access their money immediately. For us, people can come to the branch, but since your members are all over, they will need a way to access cash easily. Of course, we will benefit from this, but it makes sense, as you will roll this out large-scale to your members.

"With this option, you will be no different from the old ING Direct, Capital One 360. I am available to talk about all this, and once we lock this down, we are prepared to execute a contract to solidify this deal. Our board is enthusiastic about this and ready to make it happen.

"It is a true win-win from our perspective."

MR. NOBLE: On April 22nd, 2014, Anthony Murgio responded: "We just wanted to get a business account and personal account set up and do some test transactions with ACH and transfer of money in and out once we do this, but can pay the 15K. As for debit, we may move quicker. We just want to make sure this is a good fit. If you would like to set up a time to speak to my dad, that would be great. I should be back in the States in a week. I will then go over everything with him. He can show me all of the functionality.

"I would like to try and get a business account for Collectables Club set up and have the ability to debit and credit our members' bank accounts for ACH."

Can you please take that down and bring up Government Exhibit 1082.

This is an email exchange between Trustee Collectables, or Anthony Murgio, Michael Murgio, and Trevon Gross.

Can we please flip to the second page.

On April 23rd, Trustee Collectables wrote: "Let me know your thoughts. I can have this completed in a week if you both like the design. It will be fully responsive, so it will work on mobile phones and tablets seamlessly. It will itemize and align properly no matter what device you are using, and there's a link to a Google Drive."

MR. SHIN: On April 23rd, 2014, Trevon Gross responded: "Looks good. What platform is this built on? We currently use a CMS that is flexible to accommodate this design, but if you have a designer who will do it, we can just change the DNS. We also have a WordPress platform. Just let me know what you need to move forward."

MR. NOBLE: On Wednesday, April 23rd, 2014, Trustee Collectables, Anthony Murgio responded: "Thanks. Will be WordPress Bootstrap 3."

April 23rd, 2014, Trustee Collectables then wrote:

"Thanks."

MR. SHIN: Later that day, Trevon Gross responded: "Let me know what content we need to create. We'll get right on it."

MR. NOBLE: Later, Anthony Murgio responded: "I will copy from the current site and add some new, and you can have time to review and edit with all of us. Will put it on a staging server for review in about one week. Then we can all review and make necessary revisions."

MR. SHIN: Trevon Gross responded: "Sounds good. Have you tried to open an account yet?"

MR. NOBLE: Anthony Murgio responded: "I have not yet. My father has, and I am going to set up a business account for Collectables Club."

Can you bring up Government Exhibit 1083.

This is an email from Michael Murgio to Anthony Murgio on April 25th, 2014, with a subject: "Trevon, we can do whatever we like."

Can you bring up Government Exhibit 1085.

This is an email exchange between Trevon Gross, Anthony Murgio, and Michael Murgio. On April 26, 2014, Michael Murgio wrote: "Hi, Trevon. I set up a personal checking account and will be able to fund it as soon as SunTrust verifies it. I want to set up a business account for Collectables Club. Do I use the same setup page and put

Collectables in the first name and Club as the last name, birth date would be date of incorporation, et cetera, or is there another online form specific to business accounts?"

MR. SHIN: Trevon Gross responded: "Yes, just set it up the way you mentioned, and then on Monday, if you are available, I will show you how to convert it to an organizational account. You should have your log-in by then, so you can begin exploring and learning the system."

MR. NOBLE: Can you please bring up Government Exhibit 1086.

This is an email from Michael Murgio to Anthony Murgio on April 29th, 2014, with the subject "Just got off phone." The body reads: "We will need to give Trevon the name of five board members."

Can you please bring up Government Exhibit 1088-A.

The bottom portion is an email from amurginc@gmail.com; subject, "HOPE Federal Credit Union to jnfreundt@hotmail.com, Wednesday April 30, 2014.

Anthony wrote: "Would you be interested in being on the board of a credit union I'm taking over? My dad will be on it. Tim, the guy at 101 before you, will be on it. Asking Rico as well. Working out everything now. Can let you know what it will require, if anything, in compensation. Just wanted to know if you would be interested."

MR. SHIN: Later that day, Jose Freundt responded:

"Yes, I would."

MR. NOBLE: Can you please bring up Government Exhibit 1089.

Same email that was sent by Anthony Murgio to Jose Freundt was sent to Rico at 7ricos@gmail.com on April 30th, 2014.

MR. SHIN: Rico responded: "Absolutely. Please let me know what is required. I am def interested."

MR. NOBLE: Would you please bring up Government Exhibit 1092-A.

MR. SHIN: On May 6, 2014, Trevon Gross wrote from tgross@hope-fcu.com to Trustee Collectables with the subject line "Agreement."

"Hey, Anthony, I met with our board last night, and though they are intrigued by your offer, they will not proceed until we have satisfied the initial terms of our MOU, which call for your organization to make a donation in the amount of 15K dollars and cover the expenses for debit cards. To date, we have held two training sessions, given complete back-office access to your organization, and created email accounts for the club and officers. We have also researched how to set up subaccounts, so our transactions, et cetera, are separated on our books. ACH transactions have been tested and worked successfully, and we have the process to set up automated ACH transactions.

"Please ACH 15K dollars to Hope Cathedral:" and then a routing number and an account number are set forth. "Please ACH 6K dollars to HOPE FCU to start debit card process, $2,500 to Shazam, and $3,500 to CU South for realtime balance availability and setup." And then a routing number and account number are set forth.

"Upon receiving these funds by Friday, May 9th, the executive board will meet and recommend for election to the board six (6) people from your organization. The six seats will give you the majority position on the board. The whole board will ratify your nomination on May 17th, by which time we would like to have received the second 15K dollars donation. Once your names are placed in nomination, the six people will be officially elected to the board at the June annual meeting. This is the only time when we can change board members. You will have to designate who among your new board will serve as chairman, secretary, treasurer, and supervisory committee chair. The existing board members will tender their resignations to be effective at your choosing. Before this vote happens, the remainder of the donation to assume control of the CU would need to be received.

"I will be the only board member to remain to assist in the transition as a consultant to interface with the NCUA examiner, set up your local office, and well as establish a branch in Florida, so you can have teller terminals and

printers, et cetera. We believe this is a prudent way. Please advise."

MR. NOBLE: Please bring up Government Exhibit 1093B.

This is an email exchange between Trevon Gross and Anthony Murgio on Wednesday, May 7, 2014, with the subject "Shazam contact information." Beginning with the email --

Please go back up.

-- on May 7, 2014, at 3:44 p.m., above: "The members want the funds to be held in some third-party escrow. Can we make this happen?"

MR. SHIN: Trevon Gross responded: "No. We have a signed agreement, and as you have acknowledged, we have kept our part. Based on the already executed agreement, we are due the 15K dollars. If you would like to put the larger donation in third-party escrow until the board election, I am fine with that."

MR. NOBLE: Later that day, Anthony Murgio responded: "Yes, that's what we were wondering."

MR. SHIN: And later that day, Trevon Gross responded: "Hey, Anthony. I wanted to follow up on the status of things."

MR. NOBLE: Could you please bring up Government Exhibit 1094.

This is a forwarded email from Anthony Murgio to Mark Francis, mark@kapitalinc.com, on May 8, 2014, with the subject "Agreement," and he's just forwarding the email that we

previously read.

Can you please bring up Government Exhibit 1101.

This is an email from Anthony Murgio to Yuri Lebedev on May 9, 2014, with the subject "Credit union board member."

"Yuri, this is the website for the credit union," which lists www.hope-fcu.com. They were a small credit union, 107 members, no full-time employees. I was trying to find small credit unions that would be willing to allow to add new technology by Bitcoin integration and peer-to-peer lending. Both of these industries are booming, but large banks and credit unions are too slow to keep up with the moving technology. I went to New Jersey to meet with them. Very nice guys. Pastor of a church. We came to an agreement that we would be able to have control of the credit union. We have asked the regulators if the peer-to-peer lending and BTC would be fine and have confirmation that both would be.

"Here is a company that Google invested in that is doing the peer-to-peer model, www.prosper.com. They bought a bank. Here is a link to the first bank integrating with the digital currency," and there's a URL to a coindesk.com article. "As you can see, these things are starting to happen, but the cornerstone is always having a financial institution that can move quick enough. We now have that institution.

"I have selected six people that I trust, one being a lawyer, to read over everything that has to do with legalities.

The credit union will sign the contract with a financial technology company that I control. This will give my financial technology the exclusive rights for anything that integrates with this credit union. For being an advisory member on the board, it requires one meeting a month for about one hour. For this, we can pay $5,000.

"Let me know if you are in or if you are in or have any questions."

Can you please bring up Government Exhibit 1105.

This is an email exchange between Trevon Gross and Anthony Murgio.

Can you flip to the next page.

On May 6, 2014, Trustee Collectables wrote: "The home page is just being finished. We will be adding the other pages in over the next few days."

And there is a link to CollectPMA.com/hope_wp.

MR. SHIN: Trevon Gross responded on May 9th: "The web page looks great. How can we make some content changes?"

MR. NOBLE: On May 9, 2014, Anthony Murgio responded: "It's all being updated, then we can make any changes we want. We will have a log-in."

MR. SHIN: Later on May 9th, Trevon Gross wrote: "Got it. We will also make provisions to transfer the domain to you all."

MR. NOBLE: Can you please go to Government Exhibit

1107-A.

This is an email from Trustee Collectables to Trevon Gross, Jose Freundt, and Michael Murgio on Friday, May 9, 2014, with the subject "Capital requirements doc."

"Trevon, glad the donation money hit the account. I found this link below. Is this what you were speaking of? I also attached a graph I found. Looks like the way to go is get a grant from individuals that are part of the CU or association. Where is this money kept? The banks? Bank account? Ha-ha. Or is it just on the balance sheet? It must be delineated."

There's a link to hallassociatesllc.com. "I have also copied Jose Freundt. He will be one of the board members that will be running many of the operations."

You can just flip to the attachment. The attachment is labeled "Table 4: Proposed Capital Categories." The column headings read "The Credit Union's Net Worth Classification Is," Net Worth Ratio," "Risk-Based Capital Ratio" and "Subject To The Following Conditions." The entry for well capitalized indicates, "The net worth ratio of 7 percent or above or a risk-based capital ratio of 10.5 percent or above, subject to the conditions that must pass both net worth ratio and risk-based capital ratio."

Take that down.

Can you please bring up Government Exhibit 1107-C.

Can we read the reply that Trevon Gross sent on May 9, 2014.

MR. SHIN: Trevon Gross wrote: "Yes, this is exactly what we were talking about. The donations can come from anyone, individual or corporation. They would be put on the books as miscellaneous income."

MR. NOBLE: Please blow up the very top header section. It indicates that this email chain was forwarded by Anthony Murgio to Mark Francis and shoula@kapitalinc.com on May 10, 2014.

Please bring up Government Exhibit 1108-A.

MR. SHIN: On May 12, 2014, Trevon Gross wrote to Trustee Collectables with a copy to Michael Murgio, in response to the capital requirements doc chain: "Good morning. The executive board has placed a nomination, the six names. This Saturday, they will be confirmed to be placed on the ballot for the June annual meeting. A couple of things need to happen ASAP:

"(1) Need to know officers - chairman, secretary, treasurer, supervisory committee chair. These are all mandatory positions. The supervisory committee serves as your internal auditors. Each month they review all aspects of the operations and report to the board. Only the committee chair can be a board member, while the others must be nonboard members, but still members of the CU. So you will need two

more people who can be appointed at the June meeting to serve on the SC.

"(2) How do you want operations handled? Operations manager or CEO, tellers, et cetera? And who that will be? I have offered under a consultancy agreement to help train and make a smooth transition, but we need to nail down the particulars.

"(3) All new members will need an active account funded in the CU before Saturday.

"(4) Need abbreviated resume on all board members. The NCUA passed a new regulation that board members have to demonstrate financial competence through work experience, degrees in accounting or take a financial literacy class, and document the board minutes. This is in response to many boards stating that they did not know how to read financial statements and didn't understand that their CU was in trouble.

"(5) Final installment on current memorandum of understanding wired to PNC Bank.

"(6) I'd like to use our attorney, Wigginton & Associates, as the third-party escrow until we hold the election in June. We can execute a confidential MOU that will govern when funds are to be released, et cetera.

"Recap of next steps." First bullet point: "Final nomination and ratification of change in board will happen this Saturday."

Next bullet point: "We then have one month to put all the pieces in place as to operations, setting up a branch in Florida, establishing presence in Lakewood, approving new policies as it relates to fees, et cetera, so we can program into the system and get ready for new members."

Next bullet point: "At the conclusion of June annual meeting, current board members, except me, will tender their resignations effective September 1st. This date is set because we have our annual examination on July 7th. They like to come back and meet with the board about a month afterwards to discuss findings, and we don't want them to see an entirely new board at that meeting. That normally happens in August. All members have agreed to see this through to September 1. After the June meeting, you all will have majority vote on the board, so there is no turning back at that point."

MR. NOBLE: Can you please bring up Government Exhibit 1108-B.

This is an email exchange on the same thread, capital requirements, between Trevon Gross, Michael Murgio, and Trevon Gross.

Can we please flip to the second page.

Beginning with the email on May 12th, 2014, at 7:02 p.m., near the bottom, from Anthony Murgio: "I was thinking to have a couple of the old members as supervisory committee or onboard, so the transition does not look so

drastic, unless you think it does not matter. Thoughts?"

MR. SHIN: Later that day, Trevon Gross responded: "I think on supervisory committee is good, one on supervisory and two stay onboard. We would be the clear minority, but it would also allow us to advocate for our members and set policy for our members. Also, depending on how you want operations, some of them could serve as tellers while we train your people. Whatever you are comfortable with."

MR. NOBLE: Later that day, Anthony Murgio responded: "Okay. So we will put Kendra Pannitti on supervisory committee, and then you will have one onboard, you and one on supervisory. Also, can we just create accounts for these members, and the association will deposit funds in their accounts for them, or do they have to go through the signup process on the site?"

MR. SHIN: Trevon Gross responded: "If you give me all the information, I can create their accounts, and then you all can transfer money into them. Okay about Kendra. Will need resume. I would put two on board, me plus one, and one on supervisory committee. There are periodic meetings when the examiner comes, and if I am not available, then there will be another local board member. Let me know if you are okay with this."

MR. NOBLE: Later in the day, Anthony Murgio responded: "What info do you need? Also, would like to know,

after full integration, that we can replace with our own members."

MR. SHIN: Trevon Gross responded: "It's a lot of personal information. I'd prefer you all get it, if you don't already have it, and open the accounts, and then I can scan paperwork and get you all to sign it. We need driver's license number, Social Security, address, at a minimum. Most definitely. We would only need to maintain the capacity to serve our members."

MR. NOBLE: Anthony Murgio responded: "I will have them sign up online. Easier."

Can you please bring up Government Exhibit 1110.

This is an email from Anthony Murgio sent on May 12, 2014, with the subject "Some small things needed to Kevin Tomasso, Yuri Lebedev, Jose Freundt, Little Rico, Tim Ellrich and Chad Lio."

"When you guys have a chance, please send me your resume. This is needed to be on file. If you have any previous banking or financial sector experience, please make sure that it is on the resume. If you have any financial degree, please also include on the resume. You will formally become board in June, and first payment starts July. These will be the three mandatory chairs we will be filling, the others will be nonmandatory: Chairman, Jose; Secretary, Rico; Treasurer, Yuri."

Can you please bring up Government Exhibit 1114.

This is continuation of an email chain from the capital requirements email chain. At the very top, this is an email sent by Anthony Murgio to Mark Francis and Shoula Cohen on May 2013, 2014; subject, "Read this, Mark. This is the deal forward capital requirements doc.

"Make sure to read the forwarded message below. I got him to agree to put our members on the board sooner and let us take control. They have already been nominated. We all can go to Jersey, if you want, next week. We can get ACH in operation over the next two weeks just as long as we get proper documentation for back-end system. Then I just want to make sure our members are elected first, but we can start implementing the technology. I reached out to Kevin, and he understands that the system is one level above what Kap has the technology written for. We are still waiting to hear back from CU base, the technology backbone of the CU. Once we have the proper backing system documentation, then we can make sure things are hooked up properly. As for the numbers: 15K up front paid, done. 15K, once in operation. Waiting to get docs back from CU South to start integrating. 120K when members are sworn in June 15th. We have control. 50K miscellaneous expenses for lawyers and such, but that's up to you. I'm just estimating your costs on high end. Even if Kap is able to process for one month, you will make your return. All costs,

150K plus whatever, will be deducted as an expense first, and Kap will be repaid."

Please bring up Government Exhibit 1121.

This is an email exchange between Anthony Murgio and Kevin Tomasso. It's in response to an earlier email sent by Anthony Murgio on May 12, 2014, which wrote: "When you guys have a chance, please send me your resume."

I'm sorry, this is the email we previously read.

Kevin Tomasso responded at the top: "Here's my resume. Unfortunately, I don't really have anything resembling financial experience. I hope they don't pull a credit report."

Can you bring up the next page, the attachment. Just blow that up for the jury to review.

And the bottom section.

Thank you.

Please bring up Government Exhibit 1142-B.

This is an email exchange between Anthony Murgio, Michael Murgio, and Trevon Gross.

Can you please flip to the second page.

This is in response to the earlier email chain, capital requirements.

Let's go back up to the bottom of the first page.

And, Mr. Shin, would you please read the email sent by Trevon Gross.

MR. SHIN: Yes.

On May 15, 2014, at 6:11 p.m., Trevon Gross wrote: "Hey, Anthony. I wanted to resend the list of items that need to be completed by tomorrow. It does not appear that we have made any progress. I have a funeral tomorrow and will have limited availability. Please advise because these items are crucial to being able to have our meeting on Saturday."

MR. NOBLE: At the top, beginning with number one, these are the emails -- this is the section that was sent by Trevon Gross.

Go ahead and read number one, Mr. Shin.

MR. SHIN: Mr. Gross had written: "Need to know officers: Chairman, secretary, treasurer, supervisory committee chair. These are mandatory positions. The supervisory committee serves as your internal auditors. Each month they review all aspects of the operations and report to the board. Only the committee chair can be a board member, while the others must be nonboard members, but still members of the CU. So you will need two more people who can be appointed at the June meeting to serve on the SC."

MR. NOBLE: Anthony Murgio responded: "Chairman, Jose; Secretary, Rico, Treasurer, Yuri; Committee Chair, Tim Ellrich."

MR. SHIN: In item number 4, Trevon Gross had written: "Need abbreviated resume on all board members. The NCUA passed a new regulation that board members have to demonstrate

financial competence through work experience, degrees in accounting or take a financial literacy class, and document the board minutes. This is in response to many boards stating that they did not know how to read financial statements and didn't understand that their CU was in trouble."

MR. NOBLE: Then Anthony responded: "Resumes are here and included a link to a Google Drive account."

Please read number five, Mr. Shin.

MR. SHIN: Trevon Gross wrote: "Final installment on current MOU wired to PNC Bank."

MR. NOBLE: And then Anthony Murgio responded: "When do you need this by?"

Can we please bring up Government Exhibit 1142C.

Mr. Shin, if you would read this email.

MR. SHIN: On --

MS. SANTILLO: Excuse me, your Honor. 106 with the resumes?

MR. NOBLE: I apologize.

THE COURT: The resumes?

MS. SANTILLO: 106 with the resumes?

MR. NOBLE: The resumes are not included in this email. It's just a link to the email -- to where the resumes were stored.

If we could address this issue later, your Honor?

THE COURT: We had an intention of showing resumes.

Was this not the place?

MR. NOBLE: This is not the place.

THE COURT: You need a sidebar?

MS. SANTILLO: Just the link to the resumes is in the email.

MR. NOBLE: The link to the resumes is in the email.

THE COURT: All right.

Ms. Santillo, anything further?

MS. SANTILLO: Yes, that's fine.

THE COURT: I'm happy to hear you.

MS. SANTILLO: No, that's fine.

THE COURT: All right. Thank you.

MR. NOBLE: 1142C, if you could just read the response portions to the previous chain, Mr. Shin.

MR. SHIN: Yes.

So Trevon Gross wrote on May 15, 2014, to Trustee Collectables, copying Michael Murgio. He wrote: "See below."

And then under item 1, underneath the list of chairman, secretary, treasurer, and committee chair, Trevon Gross wrote: "Okay. I would suggest that Jose be CEO and I remain chair through our NCUA examination, and then I resign."

And then under item 2, regarding how operations will be handled, Trevon Gross wrote: "Here, Jose would be CEO, which heads operations."

And then under item 3, regarding new members needing

an active account funded in the CU before Saturday, Trevon Gross wrote: "Great. I will send down account numbers, so that you all can fund their accounts."

Under item 4, regarding needing an abbreviated resume on all board members and below the link to the resumes that had been provided, Trevon Gross wrote: "Great. I'm driving five regarding the final installment on the current MOU wired to PNC Bank."

In response to the question, "When do you need this by," Trevon Gross wrote: "Friday, May 16th."

And under item 6, regarding putting money in an escrow account, Trevon Gross wrote: "Just let me know what you need. Attorney escrow accounts are governed by law, and funds cannot be disbursed without legal agreement. He will also be putting together the confidential MOU for the deal."

MR. NOBLE: Can you please bring up Government Exhibit 1142F.

This is simply forwarding that chain that we just read through by Anthony Murgio to Mark Francis and Shoula Cohen on May 15, 2014.

Please bring up Government Exhibit 1142H.

These are additional emails in the same chain.

Can we please flip to page 2.

Beginning with near the top, on May 15, 2014, Anthony Murgio wrote: "The one supervisory on our end is Kendra

Pannitti. Thought you were going to put one on. Maybe current treasurer? And then you are going to stay on board, correct?"

MR. SHIN: Later that day, Trevon Gross responded: "Yes, we will have one on supervisory, and I thought we agreed two would remain on board, me plus one."

MR. NOBLE: Later that day, Anthony Murgio responded: "So that would mean six of ours and two of yours."

MR. SHIN: Trevon Gross responded: "Yes."

MR. NOBLE: Anthony Murgio responded: "Great. Really appreciate it. How long did they say to get ACH approved for the CU?"

MR. SHIN: Trevon Gross responded: "They are sending over the paper tomorrow. We will turn it around quickly, and it should be approved by next week."

MR. NOBLE: Anthony Murgio responded: "Cool. Thanks."

Can we please bring up Government Exhibit 1142J.

This is a continuation of the same chain.

Can we please flip to the second page.

Beginning with the email on May 15, 2014, from Anthony Murgio: "Can we have until Tuesday to get you the other 15K? It's just needing to transfer funds. If not, can probably do. Just have to send from another account that would make things more complicated on our end."

MR. SHIN: Trevon Gross responded: "Okay. But the

nominations will be contingent on receiving it on Tuesday."

MR. NOBLE: Anthony Murgio responded: "Yes, that's fine, but, also, how do we know if they are elected, et cetera?"

MR. SHIN: Trevon Gross responded: "There will be minutes of the nomination, which I will get to you by Tuesday. That is the point of no return."

MR. NOBLE: Anthony Murgio responded: "But nomination does not mean anything, though. They must be elected. Or is it that they are being run unopposed, so then they will get in?"

MR. SHIN: Trevon Gross responded: "There are no nominations from the floor. Only those nominated can be elected. So once nominated, the election is assured."

MR. NOBLE: Anthony Murgio responded: "Got you. Okay, makes sense." He then later responded: "If you are going to stay as chairman, I would put Jose as treasurer."

Can we please bring up Government Exhibit 1142K.

And then Anthony Murgio also wrote later, at the very top: "Then I would make Jose treasurer and CEO?"

Can we bring up Government Exhibit 1142L.

This is an email exchange between Anthony Murgio, Michael Murgio, and Trevon Gross, with blind carbon copies to Shoula Cohen and Mark Francis, with, again, the subject line is "Capital requirements doc."

Can we flip down to the next page.

So this is just picking up from the last email chain. "Then I would make Jose treasurer and CEO."

Let's just go back up to the first page.

And, Mr. Shin, if you could just read the email sent by Trevon Gross on May 16th, at 12:44 p.m.

MR. SHIN: Trevon Gross wrote: "From your CU account? If so, then all you need is XXXXOOO. Also, just to confirm, these are the board members who will be placed in nomination: Jose Freundt, Timothy Ellrich, Kevin Tomasso (need resume), Ricardo Hill, Yuri Lebedev, Chad Lid (need resume). At the July meeting, we will appoint the following positions: Chair, Trevon Gross; Vice Chair/CEO, Jose Freundt; Secretary, Ricardo Hill; Treasurer, Yuri Lebedev; Supervisory Committee Chair, Timothy Ellrich; SC Member, Kendra Pannitti; SC Member, Marvin Purry."

MR. NOBLE: Can we please bring up Government Exhibit 1146A.

This is an email sent by Anthony Murgio to Trevon Gross, with the subject "Kap driver's license," on May 23, 2014. "Please see attached."

Please bring up the attachment.

The attachment is Quebec Permis de Conduire from Mark Francis, with most of the language is in French.

You can take that down.

Can you please bring up Government Exhibit 1147.

This is a continuation of the email we just saw, "Please see attached," at the bottom.

On May 23rd, 2014, Anthony Murgio wrote: "Email address for the account is mark@kapitalinc.com."

MR. SHIN: Trevon Gross responded later that day: "Account created: 6527. Me, charter date, and main telephone number. Mark should be able to log in and use last four of TIN to access online account."

MR. NOBLE: Anthony Murgio forwarded that email chain to Shoula Cohen and Mark Francis on May 23rd, 2014, and stated: "To fund the account at the credit union, let's go, baby." Routing number ending in 9272, account number ending in -- well, beginning with 6527.

Take that down.

Please bring up Government Exhibit 1149.

This is an email exchange between Trevon Gross and Anthony Murgio.

Can we please flip to the second page.

On May 27, 2014, Anthony wrote: "Trevon, Mark would like to test ACH with the manual system of the CU. Can we set up a customized descriptor for his company? Any status on Fed app? Mark, please submit proper licenses for the CU's file. Thanks."

MR. SHIN: Later that day, Trevon Gross responded:

"Form has been received and is in process. I'll check when I'm in the office tomorrow about their ACH. Will need more clarity as to what they actually want to do via ACH."

MR. NOBLE: Anthony Murgio responded: "They are going to test the system with a small amount of transactions manually. I'm sure they are going to do this for one of their smaller merchants. Because they are an aggregator, they either are able to put descriptors for each individual merchant, and if a bank does not have that level of a system, then the descriptor says their business name on it. They are no different than other gateways and processors like," and there are a series of three URLs.

Anthony Murgio later wrote: "They said they are going to utilize for their internal payments to employees and merchants."

He later wrote: "Here is NACHA organization they are part of." And then the link to a nacha.org URL.

MR. SHIN: On May 29, 2014, Trevon Gross responded to Trustee Collectables: "Okay. So to get this started, they will need to give us a list of all the accounts to which they will want to send ACH. With the manual process, we actually have to set them all up and verify the accounts, then they log into their online account, and all of the accounts will appear there."

MR. NOBLE: Let's bring up Government Exhibit 1150.

This is a continuation of that chain, beginning at the bottom on Thursday, May 29th, the email by Trevon Gross.

MR. SHIN: Trevon Gross wrote: "I thought you all were coming up this week. There are a lot of transition items that we need to discuss. Also, only Tim has returned his account information as a board member. There is a great deal of responsibility that falls on these board members. I truly hope they are prepared."

MR. NOBLE: Anthony Murgio responded later that day: "I will be up next week. Had a ton of stuff going on. I have attached Jose on this email thread. He can get all the proper documentation needed for the board members. They will be prepared. We just need good communication. Jose can start getting everyone onboard and get what needs to be done done. I will update you on next week."

And then on May 29th, Jose Freundt responded: "Good afternoon, Trevon. I am not quite sure which documentation or account information we have failed to send. As far as I know, the only thing I have not returned is the beneficiary form. I've looked back to my emails, and I did not find one referring to account information as board member. Would you please resend me the forms needed, and I will make sure that they get back to you as soon as possible. With regards, Jose."

MR. SHIN: And later that day, Trevon Gross responded: "Yes. That is the form, plus identification. If examiner were

to show up, this would be a serious violation of Bank Secrecy Act. There are two resumes missing, and we need that for ballot."

MR. NOBLE: Can we please bring up Government Exhibit 1152B.

This is an email exchange with the subject "Update" between Anthony, Jose, and Trevon Gross.

Please flip to the second page.

And, Mr. Shin, please read that one.

I'm sorry. On June 2nd, 2014, Trustee Collectables wrote: "Trevon, we are looking to come visit this Friday. Also, what is the status on info needed from new board members? Jose is copied on this email and can get whatever is needed. What is the status with ACH? I just want to make sure everything is still on the right track."

MR. SHIN: Later that day, Trevon Gross wrote: "Hey, Anthony. Jose just sent out an email to request information. Still awaiting. I do have resumes and voting information. Will go out to CU members by Wednesday. Can we get the new website up by then? If not, I'll add it to the current website. It will just be the ballot and the resumes. I received an email on Friday saying they were in the final stages of confirming everything with the Federal Reserve Bank. So, we should be all set this week. What time on Friday?"

MR. NOBLE: Anthony Murgio responded: "Sounds good.

I will get the info for you to get the site up and running by tomorrow. I think we should get to New Jersey around 1:00 or 2:00. Will update you tomorrow."

MR. SHIN: Trevon Gross responded: "Hey. That time won't work. I am actually in NYC this weekend for a conference."

MR. NOBLE: Anthony Murgio responded: "Where in NYC? Maybe we can meet up for a lunch or something in NYC. If not, maybe the following week."

At this point, your Honor, the parties have a factual stipulation regarding this email.

THE COURT: All right. Let me just give the jurors a standing stretch break and then read the stip.

(Pause)

THE COURT: All right. Thank you.

MR. NOBLE: Thank you, your Honor.

The factual stipulation is simply that there is no evidence that Trevon Gross and Anthony Murgio, in fact, met up in New York City on or about the dates set forth in this email.

THE COURT: Thank you.

MR. NOBLE: Can we please bring up Government Exhibit 1154-B.

This is an email beginning at the bottom from Amy Paysour, with an email at rich.frb.org with a subject "Federal Reserve contact," sent on June 5th, 2014, to Trevon Gross and

blarkins@hope-FCU.com.

"Good morning, Trevon and Sylvester. Hope you are doing well and enjoying the warmer weather. I wanted to reach out to the two of you as your account executive with the Federal Reserve Bank to introduce myself and also provide you with my contact information below. I have looked over your services set up through the Fed and don't see anything that needs to be brought to your attention. If you have any questions in the future or need assistance on our products and services, please do not hesitate to give me a call or send me an email. I'll be glad to assist."

It indicates that Amy Paysour is an account executive in the customer relations and support office for the Federal Reserve Bank.

MR. SHIN: On June 5, 2014, Trevon Gross forwarded the email to Trustee Collectables, and he wrote: "Hey, the Fed has served the paperwork, and it is in order. We just need to get up the back end."

MR. NOBLE: Later that day, Anthony Murgio forwarded the email to Mark Francis and Yuri Lebedev and wrote: "Boomsticks."

Can you please bring up Government Exhibit 1155A.

This is an email exchange with the subject line "Contact list of board members" between various people, including Anthony Murgio, and Trevon Gross, and Yuri Lebedev.

At the bottom, on June 2nd, 2014, Jose Freundt wrote: "Good afternoon, gentlemen. In order to finalize the board and to continue forth with the process, we need to complete all forms. The one with particular urgency is the membership application with account beneficiary. It is imperative that Trevon has all this information, including a picture of you holding your state-issued ID. This is solely to have the right documentation to open an account. If HOPE FCU would get audited right now, there would be a huge liability, and we are not in compliance with CIP of the USA PATRIOT Act, Section 326, for those who would like to read it. All this also plays a part with the Bank Secrecy Act and anti-money laundering. As you can see, this affects many areas that we need to be in compliance with. Please get this done as soon as possible. If you have any questions, please do not hesitate to contact me," and a telephone number.

MR. SHIN: On June 3rd, Kevin Tomasso responded: "FYI: I have sent in all of my info. As far as the initial deposit is concerned, is that taken care of, or do we need to wire money through each of our accounts? If so, what is the required amount? Thanks."

MR. NOBLE: On June 3rd, Chad Lio wrote: "Trevon, I refaxed in my membership application. Please confirm when you have a moment. Thanks."

MR. SHIN: Trevon Gross responded: "Fax arrived. We

are all set for you."

MR. NOBLE: Anthony Murgio later responded to the group: "Has everyone submitted all info required?"

Can you please bring up Government Exhibit 1157.

This is an email exchange with the subject "New HOPE website" between Trevon Gross, Yuri Lebedev, Harpreet Design, Jose Freundt, and Anthony Murgio.

And if we can flip to the second page. Actually, the third page.

Sorry, go back up to the bottom.

On June 3, 2014, Anthony Murgio wrote: "Yuri, I need you to facilitate getting the new HOPE website up and running. Trevon needs to give access to the server. Harpreet needs to provide the new files."

MR. SHIN: On June 4, Yuri Lebedev wrote: "Trevon, in order for me to deploy this, I need to know some information about the destination server, the credentials. Does it currently have my SQL? Is it LAMP stack? Thank you. Yuri."

MR. NOBLE: Anthony Murgio later replied: "I don't believe Trevon is a programmer, Yuri. I think you can simple get access to the server if he feels comfortable, and you can check it out. You can then give a good opinion on what is the best approach to take."

MR. SHIN: Trevon Gross responded: "LOL. I used to be a programmer when Pascal was the main programming language.

I think that is before your time. The current site is on a customized CMS, so the DNS points to their servers for hosting. We have MX records, so we can create our email accounts. We can stop the DNS redirect, which will cause the site to go down, and then you can upload all the files because there is a WordPress/bootstrap framework available. Just say the word, and I can do that part. Then I will give you the admin to upload everything."

And then Yuri Lebedev responded on the next day, June 5th: "Trevon, thank you for providing this information. Can we first try to deploy the database and the site and then switch the DNS? This way, we can minimize the down time. Thank you. Yuri. P.S.: I used to extensively program in Pascal and Delphi."

Later that day, Trevon Gross responded: "Okay. We are setting up a mirror so he can install and test the site, and once it is ready, then we can remove the DNS. This mirror should be ready later tonight, and I will send over the credentials."

Later that day, Yuri Lebedev responded: "Great. Thank you."

MR. NOBLE: Oh, I'm sorry. Anthony Murgio responded: "Trevon, look at you. Brush the shoulders off."

MR. SHIN: The next day, June 6, 2014, Trevon Gross responded: "LOL. They just have good customer service, and I

can repeat what they said. Here is the info," and then there is a URL, hope-fcu.dreamhosters.com. "User name is admin. Password is the same one we used before for financials."

MR. NOBLE: Can you please bring up Government Exhibit 1160-C.

This is an email at the bottom, a forwarded message that Anthony Murgio forwarded to Shoula Cohen and Mark Francis on June 14, 2014, with the subject "Inspection and advice." The forwarded email was sent from Anthony Murgio to Trevon Gross on the same day -- I'm sorry, the previous day and stated: "Trevon, after speaking today, I would like to get your opinion on the Kapcharge processing structure. I would like to get them up and going, but I don't want the regulators to ask a ton of questions if we have five new businesses all of a sudden that recently just starting doing ACH processing, when most likely you have never had this type of traffic and account set up under the CU. If this was a larger bank or association, it would not be an issue, I'm sure, but I feel like there is hardly anything for them to look at with HOPE, and any increase or new accounts will be the only thing they will inspect. I would like to hear the inspection process and if you think this is an issue at all. Once again, I would love to get things going with Kap to start generating rev for the CU, but at the same time, don't want to create issue for the CU."

(Continued on next page)

MR. NOBLE: The forwarded email sent to Sheila Cohen and Mark Francis from Anthony stated, "Trevon said that signing up the companies and doing the transactions should not be a big deal for the examiners. He said things with them are more at a macro level, so I guess we are good to go next week."

MS. SANTILLO: Your Honor, I have a Rule 106 objection here. There was a response from Trevon Gross that was in an earlier exhibit that the government has.

MR. NOBLE: That's a separate exhibit. I'm happy to read that portion of the email, as well.

THE COURT: Okay, go ahead.

MR. NOBLE: Can you bring up Government's Exhibit 160-B -- I'm sorry -- 1160-B. Then in response to that email, Trevon had written -- and Mr. Shin, would you please read Mr. Gross' response?

MR. SHIN: Yes. So on June 13th, 2014, Trevon Gross wrote, "It should be a problem. Examinations are generally on the macro level. I think for the rest of the year it should be limited as more members join, then they can open up full throttle. Plus, you will need to have income to offset their reserve deposits. Net worth must stay above 7, ideally above 10. The retreat idea is important so that a strategic plan can be developed. If we put things like more organization/business accounts in the plan then they won't have a problem with it. Just go slow. The other aspect is that the club should really

start moving all of its accounts to the CU. The more you all see it as a bank and leverage its power, others will share that passion. Here is the link to the automated account service. We would still have to manually enter people into CU Base, but it would be all online and security compliant. CU Base is developing their own automated system which is supposed to be released next year. This gets the CU completely automated on the front end, and since you have staff who can input info, this would work. It's only three mins per member to manually enter a person." And then there's a URL provided.

MR. NOBLE: And then Anthony Murgio had responded, "Thanks. It should or shouldn't be a problem?"

MR. SHIN: And then Trevon Gross responded, "Ops, shouldn't."

MR. NOBLE: Can you bring up Government's Exhibit 1161-B? This is a forwarded email with a Subject: Setting up accounts, from anthony Murgio to Sheila Cohen. The original email was sent on June 13th, 2014 from Anthony to Trevon Gross addressed, "Mark. Trevon and I discussed setting up the account for you so you can set up subaccounts and descriptors yourself to do some test transactions. Both Trevon and myself were a little cautious about doing too much prior to the inspectors that come in mid July. We don't want to draw up any regular flags at all. There is already going to be a large transition as it is. We also don't want there to be any issues

that arise without the proper staff on hand. If you can please send over the liability waiver to Trevon, that can help start this process. Trevon can also guide you through how to use the system to start manually processing these ACH transactions. I believe Trevon feels fine with doing 25 to 50 transactions daily in all but would like to limit these as much as possible. In the meantime, Trevon is getting the required specs from Alloya for automation."

You can take that down. Can you bring up 1162-A? This is an email sent from Anthony Murgio to Trevon Gross on June 13th, 2014 with the Subject: Touching base. "Trevon. I appreciate you taking the time out to meet with us yesterday. I gained a good amount of information from hearing the discussion. I wanted to touch on a few things. One, the docs from Alloya; two, CU South info for building technology within their secure framework; three, setting up an account for Capital so they can do some manual ACH transactions. Let me know if you have any questions."

Can you bring up 1162-B? This is the same email thread. Can we turn to the next page? And the next page. The next page. On page 3, on Friday, June 13th at 2:14, Mr. Shin, can you please -- at 4:20 p.m. at the bottom, Mr. Chang-Frieden -- can you please read that email?

MR. SHIN: Trevon Gross wrote: "Hey, Anthony. I will forward what they sent but it still is not the detail you

desire. They said that once we are in implementation, Margarite with whom we spoke will forward over the implementation docs. They will not send this out before. I spoke with CU South and they actually work with a third party provided for automated membership. They are forwarding the information for us. Kapcharge already has an account, and if they want to do manual transactions they are ready now, they would just need to create the accounts as subaccounts and then we would set up the A2A accounts so they can test it manually.

Honestly, I would suggest that we focus on a successful transition of the CU and its operations before we take on this task. There are a lot of pieces which could go wrong, and I think we need to make certain that our operational house is in order first.

Further, we have not discussed how the CU will be managed 9:00 to 5:00 Monday through Friday, as this is a requirement of ACH. We have staffed it with volunteers.

How are we handling the final payment and the set-aside amount for us to start our own CU? Also, you had mentioned 50K dollars to start our own. From my own research, this amount will enable us to charter a savings account only CU which is not where we are. They suggest 71K dollars for a full service CU, which is what you all are taking over. I would respectfully as that you consider a number closer to the 71K dollars to be fair. We will charter another CU once we know

that this transition is smooth and you all are set. Please advise."

MR. NOBLE: Anthony Murgio responded, "One. As for Kapcharge, I'm getting them to send over the same liability waiver that they have with their other banks. Two. We are opening an office and we will have online chat and support set up by next month. Three. Please explain what A2A means for Kapcharge transactions.

As for another CU, we have agreed to the 50K over time, but this is to start another and we would simply need to see documentation in the direction of setting up another. I would have to discuss the extra 21K dollars with the association, but just because they suggest it will be closer to 71K does not mean that it can't be done for half of this. These docs are not prepared by business savvy individuals like yourself. Smiley face. What do you suggest for a successful transition?"

MR. SHIN: Later that same day, Trevon Gross responded, "A2A is the standard capability that CU South has to send and receive ACH transactions. It is manual. It requires that we set up and validate the accounts that are outside of the CU. But once set up, the individual/organization can do ACH transactions to those accounts only. The CU staff has to set up each new account.

I think we need to get clarity on what "over time

means". I understood that to mean as a part of this deal. Part of this money is just to meet capital requirements of the NCUA. Also, most people hire a consultant who prepared the paperwork and walks it through the NCUA. This usually means getting a US Congressman/Senator to put in a recommendation. I think $65 would more than allow us to charter a full service CU. Please let me know your thinking.

As to successful transition, there needs to be a lot of training and staff person, at least one, who can manage the office/serve as teller. Because we already have the infrastructure and office in place, I don't see the wisdom in moving the office, et cetera. Plus, I do not think it is wise to change addresses again. We just changed it in 2013 to the current location. These are the types of things I really wanted to talk about yesterday."

MR. NOBLE: Anthony Murgio responded, "One. Thanks for clarifying. Two. Over time means setting up a credit union does not incur these expenses immediately. I believe these expenses are accrued over time so the expenses should be delineated. The goal is to help financially get another CU set up for your members. We want to make sure that this is done as effectively as possible. 3. We can keep the office there, but we are allowed to provide support from another branch office, correct? Also, I would love to have a couple of members train, including myself. Please let me know some dates that we can

come there for two or three days, or however long you think it may take, and we will learn the system. Possibly next weekend. We can take a course. We can make sure that all information is recorded and steps on the computer are recorded so we can use for a training site to train new employees. I'm open to suggestions."

MR. SHIN: Later that day, Trevon Gross responded, "If we hire a consultant to lead the effort, it will incur expenses as there is a retainer for those services. I just need clarity what you propose to mean "over time". It takes about 12 to 18 months for the entire process, and I would like to get started ASAP. My preference is that this money be put up by the end of the year so we can, in earnest, start the process January 1. I do not think it will be productive to keep coming back every time there is an expense incurred.

Yes, there can be another branch, and there should be one in Florida so that you can get reports, et cetera, and provide teller services.

Training can initially be one full day. Come in night before and start early next day, flight out on evening. This should enable us to cover the basics. But I think we need to invest in one person who can be a teller/operations assistant who can be available 9:00 to 5:00 Monday through Friday up here since this is the branch that the examiner stops in from time to time. We have someone who we used before, but I need to

understand how you plan to run operations. There are a lot of moving pieces with having a bank, and someone daily has to be on top of it. I would suggest that you bring a person on up here who can be the day-to-day operations person."

MR. NOBLE: Anthony Murgio responded later the same day, "By January 1st we can put this money up in escrow. Also, can we have limited office hours for the home office Mondays from 12:00 to 5:00? The other branches and member support can be on a different schedule?"

MR. SHIN: Trevon Gross responded, "We probably need to talk. When can we all get on a call?"

MR. NOBLE: Anthony Murgio responded, "Ready now."

THE COURT: Mr. Noble, it's time for our midmorning break. What's your time estimate?

MR. NOBLE: We have about, I would say, ten more emails to read.

THE COURT: All right.

Members of the jury, we'll take a 10 to 15-minute break. Enjoy your break. See you then.

(Continued on next page)

(Jury not present)

THE COURT: Matters to take up?

MS. SANTILLO: Your Honor, with respect to the resumes.

THE COURT: Yes. Could you pull up the microphone?

MS. SANTILLO: We would request that the resumes be played at the earliest opportunity. I didn't want to mess up the program if they hadn't been queued up, but we do think it's important for completeness.

THE COURT: Mr. Noble.

MR. NOBLE: I don't think it's necessary for completeness. The resumes will come in through other evidence later on in the trial. It's already been established that the resumes were sent to Trevon Gross. I don't think it's necessary to publish those to the jury right now as part of the government's case at this point in time for completeness purposes. I mean, the defense may want to use them in their case.

THE COURT: I don't want to -- just let's go back to the discussion yesterday when I think the government agreed it would show the resumes. What was that in reference to?

MR. NOBLE: I believe we said that the resumes will come up at certain points of time in the government's case, but not while we were like reading all of these emails because it just interrupts the flow of the email just to publish resumes

to the jury. That was not part of our planned process of publishing these emails to the jury. There's no dispute that they will be in evidence. They can be published at some point. We will probably use them with some of our witnesses, and the defense can publish them in their case when it's their turn, but I don't think the government is under an obligation, at least under Rule 106, just for completeness purposes, to publish them given that we've already established the fact that these resumes -- and we've published one of them, one of the resumes went -- that Trevon Gross was sent the resumes.

THE COURT: In the remaining emails to read in this series, are there links to resumes?

MR. NOBLE: No.

MS. SANTILLO: Your Honor, first of all, they said yesterday that they were going to include the resumes if there were links to them.

Second of all, they already put on an email where there was an email suggestion that there were people who didn't have financial experience, and that's the only resume they showed. They showed an email where he was receiving information, including resumes, and there's a Google Doc link within the email. It's only fair to not leave a misleading impression, which they're trying to leave, that he wasn't being thorough and he wasn't checking their background, to include that.

We have agreed to do some of these emails by stipulation, but if there was a witness, we would absolutely have an opportunity to cross examine that witness, and by virtue of this process, we're being deprived an opportunity to confront that, and this has squarely been a Rule 106 contemplation because it is a link within the very email that they have tried to introduce.

THE COURT: In light of the agreement/my ruling yesterday, you'll publish the resumes that were linked in the email already shown.

MS. CHOI: Well, your Honor, part of the problem is that link doesn't -- we can't access that link. So we have copies of the resume, we can publish those copies, but we're never going to be able to get that link. It's just not something that we can do because those links are related to the Google Drive, and so there's no way to actually access them without having the password for them.

MR. NOBLE: We can confer with defense counsel to make sure that the versions of the resume that we publish to the jury are acceptable to them.

THE COURT: All right, do that.

MR. NOBLE: We'll bring back up the email, I think with the link, and say, "Here are the resumes."

THE COURT: Okay.

MS. SANTILLO: That's fine.

THE COURT: What else?

MS. SANTILLO: Your Honor, I was wondering if we could have a copy of the instructions that the Court plans to give in connection with Clayton Curry's testimony. We had sent some proposals, but we didn't have the final versions, and it may be that we want to cross the witness on some of the rules that are in the instructions.

THE COURT: You mean the NCUA regs?

MS. SANTILLO: Yes.

THE COURT: I have the version that is final after implementation of our discussion and changes. You want a copy, is that what you're saying?

MS. SANTILLO: Yes, please.

THE COURT: I'll ask my clerk to run a copy.

MS. SANTILLO: Thank you, your Honor.

THE COURT: What else?

So that was an hour and 45. You're losing the jury's attention, so at some point I have to get it under control.

MR. NOBLE: Judge, I mean, this is the last set of emails that we intend to read for quite some time, and we think that these are very relevant.

THE COURT: I understand that, but if I see members of the jury unable to pay attention because of the length at which it's going on, I have to do something to manage the process, and I will.

I'll see you in a few minutes.

(Recess)

THE COURT: Any matters to take up?

MS. SANTILLO: With regard to the resumes, I want to just be sensitive to the jury's attention, as well. I was wondering if we could come up with a strategy to not have to read every single item but to highlight certain things, so maybe can we just confer for a second about what the best way to do that is?

MR. NOBLE: Sure.

THE COURT: Thank you.

(Pause)

MS. SANTILLO: Your Honor, we've agreed that we will just scroll slowly through them so that the jury can read them.

THE COURT: Okay, thank you.

MS. SANTILLO: But hopefully, we do that at the beginning so they don't lose --

MR. NOBLE: Yes. We're going to go back to that email.

THE COURT: You're going do that first?

MR. NOBLE: Yes.

THE COURT: Thank you.

Let me just raise the jury questions that -- logistic questions that came in this morning.

Juror number 3, Ms. Pico, raised some new appointment

issues or more appointment issues. It sounds like the base of her request is whether next Tuesday, and perhaps the following Tuesday, we could do what we did yesterday.

Juror number 8 also indicated that he or she -- I don't have my list right in front of me -- she has a doctor's appointment at 5:30 on Wednesday and had trouble rescheduling it. It doesn't sound like a lot of time is needed, but something like ten minutes early.

I guess we're taking requests.

MR. KLINGEMAN: Is that tomorrow?

THE COURT: No, next Wednesday, March 1st.

Then another juror asked kind of generally about the calendar, saying, "Are the trial dates shown on the schedule, do those include or not include deliberation dates?"

So as the last, I propose just reiterating that we don't have exact certainty as to when evidence will finish and we've done our best to estimate. We have no further information at this time, although I think we're on schedule. Does everyone agree with that?

MR. NOBLE: Yes, Judge. We're actually a little more quickly I think than we anticipated.

THE COURT: Good. So I think just some general answer along those lines is what I'd propose.

I think with the next Wednesday, March 1st, I guess I'd like to accommodate that one since it's ten minutes that

we're talking about, but I think I should probably convey what I hope is obvious, but that none of this process can happen without everybody, and the more we accommodate, the longer it takes, but that we can try to make up some of that time by shortening the lunch break again.

Then I guess with respect to juror number 3, I'm inclined to see if she can't move those appointments to some of the days that we're not meeting next week. Next week we're not sitting Thursday or Friday. Apparently, she indicated that her doctor isn't available next Thursday and Friday so she wasn't able to reschedule the allergy shot for then. I mean, we can start 15 minutes early maybe on Monday and end 15 minutes later on Wednesday or something like that, but I don't like doing that. I've assured the other jurors that they can kind of bank on start and end times so --

MR. NOBLE: Could we do what we did the other day and take the abbreviated lunch break and perhaps shorter morning and afternoon breaks?

THE COURT: We can do that. My concern, like what happened yesterday, is that it doesn't really turn -- just because between us needing to eat and deal with legal issues, it doesn't much turn into a shortened break, but we can try to do that.

I think I'll take it up with them before the lunch break. I'll indicate that we can make the two adjustments for

next week, but express concern that the more we do it, the more it lengthens the process, so if folks can try to work with the unscheduled days, the better. Then I'll make my general statement as to no more information about the precise length of the time, which we've estimated to include the time for trial -- well, I think I'll leave it at that.

Any concerns or questions? All right.

MR. NOBLE: No, your Honor.

THE COURT: Matters to take up?

MR. NOBLE: Just to give the Court a heads up. The version of the board minutes which the parties have agreed on is a version that the NCUA had in its custody, and so we are going to read the stipulation regarding NCUA records and admit those exhibits before we do the publication, just to give everybody a heads up.

MS. SANTILLO: You mean the resumes, right?

MR. NOBLE: Yes. And to also admit the other exhibits that are subject to the stipulation by the NCUA, which I don't believe the defendants have any objection to.

MS. SANTILLO: No, we do not. However, we would like to admit some board minutes ourselves, which I think are actually admitted pursuant to the stip.

MR. NOBLE: Exactly. That's why I'm reading the stip.

MS. SANTILLO: Okay, great. Thanks.

THE COURT: Sounds like I'm not needed. Let's bring

in the jury.

(Continued on next page)

(Jury present)

THE COURT: Thank you, members of the jury.

Mr. Noble, you may proceed.

MR. NOBLE: Thank you, your Honor. At this time, the government would like to offer into evidence a number of exhibits pursuant to a stipulation signed between the parties that's been marked Government's Exhibit 4011.

THE COURT: All right.

MR. NOBLE: First, we move this exhibit into evidence and offer it and publish it for the jury, Government's Exhibit 4011, the stipulation.

THE COURT: Without objection, 4011 is admitted on stipulation.

(Government's Exhibit 4011 received in evidence)

MR. NOBLE: I'm going to summarize that the following exhibits the parties have stipulated are business records of the National Credit Union Administration.

At this time, the government will offer Government's Exhibits 6001 through 6019, 6061 through 6076, 6081 through 6099, 6101 through 6107, 6111, 6112, 6113, 6121, 6122, 6125, 6126, 6129, 6130, 6131, 6133 through 6136, 6143, and 6200 through 6207.

THE COURT: On stipulation, they are admitted.

(Government's Exhibits 6001 through 6019, 6061 through 6076, 6081 through 6099, 6101 through 6107, 6111, 6112, 6113,

6121, 6122, 6125, 6126, 6129, 6130, 6131, 6133 through 6136, 6143, and 6200 through 6207 received in evidence)

MR. NOBLE: In addition, the parties have stipulated that Government's Exhibit 6124 is a true and accurate copy of a letter of understanding and agreement entered into by the NCUA and the board of directors of HOPE FCU on or about March 25th, 2015, and the government would offer Government's Exhibit 6124.

THE COURT: Without objection and on stipulation, 6124 is admitted.

(Government's Exhibit 6124 received in evidence)

MR. NOBLE: Thank you, your Honor.

Mr. Chang-Frieden, can you be go back to Government's Exhibit 1142-B. This is the email we saw earlier with a link to a Google Drive account which included certain resumes of proposed board members.

At this time, Mr. Chang-Frieden, can you please bring up Government's Exhibit 6136 in evidence? If we could just slowly publish each of these resumes for the jury.

(Pause)

THE COURT: Little bit slower.

MR. NOBLE: Could we go a little bit slower, Mr. Chang-Frieden?

(Pause)

MR. NOBLE: I believe the jury previously saw this one so we can move to the next one.

THE COURT: They did. Go ahead.

(Pause)

THE COURT: Thank you.

MR. NOBLE: Great. Can you please bring up Government's Exhibit 1167-A? This is an email exchange with the Subject: Expenses, between Trevon Gross and Anthony Murgio. Could you please flip to the second page?

Mr. Shin, could you please read the first email in the chain?

MR. SHIN: On June 17, 2014, Trevon Gross wrote, "Hey. The additional router for the Florida branch will be like $99 per month and the GUAPPLE is like $600 plus $29 per month maintenance fee. You will need a PC and two printers, a report printer and a check printer with MICR Inc. Will Yuri manage this? I just wanted to make you are aware of this. Currently, the overhead is like $450 for outside accounting and connectivity to CU South.

MR. NOBLE: Anthony Murgio responded, "Yes. Yuri will manage this or somebody in the office like Rico or Jose."

MR. SHIN: Trevon Gross responded, "Okay. We'll need an address to ship it to."

MR. NOBLE: Anthony Murgio responded, "2940 East Park Avenue, Tallahassee, Florida, 32301. Collectables Club."

MR. SHIN: Trevon Gross responded, "Okay. Do you plan on using that Lakewood address for that Collectables Club that

Kapcharge is using? If you can, that would be great. Also, please fund your account so that you can vote before Friday night. The other new board members won't be able to vote until their deposits have hit and they have satisfied par."

MR. NOBLE: Anthony Murgio responded, "I sent the $175. Can you allocate that? We can also use that address no problem. But you are going to send the stuff there?"

MR. SHIN: And Trevon Gross responded, "No. All records will go with to the Jackson address or the Florida address. Just to have all our bases covered you all should be able to point to a Lakewood address if asked. Anthony, do you believe in the CU? $175 for seven accounts? That's $25 per account. That is not a vote of confidence from those who would be board members. From our low-income members we require $30 minimum. I will do what you asked because Saturday this is your credit union, but I don't think this sends the right message about your commitment to this CU. Just putting in my 2 cents."

MR. NOBLE: Can we bring up Government's Exhibit 1170? Mr. Shin?

MR. SHIN: Trevon Gross wrote on June 17th, 2014, "Hey Anthony. I wanted to recap the items we discussed. I added a couple things that we had talked about previously as well.

"1. Your leaders will be elected to the board on Saturday, June 21st.

"2. Existing board members except two, me and Bernard, will tender their resignations effective end of August or past the examination report date.

"3. I will remain chair until September at which time you will be elected to the board and elected as chairman.

"4. That Hope Cathedral members will have use of CU as long as we desire and can operate autonomously within NCUA regulations/board policy.

"5. Any technology developed or leveraged by the CU will be available for use by Hope Cathedral members, and when we charter a new CU, it would be made available to us at a reasonable cost.

"6. Starting July 1st, Florida branch operations will commence. Need a day and a half training session planned. You all will bring me down to train on new equipment.

"7. Beyond the training, my role will be as a board member only offering occasional advice.

"8. If at any point in the future you decide that you do not want the CU, you will give it back to us so that the charter will continue.

"9. A bank check/certified funds will be given on Saturday, June 21st at the conclusion of the annual meeting.

"10. The final donation will arrive by January 1st.

"Decisions needed. There are standing committees/officer roles that will need been filed: Loan

officer, BSA officer, security officer.

"Signing authority. Who will have signing authority for the CU? This includes Alloya, Federal Reserve, and local bank.

"Harmony. Currently we have a local bank where we deposit cash. If you have a P&C bank near you then I would suggest that we move this account to P&C, and when you are here this weekend, we can open an account there with the signers.

"Operationally. Who will serve as tellers, et cetera? All officers will need access to CU Base with clear segregation of duties. We will need to grant access to the system.

"Please advise. Thanks."

(Continued on next page)

MR. NOBLE: Can we bring up Government Exhibit 1175-A.

This is an email chain between Kirk Agapitos at kirk@kapitalinc.com, Anthony Murgio, Mark Francis, and George Fanous.

Beginning at the bottom, Anthony Murgio wrote on June 19, 2014, with the subject "Agreement with HOPE."

"Can someone please update me on this?"

Then Kirk Agapitos replied...

MR. SHIN: On June 19, 2014, he wrote: "How does this look, guys? I've added a second signature section for HOPE FCU just in case. The original merchant agreement only has one section for the merchant to sign; i.e., Kapcharge USA Inc. in this case. I also put the fee schedule for ACH origination and receipt as provided by Sandra L. Albertson to Pastor Trevon on June 16th in schedule A. Please modify as needed and let me know if anything more is required. Thank you."

MR. NOBLE: If we can just blow up -- I'm sorry -- the bottom portion earlier in the chain.

Anthony Murgio had written on June 18th: "Gentlemen, I'm a little lost, and maybe I missed it. Can you please send over the agreement that is to be signed with HOPE and Kap? It must use the NJ address for Kap. Thanks."

If we can just publish the next page for the jury, which is the exclusive registered agent agreement between HOPE Federal Credit Union and Kapcharge, Inc. We're not going to

read that at this time.

Can we go to Government Exhibit 1175-D.

Beginning -- this is an email chain between Mark Francis. It's a continuation of the previous chain. On June 19, 2014, Anthony Murgio wrote: "Looks good. Why is it called exclusive?"

MR. SHIN: Kirk Agapitos responded: "Because Mark specified that. Didn't question it, just did it."

MR. NOBLE: Mark Francis then replied: "It's called exclusive because that's exactly what it is."

Can you bring up Government Exhibit 1180.

This is an email with the subject "Annual meeting" sent by Anthony Murgio to Shoula Cohen and Mark Francis on June 20, 2014, stating: "The annual meeting for the CU will be held tomorrow at 10:00 a.m. I think it would be good for you both to be on. I am setting up a Google Hangout that you can join. The new board members will also be elected at this time. Let me know if you are interested."

Can you bring up Government Exhibit 1184-A.

This is an email sent by Anthony Murgio with the subject "Docs" on June 19, 2014, to Trevon Gross: "Here are the three docs. Please review and sign two copies of each and send to me. I will resign and send back a copy. There are three attachments, one for currency exclusive HOPE, a second for Memorabilia and Collectables Club membership contract, and

third an association contract."

Can we just go through and publish those -- just flip through the attachments for the jury.

Can we bring up Government Exhibit 1184-B.

Mr. Shin, would you read Pastor Trevon Gross' response?

MR. SHIN: On June 20, 2014, Trevon Gross responded to Trustee Collectables: "For the memberships, should it be for the credit union? Not certain why this is necessary. Here is the technology agreement. It is dated as of Monday because we will vote on it tomorrow."

MR. NOBLE: Can we just flip through the attachment to the last page. I note that the signature line on behalf of HOPE Federal Credit Union by Trevon Gross with the signature and dated June 23rd, 2014.

Can you bring up Government Exhibit 1184-C.

Mr. Shin, if you would read the header information.

MR. SHIN: So on June 20, 2014, Trevon Gross replied to the prior email we looked at to Trustee Collectables, and he wrote: "These don't need board approval."

MR. NOBLE: If we can just flip through the attachment there to the signature pages. It shows that this agreement was signed on behalf of Helping Other People Excel Federal Credit Union by Trevon Gross and the address of the credit union.

I'm sorry, go back -- the Collectables Club membership

contract for the credit union, for HOPE Federal Credit Union.

You can just flip to the last page. Again, sorry, second to last page.

Signed by Trevon Gross on behalf of the HOPE Federal Credit Union on June 23rd, 2014.

You can take that down.

Can we bring up Government Exhibit 1188-A.

This is an email sent by Anthony Murgio on June 20, 2014, to a number of recipients, including Yuri Lebedev and Trevon Gross: "Gentlemen and lady, tomorrow is the annual meeting for the CU. All board members will be elected at this time. I will be setting up a Google Hangout so we can all be there virtually, if you can attend. Please let me know if you have any questions."

Can we please bring up Government Exhibit 1188-C.

Mr. Shin.

MR. SHIN: Trevon Gross replied to the prior email on June 20, 2014: "Please log in your it's me 24/7 account and cast your vote. Voting ends at midnight tonight. If you need your password reset, please let me know. User name is your account number."

MR. NOBLE: Can you bring up Government Exhibit 1189.

This is picking up on the earlier chain down below the June 20, 2014 email sent by Trevon Gross to Anthony Murgio.

Scroll back out.

Anthony Murgio responded -- or, I'm sorry, and then Trevon Gross further wrote on June 20th at 11:33.

Up above, Mr. Chang-Frieden.

MR. SHIN: Trevon Gross wrote: "So fill it out for the CU."

MR. NOBLE: Anthony Murgio responded: "Are there people running against the board members?"

MR. SHIN: Trevon Gross responded: "No, but I just wanted to get as many votes in the system since this is the first time we've used online voting. I want to make certain that this election is incontestable."

MR. NOBLE: Anthony Murgio responds: "Great."

Can we please bring up Government Exhibit 1191.

This is an email sent by Anthony Murgio on June 22nd, 2014, with the subject "New positions in pay" sent to the various new board members, including Yuri Lebedev, blind carbon copying Shoula Cohen and Mark Francis: "Hello all. You are officially board members. The discussed pay will start monthly. Your first payment will be August 1st for all of July. Once, again, if you are interested in having a full-time position to help increase CU revenue, we can figure something out, please get in contact with me. Looking for business and personal membership growth."

Take that down.

At this time, your Honor, the government would like to

call its next witness.

THE COURT: You may do so.

MR. NOBLE: The government calls Clayton Curry.

THE COURT: Mr. Curry may come forward.

CLAYTON CURRY,

called as a witness by the Government,

having been duly sworn, testified as follows:

THE COURT: Please be seated and pull yourself up to the microphone. And then state and spell your name for the record.

THE WITNESS: My name is Clayton Curry. Clayton, C-L-A-Y-T-O-N, last name Curry, C-U-R-R-Y.

THE COURT: You may proceed.

MR. NOBLE: Thank you, your Honor.

DIRECT EXAMINATION

BY MR. NOBLE:

Q. Where do you work?

A. I work for the National Credit Union Administration, or NCUA.

Q. What is the NCUA?

A. They are the regulator of federal credit unions and the insurer of federally insured credit unions. So that would be federal or state-chartered credit unions.

Q. Is the NCUA a federal agency?

A. Yes.

Q. What is your title at the NCUA?
A. Supervision analyst.
Q. How long have you worked at the NCUA?
A. Altogether, approximately eight and a half years.
Q. What positions have you held there?
A. I was an examiner for approximately five and a half years and a supervision analyst for approximately three years now.
Q. What did you do before joining the NCUA?
A. I was finishing up my Master's in business administration and working at a bank.
Q. What were your positions at the bank?
A. At the bank, which was Washington Mutual Bank, I served as a personal banker, a teller, teller supervisor.
Q. You mentioned that you had been studying for a Master's in business administration. Did you obtain that degree?
A. Yes.
Q. Where did you obtain that degree from?
A. The University of Texas in Dallas.
Q. Do you have an undergraduate degree?
A. Yes.
Q. What is it, and from where?
A. It's a Bachelor's of Arts in criminal justice studies from the University of Texas at Dallas, also.
Q. Can you describe what your duties and responsibilities are as a supervision analyst at the NCUA?

A. Yes. Part of my job duties include assessing the quality of the examination and supervision process for our region. Also, I assist examiners with drafting various types of administrative and enforcement actions. I'm tasked with developing and reviewing various risk reports for risk management purposes of the credit unions located in our region.

Q. You mentioned that you cover a particular region. What region is that?

A. It's called Region II, and it's headquartered in Alexandria, Virginia.

Q. What states or geographic areas are included in Region II?

A. So the states -- because District of Columbia is in the region, Virginia, Maryland, West Virginia, Pennsylvania, New Jersey, Ohio, Delaware.

Q. Mr. Curry, when you joined the NCUA, did you receive any training on how to do your job?

A. Yes. Upon being hired at the NCUA, at the time, we went through five levels of training, which the first level or two covered kind of the high points of the job, the administrative side, and then the latter levels went more into financial trend analysis, what to look for in an exam. There is some oral and written communication training to help with our jobs.

Q. What, if any, training do you receive on an ongoing basis?

A. It varies year to year. We don't have required training that we're supposed to do every year. Ideally, we would like

to do two to three training classes a year, if possible.

Q. Do you do such training classes on a periodic basis?

A. Yes.

Q. What topics, generally, do you continue to be trained on?

A. Well, last year, I took a fraud detection training class, I took an electronic payment systems risk class. It just varies from year to year based on the individual.

Q. Were you a supervision analyst, your current position, in 2014 and 2015?

A. Yes.

Q. I'd like to ask you some background questions about credit unions, federal credit unions in particular.

Can you just explain to the jury what a credit union is?

A. So a credit union is similar to a bank. They offer the same products and services, except a credit union is a member-owned, not-for-profit, they serve their field of memberships. So you have to be eligible for a credit union in order to be a member. So with them being member-owned and not-for-profit, each member, regardless of how much money you maintain at the credit union, you have a vote. Every member, regardless of money, has one vote. So, for example, at the annual meetings that are held every year where you elect the board of directors, each person has a vote, they have the opportunity to vote, have equal say.

Banks on the other hand, they're for-profit corporations that operate to essentially please their stakeholders.

Q. Now, what, in general, is the purpose of a credit union? Can you explain why we have credit unions?

A. So we have credit unions to serve members that may be in an underserved area or the unbanked. They're essentially set up to provide financial services, deposit services, loan services to members that fall within their field of membership.

Q. How is a credit union funded in order to provide those services?

A. Through member deposits.

Q. I believe you've used the term "a share" before in your testimony. Can you explain what a share is?

A. A share -- so, upon joining a credit union, there's a minimum deposit amount, usually five dollars, $25, and that's considered your share. So that's your share in that credit union. So that's typically called your regular share.

You also have shared drafts, which are just like a checking account at a bank.

Q. How does a credit union generate revenue?

A. They generate revenue through loan and investment interest income primarily. There's also other sources of income, such as fee income, which may be for nonsufficient funds fees, overdraft fees, credit/debit card interchange fees, ACH

processing.
Q. What is ACH? What does that stand for?
A. Sorry. It's an acronym for automated clearinghouse.
Q. I'll ask you some more questions about that later on.
Are you familiar with the term "charter" as it relates to a credit union?
A. Yes.
Q. What is a charter?
A. The charter is essentially the federal credit union's license to operate as a federal credit union.
Q. Are there different types of credit union charters?
A. Yes. For federal credit unions, there's three different types of charters. You have a single common bond, multiple common bond, and a community charter.
Q. Are you familiar with the term "low-income designated credit union"?
A. Yes.
Q. What does that mean?
A. So it's a specific designation a credit union can have if a majority of their field of membership fall below a certain designation for low-income. And NCUA -- we have an office that determines this. On a periodic basis, they'll assess credit unions' field of memberships and locations to see if they're primarily low-income and let them know that they've been approved for low-income designation. The credit union just has

to say, yes, we accept. Or if the credit union believes they're a low-income designated credit union, but NCUA hasn't approached them yet, they can request that NCUA looks into that process for them.

Q. Now, are there any laws or regulations that govern the management and operation of credit unions?

A. Yes.

Q. Can you just briefly describe what those laws or regulations are, just generally, without going into the details?

A. Okay. So there's a number of rules, and regulations, and laws, primarily the Federal Credit Union Act, NCUA's rules and regulations, the Bank Secrecy Act, the USA PATRIOT Act. There are certain laws and regulations enforced by the Office of Foreign Asset Control, Financial Crimes Enforcement Network, and there's also a variety of consumer compliance-related regulations.

Q. I might ask you some more specific questions about some of those laws and regulations later on in your testimony.

A. Okay.

Q. For now, can you describe the process of forming a federal credit union?

A. So if a group of individuals wanted to start their own credit union, there's an application process that goes through NCUA's Office of Consumer Financial Protection & Access. I

think they call it a charter application. There's also various other documents that you have to submit with this request, one of which included your proposed field of membership. So you're going to outline what group of people, what sponsor company, what community you plan to serve.

Q. Does the NCUA have to approve the chartering of a new credit union?

A. Yes.

Q. Is it possible to either buy or sell a federal credit union?

A. No.

Q. Why not?

A. It's just impossible. Each member of the credit union owns a share. You can't sell your shares to another individual. No individual can ever have more than one share.

Q. Now, you mentioned a number of laws and regulations that govern credit unions. Do credit unions themselves have any kind of internal governing rules?

A. So -- can you repeat the question, please?

Q. I'm sorry. Do credit unions have any type of internal governing rules?

A. Yes.

Q. And what are those?

A. So those would be called the federal credit union bylaws.

Q. What are bylaws?

A. So bylaws -- upon your charter being approved by NCUA and you starting your credit union, you have to adopt a set of bylaws, which is your framework for how the credit union will be operated, how the board of directors will be constructed, outline the various meetings of the members, meetings of the board, a variety of topics.

Q. Are members of the board of directors required to follow the rules set forth in the credit union's bylaws?

A. Yes.

Q. Who, generally, manages the affairs of a credit union?

A. The board of directors.

Q. Do you have to be a member of the credit union in order to serve on the board?

A. Yes.

Q. Are directors elected to the board?

A. Yes.

Q. When does that occur, and how does that happen?

A. So, members that would like to be on the board of directors have to be nominated, and the actual election takes place at the annual meeting, which they have just like the name suggests, it has to be held every year, and that's the time that any new board members would be voted as new members on the board.

Q. You mentioned something called being nominated. What does that mean?

A. So, according to whatever -- whichever election process the credit union chooses to go with, I think our standard bylaws has four different voting options. Depending on what type they go with, the board chair has to appoint a nominating committee. The nominating committee then goes out into the field of membership, approaches people that they think might be good for the board or anyone that's interested, they nominate, and then it goes towards their election process.

Q. Who elects the members of the board of directors of a credit union?

A. The members of the credit union.

Q. I believe you said earlier every member gets one vote at the annual meeting to elect?

A. Right. Regardless of their relations with the credit union or how much money they have on deposit, each member still only has one vote, and they have the opportunity to vote.

Q. In order to be nominated for the election, does that person have to be a member of the credit union at that time?

A. Yes. The individual would have to be a member of the credit union before the ballots are distributed.

Q. Now, you testified that the board of directors is generally in charge of managing and overseeing a credit union, correct?

A. Yes.

Q. How many board members can serve on the board?

A. The bylaws state that between five and fifteen members can

serve on the board of directors, and it must be an odd number.

Q. Now, is there anything that could disqualify a person from being a member of a credit union?

A. Yes. The clear one being they're not a member of the credit union. The other requirement would be that you've never been convicted of a crime involving dishonesty or breach of trust.

Q. Are there any officer positions on the board of directors of a credit union?

A. Yes.

Q. What are they?

A. Typically, there's four officer positions. You have the chairperson, vice chairperson, the secretary, and what's called either the treasurer or financial officer.

Q. Are you familiar with the term "supervisory committee"?

A. Yes.

Q. What is that?

A. So the supervisory committee is also comprised of members of the credit union, and they essentially serve as the internal audit. And essentially what that means is they review credit union operations like on a day-to-day basis, make sure they're doing what the board of directors want them to be doing, making sure their operations are in compliance with the various laws, and rules, and regulations. They're also in charge of engaging the annual audit. Federal credit unions are supposed to have

an annual independent audit every year.

Q. Now, you mentioned some of the other officer positions on the board. Can you describe what the role of the chairperson is?

A. So the chairperson presides over the meetings of the members and the meetings of the directors.

Q. And the role of the secretary?

A. So the secretary is tasked with the task of maintaining minutes of every meeting of the members, meeting of the boards. They're supposed to document every event that took place during the meeting and maintain those minutes.

Q. Are minutes just another way of saying that these are notes of what occurred at the board meeting?

A. Correct. It summarizes the events of what took place during that particular meeting.

Q. Are board members allowed to be paid for their service on the board?

A. The bylaws say that one board officer can be compensated for their services.

Q. What about the other members of the board?

A. There is also a section of the bylaws that has a blank spot talking about different board directors could be compensated as employees of the credit union, but the bylaws need to outline how many people, and that amount of people cannot make up a majority of the board of directors.

Q. And are the rest of the board members supposed to be volunteers?

A. Yes.

Q. How frequently are board meetings supposed to be held at credit unions?

A. On a monthly basis.

Q. As a general matter, what types of things does the board do at those monthly meetings?

A. So, during the monthly board meetings, they'll go over the current events of the credit union, what's going on or are there new products or services they are going to get involved in. They'll get into the financial reports. So they'll go over the balance sheet, the income statement, the loan portfolio, the loan delinquency reports, investment schedules. They'll also go through any new member accounts, closed member accounts, any recommended charge-offs from the loan portfolio that need to be approved by the board that. A variety of topics.

Q. I believe you testified that everything that happens at the board meeting is supposed to be recorded in the minutes; is that right?

A. Correct.

Q. Do credit unions submit their board meeting minutes to the NCUA?

A. Not typically.

Case 1:15-cr-00769-AJN Document 482 Filed 04/07/17 Page 104 of 260

Q. Are there any circumstances under which the NCUA would review the meetings of the board of a particular credit union?
A. So, as part of our examination process, when examiners actually go on-site to perform their exam or supervision contact, they will look at the board minutes dating back to the last time an NCUA employee was on-site.
Q. Are there any requirements regarding the completeness and accuracy of board meeting minutes?
A. Yes. It's required by law that anything contained in the board minutes is accurate.
Q. Why does that matter to the NCUA?
A. Well, like I said, it's required by law. Number two, we can't do our job effectively in insuring member deposits if we can't rely on the information that we're being provided by credit unions.
Q. Are there any rules or regulations that govern the conduct of board members of a credit union?
A. Sorry, can you repeat the question?
Q. Sure.
Are there any rules or regulations that govern the conduct of members of the board of directors of a credit union?
A. Yes.
Q. Where are those rules and regulations generally set forth?
A. In the NCUA rules and regulations.
Q. Are you familiar with the term "fiduciary duty"?

A. Yes.

Q. What is a fiduciary duty, generally?

A. So --

MS. SANTILLO: Objection. 702.

THE COURT: Overruled.

You may answer.

THE WITNESS: Okay.

A fiduciary duty? The directors on the board have a fiduciary duty or a responsibility to act in the best interests of the members of the credit union.

Q. Do board members of a credit union have fiduciary duties?

A. Yes.

Q. Does a chairman of the board have the same duties and responsibilities as the other members of the board of directors?

A. Yes.

MR. NOBLE: Your Honor, at this time I believe the parties would request that the Court instruct the jury concerning certain legal matters.

THE COURT: Without objection, counsel?

MS. SANTILLO: No, your Honor.

MR. CREIZMAN: No.

THE COURT: Okay. Thank you.

Members of the jury, I'll now instruct you on certain provisions of the Federal Credit Union Act and National Credit

Union Administration Regulations.

I instruct you that a violation of any of these laws or regulations is not a crime in and of itself. In other words, the defendants are not charged with criminal violations of the Federal Credit Union Act or the National Credit Union Administration Regulations, and you can't find either defendant guilty based solely upon a violation of the Federal Credit Union Act or the National Credit Union Administration Regulations or -- let me say that again. And I'm going to abbreviate National Credit Union Administration as NCUA. I'll just read that sentence again.

In other words, the defendants are not charged with criminal violations of the Federal Credit Union Act or NCUA regulations, and you cannot find either defendant guilty based solely upon a violation of the Federal Credit Union Act or an NCUA regulation. If you hear evidence about any violations of the Federal Credit Union Act or NCUA regulations, you may consider it as you would any other evidence in the case.

Field of membership: Under the act, the membership of a federal credit union is limited to those persons and organizations that fall within the credit union's field of membership. For community-chartered credit unions, the field of membership is limited to persons and organizations within a well-defined local community, neighborhood, or rural district.

The field of membership for the Helping Other People

Excel Credit Union was: (1) persons who live, work, worship or attend school in, and other businesses, and other legal entities in Lakewood, New Jersey; (2) spouses of persons who died while in the field of membership of this credit union, volunteers in the community, employees of the credit union, and organizations of such persons.

There are no additional National Credit Union Administration rules or regulations discussing the field of membership as it relates to business or legal entities.

Board of directors: The management of a federal credit union shall be by a board of directors and a supervisory committee. The board of directors is responsible for the general direction and control of the affairs of the credit union. The board of directors must consist of an odd number of directors and must have at least five members. The directors are to be elected at an annual meeting of the members of the credit union. Only members of a credit union are eligible to serve on the board of directors. The board of directors of the credit union must meet at least once per month. Minutes of all board meetings must be kept. At the first meeting after the annual meeting of the members, the members of the board must elect the board officers.

No member of the board or of any other committee shall, as such, be compensated except that the reimbursement of reasonable expenses incurred in the execution of the duties of

the position is not considered compensation. Only one board officer may be compensated as an officer of the board. All other board members must be volunteers.

Under the act and NCUA regulation, each director has the following duties: First, to carry out his or her duties as a director in good faith in a manner such director reasonably believes to be in the best interests of the membership of the credit union as a whole and with the care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances;

Second, to administer the affairs of the credit union fairly and impartially and without discrimination in favor of or against any particular member;

Third, at the time of the election or appointment, or within a reasonable time thereafter, not to exceed six months, have at least a working familiarity with the basic finance and accounting practices;

And, fourth, direct management's operations of the credit union in conformity with the requirements set forth in the Federal Credit Union Act, NCUA regulations, and other applicable law and sound business practices.

In carrying out its duties and responsibilities, the board of directors and its committees have authority to retain staff and outside counsel, independent accountants, financial advisors, and other outside consultants at the expense of the

Case 1:15-cr-00769-AJN Document 482 Filed 04/07/17 Page 109 of 260

credit union.

The last instruction here reports to the NCUA. Every federal credit union is required to submit periodic reports concerning the credit union's financial condition and profile to the NCUA. Each report must include a declaration by an officer designated by the board of directors that the report is true and correct to the best of the officer's knowledge and belief. Each credit union is required to maintain records that will readily permit the NCUA to verify the correctness of the credit union's reports of conditions and certified statements.

MR. NOBLE: Thank you, Judge.

BY MR. NOBLE:

Q. Mr. Curry, I'd like to now discuss or ask you some questions about services provided by credit unions.

What types of services do credit unions generally provide?

A. So, deposit and loan services. So that would be checking accounts, certificates of deposit, money markets, debit card, credit card, consumer loans, real estate loans, ACH processing, wire transfers.

Q. Does the board of directors have any role in overseeing the various services that are provided by credit unions?

A. Yes. They have the ultimate responsibility to make sure appropriate procedures and policies are in operation governing each type of service or product they offer.

Q. What role, if any, does the board play in reviewing new member accounts?

A. As I mentioned earlier, that would be required to be reviewed during their monthly board meetings. So, like I had mentioned earlier, the board meetings should cover new members, closed member accounts, and so during their board meeting they have, that happens every month. They would review new members to the credit union.

Q. Does the board's role in reviewing member applications vary depending on whether the application is for a person or for a business?

A. No.

Q. When the NCUA conducts an examination of a credit union, are new member accounts one of the things that the NCUA looks at?

A. Yes.

Q. Why does the NCUA do that?

A. Well, it's twofold. We do it to make sure that they fall within the field of membership. We also do it because the Bank Secrecy Act outlines various customer identification requirements that all financial institutions are supposed to go through when they open a new account.

Q. Can you describe some of the things that financial institutions are supposed to do under the Bank Secrecy Act with respect to new accounts?

A. So they're supposed to develop a customer identification program, and they're supposed to form a -- I mean they're supposed to put out steps to verify the identity of the member. Like they can determine that the member is who they say they are, and they have to verify different forms of identification, obtain a physical address, et cetera.

Q. Are there any particular or additional requirements for certain types of businesses that open accounts at a credit union?

A. Well, just like an individual, you need to make sure that business is within the field of membership. Depending on the nature of the business, what transactions they want to perform at your credit union, you may be required to perform enhanced due diligence on them.

Q. What does "enhanced due diligence" mean?

A. It just means -- like I said, again, depending on the nature of the business, you may need to take additional steps to see exactly what type of businesses they conduct business with, what industry are they in, what are they going to be using your credit union for.

Q. Again, why does the NCUA care that a credit union does those things?

A. Because, ultimately, NCUA, we protect the members of a credit union and our National Credit Union Share Insurance Fund, so we want to make sure the credit union knows who

they're conducting business with, making sure that they're complying with any federal law and regulation, and they're operating in a safe and sound manner.

Q. Now, you used the term "safe and sound manner." Is that a term of art that the NCUA uses?

A. Yes.

Q. Can you just generally describe what that means?

A. So, to operate safe and sound is to have a strong understanding of what action you're getting involved in, making sure it's in the best interests of the membership in the credit union, making sure it complies with any applicable law and regulation.

Q. Now, you mentioned that another service that credit unions can offer their members is processing ACH transactions; is that right?

A. Yes.

Q. Can you give the jury just some examples of what ACH transactions are?

A. So a couple of the obvious examples would be direct deposit. So if your employer pays you via direct deposit, that's an ACH transaction. If you've set up Bill Pay to pay various merchants and vendors, that is also an ACH transaction.

Q. Are there any rules that credit unions must follow in conducting ACH processing for its members?

A. Yes.

Q. What rules are those?
A. So the National Automated Clearinghouse Association, or NACHA, they've established various operating rules that financial institutions must adhere to.
Q. When the NCUA conducts an examination of a credit union, is the credit union's ACH processing one of the things that you look at?
A. Yes, typically.
Q. Why do you do that?
A. To make sure that they have -- that the board of directors have established the appropriate procedures and controls to conduct this business in a safe and sound manner.
Q. Are there any applicable laws or regulations that you check the credit union's compliance with when you conduct an examination, generally?
A. Yes.
Q. What are some of those laws and regulations?
A. Well, the Bank Secrecy Act, the laws and regulations put forth by the Office of Foreign Asset Control, Financial Crimes Enforcement Network.
Q. Let me stop you there. You've mentioned this a couple of times now, the Office of Foreign Asset Control. Is that also known as OFAC?
A. Yes.
Q. Can you just explain to the jury what OFAC is as it relates

to ACH processing in a credit union?

A. Okay. So OFAC, they maintain a list of specially designated nationals and block parties as a point of furthering our U.S. foreign policy and national security. So they maintain this list of these individuals, and credit unions, at the time they open an account, they're supposed to scrub this list to make sure this individual, or business, or organization that's trying to open an account is not on the list.

As far as the transactions go, such as ACH transactions, they need to have appropriate programs or software packages in place to make sure the transactions that are flowing through the credit union aren't for parties that would be maintained on this list.

Q. What, if any, responsibility does the board of directors have in overseeing the processing of ACH transactions at a credit union?

A. Well, they have the ultimate responsibility to ensure the procedures and the program they have in place is commensurate with the level of ACH activity they're performing.

Q. Do -- the board of directors, are they responsible for adopting the policies and procedures for ACH processing that you've been talking about?

A. Yes.

Q. Now, you've testified about something called the National Credit Union Share Insurance Fund; is that right?

A. Yes.

Q. I believe you said that that's one of the responsibilities of the NCUA, is to protect that fund; is that right?

A. Yes.

Q. Can you just explain, in a little more detail, what the share insurance fund is, and does it have any kind of equivalent in the banking sector?

A. So the National Credit Union Share Insurance Fund is essentially the same thing as the Federal Deposit Insurance Corporation, or the FDIC, that you hear talked about all the time in association with banks. So, we insure member deposits, just like the FDIC, up to $250,000.

So, our main role at NCUA is to protect both the members of credit unions and to protect the National Credit Union Share Insurance Fund. So, in doing so, we have to carry out our exam and supervision process, and in the event a credit union fails for any reason, we make the members of that credit union whole, so that they don't lose any of their deposits that they had on file at the credit union.

Q. Now, you've talked several times about examination, you've used the term examination. Can you explain to the jury what an NCUA examination entails, generally?

A. Yes. So, typically, on a 12- to 18-month basis -- it changes from time to time -- an NCUA examiner will go on-site and conduct what we call an examination of a credit union. So,

as part of the examination, we have a series of required and recommended review steps that examiners will go through to make sure the credit union is operating within all the applicable laws and regulations, review board minutes, loan portfolios, investment portfolios, review their annual audit, member account verification, a number of areas.

Q. How does the NCUA obtain the information that it uses to conduct the examination?

A. So we use the data that credit unions submit on a quarterly basis, and we also use the files and records that are provided to NCUA examiners while on-site at the credit union.

Q. Are credit unions required to provide that information to the NCUA?

A. Yes.

Q. You mentioned that there are periodic financial reports that credit unions submit to the NCUA?

A. Yes.

Q. What are those called?

A. They're called 5300 Call Reports and credit union online profiles.

Q. Starting with the call report, can you just describe, generally, what information is included in this?

A. The 5300 Call Report will include all of the financial data for the federal credit union. So, it will include the balance sheet information, income statement, loan portfolio

information, investments, et cetera.

Q. Are you familiar with the term "net worth ratio"?

A. Yes.

Q. Can you describe what that means in relation to credit unions?

A. So, the net worth ratio is the capital that a credit union has accrued over its existence. So the net income that you would generate from your operations flows right into your net worth figure, and so the net worth ratio would be your amount of net worth, or capital, in relation to your total asset size.

Q. Are there certain percentages of net worth ratio that credit unions are expected to maintain?

A. Correct. We would expect you to maintain a net worth ratio of at least 7 percent.

Q. Now, how, if at all, does a net worth ratio relate to, say, ACH processing at a credit union? Is there any relation?

A. There's some relation as far as judging the safety and soundness of a particular program. If you had a very low net worth ratio, we would not expect it to be a safe and sound decision to move into a new program that may include a number of risks that you are not familiar with.

Q. Can ACH processing, the financial flow of money involved in ACH processing, affect a credit union's net worth ratio, and, if so, how?

A. It could if there were any unauthorized ACH transactions

flowing through your credit union. I'm not that familiar on the specific deadlines for each type of transaction, but it's typically 30 to 60 days. Consumers or businesses have that 30-to-60 day time frame to dispute any unauthorized ACH transactions.

Q. How would particular members depositing of a large amount of money in a credit union affect a credit union's net worth ratio?

A. So, if a number of members, let's say, deposited a large amount of money into the credit union on -- like today, for example, the net worth ratio would drop significantly because the denominator, which is the asset size, will have expanded, but the capital, or the net worth, which is the numerator, would have stayed the same, so the ratio would have dropped.

Q. Is the net worth ratio data typically reported in these 5300 Call Reports that you have been testifying about?

A. Yes.

Q. I'd like to ask you about the other type of report that you mentioned credit unions are required to file. Can you remind the jury what that is?

A. It's called a credit union online profile.

Q. And what information do profiles typically contain?

A. Essentially it's a snapshot of a particular credit union. So it'll tell you where they're headquartered, what branch offices they have, who's on their board of directors, who's

part of the senior management team, what products and services they offer, a variety of information.

Q. Are there any requirements about the truthfulness and accuracy of the information that credit unions provide to the NCUA in those reports?

A. Yes. The information is supposed to be accurate.

Q. Why is that?

A. It's required by law in the Federal Credit Union Act.

Q. Are you familiar with the term "CAMEL rating," C-A-M-E-L?

A. Yes.

Q. What is CAMEL?

A. CAMEL is an acronym. It stands for capital adequacy, asset quality, management, earnings, and asset liability management, and it's an internal rating that NCUA and other financial regulators use to measure the risk and allocate resources for supervision efforts.

Q. Can you explain to the jury how a variation in the CAMEL rating, how that equates to how risky or less risky a credit union is?

A. So, each -- the five components I outlined in CAMEL, they each receive a rating of one to five, one being strong, five being weak, and then there's a deposit, and it's the same scale, one being great, five being weak. So, a CAMEL 1 credit union would have minimal, minimal risk, or if they do have any risk, it's well managed, there's not a lot of risk on their

balance sheet or in their operations. And, adversely, a CAMEL 5 would have a large amount of risk, it's uncontrolled, requires constant supervision by NCUA.

Q. Can you describe what steps an examiner can take if he or she detects problems or issues at a credit union during an examination?

A. So it will depend on the severity of the issue or the materiality of the risk that was observed during the exam. Typically, though, we like to work with management, draft it in an examiner's findings, which is very informal. Typically, you want to work with credit union management in developing time frames for that, so you come up -- you'd have your issue, you'd draft it, throw out a date, say you think you can have this resolved in the next six months. You try to negotiate a time frame for completing this.

If it's a more severe issue, we would go the route of a document resolution corrective action item, which outlines the finding, outlines the corrective action, the requirement that we were placing on the credit union management, and it will include a deadline that we expect to see that issue resolved in.

Q. Is the document of resolution sometimes referred to as a DOR?

A. Yes. Or a DOR.

Q. A DOR?

What happens if the credit union doesn't resolve the issue after the DOR is issued?

A. Again, depending on the severity, if it's not overly material, we may reissue it as a repeat DOR item. But if it's a material issue that we wanted to see resolved within a short amount of time, and it goes unresolved or ignored, then we would upgrade our administrative action to what's called a letter of understanding and agreement.

Q. Is that sometimes referred to as an LUA?

A. Yes.

Q. Can you just describe what an LUA is?

A. It's a more formal approach at resolving the corrective action that we required to be resolved. So it will include a lot of the same language that's included in the DOR, except the credit union officials are required to sign it, agreeing that -- essentially signing an agreement that they will agree to resolve these issues contained within, and then the NCUA examiner, supervisor, and regional director also sign this document.

Q. What happens if the problem continues and is not addressed after the LUA is issued and signed by the board?

A. We explore other options, which the next option in line would be what's called a preliminary warning letter, and it's exactly like what it sounds like. It's warning that if -- it's warning credit union officials that if they don't take actions

to resolve the issues immediately, we have additional enforcement actions that we can take, if necessary.

Q. And what are some of those other additional more formal enforcement actions the NCUA can take?

A. It would be a cease and desist, conservatorship, civil money penalties, et cetera.

Q. You mentioned something called "conservatorship." What is that?

A. A conservatorship is essentially a last line of defense on NCUA's part where the issues are so bad, and they're not being resolved, there's ineffective management, the NCUA comes in and essentially takes control of the credit union in the best interests of the members. So they'll come in, box up the files, restrict access from current credit union officials to any kind of online bank accounts, third-party vendor sites, and essentially change the access from credit union officials to NCUA.

Q. Is it fair to say that in a conservatorship, the NCUA takes over the credit union and tries to run it?

A. Yes.

Q. What are some of the options that can happen after a credit union is placed into conservatorship?

A. It can perform a purchase and assumption agreement.

Q. In layman's terms, what does that mean?

A. That means you're working with another credit union in an

attempt to continue the services for the current credit union members. We want to do -- make every effort we can to continue that service. So we want to find a credit union in the general locality that is able to take them in, and they'll essentially purchase any loans, if they want, assume any of the liabilities or shares in this instance.

Q. What happens if you can't essentially merge that credit union with another credit union?

A. So like I mentioned, we want to go forward with the purchase and assumption agreement, if possible, but, if not, and the credit union ultimately becomes insolvent, we would have to approach an involuntary liquidation.

Q. What does "insolvent" mean?

A. Insolvent essentially means the credit union can no longer pay their debts. So the amount of liabilities that they owe and the amount of shares that they have on their balance sheet exceed the value of the assets they hold.

Q. And what happens in a liquidation?

A. So, in a liquidation, we essentially -- our asset management and assistance control center located in Austin, Texas, will try to sell the assets. If they can't work with another credit union in selling these assets or having them take on the shares, we'll pay out the shares to the amount that's on record. We'll also work with the borrowers in accepting payments on behalf of the credit union, et cetera.

Q. If a credit union, in liquidation, doesn't have enough assets to cover its members' deposits, what happens in that scenario?

A. So, that would essentially come down to a liquidation loss, which would be a hit to the National Credit Union Share Insurance Fund. So we would have to pay out the difference in order to make -- to pay off any outstanding third-party contracts or member share deposits.

Q. So, essentially, it would make the members whole by paying them through the insurance fund?

A. Yes.

Q. Up to $250,000, I believe you said?

A. Yes. It also depends on how their specific accounts are structured.

MR. NOBLE: Judge, I'm about to transition to a next segment of my direct.

THE COURT: All right. Thank you.

Members of the jury, we'll take our lunch break now. It's 12:55. Please be back in the jury room ready to go by 1:55, so we can start right then. Thank you so much. Enjoy your lunch.

(Luncheon recess)

(Continued on next page)

(Jury not present)

THE COURT: Matters to take up?

MR. NOBLE: Judge, may the witness be excused?

THE COURT: Yes. You may step down.

(Witness temporarily excused)

THE COURT: Is there a matter to take up?

MR. NOBLE: Not from the government.

MS. SANTILLO: Not right now, your Honor.

THE COURT: All right.

Anyone anticipate a discussion before we return?

MS. SANTILLO: Your Honor, one issue that I'd like to sort of discuss with the government a little bit more is, we've had extensive in limine practice about the conservatorship and the liquidation in this case, including the fact that the actual findings of the NCUA couldn't come into evidence because they were highly prejudicial, and they were also hearsay. So I want to make sure that we maintain that line. We just kind of did an overview of that process, but I just want to get some more clarity from the government about where they plan to go with that, and so we may have an issue that relates to that.

But I don't know, because as we talked yesterday, we kind of agreed that we were going to steer clear of that, but I just don't know how much more we're going to revisit that topic.

MR. NOBLE: I made a factual proffer to counsel as to the relevance of the fact that HOPE FCU was placed into conservatorship. I don't intend to elicit the reasons why the NCUA did so. I expect he will just testify that the conservatorship occurred, he participated in it, the NCUA ran the credit union for about a month, and then they liquidated it, and that's it. I'm not going to get into the loss, I'm not going to get into the underlying reasons for the conservatorship that were set forth in that confidential statement that we tried to get into.

I would say, however, if -- on cross-examination, if defense opens the door to questioning why the NCUA took certain steps that it did, particularly with respect to conservatorship or liquidation, it could be fair game for the government on redirect to ask this witness some questions based upon his knowledge for why the NCUA took the regulatory -- the enforcement actions that it did.

THE COURT: All right. So why don't you take Ms. Santillo's suggestion, just discuss a little bit further to see if anyone has uncertainty about the basic lines. And I appreciate hearing this, so I can get my head fresh in my in limine ruling and have that line in mind as well.

So enjoy your lunch. Why don't we plan to be back 15 minutes before the jury. Thank you.

MR. NOBLE: Thank you, Judge. (Luncheon recess)

AFTERNOON SESSION

1:51 p.m.

(In open court; jury not present)

THE COURT: Matters to take up?

MS. SANTILLO: Yes, your Honor. We did discuss and we kind of know what the primary issues are, and I think it comes down to a couple of things. One thing that we were hoping to do is to get clarity on one of your --

THE COURT: I can only partially hear you.

MS. SANTILLO: I'm sorry. One thing we were hoping to do was get some clarity on one of your prior in limine rulings. The government had moved in limine to try to introduce evidence related to email accounts and the subpoena response for Mr. Gross. We understood your ruling to be that the government was precluded from asking Mr. Gross questions about his subpoena response and the adequacy of that. I think both the government and I have an open question about whether it would be permissible to talk about when passwords were turned over to the NCUA, the fact that the Collectables Club accounts, which had been closed in December, 2014, the fact that those passwords were not turned over to the NCUA somehow creates some inference that he was trying to hide something, and that's what the government would want to prove, I think, and that's what they set forth in their motion.

Is that correct? I don't want to mischaracterize your

motion.

MR. NOBLE: No, that's correct. To orient your Honor, this was in the context of the conservatorship when the NCUA took over the credit union and asked Trevon Gross to provide access to all the email accounts. He turned over a portion of them but did not turn over the email accounts relating to the Collectables Club members to the NCUA. And that's the portion of the evidence that the government believes, according to your Honor's ruling, is still admissible, as opposed to whether or not the subpoena -- the grand jury subpoena return produced by the credit union was complete, which your Honor has ruled we cannot put in in our case in chief unless they open the door.

THE COURT: I'm going to have my clerk pull up the transcript while you're talking.

MS. SANTILLO: We don't think any of it is relevant because this all happened in October, 2015. Nobody asked him for the passwords of the Collectables Club. Those email accounts had been closed a year before and there was no follow up until the trial started.

MR. NOBLE: But your Honor, I believe that this issue has been settled. I'm looking at the February 14, 2017 transcript. It's at page 277 or 276.

THE COURT: I'm waiting. It's at what page?

MR. NOBLE: This is in the middle of Ms. Choi's explanation of the --

THE COURT: What page?

MR. NOBLE: 276.

THE COURT: So what did you want to point me to?

MR. NOBLE: Your Honor, Ms. Choi had been arguing that there's a distinction between the response to the grand jury served on the credit union and Trevon Gross' failure to turn over all of the email accounts associated with the HOPE FCU domain name when he was requested to do so by the NCUA during the time of the conservatorship.

THE COURT: So a distinction between the grand jury subpoena and --

MR. NOBLE: Yes. There were different points in time. The failure to turn over the email accounts occurred in October, 2015 --

THE COURT: Right.

MR. NOBLE: -- during the conservatorship, and I think that your Honor had ruled, and Mr. Klingeman said that -- and this is on page 277, line 11 -- "As I indicated last night, intimately involved. But be that as it may, all I'm saying is our attempt to defend against and rebut the allegations concerning Mr. Gross' response to the NCUA does not open the door to the government introducing evidence about his response to the grand jury. That's solely my point. We're going to go mindful of the door. We're going to stay away from the door," et cetera.

And there, I think Mr. Klingeman recognizes a distinction being drawn between the evidence concerning the grand jury subpoena response and the issue of failing to turn over all the email accounts to the NCUA when requested to do so.

And the email is clear -- we can bring up the email -- but the NCUA clearly requested all email accounts associated with the domain name. We have other evidence that will show the Collectables Club email accounts were still in existence at the time, and to this day, the subpoena return from the internet service provider shows that there's data in those accounts, and Trevon Gross failed to turn over those email accounts belonging to the Collectables Club members to the NCUA, and we believe it's a fair inference from there that he's trying to hide something, he was trying to hide his relationship with the Collectables Club, the fact that they had email accounts, and that's the evidence that we intend to seek to admit.

And the reason why that's relevant to this conversation today is because we intend to ask Mr. Curry about his involvement with the conservatorship, the fact that the conservatorship occurred, what that meant, ie., that the NCUA took over control of the credit union, its books, its records, its accounts, and that's it. I just want to be able to elicit that background fact because that's necessary to understand the

context in which the NCUA was requesting control of the credit union's email accounts.

I have other relevant proffers as well, but I think that's sufficient as to why we should be able to elicit the mere fact that HOPE FCU was placed into conservatorship without going into, as your Honor has ruled, the underlying reasons why the NCUA did so. I don't intend to elicit that from Mr. Curry or from any other NCUA witness unless, as I said before, the door is opened by the defense.

MS. SANTILLO: I want to go back to the initial ruling, because the reason that we had argued that none of this email stuff should come in at all is because all of this took place in October, 2015. There were no followup requests for information. This is something that the government didn't raise until the eve of trial, and we think that that's belated 404 evidence.

THE COURT: But what was raised at the eve of trial was related to the return of the grand jury subpoena.

MS. SANTILLO: It was both. It was both. They put it in the same email -- or the same motion in limine that they wanted to introduce both of these pieces of evidence against Mr. Gross.

MR. NOBLE: Judge, we had this evidence. I don't think that we had any obligation to move on it in limine. And moreover, this was in response to the belated motion by defense

counsel for the spoliation instruction that it was the government's fault that these email accounts were not preserved, or not properly turned over to the defense. And so the reason why this came up is because of the defense's motion, and we responded. And therefore, to make it completely explicit, we moved in limine in accordance with the deadlines set by your Honor to make it clear that we intended to put in both the grand jury subpoena response evidence, which your Honor has ruled could not come in, and this failure to turn over all the email accounts to the NCUA.

And your Honor, this is not 404(b) evidence for which we have to give notice, it's direct evidence of corrupt intent on the part of Mr. Gross because it's part of the coverup. That's direct evidence. We've cited the cases earlier in our motion in limine as to why evidence of a defendant's participation in a coverup is probative of his intent with respect to the bribery offenses.

MS. SANTILLO: Your Honor, these people were shut off from these accounts in December, 2014, as the evidence we discussed yesterday showed, and so the question was, the NCUA asked, give us the passwords of the accounts, and all the other accounts that were actually active accounts were turned over.

So this is a very minor issue that has not -- he was never asked for any follow up. He had already resigned from his role in the credit union by that point.

And the conservatorship is so deeply linked to the issues in the criminal case that there's just tremendous prejudice and sort of sifting through the difference between what the conservatorship meant in terms of the finances of the credit union versus the criminal case that we're litigating right now.

MR. NOBLE: Well, Judge, just to respond briefly to that point, or the previous point. Whether or not this was part of a coverup for Mr. Gross to -- you know, failure to turn over all the email accounts is a factual matter that can be argued to the jury. This is about -- like it goes to weight, it doesn't go to the admissibility of this evidence. Defense counsel can argue, as she just did, to the jury that he didn't really mean anything, it was just a misunderstanding, it wasn't corrupt intent. That's all argument for the jury. But the government should still be permitted to introduce this evidence and make the counterarguments to the jury.

THE COURT: Just a moment. I'm going to read back a few more of the transcript.

(Pause)

THE COURT: I think there's somewhat of a problem with the transcript that it's difficult, at least on the screen, for me to work through.

My preliminary ruling, which then led into a discussion that bifurcated the grand jury subpoena from the

emails turned over to NCUA, my preliminary ruling had been to both, and then the biforcation happened at the question of door opening, as I read the transcript.

So with that background in mind as what I ruled to, I do think that what you're suggesting, Mr. Noble, falls within my ruling excluding it.

MR. NOBLE: To be clear, the Court is excluding the evidence of the failure to turn over all the email accounts as requested by the NCUA to Mr. Gross?

THE COURT: For the same chain of custody confusion and prejudice issues articulated at the conference.

MR. NOBLE: Would your Honor entertain a written motion for reconsideration on that point?

THE COURT: I'd be happy to take that in light of what is a little bit of a jumble --

MR. NOBLE: A murky -- right. I'm not sure that that issue was fully fleshed out at the prior conference, and there does appear -- despite your Honor saying there was clarity, I think there is some lack of clarity in the record, so we would appreciate the opportunity to at least set forth why we think this is different.

THE COURT: That's fine. Obviously, not to get into today, but --

MR. NOBLE: Of course not. Right.

THE COURT: That's fine.

MR. NOBLE: I could proffer other reasons if your Honor maintains that ruling as to why conservatorship -- the fact of conservatorship is still necessary. Largely, it's necessary background evidence to explain some of the subsequent testimony from other NCUA officials who were involved -- also involved in the examination and conservatorship.

For instance, Terry Adam, who is one of the examiners, he was the supervisor examiner for the credit union in 2015, will be testifying about various things, including his involvement in the conservatorship, and during which time he had communications with Mark Francis regarding efforts by Kapcharge to find out what was going on with HOPE Federal Credit Union, whether there was anything they could do to assist the credit union and whether the NCUA would permit Kapcharge to continue to process ACH transactions through the credit union. And that would come in in the background with the background evidence that Kapcharge was providing additional funding to the credit union, as we talked about before, paying for the salary for Charles Blue, the CEO, so that he could be the one at the credit union trying to convince the NCUA to allow the credit union to process the ACH transactions for Kapcharge. They also funded $30,000 worth of legal fees that the credit union was incurring because of their insistence on trying to process the ACH transactions. So Terry Adam will be testifying that he took control of these email accounts, he had

control of the credit union's email accounts, and during that time he had correspondence, they received correspondence, found correspondence with Kapcharge about these issues. They discovered the emails about the legal fee payments, and they also had phone conversations with Mark Francis where he's explaining and trying to convince the NCUA to do whatever they can to continue to process the ACH transactions through the credit union, notwithstanding the fact that it been conserved. I think that that's relevant evidence of the ongoing conspiracy, it's statements of a coconspirator in furtherance of the conspiracy to continue to try to convince the NCUA that everything that they were doing at the credit union, that is Kapcharge was doing at the credit union, was on the up and up, and basically trying to lead the NCUA astray as to, you know, that nothing nefarious was going on. So it's necessary to explain --

THE COURT: And just redefine the "it's" so that we have clarity.

MR. NOBLE: The fact that the NCUA had placed the credit union in conservatorship is necessary.

THE COURT: That's all that's in the bucket?

MR. NOBLE: Yes. Just the fact of conservatorship.

THE COURT: Because of the lack of clarity we're wading through, I think it's important to pause and not use pronouns frequently, but make sure we're on the same page.

MR. NOBLE: Sorry.

THE COURT: So the government's specific application is to elicit the fact of HOPE FCU being placed in conservatorship.

MR. NOBLE: That's it.

MS. SANTILLO: And just to clarify, you're not talking about liquidation?

MR. NOBLE: No. We won't elicit the fact -- we've discussed internally, we won't elicit the fact that the credit union was subsequently liquidated because we don't think that's relevant to the charges in this case necessarily. I think a case could be made as to the relevance, but based on your Honor's prior rulings, we don't think we can advance that argument, but we do think -- and we have a good faith basis for saying -- that conservatorship, and the fact of conservatorship, is relevant as relevant background evidence to explain why certain things happened that are relevant to the conspiracy.

MS. SANTILLO: Your Honor, I think the fact that the NCUA has access to documents and records from the credit union is established by the fact that they are examiners and they can go in and they can do it.

THE COURT: Are you making an objection to eliciting the fact that HOPE FCU was placed in conservatorship?

MS. SANTILLO: That was our initial motion in

connection with the ruling that your Honor made, because the conservatorship didn't come about until after the criminal complaints were filed in July, 2015. And the reasons for the conservatorship were deeply intertwined with the criminal investigation. And the examiners then started sharing information with the U.S. Attorney's Office, and that was the reason that the NCUA put the credit union into conservatorship. So it's not relevant to the charges against Mr. Gross.

THE COURT: Well, a statement of relevance was just articulated, which is certainly plausible on its face.

MS. SANTILLO: Well, if you think about a conspiracy with Mark Francis, the fact that he's calling the NCUA when Pastor Gross had resigned from the credit union, before the conservatorship, the credit union was already in conservatorship and he's reaching out, that's not a conspiracy that he's even -- he wants to do business with the new credit union that was taken over by the NCUA, he's not trying to do business with Pastor Gross. Pastor Gross was not even a part of that business.

THE COURT: The government's specific proffer was that it goes to the relevance of -- state again, Mr. Noble, with clarity, the --

MR. NOBLE: It's relevant evidence of the existence of the conspiracy, the fact that Mark Francis felt that he was in a position to be reaching out to the NCUA directly, sending

emails to Charles Blue to try to find out what was going on with the meeting with the NCUA, which NCUA witnesses will testify is completely improper to have a member corresponding with management of the credit union about their examination. And these are all things that were discovered because the NCUA got access to those email accounts during the conservatorship. It's not in the normal course of an examination that the NCUA would have access to all the email accounts of the credit union management, it's only because they had those and they found those emails in those accounts.

And then Mark Francis called them after they had found those emails, as well, and made the statements that were referred to earlier. I think it's critical evidence to explain why the NCUA was in a position to be receiving this correspondence from Kapcharge, and it's evidence of the ongoing conspiracy and the level of access that Kapcharge had to the credit union officials.

MS. SANTILLO: I just don't know what it has to do with Mr. Gross.

THE COURT: Well, your point is you don't know what it has to do with Mr. Gross because the defense is that, even to the extent a conspiracy existed, he's withdrawn at this point.

MS. SANTILLO: And not only that --

THE COURT: Right? Is that what's driving your argument?

MS. SANTILLO: Yes. He had no involvement with Mark -- you know, with the credit union at that time.

THE COURT: So I do think we've come to what you're suggesting is a lack of relevance are really defense arguments to be made to the jury and found by the jury and not by the Court. So on the specific question of whether the government may elicit testimony and evidence of HOPE FCU being placed into the conservatorship proffered for the purpose of showing the continuation of the conspiracy, the objection is overruled.

MS. SANTILLO: Okay. That leads me to a second issue, which is that there's this question about legal fees.

THE COURT: The question about what?

MS. SANTILLO: Legal fees. And we have concerns about that because we don't want it in the case. Maybe we can agree to a sort of compromise to say that payments were made as opposed to legal fees because it's just a --

THE COURT: I don't know what you're talking about, so if this is a conversation for me to join, you have to give me a little more context.

MR. KLINGEMAN: Could I have a moment with the government?

THE COURT: Go ahead.

MR. KLINGEMAN: Your Honor, we'll take this up separately. Thank you.

THE COURT: Okay. You'll go back and look at the

transcript and you'll make an argument if you want reconsideration?

MR. NOBLE: We'll put it in writing.

THE COURT: Let's set a timeframe so they've got an opportunity to respond.

MR. NOBLE: Judge, just due to the trial schedule and witness prep and stuff, we don't think this is evidence that would come in until near the end with one of the last NCUA witnesses.

THE COURT: Okay.

MR. NOBLE: So if we could just have until some point over the weekend, even like Saturday afternoon, we'll file a letter.

THE COURT: I'll let you confer so they can work out what's fair. But there was a point in the transcript -- I started my initial ruling on 257 to 58. There was discussion. I reaffirm the ruling at 270. It was then at 271 that we got into the question of what might open the door, and I think this is where the conversation sort of narrowed to the grand jury subpoena return, but you can take a look.

At page 271 to 272, Ms. Choi says, "We are not intending to go forward in our affirmative case with regard to the October deletion prior to turning over emails to the NCUA."

MR. NOBLE: Yes. That's different. We're not arguing about the deletion of the emails, it's --

THE COURT: Talking about turning over some --

MR. NOBLE: -- access to the emails themselves as opposed to the deletion. That was the distinction I think we were trying to draw.

THE COURT: Okay.

MR. NOBLE: We'll confer.

THE COURT: The ruling stands based on what was teed up to me previously, and I'll take your motion in light of the potential for confusion.

MR. NOBLE: Okay. We'll confer on that schedule for the Court's consideration.

THE COURT: Please.

MR. NOBLE: Okay.

THE COURT: Other matters?

MR. SHIN: Your Honor, may I briefly? There's one other topic --

THE COURT: I can only partially hear you.

MR. SHIN: There's one other topic regarding the potential cross examination of Mr. Hill. I apologize for not raising it earlier. I've discussed it with Mr. Klingeman and Mr. Creizman. His criminal history includes convictions arising from two burglaries that he and others committed. He was convicted of those and he served a sentence on those crimes.

The initial charge on one of the burglaries included a

homicide charge. He was ultimately not convicted of the homicide, and Mr. Hill has proffered to the government that in the course of the burglaries, he and his accomplices heard someone screaming, they fled. He later learned -- word got back to him that the occupants of one of the homes had had a stroke, but this was kind of like word on the street that got back to him. He otherwise proffered to us that he has no idea what happened with that occupant.

I'll note he was not convicted of that charge, and so I've asked Mr. Klingeman and Mr. Creizman whether they would agree not to cross examine on that charge or the facts surrounding what happened to this person who may have had a stroke, the occupant of the home.

I think we've come to agreement. The government's position is that that initial charge and the facts about what happened to that person do not go to his credibility, and therefore, are not a proper subject of cross examination.

THE COURT: Okay.

Mr. Creizman.

MR. CREIZMAN: I concur so long as the government doesn't provoke me, but yes.

THE COURT: Speaking of provoking...

Mr. Klingeman.

MR. KLINGEMAN: I agree.

THE COURT: Okay, thank you.

MR. SHIN: Thank you, Judge.

THE COURT: What I had read in coming in pertained not to what you've raised, but you have clarity as to the lines around this witness' testimony?

MR. NOBLE: Yes. I'm not going to ask him about the liquidation, but I'll instruct the witness not to mention the fact that HOPE FCU was liquidated when he comes in.

THE COURT: Okay. Otherwise, the defense is basically aware of the scope of the testimony coming, and there are no issues that need -- obviously, sometimes issues emerge but --

MR. NOBLE: As far as I know. I mean, if they have objections to my particular questions, they can object, but I sent two days ago the exhibits that I intend to use, and those are all the same.

We also recently received copies of the bylaws of HOPE Federal Credit Union. I had emailed counsel last night to see whether they have any objection, and I don't think they do as long as I'm not asking the witness to interpret the bylaws. I think we're just going to have him read certain portions of the bylaws.

THE COURT: How much longer with the witness?

MR. NOBLE: At least an hour. We're about to get into the actual facts of HOPE FCU, so we got the background out of the way, we're now focusing on his knowledge of the facts.

THE COURT: I guess I'll raise what had come up in the

in limines around the NCUA documents that had originally been put forward as documents and testimony.

My ruling, because I didn't have any specific examples of testimony in that regard, was limited to the specific documents discussed, and I just want to make sure everybody has -- if there are lines to be drawn here, that we should discuss it -- I have an opportunity to hear from you without forcing the jury into a sidebar.

MS. SANTILLO: Yes, your Honor. I do think there is some danger in terms of -- you know, I raised one 702 objection.

THE COURT: With respect to a question about the fiduciary duty and the meaning of it, which was a word he was using in his testimony. That was the only 701 objection.

MS. SANTILLO: Yes. And I do think there are other lines that I would like to kind of hear your Honor's view about because there were some things where he said like "bylaws say", and he wasn't even being specific. And we just got the bylaws for HOPE FCU last night, and there's also kind of general bylaws that he was talking about. So I just don't know -- he seems to be opining on sort of the Bank Secrecy Act, and OFAC, and all this other stuff that is really like regulatory regimes, which is fine, but once he -- if he starts interpreting the law then I think we're going to have some problems.

THE COURT: Mr. Noble.

MR. NOBLE: I mean, I don't anticipate that he is going to be interpreting any law. The rest of his testimony is based on his knowledge of the facts and what happened at HOPE FCU.

I can proffer that his involvement focused mainly on responding to the initial tip, we've called it, from the former NCUA employee about what was going on at the credit union, that that person had been contacted by Anthony Murgio, and Mr. Curry was tasked with looking into it.

Then he's going to testify about what he found when he was looking into it, when he looked into particular issues, which resulted in the NCUA instructing the examiners to look at certain issues.

He's not going to testify what the examiners found because he doesn't have the personal knowledge.

He'll also testify, too, about the ACH processing and how the NCUA became alerted to the ACH processing at the credit union. Again, similarly, he sent in the examiners to look at this issue, the ACH processing.

He's not going to testify about what the examiners found. Again, he doesn't have the personal knowledge.

And I believe that's pretty much the bulk of the remainder of his testimony. I can just show him some exhibits, but he's not going to be testifying about the underlying

reasons, for example why HOPE FCU was placed into conservatorship, as I've said before.

THE COURT: All right.

MR. NOBLE: In a lot of ways his testimony really gives the context for the testimony of the examiners who are actually on the ground and have personal knowledge and can testify from personal knowledge what they saw going on at the credit union based on their conversations with Mr. Gross and others, their review of documents, et cetera. This is basically just kind of setting up that testimony.

THE COURT: Okay.

MS. SANTILLO: Okay.

THE COURT: Thank you.

We'll bring in the jury. Bring the witness up, please.

(Continued on next page)

(Jury present)

THE COURT: Thank you, members of the jury. I apologize for keeping you waiting. We were working through a few legal issues to try to help keep the process moving efficiently, and it seems as though it would be better to leave you in the jury room while we sort that out, rather than having you sitting here silently. I do apologize for falling a little bit off our schedule. I hope you had a pleasant lunch.

Mr. Noble, you may resume your direct examination of Mr. Curry.

Mr. Curry, I remind you that you are under oath.

MR. NOBLE: Thank you Judge.

CLAYTON CURRY, resumed.

DIRECT EXAMINATION (cont'd)

BY MR. NOBLE:

Q. Mr. Curry, are you familiar with a credit union named Helping Other People Excel Federal Credit Union in New Jersey?

A. Yes.

Q. Is that also sometimes referred to as HOPE FCU?

A. Yes.

Q. If you use the term "HOPE FCU", will you understand what I'm referring to in my questions?

A. Yes.

Q. When did you first hear of HOPE FCU?

A. In August of 2014.

Q. And how did you hear about HOPE FCU?

A. A former NCUA employee, Jerry Coursen, I guess was approached by some individuals to develop some type of business plan that would be acceptable to NCUA in relation to HOPE -- HOPE Federal Credit Union located in Jersey for purposes of placing new individuals on the board and putting millions of dollars into the credit union.

Q. And for the record, is Coursen spelled C-o-u-r-s-e-n?

A. To my knowledge, yes.

Q. And was HOPE Federal Credit Union in the geographic region that you covered in 2014/2015?

A. Yes.

Q. After receiving that information from Mr. Coursen, did there come a time when you did some basic research about HOPE FCU?

A. Yes. That tip was provided to our regional director Jane Walters, who then contacted my supervisor, then it made its way down to me, and so I began researching almost immediately after that.

Q. Was HOPE Federal Credit Union insured by the National Credit Union Share Insurance Fund in 2014 and 2015?

A. Yes.

MR. NOBLE: Can we bring up Government's Exhibit 6133 in evidence?

Q. Mr. Curry, what is this document?

A. This is their insurance certificate showing that they are insured by the NCUA and what date that insurance certificate was issued.

Q. And what is the date that it was issued?

A. December 20th, 1978.

MR. NOBLE: You can take that down.

Q. Mr. Curry, was HOPE FCU, based on your research, previously known by any other name?

A. I believe prior to 2012 they were known as Lakewood Community.

Q. Federal Credit Union?

A. Yes. Lakewood Community Federal Credit Union.

MR. NOBLE: Could we bring up Government's Exhibit 6134 in evidence? Can we blow that up a little bit?

Q. Mr. Curry, what does this document indicate?

A. This is a certificate of name change drafted by NCUA.

Q. Can you just read it for the jury?

A. "I, the undersigned, certify that, in accordance with the prescribed procedures of the National Credit Union Administration, the name of the Lakewood Community Federal Credit Union was changed to Helping Other People Excel Federal Credit Union. The amendment of the charter changing the name of the credit union was approved on November 1st, 2012."

Q. Now, this mentions that HOPE FCU had a charter, correct?

A. Yes.

Q. What kind of charter did HOPE FCU have?
A. A community charter.
Q. Can you just remind the jury what a community-based charter means?
A. A community-based charter means, depending on where the community is, you can serve anyone that lives, works, worships, or businesses or other entities located within that community.

MR. NOBLE: You can take that down Mr. Chang-Frieden.

Q. Did HOPE FCU have any type of special designation?
A. They were a low-income designated credit union.

MR. NOBLE: Could we bring up just for identification Government's Exhibit 6150?

Q. Mr. Curry, could you please just take a look at this document?

MR. NOBLE: Mr. Chang-Frieden, if you could flip through the various pages of the document.

Q. Mr. Curry, do you recognize this document?
A. Yes. It is HOPE's bylaws.
Q. Is this a document that was maintained by the National Credit Union Administration?
A. Yes.

MR. NOBLE: Your Honor, the government offers Government's Exhibit 6150.

THE COURT: Without objection?

MR. CREIZMAN: No objection.

MS. SANTILLO: No, your Honor.

THE COURT: 6510 is admitted. Thank you.

(Government's Exhibit 6510 received in evidence)

MR. NOBLE: May we publish for the jury?

THE COURT: You may.

MR. NOBLE: Mr. Chang-Frieden, could you flip to page 2. Can you please blow up the section number 2. No, section number 2. I apologize.

BY MR. NOBLE:

Q. Mr. Curry, can you just read what section 2 states of the bylaws?

A. Section 2, "Purposes. This credit union is a member-owned, democratically-operated, not-for-profit organization managed by a volunteer board of directors with the specified mission Of meeting the credit and savings needs of consumers, especially persons of modest means. The purpose of this credit union is to promote thrift among its members by affording them an opportunity to accumulate their savings and to create for them a source of credit for prominent business or productive purposes."

MR. NOBLE: Can we zoom back out? And let's blow up the section 1 under article 2. Keep going down. Thank you.

Q. What does this section indicate, Mr. Curry?

A. This is their field of membership.

Q. Can you just read what the field of membership was for HOPE

Federal Credit Union?

A. Yes. "The field of membership of this credit union is limited to that stated in section 5 of its charter. The field of membership shall be limited to those having the following common bond: Persons who live, work, worship, or attend school in, and businesses and other legal entities in Lakewood, New Jersey, spouses or persons who died while within the field of membership of this credit union, volunteers in the community (added October 11th, 2007) employees of this credit union, and organizations of such persons."

MS. SANTILLO: Excuse me, your Honor. I have a foundation objection. I just would like to establish the date of these bylaws.

THE COURT: Overruled. You can ask your next question.

MR. NOBLE: If we can flip forward to page 5, please. Can we blow up the first half of the paragraph under article 5, "Elections"?

Q. Mr. Curry, can you please read for the jury the elections procedures set forth, beginning with section a, little a?

A. "Section a. At least 120 days before each annual meeting the Chair will appoint a nominating committee of three or more members. It is the duty of the nominating committee to nominate at least one member for each vacancy, including any unexpired term vacancy for which elections are being held and

to determine that the members nominated are agreeable to the placing of their names in nomination and will accept office if elected."

Q. Please read letter b.

A. "The nominating committee files its nominations with the secretary of the credit union at least 90 days before the annual meeting and the secretary notifies in writing all members eligible to vote at least 75 days before the annual meeting, that nominations for vacancies may also be made by petition signed by 1 percent of the members with a minimum of 20 and a maximum of 500. The secretary may" --

Q. You can stop there.

A. Okay.

Q. Thank you.

MR. NOBLE: Can we please flip to page 7 of this document and blow up Section 6?

Q. Mr. Curry, can you please read what it states after "submission of information regarding credit union officials to NCUA"?

A. "The names and addresses of members of the board, board officers, executive committee, and members of the credit committee, if applicable, and supervisory committees must be forwarded to the administration in accordance with the act and regulations in the manner as may be required by the administration."

Q. Before we broke for lunch you testified about something called an online profile report. Do you remember that?

A. Yes.

Q. Is that the manner in which the NCUA requires credit unions to update the NCUA as to the members of its board of directors and its officers?

A. Yes.

MR. NOBLE: Can we flip to page 8, please? Can you blow up the little 1 for eligibility requirements? All the way down to number 2, please.

Q. "Mr. Curry, can you please read what the eligibility requirements are for membership on the board of directors at HOPE?

A. Yes. "The Act and the FCU bylaws contain the only eligibility requirements for membership on FCU's board of directors which are as follows:

"The individual must be a member of the FCU before distribution of ballots; the individual cannot have been convicted of a crime involving dishonesty or breach of trust, unless the NCUA board has waived the prohibition for the conviction; and the individual meets the minimum age requirement established under article 5 section 7 of the FCU bylaws.

"Anyone meeting the three eligibility requirements may run for a seat on the board of directors if properly nominated.

It is the nominating committee's duty to ascertain that all nominated candidates, including those nominated by petition, meet the eligibility requirements."

MR. NOBLE: Can you blow that back up, please?

Q. Do you see under section c it makes reference to the FCU bylaws?

A. Yes.

Q. Do you see that? I believe you testified earlier that there are also general bylaws that the NCUA produces; is that right?

A. Yes.

Q. How do these bylaws for a particular credit union relate to the bylaws that you were testifying about earlier that the NCUA produces?

A. They're in line with the standard bylaws.

Q. So is it fair to say a credit union can take the standard bylaws, make changes to the bylaws, as long as those changes are approved by the NCUA?

A. Correct.

Q. To be clear, these are the bylaws that applied to HOPE FCU.

A. Yes.

Q. Okay.

MR. NOBLE: Can we please flip to page 9 under article 6, "board of directors"? Can we please blow up section 1?

Q. And Mr. Curry, please read what it states after "number of

members".

A. "The board consists of 7 members, all of whom must be members of this credit union. The number of directors may be changed to an odd number not fewer than 5 nor more than 15 by resolution of the board. No reduction in the number of directors may be made unless corresponding vacancies exist as a result of deaths, resignations, expiration of terms of office, or other actions provided by these bylaws. A copy of the resolution of the board covering any increase or decrease in the number of directors must be filed with the official copy of bylaws of this credit union."

MR. NOBLE: Please flip to page 13. Blow up section 9.

Q. Mr. Curry, can you please read the first two sentences following "duties of secretary"?

A. "The secretary prepares and maintains full and correct records of all meetings of the members and of the board, which records will be prepared within 7 days after the respective meetings. The secretary must promptly inform the administration in writing of any change in the address of the office or this credit union or the location of its principal records."

Q. You can stop there.

Can you describe for the jury what types of events or issues should be documented in a board meeting minute?

A. Any events that are taking place with the credit union, if there are new programs, new services they plan on offering, we would like to see discussion of that, if they were -- like we mentioned earlier, if there's new members or closed member accounts, we'd like to see documentation of that, the overall financial condition of the credit union, any new activities that they're planning on being involved in.

Q. If the credit union were entering into a strategic partnership with another entity, is that something you'd expect to see in the board meeting minutes?

A. Yes.

MR. NOBLE: Can we please flip to page 17 under article 16, "general". Can you please blow up section number 1?

Q. Can you please read what it states after "compliance with law and regulation"?

A. "All power, authority, duties, and functions of the members, directors, officers, and employees of this credit union, pursuant to the provisions of these bylaws, must be exercised in strict conformity with the provisions of applicable law and regulations and of the charter and the bylaws of this credit union."

MR. NOBLE: Can we zoom out? And please blow up section number 4.

Q. And could please read what it states after "conflicts of

interest prohibited"?

A. "No director, committee member, officer, agent, or employee of this credit union may participate in any manner, directly or indirectly, in the deliberation upon or the determination of any question affecting his or her pecuniary or personal interests or the pecuniary interest of any corporation, partnership, or association other than this credit union in which he or she is directly or indirectly interested. In the event of disqualification" --

Q. You can stop there.

A. Thank you.

Q. Can you explain what the word "pecuniary" means? Sorry to put you on the spot.

A. Yeah. Seems like their own vested interest in a particular organization or to serve their own needs.

Q. Is it fair to say it relates to a financial interest?

A. Yes.

Q. And if you can go ahead and continue to read, I'm sorry, where I cut you off. "In the event of the disqualification".

A. "In the event of the disqualification of any director respecting any manner presented to the board for deliberation or determination, that director must withdraw from the deliberation or determination, and if the remaining qualified director is present at the meeting, plus the disqualified director or directors constitute a quorum, the remaining

qualified directors may exercise, with respect to this matter, by majority vote, all the powers of the board.

"In the event of the disqualification of any member of the credit committee, if applicable, or the supervisory committee, that committee member must withdraw from the deliberation or determination."

Q. Thank you.

MR. NOBLE: You can take down that exhibit, Mr. Chang-Frieden.

Q. Mr. Curry, after the NCUA received this tip from Jerry Coursen in August, 2014, did there come a time when you started researching the directors of HOPE Federal Credit Union?

A. Yes.

Q. Explain what steps you took to learn about HOPE's board of directors.

A. So my first step, I went to our credit union online profile, typed in HOPE's charter number, and began looking there first, because as I mentioned earlier, that gives you a snapshot of the credit union, who's on their board of directors, where they're located, et cetera.

Q. What was the second step you took?

A. Second step, they also had a link for their website on their profile, so that was my next approach, to click the link and review their website.

Q. What did you learn by taking those two steps?

Case 1:15-cr-00769-AJN Document 482 Filed 04/07/17 Page 161 of 260

A. That the board of directors on the credit union profile, some of them were different than what was reported on their website.

Q. Who was the chairman of the board and CEO of HOPE Federal Credit Union at that time?

A. Trevon Gross.

Q. Have you ever met or spoken with Mr. Gross?

A. No.

Q. Are credit unions required to update the NCUA concerning changes in its board of directors?

A. Yes.

Q. And I believe you testified that credit unions do that through the online profile, correct?

A. Yes.

MR. NOBLE: Can we bring up Government's Exhibit 6111 in evidence?

Q. Mr. Curry, do you recognize this document?

A. Yes.

Q. What is it?

A. It's the certification page of a credit union online profile form.

Q. Can you walk the jury through this? What is the date that the document was submitted to the NCUA, and what is the "as of" date for the certification?

A. This document was certified and delivered to NCUA on

July 25th, 2014. The "as of" date in the top right corner, June 30, 2014, is the most recent financial data effective date.

Q. And I believe you testified that credit unions typically submit these reports four times per year; is that right?

A. Right. At least. They have to certify at least the four times a year, plus any time they make any changes with their operations.

Q. Can you read just that paragraph that appears below "certification", beginning with "I understand"?

A. "I understand each operating insured credit union must update their credit union profile within 10 days after the election or appointment of senior management or voluntary officials, or within 30 days of any change of the information in the profile.

"I hearby certify to the best of my knowledge and belief the information provided is current and accurate.

"I make this certification pursuant to Sections 106, 120, and 204 of the Federal Credit Union Act."

Q. You don't have to read the statutory provisions. Who certified this report?

A. Bernard Larkins.

MR. NOBLE: Can we zoom back out, please, and flip to page 3?

Q. Mr. Curry, I'd like to have you walk the jury through some

of the information that's included in this profile report for HOPE. Beginning on page 3 under "general information".

MR. NOBLE: Can we zoom in? That's fine.

Q. First, I'd like to direct your attention to number 8. What information is provided there?

A. The asset size of the credit union as of June 30, 2014.

Q. And what was the asset size of the credit union?

A. $88,997.

Q. What information is provided in number 9?

A. The number of members of the credit union.

Q. And how many members did HOPE have as of June 30th, 2014, according to this report?

A. 107.

Q. What information is provided under number 11?

A. Provide the credit union website address.

Q. What was HOPE's website?

A. Www.hope-fcu.com.

MR. NOBLE: Can we flip to page 4? Blow up the top portion for now.

Q. What information is included on this page?

A. Anything pertaining to the credit union's information systems and technology.

Q. Focusing on number 7, what information is provided there?

A. Name of the primary share loan data processing vendor, which is CU Answers.

MR. NOBLE: Zoom out. Can we blow up 10, 11 and 12?

Q. What information is provided within this section of the report?

A. Number 10 outlines any systems that are used to process electronic payments, and none --

Q. Do electronic payments include ACH transactions?

A. Yes.

Q. And under number 11?

A. "If the credit union performs ACH transfer, where does the credit union transfer funds? Check all that apply."

Q. And nothing is checked there, correct?

A. Correct.

Q. Number 12?

A. "If the credit union is an originating repository financial institution, ACH transactions originated by the credit union."

Q. What is checked there?

A. "Consumer transactions".

Q. Is the box for "business transactions" checked?

A. No.

MR. NOBLE: Can we zoom out, please, and flip to page 6? Let's just blow up that top portion.

Q. Focusing your attention on number 1, what does that read?

A. "Does your credit union use a corporate credit union for payment systems services?"

Q. Can you explain to the jury what a corporate credit union

is?

A. So HOPE Federal Credit Union is what we call a natural person credit union, which means they're set up to serve individuals like you and me. A corporate credit union is set up to serve natural person credit unions, with different payment processing, including share drafts, ACH processing. They also make available lines of credit for liquidity purposes if a credit union ever is in a liquidity crunch.

Q. And who was HOPE FCU's corporate credit union, according to this document?

A. Alloya Corporate.

Q. What services did Alloya provide?

A. Share draft processing and settlement, electronic funds transfer, and direct deposit.

MR. NOBLE: Can you zoom out and can we flip forward to page 14?

Q. What information generally is provided on this page?

A. This is a section where a credit union would check any of the programs or services they have available to their membership.

MR. NOBLE: Can we zoom out, please? Actually, I'm sorry, can we just blow up the portion called "depository"? Yes, right there on the left-hand side.

Q. What does the depository category indicate?

A. The type of deposit they offer at their credit union.

Q. And I believe you testified earlier, a share account is similar to like a checking account; is that correct?

A. Well, a share account could be like a savings account or a share draft account would be more like a checking account.

Q. Is the box for "business share accounts" checked here?

A. No.

Q. What would that indicate to you, since that box is not checked?

A. That they don't offer account services for businesses.

MR. NOBLE: You can zoom out, and let's flip forward to page 21.

Q. What information is included on page 21 and the subsequent pages?

A. This is the contacts section of the online profile, which would outline who is on the board of directors, who is on the supervisory committee, who is on the credit committee, if they have one, any members of senior management.

Q. Do you see on this page, does it indicate the identity of any of the board members as of June 30th, 2014?

A. Yes.

Q. Who?

A. Frederick DeSilva.

Q. And you know that how?

A. Under -- well, at the top, under "job titles" it says "board member".

Q. Okay.

MR. NOBLE: Can we flip to the second page, or next page?

Q. Any board members on this page?

A. No.

MR. NOBLE: Let's go to the next page.

Q. Any board members on this page?

A. Yes.

Q. Who?

A. The first one is Joseph Lane, the second one is Sylvester B. Larkins, who is listed as the board treasurer and board member.

Q. Have we seen that name on this document previously?

A. Yes. Bernard Larkin certified the online profile.

MR. NOBLE: Can you zoom out? Could we go to the next page?

Q. Any board members on this page?

A. Yes.

Q. Who?

A. Marvin Purry.

Q. And I believe up at the top there there's somebody listed as a supervisory committee member. Do you see that?

A. Yes.

Q. But that person is not listed as being a member of the board?

A. Correct.
Q. Is there a difference between being a board member and a member of the supervisory committee?
A. Yes.
Q. How? Can you explain to the jury?
A. The board is ultimately responsible for the decision-making process of the credit union. They enforce the bylaws, set forth operations of the credit union.
And the supervisory committee is there, as I mentioned earlier, in more of an internal audit function. They're there to make sure the credit union is operating in compliance with the applicable laws and regulations, and employees of the credit union are doing what they're supposed to be doing.
Q. Are there typically any members of the board of directors on the supervisory committee?
A. I believe the bylaws allow one individual to serve -- one board member to serve on the supervisory committee.
Q. Let's go to the next page. Any board members indicated on this page?
A. Yes.
Q. Who?
A. Trevon Gross, Sr.
Q. What titles does he hold?
A. Chairperson and board member.
MR. NOBLE: Zoom out.

Q. Any other board members?
A. Yes.
Q. Who?
A. Delores Wyatt.
Q. What title does she have?
A. Board secretary.

MR. NOBLE: Let's zoom out. Let's go to the next page. Sorry. Can we go back up one page?

Q. I believe this is the last board member listed in the profile report; is that correct?
A. Yes.
Q. Who is that?
A. George Wyatt.
Q. And what title is he listed as having?
A. Manager or CEO and board member.

MR. NOBLE: Can we go back up one page? Can we blow up the entry for Mr. Gross?

Q. What does it indicate for employment type for Mr. Gross?
A. Volunteer.
Q. Does that mean that he's not supposed to be paid?
A. Correct.

MR. NOBLE: You can zoom out. Let's go to the last page of this document.

Q. What information is included on this page?
A. This is the site section of the online profile. So it

would outline where their main corporate office is located at, if they have any branch offices, any off-site disaster recovery type locations.

Q. What locations are indicated for HOPE Federal Credit Union as of June 30th, 2014?

A. They have two sites. One is the corporate office of HOPE Federal Credit Union, which is located at 46 Bennetts Mills Road, Jackson, New Jersey, 08527.

(Continued on next page)

BY MR. NOBLE:

Q. Any other locations?

A. They have another site type of CU South located at 23210 U.S. Highway 98, Fairhope, Alabama 36532, and the site functions are member services, disaster recovery site.

Q. Are there any locations in Florida indicated on this page?

A. No.

Q. Based on that, the absence of that information, would you expect the credit union to have a location in Florida?

A. No.

MR. NOBLE: You can take that down.

Q. So, Mr. Curry, you said the first step in your investigation was looking at that profile report, correct? I'm sorry, correct?

A. Yes.

Q. Is that the report you looked at?

A. Yes.

Q. And then remind the jury, what step did you take after that?

A. After I looked at the online profile, I then clicked on their link, which on the online version is a hyperlink to their website. So then I went to review their website.

MR. NOBLE: Can we bring up, just for identification, Government Exhibit 724-4.

Q. Now, Mr. Curry, do you recognize this document?

A. Yes, it looks familiar.
Q. How does it look familiar?
A. The logo on the top left, the board of directors, the -- pretty much the entire layout.
MR. NOBLE: Can we flip to the second page.
Q. What do you recognize this document to be?
A. It seems to be -- it's from their website.
Q. The website of whom?
A. HOPE Federal Credit Union.
Q. I'd like to direct your attention to the upper left-hand corner, the date there. Do you see that?
A. Yes.
Q. What is that date?
A. September 19, 2014.
Q. When did you visit the website as part of your investigation that you've been describing?
A. In August 2014.
Q. Does this website resemble the site as you recalled it when you looked at it in August 2014?
A. Yes.
Q. Or this particular pages that we're looking at, correct?
A. Yes.
MR. NOBLE: Your Honor, the government offers Government Exhibit 724-4.
MR. CREIZMAN: No objection.

MS. SANTILLO: No objection.

THE COURT: Thank you.

724-4 is admitted.

(Government's Exhibit 724-4 received in evidence)

MR. NOBLE: May we publish for the jury?

THE COURT: You may.

BY MR. NOBLE:

Q. Again, what is this document?

A. This is HOPE Federal Credit Union's website.

MR. NOBLE: Can we just blow up the section under "Administration."

Q. Can you just read off the various board of directors members?

I believe this lists the officer positions, correct?

A. Yes.

Q. Who is listed as chairman?

A. Trevon Gross.

Q. Vice chair?

A. Yuri Lebedev.

Q. Secretary?

A. Ricardo Hill.

Q. Assistant secretary?

A. Delores Wyatt.

Q. Treasurer?

A. Bernard Larkins.

Q. Assistant treasurer?

A. Jose Freundt.

Q. And chairman emeritus?

A. George Wyatt.

MR. NOBLE: Flip to the next page.

Q. Who is the supervisory committee chair?

A. Timothy Ellrich.

Q. And who are the other four members of the board?

A. Frederick DeSilva, Joseph Lane, Chad Lio, and Kevin Tomasso.

MR. NOBLE: Can we go down to supervisor committee.

Q. Who is the chairman, again?

A. Timothy Ellrich.

Q. Who are the other two members?

A. Kendra Pannitti and Marvin Purry.

MR. NOBLE: Zoom out.

Q. Who is listed as the management team for the credit union?

A. The chief executive officer is listed as Trevon Gross.

Q. And the chief operating officer?

A. Ricardo Hill.

Q. Chief financial officer?

A. Bernard Larkins.

Q. Chief security officer?

A. Yuri Lebedev.

Q. Chief membership officer?

A. Cynthia Purry.

Q. And chief loan officer?

A. Joseph Lane.

Q. How do the names that were listed here for -- as the board of directors compare to the online profile report that you reviewed?

A. There's more names listed on the website than there were on the profile.

Q. Are the names different on the website than what you saw in the profile?

A. Yes.

MR. NOBLE: Take this down.

Q. Now, did there come a time when you obtained a copy of the minutes of HOPE Federal Credit Union's annual meeting for 2014?

A. Yes.

Q. Have you reviewed those minutes?

A. Yes.

MR. NOBLE: Can we bring up Government Exhibit 6086 in evidence.

Q. What is this document?

A. The minutes of their 2014 annual membership/board members' meeting.

Q. What is the date of that meeting?

A. June 21st, 2014.

Q. Is that prior to the effective date of the online profile

report that we just looked at earlier --
A. Yes.
Q. -- in Government Exhibit -- just for the record, Government Exhibit 6111?
A. Yes.
MR. NOBLE: Can we just begin by blowing up the top third under the minutes section itself beginning with "Annual meeting."
Q. It states, "The annual meeting was called to order at 10:00 a.m. by Chairman Trevon Gross with prayer. Board members present: Chairman Trevon Gross, Bernard Larkins, Qwynn Gross, Joseph Lane, George Wyatt, Frederick DeSilva, S. Moore, Clive Williams, and Delores Wyatt. Excused: M. Purry, C. Purry, both due illness."
MR. NOBLE: Zoom out.
Q. Did I read that correctly?
A. Yes.
MR. NOBLE: Can we go ahead and flip to the second page and highlight the section "Board of Elections" through the end of the text.
Q. Mr. Curry, can you read to the jury what it states under "Board of Elections" in the minutes of the annual meeting?
A. Yes. "The slate of new board members introduced themselves with a brief bio via visual conference (See attached). Election of board members: Annual meeting notice a new board

of director ballot were previously presented to all members online. Based on the electronic voting tally, the current board recommends that the slate for new board members to HOPE FCU board be closed, the new slate of new HOPE FCU board of directors be approved, and by common consent, directed the secretary to cast one vote to elect all the new board members. Resolution passed."

Q. Who submitted these minutes?

A. Delores Wyatt, board secretary.

Q. And she signed the minutes?

A. Yes.

MR. NOBLE: Zoom out. Let's go to the next page. Next page. Can we just blow up that bottom portion there.

Q. What is the date of this document up in the top right-hand corner?

A. June 21st, 2014.

Q. And in the center, it states, "HOPE Federal Credit Union"; is that right?

A. Yes.

Q. What is stated underneath there?

A. "Ballot results report."

Q. And then next to that, it says, "Annual meeting board election," correct?

A. Yes.

Q. Can you read what the question is, what is stated below the

question on the left-hand side?
A. "The following members are recommended for election of a."
Q. Okay and then under "Answer," can you read who the board members were?
A. "Trevon Gross, Jose Freundt, S. Bernard Larkins, Timothy Ellrich, Cynthia Purry, Kevin Tomasso, Joseph Lane, Ricardo Hill, Frederick DeSilva, Yuri Lebedev, and Chad Lio."
Q. Who was elected to serve on the superv -- it says superv. It's cut off. Who's elected there?
A. Timothy Ellrich, Marvin Curry, Kendra Pannitti.
Q. Are these the names of the individuals that you saw on the HOPE's website in or about August 2014?
A. Yes.
MR. NOBLE: Take that down.
I'm sorry, bring back up the exhibit, 6086, and just flip to the second page.
Q. Under "Board of Elections," based on the language you read, what is your understanding of whether these individuals that we just looked at were elected to the board of HOPE Federal Credit Union?
A. Can you repeat that question?
Q. Sure. It was a little complicated.
MS. SANTILLO: Objection.
THE COURT: Sustained.
Q. At the annual meeting, is that generally when elections for

the board of directors are held?

A. Yes.

MR. NOBLE: You can take that down.

Q. After the annual meeting is held, and the election takes place, are the individuals who are elected considered board members?

MS. SANTILLO: Objection.

THE COURT: Sustained.

Q. Is it necessary for election results for the board of directors of a credit union to be subsequently confirmed by approving subsequent minutes of the meeting?

A. I believe --

MS. SANTILLO: Objection.

THE COURT: Sustained.

Q. Does an election of the board of directors occur at the time of the annual meeting? Is that when the election takes place?

A. Yes.

Q. And after that, those individuals who have been nominated and elected are on the board?

A. Yes.

Q. Now, after you conducted this investigation, what did you do?

A. I consulted with my supervisors on my findings, and they then reached out to the supervisory examiner in charge of this

particular credit union.

Q. And why did you do that?

A. Because these were obvious red flags that warranted in-depth review.

Q. What do you mean by red flag?

A. The fact that the board members that they're reporting to NCUA differ significantly from those that they're advertising on their website, and that, coupled with the tip that Jerry Coursen provided NCUA.

Q. What did you do after consulting with your supervisor?

A. Well, they reached out to the supervisory examiner in charge and asked that they send their examiner on-site to review these inconsistencies.

Q. To your knowledge, was there an examination of HOPE Federal Credit Union going on at that time?

A. Correct. Yes.

Q. Were you personally involved in that examination?

A. No.

Q. After you referred the matter to the examiners, did there come a time when HOPE Federal Credit Union submitted an updated profile to the NCUA?

A. Yes.

Q. Have you reviewed that profile?

A. Yes.

MR. NOBLE: Can you bring up Government Exhibit 6112

in evidence.

Q. What is the date of this certification in the as-of date for the document?

A. This online profile was certified on October 24th, 2014, and the effective date of this online profile is September 30th, 2014.

Q. To your knowledge, were there any other profiles submitted by HOPE Federal Credit Union between the one we looked at before and this one?

A. No.

Q. And who certified the profile for September 30th, 2014?

A. Bernard Larkins.

MR. NOBLE: Can we flip to page 4, please. Can we blow up Section number 12.

Q. Is the box for "Business Transactions for ACHs" checked here?

A. No.

Q. Based on that information, what is your understanding of whether HOPE FCU was involved in processing ACH transactions for businesses at this time?

A. I would interpret this to mean that they do not process ACH activity for businesses.

MR. NOBLE: Can we zoom out and flip to page 21.

Q. Can you just walk the jury through all the members of the board that were reported to the NCUA in this profile report?

Case 1:15-cr-00769-AJN Document 482 Filed 04/07/17 Page 182 of 260

A. Yes. First board member, Mr. Frederick P. DeSilva. Next board member, Mr. Timothy Ellrich. The next board member, Mr. Jose Freundt. Chairperson and board member, Mr. Trevon Gross, Sr. The board secretary, and board member, and manager or CEO is listed as Ricardo Hill. The next board member and credit committee chairperson is Joseph Lane. Board treasurer/board member and chief financial officer listed as Sylvester B. Larkins. Vice chairperson, board member, chief information officer listed as Mr. Yuri Lebedev. Board member listed as Mr. Chad J. Lio. There is no board members on this page.

Q. Okay.

MR. NOBLE: Let's flip forward to -- oh, stop there.

A. Board member, Mr. Kelvin Tomasso. Board member, Mr. George Wyatt.

MR. NOBLE: Next page.

A. And the last entry is board member, Mrs. Delores Wyatt.

MR. NOBLE: Zoom out. Next page.

Q. What information is included on this site -- on this page?

A. This is the physical addresses of the credit union. So the first physical address is their corporate office, which is headquartered at 46 Bennetts Mills Road.

Q. You don't need to read the address again.

A. Oh, okay.

Q. That's the location in Jackson, New Jersey?

A. Yes.

Q. And what's the other location?

A. It's their CU South disaster recovery location in Fairhope, Alabama.

Q. Any locations for -- any branches in Florida listed?

A. No.

MR. NOBLE: Take that down.

Q. Did there come a time when you learned the results of the examination concerning the composition of HOPE Federal Credit Union's board of directors?

MS. SANTILLO: Objection.

MR. NOBLE: Judge --

THE COURT: Is this something other than the line that we discussed during the break?

MS. SANTILLO: No. It's that.

THE COURT: Okay. So overruled.

BY MR. NOBLE:

Q. Did there come a time when you learned the results of the examination?

A. Yes.

Q. What was the outcome of that examination?

A. That there were members from the Collectables Club that were on the board of directors at HOPE.

Q. And what, if anything, did the NCUA do with respect to those board members from Collectables Club?

A. There was corrective action included in the document of resolution in the examination report informing the board of directors that they need to -- any board of directors that do not qualify for eligibility into the field of membership needs to vacate their seats.

Q. Now, did there come a time after those examination reports were delivered that you received a communication from the Collectables Club regarding their eligibility for membership in the credit union?

A. Yes.

MR. NOBLE: Can you bring up Government Exhibit 6121 in evidence.

Q. Do you recognize this document?

A. Yes.

Q. What is it?

A. This was a complaint letter they drafted to the attention of Ms. Jane A. Walters, our regional director in NCUA Region II.

Q. When you say "they," who do you mean?

A. Members of the Collectables Club.

Q. Is this a letter that you personally received in or about January 2015?

A. Right. It was addressed to our office, but it was assigned to me to review, yes.

Q. What is the subject matter of this letter?

Case 1:15-cr-00769-AJN Document 482 Filed 04/07/17 Page 185 of 260

A. Helping People Excel Federal Credit Union, Charter Number 23265.

MR. NOBLE: Can we zoom back out, and let's blow up the first paragraph.

Q. Mr. Curry, can you read that paragraph to the jury?

A. "We, the undersigned, were properly elected as directors of Helping Other People Excel Federal Credit Union at the June 2014 annual meeting (See attached ballots results report dated June 21, 2014). We have been advised of our removal as directors, allegedly at the direction of your agency. It appears that this removal is based on a recent documented resolution (See attached) stating the issue as ineligible board of directors, which, in part, reads, 'However, since their primary residence is out of state, and they do not live, work, worship, attend school, or volunteer in Lakewood, they are not eligible for membership.' We believe the DOR, as written, is incorrect since it does not address, nor take into consideration the fact that Helping Other People Excel Federal Credit Union is a low-income credit union. The NCUA chartering and field of membership manual, Section 2.E, 'Special rules for low-income federal credit union,' states: 'In addition to serving members who live, work, worship, or attend school in the community, a low-income community federal credit union may also serve persons who participate in programs to alleviate poverty or distress or who participate in associations

headquartered in the community.'"

MR. NOBLE: Can we zoom back out?

Q. Can you read the bottom portion?

MR. NOBLE: Blow that up.

Q. And please read it, Mr. Curry.

A. "We are all members of an association headquartered in Lakewood, New Jersey, and based on the rules, are eligible for membership as voting members of the Helping Other People Excel Federal Credit Union. Therefore, we respectfully request you take the following action: Advise Helping Other People Excel Federal Credit Union that removal of board members Timothy Ellrich, Jose Freundt, Ricardo Hill, Yuri Lebedev, Chad Lio, and Kevin Tomasso were made in violation of the Federal Credit Union Act in the bylaws, and that these board members were valid actively current board members. Advise Helping Other People Excel Federal Credit Union that any board action taken after the resignation of two board members on November 22nd, 2014, without at least six board members in attendance, which would have to include at least one of the above named board members, are null and void as a quorum of six could not have been achieved (See attached NCUA profile taken from the NCUA website on October 20th, 2014, and resignation emails from Sylvester Bernard Larkins and Joseph Lane)."

MR. NOBLE: Zoom out.

And then can you just blow up the section beginning

"Your timely response."

A. "Your timely response regarding this important issue is appreciated. You may reply to all of us at the following address: Collectables Club Private Member Association, Care of Frank Oswald, 10 La Quinta Drive, Lakewood, New Jersey 08701."

MR. NOBLE: Zoom out.

Can we please blow up the signature block.

Q. Who signed this letter to the NCUA?

A. Timothy Ellrich, Ricardo Hill, and Yuri Lebedev.

MR. NOBLE: You can take that down.

Q. What, if any, action did the NCUA take in response to this letter?

A. I was tasked with drafting a response to this letter, which I ultimately submitted to the regional director, Jane A. Walters, for her approval and signature.

Q. What did you do with the letter after it was approved?

A. It was sent to the address on this letter.

MR. NOBLE: Can we bring up Government Exhibit 6122.

THE COURT: Mr. Noble, how much time left with the witness?

MR. NOBLE: I'd say probably about 15 minutes.

THE COURT: All right. We'll do our mid-afternoon break.

Members of the jury, I will make it a short break so we make up for some of our lost lunchtime. About ten minutes,

please. Thank you.

(Continued on next page)

(Jury not present)

THE COURT: Matters to take up?

MR. CREIZMAN: Your Honor, would it be a problem if Ms. Santillo started the cross-examination, and I came second, we just go out of order?

THE COURT: No concern with that?

MR. NOBLE: No, your Honor.

THE COURT: That's fine. All right.

So, counsel for Mr. Gross will begin the cross-examination.

Other matters to take up?

MR. NOBLE: Can the witness be excused in case there are?

THE COURT: Yes. Well, if there aren't, then we can all be excused.

MR. NOBLE: There are no matters from the government, your Honor.

THE COURT: Anything from defense?

MR. KLINGEMAN: No. Thank you.

MR. CREIZMAN: Nothing.

THE COURT: All right. Let's just return within -- do what you need to do and then return, so we can take up anything, if necessary. About five minutes.

MR. NOBLE: Okay.

THE COURT: Thank you.

Case 1:15-cr-00769-AJN Document 482 Filed 04/07/17 Page 190 of 260

(Recess)

THE COURT: Matters to take up?

MR. NOBLE: Not from the government.

THE COURT: All right. We'll bring in the jury.

MS. SANTILLO: Your Honor, one minor thing: We did switch back, so Mr. Creizman is going to go next.

THE COURT: Okay. You're keeping me on my toes.

Cross-examinations are anticipated to be lengthy or not lengthy?

MR. CREIZMAN: Mine should be not lengthy, like -- short. And I think I am going first, actually.

THE COURT: That's what we established a moment ago.

MS. SANTILLO: Your Honor, I would say maybe 45 minutes, maybe a little longer.

THE COURT: All right. And you will be done in 15, Mr. Noble?

MR. NOBLE: Ten or fifteen.

THE COURT: Great.

(Continued on next page)

(Jury present)

THE COURT: Thank you, members of the jury. Everyone may be seated.

Mr. Noble, you may continue and complete your direct examination of Mr. Curry.

MR. NOBLE: Thank you, Judge.

Can we bring up Government Exhibit 6122 in evidence.

BY MR. NOBLE:

Q. Directing your attention to the screen, what is this document?

A. This was our response to the complaint letter we received from the Collectables Club.

Q. To whom is it addressed?

A. Collectables Club Private Member Association, Attention Timothy Ellrich, Ricardo Hill, and Yuri Lebedev.

Q. You sent it to that same address listed in the earlier document we saw in Lakewood, New Jersey, correct?

A. Yes.

Q. Can you just read to the jury what you wrote?

A. "Dear Gentlemen: I received your January 7th, 2015 correspondence expressing your concern with being removed from the board of directors at Helping Other People Excel Federal Credit Union. You are correct in stating HOPE is designated as a low-income credit union. However, HOPE's charter does not contain language indicating they can serve persons belonging to

associations within their community. Therefore, membership in the Collectables Club Private Member Association does not meet the qualifications for membership into HOPE. As you are not authorized to conduct business on behalf of HOPE, we will not be permitted to discuss additional matters concerning HOPE with you. If you wish to discuss the matter further, please contact HOPE's officials."

MR. NOBLE: Can you zoom out.

Q. Who is copied on this letter?

A. Our associate regional director of program, Kelly Lay, Supervisory Examiner Terrence Adam, Examiner Len Siwak, and Examiner Meg Flok.

Q. Why were these individuals copied?

A. They had either been on-site at HOPE during the examination process or were familiar with HOPE in some capacity.

MR. NOBLE: Can we blow up the address portion again.

Q. Mr. Curry, based on the letter that you received from the Collectables Club members, what was your understanding of where the Collectables Club was headquartered?

A. At 10 La Quinta Drive, Lakewood, New Jersey 08701.

Q. Does that information have any relevance as to whether or not the Collectables Club members could be members of HOPE Federal Credit Union?

A. That address is located within their field of membership, so it brings into question whether or not they are eligible.

Q. What was your determination as to whether they were eligible or not?

A. Well, we consulted with our Office of Consumers Financial Protection & Access. They're the office of NCUA that handles any chartering, or field of membership amendments, or if we have any questions in the field about needing a clarification, we would go through them for their assessment, determination. And they determined that this association did not qualify for membership.

MR. NOBLE: If we can zoom back out.

Q. Is that based at least, in part, on what you wrote here, that HOPE's charter did not include language indicating that they can serve persons belonging to associations within their community?

A. Yes.

MR. NOBLE: You can take that exhibit down.

Q. Now, Mr. Curry, approximately how many credit unions are there in Region II, the region that you cover?

A. Probably between 1100 and 1200.

Q. So it's a large number of credit unions?

A. Yes.

Q. Prior to your involvement looking into issues at HOPE Federal Credit Union, had you ever heard of HOPE Federal Credit Union?

A. No.

Q. Now, did there come a time in the fall of 2014 when you received a telephone call from somebody at the Federal Reserve Bank regarding HOPE Federal Credit Union?
A. Yes.
Q. Is the Federal Reserve Bank sometimes referred to as "the Fed"?
A. Yes.
Q. Is it unusual for the NCUA to receive a call from the Fed concerning a particular credit union?
A. We work collaboratively from time to time, but it is unusual to receive emails and voicemails pertaining to a particular credit union from the Fed.
Q. Why did the Fed contact you or the NCUA regarding HOPE Federal Credit Union?
A. As part of their due diligence process, apparently HOPE was trying to set up direct access through the Fed with a Fed wire, so they were trying to set up direct access for ACH processing and wire transfers with the Fed. And as part of their due diligence, they reached out to the regulator, which is NCUA, to see if we knew why they were doing that, if we had any concerns. And during these conversations is when we realized that Alloya Corporate, who had been helping HOPE with their payment processing, ACH processing, had terminated service with them at, I believe, some point in November of 2014.
Q. Did there come a time when you learned what types of ACH

transactions HOPE FCU was processing?
A. At that point we were just being notified about the volume of ACH transactions, and that there was a couple of money transmitters or money transfer companies that were involved in this ACH transacting.
Q. Are you familiar with the name Kapcharge?
A. Yes.
Q. How are you familiar with Kapcharge?
A. Due to their association with HOPE.
Q. Can you explain how Kapcharge was associated with HOPE?
A. I first learned of Kapcharge in late December 2014, after our examiner in charge had completed a supervision contact. Kapcharge is a third-party payment processor, which means they are a third party that processes various types of electronic payments on behalf of other merchants or businesses, companies, or individuals, through their own account at a particular financial institution.
Q. In this case, were they using their account at HOPE FCU to process transactions for their customers?
A. Yes.
Q. What types of -- I'm sorry, where is Kapcharge based?
A. In Canada.
Q. For what types of customers was Kapcharge processing ACH transactions?
A. At first, it was a couple money transfer type companies,

similar to like a PayPal account or -- like PayPal. I believe one was TransferWise and one was PreCash.

Q. And you said at first you learned about the money-transmitting businesses. Did there come a time when you learned about other businesses Kapcharge was processing for?

A. Yes. Later on, we learned that they were also processing payments for various payday lenders.

Q. What is a payday lender?

A. They -- so, for individuals that don't have access to loans at traditional banks or credit unions, there are these payday lenders, who will give you small-dollar-amount loans at very high interest rates.

Q. Are credit unions allowed to conduct business or have payday lenders as their members?

A. Not to my knowledge.

Q. But is there anything inherently improper about payday lending?

A. Well, federal credit unions and, I believe, all financial institutions, there's a maximum interest rate you can charge on loans, which is 18 percent. And a few years back, NCUA made -- they wanted to come up with a solution for an alternative to payday lending, in order to help low-income members gain access to loans without being charged an excessive interest rate. So they called these short-term small-dollar amount loans, and they were essentially an alternative to payday lending.

Q. That's something federal credit unions were allowed do on behalf of their members?

A. Yes.

Q. Now, did the ACH processing that you learned about that was being done by Kapcharge at HOPE affect HOPE's financial condition in any way?

A. With the dollar amount flowing through the credit union, it was often inflating and then deflating their asset size.

MR. NOBLE: Can we bring up Government Exhibit 6102 in evidence.

Q. Do you recognize this document?

A. Yes.

Q. What is it?

A. This is the 5300 Call Report form and instructions.

Q. For what period of time?

A. The second quarter of 2014, which would be June 30, 2014.

MR. NOBLE: Can we flip to the next page. And let's keep flipping through.

Q. For what credit union is this the 5300 report?

A. Helping Other People Excel, or HOPE.

MR. NOBLE: Can we please flip to page 5. I'm sorry, I guess we were on 5. Can you please zoom in on number 33.

Q. What information is --

MR. NOBLE: All the way over, Mr. Chang-Frieden.

Q. What information is included in line 33?

Case 1:15-cr-00769-AJN Document 482 Filed 04/07/17 Page 198 of 260

A. This is the total assets the credit union holds.

Q. So what was HOPE's total assets, as of June 30th, 2014?

A. $77,605.

MR. NOBLE: Can we flip to page 8.

Q. What is this document? What information is included on this page of the document?

A. This would be -- this is the credit union's income statement, so it will be various sources of income and expenses.

Q. Is a credit union supposed to accurately report all of its income and expenses in the call report?

A. Yes.

MR. NOBLE: You can take that down. Let's bring up Government Exhibit 6103.

Q. Mr. Curry, what is this document?

A. This is the 5300 Call Report form and instructions for the third quarter of 2014, which is September 30, 2014.

MR. NOBLE: Let's flip to page 5.

Q. For what credit union is this the call report?

A. Helping Other People Excel, or HOPE.

MR. NOBLE: Let's zoom in again on line 33, all the way across.

Q. What was HOPE Federal Credit Union's reported assets as of September 30th, 2014?

A. $436,642.

Q. How did that compare to the size of the credit union three months earlier?

A. It grew by six times.

Q. Is that unusual?

A. Yes.

Q. Is that increase in the credit union's assets something that the NCUA cares about?

A. Yes.

Q. Why?

A. Because it's for, I don't know, ten, twenty, twenty-five years, the credit union maintained an asset size similar to what they reported to June 30, 2014, and then within the span of three months it grew six times where it was at on June 30, 2014.

MR. NOBLE: You can take that down.

Q. Now, Mr. Curry, after you received the call from the Fed concerning the ACH processing at the credit union, what did you do?

A. We again reached out, I contacted my supervisors, who were in the same office as me, and then we reached out to the supervisory examiner and examiner in charge, and asked that they follow up on these concerns.

Q. Who were those individuals you contacted in the field?

A. The supervisory examiner was Brian McDonough at the time, and the examiner was Meg Flok.

Q. Did there come a time in 2015 when you became involved in a conservatorship of HOPE FCU?

A. Yes.

Q. About when did that occur?

A. Middle of October 2015.

Q. What role did you play in the conservatorship?

A. I was in the regional office in Alexandria, Virginia, compiling various source documents from our examiners and supervisory examiners that have actually been on-site at HOPE. I compiled them into one report. That way, we could get concurrence from our general counsel and our office of examination and insurance, and ultimately approval from the NCUA board.

Q. Is it fair to say you helped draft all the documentation necessary to get approval to conserve HOPE?

A. Yes. In coordination with various other NCUA offices.

Q. Did there come a time when you went on-site to HOPE?

A. Yes.

Q. About when was that?

A. The day of conservatorship, which I believe was October 16, 2015.

Q. What did you do when you were there?

A. I assisted the examiners in boxing up various credit union records and assisting and changing the access from the credit union to NCUA.

Q. What was the purpose of the NCUA placing HOPE into conservatorship?

MS. SANTILLO: Objection.

THE COURT: Just a second.

Statement of grounds?

MS. SANTILLO: Based on the Court's prior ruling.

THE COURT: Overruled.

Q. What was the basic purpose of placing the credit union into conservatorship, without getting into the underlying reasons?

A. Essentially, ineffective management and unsafe and --

MS. SANTILLO: Objection.

THE COURT: Sustained. The jury will disregard the answer. Rephrase your question.

Q. What is the general purpose of placing a credit union into conservatorship?

A. To take access of the records and change access in the best interests of the members of the particular credit union.

Q. Is it also to protect the share insurance fund?

A. Yes.

Q. And, again, that's the main purpose of the NCUA, correct?

A. Yes.

THE COURT: Just a second, just a second.

You have an objection?

MS. SANTILLO: Yes, leading.

THE COURT: Sustained.

Q. What, if any, any other role did you have in the conservatorship?

A. That was it. I compiled the documents for the approval of the NCUA board, and then I assisted the day of the conservatorship.

Q. After that point in time, the NCUA controlled the books and records and had access to the accounts of the credit union?

A. Yes.

MR. NOBLE: No further questions, your Honor.

THE COURT: All right. Thank you.

We'll have cross-examination on behalf of Mr. Lebedev.

Mr. Creizman?

MR. CREIZMAN: Thank you.

I proceed, your Honor?

THE COURT: You may.

CROSS-EXAMINATION

BY MR. CREIZMAN:

Q. Good afternoon.

A. Hi.

Q. You told the jury earlier about certain responsibilities of board members on credit unions; is that correct?

A. Yes.

Q. And fiduciary responsibilities?

A. Yes.

Q. Now, you have been at the National Credit Union

Administration for over eight years; is that right?
A. That's correct, yes.
Q. And over that time, you've gotten a lot of experience with the rules and regulations of the NCUA?
A. Yes.
Q. And we can agree that people who are new to credit unions wouldn't have the same kind of knowledge of NCUA's rules and regulations; fair to say?
A. That's fair to say.
Q. It's natural that new board members to a credit union may not have the breadth of knowledge that you do?
A. That's fair to say.
Q. Now, in 2014 or 2015, you received a telephone call from someone identifying himself as Timothy Ellrich, correct?
A. Yes. He actually called our main office for the regional office, yes.
Q. And Mr. Ellrich was switched over to you?
A. It happened to be my day for phone duty. We take turns in the office.
Q. Okay. And Mr. Ellrich said that he was a member of the supervisory board of the HOPE FCU?
MR. NOBLE: Objection.
THE COURT: Sustained.
Q. The caller identified himself as a supervisory member of the FCU?

MR. NOBLE: Objection.

THE COURT: Same grounds?

MR. NOBLE: Same grounds.

THE COURT: Which?

MR. NOBLE: Hearsay.

THE COURT: Sustained.

Q. Mr. Ellrich asked you a bunch of questions about the responsibilities of being a board member of a credit union?

A. Yes, to my knowledge.

Q. And you gave him some answers?

A. Correct. I gave him -- from my recollection, I gave him some general advice on what their duties would be as a director on a board.

Q. During that conversation, Mr. Ellrich didn't hide the fact that he didn't know a lot about what responsibilities he had?

A. From my recollection, that's correct.

Q. Now, with all of your experience with the NCUA, is it fair to say that even you don't know everything, off the top of your head at least, right?

A. That would be correct.

Q. And, in fact, you met with the government on a couple of occasions to talk about the testimony you would be providing in this case; is that right?

A. That's correct.

Q. And on one occasion, you told the government that you

thought it was possible that establishing a virtual office in a community might qualify that entity within a field of membership of a credit union?

A. I believe it would be something to ask our office that would handle that, because it's foreign to me, that thought.

Q. But it was something that you said you weren't sure about?

A. Correct.

Q. Now, you also said before that HOPE FCU was designated as a low-income credit union?

A. That's correct.

Q. There is some significance to that designation in NCUA rules and regulations; is that right?

A. Yes.

Q. One important fact about that designation is that there are certain relaxed regulations with respect to low-income credit unions, right?

A. Yes, in certain areas.

Q. And the purpose of relaxing those regulations is to stimulate community investment; is that accurate?

A. Yes.

Q. And one example of the relaxed regulation is that a low-income credit union can accept a larger number of nonmember deposits; is that right?

A. That's correct.

Q. Now, at some point you received a letter from a lawyer --

not a "lawyah," a lawyer -- representing three members of the board that were kicked off of the HOPE FCU board, correct?

A. Correct.

Q. And those were members of the Collectables Club; is that right?

A. Correct.

Q. Now, the lawyer made an argument that they shouldn't be kicked off the Collectables Club?

MR. NOBLE: Objection.

THE COURT: Overruled.

A. I'm sorry, can you repeat the question?

Q. The lawyer argued that those individuals shouldn't have been kicked off the Collectables Club -- I'm sorry, the HOPE FCU board?

A. That's correct.

Q. Now, you didn't respond to that lawyer, correct?

A. That's correct.

Q. That law firm was based in Alabama; is that right?

A. I'm not -- I have no idea.

Q. Is there something I could show you that might help refresh your recollection?

A. Sure.

MR. CREIZMAN: Your Honor, I'd like to show the witness, marked for identification, Government Exhibit 3522-1, which I will hand to the prosecutor.

I'm sorry, wrong one. 3522-5. That's the one. Here you go.

THE COURT: Is that for me?

MR. CREIZMAN: Yes.

(Continued on next page)

BY MR. CREIZMAN:

Q. I'm showing the witness Government's Exhibit 3522-5, and I want to focus you -- you can read the whole thing, but I wanted focus you to page 2, the bottom email -- I'm sorry -- the bottom of the page, lines 3 through 10. Just read that to yourself and let me know if that helps refresh your recollection.

A. Okay.

Q. Does that refresh your recollection?

A. Yes, vaguely. I know there was a lot of chains of emails going around around that time. That seems like that was an email between the supervisory examiner and then our regional -- okay.

Q. No, that's okay. I just want to know if that refreshes your recollection that the law firm that you were using was from Alabama?

A. It does, yes.

Q. Do you recall that the name of the law firm was Dollar Associates?

A. Yes. If that was in that email. I don't --

MR. NOBLE: Objection.

THE COURT: Sustained.

Q. If you don't remember, is there something that I could show you that might help refresh your recollection?

A. Yes.

Q. Terrific. I'm showing you --

MR. CREIZMAN: I would like to show the witness Defendant's Exhibit 10 marked for identification.

THE COURT: Okay, go ahead.

MR. CREIZMAN: I will hand a copy to the prosecutor and to the Court. You can look through the three pages, and I've highlighted certain portions, and after he's read it to himself, just let me know.

MR. NOBLE: Judge, we have an objection as to this being used to refresh the witness' recollection.

THE COURT: Hang on. What you've been handed, is it something you've seen before?

THE WITNESS: I don't recall seeing this information before.

THE COURT: All right, thank you. You can hand it back it counsel.

Sustained.

MR. CREIZMAN: Your Honor, just for the record, I don't think that --

THE COURT: Counsel, if you want to sidebar, we can.

MR. CREIZMAN: Can we have a brief sidebar?

THE COURT: Yes.

(Continued on next page)

(At sidebar)

THE COURT: He hasn't indicated that this is something he's seen before that would refresh his recollection.

MR. CREIZMAN: My apologies for the sidebar, but my understanding from the rule about refreshing recollection is that -- I've always learned you could show anything that might help refresh recollection even if it's something the witness never has seen before.

THE COURT: So if you wrote down on a piece of paper "the law firm that contacted you was called Dollar Associates", can you show that to him?

MR. CREIZMAN: I think that that's -- I do think that that's not -- I mean, from my understanding, you could show them something that they haven't seen before.

THE COURT: There has to be some indication that there's a memory that could be triggered and that there's something that is something that is not just the lawyer feeding him information --

MR. CREIZMAN: Okay.

THE COURT: -- of your own creation.

MR. CREIZMAN: Right. But yes -- no, I wasn't trying to do that, I was just trying to see if that would stimulate --

THE COURT: Do you have a basis for thinking he knows the name of this law firm?

THE WITNESS: Yes, because he received the letter from

the law firm. He knew it was from Alabama.

THE COURT: So the letter would be something.

MR. CREIZMAN: But I don't have the letter. I don't have the letter. I've never seen the letter. But I knew that they hired this law firm, Dollar Associates from Alabama, and so that is what I wanted to see if showing him the name might help refresh his recollection that that was it.

THE COURT: I think you asked him. I think you asked him the name.

MR. CREIZMAN: Right, and he says "I don't remember".

THE COURT: Right. So you can't then just show him the name that you printed off the website. If saying the name didn't trigger a memory, then showing him a document that he's never seen before --

MR. CREIZMAN: I certainly didn't intend to violate the rules.

THE COURT: I understand.

MR. CREIZMAN: But I just thought that that was okay.

MR. NOBLE: I think he made it clear that this does not refresh his recollection.

MR. CREIZMAN: Okay.

THE COURT: He did. I mean, to be clear, what's been marked as Defendant's 10 I presume is something you printed off the website?

MR. CREIZMAN: Yes.

Case 1:15-cr-00769-AJN Document 482 Filed 04/07/17 Page 212 of 260

THE COURT: And it contains the name Dollar Associates, which is the name that you --

MR. CREIZMAN: Right.

THE COURT: -- asked him about, so all you're doing is asking him again about the name, you're just showing him.

MR. CREIZMAN: Right. If he saw with the firm -- it's just like a letter from Sullivan & Cromwell. If I showed him Sullivan & Cromwell, maybe it would refresh, but I --

THE COURT: We'll move on.

MR. CREIZMAN: Okay.

(Continued on next page)

(In open court)

THE COURT: You may proceed, Mr. Creizman.

BY MR. CREIZMAN:

Q. Are you familiar with an individual named Dennis Dollar?

A. I've heard the name.

Q. Are you aware that he was the chairman of the National Credit Union Administration for a time?

A. For a time before I was hired, yes.

MR. CREIZMAN: No further questions.

THE COURT: All right. We'll now have cross examination by Ms. Santillo on behalf of Mr. Gross.

MS. SANTILLO: Yes, your Honor.

CROSS EXAMINATION

BY MS. SANTILLO:

Q. Good afternoon, Mr. Curry.

A. Good afternoon.

Q. My name is Kristen Santillo, and I'm an attorney on behalf of Trevon Gross.

One of the things you mentioned when you were testifying was talking about board minutes, correct?

A. Yes.

Q. One of the things you said was that if there was a strategic partnership, you would expect that to be in the board minutes.

A. Yes.

MS. SANTILLO: Could I have Government's Exhibit 6085?

THE COURT: Which is in evidence?

MR. NOBLE: It is.

MS. SANTILLO: Yes.

THE COURT: All right. You can publish that.

BY MS. SANTILLO:

Q. Now, does this appear to be board minutes from the HOPE FCU?

A. Yes, ma'am.

Q. And they're dated May 17th, 2014?

A. Yes.

Q. And if I could direct your attention to where it says "strategic partnership update". Could you read that for us, please?

A. Oh, I see. Okay.

THE COURT: Could you make it larger, please?

THE WITNESS: "Strategic partnership update. Chairman Gross gave an updated report on the new partnership leadership with the HOPE FCU. They will take on the responsibility of running the entire credit union. We would continue to conduct and do our credit union business for our customers and clients. The board will nominate six new board members to work with HOPE FCU."

Q. You said one of the things that the examiners look at when they come in for their examinations is board minutes.

A. That is correct.

Q. So if the examiners were in to look at the HOPE FCU, they would look at these board minutes.

A. That is correct.

Q. And they would be on notice of the strategic partnership.

A. That would be correct.

Q. Now, you said you got a tip in August, 2014, correct?

A. Our office did, yes.

Q. Yes. And that led you to go onto the HOPE FCU website.

A. That's correct.

MS. SANTILLO: Could I have Government's Exhibit 724-4?

Q. When you went onto the HOPE FCU website, you could see members -- it listed the board of directors and included people including Yuri Lebedev, Ricardo Hill, and Jose Freundt?

A. That's correct.

Q. And you didn't have to go to any special page on the website, this was on the first page of the website.

A. I don't recall exactly if it was on a different like link on the site or if it was on the main page.

Q. But it was a publicly available document.

A. Yes.

Q. Something you noticed right away.

A. Yes.

Q. No effort to hide it.

A. I don't believe so, no.

Q. And you were in the courtroom when the Court gave a legal instruction to the jury about some of the NCUA rules and regulations, correct?

A. That is correct.

Q. And did you agree with the Court's interpretation of the NCUA rules and regulations?

MR. NOBLE: Objection.

THE COURT: Sustained.

Q. One of the instructions that the Court gave stated that, "The board of directors of the credit union must meet at least once per month, minutes of all board meetings must be kept, at the first meeting after the annual meeting of the members the members of the board must elect the board officers."

A. Yes.

Q. Do you agree with that statement?

MR. NOBLE: Objection.

THE COURT: Sustained.

Q. You noted that there are specific rules about membership. Is it correct that it's not until after the first meeting after the annual meeting of the members that the members of the board must elect the board officers?

A. From my understanding in the bylaws that they have to hold a meeting not to exceed seven days after the annual meeting in order to elect the people that were elected to the board to

their positions.

Q. But it's not at the annual meeting that the board officers are elected.

A. Well, that's when they go through the election results from the field of membership, from the members of the credit union. I can't say for sure that they are supposed to take their seats that day.

Q. Okay. So you don't know if at the annual meeting the board officers, as opposed to the board members, have to take their meeting?

A. Correct. I can't answer that.

Q. Okay. Now, if we look at the profile that you looked on at 6111. If you look at the certification, the certification is with respect to the appointment of senior management or volunteer officials, it doesn't say "board members", correct?

A. Of senior management or volunteer officials, that is correct.

Q. And this certification is dated as of June 30th, 2014. That's what you testified to, correct?

A. That is correct.

MS. SANTILLO: If I could have Exhibit 6087, please.

Q. This is board meeting minutes from July 19, 2014, and there was no meeting held by the HOPE FCU because there was not a quorum. Is that how you would read these minutes?

A. Yes, that's how I would read that.

MS. SANTILLO: If you could turn to Exhibit 6088, which is the minutes of the board of directors meeting for August 16th, 2014. If you could scroll to the bottom, please. The last page. I'm sorry, the next page up. One more up.

BY MS. SANTILLO:

Q. Does it appear that it wasn't until the August 14th meeting that the board officers were chosen, August, 2014 meeting?

A. Yes, it appears so.

Q. So when you went onto the website in August, 2014, the board officers are as reflected in these board minutes.

A. Yes.

Q. So the website accurately reflected the board composition as of the August, 2014 meeting.

A. Yes. These names were -- that are in the minutes as board officers were also on the website.

Q. Okay. Now, you've been an examiner, that's correct?

A. Yes, that is correct.

Q. And so there is a process of examination that you follow; is that correct?

A. That is correct.

Q. Would you say it's an ongoing process?

A. Correct.

Q. So examiner comes in, examiner looks at things in the files, including board minutes?

A. Correct.

Q. Member files?
A. Correct.
Q. They would look at the applications of board members.
A. Occasionally they would. It's not necessarily a required step.
Q. If they wanted to, they could go into the files.
A. That's correct.
Q. They might look at things like their driver's license.
A. That's correct.
Q. But a credit union would expect that they'd be able to look into their files.
A. Yes.
Q. And they would look at the minutes, as we've discussed.
A. Yes, that's correct.
Q. Examiners can come to some preliminary findings during their examination; is that correct?
A. That's correct.
Q. And they may discuss those findings with members of the credit union.
A. That is correct. Hold on. Not necessarily members of the credit union, but management officials of the credit union.
Q. I understand your distinction, and that's correct. The people who are participating in the examination as board members are officers of the credit union.
A. Correct.

Q. And the examination process contemplates a back and forth.
A. Correct.
Q. And sometimes the NCUA may come up with a preliminary finding and a member of the management might disagree with that finding.
A. Yes, that's correct.
Q. And sometimes there's a negotiation.
A. That is correct.
Q. And sometimes you're able to reach a resolution.
A. That is correct.
Q. But sometimes you don't reach a resolution.
A. That is also correct.
Q. And there is an appellate process when this happens; is that correct?
A. That's correct.
Q. And members of the credit union are encouraged to use that process if they disagree with the finding of the examiner.
A. That is correct.
Q. There's actually several levels of appeal.
A. To my understanding, yes, that is correct.
Q. So if you are not able to reach a resolution with the examiner, you can appeal to the supervisory examiner.
A. That is correct.
Q. And you can state your case to the supervisory examiner.
A. That is correct.

Case 1:15-cr-00769-AJN Document 482 Filed 04/07/17 Page 221 of 260

Q. There's nothing wrong or improper with disagreeing with the examiner.
A. Not at all.
Q. In fact, there's protections in place that say that nobody could retaliate against somebody for raising an appeal with an examiner.
A. That is correct.
Q. And if you end up disagreeing with the supervisory examiner, you can take an appeal of that?
A. That is also correct.
Q. And you could appeal to the regional office.
A. Yes.
Q. You could even appeal even higher than that if you wanted to.
A. Yes.
Q. Okay. And so a back and forth between the examiner and the credit union is a part of the process.
A. That is correct.
Q. You mentioned something called a letter of understanding; is that correct?
A. That is correct.
Q. And that's one of the findings that an examiner can make in the course of an examination.
A. Well, that's more of an administrative remedy as opposed to a finding.

Q. Okay. Well then we'll back it up a little bit.
A. Okay.
Q. So you mentioned that there's some things that can be agreed upon between the examiner and the members of the credit union; is that correct?
A. That is correct.
Q. And so if there is a violation to be found in the credit union, sometimes people are given an opportunity to remedy that violation.
A. That is correct.
Q. Sometimes they're given a timeframe that do that?
A. Yes.
Q. Maybe a checklist of items that they can check off to bring themselves into compliance.
A. That is correct.
Q. And does the letter of understanding contemplate that there are things the management agrees to work on to try to come into compliance?
A. That is correct. It outlines the various corrective action items that we expect them to resolve by the timeframes listed inside the letter of understanding and agreement.
Q. Okay. And it gives them a chance to do that.
A. Yes.
Q. Now, you mentioned ACH processing a little bit.
A. Yes.

Q. And there's different kinds of ACH processing, and you mentioned that ACH processing is one of the sources of fee income for credit unions; is that correct?
A. That's correct.
Q. It's a business that helps grow the assets of the credit union.
A. That's correct.
Q. And there's nothing inherently wrong with ACH processing.
A. Not inherently, no.
Q. As long as you have the right compliance structures in place, it's okay for a credit union to do ACH processing.
A. That is correct.
Q. One of the things you mentioned was conflicts of interest, correct?
A. Yes.
Q. You can't really vote as a board member on something that you have a conflict of interest about, correct?
A. Correct.
Q. Now, you also mentioned the roles of members of the board, and you walked through sort of various different functions of the various members of the board; is that correct?
A. That is correct.
Q. And one of the things you said is that the chairman has a certain role in the credit union.
A. That's correct.

Q. And that includes to preside over meetings.

A. Yes.

Q. And you looked at the HOPE FCU bylaws, correct?

A. Yes.

Q. And in the HOPE FCU bylaws, it has something called the Roberts Rules of Order, it adopts those principles. Are you familiar with those?

A. I glanced at them, but I'm not overly familiar with that section.

Q. Well, is it your understanding that the chairman in both the general credit union laws and in the HOPE FCU credit union laws doesn't actually vote unless he's breaking a tie?

A. That sounds familiar, but I can't say with 100 percent confidence.

Q. Okay. So you think it's possible that the chairman actually doesn't vote, that he only votes when he breaks a tie and his role is to preside over meetings?

A. That's my understanding.

Q. So to the extent there would be a conflict, if the chairman is not even voting on that, then he doesn't have a conflict because he's not voting.

A. I would still think a conflict could exist potentially.

Q. A theoretical.

A. Correct.

Q. Now, you mentioned that nobody can own a credit union,

correct?

A. Correct.

Q. But you could become a member of a credit union.

A. Correct. A member/owner, yes.

Q. And once you become a member of a credit union, you can become a director of a credit union.

A. That's correct.

Q. And if you have a group of members who join a credit union, they can collectively vote to elect somebody who they want to be on the board.

A. Correct, as long as they're within the field of membership, yes.

Q. As long as they're in the field of membership, and if they have enough power to elect the people they want onto the board.

A. Correct.

Q. So the ownership stays with the members, correct?

A. Correct.

Q. But the control, you know, the supervision of the credit union goes with the directors.

A. Correct.

Q. Now, Mr. Creizman addressed this with you before, I just want to address it one more time. You met with the government and they asked you some questions.

A. That's correct.

Q. And they asked you specifically about whether a virtual

office could be within the field of membership.
A. Correct.
Q. And you didn't know the answer.
A. That is correct.
Q. Okay. And you've been an examiner for eight and a half years.
A. That is correct.
Q. Okay. And you went through five levels of training.
A. That is correct.
Q. Okay. And you do continuing training.
A. That's correct.
Q. Every year.
A. Well, most years, yes.
Q. Okay. Fair enough. Okay.

Now, another question the government asked you was about whether organizations can offer financial support to credit unions.
A. Yes.
Q. And that can be done, there's nothing wrong with an organization helping to support a credit union.
A. No.
Q. It's actually fairly common.
A. Exactly. In most credit unions, especially if they're a single common bond charter, for example, the sponsor company provides support for that specific credit union.

Q. And there's nothing wrong or improper for them providing financial support to the credit union.
A. No.
Q. Now, you said you received a tip from somebody named Jerry Coursen in August, 2014?
A. Our office did, yes, ma'am.
Q. And the tip, was that related -- in the tip, somebody went to Mr. Coursen and said they were trying to put millions of dollars into the credit union; is that correct?
A. That is how it was relayed to me, yes.
Q. Okay. So you don't have personal knowledge of that call?
A. It was on a phone call and I wasn't on the phone call.
Q. Okay. And who was that person?
A. It was our regional director, Jane Walters.
Q. Who did you understand the person who went to Mr. Coursen was?
A. I never received a name.
Q. All right. But you knew that somebody was trying to put millions of dollars into the HOPE Credit Union to take it over.
A. Yes.
Q. And to your knowledge, was that ever conveyed to Mr. Gross?

MR. NOBLE: Objection, calls for speculation.

THE COURT: Overruled.

THE WITNESS: Can you repeat the question?

Q. Sure. To your knowledge, was that ever conveyed to

Mr. Gross?

A. Not to my knowledge.

Q. So August, 2014, there's a tip, and that started the examination process of HOPE FCU in the Fall of 2014.

A. Well, that started my review process, at which point we found out that an examination was still open for HOPE.

Q. Okay. But that was what prompted the NCUA to go in and to start looking at the credit union more closely.

A. Correct, to go back on-site, yes, ma'am.

Q. I guess my last question would be, another thing that we raised with respect to the -- when the government was speaking with you about the conflict of interest question, they asked you a specific question about what "pecuniary" meant.

A. Correct.

Q. You didn't know the answer to that question.

A. I haven't -- no. I don't use that word normally, no.

Q. Okay. But the government asked you a question, and they wanted an answer.

A. That's correct.

Q. And so you came up with an answer.

A. I inferred what it meant by how it was used in that sentence, yes, ma'am.

Q. Thank you.

MS. SANTILLO: That's my last question.

THE COURT: All right.

Mr. Noble.

MR. NOBLE: Yes, Judge.

REDIRECT EXAMINATION

BY MR. NOBLE:

Q. Mr. Curry, I'd just like to clarify a few things with you. Mr. Creizman asked you about some of the relaxed rules that apply to low-income designated credit unions. Do you remember that?

A. Yes, I do.

Q. And he, I believe, asked you specifically about business share accounts and some of the relaxed rules that pertain to business share accounts.

A. I believe he asked to non-member business accounts.

Q. Yes. I apologize. Non-member business accounts. Can you explain to the jury what those relaxed rules are?

A. They can accept non-member deposits from any source. So it could be from a business, but NCUA's interpretation on that is that the account cannot be transactional.

Q. What does that mean, the account cannot be transactional?

A. It cannot be used to process transactions.

Q. Would that include ACH transactions?

A. That is correct.

MR. NOBLE: Can we bring up Government's Exhibit 6085 in evidence? And blow up the portion of chairman's report by Trevon Gross.

Q. Do you remember being asked some questions about this by Ms. Santillo on your cross examination?
A. Yes, I do.
Q. And you see the section she highlighted regarding the strategic partnership update?
A. Yes, I do.
Q. Can you just read that section to yourself for a moment? Look up when you're done.

Do the board meeting minutes include anything regarding any payments that were going to be made to HOPE Federal Credit Union in connection with the strategic partnership?
A. No.
Q. Do the board meeting minutes include any mention of any payments that were going to be made to Hope Cathedral in connection with the strategic partnership?
A. No.
Q. Do the board meeting minutes include any mention of a written memorandum of understanding between the credit union and another entity in connection with the strategic partnership?
A. No.
Q. If there had been a written agreement or any of the payments that I previously described, would you expect those to be included in the board meeting minutes?

MS. SANTILLO: Objection.

THE COURT: Overruled.

THE WITNESS: Can you repeat that? I'm sorry.

Q. If there had been any payments, as I previously asked you about, or a written memorandum of understanding in connection with this strategic partnership, would you expect that that would be something included in the board meeting minutes?

A. I would expect there to be some commentary in the actual minutes here and then some type of an attachment explaining the relationship.

Q. Would you expect to see the memorandum of understanding included in the board meeting minutes if it had been discussed by the board?

MS. SANTILLO: Objection.

THE COURT: Overruled. You may answer.

THE WITNESS: Can you explain? I'm sorry.

Q. Sure. If the credit union entered into a strategic partnership with an outside entity, a third party, would you expect that's something that the board would discuss?

A. Yes.

Q. Would the board have access to any written agreement that the credit union entered into?

A. Yes. I would expect that to be in the board minutes and that the board had an opportunity to look at this agreement.

Q. Similarly, if a donation had been made to an individual or

an entity associated with an individual on the board, is that something that you expect to see in the board meeting minutes?

A. Yes.

Q. Now, I believe that Ms. Santillo asked you some questions about the duties of the chairman and whether or not he gets to vote on all matters, correct?

A. Correct.

Q. Do you remember that?

Does the chairman get to participate in the deliberations of the board, even if he doesn't have a vote?

A. Yes.

MR. NOBLE: Can we bring up Government's Exhibit 6150? These are the bylaws of the HOPE Federal Credit Union. Please flip to page 17. I'm sorry. Can we go back and start with the previous page? Actually, sorry, it's page 11. I apologize, Mr. Chang-Frieden.

Q. Now, do you remember Ms. Santillo asked you whether, in the bylaws, there was anything about the chair not having a vote in the case of a tie?

A. I do remember that.

Q. You remember that?

A. That coming up in a question earlier, yes.

Q. Now, generally, are ties supposed to occur on boards of federal credit unions?

A. No.

Q. Why not?

A. Because there's supposed to be an odd number of board members.

Q. Can you just read section 3 after the words "duties of chair"?

A. "The chair presides at all meetings of the members and at all meetings of the board unless disqualified through suspension by the supervisory committee. The chair also performs other duties customarily assigned to the office of the chair or duties he or she is directed to perform by resolution of the board not inconsistent with the act and regulations in these bylaws."

Q. Does that say anything about the chair not having a vote in the case of a tie?

A. It does not.

MR. NOBLE: If we can flip forward to page 17. Under section 4, after "conflicts of interest prohibited", can you blow up that section?

Q. Can you just read the first sentence?

A. "No director, committee member, officer, agent, or employee of this credit union may participate in any manner, directly or indirectly, in the deliberation upon or the determination of any question affecting his or her pecuniary or personal interest or the pecuniary interest of any corporation, partnership, or association other than this credit union in

which he or she is directly or indirectly interested."

Q. And focus your attention first on the words "director" and "officer". Would that include the chairperson of the credit union?

A. Yes.

Q. And focusing your attention on the words "in the deliberation upon" followed by "or the determination of any question", do you see that?

A. Yes.

Q. So under that, "a person with a conflict of interest on the board of directors should recuse him or herself from the deliberation of a question that would affect that interest," correct?

A. Correct.

Q. It would also require the person to recuse him or herself in connection with the determination of that question, right?

MS. SANTILLO: Objection. He's interpreting the provision.

THE COURT: If you mean leading, I'll sustain.

Q. Is it correct that this language includes, between "deliberation upon" and "the determination of" the word "or"?

A. Yes.

MR. NOBLE: You can take that down, Mr. Chang-Frieden.

Q. Now, you were asked some questions by Ms. Santillo about the election of directors and the election of officers. Do you

remember that?

A. Yes.

Q. Is there a difference between officers and directors?

A. I believe there is a difference. There's general board directors, and then there's board officers which would be your chairperson, your vice chair person, your secretary, treasurer.

Q. Who elects the directors on the board of directors?

A. The members of the credit union elect the directors.

Q. And when does that occur?

A. At the annual meeting.

Q. And who elects the officers on the board of directors?

A. I believe that's carried out by the board of directors.

Q. And when does that occur?

A. I believe, according to the bylaws, it has to take place within seven days after the annual meeting.

MR. NOBLE: Can we bring back up Government's Exhibit 6111? Blow up the first paragraph under the certification.

Q. Do you remember Ms. Santillo asking you some questions about senior management or volunteer officials?

A. Yes.

Q. Would that include board members?

A. Yes.

MR. NOBLE: You can take that down, Mr. Chang-Frieden.

Q. Now, you were also asked some questions about ACH

processing, correct, by Ms. Santillo?

A. Yes.

Q. And you said that there's nothing inherently evil or improper about ACH processing, correct?

A. That is correct.

Q. Okay. Is it unusual for a small credit union to process a very large volume of ACH transactions?

MS. SANTILLO: Objection.

THE COURT: Just a moment.

MS. SANTILLO: 701.

THE COURT: I'll sustain.

Q. Now, you testified ACH processing is one way credit union can generate fees, correct?

A. That's correct.

Q. Would you expect small credit unions to generate a large amount of fees through their ACH processing, based on your training and experience?

MS. SANTILLO: Objection.

THE COURT: Sustained.

Q. You were asked some questions about the conflicts, correct, conflicts of interest --

A. Correct.

Q. -- by Ms. Santillo?

Would there be a conflict if a chairman of the board of directors or an organization that he was affiliated with

received money from a group --

MS. SANTILLO: Objection.

MR. NOBLE: -- trying do business with the credit union?

THE COURT: Wait a second. Wait a second. There was an objection.

MR. NOBLE: I'm sorry.

THE COURT: Grounds?

MS. SANTILLO: It's 701.

THE COURT: Sustained.

BY MR. NOBLE:

Q. Based on your training and experience as an examiner, have you ever seen situations in which a member of a board had a financial interest that could have been affected by a decision that was being made by a board of directors?

MS. SANTILLO: Objection. 701.

THE COURT: Sustained.

Q. Have you ever seen that situation?

MS. SANTILLO: Objection, relevance.

THE COURT: Sustained.

Q. Ms. Santillo asked you about conflicts of interest generally, right?

A. Yes.

Q. She asked you whether a person would have to recuse him or herself if they were serving as the chairperson of the board?

MS. SANTILLO: Objection, misstates.

THE COURT: Overruled. You may answer.

THE WITNESS: Can you repeat that, please?

Q. Yes, sure. I was just saying, Ms. Santillo asked you about a situation in which a chairperson of the board of a credit union had a pecuniary interest, a financial interest in a transaction that the board was considering, whether that person could vote or would have to vote on that, correct?

A. Correct.

Q. Okay. In that situation, if that person had a financial interest, would that person be allowed to vote based on the bylaws?

MS. SANTILLO: Objection, interpretation of the bylaws.

THE COURT: Within the scope. Overruled. You may answer.

THE WITNESS: No.

Q. Can you clarify what you mean by "no"? Would that person be allowed to participate in that decision?

A. No, they would not be able to participate in that decision.

MR. NOBLE: No further questions.

THE COURT: Mr. Creizman.

MR. CREIZMAN: No further questions.

THE COURT: Ms. Santillo.

MS. SANTILLO: Yes.

THE COURT: Briefly.

RECROSS EXAMINATION

BY MS. SANTILLO:

Q. Yes. You had mentioned -- you know, you talked about board minutes, correct?

A. Correct.

Q. And what the process is for taking board minutes.

A. Yes.

Q. And what needs to be included in board minutes.

A. Yes.

Q. And when you were initially testifying, you said that the board minutes are a summary of what happens at meetings, correct?

A. That is correct.

Q. And you don't need to take a transcript of the meeting, correct?

A. No.

MS. SANTILLO: If we could pull up -- let me just see. I think it was 6685, but I don't know. The May 14, 2014 minutes.

MR. NOBLE: 6085.

MS. SANTILLO: 6085. Thank you. 6085.

BY MS. SANTILLO:

Q. And there are details that would not be in there, for example, there's no details in there about the partnership

paying for debit cards.

A. I don't see that discussed on this page.

Q. And there's no record of anybody saying "good morning" at 10:00 a.m.

MR. NOBLE: Objection.

THE COURT: I'll allow it, and then we're done with that line. You may answer.

THE WITNESS: No.

MS. SANTILLO: Thank you.

Q. We discussed this issue about whether a chairman votes at a meeting, correct?

A. Correct.

Q. And in these bylaws, it refers to using the Roberts Rules of Order, correct?

A. Correct.

Q. And you weren't familiar with the Roberts Rules of Order.

A. No, I'm not that familiar with it, no.

Q. Okay. So you can't testify here today one way or another about what the Roberts Rules of Order say about the chairman's participation in voting.

A. That would be correct.

Q. Okay. So everything that you testified to about the conflicts of interest that might exist with respect to a chairman's participation in voting is not based on the Roberts Rules of Order.

MR. NOBLE: Well, objection.

THE COURT: Overruled.

THE WITNESS: Can you repeat that? I'm sorry.

Q. Sure. The hypotheticals the government proposed about situations where a chairman would vote is not based on any personal knowledge you have about the Roberts Rules of Order.

A. That would be correct.

Q. Okay.

MS. SANTILLO: That's it. I have no further questions.

THE COURT: All right.

MR. NOBLE: No redirect.

THE COURT: All right. Thank you. Mr. Curry, you are excused. You may step down.

(Witness excused)

THE COURT: We have 15 minutes remaining. Government may call your next witness.

MR. SHIN: Your Honor, the parties have entered into a stipulation that the government will now offer. It's marked for identification as Government's Exhibit 4010.

THE COURT: Okay.

MR. SHIN: Mr. Chang-Frieden, if you could publish if for the jury. Thank you.

THE COURT: So 4010, without objection and on stipulation, is admitted. Go ahead.

MR. KLINGEMAN: Yes.

THE COURT: Thank you.

(Government's Exhibit 4010 received in evidence)

MR. SHIN: Thank you, your Honor. The stipulation provides that, "If called to testify, Frank Oswald would testify that, "Paragraph 1. Frank Oswald" --

MR. KLINGEMAN: Your Honor.

THE COURT: Do you have paper? One of the screens is not working.

MR. SHIN: I believe we have a few copies, your Honor.

THE COURT: Okay.

MR. SHIN: One moment. Your Honor, we're handing over one paper copy and we're ready to proceed.

THE COURT: Okay. Anyone who doesn't have their eyes on it? Okay. Looks like we're good.

Go ahead. Thank you.

MR. SHIN: Thank you, your Honor.

"Paragraph 1. Frank Oswald and his mother, Mary Jo Oswald, have resided at 10 La Quinta Lane in Lakewood, New Jersey (The Oswald Residence) since approximately 2012.

"2. Mary Jo Oswald and Michael Murgio are siblings. Michael Murgio is Frank Oswald's uncle, and Anthony Murgio is Frank Oswald's first cousin.

"3. Michael Murgio grew up in Passaic, New Jersey before moving to Florida when he was in his 20s. Michael

Murgio has extended family in New Jersey. The extended family has family reunions in New Jersey nearly ever year. Michael Murgio attended one such reunion in or about June of 2014.

"4. Michael Murgio started out as a school teacher in Florida before becoming a principal and then a superintendent there. Then he was elected to and served on a school board in Florida before resigning in 2016.

"5. In or about October or November, 2014, Anthony Murgio and Michael Murgio visited Frank Oswald and Mary Jo Oswald at The Oswald Residence two or three times.

"6. Anthony Murgio and Michael Murgio told Frank Oswald that they needed someone with a New Jersey address to serve on the board of directors of HOPE Federal Credit Union.

"7. Anthony Murgio asked Frank Oswald if he would serve on the board of directors of HOPE Federal Credit Union. Frank Oswald said that he was interested and he signed a form Anthony Murgio sent him for a background check, but Anthony Murgio did not follow up. Frank Oswald did not in fact serve on or attend any meeting of the board of directors of HOPE Federal Credit Union.

"8. Frank Oswald never discussed with Anthony Murgio using The Oswald Residence to operate the Collectables Club. Frank Oswald never personally received any correspondence at The Oswald Residence addressed to Anthony Murgio or the Collectables Club. Continuing. The Collectables Club never in

fact operated out of the Oswald residence.

"9. Frank Oswald has never met or communicated with Yuri Lebedev. Frank Oswald does not recall ever hearing about Yuri Lebedev from either Anthony Murgio or Michael Murgio.

"10. Frank Oswald has never met or communicated with Trevon Gross. Frank Oswald does not recall ever hearing about Trevon Gross from either Anthony Murgio or Michael Murgio.

"And it's further stipulated and agreed that this stipulation, which is Government's Exhibit 4010, may be received into evidence as a government exhibit at trial, signed by counsel for the parties."

THE COURT: Thank you.

The government may call its next witness.

MR. SHIN: Thank you. The government calls Ricardo Hill to testify.

THE COURT: I do invite the jury to stand and stretch.

We have just ten minutes remaining.

(Pause)

THE COURT: Mr. Hill, you may come forward toward the witness stand.

RICARDO HILL,

called as a witness by the Government,

having been duly sworn, testified as follows:

THE COURT: You may proceed.

MR. SHIN: Thank you, your Honor.

DIRECT EXAMINATION

BY MR. SHIN:

Q. Mr. Hill, please state and spell your name for the jury.

A. Ricardo Hill. R-i-c-a-r-d-o, H-i-l-l.

Q. I'm sorry, Mr. Hill. Would you mind speaking closer to the mic?

A. Yes. Should I do it again?

Q. Yes. If you could state and spell your name for the jury, please.

A. Ricardo Hill. R-i-c-a-r-d-o, H-i-l-l.

Q. Do you have any nicknames?

A. Yes, Rico. R-i-c-o.

Q. How old are you?

A. I'm 38 years old.

Q. Where do you currently live?

A. In Brandon, Florida.

Q. Could you please describe your educational background?

A. I graduated high school and did some college.

Q. Are you currently employed?

A. Yes, I am.

Q. Where are you currently employed?

A. At Miller's Ale House in Brandon, Florida.

Q. Is that a restaurant?

A. Yes.

Q. What do you do there?

A. I'm the quality and assurance manager.
Q. If you could just briefly describe what that means.
A. It's like the expediter. Before the food goes out to the table, I assure its quality and assurance.
Q. Are you familiar with Coin.mx?
A. Yes, I am.
Q. How is it that you are familiar with Coin.mx?
A. I worked there from 2014 and 2015.
Q. What kind of business was Coin.mx?
A. It's a Bitcoin exchange.
Q. And for whom did you work at Coin.mx?
A. For Anthony Murgio.
Q. What was your title at Coin.mx?
A. I was a manager.
Q. A manager of any particular area?
A. Yes, the back end, and also the customer service representatives.
Q. Now, were you involved in any criminal activity in connection with your work at Coin.mx?
A. Yes.
Q. What were those criminal activities?
A. Bank fraud, and wire fraud, and conspiracy to do so. Also, operating an unlicensed money exchange and conspiracy to do so.
Q. You referred to bank and wire fraud. Just generally speaking, what did you do that constituted bank or wire fraud?

A. We made three-way calls with customers to their banks and instructed them to not mention the nature of our business, which was being a Bitcoin exchange.
Q. Do you see anyone else in the courtroom who also worked for Coin.mx?
A. Yes.
Q. Do you know his name?
A. Yuri Lebedev.
Q. Could you please describe where he's sitting and identify a piece of clothing he's wearing?
A. The gentleman at the defendant's table --
THE COURT: Record will reflect Mr. Lebedev is standing. Thank you.
MR. SHIN: Thank you, your Honor.
Q. Now, are you familiar with HOPE Federal Credit Union in New Jersey?
A. Yes.
Q. And how is it that you're familiar with that?
A. I was a board member there, and also worked there from approximately the Summer of 2014 to November of 2014.
Q. You referred to being a board member. Did you have any other roles there?
A. Yes. I was the operations officer.
Q. And who, if anyone, asked you to become a board member and officer of HOPE Federal Credit Union?

A. Anthony Murgio.

Q. Now, did there come a time when you became aware of payments that Anthony Murgio had made to anyone in order to gain control of HOPE Federal Credit Union?

A. Yes.

Q. And from whom did you learn that?

A. Anthony Murgio.

Q. And to whom did Anthony Murgio make those payments?

A. To Trevon Gross and Hope Cathedral.

Q. And do you see that person in this courtroom?

A. Yes.

Q. Could you please describe where he's sitting and identify a piece of clothing he's wearing?

A. The gentleman at the defendant's table, suit, white shirt --

THE COURT: Thank you, Mr. Gross.

The record will reflect the witness identified Mr. Gross, who stood up.

MR. SHIN: Thank you, your Honor.

Q. Now, did you assist Anthony Murgio in making payments to Trevon Gross in relation to HOPE FCU?

A. Yes.

Q. Was anyone else who is currently in this courtroom involved in helping to make those payments?

MR. CREIZMAN: Objection, foundation.

THE COURT: Just a moment. Sustained.

Q. In connection with your assisting Anthony Murgio in making the payments to Trevon Gross, did you come to learn whether any other people were also involved?

MR. CREIZMAN: Objection.

THE COURT: Overruled.

THE WITNESS: Yes.

Q. And do you see any of them in the courtroom today?

A. Yes.

Q. Who is that?

A. Yuri Lebedev.

Q. Now, in addition to the payments that we've been talking about, were you involved in any other criminal activities in connection with your work at HOPE FCU?

A. Yes.

Q. What were those?

A. Obstructing the examinations of a federal regulator and conspiracy to do so.

Q. Now, did there come a time when you were interviewed by FBI agents concerning your involvement in Coin.mx and HOPE Federal Credit Union?

A. Yes.

Q. And about when was that?

A. May or April of 2016.

Q. Did you admit to the agents your involvement in the

criminal activities in connection with Coin.mx and the HOPE FCU?

A. Yes, I did.

Q. Did there come a time when you were subsequently arrested in this case?

A. Yes.

Q. About when was that?

A. In October of 2016.

Q. Now, prior to this case, have you ever been arrested?

A. Yes.

Q. For what?

A. As a juvenile, I was arrested multiple times; once for petty theft from a department store, another time was for passing bad checks, that was done twice, I was also arrested for battery, for fighting in school, as well as possessing of a concealed weapon while at school.

And as an adult, I was arrested for two armed robberies I committed.

Q. Okay. Let's go back to the juvenile arrests that you described.

A. Yes.

Q. What were the results of those cases?

A. Each time I was sentenced to 21 to 30 days in a detention center and then expelled from school for possession of a concealed firearm at school.

Q. And you referenced the burglary convictions as an adult?

A. Yes.

Q. Did you commit those -- was it one or more than one, just to be clear?

A. There was two.

Q. Did you commit those alone or with other people?

A. With other codefendants.

Q. And I believe you referenced that they were armed burglaries; is that correct?

A. Yes.

Q. Did you possess the firearm or did someone you were working with -- was one of your accomplices in possession of the firearm?

A. One of my codefendants was.

Q. What was the result of the criminal case arising out of the burglaries?

A. I was sentenced to ten years in Florida prison.

Q. And about how much time did you serve?

A. Eight and a half years.

Q. Now, in addition to those crimes that you just described for which --

THE COURT: Mr. Shin, we're at 5:00 so we'll break for the day.

MR. SHIN: Thank you, your Honor.

THE COURT: Members of the jury, I do just briefly

want to pick up -- there were two issues raised with Ms. Nuñez for next week regarding a request to accommodate leaving a little bit early for some appointments. I'll speak to counsel and give you more information on that tomorrow. I think we will be able to do that, again, with shaving some time off of lunch. I'll just note that I will try to do that if it's necessary. The more we try to do that, my concern is it just adds up over time, so that's going to mean pushing the days further than they would otherwise go, but we'll do our best as long as we can make up some time, but I'll come back to that tomorrow.

There was also some question about the schedule generally and whether the calendar that we gave was anticipated to be for the full trial, including deliberation. As I've said, I can't predict exactly when the evidentiary portion of the trial will end. Nothing's changed the estimate that indicated in total three to four weeks. If I have any further information about that shorter or longer, I'll let you know, it's just that I can't precisely predict beyond what we've done so far. But we certainly appear to be on schedule, and we'll keep making sure that we do our best in that regard. You're certainly doing your part, which I greatly appreciate.

Bearing my instructions in mind, as always, I wish you a good night. We'll start promptly at 9:30 tomorrow. Thank you so much.

(Continued on next page)

(Jury not present)

THE COURT: Mr. Hill, you may step down. You're excused for the evening.

THE WITNESS: Thank you, your Honor.

THE COURT: Everyone may be seated. Matters to take up, counsel?

MR. NOBLE: None from the government.

MS. SANTILLO: No, your Honor.

MR. CREIZMAN: No, your Honor. Thanks.

MR. KLINGEMAN: I have one matter, your Honor.

THE COURT: Go ahead, Mr. Klingeman.

MR. KLINGEMAN: During the oral argument midday concerning the NCUA conservatorship evidence --

THE COURT: Yes.

MR. KLINGEMAN: -- the government made reference to evidence, or at least an allegation that Kapcharge may have provided funds to HOPE FCU that were subsequently used to pay legal fees. I have no information about that, but I would ask the Court to direct the government to front that issue, at least with counsel, if not the Court, if there is any prospect of that evidence being elicited from a witness in front of the jury.

I would submit, without knowing more, that it's irrelevant and potentially prejudicial, but I don't know anything about it, and I don't want it to come up in the middle

of direct examination.

MR. NOBLE: We're happy to discuss it with defense counsel.

THE COURT: All right. Do that right after I step down so that you can raise with me by letter over the evening if it's something that needs to be addressed for the first segment tomorrow morning. I don't know that it will be, but see if you can get to either agreement or a common understanding of disagreement.

MR. NOBLE: So your Honor isn't expecting anything, as I said earlier, I don't think this is going to be an issue until the testimony of Terry Adam, who is one of our last NCUA witnesses, so this isn't -- if it comes in, it's not going to come in until near the end of trial.

THE COURT: Well, good for now, but --

MR. NOBLE: Yes.

THE COURT: Please do let --

MR. NOBLE: Of course.

THE COURT: -- defense counsel know what's anticipated since they have inquired.

Did you have something, Mr. Creizman, or you're just standing?

MR. CREIZMAN: I do. I've mustered up the courage. If I could have your Honor submit an amended electronic form so that I can bring in two iPads, because I have --

THE COURT: One for me, right?

MR. CREIZMAN: Yes, one for your Honor. And also, I have like law books on it, and I would have been able to show your Honor about the refreshing recollection, or I would have been wrong, but I think at least I would have had it, and my one is dead, so that's the only problem.

THE COURT: You can submit it and I'll probably sign it.

MR. NOBLE: I have an objection.

THE COURT: You think he's more dangerous with or without law?

Let me just note, because though I've invited it about eight times, I haven't had briefing or argument really on where the line will be between lay and expert testimony. It did come up a little bit. I wrote on objections. If anybody wants to brief the issue or raise the issue orally in advance, you certainly can. I do think wherever the appropriate line is drawn, certainly if the defense uses a witness in a way that elicits more generalized, specialized testimony then it is opening the door and within the scope of a redirect, which is, by my estimation, what happened today.

MR. NOBLE: That was my thinking, as well. I tried to steer clear of it on the direct. I believe there was only one 701 or 702 objection during the direct about fiduciary. I could be mistaken. But I tried with --

THE COURT: They may.

MR. NOBLE: -- some difficulty to get it in on redirect.

THE COURT: And they may make choices at which point to object or not, or maybe they agree with you on where the line is drawn. If the government gets away with something on direct and then -- and for strategic or for other reasons the defense then uses that as a point of questioning in cross, then I -- unless one has an argument that it's inappropriate, if that's done on cross, I can't see why it would be inappropriate on redirect. So that's my thinking. You can tell me if or why you have a different view, and if anybody has concerns about -- especially, I suspect with respect to the examiners, as to where that line will be drawn and wants to be heard on it, I do encourage you to either brief or write the Court or raise it orally.

We'll meet at 9:00. Anything else?

MR. SHIN: Your Honor, just one scheduling point for tomorrow. I expect that Mr. Hill's testimony will take much, if not all, of tomorrow, in part because I anticipate that there will be a lengthy cross examination.

THE COURT: I thought you were indicating his direct would take all day.

MR. SHIN: No. We do have one other witness who, for scheduling reasons, we would like to put on -- he's only

available tomorrow and in town tomorrow. It's a witness from Bank of America, and we expect the testimony will be fairly brief. He'll be testifying about some wire transactions, the relevance of which include for venue. And so we would propose that, similarly to what we did for interrupting Special Agent Jarrow's testimony to permit Ms. Wotherspoon to get on and off, we would propose to do that for the Bank of America witness, Andrew Leavy, tomorrow, unless there's any objection.

MR. KLINGEMAN: A couple things. No objection --

THE COURT: You need a microphone.

MR. KLINGEMAN: -- no objection in principle to what the government is suggesting, but I have two requests. It's my understanding that we don't have Jencks material yet for this witness. Two, I would ask that if he's going to interrupt and examination, he interrupt the direct and at least not my cross.

MR. SHIN: That's fine. I mean, I think it may make sense just to put the Bank of America witness on early in the day, perhaps even first. We'll have some Jencks material for you tonight. I don't expect it to be voluminous.

MR. KLINGEMAN: I wouldn't be anticipating it. If you could bring me a hard copy, too, I'd appreciate it.

MR. SHIN: Just for you.

MR. KLINGEMAN: I'm truly old school.

MR. SHIN: With the Court's indulgence, if we could put the Bank of America witness on first tomorrow and then

resume with Mr. Hill?

THE COURT: That's fine with me.

MR. KLINGEMAN: That's fine.

THE COURT: Mr. Creizman, maybe instead of an iPad for me you get a printer for Klingeman.

So that's the plan. What's the witness' name?

MR. SHIN: Andrew Leavy.

THE COURT: So Leavy first, and it's short? Is that --

MR. SHIN: Yes, your Honor.

THE COURT: Okay. And then return to direct. And I'll give the jury a similar instruction as to yesterday.

MR. SHIN: Thank you.

THE COURT: Anything else?

Thank you everyone. Have a good night. See you at 9:00.

(Adjourned to February 23rd, 2017, at 9:00 a.m.)

INDEX OF EXAMINATION

Examination of: Page

CLAYTON CURRY

Direct By Mr. Noble . . . . . . . . . . . . . . .1051

CLAYTON CURRY

Direct By Mr. Noble . . . . . . . . . . . . . . .1108
Cross By Mr. Creizman . . . . . . . . . . . . . .1162
Cross By Ms. Santillo . . . . . . . . . . . . . .1173
Redirect By Mr. Noble . . . . . . . . . . . . . .1189
Recross By Ms. Santillo . . . . . . . . . . . . .1199

RICARDO HILL

Direct By Mr. Shin . . . . . . . . . . . . . . . .1205

GOVERNMENT EXHIBITS

Exhibit No. Received

4011 . . . . . . . . . . . . . . . . . . . . .1040

6001 through 6019, 6061 through 6076, 6081 through 6099, 6101 through 6107, 6111, 6112, 6113, 6121, 6122, 6125, 6126, 6129, 6130, 6131, 6133 through 6136, 6143, and 6200 through 6207 . . . .1040

6124 . . . . . . . . . . . . . . . . . . . . .1041

6510 . . . . . . . . . . . . . . . . . . . . .1112

724-4 . . . . . . . . . . . . . . . . . . . .1133

4010 . . . . . . . . . . . . . . . . . . . . .1202