```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4            v.                              15 Cr. 769 (AJN)

 5   YURI LEBEDEV and TREVON GROSS,

 6            Defendants.                     Jury Trial

 7   ------------------------------x

 8                                            New York, N.Y.
                                             February 22, 2017
 9                                            9:04 a.m.

10
     Before:
11
                         HON. ALISON J. NATHAN,
12
                                             District Judge
13                                           And A Jury

14                          APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     BY:  EUN YOUNG CHOI
17        DANIEL S. NOBLE
          WON S. SHIN
18        MICHAEL CHANG-FRIEDEN, Paralegal
          Assistant United States Attorneys
19
     CREIZMAN, PLLC
20        Attorneys for Defendant Yuri Lebedev
     BY:  ERIC M. CREIZMAN
21        MELISSA MADRIGAL
          JONATHAN MICHAELSON, Paralegal
22
     KROVATIN KLINGEMAN, LLC
23        Attorneys for Defendant Trevon Gross
     BY:  KRISTEN M. SANTILLO
24   BY:  HENRY E. KLINGEMAN

25
```

```
 1                 (Trial resumed; jury not present)

 2                 THE COURT:  Preliminary matters to take up?

 3                 I did receive this morning an in limine on behalf of

 4      Mr. Gross and a response from the government.  I have reviewed

 5      those.

 6                 Ms. Santillo, if you want to take a moment to respond

 7      to the government's opposition, I'm happy to hear you.

 8                 MS. SANTILLO:  Sure.  So I think the main objection we

 9      have is to the sort of prejudicial connotation of the term

10      "payday loans".  And I think if you look at the government's

11      letter where they describe what a payday loan is, it says, "a

12      payday loan is generally described as a short-term, extremely

13      high interest loan that is typically due on the borrow's next

14      payday."  So within that phrase is "short-term", "extremely

15      high interest", "typically due", and those are all subjective

16      terms.

17                 There are different laws in every jurisdiction with

18      respect to what a payday loan is, and so my real concern is

19      basically having this loaded term used during the examination.

20      And if we were to call it "short-term loans" I think we would

21      be fine.  They would have to establish the terms of these loans

22      in order to say why there's anything problematic about it.

23      There's nothing illegal about it.

24                 THE COURT:  So your specific application would be to

25      have the government and all of its witnesses use the phrase
```

 1   "short-term loans" rather than "payday loans", is that the

 2   specific --

 3         MS. SANTILLO:  Yes.  Or if there's another -- you

 4   know, what is it?  Because it's not even clear to me exactly --

 5   some of these companies do have a lot of different things.

 6   Like, for example, Kapcharge processes transactions for

 7   TransferWise, which is the vast majority of the ACH

 8   transactions that were processed at the credit union, and that

 9   has nothing to do with payday loans.

10         So some of these businesses are doing other things

11   besides what the government will generally call payday loans,

12   and they're going to say, 'Oh, do you know that Kapcharge was

13   processing payday loans?'  First of all, what does that mean?

14   Second of all, what does that mean in the context of their

15   business?

16         So I think if they have a specific issue with a

17   particular practice at the company that was going through the

18   credit union then we should talk about that in a granular way.

19   So if "short-term" doesn't solve what they deem to be

20   problematic about it --

21         THE COURT:  What if the witness' factual testimony --

22   if that's a word that's used to describe certain categories of

23   loan instruments?

24         MS. SANTILLO:  Well, I think they would have to

25   describe their basis for why they would use that connotation.

1    Because I don't think it's fair to say, for example, to members

2    of the HOPE Credit Union, as they put in their letter, 'Have

3    you ever heard about payday loans?'  And they say, 'No,' and

4    then someone says, 'Have you ever heard about check cashing

5    places?'  It's an umbrella term that applies to various things,

6    and it has a lot of potential to be problematic if you use

7    something that, you know, when the government's own definition

8    is so loose.

9              THE COURT:  Who will I hear from?

10             MR. NOBLE:  Your Honor, the Court's exactly correct.

11   Witnesses will use the term "payday loans" because that's how

12   they referred to this type of financial product.  The articles

13   that Ms. Santillo cited to the Court generally refer to "payday

14   loans".  It's a term of art that's used in the financial

15   industry.  It describes a particular type of financial product

16   that's generally tied to the lender's repayment of a loan on

17   their payday.  They take out loans in anticipation of a

18   paycheck.  They're high interest, short-term, typically

19   low-dollar-amount loans.  The industry generally refers to them

20   as "payday loans".  The witnesses will refer to them as "payday

21   loans" because that's the type of business that they knew they

22   were engaged in.  Kapcharge itself, its employees, Anthony

23   Murgio, everyone refers to them as "payday loans", or "PDL" for

24   short.  You'll see that term come up in emails, it comes up in

25   other documents, and the witnesses -- it would be unnatural and

1    unfair and potentially confusing to the jury not to allow the

2    witnesses to describe this particular type of financial product

3    for what it is.

4            THE COURT:  All right, thank you.

5            MR. NOBLE:  There's nothing inherently evil about

6    them, either, and the government is not going to be arguing

7    that.  It's just that, as we explained in our brief, there are

8    certain other due diligence and policies and procedures that a

9    credit union has to have in place if they're going to be

10   engaged in processing for payday lenders.

11           THE COURT:  I deny the motion, or overrule the

12   defendant's motion on behalf of Mr. Gross.

13           The government's letter -- this was filed on ECF?

14           MR. NOBLE:  We did file it on ECF.

15           THE COURT:  I will ask, maybe because of the late hour

16   you didn't have access to ECF, if you can please do ECF so it

17   becomes part of the record.  But I understand the timing issue.

18   But if you would go back at some point this evening and file

19   your letter on ECF, Ms. Santillo, so that it is part of the

20   record on the docket.

21           But for the reasons stated in the government's letter

22   dated February 22nd, 2017, there are three categories of

23   arguments as to the relevance of evidence that may include

24   discussion of payday loans.  I do not find, based on the

25   showing that's been made, that that relevant evidence is

1    outweighed by any unfair prejudice based on the term "payday

2    loans".  Certainly, defense can cross examine witnesses as to

3    the meaning of the loans, but it is not unduly prejudicial, and

4    I think it would be artificial and unfair and confusing to the

5    jury to try to force witnesses to use some language other than

6    the term of art that has been proffered is used and appears

7    throughout the evidence and, in any event, I don't find the

8    term unduly prejudicial, so I will deny that motion.

9            Other matters I could take up?  Go ahead.

10           MS. SANTILLO:  Your Honor, could I make a followup

11   request which would be, you know, in the instructions to the

12   jury, when they first came in, we had an instruction about how

13   Bitcoin is not unlawful.  I'd like to propose an instruction

14   about how payday lending is not unlawful, and how this term has

15   different meanings in different jurisdictions, because I wanted

16   to just take the sting out of that.  I mean, it's specifically

17   an NCUA policy not to stop credit unions from working with

18   these kinds of businesses, and I think that that's a legal

19   definition in a lot of jurisdictions.

20           THE COURT:  Mr. Noble.

21           MR. NOBLE:  Judge, payday lending is not a legal

22   definition, it requires no legal instruction, it's a factual

23   matter, and I believe defense counsel can --

24           THE COURT:  Ask on cross examine?

25           MR. NOBLE:  -- ask on cross examine about this.

1      THE COURT:  I agree with that.  The reason for making

2  the special instruction regarding the legality of Bitcoins, I

3  think, is, given the potential for prejudice that does inhere

4  in that term, the lack the familiarity with it as a general

5  matter, and the centrality of that, particularly to the charge

6  regarding unregulated money transfer and the like, I don't

7  think it's comparable, and I see no reason why the same point

8  can't effectively be made through cross examination.  I don't

9  understand the government to -- and certainly it would be a

10  concern if there were evidence to -- suggest illegality of

11  payday loans, so I will deny the followup request.

12      Other matters to take up?

13      MR. SHIN:  Your Honor, just one other point.  This is

14  with respect to Ricardo Hill, who we expect will be testifying

15  today.

16      THE COURT:  Yes.

17      MR. SHIN:  He has signed, pursuant to a cooperation

18  agreement with the government, and one of the relevant conduct

19  items in his cooperation agreement that he disclosed and that's

20  covered by the agreement is payment via cocaine for some

21  prostitutes.  And we've reached agreement with defense counsel

22  that the government does not plan to specifically elicit the

23  fact that he was paying prostitutes as it was the general

24  testimony that he was paying others with the cocaine, and

25  they've agreed not to cross examine him on that particular

 1  point in light of the potential for undue prejudice with the

 2  jury.  I just wanted to note that agreement on the record, your

 3  Honor.

 4          MR. KLINGEMAN:  As I understand it, we are permitted

 5  to cross examine Mr. Hill to the effect that he used cocaine to

 6  pay others for services and not to mention "prostitutes", and

 7  that's what I hear from the government, that's what I certainly

 8  agreed to.  I'm not going to mention prostitution or sex

 9  activity.

10          THE COURT:  Okay.  Is that consistent with the

11  government's --

12          MR. SHIN:  It is, your Honor.

13          THE COURT:  All right.  So basically, using "services"

14  as a substitute for "prostitution".

15          MR. SHIN:  Right.  I think the way he has put it, and

16  during our meetings, is that he paid people that he owed money

17  to in cocaine on some occasions, which I think is consistent

18  with what Mr. Klingeman is saying.

19          THE COURT:  Okay.

20          Mr. Creizman, you agree with that?

21          MR. CREIZMAN:  I agree.  That's fine.

22          THE COURT:  Okay.

23          MR. CREIZMAN:  I didn't plan on even crossing on that,

24  but that's fine, now I have that option.

25          THE COURT:  All right.

1              What else can I take up?

2              Mr. Klingeman, did you have something?  You looked,

3    before Mr. Shin stood up, as though you had something.

4              MR. KLINGEMAN:  No, your Honor.

5              THE COURT:  Nothing else?  All right.

6              Let me just say thank you for flagging that issue on

7    the payday loan matter in advance.  It helped me to be able to

8    consider it before coming down, so I thank you for that.  I

9    know time is short.  I appreciate it.

10             We will wait until we have our jury, and I'll see you

11   in about 15 minutes.  Thank you.

12             (Recess)

13             THE COURT:  We have all our jurors.  I continue to be

14   impressed.

15             Mr. Klingeman.

16             MR. KLINGEMAN:  For the benefit of juror number 4, are

17   you planning to reread the instruction?

18             THE COURT:  I will.  I will just, after welcoming

19   them, say, "Because of an indication that there was difficulty

20   hearing the two limiting instructions given at the end of the

21   day, I will repeat them," and then repeat them.

22             MR. KLINGEMAN:  Thank you.

23             THE COURT:  Thank you.

24             Other matters to take up?

25             There were a couple of scheduling questions posed to

1    Ms. Nuñez from a couple of the jurors.  I have those.  I want

2    to bring them out on time.  It's nothing pressing so I'll raise

3    them with you either at the beginning or the end of the lunch

4    break.

5          Please bring in the jurors.  Our witness can return to

6    the stand.

7          MR. NOBLE:  There are no witnesses.  We will be

8    reading more emails.

9          THE COURT:  But only for a very brief period of time.

10   In seriousness, how long do you anticipate for the reading?

11         MR. NOBLE:  We do have a number of emails that we'd

12   like to read, so it probably will go about an hour and a half.

13         THE COURT:  Really?

14         MR. NOBLE:  They're good.

15         THE COURT:  Well, I'm giving you room, but I really --

16   at some point I'm going to have to -- you've made an assessment

17   as to their necessity for your case, but I'll be paying

18   attention.

19         MR. NOBLE:  We can represent these are very necessary

20   to our case.

21          (Continued on next page)

22

23

24

25

1              (Jury present)

2         THE COURT:  Good morning, members of the jury, and

3    thank you again for your timeliness and your diligence.  It's

4    greatly appreciated.

5         I did receive an indication at the end of the day that

6    there may have been some trouble hearing the limiting

7    instructions I gave at the end of the day so we're going to

8    begin with me just repeating those limiting instructions and

9    then return to the government's direct case.

10        One limiting instruction with respect to Mr. Yuri

11   Lebedev.  You have heard testimony from the first two witnesses

12   about alleged illegal activity not charged in the case,

13   including internet gambling and securities fraud.  This

14   testimony has been presented to you solely as background

15   relevant to prove the existence of relationships among certain

16   individuals whom the government alleges were part of a broad

17   conspiracy that the government alleges Mr. Lebedev joined.  The

18   evidence does not suggest Mr. Lebedev knew of or participated

19   in internet gambling or securities fraud, and the government

20   does not allege that he was.  Therefore, I instruct you that

21   you may consider this testimony against Mr. Lebedev only to

22   determine whether a conspiracy existed and not whether he

23   joined the conspiracy.

24        With respect to Mr. Gross.  You have heard testimony

25   from the first two witnesses about alleged illegal activity not

1    charged in this case, including internet gambling, securities

2    fraud, and involving the so-called Darknet.  This testimony has

3    been presented to you as background.  I instruct you that you

4    may not consider this testimony against Trevon Gross as it is

5    not offered against him.

6           With that, Mr. Noble, Ms. Choi, you may resume with

7    reading of emails and chats.  Go ahead

8           MR. NOBLE:  Thank you, Judge.  These are some of the

9    emails that were admitted yesterday into evidence.

10          Can we bring up Government's Exhibit 1401, please?

11   It's going to be Mr. Shin and myself who will be reading these

12   emails.

13          THE COURT:  Okay.

14          MR. NOBLE:  Government's Exhibit 1041 is an email

15   between Anthony Murgio and Michael Murgio.  Beginning with the

16   bottom portion, on Sunday, October 20th, 2013, Anthony Murgio

17   wrote, "1, bankruptcy," and then he included a URL.  "Speak to

18   him about what it would take to get the bankruptcy cleared up.

19   3, we need to try and settle with creditors and clean my

20   record.  2, setting up a credit union.  Speak to them about

21   consulting services.  Don't speak too much.  We have an

22   association that provides services to our members.  We are a

23   collectibles and memorabilia club that wants to offer financial

24   services to our members.  1," there's a URL.  "2, see what it

25   would cost to hire a consultant to help us get a credit union

 1   set up.  3, we want a local credit union, not a federal credit

 2   union, I think.  Love you, thanks."

 3          On Sunday, October 20th, 2013, Anthony Murgio wrote,

 4   "You included a website whose domain name is www.cvcu.coop."

 5          Then on October 20th, 2013, Anthony Murgio wrote, "We

 6   need check 21 services and ACH services," and then he included

 7   a URL.

 8          Can you bring up Government's Exhibit 1044?  This is

 9   another email chain between Michael Murgio and trustee at

10   trustee@collectpma.com.  On Saturday, November 30th, 2013,

11   trustee wrote, "Dad.  Can pay you 5K if you can find a

12   distressed credit union our association can take over.  Please

13   let me know if you're interested.  We need to find one in the

14   next month by Jan 1."

15          MR. SHIN:  On Sunday, December 1st, 2013, at

16   8:52 a.m., Michael Murgio wrote, "So you need me to search for

17   a failing credit union that you can take over?  Would the

18   current people stay in their positions?  That might be easier

19   since you need someone who knows what they are doing."

20          MR. NOBLE:  On Sunday, December 1st, 2013, trustee

21   wrote, "Yes.  And we need to take it over.  We can pay them to

22   replace their positions.  We need our people in place of them.

23   We need control.  Can't invest without control."

24          MR. SHIN:  On December 1st, 2013, Michael Murgio

25   wrote, "Yes, you need your people in control, but it might make

1    it easier to keep some of their people in place that have the

2    banking background that is required by law.  I will begin

3    searching.  I think you need a federal credit union so you can

4    operate in all states."

5            MR. NOBLE:  Please bring up Government's

6    Exhibit 1051-A.  This is an email sent by Anthony Murgio to

7    Mark Francis, mark@capitalinc.com, on April 2nd, 2014, with the

8    Subject:  Here.  The body reads, "Credit union's spreadsheet."

9            Please bring up Government's Exhibit 1051-B, which is

10    the attachment to this email.  Just slowly scroll through this

11    spreadsheet and pause when you come to line 41.  Pause there.

12    Can you highlight row 41?

13            Column A reads, "Could be amazing."  Column B reads,

14    "23265."  Column C reads, "Helping Other People Excel."  Column

15    D reads, "New Jersey."  Can you scroll over?  Column G reads,

16    "www.hope-fcu.com.  Column H reads, "Wyatts, George."  Column J

17    reads, "106 $7,074."

18            You can take that down.  Can you please bring up

19    Government's Exhibit 1071?  This is an email from Trustee

20    Collectibles.  Trustee at collectpma.com.  Sent to

21    info@hopecathedral.com on April 2, 2014.  Subject:  Partnership

22    with HOPE FCU.  "Hello.  We are a memorabilia and financial

23    education association with over 14,000 members.  We are

24    interested in joining a credit union that we can add value to.

25    We have many members that are tech savvy and are interested in

 1    adding many accounts in technology to a credit union.  Please

 2    let us know who would be the best person in your organization

 3    to speak to.  Regards, Mike Murgio."

 4            Can you please bring up Government's Exhibit 1072-A?

 5    This is an email sent by Trustee Collectibles to

 6    tgross@hope-fcu.com.  On April 2, 2014 with a Subject:  HOPE

 7    Credit Union opportunity.  The email reads, "Mr. Gross.  My son

 8    Anthony reached out to you to discuss an opportunity with your

 9    credit union.  We are interested in starting our own credit

10    union or possibly bringing our business to an existing credit

11    union.  We started a memorabilia and financial guidance

12    association about a year and a half ago.  We have been able to

13    attract many members, and now we're looking to provide a credit

14    union for our members.

15            What we are looking to accomplish.  Option 1, bringing

16    our accounts and members to your existing credit union.  We

17    would be looking to be able to offer our members checking

18    accounts, loans, debit cards, ACH, mobile banking, mobile

19    wallets.  Option 2.  Paying you and other officers a nice

20    monthly fee for a couple of years for the ability to take over

21    the credit union.  This will also take any liability off

22    current officers.  This option is because if we have more

23    control over the credit union, we will then invest time and

24    money into developing the technology and trying to grow the

25    credit union.  Your existing members and everyone else will

1     still have complete access to utilizing all services that are

2     currently available, as well as utilizing new technology we

3     will be implementing.  Option 3, utilizing HOPE CU for a period

4     of time while utilizing your knowledge and contacts to start

5     our own credit union and pay a consulting fee for the help.  We

6     look forward to your response.  Regards, Mike Murgio."  And

7     then there's a LinkedIn link.

8            Can you bring that down?  Can you bring up 172-B?

9     Just blow up the top portion, which is the reply.

10           MR. SHIN:  On April 2nd, 2014, Trevon Gross, using the

11    email address trevongross@me.com wrote to trustee@collectpma

12    using the Subject line:  HOPE Credit Union opportunity.  "Hey

13    Mike.  Glad to hear from you.  Option 3 is the most plausible

14    as we just assumed this credit union two years ago and it is a

15    part of our mission.  We do have mobile banking and online

16    banking.  The only thing we do not have, but are about to

17    introduce, is debit cards.  We have checking, loans, ACH/wires,

18    online bill pay and financial counseling.  Let me know if this

19    works for you.  I am very willing to meet to discuss this

20    further.  Trevon Gross."

21           MR. NOBLE:  Can you bring up Government's

22    Exhibit 1072-D?  Just blow up the top portion.  This is an

23    email sent from Trustee Collectibles to Trevon Gross on

24    April 3rd, 2014 with the Subject:  HOPE Credit Union

25    opportunity.  "Anthony here.  It was great speaking with you

1    this afternoon.  My father is out of town until next Thursday.

2    I can fly from Montreal to New Jersey tomorrow until Sunday or

3    Monday.  I have some friends there and would like to meet with

4    you, as well.  Please let me know what works for you and I will

5    make it work."

6            Can you please bring up Government's Exhibit 1074-B?

7    Can we blow up the bottom portion first?  This is an email sent

8    on April 7th, 2014, by Michael Murgio to Trevon Gross.

9    "Mr. Gross.  I'm sorry I was unable to make the meeting last

10   week.  Anthony told me it went well and he enjoyed the

11   opportunity to meet and discuss working together.  I look

12   forward to meeting you in the near future and creating a

13   relationship that will benefit all parties."

14           MR. SHIN:  At 10:33 p.m. the same day, Trevon Gross

15   wrote, "Thanks so much.  I believe it was productive and is the

16   beginning of an innovative partnership.  In order to finalize

17   the MOU, I will need the organization's name and address.  I

18   should have a draft from our team by Wednesday, if not before.

19   Thanks, Trevon Gross."

20           MR. NOBLE:  Last email in the chain was sent by

21   Trustee Collectibles, copying Michael Murgio, to Trevon Gross

22   on April 8th, 2014.  "Trevon.  The organization's name is

23   Collectables Club PMA.  Address, 11618 River Chase Run, West

24   Palm Beach, Florida, 33412."

25           Can you please bring up Government's Exhibit 174-D?

 1   Just to orient the jury, this is an email exchange between

 2   Trevon Gross, Michael Murgio, and Trustee Collectibles, which

 3   is Anthony Murgio.

 4          Can we please flip to the second page?  This picks up

 5   where the last email left off.  Sorry, go back to the first

 6   page, the bottom.  This is an email sent on April 11th, 2014 by

 7   Trustee Collectibles, Anthony Murgio, which reads, "Mr. Gross.

 8   Hope all is well.  We wanted to check in to see how the MOU was

 9   coming along.  We are assessing various options right now and

10   wanted to verify that this is something you are still

11   interested in exploring.  Regards."

12          MR. SHIN:  On April 11th, Trevon Gross wrote to

13   Trustee Collectibles with a copy to Michael Murgio.  "Hey.

14   Here is the draft of the agreement.  Let me know your thoughts.

15   We see this as only a starting point, and we have already

16   gotten our examiner's clearance for this partnership.  In

17   reality, we have also not taken off the table to assuming

18   leadership in this CU.  It would be dependent upon the success

19   of this partnership.  Trevon Gross."

20          MR. NOBLE:  Can we flip forward a few pages in this

21   exhibit to the attachment?  Stop there.  Can you just blow up

22   the top half?  The document reads, "Memorandum of

23   understanding.  This memorandum of understanding (The

24   Memorandum) is made on this, April 11th, 2014, by and between

25   Helping Other People Excel FCU of the address in Jackson, New

1   Jersey, hereinafter referred to as HOPE FCU and Collectables

2   Club PMA of West Palm Beach, Florida, herein after referred to

3   as "The Club" for the purpose of achieving the various aims and

4   objectives relating to the strategic partnership for mutual

5   advancement (The Project).  Whereas HOPE FC and The Club desire

6   to enter into an agreement in which HOPE FCU and The Club will

7   work together to complete the project.  And whereas HOPE FCU

8   and The Club are desirous to enter into a Memorandum of

9   Understanding between them setting out the working arrangements

10  that each of the partners agree and necessary to complete The

11  Project."

12          Can we flip down to the section titled "Cooperation"

13  and blow up that section?  "Cooperation.  The activities and

14  services for The Project shall include, but not limited to:

15          A.  Services to be rendered by HOPE FCU include

16  representation on the board of directors to lead the

17  development and deployment of new technologies, products, and

18  programs to benefit its members.  Access to all products,

19  services, and technology for the smooth integration of The Club

20  into HOPE FCU.  Assist in the acquisition or establishment of a

21  new credit union.

22          B.  Services to be rendered by The Club include:

23          Place five names in nomination for positions on the

24  directors.  Assist in building product and service

25  infrastructure to offer more benefits to all our members,

1    including debit cards, e-document services, and separate branch

2    establishment, pilot and deploy within NCUA regulations new

3    products, services, and technologies, including but not limited

4    to peer-to-peer lending, grant non-exclusive use of any

5    products, services, and technology developed under this

6    partnership to HOPE FCU.

7          Under a separate agreement, the details of this will

8    be enumerated."

9          Can we blow up the next section called "Resources?

10   "Resources.  The partners will endeavor to have final approval

11   and secure any financing necessary to fulfill their individual

12   financial contributions at the start of the planning for the

13   development of The Project.

14          A.  HOPE FCU agrees to provide the following financial

15   material and labor resources in respect to the project:

16          HOPE FCU will provide the basic technological

17   infrastructure upon which this partnership will be built, and

18   will liaise with the appropriate NCUA officials concerning

19   regulations.

20          B.  The Club hereby agrees to provide the following

21   financial material and labor resources in respect to the

22   project:

23          The Club will provide all labor and technology in

24   order to serve its members and assume all costs related to

25   integration with existing systems.  The Club will cover all

1    operating costs associated with implementing new products,

2    services, and technologies.  The Club will donate blank towards

3    the establishment of a reserve fund for future development."

4         Can we please flip to the last page?  Blow up section

5    letter D.  Letter D reads, "Nothing in this memorandum shall

6    obligate any partner to the transfer of funds.  Any endeavor

7    involving reimbursement or contribution of funds between the

8    partners of this memorandum will be handled in accordance with

9    applicable laws, regulations, and procedures.  Such endeavors

10   will be outlined in separate agreements that shall be made in

11   writing by representatives of the partners involved and shall

12   be independently authorized by appropriate statutory authority.

13   This memorandum does not provide such authority."

14        Zoom back out.  Then there are signature lines on

15   behalf of Helping Other People Excel FCU, by Trevon Gross as

16   chairman, and on behalf of Collectables Club PMA by Michael

17   Murgio, its president.  The document is currently unsigned.

18        Can we please bring up Government's Exhibit 1074-E?

19   This is just a forwarding of a previous email chain from

20   Trustee Collectibles, that's Anthony Murgio, on April 11th,

21   2014 to test@coin.mx.  The subject is:  Forward meeting.  The

22   body of the email just reads, "Boom."

23        Take that down.  Can you please bring up Government's

24   Exhibit 1075?

25        MR. SHIN:  This is an email from Trevon Gross sent on

 1    April 14th, 2014 to Trustee Collectibles, Subject:  Meeting.

 2    The body of the email is, "Here is the updated MOU.  Trevon

 3    Gross."

 4            MR. NOBLE:  Can you zoom back out?  Below that on

 5    April 14, 2014, Trustee Collectibles, Anthony Murgio, had

 6    written, "Everything looks go.  We -- the only thing is

 7    switching my father's role to treasurer.  We do not have a

 8    president."

 9            Can we please bring up Government's Exhibit 1076?

10    This is an email sent by Michael Murgio to Anthony Murgio with

11    an attachment sig page, and Subject:  Sig page, on April 15,

12    2014.  Can we zoom out and flip to the attachment?  Just blow

13    up the bottom section.  Thank you.

14            Take that down and please bring up Government's

15    Exhibit 1078.  This is an email exchange between Michael

16    Murgio, Anthony Murgio, and Trevon Gross.  Can we flip to the

17    next page?  Sorry.  Go back to the first page.  Starting with

18    the bottom email.

19            MR. SHIN:  On April 17th, 2014, Trevon Gross wrote

20    from tgross@hopecathedral.com.  "Hey Mike.  Great to talk with

21    you.  Here is a copy of the original documents that are

22    associated with the new account.  On one of the forms it still

23    has our old name.  This will be corrected.  We have not talked

24    about the donation yet, and I would like to get a sense of how

25    this will happen in addition to covering the operational costs

 1    for some of the upgrades like debit cards.  I should have the

 2    proposal for the debit cards tomorrow.  It takes 90 days from

 3    signing of agreement to have program implemented.  Trevon

 4    Gross."

 5              MR. NOBLE:  Go back to the first page.  On April 18,

 6    2014, Michael Murgio responded to Trevon Gross, copying Anthony

 7    Murgio, "Hi, Trevon.  Thanks for taking the time to walk me

 8    through some of the procedures.  It helped me gain a much

 9    better starting point for learning about the CU operations.

10    Anthony will be able to work out the donation process and the

11    handling of the upgrades and associated operational costs with

12    you.  I've attached the executed signature page from the

13    documents that you sent me.  Once you send me the routing

14    number, I will fund my account.  Regards, Mike Murgio."

15              Can you please bring up -- actually, flip forward to

16    the signature page, the attachment.  Can we just blow up the

17    top portion, please?  This is a HOPE FCU membership application

18    for Michael Murgio located in West Palm Beach, Florida.  Take

19    that down.  Flip to the next page.  You can take that down.

20              Can we bring up Government's Exhibit 1079?  This is an

21    email exchange between Anthony Murgio and Michael Murgio.  Can

22    we flip to the next page?  Beginning with the email on

23    April 19, 2014, Michael Murgio wrote to Anthony Murgio, "Good

24    news.  We will be able to segregate the Collectables Club

25    members from the rest of the CU members.  We will be able to

 1    set our own fees for services.  There appears to be a lot of

 2    flexibility."

 3            Mr. Shin, will you read the portion of Anthony Murgio?

 4            MR. SHIN:  Later that day Anthony Murgio wrote,

 5    "Great.  Any news on ACH abilities?"

 6            MR. NOBLE:  Let's go back up to the first page.  On

 7    April 19, 2014, Michael Murgio wrote, "Yes.  Right now they do

 8    not charge anything for sending money via ACH.  He said that is

 9    because they want to get people to use the CU.  When I asked

10    how much it costs the CU to do an ACH, he said that he was not

11    sure but it was 10 or 20 cents.  Regards."

12            MR. SHIN:  Anthony Murgio replied, "Are we on ODFI?

13    Can do debit and credit with the business account?  Who

14    facilitates NSF issues, et cetera?  If we are on ODFI then we

15    are in control with nobody over us.  Thank you for doing all

16    this.  This is very important on so many fonts."

17            (Continued on next page)

18

19

20

21

22

23

24

25

 1          MR. NOBLE:  On April 19th, 2014 -- oh, sorry --

 2   Michael Murgio wrote:  "We can set up business accounts.  Not

 3   sure if CU is an ODFI or whether the company that does their

 4   back-end processing is the ODFI.  Does it make a difference

 5   since the cost is so low anyway?  Not sure exactly how NSF is

 6   handled."

 7          MR. SHIN:  And at 8:58 a.m. on the same day, Anthony

 8   Murgio wrote to Michael Murgio:  "Well, only diff is if ODFI,

 9   we don't need to answer to anyone.  It is less of a cost issue

10   and more of a control our own destiny."

11          MR. NOBLE:  Take that down and please bring up

12   Government Exhibit 1081D.

13          This is an email exchange between Trustee

14   Collectables, Anthony Murgio, and Trevon Gross on April 2nd,

15   2014.

16          Can you please flip to the third page.

17          MR. SHIN:  On April 19, 2014, Trevon Gross wrote:

18   "Hey, Anthony, your dad and I had a great first session, and

19   things are moving forward.  I wanted to follow up with you

20   concerning two points of our agreement, the donation and the

21   investment and debit cards/operational upgrades.  Have you

22   given thoughts to this?  We are ready to go with debit cards

23   and will take a 12K investment to launch it.  From signing a

24   contract, it takes 90 days to implement.  Let me know your

25   thoughts.  Trevon Gross."

1          MR. NOBLE:  On April 20th, 2014, Anthony Murgio

2    responded:  "Trevon, I hope your weekend is going well.  My dad

3    mentioned that you guys have been spending some time together

4    and that things are looking pretty flexible.  He is starting to

5    see the potential value this can have for our members.  I

6    appreciate your responsiveness and openness with our

7    organization up to this point.  As for the debit cards, I think

8    we would want to proceed with this option, but we would need to

9    know how well our association is integrated.  The same premise

10   would go for the donation.  Our association would want to

11   establish our role in the credit union prior to making this

12   contribution.  We truly appreciate all the time and hospitality

13   you have shown and feel that this is going to benefit both

14   parties greatly.  We would like to hear the possible

15   opportunities/roles our association will have access to.  If

16   our association can analyze various options that your

17   organization proposes, I believe we can more accurately value

18   the cost benefit of the relationship.  Look forward to your

19   response."

20         MR. SHIN:  On April 21st, 2014, Trevon Gross wrote:

21   "Yes, it's been a busy, but good weekend.  I thought our MOU

22   enumerated our roles.  Were these unclear or unacceptable?  I

23   presented the agreement to our board.  Please let me know what

24   clarity you seek."

25         MR. NOBLE:  On April 21st, 2014, Anthony Murgio

1  responded:  "From what I gather, this is a memorandum of

2  understanding.  It says something in the agreement about the

3  final contract.  That being said, I would like to offer the

4  debit card service after one month of operation.  We will pay

5  for this.  This will be used for everyone.  You will also be

6  able to utilize all of the features that we will build out for

7  your service.  As far as a large donation, we would be willing

8  to do this upon our ability to have full control of a CU.  We

9  will then donate a large amount for your guidance along the

10  way.  After one month of running an operation, we can also make

11  a small donation to the church or organization of your choice.

12  So to organize my thoughts:

13        "(1) Within one month of operation:  One, debit card

14  program paid; two, unlimited free use of banking service

15  technology; three, small donation, approx. $10,000 to

16  organization/group of your choice.

17        "(2) New credit union or take over existing credit,

18  HOPE or another, union with full control.  One, large donation

19  of 150K to organization of your choice; two, unlimited free use

20  of banking service technology.

21        "How does this sound?"

22        MR. SHIN:  On April 22nd, 2014, Trevon Gross

23  responded:  "Hey, Anthony.  Thanks for the response.  Here are

24  some things we need to clarify:

25        "(1) What does 'after one month of running and

1    operating' mean?  From my perspective, we are in operations

2    right now as I have requested system access for your father and

3    you so you can begin to get training, et cetera.

4              "(2) I think that the smaller donation amount is too

5    small and the larger donation is too large.  I believe in being

6    fair in all things.  Based on our current memorandum of

7    understanding, you all are really going to function as a

8    separate financial institution within the CU.  I have been

9    spending time working with CU South to see if you can get your

10   own branded CU based software for the debit card as well to

11   bear your logo.  You have complete independence in the

12   operational affairs of your members and co-departments as it

13   relates to policy.  Since NCUA only sees us as one, we will

14   have to make certain that our policies are in keeping with NCUA

15   regulations.  This is why I recommended that you all move

16   towards setting up your own branch in Florida, so your members

17   can contact you directly.  Even if we have to use a digital

18   number, so that when people call, it will say for Collectables

19   Club PMA, please push 2, and it would ring in Florida.  I can

20   say more, but I think you will see that we are flexible to give

21   you everything you want.  What I think is fair is 15K dollars

22   up front, and 45 days of operation, another 15K dollars, then

23   once we find you a CU or take over ours, this is still on the

24   table, then 120K dollars would made as a donation.  I am using

25   a great deal of time to bring this partnership together, and I

1    think this will fairly recognize the seriousness with which we

2    have taken this partnership and the value of having your own

3    affinity financial institution.

4         "(3) As to debit cards, I really think waiting 30 days

5    makes the CU less attractive to your members since they will

6    not have a way to access their money immediately.  For us,

7    people can come to the branch, but since your members are all

8    over, they will need a way to access cash easily.  Of course,

9    we will benefit from this, but it makes sense, as you will roll

10   this out large-scale to your members.

11        "With this option, you will be no different from the

12   old ING Direct, Capital One 360.  I am available to talk about

13   all this, and once we lock this down, we are prepared to

14   execute a contract to solidify this deal.  Our board is

15   enthusiastic about this and ready to make it happen.

16        "It is a true win-win from our perspective."

17        MR. NOBLE:  On April 22nd, 2014, Anthony Murgio

18   responded:  "We just wanted to get a business account and

19   personal account set up and do some test transactions with ACH

20   and transfer of money in and out once we do this, but can pay

21   the 15K.  As for debit, we may move quicker.  We just want to

22   make sure this is a good fit.  If you would like to set up a

23   time to speak to my dad, that would be great.  I should be back

24   in the States in a week.  I will then go over everything with

25   him.  He can show me all of the functionality.

1          "I would like to try and get a business account for

2    Collectables Club set up and have the ability to debit and

3    credit our members' bank accounts for ACH."

4          Can you please take that down and bring up Government

5    Exhibit 1082.

6          This is an email exchange between Trustee

7    Collectables, or Anthony Murgio, Michael Murgio, and Trevon

8    Gross.

9          Can we please flip to the second page.

10         On April 23rd, Trustee Collectables wrote:  "Let me

11   know your thoughts.  I can have this completed in a week if you

12   both like the design.  It will be fully responsive, so it will

13   work on mobile phones and tablets seamlessly.  It will itemize

14   and align properly no matter what device you are using, and

15   there's a link to a Google Drive."

16         MR. SHIN:  On April 23rd, 2014, Trevon Gross

17   responded:  "Looks good.  What platform is this built on?  We

18   currently use a CMS that is flexible to accommodate this

19   design, but if you have a designer who will do it, we can just

20   change the DNS.  We also have a WordPress platform.  Just let

21   me know what you need to move forward."

22         MR. NOBLE:  On Wednesday, April 23rd, 2014, Trustee

23   Collectables, Anthony Murgio responded:  "Thanks.  Will be

24   WordPress Bootstrap 3."

25         April 23rd, 2014, Trustee Collectables then wrote:

 1    "Thanks."

 2              MR. SHIN:  Later that day, Trevon Gross responded:

 3    "Let me know what content we need to create.  We'll get right

 4    on it."

 5              MR. NOBLE:  Later, Anthony Murgio responded:  "I will

 6    copy from the current site and add some new, and you can have

 7    time to review and edit with all of us.  Will put it on a

 8    staging server for review in about one week.  Then we can all

 9    review and make necessary revisions."

10              MR. SHIN:  Trevon Gross responded:  "Sounds good.

11    Have you tried to open an account yet?"

12              MR. NOBLE:  Anthony Murgio responded:  "I have not

13    yet.  My father has, and I am going to set up a business

14    account for Collectables Club."

15              Can you bring up Government Exhibit 1083.

16              This is an email from Michael Murgio to Anthony Murgio

17    on April 25th, 2014, with a subject:  "Trevon, we can do

18    whatever we like."

19              Can you bring up Government Exhibit 1085.

20              This is an email exchange between Trevon Gross,

21    Anthony Murgio, and Michael Murgio.  On April 26, 2014, Michael

22    Murgio wrote:  "Hi, Trevon.  I set up a personal checking

23    account and will be able to fund it as soon as SunTrust

24    verifies it.  I want to set up a business account for

25    Collectables Club.  Do I use the same setup page and put

1   Collectables in the first name and Club as the last name, birth

2   date would be date of incorporation, et cetera, or is there

3   another online form specific to business accounts?"

4           MR. SHIN:  Trevon Gross responded:  "Yes, just set it

5   up the way you mentioned, and then on Monday, if you are

6   available, I will show you how to convert it to an

7   organizational account.  You should have your log-in by then,

8   so you can begin exploring and learning the system."

9           MR. NOBLE:  Can you please bring up Government Exhibit

10  1086.

11          This is an email from Michael Murgio to Anthony Murgio

12  on April 29th, 2014, with the subject "Just got off phone."

13  The body reads:  "We will need to give Trevon the name of five

14  board members."

15          Can you please bring up Government Exhibit 1088-A.

16          The bottom portion is an email from

17  amurginc@gmail.com; subject, "HOPE Federal Credit Union to

18  jnfreundt@hotmail.com, Wednesday April 30, 2014.

19          Anthony wrote:  "Would you be interested in being on

20  the board of a credit union I'm taking over?  My dad will be on

21  it.  Tim, the guy at 101 before you, will be on it.  Asking

22  Rico as well.  Working out everything now.  Can let you know

23  what it will require, if anything, in compensation.  Just

24  wanted to know if you would be interested."

25          MR. SHIN:  Later that day, Jose Freundt responded:

 1    "Yes, I would."

 2              MR. NOBLE:  Can you please bring up Government Exhibit

 3    1089.

 4              Same email that was sent by Anthony Murgio to Jose

 5    Freundt was sent to Rico at 7ricos@gmail.com on April 30th,

 6    2014.

 7              MR. SHIN:  Rico responded:  "Absolutely.  Please let

 8    me know what is required.  I am def interested."

 9              MR. NOBLE:  Would you please bring up Government

10    Exhibit 1092-A.

11              MR. SHIN:  On May 6, 2014, Trevon Gross wrote from

12    tgross@hope-fcu.com to Trustee Collectables with the subject

13    line "Agreement."

14              "Hey, Anthony, I met with our board last night, and

15    though they are intrigued by your offer, they will not proceed

16    until we have satisfied the initial terms of our MOU, which

17    call for your organization to make a donation in the amount of

18    15K dollars and cover the expenses for debit cards.  To date,

19    we have held two training sessions, given complete back-office

20    access to your organization, and created email accounts for the

21    club and officers.  We have also researched how to set up

22    subaccounts, so our transactions, et cetera, are separated on

23    our books.  ACH transactions have been tested and worked

24    successfully, and we have the process to set up automated ACH

25    transactions.

1        "Please ACH 15K dollars to Hope Cathedral:" and then a

2    routing number and an account number are set forth.  "Please

3    ACH 6K dollars to HOPE FCU to start debit card process, $2,500

4    to Shazam, and $3,500 to CU South for realtime balance

5    availability and setup."  And then a routing number and account

6    number are set forth.

7        "Upon receiving these funds by Friday, May 9th, the

8    executive board will meet and recommend for election to the

9    board six (6) people from your organization.  The six seats

10   will give you the majority position on the board.  The whole

11   board will ratify your nomination on May 17th, by which time we

12   would like to have received the second 15K dollars donation.

13   Once your names are placed in nomination, the six people will

14   be officially elected to the board at the June annual meeting.

15   This is the only time when we can change board members.  You

16   will have to designate who among your new board will serve as

17   chairman, secretary, treasurer, and supervisory committee

18   chair.  The existing board members will tender their

19   resignations to be effective at your choosing.  Before this

20   vote happens, the remainder of the donation to assume control

21   of the CU would need to be received.

22       "I will be the only board member to remain to assist

23   in the transition as a consultant to interface with the NCUA

24   examiner, set up your local office, and well as establish a

25   branch in Florida, so you can have teller terminals and

1    printers, et cetera.  We believe this is a prudent way.  Please

2    advise."

3              MR. NOBLE:  Please bring up Government Exhibit 1093B.

4              This is an email exchange between Trevon Gross and

5    Anthony Murgio on Wednesday, May 7, 2014, with the subject

6    "Shazam contact information."  Beginning with the email --

7              Please go back up.

8              -- on May 7, 2014, at 3:44 p.m., above:  "The members

9    want the funds to be held in some third-party escrow.  Can we

10   make this happen?"

11             MR. SHIN:  Trevon Gross responded:  "No.  We have a

12   signed agreement, and as you have acknowledged, we have kept

13   our part.  Based on the already executed agreement, we are due

14   the 15K dollars.  If you would like to put the larger donation

15   in third-party escrow until the board election, I am fine with

16   that."

17             MR. NOBLE:  Later that day, Anthony Murgio responded:

18   "Yes, that's what we were wondering."

19             MR. SHIN:  And later that day, Trevon Gross responded:

20   "Hey, Anthony.  I wanted to follow up on the status of things."

21             MR. NOBLE:  Could you please bring up Government

22   Exhibit 1094.

23             This is a forwarded email from Anthony Murgio to Mark

24   Francis, mark@kapitalinc.com, on May 8, 2014, with the subject

25   "Agreement," and he's just forwarding the email that we

1    previously read.

2              Can you please bring up Government Exhibit 1101.

3              This is an email from Anthony Murgio to Yuri Lebedev

4    on May 9, 2014, with the subject "Credit union board member."

5              "Yuri, this is the website for the credit union,"

6    which lists www.hope-fcu.com.  They were a small credit union,

7    107 members, no full-time employees.  I was trying to find

8    small credit unions that would be willing to allow to add new

9    technology by Bitcoin integration and peer-to-peer lending.

10   Both of these industries are booming, but large banks and

11   credit unions are too slow to keep up with the moving

12   technology.  I went to New Jersey to meet with them.  Very nice

13   guys.  Pastor of a church.  We came to an agreement that we

14   would be able to have control of the credit union.  We have

15   asked the regulators if the peer-to-peer lending and BTC would

16   be fine and have confirmation that both would be.

17             "Here is a company that Google invested in that is

18   doing the peer-to-peer model, www.prosper.com.  They bought a

19   bank.  Here is a link to the first bank integrating with the

20   digital currency," and there's a URL to a coindesk.com article.

21   "As you can see, these things are starting to happen, but the

22   cornerstone is always having a financial institution that can

23   move quick enough.  We now have that institution.

24             "I have selected six people that I trust, one being a

25   lawyer, to read over everything that has to do with legalities.

1   The credit union will sign the contract with a financial

2   technology company that I control.  This will give my financial

3   technology the exclusive rights for anything that integrates

4   with this credit union.  For being an advisory member on the

5   board, it requires one meeting a month for about one hour.  For

6   this, we can pay $5,000.

7            "Let me know if you are in or if you are in or have

8   any questions."

9            Can you please bring up Government Exhibit 1105.

10           This is an email exchange between Trevon Gross and

11  Anthony Murgio.

12           Can you flip to the next page.

13           On May 6, 2014, Trustee Collectables wrote:  "The home

14  page is just being finished.  We will be adding the other pages

15  in over the next few days."

16           And there is a link to CollectPMA.com/hope_wp.

17           MR. SHIN:  Trevon Gross responded on May 9th:  "The

18  web page looks great.  How can we make some content changes?"

19           MR. NOBLE:  On May 9, 2014, Anthony Murgio responded:

20  "It's all being updated, then we can make any changes we want.

21  We will have a log-in."

22           MR. SHIN:  Later on May 9th, Trevon Gross wrote:  "Got

23  it.  We will also make provisions to transfer the domain to you

24  all."

25           MR. NOBLE:  Can you please go to Government Exhibit

1    1107-A.

2              This is an email from Trustee Collectables to Trevon

3    Gross, Jose Freundt, and Michael Murgio on Friday, May 9, 2014,

4    with the subject "Capital requirements doc."

5              "Trevon, glad the donation money hit the account.  I

6    found this link below.  Is this what you were speaking of?  I

7    also attached a graph I found.  Looks like the way to go is get

8    a grant from individuals that are part of the CU or

9    association.  Where is this money kept?  The banks?  Bank

10   account?  Ha-ha.  Or is it just on the balance sheet?  It must

11   be delineated."

12             There's a link to hallassociatesllc.com.  "I have also

13   copied Jose Freundt.  He will be one of the board members that

14   will be running many of the operations."

15             You can just flip to the attachment.  The attachment

16   is labeled "Table 4:  Proposed Capital Categories."  The column

17   headings read "The Credit Union's Net Worth Classification Is,"

18   Net Worth Ratio," "Risk-Based Capital Ratio" and "Subject To

19   The Following Conditions."  The entry for well capitalized

20   indicates, "The net worth ratio of 7 percent or above or a

21   risk-based capital ratio of 10.5 percent or above, subject to

22   the conditions that must pass both net worth ratio and

23   risk-based capital ratio."

24             Take that down.

25             Can you please bring up Government Exhibit 1107-C.

 1              Can we read the reply that Trevon Gross sent on May 9,

 2    2014.

 3              MR. SHIN:  Trevon Gross wrote:  "Yes, this is exactly

 4    what we were talking about.  The donations can come from

 5    anyone, individual or corporation.  They would be put on the

 6    books as miscellaneous income."

 7              MR. NOBLE:  Please blow up the very top header

 8    section.  It indicates that this email chain was forwarded by

 9    Anthony Murgio to Mark Francis and shoula@kapitalinc.com on

10    May 10, 2014.

11              Please bring up Government Exhibit 1108-A.

12              MR. SHIN:  On May 12, 2014, Trevon Gross wrote to

13    Trustee Collectables with a copy to Michael Murgio, in response

14    to the capital requirements doc chain:  "Good morning.  The

15    executive board has placed a nomination, the six names.  This

16    Saturday, they will be confirmed to be placed on the ballot for

17    the June annual meeting.  A couple of things need to happen

18    ASAP:

19              "(1) Need to know officers – chairman, secretary,

20    treasurer, supervisory committee chair.  These are all

21    mandatory positions.  The supervisory committee serves as your

22    internal auditors.  Each month they review all aspects of the

23    operations and report to the board.  Only the committee chair

24    can be a board member, while the others must be nonboard

25    members, but still members of the CU.  So you will need two

1    more people who can be appointed at the June meeting to serve

2    on the SC.

3            "(2) How do you want operations handled?  Operations

4    manager or CEO, tellers, et cetera?  And who that will be?  I

5    have offered under a consultancy agreement to help train and

6    make a smooth transition, but we need to nail down the

7    particulars.

8            "(3) All new members will need an active account

9    funded in the CU before Saturday.

10           "(4) Need abbreviated resume on all board members.

11   The NCUA passed a new regulation that board members have to

12   demonstrate financial competence through work experience,

13   degrees in accounting or take a financial literacy class, and

14   document the board minutes.  This is in response to many boards

15   stating that they did not know how to read financial statements

16   and didn't understand that their CU was in trouble.

17           "(5) Final installment on current memorandum of

18   understanding wired to PNC Bank.

19           "(6) I'd like to use our attorney, Wigginton &

20   Associates, as the third-party escrow until we hold the

21   election in June.  We can execute a confidential MOU that will

22   govern when funds are to be released, et cetera.

23           "Recap of next steps."  First bullet point:  "Final

24   nomination and ratification of change in board will happen this

25   Saturday."

1    Next bullet point: "We then have one month to put all

2    the pieces in place as to operations, setting up a branch in

3    Florida, establishing presence in Lakewood, approving new

4    policies as it relates to fees, et cetera, so we can program

5    into the system and get ready for new members."

6    Next bullet point: "At the conclusion of June annual

7    meeting, current board members, except me, will tender their

8    resignations effective September 1st.  This date is set because

9    we have our annual examination on July 7th.  They like to come

10   back and meet with the board about a month afterwards to

11   discuss findings, and we don't want them to see an entirely new

12   board at that meeting.  That normally happens in August.  All

13   members have agreed to see this through to September 1.  After

14   the June meeting, you all will have majority vote on the board,

15   so there is no turning back at that point."

16   MR. NOBLE:  Can you please bring up Government Exhibit

17   1108-B.

18   This is an email exchange on the same thread, capital

19   requirements, between Trevon Gross, Michael Murgio, and Trevon

20   Gross.

21   Can we please flip to the second page.

22   Beginning with the email on May 12th, 2014, at

23   7:02 p.m., near the bottom, from Anthony Murgio:  "I was

24   thinking to have a couple of the old members as supervisory

25   committee or onboard, so the transition does not look so

1    drastic, unless you think it does not matter.  Thoughts?"

2         MR. SHIN:  Later that day, Trevon Gross responded:  "I

3    think on supervisory committee is good, one on supervisory and

4    two stay onboard.  We would be the clear minority, but it would

5    also allow us to advocate for our members and set policy for

6    our members.  Also, depending on how you want operations, some

7    of them could serve as tellers while we train your people.

8    Whatever you are comfortable with."

9         MR. NOBLE:  Later that day, Anthony Murgio responded:

10   "Okay.  So we will put Kendra Pannitti on supervisory

11   committee, and then you will have one onboard, you and one on

12   supervisory.  Also, can we just create accounts for these

13   members, and the association will deposit funds in their

14   accounts for them, or do they have to go through the signup

15   process on the site?"

16        MR. SHIN:  Trevon Gross responded:  "If you give me

17   all the information, I can create their accounts, and then you

18   all can transfer money into them.  Okay about Kendra.  Will

19   need resume.  I would put two on board, me plus one, and one on

20   supervisory committee.  There are periodic meetings when the

21   examiner comes, and if I am not available, then there will be

22   another local board member.  Let me know if you are okay with

23   this."

24        MR. NOBLE:  Later in the day, Anthony Murgio

25   responded:  "What info do you need?  Also, would like to know,

1    after full integration, that we can replace with our own

2    members."

3              MR. SHIN:  Trevon Gross responded:  "It's a lot of

4    personal information.  I'd prefer you all get it, if you don't

5    already have it, and open the accounts, and then I can scan

6    paperwork and get you all to sign it.  We need driver's license

7    number, Social Security, address, at a minimum.  Most

8    definitely.  We would only need to maintain the capacity to

9    serve our members."

10             MR. NOBLE:  Anthony Murgio responded:  "I will have

11   them sign up online.  Easier."

12             Can you please bring up Government Exhibit 1110.

13             This is an email from Anthony Murgio sent on May 12,

14   2014, with the subject "Some small things needed to Kevin

15   Tomasso, Yuri Lebedev, Jose Freundt, Little Rico, Tim Ellrich

16   and Chad Lio."

17             "When you guys have a chance, please send me your

18   resume.  This is needed to be on file.  If you have any

19   previous banking or financial sector experience, please make

20   sure that it is on the resume.  If you have any financial

21   degree, please also include on the resume.  You will formally

22   become board in June, and first payment starts July.  These

23   will be the three mandatory chairs we will be filling, the

24   others will be nonmandatory:  Chairman, Jose; Secretary, Rico;

25   Treasurer, Yuri."

1     Can you please bring up Government Exhibit 1114.

2     This is continuation of an email chain from the

3  capital requirements email chain.  At the very top, this is an

4  email sent by Anthony Murgio to Mark Francis and Shoula Cohen

5  on May 2013, 2014; subject, "Read this, Mark.  This is the deal

6  forward capital requirements doc.

7     "Make sure to read the forwarded message below.  I got

8  him to agree to put our members on the board sooner and let us

9  take control.  They have already been nominated.  We all can go

10  to Jersey, if you want, next week.  We can get ACH in operation

11  over the next two weeks just as long as we get proper

12  documentation for back-end system.  Then I just want to make

13  sure our members are elected first, but we can start

14  implementing the technology.  I reached out to Kevin, and he

15  understands that the system is one level above what Kap has the

16  technology written for.  We are still waiting to hear back from

17  CU base, the technology backbone of the CU.  Once we have the

18  proper backing system documentation, then we can make sure

19  things are hooked up properly.  As for the numbers:  15K up

20  front paid, done.  15K, once in operation.  Waiting to get docs

21  back from CU South to start integrating.  120K when members are

22  sworn in June 15th.  We have control.  50K miscellaneous

23  expenses for lawyers and such, but that's up to you.  I'm just

24  estimating your costs on high end.  Even if Kap is able to

25  process for one month, you will make your return.  All costs,

 1    150K plus whatever, will be deducted as an expense first, and

 2    Kap will be repaid."

 3              Please bring up Government Exhibit 1121.

 4              This is an email exchange between Anthony Murgio and

 5    Kevin Tomasso.  It's in response to an earlier email sent by

 6    Anthony Murgio on May 12, 2014, which wrote:  "When you guys

 7    have a chance, please send me your resume."

 8              I'm sorry, this is the email we previously read.

 9              Kevin Tomasso responded at the top:  "Here's my

10    resume.  Unfortunately, I don't really have anything resembling

11    financial experience.  I hope they don't pull a credit report."

12              Can you bring up the next page, the attachment.  Just

13    blow that up for the jury to review.

14              And the bottom section.

15              Thank you.

16              Please bring up Government Exhibit 1142-B.

17              This is an email exchange between Anthony Murgio,

18    Michael Murgio, and Trevon Gross.

19              Can you please flip to the second page.

20              This is in response to the earlier email chain,

21    capital requirements.

22              Let's go back up to the bottom of the first page.

23              And, Mr. Shin, would you please read the email sent by

24    Trevon Gross.

25              MR. SHIN:  Yes.

1   On May 15, 2014, at 6:11 p.m., Trevon Gross wrote:

2   "Hey, Anthony.  I wanted to resend the list of items that need

3   to be completed by tomorrow.  It does not appear that we have

4   made any progress.  I have a funeral tomorrow and will have

5   limited availability.  Please advise because these items are

6   crucial to being able to have our meeting on Saturday."

7   MR. NOBLE:  At the top, beginning with number one,

8   these are the emails -- this is the section that was sent by

9   Trevon Gross.

10  Go ahead and read number one, Mr. Shin.

11  MR. SHIN:  Mr. Gross had written:  "Need to know

12  officers:  Chairman, secretary, treasurer, supervisory

13  committee chair.  These are mandatory positions.  The

14  supervisory committee serves as your internal auditors.  Each

15  month they review all aspects of the operations and report to

16  the board.  Only the committee chair can be a board member,

17  while the others must be nonboard members, but still members of

18  the CU.  So you will need two more people who can be appointed

19  at the June meeting to serve on the SC."

20  MR. NOBLE:  Anthony Murgio responded:  "Chairman,

21  Jose; Secretary, Rico, Treasurer, Yuri; Committee Chair, Tim

22  Ellrich."

23  MR. SHIN:  In item number 4, Trevon Gross had written:

24  "Need abbreviated resume on all board members.  The NCUA passed

25  a new regulation that board members have to demonstrate

1  financial competence through work experience, degrees in

2  accounting or take a financial literacy class, and document the

3  board minutes.  This is in response to many boards stating that

4  they did not know how to read financial statements and didn't

5  understand that their CU was in trouble."

6         MR. NOBLE:  Then Anthony responded:  "Resumes are here

7  and included a link to a Google Drive account."

8         Please read number five, Mr. Shin.

9         MR. SHIN:  Trevon Gross wrote:  "Final installment on

10  current MOU wired to PNC Bank."

11         MR. NOBLE:  And then Anthony Murgio responded:  "When

12  do you need this by?"

13         Can we please bring up Government Exhibit 1142C.

14         Mr. Shin, if you would read this email.

15         MR. SHIN:  On --

16         MS. SANTILLO:  Excuse me, your Honor.  106 with the

17  resumes?

18         MR. NOBLE:  I apologize.

19         THE COURT:  The resumes?

20         MS. SANTILLO:  106 with the resumes?

21         MR. NOBLE:  The resumes are not included in this

22  email.  It's just a link to the email -- to where the resumes

23  were stored.

24         If we could address this issue later, your Honor?

25         THE COURT:  We had an intention of showing resumes.

 1   Was this not the place?

 2              MR. NOBLE:  This is not the place.

 3              THE COURT:  You need a sidebar?

 4              MS. SANTILLO:  Just the link to the resumes is in the

 5   email.

 6              MR. NOBLE:  The link to the resumes is in the email.

 7              THE COURT:  All right.

 8              Ms. Santillo, anything further?

 9              MS. SANTILLO:  Yes, that's fine.

10              THE COURT:  I'm happy to hear you.

11              MS. SANTILLO:  No, that's fine.

12              THE COURT:  All right.  Thank you.

13              MR. NOBLE:  1142C, if you could just read the response

14   portions to the previous chain, Mr. Shin.

15              MR. SHIN:  Yes.

16              So Trevon Gross wrote on May 15, 2014, to Trustee

17   Collectables, copying Michael Murgio.  He wrote:  "See below."

18              And then under item 1, underneath the list of

19   chairman, secretary, treasurer, and committee chair, Trevon

20   Gross wrote:  "Okay.  I would suggest that Jose be CEO and I

21   remain chair through our NCUA examination, and then I resign."

22              And then under item 2, regarding how operations will

23   be handled, Trevon Gross wrote:  "Here, Jose would be CEO,

24   which heads operations."

25              And then under item 3, regarding new members needing

1    an active account funded in the CU before Saturday, Trevon

2    Gross wrote:  "Great.  I will send down account numbers, so

3    that you all can fund their accounts."

4           Under item 4, regarding needing an abbreviated resume

5    on all board members and below the link to the resumes that had

6    been provided, Trevon Gross wrote:  "Great.  I'm driving five

7    regarding the final installment on the current MOU wired to PNC

8    Bank."

9           In response to the question, "When do you need this

10   by," Trevon Gross wrote:  "Friday, May 16th."

11          And under item 6, regarding putting money in an escrow

12   account, Trevon Gross wrote:  "Just let me know what you need.

13   Attorney escrow accounts are governed by law, and funds cannot

14   be disbursed without legal agreement.  He will also be putting

15   together the confidential MOU for the deal."

16          MR. NOBLE:  Can you please bring up Government Exhibit

17   1142F.

18          This is simply forwarding that chain that we just read

19   through by Anthony Murgio to Mark Francis and Shoula Cohen on

20   May 15, 2014.

21          Please bring up Government Exhibit 1142H.

22          These are additional emails in the same chain.

23          Can we please flip to page 2.

24          Beginning with near the top, on May 15, 2014, Anthony

25   Murgio wrote:  "The one supervisory on our end is Kendra

 1    Pannitti.  Thought you were going to put one on.  Maybe current

 2    treasurer?  And then you are going to stay on board, correct?"

 3            MR. SHIN:  Later that day, Trevon Gross responded:

 4    "Yes, we will have one on supervisory, and I thought we agreed

 5    two would remain on board, me plus one."

 6            MR. NOBLE:  Later that day, Anthony Murgio responded:

 7    "So that would mean six of ours and two of yours."

 8            MR. SHIN:  Trevon Gross responded:  "Yes."

 9            MR. NOBLE:  Anthony Murgio responded:  "Great.  Really

10    appreciate it.  How long did they say to get ACH approved for

11    the CU?"

12            MR. SHIN:  Trevon Gross responded:  "They are sending

13    over the paper tomorrow.  We will turn it around quickly, and

14    it should be approved by next week."

15            MR. NOBLE:  Anthony Murgio responded:  "Cool.

16    Thanks."

17            Can we please bring up Government Exhibit 1142J.

18            This is a continuation of the same chain.

19            Can we please flip to the second page.

20            Beginning with the email on May 15, 2014, from Anthony

21    Murgio:  "Can we have until Tuesday to get you the other 15K?

22    It's just needing to transfer funds.  If not, can probably do.

23    Just have to send from another account that would make things

24    more complicated on our end."

25            MR. SHIN:  Trevon Gross responded:  "Okay.  But the

1    nominations will be contingent on receiving it on Tuesday."

2           MR. NOBLE:  Anthony Murgio responded:  "Yes, that's

3    fine, but, also, how do we know if they are elected,

4    et cetera?"

5           MR. SHIN:  Trevon Gross responded:  "There will be

6    minutes of the nomination, which I will get to you by Tuesday.

7    That is the point of no return."

8           MR. NOBLE:  Anthony Murgio responded:  "But nomination

9    does not mean anything, though.  They must be elected.  Or is

10   it that they are being run unopposed, so then they will get

11   in?"

12          MR. SHIN:  Trevon Gross responded:  "There are no

13   nominations from the floor.  Only those nominated can be

14   elected.  So once nominated, the election is assured."

15          MR. NOBLE:  Anthony Murgio responded:  "Got you.

16   Okay, makes sense."  He then later responded:  "If you are

17   going to stay as chairman, I would put Jose as treasurer."

18          Can we please bring up Government Exhibit 1142K.

19          And then Anthony Murgio also wrote later, at the very

20   top:  "Then I would make Jose treasurer and CEO?"

21          Can we bring up Government Exhibit 1142L.

22          This is an email exchange between Anthony Murgio,

23   Michael Murgio, and Trevon Gross, with blind carbon copies to

24   Shoula Cohen and Mark Francis, with, again, the subject line is

25   "Capital requirements doc."

1          Can we flip down to the next page.

2          So this is just picking up from the last email chain.

3    "Then I would make Jose treasurer and CEO."

4          Let's just go back up to the first page.

5          And, Mr. Shin, if you could just read the email sent

6    by Trevon Gross on May 16th, at 12:44 p.m.

7          MR. SHIN:  Trevon Gross wrote:  "From your CU account?

8    If so, then all you need is XXXXOOO.  Also, just to confirm,

9    these are the board members who will be placed in nomination:

10   Jose Freundt, Timothy Ellrich, Kevin Tomasso (need resume),

11   Ricardo Hill, Yuri Lebedev, Chad Lid (need resume).  At the

12   July meeting, we will appoint the following positions:  Chair,

13   Trevon Gross; Vice Chair/CEO, Jose Freundt; Secretary, Ricardo

14   Hill; Treasurer, Yuri Lebedev; Supervisory Committee Chair,

15   Timothy Ellrich; SC Member, Kendra Pannitti; SC Member, Marvin

16   Purry."

17         MR. NOBLE:  Can we please bring up Government Exhibit

18   1146A.

19         This is an email sent by Anthony Murgio to Trevon

20   Gross, with the subject "Kap driver's license," on May 23,

21   2014.  "Please see attached."

22         Please bring up the attachment.

23         The attachment is Quebec Permis de Conduire from Mark

24   Francis, with most of the language is in French.

25         You can take that down.

1          Can you please bring up Government Exhibit 1147.

2          This is a continuation of the email we just saw,

3    "Please see attached," at the bottom.

4          On May 23rd, 2014, Anthony Murgio wrote:  "Email

5    address for the account is mark@kapitalinc.com."

6          MR. SHIN:  Trevon Gross responded later that day:

7    "Account created:  6527.  Me, charter date, and main telephone

8    number.  Mark should be able to log in and use last four of TIN

9    to access online account."

10          MR. NOBLE:  Anthony Murgio forwarded that email chain

11    to Shoula Cohen and Mark Francis on May 23rd, 2014, and stated:

12    "To fund the account at the credit union, let's go, baby."

13    Routing number ending in 9272, account number ending in --

14    well, beginning with 6527.

15          Take that down.

16          Please bring up Government Exhibit 1149.

17          This is an email exchange between Trevon Gross and

18    Anthony Murgio.

19          Can we please flip to the second page.

20          On May 27, 2014, Anthony wrote:  "Trevon, Mark would

21    like to test ACH with the manual system of the CU.  Can we set

22    up a customized descriptor for his company?  Any status on Fed

23    app?  Mark, please submit proper licenses for the CU's file.

24    Thanks."

25          MR. SHIN:  Later that day, Trevon Gross responded:

1    "Form has been received and is in process.  I'll check when I'm

2    in the office tomorrow about their ACH.  Will need more clarity

3    as to what they actually want to do via ACH."

4        MR. NOBLE:  Anthony Murgio responded:  "They are going

5    to test the system with a small amount of transactions

6    manually.  I'm sure they are going to do this for one of their

7    smaller merchants.  Because they are an aggregator, they either

8    are able to put descriptors for each individual merchant, and

9    if a bank does not have that level of a system, then the

10    descriptor says their business name on it.  They are no

11    different than other gateways and processors like," and there

12    are a series of three URLs.

13        Anthony Murgio later wrote:  "They said they are going

14    to utilize for their internal payments to employees and

15    merchants."

16        He later wrote:  "Here is NACHA organization they are

17    part of."  And then the link to a nacha.org URL.

18        MR. SHIN:  On May 29, 2014, Trevon Gross responded to

19    Trustee Collectables:  "Okay.  So to get this started, they

20    will need to give us a list of all the accounts to which they

21    will want to send ACH.  With the manual process, we actually

22    have to set them all up and verify the accounts, then they log

23    into their online account, and all of the accounts will appear

24    there."

25        MR. NOBLE:  Let's bring up Government Exhibit 1150.

 1          This is a continuation of that chain, beginning at the

 2    bottom on Thursday, May 29th, the email by Trevon Gross.

 3          MR. SHIN:  Trevon Gross wrote:  "I thought you all

 4    were coming up this week.  There are a lot of transition items

 5    that we need to discuss.  Also, only Tim has returned his

 6    account information as a board member.  There is a great deal

 7    of responsibility that falls on these board members.  I truly

 8    hope they are prepared."

 9          MR. NOBLE:  Anthony Murgio responded later that day:

10    "I will be up next week.  Had a ton of stuff going on.  I have

11    attached Jose on this email thread.  He can get all the proper

12    documentation needed for the board members.  They will be

13    prepared.  We just need good communication.  Jose can start

14    getting everyone onboard and get what needs to be done done.  I

15    will update you on next week."

16          And then on May 29th, Jose Freundt responded:  "Good

17    afternoon, Trevon.  I am not quite sure which documentation or

18    account information we have failed to send.  As far as I know,

19    the only thing I have not returned is the beneficiary form.

20    I've looked back to my emails, and I did not find one referring

21    to account information as board member.  Would you please

22    resend me the forms needed, and I will make sure that they get

23    back to you as soon as possible.  With regards, Jose."

24          MR. SHIN:  And later that day, Trevon Gross responded:

25    "Yes.  That is the form, plus identification.  If examiner were

1   to show up, this would be a serious violation of Bank Secrecy

2   Act.  There are two resumes missing, and we need that for

3   ballot."

4          MR. NOBLE:  Can we please bring up Government Exhibit

5   1152B.

6          This is an email exchange with the subject "Update"

7   between Anthony, Jose, and Trevon Gross.

8          Please flip to the second page.

9          And, Mr. Shin, please read that one.

10          I'm sorry.  On June 2nd, 2014, Trustee Collectables

11   wrote:  "Trevon, we are looking to come visit this Friday.

12   Also, what is the status on info needed from new board members?

13   Jose is copied on this email and can get whatever is needed.

14   What is the status with ACH?  I just want to make sure

15   everything is still on the right track."

16          MR. SHIN:  Later that day, Trevon Gross wrote:  "Hey,

17   Anthony.  Jose just sent out an email to request information.

18   Still awaiting.  I do have resumes and voting information.

19   Will go out to CU members by Wednesday.  Can we get the new

20   website up by then?  If not, I'll add it to the current

21   website.  It will just be the ballot and the resumes.  I

22   received an email on Friday saying they were in the final

23   stages of confirming everything with the Federal Reserve Bank.

24   So, we should be all set this week.  What time on Friday?"

25          MR. NOBLE:  Anthony Murgio responded:  "Sounds good.

1    I will get the info for you to get the site up and running by

2    tomorrow.  I think we should get to New Jersey around 1:00 or

3    2:00.  Will update you tomorrow."

4         MR. SHIN:  Trevon Gross responded:  "Hey.  That time

5    won't work.  I am actually in NYC this weekend for a

6    conference."

7         MR. NOBLE:  Anthony Murgio responded:  "Where in NYC?

8    Maybe we can meet up for a lunch or something in NYC.  If not,

9    maybe the following week."

10        At this point, your Honor, the parties have a factual

11   stipulation regarding this email.

12        THE COURT:  All right.  Let me just give the jurors a

13   standing stretch break and then read the stip.

14        (Pause)

15        THE COURT:  All right.  Thank you.

16        MR. NOBLE:  Thank you, your Honor.

17        The factual stipulation is simply that there is no

18   evidence that Trevon Gross and Anthony Murgio, in fact, met up

19   in New York City on or about the dates set forth in this email.

20        THE COURT:  Thank you.

21        MR. NOBLE:  Can we please bring up Government Exhibit

22   1154-B.

23        This is an email beginning at the bottom from Amy

24   Paysour, with an email at rich.frb.org with a subject "Federal

25   Reserve contact," sent on June 5th, 2014, to Trevon Gross and

1    blarkins@hope-FCU.com.

2              "Good morning, Trevon and Sylvester.  Hope you are

3    doing well and enjoying the warmer weather.  I wanted to reach

4    out to the two of you as your account executive with the

5    Federal Reserve Bank to introduce myself and also provide you

6    with my contact information below.  I have looked over your

7    services set up through the Fed and don't see anything that

8    needs to be brought to your attention.  If you have any

9    questions in the future or need assistance on our products and

10   services, please do not hesitate to give me a call or send me

11   an email.  I'll be glad to assist."

12             It indicates that Amy Paysour is an account executive

13   in the customer relations and support office for the Federal

14   Reserve Bank.

15             MR. SHIN:  On June 5, 2014, Trevon Gross forwarded the

16   email to Trustee Collectables, and he wrote:  "Hey, the Fed has

17   served the paperwork, and it is in order.  We just need to get

18   up the back end."

19             MR. NOBLE:  Later that day, Anthony Murgio forwarded

20   the email to Mark Francis and Yuri Lebedev and wrote:

21   "Boomsticks."

22             Can you please bring up Government Exhibit 1155A.

23             This is an email exchange with the subject line

24   "Contact list of board members" between various people,

25   including Anthony Murgio, and Trevon Gross, and Yuri Lebedev.

1    At the bottom, on June 2nd, 2014, Jose Freundt wrote:  "Good

2    afternoon, gentlemen.  In order to finalize the board and to

3    continue forth with the process, we need to complete all forms.

4    The one with particular urgency is the membership application

5    with account beneficiary.  It is imperative that Trevon has all

6    this information, including a picture of you holding your

7    state-issued ID.  This is solely to have the right

8    documentation to open an account.  If HOPE FCU would get

9    audited right now, there would be a huge liability, and we are

10   not in compliance with CIP of the USA PATRIOT Act, Section 326,

11   for those who would like to read it.  All this also plays a

12   part with the Bank Secrecy Act and anti-money laundering.  As

13   you can see, this affects many areas that we need to be in

14   compliance with.  Please get this done as soon as possible.  If

15   you have any questions, please do not hesitate to contact me,"

16   and a telephone number.

17        MR. SHIN:  On June 3rd, Kevin Tomasso responded:

18   "FYI:  I have sent in all of my info.  As far as the initial

19   deposit is concerned, is that taken care of, or do we need to

20   wire money through each of our accounts?  If so, what is the

21   required amount?  Thanks."

22        MR. NOBLE:  On June 3rd, Chad Lio wrote:  "Trevon, I

23   refaxed in my membership application.  Please confirm when you

24   have a moment.  Thanks."

25        MR. SHIN:  Trevon Gross responded:  "Fax arrived.  We

1    are all set for you."

2         MR. NOBLE:  Anthony Murgio later responded to the

3    group:  "Has everyone submitted all info required?"

4         Can you please bring up Government Exhibit 1157.

5         This is an email exchange with the subject "New HOPE

6    website" between Trevon Gross, Yuri Lebedev, Harpreet Design,

7    Jose Freundt, and Anthony Murgio.

8         And if we can flip to the second page.  Actually, the

9    third page.

10         Sorry, go back up to the bottom.

11         On June 3, 2014, Anthony Murgio wrote:  "Yuri, I need

12    you to facilitate getting the new HOPE website up and running.

13    Trevon needs to give access to the server.  Harpreet needs to

14    provide the new files."

15         MR. SHIN:  On June 4, Yuri Lebedev wrote:  "Trevon, in

16    order for me to deploy this, I need to know some information

17    about the destination server, the credentials.  Does it

18    currently have my SQL?  Is it LAMP stack?  Thank you.  Yuri."

19         MR. NOBLE:  Anthony Murgio later replied:  "I don't

20    believe Trevon is a programmer, Yuri.  I think you can simple

21    get access to the server if he feels comfortable, and you can

22    check it out.  You can then give a good opinion on what is the

23    best approach to take."

24         MR. SHIN:  Trevon Gross responded:  "LOL.  I used to

25    be a programmer when Pascal was the main programming language.

1    I think that is before your time.  The current site is on a

2    customized CMS, so the DNS points to their servers for hosting.

3    We have MX records, so we can create our email accounts.  We

4    can stop the DNS redirect, which will cause the site to go

5    down, and then you can upload all the files because there is a

6    WordPress/bootstrap framework available.  Just say the word,

7    and I can do that part.  Then I will give you the admin to

8    upload everything."

9         And then Yuri Lebedev responded on the next day,

10   June 5th:  "Trevon, thank you for providing this information.

11   Can we first try to deploy the database and the site and then

12   switch the DNS?  This way, we can minimize the down time.

13   Thank you.  Yuri.  P.S.:  I used to extensively program in

14   Pascal and Delphi."

15        Later that day, Trevon Gross responded:  "Okay.  We

16   are setting up a mirror so he can install and test the site,

17   and once it is ready, then we can remove the DNS.  This mirror

18   should be ready later tonight, and I will send over the

19   credentials."

20        Later that day, Yuri Lebedev responded:  "Great.

21   Thank you."

22        MR. NOBLE:  Oh, I'm sorry.  Anthony Murgio responded:

23   "Trevon, look at you.  Brush the shoulders off."

24        MR. SHIN:  The next day, June 6, 2014, Trevon Gross

25   responded:  "LOL.  They just have good customer service, and I

1    can repeat what they said.  Here is the info," and then there

2    is a URL, hope-fcu.dreamhosters.com.  "User name is admin.

3    Password is the same one we used before for financials."

4              MR. NOBLE:  Can you please bring up Government Exhibit

5    1160-C.

6              This is an email at the bottom, a forwarded message

7    that Anthony Murgio forwarded to Shoula Cohen and Mark Francis

8    on June 14, 2014, with the subject "Inspection and advice."

9    The forwarded email was sent from Anthony Murgio to Trevon

10   Gross on the same day -- I'm sorry, the previous day and

11   stated:  "Trevon, after speaking today, I would like to get

12   your opinion on the Kapcharge processing structure.  I would

13   like to get them up and going, but I don't want the regulators

14   to ask a ton of questions if we have five new businesses all of

15   a sudden that recently just starting doing ACH processing, when

16   most likely you have never had this type of traffic and account

17   set up under the CU.  If this was a larger bank or association,

18   it would not be an issue, I'm sure, but I feel like there is

19   hardly anything for them to look at with HOPE, and any increase

20   or new accounts will be the only thing they will inspect.  I

21   would like to hear the inspection process and if you think this

22   is an issue at all.  Once again, I would love to get things

23   going with Kap to start generating rev for the CU, but at the

24   same time, don't want to create issue for the CU."

25              (Continued on next page)

 1          MR. NOBLE:  The forwarded email sent to Sheila Cohen

 2    and Mark Francis from Anthony stated, "Trevon said that signing

 3    up the companies and doing the transactions should not be a big

 4    deal for the examiners.  He said things with them are more at a

 5    macro level, so I guess we are good to go next week."

 6          MS. SANTILLO:  Your Honor, I have a Rule 106 objection

 7    here.  There was a response from Trevon Gross that was in an

 8    earlier exhibit that the government has.

 9          MR. NOBLE:  That's a separate exhibit.  I'm happy to

10    read that portion of the email, as well.

11          THE COURT:  Okay, go ahead.

12          MR. NOBLE:  Can you bring up Government's

13    Exhibit 160-B -- I'm sorry -- 1160-B.  Then in response to that

14    email, Trevon had written -- and Mr. Shin, would you please

15    read Mr. Gross' response?

16          MR. SHIN:  Yes.  So on June 13th, 2014, Trevon Gross

17    wrote, "It should be a problem.  Examinations are generally on

18    the macro level.  I think for the rest of the year it should be

19    limited as more members join, then they can open up full

20    throttle.  Plus, you will need to have income to offset their

21    reserve deposits.  Net worth must stay above 7, ideally above

22    10.  The retreat idea is important so that a strategic plan can

23    be developed.  If we put things like more organization/business

24    accounts in the plan then they won't have a problem with it.

25    Just go slow.  The other aspect is that the club should really

1    start moving all of its accounts to the CU.  The more you all

2    see it as a bank and leverage its power, others will share that

3    passion.  Here is the link to the automated account service.

4    We would still have to manually enter people into CU Base, but

5    it would be all online and security compliant.  CU Base is

6    developing their own automated system which is supposed to be

7    released next year.  This gets the CU completely automated on

8    the front end, and since you have staff who can input info,

9    this would work.  It's only three mins per member to manually

10   enter a person."  And then there's a URL provided.

11        MR. NOBLE:  And then Anthony Murgio had responded,

12   "Thanks.  It should or shouldn't be a problem?"

13        MR. SHIN:  And then Trevon Gross responded, "Ops,

14   shouldn't."

15        MR. NOBLE:  Can you bring up Government's

16   Exhibit 1161-B?  This is a forwarded email with a Subject:

17   Setting up accounts, from anthony Murgio to Sheila Cohen.  The

18   original email was sent on June 13th, 2014 from Anthony to

19   Trevon Gross addressed, "Mark.  Trevon and I discussed setting

20   up the account for you so you can set up subaccounts and

21   descriptors yourself to do some test transactions.  Both Trevon

22   and myself were a little cautious about doing too much prior to

23   the inspectors that come in mid July.  We don't want to draw up

24   any regular flags at all.  There is already going to be a large

25   transition as it is.  We also don't want there to be any issues

1    that arise without the proper staff on hand.  If you can please

2    send over the liability waiver to Trevon, that can help start

3    this process.  Trevon can also guide you through how to use the

4    system to start manually processing these ACH transactions.  I

5    believe Trevon feels fine with doing 25 to 50 transactions

6    daily in all but would like to limit these as much as possible.

7    In the meantime, Trevon is getting the required specs from

8    Alloya for automation."

9           You can take that down.  Can you bring up 1162-A?

10   This is an email sent from Anthony Murgio to Trevon Gross on

11   June 13th, 2014 with the Subject:  Touching base.  "Trevon.  I

12   appreciate you taking the time out to meet with us yesterday.

13   I gained a good amount of information from hearing the

14   discussion.  I wanted to touch on a few things.  One, the docs

15   from Alloya; two, CU South info for building technology within

16   their secure framework; three, setting up an account for

17   Capital so they can do some manual ACH transactions.  Let me

18   know if you have any questions."

19          Can you bring up 1162-B?  This is the same email

20   thread.  Can we turn to the next page?  And the next page.  The

21   next page.  On page 3, on Friday, June 13th at 2:14, Mr. Shin,

22   can you please -- at 4:20 p.m. at the bottom,

23   Mr. Chang-Frieden -- can you please read that email?

24          MR. SHIN:  Trevon Gross wrote:  "Hey, Anthony.  I will

25   forward what they sent but it still is not the detail you

1    desire.  They said that once we are in implementation,

2    Margarite with whom we spoke will forward over the

3    implementation docs.  They will not send this out before.  I

4    spoke with CU South and they actually work with a third party

5    provided for automated membership.  They are forwarding the

6    information for us.  Kapcharge already has an account, and if

7    they want to do manual transactions they are ready now, they

8    would just need to create the accounts as subaccounts and then

9    we would set up the A2A accounts so they can test it manually.

10           Honestly, I would suggest that we focus on a

11   successful transition of the CU and its operations before we

12   take on this task.  There are a lot of pieces which could go

13   wrong, and I think we need to make certain that our operational

14   house is in order first.

15           Further, we have not discussed how the CU will be

16   managed 9:00 to 5:00 Monday through Friday, as this is a

17   requirement of ACH.  We have staffed it with volunteers.

18           How are we handling the final payment and the

19   set-aside amount for us to start our own CU?  Also, you had

20   mentioned 50K dollars to start our own.  From my own research,

21   this amount will enable us to charter a savings account only CU

22   which is not where we are.  They suggest 71K dollars for a full

23   service CU, which is what you all are taking over.  I would

24   respectfully as that you consider a number closer to the 71K

25   dollars to be fair.  We will charter another CU once we know

1    that this transition is smooth and you all are set.  Please

2    advise."

3         MR. NOBLE:  Anthony Murgio responded, "One.  As for

4    Kapcharge, I'm getting them to send over the same liability

5    waiver that they have with their other banks.  Two.  We are

6    opening an office and we will have online chat and support set

7    up by next month.  Three.  Please explain what A2A means for

8    Kapcharge transactions.

9         As for another CU, we have agreed to the 50K over

10   time, but this is to start another and we would simply need to

11   see documentation in the direction of setting up another.  I

12   would have to discuss the extra 21K dollars with the

13   association, but just because they suggest it will be closer to

14   71K does not mean that it can't be done for half of this.

15   These docs are not prepared by business savvy individuals like

16   yourself.  Smiley face.  What do you suggest for a successful

17   transition?"

18        MR. SHIN:  Later that same day, Trevon Gross

19   responded, "A2A is the standard capability that CU South has to

20   send and receive ACH transactions.  It is manual.  It requires

21   that we set up and validate the accounts that are outside of

22   the CU.  But once set up, the individual/organization can do

23   ACH transactions to those accounts only.  The CU staff has to

24   set up each new account.

25        I think we need to get clarity on what "over time

means".  I understood that to mean as a part of this deal.

Part of this money is just to meet capital requirements of the

NCUA.  Also, most people hire a consultant who prepared the

paperwork and walks it through the NCUA.  This usually means

getting a US Congressman/Senator to put in a recommendation.  I

think $65 would more than allow us to charter a full service

CU.  Please let me know your thinking.

        As to successful transition, there needs to be a lot

of training and staff person, at least one, who can manage the

office/serve as teller.  Because we already have the

infrastructure and office in place, I don't see the wisdom in

moving the office, et cetera.  Plus, I do not think it is wise

to change addresses again.  We just changed it in 2013 to the

current location.  These are the types of things I really

wanted to talk about yesterday."

        MR. NOBLE:  Anthony Murgio responded, "One.  Thanks

for clarifying.  Two.  Over time means setting up a credit

union does not incur these expenses immediately.  I believe

these expenses are accrued over time so the expenses should be

delineated.  The goal is to help financially get another CU set

up for your members.  We want to make sure that this is done as

effectively as possible.  3.  We can keep the office there, but

we are allowed to provide support from another branch office,

correct?  Also, I would love to have a couple of members train,

including myself.  Please let me know some dates that we can

1    come there for two or three days, or however long you think it

2    may take, and we will learn the system.  Possibly next weekend.

3    We can take a course.  We can make sure that all information is

4    recorded and steps on the computer are recorded so we can use

5    for a training site to train new employees.  I'm open to

6    suggestions."

7    MR. SHIN:  Later that day, Trevon Gross responded, "If

8    we hire a consultant to lead the effort, it will incur expenses

9    as there is a retainer for those services.  I just need clarity

10    what you propose to mean "over time".  It takes about 12 to 18

11    months for the entire process, and I would like to get started

12    ASAP.  My preference is that this money be put up by the end of

13    the year so we can, in earnest, start the process January 1.  I

14    do not think it will be productive to keep coming back every

15    time there is an expense incurred.

16    Yes, there can be another branch, and there should be

17    one in Florida so that you can get reports, et cetera, and

18    provide teller services.

19    Training can initially be one full day.  Come in night

20    before and start early next day, flight out on evening.  This

21    should enable us to cover the basics.  But I think we need to

22    invest in one person who can be a teller/operations assistant

23    who can be available 9:00 to 5:00 Monday through Friday up here

24    since this is the branch that the examiner stops in from time

25    to time.  We have someone who we used before, but I need to

1    understand how you plan to run operations.  There are a lot of

2    moving pieces with having a bank, and someone daily has to be

3    on top of it.  I would suggest that you bring a person on up

4    here who can be the day-to-day operations person."

5          MR. NOBLE:  Anthony Murgio responded later the same

6    day, "By January 1st we can put this money up in escrow.  Also,

7    can we have limited office hours for the home office Mondays

8    from 12:00 to 5:00?  The other branches and member support can

9    be on a different schedule?"

10          MR. SHIN:  Trevon Gross responded, "We probably need

11   to talk.  When can we all get on a call?"

12          MR. NOBLE:  Anthony Murgio responded, "Ready now."

13          THE COURT:  Mr. Noble, it's time for our midmorning

14   break.  What's your time estimate?

15          MR. NOBLE:  We have about, I would say, ten more

16   emails to read.

17          THE COURT:  All right.

18          Members of the jury, we'll take a 10 to 15-minute

19   break.  Enjoy your break.  See you then.

20          (Continued on next page)

21

22

23

24

25

```
 1                (Jury not present)

 2            THE COURT:  Matters to take up?

 3            MS. SANTILLO:  Your Honor, with respect to the

 4   resumes.

 5            THE COURT:  Yes.  Could you pull up the microphone?

 6            MS. SANTILLO:  We would request that the resumes be

 7   played at the earliest opportunity.  I didn't want to mess up

 8   the program if they hadn't been queued up, but we do think it's

 9   important for completeness.

10            THE COURT:  Mr. Noble.

11            MR. NOBLE:  I don't think it's necessary for

12   completeness.  The resumes will come in through other evidence

13   later on in the trial.  It's already been established that the

14   resumes were sent to Trevon Gross.  I don't think it's

15   necessary to publish those to the jury right now as part of the

16   government's case at this point in time for completeness

17   purposes.  I mean, the defense may want to use them in their

18   case.

19            THE COURT:  I don't want to -- just let's go back to

20   the discussion yesterday when I think the government agreed it

21   would show the resumes.  What was that in reference to?

22            MR. NOBLE:  I believe we said that the resumes will

23   come up at certain points of time in the government's case, but

24   not while we were like reading all of these emails because it

25   just interrupts the flow of the email just to publish resumes
```

1   to the jury.  That was not part of our planned process of

2   publishing these emails to the jury.  There's no dispute that

3   they will be in evidence.  They can be published at some point.

4   We will probably use them with some of our witnesses, and the

5   defense can publish them in their case when it's their turn,

6   but I don't think the government is under an obligation, at

7   least under Rule 106, just for completeness purposes, to

8   publish them given that we've already established the fact that

9   these resumes -- and we've published one of them, one of the

10  resumes went -- that Trevon Gross was sent the resumes.

11          THE COURT:  In the remaining emails to read in this

12  series, are there links to resumes?

13          MR. NOBLE:  No.

14          MS. SANTILLO:  Your Honor, first of all, they said

15  yesterday that they were going to include the resumes if there

16  were links to them.

17          Second of all, they already put on an email where

18  there was an email suggestion that there were people who didn't

19  have financial experience, and that's the only resume they

20  showed.  They showed an email where he was receiving

21  information, including resumes, and there's a Google Doc link

22  within the email.  It's only fair to not leave a misleading

23  impression, which they're trying to leave, that he wasn't being

24  thorough and he wasn't checking their background, to include

25  that.

1    We have agreed to do some of these emails by

2    stipulation, but if there was a witness, we would absolutely

3    have an opportunity to cross examine that witness, and by

4    virtue of this process, we're being deprived an opportunity to

5    confront that, and this has squarely been a Rule 106

6    contemplation because it is a link within the very email that

7    they have tried to introduce.

8        THE COURT:  In light of the agreement/my ruling

9    yesterday, you'll publish the resumes that were linked in the

10   email already shown.

11       MS. CHOI:  Well, your Honor, part of the problem is

12   that link doesn't -- we can't access that link.  So we have

13   copies of the resume, we can publish those copies, but we're

14   never going to be able to get that link.  It's just not

15   something that we can do because those links are related to the

16   Google Drive, and so there's no way to actually access them

17   without having the password for them.

18       MR. NOBLE:  We can confer with defense counsel to make

19   sure that the versions of the resume that we publish to the

20   jury are acceptable to them.

21       THE COURT:  All right, do that.

22       MR. NOBLE:  We'll bring back up the email, I think

23   with the link, and say, "Here are the resumes."

24       THE COURT:  Okay.

25       MS. SANTILLO:  That's fine.

```
 1                THE COURT:  What else?

 2                MS. SANTILLO:  Your Honor, I was wondering if we could

 3   have a copy of the instructions that the Court plans to give in

 4   connection with Clayton Curry's testimony.  We had sent some

 5   proposals, but we didn't have the final versions, and it may be

 6   that we want to cross the witness on some of the rules that are

 7   in the instructions.

 8                THE COURT:  You mean the NCUA regs?

 9                MS. SANTILLO:  Yes.

10                THE COURT:  I have the version that is final after

11   implementation of our discussion and changes.  You want a copy,

12   is that what you're saying?

13                MS. SANTILLO:  Yes, please.

14                THE COURT:  I'll ask my clerk to run a copy.

15                MS. SANTILLO:  Thank you, your Honor.

16                THE COURT:  What else?

17           So that was an hour and 45.  You're losing the jury's

18   attention, so at some point I have to get it under control.

19                MR. NOBLE:  Judge, I mean, this is the last set of

20   emails that we intend to read for quite some time, and we think

21   that these are very relevant.

22                THE COURT:  I understand that, but if I see members of

23   the jury unable to pay attention because of the length at which

24   it's going on, I have to do something to manage the process,

25   and I will.
```

 1          I'll see you in a few minutes.

 2          (Recess)

 3          THE COURT:  Any matters to take up?

 4          MS. SANTILLO:  With regard to the resumes, I want to

 5   just be sensitive to the jury's attention, as well.  I was

 6   wondering if we could come up with a strategy to not have to

 7   read every single item but to highlight certain things, so

 8   maybe can we just confer for a second about what the best way

 9   to do that is?

10          MR. NOBLE:  Sure.

11          THE COURT:  Thank you.

12          (Pause)

13          MS. SANTILLO:  Your Honor, we've agreed that we will

14   just scroll slowly through them so that the jury can read them.

15          THE COURT:  Okay, thank you.

16          MS. SANTILLO:  But hopefully, we do that at the

17   beginning so they don't lose --

18          MR. NOBLE:  Yes.  We're going to go back to that

19   email.

20          THE COURT:  You're going do that first?

21          MR. NOBLE:  Yes.

22          THE COURT:  Thank you.

23          Let me just raise the jury questions that -- logistic

24   questions that came in this morning.

25          Juror number 3, Ms. Pico, raised some new appointment

1  issues or more appointment issues.  It sounds like the base of

2  her request is whether next Tuesday, and perhaps the following

3  Tuesday, we could do what we did yesterday.

4          Juror number 8 also indicated that he or she -- I

5  don't have my list right in front of me -- she has a doctor's

6  appointment at 5:30 on Wednesday and had trouble rescheduling

7  it.  It doesn't sound like a lot of time is needed, but

8  something like ten minutes early.

9          I guess we're taking requests.

10          MR. KLINGEMAN:  Is that tomorrow?

11          THE COURT:  No, next Wednesday, March 1st.

12          Then another juror asked kind of generally about the

13  calendar, saying, "Are the trial dates shown on the schedule,

14  do those include or not include deliberation dates?"

15          So as the last, I propose just reiterating that we

16  don't have exact certainty as to when evidence will finish and

17  we've done our best to estimate.  We have no further

18  information at this time, although I think we're on schedule.

19  Does everyone agree with that?

20          MR. NOBLE:  Yes, Judge.  We're actually a little more

21  quickly I think than we anticipated.

22          THE COURT:  Good.  So I think just some general answer

23  along those lines is what I'd propose.

24          I think with the next Wednesday, March 1st, I guess

25  I'd like to accommodate that one since it's ten minutes that

1  we're talking about, but I think I should probably convey what

2  I hope is obvious, but that none of this process can happen

3  without everybody, and the more we accommodate, the longer it

4  takes, but that we can try to make up some of that time by

5  shortening the lunch break again.

6          Then I guess with respect to juror number 3, I'm

7  inclined to see if she can't move those appointments to some of

8  the days that we're not meeting next week.  Next week we're not

9  sitting Thursday or Friday.  Apparently, she indicated that her

10 doctor isn't available next Thursday and Friday so she wasn't

11 able to reschedule the allergy shot for then.  I mean, we can

12 start 15 minutes early maybe on Monday and end 15 minutes later

13 on Wednesday or something like that, but I don't like doing

14 that.  I've assured the other jurors that they can kind of bank

15 on start and end times so --

16          MR. NOBLE:  Could we do what we did the other day and

17 take the abbreviated lunch break and perhaps shorter morning

18 and afternoon breaks?

19          THE COURT:  We can do that.  My concern, like what

20 happened yesterday, is that it doesn't really turn -- just

21 because between us needing to eat and deal with legal issues,

22 it doesn't much turn into a shortened break, but we can try to

23 do that.

24          I think I'll take it up with them before the lunch

25 break.  I'll indicate that we can make the two adjustments for

1    next week, but express concern that the more we do it, the more

2    it lengthens the process, so if folks can try to work with the

3    unscheduled days, the better.  Then I'll make my general

4    statement as to no more information about the precise length of

5    the time, which we've estimated to include the time for

6    trial -- well, I think I'll leave it at that.

7              Any concerns or questions?  All right.

8              MR. NOBLE:  No, your Honor.

9              THE COURT:  Matters to take up?

10             MR. NOBLE:  Just to give the Court a heads up.  The

11   version of the board minutes which the parties have agreed on

12   is a version that the NCUA had in its custody, and so we are

13   going to read the stipulation regarding NCUA records and admit

14   those exhibits before we do the publication, just to give

15   everybody a heads up.

16             MS. SANTILLO:  You mean the resumes, right?

17             MR. NOBLE:  Yes.  And to also admit the other exhibits

18   that are subject to the stipulation by the NCUA, which I don't

19   believe the defendants have any objection to.

20             MS. SANTILLO:  No, we do not.  However, we would like

21   to admit some board minutes ourselves, which I think are

22   actually admitted pursuant to the stip.

23             MR. NOBLE:  Exactly.  That's why I'm reading the stip.

24             MS. SANTILLO:  Okay, great.  Thanks.

25             THE COURT:  Sounds like I'm not needed.  Let's bring

1     in the jury.

2              (Continued on next page)

1           (Jury present)

2           THE COURT:  Thank you, members of the jury.

3           Mr. Noble, you may proceed.

4           MR. NOBLE:  Thank you, your Honor.  At this time, the

5   government would like to offer into evidence a number of

6   exhibits pursuant to a stipulation signed between the parties

7   that's been marked Government's Exhibit 4011.

8           THE COURT:  All right.

9           MR. NOBLE:  First, we move this exhibit into evidence

10  and offer it and publish it for the jury, Government's

11  Exhibit 4011, the stipulation.

12          THE COURT:  Without objection, 4011 is admitted on

13  stipulation.

14          (Government's Exhibit 4011 received in evidence)

15          MR. NOBLE:  I'm going to summarize that the following

16  exhibits the parties have stipulated are business records of

17  the National Credit Union Administration.

18          At this time, the government will offer Government's

19  Exhibits 6001 through 6019, 6061 through 6076, 6081 through

20  6099, 6101 through 6107, 6111, 6112, 6113, 6121, 6122, 6125,

21  6126, 6129, 6130, 6131, 6133 through 6136, 6143, and

22  6200 through 6207.

23          THE COURT:  On stipulation, they are admitted.

24          (Government's Exhibits 6001 through 6019, 6061 through

25  6076, 6081 through 6099, 6101 through 6107, 6111, 6112, 6113,

1    6121, 6122, 6125, 6126, 6129, 6130, 6131, 6133 through 6136,

2    6143, and 6200 through 6207 received in evidence)

3         MR. NOBLE:  In addition, the parties have stipulated

4    that Government's Exhibit 6124 is a true and accurate copy of a

5    letter of understanding and agreement entered into by the NCUA

6    and the board of directors of HOPE FCU on or about March 25th,

7    2015, and the government would offer Government's Exhibit 6124.

8         THE COURT:  Without objection and on stipulation, 6124

9    is admitted.

10        (Government's Exhibit 6124 received in evidence)

11        MR. NOBLE:  Thank you, your Honor.

12        Mr. Chang-Frieden, can you be go back to Government's

13   Exhibit 1142-B.  This is the email we saw earlier with a link

14   to a Google Drive account which included certain resumes of

15   proposed board members.

16        At this time, Mr. Chang-Frieden, can you please bring

17   up Government's Exhibit 6136 in evidence?  If we could just

18   slowly publish each of these resumes for the jury.

19        (Pause)

20        THE COURT:  Little bit slower.

21        MR. NOBLE:  Could we go a little bit slower,

22   Mr. Chang-Frieden?

23        (Pause)

24        MR. NOBLE:  I believe the jury previously saw this one

25   so we can move to the next one.

 1              THE COURT:  They did.  Go ahead.

 2              (Pause)

 3              THE COURT:  Thank you.

 4              MR. NOBLE:  Great.  Can you please bring up

 5    Government's Exhibit 1167-A?  This is an email exchange with

 6    the Subject:  Expenses, between Trevon Gross and Anthony

 7    Murgio.  Could you please flip to the second page?

 8              Mr. Shin, could you please read the first email in the

 9    chain?

10              MR. SHIN:  On June 17, 2014, Trevon Gross wrote, "Hey.

11    The additional router for the Florida branch will be like $99

12    per month and the GUAPPLE is like $600 plus $29 per month

13    maintenance fee.  You will need a PC and two printers, a report

14    printer and a check printer with MICR Inc.  Will Yuri manage

15    this?  I just wanted to make you are aware of this.  Currently,

16    the overhead is like $450 for outside accounting and

17    connectivity to CU South.

18              MR. NOBLE:  Anthony Murgio responded, "Yes.  Yuri will

19    manage this or somebody in the office like Rico or Jose."

20              MR. SHIN:  Trevon Gross responded, "Okay.  We'll need

21    an address to ship it to."

22              MR. NOBLE:  Anthony Murgio responded, "2940 East Park

23    Avenue, Tallahassee, Florida, 32301.  Collectables Club."

24              MR. SHIN:  Trevon Gross responded, "Okay.  Do you plan

25    on using that Lakewood address for that Collectables Club that

1    Kapcharge is using?  If you can, that would be great.  Also,

2    please fund your account so that you can vote before Friday

3    night.  The other new board members won't be able to vote until

4    their deposits have hit and they have satisfied par."

5        MR. NOBLE:  Anthony Murgio responded, "I sent the

6    $175.  Can you allocate that?  We can also use that address no

7    problem.  But you are going to send the stuff there?"

8        MR. SHIN:  And Trevon Gross responded, "No.  All

9    records will go with to the Jackson address or the Florida

10    address.  Just to have all our bases covered you all should be

11    able to point to a Lakewood address if asked.  Anthony, do you

12    believe in the CU?  $175 for seven accounts?  That's $25 per

13    account.  That is not a vote of confidence from those who would

14    be board members.  From our low-income members we require $30

15    minimum.  I will do what you asked because Saturday this is

16    your credit union, but I don't think this sends the right

17    message about your commitment to this CU.  Just putting in my 2

18    cents."

19        MR. NOBLE:  Can we bring up Government's Exhibit 1170?

20    Mr. Shin?

21        MR. SHIN:  Trevon Gross wrote on June 17th, 2014, "Hey

22    Anthony.  I wanted to recap the items we discussed.  I added a

23    couple things that we had talked about previously as well.

24        "1.  Your leaders will be elected to the board on

25    Saturday, June 21st.

1       "2.  Existing board members except two, me and

2   Bernard, will tender their resignations effective end of August

3   or past the examination report date.

4       "3.  I will remain chair until September at which time

5   you will be elected to the board and elected as chairman.

6       "4.  That Hope Cathedral members will have use of CU

7   as long as we desire and can operate autonomously within NCUA

8   regulations/board policy.

9       "5.  Any technology developed or leveraged by the CU

10  will be available for use by Hope Cathedral members, and when

11  we charter a new CU, it would be made available to us at a

12  reasonable cost.

13      "6.  Starting July 1st, Florida branch operations will

14  commence.  Need a day and a half training session planned.  You

15  all will bring me down to train on new equipment.

16      "7.  Beyond the training, my role will be as a board

17  member only offering occasional advice.

18      "8.  If at any point in the future you decide that you

19  do not want the CU, you will give it back to us so that the

20  charter will continue.

21      "9.  A bank check/certified funds will be given on

22  Saturday, June 21st at the conclusion of the annual meeting.

23      "10.  The final donation will arrive by January 1st.

24      "Decisions needed.  There are standing

25  committees/officer roles that will need been filed:  Loan

1    officer, BSA officer, security officer.

2              "Signing authority.  Who will have signing authority

3    for the CU?  This includes Alloya, Federal Reserve, and local

4    bank.

5              "Harmony.  Currently we have a local bank where we

6    deposit cash.  If you have a P&C bank near you then I would

7    suggest that we move this account to P&C, and when you are here

8    this weekend, we can open an account there with the signers.

9              "Operationally.  Who will serve as tellers, et cetera?

10   All officers will need access to CU Base with clear segregation

11   of duties.  We will need to grant access to the system.

12             "Please advise.  Thanks."

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1      MR. NOBLE:  Can we bring up Government Exhibit 1175-A.

2          This is an email chain between Kirk Agapitos at

3  kirk@kapitalinc.com, Anthony Murgio, Mark Francis, and George

4  Fanous.

5          Beginning at the bottom, Anthony Murgio wrote on

6  June 19, 2014, with the subject "Agreement with HOPE."

7          "Can someone please update me on this?"

8          Then Kirk Agapitos replied...

9      MR. SHIN:  On June 19, 2014, he wrote:  "How does this

10  look, guys?  I've added a second signature section for HOPE FCU

11  just in case.  The original merchant agreement only has one

12  section for the merchant to sign; i.e., Kapcharge USA Inc. in

13  this case.  I also put the fee schedule for ACH origination and

14  receipt as provided by Sandra L. Albertson to Pastor Trevon on

15  June 16th in schedule A.  Please modify as needed and let me

16  know if anything more is required.  Thank you."

17      MR. NOBLE:  If we can just blow up -- I'm sorry -- the

18  bottom portion earlier in the chain.

19          Anthony Murgio had written on June 18th:  "Gentlemen,

20  I'm a little lost, and maybe I missed it.  Can you please send

21  over the agreement that is to be signed with HOPE and Kap?  It

22  must use the NJ address for Kap.  Thanks."

23          If we can just publish the next page for the jury,

24  which is the exclusive registered agent agreement between HOPE

25  Federal Credit Union and Kapcharge, Inc.  We're not going to

 1    read that at this time.

 2          Can we go to Government Exhibit 1175-D.

 3          Beginning -- this is an email chain between Mark

 4    Francis.  It's a continuation of the previous chain.  On

 5    June 19, 2014, Anthony Murgio wrote:  "Looks good.  Why is it

 6    called exclusive?"

 7          MR. SHIN:  Kirk Agapitos responded:  "Because Mark

 8    specified that.  Didn't question it, just did it."

 9          MR. NOBLE:  Mark Francis then replied:  "It's called

10    exclusive because that's exactly what it is."

11          Can you bring up Government Exhibit 1180.

12          This is an email with the subject "Annual meeting"

13    sent by Anthony Murgio to Shoula Cohen and Mark Francis on

14    June 20, 2014, stating:  "The annual meeting for the CU will be

15    held tomorrow at 10:00 a.m.  I think it would be good for you

16    both to be on.  I am setting up a Google Hangout that you can

17    join.  The new board members will also be elected at this time.

18    Let me know if you are interested."

19          Can you bring up Government Exhibit 1184-A.

20          This is an email sent by Anthony Murgio with the

21    subject "Docs" on June 19, 2014, to Trevon Gross:  "Here are

22    the three docs.  Please review and sign two copies of each and

23    send to me.  I will resign and send back a copy.  There are

24    three attachments, one for currency exclusive HOPE, a second

25    for Memorabilia and Collectables Club membership contract, and

1     third an association contract."

2               Can we just go through and publish those -- just flip

3     through the attachments for the jury.

4               Can we bring up Government Exhibit 1184-B.

5               Mr. Shin, would you read Pastor Trevon Gross'

6     response?

7               MR. SHIN:  On June 20, 2014, Trevon Gross responded to

8     Trustee Collectables:  "For the memberships, should it be for

9     the credit union?  Not certain why this is necessary.  Here is

10    the technology agreement.  It is dated as of Monday because we

11    will vote on it tomorrow."

12              MR. NOBLE:  Can we just flip through the attachment to

13    the last page.  I note that the signature line on behalf of

14    HOPE Federal Credit Union by Trevon Gross with the signature

15    and dated June 23rd, 2014.

16              Can you bring up Government Exhibit 1184-C.

17              Mr. Shin, if you would read the header information.

18              MR. SHIN:  So on June 20, 2014, Trevon Gross replied

19    to the prior email we looked at to Trustee Collectables, and he

20    wrote:  "These don't need board approval."

21              MR. NOBLE:  If we can just flip through the attachment

22    there to the signature pages.  It shows that this agreement was

23    signed on behalf of Helping Other People Excel Federal Credit

24    Union by Trevon Gross and the address of the credit union.

25              I'm sorry, go back -- the Collectables Club membership

 1     contract for the credit union, for HOPE Federal Credit Union.

 2              You can just flip to the last page.  Again, sorry,

 3     second to last page.

 4              Signed by Trevon Gross on behalf of the HOPE Federal

 5     Credit Union on June 23rd, 2014.

 6              You can take that down.

 7              Can we bring up Government Exhibit 1188-A.

 8              This is an email sent by Anthony Murgio on June 20,

 9     2014, to a number of recipients, including Yuri Lebedev and

10     Trevon Gross:  "Gentlemen and lady, tomorrow is the annual

11     meeting for the CU.  All board members will be elected at this

12     time.  I will be setting up a Google Hangout so we can all be

13     there virtually, if you can attend.  Please let me know if you

14     have any questions."

15              Can we please bring up Government Exhibit 1188-C.

16              Mr. Shin.

17              MR. SHIN:  Trevon Gross replied to the prior email on

18     June 20, 2014:  "Please log in your it's me 24/7 account and

19     cast your vote.  Voting ends at midnight tonight.  If you need

20     your password reset, please let me know.  User name is your

21     account number."

22              MR. NOBLE:  Can you bring up Government Exhibit 1189.

23              This is picking up on the earlier chain down below the

24     June 20, 2014 email sent by Trevon Gross to Anthony Murgio.

25              Scroll back out.

1          Anthony Murgio responded -- or, I'm sorry, and then

2  Trevon Gross further wrote on June 20th at 11:33.

3          Up above, Mr. Chang-Frieden.

4          MR. SHIN:  Trevon Gross wrote:  "So fill it out for

5  the CU."

6          MR. NOBLE:  Anthony Murgio responded:  "Are there

7  people running against the board members?"

8          MR. SHIN:  Trevon Gross responded:  "No, but I just

9  wanted to get as many votes in the system since this is the

10  first time we've used online voting.  I want to make certain

11  that this election is incontestable."

12          MR. NOBLE:  Anthony Murgio responds:  "Great."

13          Can we please bring up Government Exhibit 1191.

14          This is an email sent by Anthony Murgio on June 22nd,

15  2014, with the subject "New positions in pay" sent to the

16  various new board members, including Yuri Lebedev, blind carbon

17  copying Shoula Cohen and Mark Francis:  "Hello all.  You are

18  officially board members.  The discussed pay will start

19  monthly.  Your first payment will be August 1st for all of

20  July.  Once, again, if you are interested in having a full-time

21  position to help increase CU revenue, we can figure something

22  out, please get in contact with me.  Looking for business and

23  personal membership growth."

24          Take that down.

25          At this time, your Honor, the government would like to

 1    call its next witness.

 2              THE COURT:  You may do so.

 3              MR. NOBLE:  The government calls Clayton Curry.

 4              THE COURT:  Mr. Curry may come forward.

 5     CLAYTON CURRY,

 6          called as a witness by the Government,

 7          having been duly sworn, testified as follows:

 8              THE COURT:  Please be seated and pull yourself up to

 9    the microphone.  And then state and spell your name for the

10    record.

11              THE WITNESS:  My name is Clayton Curry.  Clayton,

12    C-L-A-Y-T-O-N, last name Curry, C-U-R-R-Y.

13              THE COURT:  You may proceed.

14              MR. NOBLE:  Thank you, your Honor.

15    DIRECT EXAMINATION

16    BY MR. NOBLE:

17    Q.  Where do you work?

18    A.  I work for the National Credit Union Administration, or

19    NCUA.

20    Q.  What is the NCUA?

21    A.  They are the regulator of federal credit unions and the

22    insurer of federally insured credit unions.  So that would be

23    federal or state-chartered credit unions.

24    Q.  Is the NCUA a federal agency?

25    A.  Yes.

 1    Q.   What is your title at the NCUA?

 2    A.   Supervision analyst.

 3    Q.   How long have you worked at the NCUA?

 4    A.   Altogether, approximately eight and a half years.

 5    Q.   What positions have you held there?

 6    A.   I was an examiner for approximately five and a half years

 7    and a supervision analyst for approximately three years now.

 8    Q.   What did you do before joining the NCUA?

 9    A.   I was finishing up my Master's in business administration

10    and working at a bank.

11    Q.   What were your positions at the bank?

12    A.   At the bank, which was Washington Mutual Bank, I served as

13    a personal banker, a teller, teller supervisor.

14    Q.   You mentioned that you had been studying for a Master's in

15    business administration.  Did you obtain that degree?

16    A.   Yes.

17    Q.   Where did you obtain that degree from?

18    A.   The University of Texas in Dallas.

19    Q.   Do you have an undergraduate degree?

20    A.   Yes.

21    Q.   What is it, and from where?

22    A.   It's a Bachelor's of Arts in criminal justice studies from

23    the University of Texas at Dallas, also.

24    Q.   Can you describe what your duties and responsibilities are

25    as a supervision analyst at the NCUA?

 1   A.   Yes.   Part of my job duties include assessing the quality

 2   of the examination and supervision process for our region.

 3   Also, I assist examiners with drafting various types of

 4   administrative and enforcement actions.   I'm tasked with

 5   developing and reviewing various risk reports for risk

 6   management purposes of the credit unions located in our region.

 7   Q.   You mentioned that you cover a particular region.   What

 8   region is that?

 9   A.   It's called Region II, and it's headquartered in

10   Alexandria, Virginia.

11   Q.   What states or geographic areas are included in Region II?

12   A.   So the states -- because District of Columbia is in the

13   region, Virginia, Maryland, West Virginia, Pennsylvania,

14   New Jersey, Ohio, Delaware.

15   Q.   Mr. Curry, when you joined the NCUA, did you receive any

16   training on how to do your job?

17   A.   Yes.   Upon being hired at the NCUA, at the time, we went

18   through five levels of training, which the first level or two

19   covered kind of the high points of the job, the administrative

20   side, and then the latter levels went more into financial trend

21   analysis, what to look for in an exam.   There is some oral and

22   written communication training to help with our jobs.

23   Q.   What, if any, training do you receive on an ongoing basis?

24   A.   It varies year to year.   We don't have required training

25   that we're supposed to do every year.   Ideally, we would like

 1   to do two to three training classes a year, if possible.

 2   Q.  Do you do such training classes on a periodic basis?

 3   A.  Yes.

 4   Q.  What topics, generally, do you continue to be trained on?

 5   A.  Well, last year, I took a fraud detection training class, I

 6   took an electronic payment systems risk class.  It just varies

 7   from year to year based on the individual.

 8   Q.  Were you a supervision analyst, your current position, in

 9   2014 and 2015?

10   A.  Yes.

11   Q.  I'd like to ask you some background questions about credit

12   unions, federal credit unions in particular.

13        Can you just explain to the jury what a credit union

14   is?

15   A.  So a credit union is similar to a bank.  They offer the

16   same products and services, except a credit union is a

17   member-owned, not-for-profit, they serve their field of

18   memberships.  So you have to be eligible for a credit union in

19   order to be a member.  So with them being member-owned and

20   not-for-profit, each member, regardless of how much money you

21   maintain at the credit union, you have a vote.  Every member,

22   regardless of money, has one vote.  So, for example, at the

23   annual meetings that are held every year where you elect the

24   board of directors, each person has a vote, they have the

25   opportunity to vote, have equal say.

1      Banks on the other hand, they're for-profit

2   corporations that operate to essentially please their

3   stakeholders.

4   Q.  Now, what, in general, is the purpose of a credit union?

5   Can you explain why we have credit unions?

6   A.  So we have credit unions to serve members that may be in an

7   underserved area or the unbanked.  They're essentially set up

8   to provide financial services, deposit services, loan services

9   to members that fall within their field of membership.

10  Q.  How is a credit union funded in order to provide those

11  services?

12  A.  Through member deposits.

13  Q.  I believe you've used the term "a share" before in your

14  testimony.  Can you explain what a share is?

15  A.  A share -- so, upon joining a credit union, there's a

16  minimum deposit amount, usually five dollars, $25, and that's

17  considered your share.  So that's your share in that credit

18  union.  So that's typically called your regular share.

19      You also have shared drafts, which are just like a

20  checking account at a bank.

21  Q.  How does a credit union generate revenue?

22  A.  They generate revenue through loan and investment interest

23  income primarily.  There's also other sources of income, such

24  as fee income, which may be for nonsufficient funds fees,

25  overdraft fees, credit/debit card interchange fees, ACH

 1   processing.

 2   Q.  What is ACH?  What does that stand for?

 3   A.  Sorry.  It's an acronym for automated clearinghouse.

 4   Q.  I'll ask you some more questions about that later on.

 5       Are you familiar with the term "charter" as it relates

 6   to a credit union?

 7   A.  Yes.

 8   Q.  What is a charter?

 9   A.  The charter is essentially the federal credit union's

10   license to operate as a federal credit union.

11   Q.  Are there different types of credit union charters?

12   A.  Yes.  For federal credit unions, there's three different

13   types of charters.  You have a single common bond, multiple

14   common bond, and a community charter.

15   Q.  Are you familiar with the term "low-income designated

16   credit union"?

17   A.  Yes.

18   Q.  What does that mean?

19   A.  So it's a specific designation a credit union can have if a

20   majority of their field of membership fall below a certain

21   designation for low-income.  And NCUA -- we have an office that

22   determines this.  On a periodic basis, they'll assess credit

23   unions' field of memberships and locations to see if they're

24   primarily low-income and let them know that they've been

25   approved for low-income designation.  The credit union just has

 1    to say, yes, we accept.  Or if the credit union believes

 2    they're a low-income designated credit union, but NCUA hasn't

 3    approached them yet, they can request that NCUA looks into that

 4    process for them.

 5    Q.  Now, are there any laws or regulations that govern the

 6    management and operation of credit unions?

 7    A.  Yes.

 8    Q.  Can you just briefly describe what those laws or

 9    regulations are, just generally, without going into the

10    details?

11    A.  Okay.  So there's a number of rules, and regulations, and

12    laws, primarily the Federal Credit Union Act, NCUA's rules and

13    regulations, the Bank Secrecy Act, the USA PATRIOT Act.  There

14    are certain laws and regulations enforced by the Office of

15    Foreign Asset Control, Financial Crimes Enforcement Network,

16    and there's also a variety of consumer compliance-related

17    regulations.

18    Q.  I might ask you some more specific questions about some of

19    those laws and regulations later on in your testimony.

20    A.  Okay.

21    Q.  For now, can you describe the process of forming a federal

22    credit union?

23    A.  So if a group of individuals wanted to start their own

24    credit union, there's an application process that goes through

25    NCUA's Office of Consumer Financial Protection & Access.  I

 1    think they call it a charter application.  There's also various

 2    other documents that you have to submit with this request, one

 3    of which included your proposed field of membership.  So you're

 4    going to outline what group of people, what sponsor company,

 5    what community you plan to serve.

 6    Q.  Does the NCUA have to approve the chartering of a new

 7    credit union?

 8    A.  Yes.

 9    Q.  Is it possible to either buy or sell a federal credit

10    union?

11    A.  No.

12    Q.  Why not?

13    A.  It's just impossible.  Each member of the credit union owns

14    a share.  You can't sell your shares to another individual.  No

15    individual can ever have more than one share.

16    Q.  Now, you mentioned a number of laws and regulations that

17    govern credit unions.  Do credit unions themselves have any

18    kind of internal governing rules?

19    A.  So -- can you repeat the question, please?

20    Q.  I'm sorry.  Do credit unions have any type of internal

21    governing rules?

22    A.  Yes.

23    Q.  And what are those?

24    A.  So those would be called the federal credit union bylaws.

25    Q.  What are bylaws?

1  A.  So bylaws -- upon your charter being approved by NCUA and

2  you starting your credit union, you have to adopt a set of

3  bylaws, which is your framework for how the credit union will

4  be operated, how the board of directors will be constructed,

5  outline the various meetings of the members, meetings of the

6  board, a variety of topics.

7  Q.  Are members of the board of directors required to follow

8  the rules set forth in the credit union's bylaws?

9  A.  Yes.

10  Q.  Who, generally, manages the affairs of a credit union?

11  A.  The board of directors.

12  Q.  Do you have to be a member of the credit union in order to

13  serve on the board?

14  A.  Yes.

15  Q.  Are directors elected to the board?

16  A.  Yes.

17  Q.  When does that occur, and how does that happen?

18  A.  So, members that would like to be on the board of directors

19  have to be nominated, and the actual election takes place at

20  the annual meeting, which they have just like the name

21  suggests, it has to be held every year, and that's the time

22  that any new board members would be voted as new members on the

23  board.

24  Q.  You mentioned something called being nominated.  What does

25  that mean?

H2MKLER4                         Curran - direct

1   A.   So, according to whatever -- whichever election process the

2   credit union chooses to go with, I think our standard bylaws

3   has four different voting options.  Depending on what type they

4   go with, the board chair has to appoint a nominating committee.

5   The nominating committee then goes out into the field of

6   membership, approaches people that they think might be good for

7   the board or anyone that's interested, they nominate, and then

8   it goes towards their election process.

9   Q.   Who elects the members of the board of directors of a

10  credit union?

11  A.   The members of the credit union.

12  Q.   I believe you said earlier every member gets one vote at

13  the annual meeting to elect?

14  A.   Right.  Regardless of their relations with the credit union

15  or how much money they have on deposit, each member still only

16  has one vote, and they have the opportunity to vote.

17  Q.   In order to be nominated for the election, does that person

18  have to be a member of the credit union at that time?

19  A.   Yes.  The individual would have to be a member of the

20  credit union before the ballots are distributed.

21  Q.   Now, you testified that the board of directors is generally

22  in charge of managing and overseeing a credit union, correct?

23  A.   Yes.

24  Q.   How many board members can serve on the board?

25  A.   The bylaws state that between five and fifteen members can

1   serve on the board of directors, and it must be an odd number.

2   Q.  Now, is there anything that could disqualify a person from

3   being a member of a credit union?

4   A.  Yes.  The clear one being they're not a member of the

5   credit union.  The other requirement would be that you've never

6   been convicted of a crime involving dishonesty or breach of

7   trust.

8   Q.  Are there any officer positions on the board of directors

9   of a credit union?

10  A.  Yes.

11  Q.  What are they?

12  A.  Typically, there's four officer positions.  You have the

13  chairperson, vice chairperson, the secretary, and what's called

14  either the treasurer or financial officer.

15  Q.  Are you familiar with the term "supervisory committee"?

16  A.  Yes.

17  Q.  What is that?

18  A.  So the supervisory committee is also comprised of members

19  of the credit union, and they essentially serve as the internal

20  audit.  And essentially what that means is they review credit

21  union operations like on a day-to-day basis, make sure they're

22  doing what the board of directors want them to be doing, making

23  sure their operations are in compliance with the various laws,

24  and rules, and regulations.  They're also in charge of engaging

25  the annual audit.  Federal credit unions are supposed to have

1   an annual independent audit every year.

2   Q.  Now, you mentioned some of the other officer positions on

3   the board.  Can you describe what the role of the chairperson

4   is?

5   A.  So the chairperson presides over the meetings of the

6   members and the meetings of the directors.

7   Q.  And the role of the secretary?

8   A.  So the secretary is tasked with the task of maintaining

9   minutes of every meeting of the members, meeting of the boards.

10  They're supposed to document every event that took place during

11  the meeting and maintain those minutes.

12  Q.  Are minutes just another way of saying that these are notes

13  of what occurred at the board meeting?

14  A.  Correct.  It summarizes the events of what took place

15  during that particular meeting.

16  Q.  Are board members allowed to be paid for their service on

17  the board?

18  A.  The bylaws say that one board officer can be compensated

19  for their services.

20  Q.  What about the other members of the board?

21  A.  There is also a section of the bylaws that has a blank spot

22  talking about different board directors could be compensated as

23  employees of the credit union, but the bylaws need to outline

24  how many people, and that amount of people cannot make up a

25  majority of the board of directors.

1    Q.   And are the rest of the board members supposed to be

2    volunteers?

3    A.   Yes.

4    Q.   How frequently are board meetings supposed to be held at

5    credit unions?

6    A.   On a monthly basis.

7    Q.   As a general matter, what types of things does the board do

8    at those monthly meetings?

9    A.   So, during the monthly board meetings, they'll go over the

10   current events of the credit union, what's going on or are

11   there new products or services they are going to get involved

12   in.   They'll get into the financial reports.   So they'll go

13   over the balance sheet, the income statement, the loan

14   portfolio, the loan delinquency reports, investment schedules.

15   They'll also go through any new member accounts, closed member

16   accounts, any recommended charge-offs from the loan portfolio

17   that need to be approved by the board that.   A variety of

18   topics.

19   Q.   I believe you testified that everything that happens at the

20   board meeting is supposed to be recorded in the minutes; is

21   that right?

22   A.   Correct.

23   Q.   Do credit unions submit their board meeting minutes to the

24   NCUA?

25   A.   Not typically.

1   Q.  Are there any circumstances under which the NCUA would

2   review the meetings of the board of a particular credit union?

3   A.  So, as part of our examination process, when examiners

4   actually go on-site to perform their exam or supervision

5   contact, they will look at the board minutes dating back to the

6   last time an NCUA employee was on-site.

7   Q.  Are there any requirements regarding the completeness and

8   accuracy of board meeting minutes?

9   A.  Yes.  It's required by law that anything contained in the

10  board minutes is accurate.

11  Q.  Why does that matter to the NCUA?

12  A.  Well, like I said, it's required by law.  Number two, we

13  can't do our job effectively in insuring member deposits if we

14  can't rely on the information that we're being provided by

15  credit unions.

16  Q.  Are there any rules or regulations that govern the conduct

17  of board members of a credit union?

18  A.  Sorry, can you repeat the question?

19  Q.  Sure.

20          Are there any rules or regulations that govern the

21  conduct of members of the board of directors of a credit union?

22  A.  Yes.

23  Q.  Where are those rules and regulations generally set forth?

24  A.  In the NCUA rules and regulations.

25  Q.  Are you familiar with the term "fiduciary duty"?

1   A.  Yes.

2   Q.  What is a fiduciary duty, generally?

3   A.  So --

4           MS. SANTILLO:  Objection.  702.

5           THE COURT:  Overruled.

6           You may answer.

7           THE WITNESS:  Okay.

8           A fiduciary duty?  The directors on the board have a

9   fiduciary duty or a responsibility to act in the best interests

10  of the members of the credit union.

11  Q.  Do board members of a credit union have fiduciary duties?

12  A.  Yes.

13  Q.  Does a chairman of the board have the same duties and

14  responsibilities as the other members of the board of

15  directors?

16  A.  Yes.

17          MR. NOBLE:  Your Honor, at this time I believe the

18  parties would request that the Court instruct the jury

19  concerning certain legal matters.

20          THE COURT:  Without objection, counsel?

21          MS. SANTILLO:  No, your Honor.

22          MR. CREIZMAN:  No.

23          THE COURT:  Okay.  Thank you.

24          Members of the jury, I'll now instruct you on certain

25  provisions of the Federal Credit Union Act and National Credit

1    Union Administration Regulations.

2          I instruct you that a violation of any of these laws

3    or regulations is not a crime in and of itself.  In other

4    words, the defendants are not charged with criminal violations

5    of the Federal Credit Union Act or the National Credit Union

6    Administration Regulations, and you can't find either defendant

7    guilty based solely upon a violation of the Federal Credit

8    Union Act or the National Credit Union Administration

9    Regulations or -- let me say that again.  And I'm going to

10   abbreviate National Credit Union Administration as NCUA.  I'll

11   just read that sentence again.

12         In other words, the defendants are not charged with

13   criminal violations of the Federal Credit Union Act or NCUA

14   regulations, and you cannot find either defendant guilty based

15   solely upon a violation of the Federal Credit Union Act or an

16   NCUA regulation.  If you hear evidence about any violations of

17   the Federal Credit Union Act or NCUA regulations, you may

18   consider it as you would any other evidence in the case.

19         Field of membership:  Under the act, the membership of

20   a federal credit union is limited to those persons and

21   organizations that fall within the credit union's field of

22   membership.  For community-chartered credit unions, the field

23   of membership is limited to persons and organizations within a

24   well-defined local community, neighborhood, or rural district.

25         The field of membership for the Helping Other People

1   Excel Credit Union was:  (1) persons who live, work, worship or

2   attend school in, and other businesses, and other legal

3   entities in Lakewood, New Jersey; (2) spouses of persons who

4   died while in the field of membership of this credit union,

5   volunteers in the community, employees of the credit union, and

6   organizations of such persons.

7           There are no additional National Credit Union

8   Administration rules or regulations discussing the field of

9   membership as it relates to business or legal entities.

10          Board of directors:  The management of a federal

11  credit union shall be by a board of directors and a supervisory

12  committee.  The board of directors is responsible for the

13  general direction and control of the affairs of the credit

14  union.  The board of directors must consist of an odd number of

15  directors and must have at least five members.  The directors

16  are to be elected at an annual meeting of the members of the

17  credit union.  Only members of a credit union are eligible to

18  serve on the board of directors.  The board of directors of the

19  credit union must meet at least once per month.  Minutes of all

20  board meetings must be kept.  At the first meeting after the

21  annual meeting of the members, the members of the board must

22  elect the board officers.

23          No member of the board or of any other committee

24  shall, as such, be compensated except that the reimbursement of

25  reasonable expenses incurred in the execution of the duties of

 1    the position is not considered compensation.  Only one board

 2    officer may be compensated as an officer of the board.  All

 3    other board members must be volunteers.

 4              Under the act and NCUA regulation, each director has

 5    the following duties:  First, to carry out his or her duties as

 6    a director in good faith in a manner such director reasonably

 7    believes to be in the best interests of the membership of the

 8    credit union as a whole and with the care, including reasonable

 9    inquiry, as an ordinarily prudent person in a like position

10    would use under similar circumstances;

11              Second, to administer the affairs of the credit union

12    fairly and impartially and without discrimination in favor of

13    or against any particular member;

14              Third, at the time of the election or appointment, or

15    within a reasonable time thereafter, not to exceed six months,

16    have at least a working familiarity with the basic finance and

17    accounting practices;

18              And, fourth, direct management's operations of the

19    credit union in conformity with the requirements set forth in

20    the Federal Credit Union Act, NCUA regulations, and other

21    applicable law and sound business practices.

22              In carrying out its duties and responsibilities, the

23    board of directors and its committees have authority to retain

24    staff and outside counsel, independent accountants, financial

25    advisors, and other outside consultants at the expense of the

1    credit union.

2           The last instruction here reports to the NCUA.  Every

3    federal credit union is required to submit periodic reports

4    concerning the credit union's financial condition and profile

5    to the NCUA.  Each report must include a declaration by an

6    officer designated by the board of directors that the report is

7    true and correct to the best of the officer's knowledge and

8    belief.  Each credit union is required to maintain records that

9    will readily permit the NCUA to verify the correctness of the

10   credit union's reports of conditions and certified statements.

11          MR. NOBLE:  Thank you, Judge.

12   BY MR. NOBLE:

13   Q.  Mr. Curry, I'd like to now discuss or ask you some

14   questions about services provided by credit unions.

15          What types of services do credit unions generally

16   provide?

17   A.  So, deposit and loan services.  So that would be checking

18   accounts, certificates of deposit, money markets, debit card,

19   credit card, consumer loans, real estate loans, ACH processing,

20   wire transfers.

21   Q.  Does the board of directors have any role in overseeing the

22   various services that are provided by credit unions?

23   A.  Yes.  They have the ultimate responsibility to make sure

24   appropriate procedures and policies are in operation governing

25   each type of service or product they offer.

1  Q.  What role, if any, does the board play in reviewing new

2  member accounts?

3  A.  As I mentioned earlier, that would be required to be

4  reviewed during their monthly board meetings.  So, like I had

5  mentioned earlier, the board meetings should cover new members,

6  closed member accounts, and so during their board meeting they

7  have, that happens every month.  They would review new members

8  to the credit union.

9  Q.  Does the board's role in reviewing member applications vary

10 depending on whether the application is for a person or for a

11 business?

12 A.  No.

13 Q.  When the NCUA conducts an examination of a credit union,

14 are new member accounts one of the things that the NCUA looks

15 at?

16 A.  Yes.

17 Q.  Why does the NCUA do that?

18 A.  Well, it's twofold.  We do it to make sure that they fall

19 within the field of membership.  We also do it because the Bank

20 Secrecy Act outlines various customer identification

21 requirements that all financial institutions are supposed to go

22 through when they open a new account.

23 Q.  Can you describe some of the things that financial

24 institutions are supposed to do under the Bank Secrecy Act with

25 respect to new accounts?

H2MKLEB4                            Curran - direct

A.  So they're supposed to develop a customer identification

program, and they're supposed to form a -- I mean they're

supposed to put out steps to verify the identity of the member.

Like they can determine that the member is who they say they

are, and they have to verify different forms of identification,

obtain a physical address, et cetera.

Q.  Are there any particular or additional requirements for

certain types of businesses that open accounts at a credit

union?

A.  Well, just like an individual, you need to make sure that

business is within the field of membership.  Depending on the

nature of the business, what transactions they want to perform

at your credit union, you may be required to perform enhanced

due diligence on them.

Q.  What does "enhanced due diligence" mean?

A.  It just means -- like I said, again, depending on the

nature of the business, you may need to take additional steps

to see exactly what type of businesses they conduct business

with, what industry are they in, what are they going to be

using your credit union for.

Q.  Again, why does the NCUA care that a credit union does

those things?

A.  Because, ultimately, NCUA, we protect the members of a

credit union and our National Credit Union Share Insurance

Fund, so we want to make sure the credit union knows who

 1   they're conducting business with, making sure that they're

 2   complying with any federal law and regulation, and they're

 3   operating in a safe and sound manner.

 4   Q.  Now, you used the term "safe and sound manner."  Is that a

 5   term of art that the NCUA uses?

 6   A.  Yes.

 7   Q.  Can you just generally describe what that means?

 8   A.  So, to operate safe and sound is to have a strong

 9   understanding of what action you're getting involved in, making

10   sure it's in the best interests of the membership in the credit

11   union, making sure it complies with any applicable law and

12   regulation.

13   Q.  Now, you mentioned that another service that credit unions

14   can offer their members is processing ACH transactions; is that

15   right?

16   A.  Yes.

17   Q.  Can you give the jury just some examples of what ACH

18   transactions are?

19   A.  So a couple of the obvious examples would be direct

20   deposit.  So if your employer pays you via direct deposit,

21   that's an ACH transaction.  If you've set up Bill Pay to pay

22   various merchants and vendors, that is also an ACH transaction.

23   Q.  Are there any rules that credit unions must follow in

24   conducting ACH processing for its members?

25   A.  Yes.

1   Q.   What rules are those?

2   A.   So the National Automated Clearinghouse Association, or

3   NACHA, they've established various operating rules that

4   financial institutions must adhere to.

5   Q.   When the NCUA conducts an examination of a credit union, is

6   the credit union's ACH processing one of the things that you

7   look at?

8   A.   Yes, typically.

9   Q.   Why do you do that?

10  A.   To make sure that they have -- that the board of directors

11  have established the appropriate procedures and controls to

12  conduct this business in a safe and sound manner.

13  Q.   Are there any applicable laws or regulations that you check

14  the credit union's compliance with when you conduct an

15  examination, generally?

16  A.   Yes.

17  Q.   What are some of those laws and regulations?

18  A.   Well, the Bank Secrecy Act, the laws and regulations put

19  forth by the Office of Foreign Asset Control, Financial Crimes

20  Enforcement Network.

21  Q.   Let me stop you there.  You've mentioned this a couple of

22  times now, the Office of Foreign Asset Control.  Is that also

23  known as OFAC?

24  A.   Yes.

25  Q.   Can you just explain to the jury what OFAC is as it relates

1    to ACH processing in a credit union?

2    A.   Okay.  So OFAC, they maintain a list of specially

3    designated nationals and block parties as a point of furthering

4    our U.S. foreign policy and national security.  So they

5    maintain this list of these individuals, and credit unions, at

6    the time they open an account, they're supposed to scrub this

7    list to make sure this individual, or business, or organization

8    that's trying to open an account is not on the list.

9          As far as the transactions go, such as ACH

10   transactions, they need to have appropriate programs or

11   software packages in place to make sure the transactions that

12   are flowing through the credit union aren't for parties that

13   would be maintained on this list.

14   Q.   What, if any, responsibility does the board of directors

15   have in overseeing the processing of ACH transactions at a

16   credit union?

17   A.   Well, they have the ultimate responsibility to ensure the

18   procedures and the program they have in place is commensurate

19   with the level of ACH activity they're performing.

20   Q.   Do -- the board of directors, are they responsible for

21   adopting the policies and procedures for ACH processing that

22   you've been talking about?

23   A.   Yes.

24   Q.   Now, you've testified about something called the National

25   Credit Union Share Insurance Fund; is that right?

1   A.  Yes.

2   Q.  I believe you said that that's one of the responsibilities

3   of the NCUA, is to protect that fund; is that right?

4   A.  Yes.

5   Q.  Can you just explain, in a little more detail, what the

6   share insurance fund is, and does it have any kind of

7   equivalent in the banking sector?

8   A.  So the National Credit Union Share Insurance Fund is

9   essentially the same thing as the Federal Deposit Insurance

10  Corporation, or the FDIC, that you hear talked about all the

11  time in association with banks.  So, we insure member deposits,

12  just like the FDIC, up to $250,000.

13          So, our main role at NCUA is to protect both the

14  members of credit unions and to protect the National Credit

15  Union Share Insurance Fund.  So, in doing so, we have to carry

16  out our exam and supervision process, and in the event a credit

17  union fails for any reason, we make the members of that credit

18  union whole, so that they don't lose any of their deposits that

19  they had on file at the credit union.

20  Q.  Now, you've talked several times about examination, you've

21  used the term examination.  Can you explain to the jury what an

22  NCUA examination entails, generally?

23  A.  Yes.  So, typically, on a 12- to 18-month basis -- it

24  changes from time to time -- an NCUA examiner will go on-site

25  and conduct what we call an examination of a credit union.  So,

1    as part of the examination, we have a series of required and

2    recommended review steps that examiners will go through to make

3    sure the credit union is operating within all the applicable

4    laws and regulations, review board minutes, loan portfolios,

5    investment portfolios, review their annual audit, member

6    account verification, a number of areas.

7    Q.   How does the NCUA obtain the information that it uses to

8    conduct the examination?

9    A.   So we use the data that credit unions submit on a quarterly

10   basis, and we also use the files and records that are provided

11   to NCUA examiners while on-site at the credit union.

12   Q.   Are credit unions required to provide that information to

13   the NCUA?

14   A.   Yes.

15   Q.   You mentioned that there are periodic financial reports

16   that credit unions submit to the NCUA?

17   A.   Yes.

18   Q.   What are those called?

19   A.   They're called 5300 Call Reports and credit union online

20   profiles.

21   Q.   Starting with the call report, can you just describe,

22   generally, what information is included in this?

23   A.   The 5300 Call Report will include all of the financial data

24   for the federal credit union.  So, it will include the balance

25   sheet information, income statement, loan portfolio

1    information, investments, et cetera.

2    Q.  Are you familiar with the term "net worth ratio"?

3    A.  Yes.

4    Q.  Can you describe what that means in relation to credit

5    unions?

6    A.  So, the net worth ratio is the capital that a credit union

7    has accrued over its existence.  So the net income that you

8    would generate from your operations flows right into your net

9    worth figure, and so the net worth ratio would be your amount

10   of net worth, or capital, in relation to your total asset size.

11   Q.  Are there certain percentages of net worth ratio that

12   credit unions are expected to maintain?

13   A.  Correct.  We would expect you to maintain a net worth ratio

14   of at least 7 percent.

15   Q.  Now, how, if at all, does a net worth ratio relate to, say,

16   ACH processing at a credit union?  Is there any relation?

17   A.  There's some relation as far as judging the safety and

18   soundness of a particular program.  If you had a very low net

19   worth ratio, we would not expect it to be a safe and sound

20   decision to move into a new program that may include a number

21   of risks that you are not familiar with.

22   Q.  Can ACH processing, the financial flow of money involved in

23   ACH processing, affect a credit union's net worth ratio, and,

24   if so, how?

25   A.  It could if there were any unauthorized ACH transactions

1   flowing through your credit union.  I'm not that familiar on

2   the specific deadlines for each type of transaction, but it's

3   typically 30 to 60 days.  Consumers or businesses have that

4   30-to-60 day time frame to dispute any unauthorized ACH

5   transactions.

6   Q.  How would particular members depositing of a large amount

7   of money in a credit union affect a credit union's net worth

8   ratio?

9   A.  So, if a number of members, let's say, deposited a large

10  amount of money into the credit union on -- like today, for

11  example, the net worth ratio would drop significantly because

12  the denominator, which is the asset size, will have expanded,

13  but the capital, or the net worth, which is the numerator,

14  would have stayed the same, so the ratio would have dropped.

15  Q.  Is the net worth ratio data typically reported in these

16  5300 Call Reports that you have been testifying about?

17  A.  Yes.

18  Q.  I'd like to ask you about the other type of report that you

19  mentioned credit unions are required to file.  Can you remind

20  the jury what that is?

21  A.  It's called a credit union online profile.

22  Q.  And what information do profiles typically contain?

23  A.  Essentially it's a snapshot of a particular credit union.

24  So it'll tell you where they're headquartered, what branch

25  offices they have, who's on their board of directors, who's

1    part of the senior management team, what products and services

2    they offer, a variety of information.

3    Q.  Are there any requirements about the truthfulness and

4    accuracy of the information that credit unions provide to the

5    NCUA in those reports?

6    A.  Yes.  The information is supposed to be accurate.

7    Q.  Why is that?

8    A.  It's required by law in the Federal Credit Union Act.

9    Q.  Are you familiar with the term "CAMEL rating," C-A-M-E-L?

10   A.  Yes.

11   Q.  What is CAMEL?

12   A.  CAMEL is an acronym.  It stands for capital adequacy, asset

13   quality, management, earnings, and asset liability management,

14   and it's an internal rating that NCUA and other financial

15   regulators use to measure the risk and allocate resources for

16   supervision efforts.

17   Q.  Can you explain to the jury how a variation in the CAMEL

18   rating, how that equates to how risky or less risky a credit

19   union is?

20   A.  So, each -- the five components I outlined in CAMEL, they

21   each receive a rating of one to five, one being strong, five

22   being weak, and then there's a deposit, and it's the same

23   scale, one being great, five being weak.  So, a CAMEL 1 credit

24   union would have minimal, minimal risk, or if they do have any

25   risk, it's well managed, there's not a lot of risk on their

1    balance sheet or in their operations.  And, adversely, a

2    CAMEL 5 would have a large amount of risk, it's uncontrolled,

3    requires constant supervision by NCUA.

4    Q.  Can you describe what steps an examiner can take if he or

5    she detects problems or issues at a credit union during an

6    examination?

7    A.  So it will depend on the severity of the issue or the

8    materiality of the risk that was observed during the exam.

9    Typically, though, we like to work with management, draft it in

10   an examiner's findings, which is very informal.  Typically, you

11   want to work with credit union management in developing time

12   frames for that, so you come up -- you'd have your issue, you'd

13   draft it, throw out a date, say you think you can have this

14   resolved in the next six months.  You try to negotiate a time

15   frame for completing this.

16          If it's a more severe issue, we would go the route of

17   a document resolution corrective action item, which outlines

18   the finding, outlines the corrective action, the requirement

19   that we were placing on the credit union management, and it

20   will include a deadline that we expect to see that issue

21   resolved in.

22   Q.  Is the document of resolution sometimes referred to as a

23   DOR?

24   A.  Yes.  Or a DOR.

25   Q.  A DOR?

1     What happens if the credit union doesn't resolve the

2   issue after the DOR is issued?

3   A.  Again, depending on the severity, if it's not overly

4   material, we may reissue it as a repeat DOR item.  But if it's

5   a material issue that we wanted to see resolved within a short

6   amount of time, and it goes unresolved or ignored, then we

7   would upgrade our administrative action to what's called a

8   letter of understanding and agreement.

9   Q.  Is that sometimes referred to as an LUA?

10  A.  Yes.

11  Q.  Can you just describe what an LUA is?

12  A.  It's a more formal approach at resolving the corrective

13  action that we required to be resolved.  So it will include a

14  lot of the same language that's included in the DOR, except the

15  credit union officials are required to sign it, agreeing

16  that -- essentially signing an agreement that they will agree

17  to resolve these issues contained within, and then the NCUA

18  examiner, supervisor, and regional director also sign this

19  document.

20  Q.  What happens if the problem continues and is not addressed

21  after the LUA is issued and signed by the board?

22  A.  We explore other options, which the next option in line

23  would be what's called a preliminary warning letter, and it's

24  exactly like what it sounds like.  It's warning that if -- it's

25  warning credit union officials that if they don't take actions

1   to resolve the issues immediately, we have additional

2   enforcement actions that we can take, if necessary.

3   Q.  And what are some of those other additional more formal

4   enforcement actions the NCUA can take?

5   A.  It would be a cease and desist, conservatorship, civil

6   money penalties, et cetera.

7   Q.  You mentioned something called "conservatorship."  What is

8   that?

9   A.  A conservatorship is essentially a last line of defense on

10  NCUA's part where the issues are so bad, and they're not being

11  resolved, there's ineffective management, the NCUA comes in and

12  essentially takes control of the credit union in the best

13  interests of the members.  So they'll come in, box up the

14  files, restrict access from current credit union officials to

15  any kind of online bank accounts, third-party vendor sites, and

16  essentially change the access from credit union officials to

17  NCUA.

18  Q.  Is it fair to say that in a conservatorship, the NCUA takes

19  over the credit union and tries to run it?

20  A.  Yes.

21  Q.  What are some of the options that can happen after a credit

22  union is placed into conservatorship?

23  A.  It can perform a purchase and assumption agreement.

24  Q.  In layman's terms, what does that mean?

25  A.  That means you're working with another credit union in an

1    attempt to continue the services for the current credit union

2    members.  We want to do -- make every effort we can to continue

3    that service.  So we want to find a credit union in the general

4    locality that is able to take them in, and they'll essentially

5    purchase any loans, if they want, assume any of the liabilities

6    or shares in this instance.

7    Q.  What happens if you can't essentially merge that credit

8    union with another credit union?

9    A.  So like I mentioned, we want to go forward with the

10   purchase and assumption agreement, if possible, but, if not,

11   and the credit union ultimately becomes insolvent, we would

12   have to approach an involuntary liquidation.

13   Q.  What does "insolvent" mean?

14   A.  Insolvent essentially means the credit union can no longer

15   pay their debts.  So the amount of liabilities that they owe

16   and the amount of shares that they have on their balance sheet

17   exceed the value of the assets they hold.

18   Q.  And what happens in a liquidation?

19   A.  So, in a liquidation, we essentially -- our asset

20   management and assistance control center located in Austin,

21   Texas, will try to sell the assets.  If they can't work with

22   another credit union in selling these assets or having them

23   take on the shares, we'll pay out the shares to the amount

24   that's on record.  We'll also work with the borrowers in

25   accepting payments on behalf of the credit union, et cetera.

1   Q.  If a credit union, in liquidation, doesn't have enough

2   assets to cover its members' deposits, what happens in that

3   scenario?

4   A.  So, that would essentially come down to a liquidation loss,

5   which would be a hit to the National Credit Union Share

6   Insurance Fund.  So we would have to pay out the difference in

7   order to make -- to pay off any outstanding third-party

8   contracts or member share deposits.

9   Q.  So, essentially, it would make the members whole by paying

10  them through the insurance fund?

11  A.  Yes.

12  Q.  Up to $250,000, I believe you said?

13  A.  Yes.  It also depends on how their specific accounts are

14  structured.

15          MR. NOBLE:  Judge, I'm about to transition to a next

16  segment of my direct.

17          THE COURT:  All right.  Thank you.

18          Members of the jury, we'll take our lunch break now.

19  It's 12:55.  Please be back in the jury room ready to go by

20  1:55, so we can start right then.  Thank you so much.  Enjoy

21  your lunch.

22          (Luncheon recess)

23

24

25

1    (Continued on next page)

2    (Jury not present)

3    THE COURT:  Matters to take up?

4    MR. NOBLE:  Judge, may the witness be excused?

5    THE COURT:  Yes.  You may step down.

6    (Witness temporarily excused)

7    THE COURT:  Is there a matter to take up?

8    MR. NOBLE:  Not from the government.

9    MS. SANTILLO:  Not right now, your Honor.

10   THE COURT:  All right.

11   Anyone anticipate a discussion before we return?

12   MS. SANTILLO:  Your Honor, one issue that I'd like to

13   sort of discuss with the government a little bit more is, we've

14   had extensive in limine practice about the conservatorship and

15   the liquidation in this case, including the fact that the

16   actual findings of the NCUA couldn't come into evidence because

17   they were highly prejudicial, and they were also hearsay.  So I

18   want to make sure that we maintain that line.  We just kind of

19   did an overview of that process, but I just want to get some

20   more clarity from the government about where they plan to go

21   with that, and so we may have an issue that relates to that.

22   But I don't know, because as we talked yesterday, we

23   kind of agreed that we were going to steer clear of that, but I

24   just don't know how much more we're going to revisit that

25   topic.

1    MR. NOBLE:  I made a factual proffer to counsel as to

2    the relevance of the fact that HOPE FCU was placed into

3    conservatorship.  I don't intend to elicit the reasons why the

4    NCUA did so.  I expect he will just testify that the

5    conservatorship occurred, he participated in it, the NCUA ran

6    the credit union for about a month, and then they liquidated

7    it, and that's it.  I'm not going to get into the loss, I'm not

8    going to get into the underlying reasons for the

9    conservatorship that were set forth in that confidential

10   statement that we tried to get into.

11       I would say, however, if -- on cross-examination, if

12   defense opens the door to questioning why the NCUA took certain

13   steps that it did, particularly with respect to conservatorship

14   or liquidation, it could be fair game for the government on

15   redirect to ask this witness some questions based upon his

16   knowledge for why the NCUA took the regulatory -- the

17   enforcement actions that it did.

18       THE COURT:  All right.  So why don't you take

19   Ms. Santillo's suggestion, just discuss a little bit further to

20   see if anyone has uncertainty about the basic lines.  And I

21   appreciate hearing this, so I can get my head fresh in my

22   in limine ruling and have that line in mind as well.

23       So enjoy your lunch.  Why don't we plan to be back 15

24   minutes before the jury.  Thank you.

25       MR. NOBLE:  Thank you, Judge.  (Luncheon recess)

1                             AFTERNOON SESSION

2                             1:51 p.m.

3              (In open court; jury not present)

4              THE COURT:  Matters to take up?

5              MS. SANTILLO:  Yes, your Honor.  We did discuss and we

6  kind of know what the primary issues are, and I think it comes

7  down to a couple of things.  One thing that we were hoping to

8  do is to get clarity on one of your --

9              THE COURT:  I can only partially hear you.

10             MS. SANTILLO:  I'm sorry.  One thing we were hoping to

11  do was get some clarity on one of your prior in limine rulings.

12  The government had moved in limine to try to introduce evidence

13  related to email accounts and the subpoena response for

14  Mr. Gross.  We understood your ruling to be that the government

15  was precluded from asking Mr. Gross questions about his

16  subpoena response and the adequacy of that.  I think both the

17  government and I have an open question about whether it would

18  be permissible to talk about when passwords were turned over to

19  the NCUA, the fact that the Collectables Club accounts, which

20  had been closed in December, 2014, the fact that those

21  passwords were not turned over to the NCUA somehow creates some

22  inference that he was trying to hide something, and that's what

23  the government would want to prove, I think, and that's what

24  they set forth in their motion.

25              Is that correct?  I don't want to mischaracterize your

 1    motion.

 2            MR. NOBLE:  No, that's correct.  To orient your Honor,

 3    this was in the context of the conservatorship when the NCUA

 4    took over the credit union and asked Trevon Gross to provide

 5    access to all the email accounts.  He turned over a portion of

 6    them but did not turn over the email accounts relating to the

 7    Collectables Club members to the NCUA.  And that's the portion

 8    of the evidence that the government believes, according to your

 9    Honor's ruling, is still admissible, as opposed to whether or

10    not the subpoena -- the grand jury subpoena return produced by

11    the credit union was complete, which your Honor has ruled we

12    cannot put in in our case in chief unless they open the door.

13            THE COURT:  I'm going to have my clerk pull up the

14    transcript while you're talking.

15            MS. SANTILLO:  We don't think any of it is relevant

16    because this all happened in October, 2015.  Nobody asked him

17    for the passwords of the Collectables Club.  Those email

18    accounts had been closed a year before and there was no follow

19    up until the trial started.

20            MR. NOBLE:  But your Honor, I believe that this issue

21    has been settled.  I'm looking at the February 14, 2017

22    transcript.  It's at page 277 or 276.

23            THE COURT:  I'm waiting.  It's at what page?

24            MR. NOBLE:  This is in the middle of Ms. Choi's

25    explanation of the --

1          THE COURT:  What page?

2          MR. NOBLE:  276.

3          THE COURT:  So what did you want to point me to?

4          MR. NOBLE:  Your Honor, Ms. Choi had been arguing that

5    there's a distinction between the response to the grand jury

6    served on the credit union and Trevon Gross' failure to turn

7    over all of the email accounts associated with the HOPE FCU

8    domain name when he was requested to do so by the NCUA during

9    the time of the conservatorship.

10          THE COURT:  So a distinction between the grand jury

11   subpoena and --

12          MR. NOBLE:  Yes.  There were different points in time.

13   The failure to turn over the email accounts occurred in

14   October, 2015 --

15          THE COURT:  Right.

16          MR. NOBLE:  -- during the conservatorship, and I think

17   that your Honor had ruled, and Mr. Klingeman said that -- and

18   this is on page 277, line 11 -- "As I indicated last night,

19   intimately involved.  But be that as it may, all I'm saying is

20   our attempt to defend against and rebut the allegations

21   concerning Mr. Gross' response to the NCUA does not open the

22   door to the government introducing evidence about his response

23   to the grand jury.  That's solely my point.  We're going to go

24   mindful of the door.  We're going to stay away from the door,"

25   et cetera.

1      And there, I think Mr. Klingeman recognizes a

2  distinction being drawn between the evidence concerning the

3  grand jury subpoena response and the issue of failing to turn

4  over all the email accounts to the NCUA when requested to do

5  so.

6      And the email is clear -- we can bring up the email --

7  but the NCUA clearly requested all email accounts associated

8  with the domain name.  We have other evidence that will show

9  the Collectables Club email accounts were still in existence at

10  the time, and to this day, the subpoena return from the

11  internet service provider shows that there's data in those

12  accounts, and Trevon Gross failed to turn over those email

13  accounts belonging to the Collectables Club members to the

14  NCUA, and we believe it's a fair inference from there that he's

15  trying to hide something, he was trying to hide his

16  relationship with the Collectables Club, the fact that they had

17  email accounts, and that's the evidence that we intend to seek

18  to admit.

19      And the reason why that's relevant to this

20  conversation today is because we intend to ask Mr. Curry about

21  his involvement with the conservatorship, the fact that the

22  conservatorship occurred, what that meant, ie., that the NCUA

23  took over control of the credit union, its books, its records,

24  its accounts, and that's it.  I just want to be able to elicit

25  that background fact because that's necessary to understand the

1    context in which the NCUA was requesting control of the credit

2    union's email accounts.

3         I have other relevant proffers as well, but I think

4    that's sufficient as to why we should be able to elicit the

5    mere fact that HOPE FCU was placed into conservatorship without

6    going into, as your Honor has ruled, the underlying reasons why

7    the NCUA did so.  I don't intend to elicit that from Mr. Curry

8    or from any other NCUA witness unless, as I said before, the

9    door is opened by the defense.

10        MS. SANTILLO:  I want to go back to the initial

11   ruling, because the reason that we had argued that none of this

12   email stuff should come in at all is because all of this took

13   place in October, 2015.  There were no followup requests for

14   information.  This is something that the government didn't

15   raise until the eve of trial, and we think that that's belated

16   404 evidence.

17        THE COURT:  But what was raised at the eve of trial

18   was related to the return of the grand jury subpoena.

19        MS. SANTILLO:  It was both.  It was both.  They put it

20   in the same email -- or the same motion in limine that they

21   wanted to introduce both of these pieces of evidence against

22   Mr. Gross.

23        MR. NOBLE:  Judge, we had this evidence.  I don't

24   think that we had any obligation to move on it in limine.  And

25   moreover, this was in response to the belated motion by defense

1    counsel for the spoliation instruction that it was the

2    government's fault that these email accounts were not

3    preserved, or not properly turned over to the defense.  And so

4    the reason why this came up is because of the defense's motion,

5    and we responded.  And therefore, to make it completely

6    explicit, we moved in limine in accordance with the deadlines

7    set by your Honor to make it clear that we intended to put in

8    both the grand jury subpoena response evidence, which your

9    Honor has ruled could not come in, and this failure to turn

10   over all the email accounts to the NCUA.

11            And your Honor, this is not 404(b) evidence for which

12   we have to give notice, it's direct evidence of corrupt intent

13   on the part of Mr. Gross because it's part of the coverup.

14   That's direct evidence.  We've cited the cases earlier in our

15   motion in limine as to why evidence of a defendant's

16   participation in a coverup is probative of his intent with

17   respect to the bribery offenses.

18            MS. SANTILLO:  Your Honor, these people were shut off

19   from these accounts in December, 2014, as the evidence we

20   discussed yesterday showed, and so the question was, the NCUA

21   asked, give us the passwords of the accounts, and all the other

22   accounts that were actually active accounts were turned over.

23            So this is a very minor issue that has not -- he was

24   never asked for any follow up.  He had already resigned from

25   his role in the credit union by that point.

1    And the conservatorship is so deeply linked to the

2    issues in the criminal case that there's just tremendous

3    prejudice and sort of sifting through the difference between

4    what the conservatorship meant in terms of the finances of the

5    credit union versus the criminal case that we're litigating

6    right now.

7         MR. NOBLE:  Well, Judge, just to respond briefly to

8    that point, or the previous point.  Whether or not this was

9    part of a coverup for Mr. Gross to -- you know, failure to turn

10   over all the email accounts is a factual matter that can be

11   argued to the jury.  This is about -- like it goes to weight,

12   it doesn't go to the admissibility of this evidence.  Defense

13   counsel can argue, as she just did, to the jury that he didn't

14   really mean anything, it was just a misunderstanding, it wasn't

15   corrupt intent.  That's all argument for the jury.  But the

16   government should still be permitted to introduce this evidence

17   and make the counterarguments to the jury.

18        THE COURT:  Just a moment.  I'm going to read back a

19   few more of the transcript.

20        (Pause)

21        THE COURT:  I think there's somewhat of a problem with

22   the transcript that it's difficult, at least on the screen, for

23   me to work through.

24        My preliminary ruling, which then led into a

25   discussion that bifurcated the grand jury subpoena from the

1    emails turned over to NCUA, my preliminary ruling had been to

2    both, and then the biforcation happened at the question of door

3    opening, as I read the transcript.

4            So with that background in mind as what I ruled to, I

5    do think that what you're suggesting, Mr. Noble, falls within

6    my ruling excluding it.

7            MR. NOBLE:  To be clear, the Court is excluding the

8    evidence of the failure to turn over all the email accounts as

9    requested by the NCUA to Mr. Gross?

10           THE COURT:  For the same chain of custody confusion

11   and prejudice issues articulated at the conference.

12           MR. NOBLE:  Would your Honor entertain a written

13   motion for reconsideration on that point?

14           THE COURT:  I'd be happy to take that in light of what

15   is a little bit of a jumble --

16           MR. NOBLE:  A murky -- right.  I'm not sure that that

17   issue was fully fleshed out at the prior conference, and there

18   does appear -- despite your Honor saying there was clarity, I

19   think there is some lack of clarity in the record, so we would

20   appreciate the opportunity to at least set forth why we think

21   this is different.

22           THE COURT:  That's fine.  Obviously, not to get into

23   today, but --

24           MR. NOBLE:  Of course not.  Right.

25           THE COURT:  That's fine.

1          MR. NOBLE:  I could proffer other reasons if your

2    Honor maintains that ruling as to why conservatorship -- the

3    fact of conservatorship is still necessary.  Largely, it's

4    necessary background evidence to explain some of the subsequent

5    testimony from other NCUA officials who were involved -- also

6    involved in the examination and conservatorship.

7          For instance, Terry Adam, who is one of the examiners,

8    he was the supervisor examiner for the credit union in 2015,

9    will be testifying about various things, including his

10   involvement in the conservatorship, and during which time he

11   had communications with Mark Francis regarding efforts by

12   Kapcharge to find out what was going on with HOPE Federal

13   Credit Union, whether there was anything they could do to

14   assist the credit union and whether the NCUA would permit

15   Kapcharge to continue to process ACH transactions through the

16   credit union.  And that would come in in the background with

17   the background evidence that Kapcharge was providing additional

18   funding to the credit union, as we talked about before, paying

19   for the salary for Charles Blue, the CEO, so that he could be

20   the one at the credit union trying to convince the NCUA to

21   allow the credit union to process the ACH transactions for

22   Kapcharge.  They also funded $30,000 worth of legal fees that

23   the credit union was incurring because of their insistence on

24   trying to process the ACH transactions.  So Terry Adam will be

25   testifying that he took control of these email accounts, he had

1    control of the credit union's email accounts, and during that

2    time he had correspondence, they received correspondence, found

3    correspondence with Kapcharge about these issues.  They

4    discovered the emails about the legal fee payments, and they

5    also had phone conversations with Mark Francis where he's

6    explaining and trying to convince the NCUA to do whatever they

7    can to continue to process the ACH transactions through the

8    credit union, notwithstanding the fact that it been conserved.

9    I think that that's relevant evidence of the ongoing

10   conspiracy, it's statements of a coconspirator in furtherance

11   of the conspiracy to continue to try to convince the NCUA that

12   everything that they were doing at the credit union, that is

13   Kapcharge was doing at the credit union, was on the up and up,

14   and basically trying to lead the NCUA astray as to, you know,

15   that nothing nefarious was going on.  So it's necessary to

16   explain --

17          THE COURT:  And just redefine the "it's" so that we

18   have clarity.

19          MR. NOBLE:  The fact that the NCUA had placed the

20   credit union in conservatorship is necessary.

21          THE COURT:  That's all that's in the bucket?

22          MR. NOBLE:  Yes.  Just the fact of conservatorship.

23          THE COURT:  Because of the lack of clarity we're

24   wading through, I think it's important to pause and not use

25   pronouns frequently, but make sure we're on the same page.

1      MR. NOBLE:  Sorry.

2      THE COURT:  So the government's specific application

3  is to elicit the fact of HOPE FCU being placed in

4  conservatorship.

5      MR. NOBLE:  That's it.

6      MS. SANTILLO:  And just to clarify, you're not talking

7  about liquidation?

8      MR. NOBLE:  No.  We won't elicit the fact -- we've

9  discussed internally, we won't elicit the fact that the credit

10 union was subsequently liquidated because we don't think that's

11 relevant to the charges in this case necessarily.  I think a

12 case could be made as to the relevance, but based on your

13 Honor's prior rulings, we don't think we can advance that

14 argument, but we do think -- and we have a good faith basis for

15 saying -- that conservatorship, and the fact of

16 conservatorship, is relevant as relevant background evidence to

17 explain why certain things happened that are relevant to the

18 conspiracy.

19     MS. SANTILLO:  Your Honor, I think the fact that the

20 NCUA has access to documents and records from the credit union

21 is established by the fact that they are examiners and they can

22 go in and they can do it.

23     THE COURT:  Are you making an objection to eliciting

24 the fact that HOPE FCU was placed in conservatorship?

25     MS. SANTILLO:  That was our initial motion in

1   connection with the ruling that your Honor made, because the

2   conservatorship didn't come about until after the criminal

3   complaints were filed in July, 2015.  And the reasons for the

4   conservatorship were deeply intertwined with the criminal

5   investigation.  And the examiners then started sharing

6   information with the U.S. Attorney's Office, and that was the

7   reason that the NCUA put the credit union into conservatorship.

8   So it's not relevant to the charges against Mr. Gross.

9           THE COURT:  Well, a statement of relevance was just

10   articulated, which is certainly plausible on its face.

11           MS. SANTILLO:  Well, if you think about a conspiracy

12   with Mark Francis, the fact that he's calling the NCUA when

13   Pastor Gross had resigned from the credit union, before the

14   conservatorship, the credit union was already in

15   conservatorship and he's reaching out, that's not a conspiracy

16   that he's even -- he wants to do business with the new credit

17   union that was taken over by the NCUA, he's not trying to do

18   business with Pastor Gross.  Pastor Gross was not even a part

19   of that business.

20           THE COURT:  The government's specific proffer was that

21   it goes to the relevance of -- state again, Mr. Noble, with

22   clarity, the --

23           MR. NOBLE:  It's relevant evidence of the existence of

24   the conspiracy, the fact that Mark Francis felt that he was in

25   a position to be reaching out to the NCUA directly, sending

1    emails to Charles Blue to try to find out what was going on

2    with the meeting with the NCUA, which NCUA witnesses will

3    testify is completely improper to have a member corresponding

4    with management of the credit union about their examination.

5    And these are all things that were discovered because the NCUA

6    got access to those email accounts during the conservatorship.

7    It's not in the normal course of an examination that the NCUA

8    would have access to all the email accounts of the credit union

9    management, it's only because they had those and they found

10    those emails in those accounts.

11          And then Mark Francis called them after they had found

12    those emails, as well, and made the statements that were

13    referred to earlier.  I think it's critical evidence to explain

14    why the NCUA was in a position to be receiving this

15    correspondence from Kapcharge, and it's evidence of the ongoing

16    conspiracy and the level of access that Kapcharge had to the

17    credit union officials.

18          MS. SANTILLO:  I just don't know what it has to do

19    with Mr. Gross.

20          THE COURT:  Well, your point is you don't know what it

21    has to do with Mr. Gross because the defense is that, even to

22    the extent a conspiracy existed, he's withdrawn at this point.

23          MS. SANTILLO:  And not only that --

24          THE COURT:  Right?  Is that what's driving your

25    argument?

1    MS. SANTILLO:  Yes.  He had no involvement with

2    Mark -- you know, with the credit union at that time.

3    THE COURT:  So I do think we've come to what you're

4    suggesting is a lack of relevance are really defense arguments

5    to be made to the jury and found by the jury and not by the

6    Court.  So on the specific question of whether the government

7    may elicit testimony and evidence of HOPE FCU being placed into

8    the conservatorship proffered for the purpose of showing the

9    continuation of the conspiracy, the objection is overruled.

10    MS. SANTILLO:  Okay.  That leads me to a second issue,

11    which is that there's this question about legal fees.

12    THE COURT:  The question about what?

13    MS. SANTILLO:  Legal fees.  And we have concerns about

14    that because we don't want it in the case.  Maybe we can agree

15    to a sort of compromise to say that payments were made as

16    opposed to legal fees because it's just a --

17    THE COURT:  I don't know what you're talking about, so

18    if this is a conversation for me to join, you have to give me a

19    little more context.

20    MR. KLINGEMAN:  Could I have a moment with the

21    government?

22    THE COURT:  Go ahead.

23    MR. KLINGEMAN:  Your Honor, we'll take this up

24    separately.  Thank you.

25    THE COURT:  Okay.  You'll go back and look at the

 1    transcript and you'll make an argument if you want

 2    reconsideration?

 3              MR. NOBLE:  We'll put it in writing.

 4              THE COURT:  Let's set a timeframe so they've got an

 5    opportunity to respond.

 6              MR. NOBLE:  Judge, just due to the trial schedule and

 7    witness prep and stuff, we don't think this is evidence that

 8    would come in until near the end with one of the last NCUA

 9    witnesses.

10              THE COURT:  Okay.

11              MR. NOBLE:  So if we could just have until some point

12    over the weekend, even like Saturday afternoon, we'll file a

13    letter.

14              THE COURT:  I'll let you confer so they can work out

15    what's fair.  But there was a point in the transcript -- I

16    started my initial ruling on 257 to 58.  There was discussion.

17    I reaffirm the ruling at 270.  It was then at 271 that we got

18    into the question of what might open the door, and I think this

19    is where the conversation sort of narrowed to the grand jury

20    subpoena return, but you can take a look.

21              At page 271 to 272, Ms. Choi says, "We are not

22    intending to go forward in our affirmative case with regard to

23    the October deletion prior to turning over emails to the NCUA."

24              MR. NOBLE:  Yes.  That's different.  We're not arguing

25    about the deletion of the emails, it's --

```
 1              THE COURT:  Talking about turning over some --
 2              MR. NOBLE:  -- access to the emails themselves as
 3   opposed to the deletion.  That was the distinction I think we
 4   were trying to draw.
 5              THE COURT:  Okay.
 6              MR. NOBLE:  We'll confer.
 7              THE COURT:  The ruling stands based on what was teed
 8   up to me previously, and I'll take your motion in light of the
 9   potential for confusion.
10              MR. NOBLE:  Okay.  We'll confer on that schedule for
11   the Court's consideration.
12              THE COURT:  Please.
13              MR. NOBLE:  Okay.
14              THE COURT:  Other matters?
15              MR. SHIN:  Your Honor, may I briefly?  There's one
16   other topic --
17              THE COURT:  I can only partially hear you.
18              MR. SHIN:  There's one other topic regarding the
19   potential cross examination of Mr. Hill.  I apologize for not
20   raising it earlier.  I've discussed it with Mr. Klingeman and
21   Mr. Creizman.  His criminal history includes convictions
22   arising from two burglaries that he and others committed.  He
23   was convicted of those and he served a sentence on those
24   crimes.
25              The initial charge on one of the burglaries included a
```

1   homicide charge.  He was ultimately not convicted of the

2   homicide, and Mr. Hill has proffered to the government that in

3   the course of the burglaries, he and his accomplices heard

4   someone screaming, they fled.  He later learned -- word got

5   back to him that the occupants of one of the homes had had a

6   stroke, but this was kind of like word on the street that got

7   back to him.  He otherwise proffered to us that he has no idea

8   what happened with that occupant.

9          I'll note he was not convicted of that charge, and so

10   I've asked Mr. Klingeman and Mr. Creizman whether they would

11   agree not to cross examine on that charge or the facts

12   surrounding what happened to this person who may have had a

13   stroke, the occupant of the home.

14          I think we've come to agreement.  The government's

15   position is that that initial charge and the facts about what

16   happened to that person do not go to his credibility, and

17   therefore, are not a proper subject of cross examination.

18          THE COURT:  Okay.

19          Mr. Creizman.

20          MR. CREIZMAN:  I concur so long as the government

21   doesn't provoke me, but yes.

22          THE COURT:  Speaking of provoking...

23          Mr. Klingeman.

24          MR. KLINGEMAN:  I agree.

25          THE COURT:  Okay, thank you.

H2MQLER5

```
 1              MR. SHIN:  Thank you, Judge.

 2              THE COURT:  What I had read in coming in pertained not

 3    to what you've raised, but you have clarity as to the lines

 4    around this witness' testimony?

 5              MR. NOBLE:  Yes.  I'm not going to ask him about the

 6    liquidation, but I'll instruct the witness not to mention the

 7    fact that HOPE FCU was liquidated when he comes in.

 8              THE COURT:  Okay.  Otherwise, the defense is basically

 9    aware of the scope of the testimony coming, and there are no

10    issues that need -- obviously, sometimes issues emerge but --

11              MR. NOBLE:  As far as I know.  I mean, if they have

12    objections to my particular questions, they can object, but I

13    sent two days ago the exhibits that I intend to use, and those

14    are all the same.

15              We also recently received copies of the bylaws of HOPE

16    Federal Credit Union.  I had emailed counsel last night to see

17    whether they have any objection, and I don't think they do as

18    long as I'm not asking the witness to interpret the bylaws.  I

19    think we're just going to have him read certain portions of the

20    bylaws.

21              THE COURT:  How much longer with the witness?

22              MR. NOBLE:  At least an hour.  We're about to get into

23    the actual facts of HOPE FCU, so we got the background out of

24    the way, we're now focusing on his knowledge of the facts.

25              THE COURT:  I guess I'll raise what had come up in the
```

1    in limines around the NCUA documents that had originally been

2    put forward as documents and testimony.

3         My ruling, because I didn't have any specific examples

4    of testimony in that regard, was limited to the specific

5    documents discussed, and I just want to make sure everybody

6    has -- if there are lines to be drawn here, that we should

7    discuss it -- I have an opportunity to hear from you without

8    forcing the jury into a sidebar.

9         MS. SANTILLO:  Yes, your Honor.  I do think there is

10   some danger in terms of -- you know, I raised one 702

11   objection.

12        THE COURT:  With respect to a question about the

13   fiduciary duty and the meaning of it, which was a word he was

14   using in his testimony.  That was the only 701 objection.

15        MS. SANTILLO:  Yes.  And I do think there are other

16   lines that I would like to kind of hear your Honor's view about

17   because there were some things where he said like "bylaws say",

18   and he wasn't even being specific.  And we just got the bylaws

19   for HOPE FCU last night, and there's also kind of general

20   bylaws that he was talking about.  So I just don't know -- he

21   seems to be opining on sort of the Bank Secrecy Act, and OFAC,

22   and all this other stuff that is really like regulatory

23   regimes, which is fine, but once he -- if he starts

24   interpreting the law then I think we're going to have some

25   problems.

```
1                 THE COURT:  Mr. Noble.

2                 MR. NOBLE:  I mean, I don't anticipate that he is

3       going to be interpreting any law.  The rest of his testimony is

4       based on his knowledge of the facts and what happened at HOPE

5       FCU.

6                 I can proffer that his involvement focused mainly on

7       responding to the initial tip, we've called it, from the former

8       NCUA employee about what was going on at the credit union, that

9       that person had been contacted by Anthony Murgio, and Mr. Curry

10      was tasked with looking into it.

11                Then he's going to testify about what he found when he

12      was looking into it, when he looked into particular issues,

13      which resulted in the NCUA instructing the examiners to look at

14      certain issues.

15                He's not going to testify what the examiners found

16      because he doesn't have the personal knowledge.

17                He'll also testify, too, about the ACH processing and

18      how the NCUA became alerted to the ACH processing at the credit

19      union.  Again, similarly, he sent in the examiners to look at

20      this issue, the ACH processing.

21                He's not going to testify about what the examiners

22      found.  Again, he doesn't have the personal knowledge.

23                And I believe that's pretty much the bulk of the

24      remainder of his testimony.  I can just show him some exhibits,

25      but he's not going to be testifying about the underlying
```

1   reasons, for example why HOPE FCU was placed into

2   conservatorship, as I've said before.

3          THE COURT:  All right.

4          MR. NOBLE:  In a lot of ways his testimony really

5   gives the context for the testimony of the examiners who are

6   actually on the ground and have personal knowledge and can

7   testify from personal knowledge what they saw going on at the

8   credit union based on their conversations with Mr. Gross and

9   others, their review of documents, et cetera.  This is

10  basically just kind of setting up that testimony.

11         THE COURT:  Okay.

12         MS. SANTILLO:  Okay.

13         THE COURT:  Thank you.

14         We'll bring in the jury.  Bring the witness up,

15  please.

16         (Continued on next page)

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Thank you, members of the jury.  I

3    apologize for keeping you waiting.  We were working through a

4    few legal issues to try to help keep the process moving

5    efficiently, and it seems as though it would be better to leave

6    you in the jury room while we sort that out, rather than having

7    you sitting here silently.  I do apologize for falling a little

8    bit off our schedule.  I hope you had a pleasant lunch.

9          Mr. Noble, you may resume your direct examination of

10    Mr. Curry.

11          Mr. Curry, I remind you that you are under oath.

12          MR. NOBLE:  Thank you Judge.

13    CLAYTON CURRY, resumed.

14    DIRECT EXAMINATION (cont'd)

15    BY MR. NOBLE:

16    Q.  Mr. Curry, are you familiar with a credit union named

17    Helping Other People Excel Federal Credit Union in New Jersey?

18    A.  Yes.

19    Q.  Is that also sometimes referred to as HOPE FCU?

20    A.  Yes.

21    Q.  If you use the term "HOPE FCU", will you understand what

22    I'm referring to in my questions?

23    A.  Yes.

24    Q.  When did you first hear of HOPE FCU?

25    A.  In August of 2014.

1    Q.   And how did you hear about HOPE FCU?

2    A.   A former NCUA employee, Jerry Coursen, I guess was

3    approached by some individuals to develop some type of business

4    plan that would be acceptable to NCUA in relation to HOPE --

5    HOPE Federal Credit Union located in Jersey for purposes of

6    placing new individuals on the board and putting millions of

7    dollars into the credit union.

8    Q.   And for the record, is Coursen spelled C-o-u-r-s-e-n?

9    A.   To my knowledge, yes.

10   Q.   And was HOPE Federal Credit Union in the geographic region

11   that you covered in 2014/2015?

12   A.   Yes.

13   Q.   After receiving that information from Mr. Coursen, did

14   there come a time when you did some basic research about HOPE

15   FCU?

16   A.   Yes.  That tip was provided to our regional director Jane

17   Walters, who then contacted my supervisor, then it made its way

18   down to me, and so I began researching almost immediately after

19   that.

20   Q.   Was HOPE Federal Credit Union insured by the National

21   Credit Union Share Insurance Fund in 2014 and 2015?

22   A.   Yes.

23            MR. NOBLE:  Can we bring up Government's Exhibit 6133

24   in evidence?

25   Q.   Mr. Curry, what is this document?

 1   A.  This is their insurance certificate showing that they are

 2   insured by the NCUA and what date that insurance certificate

 3   was issued.

 4   Q.  And what is the date that it was issued?

 5   A.  December 20th, 1978.

 6        MR. NOBLE:  You can take that down.

 7   Q.  Mr. Curry, was HOPE FCU, based on your research, previously

 8   known by any other name?

 9   A.  I believe prior to 2012 they were known as Lakewood

10   Community.

11   Q.  Federal Credit Union?

12   A.  Yes.  Lakewood Community Federal Credit Union.

13        MR. NOBLE:  Could we bring up Government's

14   Exhibit 6134 in evidence?  Can we blow that up a little bit?

15   Q.  Mr. Curry, what does this document indicate?

16   A.  This is a certificate of name change drafted by NCUA.

17   Q.  Can you just read it for the jury?

18   A.  "I, the undersigned, certify that, in accordance with the

19   prescribed procedures of the National Credit Union

20   Administration, the name of the Lakewood Community Federal

21   Credit Union was changed to Helping Other People Excel Federal

22   Credit Union.  The amendment of the charter changing the name

23   of the credit union was approved on November 1st, 2012."

24   Q.  Now, this mentions that HOPE FCU had a charter, correct?

25   A.  Yes.

1    Q.  What kind of charter did HOPE FCU have?

2    A.  A community charter.

3    Q.  Can you just remind the jury what a community-based charter

4    means?

5    A.  A community-based charter means, depending on where the

6    community is, you can serve anyone that lives, works, worships,

7    or businesses or other entities located within that community.

8            MR. NOBLE:  You can take that down Mr. Chang-Frieden.

9    Q.  Did HOPE FCU have any type of special designation?

10   A.  They were a low-income designated credit union.

11           MR. NOBLE:  Could we bring up just for identification

12   Government's Exhibit 6150?

13   Q.  Mr. Curry, could you please just take a look at this

14   document?

15           MR. NOBLE:  Mr. Chang-Frieden, if you could flip

16   through the various pages of the document.

17   Q.  Mr. Curry, do you recognize this document?

18   A.  Yes.  It is HOPE's bylaws.

19   Q.  Is this a document that was maintained by the National

20   Credit Union Administration?

21   A.  Yes.

22           MR. NOBLE:  Your Honor, the government offers

23   Government's Exhibit 6150.

24           THE COURT:  Without objection?

25           MR. CREIZMAN:  No objection.

 1          MS. SANTILLO:  No, your Honor.

 2          THE COURT:  6150 is admitted.  Thank you.

 3          (Government's Exhibit 6150 received in evidence)

 4          MR. NOBLE:  May we publish for the jury?

 5          THE COURT:  You may.

 6          MR. NOBLE:  Mr. Chang-Frieden, could you flip to

 7    page 2.  Can you please blow up the section number 2.  No,

 8    section number 2.  I apologize.

 9    BY MR. NOBLE:

10    Q.  Mr. Curry, can you just read what section 2 states of the

11    bylaws?

12    A.  Section 2, "Purposes.  This credit union is a member-owned,

13    democratically-operated, not-for-profit organization managed by

14    a volunteer board of directors with the specified mission Of

15    meeting the credit and savings needs of consumers, especially

16    persons of modest means.  The purpose of this credit union is

17    to promote thrift among its members by affording them an

18    opportunity to accumulate their savings and to create for them

19    a source of credit for prominent business or productive

20    purposes."

21          MR. NOBLE:  Can we zoom back out?  And let's blow up

22    the section 1 under article 2.  Keep going down.  Thank you.

23    Q.  What does this section indicate, Mr. Curry?

24    A.  This is their field of membership.

25    Q.  Can you just read what the field of membership was for HOPE

1    Federal Credit Union?

2    A.   Yes.   "The field of membership of this credit union is

3    limited to that stated in section 5 of its charter.   The field

4    of membership shall be limited to those having the following

5    common bond:  Persons who live, work, worship, or attend school

6    in, and businesses and other legal entities in Lakewood, New

7    Jersey, spouses or persons who died while within the field of

8    membership of this credit union, volunteers in the community

9    (added October 11th, 2007) employees of this credit union, and

10   organizations of such persons."

11        MS. SANTILLO:  Excuse me, your Honor.  I have a

12   foundation objection.  I just would like to establish the date

13   of these bylaws.

14        THE COURT:  Overruled.  You can ask your next

15   question.

16        MR. NOBLE:  If we can flip forward to page 5, please.

17   Can we blow up the first half of the paragraph under article 5,

18   "Elections"?

19   Q.   Mr. Curry, can you please read for the jury the elections

20   procedures set forth, beginning with section a, little a?

21   A.   "Section a.  At least 120 days before each annual meeting

22   the Chair will appoint a nominating committee of three or more

23   members.  It is the duty of the nominating committee to

24   nominate at least one member for each vacancy, including any

25   unexpired term vacancy for which elections are being held and

1   to determine that the members nominated are agreeable to the

2   placing of their names in nomination and will accept office if

3   elected."

4   Q.  Please read letter b.

5   A.  "The nominating committee files its nominations with the

6   secretary of the credit union at least 90 days before the

7   annual meeting and the secretary notifies in writing all

8   members eligible to vote at least 75 days before the annual

9   meeting, that nominations for vacancies may also be made by

10  petition signed by 1 percent of the members with a minimum of

11  20 and a maximum of 500.  The secretary may" --

12  Q.  You can stop there.

13  A.  Okay.

14  Q.  Thank you.

15          MR. NOBLE:  Can we please flip to page 7 of this

16  document and blow up Section 6?

17  Q.  Mr. Curry, can you please read what it states after

18  "submission of information regarding credit union officials to

19  NCUA"?

20  A.  "The names and addresses of members of the board, board

21  officers, executive committee, and members of the credit

22  committee, if applicable, and supervisory committees must be

23  forwarded to the administration in accordance with the act and

24  regulations in the manner as may be required by the

25  administration."

1  Q.  Before we broke for lunch you testified about something

2  called an online profile report.  Do you remember that?

3  A.  Yes.

4  Q.  Is that the manner in which the NCUA requires credit unions

5  to update the NCUA as to the members of its board of directors

6  and its officers?

7  A.  Yes.

8          MR. NOBLE:  Can we flip to page 8, please?  Can you

9  blow up the little 1 for eligibility requirements?  All the way

10  down to number 2, please.

11  Q.  "Mr. Curry, can you please read what the eligibility

12  requirements are for membership on the board of directors at

13  HOPE?

14  A.  Yes.  "The Act and the FCU bylaws contain the only

15  eligibility requirements for membership on FCU's board of

16  directors which are as follows:

17          "The individual must be a member of the FCU before

18  distribution of ballots; the individual cannot have been

19  convicted of a crime involving dishonesty or breach of trust,

20  unless the NCUA board has waived the prohibition for the

21  conviction; and the individual meets the minimum age

22  requirement established under article 5 section 7 of the FCU

23  bylaws.

24          "Anyone meeting the three eligibility requirements may

25  run for a seat on the board of directors if properly nominated.

1     It is the nominating committee's duty to ascertain that all

2     nominated candidates, including those nominated by petition,

3     meet the eligibility requirements."

4                MR. NOBLE:  Can you blow that back up, please?

5     Q.  Do you see under section c it makes reference to the FCU

6     bylaws?

7     A.  Yes.

8     Q.  Do you see that?  I believe you testified earlier that

9     there are also general bylaws that the NCUA produces; is that

10    right?

11    A.  Yes.

12    Q.  How do these bylaws for a particular credit union relate to

13    the bylaws that you were testifying about earlier that the NCUA

14    produces?

15    A.  They're in line with the standard bylaws.

16    Q.  So is it fair to say a credit union can take the standard

17    bylaws, make changes to the bylaws, as long as those changes

18    are approved by the NCUA?

19    A.  Correct.

20    Q.  To be clear, these are the bylaws that applied to HOPE FCU.

21    A.  Yes.

22    Q.  Okay.

23                MR. NOBLE:  Can we please flip to page 9 under article

24    6, "board of directors"?  Can we please blow up section 1?

25    Q.  And Mr. Curry, please read what it states after "number of

1  members".

2  A.  "The board consists of 7 members, all of whom must be

3  members of this credit union.  The number of directors may be

4  changed to an odd number not fewer than 5 nor more than 15 by

5  resolution of the board.  No reduction in the number of

6  directors may be made unless corresponding vacancies exist as a

7  result of deaths, resignations, expiration of terms of office,

8  or other actions provided by these bylaws.  A copy of the

9  resolution of the board covering any increase or decrease in

10  the number of directors must be filed with the official copy of

11  bylaws of this credit union."

12          MR. NOBLE:  Please flip to page 13.  Blow up

13  section 9.

14  Q.  Mr. Curry, can you please read the first two sentences

15  following "duties of secretary"?

16  A.  "The secretary prepares and maintains full and correct

17  records of all meetings of the members and of the board, which

18  records will be prepared within 7 days after the respective

19  meetings.  The secretary must promptly inform the

20  administration in writing of any change in the address of the

21  office or this credit union or the location of its principal

22  records."

23  Q.  You can stop there.

24          Can you describe for the jury what types of events or

25  issues should be documented in a board meeting minute?

1   A.  Any events that are taking place with the credit union, if

2   there are new programs, new services they plan on offering, we

3   would like to see discussion of that, if they were -- like we

4   mentioned earlier, if there's new members or closed member

5   accounts, we'd like to see documentation of that, the overall

6   financial condition of the credit union, any new activities

7   that they're planning on being involved in.

8   Q.  If the credit union were entering into a strategic

9   partnership with another entity, is that something you'd expect

10  to see in the board meeting minutes?

11  A.  Yes.

12          MR. NOBLE:  Can we please flip to page 17 under

13  article 16, "general".  Can you please blow up section number

14  1?

15  Q.  Can you please read what it states after "compliance with

16  law and regulation"?

17  A.  "All power, authority, duties, and functions of the

18  members, directors, officers, and employees of this credit

19  union, pursuant to the provisions of these bylaws, must be

20  exercised in strict conformity with the provisions of

21  applicable law and regulations and of the charter and the

22  bylaws of this credit union."

23          MR. NOBLE:  Can we zoom out?  And please blow up

24  section number 4.

25  Q.  And could please read what it states after "conflicts of

H2MQLEB5                    Curcio - Direct

1    interest prohibited"?

2    A.  "No director, committee member, officer, agent, or employee

3    of this credit union may participate in any manner, directly or

4    indirectly, in the deliberation upon or the determination of

5    any question affecting his or her pecuniary or personal

6    interests or the pecuniary interest of any corporation,

7    partnership, or association other than this credit union in

8    which he or she is directly or indirectly interested.  In the

9    event of disqualification" --

10   Q.  You can stop there.

11   A.  Thank you.

12   Q.  Can you explain what the word "pecuniary" means?  Sorry to

13   put you on the spot.

14   A.  Yeah.  Seems like their own vested interest in a particular

15   organization or to serve their own needs.

16   Q.  Is it fair to say it relates to a financial interest?

17   A.  Yes.

18   Q.  And if you can go ahead and continue to read, I'm sorry,

19   where I cut you off.  "In the event of the disqualification".

20   A.  "In the event of the disqualification of any director

21   respecting any manner presented to the board for deliberation

22   or determination, that director must withdraw from the

23   deliberation or determination, and if the remaining qualified

24   director is present at the meeting, plus the disqualified

25   director or directors constitute a quorum, the remaining

1  qualified directors may exercise, with respect to this matter,

2  by majority vote, all the powers of the board.

3          "In the event of the disqualification of any member of

4  the credit committee, if applicable, or the supervisory

5  committee, that committee member must withdraw from the

6  deliberation or determination."

7  Q.  Thank you.

8          MR. NOBLE:  You can take down that exhibit,

9  Mr. Chang-Frieden.

10 Q.  Mr. Curry, after the NCUA received this tip from Jerry

11 Coursen in August, 2014, did there come a time when you started

12 researching the directors of HOPE Federal Credit Union?

13 A.  Yes.

14 Q.  Explain what steps you took to learn about HOPE's board of

15 directors.

16 A.  So my first step, I went to our credit union online

17 profile, typed in HOPE's charter number, and began looking

18 there first, because as I mentioned earlier, that gives you a

19 snapshot of the credit union, who's on their board of

20 directors, where they're located, et cetera.

21 Q.  What was the second step you took?

22 A.  Second step, they also had a link for their website on

23 their profile, so that was my next approach, to click the link

24 and review their website.

25 Q.  What did you learn by taking those two steps?

1   A.  That the board of directors on the credit union profile,

2   some of them were different than what was reported on their

3   website.

4   Q.  Who was the chairman of the board and CEO of HOPE Federal

5   Credit Union at that time?

6   A.  Trevon Gross.

7   Q.  Have you ever met or spoken with Mr. Gross?

8   A.  No.

9   Q.  Are credit unions required to update the NCUA concerning

10  changes in its board of directors?

11  A.  Yes.

12  Q.  And I believe you testified that credit unions do that

13  through the online profile, correct?

14  A.  Yes.

15          MR. NOBLE:  Can we bring up Government's Exhibit 6111

16  in evidence?

17  Q.  Mr. Curry, do you recognize this document?

18  A.  Yes.

19  Q.  What is it?

20  A.  It's the certification page of a credit union online

21  profile form.

22  Q.  Can you walk the jury through this?  What is the date that

23  the document was submitted to the NCUA, and what is the "as of"

24  date for the certification?

25  A.  This document was certified and delivered to NCUA on

1  July 25th, 2014.  The "as of" date in the top right corner,

2  June 30, 2014, is the most recent financial data effective

3  date.

4  Q.  And I believe you testified that credit unions typically

5  submit these reports four times per year; is that right?

6  A.  Right.  At least.  They have to certify at least the four

7  times a year, plus any time they make any changes with their

8  operations.

9  Q.  Can you read just that paragraph that appears below

10  "certification", beginning with "I understand"?

11  A.  "I understand each operating insured credit union must

12  update their credit union profile within 10 days after the

13  election or appointment of senior management or voluntary

14  officials, or within 30 days of any change of the information

15  in the profile.

16          "I hearby certify to the best of my knowledge and

17  belief the information provided is current and accurate.

18          "I make this certification pursuant to Sections 106,

19  120, and 204 of the Federal Credit Union Act."

20  Q.  You don't have to read the statutory provisions.  Who

21  certified this report?

22  A.  Bernard Larkins.

23          MR. NOBLE:  Can we zoom back out, please, and flip to

24  page 3?

25  Q.  Mr. Curry, I'd like to have you walk the jury through some

1   of the information that's included in this profile report for

2   HOPE.  Beginning on page 3 under "general information".

3            MR. NOBLE:  Can we zoom in?  That's fine.

4   Q.  First, I'd like to direct your attention to number 8.  What

5   information is provided there?

6   A.  The asset size of the credit union as of June 30, 2014.

7   Q.  And what was the asset size of the credit union?

8   A.  $88,997.

9   Q.  What information is provided in number 9?

10  A.  The number of members of the credit union.

11  Q.  And how many members did HOPE have as of June 30th, 2014,

12  according to this report?

13  A.  107.

14  Q.  What information is provided under number 11?

15  A.  Provide the credit union website address.

16  Q.  What was HOPE's website?

17  A.  Www.hope-fcu.com.

18            MR. NOBLE:  Can we flip to page 4?  Blow up the top

19  portion for now.

20  Q.  What information is included on this page?

21  A.  Anything pertaining to the credit union's information

22  systems and technology.

23  Q.  Focusing on number 7, what information is provided there?

24  A.  Name of the primary share loan data processing vendor,

25  which is CU Answers.

1          MR. NOBLE:  Zoom out.  Can we blow up 10, 11 and 12?

2   Q.   What information is provided within this section of the

3   report?

4   A.   Number 10 outlines any systems that are used to process

5   electronic payments, and none --

6   Q.   Do electronic payments include ACH transactions?

7   A.   Yes.

8   Q.   And under number 11?

9   A.   "If the credit union performs ACH transfer, where does the

10  credit union transfer funds?  Check all that apply."

11  Q.   And nothing is checked there, correct?

12  A.   Correct.

13  Q.   Number 12?

14  A.   "If the credit union is an originating repository financial

15  institution, ACH transactions originated by the credit union."

16  Q.   What is checked there?

17  A.   "Consumer transactions".

18  Q.   Is the box for "business transactions" checked?

19  A.   No.

20         MR. NOBLE:  Can we zoom out, please, and flip to

21  page 6?  Let's just blow up that top portion.

22  Q.   Focusing your attention on number 1, what does that read?

23  A.   "Does your credit union use a corporate credit union for

24  payment systems services?"

25  Q.   Can you explain to the jury what a corporate credit union

1  is?

2  A.   So HOPE Federal Credit Union is what we call a natural

3  person credit union, which means they're set up to serve

4  individuals like you and me.  A corporate credit union is set

5  up to serve natural person credit unions, with different

6  payment processing, including share drafts, ACH processing.

7  They also make available lines of credit for liquidity purposes

8  if a credit union ever is in a liquidity crunch.

9  Q.   And who was HOPE FCU's corporate credit union, according to

10  this document?

11  A.   Alloya Corporate.

12  Q.   What services did Alloya provide?

13  A.   Share draft processing and settlement, electronic funds

14  transfer, and direct deposit.

15          MR. NOBLE:  Can you zoom out and can we flip forward

16  to page 14?

17  Q.   What information generally is provided on this page?

18  A.   This is a section where a credit union would check any of

19  the programs or services they have available to their

20  membership.

21          MR. NOBLE:  Can we zoom out, please?  Actually, I'm

22  sorry, can we just blow up the portion called "depository"?

23  Yes, right there on the left-hand side.

24  Q.   What does the depository category indicate?

25  A.   The type of deposit they offer at their credit union.

1    Q.  And I believe you testified earlier, a share account is

2    similar to like a checking account; is that correct?

3    A.  Well, a share account could be like a savings account or a

4    share draft account would be more like a checking account.

5    Q.  Is the box for "business share accounts" checked here?

6    A.  No.

7    Q.  What would that indicate to you, since that box is not

8    checked?

9    A.  That they don't offer account services for businesses.

10         MR. NOBLE:  You can zoom out, and let's flip forward

11   to page 21.

12   Q.  What information is included on page 21 and the subsequent

13   pages?

14   A.  This is the contacts section of the online profile, which

15   would outline who is on the board of directors, who is on the

16   supervisory committee, who is on the credit committee, if they

17   have one, any members of senior management.

18   Q.  Do you see on this page, does it indicate the identity of

19   any of the board members as of June 30th, 2014?

20   A.  Yes.

21   Q.  Who?

22   A.  Frederick DeSilva.

23   Q.  And you know that how?

24   A.  Under -- well, at the top, under "job titles" it says

25   "board member".

1  Q.  Okay.

2          MR. NOBLE:  Can we flip to the second page, or next

3  page?

4  Q.  Any board members on this page?

5  A.  No.

6          MR. NOBLE:  Let's go to the next page.

7  Q.  Any board members on this page?

8  A.  Yes.

9  Q.  Who?

10 A.  The first one is Joseph Lane, the second one is Sylvester

11 B. Larkins, who is listed as the board treasurer and board

12 member.

13 Q.  Have we seen that name on this document previously?

14 A.  Yes.  Bernard Larkin certified the online profile.

15         MR. NOBLE:  Can you zoom out?  Could we go to the next

16 page?

17 Q.  Any board members on this page?

18 A.  Yes.

19 Q.  Who?

20 A.  Marvin Purry.

21 Q.  And I believe up at the top there there's somebody listed

22 as a supervisory committee member.  Do you see that?

23 A.  Yes.

24 Q.  But that person is not listed as being a member of the

25 board?

1  A.  Correct.

2  Q.  Is there a difference between being a board member and a

3  member of the supervisory committee?

4  A.  Yes.

5  Q.  How?  Can you explain to the jury?

6  A.  The board is ultimately responsible for the decision-making

7  process of the credit union.  They enforce the bylaws, set

8  forth operations of the credit union.

9          And the supervisory committee is there, as I mentioned

10  earlier, in more of an internal audit function.  They're there

11  to make sure the credit union is operating in compliance with

12  the applicable laws and regulations, and employees of the

13  credit union are doing what they're supposed to be doing.

14  Q.  Are there typically any members of the board of directors

15  on the supervisory committee?

16  A.  I believe the bylaws allow one individual to serve -- one

17  board member to serve on the supervisory committee.

18  Q.  Let's go to the next page.  Any board members indicated on

19  this page?

20  A.  Yes.

21  Q.  Who?

22  A.  Trevon Gross, Sr.

23  Q.  What titles does he hold?

24  A.  Chairperson and board member.

25          MR. NOBLE:  Zoom out.

1  Q.  Any other board members?

2  A.  Yes.

3  Q.  Who?

4  A.  Delores Wyatt.

5  Q.  What title does she have?

6  A.  Board secretary.

7          MR. NOBLE:  Let's zoom out.  Let's go to the next

8  page.  Sorry.  Can we go back up one page?

9  Q.  I believe this is the last board member listed in the

10  profile report; is that correct?

11  A.  Yes.

12  Q.  Who is that?

13  A.  George Wyatt.

14  Q.  And what title is he listed as having?

15  A.  Manager or CEO and board member.

16          MR. NOBLE:  Can we go back up one page?  Can we blow

17  up the entry for Mr. Gross?

18  Q.  What does it indicate for employment type for Mr. Gross?

19  A.  Volunteer.

20  Q.  Does that mean that he's not supposed to be paid?

21  A.  Correct.

22          MR. NOBLE:  You can zoom out.  Let's go to the last

23  page of this document.

24  Q.  What information is included on this page?

25  A.  This is the site section of the online profile.  So it

1  would outline where their main corporate office is located at,

2  if they have any branch offices, any off-site disaster recovery

3  type locations.

4  Q.  What locations are indicated for HOPE Federal Credit Union

5  as of June 30th, 2014?

6  A.  They have two sites.  One is the corporate office of HOPE

7  Federal Credit Union, which is located at 46 Bennetts Mills

8  Road, Jackson, New Jersey, 08527.

9              (Continued on next page)

H2MKLEB5                      Curry - Direct

BY MR. NOBLE:

1

2    Q.   Any other locations?

3    A.   They have another site type of CU South located at 23210

4    U.S. Highway 98, Fairhope, Alabama 36532, and the site

5    functions are member services, disaster recovery site.

6    Q.   Are there any locations in Florida indicated on this page?

7    A.   No.

8    Q.   Based on that, the absence of that information, would you

9    expect the credit union to have a location in Florida?

10   A.   No.

11            MR. NOBLE:   You can take that down.

12   Q.   So, Mr. Curry, you said the first step in your

13   investigation was looking at that profile report, correct?  I'm

14   sorry, correct?

15   A.   Yes.

16   Q.   Is that the report you looked at?

17   A.   Yes.

18   Q.   And then remind the jury, what step did you take after

19   that?

20   A.   After I looked at the online profile, I then clicked on

21   their link, which on the online version is a hyperlink to their

22   website.  So then I went to review their website.

23            MR. NOBLE:   Can we bring up, just for identification,

24   Government Exhibit 724-4.

25   Q.   Now, Mr. Curry, do you recognize this document?

 1    A.  Yes, it looks familiar.

 2    Q.  How does it look familiar?

 3    A.  The logo on the top left, the board of directors, the --

 4    pretty much the entire layout.

 5          MR. NOBLE:  Can we flip to the second page.

 6    Q.  What do you recognize this document to be?

 7    A.  It seems to be -- it's from their website.

 8    Q.  The website of whom?

 9    A.  HOPE Federal Credit Union.

10    Q.  I'd like to direct your attention to the upper left-hand

11    corner, the date there.  Do you see that?

12    A.  Yes.

13    Q.  What is that date?

14    A.  September 19, 2014.

15    Q.  When did you visit the website as part of your

16    investigation that you've been describing?

17    A.  In August 2014.

18    Q.  Does this website resemble the site as you recalled it when

19    you looked at it in August 2014?

20    A.  Yes.

21    Q.  Or this particular pages that we're looking at, correct?

22    A.  Yes.

23          MR. NOBLE:  Your Honor, the government offers

24    Government Exhibit 724-4.

25          MR. CREIZMAN:  No objection.

```
 1              MS. SANTILLO:  No objection.

 2              THE COURT:  Thank you.

 3              724-4 is admitted.

 4              (Government's Exhibit 724-4 received in evidence)

 5              MR. NOBLE:  May we publish for the jury?

 6              THE COURT:  You may.

 7   BY MR. NOBLE:

 8   Q.  Again, what is this document?

 9   A.  This is HOPE Federal Credit Union's website.

10              MR. NOBLE:  Can we just blow up the section under

11   "Administration."

12   Q.  Can you just read off the various board of directors

13   members?

14              I believe this lists the officer positions, correct?

15   A.  Yes.

16   Q.  Who is listed as chairman?

17   A.  Trevon Gross.

18   Q.  Vice chair?

19   A.  Yuri Lebedev.

20   Q.  Secretary?

21   A.  Ricardo Hill.

22   Q.  Assistant secretary?

23   A.  Delores Wyatt.

24   Q.  Treasurer?

25   A.  Bernard Larkins.
```

 1  Q.  Assistant treasurer?

 2  A.  Jose Freundt.

 3  Q.  And chairman emeritus?

 4  A.  George Wyatt.

 5          MR. NOBLE:  Flip to the next page.

 6  Q.  Who is the supervisory committee chair?

 7  A.  Timothy Ellrich.

 8  Q.  And who are the other four members of the board?

 9  A.  Frederick DeSilva, Joseph Lane, Chad Lio, and Kevin

10  Tomasso.

11          MR. NOBLE:  Can we go down to supervisor committee.

12  Q.  Who is the chairman, again?

13  A.  Timothy Ellrich.

14  Q.  Who are the other two members?

15  A.  Kendra Pannitti and Marvin Purry.

16          MR. NOBLE:  Zoom out.

17  Q.  Who is listed as the management team for the credit union?

18  A.  The chief executive officer is listed as Trevon Gross.

19  Q.  And the chief operating officer?

20  A.  Ricardo Hill.

21  Q.  Chief financial officer?

22  A.  Bernard Larkins.

23  Q.  Chief security officer?

24  A.  Yuri Lebedev.

25  Q.  Chief membership officer?

1    A.    Cynthia Purry.

2    Q.    And chief loan officer?

3    A.    Joseph Lane.

4    Q.    How do the names that were listed here for -- as the board

5    of directors compare to the online profile report that you

6    reviewed?

7    A.    There's more names listed on the website than there were on

8    the profile.

9    Q.    Are the names different on the website than what you saw in

10   the profile?

11   A.    Yes.

12          MR. NOBLE:    Take this down.

13   Q.    Now, did there come a time when you obtained a copy of the

14   minutes of HOPE Federal Credit Union's annual meeting for 2014?

15   A.    Yes.

16   Q.    Have you reviewed those minutes?

17   A.    Yes.

18          MR. NOBLE:    Can we bring up Government Exhibit 6086 in

19   evidence.

20   Q.    What is this document?

21   A.    The minutes of their 2014 annual membership/board members'

22   meeting.

23   Q.    What is the date of that meeting?

24   A.    June 21st, 2014.

25   Q.    Is that prior to the effective date of the online profile

 1    report that we just looked at earlier --

 2    A.  Yes.

 3    Q.  -- in Government Exhibit -- just for the record, Government

 4    Exhibit 6111?

 5    A.  Yes.

 6         MR. NOBLE:  Can we just begin by blowing up the top

 7    third under the minutes section itself beginning with "Annual

 8    meeting."

 9    Q.  It states, "The annual meeting was called to order at

10    10:00 a.m. by Chairman Trevon Gross with prayer.  Board members

11    present:  Chairman Trevon Gross, Bernard Larkins, Qwynn Gross,

12    Joseph Lane, George Wyatt, Frederick DeSilva, S. Moore, Clive

13    Williams, and Delores Wyatt.  Excused:  M. Purry, C. Purry,

14    both due illness."

15         MR. NOBLE:  Zoom out.

16    Q.  Did I read that correctly?

17    A.  Yes.

18         MR. NOBLE:  Can we go ahead and flip to the second

19    page and highlight the section "Board of Elections" through the

20    end of the text.

21    Q.  Mr. Curry, can you read to the jury what it states under

22    "Board of Elections" in the minutes of the annual meeting?

23    A.  Yes.  "The slate of new board members introduced themselves

24    with a brief bio via visual conference (See attached).

25    Election of board members:  Annual meeting notice a new board

1   of director ballot were previously presented to all members

2   online.  Based on the electronic voting tally, the current

3   board recommends that the slate for new board members to HOPE

4   FCU board be closed, the new slate of new HOPE FCU board of

5   directors be approved, and by common consent, directed the

6   secretary to cast one vote to elect all the new board members.

7   Resolution passed."

8   Q.  Who submitted these minutes?

9   A.  Delores Wyatt, board secretary.

10  Q.  And she signed the minutes?

11  A.  Yes.

12          MR. NOBLE:  Zoom out.  Let's go to the next page.

13  Next page.  Can we just blow up that bottom portion there.

14  Q.  What is the date of this document up in the top right-hand

15  corner?

16  A.  June 21st, 2014.

17  Q.  And in the center, it states, "HOPE Federal Credit Union";

18  is that right?

19  A.  Yes.

20  Q.  What is stated underneath there?

21  A.  "Ballot results report."

22  Q.  And then next to that, it says, "Annual meeting board

23  election," correct?

24  A.  Yes.

25  Q.  Can you read what the question is, what is stated below the

1    question on the left-hand side?

2    A.   "The following members are recommended for election of a."

3    Q.   Okay and then under "Answer," can you read who the board

4    members were?

5    A.   "Trevon Gross, Jose Freundt, S. Bernard Larkins, Timothy

6    Ellrich, Cynthia Purry, Kevin Tomasso, Joseph Lane, Ricardo

7    Hill, Frederick DeSilva, Yuri Lebedev, and Chad Lio."

8    Q.   Who was elected to serve on the superv -- it says superv.

9    It's cut off.  Who's elected there?

10   A.   Timothy Ellrich, Marvin Curry, Kendra Pannitti.

11   Q.   Are these the names of the individuals that you saw on the

12   HOPE's website in or about August 2014?

13   A.   Yes.

14             MR. NOBLE:  Take that down.

15             I'm sorry, bring back up the exhibit, 6086, and just

16   flip to the second page.

17   Q.   Under "Board of Elections," based on the language you read,

18   what is your understanding of whether these individuals that we

19   just looked at were elected to the board of HOPE Federal Credit

20   Union?

21   A.   Can you repeat that question?

22   Q.   Sure.  It was a little complicated.

23             MS. SANTILLO:  Objection.

24             THE COURT:  Sustained.

25   Q.   At the annual meeting, is that generally when elections for

1   the board of directors are held?

2   A.  Yes.

3          MR. NOBLE:  You can take that down.

4   Q.  After the annual meeting is held, and the election takes

5   place, are the individuals who are elected considered board

6   members?

7          MS. SANTILLO:  Objection.

8          THE COURT:  Sustained.

9   Q.  Is it necessary for election results for the board of

10  directors of a credit union to be subsequently confirmed by

11  approving subsequent minutes of the meeting?

12  A.  I believe --

13         MS. SANTILLO:  Objection.

14         THE COURT:  Sustained.

15  Q.  Does an election of the board of directors occur at the

16  time of the annual meeting?  Is that when the election takes

17  place?

18  A.  Yes.

19  Q.  And after that, those individuals who have been nominated

20  and elected are on the board?

21  A.  Yes.

22  Q.  Now, after you conducted this investigation, what did you

23  do?

24  A.  I consulted with my supervisors on my findings, and they

25  then reached out to the supervisory examiner in charge of this

1   particular credit union.

2   Q.  And why did you do that?

3   A.  Because these were obvious red flags that warranted

4   in-depth review.

5   Q.  What do you mean by red flag?

6   A.  The fact that the board members that they're reporting to

7   NCUA differ significantly from those that they're advertising

8   on their website, and that, coupled with the tip that Jerry

9   Coursen provided NCUA.

10  Q.  What did you do after consulting with your supervisor?

11  A.  Well, they reached out to the supervisory examiner in

12  charge and asked that they send their examiner on-site to

13  review these inconsistencies.

14  Q.  To your knowledge, was there an examination of HOPE Federal

15  Credit Union going on at that time?

16  A.  Correct.  Yes.

17  Q.  Were you personally involved in that examination?

18  A.  No.

19  Q.  After you referred the matter to the examiners, did there

20  come a time when HOPE Federal Credit Union submitted an updated

21  profile to the NCUA?

22  A.  Yes.

23  Q.  Have you reviewed that profile?

24  A.  Yes.

25          MR. NOBLE:  Can you bring up Government Exhibit 6112

1    in evidence.

2    Q.  What is the date of this certification in the as-of date

3    for the document?

4    A.  This online profile was certified on October 24th, 2014,

5    and the effective date of this online profile is

6    September 30th, 2014.

7    Q.  To your knowledge, were there any other profiles submitted

8    by HOPE Federal Credit Union between the one we looked at

9    before and this one?

10   A.  No.

11   Q.  And who certified the profile for September 30th, 2014?

12   A.  Bernard Larkins.

13           MR. NOBLE:  Can we flip to page 4, please.  Can we

14   blow up Section number 12.

15   Q.  Is the box for "Business Transactions for ACHs" checked

16   here?

17   A.  No.

18   Q.  Based on that information, what is your understanding of

19   whether HOPE FCU was involved in processing ACH transactions

20   for businesses at this time?

21   A.  I would interpret this to mean that they do not process ACH

22   activity for businesses.

23           MR. NOBLE:  Can we zoom out and flip to page 21.

24   Q.  Can you just walk the jury through all the members of the

25   board that were reported to the NCUA in this profile report?

1    A.   Yes.   First board member, Mr. Frederick P. DeSilva.   Next

2    board member, Mr. Timothy Ellrich.   The next board member,

3    Mr. Jose Freundt.   Chairperson and board member, Mr. Trevon

4    Gross, Sr.   The board secretary, and board member, and manager

5    or CEO is listed as Ricardo Hill.   The next board member and

6    credit committee chairperson is Joseph Lane.   Board

7    treasurer/board member and chief financial officer listed as

8    Sylvester B. Larkins.   Vice chairperson, board member, chief

9    information officer listed as Mr. Yuri Lebedev.   Board member

10   listed as Mr. Chad J. Lio.   There is no board members on this

11   page.

12   Q.   Okay.

13           MR. NOBLE:   Let's flip forward to -- oh, stop there.

14   A.   Board member, Mr. Kelvin Tomasso.   Board member, Mr. George

15   Wyatt.

16           MR. NOBLE:   Next page.

17   A.   And the last entry is board member, Mrs. Delores Wyatt.

18           MR. NOBLE:   Zoom out.   Next page.

19   Q.   What information is included on this site -- on this page?

20   A.   This is the physical addresses of the credit union.   So the

21   first physical address is their corporate office, which is

22   headquartered at 46 Bennetts Mills Road.

23   Q.   You don't need to read the address again.

24   A.   Oh, okay.

25   Q.   That's the location in Jackson, New Jersey?

 1   A.  Yes.

 2   Q.  And what's the other location?

 3   A.  It's their CU South disaster recovery location in Fairhope,

 4   Alabama.

 5   Q.  Any locations for -- any branches in Florida listed?

 6   A.  No.

 7          MR. NOBLE:  Take that down.

 8   Q.  Did there come a time when you learned the results of the

 9   examination concerning the composition of HOPE Federal Credit

10   Union's board of directors?

11          MS. SANTILLO:  Objection.

12          MR. NOBLE:  Judge --

13          THE COURT:  Is this something other than the line that

14   we discussed during the break?

15          MS. SANTILLO:  No.  It's that.

16          THE COURT:  Okay.  So overruled.

17   BY MR. NOBLE:

18   Q.  Did there come a time when you learned the results of the

19   examination?

20   A.  Yes.

21   Q.  What was the outcome of that examination?

22   A.  That there were members from the Collectables Club that

23   were on the board of directors at HOPE.

24   Q.  And what, if anything, did the NCUA do with respect to

25   those board members from Collectables Club?

1    A.  There was corrective action included in the document of

2    resolution in the examination report informing the board of

3    directors that they need to -- any board of directors that do

4    not qualify for eligibility into the field of membership needs

5    to vacate their seats.

6    Q.  Now, did there come a time after those examination reports

7    were delivered that you received a communication from the

8    Collectables Club regarding their eligibility for membership in

9    the credit union?

10   A.  Yes.

11            MR. NOBLE:  Can you bring up Government Exhibit 6121

12   in evidence.

13   Q.  Do you recognize this document?

14   A.  Yes.

15   Q.  What is it?

16   A.  This was a complaint letter they drafted to the attention

17   of Ms. Jane A. Walters, our regional director in NCUA Region

18   II.

19   Q.  When you say "they," who do you mean?

20   A.  Members of the Collectables Club.

21   Q.  Is this a letter that you personally received in or about

22   January 2015?

23   A.  Right.  It was addressed to our office, but it was assigned

24   to me to review, yes.

25   Q.  What is the subject matter of this letter?

1    A.   Helping People Excel Federal Credit Union, Charter Number

2    23265.

3              MR. NOBLE:   Can we zoom back out, and let's blow up

4    the first paragraph.

5    Q.   Mr. Curry, can you read that paragraph to the jury?

6    A.   "We, the undersigned, were properly elected as directors of

7    Helping Other People Excel Federal Credit Union at the

8    June 2014 annual meeting (See attached ballots results report

9    dated June 21, 2014).  We have been advised of our removal as

10   directors, allegedly at the direction of your agency.  It

11   appears that this removal is based on a recent documented

12   resolution (See attached) stating the issue as ineligible board

13   of directors, which, in part, reads, 'However, since their

14   primary residence is out of state, and they do not live, work,

15   worship, attend school, or volunteer in Lakewood, they are not

16   eligible for membership.'  We believe the DOR, as written, is

17   incorrect since it does not address, nor take into

18   consideration the fact that Helping Other People Excel Federal

19   Credit Union is a low-income credit union.  The NCUA chartering

20   and field of membership manual, Section 2.E, 'Special rules for

21   low-income federal credit union,' states:  'In addition to

22   serving members who live, work, worship, or attend school in

23   the community, a low-income community federal credit union may

24   also serve persons who participate in programs to alleviate

25   poverty or distress or who participate in associations

1   headquartered in the community.'"

2              MR. NOBLE:  Can we zoom back out?

3   Q.  Can you read the bottom portion?

4              MR. NOBLE:  Blow that up.

5   Q.  And please read it, Mr. Curry.

6   A.  "We are all members of an association headquartered in

7   Lakewood, New Jersey, and based on the rules, are eligible for

8   membership as voting members of the Helping Other People Excel

9   Federal Credit Union.  Therefore, we respectfully request you

10  take the following action:  Advise Helping Other People Excel

11  Federal Credit Union that removal of board members Timothy

12  Ellrich, Jose Freundt, Ricardo Hill, Yuri Lebedev, Chad Lio,

13  and Kevin Tomasso were made in violation of the Federal Credit

14  Union Act in the bylaws, and that these board members were

15  valid actively current board members.  Advise Helping Other

16  People Excel Federal Credit Union that any board action taken

17  after the resignation of two board members on November 22nd,

18  2014, without at least six board members in attendance, which

19  would have to include at least one of the above named board

20  members, are null and void as a quorum of six could not have

21  been achieved (See attached NCUA profile taken from the NCUA

22  website on October 20th, 2014, and resignation emails from

23  Sylvester Bernard Larkins and Joseph Lane)."

24              MR. NOBLE:  Zoom out.

25              And then can you just blow up the section beginning

1    "Your timely response."

2    A.  "Your timely response regarding this important issue is

3    appreciated.  You may reply to all of us at the following

4    address:  Collectables Club Private Member Association, Care of

5    Frank Oswald, 10 La Quinta Drive, Lakewood, New Jersey 08701."

6                MR. NOBLE:  Zoom out.

7                Can we please blow up the signature block.

8    Q.  Who signed this letter to the NCUA?

9    A.  Timothy Ellrich, Ricardo Hill, and Yuri Lebedev.

10               MR. NOBLE:  You can take that down.

11   Q.  What, if any, action did the NCUA take in response to this

12   letter?

13   A.  I was tasked with drafting a response to this letter, which

14   I ultimately submitted to the regional director, Jane A.

15   Walters, for her approval and signature.

16   Q.  What did you do with the letter after it was approved?

17   A.  It was sent to the address on this letter.

18               MR. NOBLE:  Can we bring up Government Exhibit 6122.

19               THE COURT:  Mr. Noble, how much time left with the

20   witness?

21               MR. NOBLE:  I'd say probably about 15 minutes.

22               THE COURT:  All right.  We'll do our mid-afternoon

23   break.

24               Members of the jury, I will make it a short break so

25   we make up for some of our lost lunchtime.  About ten minutes,

1    please.   Thank you.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  (Jury not present)

 2              THE COURT:  Matters to take up?

 3              MR. CREIZMAN:  Your Honor, would it be a problem if

 4     Ms. Santillo started the cross-examination, and I came second,

 5     we just go out of order?

 6              THE COURT:  No concern with that?

 7              MR. NOBLE:  No, your Honor.

 8              THE COURT:  That's fine.  All right.

 9              So, counsel for Mr. Gross will begin the

10     cross-examination.

11              Other matters to take up?

12              MR. NOBLE:  Can the witness be excused in case there

13     are?

14              THE COURT:  Yes.  Well, if there aren't, then we can

15     all be excused.

16              MR. NOBLE:  There are no matters from the government,

17     your Honor.

18              THE COURT:  Anything from defense?

19              MR. KLINGEMAN:  No.  Thank you.

20              MR. CREIZMAN:  Nothing.

21              THE COURT:  All right.  Let's just return within -- do

22     what you need to do and then return, so we can take up

23     anything, if necessary.  About five minutes.

24              MR. NOBLE:  Okay.

25              THE COURT:  Thank you.
```

```
 1          (Recess)

 2          THE COURT:  Matters to take up?

 3          MR. NOBLE:  Not from the government.

 4          THE COURT:  All right.  We'll bring in the jury.

 5          MS. SANTILLO:  Your Honor, one minor thing:  We did

 6     switch back, so Mr. Creizman is going to go next.

 7          THE COURT:  Okay.  You're keeping me on my toes.

 8          Cross-examinations are anticipated to be lengthy or

 9     not lengthy?

10          MR. CREIZMAN:  Mine should be not lengthy, like --

11     short.  And I think I am going first, actually.

12          THE COURT:  That's what we established a moment ago.

13          MS. SANTILLO:  Your Honor, I would say maybe 45

14     minutes, maybe a little longer.

15          THE COURT:  All right.  And you will be done in 15,

16     Mr. Noble?

17          MR. NOBLE:  Ten or fifteen.

18          THE COURT:  Great.

19          (Continued on next page)

20

21

22

23

24

25
```

 1                (Jury present)

 2                THE COURT:  Thank you, members of the jury.  Everyone

 3   may be seated.

 4                Mr. Noble, you may continue and complete your direct

 5   examination of Mr. Curry.

 6                MR. NOBLE:  Thank you, Judge.

 7                Can we bring up Government Exhibit 6122 in evidence.

 8   BY MR. NOBLE:

 9   Q.  Directing your attention to the screen, what is this

10   document?

11   A.  This was our response to the complaint letter we received

12   from the Collectables Club.

13   Q.  To whom is it addressed?

14   A.  Collectables Club Private Member Association, Attention

15   Timothy Ellrich, Ricardo Hill, and Yuri Lebedev.

16   Q.  You sent it to that same address listed in the earlier

17   document we saw in Lakewood, New Jersey, correct?

18   A.  Yes.

19   Q.  Can you just read to the jury what you wrote?

20   A.  "Dear Gentlemen:  I received your January 7th, 2015

21   correspondence expressing your concern with being removed from

22   the board of directors at Helping Other People Excel Federal

23   Credit Union.  You are correct in stating HOPE is designated as

24   a low-income credit union.  However, HOPE's charter does not

25   contain language indicating they can serve persons belonging to

1   associations within their community.  Therefore, membership in

2   the Collectables Club Private Member Association does not meet

3   the qualifications for membership into HOPE.  As you are not

4   authorized to conduct business on behalf of HOPE, we will not

5   be permitted to discuss additional matters concerning HOPE with

6   you.  If you wish to discuss the matter further, please contact

7   HOPE's officials."

8               MR. NOBLE:  Can you zoom out.

9   Q.  Who is copied on this letter?

10  A.  Our associate regional director of program, Kelly Lay,

11  Supervisory Examiner Terrence Adam, Examiner Len Siwak, and

12  Examiner Meg Flok.

13  Q.  Why were these individuals copied?

14  A.  They had either been on-site at HOPE during the examination

15  process or were familiar with HOPE in some capacity.

16              MR. NOBLE:  Can we blow up the address portion again.

17  Q.  Mr. Curry, based on the letter that you received from the

18  Collectables Club members, what was your understanding of where

19  the Collectables Club was headquartered?

20  A.  At 10 La Quinta Drive, Lakewood, New Jersey 08701.

21  Q.  Does that information have any relevance as to whether or

22  not the Collectables Club members could be members of HOPE

23  Federal Credit Union?

24  A.  That address is located within their field of membership,

25  so it brings into question whether or not they are eligible.

H2MKLEB5                     Curry - Direct

1   Q.  What was your determination as to whether they were

2   eligible or not?

3   A.  Well, we consulted with our Office of Consumers Financial

4   Protection & Access.  They're the office of NCUA that handles

5   any chartering, or field of membership amendments, or if we

6   have any questions in the field about needing a clarification,

7   we would go through them for their assessment, determination.

8   And they determined that this association did not qualify for

9   membership.

10              MR. NOBLE:  If we can zoom back out.

11  Q.  Is that based at least, in part, on what you wrote here,

12  that HOPE's charter did not include language indicating that

13  they can serve persons belonging to associations within their

14  community?

15  A.  Yes.

16              MR. NOBLE:  You can take that exhibit down.

17  Q.  Now, Mr. Curry, approximately how many credit unions are

18  there in Region II, the region that you cover?

19  A.  Probably between 1100 and 1200.

20  Q.  So it's a large number of credit unions?

21  A.  Yes.

22  Q.  Prior to your involvement looking into issues at HOPE

23  Federal Credit Union, had you ever heard of HOPE Federal Credit

24  Union?

25  A.  No.

H2MKLEB5                          Curran - Direct

1  Q.  Now, did there come a time in the fall of 2014 when you

2  received a telephone call from somebody at the Federal Reserve

3  Bank regarding HOPE Federal Credit Union?

4  A.  Yes.

5  Q.  Is the Federal Reserve Bank sometimes referred to as "the

6  Fed"?

7  A.  Yes.

8  Q.  Is it unusual for the NCUA to receive a call from the Fed

9  concerning a particular credit union?

10  A.  We work collaboratively from time to time, but it is

11  unusual to receive emails and voicemails pertaining to a

12  particular credit union from the Fed.

13  Q.  Why did the Fed contact you or the NCUA regarding HOPE

14  Federal Credit Union?

15  A.  As part of their due diligence process, apparently HOPE was

16  trying to set up direct access through the Fed with a Fed wire,

17  so they were trying to set up direct access for ACH processing

18  and wire transfers with the Fed.  And as part of their due

19  diligence, they reached out to the regulator, which is NCUA, to

20  see if we knew why they were doing that, if we had any

21  concerns.  And during these conversations is when we realized

22  that Alloya Corporate, who had been helping HOPE with their

23  payment processing, ACH processing, had terminated service with

24  them at, I believe, some point in November of 2014.

25  Q.  Did there come a time when you learned what types of ACH

1  transactions HOPE FCU was processing?

2  A.  At that point we were just being notified about the volume

3  of ACH transactions, and that there was a couple of money

4  transmitters or money transfer companies that were involved in

5  this ACH transacting.

6  Q.  Are you familiar with the name Kapcharge?

7  A.  Yes.

8  Q.  How are you familiar with Kapcharge?

9  A.  Due to their association with HOPE.

10  Q.  Can you explain how Kapcharge was associated with HOPE?

11  A.  I first learned of Kapcharge in late December 2014, after

12  our examiner in charge had completed a supervision contact.

13  Kapcharge is a third-party payment processor, which means they

14  are a third party that processes various types of electronic

15  payments on behalf of other merchants or businesses, companies,

16  or individuals, through their own account at a particular

17  financial institution.

18  Q.  In this case, were they using their account at HOPE FCU to

19  process transactions for their customers?

20  A.  Yes.

21  Q.  What types of -- I'm sorry, where is Kapcharge based?

22  A.  In Canada.

23  Q.  For what types of customers was Kapcharge processing ACH

24  transactions?

25  A.  At first, it was a couple money transfer type companies,

1   similar to like a PayPal account or -- like PayPal.  I believe

2   one was TransferWise and one was PreCash.

3   Q.  And you said at first you learned about the

4   money-transmitting businesses.  Did there come a time when you

5   learned about other businesses Kapcharge was processing for?

6   A.  Yes.  Later on, we learned that they were also processing

7   payments for various payday lenders.

8   Q.  What is a payday lender?

9   A.  They -- so, for individuals that don't have access to loans

10  at traditional banks or credit unions, there are these payday

11  lenders, who will give you small-dollar-amount loans at very

12  high interest rates.

13  Q.  Are credit unions allowed to conduct business or have

14  payday lenders as their members?

15  A.  Not to my knowledge.

16  Q.  But is there anything inherently improper about payday

17  lending?

18  A.  Well, federal credit unions and, I believe, all financial

19  institutions, there's a maximum interest rate you can charge on

20  loans, which is 18 percent.  And a few years back, NCUA made --

21  they wanted to come up with a solution for an alternative to

22  payday lending, in order to help low-income members gain access

23  to loans without being charged an excessive interest rate.  So

24  they called these short-term small-dollar amount loans, and

25  they were essentially an alternative to payday lending.

1    Q.  That's something federal credit unions were allowed do on

2    behalf of their members?

3    A.  Yes.

4    Q.  Now, did the ACH processing that you learned about that was

5    being done by Kapcharge at HOPE affect HOPE's financial

6    condition in any way?

7    A.  With the dollar amount flowing through the credit union, it

8    was often inflating and then deflating their asset size.

9            MR. NOBLE:  Can we bring up Government Exhibit 6102 in

10   evidence.

11   Q.  Do you recognize this document?

12   A.  Yes.

13   Q.  What is it?

14   A.  This is the 5300 Call Report form and instructions.

15   Q.  For what period of time?

16   A.  The second quarter of 2014, which would be June 30, 2014.

17           MR. NOBLE:  Can we flip to the next page.  And let's

18   keep flipping through.

19   Q.  For what credit union is this the 5300 report?

20   A.  Helping Other People Excel, or HOPE.

21           MR. NOBLE:  Can we please flip to page 5.  I'm sorry,

22   I guess we were on 5.  Can you please zoom in on number 33.

23   Q.  What information is --

24           MR. NOBLE:  All the way over, Mr. Chang-Frieden.

25   Q.  What information is included in line 33?

1   A.   This is the total assets the credit union holds.

2   Q.   So what was HOPE's total assets, as of June 30th, 2014?

3   A.   $77,605.

4        MR. NOBLE:   Can we flip to page 8.

5   Q.   What is this document?   What information is included on

6   this page of the document?

7   A.   This would be -- this is the credit union's income

8   statement, so it will be various sources of income and

9   expenses.

10  Q.   Is a credit union supposed to accurately report all of its

11  income and expenses in the call report?

12  A.   Yes.

13       MR. NOBLE:   You can take that down.   Let's bring up

14  Government Exhibit 6103.

15  Q.   Mr. Curry, what is this document?

16  A.   This is the 5300 Call Report form and instructions for the

17  third quarter of 2014, which is September 30, 2014.

18       MR. NOBLE:   Let's flip to page 5.

19  Q.   For what credit union is this the call report?

20  A.   Helping Other People Excel, or HOPE.

21       MR. NOBLE:   Let's zoom in again on line 33, all the

22  way across.

23  Q.   What was HOPE Federal Credit Union's reported assets as of

24  September 30th, 2014?

25  A.   $436,642.

1   Q.  How did that compare to the size of the credit union three

2   months earlier?

3   A.  It grew by six times.

4   Q.  Is that unusual?

5   A.  Yes.

6   Q.  Is that increase in the credit union's assets something

7   that the NCUA cares about?

8   A.  Yes.

9   Q.  Why?

10  A.  Because it's for, I don't know, ten, twenty, twenty-five

11  years, the credit union maintained an asset size similar to

12  what they reported to June 30, 2014, and then within the span

13  of three months it grew six times where it was at on June 30,

14  2014.

15          MR. NOBLE:  You can take that down.

16  Q.  Now, Mr. Curry, after you received the call from the Fed

17  concerning the ACH processing at the credit union, what did you

18  do?

19  A.  We again reached out, I contacted my supervisors, who were

20  in the same office as me, and then we reached out to the

21  supervisory examiner and examiner in charge, and asked that

22  they follow up on these concerns.

23  Q.  Who were those individuals you contacted in the field?

24  A.  The supervisory examiner was Brian McDonough at the time,

25  and the examiner was Meg Flok.

 1   Q.  Did there come a time in 2015 when you became involved in a

 2   conservatorship of HOPE FCU?

 3   A.  Yes.

 4   Q.  About when did that occur?

 5   A.  Middle of October 2015.

 6   Q.  What role did you play in the conservatorship?

 7   A.  I was in the regional office in Alexandria, Virginia,

 8   compiling various source documents from our examiners and

 9   supervisory examiners that have actually been on-site at HOPE.

10   I compiled them into one report.  That way, we could get

11   concurrence from our general counsel and our office of

12   examination and insurance, and ultimately approval from the

13   NCUA board.

14   Q.  Is it fair to say you helped draft all the documentation

15   necessary to get approval to conserve HOPE?

16   A.  Yes.  In coordination with various other NCUA offices.

17   Q.  Did there come a time when you went on-site to HOPE?

18   A.  Yes.

19   Q.  About when was that?

20   A.  The day of conservatorship, which I believe was October 16,

21   2015.

22   Q.  What did you do when you were there?

23   A.  I assisted the examiners in boxing up various credit union

24   records and assisting and changing the access from the credit

25   union to NCUA.

1   Q.  What was the purpose of the NCUA placing HOPE into

2   conservatorship?

3              MS. SANTILLO:  Objection.

4              THE COURT:  Just a second.

5              Statement of grounds?

6              MS. SANTILLO:  Based on the Court's prior ruling.

7              THE COURT:  Overruled.

8   Q.  What was the basic purpose of placing the credit union into

9   conservatorship, without getting into the underlying reasons?

10  A.  Essentially, ineffective management and unsafe and --

11             MS. SANTILLO:  Objection.

12             THE COURT:  Sustained.  The jury will disregard the

13  answer.  Rephrase your question.

14  Q.  What is the general purpose of placing a credit union into

15  conservatorship?

16  A.  To take access of the records and change access in the best

17  interests of the members of the particular credit union.

18  Q.  Is it also to protect the share insurance fund?

19  A.  Yes.

20  Q.  And, again, that's the main purpose of the NCUA, correct?

21  A.  Yes.

22             THE COURT:  Just a second, just a second.

23             You have an objection?

24             MS. SANTILLO:  Yes, leading.

25             THE COURT:  Sustained.

1   Q.  What, if any, any other role did you have in the

2   conservatorship?

3   A.  That was it.  I compiled the documents for the approval of

4   the NCUA board, and then I assisted the day of the

5   conservatorship.

6   Q.  After that point in time, the NCUA controlled the books and

7   records and had access to the accounts of the credit union?

8   A.  Yes.

9           MR. NOBLE:  No further questions, your Honor.

10          THE COURT:  All right.  Thank you.

11          We'll have cross-examination on behalf of Mr. Lebedev.

12          Mr. Creizman?

13          MR. CREIZMAN:  Thank you.

14          I proceed, your Honor?

15          THE COURT:  You may.

16  CROSS-EXAMINATION

17  BY MR. CREIZMAN:

18  Q.  Good afternoon.

19  A.  Hi.

20  Q.  You told the jury earlier about certain responsibilities of

21  board members on credit unions; is that correct?

22  A.  Yes.

23  Q.  And fiduciary responsibilities?

24  A.  Yes.

25  Q.  Now, you have been at the National Credit Union

```
 1   Administration for over eight years; is that right?

 2   A.  That's correct, yes.

 3   Q.  And over that time, you've gotten a lot of experience with

 4   the rules and regulations of the NCUA?

 5   A.  Yes.

 6   Q.  And we can agree that people who are new to credit unions

 7   wouldn't have the same kind of knowledge of NCUA's rules and

 8   regulations; fair to say?

 9   A.  That's fair to say.

10   Q.  It's natural that new board members to a credit union may

11   not have the breadth of knowledge that you do?

12   A.  That's fair to say.

13   Q.  Now, in 2014 or 2015, you received a telephone call from

14   someone identifying himself as Timothy Ellrich, correct?

15   A.  Yes.  He actually called our main office for the regional

16   office, yes.

17   Q.  And Mr. Ellrich was switched over to you?

18   A.  It happened to be my day for phone duty.  We take turns in

19   the office.

20   Q.  Okay.  And Mr. Ellrich said that he was a member of the

21   supervisory board of the HOPE FCU?

22              MR. NOBLE:  Objection.

23              THE COURT:  Sustained.

24   Q.  The caller identified himself as a supervisory member of

25   the FCU?
```

```
1          MR. NOBLE:  Objection.

2          THE COURT:  Same grounds?

3          MR. NOBLE:  Same grounds.

4          THE COURT:  Which?

5          MR. NOBLE:  Hearsay.

6          THE COURT:  Sustained.

7  Q.  Mr. Ellrich asked you a bunch of questions about the

8  responsibilities of being a board member of a credit union?

9  A.  Yes, to my knowledge.

10 Q.  And you gave him some answers?

11 A.  Correct.  I gave him -- from my recollection, I gave him

12 some general advice on what their duties would be as a director

13 on a board.

14 Q.  During that conversation, Mr. Ellrich didn't hide the fact

15 that he didn't know a lot about what responsibilities he had?

16 A.  From my recollection, that's correct.

17 Q.  Now, with all of your experience with the NCUA, is it fair

18 to say that even you don't know everything, off the top of your

19 head at least, right?

20 A.  That would be correct.

21 Q.  And, in fact, you met with the government on a couple of

22 occasions to talk about the testimony you would be providing in

23 this case; is that right?

24 A.  That's correct.

25 Q.  And on one occasion, you told the government that you
```

1  thought it was possible that establishing a virtual office in a

2  community might qualify that entity within a field of

3  membership of a credit union?

4  A.  I believe it would be something to ask our office that

5  would handle that, because it's foreign to me, that thought.

6  Q.  But it was something that you said you weren't sure about?

7  A.  Correct.

8  Q.  Now, you also said before that HOPE FCU was designated as a

9  low-income credit union?

10 A.  That's correct.

11 Q.  There is some significance to that designation in NCUA

12 rules and regulations; is that right?

13 A.  Yes.

14 Q.  One important fact about that designation is that there are

15 certain relaxed regulations with respect to low-income credit

16 unions, right?

17 A.  Yes, in certain areas.

18 Q.  And the purpose of relaxing those regulations is to

19 stimulate community investment; is that accurate?

20 A.  Yes.

21 Q.  And one example of the relaxed regulation is that a

22 low-income credit union can accept a larger number of nonmember

23 deposits; is that right?

24 A.  That's correct.

25 Q.  Now, at some point you received a letter from a lawyer --

 1  not a "lawyah," a lawyer -- representing three members of the

 2  board that were kicked off of the HOPE FCU board, correct?

 3  A.  Correct.

 4  Q.  And those were members of the Collectables Club; is that

 5  right?

 6  A.  Correct.

 7  Q.  Now, the lawyer made an argument that they shouldn't be

 8  kicked off the Collectables Club?

 9          MR. NOBLE:  Objection.

10          THE COURT:  Overruled.

11  A.  I'm sorry, can you repeat the question?

12  Q.  The lawyer argued that those individuals shouldn't have

13  been kicked off the Collectables Club -- I'm sorry, the HOPE

14  FCU board?

15  A.  That's correct.

16  Q.  Now, you didn't respond to that lawyer, correct?

17  A.  That's correct.

18  Q.  That law firm was based in Alabama; is that right?

19  A.  I'm not -- I have no idea.

20  Q.  Is there something I could show you that might help refresh

21  your recollection?

22  A.  Sure.

23          MR. CREIZMAN:  Your Honor, I'd like to show the

24  witness, marked for identification, Government Exhibit 3522-1,

25  which I will hand to the prosecutor.

1          I'm sorry, wrong one.  3522-5.  That's the one.  Here

2    you go.

3          THE COURT:  Is that for me?

4          MR. CREIZMAN:  Yes.

5          (Continued on next page)

1  BY MR. CREIZMAN:

2  Q.  I'm showing the witness Government's Exhibit 3522-5, and I

3  want to focus you -- you can read the whole thing, but I wanted

4  focus you to page 2, the bottom email -- I'm sorry -- the

5  bottom of the page, lines 3 through 10.  Just read that to

6  yourself and let me know if that helps refresh your

7  recollection.

8  A.  Okay.

9  Q.  Does that refresh your recollection?

10 A.  Yes, vaguely.  I know there was a lot of chains of emails

11 going around around that time.  That seems like that was an

12 email between the supervisory examiner and then our regional --

13 okay.

14 Q.  No, that's okay.  I just want to know if that refreshes

15 your recollection that the law firm that you were using was

16 from Alabama?

17 A.  It does, yes.

18 Q.  Do you recall that the name of the law firm was Dollar

19 Associates?

20 A.  Yes.  If that was in that email.  I don't --

21          MR. NOBLE:  Objection.

22          THE COURT:  Sustained.

23 Q.  If you don't remember, is there something that I could show

24 you that might help refresh your recollection?

25 A.  Yes.

1    Q.   Terrific.  I'm showing you --

2             MR. CREIZMAN:  I would like to show the witness

3    Defendant's Exhibit 10 marked for identification.

4             THE COURT:  Okay, go ahead.

5             MR. CREIZMAN:  I will hand a copy to the prosecutor

6    and to the Court.  You can look through the three pages, and

7    I've highlighted certain portions, and after he's read it to

8    himself, just let me know.

9             MR. NOBLE:  Judge, we have an objection as to this

10   being used to refresh the witness' recollection.

11            THE COURT:  Hang on.  What you've been handed, is it

12   something you've seen before?

13            THE WITNESS:  I don't recall seeing this information

14   before.

15            THE COURT:  All right, thank you.  You can hand it

16   back it counsel.

17            Sustained.

18            MR. CREIZMAN:  Your Honor, just for the record, I

19   don't think that --

20            THE COURT:  Counsel, if you want to sidebar, we can.

21            MR. CREIZMAN:  Can we have a brief sidebar?

22            THE COURT:  Yes.

23            (Continued on next page)

24

25

1              (At sidebar)

2              THE COURT:  He hasn't indicated that this is something

3    he's seen before that would refresh his recollection.

4              MR. CREIZMAN:  My apologies for the sidebar, but my

5    understanding from the rule about refreshing recollection is

6    that -- I've always learned you could show anything that might

7    help refresh recollection even if it's something the witness

8    never has seen before.

9              THE COURT:  So if you wrote down on a piece of paper

10   "the law firm that contacted you was called Dollar Associates",

11   can you show that to him?

12             MR. CREIZMAN:  I think that that's -- I do think that

13   that's not -- I mean, from my understanding, you could show

14   them something that they haven't seen before.

15             THE COURT:  There has to be some indication that

16   there's a memory that could be triggered and that there's

17   something that is something that is not just the lawyer feeding

18   him information --

19             MR. CREIZMAN:  Okay.

20             THE COURT:  -- of your own creation.

21             MR. CREIZMAN:  Right.  But yes -- no, I wasn't trying

22   to do that, I was just trying to see if that would stimulate --

23             THE COURT:  Do you have a basis for thinking he knows

24   the name of this law firm?

25             THE WITNESS:  Yes, because he received the letter from

1  the law firm.  He knew it was from Alabama.

2          THE COURT:  So the letter would be something.

3          MR. CREIZMAN:  But I don't have the letter.  I don't

4  have the letter.  I've never seen the letter.  But I knew that

5  they hired this law firm, Dollar Associates from Alabama, and

6  so that is what I wanted to see if showing him the name might

7  help refresh his recollection that that was it.

8          THE COURT:  I think you asked him.  I think you asked

9  him the name.

10          MR. CREIZMAN:  Right, and he says "I don't remember".

11          THE COURT:  Right.  So you can't then just show him

12  the name that you printed off the website.  If saying the name

13  didn't trigger a memory, then showing him a document that he's

14  never seen before --

15          MR. CREIZMAN:  I certainly didn't intend to violate

16  the rules.

17          THE COURT:  I understand.

18          MR. CREIZMAN:  But I just thought that that was okay.

19          MR. NOBLE:  I think he made it clear that this does

20  not refresh his recollection.

21          MR. CREIZMAN:  Okay.

22          THE COURT:  He did.  I mean, to be clear, what's been

23  marked as Defendant's 10 I presume is something you printed off

24  the website?

25          MR. CREIZMAN:  Yes.

H2MQLEB5                     Cur...28 - Cross

```
 1              THE COURT:  And it contains the name Dollar
 2   Associates, which is the name that you --
 3              MR. CREIZMAN:  Right.
 4              THE COURT:  -- asked him about, so all you're doing is
 5   asking him again about the name, you're just showing him.
 6              MR. CREIZMAN:  Right.  If he saw with the firm -- it's
 7   just like a letter from Sullivan & Cromwell.  If I showed him
 8   Sullivan & Cromwell, maybe it would refresh, but I --
 9              THE COURT:  We'll move on.
10              MR. CREIZMAN:  Okay.
11              (Continued on next page)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1              (In open court)

 2              THE COURT:  You may proceed, Mr. Creizman.

 3   BY MR. CREIZMAN:

 4   Q.  Are you familiar with an individual named Dennis Dollar?

 5   A.  I've heard the name.

 6   Q.  Are you aware that he was the chairman of the National

 7   Credit Union Administration for a time?

 8   A.  For a time before I was hired, yes.

 9              MR. CREIZMAN:  No further questions.

10              THE COURT:  All right.  We'll now have cross

11   examination by Ms. Santillo on behalf of Mr. Gross.

12              MS. SANTILLO:  Yes, your Honor.

13   CROSS EXAMINATION

14   BY MS. SANTILLO:

15   Q.  Good afternoon, Mr. Curry.

16   A.  Good afternoon.

17   Q.  My name is Kristen Santillo, and I'm an attorney on behalf

18   of Trevon Gross.

19              One of the things you mentioned when you were

20   testifying was talking about board minutes, correct?

21   A.  Yes.

22   Q.  One of the things you said was that if there was a

23   strategic partnership, you would expect that to be in the board

24   minutes.

25   A.  Yes.
```

 1          MS. SANTILLO:  Could I have Government's Exhibit 6085?

 2          THE COURT:  Which is in evidence?

 3          MR. NOBLE:  It is.

 4          MS. SANTILLO:  Yes.

 5          THE COURT:  All right.  You can publish that.

 6   BY MS. SANTILLO:

 7   Q.  Now, does this appear to be board minutes from the HOPE

 8   FCU?

 9   A.  Yes, ma'am.

10   Q.  And they're dated May 17th, 2014?

11   A.  Yes.

12   Q.  And if I could direct your attention to where it says

13   "strategic partnership update".  Could you read that for us,

14   please?

15   A.  Oh, I see.  Okay.

16          THE COURT:  Could you make it larger, please?

17          THE WITNESS:  "Strategic partnership update.  Chairman

18   Gross gave an updated report on the new partnership leadership

19   with the HOPE FCU.  They will take on the responsibility of

20   running the entire credit union.  We would continue to conduct

21   and do our credit union business for our customers and clients.

22   The board will nominate six new board members to work with HOPE

23   FCU."

24   Q.  You said one of the things that the examiners look at when

25   they come in for their examinations is board minutes.

H2MQLEB5                         Curran - Cross

1    A.  That is correct.

2    Q.  So if the examiners were in to look at the HOPE FCU, they

3    would look at these board minutes.

4    A.  That is correct.

5    Q.  And they would be on notice of the strategic partnership.

6    A.  That would be correct.

7    Q.  Now, you said you got a tip in August, 2014, correct?

8    A.  Our office did, yes.

9    Q.  Yes.  And that led you to go onto the HOPE FCU website.

10   A.  That's correct.

11          MS. SANTILLO:  Could I have Government's

12   Exhibit 724-4?

13   Q.  When you went onto the HOPE FCU website, you could see

14   members -- it listed the board of directors and included people

15   including Yuri Lebedev, Ricardo Hill, and Jose Freundt?

16   A.  That's correct.

17   Q.  And you didn't have to go to any special page on the

18   website, this was on the first page of the website.

19   A.  I don't recall exactly if it was on a different like link

20   on the site or if it was on the main page.

21   Q.  But it was a publicly available document.

22   A.  Yes.

23   Q.  Something you noticed right away.

24   A.  Yes.

25   Q.  No effort to hide it.

1    A.  I don't believe so, no.

2    Q.  And you were in the courtroom when the Court gave a legal

3    instruction to the jury about some of the NCUA rules and

4    regulations, correct?

5    A.  That is correct.

6    Q.  And did you agree with the Court's interpretation of the

7    NCUA rules and regulations?

8              MR. NOBLE:  Objection.

9              THE COURT:  Sustained.

10   Q.  One of the instructions that the Court gave stated that,

11   "The board of directors of the credit union must meet at least

12   once per month, minutes of all board meetings must be kept, at

13   the first meeting after the annual meeting of the members the

14   members of the board must elect the board officers."

15   A.  Yes.

16   Q.  Do you agree with that statement?

17             MR. NOBLE:  Objection.

18             THE COURT:  Sustained.

19   Q.  You noted that there are specific rules about membership.

20   Is it correct that it's not until after the first meeting after

21   the annual meeting of the members that the members of the board

22   must elect the board officers?

23   A.  From my understanding in the bylaws that they have to hold

24   a meeting not to exceed seven days after the annual meeting in

25   order to elect the people that were elected to the board to

1   their positions.

2   Q.  But it's not at the annual meeting that the board officers

3   are elected.

4   A.  Well, that's when they go through the election results from

5   the field of membership, from the members of the credit union.

6   I can't say for sure that they are supposed to take their seats

7   that day.

8   Q.  Okay.  So you don't know if at the annual meeting the board

9   officers, as opposed to the board members, have to take their

10  meeting?

11  A.  Correct.  I can't answer that.

12  Q.  Okay.  Now, if we look at the profile that you looked on at

13  6111.  If you look at the certification, the certification is

14  with respect to the appointment of senior management or

15  volunteer officials, it doesn't say "board members", correct?

16  A.  Of senior management or volunteer officials, that is

17  correct.

18  Q.  And this certification is dated as of June 30th, 2014.

19  That's what you testified to, correct?

20  A.  That is correct.

21          MS. SANTILLO:  If I could have Exhibit 6087, please.

22  Q.  This is board meeting minutes from July 19, 2014, and there

23  was no meeting held by the HOPE FCU because there was not a

24  quorum.  Is that how you would read these minutes?

25  A.  Yes, that's how I would read that.

1           MS. SANTILLO:  If you could turn to Exhibit 6088,

2   which is the minutes of the board of directors meeting for

3   August 16th, 2014.  If you could scroll to the bottom, please.

4   The last page.  I'm sorry, the next page up.  One more up.

5   BY MS. SANTILLO:

6   Q.  Does it appear that it wasn't until the August 14th meeting

7   that the board officers were chosen, August, 2014 meeting?

8   A.  Yes, it appears so.

9   Q.  So when you went onto the website in August, 2014, the

10  board officers are as reflected in these board minutes.

11  A.  Yes.

12  Q.  So the website accurately reflected the board composition

13  as of the August, 2014 meeting.

14  A.  Yes.  These names were -- that are in the minutes as board

15  officers were also on the website.

16  Q.  Okay.  Now, you've been an examiner, that's correct?

17  A.  Yes, that is correct.

18  Q.  And so there is a process of examination that you follow;

19  is that correct?

20  A.  That is correct.

21  Q.  Would you say it's an ongoing process?

22  A.  Correct.

23  Q.  So examiner comes in, examiner looks at things in the

24  files, including board minutes?

25  A.  Correct.

1   Q.  Member files?

2   A.  Correct.

3   Q.  They would look at the applications of board members.

4   A.  Occasionally they would.  It's not necessarily a required

5   step.

6   Q.  If they wanted to, they could go into the files.

7   A.  That's correct.

8   Q.  They might look at things like their driver's license.

9   A.  That's correct.

10  Q.  But a credit union would expect that they'd be able to look

11  into their files.

12  A.  Yes.

13  Q.  And they would look at the minutes, as we've discussed.

14  A.  Yes, that's correct.

15  Q.  Examiners can come to some preliminary findings during

16  their examination; is that correct?

17  A.  That's correct.

18  Q.  And they may discuss those findings with members of the

19  credit union.

20  A.  That is correct.  Hold on.  Not necessarily members of the

21  credit union, but management officials of the credit union.

22  Q.  I understand your distinction, and that's correct.  The

23  people who are participating in the examination as board

24  members are officers of the credit union.

25  A.  Correct.

1    Q.   And the examination process contemplates a back and forth.

2    A.   Correct.

3    Q.   And sometimes the NCUA may come up with a preliminary

4    finding and a member of the management might disagree with that

5    finding.

6    A.   Yes, that's correct.

7    Q.   And sometimes there's a negotiation.

8    A.   That is correct.

9    Q.   And sometimes you're able to reach a resolution.

10   A.   That is correct.

11   Q.   But sometimes you don't reach a resolution.

12   A.   That is also correct.

13   Q.   And there is an appellate process when this happens; is

14   that correct?

15   A.   That's correct.

16   Q.   And members of the credit union are encouraged to use that

17   process if they disagree with the finding of the examiner.

18   A.   That is correct.

19   Q.   There's actually several levels of appeal.

20   A.   To my understanding, yes, that is correct.

21   Q.   So if you are not able to reach a resolution with the

22   examiner, you can appeal to the supervisory examiner.

23   A.   That is correct.

24   Q.   And you can state your case to the supervisory examiner.

25   A.   That is correct.

 1    Q.   There's nothing wrong or improper with disagreeing with the

 2    examiner.

 3    A.   Not at all.

 4    Q.   In fact, there's protections in place that say that nobody

 5    could retaliate against somebody for raising an appeal with an

 6    examiner.

 7    A.   That is correct.

 8    Q.   And if you end up disagreeing with the supervisory

 9    examiner, you can take an appeal of that?

10    A.   That is also correct.

11    Q.   And you could appeal to the regional office.

12    A.   Yes.

13    Q.   You could even appeal even higher than that if you wanted

14    to.

15    A.   Yes.

16    Q.   Okay.  And so a back and forth between the examiner and the

17    credit union is a part of the process.

18    A.   That is correct.

19    Q.   You mentioned something called a letter of understanding;

20    is that correct?

21    A.   That is correct.

22    Q.   And that's one of the findings that an examiner can make in

23    the course of an examination.

24    A.   Well, that's more of an administrative remedy as opposed to

25    a finding.

 1  Q.  Okay.  Well then we'll back it up a little bit.

 2  A.  Okay.

 3  Q.  So you mentioned that there's some things that can be

 4  agreed upon between the examiner and the members of the credit

 5  union; is that correct?

 6  A.  That is correct.

 7  Q.  And so if there is a violation to be found in the credit

 8  union, sometimes people are given an opportunity to remedy that

 9  violation.

10  A.  That is correct.

11  Q.  Sometimes they're given a timeframe that do that?

12  A.  Yes.

13  Q.  Maybe a checklist of items that they can check off to bring

14  themselves into compliance.

15  A.  That is correct.

16  Q.  And does the letter of understanding contemplate that there

17  are things the management agrees to work on to try to come into

18  compliance?

19  A.  That is correct.  It outlines the various corrective action

20  items that we expect them to resolve by the timeframes listed

21  inside the letter of understanding and agreement.

22  Q.  Okay.  And it gives them a chance to do that.

23  A.  Yes.

24  Q.  Now, you mentioned ACH processing a little bit.

25  A.  Yes.

 1    Q.  And there's different kinds of ACH processing, and you

 2    mentioned that ACH processing is one of the sources of fee

 3    income for credit unions; is that correct?

 4    A.  That's correct.

 5    Q.  It's a business that helps grow the assets of the credit

 6    union.

 7    A.  That's correct.

 8    Q.  And there's nothing inherently wrong with ACH processing.

 9    A.  Not inherently, no.

10    Q.  As long as you have the right compliance structures in

11    place, it's okay for a credit union to do ACH processing.

12    A.  That is correct.

13    Q.  One of the things you mentioned was conflicts of interest,

14    correct?

15    A.  Yes.

16    Q.  You can't really vote as a board member on something that

17    you have a conflict of interest about, correct?

18    A.  Correct.

19    Q.  Now, you also mentioned the roles of members of the board,

20    and you walked through sort of various different functions of

21    the various members of the board; is that correct?

22    A.  That is correct.

23    Q.  And one of the things you said is that the chairman has a

24    certain role in the credit union.

25    A.  That's correct.

H2MQLEB5                   Cmx-248 - Cross

1  Q.  And that includes to preside over meetings.

2  A.  Yes.

3  Q.  And you looked at the HOPE FCU bylaws, correct?

4  A.  Yes.

5  Q.  And in the HOPE FCU bylaws, it has something called the

6  Roberts Rules of Order, it adopts those principles.  Are you

7  familiar with those?

8  A.  I glanced at them, but I'm not overly familiar with that

9  section.

10 Q.  Well, is it your understanding that the chairman in both

11 the general credit union laws and in the HOPE FCU credit union

12 laws doesn't actually vote unless he's breaking a tie?

13 A.  That sounds familiar, but I can't say with 100 percent

14 confidence.

15 Q.  Okay.  So you think it's possible that the chairman

16 actually doesn't vote, that he only votes when he breaks a tie

17 and his role is to preside over meetings?

18 A.  That's my understanding.

19 Q.  So to the extent there would be a conflict, if the chairman

20 is not even voting on that, then he doesn't have a conflict

21 because he's not voting.

22 A.  I would still think a conflict could exist potentially.

23 Q.  A theoretical.

24 A.  Correct.

25 Q.  Now, you mentioned that nobody can own a credit union,

correct?

A.   Correct.

Q.   But you could become a member of a credit union.

A.   Correct.  A member/owner, yes.

Q.   And once you become a member of a credit union, you can become a director of a credit union.

A.   That's correct.

Q.   And if you have a group of members who join a credit union, they can collectively vote to elect somebody who they want to be on the board.

A.   Correct, as long as they're within the field of membership, yes.

Q.   As long as they're in the field of membership, and if they have enough power to elect the people they want onto the board.

A.   Correct.

Q.   So the ownership stays with the members, correct?

A.   Correct.

Q.   But the control, you know, the supervision of the credit union goes with the directors.

A.   Correct.

Q.   Now, Mr. Creizman addressed this with you before, I just want to address it one more time.  You met with the government and they asked you some questions.

A.   That's correct.

Q.   And they asked you specifically about whether a virtual

H2MQLEB7                      Curr484 - Gross

1  office could be within the field of membership.

2  A.  Correct.

3  Q.  And you didn't know the answer.

4  A.  That is correct.

5  Q.  Okay.  And you've been an examiner for eight and a half

6  years.

7  A.  That is correct.

8  Q.  Okay.  And you went through five levels of training.

9  A.  That is correct.

10  Q.  Okay.  And you do continuing training.

11  A.  That's correct.

12  Q.  Every year.

13  A.  Well, most years, yes.

14  Q.  Okay.  Fair enough.  Okay.

15       Now, another question the government asked you was

16  about whether organizations can offer financial support to

17  credit unions.

18  A.  Yes.

19  Q.  And that can be done, there's nothing wrong with an

20  organization helping to support a credit union.

21  A.  No.

22  Q.  It's actually fairly common.

23  A.  Exactly.  In most credit unions, especially if they're a

24  single common bond charter, for example, the sponsor company

25  provides support for that specific credit union.

 1   Q.  And there's nothing wrong or improper for them providing

 2   financial support to the credit union.

 3   A.  No.

 4   Q.  Now, you said you received a tip from somebody named Jerry

 5   Coursen in August, 2014?

 6   A.  Our office did, yes, ma'am.

 7   Q.  And the tip, was that related -- in the tip, somebody went

 8   to Mr. Coursen and said they were trying to put millions of

 9   dollars into the credit union; is that correct?

10   A.  That is how it was relayed to me, yes.

11   Q.  Okay.  So you don't have personal knowledge of that call?

12   A.  It was on a phone call and I wasn't on the phone call.

13   Q.  Okay.  And who was that person?

14   A.  It was our regional director, Jane Walters.

15   Q.  Who did you understand the person who went to Mr. Coursen

16   was?

17   A.  I never received a name.

18   Q.  All right.  But you knew that somebody was trying to put

19   millions of dollars into the HOPE Credit Union to take it over.

20   A.  Yes.

21   Q.  And to your knowledge, was that ever conveyed to Mr. Gross?

22           MR. NOBLE:  Objection, calls for speculation.

23           THE COURT:  Overruled.

24           THE WITNESS:  Can you repeat the question?

25   Q.  Sure.  To your knowledge, was that ever conveyed to

 1   Mr. Gross?

 2   A.  Not to my knowledge.

 3   Q.  So August, 2014, there's a tip, and that started the

 4   examination process of HOPE FCU in the Fall of 2014.

 5   A.  Well, that started my review process, at which point we

 6   found out that an examination was still open for HOPE.

 7   Q.  Okay.  But that was what prompted the NCUA to go in and to

 8   start looking at the credit union more closely.

 9   A.  Correct, to go back on-site, yes, ma'am.

10   Q.  I guess my last question would be, another thing that we

11   raised with respect to the -- when the government was speaking

12   with you about the conflict of interest question, they asked

13   you a specific question about what "pecuniary" meant.

14   A.  Correct.

15   Q.  You didn't know the answer to that question.

16   A.  I haven't -- no.  I don't use that word normally, no.

17   Q.  Okay.  But the government asked you a question, and they

18   wanted an answer.

19   A.  That's correct.

20   Q.  And so you came up with an answer.

21   A.  I inferred what it meant by how it was used in that

22   sentence, yes, ma'am.

23   Q.  Thank you.

24           MS. SANTILLO:  That's my last question.

25           THE COURT:  All right.

 1              Mr. Noble.

 2              MR. NOBLE:  Yes, Judge.

 3  REDIRECT EXAMINATION

 4  BY MR. NOBLE:

 5  Q.  Mr. Curry, I'd just like to clarify a few things with you.

 6  Mr. Creizman asked you about some of the relaxed rules that

 7  apply to low-income designated credit unions.  Do you remember

 8  that?

 9  A.  Yes, I do.

10  Q.  And he, I believe, asked you specifically about business

11  share accounts and some of the relaxed rules that pertain to

12  business share accounts.

13  A.  I believe he asked to non-member business accounts.

14  Q.  Yes.  I apologize.  Non-member business accounts.  Can you

15  explain to the jury what those relaxed rules are?

16  A.  They can accept non-member deposits from any source.  So it

17  could be from a business, but NCUA's interpretation on that is

18  that the account cannot be transactional.

19  Q.  What does that mean, the account cannot be transactional?

20  A.  It cannot be used to process transactions.

21  Q.  Would that include ACH transactions?

22  A.  That is correct.

23              MR. NOBLE:  Can we bring up Government's Exhibit 6085

24  in evidence?  And blow up the portion of chairman's report by

25  Trevon Gross.

1   Q.  Do you remember being asked some questions about this by

2   Ms. Santillo on your cross examination?

3   A.  Yes, I do.

4   Q.  And you see the section she highlighted regarding the

5   strategic partnership update?

6   A.  Yes, I do.

7   Q.  Can you just read that section to yourself for a moment?

8   Look up when you're done.

9            Do the board meeting minutes include anything

10  regarding any payments that were going to be made to HOPE

11  Federal Credit Union in connection with the strategic

12  partnership?

13  A.  No.

14  Q.  Do the board meeting minutes include any mention of any

15  payments that were going to be made to Hope Cathedral in

16  connection with the strategic partnership?

17  A.  No.

18  Q.  Do the board meeting minutes include any mention of a

19  written memorandum of understanding between the credit union

20  and another entity in connection with the strategic

21  partnership?

22  A.  No.

23  Q.  If there had been a written agreement or any of the

24  payments that I previously described, would you expect those to

25  be included in the board meeting minutes?

```
 1              MS. SANTILLO:  Objection.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  Can you repeat that?  I'm sorry.

 4   Q.  If there had been any payments, as I previously asked you

 5   about, or a written memorandum of understanding in connection

 6   with this strategic partnership, would you expect that that

 7   would be something included in the board meeting minutes?

 8   A.  I would expect there to be some commentary in the actual

 9   minutes here and then some type of an attachment explaining the

10   relationship.

11   Q.  Would you expect to see the memorandum of understanding

12   included in the board meeting minutes if it had been discussed

13   by the board?

14              MS. SANTILLO:  Objection.

15              THE COURT:  Overruled.  You may answer.

16              THE WITNESS:  Can you explain?  I'm sorry.

17   Q.  Sure.  If the credit union entered into a strategic

18   partnership with an outside entity, a third party, would you

19   expect that's something that the board would discuss?

20   A.  Yes.

21   Q.  Would the board have access to any written agreement that

22   the credit union entered into?

23   A.  Yes.  I would expect that to be in the board minutes and

24   that the board had an opportunity to look at this agreement.

25   Q.  Similarly, if a donation had been made to an individual or
```

H2MQLEB5                          Curran - Redirect

1  an entity associated with an individual on the board, is that

2  something that you expect to see in the board meeting minutes?

3  A.  Yes.

4  Q.  Now, I believe that Ms. Santillo asked you some questions

5  about the duties of the chairman and whether or not he gets to

6  vote on all matters, correct?

7  A.  Correct.

8  Q.  Do you remember that?

9      Does the chairman get to participate in the

10  deliberations of the board, even if he doesn't have a vote?

11  A.  Yes.

12      MR. NOBLE:  Can we bring up Government's Exhibit 6150?

13  These are the bylaws of the HOPE Federal Credit Union.  Please

14  flip to page 17.  I'm sorry.  Can we go back and start with the

15  previous page?  Actually, sorry, it's page 11.  I apologize,

16  Mr. Chang-Frieden.

17  Q.  Now, do you remember Ms. Santillo asked you whether, in the

18  bylaws, there was anything about the chair not having a vote in

19  the case of a tie?

20  A.  I do remember that.

21  Q.  You remember that?

22  A.  That coming up in a question earlier, yes.

23  Q.  Now, generally, are ties supposed to occur on boards of

24  federal credit unions?

25  A.  No.

1   Q.  Why not?

2   A.  Because there's supposed to be an odd number of board

3   members.

4   Q.  Can you just read section 3 after the words "duties of

5   chair"?

6   A.  "The chair presides at all meetings of the members and at

7   all meetings of the board unless disqualified through

8   suspension by the supervisory committee.  The chair also

9   performs other duties customarily assigned to the office of the

10  chair or duties he or she is directed to perform by resolution

11  of the board not inconsistent with the act and regulations in

12  these bylaws."

13  Q.  Does that say anything about the chair not having a vote in

14  the case of a tie?

15  A.  It does not.

16         MR. NOBLE:  If we can flip forward to page 17.  Under

17  section 4, after "conflicts of interest prohibited", can you

18  blow up that section?

19  Q.  Can you just read the first sentence?

20  A.  "No director, committee member, officer, agent, or employee

21  of this credit union may participate in any manner, directly or

22  indirectly, in the deliberation upon or the determination of

23  any question affecting his or her pecuniary or personal

24  interest or the pecuniary interest of any corporation,

25  partnership, or association other than this credit union in

1  which he or she is directly or indirectly interested."

2  Q.  And focus your attention first on the words "director" and

3  "officer".  Would that include the chairperson of the credit

4  union?

5  A.  Yes.

6  Q.  And focusing your attention on the words "in the

7  deliberation upon" followed by "or the determination of any

8  question", do you see that?

9  A.  Yes.

10 Q.  So under that, "a person with a conflict of interest on the

11 board of directors should recuse him or herself from the

12 deliberation of a question that would affect that interest,"

13 correct?

14 A.  Correct.

15 Q.  It would also require the person to recuse him or herself

16 in connection with the determination of that question, right?

17         MS. SANTILLO:  Objection.  He's interpreting the

18 provision.

19         THE COURT:  If you mean leading, I'll sustain.

20 Q.  Is it correct that this language includes, between

21 "deliberation upon" and "the determination of" the word "or"?

22 A.  Yes.

23         MR. NOBLE:  You can take that down, Mr. Chang-Frieden.

24 Q.  Now, you were asked some questions by Ms. Santillo about

25 the election of directors and the election of officers.  Do you

1    remember that?

2    A.   Yes.

3    Q.   Is there a difference between officers and directors?

4    A.   I believe there is a difference.  There's general board

5    directors, and then there's board officers which would be your

6    chairperson, your vice chair person, your secretary, treasurer.

7    Q.   Who elects the directors on the board of directors?

8    A.   The members of the credit union elect the directors.

9    Q.   And when does that occur?

10   A.   At the annual meeting.

11   Q.   And who elects the officers on the board of directors?

12   A.   I believe that's carried out by the board of directors.

13   Q.   And when does that occur?

14   A.   I believe, according to the bylaws, it has to take place

15   within seven days after the annual meeting.

16            MR. NOBLE:  Can we bring back up Government's

17   Exhibit 6111?  Blow up the first paragraph under the

18   certification.

19   Q.   Do you remember Ms. Santillo asking you some questions

20   about senior management or volunteer officials?

21   A.   Yes.

22   Q.   Would that include board members?

23   A.   Yes.

24            MR. NOBLE:  You can take that down, Mr. Chang-Frieden.

25   Q.   Now, you were also asked some questions about ACH

1  processing, correct, by Ms. Santillo?

2  A.  Yes.

3  Q.  And you said that there's nothing inherently evil or

4  improper about ACH processing, correct?

5  A.  That is correct.

6  Q.  Okay.  Is it unusual for a small credit union to process a

7  very large volume of ACH transactions?

8          MS. SANTILLO:  Objection.

9          THE COURT:  Just a moment.

10          MS. SANTILLO:  701.

11          THE COURT:  I'll sustain.

12  Q.  Now, you testified ACH processing is one way credit union

13  can generate fees, correct?

14  A.  That's correct.

15  Q.  Would you expect small credit unions to generate a large

16  amount of fees through their ACH processing, based on your

17  training and experience?

18          MS. SANTILLO:  Objection.

19          THE COURT:  Sustained.

20  Q.  You were asked some questions about the conflicts, correct,

21  conflicts of interest --

22  A.  Correct.

23  Q.  -- by Ms. Santillo?

24          Would there be a conflict if a chairman of the board

25  of directors or an organization that he was affiliated with

 1   received money from a group --

 2           MS. SANTILLO:  Objection.

 3           MR. NOBLE:  -- trying do business with the credit

 4   union?

 5           THE COURT:  Wait a second.  Wait a second.  There was

 6   an objection.

 7           MR. NOBLE:  I'm sorry.

 8           THE COURT:  Grounds?

 9           MS. SANTILLO:  It's 701.

10           THE COURT:  Sustained.

11   BY MR. NOBLE:

12   Q.  Based on your training and experience as an examiner, have

13   you ever seen situations in which a member of a board had a

14   financial interest that could have been affected by a decision

15   that was being made by a board of directors?

16           MS. SANTILLO:  Objection.  701.

17           THE COURT:  Sustained.

18   Q.  Have you ever seen that situation?

19           MS. SANTILLO:  Objection, relevance.

20           THE COURT:  Sustained.

21   Q.  Ms. Santillo asked you about conflicts of interest

22   generally, right?

23   A.  Yes.

24   Q.  She asked you whether a person would have to recuse him or

25   herself if they were serving as the chairperson of the board?

1          MS. SANTILLO:  Objection, misstates.

2          THE COURT:  Overruled.  You may answer.

3          THE WITNESS:  Can you repeat that, please?

4  Q.  Yes, sure.  I was just saying, Ms. Santillo asked you about

5  a situation in which a chairperson of the board of a credit

6  union had a pecuniary interest, a financial interest in a

7  transaction that the board was considering, whether that person

8  could vote or would have to vote on that, correct?

9  A.  Correct.

10 Q.  Okay.  In that situation, if that person had a financial

11 interest, would that person be allowed to vote based on the

12 bylaws?

13         MS. SANTILLO:  Objection, interpretation of the

14 bylaws.

15         THE COURT:  Within the scope.  Overruled.  You may

16 answer.

17         THE WITNESS:  No.

18 Q.  Can you clarify what you mean by "no"?  Would that person

19 be allowed to participate in that decision?

20 A.  No, they would not be able to participate in that decision.

21         MR. NOBLE:  No further questions.

22         THE COURT:  Mr. Creizman.

23         MR. CREIZMAN:  No further questions.

24         THE COURT:  Ms. Santillo.

25         MS. SANTILLO:  Yes.

 1            THE COURT:  Briefly.

 2   RECROSS EXAMINATION

 3   BY MS. SANTILLO:

 4   Q.  Yes.  You had mentioned -- you know, you talked about board

 5   minutes, correct?

 6   A.  Correct.

 7   Q.  And what the process is for taking board minutes.

 8   A.  Yes.

 9   Q.  And what needs to be included in board minutes.

10   A.  Yes.

11   Q.  And when you were initially testifying, you said that the

12   board minutes are a summary of what happens at meetings,

13   correct?

14   A.  That is correct.

15   Q.  And you don't need to take a transcript of the meeting,

16   correct?

17   A.  No.

18            MS. SANTILLO:  If we could pull up -- let me just see.

19   I think it was 6685, but I don't know.  The May 14, 2014

20   minutes.

21            MR. NOBLE:  6085.

22            MS. SANTILLO:  6085.  Thank you.  6085.

23   BY MS. SANTILLO:

24   Q.  And there are details that would not be in there, for

25   example, there's no details in there about the partnership

1   paying for debit cards.

2   A.  I don't see that discussed on this page.

3   Q.  And there's no record of anybody saying "good morning" at

4   10:00 a.m.

5            MR. NOBLE:  Objection.

6            THE COURT:  I'll allow it, and then we're done with

7   that line.  You may answer.

8            THE WITNESS:  No.

9            MS. SANTILLO:  Thank you.

10  Q.  We discussed this issue about whether a chairman votes at a

11  meeting, correct?

12  A.  Correct.

13  Q.  And in these bylaws, it refers to using the Roberts Rules

14  of Order, correct?

15  A.  Correct.

16  Q.  And you weren't familiar with the Roberts Rules of Order.

17  A.  No, I'm not that familiar with it, no.

18  Q.  Okay.  So you can't testify here today one way or another

19  about what the Roberts Rules of Order say about the chairman's

20  participation in voting.

21  A.  That would be correct.

22  Q.  Okay.  So everything that you testified to about the

23  conflicts of interest that might exist with respect to a

24  chairman's participation in voting is not based on the Roberts

25  Rules of Order.

```
 1              MR. NOBLE:  Well, objection.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  Can you repeat that?  I'm sorry.

 4   Q.  Sure.  The hypotheticals the government proposed about

 5   situations where a chairman would vote is not based on any

 6   personal knowledge you have about the Roberts Rules of Order.

 7   A.  That would be correct.

 8   Q.  Okay.

 9              MS. SANTILLO:  That's it.  I have no further

10   questions.

11              THE COURT:  All right.

12              MR. NOBLE:  No redirect.

13              THE COURT:  All right.  Thank you.  Mr. Curry, you are

14   excused.  You may step down.

15              (Witness excused)

16              THE COURT:  We have 15 minutes remaining.  Government

17   may call your next witness.

18              MR. SHIN:  Your Honor, the parties have entered into a

19   stipulation that the government will now offer.  It's marked

20   for identification as Government's Exhibit 4010.

21              THE COURT:  Okay.

22              MR. SHIN:  Mr. Chang-Frieden, if you could publish if

23   for the jury.  Thank you.

24              THE COURT:  So 4010, without objection and on

25   stipulation, is admitted.  Go ahead.
```

```
 1            MR. KLINGEMAN:  Yes.

 2            THE COURT:  Thank you.

 3            (Government's Exhibit 4010 received in evidence)

 4            MR. SHIN:  Thank you, your Honor.  The stipulation

 5   provides that, "If called to testify, Frank Oswald would

 6   testify that, "Paragraph 1.  Frank Oswald" --

 7            MR. KLINGEMAN:  Your Honor.

 8            THE COURT:  Do you have paper?  One of the screens is

 9   not working.

10            MR. SHIN:  I believe we have a few copies, your Honor.

11            THE COURT:  Okay.

12            MR. SHIN:  One moment.  Your Honor, we're handing over

13   one paper copy and we're ready to proceed.

14            THE COURT:  Okay.  Anyone who doesn't have their eyes

15   on it?  Okay.  Looks like we're good.

16            Go ahead.  Thank you.

17            MR. SHIN:  Thank you, your Honor.

18            "Paragraph 1.  Frank Oswald and his mother, Mary Jo

19   Oswald, have resided at 10 La Quinta Lane in Lakewood, New

20   Jersey (The Oswald Residence) since approximately 2012.

21            "2.  Mary Jo Oswald and Michael Murgio are siblings.

22   Michael Murgio is Frank Oswald's uncle, and Anthony Murgio is

23   Frank Oswald's first cousin.

24            "3.  Michael Murgio grew up in Passaic, New Jersey

25   before moving to Florida when he was in his 20s.  Michael
```

1  Murgio has extended family in New Jersey.  The extended family

2  has family reunions in New Jersey nearly ever year.  Michael

3  Murgio attended one such reunion in or about June of 2014.

4          "4.  Michael Murgio started out as a school teacher in

5  Florida before becoming a principal and then a superintendent

6  there.  Then he was elected to and served on a school board in

7  Florida before resigning in 2016.

8          "5.  In or about October or November, 2014, Anthony

9  Murgio and Michael Murgio visited Frank Oswald and Mary Jo

10  Oswald at The Oswald Residence two or three times.

11          "6.  Anthony Murgio and Michael Murgio told Frank

12  Oswald that they needed someone with a New Jersey address to

13  serve on the board of directors of HOPE Federal Credit Union.

14          "7.  Anthony Murgio asked Frank Oswald if he would

15  serve on the board of directors of HOPE Federal Credit Union.

16  Frank Oswald said that he was interested and he signed a form

17  Anthony Murgio sent him for a background check, but Anthony

18  Murgio did not follow up.  Frank Oswald did not in fact serve

19  on or attend any meeting of the board of directors of HOPE

20  Federal Credit Union.

21          "8.  Frank Oswald never discussed with Anthony Murgio

22  using The Oswald Residence to operate the Collectables Club.

23  Frank Oswald never personally received any correspondence at

24  The Oswald Residence addressed to Anthony Murgio or the

25  Collectables Club.  Continuing.  The Collectables Club never in

1    fact operated out of the Oswald residence.

2           "9.  Frank Oswald has never met or communicated with

3    Yuri Lebedev.  Frank Oswald does not recall ever hearing about

4    Yuri Lebedev from either Anthony Murgio or Michael Murgio.

5           "10.  Frank Oswald has never met or communicated with

6    Trevon Gross.  Frank Oswald does not recall ever hearing about

7    Trevon Gross from either Anthony Murgio or Michael Murgio.

8           "And it's further stipulated and agreed that this

9    stipulation, which is Government's Exhibit 4010, may be

10   received into evidence as a government exhibit at trial, signed

11   by counsel for the parties."

12          THE COURT:  Thank you.

13          The government may call its next witness.

14          MR. SHIN:  Thank you.  The government calls Ricardo

15   Hill to testify.

16          THE COURT:  I do invite the jury to stand and stretch.

17          We have just ten minutes remaining.

18          (Pause)

19          THE COURT:  Mr. Hill, you may come forward toward the

20   witness stand.

21    RICARDO HILL,

22        called as a witness by the Government,

23        having been duly sworn, testified as follows:

24          THE COURT:  You may proceed.

25          MR. SHIN:  Thank you, your Honor.

1   DIRECT EXAMINATION

2   BY MR. SHIN:

3   Q.  Mr. Hill, please state and spell your name for the jury.

4   A.  Ricardo Hill.  R-i-c-a-r-d-o, H-i-l-l.

5   Q.  I'm sorry, Mr. Hill.  Would you mind speaking closer to the

6   mic?

7   A.  Yes.  Should I do it again?

8   Q.  Yes.  If you could state and spell your name for the jury,

9   please.

10  A.  Ricardo Hill.  R-i-c-a-r-d-o, H-i-l-l.

11  Q.  Do you have any nicknames?

12  A.  Yes, Rico.  R-i-c-o.

13  Q.  How old are you?

14  A.  I'm 38 years old.

15  Q.  Where do you currently live?

16  A.  In Brandon, Florida.

17  Q.  Could you please describe your educational background?

18  A.  I graduated high school and did some college.

19  Q.  Are you currently employed?

20  A.  Yes, I am.

21  Q.  Where are you currently employed?

22  A.  At Miller's Ale House in Brandon, Florida.

23  Q.  Is that a restaurant?

24  A.  Yes.

25  Q.  What do you do there?

 1   A.  I'm the quality and assurance manager.

 2   Q.  If you could just briefly describe what that means.

 3   A.  It's like the expediter.  Before the food goes out to the

 4   table, I assure its quality and assurance.

 5   Q.  Are you familiar with Coin.mx?

 6   A.  Yes, I am.

 7   Q.  How is it that you are familiar with Coin.mx?

 8   A.  I worked there from 2014 and 2015.

 9   Q.  What kind of business was Coin.mx?

10   A.  It's a Bitcoin exchange.

11   Q.  And for whom did you work at Coin.mx?

12   A.  For Anthony Murgio.

13   Q.  What was your title at Coin.mx?

14   A.  I was a manager.

15   Q.  A manager of any particular area?

16   A.  Yes, the back end, and also the customer service

17   representatives.

18   Q.  Now, were you involved in any criminal activity in

19   connection with your work at Coin.mx?

20   A.  Yes.

21   Q.  What were those criminal activities?

22   A.  Bank fraud, and wire fraud, and conspiracy to do so.  Also,

23   operating an unlicensed money exchange and conspiracy to do so.

24   Q.  You referred to bank and wire fraud.  Just generally

25   speaking, what did you do that constituted bank or wire fraud?

 1   A.  We made three-way calls with customers to their banks and

 2   instructed them to not mention the nature of our business,

 3   which was being a Bitcoin exchange.

 4   Q.  Do you see anyone else in the courtroom who also worked for

 5   Coin.mx?

 6   A.  Yes.

 7   Q.  Do you know his name?

 8   A.  Yuri Lebedev.

 9   Q.  Could you please describe where he's sitting and identify a

10   piece of clothing he's wearing?

11   A.  The gentleman at the defendant's table --

12           THE COURT:  Record will reflect Mr. Lebedev is

13   standing.  Thank you.

14           MR. SHIN:  Thank you, your Honor.

15   Q.  Now, are you familiar with HOPE Federal Credit Union in New

16   Jersey?

17   A.  Yes.

18   Q.  And how is it that you're familiar with that?

19   A.  I was a board member there, and also worked there from

20   approximately the Summer of 2014 to November of 2014.

21   Q.  You referred to being a board member.  Did you have any

22   other roles there?

23   A.  Yes.  I was the operations officer.

24   Q.  And who, if anyone, asked you to become a board member and

25   officer of HOPE Federal Credit Union?

 1    A.   Anthony Murgio.

 2    Q.   Now, did there come a time when you became aware of

 3    payments that Anthony Murgio had made to anyone in order to

 4    gain control of HOPE Federal Credit Union?

 5    A.   Yes.

 6    Q.   And from whom did you learn that?

 7    A.   Anthony Murgio.

 8    Q.   And to whom did Anthony Murgio make those payments?

 9    A.   To Trevon Gross and Hope Cathedral.

10    Q.   And do you see that person in this courtroom?

11    A.   Yes.

12    Q.   Could you please describe where he's sitting and identify a

13    piece of clothing he's wearing?

14    A.   The gentleman at the defendant's table, suit, white

15    shirt --

16              THE COURT:   Thank you, Mr. Gross.

17              The record will reflect the witness identified

18    Mr. Gross, who stood up.

19              MR. SHIN:   Thank you, your Honor.

20    Q.   Now, did you assist Anthony Murgio in making payments to

21    Trevon Gross in relation to HOPE FCU?

22    A.   Yes.

23    Q.   Was anyone else who is currently in this courtroom involved

24    in helping to make those payments?

25              MR. CREIZMAN:   Objection, foundation.

1    THE COURT:  Just a moment.  Sustained.

2   Q.  In connection with your assisting Anthony Murgio in making

3   the payments to Trevon Gross, did you come to learn whether any

4   other people were also involved?

5    MR. CREIZMAN:  Objection.

6    THE COURT:  Overruled.

7    THE WITNESS:  Yes.

8   Q.  And do you see any of them in the courtroom today?

9   A.  Yes.

10  Q.  Who is that?

11  A.  Yuri Lebedev.

12  Q.  Now, in addition to the payments that we've been talking

13  about, were you involved in any other criminal activities in

14  connection with your work at HOPE FCU?

15  A.  Yes.

16  Q.  What were those?

17  A.  Obstructing the examinations of a federal regulator and

18  conspiracy to do so.

19  Q.  Now, did there come a time when you were interviewed by FBI

20  agents concerning your involvement in Coin.mx and HOPE Federal

21  Credit Union?

22  A.  Yes.

23  Q.  And about when was that?

24  A.  May or April of 2016.

25  Q.  Did you admit to the agents your involvement in the

H2MQLEB7                          Hill - Direct

1   criminal activities in connection with Coin.mx and the HOPE

2   FCU?

3   A.  Yes, I did.

4   Q.  Did there come a time when you were subsequently arrested

5   in this case?

6   A.  Yes.

7   Q.  About when was that?

8   A.  In October of 2016.

9   Q.  Now, prior to this case, have you ever been arrested?

10  A.  Yes.

11  Q.  For what?

12  A.  As a juvenile, I was arrested multiple times; once for

13  petty theft from a department store, another time was for

14  passing bad checks, that was done twice, I was also arrested

15  for battery, for fighting in school, as well as possessing of a

16  concealed weapon while at school.

17          And as an adult, I was arrested for two armed

18  robberies I committed.

19  Q.  Okay.  Let's go back to the juvenile arrests that you

20  described.

21  A.  Yes.

22  Q.  What were the results of those cases?

23  A.  Each time I was sentenced to 21 to 30 days in a detention

24  center and then expelled from school for possession of a

25  concealed firearm at school.

1    Q.  And you referenced the burglary convictions as an adult?

2    A.  Yes.

3    Q.  Did you commit those -- was it one or more than one, just

4    to be clear?

5    A.  There was two.

6    Q.  Did you commit those alone or with other people?

7    A.  With other codefendants.

8    Q.  And I believe you referenced that they were armed

9    burglaries; is that correct?

10   A.  Yes.

11   Q.  Did you possess the firearm or did someone you were working

12   with -- was one of your accomplices in possession of the

13   firearm?

14   A.  One of my codefendants was.

15   Q.  What was the result of the criminal case arising out of the

16   burglaries?

17   A.  I was sentenced to ten years in Florida prison.

18   Q.  And about how much time did you serve?

19   A.  Eight and a half years.

20   Q.  Now, in addition to those crimes that you just described

21   for which --

22            THE COURT:  Mr. Shin, we're at 5:00 so we'll break for

23   the day.

24            MR. SHIN:  Thank you, your Honor.

25            THE COURT:  Members of the jury, I do just briefly

1   want to pick up -- there were two issues raised with Ms. Nuñez

2   for next week regarding a request to accommodate leaving a

3   little bit early for some appointments.  I'll speak to counsel

4   and give you more information on that tomorrow.  I think we

5   will be able to do that, again, with shaving some time off of

6   lunch.  I'll just note that I will try to do that if it's

7   necessary.  The more we try to do that, my concern is it just

8   adds up over time, so that's going to mean pushing the days

9   further than they would otherwise go, but we'll do our best as

10  long as we can make up some time, but I'll come back to that

11  tomorrow.

12           There was also some question about the schedule

13  generally and whether the calendar that we gave was anticipated

14  to be for the full trial, including deliberation.  As I've

15  said, I can't predict exactly when the evidentiary portion of

16  the trial will end.  Nothing's changed the estimate that

17  indicated in total three to four weeks.  If I have any further

18  information about that shorter or longer, I'll let you know,

19  it's just that I can't precisely predict beyond what we've done

20  so far.  But we certainly appear to be on schedule, and we'll

21  keep making sure that we do our best in that regard.  You're

22  certainly doing your part, which I greatly appreciate.

23           Bearing my instructions in mind, as always, I wish you

24  a good night.  We'll start promptly at 9:30 tomorrow.  Thank

25  you so much.

1           (Continued on next page)

 1                    (Jury not present)

 2              THE COURT:  Mr. Hill, you may step down.  You're

 3     excused for the evening.

 4              THE WITNESS:  Thank you, your Honor.

 5              THE COURT:  Everyone may be seated.  Matters to take

 6     up, counsel?

 7              MR. NOBLE:  None from the government.

 8              MS. SANTILLO:  No, your Honor.

 9              MR. CREIZMAN:  No, your Honor.  Thanks.

10              MR. KLINGEMAN:  I have one matter, your Honor.

11              THE COURT:  Go ahead, Mr. Klingeman.

12              MR. KLINGEMAN:  During the oral argument midday

13     concerning the NCUA conservatorship evidence --

14              THE COURT:  Yes.

15              MR. KLINGEMAN:  -- the government made reference to

16     evidence, or at least an allegation that Kapcharge may have

17     provided funds to HOPE FCU that were subsequently used to pay

18     legal fees.  I have no information about that, but I would ask

19     the Court to direct the government to front that issue, at

20     least with counsel, if not the Court, if there is any prospect

21     of that evidence being elicited from a witness in front of the

22     jury.

23              I would submit, without knowing more, that it's

24     irrelevant and potentially prejudicial, but I don't know

25     anything about it, and I don't want it to come up in the middle

 1    of direct examination.

 2            MR. NOBLE:  We're happy to discuss it with defense

 3    counsel.

 4            THE COURT:  All right.  Do that right after I step

 5    down so that you can raise with me by letter over the evening

 6    if it's something that needs to be addressed for the first

 7    segment tomorrow morning.  I don't know that it will be, but

 8    see if you can get to either agreement or a common

 9    understanding of disagreement.

10            MR. NOBLE:  So your Honor isn't expecting anything, as

11    I said earlier, I don't think this is going to be an issue

12    until the testimony of Terry Adam, who is one of our last NCUA

13    witnesses, so this isn't -- if it comes in, it's not going to

14    come in until near the end of trial.

15            THE COURT:  Well, good for now, but --

16            MR. NOBLE:  Yes.

17            THE COURT:  Please do let --

18            MR. NOBLE:  Of course.

19            THE COURT:  -- defense counsel know what's anticipated

20    since they have inquired.

21            Did you have something, Mr. Creizman, or you're just

22    standing?

23            MR. CREIZMAN:  I do.  I've mustered up the courage.

24    If I could have your Honor submit an amended electronic form so

25    that I can bring in two iPads, because I have --

1            THE COURT:  One for me, right?

2            MR. CREIZMAN:  Yes, one for your Honor.  And also, I

3    have like law books on it, and I would have been able to show

4    your Honor about the refreshing recollection, or I would have

5    been wrong, but I think at least I would have had it, and my

6    one is dead, so that's the only problem.

7            THE COURT:  You can submit it and I'll probably sign

8    it.

9            MR. NOBLE:  I have an objection.

10            THE COURT:  You think he's more dangerous with or

11    without law?

12            Let me just note, because though I've invited it about

13    eight times, I haven't had briefing or argument really on where

14    the line will be between lay and expert testimony.  It did come

15    up a little bit.  I wrote on objections.  If anybody wants to

16    brief the issue or raise the issue orally in advance, you

17    certainly can.  I do think wherever the appropriate line is

18    drawn, certainly if the defense uses a witness in a way that

19    elicits more generalized, specialized testimony then it is

20    opening the door and within the scope of a redirect, which is,

21    by my estimation, what happened today.

22            MR. NOBLE:  That was my thinking, as well.  I tried to

23    steer clear of it on the direct.  I believe there was only one

24    701 or 702 objection during the direct about fiduciary.  I

25    could be mistaken.  But I tried with --

```
 1              THE COURT:  They may.

 2              MR. NOBLE:  -- some difficulty to get it in on

 3    redirect.

 4              THE COURT:  And they may make choices at which point

 5    to object or not, or maybe they agree with you on where the

 6    line is drawn.  If the government gets away with something on

 7    direct and then -- and for strategic or for other reasons the

 8    defense then uses that as a point of questioning in cross, then

 9    I -- unless one has an argument that it's inappropriate, if

10    that's done on cross, I can't see why it would be inappropriate

11    on redirect.  So that's my thinking.  You can tell me if or why

12    you have a different view, and if anybody has concerns about --

13    especially, I suspect with respect to the examiners, as to

14    where that line will be drawn and wants to be heard on it, I do

15    encourage you to either brief or write the Court or raise it

16    orally.

17              We'll meet at 9:00.  Anything else?

18              MR. SHIN:  Your Honor, just one scheduling point for

19    tomorrow.  I expect that Mr. Hill's testimony will take much,

20    if not all, of tomorrow, in part because I anticipate that

21    there will be a lengthy cross examination.

22              THE COURT:  I thought you were indicating his direct

23    would take all day.

24              MR. SHIN:  No.  We do have one other witness who, for

25    scheduling reasons, we would like to put on -- he's only
```

1  available tomorrow and in town tomorrow.  It's a witness from

2  Bank of America, and we expect the testimony will be fairly

3  brief.  He'll be testifying about some wire transactions, the

4  relevance of which include for venue.  And so we would propose

5  that, similarly to what we did for interrupting Special Agent

6  Jarrow's testimony to permit Ms. Wotherspoon to get on and off,

7  we would propose to do that for the Bank of America witness,

8  Andrew Leavy, tomorrow, unless there's any objection.

9          MR. KLINGEMAN:  A couple things.  No objection --

10          THE COURT:  You need a microphone.

11          MR. KLINGEMAN:  -- no objection in principle to what

12  the government is suggesting, but I have two requests.  It's my

13  understanding that we don't have Jencks material yet for this

14  witness.  Two, I would ask that if he's going to interrupt and

15  examination, he interrupt the direct and at least not my cross.

16          MR. SHIN:  That's fine.  I mean, I think it may make

17  sense just to put the Bank of America witness on early in the

18  day, perhaps even first.  We'll have some Jencks material for

19  you tonight.  I don't expect it to be voluminous.

20          MR. KLINGEMAN:  I wouldn't be anticipating it.  If you

21  could bring me a hard copy, too, I'd appreciate it.

22          MR. SHIN:  Just for you.

23          MR. KLINGEMAN:  I'm truly old school.

24          MR. SHIN:  With the Court's indulgence, if we could

25  put the Bank of America witness on first tomorrow and then

1    resume with Mr. Hill?

2              THE COURT:  That's fine with me.

3              MR. KLINGEMAN:  That's fine.

4              THE COURT:  Mr. Creizman, maybe instead of an iPad for

5    me you get a printer for Klingeman.

6              So that's the plan.  What's the witness' name?

7              MR. SHIN:  Andrew Leavy.

8              THE COURT:  So Leavy first, and it's short?  Is

9    that --

10             MR. SHIN:  Yes, your Honor.

11             THE COURT:  Okay.  And then return to direct.  And

12   I'll give the jury a similar instruction as to yesterday.

13             MR. SHIN:  Thank you.

14             THE COURT:  Anything else?

15             Thank you everyone.  Have a good night.  See you at

16   9:00.

17             (Adjourned to February 23rd, 2017, at 9:00 a.m.)

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

CLAYTON CURRY
Direct By Mr. Noble . . . . . . . . . . . .1051
CLAYTON CURRY
Direct By Mr. Noble . . . . . . . . . . . .1108
Cross By Mr. Creizman  . . . . . . . . . . .1162
Cross By Ms. Santillo  . . . . . . . . . . .1173
Redirect By Mr. Noble  . . . . . . . . . . .1189
Recross By Ms. Santillo  . . . . . . . . . .1199
RICARDO HILL
Direct By Mr. Shin . . . . . . . . . . . . .1205

GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 4011    . . . . . . . . . . . . . . . . . . .1040

 6001 through 6019, 6061 through 6076, . . . .1040

           6081 through 6099, 6101

           through 6107, 6111, 6112,

           6113, 6121, 6122, 6125, 6126,

           6129, 6130, 6131, 6133 through

           6136, 6143, and 6200 through

           6207

 6124    . . . . . . . . . . . . . . . . . . .1041

 6150    . . . . . . . . . . . . . . . . . . .1112

 724-4   . . . . . . . . . . . . . . . . . . .1133

 4010    . . . . . . . . . . . . . . . . . . .1202