H2NKLEB1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                 v.                        15 Cr. 769 (AJN)

5   YURI LEBEDEV and TREVON GROSS,

6                 Defendants.              Jury Trial

7   ------------------------------x

8                                          New York, N.Y.
                                           February 23, 2017
9                                          9:10 a.m.

10
    Before:
11
                         HON. ALISON J. NATHAN,
12
                                           District Judge
13                                         And A Jury

14                          APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    BY:  EUN YOUNG CHOI
17       DANIEL S. NOBLE
         WON S. SHIN
18       MICHAEL CHANG-FRIEDEN, Paralegal
         EMILY GRANT, Paralegal
19       Assistant United States Attorneys

20  CREIZMAN, PLLC
         Attorneys for Defendant Yuri Lebedev
21  BY:  ERIC M. CREIZMAN
         MELISSA MADRIGAL
22       JONATHAN MICHAELSON, Paralegal

23  KROVATIN KLINGEMAN, LLC
         Attorneys for Defendant Trevon Gross
24  BY:  KRISTEN M. SANTILLO
    BY:  HENRY E. KLINGEMAN

25

H2NKLEB1

```
 1                    (In open court; jury not present)
 2                    THE COURT:  Good morning.
 3                    COUNSEL:  Good morning, your Honor.
 4                    THE COURT:  Matters to take up?
 5                    MS. CHOI:  Your Honor, briefly.  If your Honor
 6      recalls, in our WhatsApp deliberations and conference, there
 7      was an issue that arose with regard to statements that
 8      Mr. Gross made in a conversation with Anthony Murgio regarding
 9      certain groups within Lakewood.
10                    THE COURT:  Yes.
11                    MS. CHOI:  We have a proposed redacted version that we
12      shared with defense counsel.  What we would propose, I think,
13      makes the point that we would like to make, but is neutral with
14      regard to referencing specific ethnic groups.
15                    THE COURT:  Okay.  I'll take a look.
16                    MS. CHOI:  If the Court would indulge me on relevance,
17      once you have a moment, of why we think this is material
18      evidence.
19                    THE COURT:  Okay.  Go ahead.
20                    MS. CHOI:  Your Honor, the defense opened with a
21      theory that this was a small credit union for which Mr. Gross
22      was trying to grow, and one of the many things that was
23      important to Mr. Gross was growth of the membership, the number
24      of people who actually joined the credit union.  This is
25      excellent evidence, in the government's opinion, that, in fact,
```

1    that wasn't true.  Mr. Gross wasn't -- his priority concern was

2    not growing the membership of the credit union.  In fact, he

3    was very concerned about one particular group of individuals in

4    this case, the Jewish population, taking over control of the

5    credit union, so that he wanted to go after another group.

6           And I think the redactions that we propose makes

7    neutral and hides the fact of what sort of group of people they

8    are.  It just makes clear that there is one group of people

9    that he does not want into the credit union, because they will

10   take over the credit union, but there are other people that

11   they are willing to enter in.  And I think it's an important

12   point because it emphasizes the fallacy of this assumption that

13   with regard to good faith, that Mr. Gross was working and

14   trying to do everything he could to grow this credit union.  In

15   fact, he cared deeply about maintaining control over the credit

16   union, and even though there was an ample group of individuals

17   who could add assets and open share accounts, he did not want

18   that to happen.

19          So that's why we would propose this.  It eliminates

20   all reference to the types of groups.  We got rid of the -- if

21   you recall, there was a discussion about I can salsa in

22   reference to the Latino population, which is the group that

23   Mr. Gross preferred over the Jewish population of Lakewood.  We

24   eliminated all of that.  It could be any -- it makes clear that

25   there are two groups of people, one he prefers and one he does

H2NKLEB1

1    not.  It could be any group of people.  It could be older

2    people, younger people.  I think it makes neutral what group of

3    people it is.

4              THE COURT:  All right.

5              MS. SANTILLO:  Your Honor, the relevance here is, I

6    think, zero, and the prejudice is extraordinary, and I think

7    that it should be excluded altogether.  The redactions only

8    suggest that there is some sort of ethnic population that is

9    targeted here, and it's totally -- it has zero relevance to --

10             THE COURT:  Why does it suggest an ethnic population?

11             MS. SANTILLO:  I think if you read it in context,

12   that's what it -- "They run Lakewood."

13             THE COURT:  I wonder if we could get rid of that line,

14   "They run Lakewood" line, just because I think that might cause

15   someone to speculate in the way Ms. Santillo is suggesting.

16   I'm not sure otherwise it's there.  Just so we're talking about

17   the same thing, what do you say?

18             MS. CHOI:  Yes, your Honor.  If we just got rid of the

19   portion on line just to be clear for the record, PK3906, just

20   the part that says "They run Lakewood," we'd be happy with

21   that.

22             THE COURT:  So it would say, "So many blank people

23   here crazy," next line "Yes," next line, "It's the craziest

24   thing.  I know a possible approach for membership, but then

25   they could take over.  We can speak about it."  Next line,

H2NKLEB1

"They will take over.  We need to go after blank population,"
and then that's the end.

       MS. CHOI:  Yes, your Honor, no reference to salsa.

       MS. SANTILLO:  Your Honor, the phrase population still
suggests that it's going after a specific targeted group, and I
think that the fact that they are trying to add members from
any population goes against whatever inference it is that the
government is trying to offer.  They're trying to get members.
So what they're saying doesn't even make logical sense.

       THE COURT:  Well, I disagree with you, with this
redaction, that there is some -- it could literally mean
anything.  I don't think it causes one to speculate as to an
ethnic population as opposed to, who knows, a specific
geography or the like.  I agree with you that with the "They
run Lakewood," that that might cause people to speculate, but
I'm not seeing it without that.

       MS. SANTILLO:  I think there is a lot of suggestive
things, this kind of people here crazy, population.

       THE COURT:  That's just talking about people and
population.

       MS. SANTILLO:  Yeah.

       THE COURT:  I understand the government's argument for
relevance.  And with the redactions we've discussed, I don't
see the prejudice.  So, with the additional redaction, I will
allow it.

H2NKLEB1

1          MS. CHOI:  Thank you, your Honor.

2          MR. NOBLE:  Just a couple of other things to note,

3     your Honor.

4          I conferred with Mr. Klingeman regarding the evidence

5     regarding the payment of legal fees.

6          THE COURT:  Yes.

7          MR. NOBLE:  And I think we're going to be able to come

8     to some resolution.  We're going to work out some alternative

9     language that would be acceptable to the defense, but still get

10    in the evidence that these payments occurred.  So the parties

11    are going to work on that.

12         I don't expect that evidence to come in until late

13    next week, but more likely, early the following week, so I

14    think we have a little time to work that out, and I will work

15    that out with Mr. Klingeman.

16         THE COURT:  Okay.

17         MR. NOBLE:  I spoke with Ms. Santillo regarding a

18    briefing schedule relating to the issue of failing to turn over

19    the email accounts.  We would propose that the government file

20    a letter by Sunday, and Ms. Santillo would file her letter by

21    Thursday.  Again, this is evidence that we don't expect will

22    come in until the following week.  If the Court is prepared, we

23    can address it at the charge conference on Friday or we could

24    even bring it up first thing Monday morning after your Honor

25    has had a chance to read the letters.

H2NKLEB1

1           THE COURT:  So tell me, one more time, the schedule.

2           MR. NOBLE:  The government will file its letter by

3      this Sunday, and Ms. Santillo would file her letter by next

4      Thursday.

5           THE COURT:  Let me just look at the calendar.  You

6      file Sunday and Thursday, and then the charge conference is

7      Friday.  That's what you're suggesting, we discuss it on

8      Friday?

9           MR. NOBLE:  We could discuss it on Friday or we could

10      discuss it first thing the following Monday morning.

11           THE COURT:  That strikes me as excessive on your end

12      and crunched on my end, just given the schedule.  So how about

13      Saturday and Wednesday?

14           MR. NOBLE:  That's fine.  We're trying to accommodate

15      Ms. Santillo because she's going to be doing all of the

16      witnesses on Wednesday.  It's fine for the government, we're

17      happy to file by Saturday, but I don't know if Ms. Santillo --

18      she requested a little more time.

19           THE COURT:  Well, by 11:59 on Wednesday and then -- if

20      you need that much time to brief it, I need time to look at it,

21      and I have a full calendar on Thursday and Friday.

22           MR. NOBLE:  Yes, your Honor.  We'll file it by

23      Saturday.

24           THE COURT:  All right.

25           What else?

H2NKLEB1

1          MR. NOBLE:  Just one other issue that came up

2     yesterday during Mr. Creizman's cross-examination of Mr. Curry.

3     He cross-examined him on this firm, Dollar Associates.  It

4     turns out Dollar Associates is not a law firm, as Mr. Creizman

5     represented and tried to get the witness to recall the name of.

6     I don't think that we are requesting any kind of curative

7     instruction, but we just wanted to alert your Honor to the fact

8     that Dollar Associates is a consulting firm run by a former

9     NCUA official, it's not, in fact, a law firm.  So that could

10    have been misleading to the jury.

11         THE COURT:  So there is no application?

12         MR. NOBLE:  No, no application to that.  We just

13    wanted to alert your Honor to that fact.

14         Also, the bigger picture, the bigger point is, we have

15    concerns that counsel might be trying to backdoor in an

16    advice-of-counsel defense.  We have conferred with Mr. Creizman

17    about this, and we're going to kind of closely monitor it, but

18    there may be issues because, to the extent they argue that

19    Mr. Lebedev was relying on advice of counsel, either directly

20    from an attorney or through Anthony Murgio, we would have an

21    issue with that because it raises some of the privilege

22    concerns in this case.  The government has not seen all of the

23    email correspondence between Anthony Murgio and his attorneys

24    because of the privilege, including some that may have included

25    Mr. Lebedev.  And to the extent counsel is trying to put forth

H2NKLEB1

an argument to the jury that Mr. Lebedev was acting in good

faith because he was relying on the fact that Anthony Murgio

had consulted with an attorney about various issues, we may

want to attempt to pierce that privilege and force a waiver, so

that we can understand what representations were being made to

the attorneys, what advice the attorneys were giving, because

it could be relevant in addressing this argument from counsel

that Mr. Lebedev was acting in good faith based on advice of

counsel, either directly or indirectly through Anthony Murgio,

because we have concerns, there's evidence that suggests that

Anthony Murgio and others were not completely forthright with

the attorneys that they were consulting with.

        For instance, their chat communications in which

Anthony Murgio tells others that they're not going to disclose

to one attorney the fact that they had paid the money to Trevon

Gross and his church, they were going to withhold that from an

attorney when they were seeking advice from that attorney about

how to proceed with the HOPE FCU situation.  So that's just one

example where Murgio, Lebedev, others could have been either

making misrepresentations to the attorneys or withholding

relevant information in order to get some kind of legal cover

for the conduct that they were engaging in.

        MR. CREIZMAN:  Your Honor, I'd just like to address

both points.

        First of all, with respect to the law firm, number

1    one, there was no intent to deceive or misrepresent anything to

2    the jury.  In Government Exhibit 3522-005, which includes

3    communications between a Brian McDonough of the NCUA and other

4    NCUA people in which Clayton Curry was copied, there's a

5    reference to, "I have communicated" -- this is from Brian

6    McDonough -- "I have communicated with an attorney representing

7    board members who were asked to vacate their seats based on our

8    examined board issue in September.  For some reason, they have

9    retained an attorney based in Alabama to review this matter."

10          Clayton Curry also told the government, in Government

11   Exhibit 3522-001, that he had received a letter from an

12   attorney about the three Collectables members.  And in other

13   communications, in WhatsApp communications that Murgio --

14   Anthony Murgio had with members of his group, he said -- and

15   Michael Murgio -- they said that they were retaining two

16   different firms, one of which was Dollar Associates.  Dollar

17   Associates is based in Alabama.  So to the extent that everyone

18   seemed to refer to them as law firms, that is where -- there's

19   no question that that is the firm that wrote the letter.  So

20   there's no intent to mislead a jury about whether it was a law

21   firm or not.

22          THE COURT:  Well, did you think they were a law firm

23   yesterday?

24          MR. CREIZMAN:  I did, actually, until Mr. Noble

25   brought it to my attention yesterday that they, in fact, were

1    not a law firm, they were a consulting firm for NCUA matters,

2    for credit union matters.

3            But the point is that everyone considered them a law

4    firm.  The only point of all of this was that, from

5    Mr. Lebedev's perspective, who had seen Anthony Murgio write,

6    "We're retaining these guys, look at their credentials," okay,

7    and one of the people was the former NCUA chairman, and

8    Mr. Curry apparently thought that this person was a lawyer,

9    and --

10           THE COURT:  Well, I'm not sure about that, but he was

11   confused by your assertion or suggestion that this was a law

12   firm, that Dollar Associates was a law firm.

13           Now, you're saying you got that from the 3500

14   material, but that might be because you made an assumption

15   that, I don't know, maybe there's another lawyer from Alabama,

16   or maybe you're right, that he made the mistake.  In any event,

17   I take you at your word that you didn't know yesterday, when

18   you suggested it, that Dollar Associates is not a law firm.

19           MR. CREIZMAN:  Right.  And I pieced it together from

20   various sources is what I'm pointing out.  The purpose of the

21   cross-examination wasn't to establish that there was a law

22   firm, so much as what people who worked for Anthony Murgio or

23   who worked with Anthony Murgio on the HOPE FCU believed was

24   going on in terms of communications with the NCUA and -- that

25   this was being handled by Anthony Murgio and Michael Murgio

H2NKLEB1

1    with the assistance of -- in this case, it wasn't a lawyer, but

2    certainly professionals who have experience.  That's what goes

3    to the second point.

4           I'm not asserting an advice-of-counsel defense.  I

5    don't believe that Mr. Lebedev was privy to any attorney-client

6    communications.  And I think that this is a pattern that even

7    the government would acknowledge, that Murgio had told other

8    people, such as Jen Wotherspoon, that there was a lawyer in

9    Texas that says that it's okay to set up an association that

10   could deal in Bitcoins, and you don't need a money transmitter

11   license, and then he's telling people in the group that, A,

12   we've retained this attorney, this law firm, Perkins Cowhey,

13   which I believe is a law firm, and Dollar Associates, which

14   apparently is not.  But the point is that this is what's being

15   communicated online, and the people who are kind of part of the

16   group are not really -- other than Anthony and Michael, they're

17   not communicating with these lawyers.  All they know is that

18   someone's talking about talking to lawyers.  That's all it is.

19          So there's no advice-of-counsel defense, but it does

20   go to Mr. Lebedev's state of mind in terms of good faith, that

21   obviously this is what I'm being told, I'm being told they're

22   handling it with lawyers.  That doesn't give Mr. Lebedev the

23   right to make intentional misrepresentations or -- and maybe it

24   doesn't absolve him in some way of being careless or reckless,

25   but my point is, this is a criminal case, and intent is

```
 1   critical here.  So if the government wants to sift through

 2   attorney-client communications of Anthony Murgio and Michael

 3   Murgio, I'm pretty sure that Yuri Lebedev is not in those

 4   communications and is not making representations to attorneys.

 5   That's not the purpose of why we brought any of this stuff up.

 6           THE COURT:  So let me just make sure I have what you

 7   want to do with it, and then I'll get the government's view.

 8           So you're not saying Mr. Lebedev sought legal advice

 9   himself?

10           MR. CREIZMAN:  Exactly.

11           THE COURT:  And acted pursuant to that advice?

12           MR. CREIZMAN:  Absolutely right.

13           THE COURT:  Or that in seeking legal advice, he acted

14   and, therefore, was acting in good faith?

15           MR. CREIZMAN:  That's right.

16           THE COURT:  But you are saying that to the extent that

17   Mr. Murgio led him to believe that Mr. Murgio sought legal

18   advice --

19           MR. CREIZMAN:  Correct.

20           THE COURT:  -- and based on that advice, Mr. Lebedev

21   understood himself to be acting in good faith?

22           MR. CREIZMAN:  Correct.  Understood that this was not

23   a -- this was a legitimate organization, this was a legitimate

24   effort to try to gain seats to get back their board control of

25   the HOPE Federal Credit Union, that this was not some sort of
```

H2NKLEB1

1      effort to deceive the NCUA in any way.

2              THE COURT:  The idea is that while if Mr. Lebedev did

3      that directly from an attorney, that would be an invocation of

4      an advice-of-counsel defense, but getting that same information

5      through a nonattorney intermediary somehow means it's not an

6      advice-of-counsel defense?

7              MR. CREIZMAN:  No, I wouldn't even say that.  If

8      Anthony Murgio says, look, our lawyer says that it's okay to

9      lie about where you live or something along those lines, this

10     is what this lawyer told me, no, that would approach

11     advice-of-counsel defense.  All I am just trying to point out

12     is that Anthony Murgio and Michael Murgio were representing to

13     the group that they were dealing with lawyers, that they were

14     acting with lawyers, that they were communicating with the

15     NCUA, and strategizing with the insistence of lawyers, not that

16     any particular statement or any particular communication was

17     based on legal advice or anything along those lines.  It's just

18     more of a general idea that the people who are most invested in

19     this business, which were Anthony Murgio and Michael Murgio,

20     were actively seeking counsel and people who pretend -- seemed

21     to be counsel, like Dollar Associates.

22              That's essentially it.  I don't think that comes near

23     to the realm of advice of counsel, because I'm not suggesting

24     that Yuri was told this is okay to do, and we've checked it out

25     with lawyers, but it's more like, you know, just an

H2NKLEB1

1    understanding of the general business.  It's not like Anthony

2    Murgio is saying, hey, let's communicate lies to the NCUA, it

3    was more of a, we're working with attorneys, we're doing what

4    we have to do.  And they never said that this particular

5    communication was approved by an attorney or anything else.

6    I'm just saying that it would impact, I think, on Mr. Lebedev's

7    overall view of the situation that was going on and their

8    efforts, and it probably would impact on his -- I guess his

9    feeling the need to investigate what exactly is happening over

10   here, what they're doing, and how closely he needs to be

11   involved in this process.

12            THE COURT:  Okay.  I understand the distinction.

13            Mr. Noble?

14            MR. NOBLE:  Judge, it does approach an

15   advice-of-counsel defense, an indirect advice-of-counsel

16   defense.  Our main issue with this is that if Yuri Lebedev was

17   copied on any communications, privileged communications,

18   between Anthony Murgio and the lawyers in which

19   misrepresentations were made to the lawyers, that evidence

20   would tend to undermine any defense the mere fact that Anthony

21   Murgio was consulting lawyers somehow implies that Yuri Lebedev

22   was acting in good faith.

23            The problem with that is, we just don't know because

24   we don't have access -- we haven't seen all of the

25   communications between Murgio and the attorneys, because of the

H2NKLEB1

privilege issue.  What we want to do, which we will do, is go
back and see, from our privilege log and speaking with the
taint AUSA, if Yuri Lebedev was copied on any of these emails
communications with attorneys, in which case we may want to
pierce the privilege or seek to pierce the privilege, so that
we can see whether or not Lebedev was on any email
communications that contain misrepresentations, because,
otherwise, we do have a Rule 403 argument to exclude this
evidence and this line of cross-examination, this line of
argument to the jury, that somehow Yuri Lebedev was acting in
good faith based upon the mere fact that Anthony Murgio told
him that he was consulting with lawyers about all this stuff.
Because it does imply that somehow lawyers are giving a
blessing to everything that they're doing.

            Whether you call it a pure advice-of-counsel defense
or an indirect advice-of-counsel defense, that's the value of
this evidence to the defense, and we think it's wholly unfair
if they are making misrepresentations, and Mr. Lebedev is aware
of misrepresentations to lawyers, to be able to permit the
defense to argue to the jury he did nothing wrong, he acted in
good faith based upon the mere fact that they were consulting
lawyers, if the jury doesn't get to hear the full story that
they're actually lying to the lawyers about what they're doing.

            Part of our problem and the reason we're raising this
is just that we want to flag it for your Honor.  It could be an

1    improper line of cross-examination, argument to the jury.  We

2    don't know the full story because we haven't seen all the

3    privileged communications, what exactly it was that Anthony

4    Murgio was telling the lawyers, what Mr. Lebedev knew Anthony

5    Murgio was telling to the lawyers.  We have hints of it in some

6    of the chat messages that are not privileged, but we don't have

7    the full picture yet.

8              MR. CREIZMAN:  I would say that to the extent that

9    Yuri Lebedev was copied on any communications with Perkins

10   Cowhey, Dollar Associates, or any of the firms that Anthony

11   Murgio represented he was talking to, certainly we waive the

12   privilege as to those communications because the point is not

13   even an indirect advice of counsel, it's, again, a more

14   generalized, these are the people in charge, these are the guys

15   who are handling things.  It's not that everything has been

16   blessed by an attorney.  It's more that Yuri Lebedev's degree

17   of care, in terms of reviewing documents and being on guard as

18   to whether some illegality is going on, that is where this all

19   goes to.

20             And I think that that's something that Jen Wotherspoon

21   testified about, and I think that Rico Hill, at least in some

22   of his communications and meetings with the government, said

23   that he thought that lawyers were involved, that Anthony had

24   represented that to him.  Yuri doesn't get a pass just

25   because -- if he makes a misrepresentation, but you can be

1    careless and not looking at a representation and signing onto a

2    representation, and that doesn't make you guilty of a crime,

3    that doesn't give you the necessary intent or even willful

4    blindness unless there is really willful blindness.  And if you

5    are being told that lawyers are in the mix and not with respect

6    to any particular document, just that that's what they're

7    looking at, then I would say that's a factor for the jury to

8    consider.

9            THE COURT:  I think maybe you don't disagree with

10   Mr. Noble.

11           MR. CREIZMAN:  Never.  I never disagree with him.

12           THE COURT:  What would you propose to do?  So you want

13   to say Mr. Lebedev has been given this information that lawyers

14   are involved and Mr. Murgio's consulting lawyers in a way that

15   would suggest to the jury not that a lawyer has given him

16   specific advice to do what he does, but it's relevant to an

17   argument of the lack of good faith, right?

18           MR. CREIZMAN:  That's right.

19           THE COURT:  That's your argument.

20           If with the waiver that you have just indicated -- and

21   I haven't heard Mr. Noble yet as to if there are other people's

22   privilege involved as well.  But if, in fact, Mr. Lebedev is

23   cc'd on some significant number or some number of

24   communications between the Murgios and the lawyers or Dollar

25   Associates, such that he might be copied on misrepresentations

H2NKLEB1

1     to them or the like, it is your position, then, that this could

2     come in to rebut the good-faith argument that you're making?

3             MR. CREIZMAN:  Yes.  Yes, I would think that's fair.

4     I would think that's fair.

5             MR. NOBLE:  Those would be coconspirator statements in

6     furtherance of the conspiracy, we would argue.

7             THE COURT:  So are you in vigorous agreement?

8             MR. NOBLE:  I think we've come to a common ground.  I

9     think in terms of our next steps is we'll go back and look at

10    the privilege log and see if there are any additional

11    communications that the government hasn't seen that Mr. Lebedev

12    may have been copied on.

13            THE COURT:  On the theory that you have now been given

14    a waiver with respect to Mr. Lebedev's communications -- I'm

15    not sure what that means.

16            MR. NOBLE:  Yeah, I think that the communications are

17    still privileged, and I think we would have to have your Honor

18    review them in camera.  We'd have to come up with a way to

19    either seek waiver from other individuals, probably Murgio, on

20    those emails to see if we can actually read them.  We could

21    also submit them to your Honor for review, in camera review, to

22    determine whether or not it appears that there is -- I think

23    the crime-fraud exception would apply if they're lying to

24    attorneys in order to further the conspiracy to try to get

25    legal cover for what they're doing.

H2NKLEB1

1          So we may have arguments that we can pierce the

2     privilege on crime fraud, otherwise we can seek waiver, but I

3     think Mr. Lebedev himself just waiving privilege is not

4     sufficient for the government to get access to those emails.

5          THE COURT:  I think we just need a path forward that's

6     realistic in this time frame.

7          When would this come up?

8          MR. NOBLE:  Do you intend to cross Mr. Hill?

9          MR. CREIZMAN:  The answer is that there may be a

10    WhatsApp communication in which Murgio mentions we're going --

11    look who we're hiring or something like that, that would be the

12    extent of it.  So that would really be it.  I don't think there

13    is anything -- to the extent that Mr. Hill said anything in his

14    proffers with the government about, Murgio told me that

15    everything was okay because he had talked to a lawyer, Murgio

16    represented to people that he had talked to regulators, and

17    everything was okay, so I might cross-examine him on that.  On

18    any particular advice that was given, I don't think Murgio ever

19    said that any particular communication was advised by a lawyer

20    or any --

21         THE COURT:  I guess Dollar Associates, is there a

22    privilege issue since they're not lawyers?

23         MR. CREIZMAN:  No.  And, in fact, in order to restore

24    my good name to this very Court, I would like Mr. Noble to

25    check and see if any communications with Dollar Associates are

H2NKLEB1

1  on the government's privilege log, because if they are, then

2  someone might owe me an apology.

3          MR. NOBLE:  I'm not sure if there are any, but we will

4  check.

5          THE COURT:  So the specific question, Mr. Noble, is:

6  In light of what Mr. Creizman has just said might happen with

7  respect to Mr. Hill, do you have concerns?

8          MR. NOBLE:  Well, first of all, to the extent that he

9  elicits hearsay from Mr. Hill about what Anthony Murgio told

10 him, we would have a hearsay objection.

11         To the extent your Honor admits the testimony from

12 Mr. Hill that Anthony Murgio told me he consulted a lawyer, we

13 would request a limiting instruction that obviously that's not

14 coming in for its truth, it's coming in for, I guess, the

15 purpose of state of mind, but along the lines -- I don't think

16 we would have any, other than the potential hearsay objections,

17 to the line of cross-examination that Mr. Creizman has

18 outlined.

19         THE COURT:  All right.

20         MR. NOBLE:  We would reserve the right to possibly

21 request later on some kind of instruction to the jury that it

22 should disregard this line if we later find out evidence that a

23 lot of this is based on misrepresentations.

24         THE COURT:  Well, I would think you could put on the

25 evidence.  I don't know that it would lead to instructing them.

H2NKLEB1

1    That is to say, unless there's some deeply misleading, but if

2    it's just a contested factual question, then you would have the

3    opportunity to present counter evidence.

4            MR. NOBLE:  Yes.  We just want to reserve our right to

5    make an application in that regard, depending on your Honor's

6    rulings on privilege issues and what we find.

7            THE COURT:  I would never stop an application.

8            MR. NOBLE:  Okay.

9            THE COURT:  We do have all of our jurors.  They're so

10   responsible; it is truly admirable.  One had missed a train by

11   about ten seconds, and so contacted Ms. Nunez to say she

12   wouldn't be here until about 9:40.  She's here, so she just

13   needs a few minutes to settle in.  So, unless there's anything

14   else we need to take up, I propose everybody just take two

15   minutes, and then we'll bring out the jury.

16           MR. NOBLE:  Thank you, Judge.

17           MR. KLINGEMAN:  If I could let you know what's

18   happening with Mr. Hill.  The government the night before last

19   provided to me, who will be handling Mr. Hill, a list of the

20   exhibits that the government intends to show to Mr. Hill.  I

21   have reviewed that list, and I don't have any objections.

22           Late last night, or should I say early this morning,

23   the government supplemented that list with some more exhibits.

24   I'm going to need some time today, lunch, whatever, to look at

25   them, but I don't anticipate any objections.

H2NKLEB1

1         The government also provided to me a stipulation

2    concerning the admissibility of audio recordings and

3    transcripts corresponding to those audio recordings.  I'm

4    prepared to sign the stipulation when it's given to me, I'm

5    prepared to consent to the admissibility of these audio

6    recordings and the playing of those audio recordings to the

7    jury today.

8         I'm also stipulating to the use of the transcripts.  I

9    did tell the government that I will be listening carefully, as

10   we all will, and if we pick up any stray errors in the

11   transcripts, we can correct them, but one thing I don't know is

12   the Court's practice with respect to transcripts going in

13   evidence and to the jury.  And, obviously, I defer to the Court

14   on that, but if the transcripts are going to the jury, then I

15   want to reserve the right to correct any of them as we're

16   listening in court today.

17         THE COURT:  I've always managed to get agreement

18   between the parties on this question.  So why don't you see if

19   there's agreement.

20         MR. KLINGEMAN:  Will do.

21         THE COURT:  And then if there's not --

22         MR. KLINGEMAN:  Finally, the government's offering

23   these so-called WhatsApp chats, and, again, I have no objection

24   to their use and publication to the jury today.  So the only

25   thing I'm going to try to do sometime while Mr. Hill is on

H2NKLEB1

1    direct is review the second set of exhibits.  Otherwise, we're

2    good to go.

3            THE COURT:  And we have another witness first?

4            MS. CHOI:  Yes, your Honor.  I'm sorry.  I just want

5    to get clarity.  Your Honor said that, in your experience, the

6    parties have agreed as to whether or not transcripts go back

7    with the jury or not?

8            THE COURT:  Yes.

9            MS. CHOI:  I just wanted to make sure I had heard that

10   correctly.

11           THE COURT:  Yes.  People have different views.

12           MS. CHOI:  Right.

13           THE COURT:  And I haven't had to resolve different

14   views in that regard.

15           MS. CHOI:  Understood.

16           THE COURT:  I'm going to take one minute.  And, thank

17   you, Mr. Klingeman, for the report.  I appreciate the efforts.

18   We'll take a minute, and I will come back in one minute, and

19   then we'll bring in the jury.

20           (Recess)

21           MR. SHIN:  Judge, just as the jury is coming out, a

22   reminder that we're planning to put on the Bank of America

23   witness.

24           THE COURT:  What's the witness' name?

25           MR. SHIN:  Andrew Levy.

H2NKLEB1

1          THE COURT:  Thank you, Mr. Shin.

2          MR. SHIN:  So we'd ask the Court to provide that

3     instruction we had discussed yesterday.

4          THE COURT:  I will.

5          MR. SHIN:  Thank you.

6          THE COURT:  About how long for the direct?

7          MR. SHIN:  Five to ten minutes.

8          MR. KLINGEMAN:  I've got about three hours of cross.

9          THE COURT:  Excellent.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H2NKLEB1

 1              (Jury present)

 2              THE COURT:  Good morning, everyone.

 3              JURY MEMBERS:  Good morning.

 4              THE COURT:  Please take your seats.

 5         Good morning, ladies and gentlemen of the jury.  Thank

 6    you again for your attention and diligence.  I note there was a

 7    train issue this morning, which means a slightly late start,

 8    but I'm very grateful for everyone's continuing efforts to be

 9    here on time.  It's really helping us keep this process moving.

10              As happened last week, there is a scheduling issue,

11    and so rather than returning immediately to Mr. Hill's direct

12    examination, we're going to interrupt that now, and the

13    government will call a different witness, and we will do the

14    direct, cross, and redirect of that witness and then return to

15    Mr. Hill.

16              Mr. Shin.

17              MR. SHIN:  Thank you, your Honor.  The government

18    calls Andrew Levy to the stand.

19              THE COURT:  All right.  Mr. Levy may come toward.

20     ANDREW LEVY,

21         called as a witness by the Government,

22         having been duly sworn, testified as follows:

23              THE COURT:  Please be seated, and once you are seated,

24    please pull yourself up close to the microphone, and state and

25    spell your name for the record.

1       THE WITNESS:  Andrew Levy, A-n-d-r-e-w, L-e-v-y.

2       THE COURT:  You may proceed.

3       MR. SHIN:  Thank you, your Honor.

4   DIRECT EXAMINATION

5   BY MR. SHIN:

6   Q.  Mr. Levy, good morning.

7   A.  Good morning.

8   Q.  Where do you work?

9   A.  Bank of America.

10  Q.  And how long have you worked there?

11  A.  For a little over ten years.

12  Q.  And during those ten years, have you had the same job the

13  entire time?

14  A.  No.

15  Q.  Could you please describe for the jury the different jobs

16  you've had at Bank of America?

17  A.  Sure.  I started as a senior account manager in customer

18  assistance, then I moved to the risk detection unit as a senior

19  credit analyst, and then into my current role, about six and a

20  half years ago, working in legal order processing.

21       MR. SHIN:  Your Honor, if we could just adjust the

22  microphone?

23       THE COURT:  Go ahead.

24       Thank you, Ms. Choi.

25  Q.  And, Mr. Levy, in your current role in the legal order

1    processing department, what's your title?

2    A.   Operations analyst bank officer.

3    Q.   What do you do in that role?

4    A.   I'm the custodian of records for the Northeast region of

5    the country.   I testify on behalf of the bank whenever bank

6    documents are subpoenaed.

7    Q.   And approximately how many times have you testified prior

8    to today?

9    A.   Roughly about 600.

10   Q.   Have you ever testified on the topic of wire transfers?

11   A.   Yes, I have.

12   Q.   And about how many times have you testified on that

13   subject?

14   A.   Probably ten to a dozen.

15   Q.   Now, in connection with testifying about wire transfers

16   previously, have you gained knowledge necessary for that

17   testimony?

18   A.   Both through training -- mandatory training at the bank, as

19   well as developing some contacts within the bank who I've had

20   to discuss wires with, people that work with wires on a regular

21   basis within the bank.

22          MR. SHIN:   Your Honor, at this time the government

23   offers Exhibit 864, which the parties have agreed, pursuant to

24   stipulation, is an admissible bank record.

25          MR. KLINGEMAN:   No objection.

1          MR. CREIZMAN:  No objection.

2          THE COURT:  Thank you.

3          864 is admitted.

4          (Government's Exhibit 864 received in evidence)

5          MR. SHIN:  Your Honor, may we publish to the jury?

6          THE COURT:  You may.

7          MR. SHIN:  Ms. Grant, if you could just page through

8    that for Mr. Levy's benefit.

9    BY MR. SHIN:

10   Q.  Mr. Levy, do you recognize this exhibit?

11   A.  Yes, I do.

12   Q.  What is it?

13   A.  They are copies of wire transfers from a Bank of America

14   account.

15   Q.  How many copies of wire transfers are in this exhibit?

16   A.  There are two separate wire transfers.

17   Q.  What is a wire transfer?

18   A.  A wire transfer is basically an electronic way of sending

19   money from one person to another, from one bank to another.

20   Q.  And these two documents, generally, what are these sorts of

21   documents called here that we're looking at?

22   A.  The Bank of America name is a full tran report.  It can

23   also be called a Fedwire.

24   Q.  What is the purpose of this document?

25   A.  It's basically a set of instructions for how to move the

H2NKLEB1                        Levy - Direct

1    money from one entity to another.

2    Q.  Are wire transfer instructions like these available to

3    customers on request?

4    A.  Yes.

5    Q.  So just to be clear, the documents we're looking at, what

6    entity created these documents?

7    A.  Bank of America.

8            MR. SHIN:  Ms. Grant, if you could turn to page 4 of

9    the document.  And if you could zoom in roughly the top third

10   of the page.

11   Q.  Mr. Levy, is this one of the two wire transfers in this

12   exhibit?

13   A.  Yes, it is.

14   Q.  What is the date and amount of this wire transfer?

15   A.  The date was May 9th of 2014 and in the amount of $15,000.

16   Q.  If you could just explain for the jury what entities are

17   involved in this wire transfer?

18   A.  Sure.  You basically had two banks and two customers.  Bank

19   of America was one of the banks, and their customer, our

20   customer, was Currency Enthusiasts, and the other entity was

21   PNC Bank, whose customer was Hope Cathedral.

22           MR. SHIN:  Sorry, could you return to that zoom-in,

23   please, Ms. Grant.

24   Q.  So, just to be clear, the Bank of America customer in this

25   case is who?

```
 1   A.  Currency Enthusiasts.

 2   Q.  And that's indicated on the left side of the exhibit; is

 3   that right?

 4   A.  That's correct, three lines down on the left side.

 5   Q.  The recipient of this wire transfer is whom?

 6   A.  Hope Cathedral.

 7   Q.  Who is its Bank?

 8   A.  Hope Cathedral's bank was PNC.

 9   Q.  So, Mr. Levy, if you look a few lines down from Hope

10   Cathedral, do you see the field there that says, "Orig to Benef

11   Info"?

12   A.  I do.

13   Q.  What is that field?

14   A.  That's basically like a memo line on the check to indicate

15   from -- the sending customer would have that line entered and

16   just a way to denote what the money was for, what the wire

17   was for.

18   Q.  And what is the entry in that field here?

19   A.  This says "Donation."

20   Q.  That information is provided by whom in this transaction?

21   A.  By the customer, Currency Enthusiasts.

22           MR. SHIN:  Ms. Grant, if you could zoom out, please.

23           And on that same page, if you could zoom into that

24   bottom section.

25           Thank you.
```

H2NKLEB1                        Levy - Direct

1    Q.  Mr. Levy, if you look at the section there labeled "3100"?

2    A.  Yes.

3    Q.  What is the sending bank indicated in that section?

4    A.  The sending bank is Bank of America NYC.

5    Q.  And where is it located?

6    A.  New York City.

7    Q.  Now, do you see there in that same section, there's a term,

8    "ABA number"?

9    A.  Yes.

10   Q.  What does that mean?

11   A.  ABA stands for American Bankers Association.  It can also

12   be referred to as a routing number.  It's basically a bank's

13   identifier, so other banks know where to send money to, that it

14   is specifically going to go to that bank.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1    BY MR. SHIN:

2    Q.  And the specific number here ending in 9593, do you

3    recognize that number?

4    A.  I do.

5    Q.  What is it?

6    A.  This is Bank of America's unique routing number for our

7    account with the Federal Reserve Bank of New York.

8    Q.  So the fact that that number is listed here in these

9    instructions, what, if anything, does that tell you about this

10   wire transfer?

11   A.  That this particular wire transfer went through the Federal

12   Reserve Bank of New York.

13   Q.  And when you say it went through the Federal Reserve Bank

14   of New York, what is the New York Federal Reserve Bank's role

15   in this transaction?

16   A.  They're basically the middleman, the entity that took money

17   out of Bank of America's account, Currency Enthusiasts, and put

18   it into the PNC account of Hope Cathedral.

19   Q.  Where is the Federal Reserve Bank of New York located?

20   A.  Manhattan.

21        MR. SHIN:  If you could turn to page 1 of the

22   document, please?  If you could zoom in to the top portion as

23   you had previously?

24   Q.  Mr. Levy, what is the date and amount of this wire

25   transfer?

H2NOLEB2                        Levy - Direct

1   A.  This was May 21st of 2014 in the amount of $15,000.

2   Q.  Are the customers and banks involved in this transaction

3   the same as what we saw previously?

4   A.  Yes, they are.

5            MR. SHIN:  Ms. Grant, if you could zoom out and zoom

6   in to the bottom half.

7   Q.  Mr. Levy, again directing your attention to the

8   3100 section.

9   A.  Yes.

10  Q.  So again, what is the sending bank on this wire transfer?

11  A.  Sending bank was Bank of America NYC.

12  Q.  That's located where?

13  A.  In New York City.

14  Q.  And is the ABA number for this wire transfer the same one

15  that we saw earlier ending in 9593?

16  A.  Yes, it is.

17  Q.  What does that tell you about that wire transfer?

18  A.  This particular wire transfer went through the Federal

19  Reserve Bank of New York.

20           MR. SHIN:  No further questions, your Honor.

21           THE COURT:  Thank you, Mr. Shin.

22           Mr. Creizman.

23           MR. CREIZMAN:  No questions, your Honor.

24           THE COURT:  Mr. Klingeman.

25           MR. KLINGEMAN:  Thank you, your Honor.

1      THE COURT:  Cross examination of Mr. Levy on behalf of

2  Mr. Gross.  Mr. Klingeman, when you're ready.

3      MR. KLINGEMAN:  Thank you, your Honor.

4  CROSS EXAMINATION

5  BY MR. KLINGEMAN:

6  Q.  Good morning, Mr. Levy.

7  A.  Good morning.

8  Q.  Welcome.  My name is Henry Klingeman and I represent Trevon

9  Gross.

10      Just by way of reference, if you need to look at

11  Exhibit 864 at any point, just let me know, but I presume, just

12  having looked at it 45 seconds ago, you can bear with me.

13  A.  Sure.

14  Q.  You described the memo line as an explanation of -- to use

15  your words -- "what the wire is for".

16  A.  Correct.

17  Q.  Okay.  And in the memo line for these two wire transfers,

18  the purpose given is "donation"?

19  A.  Correct.

20  Q.  And the beneficiary of the donation is the Hope Cathedral?

21  A.  Correct.

22  Q.  Let me ask you some questions about New York's connection,

23  geographical connection to this pair of wire transfers, okay?

24  A.  All right.

25  Q.  You indicated that the Federal Reserve Bank of New York,

1    which is a few blocks from here, played some role in this?

2    A.  Yes.

3    Q.  But the Bank of America customer in this case opened the

4    account in Florida, correct?

5    A.  Their address is in Florida, yes.

6    Q.  The address is in Florida.

7    A.  Correct.

8    Q.  And the Bank of America customer in Florida was sending the

9    money -- or sending the direction from Florida, right?

10   A.  I'm not sure where they actually originated the wire

11   transfer from.

12   Q.  Okay.  But the customer is located in Florida, according to

13   the address in the records that you just talked about.

14   A.  Correct.

15   Q.  And the money was directed to a beneficiary, Hope

16   Cathedral, located in New Jersey.

17   A.  Correct.

18   Q.  The money, the wire transfer, was not directed by the

19   customer in Florida to New York, right?

20   A.  No, not they themselves, no.

21   Q.  That happened because that's the way Bank of America

22   processed this particular wire transfer.

23   A.  Correct.

24   Q.  There's no indication in the Government's Exhibit 864 that

25   the recipient, Hope Cathedral, was notified that the money had

```
1   passed through New York, correct?
2   A.  That's correct.
3   Q.  I think you indicated, and you can correct me if I'm wrong,
4   that a Bank of America customer, the Florida customer for
5   example, could visit Bank of America and look at the wire
6   transfer records if that person wanted to, correct?
7           MR. SHIN:  Objection, your Honor.
8           THE COURT:  Misstates?  Is that the objection?
9           MR. SHIN:  Yes, your Honor.
10          THE COURT:  Sustained.
11  BY MR. KLINGEMAN:
12  Q.  Why don't you tell us -- do you recall what I'm referring
13  to?
14  A.  Yes.
15  Q.  Please, help me and help the jury.
16  A.  What do you want me to explain?
17  Q.  What did you say to counsel earlier about that?
18  A.  He asked if a Bank of America customer could ask for that
19  information from the bank, and my answer was "yes".
20  Q.  Okay.  By visiting a branch, for example?
21  A.  Yes.
22  Q.  Or perhaps making an online inquiry?
23  A.  I'm not sure if they could do it online or not.
24  Q.  Or over the telephone?
25  A.  Again, not sure.
```

H2NOLEB2                        Levy – Cross

1    Q.  But certainly, a Bank of America customer could go to a

2    Bank of America branch and ask for this information.

3    A.  That's correct.

4    Q.  Any indication in the exhibit that you were shown,

5    Government's 864, that the Bank of America customer in Florida

6    ever did that?

7    A.  No.

8    Q.  How about a non-Bank of America customer?

9    A.  No, the non-Bank of America customer could not request

10   documents for a Bank of America account.

11   Q.  So if a non-Bank of America customer went to a Bank of

12   America branch and said 'I want to see the wire transfer

13   records', Bank of America would say 'no'.

14   A.  That's correct.

15   Q.  'None of your business'.

16   A.  Essentially.

17   Q.  And Hope Cathedral, according to the record that you have

18   in front of you, is a customer of PNC Bank in New Jersey.

19   A.  According to this record, yes.

20   Q.  And not a customer of Bank of America.

21   A.  I'm not sure if she is or not.

22   Q.  You don't know all the customers of Bank of America?

23   A.  I can't say I do.

24   Q.  Of course not.  But there's no indication in the records

25   that you've looked at that Hope Cathedral is a Bank of America

1    customer.

2    A.  Not from this record, no.

3    Q.  And assuming for the sake of my question that Hope

4    Cathedral were not a Bank of America customer, Hope Cathedral

5    could not go to Bank of America and say 'hey, let me see the

6    wire transfer records', right?

7    A.  That would be correct.

8            MR. KLINGEMAN:  Thank you, your Honor.  No further

9    questions.

10           THE COURT:  Thank you.

11           MR. SHIN:  Your Honor, may I just briefly?

12           THE COURT:  Go ahead.

13   REDIRECT EXAMINATION

14   BY MR. SHIN:

15   Q.  Mr. Levy, you recall the last few questions about whether a

16   non-Bank of America customer could ask Bank of America for wire

17   instruction records?

18   A.  Yes.

19   Q.  In your experience, can a Bank of America customer who

20   receives a wire transfer go to Bank of America and ask for

21   these instructions?

22   A.  Yes, they could.

23           MR. KLINGEMAN:  Objection, relevance.

24           MR. SHIN:  Your Honor, I think --

25           THE COURT:  I'll overrule.  You can ask a follow-up.

1    BY MR. SHIN:

2    Q.  Do you have any reason to believe that that availability to

3    a receiving customer is any different at any other bank?

4    A.  No.

5              MR. SHIN:  No further questions, your Honor.

6              THE COURT:  Mr. Klingeman?

7              MR. KLINGEMAN:  Nothing.  Thank you, your Honor.

8              THE COURT:  Mr. Creizman?

9              MR. CREIZMAN:  No.  Thank you, your Honor.

10             THE COURT:  Mr. Levy, you're excused.  Thank you.

11             THE WITNESS:  Thank you, your Honor.

12             (Witness excused)

13             THE COURT:  You may call Mr. Hill back to the stand.

14             MS. CHOI:  Your Honor, right before we do that, we'd

15   like to publish one exhibit.  And just so counsel can have an

16   opportunity to review it, it's Government's Exhibit 800-H,

17   which the parties have stipulated are wire transfer records

18   belonging to PNC Bank.

19             MR. KLINGEMAN:  I object, your Honor.  I object.

20             THE COURT:  All right.

21             MR. KLINGEMAN:  I object to the timing of this.

22             THE COURT:  Sustained.  Not discussed.  We'll stick

23   with the plan.  You can raise it with me at the break.

24             MR. SHIN:  Your Honor, the government calls Ricardo

25   Hill.

H2NOLEB2                          Hill - Direct

1          THE COURT:  Thank you.  Mr. Hill, I will swear you in

2     again.

3      RICARDO HILL,

4          recalled as a witness by the Government,

5          having been previously sworn, testified as follows:

6          THE COURT:  Mr. Shin, you may resume your direct

7     examination of Mr. Hill.

8          MR. SHIN:  Thank you, your Honor.

9     DIRECT EXAMINATION CONTINUED

10    BY MR. SHIN:

11    Q.  Good morning, Mr. Hill.

12    A.  Good morning.

13    Q.  Mr. Hill, I believe where we left off yesterday, you were

14    describing your criminal history?

15    A.  Yes.

16    Q.  And I believe the last bit of that topic we covered was you

17    served some time in prison for two burglary convictions; is

18    that correct?

19    A.  Yes.

20    Q.  And about when were you released?

21    A.  In January of 2006.

22    Q.  So in addition to the crimes and juvenile offenses that you

23    described yesterday, have you ever committed other crimes for

24    which you have not been arrested?

25    A.  Yes.

H2NOLEB2                          Hill - Direct

1   Q.  Could you describe those for the jury, please?

2   A.  Sure.  I helped friends of mine obtain small quantities of

3   cocaine, molly, and marijuana.  I also paid what I owed in

4   cocaine.  And I also stole a bag of marijuana from a guy in my

5   neighborhood.

6   Q.  So in addition to what you just described with respect to

7   narcotics, have you personally used narcotics?

8   A.  Yes.  I've used marijuana throughout my life, and I also

9   tried cocaine while in high school.

10  Q.  Now, returning to your arrest in this case, could you

11  remind the jury when you were arrested?

12  A.  In October of 2016.

13  Q.  So after your arrest, what did you decide to do afterward?

14  A.  Cooperate with the government.

15  Q.  And then did you meet with FBI agents and prosecutors to be

16  interviewed by the government?

17  A.  Yes, I did.

18  Q.  About how many times have you met with the government to

19  date?

20  A.  About 12 to 15 times.

21  Q.  During these meetings, did you admit to the crimes you

22  committed in connection with Coin.mx and HOPE FCU?

23  A.  Yes.

24  Q.  Did you tell the government about the people you committed

25  those crimes with?

H2NOLEB2                          Hill - Direct

1    A.  Yes.

2    Q.  Have you pled guilty to those crimes?

3    A.  Yes, I have.

4    Q.  Could you describe to the jury what crimes you've pled

5    guilty to?

6    A.  I pled guilty to bank fraud and wire fraud and conspiracy

7    to do so, I pled guilty to making false statements to federal

8    regularities, I also pled guilty to obstructing the examination

9    of federal regularities, I also pled guilty to -- I'm sorry, I

10   can't remember them all.

11   Q.  Did you plead guilty to offenses related to operating

12   Coin.mx?

13   A.  Yes, conspiracy to operate an unlicensed money transmitting

14   business, and also operating an unlicensed money transmitting

15   business.

16   Q.  Did you plead guilty to any crimes in connection with the

17   payments to Mr. Gross that you described yesterday?

18   A.  Yes, conspiracy to make corrupt payments to a bank official

19   and making corrupt payments to a bank official.

20   Q.  Thank you, Mr. Hill.

21        Now, in conjunction with your guilty plea, did you

22   enter into an agreement with the government?

23   A.  Yes, I did.

24   Q.  Do you know what that agreement is called?

25   A.  A cooperation agreement.

1          MR. SHIN:  Ms. Grant, if you could bring up, just for

2     the witness and the Court and counsel, 3502-15?  Maybe if you

3     could zoom out so you can see a page at a time.  If you could

4     just page through that for Mr. Hill's benefit.

5     BY MR. SHIN:

6     Q.  What is this document?

7     A.  My cooperation agreement.

8          MR. SHIN:  Ms. Grant, if you could turn to the last

9     page.  Thank you.

10    Q.  On what date did you enter into this agreement, Mr. Hill?

11    A.  January 17th of 2017.

12    Q.  Did you plead guilty to the crimes you listed earlier on

13    that date?

14    A.  Yes.

15         MR. SHIN:  Ms. Grant, if you could take that down now,

16    and if you could please bring up 3502-26, just for the witness

17    and the Court and counsel.  If you could just page through

18    that.

19    Q.  Mr. Hill, what is this document?

20    A.  This is an amended cooperation agreement.

21         MR. SHIN:  Ms. Grant, if you could turn to the last

22    page, please.

23    BY MR. SHIN:

24    Q.  On what date did you enter into this agreement?

25    A.  On February 7th of 2017.

H2NOLEB2                              Hill - Direct

1    Q.  Now, on that date, did you go back into court and agree to

2    be bound by this amended cooperation agreement?

3    A.  Yes, I did.

4    Q.  Mr. Hill, what was amended between the first agreement and

5    the second agreement?

6    A.  Crimes that I was not arrested for that I disclosed to the

7    government.

8    Q.  What particular crimes that you disclosed to the government

9    were changed in the agreement?

10   A.  Helping my friends obtain small quantities of cocaine,

11   marijuana, and molly, also paying individuals that I owed money

12   to in cocaine, and also stealing a bag of marijuana from a guy

13   in my neighborhood.

14   Q.  Now, had you disclosed those particular crimes to the

15   government prior to entering into the original cooperation

16   agreement?

17   A.  No, I didn't.

18   Q.  Why not?

19   A.  When asked about my past crimes, I didn't remember, I

20   forgot about those items I disclosed later.

21   Q.  Was there anything about the way the questions were posed

22   to you that led to your not remembering those items?

23   A.  Yes.  I remember being asked if I was a drug dealer, and I

24   answered "no", that I wasn't, so therefore, I didn't consider

25   the crimes that I disclosed later.

1   Q.  Just to be clear, you subsequently disclosed those to the

2   government?

3   A.  Yes.

4   Q.  Now, do you have an understanding of the effect of

5   including these additional items in this amended cooperation

6   agreement?

7   A.  Yes.  The government would not prosecute me for the crimes

8   that I disclosed that I had not been arrested for, and also,

9   the judge would consider those crimes during my sentencing.

10  Q.  Mr. Hill, you listed the various crimes you pled to

11  previously.

12  A.  Yes.

13  Q.  What is the highest possible sentence you face as a result

14  of pleading guilty to those crimes?

15  A.  125 years.

16  Q.  Have you been sentenced yet?

17  A.  No, I have not.

18  Q.  Now, under the cooperation agreement, are you required to

19  do certain things?

20  A.  Yes, I am.

21  Q.  Could you describe those for the jury, please?

22  A.  I'm required to testify truthfully, to disclose all

23  information and activities about myself and others pertaining

24  to this case, I'm required to cooperate with the government and

25  meet with them whenever they request my presence, to commit no

H2NOLEB2                          Hill - Direct

1    more crimes whatsoever.

2    Q.  Now, under the cooperation agreement, are you also required

3    to file amended tax returns for certain years and to pay past

4    taxes and penalties?

5    A.  Yes, I am.

6    Q.  Why is that?

7    A.  I disclosed to the government a number of years that I did

8    not file taxes completely.

9    Q.  Now, you alluded to the fact that one of the requirements

10   of the cooperation agreement is that you testify truthfully

11   here today.

12   A.  Yes, that's correct.

13   Q.  So just to be clear, are you testifying here today because

14   you are required to do so under the cooperation agreement?

15   A.  Yes.

16            MR. CREIZMAN:  Objection.

17            THE COURT:  Just a moment.

18            MR. CREIZMAN:  Bolstering.

19            THE COURT:  I'm sorry?

20            MR. CREIZMAN:  Bolstering.

21            THE COURT:  Overruled.

22   Q.  Now, if you comply with the requirements of the cooperation

23   agreement, what's your understanding of what the government

24   will do?

25   A.  The government will write a 5K letter to the judge.

1   Q.  What judge is that?

2   A.  Judge Nathan.

3   Q.  And do you know what proceeding that would be in connection

4   with?

5   A.  That would be in connection to my sentencing.

6   Q.  What's your understanding of the information that the

7   government would include if it were to write that letter?

8   A.  All relevant conduct and criminal conduct that I disclose

9   according to this case and my past, and of course the details

10  of my cooperating.

11  Q.  So sitting here today, do you know for sure whether the

12  government will write that letter to the judge?

13  A.  No, I do not.

14  Q.  If the government were to write that letter, would the

15  government recommend a particular sentence for you?

16  A.  No.

17  Q.  So do you know for certain right now whether your sentence

18  will, in fact, be reduced?

19  A.  No.

20  Q.  Has the government made any promises to you about what your

21  sentence will be?

22  A.  No.

23  Q.  So is it still possible for you to be sentenced up to 125

24  years in prison?

25  A.  Yes.

1   Q.  To your understanding of the cooperation agreement, does

2   your sentence in your case depend in any way on the outcome of

3   this trial?

4   A.  No, it does not.

5   Q.  If the government were to find out that you testified

6   falsely during this trial, what is your understanding of what

7   would happen?

8           MR. CREIZMAN:  Objection.

9           THE COURT:  Same objection?  Is it the same objection?

10           MR. CREIZMAN:  Yes.

11           THE COURT:  Overruled.

12           THE WITNESS:  I'm sorry?

13           THE COURT:  You may answer.

14           THE WITNESS:  I would not receive a 5K letter, and I

15   also can be charged with perjury and/or obstruction of justice.

16   BY MR. SHIN:

17   Q.  Mr. Hill, you testified yesterday that you worked for

18   Anthony Murgio at Coin.mx, correct?

19   A.  Yes.

20   Q.  How did you first meet Mr. Murgio?

21   A.  I worked at a restaurant called 101 Restaurant that he

22   owned previously.

23   Q.  Just briefly, what did you do there?

24   A.  I began as a server there, and I eventually became the

25   general manager at the restaurant.

H2NOLEB2                              Hill - Direct

1    Q.  What period of time was this?

2    A.  From the end of 2010 to the Summer of 2013.

3    Q.  Why did you stop working at the restaurant?

4    A.  The ownership changed, and I eventually resigned.

5    Q.  Now, while you were working at this restaurant, did you

6    become aware of any legal problems that Anthony Murgio was

7    facing?

8    A.  Yes.  While working at the restaurant, I witnessed him

9    being arrested for a tax issue.

10   Q.  Where was he arrested?

11   A.  At 101 Restaurant.

12   Q.  At the restaurant where you worked?

13   A.  Yes.

14   Q.  Did you subsequently try to find out more about Murgio's

15   arrest?

16   A.  Yes.  I looked it up on Google.

17   Q.  Were you able to find more information about it?

18   A.  Yes.

19   Q.  Did that information indicate what the problems were?

20   A.  Yes.

21   Q.  What were they?

22   A.  That he didn't pay --

23            MR. KLINGEMAN:  Objection.

24            THE COURT:  Just a moment.

25            MR. KLINGEMAN:  Hearsay now.  Not the previous

1    questions.

2              THE COURT:  Understood.  Sustained.

3    BY MR. SHIN:

4    Q.  Could you describe for the jury what you did to find this

5    additional information?

6    A.  I Googled "Anthony Murgio arrested".

7    Q.  Was that difficult to do?

8    A.  Not at all.

9    Q.  Now, do you recall testifying yesterday that Yuri Lebedev

10   also worked for Coin.mx and was also on the board with you at

11   HOPE Federal Credit Union?

12   A.  Yes.

13   Q.  How did you first come in contact with Mr. Lebedev?

14   A.  Via emails while working at Coin.mx.

15   Q.  Did you come to meet Mr. Lebedev in person?

16   A.  Eventually, yes.

17   Q.  Could you just describe how it was that you met him?

18   A.  I met him twice; once around Halloween of 2014, and then

19   again in November of 2014.

20   Q.  Mr. Hill, when did you work at Coin.mx?

21   A.  From 2014 to 2015.

22   Q.  Did you complete any training when you started working

23   there?

24   A.  Yes.

25   Q.  Could you just briefly describe that training?

H2NOLEB2                         Hill - Direct

1    A.  The training was about the back end of Coin.mx, how to

2    manage the account creation, how to manage transfers,

3    withdrawals, deposits, and how to use the customer support chat

4    area.

5    Q.  How was that training delivered to you?

6    A.  I was given a link to follow.  All the training was on the

7    website, and you just go through all the information.

8    Q.  You said it was on the website.  What website was it on?

9    A.  Collectpma.com.

10   Q.  It was not on the Coin.mx website?

11   A.  No.

12   Q.  Were these training materials publicly accessible?

13   A.  No.

14   Q.  How was it that you were able to access it?

15   A.  I was given the link from my boss, Anthony Murgio.

16   Q.  What were your duties and responsibilities at Coin.mx?

17   A.  I managed the back end, I approved deposit and withdrawals

18   and Bitcoins transactions, I helped the chat support agents

19   with questions that they couldn't answer themselves.

20   Q.  How much did you earn while working at Coin.mx?

21   A.  About $2,000 a month.

22   Q.  In addition to Anthony Murgio and Yuri Lebedev, who you've

23   already mentioned, did you work with any other people at

24   Coin.mx?

25   A.  Yes.  I worked with Jen Wotherspoon, and eventually Jose

H2NOLEB2                          Hill - Direct

1    Freundt.  We also had a few chat support agents; Eric, JD.

2    Q.  Did you work with any individuals in other functions at

3    Coin.mx, in other departments of Coin.mx?

4    A.  In other departments?  No.

5    Q.  So when you encountered technical problems, did you contact

6    or work with any people?

7    A.  Yes.

8    Q.  Who were those people?

9    A.  Our developers at Coin.mx and Yuri Lebedev.

10   Q.  Do you remember the names of any of those people in

11   addition to Yuri Lebedev?

12   A.  I don't remember.  I don't even remember like email

13   addresses.  We would send out problems and issues to the

14   emails.

15   Q.  Do you know where they were located, the technical people?

16   A.  In Russia.

17   Q.  Did you work with any individuals from an accounting

18   department?

19   A.  Yes.

20   Q.  Do you remember their names?

21   A.  I remember Eva.

22   Q.  Now, did Anthony Murgio answer to anyone with respect to

23   Coin.mx?

24   A.  Yes.

25   Q.  Who was that?

1    A.  His name was Vlad.

2    Q.  Do you know anything else about this person named Vlad?

3    A.  Only that he spoke with a Russian accent.

4    Q.  How is it that you know that Anthony Murgio answered to

5    Vlad?

6    A.  I've been in the office with Murgio while on the conference

7    call, and I can hear him barking orders at Anthony, and Anthony

8    accepted those, so that's what led me to believe that he

9    answered to Vlad.

10   Q.  What role did Yuri Lebedev have at Coin.mx?

11   A.  He was a top-level tech guy, if our developers had an issue

12   that they couldn't fix, we would attach Yuri to the email, and

13   he would direct them to fixing the issue or do it himself.

14   Q.  Now, when you first started at Coin.mx, where did you work?

15   A.  From home on my laptop.

16   Q.  You didn't work in an office?

17   A.  No.

18   Q.  Did Coin.mx have any offices at that time when you started?

19   A.  Yes.  They had an office in Orlando, Florida where a couple

20   of the chat support agents worked at.

21   Q.  Now, did there come a time when Coin.mx opened any

22   additional offices?

23   A.  Yes.  We eventually opened an office in Tallahassee,

24   Florida where I then began working out of.

25   Q.  And about when was that?

H2NOLEB2                          Hill - Direct

1  A.  In July of 2014.

2  Q.  Now, Mr. Hill, could customers purchase Bitcoins on

3  Coin.mx?

4  A.  Yes.

5  Q.  And were there any initial steps they had to take in order

6  to do so?

7  A.  Yes.  You had to, one, create an account with the general

8  information, you had to be a part of the Collectables Club

9  association, and you would sign a membership agreement, and

10  then you would have to use a debit card or credit card to

11  deposit funds on Coin.mx.  And once that was approved, you can

12  then transfer -- you could then exchange your USD that you

13  deposited for Bitcoin.

14  Q.  You referred to the Collectables Club in your answer.

15  A.  Yes.

16  Q.  What is the Collectables Club?

17  A.  Collectables Club was the parent company of Coin.mx.

18  Q.  Did you hear that phrase "parent company of Coin.mx" from

19  anyone?

20  A.  Yes, Anthony Murgio.

21  Q.  Now, in connection with your work at Coin.mx, did you ever

22  work with selling stamps?

23  A.  No.

24  Q.  Antiques?

25  A.  No.

H2NOLEB2                          Hill - Direct

1    Q.  Any other kind of memorabilia?

2    A.  No.

3    Q.  Did you ever attend meetings of the Collectables Club?

4    A.  No.

5    Q.  Did you ever, for example, pack up memorabilia to ship out

6    to customers?

7    A.  No.

8    Q.  So you described earlier that once a customer created a

9    Coin.mx account, they could then use their debit or credit

10   cards; is that correct?

11   A.  Yes.

12   Q.  Do you know how Coin.mx processed credit and debit card

13   transactions?

14   A.  I don't know how, but we used the processer from another

15   country.

16   Q.  Do you remember what that other country was?

17   A.  It was in Azerbaijan.

18   Q.  How is it that you know that there was another country,

19   Azerbaijan, that was involved?

20   A.  Well, dealing with customers that had complaints about the

21   charge on their credit card showing up from an outside country,

22   I then learned where our processer was.

23   Q.  Did Coin.mx have an office in Azerbaijan?

24   A.  No.

25   Q.  Now, in general, do you know what the Coin.mx customers

1   were using the Bitcoins for once they purchased them?

2   A.  Yes.

3   Q.  Could you explain that to the jury, please?

4   A.  Well, I learned that some customers used Bitcoin to

5   purchase products from Black Market sites.  I also learned that

6   some customers used Bitcoins to purchase from merchants who

7   accepted Bitcoin, and I also learned that some customers used

8   Bitcoin to pay for Ransomware when their files were encrypted.

9   Q.  Of those examples you cited, was any one of those more

10  common than the others?

11  A.  Yes.  We had a ton of customers who would pay for

12  Ransomware when their files were encrypted.

13  Q.  Now, while you were working at Coin.mx, did you become

14  aware of Coin.mx bank accounts being closed down?

15  A.  Yes, a couple of times.

16  Q.  Who did you learn that from?

17  A.  Anthony Murgio.

18  Q.  What did he say about it?

19  A.  That our accounts were closed because there was customers

20  attempting to make deposits, and the "what the deposit was for

21  feel", they were to purchase Bitcoins.

22  Q.  Now, Mr. Hill, you testified earlier that you were involved

23  in wire fraud and bank fraud?

24  A.  Yes.

25  Q.  And generally speaking, what was the conduct underlying the

1    wire fraud and the bank fraud you were involved with?

2    A.  We would have three-way calls with our customers and their

3    bank in an effort to increase the limits that they can spend

4    with Coin.mx, but prior to patching in the bank on the call we

5    would let the customers know not to mention Bitcoin.  And then,

6    of course, when we have the bank official on the line, I

7    wouldn't tell them that the customers were purchasing Bitcoin.

8    Q.  So you omitted telling the banks about Bitcoin?

9    A.  Yes.

10   Q.  Did you affirmatively tell them anything in the

11   alternative?

12   A.  Yes.  I would let them know that the customers were

13   purchasing products and services from us, or paying for

14   membership fees, collectibles, and memorabilia.

15   Q.  Did you instruct the customers similarly?

16   A.  Absolutely.

17   Q.  And when you say you were calling the banks, what banks are

18   we talking about?

19   A.  General banks; Bank of America, Chase, any bank that a

20   customer had a bank card or debit card from.  There was really

21   no limit to what banks we were calling.

22   Q.  You said bank card, debit card, also credit cards?

23   A.  Credit cards, yes.

24   Q.  Now, you testified that this was in connection with

25   increasing customers' limits at Coin.mx so they could spend

1   more?

2   A.  Yes.

3   Q.  Were there any other reasons for making these calls?

4   A.  Yes.  We also made those three-way calls with the customers

5   to their bank to rescind chargebacks.  A number of customers

6   would initiate a chargeback when they didn't recognize the

7   charge on their bank statement.

8   Q.  Who at Coin.mx was involved in making these calls?

9   A.  Myself, Jen Wotherspoon, and eventually Jose Freundt.  He

10  began working with us later.

11  Q.  And about how often would you make these sorts of calls

12  collectively?

13  A.  At least five to ten times a day.

14  Q.  Now, the approach that you described and what you told the

15  credit card companies, did you learn how to do that from

16  anyone?

17  A.  Yes.  Anthony Murgio gave us a script so we wouldn't

18  mention Bitcoin.

19  Q.  Did he ever explain to you why you should use that

20  approach?

21  A.  Yes.  Banks don't like Bitcoin and wouldn't allow their

22  customers to use their debit cards or credit cards on our

23  website.

24  Q.  Now, Mr. Hill, did there come a time when Anthony Murgio

25  contacted you about taking over a credit union?

1    A.  Yes.

2              MR. SHIN:  Ms. Grant, if you could please publish for

3    the jury Government's Exhibit 1089 in evidence?

4    Q.  Mr. Hill, do you recognize this document?

5    A.  Yes, I do.

6    Q.  Just generally, what is it?

7    A.  It's an email from Anthony Murgio to myself about HOPE

8    Credit Union.

9    Q.  Could you describe the content of the email, please?

10   A.  He asked me would I be interested in being on the board of

11   directors of a credit union, and I let him know I definitely

12   was.

13   Q.  Why were you interested?

14   A.  Why was I interested?

15   Q.  Mm-hmm.

16   A.  I knew that having access to the credit union would extend

17   the -- would extend our platform in a way that it would make it

18   easier for our customers at Coin.mx to make deposits and

19   withdrawals, as we were having issues with their bank cards and

20   credit cards.

21   Q.  Had you always wanted to be on the board of a credit union?

22   A.  I hadn't ever thought about being on the board of a credit

23   union.

24   Q.  When Anthony asked you to serve on the board of a credit

25   union, do you know if he was aware of your criminal history?

1    A.  Yes.

2    Q.  How do you know that?

3    A.  I knew him for a long time, and at the restaurant he --

4    we've had talks about my past.

5    Q.  Including your criminal history?

6    A.  Yes.

7            MR. SHIN:  Ms. Grant, you can take that down.  Thank

8    you.

9    Q.  So what did Anthony Murgio tell you, if anything, about why

10   he wanted to take over a credit union?

11   A.  It would extend the functionality of our platform, and it

12   would -- again, it would make it easier for our customers to

13   make deposits and withdrawals.  We were having issues with a

14   lot of bank cards and debit cards that would just not go

15   through, and this would irradicate that issue.

16   Q.  So Mr. Hill, in your answer you used "our" and "us" and

17   "we" as various points.  Who are you referring to in your

18   answer?

19   A.  Coin.mx.

20   Q.  Did you learn from Mr. Murgio that he had a particular

21   credit union in mind?

22   A.  Yes.

23   Q.  What was it?

24   A.  HOPE Federal Credit Union.

25           MR. SHIN:  Ms. Grant, if you could please publish for

1    the jury 1099 in evidence?

2    Q.  Mr. Hill, do you recognize this document?

3    A.  Yes, I do.

4    Q.  Is it correct that this is an email exchange between you

5    and Anthony Murgio?

6    A.  Yes, it is an email from Anthony to myself.

7         MR. SHIN:  Ms. Grant, if you could highlight in the

8    bottom email the paragraph starting with "I went to New

9    Jersey".  Yes, there you go.

10   Q.  Mr. Hill, if you could just read that paragraph for the

11   jury, please.

12   A.  "I went to New Jersey to meet with them.  Very nice guys.

13   Passover church.  We came to an agreement that we would be able

14   to have control over the credit union."

15   Q.  Now, did Anthony Murgio offer to pay you anything for

16   serving on the board?

17   A.  Yes, 5,000 a year.  I would receive like $416 a month.

18   Q.  Now, did you subsequently learn how Murgio planned to take

19   over the credit union?

20   A.  Yes.

21   Q.  Before we get into the plan, how did you learn of the plan?

22   A.  He let me know, myself and others, other friends and

23   colleagues of his that he invited to be on the board.

24   Q.  Did he inform you and others in person or in some other

25   setting?

H2NOLEB2                        Hill - Direct

1    A.   Over a conference call that we were all on.

2    Q.   Was there one call or more than one call?

3    A.   There was multiple calls.

4    Q.   Who were the other individuals on these calls that you

5    referred to as the "proposed board members"?

6    A.   Myself, Jose Freundt, Tim Ellrich, Yuri Lebedev, Kevin

7    Tomasso, Chad Leo, Kendra Pannitti.

8    Q.   What, if anything, did you all have in common?

9    A.   We were all friends or colleagues of Anthony Murgio.

10   Q.   So in general terms, what was the plan?

11   A.   The plan was for us to make payments to Trevon Gross and

12   Hope Cathedral, and in turn take full control of the credit

13   union.

14   Q.   So if we just take that one step at a time.  You referred

15   to "payments".

16   A.   Yes.

17   Q.   Could you describe what the plan of payments were?

18   A.   Yeah.  The payments would be sent in intervals over the

19   next six to eight months.

20   Q.   Do you recall what the total payments was that was planned?

21   A.   Yes.  150 to 200K.

22   Q.   To be clear, to whom would the payments be made?

23   A.   To Trevon Gross and Hope Cathedral.

24   Q.   That's the church?

25   A.   That's the church, yes.

1   Q.   Now, so let's talk about the other half of this plan.   How

2   is it that Murgio would actually get control of the credit

3   union?

4   A.   Trevon would ensure that we were nominated to be voted on

5   the board, and then we would have the vote, and in turn,

6   eventually have complete control of the credit union.

7   Q.   And who would select the individual board members that

8   would be nominated?

9   A.   Who would select?

10  Q.   Who picked you and the other proposed board members?

11  A.   Trevon Gross.

12  Q.   Who actually chose who the people were that would serve on

13  the board?

14  A.   Anthony Murgio.

15  Q.   And then who was involved, under this plan, who would be

16  involved in actually getting you and these other people onto

17  the board?

18  A.   Trevon Gross.

19  Q.   Now, under this plan, after you and the other friends of

20  Murgio were elected to the board, what was going to happen to

21  the existing board members?

22  A.   They would eventually resign.

23  Q.   Was there a timeframe that was discussed?

24  A.   Yes.   It was two to three months later.

25  Q.   Was there ever any discussion of why they would resign two

H2NOLEB2                          Hill - Direct

1    to three months later rather than immediately?

2    A.   Yes.   The NCUA who regulates the credit unions were having

3    our annual -- the annual examination, and they would usually

4    return a month later to report their findings.  Trevon let us

5    know that it wouldn't look good for them to return a month

6    later and see a whole new board.

7    Q.   Now, do you recall testifying earlier about how Anthony

8    Murgio instructed you not to mention Bitcoin to credit card

9    companies, banks --

10   A.   Yes.

11   Q.   -- because they don't like Bitcoin?

12   A.   Correct.

13   Q.   Now, during these conference calls that you had with Murgio

14   and the other proposed board members, did Murgio ever say to

15   you 'Don't mention Bitcoin to anyone at HOPE Federal Credit

16   Union'?

17   A.   No.

18   Q.   Did he ever say 'Don't mention Coin.mx to anyone at HOPE

19   Federal Credit Union'?

20   A.   No.

21   Q.   At any point during your involvement with HOPE Federal

22   Credit Union, did Murgio ever tell you 'Don't mention Bitcoin

23   or Coin.mx to anyone from HOPE Federal Credit Union'?

24   A.   No, not at all.

25   Q.   What were the eligibility requirements for becoming a

1   member of HOPE Federal Credit Union?

2   A.  You had to either live, work, or worship in Lakewood,

3   New Jersey.

4   Q.  So at the time you were approached by Anthony Murgio and

5   had these discussions with him and the other proposed board

6   members, where were you living?

7   A.  In Tallahassee, Florida.

8   Q.  And where were you working?

9   A.  In Tallahassee, Florida.

10  Q.  Did you worship in Lakewood, New Jersey?

11  A.  No.

12  Q.  Had you ever even been to New Jersey prior to that?

13  A.  No.

14  Q.  Do you know where the other proposed board members lived?

15  A.  Yes, most of them.

16  Q.  Let's go through them.  Where did Jose Freundt live?

17  A.  In Tallahassee, Florida.

18  Q.  Kevin Tomasso?

19  A.  In Tallahassee, Florida.

20  Q.  Yuri Lebedev?

21  A.  In Jacksonville, Florida.

22  Q.  Tim Ellrich?

23  A.  He used to live in Tallahassee, Florida, but I learned that

24  he moved to Tennessee.

25  Q.  Chad Leo?

1    A.  In Jacksonville, Florida.

2    Q.  And Kendra Pannitti?

3    A.  I did not know where Kendra lived.

4    Q.  And so at this time, where was the Collectables Club, the

5    so-called parent company of Coin.mx, where was the Collectables

6    Club based?

7    A.  In Tallahassee, Florida.

8    Q.  Did it have any presence in Lakewood, New Jersey?

9    A.  No.

10   Q.  Did it have an office in Lakewood, New Jersey?

11   A.  No.

12   Q.  Did it have any employees who worked there?

13   A.  No.

14   Q.  So when you learned the plan to take over the credit union

15   from Anthony Murgio, did it seem like a legitimate business

16   transaction to you?

17   A.  No, it did not.

18   Q.  Why not?

19   A.  Making payments to an individual in a church to take over a

20   credit union, I mean, that was obviously not a legitimate

21   business deal.

22   Q.  Was there anything else about this plan that led you to

23   believe that it wasn't a legitimate business deal?

24   A.  First, to be members of the credit union, it was stated you

25   had to live, work, or worship in Lakewood, New Jersey; we did

H2NOLEB2                          Hill - Direct

1   neither.

2   Q.  Now, did you ultimately accept Anthony Murgio's offer to

3   join the board of HOPE FCU?

4   A.  Yes.

5   Q.  So leading up to becoming a board member, did you provide

6   any information?

7   A.  Yes, I did.

8   Q.  What information was that?

9   A.  My resume, my contact information, and a copy of my

10  Florida's driver's license.

11  Q.  I'm sorry.  A copy of what driver's license?

12  A.  My Florida driver's license.

13  Q.  To whom did you provide that information?

14  A.  To Trevon Gross.

15  Q.  Do you know whether similar information was provided by the

16  other proposed board members?

17  A.  Yes.  All of us had to submit the same info.

18  Q.  To whom?

19  A.  To Trevon Gross.

20          MR. SHIN:  Ms. Grant, if you could please publish for

21  the jury 1110 in evidence?

22  Q.  Mr. Hill, what's happening in this email?

23  A.  This is an email from Anthony to all of us about the info

24  that we needed to have on file.

25  Q.  Could you please read in the first paragraph.  Could you

1   please read starting with "if you have any"?  Could you read
2   those two sentences?
3   A.  "If you have any previous banking or financial sector
4   experience, please make sure that is on the resume.  If you
5   have any financial degree, please also include that on the
6   resume."
7   Q.  Did you have any previous banking experience?
8   A.  No, I did not.
9   Q.  Did you have any previous financial sector experience?
10  A.  No, I did not.
11  Q.  Is it correct that one of your prior jobs was working at a
12  tax preparation business?
13  A.  Yes.
14  Q.  What was your role there?
15  A.  I just managed the incoming clients, just getting them
16  signed up and prepared to go to meet with a tax preparer.
17  Q.  Were you a tax preparer?
18  A.  No.
19  Q.  Did you have a financial degree?
20  A.  No, I did not.
21  Q.  Now, Mr. Hill, do you see toward the bottom of the email it
22  says "Chairman Jose, Secretary Rico, and Treasurer Yuri"?
23  A.  Yes.
24  Q.  What does that mean there, "Secretary Rico"?
25  A.  I would be the secretary of the board of directors.

H2NOLEB2                          Hill - Direct

1    Q.  And what would your responsibilities be as secretary?

2    A.  I would take the minutes at the board meetings and also

3    make sure that everybody was prepared for the meetings.

4             MR. SHIN:  Ms. Grant, if you could please put up

5    1155-B in evidence?  If you could flip down to the second page,

6    please?  Actually, if you could flip to the next page, as well.

7    Q.  So you see kind of at the bottom of 2 and the top of 3, you

8    see the list of individuals?

9    A.  Yes.  Yes, I do.

10            MR. SHIN:  If you could come up to the prior page,

11   Ms. Grant?

12   Q.  If you could just review what Jose Freundt wrote in the

13   middle of that page, and when you're ready to answer, if you

14   could describe, what was it that Jose Freundt urgently wanted?

15            Well, let me just ask it this way.  In the second

16   sentence of that paragraph, do you see there where it says,

17   "The one with particular urgency is the membership

18   application"?

19   A.  Yes.

20   Q.  Did you complete that form in connection with becoming a

21   board member?

22   A.  Yes.

23   Q.  Do you recall what kind of information you provided in that

24   membership application?

25   A.  Just my general info and along with account beneficiary.

H2NOLEB2                          Hill - Direct

1   Q.  What do you mean when you say "general info"?

2   A.  My name, my address, my contact information.

3          MR. SHIN:  If you could scroll up one, please?  The

4   first page, please?

5   Q.  Do you see at the bottom there, Chad Leo writes -- could

6   you just read what Chad Leo writes at the bottom?

7   A.  Yes.  "Trevon, I've refaxed my membership application.

8   Please confirm when you have a moment."

9          MR. SHIN:  You can take that down, Ms. Grant.

10  Q.  Now, before becoming a board member, did you, Anthony

11  Murgio, and the other proposed board members ever have

12  discussions with Trevon Gross?

13  A.  Yes.

14  Q.  One, or more than one?

15  A.  More than one.

16  Q.  What was discussed during these discussions?

17  A.  Well, we were all introduced to Trevon, and Anthony Murgio

18  would talk about our plan for the credit union and why we

19  wanted to have it.

20  Q.  Let's break that down.  So you said you were introduced to

21  Trevon?

22  A.  Yes.

23  Q.  So just to be clear, was this a group call?

24  A.  Yes, a conference call.

25  Q.  So how were you introduced to Trevon?

1   A.   Each of us, each of us introduced our ourselves to him and

2   also let him know our relationship to Anthony Murgio.

3   Q.   Was there any discussion of your professional backgrounds?

4   A.   No.

5   Q.   Going through your resumes?

6   A.   No.

7   Q.   Now, you also alluded to other information, other parts of

8   this discussion.

9   A.   Yes.

10  Q.   Could you please just explain what was discussed after you

11  introduced yourselves?

12  A.   Just our plan going forward, and why we wanted a credit

13  union, and how it would extend the functionality of Coin.mx.

14  Q.   Who was saying this on these calls?

15  A.   Anthony Murgio.

16  Q.   Was there any discussion of the Collectables Club during

17  this call?

18  A.   Yes.

19  Q.   And again, was Anthony Murgio speaking?

20  A.   Yes.

21  Q.   What did he say about the Collectables Club?

22  A.   Just who we were, like we were -- Collectables Club is an

23  association, and we have a platform that our members can buy,

24  sell, and trade digital currency and digital assets.

25  Q.   You testified that there was more than one call.

1    A.  Yes.

2    Q.  Besides what you've already testified to, were there any

3    other topics discussed during any of these calls?

4    A.  Any other topics?

5    Q.  Yes.  Besides introducing yourselves and explaining what

6    Collectables Club was.

7    A.  Just getting prepared for the board meeting where we would

8    be voted in on.

9    Q.  So apart from these calls with you, Murgio, the proposed

10   board members, and Trevon Gross, were you ever interviewed by

11   anyone from HOPE FCU as part of the process of becoming a board

12   member?

13   A.  No, I wasn't.

14   Q.  Did Trevon Gross or anyone else from HOPE FCU ever ask you

15   for your qualifications to serve as a board member?

16   A.  No.

17   Q.  Did you ever travel to New Jersey to visit HOPE FCU prior

18   to becoming a board member?

19   A.  No.

20   Q.  Do you recall when the election was for you and the other

21   board members?

22   A.  It was in June of 2014.

23            MR. SHIN:  Ms. Grant, if you could put up 1188-B in

24   evidence.

25   Q.  If you could just read the bottom email under "Gentlemen

1   and Lady"?

2   A.   "Tomorrow is the annual meeting for the CU.  All board

3   members will be elected at this time.  I will be setting up a

4   Google hangout so we can all be there virtually.  If you

5   attend, please let me know if you have any questions."

6   Q.   Okay.  And this is an email written by Anthony Murgio?

7   A.   Yes.

8   Q.   On June 20th?

9            If you could just read into the record --

10           THE COURT:  Just a moment.  You asked a question and

11   there was no response.

12           MR. SHIN:  I'm sorry, your Honor.  I forgot what the

13   last --

14           THE COURT:  You said, "On June 20th?"

15           MR. SHIN:  Right.

16   BY MR. SHIN:

17   Q.   So was this email exchange on June 20th?

18   A.   Yes.

19           MR. SHIN:  Thank you, your Honor.

20   Q.   Could you read into the record, Mr. Hill, who the

21   recipients of this email are?

22   A.   Yes.  Yuri Lebedev, Jose Freundt, myself, Tim Ellrich, Chad

23   Leo, Trevon Gross, Michael Murgio, Kendra Pannitti, and Kevin

24   Tomasso.

25   Q.   Thank you.

1           MR. SHIN:  Ms. Grant, if you could please put up

2    1188-C in evidence.

3    Q.  Is this the June 20th email?

4    A.  Yes, it is.

5    Q.  Could you please read the top email -- first, who wrote the

6    top email there?

7    A.  It's from Trevon Gross to all of us.

8    Q.  Could you please read what he wrote?

9    A.  "Please log into your It's Me 247 account and cast your

10   vote.  Voting ends at midnight tonight.  If you need your

11   password reset please let me know.  User name is your account

12   number."

13          MR. SHIN:  You can take that down.

14   Q.  Could you just generally describe for the jury what the

15   voting process was for this board election?

16   A.  Yes.  We would log into our accounts on It's Me 247, which

17   was the customer's version of logging into your bank account at

18   HOPE FCU, and we select the tab to vote for the upcoming

19   election, and then we all voted for each other, as you could

20   not vote for yourself.

21   Q.  And by this point, in order to vote, had you already had an

22   account opened in your name?

23   A.  Yes.

24   Q.  Was that true of the other proposed board members, as well?

25   A.  Yes.  All of us, you had to have an account, an active

H2NOLEB2                         Hill - Direct

1     account at HOPE FCU to place a vote.

2     Q.  Who opened those accounts for you?

3     A.  Anthony Murgio.

4     Q.  Anthony Murgio actually opened them?

5     A.  No, he funded them.  Our accounts were created by Trevon

6     Gross.

7     Q.  When you say "he funded them", what do you mean.  When you

8     say "Anthony Murgio funded them", what do you mean?

9     A.  They had to be active accounts, therefore, they had to have

10    a balance on them, so Collectables Club and Anthony Murgio

11    funded our accounts.

12                (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

H2NKLEB3                          Hill - Direct

1    BY MR. SHIN:
2    Q.   Again, just to be clear, because I think maybe there was a
3    little confusion there, who actually opened -- who created the
4    accounts for you?
5    A.   Trevon Gross created the accounts.
6    Q.   Did you actually vote?
7    A.   Yes.
8    Q.   Did you attend the board meeting the next day?
9    A.   Via conference call, yes.
10   Q.   Could you just describe how it was that -- you just said
11   "Via conference call."  Can you just describe mechanically what
12   happened for your participation in the board meeting?
13   A.   Myself and the proposed board members would all get on the
14   conference call first, and then we were patched in to Trevon
15   Gross and the meeting.
16   Q.   When you say you and the other proposed board members would
17   get on the conference call first --
18   A.   Yes.
19   Q.   -- who was on that first conference call?
20   A.   Myself, Anthony Murgio, Tim Ellrich, Yuri Lebedev, Jose
21   Freundt, Kendra Pannitti, Kevin Tomasso.  I don't remember if
22   Michael Murgio was on that call initially.
23   Q.   And then you made reference to patching in?
24   A.   Yes.
25   Q.   What was your group of people on the call then patching

1    into?

2    A.  To a conference that was Trevon and the board members, the

3    current board members.

4            MR. SHIN:  Ms. Grant, if you could please put up

5    Government Exhibit -- actually, before we do that:

6    Q.  Could you just generally describe what happened during the

7    board meeting?

8    A.  Yes.  Trevon called the meeting to order, they went over

9    their monthly reports, and then it eventually got to the

10   election.  Trevon recounted -- I mean gave an account of the

11   election results, and we were all named as board members.

12           MR. SHIN:  Ms. Grant, if you could please put up 6086

13   in evidence.

14   Q.  Are these the June 21st, 2014 board minutes of HOPE FCU?

15   A.  Yes.

16           MR. SHIN:  Ms. Grant, if you could highlight the list

17   of attendees at the top.

18   Q.  Could you tell, from your participation on the call, who

19   was present from the HOPE FCU side?

20   A.  No, I couldn't tell on their call, except Trevon, he was

21   the only one speaking, or those who gave the reports, but I

22   don't remember what individuals gave what report.

23           MR. SHIN:  You can zoom out, please.

24           And if you could turn to page 2, please.  If you could

25   zoom in on the "Board of Elections" section, please.

H2NKLEB3                         Hill - Direct

1    Q.  Could you just read that section into evidence, please?

2    A.  Yes.  "The slate of new board members introduced themselves

3    with a brief bio via visual conference (See attached).

4    Election of board members annual meeting notice and new board

5    of director ballot were previously presented to all members

6    online.  Based on the electronic voting tally, the current

7    board recommends that the slate of new board members of HOPE

8    FCU board be closed, the new slate of HOPE FCU board of

9    directors be approved, and by common consent, direct the

10   secretary to" east "one vote to elect all the new board

11   members.  Resolution passed."

12   Q.  I think you said "secretary to east one."  Is it possible

13   that that says to cast one?

14   A.  To cast, yes.  It just looks weird here.

15   Q.  It's blurry.

16   A.  Yeah.

17           MR. SHIN:  You can zoom out, please.

18           If you could go to the attachment, please, Ms. Grant.

19   If you could zoom in on that.

20   Q.  Do you see there a list of people that says, "The following

21   members are recommended for election of a," and then it has a

22   list?

23   A.  Yes.

24   Q.  Is it your understanding that these were the individuals

25   who were voted on and elected as members of the board?

1    A.  Yes.

2    Q.  If you could just read -- I'll highlight certain ones.

3    What's the name next to 01?

4    A.  Trevon Gross.

5    Q.  08?

6    A.  Ricardo Hill, myself.

7    Q.  10?

8    A.  Yuri Lebedev.

9    Q.  Is Anthony Murgio listed anywhere on this as someone who

10   was elected?

11   A.  No.

12   Q.  He wasn't proposed to be a board member?

13   A.  Correct, he wasn't.

14   Q.  Why not?

15   A.  Why not?

16   Q.  Did Anthony Murgio ever tell you why he wasn't going to

17   serve on the board?

18   A.  No.

19   Q.  Did you have an understanding of why he wouldn't serve on

20   the board?

21            MR. CREIZMAN:  Objection.

22            MR. KLINGEMAN:  Objection; foundation.

23            THE COURT:  Just answer directly the question, which

24   is a yes-or-no question:  Did you have any understanding of why

25   he wouldn't serve on the board?

1          THE WITNESS:  No, I don't.

2          MR. SHIN:  You can take that down, please, Ms. Grant.

3          If you could please put up 1191 in evidence.

4    BY MR. SHIN:

5    Q.  Who is this email from?

6    A.  It's from Anthony.

7    Q.  You received this email?

8    A.  Yes, I did.

9    Q.  And Yuri Lebedev is also a recipient of this email?

10   A.  Yes, he is.

11   Q.  And you will see here that actually says, "bcc:  Shoula

12   Cohen, Mark Francis."  Do you see that?

13   A.  Yes.

14   Q.  When you received this email, were you aware that this was

15   being sent to those people?

16   A.  No.

17   Q.  Could you please read the first paragraph under "Hello,

18   all."

19   A.  "You are officially board members.  The discussed pay will

20   start monthly.  Your first payment will be August 1st for all

21   of July.  Once again, if you are interested in having a

22   full-time position to help increase CU revenue, we can figure

23   something out.  Please get in contact with me.  Looking forward

24   to business and personal membership growth.  Regards, Anthony."

25          MR. SHIN:  You can take that down, Ms. Grant.

1    Q.  After the meeting -- after the vote and then the meeting

2    that you called into of the HOPE FCU board, what was your

3    understanding of whether you were then a board member?

4    A.  I was a board member.

5    Q.  After that board meeting that we just looked at the minutes

6    of --

7    A.  Uh-huh.

8    Q.  -- did Trevon Gross treat you as a board member?

9    A.  Yes.

10        MR. SHIN:  I'm sorry, Ms. Grant, would you mind just

11   putting that up one more second, the one we were just looking

12   at, 1191.  Thank you.

13   Q.  So we looked at that bcc line, Shoula Cohen and Mark

14   Francis.  Do you recognize those names?

15   A.  Yes, I do.

16   Q.  And do you recognize that domain, kapitalinc.com?

17   A.  Yes.

18   Q.  Who are those people?

19   A.  They are employees at Kapcharge.

20   Q.  And Kapital Inc., does that have something to do with

21   Kapcharge?

22   A.  Yes.  That's just a corporate email.  Kapcharge is the same

23   company as Kapital Inc.

24   Q.  We'll return to that later.

25        MR. SHIN:  You can take that down.

H2NKLEB3                         Hill – Direct

1              THE COURT:  Mr. Shin, let's take our mid-morning break

2       here.

3              MR. SHIN:  Thank you.

4              THE COURT:  Ladies and gentlemen of the jury, we'll

5       take about a ten-minute break.  Enjoy your break.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Jury not present)

2      THE COURT:  Any matters to take up?  No?

3      MS. CHOI:  Not from the government.

4      THE COURT:  All right.  We'll return in about eight

5  minutes, and I will check in and make sure there are no

6  matters.  If not, we'll get the jury.  Thank you.  Enjoy your

7  break.

8      (Recess)

9      THE COURT:  Anything to take up, counsel?

10     MR. NOBLE:  I think we do have an issue, your Honor,

11 that's come to our attention.

12     THE COURT:  All right.  Go ahead.

13     MS. CHOI:  Your Honor, as you know, the parties have

14 been working over the course of the last few months on

15 stipulations that would, with regard to certain business

16 records, preserve the ability for the defense to assert, under

17 relevance grounds or 403 grounds, that they shouldn't be

18 admitted, but otherwise be admitted as evidence.

19     THE COURT:  Right.

20     MS. CHOI:  As an accommodation to defense counsel, I

21 asked, many moons ago, if there are specific witnesses for

22 which they would need, in addition to the stipulation, a

23 witness because they would want to cross-examine, and as an

24 accommodation, the Bank of America witness was one that

25 Ms. Santillo had identified to us as someone they would like to

1    make their point.

2           I just had a conversation with defense counsel in

3    which Mr. Klingeman indicated that he would object to the

4    publishing of documents for which the parties had stipulated

5    were business records and object to their being published to

6    the jury without having a witness from the entity present.  We

7    made this accommodation --

8           THE COURT:  For Bank of America?

9           MS. CHOI:  No, for PNC Bank, which are the records

10   that are the corresponding records from Hope Cathedral.

11          Your Honor, we made those arrangements with regard to

12   Bank of America because they asked for it weeks ago.  We've

13   planned around the fact that we would have stipulations that

14   would lay the foundation to allow us to publish and argue about

15   these exhibits to the jury.  I understand that Mr. Klingeman

16   now wants a witness.  And what we would like to know is whether

17   or not there are other documents for which they have already

18   stipulated that there is a foundation for them to be entered

19   into as business records for which they want a witness.

20          The reason why this is an issue is, we have let PNC

21   know we didn't need them as a witness on reliance of defense

22   counsel's representations.  It's not easy for us to get

23   witnesses available, and I think there really isn't a basis for

24   which they can argue that we are not allowed to publish

25   exhibits for which they have stipulated there is admissible

H2NKLEB3                          Hill - Direct

1    ground to the witnesses.  That would include not only bank

2    documents and business records that we've already stipulated

3    to, but there's also stipulations regarding IRS documents,

4    Department of Homeland Security documents, and other documents.

5            And I think if your Honor -- I don't think there's a

6    basis for this objection from defense counsel.  If your Honor

7    were to rule in defense's favor, I think there has to be some

8    sort of accommodation to the government in order to try to get

9    these witnesses.  It's very hard to line them up.  These are

10   witnesses that we have --

11           THE COURT:  Okay, okay.  I get it.

12           Mr. Klingeman?

13           MR. KLINGEMAN:  Your Honor --

14           THE COURT:  Microphone.

15           MR. KLINGEMAN:  Your Honor, our agreement to the

16   applicability of the rules of evidence to the government's

17   exhibits extended to noncontroversial matters, such as

18   establishing something -- the basic foundation of a business

19   record or authenticity and other foundational matters, and that

20   stands.

21           THE COURT:  Reserving your right to --

22           MR. KLINGEMAN:  Reserving our right --

23           THE COURT:  Let me finish my sentence.

24           MR. KLINGEMAN:  I'm sorry, your Honor.

25           THE COURT:  Reserving your right to make other

1   evidentiary objections?

2              MR. KLINGEMAN:  Yes.

3              THE COURT:  And otherwise indicating if you wanted a

4   witness present?

5              MR. KLINGEMAN:  Yes.  And the latter is of the utmost

6   importance because that is a condition that I placed on these

7   stipulations in conversations with the government from jump

8   street.

9              Here's my concern:  If the government, with no notice,

10  as there wasn't any this morning, intends to publish a document

11  to the jury and nakedly offer it without any highlighting,

12  without any scrolling, without any explanation, I --

13             THE COURT:  Well, let's just backtrack.  So this was

14  the document -- I can't recall the number, but it's a PNC Bank

15  record?

16             MS. CHOI:  Yes, your Honor.  It would be several PNC

17  Bank records, but the specific one that we were referencing was

18  the wire transfer documents that would have been the inverse of

19  what the Bank of America witness had testified to, and it would

20  have been in response to Mr. Klingeman's line of cross.

21             THE COURT:  I get it.  I get it.

22             So this was a document you were aware of?

23             MR. KLINGEMAN:  Oh, sure.

24             THE COURT:  And you had specifically requested a Bank

25  of America, but not a PNC witness; is that correct?

H2NKLEB3                          Hill - Direct

1             MR. KLINGEMAN:  We -- no -- yes.

2             THE COURT:  Well, is it no or yes?

3             MR. KLINGEMAN:  I'm not sure I understand the

4      question.

5             THE COURT:  Well, they had a Bank of America witness

6      here.  I understand that's because you requested a Bank of

7      America witness?

8             MR. KLINGEMAN:  Yes.

9             THE COURT:  You didn't make a comparable request with

10     respect to the PNC witness?

11            MR. KLINGEMAN:  Not up to this time.

12            THE COURT:  Well, we'll get to that.

13            What was your understanding of what you were

14     stipulating to with respect to the PNC documents?

15            MR. KLINGEMAN:  That they were business records, and

16     that we weren't going to object on foundational grounds.

17            THE COURT:  But that you could make other evidentiary

18     objections?

19            MR. KLINGEMAN:  And insist on the attendance of a

20     witness.

21            THE COURT:  So you don't have other evidentiary

22     objections?

23            MR. KLINGEMAN:  Well --

24            THE COURT:  For example, to the document that they

25     tried to publish today.

1           MR. KLINGEMAN:  I do, in terms of 403, which we

2    preserve with respect to every stipulated exhibit.

3           THE COURT:  I'm just asking if you have an objection.

4           MR. KLINGEMAN:  Yes, yes.

5           THE COURT:  You have a 403 objection to the PNC

6    document?

7           MR. KLINGEMAN:  Yes.

8           THE COURT:  And what's that?

9           MR. KLINGEMAN:  I'm assuming, in response to my

10   cross-examination of the witness this morning, the government

11   is going to purport to offer this exhibit and then highlight

12   portions of it, including information concerning the wire, and

13   argue to the jury perhaps that somehow Mr. Gross had knowledge

14   of the contents of this document or could have had knowledge of

15   the contents of this document if he had gone to PNC, as we

16   discussed with the Bank of America witness, and asked for the

17   records and then reviewed them.

18          THE COURT:  When did you ask for the Bank of America

19   witness to be present?

20          MR. KLINGEMAN:  Pretrial.  Sometime pretrial.

21          THE COURT:  And what was your understanding of the

22   time?

23          MR. KLINGEMAN:  We never made an agreement.  This is

24   trial, it's fluid.  We have no idea what's coming next.

25          Let me get to the point, your Honor:  This evidence is

1   going to be offered by the government to try to establish

2   venue.

3           THE COURT:  Sure.

4           MR. KLINGEMAN:  Not jurisdiction, venue.

5           THE COURT:  Right.

6           MR. KLINGEMAN:  Not Commerce Clause -- not meeting the

7   Commerce Clause, venue.

8           THE COURT:  Right.  And that's why you wanted the Bank

9   of America witness here, right?

10          MR. KLINGEMAN:  Right, because we want to make clear

11  to the jury in terms of venue and to the Court in terms of Rule

12  29 in terms of venue that the defendant on trial has to have

13  some knowledge.

14          THE COURT:  I understand.  And you'll make your

15  arguments, and these were previewed in the earlier motions.

16          MR. KLINGEMAN:  And in the absence of a witness, the

17  PNC document is going to be used by the government to establish

18  the defendant's knowledge.

19          THE COURT:  What I'm not going to allow is some

20  gamesmanship around who you indicated you needed here and who

21  you gave the impression you did not need here.  So I'm guarding

22  against that.  Who do you want here -- with respect to

23  stipulations that you've made, custodial stipulations, who do

24  you want here as custodian?

25          MR. KLINGEMAN:  I don't know.  I want a PNC Bank

H2NKLEB3                         Hill - Direct

1    witness in response to the specific issue being presented to

2    the jury.  I can't possibly forecast -- the government has

3    marked, your Honor, literally thousands of exhibits.  I can't

4    tell anyone at this point --

5              THE COURT:  Look, you knew --

6              MR. KLINGEMAN:  I'm trying --

7              THE COURT:  You knew venue was an issue, you're making

8    it an issue.  You knew enough to know that you wanted the Bank

9    of America witness here, so they had notice and arranged for

10   it.  It seems to me you, therefore, knew that the PNC

11   documents, or ought to have known, would be comparably

12   relevant, and you either failed to or chose not to request a

13   PNC witness here.

14             Now, I'm going to see if it can be accommodated

15   without affecting the trial, but it's troublesome.

16             MR. KLINGEMAN:  Well, I object to the Court's

17   attribution of gamesmanship or any other ill intent on behalf

18   of defense.  We have struggled to accommodate the schedule of

19   the Court and to be mindful of the Court's admonitions to us,

20   and I reject that, I object to it.  I have worked hard to honor

21   the Court's direction, I've worked hard with the government,

22   and there's no gamesmanship here, your Honor.  I'm simply

23   reacting to evidence as it's coming in before the jury or

24   offered before the jury.

25             THE COURT:  You, nonetheless, will have to live with

H2NKLEB3                        Hill - Direct

 1    stipulations that you've made --

 2              MR. KLINGEMAN:  I do.

 3              THE COURT:  -- if what you failed to do is identify

 4    witnesses that you need here, and they can't be brought here.

 5              Who else, other than a PNC witness?

 6              MR. KLINGEMAN:  I don't know.

 7              THE COURT:  Well, you will work hard to think who else

 8    you might need, so that they can be requested in time.

 9              MR. KLINGEMAN:  Of course.  We have been working hard

10    every second.

11              THE COURT:  So by tomorrow, you will let us know.

12              You'll work, Ms. Choi, on getting a PNC witness?

13              MS. CHOI:  Yes, your Honor.  I just want to note for

14    the record that there are -- we had sent a series of

15    stipulations early, sort of in anticipation of early 3500

16    production to the defense.  We then had some revisions.

17    Ms. Santillo has been working hard.  I don't want to give the

18    misimpression that this is -- I just want to note that I

19    understand Ms. Santillo's been working very hard to get through

20    these documents and these stipulations.

21              There are still two of note that she has not executed,

22    or reexecuted, the IRS stipulation as to IRS records and the

23    DHS stipulation as to DHS records.  They had already agreed to

24    this.  If they're now going to ask that we get witnesses, I'd

25    also like a representation from counsel tomorrow about which of

1    those witnesses we also need to prepare and anyone that's

2    listed in any of the bank or business record or any of the

3    stipulations, because this is going to -- it took us weeks --

4    it's still taking us time to try to get a lot of these

5    witnesses lined up, it's a lot of effort, and we need to start

6    working on that immediately.

7             MR. KLINGEMAN:  I couldn't agree more.  And here's my

8    problem:  The Court has essentially accused me of gamesmanship.

9    So why am I not in a position of now saying I want a witness

10   for all of these documents?  Because if I don't, and I make a

11   miscalculation as to who I need, then I'm going to be told I'm

12   engaged in gamesmanship.

13            I don't want a PNC Bank witness because I wanted one

14   two weeks ago.

15            THE COURT:  Mr. Klingeman, first of all, I didn't

16   accuse you.  I said I'm concerned about it.

17            MR. KLINGEMAN:  Well, the Court expressed concern.  I

18   take that very seriously.

19            THE COURT:  And I'm concerned.  I'm judging your body

20   language, you didn't stand up and say, your Honor, we made a

21   mistake, now I see the need, the necessity for a PNC witness

22   for this, and I want to raise that, and I'm going to talk to

23   the government and hope it can be worked out, we need to figure

24   out an accommodation, okay?  That's not how you presented this.

25            MR. KLINGEMAN:  I had no chance to do any of that.

1    First of all, I don't believe I made a mistake.  I'm trying
2    to react in realtime to evidence that's coming before the
3    Court, but I hope I've established some kind of record with the
4    Court that we don't engage in gamesmanship, and I have to be
5    very defensive about that.  I have a client here who's on
6    trial, and when the Court makes even an indirect assertion like
7    that, it cuts right to my responsibilities as an attorney.
8            I don't want to say to the government in the next 24
9    hours bring me a witness for every single group of documents
10   you have.  I don't want this trial to go on for another six
11   months.  I just want some ability to be able to react to what
12   they're doing.
13           THE COURT:  Then, Mr. Klingeman, your response to me
14   should have been:  I understand the concern, not I don't know
15   who I'll need, but I understand the concern, we're going to
16   work to think through this hard, and more, and again.  And I
17   assure you it was not an effort to prohibit the government, or
18   mislead with respect to my stipulation, or any of those things.
19   It's not what I heard, and it's not what I'm reading from you,
20   and so I'm going to make sure that we can proceed.
21           And I have said repeatedly that I'm grateful for
22   everyone working through the stipulations.  This trial is a
23   long time coming, a long time coming, everybody's had as much
24   time as they've requested to prepare.  I get that it's a lot of
25   documents.  I have provided resources with respect to every

H2NKLEB3                        Hill - Direct

request.  At some point you simply have to make these decisions

and move on.  I haven't said you can't request the witnesses.

I, too, have to react to what I'm seeing and safeguard this

process.

          I have not accused you of gamesmanship.  I have said

I'm concerned about it.  And at some point, we just have to get

through, we have to get through.

          So, yes, there are a lot of documents, yes, there are

a lot of stipulations.  It's time to make what it sounds like

were understood previously as final decisions about witnesses,

it's time to make predictions about what you need.  If

something unexpected comes up, if something you couldn't have

foreseen comes up, or that was incredibly difficult to foresee,

and an accommodation be made, we'll do it.

          MR. KLINGEMAN:  Your Honor, every time something

challenging has come up, we have been able to work it out.  And

if I had been given an opportunity -- while my attention is

totally focused on the critical witnesses on the stand, if I

had, nonetheless, been given an opportunity to reflect on this,

I'm sure I could come up with an accommodation.  The problem

is, the government stood up spontaneously at the end of the

Bank of America's testimony and offered this document.  I

objected.  Your Honor sustained the objection.

          THE COURT:  Right.

          MR. KLINGEMAN:  And then, as I'm literally leaving the

1  court to attend to my cross-examination, the government comes

2  at me with the very demand that the Court is now imposing on

3  me, that I identify every single witness from now on I want

4  brought to the case.

5         Here's the thing:  I don't want a PNC Bank witness.

6  If we can get a stipulation that if a PNC Bank witness were to

7  testify, her testimony would be consistent with what the Bank

8  of America witness said, that's fine, then I don't need a

9  witness.  But I just need a few minutes to think about it, talk

10  to the government, and accommodate the Court.  And, instead,

11  I'm being put on the spot where the government is in my face,

12  your Honor hasn't accused me directly of gamesmanship, but has

13  used the term in connection with my behavior, and I'm at a

14  loss.  I'm trying to do the best I can without doing injury to

15  the Court's schedule and the jury's time.

16         THE COURT:  Well, it seems as though this has been

17  productive because you've suggested a possible stipulation that

18  might be worked out.  So let's keep pursuing that process, but

19  you have parameters for thinking it through, thinking through

20  what the requests are, thinking through what's needed and

21  what's possible.

22         What else?

23         MS. CHOI:  That's it, your Honor.  We'll work with

24  Ms. Santillo and Mr. Klingeman to see what other witnesses they

25  would like by tomorrow, so that we can make efforts.  I presume

1    that the Court would accommodate if we would have to put that

2    in the middle of the defense case or whatever need be, it is

3    what it is.  But if we can reach stipulations, so be it, that

4    would be fantastic.

5            THE COURT:  Okay.  Anything else?

6            MS. CHOI:  Not from the government, your Honor.

7            THE COURT:  All right.

8            Let's get our jury.

9            MR. SHIN:  Shall we bring in the witness, your Honor?

10           THE COURT:  Oh, we should.

11           Mr. Shin, you have a lovely demeanor.  You're very

12   careful.  If you could put your foot on the gas a little bit.

13   There are some pauses which extends the time, but also you lose

14   interest of the jury.

15           MR. SHIN:  Understood, your Honor.

16           THE COURT:  Foot on the gas.

17           MR. SHIN:  I'll do my best.  Thank you.

18           (Continued on next page)

19

20

21

22

23

24

25

1            (Jury present)

2            THE COURT:  Thank you, everyone.  You may take your

3    seats.

4            Thank you, members of the jury, for your continued

5    attention.

6            Mr. Shin, you can proceed with direct.

7            MR. SHIN:  Thank you, your Honor.

8    BY MR. SHIN:

9    Q.  Mr. Hill, you testified earlier that under this arrangement

10   for you to become a board member, you were to receive payments?

11   A.  Yes.

12   Q.  And they were to be paid on a monthly basis?

13   A.  That's correct.

14   Q.  Did you, in fact, ever receive such payments?

15   A.  Yes.  For about five months, from June/July to November.

16   Q.  Who paid you?

17   A.  Collectables Club.

18   Q.  Not HOPE FCU?

19   A.  No.

20   Q.  Do you know if the other new board members received any

21   such payments?

22   A.  Yes.

23   Q.  How do you know that?

24   A.  I was in charge of arranging those payments to be made by

25   providing the HOPE FCU account numbers of our board members to

1    Eva, who would have made those payments to our accounts.

2    Q.  This Eva that you're referencing, who is that again?

3    A.  She handled our account in Coin.mx and Collectables Club.

4         MR. SHIN:  Ms. Grant, if you could please publish for

5    the jury 2144 in evidence.

6    Q.  Mr. Hill, if you could describe this email, who it's from

7    and to, and what date it is?

8    A.  This email is dated July 30th of 2014, from Yuri Lebedev to

9    myself.

10   Q.  Just looking at the overall email, it appears to be an

11   email chain; is that correct?

12   A.  Yes.

13   Q.  Now, if you could -- if I could direct your attention to

14   that bottom portion of that email, your email at the bottom.

15   Could you read that, please?

16   A.  "Hi all.  This is to notify you that $417 will be credited

17   to your HOPE FCU checking account.  Please let us know if you

18   have any questions."

19   Q.  If you could read the top email, please?

20        THE COURT:  Can you just confirm, did this come in

21   today?

22        MR. SHIN:  I believe this came in --

23        THE COURT:  Take it down for a moment, Ms. Grant.

24        I don't have it on my admitted list.

25        MR. SHIN:  I'm sorry, your Honor.  That was my

H2NKLEB3                          Hill - Direct

```
 1   mistake.  I'll lay the appropriate foundation, your Honor.
 2            Ms. Grant, if you could please publish this just to
 3   the witness, and to the Court, and to counsel.
 4   BY MR. SHIN:
 5   Q.  Do you recognize this document, Mr. Hill?
 6   A.  Yes.
 7   Q.  Could you, just in general terms, describe what it is?
 8   A.  An email from Yuri Lebedev to myself on June 30th, 2014.
 9            MR. SHIN:  Your Honor, the government offers
10   Exhibit 2144 into evidence.
11            MR. CREIZMAN:  No objection.
12            MR. KLINGEMAN:  No objection.
13            THE COURT:  Thank you.
14            2144 is admitted.
15            (Government's Exhibit 2144 received in evidence)
16            MR. SHIN:  If you could publish that for the jury,
17   please, Ms. Grant.
18   Q.  If you could read Mr. Lebedev's response at the very top?
19   A.  "Rico, I talked to Trevon, and he helped me log in.  Also,
20   I don't know if you processed the request for $417 into my HOPE
21   account yet, but I am attaching an agreement where I am billing
22   for that $417 via my consulting company.  So if it's not too
23   late, I need to submit a bill that way.  Thanks, Yuri."
24            MR. SHIN:  Ms. Grant, if you could turn to the
25   attachment, please.
```

1    Q.  Mr. Hill, could you read just the section under

2    "Agreement"?

3    A.  Yes.  "This agreement is entered into by and between HOPE

4    Federal Credit Union and Intelligent VR and is issued under the

5    independent contractor agreement."

6    Q.  Thank you.

7         MR. SHIN:  Ms. Grant, if you could highlight the

8    signature block at the bottom.

9    Q.  Who signed on behalf of which entities, Mr. Hill?

10   A.  For HOPE Federal Credit Union, it's signed by Jose Freundt,

11   and for Intelligent VR, it's signed by Yuri Lebedev.

12        MR. SHIN:  Ms. Grant, if you would put up, just for

13   the witness, Exhibit 2265.

14   Q.  Mr. Hill, do you recognize this document?

15   A.  Yes.  It's an email from Yuri Lebedev to myself.

16   Q.  Is it dated August 28th of 2014?

17   A.  Yes.

18        MR. SHIN:  The government offers Exhibit 2265 into

19   evidence.

20        THE COURT:  Without objection?

21        MR. CREIZMAN:  No objection.

22        MR. KLINGEMAN:  No objection.

23        THE COURT:  Thank you.

24        2265 is admitted.

25        (Government's Exhibit 2265 received in evidence)

1    MR. SHIN:  May we publish, your Honor?

2    THE COURT:  You may.

3    BY MR. SHIN:

4    Q.  Could you please read the top portion of that email from

5    Mr. Lebedev?

6    A.  "Thank you, Rico.  For $417 payment, when you send the bill

7    to Eva, could you use my Intelligent VR company?  Last month I

8    contacted her, and she was able to reroute.  Thank you again.

9    Regards, Yuri."

10    MR. SHIN:  Thank you, Ms. Grant.  If you could take

11    that down.

12    Q.  Mr. Hill, after the June election that we discussed earlier

13    today --

14    A.  Yes.

15    Q.  -- was Trevon Gross still a board member of HOPE FCU?

16    A.  Yes, he was.

17    Q.  In fact, did he have a particular position on the board?

18    A.  He was the chairman.

19    Q.  Now, do you know whether, after the June election, Gross

20    received payments for his role at HOPE FCU?

21    A.  Yes, he did.

22    Q.  What were those payments for?

23    A.  It was for consulting for $3,000 a month.

24    Q.  Who paid Mr. Gross those consulting payments?

25    A.  Collectables Club as well as Kapcharge.

H2NKLEB3                              Hill - Direct

1             MR. SHIN:  Ms. Grant, if you could please put up, for

2     the witness only, Exhibit 2153.

3     Q.  Mr. Hill, do you recognize this document?

4     A.  Yes.  It's an email from Eva to myself with Anthony Murgio

5     attached.

6             MR. SHIN:  The government offers 2153 into evidence.

7             MR. CREIZMAN:  No objection.

8             MR. KLINGEMAN:  No objection.

9             THE COURT:  Thank you.

10            2153 is admitted.

11            (Government's Exhibit 2153 received in evidence)

12            MR. SHIN:  May we publish?

13            THE COURT:  You may.

14    BY MR. SHIN:

15    Q.  Now, directing your attention to the bottom of the email

16    chain, Mr. Hill --

17    A.  Yes.

18    Q.  -- could you please read what you wrote, the line under,

19    "Hi Eva."  Or, actually, starting with "Hi Eva."

20    A.  "Hi Eva.  We need to send Trevon Gross the following

21    payment:  $1,500 consultancy fee for July and August, $250

22    rental fee for July and August, total to ACH Trevon Gross,

23    $3,500.  Can we please get this to him by tomorrow?"

24    Q.  And further up the chain, is there a reference to certain

25    agreements?

1   A.  Yes, there is.

2   Q.  What agreements are those?

3   A.  The consultancy agreement and the rental agreement.

4           MR. SHIN:  Ms. Grant, if you could please put up, just

5   for the witness, 1354-A.

6   Q.  Do you recognize this document, Mr. Hill?

7   A.  Yes.  It's an email from myself to Anthony Murgio.

8   Q.  What's it regarding?

9   A.  It's about the lease agreement.

10          MR. SHIN:  The government offers 1354-A into evidence.

11          MR. CREIZMAN:  No objection.

12          MR. KLINGEMAN:  No objection.

13          THE COURT:  Thank you.

14          1354-A is admitted.

15          (Government's Exhibit 1354-A received in evidence)

16          MR. SHIN:  May we publish?

17          Could we take a look at the attachment, please.

18  Q.  Mr. Hill, what is this agreement?

19  A.  This is the rental agreement.

20  Q.  Who is it between?

21  A.  Between Hope Cathedral.

22  Q.  And?

23  A.  And HOPE FCU.

24  Q.  So Hope Cathedral is the landlord, and HOPE FCU is the

25  tenant?

1    A.  Yes.

2              MR. SHIN:  Ms. Grant, could you please turn to page 5

3    of the attachment, the signature block.  Or the notice block, I

4    should say, of page 5.

5    Q.  Who are the persons indicated there for receiving notice

6    regarding the lease?

7    A.  The landlord, Loretta Larkins, and tenant, Ricardo Hill.

8              MR. SHIN:  Ms. Grant, if you could just go back to the

9    first page of the agreement again, please.  If you could zoom

10   in under "Term."

11   Q.  What is the term there?  What are the beginning and end

12   dates?

13   A.  Beginning July 1st of 2014 and ending June 30th of 2016.

14   Q.  So what's your understanding of whether there was a

15   preexisting lease or new lease that was executed?

16   A.  It was a new lease.

17             MR. SHIN:  Ms. Grant, if you could publish, just for

18   the witness, 1354-B.

19   Q.  Mr. Hill, do you recognize this document?

20   A.  Yes.  An email from Anthony Murgio to myself.

21             MR. SHIN:  The government offers 1354-B into evidence.

22             MR. CREIZMAN:  No objection.

23             MR. KLINGEMAN:  No objection.

24             THE COURT:  Thank you.

25             1354-B is admitted.

1          (Government's Exhibit 1354-B received in evidence)

2          MR. SHIN:  Could we please publish that to the jury?

3          THE COURT:  You may.

4          MR. SHIN:  Thank you.

5  BY MR. SHIN:

6  Q.  What's the subject line here, Mr. Hill?

7  A.  "Rental Agreement."

8  Q.  What did you write to Mr. Murgio?

9  A.  "Cool.  Just elect sign for Collectables Club."

10  Q.  Mr. Hill, if I could direct your attention to the bottom

11  email where you write.  What did you write initially?

12  A.  Oh.  "Filled out and sent to Trevon with the info he

13  provided."

14  Q.  And then how did Anthony Murgio respond?

15  A.  Anthony responded, "Cool.  Just elect sign for

16  Collectables."

17  Q.  Do you mean what he meant by "elect sign"?

18  A.  I don't remember, but I think it's about using our -- using

19  the electronic signature.

20  Q.  So you believe "elect" means electronic?

21  A.  Yes.  We would use RightSignature to sign things

22  electronically.

23          MR. SHIN:  Ms. Grant, if you could please show the

24  witness 2158.

25  Q.  Mr. Hill, do you recognize this?

H2NKLEB3                         Hill - Direct

1    A.  This is an email from myself to Trevon.

2    Q.  And there is an attachment?  Is there an attachment listed

3    in the header?

4    A.  Yes.

5              MR. SHIN:  The government offers 2158 into evidence.

6              MR. CREIZMAN:  No objection.

7              MR. KLINGEMAN:  No objection.

8              THE COURT:  Thank you.

9              2158 is admitted.

10             (Government's Exhibit 2158 received in evidence)

11             MR. SHIN:  May we publish?

12             THE COURT:  You may.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

H2NOLEB4                        Hill - Direct

1   BY MR. SHIN:

2   Q.  Mr. Hill, could you read what you wrote in the initial

3   email at the bottom?

4   A.  I post the right signature link and write "for landlord go

5   to sign".

6   Q.  What's the date on which you sent that email?

7   A.  On September 29th, 2014.

8   Q.  And what did Mr. Gross respond?

9   A.  "This is not working.  Please just send me clean PDF and I

10  will manually sign it.  Thanks."

11          MR. SHIN:  Ms. Grant, if we could just flip through

12  the attachment.

13  Q.  Is that a PDF of the lease agreement?

14  A.  Yes.

15          MR. SHIN:  Ms. Grant, you can take that down.

16  Ms. Grant, could you please just show the witness 1332?

17  Q.  Mr. Hill, do you recognize this document?

18  A.  Yes.  This is an email on October 3rd from Anthony Murgio

19  to myself and Trevon.

20          MR. SHIN:  Government offers 1322 into evidence.

21          MR. CREIZMAN:  No objection.

22          MR. KLINGEMAN:  No objection.

23          THE COURT:  Thank you.  1322 is admitted.

24          (Government's Exhibit 1322 received in evidence)

25          MR. SHIN:  May we publish?

1    THE COURT:  You may.

2    BY MR. SHIN:

3    Q.  Mr. Hill, if you could just read that email please into the

4    record?

5    A.  "RICO.  We need to get Trevon pay $1,500 for August and 3K

6    for September.  This needs to come out of our funds from HOPE.

7    The 1,500 from August is coming from Kap and 3K for September

8    will be split 1,500 and 1,500 from Collectables and Kapcharge.

9    Please speak with Trevon to figure out the best way to do this,

10   and then I'll notify Kap and we can notify Eva from

11   Collectables."

12   Q.  I think you actually did the translation on the way --

13   A.  "Kap" is "Kapcharge".

14           MR. SHIN:  Ms. Grant, if we could show just the

15   witness 1658?

16   Q.  Do you recognize this document, Mr. Hill?

17   A.  Yes.  This is an email from Trevon to Anthony Murgio and

18   myself.

19           MR. SHIN:  The government offers 1658 into evidence.

20           MR. CREIZMAN:  No objection.

21           MR. KLINGEMAN:  No objection.

22           THE COURT:  Thank you.  1658 is admitted.

23           (Government's Exhibit 1658 received in evidence)

24           MR. SHIN:  May we publish?

25           THE COURT:  You may.

1    BY MR. SHIN:

2    Q.  Mr. Hill, do you see how the bottom of this chain is the

3    same email we just looked at previously?

4    A.  Yes.

5    Q.  Could you then read what Anthony Murgio responded?

6    A.  "Gentlemen.  What is the status on this?  I hate this

7    hanging over my head.  I want to make sure Trevon gets paid out

8    his consultant fees for all he has done.  Thanks."

9    Q.  Could you please read Trevon Gross' response on top?

10   A.  "Ricardo was handling everything.  Now that he has clear

11   instructions, it should all be completed tomorrow."

12   Q.  Mr. Hill, who provided you those instructions that he's

13   referencing?

14   A.  Trevon.

15          MR. SHIN:  Ms. Grant, if you could show the witness

16   2175?

17   Q.  Mr. Hill, do you recognize this document?

18   A.  Yes.  This is the email from Trevon to myself.

19   Q.  And it's dated October 7, 2014?

20   A.  Correct.

21          MR. SHIN:  Government offers 2175 into evidence.

22          MR. CREIZMAN:  No objection.

23          MR. KLINGEMAN:  No objection.

24          THE COURT:  Thank you.  2175 is admitted.

25          (Government's Exhibit 2175 received in evidence)

H2NOLEB4                          Hill - Direct

1          MR. SHIN:  Could we publish?

2          THE COURT:  You may.

3  BY MR. SHIN:

4  Q.  Mr. Hill, if you could read the bottom email from Trevon

5  Gross?

6  A.  "One payment was moved from Collectables Club to HOPE

7  account.  The other two should be moved from Kapcharge to

8  Collectables Club, then to 5170."

9  Q.  Then could you read your response, please?

10  A.  "To be clear, I only need to move 3K from Kap to

11  Collectables Club, then from Collectables Club to 5170?"

12  Q.  And what was Trevon Gross' response?

13  A.  "Yes.  Thanks."

14  Q.  Could you explain for the jury what's happening here?  What

15  is Trevon Gross saying?  What's your understanding of what

16  Trevon Gross was saying at the bottom of the initial email?

17          MR. KLINGEMAN:  Objection, speculation.

18          THE COURT:  You can rephrase.

19  BY MR. SHIN:

20  Q.  Mr. Hill, did you understand Trevon Gross' instructions in

21  the bottom email?

22  A.  Yes.

23  Q.  And in particular, after he answered your clarifying

24  question, did you understand the instructions that were posed?

25  A.  Yes.

1    Q.  So what was Mr. Gross telling you to do in this email?

2    A.  He was telling me what payment to move from Collectables

3    Club to the HOPE account, and what payments to move from

4    Kapcharge to Collectables Club, then to the HOPE account.

5    Q.  What is 5170?

6    A.  5170 is his HOPE account.

7    Q.  Trevon Gross' HOPE account?

8    A.  Yes.

9           MR. SHIN:  Ms. Grant, if you could please show the

10   witness 2177?

11   Q.  Do you recognize this document?

12   A.  Yes.  This is an email from -- well, it's a chain email,

13   one from Trevon to myself, the other from Trevon to an employee

14   at Kapcharge, Christine.

15          MR. SHIN:  Government offers 2177 into evidence.

16          MR. CREIZMAN:  No objection.

17          MR. KLINGEMAN:  No objection.

18          THE COURT:  Thank you.  2177 is admitted.

19          (Government's Exhibit 2177 received in evidence)

20          MR. SHIN:  May we publish?

21          THE COURT:  You may.

22   BY MR. SHIN:

23   Q.  Mr. Hill, the email, the second email in the chain from

24   Trevon Gross to Christine Corida, October 8, 2014 --

25   A.  Yes.

1   Q.  I'm sorry.  Actually, let's go to the one just below from

2   Christine Corida.  Could you please read what she wrote there?

3   A.  "Hi.  Please advise when the entries below will be posted.

4   I will be sending today's entries later on this morning.  Also,

5   please advise in regards to the $3,000.  Thank you."

6   Q.  What was Trevon Gross' response?

7   A.  "Ricardo, these were not done yesterday?  Also, you should

8   create an invoice from Collectables Club to Kapcharge for

9   consultant services to justify the $3,000.  Make it from

10  Anthony since he stated it.  Please advise."

11  Q.  So just to be clear, this email was sent from Trevon Gross

12  to whom?  The one you just read, who was the recipient of that

13  email?

14  A.  Christine.

15  Q.  But he actually addressed the email to whom?

16  A.  Myself.

17  Q.  And then is the top email him forwarding that statement to

18  you, forwarding the email chain to you?

19  A.  That's correct.

20          MR. SHIN:  Ms. Grant, if you could please show the

21  witness 2183?

22  Q.  Do you recognize this document?

23  A.  Yes.  This is an email from myself to Christine at

24  Kapcharge.  It has an attachment.

25          MR. SHIN:  Government offers 2183 into evidence.

1    MR. CREIZMAN:  No objection.

2    MR. KLINGEMAN:  No objection.

3    THE COURT:  Thank you.  2183 is admitted.

4    (Government's Exhibit 2183 received in evidence)

5    BY MR. SHIN:

6    Q.  Could you just read the text of the email, the top of the

7    email that you write to Christine at Capital Inc.?

8    A.  I can't see --

9    Q.  Do you see --

10   A.  I'm sorry.

11   Q.  Please.  If you could read that text?

12   A.  "Just a notice that all postings are complete."

13   Q.  I'm sorry.  The top email?

14   A.  "Invoice attached."

15   MR. SHIN:  Ms. Grant, if we could look at the

16   attachment, please?

17   Q.  What is this document, Mr. Hill?

18   A.  This is an invoice to Kapcharge for consulting fees.

19   Q.  Consulting fees for whom?

20   A.  For Trevon in the amount of $3,000.

21   Q.  It's for what time period?

22   A.  For October of 2014.

23   Q.  Who created this invoice?

24   A.  I did.

25   Q.  And on whose instructions?

H2NOLEB4                          Hill - Direct

 1   A.   Trevon's.

 2   Q.   Did anyone else also instruct you on making this invoice?

 3   A.   Anthony Murgio.

 4           MR. SHIN:  Ms. Grant, 1324-C, please.

 5   Q.   Mr. Hill, do you recognize this document?

 6   A.   Yes.  This is an email from Anthony Murgio to myself with

 7   others attached from Kapcharge.

 8           MR. SHIN:  Government offers 1324-C into evidence.

 9           MR. CREIZMAN:  No objection.

10           MR. KLINGEMAN:  No objection.

11           THE COURT:  Thank you.  1324-C is admitted.

12           (Government's Exhibit 1324-C received in evidence)

13   BY MR. SHIN:

14   Q.   Could you read the second email down from Christine Corida?

15   What did she write beginning with "I understand"?

16   A.   I'm sorry.  I can't see it yet.  "I understand, but which

17   months are being billed?  This is very important."

18   Q.   And what did Anthony Murgio respond?

19   A.   "August and September."

20   Q.   Do you understand what this conversation is in reference

21   to?

22   A.   Yes.  Christine mentioned that their portion of the

23   consulting fees should have only been 1,500 a month.  Anthony

24   is telling her to recharge 3,000 for this one because it was

25   done for two months, August and September.

1          MR. SHIN:  Ms. Grant, 2180 for the witness, please.

2     Q.  Do you recognize this document, Mr. Hill?

3     A.  Yes.  This is an email from me to Anthony Murgio with

4     Kapcharge attached.  It has a couple of attachments.

5          MR. SHIN:  Government offers 2180 into evidence,

6     please.

7          MR. CREIZMAN:  No objection.

8          MR. KLINGEMAN:  No objection.

9          THE COURT:  Thank you.  2180 is admitted.

10         (Government's Exhibit 2180 received in evidence)

11         MR. SHIN:  May we publish to the jury?

12         THE COURT:  You may.

13         MR. SHIN:  Ms. Grant, could we look at the first

14    attachment?

15    BY MR. SHIN:

16    Q.  What is this document?

17    A.  This is an invoice to Kapcharge for consultant fees for

18    Trevon.

19    Q.  For what period?

20    A.  For the month of September, 2014.

21    Q.  In what amount?

22    A.  For $1,500.

23         MR. SHIN:  Ms. Grant, if we could look at the next

24    attachment, please?

25    Q.  What is this, Mr. Hill?

1    A.  Also an invoice to Kapcharge for consulting fees for

2    Trevon.  It's for August of 2014 for $1,500.

3    Q.  Who made these invoices?

4    A.  I made them.

5    Q.  And on whose instructions?

6    A.  Trevon and Anthony Murgio.

7            MR. SHIN:  Ms. Grant, 2189 for the witness, please?

8    Q.  Mr. Hill, do you recognize this document?

9    A.  Yes.  This is an email from Trevon to myself.

10           MR. SHIN:  Government offers 2189 into evidence.

11           MR. CREIZMAN:  No objection.

12           MR. KLINGEMAN:  No objection.

13           THE COURT:  Thank you.  2189 is admitted.

14           (Government's Exhibit 2189 received in evidence)

15   BY MR. SHIN:

16   Q.  What's the date of this email?

17   A.  October 15, 2014.

18   Q.  Could you please read what Trevon Gross wrote in the

19   initial email at the bottom?

20   A.  "Hey, Ricardo.  Did you ever get that invoice over to

21   Kapcharge for the 3K?"

22   Q.  How did you reply?

23   A.  "Yes, I sure did."

24           MR. SHIN:  Ms. Grant, if you could please show the

25   witness 2280?

H2NOLEB4                         Hill - Direct

1    Q.  Do you recognize this document?

2    A.  Yes.  This is an email from Anthony Murgio to myself and

3    Trevon.

4    Q.  On November 9th of 2014?

5    A.  Yes.

6            MR. SHIN:  Government offers 2280 into evidence.

7            MR. CREIZMAN:  No objection.

8            MR. KLINGEMAN:  No objection.

9            THE COURT:  Thank you.  2280 is admitted.

10           (Government's Exhibit 2280 received in evidence)

11           MR. SHIN:  May we publish?

12           THE COURT:  You may.

13   BY MR. SHIN:

14   Q.  Mr. Hill, what's the subject line of this email?

15   A.  "Trevon pay".

16   Q.  And could you please read what Anthony Murgio writes to you

17   and Mr. Gross?

18   A.  "Rico.  Trevon is to be paid 3K a month from Collectables.

19   Collectables needs to charge Kap 1,500 a month to compensate

20   for half.  Please invoice Kap for consultant from Collectables

21   Club then pay Trevon."

22   Q.  Thank you.

23           MR. SHIN:  Ms. Grant, if you could please put up 2227

24   for the witness?

25   Q.  Do you recognize this document?

1   A.  Yes.  This is an email from myself to Kevin from Kapcharge.

2   It has an attachment on November 10th, 2014.

3            MR. SHIN:  Government offers 2227 into evidence.

4            MR. CREIZMAN:  No objection.

5            MR. KLINGEMAN:  No objection.

6            THE COURT:  Thank you.  2227 is admitted.

7            (Government's Exhibit 2227 received in evidence)

8            MR. SHIN:  May we publish?

9            THE COURT:  You may.

10  BY MR. SHIN:

11  Q.  Who is Kevin -- who is the recipient of this email, Kevin?

12  A.  Kevin from Kapcharge.  He's an employee at Kapcharge.

13  Q.  And could you please read what you wrote to Kevin?

14  A.  "Invoice attached for consulting for Trevon."

15  Q.  Just for the record, Kevin's last name is?

16  A.  Pepe.

17            MR. SHIN:  Could we look at the attachment, please,

18  Ms. Grant?

19  Q.  What is this document, Mr. Hill?

20  A.  This is an invoice to Kapcharge for consulting for Trevon

21  for the month of November in the amount of $1,500.

22  Q.  Did you make this document?

23  A.  Yes.

24            MR. SHIN:  Ms. Grant, could you please show the

25  witness 1326-C?

H2NOLEB4                          Hill - Direct

1    Q.  Do you recognize this document?

2    A.  Yes.  This is an email chain between myself, Anthony

3    Murgio, and Eva.

4    Q.  Is there an attachment?

5    A.  Yes, there is.

6    Q.  The email chain is dated November 14, 2014?

7    A.  Yes.

8            MR. SHIN:  Government offers 1326-C into evidence.

9            MR. CREIZMAN:  No objection.

10           MR. KLINGEMAN:  No objection.

11           THE COURT:  Thank you.  1326-C is admitted.

12           (Government's Exhibit 1326-C received in evidence)

13           MR. SHIN:  May we publish?

14           THE COURT:  You may.

15   BY MR. SHIN:

16   Q.  Mr. Hill, near the bottom of the first page, Eva writes an

17   email.  What is she asking for in that email?

18   A.  "Hello.  Do you now have the agreement with Trevon?"

19   Q.  What does Anthony Murgio respond?

20   A.  "What agreement do you need?  Showing that he is

21   consulting?"

22           MR. SHIN:  Ms. Grant, if you could highlight just kind

23   of the top half of the email from here on?

24   Q.  What does Eva respond?

25   A.  "Is it possible to provide me with it?"

H2NOLEB4                          Hill - Direct

1    Q.  And what does Anthony Murgio respond?

2    A.  "Sure.  We can make one.  Rico, please create and have

3    Trevon sign."

4    Q.  What's your response to that?

5    A.  "Sure.  I need Collectables Club letterhead."

6    Q.  What does Anthony Murgio respond?

7    A.  "Yo, just go on collectpma.com."

8    Q.  And is your response there at the very top "see attached"?

9    A.  Yes.

10          MR. SHIN:  Ms. Grant, could we look at the attachment?

11   Q.  What is this document, Mr. Hill?

12   A.  This is the consulting agreement between Collectables Club

13   and Trevon.

14   Q.  What's the date on this document?

15   A.  August 1st, 2014.

16   Q.  Do you recall when the date of this email chain was that we

17   were looking at at the beginning of this document?

18   A.  In November.

19   Q.  Was it November 14 of 2014?

20   A.  Yes.

21   Q.  But was this actually created on August 1st, 2014?

22   A.  No.

23   Q.  Was there a written consulting agreement prior to your

24   making this agreement around this time of November, 2014?

25   A.  Was there already one?

1   Q.  Correct.

2   A.  No.

3   Q.  Did Trevon Gross actually sign that document?

4   A.  I don't remember, but he could have asked me to do so.  I

5   don't know if he signed it or I signed it for him.

6   Q.  Were there occasions where you signed for Trevon Gross?

7   A.  Yes.

8   Q.  And when you did so, would you do so at his direction?

9   A.  Yes.

10  Q.  Did you do that here?

11  A.  Yes, I believe so.

12          MR. SHIN:  Ms. Grant, if we could show the witness

13  1326-B?

14  Q.  Do you recognize this document, Mr. Hill?

15  A.  Yes.  This is an email chain from Eva to myself and Anthony

16  Murgio.

17          MR. SHIN:  Government offers 1326-B into evidence.

18          MR. CREIZMAN:  No objection.

19          MR. KLINGEMAN:  No objection.

20          THE COURT:  Thank you.  1326-B is admitted.

21          (Government's Exhibit 1326-B received in evidence)

22          MR. SHIN:  May we publish?

23          THE COURT:  You may.

24          MR. SHIN:  Ms. Grant, if you could focus on the top

25  half.

1   BY MR. SHIN:

2   Q.   If you could just explain what this email from Eva -- what

3   is she telling you and Anthony Murgio?

4   A.   She wants me -- she's trying to add Trevon's bank account

5   to Collectables Club's payee on their HOPE account.  She could

6   not do it by herself and was asking was I able to find out how

7   to do this.  She also was asking to add the following

8   Collectables Club account to our HOPE account in order to

9   transfer funds to the HOPE account for Collectables Club.

10  Q.   Okay.  Let's break that down a little bit.  So what is the

11  6437 HOPE account?

12  A.   6437 is Collectables Club's account at HOPE FCU.

13  Q.   And when she said, "Please add Trevon's bank account to the

14  6437 HOPE account," what is she asking you to do?

15  A.   She wants me to add Trevon's bank account as a payee to

16  6437 so she can move funds from our -- from Collectables Club

17  HOPE account 6437 to Trevon's bank account, what she's asking

18  me to add.

19  Q.   So then in this next paragraph, when she asks to you add

20  the following Collectables Club account in order to transfer

21  funds into 6437 HOPE, what is she asking you to do there?

22  A.   She's asking me to add one of Collectables Club's outside

23  bank accounts, that routing and account number, and this will

24  allow her to transfer funds from an outside bank account into

25  the Collectables Club account at HOPE FCU.

1    Q.  Just for the record, what is the subject line of this

2    email?

3    A.  "Funds for Trevon".

4              MR. SHIN:  Ms. Grant, 1330-A just for the witness,

5    please?

6    Q.  Do you recognize this document, Mr. Hill?

7    A.  Yes.  This is an email from myself to Eva and Anthony on

8    November 24th, 2014.

9              MR. SHIN:  Government offers 1330-A into evidence.

10             MR. KLINGEMAN:  No objection.

11             MR. CREIZMAN:  No objection.

12             THE COURT:  Thank you.  1330-A is admitted.

13             (Government's Exhibit 1330-A received in evidence)

14             MR. SHIN:  May we publish?

15             THE COURT:  You may.

16   BY MR. SHIN:

17   Q.  Could you please read what you wrote under "Hi all"?

18   A.  "Eva, we need to pay Trevon 6K.  The wire instructions are

19   below.  Future credit to Collectables Club at HOPE.  When

20   received I'll transfer funds to Trevon's account."

21   Q.  We don't need to read all the account information

22   underneath.

23             Could you just explain, is this a multistep process,

24   again describing that first paragraph?

25   A.  Yes.  I need Eva to credit funds to Collectables Club at

1    HOPE.  When those funds are received, I can then transfer them

2    from Collectables' account at HOPE FCU to Trevon's account at

3    HOPE FCU.

4    Q.  What's the subject of this email?

5    A.  "Trevon pay".

6    Q.  Mr. Hill, we've looked at now numerous emails and invoices

7    and other documents relating to the payment of consulting fees

8    to Mr. Gross; is that correct?

9    A.  Yes.

10   Q.  Did you attend any board meetings of HOPE FCU after you

11   were elected to the board?

12   A.  Yes.

13   Q.  Was there discussion during these board meetings of paying

14   Trevon Gross, the chairman of the board, consulting fees?

15   A.  No.

16            MR. SHIN:  You can take that down.  Thank you.

17   Q.  Mr. Hill, after you became a board member of HOPE Federal

18   Credit Union in June of 2014, did you have any involvement in

19   running the credit union?

20   A.  Yes, I did.

21   Q.  Just in general terms, what involvement did you have?

22   A.  I also managed the back end of the credit union via CU

23   Base, I helped with all account creation for new members to

24   open accounts at HOPE FCU, I also processed ACH transactions

25   for Kapcharge, who also had an account at HOPE FCU.

1  Q.  What was the software program that you used to manage the

2  back end?

3  A.  It's called CU Base.

4  Q.  In fact, did you start preparing to have this role in

5  running the credit union before you were actually elected to

6  the board?

7  A.  Yes.  I began training to learn the backend software.

8          MR. SHIN:  Ms. Grant, could we show the witness 2143,

9  please?

10  Q.  Do you recognize this document?

11  A.  Yes.  There's an email chain from Trevon to myself, Jose,

12  Tim, Yuri, with Anthony Murgio copied on June 17th, 2014.

13          MR. SHIN:  Government offers 2143 into evidence.

14          MR. CREIZMAN:  No objection.

15          MR. KLINGEMAN:  No objection.

16          THE COURT:  Thank you.  2143 is admitted.

17          (Government's Exhibit 2143 received in evidence)

18          MR. SHIN:  May we publish?

19          THE COURT:  You may.

20  BY MR. SHIN:

21  Q.  Mr. Hill, looking at Trevon Gross' email at the bottom,

22  could you just right under the names, what it is that he wrote?

23  A.  "Here is your login for our back office software.  In

24  addition, you should have received an invitation from

25  logmein.com to have access to our remote machine in the CU.

H2NOLEB4                          Hill - Direct

1    The user name, once you are on the machine, is GDS.  The

2    password is the standard one we always use."

3    Q.  What is the date that that email was sent to you?

4    A.  June 17th of 2014.

5    Q.  Was that before or after you were elected a board member?

6    A.  Before.

7    Q.  Before?  Okay.

8           MR. SHIN:  Ms. Grant, if you could highlight just the

9    user names below?

10   Q.  I'm not going to ask you to read those.  Are those the

11   credentials that you used to log into the backend software?

12   A.  Yes.

13   Q.  Just to be clear, who were the other individuals who were

14   given access here?

15   A.  Tim, Eric, Yuri Lebedev, and Jose Freundt.

16   Q.  And do you see how Anthony Murgio is copied on this email?

17   A.  Yes.

18   Q.  Was he given access?

19   A.  No.

20   Q.  So after you were given access to the system -- which I

21   believe you called CU Base?

22   A.  Yes.

23   Q.  -- did Trevon Gross still have access to the backend

24   system?

25   A.  Yes.

1    Q.  Now, did you have an understanding whether there was any

2    difference between what access you had and what access Trevon

3    Gross had?

4    A.  Yes.  Trevon's login was superior to all of ours.

5    Q.  And so what does that mean, that it's superior?

6    A.  That he has master access.  Basically, he controls who

7    logged in, who was given passwords, or who can't log in.

8    Q.  So would that give his access any ability with respect to

9    your and these other people's access?

10   A.  Yes.  If at any time he wanted to revoke our access, he

11   could be the only one to do so.

12            THE COURT:  I invite the jury to take a standing break

13   with me.

14            (Pause)

15            MR. SHIN:  Ms. Grant, if you could please put up 1173,

16   which is already in evidence?

17   BY MR. SHIN:

18   Q.  Mr. Hill, let's take a look at the bottom email.  Could you

19   please read that paragraph that Anthony Murgio wrote?

20   A.  "Trevon.  Rico will be facilitating the transition and the

21   training for the credit union.  Rico is very organized so I

22   would like you to both get together on the steps that need to

23   be taken over the next month or so for a smooth transition."

24            MR. SHIN:  Could we look at the next email up,

25   Ms. Grant?

H2NOLEB4                          Hill - Direct

1    Q.   How did Trevon Gross respond?

2    A.   "Okay.  Rico, looking forward to working with you.  You

3    should have everything to log in and see the system.  Let me

4    know your availability for later today, Wednesday, or Thursday.

5    Thanks."

6    Q.   Let's take a look at the next email up.  If you could read

7    that, please?

8    A.   "Hi.  I have made it through the first five training

9    modules.  I'll be free after 6:00 p.m. Eastern or early

10   tomorrow before 10:00 a.m.  I'm currently on the ACH process

11   training."

12          MR. SHIN:  You can zoom out, Ms. Grant.

13   Q.   What is this reference to training here?

14   A.   How to enter transactions via -- how to enter ACH

15   transactions to certain accounts.

16   Q.   Let me start more broadly.  There's a reference here to

17   "first five training modules".  Could you describe what

18   training you participated in around this time?

19   A.   Oh.  It was overall training of the CU Base, the backend

20   software for HOPE Federal Credit Union, from account creation,

21   to approving the deposit or withdrawals, to changing passwords

22   for customers of the credit union, to ensuring debit cards were

23   mailed to the correct address; just an overall training of the

24   whole CU Base.

25   Q.   Did you also, around this time, receive any training on

1  compliance-related issues?

2  A.  Yes.

3  Q.  Could you describe what those were?

4  A.  It was an online training, basically like a Q and A, for

5  bank regulations.  You read through the material, and at the

6  end there were questions, and you had to pass with a certain

7  score to complete the training.

8  Q.  Do you remember what topics were covered in those

9  compliance trainings?

10 A.  Yes, I remember most.  OFAC, BSA, SAR.  I don't remember

11 them all.

12 Q.  You just actually gave several acronyms.  Do you remember

13 what any of those stand for?

14 A.  Yeah, a few.  BSA is Bank Secrecy Act.  SAR is Suspicious

15 Activity Report.  I don't remember what OFAC is.  I can't

16 remember all of them.

17 Q.  You made a reference to these being online trainings?

18 A.  Yes.  It was on online training module where it read

19 through each of the acronyms I mentioned, and then they asked

20 questions afterwards to make sure that you read the material.

21 Q.  Do you remember what format, what form these questions were

22 in?

23 A.  The questions were in multiple choice.

24 Q.  Were there many of them?  Do you recall the number of

25 questions?

1   A.  It wasn't a lot.  It took 20, 25 minutes to complete the
2   whole thing.
3   Q.  20, 25 minutes for each training or all of them?
4   A.  For all of them.
5   Q.  So on all of those compliance topics it took 25 minutes to
6   train?
7   A.  Yes.
8   Q.  Would you describe those trainings as detailed?
9   A.  Yes.  It lists the acronyms and told what it stood for and
10  what needs to be done in certain situations.
11  Q.  Did you feel like you had a full understanding of all those
12  compliance issues after taking the 25 minutes worth of
13  training?
14  A.  No.
15         MR. SHIN:  I'm sorry.  Could we put that back up,
16  please, Ms. Grant?  Thank you.
17  Q.  There is a reference here in your email, Mr. Hill, after
18  you say you've made it through the training modules.
19  A.  Yes.
20  Q.  And you say you'll be free after 6:00 p.m. or early
21  tomorrow before 10:00?
22  A.  Yes.
23  Q.  Did you have a subsequent discussion with Mr. Gross about
24  these trainings?
25  A.  Yes.  He asked if we went through it and completed it, and

1   if we passed, you had to have a certain passing score, I mean

2   answering the questions correctly, for actually to complete it.

3   Q.  Was there followup discussion about the substance of the

4   trainings?

5   A.  No.

6   Q.  For example, did you ask followup questions of him about

7   OFAC or BSA or SARs?

8   A.  No.  I just made sure I passed it and that was it.

9   Q.  Did he ask you any additional followup questions to make

10  sure you understood those topics?

11  A.  No.

12  Q.  There's a reference here to "I'm currently on the ACH

13  processing training."  What was that training.  Could you

14  describe what that training was like?

15  A.  It was how to manually enter transactions via ACH to a

16  specific account.

17  Q.  Was the format similar to the format you described earlier

18  for the other trainings?

19  A.  Yes.

20  Q.  So after that training, do you feel like you had a thorough

21  understanding of what ACH was?

22  A.  No, not at all.

23           MR. SHIN:  Ms. Grant, if you could please put up 1174

24  in evidence?

25  Q.  You see this is an email from Trevon Gross.  Who are the

1    individuals who are receiving this email?

2    A.  Myself, Anthony Murgio, Yuri Lebedev, and Jose.

3           MR. SHIN:  If you could zoom out, please, Ms. Grant?

4    Q.  Just generally, what's being provided here?

5    A.  Information about the credit union; the founding date, the

6    branch location, the phone number.

7           MR. SHIN:  If we could actually zoom in on the bottom

8    half, please?

9    Q.  Do you see there under "wires to HOPE FCU" there's a word

10   Alloya?

11   A.  Yes.

12   Q.  What is Alloya?

13   A.  Alloya is a corporate credit union.

14   Q.  What relationship was there between Alloya and HOPE FCU?

15   A.  Alloya was HOPE's corporate credit union.

16   Q.  What did Alloya do for HOPE FCU?

17   A.  I don't know.  I never understood that relationship.

18   Q.  Do you recall any terms being used to describe what Alloya

19   was other than "corporate credit union"?

20   A.  Yes.  Alloya was a settlement bank for HOPE or an

21   originations bank for HOPE.

22   Q.  Do you understand what those terms mean?

23   A.  No, I don't.

24   Q.  So sitting here today, do you have an understanding of what

25   exactly Alloya did for HOPE FCU?

1    A.  No, I really don't.

2    Q.  Did Trevon Gross ever explain that to you?

3    A.  He may have made an attempt to explain it, but I never

4    understood.

5    Q.  You were the one who was responsible for running the

6    day-to-day operations, or you had a role in running the

7    day-to-day operations of HOPE FCU?

8    A.  Yes.

9               THE COURT:  Just a moment.

10              MR. CREIZMAN:  Objection, form.

11              THE COURT:  All right.  I'll sustain.  Little bit of

12   room, but --

13              MR. SHIN:  Thank you, your Honor.

14              THE COURT:  Thank you.

15   BY MR. SHIN:

16   Q.  Mr. Hill, do you recall testifying earlier that you managed

17   the back end --

18   A.  Yes.

19   Q.  -- of HOPE FCU?

20   A.  Yes.

21   Q.  Was that a day-to-day job or a once-in-a-while job?

22   A.  Every day.  Well, Monday through Friday.

23   Q.  Now, while you were doing that, did you work with anyone

24   else associated with HOPE FCU?

25   A.  Yes, Trevon.

H2NOLEB4                        Hill - Direct

1   Q.  How often did you deal with him in connection with that

2   work?

3   A.  On a daily basis, or Monday through Friday.

4   Q.  What kinds of interactions did you have with Gross on a

5   day-to-day basis for work?

6   A.  He would give me instructions and directions on how to do

7   certain tasks, and he would also doublecheck on any work that

8   I've done or any tasks I completed.

9   Q.  Did he ever give you assignments of things to do?

10  A.  Yes.

11  Q.  I believe you testified that he checked on your work?

12  A.  Yes.

13  Q.  Did he ever correct mistakes that you had made?

14  A.  Or showed me how to do so.

15  Q.  So would you say that you worked closely with him --

16  A.  Yes.

17  Q.  -- on a day-to-day basis?

18  A.  Correct.

19  Q.  Now, while working with Gross, did you ever talk about

20  Coin.mx?

21  A.  I'm sure that I told him what I did for Collectables Club.

22  Q.  I'm sorry.  Would you mind repeating that answer?

23  A.  I'm sure I told Trevon what I did for Collectables Club and

24  Coin.mx.

25  Q.  I'm using Coin.mx differently from Collectables Club in my

1    question.  Did you ever mention Coin.mx?

2    A.  Yes.  That's the platform that I worked on before working

3    on HOPE's back end.

4    Q.  Could you just describe how this came up?

5    A.  Trevon noticed that I was catching on to the back end

6    pretty quickly from CU Base, the CU Base training, and just me

7    picking it up in general, and he had asked if I worked on any

8    backend software before, and I would mention that, yes, I run

9    the back end on Coin.mx, and the back end of Coin.mx is a lot

10   harder than the CU Base back end was.

11   Q.  How did Trevon Gross react when you said that you were

12   doing work for Coin.mx?

13   A.  He didn't.  He didn't seem like he was surprised or he

14   didn't ask any questions about it.

15   Q.  Did you try to hide the fact that you were associated with

16   Coin.mx from Trevon Gross?

17   A.  No, not at all.

18   Q.  Now, where was the credit union's operations when you

19   joined the board and started working for HOPE FCU?

20   A.  It was located in Jackson, New Jersey.

21   Q.  Did there come a time when another location was opened?

22   A.  Yes, in Tallahassee, Florida.

23   Q.  And when was that?

24   A.  In July of 2014.

25   Q.  Now, you testified earlier today that Coin.mx opened a

1    location in Tallahassee in July of 2014.  Was there any

2    relationship between those two things?

3    A.  It was the same office.

4    Q.  Why did HOPE FCU open an office in Tallahassee, Florida?

5    A.  That's where I was located, and that's where the branch was

6    going to be located as I was doing the day-to-day operations

7    there.

8    Q.  When you say "that's where the branch was going to be

9    located", what was actually going to be located at the office

10   in Tallahassee?

11   A.  A workstation -- a complete workstation with a desktop, a

12   tower, a secure router and a GUAPPLE.

13   Q.  I'm sorry.  What was a GUAPPLE?

14   A.  A GUAPPLE is similar to a router.  It securely allows a

15   desktop to connect to CU South via CU Base.

16   Q.  So it would connect your computer?

17   A.  To the back end of the credit union.

18   Q.  Who was going to work for the credit union at that location

19   in Tallahassee?

20   A.  I was.

21   Q.  Anyone else?

22   A.  No.

23        MR. SHIN:  Ms. Grant, if you could put up 51, please,

24   already in evidence?

25   Q.  What is this that we're looking at here?

1   A.  This is the outside of the office in Tallahassee, Florida.

2   Q.  Who is that individual on the lower left-hand corner?

3   A.  Jose Freundt.

4          MR. SHIN:  If we could go to 52, please?

5   Q.  What are we looking at here, Mr. Hill?

6   A.  The signage in front of the building, particularly that

7   sign HOPE FCU and Collectables Club.

8   Q.  We note here it says "Collectables Club".  Was there any

9   memorabilia sold out of this location?

10  A.  No.

11  Q.  Or stored at this location?

12  A.  No.

13  Q.  Were there meetings of collectibles enthusiasts at this

14  location?

15  A.  No.

16         MR. SHIN:  If we could go to 53, please?

17  Q.  What's in this photo here, Mr. Hill?

18  A.  The signage in front of the entrance to our office.

19         MR. SHIN:  Could we take a look at that?

20  Q.  So the sign here says it's the offices of HOPE FCU and

21  Coin.mx; is that correct?

22  A.  Yes.

23         MR. SHIN:  Could we look at 54, please?  Thank you.

24  Q.  What are we looking at here?

25  A.  The inside of the office in Tallahassee, Florida.

1    Q.  This was for both HOPE FCU and Coin.mx, correct?

2    A.  Yes.

3         MR. SHIN:  If we could move on to the next photo,

4    please?

5    Q.  So the sign here says "HOPE FCU management office".  What

6    was the management office?

7    A.  That's where the workstation was located, the desktop --

8    the desktop, monitor, and the tower.

9    Q.  And that's where you worked?

10   A.  Yes.

11        MR. SHIN:  Could we look at the next photo, please?

12   Q.  What office is this?

13   A.  That's inside the management office of HOPE FCU at

14   Tallahassee, Florida.

15        MR. SHIN:  Next photo, please.

16   Q.  What is this, Mr. Hill?

17   A.  The next door over is Coin.mx member support.

18   Q.  What was done out of that office?

19   A.  Jen worked inside that office and on the back end of

20   Coin.mx.  She also managed the back end of Coin.mx with me.

21        MR. SHIN:  Could we take a look at 61, actually,

22   Ms. Grant?  Thank you.

23   Q.  What's this?

24   A.  That's inside the router room where the GUAPPLE, the secure

25   servers, our internet system, our internet router, and the

1    printers were set up.  It's across the hall from the two

2    offices.

3    Q.  You called this a router room?

4    A.  Yes.  It's -- the secure server and router has to be behind

5    a lock and key, and this is that room.

6    Q.  How big was this room?

7    A.  I'm not good with feet or whatever, but it's very small,

8    just enough to hold the items we see there.

9    Q.  I guess another way to put it, is there much more to this

10   room than what we're looking at in this photo?

11   A.  Oh, no.

12        MR. SHIN:  Could we take a look at 62?

13   Q.  What's that?

14   A.  That's the HOPE router -- I'm sorry -- yeah, the HOPE

15   router connected to the workstation, the desktop workstation in

16   the other office.

17        MR. SHIN:  Could we look at Exhibit 63, please?

18   Q.  What is that?

19   A.  The GUAPPLE.

20   Q.  This is the GUAPPLE that you described earlier?

21   A.  Yes.

22        MR. SHIN:  If we could look at 58, please?

23   Q.  We looked at two different rooms that were used for HOPE

24   FCU business?

25   A.  Uh-huh.

1    Q.  Could you just describe where they are in this photo?

2    A.  The two different rooms?  The door down the hall on the

3    left is where the GUAPPLE and secure router is located, and

4    directly across the hall is the two offices we saw; one being

5    the HOPE management office and the other the Coin.mx customer

6    support office.

7    Q.  Is there something on the floor there between those two

8    offices, those two rooms?

9    A.  Yes, there's a cable connecting the GUAPPLE to the

10   workstation.

11   Q.  So that was the HOPE FCU branch in Tallahassee, Florida?

12   A.  Yes.

13   Q.  Was there anything more to the branch than what we've

14   looked at?

15   A.  No.

16            THE COURT:  Mr. Shin, what's your time estimate for

17   the witness?

18            MR. SHIN:  Your Honor, there's significantly more to

19   do.  I think there was at least a couple more hours of

20   testimony.

21            THE COURT:  All right.  We'll break for lunch.

22            It's 12:45, ladies and gentlemen of the jury, so we'll

23   return at 1:45.  Enjoy your lunch.  Thank you.

24            (Continued on next page)

25

H2NOLEB4                          Hill - Direct

1          (Jury not present)

2          THE COURT:  You may step down, Mr. Hill.

3          Matters to take up, counsel?

4          MR. SHIN:  Nothing from the government, your Honor.

5          THE COURT:  So several hours, maybe?

6          MR. SHIN:  Yes, your Honor.

7          THE COURT:  We'll see if during lunch you can shorten.

8          MR. SHIN:  Believe it or not, I actually cut some

9    stuff on the fly during my presentation this morning, but I

10   have further evidence --

11         THE COURT:  Let's really use lunch for more of that.

12   I mean, just for example, you're going back over at some length

13   photos that we've been walked through already by

14   Ms. Wotherspoon.  And I can see why some of it, but some of it

15   feels duplicative.  Let's move it along.

16         Matters to take up?  Anything?

17         MR. SHIN:  We'll work on it, your Honor.

18         THE COURT:  Okay.  Nothing?

19         MR. SHIN:  Nothing else, your Honor.

20         MS. SANTILLO:  One matter I'll confer with the

21   government about, but it may be an issue.

22         THE COURT:  Okay.  We'll meet back in 40 minutes.

23   Thank you.

24         (Luncheon recess)

25

H2NKLEB5

```
1                       AFTERNOON SESSION

2                           1:38 PM

3           (In open court; jury not present)

4           THE COURT:  Thank you for being here on time.  I'll

5    wait for the government.

6           MR. KLINGEMAN:  Your Honor, I'm going through the

7    exhibits that the government has told me they're planning to

8    use this afternoon.

9           THE COURT:  Thank you.

10          MR. CREIZMAN:  Off the record.

11          (Discussion off the record)

12          MR. NOBLE:  Apologies, your Honor.

13          THE COURT:  All right.  Matters to take up?

14          MR. NOBLE:  Not from the government.

15          MS. SANTILLO:  Yes, I do have one issue.

16          THE COURT:  We can't hear you.

17          (Pause)

18          MS. SANTILLO:  Your Honor, there are going to be some

19    rather long calls today, and I just wanted to confer with the

20    government to make sure we had no completeness issues with

21    respect to that.  So I'm just reviewing a transcript that you

22    just saw.

23          THE COURT:  Great.

24          MR. SHIN:  So during --

25          THE COURT:  Microphone.
```

H2NKLEB5

1            MR. SHIN:  Thank you for the reminder, your Honor.

2            THE COURT:  I'm a bad lip reader, so I have to remind

3       you.

4            MR. SHIN:  Appreciate that.

5            So during Mr. Hill's testimony, in addition to some

6       more emails and the like, I'm planning to play during his

7       testimony recordings of certain calls that he participated in.

8       They include a call with Mr. Gross, and Mr. Murgio, and

9       representatives of Kapcharge.  That is the one that

10      Ms. Santillo is currently looking at because I'm planning to

11      chop off part of the beginning of the call.

12           We are also planning to play a call with Mr. Hill,

13      Mr. Murgio, and Mr. Gross, a discussion of Alloya and their

14      services being cut off.  That's a relatively short call, it's

15      about seven minutes long, so we're planning to play that in the

16      entirety.

17           The call that Ms. Santillo is reviewing, it's 30-plus

18      minutes long.  We're planning to cut off -- we're proposing to

19      cut off about six minutes up front, about a 20 percent cut of

20      the time.  And the last call that we're proposing to play --

21      sorry, not a call, a meeting -- a recording of a meeting, it's

22      this big falling-out meeting that we've heard so much about

23      during these proceedings in November.  It includes Mr. Hill,

24      Mr. Gross, Mr. Lebedev, Mr. Murgio, others on the board.  The

25      call in total is about an hour long.  We have been in

H2NKLEB5

1     discussions -- we actually just discussed it with counsel, and

2     I think we're in agreement that it makes sense, given how

3     critical that call is, to play the entire call.

4               THE COURT:  It's not a call, right?

5               MR. SHIN:  My apologies.  The recording of a meeting.

6     So I wanted to just note that for your Honor.  That's going to

7     take up a substantial amount of time, but we're all agreed that

8     it's a critical piece of evidence in this case.

9               THE COURT:  Okay.  Was that included in your

10    several-hour estimation?

11              MR. SHIN:  Yes, your Honor.

12              THE COURT:  Okay.  Makes me feel slightly better.

13              (Pause)

14              THE COURT:  May I ask:  Are the recordings clear?  Are

15    there going to be transcripts running?  I know you had said you

16    had come to basic agreement on -- how technologically will it

17    be presented?

18              MR. SHIN:  The recordings, we've tested, and they're

19    audible, relatively clear.  Our proposal had been to have them

20    running and have Ms. Grant run the transcript kind of following

21    along, so that the jury can follow along.  It occurs to me -- I

22    believe the defense has signed the transcript stipulation?

23              We reached agreement in principle overnight, so I

24    believe they're executing it now.

25              (Pause)

H2NKLEB5

1          THE COURT:  Thank you.

2          MR. SHIN:  Just one other note is that we are planning

3     to go through some of the WhatsApp messages with Mr. Hill as

4     well -- he was on some of those messages -- and we're not

5     planning on reading through entire portions of it, but select

6     excerpts that I'll have Mr. Hill likely read his part, and I

7     will read other parts just to get that in.

8          THE COURT:  So that's not repetition of chats already

9     read, right?

10          MR. SHIN:  I don't believe so, your Honor.  I don't

11     believe any WhatsApps have been read to this point.  Oh, right,

12     there was some Wotherspoon read, and there were some Google

13     Chats read, but these are different chats.

14          THE COURT:  Okay.

15          MR. SHIN:  Thank you.

16          MR. KLINGEMAN:  We consent to everything the

17     government has described.

18          I also want to alert the government and the Court that

19     over the lunch break, I reviewed the -- I reviewed the exhibits

20     that the government emailed to us, in terms of the numerical

21     list, late last night on behalf of Mr. Gross, and on behalf of

22     Mr. Gross, I do not anticipate any objections.

23          THE COURT:  Thank you.

24          Anything else?

25          We have our jury?  All right.  We'll bring in the

1    jury.

2            MR. NOBLE:  Judge, we may have one more just brief

3    issue.

4            THE COURT:  Okay.  Hang on.

5            MR. NOBLE:  That will, hopefully, speed things up.

6            (Pause)

7            MR. SHIN:  We're --

8            THE COURT:  Work it out.

9            MR. SHIN:  Thank you, your Honor.

10           (Pause)

11           THE COURT:  Folks?

12           MR. SHIN:  Counsel has identified one document among

13   the emails that we're planning to use.  I'll describe the

14   document.  It's an email from this company called Magic

15   Wrighter that HOPE FCU was using in connection with ACH

16   processing.  It's Exhibit 2229.

17           So just the context again:  This company is writing

18   first to Mr. Gross, and then there is -- a copy of that email

19   was sent to Mr. Hill essentially cutting off services to them

20   in light of risks.  The government is offering this document

21   not for the truth of its contents, but for the state of mind,

22   particularly Mr. Gross' state of mind, its effect on the

23   listener.  So, again, not for the truth.  It helps complete the

24   story of the sequence of Alloya cutting them off, and then

25   Magic Wrighter cutting them off, and then that precipitated the

H2NKLEB5

1    big -- this was one of the events that precipitated the big

2    meeting at the end of November.  So, one, it's necessary to

3    complete the story of the conspiracy; and, two, in any event,

4    it's not offered for the truth, but for state of mind of

5    Mr. Gross.

6              THE COURT:  What is it supposed to tell the jury about

7    the state of mind of Mr. Gross?

8              MR. SHIN:  When Mr. Gross is told about the risks that

9    are posed by this volume of ACH transactions, his knowledge of

10   that risk in connection with processing all of these ACH

11   transactions that he had been doing to date and continued to

12   after this email even, it goes to his corrupt intent and the

13   intent to be influenced.  So he was making these decisions on

14   behalf of the credit union knowing about the risks that were

15   stated to him by these outside vendors that HOPE FCU was using.

16             MS. SANTILLO:  Your Honor, we have strong objections

17   to this email.

18             THE COURT:  Can you pull up the microphone?

19             MS. SANTILLO:  Sorry.  We have strong objections to

20   this email, and we have already indicated this to the

21   government, that this is somebody who is speaking about his

22   years of experience in the industry, they're not planning to

23   call this person as a witness, we have no opportunity to

24   cross-examine this person, he's basically purporting to offer

25   his expert opinion about the credit union industry, and it's

H2NKLEB5

1    highly prejudicial to Mr. Gross.

2              It's a 403 argument, and it's also an expert lay

3    opinion about a witness we're not even going to have an

4    opportunity to examine.

5              THE COURT:  Can you blow up --

6              (Pause)

7              THE COURT:  All right.  Sustained.

8              Bring in the jury.

9              Oh, yes.  Can we have Mr. Hill.

10             MS. CHOI:  Your Honor, just so we understand the basis

11   of your ruling?

12             THE COURT:  Yes.  There's a lot of substance that --

13   you say you're not offering it for the truth.  I think there is

14   a hearsay problem.  I'll say it's hearsay, it's 403, and I

15   think it's also right to say that it's offering highly

16   evaluative opinions without any opportunity to cross-examine

17   them.  The suggestion that we can know something regardless of

18   what the truth value is that's interposed in it about what

19   Mr. Gross thought or responded, I just don't find plausible.

20   And in light of the significance of the content of the email to

21   the underlying issues, it's a 403 problem.

22             MS. CHOI:  So may I just ask for guidance with regard

23   to that?  Tomorrow we're going to have Alloya witnesses discuss

24   the reasons why they decided to cut off HOPE FCU in their ACH

25   processing.  There will be two live witnesses.  I presume

H2NKLEB5

1    you're not going to have similar problems with regard to

2    various items that they have recognized, they will lay the

3    foundation for being business records, but they're internal

4    deliberations on the risk it poses to Alloya, so long as

5    they're available for cross-examination?

6              THE COURT:  If there's a particular document you want

7    to use as an example, and then I can hear if there is some

8    additional objection.

9              MS. CHOI:  I'm just saying I think we may have to air

10   this out tonight because I have to meet with these Alloya

11   witnesses.  We have disclosed the 3500 on them, they understood

12   what their testimony would be with regard to Alloya's reasons

13   for cutting off the ACH transactions, which is they pose an

14   incredible risk that was unprecedented at Alloya in terms of

15   what other credit union -- other small credit unions were

16   doing, and that there weren't any controls in place.  That's

17   critical evidence, it's material evidence for the government.

18   I think we need to air this out because if it's the case

19   that -- I just don't think there's a basis to exclude their

20   conclusions.  It's not something the defense has asked to

21   exclude.  They were on notice about this.  It wasn't a subject

22   of a motion in limine.  So I do think that we may have to deal

23   with this issue tonight.

24             THE COURT:  Agreed.

25             MS. CHOI:  Similarly, I would just like to place -- so

H2NKLEB5

1       long as the rulings are consistent, I don't think your Honor

2       has in principle any problem with our calling, if we'd like to

3       get this piece of evidence in, the Magic Wrighter individual to

4       explain the bases for that.

5              THE COURT:  If you can lay a foundation, and they're

6       here for cross-examination, and the conclusions that are

7       reached are based on nonspecialized technical, but factual

8       inferences --

9              MS. CHOI:  Right.

10             THE COURT:  -- that were available based on personal

11      experience, then unless they articulate some separate basis for

12      the objection -- but that's very different.

13             MS. CHOI:  No, I understand.

14             THE COURT:  Very different.

15             MS. CHOI:  I understand.  I just wanted to understand

16      the scope.  And just to highlight, one of the issues is, these

17      are people who work in credit unions, so they do have some

18      knowledge about how their own credit unions work.  I presume

19      your Honor doesn't have an issue with regard to their talking

20      about their own experiences, what they see at Alloya, what they

21      do at Alloya or at Magic Wrighter, in turn.  I just think these

22      are things we may need to flesh out tonight, unfortunately.

23             THE COURT:  I have invited -- this is now the ninth

24      time.  I'm sure you're well aware of the pertinent evidentiary

25      rules and Second Circuit decisions that define the boundaries.

H2NKLEB5

1     If you want to tee up a particular issue, I'm all ears.

2               MS. CHOI:  I think we'll just do that after the --

3               THE COURT:  We'll bring in the jury.

4               You may come forward, Mr. Hill.

5               (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H2NKLEB5

1          (Jury present)

2          THE COURT:  Members of the jury, I hope you had a

3    pleasant lunch on this balmy February day.  We will continue

4    with the government's direct examination of Mr. Hill.

5          Mr. Hill, I do remind you that you are under oath.

6          Mr. Shin, you may proceed when you're ready.

7          MR. SHIN:  Thank you, your Honor.

8          Ms. Grant, could you display, for the Court,

9    Government Exhibit 4009.

10          Your Honor, we've marked for identification Government

11    Exhibit 4009, which is a stipulation among the parties

12    regarding certain recordings and transcriptions.  The

13    government would offer this stipulation into evidence.

14          THE COURT:  Without objection?

15          MR. KLINGEMAN:  No objection.

16          MR. CREIZMAN:  No objection.

17          THE COURT:  Thank you.

18          4009 is admitted on stipulation.

19          (Government's Exhibit 4009 received in evidence)

20          MR. SHIN:  Ms. Grant, if you could publish this for

21    the jury, please.

22          Paragraph 4 reads:  "The first page of the transcripts

23    accurately reflects the following information for each recorded

24    conversation:  The original file name and the date modified

25    information associated with the corresponding audio file, if

H2NKLEB5

1    available; the date that the audio recording was made, if

2    available; the date that the file was sent, if available; the

3    length of the file; the participants in the conversation; and

4    certain abbreviations used in the transcription."

5         Paragraph 5 reads:  "The right column of each

6    transcript contains true and accurate transcriptions of the

7    corresponding audio file and descriptions as to events that are

8    heard on the audio file."

9         Paragraph 6:  "The left column of each transcript

10   accurately identifies the speaker of the transcribed text and

11   contains accurate timestamps noting the portion of the

12   recording at which the event that was transcribed occurred."

13        And turning back to -- the exhibits covered by the

14   stipulation are 1418-B, 2502, 2504, 2505 and 2506, and the

15   government exhibits with the same numbers, with the letter T

16   added as a suffix, are the corresponding transcriptions,

17   collectively the transcripts.

18        So, at this time, based on the stipulation, the

19   government offers into evidence Government Exhibits 1418-B,

20   2502, 2504, 2505, 2506, as well as Exhibits 1418-B-T, 2502-T,

21   2504-T, 2505-T, and 2506-T.

22        MR. KLINGEMAN:  No objection.

23        MR. CREIZMAN:  No objection.

24        THE COURT:  Thank you.

25        Those set of exhibits just indicated by Mr. Shin are

H2NKLEB5                          Hill - Direct

1    admitted.

2              (Government's Exhibits 1418-B, 2502, 2504, 2505, 2506,

3    1418-B-T, 2502-T, 2504-T, 2505-T, and 2506-T received in

4    evidence)

5              MR. SHIN:  At this time, the government also would

6    move, pursuant to Mr. Priest's foundational testimony, for

7    admission into evidence of the following numbered WhatsApp

8    transcriptions:  4500, 4501, 4502, 4504, 4505, 4506, 4507,

9    4508, and 4510.

10             MR. CREIZMAN:  No objection.

11             MR. KLINGEMAN:  No objection.

12             THE COURT:  Thank you.

13             They're admitted.

14             (Government's Exhibits 4500, 4501, 4502, 4504, 4505,

15   4506, 4507, 4508, and 4510 received in evidence)

16    RICARDO HILL, resumed.

17   DIRECT EXAMINATION CONTINUED

18   BY MR. SHIN:

19   Q.  Mr. Hill --

20   A.  Yes.

21   Q.  -- you testified earlier about a company called Kapcharge

22   paying for part of the consulting fees that were paid to Trevon

23   Gross, correct?

24   A.  Yes.

25   Q.  Are you generally familiar with that company called

1    Kapcharge?

2    A.  Yes, I am.

3    Q.  How are you familiar with it?

4    A.  I worked with them on a daily basis as I received files

5    from them to process the ACH transactions on their account at

6    HOPE.

7    Q.  What kind of a business is Kapcharge?

8    A.  They are a payment gateway.

9    Q.  What does that mean?

10   A.  That means they process debits and credits to individuals

11   and businesses.

12   Q.  Do you know who those individuals and businesses are?

13   A.  No, I don't.

14   Q.  Now, we've seen some names of individuals associated with

15   Kapcharge.  Could you just tell the jury who are the people

16   associated with Kapcharge that you're aware of?

17   A.  Kevin Pepe, Mark Francis, Shoula Cohen, and a few others, I

18   don't know their last names, Christine, Kirk, and Sam.

19   Q.  What, if any, relationship was there between Anthony Murgio

20   and individuals from Kapcharge?

21   A.  They were previously colleagues or friends before we joined

22   the credit union.

23   Q.  How do you know that?

24   A.  Just from being on conversations with them when they talked

25   about the past, college years, past parties, just general stuff

1       like that.

2       Q.  Did there come a time when Kapcharge became a member of

3       HOPE Federal Credit Union?

4       A.  Yes.

5       Q.  When was that?

6       A.  Shortly after we had taken over the board.  So, it was

7       after June.  I'm not sure the specific date.

8       Q.  This is June of 2014?

9       A.  That's correct.

10      Q.  Where was Kapcharge located?

11      A.  In Montreal, Canada.

12              MR. SHIN:  Ms. Grant, if you could show the witness

13      2264, please.

14      Q.  Do you recognize this document, Mr. Hill?

15      A.  Yes.  It's an email chain from Anthony Murgio to Trevon,

16      with myself copied on it.  It has an attachment.

17      Q.  The date on this email is also August 27th of 2014?

18      A.  Yes.

19              MR. SHIN:  Now, the government offers 2264 into

20      evidence.

21              THE COURT:  Without objection?

22              MR. CREIZMAN:  No objection.

23              MR. KLINGEMAN:  No objection.

24              THE COURT:  Thank you.

25              2264 is admitted.

1    (Government's Exhibit 2264 received in evidence)

2        MR. SHIN:  May we publish?

3        THE COURT:  You may.

4    BY MR. SHIN:

5    Q.  Could you please read for the jury -- under the August 27,

6    2014, 2:56 email by Trevon Gross, could you read the line

7    related to Kap?

8    A.  "Kap signed document.  No corporate docs yet."

9    Q.  Above that, could you please read Anthony Murgio's

10   response?

11   A.  "Here it is, just in case."

12       MR. SHIN:  Sorry, Ms. Grant.  Could you cover the next

13   email as well.

14   Q.  So what did Mr. Murgio initially respond?

15   A.  "Corporate docs were attached to Kap's email."

16       MR. SHIN:  Ms. Grant, could we look at the first

17   attachment, please, or look at the first page of the

18   attachment.

19   Q.  Mr. Hill, could you please read the address listed under

20   Kapcharge USA Inc.?

21   A.  1 Westmount Square, Suite 1800, Montreal, Quebec.

22       MR. SHIN:  Can we look at the next page, please,

23   Ms. Grant.

24   Q.  What is this document, Mr. Hill?

25   A.  This is an EIN number for a company, Kapcharge.

1    Q.   Specifically, is the company Kapcharge USA Inc.?

2    A.   Yes.

3    Q.   What is the address listed there?

4    A.   759 Square Victoria, Suite 200, Montreal, Quebec.

5    Q.   Now, Mr. Hill, to your knowledge, did Kapcharge have an

6    office in Lakewood, New Jersey?

7    A.   No.

8    Q.   Did Kapcharge have any employees in Lakewood, New Jersey?

9    A.   No.

10              MR. SHIN:   Ms. Grant, you can take down the exhibit,

11   please.   Thank you.

12   Q.   What, if any, services did HOPE FCU provide to Kapcharge?

13   A.   ACH processing.

14   Q.   What is ACH?

15   A.   I just know ACH to stand for all clearinghouse.

16   Q.   Do you know of any examples of ACH transactions?

17   A.   Yes.   Direct deposit from an employer to an employee.

18   Q.   Do you know any other examples?

19   A.   No, I don't.

20   Q.   Do you recall testifying earlier, when we were looking at

21   an email, regarding some early training, including ACH

22   processing?

23   A.   Yes.

24   Q.   Apart from that training, did you receive any other formal

25   trainings about ACH while you were working at HOPE FCU?

1    A.   No.

2    Q.   Do you know what kinds of ACH transactions HOPE FCU was

3    processing for Kapcharge?

4    A.   Debits and credits.

5    Q.   Do you know what those debits and credits were for?

6    A.   No, I don't.

7    Q.   To your knowledge, over what period of time did HOPE FCU

8    process ACH transactions for Kapcharge?

9    A.   From the summer of 2014 to November of 2014.

10   Q.   Do you know, one way or another, whether HOPE FCU continued

11   to process ACH transactions for Kapcharge after November 2014?

12   A.   No, I don't.

13   Q.   Did HOPE FCU process ACH transactions for any other

14   companies?

15   A.   No.

16   Q.   Now, what, if any, role did you have in helping HOPE FCU

17   process ACH transactions for Kapcharge?

18   A.   I manually entered the ACH transactions to the HOPE account

19   via the back end of CU Base.

20   Q.   Did you do anything else in connection with ACH processing?

21   A.   I also posted -- I compared the previous day's originations

22   to make sure that they were correct.

23   Q.   Where were you doing all this from?

24   A.   From the office in Tallahassee, Florida.

25             MR. SHIN:  Your Honor, may I approach?

H2NKLEB5                          Hill - Direct

1              THE COURT:  You may.

2    Q.  Mr. Hill, I've handed you what has been marked for

3    identification as Government Exhibits 2141 and 2142.  Do you

4    see those in front of you?

5    A.  Yes.

6    Q.  Let's start with 2141.

7              Do you recognize that item?

8    A.  Yes, I do.

9    Q.  Just if you could describe for the jury, what physically is

10   that item?

11   A.  It's a disk with daily ACH reports on it.

12   Q.  So it's a disk?

13   A.  It's a disk.

14   Q.  That has some data on it?

15   A.  Yes.

16   Q.  Do you recognize that disk?

17   A.  Yes, I do.

18   Q.  How do you recognize it?

19   A.  My initials are on it.

20   Q.  Did you review the contents of that disk?

21   A.  Yes.

22   Q.  And when did you do that?

23   A.  When did I do it?

24   Q.  Yes.

25   A.  During my meetings with the government.

H2NKLEB5                          Hill - Direct

1    Q.  Looking at 2142 now, do you recognize that disk?

2    A.  Yes, I do.

3    Q.  How do you recognize that?

4    A.  My initials are on it.

5    Q.  Also, is there a label on that disk?

6    A.  Yes.

7    Q.  Could you read that label?

8    A.  It's the previous day originations and incoming wires.

9    Q.  Did you review the contents of that disk?

10   A.  Yes.

11   Q.  And when was that?

12   A.  Also during my meetings with the government.

13              MR. SHIN:  Your Honor, the government offers Exhibits

14   2141 and 2142 into evidence.

15              MR. CREIZMAN:  No objection.

16              MR. KLINGEMAN:  No objection.

17              THE COURT:  Thank you.

18              They're admitted.

19              (Government's Exhibits 2141 and 2142 received in

20   evidence)

21              MR. SHIN:  Thank you, your Honor.

22              One moment, your Honor?

23              (Pause)

24              MR. SHIN:  Ms. Grant, if you could publish -- we'll

25   just publish -- we'll flip through several files that are

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

H2NKLEB5                          Hill - Direct

1   contained first on 2141.  If we could publish -- let's put up

2   1, so 2141-1.

3              THE COURT:  Yes.

4              MR. SHIN:  If you could display the attachment.

5              THE COURT:  I don't think we have it published.  There

6   we go.  Thank you.

7              MR. SHIN:  Actually, before we flip off of this:

8   BY MR. SHIN:

9   Q.  Mr. Hill, what is this?

10  A.  This is an email from one of my email addresses to another

11  of my email addresses, with attachments.

12  Q.  What are these attachments?

13  A.  These attachments are ACH -- they're spreadsheets

14  containing ACH transactions.  These are the transactions that I

15  posted on Kapcharge's account.

16  Q.  You're emailing these from one of your addresses to another

17  one of your own addresses?

18  A.  Yes.

19  Q.  Where did you get these attached files from?

20  A.  From the email I received from Kapcharge.

21  Q.  Just curious:  Why are you writing that note to yourself in

22  that email?

23  A.  I'm sorry?

24  Q.  This is an email from yourself to yourself.  Why are you

25  writing that little note to yourself?

H2NKLEB5                          Hill - Direct

1    A.  I don't know.  Just to make sure they all were saying the

2    same thing, to make sure I know that these has attachments on

3    it.

4              MR. SHIN:  Ms. Grant, could you display -- we'll just

5    flip through each of the attachments, please.

6    Q.  Now, if you could just generally describe for the jury,

7    what is this file?

8    A.  This is a spreadsheet with individual transactions on them.

9    This is what I use to -- this is what I use to get the name,

10   the date, and the transaction amount to post to the Kapcharge

11   account via CU Base.

12   Q.  What's the date on the spreadsheet?

13   A.  August 20th, 2014.

14   Q.  Now, can you point out for the jury, what's the total

15   amount of these transactions here?

16   A.  $3,896.

17   Q.  What's the total of credits?

18   A.  Zero.

19   Q.  That total amount, less than $4,000, is that representative

20   of the ACH transactions that you were processing during your

21   time at HOPE FCU?

22   A.  I mean, in the beginning, it was smaller, but it got much

23   bigger.

24   Q.  When you received this file from Kapcharge, what did you

25   actually do with it?

1   A.  I would open it up on my computer, so I can see the data

2   all laid out.  I would then log into CU Base, open Kapcharge's

3   account, go to the section that I would enter the ACH

4   transactions, and then following the code, the amount, and

5   name, I would enter the name, the individual's name, the

6   transaction code, and the amount, and the date.

7   Q.  And you would do that for each transaction?

8   A.  Yes.

9   Q.  And you couldn't just copy and paste this in?

10  A.  No.

11  Q.  You had to manually enter it?

12  A.  You had to manually enter in the name, transaction code,

13  amount, and the date.

14  Q.  How often were you doing this?

15  A.  Every day, Monday through Friday.

16  Q.  How much time did that take up for you?

17  A.  In the beginning, they were short like this -- this

18  wouldn't take long -- but it began to take up hours and hours

19  of the day.

20  Q.  Did you encounter any difficulties in doing that task?

21  A.  Yes.  I'm manually entering tons and tons of transactions,

22  so there have been a lot of mistakes entering the wrong number,

23  you know, just going too fast, misspelling a name, putting in

24  the wrong transaction code.  It could be a number of things.

25          MR. SHIN:  Just so we can get one more example for the

H2NKLEB5                          Hill - Direct

1   jury, Ms. Grant, if you could put up number 31 out of this set.
2   If you close out this spreadsheet.  Let's look at 31.
3   BY MR. SHIN:
4   Q.  Is this another one of those emails?
5   A.  Yes, it is, with an attachment of an ACH spreadsheet.
6   Q.  And what's the date here?
7   A.  October 17, 2014.
8   Q.  So here you're sending it from one of your addresses to one
9   of your other addresses, but also to Kevin Pepe?
10  A.  Yes.
11  Q.  At Kapital Inc.?
12  A.  Yes.
13  Q.  He's from Kapcharge; is that right?
14  A.  Yes, he works at Kapcharge.
15  Q.  Why were you sending this to him?
16  A.  He probably requested a copy of it if he wasn't there that
17  day.  I usually receive them from Kevin on a day-to-day basis,
18  but if Kevin missed a day or wasn't at work, he will also like
19  to have a copy of the transaction -- I mean the spreadsheet.
20  So I was just sending them to him if he missed it.  I could
21  have gotten it from Sam or Christine if Kevin wasn't in.
22          MR. SHIN:  Ms. Grant, could you open up the
23  spreadsheet, please.  If you could scroll down, please.
24  Q.  So, what's the totals here?
25  A.  The total debits?  $1,043.75.  Total credits:  $7,611.46.

1    Q.  Over the course of the time you were doing this, is this a

2    lot of transactions?  Is this on the high end or the lower end

3    of transactions that you were doing on a daily basis?

4    A.  This is on the lower end.

5    Q.  So still on the lower end?

6    A.  Yes.

7    Q.  All right.  So this was the -- we talked now about your

8    entering the transactions on a daily basis.  What was the other

9    piece that you were doing regularly?

10   A.  Just double-checking the previous day's originations to

11   make sure that I entered the numbers correctly and also posting

12   any incoming wires that were sent to me.

13          MR. SHIN:  Ms. Grant, could you please publish, for

14   the jury, 2142, number 2, subnumber 2.

15   Q.  Why don't you just walk us through this email.  First, what

16   is this email, Mr. Hill?

17   A.  This is an email from Christine at Kapcharge to myself with

18   others attached.

19          I would get these daily.  It's the previous day

20   origination totals for posting to the Kapcharge account, which

21   is the 6527000.  And, also, it will reflect the incoming wire

22   to be posted to the account, and I would have a wire

23   confirmation attached to this email.

24   Q.  First, who are the recipients of this email?

25   A.  Myself, Trevon, Anthony Murgio, and copied would be

1    Kapcharge employees, Shoula, Kevin, Kirk.

2    Q.  So just to make sure we understand, what does it mean,

3    "previous day origination totals"?

4    A.  These were debit and credit originations from the day

5    before.

6    Q.  So these are the total amounts --

7    A.  Yes, debits and total amounts for credits.

8    Q.  So what you had entered the prior day --

9    A.  Yes.

10   Q.  -- using the spreadsheet; is that right?

11   A.  Yes.

12   Q.  And what are the totals here for credit posting and debit

13   posting?

14   A.  For credit posting is $22,499.69, and for debit posting,

15   $1,074,557.71.

16   Q.  There's a reference -- below that little chart in the

17   email --

18   A.  Uh-huh.

19   Q.  -- there's a reference to a wire today?

20   A.  Yes.

21   Q.  What's the total there?

22   A.  The total for the wire is $869,701.

23   Q.  What, if anything, did you do with that wire that was sent

24   to you, the wire information that was provided to you?

25   A.  I would first check if there was an attached wire

1    confirmation, and, if so, I would post that wire to the 6527

2    account, which is Kapcharge's account with HOPE.

3         MR. SHIN:  Ms. Grant, could we look at the next page

4    of this exhibit, please.

5    Q.  What is this?

6    A.  This is a wire confirmation.

7    Q.  So this was the attachment to the email we were just

8    looking at, right?

9    A.  Yes.

10   Q.  Looking at this, do you know where the money was going from

11   and where it was going to, where the money was from and where

12   it was going?

13   A.  I'm sorry, can you ask that again?

14   Q.  Do you know where the money was being sent from, what

15   entity or what -- who was the sender of this wire?

16   A.  Kapcharge.

17   Q.  Who was the beneficiary?

18   A.  HOPE FCU.

19        MR. SHIN:  Could we look at the next page, Ms. Grant.

20   Q.  Do you see at the top there?  Could you read that section

21   there starting with the upper left?  It seems a little obscured

22   by that corner.

23   A.  That's the intermediary bank.

24   Q.  And what is the bank name?

25   A.  HSBC Bank USA National Association.

1   Q.  What's the address listed for that bank?

2   A.  452 Fifth Avenue, New York City, New York.

3   Q.  Let's just look at one more example of this, Mr. Hill.

4          MR. SHIN:  Ms. Grant, could you put up number 21 in

5   this set.

6   Q.  What is this, Mr. Hill?

7   A.  This is also a previous day origination and incoming wire

8   email from Christine at Kapcharge to myself on October 15,

9   2014.

10  Q.  Are you the only recipient?

11  A.  No, I'm not.  It's to me, Trevon Gross, with others

12  attached, other Kapcharge employees, Kevin, Kirk, Shoula.

13  Q.  And also Anthony Murgio?

14  A.  And Anthony Murgio.

15  Q.  Is the overall content of this email generally similar to

16  the one we looked at earlier?

17  A.  Yes.  It will have totals for -- credit posting totals for

18  debit posting and also the amount of the wire that was sent in

19  today with an attachment of the wire confirmation.

20  Q.  What's the total credit origination for debit posting in

21  this email?

22  A.  The total for debit posting is $2,616,300.61.

23  Q.  So just to be clear, what does that number have to do with

24  the other category of tasks that you were describing earlier?

25  What does that number have to do with what you were doing

H2NKLEB5                          Hill - Direct

1   otherwise?

2   A.   That's the total number of debits posted to that account.

3   Q.   Is that referencing to what you had entered in the day

4   before from the spreadsheets?

5   A.   Yes.

6   Q.   So what this means, just to be clear, is that the prior

7   day, you had entered in $2.6 million worth of transactions from

8   a spreadsheet?

9   A.   Yes.

10          MR. SHIN:   Could we just look at the next page of this

11  exhibit, please, Ms. Grant.

12  Q.   Is this another wire instruction?

13  A.   This is another wire confirmation.

14  Q.   Again, is this similar to what we looked at previously?

15  A.   Yes.

16          MR. SHIN:   Ms. Grant, if you could just turn to the

17  next page, please.

18  Q.   What's the intermediary bank listed on this wire

19  instruction?

20  A.   HSBC Bank USA National Association.   The address, 452 Fifth

21  Avenue, New York City, New York.

22          MR. SHIN:   You can take that down, please, Ms. Grant.

23  Q.   So we've only looked at a couple of examples of each of

24  these things.   How often were you getting -- let's start with

25  the spreadsheets.   How often were you getting those?

1    A.   Monday through Friday, every day.

2    Q.   So Monday through Friday, every day?

3    A.   Yes.

4    Q.   Every week?

5    A.   Every day, every week, Monday through Friday.

6    Q.   What about the other set, the previous day origination

7    emails?

8    A.   Every day, Monday through Friday.

9    Q.   Who else was involved at HOPE FCU in dealing with ACH

10   transactions for Kapcharge?

11   A.   Myself, Trevon, and Yuri Lebedev.

12   Q.   So what was Yuri Lebedev's role with respect to ACH for

13   Kapcharge?

14   A.   He was just searching for third-party companies to help

15   automate what I was doing manually.

16   Q.   Why were you looking to automate what you were doing

17   manually?

18   A.   Because it was the worst ever doing individual transactions

19   one by one for those totals.  It would take hours and hours for

20   me to do that.

21   Q.   What was Trevon Gross' role with respect to ACH for

22   Kapcharge?

23   A.   To ensure that I entered everything correctly.  He just

24   double-checked to make sure that they were getting done because

25   I was -- you know, I would give up some days and not complete

1     it.

2     Q.  So was he involved with you regularly in connection with

3     those tasks?

4     A.  Yes.  They would have to be done on a daily basis, or

5     should have been done on a daily basis, so he just made sure

6     that I was completing the task.

7              MR. SHIN:  Ms. Grant, if you could display, for the

8     witness, GX 2164.

9     Q.  Do you recognize this document, Mr. Hill?

10    A.  Yes.  This is an email from myself to Trevon in reference

11    to one of the Kapcharge emails about the previous day

12    originations.

13             MR. SHIN:  The government offers 2164 into evidence.

14             MR. CREIZMAN:  No objection.

15             MR. KLINGEMAN:  No objection.

16             THE COURT:  Thank you.

17             2164 is admitted.

18             (Government's Exhibit 2164 received in evidence)

19             MR. SHIN:  If you could please publish that for the

20    jury, Ms. Grant.

21    Q.  Just to orient ourselves, the bottom half of the email, is

22    that one of these previous day origination emails that we were

23    talking about earlier?

24    A.  Yes.

25    Q.  Just so we know, what's the total that we're talking about

1   here in this email?

2   A.  The total for credit posting is $35,753.86.  For debit

3   posting, $1,884,860.87.  I can't see if there's a wire.

4   Q.  I'm sorry, we'll move on.

5        MR. SHIN:  Ms. Grant, could you focus on the top

6   portion, the top half now, of the email.

7   Q.  What did Trevon Gross write to you in that email?

8   A.  "Hey, I thought you said you were all done with posting

9   returns for last week."

10  Q.  And what did you respond?

11  A.  "Returns for yesterday and the 25th?  Sorry, I missed that

12  one.  And the originations have been posted."

13  Q.  Just for clarity, what was this -- what was the posting

14  returns that you and Mr. Gross are discussing?

15  A.  In addition to sending me spreadsheets and the previous

16  day's originations, Kapcharge would also list any returns that

17  needed to be posted for debit or credit, and I was supposed to

18  check for those and have those posted to the account, also.

19       MR. SHIN:  Ms. Grant, if you could display, for the

20  witness, 2166, please.

21  Q.  Mr. Hill, do you recognize this document?

22  A.  Yes.  This is an email chain from Trevon to myself.

23  Q.  And it's dated October 1, 2014?

24  A.  Yes.

25       MR. SHIN:  The government offers 2166 into evidence.

H2NKLEB5                        Hill - Direct

1              MR. CREIZMAN:  No objection.

2              MR. KLINGEMAN:  No objection.

3              THE COURT:  Thank you.

4              2166 is admitted.

5              (Government's Exhibit 2166 received in evidence)

6              MR. SHIN:  Now, if we could just look at the very

7    bottom email first.  Sorry, if you could include the sender as

8    well, so we could see who sent that email.  Thank you.

9    BY MR. SHIN:

10   Q.  So what is Christine Carida from Kapital Inc. writing to

11   you here -- writing to you and others?

12   A.  "Hello.  We have sent in a wire today for $2,251,591 to be

13   posted to the 6527 account."

14             MR. SHIN:  Ms. Grant, if you could just zoom in the

15   entire top half of the email.

16   Q.  What did Trevon Gross write to you?

17   A.  "Did you post the wire transfer?"

18   Q.  What did you respond?

19   A.  "No.  You said not to."

20   Q.  What did he respond?

21   A.  "Our balance was still high last night."

22   Q.  Do you know what he meant by that?

23   A.  I don't remember, but I think, because this is at the end

24   of the month --

25             MR. KLINGEMAN:  Objection.

1       THE COURT:  Sustained.

2  Q.  Do you recall, while you were working at HOPE FCU with

3  Trevon Gross, were there issues about balances being high from

4  the night before?  Did you ever encounter those issues?

5  A.  Only a couple of times.

6  Q.  Do you have an understanding of what the issue was those

7  couple of times you encountered it?

8  A.  Yes.

9  Q.  What was it?

10 A.  Towards the end of the month, the balances should

11 reflect -- should only reflect transactions that we were well

12 capitalized for.

13 Q.  So what does it mean for a balance to be still high?

14 A.  That means that our transactions throughout that month were

15 too high for our capitalization requirements.  That means we

16 only had a certain amount of operating capital and, therefore,

17 should only have a certain amount of transactions, but if our

18 balance was high, our transactions were way higher than they

19 should be.

20 Q.  You mentioned capitalization in your answer.  In general

21 terms, can you describe what that is, capitalization or

22 capitalization requirements?

23 A.  Yes.  A credit union, such as ourselves, HOPE, we should

24 have at least 10 percent of our transaction volume on our

25 operating account.

1    Q.  How is it that you know about this?

2    A.  I learned from Trevon.

3            MR. SHIN:  Ms. Grant, could you please display, for

4    the witness, 2169.

5    Q.  Do you recognize this document, Mr. Hill?

6    A.  Yes.  This is an email from Trevon to myself on October 2nd

7    of 2014.

8            MR. SHIN:  The government offers 2169 into evidence.

9            MR. KLINGEMAN:  No objection.

10           MR. CREIZMAN:  No objection.

11           THE COURT:  Thank you.

12           2169 is admitted.

13           (Government's Exhibit 2169 received in evidence)

14           MR. SHIN:  Ms. Grant, if you could please publish that

15   for the jury.

16   Q.  Could you please read the bottom email that you wrote,

17   Mr. Hill?

18   A.  "Hey there.  How's everything?  Need me to do anything?

19   Any reply about workstation ID?  I only have to post returns

20   for today."

21   Q.  Why were you writing "Need me to do anything"?

22   A.  I will always check in with Trevon to see if there was

23   anything that needs to be done on the back end of the CU.

24   Q.  How regularly would you check in with him?

25   A.  Only when I didn't have any tasks or when I had completed

1    any other tasks that he had given me before.

2    Q.  Now, what's this reference here to "workstation ID"?

3    A.  The workstation that was sent to the office, to the

4    Tallahassee location, it had to be set up.  So I was still

5    awaiting for my workstation ID to be reset because I locked

6    myself out of it trying to set it up and putting in the wrong

7    password, so I had to get a new one.  I had to get a new

8    workstation ID.

9    Q.  Did Mr. Gross provide you any direction here?

10   A.  Yes.  He just told me to call CU Base and have them walk me

11   through how to set it up.

12           MR. SHIN:  Ms. Grant, if you could display, for the

13   witness, 2170, please.

14   Q.  Do you recognize this document?

15   A.  Yes.  This is an email from Trevon to myself on

16   October 2nd.

17           MR. SHIN:  The government offers 2170 into evidence.

18           MR. KLINGEMAN:  No objection.

19           MR. CREIZMAN:  No objection.

20           THE COURT:  Thank you.

21           2170 is admitted.

22           (Government's Exhibit 2170 received in evidence)

23           MR. SHIN:  Would you please publish that for the jury,

24   Ms. Grant.

25   Q.  What's the subject line here?

H2NKLEB5                          Hill - Direct

1    A.  "Workstation ID."

2           MR. SHIN:  Ms. Grant, if you could highlight the lower

3    half of the email -- of the document, please.

4    Q.  Just at the top there, Mr. Hill, what did Trevon Gross

5    write?

6    A.  "See below.  Did Greg call you?"

7    Q.  Do you know what that's in reference to?

8    A.  Yes.

9    Q.  What is it?

10   A.  They're from CU South, who was going to help me set up the

11   workstation.

12          MR. SHIN:  Ms. Grant, could you highlight the top half

13   of the email, please.

14   Q.  What did you respond?

15   A.  "No.  I spoke with Keith Kramer.  I have workstation ID,

16   but have to call helpline to set up the GUAPLLE in the a.m."

17   Q.  Do you know how to spell GUAPLLE?

18   A.  Only from me looking at it here.  G-U-A-P-L-L-E.

19   Q.  And what did Trevon Gross respond?

20   A.  "They are still open to 6:00."

21   Q.  Did you have an understanding of what he meant by telling

22   you they're open till 6:00?

23   A.  I should call right now, I got nine minutes.

24   Q.  So he expected you to call right away?

25   A.  Yeah.

H2NKLEB5                        Hill - Direct

1           MR. SHIN:  Ms. Grant, if you could display, for the

2    witness, 2171, please.

3    Q.  Do you recognize this document, Mr. Hill?

4    A.  Yes.  This is the email from Trevon to myself.

5    Q.  It's dated October 3rd, 2014?

6    A.  Yes.

7           MR. SHIN:  The government offers 2171 into evidence.

8           MR. CREIZMAN:  No objections.

9           MR. KLINGEMAN:  No objections.

10           THE COURT:  Thank you.

11           2171 is admitted.

12           (Government's Exhibit 2171 received in evidence)

13           MR. SHIN:  Ms. Grant, if you could publish that for

14    the jury.

15           If you could highlight the top half.  A little further

16    down.  Thank you.

17    Q.  What does Mr. Gross write at the bottom?

18    A.  "Greg is calling for you."

19    Q.  There's an exclamation point there?

20    A.  Yes.

21    Q.  What do you respond?

22    A.  "I'm on with CU answer still setting up the GUAPLLE."

23    Q.  What does Mr. Gross respond?

24    A.  "Let me know when it's resolved."

25    Q.  Now, we've looked at --

1      MR. SHIN:  We can take the exhibit down, Ms. Grant.

2    Q.  We've looked at several emails on this issue with the

3    workstation ID.  Do you recall this -- in addition to these

4    emails, do you recall this issue coming up at the time?

5    A.  Yes.

6    Q.  Do you recall your discussions with Mr. Gross?

7    A.  Yes.

8    Q.  Did you get a sense from your conversations the urgency

9    with which he wanted you to deal with this?

10   A.  Yes.

11   Q.  Could you describe what that was?

12   A.  Well, he wanted to make sure that I stayed on top of it

13   because it was -- it had been going on for a couple of weeks

14   now, and it was important that I get it set up, so I can start

15   doing the work and doing my working tasks on the workstation

16   that was sent to me.  So he just made sure that I stayed on top

17   of it until I got it done.

18   Q.  He was directing you?

19   A.  Yes.

20        MR. SHIN:  Ms. Grant, if you could display, for the

21   witness, 2176.

22   Q.  Do you recognize this document?

23   A.  Yes.  It's one of Kapcharge's previous day originations and

24   incoming wire forwarded.  Trevon is replying to it for me.

25        MR. SHIN:  The government offers 2176 into evidence.

1        MR. KLINGEMAN:  No objection.

2        MR. CREIZMAN:  No objection.

3        THE COURT:  Thank you.  It's admitted.

4        (Government's Exhibit 2176 received in evidence)

5        MR. SHIN:  If we could publish that for the jury,

6   Ms. Grant.

7   Q.  Just generally, is this bottom half another one of those

8   previous day origination emails?

9   A.  Yes, with a wire attached -- I mean with a wire and a wire

10  confirmation attached.

11  Q.  What does Trevon Gross write to you at the top of that

12  email?

13  A.  "Please confirm receipt and post today."

14       MR. SHIN:  You can take that down, Ms. Grant.

15       If you could please display, for the witness, 2182.

16  Q.  Do you recognize this document?

17  A.  Yes.  It's also an email from Trevon to myself.

18  Q.  It's dated October 9, 2014?

19  A.  Yes.

20       MR. SHIN:  The government offers 2182.

21       MR. CREIZMAN:  No objection.

22       MR. KLINGEMAN:  No objection.

23       THE COURT:  Thank you.  2182 is admitted.

24       (Government's Exhibit 2182 received in evidence)

25       (Continued on next page)

1   BY MR. SHIN:

2   Q.  Now, Mr. Hill, if you could look at the bottom.

3           MR. SHIN:  Actually, Ms. Grant, if you could flip to

4   the second page?

5   Q.  Is this another one of those previous-day origination

6   emails?

7   A.  Yes, with also a wire and an attached wire confirmation.

8           MR. SHIN:  If we could turn to the first page,

9   Ms. Grant?  Let's begin at the bottom.  The bottom half of the

10  page.

11  Q.  What does Mr. Gross write there?  Do you see right in the

12  middle there on Thursday?

13  A.  Yes.  "Has this been handled?  Have you asked for

14  verification?  I have not seen any responses."

15          MR. SHIN:  Then if you could scroll up, Ms. Grant, so

16  we could see the next response?  You can just highlight the top

17  half, please.  Thank you.  Let's capture the entire top half,

18  please.

19  Q.  What was your response?

20  A.  "Yes.  I'm sorry.  I replied to Christine."

21  Q.  What did you mean by that?

22  A.  I did reply to Christine, but I apologized if he didn't see

23  any response.  I would always let them know that I received it

24  and I was on it.  I was going to post it.

25  Q.  All right.  And what did Mr. Gross respond?

1   A.  "Please always copy me so that we can have checks and

2   balances."

3   Q.  So when you replied to Christine, had you copied Mr. Gross?

4   A.  No, probably not this time.  I probably missed it.  But I

5   did that at times, I missed it.

6   Q.  Do you know why he wanted you to copy him?

7   A.  Just so he could -- he can always know what was coming

8   through, what was being posted.  Just another way to keep

9   posted on my task.

10  Q.  So he wanted to keep tabs on you?

11  A.  Yes.

12          MR. KLINGEMAN:  I'm sorry.  I couldn't catch counsel's

13  question.

14          MR. SHIN:  I had said, "So he wanted to keep tabs on

15  you."

16          MR. KLINGEMAN:  Thank you.

17          MR. SHIN:  You can take that down, Ms. Grant.

18          Ms. Grant, could you queue up Government's

19  Exhibit 2502, and also the corresponding transcript, 2502-T?

20          THE COURT:  Just while you're getting that, I'll

21  invite the jury to stand and stretch with me.

22          (Pause)

23          THE COURT:  Okay.

24          MR. SHIN:  Ms. Grant, could you publish 2502-T, the

25  transcript?  Yes.

1    BY MR. SHIN:

2    Q.  Mr. Hill, have you seen this document before?

3    A.  Yes.

4    Q.  What is it?

5    A.  It's a call between myself, Anthony, Trevon, and

6    Kapcharge -- well, Sheila, Mark, and Kevin from Kapcharge.

7    Q.  All right.  The recording that corresponds with this, have

8    you listened to the recording?

9    A.  Yes.

10   Q.  Just to be clear, you were a participant on this call?

11   A.  Yes.

12   Q.  And how do you know that you were a participant on this

13   call?

14   A.  How do I know that?

15   Q.  Right.  Did you say --

16   A.  I heard myself --

17   Q.  Please.

18   A.  I heard myself on the call.

19          MR. SHIN:  Ms. Grant, if you could start playing the

20   recording, please, and have the transcript follow along for the

21   jury's benefit?

22          (Recording played)

23          THE COURT:  Let's pause, please.  We're going to take

24   our midafternoon break.  About 10 minutes, members of the jury.

25          (Continued on next page)

H2NOLEB6                          Hill - Direct

1           (Jury not present)

2           THE COURT:  How much is left in this audio?

3           MR. SHIN:  I believe this audio only has about four

4    minutes left or so.

5           THE COURT:  And then are we straight into the meeting

6    audio?

7           MR. SHIN:  No, that comes later, your Honor.

8           THE COURT:  Are you going to finish your direct today?

9           MR. SHIN:  It is looking -- I'm more pessimistic than

10   I was earlier, your Honor.  There are other parts of the story

11   still to remain.

12          MR. KLINGEMAN:  I wanted to excuse the witness.

13          THE COURT:  That's fine.  Yes.  Thank you.

14          You may step down.

15          Thank you, Mr. Klingeman.

16          MR. SHIN:  I'll wait, your Honor.

17          (Pause)

18          THE COURT:  Thank you.  Go ahead.

19          MR. SHIN:  So just seeing where we are now in my

20   outline, your Honor, it does appear that we won't be able to

21   finish today.  We had been hoping to play a portion of that

22   recording.  There was some that we were going to chop off,

23   defense counsel wanted the entire record for completeness.  Not

24   to completely lay the blame on them, we didn't give them a ton

25   of time to review it, so I think we share that responsibility

1    there, your Honor.

2          I mentioned that there's a shorter recording that

3    we're planning on playing, and then the large November meeting

4    recording, but there are also some other topics of testimony

5    that I'm planning to cover with the witness, and so at this

6    point, given that it's already almost 3:30, I don't think we're

7    going to finish today, your Honor, the direct.  And I apologize

8    for being perhaps overly optimistic earlier slash not very good

9    at estimating my time here.

10         THE COURT:  Okay.  We'll return shortly.

11         Anything to take up before we go?

12         MR. NOBLE:  No, Judge.

13         THE COURT:  Okay.

14         (Recess)

15         THE COURT:  Matters to take up?

16         MR. SHIN:  Nothing from the government, your Honor.

17         THE COURT:  Okay.  Anything, folks, before we bring

18   the jury back?  Let's give them a minute warning.  Thank you.

19         A few minutes left in this, and then about how long

20   until we get to the next audio?  I guess my basic question is,

21   will we get to the longer audio today, correct?

22         MR. SHIN:  I don't think we're going to get into that

23   today, no, your Honor.  That audio is one of the last areas of

24   the direct, your Honor, and so we'll get through a few more

25   areas of direct that I expect to get to, and I anticipate

1   tomorrow will be that meeting, we'll get into that meeting and

2   including that audio, your Honor.

3          THE COURT:  Let's get the jury.  I should tell you,

4   just on scheduling, the Tuesday appointment issue seems to have

5   resolved itself.  The juror was able to make a morning

6   appointment.  We still have the Wednesday leave slightly early

7   issue, which I'll let them know at the end of the day.  Let's

8   bring them in.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Jury present)

2              THE COURT:  Mr. Shin, you may proceed.

3              MR. SHIN:  Your Honor, may we resume the playing of

4      the recording?

5              THE COURT:  You may.

6              MR. SHIN:  Thank you.

7              (Recording played)

8      BY MR. SHIN:

9      Q.  Mr. Hill.

10     A.  Yes.

11     Q.  Did there come a time when Trevon Gross raised concerns

12     about ACH processing for Kapcharge?

13     A.  Yes.

14     Q.  Generally speaking, what were the concerns?

15     A.  The volume, the high amount that we were doing on a daily

16     basis.

17     Q.  And you had discussions with him about his concerns?

18     A.  Yes.

19             MR. SHIN:  Ms. Grant, could you display for Mr. Hill

20     1427-D?

21     Q.  Do you recognize this document?

22     A.  Yes.  This is an email from Trevon and myself -- to Anthony

23     with myself copied on September 17th of 2014.

24             MR. SHIN:  Government offers 1427-D into evidence.

25             MR. CREIZMAN:  No objection.

H2NOLEB6                        Hill - Direct

1           MR. KLINGEMAN:  No objection.

2           THE COURT:  Thank you.  1427-D admitted.

3           (Government's Exhibit 1427-D received in evidence)

4           MR. SHIN:  Could you publish for the jury, please?

5    And could you zoom in on the lower half of the document?

6    BY MR. SHIN:

7    Q.  Mr. Hill, so at the bottom there, I'll read what Trevon

8    Gross wrote.  "Hey, I got a call from them and they have more

9    questions about our processing.  Kapcharge is putting through

10   $1 million per day so they are very nervous."  Did I read that

11   correctly?

12   A.  Yes.

13   Q.  How did Anthony Murgio respond?

14   A.  "So what should we do?"

15   Q.  Trevon Gross responded, "I'll talk to them.  They are just

16   nervous.  We just need to have on record all paperwork.  This

17   week alone we have moved over $5 million.  I don't know too

18   many credit unions doing that."  Is that accurate?

19   A.  Yes.

20          MR. SHIN:  Top half of the email, please, Ms. Grant.

21   Q.  And how did Anthony Murgio respond?

22   A.  "Oh, yeah.  That's how we do.  Let's go.  Ha ha.  But

23   seriously, I want to make sure that we have everything they

24   want and you want so all parties will feel comfortable.  Do you

25   know the fees we made?"

H2NOLEB6                        Hill - Direct

1    Q.  How did Mr. Gross respond, at the very top email?

2    A.  "LOL!  I will talk with them tomorrow and put them at

3    ease."

4    Q.  I didn't mention this at the beginning.  What is the

5    subject line of this email?

6    A.  "Alloya".

7    Q.  Could you remind the jurors what Alloya was?

8    A.  They're a corporate credit union.  They're HOPE FCU's

9    corporate credit union.

10          MR. SHIN:  Ms. Grant, could you please display for

11   Mr. Hill 2155?

12   Q.  Do you recognize this document?

13   A.  Yes, this is an email from Trevon to myself with

14   attachments on September 29th of 2014.

15          MR. SHIN:  Government offers 2155 into evidence.

16          MR. CREIZMAN:  No objection.

17          MR. KLINGEMAN:  No objection.

18          THE COURT:  Thank you.  2155 is admitted.

19          (Government's Exhibit 2155 received in evidence)

20          MR. SHIN:  Please publish this for the jury.

21   Ms. Grant, could you actually turn to the attachment, the

22   second page of the attachment?

23   BY MR. SHIN:

24   Q.  Mr. Hill, in the upper right-hand corner, do you see the

25   name next to business consultant?

1    A.  Yes.

2    Q.  What's the name?

3    A.  Sandy Albertson.

4    Q.  Do you recognize that name?

5    A.  Yes.  She's from Alloya.

6         MR. SHIN:  We can zoom out, please, Ms. Grant.

7    Q.  So is this an Alloya document, this attachment?

8    A.  Yes.

9         MR. SHIN:  Ms. Grant, could you please turn to the

10   prior page?

11   Q.  Mr. Hill, could you actually read the footnote at the

12   bottom of this page?

13   A.  "Capital Solutions wires into HOPE deposits of 1.5 million

14   to be sent via ACH to others."

15        MR. SHIN:  Ms. Grant, could you turn to the email?

16   Zooming in on the email.

17   Q.  Could you please read that first paragraph of what Trevon

18   Gross wrote to you and Mr. Murgio?

19   A.  "Hey, guys.  It was a brief call.  I basically said stop

20   telling us what we can't do and tell us what we need to do to

21   keep going.  They were questioning capitalization based on the

22   transactions of Kapcharge.  I asked them to just give us a

23   number so they are going to take a couple of days to get back

24   to us.  Basically here's what we know.  They're going to want

25   to see 10 percent of transactions to enter in the account.

1    They are using the attached document.  The issue is though that

2    this would have to be revenue to the CU and not in members'

3    reserves.  It basically boils down to having about 150K on the

4    books as revenue."

5                MR. SHIN:  Ms. Grant, could you display for the

6    witness 2168?

7    Q.  Do you recognize this document, Mr. Hill?

8                MR. KLINGEMAN:  Could we have the last paragraph of

9    that exhibit read, as well?

10               THE COURT:  Yes.  If you could go back and just show

11   the last paragraph.

12               THE WITNESS:  Read it?

13               MR. KLINGEMAN:  If I could have the witness read it,

14   please.

15               THE WITNESS:  "The truth is."

16               MR. SHIN:  Objection, your Honor.

17               THE COURT:  No.  You can do it on cross.

18               Move on.

19               MR. SHIN:  Ms. Grant, 2168, please.

20   BY MR. SHIN:

21   Q.  Do you recognize this document, Mr. Hill?

22   A.  Yes.  This is an email from Trevon to myself with a couple

23   people attached, Jose, Anthony, on October 2nd of 2014.

24               MR. SHIN:  Government offers 2168 into evidence.

25               MR. KLINGEMAN:  No objection.

H2NOLEB6                         Hill - Direct

1          MR. CREIZMAN:  No objection.

2          THE COURT:  Thank you.  2168 is admitted.

3          (Government's Exhibit 2168 received in evidence)

4          MR. SHIN:  Would you please publish it for the jury,

5    Ms. Grant?  Actually, could we look at the attachment?  If you

6    could zoom in to the blue block on the left.

7    BY MR. SHIN:

8    Q.  Mr. Hill, what's the total volume of credits and debits in

9    September of 2014?

10   A.  The total credits in September, '14 are $10,513,960, and

11   the total debits for September, 2014 is $115,717.

12   Q.  Reading this document, do you understand what the numbers

13   next to those dollar amounts are, the 4,029 and the 389?

14   A.  Yes.

15   Q.  What are those?

16   A.  Transactions.

17   Q.  Those are the numbers of transactions?

18   A.  Yes.

19   Q.  So those are the numbers of transactions you entered during

20   that month?

21   A.  Yes.

22   Q.  A lot of typing.

23   A.  I told you.  Ha ha.

24          MR. SHIN:  Ms. Grant, 2178-A for the witness, please?

25   Q.  Do you recognize this document, Mr. Hill?

1    A.  Yes.  This is an email from Trevon to Anthony with myself

2    attached from October 9th of 2014.

3              MR. SHIN:  Government offers 2178-A into evidence.

4              MR. KLINGEMAN:  No objection.

5              MR. CREIZMAN:  No objection.

6              THE COURT:  Thank you.  2178-A is admitted.

7              (Government's Exhibit 2178-A received in evidence)

8              MR. SHIN:  Could we publish that to the jury, please?

9    BY MR. SHIN:

10   Q.  Could you please read this email that Trevon Gross wrote?

11   A.  "Hey Anthony.  Alloya got back to us and here's what they

12   are saying based on our current activity.  We would need to

13   place permanently with them 160K.  They would then give us 50

14   times as a line of credit which is $8 million.  Once we give

15   them this 160K it is a permanent investment with them.  We get

16   interest, but we can never, ever, ever get it back.  It's

17   always ours, but we cannot redeem it.  $2 million in prefunding

18   for transactions that they will sweep every day and then return

19   after settlement, show that we have been trained by the payment

20   authority, that we have a dedicated individual to ACH

21   transactions."

22   Q.  Mr. Hill, do you recall this issue with the $160,000 and

23   Alloya?

24   A.  Yes.

25   Q.  Could you just explain to the jury just in general terms

1    what was going on?

2    A.  After Alloya noticed the amount of transactions we were

3    doing, they let us know that we needed to have this permanent

4    deposit at their CU, at their corporate CU, but it was a

5    permanent deposit which we earn interest on, but this was the

6    only way they would give us enough line of credit to continue

7    making the transactions that we were doing.

8              MR. SHIN:  Ms. Grant, 2190 for the witness, please?

9    Q.  Do you recognize this document?

10   A.  Yes.  This is an email from myself to Trevon about our

11   Alloya origination summary from October 17, 2014.

12             MR. SHIN:  Government offers 2190 into evidence.

13             MR. CREIZMAN:  No objection.

14             MR. KLINGEMAN:  No objection.

15             THE COURT:  Thank you.  2190 is admitted.

16             (Government's Exhibit 2190 received in evidence)

17             MR. SHIN:  May we publish that for the jury, please?

18   Ms. Grant, if you could actually turn all the way to the last

19   page of the attachment?  First, if we could zoom in on the

20   title, the header at the top?

21   BY MR. SHIN:

22   Q.  Mr. Hill, what time period is this document regarding?

23   A.  This is between October 1st of 2014 to October 17th of

24   2014.

25   Q.  And what is the title of this document?

1    A.  "ACH release log for HOPE FCU".

2    Q.  Do you know what that means, "ACH release log"?

3    A.  No.

4    Q.  Is it fair to say it has something to do with ACH at HOPE

5    FCU?

6    A.  Yes.

7          MR. SHIN:  Ms. Grant, could we zoom in on the totals

8    at the bottom?

9    Q.  Mr. Hill, what is the total credits in dollars that's

10   reflected here?

11   A.  Total credits equal $17,228,866.97.

12   Q.  And total debits?

13   A.  Total debits, $412,097.53.  Damn.

14   Q.  This was only for part of the month?

15   A.  Like 16 days.

16         MR. SHIN:  Ms. Grant, if you could please display for

17   the witness 2192?

18   Q.  Do you recognize this document?

19   A.  Yes.  This is an email from myself.  I forwarded it to

20   myself to have the fees open up.  It has an attachment on it

21   about the September fee that HOPE was charging Kapcharge to

22   transact.

23         MR. SHIN:  Government offers 2192 into evidence.

24         MR. CREIZMAN:  No objection.

25         MR. KLINGEMAN:  No objection.

1    THE COURT:  Thank you.  2192 is admitted.

2    (Government's Exhibit 2192 received in evidence)

3    MR. SHIN:  Could we please publish this for the jury,

4    Ms. Grant?  Let's focus on the bottom email, Ms. Grant.

5    BY MR. SHIN:

6    Q.  Mr. Hill, who was sending this document and to who was it

7    being sent?

8    A.  Christine from Kapcharge was sending it to Trevon, myself,

9    and she's -- she's copied Kapcharge employees, as well as

10   Anthony Murgio.

11   Q.  And the subject here is "September fees"?

12   A.  September fees, correct.

13   Q.  Could you please read the first line under "Hi"?

14   A.  "Please find attached the fees calculation for

15   September 1st through the 29th of 2014.  Total fees have been

16   calculated at $1,613.25.  Please verify the calculation for

17   both August and September so that the fees can be posted

18   accordingly.  Thank you."

19   Q.  Mr. Hill, do you have an understanding of what fees are

20   being discussed here in this email?

21   A.  Fees that HOPE FCU was charging Kapcharge for the ACH

22   transactions.

23   Q.  Do you recall from a few exhibits ago the volume, the

24   approximate volume for September that HOPE FCU processed for

25   Kapcharge?

H2NOLEB6                          Hill - Direct

1    A.  Not exactly the number, but I know it was millions.

2    Q.  Does about 10 million seem about right?

3    A.  Yes.

4    Q.  So from this email, what's the total in fees that HOPE FCU

5    received for processing $10 million of ACH transactions?

6    A.  Just over $1,600.  Ha ha.

7    Q.  How much were you receiving for your position on the board?

8    How much were you being paid for your position on the board?

9    A.  $417 per month.

10   Q.  And each of the other board members were receiving that

11   amount?

12   A.  Yes.

13   Q.  How much did you earn at Coin.mx?

14   A.  About $2,000 per month.

15          MR. SHIN:  Your Honor, the government would now like

16   to play another recording.  This one is much shorter than the

17   prior one, about seven and a half minutes long.

18          THE COURT:  Go ahead.

19          MR. SHIN:  Ms. Grant, if you could queue up

20   Exhibit 2505 and the corresponding transcript 2505-T.

21          Before we start playing it, Ms. Grant, could you

22   highlight the top portion?

23   BY MR. SHIN:

24   Q.  Do you recognize this transcript that's on your screen?

25   A.  Yes.

H2NOLEB6                        Hill - Direct

1   Q.  Have you looked at this transcript previously?

2   A.  Yes.

3   Q.  And have you also listened to the corresponding recording?

4   A.  Yes, I have.

5           MR. SHIN:  Ms. Grant, why don't we play the recording

6   and follow along in the transcript.

7           (Recording played)

8           (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. SHIN:

2   Q.  Mr. Hill, did you hear during -- or following along on the

3   transcript of that recording, did you hear or read reference to

4   a donation?

5   A.  Yes.

6   Q.  Just to be clear, did you have an understanding of what

7   Mr. Gross meant by donation in this conversation?

8   A.  Yes.

9   Q.  What was that?

10  A.  Kap donating what would be the permanent deposit that

11  Alloya was asking for, which was 160,000.

12  Q.  At the very beginning of your testimony, you talked about

13  how there was 150,000 to 200,000 dollars of payments that would

14  be made to Mr. Gross and his church in exchange for control of

15  the credit union?

16  A.  Yes.

17  Q.  Have you ever heard that being described as a donation?

18  A.  Yes.

19  Q.  So, just to be clear, this donation and that donation, are

20  they the same or different?

21  A.  No, they're completely different.

22  Q.  Thank you.

23          MR. SHIN:  Ms. Grant, 2207 for the witness, please.

24  Q.  Do you recognize this document?

25  A.  Yes.  This is an email from Trevon to our contacts at

1   Alloya and with myself attached.

2           MR. SHIN:  The government offers 2207 into evidence.

3           MR. KLINGEMAN:  No objection.

4           MR. CREIZMAN:  No objection.

5           THE COURT:  Thank you.

6           2207 is admitted.

7           (Government's Exhibit 2207 received in evidence)

8   Q.  Mr. Hill, could you read the subject line and then the body

9   of the email?

10  A.  Subject line is "ACH Processing."  It reads:  "Sandy, our

11  board has agreed to make a capital deposit.  Please inform us

12  how this can be done."

13  Q.  Mr. Hill, do you have an understanding of what Mr. Gross is

14  agreeing to do here?

15  A.  To make the permanent deposit of 160K that Alloya requested

16  for us to process at the rate we were.

17  Q.  Do you see the reference in Mr. Gross' email about the

18  board having agreed to make the capital deposit?

19  A.  Yes.

20  Q.  Was there a board meeting at which this was discussed?

21  A.  No.

22  Q.  Do you recall there being an October board meeting?

23  A.  No, I don't remember, but this was done on a call with

24  myself, Anthony, and Trevon.

25  Q.  So, the three of you decided to make the deposit?

H2NKLEB7                           Hill - direct

1    A.  Yes.

2    Q.  Were any other board members involved?

3    A.  No.

4              MR. SHIN:  Ms. Grant, 2215, please.  Just for the

5    witness, please.  Thank you.

6    Q.  Do you recognize this document?

7    A.  Yes.  This is an email from Trevon to myself about our

8    daily limit increase request -- I'm sorry, from Trevon to

9    our -- one of our third-party ACH processors, which was Magic

10   Wrighter, and I am attached.

11             MR. SHIN:  The government offers 2215 into evidence.

12             MR. CREIZMAN:  No objection.

13             MR. KLINGEMAN:  No objection.

14             THE COURT:  Thank you.

15             2215 is admitted.

16             (Government's Exhibit 2215 received in evidence)

17             MR. SHIN:  Ms. Grant, could you please publish that

18   for the jury.

19   Q.  You mentioned Magic Wrighter as being another entity that

20   you worked with on ACH?

21   A.  Yes.

22   Q.  What did Magic Wrighter do?

23   A.  Magic Wrighter was able to automate the process that I was

24   doing manually, and basically they can do it a hundred times

25   faster than me.  So instead of sending me an individual file

1    that I will -- instead of sending me an individual spreadsheet

2    that I will then enter the transactions manually, with Magic

3    Wrighter, you can send a batch of spreadsheets that they can

4    process just as quickly.

5    Q.  Was Magic Wrighter -- were they a service provider in

6    addition to Alloya, or was it a replacement for Alloya?  What

7    was the relative situation there?

8    A.  In addition to Alloya.

9    Q.  So HOPE FCU worked with both?

10   A.  Yes.

11   Q.  Could you please read what Trevon Gross wrote in this email

12   to Magic Wrighter?

13   A.  "Hi, Brooke.  This is my formal request to increase the

14   daily and batch risk limits" --

15   Q.  Even if it's ungrammatical, you can read it.

16   A.  -- "or increase to $5 million.  Thank you."

17   Q.  Do you know what that means, "daily and batch risk limits"?

18   A.  We want to increase our daily limit to $5 million per day.

19   Q.  And this was with respect to the ACH for Kapcharge?

20   A.  Yes.

21           MR. SHIN:  Ms. Grant, 2217, please, for the witness.

22   Q.  Do you recognize this document?

23   A.  Yes.  This is an email from Trevon to myself on

24   November 4th of 2014.  It has attachments about our ACH

25   transaction volume report.

H2NKLEB7                          Hill - direct

```
 1              MR. SHIN:  The government offers 2217 into evidence.

 2              MR. KLINGEMAN:  No objection.

 3              MR. CREIZMAN:  No objection.

 4              THE COURT:  Thank you.

 5              2217 is admitted.

 6              (Government's Exhibit 2217 received in evidence)

 7              MR. SHIN:  Ms. Grant, if you could publish for the

 8    jury, please.

 9    Q.  Mr. Hill, is Mr. Gross receiving the report in the bottom

10    email?

11    A.  Yes, from the payment authority.

12              MR. SHIN:  Ms. Grant, if you could turn to the

13    attachment, please.  And if you could zoom in on the blue box

14    on the left.

15    Q.  Mr. Hill, what was -- we saw the September number in an

16    earlier exhibit; is that correct?

17    A.  Yes.

18    Q.  And what's the October volume of ACH?

19    A.  The October total credits?  The total credit for October is

20    $32,933,210, and the total debits for October, $1,099,705.

21    Q.  Thank you.

22              MR. SHIN:  You can take that exhibit down, Ms. Grant.

23    Q.  Mr. Hill, do you remember we looked at that earlier email

24    in which Mr. Gross approved an increase to $5 million per day?

25    A.  Yes.
```

1    Q.  Do you know whether that meant business day, versus seven

2    days a week, versus five business days a week?

3    A.  I don't know.

4    Q.  Would you be able to approximate what a $5 million per day

5    limit would mean in a month, if you just counted business days?

6    A.  Yes.  Approximately five times 25 or five times 20.

7    Q.  Okay.  Which is what?

8    A.  At millions?  100.

9    Q.  $100 million?

10   A.  $100 million in a month.

11   Q.  In a month if we just count business days?

12   A.  If we just count business days.

13           MR. SHIN:  2277 for the witness, please.

14   Q.  Do you recognize this document?

15   A.  Yes.  This is an email from Trevon to Anthony, with myself

16   attached, from November 4th of 2014 about our daily limit

17   increase request.

18           MR. SHIN:  The government offers 2277 into evidence,

19   please.

20           MR. CREIZMAN:  No objection.

21           MR. KLINGEMAN:  No objection.

22           THE COURT:  Thank you.

23           It's admitted.

24           (Government's Exhibit 2277 received in evidence)

25   Q.  Mr. Hill, if you could review the email until you have a

1    sense of what this email is about.  It's several pages long,

2    and we can ask Ms. Grant to page through it to the extent you

3    need more context.

4    A.  Yes, I remember this.

5    Q.  Generally speaking, what's this about?

6    A.  This is when we found Magic Wrighter with the help from one

7    of our contacts at the FRB.

8    Q.  If you look at the Anthony Murgio email there --

9    A.  Uh-huh.

10            MR. SHIN:  Zoom in.

11   Q.  -- could you read that last paragraph of Mr. Murgio's

12   email?

13   A.  From "we then"?

14   Q.  Yes, "we then."

15   A.  "We then got with them Monday morning and figured out this

16   solution in one day.  They're setup timeline is two weeks.

17   Ricardo really helped in grinding things out, and we are back

18   up."

19   Q.  Do you know what this is referring to about figuring out a

20   solution, and your helping in grinding things out, and being

21   back up?

22            MR. CREIZMAN:  Objection.

23            MR. SHIN:  Your Honor, I asked if he knew.

24            THE COURT:  You're asking if he had an understanding?

25            MR. SHIN:  Yes, your Honor.

H2NKLEB7                        Hill - direct

1          THE COURT:  All right, I'll allow it.

2          THE WITNESS:  Yes, I did.

3  Q.  And what is that understanding?

4  A.  A lawyer had cut us off, and we weren't able to process, we

5  were down for a few days.  So we were frantically trying to

6  find a solution to process ACH for Kap, and we found Magic

7  Wrighter and figured it out.  And this is what this is about.

8          MR. SHIN:  Ms. Grant, if you could zoom in on the top

9  email.

10  Q.  And what is Mr. Gross' response there?

11  A.  "Awesome."

12  Q.  Now, you referred --

13          MR. SHIN:  We can take down the exhibit, please.

14  Thank you.

15  Q.  You referred to Alloya cutting you off?

16  A.  Yes.

17  Q.  What do you mean by that?

18  A.  They weren't --

19  Q.  What does cutting you off mean?

20  A.  They cut us off from originating our ACH transactions.

21  Q.  Just to be clear, we're talking about HOPE FCU here, right?

22  A.  HOPE FCU, correct.

23  Q.  Were there discussions between you and other people at HOPE

24  FCU and Alloya regarding this potential termination?

25  A.  Yes.

1    Q.  Who was involved in those discussions?

2    A.  Myself, Anthony, Trevon, and our contacts at Alloya that

3    basically gave us a week to ten-day window to find another

4    account because they was closing ours down.

5    Q.  They cut you off even though Trevon Gross had approved the

6    $160,000 deposit?

7    A.  Yes, but we didn't -- Kapcharge never made the donation of

8    our 160K.  He just simply told them that we would do so, but

9    Anthony and I couldn't give a confirmation from Kapcharge to

10   say that they were going to make a permanent donation of 160K.

11              MR. SHIN:  Ms. Grant, 2228 for the witness, please.

12   Q.  Do you recognize this document?

13   A.  Yes.  This is the email from Sandra Albertson from Alloya

14   to Trevon and myself attached.  This is about the termination

15   of ACH services.

16              MR. SHIN:  The government offers 2228 into evidence,

17   please.

18              MR. KLINGEMAN:  No objection.

19              THE COURT:  Thank you.

20              2228 is admitted without objection.

21              (Government's Exhibit 2228 received in evidence)

22              MR. SHIN:  If we could publish this for the jury,

23   please.

24   Q.  What's being conveyed on this email?

25   A.  That this is an official letter terminating all of our ACH

1   abilities with Alloya.

2            MR. SHIN:  If we could flip to the attached letter,

3   please, Ms. Grant.

4   Q.  Who is this letter from?

5   A.  Alloya.

6   Q.  And who is it addressed to?

7   A.  Trevon Gross.

8   Q.  If you could just generally describe what this letter is

9   saying?

10  A.  This is the official letter terminating ACH origination

11  processing through Alloya.  It was ending at the end of

12  October, but I mean, it gave us, I think, like seven to ten

13  days, and then we got the official letter.  And that's what

14  this is.

15  Q.  Okay.

16           MR. SHIN:  Ms. Grant, could you please publish, for

17  the jury, Exhibit 4507, which is the WhatsApp chat Rico 101.

18  Q.  Mr. Hill --

19  A.  Yes.

20  Q.  -- do you have this on your screen?

21           THE COURT:  Did this come in before?

22           MR. SHIN:  This came in at the beginning of our

23  resumption.  We put all of the WhatsApp chats in, save one, at

24  the same time.

25           THE COURT:  Right.  Go ahead.  Thank you.

H2NKLEB7                          Hill - direct

1    BY MR. SHIN:

2    Q.  Do you recognize this?

3    A.  Yes.

4    Q.  What is this?

5    A.  A WhatsApp chat between myself and Anthony Murgio.

6    Q.  So, just to be clear, when it's in the from column, Rico

7    101 is whom?

8    A.  That's me.  That's me.

9    Q.  And "me" is whom?

10   A.  Anthony Murgio.

11          MR. SHIN:  Ms. Grant, could we scroll down to line

12   644, please.

13   Q.  Now, Mr. Hill, I'm going to ask you to read -- we're just

14   going to read a few lines here, but I'm going to ask you to

15   read your chats, and I'll read Anthony Murgio's chats.  So,

16   let's start with line 644, please.

17   A.  "Kapcharge is now requesting Magic Wrighter to increase

18   30-day limit to 50 million.  Trevon will need to approve before

19   I send request."

20   Q.  "Wow, this is what that we're doing."

21   A.  "What?"

22   Q.  "They're doing about 1.5 million a day before, so if you

23   multiply 1.5 times 30, you get about 50 million.  So it's not

24   increasing what they were doing.  Is that what I'm say cut

25   off?"

1    A.  "How is this not already done?  I thought we raised it to

2    100 million already.  Like, never mind, I'll figure it out."

3    Q.  "Right, I did as well."

4    A.  "Trevon would need to approve whatever it is anyway.  I

5    won't be pulling the trigger just because Kap says so.  Speak

6    up, please."

7    Q.  "Sounds good."

8            So we'll stop there.

9            In this discussion of increasing Magic Wrighter

10   limits --

11   A.  Yes.

12   Q.  -- you told Mr. Murgio that Trevon will need to approve --

13   A.  Correct.

14   Q.  -- whatever it is anyway; is that correct?

15   A.  Yes.

16   Q.  And that you wouldn't be pulling the trigger?

17   A.  Right.

18   Q.  Why is it that you needed Trevon to approve?

19   A.  I will always go to Trevon first before I do anything.  I

20   mean, there was an instance where I made a request on my own,

21   and Trevon chewed me out because I raised the limits without

22   asking him first, without getting him to approve it first, and

23   it was a request from Kapcharge, and I sent the request to

24   Magic Wrighter, and once Trevon found out, he chewed me out,

25   telling me I need to always run it past him.

1    Q.  So you followed that instruction?

2    A.  Yes.

3           MR. SHIN:  Ms. Grant, if you could put up Government

4    Exhibit 4502, which is the HOPE CU WhatsApp chat.  And if you

5    could publish that for the jury as well.

6           Ms. Grant, if you could scroll down to line 3332.

7    Q.  Starting there, Mr. Hill, let's just -- I would propose

8    that we just take turns reading, just so we can get through

9    this, because there are multiple participants in this chart.

10   I'll start, and then we'll just take turns, okay?

11   A.  Okay.

12   Q.  So Trevon Gross writes:  "To all:  Please be advised that

13   as of this morning, the CU has ceased to be able to function as

14   a financial institution.  Because of overly aggressive

15   decisions made over the past three months, our correspondent

16   bank terminated our settlement ability.  This was completely

17   avoidable.  Traveling to New Jersey is a waste of time and

18   money because unless we can get a correspondent bank, we can't

19   function.  I have been making calls all day trying to get

20   someone to take us on, but word has spread that we are risky.

21   You should know this because we, as board members, are liable

22   for these decisions."

23   A.  "What was voted on?  What was voted on as a board that

24   invited risk?"

25          MR. SHIN:  Just for the record, that was Tim Ellrich.

H2NKLEB7                         Hill - direct

1  Q.  So, going forward, Mr. Hill, if you could define the

2  person.

3  A.  Say so.

4  Q.  So then Kevin Tomasso writes:  "This is obviously very

5  serious, and I am sure the main officers will be scrambling

6  today, but can we figure out a forum or meeting where we can

7  discuss the implications of this?"

8  A.  Rico replies:  "Trevon, we were under the impression that

9  we were operating within our parameters.  We know Alloya had

10  issues with certain merchants, which we provided all

11  documentation to negate any suspicion."  As following an

12  aggressive -- "As far as an aggressive approach, we" waited --

13  "we awaited the go-ahead to open the floodgates."

14  Q.  Trevon Gross writes:  "The board made no decisions, but

15  allowed this to happen.  I'd like to, because this is serious,

16  if a member has a car payment that comes through, it will be

17  returned.  Who would trust a bank after something like this

18  happens?"

19       And, Mr. Hill, I'll read the next one as well just

20  because it's the same person.

21       Trevon Gross:  "Ricardo, the current approach was

22  risky, and this flag was raised and ignored.  It was the volume

23  and the capitalization.  In October, we had over $30 million

24  pass through the CU with no buffer or capitalization."

25  A.  Rico:  "Yes, I see.  Can you please get on the call and get

1    updated about moving forward, or what's next, or email a

2    recap?"

3    Q.  Just pausing there, Mr. Hill, do you see in line 3363 --

4    A.  Yes.

5    Q.  -- do you see that Mr. Gross wrote, "The board made no

6    decisions, but allowed this to happen"?

7    A.  Yes.

8    Q.  Did Trevon Gross raise concerns about ACH transaction

9    volume during board meetings?

10   A.  Not during board meetings.

11   Q.  He raised them outside of the context of board meetings?

12   A.  Yes.

13   Q.  In discussions with you?

14   A.  Yes.

15   Q.  And with who else?

16   A.  And Anthony.

17   Q.  Was Anthony Murgio on the board?

18   A.  No.

19   Q.  So during proper board meetings of the HOPE FCU board of

20   directors, did Mr. Gross raise these concerns?

21   A.  No.

22          MR. SHIN:  Can we scroll down, Ms. Grant.  So let's

23   pick up on 3375.

24   Q.  I'll pick up there.

25          Mr. Murgio writes:  "But we did discuss this, and

1    under guidance, were told that all is fine as long as our

2    capitalization was brought in line by the end of the quarter.

3    I wrote an email saying I don't think we should wait for the

4    donation, and we should get it ASAP.  I was told it's not

5    urgent.  Please confirm."

6           Mr. Murgio continues:  "These things don't sit well

7    with me.  I was also told to tell Kap to stop until we get with

8    the Fed.  I did that as well."

9           Mr. Murgio continues:  "Please confirm."

10          And Mr. Hill?

11   A.  Trevon replies:  "Capitalization is an internal matter that

12   we need to be concerned about.  Alloya's issue and Magic

13   Wrighter was the amount of transactions, which I have

14   consistently said were risky.  You can't go from 30K in ACH to

15   30 million in one month without raising red flags.  Red flags

16   are waving all through the industry.  You told Kapcharge too

17   late.  Our ACH processing ability was terminated when you

18   finally told them.  Now our settlement ability has been

19   stopped."

20   Q.  So pausing there, Mr. Hill, do you recall -- in that chat

21   by Mr. Gross, there is a reference of going from 30K to

22   30 million?

23   A.  Yes.

24   Q.  Do you recall the earlier email we saw in which Mr. Gross

25   approved the $5 million a day limit?

1    A.   Yes.

2    Q.   And we did some rough math.  Approximately what did that

3    correspond to per month?

4    A.   A hundred million.

5    Q.   So, continuing at 3384, Anthony Murgio writes:  "Right.

6    But did you tell Kap everything was fine after Alloya pulled

7    their stunt, and that we can use our account there and Magic

8    Wrighter to transmit?"

9    A.   Rico:  "This and our point to the above comment is what I

10   was sure we were comfortable doing."

11   Q.   Mr. Gross writes:  "Anthony, you know I have consistently

12   told you this was too aggressive.  I have the documentation to

13   prove it.  You plowed ahead, and we here we are.  CU reputation

14   is damaged, and I am scrambling to get the CU functioning."

15   A.   Anthony Murgio replies:  "Okay."

16          And, again, Anthony Murgio:  "See you in a bit."

17   Q.   Jose Freundt writes:  "It is not constructive or productive

18   to start playing the blame game.  What needs to happen in the

19   short-term is find a solution to the issue at hand, and in the

20   long-term, find a way to do what's best for the credit union

21   and all parties involved.  If we have people in place in

22   certain positions, let them form their position."

23   A.   Rico replies:  "Agreed."

24   Q.   Jose Freundt writes:  "And, personally speaking, unless we

25   find a way to have unified criteria on how things are to be

1    done, the direction of the CU and processing procedures, we

2    will not succeed"?

3    A.   Trevon replies:  "Accountability is not blame.  A problem

4    cannot be corrected until the root is uncovered.  The only

5    party involved is the CU.  This has to be agreed upon before

6    anything else is done."

7    Q.   Jose Freundt writes:  "I agree with that statement, but I

8    don't think looking for the accountable party will lead to

9    solving the immediate issue.  Let's find how to resolve this

10   and use this incident as a tool for learning and not as a tool

11   for dividing.  Let's use this as an example of what will happen

12   if we don't share one common goal and path."

13   A.   Trevon replies:  "Agreed."

14   Q.   Tim Ellrich writes:  "So how were we getting this increase

15   of transactions?  Maybe this was discussed as a board while

16   during meeting that I was absent, but how did we add two zeros

17   to our transactions?  How do these red flags get fixed?"

18   A.   Trevon replies:  "We have regained our ability to settle

19   transactions.  Red flags are overcome by being squeaky clean

20   and above reproach."

21   Q.   Anthony Murgio writes:  "Squeaky misspelled.  Thanks."

22   A.   Jose:  "Great news."

23   Q.   Ellrich writes -- Tim Ellrich continues:  "Still I'm

24   confused how one day we have a code-red shutdown that escalates

25   to top of liability, and the next day, all is well.  I don't

1    want to be on the bench if I'm liable for anything.  I'm sure

2    the rest of the board agrees.  Beyond that, it looks like

3    you've been busy rebuilding trust with the Fed.  Thank you for

4    that.  So, we are still on this weekend, I assume?  I look

5    forward to discussing in person what squeaky clean looks like

6    in the eyes of the Fed.  I look forward to in-depth dialogue

7    this weekend."

8    A.  Jose Freundt:  "My flight is booked."

9    Q.  Trevon Gross writes:  "I did not say all was well, I said

10   that the ability to actually conduct business and settle member

11   transactions has been restored.  There's a whole bunch that

12   still needs to be done to clear the red flags.  Prolonged red

13   flags means liability.  As I said earlier, I'm not available

14   this Saturday, so I will not be involved in any discussions."

15   A.  Tim Ellrich:  "Okay.  When is your next availability?  I

16   would like to see if we can find a weekend after this meeting

17   that works mutually."

18   Q.  Kevin Tomasso writes:  "Are we restored with Alloya, or did

19   another bank pick us up?"

20   A.  Anthony Murgio:  "Another.  Another."

21         Anthony Murgio:  "Trevon was able to get a credit

22   union of the Northwest to settle for us."

23   Q.  Kevin Tomasso:  "Wonderful."

24   A.  Yuri:  "Thank you, Pastor."

25   Q.  Let's stop that there.

1        MR. SHIN:  And we can take that down, please,

2   Ms. Grant.

3   Q.  Mr. Hill, while you were involved with HOPE FCU, did Trevon

4   Gross ever tell you to stop processing ACH transactions for

5   Kapcharge?

6   A.  No.

7   Q.  Did he ever actually take any action to stop you from

8   processing ACH transactions for Kapcharge?

9   A.  No.

10  Q.  Did he have the ability to stop you from processing ACH for

11  Kapcharge?

12  A.  Absolutely.

13  Q.  And what was that ability?

14  A.  He had the master log-in, he can close any account.  He can

15  lock out any back-end user.  So, yes, he had the power to do

16  so.

17  Q.  Mr. Hill, you worked at HOPE FCU for a number of months?

18  A.  Yes.

19  Q.  We've heard about a lot of what you did there.

20        In your view, based on your experience and your

21  working with people, who was in charge of the credit union?

22  A.  I answered to Murgio, he was my boss.  However, Trevon had

23  the master password and master access, so he had control of the

24  credit union.

25  Q.  So let's just break that down.  You said you answered to

1   Anthony Murgio?

2   A.  Yes.

3   Q.  And what do you mean by that?

4   A.  If there was a request from Anthony and one from Trevon, I

5   would do what Anthony said first.

6   Q.  Now, did Anthony Murgio have access to the HOPE Credit

7   Union back-end system?

8   A.  No.

9   Q.  Was he a board member?

10  A.  No.

11  Q.  Or any kind of officer of the credit union?

12  A.  No.

13  Q.  Was he actually on-site at the credit union?

14  A.  No.

15  Q.  Either in New Jersey or in Tallahassee?

16  A.  Only when he visited our office, but he wasn't there in

17  Tallahassee, Florida, and not in New Jersey either.

18  Q.  Did you work more frequently with Mr. Gross or Mr. Murgio

19  in connection with your activities at HOPE FCU?

20  A.  With Trevon.

21  Q.  Is it fair to say that Mr. Gross supervised your

22  activities?

23  A.  Yes.

24  Q.  In fact, we've seen some examples of this during your

25  testimony; is that correct?

1   A.  Yes.

2   Q.  So, ultimately, as between Mr. Gross and Mr. Murgio, who

3   had the actual ability to stop what was going on?

4   A.  Only Trevon.

5   Q.  Mr. Hill, were you aware, during your work at HOPE FCU, of

6   examinations by the National Credit Union Administration, also

7   known as the NCUA?

8   A.  Yes.

9   Q.  Now, were you involved in any NCUA examinations?

10  A.  Yes, I was.

11          MR. SHIN:  Ms. Grant, Government Exhibit 2266 for the

12  witness, please.

13  Q.  Do you recognize this?

14  A.  Yes.  This is me replying to Anthony about a trip to

15  New Jersey slated for September.  The email is from

16  August 29th.

17          MR. SHIN:  The government offers 2266 into evidence.

18          MR. KLINGEMAN:  No objection.

19          MR. CREIZMAN:  No objection.

20          THE COURT:  Thank you.

21          It's admitted.

22          (Government's Exhibit 2266 received in evidence)

23          MR. SHIN:  If we could zoom in, Ms. Grant.

24  Q.  If you could read the body of Anthony Murgio's email.

25  A.  "Can you go up to New Jersey around the 8th or 9th to be

1    there for the inspection on the 10th?  I also want you to make

2    sure shit is on point."

3    Q.  "And you agreed?"

4    A.  "Sure.  Would love to."

5    Q.  And so just to be clear, this is an inspection by the NCUA?

6    A.  Yes.

7    Q.  And the date here is August 29th, correct?

8    A.  That's correct.

9    Q.  So, when was the inspection slated to happen?

10   A.  September 10th or 11th, but I was going up there a couple

11   of days prior to it.

12          MR. SHIN:  Ms. Grant, you can take down the exhibit,

13   please.

14   Q.  Did you actually go up to New Jersey for this examination?

15   A.  Yes, I did.

16   Q.  And what did you do there?

17   A.  I went up maybe a day or two prior to the examiners coming

18   in.  I helped get our files together, meaning the new board

19   members' files, to make sure everyone had a complete folder,

20   with their resume, copy of their ID, and membership

21   application, and I also helped gather other documents that was

22   needed that Trevon instructed us to do.

23   Q.  When you were up there helping to prepare for the

24   examination, who else were you working with?

25   A.  Trevon Gross.  And while Trevon was there, and Anthony was

H2NKLEB7                          Hill - direct

1    on the phone.

2    Q.  Anthony Murgio?

3    A.  Yes.

4    Q.  What was he doing on the phone?

5    A.  Helping me gather different documents or getting others to

6    fill out necessary paperwork that they hadn't done before.

7    Q.  Was anyone else involved in this preparation process from

8    HOPE FCU?

9    A.  Yes.  I think Bernard was there, but he was doing his

10   portion.

11   Q.  Who's Bernard?

12   A.  He's one of the original board members at HOPE FCU.

13   Q.  Now, you described the work that you were doing -- I

14   apologize.  Did you give any examples of what you were helping

15   to organize?

16   A.  Yes.  The files for the new board members.

17           MR. SHIN:  Ms. Grant, could you display 1252-A for the

18   witness.

19   Q.  Do you recognize this document?

20   A.  Yes.  This is an email from Anthony to all of us, meaning

21   Kim -- Kim -- Tim, Kevin, Kendra, Jose, Yuri, myself, Chad,

22   Kevin.

23           MR. SHIN:  The government offers 1252-A into evidence.

24           MR. CREIZMAN:  No objection.

25           MR. KLINGEMAN:  No objection.

1          THE COURT:  Thank you.

2          It's admitted.

3          (Government's Exhibit 1252-A received in evidence)

4          MR. SHIN:  If you could publish for the jury.

5    BY MR. SHIN:

6    Q.  What is Anthony conveying to you and the others in this

7    email?

8    A.  That -- this is a list of people who are missing some

9    documents and maybe a picture ID or a signed form -- a signed

10   membership agreement, but he says, "I don't know what is going

11   on with the organization over there.  Rico will be taking

12   over," but the following people needed either a clean picture

13   of their ID or their membership application signed.

14   Q.  So, is this the time when you were up in New Jersey

15   handling that?

16   A.  Yes.

17   Q.  By the way -- you testified to, and I believe we saw some

18   documents -- back when you were about to be placed on the

19   board --

20   A.  Yes.

21   Q.  -- weren't you sending these same documents in?

22   A.  Yeah.

23   Q.  So why were you doing it again?

24   A.  I don't know.  All of us should have done this in June.  I

25   don't know why -- when I got there, I couldn't find the ones

1    for these members, the following:  Kendra, Jose, Yuri, and

2    Kevin.

3              MR. SHIN:  Ms. Grant, 2268 for the witness, please.

4    Q.  Do you recognize this document?

5    A.  Yes.  This is an email forwarded to me from Anthony.  It

6    has an attachment.  It's a membership package from one of the

7    board members.  I think this is from Yuri.

8              MR. SHIN:  The government offers 2268 into evidence.

9              MR. CREIZMAN:  No objection.

10             MR. KLINGEMAN:  No objection.

11             THE COURT:  Thank you.

12             It's admitted.

13             (Government's Exhibit 2268 received in evidence)

14             MR. SHIN:  If we could look at the attachment, please.

15   Q.  What's that document?

16   A.  It's the HOPE membership application.

17   Q.  Who is it completed by?

18   A.  Yuri Lebedev.

19   Q.  So was this in connection with your preparing the files for

20   the NCUA examination?

21   A.  Yes.

22             MR. SHIN:  Ms. Grant, you can take that down, please.

23   Q.  In September, when you were there for the NCUA exam, did

24   you actually meet with anyone from the NCUA?

25   A.  Yes.  I was there when the examiners showed up.

H2NKLEB7                          Hill - direct

1   Q.  Do you remember who you met with from the NCUA?

2   A.  Yes, I remember.  I don't know their full names, but I

3   remember them.

4   Q.  What do you remember?  What names do you remember?

5   A.  Two guys, one named Keith, the other named Mark.

6   Q.  Who was present from the HOPE FCU side during this meeting

7   with the NCUA?

8   A.  Trevon and Bernard.

9   Q.  In addition to you?

10  A.  And myself, yes.

11  Q.  Now, during the examination, during the meeting between

12  HOPE FCU and the NCUA, were the new board members that had been

13  elected in June discussed?

14  A.  Yes, briefly.

15  Q.  What, if anything, did Trevon Gross say to the NCUA

16  examiners about the new board members?

17  A.  Well, I was introduced as a new board member, and Trevon

18  let them know that I was one of the board members that would be

19  moving to New Jersey soon.

20  Q.  So he identified you as someone who would be moving to

21  New Jersey?

22  A.  Yes.

23  Q.  Any other board members -- did Mr. Gross identify any other

24  board members as moving to New Jersey?

25  A.  Yes.  Tim and Jose.

1    Q.  Could you give the full names for those two people?

2    A.  Oh, sorry.  Jose Freundt and Tim Ellrich.

3    Q.  Mr. Hill, were you, in fact, planning to move to Lakewood,

4    New Jersey?

5    A.  No.

6    Q.  Did you have any desire to move to Lakewood, New Jersey?

7    A.  No.

8    Q.  Why not?

9    A.  I'm from Florida.  Why would I leave Florida?

10   Q.  Fair enough.

11          Mr. Hill, did you tell Trevon Gross that you were, in

12   fact, planning to move to New Jersey?

13   A.  No.

14          MR. SHIN:  Ms. Grant, if you could put up 1249 for the

15   witness, please.

16          THE COURT:  Just while doing that, we have about 12

17   minutes to go, so I'll invite everybody for our last stretch.

18          (Pause)

19          THE COURT:  All right.  Thank you.

20   Q.  Mr. Hill, do you recognize this document?

21   A.  Yes.  This is an email from myself to Anthony Murgio.

22          MR. SHIN:  The government offers 1249 into evidence,

23   please.

24          MR. KLINGEMAN:  No objection.

25          THE COURT:  Without objection, 1249 is admitted.

1    Thank you.

2              (Government's Exhibit 1249 received in evidence)

3              MR. SHIN:  May this be published for the jury, please.

4    BY MR. SHIN:

5    Q.  This email is from you to Anthony Murgio, September 9th,

6    "Subject:  Items they will need for the review."  What is this,

7    Mr. Hill?

8    A.  This is a list of items that we needed to gather for the

9    NCUA.

10   Q.  For purposes of the examination?

11   A.  Yes.

12             MR. SHIN:  Ms. Grant, if you could show 2267, for the

13   witness.

14   Q.  Do you recognize this document?

15   A.  Yes.  This is an email from myself to Anthony Murgio, with

16   an attachment.

17             MR. SHIN:  The government offers 2267 into evidence.

18             MR. KLINGEMAN:  No objection.

19             MR. CREIZMAN:  No objection.

20             THE COURT:  Thank you.  It's admitted.

21             (Government's Exhibit 2267 received in evidence)

22             MR. SHIN:  Could you please publish the email for the

23   jury, Ms. Grant.

24   Q.  The subject line here is "Certified Reso in PDF," correct?

25   A.  Yes.

1    Q.  And the attachment is Certified Resolution.pdf?

2    A.  Yes.

3           MR. SHIN:  Ms. Grant, could you turn to the

4    attachment, please.

5    Q.  Mr. Hill, if I could direct your attention immediately

6    above the -- below the "resolved."

7    A.  Yes.

8    Q.  Do you see the line there that begins, "Governor"?

9    A.  I do.

10   Q.  Could you just list the entities that are listed there?

11   A.  Governor, The Connecticut Department of Public Works, the

12   Connecticut State Properties Review Board, and the Office Of

13   Attorney General -- of the Attorney General Associated With

14   Such Contracts And Amendments.

15   Q.  Mr. Hill, what is this?

16   A.  This is a certified resolution, but this is a template of a

17   certified resolution that we were going to use after rewording

18   it, of course.

19   Q.  Just if you could elaborate a little further, Mr. Hill, why

20   were you sending this document to Mr. Murgio?

21   A.  Trevon let us know that we needed a certified resolution,

22   and it was up to me to get one.  I didn't know how to write

23   one, so I went on Google to find a template.  I found this,

24   sent it to Anthony to see if this is something that can be

25   edited to fit what we needed.

1    Q.  You said Mr. Gross told you that you needed a certified

2    resolution?

3    A.  Yes.

4    Q.  The certified resolution for what?

5    A.  A certified resolution gives signing authority to one board

6    member, and we didn't have one on file and we needed one on

7    file for the NCUA.

8    Q.  So you found this document on the Internet?

9    A.  Yes.

10            MR. SHIN:  Ms. Grant, could you put up for the witness

11   2269.

12   Q.  Do you recognize this document?

13   A.  Yes.  It's an email from myself to Anthony on

14   September 9th.

15            MR. SHIN:  The government offers 2269 into evidence.

16            MR. CREIZMAN:  No objection.

17            MR. KLINGEMAN:  No objection.

18            THE COURT:  Thank you.  It's admitted.

19            (Government's Exhibit 2269 received in evidence)

20            MR. SHIN:  Ms. Grant, if you could publish it for the

21   jury, please.

22   Q.  Mr. Hill, the subject here is still "Certified Reso In

23   PDF," correct?

24   A.  Yes.

25   Q.  That's the email we just saw?

H2NKLEB7                          Hill - direct

1    A.  Right.

2    Q.  So what is Mr. Murgio's response to you?

3    A.  He says, "Good."

4    Q.  And then?

5    A.  "Okay, cool.  Pass it on to Trevon for final touches."

6    Q.  What did you do after sending this email to Mr. Murgio?

7    A.  Sent it to Trevon so he can edit it.

8    Q.  Sorry, you sent what to Trevon?

9    A.  I sent the template of the certified resolution to Trevon

10   so he can make it fit for what we needed, by editing it.

11           MR. SHIN:  Ms. Grant, if you could put up 2613,

12   please.

13   Q.  Do you recognize this document?

14   A.  Yes.  This is the edited version of the certified

15   resolution template that I found.

16           MR. SHIN:  The government offers 2613 into evidence.

17           MR. CREIZMAN:  No objection.

18           MR. KLINGEMAN:  No objection.

19           THE COURT:  Thank you.  It is admitted.

20           (Government's Exhibit 2613 received in evidence)

21           MR. SHIN:  Could you please publish that for the jury,

22   Ms. Grant.

23   Q.  Now that the jury has the benefit of having it on the

24   screen, what is this document?

25   A.  This is the edited version of the certified resolution,

1   from the template that I started with.

2   Q.  So, is that HOPE FCU's letterhead on the stop?

3   A.  Yes.

4   Q.  And who created or edited this document from the template

5   that you had found?

6   A.  Trevon.

7   Q.  Mr. Hill, could you read -- this might be somewhat awkward

8   because of the blanks but please do your best -- could you read

9   starting with "I"?

10  A.  Okay.  "I, secretary of...a corporation organized and

11  existing under the laws of the State of...do hereby certify

12  that the following is a true and correct copy of a resolution

13  duly adopted at a meeting of the board of directors of the

14  company duly held and convened on" blank date, blank year "at

15  which meeting a duly constituted quorum of the board of

16  directors was present and acting throughout, and that such

17  resolution has not been modified, rescinded or revoked, and is

18  at present in full force and effect."

19          MR. SHIN:  Ms. Grant, if you could zoom down into the

20  remainder of the document.

21  Q.  And if you could please continue, Mr. Hill.

22  A.  "Resolved that," blank name and title, "of" blank

23  corporation "is empowered and authorized on behalf of the

24  company, open/closed as necessary depositor accounts and

25  execute all financial transactions."

1          MR. SHIN:  Ms. Grant, if you could show the very

2     bottom of the signature block.

3     Q.  So there's a space there?

4     A.  Yes.

5     Q.  Sorry, Mr. Hill, who was supposed to sign this document?

6     A.  I was.

7     Q.  Is that because you were the secretary of the board?

8     A.  Yes.

9          MR. SHIN:  You can zoom out, please, Ms. Grant.

10    Q.  So after this document was prepared, what was done with it?

11    After this blank edited document on HOPE FCU letterhead was

12    prepared, what was done with it?

13    A.  It was filled out and signed by myself.

14    Q.  Did you do that at anyone's direction?

15    A.  Yes.  Trevon and Anthony.

16    Q.  Did you, Mr. Gross, and others actually convene a board

17    meeting for this to be signed and resolved?

18    A.  No.  We did it on the fly because we needed it.

19    Q.  Who was present when you did that?

20    A.  Me and Trevon, with Anthony on the phone.

21    Q.  So, after you signed this document, what was done with the

22    signed document?

23    A.  It was put in the folder as where our certified resolutions

24    should have been kept.

25    Q.  When you say it was put in the folder --

1   A.   A folder that was prepared for the NCUA examiners.

2   Q.   So, is it fair to say it was put into HOPE FCU's files?

3   A.   Yes.

4   Q.   And those files were available to the examiners who were

5   conducting their examination?

6   A.   Yes.

7   Q.   Mr. Hill, just to be clear, what was the purpose of this

8   document?

9   A.   The purpose of the certified resolution?  To give one board

10  member signing authority.

11  Q.   On behalf of the credit union?

12  A.   On behalf of the credit union board of directors.

13  Q.   And that one person was whom?

14  A.   Myself.

15  Q.   So, this gave you signing authority?

16  A.   Yes.

17          THE COURT:  All right, Mr. Shin, it's two minutes

18  before 5:00, so we'll stop there for the day.

19          Members of the jury, just to turn to the schedule

20  issue that I touched on -- gosh, I can't remember if that was

21  yesterday or this morning -- I know that one of the appointment

22  issues resolved, so, as of now, I think our only expected

23  alteration to the schedule that I've given you is that on

24  Wednesday of next week we'll end ten minutes early so someone

25  can make an appointment, and we'll try to make up the time at

H2NKLEB7                         Hill – direct

1    lunch.  We'll just shave about ten minutes off lunch, to do

2    that.

3              Otherwise, I wish you a very good night.  And I will

4    see you in the morning at 9:30.  Please keep all my

5    instructions in mind.  Have a good night.  Thank you.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H2NKLEB7                         Hill - direct

1               (Jury not present)

2               THE COURT:  Mr. Hill, you may step down.  Thank you.

3               (Witness temporarily excused)

4               THE COURT:  Everyone may be seated.

5               Matters to take up, Counsel?

6               MS. CHOI:  Your Honor, I think just to give the Court

7      and defense counsel a heads-up, the next few witnesses that we

8      had lined up were two individuals from Alloya, Michelle

9      McDowell and Neil Kumar.  Obviously, I think none of us

10     anticipated that Rico Hill would last as long as he did, and we

11     haven't even gotten to sort of the meat of that sort of end

12     part of his testimony, nor to the cross.

13              We are going to go talk to them and figure out what

14     their schedules are like and whether or not they have a

15     preference to go tomorrow and interrupt the direct of Ricardo

16     Hill -- they're out-of-town witnesses -- if defense counsel has

17     no objection to that, but we'll know that later tonight.

18              So I think that's the next sort of sequence of

19     individuals and then, after that, we anticipate calling Jose

20     Freundt as the next government witness.

21              THE COURT:  Any concerns, Counsel?

22              MR. CREIZMAN:  All I know is that I just have to run

23     out to see Judge Engelmayer and argue something in his court.

24              THE COURT:  Now?

25              MR. CREIZMAN:  What's that?  No, I think it's either

1   between 3:30 and 4:30 or -- it's at 4:00, it's at 4:00.  I

2   don't want to miss that.  During Judge Rakoff's trial, a couple

3   weeks ago, I accidentally stood Judge Engelmayer up for an

4   in camera hearing, and he issued a bench warrant.  So I think I

5   I'll be there --

6               THE COURT:  I concur.

7               You being away, do you then have -- a serious

8   question -- do you have any concerns with taking witnesses out

9   of order?

10              MR. CREIZMAN:  The only concern that I have is that I

11   am set to cross-examine Mr. Hill, and Ms. Madrigal is set to

12   cross-examine the Alloya witnesses.

13              THE COURT:  So it sounds like it's --

14              MR. CREIZMAN:  It could be a problem.

15              THE COURT:  -- an issue.

16              MS. CHOI:  Well, I think --

17              THE COURT:  Sounds like we have to finish Hill.

18              MR. KLINGEMAN:  Maybe if we had a sense of what's left

19   with Hill on direct, we could plan around this.

20              MR. SHIN:  Your Honor, I don't have much left on this

21   topic, of dealings with the NCUA, and then the immediate next

22   topic is the final meeting.  There will be some other documents

23   around that meeting, but the bulk of that is going to be the

24   playing of the audio.  And then after that topic, there's going

25   to be some short testimony regarding the eCommerce PMA, which

1    was the subject of some motions in limine, and your Honor

2    permitted that evidence.

3              So that's what's remaining, just so that I don't

4    disappoint your Honor again.

5              THE COURT:  It's too late.

6              MR. SHIN:  That's why I said again, that's why I said

7    again, your Honor.

8              I would say maybe there is an hour and a half to two

9    hours left tomorrow, including the hour recording.

10             MR. KLINGEMAN:  Do we know how long the Alloya folks

11   are going to be on direct?

12             MS. CHOI:  I think they would be medium witnesses, so

13   I would say about Clayton Curry length.  So it seems to me

14   that, given that circumstance.  Because if we were to put them

15   on before Mr. Hill, there is a possibility that Mr. Creizman

16   would miss some portion of the Hill cross, I think we're going

17   to have to put them on after Mr. Hill has been crossed.  I just

18   need to double-check with their schedules.  I think that would

19   probably be fine, although they may be disappointed; c'est la

20   vie.  So we'll work with defense counsel and make sure that we

21   can sort that out.

22             But, yes, I think that both of them will be about

23   Clayton Curry -- one will be maybe Clayton Curry level and the

24   other may be a little less than Clayton Curry.  Not height;

25   length.  That sounded really wrong.  I meant length of time as

1    opposed to how tall he was.  I was trying to be funny but it

2    didn't work.

3              MS. SANTILLO:  Speaking of Clayton Curry and the

4    Alloya people, we have a similar expert issue that was raised

5    in both the Magic Wrighter and in some documents that I flagged

6    that we object to with respect to the Alloya production.  There

7    are some very summary documents that were created by the people

8    at Alloya who were kind of analyzing the business of HOPE

9    Credit Union, and we believe that all those are hearsay and,

10   also, these people weren't qualified as experts, and so we have

11   objections.  And I have listed all of the exhibits that we have

12   objections to.  It's 723A, 723B, 724, 724-1, 724-2 and 725.

13             THE COURT:  And these are documents prepared by folks

14   other than the Alloya witnesses?

15             MS. SANTILLO:  Well, some of them are -- I don't know.

16   They are summary documents and it's not clear exactly who the

17   author is.  But they also are incorporating various sources.

18             MS. CHOI:  Your Honor, Ms. Santillo gave us this

19   list -- I'm just saying, we're going to talk about it, I think

20   we can resolve some of these.  I'm not complaining about the

21   timing.  I just mean, we haven't had an ability to talk to you

22   about the list -- you've given us the list, we're going to talk

23   about it -- but I think there is one thing that I want to make

24   clear for the Court, which is:  My understanding of a lot of

25   your Honor's rulings with regard to the NCUA and the original

H2NKLEB7                        Hill - direct

1    NCUA documents coming in are the prejudice to the defendants

2    because of the nature of the charges involving obstruction of

3    an examination and the imprimatur that the NCUA's name on these

4    documents may lend to certain of these conclusions.

5           I think the distinction here is:  Alloya serves as the

6    corporate credit union for HOPE.  They had reasons, that we

7    need to get into, for why they decided, I think validly, that

8    the type of transactions that HOPE was engaging in, both as to

9    process and to the volume size, were causing problems for

10   Alloya to function, ultimately led to the conclusion that they

11   could no longer function, no longer function as the settling

12   institution for HOPE.

13          A lot of these documents are actually prepared by the

14   two witnesses that we're going to call, so we do not have the

15   cross-examination concern that Ms. Santillo had raised

16   previously, but I think it's fair game for someone who, as

17   their job, for example, makes sure that they manage risk at

18   Alloya, to say, I did research, given the files that we had,

19   what we saw coming in as the corporate credit union for HOPE

20   FCU, the types of transactions, the volume of transactions, and

21   when we went to follow up with HOPE FCU about who these people

22   were or who these entities were for which they were doing these

23   transactions, we didn't have comfort with the answers that we

24   were given because they didn't comport with what we understood

25   to be true and what we had determined to be true, given what

1    we, as Alloya individuals and as people who run the corporate

2    credit union, could see from their own records.

3          So, as background, a lot of these documents, even if

4    Ms. Santillo claims that they're hearsay, were (a) created by

5    these particular individuals at issue; (b) can be certified as

6    business records because they're records that were kept in the

7    ordinary course of Alloya making these business decisions and

8    contain conclusions and the rationales reached for those

9    particular decisions; and (c) I think it would be highly

10   prejudicial if the Court were to exclude our ability to ask

11   Alloya witnesses based on what they did in their

12   day-in-and-day-out jobs in Alloya to manage their own risk and

13   to deal with their own businesses, any conclusions they reached

14   about the nature of how HOPE was operating, since HOPE had to

15   use Alloya in order to do these ACH transactions.

16          THE COURT:  Maybe I'm confused.  It seems to me that

17   you've not addressed what was the basis for the objection.

18          MS. CHOI:  Which is that it's expert?

19          THE COURT:  Yes.

20          MS. CHOI:  They're percipient witnesses.  They are

21   explaining their opinions and the conclusions that Alloya

22   reached based on their observations at Alloya.  I don't think

23   that they have specialized knowledge in the traditional sense

24   of an expert, because these were things that they saw at the

25   time and they were making those determinations.

H2NKLEB7                        Hill - direct

```
 1            Now, I don't know what the alternative would be.  I
 2   suppose that we could go through the process of having some
 3   sort of Daubert test of them, but I think, given that they've
 4   had the 3500 on these people for months, we have marked these
 5   exhibits and told them that this is the type of --
 6            THE COURT:  You're confusing me.  Now you're
 7   addressing the issue and now there's a 701 objection that's
 8   been made and I need to hear the specifics.  I think, as you
 9   describe it, as you started describing the anticipated
10   testimony, assuming a sufficient foundation can be laid,
11   et cetera, what you described sounded fine.
12            I'm not prejudging -- the objection still may be
13   available -- but you described testimony that was different
14   than the objection which went to some specific documents, which
15   Ms. Santillo said she wasn't sure whether or not these
16   individuals created them or not, and that they drew on
17   information from other sources and the like.  So there could be
18   an issue with respect to those documents.
19            But then just with respect to the testimony, you
20   switched gears to say, well, we could go through a
21   qualification process --
22            MS. CHOI:  I don't think it's necessary.
23            THE COURT:  You haven't offered them.
24            MS. CHOI:  No.
25            THE COURT:  You haven't offered it as expert
```

1    testimony?

2              MS. CHOI:  No.

3              THE COURT:  You're saying it doesn't rely on?

4              MS. CHOI:  No.

5              THE COURT:  It's within Rule 701.  You have United

6    States versus Garcia in mind, you have Bank of China in mind,

7    the Second Circuit cases --

8              MS. CHOI:  Yes.

9              THE COURT:  -- that I have in mind when I think about

10   where the line is?

11             So I'm not sure it helps to shift gears at this point

12   and say, we could go though --

13             MS. CHOI:  Right, no, let's not do that.  Withdrawn,

14   your Honor.  I think there are two separate questions, then.

15             One is whether or not a proper foundation can be laid

16   for these particular documents for which defense counsel has

17   objected.  We may just decide not to offer some of them.  But I

18   think, for the ones that we do offer, so long as we can

19   establish that they were valid business records that were made

20   at the time, by people who were knowledgeable about the

21   information and were kept in the ordinary course of Alloya's

22   business --

23             THE COURT:  That sounds like that would potentially

24   resolve a hearsay problem.

25             MS. CHOI:  Correct, your Honor.  That's what I'm

H2NKLEB7                        Hill - direct

1      thinking.

2               THE COURT:  It doesn't necessarily mean it would

3      resolve a 701 objection.

4               MS. CHOI:  Well, yes.  And I think the 701 objection,

5      again, I don't expect them to start opining writ large about

6      the Bank Secrecy Act except to give general background about

7      what OFAC is, what BSA is and how it relates to their jobs at

8      Alloya.  They will opine -- not opine but give statements about

9      what Alloya's position was when Mr. Gross made representations

10     about the nature of these transactions and why they did not

11     ultimately decide that it was safe and sound for Alloya or,

12     from their perspective, from their business perspective, to

13     allow for these transactions to continue.

14               So it gives background to that November 11th letter

15     that has now been received into evidence, that shows that

16     Alloya stopped doing this.  But I don't think that any of those

17     opinions really cross the line between 701 to 702.

18               MS. SANTILLO:  Your Honor, just to be clear, I have a

19     strong objection also to the qualification of these as business

20     records, particularly in light of the way the government talks

21     about it.  This isn't a usual-course-of-business kind of thing.

22     I stipulated to a lot of Alloya business records, and these are

23     situations where they are trying to sort of analyze the

24     situation and cover a situation in a very evaluative way.  It's

25     not a routine document that is kept in the ordinary course.

1    And I think there are also kind --

2            THE COURT:  Wait.  Is the suggestion that -- there

3    might be a separate problem -- that business records can't

4    include evaluative documents?

5            MS. SANTILLO:  Well, I think they were sort of trying

6    to cover themselves a little bit, in the sense of -- I think if

7    you read the documents, it's going to be clear what my problem

8    is, because they're very robust reports that have charts and

9    graphs about the lines of HOPE's business, and it has summaries

10   of interviews, and it's a report that they're drafting.  And I

11   have an objection to that.

12           I may have some lines to draw in terms of the Bank

13   Secrecy Act and things like that, but in terms of the way that

14   she described them, just walking through what their reasoning

15   was for not doing business, I didn't see a problem with that.

16   What I'm objecting to is these reports that are in the

17   documents that I've identified.  They're hearsay, and I think

18   they do not fall within the business records exception.  That's

19   why I stipulated to lots of Alloya records under business

20   records but not this.  I told them long ago that I had this

21   objection.

22           MS. CHOI:  We understand that.  And that's we only

23   stipulated as to authenticity with regard to certain of these.

24   But I do think -- and I think we articulated this to

25   Ms. Santillo at the time -- that so that long as we lay a

1    proper foundation for these being business records, meaning how

2    was this document created, was it kept in its ordinary

3    course -- and most of these documents were created during their

4    assessment of exactly what was happening with regard to HOPE

5    FCU's ACH transactions, as part ever their jobs, as part of

6    their managing risk and setting up ACH and oversight for ACH

7    transactions within their credit union.  I think it's hard to

8    say that any document that relates to that, that may contain

9    conclusions, can no longer be a business record, so long as the

10   foundation is appropriately laid out.

11           THE COURT:  I think what would be useful, I think it's

12   helpful to identify the exactly documents.  And I do think

13   folks need to think through and look at law, evidentiary law,

14   on the questions.

15           So the objections that are anticipated to the

16   documents that Ms. Santillo said, 723A, 723B, 724-1 and 724-2

17   and 724-5 -- do I have those right, Ms. Santillo?

18           MS. SANTILLO:  723A, 723B, 724, 724-1, 724-2 and 725.

19           THE COURT:  Okay.  I think a short written briefing

20   this evening on these documents, after you've looked at it and

21   discussed it, would be useful.  I'm going to look at them but

22   I'll give you -- and this is on the hearsay and the business

23   records rule -- a Second Circuit case called Abascal,

24   A-b-a-s-c-a-l, 820 F.3d 561 (2d Cir. 2016) -- this is a

25   parenthetical description that I have, I need to look at it --

1  finding that a prison-monitoring report by a private nonprofit

2  corporation, created on the basis of questionnaires, interviews

3  and personal observations, could not be admitted as a business

4  record, in part, because the creation of the report required

5  interpreting survey results and inmate interviews and then

6  creating a summary of the findings, a process that the Circuit

7  here concluded was a far cry from the simple act of recording

8  observable information, the type of regularly conducted

9  activity envisioned by the business records exception.

10         So you'll have to address that.  Again, I have by no

11  means come to a conclusion; I'm just thinking through as I hear

12  it.

13         So it sounds like there are potential hearsay

14  objections that the government will need to address.  And then

15  there may be 701 based objections.  And, again, I have in mind

16  the United States versus Garcia and Bank of China case --

17         MS. CHOI:  Your Honor, could we get the cites for

18  that, just to make sure we have the right ones?  If they're

19  obvious, we can get them but I didn't know if you had them

20  handy.  We have Garcia.  The law people are telling me they

21  have them.

22         THE COURT:  You don't want me to be your law clerk?

23         MS. CHOI:  Well, I don't think I'll ever get a law

24  clerk but --

25         THE COURT:  Well, I happen them here.  I was reading

1    them.

2            MS. CHOI:  I wonder if you had them handy.

3            THE COURT:  United States versus Garcia is 413 F.3d

4    201 (2d Cir. 2005).  Bank of China is 359 F.3d 171, (2d Cir.

5    2004).  It's discouraging to me that you don't know those

6    cases.

7            MS. CHOI:  I don't know a lot of things,

8    unfortunately.

9            THE COURT:  You may see you have some difficulties

10   with some of this evidence.

11           MS. CHOI:  Okay.  Understood, your Honor.

12           THE COURT:  My clerk wants me to give you more

13   citations.

14           I haven't read these today.  United States versus Cuti

15   C-u-t-i, 720 F.3d 453, which is a 2013 -- I recall this one

16   now -- 2013, a Second Circuit case, and United States versus

17   Rigas, 490 F.3d 208, 2007.

18           MS. CHOI:  Those I have heard, your Honor.  I'll look

19   into it.

20           THE COURT:  I think the way to do this is:  It's the

21   defendants' objection, so you'll do a short letter brief and

22   then the government can respond to it.

23           We've got the specific documents in mind, which is

24   very helpful, so I can look at these as I consider your

25   arguments.  And there will be, I think, what's been discussed

1  as potential 701 issues around anticipated testimony but,

2  again, as you've described it, I think we're within the realm

3  of the possible, but you will need to have your relevant Second

4  Circuit law in mind and, of course, the text of the rule in

5  mind as we consider where that line should be drawn.

6         Other matters to take up, Counsel?

7         MR. KLINGEMAN:  Can I just ask a question about this

8  last matter:  Does this mean the Alloya folks are not coming

9  tomorrow?

10        MS. CHOI:  No, I think the Alloya folks are coming.

11        THE COURT:  It sounds like they'll be after?

12        MS. CHOI:  They will after Mr. Hill, I think, given

13 Mr. Creizman's scheduling.

14        MR. KLINGEMAN:  Okay.

15        THE COURT:  And we may not get through both of them in

16 their entirety, it sounds like, depending on Mr. Shin's ability

17 to not disappoint me tomorrow.

18        Anything else I can take up?

19        Do we need to talk about timing?  When will we see a

20 letter, Ms. Santillo?  No time like the present.

21        MS. SANTILLO:  I'll try to do it fast.  8:30.

22        THE COURT:  And then a couple hours after that I'll

23 hear from the government.

24        MS. CHOI:  I think we can get that to happen, your

25 Honor.

1          THE COURT:  What's that?

2          MS. CHOI:  I think we can get to that happen, your

3     Honor.

4          THE COURT:  Terrific.  I'll be up, I'll be reading.

5          If you would, cc Mr. Rosen.  As we discussed, do ECF

6     filing unless there's some reason not to, but send a courtesy

7     PDF to chambers with cc to Mr. Rosen so that it's easy for him

8     to get to me.

9          Anything else, folks?  All right, see you at 9:00.

10    Have a good night.

11          (Adjourned to February 24, 2017 at 9:00 a.m.)

12                              * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                     INDEX OF EXAMINATION
 2   Examination of:                           Page
 3   ANDREW LEVY
 4   Direct By Mr. Shin . . . . . . . . . . . . .1247
 5   Cross By Mr. Klingeman . . . . . . . . . . .1255
 6   Redirect By Mr. Shin . . . . . . . . . . . .1259
 7   RICARDO HILL
 8   Direct By Mr. Shin . . . . . . . . . . . . .1261
 9                     GOVERNMENT EXHIBITS
10   Exhibit No.                            Received
11    864   . . . . . . . . . . . . . . . . . .1249
12    2144   . . . . . . . . . . . . . . . . . .1320
13    2265   . . . . . . . . . . . . . . . . . .1321
14    2153   . . . . . . . . . . . . . . . . . .1323
15    1354-A   . . . . . . . . . . . . . . . . .1324
16    1354-B   . . . . . . . . . . . . . . . . .1326
17    2158   . . . . . . . . . . . . . . . . . .1327
18    1322   . . . . . . . . . . . . . . . . . .1328
19    1658   . . . . . . . . . . . . . . . . . .1329
20    2175   . . . . . . . . . . . . . . . . . .1330
21    2177   . . . . . . . . . . . . . . . . . .1332
22    2183   . . . . . . . . . . . . . . . . . .1334
23    1324-C   . . . . . . . . . . . . . . . . .1335
24    2180   . . . . . . . . . . . . . . . . . .1336
25    2189   . . . . . . . . . . . . . . . . . .1337
```

```
 1    2280     . . . . . . . . . . . . . . . .1338

 2    2227     . . . . . . . . . . . . . . . .1339

 3    1326-C    . . . . . . . . . . . . . . .1340

 4    1326-B    . . . . . . . . . . . . . . .1342

 5    1330-A    . . . . . . . . . . . . . . .1344

 6    2143     . . . . . . . . . . . . . . . .1346

 7    4009     . . . . . . . . . . . . . . . .1373

 8    1418-B, 2502, 2504, 2505, 2506, . . . . . .1375

 9            1418-B-T, 2502-T, 2504-T,

10            2505-T, and 2506-T

11    4500, 4501, 4502, 4504, 4505, 4506, . . . .1375

12            4507, 4508, and 4510

13    2264     . . . . . . . . . . . . . . . .1378

14    2141 and 2142   . . . . . . . . . . . . .1382

15    2164     . . . . . . . . . . . . . . . .1393

16    2166     . . . . . . . . . . . . . . . .1395

17    2169     . . . . . . . . . . . . . . . .1397

18    2170     . . . . . . . . . . . . . . . .1398

19    2171     . . . . . . . . . . . . . . . .1400

20    2176     . . . . . . . . . . . . . . . .1402

21    2182     . . . . . . . . . . . . . . . .1402

22    1427-D    . . . . . . . . . . . . . . .1410

23    2155     . . . . . . . . . . . . . . . .1411

24    2168     . . . . . . . . . . . . . . . .1414

25    2178-A    . . . . . . . . . . . . . . .1415
```

1    2190      . . . . . . . . . . . . . . . . . .1416

2    2192      . . . . . . . . . . . . . . . . . .1418

3    2207      . . . . . . . . . . . . . . . . . .1422

4    2215      . . . . . . . . . . . . . . . . . .1423

5    2217      . . . . . . . . . . . . . . . . . .1425

6    2277      . . . . . . . . . . . . . . . . . .1426

7    2228      . . . . . . . . . . . . . . . . . .1429

8    2266      . . . . . . . . . . . . . . . . . .1442

9    1252-A    . . . . . . . . . . . . . . . . . .1445

10   2268      . . . . . . . . . . . . . . . . . .1446

11   1249      . . . . . . . . . . . . . . . . . .1449

12   2267      . . . . . . . . . . . . . . . . . .1449

13   2269      . . . . . . . . . . . . . . . . . .1451

14   2613      . . . . . . . . . . . . . . . . . .1452

15

16

17

18

19

20

21

22

23

24

25