H2OKLEB1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

              v.                         15 Cr. 769 (AJN)

YURI LEBEDEV and TREVON GROSS,

                 Defendants.            Jury Trial

------------------------------x

                                        New York, N.Y.
                                        February 24, 2017
                                        9:15 a.m.


Before:

                    HON. ALISON J. NATHAN,

                                        District Judge
                                        And A Jury

                          APPEARANCES

PREET BHARARA
      United States Attorney for the
      Southern District of New York
BY:   EUN YOUNG CHOI
      DANIEL S. NOBLE
      WON S. SHIN
      MICHAEL CHANG-FRIEDEN, Paralegal
      EMILY GRANT, Paralegal
      Assistant United States Attorneys

CREIZMAN, PLLC
      Attorneys for Defendant Yuri Lebedev
BY:   ERIC M. CREIZMAN
      MELISSA MADRIGAL
      JONATHAN MICHAELSON, Paralegal

KROVATIN KLINGEMAN, LLC
      Attorneys for Defendant Trevon Gross
BY:   KRISTEN M. SANTILLO
BY:   HENRY E. KLINGEMAN

H2OKLEB1

1            (In open court; jury not present)

2            THE COURT:  Matters to take up?

3            MS. CHOI:  Yes, your Honor.  This is with regard to

4    the Alloya witness.  Defense counsel has indicated there is

5    a -- well, in discovery, we had produced an audio recording

6    that Alloya had in its files regarding a September 18th

7    conversation that both of the witnesses, Ms. McDowell and

8    Mr. Kumar, were on with the defendant, Trevon Gross.  The

9    government was not going to introduce that phone call in its

10   case in chief, although obviously that conversation is the

11   subject, generally speaking -- and all conversations that

12   Mr. Gross had and interactions that Alloya had with HOPE are

13   the subject of the Alloya witnesses' testimony.

14           Defense counsel has indicated they intend to introduce

15   the entirety of the tape, I believe, or parts of the tape, as

16   evidence and would like to use that to cross-examine

17   Ms. McDowell -- at least Ms. McDowell, who will be on the stand

18   today.  We believe that from talking to defense counsel, it's

19   their intention that they would actually introduce statements,

20   audio recorded statements, of Mr. Gross for purposes of

21   cross-examination, which we would object to, both because it is

22   hearsay under Rule 802, and it would be unfairly prejudicial in

23   certain respects, depending upon what portions she intends to

24   use.

25           Obviously, I'll let her talk to the reasons why

1    Ms. Santillo wishes to introduce the audio recording, but the

2    government's position -- and I think it is in line with what

3    your Honor ruled with regard to the WhatsApp statements of

4    Ms. Wotherspoon -- obviously, if there are statements that are

5    made by that witness that are contrary to what she's stating on

6    the stand, they can impeach her, use that to impeach or

7    challenge the veracity of the testimony, but simply playing

8    portions of Trevon Gross' statements would be classic hearsay

9    under Rule 802.

10            I think also under 403, we would object because it

11   essentially is allowing the defendant's statements to come in

12   from the defense without an opportunity for us to cross-examine

13   him.

14            I don't understand, and maybe defense counsel can

15   better articulate to the Court, what the purpose would be but

16   for the truth.  The relevance only comes for the truth of what

17   Trevon Gross is saying, meaning his intentions with regard to

18   what ACH transactions he wanted the credit union to engage in,

19   and, thus, we would object on hearsay grounds.

20            THE COURT:  Just so I have a sense, I think you

21   included this in your description, the Alloya witnesses will

22   testify about those conversations?

23            MS. CHOI:  Well, in the sense that they will say --

24   yes, they will testify about interactions they had with HOPE

25   FCU, and they will testify that Mr. Gross told them that he

H2OKLEB1

1    wanted to build the ACH product in order to gain fees.  So that

2    fact, in and of itself, will come in, and obviously we're

3    allowed to elicit that fact since it is both a coconspirator

4    statement in furtherance of a conspiracy, and, also, the

5    defendant's own statements that we're admitting against him.

6    If there are contradictions with regard to what they say with

7    regard to Mr. Gross said, obviously they're allowed to

8    cross-examine her on that fact, but, A, they shouldn't be

9    allowed to cross-examine them simply by publishing or playing

10   those audio recordings.  It should be done in a proper fashion,

11   meaning they can try to impeach them with the transcript or

12   having her listen to the audio recording; and, B, if they were

13   to just play those portions of Mr. Gross' statements that were

14   not the subject of her testimony, that would be pure -- it

15   would just be for hearsay purpose.

16            THE COURT:  Okay.  Thank you.

17            MS. SANTILLO:  Good morning, your Honor.

18            THE COURT:  Good morning.

19            MS. SANTILLO:  We think that the call -- we're

20   intending to introduce it for a nonhearsay purpose, which is

21   Pastor Gross' intent and his state of mind with respect to why

22   he wanted to process ACH transactions.  That's what the

23   testimony is going to be all about.  This is a corruption case,

24   his state of mind is directly at issue, and it's a nonhearsay

25   purpose we're trying to introduce it for.

1          THE COURT:  I don't understand the nontruth purpose.

2          MS. SANTILLO:  It's for his state of mind in terms of

3     why he wanted to process ACH transactions.

4          THE COURT:  What's the relevance of that?

5          MS. SANTILLO:  They're arguing that it draws an

6     inference of corruption, that he wanted to process ACH

7     transactions.

8          THE COURT:  Right.

9          MS. SANTILLO:  And he says on the call about how this

10    is a good business plan and how, you know, he wants to be able

11    to have fees to serve the unbanked, and all of those things go

12    to his intent, and to his motive, and to his state of mind and

13    fall outside the hearsay rules.

14         THE COURT:  No.  What you're suggesting is offering

15    something for the truth of his intentions, which they're trying

16    to establish for their case, just like when a defendant -- all

17    kinds of reasons one doesn't, but any time a witness testifies

18    about what was motivating them, they're there for

19    cross-examination to confront those issues.  Out-of-court

20    statements that are being proffered precisely to counter the

21    government's efforts to establish relevant mens rea and

22    elements of the charge, you would be offering for their truth

23    and not for something other than the truth.

24         So, it sounds to me like it is classic hearsay.

25    Certainly, for impeachment, if a witness testifies that

1       Mr. Gross said something, as they may do, and you have a

2       legitimate basis to impeach that, you may do so.  That happens

3       not infrequently.  But I don't see the basis for proffering

4       out-of-court statements of Mr. Gross for the purpose of

5       rebutting a component of the government's case in chief.

6               MS. SANTILLO:  I just want to make clear, if I wasn't

7       clear, that I am relying on Rule 803, that this is a statement

8       of his then existing state of mind, such as his motive intent

9       or plan.

10              THE COURT:  But it goes to the mens rea with respect

11      to the charged conduct, correct?

12              MS. SANTILLO:  Yes.  So, it's not for the truth, it's

13      for his motive, his intent, or his plan.

14              THE COURT:  It's hearsay.

15              MS. SANTILLO:  Your Honor, I have another objection

16      with respect to the Alloya witnesses.

17              THE COURT:  Okay.

18              MS. SANTILLO:  It's a 403 argument, essentially.

19      We're able to agree that a lot of the documents they want to

20      introduce with respect to their analysis of HOPE Credit Union

21      were not admissible, and they want to introduce a chart which

22      shows the general process of ACH processing, which we have no

23      issue with the chart for the sake of the chart, but we have

24      already had testimony from Clayton Curry about ACH processing,

25      we had testimony from Rico Hill yesterday about ACH processing,

H2OKLEB1

and we're going to hear a recorded meeting today where Pastor
Gross admits that he was negligent with respect to ACH
processing.  So that's already three pieces of evidence that go
to this issue.

We think this kind of piling on about this issue about
ACH processing raises serious 403 issues because it raises
unfair prejudice, confusing the issues, misleading the jury,
undue delay, wasting time, needlessly presenting cumulative
evidence.

Mr. Gross is not charged with negligently processing
ACH transactions.  He's admitted that in a call that will come
in today.  How many witnesses have to say it?  It's not a
crime.  It's a corruption case, and I feel like we're going to
have witnesses who the government is going to put on as
teaching witnesses about this issue, two of them from the same
company who were involved in an arm's-length business
relationship with this credit union.  I anticipate that their
testimony will involve details about the credit union industry,
their assessment about whether or not it would be negligent to
do this.  I just feel like we're going to have three or four
more examiners next week that are going to talk about ACH
processing, and it's a sideshow, it's misleading, and I may be
making arguments along the way that these people are kind of
teaching witnesses about this issue, and it's just unduly
prejudicial.

H2OKLEB1

1          THE COURT:  Your specific application related to the

2     chart or to testimony?  Your 403 objection is to preclude the

3     Alloya witnesses from discussing Mr. Gross' processing of ACH

4     application?  You hear me.  What's your specific application?

5          MS. SANTILLO:  My specific application, not knowing

6     what they're going to testify about, and I'm raising it because

7     I may be making these objections during their testimony --

8          THE COURT:  I appreciate it.  I appreciate it.

9          MS. SANTILLO:  -- is that we are getting into

10    testimony yesterday where we spent --

11         THE COURT:  I understand the rationale.  I lost the

12    beginning of your request because it started with the chart,

13    and then it turned into the testimony.

14         MS. SANTILLO:  So the chart they're going to introduce

15    shows like the process, the ACH processing.

16         THE COURT:  You're objecting to that on 403 grounds?

17         MS. SANTILLO:  I'm not objecting to the chart itself,

18    but to the extent that this witness is going to be a teaching

19    witness for the jury, who is sort of somebody who is just in a

20    business relationship with HOPE.  I may be objecting along

21    those lines because if they're going to testify about their

22    expertise in the credit union industry -- they're just a

23    business partner, and so I feel like we're going to be getting

24    into issues about -- they made a determination that the HOPE

25    business model wasn't consistent with their balance sheet, what

H2OKLEB1

their business practice is, and that's fine.  But it's only so

relevant to the issues in this case.  So to go on and on and

have a witness testify for hours -- two witnesses testify for

hours about this issue, when it's already been conceded in a

tape, is just kind of piling on on an issue that is already

established in the case.

THE COURT:  All right.

MS. CHOI:  Your Honor, I think a few things:

One is, as Ms. Santillo -- I wish I had the transcript

in front of me -- stated, I believe, on the record it would be

helpful for the jury to understand context of ACH.  We don't

intend to have these people talk about nuts and bolts of ACH

transactions multiple times.  It will not be cumulative.

I will say, Ms. McDowell is going to testify first

with regard to Alloya.  I think it is necessary, and I think

because, as Ms. Santillo agrees, there is a chart, the chart

will give context to how ACH works.  It's true that there have

been references to how the ACH processing and the like, but the

jurors have not been sort of walked through the process of how

ACH works.  We intend to do that once, with one witness, and

not have it go over and over again with every Alloya witness

and every examiner.  It's just to give context to what we're

talking about.

Second, defense counsel says that, essentially,

Mr. Gross has not been charged with negligence with regard to

1    the ACH transfers.  It's the government's case that the corrupt

2    intent is established, in part, by the fact that he ran his

3    credit union in a way that would severely make out of whack the

4    capitalization ratio that's required by the NCUA.  One of the

5    ways to establish that is by the virtue of the fact that ACH

6    transactions require a certain influx of cash in order to cover

7    certain transactions, which is what was going on with regard to

8    Alloya, and that was what basically very much threw the net

9    worth ratio of the credit union to below 7 percent, which is

10   what is required under ACH, and that the credit union lied to

11   the NCUA about the true nature, the true capitalization ratio,

12   in various statements.

13         So, it goes to the heart of the fact that they were

14   lying to the regulators in order to hide the fact that these

15   ACH transactions and the millions of dollars by which they were

16   processing through their credit union using Alloya caused a

17   huge impact to their balance sheet, and we will establish that

18   they made false representations to the NCUA as a result.

19         Alloya is necessary to explain that, because it's the

20   Alloya documents that show the flows of money in and out.

21   Alloya served as the credit union, the corporate credit union,

22   to HOPE.  So, that's why we need to call them, to establish

23   those facts about the true nature of how much cash was being

24   held by the credit union, by HOPE FCU, at Alloya and the amount

25   of wires that were going in and out of their account.

H2OKLEB1

1          That's why it goes to the heart of the corrupt intent

2     situation and false statements that were made to the NCUA,

3     because Alloya knows, and Alloya can establish, through its own

4     records, what exactly was going on with regard to the balance

5     sheet at HOPE FCU.

6          But putting that aside, we're not intending, and we're

7     very cognizant, of not having witnesses talk at great length in

8     a cumulative fashion.  Ms. McDowell has a very different

9     perspective than Mr. Kumar, and Ms. McDowell's perspective from

10    the ACH situation is with regard to the volume of ACH

11    transactions that caused her concern and capitalization ratio.

12    So, she will testify as to those two particular concerns that

13    Alloya had that they discussed with Mr. Gross.

14          Mr. Kumar is a BSA, AML risk compliance individual.

15    So he will talk about the third issue that Alloya had with

16    regard to these issues, which is sort of in line with the

17    volume, the fact that there were no processes in place at HOPE

18    FCU, as Alloya would expect their member credit union to have

19    when they're engaging in international ACH transactions at the

20    volume in which they were having.

21          And there will be a little overlap in the sense that

22    just to compete the story, it wasn't like this person had two

23    conclusions, and this other guy had this other conclusion, but

24    we're not going to go into depth and cover the same bases with

25    both of those witnesses.  They're very distinct.

H2OKLEB1

```
 1              In that sense, I think it is also distinct from the
 2     standpoint of the NCUA witnesses, who will not, again, go into
 3     the nuts and bolts of the ACH, but just limit their testimony
 4     to what they saw with regard to the ACH transactions and what
 5     they were told by HOPE FCU.  And I think, given that division
 6     of labor, it's very hard to say -- and obviously your Honor can
 7     rule if you see that it's becoming cumulative with witness
 8     three or four with regard to ACH transactions, your Honor can
 9     obviously rule at that time that it's cumulative, but we have
10     been very cognizant and mindful of trying to keep testimony in
11     ways that would not be cumulative.  I think the Alloya
12     testimony is material, and important, and unique as compared to
13     the other witnesses that we've seen to date.
14              THE COURT:  All right.  I understand the arguments.
15     I'll give you some room to make the points.  I certainly hear
16     clarity of relevance with respect to the NCUA obstruction
17     point, and if 403 objections are made during testimony, I'll
18     rule with your arguments in mind.
19              MS. CHOI:  Thank you, your Honor.  Appreciate that.
20              THE COURT:  Anything else I can take up?
21              MS. SANTILLO:  I don't think so.
22              MS. CHOI:  Not at this time.  I think just to give
23     your Honor an update:  We're going to try to work out a
24     stipulation with regard to the PNC Bank witness.  Defense
25     counsel and I, and Mr. Noble, and Mr. Shin will try to see if
```

H2OKLEB1

1   there are any other witnesses, over lunch, and try to finalize

2   if there are any other people that sort of fit in the category

3   that Mr. Klingeman had identified yesterday.

4           THE COURT:  Great.  Thank you.

5           MS. SANTILLO:  Your Honor, with respect to your ruling

6   on the phone call, we would like to have a copy of the

7   transcript introduced into evidence for the record, in case of

8   appeal.

9           THE COURT:  Oh, that's fine.  You can mark it.

10          MS. SANTILLO:  I'm sorry, into the record, marked as

11  an exhibit.

12          THE COURT:  I'm sorry?

13          MR. KLINGEMAN:  Not into evidence.

14          MS. SANTILLO:  Not into evidence.

15          MR. KLINGEMAN:  She said for the record.

16          THE COURT:  Identify it.

17          MS. CHOI:  I don't have a problem with it.  Can I just

18  read your version of the transcript, just in case there are any

19  facts before we mark it and put it in?  Not put it in, but mark

20  it for the record.

21          THE COURT:  And, of course, for purposes of

22  cross-examination, I presume with these skilled lawyers, they

23  know how to do it, but they can look at the transcript, and if

24  there's anything that they think cross-examination would

25  require for context or for impeachment directly, they can get

1   up -- do the Alloya witnesses know the conversation was

2   recorded?

3           MS. CHOI:  Yes, because they recorded it.  So --

4           THE COURT:  They can ask you're aware that that was

5   recorded, correct?  Yes.  And earlier you said that Mr. Gross

6   said X, but didn't he also say but not X, right?  That's all

7   legitimate cross-examination, assuming a factual basis for

8   impeachment?

9           MS. CHOI:  Yes, so long as, again, when X and not X as

10  opposed to you testified that Trevon Gross said X, he also said

11  Y, some other --

12          THE COURT:  Well, but if that's necessary for

13  understanding the context that cast some doubt on the fullness

14  of the story the witness told, right?

15          MS. CHOI:  Right.  Yes, your Honor, for truthfulness

16  or completeness, but not a totally separate --

17          THE COURT:  Because impeachment does not have to be a

18  direct contradiction, it can be taking something out of

19  context, it could be failing to provide helpful information

20  that was provided, all of those things.

21          MS. CHOI:  Right.

22          THE COURT:  So, it seems to me, depending on how the

23  testimony goes, the defense can accomplish a lot of what they

24  might otherwise be seeking to do through just playing the tape.

25          MS. CHOI:  Right.  Understood, your Honor.

H2OKLEB1

1          THE COURT:  Counsel is asking to see the version of

2     the transcript.

3          MS. SANTILLO:  We now have dueling transcripts, and we

4     could probably agree on what a good exhibit is to put in.

5          THE COURT:  All right.

6          If it's being used for impeachment and during the

7     cross-examination, I'll want a copy, too, so I can make rulings

8     as we go.

9          We have all of our jurors.  Everybody ready?

10          I need one minute.  See you in a minute.

11          (Pause)

12          THE COURT:  We'll bring in our jury.

13          MR. SHIN:  Shall we bring in the witness, your Honor?

14          THE COURT:  Yes.  Thanks.

15          Good morning, Mr. Hill.

16          THE WITNESS:  Good morning, your Honor.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Good morning, everyone.  Please take your

3  seats.

4          Good morning, members of the jury.  Thank you again

5  for being here ready to go.  I greatly appreciate it.  I will

6  swear in Mr. Hill again because it's a new day and resume the

7  direct examination.

8          Mr. Shin, when you're ready, you may proceed.

9          MR. SHIN:  Thank you, your Honor.

10  RICARDO HILL, resumed.

11     called as a witness by the Government,

12     having previously been duly sworn, testified as follows:

13  DIRECT EXAMINATION (cont'd)

14  BY MR. SHIN:

15  Q.  Good morning, Mr. Hill.

16  A.  Good morning.

17          MR. SHIN:  Ms. Grant, would you please show the

18  witness 1352-C.

19  Q.  Do you recognize this document, Mr. Hill?

20  A.  Yes.  This is an email from Anthony to Trevon Gross and

21  myself, from August 25th of 2014.

22          MR. SHIN:  The government offers 1532-C into evidence.

23          MR. KLINGEMAN:  No objection.

24          MR. CREIZMAN:  No objection.

25          THE COURT:  Thank you.

1       1532-C is admitted.

2             (Government's Exhibit 1532-C received in evidence)

3             MR. SHIN:  Ms. Grant, could you please publish that

4   for the jury.

5   BY MR. SHIN:

6   Q.  Mr. Hill, could you please read --

7             MR. SHIN:  Ms. Grant, if you could blow up the bottom

8   half of the email, please.

9   Q.  Mr. Hill, could you please read the second email down there

10  on the screen that begins with, "Just please"?

11  A.  "Just please provide a statement showing that Collectables

12  Club has an address there for since April on the letterhead."

13            MR. SHIN:  Ms. Grant, if you could highlight the top

14  portion now.

15  Q.  And then, Mr. Hill, is there an email there from Riviera

16  Executive Center to Anthony Murgio?

17  A.  Yes.

18  Q.  And then Anthony Murgio forwards that to you and Mr. Gross?

19  A.  Yes.

20            MR. SHIN:  Ms. Grant, could you please show the

21  attachment.  And if you could zoom in on the top half.  Thank

22  you.

23  Q.  Mr. Hill, could you just read the logo on the upper

24  left-hand corner and the address underneath?

25  A.  "The Riviera" -- "the Riviera Executive Center, 216 River

1    Avenue, Lakewood, New Jersey.

2    Q.  What is the text of the letter?

3    A.  "This letter is hereby stating that the Collectables Club

4    has had an address here since April of 2014."

5    Q.  Now, Mr. Hill, are you aware of any office or location that

6    Collectables Club actually had in Lakewood, New Jersey, as of

7    April 2014?

8    A.  No, we did not.

9    Q.  Or any office of Coin.mx in Lakewood, New Jersey, as of

10   April 2014?

11   A.  No, we did not.

12   Q.  Was either Coin.mx or the Collectables Club located in

13   Lakewood any time between April and August of 2014?

14   A.  No, it was not.

15   Q.  Or as far as your understanding is, was there ever a

16   location of either of Coin.mx or Collectables Club in Lakewood?

17   A.  No, there was not.

18   Q.  And you never worked in this location; is that correct?

19   A.  That's correct, I never worked in this location.

20          MR. SHIN:  Ms. Grant, if you could please display, for

21   the witness, 1352-D.

22   Q.  Do you recognize this document, Mr. Hill?

23   A.  Yes.  This is an email from Trevon to myself and Anthony,

24   from August 26th of 2014.

25          MR. SHIN:  The government offers 1352-D into evidence.

1        MR. CREIZMAN:  No objection.

2        MR. KLINGEMAN:  No objection.

3        THE COURT:  It's admitted.

4        (Government's Exhibit 1352-D received in evidence)

5        MR. SHIN:  Ms. Grant, if you could zoom in on the top

6   half, please.

7   Q.  Mr. Hill, you were looking earlier at the entirety of the

8   first page here.  Is this a reply to the previous email we were

9   looking at?

10  A.  Yes, it is.

11  Q.  And what does Trevon Gross write at the top?

12  A.  "We will keep this if we need it.  Rico, can you make

13  certain that this is the main address and the system for

14  Collectables Club?"

15  Q.  Now, Mr. Hill, do you know what the -- what's the system

16  that's being referred to here?

17  A.  The CU Base, the HOPE Federal Credit Union system.

18  Q.  Do you know what the address was -- did you, in fact, make

19  this change?

20  A.  Yes, I made that change.

21  Q.  Do you know what the prior address was for Collectables

22  Club in the system?

23  A.  It was previously an address in West Palm Beach, Florida.

24  Q.  Are you familiar with the prior address?

25  A.  Yes.  It's an office of Mike Murgio.

H2OKLEB1                        Hill - Direct

1    Q.  Mr. Hill, the first sentence here, "We will keep this if we
2    need it," did you have an understanding of what that
3    instruction meant?
4    A.  Yes, I understood that --
5            THE COURT:  Just a moment.
6            MR. KLINGEMAN:  Sorry.  Withdrawn.
7            THE COURT:  Thank you.
8            You may proceed.
9            THE WITNESS:  As I understood it, we wanted to keep
10   that document --
11           MR. KLINGEMAN:  Objection; foundation first.
12           THE COURT:  All right.  Go ahead.
13   BY MR. SHIN:
14   Q.  Mr. Hill, did you -- that first sentence, "We will keep
15   this if we need it," did you have any further discussion with
16   either Anthony Murgio or Trevon Gross about that?
17   A.  Yes, I did.
18   Q.  And what were you told about what to do with the
19   letterhead?
20           MR. KLINGEMAN:  Objection; form.
21           MR. SHIN:  I'm sorry.
22   Q.  Who did you have discussions with about what to do with the
23   letter that we saw?
24   A.  Trevon and Anthony.
25   Q.  Both of them?

1    A.  Yes.

2    Q.  What did you understand the instruction to be with respect

3    to the letterhead?

4              MR. KLINGEMAN:  Objection.

5    Q.  Let's limit it to --

6              MR. SHIN:  I'm sorry.

7              THE COURT:  You want to state your grounds?  You may.

8              MR. KLINGEMAN:  The foundation should be confined to

9    Mr. Gross, not Mr. Murgio in the context.

10             THE COURT:  Can you rephrase?

11   BY MR. SHIN:

12   Q.  Did you have any discussion with Mr. Gross about what to do

13   with the letter that we saw previously?

14   A.  Yes.

15   Q.  And what was that instruction?  Or what was that discussion

16   with Mr. Gross?

17   A.  We needed a formal document that stated where our address

18   was located in Lakewood.

19   Q.  Did you have a discussion about where you would keep this?

20   A.  In our files at HOPE FCU.

21   Q.  And "If we need it," did you have a discussion about what

22   was meant by "If we need it," need it for what?

23   A.  If we needed it for the federal regulators, the NCUA.

24   Q.  Thank you.

25             MR. SHIN:  Ms. Grant, could you please show, just the

1   witness, 1432-F.

2   Q.  Do you recognize this document, Mr. Hill?

3   A.  Yes.  This is an email from Trevon to myself and other

4   board members, as well as Kapcharge employees, from

5   October 21st of 2014.

6              MR. SHIN:  The government offers 1432-F into evidence.

7              MR. KLINGEMAN:  No objection.

8              MR. CREIZMAN:  No objection.

9              THE COURT:  Thank you.

10             THE WITNESS:  It's admitted.

11             (Government's Exhibit 1432-F received in evidence)

12             MR. SHIN:  Ms. Grant, if you could zoom in on the

13  bottom email.  And if you could actually include the date.

14  Great.  Thank you.

15  Q.  Mr. Hill, if you could read that first paragraph of the

16  email under "Trevon."

17             And this is an email from Shoula Cohen; is that

18  correct?

19  A.  Yes, Shoula Cohen from Kapcharge.

20             "Trevon, I had a conversation with Anthony at the show

21  about the reconciliations at Alloya.  I have an issue with the

22  fact that nobody is reconciling HOPE on a daily basis.  Rico is

23  simply taking our emails and posting them quarterly.  All of

24  these entries need to be cross-referenced with Alloya on the

25  same day.  The transactions that do not belong to Kapcharge

1    also need to be identified and booked.  It is difficult for us

2    to do that type of work since we do not know what is going on

3    at HOPE and the other business that you are attending to.  We

4    are now ready to ramp up the volume, and I am concerned that

5    transactions can get lost, missed, and go unreported to our

6    customers."

7    Q.  So, Mr. Hill --

8            MR. KLINGEMAN:  Objection; 106.

9            THE COURT:  Do it on cross.

10           You may proceed, Mr. Shin.

11   Q.  Mr. Hill, did you see the reference in that last sentence

12   to "We are now ready to ramp up the volume"?

13   A.  Yes.

14   Q.  Did that, in fact, occur?

15   A.  Yes.

16   Q.  That is ramping up a volume of what, to your understanding?

17   A.  ACH transaction processing.

18   Q.  For what company?

19   A.  Kapcharge.

20   Q.  You testified to, and we saw some evidence of that

21   yesterday; is that correct?

22   A.  Yes.

23           MR. SHIN:  Ms. Grant, could you please show the

24   witness 2279.

25   Q.  Do you recognize this document, Mr. Hill?

1    A.  Yes.  This is an email from Anthony Murgio to myself,

2    Kapcharge -- or Kevin from Kapcharge and Trevon.

3              MR. SHIN:  The government offers 2279 into evidence.

4              MR. KLINGEMAN:  No objection.

5              MR. CREIZMAN:  No objection.

6              THE COURT:  Thank you.

7              It's admitted.

8              (Government's Exhibit 2279 received in evidence)

9              MR. SHIN:  If you could publish that.  Great.

10   Q.  Mr. Hill, could you please read back what Trevon Gross

11   wrote near the top of that email under "agreed"?  What did

12   Trevon Gross write on November 6, 2014, at 3:50 p.m.?

13   A.  "We cannot wait until we move to the Federal Reserve Bank.

14   If the NCUA comes in to look at our October books, they will

15   see us with less than 1 percent capitalization.  We should draw

16   up an immediate agreement that the 430K is an operational

17   grant.  We can have a side agreement that it gives them the

18   ability to operate fee-free for X" amount of years -- "for X

19   years."  Sorry.  "We cannot tie the two together because they

20   will say that only a portion of it can be realized now, and

21   we'll have to post each year of the agreement.  We need to do

22   this to show as revenue right now."

23   Q.  If you could continue through the end of the email?

24   A.  "We have to be on the same page about all of this because I

25   have been dancing with the examiner since July.  Honestly, I am

1    tired."

2    Q.  Mr. Hill, do you have an understanding of what this

3    discussion is about?

4    A.  Yes, I do.

5    Q.  Did you discuss the issues that are contained in this email

6    with Trevon Gross?

7    A.  Yes.

8    Q.  There is some dense language here.  Could you explain to

9    the jury what the issue was that was being discussed here?

10   A.  According to the amount of transactions we were processing,

11   we were well undercapitalized to do that amount.  So our plan

12   was to get Kapcharge to donate over $400,000 to put in the

13   operational account at HOPE FCU.  However, that donation needed

14   to show as income, as well as we wanted to give Kap a side

15   agreement to let them operate fee-free for donating that amount

16   of money, but at the same time, those two things couldn't be

17   tied together because the NCUA needed to see over 400K as

18   income on HOPE FCU's books.

19   Q.  There's reference here to two agreements, an immediate

20   agreement and a side agreement?

21   A.  Correct.

22   Q.  Now, was the plan for both of those agreements to be

23   available to the NCUA?

24   A.  No.  We wanted to have one agreement available for the NCUA

25   to show that we had over 400K for an operational grant and a

1    side agreement only with Kapcharge to allow them to process

2    fee-free for a certain amount of years to cover that payment.

3              MR. SHIN:  Ms. Grant, could you please display 6091,

4    already in evidence.  And if you could display the top half,

5    down through the chairman's report.  Yes, yes.

6    Q.  Mr. Hill, these are the November 15, 2014 minutes of the

7    board of directors meeting?

8    A.  Yes.

9    Q.  Were you in attendance at this meeting?

10   A.  Yes.

11   Q.  If you could just -- there's a section there, "Board

12   Members Present," correct?

13   A.  Yes.

14   Q.  And the other members present included Trevon Gross and

15   Yuri Lebedev?

16   A.  Correct.

17   Q.  Now, do you recall there being any discussion during this

18   meeting about field of membership?

19   A.  Yes.

20   Q.  And what do you recall about that discussion?

21   A.  About our field of membership being expanded to include

22   members from other parts of the nation or members who are part

23   of the Collectables Club Association.

24   Q.  Was there any discussion of concerns raised by the NCUA

25   about field of membership?

1    A.  Yes.

2    Q.  And what were those discussions?

3    A.  Because HOPE -- there were members that had bank accounts

4    at HOPE that did not live, work, or worship in Lakewood, New

5    Jersey.

6    Q.  Was there any discussion about field of membership

7    specifically about members -- about directors on the board?

8    A.  Yes.  We had multiple board members that did not live,

9    work, or worship in Lakewood, New Jersey.

10              MR. SHIN:  Ms. Grant, if you could highlight the next

11   section.

12   Q.  Could you read that first paragraph, please, Mr. Hill?

13   A.  The resolution starting?

14   Q.  Yes.

15   A.  "Resolved that in response to the DOR dated March 31st,

16   2014, the newly elected board members outside of the field of

17   membership hereby voluntarily vacate all offices held and seats

18   on the board and are moved to an advisory board status with no

19   voting rights.  Moved by G. Wyatt, seconded by B. Larkins,

20   unanimously approved."

21   Q.  Now, Mr. Hill, do you recall that occurring during this

22   board meeting?

23   A.  No, I do not.

24   Q.  So, just to be clear, this board meeting that you were

25   participating in, were any of the new board members, you or the

1   other people associated with Anthony Murgio, were any of you

2   vacated from your offices?

3   A.  No, we were not.

4            MR. SHIN:  Ms. Grant, if you could turn to the

5   signature on the next page.

6   Q.  Mr. Hill, could you remind the jury what your position was

7   on the board?

8   A.  Secretary.

9            MR. SHIN:  Sorry.  If you could zoom in, please.

10  Q.  Who signed these board minutes?

11  A.  Delores Wyatt.

12  Q.  Did you prepare these minutes?

13  A.  No, I did not.

14           MR. SHIN:  Ms. Grant, if you could please show, just

15  the witness, 1289, please.

16  Q.  Do you recognize this document?

17  A.  Yes.  This is an email from myself to Anthony Murgio, from

18  November 20th of 2014.

19           MR. SHIN:  The government offers 1289 into evidence.

20           MR. KLINGEMAN:  No objection.

21           MR. CREIZMAN:  No objection.

22           THE COURT:  Thank you.

23           It's admitted.

24           (Government's Exhibit 1289 received in evidence)

25           MR. SHIN:  Ms. Grant, if you could please publish this

1    for the jury.

2    Q.   First, Mr. Hill, what is this?

3    A.   These are my notes from the board member -- I'm sorry, the

4    board member meeting from November 15th, 2014.

5    Q.   And why were you taking these notes?

6    A.   I would take notes to prepare to write the board minutes

7    after -- after the meeting was over.

8    Q.   So did you take these calls while you were participating in

9    that November meeting?

10   A.   Yes.

11   Q.   Before we get into the body here, why are you sending these

12   notes to Anthony Murgio on November 20th?

13   A.   On this day, he was requesting multiple documents from me,

14   and this was one of the ones he asked for on that day.

15   Q.   Why was he requesting documents from you on that day?

16   A.   He was in New Jersey at the time preparing for an

17   examination by the NCUA.

18          MR. SHIN:   Ms. Grant, if you could please zoom in on

19   "Chairman report by Trevon Gross," that section.

20   Q.   And if you could please read the first several paragraphs

21   there, Mr. Hill?

22   A.   Yes.  "Chairman report by Trevon Gross:   Annual audit by

23   NCUA.   Concern raised in reference to field of membership.

24   Deal with field of membership clarification.   Document of

25   resolution.   Move board members to advisory board to be further

H2OKLEB1                         Hill - Direct

1    discussed."

2    Q.  You can stop there.

3         What do your notes reflect about the discussion

4    regarding board members and moving them to an advisory board?

5    A.  In order to address the issue about the field of

6    membership, we were discussing which board members needed to be

7    moved to an advisory board and which board members needed to

8    live or worship in New Jersey, but it was to be further

9    discussed which ones would be doing so.

10   Q.  So, was any decision made during the board meeting to move

11   any particular board member off the board onto this advisory

12   board?

13   A.  No, it wasn't.

14        MR. SHIN:  Ms. Grant, 1372, please, just for the

15   witness.

16   Q.  Do you recognize this document?

17   A.  Yes.

18   Q.  And what is it?

19   A.  This is an email from myself to Anthony Murgio about

20   Kapcharge info on November 20th, 2014.

21        MR. SHIN:  The government offers 1372 into evidence.

22        MR. CREIZMAN:  No objection.

23        MR. KLINGEMAN:  No objection.

24        THE COURT:  Thank you.

25        It's admitted.

1    (Government's Exhibit 1372 received in evidence)

2    MR. SHIN:  Ms. Grant, if you could please publish to

3  the jury.

4  Q.  Mr. Hill, first, why are you sending this email to Anthony

5  Murgio on November 20th?

6  A.  This is the same day he was requesting multiple documents

7  and info from me, and this is one of his requests, Kapcharge

8  info.

9  Q.  So, he had asked you for Kapcharge's address?

10 A.  Yes.

11 Q.  Could you please read the body of the email into the

12 record, please?

13 A.  "Kapcharge USA Inc., 216 River Avenue, Lakewood, New

14 Jersey."

15 Q.  Do you recognize that address from earlier today?

16 A.  Yes, I do.

17 Q.  Where did we see that address earlier today?

18 A.  On the documents that were Collectables Club was located.

19 Q.  That was the Riviera Executive Center letter that we looked

20 at earlier?

21 A.  Yes.

22 Q.  Are you aware whether Kapcharge USA was, in fact, located

23 at that address?

24 A.  They were not.

25 Q.  Where were they located?

H2OKLEB1                        Hill - Direct

1    A.  In Montreal, Quebec.

2           MR. SHIN:  Ms. Grant, you can take down the document,

3    please.

4    Q.  Mr. Hill, you testified yesterday about taking some

5    trainings early on about compliance issues, like BSA, SAR,

6    OFAC?

7    A.  Yes.

8    Q.  Now, while processing ACH transactions for Kapcharge, did

9    you ever check for Bank Secrecy Act violations?

10   A.  No.

11   Q.  Would you know what to check for to see if there were any

12   Bank Secrecy Act violations?

13   A.  No.

14   Q.  Did you ever file any suspicious activity reports?

15   A.  No, not at all.

16   Q.  Did you ever scrub transactions for OFAC hits?

17   A.  No.

18   Q.  Would you know how to do that?

19   A.  No.

20   Q.  Did Trevon Gross ever direct you to do those things?

21   A.  No.

22   Q.  Did there come a time, in November of 2014, when you

23   traveled to New Jersey for a meeting about HOPE Federal Credit

24   Union?

25   A.  Yes.

1    Q.  And about when was that?

2    A.  November 21st or 22nd.

3    Q.  2014?

4    A.  2014.

5    Q.  What was the purpose of this meeting?

6    A.  There was a ton of things to discuss about the board, our

7    position, the very recent NCUA examination, among other things.

8    I can't remember all, but it was a lot of topics to be

9    discussed.  We wanted to do it face to face.

10   Q.  Who attended that meeting?

11   A.  Myself, Jose Freundt, Tim Ellrich, Yuri Lebedev, Trevon

12   Gross, Anthony Murgio, Mike Murgio, Mark Chung.

13   Q.  And --

14   A.  That was it.

15   Q.  I'm sorry, I'll let you finish.

16   A.  No, that was it.

17   Q.  I don't believe the jury -- they may not have heard the

18   name Mark Chung before or it may have been a while.  Who is

19   Mark Chung?

20   A.  He's a friend and colleague of Anthony Murgio.

21   Q.  Was there anyone else from HOPE FCU other than Trevon

22   Gross?

23   A.  I remember Bernard being there for a while, but he didn't

24   attend the roundtable meeting.

25   Q.  So you referred to this roundtable meeting.  Where did the

1  meeting actually take place?

2  A.  At Hope Cathedral in their office where HOPE FCU was kept.

3          MR. SHIN:  Ms. Grant, if you could please show the

4  witness 73.

5  Q.  Do you recognize this photo?

6  A.  Yes.

7  Q.  Just, in general, what is it a photo of?

8  A.  This is a photo of the location of the meeting.  This is

9  like the office for HOPE FCU at Hope Cathedral's compound.

10          MR. SHIN:  The government offers Government Exhibit 73

11  into evidence.

12          MR. CREIZMAN:  No objection.

13          MR. KLINGEMAN:  No objection.

14          THE COURT:  Thank you.

15          It's admitted.

16          (Government's Exhibit 73 received in evidence)

17          MR. SHIN:  If you could please publish.

18  Q.  So this room was located at the church?

19  A.  Yes.

20  Q.  I think you described this earlier.  This was the office

21  for HOPE FCU?

22  A.  Yes.  And that little door is the inner office there.  This

23  is like a meeting table just outside of it.

24  Q.  Is this the table where that meeting occurred?

25  A.  Yes.

1    Q.  Now --

2             MR. SHIN:  Ms. Grant, you can take down the photo.

3    Thank you.

4    Q.  Now, was the meeting -- did it occur in one continuous

5    meeting, or was it broken up into parts?

6    A.  It was broken up into two parts.

7    Q.  So, let's break that down.  What happened in the first part

8    of the meeting?

9    A.  In the first part of the meeting, we discussed a ton of

10   topics that we came there for.  We eventually came to an

11   agreement to take complete control of the credit union and have

12   the rest of the -- well, the old board members as well as

13   Trevon step down.

14   Q.  So, this agreement involved -- were there any other

15   components of that agreement, other than what you just

16   described?

17   A.  Yes.  We were going to make our final payment to Hope

18   Cathedral and Trevon Gross, and they were resigning, and we

19   would take full control of the credit union.

20   Q.  And what were the payments?

21   A.  The payments were -- it was a final installment of $50,000

22   and also the previous two months for consulting -- for the

23   consultant pay for Trevon.

24   Q.  And how was it that you and Anthony Murgio would finally

25   take control of the credit union?

1    A.  We would have complete control of the board, and we would

2    also have the master log-in, basically the superior log-in to

3    the back end of CU Base and HOPE FCU.

4    Q.  What happened next?

5    A.  On the way out the door -- we had an agreement.  So, on the

6    way out the door, I came to learn that Anthony Murgio whispers

7    to his father, Mike, a little change in the agreement.  We had

8    agreed to make our final installment -- our final payment

9    installment, and then the board -- the old board members would

10   step down as well as Trevon.  Trevon actually heard Anthony

11   tell his father that we would not make that final payment until

12   everyone stepped down.

13   Q.  And so, just to be clear, there was a comment made by

14   Mr. Murgio with respect to the timing of those respective

15   actions?

16   A.  Yes.

17            MR. SHIN:  Ms. Grant, if you --

18            Your Honor, may we play the recording of this meeting?

19            THE COURT:  Without objection?

20            MR. KLINGEMAN:  No objection.

21            MR. CREIZMAN:  No objection.

22            THE COURT:  Go ahead.

23            MR. SHIN:  Sorry, just before we cue that up:

24   Q.  There was this comment that was made by Mr. Murgio?

25   A.  Yes.

1   Q.  That Trevon Gross --

2   A.  That Trevon overheard.

3   Q.  And then what happened?

4   A.  He angrily called everyone back into the meeting.  Half of

5   us -- half of us was outside, the other half was coming through

6   the door.  He stopped everyone and called us all back in to sit

7   back down at the table, and he let us know that we had an

8   agreement, he overheard what Anthony said, and he wanted to put

9   everything back on the table and, you know, make sure we were

10  all going to uphold our end of the bargain.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. SHIN:

2    Q.  Now, I made reference to a recording just a moment ago.

3    Mr. Hill, have you listened to this recording?

4    A.  Yes, I have.

5    Q.  And you've also looked at a transcript of it?

6    A.  Yes, I have.

7    Q.  Now, at the time of the meeting, were you aware that this

8    meeting was being recorded?

9    A.  No.

10   Q.  Had anyone announced during this meeting that this meeting

11   was being recorded?

12   A.  No.

13            MR. SHIN:  Ms. Grant, if you could please cue up the

14   recording which is Government Exhibit 2506 and also cue up the

15   transcript which is 2506-T.

16            (Audio played)

17            MR. SHIN:  Ms. Grant, if you could pause the

18   recording.

19            Your Honor, that's about halfway through.  Perhaps it

20   would be beneficial for the jury to have a stretching break at

21   this time, if your Honor would be amenable to it, given that

22   it's about halfway through the recording.

23            THE COURT:  Fine.

24            MR. SHIN:  Thank you, Judge.

25            Ms. Grant, if you could resume the recording, please.

1        (Audio played)

2            THE COURT:  All right.  We'll take our mid-morning

3    break.  Members of the jury, see you in about ten minutes.

4    Thank you.

5        (Recess)

6            THE COURT:  Mr. Hill, you may step down.

7        (Witness temporarily excused).

8            THE COURT:  Matters to take up?

9            MR. CREIZMAN:  I just want to thank your Honor for the

10    order about letting me in without my wallet.  I appreciate

11    that.  I do.

12        (Pause)

13            THE COURT:  I don't know what the answer is to my

14    question of whether there are matters to take up.  Are there?

15            MR. CREIZMAN:  No.

16            THE COURT:  How long, Mr. Shin?

17            MR. SHIN:  About 30, 40 minutes remaining, your Honor.

18    I think that still keeps us within the two hours that I had

19    described yesterday, your Honor.

20            THE COURT:  I guess that's right.  I think just in

21    total, it's so far over the original projection that I'm

22    concerned what this means for the overall estimation of the

23    time.

24            MS. CHOI:  Of the trial, your Honor?

25            THE COURT:  Yes.

1          MS. CHOI:  We're on track, your Honor.  We've cut some

2     witnesses.  We're moving it along.

3          THE COURT:  Good, because --

4          MS. CHOI:  You're concerned.  We understand that.

5          THE COURT:  I'm deeply concerned.  You had originally

6     predicted I think about a half a day for direct for this

7     witness.  Obviously, it's going to be more like a day and a

8     half, which then means whatever it means for the length

9     appropriately of the cross-examination.

10         So I'm expressing this concern so that you do keep

11    working ahead to cut because we've made some, not specific

12    promises, but some basic assurances to this jury as to how long

13    they'll be here, and when a single witness goes a day over what

14    has been predicted, it causes me concern.

15         Everything else is running smoothly so far.  Everybody

16    is showing up.  We haven't had significant sidebars, the kinds

17    of things that generally slow trials down, one juror gets stuck

18    on a train and is two hours late, those sorts of things.  If

19    we're not early, we're late, as far as I'm concerned.

20         MS. CHOI:  Just to give your Honor some comfort, we

21    have cut out witnesses.  We are narrowing the scope of the

22    documents that we're going to publish.  Hopefully we can work

23    it out with defense counsel some of these documents that we

24    would like in evidence so that we can argue from them in

25    closing that they'll stipulate that we can just get them in.

H20YLEB2                        Hill - Direct

1    We're working on that.

2            I don't think that our estimate has changed in terms

3    of the total length.  I understand that your Honor is concerned

4    because this particular witness has gone on for some time, but

5    we will make the representation that he is the most significant

6    witness that we are going to call for this period of time.

7    No one else that we're calling is even going to come close.

8            So I think we appreciate that your Honor is indulging

9    us.  We are maintaining our representation about the length of

10   this trial, and we are working with defense counsel to keep it

11   short.

12           THE COURT:  Thank you.  See you shortly.

13           (Recess)

14           (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

 1              (In open court; jury not present)

 2              THE COURT:  Matters to take up?

 3              MR. CREIZMAN:  I do believe we have some matters to

 4     take up.  There are exhibits I would like to introduce in

 5     evidence in cross-examination for nonhearsay purposes, or under

 6     the exceptions to the hearsay rule, and the government says

 7     that it is hearsay.  So I can hand up the exhibits to your

 8     Honor.

 9              THE COURT:  Great.

10              While I'm thinking of it on this point, on the Alloya

11     potential cross-examination issue that you raised,

12     Ms. Santillo --

13              MS. SANTILLO:  Yes.

14              THE COURT:  -- I think I do need to see the

15     transcript, and I want to give you the opportunity -- I'm not

16     sure of the exact timing, but I think the details of the

17     transcript -- and I'll give you an opportunity to either do a

18     brief letter-writing about it this evening or the like before I

19     come to a final conclusion on that.  Okay?

20              MS. SANTILLO:  Okay.  Do you want us to give a

21     specific version of the transcript?

22              THE COURT:  Is that witness today?

23              MS. CHOI:  Yes, your Honor.  That's fine, if you would

24     like to have -- obviously, if your Honor wants further

25     briefing.  I guess my concern is, if we get to cross of this

H2OKLEB3

1    witness, which is possible, that, obviously, that -- even if it

2    means, I guess, leaving early -- I guess I don't know the

3    logistics of this, if we get to a point where she's on cross.

4              THE COURT:  Yes, I do think there are separate

5    questions.  I think we've discussed the contours of appropriate

6    cross-examination.  So, we kind of get to the question of the

7    affirmative admissibility in the defendants' case if it's

8    something that it would be appropriate for cross-examination,

9    if there is impeachment or credibility issue with respect to

10   the witness.

11             MS. CHOI:  Oh, I see.

12             THE COURT:  I think there is a separate -- I don't

13   think it comes in initially pursuant to 106.  We've discussed,

14   as I said, how it could be handled with respect to impeachment

15   and the like.  I think there is still the question, if I

16   understood you correctly, as to whether you would be offering

17   it as part of the defendants' case; is that right?  And if it

18   were admissible as part of the defendants' case, could it come

19   in now?  Is that the suggestion?

20             MS. SANTILLO:  Yes.  I think it goes to the motive of

21   my client, and all of the processing activity needs to be

22   viewed in that context because they're talking about the

23   balance sheet, and it all needs to be understood in the context

24   of what he was trying to accomplish.

25             THE COURT:  So, you're saying it might not be sort of

H2OKLEB3

1    immediate impeachment or within the scope of cross?  I guess my

2    point is, whatever is done with it on cross; that is, to say

3    use it kind of classically as a basis for what you're asking

4    questions to paint a different story as to what the witness

5    says, you might also want to affirmatively seek to enter its

6    admission as part of the defense case?

7            MS. SANTILLO:  I think it's fair game to enter into

8    the defense case.  I think it is within the hearsay exception.

9    I also --

10           THE COURT:  But what I'm saying is that we can deal

11   with when we have time to deal with.

12           MS. SANTILLO:  But with respect to the -- obviously,

13   it depends on the direct, but I think that there is a lot of

14   reasons why it could be very relevant for impeachment purposes

15   and directly relevant to their testimony, because it goes to

16   the fundamental goal that everybody was trying to accomplish

17   here and whether it could be done at Alloya or whether it

18   needed to be done somewhere else.  And to the various

19   businesses -- for example, there are things in there that talk

20   about how credit unions are --

21           THE COURT:  I'm sorry, I don't mean to interrupt.  Let

22   me pause you.  We're certainly not going to get to this witness

23   before lunch, or the cross-examination.

24           MS. SANTILLO:  Yes.

25           THE COURT:  So, maybe the thing to do is we take it up

1    on the back end of the lunch.

2            MS. SANTILLO:  And we can give you the transcript.

3            THE COURT:  Right.

4            Or at least figure out a plan for taking it up.  I do

5    want to allow Mr. Creizman to raise issues that we have for

6    what will likely happen before lunch.  So go ahead.  I started

7    you down that path, Ms. Santillo, and we'll come back to it at

8    a more appropriate time.

9            MS. SANTILLO:  No problem.

10           MR. CREIZMAN:  Your Honor, it looks like this matter

11   has been resolved on the limiting instruction that the

12   government shall propose.  I nominate Daniel Noble to give the

13   language.

14           MR. NOBLE:  It's Mr. Shin's witness, so I'm going to

15   let him handle it.

16           THE COURT:  By designee.  Go ahead.

17           MR. SHIN:  The three emails Mr. Creizman handed up,

18   these are emails that include statements by Anthony Murgio to

19   the other Collectables Club related board members that we have

20   been hearing so much about, as well as including Mr. Lebedev.

21   So, Mr. Creizman proposes to offer these into evidence.  His

22   proffer is that these would go toward not for the truth of the

23   contents of the statements that Mr. Murgio is making in these

24   emails, but for on the effect of the listener, including

25   Mr. Lebedev, and his state of mind.  That sounds right to us,

H2OKLEB3

1     so we are proposing -- we don't object to their coming in, so

2     long as the Court --

3               THE COURT:  Limiting?

4               MR. SHIN:  Correct, your Honor.

5               So, we would propose language that when these

6     documents are admitted, an instruction that these emails are

7     not coming in for the truth of the statements made therein, but

8     for the purpose of their effect on the listener and the state

9     of mind of the listener.  Or maybe reader is the more

10    appropriate word to use instead of listener, the recipient or

11    reader.

12              THE COURT:  So, the emails would not come in for the

13    truth of the statements made therein, but for the purpose of

14    their effect on the recipient and the state of mind of the

15    recipient.

16              MR. SHIN:  Maybe limited purpose, maybe that modifier

17    could be added.

18              THE COURT:  So I'll say it again, and you just let me

19    know if you agree.

20              The emails are not coming in for the truth of the

21    statements made therein, but for the limited purpose of their

22    effect on the recipient and the state of mind of the recipient.

23              MR. CREIZMAN:  I agree.

24              THE COURT:  All right.

25              MR. SHIN:  Thank you, your Honor.

H2OKLEB3

1        THE COURT:  I suppose the government will ask me at

2   the appropriate time to provide the limiting instruction?

3        MR. SHIN:  Yes, your Honor.  I anticipate it will be

4   when Mr. Creizman offers these into evidence.

5        THE COURT:  Okay.  Thank you.

6        What else?  Mr. Klingeman?

7        MR. KLINGEMAN:  Thank you, your Honor.

8        THE COURT:  Do you have another one, Mr. Creizman?

9        MR. CREIZMAN:  Oh, no.  Thank you.

10        THE COURT:  Okay.  Mr. Klingeman.

11        MR. KLINGEMAN:  I do have at this point nine documents

12   I have marked for identification.  I will give them to the

13   government to review once the witness is tendered for cross.  I

14   assume, given the fact of the time of day, that the government

15   will have at least the opportunity over lunch to review my

16   potential exhibits and give us a chance to talk about them.

17        THE COURT:  Okay.

18        Anything else?

19        MR. SHIN:  Nothing from the government, your Honor.

20        THE COURT:  All right.  We'll bring in the jury.

21        MR. SHIN:  Shall we bring in the witness?

22        THE COURT:  Yes, please.  Thank you.

23        (Continued on next page)

24

25

H2OKLEB3

```
 1                (Jury present)
 2                THE COURT:  Thank you.  Everyone may be seated,
 3     members of the jury.
 4                Mr. Shin, you may proceed with your direct
 5     examination.
 6                MR. SHIN:  Thank you, your Honor.
 7     BY MR. SHIN:
 8     Q.  Mr. Hill, with respect to the recording we heard prior to
 9     the break --
10     A.  Yes.
11     Q.  -- you testified earlier that you were not aware at the
12     time that it was being recorded?
13     A.  That's correct.
14     Q.  Now, did there come a time, sometime subsequent to the
15     meeting, that you learned that the meeting was recorded?
16     A.  Yes.
17     Q.  Do you know who recorded it?
18     A.  Anthony Murgio.
19     Q.  Mr. Hill, in the recording, there was discussion of a
20     capital infusion.  Do you recall that?
21     A.  Yes.
22     Q.  And there were numbers thrown around, 100,000, 500,000.  Do
23     you recall that?
24     A.  Yes.
25     Q.  Is that capital infusion -- actually, let me take a step
```

1    back.

2             Do you also recall hearing about a $50,000 donation?

3    A.   That's correct, yes.

4    Q.   Are those two things the same or different?

5    A.   They're different.

6    Q.   Could you explain your understanding of what agreement was

7    reached by the end of that second part of the meeting?

8    A.   It was agreed that a number of the board members, the

9    current board members, would send in their resignations by

10   Monday.  This happened on Saturday, the 22nd.  So, by Monday, a

11   number of board members that were agreed upon would send in

12   their resignations to myself, and also on Monday, we will send

13   the final installment of our payment to Trevon and Hope

14   Cathedral, which was the $50,000.

15   Q.   Was there any other payment in addition to the $50,000,

16   that was promised?

17   A.   Yes.  There was a $6,000 payment, which was a total for the

18   last two months of consulting for Collectables Club to pay to

19   Trevon.

20   Q.   Was there an agreement reached regarding this capital

21   infusion?

22   A.   It wasn't solidified as of yet, but we knew that we had to

23   make one, but the terms of how much it would be hadn't been

24   disclosed or hadn't been settled at the moment.

25   Q.   So, Mr. Hill, what did you do after the meeting?

H2OKLEB3

1    A.  After the meeting, we left all together, and we ended up at

2    Anthony Murgio's aunt's house.  She lived in Lakewood.

3    Q.  When you say that you all went together, who are the

4    individuals who went to Mr. Murgio's aunt's house?

5    A.  Myself, Jose Freundt, Tim Ellrich, Yuri Lebedev, Mark

6    Chung, Mike Murgio, Anthony Murgio, we all met there.

7    Q.  Did Mr. Gross accompany you there?

8    A.  No.

9    Q.  Do you recall the name of the aunt?

10   A.  I don't remember her name.

11   Q.  Were there any other occupants of that home?

12   A.  Yes.  There was a gentleman, also, that lived there, but I

13   don't remember his name.

14   Q.  Now, did Collectables Club or Coin.mx have an office in

15   that home?

16   A.  No.

17   Q.  Did it operate its business there?

18   A.  No.

19   Q.  So, subsequent to the meeting, did you, in fact, receive

20   any of the resignations that were promised?

21   A.  Yes, I did.  I received resignation emails from three

22   different board members.

23   Q.  When did you receive those?

24   A.  I received two that night and one the following morning.

25          MR. SHIN:  Ms. Grant, could you please display, for

H2OKLEB3

1  the witness, in sequence, Government Exhibits 2245, 2246, and

2  2247.

3  Q.  Mr. Hill, did you get a chance to look at those three

4  documents?

5  A.  Yes.

6  Q.  Do you recognize them?

7  A.  Yes, I do.

8  Q.  What are they?

9  A.  They were emails from the number of board members that was

10  sending in their resignations.  The final one was actually

11  forwarded to me from -- Trevon forwarded it to me from the last

12  board member who sent in the resignation.

13         MR. SHIN:  The government offers 2245, 2246, and 2247

14  into evidence.

15         MR. KLINGEMAN:  No objection.

16         MR. CREIZMAN:  No objection.

17         THE COURT:  Thank you.

18         They're admitted.

19         (Government's Exhibits 2245, 2246, and 2247 received

20  in evidence)

21         MR. SHIN:  Could you publish, Ms. Grant, 2244 and 2245

22  and publish to the jury, please.

23  Q.  So, Mr. Hill, whose resignation is reflected on this email?

24  A.  Joseph Lane.

25         MR. SHIN:  2246, please.

1  Q.  And whose resignation is reflected here?

2  A.  Marvin Purry.

3          MR. SHIN:  And 2247, please.

4  Q.  And who is resigning in this email?

5  A.  Bernard Larkins.

6  Q.  As you noted earlier, this resignation, unlike the others,

7  was sent to Mr. Gross and then forwarded to you?

8  A.  Yes.

9  Q.  Now, were the promised final payments made to Mr. Gross?

10 A.  The 6,000 for the last two months of consulting was made in

11 a timely manner; however, the 50K installment to Trevon and

12 Hope Cathedral, it was not done on time.

13         MR. SHIN:  Ms. Grant, if you could publish 1330-A,

14 already in evidence.

15 Q.  Mr. Hill, this email subject, "Trevon pay," does this

16 reflect that $6,000 payment?

17 A.  Yes.

18 Q.  And the money is being sent to what institution there?

19 A.  To United Advantage Northwest FCU.

20 Q.  Do you know who controlled that account?

21 A.  Trevon Gross.

22         MR. SHIN:  Ms. Grant, if you could publish 4507,

23 already in evidence, the Rico 101 WhatsApp, please.  If you

24 could scroll down to line 7836, please.

25 Q.  Mr. Hill, could you read what Anthony Murgio wrote to you?

H2OKLEB3

A.  "Hey.  Can you ask Trevon to look for the 50K we sent and make sure that it's credited to our account?  Let him know that for some reason, you don't have access anymore."

MR. SHIN:  Ms. Grant, if you could scroll down to 7923, please.

Q.  Could you read what you wrote in 7923?

A.  "Trevon says he will check on wire when he gets to his computer."

MR. SHIN:  Ms. Grant, if you could scroll to 7948, please.

MR. KLINGEMAN:  I'm sorry, what number?

MR. SHIN:  7948.

Q.  Mr. Hill, if you could read 7948 and 7950, please.  First, 7948, what Mr. Murgio wrote.

A.  "But there was some little issue with the beneficiary names, so they had to change that.  We put 'Northwest Credit Union' instead of 'Helping Other People Excel' with further, and then we did future credit, too, so they're not sure if it's hit yet or not.  It left the Citibank account, and it should be sitting in Northwest."

Then I reply:  "He's going to check and let me know ASAP."

Q.  Who are you referring to there when you wrote that "he is going to check"?

A.  Trevon.

1    Q.  So, Mr. Hill, the $50,000 payment was attempted to be made?

2    A.  It was, but it was well after the date we agreed upon.

3    Q.  Do you know whether the money went through, the 50,000?

4    A.  I remember that the wire was returned.

5    Q.  Do you know what the cause was of the return?

6    A.  Either because we didn't address it correctly or it was

7    rejected, but I don't remember which one.

8            MR. SHIN:  You can take down the exhibit, please.

9    Thank you.

10   Q.  So, did you speak with Trevon Gross after meeting?

11   A.  I didn't speak with him, but I reached out multiple times.

12   I called, text, or WhatsApp, but days later, he replied to me

13   via text.

14   Q.  What did he say?

15   A.  He let me know that he wouldn't be negotiating with us

16   anymore, that we should not try to wire funds into the credit

17   union anymore, basically that we were done.

18   Q.  Now, did you and the other members of the board affiliated

19   with Coin.mx and the Collectables Club, did you keep control of

20   HOPE Credit Union?

21   A.  Yes, but only for a few more days.

22   Q.  And then what happened?

23   A.  We couldn't log in anymore.  We couldn't access our regular

24   accounts.  I could not log into the back end.  Our account SS

25   had been restricted.  The first couple of days, the account

H2OKLEB3

1    access had been restricted, I could only do a number of things,

2    and then I noticed maybe a day later, that I couldn't get in at

3    all.

4            MR. SHIN:  Ms. Grant, if you could show the witness

5    2251.

6    Q.  Do you recognize that document?

7    A.  Yes.  This is an email from myself to Trevon on

8    November 25th.

9            MR. SHIN:  The government offers 2251 into evidence.

10           MR. CREIZMAN:  No objection.

11           MR. KLINGEMAN:  No objection.

12           THE COURT:  Thank you.

13           It's admitted.

14           (Government's Exhibit 2251 received in evidence)

15           MR. SHIN:  Ms. Grant, could you could please publish.

16   Q.  Mr. Hill, could you just generally describe what the

17   contents of this email are?

18   A.  This is a formal request to Trevon requesting a special

19   board meeting being held on a specific date, which was

20   November 25th of 2014, stating that we would all be on the

21   call.  If we couldn't show up in person, we would attend via

22   our call-in number that we used.  And it also stated that if we

23   didn't hear back from him by a certain time on that date, I

24   would request that our vice chairman, Yuri Lebedev, would call

25   that meeting.

1    Q.  Why did you send this email to Trevon Gross?

2    A.  This is just after we had been locked out of our accounts.

3    So Anthony Murgio and Mike Murgio drafted this theme and asked

4    that all our board members from Collectables Club all

5    individually send it to Trevon.

6            MR. SHIN:  Ms. Grant, 2252 for the witness, please.

7    Q.  Do you recognize this document, Mr. Hill?

8    A.  Yes.  This is the email from Trevon to all of the

9    Collectables Club board members, myself, Yuri, Chad, Kevin,

10   Jose, all of us who sent in a request to him.  This is his

11   reply.

12           MR. SHIN:  The government offers 2252 into evidence.

13           MR. CREIZMAN:  No objection.

14           MR. KLINGEMAN:  No objection.

15           THE COURT:  It's admitted.

16           (Government's Exhibit 2252 received in evidence)

17   Q.  Could you please read --

18           MR. SHIN:  Oh, Ms. Grant, if you could publish it.

19   Q.  Mr. Hill, if you could please read Mr. Gross' response?

20   A.  "To all:  I have received your multiple requests for a

21   special board meeting.  Unfortunately, as all of you are aware,

22   as nonmembers of the credit union, you have no standing on the

23   board to request a board meeting.  Thank you."

24   Q.  I'm sorry, what's making you laugh there?

25   A.  This was a mess.  Like I was in the middle of this, so just

1    looking at it takes me back, and it's funny to me.

2    Q.  Mr. Hill, that --

3              MR. SHIN:  You can take down the exhibit, please.

4    Q.  Do you recall at the end of the recording that we listened

5    to, there were some questions posed to you as to whether you're

6    all right or whether you're okay?

7    A.  Yes, I remember.

8    Q.  Was something bothering you at the time?

9    A.  Yes.  I didn't want to be there.  My family was in town for

10   early Thanksgiving.  We were never able to get the dates

11   correct, so we're never able to meet like the following week

12   before Thanksgiving, and they asked me to fly up there to

13   Jersey to listen to a argument, so I was pissed.  The whole

14   time, I didn't say -- I came, I got on the plane, but I didn't

15   want to be there.  So they could tell that I was upset about

16   something.  And that's what it was.

17             MR. SHIN:  Ms. Grant, if you could put up the Rico 101

18   WhatsApp again, 4507, and scroll to 5752, please.  You need to

19   go up to 5752.

20   Q.  Mr. Hill, could you please read 5752, dated November 25,

21   2014?

22   A.  Yes.  "It seems as if I only have minimal access in CU

23   Base, so I can't get to account creation, and -- but I think I

24   just need to call CU South in the morning because my password

25   was reset and do it that way."

1          MR. SHIN:  Ms. Grant, if you could scroll to 6817.

2     Q.  Mr. Hill, if you could read that message, dated

3     November 29th, 2014?

4     A.  "We have been logged out of CU Base."

5          MR. SHIN:  You can take down that exhibit, please.

6     Q.  Mr. Hill, do you know who, if anyone, had the ability to

7     lock you out of CU Base?

8     A.  Trevon was the only one that could do so.

9          MR. SHIN:  Ms. Grant, could you please show the

10    witness 2253.

11    Q.  Do you recognize this document?

12    A.  Yes.  This is an email from Yuri Lebedev to all the

13    Collectables Club board members and the HOPE FCU board members.

14         MR. SHIN:  The government offers 2253 into evidence.

15         MR. CREIZMAN:  No objection.

16         MR. KLINGEMAN:  No objection.

17         THE COURT:  It's admitted.

18         (Government's Exhibit 2253 received in evidence)

19         MR. SHIN:  Ms. Grant, could you please publish to the

20    jury.

21    Q.  Mr. Hill, what did you understand this message to mean?

22    A.  This was another request for a special meeting.  Yuri sent

23    it to all to let us know that we needed to be all available for

24    this meeting and that there's certain issues that are inside

25    this email.

H2OKLEB3

1  Q.  Was this email sent after Mr. Gross had rejected the

2  request for a special meeting?

3  A.  Yes.

4  Q.  This meeting that was proposed by Yuri Lebedev, did it end

5  up happening?

6  A.  No.

7          MR. SHIN:  Ms. Grant, you can take down the exhibit,

8  please.

9  Q.  Mr. Hill, did there come a time when you and the other

10 Murgio-affiliated board members tried to get the NCUA to help

11 you?

12 A.  Yes.

13         MR. SHIN:  Ms. Grant, could you please show --

14 actually, could you please publish 6121, already in evidence.

15 Q.  Do you recognize this letter, Mr. Hill?

16 A.  Yes, I do.

17 Q.  What is it?

18 A.  This is a letter that Anthony and Mike Murgio crafted to

19 send to the NCUA.  I'm sure that I signed this letter.

20         MR. SHIN:  In fact, Ms. Grant, if you could turn to

21 page 2.

22 Q.  Is that your signature there?

23 A.  Yes, it is.

24 Q.  Could you please read who the other signatories are?

25 A.  Tim Ellrich and Yuri Lebedev.

1          MR. SHIN:  Ms. Grant, if you could return to page 1,

2     please.  And if you could highlight the bottom portion of the

3     page.

4     Q.  Could you please read that first statement there, "We are

5     all members"?

6     A.  Yes.  "We are all members of an association headquartered

7     in Lakewood, New Jersey, and based on the rules, are eligible

8     for membership as voter members of the Helping Other People

9     Excel Federal Credit Union.  Therefore, we respectfully request

10    you take the following action."

11    Q.  Okay.

12         MR. SHIN:  Ms. Grant, if you could flip to the second

13    page, please.  If you could highlight the bottom portion of the

14    page.

15    Q.  In the bottom of that highlight, what's the organization

16    and address listed there?

17    A.  Collectables Club Private Member Association, C/O Frank

18    Oswald, 10 La Quinta Drive, Lakewood, New Jersey.

19    Q.  So, where we had read on the first page, "We are all

20    members of an association headquartered in Lakewood,

21    New Jersey," what association did you understand that to be

22    referring to?

23    A.  Collectables Club.  However, we were not headquartered in

24    New Jersey.

25    Q.  Where were you headquartered?

H2OKLEB3

1   A.  In Tallahassee, Florida.

2   Q.  Even as of this date, as of the date of this letter,

3   January 7, 2015, did Collectables Club have any operations in

4   Lakewood, New Jersey?

5   A.  No.

6   Q.  Or any presence there at all?

7   A.  None at all.

8   Q.  This address here, care of Frank Oswald, do you know who

9   that is?

10  A.  I don't remember -- I recognize that name, but I just don't

11  remember who...

12  Q.  That's fine.  Okay.

13          What about the address there, do you recognize that

14  address?

15  A.  I recognize the address, yes.

16  Q.  How do you recognize that address?

17  A.  From Anthony Murgio's aunt's house.  I remember copying it

18  to Google to get back to it when running to the store.

19  Q.  And this is the aunt's house that you went to after the big

20  meeting in November?

21  A.  Yes.

22  Q.  Mr. Hill, was this letter, in fact, sent to the NCUA?

23  A.  Yes.

24  Q.  Did the NCUA help you take back control of HOPE Federal

25  Credit Union?

1    A.  No.

2            MR. SHIN:  Ms. Grant, if you could take down the

3    exhibit.

4    Q.  After Anthony Murgio, and you, and the other board members

5    lost control of the HOPE Federal Credit Union, do you know one

6    way or the other whether Kapcharge continued to run ACH

7    transactions through HOPE Federal Credit Union?

8    A.  No, I don't know.

9    Q.  Did you have any further discussions with Anthony Murgio

10   about gaining control of another credit union?

11   A.  Yes.  He mentioned trying to find another credit union for

12   us to take control of.

13           MR. SHIN:  Ms. Grant, if you could show the witness

14   2284.

15   Q.  Do you recognize this document, Mr. Hill?

16   A.  Yes.  An email from Anthony to myself and the other

17   Collectables Club members.

18           MR. SHIN:  The government offers 2284 into evidence.

19           MR. KLINGEMAN:  No objection.

20           MR. CREIZMAN:  No objection.

21           THE COURT:  It's admitted.  Thank you.

22           (Government's Exhibit 2284 received in evidence)

23           MR. SHIN:  If you could please publish that for the

24   jury.

25   Q.  Mr. Hill, if you could please read the recipients of the

1    email?

2    A.  Tim Ellrich, Yuri Lebedev, myself, Michael Murgio, and Jose

3    Freundt.

4    Q.  Is this what you were referring to earlier about

5    discussions about taking over another credit union?

6    A.  Yes.

7            MR. SHIN:  You can take down the exhibit, please,

8    Ms. Grant.

9    Q.  Mr. Hill, are you familiar with something called the

10   eCommerce Private Membership Association?

11   A.  Yes, I am.

12   Q.  What is that?

13   A.  That was another attempt to create a branchless online-only

14   credit union or bank.

15   Q.  Attempt by whom?

16   A.  By Anthony Murgio and Yuri Lebedev.

17   Q.  Were others involved?

18   A.  There was going to be -- they was going to ask the same

19   people who was on the board with us to be a part of it.

20   Q.  And you were involved in those discussions?

21   A.  Yes.

22           MR. SHIN:  Ms. Grant, if you could show the witness

23   2287.

24   Q.  Do you recognize this document?

25   A.  Yes.  This is an email from Michael Murgio to all of us.

H2OKLEB3

1    Jose, Tim, Yuri, Chad, Mark Chung is on here, and even Joseph

2    Murgio.

3    Q.  The email is dated January 13, 2015?

4    A.  Yes.

5             MR. SHIN:  The government offers 2287 into evidence.

6             MR. KLINGEMAN:  No objection.

7             MR. CREIZMAN:  No objection.

8             THE COURT:  Thank you.

9             It's admitted.

10            (Government's Exhibit 2287 received in evidence)

11            MR. SHIN:  Ms. Grant, if you could publish and

12   highlight the top half of the people.

13   Q.  Mr. Hill, is this -- the subject here is "New credit

14   union"; is that correct?

15   A.  Yes.

16   Q.  And the recipients include yourself, Jose Freundt, and Yuri

17   Lebedev, among others?

18   A.  Yes.

19   Q.  If you could just read that first paragraph, please.

20   A.  "As you know, we will be forming a new credit union.  Our

21   tentative thoughts on name is eCommerce Federal Credit Union.

22   The first step is to name the seven subscribers, the SU.  As a

23   subscriber of the people who are starting the credit union and

24   the NCUA chartering application" -- "and the NCUA chartering

25   application guide, subscribers are advised to begin the

H2OKLEB3

1    chartering process by doing some research.  Many of you already

2    have knowledge from working with HOPE."

3    Q.  You can stop there.

4    A.  Oh.

5    Q.  Were you involved in other discussions -- in addition to

6    receiving this email, were you involved in other discussions

7    about this eCommerce-related credit union?

8    A.  From what I remember, it didn't go much further than this.

9         MR. SHIN:  You can take the exhibit down, please,

10   Ms. Grant.

11   Q.  Now, Mr. Hill, during the entire HOPE FCU period that we

12   heard from in your testimony --

13   A.  Yes.

14   Q.  -- were you also still working at Coin.mx?

15   A.  Yes.

16   Q.  When did you stop working there?

17   A.  About May or June of 2015.

18   Q.  During that period, during the entire period even when you

19   were working at HOPE and then through May of 2015, were you

20   continuing to engage in the activities and work that you had

21   described earlier in your testimony?

22   A.  Yes.

23        MR. SHIN:  One moment, your Honor?

24        THE COURT:  Okay.

25        (Pause)

H2OKLEB3                          Hill - Cross

1            MR. SHIN:  No further questions, your Honor.

2            THE COURT:  Thank you.

3            Mr. Creizman?

4            MR. CREIZMAN:  Yes, your Honor.

5            May I proceed, your Honor?

6            THE COURT:  You may.  Thank you.

7            MR. CREIZMAN:  Thank you.

8    CROSS-EXAMINATION

9    BY MR. CREIZMAN:

10   Q.  Good afternoon.

11   A.  How are you?

12   Q.  Okay.

13            You were in prison for eight and a half years; is that

14   right?

15   A.  That's correct.

16   Q.  And that was from when you were 18 years old to 26?

17   A.  That's correct.

18   Q.  And now you're 38 years old?

19   A.  Yes.

20   Q.  So, basically, a third of your life has been spent in -- a

21   third of your adult life has been spent in prison?

22   A.  Yes.

23   Q.  And you missed out on an important part of your life, true?

24   A.  Yes, I agree.

25   Q.  Young adulthood?

1   A.  Right.

2   Q.  Fair to say?

3   A.  Yes.

4   Q.  College?

5   A.  Yes.

6   Q.  And you had to go through some hardships that no one in

7   this courtroom could understand; is that right?

8   A.  Not unless you've been to prison.

9   Q.  What's that?

10  A.  Not unless you've been to prison.

11  Q.  Right.  Not unless you've been in prison.

12          And when you finally were released from prison, you

13  were determined to turn your life around; is that right?

14  A.  Yes.

15  Q.  You didn't want to go back to prison again?

16  A.  That's correct.

17  Q.  And you were determined to make the right choices; isn't

18  that true?

19  A.  Yes.

20  Q.  And you wanted to make something of yourself, true?

21  A.  Did I want to make something of myself?

22  Q.  Yes.

23  A.  I wanted to get a job and be a normal citizen.

24  Q.  You wanted to be a productive member of society?

25  A.  Yes.

1  Q.  Because you had the ability to do it, right?

2  A.  Yes.

3  Q.  You pick up on concepts quickly; isn't that right?

4  A.  Usually, if I'm interested.

5  Q.  You have a good work ethic?

6  A.  Yes.

7  Q.  And you don't want to spend the rest of your life in

8  prison, true?

9  A.  No one does.

10  Q.  Now, when you got out of prison, you attended a technical

11  school; is that right?

12  A.  Yes, I did.

13  Q.  ITT Tech?

14  A.  That's correct.

15  Q.  You studied computers?

16  A.  That's correct.

17  Q.  And you found a job as a waiter?

18  A.  Yes.

19  Q.  In Tallahassee, correct?

20  A.  Yes.

21  Q.  It was a popular restaurant?

22  A.  Yes, very.

23  Q.  101?

24  A.  Yes, that's correct.

25  Q.  That's Anthony Murgio's restaurant?

```
 1   A.  Yes, that's the restaurant he owned.
 2   Q.  And it's not easy to get a job as a convicted felon; fair
 3   to say?
 4   A.  That's correct.
 5   Q.  So you were grateful to Mr. Murgio?
 6   A.  For?
 7   Q.  For giving you the job?
 8   A.  He didn't actually hire me.  He was the owner.  I was hired
 9   by the GM of the restaurant.
10   Q.  Well, you were happy for the opportunity; isn't that true?
11   A.  Yes.
12   Q.  And you worked hard?
13   A.  Yes.
14   Q.  And you kept getting promoted?
15   A.  Yes.
16   Q.  And you earned those promotions?
17   A.  Yes, I did.
18   Q.  And you ultimately became the general manager of 101; isn't
19   that right?
20   A.  Yes, I did.
21   Q.  Now, at some point, Anthony Murgio left the business, 101,
22   correct?
23   A.  Yes, that's correct.
24   Q.  And there was a new owner?
25   A.  Yes.
```

1  Q.  And that new owner kept you on as manager?

2  A.  Yes, he did for a while.

3  Q.  He kept you on for six months at least, correct?

4  A.  Yes.

5  Q.  And that was because you were good at what you did, right?

6  A.  Yes.

7  Q.  Now, I want to ask you a couple of questions about when you

8  heard next from Anthony Murgio, in around 2013.  You

9  understand?

10  A.  Yes.

11  Q.  So now, late 2013, you get a message from Anthony Murgio,

12  correct?

13  A.  Yes.

14  Q.  Was it an electronic message?

15  A.  Yes.

16  Q.  Facebook?

17  A.  I believe so, or a text, yes.

18  Q.  And you hadn't heard from him in a while, fair to say?

19  A.  Yes, it had been a while.

20  Q.  And Anthony tells you he's getting back on his feet; is

21  that right?

22  A.  Yes.

23  Q.  He tells you about a new business he's starting, right?

24  A.  That's correct.

25  Q.  And it's a Bitcoin exchange business?

H2OKLEB3                              Hill - Cross

1    A.  Yes.

2    Q.  Coin.mx?

3    A.  Coin.mx.

4    Q.  And he wants you to come onboard?

5    A.  Yes.

6    Q.  And he encourages you to learn about Bitcoins, right?

7    A.  Yes.

8    Q.  And you do learn about Bitcoins, don't you?

9    A.  I do -- I did.

10   Q.  You went on some sort of online school, correct?

11   A.  Yes.

12   Q.  Khan Academy, is it called?

13   A.  Yes.

14   Q.  And while you're studying about Bitcoins on Khan Academy,

15   you also learn about money-transmitting businesses, correct?

16   A.  Yes.

17   Q.  And you learn that you need a license for a

18   money-transmitting business, correct?

19   A.  I don't remember, but I'm sure it was part of the training.

20   Q.  Well, you recall asking Anthony Murgio whether he had the

21   appropriate licenses for his Coin.mx business?

22   A.  Yes.  I don't know if that was in the beginning or while I

23   was working there, but I do recall asking him.

24   Q.  Do you recall him saying, of course, I wouldn't put you in

25   that position?

1    MR. SHIN:  Objection.

2    THE COURT:  State your grounds.

3    MR. SHIN:  Hearsay, your Honor.

4    MR. CREIZMAN:  Not for its truth.

5    THE COURT:  Right.  I'll overrule on that basis.

6    BY MR. CREIZMAN:

7    Q.  So, do you recall him saying, of course, I wouldn't put you

8    in that position?

9    A.  Yes.

10   Q.  He doesn't tell you to commit crimes with him, right?

11   A.  No, he doesn't.

12   Q.  And you wouldn't do that anyway, right?

13   A.  No.

14   Q.  So you took the job with Anthony?

15   A.  Yes.

16   Q.  And you weren't being paid very much; is that right?

17   A.  That's right.

18   Q.  And you weren't being paid that often, right?

19   A.  That often?

20   Q.  Meaning once a month, I think it was, correct?

21   A.  Well, that was up to me, if I wanted to be paid biweekly or

22   once a month.

23   Q.  Okay.  But you weren't even being paid on time as -- all

24   the time; isn't that right?

25   A.  That's right.

1   Q.  And the work wasn't easy?

2   A.  No, it wasn't.

3   Q.  It was pretty demanding?

4   A.  Yes.

5   Q.  Requiring some substantial office hours, correct?

6   A.  Yes.

7   Q.  And Anthony himself was not an easy boss to work for?

8   A.  No.  I had worked with him before, so I knew.

9   Q.  Right.  And you knew what you were getting into?

10  A.  Yeah.

11  Q.  He's a bit of a micromanager, fair to say?

12  A.  Absolutely.

13  Q.  Now, we can agree that there are easier ways to make money

14  than doing what you did for Mr. Murgio, right?

15  A.  Yes.

16  Q.  And, certainly, there are crimes out there that could make

17  someone more money than what you were getting for Coin.mx;

18  isn't that right?

19          MR. SHIN:  Objection, your Honor.

20          THE COURT:  Overruled.

21          You may answer.

22          THE WITNESS:  Can you repeat the question, please?

23  Q.  Certainly.

24          There were crimes that could make you more money than

25  what you were getting at Coin.mx; isn't that right?

1    A.  I don't know that for a fact.

2    Q.  Certainly crimes that would be easier way of making money

3    than Coin.mx, true?

4              MR. SHIN:  Objection, your Honor.

5              THE COURT:  Grounds?

6              MR. SHIN:  Calls for speculation, your Honor.

7              THE COURT:  Overruled.

8              THE WITNESS:  Can you repeat the question, please?

9    Q.  Certainly, there are certain crimes that can make you money

10   faster than -- I'm sorry, easier than you would have doing what

11   you were doing at Coin.mx, correct?

12   A.  I can't agree with that.  I've only made money from

13   employers paying me.  I've never made money from any of these

14   crimes you've mentioned.

15   Q.  Okay.  Now, you knew people --

16             MR. KLINGEMAN:  Can I hear the last answer?  Can we

17   have the witness speak into the microphone?

18             THE COURT:  I will.  And the statement was:  "I can't

19   agree with that.  I've only made money from employers paying

20   me.  I've never made money from any of these crimes you've

21   mentioned."

22             MR. KLINGEMAN:  Thank you.

23             THE COURT:  And I will ask, Mr. Hill, if you could

24   just keep your voice up and into the microphone.

25             THE WITNESS:  Will do.  Thank you.

 1                THE COURT:  Thank you.

 2                Go ahead.

 3                MR. CREIZMAN:  Thank you.

 4     BY MR. CREIZMAN:

 5     Q.  While you were working at Coin.mx, at the time you started

 6     working at Coin.mx, you still knew people from your days back

 7     in prison, correct?

 8     A.  No, not in my -- not in the city I lived in.

 9     Q.  No, not in the city you lived.

10                You didn't know where they were or anyone was from

11     your days in prison?

12     A.  I don't remember.

13                MR. SHIN:  Objection, your Honor.

14                THE COURT:  Overruled.

15                THE WITNESS:  I don't remember.  It was a very long

16     time ago.

17     Q.  Okay.  All right.

18                Truth is, though, that with Coin.mx, you thought this

19     was a good opportunity; is that fair to say?

20     A.  Yes.

21     Q.  And one that you would be working in legally, correct?

22     A.  Yes.

23                MR. CREIZMAN:  I'd like to show, just the witness and

24     counsel, the document marked Defense Exhibit 12 --

25                THE COURT:  All right.

H2OKLEB3                        Hill - Cross

1            MR. CREIZMAN:  -- for identification.  If I could do

2    it on the ELMO.  Is that possible?  I mean, is it possible for

3    me?  No.  But is it possible for most people?  Maybe.

4            THE COURT:  It looks like your colleague across the

5    desk is giving you assistance there.

6            MR. CREIZMAN:  Yes.  Thank you very much.

7            Thank you, Ms. Choi.

8            Can I show the witness one?  I have one for the

9    witness.

10           THE WITNESS:  I can see it.

11           MR. CREIZMAN:  Oh, you can see it?  Oh, perfect.

12   BY MR. CREIZMAN:

13   Q.  Please take a look at the exhibit and let me know if you

14   recognize it.

15   A.  Yes.  This is an email from Anthony to myself and other

16   proposed board members.

17   Q.  I'm going to move down a little bit.  I'm going to move

18   this down the page a bit.

19           Do you see that it's an email chain?

20   A.  Yes.

21   Q.  Everyone who's on the top of the email were copied on it?

22   A.  Yes.

23   Q.  I'm just going to turn to the second page.  And you see

24   that?

25   A.  Yes, I can see it.

H2OKLEB3                    Hill - Cross

1  Q.  Just going back to the -- who is the email from?

2  A.  It's from Anthony Murgio.

3  Q.  What's the email address that's listed?

4  A.  Trustee@collectPMA.com.

5  Q.  And what's the date?

6  A.  May 14, 2014.

7  Q.  Are you cc'd on the email?

8  A.  Yes, I am.

9  Q.  And your email address is 7ricos@gmail.com?

10 A.  Yes.

11 Q.  And is Yuri Lebedev also cc'd on the email?

12 A.  Yes.

13 Q.  Are some other people cc'd on the email?

14 A.  Yes.

15         MR. CREIZMAN:  Your Honor, I wish to introduce Defense

16 Exhibit 12 into evidence.

17         MR. KLINGEMAN:  No objection.

18         MR. SHIN:  No objection, your Honor, subject to the

19 limitation agreed upon.

20         THE COURT:  All right.  I'm going to admit Defendants'

21 12 for a limited purpose and give you an instruction, members

22 of the jury.

23         This email is not coming in for the truth of the

24 statements made therein, but for the limited purpose of their

25 effect on the recipient and the state of mind of the recipient.

1           With that instruction, Defense 12 is admitted.

2           (Defendants' Exhibit 12 received in evidence)

3   BY MR. CREIZMAN:

4   Q.  Now, you recall Mr. Murgio asking you to join the HOPE

5   Credit Union?

6   A.  Yes.

7   Q.  Does this email discuss the HOPE Credit Union?

8   A.  Yes.

9   Q.  I want to start at the bottom --

10          MR. SHIN:  Actually, may we publish the exhibit?

11          THE COURT:  You may.  It's published.

12          MR. CREIZMAN:  Terrific.

13  Q.  So let's look at the top of the email.  And as we can see,

14  the top of the email includes -- it's from Trustee

15  Collectables, includes Tim Ellrich, K. Pannitti -- who is K.

16  Pannitti, by the way?

17  A.  Kendra Pannitti.

18  Q.  Who is Kendra Pannitti?

19  A.  She was one of the board members from Collectables Club.

20  Q.  Did you know Ms. Pannitti?

21  A.  I didn't know her prior to Anthony introducing us with the

22  rest of these board members.

23  Q.  Did you ever meet her in person?

24  A.  No.

25  Q.  And did you know what she did for a living?

1   A.   Yeah.   I learned that she was a lawyer.

2   Q.   And Yuri Lebedev is on the email, as you said, and Jose

3   Freundt?

4   A.   Yes.

5   Q.   And Kevin Tomasso?

6   A.   Yes.

7   Q.   And these are all individuals that Mr. Murgio asked to be

8   on HOPE FCU, correct?

9   A.   Yes.

10  Q.   Now, I'm going to start from the bottom of the email, the

11  earliest email.

12       It says here, "Proposed board to be elected:   Jose

13  Freundt, trustworthy friend, CFO of 101."  Do you see that?

14  A.   Yes.

15  Q.   And "Rico Hill, manager of 101, a doer, gets things done;

16  Yuri Lebedev, technical genius, architect on many of my tech

17  projects; Kendra Pannitti, lawyer in New Jersey, frequent 101er

18  back in the day."  I assume that means that she visited the

19  restaurant?

20  A.   Yes, that's what I think that means.

21  Q.   Okay.   "Kevin Tomasso, long-time friend," website -- "web

22  developer and designer, stuck with me from beginning; and Tim

23  Ellrich, best friend since kindergarten, old 101 CFO."

24       Now, I'm going to go to the second line.   And if you

25  don't mind reading the second -- starting from here?

1  A.  Okay.  "HOPE Credit Union and many other credit unions

2  require a geographical presence in the location of their

3  headquarters.  How would this change when dealing with their

4  peer-to-peer online currency?  I assume most members will not

5  reside in Monmouth" County -- "Monmouth area of New Jersey."

6  Q.  You could stop there.

7       Do you know who asked that question?

8  A.  I think Tim -- I remember Tim asking the majority of the

9  questions.

10  Q.  And then can you continue reading?

11  A.  "Only requirement is having an account with a CU.  We will

12  be setting this up for you and placing funds in for you.  For

13  peer-to-peer, no, they will all be part of an association,

14  which will be part of the credit union.  All members of the

15  association will fall under these parameters.  Spoke with the

16  regulator about this."

17  Q.  And who is that responding?

18  A.  That's Anthony responding.

19  Q.  I'm just going to refer you to this part, where it says,

20  "For the geographical question."

21  A.  Yes.

22  Q.  Is that Anthony writing that?

23  A.  Yes.

24  Q.  And what does it say?

25  A.  "For the geographical question, we have two associations

1   that have made contributions to the church as well as setting

2   up offices within Lakewood, New Jersey.  All members that are

3   part of those associations will then be allowed to bank with

4   the CU and run for being a board member."

5   Q.  Thank you.

6          So, fair to say that Mr. Murgio was telling the group

7   that any geographical location was overcome by whatever he had

8   set up, correct?

9   A.  Yes.

10  Q.  Actually, I do want to show you one more thing from Defense

11  Exhibit 12, and I want to read the top two.

12          There's an email from Kevin Tomasso?

13  A.  Yes.

14  Q.  And he's the web developer, right?

15  A.  Yes.

16  Q.  And he asks, "Will there be any formal documentation with

17  the responsibilities and any potential liabilities, legal or

18  financial, that come with this position?  Since this is very

19  new to me, I'd like to know the finer details before anything

20  official is sworn in.  Let me know.  Thanks."

21          Could you read Anthony's answer?  Just the first

22  sentence.  I'm not going to tax you.

23  A.  Oh.  "Financial responsibility is zero.  Liability is zero

24  unless you knowingly take part in something that is illegal."

25  Q.  Okay.  Thank you.

1        MR. CREIZMAN:  Now I'd like to show the witness

2  another exhibit marked Defense Exhibit 13, and just the witness

3  and counsel only.

4  Q.  Do you see the exhibit?

5  A.  Yes, I can see this.

6  Q.  I'm just going to bring it up.

7        Do you recognize this exhibit?

8  A.  Yes.  This is an email from Anthony Murgio to myself and a

9  lot of other people on here, which includes Trevon Gross, Tim

10  Ellrich, Kevin Tomasso, Yuri Lebedev, Jose Freundt, Chad Lio.

11  Q.  And the date of the email?

12  A.  June 18, 2014.

13  Q.  Who is sending the email?

14  A.  From Anthony Murgio.

15  Q.  And what's the email address he's using?

16  A.  Amurginc@gmail.com.

17        MR. CREIZMAN:  Your Honor, may I publish this --

18  sorry, I move to admit Defense Exhibit 13.

19        MR. KLINGEMAN:  No objection.

20        MR. SHIN:  No objection, subject to the same limit

21  instruction, your Honor.

22        THE COURT:  All right.  Thank you.

23        I'll admit Defense 13.

24        And, again, ladies and gentlemen, the email is coming

25  in not for the truth of the statements made therein, but for

1     the limited purpose of their effect on the recipient and the

2     state of mind of the recipient.

3             And with that limiting instruction, Defendants' 13 is

4     admitted.

5             (Defendants' Exhibit 13 received in evidence)

6     Q.  Is it fair to say this is a list of goals that Anthony

7     Murgio is saying that he envisions the credit union to achieve?

8     A.  Yes, that's correct.

9     Q.  Number 1, "Peer-to-peer lending."  Do you see that?

10    A.  Yes.

11    Q.  "Endorse and provide banking platform for technology that

12    enables members to facilitate loans with fellow members of the

13    credit union or one of our affiliated associations.

14    Micropayments" -- I'm going to go -- there is something in

15    three, that "Endorse and provide banking platform for a system

16    to integrate digital currency is another transmission protocol

17    (Bitcoin); number 4, be the first credit union to approve and

18    issue wallets for a digital money protocol (iCoin); number 5,

19    help underbanked individuals to get a bank account, debit card

20    and loans; six, help underbanked and low-credit individuals by

21    providing them the tools they need to succeed; seven" -- I'm

22    just skipping -- "seven, provide" --

23            THE COURT:  Can you just move the document a little

24    bit, so that -- the side of it is cut off.

25            MR. CREIZMAN:  Oh, sure.

1            THE COURT:  At least on mine.  There you go.  Thank

2    you.

3            MR. CREIZMAN:  No problem.

4    BY MR. CREIZMAN:

5    Q.  -- "provide superior business and personal banking

6    services."  Then there's something about number 8 which I'm

7    going to spare everyone reading.

8            Now, do you recall reading this email?

9    A.  Yes.

10   Q.  And did you believe what Anthony Murgio was saying at the

11   time?

12   A.  Did I believe his envisions for the credit union?

13   Q.  Yes.

14   A.  Yes.

15   Q.  And it sounded pretty exciting, correct?

16   A.  Yes.

17   Q.  It sounded like something you would want to get involved

18   with, correct?

19   A.  Yes.

20   Q.  The truth is, right, that as of the date of Defense Exhibit

21   13, June 2014, you didn't think that there was anything wrong

22   or illegal about that credit union, correct?

23   A.  Did I think there was anything wrong with HOPE FCU?

24   Q.  Yes, at that time.

25   A.  No.

H2OKLEB3                          Hill - Cross

1   Q.  The truth is when -- you recall when the federal agents

2   visited your apartment, correct?

3   A.  Yes.

4   Q.  And that was, I think, March 2016?

5   A.  Yes.

6   Q.  And you remember telling them, "I was having a blast, and I

7   thought it was legit," correct?

8   A.  I don't remember exactly what I said to them.

9   Q.  I have a document that I could show you that might help

10  refresh your recollection.  Do you think --

11  A.  Is it something that I wrote?

12  Q.  No, it's nothing that you wrote.

13  A.  But I can't really be sure that I said it if I didn't write

14  it.

15  Q.  Let me ask you this:  You testified that you met with the

16  government -- and by the government, I mean the prosecutors,

17  the investigating agents -- about 12 to 15 times, correct?

18  A.  Yes.

19  Q.  Does that include the times that you met with them in

20  preparation for this testimony today?

21  A.  Yes.

22  Q.  In each of those occasions, you recall that there was an

23  agent taking notes, correct?

24  A.  Yes.

25  Q.  Of what you were saying, correct?

H2OKLEB3                        Hill - Cross

1    A.  I'm not sure what he was writing down.

2    Q.  But there was an agent taking notes?

3    A.  There was an agent taking notes.

4    Q.  If I could show you a document that you could look at might

5    help refresh your recollection, it may not, would you take a

6    look at it and see?

7    A.  I've never seen --

8              MR. SHIN:  Objection, your Honor.

9              THE COURT:  Sustained.

10   Q.  I do want to ask you some questions about when you got

11   approached by law enforcement in March of 2016.

12   A.  Okay.

13   Q.  And that was March 31st, 2016?

14   A.  I don't remember the date, but that's an approximate time

15   of year.

16   Q.  You were in your apartment?

17   A.  Yes, I was.

18   Q.  And you were living in Tallahassee?

19   A.  Yes.

20   Q.  Minding your own business?

21   A.  Kind of.

22   Q.  Okay.  You were alone?

23   A.  Yes, I was alone.

24   Q.  Okay.  No friends?

25   A.  I mean, I had a roommate at the time, but I think he was at

1    work.

2    Q.  And you hear a knock at the door?

3    A.  No.  I looked out the window, and I saw somebody passing

4    by, so I opened the door.

5    Q.  Ah, okay.  And you saw two men?

6    A.  I saw one and then another across the street to join him.

7    Q.  And they approached your apartment?

8    A.  Yes.

9    Q.  They identified themselves as FBI agents?

10   A.  Yes.

11   Q.  You weren't expecting them, fair to say?

12   A.  No, I wasn't expecting them.

13   Q.  You hadn't invited them over?

14   A.  No, I didn't call the FBI to say, oh, come into my house.

15   Q.  And they didn't tell you -- they didn't call you and tell

16   you, Ray, we're coming on over in advance, right?

17   A.  If they did, I probably would have moved.

18   Q.  Certainly not the kind of visitors you were hoping for,

19   correct?

20   A.  Yes, that's correct.

21   Q.  Now, at that time, you knew that Anthony Murgio had been

22   arrested already, right?

23   A.  Yes.

24   Q.  At least about eight to ten months before, something like

25   that?

H2OKLEB3                          Hill - Cross

1   A.   Yes.

2   Q.   And at the time, did you know what this was about?

3   A.   When they introduced themselves to me?

4   Q.   Yeah.

5           MR. SHIN:  Objection.

6           THE COURT:  The question is at the time, did you know

7   what it was about?

8           MR. CREIZMAN:  Yes, did you think -- sorry.

9           THE COURT:  Was that the question?

10          MR. CREIZMAN:  Yes.

11          THE COURT:  What's the objection?

12          MR. SHIN:  Just vague, your Honor.  I didn't

13   understand the question.

14          THE COURT:  If you would rephrase.

15          MR. CREIZMAN:  Okay.

16   BY MR. CREIZMAN:

17   Q.   When you saw the agents -- when the agents introduced

18   themselves, did you have an idea of what this was going to be

19   about?

20   A.   I don't know.  It was not until he said Anthony Murgio,

21   that I allowed them in.

22   Q.   Okay.  So you let them in?

23   A.   Yes, I let them in.

24   Q.   And they asked you some questions?

25   A.   Yes.

1    Q.  About Coin.mx?

2    A.  Yes.

3    Q.  And HOPE FCU?

4    A.  Yes.

5    Q.  And you gave them answers?

6    A.  Yes.

7    Q.  You were truthful with them?

8    A.  Yes.

9    Q.  And when they were done, they left you with a couple of

10   documents, correct?

11   A.  Yes.

12   Q.  One of them was a grand jury subpoena, correct?

13   A.  Yes.

14   Q.  Which required you to travel to New York on April 10th --

15   12th, right?

16   A.  I don't remember the date, but that's what it was.

17   Q.  And it was to testify before a grand jury, right?

18   A.  I don't remember what it said, but I was -- they left a

19   subpoena with me, yes.

20   Q.  They also left you a financial form, correct?

21   A.  No, he only left a subpoena.  I obtained the financial form

22   after being in touch with someone from the courts that helped

23   me get that document to obtain a lawyer.

24   Q.  Did they tell you to get the financial form?

25   A.  Who is "they," the agents that visited me?

1    Q.  Yes.

2    A.  No, not the agents that visited me.  I don't remember who I

3    spoke with, but it was -- it was from the courts, and they

4    asked if I can afford a lawyer.  I told them I couldn't, and

5    that's how I got that doc.

6    Q.  Okay.  So the purpose of the financial affidavit was so

7    that you could get a lawyer appointed for you?

8    A.  Yes.

9    Q.  Did the agents tell you you needed a lawyer?

10   A.  No.

11   Q.  But you felt like you needed a lawyer?

12   A.  No.  I wasn't under arrest.  They questioned me, and they

13   left.  I didn't think I needed a lawyer.  I started calling

14   about the subpoena, about, yo, I can't get to New York in

15   weeks.  So it went from there.

16   Q.  And you filled out the financial affidavit, so that you

17   could appear for the grand jury testimony?

18   A.  Yes.

19   Q.  And so that, hopefully, you could get some counsel to help

20   represent you for that?

21   A.  Yes.

22   Q.  Is it fair to say you were angry at that point?

23   A.  Angry?

24   Q.  Angry.

25   A.  No.  I hadn't been arrested.  They came -- I answered their

1    questions, and they left.

2    Q.  Not at the agents, but at Anthony Murgio?

3    A.  I was angry at Murgio while working for him, so --

4           THE COURT:  Mr. Creizman, please talk into the mic.

5           MR. CREIZMAN:  Oh, sorry.  Sorry.

6    Q.  So you were angry at Anthony Murgio while you were working

7    for him?

8    A.  Yeah.

9    Q.  This couldn't have improved the situation, right?

10   A.  That's correct.

11   Q.  And fair to say that you knew at this point you had a bit

12   of a problem on your hands?

13   A.  No, I didn't think I had a problem at all.  However, I knew

14   that being visited by the FBI and asked questions, that was an

15   issue because I worked with someone who just had been arrested

16   months ago.

17   Q.  And you felt Anthony Murgio basically brought that on you,

18   correct?

19   A.  I don't think he brought it on.  This was just confirming

20   my suspicions that I had later on throughout my tenure for

21   working with him.

22   Q.  Okay.  Fair enough.

23          Now, you remember -- let me ask it this way:  You know

24   Jen Wotherspoon, correct?

25   A.  Yes.

1    Q.  She's a friend of yours?

2    A.  Yes.

3    Q.  You've known her since the time when you were at 101,

4    correct?

5    A.  Yes.

6    Q.  She did marketing work for 101?

7    A.  Yes.

8    Q.  And you worked with her at Coin.mx, correct?

9    A.  Yes.

10   Q.  And that was day to day, you spent a lot of time with

11   Ms. Wotherspoon?

12   A.  Yes.

13   Q.  And not too long after you got approached by the agents,

14   you messaged with her about it, correct?

15   A.  Yeah.

16   Q.  You messaged with her on Facebook, right?

17   A.  Yeah.

18   Q.  You heard from her that she was approached by law

19   enforcement, too, right?

20   A.  Yes.

21   Q.  Now, during that conversation, do you recall telling her,

22   "Murgio could not fuck me over.  This court shit will ruin my

23   job opportunities"?  Do you recall that?

24   A.  Yes.  Something similar to that, yes.

25   Q.  And so you were angry at that point at Murgio because you

H2OKLEB3                    Hill - Cross

1  thought he used you?

2  A.   That's -- I wasn't angry because I thought he used me.  I

3  had a really good job opportunity, and then the agents showed,

4  and this wasn't a good time.

5  Q.   But you were saying Murgio was screwing you over?

6  A.   Because it was to the point that I thought that, you know,

7  Murgio would have let the officials know what my role was, that

8  I -- you know, I didn't start this company, I didn't create it,

9  I had a job.  But, again, I did -- again, I pled guilty to a

10  number of federal offenses, so I can't say he used me.

11  Q.   Right.  But Murgio did bring you into it?

12  A.   Yes, he brought me in.

13  Q.   And when he brought you in, you didn't think you were

14  getting involved in a whole criminal scheme?

15  A.   Of course not.

16  Q.   Right.  So you had reason to be pretty angry at the guy?

17  A.   I was angry with him while working with him.  So that

18  didn't change.

19  Q.   Understood, understood.

20          Now, you recall at one point that you asked him, are

21  we legit, is this what we're doing legit, and he answered, of

22  course, I would never put you in this position?

23  A.   Yeah, multiple times.

24  Q.   But he did put you in that position, right?

25  A.   Yeah.  He lied to me about the legitimacy of the companies

1    he had.

2    Q.  Now, a couple of days after you text with Ms. Wotherspoon,

3    you hear from Anthony Murgio's attorney, right?

4    A.  Yes.  Sometime -- yeah, that's the time frame.

5    Q.  He calls you on the phone?

6    A.  Yes.

7    Q.  Identifies himself as Anthony Murgio's attorney?

8    A.  Yes.

9    Q.  And fair to say you cursed him out and hung up?

10   A.  Yes.

11   Q.  He didn't leave you alone, though, did he?

12   A.  But I can tell his number, so I just thought -- I can see

13   the number he was calling from.  I would either not answer it

14   or blocked it.

15   Q.  Do you remember him texting you?

16   A.  Yes.

17   Q.  And he said, "I want to meet you and ask you a few

18   questions"?

19   A.  Yes.

20   Q.  And you remember telling him, "I don't see how that

21   benefits me.  Murgio shitted on us.  He never reached out to

22   say anything.  Now that I get approached by the Feds, Murgio's

23   lawyer wants to meet and talk?  What's in it for me?  Do I get

24   saved, paid, name clean?  No."  Do you remember that?

25   A.  Yeah, I do.

H2OKLEB3                          Hill - Cross

Q.  Now, you remember telling him that you're not interested,

and you could buy an interview from me for $50,000 --

A.  Yes.

Q.  -- or never contact me again?

A.  Yes.

Q.  He never contacted you again?

A.  That's correct.

Q.  Okay.  Now --

        THE COURT:  Actually, Mr. Creizman, it's 12:45.  We're

going to break now for lunch.

        MR. CREIZMAN:  That's fine.

        THE COURT:  And give the jury an hour for your lunch

break.  Enjoy, and we'll see you at 1:45.  Thank you.

        (Continued on next page)

 1            (Jury not present)

 2            THE COURT:  Mr. Hill, you may step down.

 3            (Witness temporarily excused)

 4            MS. CHOI:  Your Honor, could you just instruct the

 5     witness on when he should come back since he's on cross, and we

 6     can't talk to him?

 7            THE COURT:  Sure.

 8            Mr. Hill, you'll plan to start back with your

 9     cross-examination at 1:45.  So if you can be outside --

10            Are you meeting him outside the courtroom?

11            MR. NOBLE:  Yes.

12            MS. CHOI:  That's fine.

13            THE COURT:  So you'll have your paralegal bring him

14     in?

15            MS. CHOI:  Yes.  That's fine.

16            THE COURT:  If you would just wait outside the

17     courtroom by 1:40 --

18            THE WITNESS:  Okay.

19            THE COURT:  -- so someone can get you.

20            THE WITNESS:  Will do, your Honor.

21            THE COURT:  Thank you.  Enjoy your lunch.

22            Everyone may be seated.  I have a criminal matter in

23     my courtroom I need to attend to, so unless there's anything

24     immediately pressing, I want to make one point about the

25     recording issue and how I want to tee it up.  But anything else

1    we need to discuss before we break for lunch?

2                MR. KLINGEMAN:  I want to note for the record, I'm

3    going to hand to defense counsel for Mr. Lebedev, as well as

4    counsel for the government, the exhibits that I propose to use

5    during the cross-examination.

6                THE COURT:  Thank you very much, Mr. Klingeman.

7                So, why don't we come back by -- I'm wondering whether

8    we need more than 15 minutes, but we'll give ourselves 15

9    minutes, so that we can address any issues with respect to

10   those documents.

11               Ms. Santillo, I'm still not sure precisely what the

12   timing -- I'll take the transcript over the lunch break,

13   although, as I say, I have a criminal conference.  I do think

14   what you will need to do is identify what specific passages --

15   and I want to make sure, your argument is that there are 803

16   present-sense -- it's 803.3, right?

17               MS. SANTILLO:  Yes.

18               THE COURT:  Then existing mental state?

19               MS. SANTILLO:  Yes.

20               THE COURT:  So, looking -- I was looking at a few

21   circuit cases on this over the break, including the DiMaria

22   case, D-I-M-A-R-I-A, 727 F.2d 265, and from what you described,

23   I still think the rule was right, but I'll let you identify

24   specific passages that you want to argue fall within 803.3, and

25   then the government, with that case law in mind, can take up

H2OKLEB3                    Hill - Cross

1    with the specific passages in mind.

2               MS. CHOI:  Yes, your Honor.  I'm sorry, I just want to

3    make sure I got the citation correctly because I may have

4    misheard it.  727 F.2d 265, you said DiMaria?  Is that what you

5    said?

6               THE COURT:  That's right.

7               MS. CHOI:  Thank you, your Honor.

8               THE COURT:  And many other cases cite to that, but

9    that is a judge-friendly decision that a lot of cases rely on.

10              I do think we need to have the specific passages in

11   mind.  Again, there might be a distinction between what would

12   be appropriate on cross and what might otherwise be admissible

13   as part of the defense's case, but we can take that up.  As I

14   say, I'm not certain we need resolution at the end of the lunch

15   break, but we'll save ourselves 15 minutes to address that.

16              MS. CHOI:  Your Honor, for timing -- and I know these

17   are just approximate times, given the flux, but if we could get

18   an estimate about defense's cross?

19              THE COURT:  Mr. Creizman?

20              MR. CREIZMAN:  I don't think it's going to be that

21   much longer.

22              THE COURT:  Now that you've mastered the ELMO.

23              MR. CREIZMAN:  Yes.  And if your Honor lets me

24   cross-examine about El GUAPLLE, then I will cut it by 30

25   minutes.

H2OKLEB3

1          MS. CHOI:  She doesn't get the joke.

2          MR. NOBLE:  That is a Three Amigos reference.

3          THE COURT:  I thought it was a server joke.

4          MR. CREIZMAN:  That, too.

5          THE COURT:  I didn't get that.

6          MR. CREIZMAN:  I don't think it's going to be more

7     than an hour, and I think probably a half hour.

8          THE COURT:  And, Mr. Klingeman, you can give us a

9     range if you're scared of me.

10          MR. KLINGEMAN:  I'm up in the air.

11          I am going to guesstimate one to two hours.

12          THE COURT:  Okay.

13          MR. KLINGEMAN:  Thank you.

14          MS. CHOI:  Thank you.  We just want to make sure we

15     have enough witnesses.

16          THE COURT:  Absolutely.

17          I'll see everyone in 45 minutes.  Thanks.

18          MR. NOBLE:  Thank you.

19          (Luncheon recess)

20

21

22

23

24

25

H2OKLEB3

AFTERNOON SESSION

1:40 PM

1    (In open court; jury not present)

2         THE COURT:  Why don't we begin.  Are there government

3    objections to the documents that Mr. Klingeman has shared in

4    advance?

5         MR. KLINGEMAN:  Your Honor, we're still working our

6    way through them, and I think we're going to have time with the

7    first afternoon break to finish that discussion, but so far,

8    we've agreed on the ones we've talked about.

9         THE COURT:  Great.  I appreciate it very much.

10        Is there anything I should take up before the next

11   segment?

12        MS. CHOI:  No, your Honor.  I think the state of play

13   is we're awaiting defense counsel to isolate those particular

14   portions of the transcription that they may be interested in

15   introducing or cross-examining.  I'm not sure which.

16        THE COURT:  For the Alloya witness?

17        MS. CHOI:  Correct.  But we don't have to deal with

18   that now.  I just wanted to note, we're still working on that.

19        THE COURT:  Great.  I appreciate that, too.

20        So, it sounds like you can bring in the jury.

21        MR. NOBLE:  Shall we get Mr. Hill?

22        THE COURT:  Yes, please.  We're even on time.  It's

23   1:41.  We're waiting on one juror.  (Continued on next page)

H2OKLEB3B                          Hill - Cross

 1              (Jury present)

 2              THE COURT:  Thank you, everyone.  Members of the jury,

 3     thank you so much.  I hope you enjoyed your lunch, and I hope

 4     you got outside.

 5              We will continue now, Mr. Creizman, with the

 6     cross-examination of Mr. Hill on behalf of Mr. Lebedev.  You

 7     may proceed.

 8              MR. CREIZMAN:  Thank you, your Honor.

 9      RICARDO HILL,

10     CROSS-EXAMINATION CONTINUED

11     BY MR. CREIZMAN:

12     Q.  I'm going to resume back in April of 2016.

13     A.  Okay.

14     Q.  Now, your Facebook -- you have a Facebook account, correct?

15     A.  Yes.

16     Q.  And at that time, the Facebook account had a name, Ricardo

17     Rico Rick; is that accurate?

18     A.  Yes.

19     Q.  On April 25th, were you friends with Anthony Murgio on

20     Facebook?

21     A.  Yes.

22     Q.  And did you post a message on his Facebook account?

23     A.  Yes.

24     Q.  And was the post, "Better tell the Feds I had nothing to do

25     with this or you'll have a worse problem than the FBI"?

1   A.  Yes.

2   Q.  Now, it's true that you were not really threatening him,

3   were you?  Meaning you were telling him to tell the truth;

4   isn't that right?

5   A.  Yes, ma'am.

6   Q.  Because you did not think you were guilty?

7   A.  Correct.

8   Q.  And you had a girlfriend at the time?  Shana?

9   A.  Yes.

10  Q.  And she posted a similar message on Mr. Murgio's Facebook

11  account?

12  A.  I wasn't aware of that.

13  Q.  Now, Mr. Murgio doesn't do anything, as far as you know,

14  right, in response to your --

15  A.  He doesn't, no.

16  Q.  I want to ask you some questions about the crimes that you

17  pled guilty to.  You understand?

18  A.  Okay.

19  Q.  You pled guilty to bank fraud, correct?

20  A.  Yes.

21  Q.  And wire fraud?

22  A.  Yes.

23  Q.  And conspiracy to commit bank fraud and wire fraud?

24  A.  Yes.

25  Q.  You pled guilty -- the activity that made you guilty of

1    that was that you lied to banks, correct?

2    A.  Yes.

3    Q.  You told customers to lie to banks, right?

4    A.  Yes.

5    Q.  And the nature of the lies was that the banks -- was to

6    prevent the banks from knowing that you were engaging in

7    Bitcoin transactions, correct?

8    A.  Yes.

9    Q.  Because you understood that the banks would close the

10   accounts if they knew that there were Bitcoin transactions

11   going on, correct?

12   A.  Or not let their customers use their cards on our platform.

13   Q.  I'm sorry?

14   A.  We thought the banks would not allow their customers to use

15   their bank cards, or debit cards, or credit cards on our

16   platform.

17   Q.  I see, okay.  And that's because there were Bitcoins

18   involved?

19   A.  Yes.

20   Q.  When you lied to the banks, you weren't trying to steal

21   money from the banks, were you?

22   A.  No.

23   Q.  You never thought you were cheating the banks, did you?

24   A.  No.

25   Q.  You were never trying to put the banks' money at risk,

1   correct?

2   A.  Correct.

3   Q.  All you were trying to do was to facilitate these Bitcoin

4   transactions, correct?

5   A.  Yes.

6   Q.  And Mr. Murgio had told you that banks don't like Bitcoins?

7   A.  Yes.

8   Q.  Now, in any case, you were on these calls with the banks,

9   correct?

10  A.  Yes.

11  Q.  When I say banks, I'm including credit card companies as

12  well.

13  A.  Yes, that's correct.

14  Q.  Jen Wotherspoon was on similar calls with the banks,

15  correct?

16  A.  Yes.

17  Q.  And she also told customers to lie, correct?

18  A.  Yes.

19  Q.  And Jose Freundt was on similar calls as you and Jen with

20  the banks?

21  A.  Yes.

22  Q.  And he told customers to lie, correct?

23  A.  Yes.

24  Q.  And Anthony Murgio knew all about these calls, right?

25  A.  Yes.

 1    Q.  And he instructed the three of you to do this?

 2    A.  Yes.

 3    Q.  Now, we can agree that Yuri Lebedev was never on any of

 4    these calls, correct?

 5    A.  That's correct.

 6    Q.  And Yuri Lebedev never told you to do any of these calls?

 7    A.  That's correct.

 8    Q.  And as far as you know, Yuri Lebedev didn't know about any

 9    of these calls?

10    A.  Not to my knowledge.

11    Q.  Now, you pled guilty to bribery, correct?

12    A.  Yeah, of making corrupt payments to a bank official.

13    Q.  Right?

14    A.  Yes.

15    Q.  So you pled guilty to making corrupt payments to a bank

16    official and conspiracy as well to do so?

17    A.  Yes.

18    Q.  And that bank official was Mr. Gross?

19    A.  Correct.

20    Q.  Now, at the time -- you knew, when Mr. Murgio recruited you

21    to join the HOPE Federal Credit Union, that there was going to

22    be an effort to take over the credit union, correct?

23    A.  Yes.

24    Q.  At that time, you didn't think that it was anything other

25    than a business transaction, fair to say?

H2OKLEB3B                           Hill - Cross

1    A.  Yes.

2    Q.  You didn't view it as a bribe at that time?

3    A.  Correct.

4    Q.  There were donations to a credit union, correct?

5    A.  Yes.

6    Q.  And donations to a church that was affiliated with the

7    credit union?

8    A.  Yes.

9    Q.  Now, you recall during your direct examination that the

10   government showed you a number of exhibits that involved wire

11   transfers, correct?

12   A.  Yes.

13   Q.  Wire transfers from Collectables Club to HOPE FCU accounts,

14   correct?

15   A.  Yes.

16   Q.  And to accounts affiliated with Pastor Gross?

17   A.  Yes.

18   Q.  And from Kapcharge to HOPE FCU?

19   A.  Yes.

20   Q.  And there are a large number of those exhibits that you

21   saw?

22   A.  Yes.

23   Q.  These exhibits occurred over a period of months, correct?

24   A.  Yes, that's correct.

25   Q.  And you got in on the ground floor right from the

H2OKLEB3B                        Hill - Cross

1  beginning, you were handling this stuff?

2  A.  Yes.

3  Q.  Now, fair to say that Yuri Lebedev was not on a single one

4  of those emails?

5          MR. SHIN:  Objection, your Honor.

6          THE COURT:  Overruled.

7  A.  A single one of the emails from Kapcharge?  Which emails?

8  Q.  The emails involving the wire transfers to the HOPE FCU

9  from Collectables Club.

10 A.  I don't remember him on any of those emails.

11 Q.  You never got a call from Yuri Lebedev telling you to

12 transfer any money to HOPE FCU, correct?

13 A.  Any calls from Yuri telling me --

14 Q.  Yes.

15 A.  -- to transfer money to the CU?

16 Q.  Yes.

17 A.  No.

18 Q.  Or to Pastor Gross?

19 A.  No.

20 Q.  Now, we heard a recording of that meeting on November 22nd,

21 I believe it was?

22 A.  Yes.

23 Q.  And that was in the Hope Cathedral?

24 A.  Yes.

25 Q.  And you were at that meeting?

1    A.  Yes, I was.

2    Q.  And Yuri Lebedev was at that meeting?

3    A.  Yes, he was.

4    Q.  And some other members of the board were at that meeting?

5    A.  Yes.

6    Q.  And Pastor Gross was at the meeting?

7    A.  Yes.

8    Q.  And it was a heated meeting?

9    A.  Yes.

10   Q.  Do you recall, sitting here today, Yuri Lebedev talking at

11   that meeting?

12   A.  I don't remember what he said, but he spoke a few times.

13   Q.  You didn't know him too well; is that right, at that point?

14   A.  No, not as well as I knew Anthony Murgio.

15   Q.  Right.  It was basically the second time you met Yuri in

16   person?

17   A.  Yes.

18   Q.  Fair to say Yuri is a bit of a clown at times?

19   A.  Yeah.

20   Q.  Maybe no more than me, but...

21        Do you recall Mr. Lebedev ever suggesting, during that

22   call, that he would lend Anthony Murgio the $50,000?

23   A.  I remember him saying something about 50K.  I don't

24   remember the context in which he used that.

25   Q.  But Mr. Murgio didn't really pay attention to him; is that

1    fair to say?

2    A.  Yes.

3    Q.  Now, we saw an email that -- there was an exhibit in which

4    you tried to transfer $50,000 to an account belonging to Pastor

5    Gross, correct?

6    A.  Yes.  Collectables Club attempted to send 50K to Trevon.

7    Q.  And that was unsuccessful, correct?

8    A.  Yes, that's correct.

9    Q.  Now, you know that $50,000 came from Vlad, correct?

10   A.  No, I don't know that.

11   Q.  You don't know where it came from?

12   A.  That's correct.

13   Q.  Now, you also said that you knew that Anthony Murgio

14   recorded that conversation on November 22nd?

15           MR. SHIN:  Objection, your Honor.

16           THE COURT:  Grounds?

17           MR. SHIN:  Just the clarification about when he knew

18   it in the question.

19           THE COURT:  All right.  So, vague.

20           Rephrase, please.  Are you asking current knowledge?

21           MR. CREIZMAN:  No.

22           THE COURT:  Rephrase.

23   BY MR. CREIZMAN:

24   Q.  Before you were involved in this particular case, were you

25   aware that Anthony Murgio had recorded that conversation?

H2OKLEB3B                        Hill - Cross

1    A.  No, I was not.

2    Q.  Do you remember having conversations with other members of

3    the board after that November 22nd meeting?

4    A.  I'm sure I talked to the members of the board after that

5    meeting.

6    Q.  And you recall that Mr. Murgio was trying to sell everybody

7    on the idea that Pastor Gross was trying to cut Collectables

8    Club out of a deal?  Do you recall that?

9    A.  Anthony had his suspicions about some of Trevon's actions,

10   and he mentioned that to us.

11   Q.  Part of your job, while you were at Coin.mx, was dealing

12   with tech issues, correct?

13   A.  I'm sorry?

14   Q.  Was dealing with IT issues, tech issues?

15   A.  Not part of my job, but we were sending those to the

16   appropriate individuals.

17   Q.  And you copied Mr. Lebedev from time to time?

18   A.  Yes.

19   Q.  Do you remember a fellow named Dmitry?

20   A.  I recognize that name as one of the developers.

21   Q.  And the developers were located in Russia, correct?

22   A.  Yes.

23   Q.  When you communicated with them, you communicated over

24   Jabber, correct?

25   A.  Yes.

```
 1   Q.  And those were the people who controlled the Coin.mx
 2   servers, to your knowledge, correct?
 3   A.  Yes.
 4   Q.  I want to ask you some questions about that cooperation
 5   agreement you testified about.
 6           Before you got your cooperation agreement, you had to
 7   meet with the government a few times under something called a
 8   proffer agreement, right?
 9   A.  Yes.
10   Q.  And that proffer agreement gave you some protection,
11   correct?
12   A.  Yes.
13   Q.  And that protection was that whatever you say during that
14   meeting would not be used against you if you were prosecuted,
15   correct?
16   A.  Yes.
17   Q.  The purpose of these proffer agreements were ultimately to
18   get a cooperation agreement, correct?
19           MR. SHIN:  Objection, your Honor.
20           THE COURT:  Sustained.
21   Q.  As you understood it, the purpose of the proffer meetings
22   were to get a cooperation agreement, correct?
23           MR. SHIN:  Objection, your Honor.
24           THE COURT:  State your grounds.  Vague?
25           MR. SHIN:  Yes, your Honor.
```

1           THE COURT:  Sustained.

2    BY MR. CREIZMAN:

3    Q.  Every time you went into these proffer agreements, the

4    government asked you questions, correct?

5    A.  Yes.

6    Q.  They asked you questions about Coin.mx?

7    A.  Yes.

8    Q.  And what you did at Coin.mx?

9    A.  Yes.

10   Q.  And they asked you questions about what you did at HOPE

11   FCU?

12   A.  Yes.

13   Q.  And they asked you questions about whatever -- tell us

14   whatever other crimes or illegal activity you've ever committed

15   in your life, basically?

16   A.  Yes.

17   Q.  Ultimately, after a couple of meetings, you ended up

18   getting that cooperation agreement, correct?

19   A.  Yes.

20   Q.  Did the government ever tell you that the -- when I say

21   "government," I mean the prosecutors or agents.  Did the

22   government ever tell you that the reason we are asking you

23   these questions is to determine whether you're being truthful,

24   correct?

25   A.  Can you rephrase the question, please?

1  Q.  Sure.

2          The reason we're having these proffer meetings is to

3  determine whether you're being truthful?

4  A.  I don't remember them saying that.  I just remember them

5  asking questions.

6  Q.  They thought you were truthful?

7          MR. SHIN:  Objection, your Honor.

8          THE COURT:  Sustained.

9  Q.  They never complained that you were lying?

10  A.  I don't remember them complaining about me lying.

11  Q.  Now, the cooperation agreement has some obligations that

12  you have to fulfill, correct?

13  A.  Yes.

14  Q.  Your hope is that if you fulfill those obligations, you're

15  going to get what you described as the 5K1 letter?

16  A.  Yes.

17  Q.  And the 5K1 letter is a letter from the government to the

18  judge telling the judge basically everything you did to

19  cooperate?

20  A.  Among other things.

21  Q.  Among other things.

22          For example?

23  A.  All my relevant criminal conduct regarding this case and

24  anything I have disclosed to them.

25  Q.  And that you were honest and truthful, correct?

1  A.  Yes.

2  Q.  And the hope is that by such a letter, you'll get a lenient

3  sentence?

4  A.  I'm sorry?

5  Q.  The hope is that with that letter, you'll get a lenient

6  sentence?

7  A.  I hope to get the letter.

8  Q.  And that letter -- well, because it will give you -- you're

9  hoping not to get 125 years in jail?

10 A.  I hope to get the letter to Judge Nathan from the

11 government.  I'm not sure what that's going to do.

12 Q.  Well, you're facing 125 years in jail.  You're hoping that

13 you don't spend even a day in jail; isn't that true?

14 A.  Of course, I don't want to spend a day in jail, but I'm

15 just hoping to get the 5K letter.  I don't know what that's

16 going to do for me.

17 Q.  You don't know that the 5K letter is so that -- for

18 sentencing -- for lenience at sentencing?

19 A.  It's to be considered at my sentencing.  That's all that I

20 know.

21 Q.  Okay.  So that it would be considered at your sentencing?

22 A.  Yes.

23 Q.  Now, you prepared your testimony with the government in the

24 past two weeks, correct?

25 A.  Yes.

1     Q.  I'm not trying to pin you down to a number, but,

2     approximately, over the last two weeks, about how much time did

3     you spend meeting with the government in preparation of your

4     testimony?

5     A.  Over the last two weeks?

6     Q.  Over the last two weeks.

7     A.  Three days.

8     Q.  Three days.

9               And those --

10    A.  Four days.  Three or four days, I'm sorry.

11    Q.  That's okay.  Three or four days.

12              And those days were full days, early in the morning

13    till end of the day?

14    A.  Mostly.

15    Q.  During that time, the government -- there was a point where

16    you're -- you're sitting in a conference room?

17    A.  Yes.

18    Q.  And there's a point where the government says, let's

19    practice direct examination, like what you went through with

20    Mr. Shin earlier?

21    A.  Yes.

22    Q.  And asked you some questions, you answered them, correct?

23    A.  Yes.

24    Q.  There was even a time, perhaps, or there was a time where

25    they did a practice cross-examination, correct?

1    A.  I was asked questions by another one of the attorneys.

2    Q.  Like to do a practice as if I were asking you?

3    A.  Yes.

4    Q.  Except not as good looking?  I'm sorry.

5            The question being, though:  During any of those

6    sessions, did the government ever suggest to you how to answer

7    a question?

8    A.  No, they never gave me any ways to answer any questions.

9    Q.  Okay.  Well, maybe not gave you -- but don't answer it this

10   way, answer it that way?

11   A.  That's incorrect.

12   Q.  I'm asking.

13   A.  Oh, no.

14   Q.  Let me be specific.  You were asked -- this is the

15   question:  "Now, under the cooperation agreement, are you

16   required to do certain things?

17   "A.  Yes, I am.

18   "Q.  Could you describe those for the jury, please?

19   "A.  I'm required to testify truthfully, to disclose all

20   information and activity about myself and others pertaining to

21   the case."

22   Q.  Do you recall that?

23   A.  Yes.

24   Q.  Did the government suggest how to answer that question?

25   A.  No.  I read my cooperation agreement and used my own words

1    to answer those questions.

2    Q.  Okay.  In terms of telling the truth, under this

3    cooperation agreement, who determines whether you tell the

4    truth?

5    A.  Judge Nathan.

6    Q.  Not the government?

7    A.  I don't think so.

8    Q.  Can we take a look at your cooperation agreement.

9    A.  Should we?

10   Q.  I think we might have to.

11   A.  Okay.

12          MR. CREIZMAN:  Just for the witness, because it's not

13   in evidence, and this is Government Exhibit 3502-26.

14   Q.  Do you recognize this?

15   A.  Yes.

16   Q.  It's a letter dated February 6, 2017?

17   A.  Yes.

18   Q.  It's from the U.S. Department of Justice, U.S. Attorney,

19   Southern District of New York?

20   A.  Yes.

21   Q.  It's to two individuals, Peter E. Quijano and Anna N.

22   Sideris, correct?

23   A.  Yes.

24   Q.  Those are your attorneys?

25   A.  Yes.

H2OKLEB3B                         Hill - Cross

1    Q.  And you know what this document is?

2    A.  This is my cooperation agreement.

3    Q.  So, I want to turn --

4              MR. CREIZMAN:  May I publish -- I'm sorry.  I'm moving

5    for admission, Government Exhibit 3502-26.

6              MR. SHIN:  No objection from the government, your

7    Honor.

8              MR. KLINGEMAN:  No objection.

9              THE COURT:  All right.  It's admitted.

10             Sorry, Mr. Klingeman.

11             MR. KLINGEMAN:  I'm still here, your Honor.

12             THE COURT:  I see.  It's larger than my normal

13   courtroom, so I lost you in my peripheral vision.  For the

14   record, I'm joking, but --

15             MR. KLINGEMAN:  Joke accepted.

16             THE COURT:  It's received into evidence.  You may

17   publish.

18             MR. CREIZMAN:  Thank you.  I would like to publish.

19             (Government's Exhibit 3502-26 received in evidence)

20             (Continued on next page)

21

22

23

24

25

1    BY MR. CREIZMAN:

2    Q.  Now, I'm on page 3.

3           You've read this agreement; right?

4    A.  Yes, I have.

5    Q.  So I'm just going to point out this paragraph with the

6    little flag on it.  That paragraph lays out some of your

7    obligations under the agreement; correct?

8    A.  Yes.

9    Q.  "It is understood that Hill, A., shall truthfully and

10   completely disclose all information with respect to the

11   activities of himself and others concerning all matters about

12   which this office inquires of him, which information can be

13   used for any purpose."

14          I'll move down to E.  "Shall truthfully testify before

15   the grand jury and at any trial and other court proceeding with

16   respect to any matters about which this office may request his

17   testimony."

18          Do you see that?

19   A.  Yes.

20   Q.  And you understand that to be your obligations; correct?

21   A.  Yes.

22   Q.  Now I'm turning to page 4 at the bottom of the page.

23          Aside from telling the truth, is it also your

24   understanding that you have to give what is called substantial

25   assistance to the government?

1    A.  Yes.

2    Q.  And that means assistance in the investigation and

3    prosecution of others?

4    A.  That's incorrect.

5    Q.  That's incorrect?

6    A.  I'm not -- I'm just here to answer questions truthfully.

7    Q.  I'm not saying results.  I'm just saying substantial

8    assistance.

9    A.  Substantial assistance according to my obligations in this

10   agreement.

11   Q.  Now, we'll go to the bottom of page 4.  "It is understood

12   that should this office" -- meaning the U.S. Attorney's Office;

13   right?

14   A.  Yes.

15   Q.  -- "determine that either Hill has not provided substantial

16   assistance in an investigation or prosecution or that Hill has

17   violated any provision of this agreement, such a determination

18   will release this office from any obligation to file a motion

19   pursuant to Section 5K1.1 of the sentencing guidelines but will

20   not entitle Hill to withdraw his guilty plea once it has been

21   entered."

22           Now, is it still your testimony before this jury that

23   Judge Nathan is the party that determines whether you are

24   truthful or not?

25   A.  No.  It's the government.  I'm sorry.  I just forgot about

1   this part.  I thought it was Judge Nathan.

2   Q.  It's also the government who determines whether or not

3   you've provided substantial assistance.  Isn't that true?

4   A.  Yes.

5   Q.  Now, you were getting some press inquiries about this case;

6   isn't that right?

7   A.  Press inquiries?

8   Q.  For an interview.

9   A.  I'm sorry?

10  Q.  Were you ever asked by any press organization for an

11  interview?

12  A.  Oh, yes, I was.

13  Q.  Did you tell them, the press, that you would only agree to

14  be interviewed if you were paid?

15  A.  Yes.

16  Q.  You would offer only to the highest bidder?

17  A.  Yes.

18  Q.  There was no interview; correct?

19  A.  That's correct.

20  Q.  We've gone through this.  You offered to talk to Anthony

21  Murgio's lawyer for $50,000; correct?

22  A.  Yes.

23  Q.  Now, we can agree that your freedom is more valuable than

24  $50,000.  Isn't that right?

25  A.  Yes.

1    Q.  Now, you wouldn't lie for your freedom?

2    A.  I'm sorry?

3    Q.  Would you lie for your freedom?

4    A.  No.

5            MR. CREIZMAN:  No further questions.

6            THE COURT:  Thank you, Mr. Creizman.

7            Mr. Klingeman.

8            We're going to have cross-examination on behalf of

9    Mr. Gross.

10           Mr. Klingeman, whenever you're ready.

11           MR. KLINGEMAN:  Thank you, your Honor.

12   CROSS-EXAMINATION

13   BY MR. KLINGEMAN:

14   Q.  Mr. Hill, I'm going to direct your attention to the

15   questions that you were asked and the answers that you gave

16   when the government lawyer questioned you over the last three

17   days.

18           Do you follow me?

19   A.  Yes.

20   Q.  At no time during that testimony did you tell the jury that

21   you, Mr. Hill, ever told Pastor Gross about the crimes you were

22   committing at Coin.mx; correct?

23   A.  Can you repeat that again.  I'm sorry.

24   Q.  During the time that you testified in answer to the

25   government's questions over the last three days, you never told

1    this jury, as part of your testimony, that you, Mr. Hill, ever

2    told Pastor Gross about the crimes you were committing at

3    Coin.mx; correct?

4    A.  That's correct.

5    Q.  Likewise, you never testified to this jury that you have

6    told Pastor Gross that Collectables Club was a sham, a front.

7    Correct?

8    A.  That's correct.

9    Q.  You never testified to this jury, in answer to the

10   government's questions, that you ever told Pastor Gross about

11   your criminal history; correct?

12   A.  That's correct.

13   Q.  You never testified to this jury that you ever told

14   Pastor Gross that the purpose of Coin.mx taking control of the

15   HOPE Federal Credit Union was to process Bitcoin-related

16   transactions.  Correct?

17   A.  That's correct.

18   Q.  You never told this jury that you ever discussed with

19   Mr. Gross the money that was paid amounted to a bribe.

20   Correct?

21   A.  I never told the jury that the money paid to Mr. Gross --

22   I'm sorry.  Can you repeat it.

23   Q.  That's not my question.  My question, Mr. Hill, is whether

24   over the last three days, in answer to the government's

25   questions, you ever discussed with Mr. Gross the money that was

1    paid amounted to a bribe.

2             MR. SHIN:  Objection as to form, your Honor.

3             THE COURT:  I'll sustain.  Rephrase.

4    BY MR. KLINGEMAN:

5    Q.  You never told this jury over the last three days, in

6    answer to the government's questions, that you discussed with

7    Mr. Gross the fact that the money paid amounted to a bribe.

8    Correct?

9             MR. SHIN:  Objection, your Honor.

10            THE COURT:  That's not the same question.  Overruled.

11            THE WITNESS:  That's correct.

12   BY MR. KLINGEMAN:

13   Q.  Based on what Anthony Murgio told you in the spring of

14   2014, you understood that Anthony Murgio was negotiating with

15   Pastor Gross about this transaction; correct?

16   A.  Yes.

17   Q.  And you, Mr. Hill, were not part of those negotiations;

18   correct?

19   A.  That's correct.

20   Q.  Now, you told us, Mr. Hill, that you are 38 years old as

21   you sit here?

22   A.  Yes.

23   Q.  And that your criminal activities began while you were a

24   juvenile?

25   A.  Yes.

1    Q.  So over 20 years ago.

2    A.  Yes.

3    Q.  Those crimes included crimes of violence.

4    A.  Yes.

5    Q.  You described an armed burglary.

6    A.  Yes.

7    Q.  A second armed burglary.

8    A.  Yes.

9    Q.  And then more recently you described how you stole some

10   marijuana from another person.

11   A.  Yes.

12   Q.  When you did that, you beat him up; right?

13   A.  Yes.

14   Q.  When did that take place?

15   A.  2013/'14.  I don't remember specifically.

16   Q.  2013 was when you started with Coin.mx?

17   A.  December I was asked about Coin.mx.  I officially started

18   in 2014.

19   Q.  So you were asked by Mr. Murgio to consider participating

20   in Coin.mx in late 2013?

21   A.  Yes.

22   Q.  December?

23   A.  Yes.

24   Q.  But you didn't start working until early 2014.

25   A.  Yes.

1    Q.  It was some time in that time period where you assaulted

2    this person and stole his marijuana?

3    A.  I really don't know if it was 2013 or/'14, but I'll say

4    yes.

5    Q.  In addition to stealing the marijuana, you've distributed

6    drugs; correct?

7    A.  Distributed?

8    Q.  Yes.

9    A.  No.  I helped friends obtain drugs, if that's what you're

10   saying.

11   Q.  I'm asking you what you're saying.  I wasn't there.

12   A.  I helped friends get drugs.

13   Q.  You helped friends get drugs?

14   A.  Yes.

15   Q.  So you would go out and buy drugs?

16   A.  No.  I would, hey, I'm going to pick up weed.  Do you guys

17   want anything?  They would all give me their money, and I would

18   get what they wanted as I was going out and getting what I

19   wanted.

20   Q.  So you would go out and buy marijuana?

21   A.  Yes.

22   Q.  With your friends' money?

23   A.  Yes.

24   Q.  For them?

25   A.  Yes.

1   Q.  And then you would distribute it to them?

2   A.  Yes.

3   Q.  Also cocaine?

4   A.  Yes.

5   Q.  Ecstasy?

6   A.  Yes.

7   Q.  And yet you quarrel with calling yourself a drug dealer.

8   Right?

9   A.  I didn't earn any money from it.  So that's why I quarrel

10  with calling myself a drug dealer.

11  Q.  You were an unsuccessful drug dealer.

12  A.  There you go.

13  Q.  When the FBI came to your home in March of 2016, they

14  observed a scale in the home; correct?

15  A.  Yes.

16  Q.  And a scale is something you use to weigh drugs?

17  A.  Yes.

18  Q.  And you had the scale to weigh drugs; right?

19  A.  I have a scale to weigh marijuana so I can smoke the same

20  amount each time so it can last longer.

21  Q.  So it was a personal-use scale?

22  A.  Yes.

23  Q.  In addition to the drug distribution, you indicated that

24  you were convicted at some point for passing bad checks.

25  A.  Yes.  As a juvenile I was.

1  Q.  Did you get any money by passing bad checks?

2  A.  I got caught twice.  So, no.

3  Q.  An unsuccessful bad-check passer.

4  A.  That too.

5  Q.  But the purpose of passing bad checks was to try to get

6  money?

7  A.  That's correct.

8  Q.  And you would agree with me that the crime of passing bad

9  checks is a crime of deception?

10  A.  Yes.

11  Q.  In other words, you're representing to the person you give

12  the check to that this is a good check when it was a bad check.

13  A.  Yes.

14  Q.  And you knew it was a bad check when you passed it.

15  A.  Yes.

16  Q.  And while you were at Coin.mx, you engaged in bank fraud?

17  A.  Yes.

18  Q.  The prosecutor asked you a lot of questions about that.

19  A.  Yes.

20  Q.  The lawyer for Mr. Lebedev asked you a lot of questions

21  about that.

22  A.  Yes.

23  Q.  So we don't need to go through that.  Suffice it to say,

24  that's another crime of deception; correct?

25  A.  Yes.

H2OYLEB4                        Hill - Cross - By MR. Klingeman

1    Q.  And then, likewise, you indicated you committed some form

2    of wire fraud?

3    A.  Yes.

4    Q.  Again, emphasis on the fraud, that's a crime of deception.

5    A.  Yes.

6    Q.  And there were other Coin.mx-related crimes; right?

7    A.  Yes.

8    Q.  Operating an unlicensed money-transmitting business?

9    A.  Yes.

10   Q.  And conspiracy to operate a money transmitting business?

11   A.  Yes.

12   Q.  Unlicensed money transmitting business.

13            So I take it these various times that you were caught

14   committing the various crimes you've described, you ultimately

15   came to court; right?

16   A.  Yes.

17   Q.  How many times in your life have you been sentenced by a

18   judge?

19   A.  How many times have I been sentenced by a judge?

20   Q.  Yes.

21   A.  Three or four times.

22   Q.  On each of those occasions, you were given the opportunity

23   to say something to the judge before you were sentenced; right?

24   A.  No.

25   Q.  Really?

1    A.  That's correct.

2    Q.  Florida doesn't honor the Constitution?

3    A.  Probably not.  It's Florida.

4    Q.  That's a serious question.

5    A.  I don't know, but I wasn't -- as a juvenile, I remember

6    getting sentenced to the detention center.  When I was an

7    adult, I remember getting sentenced to ten years in prison.  I

8    didn't get a chance to say anything.

9    Q.  That's my question.  Let's focus on the adult sentencing.

10   A.  Okay.

11   Q.  Your best recollection is when you went to court to be

12   sentenced, the judge did not give you an opportunity to say

13   anything?

14   A.  I had my parents and teachers and baseball coach and stuff

15   like that.  They spoke for me.

16   Q.  They spoke for you?

17   A.  Yeah.

18   Q.  But you, Mr. Hill, don't recall actually speaking?

19   A.  Correct.

20   Q.  You had other folks speaking for you?

21   A.  Yes.

22   Q.  And I presume they were delivering a message to the court

23   that you wanted them to deliver?

24   A.  Yes.

25   Q.  That is that you were sorry for what you had done.

1    A.  Yes.

2    Q.  You knew you were wrong.

3    A.  Yes.

4    Q.  You were planning to turn your life around.  Right?

5    A.  Yes.

6    Q.  And not do those criminal things again.

7    A.  Correct.

8    Q.  And yet you did engage in criminal activity even after

9    those various sentences were imposed.

10   A.  Yes.

11   Q.  As recently as 2015 with Coin.mx.

12   A.  Yes.

13   Q.  Now, you've made a promise to the government in your

14   cooperation agreement to come here and tell the truth; right?

15   A.  Yes.

16   Q.  And you've made a similar promise to the jury to tell the

17   truth; right?

18   A.  Yes.

19   Q.  In fact, the judge has administered the oath to you twice.

20   A.  Yes.

21   Q.  And reminded you after various breaks that you're under

22   oath.

23   A.  Yes.

24   Q.  So that's a promise of very serious magnitude.  Correct?

25   A.  I'd agree.

1    Q.  Do you agree that the promises that your baseball coach,

2    your parents, your teachers made to the court about your

3    turning your life around and not committing additional crimes

4    was of equal serious import?

5    A.  Was them telling the judge equally as seriously important

6    as me telling the truth now under oath?

7    Q.  Yes.

8    A.  They didn't have the incentive that I have to tell the

9    truth right now.

10   Q.  Well, let's talk about that incentive.

11           After Coin.mx blew up and the FBI appeared on the

12   scene, you made that post on Facebook April 25, 2016, directed

13   to Mr. Murgio; correct?

14   A.  Yes.

15   Q.  When I say "Mr. Murgio," I'm talking about Anthony Murgio,

16   not Michael Murgio.

17   A.  Yes.

18   Q.  Anthony, the son, not Michael, the father.

19   A.  Correct.

20   Q.  You said something to the effect to Mr. Murgio, "You better

21   tell the FBI I had nothing to do with this, or you'll have a

22   bigger problem than the government."

23           (Pause)

24   BY MR. KLINGEMAN:

25   Q.  Mr. Hill, I'll repeat the question.

H2OYLEB4                       Hill - Cross - By MR. Klingeman

1              You posted on Facebook to Mr. Merge, "You better tell

2     the FBI I had nothing to do with this, or you'll have a bigger

3     problem than the government."

4     A.   Yes.

5     Q.   That's a pretty close paraphrase of what you said.

6     A.   Yes.

7     Q.   Now, are you telling us that was not a threat?

8     A.   That was a nudge to get him to tell the truth.

9     Q.   Now, you were encouraging Anthony merge via a Facebook post

10    to tell the truth about you.

11    A.   Yes.

12    Q.   Is that what you're telling us?

13    A.   Yes.

14    Q.   By "truth," you said in the Facebook post, "I had nothing

15    to do with this."  Right?

16    A.   Yes.

17    Q.   But that, Mr. Hill, is itself a lie.  Correct?

18    A.   Yes.

19    Q.   In fact, you had to do with this the things you described

20    earlier -- the bank fraud, the wire fraud, the operation of an

21    unlicensed money transmitting business, etc.  Correct?

22    A.   Yes.

23    Q.   So you were in fact telling Anthony merge to lie to the FBI

24    on your behalf.

25    A.   Okay.

1    Q.   True?

2    A.   I wanted him to admit and let the official know how I got

3    involved.  I didn't create Coin.mx.  I didn't come up with the

4    idea to get into the credit union.  I accepted an offer.

5    Q.   Is that what you said in the Facebook post.

6    A.   That's not what I said.

7    Q.   You said, "I had nothing to do with this."  Right?

8    A.   Yes.

9    Q.   In fact, your very presence in this courtroom on that

10   witness stand is evidence that you had everything to do with

11   this; right?

12   A.   Yes.  I subsequently have pled guilty to seven federal

13   offenses.

14   Q.   In doing so, you contradicted what you said in this

15   Facebook post; right?

16   A.   Yes.

17   Q.   What you said in the Facebook post, as you told us a few

18   moments ago, is in fact a lie.

19   A.   Yes.

20   Q.   And it was a lie that you wanted Anthony Murgio to tell the

21   FBI.  Right?  Yes?  No?

22   A.   Yes.

23   Q.   Knowing Anthony Murgio as you did, I presume you thought he

24   was fully capable of lying to the FBI.

25   A.   I don't know if he's capable of lying to the FBI.

1    Q.  Well, he lied to you.

2    A.  But the FBI is different than I am.

3    Q.  Well, that's irrelevant.  What he did or did not do is

4    irrelevant.

5             MR. SHIN:  Objection, your Honor.

6             THE COURT:  Sustained.

7             Mr. Klingeman, stick to the questions.  No commentary.

8    Thank you.

9    BY MR. KLINGEMAN:

10   Q.  But when his lawyer, Mr. Murgio's lawyer, contacted you,

11   you offered to trade the information that you had for money;

12   right?

13   A.  Yes.

14   Q.  And, likewise, when the media contacted you in 2016, you

15   offered to trade the information you had to the media for

16   money; right?

17   A.  Yes.

18   Q.  Now, what's more valuable to you than money?

19   A.  My life.

20   Q.  Your freedom.  Yes?

21   A.  Yes.

22   Q.  That's especially true for someone such as yourself who

23   spent 8 1/2 years in the Florida prison system.  Right?

24   A.  Yes.

25   Q.  You've been there.

1   A.  Yes.

2   Q.  You know how awful it is.

3   A.  Yes.

4   Q.  So, when you testify here, you're doing so pursuant to that

5   cooperation agreement; correct?

6   A.  Yes.

7   Q.  And testifying here is probably the second-to-last place

8   you want to be in the world; right?

9   A.  I could think of worst places.

10  Q.  Prison.

11  A.  I could think of more than being here.

12  Q.  Prison is certainly worse than this gorgeous courtroom.

13  A.  Yes.  That's one of them.

14  Q.  Despite the fact that you're under cross-examination;

15  correct?

16  A.  Yes.

17  Q.  But pursuant to that cooperation agreement, you're offering

18  what you purport to be truthful testimony; correct?

19  A.  Yes.

20  Q.  In exchange for what?

21  A.  A 5K letter.

22  Q.  The possibility of leniency.  Yes?

23  A.  Yes.

24  Q.  The possibility of freedom.

25  A.  Yes.

1   Q.  Information being the same thing you offered to trade for

2   money.  Yes?

3   A.  I'm sorry.  Can you repeat that.

4   Q.  Information being the same thing you offered to trade for

5   money.

6   A.  Under different circumstances.  I hadn't been arrested at

7   the time.

8   Q.  Finish, please.

9   A.  I hadn't been arrested at the time that I said, hey.  Pay

10  me for this interview.  Or I told the lawyer, I'll talk to you

11  for 50k.  There's a huge difference after being arrested.

12  Q.  Of course.  That difference being when you're out on the

13  street and lawyers are calling you or the media is calling you,

14  you aren't worried about going to prison; right?

15  A.  Right.

16  Q.  You're worried about money, or you're interested in money

17  shall we say.  Right?

18  A.  Yes.

19  Q.  Whereas, once you're arrested and you're facing the U.S.

20  Attorney's Office and the FBI, that's when freedom becomes of

21  central importance.

22  A.  Yes.

23  Q.  Now, speaking of the FBI, one of the very first questions

24  the government asked you when you began your testimony on

25  Wednesday afternoon was whether there came a time when you were

1    interviewed by the FBI agents concerning your involvement in

2    Coin.mx and HOPE Federal Credit Union?

3            Do you remember being asked that question?

4    A.  Yes.

5    Q.  And the answer you gave, of course, was yes.

6    A.  Yes.  That's correct.

7    Q.  It was a truthful answer.

8    A.  Yes.

9    Q.  The next question was, when was that.  And you indicated

10   April or May of 2016.

11   A.  Yes.

12   Q.  In fact, it was March but in the same general time frame.

13   A.  Right.  I couldn't remember the exact day.

14   Q.  Then the government lawyer asked you the following

15   question:

16   "Q.  Did you admit to the agents your involvement in the

17   criminal activities in connection with Coin.mx and the HOPE

18   FCU?"

19           Do you remember that question?

20   A.  Yes.

21   Q.  What was your answer?

22   A.  It was yes.

23   Q.  Yes.  Your answer was in fact, "Yes, I did."  Right?

24   A.  Yes.

25   Q.  So let's talk about that interview.

1          You in fact during that interview spoke to the agents

2     for a while; right?

3     A.  Yes.

4     Q.  Over an hour.

5     A.  I don't remember the time.

6     Q.  One of the agents was FBI Special Agent Joel DeCapua;

7     correct?

8     A.  Yes.

9     Q.  And Special Agent DeCapua is sitting to my left in the

10    courtroom.

11    A.  Yes.

12    Q.  Do you recall him from that interview?

13    A.  Yes.

14    Q.  And you've spent time with him since.

15    A.  Yes.

16    Q.  He participated in your preparation to testify before the

17    members of the jury; correct?

18    A.  Yes.

19    Q.  So he and another agent who is not here questioned you at

20    your home on March 31, 2016; right?

21    A.  Yes.

22    Q.  They asked you about whether Coin.mx was licensed; right?

23    A.  I don't remember every question they asked me.

24    Q.  I'm not asking you to remember every question.

25    A.  I don't remember that question.

H2OYLEB4                          Hill - Cross - By MR. Klingeman

1    Q.   I'm asking if you remember that specific topic.

2    A.   No, I don't.

3    Q.   Do you remember them asking you about the bank fraud

4    activity that you've testified about?

5    A.   The calls?

6    Q.   Yes.

7    A.   I remember that.

8    Q.   The misrepresentations to banks that you would make; right?

9    A.   Yes.

10   Q.   And the misrepresentations that you would direct Coin.mx

11   customers to make.

12   A.   Yes.

13   Q.   And the fact that Coin.mx represented itself to banks as a

14   company called Collectables Club.

15   A.   Yes.

16   Q.   And that Collectables Club told banks that it dealt with

17   memorabilia such as baseball cards but really its only function

18   was to trade Bitcoins.

19   A.   Yes.

20   Q.   And that it was Murgio's idea to represent Coin.mx to banks

21   as Collectables Club rather than as a Bitcoin exchange?

22   A.   Yes.

23   Q.   Then you talked, as we just said, about the different

24   things you would tell customers to do to lie to the banks.

25   A.   Yes.

1    Q.  Along with Ms. Wotherspoon.

2    A.  Yes.

3    Q.  Jose Freundt.

4    A.  Yes.

5    Q.  And then you also told the agents about something called

6    ransom ware.

7    A.  Yes.

8    Q.  Ransom ware being a situation where a hacker takes control

9    of an innocent person's computer system and refuses to give the

10   control back unless the hacker is paid.

11   A.  Yes.

12   Q.  In the case of Coin.mx, Coin.mx would arrange for payment

13   through Bitcoin?

14   A.  We wouldn't arrange for payment.  Customers would come and

15   purchase Bitcoin from us.

16   Q.  To make payment.

17   A.  To make payments.

18   Q.  So you played some role in facilitating the payment of

19   ransom; correct?

20   A.  Yes.

21   Q.  As you sit here today, do you know if what you did with

22   respect to ransom ware was illegal or not?

23   A.  Do I know what I did?

24   Q.  Yes.

25   A.  Helping customers to purchase Bitcoin to pay ransom ware?

1   Q.   Yes.

2   A.   I don't know.

3   Q.   That's my question.

4   A.   I helped customers every day all day purchase Bitcoin.

5   What they do with it -- I didn't help them --

6   Q.   Go ahead.

7   A.   I didn't help them go spend it after they obtained it.

8   Q.   That's my question.  If you knew that a customer was buying

9   Bitcoin from you to pay ransom, to your knowledge, is that

10  illegal?

11  A.   I know that now.  I didn't know that then.

12  Q.   So you believe it's illegal?

13  A.   Yes.

14  Q.   Certainly if someone came to you and said, I want to buy

15  some Bitcoin so I can buy some cocaine or some child

16  pornography, that would clearly be illegal.

17  A.   Of course.

18  Q.   And you wouldn't be allowed to help them do that.

19  A.   That was never the case.  People come to buy Bitcoin.

20  Q.   From you that was never the case.

21  A.   I'm sorry?

22  Q.   From you that was never the case.

23  A.   Right.

24  Q.   So we're just talking in terms of your involvement with

25  ransom ware.

1    A.   Okay.

2    Q.   You actually never turned away any customers to Coin.mx who

3    wanted to purchase Bitcoin to pay ransom; correct?

4    A.   Not until Murgio found out that we were assisting

5    customers.

6    Q.   But you told the FBI that even after Murgio found out and

7    made it the official policy of Coin.mx not to pay ransom,

8    Coin.mx continued to help people pay ransom; correct?

9    A.   Yes.  As long as they didn't mention what it was for, we

10   didn't bug them out.  If anyone said something about their

11   files being locked, we would let them know that we couldn't

12   help them.

13   Q.   And then, as you indicated when you testified on Wednesday

14   afternoon, the FBI agents also asked you about HOPE FCU; right?

15   A.   Yes.

16   Q.   You had a discussion with them about HOPE FCU?

17   A.   Yes.

18   Q.   You told them that Murgio told you that he had agreed,

19   meaning Murgio, to buy control of the credit union by making

20   two payments to Trevon Gross, the chairman of HOPE FCU.  Right?

21   A.   I don't remember how many payments, but making payments to

22   Hope Cathedral and Trevon Gross to take over the credit union.

23   Q.   I'm sorry.  Were you finished?

24   A.   Yes.

25   Q.   Now, you've testified about these payments several times

1   over the last three days, and I have noticed that each time you

2   do, you say payments to Trevon Gross or Hope Cathedral as you

3   just did.

4          Do you follow me?

5   A.  Yes.

6   Q.  Now, as you sit here today, do you know whether the

7   payments went to Mr. Gross personally or to Hope Cathedral, the

8   church?

9   A.  I don't know.

10  Q.  You told the agents about how you got involved with running

11  or managing the operations of the credit union in August of

12  2014.  Right?

13  A.  Yes.

14  Q.  And that you would travel to Lakewood twice, Lakewood, New

15  Jersey, from Florida?

16  A.  Yes.

17  Q.  And you stayed for approximately a week for each visit?

18  A.  I didn't say I stayed for a week for each visit.

19  Q.  Approximately a week.

20  A.  Okay.  It was only for a couple days, but --

21  Q.  Just to be very clear, you never moved your personal

22  residence from Florida to Lakewood, period.

23  A.  Correct.

24  Q.  But you did visit.

25  A.  Yes.

1   Q.  You visited.  A nice place to visit, but you wouldn't want

2   to live there; right?

3           Now --

4           MR. SHIN:  Your Honor, if that was a question, there

5   wasn't an answer.  Otherwise, we would move to strike the

6   comment.

7   BY MR. KLINGEMAN:

8   Q.  A nice place to visit, but you wouldn't want to live there?

9   A.  New Jersey?

10  Q.  Lakewood, New Jersey.

11  A.  None of it.  Why would I want to live there?

12  Q.  In addition, you told the agents that Trevon Gross warned

13  you, Mr. Hill, that what Murgio was doing with the HOPE FCU was

14  suspicious.

15  A.  I'm sorry.  Can you say it again.

16  Q.  Among the things you said to the FBI on March 31, 2016, was

17  that Gross warned you, Mr. Hill, that what Murgio was doing

18  with HOPE FCU was suspicious.

19  A.  I don't remember saying that Trevon said it was suspicious.

20  I remember him giving us warnings about the volume that we were

21  transacting, not necessarily that that was suspicious.

22  Q.  The volume of ACH transactions?

23  A.  Yes.

24  Q.  That's what you talked about yesterday afternoon.

25  A.  Yes.

1    Q.  We'll talk about it again.

2    A.  Okay.

3    Q.  What I'm asking you is if you remember telling the FBI that

4    Mr. Gross had told you, Mr. Hill, sometime when you were both

5    at HOPE FCU, that what Murgio was doing at HOPE FCU was

6    "suspicious."

7    A.  No.  I don't remember saying that.

8    Q.  You talked with the FBI about the National Credit Union

9    Association; correct?  The NCUA.

10   A.  Yes.

11   Q.  You told the FBI that you had lied to the NCUA examiners

12   during the September 2014 audit because you told them that you

13   lived in New Jersey full time to manage HOPE FCU?

14   A.  I remember telling them that we were supposed to move to

15   New Jersey.  I never lived in New Jersey.

16   Q.  Well, do you remember telling the FBI that you lied to the

17   NCUA about that?

18   A.  About moving to New Jersey?

19   Q.  No.  About living in New Jersey.

20   A.  No.  I do not remember that.

21   Q.  Forget about the FBI.  As you sit here today, did you lie

22   to the NCUA and tell the NCUA that you, Mr. Hill, actually

23   lived in New Jersey?

24   A.  I never told them that I actually lived in New Jersey.

25   Q.  You told them that you were planning to move to New Jersey?

H2OYLEB4                    Hill - Cross - By MR. Klingeman

1   A.  Yes.

2   Q.  And Pastor Gross told them the same thing; right?

3   A.  Yes.

4   Q.  And then prior to the audit, you told the FBI that you

5   attempted to sign leases and install utility connections to

6   provide proof that you and other new board members lived in New

7   Jersey full time.

8            Do you remember that?

9   A.  No, I don't.  But the plan was to, you know, look for

10  apartments if we were going to move there, but we never made it

11  to that.

12  Q.  So the plan was to look for apartments?

13  A.  Yes.

14  Q.  And if you found an apartment, you would presumably lease

15  the apartment?

16  A.  Yes.

17  Q.  Register with the utility company to make sure you had

18  electric and all those other things; right?

19  A.  Yes.

20  Q.  And then you would be able to prove residence with those

21  documents.

22  A.  Right.

23  Q.  And actually have an apartment with a real address; right?

24  A.  Yes, but you asked did we attempt to do so.  We didn't make

25  it that far.

1   Q.  When did you do those things?  Do you remember

2   approximately?

3   A.  No.  I don't remember.

4   Q.  Late summer/early fall?  A particular month?

5   A.  I don't remember any particular time.

6   Q.  But obviously it was before the November 22, 2014, meeting;

7   right?

8   A.  I don't remember the time.

9   Q.  Well, you remember the meeting; right?

10  A.  Yes.

11  Q.  You heard the recording of the meeting this morning; right?

12  A.  Yes.

13  Q.  It's your recollection that when you went out apartment

14  hunting, it was before that meeting; right?

15  A.  Before the 11-22 meeting, yes.

16  Q.  But you don't have a specific recollection if it was a

17  month before or weeks before?

18  A.  No, I don't.

19  Q.  And then, in addition in preparation for the NCUA audit,

20  you told the FBI that you had to work with Pastor Gross to

21  create and update the policies that were supposed to be in

22  place but were not.  Right?

23  A.  Yes.

24  Q.  Anti-money laundering; right?

25  A.  I don't remember which policies.  I do remember certified

1    resolution was one of them.

2    Q.  Anti-money laundering?

3    A.  I don't remember if we did that one.

4    Q.  Bank Secrecy?

5    A.  I don't remember if we did that one.

6    Q.  Suspicious activity report filing?

7    A.  I don't remember if we did that one either.

8    Q.  Currency transaction report filing?

9    A.  No.

10   Q.  You don't remember?

11   A.  I don't remember.

12   Q.  You also told the FBI, in answer to their questions about

13   HOPE FCU, that you, Mr. Hill, did not tell the NCUA about the

14   payments to Gross in exchange for control of HOPE FCU.

15   Correct?

16   A.  No.  That wasn't mentioned during the NCUA examination.

17   Q.  Murgio never told you not to talk about that; right?

18   A.  Murgio never told me not to talk about?

19   Q.  The payments that you described earlier.

20   A.  No.

21   Q.  To Mr. Gross or Hope Cathedral; right?

22   A.  Right.

23   Q.  And Mr. Gross never told you not to talk about those

24   things.

25   A.  No.

1   Q.  He never told you to lie about them?

2   A.  No one ever asked me about them.

3   Q.  That's not my question.

4   A.  No.

5   Q.  My question was whether or not --

6   A.  No.  He never told me that.

7          THE COURT:  I want to remind the witness and

8   Mr. Klingeman to let each other finish speaking rather than

9   speaking on top of each other.  Thank you.

10         THE WITNESS:  Yes, your Honor.

11  BY MR. KLINGEMAN:

12  Q.  I'll just repeat the last two questions.

13  A.  Okay.

14  Q.  Mr. Gross, Pastor Gross, never told you not to discuss

15  those payments with anyone.

16  A.  That's correct.

17  Q.  And he never told you to lie about those payments to

18  anyone.

19  A.  That's correct.

20  Q.  Including the NCUA.

21  A.  That's correct.

22  Q.  Now, you also were asked by the FBI about the November 22,

23  2014, meeting, the recording of which we had listened to this

24  morning.  Right?

25  A.  Yes.

1   Q.  You told the FBI that the purpose of the meeting was to

2   discuss slowing down the amount of ACH volume and also to

3   negotiate the second payment to Gross.  Right?

4   A.  I don't know of that detail, but he asked about the meeting

5   and what the meeting was about.

6   Q.  But you don't remember what answers you may have given to

7   the FBI at that time?

8   A.  No.

9   Q.  You do recall being asked those same questions here this

10  morning; right?

11  A.  Yes.

12  Q.  By the government lawyer.

13  A.  Yes.

14  Q.  Finally, you were asked about the Coin.mx and Murgio

15  association, and you told the FBI that at the time you were

16  "making money, having a blast, and thought it was legitimate."

17  A.  Yes.

18  Q.  That's what you told them; right?

19  A.  Something similar to that.  I'm sorry.  I can't remember

20  verbatim.  Yes.

21  Q.  You and counsel for Mr. Lebedev had a little jokey-joke

22  exchange about the FBI this afternoon.  You were asked about

23  the contact with the FBI, and you said you were never call the

24  FBI yourself.  Right?

25  A.  Correct.

1    Q.  Do you recall Jose Freundt calling the United States Secret

2    Service about you?

3    A.  About me?

4    Q.  Yes.

5    A.  No.

6    Q.  You don't know anything about that?

7    A.  About calling the secret service about myself?

8    Q.  Yes.

9    A.  I don't remember this.

10   Q.  Yesterday you were asked a series of questions by the

11   government prosecutor concerning a WhatsApp chat where

12   Mr. Gross is talking about the ACH transaction volume.

13           Do you remember those questions?

14   A.  Yes.

15   Q.  Specifically at one point in the WhatsApp chat, Mr. Gross

16   writes, "The board made no decisions but allowed this to

17   happen."

18   A.  I remember that.

19   Q.  And you were asked some questions about that statement by

20   Mr. Gross; right?

21   A.  Yes.

22   Q.  Specifically the very next question the government

23   prosecutor asked you was -- this is the direct examination of

24   Ricardo Hill, February 23, 2017, at page 1435, line 8.

25   "Q.  Did Trevon Gross raise concerns about ACH transaction

1   volume during board meetings?

2   "A.  Not during board meetings."

3            Do you remember that question and answer?

4   A.  Yes.

5   Q.  It was just yesterday; correct?

6   A.  Yes.

7   Q.  And then the government followed up by saying the following

8   question at line 19:

9   "Q.  So during proper board meetings of the HOPE FCU board of

10  directors, did Mr. Gross raise these concerns?

11  "A.  No."

12           Right?

13  A.  Yes.

14  Q.  Now, you did testify that Mr. Gross offered his concerns,

15  his objections, his directions, his resistance outside of the

16  board meetings.  Right?

17  A.  Yes.

18           MR. SHIN:  Objection, your Honor.

19           THE COURT:  Just a moment.

20           Grounds?

21           MR. SHIN:  Form, your Honor.

22           THE COURT:  Overruled.

23  BY MR. KLINGEMAN:

24  Q.  The answer to my question was yes?

25  A.  Yes.

H2OYLEB4                          Hill - Cross - By MR. Klingeman

1    Q.  There's email to that effect; right?

2    A.  Yes.

3    Q.  In fact, in early November 2014, you wanted to raise the

4    ACH transaction limits with Magic Wrighter; right?

5    A.  Yes.

6    Q.  And Mr. Murgio was behind that, so to speak?

7    A.  Yes.

8    Q.  Supportive?

9    A.  Yes.

10   Q.  In fact, did you want to do that at his direction?

11   A.  I remember it was Kapcharge that made the request.

12   Q.  This is something Mr. Murgio was initiating?

13   A.  I remember Kapcharge made the request.

14   Q.  When you say "Kapcharge," can I use the name Kevin Pepe?

15   Are we talking about the same person?

16   A.  Yes.  He's an employee at Kapcharge.

17   Q.  So Kevin Pepe wanted this?

18   A.  Wanted to raise the limits at Magic Wrighter?

19   Q.  Yes.

20   A.  Yes.

21   Q.  As did Mr. Murgio?

22   A.  Yes.

23   Q.  As did you?

24   A.  Did I want to raise the limits at Magic Wrighter?

25   Q.  Or maybe you didn't really care.

H2OYLEB4                          Hill - Cross - By MR. Klingeman

1    A.  I didn't really care.

2    Q.  But it was important to people at Kapcharge; right?

3    A.  Yes.

4    Q.  And it was important to Murgio.

5    A.  Yes.

6    Q.  And Mr. Hill, yourself, was indifferent; correct?

7    A.  Yes.

8    Q.  You didn't care?

9    A.  Yes.

10   Q.  But Pastor Gross was opposed to it.

11   A.  Yes, he was.

12   Q.  In fact, his response to you was, "Gentlemen, please," in

13   all caps.

14   A.  Right.

15   Q.  As if to say stop; right?

16   A.  He didn't stop us, but he said --

17   Q.  I didn't ask you that question.  I just asked you if that

18   was his reaction.

19   A.  He said, "Gentlemen, please" in all caps.

20   Q.  But the point is you testified yesterday under oath to this

21   jury that Mr. Gross never raised these ACH transaction volume

22   concerns during board meetings.  Right?

23   A.  Yes.

24   Q.  And that during proper board meetings at the HOPE FCU, he

25   did not raise these concerns.

H2OYLEB4                         Hill - Cross - By MR. Klingeman

1   A.  Yes.

2   Q.  You said it twice; right?

3          Your Honor, could I ask the government to publish

4   what's in evidence as Government Exhibit 6089.

5          THE COURT:  Yes.  Please.

6          While that's getting up, if the jurors would like to

7   take a standing break.  We'll do our mid-afternoon break in

8   about ten minutes.

9          (Pause)

10          THE COURT:  Thank you.

11  BY MR. KLINGEMAN:

12  Q.  Mr. Hill, do you have Government Exhibit 6089 in front of

13  you?

14  A.  Yes.

15  Q.  This is the HOPE FCU minutes of board of directors meeting

16  September 20, 2014.  Correct?

17  A.  Yes.

18  Q.  In attendance, according to the list, is Trevon Gross?

19  A.  Yes.

20  Q.  And Ricardo Hill.

21  A.  Yes.

22  Q.  Among others.  Yes?

23  A.  Yes.

24  Q.  So I'm going to direct your attention to the bottom half of

25  the page beginning at the headline CFO report by Bernard

1   Larkins.

2            Do you see that?

3   A.  Yes.

4   Q.  Bernard Larkins was what we'll call a legacy board member,

5   an old member?

6   A.  Yes.

7   Q.  He wasn't a new member.

8   A.  Yes.

9   Q.  Mr. Larkins was the chief financial officer?

10  A.  Yes.

11  Q.  In this report that he provides, specifically in the second

12  and third sentences, "He noted that we are seeing more ACH

13  activity through one of our business members, and he asked that

14  the supervisory committee pay special attention to ensure that

15  we are in compliance.  The board discussed the need to bring in

16  some assistance to ensure that our back office is properly

17  organized."

18           Do you see that?

19  A.  Yes.

20  Q.  So that's a direct discussion being initiated by Bernard

21  Larkins of the increased ACH activity involving Kapcharge;

22  correct?

23  A.  That is.

24  Q.  And then who speaks next according to the minutes?

25  A.  Who speaks next?

H2OYLEB4                          Hill - Cross - By MR. Klingeman

 1   Q.  Yes.  In the next paragraph.

 2   A.  I can't see it yet.

 3   Q.  I'm sorry.

 4            If we could just enlarge this a little bit.

 5   A.  Trevon Gross.

 6   Q.  Trevon Gross.

 7   A.  Yes.

 8   Q.  The very person you said did not address these concerns at

 9   any board meeting; right?

10   A.  You're showing me the minutes.

11   Q.  Excuse me?

12   A.  The minutes are not read verbatim at a board meeting.  Just

13   because it shows in the minutes doesn't mean it was discussed

14   thoroughly over the board meeting.  So I wouldn't remember.  If

15   this was in the minutes, but I do not recall us having a

16   thorough discussion about what you just pointed out.

17   Q.  Mr. Hill, you'll agree with me that it's in the minutes.

18   A.  Yes, it is.

19   Q.  So the question you're raising now is whether it was

20   discussed verbally at the meeting.  Right?

21   A.  I don't remember it being discussed at the meeting, but I

22   see that it's in the minutes.

23   Q.  But you'll agree with me that the minutes say that

24   Mr. Larkins stated that he is preparing to end a very strong

25   quarter.  Do you see that?

1   A.  Yes.

2   Q.  It goes on to say, "Mr. Larkin has noted that we are seeing

3   more ACH activity."

4            Do you see that?

5   A.  Yes.

6   Q.  It says, "Mr. Larkin has asked that the supervisory

7   committee pay special attention."

8   A.  Yes.

9   Q.  And then it goes on to say in the last sentence of that

10  paragraph, "The board discussed."

11           Do you see that?

12  A.  Yes.

13  Q.  So doesn't that give you, in any common sense

14  interpretation of this document, that there was a verbal

15  discussion of this issue at the meeting?

16  A.  Again, I don't remember that we discussed it at the meeting

17  even though I see it in the minutes.

18  Q.  But you didn't testify yesterday that you didn't remember

19  such a discussion, did you?

20  A.  I testified that we did not have a discussion during the

21  board meetings about Trevon's concern about ACH.  That's

22  correct.

23  Q.  But this document contradicts that testimony; correct?

24           MR. SHIN:  Objection, your Honor.

25           THE COURT:  Sustained.

1   BY MR. KLINGEMAN:

2   Q.  This document shows that there was a discussion at a

3   meeting that Mr. Gross attended; correct?

4            MR. SHIN:  Objection, your Honor.

5            THE COURT:  Overruled.

6   BY MR. KLINGEMAN:

7   Q.  You may answer.

8   A.  It says that, yes.

9   Q.  And you were also present at that meeting.

10  A.  Yes.

11           MR. KLINGEMAN:  If we could see Government's 6091 in

12  evidence.

13  Q.  Mr. Hill, this document in front of you now are the minutes

14  of the HOPE FCU board of directors meeting November 15, 2014.

15  Correct?

16  A.  Yes.

17  Q.  Among the people shown in attendance are Trevon Gross?

18  A.  Yes.

19  Q.  And Ricardo Hill.

20  A.  Yes.

21  Q.  Among others.  Yes?

22  A.  Yes.

23           MR. KLINGEMAN:  If we could go to the second page.

24  Q.  Supervisory committee report.  Tell me if I'm reading this

25  correctly.  "The committee submitted their report that they are

1    following their work plan.  They expressed their concern about

2    the volume of ACH transactions and would review our ACH BSA CIP

3    and third-party vendor policies to ensure compliance.  They

4    also pointed out that the cost of compliance with the NCUA

5    requests has distracted staff from their operational duties.

6    The vetting of the entire membership has cost the CU about a

7    month and a half of time which has caused certain operational

8    activities to be delayed."

9           The next paragraph, "The board agreed that we cannot

10   allow this to happen again, and the addition of a new CEO will

11   give us the ability to filter these requests and better manage

12   operations."

13          Did I read that correctly?

14   A.  Yes.

15   Q.  So is it not a fact that in the November 15, 2014, board

16   meeting at which Mr. Gross was present and presiding --

17   A.  Yes.

18   Q.  And you were also in attendance --

19   A.  Yes.

20   Q.  -- that the concern about ACH transaction was raised and

21   addressed?

22   A.  It says that in the minutes.  However, I was on the call,

23   and we didn't discuss this in detail as Trevon and I discussed

24   via email or chat or on the phone.  But, yes, it is here in the

25   minutes.

1   Q.  It was discussed to some extent?

2   A.  Yes.

3   Q.  So, when you told this jury yesterday that Mr. Gross had

4   never raised this issue at a board meeting, that testimony was

5   not true.

6   A.  I testified that Trevon -- in the fashion that he raised

7   the issue with me over the phone or via messages was definitely

8   not similar to the way the issue was talked about at that board

9   meeting.

10  Q.  That's in fact not what you testified to.  So I'm going to

11  read you your testimony again.

12  A.  Okay.

13  Q.  What you said was the following:

14  "Q.  Did Trevon Gross raise concerns about ACH transaction

15  volume during board meetings?

16  "A.  Not during board meetings."

17          Do you remember that testimony you gave 24 hours ago?

18  A.  Yes.  I remember that.  Yes.

19  Q.  That testimony is in fact not accurate.

20  A.  Okay.

21  Q.  Do you agree?

22          MR. SHIN:  Objection, your Honor.

23          THE COURT:  Overruled.

24  BY MR. KLINGEMAN:

25  Q.  Agree?

H2OYLEB4                    Hill - Cross - By MR. Klingeman

1    A.  Yes.

2    Q.  You were also asked some questions yesterday about payments

3    to Mr. Gross for consulting services.  Right?

4    A.  Yes.

5              THE COURT:  Mr. Klingeman, before you start the next

6    line, we'll take our mid-afternoon break.

7              MR. KLINGEMAN:  Thank you, your Honor.

8              THE COURT:  Ladies and gentlemen, we'll take about a

9    ten-minute break.  Thank you.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court; jury not present)

2           THE COURT:  Mr. Hill, you may step down.

3           (Witness temporarily excused)

4           THE COURT:  Matters to take up, counsel?

5           MR. SHIN:  Your Honor, if we can have a sense of

6    Mr. Klingeman's remaining cross, the length of it, so we can

7    plan for our next witness.

8           MR. KLINGEMAN:  I'm budgeting another hour.

9           THE COURT:  Is there anything to address?  You're

10   still conferring on the final documents.  Is that right?

11          MR. KLINGEMAN:  Yes, please.

12          THE COURT:  So I'll come back in a few minutes to take

13   anything up.  Thank you.

14          (Recess)

15          THE COURT:  Is there anything else we can take up?

16          MS. CHOI:  Defense counsel has indicated to us the

17   portions of that transcript that they intend to attempt

18   introduce.  I think the only question becomes whether or not

19   we'll agree.  There's some issue about when that should come

20   in, and I guess we'll try to work it out.  If not, you may be

21   receiving some short letters over the weekend.

22          THE COURT:  Okay.

23          MS. CHOI:  Aside from that, I think the only other

24   outstanding issue, from our perspective, is whether or not

25   there are other witnesses that the defense counsel indicated

1    that they would want either a stipulation to or a live witness

2    with regard to documents they've already stipulated in as

3    business records.

4             We're going to deal with the PNC issue.  I just don't

5    know if there's anything else.  I think we should probably try

6    to figure that out soon so we can get those witnesses if

7    necessary.

8             THE COURT:  Okay.

9             MS. SANTILLO:  We will confirm that.

10            MR. CREIZMAN:  At 3:55 I'm just going to exit stage

11   left and go up to Judge Engelmayer quietly.

12            THE COURT:  So, Mr. Shin, are there any objections to

13   what the defense intends to introduce that you're aware of as

14   you sit here?

15            MR. SHIN:  Your Honor, we've reached agreement on most

16   of the documents.  I think there are a number of hearsay issues

17   in those documents, but we've agreed that they can come in with

18   a limiting instruction similar to the one that your Honor

19   proposed earlier.

20            THE COURT:  Okay.

21            MR. SHIN:  The difference here though is in the

22   earlier statements, Mr. Lebedev was the recipient, listener,

23   reader.  Therefore, the point was state of mind as the listener

24   in those cases.

25            THE COURT:  Right.

1          MR. SHIN:  Here some of those statements fall under

2     that same rubric.  There are some Murgio or other statements

3     that Mr. Gross would have been the reader or recipient of.

4     Some of those are Mr. Gross' own statements in which they're

5     relying on 803 present sense state of mind.  So there I think

6     there needs to be a limiting instruction.  These are not coming

7     in for the truth of Mr. Gross' statements but as --

8          THE COURT:  Are they coming in under 803(3)?

9          MR. KLINGEMAN:  They're coming in under one of two

10     rationales.  If we need to come into each one, we can.

11          THE COURT:  It only matters if it's 803(3), that it's

12     an exception.

13          MR. KLINGEMAN:  Yes, but some of the documents that

14     counsel has concerns about are documents I'm not offering as a

15     hearsay exception.  I'm offering as not hearsay.

16          THE COURT:  Not for the truth.  For some other

17     purpose.

18          MR. KLINGEMAN:  Exactly.  For a statement of present

19     intention in almost every situation -- I intend to do this.  I

20     want you to do that.  I am going here.  I want you to go there,

21     that kind of thing, which is not hearsay.  It's not an

22     exception to hearsay.  It's just not hearsay.

23          THE COURT:  I don't know what specific statements

24     you're talking about.  It matters if you have a non-truth basis

25     for which they're being proffered that the government agrees

1    and wants a limiting instruction, I'll give a limiting

2    instruction.  If some things being offered and the government

3    agrees to it as coming in under an exception, there's no need

4    for a limiting instruction.

5         MR. KLINGEMAN:  I understand from the government's

6    colloquy and my colloquy to me what specific exhibits they want

7    the instruction for, and I consent to that.  So I haven't

8    committed to actually introducing all of these.  It will depend

9    in part on what the witness has to say.

10        There are some foundation questions.  To the extent

11   that I offer a particular exhibit, I'll certainly raise with

12   the Court the need for the limiting instruction, and the

13   government is obviously welcome to, if I don't, because I have

14   no problem with limiting instructions on these documents.  It's

15   just with respect to some of them, a limiting instruction is

16   not necessary.  That's all.

17        THE COURT:  I don't know what the proposed limiting

18   instruction is, but --

19        MR. KLINGEMAN:  I had understood from government

20   counsel that the limiting instruction should mirror what the

21   Court used.

22             (Continued on next page)

23

24

25

1          THE COURT:  He started to say that, and then he said

2    but it's different because some of them don't have Mr. -- in

3    this case, it would be Mr. Gross as the recipient, right?

4          MR. SHIN:  Yes, your Honor.  Some of the emails

5    involve Mr. Gross' own statements.

6          THE COURT:  Okay.

7          MR. SHIN:  And so they're statements as to -- he's

8    providing direction about what needs to happen, he is

9    describing certain events, things of that nature.  And so,

10   they're not coming in for the truth of those events, that those

11   events actually happened, but for the narrower purpose

12   proffered by Mr. Klingeman.

13         THE COURT:  You're not objecting to that, correct?

14         MR. SHIN:  Correct.

15         THE COURT:  Are you requesting a limiting instruction?

16         MR. SHIN:  Yes, your Honor.

17         THE COURT:  I think that's where we left off, which is

18   you started to say, basically, the same limiting instruction,

19   but different.  So, tell me what the request is that's

20   different.

21         MR. SHIN:  So they don't all fall in the same category

22   again.  Some of them feature statements by people other than

23   Mr. Gross, and, therefore, the instruction would be similar to

24   the one that was provided earlier with respect to

25   Mr. Creizman's exhibits and other feature statements by

 1    Mr. Gross that I described earlier, and so the adjustment that

 2    needs to be made is not that these are offered not for their

 3    truth, but for the limited purpose of proof of Mr. Gross' state

 4    of mind or intention.  It would just be confusing then to say

 5    recipient again because --

 6              THE COURT:  I get that it's confusing.  Maybe we need

 7    Mr. Noble as the word guy, but all I'm asking, if you're making

 8    a request for a limiting instruction, because what I don't want

 9    to do is interrupt mid-stream, and I'm certainly not going to

10    instruct the jury, well, we said recipient earlier, but now

11    it's not the recipient.

12              MR. SHIN:  Right, right.

13              THE COURT:  So make your proposal, and I will either

14    agree or disagree with you.

15              MR. SHIN:  Yes, your Honor.  So, your Honor should say

16    this email is being offered not for the truth of its contents,

17    but for the limited purpose of proof of Mr. Gross' state of

18    mind or then present intention.  Again, those are for the

19    emails that have his statements.

20              I guess the thing we need to figure out is how to flag

21    for your Honor which of these exhibits --

22              THE COURT:  Here's my suggestion:  Why don't you just

23    take a moment and discuss it.  Just do a variation on the first

24    one, we'll call that limiting instruction one, and come to an

25    agreement on a proposal for the second one, we'll call that

1    limiting instruction two, and assuming I agree with you, then

2    you can refer to those by those terms.  How is that?

3            MR. SHIN:  That sounds perfect, your Honor.  We'll

4    take a moment.

5            (Pause)

6            MR. SHIN:  Your Honor, we've come up with a universal

7    instruction, so as to avoid needing to figure out two.

8            THE COURT:  Okay.

9            MR. SHIN:  So we would propose that your Honor

10   instruct the jury:  "This email contains statements by

11   Mr. Gross and possibly others as well.  The statements made by

12   Mr. Gross are being offered as evidence of his state of mind.

13   The statements of other authors are being offered not for the

14   truth, but for the limited purpose of providing context for the

15   conversation."

16           THE COURT:  I'm just reflecting if that makes sense to

17   me and would, therefore, make sense to the jury.

18           I'll just repeat what you've said and make sure

19   everybody agrees.  I think it's fine.

20           This email contains statements by Mr. Gross and

21   possibly others as well?  You mean these emails?  What do you

22   mean, "possibly"?  Does it depend on what document we're

23   looking at at a particular time?

24           MR. SHIN:  Actually, no.  Some of them just have a

25   statement of Mr. Gross, others are chains that have statements

1   by multiple people.  They were just attempting to --

2              THE COURT:  Are they all going to come in once?  Is

3   the idea they all come up in at once, and I'll do one limiting?

4              MR. KLINGEMAN:  No, no, they're not all coming in at

5   once, and I hope some never come in.  But I think by the time

6   your Honor would want to give a limiting instruction, you will

7   have the exhibit in front of you, and you can tailor --

8              THE COURT:  That's fine.  The basic idea is the emails

9   contain statements by Mr. Gross and others -- and possibly

10  others, either it will or it won't.  The statements made by

11  Mr. Gross are being offered as evidence of his state of mind.

12  The statements of other authors are being offered not for the

13  truth, but for the limited purpose of providing context for the

14  conversation.  Is that what you want?

15             MR. SHIN:  Yes, your Honor.

16             THE COURT:  Mr. Klingeman?

17             MR. KLINGEMAN:  Yes, your Honor.

18             THE COURT:  All right.  We'll get our jury.  And if

19  you could bring Mr. Hill back.  Thank you.

20             Who is next after Mr. Hill?

21             MS. CHOI:  Your Honor, there will be a brief email

22  interlude to the next Alloya witness, who is Michelle McDowell.

23  I don't know if we're going to get there, but we're optimistic.

24             THE COURT:  Okay.  Thank you.

25             (Continued on next page)

1    (Jury present)

2         THE COURT:  Thank you.  Everyone may be seated.

3         Mr. Klingeman, when you're ready, you may proceed with

4    your cross-examination of Mr. Hill on behalf of Mr. Gross.

5         Mr. Hill, I remind you that you are under oath.

6         MR. KLINGEMAN:  Thank you, Judge.

7    BY MR. KLINGEMAN:

8    Q.  Mr. Hill, yesterday afternoon, you testified about

9    Mr. Gross, Pastor Gross, serving as a consultant to

10   Collectables Club during the period when Collectables Club was

11   involved with HOPE FCU?

12   A.  Yes.

13   Q.  And you talked about how you helped create a consultant

14   agreement, you used some kind of device to sign Mr. Gross' name

15   to the agreement, and so forth?

16   A.  Yes.

17   Q.  And you told us that you had Mr. Gross' consent to do all

18   that?

19   A.  Yes.

20   Q.  Is there any kind of email where you two discuss you

21   signing his name to documents?

22   A.  I don't know if it's an email, or chat, or on the phone.  I

23   don't remember.

24   Q.  So, you haven't seen an email to that effect recently?

25   A.  No.

1    Q.  A WhatsApp chat?

2    A.  No.

3    Q.  And if it were on the phone, unless it had been recorded by

4    Anthony Murgio, you wouldn't have a recording of that, right?

5    A.  Yes.

6    Q.  But, nevertheless, Mr. Gross served as a consultant to

7    Collectables Club in the operation of the HOPE FCU during the

8    period that you were involved, right?

9    A.  Yes.

10   Q.  And at the same time, he was a full-time pastor of Hope

11   Cathedral?

12   A.  Yes.

13   Q.  And you were on-site a couple of times, right?

14   A.  At Hope Cathedral?

15   Q.  Right.

16   A.  Twice.

17   Q.  Yeah, you saw the office that we looked at this morning in

18   that picture, Government Exhibit 73?

19   A.  Yes.

20   Q.  It's really the kitchen of a house, right?

21   A.  Yes.

22   Q.  There was a house on the side of the road in Jackson?

23   A.  Yes.

24   Q.  And inside the house, the credit union was located?

25   A.  Yes.

1   Q.   Essentially in the kitchen?

2   A.   Yes.

3   Q.   And then there was a second office off the kitchen where

4   there was electronic equipment, and perhaps work was done in

5   that room as well, right?

6   A.   Yes.

7   Q.   That's essentially the old pantry of the kitchen, right?

8   A.   I don't know what it is.  It's like a little office.

9   Q.   But it's a little room off the kitchen?

10  A.   Yes.

11  Q.   And it's an old house?

12  A.   It is.

13  Q.   Then as you're walking out of the back of the house,

14  there's a second room, if you recall?

15  A.   Yes.

16  Q.   Where there could be meetings or a small worship service?

17  A.   Yes.

18  Q.   A little piano there?

19  A.   Yes.

20  Q.   In fact, somebody started playing the piano as he was

21  walking out of the meeting that day, right?

22  A.   Yes.

23  Q.   You can hear it at the end of the recording?

24  A.   Yes.

25  Q.   And then behind the house is a building where a preschool

1    is located, right?

2    A.  Yes.

3    Q.  And then adjacent to that building, across the parking lot,

4    is the church cathedral itself?

5    A.  The church, yes.

6    Q.  Were you ever inside the church?

7    A.  No.  Nor the school.

8    Q.  Nor the school?  Okay.

9            But Pastor Gross had responsibilities to the church

10   and the school at the same time he was the CEO of the credit

11   union, right?

12   A.  Yes.

13   Q.  And in this period of transition when control of the credit

14   union was going from him and the old board to you and the new

15   board, he worked as a consultant, right?

16   A.  Yes.

17   Q.  And he did a lot?

18   A.  Yes.

19   Q.  I mean, it wasn't a noshow, right?

20   A.  No.

21   Q.  It wasn't a low-show?

22   A.  No.  He did a lot.

23   Q.  Sure.  And, in fact, you looked at an email yesterday in

24   which Mr. Murgio encourages payment of the $3,000 for

25   Mr. Gross' consultant services by saying, this is for all that

H2OKLEB5                          Hill - Cross

1    Trevon Gross has done, right?

2    A.  Yes.

3    Q.  Among the things that Mr. Gross did, in an email that you

4    read yesterday, he provided checks and balances, right?

5    A.  He provided checks and balances?

6    Q.  Yes.  We can call it up, if necessary, but it was

7    Government Exhibit 2182.  The point is, he looked after things?

8    A.  Oh, yes.

9    Q.  Including you?

10   A.  Yes, definitely.

11   Q.  He checked your work?

12   A.  Yes.

13   Q.  He would sometimes serve as a teller?  Did you ever observe

14   him serving as a teller?

15   A.  A teller?

16   Q.  Yes.

17   A.  A bank teller?

18   Q.  At the credit union.

19   A.  No.

20   Q.  Well, did you observe him answering phone calls in

21   connection with the business of the credit union?

22   A.  I don't know who -- what calls he answered, I'm sorry.

23   Q.  Okay.  I'm just asking.

24   A.  I heard him -- I seen him answering phones, but I can't say

25   what it was for.

H2OKLEB5                          Hill - Cross

1   Q.  So you didn't overhear the conversation from his

2   perspective and know that it concerned credit union business?

3   A.  Correct.

4   Q.  But you know he was on email because we looked at a lot of

5   those emails over the last three days, right?

6   A.  Yes.

7   Q.  And he obviously helped supervise the work that you were

8   doing?

9   A.  Yes.

10  Q.  Participated in training?

11  A.  Yes.

12  Q.  The two of you, in fact, attended a credit union conference

13  in New Orleans in September of 2014, right?

14  A.  Yes.

15  Q.  Together?

16  A.  Yes.

17  Q.  Two-day conference?

18  A.  Yes.

19  Q.  In connection with these consulting duties, he had an

20  agreement with Collectables Club to be paid for those duties,

21  right?

22  A.  Yes.

23  Q.  Do you remember how much it was?

24  A.  For the consultant agreement?

25  Q.  Yes.

1    A.   It was 3,000 a month.

2    Q.   And who paid that consulting fee to him?

3    A.   It was Collectables Club at first, and then Kapcharge began

4    to pay half of it.

5    Q.   So, not HOPE Federal Credit Union?

6    A.   Correct.

7    Q.   You were asked some questions about one of those particular

8    payments yesterday afternoon.  You remember?

9    A.   No.  Please refresh my memory.

10   Q.   Okay.

11           MR. KLINGEMAN:  Can we call up Government's 2175 in

12   evidence.

13   Q.   Mr. Hill, you see the document in front of you?

14   A.   Yes.

15   Q.   It's an email exchange you were shown yesterday

16   afternoon --

17   A.   Yes.

18   Q.   -- by the government prosecutor?

19   A.   Yes.

20   Q.   And it begins with a question from you via email to

21   Mr. Gross via email?

22   A.   Yes.

23   Q.   And you say, "To be clear, I only need to move 3K from Kap

24   to Collectables Club, but from Collectables Club to 5170?"

25   Right?

1  A.  Yes.

2  Q.  And what you're saying there is moving $3,000 from

3  Kapcharge to Collectables Club, and then from Collectables Club

4  to a HOPE Federal Credit Union account bearing the number 5170?

5  A.  Yes.

6  Q.  And then what's Mr. Gross' response?

7  A.  "Yes, thanks."

8  Q.  So the point was, you were trying to get direction from him

9  as to where the payments should go, and he was giving you that

10  direction, right?

11  A.  Yes.

12  Q.  And the specific direction was to send it ultimately to

13  account 5170 at HOPE Federal Credit Union, right?

14  A.  Yes.

15  Q.  And you remember being asked some questions about account

16  5170 yesterday in front of the jury under oath?

17  A.  Yes.

18  Q.  And specifically, during the direct testimony of Ricardo

19  Hill, dated February 23rd, 2017, at page 1332, line 5, the

20  government prosecutor asked you the question:

21  "Q.  What is 5170?"

22        You remember that question?

23  A.  Yes.

24  Q.  You remember the answer that you gave?

25  A.  Yes.  I'm sure I said it was Trevon's account.

H2OKLEB5                          Hill - Cross

1   Q.  And that account, your answer verbatim was, quote, "5170 is

2   his HOPE account"?

3   A.  Yes.

4   Q.  And then the prosecutor wanted to clarify that, apparently,

5   and asked you, "Trevon Gross' HOPE account?"

6   A.  Yes.

7   Q.  And your answer was yes, right?

8   A.  Yes.

9           MR. KLINGEMAN:  If we could call up Government's 6064

10  in evidence, and specifically the upper right-hand corner of

11  the page.

12  Q.  This is the statement of account for member number 5170,

13  Mr. Hill?

14  A.  I see.

15          MR. KLINGEMAN:  Could we go to the left side of that

16  same page to identify the accountholder.

17  Q.  Mr. Hill, who's the accountholder of 5170?

18  A.  Hope Cathedral.

19  Q.  Not Trevon Gross?  Yes or no?

20  A.  Yes.

21  Q.  Additionally, yesterday you were shown an email --

22          MR. KLINGEMAN:  I'm not asking for it to be published

23  right this minute.

24  Q.  -- Government Exhibit 2115 in evidence, an email from

25  Trevon Gross to a woman named Brooke at MVP Banking.  Do you

1    remember that?

2    A.  Yes.

3           MR. KLINGEMAN:  Now we can publish, please.  Thank

4    you.

5    Q.  So, this is the email, right?

6    A.  Yes.

7    Q.  And it's from Mr. Gross at HOPE FCU?

8    A.  Yes.

9    Q.  And it's to csr@mvpbanking.com, right?

10   A.  Yes.

11   Q.  And it's addressed to a person named Brooke -- I presume

12   it's a woman, but I could be wrong -- right?

13   A.  Yes.

14   Q.  And it says, "This is my formal request to increase the

15   daily and batch limits are increased to 5 million.  Thank you,

16   Trevon Gross, Chairman."  Do you see that?

17   A.  Yes.

18   Q.  Now, you were asked about this yesterday, right?

19   A.  Uh-huh.

20   Q.  And you were asked by the prosecutor to read what I just

21   read back, right?

22   A.  Right.

23   Q.  And then you were asked by the prosecutor:

24   "Q.  Do you know what that means, 'daily and batch risk

25   limits'?"

1    And your answer was:  "We want to increase our daily

2    limit to 5 million per day."  Right?

3    A.  Yes.

4    Q.  And then you were asked:

5    "Q.  And this was with respect to the ACH for Kapcharge?"

6    A.  Yes.

7    Q.  And your answer was yes, right?

8    A.  Yes.

9    Q.  And this was the only email you were shown about that

10   particular request for an increase in limits, right?

11   A.  To measure -- that particular request?

12   Q.  Yes.

13   A.  I don't remember.

14   Q.  Well, do you remember, as you sit here now, whether the

15   prosecutor showed you any other emails about that batch limit

16   request yesterday?

17   A.  That particular one?

18   Q.  Right.

19   A.  No, I don't remember.  I'm sorry, I seen a bunch of emails

20   yesterday.

21   Q.  Of course, but I'm asking you:  Do you remember being shown

22   any other emails about that particular request when you

23   testified yesterday?

24   A.  I don't remember if I seen the reply to that request.  I

25   don't remember, I'm sorry.

H2OKLEB5                          Hill - Cross

1    Q.  There's nothing to apologize about.

2    A.  Okay.

3    Q.  What I would like to do now, Mr. Hill, is show you a

4    defense exhibit.

5          MR. KLINGEMAN:  Your Honor, I'm handing, for the

6    Court, what's been marked for identification as TG12, Trevon

7    Gross 12, and I'm going to hand a copy of the original marked

8    exhibit to the witness.

9          THE WITNESS:  Thank you.

10   Q.  Mr. Hill, I've placed before you what has been marked for

11   identification as TG12, and I'd ask you to look at it

12   carefully, and let me know when you're done.

13   A.  Okay.

14   Q.  Do you recognize this document?

15   A.  Yes.  This is an email --

16   Q.  You recognize it as a document you've seen at the time that

17   it was created?

18   A.  Yes.

19   Q.  And do you recognize it as being the same as when you first

20   saw it when it was created?

21   A.  Yes.

22         MR. KLINGEMAN:  Your Honor, I'd ask that TG12 be

23   received in evidence.

24         MR. SHIN:  No objection, your Honor, subject to a

25   limiting instruction.

1        THE COURT:  All right.  I will admit TG12.

2        Ladies and gentlemen of the jury, the email contains

3   statements by Mr. Gross.  The statements made by Mr. Gross are

4   being offered as evidence of his state of mind.

5        MR. KLINGEMAN:  Thank you, your Honor.

6        (Defendants' Exhibit TG12 received in evidence)

7        MR. KLINGEMAN:  Can we publish TG12 for the benefit of

8   the jury.

9   BY MR. KLINGEMAN:

10  Q.  Mr. Hill --

11  A.  Yes.

12  Q.  -- you can see the marking TG12 in the upper left?

13  A.  Yes.

14  Q.  This is an email from Mr. Gross to you, correct?

15  A.  Yes.

16  Q.  Just to be clear, this email is dated Tuesday, November 4,

17  2014, at 5:05 p.m., right?

18  A.  Yes.

19  Q.  The email that we just looked at that Mr. Gross wrote to

20  Brooke is the same date, November 4, 2014, at 4 p.m., right?

21  A.  Yes.

22  Q.  About an hour before the email that's on the screen, right?

23  A.  Yes.

24  Q.  And so Mr. Gross is following up with you here, right?

25  A.  Yes.

1   Q.  And he says, "Ricardo, I was just on the phone with Brooke

2   about a request you put in for increasing our daily limit from

3   3 million to 10 million.  I happened to be on the phone with

4   her.  She was immediately alarmed and said that she would need

5   to escalate this request.  We cannot keep pushing these limits

6   like this.  I sent a request to have the limits raised to

7   5 million.  Remember, we are only capitalized at 400,000.  Last

8   month, we had over 40 million in ACH transactions flow through

9   the CU.  We should address the capitalization before we raise

10  the limit again.  The FRB will require us to have money set

11  aside in reserve, but it will not be permanent.  These things

12  must be done incrementally, so that we do not send up red

13  flags...please, can we not be this aggressive!!!!" signed -- or

14  from Trevon Gross.

15          Did I read that right?

16  A.  Yes.

17  Q.  And, just to be clear, the initials "FRB" refers to Federal

18  Reserve Board or Federal Reserve Bank?

19  A.  Federal Reserve Bank.

20  Q.  Yes.

21          So, is Pastor Gross reacting to having just heard from

22  Brooke that you, Mr. Hill, made a request to increase the ACH

23  limit to $10 million?

24  A.  Yes.

25  Q.  And is that something you, in fact, did?

1    A.  Yes.

2    Q.  At Mr. Murgio's direction?

3    A.  And/or Kapcharge.

4    Q.  Okay.  So it was either at the direction of someone at

5    Kapcharge, right?

6    A.  Yes.

7    Q.  Kevin Pepe, perhaps?

8    A.  Yes.

9    Q.  Who was also a carbon copy on Pastor Gross' email?

10   A.  Yes.

11   Q.  Or Anthony Murgio?

12   A.  Yes.

13   Q.  Who was also a carbon copy on Pastor Gross' email, right?

14   A.  Yes.

15   Q.  Presumably, Pastor Gross didn't tell you to do that?

16   A.  Correct.

17   Q.  Because in this email, he's objecting to you having done

18   that, right?

19   A.  Right.

20   Q.  And, instead, as some kind of compromise, he sent the other

21   email saying raise it to 5 million?

22           MR. SHIN:  Objection.

23           THE COURT:  Grounds?

24           MR. SHIN:  Assumes facts not in evidence, compromise.

25           THE COURT:  Sustained.

H2OKLEB5                        Hill - Cross

BY MR. KLINGEMAN:

Q.  Well, you understand the context of what is going on here,
right?

A.  Yes.

Q.  In other words, you understood what you did?

A.  Yes.

Q.  Because you did it, right?

A.  Yes.

Q.  You asked for a $10 million increase?

A.  Yes.

Q.  And you understood that Pastor Gross is saying, at the very
end, please, can we not be this aggressive, right?

A.  Yes.

Q.  So you know he objects to your, without his permission and
without his knowledge, asking for the limit to be raised to
10 million?

A.  Yes.

Q.  But in the meantime, he's offered, or he's requested, that
it be raised to 5 million, in other words, half that amount,
right?

A.  Yes.

Q.  And you agree that's a compromise?

A.  A compromise?

Q.  Meeting in the middle?

A.  Yes.

H2OKLEB5                        Hill - Cross

1    Q.  And it's not zero, right?

2    A.  I'm sorry?

3    Q.  It's not zero?

4    A.  Right.

5    Q.  It's not 10 million?

6    A.  Right.

7    Q.  It's a compromise?

8    A.  Yes.

9    Q.  You were upset to receive this email from him?

10   A.  Was I?

11   Q.  Yes.  Were you?  That's my question.

12   A.  No, no.  Was I upset?

13   Q.  Were you upset?

14   A.  No, I was not upset.

15   Q.  Okay.  So you were not frustrated?

16   A.  Frustrated?  Yes.

17   Q.  Why were you frustrated?

18   A.  Because I only raised the limit because I received the

19   request.

20   Q.  And what about that made you frustrated?

21   A.  Because of one side is requesting me to raise the limit,

22   and then another side is telling me, hey, what are you doing,

23   you shouldn't do this.

24   Q.  You felt like you were caught in the middle?

25   A.  Yeah.

H2OKLEB5                     Hill - Cross

1   Q.  And Pastor Gross is essentially calling you out?

2   A.  Yeah.  This is not the first time.

3   Q.  It's not the first time he called you out like this?

4   A.  Correct.

5   Q.  And so that made you frustrated?

6   A.  Yeah.

7   Q.  And you expressed your frustration in subsequent

8   communications with other people involved in this situation?

9   A.  Yes.

10  Q.  I want to show you now what's been marked in evidence by

11  the government this morning as 2279.  2279.

12          Do you remember seeing this email this morning,

13  Mr. Hill?

14  A.  Yes.

15  Q.  When the government prosecutor showed it to you?

16  A.  Yes.

17  Q.  And he had you read the top of the email aloud to the jury,

18  correct?

19  A.  Yes.

20  Q.  So Trevon Gross' email to Anthony Murgio and then

21  Mr. Murgio's response, correct?

22  A.  Yes.

23  Q.  But you were not asked to read the other part of the email,

24  correct?

25  A.  The other part?

1    Q.  The other -- the rest of this document, you were not asked

2    to read it this morning?

3    A.  Oh, yes, yes.

4    Q.  Yes, you were not asked to read it, right?

5    A.  Yes.

6    Q.  I'd like you to read it now.

7    A.  Okay.  Starting from?

8    Q.  Let's go to the end of the document, the second page.  The

9    very first email in this chain says that on November 6, 2014,

10   at 3:38 p.m., Rico Hill, 7ricos@gmail.com, wrote:

11   "Gentlemen --"

12          First of all, who were you addressing?  Who are the

13   gentlemen?

14   A.  Kapcharge and Anthony Murgio.

15   Q.  And read aloud to the jury what you said to them on

16   November 6, 2014.

17   A.  Okay.  "Why am I being requested to do things that may or

18   may not be okay to do?  If we are aware of our capitalization

19   requirements, why am I being instructed to authorize

20   100 million to pass through the CU?  Number one, we are

21   obviously not capitalized for this amount.  Number two, my name

22   is on all of these documents as well as Trevon.  Number three,

23   I'm sure you all know that Alloya still can, and most likely

24   will, alert the NCUA of our activity, causing them to snoop

25   again.  Four, Magic Wrighter does not care if we remain

1    compliant in reference to our capitalization requirements.

2    They just want to get paid.  Five, do we not care?

3              "Just because this is legal does not mean that it is

4    encouraged to be operating outside such parameters.  From what

5    I understand" -- I think it's supposed to be "ratio" -- "the

6    ratio we must maintain is very important, and it seems that

7    only Trevon is attempting to ensure we remain compliant.

8    Please reply with your thoughts."

9    Q.  Thank you.

10             So you are addressing this to Anthony Murgio and Kevin

11   Pepe at Kapcharge, correct?

12   A.  Yes.

13   Q.  And this is in response to the email exchanges we just

14   looked at involving increasing the credit limits 5 million or

15   10 million, correct?

16   A.  Not that exact one.

17   Q.  Okay.  Well, the situation involving ACH processing?

18   A.  Yes.

19   Q.  An example of which is those pair of emails we looked at a

20   little bit earlier?

21   A.  Yes.

22   Q.  And you are frustrated with Anthony Murgio and Kevin Pepe?

23   A.  Yes.

24   Q.  Because they are asking you things -- they are asking you

25   to do things -- you, Ricardo Hill -- to do things that may or

1    may not be okay to do, right?

2    A.   Yes.

3    Q.   Pastor Gross is not asking you to do these things?

4    A.   No.

5    Q.   And so you explain what you think the problems are here,

6    right?

7    A.   Correct.

8    Q.   And then you say, towards the bottom, "Just because this is

9    legal does not mean it is encouraged to be operating outside

10   such parameters," you go on to talk about the ratio, right?

11   A.   Yes.

12   Q.   So can we presume, from that, that you thought that what

13   you were doing here was legal?

14           MR. SHIN:  Objection, your Honor.

15           THE COURT:  Overruled.

16   A.   Processing ACH transactions?  Yes.

17   Q.   Perfectly legal, right?

18   A.   Yes.

19   Q.   It's just the ratios may have been out of whack?

20   A.   Yeah.

21   Q.   Or other requirements, regulatory requirements, may not be

22   being satisfied, right?

23   A.   Yes.

24   Q.   There was no crime?

25   A.   Not with ACH processing.

H2OKLEB5                          Hill - Cross

1   Q.  From your perspective?

2   A.  Correct.

3   Q.  But, nevertheless, according to you, you're operating,

4   being asked to operate outside certain parameters, right?

5   A.  Yes, the capitalization.

6   Q.  You're being asked to do things that may or may not be

7   okay?

8   A.  Yes.

9   Q.  Even if they're legal, right?

10  A.  Correct.

11  Q.  And who is the only person attempting to ensure that the

12  HOPE Federal Credit Union is compliant?

13  A.  Trevon.

14  Q.  You were asked yesterday afternoon a series of questions

15  about ACH processing, towards the end of the afternoon.

16  Specifically, you were asked by the government prosecutor, page

17  1440, line 3:

18  "Q.  Mr. Hill, while you were involved with HOPE FCU, did

19  Trevon Gross ever tell you to stop processing ACH transactions

20  for Kapcharge?

21  "A.  No."

22  A.  No.

23  Q.  True statement, right?

24  A.  Yes.

25  Q.  He never told you to stop?

H2OKLEB5                         Hill - Cross

1    A.   Never told me to stop.

2    "Q.   Did he ever actually take any action to stop you from

3    processing ACH transactions for charge?"

4    Q.   Answer?

5    A.   No.

6    Q.   That's not a true answer, right?

7    A.   He never stopped me.

8    Q.   Sure he did.  You told us about it this morning.

9    A.   That he stopped me from processing ACH transaction?

10   Q.   Yes.  Okay, put a pin in that.

11           Next question:  "Did he have the ability to stop you

12   from processing ACH for Kapcharge answer?"

13   A.   Yes.

14   Q.   More than yes:  Absolutely?

15   A.   Yes.  I mean he was the only one that can stop us.

16   Q.   And what was that ability?

17   A.   He had the master log-in.

18   Q.   He can close any account?

19   A.   Yes.

20   Q.   He can lock out any back-end user?

21   A.   Yes.

22   Q.   So, yes, he had the power to do so, right?

23   A.   Yes.

24   Q.   So let me ask the question again, that the prosecutor asked

25   you yesterday afternoon.

H2OKLEB5                         Hill - Cross

1    A.   Uh-huh.

2    Q.   Did he ever actually take any action to stop you from

3    processing ACH transactions for Kapcharge?

4    A.   No.

5    Q.   Mr. Hill, what did you tell us this morning?

6            MR. SHIN:  Objection, your Honor.

7            THE COURT:  Sustained.  Eight hours of testimony,

8    Mr. Klingeman.  You just asked what:  Did you tell us this

9    morning?

10           MR. KLINGEMAN:  About this very question.

11   A.   About him stopping us from --

12   Q.   Yes.

13   A.   -- processing?

14   Q.   Yes.  From taking any action.

15   A.   I'm sorry, sir --

16   Q.   Okay, it's late.  Let's move.

17           You told us this morning, Mr. Hill, that in late

18   November 2014, you were shut out of the HOPE Federal Credit

19   Union.

20   A.   Oh, yeah, we were -- eventually, we were cut off.

21   Q.   You were cut off completely?

22   A.   Yes, we had our accounts closed, we were removed from

23   the -- well, we had no control of the credit union anymore.

24   Q.   And no ability to process ACH transactions with Kapcharge

25   or anyone else, right?

1    A.  That's not when it stopped.  We had already agreed to stop

2    processing for Kapcharge before our accounts were closed.  I'm

3    sure -- I now remember that this morning, and I'm positive that

4    I said that -- we went over one of the emails.

5    Q.  So, really, you stopped doing it even before then, right?

6    A.  Yes.

7    Q.  In fact, you talked about that in the meeting?

8    A.  Yes.  That's when we stopped processing.

9    Q.  So, yesterday you told us that Pastor Gross never stopped

10   you -- took any action to stop you from processing ACH

11   transactions for Kapcharge when in fact he did, right?

12   A.  No.

13   Q.  Could you --

14   A.  We, as a board -- I mean it was agreed at the meeting that

15   this was something that we wouldn't do until we got everything

16   in order.

17   Q.  Who was the chairman of the board?

18   A.  Trevon Gross.

19   Q.  So he participated in that?

20   A.  Yes.

21   Q.  He participated in that decision?

22   A.  But it wasn't his sole decision.

23   Q.  I didn't ask you if it was his sole decision.

24   A.  Well, you're correct, yes.

25   Q.  You said yesterday he didn't stop you.

1    A.  You're right.  I did say that.

2    Q.  Thank you.

3            Now, you told us, in answer to questions that the

4    government asked you yesterday, that one of your prior jobs was

5    working at a tax preparation business, right?

6    A.  Yes.

7    Q.  And you told us that your role there was to manage incoming

8    clients?

9    A.  Yes.

10   Q.  Getting them signed up?

11   A.  Yes.

12   Q.  And prepared to meet with the tax preparer?

13   A.  Yes.

14   Q.  And then the government asked you pointblank:  "Were you a

15   tax preparer?"

16   A.  No.

17   Q.  Your answer is what?

18   A.  No.

19   Q.  Now, when Mr. Murgio asked you to participate in the

20   operation of HOPE FCU and join the board, you had to complete

21   certain requirements, right?

22   A.  Yes.

23   Q.  Supply certain paperwork?

24   A.  Yes.

25   Q.  And one of the things you supplied was a resume?

1    A.  Yes.

2    Q.  In fact, everybody from the Coin.mx group, Collectables

3    Club group, had to prepare a resume and send it in?

4    A.  Yes.

5    Q.  Did you see your own resume?

6    A.  Did I see my own resume?  Yes.

7    Q.  Well, you indicated that Mr. Murgio helped you prepare it?

8    A.  Yes.

9    Q.  But you participated in its preparation as well?

10   A.  Yes.

11   Q.  And then you personally submitted it?

12   A.  Yes.

13   Q.  Did you see anyone else's resume?

14   A.  No.

15          MR. KLINGEMAN:  Can we put up what's marked in

16   evidence Government Exhibit 6136-19.

17   Q.  It's not a particularly clear image, Mr. Hill, but can you

18   see it?

19   A.  If you blow it up, I can see it.  Yeah, I can see it,

20   zoomed in.

21   Q.  And this is the resume, the first page of the two-page

22   resume, that you submitted?

23   A.  Yes.

24          MR. KLINGEMAN:  If we could take the zoom back so that

25   Mr. Hill can see it.  And then show him the second page as

H2OKLEB5                          Hill - Cross

1    well.

2             THE WITNESS:  Yes.

3    Q.  So you're now familiar with this document, recalling its

4    contents?

5    A.  Yes.

6    Q.  What's missing?

7    A.  What's missing?

8    Q.  Yes.

9    A.  From?

10   Q.  From the resume.

11   A.  Can you be more specific?

12   Q.  You list your experience, right?

13   A.  Yes.

14   Q.  You list two jobs, right?

15   A.  Yes.  Can you go back to the top --

16            MR. KLINGEMAN:  The first page.  Bottom third of the

17   page, bottom half of the page.

18   Q.  Two jobs, right?

19   A.  Yes.

20   Q.  J&J Tax Service?

21   A.  Yes.

22   Q.  And then general manager of the restaurant you described?

23   A.  Yes.

24   Q.  Mr. Murgio's restaurant, right?

25   A.  Yes.

1    Q.  But what's missing from this experience?

2    A.  What's missing?

3    Q.  Yes.  What job didn't you list in this resume that went to

4    HOPE FCU?

5    A.  Oh, Coin.mx.

6    Q.  Coin.mx?

7    A.  Yes.

8    Q.  It's not here, right?

9    A.  It's not.

10   Q.  And that was the job you had at the time that you prepared

11   this resume?

12   A.  Yes.

13   Q.  It's the job you continued to have after you submitted the

14   resume?

15   A.  Yes.

16   Q.  It's the job that you continued to have even after

17   Mr. Gross cut you off from the HOPE Federal Credit Union,

18   right?

19   A.  Yes.

20   Q.  And yet it's nowhere on the resume?

21   A.  Yeah, but -- I noticed that but it's --

22   Q.  It's nowhere on the resume?

23        THE COURT:  Just a second.  Let me remind both of

24   you -- Mr. Klingeman, too -- to let the witness finish

25   answering and, Mr. Hill, let the question finish and then

1    speak.

2              And, Mr. Klingeman, while you're interrupted, pull the

3    microphone closer to you, please.

4    Q.  Mr. Hill, nowhere on your resume that you submitted to HOPE

5    Federal Credit Union does the job at Coin.mx appear, correct?

6    A.  Correct.

7    Q.  And, in fact, if you go to page 2, you highlight, as among

8    your skills, tax preparer, right?

9    A.  Yes.

10   Q.  That's false?

11   A.  Yes.

12   Q.  And then you add "motivating, encouraging and inspiring,"

13   right?

14   A.  Yes.

15   Q.  I want to just talk about this 11/22/14 meeting that we

16   heard a recording of this morning.  Okay?

17   A.  Okay.

18   Q.  I'm going to ask the government to make available the

19   transcript but we're not going to play the recording again

20   unless you, Mr. Hill, want to hear it.

21   A.  No, no, I don't.

22   Q.  You testified that Mr. Murgio made this recording, right?

23   A.  Yes.

24   Q.  He didn't tell anybody he was making the recording, to your

25   knowledge?

1    A.  Correct.

2    Q.  In other words, he didn't place the recording device in the

3    center of the table so everyone could see it?

4    A.  Right.

5    Q.  And for you, at least, you had no idea the meeting was

6    being recorded?

7    A.  That's correct.

8    Q.  So you have no idea why he recorded it, I take it?

9    A.  That's correct.

10   Q.  Do you have any knowledge, from being present at the

11   meeting, whether Pastor Gross knew it was being recorded?

12   A.  I don't know if he knew.

13   Q.  Now, nowhere in the recording is there a discussion of

14   using HOPE Federal Credit Union to process Bitcoin transactions

15   for Coin.mx, correct?

16   A.  No, I don't think so.

17   Q.  And nowhere in the recording do you say, for example, "I'm

18   not moving to New Jersey"?

19   A.  No.

20   Q.  And nowhere in the recording do you say something to the

21   effect of, "I've been here for several months, I feel like I'm

22   untrained, I feel like I don't know what I'm doing," right?

23   A.  Right.

24   Q.  In fact, you never told Pastor Gross that, right?

25   A.  No, I don't think I ever told him that.

H2OKLEB5                        Hill - Cross

1   Q.  You told him every time you finished one of those training

2   modules, right?

3   A.  Yeah.

4           MR. KLINGEMAN:  I just need one second, your Honor,

5   please.

6   Q.  You pleaded guilty to, among other things, conspiracy,

7   correct?

8   A.  Yes.

9   Q.  And you were sitting at this meeting, right?

10  A.  Yes.

11  Q.  With some of your alleged coconspirators?

12  A.  Yes.

13  Q.  Mr. Gross?

14  A.  Yes.

15  Q.  One, right?

16  A.  Yes.

17  Q.  Mr. Murgio?

18  A.  Yes.

19  Q.  Mr. Freundt?

20  A.  Yes.

21  Q.  Mr. Lebedev?

22  A.  Yes.

23  Q.  Mr. Chung?

24  A.  Yes.

25  Q.  Mr. Ellrich?

1   A.  Yes.

2   Q.  Mr. Michael Murgio?

3   A.  Yes.

4   Q.  If we could flip to page 3, we have Mr. Freundt saying, at

5   the top of page 3, "I'm saying, it's not we have a conspiracy

6   here," right?

7   A.  Yes.

8   Q.  And you don't correct him?

9   A.  No.

10  Q.  Nobody does, right?

11  A.  No.

12  Q.  In fact, the conversation gets quite serious about the

13  various topics, does it not?

14  A.  Yes.

15  Q.  And, among other things, Mr. Gross complains that he's been

16  talking about some of these problems at the credit union for

17  two months?

18  A.  Yes.

19  Q.  Specifically, the fact that no one is actually moving to

20  New Jersey?

21  A.  Correct.

22  Q.  And there's too much ACH processing?

23  A.  Yes.

24  Q.  And this is where it's evidenced, as you testified a few

25  minutes ago, that HOPE Federal Credit Union eventually called a

1    halt to the ACH processing, right?

2    A.  Yes.

3    Q.  But Mr. Gross keeps bringing up these concerns, because he

4    mentions them several times, correct?

5    A.  Yes.

6    Q.  And then, in addition, he talks about the money that is

7    supposed to be paid into the credit union for capital to

8    establish a greater capitalization, right?

9    A.  Yes.

10   Q.  He talks about money that is supposed to be paid to the

11   Hope Cathedral in the event that the legacy board leaves HOPE

12   Federal Credit Union?

13   A.  Yes.

14   Q.  You testified earlier that he talks also about the

15   consulting fees.  Do you recall him actually doing that during

16   this particular conversation?

17   A.  No, I don't remember -- I'm sorry, I don't remember.

18   Q.  But be that as it may -- and we can go to page 13 -- when

19   talking about money, Pastor Gross says to these alleged

20   coconspirators, "I don't get a dime of that money."  Do you see

21   that?

22   A.  I see that.

23   Q.  Now, he goes on to talk about how, if the credit union is

24   going to survive, if it's going to survive financially, it

25   needs not to appear to have an infrastructure but to actually

1  have an infrastructure, right?

2  A.  Yes.

3  Q.  In other words, not to borrow money from Kapcharge but

4  actually have increased capitalization?

5  A.  Yes.

6  Q.  Relevant to you, Mr. Hill, on page 30, there's a discussion

7  of you moving to New Jersey, correct?

8  A.  Yes.

9  Q.  And you don't say a word, interestingly, right?

10 A.  Right.

11 Q.  But Mr. Gross says, "Rico is a board member"?  The bottom

12 third.

13 A.  Yes, I see.

14 Q.  And Michael Murgio says, "he's going to live here," meaning

15 New Jersey, right?

16 A.  Yes.

17 Q.  And Anthony Murgio says, "Right," and you say, "Correct,"

18 right?  Not you; Mr. Gross says, "correct," right?

19 A.  Yes.

20 Q.  Now, you're sitting right there, at the table?

21 A.  Yes.

22 Q.  You don't say, no, I'm not moving?

23 A.  I don't.

24 Q.  Right, I mean --

25 A.  Yeah, I'm agreeing:  I didn't, I didn't say anything.

1    Q.  But you don't want to move to New Jersey?

2    A.  No.

3    Q.  So at the very end of the conversation -- let's go to the

4    very end of the conversation -- people are walking out, right?

5    A.  Yes.

6    Q.  And you're among Anthony Murgio and some of the others?

7    A.  Yes.

8    Q.  And Anthony says, Anthony Murgio says to you, at the very

9    end, "Rico, you all right, man?" right?

10   A.  Yes.

11   Q.  And you said, "Yeah, man, I got to figure it out.  No,

12   yeah, I'll figure it out," right?

13   A.  Yes.

14   Q.  You're talking about, or you're thinking about, at least,

15   this whole idea that these guys want you to move to New Jersey

16   and you want no part of that, right?

17   A.  That is -- no, that's incorrect.

18   Q.  Okay.  What are you saying you've got to figure out here?

19   A.  To get back to my family by the night's end.  If I was

20   going to pay for my own flight, I didn't want to be here.  I

21   testified to this earlier, sir.

22   Q.  You did testify to it earlier.  But my question is:  Is

23   that particular comment that you made a reference to you being

24   frustrated that these guys want you to move to New Jersey when

25   you don't want to move to New Jersey?

H2OKLEB5                          Hill - Cross

1   A.  No, it is not.

2   Q.  Now, you did say just a moment ago, and what you said this

3   morning, which is that a reason that you were unhappy at this

4   meeting was because you didn't want to be there?

5   A.  Correct.

6   Q.  You had family visiting in Florida?

7   A.  Yes.

8   Q.  And you were missing them?

9   A.  Yes.

10  Q.  But do you remember, in the days before the meeting,

11  Anthony Murgio asking you to come to New Jersey for the purpose

12  of attending this meeting?

13  A.  Yes.

14  Q.  And he gave you a long explanation by email as to why he

15  wanted you to there, right?

16  A.  Yes.

17  Q.  Why he needed you there, right?

18  A.  Yes.

19  Q.  And you replied to him, did you not?

20  A.  Yes.

21  Q.  And you said, "Yes, understood, I will come.  It just has

22  to be after this coming week.  I want to be there to help

23  handle this.  I will give you a date.  I can fly out ASAP."

24          You remember telling him that?

25  A.  Yes.

1   Q.  And now you're telling us you really didn't want to be

2   there?

3   A.  I didn't.

4   Q.  You did?

5   A.  I did not want to be there.

6   Q.  But your not wanting to be there had nothing to do with

7   your not wanting to move to New Jersey?

8   A.  I didn't want to move to New Jersey, I didn't want to be at

9   the meeting; both of those are correct statements.

10  Q.  But you didn't tell anybody either of those things --

11  A.  That doesn't mean I don't want to be there, sir.

12  Q.  But you didn't tell anybody either of those things at the

13  time?

14  A.  You're correct.

15  Q.  And then shortly after this meeting, Trevon Gross cut you

16  all off, right?

17  A.  Yes.

18  Q.  And you tried to get back in?

19  A.  Yes.

20  Q.  You wrote some kind of email requesting a special meeting?

21  A.  Yes.

22  Q.  You addressed it to Mr. Gross?

23  A.  Yes.

24  Q.  And he responded?

25  A.  Yeah, he eventually responded to us all.

1    Q.  And we looked at that this morning, did we not?

2    A.  Yes.

3    Q.  And he said, you don't qualify for membership, right?

4    A.  Right.

5    Q.  You don't live, worship, work --

6    A.  Correct.

7    Q.  -- in the field of membership?

8    A.  Correct.

9    Q.  He cut you off?

10   A.  Yes.

11           MR. KLINGEMAN:  No further questions.

12           THE COURT:  Thank you.

13           Mr. Shin?

14           MR. SHIN:  Thank you, your Honor.

15   REDIRECT EXAMINATION

16   BY MR. SHIN:

17   Q.  Mr. Hill --

18   A.  Yes.

19   Q.  -- do you recall being asked a number of questions by both

20   counsel regarding your cooperation agreement?

21   A.  Yes.

22           MR. KLINGEMAN:  Objection.

23           THE COURT:  By both counsel?

24           MR. KLINGEMAN:  Both counsel.

25           MR. SHIN:  Well, I'll rephrase, your Honor.

 1      THE COURT:  Thank you.

 2  Q.  Do you recall being asked by Mr. Creizman a number of

 3  questions about your cooperation agreement?

 4  A.  Yes.

 5  Q.  And about a potential 5K letter?

 6  A.  Yes.

 7  Q.  Based on your understanding of your cooperation agreement,

 8  does the outcome of this trial have any effect on whether you

 9  will get that 5K letter?

10  A.  None at all.

11      MR. KLINGEMAN:  I am going to object.  Bolstering

12  the --

13      THE COURT:  You're not talking to the court reporter.

14  And saying it quietly doesn't change my rules for how to make

15  an objection.

16      MR. KLINGEMAN:  I understand that.

17      THE COURT:  Overruled.

18      You may answer.

19  A.  I'm sorry, sir, can you repeat the question?

20  Q.  Mr. Hill, based on your understanding of the cooperation

21  agreement, does the outcome of this trial have any effect on

22  whether you will get that 5K1 letter?

23  A.  No, it does not.

24  Q.  If you lie during your testimony but the defendants are

25  still convicted, will you get that letter?

```
 1              MR. KLINGEMAN:  Objection; leading.

 2              THE COURT:  Sustained.

 3   Q.  Do you want to get that 5K letter?

 4   A.  Yes, I do.

 5   Q.  And what do you need to do in court during this trial in

 6   order to get that 5K letter?

 7   A.  Testify truthfully.

 8   Q.  Do you remember being asked by Mr. Creizman and

 9   Mr. Klingeman about the possibility of going back to prison?

10   A.  Yes.

11   Q.  You'd like to avoid that or go for as little time as

12   possible, right?

13   A.  Correct.

14   Q.  How do you do that in this case?

15   A.  One, by testifying truthfully, and holding up my end to all

16   the rest of the obligations that are in the cooperation

17   agreement.

18   Q.  Do you recall being asked a number of questions about

19   whether, when you joined Coin.mx, whether you intended to

20   commit illegal activities at that time?

21   A.  Do I remember being asked that?

22   Q.  Do you remember being asked by Mr. Creizman whether, at the

23   time that you joined Coin.mx, whether you intended to get

24   involved in illegal activities at that time?

25   A.  Yes, I remember.
```

H2OKLEB5                          Hill - Redirect

1   Q.  During your employment at Coin.mx, did you eventually

2   commit criminal activities?

3   A.  Yes.

4   Q.  And did you know you were doing so at the time?

5   A.  Yes.

6   Q.  And what were those criminal activities, briefly?

7   A.  Misleading the banks or lying to them.

8   Q.  Did you also become aware of whether or not Coin.mx was a

9   licensed money-transmitting business during your time at

10  Coin.mx?

11  A.  Can you repeat the question?

12  Q.  While you were at Coin.mx, at some point, did there come a

13  time when you learned that Coin.mx -- whether or not it had a

14  license to transmit money?

15  A.  I began to ask questions about it and was never given a

16  straight answer.

17  Q.  Straight answer by?

18  A.  By Anthony Murgio, if we did or did not -- if we were or

19  were not able to operate legally.

20  Q.  Do you recall being asked whether HOPE FCU itself was legal

21  or legitimate business?

22          MR. KLINGEMAN:  Objection.

23          THE COURT:  Sustained.

24  Q.  Do you recall being asked questions about when you first

25  agreed to join the board of HOPE FCU, whether you were aware

H2OKLEB5                          Hill - Redirect

1   that Anthony Murgio's plan was illegal or legitimate?

2   A.  Yes.

3             MR. KLINGEMAN:  Objection.

4             THE COURT:  Grounds?

5             MR. KLINGEMAN:  Leading, and also misstates the

6   questions I asked.

7             THE COURT:  All right, all right.

8             I will sustain.  And I will ask that if you're drawing

9   the witness' attention to a question, specify which counsel

10  you're asking about and as much specificity as you can.

11            MR. SHIN:  Yes, your Honor.

12  BY MR. SHIN:

13  Q.  Do you recall Mr. Klingeman asking you whether you thought

14  the plan proposed by Anthony Murgio was a legitimate business

15  deal, when you first agreed to join?

16  A.  Yes.

17            MR. KLINGEMAN:  Objection.

18            THE COURT:  Just a moment.

19            Can you give a time frame, Mr. Shin?

20            MR. SHIN:  Your Honor, I believe the question was

21  regarding at the time that he agreed to join the board.

22            THE COURT:  So you're asking about at the time that he

23  agreed to join the board?  That was not what you said in your

24  question, so I'll sustain.  Rephrase.

25            (Continued on next page)

BY MR. SHIN:

Q.  Do you recall being asked by Mr. Klingeman at the time you
agreed to join the board whether you viewed the plan proposed
by Anthony Murgio to be a legitimate business transaction?

          MR. KLINGEMAN:  Objection.

          THE COURT:  Overruled.

          THE WITNESS:  Yes.

BY MR. SHIN:

Q.  Now, how is it that you came to learn about this plan
proposed by Mr. Murgio?

A.  He explained it to me.

Q.  What were the circumstances in which the plan was explained
to you?

A.  On a conference call with other proposed board members.

Q.  It was on that call that you learned the details of the
plan?

A.  Yes.

Q.  What was your awareness of what those details were?  What
the plan was.

A.  That we would make payments to trough Gross and Hope
Cathedral and take over the board.

Q.  Just to be clear, Mr. Hill, did you view that at the time
as a legitimate business transaction or that there was
something wrong with that?

A.  I didn't view it as a legitimate business transaction.

H2OYLEB6                          Hill - Redirect

1  Q.  So, when you responded to that earlier to Mr. Klingeman,

2  were you misspeaking?

3               MR. KLINGEMAN:  Objection.

4               THE COURT:  Come to the sidebar.

5               (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the side bar)

2          MR. KLINGEMAN:  My recollection is that the questions

3     concerning the legitimacy of the business transaction were

4     posed by government counsel yesterday both in the morning and

5     later in the afternoon.  That's what my notes reflect.  I did

6     not ask him about the legitimacy of the business transaction.

7     I deliberately stayed away from seeking his opinion about that

8     issue.

9          Now the government has purported to ask questions

10    based on questions I never asked to redirect the witness so

11    that he can reassert the government theory of the prosecution.

12    It's beyond the scope.

13         THE COURT:  It's a beyond-the-scope objection.

14         MR. KLINGEMAN:  Yes.  Specifically because it doesn't

15    reflect a question I actually asked.

16         THE COURT:  What question are you referencing?

17         MR. SHIN:  My notes aren't here, but I have a

18    recollection, your Honor, that he posed, at the time that the

19    deal was proposed, the HOPE FCU deal -- I don't remember the

20    exact language, but the gist was whether he thought it was

21    legitimate or not, and I believe he answered in his view it

22    was.

23         MR. KLINGEMAN:  I don't want to interrupt counsel, but

24    the witness did testify yesterday on direct examination that he

25    did not think it was a legitimate business deal.  That's why I

1  did not ask him the question on cross, because I knew he would

2  give that answer.

3           THE COURT:  I think it's a time-frame question.  In my

4  mind, there were times when you asked whether what was going on

5  was legal or not.  From my mind, it was a time-frame question.

6  I'll go look through the LiveNote and see.

7           (Pause)

8           THE COURT:  Give me your question again, Mr. Shin.

9           MR. SHIN:  The question was:  Do you recall being

10 asked by Mr. Klingeman about whether at the time that you

11 agreed to join HOPE FCU, whether you thought Anthony Murgio's

12 plan was a legitimate business transaction?

13          THE COURT:  You asked whether over the course of his

14 responses to the government that he ever said that he

15 understood the payment to Mr. Gross to be a bribe.

16          MR. SHIN:  Yes.

17          THE COURT:  And you're asking --

18          MR. KLINGEMAN:  If I could -- I don't want to

19 interrupt.

20          THE COURT:  There's a vagueness to your question.

21          MR. SHIN:  Your Honor, I'm prepared to move on.

22          MR. KLINGEMAN:  I have a clarification because I do

23 not want to run afoul of your Honor's rules.  You told me

24 pretrial, if you object, say "Objection" and either cite a rule

25 or a one-word answer.  I didn't mean to offend you, but I had

H2OYLEB6                      Hill - Redirect

1    to tell you what I was thinking.  So I apologize.  I'm not sure

2    how to convey my point if I don't say that.

3           THE COURT:  Say, "Objection."  I will ask for grounds.

4    Don't talk to the jury or the court reporter when you're making

5    an objection.

6           MR. KLINGEMAN:  I'm not.

7           THE COURT:  You weren't looking at me.

8           MR. KLINGEMAN:  Fine.  I'm sorry.

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1            (In open court)

 2            THE COURT:  The question is withdrawn.

 3  BY MR. SHIN:

 4  Q.  Mr. Hill, do you remember being asked by Mr. Klingeman

 5  whether there were any emails in which Trevon Gross authorized

 6  you to sign his signature?

 7  A.  Yes.

 8            MR. SHIN:  The government offers just for

 9  identification to be shown to the witness Government Exhibit

10  1446-H.

11  Q.  Mr. Hill, do you recognize this document?

12  A.  Yes.  This is an email from Trevon Gross to myself with

13  Anthony Murgio attached from November 10, 2014.

14            MR. SHIN:  The government offers 1446-H into evidence.

15            MR. KLINGEMAN:  No objection.

16            THE COURT:  Thank you.  It's admitted.

17            (Government's Exhibit 1446-H received in evidence)

18            MR. SHIN:  Could you publish it to the jury, please,

19  Mr. Chang-Frieden.  Is there a second page there?

20  Q.  Just to orient the jury here, Mr. Hill, do you see a

21  particular name on this page that helps you identify what this

22  is concerning?  This email.  Let me take a step back.

23            This email on this page that begins on the top -- who

24  is it from?

25  A.  I can't see the top.  Starting from right there, it's from

1    Sandra from Alloya to Trevon Gross with myself attached.

2    Q.  Thank you.

3         MR. SHIN:  If we could move up to the first page,

4    please.

5    Q.  Is this email chain a conference responding to that email

6    from the lawyer?

7    A.  Yes.

8    Q.  The subject line here is what?

9    A.  Termination of ACH services.

10   Q.  Now, Mr. Hill, could you please read Mr. Gross' email at

11   the very top.

12   A.  "It's a checking account.  I've told you before to sign my

13   name if necessary."

14   Q.  Mr. Hill, if I could just ask you:  The bottom email

15   there --

16        MR. SHIN:  Mr. Chang-Frieden, if you could highlight

17   the bottom third.

18   Q.  What is it that you're writing there?

19   A.  I'm writing "That is a no on moving to Magic Wrighter."

20        MR. SHIN:  Then if we could zoom up.

21   Q.  What does Mr. Gross respond to you?

22   A.  "We do have a local bank here in Jackson.  See in Magic

23   Wrighter can use that account."

24   Q.  What do you reply there, Mr. Hill?

25   A.  "Whatever we changed to Magic Wrighter, they will need a

1   notice from you on letterhead what account in Jackson.  What

2   type of account is it?  I'll ask her."

3          MR. SHIN:  Mr. Chang-Frieden, if you could just

4   highlight Mr. Gross' response.

5   Q.  What does Mr. Gross respond to you?

6   A.  "It's a checking account.  I've told you before to sign my

7   name if necessary."

8   Q.  Mr. Hill, do you recall being asked by Mr. Klingeman

9   whether Trevon Gross in fact stopped you from processing ACH

10  transactions after the November 22 meeting?

11  A.  Yes.

12  Q.  Do you recall by that point approximately what volume of

13  ACH transactions HOPE FCU had processed for Kapcharge?

14  A.  Total?

15  Q.  Approximately.

16  A.  Hundreds of millions.

17  Q.  Do you recall seeing certain documents yesterday regarding

18  monthly volumes?

19  A.  Yes.

20  Q.  Do you recall any particular volumes that were associated

21  with any kind of particular month?

22  A.  Not specifically, but I remember the documents that had

23  huge numbers for credits and smaller numbers for debits.  I'm

24  sorry.  I just don't remember the numbers specifically.

25  Q.  Is it fair to say it was millions and millions of dollars?

1    A.   Yes.

2    Q.   Mr. Hill, do you recall being asked a series of questions

3    by Mr. Klingeman regarding whether Trevon Gross in fact raised

4    concerns about ACH processing, whether those concerns were

5    raised at board meetings?

6    A.   Yes.

7    Q.   Do you recall being shown some board minutes during that

8    line of questioning?

9    A.   Yes.

10   Q.   Was one of those set of board minutes that you were shown

11   the November board minutes?

12   A.   From November 15.

13   Q.   Based on your review of those board minutes, both during

14   Mr. Klingeman's questioning and during my questioning earlier

15   in the day, what's your view as to the accuracy of those board

16   minutes?

17   A.   They're incorrect on a number of aspects.

18   Q.   In any event, from those board minutes that Mr. Klingeman

19   showed you, did you see any reference in there specifically to

20   Trevon Gross raising concerns about processing ACH transactions

21   for Kapcharge?

22   A.   No.

23            MR. SHIN:  Mr. Chang-Frieden, if you could, please,

24   publish 2506-T in evidence.  Mr. Chang-Frieden, if you could

25   highlight Mr. Gross' third statement on that page.

H2OYLEB6                    Hill - Recross examination - By Mr.
Klingeman

1   Q.   Could you please read what is listed there as a statement

2   by Mr. Gross.

3   A.   "My point is the direction with Kapcharge, the value with

4   Kapcharge, even though you know I did not agree with all that

5   value, I never called a board meeting, which I could have done.

6   There are a whole bunch of things that I could have done in

7   this whole process if I really wanted to derail this and steal

8   your money, if that's what, you know."

9            MR. SHIN:   No further questions.

10           THE COURT:   Ms. Madrigal?

11           MS. MADRIGAL:   No redirect on behalf of Mr. Lebedev.

12           THE COURT:   Thank you.

13           Mr. Klingeman.

14   RECROSS EXAMINATION

15   BY MR. KLINGEMAN:

16   Q.   In the meeting the excerpt of which you were just asked

17   about --

18   A.   Yes.

19   Q.   -- Mr. Gross says that he tolerated the volume of ACH

20   transactions, despite his misgivings about the volume; correct?

21   A.   Yes, that he didn't agree.

22   Q.   He didn't put a stop to it prior to that time, according to

23   that statement; right?

24   A.   Yes.

25   Q.   In fact, he put a stop to it when he cut you off from the

H2OYLEB6                    Hill - Recross examination - By Mr.
Klingeman

1    HOPE Federal Credit Union.  Right?

2    A.  It was stopped prior to us being cut off.

3    Q.  When was it stopped, Mr. Hill?

4    A.  We agreed at this meeting to not continue processing it

5    until we had our affairs in order with the credit union.

6    Q.  So you're saying it was stopped as of November 22, 2014?

7    A.  The week of November 22, 2014.

8    Q.  The week before or the week after?

9    A.  The week before.

10   Q.  It was done so by a decision of the board?

11   A.  Yes.

12   Q.  Shared by Trevon Gross?

13   A.  Yes.

14   Q.  Who agreed with the decision?

15   A.  Yes.

16   Q.  You just testified that these board minutes that I showed

17   you earlier contain inaccuracies.

18   A.  Yes.

19          MR. KLINGEMAN:  Could we display Government's 6089 in

20   evidence.

21   Q.  What are the inaccuracies?

22          MR. SHIN:  Objection, your Honor.

23          THE COURT:  You have to show him the whole document.

24   BY MR. KLINGEMAN:

25   Q.  Mr. Hill, take a look at it as the government displays it

H2OYLEB6                          Hill - Recross examination - By Mr.
Klingeman

1    for you.

2              THE COURT:  Are you able to see it?

3    BY MR. KLINGEMAN:

4    Q.  Let me ask you this, Mr. Hill.

5    A.  Yes.

6    Q.  The government just asked you if these board minutes

7    contain inaccuracies, and you said yes.

8              MR. SHIN:  Objection.  Misstatement.

9              THE COURT:  What's the date of this document?

10             MR. KLINGEMAN:  The first one is September 20, 2014.

11             THE COURT:  This is September?

12             MR. KLINGEMAN:  Yes, your Honor.

13             THE COURT:  Sustained.

14   BY MR. KLINGEMAN:

15   Q.  Mr. Hill, which board minutes were you referring to when

16   you said they contain inaccuracies?

17   A.  November's.

18             MR. KLINGEMAN:  Let's turn to government 6091 in

19   evidence.

20   Q.  The government just asked you if this set of board minutes

21   contained inaccuracies, and you said yes.  Correct?

22   A.  Yes.

23   Q.  What are the inaccuracies?

24   A.  About the board members being moved -- I can't find it --

25   being moved to an advisory board.

H2OYLEB6                         Hill - Recross examination - By Mr.
Klingeman

1    Q.  Can you point out to the members of the jury the inaccuracy

2    that you're just describing.

3    A.  "Under resolution 14115-02, resolved that in response to

4    the DRO dated March 31, 2014, the newly elected board members

5    outside of the Field of membership hereby voluntarily vacate

6    all offices held and seats of the board and are moved to an

7    advisory board status with no voting rights.  Moved by

8    G. Wyatt, seconded by B. Larkins unanimously approved."

9    Q.  What about that is inaccurate?

10   A.  We were not moved to an advisory board with no voting

11   rights at this board meeting.

12   Q.  When you say "we," who are you talking about?

13   A.  The Collectables Club -- the members associated with the

14   Collectables Club.

15   Q.  Which names?

16   A.  Ricardo Hill, Jose Freundt, Tim Ellrich, Yuri Lebedev.  I

17   think -- there are more.  I'm sorry.  Jose Freundt.

18   Q.  Is it your testimony that at this November 15, 2014, board

19   meeting, the full board did not take the action that the newly

20   elected board members you just named were to voluntarily vacate

21   their offices and seats on the board be moved to an advisory

22   board?

23   A.  No.  That would relinquish control of the credit union.  We

24   still had control of the credit union.

25   Q.  Are you saying the action described in that paragraph did

1    not take place at the meeting you attended?

2    A.  Yes.

3              MR. SHIN:  Objection, your Honor.

4              THE COURT:  Overruled.

5    BY MR. KLINGEMAN:

6    Q.  You're saying it did not take place?

7    A.  Yes.

8    Q.  And you were there for the whole meeting?

9    A.  Yes.

10   Q.  And you observed the proceedings from beginning to end?

11   A.  We were never there for the meeting.  We were on calls for

12   these meetings.

13   Q.  So you dialed in?

14   A.  Every time.

15   Q.  Do you remember listening to this meeting via telephone?

16   A.  Yes.

17   Q.  And it's your testimony that during the time you were

18   listening, this board action never took place?

19   A.  Yes.

20             MR. KLINGEMAN:  Nothing further.

21             MR. SHIN:  Your Honor, just very briefly?

22             THE COURT:  Very briefly.

23   REDIRECT EXAMINATION

24   BY MR. SHIN:

25   Q.  Mr. Hill, do you recall being asked by Mr. Klingeman on the

1    last recross questions regarding Mr. Gross again putting a stop

2    to ACH after the November 22 meeting?

3    A.  Yes.

4    Q.  Did Mr. Murgio fail to pay the $50,000 prior to your being

5    locked out of CU system?

6    A.  Yes.

7    Q.  Do you know whether HOPE FCU continued to process ACH

8    transactions for Kapcharge after you were locked out?

9             MR. KLINGEMAN:  Objection.

10   BY MR. SHIN:

11   Q.  Do you know one way or the other?

12   A.  No.  I don't know.

13            MR. SHIN:  No further questions, your Honor.

14            THE COURT:  Ms. Madrigal?

15            MS. MADRIGAL:  Nothing on behalf of Mr. Lebedev.

16            THE COURT:  Mr. Klingeman?

17            MR. KLINGEMAN:  No further questions.

18            THE COURT:  Thank you, Mr. Hill.  You're excused.  You

19   may step down.

20            (Witness excused)

21            MS. CHOI:  Shall I call the next witness?

22            THE COURT:  Do you have about five minutes' worth of

23   material?

24            MS. CHOI:  We could introduce her, and I think that

25   would use the five minutes, yes.

1           THE COURT:  All right.  Let's do that.  Actually, you

2     know what, it's now four minutes.  By the time she gets up here

3     and is sworn, there will be two minutes.  It's Friday after

4     all.

5           So, members of the jury, thank you so much for your

6     hard work this week.  We will resume at 9:30 on Monday.  Of

7     course please do keep in mind and in heart my instructions.

8           No discussions with each other or anyone else about

9     the case.  No research through any means of any kind about the

10    case.  As you see evidence comes in piece by piece, continue to

11    keep an open mind until you begin your deliberations.  Have a

12    great weekend.  I'll see you Monday at 9:30.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (In open court; jury not present)

 2              THE COURT:  I do appreciate your willingness to use

 3     every moment.  I would usually take you up on it, but we were

 4     just at the cutoff there.

 5              Matters to take up?

 6              MR. KLINGEMAN:  We'd like a preview of what's to come

 7     next week.

 8              THE COURT:  Also let's take up Ms. Choi's request to

 9     discuss any potential additional live witnesses or at least a

10     process for resolving that.

11              An Alloya witness is next?

12              MR. NOBLE:  Yes.  We have two Alloya witnesses,

13     Michelle McDowell -- she'll be first -- then Neil Kumar; then

14     Jose Freundt, a cooperator; and then Meg Flok from the NCUA,

15     F-l-o-k.  I believe that should take us into Tuesday at least.

16              THE COURT:  We'll see where we are on Monday and get

17     more information after that.

18              MR. NOBLE:  By Monday we'll know who the rest of the

19     witnesses who will through Wednesday and possibly even sooner.

20     Once we have witness schedules confirmed, we'll let defense

21     counsel know.

22              The other issue is we are cognizant of the fact that

23     Mr. Klingeman is going to be absent on Wednesday.  So we will

24     make sure that the only witnesses we're calling on Wednesday

25     are those whom Ms. Santillo will be cross-examining.  So that
```

 1    kind of complicates our scheduling, but we'll work with defense

 2    counsel to make that happen.

 3              MR. KLINGEMAN:  Thank you.

 4              MS. MADRIGAL:  Your Honor, if Mr. Lebedev can be

 5    excused just because he has to catch a flight.

 6              THE COURT:  Yes.  That's fine.

 7              MS. MADRIGAL:  Thank you, your Honor.

 8              THE COURT:  I think the only other scheduling matter

 9    to take up is Ms. Choi had asked at the break where things

10    stood with respect to any additional requests for witnesses so

11    that arrangements can be made.

12              MS. SANTILLO:  Your Honor, the only issue that I

13    anticipate at this moment is arising out of the potential

14    briefing this weekend with respect to this DreamHost issue,

15    which is the question about emails.

16              If they're going to make some kind of forensic

17    argument, then it's possible that we would want a witness.  If

18    your Honor's ruling stands that we're not going to talk about

19    those emails, then we wouldn't need a witness.

20              MS. CHOI:  Your Honor, I think there's some confusion.

21    I think if we explain it, it may clear this issue up.  The only

22    thing that we're going to be briefing this weekend is whether

23    or not we can make the argument that there were counts that

24    belonged to the Collectables Club members at HOPE FCU that

25    Trevon Gross refused to turn over, did not turn over over the

1    course of the conservatorship.

2             It does not require forensic analysis because there

3    are records from DreamHost that have been stipulated to by

4    Ms. Santillo that just say in February of 2017, that we're in,

5    these email accounts still exist at DreamHost.

6             If you look at the list of Collectables Club

7    members -- and we're going to have testimony from the NCUA

8    about which email accounts Trevon Gross gave them access to

9    over the course of the conservatorship.  That doesn't require a

10   forensic analysis, your Honor.

11            It's just like a question of which documents did he

12   give over to the NCUA at the time of the conservatorship.  It

13   doesn't require anyone with any type of forensic experience.

14   They've already stipulated to the business records, the fact

15   that the statement by DreamHost about which accounts still

16   exists are business records.

17            THE COURT:  When you say there were accounts that were

18   turned over or not turned over, what does "turned over" mean?

19            MS. CHOI:  Meaning, if you recall, the conservatorship

20   happens on a Friday.

21            THE COURT:  Who is "they"?

22            MS. CHOI:  NCUA.

23            THE COURT:  Access to what?

24            MS. CHOI:  All the email accounts and the domain

25   hope-fcu.com.  NCUA emailed DreamHost.  DreamHost emailed

1    Mr. Gross, told Mr. Gross, we don't know what's going on here.

2    You can go reach out to the NCUA and figure it out.

3          Mr. Gross then on Saturday reaches out to the NCUA.

4    They go back and forth, and then Mr. Gross says, here are all

5    the accounts and lists which accounts he's given access to the

6    NCUA.  There are emails to this effect.  Those accounts did not

7    include any of the Collectables Club.

8          THE COURT:  When you say that he's "given access," do

9    you mean by listing those names?  What do you mean?

10         MS. CHOI:  He gave them password access, your Honor.

11   He changed the passwords to the name of an NCUA examiner so the

12   NCUA could go and take over those accounts, but he did not give

13   access to any of the Collectables Club accounts even though, A,

14   he knew that they existed; and B, the data there still exists

15   at DreamHost.

16         So it wasn't as though he deleted them at the time

17   that the Collectables Club left.  We know that also because we

18   did a search warrant of certain of those accounts after the

19   conservatorship, for email accounts specifically in the name of

20   Ricardo Hill and Jose Freundt that Mr. Gross did not give

21   access to to the NCUA but we knew had relevant emails, some of

22   which we we're going to be introducing in evidence.

23         The point is Mr. Gross knew those email accounts

24   existed.  He deliberately did not turn over access to the

25   Collectables Club accounts even though there still was data

1    there and he knew there was data there.

2              He only turned over the email accounts for his current

3    board members.  So for himself, Bernard Larkins, and the like.

4    So it's different than the deletion argument.  Trevon Gross was

5    the administrator.  He's the one who had access to all these

6    email account, and he cherrypicked which ones he gave access to

7    the NCUA.

8              THE COURT:  I just want to make sure I understand the

9    government's argument.

10             When you say "give access," you mean there are some

11   email accounts for which he provided passwords that allowed the

12   examiners to go in and look through the email accounts?

13             MS. CHOI:  Right.

14             THE COURT:  And what was that in request to?

15             MS. CHOI:  The NCUA wrote him directly, wrote him at

16   Hope Cathedral saying, we're in conservatorship.  Please give

17   us access to the domain and all email accounts.  He said, okay.

18   Here is a list of all the email accounts.  Here is a password

19   for them.  That list doesn't have any of the Collectables Club

20   data there, collectables Club accounts.

21             THE COURT:  You mean there were Collectables Club

22   email accounts that were not listed in response and were not

23   given passwords, both of those things?

24             MS. CHOI:  Correct.  They were not listed in

25   response --

1           THE COURT:  Just give me an example of one of those

2    accounts.

3           MS. CHOI:  Amurgio@hope-fcu.com, the two that we got

4    email search warrants for.  So that would be the one for

5    Ricardo Hill and the one for Jose Freundt, Mr. Lebedev that we

6    also searched on consent.

7           All of those searches led to Evidence that was

8    relevant.  We know that that data still existed because when we

9    went back in response to Ms. Santillo's assertion that there

10   had been some sort of spoliation on the part of the government,

11   we went back to DreamHost and subpoenaed DreamHost.

12          DreamHost told us, nope.  Those accounts still exist.

13   Those are the only accounts that still exist with the HOPE FCU

14   domain.  It's the one for Mr. Gross' wife and the Collectables

15   Club members, every single one of them -- Chad Lio, Kendra

16   Pannitti, all of them.

17          THE COURT:  Again, the request that was made by the

18   NCUA was, give us all email accounts?

19          MS. CHOI:  Yes.

20          THE COURT:  There was no carving out.  It was

21   literally looking for access to every HOPE FCU email account?

22          MS. CHOI:  Yes.  They noticed at the time that there

23   were no Collectables Club accounts because they didn't have

24   criminal search warrant authority.  They tried to get them from

25   DreamHost, and they weren't able to get them from DreamHost.

 1              THE COURT:  And the specific purpose for which the

 2     government wants to establish that the NCUA requested this

 3     information and that Mr. Gross did not give it to them is?

 4              MS. CHOI:  It was in the course of the

 5     conservatorship.  So it's direct evidence of his obstructive

 6     conduct when it came to the NCUA and we would say also of the

 7     false statements to the NCUA about the nature of HOPE FCU's

 8     operations.

 9              I think it also goes to his corrupt intent and the

10     fact that he is continuing to hide the fact that Collectables

11     Club members had negotiated this deal with him in which they

12     made these payments because these email accounts would make

13     obvious that there were these side board members and they have

14     incriminating emails within them about the nature of

15     Collectables Club's relationship with HOPE.

16              THE COURT:  When NCUA made that request, was there an

17     attorney intermediary at that point?

18              MS. CHOI:  No.

19              THE COURT:  Ms. Santillo.

20              MS. SANTILLO:  The conservatorship didn't take place

21     until October 2015.

22              THE COURT:  What date specifically?

23              MS. SANTILLO:  Pardon?

24              THE COURT:  Do you know what date?

25              MS. SANTILLO:  I believe the conservatorship was

October 15, and the request was made on October 17 for the

accounts.

            THE COURT:  Okay.

            MS. SANTILLO:  As we have seen in the WhatsApp chats,

all of the email accounts for the Collectables Club board

members were turned off in December of 2014.  So they were not

active accounts.

            THE COURT:  What exactly are you thinking of in the

WhatsApp?  You mean the cutoff of access?

            MS. SANTILLO:  Yes.  Mr. Hill testified today that all

of the Collectables Club members were cut off from their email

accounts.  So those are no longer active accounts for at least

ten months before the conservatorship.

            The conservatorship was taking of control over the

credit union.  It wasn't a forensic exercise.  So there are,

like, obvious relevance issues.  The inference is sort of

implausible.

            I also think if it became necessary to establish that

these accounts were cut off for some reason, that might be an

issue.  We have been put on the spot to anticipate any

potential forensic issues that might come up or anything we

might need to have a forensic or a reference custodian for, and

that's the only thing I can think of off the top of my head

right now that might come up.

            THE COURT:  So you would somehow want to potentially

1    try to establish that these email accounts didn't exist at the

2    time of October 17, 2015, when the request was made for access

3    to the existing email accounts.  Is that the idea?

4              MS. SANTILLO:  Yes.  To say that they had been turned

5    off at an earlier point in time.  And also the inference is

6    sort of negated by the fact that these emails all still exist.

7              THE COURT:  What?

8              MS. SANTILLO:  Because they're sort of suggesting

9    they're hiding something, but the emails still exist.  So they

10   have access to them.  Nobody asked them for follow up.  If we

11   need to establish an account still exists, if they need to

12   establish when they were turned off, any of those things.

13             THE COURT:  I understand now the point.  In a sense

14   you're saying if this comes in -- this is what I'm going to get

15   briefing on, although I'm not sure I need it.  If this comes

16   in, you're going to make some kind of cross-arguments that

17   would go to the weight of this evidence.

18             MS. SANTILLO:  Yes.

19             THE COURT:  Yes, he didn't turn it over, but that's

20   because Mr. Forensic person tells us that these accounts ceased

21   operating ten months earlier or the like.

22             MS. SANTILLO:  Yes.

23             THE COURT:  And then you would ask the jury to draw

24   inferences different than the inferences the government is

25   asking them to draw.

1          MS. SANTILLO:  Yes.  I feel like we should clarify

2    that the government has repeatedly represented to us that if we

3    sign stipulations, we can have a witness.  So the idea that

4    we've signed away our right to call a witness is --

5          THE COURT:  I see the point here, and I do think --

6    again --

7          MS. SANTILLO:  I don't know if it will be an issue.

8          THE COURT:  Let me back up a step.

9          Where are you with respect to your objection as to

10   this evidence?  Because when I ruled -- and the reason I

11   allowed the motion for reconsideration -- is because I needed

12   more clarity as to what this was.  I had put it in the bucket

13   of what I had ruled on, and I'm not certain that that's right.

14         MS. SANTILLO:  There has never been a follow-up

15   request as of October 2015 to Mr. Gross who was represented by

16   counsel at that time.  So, to the extent there is an ambiguity

17   in any of this, there was never any followup request for

18   information, and it's now been a year and a half.

19         So the inferences they're trying to draw based on some

20   kind of obstruction, to me it seems like the period has long

21   since passed when any of these issues could have been corrected

22   or addressed by counsel or Mr. Gross, if there was a

23   misunderstanding that it shouldn't be active accounts, that it

24   should be every account that ever existed in HOPE FCU.  So I

25   think it's unfair to draw that inference now when there were no

1    opportunities to remedy it or get clarity at the time.

2              THE COURT:  Was there ever any followup request made?

3              MS. CHOI:  Your Honor, I don't have the email in front

4    of me.  It was clear that it said control of all emails and the

5    domain.

6              THE COURT:  We'll play hypothetical.  So let's say

7    someone worked at HOPE FCU five years ago, five years before

8    the collapse, but they had left and weren't there.  The account

9    had been dormant for five years.  Should that have been

10   included in the response?

11             MS. CHOI:  Yes, your Honor, because the NCUA order of

12   conservatorship makes clear that they have control over

13   everything belonging to HOPE FCU.  Trevon Gross knows that.  So

14   for him to just cherrypick certain accounts when he went in and

15   changed the passwords, he would have seen all of the accounts

16   that existed.

17             THE COURT:  How do I know that?

18             MS. CHOI:  Because the DreamHost data says that.

19             THE COURT:  That sounds forensic.

20             MS. CHOI:  It's not forensic, your Honor.

21             THE COURT:  In other words, I don't know what process

22   one goes through.  When somebody says, give us access to all

23   the email accounts, I don't know what one does to do that.  I

24   don't know.

25             I could imagine it's possible -- I don't know -- that

1    you have to go email account by email account, and some

2    distinction might be drawn between active accounts and inactive

3    accounts.

4           MS. CHOI:  Your Honor, if the question is on the table

5    how would Trevon Gross have seen the back end of DreamHost when

6    he went in and made those changes and would he have known that

7    emails still existed --

8           THE COURT:  Just wait a second.  Just calmly answer

9    this question.  I'm serious.  The suggestion that's being made

10   is a request was made for access to the email accounts.  I know

11   you have a different view, but the response that's being

12   suggested is he gave access to all of the active email

13   accounts.  That's why the ones that are missing are the

14   inactive ones.

15          MS. CHOI:  I understand.  I think that's an argument

16   that can be made to the jury, but that goes to the weight of

17   the evidence, not whether or not --

18          THE COURT:  But isn't that a forensic --

19          MS. CHOI:  No.  I'm sorry.

20          THE COURT:  That's a question that turns on what one

21   does to give access to accounts, what that process looks like.

22          MS. CHOI:  Your Honor, if I could just take a step

23   back with regard to that question.  Again, "forensics" is not

24   being used, I think, in a precise way.  So I'm going to try to

25   be precise.

1          If the issue on the table is it is not clear to

2    Ms. Santillo what Mr. Gross would have seen when he changed

3    those passwords and that's her objection, having a DreamHost

4    witness would solve that because we could ask the DreamHost

5    witness as an admin of this domain, what would Trevon Gross had

6    to have done in order to change those passwords.  Would he have

7    known that there are these other email accounts in there, or

8    would it have just been some subset that were "active."

9          If the answer to that is he wouldn't have known that

10   these dormant email accounts even existed, maybe there is an

11   argument to be had by Ms. Santillo, but that's not our

12   understanding.

13          I think that's a question of whether or not we choose

14   to call a DreamHost witness and can get him to explain that.

15   So that's a question of whether or not the witness is available

16   for cross-examination on that precise question.

17          That is a separate question as to whether or not this

18   is material, relevant evidence.  If we can establish it,

19   evidence of Mr. Gross' corrupt intent and his intention to

20   obstruct the examination because if we can establish the

21   predicate from DreamHost that in fact he would have seen all of

22   the data from the Collectables Club, which we knew existed

23   after they left because Mr. Lebedev gave us access to that

24   during his consent search in July of 2016.  So we knew that he

25   at least had access to his account after he had long been

1    "kicked off" of the board and had access to his email accounts

2    shut off.

3            I don't think, by the way, Mr. Hill's testimony is

4    contrary.  He was talking about back end access to the credit

5    union, which is different than the web hosting of the emails.

6            In any event, that question is a predicate question.

7    If we can establish that Mr. Gross in fact should have known,

8    given how he logged into DreamHost, that this data still

9    existed and that despite being served with the order of

10   conservatorship from the NCUA, which will be established in the

11   emails, he deliberately chose not to turn over the data of the

12   most incriminating of the members of the HOPE FCU former board,

13   I think that that is material evidence that goes both to his

14   corrupt intent as well as direct evidence of the fact that he

15   continued to obstruct the NCUA's examination and continued to

16   make false statements to the NCUA.

17           Again, I think the question of relevance and whether

18   or not if we can establish those things, if your Honor would

19   allow us to do that, I think we need to have that discussion

20   first.

21           Ms. Santillo can raise her grounds about not

22   establishing a relevant foundation later if we can't get the

23   DreamHost witness to say that Mr. Gross would have known that.

24           You've seen the emails, your Honor.  Mr. Gross was a

25   computer programmer.  He understood how DNS worked.  He set up

1    his own mailbox, his own MX server.  He understands how all

2    these things worked.

3            So the notion that somehow he is ignorant about this

4    data is quite, in the government's opinion, contrary to what we

5    understand Mr. Gross to be in terms of his technological savvy.

6            THE COURT:  Ms. Santillo.

7            MS. SANTILLO:  I have so many issues with the terms of

8    the materiality.  I think the materiality question would turn

9    on the DreamHost analysis.

10           THE COURT:  It sounds like it.

11           MS. SANTILLO:  So, obviously we're putting the cart

12   before the horse a little bit because we haven't reached the

13   question of whether or not this evidence is coming in.

14           The only reason I raise this issue now is because the

15   government has given a deadline of today to make a decision

16   about what custodians we anticipate might be possible in the

17   next week, given what we know about the government's case is.

18           So that's why I'm raising this issue now, because I

19   don't know whether the evidence is coming in or whether, when

20   it is presented, it is going to be raising a forensic issue.

21           The other question is -- I have numerous rebuttals to

22   the materiality argument, including the fact that

23   conservatorship is really an assumption of control.  It's not a

24   subpoena for forensic purposes.

25           It makes perfect sense that you would give all the

H2OYLEB6                              Hill - Redirect

1     active control of what is the ongoing concern over to the NCUA

2     in response to their desire to take over the credit union.

3     There was nothing to take over of those other accounts.  They

4     were inactive.

5          THE COURT:  Why aren't those weight arguments that are

6     not bound up in the kind of prejudice concerns that I

7     articulated with respect to the subpoena return?

8          MS. SANTILLO:  Well, I'm responding to these

9     materiality questions.  If it becomes a

10    prejudicial-versus-probative type of analysis, I think the

11    probative aspect of this is very, very minimal.

12         THE COURT:  I guess the question is:  Do you want to

13    brief this?  There's the predicate question that we had laid

14    out a briefing schedule for.  Is there any reason to deviate

15    from that?

16         MS. CHOI:  No.  I just want to be clear about what the

17    scope is.  Again, I need to verify with DreamHost that we can

18    set up the predicate act.  We may not end up going down that

19    road.

20         I think the predicate question is whether or not this

21    would be relevant evidence.  If the government can put together

22    the facts, this would be relevant evidence to the question of

23    Mr. Gross' guilt of the crimes with which he's charged.

24         We can brief the relevance question, assuming that the

25    facts can be established by the government the way that it

1    believes that it could be.

2            I want to reserve.  If, after we talk to DreamHost,

3    somehow they have a different understanding than we understand

4    how DreamHost works, then we won't put on that evidence.  I

5    think before we go down that road, I just want clarity as to

6    whether or not the Court would entertain the government putting

7    forth that evidence assuming --

8            THE COURT:  I thought that's what you were going to

9    brief.

10           MS. CHOI:  I just want to make sure that is what we're

11   going to brief and not the hypothetical of what DreamHost and

12   forensic, etc., because I think it's relevance.

13           THE COURT:  I think you should find out the answers to

14   your predicate question and, if you get what you want, include

15   that in a proffer that goes to relevance, and then they can

16   argue either 401 and 403, and I'll consider it.  I have a much

17   better sense now than I did at the time.

18           MS. CHOI:  Understood.

19           THE COURT:  I'll consider it.  This preview helps me.

20   I like reading things more than I like hearing things.

21           MS. CHOI:  Understood.  I just wanted to note for

22   your Honor.  It's Friday afternoon.  I don't know if we're

23   going to be able to talk to DreamHost over the weekend.

24           To the extent that your Honor wanted briefing about

25   it, we can give you the background with NCUA's interactions

1    with Mr. Gross obviously, how he was on notice of the

2    conservatorship, etc.

3            I don't know if we're going to be able to answer the

4    question about DreamHost.  I think that will give your Honor

5    enough to at least consider the relevance question.

6            THE COURT:  See what you can do with the understanding

7    that if I do allow this presentation evidence, it sounds like

8    we will need a witness.

9            MS. CHOI:  Understood, your Honor.

10           THE COURT:  Because they have cross-points that they

11   want to make that go to the weight of evidence and the

12   significance of the evidence.

13           MS. CHOI:  I think if we go down that road, it would

14   be totally appropriate to get a DreamHost individual to

15   testify.  We'll see what we need to do.  I just wanted to say

16   we'll brief the question of whether or not it's admissible in

17   the first instance this weekend.

18           THE COURT:  For me to understand the relevance, I need

19   to see what the question was with a time frame and what the

20   response was and what that looked like, etc., the kinds of

21   questions I'm asking.  If you could lay that out.

22           MS. CHOI:  Yes.  We'll give you all of those

23   documents, your Honor.

24           THE COURT:  What else?

25           MR. KLINGEMAN:  In this regard, I've been trying to

H2OYLEB6                          Hill - Redirect

1    think of potential witnesses, and the government has given us a

2    full witness list.  If those folks are called, my concerns will

3    be allayed.  So I'm going to focus my request on a single issue

4    and explain how I would suggest approaching it.

5            As your Honor recalls from the pretrial motions, we

6    are very much focused on venue.  It's my belief that the Bank

7    of America witness, Mr. Levy who testified earlier in the week,

8    may have been offered to establish jurisdiction, may have been

9    offered to satisfy whatever commerce clause issues may lurk in

10   this case, and I would concede that he establishes both of

11   those things with his testimony.

12           But what I would submit -- and I'm not asking for an

13   argument or a ruling -- is that he does not satisfy the venue

14   requirement.  In answer to your Honor's concerns about the PNC

15   Bank issue, I'm more than willing to work out a stipulation

16   with the government to avoid the testimony of a PNC Bank

17   witness, provided PNC Bank's policies and procedures are

18   consistent with Bank of America.  In other words, if we were to

19   get the same thing out of PNC that we got out of Bank of

20   America, then I'll stipulate.  The government has to talk to

21   PNC and figure that out.

22           In terms of venue in particular, if the government is

23   going to offer documents or other forms of non-testimonial

24   evidence without a witness and then try to argue to the jury

25   about venue, I'd like to know what that is so I can meet it

1    with a request for a witness to cross-examine.  Right now I

2    don't know what they're planning to do.  That's what I'm asking

3    for.

4               MS. CHOI:  Your Honor, to establish venue, we'll be

5    putting forth Mr. Gross' credit card statements and Mr. Gross'

6    Marriott stays that show the dates in which he was in

7    New York City, his own emails that show the time frame in which

8    he was in New York City, and then other emails during that

9    period which show not only that he talked about the

10   Collectables Club deal but also engaged in other business that

11   would be part of the charged crimes.

12              So, aside from the venue that we think is established

13   we think amply from the actual wires themselves, the two bribe

14   payments, those are the other sources of venue that we can

15   articulate right now.

16              There is one other category which we've already

17   published to the jury.  Every single daily wire that came in

18   from Kapcharge to cover its ACH transactions required a

19   corresponding bank through HSBC.

20              Those wire details were sent to Mr. Gross on a daily

21   basis.  Each one of those wire details say HSBC New York,

22   New York City, with a New York address on 7th Avenue.

23              MR. KLINGEMAN:  From what I just heard, the only thing

24   I'm concerned about is the "other emails" that are not

25   specified.  I'm not going to want a witness for Mr. Gross'

 1    credit card statements.  I'm not going to want a witness for

 2    Mr. Gross' emails, but I am going to want a witness for other

 3    emails, and I don't know what those "other emails" are, who

 4    sent them, who received them, etc., unless I get more details.

 5             MS. CHOI:  The details are there were certain dates

 6    he's in the Southern District of New York or certain dates that

 7    Anthony Murgio was in the Southern District of New York -- we

 8    can outline those for you.  They're already in some of the

 9    analysis that we've given you for the RSM witness -- and then

10    emails that have been marked by date in the exhibit list that

11    establish that there were communications between the -- the

12    emails or chats that establish there were communications with

13    Mr. Gross or between coconspirators during that time.

14             MR. KLINGEMAN:  I would submit that's inadequate.  I

15    don't know if your Honor has looked at the exhibit list.  It

16    literally contains thousands --

17             THE COURT:  You're not arguing venue now, are you?

18             MR. KLINGEMAN:  No, but my point is I can't spend the

19    weekend picking through every exhibit to look through

20    references to New York.  I need to be preparing for the next

21    witnesses.

22             THE COURT:  You said you'd outline them.

23             MS. CHOI:  It's not a problem.  We can tell you the

24    dates.  Those with the ones that we have now.  We may identify

25    other venue arguments later, but those are the ones we have

1    now.

2              MR. KLINGEMAN:  All I would need is the exhibit

3    numbers.

4              THE COURT:  You'll do that?

5              MR. KLINGEMAN:  If the government gives us the night

6    before a hundred exhibits, I'm willing to get up at 6:00 in the

7    morning and go through them.  I'm willing to compromise.

8              THE COURT:  When do you think you can provide the

9    exhibit list that are the emails you intend to use to make the

10   venue point noting that it's emails that are lining up with the

11   dates that you're going to establish his presence in New York

12   through the credit card statements and the like?

13             MS. CHOI:  The middle of next week, your Honor.

14             THE COURT:  We're only going the middle of next week.

15   You're not putting these on until the following week?

16             MS. CHOI:  Certain of the evidence we'll move in.  The

17   Marriott business records, for example, we'll move in, and

18   they'll establish the dates.

19             What I can do is I can give him, as we currently

20   stand, at least with regard to his client, the date he was in

21   New York.  I can point him to those exhibits, and I can tell

22   him which emails fall within that realm.

23             I also don't want to be placed in a position where I

24   could come across other venue information and I'm somehow

25   handcuffed to that set.  I think it's fairly straightforward.

1          I think we can identify the dates that Mr. Gross was

2     there, identify the dates that Anthony Murgio was in New York,

3     and then tell him the ranges in the exhibit list that are

4     evidence of that.

5          Putting that aside, again, the HSBC wires to which

6     Mr. Gross had daily incoming wire details that show that those

7     wires went through the Southern District of New York.  We'll

8     point those out to defense counsel as well.

9          THE COURT:  So not that last point but the date range

10    and the exhibits --

11         MS. CHOI:  I can get you the date range over the

12    weekend.  The exhibits I would just like a little bit of time

13    so that I can make sure that we have a complete set compiled,

14    and we could get it to them by Wednesday or Thursday of next

15    week.

16         THE COURT:  Just for my own benefit, once you have

17    dates, how hard is it to search the emails?

18         MS. CHOI:  I think the point is we want to make sure

19    that we have all the exhibits marked properly, and I haven't

20    done that exercise.

21         I was going to do that during the end of next week to

22    make sure that we had established venue now that it's obvious

23    that that's going to be one of their primary defenses.  It's

24    always been obvious.  I need to spend some time doing that.

25    It's not something that I want to rush.

1    THE COURT:  You'll get the date ranges over the

2    weekend, by Sunday mid-day.

3    MS. CHOI:  Yes, your Honor.  Again, reserving, if we

4    find other information later, we'll supplement that.  But, yes.

5    At least we can get him what we have for now.

6    THE COURT:  So the date ranges that you have now by

7    Sunday.  To the extent you have emails, not exhaustive, but to

8    the extent you have emails identified from those identifiable

9    date ranges that have been marked, you'll give those exhibit

10   numbers also by mid-day Sunday?  Not exhaustive, what you have.

11   MS. CHOI:  How about the list by Saturday and then the

12   end of the day Sunday for the emails.

13   THE COURT:  All right.  Fine.  Thank you.

14   What else?

15   MS. SANTILLO:  I'm not sure what the protocol is going

16   to be about the phone call.  Are we conferring about that?

17   MR. NOBLE:  We'd like the opportunity to review the

18   portions that you've identified that you'd like to play to see

19   whether or not we have an objection.  Then we can confer over

20   the weekend.

21   THE COURT:  So make your own schedule for conferring.

22   I'll hear from you by Sunday at noon.  Why don't you just put

23   in a joint letter by Sunday at noon laying out your arguments.

24   MR. NOBLE:  If there is argument.  It may just be an

25   email we've worked out the differences.

```
1              THE COURT:  That would be delightful.

2              MR. NOBLE:  Just for clarity too, the only other

3    witness that they're thinking of having us call, aside from

4    possibly a witness for some of these venue issues, if there are

5    any issues, is from DreamHost and the possible PNC stipulation

6    that we may or may not be able to work out.

7              THE COURT:  The PNC stipulation or witness, DreamHost

8    witness potentially.

9              As you stand here, are there any others?

10             MS. SANTILLO:  No, your Honor.  I would just like to

11   note all the caveats that have been given about their potential

12   ability to enter evidence and note that I don't know what's

13   coming our way.  We are making this representation based on a

14   deadline that the government has set as of today.

15             THE COURT:  I set it.

16             MS. SANTILLO:  We don't know what's coming, but that

17   is all I can anticipate right now.

18             THE COURT:  So you thought through, for example, IRS?

19             MS. SANTILLO:  Yes.  We have no issues with the IRS.

20             THE COURT:  What was the other one?

21             MS. CHOI:  DHS.

22             THE COURT:  What are the other categories?

23             MS. CHOI:  The categories are there are two long

24   stipulations for which they have agreed to business records.

25             THE COURT:  They're preserving their rights.
```

1           MS. CHOI:  They know what these records are.  We've

2     given them to them over a month and a half ago now.  I just

3     don't know how much longer -- I understand they've reserved

4     their rights.

5           There are reasons why they may want to call those

6     witnesses.  I just want everyone to understand it's not as

7     though we can instantaneously produce a custodian.  We're still

8     struggling to work out schedules for the people we've already

9     noticed as witnesses.

10          So, to the extent that your Honor or defense counsel

11    makes an 11th-hour request about getting a particular witness

12    to court, I think everyone just needs to understand that it

13    takes days in order to facilitate that.  It's not an overnight

14    process.

15          I wouldn't want there to be prejudice, either to the

16    government or to any of the rest of us, because we need to make

17    these last-minute changes.  That's our only point, your Honor.

18    We're going to do our best, but it's not something -- I know

19    that people think the government can do everything.  It's not

20    something we can do within 24 hours.

21          THE COURT:  You had flagged IRS and DHS.

22          Are there any others that you can think of where there

23    might be issues raised?  You're not thinking right then but

24    from your perspective.

25          MS. CHOI:  No, your Honor.  I understand the PNC

1731

1    argument, although I think we can work that out.  I understand

2    the DreamHost argument.  I can't think of anything else that

3    falls into those categories.

4              THE COURT:  It sounds like, as they stand here, they

5    can't either.  To the extent that something unexpected comes

6    up, we'll deal with it as best we can.

7              Anything else?

8              MS. SANTILLO:  No.  Thank you.

9              THE COURT:  I'll hear from you over the weekend as

10   we've discussed hopefully telling me you've worked it all out

11   but, if not, telling me your views, and I'll see everybody

12   9:00 a.m. on Monday.  Have a good weekend.

13             (Adjourned to February 27, 2017, at 9:00 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                        Page

 3   RICARDO HILL

 4   Direct By Mr. Shin . . . . . . . . . . . . .1492
     Cross By Mr. Creizman  . . . . . . . . . . .1542
 5   RICARDO HILL

 6   Cross By Mr. Creizman  . . . . . . . . . . .1577
     Cross By Mr. Klingeman . . . . . . . . . . .1598
 7   Redirect By Mr. Shin . . . . . . . . . . . .1686
     Recross By Mr. Klingeman . . . . . . . . . .1700
 8   Redirect By Mr. Shin . . . . . . . . . . . .1704

 9                    GOVERNMENT EXHIBITS

10   Exhibit No.                         Received

11    1532-C  . . . . . . . . . . . . . . . . . .1493

12    1352-D  . . . . . . . . . . . . . . . . . .1495

13    1432-F  . . . . . . . . . . . . . . . . . .1498

14    2279  . . . . . . . . . . . . . . . . . . .1500

15    1289  . . . . . . . . . . . . . . . . . . .1504

16    1372  . . . . . . . . . . . . . . . . . . .1507

17    73  . . . . . . . . . . . . . . . . . . . .1510

18    2245, 2246, and 2247  . . . . . . . . . . .1527

19    2251  . . . . . . . . . . . . . . . . . . .1531

20    2252  . . . . . . . . . . . . . . . . . . .1532

21    2253  . . . . . . . . . . . . . . . . . . .1534

22    2284  . . . . . . . . . . . . . . . . . . .1538

23    2287  . . . . . . . . . . . . . . . . . . .1540

24    3502-26  . . . . . . . . . . . . . . . . . .1594

25
```

1      1446-H    . . . . . . . . . . . . . . .1696

2                       DEFENDANT EXHIBITS

3      Exhibit No.                              Received

4      12    . . . . . . . . . . . . . . . .1554

5      13    . . . . . . . . . . . . . . . .1559

6      TG12    . . . . . . . . . . . . . . .1660