1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4          v.                15 Cr. 769 (AJN)

5   YURI LEBEDEV and TREVON GROSS,

6            Defendants.      Jury Trial

7   ------------------------------x

8                       New York, N.Y.
                       February 27, 2017
9                       9:05 a.m.

10

    Before:
11

                HON. ALISON J. NATHAN,
12

                       District Judge
13                       And A Jury

14                 APPEARANCES

15   PREET BHARARA
        United States Attorney for the
16        Southern District of New York
    BY:  EUN YOUNG CHOI
17        DANIEL S. NOBLE
        WON S. SHIN
18        MICHAEL CHANG-FRIEDEN, Paralegal
        Assistant United States Attorneys
19

    CREIZMAN, PLLC
20        Attorneys for Defendant Yuri Lebedev
    BY:  ERIC M. CREIZMAN
21        MELISSA MADRIGAL
        JONATHAN MICHAELSON, Paralegal
22

    KROVATIN KLINGEMAN, LLC
23        Attorneys for Defendant Trevon Gross
    BY:  KRISTEN M. SANTILLO
24    BY:  HENRY E. KLINGEMAN

25

 1                    (Trial resumed; jury not present)

 2                    THE COURT:  Matters to take up, counsel?

 3                    MS. CHOI:  Your Honor, I just wanted to give you a

 4      roadmap of what we expect to happen this morning and later

 5      today.

 6                    We've discussed with defense counsel, there are a

 7      series of government exhibits that we would move to admit based

 8      on stipulations and agreement with the parties.  We don't

 9      display all of them, we'll only display a small subsection of

10      them to give context to the first two witnesses, which are

11      Michelle McDowell from Alloya and Neil Kumar from Alloya.

12                    Defense counsel, Ms. Santillo in particular, wanted to

13      use a tape of a September 18th phone call between Mr. Gross and

14      various people at Alloya, including the two witnesses, in her

15      cross.  To accommodate her, we are going to play portions of

16      the tape that we have agreed upon in Ms. McDowell's direct

17      examination just to move things along and introduce the

18      transcript and the fact of the tape, and then elicit certain

19      other facts obviously about that conversation so we don't put

20      in all 20 minutes or 30 minutes of the tape.

21                    Just to alert your Honor, there was a portion where

22      Mr. Gross explains along the lines of what the WhatsApp

23      communication.  There are certain communities --

24                    THE COURT:  I remember reading that.

25                    MS. CHOI:  Right.  So we have redacted that.  There

1    will be an extended bleep that will appear in the audio.

2    Defense counsel has consented to that, I believe.  We'll try to

3    spare everyone's ears, but that will kind of continue for a

4    portion of Mr. Gross' statements about his intent with the

5    credit union.

6              THE COURT:  Okay.

7              Ms. Santillo, you're in agreement with this proposed

8    course?

9              MS. SANTILLO:  I'm okay with that.  I would just like

10   to have a limiting instruction like we've had before about

11   disregarding evidence that has been redacted or, in this case,

12   bleeped.

13             THE COURT:  I can do a version of the redaction.

14             MS. CHOI:  The bleeping instruction.

15             THE COURT:  Right.

16             MS. CHOI:  So we'll have Ms. McDowell go first and

17   then Mr. Kumar.  Ms. McDowell deals with the ACH origination

18   process at Alloya, Mr. Kumar is a compliance individual.

19             With Mr. Kumar, I just wanted to give the Court a

20   heads up that we will be using a calculating with Mr. Kumar so

21   as to help explain to the jury the nature of his testimony with

22   regard to certain numbers.

23             THE COURT:  It sounds scintillating.

24             MS. CHOI:  I think it's rivetting, I'm very excited,

25   your Honor, but maybe that's just the true nerd in me.

```
1          And then the last portion of the afternoon will be

2   Mr. Freundt, who is a cooperating witness.

3          THE COURT:  Right.

4          MS. CHOI:  We are working diligently to narrow the

5   government's case.  I just wanted to make sure your Honor

6   understands that we still are on track to end, I think on

7   Tuesday of next week at the very latest, and we're still

8   working to see if we can cut things down.

9          Part of this is -- and we have expressed this to

10  defense counsel -- there are other exhibits that we would like

11  to have access to for purposes of closing that we don't need to

12  necessarily publish seriatim with the jury.  Hopefully defense

13  counsel will be able to agree with us on that fact, and we'll

14  accommodate them in the documents that they would like to have

15  in, as well.  That would cut down on a lot of the publishing.

16  We're trying to keep it so it's just to point the jury as to

17  what's going on, if necessary.

18         THE COURT:  Look, if it's in evidence -- and

19  obviously, you get to show the jury during the course of the

20  trial what you want -- but if it's really something you just

21  need in for purposes of being able to refer to it at closing,

22  then I think both sides should be on board with that.

23         MS. CHOI:  That's our intent, your Honor.

24         MR. KLINGEMAN:  Your Honor, if I could just address

25  that last -- good morning, by the way.
```

1      THE COURT:  Good morning.

2      MR. KLINGEMAN:  If I could just address that last

3  point?

4      THE COURT:  Sure.

5      MR. KLINGEMAN:  In principle, we have no objection to

6  the government admitting exhibits about which there will be no

7  testimony, but nevertheless, allowing the exhibits to be

8  available for use in some kind of summary chart or even comment

9  during closing, and the government's agreed provisionally to

10  point out those exhibits to us in advance of their being

11  offered and to provide some kind of relevance proffer.  So

12  that's the process we're planning to follow.

13      My concern is this.  If the government were to offer a

14  massive number of exhibits without any kind of testimony, it's

15  very hard for us to review them all thoroughly and understand

16  exactly what the significance of each and every aspect of each

17  and every exhibit is.  And I'd hate to be in the position where

18  I'm finally hearing about the relevance or importance or

19  significance of an exhibit during the middle of the

20  government's closing.  So that's why I'm simply asking for some

21  patience from the government and from the Court with me having

22  an opportunity to review this stuff before it actually goes in

23  evidence.  I'm not asking for any --

24      THE COURT:  No, of course.

25      MR. KLINGEMAN:  -- intersession, but I'm just telling

1    you the background of my concern.  I'm not being obstructive,

2    I'm just trying to know what's coming.

3              THE COURT:  Thank you.

4              MS. CHOI:  Your Honor, just to follow up on that.

5    Mr. Klingeman, over the weekend, asked us for a rough proffer

6    as to the relevance of all of the exhibits.  We said we're

7    happy to explain to you any particular document for which you

8    may have concerns.  I think if you read the four corners of the

9    document, these are documents they've now had for seven weeks.

10   It is apparent what the relevance will be, but we're happy to

11   help point out certain facts to them if they want a little

12   context.  What I don't want to have happen is, obviously, it'd

13   be the government's burden to establish relevance in some form

14   for every single one of these documents if it is apparent on

15   the four corners if you read the document.

16             So we're going to be giving them chunks of documents

17   as we go along, and hopefully that will alleviate it.  And if

18   there are any issues, as always, we will be able to address

19   them if they bring them to our attention.

20             THE COURT:  Go ahead, Mr. Klingeman.

21             MR. KLINGEMAN:  My only concern about that is as

22   following.  Obviously, it's the government's burden in the

23   case.  And if the government produces a massive number of

24   exhibits, I think the government -- it should be government's

25   burden to at least proffer to me and the Court the general

1    relevance of the exhibits before they're received in evidence.

2           And again, I don't want to be burdened with the idea

3    with picking through literally hundreds, if not thousands, of

4    pages of documents on the night before they're being offered,

5    or even the day before they're being offered, when I have

6    everything else that I'm trying to do in the case.

7           So I'm not asking for any intersession, I'm just -- I

8    want to talk to the government before we bring any issues

9    before the Court.  I just want to forecast my concern that it

10   would not be fair to do a huge document dump and ask the Court,

11   sight unseen, to admit evidence.  That's all.

12          THE COURT:  All right.  No, that sounds perfectly

13   reasonable, Mr. Klingeman.

14          I mean, maybe I'm overextrapolating from other -- what

15   happens frequently is there's some set of documents that are

16   repetitive in nature, so you sort of say, well, here's the

17   relevance of this one document, and then the following 100

18   documents are essentially making the same point or doing the

19   same thing.  And certainly, if those are coming in, hopefully

20   by stipulation, it wouldn't be something that we'd need to

21   publish every one to the jury.

22          But I don't disagree with anything you said,

23   Mr. Klingeman.  If you're willing to stipulate and have

24   documents come in without requiring the presence of a

25   testifying witness and otherwise stipulating, then I think the

1    government can and should make proffers to you as to relevance

2    to facilitate your ability to stipulate or not stipulate.

3            MS. CHOI:  Right.  And we're happy to do that.  I

4    think, again, it's pretty obvious what the relevance will be,

5    but if they have any questions, we can tell them the groups of

6    documents that we would like to put in and what's their general

7    subject matter.

8            MR. KLINGEMAN:  The government's already begun that

9    process, I should say.

10           THE COURT:  All right, great.  Thank you.

11           Thank you both.

12           Ms. Santillo.

13           MS. SANTILLO:  Good morning, your Honor.

14           THE COURT:  Good morning.

15           MS. SANTILLO:  I just wanted to address the

16    government's comment about Mr. Kumar's testimony.

17           I don't know what they plan to do with this

18    calculator, but this is again where this man is not an expert,

19    he's a fact witness, an arm's length business partner that the

20    HOPE Credit Union was working with.  So to the extent they're

21    going to try to use him to make elaborate technical points, I

22    may be raising some objections.  I don't think that that's

23    necessary, especially given the fact that we've had three

24    witnesses who have talked about the volume of ACH processing

25    here.

1    MS. CHOI:  Your Honor, I'll proffer specifically what

2    will happen, and it was in his 3500.  As part of their analysis

3    they look at the -- as part of Alloya's analysis, they look at

4    the underlying data that is provided by the credit union to the

5    NCUA about their financial condition.  They reiterated multiple

6    times to Mr. Gross that they thought that they were going to --

7    that his ACH volume would "blow up the balance sheet", meaning

8    it would skew the ratio that is required by the NCUA to be at

9    7 percent.  You've heard testimony about that.

10       I think it is -- the exercise will be an analysis of

11   Mr. Kumar has done, which is after September 30th, they went

12   back and looked at the call data that had been posted by

13   Mr. Gross, and they will realize that -- they realized that

14   Mr. Gross had neglected to put approximately 3.2 million, I

15   believe, of cash that they had on hand at Alloya in the call

16   report.

17       I think it's important -- the math is simple.  It's

18   laid out in the NCUA document itself.  There are lines where

19   you add certain lines, and then you do a numerator and a

20   denominator, but I think the point needs to be made that their

21   concerns were borne out, that Mr. Gross, in fact, made a

22   material misstatement with regards to the balance sheet to the

23   NCUA.

24       We could do it with an NCUA witness, but I think they

25   would have the same objection.  And I think the objection is

1    basically, because all it's really doing is explaining from his

2    perspective what Alloya does day in and day out, and why their

3    concerns were, in fact, borne out, and they realized that after

4    they received the call report data.  And it's for

5    September 30th, 2014, which to orient your Honor is right

6    when -- in that September period, the phone call is

7    September 18th, that's when Alloya was having these discussions

8    with Mr. Gross warning him that they really didn't think that

9    this capitalization could be maintained given the volume, and

10   then, in fact, Mr. Gross made a material misstatement on the

11   call report, which Alloya realized after the fact.

12              THE COURT:  So what does the calculate do?

13              MS. CHOI:  The calculator just walks them through so I

14   can establish with Mr. Kumar the difference between the amount

15   of cash on hand that was reported to the NCUA by HOPE FCU as to

16   how much cash HOPE FCU had at Alloya, which goes into the

17   calculation of net worth ratio.  So they said approximately

18   $400,000, when, in fact, it was over $3 million that was on

19   hand.  So you can find that difference and the fact of that

20   difference with the net worth ratio.

21              All the underlying documents have already been

22   admitted, your Honor.  The call report has already been

23   admitted, the parties have stipulated to the ACH detail, and

24   the statements that HOPE had at Alloya that will be used to

25   establish the fact that, as of September 30th, which is the

1    effective date, the date that they are supposed to report --

2    HOPE is supposed to report its financial condition to the NCUA,

3    they had over -- I believe over $3 million of cash on hand at

4    the credit union, at the corporate credit union, and in that

5    line of the call report, Mr. Gross reported $400,000, which the

6    difference is, your Honor, the net worth ratio goes from

7    approximately 12 percent to 1 percent.

8        MS. SANTILLO:  Your Honor, in this case, the

9    government has given us a proffer of what they said the

10    material misstatements were.  They've never mentioned that as a

11    material misstatement.  I would object to bringing in a

12    technical witness at the last minute to try to establish this

13    point, which we are now on notice of.  That's one.

14        The second is, Mr. Gross did not make the call report,

15    so the idea that they are trying to say that he misrepresented

16    what was in the call report, you know, that requires an

17    analysis of how the math was done that is being introduced into

18    the case at the last minute.

19        So I have objections on notice grounds and on the fact

20    that this man is sort of being a forensic expert and going back

21    and looking at HOPE's books and records.  It wasn't his job to

22    do, he's not an examiner, and so I object on that basis.

23        MS. CHOI:  Your Honor, the rules clearly allow it.

24    1006 allows it, 611 allows it.  He is not being -- he's a fact

25    witness to Alloya's viewing of what is going on, what they are

1    telling Mr. Gross in that September timeframe, the timeframe

2    that Ms. Santillo wants that tape to be played.  And they warn

3    him, and he acknowledges on this tape, "Yes, I understand.  The

4    NCUA and I are in conversations.  We understand that our net

5    worth ratio is important.  We have it at 10.7 percent now."

6         The argument that it wasn't Mr. Gross who submitted

7    the call report, there are only two people who could have

8    submitted that call report; Mr. Gross or Mr. Larkins.  And we

9    have charged a conspiracy, which means, even if it was not

10   Mr. Gross at the table right there, it is a very simple

11   calculation.  The question in the call report says, "What is

12   your cash on hand at the corporate credit union?"  You go to

13   your Alloya statement and say, "How much do I have on hand at

14   my corporate credit union?"

15        And I think the notion that somehow he didn't

16   understand that this was a manipulation when he's very clear on

17   the phone call that he understands the importance of his net

18   worth ratios is a fallacious one.

19        It's also relevant as established from the call that

20   they had with Kapcharge where he's expressing his understanding

21   of these basic issues with regard to the net worth ratio.

22        We're not using it as an expert, this is the type of

23   stuff that -- this is basic math that Alloya does day in and

24   day out when they look at their member credit unions.  I think

25   the jurors have not been walked through these mathematical

1    steps.  It is to aid them in understanding what he does as part

2    of his job at Alloya, and it shows that, in fact, it was borne

3    out by the evidence.  That this did blow up their balance

4    sheet.  There was a reason why Alloya -- Alloya for good reason

5    shut off this business.  And, in fact, given what Ms. Santillo

6    has proffered as to reliance of cross examination, the defense

7    is going to say Alloya did this out of spite, that they just

8    shut them off and stopped the small credit union.  I think it's

9    very important to establish that they were, in fact, correct

10   about the risks that were to both HOPE FCU and to Alloya.

11             THE COURT:  All right.  I appreciate hearing the

12   arguments in advance, the issue I invited briefing on five or

13   six times, but I've heard your arguments.

14             It sounds to me from the proffer that the government

15   is within the bounds of what is appropriate fact testimony and

16   lay opinion under cases like --

17             MS. CHOI:  Bank of China, and Garcia and Cuti, your

18   Honor.

19             THE COURT:  Yes.  It strikes me as very similar to

20   Cuti in particular as it's been proffered, but I'll guard --

21   I'll be listening carefully for the foundation that's laid and

22   the reasoning process that's proffered and will hear any

23   contemporaneous objections as it comes.

24             But based on what I've heard, it appears both

25   relevant, the proffer suggests it will fall on the appropriate

1    side of the line, and given that the Alloya witness and the

2    documents that this is grounded in are actually already

3    admitted, I don't see the basis for the lack of notice

4    objection.  The points that Ms. Santillo has raised sound to me

5    like perfectly appropriate cross examination points.

6         So as an in limine matter, I won't exclude it, but

7    I'll hear the contemporaneous objections, and I'll be listening

8    carefully to make sure an appropriate foundation is laid and

9    that the appropriate testimony that comes is not something that

10   ought to have been noticed as expert testimony.

11        MS. CHOI:  Thank you, your Honor.

12        MS. SANTILLO:  Your Honor, it's not just -- I just

13   want to clarify my notice concern, which is not just that they

14   didn't notice the expert, they didn't notice the

15   misrepresentation.  They gave us a list of what they said were

16   material misrepresentations, and that was not one of them.

17        What I'm hearing for the first time is that Alloya

18   went back and made calculations.  They didn't have access to

19   HOPE's financials.  They didn't have access to what HOPE --

20   what methodology people at HOPE, who were not Pastor Gross, did

21   to calculate the call report.  And so, you know, they're now

22   throwing something in.  We had a list of six or seven things

23   that were specific misrepresentations, and this was not one of

24   them.

25        MS. CHOI:  Your Honor, there are categories, and net

1    worth ratio and misrepresenting the financials were definitely
2    one of them.
3              THE COURT:  Is there a document that you're referring
4    to, Ms. Santillo?
5              MS. SANTILLO:  I don't know what they're referring to.
6              THE COURT:  No, I'm asking you.  You said they made a
7    representation as to what the misrepresentations were.  Was
8    that in a document?
9              MS. SANTILLO:  It was on a phone call, and I have
10   notes from that phone call.
11             THE COURT:  And just to be clear, you're saying this
12   wasn't included, and Ms. Choi, you're saying it was included.
13             MS. CHOI:  Your Honor, we have notes from the phone
14   call right here that Mr. Noble and I had with defense counsel.
15   Number 5 is "discussions of manipulating net worth ratio".
16             MS. SANTILLO:  Which, as I understand it, was with
17   respect to the calls with Kapcharge, it had nothing to do with
18   Alloya on September 18, 2014, and it had nothing to do with
19   Alloya doing a forensic investigation after the September 31st
20   call report was filed, probably a month later, right?  And
21   going back and finding $3 million that were missing.
22             THE COURT:  What was the basis as to your assumption
23   of what they were talking about when they were talking about
24   the -- when they were talking about -- you agree that included
25   in that discussion was manipulating net worth ratio?

1    MS. SANTILLO:  Well, I would agree that they directed

2    us to a specific phone call that --

3    THE COURT:  I can't adjudicate what happened in your

4    phone call.  If you don't put this in -- how could I

5    possibly --

6    MS. SANTILLO:  No, I'm talking about a piece of

7    evidence that is a phone call.  There is a phone call in which

8    part of the conspiracy is that --

9    THE COURT:  I know.  But as I sit here, they're saying

10   they did talk about this category of misrepresentation, and

11   you're saying they didn't.  What am I supposed to do to

12   adjudicate a notice objection?

13   MS. SANTILLO:  Well, I think that it would be helpful

14   to lay out the chronology of what they're trying to do now

15   versus the piece of evidence that we have been on notice was

16   the basis for their conspiracy charge.  I mean, part of the

17   reason that we even had that phone conversation was because we

18   objected to the new indictment and the conspiracy charges being

19   leveled at the last minute, and we asked for clarification.

20   THE COURT:  The last minute was now how many months

21   ago?

22   MS. SANTILLO:  Yes, but --

23   THE COURT:  How many months ago?

24   MS. SANTILLO:  But we --

25   THE COURT:  It's a question.  How many months ago is

1    what you're characterizing as last minute?

2              MS. SANTILLO:  It was about a month and a half ago.

3              And in order to prepare us for trial, we asked for

4    specifics about what the misrepresentations were and that was

5    what they gave us.  And until this moment, I have never heard

6    of what they just said.

7              THE COURT:  You're disagreeing with that, Ms. Choi?

8    You're saying she has heard of it because you raised it?

9              MS. CHOI:  Your Honor, first of all, we said

10   "categories of misstatements", we gave as an example that call.

11   But obviously, if we're saying manipulating net worth ratios,

12   we have to establish what the net worth ratio should have been.

13             They have had these documents now for six weeks.  They

14   have admitted -- they've already agreed to admit the documents

15   that establish the misrepresentation that the net worth ratio

16   was in fact not what HOPE FCU and their client had stated it

17   was.

18             We have notes of that particular call, and we have it

19   "categories of documents".  We elucidated and pointed them to

20   the specific portions of that, such as a conversation which

21   they expressly discuss the manipulating net worth ratio.

22             But obviously, when we say "manipulations of net worth

23   ratio" we have to establish the manipulation, if that happened,

24   and one of the obvious ways to do that is to show what the net

25   worth ratio should have been.

1    I think it is disingenuous to assert that because on a

2    phone call she didn't comprehend that we had to establish the

3    underlying facts to prove the false statements and obstruction

4    that now she is prejudiced.  They've had the indictment since

5    late December.  Since late December, we have had multiple phone

6    calls walking them through the evidence, we have given them

7    notice about the categories of misrepresentations that we are

8    going to prove, and they have had these documents which amply

9    lay out what the misrepresentations were, both because they

10   were factually inaccurate, because they establish facts that

11   are not what Mr. Gross said, and also because they are specific

12   conversations between Mr. Gross and his various coconspirators

13   as to how to hide those underlying facts.  It is disingenuous

14   for them to say now we don't understand the math.

15            MS. SANTILLO:  May I respond?

16            THE COURT:  Briefly, and then we'll move on.

17            MS. SANTILLO:  I'm not saying I don't understand the

18   math, I'm saying that I don't even -- as the government is

19   standing here today, I don't even know what the

20   misrepresentation is.  Because if it's visa vis the NCUA, NCUA

21   had more information than Alloya did about HOPE's books, they

22   had details about their finances, and they have never cited a

23   violation of them not being accurate in their call reports.

24            This is Mr. Kumar doing his own little detective work

25   and going back and reinventing, you know, what may have been on

1    HOPE financial's books and suddenly saying there's a

2    misrepresentation.  I mean, there's no duty to disclose -- I

3    don't know where the duty to disclose to Mr. Kumar was.  I

4    don't know what he's saying was a violation that was not valid

5    information that wasn't disclosed to the NCUA.  I mean, this is

6    very far afield from what we understood to be material

7    misrepresentation.  It would have to be a specific

8    representation that was made to somebody that they had to duty

9    to disclose to and, you know, I think --

10              MS. CHOI:  Your Honor.

11              MS. SANTILLO:  -- it's totally different category of

12   documents than what we have been talking about.

13              MS. CHOI:  Government's Exhibit 705, which the defense

14   objected to, was in fact Alloya's internal interpretation of

15   the call report data.  They objected to that because it was

16   expert report.  They said it was an expert report.  They didn't

17   know how it was created, et cetera.  We agreed not to do that,

18   but that's based on the notice as to what the misrepresentation

19   was.

20              So they understood -- they should have understood from

21   705 where there's a highlighted box about what was said on the

22   September call report, that we were going to elicit that fact

23   from the witness, because that was the agreement that we

24   reached.  We reached the agreement that some of these reports

25   that quote/unquote, as the defense has marked, expert reports

1    were not going to come in because I could elicit those facts

2    from the witness.  That's point number 1.

3         Point number 2, we will amply establish that Alloya,

4    as the corporate credit union for its member credit unions,

5    including HOPE FCU, was obliged to know what the underlying

6    financials were because it affected HOPE FCU, because it

7    affected their risk, it affects the risk of their members, and

8    they have their own reported requirements to the NCUA.

9         For them to now assert that we don't know, we didn't

10   know that there was some sort of obligation to report to Alloya

11   is besides the point because they all rely in good faith on the

12   representations of financials that are contained in the

13   5300 call reports, that are contained in various public

14   documents that are made available, and that they know from

15   their own members because they have to look at their members'

16   financials as part of the corporate credit union.

17        It is a conspiracy charge, your Honor.  We are allowed

18   to prove up why and how these misrepresentations were made and

19   to whom.

20        THE COURT:  So just walk me through -- so the charge

21   is conspiracy to?

22        MS. CHOI:  Misrepresents -- to make misrepresentations

23   to the NCUA and obstruct their examination.

24        THE COURT:  Okay.  So misrepresentations that are

25   criminal here --

```
 1              MS. CHOI:  Correct.

 2              THE COURT:  -- are to the NCUA.

 3              MS. CHOI:  Correct.

 4              THE COURT:  We're talking now about testimony

 5    regarding misrepresentation to Alloya.

 6              MS. CHOI:  No.  It's misrepresentations to the NCUA

 7    that Alloya relied on in assessing whether or not they are

 8    running their credit union the way that they should.

 9              THE COURT:  So walk me through that because I don't

10    totally see the triangulation.

11              MS. CHOI:  Because Alloya -- we'll establish this

12    through testimony, your Honor -- Alloya is the corporate credit

13    union.  They work as a credit union's credit union.  Their only

14    membership is other credit unions.  So as part of their own

15    risk analysis, they have to evaluate what each of their member

16    union's financials are, guide them through any issues that

17    might arise with regard to risk.

18              They had multiple conversations with Mr. Gross where

19    they warn him, "Mr. Gross, I know you want to do this ACH

20    volume.  We think it's going to" -- the phone call you listen

21    to say will say, "It will blow up your balance sheet."  He

22    makes a representation he understands that.  He's been talking

23    to the NCUA.  He understands what the net worth ratio issue is

24    and that he's going to maintain it above 7 percent, which is

25    what is necessary.
```

1     They then make the decision that there's no way,

2 looking in mid September, knowing how much cash they have on

3 the books, that the ratio will be able to be maintained at

4 quarter end, which is September 30th.

5     So they tell Mr. Gross, "We're not going to do this

6 ACH volume anymore for you because we don't think that you will

7 be able to sustain your credit union.  The NCUA is going to

8 shut you down."  They tell him that.  They expressly tell him

9 that fact.

10     Lo and behold, as part of what they're doing -- to be

11 clear, HOPE continues to be a member credit union of Alloya

12 after they decide not to do ACH because they're doing check

13 settlements, they're doing all sorts of other things at Alloya.

14 They go back and they're monitoring what's going on at HOPE FCU

15 because they realize that there have been problems here, and

16 they, in fact, establish that there were these

17 misrepresentations about --

18          THE COURT:  To Alloya.

19          MS. CHOI:  -- to both Alloya and the NCUA.

20          THE COURT:  Well, you let yourself get sidetracked

21 down the road, but what you haven't done is connected the

22 relevance of what you're saying are misrepresentations to

23 Alloya to the charged conduct.

24          MS. CHOI:  Because Alloya has to rely on the call

25 reports that are made by its member credit unions, and they do

1    rely on this in assessing the financials of the member credit

2    unions.  So they pull all the 5300 call data for every quarter

3    and they assess that when they're looking at what's going on at

4    their underlying member credit unions, because they have to

5    rely on the fact that these things -- that these items are

6    accurately stated.  And so it is -- they are going to attack

7    Alloya and say -- their line of cross will be --

8              THE COURT:  Wait.  Before we get to cross -- I mean,

9    if this is where we are, then I see the problem.  You have

10   not -- I mean, if I can't follow a line of relevance between

11   what you're offering with respect to Alloya and the charged

12   conduct, then I would have concerns that the jury can't.

13             MS. CHOI:  Well, they discovered the misrepresentation

14   to the NCUA, your Honor.

15             THE COURT:  You haven't -- just --

16             MS. CHOI:  Okay.

17             THE COURT:  I'm giving you the opportunity, Ms. Choi,

18   to explain to me the government's argument as to relevance, and

19   you've now spent ten minutes and haven't gotten there.  So one

20   more shot.

21             MS. CHOI:  They looked at the call report that HOPE

22   FCU --

23             THE COURT:  Who is "they"?

24             MS. CHOI:  Alloya looked at the call report that HOPE

25   FCU sent to the NCUA about their financials as of

1   September 30th, and they realized the misrepresentation.  They

2   can establish the misrepresentation because -- made to the

3   NCUA.  Because the representation from HOPE FCU to the NCUA

4   was, "We only had approximately $40,000 of cash on hand as of

5   September 30th, 2014."  Alloya looked at their own financials

6   and said, "That's not true.  They had over $3 million worth of

7   cash on hand at Alloya."  So that is a material misstatement

8   that was made by HOPE FCU to the NCUA which Alloya, in the

9   course of its business, realized.

10          THE COURT:  So I'm looking at what you said.  The

11   misrepresentation to the NCUA that the government is arguing is

12   the September 30th report to the NCUA, and in that report, HOPE

13   FCU says, "We only had approximately $40,000" --

14          MS. CHOI:  400,000, your Honor.

15          THE COURT:  -- "$400,000 in cash on hand as of

16   September 30th, 2014."  And the government wants to partly show

17   that that wasn't true based on the information that Alloya had,

18   which included Alloya having over $3 million worth of cash --

19   Alloya being aware of --

20          MS. CHOI:  HOPE having $3 million worth of cash at

21   Alloya.

22          THE COURT:  At Alloya.

23          MS. CHOI:  As of September 30th, 2014.

24          THE COURT:  All right.  Well, that point I understand.

25   Is that the limited point that's being made?

1      MS. CHOI:  And the extent to which that affects the

2   net worth ratio, why that is, in fact, a material misstatement

3   that Alloya would care about, because again --

4      THE COURT:  A material misstatement to?

5      MS. CHOI:  To the NCUA and -- to the NCUA about HOPE's

6   financials.  Because as your Honor knows, the net worth ratio

7   is everything.  It's one of the key points that the NCUA has

8   noted it evaluates in establishing the financials.  And I think

9   it would be helpful to explain why the difference between

10  $400,000 and $3 million impacts the net worth ratio.  All we're

11  going to do is walk through the call report.  That's simple

12  math to establish what the effect would have been, meaning that

13  it would drop the net worth ratio to under 2 percent.

14      THE COURT:  Ms. Santillo, as I understand, it's a

15  misrepresentation to the NCUA in the form of the report that

16  states how much cash is on hand that's being proffered to be

17  disputed here by facts that Alloya has.  So that seems relevant

18  to me.

19      MS. SANTILLO:  So Alloya has one piece of information

20  which is what cash is on their books.  What they don't have is

21  information about how HOPE treats its liabilities and whether

22  that money is profit.

23      THE COURT:  All right.  So those are cross points and

24  defense points.

25      MS. SANTILLO:  But I think the more important issue is

1   that we have numerous, numerous reports from the NCUA about any

2   material violations that they found based on their review of

3   the ACH processing at HOPE.  That is what the issue in the case

4   is, and these have never been raised as issues that the NCUA

5   identified, when they had access to all of information at HOPE,

6   including the liabilities and the profit.

7          THE COURT:  When you say "this has never been raised",

8   what do you mean "this"?

9          MS. SANTILLO:  This issue about there being more cash

10   at Alloya than they reported on the call report.  There are a

11   number of issues that the NCUA raised when they looked over

12   this credit union with a fine-toothed comb, and those are the

13   issues that we are litigating in this case.  And to say that

14   Alloya was --

15          THE COURT:  Just, the NCUA -- I mean, they can

16   establish separate misrepresentations to the NCUA, I mean, the

17   misrepresentations to the NCUA that might have theoretically

18   led the NCUA to reach certain conclusions.  So the fact that

19   the NCUA wasn't aware of a fact that establishes a

20   misrepresentation, I don't understand the argument that that

21   can't be proved here in light of the charge being

22   misrepresentations to the NCUA.

23          MS. SANTILLO:  Well, what I'm saying is that -- I

24   mean, first, there's a couple of layers of this.  One is that

25   it's a materiality issue.  If this man has access to one piece

1  of information and -- it's relevance, prejudice, and it goes to

2  the question of whether the information that is in Alloya's

3  books is material at all in terms of -- and I'm not saying this

4  in terms of a relevance perspective but in terms of a material

5  misrepresentation perspective.

6  THE COURT:  The NCUA doesn't have to rely on a

7  misstatement in order for it to be established as a falsity or

8  omission, do they?

9  MS. SANTILLO:  No, but it has to be something that

10  could have the ability to influence the NCUA.  And one piece of

11  the entire picture of the HOPE financials is not that, right?

12  Like tabbing "cash" without any assessment of how it filters

13  into their -- whether it's profit, whether there's liability,

14  all of that is a part of a bigger mix of whether it's material

15  in the first place to --

16  THE COURT:  All right.  I understand the points.  Of

17  course, materiality is a fact question.  So everything that

18  you've said I deem certainly appropriate as points for cross

19  examination and affirmative case of the defense.

20  I don't think that there was insufficient notice of

21  this general category of argumentation.  The documents are in.

22  The awareness of the Alloya witnesses are in.  So I'll overrule

23  on that grounds.  Relevance enough to allow it to go before the

24  jury has been established.

25  I will, as I said at the outset, hear contemporaneous

1    objections.  If what we are hearing goes beyond the narrow

2    scope that's been proffered to me, I would hear objections on

3    those grounds, certainly, and the 701 grounds that we've

4    discussed, and the like.  But otherwise, I will overrule the

5    defense's objection.

6            We have all our jurors and we'll get them.  Thank you.

7            So you're going to call out of the box the next

8    witness?

9            MS. CHOI:  No, your Honor.  I think we're going to do

10   a few emails.  Just admit them, publish a few, and then call

11   the witness.

12           THE COURT:  All right.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1    (Jury present)

2    THE COURT:  Good morning, members of the jury.  I hope

3    you had a great weekend, and thank you, again, for your

4    timeliness and diligence.

5    We continue with the government's presentation.

6    Ms. Choi, you have some documents to move into

7    evidence; is that correct?

8    MS. CHOI:  Yes, your Honor.  The government at this

9    time would offer the following exhibits:

10    Government's Exhibits 1416-A through C, 1417, 1426-A,

11    1428, 1429, 1430-A through D, 1431, 1432-E, 1432-G, 1433-A

12    through C, 1434-B, 1435-A, 1435-B, 1891, 1903, 1905, 1908,

13    1921, 1922, 1943, 1944, 1953, 1960.  Those would be pursuant to

14    the email and electronic records stipulation.

15    THE COURT:  All right.  Without objection, counsel?

16    MR. CREIZMAN:  No objection.

17    MR. KLINGEMAN:  No objection.

18    THE COURT:  Thank you.  The documents just listed by

19    Ms. Choi are admitted by stipulation.

20    (Government's Exhibits 1416-A through C, 1417, 1426-A,

21    1428, 1429, 1430-A through D, 1431, 1432-E, 1432-G, 1433-A

22    through C, 1434-B, 1435-A, 1435-B, 1891, 1903, 1905, 1908,

23    1921, 1922, 1943, 1944, 1953, 1960 received in evidence)

24    MS. CHOI:  Thank you, your Honor.  Could we please

25    publish Exhibit 1905 for the jury, please?  Could we just focus

1     in on the top portion in the first email?

2          Subject:  "ACH verification goals for today" from Yuri

3     Lebedev to Unit Test dated May 28th, 2014.  "Test, we were

4     supposed to have everything for ACH verification and processing

5     in staging today.  I have a Web API async service with one easy

6     method: BeginVefiry, which will post back verification status

7     for a user, and a real-time call GetAllowedAmount which will in

8     real-time return allowed max amount that that user can deposit.

9     Those methods do all the work in contacting the Microbilt

10    starting the aggregation on user, running business rules via

11    Workflows to determine the allowed amounts and such. So CMX

12    side would become extremely simple for now, no iphrames."

13         If you could zoom out please and note that the bottom

14    of the email is in cyrillic.

15         Government's Exhibit 1908, please.

16         Government's Exhibit 1921, please.  Email chain

17    between Yuri Lebedev, Trevon Gross, and Anthony Murgio dated

18    June 17, 2014.  Subject:  ACH origination.  The first email at

19    the bottom of page 1 from Marietta Fortier at Alloyacorp.org to

20    TGross@hope-fcu.com.

21         "Good afternoon.  Welcome to the ACH origination

22    product.  We offer free system training for you and the staff."

23         Could you zoom out, please?  The email above that on

24    Tuesday, June 17th, 2014.  Trevon Gross wrote, "FYI."

25         Later that day, Anthony Murgio wrote, "Yuri.  This is

1    very important to start learning how to integrate with Alloya

2    for automated ACH to the fed.  Please confirm that you can make

3    this time this Thursday."

4           The top email later that day Yuri Lebedev replies,

5    "Hello guys.  I will be there."

6           Government's Exhibit 1416-C, please.  This is an email

7    chain between Yuri Lebedev, Anthony Murgio, Mark Francis, and

8    Shoula Cohen, and Kevin Pepe.  Subject:  ACH up and running by

9    Wednesday.  Date June 23rd, 2014.

10          If we could zoom in on the bottom email starting from

11   Yuri Lebedev on June 23rd.  Thank you.

12          Yuri Lebedev writes to Anthony Murgio, Kevin Pepe,

13   Mark Francis and Shoula Cohen on Monday, June 23rd.  "Hello

14   guys.  Here is our site:  Https://ach.coin.mx.  You also have

15   CSV and it converts and sends NACHA back.  This was a prototype

16   and core functionality is implemented in Lightning platform.

17   It can serve as a proof of concept.  Please ask me for any

18   questions."

19          And Kevin Pepe responds, "Hi Yuri.  Do you have a CSV

20   file spec that we can use to create our CSV file?"  That's

21   fine.

22          Government's Exhibit 1417, please.  This is an email

23   chain between -- this is an email sent from Trustee

24   Collectibles to Kevin Pepe, Mark Francis, Shoula Cohen, and

25   Yuri Lebedev dated June 23rd, 2014.  Subject:  Great progress

1    today.  Important, please read.  Email reads "Kevin.  Thanks

2    for your help today.  Things we accomplished:

3         "1.  We logged into our account with Alloya.

4         "2.  We went through the system and spoke to Alloya

5    support about the different upload methods and came to a

6    conclusion."

7         And going down to number 3 under that -- no, sorry,

8    number 3 under number 2.

9         "We will work on automating the process by creating a

10   NACHA file to upload.  Once we do this we can input our own

11   merchant names and descriptors so we will not rely on Alloya to

12   keep creating subaccounts and us having to upload individual

13   files.  We must work on:

14        "1.  Taking all CSVs, creating one large CSV with all

15   data, running that CSV on ach.coin.mx system and then uploading

16   that NACHA file one time.

17        "2.  Then pulling the results through NACHA and then

18   splitting out this data back into a CSV excel for Kap to upload

19   back into each of their client's back end automatically."

20        Could you go to 4, please?

21        "Things to consider:

22        "1.  Trevon asked us not to make large deposits on any

23   merchant or bank accounts on the CU until July 1st.  This is

24   when they will create their reports for regulators that come in

25   during the middle of the month for inspection.

1        "2.  After July 1st we can credit business accounts,

2   just don't want to create any regular flags until then.

3        "3.  We can however start processing files slowly, we

4   just need to have a little reserve to protect the CU."

5        Government's Exhibit 1426-A, please.  This is an email

6   exchange between Anthony Murgio, Trevon Gross, Yuri Lebedev,

7   and Kevin Pepe, Mark Francis and Shoula Cohen of Capital Inc.

8   dated September 15th, 2014.  Could we just start with the Kevin

9   Pepe email at 10:00 a.m.?

10       Kevin Pepe wrote, "Hi Trevon, Yuri.  We will be

11  processing upwards of 1.3 million in credit payments today

12  through Alloya.  Would you be able to contact Alloya to

13  determine how much in reserves we would need in order to ensure

14  these payments are processed?

15       "Trevon, once I know the amount, I will send you an

16  email requesting that you move the funds from our account to

17  the reserve account.  Please let me know ASAP.  Thank you."

18       Trevon Gross then writes, "I have a 12:30 call with

19  them.  I will find out then."

20       And Anthony responds, "Thanks for the quick response."

21       Government's Exhibit 1428.  This is an email chain

22  between Trevon Gross, Anthony Murgio, Yuri Lebedev, Jose

23  Freundt, and Ricardo Hill dated September 23rd, 2014.  Subject:

24  Trace number inquiries.

25       Could you go to page 2 of this chain, please?  Now go

1    to page 1.  The bottom.  September 23rd, 2014 at 9:19 a.m.,

2    Anthony Murgio wrote, "Thanks.  But aren't they dropping us

3    anyways?"

4         Trevon Gross responds later that day, "We have 30

5    days.  It's not over until it is."

6         Anthony Murgio responds, "Can any bank or credit union

7    that has an account with the fed act as a conduit like Alloya

8    is now?  I will start to look today.  Just need to know the

9    specifics."

10        Trevon Gross responds, "Alloya is a corporate CU.  We

11   need another one like them."

12        Government's Exhibit 1431, please.  This is an email

13   chain between Trevon Gross, Ricardo Hill, and Anthony Murgio.

14   Subject "corporate credit union other than Alloya.  Date,

15   October 10th, 2014.

16        Starting with the first email at the bottom, Anthony

17   Murgio writes, "Rico.  Can you please call or email these two

18   corporate credit unions?  Trevon said you can call and/or email

19   from your personal info to these corporate credit unions.  We

20   don't need to disclose what CU we are with, just let them know

21   that you are consulting for a couple of credit unions and was

22   gathering information about their services.  Trevon can add the

23   questions below or alter them as I am not sure of exactly what

24   we need to ask."

25        The questions at the bottom.  "We need to know:

1           "1.  The cost of becoming a member.

2           "2.  The costs for the services they provide.

3           "3.  What the capital requirements are for doing

4    8 million of daily ACH originations.

5           "4.  The integration time and setup process with CU

6    South."

7           And then at the top, Trevon Gross responds, "These are

8    perfect questions."

9           Government's Exhibit 1432-E.  If we could go -- this

10   is a string between Anthony Murgio and Mark Francis.  Subject:

11   Reconciliations for HOPE and Alloya.

12          If we could go to the end of this document first.

13   This is an email from Shoula Cohen to Trevon Gross which we've

14   already seen in evidence.

15          If you could go back to that email, please.  "Just to

16   say".  October 21st, 2014.  "Trevon.  I had a conversation with

17   Anthony at the show about the reconciliations at Alloya.  I

18   have an issue with the fact that nobody is reconciling HOPE on

19   a daily basis."

20          Could we go back to the next page before that?

21   Anthony Murgio wrote, "Ha ha ha.  This is funny.  Not a

22   good email.  Would appreciate if you called me before you wrote

23   these.  Whatever."

24          And then an email from Anthony Murgio to Shoula Cohen

25   and Mark Francis on October 21st, 2014 at 11:12 p.m.  "What

1    show?  Why is Anthony with you at the show?  Ramp up.  Alloya

2    is about to shut down our account.  We are connecting to the

3    fed and getting a new software currently to be able to handle

4    this.  You just don't know the inner workings and what's going

5    on.  You guys had the access to Alloya and Rico does not.

6    You're not even supposed to have access.  Just not good."

7           At the top -- and we'll just go to the top of this

8    email -- the email from Anthony Murgio to Mark Francis at

9    1:19 p.m.  No, the whole thing.  "I will stay out of it and let

10   Trevon handle it as he sees fit.  It's not drama, it's reality.

11   Get with it.  The CU is small and not a business that you can

12   afford to burn and fuck up, it is a licensed institution."

13          From Anthony Murgio to Mark Francis.  1432-G.  Anthony

14   responds to the full group on this chain; Trevon Gross, Ricardo

15   Hill, Christine Carida, Kevin Pepe, Mark Francis, and Shoula

16   Cohen writes, "Shoula -- Anthony writes, "Shoula.  Many things

17   going on here.

18          "1.  We are looking into a new system that will

19   systematically do what you are asking.  Profitstars.com.  We

20   have a demo with them Thursday morning for the CU.

21          2.  It's great that you are ready to ramp up volume.

22   As discussed, there are current limitations due to Alloya.

23   They want us to pay 160,000 nonrefundable to process up to

24   8 million a day.  We have filled out paperwork with the fed to

25   have an account directly with them.  We are looking into other

1    corporate federal credit unions in the meantime.

2         "The more organization the better.  We all agree.

3    Getting the technology to systematically do these things is not

4    as easy as you may think.  The credit union is a fully

5    chartered by the government and NCUA insured financial

6    institution.  While you may be used working quick in the

7    private sector, this is not the case when you are a financial

8    institution.  We are trying our best to get the systems in

9    place to allow us to process volume in an organized manner.

10   Thank you for your patience."

11        Government's Exhibit 1435-A.  Email.  Subject:

12   Alloya, from Mark Francis to Anthony Murgio and Trevon Gross,

13   dated October 29, 2014.  "Gentlemen, I hope all is well.  We

14   want to solidify the relationship with Alloya and discuss

15   possible options with respect to processing capacity.  This

16   needs to be done ASAP as the 31st deadline is rapidly

17   approaching.  I know Anthony is trying to get a call going

18   between us, I just need to stress the importance of it so we

19   can come up with a solution and execute."

20        Government's Exhibit 1435-B.  Anthony responds to the

21   previous email to Trevon Gross and Mark Francis.  "We are on

22   the phone with Catalyst and Alloya now."

23        The government now calls Michelle McDowell of Alloya.

24        THE COURT:  Thank you.

25        Ms. McDowell may come forward.

1          THE WITNESS:  Michelle McDowell, M-i-c-h-e-l-l-e,

2    M-c-D-o-w-e-l-l.

3          THE COURT:  You may proceed, Ms. Choi.

4    DIRECT EXAMINATION

5    BY MS. CHOI:

6    Q.  Good morning, Ms. McDowell.

7    A.  Good morning.

8    Q.  Where do you work?

9    A.  I work at Alloya Corporate Federal Credit Union.

10   Q.  Also known as Alloya?

11   A.  Yes.

12   Q.  How long have you worked at Alloya?

13   A.  About 22 years.

14   Q.  Have you had the same position or different positions over

15   time?

16   A.  I've had different positions.

17   Q.  Could you describe sort of your progression through Alloya

18   over the last 22 years?

19   A.  Sure.  I started in the call center taking calls from our

20   member credit unions.  I worked my way around in different

21   management positions.  My current role is product manager of

22   our ACH and wire products, and prior to that, I was manager of

23   the ACH and wire operations areas.

24   Q.  Now, I think you just said that the name of the institution

25   is Alloya Corporate Federal Credit Union.  Could you describe

1    what a credit union is and how it differs from a bank?

2    A.  Sure.  So a credit union is a non-for-profit financial

3    institution that offers services to consumers, like you or I,

4    or businesses, and they are owned by their members.  A bank is

5    a for-profit institution that offers similar products and

6    services to consumers and businesses, but they are owned by

7    their shareholders or stockholders.

8    Q.  Are you familiar with the term "natural person credit

9    union"?

10   A.  Yes.  So in the example I just provided, that would be a

11   natural person credit union that provides services to

12   individuals and businesses.

13   Q.  And what is the difference between a natural person credit

14   union and a corporate credit union?

15   A.  Okay.  Alloya is a corporate credit union, so we can only

16   provide services to other credit unions within our field of

17   membership.  So our field of membership is any credit union

18   that's in the United States.

19   Q.  Do you know how many credit unions are members of Alloya

20   presently?

21   A.  We have about 1600 credit unions.

22   Q.  Do you know the approximate asset size of Alloya?

23   A.  Alloya's asset size is $3.5 billion.

24   Q.  Who owns Alloya?

25   A.  Alloya is owned by the credit unions that are members of

1   us.  So 1600 credit unions are our owners.

2   Q.  Does each credit union who is a member of Alloya have an

3   equal vote at Alloya, or are the votes unequal between credit

4   unions?

5   A.  They are equal.  Each credit union, regardless of their

6   size, has one vote.

7   Q.  Are you aware of the services that Alloya provides to its

8   member credit unions?

9   A.  Yes, I am.

10  Q.  Could you describe some of those services?

11  A.  Sure.  So our settlement services, we offer ACH processing,

12  wire processing, check services, cash vaulting services.

13  Q.  "Cash vaulting," you said?

14  A.  Yes.

15  Q.  And those services, is there a term that you use at Alloya

16  to describe those services generally?

17  A.  Yes.  So we would call those our settlement services.

18  Q.  Also, potentially, are you familiar with the term

19  "products"?

20  A.  Products, yes.

21  Q.  And how does Alloya view its role as it relates to its

22  member credit unions?

23  A.  So our role is to help credit unions, regardless of their

24  size, to be able to offer products and services to their

25  membership.  So, as a corporate credit union, we're a

1    cooperative, so we aggregate the volume of all the credit

2    unions that process through us, so that we can offer products

3    and services to all credit unions at one low fee for everyone.

4    Q.   You described your role as the product manager for ACH and

5    wire transfers at Alloya?

6    A.   Sure.  As a product manager, I have multiple roles, but one

7    of them is to work with our marketing and sales team to sell

8    the products and services to our credit unions.  I also work

9    with our operations team that do the daily processing of the

10   wire and ACH transactions to ensure that they are operating

11   efficiently and meeting the service levels that we've expressed

12   to the credit unions.  I then also work with any vendors that

13   we may partner with in offering the services to ensure that

14   they are meeting our needs.

15   Q.   What role, if any, do you play with regard to setting up

16   ACH origination?

17   A.   I do the review.  Once the operations team has set the

18   credit unions up in our system, I will do the review to ensure

19   that it's correct.

20   Q.   How far did you go in your education?

21   A.   I graduated from the University of Illinois with a B.A. in

22   business administration.

23   Q.   Let's switch gears a little bit.  Could you describe what

24   an ACH is?

25   A.   Sure.  An ACH is an electronic transfer of funds from one

1   account to another through a bank, credit union, or financial

2   institution.

3   Q.  What does ACH stand for?

4   A.  Automated clearinghouse.

5   Q.  Are ACH transactions processed individually or in groups?

6   A.  They're processed in batches.

7   Q.  Can you describe the batching process?

8   A.  Sure.  I'll use an example.  So, your employer needs to pay

9   you on payday, so they batch up all the transactions for all

10  the employees that are going to get paid.  The reason why they

11  batch it is so that all the transactions are classified with

12  the reason for the payment and the effective date that they're

13  paid on.

14  Q.  You gave an example about a payroll transaction.  Could you

15  give another example that the jurors might understand with

16  regard to the types of ACH transactions that you have

17  interacted with?

18  A.  Sure.  So the payroll example is what we would call a

19  credit transaction because a deposit is going into the

20  consumer's account.  There's also withdrawal transactions, and

21  that could be like if you have a loan payment for your car, or

22  a mortgage payment, or a rent payment that you pay monthly, you

23  can set those up, so that they're automatically being withdrawn

24  from your bank account on a given day.

25  Q.  You said that the payroll example would be a credit?

```
 1   A.  Yes.

 2   Q.  What would those examples be?

 3   A.  Those would be debits.

 4   Q.  Are you familiar with the term "National Automated

 5   Clearinghouse Association"?

 6   A.  Yes.

 7   Q.  Could you describe what that is?

 8   A.  Sure.  So we call them NACHA for short, and they are the

 9   governing body that creates the rules and monitors the rules

10   for all of the participants that process ACH transactions.

11           MS. CHOI:  Mr. Chang-Frieden, could you just publish

12   for the witness, and the counsel, and the Court Government

13   Exhibit 92, please.

14   Q.  Ms. McDowell, are you familiar with this document?

15   A.  I am, yes.

16   Q.  What is it?

17   A.  This is a flow chart out of the NACHA rules book.

18           MS. CHOI:  The government offers Government Exhibit

19   92.

20           MS. SANTILLO:  No objection.

21           MS. MADRIGAL:  No objection.

22           THE COURT:  Thank you.

23           92 is admitted.

24           (Government's Exhibit 92 received in evidence)

25           MS. CHOI:  If we could publish that for the jury,
```

1   please.

2   BY MS. CHOI:

3   Q.  This flow chart, why don't we start at the bottom left-hand

4   corner, where it says "Originator."  Would you mind sort of

5   walking us through what this chart shows in terms of how ACH

6   processing occurs?

7   A.  Sure.  So, for each ACH transaction, there must be a

8   company or entity that is the originator creating the ACH

9   transactions that are going into the ACH network.

10  Q.  In the example, let's say the payroll example that you

11  gave, who would the originator be for the payroll example?

12  A.  So, in that case, it would be company ABC that has

13  employees that they're paying.

14  Q.  Above that, there is what looks like a bank, and it says

15  "ODFI."  Are you familiar with the term "ODFI"?

16  A.  Yes.

17  Q.  What is that?

18  A.  Originating depository financial institution.

19  Q.  Could you describe what the ODFI's rule is?

20  A.  Sure.  So, the ABC company that as a batch of payroll

21  transactions, they need to process that through a bank credit

22  union, what we also call financial institutions, and so the

23  ODFI is the company ABC's bank.

24  Q.  Then above the ODFI, to the right, the arrow continues to

25  what's called the ACH operator.  Do you see that?

 1   A.  I do.

 2   Q.  Could you describe what the ACH operator is?

 3   A.  Sure.  So, there are two ACH operators.  One is the Federal

 4   Reserve Bank, and the other is the clearinghouse.  And they are

 5   an aggregator of all of the ACH transactions that are processed

 6   each day.

 7   Q.  Then to the right, the arrow continues to what's marked --

 8   to what appears to be another bank, and it says "RDFI."  Do you

 9   see that?

10   A.  I do.

11   Q.  What is an RDFI?

12   A.  That's the receiving depository financial institution.

13   Q.  Could you describe what the role of the RDFI is in the ACH

14   flow?

15   A.  Sure.  So, they are the bank where the payroll deposit is

16   going to for the individual person.

17   Q.  So, for example, if I'm getting paid, what bank would be

18   the RDFI?

19   A.  That would be your bank.

20   Q.  And then beneath there, it says "Receiver"?

21   A.  Yes.

22   Q.  Who is the receiver in this example?

23   A.  So, that would be the individual employee that's getting

24   paid.

25   Q.  Where, in this chart, does Alloya sit in this network?

1    A.   Sure.  So, Alloya plays roles on either -- in between the

2    ODFI and ACH operator or in between the ACH operator and the

3    RDFI.

4    Q.   Can you describe how Alloya plays that role?

5    A.   Sure.  So, as an aggregator, a cooperative for credit

6    unions, we provide the connection point to the Federal Reserve

7    Bank on their behalf.  They could go directly, but in a lot of

8    cases, we're able to save them fees and make the processing

9    less complex if they process through us.

10   Q.   On the other side, you can serve a similar capacity between

11   the ACH operator and the RDFI?

12   A.   Yes.  So, in that case, we receive one file from the

13   Federal Reserve Bank that has transactions for all of our 1600

14   credit unions, and then we will parse those out into individual

15   files for each credit union.

16   Q.   If we could turn to the mechanics of how ACH transactions

17   work in the context of Alloya, you previously mentioned that

18   ACH works in batches.  Can you describe the item that is used

19   in order to process those batches?

20   A.   Yes.  So -- I'm not certain I understand your question.

21   Q.   Are you familiar with the term "batch file"?

22   A.   Yes.

23   Q.   Could you describe the batch file and how that works?

24   A.   Sure.  So, the credit unions can use our ACH system to

25   submit a file containing a batch or multiple batches or they

1   can use a system to directly key in information to create a

2   batch.

3   Q.  When you say "directly key in," what do you mean by that?

4   A.  So, we have an online system that the credit unions can

5   access where if they -- let's say they had five transactions,

6   and they didn't have that data in a file, they could key that

7   into the system through a data entry screen to create the batch

8   record for the ACH transactions.

9   Q.  With regard to the batch file, does it contain one batch or

10  can it contain many batches?

11  A.  Sure.  So, an ACH file could contain multiple batches.

12  It's up to the originator how they want to create that file.

13  Q.  Are you aware of the format that that ACH file needs to be

14  in?

15  A.  Yes.  So, all ACH files that are submitted to the Federal

16  Reserve Bank need to be in a NACHA-formatted file.  So, that's

17  a file that is defined by NACHA through their rules book that

18  define the certain standards for the layout of the file, as

19  well as the data that goes into the file records.

20  Q.  What products, if any, does Alloya provide its member

21  services -- member credit unions in order to create those type

22  of NACHA-formatted files?

23  A.  Sure.  So, we have an online system we call Premier View.

24  It's an online system that the credit unions can log into to

25  see their account history information for their statements, but

1   they also can use that to click on a menu link that takes them

2   into our ACH system.  Once they're in there, they can either

3   upload a file that's already formatted.  They may have a system

4   that formats the files into the NACHA format, so they can

5   upload that file directly or they can -- as I described before,

6   they can key in the data into the system to create an

7   individual batch.

8   Q.  What is a header record?

9   A.  So, a header record in a NACHA file indicates who the file

10  is coming from, where the file is going to, and then the date

11  that the file was created.

12  Q.  What is a batch header?

13  A.  So a batch header contains information that describes the

14  types of transactions that are in that batch.  So, for example,

15  payroll, you would have all payroll credits in one batch with

16  the effective date that all transactions are paid on the same

17  effective date within that individual batch, and then you also

18  have the company ID and name that identifies the company that's

19  creating those batch of transactions.

20  Q.  Does the batch header also involve information about the

21  type of ACH transaction that is at issue in that batch?

22  A.  Yes.  So there are several codes that the NACHA rules allow

23  originators to use.  So, in the case of a payroll batch, we

24  would call those PPD transactions.

25  Q.  What does that stand for?

1  A.  So it's prearranged payment and deposit.  It's a term that

2  would classify transactions that are domestic transactions that

3  can either be one-time payment or recurring payments.

4  Q.  Is there a separate code for international transactions?

5  A.  There is.  That would be IAT.

6  Q.  And is there a difference between the data that's involved

7  with a PPD as opposed to data that's involved with an IAT?

8  A.  Yes.  So PPD transactions, since they're domestic, they

9  don't require as much information for each individual record

10 within the batch.  And IAT transactions, since it's

11 international, so it's going across borders, that requires

12 additional data to be contained in the record that identifies

13 the receiver or the originator of the transaction.

14 Q.  Who sets that distinction between the PPT and the IAT --

15 the PPD and the IAT?  Excuse me.

16 A.  Right.  So it's defined in the rules book as to how all of

17 the originators need to use those codes appropriately.

18 Q.  And the rules book that you mentioned, what rules book is

19 that?

20 A.  It's the NACHA rules book.

21 Q.  So we got to the point of an ODFI uploading their batch

22 files to Alloya's system.  What, if anything, does Alloya do

23 once those batch files are uploaded?

24 A.  So we process and monitor those files throughout the day,

25 and three times a day, we will release and send those files to

1    the ACH operator.

2    Q.   What restrictions, if any, does Alloya impose upon its

3    member credit unions who want to do ACH origination?

4    A.   So in order for a credit union to do origination through

5    Alloya, they, one, first must be a member.  So, to be a member

6    of Alloya, you would need to invest capital into Alloya.  To

7    process ACH, you also need to have a line of credit established

8    at Alloya.  Typically, we assign a line of credit, which would

9    be 50 times their capital deposit.  And then, lastly, they need

10   to sign a specific contract for ACH origination services.

11   Q.   Is there a relationship, generally speaking, between the

12   amount of the line of capital that a credit union has available

13   at Alloya and the volume of ACH transactions that Alloya allows

14   that credit union to have?

15   A.   Sure.  So we use the line of credit to determine what limit

16   we can put within the ACH system for the credit union.

17   Q.   And, generally, does the volume have to be below the line

18   of credit, or can it be above the line of credit?

19   A.   No, we require that the total value of the ACH transactions

20   that are processed on each day must be below their line of

21   credit.

22   Q.   I think you had said that you had approximately 1500 member

23   credit unions at Alloya.  Of those, how many of those credit

24   unions originate ACH at Alloya?

25   A.   We have about 500 credit unions.

1  Q.  Can you generally describe the types of ACH origination

2  that Alloya's member credit unions engage in?

3  A.  Sure.  So the majority of our credit unions are doing ACH

4  transactions on their own behalf, so for their own members that

5  may want to make a loan payment with their credit union or

6  another financial institution or to transfer funds from one

7  account to another.  A lot of our credit unions also process

8  transactions for small businesses that have accounts at the

9  credit union.

10 Q.  Was Alloya ever called a different name?

11 A.  Yes.  We were previously known as Members United.

12 Q.  Does Alloya charge fees for the ACH processing that it

13 offers to its member credit unions?

14 A.  Yes, we do.

15 Q.  Could you describe what that fee is?

16 A.  So we charge 6 cents per transaction.

17 Q.  Are you aware of Alloya's main source of net income?

18 A.  I am, yes.

19 Q.  Could you describe what that main source is?

20 A.  Sure.  So, most of our income is generated from our loans

21 and investment products and not necessarily from our settlement

22 services products, such as ACH.

23 Q.  What costs, if any, are there to Alloya in providing

24 settlement services such as ACH?

25 A.  So there's -- one would be any vendor expenses that we pay

1    to partner with providing those services to the credit unions.

2    We also have internal staffing costs.  So we have a specific

3    ACH department that processes these transactions for the

4    500-plus credit unions.  We have a call center that takes calls

5    from credit unions with any questions they may have regarding

6    the services.  And then just your general overhead for sales,

7    marketing, rent, utilities to operate the office locations that

8    we work in.

9    Q.  Does Alloya make money or lose money on its settlement

10   services?

11             MS. SANTILLO:  Objection; relevance.

12             THE COURT:  Sustained.

13   Q.  Why do you provide settlement services to your member

14   credit unions?

15   A.  Sure.  So our mission is to help credit unions grow, so

16   that they can provide products and services to the members

17   within their areas.

18   Q.  Are you aware of the concept of a third-party service

19   provider?

20   A.  Yes.

21   Q.  Could you describe what that is?

22   A.  Yes.  So that's a term that's defined in the NACHA rules

23   book, and it describes an entity that provides processing

24   services in regards to ACH for any one of the participants that

25   we saw on that earlier flow chart.

 1  Q.  Are you aware of a company called Magic Wrighter?

 2  A.  I am, yes.

 3  Q.  Can you describe what Magic Wrighter is?

 4  A.  To my knowledge, they are an ACH processor similar to

 5  Alloya.

 6  Q.  So they would be one of Alloya's competitors, then, in some

 7  sense?

 8  A.  In some sense, yes.

 9  Q.  Did there come a time when you learned about a credit union

10  named HOPE Federal Credit Union?

11  A.  Yes.

12  Q.  Could you describe the circumstances under which you

13  learned about -- you first learned about HOPE FCU?

14  A.  I first learned of them when we received their setup form

15  for the ACH origination services.

16          MS. CHOI:  The government offers Government Exhibit

17  700 pursuant to stipulation.

18          You can publish it for them, so they can see it.

19          THE COURT:  This is in, 700?  It's already in.

20          MS. SANTILLO:  No objection.

21          MS. MADRIGAL:  No objection.

22          THE COURT:  All right.  700 is admitted.  Thank you.

23          (Government's Exhibit 700 received in evidence)

24          MS. CHOI:  If we could publish that --

25          THE COURT:  You can publish.

 1                MS. CHOI:  If we could publish that to the jury,

 2   please.

 3   BY MS. CHOI:

 4   Q.  Ms. McDowell, are you familiar with this document?

 5   A.  Yes, I am.

 6   Q.  What is this?

 7   A.  This is Alloya's setup form for ACH origination services.

 8   Q.  So this appears to be a setup form, and if you could just

 9   read section 1, what is the credit union name at issue here?

10   A.  Helping Other People Excel Federal Credit Union.

11   Q.  And who is the primary ACH contact?

12   A.  Trevon Gross.

13   Q.  And who is the after-hours contact?

14   A.  Trevon Gross.

15                MS. CHOI:  If we could go to section 2 of this first

16   page.

17   Q.  Now, what role for this ACH origination was checked off by

18   HOPE FCU for this form?

19   A.  Credit union originator.

20   Q.  Do you see where it says "Payment Options Permitted"?

21   A.  Yes.

22   Q.  Which payment options were checked off there?

23   A.  PPD, CCD, and Web.

24   Q.  So I guess we've already talked about PPD.  What is CCD and

25   Web?  What are those two codes?

1    A.  Sure.  So CCD would be a commercial deposit.  So, similar

2    to the PPD, but the receiver in that case is a business.  So,

3    there are different rules that define consumer transactions

4    versus business transactions.

5    Q.  Then, also, you said there's "Web" checked off.  What is

6    Web?

7    A.  Yes, so a Web would be an ACH transaction that would be

8    originated on the Internet.

9    Q.  On the far right, you see how there is IAT listed there?

10   A.  Yes.

11   Q.  Is it checked off or not checked off?

12   A.  It is not checked.

13   Q.  Does Alloya allow for credit unions to process IAT

14   transactions?

15   A.  Yes, we do.

16   Q.  Again, what are the IAT transactions?

17   A.  Those would be international ACH transactions.

18          MS. CHOI:  Can we go to page 2 of this document, the

19   top.  Can we blow up section 3.

20   Q.  So section 3 is FTP, file transfer protocol.  Could you

21   describe what section 3 lists?

22   A.  Sure.  So the credit union here is indicating to us that in

23   addition to using our online ACH system that I described

24   earlier, that they would also send us a fully formatted NACHA

25   file through our secure file transfer program that exists

1   outside of the ACH system.

2   Q.  Could you read the technical contact that appears here?

3   A.  Yuri Lebedev.

4   Q.  Did there come a time where you had communications with

5   Yuri Lebedev?

6   A.  I believe I had some email communication with him.

7   Q.  Could you describe what email communications those were,

8   the general nature?

9   A.  Sure.  I believe he was looking to confirm if we received

10  their batches that they submitted and to confirm if they would

11  be processed.

12  Q.  On the previous page, the primary contact that was listed

13  was Trevon Gross.  Did there come a time where you had

14  communications with Trevon Gross?

15  A.  Yes.

16  Q.  And what kind of -- types of communications were they?

17  A.  We had reached out to Trevon to get a better understanding

18  of the types of ACH transactions HOPE Credit Union was going to

19  originate.

20  Q.  Putting aside the subject matter, did you have phone calls

21  with Mr. Gross?

22  A.  Yes, we did.

23  Q.  How many, approximately?

24  A.  I was involved in two, and I believe there were other phone

25  calls that occurred with individuals within Alloya to Trevon.

 1   Q.  Did you also have email communications with Mr. Gross?

 2   A.  Yes.

 3          MS. CHOI:  If we could display 701-A just for the

 4   witness and for counsel, which the government offers pursuant

 5   to stipulation.

 6          MS. MADRIGAL:  No objection.

 7          MS. SANTILLO:  No objection.

 8          THE COURT:  Thank you.

 9          701-A is admitted.

10          (Government's Exhibit 701-A received in evidence)

11          MS. CHOI:  If we could publish that to the jury,

12   please.

13   Q.  Ms. McDowell, what this?

14   A.  This is Alloya's ACH contract.

15   Q.  Is this a standard contract for Alloya?

16   A.  Yes, it is.

17   Q.  What is the date on this contract?

18   A.  May 20th, 2014.

19          MS. CHOI:  Can we go to page 9 of this contract.

20   Could you highlight the -- zoom in on the signature page at the

21   bottom.

22   Q.  Who executed this contract on behalf of HOPE?

23   A.  Trevon Gross.

24          MS. CHOI:  Government 701-B.  Oh, sorry, just for

25   counsel and the witness.

 1            The government offers Government Exhibit 701-B and

 2    701-C pursuant to stipulation.

 3            MS. MADRIGAL:  No objection.

 4            MS. SANTILLO:  No objection.

 5            THE COURT:  Thank you.

 6            701-B and C are admitted.

 7            (Government's Exhibits 701-B and 701-C received in

 8    evidence)

 9    Q.  What is this, Ms. McDowell?

10            MS. CHOI:  You can publish it for the jury.

11    A.  This is a Federal Reserve Bank form where HOPE Credit Union

12    is indicating to the Fed that they wish to settle their ACH

13    daily activity and service charges through Alloya Corporate

14    Credit Union.

15            MS. CHOI:  Page 2 of this document.

16    Q.  Again, who executed this document on behalf of HOPE?

17    A.  Trevon Gross.

18            MS. CHOI:  Government Exhibit 701-C, please.

19    Q.  What is this, Ms. McDowell?

20    A.  This is another Federal Reserve Bank form.  This is the

21    Feds authorized the signers list for HOPE Credit Union.

22    Q.  Who is the authorized signer listed here?

23    A.  Trevon Gross.

24    Q.  So we just went through Government Exhibit 701-A, B, and C.

25    Are those part of the setup process for origination at Alloya?

H2RKLEB2                    McDowell - Direct

1   A.  Yes, they are.

2            MS. CHOI:  Can we go to Government Exhibit 702-A just

3   for the witness and counsel.

4            MS. SANTILLO:  No objection.

5            MS. MADRIGAL:  No objection.

6            THE COURT:  Thank you.

7            MS. CHOI:  The government offers 702-A.

8            THE COURT:  It's admitted.  Thank you.

9            MS. CHOI:  Thank you.

10           (Government's Exhibit 702-A received in evidence)

11           MS. CHOI:  Could we publish to the jury, please.

12   Q.  What is this, Ms. McDowell?

13   A.  This is Alloya's form where HOPE is requesting to set up

14   individuals on our Premier View system.

15   Q.  Again, what was the Premier View system?

16   A.  The Premier View system is our primary online account

17   management and transaction processing system that all credit

18   unions will log into to access the various products and

19   services that are offered by Alloya.

20   Q.  What is the effective date of this Premier View document --

21   sorry, Premier View authority change request?

22   A.  June 17th, 2014.

23   Q.  Who are the two individuals for whom authorization had been

24   added?

25   A.  Jose Freundt and Yuri Lebedev.

 1              MS. CHOI:  Flip to the next page, please.  And then

 2    the page after that, please.  And the next page.  And the page

 3    after that.  Can we blow this page up, the top half, please.

 4    Q.  What information appears here, Ms. McDowell, with regard to

 5    the user?

 6    A.  This is the individual setup form for Yuri that provides

 7    specific information about the user ID that we would set up for

 8    him.

 9    Q.  And what is the title that's listed there?

10    A.  His title?

11    Q.  Yes.

12    A.  CFO.

13              MS. CHOI:  Can we go to the next page of this

14    document, please.

15    Q.  Could you explain what data appears here with regard to the

16    authorities detail form on page 6 of 702-A?

17    A.  Here, he is asking to receive access for ACH and other

18    products offered through Premier View.

19    Q.  See how it says "e-desk role number" right there?

20    A.  Yes.

21    Q.  It says "37."  What does 37 mean?

22    A.  So 37 is a role ID that would provide the user access to

23    the images in our check system, as well as the ability to

24    upload and download check files, and perform adjustments for

25    the check services.

1   Q.  To be clear, the e-desk role number of 37 goes beyond the

2   ACH settlement product, correct?

3   A.  Right.  It's a separate product.

4           MS. CHOI:  If we could zoom out for a second.  If we

5   could zoom in on "Administration," the option "Administration"

6   towards the top of the page.

7   Q.  There are a series of checks that say, "Grant access under

8   administration."  Do you see that?

9   A.  Yes, I do.

10  Q.  What does that allow Mr. Lebedev access to?

11  A.  So this would allow him to become an administrator for HOPE

12  Credit Union to set up and administer other users for HOPE

13  Credit Union in the Premier View system.

14          MS. CHOI:  Could you zoom out, please.

15  Q.  At the bottom, if you could see statements, please.  It

16  says, "Grant access to statements."  What information does that

17  provide to you about Yuri Lebedev's access?

18  A.  He was granted access to all of the statements that Alloya

19  generates.

20  Q.  I think you said at some point earlier in your testimony

21  that there came a point where you were reviewing the setup of

22  origination for HOPE FCU for ACH at Alloya.  Approximately when

23  did you get to sort of set the stage -- approximately when did

24  you get these forms to set up ACH origination from the credit

25  union?

1   A.   It was mid- to late June of 2014.

2   Q.   And could you describe sort of what you did when you first

3   began your review of the setup of ACH origination for HOPE FCU?

4   A.   Sure.  So the first thing I do was just log into the ACH

5   system to make sure that the setup is complete and accurate.

6   The next step that I will do is to look up the line of credit

7   that HOPE has with Alloya, so that I can determine what limit

8   we're going to put in the ACH system for them.

9   Q.   So let's start with the line of credit.  At that time, what

10  did you determine the line of credit to be for HOPE FCU?

11  A.   I found their line of credit to be at $5,000.

12  Q.   What was their asset size, approximately, at that time?

13  A.   About $89,000.

14  Q.   How did you determine that HOPE's asset size was $89,000 in

15  this June/July time frame?

16  A.   So when I first looked up their line of credit and realized

17  that it was $5,000, I was caught a bit offguard because that's

18  a very low dollar amount for a credit union to have when

19  they're going to process ACH origination transactions.  So,

20  again, the limit that we put into our ACH system cannot be

21  greater than their line of credit, which would mean that they

22  wouldn't be able to process transactions greater than $5,000.

23          So I then looked at their asset size to see if perhaps

24  they had sufficient assets, that they could purchase a higher

25  line of credit.

1  Q.  How specifically -- if you can work through the mechanics

2  of how you can determine what the asset size was for HOPE FCU?

3  A.  Yes.  So we have -- we pull in information from various

4  sources, one being the NCUA, where the credit unions report

5  their financials on a quarterly basis.  So we'll pull that

6  information into our internal system, so that we kind of have

7  it at our fingertips to look it up when we need to.

8  Q.  That quarterly report, do you know what the name of that

9  quarterly report is?

10 A.  5300 report.

11 Q.  Also, the 5300 Call Report?

12 A.  Yes.

13 Q.  So once you determine that the line of credit was $5,000

14 and the asset size was $89,000 for HOPE FCU, what did you do

15 next?

16 A.  So while that was going on, our ACH operations team was

17 also working with a company called Capital Solutions that was

18 working on behalf of HOPE Credit Union.  And our team was

19 working with them to test the ACH files that they were

20 uploading to make sure that they were formatted correctly.  And

21 that also caught us offguard as well because we -- generally,

22 when we're working with a credit union to set them up for ACH

23 services, we're just working with the credit union and their

24 technical staff, we don't typically work with another outside

25 company that's originating transactions through the credit

1    union.  So, with that information and the low line of credit, I

2    had asked our operations team to reach out to the credit union

3    to gain a better understanding of what their intentions were

4    with processing ACH, what the dollar values and transaction

5    counts may be.

6            MS. CHOI:  So before we get to that later

7    conversation, let's, if we could, look at Government Exhibit

8    703-A, just for the witness and for counselor.  And 703-B,

9    which the government offers pursuant to stipulation.

10           MS. MADRIGAL:  No objection.

11           MS. SANTILLO:  No objection.

12           THE COURT:  Thank you.

13           703-A and B are admitted.

14           MS. CHOI:  Thank you, your Honor.

15           (Government's Exhibits 703-A and 703-B received in

16   evidence)

17           MS. CHOI:  If we could just start with Government

18   Exhibit 703-A.

19   Q.  Ms. McDowell, do you recognize this document?

20   A.  I do.  This is a report out of Alloya's ACH system.

21   Q.  What kind of a report is it?

22   A.  This is a report that lists all of the ACH batches that

23   HOPE originated.

24           MS. CHOI:  If we could just flip through this, just so

25   Ms. McDowell can orient herself with regard to the date range

1    here.

2    Q.  On page 1, it says "Effective June 30th, 2014."

3    A.  Correct.

4    Q.  And created June 27, 2014?

5    A.  Yes.

6            MS. CHOI:  If we could go to the last page of this

7    document.

8    Q.  For what days does this document cover?

9    A.  June 26th and 27th, it looks like.

10   Q.  That's with regard to page 4?

11   A.  Yes.

12   Q.  Why don't we go back to page 1, please, and let's walk

13   through some of these items that are here.

14           You had said that during this period, Alloya had been

15   working with Capital Solutions to do some test runs of the ACH

16   originations?

17   A.  Correct.

18   Q.  Are these documents related to those test runs?

19   A.  They are.  I'm not certain if this was the Capital

20   Solutions' test files or other test files that the credit union

21   was creating.

22   Q.  Understood.  Why don't we start with the information that

23   appears on this page.  If you look at -- do you see where it

24   says "Batch"?

25   A.  Yes.

1   Q.  It says, "HOPE testing file for return."  Do you see that?

2   A.  I do.

3   Q.  Could you describe, generally, what the batch field

4   provides?

5   A.  So the batch name is a name that the credit union can

6   assign.  It can be anything.  It's not part of the detail that

7   gets sent with the ACH file, so a lot of times it's a naming

8   convention that means something to the credit union.

9   Q.  When you say credit union in this context, we're talking

10  about HOPE Credit Union, correct?

11  A.  Correct, yes.

12  Q.  If you look at the top right-hand portion of the page, it

13  says "Creation:  June 27, 2014"?

14  A.  Yes.

15  Q.  What is the creation date?

16  A.  That is the date that the batch of transactions is created

17  in the ACH system.

18  Q.  Then if you look next to the batch line in the black area

19  where it says "SEC PPD," prearranged payment and deposit.  Do

20  you see that?

21  A.  Yes.

22  Q.  What is that?

23  A.  That is indicating the types of transactions that are

24  within this batch.

25  Q.  It says "Effective," and it has a date of June 30th, 2014?

 1   A.  Correct.

 2   Q.  What is that?

 3   A.  That is the effective date that the individual items within

 4   that batch are to be paid on.

 5   Q.  Now going back to the left-hand side under "Batch," it says

 6   "ODFI ABA number"?

 7   A.  Yes.

 8   Q.  What is that?

 9   A.  That is HOPE Credit Union's running and transit number.

10   Q.  Then to the right of there, it says "Company ID and company

11   name"?

12   A.  Correct.

13   Q.  Who provides those two fields?

14   A.  So the HOPE Credit Union would request from Alloya to

15   establish the company ID, so that when we receive files in this

16   system, we can match the company IDs that are in the batches

17   with our system to make sure that we're getting correct batches

18   for each credit union, and we can identify which credit union

19   it belongs to.

20   Q.  Then with regard to company name?

21   A.  Company name is a name that HOPE Credit Union would define

22   for themselves for this batch of transactions.

23   Q.  Are there any rules that apply with regard to

24   identification of company name?

25   A.  Sure.  So the company ID -- the company name should be

1    identifiable to the consumer that's receiving the transaction.

2    And in general terms, it's not defined in the rules book, but

3    general best practices are that you should have one company

4    name associated with one company ID, so that it's easier for

5    reconciliation purposes within the financial institution to

6    identify who this batch truly belongs to.

7    Q.  Here, it says "Receiver ID" and "Receiver Name."  Do you

8    see that?

9    A.  Yes.

10   Q.  Could you describe sort of what information that provides?

11   A.  Sure.  So the receiver name is the individual who is going

12   to receive the debit or credit transaction.  The receiver ID is

13   information that helps HOPE identify who that individual may

14   be.

15   Q.  For ABA number and account number, as it appears next to

16   "Receiver Name," whose ABA number and account number are those?

17   A.  So the ABA number is the routing and transit number for the

18   bank or credit union of the receiver, and then the account

19   number is their individual account number at that financial

20   institution.

21   Q.  Now, just looking at this item detail form, can you tell if

22   this is a credit or a debit?

23   A.  I can.  So for one thing, the dollar amount is in the debit

24   amount column, and then the transaction code also identifies if

25   it's a debit or credit transaction.

1    Q.  And, here it says "Tran code 27," and that identifies it to

2    you as being a debit?

3    A.  Correct.

4    Q.  And then with regard to service class on the left-hand

5    side, does that also provide information as to whether it's a

6    debit or a credit transaction?

7    A.  Yes, it does.

8    Q.  So directing your attention back to the July time frame.

9    You said that you had done some look-up with regard to the

10   asset size and the line of credit at HOPE FCU.  Did you direct

11   anyone to do anything with that information?

12   A.  Can you -- I'm not sure I understand the question.

13   Q.  Are you familiar with an individual named Thea Hatter?

14   A.  Yes, I am.

15   Q.  Who is Thea Hatter?

16   A.  Thea worked in our operations area, so she was the one who

17   set up HOPE in the ACH system, as well as worked with them to

18   perform their testing.

19   Q.  Did you direct Thea Hatter to do anything once you learned

20   about the line of credit issue and the asset issue with regard

21   to HOPE?

22   A.  Yes.  I had asked Thea to reach out to Trevon to see if we

23   can gain a better understanding of what their intended use of

24   ACH origination was going to be.

25   Q.  And what information did you learn from Trevon Gross?

1  A.  So we learned that originally they were going to originate

2  transactions for a Collectables Club, and that the dollar

3  amount of those transactions would be relatively low.  We also

4  asked them about the work that we were doing with them for

5  testing with Capital Solutions, and they indicated that at that

6  time, they were not going to do any processing on behalf of

7  Capital Solutions.

8  Q.  With that information, what adjustments, if any, did you do

9  with regard to limits that Alloya imposed on ACH origination

10  for HOPE FCU?

11  A.  Sure.  So we set their limit at one dollar in the ACH

12  system, and that's because we wanted -- what would happen,

13  then, is any time they submitted a batch of transactions, if it

14  was higher than a dollar, it would suspend on our ACH system,

15  and that would just give our staff the opportunity to review

16  the types of transactions that HOPE was processing.

17  Q.  We talked about the line of credit before.  You said it was

18  about $5,000 at the time.  What is the lending department at

19  Alloya?

20  A.  The lending department works with our credit unions to,

21  one, identify what line of credit we can offer to each credit

22  union, and also provide loan services to each credit union, if

23  they so choose.

24  Q.  Did there come a time where you informed, over the course

25  of these communications you had with HOPE FCU, that they should

1    engage lending on the question of the line of credit?

2    A.  Yes.  So there was some questions about the dollar limit

3    that we would assign for HOPE in our ACH system, and it

4    appeared that it was going to be much higher than the $5,000

5    limit that they had for their line of credit.  So we had

6    advised them to speak with staff in our lending department to

7    determine if they could increase their line of credit.

8    Q.  So we already talked about how, generally speaking, Alloya

9    requires that ACH transactions be below the line of credit.  In

10   HOPE's case, did Alloya -- what, if anything, did Alloya do in

11   order to try to accommodate their increased volume?

12   A.  Right.  So, initially the transactions that they were

13   processing, while they were over that line of credit on some

14   days, our lending department gave our operations team the

15   authority to process those transactions if they were over the

16   line of credit, but below their share account balance, so the

17   balance they had on deposit with Alloya.  So if they had

18   sufficient funds in their deposit account, we could still

19   process the file on HOPE's behalf.

20   Q.  To be clear, assuming that the line of credit was $5,000,

21   was that an aggregate amount, or was that for each individual

22   ACH transaction that went through?

23   A.  Sure.  So the limit is a daily limit.  So HOPE could have

24   sent us multiple batches throughout the day, and we take the

25   aggregate total of all of those batches at the end of the day

1    to determine if they've reached their limit or not.

2    Q.  So with regards to lending providing you the authority to

3    allow for ACH transaction volumes on a daily basis that

4    exceeded the line of credit, but were still lower than the

5    share balance, had you ever gotten that type of authority

6    before?

7            MS. SANTILLO:  Objection.

8            THE COURT:  Grounds?

9            MS. SANTILLO:  Are you talking generally or in this

10   case?  I just didn't understand the question.

11           THE COURT:  Overruled.

12   Q.  Do you remember the question, or should I repeat it?

13   A.  No.  Could you repeat it, please?

14   Q.  Okay.  Fair enough.

15           So you had just talked about lending giving you the

16   authority to allow for ACH transactions on a daily basis for

17   HOPE FCU even if it was above the line of credit, so long as

18   the share balance -- that the volume did not exceed the share

19   balance on a daily basis?

20   A.  Correct.

21   Q.  Was that the first time that you had gotten that type of

22   authorization for a member credit union, or had that happened

23   before?

24   A.  So in general practice, we don't do that on a daily basis

25   for a specific credit union.  So that was something new for us.

1  However, we have, in the course of our processing, on specific

2  occasions, when a credit union may exceed their line of credit,

3  but be within their share account balance, we have released

4  those files as well for other credit unions.

5  Q.  Now, this is sort of all happening in the July -- late

6  summertime frame.  Directing your attention to August into

7  September, what, if anything, happened with regard to HOPE

8  FCU's volume for ACH origination?

9  A.  Sure.  So they initially started off with transactions that

10 met those thresholds of either being below the line of credit

11 or within their share account balance, but by mid-September,

12 they were starting to exceed both of those values.

13          MS. CHOI:  If we could go to Government Exhibit 703-B,

14 which is in evidence.

15          THE COURT:  You said B, like boy?

16          MS. CHOI:  B as in boy, yes, your Honor.

17          THE COURT:  Thank you.

18          MS. CHOI:  If you could go to page 740 of this

19 document.

20 Q.  Looking at page 740, Ms. McDowell, could you tell the jury

21 what the date -- the effective date is for this particular ACH

22 batch?

23 A.  The effective date is 9/5/2014.

24 Q.  Who is the company name for which HOPE was transacting this

25 batch?

1    A.   Collectables Club.

2    Q.   For this batch at the bottom, they have a debit amount and

3    a credit amount.  Could you just say out loud what those items

4    were?

5    A.   Sure.  The debit total was $30,000, and the credit total

6    was $17,107.77.

7    Q.   Just with regard to the company name, Collectables CLU, to

8    your understanding, that is the collectables company that

9    Mr. Gross had mentioned to Alloya early on with regard to the

10   ACH origination?

11   A.   Correct.

12          MS. CHOI:  Could we go to page 739, please.

13   Mr. Chang-Frieden, could you just scroll backwards from page

14   739 to 732.  So, on page 732, if you could blow up the bottom

15   part of this -- yes, the bottom page just a little bit above

16   that where it says "Batch."  Yes, and the bottom.  Great.

17   Thank you.

18   Q.   Now, Ms. McDowell, what are we looking at here?

19   A.   This is a batch of transactions effective dated

20   September 8, 2014.

21   Q.   For what company are these transactions?

22   A.   Transferwise.com.

23   Q.   Did there come a time where you did more sort of research

24   into what TransferWise was?

25   A.   Yes.  This is the first time we had learned of

1    transferwise.com.

2    Q.  What, if anything -- I guess, did you focus on the fact --

3    did you start to focus on transferwise.com?

4    A.  We did.  So, for one reason is I believe the total amount

5    of the transactions were into the millions of dollars for the

6    individual batch, and then second is that we didn't know who

7    transferwise.com was.  And in general practices, most of our

8    credit unions only process transactions for themselves.  So

9    seeing a different company here that was processing under

10   HOPE's routing and transit number caused us to want to

11   investigate who this company was.

12           MS. CHOI:  So why don't we go to page 653, please.

13   Q.  What is the effective date of this particular batch?

14   A.  September 16th, 2014.

15   Q.  What is the creation date for this?

16   A.  September 15th, 2014.

17           MS. CHOI:  If we could just scroll through -- start

18   with this page, actually.  And if you could just scroll through

19   forward till we hit page 662.  Okay.

20   Q.  If we would read the batch total there with regards to the

21   file here?

22   A.  Sure.  There were 457 items, totaling $1,393,324.22.

23   Q.  What happened once you saw this?

24   A.  So this definitely exceeded their limits on our system, so

25   the file did stop.  And I believe we reached out to the credit

 1    union to understand what was going on.

 2            MS. CHOI:  At this time the government would offer

 3    Government Exhibit 791, which is a phone call with Alloya, as

 4    well as 791-T, on consent with the parties.

 5            MS. MADRIGAL:  No objection.

 6            MS. SANTILLO:  No objection.

 7            THE COURT:  Thank you.

 8            791 and 791-T are admitted.

 9            (Government's Exhibits 791 and 791-T received in

10    evidence)

11            MS. CHOI:  If we could put up 791-T first for the

12    jurors.

13    Q.  In preparation for your testimony today, Ms. McDowell, have

14    you had an opportunity to review both the audio and the

15    transcript of this particular call?

16    A.  Yes, I have.

17    Q.  And the date of the file is September 18th of 2014.  Is

18    that the date that the phone call took place?

19    A.  Yes.

20    Q.  Is this the first phone call that you had with Trevon

21    Gross, or was this one of several?

22    A.  This is one of several that we've had.

23    Q.  So it was not the first call that you had had?

24    A.  Not the first call, no.

25            MS. CHOI:  Mr. Chang-Frieden, if you could zoom out

1    for a second and cue --

2           MS. SANTILLO:  Your Honor, we would request a limiting

3    instruction as well.

4           THE COURT:  All right.  So the redaction instruction,

5    counsel?

6           MS. SANTILLO:  Yes.

7           THE COURT:  Ms. Choi, I'll do the redaction

8    instruction.

9           Ladies and gentlemen of the jury, as with before,

10   certain pieces of evidence that have been admitted, you may

11   notice that there are redactions in this case, bleeped content,

12   meaning portions of the evidence have been omitted or bleeped

13   out.  You are not to speculate about what material has been

14   omitted in your consideration of this evidence.

15          Thank you.

16          MS. CHOI:  If we could look at Government Exhibit

17   791-T.

18          And if you could start the tape, Mr. Chang-Frieden,

19   while we also -- do two things at once -- scroll through the

20   transcript, if you could, for the jury.  Thank you.

21          (Audio playback)

22          (Continued on next page)

23

24

25

 1           MS. CHOI:  If you can stop there?  Thank you

 2   Mr. Chang-Frieden.

 3           If we could just stay on this transcript right there

 4   on page 4 for a moment.

 5   BY MS. CHOI:

 6   Q.  Ms. McDowell, can you see the portion where --

 7           MS. CHOI:  If you scroll up a bit.  Thank you.

 8   Q.  At the top of that page, you had asked Mr. Gross if he had

 9   any interactions with the NCUA on these questions.

10   A.  Yes, I did.

11   Q.  If you go down to what Mr. Gross says in response, he

12   discusses first his net worth -- the net worth issue.  Do you

13   see that?

14   A.  Yes, I do.

15   Q.  He says, "We're like 10.7 percent right now."  Did you have

16   an understanding what he meant by that?

17   A.  Yes.  That was his capitalization ratio for the credit

18   union.

19   Q.  And then there's a portion in the middle of this with

20   Mr. Gross where he says, "It's just, the thing is, what the

21   little bank -- you know, you see, the size of transactions,

22   there's no -- no transaction comes close to being -- you know,

23   close to the threshold of the 10,000 because there's a bunch

24   of, you know, 200, 500, 300 kinds of amounts."  Do you see

25   that?

 1   A.  Yes.

 2   Q.  Do you have an understanding of why he was zeroing in on

 3   the $10,000 threshold?

 4   A.  I believe at the time we had increased their line of credit

 5   to $10,000.

 6   Q.  To be clear, the $10,000 line of credit was for the

 7   aggregate daily total amount not any individual transaction?

 8   A.  Correct.

 9   Q.  So what did you take away from what Mr. Gross was telling

10   you there?

11   A.  My interpretation was that he was assuming that, because

12   the individual transaction dollar amounts weren't exceeding the

13   line of credit of $10,000, that they were okay, that there was

14   no risk or concern there.

15   Q.  To be clear, this is as of September 18th when you're

16   having this call with him?

17   A.  Correct.

18   Q.  Just quickly, the other people on this call, there's

19   reference to a Sandy.  Who is Sandy?

20   A.  Sandy Albertson is the sales rep for HOPE Federal Credit

21   Union.

22   Q.  And there's also a reference to Neil Kumar.  Who is that?

23   A.  Neil Kumar is our compliance officer.

24   Q.  Who is Kathy Feringa?

25   A.  Kathy Farina was the manager over the ACH and wires

 1  operations area.

 2  Q.  Are you familiar with an individual named John Collins?

 3  A.  Yes, I am.

 4  Q.  Who is he?

 5  A.  At the time he was my boss.  He was the senior vice

 6  president of risk and administration.

 7          MS. CHOI:  If we could go to Government's

 8  Exhibit 703-B, please.  So again, if we could go to page 692.

 9  Q.  What was the creation date for this file?

10  A.  September 11th, 2014.

11  Q.  The effective date?

12  A.  September 12th, 2014.

13  Q.  Do you see the amounts in the credit portion here; for

14  example, WW Granger Inc. N?

15  A.  Yes.

16  Q.  Are those credit amounts over $10,000?

17  A.  Yes, they are.

18          MS. CHOI:  If we could go to page 629, please.

19  Q.  What is the creation date for this file?

20  A.  September 16th, 2014.

21  Q.  And the effective date?

22  A.  September 17th, 2014.

23  Q.  I'm sorry.  I didn't ask you this question about page 692,

24  but with regard to page 692 and page 629, what was the company

25  name for these particular transactions?

1    A.  Transferwise.com.

2            MS. CHOI:  If we could zoom out.

3    Q.  On this particular page, do you see credit amounts that

4    exceed $10,000?

5    A.  Yes, I see one.

6            MS. CHOI:  And on the next page, please.

7    Q.  On this page, do you see credit amounts that exceed

8    $10,000?

9    A.  Yes, I see multiple.

10   Q.  Do you see amounts that also exceed, say, $500, as well?

11   A.  Yes.

12           MS. CHOI:  Page 632.

13   Q.  Do you see multiple credit amounts that exceed $10,000?

14   A.  Yes, I do.

15   Q.  What about even $30,000?

16   A.  Yes.

17           MS. CHOI:  Page 633, please.

18           MS. SANTILLO:  Objection, cumulative.

19           THE COURT:  Sustained.  We'll take our midmorning

20   break.

21           Ladies and gentlemen, we'll take about a 10-minute

22   break, so see you shortly.

23           (Continued on next page)

24

25

 1                    (Jury not present)

 2                    THE COURT:  Ms. McDowell, you may step down for the

 3     break.

 4                    Matters to take up?

 5                    MS. CHOI:  Not from the government, your Honor.

 6                    MS. SANTILLO:  Your Honor, I'm going to discuss this

 7     with the government on the break, but I just went back to

 8     Government's Exhibit 705, which is what they referenced in

 9     terms of what gave us notice with respect to this testimony

10     that is coming up for Mr. Kumar, and the analysis in the

11     Exhibit 705 is clearly based on a June, 2014 call report and

12     it's not based on the September call report.

13                    MS. CHOI:  Wrong number.  Sorry.  725, not 705.

14                    MS. SANTILLO:  I'll go back and look at that.

15                    THE COURT:  All right.  Anything else to take up

16     during the break?

17                    MS. CHOI:  No, your Honor.

18                    THE COURT:  I'll come back shortly to address this if

19     you want to pursue it, Ms. Santillo.  Thank you.

20                    (Recess)

21                    THE COURT:  Ms. Santillo, you've looked at 725?

22                    MS. SANTILLO:  Yes, I have, and I continue to have an

23     objection, but I think that Ms. Choi is out in the hall.

24                    THE COURT:  Okay, we'll wait.

25                    MR. NOBLE:  She's consulting with the witness on a

1    question.

2           THE COURT:  Okay.

3           MS. CHOI:  Sorry.  What's going on?

4           MS. SANTILLO:  We were waiting for you.

5           MS. CHOI:  Fair enough.

6           THE COURT:  Go ahead, Ms. Santillo.

7           MS. SANTILLO:  So your Honor, I looked at Government's

8    Exhibit 725, and this is a very different kind of document than

9    the reports that we were given.  Could we pull up Exhibit 705

10   first?

11          So 705 is a document that was created at the time that

12   Alloya was analyzing the relationship with HOPE, and it

13   contains an analysis of the balance sheet on the call report

14   from HOPE FCU based on their June 30th call report.

15          And then if you pull up Exhibit 725?  Then do you want

16   to scroll to the different pages?  This appears to not be a

17   document that was created simultaneously to the time they were

18   analyzing the HOPE transactions, and that was something

19   Ms. Choi was trying to get clarity on, when this was created,

20   but it clearly wasn't the kind of analysis that was being done

21   essentially making their business decision about whether or not

22   to work with HOPE.

23          THE COURT:  Just because we've moved around various

24   grounds, in light of that, what's the objection?

25          MS. SANTILLO:  Well, first of all, this is what

1    purports to give us notice that the government was going to

2    have Mr. Kumar come in and give an analysis of the

3    September 30th call report.  But we have multiple documents

4    that show that the analysis was based on the September call

5    report and, in fact, there's a January email from Mr. Kumar

6    that said that he didn't think there was anything suspicious

7    about HOPE.  And then this document doesn't provide notice

8    about what the issue was with respect to what he was doing, and

9    it appears to me that it's a forensic exercise by Mr. Kumar ex

10   post.  And I don't know what the result of the proffer from the

11   witness was but --

12            MS. CHOI:  Your Honor, I think it's two separate

13   questions.  The question is whether or not they were on notice

14   that we would be relying on the September 30th, 2014 call

15   report to make this point, which I think is amply provided in

16   Government's Exhibit 725.

17            Mr. Kumar will testify that in the general course at

18   Alloya, as Ms. McDowell has testified, they look at call report

19   data on the back end because it's in Premier View.  They're

20   correct that there was no way as of September 18th they could

21   have been doing this analysis because it predates the

22   September 30th financials, and also, the September 30th

23   financials, there's a delay between when September 30th

24   happened, they're prepared, uploaded to the NCUA, and then the

25   NCUA disburses that publicly.

 1          So yes, the long and short of it this was not --

 2          THE COURT:  This is what?

 3          MS. CHOI:  Meaning the analysis of the September 30th

 4   financials was not done in the mid September, 2014 period.

 5          THE COURT:  When was --

 6          MS. CHOI:  Sorry.

 7          THE COURT:  You're talking about document 725?

 8          MS. CHOI:  Generally.  This document was separately

 9   created --

10          THE COURT:  When.

11          MS. CHOI:  -- later in 2015.  So not in the 2014

12   period.

13          THE COURT:  Why was it created?

14          MS. CHOI:  This was created after the fact by audit.

15   Mr. Kumar didn't create this document, but he is aware that

16   this was the type of -- this is the type of analysis, and he

17   will testify that comparisons between what Alloya sees of their

18   financials from the financials of a member credit union and the

19   representations they see in call reports is a comparison they

20   do on a regular basis at Alloya because that's how they can see

21   what the true financials of a credit union are.  They have it

22   all up in Premier View, you look and see what the asset size

23   was and what they're reporting in the 5300 report, and you can

24   see the realtime data in Alloya with regard to a particular

25   member credit union.

1           So the point is, the point can be made through

2   Mr. Kumar because I think it's just an illustration of the math

3   that is involved and the analysis of the net worth ratio.

4   Defense counsel is trying to exclude it because they understand

5   that it establishes a very material misstatement on the part of

6   Mr. Gross, which the phone call shows he understood was an

7   issue because he had been talking to -- he, according to what

8   he said to Alloya, had been talking about this issue to the

9   NCUA, understood that he had an issue with regard to the net

10  worth ratio, and Alloya told him that they thought that the

11  credit union couldn't survive the level of volume and the cash

12  required to do that ACH volume in light of the impact on the

13  net worth ratio.

14          So I think the point needs to be made, your Honor, to

15  the jury that, as of September 30th, in fact what Alloya had

16  told Mr. Gross did, in fact, come true, and as a result, HOPE

17  FCU made a misstatement to the NCUA about their cash on hand at

18  Alloya to try to cover that fact.

19          I mean, I could do the same point just publishing the

20  exhibit and walking through it and eliciting all of the

21  previous statements from Mr. Kumar about what the

22  September 30th statement shows, and I can do the math myself

23  without Mr. Kumar there, but the point is, Mr. Kumar -- I think

24  it makes a natural sense with Mr. Kumar on the stand because

25  this is the type of thing that Alloya does.

1          So I don't really understand -- your Honor's already

2    ruled that this is relevant, your Honor has already ruled that

3    it is obviously evidence of a material misstatement on the part

4    of HOPE FCU to its regulator.  The only point of Mr. Kumar is

5    to explain in context why Alloya would be doing this type of

6    analysis and to set up the predicate, which is Alloya can see

7    on its statement that, as of September 30th, as it says there,

8    there was over $3 million on hand in cash at Alloya.

9          If your Honor would -- you know, I just think we could

10   either do it -- we do do it one of two ways; we could either

11   have him establish all the predicate facts about the amount of

12   cash, and I could sit there myself afterwards and do the math

13   and run it through with the jury, but I think, given that we're

14   trying to expedite things and keep the jurors engaged, under

15   1006 and 611 your Honor should allow us to be able to do this

16   demonstration with Mr. Kumar.

17          THE COURT:  Go ahead.

18          MS. SANTILLO:  Your Honor, my concern, given the fact

19   this document is undated, and it wasn't conducted in connection

20   with Alloya's day-to-day activities, with respect to analyzing

21   the relationship with HOPE which had ended, you know, with

22   respect to ACH processing by November 10th, 2014, is that there

23   is evidence from Mr. Kumar's 3500 material that shows that when

24   the indictments came out in this case, Alloya went back and

25   went back to look back at this relationship.  And if they're

 1   doing detective work to try to figure out whether there was

 2   anything wrong with the financials of HOPE ex post after this

 3   indictment, then I think that's problematic to have, you know,

 4   Mr. Kumar kind of being a forensic detective and trying to

 5   testify here about what he alleges are misstatements that he

 6   has dug up from the NCUA call reports.

 7          THE COURT:  I'm not seeing the forensic detective

 8   point.

 9          MS. SANTILLO:  He filed -- so at the time, like in

10   terms of being a fact witness, at the time, Alloya looked at

11   certain information, they made a decision based on their own

12   business judgment to terminate the services of HOPE by

13   November, 2014.  By January, 2015, according to his own

14   contemporaneous emails, he determined that there was nothing

15   suspicious that was going on at HOPE.

16          THE COURT:  Just a moment.  So you're saying it's a

17   timeline issue?

18          MS. SANTILLO:  No.  I'm saying that basically what he

19   is doing is --

20          THE COURT:  You're talking about Mr. Kumar.

21          MS. SANTILLO:  Mr. Kumar.  He's not testifying as a

22   fact witness, he's testifying like he's a forensic accountant

23   who's going back through HOPE's books and trying to find

24   misstatements.

25          THE COURT:  Well, he could have done that in the

1   course of his work, right?  Are you saying that he didn't do

2   that in the course of his work, that there would be no

3   predicate with his own experience?

4           MS. SANTILLO:  I'm saying that he didn't do it in

5   connection with work with respect to analyzing the relationship

6   between HOPE, and I suspect, and the government has not given

7   an answer about this, is that what he did was, once he found

8   out about the indictment in this case, he went back and started

9   trying to figure -- going back through the call reports.

10          THE COURT:  Go ahead.

11          MS. CHOI:  Your Honor, again, this is just to show

12  that --

13          THE COURT:  What is "this"?

14          MS. CHOI:  Sorry.  Government's Exhibit 725 is just to

15  show that they were on notice that we were going to make this

16  argument.

17          THE COURT:  So you're not trying to move 725 in

18  through Mr. Kumar?

19          MS. CHOI:  No.  And we, in fact, told defense counsel

20  that we're not trying to do that.  But as a compromise, for all

21  these call reports, 704, 705, 725 that we're not getting in as

22  quote/unquote business records, even though I think there are

23  arguments that they would fall under the exception, we

24  understood from defense counsel there would be no objection to

25  eliciting facts that would support the various conclusions that

1    are found therein.

2           I think that if we can establish that Mr. Kumar, and

3    Alloya generally, in the course of their duties or business

4    goes and accesses financial data from their member credit

5    unions, which Ms. McDowell has already said, and that there are

6    statements available to Alloya for the actual cash on hand as

7    of September 30th, 2014, and Mr. Kumar will say that that is

8    the date that that statement and the amount of cash on hand for

9    HOPE FCU at Alloya is what is determinative for those entries

10   in the call report, because that's how everyone in this

11   industry, including Alloya, in assessing its member credit

12   unions understands that to be, that we can use him to go

13   through the math to show how in fact they are understating by

14   over $2 million with regard to the cash and the impact on the

15   net worth ratio.

16          Your Honor, they're going to make a point in cross

17   examination, as is evident, that Alloya was trying to shut this

18   poor little credit union down.  This poor little credit union,

19   all they wanted was fee income.  Right?  That's the reason why

20   Ms. Santillo wanted us to introduce those portions of the phone

21   call, which we did.  We are allowed to show that they were, in

22   fact, right in mid September when they told Mr. Gross this is

23   going to be an issue, it's going to blow up your balance sheet,

24   it's going to skew your net worth.  They placed Mr. Gross on

25   notice of that fact, and in fact, they were right, because as

1   of September 30th they would have been, if they had accurately

2   posted their financials, at 1.6 percent on the net worth ratio,

3   not at the 12 percent that they falsely put on their books to

4   the NCUA.  And I think Mr. Kumar can make that point.

5           I still haven't heard any rebuttal as to why, even if

6   I were to get Mr. Kumar to testify as to the cash on hand on

7   September 30th, 2014, and all the predicate facts to establish

8   the misrepresentation, I couldn't just walk the jury through

9   each individual step of the analysis with the net worth ratio

10  as exists on that call report.  There's been no answer to that.

11  And I think, given that they don't actually have a substantive

12  argument about whether or not it would be appropriate for me to

13  do it --

14          THE COURT:  So that wasn't part of what he did here,

15  or did he do that post -- the contention is he, post indictment

16  went back and looked and -- I don't -- candidly, I'm confused

17  by your argument, Ms. Choi, and I'm confused by the defense's

18  argument.  And if I'm confused, it suggests an enormous red

19  flag to me as to what the jury would do with it.

20          MS. CHOI:  Sure.  He will testify -- and we're not

21  going to ask him this question -- he didn't prepare this chart.

22  Again, 725 is just to say that we placed them on notice that we

23  were going to make this argument.

24          THE COURT:  So 725 -- you're not the moving 725 into

25  evidence.

1          MS. CHOI:  No, we're not moving 725 into evidence.

2          THE COURT:  And just so I understand, why not?

3          MS. CHOI:  Because defense counsel objected to it

4    saying that it was not a business record, that it was an expert

5    report.  And because we're trying to compromise with defense

6    counsel, I'm eliciting predicate facts that form the basis of

7    Alloya's findings and decisions with regard to HOPE FCU through

8    the witnesses without reference to --

9          THE COURT:  What I understand them saying is you're

10   not stopping there, you're sort of moving forward to have -- I

11   don't know -- temporally forward beyond that decision point to

12   have Mr. Kumar kind of validate the government's charge as to

13   what happened after that point.

14         MS. CHOI:  Well, if that's your Honor's concern, I

15   don't see there being an issue with regard to having Mr. Kumar

16   set up the predicate facts about what the balance sheet -- or

17   what the true financials were as of September 30th, 2014 from

18   Alloya's perspective when you can see HOPE FCU's cash on hand,

19   explaining how --

20         THE COURT:  Because that's something that he --

21         MS. CHOI:  He knows.

22         THE COURT:  -- he did and knows.

23         MS. CHOI:  Yes.  He can see it from the statements,

24   from setting up the predicate facts with regard to how,

25   generally speaking, Alloya does its analysis of member credit

1   unions, much like Ms. McDowell said, which is that it relies on

2   the call reports, and knowing the call report includes a net

3   worth ratio.  And then, after Mr. Kumar is done, I would like

4   the opportunity to walk the financials through with the jury

5   because --

6           THE COURT:  Well, you could do that in summation.

7           MS. CHOI:  I could, but I think we should publish it

8   because, much like they've constantly objected on the basis of

9   completeness, leaving that there and just say how much cash was

10  on hand in September doesn't get to the ultimate point which is

11  that there was a misstatement on the call report.

12          I could just put the call report up and point out

13  those lines, if that's what Ms. Santillo would like, but I

14  think --

15          MS. SANTILLO:  I'd like to cross examine you.

16          THE COURT:  I mean --

17          MS. CHOI:  That's why she can cross examine him.  I

18  think it's better to have it through him so she can cross

19  examine him.

20          THE COURT:  First of all, stand at a mic, please.

21          MS. CHOI:  Okay, your Honor.

22          THE COURT:  Everybody, take it down a notch.  I feel

23  like I'm getting yelled at by counsel, and I don't like it.  I

24  get yelled at by my children all weekend, and having it done by

25  you, it has an eerie similarity to it that drives me nuts.

Case 1:15-cr-00769-AJN   Document 491   Filed 04/07/17   Page 94 of 305

1            MS. CHOI:  Your Honor --

2            THE COURT:  It's how you talk.

3            MS. CHOI:  It's how I talk.

4            THE COURT:  But from now on, not to me.  Fair?

5            MS. CHOI:  I'll try.  Yes, your Honor.

6            MR. KLINGEMAN:  I join in that.

7            THE COURT:  I'm not sure which part, but it sounds

8    good.

9            So I think the suggestion is, you're going to ask

10   Mr. Kumar about steps that he actually took, and it sounds like

11   you want to -- and part of that is to show him the call reports

12   that were part of his work, right?

13           MS. CHOI:  Your Honor, he didn't -- so again,

14   Mr. Kumar didn't do contemporaneously the call report analysis.

15   He will say generally this is the type of stuff that Alloya

16   does, as is evidenced by Government's Exhibit 725.  So what I

17   wanted to do is have him walk through the September report --

18   sorry -- the September statement which will be in evidence as

19   the financial point at Alloya, explain --

20           THE COURT:  And what document is that?

21           MS. CHOI:  That's 808 -- one moment, your Honor.

22   808-A.  And if I can give you the specific pages, if you go --

23   808-A, if you go to page 39.

24           THE COURT:  Okay.

25           MS. CHOI:  Go to the top.  So as you can see, this is

1    the September, 2014 financials.  And at the bottom it says

2    "share account totals".  I would have Mr. Kumar establish that

3    the ending balance for each of those accounts is cash on

4    hand -- represents the cash on hand of HOPE FCU at Alloya.

5           And what I was going to establish, if you go to

6    page 40 at the bottom, it shows the ending -- no, sorry, at the

7    top -- it shows the ending balance as being $3.29 million.

8           THE COURT:  Okay.

9           MS. CHOI:  Then I was going to have him establish

10   whether or not he understands that that's a number that gets

11   reported by credit unions to the NCUA as part of their

12   financials, that September 30th is the date -- the operative

13   date, the effective date for the third quarter of 2014.  So

14   those would be the accurate numbers with regard to the cash on

15   hand.

16          And then I was going to pull up the actual call report

17   and walk through the portions where they obviously misstated

18   the amounts of the cash on hand.  If your Honor wants to see

19   that, I can show you, but that's what I was --

20          THE COURT:  I just want to hear, before we get to

21   bringing up the call report, Ms. Santillo, based on what the

22   government proffered, no concerns, right?

23          MS. SANTILLO:  No.  I actually have a concern about

24   this, too --

25          THE COURT:  What is "this"?

 1            MS. SANTILLO:  -- the average daily amount -- I'm

 2   sorry.  The exhibit we're looking at right now.

 3            THE COURT:  Which is 808-A?

 4            MS. SANTILLO:  Yes.

 5            THE COURT:  Go ahead.

 6            MS. SANTILLO:  If you look at this area --

 7            THE COURT:  This is an Alloya document?

 8            MS. SANTILLO:  Yes.  If you look at the area they have

 9   blown up here, it has the ending balance, but then also goes

10   and subtracts ACH prefund, transaction account, overnight

11   account, and it takes all those out, and now we have a

12   $1.5 million number.

13            THE COURT:  So what?

14            MS. SANTILLO:  It's not 3 million.

15            MS. CHOI:  No, your Honor, those are average daily

16   balances on the document.

17            THE COURT:  This seems like the kind of factual

18   information that Mr. Kumar would be well positioned to testify

19   to.

20            MS. SANTILLO:  Well, yes.  I guess he could, you know,

21   walk through what Alloya's statement does.

22            THE COURT:  Right.  And to the extent you think the

23   government is focusing on the wrong balance or what the meaning

24   of it is, you can cross examine Mr. Kumar on that.

25            MS. SANTILLO:  And then can I reserve the right to

1   call an accountant?  Because I'm just getting notice of what

2   this issue is here, because this was not on our radar about

3   something that was not supposed to be -- is in terms of a

4   material misrepresentation on behalf of Mr. Gross.  And we were

5   never told that this was going to be the issue.  So I just want

6   to preserve my rights, because I can cross examine him about my

7   basic knowledge about this issue, but, you know, it depends on

8   factors that are based on what's actually on HOPE's books, not

9   just what's on Alloya's books.

10              THE COURT:  You can reserve your right to call an

11   accountant.  All right.

12              So then setting this aside, the next is the call

13   report.

14              MS. CHOI:  Yes, your Honor.  I would predicate his

15   testimony on his familiarity with the call report, the types of

16   financial information --

17              THE COURT:  You're not in front of microphone.

18              MS. CHOI:  -- sorry -- the type of financial

19   information it includes, the fact that Alloya relies on call

20   reports because that's publicly available information that it

21   can have, it's sort of a summary of its members' financial

22   situation each quarter, and then I would throw up Government's

23   Exhibit 6103.  If we could go to page 4 of this document.

24              Now, as you see, your Honor, on line 2, part of the

25   analysis of the financial condition includes inputting cash on

1    deposit in corporate credit unions, 432,946, which is what HOPE

2    FCU represented to the NCUA.  And Mr. Kumar will say that's

3    incorrect because we know how much was on hand at Alloya,

4    putting aside any other corporate credit union or financial

5    institution, and it was over $3 million.

6           And then what I was going to do is walk through in

7    three other parts where that difference would fund into.  But

8    ultimately, if you go to page 5, it goes into, on page 5

9    line 33, which is total assets.  So again, this understates

10   about 2. something million -- 2.8 million.  And then if you go

11   to page 14, this is the summary of how you calculate the net

12   worth at the time of September 30th, 2014.  You see at the top

13   it says "numerator net worth" and "denominator total assets",

14   and the change would happen on line 9.  That number should be

15   approximately 2.8, $2.9 million higher than it was.  The 52,530

16   net worth stays the same.  And if you go to the bottom, if you

17   look at line 14 and line -- line 13 is the net worth ratio.

18   You should take the top number, divide it by the bottom number,

19   you get 12.03, and that is how you can establish using a

20   calculator that he would have gotten 1.6 if they had actually

21   accurately stated the cash on hand.

22          THE COURT:  Ms. Santillo, with respect to this?

23          MS. SANTILLO:  Your Honor, this is not an exercise

24   that Alloya would ever do in terms of analyzing HOPE's books.

25   They only have one piece of the puzzle, and it's

1    extraordinarily misleading to have them purport to calculate

2    the net worth of the credit union based on what they know about

3    one figure in their call -- in their balance.  Right?  Like

4    whether it's the 3 million or the 1.5 million, whichever is the

5    right number, they don't know the whole picture of HOPE's

6    books.  And the NCUA comes in and audits it, and they check to

7    see whether this number is right.  This whole exercise is just

8    extraordinarily misleading and it's not -- this guy doing like

9    a forensic accounting exercise for the jury, it's not based

10   on -- he's not -- as a fact witness, he's a math -- he's

11   purporting to be a mathematician on things that he doesn't have

12   any knowledge about --

13           THE COURT:  It's not the inferences of the math that

14   are the concern, right?

15           MS. SANTILLO:  Well, it's not just the -- well, it's

16   the inferences of the math based on the fact that the way that

17   these figures are factored into the call report, there's more

18   to it than that.  At HOPE, they have to look at their assets

19   and their liabilities and what is profit and all of that, and

20   it's not just based on his outstanding checks -- it's not based

21   on just Mr. Kumar's pointing out to one number on there.

22           And to the extent that he's going back and -- he's

23   going back in time and trying to make an analysis about what

24   they should have done at that moment, it's irrelevant.  You

25   know?

 1              If the NCUA wants to talk about this, that's one

 2     thing.  But if Alloya, who is going back through their books

 3     and trying to pick out things that HOPE did wrong ex post, I

 4     think it's problematic in so many ways.

 5              THE COURT:  I'm uncomfortable with the projection.  I

 6     was with you, Ms. Choi, up and to the motive analysis that

 7     you're suggesting would happen with the call reports to the

 8     NCUA.

 9              You are asking Mr. Kumar -- it's not just math, you're

10     having him -- I mean, if it were just math, I'd let you do it.

11     But it seems to me it's not just math, it is making assumptions

12     that seem to me assumptions about what goes into the

13     calculation that I'm not certain the proffer has established

14     the predicates for.

15              MS. CHOI:  Your Honor, if I could, because I

16     understand that it looks confusing, but it's really quite

17     straightforward.  If we could go back to page 4.

18              And your Honor, just as a predicate, I do believe that

19     we won't get to Mr. Kumar until after the lunch break, so I

20     would ask your Honor if you would indulge me to just look at

21     these pages over lunch.  It's not -- it is not -- does not have

22     to apply any forensics or any expertise here, all it is is

23     simple mathematical calculation where, line 2A, and you can

24     follow it through, line 2A is entered into as part of their

25     assets, and it makes clear it's just one specific number, which

1    is the cash on deposit in corporate credit union.  So you just

2    then sum everything up and you do a simple division.  He's

3    not --

4             THE COURT:  Why wouldn't do you that -- why wouldn't

5    you get the facts as to what the government asserts were the

6    sort of real facts out of Mr. Kumar because he has access to

7    that, and then with the NCUA examiner ask sort of hypotheticals

8    based on that, if this were the amount on hand, what would this

9    calculation look like?

10            MS. CHOI:  We could do that.  I guess the other

11   question I have for your Honor is, I would like to have

12   Mr. Kumar say that he understands that there is a line in the

13   September -- in all call reports that requires a cash on

14   deposit in corporate credit unions, and that that line lines up

15   with what is supposed to be happening on their

16   September 30th -- as the balance on the statement as of

17   September 30th.  I think that we need to get -- to establish.

18   Otherwise --

19            THE COURT:  Necessity is not a rule of evidence.

20            MS. CHOI:  No, I understand.  But I think he has the

21   knowledge to testify to that much.  Right?

22            THE COURT:  Well, I don't know.  I understand that he

23   likely does.  Was that part of what he did here?

24            MS. CHOI:  This is part of what Alloya generally does.

25   So I could do it through Ms. McDowell, too.  They understand

1   this entry.  When they rely on the call reports, they

2   understand that part of the analysis of a net worth ratio

3   includes specifically asking the question of what the cash of

4   deposit on hand in other financial institutions, and Mr. Kumar

5   will say, without hesitation, that anything other than the

6   number that we saw on the statement, the $3.2 million number,

7   that is a number that must be inputted into the call report.

8   He understands that, and I think that point needs to be -- is

9   both necessary in order for us to prove the material

10  misstatement to the NCUA, but also is something that is well

11  within what a lawyer does generally when it looks at its

12  members' credit unions' financials and what is the obvious

13  answer for him with regard to -- and anyone else who is doing

14  this -- with regard to what the answer is on how much cash they

15  had on September 30th?  Well, you look at the September 30th

16  statement and you see how much cash is in their share accounts.

17          MS. SANTILLO:  Just one other point, which is that

18  there's actually another corporate credit union that HOPE has

19  business with, so this number isn't even just related to

20  Alloya, it would be a composite number.

21          THE COURT:  We'll pick it back up at lunch.

22          MS. CHOI:  At least with regard to Alloya, right?  I

23  mean --

24          THE COURT:  So we'll proceed.  I've heard your

25  argumentation.  To the extent we get to Mr. Kumar before lunch,

1   we've talked about, at least the point of which I'm comfortable

2   with.  To the extent you go beyond that, I'll take

3   contemporaneous objections and rule depending on the predicates

4   that are laid.

5              MS. CHOI:  Okay.

6              THE COURT:  Let's get our jury and the witness,

7   please.

8              I sustained the cumulative objection, Ms. Choi, so

9   you're going to move on?

10             MS. CHOI:  Yes.  Your Honor, I think just one other

11  point on that exhibit, which is that's just a sum total of the

12  number of credits because it's relevant with regard to her risk

13  assessment.  So not going through each individual credit, but

14  just the sum at the bottom of that page.

15             THE COURT:  Okay.  You may take your seat.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

```
 1              (Jury present)
 2              THE COURT:  Thank you, members of the jury.
 3              Ms. Choi, you may proceed with your direct examination
 4    of Ms. McDowell.
 5              Ms. McDowell, I remind you that you are under oath.
 6    You may proceed.
 7              MS. CHOI:  Thank you, your Honor.
 8    BY MS. CHOI:
 9    Q.  Before the break we were looking at this particular ACH
10    item detail.  Could you just refresh the jurors' recollection
11    about what the create and effective dates are for this
12    particular entry?
13    A.  Yes.  The creation date is September 16th, 2014, and the
14    effective date is September 17th, 2014.
15              MS. CHOI:  If we could just go to page -- we're on
16    page 629 right now.  If we could go to page 640, which is the
17    end of this particular batch.
18    Q.  Could you read out loud the batch total for the credit side
19    there?
20    A.  $1,849,439.11.
21    Q.  With regard to this particular timeframe in mid
22    September -- and we went through a phone call on
23    September 18th -- during that September 18th call, did you have
24    any -- from that call, did you have any understanding from
25    Mr. Gross about whether or not HOPE FCU wanted to use Alloya
```

1    for ODFI and RDFI, or just one of the two?

2    A.   The credit union was only using us to originate ACHs out

3    into the system, we were not receiving any of their inbound ACH

4    transactions.

5              MS. CHOI:  If we could put up GX 92, please.

6    Q.   So with regard to HOPE, where would HOPE fall in the

7    context of Government's Exhibit 92?

8    A.   We are between the ODFI and the ACH operator.

9    Q.   Alloya would be between the --

10   A.   Yes.

11   Q.   And where would HOPE fall on this?

12   A.   I'm sorry.  HOPE is the ODFI.

13   Q.   On the left-hand side?

14   A.   Yes.

15   Q.   Are you familiar with the term "rate of return"?

16   A.   Yes.

17   Q.   Could you describe generally what that means?

18   A.   Sure.  That's a term used in ACH.  So when transactions are

19   originated out, whether they're credits or debits, there is a

20   chance that they could be returned.  So if an item is withdrawn

21   from your checking account but you don't have enough to cover

22   it, that would be returned as nonsufficient funds.  Items can

23   also be returned for account closed or a payment can be -- a

24   stop payment can be placed on an individual transaction, and

25   then there's always unauthorized transactions, as well.  So if

1   something were to be withdrawn from your account and you didn't

2   authorize that, you could notify your bank or credit union to

3   have that transaction returned.

4   Q.  Did you discuss the issue of rate of return with Mr. Gross

5   on that September 18th call?

6   A.  I don't recall.

7   Q.  Okay.  Is there something that would refresh your

8   recollection?

9   A.  Yes.

10          MS. CHOI:  Actually, why don't we put up page 5 of

11  Government's Exhibit 791-T.  We'll make this easier.

12  Q.  Do you see, starting at the top of the page, directing your

13  attention, Ms. McDowell, to where it says "11", sort of towards

14  the top of the page that you were speaking?

15  A.  Yes.  Okay.  So I do recall having the conversation.

16  Q.  Why were you discussing the rate of return issue with

17  regard to HOPE FCU with Mr. Gross?

18  A.  So up and to this point we were primarily seeing the large

19  volume of credit transactions that HOPE was originating, but

20  during the discussion, during this call, Trevon had also

21  indicated that they wanted to also start processing debit

22  transactions in the same dollar amount aggregated total as they

23  were for credits.  So that's when we started talking about --

24  the risk there with debits is that there's -- the rate of

25  return is typically higher with the debit transaction for the

1  nonsufficient funds, account closed, unauthorized type

2  transactions.

3  Q.  Okay.  And then you have a discussion about CU South there.

4  Why were you discussing CU South?

5  A.  So when an ACH item is returned back to the originator,

6  it's returned to the RDFI of the originator.  So in this case,

7  CU South was the RDFI for HOPE FCU for their inbound ACH

8  transactions.

9       MS. CHOI:  If we could go back to Government's

10 Exhibit 92 just briefly.

11 Q.  So I think you testified that HOPE was between -- sorry --

12 HOPE was an ODFI, Alloya is between the ODFI and the ACH

13 operator, but between the ACH operator and the RDFI on the

14 other side, for HOPE, when HOPE was serving as the RDFI, what

15 entity was there?

16 A.  So that would be CU South.

17 Q.  Did you have any transparency into CU South and its

18 operations?

19 A.  We did not.

20 Q.  So as a result, what information could you get with regard

21 to receipts for HOPE's ACH transactions?

22 A.  So we had no visibility whatsoever as to the types of

23 return transactions that were being sent back to HOPE Credit

24 Union because we did not receive any of their inbound ACH

25 transactions.

1  Q.  Okay.  With regard to that September 18th phone call, do

2  you recall having a discussion with regard to prefunding on

3  that call?

4  A.  Yes, I do.

5  Q.  Again, Mr. Gross was the only individual from HOPE FCU on

6  that call?

7  A.  Correct.

8  Q.  Could you describe what discussion you had with regard to

9  prefunding?

10 A.  Sure.  So prior to the call, Alloya's stance on processing

11 the origination transactions for a million plus dollars was

12 that we were going to require the credit union to prefund their

13 ACH files on a daily basis.

14 Q.  Okay.  And what, if anything, did Alloya do to set up the

15 prefunding?

16 A.  Sure.  So what we require for prefunding is that the credit

17 union would have needed to wire in funds to cover the total

18 amount of ACH transactions that they were processing that day.

19 So on the one example we saw, it was $1.8 million.  So we would

20 have required them to have a wire come into their account to

21 cover that amount.  We would then move those funds out of their

22 main transaction account into a holding account.  It would

23 still be in HOPE's name, so they still owned those funds, but

24 they couldn't access them.  So we would hold that dollar amount

25 starting on the day that they sent us the ACH file until the

1    day that we received settlement from the Federal Reserve Bank,

2    which would be one to two days later.

3    Q.  With regard to prefunding, was that the first time that

4    Alloya had allowed a member credit union to do a prefunding

5    arrangement to allow for ACH origination?

6    A.  Yes, it was.

7    Q.  When, approximately, did you implement the prefunding

8    arrangement?

9    A.  That same day, September 18th.

10   Q.  Now, on that call, did you also have -- do you recall

11   having discussions with Mr. Gross regarding TransferWise and

12   further information Alloya wanted?

13   A.  Yes.

14   Q.  Could you describe generally what you requested of

15   Mr. Gross?

16   A.  Yes.  So we were requesting additional information to

17   describe who TransferWise was and what their business practice

18   was, as well as the anticipated transaction item counts and

19   total dollar amounts that they would potentially process

20   through HOPE Credit Union.

21   Q.  Did Mr. Gross have that information readily available to

22   him on that call?

23   A.  No, not during the call.

24   Q.  Did there come a time where you had further communication

25   with Mr. Gross on those questions?

 1   A.  Yes, there were followup emails.

 2            MS. CHOI:  If you could just display for the witness

 3   and defense counsel Government's Exhibit 721 and 722?

 4   Q.  Do you recognize these, Ms. McDowell?

 5   A.  I do.

 6   Q.  What are they?

 7   A.  So these are emails between Trevon and myself regarding the

 8   additional information that we had requested from him.

 9            MS. CHOI:  Government offers Government Exhibits 721

10   and 722 into evidence.

11            MS. SANTILLO:  No objection.

12            MS. MADRIGAL:  No objection.

13            THE COURT:  Thank you.  They're admitted.

14            (Government's Exhibits 721 and 722 received in

15   evidence)

16            MS. CHOI:  If we could just go to Government's

17   Exhibit 721 first for the jurors.

18   BY MS. CHOI:

19   Q.  So this appears to be a string between Trevon Gross,

20   yourself, and Sandra Albertson, Neil Kumar, and Kathy Feringa,

21   and Alloya.

22   A.  Correct.

23            MS. CHOI:  If we could just go to the bottom last

24   email in this page.

25   Q.  This was an email that you sent September 18th, 2014, and

H2ROLER3                          McDowell - Direct

 1   was this after the call?

 2   A.  Yes, it was.

 3   Q.  It says the subject is ACH origination.

 4        MS. CHOI:  If you could go to the second page.

 5   Q.  So generally, what were you asking Mr. Gross here in this

 6   email?

 7   A.  We were asking to get additional information on what they

 8   expected their ACH transaction volume to be for both the debit

 9   transactions and the credit transactions.

10   Q.  And it uses the phrase "counts and dollars".  Could you

11   describe what that means?

12   A.  Counts would be the number of items within the ACH batch,

13   and then the dollars would be the total aggregate dollars for

14   all of the ACH files.

15        MS. CHOI:  If we could go back to the first page,

16   please.

17   Q.  You also ask about historical return rates and the average

18   size, as well, with regard to debits, correct?

19   A.  Correct.

20        MS. CHOI:  If we could go to the first page.

21   Q.  Then you sent another email at approximately 1:53 p.m.

22   A.  Yes.

23   Q.  What were you asking Mr. Gross in that email?

24   A.  I was following up to get additional information regarding

25   transferwise.com and to understand why they were using a -- why

H2RQLEB3                          McDowell - Direct                    1845

1    they were not using the IAT ACH code for the transactions that

2    they were processing.

3    Q.  Okay.

4         MS. CHOI:  If you could go to the top of that email.

5    Q.  Mr. Gross responds with regard to the IAT question you

6    posed, so that second set of questions that you had posed.  He

7    stated, "TransferWise payments are not foreign payments, and

8    these payments are being originated using US-based ODFI and

9    received from US-based RDFI.  There's no requirement for

10   currency exchange as the funds are being transferred within the

11   US."  And then it also says, "TransferWise is indeed a UK-based

12   corporation that handles the precash due to TransferWise's

13   agent with the US-based MSB with money transmitter licenses in

14   most US states."  Do you see that?

15   A.  I do.

16   Q.  At the time, did you agree with that assessment?

17   A.  I did not.

18   Q.  And why did you not agree with that assessment?

19   A.  So what we knew about transferwise.com is that they allowed

20   individual consumers and businesses to transfer funds from

21   their US bank accounts to accounts in foreign countries.  And

22   according to the ACH rules, when an ACH transaction is

23   originated in a foreign country and received in the US, it must

24   be coded as the IAT ACH code.

25   Q.  Did you express that disagreement with Mr. Gross?

1   A.  Yes, we did.

2   Q.  Regarding the coding of these as PPD as opposed to IAT

3   transactions?

4   A.  Correct, yes.

5   Q.  Why did you tell Mr. Gross that?

6   A.  So our concern was that he did not understand the ACH rules

7   regarding the processing of these types of payments, so we

8   wanted to express our, I guess, advice and concern to him.

9   Q.  Did you give him any particular advice with regard to doing

10  further looking into this issue?

11  A.  Yes.  So he indicated that they were working with a

12  payments authority.  So they are an ACH -- they're a company

13  that provides ACH education to banks, credit unions, and

14  businesses.  So I had suggested that Mr. Gross contact them to

15  get their opinion on the situation, as well as what Alloya was

16  indicating to him.

17  Q.  From these conversations that you had with Mr. Gross, what,

18  if anything, did he represent about the BSA policies that they

19  had in place at HOPE FCU for these originations?

20  A.  So they indicated that they were working to implement the

21  BSA policies and practices into their organization.

22  Q.  But as of September 18th, 19th, of 2014, they did not have

23  those policies in place?

24  A.  Based on what we heard on the phone call, no.

25          MS. CHOI:  If we could go to Government's Exhibit 722,

1   please.  And again, if we could go to page 2 of this exhibit.

2   Q.  You see again that original email that you had sent to

3   Mr. Gross?

4   A.  Yes.

5        MS. CHOI:  And then if we could go to page 1.

6   Q.  Mr. Gross writes back to you and says, "Hey, Michelle.

7   Here are the answers."  It includes a chart, correct?

8   A.  Yes.

9   Q.  That's for the mid September, 2014 timeframe?

10  A.  Correct.

11       MS. CHOI:  And then if you could go to the bottom of

12  the page.  If we could blow up there.

13  Q.  It says, "Here is TransferWise's reply."

14       And directing your attention to five down, there's a

15  bullet point that says, "Credits are the payments that are

16  already serviced we offer, and that is why the volumes you see

17  are high and more so overnight."

18       Bullet six says, "Debits we are still working on.

19  Hoping to test them in few weeks.  Our solution now is built on

20  API and that we cannot use anymore.  Plus we are building for

21  safety net around debits to be comped in to go live to our

22  customers."

23       The next bullet point says, "Volumes would not be high

24  initially, but we are targeting higher volumes quite soon than

25  we have for credits."  Do you see that?

1    A.   I do.

2    Q.   What did you understand Mr. Gross to be relaying to you

3    with regard to those statements about the debit size?

4    A.   So in our opinion, we expected that the debit transaction

5    count, the number of transactions, as well as the total dollar

6    amount would be equal to or exceed the volumes that we had

7    already seen for the credit transactions that we were already

8    processing, or that they were already processing.

9    Q.   Did there come a time --

10             MS. CHOI:   You can take that down, Mr. Chang-Frieden.

11   Thanks.

12   Q.   Just to be clear, NSF, are you familiar with that acronym?

13   A.   Nonsufficient funds.

14   Q.   Did there come a time where you participated in doing a

15   risk analysis or assessment from Alloya's standpoint with

16   regard to HOPE's ACH origination?

17   A.   Yes.

18   Q.   And did you work on a particular type of project with

19   regard to that?

20   A.   Sure.   So throughout this timeframe from mid September and

21   on there had been several individuals within Alloya's

22   organization that had been meeting frequently to assess and

23   understand what was going on with HOPE Credit Union, and then

24   to identify all the risks that we saw, and how perhaps we could

25   either mitigate those risks so that we could continue

1   processing with HOPE or, you know, the alternative would be to

2   not allow them to process through us.

3   Q.  Could you describe the types of risk that Alloya identified

4   with regard to HOPE's ACH origination?

5   A.  Sure.  So probably our first concern was that they did not

6   have the sufficient line of credit to be processing this value

7   of ACH transactions.  So their line of credit was $10,000, but

8   they were processing, you know, on one day we saw $1.8 million

9   in transactions.  So they didn't have sufficient reserves to be

10  able to cover that volume of transactions if something were to

11  happen with TransferWise and not being able to fund for those

12  transactions.

13  Q.  Did you have a sense during this timeframe of what the

14  daily debit total was?

15  A.  I believe it was around $16,000.

16  Q.  So putting aside that concern, what other concerns did

17  Alloya have with regard to HOPE's ACH origination?

18  A.  We were also concerned that by continuing to process this

19  dollar amount of transactions, that their credit ratio would

20  decline, and it would be below the NCUA required standards.

21  Q.  What is the NCUA required standard?

22  A.  7 percent.

23  Q.  And this is mid September of 2014?

24  A.  Yes.

25  Q.  Do you have an understanding of when a member credit union,

1    such as HOPE FCU, has to report its financials to the NCUA?

2    A.   So they report them quarterly, so their next cycle would

3    have been the end of September.

4    Q.   That would be September 30th of 2014?

5    A.   Correct.

6    Q.   So putting aside the net worth ratio concern, what other

7    concerns did you have with regard to HOPE FCU's ACH

8    origination?

9    A.   So our last concern was that they didn't have adequate

10   experience with processing this volume or these types of ACH

11   transactions, as well as the policies and procedures associated

12   with any compliance regarding ACH processing.

13   Q.   Were these concerns, in fact, relayed to Trevon Gross?

14   A.   I'm not certain I understand that question.

15   Q.   Did Alloya ever discuss these risk issues with Trevon

16   Gross?

17   A.   Yes, we did.

18   Q.   Did there come a time where Alloya made its own assessment

19   as to whether it could continue doing ACH transaction

20   origination for HOPE FCU?

21   A.   Yes.

22   Q.   What was that determination?

23   A.   Around late September, early October, we determined that

24   the risks that we identified, that there was no way that we

25   could resolve that risk to where we would be comfortable for

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   Alloya's sake, nor would we be comfortable for HOPE Credit

2   Union's sake, in processing these transactions, so we decided

3   to turn off their services for ACH origination effective the

4   end of October.

5   Q.  Did you provide advanced notice to Trevon Gross about that

6   fact?

7   A.  We did.

8   Q.  What, if anything, did Trevon Gross say in response when

9   you first gave him notice of this?

10  A.  He had asked if we could continue to find or look to find a

11  way to make this work.

12  Q.  Okay.  And did you look at other alternatives that could

13  potentially help allow HOPE Federal Credit Union to continue

14  its ACH origination while mitigating these risks?

15  A.  So there were no other alternatives that we could find

16  internally, and we did, I believe, offer some suggestions to

17  HOPE that, if they wanted to find another credit union or bank

18  that was willing to be the ODFI and bear that risk, that they

19  could look for a solution such as that.

20  Q.  Do you recall ever having a conversation about $160,000

21  capital infusion that might be -- that Alloya might be able to

22  have HOPE implement in order to allow for that origination?

23  A.  Sure.  So that was one of the options we were exploring for

24  their line of credit issue or concern that we had.  So we had

25  determined that, based on the current information that we had

1   regarding their expected debit transaction volumes, that if

2   they had increased their capital investment in Alloya to be

3   $160,000, that we could then give them a $2 million line of

4   credit which should cover the total value of the transactions

5   that they were processing at that time.

6           But the reason why we didn't offer that solution to

7   HOPE was that, based on the information received from them was

8   that they expected to continue to grow the transaction volume,

9   that they were looking for other companies that they could

10  process on behalf of, and the transaction volumes would just

11  continue to grow from that point.

12          MS. CHOI:  No further questions.

13          THE COURT:  All right, thank you.

14          Ms. Madrigal.

15          This will be cross examination on behalf of

16  Mr. Lebedev.

17          Ms. Madrigal, when you're ready, you may begin.

18          MS. MADRIGAL:  Thank you, your Honor.

19  CROSS EXAMINATION

20  BY MS. MADRIGAL:

21  Q.  Good afternoon, Ms. McDowell.

22  A.  Hi.

23  Q.  You testified that in June of 2014, Alloya started

24  processing HOPE FCU's ACH transactions?

25  A.  That's when we received the paperwork for them.

1    Q.   Okay.  You actually started processing in July.

2    A.   There was test files in July, and then the live

3    transactions were early August.

4    Q.   Understood.  At that time, ACH origination was a brand new

5    business for HOPE; is that correct?

6    A.   Correct.

7    Q.   And you were aware that HOPE FCU primarily served

8    low-income and unbanked members?

9    A.   Correct, yes.

10   Q.   And processing ACH transactions for other businesses was a

11   way for HOPE to collect fees.

12   A.   Yes.

13   Q.   Is it fair to say that increased fees would create revenue

14   for HOPE?

15   A.   I don't know.  I don't know their business model.  But I

16   get -- I presume it would.

17   Q.   Well, when you process ACH transactions, you take a fee.

18   A.   Correct.

19   Q.   Is that correct?

20   A.   Yes.

21   Q.   Now, Alloya conducted due diligence on HOPE FCU; is that

22   correct?

23   A.   Yes.

24   Q.   And Alloya asked HOPE questions to better understand its

25   business model.

```
 1   A.  Yes.

 2   Q.  And HOPE management never ignored your requests for

 3   information; is that correct?

 4   A.  Correct.

 5   Q.  To the contrary, HOPE wanted to help Alloya feel

 6   comfortable with HOPE's business model.

 7   A.  Yes.

 8   Q.  And we can agree that HOPE FCU's model was somewhat

 9   untraditional?

10   A.  Yes.

11   Q.  Fair to say it was a creative business concept?

12   A.  Yes.

13   Q.  Now, you testified about several concerns that you had

14   related to HOPE FCU's ACH transactions.  You testified first

15   that you were surprised that HOPE had a low letter of credit,

16   $5,000.  Do you remember that testimony?

17   A.  Yes.

18   Q.  And in preparation for your testimony in this case, you met

19   with the government several times; is that correct?

20   A.  Correct.

21   Q.  And did you tell the government during one of the those

22   meetings that this was not unusual for a small credit union to

23   have a low letter of credit or a small letter of credit?

24   A.  Correct.

25   Q.  And that letter of credit was actually ultimately increased
```

 1  a bit to 10,000, I believe you said.

 2  A.  Yes.

 3  Q.  Okay.  You also testified that Alloya was concerned with

 4  HOPE's low capital reserves?

 5  A.  Correct.

 6  Q.  And is that related to the line of credit?

 7  A.  No, they're two different things.

 8  Q.  Okay.  So in terms of the capital reserve, you were

 9  concerned about HOPE's transaction volume?

10  A.  Correct.

11  Q.  Okay.  And the concerns really started in mid September of

12  2014.

13  A.  Yes.

14  Q.  You addressed this issue with HOPE; is that correct?

15  A.  Yes.

16  Q.  Over several calls?

17  A.  Yes.

18  Q.  Emails?

19  A.  Yes.

20  Q.  And you indicated a willingness by HOPE to actually add

21  capital to the reserves to address this concern.

22  A.  Yes.

23  Q.  And in fact, Yuri Lebedev contacted Alloya in August of

24  2014 regarding a donation that HOPE wanted to make to apply to

25  the reserves; is that right?

1    A.  I'm not aware of that.

2    Q.  In any event, you were aware that HOPE received income in

3    the form of donations; isn't that true?

4    A.  We were told that.

5    Q.  I want to ask you a couple of questions about Kapcharge.

6    Do you understand?

7    A.  Yes.

8    Q.  You knew that HOPE FCU would be processing ACH transactions

9    for Kapcharge; is that right?

10   A.  Correct.

11   Q.  And Alloya researched Capital Solutions; is that true?

12   A.  Yes.

13   Q.  And representatives from Kapcharge contacted Alloya

14   directly.

15   A.  I don't believe so.

16   Q.  I believe you testified earlier that there were

17   communications between Kapcharge and Alloya?

18   A.  Yes.  I'm sorry.  During the testing phase for file format

19   standards.

20   Q.  Okay.  And they actually called regarding training as to

21   how to upload NACHA files.

22   A.  Yes, correct.

23   Q.  Okay.  And HOPE never hid the fact that they were working

24   with Capital Solutions, did they?

25   A.  No, no.

1  Q.  You also testified that you believe that HOPE was

2  incorrectly classifying certain ACH transactions?

3  A.  Yes.

4  Q.  And that has to do with using the PPD prefix that we saw?

5  A.  Correct.

6  Q.  As opposed to the IAT prefix?

7  A.  Yes.

8  Q.  And the PPD prefix being for domestic transactions?

9  A.  Yes.

10 Q.  And the IAT being for foreign transactions.

11 A.  Correct.

12 Q.  Okay.  And the issue -- strike that.

13        Well, HOPE provided a detailed explanation, correct,

14 as to why those transactions were classified the way that they

15 were?

16 A.  Yes.

17 Q.  Okay.  And you told the jury that you didn't agree with

18 those classifications.

19 A.  Correct.

20 Q.  However, as of October 1st, 2014, you thought that HOPE's

21 explanation could be correct; is that true?

22 A.  I don't know.

23 Q.  Is there something that I could show you to refresh your

24 recollection?

25 A.  Maybe.

 1              MS. MADRIGAL:  May I approach, your Honor?

 2              THE COURT:  You may.

 3              THE WITNESS:  Okay.

 4   BY MS. MADRIGAL:

 5   Q.  Does your testimony remain the same?

 6   A.  Could you repeat the question, please?

 7   Q.  Absolutely.  As of at least October 1st, 2014, you thought

 8   that HOPE's explanation as to the classifications could be

 9   correct.

10   A.  No.

11   Q.  No.  Did you indicate that Alloya needed to seek advice

12   from NACHA --

13   A.  Yes.

14   Q.  -- as to this issue?

15   A.  Yes.

16   Q.  Okay.  So you were sure that the transactions were

17   misclassified, but you still wanted to seek advice from NACHA.

18   A.  Correct.

19   Q.  Okay.  Now, is it fair to say you didn't think that HOPE

20   understood what they were doing in regards to the actual

21   processing of ACH transactions?

22   A.  Yes, we did.

23   Q.  You believe that they didn't have adequate experience

24   processing ACH; is that true?

25   A.  Yes.

1  Q.  Were there required controls that had to be in place?

2  A.  Correct.

3  Q.  So basically, you thought that they were in over their

4  heads; is that right?

5  A.  Yes.

6  Q.  I just have a few more questions.

7  A.  Okay.

8  Q.  Alloya had a business relationship with HOPE; is that true?

9  A.  Yes.

10  Q.  And you provided a service to HOPE?

11  A.  Correct.

12  Q.  And in return, HOPE paid a fee to Alloya.

13  A.  Yes.

14  Q.  And you testified that Alloya ultimately decided to end its

15  ACH relationship with HOPE.

16  A.  Correct.

17  Q.  And that was in October of 2014?

18  A.  Yes.

19  Q.  But Alloya continued to provide other services for HOPE

20  after that time, correct?

21  A.  Yes.

22  Q.  What were those services?

23  A.  Check processing and wire transfers.

24  Q.  Do those services continue to this day?

25  A.  No.

1  Q.  Okay.  But they continued for some time.

2  A.  Yes.

3  Q.  At least a year?

4  A.  Possibly.  I don't know the date.

5  Q.  And it was a business decision on Alloya's part to stop

6  processing ACH transactions; is that right?

7  A.  Yes, it was.

8  Q.  And Alloya actually recommended that HOPE find a larger CU

9  to partner with.

10  A.  Correct.

11  Q.  And are you aware that Alloya provided names of larger

12  credit unions that might be interested in HOPE's business

13  model?

14  A.  I am not.

15  Q.  So is it fair to say that the decision to stop processing

16  ACH transactions for HOPE was based on the fact that HOPE's

17  business model was inconsistent with Alloya's business model?

18  A.  No, that's not true.

19  Q.  Okay.  Well, you testified that you recommended that Alloya

20  partner with other larger federal credit unions.

21  A.  That HOPE to partner with other credit unions?

22  Q.  Correct.

23  A.  Correct.  So not to replace what Alloya does for

24  processing, but potentially a larger credit union would have

25  sufficient capital and line of credit to be able to afford the

 1   volume of transactions that HOPE wanted to process and be able

 2   to bear the risk of processing those transactions.

 3   Q.  So HOPE's business model was just inconsistent with

 4   Alloya's business model.

 5   A.  Our concern was risk for both Alloya and the credit union.

 6   Q.  But another credit union might be willing to take that risk

 7   or have the adequate controls in place to take that risk.

 8   A.  Correct.

 9          MS. MADRIGAL:  No further questions.

10          THE COURT:  Thank you.

11          Ms. Santillo.

12          We'll have cross examination on behalf of Mr. Gross by

13   Ms. Santillo.

14          Whenever you're ready.

15   CROSS EXAMINATION

16   BY MS. SANTILLO:

17   Q.  Good afternoon, Ms. McDowell.

18   A.  Hi.

19   Q.  My name is Christine Santillo on behalf of Trevon Gross.

20   A.  Okay.

21   Q.  Alloya and HOPE had a long-standing relationship; is that

22   correct?

23   A.  Correct.

24   Q.  But it wasn't until 2014 that HOPE signed up for ACH

25   origination with Alloya.

 1   A.  Correct.

 2   Q.  This was a new business model for them.

 3   A.  Yes.

 4   Q.  So they had some questions for Alloya.

 5   A.  No.

 6   Q.  They didn't have any questions for Alloya?

 7   A.  They did -- we received their request to sign up for the

 8   service and did not have any discussions with them regarding

 9   processing ACH origination prior to receiving their setup

10   paperwork.

11   Q.  Well, in terms of getting set up --

12   A.  Right.

13   Q.  -- the system, right?

14   A.  Yes.

15   Q.  They asked how the files worked, how the batches worked.

16   A.  Right.

17   Q.  Yes.  Okay.  It was your understanding that they were still

18   doing training.

19   A.  Yes.

20   Q.  And they were working with the payment authority --

21   A.  Right.

22   Q.  -- to try to get policies and procedures in place.

23   A.  Yes.

24   Q.  And they were working towards developing a Bank Secrecy Act

25   compliance structure?

1    A.  That's what we were told.

2    Q.  But you've said, you know, that's what we were told, so

3    there's certain things about HOPE's business model that you

4    don't know.

5    A.  I'm not certain I understand the question.

6    Q.  I guess I'm just trying to address your hesitation in

7    answering questions on behalf of what HOPE knew and didn't

8    know.  So there's certain things that you don't know about HOPE

9    and how it worked.

10   A.  Right.

11   Q.  You don't know, you know, all of their assets and

12   liabilities, correct?

13   A.  No, we had visibility to that based on their 5300 call

14   report.

15   Q.  But you don't know all the details, you haven't seen their

16   books and records, correct?

17   A.  Correct.

18   Q.  But as part of your due diligence, you tried to learn a

19   little bit about their business model.

20   A.  Yes.

21   Q.  Okay.  And one of the steps you took with respect to your

22   due diligence was to speak with Trevon Gross.

23   A.  Yes.

24   Q.  And you wanted to get a sense of what his intentions were

25   for ACH processing.

1   A.  Yes.

2   Q.  And we listened to a call that reflected your conversation

3   with Mr. Gross about ACH processing.

4   A.  Yes.

5   Q.  Okay.  And he told you that the credit union served

6   primarily a low-income population; is that right?

7   A.  Correct, yes.

8   Q.  And their primary business model before they started doing

9   ACH processing was giving small loans to the low-income

10  community that they were serving.

11  A.  Yes.

12  Q.  $500 loans, $100 loans, et cetera.

13  A.  Yes.

14  Q.  And when you are giving loans to people in the amounts of

15  $100 and $500, it's hard to generate a lot of fee revenue.

16  A.  Correct.

17  Q.  And the credit union wanted to have the ability to provide

18  additional loans to this low-income community.

19  A.  Yes.

20  Q.  And they wanted to be able to provide financial services to

21  this low-income community.

22  A.  Yes.

23  Q.  Including loans and financial education.

24  A.  Yes.

25          (Continued on next page)

1    BY MS. SANTILLO:

2    Q.   So he informed you that the reason that he wanted to do ACH

3    processing was because he wanted to be able to better serve the

4    community that he was serving?

5    A.   Yes.

6    Q.   And this ACH processing is something that is common in the

7    banking industry, correct?

8    A.   Yes.

9    Q.   It's not necessarily common with respect to small credit

10   unions in terms of business processing, correct?

11   A.   Correct.

12   Q.   But it's becoming increasingly more common; is that

13   correct?

14   A.   For small credit unions?

15   Q.   Yes.  For credit unions, in general, I suppose.

16        MS. CHOI:  Objection.

17   Q.   Well, I'll get back to the specifics of your conversation

18   with Mr. Gross.

19        He specifically informed you that he thought that this

20   was a good source of revenue for credit unions to go into; is

21   that correct?

22   A.   Yes.

23   Q.   And on your call with Mr. Gross, you agreed that there may

24   be some revenue that can be captured from banks by small credit

25   unions by doing ACH processing?

H2RKLEB4                          McDowell

1    A.  Correct.

2    Q.  And the trend and things like Apple Pay makes the ACH

3    processing business a lot more lucrative?

4    A.  Yes.

5    Q.  So, as you expressed on the call, this was an interesting

6    concept in terms of trying to grow a small credit union

7    business?

8    A.  Correct.

9    Q.  And your concern was primarily just that they didn't have

10   the right policies and procedures in place?

11   A.  In addition to understanding the risks associated with the

12   processing transactions of this dollar amount.

13   Q.  Yes, understood.  So there were a couple of factors.  One

14   is that you thought that they needed to have adequate reserves;

15   is that correct?

16   A.  Correct.

17   Q.  And just taking the volume that existed with respect to the

18   credit union as of September 18th, you said that one thing that

19   might make this business model less risky would be if there

20   would be $160,000 line of credit -- or, no, I'm sorry, fixed

21   capital at Alloya with respect to -- from the HOPE Credit

22   Union; is that correct?

23   A.  Correct.

24   Q.  So you were trying to be creative, too --

25   A.  Yes.

 1   Q.   -- about how to accommodate this business?

 2   A.   Correct.

 3   Q.   And you basically came to the conclusion that one possible

 4   solution would be if HOPE Credit Union gave Alloya $160,000 and

 5   kept it at Alloya?

 6   A.   It would be their capital contribution.

 7   Q.   Yes.  But they couldn't take it back?

 8   A.   Correct.

 9   Q.   So they would have to leave $160,000 at Alloya?

10   A.   Correct.

11   Q.   And that would be -- so that would be an asset that was on

12   Alloya's books?

13   A.   In the name of HOPE Credit Union.

14   Q.   In the name of HOPE Credit Union?

15   A.   Yes.

16   Q.   Okay.  But you didn't end up doing that because that

17   $160,000 figure could only offset the risk with respect to the

18   current volume of ACH processing; is that correct?

19   A.   Correct.  Yes.

20   Q.   And HOPE Credit Union told you that they wanted to do more

21   ACH processing?

22   A.   Yes.

23   Q.   So they didn't keep that a secret from you at all?

24   A.   No.

25   Q.   They were honest about the fact that they wanted to do more

H2RKLEB4                    McDowell

1    of this business?

2    A.  Correct.

3    Q.  So whatever risk you identified, they thought that they

4    could build an adequate infrastructure, and they wanted to

5    continue to do this business?

6    A.  Yes.

7    Q.  And they had a business plan to possibly bring in more

8    businesses?

9    A.  Yes.

10   Q.  I'm going to touch on some of the things Ms. Madrigal

11   touched on a little bit, but with respect to this concept of

12   the IAT international transactions versus domestic

13   transactions --

14   A.  Yes.

15   Q.  -- Alloya did some due diligence with respect to

16   TransferWise, correct?

17   A.  Correct.

18   Q.  And one of the things that Mr. Gross informed you was that

19   there is another agent of TransferWise in the United States

20   named PreCash --

21   A.  Correct.

22   Q.  -- correct?

23             And that's a U.S.-based business?

24   A.  Correct.

25   Q.  And it's a business that is a money-transmitting business

1  in the United States, correct?

2  A.  Yes.

3  Q.  And it's registered with FinCEN?

4  A.  Yes.

5  Q.  And it's registered in numerous states; is that correct?

6  A.  Correct, yes.

7  Q.  And so you understood that it was HOPE Credit Union's

8  position that because the transactions were processed through a

9  domestic agent, that they viewed the transactions to be

10  domestic?

11  A.  That's not the interpretation in the ACH rules book.  It's

12  not who processed the transaction, it's where the receiver and

13  the originator -- where the transaction is starting from and

14  ending at.  It has nothing do with who's processing in the

15  middle.

16  Q.  I understand your interpretation of the NACHA rules.  What

17  I'm asking is, what was told to you about their understanding

18  of why these could be deemed domestic transactions?

19  A.  Correct.

20  Q.  Correct?

21          So you disagreed with that interpretation?

22  A.  Yes.

23  Q.  But you're not in a position to say whether they disagreed

24  with that?  You can't say what they thought at the time?

25          MS. CHOI:  Objection, your Honor.

1          THE COURT:  Let's refocus and rephrase the question.

2   You can go back to your original question.

3   BY MS. SANTILLO:

4   Q.  The original question was:  You were informed about what --

5   from the HOPE perspective, about why --

6          THE COURT:  Just a moment.  The original question was:

7   You understand that it was HOPE Credit Union's position that

8   because the transactions were processed through a domestic

9   agent, that they viewed the transactions to be domestic?  You

10  may answer that question.

11         THE WITNESS:  Yes.

12  BY MS. SANTILLO:

13  Q.  You had some discussion a little bit about the credit side

14  versus the debit side?

15  A.  Yes.

16  Q.  And one of the things that you noted was that the debit

17  side is a lot more risky?

18  A.  Correct.

19  Q.  So if HOPE was going to get into the debit side business,

20  you would have even greater concerns about their risk; is that

21  correct?

22  A.  Correct.

23  Q.  The vast majority of ACH transactions that were processed

24  with Alloya were credit transactions, correct?

25  A.  At that time, yes.

1    Q.   Yes.   It was never more on the debit side than the credit

2    side?

3    A.   Not at that time.

4    Q.   It was never or what?

5    A.   No, not at that time.   The debits were not larger than the

6    credits.

7    Q.   From the business ACH processing?

8    A.   Correct.

9    Q.   I'm trying to understand where you're -- why you're holding

10   back on that.

11            MS. CHOI:   Objection, your Honor.

12            THE COURT:   Do you have a question, Ms. Santillo?

13   Q.   The question is what the hesitation is about answering --

14   it was that specific time frame that you're referring to?   What

15   time frame are you referring to?

16   A.   Mid-September.

17   Q.   Mid-September?   Okay.

18            You had testified that you weren't sure one way or the

19   other about whether or not HOPE Credit Union had a history of

20   capital donations?

21   A.   Correct.

22   Q.   And one of the conclusions that you reached, in doing your

23   due diligence about this business, was that if they had a

24   history of capital donations, it's possible that that might

25   make the business make more sense and be less risky?

```
 1   A.  No, it wouldn't decrease the risk.

 2   Q.  I can show you a document, if it may refresh your

 3   recollection, about what your view of the possibility of

 4   donations being at the time.

 5           MS. CHOI:  Objection, your Honor.

 6           THE COURT:  Sustained.

 7   Q.  You were informed by the HOPE Credit Union that their

 8   credit union is nontraditional and often receives income in the

 9   form of donations; is that correct?

10   A.  Correct, yes.

11   Q.  And at the time, you concluded that sufficient donations of

12   capital and assets may make the business more reasonable?

13   A.  Correct, yes.

14   Q.  And you continued to do business with HOPE for many months

15   after you stopped processing ACH transactions?

16   A.  Correct, yes.

17   Q.  And they remained a member of your credit union?

18   A.  Yes, correct.

19   Q.  So you continued to get fees from them?

20   A.  Yes.

21   Q.  When you were -- in speaking with Mr. Gross, in particular,

22   about the plans for the credit union, he was open and honest

23   with you about what he was trying to do in terms of growing the

24   ACH business?

25   A.  Yes, correct.
```

1          MS. SANTILLO:  Thank you very much.

2          THE COURT:  All right.

3          Ms. Choi, redirect?

4          MS. CHOI:  Yes, your Honor, briefly.

5          THE COURT:  When you're ready.

6     REDIRECT EXAMINATION

7     BY MS. CHOI:

8     Q.  Ms. McDowell, you recall that on cross-examination, both

9     Ms. Madrigal and Ms. Santillo asked you some questions about

10    fee income that can be generated from ACH origination, correct?

11    A.  Yes.

12    Q.  And do you understand the difference between revenue and

13    net income?

14    A.  Yes.

15    Q.  We went into a little bit of this in direct, but you

16    explained, I believe, that there are multiple different types

17    of services that Alloya provides to its member credit unions,

18    correct?

19    A.  Yes.

20    Q.  Generally speaking, settlement services?

21    A.  Correct.

22    Q.  And that there are certain costs that are associated to

23    Alloya to provide those settlement services?

24    A.  Correct, yes.

25    Q.  Does Alloya make money or lose money on settlement

 1    services?

 2    A.   We basically break even.

 3    Q.   Break even?  So --

 4            MS. SANTILLO:  Objection; relevance.

 5            THE COURT:  Overruled.  Opened the door.

 6    BY MS. CHOI:

 7    Q.   So from a net income perspective, you don't actually make

 8    money on your ACH originations, correct?

 9    A.   Correct.

10    Q.   So, then, why would you allow for settlement services for

11    your credit unions?

12    A.   So our business model is to provide services to credit

13    unions at the lowest cost possible.  So, by aggregating the

14    volume of all the credit unions that process through us, we're

15    able to lower the fees, so that all credit unions can enjoy

16    that fee savings.

17    Q.   Now, if you recall, Ms. Santillo asked you a series of

18    questions regarding statements that Trevon Gross made to you

19    and other members of Alloya about his intention with regard to

20    ACH processing.  Do you recall those questions?

21    A.   Yes, yes.

22    Q.   And she went through a series of statements that Mr. Gross

23    had made to you, including some that were on that

24    September 18th, 2014 call?

25    A.   Yes.

1   Q.   Now, with regard to those intentions about this type of

2   business and growing this new type of business, at the time,

3   did Alloya have member credit unions that were comparably

4   small, as small as HOPE FCU?

5   A.   We didn't.

6   Q.   Could you describe the types of income, the ways in which

7   they generated net income to their credit union?

8            MS. SANTILLO:  Objection.

9            THE COURT:  Just a moment.

10           Sustained.

11  Q.   Do you recall that Ms. Santillo had discussed how at the

12  time HOPE was generating income through loans, correct?

13  A.   Correct.

14  Q.   In your opinion -- from your experience at Alloya and

15  looking at member credit unions, is that the type of way that

16  most small credit unions grow?

17  A.   Yes.

18  Q.   Now, during these conversations with Mr. Gross, did

19  Mr. Gross ever describe to you the specific nature of his

20  business relationship with Kapcharge?

21  A.   Just that they were processing -- allowing Kapcharge to

22  originate transactions through their credit union.

23  Q.   Did Mr. Gross ever disclose to you that Kapcharge had paid

24  him and his church 150 --

25           MS. SANTILLO:  Objection.

```
1            THE COURT:  Grounds?

2            MS. SANTILLO:  She's characterizing the payment.

3            THE COURT:  Overruled.

4    BY MS. CHOI:

5    Q.  Did Mr. Gross ever disclose to you that Kapcharge had paid

6    to Mr. Gross and Mr. Gross' church $150,000 prior to starting

7    the ACH origination?

8            MS. SANTILLO:  Objection; misstates the evidence.

9            THE COURT:  I'll sustain as leading.

10   Q.  Did there ever come a time where Mr. Gross disclosed any

11   payments that Kapcharge had made to Mr. Gross or Mr. Gross'

12   church?

13   A.  No.

14   Q.  Did there ever come a point in time where Mr. Gross

15   disclosed to you where these potential capital donations would

16   be coming from?

17   A.  No.

18   Q.  Did Mr. Gross ever disclose to you that it would be a

19   third-party payment provider that would be providing those

20   capital donations?

21   A.  No.

22   Q.  Did Mr. Gross ever describe to you or disclose to you that

23   their intention was to have Kapcharge pay for those donations?

24   A.  No.

25           MS. CHOI:  No further questions.
```

```
 1              THE COURT:  Ms. Madrigal?

 2              MS. MADRIGAL:  Yes, briefly, your Honor.

 3              THE COURT:  Go ahead.

 4  CROSS-EXAMINATION

 5  BY MS. MADRIGAL:

 6  Q.  You testified that ACH is not a large source of revenue for

 7  Alloya; is that correct?

 8  A.  Correct.

 9  Q.  You also testified earlier that --

10              THE COURT:  Closer to the mic, please.

11  Q.  You also testified earlier that HOPE had a creative

12  business model with processing these ACH transactions?

13  A.  Yes.

14  Q.  And do you remember on the call we heard earlier, between

15  yourself, Trevon Gross, Neil Kumar, Kathy Feringa and Sandy

16  Albertson, that this topic was actually discussed?

17  A.  Yes.

18  Q.  Do you remember saying the following:  "No, I agree.  I

19  think it's for the longest time and still, you know, credit

20  unions shy away from ACH, and if they do it, it's just

21  in-house, it's for their loans or for their collections, that

22  kind of thing.  So I do agree with you that ACH is an

23  opportunity for the credit unions to tap into, that fee income

24  stream that the banks have, you know, been basking in for so

25  long"?
```

 1              Do you remember that testimony?

 2   A.   I do.

 3              MS. MADRIGAL:  No further questions.

 4              THE COURT:  Thank you.

 5              Ms. Santillo?

 6              MS. SANTILLO:  No further questions.

 7              THE COURT:  All right.

 8              Nothing further, Ms. Choi?

 9              MS. CHOI:  No.  Thank you, your Honor.

10              THE COURT:  Thank you.

11              Ms. McDowell, you may step town.  You are excused.

12              (Witness excused)

13              THE COURT:  It's 12:46, so we'll break for lunch here.

14              Ladies and gentlemen of the jury, we will resume in an

15   hour's time, so please be ready to go at 1:46.  Enjoy your

16   lunch.  Thank you.

17              (Continued on next page)

18

19

20

21

22

23

24

25

```
 1                    (Jury not present)

 2              THE COURT:  Matters to take up at this point, counsel,

 3    or upon return from lunch?

 4              MS. CHOI:  Well -- you want to go first?

 5              MR. CREIZMAN:  No.

 6              MS. CHOI:  Okay.

 7         I think we're going to try to work out the next series

 8    of documents to admit.  There may be an issue with regard to an

 9    objection we have of a document that Ms. Santillo would like to

10    introduce for purposes of completeness.  So we can take that up

11    after the lunch break once we confer.

12         I didn't know if your Honor cared to see the call

13    report over lunch, just to sort of understand the lines.  We're

14    happy to provide a copy to you, if that would help you.

15              THE COURT:  Sure.  And this is what document?

16              MS. CHOI:  Government Exhibit 6103, which is the third

17    quarter call report for 2014.

18         Just for clarity of the record, I have flagged certain

19    portions of that.  I can take the flags off, but those are the

20    direct portions that we intend to elicit testimony about.

21              THE COURT:  All right.  I'm happy to take them with

22    the flags.  You provided the same -- are you providing the same

23    flags to opposing counsel?

24              MS. CHOI:  No, your Honor, but it's the same portions

25    that we had discussed on the record previously.  If I can walk
```

 1    them through it, that might be easiest because I just have that

 2    one copy.

 3           THE COURT:  All right.  Just flag it for them after we

 4    break.

 5           MS. CHOI:  Okay.  Great.

 6           THE COURT:  I'll look at that.  Okay.

 7           MS. SANTILLO:  Your Honor, as you're perusing the call

 8    report, I would note that there is another corporate credit

 9    union that is involved in this case from HOPE's perspective,

10    which is the Harmony Credit Union.  So that number that they're

11    trying to tie to Alloya's statements about the cash that's in

12    the bank is actually a composite number.

13           MS. CHOI:  Your Honor, just on clarity of that --

14           THE COURT:  Ms. Santillo, were you finishing your

15    thought?

16           MS. SANTILLO:  I'm sorry, I just wanted to say, it's a

17    bank that they had assets in.

18           THE COURT:  So start over because now I'm confused.

19    I'm trying my best, so you try your best.

20           MS. SANTILLO:  I'm sorry.  I lost where the place on

21    the call report was.  So I'm -- that may be an irrelevant

22    number.  We'll address it when we get back.

23           THE COURT:  Okay.

24           MS. CHOI:  Your Honor, just to be clear, I think

25    Ms. Santillo clarified that it was Harmony Bank, not a credit

1    union.  If you look at line 2 on page 4, there are carve-outs

2    where it specifically says for line 2(a) -- sorry, page 4 is

3    page 4 of the document, not page 4 -- as if it was a PDF, not

4    page 4 as marked.  I'm sorry about that.  So I think it might

5    be the first flag.  It's probably a lesser number.  It's marked

6    on the page.

7          But line 2 specifies a distinction between cash held

8    at the corporate credit union and cash held at other financial

9    institutions, such as banks.  Our understanding is there

10   weren't other corporate credit unions that HOPE was affiliated

11   with at the time.  They were affiliated with Harmony Bank, so

12   that income amount, that cash amount, would be reflected in a

13   separate subportion of item 2.

14          THE COURT:  Is that 2(b)?

15          MS. CHOI:  Your Honor, I don't have it in front of me,

16   but I think that's right.  2(a), I think, says very clearly

17   corporate credit unions.  2(b), I think, is cash on hand and

18   other financial institutions, including banks.

19          THE COURT:  Okay.  Anything else you want to flag for

20   me, Ms. Santillo, as I'm perusing this?

21          MS. SANTILLO:  Not at this moment.

22          THE COURT:  All right.  Anything else, counsel?

23          MS. CHOI:  No.  Thank you, your Honor.

24          THE COURT:  So we'll come back in 40 minutes.  It's

25   12:50 now.  See you then.  (Luncheon recess)

1        AFTERNOON SESSION

2            1:35 PM

3        (In open court; jury not present)

4        THE COURT:  Where are we with the issue we left off

5    on?  Have you discussed it further?

6        MS. CHOI:  Actually, we haven't.  I don't know if

7    there is anything else to discuss.

8        MS. SANTILLO:  I think we remain in disagreement.

9        THE COURT:  All right.

10        I think I need to hear it in the flow of trial, and

11    you can make your contemporaneous objection, depending on what

12    factual predicates are laid and what exactly the witness

13    testifies to.  I think where I see a flag is, to the extent

14    that this witness is being used to testify about things beyond

15    his own personal experience -- so that includes information

16    about facts of HOPE FCU's books that he didn't have access

17    to -- and/or sort of accounting principles as to what ought to

18    have been put in the line, those are the areas where I'm

19    concerned.  It's not adding numbers, that's the problem.  It's

20    to the extent he's being asked, essentially, accounting

21    information that requires accounting principles and information

22    about HOPE FCU's books that was not part of what he did with

23    Alloya, I have concerns.

24        MS. CHOI:  Sure.  And that makes perfect sense, your

25    Honor.  I think that the line is pretty clear, and I can

1    explain that to you, so you have a sense of how the testimony

2    is going to go.

3            He can testify generally about Alloya's reliance on

4    5300 Call Report data as giving an accurate description of the

5    financials of the credit union at any given point in time.  We

6    are going to pull up the Alloya statement of HOPE's cash on

7    hand in each of its accounts for September 30th, which he can

8    testify to as being accurate about how much cash HOPE has on

9    hand at Alloya, a corporate credit union.  I'm not going to

10   elicit the fact, but he's not going to testify about the inner

11   workings of how HOPE divides that cash amongst its various

12   members or what he does with it, et cetera.  That's besides the

13   point.  But he will say, and I think this is fair, that it's

14   his understanding that when he's looking at a 5300 Call Report

15   that says how much cash is on hand at a corporate credit union,

16   that that should accord with the amount that Alloya knows its

17   members have on hand at Alloya, because that is cash that the

18   member has at the corporate credit union.

19           Now, the math part, I think, is less of an issue, but

20   I think that's the extent of what he can say and what we're

21   going to elicit from him with regard to financial data and the

22   financials as of September 30th, 2014.  I think there is ample

23   reason to assume that he has both personal knowledge of what's

24   in those statements.  He's reviewed them, he's the one who

25   prepared the subpoena return, for instance, and he understands

1    how Alloya's statements work.  So that's all we're going to get

2    from him with regard to the accounting issues, generally just

3    how much cash does Alloya know HOPE had on hand at Alloya as of

4    September 30th, 2014.

5              The next step --

6              THE COURT:  That step seems fine to me.

7              MS. CHOI:  Okay.

8              The next step is just going to the actual call report,

9    and we don't have to do the math, if your Honor has a problem

10   with it, but just his understanding from having reviewed

11   financial data from 5300 Call Reports, that finds -- it says

12   page 1 at the bottom right-hand corner, but it's the fourth

13   page of the actual exhibit.  That 2(a), where it says "Cash on

14   deposit in corporate credit union," that should include the

15   cash on deposit at all corporate credit unions, including

16   Alloya.

17             To be clear, I understand defense counsel's concern

18   with regard to, well, no one really knows what's going on in

19   the other banks or other credit unions.  What we do know is

20   there were no other corporate credit unions -- not that he

21   would know that fact -- but we know that there were no other

22   corporate credit unions at which HOPE had an account at that

23   time.  There was a bank, Harmony Bank, and, of course, as it

24   shows right here, the balance -- well, assuming that this was

25   relatively accurate, our understanding is also that the balance

1    at Harmony Bank was quite low.  In fact, once ACH transactions

2    were shut off at Alloya, HOPE made many maneuvers, including

3    trying to move some of those funds through Harmony Bank, but in

4    any event, that's a separate line, that's line 2(b).  It's a

5    different question of whether or not cash on deposit at

6    corporate credit union was an accurate one.  Certainly, I'm not

7    going to ask him this question, but I think it's, in fact,

8    true, that there is no way that they had a negative $3 million

9    balance at some other corporate credit union that would justify

10   the $432,000 amount there.

11        Now, there are all sorts of other lines there, with

12   regard to assets and liabilities.  We're not going to get into

13   any of that.  It's just that one question, about whether or not

14   that's what his understanding is, that the Alloya balance

15   should be reflected in the call report.

16        THE COURT:  This doesn't answer the question, but why

17   wouldn't the next step with the call report, why wouldn't that

18   be done more appropriately with the NCUA witness?

19        MS. CHOI:  We could, but I think there's one point to

20   be made here, which is that, as a matter of course, just for

21   your Honor's own edification, Alloya doesn't send its

22   statements to the NCUA for each of its member unions, credit

23   unions; it relies on the member credit unions sending that

24   data.  So, our point is, we can do the rest of the math with an

25   NCUA individual or someone else, I can do it in closing,

1    whatever that might be, but this witness still has an

2    understanding about that one entry, as it reflects HOPE's true

3    cash on hand at Alloya.  And that fact is not readily available

4    to the NCUA.  The NCUA has to ask the credit union to pull it

5    or has to ask Alloya to pull it, but it's not something that is

6    available in the systems that NCUA looks at over the course of

7    its normal examination.

8            So I think that's the point that needs to be made.

9    There is a fact here that the NCUA could not have

10   instantaneously have acknowledged right at that time that he

11   understood to be the case, because he could see -- he has that

12   transparency into HOPE's cash at Alloya.  But that's not a fact

13   that in the normal course gets disclosed.  They don't send

14   these statements to the NCUA.  It's only if the NCUA figures

15   out there's an issue, and calls them and --

16           THE COURT:  No, I get the testimony around Alloya's

17   understanding of HOPE's cash on hand at that time.  Then you

18   want to show him a form submitted to the NCUA and have him say

19   this number should have reflected what Alloya understood to be

20   the cash on hand, and it doesn't?

21           MS. CHOI:  Correct.

22           THE COURT:  So I think the question is whether there

23   is specialized knowledge that he's drawing on to go from the,

24   here's what we understood, and then setting aside what we did

25   here with respect to HOPE, here is what was submitted to the

H2RKLEB4

 1  NCUA, here's what's required to be submitted to the NCUA, and

 2  here is what's wrong with what was submitted to the NCUA.

 3          MS. CHOI:  I understand, your Honor.

 4          THE COURT:  For example, the language from Bank of

 5  China I have in mind is:  "To the extent Huang's testimony was

 6  not a product of his investigation, but rather reflected

 7  specialized knowledge he has because of his extensive

 8  experience in international banking, its admission pursuant to

 9  Rule 701 was error."  It was reversible error.

10          MS. CHOI:  Understood, your Honor.

11          THE COURT:  "Thus, Huang's explanations regarding

12  typical international banking transactions or definitions of

13  banking terms and any conclusions that he made that were not a

14  result of his investigation were improperly admitted."

15          MS. CHOI:  I understand that distinction, your Honor.

16  I still think that because call report data is quarterly and

17  it's standardized, and he has reviewed call report data over

18  the course of his work at Alloya, it falls on the other side of

19  the Bank of China line for him to just simply say, I understand

20  that in the call report, they have an entry that requires you

21  to say cash on hand at a corporate credit union, and what a

22  member credit union should be doing is simply going to their

23  corporate credit union's statements and putting in numbers that

24  appear there.  That's all he would say.  I think that squarely

25  is on the other side of the Bank of China rule because this is

1    about his work at Alloya, what Alloya understands the 5300 Call

2    Report data to reflect, and Ms. McDowell alluded to this, but

3    this is data that Alloya relies upon in assessing what their

4    member credit union's business profile is, their financial

5    condition, and so members at Alloya understand there is a line

6    in there that just asks the simple question of what is the cash

7    on hand.

8            I think if we just limit it to that, and I don't go

9    through the third quarter call report with your Honor, simply

10   lay the foundation with regard to Alloya's knowledge of how the

11   call reports generally work in their course of business, and

12   also that there is specific language the witness will say he

13   understands, that is just cash on hand at a corporate credit

14   union, how would a member of a credit union ask such a

15   question, how would a member of a credit union of Alloya come

16   up with that at quarter-end, and he would say they would go to

17   Alloya's financial statement, the statement they got from

18   Alloya, and just add up the cash.

19           THE COURT:  So we at least have moved to the other

20   side of the line where we won't go where I think there's

21   agreement.  What I'll have to see, depending on the factual

22   foundation and predicates that are laid, is whether the sort of

23   last one or two questions that you suggested, if there is a

24   contemporaneous objection made, are permissible.

25           I'll see in the flow, and I'll see based on what

1    predicate gets laid.

2            MS. CHOI:  Understood.  So I understand what we're

3    talking about, the last two questions, you mean the last two

4    questions if I were to --

5            THE COURT:  You asked what belongs to be entered,

6    right?  So at least that question.

7            MS. CHOI:  Okay.

8            THE COURT:  I have no idea -- look, I pay someone to

9    do my taxes because I have trouble figuring out what goes in

10   those particular lines.  Now --

11           MS. CHOI:  As do I, your Honor.  But I think that the

12   difference here is --

13           THE COURT:  The difference is what foundation is

14   laid --

15           MS. CHOI:  Right.

16           THE COURT:  -- what factual predicates are laid, and

17   whether or not specialized and technical knowledge is what will

18   be relied upon by the jury in following this witness through or

19   whether it is percipient fact-based personal knowledge based

20   information that's being offered with appropriate foundation.

21           MS. CHOI:  Understood, your Honor.  And we'll be

22   mindful of that distinction.

23           THE COURT:  Go ahead, Ms. Santillo.

24           MS. SANTILLO:  I want to go back to this number that

25   he is going to read into the record, I guess, of being this

1890

1    $3 million cash on hand as of September 30th, 2014, because --

2            THE COURT:  No, I understand that will be not based on

3    the call report, but based on information that he had through

4    his work at Alloya.

5            MS. SANTILLO:  Yes.  But I just want to raise an

6    issue, which is that:  Their own witness just testified,

7    Ms. McDowell, that they do not have -- sometimes it takes one

8    to two days for transactions to settle, and so there are

9    outstanding liabilities that are not taken against that

10   snapshot as of the end of September, and the idea that this is

11   some kind of definitive number that --

12           THE COURT:  Well, that's a cross point or a defense

13   point to be made.  You did draw out from the witness, McDowell,

14   as you just said, that -- you drew out that it takes one to two

15   days for transactions to settle, so there are outstanding

16   liabilities, right?  That's the point you had made on cross.

17           MS. SANTILLO:  Yes.

18           THE COURT:  So you can certainly cross-examine -- you

19   did cross-examine McDowell on that point.  To the extent that

20   Kumar is making a point about the $3 million that you think

21   fails to account for certain factual information, you can cross

22   him on that, and you can put affirmative defense evidence in

23   that complicates that number.  But I don't see the factual

24   arguments that you're making as a basis to exclude it.  I'm not

25   seeing it.

1      MS. SANTILLO:  I think that that just demonstrates the

2  sort of added layer of specialized knowledge that gets baked

3  into that number in terms of accounting and whether or not

4  that's an appropriate way to reach what needs to go into the

5  call report.

6      THE COURT:  Well, as I said, I'm not sure about what

7  I'll allow with respect to the call report, but certainly the

8  Alloya witness can testify, based on his personal knowledge,

9  with supported documents presumably, what he understood HOPE's

10  cash on hand, or whatever the terminology is, to be at that

11  time, which was the basis for part of the analysis that went

12  into Alloya's decision to stop allowing the volume of ACH

13  transactions.  What I hear you now articulating, with respect

14  to just Alloya's side of the testimony, to be cross points and

15  defense points.

16      MS. SANTILLO:  Okay.  Well, I'm going to maintain the

17  line that --

18      THE COURT:  And I invite you to make the

19  contemporaneous objection.  What this has allowed me to do is

20  to hear you on this point.  When you think the line has been

21  crossed, you make your objection, and I will rule.

22      MS. SANTILLO:  And I also will just note that I know

23  you've already made your decision on this notice issue, but I

24  also feel like I would have a very different cross if I had

25  been on notice of this witness and could have consulted with an

1    accountant before I could conduct this cross, because this was

2    never on our radar of what the material misrepresentation was

3    that was alleged in this case.

4         THE COURT:  The government's response to that has been

5    the 725 document.  When did you receive that?

6         MS. SANTILLO:  We received it as part of --

7         MS. CHOI:  Seven weeks ago, your Honor.

8         MS. SANTILLO:  That little number that is totally out

9    of context, and is dated 10/18/16, and is not tied to anything

10   about the NCUA report?

11        THE COURT:  I think we're back to just whether during

12   this phone call -- we have all our jurors.  This is kind of a

13   level of generality question, I think.  The government has

14   represented at this call that they said that

15   misrepresentations, as a category, include net worth ratio.  Do

16   I have that right?

17        MS. CHOI:  Yes, your Honor.

18        THE COURT:  And that this is a component of

19   understanding that?

20        MS. SANTILLO:  Well, as I understood it, that was --

21   maybe I haven't been clear about what the -- there was a phone

22   call between me and the government, and there was also a phone

23   call --

24        THE COURT:  No, I meant the phone call between you and

25   the government --

1        MS. SANTILLO:  Yes.

2        THE COURT:  -- to put you on notice.

3        MS. SANTILLO:  But what I am saying is, I understood

4  them to be referring to specific phone calls and emails between

5  a phone call with Mark Francis and a couple of other people.

6  Like they pointed to specific evidence about what the

7  misrepresentation was, not to some sleuthing by Alloya about

8  some hidden number, you know, on a spreadsheet that they

9  created after the indictment in this case.  That was not my

10  understanding about what the alleged material misrepresentation

11  was.

12        MS. CHOI:  Your Honor, if I could.  In order to

13  establish that there was manipulation in the net worth ratio,

14  we have to establish what the net worth ratio should have been.

15  They had, for seven to eight weeks, all of the Alloya financial

16  statements that establish what the financial -- at least what

17  the cash on hand would have been.  Government Exhibit 725

18  highlights in yellow writing that there was a discrepancy in

19  the September 30th, 2014 financials, which placed them on

20  notice of this argument, and we also disclosed it with regard

21  to Mr. Kumar's 3500.  So I don't really --

22        THE COURT:  When did they get that one?

23        MS. CHOI:  We decided to try to elicit this testimony

24  over this weekend, so they got it this weekend.  Before we knew

25  that that was in the statements, and we were going to go

1    through the statements with him, but what I didn't know was

2    whether or not we were going to use this lovely calculator,

3    which I pulled, to try to go through the math with him, and so

4    that's when we made clear that this is what we were going to do

5    or attempt to do with the call report, but the statements about

6    the actual cash on hand as of September 30th, 2014, was in

7    their possession seven weeks ago, eight weeks ago.  And I think

8    it's hard to say that if the government has disclosed they're

9    going to put on evidence of manipulation of the net worth

10   ratio, that the other evidence that's been apparent to the

11   defense since we disclosed the Alloya stuff before we even

12   marked exhibits wouldn't obviously be used in order to prove

13   that what they were doing was, in fact, manipulation.  You have

14   to show what it should have been.

15           THE COURT:  All right.  Given the representation of

16   what was discussed in the phone call, the disclosure of the

17   Government Exhibit 725, the 3500 material with respect to

18   Mr. Kumar over the weekend -- and where I'm drawing the line

19   with respect to Mr. Kumar's testimony, as well as my express

20   agreement with Mr. Gross' counsel that they could call an

21   accountant if they want to -- the government has been more

22   forthcoming than I often am able to get the government to be

23   with respect to their case in advance, and I think the pieces

24   we're here to understand, certainly the general contention, and

25   that's enough.  So we've fleshed it out substantially.  If

1    there are arguments to be made, they remain available to the

2    defense to make either through cross-examination or other

3    evidence.

4            I think the only other additional layer of protection

5    I can put in is that if the defense comes back and makes some

6    proffer as to something that they would have done had they been

7    given substantially earlier notice, they talked to an

8    accountant, and they want to re-call Mr. Kumar for further

9    cross, I would allow it.

10            MS. SANTILLO:  Thank you, your Honor.

11            MS. CHOI:  I think there's only one other issue for

12    your Honor to deal with, which is there is a government exhibit

13    that we had previously proposed to your Honor that you said no

14    dice because it was --

15            THE COURT:  I said that?

16            MS. CHOI:  No, I'm just putting words in your mouth.

17    I'm sorry, I'm a little tired.  It's hard to put things

18    together in my own mind.

19            THE COURT:  I may have said that.

20            MS. CHOI:  Well, I interpreted your Honor to say no

21    dice.  1447-A, which, if your Honor recalls, is the Magic

22    Wrighter letter that your Honor had determined -- right, no,

23    no, we've got a solution.  We're going to redact.  We've come

24    up with defense counsel with a way to redact all of the

25    portions that deal with his expertise, to just relay that in

1    fact that they were going to cease ACH transmissions on behalf

2    of HOPE FCU.

3           So defense counsel agrees to the redaction.  I think

4    the only question is, defense counsel also wants to put up

5    another email, which I think Ms. Santillo may have a copy of,

6    which is forwarding up the chain where Mr. Murgio sends this

7    Magic Wrighter termination of services notice to Mr. Francis,

8    who responds and says, this is not an international ACH, but,

9    you know, let's get on the line, which we don't think -- they

10   claim is necessary for purposes of completeness.  We don't

11   think it really is, your Honor, just because it's not

12   Mr. Gross' statements.  Mr. Gross isn't on this chain.  This is

13   really about Mr. Francis trying to get back to keeping the

14   spigot open, as it were.  So we don't think that it's necessary

15   for purposes of completeness.  If the defense -- it's hearsay

16   as to -- right, it's a hearsay statement that the defendants

17   would like to introduce, and it doesn't go to the defendant's

18   state of mind because he's not on the chain.  Obviously, if

19   they want to introduce it in their defense case, that's

20   perfectly fine, so long as we can preserve our hearsay

21   objections, but I don't think it's necessary for purposes of

22   completeness.

23          THE COURT:  Can I see it?

24          MS. CHOI:  Yes.  I can show you our exhibit, your

25   Honor.  I don't have a copy of what defense wants to put up.

 MS. SANTILLO: It's Government's 1447-B.

MS. CHOI: We didn't mark that. It's not on the exhibit list. I don't even have a copy of it.

THE COURT: Is it on the electronic one?

MS. CHOI: It's not, your Honor.

MS. SANTILLO: I can pull it up and perhaps send it to Mr. Creizman's iPad.

THE COURT: Do you have a paper copy, Ms. Santillo?

MS. SANTILLO: I don't. I don't.

THE COURT: Is this for this segment before the mid-afternoon break? Just because we have our jury here.

MS. CHOI: Well, let's see. What time is it? When is the mid-afternoon break, your Honor?

THE COURT: It's usually around 3:00, 3:15.

MS. CHOI: I think we could probably -- as long as it's -- you'll have it after Mr. Kumar's testimony, so I think we can reserve until then.

THE COURT: All right, Ms. Santillo?

MS. SANTILLO: I'll pull it up.

THE COURT: You'll pull it up. Let's get the jury in the meantime. We'll call our next witness once the jury is in, right? We finished the witness, you're going to call Mr. Kumar?

MS. CHOI: Yes, your Honor. Sorry.

(Continued on next page)

1            (Jury present)

 2            THE COURT:  Everyone may be seated.

 3            All right.  Members of the jury, I hope you had a

 4   lovely lunch.  We will continue with the government's case.

 5            Ms. Choi, you may call your next witness.

 6            MS. CHOI:  Thank you.  The government calls Neil Kumar

 7   to the stand.

 8            THE COURT:  Mr. Kumar may come forward.

 9            Mr. Kumar, you may come forward.

10    NEIL KUMAR,

11        called as a witness by the Government,

12        having been duly sworn, testified as follows:

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

 1              THE COURT:  You may proceed.

 2              MS. CHOI:  Thank you, your Honor.

 3   NEIL KUMAR,

 4        called as a witness by the Government,

 5        having been duly sworn, testified as follows:

 6   DIRECT EXAMINATION

 7   BY MS. CHOI:

 8   Q.  Good afternoon.

 9   A.  Hi.

10   Q.  Where do you work?

11   A.  I work for Alloya Corporate Federal Credit Union.

12   Q.  And what is your present title?

13   A.  Systems vice president of compliance.

14   Q.  I'm sorry.  I'm having a little difficulty hearing you.  Is

15   there any way you can make sure -- you've got a cold.  Is there

16   any way you could pull the mic closer to your mouth when you

17   talk?

18   A.  Sure.

19   Q.  Thank you so much.

20              Could you describe what "compliance" means?

21   A.  Basically, it's complying with the laws and regulations of

22   the United States and the various states.

23   Q.  Specifically, are there certain types of laws of compliance

24   that Alloya focus on?

25   A.  My group specifically focuses on the Bank Secrecy Act, anti

1  money laundering laws, global sanctions, which would be the

2  Office of Foreign Assets Control regulations, and business

3  continuity.

4  Q.  How long have you worked at Alloya?

5  A.  Over ten years.

6  Q.  Have you had the same job or different jobs over time?

7  A.  Pretty much the same job.

8  Q.  Could you describe what you did prior to being at Alloya?

9  A.  Prior to Alloya I was with a bank for eight years.  The

10  last two to three years of that position -- the position I was

11  in was a general auditor and BSA compliance officer.

12  Q.  So you mentioned that one of the laws that your group

13  focuses on is the Bank Secrecy Act.  Could you describe

14  generally what the Bank Secrecy Act is?

15  A.  Sure.  They're the rules that financial institutions

16  basically have to follow to report certain financial

17  transactions to combat financial crimes.

18  Q.  Do you know the types of financial crimes specifically that

19  BSA -- that the Bank Secrecy Act --

20  A.  Money laundering.

21  Q.  Okay.  I think you answered the question before I finished,

22  but that's totally fine.

23       THE COURT:  Actually, going forward, please wait for

24  the question to be finished and then answer.  Thank you.

25  Q.  So with regard to the Bank Secrecy Act, is it also known by

1   an acronym?

2   A.   BSA.

3   Q.   And could you give some examples of the types of

4   requirements it imposes on financial institutions such as

5   Alloya?

6           MS. SANTILLO:  Objection.

7           THE COURT:  Sustained.

8   Q.   Can you describe how Alloya deals with its Bank Secrecy Act

9   obligations?

10  A.   We basically conduct a risk assessment to determine which

11  products we need to focus on to determine activity that needs

12  to be monitored on a regular basis to determine if there may be

13  something reportable to the government.

14  Q.   Okay.  And with regard to the risk assessments that you

15  make, how do you come up with a risk assessment for a given

16  member credit union?

17  A.   Well, the risk assessment is for the entire membership.

18  It's basically an analysis of where they're located at, the

19  settlement activity, what products they use, and some other

20  factors, for instance if they provide services to higher risk

21  businesses.

22  Q.   As part of the risk assessment that you undergo at Alloya,

23  what comparisons, if any, do you make with regard to any

24  particular member credit union's activities?

25  A.   We will, at times, compare credit unions of similar size to

1    see if someone basically deviates from the norm, from what

2    other of their peers are doing.  It'll alert us to, you know,

3    basically look at that activity.

4    Q.  Are you familiar with the term "anti money laundering"?

5    A.  Yes.

6    Q.  And are you familiar with whether or not there are any anti

7    money laundering rules as it relates to the BSA?

8    A.  Yes.

9    Q.  Could you describe generally, from Alloya's standpoint,

10   what those rules are?

11   A.  Basically, money laundering is the process of trying to

12   disguise funds from illegal activity and trying to make it look

13   legitimate.  Anti money laundering is the process of --

14            MS. SANTILLO:  Objection.

15            THE COURT:  Sustained.

16   Q.  Does Alloya have specific obligations as it relates to anti

17   money laundering policies?

18   A.  Yes.

19   Q.  And could you describe what Alloya's requirements are with

20   regard to anti money laundering policies?

21   A.  We're required to monitor and report activity to the

22   Financial Crimes Enforcement Network.

23   Q.  Okay.  And similarly, for that activity, does that include

24   activity that relates to member credit unions of Alloya?

25   A.  Yes.

1    Q.  And what happens if Alloya fails to meet its reporting

2    obligations under the BSA?

3    A.  Basically, our federal regulator, there is a potential for

4    fines and other actions.

5    Q.  Are you familiar with the Office of Foreign Assets Control?

6    A.  Yes.

7    Q.  Does it go by an acronym?

8    A.  OFAC.

9    Q.  As it relates to Alloya, what is your understanding of what

10   OFAC is?

11   A.  OFAC is basically the sanctions programs used to -- well,

12   it's basically the sanctions against groups of people or

13   entities to deter terrorism, narcotics trafficking, and arms

14   dealing, and things of that nature.

15   Q.  Are you familiar with the term "an OFAC list"?

16   A.  Yes.

17   Q.  And what, if anything -- how do OFAC lists relate to what

18   Alloya does in its day-in/day-out activities?

19   A.  Basically, the OFAC lists are the individuals and entities

20   that have been identified by the government that we should or

21   should -- we may not be able to process transactions for.  So

22   we screen payments against the OFAC list to determine whether

23   it may possibly involve one of those parties.

24   Q.  Are you aware of, in your capacity as compliance officer at

25   Alloya, are you aware of what obligations OFAC imposes upon

1   ODFIs that use Alloya's services?

2               MS. SANTILLO:  Objection.

3               MS. CHOI:  Your Honor, I might have another way to go

4   about this.

5               THE COURT:  Withdrawn.  Go ahead.

6               MS. CHOI:  Government's Exhibit 701-A, which is in

7   evidence, if you could highlight the first several paragraphs

8   of this item?

9   BY MS. CHOI:

10  Q.  Mr. Kumar, are you familiar with this document?

11  A.  Yes.

12  Q.  What is it?

13  A.  It's one of the contracts that are between Alloya and a

14  member credit union for ACH services.

15  Q.  Is this a general contract that Alloya uses for all of its

16  member credit unions, or just in particular for HOPE?

17  A.  It's a standard contract.

18  Q.  Okay.  Could you read the third paragraph down, which

19  starts with, "Whereas credit union wishes to initiate?"  Do you

20  see that?

21  A.  Yes.  "Whereas credit union wishes to initiate credit

22  and/or debit entries pursuant to the terms of this contract and

23  credit union is willing to act as an originating depository

24  financial institution with respect to such entries, including

25  the sanctions laws administered by the Office of Foreign Asset

1    Control, OFAC."

2              MS. CHOI:  Could we go to page 5 of this document,

3    please?

4    Q.  Do you see on page 5 it says, "10-A.  Credit union

5    representations, warranties, indemnity as to each credit entry

6    submitted either by credit union or by a third party at the

7    request of credit union, credit union represents and warrants

8    to Alloya as follows:"  Do you see that?

9    A.  You said 10-A?

10   Q.  10-A.

11   A.  Yes.

12   Q.  Okay.

13             MS. CHOI:  And if we could go to the next page,

14   please.

15   Q.  Do you see entry X at the very top of that page?

16   A.  Yes.

17   Q.  Could you read that out loud, please?

18   A.  "Credit union acknowledges and agrees that all entries

19   originated as part of the service shall comply with all

20   applicable laws and regulations, including but not limited to

21   any economic sanctions administered by the U.S. Treasury

22   Department's Office of Foreign Assets Control, OFAC, or the

23   Bank Secrecy Act, BSA, and shall not act on behalf of or

24   transmit funds to or from any party subject to such sanctions."

25   Q.  So with regard to those passages that we've just seen

1    relating to the member credit union's obligations under OFAC,

2    what is Alloya's understanding as to who is responsible for

3    doing the OFAC screening?

4    A.   The credit union is.

5    Q.   And by "the credit union", the member credit union who's

6    executed this agreement with Alloya, correct?

7    A.   Correct.

8              MS. CHOI:  Just to complete this, if we could go to

9    page 6, the bottom part.

10   Q.   If you see next to "B", it says, "As to each debit entry

11   submitted either by the credit union or by a third party at the

12   request of the credit union, credit union represents and

13   warrants to Alloya as follows:"  Do you see that?

14   A.   Yes.

15             MS. CHOI:  And if we could go to the next page.

16   Sorry, the end of the previous page under XII.

17   Q.   It says, "Credit union acknowledges and agrees that all

18   entries originated as part of the service shall:  Comply with

19   all applicable laws and regulations, including but not limited

20   to any economic sanctions administered by the U.S. Treasury

21   Department's Office of Foreign Asset Control, OFAC, or the Bank

22   Secrecy Act, BSA, and shall not act on behalf of and transmit

23   funds to or from any parties subject to such sanctions."  Do

24   you see that?

25             THE WITNESS:

1    A.  Yes.

2    Q.  To be clear, those two sections apply to both the credit

3    side and the debit side of ODFIs such as member credit unions

4    at Alloya, correct?

5    A.  Yes.

6    Q.  Does Alloya do its own OFAC screening?

7    A.  Yes, we do.

8    Q.  Could you describe what that is?

9    A.  We basically will -- we use an interdiction system called

10   Bridger Inside XG Service to basically screen all the details

11   of any wire transfer against the listing before it's even

12   processed and it's out the door.

13   Q.  Are you familiar with the term "know your customer" as it

14   relates to Alloya?

15   A.  Yes.

16   Q.  Could you describe what that means?

17   A.  It's basically just how it sounds.  You're supposed to know

18   the people you're servicing.  You know.  You should be able to

19   identify who they are and basically what their anticipated

20   activity when signing up for service would be.

21   Q.  Is that also known as KYC?

22   A.  Yes.

23   Q.  As part of the KYC process, what, if anything, do you do to

24   verify the identities of the businesses that are to do business

25   through Alloya?

 1              MS. SANTILLO:  Excuse me, your Honor.  We're

 2     difficulty hearing the witness.

 3              THE COURT:  Mr. Kumar, it sounds like you have a

 4     throat issue, but you'll be speaking for naught if we can't

 5     hear you, so please do stay close to the mic and keep your

 6     voice up as much as you can.  Thank you.

 7              THE WITNESS:  I'm sorry.  Can you repeat the question?

 8     BY MS. CHOI:

 9     Q.  Sure.  With regard to Alloya's know your customer

10     practices, what, if anything, does Alloya do in order to verify

11     the identity of the customers that it has itself?

12     A.  For our member credit unions?

13     Q.  Generally speaking, what does Alloya do?

14              MS. SANTILLO:  Objection.

15              THE COURT:  Overruled.  You may answer.

16              THE WITNESS:  We will basically confirm, you know,

17     specific details like the physical location, that they are a

18     properly state chartered or federal chartered credit union, we

19     will ensure that they are not listed on the OFAC list to be

20     able to do business, and then basically that's it.

21     BY MS. CHOI:

22     Q.  That's with regard to Alloya's checks on its member credit

23     unions, correct, just to be clear?

24     A.  Correct.

25     Q.  Are you familiar with a term "due diligence"?

1    A.   Yes.

2    Q.   Can you describe what due diligence means in the context of

3    your job at Alloya?

4    A.   It basically means doing additional scrutiny on parties

5    involved in a payment, you know, who they are, trying to find

6    out what their occupation is, you know, to try to ensure that,

7    you know, does it make sense what they're doing with the

8    payment?

9    Q.   Okay.  Now, directing your attention specifically to one of

10   your member credit unions.  Did there come a time where you

11   learned of a credit union called HOPE Federal Credit Union?

12   A.   Yes.

13   Q.   And could you describe generally the circumstances under

14   which you first learned about HOPE Federal Credit Union?

15   A.   I first learned of it from a member of our electronic

16   services staff.  She indicated that there was a spike on the

17   ACH activity and wanted me to take a look.

18   Q.   What did you do once she told you that?

19   A.   I basically requested the full details of the ACH and

20   looked at the activity, looked at the size of the credit union,

21   tried to get an understanding of what was going on.

22            MS. CHOI:  If we could show just for the witness,

23   please, Government's Exhibit 703-C.  If we could go to page 2,

24   as well.  This is just for the witness so if we could go to

25   page 2.  That's page 2?

1    BY MS. CHOI:

2    Q.   Are you familiar with this document, Mr. Kumar?

3    A.   Yes.

4    Q.   What is this?

5    A.   It's basically a chart of the daily ACH batch totals that

6    were submitted.

7             MS. CHOI:  The government offers 703-C.

8             MS. MADRIGAL:  No objection.

9             MS. SANTILLO:  No objection.

10            THE COURT:  Thank you.  It's admitted.

11            (Government's Exhibit 703-C received in evidence)

12            MS. CHOI:  Thank you, your Honor.

13            Could we go to page 1 of this exhibit, please?

14   BY MS. CHOI:

15   Q.   What does this data show, generally speaking, Mr. Kumar?

16   A.   That a major spike in activity occurred around

17   September 11th of 2014.

18   Q.   You see how there's a red -- there are red boxes and blue

19   boxes here on the first page of Government's Exhibit 703-C?

20   A.   Yes.

21   Q.   Could you describe what those boxes represent?

22   A.   It represents ACH debit transactions and ACH credit

23   transactions.

24   Q.   Is it the number of transactions or the total volume of

25   transactions?

1  A.  This is the total volume of transactions.  Aggregate

2  amount.

3          MS. CHOI:  Could we go to the second page of this

4  exhibit, please?

5  Q.  Mr. Kumar, could you describe how the second page differs

6  from the first page?

7  A.  This page is basically the aggregate total number of

8  transactions.

9  Q.  Okay.  And so with regard to the blue lines --

10 A.  The blue lines are basically the number of ACH debit

11 transactions.

12 Q.  As opposed to the volume.

13 A.  Correct.

14 Q.  And with regard to the red lines?

15 A.  The red line is basically the number of ACH credit

16 transactions.

17 Q.  So once you detected this spike, what specifically did you

18 do from your perspective as a member of the Alloya compliance

19 staff?

20 A.  We basically had an internal meeting to discuss the

21 activity to determine what was going on.

22 Q.  Did there come a time where you reviewed item details that

23 related to these particular transactions?

24 A.  Yes.

25 Q.  Did there come a time where you learned of an entity called

1    Capital Solutions?

2    A.   Yes.

3    Q.   Could you describe how you learned about the entity Capital

4    Solutions?

5    A.   I basically learned that from the member in our electronic

6    services, she said she was dealing with Capital Solutions in

7    regards to the ACH files, and we believed at the time that that

8    was the new member that the credit union was dealing with for

9    the ACH.

10   Q.   What, if anything, did you do with regard to Capital

11   Solutions?

12   A.   I used public sources to try to determine, you know, where

13   are they, what do they do, basically to get background

14   information.

15   Q.   What did you learn, if anything, about where they were?

16   A.   It appeared that they were located in Quebec, Ontario,

17   Canada.

18   Q.   What, if anything, did you learn about the nature of their

19   business?

20   A.   They appeared to be a payment processer for multiple US and

21   international clients.

22   Q.   Did any of that cause concern from Alloya's perspective as

23   a compliance officer?

24   A.   Yes.

25   Q.   Could you describe what that concern was?

 1    A.  Well, we were kind of confused as to, you know, how they

 2    even fell into their field of membership, and you know,

 3    typically a payment processer, the volumes -- basically, you

 4    know, we don't know much information about their clients and

 5    the original source of where money would be coming from, and

 6    that heightens the risk when you're dealing with anti money

 7    laundering.

 8    Q.  Did there come a time when you learned about an entity

 9    called TransferWise?

10    A.  Yes.

11    Q.  Could you describe the general context about how you

12    learned about TransferWise?

13    A.  TransferWise was a company listed in the ACH transaction

14    detail papers, and basically, based on research, it was a money

15    transmitter in the United Kingdom that deals with wiring money

16    with multiple countries and domestically.

17    Q.  What concerns, if any, did that information raise to you as

18    a member of the compliance team at Alloya?

19    A.  Well, money transmitters are one of the highest risk types

20    of businesses you can deal with in regards to money laundering.

21    Q.  Directing your attention to sort of this mid September,

22    2014 period, did there come a time where you participated in

23    phone calls with Trevon Gross?

24    A.  Yes.

25    Q.  Could you describe how many approximate phone calls you

1    participated in with Mr. Gross?

2    A.   I believe it was three.

3    Q.   Could you describe generally what the purpose of those

4    calls were?

5    A.   Basically, to try to get an understanding of what was going

6    on, you know, who are these other parties and things of that

7    nature.

8    Q.   During those phone calls, do you recall having posed

9    specifically the question of who TransferWise was to Mr. Gross?

10   A.   We requested additional documentation on TransferWise for

11   the reason being that we could not identify any licensing in

12   the US as a money transmitter.

13   Q.   Okay.  Did you also ask for specific information regarding,

14   for example, the expected volume of transactions that

15   Kapcharge -- Capital Solutions was going to be putting through

16   HOPE FCU?

17   A.   Yes.

18   Q.   What, if anything, did Mr. Gross say in response to these

19   conversations about the volume of ACH transactions?

20   A.   I don't recall.

21   Q.   Is there something that would refresh your recollection?

22   A.   Yes.

23          MS. CHOI:  Could we go to Government's Exhibit 791-T,

24   please?

25          THE COURT:  Which is in?

1    MS. CHOI:  Which is in evidence, yes, your Honor.

2    BY MS. CHOI:

3    Q.  Just to orient you, Mr. Kumar, this is a call -- a

4    transcript of a call dated September 18th, 2014.

5    Have you reviewed this transcript and the audio

6    recording prior to your testimony?

7    A.  Yes.

8    MS. CHOI:  So if you could go to page 5?

9    Q.  And Mr. Kumar, just take a moment to read the portion of

10   the page that starts with "Ms. McDowell".  You can read it to

11   yourself.  Ms. McDowell at 11 minutes in.

12   A.  Okay.

13   Q.  Does this refresh your recollection about whether or not

14   there were discussions about the total volume of ACH with

15   Mr. Gross on that line?

16   A.  Yes.  We were basically told that they were in a test phase

17   at the moment, and we were trying to get an understanding of,

18   you know, once the volumes were at the final stage, what we

19   would be seeing?

20   Q.  On that call, do you recall that you asked specific

21   questions of Mr. Gross regarding the nature of TransferWise and

22   those volumes?

23   A.  I believe I asked -- I asked if he could confirm whether

24   they were in the test run right now, and at what point that

25   test run would be done and be at that final volume.

1   Q.  Did Mr. Gross provide you an answer on the phone call?

2   A.  No, he said he'd get back to us.

3   Q.  Did that cause you any concern that at the time that

4   Mr. Gross couldn't provide you with the information about

5   anticipated ACH volumes?

6   A.  Yes.

7   Q.  Could you explain why?

8   A.  Typically, when you are on board businesses, you try to

9   determine at that point what the anticipated volume would be

10  once they're fully using the account.

11  Q.  Do you recall on this phone conversation any discussion

12  about the BSA policies or procedures that HOPE FCU had in

13  place?

14  A.  I believe a question was asked, Michelle McDowell had asked

15  a question.

16  Q.  Do you recall what Mr. Gross' response was?

17  A.  They were receiving training from the payments authority,

18  and they also would be hiring someone to handle the BSA.

19  Q.  Did you have any concern with regard to that response as it

20  relates to your work as a compliance officer at Alloya?

21  A.  Yeah.  The concern basically is that you're doing these

22  millions of dollars in payments and you don't have someone

23  already handling it.

24  Q.  Now, you had several discussions with Mr. Gross?

25  A.  About three.

1  Q.  During these discussions, did you have an assumption about

2  where HOPE FCU was located?

3  A.  Yes.

4  Q.  What was that assumption?  What was your understanding?

5  A.  My understanding is they're located in Jackson, New Jersey.

6  Q.  Did at any point Mr. Gross disclose to you or identify any

7  other branches of HOPE FCU beyond that in Jackson, New Jersey?

8  A.  No.

9  Q.  Now, did there come a point in time where you came to learn

10 of an entity called Collectables Club?

11 A.  Yes.

12 Q.  Could you describe in what context you learned about

13 Collectables Club?

14 A.  Collectables Club was one of the companies listed in the

15 ACH payments.

16 Q.  And what, if anything, did you do once you learned that

17 Collectables Club was one of the entities listed in the ACH

18 details?

19 A.  I tried to get more background information, just like I did

20 with TransferWise, and I learned that they're an entity

21 registered in the State of Florida, but other than that,

22 couldn't really determine much more about it.

23 Q.  And what, if any, concerns did that raise with regard to

24 you as a compliance officer at Alloya?

25 A.  At the time, I didn't have concerns about Collectables

 1  Club.

 2  Q.  You said that it was located in Florida?

 3  A.  Yes.

 4  Q.  And what was your understanding about the field of

 5  membership for HOPE FCU?

 6  A.  My understanding was that it was -- offhand, I believe that

 7  they're --

 8          MS. SANTILLO:  Objection.

 9          THE COURT:  Grounds?

10          MS. SANTILLO:  Foundation.

11          THE COURT:  Sustained.

12  BY MS. CHOI:

13  Q.  Did you have an understanding of what the field of

14  membership, generally speaking, was with regard to HOPE at the

15  time?

16  A.  The vicinity of New Jersey.

17  Q.  With regard to the Collectables Club, did Trevon Gross ever

18  disclose to you that the Collectables Club dealt in virtual

19  currencies, such as Bitcoin?

20  A.  No.

21  Q.  Had Alloya known that Collectables Club was operating in

22  the Bitcoin arena, what, if anything, would Alloya have done?

23  A.  We would not have offered --

24          THE COURT:  I'm sorry.

25          MS. SANTILLO:  Objection, hypothetical.

```
 1              THE COURT:  Overruled.

 2              THE WITNESS:  We would not have offered the service.

 3   BY MS. CHOI:

 4   Q.  And why is that the case?

 5   A.  We do not involve ourselves with certain industries --

 6   entities in certain industries.

 7   Q.  And with regard to virtual currency, is there a specific

 8   risk from Alloya's perspective that imposes?

 9   A.  Yes.

10   Q.  Could you describe that risk?

11   A.  Basically, it's difficult to -- it's difficult to know the

12   original source of who is involved with those payments.

13   Q.  And do you understand what a Bitcoin exchange is?

14   A.  Somewhat.

15   Q.  Okay.  And do you have an understanding of how a Bitcoin

16   exchange would function with regard to the type of business it

17   is?

18              MS. SANTILLO:  Objection, form.

19   Q.  Do you know what a money transmitter is?

20   A.  Yes.

21   Q.  Could you describe what risks, if any, a money transmitter

22   poses?

23   A.  A money transmitter basically is, in essence, a classified

24   financial institution by the U.S. Treasury.  So they are

25   required to comply with anti money laundering and so forth.
```

1    However, you know, money transmitters are -- when you're

2    dealing -- trying to provide services to a money transmitter,

3    it's very difficult to know that they're actually complying

4    with the laws that they're supposed to be doing.

5    Q.  Okay.  Do you have an understanding of what a payday lender

6    is from your perspective as an Alloya compliance officer?

7    A.  Yes.

8    Q.  Could you generally describe what a payday lender is?

9            MS. SANTILLO:  Objection.

10           THE COURT:  Grounds?

11           MS. SANTILLO:  701.

12           THE COURT:  Overruled.

13   BY MS. CHOI:

14   Q.  You can go ahead.  Thank you.

15   A.  Could you repeat the question?

16   Q.  Sure.  Do you have an understanding from your perspective

17   as an Alloya compliance officer what a payday lender is?

18   A.  Yes.  Typically, payday lenders will offer services in

19   general to consumers in a lower-income community.  They charge

20   higher, more than usual interest rates to loan the money to

21   them, and there's typically a large rate of return when dealing

22   with them.

23   Q.  Okay.  And with regards to the risks posed to Alloya for

24   processing a payday lender, how would you characterize that

25   risk?

1  A.  Higher risk.

2  Q.  You said it had a higher rate of return.  What, if any,

3  relationship is there with regard to a higher rate of return

4  and the risk posed to Alloya?

5  A.  You know, we don't really see payday lenders that much,

6  but, you know, we -- I'm not exactly --

7  Q.  That's fair.

8        Did there come a time where Trevon Gross informed

9  Alloya that some of the ACH transactions it was originating was

10  for payday lenders?

11  A.  No.

12  Q.  Now, at some point, are you familiar with whether Alloya

13  instituted a prefunding arrangement to facilitate ACH

14  transactions for HOPE?

15  A.  Yes.

16  Q.  Could you describe what that prefunding arrangement was?

17  A.  Basically, we set up a sterile account that would not be

18  accessible to the credit union, so basically they wouldn't be

19  able to withdraw funds from it.  And in order to send the ACH,

20  they'd have to pay for it and fund that one account in order to

21  cover the ACH transactions.

22  Q.  And are you aware of whether there are discussions within

23  Alloya about the risks posed by HOPE FCU's proposed ACH volume?

24  A.  I believe Michelle McDowell had those conversations.

25  Q.  Did you participate in conversations yourself about any

1    particular risks that you saw with regard to HOPE FCU's ACH

2    transactions?

3    A.   I did.

4    Q.   Could you describe those views?

5    A.   Basically, there were a few different risks.  The first

6    item was, you know, there could have been -- based on the

7    number of transactions they were processing, you know, getting

8    an understanding of the amount of payments that might be

9    returned.  So in cases of like an ACH debit transaction, there

10   could be up to 60 days where a payment can be returned.  So the

11   concern was would there be funds to cover it should it come

12   back?  So that was one thing.

13        There was another concern about, you know, due to the

14   volume of payments they were generating and the amount of money

15   that they had on balance, it would have negatively reflected --

16   impacted their capital ratio, which is basically an indicator

17   used by the NCUA to determine if a credit union is able to

18   absorb a significant loss.

19        And then the other concern, of course, was the

20   capabilities of handling the compliance obligations with that

21   level of volume

22   Q.   Okay.  With regard to the prefunding arrangement, what

23   risks, if any, did that address from Alloya's perspective?

24   A.   That addressed the returns.

25   Q.   Okay.  Did it address the other two concerns; specifically,

1   did it address the capitalization ratio concern that Alloya

2   had?

3   A.  No, it didn't.

4   Q.  To be clear, is the capitalization ratio also known as a

5   net worth ratio?

6   A.  Yes.

7   Q.  Did the prefunding arrangement resolve Alloya's concerns

8   with regard to the BSA compliance aspect?

9   A.  No, it didn't.

10  Q.  Did there come a time where Alloya considered a $160,000

11  capital infusion as one of the ways to mitigate the line of

12  credit risk?

13  A.  There was talk about possibly being able to get a donation

14  from the member.

15  Q.  Okay.  And who raised the possibility of a donation from a

16  member?

17  A.  I believe it was Trevon.

18  Q.  What, if anything, did Trevon say -- Mr. Gross say with

19  regard to identifying the source of that donation?

20  A.  It wasn't stated.

21  Q.  He didn't say where that money would come from?

22  A.  No.

23  Q.  If you were to have learned that the source of a potential

24  $160,000 capital infusion was Kapcharge, would that have caused

25  concerns from a risk perspective at Alloya?

1   A.  It would have been an additional red flag atop of

2   everything else.

3          MS. CHOI:  The government now offers Government's

4   Exhibits 808-A, 808-B, 808-C and 808-D pursuant to stipulation.

5   We can show them to defense counsel if they need a moment.

6          MS. SANTILLO:  No objection.

7          MS. MADRIGAL:  No objection.

8          THE COURT:  Thank you.  808-A through D are admitted.

9          (Government's Exhibits 808-A, 808-B, 808-C and 808-D

10  received in evidence)

11         MS. CHOI:  Let's start with 808-A, please.

12  BY MS. CHOI:

13  Q.  Mr. Kumar, are you familiar with these documents?

14  A.  It's the account statement at Alloya for Helping Other

15  People Excel FCU.

16  Q.  And generally speaking, could you describe what information

17  is contained within an account statement for a member credit

18  union at Alloya?

19  A.  It's basically the settlement transactions and their

20  balance with Alloya.

21  Q.  And this information, is this available to all member

22  credit unions for Alloya?

23  A.  Each member has access to their account information.

24  Q.  Are you aware of whether these statements provide

25  information with regard to, say, cash that a member credit

1    union has on hand at the end of the month at Alloya?

2    A.  Yes.  Each statement provides the ending balance at the

3    close of the month.

4    Q.  Are you aware of, generally speaking, about what a

5    5300 call report is?

6              MS. SANTILLO:  Objection.

7              THE COURT:  Overruled.

8              THE WITNESS:  Yes.

9    Q.  Could you describe what a 5300 call report is?

10   A.  It's basically the financial reporting to the NCUA for a

11   credit union.

12   Q.  How frequently does that reporting occur?

13   A.  Member credit unions have to file that report once a

14   quarter.

15   Q.  Over the course of Alloya's business, does Alloya at times

16   review data that is called from 5300 call reports for its

17   member credit unions?

18   A.  Yes.  We periodically download data from the call reports

19   into our systems.

20   Q.  And where is that data available to Alloya?

21   A.  It's available to all staff on our intranet.

22   Q.  Now, you said the 5300 call reports are filed quarterly?

23   A.  Yes.

24   Q.  If a member credit union wanted to determine how much cash

25   it had on hand at Alloya, its corporate credit union, at the

1   end of a quarter, what would it do?

2   A.   Look at their account statement for that last month in the

3   quarter.

4        MS. CHOI:  If we could start with page 9, please.

5   Q.   Mr. Kumar, could you describe what statement we're looking

6   at right now?

7   A.   This is the March, 2014 statement for HOPE.

8        MS. CHOI:  Now, if we could zoom out for a second.

9   Q.   Is there a significance to the March 31st, 2014 date?

10  A.   I'm sorry.  Could you repeat that?

11  Q.   You said that 5300 call reports are done on a quarterly

12  basis?

13  A.   Yes.

14  Q.   Do you know when those quarters end?

15  A.   Yes.

16  Q.   Okay.  And is there any significance with regard to

17  March 31st, 2014?

18  A.   That is the ending day of the quarter.

19       MS. CHOI:  Okay.  And if we could scroll through this

20  document.  Stop there.

21  Q.   Do you see how it says at the bottom "share account

22  totals"?

23  A.   Yes.

24  Q.   Could you describe what information appears there?

25  A.   Basically, it provides the ending balance for each of their

1    share accounts and the capital they've contributed to Alloya.

2    Q.  So with regard to -- let's start with S-020-000.  It says

3    "transaction account".  And what is the ending balance for the

4    end of March, 2014?

5    A.  $40,453.25.

6    Q.  What does that represent with regard to cash that is

7    available to HOPE FCU at Alloya?

8    A.  That is the cash available in that one account.

9    Q.  What about the next account there that says "overnight

10   account"?  What's the ending balance there?

11   A.  $12,700.

12   Q.  It looks like there are zeros for -- there's zero at the

13   next ending balance for the next account, so why don't we flip

14   to the next page.  Do you see the part that says "share

15   totals"?

16   A.  Yes.

17   Q.  It says an ending balance?

18   A.  Yes.

19   Q.  Could you read out loud that figure?

20   A.  $53,249.25.

21   Q.  So what does that figure represent?

22   A.  That figure represents the cash at hand at the end of the

23   statement date.

24   Q.  To be clear, that would be the cash at hand that HOPE FCU

25   has at its corporate credit union, Alloya, as of March 31st,

1    2014, correct?

2    A.  Correct.

3         MS. CHOI:  Could we flip forward, please, in this

4    document until we get to the June statement, please?

5    Q.  Mr. Kumar, could you just describe what statement we're

6    looking at here?

7    A.  This is the June, 2014 statement.

8    Q.  Is there any significance with regard to quarterly reports

9    for the June 30th statement?

10   A.  June 30th is the last date of the second quarter.

11        MS. CHOI:  So if we could go to the next page, please,

12   and the end of that.

13   Q.  So at the very bottom it says "share account totals".  Do

14   you see that?

15   A.  Yes.

16        MS. CHOI:  If we could go to the next page?

17   Q.  Do you see how it says underneath the perpetual contributed

18   capital entry there's "share totals" there?

19   A.  Yes.

20   Q.  What is the ending balance?

21   A.  The ending balance is $52,697.43.

22   Q.  What does that figure represent?

23   A.  The cash available at Alloya in their account at the end of

24   June 30th.

25   Q.  When you say "their account", you mean the HOPE FCU

 1    account, correct?

 2    A.  Yes.

 3            MS. CHOI:  Why don't we go to page 34.

 4    Q.  What is this, Mr. Kumar?

 5    A.  That's the September, 2014 statement.

 6    Q.  Is there any significance with regard to the date,

 7    September 30th, 2014?

 8    A.  That's the last day of the third quarter.

 9    Q.  In here we see a different entry here, there's an "ACH

10    prefund account" at the top.  Do you see that?

11    A.  Yes.

12    Q.  What does that account represent?

13    A.  That's the account that was set up in order to hold funds

14    in order to pay for the ACH as it came in and settled.

15    Q.  And whose funds were those ultimately?

16    A.  HOPE's.  HOPE FCU's.

17            MS. CHOI:  If you could zoom out, please, and flip.

18    Keep flipping.  Keep flipping.

19    Q.  At the bottom there on page 39 of Government's

20    Exhibit 808-A there is what appears to be "share account

21    totals" again.  Do you see that?

22    A.  Yes.

23    Q.  Is it generally the same layout as the other two examples

24    that we've been through?

25    A.  Yes.

 1  Q.  But as we went through, there's now this ACH prefund

 2  account, as well?

 3  A.  Correct.

 4  Q.  And the ending balance, it appears for each of these

 5  entries, what does that represent?

 6  A.  The cash at hand at Alloya.

 7        MS. CHOI:  Could we go to the next page, please?

 8  Q.  Do you see where it says "share totals" on page 40 of this

 9  exhibit?

10  A.  Yes.

11  Q.  What is the ending balance that's listed there?

12  A.  $3,290,022.45.

13  Q.  Now, Mr. Kumar, you had previously testified about concerns

14  that Alloya had related to Mr. Gross.

15        MS. CHOI:  Could you put that back up, please?  Thank

16  you.  If we could -- thank you so much.

17  Q.  You had previously testified about concerns that Alloya had

18  relayed to Mr. Gross regarding the capitalization net worth

19  ratio issue in September of 2014.  Do you recall that?

20  A.  Yes.

21  Q.  Generally speaking, do you have an understanding of whether

22  or not cash on hand at a corporate credit union affects a net

23  worth ratio for a credit union?

24  A.  Yes, it does.

25  Q.  What is your general understanding of what that is?

 1   A.  It gets included in their call report.

 2   Q.  It gets included in the call report with regard to

 3   calculation of that ultimate net worth ratio?

 4   A.  Correct.

 5   Q.  Again, just to be clear, if you were a member credit union

 6   at Alloya and you needed to determine how much cash you had on

 7   hand at the end of a quarter at Alloya, what would you do?

 8           MS. SANTILLO:  Objection.

 9           THE COURT:  Overruled.

10           THE WITNESS:  You can access your account online

11   through our online banking.  It's called Premier View.

12   BY MS. CHOI:

13   Q.  So on Premier View, would someone with Premier View access

14   from HOPE be able to see that the cash on hand as of

15   September 30th, 2014 that HOPE owned at Alloya FCU would have

16   been $3,290,022.45?

17           MS. SANTILLO:  Objection.

18           THE COURT:  Grounds?

19           MS. SANTILLO:  Assumes facts not established.

20           THE COURT:  Overruled.

21           THE WITNESS:  Yes.

22           THE COURT:  If you would repeat the question because

23   of the --

24           MS. CHOI:  Sure.

25   Q.  If a member at HOPE FCU who had access to Premier View

1    wanted to look up the cash that HOPE FCU had on hand at Alloya

2    as of September 30th, 2014, would the number $3,290,022.45 be

3    available to them?

4    A.  Yes, those account statements are available on the system.

5          MS. CHOI:  No further questions.

6          THE COURT:  Thank you.

7          Ms. Madrigal.

8          MS. MADRIGAL:  Thank you, your Honor.

9    CROSS EXAMINATION

10   BY MS. MADRIGAL:

11   Q.  Good afternoon, Mr. Kumar.

12   A.  Hi.

13   Q.  You testified a minute ago that Alloya doesn't do business

14   with companies that deal with Bitcoin?

15   A.  Correct.

16   Q.  There's no law preventing Alloya from doing business with a

17   Bitcoin exchange, is there?

18   A.  No.

19   Q.  And Bitcoin transactions are completely legal?

20   A.  Yes.

21   Q.  And many Bitcoin transactions are lawfully conducted every

22   single day.

23         MS. CHOI:  Objection, foundation.

24         THE COURT:  Sustained.

25   Q.  It isn't your decision one way or another whether Alloya

1    does business with Bitcoin exchanges, is it?

2    A.  It's not mine directly, it's our management.

3    Q.  So you don't really have a say in the matter.

4    A.  I make a recommendation.

5    Q.  Understood.  And the reason that Alloya doesn't like to

6    conduct Bitcoin business is because it makes your job harder.

7    A.  It's risk mitigation, yes.

8    Q.  So it requires increased diligence on the part of Alloya?

9    A.  Yes.

10   Q.  Would it be fair to say that that makes your job harder?

11   A.  Yes.

12   Q.  And if you found that there was some suspicious activity,

13   what you would have to do is file a suspicious activity report;

14   isn't that true?

15   A.  Yes.

16   Q.  And that's a SAR?

17   A.  Yes.

18   Q.  Okay.  And you've filed many of those, I'm sure, in your

19   career with Alloya.

20   A.  Yes.

21   Q.  And it basically means if you see some suspicious activity,

22   you say something.

23   A.  Yes.

24   Q.  It's not difficult to file a SAR, is it?

25   A.  No.

1          MS. MADRIGAL:  No further questions.  Thank you.

2          THE COURT:  Thank you.

3          Ms. Santillo.

4          Cross examination of Mr. Kumar on behalf of Mr. Gross.

5          Whenever you're ready.

6    CROSS EXAMINATION

7    BY MS. SANTILLO:

8    Q.  Hi Mr. Kumar.  I'm Kristen Santillo and I represent Trevon

9    Gross.

10         Now, you represented that when you did some diligence

11   on HOPE FCU you had some concerns about processing transactions

12   for them.

13   A.  Yes.

14   Q.  Yet you continued to process transactions for a month and a

15   half for HOPE FCU; is that correct?

16   A.  Yes.

17   Q.  So your concerns weren't so severe that you didn't process

18   them for one and a half months.

19   A.  It was discussed that it should be stopped.  I don't know

20   what date was provided.

21   Q.  But you did, as we have already established, you did

22   continue to process the transactions for one and a half months.

23   A.  Yes.

24   Q.  Okay.  And you also testified that you were aware of an

25   entity called the Collectables Club.

 1    A.   Yes.

 2    Q.   And that you did some research with respect to the

 3    Collectables Club.

 4    A.   Yes.

 5    Q.   And you testified that you would not have processed

 6    transactions on behalf of Collectables Club if you knew that

 7    they were on behalf of Bitcoin exchange.

 8    A.   Correct.

 9    Q.   But based on your research of the Collectables Club, you

10    couldn't tell it was a Bitcoin exchange.

11    A.   Correct.

12    Q.   Now, the government walked you through how to tell how much

13    cash you have on hand at the end of each quarter; is that

14    correct?

15    A.   Yes.

16    Q.   Now, sometimes when you are processing an ACH transaction,

17    the transaction doesn't settle on the same day; is that

18    correct?

19    A.   Yes.

20    Q.   So there might be a liability that's outstanding at the end

21    of the month, correct?

22    A.   Yes.

23    Q.   So say, for example, September 30th, if you had a large ACH

24    transaction that was pending and that hadn't settled, would

25    that affect the way that you would calculate your cash on hand?

 1  A.  No, not to my knowledge.

 2  Q.  So if it was going to settle as of September 30th, but on

 3  September 30th that wasn't reflected in the report, there would

 4  be no difference in the way that you would look at your cash on

 5  hand?

 6  A.  Well, I guess I misunderstood.  If it was going to settle

 7  that same day, it would have been reflected in the statement.

 8  Q.  But sometimes it takes a couple days in order to settle.

 9  A.  Yes.  ACH transactions are scheduled out.  They don't

10  process -- they don't hit the account the same day.

11  Q.  Okay.  And you're not aware -- you don't have any

12  visibility into any liabilities that HOPE FCU would have that

13  are not at Alloya.

14  A.  Correct.

15  Q.  Now, you discussed suspicious activity reports a little bit

16  with Ms. Madrigal.

17  A.  Yes.

18  Q.  And you never filed a suspicious activity report for HOPE.

19  A.  No.

20  Q.  And you've done that for other credit unions.

21  A.  Yes.

22  Q.  So you didn't think there was anything criminal going on at

23  HOPE?

24          MS. CHOI:  Objection.

25          THE COURT:  Overruled.  You may answer.

 1                  THE WITNESS:  No.

 2                  MS. SANTILLO:  Thank you very much.

 3                  MS. CHOI:  Briefly, your Honor.

 4                  THE COURT:  You may.

 5    REDIRECT EXAMINATION

 6    BY MS. CHOI:

 7    Q.  Mr. Kumar, you recall that Ms. Santillo just asked you

 8    about suspicious activity reports?

 9    A.  Yes.

10    Q.  When are you obligated to file those suspicious activity

11    reports?

12    A.  When we've gleaned something suspicious and potentially

13    criminal.

14    Q.  With regards to -- if you recall, we looked at the contract

15    that's filed between -- or that was made between Alloya and

16    HOPE FCU when origination started.  Do you recall seeing that

17    document?

18    A.  Yes.

19    Q.  Could you describe who bears the burden in doing OFAC

20    screening as it relates to ACH transactions?

21    A.  The credit union.

22    Q.  Sorry?

23    A.  HOPE.  HOPE Federal Credit Union.

24    Q.  So if there was suspicious activity that was going on with

25    regard to ACH origination that HOPE FCU was doing, who would

1  have to file the SAR?

2  A.   The member credit union.

3  Q.   So that would be HOPE's obligation, correct?

4  A.   Correct.

5  Q.   Now, if you recall, Ms. Santillo asked you a few questions

6  with regard to the cash on hand at the end of the quarter.  Do

7  you recall that?

8  A.   Yes.

9  Q.   And you don't have any sense of what the liabilities might

10 be with regard to HOPE FCU at any given point in time, correct?

11 A.   Correct.

12 Q.   Now, you're familiar generally with the type of data that

13 exists in the 5300 call report?

14 A.   Yes.

15 Q.   Do you know if there is a separate section with regard to

16 liability for HOPE?

17 A.   There is.

18 Q.   Okay.  Or any member credit union.  There's a whole

19 separate section about liabilities, correct?

20 A.   Yes.

21 Q.   Are you aware of whether or not there is a specific entry

22 on a 5300 call report that deals with the cash on hand at a

23 corporate credit union?

24 A.   Yes.

25 Q.   And if a member credit union wanted to determine the cash

1    it had on hand as of quarter end, how would they do that?

2         MS. SANTILLO:  Objection.

3         THE COURT:  Sustained.

4    BY MS. CHOI:

5    Q.  With regard to the end of month statement and the shared

6    total balances that it reflect there, what does that number

7    entail?

8    A.  It is the cash owned by the member credit union.

9    Q.  At the corporate credit union Alloya?

10   A.  Yes.

11        MS. CHOI:  No further questions, your Honor.

12        THE COURT:  Thank you.

13        Ms. Madrigal.

14        MS. MADRIGAL:  Nothing further on behalf of

15   Mr. Lebedev.

16        THE COURT:  Ms. Santillo.

17   RECROSS EXAMINATION

18   BY MS. SANTILLO:

19   Q.  Yes, Mr. Kumar.  You testified that you have filed

20   suspicious activity reports on behalf of member credit unions

21   before, correct?

22   A.  Yes.

23   Q.  So you do have some duties with respect to reporting for

24   suspicious activity reports for member credit unions?

25   A.  Yes.

 1   Q.  Thank you.

 2              THE COURT:  Nothing further?

 3              MS. CHOI:  No, your Honor.

 4              THE COURT:  Ms. Madrigal?

 5              MS. MADRIGAL:  Nothing further.

 6              THE COURT:  All right, thank you.  Mr. Kumar, you're

 7   excused.  You may step down.

 8              (Witness excused)

 9              THE COURT:  Jurors' snacks are here, so we'll take our

10   mid afternoon break.  See you in about ten minutes.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            (Jury not present)

 2            THE COURT:  What do we need to take up?

 3            MS. CHOI:  I think the only question, your Honor, is

 4   that document versus the one that defense counsel wants to

 5   introduce for purposes of completeness.

 6            THE COURT:  Okay.  May I see it?

 7            MS. SANTILLO:  I have it on my phone.  Should I email

 8   it to somebody?

 9            MS. CHOI:  I don't have wi-fi access.  If you have it

10   on your phone, we can just put it on the ELMO.

11            MS. SANTILLO:  It's 1448.

12            THE COURT:  Let's talk in the microphone, please.

13            MS. SANTILLO:  Actually, you know what?  This is not

14   the right one.

15            THE COURT:  I can't hear you, Ms. Santillo.

16            MS. SANTILLO:  I'm sorry, your Honor.  This is not the

17   right one.  I had it sent to me from my office, but this is not

18   the right one.

19            MS. CHOI:  I don't know what the number is.

20            MS. SANTILLO:  We're having trouble --

21            THE COURT:  I'll step down.  I'll return shortly.

22            (Recess)

23

24

25
```

 1          THE COURT:  Something to look at?

 2          MS. SANTILLO:  Yes, your Honor.  Michael is paralegal

 3   extraordinaire.  He has been able to bring up the document.

 4          THE COURT:  I concur with the assessment.

 5          MS. SANTILLO:  The government is seeking to introduce

 6   the bottom part where it says, "Now, we've lost Magic

 7   Wrighter."

 8          THE COURT:  Right.

 9          MS. SANTILLO:  With subject to certain redactions.

10          Have you agreed to our redactions on the -- the last

11   part of our redactions?

12          MS. CHOI:  Yes, I made that adjustment in the version

13   I handed up to the Court, which is almost all blacked out,

14   other than the fact of the termination.

15          MS. SANTILLO:  So we would like to add the last part

16   under 106.

17          THE COURT:  All right.  Can I see that?

18          MS. SANTILLO:  Go up.  The top part, yes.

19          THE COURT:  So this is an email from Mark Francis to

20   Anthony Murgio with Mark Francis saying, "What the hell?  There

21   is no international transactions."  Right?

22          MS. SANTILLO:  Yes.

23          THE COURT:  Why isn't that hearsay?

24          MS. SANTILLO:  Well, I think it goes to their state of

25   mind, and as the government has said --

1    THE COURT:  Whose state of mind?

2    MS. SANTILLO:  Well, it goes to the conspirators'

3    state of mind.  This is an alleged conspiracy.  This is about

4    whether or not they were trying to process illicit

5    international transactions where if they didn't understand them

6    to be international transactions, then that's relevant to their

7    state of mind and their intent.

8    THE COURT:  What of this earlier email is this

9    completing?  So that this is -- I'm looking at the earlier

10   email.  What's confusing and prejudicial about it?

11   MS. SANTILLO:  Well, the idea is that they're being

12   shut down, and they're saying, you know, WTF in terms of why

13   are they shutting us down, and this completes the fact that

14   they understand that they're being kind of wrongfully shut

15   down.  It's not just, oh, they caught us, it's they're shutting

16   us down on a wrongful basis.

17   THE COURT:  Is there anything in the 1447A which the

18   government is seeking to admit that speaks to the international

19   versus domestic transaction issue?

20   MS. CHOI:  Your Honor, I don't think so.  If we can

21   scroll down on 1447-3 to get the full scope.  I don't recall

22   that offhand being the concern.  Oh, sorry, that's right.

23   So the concern that they note is the full volume that

24   the credit union is requesting.  There is, at the very bottom,

25   if you look.  And we've axed this out in the blacked-out

1   version at defense counsel's request, but in the original, if

2   you see here, here they say, just as a courtesy, FYI, and they

3   highlight the OFAC obligations issue, but it's not about the

4   IAT versus PPD issue.

5          THE COURT:  But, in any event, that's redacted?

6          MS. CHOI:  Correct, your Honor.  So there's no

7   completion issue.

8          THE COURT:  Can we pull up the redacted version?

9          MS. CHOI:  Sure.

10         THE COURT:  So when this goes into the jury, it would

11  go in in redacted form?

12         MS. CHOI:  Correct, your Honor.  It would just be this

13  document.  And if you want to scroll to the second page.

14         THE COURT:  So 1447A, which I'm looking at, has the

15  redactions?

16         MS. CHOI:  Correct, your Honor.

17         THE COURT:  So given the redactions, Ms. Santillo,

18  what in that remains unredacted that would go to the jury would

19  that international line be explaining?

20         MS. SANTILLO:  This is the first time I'm actually

21  seeing the redacted version, so I'm just going to read it

22  through.

23         THE COURT:  But it's the redactions you asked for?

24         MS. SANTILLO:  No.  The government asked for those

25  redactions.  I gave them a suggested modification to the

1    redactions.  I have not yet seen the way it reads now.  I just

2    learned they accepted those redactions.

3            THE COURT:  Okay.

4            (Pause)

5            MS. CHOI:  Next page.  All redacted.

6            MS. SANTILLO:  Okay.  I recognize that it's less of a

7    problem in terms of completeness with respect to the fact that

8    it's redacted, but I do think that the sentence that they were

9    wrongfully -- the stopping the transactions was wrongful,

10   that's their response, is that they don't feel like it was

11   justified.  And that's why I think it needs to be put into

12   context.

13           THE COURT:  Well, that, again, I think falls squarely

14   within defense evidence.  The exclusion of that from here, in

15   light of the redactions, it just doesn't fall within 106.  I'll

16   deny the admission on 106 grounds without prejudging the

17   question of whether this would otherwise be admissible as part

18   of the defense's case.  But in the 106 context, I'll deny the

19   objection of the defense in the request.

20           MS. SANTILLO:  Thank you.

21           MS. CHOI:  Thank you, your Honor.

22           THE COURT:  Anything else?

23           MS. CHOI:  No.

24           THE COURT:  Mr. Creizman?

25           MR. CREIZMAN:  Thank you, your Honor.  I understand

1    from Judge Kaplan's deputy that your Honor is releasing me

2    tomorrow at 12:40?

3            THE COURT:  Yes.

4            For everyone's benefit, Mr. Creizman is needed in

5    Judge Kaplan's courtroom at 12:45, so I said we would stop for

6    lunch at 12:40.

7            MR. CREIZMAN:  Quite frankly, your Honor, I'm quite

8    nervous about this.

9            THE COURT:  That seems wise.

10            MR. CREIZMAN:  And I was hoping your Honor could use

11    her good offices to just put in a nice word for me.

12            THE COURT:  Definitely beyond my jurisdiction.

13            MR. CREIZMAN:  Thank you, your Honor.

14            THE COURT:  But eat a big breakfast because it sounds

15    like you're missing lunch.

16            MR. CREIZMAN:  Right.  Yes, your Honor.

17            THE COURT:  Let's get the jury.

18            MS. CHOI:  Your Honor, just so you know, we're going

19    to do just a few documents that relate to this issue, and then

20    we'll call our next witness.

21            THE COURT:  Okay.  And that's Mr. Freundt?

22            MS. CHOI:  Yes, your Honor.

23            (Continued on next page)

24

25

```
 1              (Jury present)
 2              THE COURT:  Thank you, everyone.  You may be seated.
 3              Ms. Choi, when you're ready.
 4              MS. CHOI:  Thank you, your Honor.  Before the
 5   government calls its next witness, the government offers
 6   Government Exhibits 1446-L, 1446-M, 1447-A, 1448-A, and 1448-C.
 7              THE COURT:  Those are by stipulation?
 8              MS. CHOI:  Yes, your Honor.
 9              Do you want to look at them?
10              MR. CREIZMAN:  Just for a moment.
11              THE COURT:  Yes, why don't you just pull them up.
12   Thank you.
13              MR. CREIZMAN:  No objection.
14              MS. SANTILLO:  No objection.
15              THE COURT:  All right.  Thank you.
16              1446-L and M, and 1447-A, B, and C are admitted.
17              MS. CHOI:  I think, your Honor, it's actually 1447-A,
18   1448-A, and 1448-C.  Sorry, your Honor.
19              THE COURT:  All right.  So, 1446-L, 1446-M, and then
20   what are they?
21              MS. CHOI:  1447-A, 1448-A, and 1448-C.
22              THE COURT:  Understood.  Thank you.
23              Those documents are admitted.
24              (Government's Exhibits 1446-L, 1446-M, 1447-A, 1448-A,
25   and 1448-C received in evidence)
```

1    MS. CHOI:  Thank you, your Honor.

2    If we could publish 1446-L for the jury, please.

3    Starting on the bottom, there is an email from

4    sandraalbertson@alloyacorp.org to Trevon Gross, copying

5    rhill@hope-fcu.com, "Subject:  Termination of ACH Services."

6    "Good morning.  Enclosed please find the letter which

7    indicates the agreed-upon termination of all ACH transactions

8    as per our telephone conversation.  Please let me know if you

9    would like a telephone conversation to discuss further.  Thank

10   you."

11   Could you go to the next page, please.

12   The email above that, Trevon Gross writes at

13   12:12 p.m.:  "So this is their play.  Ricardo, call Magic

14   Wrighter and see if we can move to them or CU South."

15   Later that day, Anthony Murgio writes:  "Saw this

16   coming.  They still had the risk."

17   And then on November 10th, 2014, at 5:40 p.m., Trevon

18   Gross writes Anthony Murgio, copying Ricardo Hill:  "There is

19   no risk, it's just being spiteful, but, yes, it was to be

20   expected."

21   1446-M.  Anthony Murgio responds to the previous chain

22   and writes to Ricardo Hill and Trevon Gross:  "We did outsmart

23   them for a couple of days."

24   Government Exhibit 1447-A.  At the bottom -- if we

25   could start with the bottom email, "Subject:  Suspension of ACH

File Transmission Services," date November 11, 2014, from

Bob -- bobw@mvpbanking.com to tgross@hopefcu.com, cc'ing

jilldean@mvpbanking.com, date November 11, 2014, Mr. Trevon

Gross.

If you could zoom in on the middle.  "Magic Wrighter

can no longer process ACH transactions from your credit union.

I see you have moved your credit union account to Harmony Bank.

The bank, I am sure, offers an ACH origination solution that

will allow your credit union to send ACH batches to their bank

just like you are doing with our data center.  It's standard

practice for banks to offer ACH origination services for credit

unions and commercial customers that have business accounts

with the bank.

"To assist you in the conversion to another ACH

originating ODFI or ACH operator, I have authorized that access

to a website stay open to your staff, but no ACH files will be

transmitted to the Federal Reserve Bank or any other operator

by our data center on behalf of your credit union.  Instead,

your credit union will be able to retrieve a daily transaction

file from our system that is in ACH format and easily

transmittible to a bank or ACH operator of your choice."

If you could go to the previous page, please.

In that next email, dated November 11, 2014, Jill Dean

at MVP Banking writes, Ricardo Hill, copying Bob Wright:

"Please be advised that the below email sent to Trevon from CEO

1    Bob Wright.  Regards, Jill Dean."

2              The email above that, Ricardo Hill forwards this email

3    to Anthony Murgio later that day and writes:  "Now we have lost

4    Magic Wrighter.  WTF!!!!"

5              Then at the top of that chain, that email has been

6    forwarded from Anthony Murgio to Mark Francis on November 11,

7    2014, at 3:55 p.m.

8              If you could go to Government Exhibit 1448-A, please.

9              Let's start with the bottom email on that page, if we

10   could.  Thank you.

11             This is an email dated November 12, 2014, from

12   jilldean@mvpbanking.com to Ricardo Hill:  "Ricardo, per your

13   voicemail, below you will find the list of the items that have

14   made a hit off of the OFAC database.  Magic Wrighter has our

15   own algorithm based on the OFAC database provided by the

16   federal government.  If a hit is made, we report to the

17   financial institutions who have contracted with Magic Wrighter

18   to assist them in OFAC compliance.  The financial institutions

19   use their own control methods to determine a false/positive

20   hit."

21             If we could look at the bottom of that page.

22             Could we flip to the next page.

23             And to the next page.

24             And to page 4.  Could you zoom in on the top half of

25   this page, please.

1          Just as an example, in the middle of this top zoomed

2     half, it says, "Juan Carlos Penalver, OFAC, Cuartez Morales,

3     Juan Carlos, in the amount of $12,460.56.  4309 individual

4     SDNT; DOB, 09 Nov 1968, cedula number 1675735 Colombia.

5          Could we go to 448-C, please.

6          This is the original chain that we have just reviewed

7     in the previous exhibit, and if we could go to the top.

8          Anthony Murgio writes to Kevin Pepe, Mark Francis,

9     Trevon Gross, Ricardo Hill, Shoula Cohen, and Jose Freundt:

10    "Well, this is very concerning.  Hopefully their licensing will

11    cover us.  I would love some clarity on this."

12         The government now calls Jose Freundt to the stand.

13         THE COURT:  Mr. Freundt may come forward.

14         Mr. Freundt, you may come forward.

15     JOSE FREUNDT,

16        called as a witness by the Government,

17        having been duly sworn, testified as follows:

18         THE COURT:  Please be seated, and once you're seated,

19    pull yourself up to the microphone, and state and spell your

20    name for the record.

21         THE WITNESS:  Name is Jose Freundt, J-o-s-e,

22    F-r-e-u-n-d-t.

23         THE COURT:  You may proceed.

24    DIRECT EXAMINATION

25    BY MR. NOBLE:

1    Q.  Good afternoon, Mr. Freundt.

2    A.  Good afternoon.

3    Q.  How old are you?

4    A.  I am 41.

5    Q.  Where were you born?

6    A.  Dominican Republic.  Santo Domingo.

7    Q.  When did you first come to the United States?

8    A.  I lived in California in 1980, and I permanently moved in

9    1988.

10   Q.  Did you become a United States citizen?

11   A.  Yes.

12   Q.  Where do you currently live?

13   A.  Tallahassee, Florida.

14   Q.  Have you always lived in Florida since moving to the United

15   States?

16   A.  Yes.

17   Q.  Can you describe for the jury your educational background?

18   A.  I have a Bachelor of Science in finance from the Florida

19   State University.

20   Q.  What year did you graduate from Florida State?

21   A.  2007.

22   Q.  Have you ever held any professional licenses?

23   A.  I hold my Series 6, 63, and 65 licenses.

24   Q.  Can you explain briefly what those are?

25   A.  Those licenses that allow me to become a financial advisor

H2RKLEB5                    Freundt - Direct

1   in mutual funds and stocks.

2   Q.   Approximately when did you hold those licenses?

3   A.   2008.

4   Q.   Are they current now, or have they lapsed?

5   A.   They lapsed.

6   Q.   Are you currently employed?

7   A.   I am currently employed as a volleyball coach for a high

8   school.

9   Q.   Is that in Florida?

10  A.   Yes.

11  Q.   Are you familiar with an entity called HOPE Federal Credit

12  Union in New Jersey?

13  A.   I am.

14  Q.   How are you familiar with HOPE?

15  A.   I was asked to become a board member of the credit union.

16  Q.   Who asked you to become a member of -- a board member of

17  that credit union?

18  A.   Anthony Murgio.

19  Q.   Did there come a time when you became aware of any payments

20  that Anthony Murgio had made to anyone in order to gain control

21  of HOPE Federal Credit Union?

22  A.   Yes.

23  Q.   How did you learn that?

24  A.   My first communication with Anthony, I asked him how he

25  managed to acquire a credit union, and he had informed me that

1   he had made arrangements to make donations to a church.

2   Q.  Whose church?

3   A.  Trevon Gross.

4   Q.  Do you see Trevon Gross in the courtroom today?

5   A.  Yes, sir.

6   Q.  Can you please identify where he's sitting?

7   A.  The gentleman standing.

8           THE COURT:  The record will reflect -- thank you,

9   Mr. Gross -- that the witness has identified Mr. Gross.

10  Q.  Now, did you assist Anthony Murgio in trying to make any

11  payments to Trevon Gross in relation to the credit union?

12  A.  Yes.

13  Q.  Do you see anyone else in the courtroom who also helped

14  make those payments?

15  A.  Yes.

16          MR. CREIZMAN:  Objection; vague, foundation.

17          THE COURT:  Overruled.

18          You may answer.

19  Q.  Do you remember the question?

20  A.  Yes.  I see some -- Yuri Lebedev.

21          MR. NOBLE:  May the record reflect that the witness

22  has identified the defendant, Mr. Lebedev.

23          THE COURT:  Thank you, Mr. Lebedev.  And the record

24  shall so reflect.

25  Q.  Now, Mr. Freundt, were you ever involved in any of Anthony

 1    Murgio's business ventures?

 2    A.   Yes.  Previously to that, I was working with him in his

 3    restaurant ventures.

 4    Q.   And did there come a time when you worked with Anthony

 5    Murgio in any other venture?

 6    A.   After Coin.mx -- after HOPE, I worked for Coin.mx with him,

 7    yes.

 8    Q.   What was Coin.mx?

 9    A.   It was a Bitcoin company, trading money exchange company.

10    Q.   When you worked at Coin.mx, were you involved in any type

11    of criminal activity?

12    A.   We were.

13    Q.   What type of activity?

14    A.   We were unlicensed to be a money trading company, and we

15    were placing calls to the banks, which made it wire fraud.

16    Q.   What types of calls were you placing to the banks that were

17    fraudulent?

18    A.   When a member wanted to increase their buying power within

19    the company, we would make a three-way call to the bank to

20    establish our relationship between the banks, members, and us,

21    and we were instructing the members not to specify the

22    purchase, what the purchase was for.

23    Q.   What was the purchase really for?

24    A.   Bitcoins.

25    Q.   Did there come a time when you were interviewed by Secret

 1   Service and FBI agents concerning your involvement with HOPE

 2   Federal Credit Union and Coin.mx?

 3   A.  Yes.

 4   Q.  About when was that?

 5   A.  About July.

 6   Q.  July of what year?

 7   A.  2015.

 8   Q.  Where did that interview occur?

 9   A.  The Tallahassee office.

10   Q.  Office of what?

11   A.  Of Coin.mx.

12   Q.  Now, did there come a time when you were again approached

13   by FBI agents in this case?

14   A.  Yes.

15   Q.  And when was that?

16   A.  April of 2016.

17   Q.  Where did that interview take place?

18   A.  At my home.

19   Q.  What did you decide to do after speaking with law

20   enforcement with respect to this case?

21   A.  I was going to cooperate.

22   Q.  Were you arrested at that time, in April 2016?

23   A.  No.

24   Q.  You have to make sure you answer verbally for the record.

25   We can't get a head nod or a shake.

1    A.   Understood.

2    Q.   Thank you.

3         Prior to this case, Mr. Freundt, had you ever been

4    arrested?

5    A.   I have.

6    Q.   What have you been arrested for previously?

7    A.   Driving with a suspended license and not paying a ticket.

8    Q.   Did there come a time when you came to New York to meet

9    with FBI agents and prosecutors in connection with this case?

10   A.   Yes.

11   Q.   Approximately how many times have you met with agents and

12   prosecutors prior to testifying today?

13   A.   About five times.

14   Q.   In general terms, what did you tell the prosecutors and

15   agents during those meetings?

16   A.   My knowledge of what was going on at Coin.mx and what will

17   happen at HOPE, who was involved, my involvement, things like

18   that.

19        MR. KLINGEMAN:   I'm sorry, your Honor, I can't hear

20   the witness very clearly.   I missed the last part of that

21   answer.

22        THE COURT:   Mr. Freundt, if you could speak directly

23   into the mic.   If your head is turned a little bit to the side,

24   the sound gets muffled.   And please keep your voice up, sir.

25   And I will ask you to repeat -- if you would repeat the

1    question, Mr. Noble.

2              MR. NOBLE:  Sure.

3    BY MR. NOBLE:

4    Q.  I asked you a question about what, in general, you

5    discussed with agents and prosecutors during your meetings with

6    the government?

7    A.  The operations of Coin.mx, what my knowledge was of HOPE

8    Credit Union, the transactions that happened, my involvement

9    and everybody else's involvement as I knew them.

10   Q.  Now, have you since pled guilty to the crimes that you

11   admitted engaging in?

12   A.  I have.

13   Q.  What crimes have you pled guilty to?

14   A.  I pled guilty to conspiracy to bribe an officer of a

15   banking institution and then bribery.  I pled guilty to

16   conspiracy to commit wire fraud and -- wire fraud and

17   conspiracy to operate an unlicensed money exchange and the

18   operations of it.

19   Q.  And that money exchange, just to be clear, was Coin.mx,

20   correct?

21   A.  Correct.

22   Q.  Now, in conjunction with your guilty plea, did you enter

23   into any type of agreement with the government?

24   A.  I entered a cooperating witness agreement.

25             MR. NOBLE:  Can we bring up, for identification only,

1    3504-14.

2    Q.  Mr. Freundt, do you see that document on your screen?

3    A.  I do.

4    Q.  What is it?

5    A.  That is the cooperating agreement.

6    Q.  What's the date of that document?

7    A.  October 13, 2016.

8              MR. NOBLE:  Mr. Chang-Frieden, can we please flip to

9    the last page.

10   Q.  Mr. Freundt, did you sign that agreement?

11   A.  I did.

12   Q.  What date did you sign the agreement on?

13   A.  October 13, 2016.

14   Q.  Did you plead guilty to the crimes that you discussed just

15   earlier, the same day?

16   A.  I did.

17             MR. NOBLE:  You can take that down.

18   Q.  Mr. Freundt, as a result of pleading guilty, what is the

19   highest possible sentence that you face?

20   A.  85 years.

21   Q.  Have you been sentenced yet?

22   A.  No.

23   Q.  Do you know exactly when you will be sentenced?

24   A.  No.

25   Q.  Under your cooperation agreement, can you explain to the

 1    jury what you are required to do?

 2    A.   I am required to be honest, testify when the government

 3    asks me to, refile my taxes, and not commit any more crimes.

 4    Q.   Why do you have to refile your taxes?

 5    A.   I didn't report the income I earned from Coin.mx or HOPE in

 6    my taxes.

 7    Q.   So you never paid taxes on that income?

 8    A.   Correct.

 9    Q.   What, if anything, have you done toward resolving your tax

10    issue with the IRS?

11    A.   We hired a CPA firm in Tallahassee.

12               MR. KLINGEMAN:  I couldn't hear that last answer, your

13    Honor.

14               THE COURT:  Could you repeat that answer.  And, again,

15    Mr. Freundt, I have to ask you to speak up, please.

16               THE WITNESS:  We hired a CPA firm in Tallahassee.

17               MR. KLINGEMAN:  Thank you.

18    Q.   You said you're required to testify under your cooperation

19    agreement if you're asked to by the government?

20    A.   Correct.

21    Q.   Is that why you're testifying here today?

22    A.   Yes.

23    Q.   Now, if you do all of those things, what is your

24    understanding of what the government is going to do?

25    A.   The government will provide a 5K1 letter to the courts on

1    my behalf.

2    Q.   What is your understanding of what will be in that letter?

3    A.   My involvement in the crimes, and my participation or my

4    cooperation with the government.

5    Q.   Do you know, as you sit here today, whether the government

6    will in fact write that letter for you?

7    A.   No.

8    Q.   In that letter, what is your understanding as to whether

9    the government will recommend a particular sentence for you?

10   A.   There is no recommendation.

11   Q.   Now, even if that letter is filed, do you know whether for

12   sure your sentence will be reduced?

13   A.   No.

14   Q.   Has the government or anyone else made any promises to you

15   about what your sentence is going to be?

16   A.   No.

17   Q.   So it's still possible that you could get up to 85 years in

18   prison?

19   A.   Correct.

20   Q.   Who will decide your sentence?

21   A.   The Court.

22   Q.   To your understanding, does your sentence in any way depend

23   on the outcome of this trial?

24   A.   No.

25   Q.   What is your understanding of what might happen if the

1    government were to find out that you testified falsely today?

2    A.   They will nullify the agreement.

3    Q.   Is it possible that you could be prosecuted for any other

4    crimes?

5    A.   If I lie on the stand, I'll be prosecuted -- I could be

6    prosecuted for perjury, yes.

7    Q.   Now, Mr. Freundt, you testified that you graduated from FSU

8    in 2007, correct?

9    A.   Correct.

10   Q.   Did you have any jobs while you were in college?

11   A.   I worked for SunTrust Bank, yes.

12   Q.   What did you do for SunTrust Bank?

13   A.   I started as a customer service representative, just

14   opening and closing the bank accounts, recommending

15   personalized bankers and credit cards, mortgages, things like

16   that.  Eventually, once I graduated, I stayed a little bit

17   longer and I became a floating manager.

18   Q.   For approximately how long did you work at SunTrust Bank?

19   A.   About two and a half years, total.

20   Q.   Now, while you were working at SunTrust, did you become

21   aware of any requirements that banks like SunTrust have to

22   detect, prevent and report illegal activities?

23   A.   Yes.

24   Q.   Can you explain, generally, what you learned from working

25   at SunTrust Bank, with respect to those issues?

 1   A.  There was a secrecy act, there was a PATRIOT Act, that was

 2   it was mainly to prevent banks from participating or to

 3   recognize any criminal activity that was happening within their

 4   members and report that to the authorities.

 5   Q.  Mr. Freundt, did you have any role overseeing ACH

 6   processing at SunTrust?

 7   A.  No.

 8   Q.  What did you do after you stopped working at SunTrust Bank?

 9   A.  I became branch manager for a credit company.

10   Q.  What kind of credit company was that?

11   A.  They would lend unsecured loans to subprime members.

12   Q.  What is subprime?

13   A.  Subprime is people that don't have very good credit, other

14   banks will reject their loan application; and they will lend

15   them money.

16   Q.  Can you just explain kind of the rest of your employment

17   history, leading up to when you worked at Coin.mx?

18   A.  After that, I went to work at Mainline Information Systems,

19   which is a IBM retail partner.  After that, I went to work at

20   Tapas lounge with Anthony Murgio the restaurant.  After that, I

21   worked for the State of Florida in the Supreme Court building,

22   and then for the Department of Agriculture, and later for the

23   Department of Financial Services.

24   Q.  Did you work for the Department of Financial Services after

25   Coin.mx?

 1    A.   Yes.

 2    Q.   You testified that you've worked with Anthony Murgio in

 3    several of his business ventures; is that right?

 4    A.   Correct.

 5    Q.   How did you first meet Anthony Murgio?

 6    A.   Through volleyball community in Tallahassee.

 7    Q.   Did you meet Anthony Murgio before or after college?

 8    A.   After I had finished college, yes.

 9    Q.   You just testified that at some point you went to work for

10    Anthony Murgio at his restaurant in Tallahassee?

11    A.   Correct.

12    Q.   What did you do there?

13    A.   I was the CFO for the Tapas Lounge.

14    Q.   During what approximate period of time did you work for

15    that restaurant?

16    A.   For the restaurant?  I worked from 2011 to about 2013.

17    Q.   Was Anthony Murgio there that entire time?

18    A.   No.

19    Q.   About when did Anthony Murgio leave the restaurant?

20    A.   He left the restaurant on December 31st, 2011.

21    Q.   Do you know why he left?

22    A.   He sold it.

23    Q.   You do you know why he told the restaurant?

24    A.   He was filing bankruptcy, there was a lawsuits against him,

25    and he was going to file bankruptcy.

1    Q.  Were you aware, aside from the bankruptcy, of any other

2    legal issues that Anthony Murgio had around that time?

3    A.  Prior to me coming over, there was a tax issue where they

4    hadn't been paying taxes.

5    Q.  Who is "they"?

6    A.  Tapas Lounge, the restaurant.

7    Q.  Were you aware of that while you were working at Tapas or

8    did you become aware of it?

9    A.  I became aware once I started working at Tapas.

10   Q.  What, if anything, happened to Anthony Murgio in connection

11   with his failure to pay sales tax at the restaurant?

12   A.  He was --

13              MR. KLINGEMAN:  Foundation.

14              THE COURT:  Just a moment.

15              Sustained.  You said foundation, Mr. Klingeman?

16              MR. KLINGEMAN:  Yes, your Honor.

17              THE COURT:  Sustained.

18   Q.  Did you have any conversations with Anthony Murgio about

19   his failure to pay sales tax?

20   A.  I hadn't.

21   Q.  You have?

22   A.  I hadn't, when I was employed.

23   Q.  Do you know what, if anything, happened to Anthony Murgio

24   in connection with the failure to pay sales tax, based on those

25   conversations?

```
 1   A.   I know he was arrested.

 2   Q.   Now, around that time, did you ever conduct a Google search

 3   for Anthony Murgio?

 4   A.   I did.

 5   Q.   What, if anything, did you --

 6             MR. KLINGEMAN:  Relevance.

 7             THE COURT:  Sustained.

 8   Q.   Do you know how Anthony Murgio's bankruptcy and arrest, the

 9   sales tax case, were resolved?

10             MR. KLINGEMAN:  Objection; foundation.

11             MR. NOBLE:  I just asked --

12             THE COURT:  Yes --

13             MR. NOBLE:  Apologies, your Honor.

14             THE COURT:  Overruled.

15   Q.   Do you know how those were resolved?

16   A.   Yes.

17   Q.   And how did you learn how those were resolved?

18   A.   I Googled what was happening with Anthony.

19             MR. KLINGEMAN:  Objection; move to strike.

20             THE COURT:  Overruled.

21   Q.   Mr. Freundt, you said that you worked for Anthony Murgio's

22   restaurant, correct?

23   A.   Correct.

24   Q.   You referred to that as Tapas?

25   A.   Tapas Lounge was the --
```

1    Q.  Are you familiar with a business called 101 Mint?

2    A.  Yes.  That was the restaurant.

3    Q.  What's the relationship, if any, between 101 Mint and

4    Tapas?

5    A.  Tapas was the main company, and then 101 Mint and

6    Versailles were part of Tapas.

7    Q.  Now, you testified that Yuri Lebedev was also involved with

8    HOPE Federal Credit Union, with you?

9    A.  Correct.

10   Q.  In what way was he involved with HOPE Federal Credit Union?

11   A.  He was also a board member.

12   Q.  How did you first meet Yuri Lebedev?

13   A.  I met him in college, through mutual friends.

14   Q.  Describe your relationship to Lebedev while you were in

15   college.

16   A.  We would go out together, have fun.

17   Q.  You were social?

18   A.  Uh-huh.

19   Q.  After graduation, do you know what kind of work Lebedev got

20   into?

21   A.  I know he left to Jacksonville and was working IT.

22   Q.  Did you remain in touch with him after college?

23   A.  Not really, no.

24   Q.  And did there come a time when you reconnected with him?

25   A.  Yes.

1   Q.   When?

2   A.   When Anthony asked me to take part of the credit union, I

3   saw Yuri's name on the list of possible board members, and I

4   was surprised, so I called him.

5   Q.   Did there come a time when Anthony Murgio contacted you

6   about buying a credit union, prior to him asking you to join

7   the board of HOPE?

8   A.   Yes.

9   Q.   About how far before he asked you to join the board did he

10  contact you about buying a credit union?

11  A.   A couple months before.

12  Q.   What did Murgio say to you and you to him?

13  A.   Well, he asked me if I had worked at a bank, and I told him

14  that I had worked at SunTrust.  He then informed me that he

15  wanted to either buy a bank or a credit union.  I told him that

16  to start a bank you need $10 million and, to buy one, you

17  probably need more than that; and you couldn't buy a credit

18  union.

19  Q.   Why can't you buy a credit union?

20  A.   Because you have a board of directors; it's owned by the

21  members.

22  Q.   Were you aware of what type of business Murgio was involved

23  in at that time?

24  A.   He was involved or starting to get involved with Bitcoin

25  and cryptocurrencies.

1   Q.  Are you familiar with an entity called Collectables Club?

2   A.  I am.

3   Q.  What is Collectables Club?

4   A.  That was an entity that made us members or eligible members

5   to the credit union.

6   Q.  How did you become familiar with Collectables Club for the

7   first time?

8   A.  Through the process of joining the credit union.

9   Q.  Did you later gain further familiarity with it when you

10  worked at Coin.mx?

11  A.  Correct.

12  Q.  Did you ever visit the website for Collectables Club?

13  A.  I did.

14  Q.  Was it a functional website?

15  A.  It was not.

16  Q.  How difficult was it to determine whether it was

17  functional?

18  A.  Not very.

19  Q.  Not very?

20  A.  Not very difficult.

21  Q.  Where was Anthony Murgio's Bitcoin business and

22  Collectables Club based, as far as you know?

23  A.  Florida.

24  Q.  Did Coin.mx or Collectables Club ever have any operations

25  in New Jersey?

 1    A.   Not that I know of.

 2    Q.   When Murgio contacted you about buying a credit union, did

 3    he explain to you why he was interested in getting a credit

 4    union?

 5    A.   Yes.

 6    Q.   What did he say in that regard?

 7    A.   He had gone to several conventions where the general topic

 8    was that e-commerce had a hard time with banking industries.

 9    Q.   What, if anything, did he tell you about his Bitcoin

10    business?

11    A.   That he was having a hard time keeping bank accounts open.

12    Q.   Now, did there come a time later on when Murgio told you

13    that he had acquired control of a credit union?

14    A.   Yes.  About two months after that, he let me know that he

15    had acquired a -- or that he was in the process of acquiring a

16    credit union.

17              MR. NOBLE:  Can we bring up Government Exhibit 1088-A,

18    which is in evidence.  Blow up the bottom portion first.

19    Q.   Mr. Freundt, do you recognize this document?

20    A.   Yes.  That's the email I got from Anthony Murgio.

21    Q.   So that's an email from Anthony on April 30th, 2014, with

22    the subject "Hope Credit Union"; is that right?

23    A.   Correct.

24    Q.   And it's sent to an email address jmfreundt@hotmail.com.

25    Is that your email address?

1    A.   That's my personal email.

2    Q.   The email states:  "Would you be interested in being on the

3    board of a credit union I'm taking over?  My dad will be on it.

4    Tim, the guy at 101 before you, will be on it.  Asking Rico as

5    well.  Working out everything now.  Can you let me know what it

6    will require, if anything, in compensation?  Just wanted to

7    know if you would be interested."  Did I read that correctly?

8    A.   Yes.

9              MR. NOBLE:  Can you just leave that up for a minute.

10   Q.   Who was Anthony Murgio's dad?

11   A.   Mike Murgio.

12   Q.   Do you know the person Tim who he's referring to in this

13   email?

14   A.   I knew of him.

15   Q.   Who is Tim?

16   A.   Tim was his childhood best friend.

17   Q.   Do you know his last name?

18   A.   Ellrich.

19   Q.   And then also Rico, do you know who Rico is?

20   A.   Rico was an employee of us at 101 Restaurant.

21   Q.   Do you know his last name?

22   A.   Hill.  Ricardo Hill.

23   Q.   After you received this email, what, if anything, did you

24   do?

25   A.   I called Anthony and asked him how he managed to get a

1    credit union.

2    Q.  What did he tell you?

3    A.  He told me he found a small credit union in New Jersey

4    where the pastor wanted out and then he offered him $300,000.

5    Q.  Did Anthony Murgio say to whom he was going to pay the

6    $300,000?

7    A.  To the pastor.

8    Q.  And what was the pastor going to do in exchange for that

9    money?

10   A.  He was going to relinquish control of the board and put our

11   names on the ballots.

12   Q.  Now, at that time, what was your understanding of whether

13   or not that was a legitimate business transaction?

14   A.  I thought Anthony had found a way to purchase a credit

15   union.

16   Q.  What do you mean by you thought he had found a way?

17   A.  Because you can't buy a credit union.  The only way to have

18   control -- in essence, ownership -- of a credit union and would

19   be to control the board and control the employees.

20           MR. NOBLE:  Can we see how Mr. Freundt responded.

21   Q.  So it hook like later that date you wrote, "Yes, I would";

22   is that right?

23   A.  Correct.

24           MR. NOBLE:  You can take that down, Mr. Chang-Frieden.

25   Thank you.

H2RKLEB6                          Freundt - Direct

1    Q.   Now, did Anthony Murgio explain to you in any detail the

2    process by which he was going to take over the credit union?

3    A.   He said that our names were going to be put on the ballot

4    on the next elections, coming up in December, and that we were

5    going to be the only ones on the ballot so we were guaranteed a

6    place.

7    Q.   What were your obligations going to be, as a board member?

8    A.   Originally, I was going to be the chairman of the board.

9    Q.   Were you going to have any role in operating the credit

10   union?

11   A.   He wanted me to be the CFO of the credit union -- the CEO

12   at first of the credit union.

13   Q.   Did you end up being the CFO of the credit union?

14   A.   No.

15   Q.   Now, how was Anthony Murgio going to be able to choose the

16   members of the board of directors?

17   A.   What you mean?  Just put the names -- I'm not sure I

18   understand the question.

19   Q.   Sure.  You said that he was going to take over the board of

20   directors; is that right?

21   A.   Correct.

22   Q.   How was he going to get the people he wanted onto the board

23   of directors?

24   A.   Well, the pastor, Trevon Gross, was going to put our names

25   on the ballot, and then we were going to be voted in.

1    Q.  What was going to happen to the existing board of the

2    credit union?

3    A.  The original plan was, once the term ceased, they would

4    step down.

5    Q.  They were going to resign?

6    A.  Correct.

7    Q.  And what was going to happen to Trevon Gross?

8    A.  He was going to stay onboard, help the transition period,

9    and then step down.

10   Q.  Was Trevon Gross going to be paid anything during the

11   transition time?

12   A.  I later learned that he was offered a salary of $3,000 a

13   month.

14   Q.  How did you learn that?

15   A.  Through communications with Trevon Gross and Anthony

16   Murgio.

17   Q.  Did Anthony Murgio offer to pay you anything for serving on

18   the board?

19   A.  He offered $5,000 a year to participate in the board

20   meetings.

21   Q.  Did you know at that time whether it was legal for board

22   members of credit unions to receive compensation for their

23   service?

24   A.  I did not know.

25   Q.  Do you know now?

1   A.  Yes.

2   Q.  Is it legal?

3   A.  No.

4           MR. KLINGEMAN:  Objection.

5           THE COURT:  Sustained.  The jury will disregard the

6   last question and answer.

7   Q.  Did you ever receive any payments for serving on the board

8   of HOPE Federal Credit Union?

9   A.  Yes.

10  Q.  About how much did you receive?

11  A.  About $420 a month.

12  Q.  For how many months?

13  A.  For about four months.

14  Q.  Did Murgio tell you who else he was going to involve in the

15  credit union?

16  A.  Yes.

17  Q.  Who?

18  A.  Rico, Ricardo Hill, Yuri Lebedev, Tim Ellrich, Chad Lio,

19  and Kendra, that I can remember.

20  Q.  Of those individuals, did you know any of them prior to

21  getting involved with HOPE?

22  A.  I knew Yuri and I knew Ricardo personally.  I knew of Tim

23  through conversations with Anthony, him being his friend for so

24  long.

25  Q.  Now, did there come a time when you contacted Yuri Lebedev,

1   after speaking with Anthony Murgio?

2   A.   Yes.

3   Q.   Why did you do that?

4   A.   To -- again, I saw his name on the email, and I was

5   surprised, I didn't know they knew each other, and I hadn't

6   spoken to him for a while.  And I just wanted to kind of see

7   the validity of what was going on or his thoughts on what

8   Anthony was doing.

9   Q.   What did you ultimately say to Anthony Murgio's offer to

10  join the board?

11  A.   I accepted.

12  Q.   After you agreed to join the board, were you involved in

13  any emails between Anthony Murgio and Trevon Gross about the

14  deal?

15  A.   The specific deal?

16  Q.   About the deal involving the takeover of the credit union?

17  A.   Yes.

18          MR. NOBLE:  Can we bring up Government Exhibit 1107-A.

19  For the record, this is already in evidence.

20  Q.   Mr. Freundt, do you recognize this document?

21  A.   Yes, I do.

22  Q.   And this is an email from Trustee Collectables.  Who used

23  that email account?

24  A.   Anthony Murgio.

25  Q.   So it's an email from Anthony to Trevon Gross, yourself and

1    Michael Murgio; is that right?

2    A.   Correct.

3    Q.   On Friday, May 9th?  Is that right, the right date?

4    A.   Yes.

5    Q.   It states, "Trevon, glad the donation money hit the

6    account."  Do you see that?

7    A.   Yes.

8    Q.   What donation money did you understand Anthony Murgio was

9    referring to?

10   A.   My understanding was that the original donation was going

11   to be paid in $50,000 increments.  So I assumed that that was

12   part of that 50,000.

13   Q.   You see the last line, that says, "I have also copied Jose

14   Freundt.  He will be one of the board members that will be

15   running many of the operations"?  Do you see that?

16   A.   Yes.

17   Q.   Did you in fact end up running a lot of the credit union's

18   operations?

19   A.   No.

20          MR. NOBLE:  You can take that down.

21   Q.   Mr. Freundt, were you aware of the eligibility requirements

22   for becoming a member of HOPE Federal Credit Union?

23   A.   I was.

24   Q.   What were they, in general?

25          MR. CREIZMAN:  Objection time frame.

```
 1                THE COURT:  Sustained.
 2   Q.  At the time that you agreed to get involved with HOPE
 3   Federal Credit Union, were you aware of the eligibility
 4   requirements?
 5   A.  I was.
 6   Q.  What were they?
 7   A.  You had to live, work or worship in the area.
 8   Q.  Where were you living at the time?
 9   A.  In Tallahassee, Florida.
10   Q.  Did you have any kind of residency in New Jersey?
11   A.  I did not.
12   Q.  Did you work in New Jersey?
13   A.  I did not.
14   Q.  Did you worship in New Jersey?
15   A.  I did not.
16   Q.  Had you ever been to New Jersey?
17   A.  No.
18   Q.  Can you describe the process by which you became a member
19   of the board of HOPE Federal Credit Union?
20   A.  We were asked to join Collectables Club.  And after that,
21   we were asked to fill out the application form, and to fax in
22   or email a copy of our license, of our identification.
23   Q.  What was the application form that you referred to?
24   A.  The application to become a member of the credit union.
25   Q.  Did you have to pay any money to join the credit union?
```

1    A.  No.

2    Q.  Did anyone pay any money on your behalf to join the credit

3    union?

4    A.  There was money deposited into our account.  Anthony Murgio

5    did that.

6    Q.  And then after you did those steps, did there come a time

7    when an account was opened for you at the credit union?

8    A.  Yes.  After I made those steps, then I had an account with

9    HOPE Credit Union.

10   Q.  Who opened that account?

11   A.  Trevon Gross.  Or his team.

12   Q.  Did you ever speak with Trevon Gross, prior to becoming a

13   board member?

14   A.  I did.

15   Q.  What did you guys discuss?

16   A.  I just wanted to introduce myself, kind of get to know him,

17   ask him what his reasoning was behind trying to leave the

18   credit union, and just get general idea of who he was.

19   Q.  What did he say when you asked him why he wanted to leave

20   the credit union?

21   A.  He said he -- that he was tired, and that he wanted to

22   dedicate more time to his church and the pastoral duties that

23   he had neglected because of the credit union.

24   Q.  Did you ever have a conversation with Trevon Gross --

25              THE COURT:  Just a moment.

1          MR. KLINGEMAN:  I'm sorry, I didn't catch that answer.

2    I heard the question.

3          THE COURT:  I will ask you, Mr. Freundt, to repeat the

4    question.  Again, we have to make sure everybody hears, the

5    jurors as well as the lawyers and parties -- so please do keep

6    your voice up.  As much as you stay directly in front of the

7    mic, the louder it is.

8          THE WITNESS:  Okay.

9          MS. CHOI:  Your Honor, may I prop it up a little bit

10   more?  That might help.

11         THE COURT:  Sure.

12   BY MR. NOBLE:

13   Q.  I'll repeat the question, Mr. Freundt, or go back to one of

14   my earlier questions.  Did you ever have any conversations with

15   Trevon Gross prior to you becoming a board member?

16   A.  I did.

17   Q.  What did you discuss with him?

18   A.  I asked him why he wanted to relinquish control of the

19   credit union.  I just wanted to get to know him a little bit.

20   Q.  What did he tell you about why he wanted to relinquish

21   control of the credit union?

22   A.  He told me he was tired and that he wanted to get more time

23   to the church, that the credit union was taking a lot of his

24   time and he wanted to be more involved with his pastoral

25   duties.

1   Q.  Did you ever have any conversations with him about why the

2   other board members were going to resign?

3   A.  Yes.

4   Q.  What did he say in that regard?

5   A.  They were church members and some of them were old, some of

6   them were ready to retire, some of them just did that, took

7   those positions, on the board to help him but they didn't

8   really want to do that.

9   Q.  Did you ever have any conversations with Trevon Gross about

10  the finances of the credit union prior to becoming a board

11  member?

12  A.  I did.

13  Q.  Did there ever come a time when an email account was

14  created for you at HOPE FCU?

15  A.  Yes.

16  Q.  Who created that email account?

17  A.  I believe it was Trevon.

18          MR. NOBLE:  Can we bring up, just for identification,

19  Government Exhibit 1818.

20  Q.  Mr. Freundt, do you recognize this document?

21  A.  Yes.

22  Q.  What is this, generally?

23  A.  That was an email from Anthony Murgio telling us about the

24  email addresses at HOPE.

25  Q.  And what is the date of the email?

1  A.   June 17th, 2014.

2          MR. NOBLE:  Your Honor, the government offers

3  Government Exhibit 1818.

4          MR. KLINGEMAN:  No objection.

5          MR. CREIZMAN:  No objection.

6          THE COURT:  Thank you.  It's admitted.

7          (Government's Exhibit 1818 received in evidence).

8          MR. NOBLE:  May we publish that for the jury?

9          THE COURT:  You may.

10          Can we blow up the lower portion of the email.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H2ROLFB7                     Freundt - Direct

BY MR. NOBLE:

Q.  Mr. Freundt, that's an email from Trevon Gross on

June 17th, 2014 with the Subject:  Email addresses, sent to

Anthony Murgio, correct?

A.  Yes.

Q.  And I believe up above, you see that was later forwarded by

Anthony to you?

A.  Correct.

        MR. NOBLE:  Can we just go back to the lower email?

Q.  And this is an email stating generally that your HOPE FCU

email account had been set up for you and explaining how to

access it?

A.  Correct.

        MR. NOBLE:  You can take that down.

Q.  You said that you had conversations with Mr. Gross about

the credit union's finances prior to becoming a board member,

correct?

A.  I did.

Q.  Did Mr. Gross ever provide you with access to the credit

union's finances before becoming a board member?

A.  He sent me an email.

        MR. NOBLE:  Can you bring up Government's Exhibit 1788

for identification and Government's Exhibit 1831 side by side

for identification?

Q.  Mr. Freundt, do you recognize those documents?

1    A.   I do.

2    Q.   What is 1788?

3    A.   That is the email I sent to Mr. Gross, an email asking him

4    some questions about the credit union, and that email is his

5    reply.

6    Q.   And what is Government's Exhibit 1831?

7    A.   That is an email that -- letting us know that we had been

8    set up with access to the back end of the credit union.

9    Q.   Who is the email from?

10   A.   Trevon Gross.

11   Q.   And you're one of the recipients of that email?

12   A.   Yes.

13         MR. NOBLE:   Government offers Government's Exhibits

14   1788 and 1831.

15         MR. CREIZMAN:   No objection.

16         MR. KLINGEMAN:   No objection, your Honor.

17         THE COURT:   Thank you.   They're admitted.

18         (Government's Exhibits 1788 and 1831 received in

19   evidence)

20         MR. NOBLE:   May we publish 1788?

21         THE COURT:   You may.

22         MR. NOBLE:   Let's start at the top.   Blow up the top

23   portion.

24   BY MR. NOBLE:

25   Q.   Mr. Freundt, that's an email from Trevon Gross to yourself

1   on May 16, 2014 responding to an earlier email from you,

2   correct?

3   A.   Correct.

4   Q.   And Mr. Gross writes "see below.."?

5   A.   Correct.

6         MR. NOBLE:   Let's go below.

7   Q.   And I believe you said you had sent Mr. Gross some

8   questions about HOPE; is that right?

9   A.   Correct.

10  Q.   And then he responded and provided you with answers to your

11  questions?

12  A.   Correct.

13        MR. NOBLE:   You can take that down.  Let's bring up

14  Government's Exhibit 1831.  Can you blow up just the header

15  information?

16  Q.   What is the date of this email?

17  A.   June 17, 2014.

18  Q.   And is that before you became an official board member?

19  A.   Yes.

20  Q.   Let's look at the body of the email.  What does that email

21  state?

22  A.   I'm sorry?

23  Q.   Can you read the email from -- just the first paragraph.

24  A.   "Jose, Yuri Rico, and Tim.  Here is your login for our back

25  office software.  In addition, you should have received an

1  invitation from LogMeIn to access our remote machine in the

2  CU."

3  Q.  And then it provides, it looks like a user name and then a

4  login for yourself.

5  A.  Correct.

6  Q.  And that was for the back office to the credit union

7  software?

8  A.  Correct.

9  Q.  Again, this was sent before you became a board member,

10  correct?

11  A.  Correct.

12          MR. NOBLE:  Take that down.

13  Q.  Mr. Freundt, did Anthony Murgio ever ask you to share the

14  credit union's financials with anyone else before the annual

15  meeting?

16  A.  Yes, he did.

17          MR. NOBLE:  Can we bring up Government's Exhibit 1176

18  in evidence?  Can we blow that up?

19  Q.  What is this document?

20  A.  This is the email Anthony sent me asking to share the

21  information.

22  Q.  Who did Anthony want you to share the information with?

23  A.  Shoula.

24  Q.  Who is Shoula?

25  A.  He worked at Kapcharge.

1   Q.  Did you know Shoula before being involved with HOPE Federal

2   Credit Union?

3   A.  No.

4   Q.  What does he say in the first line?

5   A.  He says, "Please work with Shoula with the financials of

6   HOPE."

7   Q.  And did there come a time when you shared the credit

8   union's financials with Kapcharge?

9   A.  I sent them an email with the financials, yes.

10          MR. NOBLE:  Can we bring up just for identification

11  Government's Exhibit 1193?

12  Q.  Mr. Freundt, do you recognize this document?

13  A.  I do.

14  Q.  What is it?

15  A.  That is me forwarding the documents to Shoula.

16  Q.  And on what date did you send this email?

17  A.  June 28th, 2014.

18          MR. NOBLE:  The government offers Government's

19  Exhibit 1193.

20          MR. CREIZMAN:  No objection.

21          MR. KLINGEMAN:  No objection.

22          THE COURT:  Thank you.  It's admitted.

23          (Government's Exhibit 1193 received in evidence)

24          MR. NOBLE:  If we can just blow up the email.  Let's

25  go the whole half page.

```
 1   BY MR. NOBLE:

 2   Q.  Mr. Freundt, is this a forwarded email?

 3   A.  Yes.

 4   Q.  Who were you forwarding the email from?

 5   A.  From Trevon Gross.

 6   Q.  And then attached to it is a PDF, HOPE FCU financials?

 7   A.  Correct.

 8   Q.  And it appears you sent it to Shoula at Kapcharge; is that

 9   right?

10   A.  Correct.

11           MR. NOBLE:  Can we just publish for the jury the

12   attachment to this email?

13   Q.  What are these documents?  What's the attachment?

14   A.  Those are the financials of the credit union.

15           MR. NOBLE:  You can take that down, Mr. Chang-Frieden.

16   Q.  Mr. Freundt, did you ever travel to New Jersey to visit the

17   credit union before you became a board member?

18   A.  No.

19   Q.  Were you ever interviewed by anyone as part of the process

20   of becoming a board member?

21   A.  No.

22   Q.  Aside from Mr. Gross, did you ever speak with anybody from

23   the existing board before you were elected to the board?

24   A.  No.

25   Q.  Approximately when were you elected to the board?
```

 1  A.  The last weeks of June.

 2  Q.  June of 2014?

 3  A.  Correct.

 4  Q.  Was there any nominating committee that selected you to run

 5  to be a board member?

 6  A.  Trevon Gross.

 7  Q.  Trevon Gross was the nominating committee?

 8  A.  He's the one that selected us.

 9  Q.  And at that time, were the other individuals that you

10  talked about earlier, Ricardo Hill, Yuri Lebedev, Tim Ellrich,

11  elected, as well?

12  A.  Yes.

13  Q.  Were there any other individuals who were elected to the

14  board at that time?

15  A.  I believe Chad Leo.

16  Q.  Did you know Chad Leo?

17  A.  No.

18  Q.  Anyone else that you can remember?

19  A.  Kendra, but she wasn't a board member.

20  Q.  What was Kendra elected to?

21  A.  The supervisory committee.

22  Q.  Do you know somebody named Kevin Tomasso?

23  A.  No.  I knew of him, I did not know him personally, no.

24  Q.  Was he in any way involved with HOPE?

25  A.  He was a part of the board, yes.

H2BOLEB7                    Brandt - Direct

1   Q.   What, if anything, did those individuals who were elected

2   to the board have in common?

3   A.   We all knew Anthony Murgio.

4   Q.   Did you know where those individuals lived?

5   A.   Some of them.

6   Q.   Do you know where Ricardo Hill lived?

7   A.   In Tallahassee.

8   Q.   Yuri Lebedev?

9   A.   Jacksonville.

10   Q.   Tim Ellrich?

11   A.   Tennessee.

12   Q.   Kevin Tomasso?

13   A.   No.

14   Q.   You didn't know where he lived?

15   A.   I didn't know where he lived.

16   Q.   What about Chad Leo?

17   A.   I didn't know where he lived.

18          MR. NOBLE:   Can you we bring up Government's

19   Exhibit 788-C in evidence?   Focusing on the bottom email.

20   Q.   What is this document?

21   A.   That is an email from Anthony Murgio informing us of the

22   elections coming up.

23          MR. NOBLE:   Can we go to the top email?

24   Q.   What is this email?

25   A.   That is an email from Trevon Gross letting us know how to

```
 1   cast our votes.

 2   Q.  And what date did he send that to you?

 3   A.  June 20th, 2014.

 4   Q.  Now, did you, in fact, cast a vote in the election for the

 5   board?

 6   A.  No.

 7   Q.  Did you participate in the annual meeting?

 8   A.  No.

 9   Q.  Why not?

10   A.  I was preoccupied.

11   Q.  Did you have any concerns about whether or not you would be

12   elected to the board?

13   A.  No.

14   Q.  Why not?

15   A.  Because we were told we were going to be the only names on

16   the ballots.

17   Q.  Who told you that?

18            MR. CREIZMAN:  Your Honor, I'm sorry, I just can't

19   hear the witness very well.

20            THE COURT:  All right, thank you.

21            MR. NOBLE:  Mr. Freundt, if you can sit as close to

22   the microphone as possible and make sure you do your best to

23   speak directly into it so we all can hear you.

24            THE WITNESS:  Okay.

25   Q.  I believe you testified that you didn't have any concerns
```

1    that you were going to be elected; is that right?

2    A.   Correct.

3    Q.   And why not?

4    A.   Because we were told we were going to be the only

5    members -- or the only names on the ballots.

6    Q.   Who told you that?

7    A.   Trevon Gross sent it on an email and conversations between

8    us and Anthony Murgio.

9             MR. NOBLE:  You can take that down, Mr. Chang-Frieden.

10   Q.   Now, after you were elected to the board in June, did you

11   ever have any involvement in running the credit union?

12   A.   No.

13   Q.   Who was running the credit union?

14   A.   Trevon and Rico, to my understanding.

15   Q.   That's Rico Hill?

16   A.   Ricardo Hill.

17   Q.   As far as you knew, where was the credit union's

18   operations?

19   A.   In Tallahassee and in New Jersey.

20            MR. KLINGEMAN:  Objection, lack of foundation.

21            THE COURT:  Sustained.

22   Q.   Mr. Freundt, did there ever come a time when you visited

23   Ricardo Hill at an office in Tallahassee?

24   A.   Yes.

25   Q.   And what did you observe there?

1   A.  He was working for the credit union.

2   Q.  What was Mr. Hill doing for the credit union in

3   Tallahassee?

4   A.  He was reconciling the batches or assigning the right

5   amount to the accounts based on the ACHs.

6   Q.  Did you have any role in obtaining that office?

7   A.  I met the landlord, yes.

8   Q.  Who asked you to do that?

9   A.  Anthony Murgio.

10  Q.  And what did you do when you met the landlord?

11  A.  I collected the keys.

12  Q.  Did you have an understanding of what that office was going

13  to be used for?

14  A.  Yes.

15  Q.  What was it?

16  A.  Well, some of it was going to be used for the credit union,

17  and the other part was going to be used for Coin.mx.

18  Q.  And when you visited Rico Hill at that office, what was he

19  doing?

20  A.  He was working with the credit union doing his daily

21  duties.

22  Q.  Do you know what his duties were?

23  A.  Meaning reconciling the batches from the ACHs.

24  Q.  And he did that from where?

25  A.  Tallahassee.

H2BOLEB7                      Freundt - Direct

 1   Q.  After you were elected to the board, did you ever attend

 2   any board meetings?

 3   A.  Via telephone.

 4   Q.  Who ran the meetings?

 5   A.  Trevon.

 6   Q.  Are you familiar with a company called Kapcharge?

 7   A.  I am.

 8   Q.  How are you familiar with Kapcharge?

 9   A.  I learned that they were doing business with HOPE Credit

10   Union.

11   Q.  Where is Kapcharge based?

12   A.  Montreal.

13   Q.  Canada?

14   A.  Yes.

15   Q.  Do you know whose company Kapcharge was?

16   A.  I don't know the owners.  I know they were friends of

17   Anthony's.

18   Q.  How did you know that they were friends of Anthony?

19   A.  Conversations with Anthony.

20   Q.  What kind of business does Kapcharge do?

21   A.  They were a credit card processing, ACH processing company,

22   to my understanding.

23   Q.  Did there come a time when Kapcharge became a member of

24   HOPE?

25   A.  Yes.

1  Q.  At that time, were you aware whether Kapcharge had an

2  office in Lakewood, New Jersey?

3  A.  I was not.

4  Q.  What, if any, services did HOPE provide to Kapcharge?

5  A.  They were processing their ACHs.

6  Q.  And who was principally involved in processing ACHs for

7  Kapcharge at the credit union?

8  A.  Ricardo and Trevon Gross.

9  Q.  Based on your conversations with Ricardo Hill, what, if

10  any, monitoring of the ACH transactions was he doing?

11  A.  None.

12  Q.  Did you ever do any type of compliance training personally

13  with respect to ACH processing at the credit union?

14  A.  No.

15  Q.  Did there come a time when you personally became concerned

16  about the ACH transactions that HOPE was doing for Kapcharge?

17  A.  Yes.

18  Q.  Why were you concerned?

19  A.  Well, I approached Anthony.  I just wanted to make sure

20  that Kapcharge, being in Montreal, had the same regulations

21  that we did in the United States as far as the Patriot Act and

22  the Bank Secrecy Act and all those type of things.

23  Q.  What did he tell you?

24  A.  He said Canada has the same regulations as the United

25  States so everything was taken care of.

H2ROLFB7                    Freundt - Direct

 1   Q.  Why were you concerned about those things?

 2   A.  Because I wanted to make sure we weren't helping anybody do

 3   anything illegal or any terrorists or things like that.

 4            MR. NOBLE:  Can we bring up Government's Exhibit 1853

 5   for identification?

 6   Q.  Mr. Freundt, do you recognize that document?

 7   A.  I do.

 8   Q.  What is this?

 9   A.  That's an email from Anthony in regards to the hits we had

10   with the OFAC.

11   Q.  What's the date of this document?

12   A.  That is November 12th, 2014.

13            MR. NOBLE:  The government offers Government's

14   Exhibit 1853.

15            MR. CREIZMAN:  No objection.

16            MR. KLINGEMAN:  No objection.

17            THE COURT:  Thank you.  1853 is admitted.

18            (Government's Exhibit 1853 received in evidence)

19            MR. NOBLE:  May we publish that for the jury?

20            THE COURT:  You may.

21   BY MR. NOBLE:

22   Q.  So explain to the jury what this email was, Mr. Freundt.

23   A.  That email was an email that we received saying that there

24   were a number of hits on the OFAC list.

25   Q.  Do you have an understanding of what's on the OFAC list?

 1   A.  Yes.

 2   Q.  What's on the OFAC list?

 3   A.  Those are names that are associated with illegal activities

 4   such as money laundering, terrorism, tax evasion, things like

 5   that.

 6   Q.  How did you react when you received this email?

 7   A.  I was very concerned and upset.

 8   Q.  Why?

 9   A.  Because we have a liability issue and we have the duty to

10   make sure that doesn't happen.

11   Q.  What, if any, policies and procedures did HOPE Federal

12   Credit Union have in place around that time to scrub ACH

13   transactions against the OFAC list?

14   A.  None that I know of.

15        MR. NOBLE:  You can take that down.  Can we bring up

16   Government's Exhibit 4500 in evidence?

17   Q.  Mr. Freundt, do you recognize generally what this is?

18   A.  I do.

19   Q.  What is it?

20   A.  That is a WhatsApp chat.

21   Q.  And what is WhatsApp?

22   A.  It's a messaging system for telephones.

23   Q.  Is that a messaging system that you used to communicate

24   with Anthony Murgio and others?

25   A.  Yes.

 1            MR. NOBLE:  Can we scroll down or zoom out to --

 2   yes -- to line 688.

 3   Q.  Do you see line 688, Mr. Freundt?

 4   A.  Yes.

 5   Q.  What does that indicate in the WhatsApp conversation?

 6   A.  That I was added to that conversation.

 7   Q.  So everything after this is a conversation that you

 8   participated in?

 9   A.  Correct.

10            MR. NOBLE:  Can we flip to line 772?  I'm sorry,

11   actually, let's start with 753.

12   Q.  Line 753.  Mr. Freundt, I may ask you to read some of these

13   lines just so we can trade off a little bit.

14   A.  Okay.

15   Q.  I'll begin by reading the message that Trevon Gross sent.

16            "Just got off the phone with Bob at Magic Writer.

17   Here are his issues which raised red flags.

18            "1.  Size of transactions relative to size of CU.

19            "2.  Third-party people accessing the upload

20   functionality and approving batches without CU input, credit

21   union input.

22            "3.  Some people who receive money were on the OFAC

23   watch list which means we are giving money to people who in

24   some way violate Patriot Act, BSA.  He said he would only

25   resume with a letter from the FRB."

1    Can you read what Mark Francis responded, next line?

2    A.  "Okay.  Can he tell us who was on the watch list?"

3    Q.  And Anthony Murgio responds, "Man.  I will get a system to

4    check for this.

5    Can you please read what Trevon Gross wrote?

6    A.  He stopped what's gone but he said he would have them

7    forwarded over tomorrow."

8    Q.  Then Mark Francis replied, "Can we have Rico or Jose upload

9    the batches or get some virtual connection to do it through the

10   CU?"

11   MR. NOBLE:  Holding there for a second

12   Mr. Chang-Frieden.

13   Q.  Mr. Freundt, did you have any role in uploading batches or

14   processing ACH transactions for the credit union?

15   A.  No.

16   Q.  Okay.  Who was doing that again?

17   A.  Ricardo.

18   Q.  And then, I'm sorry, Anthony Murgio responds, "What?  Did

19   you not just see what he wrote?"

20   And then how did Mark Francis respond, the next three

21   lines?

22   A.  "Yes, I did.  Point 2 states that that did not look like

23   that Kevin had access to the system.  The OFAC needs to be

24   clarified and the size of transactions really should not be an

25   issue."

1    Q.  Mr. Freundt, directing your attention to line 770, did you

2    know anyone named Kevin Pepe at Kapcharge?

3    A.  No.

4    Q.  And then Trevon Gross on line 775 replies, "It's the

5    overall volume that is the risk.  We are pushing millions

6    through a CU that has 100K dollars in assets."

7         Can you read what Anthony Murgio responded?

8    A.  "I have a checker for every company."

9    Q.  Then Mark Francis responded, "Kevin says he can handle the

10   OFAC and that maybe we could do things remotely.  He also

11   thinks we should scale down TransferWise."

12        MR. NOBLE:  Can we flip to line 934?

13   Q.  There, Mark Francis wrote, "Next thing is setting up the

14   risk procedures for the CU and capitalization."

15        How did Anthony Murgio respond?

16   A.  "Yes."

17   Q.  Mark Francis said, "Okay.  Let's get that done."

18        And then Anthony?

19   A.  "We need to be scrubbing for OFAC.  I don't ever want to

20   depend on others."

21   Q.  Mark Francis writes, "Let's look at the OFAC and batch

22   process immediately."

23        And Anthony responds?

24   A.  "From now on it will be from the CU."

25   Q.  And Kevin Pepe, Kap, responds, "Not sure how you would

H2BQLEB7                    Freundt - Direct

1    implement that at the CU."

2              How did Mark Francis respond?

3    A.  "Oh, it should be a risk requirement at the very least, I

4    guess."

5    Q.  And Kevin responded, "Doesn't MW have the ability to scrub

6    to OFAC?"

7              And how did Anthony Murgio respond?

8    A.  "Looks like we aren't using it."

9              MR. NOBLE:  Can we scroll to line 1450?

10   Q.  There Kevin Pepe writes, "Trevon.  Do you have the

11   transaction details for the OFAC hits?  Can you get them from

12   MW?"

13             And then can you read what Mark Francis responds?

14   A.  "We have informed the clients that there is a temporary

15   disruption in processing until HOPE gets our contracts with the

16   fed set up."

17   Q.  Please continue.

18   A.  "If someone can answer me about opening operating accounts

19   that's something we can continue to work on if that's ok. Also

20   can we get the list of accounts that was flagged by OFAC for us

21   to review. Thanks."

22   Q.  And then Anthony Murgio responds, "We put in a call about

23   OFAC."

24             And what did Mark Francis say?

25   A.  He asked if it was placed to MW.

1   Q.  And Anthony Murgio says, "Yes."

2          And then Mark Francis says?

3   A.  "Okay."

4   Q.  Trevon Gross writes, "Are you asking about master account

5   with FRB?

6          And how does Mark Francis respond?

7   A.  "No.  Operating accounts at HOPE for our clients.  We spoke

8   about that as well on Friday."

9   Q.  What did Mark Francis write?

10  A.  "I just don't want to move forward on it if it complicates

11  things."

12  Q.  Trevon Gross writes, "Oh, as long as they have Lakewood

13  address that is fine."

14         How does Mark Francis respond?

15  A.  "So that still applies and nothing has changed there.  Rico

16  can you get Kirk the info as we discussed on Friday, please?"

17  Q.  Trevon Gross writes, "Are they going to do the volume of

18  ACH like you all?"

19         And how does Mark Francis respond?

20  A.  "They want to do ACH through us, but that won't happen for

21  another week or so according to Anthony.  Until then I figure

22  we can set them up with operating accounts for their day-to-day

23  needs."

24  Q.  And Trevon Gross writes, "Yes."

25         How does Rico respond?

H2BOLFB7                      Freundt - Direct

1    A.   "Yes, I can get that info to Kirk."

2    Q.   And then response, "Thank you."

3         Then Pepe writes?

4    A.   "Sorry to be hitting you guys up on WhatsApp, but, uh, but

5    listen, I just, we just had a look at the OFAC hit list that,

6    uh, Rico just sent, and, I mean, that's, those are pretty weak

7    hits. We see that, uh, we have transactions showing that, uh,

8    that use the name Garcia. And it hits based on the name Garcia.

9    So I don't understand how they would consider that a possible

10   hit, as Garcia's a very common name [laughs]. Um, I don't know.

11   There's a gazillion of them in that email you sent us, and, uh,

12   it's very, very weak. I don't know how they can justify that

13   we're getting hits to the OFAC, um, based on the information

14   they just sent. It doesn't make, it doesn't make any sense."

15        MR. NOBLE:  You can take that down, Mr. Chang-Frieden.

16   Q.   Mr. Freundt, while you were involved in the credit union,

17   did Mr. Gross ever raise any concerns about ACH processing at

18   HOPE?

19   A.   Yes.

20   Q.   And about when did he raise those concerns?

21   A.   Sometime in May, June, July.

22   Q.   And what was his concern?

23   A.   The amount of ACHs that were happening.

24   Q.   Now, did there ever come a time when Mr. Gross said to stop

25   processing ACH transactions at HOPE?

 1   A.  No.

 2   Q.  To your knowledge, did Mr. Gross ever cut off the

 3   Collectables Club or Kapcharge while you were involved in the

 4   credit union with respect to ACH processing?

 5   A.  No.

 6   Q.  In late 2014, did there come a time when you became aware

 7   that the NCUA was going to be conducting an examination at

 8   HOPE?

 9   A.  Yes.

10   Q.  When did you learn this?

11   A.  Towards the end of that year Mr. Gross was saying that the

12   examiners were coming about every two weeks to the credit

13   union.

14   Q.  And did you have any discussion with Mr. Gross about what

15   the NCUA's concerns were?

16   A.  They were concerns with the amount of transactions that we

17   were sending through, and that the board members were -- you

18   know, they were not eligible to be board members of the credit

19   union.

20             THE COURT:  Just a moment.

21             MR. CREIZMAN:  I could not hear that answer.

22             THE COURT:  Could you repeat it?  Again, Mr. Freundt,

23   you need to keep your voice up.

24   Q.  So what were the concerns of the NCUA, according to

25   Mr. Gross?

1    A.   The amount of transactions based on the size of the credit

2    union and the board members' eligibility to be board members,

3    or members of the credit union.

4    Q.   Which board members in particular?

5    A.   Myself, Ricardo, Yuri, Tim, Chad, everybody that was from

6    Anthony's group.

7            MR. NOBLE:  Can we bring up Government's Exhibit 6091?

8    It's in evidence so we can publish for the jury.

9            THE COURT:  Go ahead.

10            MR. NOBLE:  Blow up the top of this.

11   Q.   Mr. Freundt, do you recognize this document?

12   A.   Yes.

13   Q.   What is it?

14   A.   Those are minutes from a previous meeting.

15   Q.   What is the date of the board meeting?

16   A.   November 15th.

17   Q.   2014?

18   A.   Correct.

19   Q.   And it indicates that the board members present included

20   yourself, correct?

21   A.   Correct.

22   Q.   And Ricardo Hill?

23   A.   Yes.

24   Q.   Yuri Lebedev?

25   A.   Correct.

1          MR. NOBLE:  And can we just zoom out and then blow up

2     the chairman's report through the resolution?  You can go up a

3     little bit.  Okay.

4     Q.  Do you see under "chairman's report by Trevon Gross" it

5     states, "Presented the DOR from the March 31st examination

6     about the FOM violations.  The board expressed concern about

7     the decision to remove newly elected board members because we

8     had received information from Consumer Affairs that low-income

9     credit unions could have associations in their FOM be part of

10    the CU."

11         Mr. Freundt, did you participate in this board

12    meeting?

13    A.  No.  Which one?

14    Q.  It says you were present, though, correct?

15    A.  Correct.  On the November 1, yes.

16    Q.  So you did participate in this meeting.

17    A.  Yes.

18    Q.  And do you recall being presented with any report from the

19    NCUA about board membership eligibility?

20    A.  No.

21    Q.  Do you see under the bold heading "resolution", and then

22    there's a number?

23    A.  Yes.

24    Q.  It says, "Resolved that in response to the DOR dated

25    March 31st, 2014, the newly elected board members outside the

1   FOM hereby voluntarily vacate all offices held and seats on the

2   board and are moved to an advisory board status with no voting

3   rights.  Moved by G Wyatt, seconded by B Larkins, unanimously

4   approved."  Do you see that?

5   A.  Yes.

6   Q.  Did that happen at this board meeting?

7   A.  No.

8   Q.  Did you voluntarily agree to vacate your position on the

9   board and move to an advisory board?

10  A.  No.

11  Q.  Was there any discussion of you doing that at this board

12  meeting?

13  A.  No.

14  Q.  Is that something that you would have done?

15  A.  No.

16  Q.  Why not?

17  A.  Because we were trying to get on the board.

18  Q.  And you were on the board at that time, correct?

19  A.  Correct.

20  Q.  Is that something that Anthony Murgio would have permitted

21  you to do?

22  A.  No.

23  Q.  Why not?

24  A.  Because he wanted control of the credit union.

25           MR. NOBLE:  You can take that down.

H2BOLFB7                    Freundt - Direct

2008

 1  Q.  Mr. Freundt, following that November 15th board meeting

 2  that you participated in by phone, what was your understanding

 3  as to whether you were still an active official board member of

 4  the credit union?

 5  A.  My understanding was that we were still board members.

 6        MR. NOBLE:  Can we bring up Government's Exhibit 4504

 7  in evidence?

 8        THE COURT:  While that's coming up, I'll invite the

 9  jury to take a standing break with me.  We have half an hour

10  left in the day.

11        (Pause)

12        THE COURT:  We're going to pause for a moment.  If

13  anyone else wants to go, you might as well.  We'll just wait.

14  You can stand or sit as you like.

15        (Pause)

16        You may proceed.

17        MR. NOBLE:  Can you bring up Government's Exhibit 4504

18  in evidence?  Can you please scroll to line 3552?

19  BY MR. NOBLE:

20  Q.  Mr. Freundt, I'd like to read up to line 3594.  I'll tell

21  you when to stop.  Please read your part, and I'll read the

22  part of Anthony Murgio, starting with line 3552.

23  A.  "Did you meet with Trevon?"

24  Q.  To orient the jury, what is the date of this communication?

25  A.  November 11th, 2014.

1   Q.  I believe -- sorry, hard to read -- but I believe it's

2   November 19th, 2014; is that right?

3   A.  Correct, November 19th.

4   Q.  Go ahead.

5   A.  "Did you meet with Trevon?"

6   Q.  "Yes.  Acting shady but please come."

7   A.  I've already booked my flight."

8   Q.  "Okay."

9   A.  "I suggest we split divisions consumer and business, make

10  his director of consumer services so he can concentrate on

11  growing the membership and it also deletes his power."

12  Q.  "He is trying to get our guys to become advisory members so

13  we lose voting rights.  Annual report shows us having power."

14          You can just stop there for a second.

15          The date of this conversation is after the

16  November 15th board meeting that we just talked about, correct?

17  A.  Correct.

18  Q.  Go ahead and read line 3560.  You can skip the expletive,

19  just is a start with "dude"?

20  A.  "Dude, you need to make a move and do it soon rather than

21  later.  You should know what greed does to people."

22  Q.  "It's crazy, man."

23  A.  "And now I think about it, he keeps using strong words and

24  consequences to the board trying to scare us off the

25  positions."

1   Q.  "Yup."

2   A.  "Well, that's -- what's your plan of action?  Obviously

3   something has to be done."

4   Q.  "I want to discuss with all of you."

5   A.  "Do we have the power to fire/evoke him?"

6   Q.  "The board is 6/6."

7   A.  "So stale.  Can you get money back?"

8   Q.  Just pausing there, what money were you referring to?

9   A.  The donation money.

10  Q.  And then Anthony Murgio responds, "Right.  I have

11  contracts, et cetera."

12  A.  "What contracts?"

13  Q.  "Well, it's not about the money.  Um, I actually got Kap

14  who they're conspiring with to go around me to put up the money

15  because they were willing to put up the money if I allowed them

16  to process short-term lending people through the credit union."

17  A.  "Have you spoken to Kap?"

18  Q.  Go ahead.

19  A.  "Sounds like you -- we are about to get expelled."

20  Q.  "Yes.  And yes, they are trying to."

21  A.  "Do you know this for sure?"

22  Q.  "To some extent, yes."

23  A.  "What did Kap say?  What's the plan of action?"

24  Q.  "They were saying, KAP was trying to get me to sign an

25  exclusive for the credit union and I didn't want to because,

1    um, I didn't want to give them that power and I already had an

2    exclusive with the credit union that I signed with currency

3    enthusiast.  My whole thing with them, hence why I didn't even

4    have a contract with them is that they were going to put up the

5    money. I could have gotten the money easily from my other guys,

6    but they were going to put up the money. Um, because we were

7    going to allow them to process short term lending loans which

8    it's hard to get banking and so, but I was always to retain

9    power hence why all of our guys are on the board and none of

10   their's were and we would just allow them to do that."

11   A.  "What can you do now to stop all this?"

12   Q.  "I have all the funds we need."

13   A.  "What happened with Kap that they were willing to mess your

14   friendship up?"

15   Q.  "I guess so."

16         THE COURT:  Just -- I appreciate you skipping the

17   expletive, but I will ask not to change the words, you can just

18   skip expletives.

19   Q.  You can say "F".

20   A.  Understood.

21   Q.  And Anthony Murgio says, "I guess so.  They are trying to

22   go around."

23   A.  "Funds for what?  We don't need funds, we have to have

24   control of the credit union."

25   Q.  "You're right.  That's what I want.  But what I'm saying is

 1   I have funds to pay whoever.  However, to just make sure we can

 2   keep."

 3   A.  "How will you be paying someone get you control of the

 4   credit union?  Paying someone off?  What is Kap saying in all

 5   of this?"

 6   Q.  "Kap is trying to control through Trevon."

 7   A.  "Can't F trust anyone anymore.  Not even a pastor.  Things

 8   getting better with Trevon?"

 9   Q.  You can stop there.

10        MR. NOBLE:  You can take that down, Mr. Chang-Frieden.

11   Q.  Now, around that time that you were having this

12   conversation, did you have any discussions with Anthony about

13   traveling to New Jersey to the credit union?

14   A.  Yes.

15   Q.  And did there come a time when you, in fact, traveled to

16   New Jersey to meet at the credit union?

17   A.  Yes.

18   Q.  How many days were you in New Jersey for that meeting?

19   A.  We arrived Thursday, midnight, and left Sunday morning.

20   Q.  And what was the purpose of traveling to New Jersey?

21   A.  We were going to meet Trevon and have a board meeting.  We

22   were going to look for some brick and mortar places to open up

23   branches.

24   Q.  Now, were you aware at the time that the NCUA had

25   instructed the credit union to remove you and others from the

H2BOLEB7              Frecandt - Direct              2013

 1    board?

 2    A.   No.

 3    Q.   Where did you stay when you were in New Jersey?

 4    A.   About 20 minutes away from the church.

 5    Q.   Did there come a time when you and the other board members

 6    met with Trevon Gross at the credit union?

 7    A.   Well, we met Friday and Saturday of that weekend.

 8    Q.   Where did those meetings take place?

 9    A.   At the branch, at the credit union.

10    Q.   Now, I'd like to walk through those two days of meetings.

11    You said there was one on Friday, one on Saturday?

12    A.   Correct.

13    Q.   So let's start with the Friday meeting.  To the best of

14    your recollection, who was present at that meeting?

15    A.   Trevon, Anthony, his dad, myself, Mark Chung, Rico, Yuri,

16    Tim Ellrich, and Bernard was in the office next door.

17    Q.   Who is Bernard?

18    A.   He was the current treasurer, CFO.  He wasn't at the table,

19    he was in a separate room.

20    Q.   And what happened at that meeting on Friday?

21    A.   We were meeting, just discussing the ACHs, how to move

22    forward.  That meeting was set up because there were some

23    examiners coming over, and we coincided to give the impression

24    of a board meeting.  But mainly the discussions were just how

25    to move forward with the ACHs, what to do next, and kind of how

1    we were going to expand our field of memberships with New

2    Jersey and maybe Florida.

3    Q.  Was it your understanding at the time that you were going

4    to retain control of the credit union?

5    A.  Yes.

6    Q.  Now, you mentioned that you knew that there were going to

7    be examiners around the credit union around that time?

8    A.  Yes.

9    Q.  Did you ever see any examiners?

10   A.  Yes.

11   Q.  Tell the jury what happened.

12   A.  Shortly after we met, I saw, to the best of my

13   recollection, two examiners walking in.  They were greeted by

14   Mr. Trevon and they conducted business in a separate room.

15          MR. KLINGEMAN:  Your Honor, I'm sorry, I couldn't hear

16   that.

17          THE COURT:  I'll ask you to repeat the answer,

18   Mr. Freundt.  Again, you have to keep your voice up.

19          THE WITNESS:  I'm sorry.  Repeat the question, please.

20   BY MR. NOBLE:

21   Q.  Sure.  I believe I asked you about what you saw with

22   respect to the examiners.

23   A.  Yes.  That shortly after we started our meeting, they came

24   in, a gentleman and a lady, and they were greeted by

25   Mr. Trevon, and they conducted business in a separate room.

 1  Q.  So they didn't stay in the same room as you and the other

 2  board members and Trevon Gross?

 3  A.  Not direct.  In the same building, but not in the same

 4  room.

 5  Q.  Do you know their names?

 6  A.  No.

 7  Q.  You said one was a male and another was female?

 8  A.  To the best of my recollection, yes.

 9  Q.  Now, did you or any of the other board members affiliated

10  with Anthony Murgio speak with the examiners?

11  A.  Not that I saw, no.

12  Q.  During that meeting, while the examiners were on site, did

13  you have any discussions about making payments to Trevon Gross

14  or Hope Cathedral?

15  A.  No.

16  Q.  What did you do after meeting with Trevon Gross?

17  A.  We went our separate ways.  We went to look for buildings.

18  Q.  What do you mean, you went to look for buildings?

19  A.  With the purpose of renting to have a branch.

20  Q.  Mr. Freundt, make sure you keep your voice up.  Maybe I'll

21  be a little louder so it will force you to do a little louder

22  back toward me.

23          Explain exactly what were you looking for, where were

24  you looking.

25  A.  We were looking for buildings to rent in the Jersey area

1    for branches, to have an actual branch.

2    Q.  For a branch of the credit union?

3    A.  Correct.

4    Q.  And did you do anything after looking for that office

5    space?

6    A.  That day, we went back to the hotel rooms.

7    Q.  And you said you returned to the credit union the next day

8    for more meetings?

9    A.  Correct.

10   Q.  Before going to that meeting, did you have any

11   conversations with Anthony Murgio at the hotel?

12   A.  Yes.

13   Q.  What did you discuss with Anthony during that conversation?

14   A.  He wanted -- he presented the role he wanted me to have

15   with the credit union.  He asked me if I was interested in

16   moving forward with the credit union and asked me if I wanted

17   to move to New Jersey.

18   Q.  Did you want to move to New Jersey?

19   A.  No.

20   Q.  Did you ask Anthony Murgio any questions when he asked you

21   about your potential involvement with the credit union going

22   forward?

23   A.  Yes.

24   Q.  What did you ask him?

25   A.  I told him I was not willing to move forward until I

1    understood the relationship between him and Vladimir.

2    Q.  Who was Vladimir?

3    A.  Vladimir was his financial backer in Russia.

4    Q.  His financial backer for what?

5    A.  For everything, as far as I understand.

6    Q.  What, if anything, did Anthony Murgio tell you about

7    Vladimir?

8    A.  That on that meeting, that he would set up a meeting for us

9    to meet.

10   Q.  He would set up a time for you to speak with Vladimir?

11   A.  Well, he offered me and Tim, who had expressed the same

12   concerns, to fly us to Europe and meet him personally at one

13   point.

14   Q.  Do you know whether Vladimir went by any other name, like

15   Vlad?

16   A.  Vlad, yes.

17   Q.  After having that conversation with Anthony Murgio, what

18   did you guys do?

19   A.  We went back to the credit union.

20   Q.  Were any NCUA examiners present at the credit union that

21   day?

22   A.  No.

23   Q.  Do you know whether any portion of the meeting on Saturday

24   was recorded?

25   A.  I do.

 1   Q.   By whom?

 2   A.   Anthony Murgio.

 3   Q.   How did you learn that?

 4   A.   It was presented to me when I met with the FBI.

 5   Q.   Did you know at the time --

 6             MR. CREIZMAN:  I'm sorry.  I didn't get the last part.

 7             THE COURT:  Just a moment.

 8             Repeat your answer, Mr. Freundt.

 9             THE WITNESS:  It was presented to me at one of the

10   meetings with the FBI.

11   Q.   So you listened to the recording prior to testifying today?

12   A.   Yes.

13   Q.   But before that, were you aware that a recording existed of

14   the meeting?

15   A.   No.

16   Q.   Can you explain, was the entire portion of the meeting on

17   Saturday recorded or was it just --

18   A.   No, it was the second half of the meeting.

19   Q.   So explain to the jury what happened during the first half

20   of the meeting.

21   A.   During the first half of the meeting, we discussed, again,

22   going back to what we had met before on Friday, just the ACH,

23   what we were going to do with Kapcharge.  At that point is when

24   I learned that there were some issues with the residency and

25   who was going to permanently move to New Jersey in order to

1   satisfy those concerns, and it was decided that we were going

2   to have a capital injection of -- to have more assets on the

3   credit union.

4   Q.  And why did you decide to have a capital injection?

5   A.  To ease the concerns of the NCUA as far as the risk.

6   Q.  Okay.  And what was the size of the capital injection going

7   to be?

8   A.  The original amount was 500,000.

9   Q.  You said that there were two halves to the meeting.  How

10  did the first half end?

11  A.  We all agreed on the capital injection, we all agreed on

12  some of the board members resigning, and we shook hands, and we

13  got up.

14  Q.  To be clear, which board members were you referring to who

15  were going to resign?

16  A.  The ones that were previous to us.

17  Q.  The ones -- the previously existing board members?

18  A.  Correct.

19  Q.  So they still had not resigned at the time of the November

20  meeting?

21  A.  Correct.

22  Q.  Why were those individuals going to resign at that time?

23  A.  For us to have control of the credit union at that point.

24  Q.  And then what was going to happen after you had control?

25  A.  As far as?

1    Q.   As far as the capital infusion.

2    A.   The capital infusion was going to happen.

3    Q.   So was there an agreement on the timing of the capital

4    infusion and the board resignations at the end of the first

5    half of the meeting.

6    A.   It was agreed that -- there wasn't a specific chronological

7    order of things happening, it was just going to be okay, we're

8    going to have the capital infusion, injection, and then the

9    board members are going to resign.

10   Q.   And what happened after the first half?

11   A.   We were called back in by Trevon Gross.

12   Q.   What do you mean you were called back in by Trevon Gross?

13   A.   We went our ways.  We were sitting in the car for about

14   five minutes.  Trevon, Anthony, and Anthony's dad stayed

15   behind.  And we heard some arguing.  And then Trevon Gross came

16   out and called us back into the room.

17   Q.   Did you go back inside?

18   A.   Yes.

19   Q.   And is that the portion of the meeting that was recorded?

20   A.   Correct.  That's when it started being recorded.

21              MR. NOBLE:  Can we publish for the jury Government's

22   Exhibit 2506-T in evidence?  Can we just blow up the top

23   portion?

24   Q.   Mr. Freundt, do you recognize this document?

25   A.   Yes.

 1    Q.  What is it?

 2    A.  That's the transcripts of the conversations.

 3    Q.  And you're one of the participants in this conversation?

 4    A.  Correct.

 5    Q.  Were you present for the entirety of the recorded portion

 6    that's reflected in the transcript?

 7    A.  Yes.

 8    Q.  And did you have a chance to review this transcript prior

 9    to testifying today?

10    A.  I did.

11    Q.  We're not going to replay this for the jury, but I would

12    like to ask you about certain portions of the transcript,

13    Mr. Freundt.

14    A.  Okay.

15              MR. NOBLE:  Could we just flip first to the bottom of

16    page 2?  Can we just blow up the very bottom?  That's fine.

17    Q.  Mr. Freundt, do you see where you said, "The conversation

18    that happened after we left we're completely ignorant to."

19    What conversation are you referring to?

20    A.  To the one that caused the argument between Anthony, Mike,

21    and Gross.

22              MR. NOBLE:  Let's keep scrolling to the top of the

23    next page.

24    Q.  Then Mike Murgio wrote, "No – no no ok, let me – let me –"

25    And what did you say?

1    A.  "It's not it - ok but I'm saying it's not we have a

2    conspiracy here."

3    Q.  What do you mean when you said "it's not we have a

4    conspiracy here"?

5    A.  Well, when we first came in, Mr. Gross was saying that we

6    had changed the original agreement, and I was letting him know

7    that I had no part in that, and I wasn't present to the

8    conversation that he had with Anthony or his dad, so there

9    wasn't a conspiracy between us to change the agreement.

10   Q.  And what agreement are you referring to?

11   A.  To the capital injection and the other board members

12   resigning.

13          MR. NOBLE:  Can we flip to page 5 of the transcript?

14   Can we just blow up the line beginning where Mr. Gross says

15   "because here's the thing".  Yeah.  The middle third of the

16   page.

17   Q.  Mr. Gross says "Because here's the thing. The original plan

18   was, you all be added to the board, and in September all of us

19   resign."  Do you see that, Mr. Freundt?

20   A.  I do.

21   Q.  Do you know what he was referring to by "the original

22   plan"?

23   A.  Correct.  The original plan was that once we were all voted

24   in, the other board members would resign.

25   Q.  The other -- the existing board members were going to

1   resign.

2   A.   Correct, the existing board members.

3   Q.   Why was there originally going to be a delay between you

4   becoming a board member and the other members resigning?

5   A.   Transition period.

6   Q.   Did you ever have any conversations with anyone regarding

7   the NCUA's view of those resignations?

8   A.   It was stated that if we all -- if they had a mass exodus,

9   it would raise red flags with NCUA.

10  Q.   You said "it is stated".  Who stated that?

11  A.   Email exchange between Trevon and Anthony.

12  Q.   And then Anthony Murgio says, "Right."

13          Michael Murgio says, "Agreed."

14          Mr. Gross says, Did not – we went through our annual

15  exam in March. The NCUA in July, because of all the stuff with

16  Alloya, came pouncing back in here –

17          Michael Murgio, "Right."

18          Anthony Murgio, "Right."

19          Gross, "At that point, you and I talked, Anthony –"

20          Michael Murgio, "And it made sense."

21          Gross, "And – no no no no no but that – no – and said,

22  "we can't resign now, because a mass exodus of old board

23  members."

24          Anthony, "Would not look good."

25          Gross, "Would send more red flags."

H2BOLFB7                        Freundt - Direct                        2024

1                    Did I read that correctly?

2    A.   Yes.

3    Q.   And was that part of the original plan that you were

4    describing earlier?

5    A.   Correct.

6                    MR. NOBLE:  Can we flip to page 12, please?  And blow

7    up the bottom third.

8    Q.   Mr. Freundt, do you see where Mr. Gross says, "To have all

9    of these examiners, one after another after another after

10   another, come through here. And the tap dances we've been

11   doing –"

12                   Michael Murgio, "Mmhmm."

13                   Gross, "You see? So, I apologize for the emotion,

14   because I like to [UI] business, [UI] handle business."

15                   Anthony, "Yeah."

16                   Gross, "But as I said earlier, I'm tired.  And I don't

17   know if I can adequately convey that.  Okay?  So I agree with

18   you, but I guess the only thing for me is we've honored

19   everything we put on the table."

20                   Anthony, "And and."

21                   Gross, "From day one."

22                   Stop there.

23                   Do you see where Mr. Gross says, "We've honored

24   everything we put on the table?"

25   A.   Yes.

H2BOLEB7                     Freundt - Direct                     2025

1   Q.  Did you have an understanding at that time what he was

2   referring to?

3   A.  His end of the deal with the board members.

4   Q.  And what was that?

5   A.  Of the resignation or staying aboard, whatever was being

6   decided at the time.

7   Q.  And I believe you testified earlier that he had helped

8   nominate you and get you elected to the board?

9   A.  Correct.  That's part of that deal that was honored.

10           MR. NOBLE:  Can we scroll to the top of page 13?  Blow

11  up the top third.  Keep going.  That's fine.

12  Q.  Gross continued, "So – but just – let me – so just –

13  bookend it."

14           Anthony, "Okay.  Yeah, yeah."

15           Gross, "And what I'm saying is, to give a level of

16  peace, and start turning off, or putting out some of these

17  fires. A capital injection would help kind of undo a lot of

18  what has gone on over the last four or five months. Not that,

19  not that what – as we said earlier in this meeting."

20           Mr. Freundt, capital injection, is that what you were

21  referring to earlier in your testimony that you had discussed

22  at the earlier part of the meeting?

23  A.  Correct.

24  Q.  Anthony Murgio clears his throat.

25           Mr. Gross continues, "I don't get a dime of that

 1    money."

 2              Just stopping there.

 3              Mr. Freundt, do you understand what money he was

 4    referring to when he says he wasn't going to get a dime of?

 5    A.   Of the capital injection money.

 6    Q.   What was that money supposed to be used for?

 7    A.   It was going to put in the books as an asset to create less

 8    risk to the NCUA.

 9    Q.   And that was in connection with the ACH processing?

10    A.   Correct.

11    Q.   Mr. Gross continues, "I did talk about the money I was

12    supposed to get."

13              Do you understand what he was referring to about the

14    money he was supposed to get?

15    A.   The original donations.

16    Q.   So he was still owed money that Anthony had promised him?

17    A.   Yes.

18    Q.   Was that your understanding at the time?

19    A.   Yes.

20    Q.   "I don't get a dime of that money. I did talk about the

21    money I was supposed to get. I don't get a dime of whatever you

22    put in. Just like whatever was put in by KapCharge. I don't get

23    a dime of that. That went to the bottom line of the credit

24    union, and it's been sustained in the credit union to work."

25              Anthony says, "Okay. So --"

 1          And Gross says, "So, so, so, there is an immediate

 2   need of capital infusion into your credit union, because I

 3   don't think it will survive the scrutiny of the examiners that

 4   are coming in, if we don't show real cash on the books before

 5   they get back here."

 6          Do you see where he wrote "your credit union"?

 7   A.   Correct.

 8   Q.   What is your understanding of who he was referring to?

 9   A.   Anthony Murgio.

10   Q.   Who had control of the credit union at that time?

11   A.   We don't know.  Anthony Murgio's?

12   Q.   I'm sorry.  What did you say?

13   A.   Well, there was a debate of how many board members there

14   were and who actually had control, but it was our understanding

15   that Anthony Murgio's group was running the credit union.

16   Q.   Okay.

17          MR. NOBLE:  Can we flip to the next page?  Can you

18   blow up the top third again?

19   Q.   Mr. Freundt, do you see where Mr. Gross writes, on the

20   third line, "But none of us, none of us are examiners. What I'm

21   saying is, they're looking at volumes, and they're running

22   percentages based on the amount of money moving. And what the –

23   and what I want to make sure of is when they look and say, "Hey

24   you all did not do your BSA like you should have on all these

25   transactions that went through your credit union.".

1           Anthony says, "Right."

2           Gross says, "And as a result, you know, we're

3    concerned that you have an exposure of --"

4           Tim Ellrich says, "Money laundering, anything."

5           And Gross says, "Yeah."

6           And Anthony says, "Well, know no that, the funds would

7    come back through."

8           And Gross says, "No no, but the point is we don't know

9    that all the peop - we can't certify that all the people we let

10   money pass through this credit union to go to weren't doing

11   something illegally with the money."

12          Did you have an understanding of what Mr. Gross was

13   saying there?

14   A.  Yes.

15   Q.  What was your understanding?

16   A.  That some issues with the OFAC hit list, and that there

17   were no controls as to verify who we were doing business with

18   or who Kapcharge was sending money through.

19   Q.  Okay.  So as of the date of this meeting, November 22nd,

20   2014, to your knowledge, did the credit union have in place any

21   type of policies or procedures or controls that applied to ACH

22   processing?

23   A.  No, other than believe that Kapcharge was doing that.

24   Q.  Say that again?

25   A.  The belief was that Kapcharge was doing that on their own.

1   Q.  You had a belief that Kapcharge was scrubbing it on their

2   own?

3   A.  Correct.

4   Q.  Did you have an understanding of whether the credit union

5   had any responsibility to do that scrubbing?

6   A.  It was our responsibility.

7   Q.  And who was primarily responsible for ACH processing in

8   terms of the operations, the physical processing at the credit

9   union?

10  A.  Ricardo and Trevon Gross.

11          MR. NOBLE:  Can we flip to page 16, please?  Blow up

12  the bottom half.

13  Q.  Do you see second line, Mr. Gross writes, "They're an

14  insurance – but see, you're asking us to speak for examiners –"

15          Did you have an understanding of who he was referring

16  to by "insurance" and "examiners"?

17  A.  Yeah, NCUA.

18  Q.  Michael Murgio said, "No no.  I understand."

19          Gross says, "These are paper pushers who if they see

20  risk all they're saying is shut it down."

21          Michael Murgio writes, "I understand but ––"

22          And Gross responds, "Move the member money and find

23  the board.  That's how –– that's how it works."

24          Michael Murgio, "They, they, they can only do that if

25  there's been some impropriety."

Case 1:15-cr-00769-AJN   Document 491   Filed 04/07/17   Page 297 of 305

```
 1              Gross says, "No, there could also be in-inactivity,

 2    which, which was your word."

 3              Ellrich says, "Negligence."

 4              Gross says, "Negligence.  Because the board is

 5    responsible."

 6              Michael Murgio, "But they have to show negligence."

 7              Gross says, Mmhmm.  I would think having $50 million

 8    of transactions run through a credit union without significant

 9    BSA controls."

10              Anthony, "All right.  So --" clears his throat.

11              Gross says, "No no no, so, I I think, if we're gonna

12    be honest, we have been negligent."

13              Mr. Freundt, do you have an understanding of what he

14    was referring to when he said $50 million of transactions had

15    run through the credit union?

16    A.   That was the amount of transactions we ran through

17    Kapcharge, or Kapcharge was running through the credit union.

18    Q.   And when you received that earlier email about the OFAC

19    hits, were these some of the concerns that you had, as well?

20    A.   Yes.

21    Q.   Did you believe that you could potentially be liable as a

22    credit union for this processing without sufficient policies or

23    controls?

24    A.   We were liable.

25    Q.   You were liable?
```

1  A.  Yes.

2  Q.  As a board member you were liable?

3  A.  And as a credit union, that was our responsibility.

4        MR. NOBLE:  Can we flip to page 25?  Could we blow up

5  from the -- almost toward the middle of the page where

6  Mr. Freundt is speaking and beginning "correct" to the bottom.

7  Q.  Mr. Freundt, you said, "Correct. That's, that's what the

8  question is, or how do we move forward benefiting the credit

9  union and assuring the injectors that the money's safe."

10       What were you discussing about assuring injectors that

11  the money's safe?

12  A.  Well, we were talking about the fact that somebody was

13  going to be putting in half a million dollars into the credit

14  union with no guarantees, that we would have control of the

15  credit union at that point.

16  Q.  And Gross responds, "But, but the thing is that you will

17  all have operational control because, Anthony, Mark and Ricardo

18  will be running the credit union."

19       You say, "And again, to play devil's advocate, the

20  board at any moment can -"

21       And Anthony, "Yeah, can fire us."

22       And Gross writes, "Well, well, well, but here's, but

23  here's the thing. I agree with that. But here - we're, we're,

24  we're me - see, here, here's the thing. Remember the, the

25  process that we put in place? We gotta show real people work

1   for the credit union. And I, I'm gonna say, "your credit

2   union." Because I believe how I've operated from day one is

3   it's your credit union. You gotta show in your credit union

4   that you got people."

5           Anthony, "Agreed.  Yeah."

6           Gross, "You can't --"

7           Anthony, "We've already agreed with that.  Yeah."

8           Gross, "But but that requires money.  To be able to

9   show that we're going to pay people."

10          Anthony, "Trevon, the, the money --"

11          Gross, "And right now we don't even have money.

12  Currently, current balance sheet we don't have the money to

13  show that we can afford a stick of bubble gum."

14          THE COURT:  Thank you, Mr. Noble.  That's 5:00.

15          Ladies and gentlemen of the jury, I'll send you home

16  for the evening.  We'll start up again at 9:30 in the morning.

17  Thank you.

18          (Continued on next page)

19

20

21

22

23

24

25

H2BOLFB7                        Freundt - Direct

1                (Jury not present)

2          THE COURT:  You may step down, Mr. Freundt.  You are

3   excused for the evening.

4                (Witness excused)

5          THE COURT:  How much longer with this witness,

6   Mr. Noble?

7          MR. NOBLE:  Your Honor, I would say about an hour.

8          THE COURT:  Okay.  What you'll have to cut out is the

9   lengthy reading of the transcript, and there were some

10  interpretive moments which I'll allow, but there was also some

11  reading of portions and asking if you read it correctly, which

12  I will no longer allow.  We listened to the whole thing,

13  they're going to have the audio with them, you're going to use

14  it in closing, so that's a place where you're going to have to

15  scrub your outline because I'm cutting that off.

16         MR. NOBLE:  I'm almost done with that transcript,

17  actually --

18         THE COURT:  Okay, but --

19         MR. NOBLE:  -- in general.

20         THE COURT:  -- any transcripts, any emails, we're not

21  rereading documents, we not rereading transcripts.  If there

22  are questions that are non-duplicative, you may ask.  I gave

23  you some room to do that today, but that's done.

24         MR. NOBLE:  Understood.

25         THE COURT:  All right.  What can I take up?

1      MS. SANTILLO:  Your Honor, we'd just like to get the

2    schedule for tomorrow, and Wednesday, preferably.

3      THE COURT:  After Mr. Freundt?

4      MR. NOBLE:  It will be Meg Flok, Magdalena Flok with

5    the NCUA.  After Ms. Flok it will be Robyn Guyer from United

6    Advantage Northwest Credit Union.  After Ms. Guyer it will be

7    Brian McDonough.

8      THE COURT:  I'm sorry.  Who?

9      MR. NOBLE:  Robyn, R-o-b-y-n, Guyer, G-u-y-e-r.  And

10   after Robin Guyer it will be Brian McDonough from the NCUA.  I

11   think those are the witnesses that we've confirmed in terms of

12   the order and availability for now.  I expect we should get

13   through Ms. Flok and Ms. Guyer tomorrow.  Maybe Ms. Guyer might

14   spill into Wednesday morning, depending on the length of the

15   cross examinations of Mr. Freundt.

16     THE COURT:  So, I mean, the cross examinations have

17   been restrained time-wise and targeted.  Assuming that pattern

18   continues, how long are you anticipating for Flok?

19     MR. NOBLE:  Ms. Flok will be probably two or three

20   hours.

21     THE COURT:  And Guyer?

22     MR. SHIN:  Ms. Guyer should be about an hour to 90

23   minutes, your Honor.

24     THE COURT:  You've heard my admonition about

25   repetition, so I will just start enforcing that.  You've got

 1     to -- we've really got to move things along.

 2            Anything I can take up?

 3            MS. SANTILLO:  Your Honor, we just -- because

 4     Mr. Klingeman is not going to be here on Wednesday, we want to

 5     make sure we're okay with the schedule on Wednesday, too.  I

 6     don't know if we can get any sort of representation about what

 7     the rest of the week looks like, but --

 8            THE COURT:  Who is after McDonough?

 9            MR. NOBLE:  Judge, we haven't -- in part because of

10     the defense scheduling issue, we're still working on making

11     sure that we have the witnesses who only Ms. Santillo will be

12     cross examining who are going to be here on Wednesday.  I

13     believe those do include people like Ms. Guyer and

14     Mr. McDonough, but we need to confirm the availability of the

15     other ones.  So we'll go back, we'll confirm, and we'll confer

16     with defense counsel.  But because we're restricted on who we

17     can call because Mr. Klingeman is gone, we're trying to nail

18     down those witnesses.  But I believe the witnesses we gave

19     should take us into at least I think mid Wednesday, or at least

20     early Wednesday.

21            THE COURT:  Well, yes.  I mean, I guess my concern,

22     just from what you've just said, is should somebody be between

23     Flok and Guyer and McDonough, if Guyer and McDonough we need to

24     happen on Wednesday?  Are there other witnesses that --

25            MR. NOBLE:  I mean, we've had some scheduling issues

H2BOLFB7                    Frauendt - Direct

1    with the witnesses, but we'll go back and look and see if
2    there's somebody we can move who is scheduled to go next week
3    who we can bring forward sooner.  But this was our planned
4    witness order because we think it makes sense in terms of the
5    flow and the chronology, and so we're trying to work with that,
6    and we're trying to work with the defense counsel's schedule.

7                THE COURT:  I appreciate that, and I see it's a lot to
8    juggling, but I just want to sort of add two things that I'm
9    concerned about; one is just making sure we don't have any
10   blocks of time that go unused, and two, making sure we're not
11   artificially extending in any way because of the schedule.  So
12   that's --

13               MR. NOBLE:  Yes.  We'll go back and take a look.
14   We're trying to confirm some witnesses.  We have Steven
15   Valentine who was the aid to Congressman Smith who is on deck,
16   we just need to confirm with him that he's available on
17   Wednesday.

18               So Ms. Santillo, I'm not sure if he's one who you will
19   be cross examining, but he's potentially a witness we would add
20   for Wednesday.

21               MS. SANTILLO:  I can take him.

22               MR. NOBLE:  So before I commit to who our witnesses
23   are going to be, I just want to go back and confirm the rest of
24   the witnesses' schedules to be able to make sure we can get
25   these people here.  But we have several lined up, some can only

 1    testify next week, which is one of the issues we're dealing

 2    with.

 3              THE COURT:  Well, again, we're not having gaps.  So I

 4    recognize --

 5              MR. NOBLE:  Understood, your Honor.

 6              THE COURT:  -- we're putting a lot of people out, you

 7    might have to put some of those witnesses who you say can only

 8    testify next week, but who will have to be here this week if

 9    that's where they fit.

10              MR. NOBLE:  Understood.

11              THE COURT:  Anything else I can address?

12              MR. KLINGEMAN:  No.  Thank you.

13              THE COURT:  All right.  So we'll see you at 9:00.

14    Thank you.

15              (Adjourned to February 28, 2017 at 9:00 a.m.)

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                        Page

Direct By Ms. Choi . . . . . . . . . . . . .1771
Cross By Ms. Madrigal   . . . . . . . . . .1852
Cross By Ms. Santillo   . . . . . . . . . .1861
Redirect By Ms. Choi . . . . . . . . . . .1873
Cross By Ms. Madrigal   . . . . . . . . . .1877

NEIL KUMAR

Direct By Ms. Choi . . . . . . . . . . . . .1899
Cross By Ms. Madrigal   . . . . . . . . . .1932
Cross By Ms. Santillo   . . . . . . . . . .1934
Redirect By Ms. Choi . . . . . . . . . . .1937
Recross By Ms. Santillo   . . . . . . . . . .1939

JOSE FREUNDT

Direct By Mr. Noble   . . . . . . . . . . . .1951

GOVERNMENT EXHIBITS

Exhibit No.                                        Received

1416-A through C, 1417, 1426-A, 1428, . . . .1762
          1429, 1430-A through D, 1431,
          1432-E, 1432-G, 1433-A through
          C, 1434-B, 1435-A, 1435-B,
          1891, 1903, 1905, 1908, 1921,
          1922, 1943, 1944, 1953, 1960
92    . . . . . . . . . . . . . . . . . . .1776
700   . . . . . . . . . . . . . . . . . . .1786
701-A   . . . . . . . . . . . . . . . . . .1790
701-B and 701-C   . . . . . . . . . . . . .1791
702-A   . . . . . . . . . . . . . . . . . .1792
703-A and 703-B   . . . . . . . . . . . . .1797
791 and 791-T   . . . . . . . . . . . . . .1809
721 and 722   . . . . . . . . . . . . . . .1843
703-C   . . . . . . . . . . . . . . . . . .1910
808-A, 808-B, 808-C and 808-D   . . . . . .1924
1446-L, 1446-M, 1447-A, 1448-A, and . . . . .1947
          1448-C
1818   . . . . . . . . . . . . . . . . . . .1982
1788 and 1831   . . . . . . . . . . . . . .1984
1193   . . . . . . . . . . . . . . . . . . .1987
1853   . . . . . . . . . . . . . . . . . . .1996