```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                          15 Cr. 769 (AJN)

 5   YURI LEBEDEV and TREVON GROSS,

 6              Defendants.                 Jury Trial

 7   ------------------------------x

 8                                          New York, N.Y.
                                            February 28, 2017
 9                                          9:15 a.m.

10

     Before:
11
                        HON. ALISON J. NATHAN,
12
                                            District Judge
13                                          And A Jury

14                          APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     BY:  EUN YOUNG CHOI
17        DANIEL S. NOBLE
          WON S. SHIN
18        MICHAEL CHANG-FRIEDEN, Paralegal
          EMILY GRANT, Paralegal
19        Assistant United States Attorneys

20   CREIZMAN, PLLC
          Attorneys for Defendant Yuri Lebedev
21   BY:  ERIC M. CREIZMAN
          MELISSA MADRIGAL
22        JONATHAN MICHAELSON, Paralegal

23   KROVATIN KLINGEMAN, LLC
          Attorneys for Defendant Trevon Gross
24   BY:  KRISTEN M. SANTILLO
     BY:  HENRY E. KLINGEMAN

25
```

1                    (In open court; jury not present)

2                    THE COURT:  Good morning, everyone.

3                    COUNSEL:  Good morning.

4                    THE COURT:  Matters to take up?

5                    MR. NOBLE:  Judge, the only issue is with regard to

6     some exhibits that we intend to publish with Ms. Flok's

7     testimony.  I had sent a list to counsel last night.  I'm in

8     discussions with Ms. Santillo about the possibility of

9     publishing or republishing additional exhibits under theory of

10    completeness at her request.

11                   We've agreed to three of the exhibits, and we're just

12    trying to locate the other three that she proposed.  So we're

13    just working through that.  Nothing really for the Court to

14    decide at this time.  Otherwise, no issues from the government.

15                   THE COURT:  Thank you.

16                   Mr. Klingeman?

17                   MR. KLINGEMAN:  Your Honor, we are still on the direct

18    examination of Jose Freundt.  As soon as he is tendered for

19    cross, I will give the government a small group of exhibits

20    potentially I may use in the cross to supplement the group I

21    gave the government last week.  So I'm going to take advantage

22    of the morning break for that purpose, because I assume we'll

23    get there, either with the direct itself or with Mr. Creizman's

24    cross.

25                   THE COURT:  All right.  Thank you, Mr. Klingeman.

1        MR. CREIZMAN:  On that note, your Honor, although it

2   hasn't been fully determined, I think I will go first with

3   Mr. Freundt, but Mr. Klingeman has been kind enough to give me

4   that choice, to go out of order, if the Court would allow.

5        THE COURT:  Okay.  You'll just signal if you're

6   switching order?

7        MR. CREIZMAN:  Something like (indicating).

8        THE COURT:  Anything will do.

9        And for scheduling, as noted, I will stop at 12:40

10  today, so you can make it over to Judge Kaplan.

11       (Pause)

12       THE COURT:  We have all our jurors.

13       Anybody need me to address anything?

14       MR. NOBLE:  We're ready to proceed.

15       THE COURT:  Great.  We'll get the jurors.

16       MR. NOBLE:  Your Honor, should we get the witness on

17  the stand?

18       THE COURT:  Yes.  Please bring up Mr. Freundt.

19       Mr. Noble, what's your time estimate now?

20       MR. NOBLE:  I think about an hour, hour and a half.

21       THE COURT:  You can come to the stand, Mr. Freundt.

22       (Continued on next page)

23

24

25

 1            (Jury present)

 2            THE COURT:  Thank you, everyone.  You may be seated.

 3            Good morning, ladies and gentlemen of the jury.  Thank

 4    you again for your diligence and attention.  The government

 5    will continue with the direct examination of Mr. Freundt.  And

 6    as it's a new day, I'll swear in Mr. Freundt again.

 7     JOSE FREUNDT,

 8         called as a witness by the Government,

 9         having been duly resworn, testified as follows:

10            THE COURT:  Mr. Noble, whenever you're ready.

11            MR. NOBLE:  Thank you, Judge.

12     JOSE FREUNDT, resumed.

13    DIRECT EXAMINATION CONTINUED

14    BY MR. NOBLE:

15    Q.  Good morning, Mr. Freundt.

16    A.  Good morning.

17    Q.  Just remember, please speak directly into the microphone

18    and project your voice, so everyone can hear.

19    A.  Understood.

20            MR. NOBLE:  Mr. Chang-Frieden, can you bring up

21    Government Exhibit 2506-T.

22    Q.  Mr. Freundt, you remember when we ended yesterday, I was

23    asking you a few questions about the lines in this transcript?

24    A.  Correct.

25    Q.  I'd like to ask you about two more portions.

 1              MR. NOBLE:  Mr. Chang-Frieden, could you please flip

 2     to page 28.  Can we blow up the portion beginning where Murgio

 3     says, "Well, I'm just saying" and go to about halfway down the

 4     page.  A little bit lower.  There you go.  Thank you.

 5     Q.  Mr. Freundt, you see Murgio says, "Well, I'm just saying

 6     that we would need to have some -- we would need to have board

 7     control and employees that are working here, I mean, for sure."

 8     Do you see that?

 9     A.  Yes.

10     Q.  At that point in time, had there been any Collectables Club

11     members who were working at the credit union in New Jersey?

12     A.  No.

13     Q.  To your knowledge, where did anybody who was affiliated

14     with Collectables Club work with respect to the credit union?

15     A.  In Florida.

16     Q.  Then Gross responds:  "Okay, okay.  So let's do this,

17     though.  Okay, so we are we go."

18              And Murgio says:  "And let's talk about the 50K, too."

19              Gross says:  "No, no.  So here's what you're saying.

20     Why don't we do this, let's keep this real simple."

21              Murgio:  "Okay."

22              Gross:  "Give us the 50K that's owed us."

23              Murgio:  "Yes."

24              Gross:  "All of us resign."

25              Murgio:  "Game over."

 1           The 50K that Mr. Gross mentions, which 50K was he

 2   referring to there?

 3   A.  The donation.

 4   Q.  What donation?

 5   A.  The original part of the original donation.

 6   Q.  Where was that donation supposed to have been made?

 7   A.  Where?

 8   Q.  Yes.  To whom?

 9   A.  To Mr. Gross or his church.

10   Q.  Or his church?

11   A.  Correct.

12           MR. NOBLE:  Mr. Chang-Frieden, can you please flip to

13   page 36 and blow up the bottom third.

14   Q.  Beginning where Mr. Gross says, "Just so we're clear,

15   Monday.  By Monday, there will be emails sent in to the

16   secretary of the board, who right now is Ricardo..."

17           That's Mr. Hill, correct, Mr. Freundt?

18   A.  Correct.

19   Q.  ... "stating resignations from the board.

20           "Correct.

21           "And upon receipt of those Monday, the 50K that the

22   church is due will be sent in."

23           Murgio says:  "Right."

24           Lebedev says:  "Everybody here.  Chung, witness."

25           Murgio:  "I mean, the only -- listen" --

1              Mike Murgio:  "Well, clarify, yeah."

2              Anthony Murgio:  "No.  All I'm saying is it could be

3    Tuesday to get the funds where they need to be, and then, I

4    mean, whether it's --"

5              Ellrich:  "The wire transfer or whatever it is."

6              MR. NOBLE:  Let's go to the top of the next page.

7    Q.  Gross says:  "No, no.  Monday.  Monday."

8              Anthony Murgio:  "I mean" --

9              And then you said:  "All right.  How about we do this?

10   When the funds are ready to be put in the deposit" --

11             Anthony:  "But he's just saying Monday."

12             And you said:  "And that's what he said in the email."

13             What email are you referring to there?

14   A.  I'm not quite sure.

15   Q.  Okay.  Anthony Murgio says:  "Yeah, that's what I'm

16   saying."

17             And Gross says:  "No, no, no.  What I'm saying is no.

18   I'm saying let's -- let's -- cuz listen, gentlemen.  I want

19   this to happen, so we can move this thing forward."

20             Mike Murgio:  "Right.  Correct."

21             And then Trevon says:  "So I don't -- I don't like all

22   of this.  Oh, it may be Tuesday.  Let's -- let's..."

23             And then Mr. Lebedev says:  "I'll get 50 I'll give

24   you.  It's fine."

25             Did you have an understanding of what Mr. Lebedev was

1   saying there?

2   A.   Yes.

3   Q.   What was it?

4   A.   The 50 that Trevon wanted deposited on Monday.

5   Q.   What was Lebedev going to do with respect to that $50,000?

6   A.   Lend them to Anthony.  Give them to Anthony.

7   Q.   For what purpose?

8   A.   To deposit into the account.

9   Q.   Of whom?

10  A.   Of Trevon.

11          MR. NOBLE:  You can take that down, Mr. Chang-Frieden.

12  Q.   Mr. Freundt, how did that portion of the meeting which was

13  recorded, how did it conclude?

14  A.   With the agreement that the 50,000 was going to be sent in,

15  and that the board was going to start sending the resignation

16  letters.

17  Q.   And what board members, to be clear, were going to resign?

18  A.   The ones that resided in New Jersey.

19  Q.   Make sure you keep your voice up, so the jury can hear you.

20  A.   Yes.

21  Q.   Thank you.

22          And when was the $50,000 supposed to be deposited?

23  A.   Monday.

24  Q.   After that point in time, who was going to control the

25  credit union going forward?

 1    A.  We were.

 2    Q.  What was supposed to happen to Trevon Gross?

 3    A.  He was supposed to stay onboard.

 4    Q.  Why?

 5    A.  To transition -- to smooth the transition and because

 6    nobody was trained properly.

 7    Q.  Was anyone else from the existing board, the prior board,

 8    going to stay on?

 9    A.  Bernard.

10    Q.  Who was Bernard?

11    A.  He was the current CFO.

12    Q.  Why was he going to stay on?

13    A.  Same reason, just to smooth the transition.

14    Q.  And what was going to happen to the rest of the prior board

15    members?

16    A.  They were going to resign.

17    Q.  Where did you go after leaving the credit union for that

18    meeting?

19    A.  We went to Anthony's aunt's house.

20    Q.  Where did Anthony's aunt live?

21    A.  In New Jersey.

22    Q.  Do you know her name?

23    A.  No, I don't remember her name.

24    Q.  Had you ever been to that house before?

25    A.  No.

1    Q.  Who was present for the meeting at the aunt's house?

2    A.  Anthony's aunt, the uncle, the cousin, Mike Murgio, myself,

3    Anthony Murgio, Tim, Ricardo, and Mark Chung.  I'm not sure if

4    Yuri was there or not, I don't remember.

5    Q.  Sorry, can you say that again?

6    A.  I don't remember if Yuri was there.

7    Q.  While you were at the aunt's house, did you have any

8    discussions about the credit union or your plans?

9    A.  Yes, we did.

10   Q.  What did you discuss?

11   A.  We were just trying to decide who was going to stay and

12   live in New Jersey.  They were talking about them getting the

13   licenses and just finding other ways that we could be legal

14   members of the credit union.

15   Q.  Why did somebody have to be in New Jersey?

16   A.  Because that was one of the criterias needed to be a member

17   of the credit union.

18   Q.  How did you learn that?

19   A.  Through conversations.

20   Q.  With whom?

21   A.  With Trevon, with Anthony.

22   Q.  You've referred to getting licenses.  What licenses do you

23   mean?

24   A.  Driver.  Driver's license.

25   Q.  From what state?

1    A.  From New Jersey.

2    Q.  And why did you want to get driver's licenses from

3    New Jersey?

4    A.  Well, the people that were going to stay there needed those

5    driver's license to prove that they were residing in

6    New Jersey.

7    Q.  Did you discuss any other strategies for trying to convince

8    the NCUA that you guys were valid board members?

9    A.  There was some chatter about if they assigned a corner on

10   the house as a praying corner, that we could argue that we

11   worship in New Jersey.

12   Q.  What, if anything, did you do after being at the aunt's

13   house?

14   A.  We went to Atlantic City.

15   Q.  Who all went to Atlantic City, to the best of your memory?

16   A.  Anthony, myself, Tim, Ricardo, and Mark Chung.

17   Q.  How did you get there?

18   A.  We had a -- we rented a minivan.

19   Q.  Were you in the car with Rico Hill?

20   A.  Yes.

21   Q.  Did there come a time when anyone in the car received an

22   email about the credit union?

23   A.  Yes.  On our way to Atlantic City, Rico received the first

24   resignation email.

25   Q.  About how long after the meeting at the credit union was

 1    that?

 2    A.   About eight hours.

 3         MR. NOBLE:   Can you bring up Government Exhibit 2245

 4    in evidence.

 5    Q.   Mr. Freundt, do you recognize this document?

 6    A.   Yes.

 7    Q.   What is it?

 8    A.   It's an email forwarded about the resignation.

 9    Q.   Who is the email from, the bottom email?

10    A.   From Joseph Lane.

11    Q.   Had you ever met Joseph Lane?

12    A.   No.

13         MR. NOBLE:   Scroll back up.

14    Q.   What time did this --

15         MR. NOBLE:   I'm sorry.   Can you bring up the header

16    informational again for both emails.   Go down.   Stop.

17    Q.   What time did Mr. Lane send in his resignation letter to

18    Rico Hill?

19    A.   At 10:18 p.m.

20    Q.   Again, do you know why he sent it to Rico?

21    A.   Rico was the secretary of the board.

22    Q.   And then it looks like Rico forwarded it to Anthony about

23    seven minutes later; is that right?

24    A.   Correct.

25    Q.   Is that when you guys were in the car on the way to

1   Atlantic City?

2   A.   Yes.

3          MR. NOBLE:   You can take that down.

4   Q.   When did you leave New Jersey?

5   A.   That Sunday morning.

6   Q.   The next day?

7   A.   Correct.

8   Q.   Did you travel with anyone else back to Florida?

9   A.   Yes.  I traveled with Rico back to Tallahassee.

10  Q.   Now, did there come a time when you had a discussion with

11  Anthony Murgio and the others involved with the credit union

12  about how to proceed?

13  A.   After we got to Tallahassee, yes.

14  Q.   How did you have this conversation?  By what means?

15  A.   WhatsApp.

16  Q.   What's WhatsApp?

17  A.   That's a messaging system.

18  Q.   Who else participated in this discussion?

19  A.   Everybody that was there at the meeting in Jersey.

20         MR. NOBLE:   Can we bring up Government Exhibit 4501 in

21  evidence.

22  Q.   What is this document?

23  A.   That's the WhatsApp communications.

24  Q.   What is the date that the conversation began?

25  A.   November 24th.

 1   Q.  And that was two days after the meeting at the credit

 2   union?

 3   A.  Correct.

 4   Q.  And you were back in Florida at this time; is that right?

 5   A.  Correct.

 6          MR. NOBLE:  Can we just scroll to the very bottom.

 7   Okay.

 8   Q.  What is the date of the last entry here at 8062?

 9   A.  December 3rd.

10   Q.  So, fair to say this was a conversation that occurred over

11   several days?

12   A.  Yes.

13   Q.  During the course of the WhatsApp discussion, did you have

14   any discussions with others about the credit union?

15   A.  I called Trevon Gross.

16   Q.  Okay.

17   A.  And we had a discussion with Vladimir.

18   Q.  So you had other telephone calls with other people?

19   A.  Yes.

20   Q.  Did you also exchange emails with others about the credit

21   union over the course of these several days?

22   A.  Yes.

23          MR. NOBLE:  Let's go back up to the top.

24   Q.  Beginning at line 4711, I'd like to read some of this for

25   the jury.  We're going to read from lines 4711 to 4750.

 1              Mr. Freundt, why don't you read the portions where you

 2    were the speaker, and I'll read the other portions.

 3    A.   Okay.

 4    Q.   So begin with 4711.  What did you say?

 5    A.   "What exactly is the situation now?  I know Trevon is not

 6    happy with the email, but what is his stance now?"

 7    Q.   Rico:  "He is not interested in renegotiating."

 8    A.   "What was the renegotiation?"

 9    Q.   "Murgio?"

10    A.   "It was all to be in escrow until everything was

11    completed."

12    Q.   And Anthony Murgio responds:  "Yes, same thing, just want

13    to release funds when done.  I can put the funds in HOPE, so he

14    sees.  We need to do this properly, with minutes signed.  We,

15    TC, et cetera.  Special meeting.  Have our new members put on."

16    A.   Anthony:  "Put 50K in the account controlled by us, plus

17    whatever is owed to him.  I think that's the first move."

18    Q.   When you said in that line "whatever is owed to him," to

19    whom were you referring to?

20    A.   To Trevon Gross.

21    Q.   Please read the next line.

22    A.   "Or actually pay him whatever is owed to him today.  It is

23    owed to him, and that will out him in a better mood."

24    Q.   When you said "out," is that a typo, it should have been

25    "put"?

1    A.  I meant "put," yes.

2    Q.  What did you mean when you said, "pay him whatever is owed

3    to him"?

4    A.  There was two months' salary not paid to him.

5    Q.  And what do you mean by -- what salary?

6    A.  The $3,000 a month that was promised.

7    Q.  So at that point in time, Collectables Club had owed Trevon

8    Gross $6,000?

9    A.  Correct.

10   Q.  And then Anthony says:  "Yes, doing now."

11   A.  "I have sent a text to him, and I'm calling your dad now.

12   Just got off the phone with him."

13   Q.  Who did you just get off the phone with?

14   A.  Trevon.

15   Q.  During that telephone conversation with Trevon Gross, what

16   did you he say to you and you to him?

17   A.  Well, I called him to clear how things had gone the prior

18   weekend.  I was somewhat offended that I was included, and a

19   lot of the conversations that I didn't know had happened.

20   Q.  Explain what you mean by that you were offended.

21   A.  Well, because he included me in some of the changes that

22   had been made or he -- the assumption was that I knew of

23   everything that was going on at that time, which wasn't

24   necessarily true.

25   Q.  Are you referring to things that were going on with Anthony

```
 1   Murgio?
 2   A.  Correct.  Conversations between him and Anthony Murgio.
 3   Q.  Fair to say you were calling to kind of clear the air; is
 4   that right?
 5   A.  Yes.
 6   Q.  What else did you talk about on that phone call?
 7   A.  Well, I wanted to know what the real issue was and what the
 8   concerns were, and that's when he informed me that he hadn't
 9   been paid, as promised, for his salary of $3,000 a month, and
10   that he wanted, also, that donation to be put in the account.
11   Q.  What donation?
12   A.  The 50,000 that was owed.
13   Q.  How did you end the conversation with Trevon?
14   A.  Well, I told him that the 50,000 had nothing to do with me,
15   that I wasn't going to do anything about that, but that I
16   promised him that I was going to get him the money owed as a
17   salary.
18   Q.  Why did you say you had nothing to do with the 50,000?
19   A.  Because I had no involvement in that negotiation.
20   Q.  Who had negotiated that $50,000 payment, to your knowledge?
21   A.  Anthony and Trevon.
22   Q.  But you said you would do something to assist with the
23   $6,000 payment?
24   A.  Correct.  That was part of the salary that he had worked,
25   and as an employee, that was owed to him.
```

1    Q.  At that point in time, what did you intend to do with

2    respect to the $6,000 payment?

3    A.  I was going to have Anthony pay him.

4    Q.  So let's pick back up on the conversation at line 4751.

5    Can you read what you wrote there after the phone call?

6    A.  "Anthony, please put the money that's owed to him as salary

7    in his account.  That money is owed regardless of the outcome,

8    and I have asked him to give me a chance to prove that my word

9    has weight."

10   Q.  And Anthony wrote:  "It was already sent.  Please tell him.

11   Tell him I initiated this morning.  Ask him to verify when it

12   hits."

13   A.  "He informed me he's done playing games and renegotiating,

14   and, quite frankly, I don't blame him."

15   Q.  What did you mean when you said, "I don't blame him"?

16   A.  Anthony had changed every agreement that we had so many

17   times, that I would have probably done the same thing.

18   Q.  At that point in time, how had Anthony proposed changing

19   the agreement that you had reached at the meeting at the credit

20   union?

21   A.  He sent Trevon an email.

22   Q.  Do you know what was in that email?

23   A.  I believe it was that he was changing the time of the

24   deposit until the resignations were received.

25   Q.  So Anthony had proposed changing the timing of the payment

1   of the $50,000 with respect to when the resignations were

2   received?

3   A.   Correct.

4   Q.   Let's keep reading.

5         Michael Murgio wrote:  "Do you have verification it

6   was sent?"

7   A.   "How much was sent, and when should he expect it?"

8         Mike:  "I'll be calling you in a few."

9   Q.   Anthony Murgio:  "Should hit today.  Was wired."

10        Rico says:  "6K?"

11  A.   "How much?"

12  Q.   Keep going.

13        Anthony Murgio:  "Not renegotiating.  It's just doing

14  things systemically."

15        Rico 101 writes:  "?"

16        Michael Murgio writes:  "I'm on phone.  Should be off

17  in ten minutes."

18        Rico writes:  "6K?  Did you send this amount?"

19        Anthony Murgio:  "Yes."

20  A.   "I have to agree in part with Trevon on this one, guys.  We

21  as a group left the table with an arrangement in place only to

22  be changed, as minimal as it was, without everyone present

23  after his team had done their part sending resignation

24  letters."

25  Q.   What you did you mean by, "his team had done their part"?

1    A.  By that time, we had received, I believe, three resignation

2    letters.

3    Q.  Did that include the one that we just looked at from Joseph

4    Lane?

5    A.  Correct.

6           MR. NOBLE:  Can we bring up side by side Government

7    Exhibits 2246 and 2247 in evidence.

8    Q.  Mr. Freundt, do you recognize these two documents?

9    A.  Yes.

10   Q.  What are they?

11   A.  Those are resignation letters from board members.

12          MR. NOBLE:  Can we blow up the header information for

13   each of the two resignation letters.

14   Q.  Beginning with 2246, the one at the bottom of the screen,

15   who sent in this resignation letter and when?

16   A.  Marvin, November 23rd.

17   Q.  That was, again, prior to the WhatsApp conversation that

18   we're talking about right now, right?

19   A.  Correct.

20          MR. NOBLE:  Let's see the other one.

21   Q.  Who sent in that resignation email?

22   A.  Bernard Larkins.

23   Q.  At what time and what date?

24   A.  November 22nd at 10:30.

25   Q.  Again, prior to the WhatsApp conversation, correct?

 1   A.  Correct.

 2   Q.  Are these the three resignation letters that you were

 3   referring to?

 4   A.  Yes.

 5   Q.  And to whom did Marvin and Bernard Larkins send these

 6   resignation emails?

 7   A.  One was sent to Ricardo Hill, the other was sent to Trevon

 8   Gross.

 9            MR. NOBLE:  Let's take those down.

10   Q.  Now, did there come a time, during the course of the

11   WhatsApp conversation, that you received any text messages from

12   Trevon Gross?

13   A.  I did.

14            MR. NOBLE:  Can we bring back up Government Exhibit

15   4501 in evidence and please scroll to line 4922.  Go back up.

16   Q.  Mr. Freundt, will you start reading 4922 and continue until

17   the end of what you said.

18   A.  The last message I received from Trevon, and I put:  "Jose,

19   I respect and appreciate everything that you are doing.

20   However, I wouldn't fight for it.  The challenge with the whole

21   thing" is that -- "has been" -- I'm sorry.  "The challenge with

22   the whole thing has been that there is a fight at every turn.

23   This is neither healthy or productive.  I hear you, and I wish

24   you had involved earlier in the process.  At this point, the

25   original dateline has passed, which means everything we talked

HASKLEB1    Freundt    Direct

1    about Saturday is void even though people resigning submitted

2    as we agreed. Trust has to be mutual. It is not. No need to

3    invest any more energy into this. There will always be another

4    hurdle."

5        And then I said: "I don't see a way forward."

6    Q. Why didn't you see a way forward at that point in time?

7    A. At that point in time, I understood Mr. Trevon Gross to be

8    done with us.

9    Q. In line 4925, where Mr. Gross writes the original deadline,

10    again, what was the original deadline for the payment?

11    A. Monday.

12    Q. Then Anthony Murgio writes in line 4927: "Kap – have not

13    heard one thing from them today. They were planning on coming

14    to New Jersey as well."

15        Do you know who he was referring to when he wrote

16    "Kap"?

17    A. Kapcharge.

18    Q. Then what did you respond?

19    A. "These are your friends, Anthony. Get to the bottom of

20    this."

21        MR. NOBLE: Can you scroll back up, Mr. Chang-Frieden.

22    Thank you.

23    Q. Mr. Freundt, what did you mean when you were writing --

24        MR. NOBLE: Can you scroll down a little bit,

25    Mr. Chang-Frieden. Thank you.

1   Q.  -- "These are your friends, Anthony.  Get to the bottom of

2   this"?

3   A.  Well, the people at Kapcharge were Anthony's college

4   friends, to my understanding.

5   Q.  What were you telling him to get the bottom of?

6   A.  Anthony believed that Kapcharge and Trevon Gross had been

7   making a side deal to kick us out.

8   Q.  To kick who out?

9   A.  The board members, the ones that Anthony brought onboard.

10           MR. NOBLE:  Can we bring up Government Exhibit 4504 in

11   evidence.

12   Q.  Mr. Freundt, do you recognize this document?

13   A.  I recognize it as a WhatsApp conversation.

14   Q.  A WhatsApp conversation; is that right?

15   A.  Correct.

16   Q.  Who is it a conversation between?

17   A.  Myself and Anthony Murgio.

18           MS. CHOI:  Mr. Chang-Frieden, can we please scroll to

19   line 4300.

20   Q.  Mr. Freundt, what is the date of this exchange with

21   Anthony?

22   A.  This is November 18th.

23   Q.  So just to orient the jury, when was this in relation to

24   the meeting at the credit union?

25   A.  Prior to the meeting.

1   Q.   Four days before that meeting on Saturday?

2   A.   Correct.

3   Q.   And you were talking to Anthony Murgio about the credit

4   union in this conversation?

5   A.   Yes.

6   Q.   Why don't you go ahead and read your portions, and I will

7   read the Anthony Murgio portions, beginning at line 3400, and

8   we're going to read to line 3426.

9   A.   "Did you and Trevon ever have a discussion on what was

10  expected?  It seems like he's on a completely different page to

11  where you have want this to go."

12  Q.   "Speak to Rico.  Don't take my word."

13  A.   "I'll take your word, I'm just curious."

14  Q.   "Short answer, everything has been made under Trevon's

15  approval and guidance.  I've been funding.  He has been more

16  open and aggressive than myself."

17  A.   "Then why is he bitching?  I'm telling you, I see another

18  Adam situation brewing, dude."

19  Q.   What do you mean by "another Adam situation brewing"?

20  A.   Adam Corey is the person that bought the restaurant from

21  Anthony Murgio.

22  Q.   What did you mean when there was going to be another Adam

23  situation?

24  A.   Adam didn't keep his end of the deal and, in essence,

25  bought the restaurant for zero dollars.

1    Q.  For zero dollars?

2    A.  Correct.

3    Q.  Did Anthony Murgio feel aggrieved by what Adam Corey had

4    done to him with respect to that restaurant?

5    A.  Correct.

6           MR. NOBLE:  Can we scroll down a little bit, and we'll

7    pick up the conversation at 3409.

8    Q.  "You have no idea how much I'm fuming.  I think, yup, yup,

9    yup."

10          MR. NOBLE:  Can we scroll down, and can we hit play on

11   that, and let's just listen to Anthony.

12          (Audio playback)

13   Q.  Anthony continues:  "Hold up to your ear.  It won't play on

14   speaker."

15          What did you say?

16   A.  "Aren't you friends with the Kap people?"

17   Q.  And Anthony says:  "Yup."

18          MR. NOBLE:  And let's scroll down a little bit, so we

19   can see the full text.  And, I'm sorry, let's hit play and then

20   please scroll as the recording plays.

21          (Audio playback)

22          MR. NOBLE:  Can you pause it, please.

23   Q.  Do you know who ran Kapcharge?

24   A.  No.

25          MR. NOBLE:  Go ahead and push play.

 1              (Audio playback)

 2   Q.   Then what did you say in response to that?

 3   A.   "Well, I don't know what to tell you.  I just hope you

 4   covered your ass when you did the deal with him."

 5   Q.   Who were you referring to when you said "him"?

 6   A.   Trevon Gross.

 7              MR. NOBLE:  Please continue.

 8   A.   "You need to" weigh -- "You need to find a way to control

 9   this credit union.  He's right now the chairman and the CEO.

10   He's got full control for all intents and purposes."

11   Q.   Then Anthony says in an audio:  "Yeah, I signed a contract.

12   It has a fine of $50 million."

13              And what did you say?

14   A.   "He asked me today if I was planning on leaving my job to

15   work full-time with the credit union, and I told him I was

16   thinking about it, but had some concerns, and he told me not to

17   do it."

18   Q.   Anthony Murgio writes:  "WTF?"

19   A.   "Don't repeat this.  I want him to think/be an allied."

20   Q.   What did you mean when you said, "I want him to think/be an

21   allied"?

22   A.   At that point I believe I was the only person that had a

23   good relationship with Trevon.

24              (Continued on next page)

25

1   BY MR. NOBLE:

2   Q.  Fair to say you were trying to stay on his good side?

3   A.  Yes.

4   Q.  And Anthony Murgio writes, "But he is planning some

5   things."

6   A.  I asked, "What is he planning?"

7           His message, "If I can't be subtle don't do it.  The

8   things we talked about in that email about risk have all come

9   to pass.  As of today our lawyer has dropped us and we cannot

10  settle transactions.  This is a mess.  We are red flagged all

11  over the industry."

12  Q.  So did you have a discussion with Trevon about the

13  possibility of you coming to work full time with the credit

14  union?

15  A.  Correct.

16  Q.  And what did he tell you?

17  A.  He told me not to do it.

18          MR. NOBLE:  Can we bring back up Government's

19  Exhibit 4501?  And please scroll to line 4956.

20  Q.  We're back in the WhatsApp conversation on November 24th,

21  correct?

22  A.  Correct.

23  Q.  And then at one point in the conversation Anthony Murgio

24  writes, "I need to get all on call with Vlad."  Do you see

25  that?

```
 1   A.   Yes.

 2   Q.   Remind the jury who Vlad is.

 3   A.   Vlad is Vladimir, the Russian.

 4   Q.   Okay.  And what was his relationship with Anthony?

 5   A.   He was his financial backer.

 6   Q.   And did there come a time when you participated in a

 7   telephone call with Vlad and Anthony?

 8   A.   Yes.

 9   Q.   Was there anyone else on that telephone call with you?

10   A.   Mike, Anthony's father.

11   Q.   Michael Murgio?

12   A.   Correct.

13   Q.   What did you all discuss on that telephone call?

14   A.   How to proceed with what was happening.

15   Q.   And to be clear, was that call on this date that we're

16   reading the WhatsApp?

17   A.   Yes.

18   Q.   So explain to the jury again, what did you discuss on the

19   call?

20   A.   Well, Anthony was informing Vladimir of what happened, and

21   what was Trevon's stance in the whole situation, and asking how

22   we should move forward as far as trying to still have control

23   of the credit union.

24   Q.   What did Anthony say he wanted to do?

25   A.   He wanted to send $150,000.
```

1    Q.   To who?

2    A.   To Trevon.

3    Q.   Why?

4    A.   He believed that if we get him the money, he would ease the

5    stand.

6    Q.   Say that again.

7    A.   He believed that if we gave Trevon the money, he would ease

8    his stand and that would solve the problem.

9    Q.   By paying Trevon more money?

10   A.   Correct.

11   Q.   How did Vlad react to that?

12   A.   He didn't think that was a good idea.

13   Q.   Did he say why?

14   A.   He wanted to, in his words, "show power or be forceful".

15   Q.   Did he say anything about the possibility of giving Trevon

16   Gross more money?

17   A.   He wasn't going to do it because he wasn't going to risk

18   his money anymore.

19   Q.   How did that telephone call with Vlad end?  What

20   conclusion, if any, did you reach?

21   A.   That we were going to hire lawyers and present them with

22   the situation and see what they thought.

23   Q.   You were going to hire lawyers to try to do what?

24   A.   To take control of the credit union.

25   Q.   Take control -- take back control of the credit union from

1    whom?

2    A.   From Trevon.

3    Q.   Now, did there come a time when you added Yuri Lebedev to

4    the WhatsApp conversation about the credit union?

5    A.   Yes, he was added.

6    Q.   Why did you add Yuri?

7    A.   Because he was the vice chairman.  He had been involved in

8    everything.

9           MR. NOBLE:  Can we bring up Government's Exhibit 4501

10   and could you please scroll to line 5004?

11   Q.   Mr. Freundt, you see where you say, "Let's as Yuri to this

12   thread."  Was this a typo?

13   A.   Correct.

14   Q.   And Tim Ellrich says, "I can help in 30 minutes."

15           And you say, "Okay.  Let me know."

16           And then it looks like Yuri is added here on

17   November 24th, correct?

18   A.   Correct.

19   Q.   That's at line 5007?

20   A.   Yes.

21   Q.   Did Yuri begin participating in the conversation at this

22   point in time?

23   A.   Correct.

24   Q.   Let's go ahead and read from lines 5008 to 5028, just a few

25   lines.

 1          Mr. Freundt, you read your part and I'll read the
 2   others.
 3   A.   "Yuri."
 4   Q.   Yuri, "Yes."
 5   A.   "Seems like Trevon is backing out of the deal and told me
 6   the relationship between both groups are unsalvageable and wish
 7   to not to continue."
 8   Q.   Yuri says, "Why."
 9          What were you doing at this first part of the
10   conversation with Yuri?
11   A.   I was trying to catch him up on what was happening.
12   Q.   Let's scroll down to line 5047 and pick up there, and we're
13   going to read to line 5128.
14          Yuri writes, "I'm glad this happened before giving
15   them half a mill."
16          Do you know what he was referring to, the "half mill"?
17   A.   That was the capital injection that we discussed.
18   Q.   Tim Ellrich writes, "True.  What is next steps?  Is all
19   possibility of salvaging this relationship lost?"
20          Yuri writes, "Anthony, did you transfer 50K to him
21   already?"
22   A.   "I don't think there's a possibility."
23   Q.   Continue.
24   A.   I'm sorry.  "And no, Yuri, money wasn't transferred."
25   Q.   What 50K was Yuri referring to?

1  A.  The donation he wanted.

2  Q.  And Yuri writes, "So what if we offer him more?  That guy

3  was clearly money hungry."

4  A.  "We don't offer more."

5  Q.  Now, was this after the conversation, to be clear, that you

6  had with Vlad?

7  A.  Yes.

8  Q.  And Yuri writes, "If he is walking away from this, the

9  only -- the only logical explanation is that he's getting much

10  more from somewhere else."

11  A.  "After lengthy conversation with Anthony, Mike, and Vlad,

12  we have to an agreement if one the next step are."

13  Q.  That's "if what the next steps are"?

14  A.  Correct.

15  Q.  And Yuri writes, "Otherwise, it's back to his low volumes

16  and no money."

17       Did you have an understanding of what he was meaning

18  by "his low volumes and no money"?

19  A.  Yes.

20  Q.  What was your understanding?

21  A.  That the credit union was a small credit union.  It had 104

22  members and practically no revenue.

23  Q.  And so basically, if this deal didn't go through, there

24  would be no processing at the credit union?

25  A.  Correct.

 1              MR. NOBLE:  Let's go ahead, and can we press "play"

 2   and scroll where Anthony Murgio speaks at line 5060?

 3              (Audio played)

 4              MR. NOBLE:  Scroll down, please.

 5   BY MR. NOBLE:

 6   Q.  And Anthony Murgio then writes, "Please listen."

 7              Tim Ellrich writes, "Makes sense.  I'm in for whatever

 8   is needed."

 9              And then you write?

10   A.  "Okay, Anthony.  We will go with your approach."

11   Q.  Did you really mean that you were going to go with

12   Anthony's proposed approach?

13   A.  No.

14   Q.  So why did you write that?

15   A.  Because I was just being sarcastic.  Anthony's a little kid

16   sometimes, he's hardheaded.

17   Q.  A little kid?

18   A.  Yes.

19   Q.  And Yuri then writes, "Have my vote."

20              Is that right?

21   A.  Correct.

22   Q.  And Anthony Murgio writes, "I don't like people to agree

23   with me.  I'm not asking you to.  But what will we do in this

24   special meeting?"

25              What special meeting is he referring to?

 1   A.  We were going to set up a special meeting to accept the

 2   resignations from the board members and to discuss the CEO

 3   position.

 4   Q.  Who was going to participate in this special meeting of the

 5   board?

 6   A.  All the board members that would attend.

 7   Q.  And what was the goal of holding that meeting?

 8   A.  To have control of the board.

 9   Q.  Then what did you write after Anthony said that about the

10   special meeting?

11   A.  "Try to speak to him tomorrow and let us know how it went.

12   I'm telling you it will not go any different than my

13   conversation with him today."

14   Q.  Yuri writes, "Did you guys consider that this will alienate

15   us from community?  Trevon will raise the masses.  They will

16   boycott.  And if it's six on six with him breaking a tie --"

17          What did you write?

18   A.  "Special meeting will be discussed.  The resignation of the

19   board members and who to put in place.  Three members sent

20   resignation emails already."

21   Q.  Anthony writes, "Well, we need my aunt and cousin to get

22   accounts."

23          Do you know what he was referring to there?

24   A.  I believe it was an aunt and cousin in New Jersey that

25   lived in New Jersey.

1   Q.   What accounts was he referring to?

2   A.   Opening accounts with the credit union.

3   Q.   Was there any discussion about a plan to have the aunt and

4   the cousin get onto the board?

5   A.   There was.

6   Q.   And why was that?

7   A.   Because they lived in New Jersey.

8   Q.   So they would qualify for membership?

9   A.   Correct.

10  Q.   What did you write after that?

11  A.   "He can't alienate us.  It's called slander."

12  Q.   Yuri writes, "What would be a locally based credit union

13  without local members?  He's a man of power and knows everyone

14  there."

15  A.   "And we can't worry about that.  All we can do now is worry

16  about how to get a grasp of the credit union.  He's in one

17  church with 107 members.  There's a whole on tap community

18  left."

19  Q.   And Yuri writes, "I know we spent a lot of time and energy

20  and money but we must consider other possibilities.  Plan B?"

21            Anthony writes, "He can call regulators in on us and

22  make us go through hell."

23            Yuri writes, "He prob had been doing that all along."

24            Anthony writes, "I truly don't think."

25            Yuri writes, "I found it difficult to grasp that he

1    never showed the result of any regulations."

2           Did Trevon Gross ever show you any of the reports that

3    the -- or exam results from the NCUA?

4    A.  I never saw one.

5    Q.  Anthony writes, on 5085, "Or he would have said they came

6    in when we weren't there.  Yes, this is true."

7    A.  "If we are in compliance, they will get tired of coming and

8    not finding anything."

9    Q.  Yuri writes, "Then saying just yesterday we got results."

10   A.  "There is no point in discussing any of this."

11   Q.  "What results was that?"  That was Anthony.

12          And then Yuri writes, "Previous checks.  He fumbled

13   and said that."

14          Tim writes, "Alienating him from the CU doesn't scare

15   me because of member support, it scares me if he has a

16   retaliation in mind.  He can make things hard with NCUA."

17          Anthony writes, "Right.  Me as well."

18   A.  "He's already alienated and combative."

19   Q.  Anthony writes, "Keep you enemies close."

20          Yuri writes, "Anthony, did he get any donation money

21   from you already?"

22          Anthony write, "R."

23          Tim writes, "He's combative because we didn't pay 50K

24   today, correct?  We knew he would be, correct?"

25          Anthony writes, "Paid the 6K today to him."

 1              Yuri writes, "And the original donation?"

 2   A.  "And he still didn't care."

 3   Q.  Why did you say -- who did you refer to by "he"?

 4   A.  Trevon.

 5   Q.  Why did you say Trevon still didn't care?

 6   A.  Then he got paid the $6,000.

 7   Q.  The $6,000 hadn't changed his mind?

 8   A.  Correct.

 9   Q.  Anthony writes, "This is true."

10              Tim writes, "This is not a surprise that he's upset.

11   Let emotions settle.  When money is back on table, people

12   overlook resentment."

13              Tim continued, "Is board fully controlled?"

14              Yuri writes, "Start from scratch somewhere else?"

15              You write, "I told him we were --"  Oh, go ahead and

16   read your part.  I'm sorry.

17   A.  "I told him we were ready to move with the money, that I

18   had settled any concerns, and he still didn't want to move

19   forward."

20   Q.  Tim writes, "He's mad.  He needs to see check in hand in

21   couple days."

22              Yuri writes, "Immediately."

23              Anthony writes, "Jose, my dad, and Vlad think dif.  I

24   think --"

25              And Tim says, "You know who needs to be middleman,

 1   Rico.  There's a level of trust there."

 2           Anthony writes, "I don't think Rico is up for that,

 3   but yes.  They have a brother bond, I'm jel."

 4           Did you have an understanding of why Tim was

 5   suggesting that Rico be sent in to deal with Trevon Gross?

 6   A.  Yes.

 7   Q.  Why?

 8   A.  Rico was the one that had been working with Trevon directly

 9   for the last couple months.

10   Q.  And what kind of relationship did Trevon have with Rico?

11   A.  My understanding, it was a good working relationship.

12           MR. NOBLE:  Can we bring up -- I'm sorry.  Can we just

13   scroll to line 5218?

14   Q.  What is the date of this portion of the transcript?

15   A.  November 25th.

16   Q.  So this is the next day?

17   A.  Correct.

18   Q.  Okay.  And do you see where you wrote, "Can I attach a file

19   in here?"

20   A.  Yes.

21   Q.  Why were you asking that?

22   A.  I was going to attach a file that I had written.

23   Q.  Okay.  What had you written that you wanted to attach?

24   A.  A letter to Trevon.

25   Q.  And at this point in time, was Yuri Lebedev still a

1  participant in the conversation?

2  A.  Yes.

3          MR. NOBLE:  Can we bring up Government's Exhibit 1811

4  for identification only?  Can we blow up that top portion?

5  Q.  Mr. Freundt, do you recognize this?

6  A.  Yes.

7  Q.  What is this?

8  A.  That's an email I sent to myself.

9  Q.  On what date?

10 A.  November 25th.

11 Q.  What is the subject -- I mean, what is the attachment

12 called?

13 A.  "Trevon".

14 Q.  Is this the same date as the chat that we were just going

15 over in the other exhibit?

16 A.  Yes.

17         MR. NOBLE:  Can we flip to just the attachment and

18 show it to Mr. Freundt?

19 Q.  What is this?

20 A.  That's the email I drafted.

21         MR. NOBLE:  The government offers Government's

22 Exhibit 1811.

23         MR. CREIZMAN:  No objection.

24         MR. KLINGEMAN:  No objection.

25         THE COURT:  Thank you.  It's admitted.

 1              (Government's Exhibit 1811 received in evidence)

 2              MR. NOBLE:  Can we go ahead and show that to the jury?

 3   I'll just publish the date for a moment.  And then please flip

 4   to the attachment.

 5   BY MR. NOBLE:

 6   Q.  Mr. Freundt, you see you wrote, "Trevon.  As most of the

 7   board members understand, you wish to terminate your

 8   relationship with us.  Although we are disappointed with the

 9   news, we understand the reasons behind your decision.  At this

10   point, I'm reaching out to you as vice chairman to discuss your

11   plans on how to smooth transition -- how to have a smooth

12   transition once you vacate the positions as chairman of the

13   board and as CEO you currently hold.  Keeping the integrity of

14   the credit union is the utmost concern of the board and wish to

15   conduct this transition as smoothly and gracefully as

16   possible."

17              Who were you writing this email from the perspective

18   of?

19   A.  Yuri.

20   Q.  So you were drafting this for Yuri to send?

21   A.  Correct.

22   Q.  Because at that point in time, who was serving as the vice

23   chairman of the credit union?

24   A.  Yuri.

25   Q.  Can you just explain to the jury why you were drafting this

1    letter about Trevon understanding -- you understand that Trevon

2    wanted to step down?

3    A.  Well, he said he wanted no part of this anymore, so we

4    chose to interpret that as that he was vacating his position

5    and resigning as the chairman.

6    Q.  What, if any, role was this letter going to play with

7    respect to the strategy of calling a special board meeting?

8    A.  We were going to include the chairman and the CEO positions

9    to be appointed.

10   Q.  At that special meeting?

11   A.  Correct.

12   Q.  In the second paragraph you wrote, "We will honor the

13   agreement currently in place between you and Collectables Club

14   once a smooth transition has taken place and latest NCUA

15   inspection has been passed.  Please do not hesitate to contact

16   me should you have any questions."

17        What did you mean when you wrote "honor the agreement

18   currently in place between Collectables Club and Trevon Gross"?

19   A.  The original agreement between him and Anthony of the

20   300,000 donation.

21   Q.  Then you wrote, "I am requesting your exit plan to be sent

22   to the board for discussion within 72 hours in order to prepare

23   and have a plan in place before your departure."

24        Is that right?

25   A.  Correct.

 1   Q.  What did you do with this email after you drafted it?

 2   A.  I sent it to the group.

 3   Q.  To what group?

 4   A.  To the members in the chat.

 5   Q.  Of the WhatsApp?

 6   A.  Correct.

 7          MR. NOBLE:  Let's go back to Government's

 8   Exhibit 4501, and please scroll to line 5238.

 9   Q.  What did you do in line 5238?

10   A.  I included that email.

11   Q.  So you cut and pasted it?

12   A.  Correct.

13   Q.  Let's keep going, and we're going to read down to

14   line 5250.

15          Anthony responds to your letter, "Looks good.  Should

16   we not mention part pay for their full team on board to step

17   down and the remaining after Jose is trained briefly and goes

18   through the NCUA inspection with you?  We are willing to pay a

19   fraction now for all your members stepping down from the board

20   including you, having a board meeting to reflect that and

21   minutes completed."

22          What was Anthony suggesting there?

23   A.  To pay as they are resigning.

24   Q.  Did he want you to include that in your draft letter?

25   A.  Yes.

1    Q.   How did you respond?

2    A.   I said, "No."

3    Q.   Let's go ahead and read what you wrote beginning at 5243.

4    A.   "Has anyone tried logging into their HOPE bank account?

5    That's a conversation you are going to have with him in

6    person."

7    Q.   What conversation were you referring to?

8    A.   To his conversation about sending money as they resign.

9    Q.   So that was a conversation that was going to be between

10   who?

11   A.   Anthony and Trevon.

12   Q.   Okay.  Continue at line 5245, please.

13   A.   "We should mention (money sign) bribery in the resignation

14   email."

15   Q.   So at this point in time, what were you referring to was

16   bribery?

17   A.   The whole 300,000 translation.

18   Q.   The whole agreement between Trevon and Anthony, the

19   original agreement that you wrote in your letter?

20   A.   Correct.

21   Q.   And then Rico says, "I can log in just fine."

22             And then what did you write?

23   A.   "That's why I worded agreement."

24   Q.   And for the record, "agreement" is in quotation marks,

25   correct?

 1   A.  Correct.

 2   Q.  Why did you put the word "agreement" in quotation marks?

 3   A.  Because I was substituting the word "bribery" for

 4   "agreement" on the letter.

 5   Q.  So you're referring to the bribe arrangement when you used

 6   the word "agreement" in the draft letter you sent to the group?

 7           MR. KLINGEMAN:  I object, leading.

 8           THE COURT:  Sustained.

 9           MR. NOBLE:  I'll move on.

10   Q.  Mr. Freundt, then what did you write at line 5248?

11   A.  "Never mind.  Put in the wrong password."

12   Q.  Then Anthony writes, at line 5249, "Donation."

13           Do you understand why Anthony was writing the word

14   "donation"?

15   A.  Correct.

16   Q.  I asked, do you understand why he wrote that?

17   A.  Yes.

18   Q.  What was your understanding?

19   A.  It was an agreement, the donation, the bribery.

20   Q.  How was he suggesting you use the word "donation" with

21   respect to your letter?

22   A.  To include it.

23   Q.  To refer to the arrangement as the donation?

24   A.  Correct.

25   Q.  As opposed to bribery?

 1    A.  Correct.

 2    Q.  And then in the next line Anthony wrote, "We can use

 3    Privnote."

 4         Do you know what Privnote is?

 5    A.  That's an email software that you open it once and it

 6    disappears.

 7    Q.  Is that a secure way of communicating?

 8    A.  Correct.  You're only allowed to see it once.

 9    Q.  And how was Anthony suggesting you use -- or what was

10    Anthony suggesting you use Privnote for?

11    A.  To send Trevon the email including and saying the words

12    "donation" or "agreement".

13         MR. NOBLE:  Can we bring up Government's Exhibit 4510

14    in evidence?  And for the record, this is a WhatsApp

15    conversation between Yuri Lebedev and Anthony Murgio.

16         Since, Mr. Freundt, you're not a participant in this,

17    I'd like to have one of my colleagues read the part of Yuri

18    Lebedev, and I will read the parts of Anthony Murgio.

19         Can you please scroll to lines 4928?  4928, please.

20    Thank you.

21         Mr. Shin, would you read the part of Yuri Lebedev,

22    beginning at line 4928?

23         MR. SHIN:  "I heard some bad news again."

24         MR. NOBLE:  Anthony, "From?"

25         MR. SHIN:  "Jose.  He didn't give any details.  Just

1    said no deal.  Care to share?"

2            MR. NOBLE:  I'm sorry.  To orient the jury, this is a

3    conversation on November 24th, 2014.

4            And then Anthony writes, "Not sure yet.  He is on it."

5            MR. SHIN:  "Money do unbelievable things to people,

6    even pastors.  Like I said, I have about 41K now.  If you need

7    to borrow, I can transfer."

8            MR. NOBLE:  Anthony, "Thank you for everything."

9            MR. SHIN:  Some kind of emoticon, and then --

10           MR. NOBLE:  We'll stop there at 4976.  Thank you,

11   Mr. Shin.

12           Can we bring back up Government Exhibit 4501?  And

13   let's scroll to line 5487.

14   BY MR. NOBLE:

15   Q.  Mr. Freundt, this is again the WhatsApp conversation on

16   November 25th, 2014.  Can you please read what you wrote at

17   line 5487?

18   A.  "Rico, please forward to everyone.  The notice of meeting

19   is what we need to send out.  The waiver is to notify any

20   provisions that members have to call an emergency meeting."

21   Q.  And what were you telling Rico to forward to everyone?

22   A.  A notice of meeting.

23   Q.  Is that the special meeting you referred to earlier?

24   A.  Correct.

25   Q.  Michael Murgio writes, "Just sent an important email.

 1  Please open and send Trevon the email I drafted."

 2  A.  "To whom, Mike?"

 3  Q.  Do you know what Michael Murgio had sent you?

 4  A.  At that point, I didn't know.

 5  Q.  And then Anthony writes, "My dad is calling you, Jose."

 6          And Anthony writes, "tgross@hope-fcu.com, but my dad

 7  will call you first."

 8  A.  "Who did he send email to?"

 9  Q.  Michael Murgio, "To Trevon."

10          Anthony Murgio, "Dad, please pick up."

11          Michael Murgio, "When you sign the email, sign it as

12  board member, Helping Other People Excel Credit Union.  Use

13  your HOPE email."

14  A.  "Call my office, Anthony."

15          MR. NOBLE:  And then at line 5498, Michael Murgio

16  includes a voice note.  Can we please play the voice note?

17          (Audio played)

18  BY MR. NOBLE:

19  Q.  Do you know what he was referring to now at that point?

20  A.  Yes.

21  Q.  What was it?

22  A.  That's the draft that we were asking Trevon to call a

23  special meeting.

24  Q.  Of the board of the credit union?

25  A.  Correct.

 1   Q.  And how did you respond at line 499?

 2   A.  "What's Trevon's email?"

 3            MR. NOBLE:  Scroll down, please.

 4   Q.  Anthony writes, "Please all listen."

 5            Anthony, "Tgross@hope-fcu.com.  All listen to father's

 6   message."

 7            Go ahead.

 8   A.  "Mike, let's change the time in the agenda to 7:00 p.m."

 9   Q.  Michael Murgio, "Will do.  Thanks."

10   A.  "Email sent to Trevon."

11   Q.  Chad Leo writes, "I sent as well before I received the

12   voice note.  Sent from my HOPE email.  Changed my name but

13   didn't include credit union in my signature."

14            Yuri writes, "Sent."

15            Rico writes, "Ditto."

16            Kevin Tomasso writes, "All of us need to send?"

17            Anthony writes, "Need majority."

18   A.  "Yes, we all need to send to have majority."

19   Q.  Kevin Tomasso, "Can and should we copy anyone else?  I

20   don't know -- I know don't forward, but can't it be CCed?  And

21   FYI, chairman is spelled wrong.  Okay.  I guess I'll just send

22   it to him."

23            Anthony writes, "You can spell chairman properly."

24            Michael Murgio, "Chairman is spelled wrong in the last

25   sentence after advice.  Sorry.  Good catch, Kevin.  Thanks."

 1              Yuri writes, "How are we non-members?"

 2    A.   "Is Trevon answering?"

 3    Q.   Yuri, "Yes.  Check your email.  Said we are nonmembers, and

 4    hence have no say."

 5    A.   "I figured that was his next move."

 6    Q.   Why did you write "I figured that was his next move"?

 7    A.   Because he was trying to get us off the board.

 8    Q.   At that point in time, what did you believe Trevon was

 9    doing?

10    A.   Taking the money and running.

11    Q.   And then Tim writes, "Is it still worth me sending email?

12    I just got home."

13    A.   "I'm going to let the lawyers figure this one out."

14    Q.   And when you said "the lawyers", to whom are you referring?

15    A.   The lawyers that we were supposed to hire.

16    Q.   Who was going to hire the lawyers?

17    A.   Anthony.

18    Q.   And for what purpose?

19    A.   To see if we have control of the credit union or not to

20    fight that.

21    Q.   And then you wrote at line 5533?

22    A.   "We have to figure out if there was deceit from the getgo."

23    Q.   What did you mean by that, "deceit from the getgo"?

24    A.   My belief on the whole thing had changed throughout time so

25    I wasn't sure if there was a real purpose or if Trevon really

 1    wanted to relinquish the credit union or if this was a plan

 2    from the beginning.

 3    Q.  A plan for what?

 4    A.  To take the money and kick us out.

 5    Q.  Who was going to take the money and kick you out?

 6    A.  Trevon.

 7    Q.  And then Tim writes, "Kap could have been in his ear."

 8             And you write.

 9    A.  "We need to question the validity of the bylaws and all.

10    Smear his name and reputation by lawsuit."

11    Q.  "By lawsuit?"

12    A.  "Correct."

13    Q.  And Anthony writes, "Hmm.  Mark from Kap just messaged me

14    that he wants to speak."

15             Do you know who Anthony was referring to when he

16    mentioned "Mark"?

17    A.  Mark was one of the guys at Kapcharge.

18    Q.  Do you know his last name?

19    A.  I believe it was Ingram.  I'm not sure.

20    Q.  So Mark from Kapcharge, right?

21    A.  Correct.

22    Q.  And then what did you write in 5544?

23    A.  "Call him.  I want to hear call."

24    Q.  Anthony, "No.  We stay the path."

25             Tim, "I'm sending email to Trevon now."

 1   A.  "Are you not calling Mark?"

 2   Q.  Anthony, "No.  He said he just doesn't want me to waste my

 3   time."

 4           Tim, "Email sent."

 5   A.  "Waste your time with how?"

 6   Q.  Anthony, "Ha ha, Trevon told him."

 7           Tim, "Mark could want you/I bow out so he and Trevon

 8   can cut you out."

 9   A.  "So call him and know where he stands."

10   Q.  Tim, "you to bow out."

11   A.  "What he says, et cetera."

12   Q.  Anthony, "Right."

13           Tim, "How are we not members?  Because physical

14   address is not New Jersey?"

15           Anthony, "He is just saying that."

16           Tim, "We need to get and voted on and get you guys

17   addresses on New Jersey."

18   A.  "Anthony, did you retain a lawyer?"

19   Q.  Anthony writes, "Yup.  Largest in country."

20           Tim writes, "Good."

21           Anthony, "They will be on meeting tomorrow."

22           Anthony, "Perkinscoie.com."

23           Tim, "Phenomenal."

24           Anthony, "They also have skin in the game.  They own

25   1 percent of the Bitcoin vehicle.  All revolves around the CU."

1          Do you know whether these lawyers had any investment

2    in Anthony Murgio's Bitcoins business?

3    A.  No.

4    Q.  Was that just something Anthony was saying?

5    A.  I don't know.

6    Q.  What did you respond?

7    A.  "Okay.  Have them sent to my email.  Let them know we have

8    retained them to represent us in Collectables Club, et cetera."

9    Q.  Anthony, "They will, and have my association lawyer.  The

10   CU joined the association when we started."

11         Do you know what association he was referring to?

12   A.  Collectables Club.

13   Q.  How did you respond?

14   A.  "He knew what he move was all along."

15   Q.  "He knew what he move was all along."  Is there a typo in

16   there?

17   A.  Yes.

18   Q.  What did you mean to say?

19   A.  "He knew what his move was all along."

20   Q.  And who were you referring to?

21   A.  Trevon.

22   Q.  Tim writes, "I don't think so.  I think he saw Anthony as a

23   cash cow.  Then once he had problems with Anthony and the way

24   things were shaking out, he called to complained to Mark, and

25   Mark offers him a way to cut ant out."

```
 1              Do you see the word "ant"?
 2   A.  Yes.
 3   Q.  What is that?
 4   A.  Anthony.
 5   Q.  Is that a nickname you guys sometime use for Anthony?
 6   A.  That was his, yeah, abbreviation.
 7   Q.  Abbreviation?
 8   A.  Correct.
 9   Q.  And then Yuri writes, "Trevon could have told us from the
10   start about issue with members and residency."
11   A.  "Exactly my point.  That was his trump card."
12   Q.  What did you mean when you said that was Trevon's trump
13   card?
14   A.  Well, he should have known that we weren't valid members
15   from the beginning.
16   Q.  And then you write, "He why."
17              Yuri writes, "Agree there."
18              Mike Murgio, "You work for Collectables Club which is
19   in Lakewood."
20              Was Collectables Club based in Lakewood, New Jersey?
21   A.  No.
22   Q.  Tim writes, "I don't think Trevon was organized enough to
23   know that.  I think the members issue came after NCUA
24   inspection.  Kap is one that benefits from this and Trevon is
25   shiesty enough to do this."
```

 1              Tim continued, "If he did know, we have a huge problem

 2     that makes him liable for jeopardizing the CU by allowing

 3     nonmembers to voted on."

 4     A.   "He knew what his next move this weekend.  He wanted to

 5     squeeze as much money."

 6     Q.   Tim, "Yup."

 7     A.   "And technically, we all do work for Collectables, although

 8     there probably no paper trail to prove it."

 9     Q.   What work did you do for Collectables Club?

10     A.   None.

11     Q.   Why did you say that you worked for Collectables Club?

12     A.   Technically our $400 a month paycheck for the board member

13     was from Collectables Club.

14     Q.   Aside from serving on the board of HOPE Federal Credit

15     Union, did you do anything for Collectables Club?

16     A.   No.

17     Q.   Did you ever trade collectibles?

18     A.   No.

19     Q.   Did you ever talk about trading collectibles?

20     A.   No.

21     Q.   Did you ever buy Bitcoin personally?

22     A.   Eventually, I did.

23     Q.   But not at this time?

24     A.   Not at that time, no.

25     Q.   Did Collectables Club ever have any kind of meeting?

 1   A.  No to my knowledge.

 2   Q.  Tim writes in line 5596, "We have monthly payments to prove

 3   it."

 4          Do you know what he was referring to?

 5   A.  That the monthly payments were received for the board.

 6   Q.  For serving on the board of the credit union?

 7   A.  Correct.

 8   Q.  And Tim writes, "As paid employees."

 9          What did you write?

10   A.  "No taxes were deducted from pay, therefore we can only be

11   independent contractors and we have to see how these payments

12   are being recorded."

13   Q.  Yuri writes, "Another point why Kap might work with T

14   directly when he was saying how ant had no role on bringing Kap

15   in."

16   A.  "However, Yuri, I will send Trevon a reply letting him know

17   we all work for Collectables, which is in Lakewood, therefore

18   making us all valid members."

19   Q.  Was it true that Collectables Club was in Lakewood?

20   A.  No.

21   Q.  And then what did you say?

22   A.  "And we continue with plan ahead."

23   Q.  Tim says, "Stay the course.  Yes."

24          Yuri says, "Remember he said working for Collectables

25   didn't matter?  We asked him."

 1              Kevin Tomasso writes, "Maybe a technicality, but what
 2      do we do for Collectables Club other than serve on the board
 3      for the credit union, which our membership is in question?"
 4              Go ahead Mr. Freundt?
 5      A.   "I think it's important to have paper trail of us telling
 6      him why we are valid members.  We are acquisition consultants."
 7      Q.   What did you mean by "acquisition consultants"?
 8      A.   That was in response to the previous message, because we
 9      were brought on board to acquire the credit union.
10      Q.   So just in general, what were you guys discussing here in
11      terms of strategies?
12      A.   We were trying to figure out a way to be valid members of
13      the credit union.
14      Q.   And then Michael Murgio writes, "Have all of you been
15      working as volunteers for the credit union?  If so, you can be
16      members of the credit union.  You all have been working very
17      hard to expand the credit union's services."
18              Tim writes, "That and this past weekend was unpaid."
19              The past weekend, that was the meeting at the credit
20      union?
21      A.   Correct.
22      Q.   And then what did you write?
23      A.   "We are all speculating.  If a law firm has been retained,
24      let's let them handle from now on."
25      Q.   Kevin Tomasso, "I agree there."

1   A.  "That they have to make their presence known sooner rather

2   than later.  Let him know we're not playing and have him

3   rethink his approach."

4   Q.  Anthony, "Sent out the beast of an email."

5        What did you say?

6   A.  "And if shit doesn't work then will call NCUA myself and

7   let them know how the credit union took donations with Kap in

8   order to do business with them at a lower rate."

9   Q.  Why did you say you might contact the NCUA?

10  A.  I was mad.

11  Q.  And what did you mean by the credit union had taken

12  donations, in quotation marks, from Kapcharge?

13  A.  It was my understanding that Kap was giving money also to

14  Trevon.

15  Q.  For what purpose?

16  A.  I was told it was to upgrade the system so it becomes

17  compatible with what Kap was doing.

18  Q.  What system?  System for what?

19  A.  For the ACH transactions.

20  Q.  You said that the credit union was going to do the ACH

21  transactions at a lower rate for Kapcharge?

22  A.  Correct.

23  Q.  Was that your understanding of the part of the deal?

24  A.  Correct.

25  Q.  What was your basis for that knowledge?  To whom did you

 1   speak to about that?

 2   A.  Anthony.

 3            MR. NOBLE:  Can we scroll down to line 8016?  That's

 4   an entry from Anthony Murgio.  Can we please press play?

 5            I'm sorry.  Can you pause?

 6   BY MR. NOBLE:

 7   Q.  To orient the jury, what is the date of this entry,

 8   Mr. Freundt?

 9   A.  December 3rd.

10   Q.  This is several days later?

11   A.  Correct.

12            MR. NOBLE:  Let's hit play.

13            (Audio played)

14            MR. NOBLE:  Can we pause there?

15   BY MR. NOBLE:

16   Q.  To your knowledge, has Collectables Club ever used the

17   aunt's house for anything?

18   A.  Not to my knowledge.

19   Q.  Had you ever traveled there before?

20   A.  Not before the meeting.

21   Q.  Were you aware whether Collectables Club had any other type

22   of office space in Lakewood?

23   A.  No.

24   Q.  Did you know one way or the other, to be clear?

25   A.  I wasn't aware.  I didn't know.

```
 1              MR. NOBLE:  Let's hit play.

 2              (Audio played)

 3   BY MR. NOBLE:

 4   Q.  And then Anthony wrote, "Please listen and let me know you

 5   understand."

 6              Yuri writes, "Clear."

 7              Rico writes, "Understood."

 8              Mr. Freundt, what did you write at line 8029?

 9   A.  "Capiche.  And is the lawyer aware of your deal with

10   Trevon?"

11   Q.  Why did you ask Anthony that?

12   A.  I thought it was important that the lawyer knew about the

13   donation.

14   Q.  Why did you think the lawyer should know about the

15   donations to Trevon?

16   A.  Because lawyers should know everything.

17   Q.  And Anthony writes, "No.  Have a separate lawyer for

18   Collectables Club."

19              And you write?

20   A.  "Okay."

21   Q.  Anthony said, "Sending notice to CU."

22   A.  "So we should mention the 50K or the previous 150K?"

23   Q.  So at that point in time, how much money did you understand

24   had been paid to Trevon or his church?

25   A.  Upwards of 200,000.
```

1    Q.   But here you refer to 150K dollars?

2    A.   Correct.

3    Q.   Okay.  And what 50K are you referring to?

4    A.   To the one that were supposed to be paid.

5    Q.   That was the 50K that was still on the table?

6    A.   Correct.

7    Q.   Line 8036, Anthony writes, "I don't think to this lawyer."

8         Anthony says, "Collectables Club lawyer."

9         Then he writes, "We're going to take the stance that

10   when we joined, we were using Kap for another -- for processing

11   for the Collectables Club and we brought them to the table.  We

12   thought that it could bring extra revenue to the credit union,

13   and then after business started picking up with them, then it

14   seems like the existing board members tried taking our power

15   away from us."

16        Anthony, "Please listen."

17        Rico, "Can you forward the signed agreement with

18   Trevon and Collectables Club?"

19        And Yuri writes, "Won't this lawyer eventual hear

20   Trevon's side?"

21        Anthony writes, "That is for Trevon to make that

22   decision.  It's a touchy subject on both sides."

23        Did you have an understanding of why it would be a

24   touchy subject?

25   A.   At that point, I did, yes.

1   Q.  Why?  Explain to the jury.

2   A.  Because that would have been considered bribery and that's

3   illegal.

4   Q.  You didn't think you should tell the lawyer about that?

5   A.  I thought -- I thought he should know.

6   Q.  Full disclosure?

7   A.  Correct.

8   Q.  Did Anthony want to do that?

9   A.  No.

10  Q.  Did Yuri Lebedev want to do that?

11  A.  Doesn't seem that way.

12          MR. NOBLE:  Let's continue just a little bit farther.

13          THE COURT:  Mr. Noble, how much longer with this

14  witness?

15          MR. NOBLE:  Judge, I probably have about, I would say

16  half hour, 45 minutes.

17          THE COURT:  Proceed.

18          MR. NOBLE:  Anthony Murgio, at line 8046, writes, "I

19  will ask the other lawyers."

20          And let's go ahead and press "play" at 8050.

21          (Audio played)

22  BY MR. NOBLE:

23  Q.  What did you write at the next few lines?

24  A.  "My only concern about going this route is that if things

25  do not work out and we have to file lawsuit, et cetera, Trevon

 1    will know which angles we are taking and he can be better

 2    informed on our strategy."

 3            MR. NOBLE:  Now, we can take that down.

 4    BY MR. NOBLE:

 5    Q.  Mr. Freundt, did you and the other Collectables Club

 6    members ultimately keep control of HOPE Federal Credit Union?

 7    A.  No.

 8    Q.  Explain what happened.

 9    A.  We just kind of died.  The whole situation just died down.

10    Q.  The special meeting strategy did not work?

11    A.  No.

12    Q.  And contacting lawyers, did that have any effect?

13    A.  I've never knew if they retained a lawyer or what happened

14    with that, but no.

15            MR. NOBLE:  Could we bring up, just for

16    identification, Government's Exhibit 4509 so defense counsel

17    can review?  This is a WhatsApp conversation.  And I believe

18    the parties have agreed to its admission, so at this time I'd

19    offer it into evidence.

20            Go ahead and scroll all the way through.

21            MR. KLINGEMAN:  What's the exhibit marking?

22            MR. NOBLE:  It's 4509.

23            Go back up.  Can you just pause there for a second?

24            MR. KLINGEMAN:  Your Honor, I'd like to take a look at

25    this at the break, please.

 1              THE COURT:  All right.

 2              MR. NOBLE:  That's fine.  We can publish this later.

 3      I'll take that down.

 4              Can we bring up Government Exhibit 1814 for

 5      identification only?

 6      BY MR. NOBLE:

 7      Q.  Mr. Freundt, do you see that document on your screen?

 8      A.  Yes.

 9      Q.  Do you recognize this?

10      A.  Yes.

11      Q.  What is it?

12      A.  That's an email I sent to Tim.

13      Q.  On what date?

14      A.  On December 3rd.

15      Q.  To be clear, that's Tim Ellrich?

16      A.  Correct.

17              MR. NOBLE:  The government offers Government's

18      Exhibit 1814.

19              MR. KLINGEMAN:  No objection.

20              MR. CREIZMAN:  No objection.

21              MR. NOBLE:  May I publish for the jury?

22              THE COURT:  1814 was -- I thought you said 4518.

23              MR. NOBLE:  1814, your Honor.

24              THE COURT:  Can I see the stickers of what this is?

25              MR. NOBLE:  Sure.

 1          THE COURT:  No objection to 1814, counsel?

 2          MR. KLINGEMAN:  No objection to 1814.

 3          MR. CREIZMAN:  No objection.

 4          THE COURT:  Thank you.  It's admitted.

 5          (Government's Exhibit 1814 received in evidence)

 6          MR. NOBLE:  Can we just publish for the jury, please,

 7   Mr. Chang-Frieden?  Let's blow up the email, the whole email.

 8   BY MR. NOBLE:

 9   Q.  Mr. Freundt, who is this an email between?

10   A.  Myself and Tim.

11   Q.  And on December 3rd, 2014, Tim Ellrich wrote, "From what I

12   understand, this whole fiasco has become much harder than

13   originally anticipated.  I guess my question echoes what Jose

14   has already asked, is it worth our while to continue messing

15   with this?  How much money has Trevon actually "gotten away

16   with"?  If he's trying to walk away with 150K, I can see why

17   we're so invested.  I don't know all the intricate details of

18   what money exchanged hands so I'm not sure how deeply invested

19   Anthony and his partners actually are.  It appears Anthony is

20   going to be digging deep with retaining lawyers and fighting

21   this.  Is it worth it?"

22          And how did you respond, Mr. Freundt?

23   A.  "Well, all that has really been invested is time.  The 150K

24   was paid but it didn't come from any of our pockets.  As much

25   as I hate people getting away with stuff like this, I'm

1    contemplating if it's just better for us to start our own

2    chapter, make it how we want it and the way we want it,

3    et cetera."

4    Q.  What did you mean by "starting our own chapter"?

5    A.  Starting a new credit union.

6              MR. NOBLE:  You can take that down.

7    Q.  After Anthony Murgio and you and the others lost control of

8    HOPE, do you know whether Kapcharge continued to process ACH

9    transactions through the credit union?

10   A.  I don't know.

11   Q.  One way or the other?

12   A.  Correct.

13   Q.  Did you have any further discussions about -- with Anthony

14   Murgio and the others about starting another credit union?

15   A.  Eventually that came up again.

16   Q.  Did you ever discuss taking over another credit union with

17   Anthony Murgio?

18   A.  Anthony sent me an email with a list of possible credit

19   unions that were in the same situation as HOPE was.

20   Q.  And did you ever have any role in helping Anthony try to

21   take control of another credit union?

22   A.  No.

23   Q.  What about trying to open another credit union?

24   A.  Eventually, I was included on being one of the founding

25   members of another credit union, yes.

1   Q.   And what was the name of that credit union going to be?

2   A.   Ecommerce Credit Union.

3   Q.   Who else was involved in the discussions about starting the

4   ecommerce Credit Union?

5   A.   To the best of my recollection, it was Mike, Anthony's

6   father, Anthony's brother Joe was included on the emails, I

7   believe Rico, Yuri, and Tim.

8   Q.   Tim Ellrich?

9   A.   Correct.

10  Q.   Rico Hill?

11  A.   Correct.

12  Q.   And Yuri Lebedev?

13  A.   Yes.

14  Q.   Now, are you familiar with an entity called ecommerce

15  Private Member Association?

16  A.   I am now.

17  Q.   What do you mean you are now?

18  A.   I know what they are now, yes.

19  Q.   Okay.  When was the first time that you recall hearing or

20  seeing communication about ecommerce PMA?

21  A.   The first time I recall was when I spoke to the government.

22  Q.   Were you copied on emails concerning ecommerce PMA?

23  A.   I might have been, yes.

24  Q.   Now, did there ever come a time when you remember joining

25  the ecommerce Private Member Association?

1    A.  I don't remember joining that association.

2    Q.  Did you ever attend any meetings of the ecommerce PMA?

3    A.  No.

4    Q.  Did you ever participate in any activities among the

5    members of the ecommerce PMA?

6    A.  No.

7    Q.  Do you know one way or the other whether ecommerce PMA did

8    anything?

9    A.  No.

10   Q.  Now, I believe you said that Anthony Murgio tried to start

11   a credit union called ecommerce Credit Union; is that right?

12   A.  Correct.

13   Q.  Was that in any way connected to the ecommerce Private

14   Membership Association?

15   A.  I believe that was the base of the membership.

16   Q.  And was Yuri Lebedev included on the email discussions

17   about that?

18   A.  I believe so.

19          MR. NOBLE:  Can we bring up, actually for

20   identification only, Government's Exhibit 2030?

21   Q.  Do you recognize this document?

22   A.  Yes.

23   Q.  What is this?

24   A.  That's the email Michael Murgio, Anthony's father, sent us.

25   Q.  On what date?

1    A.  That would be March 30th, 2015.

2            MR. NOBLE:  Government offers Government's

3    Exhibit 2030.

4            MR. CREIZMAN:  No objection.

5            MR. KLINGEMAN:  No objection.

6            THE COURT:  Thank you.  2030 is admitted.

7            (Government's Exhibit 2030 received in evidence)

8            MR. NOBLE:  May we publish for the jury?

9            THE COURT:  You may.

10            MR. NOBLE:  Can we just blow up the header information

11    for now?

12    BY MR. NOBLE:

13    Q.  Mr. Freundt, who sent this email?

14    A.  Michael Murgio.

15    Q.  And it was sent to -- do you recognize these email

16    addresses?

17    A.  I recognize Anthony's, Joe's, mine, Tim, Mark Chung,

18    Rico's, Chad Leo's, and then Yuri's.

19    Q.  Okay.  You see the email Joe@bigtreesolutions.com?

20    A.  Correct.

21    Q.  Who is that?

22    A.  That's Joe Murgio, Anthony's brother.

23    Q.  Do you know what Big Tree Solutions is?

24    A.  That was one of the other businesses in Tampa.

25    Q.  What do you mean "other businesses"?

1    A.  Anthony had a couple businesses at the same time.

2    Q.  And his brother, Joe Murgio, was involved in Big Tree?

3    A.  Correct.

4    Q.  Do you know who else was involved with Big Tree?

5    A.  I believe Mark and Tim.

6    Q.  Mark Chung and Tim Ellrich?

7    A.  Correct.

8            MR. NOBLE:  Let's go and look at the body of the

9    email.

10   Q.  So here, Michael Murgio is inviting you to view a number of

11   documents.  Do you see that?

12   A.  Yes.

13   Q.  Including a membership checklist, trustee meeting

14   documents, and some other documents.  Do you see that?

15   A.  Yes.

16   Q.  Were these links to Google documents?

17   A.  I believe so.

18   Q.  Okay.  And at the bottom he writes, "Please read over these

19   documents, especially the meeting minutes.  I'm getting ready

20   to send to NCUA and you need to be well aware of the contents.

21   Feel free to call if you have any questions."

22           MR. NOBLE:  Let's take that down.  Can we bring up for

23   identification Government's Exhibit 2031?  Let's do it side by

24   side with 2035.  When these come up.

25   Q.  Mr. Freundt, do you recognize these documents?

 1  A.  Yes.

 2  Q.  Hold on.  What are 2031 and 2035?

 3  A.  That's a correspondence between Joe Murgio and the NCUA

 4  representative.

 5  Q.  And you see on 2031 and 2035 there is somebody who's blind

 6  carbon copied?

 7  A.  Yes.

 8  Q.  Who is that?

 9  A.  Yuri Lebedev.

10  Q.  Were you also blind carbon copied on these emails?

11  A.  Yes.

12          MR. NOBLE:  The government offers Government's

13  Exhibit 2031 and 2035.

14          MR. CREIZMAN:  No objection.

15          MR. KLINGEMAN:  No objection.

16          THE COURT:  Thank you.  They're admitted.

17          (Government's Exhibits 2031 and 2035 received in

18  evidence)

19          MR. NOBLE:  Let's publish first 2031, please.  Can we

20  just blow up the header information first?

21  BY MR. NOBLE:

22  Q.  So Mr. Freundt, who is this an email from?

23  A.  Joe Murgio.

24  Q.  And what is his email address?

25  A.  Ecommercepma@gmail.com.

1   Q.  Do you know whether for a fact that it was Joe Murgio who

2   sent this email?

3   A.  Not for a fact.

4   Q.  And the subject is "Requested documentation", correct?

5   A.  Correct.

6   Q.  On April 3rd, 2015?

7   A.  Correct.

8   Q.  And then who is this email sent to at the very bottom?

9   A.  James Stupansky.

10  Q.  Who is he?

11  A.  NCUA representative, I assume.

12  Q.  Okay.  And there are a number of attachments here, right?

13  A.  Correct.

14  Q.  Including ones relating to the ecommerce PMA?

15  A.  Correct.

16          MR. NOBLE:  Let's zoom out.

17  Q.  Now, I'm not going to read this whole document, but I'd

18  like to ask you about certain portions of it.

19          MR. NOBLE:  Can we first flip to page 2?  Let's blow

20  up number 3.

21  Q.  You see it says, "Our website had been down for upgrades

22  and updating.  It is currently up and running.  The website

23  address is www.ecommercepma.com."

24  A.  Yes.

25  Q.  Did you ever go to that website?

1   A.  I don't believe I did, no.

2   Q.  Do you know who created the website?

3   A.  I believe it would have been Anthony.

4   Q.  I don't want you to speculate.  Do you know one way or the

5   other?

6   A.  No.

7           MR. NOBLE:  Can you highlight number 6 concerning the

8   membership list?

9   Q.  It says, "A current membership list is attached that

10  includes name, email addresses, membership class and dues paid.

11  You will note that our membership has been reduced from what

12  was originally reported due to recent changes in eligibility

13  requirements based on our amended bylaws and articles

14  association."

15          You testified earlier that you didn't think you were a

16  member of the ecommerce PMA, correct?

17  A.  Correct.

18          MR. NOBLE:  Let's blow up number 7.  Also in the email

19  to the NCUA it says that, "All minutes are attached," and then

20  it cites to certain attachments; is that right?

21  A.  Yes.

22  Q.  And it also says, "Please see the website for the remaining

23  2015 meeting schedule."

24  A.  Yes.

25  Q.  Is that right?  Okay.

1           MR. NOBLE:  Let's blow up number 9.

2   Q.  It states about documentation showing members'

3   participation.  "As stated under Article 1, Declaration of

4   Purpose and the Articles the Association.  Creating a collegial

5   environment for members is and continues to be one of the main

6   tenets of the association.  Since its inception, the

7   association has fostered collegiality in the sharing of ideas.

8   One example is meeting with other startup web-based companies

9   who also have office space in the incubator innovation hub we

10  are located in.  There have also been web-based sharing via

11  GoToMeetings and screen sharing activities between members."

12          Mr. Freundt, did you ever participate in any of those

13  meetings or activities?

14  A.  No.

15  Q.  Do you know whether they occurred or not?

16  A.  No.

17          MR. NOBLE:  I'd like to flip through some of the

18  attachments.  Can you just scroll forward so that the jury can

19  see the full document and I'll tell you when to stop.

20          Let's just pause there.

21  Q.  Do you see that's a letter dated January 24th, 2015 --

22  A.  Correct.

23  Q.  -- is that right, to the NCUA?

24  A.  Correct.

25  Q.  It's the Office of Consumer Protection; is that right?

 1   A.  Yes.

 2   Q.  And it says, "Please accept this letter as documentation of

 3   our association's desire to sponsor and become a part of the

 4   proposed ecommerce Federal Credit Union," and then it lists an

 5   address located in Tampa, Florida.

 6          Do you know where Anthony Murgio was living at that

 7   time?

 8   A.  In Tampa, Florida.

 9   Q.  And you see the letter, it appears to be signed by Joseph

10   Murgio, the president of the ecommerce Membership Association?

11   A.  Correct.

12          MR. NOBLE:  Let's keep flipping forward.  Let's pause

13   there.  If you can just blow up number 7 under Article 5.

14   Q.  It states, "The original trustees of the association will

15   be president, Joseph Murgio, vice president, Yuri Lebedev,

16   secretary/treasurer, Mark Chung."

17          MR. NOBLE:  Let's keep going to the next page.  Just

18   blow up the bottom portion that says "therefore".

19   Q.  Which states, "Therefore, the following charter members do

20   hereby associate themselves for the purposes and aims stated

21   herein, and hereby affix their hands and seals in witness

22   whereof this 15th day of July, 2014 and do jointly declare that

23   this association has been duly created."

24          Mr. Freundt, this document says that the association

25   was created in July of 2014.  Do you see that?

 1   A.  Yes.

 2   Q.  What were you doing in July, 2014?

 3   A.  I was having a baby.  Well, my wife was.

 4   Q.  Okay.  What about with respect to what you've been

 5   testifying about today?

 6   A.  I was living in Tallahassee, you mean?  I'm not sure where

 7   the --

 8   Q.  Sure.  I'm sorry.  My question is a little bit vague.  But

 9   in July, 2014, did you have any role at the credit union at

10   that time, at HOPE Federal Credit Union?

11   A.  Yes.

12               (Continued on next page)

1    BY MR. NOBLE:

2    Q.  What were you doing?

3    A.  I was a board member.

4    Q.  Around that time, do you recall any discussions with Yuri

5    Lebedev, or Anthony Murgio, or anyone else about starting the

6    eCommerce Private Membership Association?

7    A.  No.

8            MR. NOBLE:  You can zoom back out.  Keep flipping

9    forward to the top of the page, Article IV.

10           Sorry, at Article V, can you blow up the section 1.

11   Q.  It states, "The biannual meeting of eCommerce Private

12   Membership Association shall be held in even years in November

13   at a time and place determined by the board of trustees."  Do

14   you see that?

15   A.  Yes.

16   Q.  Was 2014 an even or odd year?

17   A.  Even.

18   Q.  And what was going on in November of 2014?

19   A.  We were meeting with HOPE.

20   Q.  Did you ever attend any meeting of the eCommerce Private

21   Membership Association in November of 2014?

22   A.  No.

23           MR. NOBLE:  Can we flip forward several pages to the

24   membership list.  And flip to page 6 of the membership list.

25   Pause there.  Can we blow up just the very middle portion of

1    the membership list.

2    Q.  Mr. Freundt, in the middle of this section, do you

3    recognize any email addresses or names as being members of the

4    eCommerce Private Membership Association?

5    A.  Chad Lio, Jennifer Wotherspoon.  Those are the only two I

6    recognize.

7              MR. NOBLE:  Let's flip to the next page.  Can you blow

8    up the top half.  That's fine.

9    Q.  Do you recognize any names here?

10   A.  Ricardo Hill, myself, Chad Lio, Yuri, Mike Murgio, Anthony

11   Murgio, Mark --

12   Q.  What about Taylor Wilson, do you know who that is?

13   A.  Yes, Taylor Wilson.  I'm sorry.

14   Q.  Who is Taylor Wilson?

15   A.  She was Anthony's on-and-off girlfriend.

16   Q.  Do you see a little bit further down, there's also Joe

17   Murgio, and Kim Murgio, and Tim Ellrich?

18   A.  Correct.  And then Mark Chung.

19   Q.  What do those people have in common?

20   A.  We all knew Anthony Murgio.

21   Q.  Now, this lists you as being a member of the eCommerce

22   Private Membership Association, correct?

23   A.  Yes.

24   Q.  Did you ever pay any kind of membership dues or fees to

25   join the association?

1    A.  No.

2    Q.  Did you believe you were a member of the association?

3    A.  No.

4              MR. NOBLE:  Can we flip forward to some of the meeting

5    minutes, one dated August 7, 2014.

6              THE COURT:  Mr. Noble, we'll take our mid-morning

7    break.

8              Members of the jury, we'll take about a 10- or

9    15-minute break, and we'll see you then.  Thank you.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1            (Jury not present)

 2            THE COURT:  Mr. Freundt, you may step down for the

 3     break.  Thank you.

 4            (Witness temporarily excused)

 5            THE COURT:  Mr. Klingeman, I know you want to look at

 6     that chat --

 7            MR. KLINGEMAN:  I think it's fine, your Honor.  I've

 8     just been conferring with Ms. Santillo, and it looks like that

 9     was a document to which we agreed.

10            THE COURT:  Thank you.

11            Anything else to take up?

12            MR. NOBLE:  No, Judge.  I apologize for running over.

13     I promise, this is my second to last exhibit, the other one is

14     short, and I just have a few more questions about Coin.mx, but

15     it will be brief.

16            THE COURT:  All right.

17            Anything to take up?

18            See you shortly.

19            (Recess)

20            THE COURT:  Matters to take up?

21            MS. SANTILLO:  Yes, your Honor.  I wanted to revisit

22     the issue that I had raised earlier, both in our severance

23     motion and in other argument, that we've kind of reached this

24     fork in the road, and Mr. Freundt has testified unequivocally

25     that Mr. Gross told him that there came a time when -- that

1    Mr. Gross wanted no part of us anymore, and that was his

2    testimony, and there are numerous prejudicial statements that

3    are made by the remaining members of the Collectables Club that

4    are taking on new ventures, including trying to create these

5    new credit unions and coming up with prayer rooms in their

6    aunt's house, and we think all of that should not be admissible

7    as against Trevon Gross.  This prejudicial information is

8    exactly why we moved for severance, and we were told we could

9    get a limiting instruction to cure any prejudice, and we would

10   like that now.

11              THE COURT:  What do you propose?

12              MS. SANTILLO:  I don't know exactly.  Can we draft a

13   proposal and try to give it at the lunch break?

14              THE COURT:  Sure.

15              MS. SANTILLO:  Okay.  Thank you.

16              THE COURT:  You'll show your proposal to the

17   government in advance, and then I'll hear their views.

18              MS. SANTILLO:  Thank you.

19              THE COURT:  Mr. Shin?

20              MR. SHIN:  Your Honor, just on that issue, I believe

21   your Honor ruled, in response to the in limine motion which

22   addressed this withdrawal issue generally, that the Court would

23   wait until the government had the opportunity to present its

24   evidence about what was in furtherance of the conspiracy and

25   the scope of the conspiracy under the Geaney rule.  And so --

1    we obviously haven't completed that, and so, in our view, one,

2    it's premature to rule that any particular evidence does or

3    does not apply to Mr. Gross, and, therefore, this -- I think

4    it's premature to attempt to craft a limiting instruction in

5    this way.  I can represent that the government intends to

6    offer -- as we described in our in limine motion, that we

7    intend to offer that Mr. Gross, in fact, did continue on in

8    this conspiracy and, in particular, continued on especially in

9    working with representatives of Kapcharge and other

10   representatives of HOPE FCU, including Charles Blue, in

11   furtherance of the conspiracy, largely focused on continuing to

12   process ACH transactions for Kapcharge and continuing to

13   obstruct and make false statements to the NCUA.

14          So, given that we haven't had the opportunity yet to

15   proffer all of that evidence, it's premature, in our view, to

16   rule, as Ms. Santillo appears -- this seems to be a back-door

17   way to try to get in a ruling that Mr. Gross withdrew from the

18   conspiracy; therefore, this limiting instruction is required.

19          THE COURT:  Maybe this will require briefing.  I guess

20   there might be two separate issues.  So there is the withdrawal

21   question, which I have -- as I ruled under the Geaney rule,

22   sought the government's proffer, and as we're proceeding, I

23   think I'm coming to the conclusion, but we'll see what

24   evidence, that there was no withdrawal in the sense that for

25   introduction of coconspirator statements, so long as they're in

1   furtherance of the conspiracy charged against Mr. Gross, that

2   those will likely continue to be admissible.  We'll take that

3   up.  But I guess I had heard Ms. Santillo -- maybe I misheard

4   you, Ms. Santillo -- to make a separate point, which is that

5   there may be evidence that is distinct from Mr. Gross, and that

6   the government would concede is not admissible against him.

7           Does the government think that's true or that it's all

8   admissible against him?

9           MR. SHIN:  Well, I think this is something we'd need

10  to work through in specifics, as your Honor always requests.

11  We had a very brief discussion about this before your Honor

12  came out, and I understood it to kind of be a broader request

13  for an instruction that applied to a large swath of evidence,

14  and so, perhaps the best course is for the government and

15  Ms. Santillo to work through specific -- whether any

16  instructions are warranted for specific pieces of testimony or

17  documents.  So we'll attempt to be as specific as possible, and

18  maybe we'll be able to reach some resolution.

19          THE COURT:  Okay.  I think that's wise.

20          Again, maybe I'm wrong, but I put these sort of in two

21  lines of issues, two categories of issues.  At some point, as I

22  said, I made the conditional ruling with respect to admission

23  of post-September --

24          MR. SHIN:  November, your Honor.

25          THE COURT:  -- November 12th meeting, and at some

 1     point -- I think the thing to do would be the government would

 2     be to brief all of the evidence that it says supports the

 3     absence of withdrawal, the continuation of the conspiracy post

 4     that meeting; therefore, some category of evidence, even after

 5     that meeting, would continue to be, as I think the evidence is

 6     bearing out, admissible against Mr. Gross.  So that's sort of

 7     one category.

 8             The other category is whether, in fact, there are

 9     aspects of the evidence and testimony that don't pertain to

10     Mr. Gross, and the government isn't seeking admission with

11     respect to Mr. Gross or that, I would agree with the defense,

12     is not in furtherance of the conspiracy as charged against

13     Mr. Gross.

14             MR. SHIN:  Understood, your Honor.

15             I think it also makes sense to deal with that after

16     lunch, given that Mr. Freundt hasn't finished testifying.  So

17     there may be other items that Ms. Santillo wishes to raise.

18             THE COURT:  Right.

19             MR. SHIN:  We'll do that.  Thank you.

20             THE COURT:  You'll think about those two categories,

21     if you agree with me that there are those two categories.  In

22     the second category, to the extent that there is either

23     agreement or disagreement, you'll let me know, and then to the

24     extent there is agreement, getting agreement on a proffered

25     limiting instruction and when to give it with respect to what

 1    evidence, and if there's disagreement, I'll hear you.

 2              MR. SHIN:  Thank you, your Honor.

 3              THE COURT:  All right.

 4              Get Mr. Freundt and the jury.

 5              MR. KLINGEMAN:  Your Honor, I don't know if the

 6    government will tender Mr. Freundt for cross before lunch, but

 7    if it does, Mr. Creizman, on behalf of Mr. Lebedev, is going to

 8    begin, just to clarify what we forecast this morning.

 9              THE COURT:  As anticipated.  Okay.  Thank you.

10              (Continued on next page)

 1            (Jury present)

 2            THE COURT:  Thank you.  Everyone may be seated.

 3            Mr. Noble, you'll continue with your direct

 4   examination of Mr. Freundt.

 5            Mr. Freundt, I remind you that you are under oath.

 6            When you're ready, Mr. Noble.

 7            MR. NOBLE:  Thank you, Judge.

 8            Can we bring back up Government Exhibit 2031.  Can we

 9   please flip forward to the October 2nd, 2014 minutes.

10            I ask Mr. Chang-Frieden to flip forward to the

11   October 2nd, 2014 meeting minutes.  Thank you.

12            Can we just highlight the top half of this page.  Blow

13   up, I mean.  Thank you.

14   BY MR. NOBLE:

15   Q.  Mr. Freundt, what is the date of this meeting?

16   A.  October 2nd, 2014.

17   Q.  It says it's a minutes of the board of trustees of the

18   eCommerce PMA Association?

19   A.  Correct.

20   Q.  You all were still involved with HOPE FCU at this time,

21   correct?

22   A.  Yes.

23   Q.  Who does it say was present at these meetings?

24   A.  Present was Joseph Murgio, Mark Chung, Tim Murgio, and Yuri

25   Lebedev.

1   Q.  And Tim Ellrich was absent?

2   A.  Correct.

3   Q.  Do you see the paragraph underneath President Murgio

4   beginning a discussion?

5   A.  Yes.

6   Q.  Can you just read that out loud for the jury?

7   A.  "A discussion on the benefits of creating a credit union to

8   provide cost-effective banking services to members of our

9   association ensued.  Tim Ellrich and Mike Murgio will take the

10  lead in providing additional information at a future trustee

11  meeting."

12  Q.  Can you remind the jury, when was the first time that you

13  ever heard about starting a credit union for eCommerce PMA?

14  A.  At sometime in 2015.

15  Q.  After you were involved with HOPE?

16  A.  Correct.

17          MR. NOBLE:  Let's zoom back out and flip forward two

18  pages, please, to the next minutes of the October 2nd, 2014

19  minutes of the member meeting.

20  Q.  Do you see that, Mr. Freundt, at the top?

21  A.  Yes.

22  Q.  It says -- it indicates kind of toward the bottom, "A

23  discussion with members regarding their position on what would

24  be the most beneficial to assuring their success."

25          Again, did you ever attend any meeting of the

1    eCommerce Private Membership Association?

2    A.   No.

3    Q.   And what was going on, again, in October 2014?

4    A.   We were involved with HOPE.

5    Q.   So you still had a credit union at that time?

6    A.   Correct.

7              MR. NOBLE:  Can we flip forward to a page that's

8    titled, "Proposed ECommerce Federal Credit Union Associational

9    Common Bond Checklist."  Let's just blow up that top paragraph.

10   I'll read it for the jury.

11             "According to chapter 2, Article III, of the NCUA

12   Chartering and Field of Membership Manual, the common bond for

13   an associational group cannot be established simply on the

14   basis of that the association exists.  In determining whether a

15   group satisfies associational common bond requirements for a

16   federal credit union charter, NCUA will consider the totality

17   of the circumstances, assessing the association's structure and

18   operational requirements, using the factors contained in the

19   table below."  And it asks the applicant to complete the table

20   below.

21             Let's zoom out, and let's blow up this portion of the

22   table.

23   BY MR. NOBLE:

24   Q.   Here it states:  "Whether members pay dues," and it's

25   indicated in this chart, "Yes, the members pay dues," correct?

1    A.  Yes.

2    Q.  Did you pay any dues?

3    A.  No.

4    Q.  It also says -- it asks whether members participate in the

5    furtherance of the goals of the association, and what box is

6    checked?

7    A.  "Yes."

8    Q.  Again, did you participate in any events for the eCommerce

9    Private Membership Association?

10   A.  No.

11         MR. NOBLE:  Let's go to the next page.  Let's blow up

12   the top portion of the chart.

13   Q.  "The other factors are the association's membership

14   eligibility requirements," and it's checked, "Yes," and it asks

15   in the comments section, "How do individuals qualify for

16   membership?"  It states, "They must receive regular income from

17   eCommerce activities."

18         At that point in time, did you receive any income from

19   eCommerce activities?

20   A.  No.

21   Q.  What were you doing at that time for work?

22   A.  I was working for the state.

23   Q.  State of Florida?

24   A.  Correct.

25         MR. NOBLE:  Again, this says, "Frequency of meetings,"

1   it says, "Yes."  It says members hold two regular meetings

2   annually, and the board meets on even months, and that there's

3   a minimum of three held annually.

4           Okay.  You can take that down, Mr. Chang-Frieden.

5           Can we bring up Government Exhibit 2035 in evidence

6   now.

7   Q.  What is this document, Mr. Freundt?

8   A.  That is an email from Joe Murgio to James Stupansky.

9   Q.  And the subject is "Federal credit union field of

10  membership request"?

11  A.  Correct.

12  Q.  Dated April 29, 2015?

13  A.  Yes.

14  Q.  And Yuri Lebedev is blind carbon copied here?

15  A.  Correct.

16  Q.  I believe you testified earlier you were also copied on the

17  email?

18  A.  Correct.

19  Q.  You say, "Mr. Stupansky, first let me thank you for your

20  timely turnaround.  We really appreciate your effort to keep

21  our application moving forward.  In response to your questions,

22  I offer the following," and I'm not going to read all of the

23  questions and answers, but I would like to flip to page 2, at

24  the bottom question and the response.

25          Can you read the question, Mr. Freundt, and I'll read

1  the response?

2  A.  "The meeting minutes of August 7th, 2014, reference Coin.mx

3  as a source for membership growth.  Do you foresee the credit

4  union being involved in Bitcoin?"

5  Q.  Response:  "We do not see the credit union being involved

6  with accepting Bitcoin.  The reason" -- I believe it's supposed

7  to be Coin.mx -- "and Big Tree are mentioned is because both

8  are located on the same floor as eCommerce PMA is and also

9  houses the incubator/innovation hub."

10        Mr. Freundt, when you see that it states that the

11  credit union was not going to be involved in Bitcoin, was that

12  what your understanding was at the time for the purpose of

13  starting the credit union?

14  A.  No.

15  Q.  Why?

16  A.  The whole purpose of the credit union was to facilitate the

17  Bitcoin transactions.

18  Q.  So, is that statement true?

19  A.  No.

20        MR. NOBLE:  You can take that down, Mr. Chang-Frieden.

21  Q.  To your knowledge, was the eCommerce Private Membership

22  Association ever chartered by the NCUA?

23  A.  I don't know.

24  Q.  One way or the other?

25  A.  Correct.

```
 1   Q.  Let's switch gears and go back to Government Exhibit 4059
 2   which is the Trevon Gross WhatsApp conversation.  It's marked
 3   on the desk, and we have an electronic copy.  The government
 4   offers 4509.
 5           MR. KLINGEMAN:  No objection.
 6           MR. CREIZMAN:  No objection.
 7           THE COURT:  Thank you.
 8           4509 is admitted.
 9           (Government's Exhibit 4509 received in evidence)
10           MR. NOBLE:  May we publish for the jury?
11           THE COURT:  You may.
12           MR. NOBLE:  Mr. Chang-Frieden, please scroll to line
13   4415.  This is a conversation between Trevon Gross and Anthony
14   Murgio.  I will read the part of Anthony Murgio, and I'd ask
15   Mr. Shin to read the part of Mr. Gross.
16           Beginning at line 4415, Anthony says -- to orient the
17   jury, this is a conversation on November 22nd, 2014.
18   Q.  Mr. Freundt, remind the jury what was going on on
19   November 22nd, 2014.
20   A.  That was the weekend of the meeting.
21   Q.  The meeting of the credit union?
22   A.  Correct.
23           MR. NOBLE:  Anthony writes:  "On way."
24           MR. SHIN:  "What's ETA?"
25           MR. NOBLE:  "Six min.  You around?"
```

 1           MR. SHIN:  "Okay.  I need to run back to my house for

 2    five mins."

 3           Anthony:  "Who will lead supervisory committee?"

 4           MR. NOBLE:  "I will discuss now."

 5           MR. SHIN:  "Also, the people who are resigning also

 6    fill volunteer staff positions, like loan officer, membership

 7    officer.  Are they expected to resign these as well?"

 8           MR. NOBLE:  "Just board."

 9           MR. SHIN:  "Okay."

10           MR. NOBLE:  "Are you in New Jersey" --

11           Oh, to orient the jury, this is now on November 24th,

12    2014.

13           "Are you in New Jersey at church"?

14           MR. SHIN:  "No, I'm not in New Jersey."

15           MR. NOBLE:  "When will you be back?  Where did you

16    go?"

17           MR. SHIN:  "Late tonight."

18           MR. NOBLE:  "Okay.  Can we complete this?  Did you get

19    your funds?  When can I call you?"

20           MR. SHIN:  "Out with my family and guests.  Maybe

21    tomorrow."

22           MR. NOBLE:  "Okay.  Can you confirm funds received,

23    please?  How many other resignations are coming?"

24           MR. SHIN:  "I have already confirmed receipt of the

25    past consulting fees."

 1          MR. NOBLE:  "So we can complete.  Can we do minutes,

 2     and get them signed and complete everything?  You can be

 3     relieved."

 4          MR. SHIN:  "Anthony, I am out with my family and not

 5     dealing with this.  Today was the deadline."

 6          MR. NOBLE:  "Just want to do things on proper order,

 7     okay?  We will speak tomorrow.  I appreciate it."

 8          "You say you want complete out.  We have an

 9     inspection.  We need to do this in two steps and honor our

10     first agreement:  One, members resign; two, transition with

11     Jose and Bernard and then step down from your positions.  I

12     would like to see you tomorrow to discuss.  Jose and Tim are

13     ready to take over.  Let me know when you are up, so I can come

14     by."

15          The next -- that's on November 25th at line 5215.

16          Now line 5277, on the same day:  "Hi, hello, good

17     morning.  You back?

18          MR. SHIN:  Anthony:  "As you are aware, we are not

19     moving forward."

20          MR. NOBLE:  "What's that mean?"

21          MR. SHIN:  Anthony:  "You know what it means."

22          MR. NOBLE:  Trevon:  "I don't know why you are being

23     this way."

24          MR. SHIN:  "Because you don't honor your word."

25          MR. NOBLE:  "Can I call, please?"

1          MR. SHIN:  "No.  My family is in town for

2     Thanksgiving.  I missed my family gathering last Saturday.  I

3     am not doing this again."

4          MR. NOBLE:  Anthony:  "You must understand these

5     things are not my sole decision.  If they were, it would be

6     much diff.  I really want to work with you.  The team is

7     excited in moving up.  You must understand the association's

8     view.  We don't have a prob with the 50, but then we have NCUA,

9     and we need to make sure that goes smooth.  This was their

10    issue.  Do you have a solution?"

11         MR. SHIN:  "No, I don't.  We sat at a table and made

12    an agreement, and then you changed the terms again.  I don't

13    operate like this."

14         MR. NOBLE:  "I know how you operate, and I agree.  You

15    think I don't, but I do.  It's not my sole decision, and those

16    concerns are valid, and I thought you would be fine with it.

17    The original agreement was when you stepped down as CEO."

18         MR. SHIN:  "You made a deal, and everyone agreed.  You

19    should have said I have no authority to make the decision."

20         MR. NOBLE:  "Because at the time, I thought it was

21    great, and then I send out an email, and I get replies with

22    those concerns."

23         MR. SHIN:  "Listen, I am going to be with my family.

24    You should do the same.  I wish you well."

25         MR. NOBLE:  "I am here in New Jersey.  I want to come

1  to this agreement and stand by it.  All they have concerns with

2  is the NCUA and transition with Jose.  That's it.  Just give me

3  something to take to them.  You are a problem solver."

4          MR. SHIN:  "No need.  We are moving forward."

5          MR. NOBLE:  Anthony:  "The 6K was okayed because I

6  told them I said 3K, and if Kap didn't pay their part, then we

7  need to.  Great.  So what do I need to do?  Got the office."

8          MR. SHIN:  "Nothing."

9          THE COURT:  "And guys moving up."

10         MR. SHIN:  Anthony:  "You know the status of things.

11 We are not moving forward together."

12         MR. NOBLE:  "Things are about to get stilly."

13         MR. SHIN:  "No, I am stopping the silly."

14         MR. NOBLE:  "Okay."

15         You can take that down.

16 BY MR. NOBLE:

17 Q.  Now, Mr. Freundt, I want to switch gears a little bit and

18 ask you about your employment at Coin.mx.  You testified that

19 after HOPE FCU, you worked for a time with Anthony at Coin.mx?

20 A.  Correct.

21 Q.  About when did you start at Coin.mx?

22 A.  April 2015.

23 Q.  Now, before you took that position, did you have any

24 conversations about Yuri Lebedev?

25 A.  I did.

1   Q.   What did you discuss with him regarding Coin.mx?

2   A.   I just called him to see if that was something -- again,

3   touch base because I knew he was involved with it.  Just touch

4   base and see the validity of the job and everything else.

5   Q.   What did Yuri tell you about Coin.mx?

6   A.   That it was a very good opportunity.  He told me that he

7   had quit his full-time job and kind of devoted all the time to

8   Anthony's business.

9   Q.   Did you know what Yuri's role was at Coin.mx?

10  A.   IT.

11  Q.   IT?

12  A.   Correct.

13  Q.   Do you know whether Anthony Murgio and Yuri Lebedev ever

14  traveled anywhere together concerning Coin.mx?

15  A.   I knew they went to Russia together.

16  Q.   Do you know why they went to Russia?

17  A.   To meet the team in Russia.

18  Q.   Do you know what team was in Russia for Coin.mx?

19  A.   The programmers, and Vladimir was there, and some of the

20  accounting offices.

21  Q.   Mr. Freundt, be sure to keep your voice up, speak slowly

22  directly into the microphone, please.

23  A.   Okay.

24  Q.   What were your duties and responsibilities at Coin.mx?

25  A.   I started as his customer service.

1   Q.  What did you do in terms of customer service?

2   A.  Every time a member wanted to increase their purchasing

3   power with Coin.mx, we would have to call the banks and

4   establish our relationship between the member and Coin.mx in

5   order to trust and increase their power for purchasing.

6   Q.  Did you receive any instructions from Anthony Murgio about

7   how to go about conducting those calls?

8   A.  Yes.  We had a script.

9   Q.  What were you told to do?

10  A.  We were told to instruct the members not to say they were

11  purchasing Bitcoins.

12  Q.  Why not?

13  A.  The explanation I got was the banks don't like to do

14  business with Bitcoin.

15  Q.  What was your understanding of if the banks knew that you

16  were calling about processing Bitcoin transactions, whether

17  they would approve the transaction or not?

18  A.  They would probably not approve it.

19  Q.  Now, were you aware whether Coin.mx processed Bitcoin

20  transactions for victims of ransomware while you were working

21  there?

22  A.  I became aware, yes.

23  Q.  How did you become aware?

24  A.  We were told not to process those Bitcoin requests.

25  Q.  Who told you that?

1  A.  Anthony.

2  Q.  Did there ever come a time when you did process ransomware

3  victims' Bitcoin transactions?

4  A.  As Coin.mx, yes.

5  Q.  Tell the jury about that.

6  A.  I received a call, was instructed because I was -- I had

7  been there a couple of weeks, that anything dealing with

8  ransomware, to transfer to Jennifer, who had been there from

9  the beginning.  And I received a call from a gentleman saying

10 that he needed about two Bitcoins for ransomware, so I

11 transferred it to Jenny.

12 Q.  Is that Jen Wotherspoon?

13 A.  Correct.

14 Q.  Do you know whether Jen processed that transaction for the

15 customer?

16 A.  She did.

17 Q.  Now, did your duties and responsibilities at Coin.mx evolve

18 over time?

19 A.  As the months passed, yes.

20 Q.  What did you start doing for Coin.mx?

21 A.  I started crediting their members with their wires.

22 Anytime a wire was sent in, we would credit the members'

23 account, and I was in charge of reconciling that.  And then

24 towards the end, I started doing some of the accounting or

25 trying to get the accounting back to the United States.

1  Q.  What do you mean, trying to get accounting back to the

2  United States?

3  A.  The accounting was done in Europe.

4  Q.  Do you know by whom?

5  A.  Her name was Eva.

6  Q.  Why were you getting involved with the accounting at that

7  point?

8  A.  Because I thought that if we were doing business here, we

9  should have the accounting here.

10  Q.  Did there ever come a time when you became involved with

11  taxes as it related to Coin.mx?

12  A.  Correct.

13  Q.  Tell the jury about what you did with respect to taxes.

14  A.  Well, I asked Anthony -- as I got more involved, I asked

15  Anthony about taxes, and he informed me that taxes hadn't been

16  paid since Coin.mx started.

17  Q.  What type of taxes?

18  A.  Any tax.

19  Q.  So no taxes had been paid by Coin.mx --

20  A.  Correct.

21  Q.  -- during its existence up to that point?

22  A.  That's my understanding.

23  Q.  Now, Mr. Freundt, did there come a time when you wanted to

24  approach law enforcement about something that was going on at

25  Coin.mx?

1    A.   Yes.

2    Q.   When was that?

3    A.   Sometime May.

4    Q.   Of what year?

5    A.   2015.

6    Q.   Why did you want to approach law enforcement?

7    A.   I discovered an identity theft ring happening.

8    Q.   Explain what you mean by "identity theft ring."  What did

9    you discover?

10   A.   Well, part of the process of becoming a member of Coin.mx

11   is you had to submit a video holding your license and the

12   credit card just for security purposes.  And after watching a

13   few, I realized that there was a couple of people holding

14   different IDs with different names and different credit cards,

15   but it was the same purpose.

16   Q.   What, if any, risk did that pose to Coin.mx?

17   A.   We will lose the business.  We will lose revenues.

18   Q.   Did you have any conversations with anyone else at Coin.mx

19   about approaching law enforcement about the identity theft?

20   A.   Yes.

21   Q.   Who did you speak with?

22   A.   I spoke to Anthony, Ricardo, and Jennifer.

23   Q.   What did they tell you when you proposed the idea of

24   approaching law enforcement?

25   A.   Not to do it.

1    Q.  Did you do it anyway?

2    A.  Yes.

3    Q.  Who did you speak with about the identity theft at Coin.mx?

4    A.  I first called the FBI office in Chicago.

5    Q.  What did they tell you?

6    A.  Well, they asked why I was calling them, because the

7    business is out of Tallahassee, Florida.  I explained that the

8    people in the video were using a Chicago address.  And they

9    told me that they couldn't do anything first because there

10   hadn't been any monetary loss, and that probably if it was

11   under 100,000, they probably wouldn't even look at it.

12   Q.  Did you ever approach any other law enforcement?

13   A.  I went to the FBI in Tallahassee.

14   Q.  What did the FBI in Tallahassee tell you?

15   A.  They informed me that that's not the jurisdiction, that is

16   Secret Service.

17   Q.  Did you ever approach the Secret Service?

18   A.  I went to the Secret Service office.

19   Q.  At that time, did anyone at Coin.mx know that you were

20   approaching law enforcement?

21   A.  No.

22   Q.  Explain what happened when you spoke with Secret Service.

23   A.  I explained -- I believe the gentleman is Mike.  I

24   explained to him what I had found, I showed him the evidence,

25   and he informed me that the lady that is in charge of that, her

1    name is Emily, and she was out of town, that she was going to

2    contact me a couple of weeks after she got back to Tallahassee.

3    Q.  Did Emily with the Secret Service ever conduct an

4    investigation, to your knowledge?

5    A.  I know she did some investigations, yes.

6    Q.  To be clear, in your conversations with law enforcement,

7    did you ever tell them about the calls you were making to banks

8    for Coin.mx?

9    A.  No.

10   Q.  Now, I believe you testified earlier that there came a time

11   when you understood that Coin.mx didn't have the proper license

12   to operate as a money-transmitting business; is that right?

13   A.  Correct.

14   Q.  Did you ever tell law enforcement that Coin.mx didn't have

15   those licenses?

16   A.  No.

17   Q.  Now, what ultimately became, if anything, of the Secret

18   Service investigation?

19   A.  I don't know.

20   Q.  Did there come a time when the Secret Service and other law

21   enforcement approached you at Coin.mx?

22   A.  Yes.

23   Q.  About when was that?

24   A.  About July.

25   Q.  And what happened on that day?

```
 1   A.  That's when they informed me that Coin.mx was being

 2   investigated parallel to what I had said by the New York

 3   office.

 4   Q.  By the New York office of whom?

 5   A.  Of the FBI.

 6   Q.  Do you know whether any arrests occurred that day?

 7   A.  Yes.

 8   Q.  Who was arrested?

 9   A.  To my understanding, Anthony Murgio and Yuri Lebedev were

10   arrested.

11   Q.  At that point in time, just focusing -- were you still

12   working in the Coin.mx Tallahassee office?

13   A.  Yes.

14   Q.  Did it have any signage inside the office?

15   A.  Yes.

16   Q.  What signs did it display?

17   A.  It displayed that Coin.mx and the HOPE Federal Credit Union

18   signs.

19             MR. NOBLE:  No further questions, your Honor.

20             THE COURT:  Thank you.

21             Mr. Creizman?

22             MR. CREIZMAN:  Yes, your Honor.

23             THE COURT:  The cross-examination of Mr. Freundt on

24   behalf of Mr. Lebedev.  Mr. Creizman, when you're ready.

25             MR. CREIZMAN:  Thank you, your Honor.
```

1    CROSS-EXAMINATION

2    BY MR. CREIZMAN:

3    Q.   Good afternoon.

4    A.   Good afternoon.

5    Q.   I want to pick up where Mr. Noble left off, the last day

6    that you were at Coin.mx.

7    A.   Okay.

8    Q.   That was July 21st, 2015?

9    A.   Correct.

10   Q.   And it was the day that Coin.mx shut down, correct?

11   A.   Correct.

12   Q.   And it was the same day that Anthony Murgio was arrested?

13   A.   Correct.

14   Q.   And that same day, you had a visit from a special agent

15   from the Secret Service, correct?

16   A.   Emily from the Secret Service and an agent from the FBI in

17   New York.

18   Q.   The agent from the Secret Service was Special Agent Beyer?

19   A.   Emily --

20   Q.   Emily Beyer?

21   A.   Yes.

22   Q.   Emily Beyer.

23        And that's not the first time you met Ms. Beyer?

24   A.   Correct.

25   Q.   The first time you met Ms. Beyer was about a month before

1   when you called in to report the fraud on Coin.mx, correct?

2   A.  I went into the office, I never called.

3   Q.  Okay.

4   A.  And that was -- I met Ms. Beyer about two, three weeks

5   after my original visit.

6   Q.  And when you went -- you went into the Secret Service

7   office, and then Ms. Beyer came to visit you?

8   A.  After -- a couple of weeks after, yes.

9   Q.  A couple of weeks after?

10         And that was in June, right, about a month before

11  Coin.mx closed down?

12  A.  I would -- yes.  I'm not sure of the dates, but, yes.

13  Q.  And then you got to see her again the last day that Coin.mx

14  was in operation?

15  A.  Correct.  She called me and let me know that she was

16  coming.

17  Q.  And Special Agent Beyer told you that Anthony Murgio was

18  arrested, correct?

19  A.  Correct.

20  Q.  And she asked you a bunch of questions about Coin.mx,

21  right?

22  A.  Her and the FBI agent, yes.

23  Q.  And the FBI Agent?

24  A.  Correct.

25  Q.  And both law enforcement agents asked you questions about

1    Coin.mx?

2    A.   Correct.

3    Q.   And its operations?

4    A.   Yes.

5    Q.   And about the people who work there?

6    A.   Yes.

7    Q.   And about your dealings with Anthony Murgio?

8    A.   Yes.

9    Q.   About where the servers were located?

10   A.   Yes.

11   Q.   And you answered their questions?

12   A.   As best as I could, yes.

13   Q.   And as best as you could and as truthfully as you could,

14   correct?

15   A.   Of course.

16   Q.   You were honest and truthful with those agents?

17   A.   Yes.

18   Q.   And when you met with the government -- and when I say the

19   government, I mean the prosecutors, the agents involved in this

20   case -- you said that you met with them about five to six

21   times, I believe?

22   A.   Four or five times.

23   Q.   Four to five times.  I'm sorry.

24        You met with them at the U.S. Attorney's Office,

25   correct?

 1   A.  Some of those meetings were there.

 2   Q.  Some of the meetings were at the U.S. Attorney's Office,

 3   and some of them involved your lawyer?  You had a lawyer with

 4   you at that time?

 5   A.  Correct.

 6   Q.  And your lawyer is actually in the courtroom, correct?

 7   A.  Correct.

 8   Q.  And you're looking at him right now?

 9   A.  I'm looking at you right now, but he's behind you.

10   Q.  Okay.  And his name is Mr. Eldridge?

11            MR. NOBLE:  Objection.

12            THE COURT:  Sustained.

13   Q.  So you were honest and truthful in those meetings with the

14   government, yes?

15   A.  Yes.

16   Q.  And just like you were honest and truthful yesterday with

17   this jury?

18   A.  Yes.

19   Q.  Just like you were honest and truthful today, correct?

20   A.  Yes.

21   Q.  Now, you recall a meeting with the government on

22   April 18th, 2016?

23   A.  Yes.

24   Q.  At that very meeting, you knew that when you met with --

25   with the prosecutors and the agents, that it is -- that they

1     viewed Coin.mx as an illegal business, correct?

2     A.  I -- at that meeting, I didn't meet with the prosecutors.

3     I only met with the agents.

4     Q.  You only met with the agents?

5     A.  Correct.

6     Q.  On April --

7     A.  I'm sorry, which one?

8     Q.  In April of 2016.

9     A.  I had two meetings on April.  The first one was at my home,

10    and then a couple of weeks after, I came to New York.  So, I'm

11    not sure which one you're referring to.

12    Q.  Okay.  I'm going to tell you.  I think that this is going

13    to refer to the meeting that you had in New York.  There was a

14    meeting that you had in New York?

15    A.  Yes.

16    Q.  In April at the United States Attorney's Office for the

17    Southern District of New York?

18    A.  Correct.

19    Q.  Not too far from this courthouse?

20    A.  Correct.

21    Q.  Now, at that very meeting, you understood that the

22    government believed that Coin.mx was an illegal business,

23    correct?

24    A.  Correct.

25    Q.  Because it was an unlicensed money-transmitting business,

1    correct?

2    A.   Correct.

3    Q.   And you also understood that the government believed that

4    you and other Coin.mx employees lied to financial institutions,

5    correct?

6    A.   Correct.

7    Q.   Now, you're sitting with the agents and prosecutors who

8    believed that you were part of an illegal business, right?

9    A.   Correct.

10   Q.   And you know it's a crime to lie to law enforcement,

11   federal law enforcement, correct?

12   A.   Correct.

13   Q.   You told the agents and the prosecutors about that last day

14   at Coin.mx, didn't you?

15   A.   I believe so.

16   Q.   And you talked to them about your meeting with Special

17   Agent Beyer and the FBI agent, right?

18   A.   Correct.

19   Q.   Now, let me just make sure that I have the story right.

20             THE COURT:  Mr. Creizman, could you pull the mic?

21             MR. CREIZMAN:  Sorry, sorry, sorry.

22   Q.   Let me sure that I have the story correct that you told

23   them, the government, at this April meeting.  You said that

24   Agent Beyer told you that Coin.mx would be shut down, right?

25   A.   Yes.

1   Q.   And that you were owed a paycheck from Coin.mx; is that

2   right?

3   A.   That's not what she said.

4   Q.   No, you told Agent Beyer that you were owed the paycheck?

5   A.   Yes.

6   Q.   That was your salary check, right?

7   A.   Correct.

8   Q.   And you wanted to know if you could withdraw your salary

9   from the Coin.mx account, correct?

10  A.   That's not how the conversation happened, but...

11  Q.   You asked her if you could withdraw money from the account?

12  A.   She suggested that.

13  Q.   She suggested that, right?

14  A.   Yes.

15  Q.   That's what you told the government?

16  A.   Correct.

17  Q.   That Special Agent Beyer suggested that you could withdraw

18  your salary and actually give yourself a nice little bonus; is

19  that right?

20               MR. NOBLE:   Objection.

21               THE COURT:   Overruled.

22  A.   Yes.

23  Q.   And, in fact, when you were at Coin.mx, you earned $1,500 a

24  week, right?

25  A.   Yes.

```
 1   Q.  And so you took that $1,500 out of the bank account,

 2   correct?

 3   A.  I took more than that.

 4   Q.  Right.  And you took $3,500 more than that, right?

 5   A.  Correct.  I took 5,000.

 6   Q.  You took $5,000.

 7        And that $5,000 -- well, let me just back up.  You had

 8   worked for Coin.mx for six months?

 9   A.  More or less.

10   Q.  More or less six months?

11   A.  Uh-huh.

12   Q.  And at that time, your total earnings, including the $5,000

13   that you took from the bank account, was about $10,000, right?

14   A.  Yes.

15   Q.  So the nice little bonus that you took for yourself was

16   half of what you had earned the entire time you were at the

17   Coin.mx, correct?

18   A.  Yes.

19   Q.  And you're saying that that was something that a special

20   agent of the Secret Service told you?

21   A.  She suggested it.

22   Q.  She suggested it?

23   A.  Correct.

24   Q.  Okay.  And you told the government this at your April 2016

25   meeting?
```

 1    A.  Yes.

 2    Q.  And the government didn't say, give back that money, right?

 3    A.  No.

 4    Q.  And you haven't given back that money, right?

 5    A.  No.

 6    Q.  And you know that was an illegal business, right?

 7    A.  At that point, yes.

 8    Q.  Well, at that point, you did.  You mean you didn't know

 9    that at the time?

10    A.  Which time are we referring?

11    Q.  The time that Agent Beyer came and visited you at your

12    office, the last day of Coin.mx.

13    A.  Correct, at that time when she came in, I knew that the

14    business was being shut down.

15    Q.  But you didn't think it was illegal?

16    A.  Well, I wasn't sure of what the term was because she said

17    it was just unlicensed.  But there was chatter that if they

18    actually got the license, then it could go back up to business.

19    Q.  At the time you thought you were okay, you thought you were

20    doing -- you weren't committing any crimes?

21    A.  Which part?

22    Q.  While Coin.mx was in existence.

23    A.  Correct.

24    Q.  It was only afterwards that you realized that you had

25    committed crimes?

1   A.  Correct.

2   Q.  Did it take a lawyer to explain that to you?

3   A.  It took my understanding of the law, yes.

4   Q.  So, at the time, though, you thought everything you were

5   doing was perfectly legal?

6   A.  Legal?  Yes.

7   Q.  But you knew, though, when you met with the government in

8   April, that you had committed crimes, right?

9   A.  I knew -- I wasn't told what was happening as far as --

10  Q.  You didn't know whether you had committed crimes at that

11  point or not?

12  A.  Correct.  I just knew that the Coin.mx was being

13  investigated, and that it was being shut down.

14  Q.  Well, it was already -- I'm sorry, I'm jumping around a

15  bit.

16  A.  Okay.

17  Q.  And that's my fault.  I tend to do that.

18          April 2016, we're back at the Southern District, just

19  a little bit -- in the United States Attorney's Office, just a

20  short walk from here?

21  A.  Correct.

22  Q.  Now, at that point, you knew you had committed crimes?

23  A.  Yes.

24  Q.  And at that point, you knew that the money that you took

25  from Coin.mx was proceeds of a crime, correct?

1   A.   Yes.

2   Q.   And the government let you keep it, right?

3   A.   They haven't told me to return it.

4   Q.   Okay.  So you've kept it?

5   A.   Yes.

6                (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. CREIZMAN:

2   Q.  All right.  And now at this very meeting, this was -- are

3   you familiar with the term "proffer"?

4   A.  Yes.

5   Q.  Okay.  Was the April meeting a proffer meeting?

6   A.  Yes.

7   Q.  And that involves a meeting under an agreement, correct?

8   A.  Yes.

9   Q.  That what you say to the government can't be used against

10  you if they prosecuted you, something along those lines?

11  A.  Correct.

12  Q.  Okay.  And the reason you were going into that proffer

13  agreement was to tell them about your involvement in criminal

14  activity?

15  A.  Correct.

16  Q.  And other people's involvement in criminal activity?

17  A.  Correct.

18  Q.  And your hope was that you would get a cooperation

19  agreement, right?

20  A.  I had no hopes then, no.

21  Q.  What's that?

22  A.  I had no hopes at that point.

23  Q.  You had no hopes?

24  A.  I wasn't -- I didn't know exactly what was going on.

25  Q.  So you didn't know why you went into a proffer agreement?

H2SQLFB4                        Freund - Cross

1   A.  Of course I knew why I went into the proffer agreement, but

2   the prosecution said at that time their stand was there wasn't

3   any deals being made.

4   Q.  You had lawyers, right?

5   A.  Yes.

6   Q.  Okay.  You made a decision with your attorneys to go and

7   talk to the government.

8   A.  I made that decision before I had the attorneys.

9   Q.  Okay.  That's right.  And you didn't -- no one was putting

10  a gun to your head to go and meet with the U.S. Attorney's

11  Office, right?

12  A.  No.

13  Q.  Okay.  So that was a choice you made.

14  A.  Yes.

15  Q.  And you made that choice, and it's not -- you wanted some

16  protection when you talked to them, correct?

17  A.  It was suggested that I have a lawyer, yes, if that's what

18  you mean by "protection".

19  Q.  Well, also, you had this proffer agreement that let you --

20  that you knew that what you said couldn't be used against you.

21  A.  Correct.

22  Q.  All right?  And you did that under -- so you put down

23  certain conditions to going into that meeting, right?

24  A.  The conditions were put forth by others, not by me.

25  Q.  And the only thing you couldn't do during that meeting was

 1    lie, correct?

 2    A.  Correct.

 3    Q.  Okay.  And so you were truthful about what the special

 4    agent told you about taking a nice little bonus for yourself.

 5    A.  Yes.

 6    Q.  But the purpose of this meeting, right, you met with the

 7    government a number of additional times, right?

 8    A.  Yes.

 9    Q.  And then you got yourself a cooperation agreement, right?

10    A.  Yes.

11    Q.  And that was something you wanted, right?

12    A.  Yes.

13    Q.  You knew that you wanted a cooperation agreement when you

14    went into these proffer meetings, correct?

15    A.  Not at first.

16    Q.  Okay.  So you had no aspirations for a cooperation

17    agreement, is that your testimony?

18    A.  My aspiration was not to be charged with anything.

19    Q.  You didn't want to be charged with anything.

20    A.  Correct.

21    Q.  Okay.  So your hope was that you would walk into the U.S.

22    Attorney's Office and that they wouldn't even charge you for

23    any crimes.

24    A.  One has really nothing to do with the other in the sense

25    that I've cooperated from the beginning, so one, whether I was

 1    charged or not had nothing to do with my cooperation.

 2    Q.   You were willing to let it all hang out on the table.

 3    A.   Yes.

 4    Q.   Let the chips fall where they may.

 5    A.   Yes.

 6    Q.   Except that the government couldn't use what you said

 7    against you if they wanted to prosecute you.

 8    A.   That was part of the proffer.

 9    Q.   Okay.  So when you went in there, though, you went in to

10    cooperate with the government, you had a hope that they would

11    ultimately decide not to charge you with any crimes.

12    A.   Yes.

13    Q.   Okay.  But that didn't work out, correct?  At some point

14    you understood that you were going to be charged with crimes.

15    A.   Yes.

16    Q.   Right?  And then you decided that I would like this

17    cooperation agreement, correct?

18    A.   The cooperation agreement was presented to me, yes, but

19    that didn't change my stand on whether to cooperate or not.

20    Q.   Understood.  You went into the meetings with the government

21    with the hope you wouldn't be charged, but you knew that you

22    could be charged, right?

23    A.   Yes.

24    Q.   And you knew that -- and I'm sure you understood -- you

25    were aware that there's such a thing as a cooperation

 1   agreement, correct?

 2   A.  I became familiar with it, yes.

 3   Q.  Okay.  And that was something that, if you didn't get no

 4   charges, at least you could get a cooperation agreement, right?

 5   A.  Yes.

 6   Q.  Because the cooperation agreement would help you at

 7   sentencing potentially.

 8   A.  Yes.

 9   Q.  Because it would help you get a letter from the government.

10   A.  Correct.

11   Q.  And you're facing 85 years for your crimes.

12   A.  Yes.

13   Q.  Okay.  So now, that agreement, the cooperation agreement

14   has certain obligations, right?

15   A.  Yes.

16   Q.  In order to get the letter that you want, okay?  In order

17   to get that letter, you said yesterday you need to tell the

18   truth, right?

19   A.  Yes.

20   Q.  Okay.

21           MR. CREIZMAN:  Can we show the witness and counsel the

22   cooperation agreement, which I believe is Government's

23   Exhibit 3504-14?

24   Q.  You know what that is, right, Mr. Freundt?

25   A.  Yes, that's my cooperating agreement.

 1  Q.  And the date on it is October 13th, 2016?

 2  A.  Correct.

 3  Q.  That's several months -- I'm not good with math -- but

 4  actually, you have a finance background, right?

 5  A.  Yes.

 6  Q.  Okay.  So how many months is that after your meeting in

 7  April?

 8  A.  Six months.

 9  Q.  Six months.

10  A.  A little bit less, but six months.

11  Q.  Okay.  And the letter is from the U.S. Department of

12  Justice, United States Attorney, Southern District of New York,

13  that's who it's from?

14  A.  Correct.

15  Q.  And it's to your attorneys, Gary Conroy, Esquire, and Jason

16  Eldrigde, Esquire?

17  A.  Correct.

18          MR. CREIZMAN:  And if we can go to the last page of

19  the agreement?

20  Q.  There's signatures on that page, correct?

21  A.  Yes.

22  Q.  And you see your signature?

23  A.  Yes.

24  Q.  It's dated October 13th, 2016?

25  A.  Yes.

 1                MR. CREIZMAN:  Your Honor, I move Government's

 2     Exhibit 3504-14 into evidence.

 3                MR. NOBLE:  No objection.

 4                MR. KLINGEMAN:  No objection.

 5                THE COURT:  Thank you.  It is admitted.

 6                (Government's Exhibit 3504-14 received in evidence)

 7                MR. CREIZMAN:  I would like to publish to the jury,

 8     please.

 9                THE COURT:  You may.

10     BY MR. CREIZMAN:

11     Q.  Now, I want to turn to page 3, final paragraph -- last

12     paragraph is the right word for that -- and I'd like to focus

13     on the sentence in the middle of that paragraph that starts

14     with, "In addition, if this office determines that Freundt has

15     provided substantial assistance in an investigation or

16     prosecution, and if he has fully complied with the

17     understandings specified in the agreement, this office will

18     file a motion pursuant to Section 5K1.1 of the sentencing

19     guidelines requesting the court to sentence Freundt in light of

20     the factors set forth in Section 5K1.1A-1 to 5."

21                Now, your understanding, sir, is that this letter

22     might obtain some leniency for you, correct, at sentencing?

23     A.  It gives the judge the option to deviate from the

24     guidelines, yes.

25     Q.  And right now you're facing 85 years.

1   A.  Up to 85 years, correct.

2   Q.  Right.  And you have a little daughter, correct?

3   A.  I have a two-year-old daughter.

4   Q.  A two-year-old daughter.

5           MR. NOBLE:  Objection.

6           THE COURT:  Sustained.

7   Q.  And 85 years is quite a long time to be away from your

8   family, yes?

9   A.  Yes.

10  Q.  All right.  So your hope is that at sentencing, you won't

11  spend anything close to 85 years in jail.

12  A.  Correct, that's my hope, with or without the letter.

13  Q.  And your hope is actually that you won't even spend a day

14  in jail, correct?

15  A.  That would be my hope, yes.

16  Q.  Okay.  Now, let's look at what your responsibilities are on

17  page 2 at the bottom of the page.

18          "It is understood that Freundt, A, shall truthfully

19  and completely disclose all information with respect to the

20  activities of himself and others concerning all matters about

21  which this office inquires of him, which information can be

22  used for any purpose, shall cooperate fully with this office,

23  the Federal Bureau of Investigation, the U.S. Secret Service,

24  and any other law enforcement agency designated by this office,

25  shall attend all meetings at which this office requests his

 1    presence, shall provide to this office upon request any

 2    document, record, and other tangible evidence relating to

 3    matters about which this office or any designated law

 4    enforcement agency inquires of him," and there's a couple more

 5    things.  I don't want to bore you or the jury.

 6            Does it say anywhere here that you have to give back

 7    the $5,000 that you took?

 8            MR. NOBLE:  Objection.

 9            THE COURT:  Overruled.

10            MR. NOBLE:  Your Honor, may I state my grounds?

11            THE COURT:  Sidebar.

12            (Continued on next page)

1          (At sidebar)

2          MR. NOBLE:  I have a Rule 106 rule of completeness

3  objection.  He did not read all of the terms and the

4  obligations of Mr. Freundt under the cooperation agreement.

5  The paragraph above clearly states that he has forfeiture and

6  restitution obligations.

7          THE COURT:  You can do that on cross and on redirect.

8          MR. NOBLE:  Does this agreement require you -- or does

9  this paragraph require you to repay the --

10         THE COURT:  Do that on redirect.

11         MR. NOBLE:  Okay.  That was my grounds.

12         THE COURT:  At the lunch break I want to hear about

13  this $5,000 encouragement to take money from Coin.mx by the

14  agent.

15         (Continued on next page)

16

17

18

19

20

21

22

23

24

25

 1                    (In open court)

 2                    MR. CREIZMAN:  Can we go back to page 20 for a moment?

 3     Top of the page.

 4     BY MR. CREIZMAN:

 5     Q.  You see there's some mentions of fines here?

 6     A.  Yes.

 7     Q.  And your understanding is that you may have to pay some

 8     fines, correct?

 9     A.  Correct.

10     Q.  You also understand that you might have to return funds

11     that you obtained illegally as a result of the offense,

12     correct?

13     A.  Correct.

14     Q.  That's call forfeiture.

15     A.  Correct.

16     Q.  And were there any victims of the crimes that you

17     participated in?

18     A.  Not to my knowledge.

19     Q.  When you lied to the banks, you weren't taking any money

20     from them, right?

21     A.  From whom?

22     Q.  The banks.

23     A.  No.

24     Q.  That wasn't the intention when you lied to the banks.

25     A.  Not to take money from the banks, no.

1    Q.   It was basically to process Bitcoin transactions, right?

2    A.   It was to allow us to be named a trusted vendor on their

3    account.

4    Q.   Right.  Because if the banks knew that you were working

5    with Bitcoins, you know, processing Bitcoin transactions, the

6    banks very well might close the account, right?

7    A.   They wouldn't put the transactions, yes.

8    Q.   That was your understanding.

9    A.   Correct.

10   Q.   But at no time were any of the lies to the bank designed to

11   take any money from the banks, right?

12   A.   No.

13   Q.   Okay.  Now, going to page 4, I want to focus on

14   paragraph 3.  If you could please read the first sentence.

15   A.   "It is understood that, should Freundt commit any further

16   crimes or should be determined that he has given false,

17   incomplete, or misleading testimony or information, or should

18   he otherwise violate any provisions of this agreement, Freundt

19   should thereafter be subject to prosecution for any federal

20   crime, violation, of which this office has knowledge, including

21   perjury and obstruction of justice."

22   Q.   Thank you.

23        Now, the government has never come to you and said you

24   lied about what Special Agent Beyer told you, correct?

25   A.   Correct.

 1    Q.  Right.  And if the government says you have to give that

 2    money back, what would you say?

 3    A.  That's what I have to do.

 4    Q.  But you wouldn't say 'but Special Agent Beyer told me I

 5    could keep it'?

 6    A.  No.

 7    Q.  And at this point, government has not prosecuted you for

 8    perjury or obstruction of justice?

 9    A.  Correct.

10    Q.  And if we back up -- I'm sorry, this is the last one on

11    this -- but if we go back to page 3, second paragraph, it's the

12    first full paragraph on the page, I'm going to go to the

13    second -- third sentence which starts with a "moreover".

14            "If Freundt fully complies with the understandings

15    specified in this agreement, he will not be further prosecuted

16    criminally by this office for any crimes except for criminal

17    tax violations related to his participation in," and it lists

18    six crimes.  You don't see anywhere there fraudulent statements

19    to law enforcement, correct?

20    A.  Correct.

21    Q.  Obstruction of justice.

22    A.  Correct.

23    Q.  Perjury.

24    A.  Correct.

25            MR. CREIZMAN:  Thanks.  You can take it down.  I

 1   appreciate it.

 2   BY MR. CREIZMAN:

 3   Q.  Yesterday you were asked about one of the requirements of

 4   the agreement is that you file correct tax returns --

 5   A.  Yes.

 6   Q.  -- for certain years.

 7        Now, you said that you have hired a CPA to work on

 8   those tax returns.

 9   A.  Correct.

10   Q.  Have those tax returns been completed?

11   A.  Not yet.

12   Q.  Have you had any discussion with the CPA about how you're

13   going to categorize the $5,000?

14   A.  Not to my knowledge.

15   Q.  Okay.  Now, I want to ask you about the criminal activities

16   that you pled guilty to.

17   A.  Okay.

18   Q.  Now, you pled guilty to bank fraud, wire fraud, and

19   conspiracy to commit those?

20   A.  Correct.

21   Q.  Operating an unlicensed money transmitting business?

22   A.  Correct.

23   Q.  Bribery and conspiracy to bribe a bank officer?

24   A.  Yes.

25   Q.  Anything else did I leave out?

 1  A.  Operating -- operating the money exchange without the

 2  proper license.

 3  Q.  Okay.

 4  A.  Conspiracy and the operation of it.

 5  Q.  Now, you're 41 years old, right?

 6  A.  Yes.

 7  Q.  And for the first 39 years of your life, you've lived

 8  completely cleanly, right?

 9  A.  Yes.

10  Q.  No crimes.

11  A.  No.

12  Q.  You were arrested twice, but that was for driving with a

13  suspended license, right?

14  A.  Correct.

15  Q.  Okay.  So you've been a productive member of society for

16  the first 39 years of your life.

17  A.  I'd like to think so.

18  Q.  And you moved to this country from the Dominican Republic,

19  right?

20  A.  Yes.

21  Q.  And you became a citizen.

22  A.  Correct.

23  Q.  And you went to college.

24  A.  Correct.

25  Q.  All right?  And you wanted to do the right thing in life,

1   right?

2   A.  Yes.

3   Q.  You got married.

4   A.  Yes.

5   Q.  All right.  In 2014, around November, 2014, at that time

6   you had a job, correct?

7   A.  Yes.

8   Q.  You were working for the State of Florida.

9   A.  Yes.

10  Q.  Okay?  And it's at that very time that you get approached

11  by Anthony Murgio, right?

12  A.  In regards to what?

13  Q.  To join his credit union, correct?

14  A.  He approached me prior to November of 2014.

15  Q.  To do what?

16  A.  To start with the credit union.

17  Q.  Okay.  He approached you before that.

18  A.  Yes.

19  Q.  All right.  And you still had your job?

20  A.  Yes.

21  Q.  All right.  And you were married.

22  A.  Yes.

23  Q.  And at that very time -- and you got involved, right?  I

24  mean, you got involved in Anthony's -- you did some diligence

25  on what Anthony was telling you about the credit union,

1   correct?

2               MR. NOBLE:  Objection, form.

3               THE COURT:  All right.  Rephrase.

4               MR. CREIZMAN:  Sure.

5   Q.  Anthony told you about this credit union, right?

6   A.  Yes.

7   Q.  He wanted you to get on board.

8   A.  Yes.

9   Q.  You were excited about it, fair to say?

10  A.  Fair to say, yes.

11  Q.  Okay.  And you were considering doing it.

12  A.  Correct.

13  Q.  All right?  And you were considering leaving the job that

14  you had at the State of Florida to join the credit union,

15  right?

16  A.  No.

17  Q.  You weren't thinking about that?

18  A.  At which point?

19  Q.  In November of 2014.

20  A.  In November, once we had the meeting, I knew I wasn't going

21  to do that.

22  Q.  Once you had the meeting with Mr. Gross in Lakewood?

23  A.  Correct.

24  Q.  Okay.  But before that you were considering it.

25  A.  He had approached me, and I said, "I'll hear you whatever

 1  you have to offer."

 2  Q.  Okay.  And in that process, you contacted Mr. Gross

 3  directly, right?

 4  A.  Yes.

 5  Q.  Okay.  And you told Mr. Murgio that you were excited about

 6  the prospect of working in this credit union, right?

 7  A.  Yes.

 8  Q.  You said you were ready to devote 100 percent, correct?

 9  A.  I might have said that, yes.

10  Q.  But you did voice your concerns about being able to support

11  your family, right?

12  A.  Correct.

13  Q.  All right.  Now, you also reached out to Yuri Lebedev,

14  right?

15  A.  Yes.

16  Q.  Okay.  And at that point, you had heard that Mr. Lebedev

17  was going to potentially be a member of the board?

18  A.  I saw his name on the list of potential board members.

19  Q.  And you knew the other board members?

20  A.  Not -- some personally, one, but not all personally.

21  Q.  You knew Rico personally?

22  A.  I knew Rico personally.

23  Q.  And you knew Rico personally from your days working as a

24  CFO for Mr. Murgio's restaurant.

25  A.  Correct.

1    Q.   Who else did you know personally?

2    A.   Yuri.

3    Q.   Yuri.  And you reach out to Yuri because you want to make

4    sure that -- because you think that he's a standup guy, right?

5    A.   I knew he was a father and he understood the necessity of

6    providing.

7    Q.   Okay.  You understood that he was a father, and you

8    understood that he was a straight shooter, right?

9    A.   Yes.

10   Q.   Okay.  And you ask him if this is a legit situation, right?

11   A.   Yes.

12   Q.   And Yuri tells you that this is a good opportunity, right?

13   A.   Correct.

14   Q.   Okay.  Now, in the weeks before your meeting with Pastor

15   Gross in Lakewood, Mr. Murgio told you about the arrangement

16   that he had with HOPE FCU, right?

17             MR. NOBLE:  Objection.

18             THE COURT:  Grounds?

19             MR. NOBLE:  Misstates the record.

20             THE COURT:  Overruled.  You may answer.

21             THE WITNESS:  I knew of the arrangement months before

22   that November meeting.

23   BY MR. CREIZMAN:

24   Q.   You knew of the arrangement much before your meeting.

25   A.   Months before, yes.

1   Q.   Months before.  And you had discussed that arrangement with

2   Anthony Murgio, right?

3   A.   Correct.

4   Q.   So you knew that Anthony Murgio had agreed to pay -- make

5   donations to the church or the credit union in a series of

6   installments, right?

7   A.   Yes.

8   Q.   Fair to say that you had some conversations with Mr. Murgio

9   about strategy in terms of taking over the credit union?

10  A.   No.

11  Q.   No?

12  A.   No.

13  Q.   You didn't have a discussion with Mr. Murgio about

14  Kapcharge and ACH processing before you went up to Lakewood?

15  A.   Yes, but that wasn't the strategy to take over the credit

16  union, that was presented already.

17  Q.   Okay.  But you heard that there were some issues, right?

18  That Pastor Gross was having issues with the volume of

19  transactions that were going on.

20  A.   Correct, before the November meeting I knew that.

21  Q.   And you understood that this meeting in November that you

22  were coming up for was an important meeting.

23  A.   Yes.

24  Q.   It was an important meeting because there was an issue as

25  to whether Anthony and the board members were going to be able

 1   to take control of the credit union, right?

 2   A.  That wasn't one of the issues.

 3   Q.  That wasn't an issue for you?  That wasn't an issue that

 4   you discussed?

 5   A.  Well, that was an issue that I learned there.

 6   Q.  Okay.  So you didn't know beforehand about any of that

 7   issue.

 8   A.  I knew there was concerns about our membership eligibility,

 9   but I also remembered an email from Mr. Trevon saying that he

10   had settled that for the time being.

11   Q.  Right.  Okay.  So there was some issues with the HOPE

12   Credit Union being able to process transactions and so forth.

13   A.  That was the main focus of our meeting in November was how

14   to deal with the ratios and to find locations for the branch.

15   Q.  How to deal with regulators that were looking into

16   basically the volume of transactions?

17   A.  Correct, how to deal with the ratios, yes.

18   Q.  Okay.  And you also understood -- or at least Mr. Murgio

19   conveyed to you his suspicions that Pastor Gross was trying to

20   edge out Anthony, cut him out of the credit union and work with

21   Kapcharge directly?

22   A.  Correct.  He had told me that.

23   Q.  Okay.  That was something that he told you.

24   A.  Well, through conversations via chat or email.  I'm not

25   sure which method.

 1   Q.  And you wanted to be protective of Mr. Murgio, correct?

 2   A.  Correct.

 3   Q.  You wanted to give him good advice.

 4   A.  Yes.

 5   Q.  When you were at the restaurant, working for him at the

 6   restaurant, you saw that -- you thought that he got taken

 7   advantage of by the subsequent owner, correct?

 8   A.  Yes.

 9   Q.  And so you didn't want to let that happen to him again.

10   A.  Correct.

11   Q.  You viewed Anthony Murgio as a friend.

12   A.  Yes.

13   Q.  And so you go to this meeting with Pastor Gross, and you

14   hear about the $300,000, right?  There's a $300,000 payment

15   that Pastor Gross wants, right?

16   A.  There was a --

17   Q.  Donation to the reserves is what I mean.

18   A.  Well, no, there was a cash injection.  Originally, it was

19   going to be 500,000, and then through discussions it was

20   decided that 350,000 was more feasible or what was needed.

21   Q.  Right.

22   A.  I'm not sure if you're referring to that or if you're

23   referring to the $300,000 donation agreement that Anthony

24   and --

25   Q.  Oh, I see what you're saying.  Oh, okay.  Yes.  Sorry.  I

 1   wasn't precise.

 2              There was a discussion about a capital injection.

 3   A.  Correct.

 4   Q.  Right?  Because that would help the HOPE Federal Credit

 5   Union be able to process ACH transactions, right?

 6   A.  It would help with the ratios.

 7   Q.  Right, the ratios.  Because the regulators were concerned

 8   that HOPE FCU didn't have sufficient funds on hand to cover any

 9   chargebacks or something along those lines.

10   A.  Correct.

11   Q.  All right.

12              MR. CREIZMAN:  Can we pull up Exhibit 4501 in

13   evidence?

14   Q.  These are WhatsApp chats?

15   A.  Correct.

16   Q.  Right?

17              MR. CREIZMAN:  Let's go to line 4732, please.  Good.

18   Q.  Now, on line 4732, what's the date on that --

19   A.  November 24th.

20   Q.  Okay.  And the time is 1:49, right?

21   A.  Correct.

22   Q.  Okay.  Now, at that point -- this happened after your

23   meeting with Pastor Gross, right?

24   A.  Correct.

25   Q.  And the discussion at this point, there was strategy as to

1    how to take over control of the HOPE Federal Credit Union.

2    A.   That was part of the discussion, yes.

3    Q.   Okay.  And here, you're saying, "Anthony, put 50K in an

4    account controlled by us, plus whatever is owed to him.  I

5    think that's the first move."

6         Now, why did you say put the $50,000 in an account

7    controlled by "us"?

8    A.   Because the issues that were happening was that there was

9    no trust.  Anthony's father didn't want to send the money

10   before the board members resigned.

11   Q.   Right.  Because if the money -- the concern was, right?

12   Even with the capital injection which was -- how much was the

13   capital injection again?

14   A.   350 to 500,000.

15   Q.   Okay.  And there was also a donation to the church that was

16   contemplated?

17   A.   That was owed, yes.

18   Q.   Okay.  And that's the $50,000?

19   A.   That's what I'm referring to, yes.

20   Q.   Right.  And there was a concern that if those funds were

21   just handed over to HOPE FCU and Anthony's group didn't have

22   control of those funds, the board could just vote them out,

23   right?

24   A.   Correct.

25   Q.   Right?  And that was the concern.

1    A.  Yes.

2    Q.  Okay.  So your solution, your proposed solution at this

3    point is, "Anthony," this is your advice, "put 50,000 in the

4    account controlled by us, and plus pay him his salary, so that

5    this way he knows we're serious," right?

6    A.  Correct.

7    Q.  "And that we are going to turn over that $50,000," right?

8    A.  Yes.

9    Q.  Okay.  Now I want to move down to line 4783.  On 4783,

10   that's you.  Who is 4784?  Who is "dad"?

11   A.  That would be Mike Murgio.

12   Q.  Mike Murgio.  Okay.  So Mike Murgio was involved with

13   Anthony in trying to take over the credit union, right?

14   A.  I know he was involved.  I don't know what his role was

15   or --

16   Q.  Okay.  Now, you say, "I'm also going to get my mother

17   involved, Mike.  When I call you, I might have my mother on the

18   line so we can draft a contract to cover us if we were to send

19   the 50,000 and he decides to break the deal."  Right?

20          So this is still the same idea, right?  You want to

21   make sure that this $50,000, you guys are protected.  That was

22   the concern about all of this in the first place, right?

23   A.  That was the reason of the disputes, yes.

24   Q.  Right.  That was why the deal fell apart that evening on

25   the 22nd.

1   A.   That's one of the reasons.

2   Q.   Okay.  Because the 50,000 wasn't turned over.  Wasn't --

3   because Anthony didn't agree to turn over the $50,000 on Monday

4   like he -- like Pastor Gross wanted.

5   A.   Correct.

6   Q.   Okay.

7            MR. CREIZMAN:  If we can go to line 4956.

8   Q.   "Me" is not me, it is Anthony Murgio, right?

9   A.   Correct.

10  Q.   "I need to get on a call with Vlad."

11           At that point, you knew who Vlad was.

12  A.   Yes.

13  Q.   You knew Vlad was Anthony Murgio's backer.

14  A.   Correct.

15  Q.   For Coin.mx.

16  A.   For everything.

17  Q.   For everything.

18  A.   That's how I understood it, yes.

19  Q.   Okay.

20           MR. CREIZMAN:  Going down to lines 4975, please.

21  Q.   This is Anthony Murgio, "Who can I get on Skype or should I

22  call and put V on the speaker?"

23           Tim Ellrich, "I can be on a call in a second.  If I

24  need to be on Skype, I need to be in a private place."

25           "Hold please," you say.  And you say, "Is anyone

1   available to draft an email.  I'm on father duties which I have

2   been neglecting the last hours and Rico is out."

3        Now, here's my question to you.  Did you get on a

4   three-way call at some point with Vlad and Anthony Murgio?

5   A.  I did.

6   Q.  You did.

7   A.  Yes.

8   Q.  Okay.  And that was to discuss the situation with HOPE FCU.

9   A.  Correct.

10  Q.  Okay?  And no question that Vlad had the money to transfer

11  $50,000 to HOPE FCU if he wanted.

12  A.  That was my belief.

13  Q.  Okay.

14        THE COURT:  Mr. Creizman, it's time for the lunch

15  break so we'll break there.

16        It's 12:40, ladies and gentlemen.  Please be back in

17  an hour and ready to go.  Enjoy your lunch.  Thank you.

18        (Continued on next page)

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  Mr. Freundt, you may step down.  If you

3     would, Mr. Freundt, just be back outside the courtroom ready to

4     go by 1:35, please.  Thank you.

5          (Witness excused)

6          THE COURT:  I have to let Mr. Creizman go, but --

7     well, I would like to -- I was quite taken aback by that fact

8     and would like to learn more.  So we can do that at the other

9     end of the break so that Mr. Creizman is here, is my proposal.

10         MR. NOBLE:  Sure.

11         MS. CHOI:  Sure.  That's fine, your Honor.  We can --

12    if I could get a sense of what precisely you would like to

13    know?

14         THE COURT:  It's an unusual fact.

15         MS. CHOI:  It is an unusual fact, your Honor.

16         THE COURT:  I just want to hear more.  I'm not making

17    evaluative judgments, but it's not something I've come across

18    before.

19         MS. CHOI:  Understood, your Honor.

20         THE COURT:  So why don't we return at -- giving

21    ourselves a solid 20 minutes, because there's this issue, and

22    to the extent that you've discussed the limiting instruction,

23    we may be able to take that up.  All right?

24         MR. NOBLE:  All right.

25         MR. KLINGEMAN:  Before we go, I want to note I'm

 1   handing up to the government now a copy of the exhibits that

 2   I've prepared for Mr. Freundt that identify for the government

 3   the handful of months, those that I at this point intend to

 4   use, depending on how the rest of the cross goes, and unless

 5   your Honor doesn't want it, I'm going to hand to your clerk,

 6   the same copy, so if there's any colloquy before the witness

 7   resumes, you'll have those, too.

 8              THE COURT:  Thank you.

 9              I will see everyone in about 38 minutes.  Good luck.

10              MS. CHOI:  38 minutes?  Okay.

11              (Luncheon recess)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        AFTERNOON SESSION

2                            1:26 PM

3            (In open court; jury not present)

4            THE COURT:  Mr. Creizman, you survived?

5            MR. CREIZMAN:  Off the record or on the record?

6            THE COURT:  Off.

7            (Discussion off the record)

8            THE COURT:  Let's start.  Ms. Santillo, do we need to

9   take up the limiting --

10           MS. SANTILLO:  We're still discussing it a little bit.

11  It may make sense to do it on the next break.

12           THE COURT:  Okay.  All right.  Thank you.

13           Other matters to take up for this segment before I

14  return to my inquiry?

15           MR. KLINGEMAN:  I would like to make a proffer in

16  connection with my cross, so that we don't get interrupted.

17  Just bear with me.  This witness pled guilty to the alleged

18  bribery of Defendant Trevon Gross and conspiracy to bribe

19  Trevon Gross.  He testified to that yesterday.  He's repeated

20  that testimony today.  There's been some testimony about chats

21  concerning bribery.  This witness, for your Honor's benefit,

22  has nothing to say, so far as I know, about the other counts

23  against Mr. Gross related to the NCUA.

24           So my cross-examination of him is focused on the

25  bribery issue.  And this witness has given a host of statements

1    over the last two and a half years, including statements that

2    appear in some of the exhibits, as well as statements in

3    interviews with the government.  And he has vacillated between

4    asserting that this was a bribe and asserting that it was not a

5    bribe, and I plan to probe those inconsistencies with him.  I

6    do it in the following context:  The bribery statute charged in

7    this case, and the conspiracy that would flow from that bribery

8    statute, are both specific intent crimes in the sense that you

9    have to have committed the illegal act, the payment of money,

10   with an illegal purpose, specifically a corrupt purpose.  And

11   obviously you have to have that purpose, that state of mind, at

12   the time you commit the illegal act, it's not something you

13   develop a year or two later.

14           In the context of that well-established set of legal

15   principles, I'm going to cross-examine him.  I do not intend to

16   use the term "specific intent" with this witness or any other

17   legal terms, but I want you to know, your Honor, what I'm

18   trying to do with him to undermine his assertion that this was

19   a bribe, even from his perspective.

20           THE COURT:  Okay.

21           Anything the government wants to say to that?

22           MR. NOBLE:  No, your Honor.

23           THE COURT:  Okay.

24           What's the story with Agent Beyer?

25           MS. CHOI:  Your Honor, I can give you some facts about

1     this.  Obviously, when we were attending the proffer of

2     Mr. Freundt, it raised concerns on our part about what happened

3     there.

4              THE COURT:  I'm glad to hear that.

5              MS. CHOI:  At the time Special Agent Jarrow, who

6     you're familiar with, was the case agent, he was not in town,

7     he was on an extended training, and so we reached out to him

8     immediately and told him that we wanted to contact her and

9     speak with her.  Just to put context -- and I think some of

10    this has been elicited from Mr. Freundt about what her role was

11    vis-a-vis the larger scope of the investigation.  She became

12    involved because the Tallahassee field office of the Secret

13    Service is quite small.  When Mr. Freundt decided to make a

14    report to the Secret Service that Coin.mx may have been victim

15    of fraud, she was the one he reached out to.  They had some

16    back-and-forth, all of which we have disclosed, and at some

17    point, she did her own searches through the Secret Service

18    database.  Now, this is the June 2015 period, very late in our

19    investigation.  We had already drafted the complaint at that

20    point, and she reached out to Special Agent Jarrow because she

21    realized this is the same organization the Secret Service had

22    been investigating vis-a-vis the larger investigation.

23              On the day of the -- the first portion of her

24    involvement in Coin.mx is Mr. Freundt's reaching out to her,

25    and then the day of the arrest taking place, again, because we

1    have to rely -- we're in Israel, we're all over the place, we

2    have to rely on local law enforcement to help us with regard to

3    an operation of this size, she was assigned to go and speak

4    with the people at the Coin.mx office.

5              THE COURT:  This is July?

6              MS. CHOI:  July 21st, 2015, your Honor.

7              So that would have been Mr. Freundt and

8    Ms. Wotherspoon who were at the office.  I think they may have

9    gone the day before just to scope it out, let them know they

10   wanted to talk to them again, and then the day of their

11   arrests, neither Mr. Freundt, nor Ms. Wotherspoon were

12   arrested, but she and another case agent, I believe, in the

13   Tallahassee field office, interviewed them.  We disclosed those

14   notes, those reports of those as well.

15             So she did have interactions with Coin.mx, but I think

16   in the context, it's sort of as a regional player with regard

17   to the execution of the operation and happenstance that

18   Mr. Freundt had reached out to her very late in our

19   investigation.

20             When we reached out to our Secret Service case agent,

21   and he reached out to her, we found out that she was on

22   extended leave from Secret Service.  If your Honor wants to

23   know the circumstances about that, I'm happy to proffer that.

24   I would like to do that sort of in camera because they're

25   personal circumstances having nothing to do with her

1    credibility or her role in this investigation.  It was an

2    extended leave of absence.

3            We've reached out to Secret Service to see what

4    follow-up has been done since then, and they're trying to

5    figure out internally -- the New York people are trying to

6    figure out internally what has happened.

7            THE COURT:  When you say follow-up in what's happened,

8    what specifically do you mean?

9            MS. CHOI:  Meaning after we tried to reach out to her,

10   and we found out she would be on leave for an extended period

11   of time, we made the determination that we didn't have to call

12   her for purposes of our case, and so we had told Secret Service

13   that this information had come up, and we don't know what steps

14   specifically they took to follow up on that.

15           THE COURT:  Just because this came at me fast --

16           MS. CHOI:  Right.

17           THE COURT:  -- and I have not reviewed the transcript,

18   and I admit my mind was reeling when I heard it.  The

19   information is that on the day of the arrest -- is that the

20   time frame?

21           MS. CHOI:  Yes, July 21st, 2015.

22           THE COURT:  -- she suggests to Mr. Freundt, who at

23   that point --

24           MS. CHOI:  Had not been arrested.

25           THE COURT:  -- had not been arrested, but had

1    proffered?

2              MS. CHOI:  No, he had not proffered.  I think -- I

3    don't want to speculate as to what happened.  There was a

4    conversation where she relayed information about Coin.mx being

5    taken down to Mr. Freundt in the context of this --

6              THE COURT:  We're not speculating, this witness has

7    testified.

8              MS. CHOI:  Right.

9              THE COURT:  I'm asking you to just walk me back

10   through that testimony, so I have the timeline in my head.

11             MS. CHOI:  Right.  So the timeline is, again, in June,

12   they had a separate conversation where Mr. Freundt, despite his

13   coworkers not wanting him to, went to --

14             THE COURT:  Reports potential fraud against Coin.mx.

15             MS. CHOI:  Yes.  So at that time, Ms. Beyer has some

16   conversation with Mr. Freundt about the potential that Coin.mx

17   had been a victim of the fraud.  In doing so, she looks at the

18   Secret Service databases, realizes there was this greater

19   investigation, and at that point, before the takedown, there is

20   some interaction between her and Special Agent Jarrow just to

21   say, hey, you know, so you know, he came in and said this stuff

22   about it, said that they had been a victim of fraud.

23             So I think this is late June, but it's definitely June

24   of 2015.  So come July, again, because we have to rely on the

25   regional law enforcement officers, Tallahassee is a small field

1    office, and there are three different operations happening at

2    Florida at the time:  There was an arrest in Tampa of

3    Mr. Murgio, there was an arrest in Jacksonville of Mr. Lebedev,

4    and then there is a Coin.mx Tallahassee office.  On the day of

5    the arrests of Mr. Murgio and Mr. Lebedev in other places of

6    Florida, this secret service agent went back to Coin.mx -- they

7    may have even sort of given them the heads-up like we'd like to

8    talk to you tomorrow on July 21st, but went back to Coin.mx on

9    that day and interviewed both Ms. Wotherspoon and Mr. Freundt.

10              THE COURT:  And in the course of that, suggests to

11    Mr. Freundt affirmatively that he take himself a bonus out of

12    Coin.mx before it shuts down?

13              MS. CHOI:  Well, right, that is Mr. Freundt's

14    position.  Mr. Freundt has stated that since April, that he had

15    interpreted what Ms. Beyer had said to him as, you know,

16    Coin.mx is going down, he had relayed back that he hadn't been

17    paid yet, and she said, well, you should pay yourself because

18    it's going to kind of go away, which is why we are -- to be

19    clear, you know, as he admitted, he took more than what he was

20    owed.  I don't have any reason to believe Ms. Beyer knew that.

21    I think this was conversation that happened between an

22    investigating officer and Mr. Freundt, which Mr. Freundt

23    interpreted and has testified to as giving him the authority in

24    his mind to --

25              THE COURT:  Clearly what he --

1          MS. CHOI:  That's what he thought, correct.

2          THE COURT:  He's been encouraged and has the authority

3  to extract money out of Coin.mx?

4          MS. CHOI:  Correct.

5          THE COURT:  From someone who's at that point seemingly

6  involved in the investigation?

7          MS. CHOI:  Yes, from his perspective, seemingly

8  involved in the investigation.  I would say from our

9  perspective, again, she's not a case agent, she's not someone

10  that we consulted with in the takedown, other than when that

11  report came from Mr. Freundt.  We knew that she existed.  You

12  know, there was something like 40 or 50 different officers that

13  were involved the day of the arrests.

14         So, Mr. Freundt has not -- that's sort of the context

15  of why this happened, and when we found this out -- I

16  understand why your Honor wanted further information -- we

17  reached out to Secret Service and said we wanted to talk to her

18  about what had happened and let them know what Mr. Freundt had

19  said, and at that time, we were told that she is on extended

20  leave from Secret Service.  I don't know if she is still on

21  extended leave or what her status is with Secret Service --

22  that's one of the things that Secret Service is trying to

23  follow up on -- and what steps were precisely done, but I will

24  say at some point, if you recall back in April of 2016, we had

25  a trial date that was going to happen in short order.  We were

1    preparing for that trial, and we realized we didn't need to

2    call this particular witness because she, among other case

3    agents -- or not case agents, among other law enforcement

4    agents on that date really didn't -- we didn't need any

5    particular evidence of her or require her testimony, and we

6    obviously disclosed this particular issue to defense counsel.

7            THE COURT:  When did that disclosure happen?

8            MS. CHOI:  3500 material was two or three weeks before

9    the start of trial.  And we have never -- to be clear, defense

10   counsel has never brought up the issue with us about wanting to

11   call Ms. Beyer or wanting follow-up information about

12   Ms. Beyer.  We understand the line of cross currently to be to

13   undermine sort of the integrity of the investigation, which,

14   obviously, they had plenty of notice of and have --

15   Mr. Creizman is making due effort to do.  So, I think obviously

16   that's fair game.

17           THE COURT:  Mr. Noble, what was the basis for your

18   objection?

19           MR. NOBLE:  I'm sorry?

20           THE COURT:  You objected when the question was first

21   raised.  What was the basis for the objection?

22           MR. NOBLE:  Oh.  Hearsay as to what she told him.

23           THE COURT:  You recognize this is not coming in for

24   the truth, it's coming in as impeachment, right?  It's a

25   suggestion, which -- are you going to redirect on this?

1            MR. NOBLE:  I may, yes.  Because, Judge, I think it's

2    fair game, or the jury needs to know to what extent Mr. Freundt

3    was aware whether she had any role in this investigation as

4    opposed to the investigation that he instigated with Secret

5    Service by going to them about the identity theft.

6            THE COURT:  So, from the government's perspective, she

7    had no further interaction with Freundt after this July 21st

8    date?

9            MR. NOBLE:  After the arrest.

10           MS. CHOI:  So there was one issue, which is at some

11   point, there was an issue about computers that may or may not

12   have been taken from him or he may have given over to Secret

13   Service.  I don't remember off the top of my head when that

14   was.  But in terms of questions about Coin.mx, no.  My

15   understanding -- I'm making this without having gone through

16   all of the records, but I'm fairly certain that -- we would not

17   have told her to go and interview Mr. Freundt further.  We're

18   not aware of any further investigations that she took.  I think

19   there may have been an issue with regard to a computer that he

20   may have turned over, and getting it back to him, and imaging

21   it, but that that would have been it.  It wouldn't have been a

22   substantive interview.

23           MR. NOBLE:  The interview she did do of him, we did

24   turn over in the 3500 material.  So, defense has that.

25           THE COURT:  When did the prosecutors in this case

1    become aware of that fact?

2          MS. CHOI:  Which?

3          THE COURT:  That this Secret Service agent suggested

4    to someone who is now a cooperating witness, but wasn't, I

5    gather, at the time, that they extract a bonus out of Coin.mx

6    before its closing?

7          MS. CHOI:  Yes, your Honor.  I think that happened in

8    April 2016, when he first proffered with us.  We didn't know

9    anything about it until April 2016.  And, again, that's when

10   Special Agent Jarrow was not -- I believe he was on extended

11   training in D.C. or somewhere south, he wasn't there at the

12   proffer.  I called him.  We reached out and said we need to

13   talk to Emily Beyer, and at that time, when he tried to get

14   into contact with her -- and I'm happy to proffer to you, your

15   Honor, off the record or sort of sealed, what the nature of it

16   was, but, again, it has nothing do with her veracity -- she was

17   on extended leave from the secret Service.  We voiced our

18   concern to Special Agent Jarrow that this issue had come up.

19   And at the time, trial preparation continued, and we never

20   ended up having -- deciding to call her, so we didn't have

21   further notes about interviews we had with her, et cetera, to

22   my knowledge.

23          I do recall talking to other Tallahassee field office

24   members during her leave to figure out what the evidence was

25   that had been collected because that's sort of part of what we

1    need to do to figure out the chain of custody, but beyond that,

2    I have not had any interaction, to my knowledge, with her

3    directly, other than this incident when we tried to reach out

4    to her.

5              MR. KLINGEMAN:  Your Honor?

6              THE COURT:  Mr. Klingeman.

7              MR. KLINGEMAN:  I am not complaining about the notice.

8    We were provided in the 3500 material approximately a week to

9    two weeks before the trial date with an FBI 302 authored by

10   Special Agent DeCapua who has been in Court.  That 302 is dated

11   July 14, 2016, and it refers to investigation on April 18th,

12   2016.

13             In the 302, on page 10, Agent DeCapua recites almost

14   verbatim the testimony that Mr. Freundt gave this morning,

15   including placing in quotes the statement that Mr. Freundt

16   attributes to the Secret Service Agent Beyer, quote, Give

17   yourself a nice little bonus, period, closed quote.

18             Now, when I read this 302 pretrial, as a former

19   Assistant United States Attorney, I concluded to a mathematical

20   certainty that Mr. Freundt was lying.  It was inconceivable.

21             THE COURT:  I can't hear you.

22             MR. KLINGEMAN:  I concluded to a mathematical

23   certainty that Mr. Freundt was lying in this anecdote.  It was

24   inconceivable to me that a special agent of the United States

25   Secret Service, a colleague of Mr. Jarrow's, not a local law

1   enforcement officer or someone marginal to this, but a United

2   States Secret Service special agent would counsel a subject of

3   a criminal investigation to clean out the bank account of the

4   wrongdoer business on the day of the takedown.

5          What I thought was going to happen is that Mr. Freundt

6   was going to take the stand this morning and either continue to

7   perpetuate this false story, in which case the government would

8   have to impeach him with their own investigation of the false

9   story, or he was going to recant the story, or he was going to

10  deny, as a third possibility, that he had ever said it to the

11  United States Attorney's Office and the FBI on April 18, 2016,

12  in which case I would have to call Special Agent DeCapua in the

13  defense case to impeach Mr. Freundt.  What I did not expect is

14  that the witness would persist in this story, apparently

15  truthfully, and learn that the government has made some kind of

16  halfhearted effort to check it out, but hasn't determined

17  whether it's true or not.

18         So, what I suggest, your Honor, or I propose -- and

19  I'm going to defer to Mr. Creizman's argument or point before I

20  come to a conclusive position -- is we have to treat what

21  Mr. Freundt is saying as true for purposes of this record and

22  for argument to the jury in terms of the integrity of the

23  investigation.

24         THE COURT:  Yes, Mr. Creizman?

25         MR. CREIZMAN:  I mean, I echo the sentiments and the

1    arguments of Mr. Klingeman.  My goal in that cross-examination

2    was I would assume that he had somehow would have admitted that

3    he had lied or someone had questioned him about this.

4         The fact is that the second interview with Special

5    Agent Beyer was about this particular investigation.  This was

6    all part of the plan, that coordinated plan that day that Agent

7    Jarrow testified about.

8         So, it's not as if -- he provided, Agent Jarrow

9    provided, questions, an outline of questions for her to ask.

10   So this had directly to do with this investigation.

11        THE COURT:  Agent Jarrow provided to Agent Beyer, on

12   the day that this occurred, questions to ask?

13        MR. CREIZMAN:  On the day it occurred or ahead of the

14   day that it occurred, I believe.  I have Agent Jarrow's 302,

15   it's just I have to find it.  But I know -- not 302, 3500

16   material.  There's an email where he sends to -- there's a

17   bunch of email exchanges between Agent Jarrow and Special Agent

18   Beyer, and -- yes.  Well, not even -- there was this.  There

19   were conversations before where -- after the June interview,

20   but I'm saying even in the July interview, the takedown, she

21   was part of this takedown situation where she would go to the

22   Coin.mx offices and ask questions, and there was a prepared,

23   like, outline.  And I'm sure I could find it right now, if your

24   Honor would like me to.  I have it on my iPad, which I can

25   pretty much find.

```
 1              MR. KLINGEMAN:  If I could just interrupt Mr. Creizman
 2   to point out to the Court, I marked for identification Defense
 3   Exhibit TG14, which I provided to the government at lunch, as
 4   well as a copy to the Court at lunch, and it's a series of
 5   emails between and among Special Agent Emily Beyer, Special
 6   Agent Tate Jarrow, and Mr. Freundt.  It does not directly speak
 7   to this issue of the money, but it does establish Ms. Beyer's
 8   intimate involvement in the investigation at the time period in
 9   question.
10              THE COURT:  What's the date again?
11              MR. KLINGEMAN:  The first email is --
12              THE COURT:  You said Trevon Gross 14?
13              MR. KLINGEMAN:  TG14, the first email in the chain
14   between Ms. Beyer and Mr. Freundt is dated June 22nd, 2015, and
15   then Mr. Jarrow joins the conversation later in July, July 9th,
16   2015, so a few weeks later.
17              THE COURT:  So prior.
18              MR. KLINGEMAN:  Your Honor has --
19              MR. CREIZMAN:  I definitely have an email, I know that
20   I've seen it, so I'm looking for it right now.  There's 491
21   3500 exhibits for him.
22              MR. NOBLE:  Judge, with respect to TG14, the exchange
23   between Agent Beyer and Jose Freundt concerns the fraud at
24   Coin.mx that Jose Freundt had reported, and the last email
25   between them is June 22nd, 2015, about a month before the
```

1    takedown, and then it wasn't until July 9th, 2015, that Agent

2    Beyer simply forwards this chain along to Agent Jarrow.

3         THE COURT:  What of the suggestion that Agent Jarrow

4    sent questions to Beyer in advance of the July 21st arrest?

5         MS. CHOI:  Your Honor, I know, generally, that Special

6    Agent Jarrow, as is the normal course, sends -- because none of

7    these people are familiar with the full scope of the

8    investigation -- sends questions to ask, but I think the time

9    frame is important here, your Honor, because that happened

10   prior to the takedown on July 21st, 2015.  At that time, that's

11   when the statement or the conversation happened that is at

12   issue here, which is Ms. Beyer making the suggestion, in Jose

13   Freundt's mind, that allowed him the opportunity to go and

14   access these funds.

15        And it wasn't until April --

16        THE COURT:  With the encouragement and, presumably,

17   protection of the government?

18        MS. CHOI:  Well, yes, your Honor.  That's clearly what

19   Mr. Freundt believes, and I think defense counsel -- what I

20   take defense counsel's point to be is that they're going to

21   make the point that the investigation is flawed, which is what

22   they're trying to -- that there were tainted agents or whatever

23   else they would like to say, which is the point that they're

24   trying to make from Mr. Freundt.  So I think as far as that's

25   concerned, I don't think there is any prejudice to the defense,

1    if that's the line that they were taking.

2          I will tell you what the government's -- if your Honor

3    would like to know -- what the government's view about this is.

4    Again, I have not talked directly to Ms. Beyer about this

5    issue, but I can see a rung knowing how these conversations can

6    happen is if someone off the cuff says, yeah, Coin.mx is going

7    down, and he asks the question, well, I haven't been paid yet,

8    you know, I could see a situation where the agent goes, well,

9    you should make sure that you get paid, and in his mind, that

10   gives him the sanction to go and take money out of a bank

11   account, and even to his own admission, he took out more than

12   what he was actually owed.

13         THE COURT:  Wait a second.  You prepared this witness,

14   right, Mr. Noble?

15         MR. NOBLE:  Yes, Judge.

16         THE COURT:  You knew his testimony was going to be

17   that he understood to have been given authority by this agent,

18   right?

19         MS. CHOI:  Yeah.

20         MR. NOBLE:  Well, he's been consistent in what he said

21   in the 302, that he remembers this conversation --

22         THE COURT:  Do you have any basis to think that that's

23   not the truth?

24         MR. NOBLE:  Not at this point, no, your Honor.

25         THE COURT:  So I don't know why I'm being told it's

1    not the truth.

2             MS. CHOI:  I'm not saying --

3             THE COURT:  Or that there's another version of the

4    truth.  You see my point, that this is --

5             MS. CHOI:  Yes, yes.  But we're saying that's fair

6    game.  We're saying -- I think defense counsel is surprised,

7    obviously, that that's been his view, and it's always been his

8    view, and we have no independent reason to believe that --

9    because we don't know what the scope of the conversation is.

10   Whatever she said to him, he has always maintained, I gave him

11   authority to at least pay himself the backpay.  Regardless of

12   the bonus he gave himself, to pay himself the backpay.  That's

13   always been his view, he's been consistent with that.  That's

14   why, when he was consistent with it and we pressed him on it in

15   April, we tried to figure out what was going on and realized

16   that she is -- and I don't know what her current status is, but

17   she had had an extended period of leave from Secret Service.

18            So, I'm just saying, in terms of this particular

19   issue, as it plays out in this court, I think it's fair game

20   for them to use this in his stance that this was, in fact, told

21   to him by a secret service agent to undermine the government's

22   investigation, make that point in closing, if that's what they

23   so choose.  I don't think there's been any prejudice to the

24   defense.  We haven't heard -- because we've disclosed all of

25   these communications in 3500s, so I think the question becomes

1    what else -- I don't know if there's anything else that needs

2    to be done with regard to what is happening in this trial

3    before the jury.

4            THE COURT:  As I sit here, I don't think I disagree

5    with that, although partly that's being informed by what I am

6    learning.  Obviously, there are the questions about protecting

7    the integrity of this process, and I think there might be

8    separate questions about what the government's obligations are

9    with respect to this agent and what has occurred.

10           Obviously, I wanted clarity as to disclosure and

11   notice and the government's understanding, in light of the

12   surprising testimony --

13           MS. CHOI:  Understood, your Honor.

14           THE COURT:  -- that came out.  I think one last

15   factual piece I have, as I chew this over is, what Agent

16   Beyer's -- whether informed by agents there or not, but what

17   her understanding in the time frame of this conversation is

18   with respect to Mr. Freundt operating as some kind of

19   government witness, or cooperator, or informant.

20           MS. CHOI:  Right.  He was not.  He was not a

21   government agent, he was not proffering with the government at

22   the time.  The only interaction he had with the government was

23   his own report, against the wishes of Coin.mx, to say that

24   Coin.mx had been a victim of fraud.

25           To be clear, our understanding of that -- and that's

also been disclosed to defense counsel in 3500s for all the

witnesses that were involved with the disclosure or knew of the

disclosure, that had been -- in the Secret Service, is that

Anthony Murgio didn't want that to happen, they all didn't want

that to happen because it would bring scrutiny to the company

that they didn't want, and he, nevertheless, did that because,

you know, he believed that it was important for him to do that.

So he went and did that against the wishes initially of

Mr. Murgio, and that was the only interaction that he had had,

interactions with Ms. Beyer in the context of reporting the

fraud upon Coin.mx, not reporting the criminal going on at

Coin.mx, if that makes sense.  Like going to say we've been a

victim of credit fraud.

THE COURT:  I understand.

MS. CHOI:  So, he wasn't a government witness at the

time.  And, to be clear, to give context, Ms. Beyer didn't

understand the bigger scope of the investigation, and that's

what Mr. Jarrow, as a case agent, does to local law

enforcement, informed her of questions that he should ask -- or

she should ask of the people at Coin.mx because they don't go

in knowing the full scope of what would be important in the

investigation or not.  So that's, I think, the context of what

Mr. Jarrow gave to Ms. Beyer.  I believe the reason they know

about this is because we disclosed all of that in his

voluminous 3500.

1          So, I think the state of play is, putting aside the

2     issues with regard to what follow-up is happening or has

3     happened within Secret Service that we're dealing with now, but

4     putting that aside, I don't think any of the parties are in

5     dispute about how to treat this within the course of the trial.

6     We have never -- and we have no reason to believe --

7          THE COURT:  I hadn't asked for grounds for the

8     objection, so I needed to know.

9          MS. CHOI:  I see.  I'm sorry, your Honor.

10          THE COURT:  When I went up to lunch, the first time I

11     heard this information --

12          MS. CHOI:  Was contemporaneous.

13          THE COURT:  -- was contemporaneous, and there was an

14     objection --

15          MS. CHOI:  Right.

16          THE COURT:  -- to keep it out, which also surprised

17     me.  So, I have more information now.

18          MR. NOBLE:  Honestly, Judge, to be clear, I don't

19     think I knew where Mr. Creizman was going at that point with

20     respect to what she was going to tell him.  So I think it was a

21     valid hearsay.  I wasn't trying to keep this information out.

22     It's obviously a valid line of cross.

23          I just thought he asked for what she said -- he asked

24     Mr. Freundt what she said, and that's what triggered hearsay in

25     my mind.  Just so the record is clear.

```
 1                THE COURT:  Okay.  Thank you.

 2                Mr. Creizman?

 3                MR. CREIZMAN:  Just to note for the Court, I have

 4    found at least -- just in the event that the government wants

 5    to, on redirect, ask questions about -- I don't think the

 6    government does plan to do this -- but Special Agent Beyer's

 7    role in this investigation, there is an email from Tate Jarrow,

 8    Government Exhibit 3501-360, that talks about the operational

 9    summary and a whole tactical operation, most of which is

10    blacked out, which is redacted, and another one with, "Here's a

11    first draft of questions for your perusal.  I know a lot of

12    these, Emily already got answers to, but wanted to be

13    thorough."  So there are at least two emails regarding the

14    takedown operation.

15                THE COURT:  And those are June dates?

16                MR. CREIZMAN:  Those are July dates.

17                THE COURT:  July what?

18                MR. CREIZMAN:  July 16th, and the other one is

19    July 17th.  And there is one that just has an outline of

20    questions, but the other one has a whole situation about the

21    preoperation test, the arrest warrants, the seizure warrants,

22    the identity of who's going to be -- Anthony Murgio, Yuri

23    Lebedev, what they're going to be arrested for, and then there

24    are several pages that are simply redacted.  I'm happy to hand

25    this up to the Court.
```

1          MS. CHOI:  Your Honor, I don't think that we -- we're

2     not going to deny that she obviously had a role on the day of

3     the takedown.  I think the only line of question we may have,

4     and we're trying to verify right now the time frame is,

5     something along the lines of after all of the Coin.mx went

6     down, you lost your job, everything else, did you ever have any

7     other further discussions substantively with Special Agent

8     Beyer.  We're trying to figure out the piecing together of the

9     computer hardware, giving it back to him, but I think that it

10    would be it because the point that we just want to make is,

11    yes, she had a role on the day of the takedown, but after that,

12    he never saw her.  And I think that's borne out by our

13    understanding of what happened in the investigation, which is,

14    you know, once the arrest happened on behalf of New York, it's

15    New York's ballgame about how they want to pursue talking to

16    any of the people that were involved.  So it was our agents

17    that went and did that, not her.

18          MR. KLINGEMAN:  Two things, your Honor:  Counsel for

19    the government, who is responsible for directing the witness,

20    has indicated that the government has no reason to dispute the

21    witness' testimony.  And so I'd ask that on redirect or

22    otherwise, the government make no suggestion, through its

23    questions or other means, to try to undermine or cast doubt on

24    what the witness has said.  That's all extrajudicial.

25          Other counsel for the government has suggested a

1    variety of different scenarios, including whether this agent

2    continued to participate in the investigation.  That is far

3    beyond the scope of this witness' knowledge, and I would object

4    to those questions being posed to this particular witness.  If

5    the government wants, at its peril, to introduce evidence about

6    how it conducted some kind of internal investigation of this

7    allegation, I'm not sure we want that at this point.

8            THE COURT:  I think the specific question suggested

9    was whether he had any contact with her, which is -- that would

10   be in the purview of his knowledge.  Do you have some --

11           MR. KLINGEMAN:  I agree that it's within the purview

12   of his knowledge in the sense that he can say whether or not he

13   ever encountered her, but the conclusion that somehow the

14   government's going to ask the jury to draw from that is well

15   beyond his knowledge; that is, whether she continued to

16   participate in the investigation in any way, shape, or form,

17   and it's not a fair factual basis to draw that conclusion.  If

18   they want to bring in another witness, again, which I'm not

19   welcoming in any way, shape, or form, that would be the

20   appropriate way to do this.  But that ship has sailed.  This

21   allegation has been sitting in the file since April of 2016,

22   and irrespective of the reason, it hasn't been investigated.

23   We're not going there.  At least I'm not going there.  But what

24   I want is this witness' testimony to stand and not to be

25   undermined by any extrajudicial knowledge that the government

1    may or may not have.

2         MR. CREIZMAN:  Just to add to that, there were

3    communications between Special Agent Jarrow and Special Agent

4    Beyer afterwards trying to get the writeup of the interview,

5    the documents, various different things.  So the communications

6    continued after Mr. Lebedev and --

7         THE COURT:  Yes, I agree with the application.  I

8    don't see the basis for the government, in light of what's

9    occurred, to try to undermine the -- not without more

10   information, Agent Beyer's role in this investigation.

11        MS. CHOI:  On that point, when you say "not without

12   more information," I guess my question is what information

13   would your Honor want to know?

14        THE COURT:  So he's just told me about emails after

15   the fact between Agent Beyer and Agent Jarrow.

16        MS. CHOI:  Yes, your Honor.  Those emails were to give

17   us the notes of what had happened during that conference,

18   which -- during those interviews, which we have disclosed to

19   defense.  That's the normal course of -- it's not as though

20   when you go out on the operation, and you have an interview,

21   that everything contemporaneously gets sent out that day.

22   There was follow-up because we need to do chain -- you know,

23   prepare the reports for chain of evidence and everything else

24   that might be involved.  I don't think she was involved in any

25   seizures because there were no seizures from the Coin.mx

1    Tallahassee office, but that's just normal follow-through.

2            I think it is still fair game, your Honor, to ask Jose

3    Freundt if he's ever seen her again.  I can represent that

4    she -- other than that incident and the incident of whatever

5    hard drives were left over, seizing them or not, or consenting

6    to searching them or not at the time, she had no role in the

7    greater investigation.  I think it is fair game to ask

8    Mr. Freundt, from his perspective, did he ever see her again,

9    did he ever talk to her again?

10           THE COURT:  No, I won't allow it.

11           MS. CHOI:  Okay.

12           THE COURT:  We'll get the jury.  And let's bring

13   Mr. Freundt.

14           MS. CHOI:  Your Honor, I'm sorry, you can keep going.

15   Can I just run to the restroom?

16           THE COURT:  Yes.

17           MS. CHOI:  Thank you.

18           (Continued on next page)

19

20

21

22

23

24

25

 1                (Jury present)

 2                THE COURT:  Members of the jury, I hope you had a

 3     pleasant lunch.  You were here on time.  I'm sorry to keep you

 4     waiting.  Again, we were working through some legal issues to

 5     try to facilitate the process going forward, so I appreciate

 6     your patience and your diligence once again.

 7                Mr. Creizman, you may continue with your

 8     cross-examination of Mr. Freundt on behalf of Mr. Lebedev.

 9                Mr. Freundt, I remind you that you are under oath.

10                When you're ready, counsel.

11      JOSE FREUNDT,

12     CROSS-EXAMINATION CONTINUED

13     BY MR. CREIZMAN:

14     Q.  Good afternoon, Mr. Freundt.

15     A.  Good afternoon.

16     Q.  Before we broke, we were discussing the reasons why

17     Mr. Murgio was hesitant, reluctant, to provide the $50,000

18     donation, correct?

19     A.  Correct.

20     Q.  And it was not a matter of whether Mr. Murgio had the

21     money, it was a matter of whether he trusted Pastor Gross with

22     the money?

23     A.  It was an issue of when he could get the money.

24     Q.  Correct.

25     A.  Correct.

 1  Q.  But the issue was whether Pastor Gross would be able to --

 2  the main issue there was trust, was it not?

 3  A.  The main issue was trust, yes.

 4  Q.  Because you did say that you -- you testified that you had

 5  a three-way call with Vlad, and that you came away with that

 6  call understanding that there would be no problem with getting

 7  the cash?

 8  A.  Correct.  There was four people involved in that call.

 9  Q.  Was that Michael Murgio as well?

10  A.  Correct.

11      And, yes, after that conversation, money didn't seem

12  to be the issue.

13      MR. CREIZMAN:  I would like to bring up Government

14  Exhibit 2506-T into evidence -- I'm sorry, which is in

15  evidence.  I'd like to publish it.

16  Q.  This is the transcription of the November 22nd, 2014

17  meeting that you had with Pastor Gross?

18  A.  Correct.

19      MR. CREIZMAN:  I'd like to turn to page 27.  Thank

20  you.

21  Q.  Do you see your name in the center of the page where it

22  says, "42 Minutes"?

23  A.  Yes.

24  Q.  Could you read that for the jury?

25  A.  It's, "How -- how do we tell the people that it's going to

 1    give the money, their money is protected, because at this

 2    point, they don't know that.  Unfortunately, they don't have a

 3    relationship with you, they don't have a relationship with me.

 4    They're writing a blank check to somebody, throwing up a coin

 5    and hoping that it lands in the right way.  Anybody who's

 6    giving money, okay, and I don't -- I'm not saying we're not --

 7    again, I'm not here to question anybody's judgment, or

 8    anybody's character, or anything like that.  That's as an

 9    investor that I have thing.  There's a risk/reward, and you

10    want to see the risk before.  I mean, it's common sense.  I

11    understand what you are saying, I understand that they are

12    saying let's keep -- stop going in circles.  We need the money.

13    Whether you think your people need to feel comfortable and say

14    here's the check, that's where we need to get to."

15    Q.  Is it fair to say, Mr. Freundt, that what you were

16    suggesting is some kind of way for both the Murgios to be

17    comfortable that their money, whether it be the $50,000, or the

18    capital infusion or both, be protected, but at the same time,

19    Mr. Gross be comfortable that he's going to have that money --

20    or not he, but that the donation would happen?

21    A.  Correct.  At that point we had been going in circles for

22    the same topic.  So I just wanted to clarify that we needed to

23    get to the real issue, which is how does the people that are

24    giving the money feel that their money is protected, and at the

25    same time, how does Mr. Gross -- is happy with the deal.

1    Q.  Fair to say you were the levelheaded party in the room at

2    the time or trying to play that part?

3    A.  I was trying to be the mediator, if that's the case, yes.

4            MR. CREIZMAN:  Let's go to page 34, if we can.  Thank

5    you.

6    Q.  Now, in the middle of the page, there is a line "Gross"

7    above A. Murgio, and it starts with "Monday, wire us the 50."

8    Do you see that?

9    A.  Yes.

10   Q.  I can read Mr. Gross' portion if you could read

11   Mr. Murgio's portion.  Is that okay?

12   A.  Yes, that's fine.

13   Q.  Okay.

14           "Monday, wire us the 50.  We'll call a special elect.

15   We'll all have the board members resign, send in letters of

16   resignation.  That can all happen Monday."

17   A.  "Can -- can we, and we can do that simultaneously?"

18   Q.  "What's the simultaneous part"?

19   A.  "Like we have the resignation letter signed already, the

20   50,000 check hits the account or whatever money order, and we

21   exchange hands."

22   Q.  "That's fine."

23   A.  "And then we document it on the board meetings."

24   Q.  Okay.  So, again, is this going to the issue of the Murgios

25   seeking that their money will be protected if they hand it over

 1    to Pastor Gross?

 2    A.  Correct.

 3          MR. CREIZMAN:  Now, if we can turn it to page 37.

 4          Actually, if we can turn it to page 36, at the bottom.

 5    Okay.  So a couple of lines higher.  I apologize for that.  I'm

 6    going to skip around a little bit.

 7    Q.  I'm going to stay in Pastor Gross' role.

 8          "Just so we're clear, Monday, by Monday, there will be

 9    email sent in to the secretary of the board, who right now is

10    Ricardo, stating resignations from the board, correct?  And

11    upon receipt of those Monday, the $50,000 that the church is

12    due will be sent in."

13          And then there is an exchange here.  I'd like you to

14    go to the second line from the bottom, A. Murgio.

15    A.  Would you like me to read it?

16    Q.  Yes, if you don't mind.

17    A.  "No.  All I'm saying is, it could be Tuesday to get the

18    funds where they need to be, and then I mean whether it's" --

19          MR. CREIZMAN:  If you can turn it to the page 37, the

20    top of.  Sorry, top of 37 -- oh, is that it?  Okay.

21    Q.  "No, no.  Monday, Monday."

22    A.  "I mean" --

23    Q.  And you can play yourself.

24    A.  "All right.  How about we do this, when the funds are ready

25    to be put in the deposit" --

1    Q.  "But he's just saying Monday."

2    A.  "And that's what he said in the email."

3    Q.  "Yeah, that's what I'm saying.  No, no, no, what I'm saying

4    is, no.  I'm saying let's, let's -- cuz, listen, gentlemen, I

5    want this to happen, so we can move this thing forward.  Right,

6    correct.  So I don't -- I don't like all this.  Or it may be

7    Tuesday.  Let's -- let's" --

8            And then Mr. Lebedev says:  "I'll get 50, I'll give

9    you, it's fine."

10            Mr. Gross continues:  "Let's make it happen.  See,

11    see, here's the thing cuz" --

12            Lebedev:  "Don't worry about it.  I got."

13            Mr. Gross:  "I just want this to happen, so that I

14    want -- cuz, see, I want you all to feel the comfort.  Yeah,

15    no, that's fine."

16            Now, you testified that you understood Mr. Lebedev to

17    be talking to Anthony Murgio at that point?

18    A.  Correct.

19    Q.  And is it fair to say that your understanding of what

20    Mr. Lebedev was saying, at least where Mr. Lebedev was coming

21    from, was a concern as to whether Anthony Murgio had the money

22    or not, correct?

23    A.  Correct.  At that point Anthony didn't know if he could get

24    the money by Monday.  There was a question whether it would be

25    Monday or Tuesday.

H2SKLEB5                          Freundt - Cross

1   Q.  That was what was said, but there was -- certainly the

2   discussion before that was about the trust factor, correct?

3   A.  That had been the discussion throughout the meeting, yes.

4   Q.  And then after Mr. Lebedev says, "I'll get 50, I'll give

5   you, it's fine.  Don't worry about it, I got," did Mr. Murgio

6   respond to Mr. Lebedev in any way?

7   A.  Not that I remember.

8   Q.  The conversations just continued to occur?

9   A.  Between?

10  Q.  Between Mr. Gross and Mr. Murgio.

11  A.  Well, everybody was at the table there.  That was a side

12  conversation between Yuri and Anthony.

13  Q.  And Mr. Murgio didn't get up and say, okay, we're going to

14  get that -- don't worry now, I have the 50,000, I'm going to

15  hand it over, that's not how it went down?

16  A.  That did not happen, no.

17  Q.  Okay.

18          MR. CREIZMAN:  If we could just go to page 38.  If we

19  could just start with Gross, where it says, "But I."  It's

20  towards the bottom middle of the page.

21  Q.  I'll be, again, Pastor Gross, and you can be Anthony Murgio

22  and Jose Freundt, if that's okay.

23          "But I -- I will make sure we all -- I will make sure

24  we are all clear, though."

25  A.  "Yeah, yeah, yeah."

1    Q.  "So resignations?"

2    A.  "Yeah, yeah, yeah, and the money."

3    Q.  "Monday?"

4    A.  "Yes.  And we'll do the minutes, right?  And we can submit

5    the call report."

6    Q.  Okay.  Thank you.

7         And it's your understanding that this is a

8    communication that essentially the money comes in, the

9    resignations happen essentially simultaneously?

10   A.  Correct.

11   Q.  Okay.  Thank you.

12        MR. CREIZMAN:  We can take this exhibit down.

13   Q.  You communicated with Mr. Lebedev via Facebook chat; is

14   that true?

15   A.  My original message, yes.

16   Q.  From time to time, you would communicate with him?

17   A.  I believe so.

18   Q.  You have a Facebook account?

19   A.  Yes.

20   Q.  And you knew Mr. Lebedev's Facebook account?

21   A.  I'm sorry?

22   Q.  And at the time you knew Mr. Lebedev's Facebook account?

23   A.  Yes.

24        MR. CREIZMAN:  I'd like to show the witness a document

25   marked for identification as Defense Exhibit 14.  I have

1    provided a copy to the government.

2            (Pause)

3    Q.  Please take an opportunity to look through the document.

4    A.  Okay.

5    Q.  Do you recognize this exhibit as exchanges between you and

6    Mr. Lebedev over Facebook chat?

7    A.  Yes.

8    Q.  And these are accurate representations of that?

9    A.  Yes.

10   Q.  And it covers the date November 24th?

11   A.  Correct.

12           MR. CREIZMAN:  Your Honor, I'd like to move to admit

13   Defense Exhibit 14 into evidence.

14           MR. NOBLE:  No objection.

15           THE COURT:  Mr. Klingeman?

16           MR. KLINGEMAN:  No objection.

17           THE COURT:  Thank you.

18           DX 14 is admitted.

19           (Defendants' Exhibit 14 received in evidence)

20           MR. CREIZMAN:  May I publish to the jury?

21           THE COURT:  You may.

22   BY MR. CREIZMAN:

23   Q.  The top of the page there says November 24th at 5:24 p.m.?

24   A.  Correct.

25   Q.  That's two days after the meeting with Pastor Gross?

1   A.  Yes.

2   Q.  That we just talked about?

3   A.  Correct.

4   Q.  If you could read your part, please?

5   A.  "Shit keeps hitting the fan, kid."

6   Q.  And I will be Mr. Lebedev.

7   A.  Okay.

8   Q.  "What do you mean"?

9           THE COURT:  Into the mic, please.

10          MR. CREIZMAN:  Oh.

11  Q.  "What do you mean?"

12          MR. CREIZMAN:  Now we've got to turn the page here.

13  A.  "Anthony sent an email last night changing the agreement.

14  Trevon canceled everything.  No, I'm left trying to clean

15  everything up."

16  Q.  "I didn't get any email."

17  A.  "He sent it to Trevon."

18  Q.  "Call me.  This is all very shady.  What do you think?"

19  A.  "It is.  What are your thoughts?"

20  Q.  "I think Trevon is ganging up with Kap and screwing Anthony

21  again.  I wonder how much did he already spend on it."

22          Just to stop there, who is Kap?

23  A.  Kapcharge was the company that was sending the ACH

24  transactions.

25  Q.  Is this a reference to Mr. Lebedev's belief that Pastor

1    Gross is working with Kapcharge to try to edge out Anthony?

2    A.  Correct.

3    Q.  And that's what Anthony was suggesting to the group?

4    A.  Correct.

5    Q.  Where he says, "I wonder how much did he already spend on

6    it," what did you understand that to mean?

7    A.  I understood it to be how much Anthony had already sent to

8    Trevon.

9    Q.  Now, if you could continue?

10   A.  "We are preparing for that."

11   Q.  "That means we won't be getting paid anymore.  U.S. is

12   huge, has tons of credit unions.  Now we know."

13          When Mr. Lebedev said, "That means we won't be getting

14   paid anymore," what did you understand that to mean?

15   A.  At that point, the only thing we were getting paid was the

16   400 and something dollars for the -- being a board member.

17   So --

18          THE COURT:  Mr. Creizman, can you move -- I can't see

19   the --

20          MR. CREIZMAN:  Sure.  Sorry.

21          THE COURT:  Thank you.

22   Q.  Is it your understanding that Mr. Lebedev was suggesting

23   that there are other credit unions to pursue?

24   A.  Yes.

25   Q.  And your response, Mr. Freundt?

 1  A.  "That means we are going to fight."

 2  Q.  "First it's 6 on 6 with Trevon tie-breaking, and even if we

 3  win, we will alienate us from community.  He will get everyone

 4  against us.  They will boycott."

 5  A.  "What's your suggestion?"

 6  Q.  "Look for another similar CI, CU."

 7  A.  "And the time money already spent?"

 8  Q.  "I think Kap was dishing out the money.  Our 417 was coming

 9  from Collectables.  Would have been much worse if we gave them

10  50K and a half a mil.  Wait.  Do you know, did Anthony transfer

11  50K already?"

12          Just to ask a quick question:  Was your understanding

13  from that question that Mr. Lebedev did not know whether the

14  $50,000 donation that was discussed at the November 22nd

15  meeting had been paid or not?

16  A.  Correct.

17  Q.  Just please read this last line.

18  A.  "Speak to the group, so everyone knows your thoughts."

19  Q.  Thank you.

20          MR. CREIZMAN:  Can we put up Government Exhibit 4501,

21  please, lines 5102 to 5105.  Could you just move it up a little

22  higher.

23          Is it 4509?  I'm looking -- the one where -- sorry.

24          THE COURT:  Why don't we take a standing stretch while

25  they're finding the spot.

 1          (Pause)

 2          THE COURT:  Are you ready, Mr. Creizman?

 3          MR. CREIZMAN:  I think so.  Mr. Noble was kind enough

 4     to...

 5          Sorry, if we can go back to Government Exhibit 4501

 6     again.  I'm sorry.  And this would be line 5007.

 7     Q.  At this point, looking at the date, it's November 24th?

 8     A.  Correct.

 9     Q.  And you add Yuri to WhatsApp?

10     A.  I asked for him to be added.  Anthony added him.

11     Q.  Okay.  You ask Yuri, "Yuri, yes, seems like Trevon is

12     backing out of the deal and told me the relationship between

13     both groups are unsalvageable and wish not to continue with

14     it."

15          MR. CREIZMAN:  Now, if we can go to 5047, line 5047.

16     Q.  I'm Yuri.  Could you be Tim Ellrich, please?

17     A.  Yes.

18     Q.  "I'm glad this happened before giving them half a mil."

19     A.  "True.  What is the next step?  Is there at all a

20     possibility of salvaging this relationship lost?"

21     Q.  Anthony:  "Did you transfer $50,000 to him already,

22     Mr. Freundt?"

23     A.  "I don't think there's a possibility, and all your money

24     wasn't transferred."

25          MR. CREIZMAN:  Now if we can go to line 5609 to 5617,

1   please.

2   Q.  Do you recall testifying about this on your direct

3   examination?

4   A.  Yes.

5   Q.  There was a discussion about how the Collectables Club

6   group could proceed against Trevon Gross, correct?

7   A.  Correct.

8   Q.  On line 5616, you say, "If shit doesn't work, I will call

9   NCUA myself and let them know how the credit union took

10  'donations' from Kap in order to do business with them at lower

11  rate."

12          Now, you were aware that, quote/unquote, donations

13  were discussed between the Collectables Club and Pastor Gross,

14  correct?

15  A.  Yes.

16  Q.  Now, you also testified about -- there was a discussion

17  that Mr. Murgio had about retaining counsel for the

18  Collectables Club, correct?

19  A.  Correct.

20  Q.  Also, Mr. Murgio talked about retaining separate counsel

21  for the credit union, correct?

22  A.  Correct.

23  Q.  There was a discussion about whether to talk about the

24  donation to one set of lawyers or -- correct or both?

25  A.  Correct.

1    Q.  And Mr. Murgio suggested that to one set of lawyers, he

2    would talk to them, and to the other, he wouldn't?

3    A.  That he would tell them about the donation, yes.

4            MR. CREIZMAN:  I'd like to move down to 8030, please.

5    Q.  Is this the testimony starting at line 8030 that we were

6    just talking about?

7    A.  Yes.

8            MR. CREIZMAN:  If we can move down to line 8045.

9    Q.  Jose Freundt:  "I have always been of the opinion to be

10   100 percent honest with lawyer, and give all info, and let them

11   decide what's important," correct?

12   A.  Yes.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

BY MR. CREIZMAN:

Q.  So your suggestion was to tell the attorneys about the
donation.

A.  To be 100 percent honest, yes.

Q.  Okay.  Is it fair to say that during your meetings with the
government, proffer meetings, you repeatedly told the
government that at the time these discussions were happening --
and when I'm saying "these discussions", the November, 2014
discussions -- that you did not see -- you never viewed the
donation as an actual bribe, correct?

A.  That's what I said, yes.

Q.  All right.  And you said that more than once to the
government, correct?

A.  Correct.

Q.  And the government gave you a cooperation agreement, did it
not?

A.  Yes.

Q.  And you were not prosecuted for perjury or obstruction of
justice.

A.  Correct.

Q.  I want to ask you about your first meeting with Special
Agent Beyer.  Do you understand?

A.  Yes.

Q.  And this was in June of 2015?

A.  About.

 1    Q.  Okay.  And this came about by your reporting a substantial

 2    fraud that was perpetrated against Coin.mx, correct?

 3    A.  There wasn't a fraud against Coin.mx, per se.  What I was

 4    reporting was that somebody was using different credit cards

 5    and different identities --

 6    Q.  I see.

 7    A.  -- to deposit money, and I just wanted to make sure that

 8    that wasn't an identify theft, and I was reporting that.

 9    Q.  So Coin.mx wasn't necessarily injured by it, but you wanted

10    to make sure that law enforcement found the people who were

11    committing identify theft, correct?

12    A.  Correct.  I was just reporting the crime that I saw.

13    Q.  And you weren't concerned that when the secret service

14    agent stopped by your office that you might get arrested?

15    A.  No.

16    Q.  Because you believed that you were working for a lawful

17    business, correct?

18    A.  Yes.

19    Q.  Now, the government asked you, do you recall, whether you

20    told Special Agent Beyer about your calls to the banks, right?

21    A.  Correct.

22    Q.  And you said, "No."

23    A.  I informed her of the calls.

24    Q.  Oh, you did inform her.  But you said in response to

25    Mr. Noble's question, you said, "I did not tell."  I thought

 1   that that's what you said.

 2   A.  No.  I did not tell her that we were told not to tell the

 3   bank it was Bitcoin.

 4   Q.  Right.  Okay.  But you did tell Special Agent Beyer that

 5   Coin.mx was dealing in Bitcoin, correct?

 6   A.  Yes.

 7   Q.  And you didn't try to hide the fact that that's what your

 8   business was doing.

 9   A.  Correct.

10   Q.  In fact, you told Special Agent Beyer that Coin.mx was the

11   only Bitcoin trading site that allows purchase of Bitcoins

12   using credit cards, correct?

13   A.  Correct.

14   Q.  And you also told Special Agent Beyer about requiring

15   customers to upload videos of themselves with the state-issued

16   ID and the credit card they were using before they could make a

17   purchase, correct?

18   A.  Correct.

19   Q.  And you were comfortable telling her this because, again,

20   you did not think you were doing anything wrong.

21   A.  I did not know I was doing anything wrong.

22   Q.  Now, government also asked you whether you told Mr. Murgio

23   that the secret service was coming, and I believe you answered,

24   "No."  Is that accurate?

25   A.  Anthony asked me not to go to the secret service, and I

 1   went.  I did not tell him that I had gone.

 2   Q.  But you did tell Mr. Murgio that they were coming, correct?

 3   A.  That was after one of our employees was expected of being a

 4   part of that fraud, Anthony said, "Go ahead and go to the

 5   secret service."

 6   Q.  You had expected one of your -- one of the Coin.mx

 7   employees of a part of that fraud.

 8   A.  Correct.

 9   Q.  And who was that?

10   A.  Ricardo Hill.

11   Q.  Now, did you give Special Agent Beyer information about

12   Mr. Hill?

13   A.  Yes.

14   Q.  And you expressed your suspicions about Mr. Hill?

15   A.  Yes.

16   Q.  And you told Special Agent Beyer that you had confronted

17   Mr. Hill about your suspicions?

18   A.  Yes.

19   Q.  And you told her that he never returned to work again?

20   A.  Correct.

21   Q.  And is it not true that when Mr. Murgio heard that the

22   secret service was coming, he was not too happy about it?

23   A.  Correct.

24   Q.  But you insisted that the secret service come to the office

25   and that you talk to them or else you wouldn't want to work

 1   there?

 2   A.  Correct.

 3   Q.  I'm sorry?

 4   A.  Correct.

 5   Q.  Okay.  Now, I want to ask you about your work at Coin.mx.

 6   A.  Okay.

 7   Q.  At some point, was it late 2014, your job with the State of

 8   Florida was canceled?

 9   A.  Early 2015.

10   Q.  Early 2015.  Okay.

11   A.  Correct.

12   Q.  And your contract was canceled.

13   A.  Correct.

14   Q.  Like a layoff essentially.

15   A.  Correct.

16   Q.  And you reached out to Anthony Murgio for work.

17   A.  Yes.

18   Q.  And Anthony Murgio offered you the opportunity to work at

19   Coin.mx.

20   A.  Temporarily, yes.

21   Q.  And you were, fair to say, enthusiastic about it?

22   A.  About not having a job.  I had a six-month-old baby so I

23   wanted --

24   Q.  Sure.

25   A.  -- income.

 1   Q.  You expressed enthusiasm to Mr. Murgio about how you were

 2   going to basically organize things in that office?

 3   A.  I might have, yes.

 4   Q.  And you worked there for six months; is that right?

 5   A.  From April to July, more or less.

 6   Q.  April to July.

 7   A.  Correct.

 8   Q.  Not in early 2015?

 9   A.  I believe I started in around April.

10   Q.  You were there most days?

11   A.  There?

12   Q.  At the office.

13   A.  No.

14   Q.  But you worked from home?

15   A.  Correct.  We were able to work from wherever the

16   computer --

17   Q.  Okay.

18   A.  -- wherever we had a computer.

19   Q.  And you were in constant touch with Anthony?

20   A.  Yes.

21   Q.  He's not an easy boss?

22   A.  He's got his ways.

23   Q.  He was a bit of a micromanager?

24   A.  Yes.

25   Q.  Wanted recaps every day?

1    A.    Yes.

2    Q.    Now, you started to become familiar with the day-to-day

3    operations of the business; is that fair to say?

4    A.    Yes.

5    Q.    And when you had IT problems, you would contact an

6    individual named Dimitry; is that right?

7    A.    Correct.

8    Q.    You must have contacted him about ten times; is that fair

9    to say?

10   A.    Him or his team, yes.

11   Q.    And Dimitry was located in Russia?

12   A.    To my understanding.

13   Q.    And to your understanding, the servers were located in

14   Russia?

15   A.    To Coin.mx, yes.

16   Q.    Now, while you were at Coin.mx, Mr. Lebedev never visited

17   the office, to your knowledge.

18   A.    No.

19   Q.    And when you had IT problems, you didn't reach out to

20   Mr. Lebedev, correct?

21   A.    No.

22   Q.    No, you did not reach out to him?

23   A.    Correct.

24   Q.    Okay.  And when Bitcoin transactions were processed for

25   Coin.mx, how would that appear on a customer's credit card?

 1    A.  As a Coin.mx transaction.

 2    Q.  Would it show Collectables Club, Coin.mx, do you know?

 3    A.  Coin.mx.

 4    Q.  It would show Coin.mx.

 5    A.  From my communications with the bank, yes.

 6    Q.  Okay.  Did you ever see any charge from a

 7    myextremedelivery.com?

 8    A.  I never saw any charges, no.

 9            MR. CREIZMAN:  No further questions.

10            THE COURT:  All right, thank you.

11            Mr. Klingeman.

12            MR. KLINGEMAN:  Thank you, your Honor.

13            THE COURT:  The cross examination on behalf of

14    Mr. Gross.  Whenever you're ready.

15            MR. KLINGEMAN:  Thank you.

16    CROSS EXAMINATION

17    BY MR. KLINGEMAN:

18    Q.  Mr. Freundt, my name is Henry Klingeman and I represent

19    Pastor Trevon Gross.

20    A.  Nice to meet you.

21            MR. KLINGEMAN:  Could we see government's 4501 in

22    evidence?  Specifically, entry 5245.

23    Q.  Mr. Freundt, in this WhatsApp message, you write, "We

24    shouldn't mention dollar signs (bribery) in the resignation

25    email."

 1    A.   Yes.

 2    Q.   This is the first reference to the word "bribery" in the

 3    various WhatsApp in which you participated, correct?

 4    A.   Correct.

 5    Q.   And it's the only mention of the word, as well, right?

 6    A.   That I participated, yes.

 7    Q.   And in the WhatsApp chats in which you participated, no one

 8    else uses the word "bribery".

 9    A.   Correct.

10    Q.   And Pastor Gross is not a participant on this chat?

11    A.   He's not.

12              MR. KLINGEMAN:   Government's 4501 in evidence.

13              THE WITNESS:   Correct.

14    Q.   In no chat that you had with Pastor Gross did you discuss

15    "bribery", correct?

16    A.   That word was never used, no.

17    Q.   And in no telephone conversation with him?

18    A.   Correct.

19    Q.   In-person meeting with him?

20    A.   No.

21    Q.   Email with him?

22    A.   No.

23    Q.   In a separate conversation you testified about yesterday,

24    you said that Pastor Gross told you why he wanted to leave the

25    HOPE Federal Credit Union in the hands of the Collectables Club

1   members.

2   A.  Correct.  That was one of our first conversations.

3   Q.  He said that he was tired.

4   A.  Correct.

5   Q.  That he wanted to dedicate more time to his church.

6   A.  Yes.

7   Q.  And the pastoral duties that he had neglected because of

8   the credit union.

9   A.  Correct.

10  Q.  Now, in this chat, Government's 4501 in evidence, you use

11  the word "bribery" at entry 5245.

12  A.  Correct.

13  Q.  And then you go on to explain that you didn't use the word

14  "bribery" in the draft of an email that you had prepared for

15  Yuri Lebedev, right?

16  A.  Yes.

17  Q.  Instead, you say at entry 5247 that you used the word

18  "agreement" instead of "bribery".

19  A.  Correct.

20  Q.  And then at 5249 Mr. Murgio chimes in.

21  A.  Correct.

22  Q.  And he says "donation".

23  A.  Yes.

24  Q.  You testified this morning that that was his euphemism for

25  "bribery"?

 1   A.  I would assume so, yes.

 2   Q.  Well, you assume so, but you know what they say about

 3   assuming.

 4   A.  Yes.

 5   Q.  In fact, he could have been correcting you from using the

 6   word "bribery" in terms of his mind, right?

 7   A.  Correct.

 8   Q.  And then at the very bottom of the -- not the bottom, but

 9   the middle of the page that's on display, Murgio says at 5250,

10   "We can use Privnote."  Do you see that?

11   A.  Yes.

12   Q.  And we've heard testimony that Privnote is some kind of

13   email communication application that causes the email message

14   to disappear after it's sent and received?

15   A.  Correct.  You're only able to open it once.

16   Q.  Okay.  And you understood at the time you received this, or

17   you saw this message from Mr. Murgio, what Privnote was, right?

18   A.  Yes.

19   Q.  And in fact, in a separate email, you told Mr. Murgio, "And

20   we shouldn't send the note on Privnote, it would make it seem

21   like we have something to hide."

22   A.  Correct.

23   Q.  Do you remember sending that email just minutes after you

24   received this WhatsApp message from Mr. Murgio?

25   A.  I remember sending the email out, I don't remember the

timing.

Q.  Okay.  Well, this WhatsApp message, 5250, from Mr. Murgio
is 9:12 a.m.

A.  Yes.

Q.  It's 9:12 in the morning.

A.  Correct.

Q.  At 10:02 a.m. that same morning, November 25th, 2014, you
sent an email to Mr. Murgio, no one else appears to be copied,
that said, "And we shouldn't send the note on Privnote, it
would make it seem like we have something to hide."

        Do you see that?  Do you remember that?

A.  I remember sending the email.  If you say that's the time
it was stamped, that must be the time, yes.

Q.  If you're not going to dispute me, I'm not going to waste
our time.

A.  No, I'm not going to dispute that.

Q.  Thank you.

        Now, would you agree with me that ever since
November 25th, 2014 when you sent this text -- this WhatsApp
message, 5245, that you've said on various occasions it was a
bribe, and on other occasions you've said it wasn't a bribe?

A.  No.

Q.  Okay.  You disagree with that.

A.  Yes.

Q.  Okay.  Now, in the day before this text exchange on

1    November 25th, there was a lot of discussion on the WhatsApp

2    about what to do about the situation.

3    A.    Correct.

4    Q.    In other words, that was on Monday after the Saturday

5    meeting up in New Jersey, right?

6    A.    Correct.

7    Q.    You folks were all back in Florida.

8    A.    Wherever we lived, yes.

9    Q.    Well, all of you on the Collectables Club side of it, with

10   the exception of Mr. Ellrich, lived in Florida, right?

11   A.    Well, yes.

12   Q.    Well, you.

13   A.    Me, Rico, and Yuri lived in Florida.

14   Q.    And Anthony Murgio?

15   A.    And Anthony, yes.

16   Q.    Michael Murgio?

17   A.    Yes.

18   Q.    And so you began this conversation on Monday the 24th, and

19   that's when you told Anthony Murgio, as the government elicited

20   from you earlier, at entry 4732 and 4733, that it was your

21   opinion, Mr. Freundt, that you all should pay Mr. Gross

22   whatever it is that is owed to him, correct?

23   A.    I was referring to the $6,000 that was owed to him, yes.

24   Q.    Okay.  Well, at 4732, you see you put a reference to the

25   50K, right?

 1   A.  Correct.

 2   Q.  And you said that money should be held back?

 3   A.  Correct.

 4   Q.  And then you also suggest an additional amount owed to

 5   Mr. Gross, which you're telling us now is the $6,000 consulting

 6   fee.

 7   A.  Correct.  That's what was owed to him.

 8   Q.  I take it that $6,000 consulting fee, in your mind, is not

 9   considered a bribe.

10   A.  That was the time he spent working for the -- the two

11   months, the salary.

12   Q.  Right.  So it's not considered part of the bribe?

13   A.  Correct, that would not be.

14   Q.  The 50K would be part of the bribe?

15   A.  Correct.

16   Q.  But not the 6K.

17   A.  Correct.

18   Q.  And then you go on at 4751 to reaffirm that you want the

19   money paid to Mr. Gross that's owed to him as salary, right?

20   A.  Correct.

21   Q.  You say that money is owed regardless of the outcome,

22   right?

23   A.  Right.  That was for his time as the CEO of the credit

24   union.

25   Q.  In other words, if this deal is truly dead, we still owe

 1    him that money.

 2    A.  Correct.

 3    Q.  And then you go on at 4756 to say that Mr. Gross has

 4    informed you that Mr. Gross is done playing games and

 5    renegotiating and, quite frankly, you, Mr. Freundt, don't blame

 6    him.

 7    A.  Correct.

 8    Q.  Now, it's the next day, on November 25th, that you make the

 9    bribery comment in the WhatsApp, correct?

10    A.  Correct.

11    Q.  But before you do that, on November 24th, 24 hours earlier,

12    you're talking on the chat about how to enforce this agreement

13    that you have with Mr. Gross, right?

14    A.  Correct.

15    Q.  And again, the very next day you call it a bribe.

16    A.  Yes.

17    Q.  But on the day before, you talk about drafting a contract

18    to cover you if you were to send the 50K you just described as

19    a bribe, right?

20    A.  I was suggesting that if he's going to send the money to

21    make sure he, Anthony Murgio, covered himself because he had

22    the tendency to do things without any contracts or anything

23    like that.

24    Q.  Okay.  So you're telling us that you wanted a written

25    contract to cover Anthony Murgio to enforce a bribery

 1    agreement?

 2    A.   I am saying that I wanted him to cover those 50,000.   At

 3    that point I was trying to figure out exactly what was going

 4    on.

 5    Q.   So if there had been a written contract at that point, as

 6    you recommended there be --

 7    A.   Mm-hmm.

 8    Q.   Yes?

 9    A.   Yes.

10    Q.   -- you would take that written contract to a court of law

11    and a judge and ask the judge to enforce that contract?

12    A.   I would have the lawyers look at the contract and figure

13    out what the next step would be, yes.

14    Q.   So you're telling us that you think lawyers may have

15    advised you to take a written contract to enforce a bribe?

16    A.   I don't know what they would have done, I'm not a lawyer.

17    Q.   But is that what your understanding was at the time you

18    wrote these words?

19    A.   I'm saying at that time it would have given us a little bit

20    more security as far as the money.

21    Q.   Well, you've been in business.

22    A.   Yes.

23    Q.   You have a finance degree.

24    A.   Yes.

25    Q.   So when you say it's enforceable, security, what you mean

1    is you have some legal right to get what you deserve under the

2    terms of the agreement, correct?

3    A.   That would be a contract, yes.

4    Q.   And you're saying that on November 24th, you wanted to

5    prepare a written contract regarding this $50,000, right?

6    A.   If we were going to -- if Anthony wanted to send the money,

7    I suggested that he have a contract, yes.

8    Q.   So if Anthony wanted to send the money, you wanted to have

9    a written contract?

10   A.   Correct.

11   Q.   So you could take it to court and enforce it.

12   A.   So we could have more security, yes.

13   Q.   By "security", you mean taking it to court and enforcing

14   it, if necessary.

15   A.   If that's what he wanted to do, yes.

16   Q.   And you're now telling us that that agreement concerned a

17   bribe arrangement.

18   A.   The day after I did.

19   Q.   Okay.  So you changed your mind overnight?

20   A.   Well, the dynamics of everything that was going on changed.

21   Q.   So I'm asking you, did you change your mind overnight?

22   A.   Yes.

23   Q.   But the day before you wanted a written contract.

24   A.   Correct.

25   Q.   And according to entry 4783, you wanted to get your own

 1  mother involved in this bribery scheme, correct?

 2  A.  That's incorrect.

 3  Q.  Okay.  Well, doesn't it say that?

 4  A.  I mentioned my mother to see if the email resignations were

 5  actually valid or not.

 6  Q.  Is your mother a lawyer?

 7  A.  She works at a law firm.

 8  Q.  What?

 9  A.  She works at a law firm.

10  Q.  Well, speaking of lawyers, in the rest of this chat,

11  Government's Exhibit 4501, do you know how many times you,

12  Mr. Freundt, urged Mr. Murgio and others to get a lawyer

13  involved?

14  A.  No.

15  Q.  Would you accept my representation that you did it no less

16  than 13 times?

17  A.  Yes.

18  Q.  And the range of dates for this chat begin on

19  November 24th, 2014 and end on December 3rd, 2014.  Do you see

20  that?

21  A.  Yes.

22  Q.  So during that two-week period, you urged Mr. Murgio no

23  less than 13 times to consult with an attorney.

24  A.  Correct.

25  Q.  About something you now say is a bribe.

1   A.  About everything that was going on, yes.

2   Q.  And including this so-called bribe.

3   A.  Correct.

4   Q.  In the hopes that an attorney would enforce that agreement,

5   or help you enforce that agreement.

6   A.  My issue was not with that agreement, my concern with the

7   lawyers -- or my request for the lawyers was to see if we were

8   valid members of the credit union or not.

9   Q.  So when you wrote in this text exchange that you wanted to

10  discuss with the lawyers getting Mr. Gross to hold up his end

11  of the bargain, you weren't talking about the agreement.

12  A.  Well, I was talking about everything.

13  Q.  Including the agreement.

14  A.  Correct.

15  Q.  Including the agreement you now say is a bribe.

16  A.  Correct.

17  Q.  What is a bribe?

18  A.  When you pay someone to do something for you they otherwise

19  wouldn't have done.

20  Q.  Okay.  Well, that sounds like an ordinary transaction.

21  Right?

22  A.  No, a transaction has two willing parties.

23  Q.  Okay.  Well, what is a bribe?

24  A.  When you pay somebody to do something they don't want to

25  do, in my opinion.  I don't know the definition in the

 1    dictionary.

 2    Q.  Well, I'm asking you.  You've used the term "bribe" a

 3    number of times yesterday and today, right?

 4    A.  Yes.

 5    Q.  And you pled guilty to paying a bribe, right?

 6    A.  To conspiracy, yes, and bribing an officer.

 7    Q.  So you've not only used the term in front of the jury, but

 8    you've actually come to court and pled guilty to

 9    bribery-related offenses, correct?

10    A.  Correct.

11    Q.  I'm asking you, based on that experience, what you

12    understand a bribe to be.

13    A.  When you offer money to an officer of a bank institution to

14    do something in your favor.

15    Q.  Okay.  Well, sometimes when you go to a bank you have to

16    pay for services, correct?

17    A.  Correct, but that's part of the daily operations of a bank.

18    Q.  So if you go to a bank and -- credit union, for example,

19    and you make a donation to the credit union, is that a bribe?

20    A.  No.

21    Q.  If you go to a credit union and you get involved in the

22    work of that credit union and you make a donation to the credit

23    union, is that a bribe?

24    A.  No.

25    Q.  If you go to a credit union and get involved in the work of

H2SQLFR6                       Freund - Cross

1   that credit union and you make a separate donation to a church,

2   is that a bribe?

3   A.  No.

4   Q.  Now, after you used the term "bribe" in this WhatsApp chat

5   on November 25th, 2014, did you have any further contact with

6   Pastor Gross?

7   A.  I don't believe so, no.

8   Q.  Did you ever give him any money?

9   A.  Did I give him money?

10  Q.  After that.

11  A.  No.

12  Q.  No mention of the word "bribe".

13  A.  No.

14  Q.  Do you know if anyone else in your Collectables group gave

15  him any money?

16  A.  No, I don't know that.

17  Q.  Now, when did you first meet Pastor Gross in person?

18  A.  The November meeting.

19  Q.  That was the very first time you had ever laid eyes on the

20  man?

21  A.  Yes.

22  Q.  And so I presume that you met him on Friday.

23  A.  Correct.

24  Q.  And then you met him again on Saturday.

25  A.  Correct.

1   Q.   So Friday was November 21st?

2   A.   Correct.

3   Q.   And Saturday, November 22nd.

4   A.   Yes.

5   Q.   So other than November 21st and 22nd, 2014, you had never

6   met -- you've never met Pastor Gross in person.

7   A.   Not in person, no.

8   Q.   Now, prior to November 21st you've had some phone call

9   contact with him.

10  A.   Yes.

11  Q.   Then afterwards you testified, after that meeting on

12  November 22nd you had another call with him.

13  A.   Correct.

14  Q.   At least one, right?

15  A.   Yes.

16  Q.   How many?

17  A.   One or two.

18  Q.   Okay.  And then you had emails with him, some of which

19  we've looked at?

20  A.   Texts.

21  Q.   But emails.  I'm talking about emails.

22  A.   With Trevon?

23  Q.   Yeah.

24  A.   After that --

25  Q.   I'm sorry.  My fault.  Let me clarify.

1                Between the time you got involved with the credit

2     union in the Spring of 2014 and the November 22nd, 2014

3     meeting, you were on emails with Pastor Gross.

4     A.  Yes.

5     Q.  Sometimes you sent emails?

6     A.  Yes.

7     Q.  Sometimes other people sent emails?

8     A.  Correct.

9     Q.  You were copied?

10    A.  Yes.

11    Q.  Now, in all of those communications with Pastor Gross,

12    which ended in late November, 2014, during that time of those

13    communications that ended in late November, 2014, you had not

14    yet begun working at Coin.mx, correct?

15    A.  Correct.

16    Q.  You didn't begin to work at Coin.mx until the Spring of

17    2015.

18    A.  Correct.

19    Q.  So I take it you were not aware of the criminal activity at

20    Coin.mx in 2014 before you began to work there.

21    A.  Correct.

22    Q.  You became aware of it after you joined up and started to

23    participate.

24    A.  Correct.

25    Q.  So I take it you never told Pastor Gross about the criminal

 1  activity at Coin.mx.

 2  A.  I wouldn't have known, no.

 3  Q.  You described the Collectables Club website yesterday as a

 4  non-functional website.

 5  A.  Correct.

 6  Q.  In other words, you couldn't actually join Collectables

 7  Club through the website.

 8  A.  It was a white website with some graphics of memorabilia,

 9  but you couldn't do anything with it.

10  Q.  Right.  But it purported to be a website for true

11  collectibles; baseball cards, antiques, things of that nature.

12  A.  Correct.

13  Q.  But it was phoney?

14  A.  Yes.

15  Q.  Collectables Club was not a real collectibles club?

16  A.  Correct.

17  Q.  Right?  And you never told Pastor Gross that Collectables

18  Club was a sham or a phoney operation, right?

19  A.  I didn't know that at that time, no.

20  Q.  And you indicated a few minutes ago that you reported

21  Ricardo Hill for identify theft to the United States Attorneys,

22  right?

23  A.  I said I had suspicions that he was involved in it.

24  Q.  Actually, the term you used when you communicated with the

25  secret service was that you were "certain".

 1   A.  Correct.

 2   Q.  So that was more than suspicion.

 3   A.  Yes.

 4   Q.  And the point is, you reported what you thought was Rico

 5   Hill's identity fraud crime to the United States Secret

 6   Service.

 7   A.  Correct.

 8   Q.  And you knew, even before you went to the secret service

 9   about Rico Hill, that Rico Hill himself had a prior criminal

10   record.

11   A.  I did not know that.

12   Q.  You did not know that?

13   A.  No.

14   Q.  Okay.  Mr. Hill hadn't told you that?

15   A.  No.

16   Q.  Mr. Murgio hadn't told you that?

17   A.  No.

18   Q.  Ms. Wotherspoon hadn't told you that?

19   A.  The only one that I knew had a criminal record was --

20   Q.  Wait.  Let's not discuss anyone else.  We'll defame them

21   when we get there.

22              MR. NOBLE:  Objection, your Honor.

23              THE COURT:  Overruled.

24   Q.  I'm just asking about Mr. Hill.

25   A.  No, I did not know he had a criminal record.

1   Q.  Okay.  And yet you worked side by side with him for a

2   period of time.

3   A.  For about three and a half years total, yes.

4   Q.  And didn't know he had a criminal record during that

5   period.

6   A.  No.

7   Q.  So presumably, you were never in a position to tell Pastor

8   Gross that Mr. Hill had a criminal record.

9   A.  Correct.

10  Q.  And you didn't tell Pastor Gross about Anthony Murgio's

11  criminal tax problem, either, did you?

12  A.  No.

13  Q.  But you did know about that.

14  A.  About the tax issues, yes.

15  Q.  Yes.  You knew, from your having been associated with his

16  Restaurant 101 and with Mr. Murgio when he was running the 101,

17  that he ran into some tax problems?

18  A.  Yes.

19  Q.  He got arrested?

20  A.  Yes.

21  Q.  He got charged with some kind of tax evasion scheme?

22  A.  Yes.

23  Q.  Then either he attempted to file for bankruptcy or

24  something?

25  A.  Correct.

1   Q.   And he lost the restaurant.

2   A.   He sold the restaurant.

3   Q.   His former friend, Adam Corey, came in and basically took

4   the restaurant from him.

5   A.   Correct.

6   Q.   And that's the reference in WhatsApp chats that you talked

7   about earlier about "Adam"?

8   A.   Yes.

9   Q.   And Mr. Murgio said to you that he saw Pastor Gross as a

10  potential second Adam.

11  A.   Correct.

12  Q.   Taking advantage of Mr. Murgio's problems.

13  A.   I'm not sure if he was referring to his problems, but yeah.

14  Q.   Well, Mr. Murgio felt that Mr. Corey had taken advantage of

15  his problems.

16  A.   Mr. Corey took advantage of the situation and didn't honor

17  an agreement that they had.

18  Q.   When you say "the situation", the situation of Mr. Murgio

19  committing tax violations?

20  A.   Mr. Murgio being arrested and declaring bankruptcy, yes.

21  Q.   Gotcha.  Yes.

22          THE COURT:  Mr. Klingeman, we're going to take our

23  midafternoon break.

24          MR. KLINGEMAN:  Thank you, your Honor.

25          THE COURT:  Ladies and gentlemen of the jury, we'll

1    see you in about 10, 15 minutes.  Thank you.

2              (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  Mr. Freundt, you may step down for the

3     break.

4          (Witness excused)

5          THE COURT:  Matters to take up before the break,

6     counsel?

7          MR. KLINGEMAN:  Your Honor, I was just representing to

8     the government my expectation to finish my cross in plenty of

9     time to allow redirect and recross, if necessary.

10         THE COURT:  Okay.

11         MR. KLINGEMAN:  So I pledge that to everyone, and if

12    we go back to the old Gong Show and someone wants to give me

13    the hook at about 4:30, please feel free to do so.

14         THE COURT:  Anything to take up before?

15         MS. SANTILLO:  Your Honor, I have some proposed text

16    for a limiting instruction, and I've sent that to Mr. Shin, as

17    well to your email.

18         MR. SHIN:  We can confer during the break, your Honor.

19         THE COURT:  Great.  I'll be back shortly.  Thank you.

20         (Recess)

21         THE COURT:  Mr. Shin.

22         MR. SHIN:  Yes, your Honor.  So regarding

23    Ms. Santillo's application for a limiting instruction, we have

24    not been able to reach an agreement.  The government's position

25    is that it's still premature.

 1              So the premise of any limiting instruction requested

 2     by Ms. Santillo is that certain evidence is not admissible

 3     against Mr. Gross.  And in our view, under the Gainey rule,

 4     it's premature to conclude that.  You start out with the

 5     premise that any coconspirator statements are admissible

 6     against the defendant as long as the coconspirator statement

 7     requirements are met.  Under the Gainey rule, that

 8     determination isn't made until the government has the

 9     opportunity to present its case and establish all the

10     requirements of the coconspirator rule.

11              Now, she's basically asking the Court to rule that, in

12     light of Mr. Freundt's testimony, the Court should rule that

13     Mr. Gross has withdrawn from the conspiracy.  That he withdrew

14     as of the November 22nd meeting, or within the next couple of

15     days.

16              We've proffered to the Court in our motions in limine

17     that we plan to put on evidence that Mr. Gross in fact

18     continued on in the conspiracy.  He continued to work with

19     Kapcharge to process ACH transactions.  He continued to work

20     with other members of HOPE FCU in connection with that goal.

21     He continued to work with Kapcharge and HOPE FCU in order to

22     obstruct the NCUA's ongoing investigation and to make false

23     statements thereof.

24              We haven't put on any of that evidence yet, your

25     Honor, and so to rule at this point that any evidence post

1    November 24th is inadmissible against Mr. Gross would -- it's

2    just an end run around game.  We haven't had the opportunity

3    yet to establish the full scope of the conspiracy, which would

4    show that he in fact did not withdraw from the conspiracy as of

5    the November 22nd, or within a couple of days thereafter.

6         And so the proper course under Gainey is for the

7    government to have the opportunity to continue to put on its

8    case, for the Court to rule after seeing all of that evidence

9    whether particular statements were made during the course of in

10   furtherance of the conspiracy to which the defendant continued

11   to be a member.  And it's simply premature to make that ruling

12   at this point.

13        And in terms of her request for a limiting

14   instruction, again, it presumes that he withdrew and that

15   therefore, it's inadmissible against her client, and so the

16   Court can't rule on that yet because it hasn't seen the full

17   context of the conspiracy.

18        THE COURT:  Okay.  So you've made the same point about

19   four times.  I've got it.

20        MR. SHIN:  Just one last point, your Honor, because I

21   anticipate that she'll make a point about how she'll be

22   prejudiced if the Court were to give a limiting instruction

23   later if the Court were to determine that certain statements

24   should not in fact been admitted under the coconspirator rule.

25        In fact, your Honor, the Court could easily give an

1    instruction at the end of the government's case, or after

2    making a determination about particular statements the Court

3    could give an instruction at that time about particular

4    categories and why evidence in those categories are admissible

5    only against one or the other defendant, and of course, the law

6    presumes that the jury will follow those instructions.  They

7    should be easily understandable.  And the Gainey rule in

8    fact -- the procedure presumes that the jury can follow those

9    instructions that are given after the evidence has come in

10   provisionally.

11           So your Honor, we would ask that the application be

12   denied.  And if the Court even were to consider it, we would

13   ask for the opportunity to brief it further.

14           THE COURT:  So I've just been sent what the proposed

15   instruction is.

16           Ms. Santillo, the instruction that I've been sent is,

17   "You've heard evidence that Michael Murgio, Anthony Murgio,

18   Rico Hill, Jose Freundt -- Rico Hill again -- Yuri Lebedev and

19   others had discussions about making payments to Trevon Gross

20   and took actions to gain control of the board at HOPE FCU after

21   Trevon Gross told them on November 24th, 2014 that he no longer

22   wanted to associate with them.  You should disregard this

23   evidence as against Mr. Gross as it is not offered against

24   him."  That's the request at this time?

25           MS. SANTILLO:  Yes, your Honor.

 1              THE COURT:  All right.  So I deny that request at this

 2     time.  I had understood you to be asking for something

 3     different.  I will wait and see what the continuing evidence is

 4     under the Gainey rule, and I would not give that instruction at

 5     this time.

 6              MS. SANTILLO:  Can I have whatever you were going to

 7     give me?  I'm just kidding.

 8              MR. KLINGEMAN:  Can I make a request?

 9              THE COURT:  Who is talking?

10              MR. KLINGEMAN:  I want to talk on behalf of Mr. Gross.

11     I have the utmost respect for my colleague, but the clock is

12     ticking --

13              THE COURT:  Yes.

14              MR. KLINGEMAN:  -- and I would suggest we take this

15     up --

16              THE COURT:  It sounds like we can, yes.

17              So as I said, I understood something different.  I've

18     ruled on what the request is now, and unless there's anything

19     else I need to take up for this segment -- is there?  No.

20     We'll bring in the jury.  Thank you.

21              MR. NOBLE:  Judge, we're bringing in the witness.

22              THE COURT:  Thank you.

23              MR. NOBLE:  Sure.

24              (Continued on next page)

25

 1                    (Jury present)

 2                    THE COURT:  Thank you, members of the jury.  We will

 3      continue with the cross examination of Mr. Freundt on behalf of

 4      Mr. Gross.

 5                    Mr. Klingeman, when you're ready.

 6                    MR. KLINGEMAN:  Thank you, your Honor.

 7      BY MR. KLINGEMAN:

 8      Q.  Mr. Freundt, one of the words you used a number of times in

 9      your answers to the questions you've been asked over the last

10      approximately 24 hours has been "trust".

11      A.  Correct.

12      Q.  And it seems like, based on the account you've given, that

13      there was not a lot of trust among the various people you've

14      talked about.

15      A.  Towards the end, yes.  Towards the end.

16      Q.  And when we say "towards the end", we're certainly talking

17      about November, 2014.

18      A.  Correct.

19      Q.  Before and after the November 22nd meeting.

20      A.  Correct.

21      Q.  Seemed like Pastor Gross didn't trust Anthony Murgio.

22      A.  Yes.

23      Q.  Anthony Murgio said on the recording he didn't trust his

24      own father, Michael Murgio.

25      A.  Correct.

1    Q.  You came to mistrust Rico Hill later?

2    A.  Later, yes.

3    Q.  But even before the November 22nd, 2014 meeting, you, at

4    least as of that time, trusted Anthony Murgio, correct?

5    A.  I did.

6    Q.  You knew about his history.

7    A.  Correct.

8    Q.  But nevertheless, you trusted him.

9    A.  Correct.

10   Q.  And fair to say that even before the November 22nd meeting

11   you didn't trust Pastor Gross?

12   A.  That wouldn't be fair.

13   Q.  Well, you had certainly never met him.

14   A.  Correct.  I had no reasons to not trust him, as well as

15   trust him.

16   Q.  I asked you if it was fair, and you said it wouldn't be

17   fair.

18   A.  Correct.

19   Q.  And one of the reasons it wouldn't be fair is you hadn't

20   even met the man in person.

21   A.  Correct.

22   Q.  You had talked to him over the phone.

23   A.  Yes.

24   Q.  You had been on email exchange with him.

25   A.  Correct.

1   Q.  But you had no basis to know him.

2   A.  Correct.

3   Q.  You had no basis to know his character.

4   A.  Correct.

5   Q.  And you had no reason to mistrust him.

6   A.  Correct.

7            MR. KLINGEMAN:  If we could put up Government's

8   Exhibit 4504 in evidence.

9   Q.  Just to orient us, Mr. Freundt, 4504 is a WhatsApp series

10  of chats that, for purposes of the trial, we've entitled "Jose

11  Freundt".

12  A.  Okay.

13  Q.  And I want you to turn to entry 3594.  You read this aloud

14  this morning, right?

15  A.  Yes.

16  Q.  And it's a chat between you and Mr. Murgio.

17  A.  Yes.

18  Q.  Anthony Murgio.

19  A.  Correct.

20  Q.  And Mr. Gross, Pastor Gross, obviously is not on this.

21  A.  Correct.

22  Q.  And the date of this chat?

23  A.  November 11th.

24  Q.  November 19th?

25  A.  I'm sorry, November 19th.

```
 1   Q.   2014.

 2   A.   Right.

 3   Q.   In other words, three days before -- excuse me -- two days

 4   before you went to New Jersey.

 5   A.   Correct.

 6   Q.   Two days before the Friday meeting at the credit union.

 7   A.   Correct.

 8   Q.   Friday before you ever laid eyes on Pastor Gross in person.

 9   A.   Correct.

10   Q.   And what do you say in this chat?

11   A.   "Can't f-ing trust anyone anywhere.  Not even a pastor."

12   Q.   Referring to Mr. Gross.

13   A.   Correct.

14   Q.   So it is fair to say that two days before you ever met the

15   man, you didn't trust him?

16   A.   I didn't know the man.  That was in reference to Anthony's

17   mistrust of him.

18   Q.   And the things Anthony Murgio told you about Pastor Gross.

19   A.   Correct.

20   Q.   That may or may not have been true when he told you.

21              THE COURT:  Mr. Klingeman, I can't hear you.

22              MR. KLINGEMAN:  Sorry, Judge.

23              Sorry, everybody.

24   Q.   They may have been things he told you about Pastor Gross.

25   A.   Correct.
```

 1    Q.   But you trusted Mr. Murgio?

 2    A.   I did.

 3    Q.   And at that time you believed him.

 4    A.   Correct.

 5    Q.   And among the things he told you in this very chat was that

 6    Mr. Gross was accelerating aggressively the growth of the

 7    credit union, and Mr. Murgio was trying to put the brakes on.

 8    A.   He did mention that.

 9    Q.   That's what Mr. Murgio told you.

10    A.   Correct.

11    Q.   That it was Mr. Gross, Pastor Gross, who had his foot on

12    the accelerator, so to speak.

13    A.   Correct.

14    Q.   And Mr. Murgio was the one saying "slow down".

15    A.   Correct.

16    Q.   And you now know that is 180 degrees false, correct?

17    A.   I believe I knew that then.

18    Q.   What?

19    A.   I believe I knew that then.

20    Q.   Even when Mr. Murgio was telling you, you knew it was

21    false?

22    A.   Well, from conversations with Mr. Gross, every time he

23    expressed that we were going too fast.

24    Q.   And you agreed with Mr. Gross.

25    A.   Of course.

1    Q.  Not Mr. Murgio.

2    A.  Correct.

3    Q.  But when Mr. Murgio was making these assertions to you in

4    the chat that it was him, Mr. Murgio, who was putting in the

5    brakes on things, you didn't disagree with him, challenge him,

6    take issue with him, correct?

7    A.  Correct.

8              (Continued on next page)

 1   BY MR. KLINGEMAN:

 2   Q.  And then, in addition to saying in the chat that you didn't

 3   or you couldn't trust Pastor Gross, you also accused him of

 4   being greedy, correct?

 5   A.  I don't remember that.

 6   Q.  Let's go to entry 3560 that, Mr. Freundt, you read earlier.

 7   Do you see that?

 8   A.  3560?  Yes.

 9   Q.  That's an entry dated November 19th, 2014?

10   A.  Yes.

11   Q.  Again, two days before even meeting Mr. Gross in person?

12   A.  Correct.

13   Q.  And what do you say to Mr. Murgio?

14   A.  I say, "F, dude.  You need to make a move and do it sooner

15   rather than later.  You should know what greed does to people."

16   Q.  When you referred to "what greed does to people," you're

17   talking about Mr. Gross being greedy?

18   A.  I'm talking about the greed that Adam Corey had when he

19   lost his business.

20   Q.  So you would now assert that this conversation is about

21   Adam Corey?

22   A.  The reference to greed that I had was in reference to he

23   knows what greed does to people.

24   Q.  Well, I'm not sure we're disagreeing, so let me ask you a

25   question.

 1            You say, quote, you should know what greed does to

 2   people, unquote.  Do you see that?

 3   A.  Yes.

 4   Q.  That's a comment addressed to Mr. Murgio?

 5   A.  Correct.

 6   Q.  And you are addressing his allegation that Mr. Corey way

 7   back when had been greedy?

 8   A.  I am saying that he should know what greed does because

 9   that's what happened with Mr. Corey.

10   Q.  You're saying he should be concerned about what greed does

11   now in this situation, too?

12   A.  I said -- my point was that he should move quickly in case

13   that Mr. Grossman was greedy.  Mr. Gross, I'm sorry, was

14   greedy.

15   Q.  Did you have any basis, at the time that you made this

16   comment, that Mr. Gross was greedy?

17   A.  Just the conversations of Anthony.

18   Q.  With Anthony?

19   A.  Correct.

20   Q.  Do you have any basis, as you sit here today, to call

21   Mr. Gross greedy?

22   A.  I don't know if greedy would be the word I use.

23   Q.  So you say at this time, you're listening to Anthony

24   Murgio?

25   A.  Correct.

 1  Q.  And, in fact, Mr. Gross and you had had some kind of -- had

 2  established some kind of relationship when you were still in

 3  Florida and he was in New Jersey, and you were communicating in

 4  the months before these conversations, correct?

 5  A.  Correct.

 6  Q.  He gave you some advice, did he not?

 7  A.  As far as?

 8  Q.  Whether to get further involved with the credit union.

 9  A.  Yes.

10  Q.  You testified a little bit about that this morning, right?

11  A.  Correct.

12          MR. KLINGEMAN:  Could we go to 3421.

13  Q.  3421 is a chat entry from you to Anthony Murgio, right?

14  A.  Yes.

15  Q.  And you write, "He asked me today if I was planning on

16  leaving my job to work full time with credit union, and I told

17  him I was thinking about it, but had some concerns, and he told

18  me not to do it."

19  A.  Correct.

20  Q.  And the "he" in that statement is Pastor Gross?

21  A.  Correct.

22  Q.  And Murgio replies with an expletive?

23  A.  Yes.

24  Q.  And then you write in parentheses to Murgio, "Don't repeat

25  this.  I want him to think/be an ally"?

1    A.  Correct.

2    Q.  In other words, you wanted Pastor Gross to think you were

3    his ally?

4    A.  Which, in part, I was, yes, correct.

5    Q.  But, in fact, you weren't?

6    A.  I saw -- I saw eye to eye with him on many of the issues we

7    had.

8    Q.  Well, you're disclosing a confidential communication you

9    had with Pastor Gross, are you not?

10   A.  Which one?  It wasn't --

11   Q.  When he told you not to get involved.

12   A.  It wasn't confidential.

13   Q.  Well, then why did you tell Anthony Murgio not to repeat

14   it?

15   A.  I didn't want him to know that I was relaying the

16   conversations.

17   Q.  Because it was confidential?

18   A.  It wasn't necessarily confidential.

19   Q.  But you didn't want Pastor Gross to know you told Anthony

20   Murgio what Pastor Gross had told you about getting further

21   involved in the credit union?

22   A.  Correct.

23   Q.  But, in fact, in hindsight, Pastor Gross' advice was good

24   advice?

25   A.  Yes.

 1   Q.  Now, when you worked at Coin.mx in the beginning of 2015,

 2   Anthony Murgio told you to lie to the banks with whom or with

 3   which Coin.mx was doing business?

 4   A.  It was a part of the script that we would have to call the

 5   banks.

 6   Q.  Who wrote the script?

 7   A.  I believe it was Anthony Murgio.

 8   Q.  So who told you to lie to the banks?

 9   A.  Anthony Murgio provided the script.

10   Q.  In the time that you worked for him, at any point -- 101

11   Restaurant, HOPE Federal Credit Union, or Coin.mx -- did he

12   tell you to lie about anything else, to your knowledge?

13   A.  Not as a direct order, no.

14   Q.  Sorry?

15   A.  Not as a direct order.

16   Q.  And he never told you to lie about the donation to the Hope

17   Cathedral that you've testified about?

18   A.  To lie to whom?

19   Q.  Anybody.

20   A.  Not that I remember, no.

21   Q.  In other words, Anthony Murgio never told you, Jose

22   Freundt, to lie about the $50,000 donation to the Hope

23   Cathedral?

24   A.  It was never a subject -- it was never a subject of talk

25   or --

1    Q.   Well, you knew about it?

2    A.   I knew about it.

3    Q.   So you learned about it from Anthony Murgio?

4    A.   Correct.

5    Q.   And he never told you, in the course of telling you about

6    it, to lie about it?

7    A.   Correct.

8    Q.   And for that matter, he never told you to lie about the

9    $300,000, or whatever the amount is, that you testified he told

10   you he was arranging to contribute to the Hope Cathedral,

11   correct?

12   A.   Correct.

13   Q.   He never told you, meaning Anthony Murgio never told you,

14   Jose Freundt, to lie about the consulting fees that

15   Collectables Club was paying to Pastor Gross?

16   A.   Correct.

17   Q.   And, needless to say, Pastor Gross never told you to lie

18   about the donation to Hope Cathedral?

19   A.   I never had a discussion with Pastor Gross about that.

20   Q.   About?

21   A.   The donation.

22   Q.   So we can infer from that, he never told you to lie?

23   A.   Correct.

24   Q.   He never told you to lie about the consulting fees that you

25   did discuss with him?

1    A.  Correct.

2    Q.  You were asked some questions yesterday about compliance

3    training at HOPE Federal Credit Union.  Do you remember those

4    questions?

5    A.  Yes.

6    Q.  Did you receive any compliance training while you were

7    preparing to work with or serve on the board of HOPE Federal

8    Credit Union?

9    A.  Not that I remember.

10   Q.  You didn't receive any anti-money laundering training via

11   video?

12   A.  Not that I remember particularly.

13   Q.  You never sat in front of a computer in Florida and looked

14   at training materials through CU South or some other portal?

15   A.  Not that I remember.

16   Q.  But then, again, Mr. Freundt, you were supposed to get very

17   seriously involved with HOPE Federal Credit Union beginning in

18   the late spring/early summer of 2014, right?

19   A.  At the beginning, I was, yes.

20   Q.  But the fact is you didn't?

21   A.  Correct.

22   Q.  And that resulted in some conflict between you and Anthony

23   Murgio?

24   A.  Correct.

25   Q.  He got on your case, so to speak?

 1   A.   Yes.

 2   Q.   He got in your face, so to speak?

 3   A.   Yes.

 4   Q.   In person, by email, and so forth?

 5   A.   Correct.

 6   Q.   And, basically, his accusation was you're not doing what

 7   you said you were going to do, and I need someone to do these

 8   things?

 9   A.   Correct.

10   Q.   And he said to you, if you're not going to do it, tell me,

11   and I'll get somebody else?

12   A.   Correct.

13   Q.   Now, at some point, did you start to get more involved in

14   the activities of HOPE Federal Credit Union?

15   A.   Not really.

16   Q.   But you did show up in November for the meeting?

17   A.   Correct.

18   Q.   And the day before you showed up for the NCUA examination

19   on Friday, November 22nd?

20   A.   Correct.

21   Q.   Although you didn't participate in that in any way?

22   A.   No.

23   Q.   As you sit here today, you really didn't do anything for

24   HOPE Federal Credit Union?

25   A.   Not really.

1   Q.  Now, when you were in that period of time -- say, late

2   spring/early summer 2014 and, say, November 22nd, 2014 --

3   getting -- purporting to get more involved in the HOPE Federal

4   Credit Union, you had heard of Collectables Club?

5   A.  Correct.

6   Q.  And you had heard of Coin.mx?

7   A.  Correct.

8   Q.  You weren't working for Coin.mx at the time?

9   A.  Correct.

10  Q.  And at the time, 2014, you thought they were two different

11  things?

12  A.  Yes.

13  Q.  Separate things?

14  A.  Correct.

15  Q.  Do you know what the term "fiduciary duty" means?

16  A.  Not particularly, no.

17          MR. KLINGEMAN:  Could we see Government's 1176 and

18  1193 side by side, if possible.

19          They're in evidence, your Honor.

20          THE COURT:  1193?

21          MR. KLINGEMAN:  I'm sorry, your Honor.  The first is

22  1176, and the second is 1193.

23          THE COURT:  Did 1193 come in today?

24          MR. KLINGEMAN:  No.  I don't know precisely when they

25  came in evidence, but the government displayed these exhibits

1   together to the witness yesterday.

2            THE COURT:  Oh, it did.

3            MR. KLINGEMAN:  Without objection.

4            THE COURT:  It came in.  Thank you.

5   BY MR. KLINGEMAN:

6   Q.  You remember yesterday afternoon, Mr. Freundt, being shown

7   these two exhibits?

8   A.  Yes.

9   Q.  The first one is an email from Anthony Murgio to Shoula

10  Cohen at Kapital Inc. and Jose Freundt, correct?

11  A.  Correct.

12  Q.  And it's a direction from Murgio to you to share the

13  financials of HOPE Federal Credit Union with Kapcharge, right?

14  A.  Yes.

15  Q.  Then the second email, 1193, if we could, is an email from

16  you to shoulacohen@kapitalinc.com, right?

17  A.  Yes.

18  Q.  Copied to Anthony Murgio?

19  A.  Correct.

20  Q.  With an attachment of the financials of the HOPE Federal

21  Credit Union?

22  A.  Correct.

23  Q.  Along with a password of some kind to access the

24  financials?

25  A.  Correct.

1    Q.   On the first email, 1176, is Pastor Gross on the email?

2    A.   No.

3    Q.   And on the second email, 1193, is Pastor Gross on the

4    email?

5    A.   No.

6    Q.   You told us that you didn't meet Pastor Gross in person

7    until November 21st, 2014?

8    A.   Correct.

9    Q.   You'd had some limited interaction with him via phone

10   before then?

11   A.   Yes.

12   Q.   Did you dial into the various board meetings?

13   A.   Yes.

14   Q.   Do you remember how many?

15   A.   No.

16   Q.   Do you remember when?

17   A.   When --

18   Q.   Beginning when?

19   A.   May of 2014.

20   Q.   You don't sound very sure.

21   A.   I wouldn't remember the dates but, it was when we started

22   is all.

23   Q.   But when you dialed in, you would hear him?

24   A.   Yes.

25   Q.   Hear him?

 1    A.   Yes.

 2    Q.   He would preside over the meetings as the chairperson?

 3    A.   Yes.

 4    Q.   And then, of course, you've testified about various emails

 5    you were on with him, right?

 6    A.   Correct.

 7    Q.   What did he know about you in terms of the information you

 8    supplied to HOPE Federal Credit Union about yourself?

 9    A.   He knew my resume.

10         MR. KLINGEMAN:   Could we call up Government's 6136-7

11    in evidence.

12    Q.   Mr. Freundt, I'm putting up on the screen your resume that

13    you submitted to HOPE Federal Credit Union.

14    A.   Correct.

15    Q.   You recognize it?

16    A.   Yes.

17    Q.   It's a three-page document?

18    A.   Yes.

19    Q.   And it lists all the experience and achievements that you

20    had at least as of that time?

21    A.   Correct.

22    Q.   I just want to draw your attention to the top where it

23    indicates the address.

24    A.   Yes.

25    Q.   And that indicates the Tallahassee, Florida address?

 1   A.  Correct.

 2   Q.  It doesn't have a Jersey address?

 3   A.  No.

 4   Q.  You never represented to anyone that you had a Jersey

 5   address?

 6   A.  No.

 7   Q.  And no one ever told you to lie that you had a Jersey

 8   address?

 9   A.  No.

10   Q.  Then it indicates, on the second page, 6136-8, the bottom

11   third, that you served as the branch manager at Sunbelt Credit

12   Union, Tallahassee, Florida.  Do you see that?

13   A.  Yes.

14   Q.  Now, did you receive compliance training when you were at

15   Sunbelt?

16   A.  No.

17   Q.  And Sunbelt is a pretty well-known bank down in Florida?

18   A.  I believe you're referring to SunTrust.

19   Q.  Okay.  Well, it says Sunbelt here.

20   A.  That is a different company.

21   Q.  Well, can you clear that up for us?  Why does it say

22   Sunbelt Credit Union on your resume?

23   A.  Because I also worked at Sunbelt Credit.

24   Q.  That's a different entity than SunTrust?

25   A.  Correct.

1  Q.  And is Sunbelt, in fact, a credit union?

2  A.  It is not.

3  Q.  So what is it?

4  A.  It's a credit company.

5  Q.  So why does it say Sunbelt Credit Union on your resume that

6  you submitted to HOPE Federal Credit Union to establish your

7  bona fides?

8  A.  Anthony put that there.

9  Q.  Did you know he put that there?

10  A.  After the fact.

11  Q.  When did you learn that?

12  A.  Recently.  Recently.

13  Q.  Oh, you mean since the end of Coin.mx, shall we say?

14  A.  Yes.

15  Q.  You did not know at the time, in 2014, that Anthony Murgio

16  doctored your resume?

17  A.  Correct.

18  Q.  To show credit union experience?

19  A.  Correct.

20  Q.  That you didn't really have?

21  A.  Correct.

22  Q.  And is SunTrust on this resume?

23  A.  No.

24  Q.  But that's appearance you actually had?

25  A.  Correct.

1   Q.  I take it when you worked for Sunbelt Credit company, you

2   didn't receive compliance training?

3   A.  It wasn't a bank.

4   Q.  But it was some kind of financial institution?

5   A.  It was a lending institution.  It was a lending

6   institution.

7   Q.  You received no compliance training there?

8   A.  Not that I remember, no.

9           MR. KLINGEMAN:  All right.  Well, I hate to do this,

10  but let's go back to, briefly, the transcript of the

11  November 22nd, 2014 conversation marked in evidence as

12  Government's 2506-T.

13  Q.  I just have a few questions, Mr. Freundt, and we're not

14  going to belabor this.

15          MR. KLINGEMAN:  If we could go to page 8, and if we

16  could highlight the top third.

17  Q.  You see where Mr. Gross says, towards the middle of the

18  page, "Have we not been talking about this for the last two

19  months?"

20  A.  Yes.

21  Q.  Do you see that?

22  A.  Yes.

23  Q.  You were present when he was talking?

24  A.  Correct.

25  Q.  You actually saw him live and in person when he uttered

1   these words, correct?

2   A.   Yes.

3   Q.   And we've had the benefit of listening to the recording.

4   You actually were in the room?

5   A.   Yes.

6   Q.   And he was speaking quite emphatically, was he not?

7   A.   Yes.

8   Q.   He wasn't yelling, but he certainly was speaking in a loud,

9   clear voice?

10  A.   Yes.

11  Q.   And when he says, "Have we not been talking about this for

12  the last two months," he's talking about the issues that have

13  not been addressed properly at the HOPE Federal Credit Union,

14  correct?

15  A.   Correct.

16  Q.   Field of membership issue, right?

17  A.   Yes.

18  Q.   The ACH processing issue?

19  A.   Correct.

20  Q.   The various compliance issues you've identified?

21  A.   Yes.

22  Q.   Who was he blaming for that?

23  A.   Anthony, I believe.

24          MR. KLINGEMAN:   Could we go to page 16.

25  Q.   At the very bottom of page 16, Pastor Gross says to the

H2SKLEF7                      Freundt - Gross

1    group, "I think if we're going to be honest, we have been

2    negligent."  Do you see that?

3    A.  Yes.

4    Q.  He's acknowledging that the things I just listed have not

5    been addressed?

6    A.  Correct.

7    Q.  Even though he and others have been talking about it for

8    two months?

9    A.  Yes.

10   Q.  Including you?

11   A.  At that point, yes.

12   Q.  Well, as far back as September, you, Mr. Freundt, were

13   ringing the bell on this issue, correct?

14   A.  Some issues, yes.

15   Q.  Well, you were taking Pastor Gross' side in terms of the

16   pace of growth?

17   A.  Yes.

18   Q.  In terms of getting personnel in place?

19   A.  Yes.

20   Q.  In terms of making sure that there was an infrastructure in

21   place, a real infrastructure, to make this credit union

22   function?

23   A.  Yes.

24   Q.  To make it compliant?

25   A.  Yes.

```
 1  Q.  And to make it successful?

 2  A.  Correct.

 3  Q.  That was your goal?

 4  A.  Yes.

 5  Q.  Your agenda?

 6  A.  Yes.

 7  Q.  And it was Pastor Gross' as well?

 8  A.  To my understanding, yes.

 9          MR. KLINGEMAN:  Go to page 26, please.  And if we

10  could go to the bottom third, please.

11  Q.  In fact, at the very last entry, he even says explicitly

12  what we just talked about, correct?

13  A.  Correct.

14  Q.  "We have to show that we have an infrastructure, not that

15  we're borrowing an infrastructure.  We got to show we have an

16  infrastructure not from somebody else's payroll."  You see

17  that?

18  A.  Yes.

19  Q.  He's not talking about faking his way through this, right?

20  A.  Correct.

21  Q.  He's talking about really doing what needs to be done?

22  A.  Yes.

23  Q.  And this is on November 22nd, 2014?

24  A.  I was at the meeting, yes.

25  Q.  You were asked twice -- and I listened very carefully --
```

1   once yesterday and once this morning, about the follow-up to

2   this meeting that you and the other Collectables Club people

3   had at Anthony Murgio's aunt's house?

4   A.  Correct.

5   Q.  In Lakewood, right?

6   A.  Yes.

7   Q.  And one of the issues that was taken up by your group,

8   outside the presence of Pastor Gross, was whether people were

9   going to move to the area and try and establish themselves in

10  the so-called field of membership, correct?

11  A.  Well, Pastor Gross knew about those people.

12  Q.  Of course.

13  A.  Yes.

14  Q.  That's one of the things he's talking about in this meeting

15  as not being addressed properly, right?

16  A.  Correct.

17  Q.  But when you left -- when I say "you," I'm talking about

18  you, and the Murgios, father and son, Ellrich, Rico Hill,

19  right?

20  A.  Yes.

21  Q.  You went to Michael Murgio's sister's house?

22  A.  Correct.

23  Q.  Anthony Murgio's aunt's house?

24  A.  Uh-huh.

25  Q.  And you talked about how to bring the credit union into

1    compliance, right?

2    A.  We had a conversation, yes.

3    Q.  And one of the issues that you mentioned, both yesterday

4    and again today, was about people moving to New Jersey?

5    A.  Rico and Chad -- and Mark were supposed to stay in

6    New Jersey.

7    Q.  Okay.  Well, that's the question you weren't asked, so let

8    me ask it.  Who did you talk about moving to New Jersey on

9    November 22nd, 2014?

10   A.  Rico and Mark were supposed to move there.

11   Q.  And what about Chad?

12   A.  Chad Lio?

13   Q.  You just mentioned him, I thought.

14   A.  No.  Rico and Mark.

15   Q.  What about you?

16   A.  I was not going to move in.

17   Q.  Not at all?

18   A.  No.  I considered -- I told Anthony that I would consider

19   coming at three months at a time maybe.

20   Q.  Okay.  But you considered at least coming up here

21   part-time?

22   A.  Correct.

23            MR. KLINGEMAN:  If we could go to page 31.

24   Q.  Now, you mentioned in previous testimony that one of the

25   financial aspects of this conversation was the $50,000

1   donation, correct?

2   A.  Correct.

3   Q.  And on page 31 and then again on page 34, Pastor Gross

4   makes it clear that that donation is going to the church,

5   correct?

6   A.  Correct.

7   Q.  Hope Cathedral?

8   A.  Correct.

9   Q.  It's not going to him personally?

10  A.  Correct.

11          MR. KLINGEMAN:  And then if we could just go to page

12  39.  And if we could highlight the second to last Freundt entry

13  at the bottom of the page.

14  Q.  You say something here that is ironic, correct?

15  A.  Yes.

16  Q.  You say, in front of Murgio, to Gross, to Pastor Gross,

17  "Let me give you something that would help.  He trusts me.  I

18  hope he trusts me.  There was a point where anytime we had a

19  conversation, he would record it to cover his ass from me.  So

20  it ain't personal."

21          Do you see that?

22  A.  Yes.

23  Q.  And the "he" you're talking about is Anthony Murgio?

24  A.  Correct.

25  Q.  Who's standing feet from you, right?

 1   A.  It was in the conversation.

 2   Q.  And you're trying to assure Pastor Gross that this isn't

 3   personal, this is business?

 4   A.  Correct.

 5   Q.  The number of people -- and what you don't know at the time

 6   is that Anthony Murgio is actually recording you again?

 7   A.  Correct.

 8          MR. KLINGEMAN:  You can take it down.  Thank you,

 9   Michael.

10   Q.  Now, that $50,000 that was going to the church, you

11   understood was for the purpose of helping the church establish

12   a new, separate credit union, correct?

13   A.  No.

14   Q.  You hadn't been told that by Pastor Gross in an email?

15   A.  That was a separate amount.

16   Q.  Say again?

17   A.  That was separate from that.

18   Q.  Okay.  So, it's your testimony that the $50,000 that you're

19   discussing on November 22nd, 2014, is not the same $50,000 that

20   had been discussed earlier in the summer to go to the church

21   for the purpose of starting a new credit union?

22   A.  Correct.

23   Q.  It's a separate $50,000?

24   A.  That 50,000 discussion was part of the original $300,000

25   donation.

 1   Q.  So you're saying that deal was canceled?

 2   A.  Which one?

 3   Q.  The original deal.

 4   A.  No.

 5   Q.  So how were you distinguishing between the 50,000 in

 6   November and the 50,000 in the summertime?

 7   A.  Because they were separate issues.  It was made clear that

 8   those were separate amounts, separate issues.

 9   Q.  So there were going to be two payments of $50,000?

10   A.  There was going to be multiple payments of 50,000 to cover

11   the 300,000.

12   Q.  And how do you know that?

13   A.  That was what Anthony said.

14   Q.  That's what Anthony said to you?

15   A.  Correct.

16   Q.  Do you have any emails with Anthony that show that?

17   A.  No.

18   Q.  Any WhatsApp exchanges with Anthony that show that?

19   A.  No.

20   Q.  And any recordings with Anthony that show that?

21   A.  No.

22   Q.  And it was after this November 22nd, 2014 meeting that you

23   all tried various methods to regain control of the credit

24   union?

25   A.  We explored methods, yes.

 1   Q.  And you sent notes to Pastor Gross?

 2   A.  We sent emails.

 3   Q.  Emails.  Okay.

 4        You consulted with attorneys?

 5   A.  Yes.

 6   Q.  But he took the position that you all were not proper

 7   members because you were not qualified to be members?

 8   A.  Correct.

 9   Q.  You were not in the field of membership?

10   A.  Correct.

11   Q.  And he refused to convene the special meeting that you all

12   demanded?

13   A.  Correct.

14   Q.  And that was the last time you ever talked to him?

15   A.  Yes.

16        MR. KLINGEMAN:  Nothing further.

17        THE COURT:  All right.

18        Mr. Noble.

19        MR. NOBLE:  Thank you, Judge.

20        Mr. Chang-Frieden, could we bring up 3504-14 in

21   evidence and publish that for the jury.

22   REDIRECT EXAMINATION

23   BY MR. NOBLE:

24   Q.  While this is coming up, Mr. Freundt, do you remember being

25   asked questions by Mr. Creizman about your cooperation

 1   agreement with the government?

 2   A.   Yes.

 3   Q.   Is that what we're looking at here on the screen?

 4   A.   Yes.

 5   Q.   Do you remember being asked some questions on cross about

 6   the money that you withdrew from the Coin.mx bank account at

 7   the time of the takedown?

 8   A.   Yes.

 9   Q.   And do you remember Mr. Creizman asking you whether you had

10   given up any of that money to the government?

11   A.   Yes.

12            MR. NOBLE:   Can we scroll down.   Keep going to at

13   least -- stop.   Sorry.

14   Q.   Do you see this paragraph that begins, "The defendant

15   furthermore admits the forfeiture allegations"?

16   A.   Yes.

17   Q.   Do you know what forfeiture is?

18   A.   Yes.

19   Q.   What does forfeiture mean?

20   A.   I have to give up.

21   Q.   What do you have to give up?

22   A.   Whatever the Court decides what are the gains from the

23   illegal activities.

24   Q.   And whatever you have to give up is spelled out here in

25   your cooperation agreement, correct?

H2SKLEF3                        Freundt - Redirect

```
 1   A.  Correct.

 2   Q.  It states, "Any property, real or personal, involved in the

 3   offenses or," later on, "any property, real or personal, which

 4   constitutes, or is derived from, the proceeds traceable to the

 5   offenses."  Do you see that?

 6   A.  Yes.

 7   Q.  So what is your understanding as to what will happen at the

 8   time of sentencing?

 9   A.  The Court will determine how much money I have to return.

10           MR. NOBLE:  You can take that down.

11   Q.  Now, you were asked some questions by both Mr. Creizman and

12   Mr. Klingeman about your understanding of the crimes that you

13   committed.

14   A.  Correct.

15   Q.  Do you remember that, on cross-examination?

16   A.  Yes.

17   Q.  I want to first ask you some questions about Coin.mx.

18           When you were working at Coin.mx, did you know that

19   the calls with the banks were wrong in any way?

20   A.  They were -- I thought they were unethical, yes.

21   Q.  You thought they were unethical?

22   A.  Correct.

23   Q.  What was unethical about the calls that you were making to

24   the banks?

25   A.  Omitting some information, specifically the nature of the
```

H2SKLEF5                Freundt - Redirect

1   purchases.

2   Q.  And why were you omitting the specific nature of the

3   purposes in those calls with the banks?

4   A.  Because the banks wouldn't allow Bitcoin transactions.

5   Q.  Was it fair to say that you lied to the banks in order to

6   get the banks to approve the transactions?

7   A.  Yes.

8   Q.  What did those transactions do with respect to Coin.mx's

9   profitability?

10  A.  That was the source of revenue.

11  Q.  For Coin.mx?

12  A.  Correct.

13  Q.  Now, at that time, did you know that that constituted wire

14  fraud?

15  A.  No.

16  Q.  Did you know it constituted bank fraud?

17  A.  No.

18  Q.  Were you familiar with those provisions of federal law, at

19  the time?

20  A.  No.

21  Q.  But you were aware that what you were doing was wrong?

22  A.  Correct.

23  Q.  Now, you were also asked some questions about the licensing

24  requirements for Coin.mx.  Do you remember that?

25  A.  Yes.

1   Q.  Did you know, at the time that you were working at Coin.mx,

2   that it was not properly licensed?

3   A.  I knew it wasn't licensed.

4   Q.  Now, did you know that that was a violation of a federal

5   law, at that time?

6   A.  The explanation that was given to me is what I believed.

7   So I believed we were in compliance.

8   Q.  What do you mean -- who gave you that explanation?

9   A.  Anthony Murgio.

10  Q.  Did you later learn that there's a law prohibiting

11  money-transmitting companies from operating without a license?

12  A.  Yes.

13  Q.  And you knew, at the time, you didn't have a license?

14  A.  Correct.

15  Q.  But were you familiar with that specific provision of

16  federal law, at the time?

17  A.  No.

18  Q.  Now, you were also asked a lot of questions about the

19  bribery that you engaged in at HOPE Federal Credit Union,

20  correct?

21  A.  Yes.

22  Q.  And I believe Mr. Klingeman asked you a number of different

23  hypotheticals that whether, in your mind, they constituted

24  bribery, correct?

25  A.  Correct.

1   Q.   What about your involvement with HOPE Federal Credit Union

2   and the payments that were made to Trevon Gross or his church

3   constituted bribery, in your mind?

4   A.   The fact that without the payments, certain things were not

5   going to happen.

6   Q.   Explain what you mean by that.  What was going to happen by

7   making the payments?

8   A.   We were going to be put on the chair -- as board members,

9   we were going to be elected, we were going to take control of

10  the credit union.

11  Q.   In your mind, would Pastor Gross have given Anthony Murgio

12  and you guys control of the boards but for those payments?

13            MR. KLINGEMAN:  Objection.

14            THE COURT:  Sustained.

15  Q.   What, if any, influence did you believe the payments had on

16  Pastor Gross' decision-making?

17            MR. KLINGEMAN:  Objection.

18            THE COURT:  Sustained.

19  Q.   Why did you and Anthony Murgio and the others involved in

20  this, including Mr. Lebedev, make payments to Pastor Gross'

21  church?

22  A.   To be able to get on the --

23            MR. CREIZMAN:  Objection.  He said Mr. Lebedev.

24            THE COURT:  Overruled.

25            You may answer.

1   A.   Would you repeat the question, please?

2   Q.   Sure.  What did you think was going to happen by making the

3   payments?  What did you and the others believe would happen by

4   making the payments to Pastor Gross or his church?

5   A.   Well, I knew that we were going to be placed on the ballots

6   and that we were going to be the only ones.

7   Q.   Okay.  I want to direct your attention specifically to

8   November of 2014, the meeting at the credit union.

9   A.   Yes.

10  Q.   What did you think was going to happen after the $50,000

11  payment that you and Mr. Lebedev and Mr. Murgio and others

12  agreed to make to Pastor Gross' church?

13  A.   The remaining board members were going to resign.

14  Q.   In the WhatsApp conversation, you described that

15  arrangement as bribery; is that right?

16  A.   I described everything that was happening as bribery.

17  Q.   And at that point in time, when you were having that

18  WhatsApp conversation, when you used the word "bribery," had

19  you had any contact with a lawyer from the government?

20  A.   No.

21  Q.   Had you had any contact with any of the agents from the

22  government?

23  A.   No.

24  Q.   So is it fair to say you used the word "bribery" on your

25  own in that conversation?

1    A.   Yes.

2    Q.   Why did you use the word "bribery"?

3    A.   Because at that point, I realized that it was bribery.

4    Q.   Now, you were also asked some questions about consulting

5    lawyers about the deal with HOPE Federal Credit Union, correct?

6    A.   Correct.

7    Q.   Do you know whether Anthony Murgio ever disclosed all the

8    details of the donations to any lawyer?

9    A.   I don't know that.

10   Q.   Did Anthony Murgio ever tell you that a lawyer had

11   quote-unquote blessed the donations that were being made to

12   Pastor Gross' church in connection with this deal?

13   A.   I don't remember him saying that or no.

14   Q.   So at the time --

15            THE COURT:  I'm sorry?

16            MR. KLINGEMAN:  Objection to the last question.

17            It's too late, so I withdraw it.

18            THE COURT:  Okay.

19            MR. NOBLE:  Does the answer stand?

20            THE COURT:  The objection was withdrawn.

21            MR. NOBLE:  Okay.

22   BY MR. NOBLE:

23   Q.   Now, I want to ask you about your knowledge of the

24   illegality of bribery, okay?

25   A.   Okay.

1   Q.  At the time, did you know whether there was any specific

2   federal statute that prohibited bribing an officer of a

3   financial institution?

4   A.  No.

5   Q.  And did you think that you were involved -- did you think

6   that there was anything wrong about the bribery at the time?

7   A.  Wrong?  Yes.  Illegal?  No.

8               MR. KLINGEMAN:  Objection.

9               THE COURT:  Just a moment.

10              MR. KLINGEMAN:  Objection.

11              I'd like to be heard, if necessary.

12              THE COURT:  All right, I'll hear you.  Sidebar.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1                    (At the sidebar)

2          MR. KLINGEMAN:  Your Honor, from the 3500 material

3     that has been produced for this witness, I anticipate the

4     answer to the question he will give is that he perceived that

5     there was something either, quote, unethical or, quote, or,

6     quote, immoral, unquote, but not, quote, illegal, unquote,

7     about the donation transaction.  And I object to him giving an

8     opinion about the ethics or morality of the conduct, on

9     relevance grounds, particularly since he couched each of those

10    assertions by saying he did not believe the conduct to be

11    illegal.

12          As I forecast in the proffer, before the witness came

13    back from the lunch break, the issue of specific intent is

14    lurking large in this particular aspect of the case.  And I

15    don't want the jury to be confused that something that's either

16    unethical or immoral, by itself, establishes a criminal

17    character or, more precisely, a corrupt character.  Something

18    obviously can be criminal and immoral but something can also be

19    immoral and not criminal.  And I think this traverses that line

20    in a confusing way, and I think the testimony should be barred.

21          MR. NOBLE:  Judge, I think it's fair redirect, to ask

22    the question what his understanding was of whether he was

23    involved in something wrongful or not wrongful at the time.

24    It's also fair to ask whether he had an understanding of

25    whether there was a specific federal statute that prohibited

 1  this, which I think he knew it was wrong -- that's what he

 2  would say -- he knew it was wrong, he knew it was unethical, he

 3  knew it was immoral, but he didn't know there was a specific

 4  federal statute that prohibited it.  That's what I was trying

 5  to clean up on redirect.

 6          MR. KLINGEMAN:  The question was not whether he knew

 7  it was a specific federal statute, your Honor.  The question is

 8  whether he knew it was legal, as opposed to immoral or

 9  unethical; and, therefore, I would continue to object.

10          THE COURT:  Let me just look at the question.

11          MR. NOBLE:  Sure.

12          THE COURT:  You did ask whether he knew there was a

13  specific federal statute.  That was answered.  And then you

14  said, then the next question, which drew the objection was:

15  Did you know whether this thing that you were involved in was

16  illegal?  So you seem to be asking something different.

17          MR. NOBLE:  I think I asked:  Was there anything wrong

18  about the bribery?  That's what the transcript says.  That's

19  what I intended to ask.

20          THE COURT:  So that's the basis for the objection.

21  You're asking about the morality of it.

22          MR. NOBLE:  Asking whether he understood that his

23  conduct was wrongful at the time in some way --

24          THE COURT:  I'll sustain the objection.

25          MR. NOBLE:  Okay.  (Continued on next page)

 1                (In open court)

 2                THE COURT:  The objection is sustained.  The jury will

 3     disregard the last question and answer.

 4     BY MR. NOBLE:

 5     Q.  Mr. Freundt, in that WhatsApp chat, where you used the word

 6     "bribery" -- do you remember that?

 7     A.  Yes.

 8     Q.  -- why did you use the word "bribery" to describe the

 9     conduct?

10     A.  Because I believed that's what we were engaging in.

11     Q.  Did you know what you were doing -- were you aware that

12     that's what you were doing at the time, that it was bribery?

13                MR. KLINGEMAN:  Objection; I thought I heard the

14     question.  I misheard the question, so I'd like to hear the

15     question before I object.

16                MR. NOBLE:  I said:  Were you aware that what you were

17     doing at the time constituted bribery?

18                MR. KLINGEMAN:  I do not object to that question.

19                THE COURT:  The objection is withdrawn?  Is that

20     right, Mr. Klingeman?

21                MR. KLINGEMAN:  Yes, your Honor, withdrawn.  Sorry.

22                THE COURT:  Thank you.  I couldn't hear.

23                MR. KLINGEMAN:  Sorry.

24                THE COURT:  Go ahead.

25     A.  That day, yes.  On that day, yes.

1   Q.  On that day, yes, you understood that that was bribery?

2   A.  As of that date, yes.

3   Q.  And what was it about that date that you realized that this

4   was -- this was a bribery scheme?

5   A.  I just kind of went back through everything and remembered

6   all the conversations, all the emails and everything, and the

7   fact that they wanted to send more money to drive everything.

8   So, to me, money was a driving factor in that.

9   Q.  Did you have any conversations with Trevon Gross that day,

10  or around that time, that influenced your views of whether this

11  was bribery or not?

12  A.  Well, we had a conversation on the phone where he asked me

13  to send the money, both the 50,000 and the $6,000.

14  Q.  And how, if at all, did that conversation affect your views

15  of whether this was bribery?

16  A.  It made me realize that he wanted money for everything.

17  Q.  And I believe Mr. Klingeman asked you on cross-examination

18  whether "greedy" was the word that you would describe Mr. Gross

19  with.  Do you remember that?

20  A.  Yes.

21  Q.  You said you weren't sure if it would be the word,

22  "greedy"?

23  A.  Correct.

24  Q.  After that phone call that you had with Mr. Gross, what

25  word would you describe -- what word would you use to describe

1   Mr. Gross' conduct?

2   A.  "Deceitful."

3   Q.  You were asked some questions by Mr. Klingeman, I believe,

4   and possibly Mr. Creizman, about Ricardo Hill and his possible

5   involvement in the identity theft ring.  Do you remember that?

6   A.  Yes.

7   Q.  I believe you testified that you told the Secret Service

8   agent that you believe Mr. Hill may have been involved?

9   A.  Yes.

10  Q.  Do you know what, if any, outcome there was to that

11  investigation of Mr. Hill?

12  A.  No.

13  Q.  One way or the other?

14  A.  I don't know what happened.

15  Q.  Did you ever find any proof that Mr. Hill was involved in

16  that conduct?

17  A.  Not direct proof, no.

18            MR. NOBLE:  No further questions.

19            THE COURT:  All right, thank you.

20            Mr. Creizman?

21            MR. KLINGEMAN:  You go first.

22            MR. CREIZMAN:  Okay.

23            THE COURT:  When you're ready.

24            MR. CREIZMAN:  Thank you.

25

1    RECROSS EXAMINATION

2    BY MR. CREIZMAN:

3    Q.  We can agree lying is wrong, right?

4    A.  Yes.

5    Q.  But you don't necessarily think that lying is unlawful,

6    correct?

7    A.  Correct.

8    Q.  And when you lied to the banks about the nature of the

9    Bitcoin transactions, you did not believe you were stealing

10   from those banks, correct?

11   A.  I did not believe I was committing a crime, no.  Or

12   stealing, I'm sorry.

13   Q.  All right.  And it's not a matter of whether you're a

14   lawyer or not; you did not believe you were engaged in some

15   kind of criminal activity, correct?

16   A.  Correct.

17   Q.  Now, we talked about proffer agreements, correct?

18   A.  Yes.

19   Q.  And under the proffer agreement that you signed, it

20   required you to tell the truth, correct?

21   A.  Correct.

22   Q.  And you were warned, each time you met with the government,

23   that if you lied, you could be prosecuted for perjury or

24   obstruction of justice?

25   A.  I wouldn't say it was each time, but I was told, yes.

1   Q.   And there was an agreement that you signed that did say

2   that, correct?

3   A.   Correct.

4   Q.   Now, on April 18th, 2016, did you or did you not tell the

5   government that you had mentioned the word "bribery" in your

6   texts but you did not see the payments to Pastor Gross as an

7   actual bribe at the time?

8   A.   I was referring to the $6,000.

9   Q.   You were referring to the $6,000?

10  A.   Correct.

11  Q.   You weren't referring to the $50,000?

12  A.   No.

13  Q.   So you believed the $50,000 was a bribe -- is that your

14  testimony -- but not the $6,000?

15  A.   Correct.  At that point, if I remember the context of the

16  conversation, they were saying that I facilitated the transfer

17  of $6,000.  And at that point is when I said that was part of

18  the salary that he was owed.  So I didn't see that as bribery.

19  Q.   Because earlier you said that you still saw it as a

20  donation, correct?

21  A.   The 6,000 was part of his salary.

22  Q.   But earlier you said that you didn't view what you had done

23  as anything illegal, correct?  You had just viewed it as wrong?

24  A.   Which part?

25  Q.   The whole part, $50,000.

1   A.   At the beginning, when I first learned of the donation

2   arrangement, I thought that Anthony had found a way to purchase

3   in essence a credit union.

4   Q.   Okay.

5   A.   I did not think that was illegal.

6   Q.   He found a way around the system?

7   A.   He found a way around the system, yes.

8   Q.   Now, it was July 21st when Coin.mx closed down?

9   A.   Correct.

10  Q.   That's around the time that Anthony Murgio was arrested?

11  A.   The same day, yes.

12  Q.   And that's the time that you were asked questions by

13  Special Agent Beyer?

14  A.   That was one of the times.

15  Q.   That was one of the times?

16       We already established, you have a Facebook account;

17  is that right?

18  A.   Yes.

19  Q.   This was July 21st, 2015, right, that Coin.mx closed down?

20  A.   Yes.

21  Q.   On August 15th, 2015, did you post on your Facebook

22  account, "I don't regret the things I've done wrong.  I regret

23  the right things that I did for the wrong people"?

24  A.   If that was on my Facebook, yes.

25  Q.   Do you recall saying that?

Freundt - Recross

1   A.  I put many things -- I put things there about once a week.

2   Q.  Could I show you something --

3   A.  Yes, please.

4   Q.  -- that might help refresh your recollection?

5   A.  Yes.  I'm not questioning that.

6   Q.  You're not --

7        THE COURT:  Okay.

8   A.  Yes, that's on my Facebook.

9   Q.  Okay.  You do recall that you posted on August 15th, "I

10  don't regret the things I've done wrong.  I regret the right

11  things I did for the wrong people."

12       Do you consider Anthony Murgio the wrong people?

13  A.  Yes.

14       MR. CREIZMAN:  No further questions.

15       THE COURT:  All right.

16       Mr. Klingeman?

17       MR. KLINGEMAN:  Thank you, your Honor.

18  RECROSS EXAMINATION

19  BY MR. KLINGEMAN:

20  Q.  Mr. Freundt, at the very end of the government's

21  examination, a few minutes ago, you were asked about Rico Hill.

22  A.  Yes.

23  Q.  And you were asked if you knew the outcome of any

24  investigation of the allegations that you made concerning Rico

25  Hill?

 1    A.   Correct.

 2    Q.   And you do not know the outcome?

 3    A.   No.

 4    Q.   And you told the government something to the effect that

 5    you had no concrete proof --

 6    A.   Correct.

 7    Q.   -- of Rico Hill's wrongdoing?

 8    A.   Correct.

 9    Q.   So you nonetheless were willing to make an accusation

10    against him?

11    A.   Yes.

12    Q.   Even though you lacked proof for it?

13    A.   I had some proofs.  I didn't know if that would constitute

14    concrete proofs or not.

15    Q.   Well, you just told you us didn't have concrete proof?

16    A.   I don't know the definition of concrete.  Or would that

17    have gotten him charged, I don't know, but I presented what I

18    had.

19    Q.   Well, are you the kind of person who makes accusations

20    without proof?

21    A.   No.

22    Q.   Well, you called Pastor Gross, a few minutes ago,

23    deceitful?

24    A.   Yes.

25    Q.   What is your proof?

1    A.  When Pastor Gross and I had a conversation, the last

2    conversation that we had, he wanted money and led me to believe

3    that that I was going to start the conversations again.  And

4    about two minutes later he sent me a text, after the money was

5    wired, that everything was done.

6    Q.  So you think he lied to you?

7    A.  Correct.

8    Q.  You think Anthony Murgio lied to him?

9    A.  I don't know the communications between them.

10   Q.  Do you think that Pastor Gross had a good reason to break

11   off this relationship with your group?

12   A.  Yes.

13            MR. KLINGEMAN:  No further questions.

14            THE COURT:  All right.

15            MR. NOBLE:  No redirect.

16            MR. CREIZMAN:  No recross.

17            THE COURT:  Thank you.

18            Mr. Freundt, you may step down.  You are excused.

19            (Witness excused)

20            THE COURT:  The government may call its next witness.

21            MR. NOBLE:  Your Honor, at this time we have some

22   emails that we would like to offer and publish for the jury

23   before we call our next witness.

24            THE COURT:  All right.

25            We'll give the jury a stretching break while you're

1    getting set up.

2              (Pause)

3              THE COURT:  All right, thank you.

4              MR. NOBLE:  At this time, your Honor, pursuant to

5    stipulation, various stipulations, the government offers

6    Government Exhibits 717A, 717B, 1290A and 1290B, 1665, 3025,

7    3555 through 3558, 3560, 3561, 3563 through 3567, 3568-B, 3571

8    and 3572.

9              THE COURT:  Is this pursuant to the stipulation?

10             MR. NOBLE:  These are pursuant to stipulations.  And I

11   consulted with defense counsel prior to offering these.

12             MS. SANTILLO:  Can we just see them come up before

13   they're published?

14             MR. NOBLE:  Which ones would you like to see?

15             THE COURT:  If we're not ready to do this, why don't

16   you call your next witness.

17             MR. NOBLE:  Your Honor, the government calls Meg Flok.

18             THE COURT:  Thank you.

19             Ms. Flok may come forward.

20             Ms. Flok, if you could come forward please and remain

21   standing and face me.

22    MAGDALENA FLOK,

23        called as a witness by the Government,

24        having been duly sworn, testified as follows:

25             THE COURT:  Please be seated.  And once you're seated,

Flok - Direct

```
 1   please pull up to the microphone as close as you can and state

 2   and spell your name for the record.

 3            THE WITNESS:  Magdalena Flok.

 4            THE COURT:  How do you spell your name?

 5            THE WITNESS:  M-a-g-d-a-l-e-n-a F-l-o-k.

 6            THE COURT:  When you're ready.

 7            MR. NOBLE:  Thank you, Judge.

 8   DIRECT EXAMINATION

 9   BY MR. NOBLE:

10   Q.  Good afternoon, Ms. Flok.

11   A.  Good afternoon.

12   Q.  Where do you work?

13   A.  NCUA.

14   Q.  And what is your title at the NCUA?

15   A.  Principal examiner, and I am a subject matter examiner in

16   IS&T.

17   Q.  What is IS&T?

18   A.  Information systems and technology.

19   Q.  What does it mean to be a subject matter examiner in that

20   area?

21   A.  It means that I mainly focus on reviewing IS&T and

22   information security at the credit unions.

23   Q.  Where were you born?

24   A.  Poland.

25   Q.  When did you come to the United States?
```

Eleka Direct

```
 1  A.   In 1997.

 2  Q.   Are you now a U.S. citizen?

 3  A.   Yes.

 4  Q.   Is English your first language?

 5  A.   No.

 6  Q.   What is your first language?

 7  A.   Polish.

 8  Q.   How long have you worked at the NCUA?

 9  A.   Eight years.

10  Q.   What did you do before joining NCUA?

11  A.   I worked for Bank of America.

12  Q.   What did you do for Bank of America?

13  A.   I was there for ten years, so I worked from being a

14  part-time teller to a teller manager.

15  Q.   Can you describe your educational background for the jury?

16  A.   I have a Bachelor degree in accounting from Cedar Crest

17  College, and I am a certified information systems auditor, and

18  currently I am enrolled in Penn State University for the

19  Master's program in information security science.

20  Q.   Can you explain to the jury what your duties and

21  responsibilities are, as an NCUA examiner?

22  A.   May main responsibility is to protect Share Insurance Fund.

23  Q.   The Share Insurance?

24  A.   I'm sorry, I know I have the accent.

25  Q.   No, that's okay.
```

```
 1              THE COURT:  The word is shared s-h-a-r-e-d?  Is that
 2     right?  Is that what you're saying, shared?
 3              THE WITNESS:  No, it's share, like the -- share
 4     accounts, I guess.  I'm not sure how to --
 5              THE COURT:  Do you know how to spell the word?
 6              THE WITNESS:  No, top of my head.  I can only spell
 7     when I write stuff down.  I can't spell from my head.
 8              MR. NOBLE:  I think it's s-h-a-r-e, share account.
 9              THE WITNESS:  Yeah.
10              THE COURT:  Thank you.
11     Q.  So you were explaining, part of your duties is to protect
12     the Share Insurance Fund?
13     A.  Correct.  And other than that, I have to examine and
14     supervise credit unions in my district, to ensure their
15     compliance with applicable laws.
16     Q.  And what, if any, training have you received to do that?
17     A.  The first year at NCUA, we are in training for the entire
18     year.  And after that, we have to complete core training, which
19     covers all risk areas that we review, and that's usually
20     completed within the first three to five years.  And after
21     that, we get 80 hours a year to pick our own training in the
22     areas that we are specializing in.
23     Q.  Approximately how many credit unions do you examine?
24     A.  Oh, that's hard to say.  I have eight credit unions in my
25     district.  Those are the credit unions that I supervise and
```

Flek - Direct

1   examine.  Other than that, I do a lot of IT reviews in my group

2   or outside of the group.

3   Q.  Is that because you're a subject matter examiner in that

4   area?

5   A.  Correct.

6   Q.  In conducting your examinations of credit unions, how do

7   you generally go about getting the materials and data that you

8   use?

9   A.  We usually send an email to the credit union with, like, a

10  standard list, depending what we reviewing.  And then, as we

11  get to a credit union, depending what we're seeing, from the

12  documents that we have received, we might be asking for

13  additional documentation.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1   Q.  Fair to say the data and materials come from the credit

2   union itself?

3   A.  Yes, all of it.

4   Q.  Now, I'd like to direct your attention to the Fall of 2014.

5   What was your position at the NCUA at that time?

6   A.  Principal examiner.

7   Q.  And did you have any supervisors?

8   A.  Yes.

9   Q.  Who?

10  A.  Brian McDonough.

11  Q.  Now, did there come a time when you had a conversation with

12  Mr. McDonough regarding a credit union called HOPE Federal

13  Credit Union in New Jersey?

14  A.  Yes.

15  Q.  About when did you have that conversation with

16  Mr. McDonough?

17  A.  Towards the end of November, maybe 18, 19th of November.

18  Q.  And at that point in time, did you have any familiarity

19  with that credit union?

20  A.  No.

21  Q.  It's not one of the regular credit unions that you

22  regularly examine?

23  A.  No.

24  Q.  Now, what did you do after your conversation with

25  Mr. McDonough?

1    A.  I sent an email to the credit union, to Mr. Gross, just

2    with the information that we are concerned with the ACH

3    activity at the credit union, and we would like to come in and

4    make sure that they do have all the proper procedures to handle

5    that type of transactions.

6    Q.  Why did you send the email to Mr. Gross?

7    A.  Because that's a standard procedure.

8    Q.  Okay.  What was his position at the credit union?

9    A.  He was the board's chair.

10   Q.  Do you see Mr. Gross in the courtroom today?

11   A.  Yes, right over there.

12              MR. NOBLE:  May the record reflect --

13              THE COURT:  Yes.

14              Thank you, Mr. Gross.

15              Record will reflect the witness has identified

16   Mr. Gross.

17              MR. NOBLE:  Now, could we bring up Government's

18   Exhibit 6023, which is not in evidence, just for

19   identification?

20   BY MR. NOBLE:

21   Q.  Ms. Flok, do you recognize this document?

22   A.  Yes.

23   Q.  What is it?

24   A.  It's an email from me to Mr. Gross.

25   Q.  And then up above, what appears there, above your email?

 1   A.  Just says, "Thanks, we'll see you in the morning."

 2   Q.  Sorry.  I was directing your attention to the header

 3   information.  Is there a reply from Mr. Gross?

 4   A.  I guess so.

 5   Q.  Well, who is the email at the very top from?

 6   A.  It is from Trevon Gross, yes.

 7   Q.  And what is the date of the email?

 8   A.  November 20th, 2014.

 9           MR. NOBLE:  The government offers Government's

10   Exhibit 6023.

11           MR. KLINGEMAN:  No objection.

12           MR. CREIZMAN:  No objection.

13           THE COURT:  Thank you.  It's admitted.

14           (Government's Exhibit 6023 received in evidence)

15           MR. NOBLE:  Can we scroll to the bottom of that email,

16   next pages?  Go back to the previous page.  Let's blow up the

17   email that is sent by Meg Flok on November 20th, 2014, please.

18   BY MR. NOBLE:

19   Q.  Ms. Flok, would you just read what you wrote on

20   November 20th to Mr. Gross?

21   A.  Yes.  "We understand you are attempting to process a

22   significant number of ACH transactions and are running into

23   some difficulty.  It is imperative that we review your process

24   immediately to ensure the credit union can handle this activity

25   and has the controls in place that would allow you to do it.  I

 1   will be at the credit union tomorrow morning.  Please ensure

 2   someone will be available at the office by 9:30 a.m."

 3          MR. NOBLE:  And scroll back up.

 4   Q.  And Mr. Gross responds, "We will be available.  Is there

 5   anything specific that you would like us to have ready for your

 6   review?"

 7          Do you see that?

 8   A.  Yes.

 9   Q.  And then let's go back up above and see what you ask for.

10   So I'd like to ask you some questions about some of these items

11   on your list.

12          Number 1, you ask for something called the 9/30/2014

13   Aries loan and share download.  Do you see that?

14   A.  Yes.

15   Q.  Explain to the jury what an Aries download is.

16   A.  Aries download is asking -- we ask the credit unions every

17   time we go in.  It's a download down from their core processer

18   that will give us a list of all the share accounts and loans

19   that the credit union has.

20   Q.  And then you also ask for the board minutes.  And then the

21   next line, number 3, you ask for the "NACHA self-audit or any

22   other ACH audit done in the previous year including

23   management's response".  Do you see that?

24   A.  Yes.

25   Q.  Also ask, number 4, ACH risk assessment, correct?

1    A.   Yes.

2    Q.   Number 5, a list of employees involved in ACH activities;

3    number 6, reports showing volume of ACH activities; number 7,

4    policies and procedures relating to ACH activities; number 8,

5    third-party agreements relating to ACH activities, ie.

6    corporate credit union, correspondent banks and ACH software

7    vendor.  Do you see that?

8    A.   Yes.

9           MR. NOBLE:  Let's go down and blow up the bottom half.

10   Q.   Number 9, accounting reconcilements for all ACH related

11   general ledger accounts for the most recent three months;

12   number 10, Electronic Fund Transfer Act disclosures, Reg E;

13   number 11, wire transfer policies and procedures; number 12, a

14   sample of any wire transfer request forms used by the credit

15   union; Number 13, a wire log for the past three months; number

16   14, a copy of the most recent statement for the correspond

17   institution used for wires, corporate union, correspondent

18   bank, FRB; number 15, a description of the process used to

19   check wires for OFAC compliance; and number 16, a copy of the

20   Bank Secrecy Act compliance as it relates to wire transfers.

21           Do you see that?

22   A.   Yes.

23   Q.   Now, most of these requests seem to relate to electronic

24   funds transfer, wires, and ACH transactions; is that fair to

25   say?

1   A.  Yes.

2   Q.  Why were you asking Mr. Gross to provide you with those

3   materials in particular?

4   A.  Because we were going to review if they have proper

5   procedures in place to handle the volume of activity that we

6   were notified about.

7   Q.  And what was your understanding at the time of the volume

8   of ACH transactions that HOPE Federal Credit Union was doing?

9   A.  It was extremely large comparing to the size of the credit

10  union.

11  Q.  And why did that matter to you or the NCUA?

12  A.  Without proper procedures of the ACH handling and

13  processing and having all the compliance with NACHA rules, it

14  can significantly pose a lot of risk to the net worth of the

15  credit union.

16  Q.  And you see up above, Mr. Gross responds, "Thanks, we'll.

17  See you in the morning."

18  A.  Yes.

19  Q.  Now, did there come a time when you went on-site at HOPE

20  Federal Credit Union as part of your examination?

21  A.  I'm sorry?

22  Q.  Did there come a time when you went on-site --

23  A.  Yes.

24  Q.  -- to the HOPE Federal Credit Union?

25  A.  Yes.

1   Q.   When was that?

2   A.   The following day, November 21st.

3   Q.   How long did you expect to spend at the credit union that

4   day?

5   A.   Normally when we go in we spend the whole day, as long as

6   the credit union is open.  Most of the times it's about eight

7   hours.

8   Q.   About what time did you arrive?

9   A.   About 9:30.

10  Q.   Did you end up spending the entire day there?

11  A.   I spent not the entire day, but as soon as we arrived, I

12  was told that we would have to leave by 1:30.

13  Q.   Who told you you would have to leave by 1:30?

14  A.   Mr. Gross.

15  Q.   Now, did you go to HOPE Federal Credit Union with anyone

16  else that day?

17  A.   Yes.  When I arrived there was a lot of people actually

18  gathered around the table in the kitchen.  I'll describe it

19  that way, the room.  I was under the impression there was a

20  board meeting.  They all introduced themselves to me.  I do not

21  remember all the names, but it was about 12, 13 people.

22  Q.   And about how long did you spend with that group of people?

23  A.   Well, few minutes, just as long as it took for everybody to

24  say their names and shake my hand.

25  Q.   Did you have any type of lengthy conversation with them?

1    A.  No.

2    Q.  What did you do after the introductions?

3    A.  I was shown the area that I was going to work, which was

4    like a little desk around the corner.  I sat down, set up my

5    computer.

6            MR. NOBLE:  Can we bring up Government's Exhibit 73 in

7    evidence?

8    Q.  Ms. Flok, do you recognize what's in that photograph?

9    A.  Yes.  That's the credit union.

10   Q.  And can you just describe where in relation to -- where in

11   relation in the picture you were when you met this group of

12   people?

13   A.  Well, I walked in towards the table.  So when I walked in,

14   they were sitting all around the table.

15   Q.  And then did you stay in that room to conduct the exam?

16   A.  Well, not exactly.  It was around the corner of the wall.

17   It was all open space, so I did not see this room, I could hear

18   everything.

19   Q.  You could hear some of the conversations?

20   A.  Right.

21           MR. NOBLE:  You can take that down.

22   Q.  At the time when you went to this location, were you aware

23   whether the credit union had any other branch locations?

24   A.  No.

25   Q.  Were you aware whether the credit union had a branch in

1    Florida?

2    A.   No.

3    Q.   Were you aware whether the credit union had a back office

4    workstation in Florida?

5    A.   No.

6    Q.   Were you aware whether any individuals in Florida were

7    accessing the credit union system from Florida?

8    A.   No.

9    Q.   Now, are any of those things something you would want to

10   know as an examiner?

11   A.   Yes.

12   Q.   Why?

13   A.   Well, there's several concerns with having remotely

14   somebody else accessing the core system.  There's a physical

15   concern.  What type of device are they using?  Is there device

16   encrypted?  Where is this device stored?  There is obviously

17   the security of the network.  What type of connection are they

18   using to connect to the credit union's core?  Also, network

19   security.  Is this device credit union's own device or is it

20   personal device?  In general, personal devices should be

21   prohibited from using because the credit union doesn't have any

22   control over this device, which means they cannot make sure

23   that this device has up-to-date antivirus.  There is no control

24   of installing security patches.  They can't make sure that is

25   there a web filtering to make sure that nobody goes on any type

1    of websites that are known for malicious software and

2    installing different things on this device.  And as soon as you

3    connect to the core of the credit union, all those viruses can

4    automatically infect the credit union.

5            And also, the last thing would be the person that's

6    using this device.  Is it an employee of the credit union or is

7    it a contractor?  If it's a contractor, do they have a contract

8    with the person?  Did they sign privacy policy?  Was there a

9    background done on that person?  Are they bonded?

10   Q.  I'm sorry, bonded?

11   A.  Bonded, yes.

12   Q.  What do you mean by that?

13   A.  Any employee of the credit union has to go through a

14   bonding company to ensure that they are -- they have no prior

15   criminal history and can work for the credit union.

16   Q.  So would it be a concern to the NCUA if you were to learn

17   that the person who was operating that backend system did, in

18   fact, have a criminal history?

19           MS. SANTILLO:  Objection.

20           THE COURT:  Grounds?

21           MS. SANTILLO:  I withdraw.

22           THE COURT:  Thank you.

23           Go ahead.  You may answer.

24           THE WITNESS:  Yes.

25   Q.  And why?  Why would you care if the person had a criminal

1    background?

2    A.   Well, because this person has access to the member

3    information, the credit union's member information that's not

4    public, and the credit union's board and the credit union in

5    general has the responsibility to protect member information

6    and private information.  So you want to make sure that the

7    person that does access that type of information is trusted,

8    and they need to be bonded, and the person with prior crime

9    background cannot be bonded.

10   Q.   Cannot be bonded if they have a criminal record?

11   A.   Correct.

12   Q.   Now, did you have any conversations with Trevon Gross

13   during the course of your on-site visit on November 21st?

14   A.   Yes.

15   Q.   During any of those conversations, did Mr. Gross tell you

16   whether the credit union was operating another branch in

17   Florida?

18   A.   No.

19   Q.   No, he never told you that?

20   A.   No.

21   Q.   Now, when you said you went to sit down at your computer to

22   start your exam, what was the first thing that you looked at?

23   A.   One of the first things that we normally look at would be

24   the Aries download which we put in our Aries system.  That's

25   what we use for credit union examinations.

```
 1              And I've noticed that the Aries download was at the

 2    wrong date.  Usually, we review quarter end Aries downloads,

 3    which I asked for September 30th, 2014, and I received

 4    October 31st, 2014.

 5    Q.  Okay.  So you're referring back to your email, which was in

 6    Government's Exhibit 6023, where you requested the

 7    September 30th Aries download from Mr. Gross?

 8    A.  Yes.

 9    Q.  And you said you were provided with the October 31st, Aries

10    download?

11    A.  Yes.

12    Q.  And that was in the middle of the quarter?

13    A.  Yes.

14    Q.  Or almost the middle of the quarter, I should say.

15    A.  Almost.

16    Q.  And who provided you with the October 31st Aries download?

17    A.  Mr. Gross.

18              MR. NOBLE:  Can we bring up just for identification

19    Government's Exhibit 6151?

20    Q.  Ms. Flok, do you recognize what this is?

21    A.  Looks like an Aries download.

22    Q.  Do you recognize which Aries download this is?

23    A.  The October 31st, 2014.

24    Q.  Is this the Aries download that Mr. Gross provided to you

25    during your exam?
```

 1   A.  Yes.

 2           MR. NOBLE:  The government offers Government's

 3   Exhibit 6151.

 4           MS. SANTILLO:  No objection.

 5           MS. MADRIGAL:  No objection.

 6           THE COURT:  Without objection, 6151 is admitted.

 7           (Government's Exhibit 6151 received in evidence)

 8           MR. NOBLE:  Can we publish for the jury?  Can we blow

 9   it up just a little bit, Mr. Chang-Frieden, so we can see the

10   column headings?

11   BY MR. NOBLE:

12   Q.  Ms. Flok, you don't have to read every column heading, but

13   in general, what type of information is included in the Aries

14   download with respect to the "shares" tab?

15   A.  It would be the member's name, their address, their account

16   number, the balance of their share accounts.

17   Q.  The balance of their share accounts?

18   A.  Yeah.  The day account was open and the dividends that they

19   getting.

20   Q.  So basically, all the account information for the members

21   of the credit union.

22   A.  Basically.

23   Q.  Is that right?

24   A.  Yes.

25           MR. NOBLE:  Let's go back to the first column.

1   Q.  Ms. Flok, when you were reviewing this Aries download,

2   what, if anything, did you notice?

3   A.  Well, the first thing we look at would be the balances

4   of -- well, actually, the first thing I look at -- I don't know

5   if every examiner does -- I look at the last activity date just

6   to make sure that I did get the correct Aries download as of

7   the date I had requested, and I noticed that it wasn't as of

8   September 30th, it was October 31st.

9           The next thing I would look at is the balances to see

10  if there's anything unusual or if there are any negative

11  balances in the share accounts.

12  Q.  Why does a negative balance in a share account catch your

13  eye?

14  A.  Well, in general, credit unions should not allow the

15  accounts to go negative unless they have courtesy program,

16  which is almost like an overdraft protection kind of program.

17  If there are any accounts that have negative balance over 45

18  days, there's an NCUA rule that those balances need to be paid

19  up by the member or they have to be converted into a loan.

20  Q.  That's for a negative balance that lasts for at least 45

21  days?

22  A.  Correct.

23  Q.  So did you notice anything unusual about this particular

24  Aries download when you reviewed it?

25  A.  Well, there were few accounts that quite large negative

1    balances, and also, one thing that really caught my eye, it was

2    an account with a balance almost $1.2 million.

3    Q.  And whose account was the $1.2 million balance?

4    A.  Kapcharge.

5             MR. NOBLE:  Can we scroll down and zoom out a little

6    bit so we can see both the member name and the account

7    balances?  It might get kind of small, and then we can blow it

8    back up.  Let's scroll down.  Keep going.  You can keep

9    scrolling, Mr. Chang-Frieden.  You can scroll a little faster.

10            Let's stop there.  Can you highlight row 189, please?

11   Q.  Ms. Flok, is that the entry that you were referring to?

12   A.  Yes.

13   Q.  And what was the balance in the Kapcharge account as of

14   October 31st, 2014?

15   A.  $1,176,614.

16   Q.  I'm sorry.  Let's blow it up so we get the right number.

17   Go ahead and read it for the record.

18   A.  $1,178,614.

19   Q.  And 4 cents?

20   A.  And 4 cents.

21   Q.  Why did you take note of this balance?

22   A.  Because this credit union is such a small credit union with

23   asset size, and big inflow of cash in a share account can

24   affect their net worth, so that really concerned me right off

25   the bat.  I took this number and just calculated their net

1    worth at the day as of this.

2    Q.  Explain to the jury how you use this number to calculate or

3    do a back-of-the-envelope calculation of the credit union's net

4    worth.

5    A.  Net worth, you would take a credit union's total net worth

6    and divide it by total assets.

7    Q.  And how did you get the credit union's net worth at that

8    time?  What number did you use?

9    A.  I used their net worth which, if I remember correctly, was

10   about $50,000.

11   Q.  And was that as of September 30th, 2014, as of the call

12   report?

13   A.  Yes.

14   Q.  And then what went into the denominator of that?

15   A.  It would be the whole entire share total that they had.

16   Q.  And based on your back-of-the-envelope calculation, what

17   was the credit union's net worth as of October 31st, 2014?

18   A.  3.62.

19   Q.  And what, if anything, did you notice about that

20   calculation?

21   A.  Well, that's very concerning.

22   Q.  Why?

23   A.  Because NCUA requires credit unions to have a net worth of

24   7 percent to be well-capitalized.  Under 7 percent, between 6

25   and 7, credit union is considered adequately capitalized.  At

1    that point we get a little bit more concerned.  If it drops

2    between 4 to 5 percent, we are imposing certain restrictions on

3    the credit union and what they can do.  And if it's between

4    2 to 4 percent, the credit union is significantly

5    undercapitalized, and at that point they have to create a net

6    worth restoration plan to bring it back to be well-capitalized.

7    They can't add anymore assets, they cannot have a non-member

8    deposits, they have to request permission to pay dividends.

9    This is just a few things that I can remember, but the list is

10   pretty extensive.

11   Q.  So fair to say it was very concerning to you when you saw

12   this?

13   A.  Yes.

14          MR. NOBLE:  Mr. Chang-Frieden, you can take that down.

15   Q.  Now, did you speak with Trevon Gross about the Kapcharge

16   account?

17   A.  Yes.

18   Q.  What, if anything, did you say to him and he to you?

19   A.  Well, first I asked, you know, what this account is and why

20   is there such a large balance, and it really affects the net

21   worth and my calculation, so it's 3.6 percent.

22          At that point, Mr. Gross said that's really not a

23   concern because by the time the quarter ends, the money from

24   the Kapcharge account will be gone, and he also is expecting

25   donations from church, about $15,000, so by the end of the

1    quarter, he should be well above 7 percent.

2    Q.  Did there ever come a time when you asked about a

3    membership file for Kapcharge?

4    A.  Yes, I did.  I asked for a file for the brand new account.

5    Q.  Okay.  And what did Trevon Gross say?

6    A.  That he does not have it at the moment because it's in a

7    storage, the credit union's in the process of moving, so it is

8    at the other location.

9    Q.  So, I'm sorry, what did he say when you asked for the

10   account file?

11   A.  That it's in a different location, it's in a storage

12   facility because they are moving.

13   Q.  And did that make sense to you?

14   A.  Well, I didn't really question if it were -- if it is in

15   the storage in another location, if they actually are moving.

16   I guess that would be under circumstances they are moving,

17   okay, although mostly all the credit union's records should be

18   at the credit union's location, and if they are not, they have

19   to be provided to us as requested quite fast.

20   Q.  Did Mr. Gross provide you with the file?

21   A.  Not at first.  He said that he cannot get to it at the

22   moment because there's nobody that can go to the facility.  And

23   I said I can come back on Monday.  But Monday he said I cannot

24   come back to the credit union because the credit union's going

25   to be closed because of the holiday, Thanksgiving.

 1               So at that point I said that I really need to see the

 2     file, and I don't mind waiting, so if there's somebody that

 3     could get to it at some point, I'll just stay at the credit

 4     union, and I have some things that I can work on, somebody can

 5     go get it.

 6     Q.  Did Mr. Gross eventually provide you with the file?

 7     A.  Yes.

 8     Q.  About how long did it take for him to retrieve the file?

 9     A.  I'm not sure.  Couple hours.

10     Q.  Was it minutes?  Was it hours?  What's your best

11     recollection?

12     A.  I would say hours.

13               MR. CREIZMAN:  Objection.

14               THE COURT:  Overruled.

15     Q.  You can answer.

16     A.  I think it was hours.  Couple hours.  I'm not talking five

17     hours, but, you know, might be two at the most.

18     Q.  Do you know where Trevon Gross obtained the Kapcharge file

19     from?

20     A.  I was told it was in a storage facility so I'm assuming it

21     was from the storage facility.

22     Q.  Do you know that for a fact?

23     A.  No.

24               MR. NOBLE:  Can we bring up Government's Exhibit 4509

25     in evidence?

1              MS. SANTILLO:  Objection.

2              THE COURT:  4509 is not in evidence?

3              MS. SANTILLO:  Oh, no.  I'm sorry.  It's fine.

4              THE COURT:  Okay.

5              MR. NOBLE:  4509 in evidence, please.  Line 3829.

6         I'll read the part of Anthony Murgio, Mr. Shin, please

7    read the part of Mr. Gross.

8              Mr. Murgio.  "Should we come see you" -- oh, and the

9    date is November 20th, 2014.

10   BY MR. NOBLE:

11   Q.  How does that relate, Ms. Flok, to --

12             MS. SANTILLO:  Objection, personal knowledge.

13             THE COURT:  Actually, in any event, I'll hear from

14   counsel after I let the jury go.

15             It's just gout 5:00 so we'll end for the day.

16             Just a quick scheduling point.  You'll remember we're

17   going break just a little bit early tomorrow, 10 to 15 minutes

18   early tomorrow, because of an appointment someone has.  So I

19   will shorten lunch by about 15 minutes, and so we'll have --

20   Ms. Nuñez will take your lunch order in the morning and we'll

21   have lunch for you to at least enable you to not have to chase

22   after lunch.  Of course, bring your lunch if you prefer that,

23   but we will supply lunch for you tomorrow.

24             Have a great night.  See you at 9:30.  Thank you.

25             (Continued on next page)

1              (Jury not present)

2              THE COURT:  Ms. Flok, you may step down.  You're

3    excused for the day.  We'll begin again in the morning.  Please

4    be here before 9:30.  Thank you.

5              (Witness excused)

6              THE COURT:  Ms. Santillo, I'll hear you on this

7    objection.

8              MS. SANTILLO:  Your Honor, this is somebody who has

9    never seen this document before, and she's role playing with

10   the prosecutor about evidence she's never seen.  She's a fact

11   witness and I don't think that's appropriate.

12             MR. NOBLE:  Judge, I was actually just going to ask

13   her about the date in relation to when she visited the credit

14   union.  I was going to have Mr. Shin read the role and I was

15   going to read the role.

16             They published WhatsApps during their cross

17   examinations of the cooperating witnesses that the cooperating

18   witnesses weren't on.

19             So this is in evidence.  We want to publish it for the

20   jury.  It provides background in context for the testimony.

21   And I was not going to do role play with the witness, I wasn't

22   even going to ask her any questions about the document.

23             THE COURT:  It's in evidence.  Among other things, I

24   think it's a waste of time.  So let's just -- you can do this

25   at closing, right?  You're just trying to remind the jury of

 1    something that we've been over?

 2           MR. NOBLE:  No.  This document is in evidence, but

 3    we've only published certain portions of the chats.

 4           THE COURT:  Why are you doing it now?

 5           MR. NOBLE:  Because it's relevant to what was going on

 6    behind the scenes when this witness was on-site at the credit

 7    union.

 8           THE COURT:  So, I mean, you're bringing a piece of

 9    evidence together -- it's just appropriate for closing.  I

10    mean, you get to focus on the portion if you want, but why

11    don't you do it after the witness, as you have with others?

12    How much of this are we going to do?

13           MR. NOBLE:  I have a couple chats and a couple emails.

14    It's not long, your Honor.  And, I mean --

15           THE COURT:  Really, I mean, right?  What you're doing

16    is you're using the witness to get one point, you're using the

17    evidence to get another point, and you're doing it at the same

18    time to summarize them together.  That's summation.

19           MR. NOBLE:  It's not just to summarize, it's to allow

20    the jury to understand the full story and what was going on.

21    The government has to be able to present its case and allow the

22    jury to make connections in their mind that we reinforce during

23    closing.  These are documents that are in evidence.  I don't

24    believe any of the other documents that we want to introduce to

25    do this with are objectionable.  And, you know, the government

 1   has a right to present its case to the jury in the manner that

 2   we think is most compelling.

 3           THE COURT:  Well, you have a right to do that within

 4   bounds, and having this witness read portions of a transcript

 5   that she's never seen before, that she has no knowledge of, I

 6   won't allow it.

 7           MR. NOBLE:  But Judge, I wasn't asking her to read the

 8   transcript.  I really wasn't.  I was asking her about the date

 9   on the transcript in relation to her own personal experience at

10   the credit union.  I had ask Mr. Shin to read the part of

11   Mr. Gross and I was going to read the part of Mr. Murgio.

12           I've been very careful about not asking the particular

13   witnesses who have no personal knowledge of a conversation to

14   participate in those conversations.  I wasn't going to ask her

15   to interpret them or anything, we're just publishing for the

16   jury exhibits, this one already in evidence, and others that

17   we'd like to offer into evidence, to which I don't think

18   there's any valid objection.

19           And another thing, your Honor.  Defense counsel had

20   exhibits since last night, and I asked them if they had any

21   objections.  This morning, Ms. Santillo addressed a couple

22   additional exhibits that she wanted me to publish at the same

23   time that I do this, and I said yes, I will accommodate that

24   request.  Some of them are in evidence, some of them weren't,

25   we weren't going to object to it, and we had agreed upon that.

1   And then, at the last minute, Ms. Santillo says "I have

2   objections to other exhibits" when you know when I'm offering

3   them in front of the jury, and I just don't think that's fair.

4         THE COURT:  I'm sorry.  Is this a separate point?

5         MR. NOBLE:  This is a separate point.

6         THE COURT:  I wanted to go back to see what you said.

7   I'll take that up in a second.

8         On this, I'm going to give you a little bit of room,

9   but I really -- in my mind you're doing summation early, and

10   I'm not going to have a witness here for a lot of extensive

11   role playing, reading by other counsel.  It's in evidence.  You

12   can -- you just have to bring those pieces together at

13   summation.  It's too much.  So a little bit of room, but it

14   needs to be limited.

15         MR. NOBLE:  Yes, your Honor.

16         THE COURT:  Now, the other point you're making which

17   is about the --

18         MR. NOBLE:  Yes.  The meet and confer process.  I, in

19   good faith, sent all my exhibits last night.  Mr. Creizman and

20   Ms. Madrigal didn't have any objections.  Ms. Santillo didn't

21   voice any objections, but she wanted some additions, which we

22   accommodated, and we were going to publish those along with the

23   others.

24         THE COURT:  Is this the emails before Ms. Flok?

25         MR. NOBLE:  Yes.  This is what I was offering ahead of

 1    time.

 2            THE COURT:  And her request was to see them before --

 3    just what happened was you said we were going to read emails.

 4    You said the numbers.  Ms. Santillo asked to see them before.

 5            MR. NOBLE:  Yes.

 6            THE COURT:  And that's when I put it off.

 7            MR. NOBLE:  100 percent, your Honor.  And like I

 8    didn't want to waste the time of doing that in front of the

 9    jury --

10            THE COURT:  Right.

11            MR. NOBLE:  -- because that's why I sent them to them

12    last night.

13            THE COURT:  Your complaint is you sent them last night

14    so it should have been a moment of agreement unless there was

15    an objection.

16            MR. NOBLE:  Particularly since we had a conversation

17    this morning where there weren't objections, there were

18    requested additions, and the government accommodated those

19    additions, and then there were objections, and then, you know,

20    we waste time in front of the jury.

21            THE COURT:  All right.

22            Ms. Santillo?

23            MS. SANTILLO:  Yes, your Honor.  The reason that I

24    objected is because I've tried to present this list of the

25    documents I'm having trouble accessing on the box to Mr. Noble

1   three times today, and it's been during a break when he's

2   obviously cross examining somebody else, and we didn't have

3   time to confer about that, so I didn't want to have them

4   published.  I've actually never seen them because it doesn't

5   come up in the box.  That happened with one of the exhibits

6   that the witness saw today, 6151, it's not coming up in the

7   production.  So it's a technical issue that I'm trying to

8   resolve, and I wanted to preempt it by actually being able to

9   see it a minute before it gets produced.

10          THE COURT:  All right.

11          MR. NOBLE:  I mean, I'll work with Ms. Santillo again

12  tonight so we can identify any problem areas so this doesn't

13  happen again tomorrow morning.

14          THE COURT:  Thank you.

15          What else?  What can I take up?

16          Mr. Creizman?

17          MR. CREIZMAN:  Yes.  I'd be remiss if I didn't

18  actually mention that Judge Kaplan left the courtroom, and

19  Judge Kaplan mentioned that 5:00 Monday I should be in his

20  courtroom.  And I was too afraid -- I mean, I think I felt like

21  I got out of there all right, so I didn't say anything.  But if

22  there's a problem, I told him that we sit every Friday -- every

23  day until 5:00 so --

24          THE COURT:  We do, and we will.  So I'll shoot him a

25  note letting him know that you'll be a few minutes after 5:00.

 1          MR. CREIZMAN:  Okay, please.

 2          MR. KLINGEMAN:  Your Honor, I have two questions or

 3   two requests.  One, I understand the Court, at least as of now,

 4   is planning to conduct a charge conference on Friday.

 5          THE COURT:  Right.

 6          MR. KLINGEMAN:  Mr. Gross has asked to be released

 7   from attending that.  And he articulated his waiver.  If your

 8   Honor wants him to, himself, on his behalf, I'm asking for him

 9   to waive his appearance.

10          THE COURT:  All right.

11          Mr. Gross, you understand that you have every right to

12   be at the conference where we'll discuss the jury charge?

13          DEFENDANT GROSS:  Yes, your Honor.

14          THE COURT:  And you've discussed with your attorneys

15   whether you should be there?

16          DEFENDANT GROSS:  Yes, your Honor.

17          THE COURT:  And you are waiving whatever right you

18   have to be there?

19          DEFENDANT GROSS:  Yes, your Honor.

20          THE COURT:  All right, thank you.

21          MR. CREIZMAN:  Your Honor, we'd like to make the same

22   application on behalf of Mr. Lebedev.

23          THE COURT:  All right, Mr. Lebedev.  Same questions.

24   You understand at the conference on Friday we'll be discussing

25   the charge that will go to the jury?

1          DEFENDANT LEBEDEV:  Yes, your Honor.

2          THE COURT:  And you've discussed the issue with your

3   attorneys?

4          DEFENDANT LEBEDEV:  Yes, your Honor.

5          THE COURT:  And you're knowingly waiving any right you

6   have to be present at that conference?

7          DEFENDANT LEBEDEV:  Yes, your Honor.

8          THE COURT:  You both don't have to attend.

9          MR. KLINGEMAN:  Thank you.  And your Honor knows that

10   I will be absent tomorrow and Friday.  I appreciate everybody's

11   indulgence.

12          I was wondering if the Court wanted to say anything to

13   the jury tomorrow about my absence, just something brief to the

14   extent that, "You'll note that Mr. Klingeman is not here.  He's

15   been excused by the Court," and that's it, something -- in your

16   own words, obviously, but just something so that no juror is

17   offended by my just being absent without explanation.

18          THE COURT:  If that's your request, I'm happy to do

19   it.  I don't have a view as to whether it draws more attention

20   or not.  Sometimes we do those things at the beginning knowing

21   that people will be in and out, but if that's your request, I'm

22   happy to do it.

23          MR. KLINGEMAN:  I would appreciate it.

24          THE COURT:  Okay.

25          MR. NOBLE:  No objection.

1              THE COURT:  Thank you.

2              MR. NOBLE:  One scheduling issue with witnesses.

3              THE COURT:  Yes.

4              MR. NOBLE:  So today went a little bit longer than we

5    anticipated.  The next witness is Robyn Guyer from the United

6    Advantage Northwest Credit Union from Oregon.  She needs to

7    catch a flight midafternoon tomorrow, so we would propose that

8    we put her on first thing, we interrupt Ms. Flok's direct.  We

9    anticipate that Ms. Guyer's direct would be about one hour.  I

10   don't know how long the crosses would be, but I can't imagine

11   they would be that long, and then we would resume Ms. Flok's

12   testimony.

13             We haven't discussed this with defense counsel, but

14   given our prior practice to accommodate witnesses' schedules, I

15   don't anticipate objections.

16             MR. CREIZMAN:  No objection.

17             MR. NOBLE:  All right.  So tomorrow's lineup, your

18   Honor, will be Ms. Guyer, we'll continue with Ms. Flok, we also

19   have on lineup Brian McDonough from the NCUA and Steve

20   Valentine from Congressman Chris Smith's office, and I believe

21   that should be enough to take us through the day.

22             THE COURT:  Okay.

23             MR. NOBLE:  And I believe those are all witnesses that

24   Ms. Santillo is crossing.

25             MS. SANTILLO:  Yes.

 1          THE COURT:  All right.  And then obviously, if you

 2    want to return to the emails that got sidetracked today.

 3          MR. NOBLE:  Yes.  We might do that in between

 4    Ms. Guyer and Ms. Flok if we can work those out.

 5          THE COURT:  Okay.  So Guyer, Flok, McDonough,

 6    Valentine.

 7          MR. NOBLE:  Yes.  We might put Mr. Valentine on before

 8    Ms. McDonough.  Again, he's up here from D.C.  He's taking time

 9    off from work to be here.  I mean not that Mr. McDonough is

10    not, but Mr. Valentine is a shorter witness, just we could just

11    get him on and off.

12          THE COURT:  And McDonough and Flok --

13          MR. NOBLE:  McDonough will be significantly shorter

14    than Flok because -- they obviously have some overlapping

15    knowledge.  Mr. McDonough does have some independent

16    information because he was involved earlier on in the

17    Collectables Club and HOPE FCU situation, whereas Ms. Flok

18    comes into the situation only with regard to the ACH

19    processing in November.

20          THE COURT:  All right, thank you.

21          MS. SANTILLO:  Your Honor.

22          THE COURT:  Go ahead.

23          MS. SANTILLO:  Your Honor, I understand that you made

24    a decision on the limiting instruction, but I didn't have an

25    opportunity to respond to Mr. Shin's point.

1          THE COURT:  Okay.

2          MS. SANTILLO:  Which was that they are going to intend

3     to introduce evidence with respect to Kapcharge, but there is

4     no evidence or there's no other witness and there's no other

5     documents that are going to establish that Mr. Gross had any

6     role in a number of things that the Collectables Club were up

7     to after he walked away.  And there's no relationship between

8     the Kapcharge prong of what's going on and the Collectables

9     Club prong of what's going on.  And there's nothing going to

10    happen that's going to be proved up in the next -- you know,

11    until Tuesday that establishes a connection between those

12    things.

13         He wasn't involved in sending letters to the NCUA

14    saying that, you know, Frank Oswald was involved in association

15    for the Collectables Club.  He wasn't involved in starting a

16    new credit union and sending any of those documents to the

17    NCUA.  So it's a completely different track.

18         So I understand what they're saying about not, you

19    know, definitively --

20         THE COURT:  But this is why I don't -- so the limiting

21    charge that you had proposed was a blanket "you may not

22    consider evidence" -- let me pull it up -- basically, "you

23    can't consider any evidence against Mr. Gross after the meeting

24    date which he withdraws".

25         MS. SANTILLO:  I stipulated to the members of the

 1   collectables Club, not with respect to Kapcharge.  It doesn't

 2   even mention Kapcharge.

 3         THE COURT:  "You've heard evidence that" -- and then

 4   it's the names -- "Murgio, Freundt, Hill, Lebedev, and others

 5   had discussions about making payments to Trevon Gross and took

 6   actions to gain control of the board of HOPE FCU after Trevon

 7   Gross told them on November 24th, 2014 that he no longer wanted

 8   to associate with them.  You should disregard this evidence as

 9   against Mr. Gross as it's not offered against him."  That just

10   doesn't make sense, and I don't understand that to be the same

11   thing that you're saying now.

12         MS. SANTILLO:  Well, maybe there's a problem with the

13   language of the instruction.  But what the problem is, is that

14   we would have moved to exclude those statements as hearsay

15   evidence that aren't relevant to Mr. Gross' intent because

16   they're not -- he has -- if that was just the conspiracy, the

17   Collectables Club piece of it, and Mr. Lebedev is in this case

18   and so those statements are being -- are admissible because

19   they go to Mr. Lebedev's intent, but they don't go to

20   Mr. Gross' intent.  He had no knowledge of what they were

21   doing.

22         THE COURT:  Go ahead, Mr. Shin.

23         MR. SHIN:  Your Honor, coconspirator statements -- a

24   particular conspirator doesn't have to have specific knowledge

25   of everything that his coconspirators are doing.  The whole

1   point of the coconspirator statement is that the conspirators

2   have agency for each other, and it's not like every single

3   member of the conspiracy has to know what every single other

4   member is doing and saying at a particular time for that

5   statement to come in against the person.

6           And so the way it works is, until they establish

7   withdrawal, the coconspirator statements are presumptively

8   admissible against Mr. Gross.  And so the question is going to

9   be ultimately, did he establish withdrawal from the conspiracy?

10          Now, Ms. Santillo is describing the conspiracy as if

11  there is just a conspiracy between Mr. Gross and the Murgio and

12  associates.  But that's not the conspiracy charged in the

13  indictment and the conspiracy that we're proving up at trial,

14  it's a broader conspiracy that involves a greater number of

15  people, and that includes multiple objects, including not just

16  receiving those bribes, but also lying to the NCUA and

17  obstructing their examination.  So you can't just carve out one

18  wing of the conspiracy as being inadmissible from here on out

19  as against Mr. Gross.

20          We've described the withdrawal law in our motion in

21  limine papers.  You have to make a clean break from the entire

22  conspiracy, you can't just pick and choose pieces that you

23  withdraw from.

24          So in light of that, our position is that, even the

25  actions that the Murgio and associates took after the

1   November 24th meeting, they are relevant evidence of Mr. Gross'

2   role in the conspiracy, so we can offer a couple of theories.

3        One, the fact that Anthony and Mike Murgio, Yuri

4   Lebedev, Ricardo Hill, that they sent that January letter to

5   the NCUA stating "We, the Collectables Club, are based in New

6   Jersey and are the rightful board members of HOPE Federal

7   Credit Union", that's direct evidence of the actions that

8   preceded it.  So it's the very same lie that was made to the

9   NCUA all during November and preceding November.  That's the

10  very same lie.  So it's further evidence of the obstruction and

11  the false statements that were made to the NCUA.  That evidence

12  also is proof -- it further confirms the existence of the

13  conspiracy and the members of it.  The fact that all these

14  people were working together corroborates the fact that they

15  were working together previously with Mr. Gross, as well.

16       As far as the -- there's another category that

17  Ms. Santillo objects to, which is further attempts with other

18  credit unions.  So with ecommerce PMA and other credit unions.

19       Your Honor, the government's theory on that category

20  is that that, too, is evidence of what came before because it

21  shows -- it confirms that there was this, you know, MO, as it

22  were, that Murgio and associates were attempting to repeat.

23       So the fact that they were attempting to trick the

24  NCUA into allowing them to control another credit union

25  confirms and corroborates the fact that that's what the

 1    original plan was as well that did involve Mr. Gross as well as

 2    Kapcharge and other members of HOPE FCU.

 3            So our position is that all of that ultimately will be

 4    shown as further proof of Mr. Gross' involvement in the

 5    conspiracy.  And so the Court doesn't have to rule on that

 6    right now, the Court, again, under Gainey, can just wait to see

 7    how the evidence develops.  And we plan to show that there was

 8    an overall broad conspiracy at which all of these objects --

 9    payment of the bribes, receipt of the bribes, obstructing the

10    NCUA and making false statements to the NCUA -- that was the

11    broad conspiracy and we believe the evidence will defeat any

12    claim by Mr. Gross that he withdrew cleanly from the entire

13    conspiracy, and therefore, all the evidence should come in

14    under the coconspirator rule.

15            MR. KLINGEMAN:  May I be excused?

16            THE COURT:  Yes.

17            MS. SANTILLO:  Your Honor, given the timing and the

18    fact that the appropriate time that I had requested -- or the

19    time I had requested the limiting instruction be given was

20    after Mr. Freundt's testimony when there was things that I

21    didn't think were relevant to Mr. Gross' intent that were being

22    introduced, and considering the fact that the charging

23    conference is coming up, and there won't be any other witnesses

24    that speak to these issues between now and then, I think we can

25    save it for the charge conference, but I think we're going to

 1    be fine tuning the nature of this conspiracy a little bit in

 2    terms of what the jury will be instructed.

 3              THE COURT:  Okay.  We can take it up then.  And I

 4    encourage, because I think it forces you to have some

 5    precision, both as to what's being asked for by both sides, I

 6    encourage -- well, I don't know -- I do more than I

 7    encourage -- I'll require short briefing on it.  All right?

 8              Mr. Shin.

 9              MR. SHIN:  We'd be glad to brief it.  I'm sorry, but I

10    may have missed --

11              Are you requiring the briefing by the charge

12    conference or is it a time to be determined?

13              THE COURT:  Well, I think it would be useful before

14    the charges conference.  I mean, again, I think --

15              MR. SHIN:  My main hesitation on that, your Honor, is

16    that we'll certainly put on additional evidence tomorrow that

17    will be relevant to this issue, but we're also planning to put

18    forth evidence next week on Monday and Tuesday.  That's our

19    current estimate for the time remaining in the government's

20    case.  And so briefing in anticipation of the charge conference

21    will either be incomplete as to the evidence that will come or

22    it will -- it may be -- you know, it'll be speaking about

23    evidence that hasn't come in yet, and we don't know how

24    precisely if and how that remaining evidence comes in.

25              I should note also that --

 1             THE COURT:  But if we wait until after then we're

 2    at -- we'll be at the defense's case and then summation and

 3    charge.  There's not going to be any -- there's no room in the

 4    schedule to break between those.

 5             MR. SHIN:  I was going to add actually, your Honor, we

 6    also don't know whether anything will come in during the

 7    defense case that adds to the coconspirator -- that further

 8    supports the coconspirator --

 9             THE COURT:  Why don't we do this.  Why don't you lay

10    out your basic arguments in briefing.

11             Ms. Santillo, just your specific request, if it's any

12    different than what you've proposed.  And if not, your

13    arguments as to why, with citation to authority --

14             I mean, actually, I'll start with the government

15    because it's your legal argument as to the breadth of what

16    comes in.  I mean, what I have in mind, for example, is that

17    when we started the trial, there was a request to do a limiting

18    instruction -- I'll abbreviate the process, but basically, an

19    instruction with respect to Mr. Gross that nothing with respect

20    to the Dark Web comes in, right?  Do you recall that?

21             MR. SHIN:  Yes, your Honor.

22             THE COURT:  So the government there conceded that

23    there was some evidence that was coming in with respect to

24    what's charged with respect to Mr. Lebedev that shouldn't be

25    considered as against Mr. Gross.  Right?

 1              MR. SHIN:  Right.

 2              THE COURT:  So again, I had understood -- I mean,

 3    there is this withdrawal question and whether I think the

 4    government ultimately will have countered the suggestion of

 5    withdrawal from the conspiracy, and I think Ms. Santillo is

 6    right that exactly how the conspiracy is defined is relevant to

 7    that question.  But there's -- certainly, I think the

 8    government, either it has in evidence or proffered that it will

 9    be in evidence post the November meeting that would go to the

10    obstruction with respect to the NCUA that I just -- I think

11    there's no question I would permit to come in as against

12    Mr. Gross.  So in that sense, it's just plainly, in my mind,

13    too broad of a requested limiting instruction.

14              But whether there is some middle space along the lines

15    that Ms. Santillo is suggesting, or others, I don't know.  That

16    was an inarticulate way of saying I think I need more precision

17    from the parties as to the narrowness or the breadth of their

18    arguments and the law in support of those positions.

19              So I'll ask the government, because we have the

20    proposed limiting instruction from Ms. Santillo, the government

21    will juster do short briefing outlining why it thinks that

22    limiting instruction is inappropriate under the law, and along

23    the lines of what you just articulated, but in writing with

24    citation, and asking whether there's any distinctions to be

25    drawn between some of the evidence that's come in with respect

1    to Mr. Lebedev that appropriately the jury ought to be

2    instructed should not be considered as against Mr. Gross.

3            Again, I sort of see these as two issues; there's sort

4    of the broad withdrawal question, and then there's this more

5    narrow question.

6            MR. SHIN:  Understood, your Honor.  So just to make

7    sure I understand you correctly.  The proposed limiting

8    instruction that we're responding to is the one that

9    Ms. Santillo forwarded to the Court this afternoon?

10            THE COURT:  Yes.

11            MR. SHIN:  And then we're also to consider whether,

12   despite the breadth of her requested instruction, whether there

13   might be perhaps narrower instructions that would be acceptable

14   to the government?

15            THE COURT:  Right.  And maybe this falls between, but

16   I want to read with more care the argument that you've just

17   presented, for example, as to the appropriateness of the

18   evidence in which Mr. Gross was not involved of the

19   representations to the NCUA regarding the establishment of

20   another credit union, the ecommerce PMA is the one we saw

21   today, and there I'd want to see the government's argument as

22   to -- with some precision and law as to the appropriateness of

23   not having a limiting instruction with respect to that

24   evidence.

25            You have, maybe with my own lack of precision, a sense

 1    of what I'm looking for.  There's the immediate response to the

 2    broad limiting instruction that Ms. Santillo has proposed,

 3    which is grounded in a notion of clear withdrawal at the post

 4    meeting, and then there's sort of the set of narrow questions

 5    as to whether there's any evidence that, consistent with what

 6    the government said, for example, about the Dark Web, any

 7    evidence that's come in with respect to Mr. Lebedev that should

 8    be -- the jury should be instructed should not be considered as

 9    against Mr. Gross.  And perhaps in that category, the

10    government's argument as to why it's appropriate for the jury

11    to consider, for example, the ecommerce PMA evidence, the

12    efforts that establishment of another credit union to which

13    Mr. Gross did not participate, why that's appropriately

14    considered against him.  Full stop.

15             MR. SHIN:  Understood, your Honor.  And so I take it

16    your Honor would like to see that before the charge conference

17    in time for the charge conference?  Would a filing at the end

18    of day on Thursday be acceptable?

19             THE COURT:  Well, I want to give them a time to

20    respond.

21             MR. SHIN:  All right.

22             THE COURT:  So it sounds like end of the day

23    Wednesday, end of the day tomorrow, and then --

24             MR. SHIN:  Your Honor, given that your Honor has laid

25    out the precise questions, maybe we should simultaneously --

 1             THE COURT:  That's fine.  Let's do that.  So by

 2   5:00 p.m. on Thursday, simultaneous briefing.  Terrific.

 3             MR. SHIN:  Thank you, your Honor.

 4             THE COURT:  And it doesn't have to be long, it just

 5   has to --

 6             MR. NOBLE:  And Judge, the government had also filed

 7   our brief in support of our motion in limine, which I believe

 8   the response is due tomorrow.

 9             THE COURT:  That's true.

10             MR. NOBLE:  Okay.  Just to make sure that's on the

11   calendar, as well.

12             THE COURT:  Yes.

13             You have that in mind, Ms. Santillo?

14             MS. SANTILLO:  I do.  And the four witnesses that I'm

15   preparing for, so yes.

16             THE COURT:  You have a lot ahead of you.  I see that.

17             Any request for an alteration in light of all that?

18             MS. SANTILLO:  I would think I could do it by tomorrow

19   night after court, I just want to --

20             THE COURT:  You mean for the response to the

21   government's papers?

22             MS. SANTILLO:  Yes.

23             THE COURT:  That's fine.  That wouldn't come in --

24   that's not really an issue until Monday, right?

25             MS. CHOI:  Yes, your Honor.

```
 1                MR. NOBLE:  Yes.

 2                THE COURT:  That's fine, Ms. Santillo.

 3                MS. SANTILLO:  Thank you.

 4                THE COURT:  Anything else?

 5                MS. CHOI:  Yes, your Honor.  I just thought you might

 6    appreciate a preview of what's to come, to the extent you're

 7    curious.

 8                THE COURT:  Sure.

 9                MS. CHOI:  Okay.  So I just thought it might be a

10    good place to sort of reaffirm our belief that we're going to

11    be done early next week.

12                THE COURT:  Monday sounds good.

13                MS. CHOI:  Sorry?

14                THE COURT:  Monday sounds good.

15                MS. CHOI:  I'm not a miracle worker, your Honor, but

16    we're working on it.  We've cut the significant number of

17    government witnesses.  So that your Honor understands, we're

18    going to have hopefully one, but maybe two, very short

19    witnesses from Chase Bank to explain the bank fraud elements as

20    to Mr. Lebedev.

21                THE COURT:  So is this -- just so I understand, this

22    is after the four witnesses we've discussed?

23                MS. CHOI:  Correct.  This is after the four witnesses

24    we've discussed.  We going to call Chris Wilson -- and I don't

25    know the precise order, these are just the people we have left
```

 1    on deck -- Chris Wilson of the First Data, who is a payment

 2    processing company that will explain payment processing.  I

 3    think combined all three of those witnesses at most would be

 4    very short.  Terry Adam from the NCUA, who again would be --

 5    there is some -- we're eliminating the overlapping evidence,

 6    but just sort of trying to target specific pieces that haven't

 7    been through the other NCUA witnesses.  I have a witness from

 8    the IRS with regard to the disclosures that were made by the

 9    defendants.  And a summary witness whom we disclosed to the

10    defense from RSM who is an accountant who will go through the

11    flow of money and the tracing of the bribes and the other

12    various funds that were flowing to Mr. Gross and his various

13    accounts, as well as to some Coin.mx accounts, and Dream Host,

14    if we get to Dream Host.

15              I just wanted to note for the record --

16              THE COURT:  That you're not calling the other board

17    members?

18              MS. CHOI:  Yes.  That we're not intending to call the

19    other board members in our case in chief.  Obviously we reserve

20    the right to call certain of them in our rebuttal case,

21    depending on what the defense decides to put on in their

22    arguments regarding corrupt intent.

23              We also wanted to advise the Court about a few other

24    matters.  First is that we have done a forensic examination of

25    Mr. Lebedev's laptop that was referenced in Mr. Jarrow's

1    testimony.  When we were trying to prepare for Mr. Lebedev's

2    cross examination, we went back to the computer and realized

3    and we have a good faith reason to believe that prior to --

4    after his arrest, but prior to proffering with the government

5    later that week, that Mr. Lebedev engage in downloading pieces

6    of software that would forensically destroy relevant evidence

7    that was on those computers.  We don't intend to introduce that

8    in our case in chief.  We've told defense counsel about it as

9    soon as we realized it.  That was over a week ago.

10            We have put the defense counsel on notice that if, to

11   the extent that they are going to argue that Mr. Lebedev's

12   efforts for consent or to otherwise talk to the government

13   shows his good faith in trying to come clean but nevertheless,

14   the government charged him, I think that that would be relevant

15   evidence that would come in in a rebuttal case to show that, in

16   fact, he had destroyed a series of documents, and you know, he

17   has a computer science background, he used forensic tools to

18   wipe his hard drive and the slack space associated with that

19   prior to giving that to the government.  So we reserve the

20   right to call him to the extent that that's the way that the

21   defense case goes.

22            THE COURT:  And "him", you mean some forensic --

23            MS. CHOI:  Right.  It would be an individual, I

24   believe his name would be Tom Kearnan, who is an individual at

25   Berkeley Research Group, former computer scientist at the FBI.

 1              THE COURT:  All right.

 2              MS. CHOI:  Putting that aside -- I'm sorry.  Did you

 3    say something?

 4              THE COURT:  I didn't, no.

 5              MS. CHOI:  Now I'm hearing things.

 6              Putting that aside, I just wanted to note that we have

 7    not received from the defense to date any expert notice, any

 8    discovery, and any 3500 with regard to any of the witnesses

 9    they intend to call for defense case.

10              We've also served both defendants with an if-as-when

11    subpoena regarding documents that would be relevant to cross

12    examination for those defendants.  We haven't received any

13    information with regard to those.

14              The only 3500 we received is with regard to the

15    proposed board members, of course, in the context of the

16    briefing with regard to the accusation of selective

17    immunization, which your Honor denied, but we have not seen any

18    other 3500, so we would just note that we would like to get

19    some sense of the defense case at some point.  I think we've

20    worked in good faith to preview all our evidence to them ahead

21    of time, and so we would ask that, to make things go smoothly,

22    especially given the Court's schedule, that we would get -- and

23    I don't have doubt about this at this point -- but that we

24    would get -- you know, we would get good faith representations

25    from the defense, because I think we're about -- we're getting

1   there, and we'd like to be able to make sure that we're

2   prepared.

3           THE COURT:  Mr. Creizman.

4           MR. CREIZMAN:  Yes, I will.  We intend to honor our

5   obligations and provide advanced 3500 and discovery, to the

6   extent we're going to use any.

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. CHOI:  By when, your Honor?

2          MR. CREIZMAN:  By soon.  By the end of the week.

3          MS. CHOI:  Okay, by the end of the week, great.

4          THE COURT:  Ms. Santillo?

5          MS. SANTILLO:  Your Honor, we have to think about our

6    defense case, in terms of the government's new information,

7    that they're not calling any board members of HOPE FCU.  So we

8    need to think about what we'll do in that regard, and it may

9    change, probably over the weekend, in terms of who we're going

10   to put on.  But we'll be able to have that information over the

11   weekend probably.

12         THE COURT:  So, short of that information -- well,

13   Mr. Creizman, I guess I should clarify:  When you say end of

14   the week -- Mr. Creizman?  When you say end of the week, what

15   do you mean?  You mean Friday?

16         MR. CREIZMAN:  Friday.

17         THE COURT:  Okay.

18         MR. CREIZMAN:  No, before then.

19         THE COURT:  Sometimes I joke "thank God it's Friday,

20   only two more days till the end of the week."

21         MR. CREIZMAN:  Right.

22         THE COURT:  So I want to make sure that wasn't what

23   you had in mind.

24         MR. CREIZMAN:  That's it; Friday afternoon they should

25   have it.

1          THE COURT:  I guess, Ms. Santillo, other than that --

2          MS. SANTILLO:  I just have to confer with

3   Mr. Klingeman, who is not here, so I don't want to give a

4   definitive date without knowing his schedule.

5          THE COURT:  All right.  You'll get back to us tomorrow

6   so we have a sense of the schedule?

7          MS. SANTILLO:  Yes.

8          THE COURT:  All right.

9          I think that's it.  Just please do prepare for a super

10  short lunch tomorrow, since the jury is coming back in a after

11  a short lunch, which will condense our time for a break even

12  more.

13         Thank you, everyone.  Have a good night.  I'll see you

14  tomorrow.

15         (Adjourned to March 1, 2017 at 9:00 a.m.)

16                            *  *  *

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                          Page

JOSE FREUNDT

Direct By Mr. Noble  . . . . . . . . . . . .2042
Cross By Mr. Creizman  . . . . . . . . . . .2142
Cross By Mr. Klingeman . . . . . . . . . . .2230
Redirect By Mr. Noble  . . . . . . . . . . .2285
Recross By Mr. Creizman  . . . . . . . . . .2299
Recross By Mr. Klingeman . . . . . . . . . .2302

MAGDALENA FLOK

Direct By Mr. Noble  . . . . . . . . . . . .2306


                    GOVERNMENT EXHIBITS

Exhibit No.                                  Received

 1811   . . . . . . . . . . . . . . . . . . .2078

 1814   . . . . . . . . . . . . . . . . . . .2102

 2030   . . . . . . . . . . . . . . . . . . .2106

 2031 and 2035  . . . . . . . . . . . . . . .2108

 4509   . . . . . . . . . . . . . . . . . . .2129

 3504-14  . . . . . . . . . . . . . . . . . .2159

 6023   . . . . . . . . . . . . . . . . . . .2312

 6151   . . . . . . . . . . . . . . . . . . .2322

                    DEFENDANT EXHIBITS

Exhibit No.                                  Received

 14   . . . . . . . . . . . . . . . . . . . .2216