1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                            15 Cr. 769 (AJN)

5    YURI LEBEDEV and TREVON GROSS,

6              Defendants.                   Jury Trial

7    ------------------------------x

                                             New York, N.Y.
8                                            March 1, 2017
9                                            9:10 a.m.

10

     Before:
11
                         HON. ALISON J. NATHAN,
12
                                             District Judge
13                                           And A Jury

14                         APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     BY:  EUN YOUNG CHOI
17        DANIEL S. NOBLE
          WON S. SHIN
18        MICHAEL CHANG-FRIEDEN, Paralegal
          Assistant United States Attorneys
19
     CREIZMAN, PLLC
20        Attorneys for Defendant Yuri Lebedev
     BY:  ERIC M. CREIZMAN
21        MELISSA MADRIGAL
          JONATHAN MICHAELSON, Paralegal
22
     KROVATIN KLINGEMAN, LLC
23        Attorneys for Defendant Trevon Gross
     BY:  KRISTEN M. SANTILLO
24   BY:  HENRY E. KLINGEMAN

25

                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

```
 1              (Trial resumed; jury not present)

 2              THE COURT:  Matters to take up.

 3              MR. NOBLE:  Judge, I indicated to your law clerk that

 4    we had an issue, but we've been able to resolve it with defense

 5    counsel.

 6              THE COURT:  Great.  Thank you.  Anything else?

 7              Just to confirm the plan, I'll make a brief note that,

 8    "As you may have noticed, sometimes lawyers are in and out

 9    dealing with various matters.  That's true today for

10    Mr. Klingeman.  They should understand that that's typical and

11    normal."

12              And then, "We will interrupt the testimony of Ms. Flok

13    for the testimony of Robyn Guyer."

14              MR. NOBLE:  That's correct.

15              THE COURT:  So we'll have -- is it Ms. Guyer?

16              MR. NOBLE:  Ms. Guyer.

17              THE COURT:  -- Ms. Guyer followed by Flok, and then

18    McDonough and Valentine.

19              MR. NOBLE:  I think it'll be the other way around,

20    Steve Valentine and then Mr. McDonough.

21              THE COURT:  Anything else, Mr. Creizman?

22              MR. CREIZMAN:  No.  I was actually setting myself up.

23    Sorry.

24              THE COURT:  That's fine.  You do you.  Was it today

25    that you're to be in Judge Kaplan's at 5:00?
```

```
 1          MR. CREIZMAN:  No.  Thank you for remembering that.

 2   Monday he wants me there.

 3          THE COURT:  All right.  I was thinking today would be

 4   fine since we're stopping early.

 5          MR. CREIZMAN:  Right.

 6          MR. NOBLE:  Judge, could you confirm the scheduling

 7   for the day just in terms of timing?  Because we have quite a

 8   few witnesses and we want to make sure we're moving things

 9   along because we'd like to finish all four witnesses today.

10          THE COURT:  We'll end the day 15 minutes early, so

11   we'll end at 4:45, and I'd like to cut 15 minutes off the lunch

12   to make up for that.  I usually stop for lunch somewhere

13   between 12:30 and 1:00, depending on where we are and when we

14   took the morning break.  So I'll give the jurors 45 minutes for

15   lunch, a little bit less for us.  Does that answer it?

16          MR. NOBLE:  Yes, Judge.

17          THE COURT:  Anything else?  If not, we'll wait for our

18   jurors and I'll be back.  Thank you.

19          (Recess)

20          THE COURT:  We have all our jurors.  Anything?  We'll

21   go get the jurors.

22          (Continued on next page)

23

24

25
```

1              (Jury present)

2              THE COURT:  Members of the jury, thank you again so

3    much for enabling us to keep everything moving along.  I

4    greatly appreciate it.

5              Just two quick preliminary announcements, I guess.

6    One, you may have noticed throughout the trial that sometimes

7    the lawyers and legal assistants are in and out at various

8    points.  I just wanted to note, as I normally do, that that is

9    normal and typical.  Sometimes the lawyers are contending with

10   other matters, other things in the case and the like.  And I'll

11   note, Mr. Klingeman is out today and wanted to make sure that

12   you knew that that was perfectly fine, and normal, and part of

13   the process.

14             Second administrative note.  For scheduling reasons,

15   similar to at other points in the case, we're going to

16   interrupt the testimony of Ms. Flok who began yesterday, and

17   the government will, for scheduling purposes, calls a different

18   witness.  They'll finish with that witness, and then we'll

19   return to Ms. Flok.

20             Mr. Shin, you may call your next witness.

21             MR. SHIN:  Thank you, your Honor.  Just prior to

22   calling our next witness, the government would seek to

23   introduce some exhibits and publish a subset of them.

24             THE COURT:  All right.  Go ahead.

25             MR. SHIN:  The government offers, pursuant to

1    stipulations with defense counsel, Exhibits 807, 2300, 2301,

2    2302, 2303, 2304, 2305, 3559, and 3704 into evidence.

3            THE COURT:  Without objection?

4            MS. SANTILLO:  No objection.

5            MS. MADRIGAL:  No objection.

6            THE COURT:  Thank you.  The exhibits just read by

7    Mr. Shin are admitted.

8            (Government's Exhibits 807, 2300, 2301, 2302, 2303,

9    2304, 2305, 3559, and 3704 received in evidence)

10           MR. SHIN:  Ms. Grant, could you please publish Exhibit

11   No. 3559?  And if you could please turn to page 3?

12           This is an email chain dated November 19th, 2014.  It

13   begins by Mr. Gross writing to Robyn Guyer, Subject:  ACH

14   origination.  "Hey, Robyn.  I just wanted to follow up on being

15   able to train for the ACH origination.  Our member's business

16   is shut down until we get this resolved.  Thank you."

17           Ms. Grant, if you could turn to page 2, please, the

18   very bottom.

19           Ms. Guyer responds, "Trevon.  Vanessa will be doing

20   the training and she will try to get to" -- if you could turn

21   to the top of the next page, please -- "that today.  However, I

22   thought your member's business was going another direction

23   until you were directly with the FRB.  UA can't take the

24   1 million per day that you had.  We can do a smaller volume for

25   your individual member consumer transactions, but the large

 1    volume will drop our ratios."

 2            Ms. Grant, if you could return to page 2, please, and

 3    if you could focus on Mr. Gross' response.

 4            Mr. Gross responds to Ms. Guyer, "That business is

 5    gone.  It's much smaller and it's payroll.  Okay, we are

 6    standing by.  Thanks."

 7            And Ms. Guyer responds, "Okay, cool.  I forwarded your

 8    last email to Vanessa.  She should be contacting you soon.

 9    She's trying to speed up some other things to figure training

10    in."

11            If you could turn to the bottom of the first page.

12    Mr. Gross responds to Ms. Guyer with a copy to -- this email is

13    copied to Vanessa Boehm.  "Hey, Vanessa.  We are standing by

14    awaiting training.  Also, for more clarity, here are the

15    average daily totals will be in this range.  Credits - $63,000

16    (85 items) Debits - $25,000 (87 items).  Our member is eager to

17    resume processing these transactions.  Please advise.  Thanks."

18            Vanessa Boehm responds to Mr. Gross, "Hi Trevon.  I

19    haven't had a chance to get you all set up in Profit Stars but

20    hoping by end of today.  I will send you an email before I

21    leave letting you know a good time for training.  Should be

22    tomorrow but I will let you know for sure.  Thanks."

23            And Ms. Grant, the top email, please.  Trevon Gross

24    forwards this email to Kevin Pepe and Mark Francis and writes,

25    "It does not look like they will be able to get us set up today

1      but they are saying tomorrow.  See below."

2             Ms. Grant, if you could please publish 3704, please.

3      This is an email from Trevon Gross to Shoula Cohen and Mark

4      Francis.  Subject:  Wiring, dated December 1st, 2014.

5             Mr. Gross writes, "Hey Shoula.  Here is how to wire

6      money to our new correspondent UANW."  And then listed below

7      his comment is the routing number, United Advantage Northwest

8      Federal Credit Union's address and phone number and account

9      number, and then a "with further credit to" number.

10             You can take that down, please.

11             Government calls Robyn Guyer.

12             THE COURT:  Ms. Guyer may come forward.

13      ROBYN GUYER,

14          called as a witness by the Government,

15          having been duly sworn, testified as follows:

16             THE WITNESS:  ROBYN, GUYER.

17             THE COURT:  When you're ready, Mr. Shin.

18             MR. SHIN:  Thank you, your Honor.

19      DIRECT EXAMINATION

20      BY MR. SHIN:

21      Q.  Ms. Guyer, good morning.

22      A.  Good morning.

23      Q.  Are you settled in?

24      A.  I think so.

25      Q.  You'll need to be close to the microphone, if you wouldn't

1    mind, as close as possible.  Thank you.

2           Ms. Guyer, where do you work?

3    A.  United Advantage Credit Union.

4    Q.  Where is that located?

5    A.  Portland, Oregon.

6    Q.  How long have you worked there?

7    A.  Since 1987.

8    Q.  And have you had the same job your entire time at United

9    Advantage?

10   A.  No.  I started there as a loan officer, moved into

11   operations about a year later.  In the early '90s, VP, in the

12   mid '90s EVP, and within about a year and a half ago coCEO.

13   Q.  And what, if any, areas have you focused on in your work at

14   United Advantage?

15   A.  Being a small credit union, you kind of do everything, but

16   focus would primarily be in the operations, accounting,

17   compliance, disaster recovery, security, physical security.

18   Q.  And are there any particular types of transactions that you

19   focus on?

20   A.  ACH, debit, and credit card transactions, and share draft

21   processing.

22   Q.  Now, what kind of a credit union is United Advantage?

23   A.  We're a seg-based credit union.  So our primary members are

24   Local 290 Union Plumbers and Pipefitters, Steamfitters, Union

25   Pacific Railroad for the Portland area, and Warren Industries,

1    manufacturing type.

2    Q.  So in addition to serving those local workers, do you also

3    have other types of customers or members?

4    A.  We do.  We have small businesses and a few small credit

5    unions.  My credit union also owns CUSO that works with credit

6    unions -- small credit unions all over the country in the back

7    office area.

8    Q.  And just because we may not be familiar, what is a CUSO?

9    A.  Credit Union Service Organization.  So it's a

10   credit-union-owned for-profit business that is primarily doing

11   something for your members or for other members.

12   Q.  What's the name of your CUSO?

13   A.  CU By Design.

14   Q.  What does CU By Design do?

15   A.  We do bookkeeping for small credit unions.  It's a way for

16   a credit union -- a smaller credit union who might have a

17   full-time bookkeeper that doesn't need -- you know, doesn't

18   have a full time -- full day's worth of bookkeeping to do, to

19   share that person with another credit union who needs a

20   bookkeeper, that type of exchange of work through the CUSO.

21   Q.  So you provide the service to other smaller credit unions.

22   A.  Yes.

23   Q.  Now, how big of a credit union is United Advantage?

24   A.  Right now about 37 million.

25   Q.  And 37 million represents what?

1   A.   Assets.  I'm sorry.

2   Q.   And what were the assets in the 2014 period?

3   A.   34 million.

4   Q.   And about how many members does your credit union have?

5   A.   6,000 roughly.

6   Q.   About how many employees?

7   A.   Ten, including the CUSO employees.  There's two in the

8   CUSO, so eight in the credit union.

9   Q.   So in your experience, your credit union, how does it size

10  up in the credit union industry?

11  A.   We're small.

12  Q.   What types of services does your credit union provide to

13  its customers?

14  A.   Car loans, mortgage loans, checking accounts, IRA accounts,

15  ACH transactions, bill pay, remote deposit, all those normal,

16  everyday banking transactions.

17  Q.   Did there come a time when you met Trevon Gross?

18  A.   Yes, in September of 2014.

19  Q.   And what were the circumstances of that meeting?

20  A.   It was a software conference, users conference.  Our credit

21  unions used the same based software, so that was in CU South's

22  conference in New Orleans.

23  Q.   And could you describe the meeting that you had with

24  Mr. Gross, or how is it you met Mr. Gross at the conference?

25  A.   I did a back office efficiency session, and he was in the

1    room and asked a lot of questions, and so, yeah.

2    Q.  Did you learn what, if any, financial institution Mr. Gross

3    was affiliated with?

4    A.  With HOPE, Helping Other People Excel, in New Jersey.

5    Q.  And did you learn what his role was with that credit union?

6    A.  He was on the board.

7    Q.  Did you meet anyone else from HOPE Credit Union at that

8    conference?

9    A.  I did.  Ricardo Hill, the manager.

10   Q.  And what did you understand his role to be at the credit

11   union?

12   A.  The manager.

13   Q.  Did there come a time when Mr. Gross asked your credit

14   union about helping HOPE FCU process ACH transactions?

15   A.  Yes.

16   Q.  When was that?

17   A.  November of 2014.

18            MR. SHIN:  Ms. Grant, if you could please publish

19   2300.

20   Q.  Ms. Guyer, is this an email chain between you and

21   Mr. Gross?

22   A.  Yes.

23   Q.  Dated November 18th, 2014?

24   A.  Yes.

25   Q.  What's the subject line of this chain?

1  A.  "Need correspondent".

2          MR. SHIN:  Ms. Grant, if you could focus on the bottom

3  email, please.  If you could include the header of the bottom

4  email.  Thank you.

5  Q.  So Ms. Guyer, if you could please read what Trevon Gross

6  wrote to you in this highlighted email.

7  A.  "Hey, Robyn.  The FRB notified us that Alloya, our

8  correspondent, filled paperwork to revoke our ability to settle

9  with them.  They wanted us to put 160K in permanent reserves

10 with them and we said we are moving to the FRB in a month and

11 would not do it.  This is their response.  Is it possible for

12 you to all to serve in the role until we are set with the FRB?

13 If so, what do we need to do?  Thanks.  I can be reached on my

14 cell."

15 Q.  Thank you, Ms. Guyer.

16          Did you learn the specifics that led Alloya to make

17 this particular decision regarding HOPE FCU?

18 A.  I did not.

19 Q.  Did HOPE FCU in fact seek to open an account at United

20 Advantage?

21 A.  Yes.

22          MR. SHIN:  Ms. Grant, if you could please publish

23 Exhibit 807, please?  If you could turn to the third page of

24 the PDF, please?

25 Q.  Ms. Guyer, what is this document?

 1  A.   This is the business account agreement to open an account

 2  at United Advantage Credit Union, a business account.

 3  Q.   Who completed the information in this agreement?

 4  A.   Mr. Gross.

 5  Q.   It's dated November 18th, 2014?

 6  A.   Yes.

 7           MR. SHIN:  Ms. Grant, if you could turn to the next

 8  page, please, and if you could focus in on the bottom.

 9  Q.   Ms. Guyer, if you could read at the very bottom next to the

10  word "initial".

11  A.   "I certify that this business is not one of the following

12  types of businesses:  Business located outside of the US,

13  casino/gambling activities --"

14           MR. SHIN:  Ms. Grant, if you could go to the top of

15  the next page, please.

16  Q.   Please continue, Ms. Guyer.  Thank you.

17  A.   "-- money service business, includes non-bank businesses

18  whose purpose is payday lending or check cashing."

19  Q.   Now, Ms. Guyer, do you permit businesses in these

20  categories of business to open accounts at United Advantage?

21  A.   No.

22  Q.   Now, do you permit credit unions that process transactions

23  for these types of businesses to open accounts at United

24  Advantage?

25  A.   We allow them to open accounts, but not to transact those

1   types of transactions through our origination.

2   Q.  And why does United Advantage impose those restrictions?

3   A.  We impose the restriction because of the cost of the

4   monitoring for the risk that you're taking when you have those

5   types of businesses -- have accounts for those types of

6   businesses.

7   Q.  Could you explain for the jury what the risks are that are

8   associated with those types of transactions or businesses?

9   A.  Those businesses -- in a credit union, you know your

10  members so you already have a relationship with them.  These

11  businesses don't generally have customers that they have a

12  relationship with and that they know well, so you spend more

13  time monitoring and watching for things like fraud, those types

14  of activities, because they are less known to you than your

15  regular members would be.  We would not be able to -- for us,

16  at our size, that would require at least a full-time person, if

17  not software to monitor those transactions, and that's

18  something that we can't afford to do.

19  Q.  In addition to the fraud risks that you identified, are

20  there any risks associated with the volumes transacted by these

21  sorts of businesses?

22  A.  There are.  It's not money that you tend to keep, so as a

23  credit union, the money you have on deposit you use to loan out

24  to your members.

25          These types of businesses, that's money in and money

1   right back out, so essentially, it's not doing you any good,

2   it's not doing your members any good, generally.  You have to

3   reserve with the Federal Reserve for the volume of the funds

4   that are going through your account with the Federal Reserve.

5   Q.  And what is the size of the volumes of these businesses as

6   opposed to other businesses?  So the overall volume.

7   A.  I don't know that -- I'm sorry.  I don't know.  I don't do

8   business with them so I don't kind of keep track of what

9   they're -- I just know it's more than what we would be

10  comfortable with.

11  Q.  So it's a higher volume than what you'd be comfortable

12  with?

13  A.  Yes.

14  Q.  Okay, fair enough.  Thank you.

15          So the account opening document that we've been

16  looking at --

17          MR. SHIN:  Ms. Grant, if you could turn back to the

18  first page -- I'm sorry, page 3 of the PDF.  Thank you.

19  Q.  Does this account opening document itself say anything

20  about ACH transactions in it?

21  A.  Not specifically, no.

22  Q.  Did Mr. Gross, in connection with opening an account,

23  complete any documents about ACH?

24  A.  Yes, an application for ACH origination.

25  Q.  And did you also have any discussions with Mr. Gross about

 1   ACH in connection with opening an account?

 2   A.  We did.  He was originating previously through Alloya and

 3   needed, for a brief period of time, to -- until they were set

 4   up with the Fed, to originate ACH, and our discussions were

 5   that we were okay with the regular transactions that you would

 6   normally do as a credit union for your members, but not -- that

 7   we couldn't handle the volume that he initially talked to us

 8   about.

 9   Q.  During these discussions, did he describe for you what

10   types of ACH transactions HOPE FCU was processing?

11   A.  Not specifically the types of transactions.  He indicated

12   in those conversations that it was a high volume and there were

13   several businesses --

14   Q.  I'm sorry.  I can't tell if you've completed your answer or

15   you're thinking.

16   A.  -- I'm thinking -- several businesses that were -- I'm

17   going to use my hands, I'm sorry -- that were somewhat of

18   benefactors.  They were wanting to do business with the credit

19   union in order for the credit union to have a stream of income

20   that they wouldn't normally have being a small credit union.

21   Q.  And you testified about two answers ago that you discussed

22   doing regular transactions or regular volumes.  Could you

23   explain what you meant by that?

24   A.  Regular volumes would be originating loan payments for

25   loans that your members have, whether with you or with someone

1   else, or account transfers between your account with the credit

2   union and your account with your bank, those types of

3   transactions.

4   Q.  And so did you tell him that there were certain types of

5   transactions, ACH transactions, that he could not do, or did

6   you impose any limits on the transactions that he could do?

7   A.  I don't remember specifically saying "you cannot do these

8   types of transactions", I think my recollection is it was

9   "these are the kinds that you can do and the volumes need to be

10  low".

11  Q.  What, if anything, did Mr. Gross say in response to your

12  telling him the types of transactions that he could do?

13  A.  He understood that we couldn't handle large volumes and he

14  was okay with that.

15          MR. SHIN:  Ms. Grant, if you could please publish

16  2301.  If you could please go to the last page of this exhibit.

17  Second page, please.  I'm sorry about that.  If you could

18  please go to the middle email.

19  Q.  Now, Ms. Guyer, is this an email chain between you and

20  Mr. Gross?

21  A.  It is.

22  Q.  Dated November 18th, 2014?

23  A.  Yes.

24  Q.  If you could please read what Mr. Gross wrote to you there

25  in that highlighted portion?

1   A.  "Files have been uploaded.  The ACH transactions will be

2   done on Thursday, and it is a mixture of payroll, merchant

3   debits, et cetera.  It will not be more than 3 million max.  We

4   are prepared to give more to cover the reserve requirement.

5   Can you send requiring instructions so we can move money?"

6   Q.  Ms. Guyer, what, if any, understanding did you have of what

7   Mr. Gross said in that email about ACH transactions?

8   A.  That that was not what we had agreed on.

9   Q.  Okay.  So your reaction to that email was that it was not

10  what you had agreed on?

11  A.  I'm sorry, yes.

12  Q.  So my question is, what was your understanding of what he

13  wrote in that email?

14          MS. SANTILLO:  Objection.

15          THE COURT:  Overruled.

16          THE WITNESS:  My understanding was that he had

17  prepared a file and these were the types of transactions that

18  were ready to be uploaded.

19  Q.  Did you have any understanding of what he meant when he

20  said "it's a mixture of payroll, merchant debits, et cetera"?

21  A.  Not specifically.

22  Q.  Did you have any understanding of what he meant when he

23  said "it will not be more than 3 million max"?

24  A.  I understood that to be a single file, the file that was

25  happening on Thursday, and that was quite a bit more than what

 1    we had talked about and agreed to.

 2    Q.  So what, if anything, did you do after you received and

 3    read this email?

 4    A.  I called him.

 5    Q.  Could you describe your discussion with him?

 6    A.  I said, "This is not what we agreed to.  We can't do that

 7    volume of transactions.  This was supposed to be regular

 8    consumer transactions, loan payments, and a small payroll, so

 9    this is quite a bit different."  It was a little pushy and not

10    what we talked about, so I wasn't terribly happy at this point.

11    Q.  What, if anything, did Mr. Gross say in response to you

12    during this conversation?

13    A.  That, yeah, he understood, and that file would not be

14    processed, and yes, we were back to our original understanding

15    of the agreement.

16              MR. SHIN:  Ms. Grant, you can take down the exhibit.

17    Thank you.

18    Q.  Ms. Guyer, in connection with opening the account, did you

19    try to find out more information about HOPE FCU?

20    A.  We use NCUA's site for information on any credit union.

21    It's public information from the quarterly 5300 call reports

22    that credit unions file.

23    Q.  Do you rely on that kind of information in deciding whether

24    to open an account for a credit union?

25    A.  We do.

1   Q.  Did you rely on it in this particular instance?

2   A.  We did.

3          MR. SHIN:  Ms. Grant, if you could publish 807 and

4   turn to page 9 of that document, please.

5   Q.  Ms. Guyer, what is this document?

6   A.  This is a copy of a web page from the NCUA website.

7   Q.  And is this something you looked at in deciding whether to

8   open an account for HOPE FCU?

9   A.  It is.

10  Q.  Could you just read for the jury what the assets are that

11  are listed here?

12  A.  $436,642.

13  Q.  And how many members are listed?

14  A.  124.

15  Q.  The manager/CEO, who is listed there?

16  A.  Ricardo Hill.

17  Q.  Now, how does the size of HOPE FCU as reflected in this

18  document compare to your credit union?

19  A.  Quite a bit smaller.

20  Q.  Quite a bit smaller than what you had said itself was a

21  small credit union?

22  A.  Yes.

23         MR. SHIN:  Ms. Grant, you can take that down.

24  Q.  Now, did you in fact open the account for HOPE FCU?

25  A.  We did.

1    Q.  Now, once the account was opened, did United Advantage

2    perform any compliance checks for HOPE FCU's ACH transactions?

3    A.  Not for the ACH transactions, no.

4    Q.  Why not?

5    A.  ACH origination, they're a financial institution, it's

6    their responsibility to do the compliance on their clients and

7    members.

8    Q.  Do you know one way or another whether HOPE FCU in fact

9    performed those checks on its ACH transactions?

10   A.  I do not.

11           MR. SHIN:  Ms. Grant, if you could publish 2302.

12   Q.  Ms. Guyer, this is an email chain involving you, Vanessa

13   Boehm, and Trevon Gross; is that correct?

14   A.  Yes.

15   Q.  Dated November 19, 2014?

16   A.  Yes.

17           MR. SHIN:  Ms. Grant, if you to turn to page 3 of this

18   document.  If you could highlight that.  Thank you.

19   Q.  Ms. Guyer, if you could just read what Mr. Gross wrote

20   there.

21   A.  "Hey, Robyn.  I just wanted to follow up on being able to

22   train for the ACH origination.  Our member's business is shut

23   down until we get this resolved.  Thanks."

24   Q.  What did you understand Mr. Gross to mean there by "our

25   member's business is shut down until we get this resolved"?

1   A.   I understood it to mean that the businesses that we had

2   talked about previously were unable to process or do anything

3   through HOPE.

4   Q.   Now, specifically, the "our member", did you have any

5   understanding of what he meant by that?

6   A.   Not specifically -- not specifically the particular

7   business.  I assumed it was one of the ones we had previously

8   talked about, but --

9   Q.   Is this what you were referring to earlier about how there

10  were benefactor businesses?

11  A.   Yes.

12          MR. SHIN:  Ms. Grant, if you could turn to page 2,

13  please, toward the bottom.

14  Q.   Ms. Guyer, I'm not going to ask you to read this email

15  aloud, but if you could look at the sentence there that says --

16  the two sentences regarding the member's business going in

17  another direction, and then UA not being able to take the

18  1 million per day.  And then --

19          MR. SHIN:  Ms. Grant, if you could flip over to the

20  next page.  The other way.

21  Q.   -- and then the end of your email there, "The large volume

22  will drop our ratios."

23          Ms. Guyer, what did you mean when you said you can't

24  take the 1 million per day and "the large volume will drop our

25  ratios"?

1    A.  We monitor our -- well, dozens of ratios, but in particular

2    liquidity ratio would have fallen had this million -- extra

3    million dollars a day that wasn't ours, so that's what I was

4    talking about there is that that's a lot of -- our average is

5    just over 500,000, 530 to $550,000, a day in ACH.  This is

6    almost double that.  So our liquidity ratios would have

7    suffered.

8    Q.  What, if any, affect would this additional volume have had

9    on capital that you were required to keep with the Federal

10   Reserve?

11   A.  It would have dramatically increased the amount of money we

12   would have had to keep at the Fed, who doesn't pay a whole lot

13   for that.  So we're not -- it's reducing our ability to earn

14   money for our members by having to hold money somewhere that

15   does nothing but sit there.

16   Q.  So Ms. Guyer, you testified that you averaged about

17   500,000, maybe $550,000 of ACH transactions per day?

18   A.  Yes.

19   Q.  Is processing ACH transactions profitable for United

20   Advantage?

21   A.  Not at all.  It costs us.

22   Q.  Could you just lay out what you mean by that?

23   A.  We don't charge for it, and we pay the Fed for processing

24   the transactions, we pay employees to process any exceptions,

25   as well as set up and process the member's requests for ACH.

1    So it's not a profitable -- it's a service we offer, but it's

2    not a moneymaker.

3    Q.  And so just to be clear, when you said that you don't

4    charge for ACH, is that true of all ACH transactions or do you

5    treat different customers differently?

6    A.  That's true of all ACH.  The only difference would be for

7    the credit unions.  We pass along what we are charged by the

8    Fed.  That wouldn't be fair to our members to have to pay for

9    other credit unions' transactions, so we do pass along the fee,

10   but there's no mark-up, it's just straight across.

11          MS. SANTILLO:  Now, Ms. Grant, if you could go to the

12   middle of page 2.

13   Q.  Ms. Guyer, when Mr. Gross wrote that the business is gone,

14   it's much smaller and it's payroll, what, if any, understanding

15   did you have of what he was writing?

16   A.  My understanding was that the only transactions that would

17   be going through ACH that they would be originating were the

18   regular consumer ones we had talked about before and a small

19   payroll, that that business would not be any of the

20   transactions that were being originated.

21          MS. SANTILLO:  Ms. Grant, if you could go to page 1.

22   If you could highlight the bottom email from Mr. Gross.

23   Q.  Ms. Guyer, when Mr. Gross writes there that, "The average

24   daily totals will be in this range:  Credit 63,000, debits

25   25,000," what was your understanding of the volume that he was

1    telling you about?

2    A.   That didn't raise any flags for me.  That looked -- that

3    didn't look unusual for me for their --

4    Q.   So fair to say this is far below the 1 million per day that

5    you were worried about?

6    A.   Yes.

7              MR. SHIN:  Ms. Grant, if you could please publish 807?

8    Page 42 of 807.

9    Q.   Ms. Guyer, what is this document?

10   A.   This is a copy of a wire.

11   Q.   If you could just describe the basic fundamentals of this

12   particular transaction for the jury.  What's the date?

13   A.   November 24th, 2014.

14   Q.   What's the amount?

15   A.   The amount is $6,000.

16   Q.   Who was sending the money?

17   A.   The sending bank is Citibank.  The originating sender, the

18   originator is Collectables Club.

19   Q.   Collectables Club?  Okay.

20   A.   Mm-hmm.

21   Q.   Who was the money being sent to?

22   A.   Helping Other People Excel FCU is the beneficiary.

23   Q.   This is to their account --

24   A.   To their account.

25   Q.   -- at your credit union?

1   A.  At my credit union.

2          MR. SHIN:  Ms. Grant, you can take that down.

3   Q.  So Ms. Guyer, after you opened HOPE FCU's account at your

4   credit union, did you monitor the account?

5   A.  For the first three to four weeks we monitored more

6   closely.  But yes, we did monitor the account.

7   Q.  Why did you monitor it more closely for the first few

8   weeks?

9   A.  I think because of the email exchanges and the phone calls

10  and the number of times that I felt pushed to do more -- not to

11  do more -- but to allow more, so I wanted to monitor and make

12  sure there weren't large amounts going through after I had

13  requested that there not be.

14         MR. SHIN:  Ms. Grant, could you please publish 807,

15  page 21?  If you could highlight the membership summary

16  section.

17  Q.  First of all, Ms. Guyer, is this a statement for the HOPE

18  FCU account for the month of November?

19  A.  Can you lower the -- yes.  Thank you.

20         MR. SHIN:  If we could just show that to the jury

21  there.  Ms. Grant, if you could zoom in again on the membership

22  summary section.

23  Q.  What, if any, reaction did you have to the total debits and

24  credits that were passing through during the month of November?

25  A.  That's approximately what I expected to see.

 1              MR. SHIN:  Ms. Grant, within this document, if you

 2      could please go to page 43.

 3      Q.   What is this document, Ms. Guyer?

 4      A.   Another copy of a wire.

 5      Q.   What's the date?

 6      A.   December 2nd.

 7      Q.   And the amount?

 8      A.   It looks like it's zero.

 9              THE COURT:  Make it larger.

10              THE WITNESS:  Oh, 50,000.

11      Q.   Who was sending this wire?

12      A.   Citibank.  It's coming from Citibank for Collectables Club.

13      Q.   So Collectables Club is the originator in this?

14      A.   Right.  And the beneficiary here is United Advantage.

15              MR. SHIN:  Ms. Grant, if you could turn to the next

16      page, please.  If you could zoom in on -- yes, if you could

17      just blow up the whole thing.

18      Q.   If you could just read to yourself there the paragraph at

19      the bottom.  What, if any, relationship is there between this

20      and the wire that we just looked at?

21      A.   This is a service message that is correcting the

22      information on the wire that we just looked at.

23      Q.   What was it correcting?

24      A.   The beneficiary.

25      Q.   So who is the beneficiary as amended?

1   A.   It's amending the beneficiary name to read Helping Other

2   People Excel FCU account, and it lists the account number at UA

3   Credit Union.

4   Q.   So that information was missing on the prior page.

5   A.   Right.

6          MR. SHIN:   Ms. Grant, if you could flip to page 46.

7   Q.   Ms. Guyer, if you could just read to yourself the text at

8   the very bottom and then explain what is happening with this

9   particular transaction.

10          THE COURT:   Make it larger, please.

11          THE WITNESS:   This is returning a wire that was

12   received on December 2nd.

13   Q.   And it's returning a wire that has some connection to

14   Collectables Club?

15   A.   It is, yes.

16   Q.   So is it fair to say this is returning the wire -- the

17   50,000 that we just looked at?

18   A.   If the IMATS match up, then yes, it would be.

19          MR. SHIN:   Ms. Grant, if you could turn to page 49.

20   If you could just zoom in on the top half.

21   Q.   What transaction is this reflecting?  Let's start with the

22   date.

23   A.   December 5th, 2014.

24   Q.   The amount?

25   A.   The amount is $1,637,946.90.

 1   Q.   Is this money being wired?

 2   A.   This is a wire.

 3   Q.   Who is the sender of this -- the originator of this wire?

 4   A.   Sending bank is HSBC bank in the US, the originator is

 5   Kapcharge Inc., and the originating financial institution is

 6   Swift Bank, or Bank of Montreal wires account.

 7              MR. SHIN:  Ms. Grant, if you could zoom in on the

 8   bottom half, please.

 9   Q.   And where is this money going?

10   A.   The beneficiary is HOPE FCU.  So it's going to HOPE FCU's

11   account at United Advantage.

12              MR. SHIN:  Ms. Grant, if you could turn to page 53,

13   please.  If we can zoom in on the text.  Thank you.

14   Q.   Is this another wire transaction?

15   A.   Yes.

16   Q.   What's the date?

17   A.   December 10th, 2014.

18   Q.   What's the amount?

19   A.   The amount is $350,000.

20   Q.   Who is the originator?

21   A.   Originating bank -- or the sender is Wells Fargo, the

22   originator is TKC Worldwide LLC.

23   Q.   And where is the money going?

24   A.   Beneficiary information WLCC.

25   Q.   WLCC space II?

 1  A.  Yes.

 2          MR. SHIN:  You can take that down, Ms. Grant.

 3  Q.  We've seen a couple of names.  We've seen Kapcharge and now

 4  WLCC.

 5  A.  Yes.

 6  Q.  Do you recognize those names?

 7  A.  I do now, yes.

 8  Q.  Okay.  And how, if at all, are you familiar with those

 9  names?

10  A.  On January, during our exam, the examiners requested the

11  compliance documentation that HOPE had for those businesses.

12  Q.  And this is January of when?

13  A.  2015.

14  Q.  So is it your understanding that they had something to do

15  with the ACH transactions that HOPE was processing through your

16  credit union?

17  A.  Yes.

18          MR. SHIN:  Ms. Grant, if you could publish 2303.

19  Q.  Ms. Guyer, do you see here in this email chain, Trevon

20  Gross, at the bottom email, he writes that he wants to

21  introduce you to Charles Blue?  He writes to Diane Kilgore, "I

22  want to introduce you to Charles Blue."

23  A.  I do see that.

24  Q.  "He is our new CEO and has day-to-day responsibility for

25  running the CU."

1    A.  Yes.

2    Q.  And this email was forwarded to you?

3    A.  Yes.

4    Q.  So after you received this email, did you subsequently have

5    dealings with Mr. Blue?

6    A.  I did.

7               MR. SHIN:  You can take that down, please, Ms. Grant.

8    Q.  Did there come a time when you became aware that HOPE FCU

9    had a larger balance in its account than you expected?

10   A.  Yes, in mid December.

11   Q.  What was the balance that you saw that you noticed?

12   A.  It was over 2 million.

13   Q.  What reaction, if any, did you have to that?

14   A.  I called HOPE to talk to someone there to find out when

15   that was going to be removed from their account.

16   Q.  Do you remember who you spoke to?

17   A.  I believe it was Charles Blue, but I'm not 100 percent.

18   Q.  Who else might it have been if not Charles Blue?

19   A.  It would either have been Mr. Gross or Charles Blue.

20   Q.  But to the best of your recollection, which one of those do

21   you believe it was?

22   A.  I believe --

23               MS. SANTILLO:  Objection.

24               MR. CREIZMAN:  Objection.

25               THE COURT:  Sustained.

1   Q.  During this conversation, what did you say during this

2   conversation?

3   A.  "The money has to go.  It cannot stay in the account.  We

4   had an arrangement and the balance was never to have gotten

5   that high."  And I also asked, "Where are we on getting set up

6   with the Fed?  Because our original discussion was we were

7   going to do this for you for a month, so where are we at?"

8   Q.  When you say "where are we at", could you just specify what

9   you meant?

10  A.  Oh, I'm sorry.  At what point in the setup with the Federal

11  Reserve Bank for HOPE to be direct with the Federal Reserve, at

12  what stage were they in that process.

13  Q.  And what, if anything, were you told during this

14  conversation?

15  A.  That they were waiting for the Fed Line Advantage equipment

16  hardware.

17  Q.  During this conversation, did you reach an agreement about

18  the timing of this move?

19  A.  Of the $2 million outside of the account, yes, it would be

20  as soon as possible.

21  Q.  Did you come to an agreement about closing down or taking

22  action with their account at your credit union?

23  A.  In December, no, we did not.

24          MR. SHIN:  Ms. Grant, if you could publish 807,

25  page 19.  If you could zoom in on the header portion.

 1    Q.  Ms. Guyer, is this an account statement for HOPE FCU at

 2    your credit union for December?

 3    A.  It is.

 4    Q.  2014?

 5    A.  Yes.

 6           MR. SHIN:  Ms. Grant, if you could zoom in on the

 7    summary, the membership summary.

 8    Q.  If you could read what the total debits and total credits

 9    were for that month?

10    A.  Total debits, $2,804,281.85.  Total credits, $3,175,941.60.

11    Q.  Were those volumes consistent with your agreement with

12    Mr. Gross?

13    A.  They were not.

14           MR. SHIN:  Ms. Grant, if you could please publish

15    2304.  If you could zoom in on the text.  Thank you.

16    Q.  Ms. Guyer, is this an email from you to Trevon Gross and

17    Charles Blue, copy to Blarkins@hope-fcu.com?

18    A.  It is.

19    Q.  Dated January 7, 2015?

20    A.  Yes.

21    Q.  Subject, "NCUA call"?

22    A.  Yes.

23    Q.  Could you please read the text of the email?

24    A.  "Could one of you call me, please, ASAP?  Our NCUA

25    supervisory examiner called this morning with serious concerns

 1    about your account with us.  Thanks."

 2    Q.  Ms. Guyer, what was the issue that you were having with the

 3    NCUA that's mentioned here?

 4    A.  NCUA did not believe that we were authorized or able to

 5    have a transaction account for a credit union.  We could have

 6    term accounts or savings accounts, but not transaction

 7    accounts.  So that was the concern.

 8    Q.  Did there come a time when you discussed this issue with

 9    anyone from HOPE FCU?

10    A.  Yes, in early January.

11    Q.  And who did you speak to?

12    A.  I believe it was Charles Blue.

13    Q.  What was that discussion with him?

14    A.  That we would have to close the account because we weren't

15    allowed to have transaction accounts for other credit unions at

16    our credit union.

17              MR. SHIN:  Ms. Grant, if you could publish 2035,

18    please.

19    Q.  Ms. Guyer, is this an email from Charles Blue to you,

20    copying Trevon Gross, subject:  ACH transactions, dated

21    January 8th, 2015?

22    A.  It is.

23    Q.  Could you please read what Mr. Blue wrote?

24    A.  "We received a cease order from the NCUA today.  Therefore,

25    and until further notice, there should be no ACH transactions

 1    originated to or from our account other than returns.  I will

 2    discuss with you tomorrow next steps and/or moving the balance

 3    out of our account.  Thank you for your attention."

 4    Q.  Ms. Guyer, what, if any, action did you take after

 5    receiving this email?

 6    A.  We removed access to the ACH origination software.

 7    Q.  And why did you do that?

 8    A.  Because NCUA had given a cease order, so NCUA is the

 9    regulator, you cease.

10    Q.  And did there come a time when you finally closed the

11    account?

12    A.  Yes.

13    Q.  About when was that?

14    A.  Mid to end of March.

15    Q.  Of 2015?

16    A.  Of 2015, yes.

17    Q.  So why was there a delay between January 8th, 2015, and

18    closing the account in March of 2015?

19    A.  Because of the originations and the ability for members to

20    dispute any origination.  They have 60 days past their

21    statement date.  So we didn't want -- UA, my credit union, did

22    not want the account closed for 60 days in the event there were

23    any disputed items, so we required that there be a balance left

24    to cover any disputed items that might come in.

25                (Continued on next page)

1        MR. SHIN:  One moment?

2        No further questions, your Honor.

3        THE COURT:  All right.  Thank you.

4        Mr. Creizman?

5        MR. CREIZMAN:  Yes.  Just briefly.

6        THE COURT:  Okay.

7   CROSS-EXAMINATION

8   BY MR. CREIZMAN:

9   Q.  Good morning.

10  A.  Good morning.

11  Q.  When was the conference that you met Pastor Gross and Rico

12  Hill?  Do you recall when -- it was 2014, correct?

13  A.  September.

14  Q.  It was in September.

15       Did you ever speak with Rico Hill again?

16  A.  I did not.

17  Q.  Did you ever speak with a man named Jose Freundt?

18  A.  Can you --

19  Q.  Jose Freundt at HOPE FCU.

20  A.  I did not.

21  Q.  Jen Wotherspoon?

22  A.  I did not.

23  Q.  Yuri Lebedev?

24  A.  I did not.

25  Q.  Anthony Murgio?

 1   A.  I did not.

 2              MR. CREIZMAN:  No further questions.

 3              THE COURT:  Thank you.

 4              Ms. Santillo?

 5   CROSS-EXAMINATION

 6   BY MS. SANTILLO:

 7   Q.  Hello, Ms. Guyer.  My name is Kristen Santillo, and I

 8   represent Pastor Gross.  I just have a few questions for you

 9   about the conference where you first met Pastor Gross.

10   A.  Okay.

11   Q.  Now, when you -- you had some -- I may show you some

12   documents, so I wanted to have the ability to put them on the

13   ELMO.

14              MS. SANTILLO:  I'd like to show the witness a document

15   that has been marked for identification as TG15.

16              THE COURT:  Okay.

17   Q.  Ms. Guyer, does this appear to be an email between you --

18   or between Trevon Gross and Leo Vaulin?

19              Is that how you pronounce it?

20   A.  I believe so.

21   Q.  And you're copied on this email, correct?

22   A.  Correct.

23   Q.  Now, does this appear to be a document that Mr. Gross sent

24   to you prior to the conference or in connection with the

25   conference?

 1   A.  I believe it was in connection with and right around the

 2   time of the conference.

 3   Q.  Okay.  And he was -- it sounds like he was reaching out to

 4   have a meeting with you to discuss the possibility of ACH

 5   origination; is that correct?

 6   A.  Yes.

 7            MS. SANTILLO:  Your Honor, I'd like to offer this as

 8   an exhibit.

 9            MR. SHIN:  No objection.

10            MR. CREIZMAN:  No objection.

11            THE COURT:  TG15 is admitted.

12            (Defendants' Exhibit TG15 received in evidence)

13   BY MS. SANTILLO:

14   Q.  And he told you that the reason he wanted to do ACH

15   processing was because it was important for the strategic

16   growth of the credit union, so that they could serve their

17   members?

18   A.  Yes.

19   Q.  You testified earlier that Pastor Gross attended a seminar

20   that you were introducing at the conference; is that correct?

21   A.  Correct.

22   Q.  On back-office efficiency?

23   A.  Correct.

24   Q.  And he was very attentive?

25   A.  Yes.

 1   Q.  He asked a lot of questions?

 2   A.  He did.

 3   Q.  And during that conference, there was -- it was called the

 4   Visionary Conference, correct?

 5   A.  Correct.

 6   Q.  And there was a discussion at the conference about the

 7   partnership between HOPE FCU and the Collectables Club or an

 8   association that they were doing business with; is that

 9   correct?

10   A.  Yes.

11   Q.  And they were openly discussing the fact that they were

12   opening -- getting into a partnership with a new association?

13   It was a topic of discussion?

14   A.  Yes.

15   Q.  What do you recall about that discussion?

16   A.  My recollection is that they talked about having members

17   who were -- owned businesses who were wanting to do business,

18   do transactions through HOPE that would give HOPE some

19   additional income.

20   Q.  Did you have a sense of what they wanted to do with that

21   income?

22   A.  It was for growing their credit union, for their community.

23   Q.  Who was discussing this at the conference?  In what context

24   did it come up?

25   A.  This was a credit union Visionary Conference.  Credit

1    unions talk about growing their credit unions and what they can

2    do for their members.  There were many conversations going on

3    like that.

4    Q.  Within the context of that conversation, how many people

5    were in the room?

6    A.  I don't recall.

7    Q.  Was it ten, or fifty, or somewhere in between?

8              MR. SHIN:  Objection, your Honor.

9              THE COURT:  Overruled.

10             You may answer.

11             THE WITNESS:  Probably between 20 and 30 people in the

12   room.

13   Q.  What types of people?  Are these people in the credit union

14   industry?

15   A.  Yes.

16   Q.  So there was an open and frank discussion about it?

17   A.  Yes.

18   Q.  And Mr. Hill was also in the room?

19   A.  I believe so.

20   Q.  And you were introduced to him there?

21   A.  Not in that room, not Mr. Hill.

22   Q.  But at the conference?

23   A.  At the conference, yes.

24   Q.  Was he attending sessions as well?  Did you meet him in any

25   other sessions?

 1   A.  I met Mr. Hill outside the hotel.  We both smoke, so we

 2   were outside -- I'm sorry, we were outside, and that's where I

 3   met him.

 4   Q.  Okay.  Fair enough.

 5           So, after the conference -- that was the first time

 6   you met Pastor Gross, correct?

 7   A.  Yes.

 8   Q.  After the conference, he reached out to your credit union

 9   as a resource?

10   A.  Yes.

11   Q.  And he wanted to learn about best practices?

12   A.  Yes.

13   Q.  And so, for example, there came a time when he wanted to

14   learn about the best way for credit unions to use debit cards

15   for expenses?  I can show you a document if it would help

16   refresh your recollection.

17           MR. SHIN:  Objection, your Honor.

18           THE COURT:  Sustained.  Sustained.

19   Q.  Do you recall a time when he asked you about best practices

20   with respect to debit cards?

21   A.  I don't recall that.

22   Q.  If I showed you a document, might it refresh your

23   recollection?

24   A.  It might.

25           MS. SANTILLO:  May I approach the witness?

1         THE COURT:  You may.

2         THE WITNESS:  Okay.

3   Q.  Ms. Guyer, did that document refresh your recollection?

4   A.  It did.

5   Q.  And what do you recall about Pastor Gross reaching out to

6   you with respect to debit cards and best practices?

7   A.  How to set up an account, a credit union, basically, on the

8   credit card account.  For credit cards is where I'm most

9   familiar with setting up for paying credit union expenses, but

10  it is common for credit unions to set -- to have an internal

11  account, issue a credit card, and use that credit card to buy

12  supplies, for example.

13  Q.  So he had not done that before, correct?  Or HOPE FCU, from

14  your conversation with Pastor Gross, HOPE FCU hadn't had that

15  kind of debit card before, correct?

16  A.  I don't remember whether or not they'd had one.  Best

17  practices can come up when you're first starting a program or

18  at any point after that.  So --

19  Q.  But he sought your advice because --

20  A.  Yes.

21  Q.  -- he thought you were a good resource?

22  A.  Yes.

23  Q.  And that you might be able to teach him how to do it right?

24  A.  Yes.

25  Q.  And he reached out to you again in November 2014 to ask for

1    compliance assistance; is that correct?

2    A.  For compliance assistance, yes.

3    Q.  He told you he wanted someone to help make sure that HOPE

4    was in compliance with regulations?

5    A.  I don't remember it being quite that broad, but, yes.

6    Q.  Well, he asked you what services he wanted help with -- you

7    asked him what services he wanted help with, and you used

8    examples ACH or wires, and he said we need all of it; is that

9    correct?

10   A.  I do remember that, yes.

11   Q.  And what service did you offer to him in connection with

12   that request?

13   A.  We offer system -- primarily system, what the system can

14   provide for you in relation to compliance.  Part of what we

15   will sit down with a credit union and review are sample

16   documents from either the software vendor or ones that we've

17   used, that type of thing.  We refer people for more

18   comprehensive compliance training to the regional ACH or other

19   types of organizations for the more comprehensive.  Often small

20   credit unions are doing simple transactions, and so we do all

21   share amongst each other policies, procedures, things that have

22   been accepted by auditors and examiners.

23   Q.  Did you work on training sessions with Pastor Gross?

24   A.  I did not.

25   Q.  Did somebody at your credit union do that?

 1   A.   Yes.

 2   Q.   What do you know about that?  Can you tell me what you know

 3   about that?

 4   A.   About those training sessions?

 5   Q.   Yes.

 6   A.   They would have -- it would have been WebEx-based sessions.

 7   They would have discussed specific transactions, types of

 8   transactions, return rules, what the system offers, and how to

 9   process transactions through the system, the CU Base system in

10   particular, or the ProfitStars origination system.

11   Q.   So, in November 2014, Pastor Gross reached out to your

12   credit union to get assistance with compliance training?

13   A.   Yes.

14   Q.   Yes.

15        And he completed that training?

16   A.   I don't know.  I didn't do his training.

17   Q.   But that's the type of training that you typically provide,

18   and you understood that he was seeking that?

19   A.   Yes.

20   Q.   Now, you discussed some of the issues with -- or the

21   difficulties of a small credit union dealing with money

22   services businesses, correct?

23   A.   Yes.

24   Q.   And it can be expensive for small credit unions to engage

25   in that kind of business?

 1   A.  Yes.

 2   Q.  And it can be hard to monitor the compliance?

 3   A.  Yes.

 4   Q.  But there's nothing unlawful about small credit unions

 5   working with money services businesses?

 6   A.  As far as I know, no.

 7   Q.  Are you familiar with FinCEN guidance on money services

 8   businesses?

 9   A.  Because we don't open accounts for money services

10   businesses, I'm not as familiar, no.

11   Q.  But it's your understanding that there is -- you don't have

12   any knowledge, as somebody who has vast experience in credit

13   unions, that there's a per se rule that credit unions can't

14   work with money services businesses?

15   A.  I do not believe that there is a rule that says we cannot.

16   Q.  It's just a business decision for your credit union that it

17   doesn't make sense?

18   A.  Correct.

19   Q.  One of the reasons is that you -- or one of the factors

20   that is unique to your business or it's a factor of your

21   business is that you don't charge for ACH processing; is that

22   correct?

23   A.  I'm sorry, can you --

24   Q.  A feature of your business is that you don't charge fees

25   for ACH processing?

 1   A.  To our members, no.

 2   Q.  To your members, no.

 3           A credit union could charge fees for ACH processing?

 4   A.  It -- they could.

 5   Q.  So they would have a different calculation about whether or

 6   not ACH processing was profitable if they charged fees for it?

 7   A.  Correct.

 8   Q.  So it might make sense for some businesses as opposed to

 9   your business?

10   A.  It might.

11   Q.  Now, we've discussed some issues that Pastor Gross had with

12   Alloya?

13   A.  Yes.

14   Q.  And Alloya is a corporate credit union?

15   A.  Yes.

16   Q.  And, in your experience, some small credit unions can have

17   difficulties with larger corporate credit unions?

18   A.  Yes.

19   Q.  Can you tell us about that?

20   A.  Specifically small credit unions.  There was a point where

21   a number of corporate credit unions basically went under, and a

22   lot of small credit unions lost money.  Our required deposit in

23   a corporate credit union -- for my credit union, we belong to

24   two corporates, so we lost over $500,000, which is a huge loss

25   for a small credit union.  So small credit unions have since

1      then not been terribly happy with how they are treated by

2      corporate credit unions.

3      Q.  Understood.

4            And with respect to the NCUA, the NCUA also regulates

5      your credit union?

6      A.  Yes.

7      Q.  In your experience, the NCUA examinations can be burdensome

8      on small credit unions?

9      A.  Incredibly.

10           MR. SHIN:  Objection, your Honor.

11           THE COURT:  Sustained.

12     Q.  There can sometimes be tension between small credit unions

13     and the NCUA?

14           MR. SHIN:  Objection, your Honor.

15           THE COURT:  State your grounds.

16           MR. SHIN:  Relevance, your Honor.

17           MS. SANTILLO:  May I address the issue at sidebar?

18           THE COURT:  How much longer do you have with the

19     witness?

20           MS. SANTILLO:  Five minutes.

21           THE COURT:  I'll give the jury their -- it's a little

22     bit early, but I'll give them their mid-morning break, and I'll

23     take up this issue.  So see you in about ten, fifteen minutes.

24           (Continued on next page)

25

 1                  (Jury not present)

 2                  THE COURT:  You may step down for the break.

 3                  (Witness temporarily excused)

 4                  THE COURT:  Go ahead, Ms. Santillo.

 5                  MS. SANTILLO:  Your Honor, they've used this witness

 6      as somebody who is an example of how credit unions

 7      profitability works, and I think it's fair game for us to talk

 8      about the dynamic between -- they're a witness who has a lot of

 9      experience with these issues, and I think given the fact that

10      they've used this witness, and Alloya --

11                  THE COURT:  Well, you are being vague.  So they did

12      ask about charges for ACH transactions.  I suppose you could

13      call that profitability.  And you inquired, without objection,

14      in that area.  And now you're asking questions about burdensome

15      regulations.

16                  MS. SANTILLO:  Well, what they asked was, is this a

17      typical small credit union -- they asked her about their

18      profitability, whether they would consider that to be a small

19      credit union.  They asked about the business model and whether

20      or not it was profitable.  They asked sort of general questions

21      about small credit unions and comparing them with HOPE FCU, and

22      I think it's fair to talk about how the NCUA interaction

23      between small credit unions and HOPE FCU -- or, I'm sorry, the

24      interaction between the NCUA and small credit unions as an

25      example of the dynamic that small credit unions experience.

 1   She's a fact witness to that.

 2              MR. SHIN:  Your Honor, may I --

 3              THE COURT:  Sure.

 4              MR. SHIN:  -- be heard?

 5        It's true that I asked about their ACH business and

 6   the profitability thereof.  That's why we didn't object when

 7   she crossed on that topic.  My questions regarding the NCUA

 8   with this witness were limited to the specific fact that they

 9   were notified in their examination that there was a problem,

10   that HOPE FCU then the next day notified her that they had a

11   problem, and then that in response to that, she cut them down.

12              The proposed line of questioning regarding the burden

13   of the NCUA or how the NCUA might conduct its examinations are

14   beyond the scope of my questioning, and I would note, also,

15   irrelevant to the case.  What's at issue in this case is

16   whether false statements were made to the NCUA and whether the

17   NCUA's examination was obstructed, not whether the victim of

18   those false statements and obstruction should be blamed in some

19   way.

20              So, both on relevance grounds and also given that it's

21   beyond the scope of the direct, we maintain our objection.

22              THE COURT:  All right.  Sustained.

23              Anything else to take up?

24              MR. SHIN:  Nothing from the government, your Honor.

25              MR. CREIZMAN:  No, your Honor.

 1              THE COURT:  So we'll return in about ten minutes.

 2     Thank you.

 3              MR. NOBLE:  Thank you, Judge.

 4              MS. CHOI:  Thank you, your Honor.

 5              (Recess)

 6              THE COURT:  Anything to take up?

 7              MS. SANTILLO:  Your Honor, I would like to ask a

 8     follow-up question of the witness about the NCUA response in

 9     this case.  The government already asked a question about that,

10     and I think that's fair game.  So I just --

11              THE COURT:  What's the question?

12              MS. SANTILLO:  The question is:  What was their

13     response to the report that HOPE was processing transactions,

14     and they had a multifaceted response, which is not just about

15     HOPE, but they kicked out other credit unions from their credit

16     union.

17              MR. SHIN:  I'm sorry, I think I would have an

18     objection on vagueness.  I'm just not sure what you're

19     referring to.

20              MS. SANTILLO:  When the NCUA came to the credit union,

21     to this -- to Robyn Guyer's credit union in response to the

22     fact that they were processing ACH transactions for HOPE, they

23     didn't just stop them from doing business with HOPE, they

24     stopped them from doing business with another credit union,

25     too, that they had a longstanding business relationship with.

1              MR. SHIN:  We would object to that on relevance and

2    also beyond the scope.

3              THE COURT:  Overruled.

4              You can get Ms. Guyer.

5              You can take the podium, Ms. Santillo, if you're

6    ready.  And we'll bring in the jury.

7              Ms. Guyer, you may come forward and resume your spot

8    on the witness stand, please.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (Jury present)

 2              THE COURT:  Ms. Santillo, you may resume your

 3     cross-examination of Ms. Guyer on behalf of Mr. Gross when you

 4     are ready.

 5              MS. SANTILLO:  Thank you.  I just have a few more

 6     questions.

 7     BY MS. SANTILLO:

 8     Q.  You spoke a bit earlier about the NCUA's response to your

 9     credit union's processing of ACH transactions for HOPE, yes?

10     A.  It was our credit union's opening a transaction account

11     for -- or a checking account for HOPE.  That was the issue, not

12     the -- specifically the ACH transactions.

13     Q.  Okay.  What was the NCUA's concern?

14     A.  They said that we weren't allowed to open a transaction

15     account for another credit union.

16     Q.  Had you opened transaction accounts for other credit unions

17     in the past?

18     A.  Yes.

19     Q.  Did the NCUA's response affect your ability to service

20     those other credit unions?

21     A.  As far as the transaction accounts?  Yes, it did.

22     Q.  The NCUA asked you to cease using all transaction accounts?

23     A.  Opening trans -- or allowing -- or having accounts for

24     credit unions that were transaction accounts or checking

25     accounts, yes.

 1   Q.  So, as a result of the NCUA's response, you had to shut

 2   down existing accounts that had nothing to do with HOPE?

 3   A.  Yes.

 4   Q.  Now, you talked about this $2 million that was unexpectedly

 5   processed through your credit union; is that correct?

 6   A.  $2 million that was the balance in the HOPE account.

 7   Q.  And you had concerns about that?

 8   A.  Yes.

 9   Q.  And you raised those with Mr. Blue?

10   A.  Yes.

11   Q.  And Mr. Blue -- what was Mr. Blue's response?

12   A.  That they would remove or move that money out of that

13   account.

14   Q.  And did they, in fact, move that money out of the account?

15   A.  I believe so.

16   Q.  Well, it's not there today, right?

17   A.  Yeah, true.

18   Q.  Mr. Shin showed you an email that was introducing Mr. Blue

19   to you and to the other members of your credit union, correct?

20   A.  It was introducing --

21   Q.  Mr. Blue, Charles Blue?

22   A.  -- Charles Blue to the software that was the CU South, and

23   then that was forwarded to me.

24   Q.  And Mr. Blue was new to HOPE Credit Union in December 2014;

25   is that correct?

 1  A.  As far as I know, yes.

 2  Q.  And Mr. Blue reached out to you as a resource?

 3  A.  Yes.

 4  Q.  He asked you questions about credit unions?

 5  A.  Yes.

 6  Q.  He asked you questions about compliance?

 7  A.  Yes.

 8  Q.  He tried to get some compliance training from you?

 9  A.  Yes.

10  Q.  Did he seem diligent?

11  A.  Yes.

12          MR. SHIN:  Objection, your Honor.

13          THE COURT:  Overruled.

14  Q.  And he was trying to learn about the credit union industry?

15  A.  Yes.

16  Q.  Are you familiar with his background?

17  A.  Not entirely, no.

18  Q.  But he was making a good-faith effort to learn about the

19  business?

20          MR. SHIN:  Objection, your Honor.

21          THE COURT:  Sustained.

22  Q.  You had frequent communications with Mr. Blue?

23  A.  Yes.

24          MS. SANTILLO:  I have no further questions.  Thank

25  you.

 1          MR. SHIN:  Your Honor, very briefly?

 2          THE COURT:  Go ahead.

 3   REDIRECT EXAMINATION

 4   BY MR. SHIN:

 5   Q.  Ms. Guyer, do you remember being asked by Ms. Santillo

 6   about the conference where you met Mr. Gross?

 7   A.  Yes.

 8   Q.  Do you remember questions regarding about Mr. Gross

 9   discussing the Collectables Club?

10   A.  The Collectables Club was not -- I don't remember that

11   specifically.  There were conversations about the businesses

12   that were going to work with the credit union and in a

13   benefactor-type scenario, but I don't specifically remember

14   that Collectables Club was named in those conversations.

15   Q.  So you testified during cross-examination regarding

16   Mr. Gross' frankness and openness regarding those relationships

17   with those entities?

18   A.  Talking about there being -- kind of my understanding was

19   what I just stated, that they had members who owned businesses

20   that wanted to throw business to credit union's direction so

21   they could make money.  So, yes, those were -- that was my

22   understanding.

23   Q.  Did Mr. Gross disclose, during those discussions, that he

24   and his church had received $150,000 in payments from entities

25   in return for control of his credit union?

1          MS. SANTILLO:  Objection.

2          THE COURT:  I'll sustain.  You can rephrase the

3     question.

4     Q.  Did Mr. Gross disclose, during these discussions, his or

5     his church receiving payments of any kind to influence his

6     particular business decisions?

7          MS. SANTILLO:  Objection.

8          THE COURT:  I'll allow the question up to the

9     payments, and then add your question mark.

10         MR. SHIN:  I'm sorry, your Honor.  Could you say that

11    one more time?

12         THE COURT:  I'm sustaining the objection.  You can

13    rephrase.

14    Q.  Did Mr. Gross disclose, during these discussions, his

15    receipt of large payments from particular members of his credit

16    union?

17         MS. SANTILLO:  Objection.

18         THE COURT:  Overruled.

19         You may answer.

20         THE WITNESS:  Thank you.

21         No.

22    BY MR. SHIN:

23    Q.  Did Mr. Gross disclose, during these discussions, his

24    receipt of so-called consulting fees paid for by members of his

25    credit union?

```
 1              MS. SANTILLO:  Object.

 2              THE COURT:  Was there an objection?

 3              MS. SANTILLO:  Yes.  Objection.

 4              THE COURT:  Overruled.

 5              You may answer.

 6              THE WITNESS:  I'm sorry, can you repeat the question?

 7   Q.  Did Mr. Gross disclose, during these discussions at the

 8   conference, his receipt of so-called consulting fees from

 9   members of his credit union?

10   A.  No.

11   Q.  Now, do you recall, during Ms. Santillo's

12   cross-examination, discussion of the account that you opened --

13   the account that you opened for HOPE FCU to process ACH

14   transactions?

15   A.  The checking account?

16   Q.  Yes.

17   A.  Yes.

18   Q.  Did Mr. Gross tell you that the NCUA had told him in

19   November of 2014 that he should stop processing ACH

20   transactions?

21   A.  No.

22   Q.  If he had told you that, would you have opened the account

23   for him?

24              MS. SANTILLO:  Objection.

25              THE COURT:  Overruled.
```

 1                 You may answer.

 2                 THE WITNESS:  I would have opened the account.  I

 3    would not have approved the ACH origination application.  The

 4    fact that they couldn't do ACH originations is separate from

 5    whether or not they could have an account.  However, there

 6    would be no reason for me to open the account except for

 7    wanting to help them with their interim issue in getting set up

 8    with the Fed for the ACH originations.

 9                 Did that make sense?

10    BY MR. SHIN:

11    Q.  So you would not have permitted them to process ACH

12    transactions through that account if he had disclosed to you

13    that the NCUA had told his credit union to stop processing ACH

14    transactions?

15    A.  Yes, agreed.  I would not have.

16                 MR. SHIN:  Nothing further, your Honor.

17                 THE COURT:  Mr. Creizman, anything further?

18                 MR. CREIZMAN:  No, your Honor.

19                 THE COURT:  Ms. Santillo, anything further?

20    RECROSS EXAMINATION

21    BY MS. SANTILLO:

22    Q.  When Mr. Blue received a cease order from the NCUA, he

23    informed you, correct?

24    A.  Yes, yes.

25    Q.  Yes?

1   A.   Yes.

2           MS. SANTILLO:   Thank you.   No further questions.

3           THE COURT:   All right.

4           MR. SHIN:   Nothing further.

5           THE COURT:   Thank you.

6           Ms. Guyer, you may step down.   You are excused.

7           (Witness excused)

8           THE COURT:   The government may call its next witness.

9           MR. NOBLE:   Your Honor, at this time, we would like to

10  offer and publish a subset of some exhibits.

11          THE COURT:   Okay.   Go ahead.

12          MR. NOBLE:   At this time, we'd like to offer into

13  evidence, pursuant to stipulation with defense counsel,

14  Government Exhibits 717-A, 717-B, 1290-A, 1290-B, 1665, 3025,

15  3555 through 3558, 3560, 3561, 3563 through 3567, 3568-B, 3571,

16  and 3572.

17          THE COURT:   Without objection, counsel?

18          MS. MADRIGAL:   No objection.

19          MS. SANTILLO:   No objection.

20          THE COURT:   The exhibits Mr. Noble just listed are

21  admitted.

22          (Government's Exhibits 717-A, 717-B, 1290-A, 1290-B,

23  1665, 3025, 3555 through 3558, 3560, 3561, 3563 through 3567,

24  3568-B, 3571, and 3572 received in evidence)

25          MR. NOBLE:   I believe Ms. Santillo has a defense

1   exhibit that the defense intends to offer to which the

2   government has no objection.

3            THE COURT:  Ms. Santillo?

4            MS. SANTILLO:  Yes, your Honor.  I'd like to offer

5   Defense Exhibit 17.

6            THE COURT:  And no objection, Ms. Madrigal?

7            MS. MADRIGAL:  No objection.

8            THE COURT:  Then Defense 17 is admitted.

9            (Defendants' Exhibit TG17 received in evidence)

10           MR. NOBLE:  Can we bring up Government Exhibit 3555 in

11  evidence.

12           Can we just blow up the bottom portion.  That's fine

13  for now.

14           So, this is an email from Anthony Murgio to Trevon

15  Gross on November 14th, 2014, with the subject, "Important Info

16  On CU, Possible Hires In New Jersey, and Plan Moving Forward."

17           The second paragraph reads --

18           JUROR:  It's not working.  We don't have anything on

19  the monitor.

20           THE COURT:  Hang on a second.

21           (Pause)

22           JUROR:  Yes, thank you.

23           MR. NOBLE:  Great.  Thank you.

24           THE COURT:  Thank you.

25           MR. NOBLE:  The second paragraph reads:  "We spoke

1   about stopping Kap.  They are the least of my worries right

2   now.  I want to make sure that our appearance, organization,

3   and structure are ironclad, and we are willing to invest in

4   this.  I want this credit union to be very sound."

5        Can we zoom out and blow up just the top portion.

6        Trevon Gross forwards this email to Mark Francis on

7   November 14th, 2014:  "Hey, Mark.  Please see below.  There is

8   a serious disconnect in Anthony's thinking.  I have no problem

9   managing this, but just want you to see where he is, especially

10  his statement that Kapcharge is the least of his worries.  I

11  refocused him, but I thought you should know that from my

12  perspective, Kapcharge's ability to function and the internal

13  integrity of the CU are the primary purpose."

14       Please publish Government Exhibit 3556.  Just blow up

15  the top portion, please.

16       This is an email exchange between Trevon Gross, Mark

17  Francis, and Shoula Cohen on November 14, 2014.  Let's go to

18  the bottom email.

19       On November 14, 2014, Mark Francis had written:  "Hey,

20  Trevon.  Hope all is well.  It is disappointing to see -- after

21  everything we have done with Anthony, to see this level of

22  loyalty in the email below.  That being said, it reaffirms your

23  plan of having his friends resign from the board and keep

24  Anthony focused on pounding the pavement locally for new

25  accounts for the CU if he chooses to do so.  I hope he chooses

1   the right path and follows your direction.

2           "I know that besides the payment traffic,

3   infrastructure, and investment/grants into the CU, we can get

4   local accounts set up as well.  I can see that you are doing a

5   great job managing this situation, and we are very appreciative

6   of your integrity.  Moving forward, we believe that staying low

7   key while we get everything set up, as we discussed yesterday,

8   is definitely what is needed here.  Do you need any help

9   logistically or financially with finding a new local employee

10  to manage and establish these day-to-day affairs?  Can you tell

11  us what you think would be an acceptable level of traffic we

12  can put through daily in debits and credits in the meantime for

13  a few small clients and how we should go about doing so during

14  this time?  We have some small merchants who have no other

15  alternative and would like to exercise whatever options we have

16  for them without bringing any attention to the CU.  I have a

17  meeting I need to go to with one of our partners, Optimal

18  Payments, a publicly traded company that has serious interest

19  in our relationship with you, and will be back in the office in

20  the afternoon.  I'm available to talk after that if you have

21  time today."

22          Let's blow up Mr. Gross' response.

23          "Hey, Mark.  Had a very productive conversation with

24  Bob at Magic Wrighter.  He said Monday he would get back to me.

25  Do you have a sense of the total daily volume of the smaller

1    companies?  He is concerned that if something illegal is going

2    on, that he will not be held responsible.  This is all from

3    Alloya, as you rightly discerned.

4         "I've put out the word, and in the near term, CU South

5    has a compliance person who can help us get everything in order

6    and even train a permanent person.  They are sending a proposal

7    by Monday as well.  Monday, we will locate an office, so we can

8    conduct proper report business, et cetera.  Will keep you

9    posted."

10        Can we bring up 3557.  Just blow that up, the top

11   portion.

12        This is in the same email chain, an email from Trevon

13   Gross to Mark Francis and Shoula Cohen, on November 15th, 2014:

14   "Had a great board meeting today.  The new board members have

15   been moved to a nonvoting advisory board.  The remaining board

16   is clear that our focus must be on building internal

17   infrastructure compliance person and moving to FRB, so that we

18   can better serve your needs.  Anthony is supposed to be up here

19   on Tuesday, and he is staying for a month.  His remit is ten

20   new local businesses by the end of December.  Will keep you

21   posted.  We will talk on Monday."

22        Please publish Government Exhibit 3558.  Can you blow

23   this up.

24        This is an email from Christine Carida to Trevon

25   Gross, copying Mark Francis, on November 18th, 2014, and it

1    states: "Hi, Trevon.  Attached is the fully executed agreement

2    for your record.  Please send me the terms of your consulting

3    agreement."  And the subject is, "Exclusive Registered Agent

4    Agreement."

5            Can you zoom out and please just flip to the

6    attachment.  Flip to the end of the attachment.

7            You can take that down.  Please bring up Government

8    Exhibit 3560.  Can we blow up the bottom email.

9            This is an email from Kevin Pepe to Rico Hill on

10   November 18, 2014, copying Trevon Gross, Shoula Cohen, and

11   Christine Carida, subject "Missing Manual Entries."

12           "Hi, Rico.  As I mentioned on WhatsApp, I have

13   attached a file showing 127 debit transactions that we

14   originated on the 24/7 site on November 13th, 14th, and 17th,

15   which have still not been adjusted in our HOPE account.

16   Usually we've seen a one-day delay.  However, we are going on

17   three days now.  Would you be able to contact CU South to

18   determine if there is a problem and when we can expect them to

19   post?"

20           Let's go to the next email in the chain.

21           This is an email from Kevin Pepe to Trevon Gross,

22   copying Mark Francis:  "Hi, Trevon.  Can you please officially

23   confirm that the transaction stated below, in fact, were not

24   processed, so that we can inform our merchant accordingly?"

25           We won't read the rest.  Let's go to the next email.

1           Kevin Pepe further writes:  "Hi, Trevon.  Further to

2   our conversation today, the daily origination totals we would

3   typically process would be as follows:  Credits:  $63,000 (85

4   items), debits:  $25,000 (87 items).  Also, if possible, we

5   would like to have our max transaction capped at 65,000 to

6   75,000.  This would allow us to be able to allow Lendini to

7   process as well as to allow Kapcharge to be able to initiate

8   ACH transactions for funding and settlement purposes."

9           Let's see Trevon Gross' response to Kevin Pepe and

10  Mark Francis on November 19th:  "Great.  I'll pass this on."

11          Can we bring up Government Exhibit 3561.  Let's blow

12  up the bottom email.

13          On November 19th, 2014, this is an email from Trevon

14  Gross:  "Hey, Kevin and Ricardo.  Here are the transactions

15  that we are unable to locate to inform the people that their

16  transactions were rejected yesterday.  Can you all provide

17  clarity?"

18          Let's go to the next email in the chain.  Back up.

19          Rico Hill writes on November 19th:  "Lendini is

20  Kapcharge's affiliate that I opened account for.  Kirk."

21          Let's go to the next email in the chain.

22          Trevon Gross writes:  "Will he put it back through?"

23          Rico Hill responds:  "They are awaiting word that they

24  can proceed."

25          And Trevon Gross responds to Ricardo Hill and Kevin

1    Pepe:  "They can put it through."

2         Can we bring up Government Exhibit 3564.  Let's blow

3    up the bottom portion of the email from Mark Francis on

4    November 24th.  And this is an email chain between Trevon

5    Gross, Mark Francis, and Shoula Cohen.

6         Mark Francis writes:  "As discussed to move forward,

7    we have agreed on the following:  We need a full scope of what

8    the credit union needs in the short term and long term to be

9    able to grow within the regulatory parameters; i.e.,

10   capitalization requirements, ratios on balances to loans, and

11   any other information you feel, Trevon, we should consider when

12   making decisions on the credit union.  Kapcharge will undertake

13   the responsibility and cost of putting in a qualified

14   compliance officer for the credit union.  Shoula will provide a

15   projection on the types of fees we can collect from our clients

16   through this processing solution.  Trevon, as the lead on this

17   project, should make all necessary arrangements to ensure the

18   success of this relationship between Kapcharge and the credit

19   union.  The board will stay under complete control of the

20   original board, who are loyal to the credit union.  Shoula and

21   I will be available next week to meet with the NCUA regulators

22   to discuss and implement on behalf of the CU all the

23   regulations needed to operate in compliance.  Most importantly,

24   we will need to discuss and decide on any issues collectively

25   because the three of us to make sure all parties are involved

1    with the success of this relationship.  Can you confirm this is

2    all correct, please, Trevon."

3            Let's go to the response up above.

4            Trevon Gross writes on November 24th, 2014:  "This is

5    accurate.  What I would respectfully add is that if for

6    whatever reason, you decide not to move forward, that you will

7    give three months before you withdraw significant funds from

8    the CU."

9            On November 24th, Mark Francis responds:  "Trevon,

10   quitting is not an option for us.  We want to make this work.

11   We have a lot invested in this relationship, and I am

12   optimistic we will make it work.  We have reserves in the

13   credit union right now and plan on leaving them there.  So we

14   can accommodate that request."

15           Then Trevon Gross responds:  "Then let's roll."

16           Can we bring up Government Exhibit 3565.

17           This is an email chain between Trevon Gross, Shoula

18   Cohen, and Mark Francis on December 8, 2014.

19           Shoula Cohen wrote:  "Trevon, can you please send us

20   some sort of invoice or acknowledgment of the donation of 150K

21   to HOPE?  Thank you."

22           Trevon Gross responds on December 8, 2014:  "Our

23   donation letters normally go out the first week in January.

24   Can this wait until then?"

25           Can we now bring up Government Exhibit 1146-A in

1    evidence.

2         This is an email dated May 23rd, 2014, from Anthony

3    Murgio to Trevon Gross with the subject "Kap Driver's License.

4    Please See Attached."  Let's look at the attachment.

5         Can we bring up Government Exhibit 1146-B.

6         This is an email exchange between Anthony Murgio, Mark

7    Francis, and Shoula Cohen.  At the bottom, on May 23rd, 2014,

8    Anthony Murgio wrote -- I'm sorry, wrote:  "Please see

9    attached."

10        Let's look at the attached.  I'm not sure there's an

11   attachment.  Sorry, yes, go back up.

12        On May 23rd, 2014, at 2:01 p.m., Anthony Murgio wrote:

13   "Email address for the account is mark@kapitalinc.com."

14        Trevon Gross, on May 23rd, 2014, wrote to Anthony

15   Murgio:  "Account created:  6527, the charter date and main

16   telephone number.  Mark should be able to log in and use last

17   four TIN to access online account."

18        And then on May 23rd, Anthony Murgio forwarded this

19   chain to Mark Francis and Shoula Cohen.

20        Can we bring up Government Exhibit 1147 in evidence.

21        And then Anthony Murgio further wrote in the same

22   chain on May 23rd, 2014, to Shoula Cohen and Mark Francis:  "To

23   fund the account at the credit union, let's go, baby."  And

24   there's a routing number and bank number.

25        Can we bring up Government Exhibit 1290-A.

1          This is an email from Trevon Gross to Anthony Murgio,

2     Mark Francis, Yuri Lebedev, Rico Hill, Jose Freundt, and Kevin

3     Pepe on November 20th, 2014, with the subject "Exam," and it

4     states:  "We can start with the items below, and then we will

5     see if we need anything else once we are at the credit union."

6     And then there's a list of various items.

7          Can we bring up Government Exhibit 1290-B.  Just blow

8     up the top portion, please.

9          It's the same chain.  This is an email from Mark

10    Francis responding to the email we just saw on November 20th,

11    2014, copying Sam Tam, with other participants in the email

12    chain:  "Please include Sam on these emails to oversee and

13    advise on all policies, and so he can weigh in on what we need

14    to be compliant."

15         Can we now bring up Government Exhibit 4507, and

16    please scroll to line 3925.

17         This is a WhatsApp conversation between Ricardo Hill

18    and Anthony Murgio.  I will read the part of Anthony Murgio

19    and, Mr. Shin, if you would read the part of Mr. Hill beginning

20    at line 3925.

21              (Continued on next page)

22

23

24

25

1      MR. NOBLE:  Anthony Murgio writes, "Hey, do you have

2      any of these minutes in a -- in Word so I can try to keep the

3      formatting the same?  Or should I just copy and paste from

4      PDF?"

5      And for the jury's reference, this is a conversation

6      on November 20th, 2014.

7      Mr. Shin.

8      MR. SHIN:  "PDF only."

9      MR. NOBLE:  "Did you or, um, Delores write these up?"

10     MR. SHIN:  "I only did the one for October.  Yes, see

11     did the rest."

12     MR. NOBLE:  "Do you have the one for October and

13     um --"

14     MR. SHIN:  "I have notes.  Have not completed it."

15     MR. NOBLE:  "Okay.  We're going to need to have that.

16     If you want to, um, just, um, if you want to just keep it in

17     Word that's fine.  If you don't have time that's okay.  Send it

18     to me and I'll handle it if you just give me the notes, but we

19     need to have that for the inspection tomorrow.  So, um, just

20     let me know.  Hey.  When you get time, can you also send me,

21     um, Capital's legal name in the, um, in the system and their

22     address and everything please?  And we need to switch their

23     phone number in the system.  So just email me that stuff and

24     then I'll email you back the phone number.  What date is that

25     meeting from?"

 1             MR. SHIN:  "Which one?"

 2             MR. NOBLE:  "What you just sent."

 3             MR. SHIN:  "The last one November 15th, 2014."

 4             MR. NOBLE:  "Also, Kap has no phone number on their

 5   account.  What number would you like me to put there?"  Oh, so

 6   that was Mr. Hill.

 7             And Anthony Murgio responds, "848-222-3458.  Thanks.

 8   And then just -- you can -- you can just tell me the name of

 9   their corporations.  If it's Capital Solutions or Kapcharge,

10   the one in Delaware.  Whatever's on there just let me know."

11             MR. SHIN:  "See what I just sent.  This one says

12   Kapcharge U.S.A. Inc. and has the Lakewood New Jersey address.

13   I just sent it."

14             MR. NOBLE:  "Thank you very much kind sir."

15             MR. SHIN:  "My pleasure."

16             MR. NOBLE:  "Hey, listen, um, we need -- sorry to put

17   this all up one you.  It's just we're trying to get everything

18   ready so we need it before you leave.  Um, all the third party

19   agreements that we've signed like, um, like with, um, Alloya,

20   anything for doing origination with them, anything that we have

21   signed that we have sent to any third parties, um, for ACH or

22   anything else we need.  Just forward it all to me please and

23   Trevon.  Copy us both on it please.  Thank you."

24             MR. SHIN:  "I have zero docs from Alloya as they were

25   already with us before.  We didn't sign up with them so I don't

1   have any of those docs.  I'm sending everything from Magic

2   Writing and you want Shazam?  Co-op?  They're the only other

3   third party things that we've actually signed or tried to set

4   up."

5   　　　　　　MR. NOBLE:  "Shazam and Co-op will --"

6   　　　　　　MR. SHIN:  "Sent Shazam.  Co-op contract was physical.

7   That was mailed out.  Also we have none of these docs sent back

8   to with their signatures.  Trevon needs to call Donna Wilson

9   from the Fed."

10  　　　　　　MR. NOBLE:  "Is everything all right?"

11  　　　　　　MR. SHIN:  "Jose does not recall signing any documents

12  for Alloya in the beginning.  Yes but she said she wanted to

13  speak with him and it's about the 26th, which is that Thursday,

14  to get our account set up and have the funds transferred.  She

15  left him a message and asked if I could have him call.  What do

16  I tell Kapcharge clients who keep asking me about wires and

17  such?"

18  　　　　　　MR. NOBLE:  "Hold off until next week.  We have an

19  inspection.  Rico, do you have a log of all wires that we have

20  received or sent out in the past three months like wires

21  received from Kap?  Any wires we sent out?  Not ACH but wire."

22  　　　　　　MR. SHIN:  "I have every wire confirmation from Kap.

23  I have no wires that HOPE has sent out."

24  　　　　　　MR. NOBLE:  "Can you send me?"

25  　　　　　　MR. SHIN:  "Do you need these now?"

1          MR. NOBLE:  "Do you have minutes for September?"

2          MR. SHIN:  "No, I do not."

3          MR. NOBLE:  "Hey Rico, any way that you can send those

4     logs maybe when you get to the airport or whatever you gotta

5     do, um, for the wires.  Sorry man.  We're just trying to figure

6     this all out."

7          MR. SHIN:  "Yes of course."

8          MR. NOBLE:  "Were you able to send?"

9          MR. SHIN:  "No.  I'm sure I'll be working through the

10    night when I arrive."

11         MR. NOBLE:  "Do you have September's minutes?"

12         MR. SHIN:  "No, I do not."

13         "Do you have minutes for September?"

14         "No, I do not.  I think that was the first meeting

15    that I found out I was supposed to take minutes after it was

16    over."

17         MR. NOBLE:  "Okay."

18         Can we now bring up Government Exhibit 4509?  And

19    please scroll to line 3829.  This is a WhatsApp conversation

20    between Anthony Murgio and Trevon Gross.  Line 3829 begins on

21    November 20th, 2014, the same date as the last WhatsApp we were

22    looking at.

23         I'll read the part of Anthony Murgio.  Mr. Shin,

24    please read the part of Trevon Gross.

25         Anthony Murgio:  "Should we come see you at 10:30?"

1    MR. SHIN: "I'll meet you there. Just got an email

2    from NCUA examiner stating that they will be here tomorrow

3    morning at 9:30 a.m. to ensure our compliance."

4    MR. NOBLE: "Okay. I can have everyone here tonight.

5    So they are here. I think could be good."

6    MR. SHIN: Why? They can't answer any questions that

7    the examiner requests. Yuri needs to be here because he has

8    been involved with the files."

9    MR. NOBLE: "Okay, great. You don't think it could be

10   good for them to at least show face?"

11   MR. SHIN: "Anthony, you are going to do whatever you

12   want."

13   MR. NOBLE: "No, I'm asking you. If you think just

14   Yuri then fine."

15   MR. SHIN: "I've already answered. Ricardo should

16   probably be here."

17   MR. NOBLE: "Okay, done."

18   MR. SHIN: "Have you been over to the 219 River Ave.

19   address to make sure that office is ready?"

20   MR. NOBLE: "I can right after. No problem. You

21   heading to the office or should we just come to the church?"

22   MR. SHIN: "No. We'll meet in Lakewood."

23   MR. NOBLE: "Okay. The agent said 11:15."

24   MR. SHIN: "Okay. I'll be there."

25   MR. NOBLE: "Okay."

1       MR. SHIN: "Don't want to stay long because we have

2 work to do. I think you should go by that 219 River and make

3 sure everything is in order."

4       MR. NOBLE: "Yes, agreed. And we will bang everything

5 out with you. I will go to 219 after this. We are inside.

6 Parking in the church on the side. Place is beat up. Just

7 warning you. The other one much nicer. Looks more secure."

8       MR. SHIN: "This is a great location and not far from

9 where we were before. Introduce me as the guy to help with the

10 build-out and renovations."

11       MR. NOBLE: "Okay. We can look at the other tomorrow

12 after examiner. Oh, damn."

13       MR. SHIN: "You are up north. I'm about five minutes

14 out."

15       MR. NOBLE: "Okay. So many people here. Crazy."

16       MR. SHIN: "Yes."

17       MR. NOBLE: "It's the craziest thing. I know a

18 possible approach for membership but then they could take over.

19 We could speak about it."

20       MR. SHIN: "They will take over. We need to go after

21 population."

22       MR. NOBLE: "Donna Wilson needs to speak to you about

23 sending our funds to the Fed on the 26th."

24       MR. SHIN: "So why didn't she call me?"

25       MR. NOBLE: "That's just what Rico said. I'm just

passing message."

MR. SHIN:  "I called and left a message."

MR. NOBLE:  "Okay.  I guess -- I was just letting you know.  Not sure why Rico didn't tell you.  Guess because he thought you were next to me."

MR. SHIN:  "They will call on Wednesday with codes to send money.  Had four people on the phone raising issues and concerns."

MR. NOBLE:  "About?  We can speak when not busy."

MR. SHIN:  "How is it coming there?"

MR. NOBLE:  "Great.  Having to format these docs."

MR. SHIN:  "Format is not an issue.  Format is not issue.  Content is.  There is a lot to accomplish."

MR. NOBLE:  "What month did we speak about ACH policies so I can revise?"

MR. SHIN:  "August."

MR. NOBLE:  "Okay thanks.  Can you pick up any binders on your way back?"

MR. SHIN:  "Almost back.  We should have some binders we can repurpose."

MR. NOBLE:  "Okay.  On way."

MR. SHIN:  "Okay.  I'll arrive at 7:15."

MR. NOBLE:  And for the jury, to orient the jurors, this is the next day, November 21st, 2014, picking up at line 4080.

1              "See you soon."

2          MR. SHIN:  "Did they change the website?"

3          MR. NOBLE:  "Yup.  Done."

4          MR. SHIN:  "Okay.  I heard her on the phone saying she

5   checked their website."

6          MR. NOBLE:  "How long ago?"

7          MR. SHIN:  "Not sure."

8          MR. NOBLE:  "Okay.  I'm having them put in a spot that

9   is small.  Not on main address page.  So she could have

10  overlooked.  But I'm not sure if she already saw it and it was

11  there already."

12         MR. SHIN:  "She mentioned something about Canada."

13         MR. NOBLE:  "Okay.  Getting them to put the address on

14  a subpage called Kapcharge.  Will sent you link in a sec.  And

15  phone."

16         MR. SHIN:  "Okay."

17         MR. NOBLE:  "So you can give them a different page."

18         MR. SHIN:  "Need Shoula's license because side the

19  account opening form."

20         MR. NOBLE:  "Okay.  Check your email."

21         MR. SHIN:  "Got it."

22         MR. NOBLE:  "Okay."  And there's a URL to

23  Capitalinc.com/solutions/kapcharge.

24             "We are come back.  Cool?"

25         MR. SHIN:  "Just pass through and grab your stuff.

1    They want Kapcharge cut off immediately until they say we can

2    process for them."

3              MR. NOBLE:  "Okay.  They still there?"

4              MR. SHIN:  "Yes.  She wanted to stay later but I said

5    we were closing."

6              MR. NOBLE:  "Is she coming back?"

7              MR. SHIN:  "Need lawyer who reviewed Kapcharge

8    contract for us.  Yes, she wants to in two weeks."

9              MR. NOBLE:  "Okay.  It was being reviewed."

10             MR. SHIN:  "Need actual attorney who we can say

11   reviewed it.  Need ASAP."

12             MR. NOBLE:  "It can be Florida or Kendra was reviewing

13   as well.  She is still here."

14             MR. SHIN:  "I know.  Get out of there.  I'm heading

15   back.  Waiting on a doc from Mark.  Trying to get financials

16   from them."

17             MR. NOBLE:  "When should we come back?  After she

18   leaves?"

19             MR. SHIN:  "Yes.  I'll say Kendra reviewed."

20             MR. NOBLE:  "Okay."

21             MR. SHIN:  "Waiting on a document from Mark so I can

22   return."

23             MR. NOBLE:  "Okay."

24             MR. SHIN:  "She just left."

25             MR. NOBLE:  "So we come back?"

1       MR. SHIN:  "Yes.  I'm about to leave.  This was a

2  major tapdance.  On a call."

3       MR. NOBLE:  "Okay.  You still want us to come or are

4  you leaving?"

5       MR. SHIN:  "I'm leaving.  Walking out now."

6       MR. NOBLE:  "So we aren't going to meet and discuss?"

7       MR. SHIN:  "How far are you?"

8       MR. NOBLE:  "20 minutes."  Sorry.  "We can meet

9  tomorrow if you want.  Just tell us what you want."

10       MR. SHIN:  "Hurry.  I am wiped out.  No, let's meet at

11  8:00 a.m."

12       MR. NOBLE:  You can take that down.  Let's bring up

13  Government's Exhibit 4506.  This is a WhatsApp conversation

14  between Anthony Murgio and Mark Francis.  Please scroll to

15  line 4083.

16       I will read the part of Anthony Murgio.  Mr. Shin,

17  please read the part of Mark Francis beginning at line 4083, an

18  entry at November 21st, 2014, the same day we were just looking

19  at in the prior WhatsApp.

20       Anthony Murgio.  "Put Lakewood address on website

21  ASAP."

22       MR. SHIN:  "Okay.  Just add it or place our Canadian

23  address?"

24       MR. NOBLE:  "No, add."

25       MR. SHIN:  "Being done right now as we speak.  Done."

1           MR. NOBLE:  "Okay.  Confirm address."

2           Is it possible to blow up that image?  And this is an

3    image of a website, and it lists at the bottom "Our offices,

4    one at 216 River Avenue, Lakewood, New Jersey, and another at

5    6505 TransCanada Highway, Suite 320, Montreal, Quebec, Canada."

6           You can take that down.  Let's go back to the chat.

7    Picking up at line 4092.

8           Anthony Murgio.  "Call and get an office.  I will go

9    pay."

10          MR. SHIN:  "Tina is calling now."

11          MR. NOBLE:  "We need to put it on a page that is a

12   small link.  The lady already said she checked the website I

13   guess so you guys need to put like a link on the bottom that

14   says like US address and then, um, have like a separate page or

15   like it popped down or something."

16          MR. SHIN:  "Call me please at the office."

17          MR. NOBLE:  "Do you have a Kapcharge website?  They

18   mentioned Canada."

19          MR. SHIN:  "Just a link on the Capital site."

20          MR. NOBLE:  "Okay.  What's the link on?  Put number

21   (848)222-3358 on it.  Please confirm."

22          MR. SHIN:  "Phone number?"

23          MR. NOBLE:  "Also answer phones today as Kapcharge

24   U.S.A.  Yes.  Put that number.  It forwards to you."

25          MR. SHIN:  "Okay.  KK."

1          MR. NOBLE:  "Need Shoula's license."

2          MR. SHIN:  "Driver's?"

3          MR. NOBLE:  "She signed account.  Yes."

4          MR. SHIN:  "Okay.  Send it to Trevon?"

5          MR. NOBLE:  "Yes."

6          MR. SHIN:  "Done."

7          MR. NOBLE:  "Site?"

8          MR. SHIN:  "Address is there, phone number being added

9  now, and phone being answered properly."

10         MR. NOBLE:  "Okay."

11         MR. SHIN:  "George emailed you the link and you can

12 tell her that Capital Solutions has different products,

13 Kapcharge being one of them, so the address is on the Kapcharge

14 link while the other address is for the other solutions that

15 have nothing to do with it."

16         MR. NOBLE:  "Got you."

17         MR. SHIN:  "I think she just called here probing

18 George with questions."

19         MR. NOBLE:  "Good."

20         MR. SHIN:  "She asked about personal accounts and if

21 she gives out her info."

22         MR. NOBLE:  "What do you mean?"

23         MR. SHIN:  "George said first off I would never give

24 personal info on your account to anyone and secondly we only

25 deal with businesses.  Personal info as in user name and

```
 1   password.  She also asked if we are on Clifton Street.  George

 2   told her no, River.

 3              MR. NOBLE:  Damn.  They could go there.

 4              MR. SHIN:  Well, our address says River Avenue.  She

 5   said Clifton Street in New Jersey.  He said our address in New

 6   Jersey is on River Ace.  Nothing specific.  Still need the

 7   office space?"

 8              MR. NOBLE:  "You didn't get?"

 9              MR. SHIN:  "50 square feet for 300.  They are on the

10   phone with Tina now.  One-year lease.  She is confirming now."

11              MR. NOBLE:  "Did the agents go there?  Does she know?

12   Regulators?"

13              MR. SHIN:  "I don't think so.  She asked this morning

14   for the office right away and told them we wanted the $300 per

15   month option.  They are getting back to her now with a one-year

16   lease for it."

17              MR. NOBLE:  You can take that down.  Can we now bring

18   up Government's Exhibit 1665?  This is an email dated

19   November 21st, 2014 from Trevon Gross to Mark Francis with the

20   subject:  Urgent.

21              "Hey.  We need your and Shoula's info and signature on

22   this form ASAP.  Need this back in ten minutes.  Date for

23   May 23rd, 2014, scan and send back via email."

24              Can you zoom out?  And there's an attachment called

25   "Kapcharge Business Account Agreement".  Just publish that
```

1   briefly for the jury.  Can you zoom out and flip to the second

2   page?  You can take that down.

3           Please bring up Government's Exhibit 3563.  This is an

4   email from Christine Corida to Trevon Gross with the subject:

5   "Documents", dated November 21st, 2014 at 1:36 p.m., and there

6   are a couple of attachments.

7           Let's zoom to the attachment.  Let's publish this.

8   Can you scroll through this so the jury can see it?  Can you

9   just scroll down to the bottom?  You can take that down.

10          At this time, the government would like to offer into

11  evidence Government's Exhibit 4005, which is a stipulation

12  between the parties regarding DHS records.

13          THE COURT:  Without objection?

14          MS. SANTILLO:  No objection.

15          MS. MADRIGAL:  No objection.

16          THE COURT:  Thank you.  4005 is admitted.

17          (Government's Exhibit 4005 received in evidence)

18          MR. NOBLE:  We're just going to read page 6 of

19  Government's Exhibit 4005.  This is paragraph 1-D for the

20  record.

21          "The chart below is a true and correct summary of CVP

22  records reflecting all border crossings by Mark Francis with

23  the date of birth of May 26, 1973 and Canadian passport number

24  QL713979 into and out of United States from April 1st, 2014

25  until January 1st, 2017, and associated international flight

 1   information from each border crossing.  The last entry on the

 2   page -- or on that chart is an entry on November 30th, 2014

 3   from Montreal, Canada to Newark on United Airlines Flight 4444.

 4           On page 7, the first entry on the chart is a flight on

 5   December 1st, 2014 from Newark back to Montreal Canada on

 6   Flight QK7745.

 7           At this time, your Honor, the government calls Mag

 8   Flok back to the stand.

 9           THE COURT:  Ms. Flok may return to the courtroom.

10           I invite the jury to stand with me if you'd like.

11           (Pause)

12    MAGDALENA FLOK,

13        recalled as a witness by the Government,

14        having been previously sworn, testified as follows:

15           MR. CREIZMAN:  Mr. Noble, when you're ready, you may

16   resume your direct examination of Ms. Flok.

17           MR. NOBLE:  Thank you, Judge.

18   DIRECT EXAMINATION CONTINUED

19   BY MR. NOBLE:

20   Q.  Ms. Flok, do you remember yesterday when we broke we were

21   discussing your request to Trevon Gross for the Kapcharge

22   membership account?  Do you remember that?

23   A.  Yes.

24           MR. NOBLE:  Could we bring up Government's

25   Exhibit 6131 in evidence?  And publish that for the jury.

1  Q.  Now, Ms. Flok, you said that after about a couple of hours,

2  Mr. Gross returned and had the file with you; is that correct?

3  A.  Yes.

4  Q.  Can you take a look at Government's Exhibit 6131 and tell

5  the jury whether you recognize what this is?

6          MR. NOBLE:  And Mr. Chang-Frieden, if you could scroll

7  through the pages.

8          THE WITNESS:  Yes, I recognize this.

9  Q.  What is this?

10  A.  These are the documentation included in the file from the

11  new account.

12  Q.  This first page appears to be in French; is that right?

13  A.  Yes.

14          MR. NOBLE:  Let's flip to page 4.  Can we just blow up

15  the top part with the address?

16  Q.  Ms. Flok, what is the address there that appears on this

17  IRS document for Kapcharge U.S.A. Inc.?

18  A.  Montreal, Quebec, Canada.

19          MR. NOBLE:  Can we flip to page 5?

20  Q.  What does this appear to be?

21  A.  This is one of the owners of the Kapcharge, at least that's

22  what it said in the file.

23  Q.  Do you read French?

24  A.  A little bit.

25  Q.  Do you know what Peraus de conduire is?

```
1   A.  No.

2   Q.  What address is listed for Ms. Cohen?

3   A.  Quebec.

4           MR. NOBLE:  Let's zoom out.  Let's go to page 6.  Can

5   you just blow up the top portion, please?

6   Q.  What is this?

7   A.  This is, I'm assuming, a driver's license for Mark Francis.

8   Q.  And who is Mark Francis?

9   A.  He's the other owner of Kapcharge.

10  Q.  And where is he located, according to his driver's license?

11  A.  Also in Quebec.

12          MR. NOBLE:  Let's go to page 7.  Can we just blow up

13  this page?

14  Q.  Ms. Flok, what is this document?

15  A.  It looks like a signature card for new account.

16  Q.  What is the date on this document?

17  A.  May 23rd, 2014.

18  Q.  What date, remind the jury, that you were on site at HOPE

19  Federal Credit Union when you obtained this?

20  A.  November 21st, 2014.

21          MR. NOBLE:  Zoom out.  Can we just blow up this bottom

22  portion, just at the very bottom where it says "initial"?

23  Q.  Do you say that line where it says, "I certify that this

24  business is not one of the following types of businesses:  A

25  business located outside of the United States."  Do you see
```

1   that?

2   A.  Yes.

3   Q.  Is there an initial there?

4   A.  Yes.

5   Q.  Based on that representation, would you understand whether

6   this business is located inside or outside the United States?

7   A.  Well, according to the statement, it should be residing in

8   United States.

9        MR. NOBLE:  Let's go to page 9 of this document.  Just

10  blow this up for the jury.  Just scroll through it.  Publish.

11  Q.  Was this another page in the membership file for Kapcharge

12  that you received on November 21st, 2014?

13  A.  Yes.

14       MR. NOBLE:  You can take that down.

15  Q.  Now, Ms. Flok, at the time, were you familiar with HOPE

16  Federal Credit Union's field of membership requirement?

17  A.  I knew there was a community charter for people that work,

18  worship, or do business in Lakewood, New Jersey.

19  Q.  Would that include businesses located in Lakewood, New

20  Jersey?

21  A.  Yes.

22  Q.  Did there come a time when you asked Mr. Gross how

23  Kapcharge qualified for membership in the credit union?

24  A.  Yes.

25  Q.  And what did he say?

 1  A.  Because they have an office in Lakewood.

 2  Q.  Did Mr. Gross ever tell you how Kapcharge came to bank with

 3  the credit union?

 4  A.  No.  I believe it was a blessing for the credit union.

 5  That's the answer I received.

 6  Q.  Sorry.  Can you say that again?

 7  A.  It was a blessing that they had met this company, and they

 8  really wanted to help the community, and that's why they got

 9  involved in the church and wanted to help Lakewood Community

10  and the church community.

11  Q.  That's why Kapcharge had gotten involved in the church?

12  A.  Yes.

13  Q.  Who told you that?

14  A.  Mr. Gross.

15  Q.  Now, did there come a time when you reviewed a copy of a

16  contract between HOPE Federal Credit Union and Kapcharge?

17  A.  Yes.

18          MR. NOBLE:  Can we bring up Government Exhibit 6152

19  for identification?

20  Q.  Do you recognize this document?

21  A.  Yes.

22  Q.  What is this?

23  A.  Executive Registration Agent Agreement.

24  Q.  Between whom?

25  A.  HOPE Credit Union and Kapcharge.

1          MR. NOBLE:  The government offers Government's

2    Exhibit 6152.

3          MS. SANTILLO:  No objection.

4          MS. MADRIGAL:  No objection.

5          THE COURT:  6152 is admitted.

6          (Government's Exhibit 6152 received in evidence)

7          MR. NOBLE:  Can we publish it for the jury?  And

8    please blow up the top half of the first page.

9          I'm just going to read the preamble.  It states,

10   "Whereas Kapcharge is a third-party payments processer and

11   member in good standing of the Electronic Payments Association;

12   whereas HOPE FCU is a fully licensed federal credit union;

13   whereas Kapcharge wishes to engage the services of HOPE Federal

14   Credit Union to process, verify, settle, confirm, report, and

15   perform related processing services relating to its business

16   operations; whereas HOPE Federal Credit Union undertakes and

17   agrees to provide, on an exclusive basis, the services to

18   Kapcharge subject to the terms and conditions set forth herein;

19   whereas HOPE FCU shall act as a conduit for and on behalf of

20   Kapcharge's operations in the United States of America," and

21   then there's subsequent agreements.

22   BY MR. NOBLE:

23   Q.  Ms. Flok, have you ever seen an exclusive registered agent

24   agreement between a credit union and one of its members?

25   A.  No.

H319LEB3                        Flok - Direct

1   Q.   Is this the type of agreement that you would have expected

2   to have been reviewed and approved by the board of directors of

3   HOPE?

4   A.   Yes.

5   Q.   And why is that?

6   A.   In general, an agreement that it's signed and the credit

7   union gets involved with, one, would have to be reviewed by a

8   legal counsel on the credit union's part to make sure that it's

9   in any way does not pose any liability for the credit union,

10  and it would be approved by the whole entire board of

11  directors.  You would see some kind of a discussion, maybe in

12  the boards minutes, if the whole board did not sign the

13  document.

14  Q.   Did you, in the course of your review, review certain

15  copies of minutes from the board of directors of HOPE FCU?

16  A.   Yes, I did.

17          MR. NOBLE:  Can we bring up -- and again, let's see on

18  this page -- actually, let's flip to the last page of the

19  document.  I'm sorry.  Go up one page to the signature page.

20  Q.   What is the date that this agreement was entered into?

21  A.   July 15th, 2014.

22  Q.   Where does it say it was signed?

23  A.   Lakewood, New Jersey.

24  Q.   By whom?  Who signed the agreement?

25  A.   Mark Francis and Trevon Gross.

 1          MR. NOBLE:  Let's look at the board meetings for June,

 2   Government Exhibit 6086 in evidence.  Let's just scroll through

 3   that.

 4   Q.  Ms. Flok, as we scroll, can you see whether you see any

 5   discussion with Kapcharge or an agreement with Kapcharge in the

 6   board meeting minutes for June?

 7          MR. NOBLE:  Please scroll, Mr. Chang-Frieden.  You can

 8   stop there.

 9   Q.  Was there any discussion of Kapcharge or an agreement with

10   Kapcharge in the June meeting minutes?

11   A.  No.

12          MR. NOBLE:  Let's bring up Government's Exhibit 6087,

13   the July board meeting minutes.

14   Q.  Again, the agreement was entered into in July, correct?

15   A.  Yes.

16   Q.  What do the minutes for the July meeting indicate?

17   A.  That there was not sufficient quorums, that they didn't

18   meet, the meeting was adjourned.

19          MR. NOBLE:  Let's bring up Government's Exhibit 6089,

20   the August minutes, the meeting after the agreement was entered

21   into.  This is September.  Must be 6088.  Thank you.  Can we

22   just scroll through this one and see any discussion of

23   Kapcharge?  Let's just pause there and go back up a little bit

24   to the New Business section.

25   Q.  Under New Business --

 1              MR. NOBLE:  Keep going.

 2   Q.  -- it says that they reviewed the ATM policy and cost

 3   schedule, reviewed the fee schedule for individual activities

 4   at the credit union.  No discussion with Kapcharge, though,

 5   correct?

 6   A.  Correct.

 7              MR. NOBLE:  Let's keep scrolling.  Okay.

 8   Q.  Ms. Flok, did you see any discussion in the August board

 9   meeting minutes of Kapcharge or the agreement with Kapcharge?

10   A.  No.

11              MR. NOBLE:  You can take that down.

12   Q.  As part of your site visit, did you review any materials

13   relating to HOPE FCU's ACH processing?

14   A.  Yes.

15   Q.  Who provided you with those materials?

16   A.  Mr. Gross.

17   Q.  I believe in that email we saw yesterday you had requested

18   kind of a laundry list of items relating to ACH that you wanted

19   to review?

20   A.  Yes.  That would be like the regular list that we would

21   submit for reviewing ACH activities.

22   Q.  Did Mr. Gross provide you with everything you requested?

23   A.  No.

24   Q.  What materials do you recall reviewing?

25   A.  I reviewed the BSA policy, ACH policy, ACH risk assessment,

1   the Aries downloads, and I am not exactly sure what else was

2   there.

3   Q.  Based on your review of the policies that you did receive,

4   what, if anything, did you observe about HOPE FCU's policies

5   regarding ACH?

6   A.  Well, the ACH policy was not adequate.  It wouldn't cover

7   everything that you would expect to see for a credit union that

8   engages in that type of activity.  And along with the ACH goes

9   BSA, and the BSA policy was outdated, did not have all the

10  required components.  It referred to all requirements, all the

11  ways to file different reports the BSA requires the credit

12  unions to do.

13  Q.  Did Mr. Gross ever provide you with a list of all the

14  employees engaged in ACH processing as you had requested?

15  A.  No.

16  Q.  What, if anything, did Mr. Gross tell you about who was

17  involved in ACH processing at the credit union?

18  A.  In that time I was told that all the credit union's

19  operations are done by Mr. Larkins.  He's the one that runs the

20  office, so he posts anything that goes through for the members.

21  Q.  Did Mr. Gross ever mention to you any role that Ricardo

22  Hill had in ACH processing?

23  A.  No.

24  Q.  Did Mr. Gross ever tell you that ACH processing was being

25  conducted in Florida?

1   A.  No.

2   Q.  Is that something that you would have wanted to know in

3   your review of the ACH processing at HOPE?

4   A.  Yes.

5   Q.  And why is that?

6   A.  Well, usually when we go to a credit union to review ACH

7   transactions and the process that's involved with it, we would

8   like to see segregations of duties.  So you need more than one

9   employee to do it.  And at that time, I was under the

10  impression it was only Mr. Larkins in the credit union that was

11  doing anything in the office, which would not allow the credit

12  union to have segregations of duties, which means only --

13  there's only one person that would create the transactions from

14  beginning to end.

15          Normal procedures would be the one person creates the

16  files for ACH and there's another person that reviews the file,

17  approves it and submits it.

18  Q.  Based on what you reviewed at the credit union, it appeared

19  to you that there were no dual controls in place at the credit

20  union.

21  A.  Correct.  Because at that point I was told only Mr. Larkins

22  runs the office.

23          MS. SANTILLO:  Your Honor, I'm having a hard time

24  hearing the witness.

25          THE COURT:  I will ask, Ms. Flok, if you can keep your

 1    voice up and loud.  Thank you.

 2              THE WITNESS:  I will try.

 3              MR. NOBLE:  Thank you.

 4    Q.  What, if anything, did Mr. Gross tell you about the credit

 5    union's plans to directly process ACH transactions through the

 6    Federal Reserve?

 7    A.  He did mention that because Alloya was not -- they didn't

 8    want to process as much ACHs as the credit union was in the

 9    past, that they were applying for direct Fed Line terminal to

10    bring into the office.  We had a conversation about it saying

11    that Fed Line, when they do allow you to bring it to the office

12    or the terminal, that there's a lot of things that they also

13    require.  They require employees that are there, they require

14    the dual controls, there has to be somebody at the credit union

15    every business day, they cannot be closed because there's a lot

16    of timing with returns and ACH postings.  So I said, "If you do

17    have the plans to do it, you definitely have to have more

18    employees in the credit union."

19    Q.  Was it concerning to you that the credit union planned to

20    try to connect directly to the Fed?

21    A.  It was.  Normally, you didn't see credit unions that size

22    to be engaging in such a large volume of ACH transactions.

23    Q.  And why is that concerning to you as an NCUA examiner?

24    A.  Well, there's a lot of risk involved with ACH transactions,

25    especially such a large volume.  The one that's the biggest

 1    risk would be if there is any returns, and the volume they were

 2    processing, up to $18 million in a month, if the returns are

 3    definite they cannot get the money back, they would need to

 4    have sufficient money in the credit union to cover it.  At that

 5    time I think their net worth was really, really low.  I can't

 6    remember it was like $50,000 maybe, so definitely not

 7    sufficient to support that type of volume and dollar amount

 8    they were processing in the credit union.

 9          Another thing is, you need to have sufficient amount

10    of employees to handle all the transactions.  The recordkeeping

11    gets very tedious and very complicated because there is, like I

12    said, there's returns, there is different things that can come

13    up with timing issues, so you have to have a lot of different

14    transactions, you have to understand what goes where and it

15    needs to be posted right.

16          Bank account reconcilement can be very difficult

17    because ACH transactions are posted in batches, and usually the

18    transactions in general ledger are posted daily and as

19    individual transactions, so it tends to be difficult at the end

20    of the month to figure out what the batch that was processed

21    matches in GL.  I've been at larger credit unions that engage

22    that type of activity when they have several employees in a

23    department just for ACH, and they do those bank reconcilements

24    daily because that's the only way they can keep up with it.

25          Another thing that you could be dealing with if you

 1   are posting transactions before you actually get the money from

 2   businesses, you need to have either credit line established or

 3   some type of deposit from the institutions just in case those

 4   ACH transactions or the money that you have sent the ACH

 5   transactions or posted them, it's not coming on time.

 6   Q.  Was there any evidence that HOPE FCU was doing any of those

 7   things at the time of your examination?

 8   A.  At the time I was at the credit union, it really didn't

 9   seem like they had anything in place to be able to handle that

10   type of activity.

11   Q.  And did there come a time during your site visit on

12   November 21st when you had a discussion with Mr. Gross about

13   whether or not the credit union should continue to process ACH

14   transactions?

15   A.  Yes, we did.  We had quite a long discussion about the BSA

16   program at the credit union, about the risk of the number of

17   transactions, the volume of transactions, the dollar amount,

18   that they don't have sufficient net worth to support it, and we

19   asked them -- well, I personally asked them, as NCUA, I was

20   concerned to stop all the activities, ACH activities for any

21   businesses until we can be assured that he does have all the

22   process in place, all the policies, all the procedures, the

23   resources, the people that have experience in this area before

24   he can actually go ahead and start doing that type of activity.

25   Q.  And what did Mr. Gross say to you?

H31QLEB3                              Flok - Direct

1   A.  He said that they will stop doing all ACH transactions

2   starting Monday, November 24th.

3   Q.  Now, after that initial visit to the credit union, did you

4   send followup emails to Mr. Gross after you left?

5   A.  Yes, I did.  Because we had discussed, as we were looking

6   at Kapcharge account file, I had a lot of questions regarding

7   the documentation in the file.  One, some of it, when it was in

8   the foreign language, do you even understand what it says.  The

9   accounting standards that were used to audit the financial

10  statements for the company were ones probably in the standards

11  of accounting in Canada, which I'm not familiar with, but the

12  one thing that struck me that one of the owners of the business

13  had audit their own financial statements which --

14  Q.  One of the owners of Kapcharge had audited Kapcharge's own

15  financial statements?

16  A.  Correct.  Which obviously, even in the States, we would

17  say, well, you can't audit yourself, so that's not really a

18  proper procedure.  I am not familiar with Canadian standards,

19  but I would assume it would be similar.

20          There was also a lot of documentations missing from

21  the file.  Normally, when you open an account for a business,

22  you would like to see like a checklist that you would figure

23  out worth, what is business doing, what would be the value of

24  transactions, would that be cash or checks, volume of

25  transactions, what are they expecting monthly business

 1    activities.  There is a lot of other things that I can't think

 2    of other at the moment.

 3    Q.  Is it fair to say there were things missing from the

 4    Kapcharge membership file that you would normally expect to

 5    see --

 6    A.  Yes.

 7    Q.  -- in terms of proper due diligence?

 8    A.  Right.  I was explaining to Mr. Gross what is expected.

 9    There were several letters to credit unions that we issue with

10    guidance, you know, what to do and what you need to obtain from

11    a business.  And especially for a money business service

12    company, which is much riskier, and the credit union needs to

13    do a lot more due diligence, and not only they need to do the

14    initial review of the company they are getting into and opening

15    account with, they also need to, every month and ongoing, they

16    have to have ongoing monitoring of those accounts.

17    Q.  Did you find any evidence that HOPE FCU was doing any of

18    that with respect to Kapcharge or the transactions that it was

19    conducting for Kapcharge?

20    A.  No.

21         MR. NOBLE:  Can we bring up Government's Exhibit 6024

22    for identification?

23    Q.  Ms. Flok, do you recognize this document?

24    A.  Yes.

25    Q.  What is it?

```
 1   A.  It is an email from Mr. Gross to me, and CCed to my

 2   supervisor.

 3   Q.  What date?

 4   A.  It is November 26, 2014.

 5           MR. NOBLE:  The government offers Government's

 6   Exhibit 6024.

 7           MS. SANTILLO:  No objection.

 8           MS. MADRIGAL:  No objection.

 9           THE COURT:  Thank you.  It's admitted.

10           (Government's Exhibit 6024 received in evidence)

11           MR. NOBLE:  Just blow up the bottom portion, the email

12   from Ms. Flok on November 25th, 2014.

13   Q.  Can you read what you write?  "Thanks for your reports?"

14   A.  Oh.  "Thank you for your reports.  However, they do not

15   explain how does your credit union comply with Bank Secrecy Act

16   and anti money laundering laws.  How do you manage your

17   transactions for suspicious activity?"

18           MR. NOBLE:  If you can just blow up Mr. Gross'

19   response.  And he wrote, "Oh, I completely misunderstood.  As

20   our daily transaction volumes have not been high, we have a

21   manual process for screening transactions for suspicious

22   activities.  Please see attached file with our manual screening

23   procedures.  As our current procedures are manual and subject

24   to human error, we have decided to improve this process by

25   adding automation."
```

1              Just pausing there.

2  Q.  Based on your review of the activity, the ACH activity, was

3  it true that their volumes had not been high?

4  A.  No, the volumes was extremely high.  They had $18 million

5  of ACH transactions just in one month.  And I remember,

6  actually before this email, when I was on site on the 21st we

7  were talking about the BSA monitoring procedures, and because

8  Mr. Larkins left already and the credit union was closed, the

9  door to where the computer was, he could not provide me with

10 any documentation or supporting reports that show me how are

11 they monitoring this.  So that's why we had this email.

12 Q.  Who could not do that?

13 A.  Mr. Gross.

14 Q.  So you were never given access to the computer that you

15 believed was being used for ACH processing?

16 A.  No.

17 Q.  Just to be clear, at that time you believed that the ACH

18 transactions were being processed on-site at the credit union

19 in New Jersey?

20 A.  Correct.

21            MR. CREIZMAN:  Objection, leading.

22            MR. NOBLE:  I can rephrase, your Honor.

23            THE COURT:  Go ahead.

24 Q.  What was your understanding of where the ACH transactions

25 were being processed as of November 21st, 2014?

1   A.   At the credit union, which the only credit union I knew was

2   the little house next to the school.

3   Q.   Located near the church?

4   A.   Right in Jackson, New Jersey, there was this home belonging

5   to the church, I believe, that the credit union resided.

6           MR. NOBLE:   Let's flip to the attachment to this

7   email.   Can you just blow up this?

8   Q.   Now, based upon your review of this, was this a sufficient

9   procedure for scrubbing ACH transactions with respect to BSA

10  compliance?

11  A.   Not at all.   This still doesn't show me at all what does

12  the credit union itself do to managing suspicious activity.

13  This looks like a generic instructions for maybe the system

14  they were using.   This doesn't even cover all the possible ways

15  to monitor for suspicious activities.   And it doesn't show me

16  at all what are the activities or what are the accounts or what

17  are the members amounts that the credit union is actually

18  reviewing.

19  Q.   Okay.

20          MR. NOBLE:   Let's take that down.

21  Q.   Ms. Flok, after your November 21st visit, did there come a

22  time when you went back to HOPE?

23  A.   Yes.

24  Q.   When was that?

25  A.   That was December 1st.

1    Q.  Why did you go back to HOPE?

2    A.  Because we were still not comfortable with all the

3    processes and BSA program and how ACH are being processed

4    through the credit union, so we needed to step in just to look

5    at couple other things.

6    Q.  Before going back to the credit union, did there come a

7    time when you visited the location that had been listed as the

8    address of Kapcharge in Lakewood, New Jersey?

9    A.  Yes.  On the way to the credit union I drove by the

10   location.

11   Q.  What did you see there?

12   A.  Just a building with some, I think, solar power sign.

13   Q.  Okay.

14            MR. NOBLE:  Let's bring up Government's Exhibit 74 in

15   evidence.  Can you just blow up kind of the central portion of

16   this picture?

17   Q.  Ms. Flok, do you recognize what's depicted in the

18   photograph?

19   A.  Yes.

20   Q.  What is it?

21   A.  That's the building under the 216 -- I can't remember the

22   street.

23   Q.  216 River Avenue?

24   A.  Yeah, River Avenue.  That's where the Kapcharge supposed to

25   be located.

1   Q.  Did you see any signs for Kapcharge?

2   A.  No.  I actually drove quickly around the building just to

3   make sure that maybe there's a different entrance to this

4   location just to see maybe there is a sign for Kapcharge.  I

5   didn't see any.

6   Q.  Now, is it part of your normal examination process to visit

7   the locations of particular members of the credit union you're

8   examining?

9   A.  No, it's not.

10  Q.  So why did you go in this case?

11  A.  Normally, when you go to a credit union that has a robust

12  adequate customer identification program, you would see in the

13  new account file something that would prove that this business

14  is actually located at this address.  From the documentation

15  that I have seen, however was in a different language, there

16  was nothing really stating that this is the actual physical

17  address, and the credit unions are obligated by law by the Bank

18  Secrecy Act to verify the actual physical address of any

19  member, business, or just personal account.  And if that was

20  completed correctly, I'll either see a lease that shows that

21  this is, you know, our location, we do have this set for

22  business, this is the proof, all I saw was really an address on

23  the application.  And I would not -- I wasn't getting a really

24  straight answers from --

25  Q.  From whom?

1  A.  -- Mr. Gross, like what is this business about?  Like how

2  did they get in touch with this business?  How did they get in

3  relationship with this business?  Why are there not all the

4  documentation in the file?

5  Q.  Now, after you went to the 216 River Avenue location, where

6  did you go next?

7  A.  To the credit union.

8  Q.  Who, if anyone, did you meet there?

9  A.  Well, we walked in, myself and another examiner, Keith

10  Olson.  To my surprise, was not only Mr. Gross there, but it

11  was also the owner of Kapcharge waiting for us.

12  Q.  Who was that?

13  A.  Mark Francis.

14         MR. NOBLE:  Can we bring up Government's Exhibit 12 in

15  evidence?

16  Q.  Who is that, Ms. Flok?

17  A.  Mark Francis.

18  Q.  Did you speak with him?

19  A.  Yes, I did.

20  Q.  What did you say to him, what did he say to you?

21  A.  Well, we introduced ourselves.  I must have said something

22  that, you know, "I'm surprised that you came here all the way

23  from Canada to meet with us."  He said that he's here to make

24  sure that whatever the NCUA needs them to do, they are willing

25  to do and comply with us, and that he is applying for a license

1  in New Jersey to be able to do the business in New Jersey.

2  Q.  Did you know what type of license, or did he say what type

3  of license?

4  A.  For the money business transmitter.

5  Q.  A money transmitting license?

6  A.  I did ask him what type of business he was, like what is

7  Kapcharge, and he said -- I can't remember it was a consultant

8  or conduit for another company that's located in London, and

9  mostly what they do was currency exchanges.

10 Q.  Do you remember the name of that company?

11 A.  Wise something.

12 Q.  Wise something?

13 A.  Yeah.  I can't remember the exact name.

14 Q.  Did Mark Francis say anything about how he found HOPE

15 Federal Credit Union in Lakewood, New Jersey?

16 A.  No, he did not, and I did not ask him at this point.  I

17 just asked him if he has an office in Lakewood.  He said,

18 "Yes."  I said, "Are there any employees currently in this

19 office?"  He said, "No, there are not, but they could be if

20 they -- you know, they need to be."  And at that point I had

21 asked Mr. Francis to leave.

22 Q.  Why did you ask Mr. Francis to leave?

23 A.  Because normally we do not discuss credit union business or

24 NCUA exam concerns with credit union members.

25 Q.  Why is that?

1  A.  Because NCUA exams are confidential.

2  Q.  Are credit unions permitted to discuss their examinations

3  by the NCUA with individual members?

4  A.  No.

5  Q.  So did Mark Francis remain?

6  A.  No, he left the building.

7  Q.  After Mark Francis left, did you discuss Kapcharge with

8  Trevon Gross?

9  A.  Yes.

10  Q.  What, if anything, did you discuss with him about

11  Kapcharge?

12  A.  Well, I asked -- I said I drove by the building and I

13  didn't see any signs for Kapcharge, and I was told that that's

14  because that sign is inside the building.

15          MS. SANTILLO:  Your Honor, I just can't hear the

16  witness.

17          THE COURT:  Again, Ms. Flok, you need to keep your

18  voice up and strong and loud and as close to the microphone as

19  possible.  And if you would repeat your last answer, please.

20          THE WITNESS:  Okay.  Where should I start?  At which

21  point?

22          THE COURT:  The question was --

23  Q.  I believe it was along the lines of what, if anything, did

24  you discuss with Mr. Gross regarding Kapcharge after Mark

25  Francis left.

1   A.   Okay.  So I did tell Mr. Gross that I have driven by the

2   building and I didn't see Kapcharge signs anywhere on it.  And

3   the explanation was that the sign is inside the building.  I

4   was also told at that time that if the NCUA is concerned with

5   the net worth of the credit union for transacting all those ACH

6   transactions, that Mr. Mark Francis is willing to donate up to

7   $500,000 to the credit union to make sure that we are

8   comfortable with HOPE processing high volume of ACH

9   transactions.

10          I also asked were they aware that the Collectables

11  Club accounts and Kapcharge had the same address, and they

12  said, "Yes.  However, there's the different suite number,"

13  which I said, "Well, why is it not the suite number listed on

14  the application?  Usually you would have, you know, all the

15  information where the business is."  And again, at that point I

16  had asked, "How did this business from another country come to

17  this tiny town in New Jersey and start doing business with and

18  wants to do all those ACH transactions with you?"  And they

19  said, "It was a blessing.  And it was one person told another

20  person and another person," and I never really got the straight

21  answer of how did they got in touch with them.

22  Q.   And when you keep saying "they", who was present for these

23  conversations with you?

24  A.   It was Mr. Gross, I believe it was Mr. Larkins, and maybe

25  board member Wyatt.

1   Q.   Okay.  At that time during that conversation, did Mr. Gross

2   say anything to you about payments that Kapcharge had made to

3   his church to do business with the credit union?

4   A.   No.  I was just told that if we require higher net worth

5   and higher capital for them to be able to do the transactions,

6   Mr. Francis was willing to donate up to $500,000.

7   Q.   Now, to be clear, over the course of your examination of

8   the HOPE Federal Credit Union, all your conversations with

9   Mr. Gross, did he ever disclose to you that payments had been

10  made to his church by Kapcharge or Collectables Club?

11  A.   No.

12  Q.   After this conversation, what did you do?

13  A.   I believe I got a couple documents that we're asking for.

14  I scanned them, because we couldn't stay at the credit union to

15  actually work on it, we had a group meeting in New Jersey

16  closer to Newark and we left the credit union.  I told the

17  credit union I will be in touch by email if I have any

18  questions or I need any further documentation.

19         MR. NOBLE:  Let's bring up Government's Exhibit 6025

20  for identification.

21  Q.   Ms. Flok, do you recognize this document?

22  A.   Yes.

23  Q.   What is it?

24  A.   That's an email from Mr. Gross to myself.

25  Q.   And is he responding to an earlier email from you?

 1   A.  Yes.

 2   Q.  And the email from Mr. Gross is dated December 1st, 2014?

 3   A.  Yes.

 4          MR. NOBLE:  Government offers Government's

 5   Exhibit 6025.

 6          MS. SANTILLO:  No objection.

 7          MS. MADRIGAL:  No objection.

 8          THE COURT:  6025 is admitted.

 9          (Government's Exhibit 6025 received in evidence)

10          MR. NOBLE:  Let's blow up the bottom portion.

11   Q.  Here, Ms. Flok, you wrote on December 1st, 2014, which was

12   the date of your site visit, correct?

13   A.  Correct.

14   Q.  You said, "I have not received the statement for Kapcharge

15   before I left.  Also, for Helping Other People Excel Inc, Hope

16   Cathedral Inc., and your account.  I only received computer

17   screenshots."  And so you asked him to provide you with those

18   account statements; is that right?

19   A.  Yes.

20   Q.  Why did you ask him for those particular account

21   statements?

22   A.  Well, one, Kapcharge was involved with all the ACH

23   transactions so we needed to know exactly what was the volume,

24   how many transactions were processed.  The other accounts I was

25   asking for because there were negative balances on the Aries

1   download, and all those accounts are what we called insider

2   accounts, which means they are in some way related to the

3   people that are involved officials of the credit union or the

4   employees of the credit union.

5               (Continued on next page)

1          MR. NOBLE:  Let's zoom out, and let's go to the first

2    page of the attachment.  Just blow up the top portion.

3    BY MR. NOBLE:

4    Q.  Can you just orient the jury:  What is this document that

5    we're looking at?

6    A.  This is a statement from HOPE Credit Union for a business

7    account called Hope Cathedral.

8    Q.  And on the right-hand side, under "Statement of Account,"

9    what is the date of this statement?

10   A.  This statement is for the period of November 2014.

11   Q.  And what's the membership number?

12   A.  5170.

13         MR. NOBLE:  Let's scroll down.  Let's look at the

14   savings account 000.

15   Q.  Ms. Flok, do you see the entry for November 24th, 2014?

16   A.  Yes.

17   Q.  What happened in the church at the Hope Cathedral's account

18   on November 24th, 2014?

19   A.  It looks like Collectables Club deposited $6,000.

20   Q.  And what happened on November 28th, 2014?

21         MR. NOBLE:  Scroll down a little bit,

22   Mr. Chang-Frieden.  Thank you.

23   Q.  November 28, 2014?

24   A.  There was a loan disbursement transfer for $19,000.

25   Q.  Just looking at the account number in the middle, 5170-561,

1    do you see that?

2    A.  Yes.

3    Q.  Is that an account that's related to Hope Cathedral as

4    well?

5    A.  I believe so.

6    Q.  A loan account?

7    A.  Yes.

8    Q.  We'll look at that a little bit later.

9         MR. NOBLE:  Let's scroll down to the checking account

10   and first just blow up -- yes, blow up that portion.

11   Q.  What was the balance as of November 1st, 2014, in the

12   checking account for the church?

13   A.  Negative 7,525.

14   Q.  You testified earlier that you saw negative balances in

15   some of the accounts that caught your attention; is that right?

16   A.  Yes.

17   Q.  Is this one of the accounts?

18   A.  Yes.

19   Q.  Can you just explain to the jury what concerns the NCUA

20   would have if there's negative balances in insider accounts at

21   a federal credit union?

22   A.  Well, we would be concerned with negative balances in any

23   account, members or insiders.  Insiders, we looking a little

24   bit closer to because they are held to a higher standards, they

25   should know they should not be overdrawn.

1   Q.  Why should you not overdraw your account?

2   A.  Because it's like using money that you don't have.

3   Q.  And if you're overdrawing your account in a credit union,

4   where does the money come from if it's not in your account?

5   A.  It comes from the members' money, members' share, the

6   membership share balance.

7   Q.  So, it's taking money from your members of the credit

8   union?

9               MS. SANTILLO:  Objection.

10              THE COURT:  Grounds?

11              MS. SANTILLO:  It's leading and misstating --

12              THE COURT:  Sustained.

13              MR. NOBLE:  Let's move on.

14              Can we just scroll down to the bottom of the account

15  to show what the ending balance was for the month of November.

16  Q.  What was the ending balance on November 30th, 2014?

17  A.  17,968.

18  Q.  Remind the jury, when did you visit the credit union?

19  A.  November 21st.

20  Q.  I should say on the first visit.  November 21st?

21  A.  November 21st, yes.

22  Q.  Did you ever have any discussions with Mr. Gross about

23  negative balances in the accounts at the credit union?

24  A.  Yes, I did.  I did mention that I have seen a couple

25  insider accounts, including his own personal account, with

1   negative balances, and I did state exactly the same thing that

2   I said earlier, that you shouldn't really have negative

3   balances in the account, and especially insider any officials

4   or employees of the credit union.

5   Q.  Do you see this entry at -- the third entry for

6   November 28, 2014, the phone transfer?

7   A.  Yes.

8   Q.  What happened on November 28, 2014, in the checking

9   account?

10  A.  There was a transfer of $19,000.

11  Q.  And it transferred from 5170000?

12  A.  Yes.

13  Q.  So that was the savings account we just looked at; is that

14  right?

15  A.  Yes.

16          MR. NOBLE:  Can we scroll down to the loan account,

17  561, the bottom one.

18  Q.  What happened in this loan account on November 28, 2014?

19  A.  There was a new loan disbursement for $19,000.

20  Q.  So this was a loan that was disbursed to the church?

21  A.  Yes.

22  Q.  And based on our review of this document, what happened to

23  the loan proceeds?

24  A.  Those loan proceeds covered the negative balance in the

25  checking account.

 1          MR. NOBLE:  Let's scroll back up to the checking

 2   account.  Can we blow up that portion, please.  The bottom

 3   portion.

 4   Q.  Do you see -- so, for instance, beginning on November 1st,

 5   2014, there was a negative $7,525.32 balance.  Do you see that?

 6   A.  Yes.

 7   Q.  Then it appears there's a $2,000 withdrawal, taking it even

 8   lower; is that right?

 9   A.  Yes.

10   Q.  But then it gets reversed, it says, "NSF draft reverse"?

11   A.  Correct.

12   Q.  But then it looks like the same draft goes through, the

13   $2,000?

14   A.  Yes.

15   Q.  Do you have an understanding of what happens when you take

16   out money that you don't have in an account?

17   A.  Well, it depends on the system, how is it set up.  We

18   usually -- the first time when the member tries to withdraw

19   money that's not available in the account, it is rejected.

20   There are some systems that will automatically repost or try to

21   repost the same amount, just because there could be a timing in

22   the system that maybe the money has become available.  At that

23   point, if the money is still not there, it should be rejected

24   again.  Sometimes if it's rejected the first time, the only way

25   to push this transaction through would have to be a manual

 1   posting.

 2   Q.   What do you mean by "a manual posting"?

 3   A.   That means that somebody at the credit union would go and

 4   overwrite the transaction.

 5            MR. NOBLE:   Can we blow up the entry for November 6,

 6   2014, draft number -- ID Number 3707.   It's the second entry on

 7   November 6, 2014.   Just highlight that one, Mr. Chang-Frieden.

 8   Q.   Ms. Flok, do you see that entry for November 6, 2014, ID

 9   Number 3707, on November 6th?

10   A.   Yes.

11   Q.   Prior to that $3,500 withdrawal, what was the balance in

12   the account?

13   A.   Negative 13,525.

14            MR. NOBLE:   Now, Mr. Chang-Frieden, can you put that

15   Exhibit 6025 side by side with Government Exhibit 808-D at 111.

16   Can we blow up the November 6th entry on the checking account

17   statement.   And can we blow up the check?

18   Q.   So, starting with the check that we're seeing on the screen

19   from 808-D, what account is this check drawn on?

20   A.   Hope Cathedral.

21   Q.   And who is it made out to?

22   A.   Trevon Gross.

23   Q.   What is the date of the check?

24   A.   November 5th, 2014.

25   Q.   And what is the check number?

1    A.  3707.

2    Q.  What's the amount of the check?

3    A.  3,500.

4    Q.  What is the financial institution that this account is held

5    at?

6    A.  Helping Other People Excel Credit Union.

7    Q.  And who signed this check?

8    A.  Mr. Gross.

9    Q.  How do you recognize that as Mr. Gross' signature?

10   A.  Because I reviewed other documents in the files of the

11   credit union, and it appears to be the same signature.

12   Q.  Now, based on your review of these documents, does this

13   check appear to be the entry on November 6th, 2014, in the

14   church's bank account?

15   A.  Yes.

16            MR. NOBLE:  You can take that down.

17            THE COURT:  Mr. Noble, we're going to do our lunch

18   break now.

19            MR. NOBLE:  Okay.

20            THE COURT:  Members of the jury, your lunch has

21   arrived.  We'll give you a 45-minute break.  You are welcome to

22   either stay in the jury room or leave the courthouse, as you

23   like, but your lunch is here in light of the shortened

24   lunchtime.  So, please do be back in the jury room ready to go

25   at 1:25.  Thank you so much.  Enjoy your lunch.

1              (Jury not present)

2              THE COURT:  Ms. Flok, you may step down.  And please

3    be outside the courtroom, ready to return, just a few minutes

4    before 1:25.

5              THE WITNESS:  Okay.  Thank you.

6              (Witness temporarily excused)

7              THE COURT:  Are there matters to take up, counsel?

8              MR. NOBLE:  Not from the government.

9              MS. SANTILLO:  Yes.

10             THE COURT:  Just a moment.

11             (Pause)

12             THE COURT:  Please exit the courtroom, Ms. Flok.

13   Thank you.

14             Ms. Santillo.

15             MS. SANTILLO:  Yes, your Honor.  I have a Rule 403

16   objection.  I feel like this is a very leading presentation

17   with respect to this witness.  She was there to review the ACH

18   processing, and the government is walking her through account

19   reconciliations that I think we've gotten the point at this

20   point, and they're just having a very cumulative, leading

21   presentation through these documents.

22             THE COURT:  Well, with respect to leading, I think

23   you've made one or two objections, and I sustained.  So I try

24   to allow some room, but if there's an objection, and I think

25   it's feeding the witness answers or rephrasing their answers in

 1    a way that's leading, I'll sustain the objection.

 2            And, Mr. Noble, I will ask you to make sure,

 3    particularly given the nature here and in light of the

 4    objection, that going forward, you stick to nonleading

 5    questions.

 6            MR. NOBLE:  Yes, Judge.

 7            I can proffer the relevance of this line of

 8    questioning, though, if your Honor has any concern.

 9            THE COURT:  All right.  Go ahead.

10            MR. NOBLE:  One point defense counsel has made is that

11    the Collectables Club consulting fees went into the Hope

12    Cathedral account, that there's evidence that, for instance, in

13    the November payment, it first went into Mr. Gross' personal

14    account, and he's like, no, don't do that, put it in the

15    church's account, and it goes into the church's account, and I

16    think they've pointed that out.  I think they may have pointed

17    it out in their opening.  And this line of questioning is just

18    showing who controls this church account, how the funds are

19    used.

20            And then, furthermore, Ms. Flok did testify that one

21    of the issues at the credit union that she observed were the

22    negative balances, and this evidence is what she looked at and

23    saw that there were negative balances.  So, I think it's highly

24    relevant, probative evidence, and it addresses a point that we

25    expect defense counsel is going to raise, that this money

1    didn't go to Mr. Gross personally, it went to the church's

2    account.

3              THE COURT:  How much more of the sort of --

4              MR. NOBLE:  I'm just going through the November

5    statement.  I may show the October ones and September ones just

6    briefly, but we're not going to do the exercise that I just

7    went through.  I might show one more check, but just to make

8    the point and move on.  I'm trying to keep it brief because

9    we're trying to get through all the witnesses.

10             THE COURT:  Well, nonleading questions.  And I can see

11   space for one more of this, in light of the argument that the

12   defense raised, but I'll stop it as cumulative after that.

13             MR. NOBLE:  Yes, Judge.

14             THE COURT:  Anything else?

15             Why doesn't everybody -- I don't know that we'll need

16   a lot of time.  Let's give ourselves ten minutes before the

17   jury returns, so please be back and ready to go at 1:15.  Thank

18   you.

19             (Luncheon recess)

20

21

22

23

24

25

H31KLEB4

```
 1                    AFTERNOON SESSION

 2                         1:21 PM

 3           THE COURT:  Matters to take up?

 4           MS. SANTILLO:  Yes, your Honor.  Earlier today, I had

 5   introduced an exhibit as Defense 17, and we're actually TG17,

 6   and they are D17, so I just want to make that clear on the

 7   record.

 8           THE COURT:  Oh, okay.  I wondered about that.  So what

 9   I admitted into evidence earlier today as Defendants' 17 is, in

10   fact, TG17?

11           MS. SANTILLO:  Yes.

12           THE COURT:  Thank you.

13           Other matters to take up?

14           Two quick notes while we get our juror count.  I will

15   send the draft charge out at some point tomorrow.  I realized I

16   didn't get a draft verdict sheet.  So if you will confer on a

17   proposed verdict sheet.  Let's just pick a time, and by that

18   time, you'll submit to me, hopefully, an agreed-upon verdict

19   sheet, but in the absence of agreement, competing proposals

20   with support for the variance of opinion.

21           What timing would you propose?

22           MS. CHOI:  Your Honor, the government would propose

23   Thursday at 5:00, and then we'll try to confer with defense

24   counsel during the day.

25           THE COURT:  Okay.  So I'll hear from you jointly by
```

1   5:00 p.m. tomorrow?

2              MS. CHOI:  Yes.

3              THE COURT:  Thank you.

4              Just to note how I'll run the charging conference.  As

5   I say, I'll send out the draft, and it will have line numbers,

6   and we'll just go to any pages on which there are any

7   suggestions or objections, and I'll ask you, to the extent you

8   have a request, to state specifically what the line numbers are

9   that you have a concern on.  To the extent you're suggesting

10  different language, come prepared with a specific proposal, and

11  to the extent it's relevant, authority for that suggestion.

12  And we'll take up both the charge and the verdict sheet, to the

13  extent that there is dispute on the verdict sheet, at that

14  point.

15             Go ahead.

16             MS. CHOI:  Your Honor, I think you said when you were

17  expecting to send out the charge.  Obviously, you need to take

18  as much time as necessary.  Just for our own internal planning.

19             THE COURT:  Yes, I think I'm close, but I definitely

20  need this evening again to go through again --

21             MS. CHOI:  Sometime tomorrow?

22             THE COURT:  Some point.

23             MS. CHOI:  I didn't know if it was going tonight or

24  tomorrow.  That was my only question.

25             THE COURT:  It will be tomorrow.

1          MS. CHOI:  Thank you, your Honor.

2          THE COURT:  But you'll have time.

3          Other questions about that?  Or anything else we can

4    take up?

5          MR. CREIZMAN:  Your Honor, are we going to get the

6    verdict sheet first and then submit proposed changes?

7          THE COURT:  I want to hear from you all jointly by

8    5:00.  So in advance of that, the government will propose a

9    verdict sheet and send it to the defense by --

10         Noon?

11         MS. CHOI:  Noon.

12         THE COURT:  -- noon tomorrow.

13         MR. CREIZMAN:  And any additional requests to charge,

14   or changes, and so on?

15         THE COURT:  Well, this will just be the verdict sheet.

16         MR. CREIZMAN:  Okay.

17         THE COURT:  So I never got a draft verdict sheet from

18   the parties, so I'm just requiring you to go through a similar

19   process as you did with the draft charge.

20         MR. CREIZMAN:  Okay.

21         THE COURT:  With respect to the charge itself, I have

22   your submissions, and to the extent there are disputes, I'm

23   resolving them and drafting and otherwise incorporating what I

24   think are the appropriate, and accurate, and clear charges.  I

25   will send that draft at some point tomorrow in advance of the

1    charging conference, and then I'll take up any issues you have

2    at the conference.

3              MR. CREIZMAN:  If there is a brief submission that we

4    could make on potentially one or two charges that we -- because

5    we weren't initially charged in certain crimes, and then we

6    ultimately were, and --

7              THE COURT:  Wasn't there a resubmission process after

8    that?

9              MR. CREIZMAN:  I'm sure that there was, yes.  But I

10   don't know that we were completely lucid at that point.

11             THE COURT:  How about now?

12             MR. CREIZMAN:  No.  But we're getting there.

13             THE COURT:  If you have some reasonable request that

14   you deem necessary in light of the evidence, I can't say I'll

15   conclude that it's been -- you'll have an opportunity to raise

16   it at the conference, and if you can run it by the government

17   and get agreement, all the better.  Obviously counsel for

18   Mr. Gross as well.  Do you want to just preview what you have

19   in mind?

20             MR. CREIZMAN:  One would be we had in mind something

21   about crimes are only defined by statute, something that would

22   be a little bit more fulsome than just the limiting instruction

23   to the jury that was read.  I guess that, you know, a violation

24   of a reg in and itself -- I think that things may have come

25   out, evidence may have come out, during trial that warrants

1    such an instruction.

2           THE COURT:  Okay.  To the extent that that is

3    something somewhat new, and it developed during the course of

4    the trial, if you have a request with respect to that charge --

5    which I think we agreed to do at the charge as well?  Is that

6    accurate?  I can't recall.

7           MS. CHOI:  Your Honor, I don't think we fully reached

8    that decision.  If I could propose that if defense counsel has

9    specific things in mind, to speed the process, they can send us

10   what they want to do.  Once we've seen your Honor's charge, and

11   we may just agree to it and not have to have Ms. Madrigal draft

12   another -- draft something else if it's not necessary.

13          THE COURT:  Okay.  So just to the extent you have

14   additional requests that you anticipate making, raise it with

15   the government and counsel for Mr. Gross in advance and see if

16   you can get agreement.  If not, I'll take it up at the charging

17   conference.

18          MR. CREIZMAN:  Okay.  Thank you.

19          THE COURT:  Anything else?

20          (Discussion off the record)

21          MS. CHOI:  Your Honor, is it okay if we put Ms. Flok

22   back on the stand?

23          THE COURT:  Yes, please.  Thank you.

24          Mr. Noble, can you give me a time estimate?

25          MR. NOBLE:  Forty-five minutes to an hour.

 1          (Jury present)

 2          THE COURT:  Thank you so much, members of the jury.  I

 3   hope lunch, though short, was pleasant.

 4          JUROR:  Yes.  Thank you.

 5          THE COURT:  Good.

 6          And, Mr. Noble, you may continue with your direct

 7   examination of Ms. Flok.

 8          Ms. Flok, I do remind you, you are under oath.

 9          When you're ready, counsel.

10          MR. NOBLE:  Thank you, Judge.

11          Can we bring up Government Exhibit 6025 again.  And

12   let's go back to the November statement for Hope Cathedral.

13          Can we flip to the next page, please.  Can we just

14   blow up the top portion of the checking account.

15    MAGDALENA FLOK, resumed.

16   DIRECT EXAMINATION CONTINUED

17   BY MR. NOBLE:

18   Q.  Ms. Flok, as of November 21st, 2014, what was the balance

19   in the Hope Cathedral account?

20   A.  Negative 26,620.32.

21          MR. NOBLE:  Let's go to the October statement, the

22   next page.  Thank you, Mr. Chang-Frieden.  Can we blow up the

23   savings account portion.

24   Q.  What happened in this account on October 7, 2014?

25   A.  There was a deposit of $3,000 from Collectables' account.

1     MR. NOBLE:  Zoom out.  Can we look at the checking

2     account.  Blow up that portion.

3     Q.  What occurred in this account on October 6, 2014?

4          I am, sorry, let me be more specific.  The first entry

5     for October 6th, 2014?

6          MS. SANTILLO:  Objection.

7     A.  The first entry --

8          MS. SANTILLO:  Objection; leading.

9          THE COURT:  Overruled.

10    Q.  You can answer.  What happened in the first entry on

11    October 6, 2014?

12    A.  There was a telephone transfer from Collectables' account

13    of $1,500.

14         MR. NOBLE:  Can we go to the next page, continuing the

15    checking account.  Can we just blow up the date and the --

16    actually, yes, let's just blow up the bottom half of the

17    screen.

18    Q.  Do you see on October 17, 2014, there was an entry in the

19    church's checking account for a purchase at Tao Massage?

20    A.  Yes.

21    Q.  How much was that purchase for on October 17th?

22    A.  $165.

23    Q.  And what had been the balance in the account before that

24    purchase?

25    A.  Negative $3,983.32.

1          MR. NOBLE:  Can we just take a look at the

2    October 17th draft number 291.  Can you highlight that row,

3    Mr. Chang-Frieden.

4    Q.  How much was that check, number 3734?

5          MS. SANTILLO:  Objection.

6          THE COURT:  Sustained.

7          MR. NOBLE:  Let's zoom out.  Can we just flip to the

8    next page.  And the next page.

9    Q.  What month is this statement for for Hope Cathedral?

10   A.  September 2014.

11         MR. NOBLE:  Can we zoom out.  And can we blow up the

12   checking account.

13   Q.  What was the balance in this account on September 11, 2014?

14   A.  Negative $22,137.42.

15         MR. NOBLE:  You can zoom out.  And you can take that

16   down.

17   Q.  Ms. Flok, did there come a time, after your visit to the

18   credit union on December 1st, that you asked Mr. Gross for more

19   information about the Collectables Club?

20   A.  Yes, I did.

21         MR. NOBLE:  Can we bring up Government Exhibit 6026.

22   Q.  And while you're doing that, Ms. Flok, we just looked at a

23   number of statements that contained negative balances; is that

24   right?

25   A.  Yes.

1  Q.  What, if any, concerns did you have when you saw these

2  negative balances in the insider accounts of the credit union?

3  A.  Well, when we go to credit unions, and not only the insider

4  accounts, but any accounts that have large negative balances

5  will be a concern because credit unions, in general, should

6  have some kind of a policy with limits of how the overdraft

7  works.  Usually they don't allow high amounts in the accounts

8  to be overdrawn because there is a risk that the person is not

9  going to pay it, and there is really no contract like a loan

10  agreement with this member to pay back.

11        So we are looking at the credit unions to see if they

12  have something that's called courtesy pay, which does allow

13  them to have a program, and let the members overdraw the

14  accounts, and then they have so many days to repay it.  We also

15  recommend to credit unions to impose fees for insufficient

16  funds, just to discourage the members from this unwanted

17  behavior.

18        So, in general, we don't see smaller credit unions to

19  allow negative drafts at all.

20  Q.  Did you find any evidence that HOPE Federal Credit Union

21  was charging insufficient fund fees for the overdrawn account

22  of the church?

23  A.  No.

24  Q.  Did you see any documentation of any type of program that

25  permitted the church to overdraw its account by over $20,000?

 1   A.  No.

 2              MS. SANTILLO:  Objection.

 3              THE COURT:  Sustained.

 4   Q.  Let's take a look at 6026, which has been brought up for

 5   your identification.  Do you recognize this document?

 6   A.  Yes.

 7   Q.  What is it?

 8   A.  It's an email from Mr. Gross to myself.

 9              MR. NOBLE:  The government offers Government Exhibit

10   6026.

11              MS. MADRIGAL:  No objection.

12              MS. SANTILLO:  No objection.

13              THE COURT:  Thank you.

14              It's admitted.

15              (Government's Exhibit 6026 received in evidence)

16              MR. NOBLE:  May we publish for the jury?

17              THE COURT:  You may.

18              MR. NOBLE:  Blow up the bottom half first, the email

19   from Ms. Flok.

20   Q.  Ms. Flok, what did you write to Mr. Gross?

21   A.  "On the ACH item detail report, there are other companies'

22   names listed in addition to TransferWise, for example,

23   Collectables Club.  Who are they?"

24   Q.  And this was the ACH item detail for HOPE Federal Credit

25   Union; is that right?

1   A.  Yes.

2   Q.  That's what you were reviewing?

3   A.  Yes.

4   Q.  And what, if anything, did you observe with respect to the

5   ACH item detail and Collectables Club?

6   A.  That they have been showing up ever so often under

7   transaction list.

8   Q.  That HOPE Federal Credit Union had processed ACHs for

9   Collectables Club; is that right?

10  A.  Yes.

11  Q.  And then how did Mr. Gross respond?

12  A.  "They are other companies for which Kapcharge does payroll

13  and invoice payment for."

14  Q.  Now, did there ever come a time --

15          MR. NOBLE:  You can take that down.

16  Q.  Did there ever come a time when Mr. Gross presented you

17  with any signed agreement between the credit union and

18  Collectables Club?

19  A.  No.

20          MR. NOBLE:  Can we bring up Government Exhibit 2510-A

21  in evidence.

22          MS. SANTILLO:  Objection.

23          THE COURT:  Can I see it?

24          Sustained.

25          MR. NOBLE:  Judge, could I be heard on this?

1                    THE COURT:  It's a foundation objection.

2                    MR. NOBLE:  Okay.  Well, my question was going to be,

3        have you ever seen this document before.

4                    THE COURT:  Right, but you just asked.  So sustained.

5                    MR. NOBLE:  Your Honor, could I be heard?

6                    THE COURT:  Sure.

7                    (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the sidebar)

2              MR. NOBLE:  My question was have you ever seen any

3     written agreement between Collectables Club and Kapcharge.  I

4     just want to confirm that for the record that she's never seen

5     that particular document before.

6              THE COURT:  But she said she hasn't seen a written

7     agreement, so for foundation, to ask her about the written

8     agreement --

9              MR. NOBLE:  I'm not going to ask her to interpret it

10    or any question about it.  I just wanted her to review it, so

11    she can testify to the jury that she has never seen that

12    document before, which is what I expect her testimony will be.

13             MS. SANTILLO:  It's very clear from her testimony

14    right now she's never seen that document, and it's just

15    cumulative, and it's putting the documents that she hasn't seen

16    in front of her to make the summary points they have been

17    trying to make throughout the entire time she's been

18    testifying.

19             THE COURT:  There was no hesitation, there was

20    suggestion, no, I saw a lot of documents, I'm not sure.  There

21    was certainty she hasn't seen it.  So if there's some

22    foundation to ask her about documents, that's different, but

23    for now, I'm sustaining the objection.

24             MR. NOBLE:  Okay.  I'll move on.

25             (Continued on next page)

1        (In open court)

2        MR. NOBLE:  You can take that down, Mr. Chang-Frieden.

3   BY MR. NOBLE:

4   Q.  Ms. Flok, after your December 1st on-site visit and those

5   follow-up emails you had with Mr. Gross, what, if anything, did

6   you do with respect to your examination of HOPE Federal Credit

7   Union?

8   A.  I issued an exam report and sent it to Mr. Gross.

9   Q.  Prior to doing that, did you confer with anyone?

10  A.  Yes.  I have reviewed some of the concerns about ACH

11  transactions, and policies, and risk assessments with one of

12  our ACH specialists in the agency, and it was also reviewed by

13  my supervisor, Brian McDonough.

14  Q.  In general, what did your exam report direct Mr. Gross to

15  do?

16  A.  Also, based on our Office of Consumer Protection, who

17  reviewed Kapcharge eligibility to belong to the credit union,

18  we issued a document resolution stating that based on our

19  review and the opinion of OCP, which is the Office of Consumer

20  Protection, Kapcharge is not eligible to be a member at HOPE

21  Credit Union, and the account should be closed.

22        Also, the credit union should stop ACH transactions

23  because they do not have sufficient procedures in place and

24  level of net worth to safely and soundly process ACHs in the

25  volume that they would like to.

1           And, also, the BSA program was not adequate to support

2    that type of activity.

3    Q.  Based on your findings, what, if anything, did the NCUA do

4    with respect to the credit union's CAMEL rating?

5    A.  Based on our findings in the document resolution, we

6    downgraded the credit union to a CAMEL IV.

7    Q.  What does that mean?

8    A.  That means that the NCUA can provide a lot more resources

9    to the field to visit the credit union more often and follow up

10   on the credit union's progress addressing the issues noted in

11   the exam.

12   Q.  About when did you communicate your exam findings to Trevon

13   Gross?

14   A.  I will say mid-December.  15th, 16th of December.

15   Q.  Now, after the NCUA makes decisions like that, is there

16   anything a credit union can do to challenge the decision?

17   A.  The credit union can challenge any exam report.  On the

18   first page of our examination, the report, actual that we issue

19   to the credit union has all the steps that the credit union can

20   pursue to appeal the CAMEL rating and the report.

21   Q.  Did there come a time when Mr. Gross appealed the NCUA's

22   decision?

23   A.  Yes.

24           MR. NOBLE:  Can we bring up Government Exhibit 6028

25   for identification.

1   Q.  Ms. Flok, what is this document?

2   A.  This is an email from Mr. Gross to myself, Mark Guberman,

3   and Keith Olsen.

4   Q.  Who is Mark Guberman and Keith Olsen?

5   A.  Mark Guberman was the district examiner of HOPE Credit

6   Union, and Keith Olsen was the examiner that went with me back

7   in November.

8           MR. NOBLE:  The government offers Government Exhibit

9   6028.

10          MS. SANTILLO:  No objection.

11          MS. MADRIGAL:  No objection.

12          THE COURT:  Thank you.

13          It's admitted.

14          (Government's Exhibit 6028 received in evidence)

15          MR. NOBLE:  May we publish the email for the jury?

16          THE COURT:  You may.

17          MR. NOBLE:  Can we just blow up the header?

18   Q.  What is the date that Mr. Gross sent in this letter?

19   A.  Wednesday, December 21st, 2014.

20          MR. NOBLE:  Zoom out.

21   Q.  In the email, it states:  "Attached is our DOR response for

22   the two reports dated March 31st and September 9th, 2014."

23          Do you see that?

24   A.  Yes.

25   Q.  Now, you testified that you delivered your results in

1   mid-December 2014.  How does that relate to the dates we see in

2   this email?

3   A.  Do you mean the date when I received the email?

4   Q.  No.  You see how Mr. Gross wrote the two reports dated

5   March 31st and September 9th, 2014?

6   A.  Yes.  Well, those are two different reports.  The

7   March 31st report, it was the exam completed by Mark Guberman,

8   the district examiner, and September 9th, 2014, is the report

9   that I issued.

10  Q.  So are exams conducted as of particular dates, like

11  quarter-end dates?

12  A.  Yes, they're all completed as of quarter-end.

13  Q.  So that there is a lag between the as-of date of a report

14  and the date that the exam report is actually issued?

15  A.  Correct.  Actually, you can have an exam started -- like,

16  say, if there's a March 31st call report, because that's what

17  we based it on, on those financials, the exam can start in June

18  right before the call report and issued after the following

19  quarter.

20  Q.  Okay.

21          MR. NOBLE:  Let's flip to the attachment.

22  Q.  What is the date of this letter, and who is it addressed

23  to?

24  A.  December 26, 2014.  It's addressed to Mark Guberman,

25  myself, and NCUA Board Chair Debbie Matz.

1          MR. NOBLE:  Let's scroll down.  Oh, pause there.  Go

2    back.

3    Q.  Do you see the paragraph that states, "Kapcharge USA, Inc.

4    is an IRS-recognized corporation with a TIN" --

5          Do you know what a TIN is?

6    A.  Yeah.  That's a tax ID number.

7    Q.  -- "incorporated in Delaware and in good standing in the

8    State of New Jersey with their USA headquarters in Lakewood,

9    New Jersey.  Our charter states that persons who live, work,

10   worship, or attend school in, and businesses, and other legal

11   entities in Lakewood, New Jersey."

12         Do you see the next paragraph, "This credit union has

13   other business accounts for whom we transact business and

14   prohibiting us from processing their legitimate ACH

15   transactions as punitive and without merit"?  Do you see that?

16   A.  Yes.

17   Q.  Based on your exam, did you see whether the credit union

18   had any business accounts other than Kapcharge for whom they

19   processed ACHs?

20   A.  Based on my visit in November and follow-up on

21   December 1st, I only saw Kapcharge.

22   Q.  You see the last sentence on this page, "We have presented

23   our BSA/AML process, which demonstrated that we were reviewing

24   all transactions manually, and that we have people managing

25   this process.  All staff have been trained in BSA/AML policies,

1    and this was presented for your review."

2         Did you see any evidence of the staff who were

3    performing the ACH processing at HOPE had been trained in any

4    way?

5    A.  When I was at the credit union, there was really no

6    procedures that could be presented to me for BSA monitoring for

7    suspicious activities or really any kind of monitoring.  The

8    only training that they have received, I believe, was back in

9    March, and it was before they even got into that type of

10   transactions and the volume of ACH activity.

11   Q.  Do you see where it states, "The software that RCU uses

12   performs the required OFAC checks, and we have used Microbilt

13   to scrub transactions to flag any suspicious activity"?

14        Did you find any evidence of that?

15   A.  I have received a spreadsheet with a list of members that I

16   was told was from Microbilt.  However, I have never seen

17   anything produced by the credit union supporting their review

18   of this material.

19   Q.  It then said, "A staff member also manually reviewed the

20   transactions for prohibited money laundering techniques, like

21   structuring."

22        Did you find any evidence of that at the credit union?

23   A.  No, I have not.  I have never seen anything that would show

24   me that there is actually a process reviewing all those

25   transactions that are gone through the credit union.  The only

 1  thing I saw was the very short, concise instructions from a

 2  program the credit union was using, but not the actual reports

 3  that would show me that they looking at transactions members

 4  based on their dates, Social Security numbers, addresses.

 5       They should be really on the 30-day rolling period

 6  that they can detect suspicious activity.  It's not a snapshot

 7  of one day.  You really have to have somebody devote time every

 8  day to review transactions, especially for that type of volume,

 9  to see if there's anything of a patterns, and that's how you

10  detect suspicious activity.

11  Q.  Did you see any evidence that that's what the credit union

12  was doing?

13  A.  No.

14       MR. NOBLE:  Let's scroll down.  Keep scrolling.  You

15  can keep scrolling.  Can you just pause there.

16  Q.  Do you see under this, there's the blue section, "Member

17  outside of field of membership," and then there's a response,

18  it says, "Kapcharge USA, Inc. has its location office at 219

19  River Avenue, Lakewood, New Jersey.  This address is within

20  HOPE FCU field of membership and qualifies for membership in

21  our credit union, and we have filed an appeal as to this item"?

22  A.  Yes.

23  Q.  Now, Ms. Flok, is that the address that you visited, 219

24  River Avenue?

25  A.  I believe it was 216.

H31KLEB4                    Elek - Direct

1          MR. NOBLE:  You can take that down, Mr. Chang-Frieden.

2     Q.   Now, after you issued the exam report, and Mr. Gross

3     appealed, did you go back to the credit union?

4     A.   I did not return to the credit union until January 5th.

5     Q.   January 5th of 2015?

6     A.   Yes.

7     Q.   And how many dates were you at the credit union in January?

8     A.   I was there January 5th, which is Monday, and then I would

9     return on Thursday, the 8th, and then my last visit to the

10    credit union was on January 12th, which is Monday.

11    Q.   Why did you go back on the 5th?  Why did you go back on the

12    5th?

13    A.   We went back because we were really concerned about the

14    activity of ACH transactions and wanted to make sure that they

15    actually did stop the activity, as they promised, as we were at

16    the credit union back in November and December, and just follow

17    up what are the procedures or what is the progress of the

18    credit union's addressing the DOR items, are they actually

19    implementing the correct BSA program, are they closed Kapcharge

20    account as they were instructed by the document of resolution.

21    Q.   Who, if anyone, did you meet with at the credit union on

22    January 5th?

23    A.   When I arrived, I was greeted by Mr. Gross and Mr. Charles

24    Blue, and I think it was the board member, Wyatt.  And before

25    we even start talking about the progress of document

1   resolution, I felt kind of unwelcomed and ambushed.  I was

2   asked why am I coming back, what was the purpose of my visit,

3   why am I asking for all this documentation, and did they feel

4   that we are being unreasonable as the NCUA to come back and

5   review all this material again.

6   Q.  You mentioned someone named Charles Blue; is that right?

7   A.  Yes.

8            MR. NOBLE:  Can we bring up, for identification,

9   Government Exhibit 9.

10  Q.  Ms. Flok, do you recognize that person?

11  A.  Yes.  That's Charles Blue.

12           MR. NOBLE:  The government offers Government Exhibit

13  9.

14           MS. MADRIGAL:  No objection.

15           MS. SANTILLO:  No objection.

16           THE COURT:  Thank you.

17           MR. NOBLE:  Can we publish for the jury?

18           THE COURT:  Government Exhibit 9 is admitted.

19           And you may.

20           (Government's Exhibit 9 received in evidence)

21  Q.  Ms. Flok, who is Charles Blue?

22  A.  I was told that he is the CEO of the credit union.

23  Q.  Who told you that?

24  A.  I actually received an email, I think, around mid-December

25  as well that he was hired as a CEO and the BSA compliance

1    officer from Mr. Gross.

2    Q.  Did you speak with Mr. Blue when you arrived about him

3    coming -- or him starting at HOPE Federal Credit Union?

4    A.  Yes.

5    Q.  What did you say to him, what did he say to you?

6    A.  Well, I asked him for his experience, for his resume, what

7    type of background does he have in managing credit unions or

8    other financial institutions, is he familiar with the Bank

9    Secrecy Act and everything that's involved with compliance, in

10   that area.

11   Q.  What did he tell you?

12   A.  He did not have any prior experience.

13        MR. NOBLE:  You can take that down, Mr. Chang-Frieden.

14   Q.  Are there any restrictions on individuals who have filed

15   for personal bankruptcy serving in management at federal credit

16   unions?

17   A.  I don't believe there is actually a regulation that

18   prohibits that, but a sound and safe practice directs the board

19   of directors to look at the candidates to manage the financial

20   institution to pick people that can show responsibility in

21   financial areas, and a person that has filed a bankruptcy shows

22   that they cannot manage they own finances.  So that could be a

23   question how that type of person can manage an institution in a

24   large-scale financial.

25   Q.  Now, did you ever ask for an employment contract for

1   Charles Blue?

2   A.  I did ask for the contract that day.  I was told that there

3   was no contract at the moment.  I followed up with a question,

4   well, how much would the credit union be paying Mr. Charles

5   Blue.  And they didn't really give me a clear answer, they just

6   said that Charles Blue had some time, and he would like to

7   donate it to the credit union and help the credit union be

8   prepared to be able to handle the ACH transactions and handle

9   the bookkeeping, and he will be paid an unknown amount of money

10  at the time, mostly it will be just volunteering.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. SANTILLO:  I didn't hear the witness.

2          THE COURT:  Just at the end, Ms. Santillo?

3          MS. SANTILLO:  I didn't hear that entire answer.

4          THE COURT:  I'll repeat the answer and just let me

5    know if you can't hear sooner rather than later.  Thank you.

6          The answer was, "I did ask for the contract that --"

7          I'll ask the court reporter to read it back.

8          (Record read)

9          MS. SANTILLO:  Thank you.

10         THE COURT:  Thank you.  I will ask Ms. Flok again,

11   throughout your answer, sometimes your voice trails off toward

12   the end of the sentence, so please keep your voice up and

13   strong the whole time.  Thank you.

14         Go ahead, Mr. Noble.

15   BY MR. NOBLE:

16   Q.  Did there come a time when you got a copy of the contract?

17   A.  Yes, I did.

18         MR. NOBLE:  Can we bring Government Exhibit 6126 in

19   evidence?

20   Q.  What is this, Ms. Flok?

21   A.  This is the contract between Charles Blue and HOPE Credit

22   Union.

23   Q.  Under number 2, "Compensation", how much was Charles Blue

24   going to be paid?

25   A.  He was going to be paid $4,167 per month.

1    Q.  How much is that per year, approximately?

2    A.  Around $50,000.

3           MR. NOBLE:  You can take that down.  Can we bring up

4    Government's Exhibit 6104, page 5 in evidence?  Page 5 of the

5    document itself.  Flip forward three pages.  Thank you.  Can we

6    blow up the bottom portion?

7    Q.  Ms. Flok, do you recognize what this document is generally?

8    A.  This is a page from a call report.

9    Q.  A call report for what credit union?

10   A.  Helping Other People Excel.

11   Q.  Okay.  And let's look at the date.

12          MS. SANTILLO:  I'm sorry.  Zoom out and blow up the

13   top portion under "statement of income and expense".

14   Q.  And Ms. Flok, what is the period of time covered by this

15   call report?

16   A.  January 1st, 2014 to December 31st, 2014.

17          MR. NOBLE:  Can we now blow up line 33?

18   Q.  What was the credit union's net income in 2014?

19   A.  $38,735.

20   Q.  Is that more or less than the amount of money that the

21   credit union was going to pay Charles Blue?

22   A.  Less.

23   Q.  Now, did you have any concerns about the amount of money

24   that the credit union had promised to pay Charles Blue?

25   A.  I did wonder how is this going to affect the credit union,

1   how they will be able to afford it.

2   Q.  Did Mr. Gross ever tell you whether Kapcharge was going to

3   help pay for the salary of Mr. Blue?

4   A.  No.

5   Q.  Now, during your visit to HOPE Federal Credit Union on

6   January 5th, what, if anything, did you learn about the ACH

7   processing?

8   A.  I reviewed statements from various accounts, credit union

9   accounts and Kapcharge accounts, and it appeared that they were

10  continuing to process ACH transactions.

11  Q.  To be clear, when did you first instruct Trevon Gross to

12  stop processing ACH transactions?

13  A.  November 21st.

14  Q.  What was the second time?

15          MS. SANTILLO:  Objection to form.

16          THE COURT:  Overruled.  I'll allow it.

17          MR. NOBLE:  So that the record is clear.

18  Q.  When was the first time you instructed Mr. Gross to stop

19  processing ACH transactions?

20  A.  The first time was on November 21st when I first visited

21  the credit union, and verbally Mr. Gross agreed to stop the

22  transactions.

23  Q.  And when was the second time?

24  A.  The second time it was instructed with the document

25  resource in the NCUA exam report.

 1   Q.  And when was that issued?

 2   A.  That was issued in mid December, I believe December 16th.

 3   Q.  How did you learn that the credit union was still

 4   processing ACHs in January of 2015?

 5   A.  I reviewed statements from Kapcharge, I reviewed statements

 6   from the credit union in Oregon, and I also reviewed Alloya

 7   statements.

 8   Q.  Alloya?

 9   A.  Alloya, yes.

10        MR. NOBLE:  Can you bring up Government's Exhibit 6044

11   for identification?

12   Q.  Ms. Flok, do you recognize this document?

13   A.  Yes.

14   Q.  What is it?

15   A.  This is an email from Charles Blue to myself.

16        MR. NOBLE:  The government offers Government's

17   Exhibit 6044.

18        THE COURT:  Without objection?

19        MS. SANTILLO:  No objection.

20        MS. MADRIGAL:  No objection.

21        THE COURT:  Thank you.  6044 is admitted.

22        (Government's Exhibit 6044 received in evidence)

23        MR. NOBLE:  Bottom email.

24   Q.  What is the date you sent this email to Mr. Blue?

25   A.  January 5th, 2015.

1    Q.  That was the date that you were on site?

2    A.  Correct.

3    Q.  And in this, what were you asking for generally?

4    A.  I was asking for anything really that had to do with our

5    concerns; ACH processing, ACH reports, BSA monitoring reports.

6    Q.  Okay.

7              MR. NOBLE:  Let's zoom out and blow up the top

8    portion, the header.

9    Q.  Mr. Blue responded the next day, and it appears to include

10   several attachments; is that right?

11   A.  Yes.

12   Q.  Are those the statements that you were just referring to

13   that you said you reviewed?

14   A.  Well, the first three were Kapcharge statements, the

15   following four items for Shazam were due diligence of a new

16   company the credit union was engaged with, and the last two are

17   the bank statements from the other credit union from Oregon.

18             MR. NOBLE:  Let's zoom out.  Can we go to the first

19   page of the first attachment?  Let's skip that one.  Sorry.

20   Next page.  Next page.  There you go.  Blow up the top portion,

21   please.

22   Q.  Ms. Flok, what statement is this for and what's the date?

23   A.  It's the statement for Kapcharge USA account at HOPE Credit

24   Union and it's for December, 2014.

25             MR. NOBLE:  Zoom out.  Can you just flip through this

1   document?  Next page.  Great.  Can you go back -- actually,

2   that's fine.  Can we blow up the entry around December 12th,

3   2014?

4   Q.  Ms. Flok, do you see the entity whose activity is reflected

5   on the Kapcharge statement around December 12th, 2014?

6   A.  Yes.

7   Q.  What is it?

8   A.  There are transfers from another account that the credit

9   union opened, and it's called Wakpamni Lake Community.

10  Q.  You said that was an account that you had seen had been

11  opened at the credit union?

12  A.  Yes.  This account was opened in December, 2014.

13          MR. NOBLE:  Can we bring up Government's Exhibit 6130

14  in evidence?  Blow up the top portion of that.

15  Q.  What is the date that this Wakpamni account was opened at

16  the credit union?

17  A.  November 13, 2014.

18  Q.  And what is the address listed for that entity?  What's the

19  city and state?

20  A.  Eatontown, New Jersey.

21  Q.  Is that in HOPE's field of membership?

22  A.  No.

23          MR. NOBLE:  Zoom out.  Can we go to the next page?

24  Can you just blow up the address, please?

25  Q.  What is the address for WLCC II?

 1   A.  Pine Ridge, South Dakota.

 2           MR. NOBLE:  Zoom out.  Go to the next page.  Next

 3   page.  Can you blow up the driver's license?

 4   Q.  Who is this a license for?

 5   A.  That's the owner of this business.

 6   Q.  What's his name?

 7   A.  Raines Raycen American Horse.

 8   Q.  And where does he live, according to his driver's license?

 9   A.  In South Dakota, Pine Ridge.

10           MR. NOBLE:  Zoom out.

11   Q.  Ms. Flok, did you ever learn what kind of business Wakpamni

12   is?

13   A.  I Googled it.  So it came up, it is a payday lender.

14           MR. NOBLE:  Let's zoom out.  Can you bring that back

15   up?  Let's go to the next page.  Can you just blow up the top

16   half?

17   Q.  Ms. Flok, what is this document?

18   A.  It's a tribe business code document.

19   Q.  Does it say "articles of incorporation"?

20   A.  Yes.

21   Q.  For Wakpamni Lake Community Corporation?

22   A.  Yes.

23           MR. NOBLE:  Zoom out.  Let's go to the next page.  Can

24   you just blow up the top portion?

25   Q.  What's the listed principal office address for Wakpamni?

1    Where is it located?

2    A.   In South Dakota.  I can't really --

3    Q.   I believe B-a-t-e-s-l-a-n-d?

4              MS. SANTILLO:  Objection.

5              THE COURT:  Overruled.  I'll allow it.

6              MR. NOBLE:  Can you zoom out?  You can flip forward.

7    Flip forward.  Keep going.  Keep going.  Just so the jury can

8    see the rest of this.  Let's blow that up.  Go back to that

9    page.

10   Q.   Where are the executive board members located for Wakpamni?

11   A.   They are all in the State of South Dakota.

12   Q.   Based on your review of this membership file, was there

13   anything to indicate that Wakpamni fell within HOPE's field of

14   membership?

15   A.   No.

16             MR. NOBLE:  Zoom out.

17   Q.   Based on your review of the account records, was HOPE

18   processing ACH transactions for this payday lender?

19   A.   It appeared that they were processing transactions for this

20   account through a Kapcharge account, and through, I believe,

21   the credit union in Oregon.

22   Q.   Did you ever speak with Charles Blue or Trevon Gross about

23   Wakpamni?

24   A.   Yes.

25   Q.   Who did you speak with?  What did you say to that person,

1    and what did that person say to you?

2    A.   At first I spoke to Charles Blue and Mr. Larkins.  And I

3    was just asking how did this account -- and there was another

4    account that was opened recently since my last visit -- how did

5    they fit in the field of membership of HOPE Credit Union?

6    There seemed to be a little bit of confusion at first.  They

7    didn't know what it was, and then they came back to me and said

8    it's because they are affiliated with Kapcharge and that's why

9    they can belong to the credit union.

10   Q.   Are credit unions permitted to conduct ACH transactions for

11   non-member accounts?

12   A.   No.

13   Q.   So what, if anything, did you do after you saw the ACH

14   activity that was ongoing at HOPE FCU?

15   A.   I sent an email to my supervisor stating that it appears

16   the HOPE Credit Union has not stopped ACH transactions as they

17   promised they would do.

18   Q.   And who was your supervisor?

19   A.   Brian McDonough.

20   Q.   You testified earlier that after the 5th, you went back to

21   the credit union on the 8th of January?

22   A.   Yes.

23   Q.   What happened on your visit on the 8th?

24   A.   It was very unusual.  We arrived at the credit union around

25   11:00, I believe, and it was me and another examiner, Peggy

1   Hershick Straub.  I asked my supervisor to have another

2   examiner go with me as, when I went there the first day on a

3   Monday, I felt like just very unwelcome and uncomfortable, so I

4   had another person with me.

5        We arrived, and we just started to unpack our

6   computers, and Mr. Gross and Mr. Blue came down and said that

7   they need to meet with us before they give us any documents

8   that we have requested.  At that point, we sat in this large

9   table in the credit union, and Mr. Gross seemed a little upset

10  and then said -- it started actually the conversation saying,

11  "Do I need a legal counsel?"  And we, Peggy and I, we kind of

12  looked at each other not understanding where is this going,

13  where is this coming from?  And he said that there is -- his

14  credit union that he's dealing with in Region 5, which is the

15  Oregon credit union, has informed him that someone in Region

16  5 -- we have five regions in NCUA -- has contacted that credit

17  union over in Oregon and said that HOPE is engaging in illegal

18  activity and may be money laundering, and they really need to

19  know why are we here?  Why are we looking at all this stuff?

20  What is this examination for?

21       And Peggy and I again stated, well, first of all, we

22  don't know where this coming from.  We never heard this

23  statement.  I actually was very surprised to even hear that

24  somebody from NCUA would do such thing, that they would contact

25  another credit union and said anything about, you know,

1    accusing people of money laundering, and explained again, which

2    we have done many times, that we are here because the credit

3    union is Code 4.  And if a credit union is Code 4 we're going

4    to be at the credit union over and over, at least once a

5    quarter, and if we do come to visit in that particular quarter,

6    it's not going to be for a day or two, and it's going to be not

7    only to follow up on the document of resolution, but we

8    reviewing documents or Aries download, and there's other areas

9    that appear to be a concern or for some reason we have more

10   questions, we might be asking for more documents, and that's

11   really what it is.  It's just a supervision contact as we would

12   normally do for any Code 4 credit union.

13   Q.  After that conversation, did there come a time during your

14   visit when you participated in a conference call?

15   A.  Yes.  Charles Blue, I believe was him that had emailed my

16   supervisor and asking for a conference call to again ask the

17   same questions.  Why are we there?  What type of examination is

18   it?  Why are we asking for all these things?  He would like to

19   have explanation.  That we didn't explain the purpose of our

20   visit, and we didn't have any introduction of our supervision

21   contact.

22          So around 2:00, I believe we all went upstairs to one

23   of the rooms -- I don't know if I mentioned that yesterday, the

24   credit union was like in a little house next to the church

25   facilities.  And we have conference call with Brian McDonough,

1   which is my supervisor, Kelly Lay, which is Brian's supervisor,

2   she's the associate director of programs, and Charles Blue,

3   Mr. Gross, and I think Mr. Larkins was there as well.

4   Q.  What, if anything, was discussed about the ACH processing

5   during that call?

6   A.  They said that they thought that they could still process

7   ACH transactions for the regular members, only stop for the

8   business.  And then, as it turned out, they were still doing

9   ACH for the businesses.

10          They promised to cooperate, that they really want to

11  put everything in place that's needed for them to continue to

12  do this business.  That they will give us time and everything

13  we ask for, but at this time, there are just too busy closing

14  the books for the end of the month and getting prepared for a

15  call report, and they will do anything that we ask for and

16  listen to our guidance and cooperate with us.

17  Q.  And after your visit on January 8th, did you ever go back

18  to the credit union?

19  A.  I went the following Monday, January 12th.

20  Q.  What happened at that visit?

21  A.  During the visit, I actually only went to transfer the

22  credit union to another examiner.  It was transferred from my

23  group to another group in New Jersey because my supervisor had

24  accepted position in Upstate New York so he was moving, and the

25  supervisor that was assigned to my group, he was on military

1   leave and was not scheduled to be back until June.  So in

2   between beginning of January until June, we knew that we were

3   not going to have a steady supervisor, it's going to be either

4   people that are on detail or acting supervisors, and the agent

5   in Region 2 felt it would be very important to have a strong

6   presence of supervisors that is continuing the same person

7   nonstop changing for the purpose of just representing the

8   credit union not all the time explaining themselves you know

9   what's going on.

10  Q.  And to whom did the credit union get transferred in terms

11  of examiners?

12  A.  To Len Siwak.

13  Q.  Is that S-i-w-a-k?

14  A.  I believe so.

15  Q.  And who is Len's supervisor?

16  A.  Terry Adams.

17  Q.  Did you have any other visits or dealings with HOPE Federal

18  Credit Union?

19  A.  No.  That was the last time I had visited the credit union.

20  There were some emails followup just to transfer all the

21  documents or information that I had to Len or Terry.

22  Q.  During the course of your examinations on-site at HOPE, did

23  you ever ask for a copy of a lease for Kapcharge?

24  A.  Yes, I did.

25  Q.  And did you ever obtain one?

1   A.  No, I have not.  I actually -- Mr. Gross got quite upset

2   with me when I said that they should really obtain the lease to

3   include in the file for the new account that they had opened

4   back in 2014.

5   Q.  For the Kapcharge account?

6   A.  Correct.

7           MR. NOBLE:  No further questions.

8           THE COURT:  All right.

9           Ms. Madrigal.

10          MS. MADRIGAL:  Thank you, your Honor.  No questions on

11  behalf of Mr. Lebedev.

12          THE COURT:  Thank you.

13          Ms. Santillo.

14  CROSS EXAMINATION

15  BY MS. SANTILLO:

16  Q.  Good afternoon, Ms. Flok.

17  A.  I'll try to speak a little louder.

18  Q.  I can hear you from here.

19          My name is Kristen Santillo, and I represent Pastor

20  Trevon Gross.

21          Now, in your testimony you talked about how when you

22  went to the credit union to do your examination, you spoke with

23  Mr. Gross about the relationship with Kapcharge, correct?

24  A.  Yes.

25  Q.  And one of the things you said that Mr. Gross said was that

 1   the relationship with Kapcharge was a blessing.

 2   A.  Yes.

 3   Q.  And you met with the government prior to your testimony

 4   today?

 5   A.  Who you mean by government?

 6   Q.  Mr. Noble.

 7   A.  Yes.

 8   Q.  And in your meetings with the government, you said that the

 9   person who said that the relationship with Kapcharge was a

10   blessing was Bernard Larkins.

11   A.  It was Mr. Gross and Mr. Larkins or the board member Wyatt.

12   I have heard this from several people.

13   Q.  So when you specifically attributed it to Mr. Larkins in

14   meetings with the government --

15   A.  I'm not sure what you're saying.

16   Q.  I'm saying, is when you met with Mr. Noble, you said that

17   it was Bernard Larkins who said that Kapcharge's relationship

18   was a blessing.

19   A.  I believe I said that several people said that to me.  I

20   have never got a straight answer from anybody from the credit

21   union how did they get this business outside of the country

22   from Canada, finding this little church, credit union in New

23   Jersey, and becoming a relationship, a member of this credit

24   union.

25   Q.  Okay.  So the first time you ever came to the HOPE Credit

 1   Union was on November 21st, 2014, correct?

 2   A.   Yes.

 3   Q.   And you had never examined this credit union before.

 4   A.   Correct.

 5   Q.   So you didn't have a personal relationship with Mr. Gross.

 6   A.   No.

 7   Q.   Or Mr. Larkins.

 8   A.   No.

 9   Q.   Or Mr. Wyatt.

10   A.   No.

11   Q.   So you didn't know their history or their background?

12   A.   Not really.

13   Q.   You said you didn't really get a straight answer about the

14   relationship with Kapcharge, but the next time that you came to

15   visit, Mark Francis from Kapcharge was there.

16   A.   Correct.

17   Q.   And he told you that he wanted to do business with this

18   credit union?

19   A.   Correct.

20   Q.   And he was there to answer all of your questions.

21   A.   Yes.

22   Q.   And he told you that he was going to -- he wanted to give

23   an infusion of $500,000 to that credit union.

24   A.   Yes.

25   Q.   And at that time, the credit union, is it fair to say it

 1   was in distress?

 2   A.   What you mean by "distress"?

 3   Q.   Well, you came in because you had problems with the ACH

 4   processing, correct?

 5   A.   We came in because the credit union was processing very

 6   large amount of ACHs that they could not support with the

 7   infrastructure, their employees, and the BSA program, and the

 8   net worth to be able to support the risk associated with that

 9   type of transactions.

10   Q.   And what Kapcharge was offering was a $500,000 capital

11   infusion to help with the ratio.

12   A.   Yes.

13   Q.   And this meeting where you met Mr. Francis took place

14   inside a church.

15   A.   Correct.

16   Q.   And the people who were participating in the meeting were

17   members of that church.

18   A.   Correct.

19   Q.   And so when they used the word "blessing", you don't know

20   what this means because you don't know them very well.

21   A.   What I do know is that we normally do not meet with members

22   of the credit union.  I have never heard of somebody offering

23   to put $500,000 in a credit union to make sure that they can

24   process their ACH transactions.  And as examiner, that

25   definitely raised red flags for me and my fellow examiners.

1   Q.  So that is based on your experience with credit unions,

2   correct?

3   A.  Correct.

4   Q.  But Mr. Francis was there to offer to make this $500,000

5   capital infusion.

6   A.  Correct.

7   Q.  And he was upfront about that.

8   A.  Yes.

9   Q.  And he also told you that while they had an office in

10  Lakewood, there were no employees at that office at that time.

11  A.  Correct.

12  Q.  And that they planned to have employees to come to that

13  office, but he didn't know when or where -- or when they were

14  going to be coming.

15  A.  Right.  But this time they were already doing business with

16  HOPE Credit Union.

17  Q.  Yes.  But they didn't have -- he was upfront about the fact

18  that they didn't have employees.

19  A.  Yes.

20  Q.  And you said that when you were investigating Kapcharge,

21  you went past the location at 216 River Avenue, correct?

22  A.  Correct.

23  Q.  And you looked, and you looked for a sign that said

24  Kapcharge, and you didn't see it.

25  A.  Correct.

1    Q.  But there is no NCUA requirement that a business has a sign

2    outside the door in order to be in the field of membership, is

3    there?

4    A.  There is not.  And that's why I asked for lease so we can

5    verify that the location is actually there, which would be a

6    normal procedure for a credit union when they do due diligence

7    of a new member, especially a business member, to verify that

8    the physical address of the business it's actually accurate.

9    That's one of the part of Bank Secrecy Act and Customer

10   Identification Program where the credit unions have to have

11   validate -- well, some kind of a proof that the physical

12   address is actually that entity's address.

13   Q.  And so that's a part of the process that credit unions

14   should follow.

15   A.  Yes.

16   Q.  And you eventually got a lease for Kapcharge.

17   A.  I have not seen one.

18   Q.  Because you weren't the examiner anymore after --

19   A.  Correct.

20   Q.  Yes.  And Kapcharge was ultimately determined to be in the

21   field of membership for HOPE.

22   A.  I don't know that.  I haven't been there after that

23   January 12 date.

24   Q.  So you don't know one way or the other whether the appeal

25   of the finding that Kapcharge was not in the field of

1   membership was successful.

2   A.  I know that at the time I was at the credit union, they

3   were not eligible for in the field of membership.

4   Q.  But as part of the examination process, sometimes the

5   members of the credit union can disagree about a finding of an

6   examiner on the ground it makes about things like being in the

7   field of membership.

8   A.  And that's why we ask for documentation to support our

9   findings and show that they are in fact residing there and

10  there is a lease.

11  Q.  As part of the examination process, if you identify a

12  problem, there is routinely time to cure that problem, correct?

13  A.  And that's why we issue document resolution for the credit

14  union to address the issues, yes.

15  Q.  Yes.  And in response to that, there was an appeal.

16  A.  Correct.

17  Q.  And documents were submitted.

18  A.  A letter was submitted.

19  Q.  During your tenure.

20  A.  Correct.

21  Q.  Now, you walked through some documents with Mr. Noble

22  relating to HOPE's -- Hope Cathedral's bank statements,

23  correct?

24  A.  Yes.

25  Q.  And you noted that there was a $19,000 loan to Hope

1    Cathedral; is that correct?

2    A.   Yes.

3    Q.   And as part of your examination process, you routinely look

4    at board minutes from the organization?

5    A.   Correct.

6           MS. SANTILLO:  I'd like to pull up Exhibit 6089.

7           THE COURT:  Which is in?

8           MS. SANTILLO:  Yes.

9           THE COURT:  All right.

10          MS. SANTILLO:  If you could scroll down to the bottom.

11   Not to the bottom, to the second page.  If you could blow up

12   the part that says "G Wyatt recommended".

13          "G Wyatt recommended that our assets grow.  We should

14   continue to put out quality loans.  He recommended a barber

15   shop in Lakewood that needs a loan of $15,000.  T Gross

16   mentioned that the Hope Cathedral and HOPE Inc. would also take

17   out loans of up to $200,000 so that we can realize interest

18   revenue.  After a discussion the board unanimously consented."

19          THE COURT:  Just on the -- you read what I see is

20   20,000 as 200,000.

21          MS. SANTILLO:  20,000.  Apologies.

22          "So we can realize interest revenue.  After discussion

23   the board unanimously consented."

24   BY MS. SANTILLO:

25   Q.   Does it appear that that loan was actually discussed during

1   that board meeting?

2   A.  Yes, but it does not discuss the fact that at that point

3   Cathedral of HOPE had negative share account balance.  Part of

4   loan underwriting, and it's very normal process, is to make

5   sure that the people, entity, member that you lending to has

6   the capacity to repay the loan.  If somebody already owes 20,

7   19, it depends because the negative balance was fluctuating, it

8   does not show the ability to repay the loan.  I have not seen

9   the loan itself so I'm not sure what the decision was based on,

10  but just looking at this short note and the balance in their

11  checking account, I do not see how this decision for approving

12  this loan was supported.

13  Q.  Okay.  So let's clarify that.  You weren't there to review

14  the loans.

15  A.  I did not review the loan.

16  Q.  You haven't looked at the loan file.

17  A.  I did not.

18  Q.  And you don't know anything else about Hope Cathedral's

19  assets except what you saw in just their account at HOPE.

20  A.  I did not.  However, if you have --

21          THE COURT:  I'll direct the witness to answer the

22  question, and then you can either explain further or counsel

23  can ask you further on redirect.

24          THE WITNESS:  Okay.

25          MS. SANTILLO:  Okay.

1   Q.  But you're making a conclusion today --

2   A.  Can I explain why I make that conclusion?

3           THE COURT:  Just let's get an answer, and then you'll

4   have an opportunity to explain.  So the question --

5           MS. SANTILLO:  I didn't finish -- yes.  Okay.

6           THE COURT:  Repeat the question, please.

7   BY MS. SANTILLO:

8   Q.  My question was, you're reaching a conclusion today, but

9   you haven't seen any of those documents, and you weren't there

10  for that purpose to evaluate that loan.

11  A.  I have not seen the loan file.

12  Q.  Okay, thank you.

13  A.  Can I explain now why do they --

14          THE COURT:  Counsel will have an opportunity to

15  redirect.  Thank you.

16          THE WITNESS:  Okay.

17  Q.  One of the things that you and Mr. Noble discussed was that

18  there were some delinquent accounts at HOPE when you were

19  there; is that correct?

20  A.  Yes.

21  Q.  Now, in your conversations with the government, you told

22  them that you checked at a later date and the accounts that had

23  a negative balance appeared to have sufficient funds.

24  A.  I don't remember saying that.

25  Q.  All right.  Do you have any reason to believe that that's

1   not true if it's in notes that the government took during your

2   meetings?

3   A.   Oh, I know that I have documented based on Aries download

4   that there were several accounts with negative balances.

5   Q.   Okay.  And so if I showed you a document, might it refresh

6   your recollection that when you checked at a later date, the

7   accounts appeared to have sufficient funds?

8            MR. NOBLE:  Objection.

9            THE COURT:  Overruled.  You may answer that question.

10           THE WITNESS:  Are you saying that you want me to --

11   you want to show me something?

12   Q.   I asked you if I showed you something, might it refresh

13   your recollection?

14   A.   Yes, I would like to see it.

15           MS. CHOI:  What is it?

16           THE COURT:  What you can do, counsel, is we could do

17   the ELMO to just counsel's table and the witness.

18           (Pause)

19           THE COURT:  Does that refresh your recollection,

20   Ms. Flok?

21           THE WITNESS:  Parts of it, I would never say

22   "delinquent accounts", I would refer "delinquent loans", not

23   "accounts".  So no, I don't believe this was the whole -- the

24   whole statement is what I said.

25   BY MS. SANTILLO:

 1    Q.   Okay.

 2    A.   At least not the kind I remember.

 3    Q.   So you don't remember making that statement, although it's

 4    in the notes?

 5              MR. NOBLE:   Objection.

 6              THE COURT:   Sustained.

 7              MS. SANTILLO:   We can move on.

 8    BY MS. SANTILLO:

 9    Q.   Now, the exam that you were asked to conduct was not a

10    typical routine exam.

11    A.   Correct.

12    Q.   And your exam is more rigorous than a typical exam.

13    A.   NCUA has the authority to examine the credit union if

14    there's anything that comes out at any time that can -- that

15    has a potentially risk to share insurance fund.  So we can

16    visit credit union at any time to verify what is really going

17    on.

18    Q.   Understood.   I guess my question is, when there's a routine

19    exam, there's a certain procedure that is followed, and there's

20    an appointment, correct?

21    A.   Correct.

22    Q.   And the people at the credit union have time to prepare.

23    A.   Correct.

24              MS. SANTILLO:   Now, if we could bring up Exhibit 6023.

25              THE COURT:   Which is in evidence?

 1          MS. SANTILLO:  It's in evidence, yes.

 2          THE COURT:  All right.

 3   BY MS. SANTILLO:

 4   Q.  This is an email that you've discussed with Mr. Noble, as

 5   well, and it was sent on November 20th at 10:18 a.m. to

 6   Mr. Gross?

 7   A.  Yes.

 8          MS. SANTILLO:  Actually, if we can scroll to the

 9   bottom.  There we go.  Okay.

10   Q.  You tell him on November 20th at 9:16 a.m. that you plan to

11   come to the credit union the next day at 9:30 a.m.

12   A.  Yes.

13   Q.  Okay.  So that was 9:16 a.m.

14          MS. SANTILLO:  Now if we could go to Mr. Gross'

15   response?

16   Q.  Now, in less than an hour, Mr. Gross wrote back and said

17   that he'd be available; is that correct?

18   A.  Yes.

19   Q.  Okay.  And he asked for anything that you wanted to have

20   ready for review.

21   A.  Yes.

22          MS. SANTILLO:  If we could go up to Ms. Flok's

23   response.

24   Q.  And you gave him a long list of things that you wanted to

25   review.

1    A.  That's actually not very long list.

2    Q.  Well, maybe for you.

3    A.  Preparing to we normally do, we give the credit unions

4    before for normal procedures when we go to credit union, this

5    is actually a very short list of items.

6    Q.  But this is a list of items that you asked to be completed

7    within 24 hours, or in 24 hours.

8    A.  All those items should be very rarely -- readily available

9    if they are held or kept at the credit union.  So the credit

10   union shouldn't have any problems getting this information with

11   this period of time.

12   Q.  And this is the first time you had ever been to this credit

13   union, correct?

14   A.  Correct.

15   Q.  So you weren't aware of any problems that they might have

16   had in terms of trying to comply with any prior NCUA

17   determinations.

18            MR. NOBLE:  Objection.

19            MS. SANTILLO:  If we could bring up exhibit --

20            THE COURT:  Are you withdrawing the question?

21            MS. SANTILLO:  No.

22            THE COURT:  All right.  Just a moment.  Grounds?

23            MR. NOBLE:  Form.

24            THE COURT:  Sustained.  Please rephrase.

25   BY MS. SANTILLO:

1   Q.  So you weren't familiar with what the people at the credit

2   union were doing on a day-to-day basis in the weeks leading up

3   to your examination.

4   A.  This really wouldn't have anything to do with the items I

5   requested to prepare for my visit.

6            MS. SANTILLO:  Could I have Government's Exhibit 6091?

7   If we could just take this down for a minute, and I'm just

8   going to ask a couple followup questions.

9   Q.  Were you aware that, prior to your examination of the

10  credit union, that there was a document of resolution with

11  respect to the field of membership at the HOPE Credit Union?

12  A.  I was aware there was an exam prior to my visit.

13  Q.  Were you aware of the conclusions of the examination with

14  respect to the field of membership?

15  A.  This was not the area that I was reviewing when I was going

16  to credit union, so no, I was not looking at that.

17  Q.  You weren't looking at the field of membership issues.

18  A.  I wasn't at the credit union to follow up on the previous

19  exam, I was at the credit union for one specific thing, that

20  was ACH processing.

21  Q.  Okay.  Well, did you ever come to learn that the NCUA

22  concluded that the church itself was not in the field of

23  membership?

24  A.  I was not aware that the church was not in the field of

25  membership.

1    Q.  Well, there was a document of resolution that was issued by

2    the NCUA that concluded that the Hope Cathedral's members were

3    not in the field of membership.

4              MR. NOBLE:  Objection.

5              THE COURT:  Grounds?

6              MR. NOBLE:  Two grounds; personal knowledge and

7    hearsay.

8              THE COURT:  Sustained.

9              MS. SANTILLO:  If we could pull up the board minutes.

10   And if you could scroll to the second page.  If you could blow

11   up the part that says "supervisory committee".  And it says,

12   "The committee submitted their report that they are following

13   their work plan.  They expressed their concern about the volume

14   of ACH transactions and would review our ACH, BSA, CIP, and

15   third-party vendor policies to ensure compliance.  They also

16   pointed out that the cost of compliance with NCUA requests has

17   distracted staff from their operational duties.  The vetting of

18   the entire membership has cost the CU about a month and a half

19   of time which has caused certain operational activities to be

20   delayed.  The board agreed we cannot allow this to happen

21   again, and the addition of a new CEO will give us the ability

22   to filter these requests and better manage operations.  The

23   board with unanimous consent received the committee's report."

24   BY MS. SANTILLO:

25   Q.  Now, you would have reviewed these minutes when you came to

1   the credit union, correct?

2   A.  What month are those minutes from?

3   Q.  These are November minutes.

4   A.  No, I would not.  November minutes are usually not

5   available for review until the following month.

6   Q.  Why is that?

7   A.  Because they have to be approved the next month before they

8   become official.

9   Q.  Okay.  They don't become official for a whole month after

10  the next board meeting.

11  A.  I did not see November board minutes until January.

12  Q.  Okay, great.  So you don't know one way or another whether

13  the credit union was having operational difficulties due to

14  complying with other orders from the NCUA that would have made

15  it difficult for them to have documents available for your

16  examination when you showed up?

17          MR. NOBLE:  Objection.

18          THE COURT:  I'll allow it.  You may answer.

19          THE WITNESS:  Normally when we go for a supervision

20  contact to a credit union it will be a followup on the previous

21  examination and a previous findings or document resolution.

22  There was an emergency contact focused only on NCUA.  I was not

23  looking at whatever they were working on to address prior

24  document resolution.  The items that I have asked for they were

25  basic information, policies that the credit union should have

1    on hand.  Regardless if they are doing ACH transactions or not,

2    they should be at the credit union, buying their own policies

3    or any kind of file that they do, it shouldn't take more than

4    five minutes to pull out policies and show them to me.  The

5    transaction reports or any other financial reports that I have

6    asked are very easy to be able to print.  Again, it doesn't

7    take a lot of time.  I was not asking to show me their progress

8    on whatever was happening as of the exam prior as you're

9    referring to, so there's really no reason for the credit union

10   not provide to me the items I have asked for unless they did

11   not have them.

12   BY MS. SANTILLO:

13   Q.  They got them to you eventually.

14   A.  They did provide me with BSA policy, ACH policy, and ACH

15   risk assessment.  I have never received anything that would

16   show me what type of process they have in place for ACH

17   transactions, they have never showed me any type of

18   documentation supporting monitoring for suspicious activity.

19   Those should be done daily on the ongoing basis.  If they were

20   doing this as required, all it takes is show the documentation

21   and it should be ready because it should be an ongoing process.

22   Q.  So your conclusion was that the ACH policies and procedures

23   of the credit union didn't meet your standards.

24   A.  They did not meet the regulations, the NACHA rules, and the

25   BSA act, not my standards.

1    Q.  Well, the standards that you were enforcing on behalf of

2    the NCUA.

3    A.  They are not my standards, again, they are the standards of

4    rules and regulations that the federal credit unions must

5    follow.  It's a Bank Secrecy Act that the credit union has to

6    follow, which is governed by FinCEN more really than NCUA, and

7    FinCEN relies on NCUA to ensure the financial institutions

8    comply with Bank Secrecy Act.  And also there are rules, not

9    this particular day when I was at the credit union, the credit

10   union has to follow, but just in general.  So no, there's not

11   my rules or my expectations, this is just something that the

12   credit union needs to do to comply with the law.

13   Q.  And you put your findings in a report.

14   A.  Yes.

15   Q.  And you gave some action steps.

16   A.  Yes.

17   Q.  And you don't know one way or the other whether those

18   action steps were followed, or do you?

19   A.  When I returned to the credit union on January 5th, they

20   were not completed at that time.

21   Q.  So they weren't done yet.

22   A.  They were not -- no, they were not addressed at that time.

23   Q.  Now, you first came to the HOPE Credit Union on

24   November 21st, 2014, correct?

25   A.  November 21st, yes.

H3LQLEB5                Elek   Cross

1   Q.   Okay.  And by December 3rd, 2014, they had already hired a

2   new CEO.

3   A.   Correct.

4   Q.   And during that time they also got new software to monitor

5   ACH transactions.

6   A.   That's what I was told.

7   Q.   So those are two things that you said were necessary.

8   A.   Yes.  However, the CEO that they have hired had absolutely

9   no experience with BSA or BSA monitoring or managing financial

10   institution, and did not know how credit unions have to comply

11   with those laws, and I did not see any reports -- they could

12   not produce any reports for me for BSA monitoring to show me

13   that they actually are doing it as they were supposed to.

14   Q.   Now, the Charles Blue, the CEO, he told you about his

15   background, right?

16   A.   Yes, I have seen his resume.

17   Q.   Okay.  So you know he was the former CFO of Bloomingdale's?

18   A.   He was the CFO in sales departments, marketing, and nothing

19   to do with financial institutions.

20   Q.   Okay.  So you don't think it's adequate for somebody who

21   was the former CFO for sales at Bloomingdale's to work at a

22   104-person member credit union because you don't think they

23   have enough experience.

24   A.   He may have enough experience for accounting part of credit

25   union's operations, however, he had no experience in Bank

1   Secrecy Act, and he has said that to me personally as well.

2   Q.  And he began undergoing training in Bank Secrecy Act even

3   while you were there for such a short window in your

4   examination.

5   A.  That's what I was told.

6   Q.  So he was undertaking the process of learning about Bank

7   Secrecy Act compliance?

8   A.  He was under the process of learning.  However, there was

9   nothing showing us at the time that there is anybody at the

10  credit union that has sufficient experience to be able to

11  handle the type of transactions and monitor transactions for

12  suspicious activity at the credit union at that time.

13  Q.  Okay.  So you said that as part of the process with respect

14  to the NCUA, you would identify a finding and then people in

15  the credit union would have sufficient time in order to come

16  into compliance and to address that finding.

17  A.  Yes.  And meanwhile they're supposed to stop doing all

18  types of ACH transactions until they have the proper procedures

19  and staff in the credit union that can handle the volume of the

20  ACH transactions and can monitor for suspicious activity.  At

21  that time, they did not have sufficient amount of employees to

22  process all the transactions, the general ledger postings, bank

23  accounts reconcilements, BSA monitoring, suspicious account

24  monitoring, but they continued to do ACH transactions.  I

25  understand that they have time to learn --

1          THE COURT:  Thank you.  Ms. Flok, I think that to keep

2     it moving along the question has been answered.  If counsel

3     wants to probe further on redirect, you can.  Go ahead.

4     BY MS. SANTILLO:

5     Q.   Now, you said that you never learned the source of who was

6     going to be paying Mr. Blue?

7     A.   The contract did not say, did not specify who is paying

8     Mr. Blue.

9     Q.   But you had a meeting with Mark Francis who said he was

10    willing to put in $500,000 to capitalize this credit union.

11    A.   But he did not say that he will pay employees of the credit

12    union.

13    Q.   But when you met with Mr. Blue, or Mr. Francis, it was on

14    December 1st.

15    A.   Correct.

16    Q.   And Mr. Blue wasn't hired until later.

17    A.   Mr. Francis said that he is willing to inflate the net

18    worth, the capital of credit union up to 500 million -- when

19    there is a donation to a credit union to inflate the capital,

20    it's usually kept in reserves, it's not a money used to finance

21    operations.

22    Q.   But you didn't make any notes about the specifics of what

23    Mr. Francis said that $500,000 was for.

24    A.   Correct.

25          THE COURT:  Ms. Santillo, how much longer with the

1   witness?

2           MS. SANTILLO:  We could take a break now.  I probably

3   have about 10 more minutes, 15, maybe.

4           THE COURT:  Well, I'll let you know when we're going

5   to break.  Go ahead.

6           MS. SANTILLO:  I may be able to shorten it if we take

7   our break now.

8           THE COURT:  Counsel --

9           MS. SANTILLO:  Okay.

10          THE COURT:  -- next question.

11          MS. SANTILLO:  Okay.

12  BY MS. SANTILLO:

13  Q.  So with respect to --

14          THE COURT:  All right.  You're not --

15          MS. SANTILLO:  I'm sorry.

16          THE COURT:  We're wasting time, so we'll take our

17  break.

18          MS. SANTILLO:  Sorry.

19          THE COURT:  See you in ten minutes.

20          (Continued on next page)

21

22

23

24

25

1                    (Jury not present)

2              THE COURT:  Ms. Flok, you may step down for the break

3    and go outside the courtroom.

4              MR. NOBLE:  Judge, could you instruct the witness just

5    to wait outside since we can't speak with her on cross?  Just

6    so she knows not to go anywhere.

7              THE COURT:  Ms. Flok, if you just -- we'll return in

8    about ten minutes, so if you could be outside the courtroom

9    ready to go within ten minutes, please.  Thank you.

10             MR. NOBLE:  Thank you, Judge.

11             MS. SANTILLO:  Apologize, your Honor.

12             THE COURT:  If I ask how long with the witness, just

13   give me your estimate.  I think I was clear, I don't like to

14   get into the dynamic of one lawyer telling the jury that they'd

15   like to give them a break and then either that not being okay

16   or not.  I drive the schedule.  It's one of the things I like

17   to micromanage.  You may have noticed.  But I genuinely don't

18   like that dynamic in front of the jury.

19             MS. SANTILLO:  I sincerely apologize.

20             THE COURT:  Thank you.  Anything to take up?

21             MR. NOBLE:  No, Judge.

22             THE COURT:  See you in ten.

23             (Recess)

24

25

1          THE COURT:  Anything to take up, counsel?

2          MR. NOBLE:  Not from the government.

3          MR. CREIZMAN:  I have a cufflink claim, I was told.

4          (Discussion off the record)

5          THE COURT:  Anybody need to raise anything?

6          Let's get our witness back, please.

7          You can take your seat, Ms. Flok.

8          I need to, I think -- I'm going to tell the jury,

9  obviously, we're not going to see them till Monday.  I think

10 I'd like to be able to tell them that we're on track for the

11 estimated time.  In my mind, the uncertainty at this point is

12 whether there will be a defense case and the length of the

13 defense case, so I think I need to get some basic estimation.

14         MS. SANTILLO:  Our basic estimate is I would reserve

15 two days.

16         THE COURT:  Mr. Creizman?

17         MR. CREIZMAN:  The affirmative defense case should not

18 be longer than a half day to three-quarters of a day, but I

19 don't know how long the government's cross -- I mean, it would

20 be a day, let's put it that way.  I think it would be a day at

21 most.

22         THE COURT:  It seems to me we may have a problem if we

23 won't finish next week.

24         MS. SANTILLO:  Your Honor, I don't want to feel rushed

25 on our defense case.

1    THE COURT:  No, I have to tell these people who have

2    been told -- it's not a matter of rushing, nobody's rushing.

3    It's dealing with the reality of the schedule and what we told

4    these jurors when they were selected.  Tell me if I'm

5    misunderstanding something, and I need to give them guidance.

6    I need to give them guidance.

7    MS. SANTILLO:  They said the maximum is two days, and

8    I think that that's a good estimate.

9    THE COURT:  Well, okay.  So if the government finishes

10   Tuesday, and we're looking at three days for defense case,

11   that's the end of the week.  That doesn't include summation,

12   that doesn't include reading the charge, and it, obviously,

13   doesn't include deliberation.

14   I think we're going to need to figure this out.  What

15   I'll tell them at the end of the day is that I have no further

16   updates at this point, and I'll give them an update on Monday.

17   But you folks need to think, including the government, about

18   how to manage this because when you tell a jury three to four

19   weeks, and it's not going to go to them by the end of four

20   weeks, that's a problem.

21   Bring them in.

22   (Continued on next page)

23

24

25

1          (Jury present)

2          THE COURT:  Continue with the cross-examination of

3   Ms. Flok on behalf of Mr. Gross.

4          Ms. Santillo, proceed.

5          MS. SANTILLO:  Yes.

6          I'd like to pull up Government Exhibit 6028, which is

7   in evidence.

8   BY MS. SANTILLO:

9   Q.  Ms. Flok, this was a document that you reviewed with the

10  government, correct?

11  A.  Yes.

12  Q.  And I'd like to just scroll through the document of

13  resolution to the bottom or to the response of the document of

14  resolution.  That wasn't signed by Mr. Gross, was it?

15  A.  It doesn't look like.

16          MS. SANTILLO:  If we go to the bottom again and see

17  who it was signed by.

18  Q.  That was signed by Mr. Wyatt, correct?

19  A.  Yes.

20  Q.  Thank you.

21          You talked about a meeting that you were in with

22  Mr. Gross where he raised concerns about the nature of the

23  investigation?

24  A.  What type of investigation?

25  Q.  Oh, I'm sorry, your examination, the nature of your

1    examination.

2    A.   Yes.

3    Q.   And they heard from another credit union that you had been

4    concerned about money laundering, and they were worried about

5    that?

6    A.   That was not what I was concerned.   He said that he heard

7    it from his credit union.   That's not what I've heard from

8    either my agency or another credit union.

9    Q.   He raised a concern that he was worried that that's what

10   you were looking at, correct?   He heard a rumor about that?

11   A.   That's what he said, that he is concerned about it.

12   Q.   And you assured him that that wasn't the case?

13   A.   I assured him that we are at the credit union to look at

14   the ACH activity and the credit union's progress on addressing

15   document resolution, as well as the reason for the visit is the

16   comment code 4, which is the presence of NCUA examiners more

17   often at the credit union.

18   Q.   And that was about ACH processing?

19   A.   That was about ACH processing, BSA monitoring.   At that

20   point I reviewed 12/31/2014 Aries, which was the new accounts

21   that they have opened for other entities.   And that was pretty

22   much what I can recall at the moment.

23   Q.   The question is:   It wasn't about money laundering?

24   A.   We were not looking for money laundering.

25   Q.   That wasn't what the investigation was about?

1   A.  There was no investigation, there was a follow-up

2   supervision on outstanding document resolution that I issued in

3   December, and it was a follow-up visit for CAMEL code credit

4   union.

5   Q.  Okay.  Thank you.

6           Now, one thing that you made clear is that in your

7   process of examinations, members of the credit union are

8   allowed to disagree with you?

9   A.  Of course.

10  Q.  It's part of the process?

11  A.  They might have a different opinion.

12  Q.  And they're allowed to follow the appellate process if they

13  do?

14  A.  That's the process.

15          MS. SANTILLO:  Okay.  Thank you very much, Ms. Flok.

16  REDIRECT EXAMINATION

17  BY MR. NOBLE:

18  Q.  Ms. Flok, Ms. Santillo just asked you about the appellate

19  process within the NCUA regarding examinations.  Do you

20  remember that?

21  A.  Yes.

22  Q.  During that appellate process, is it important that credit

23  unions be truthful and accurate in representations that they

24  make -- sorry.

25          In the appellate process, is it important that credit

1    unions be truthful and accurate in representations that they

2    make to the NCUA as part of the appeal?

3    A.  Yes.

4              THE COURT:  Just a second.

5              MS. SANTILLO:  Objection.

6              THE COURT:  Overruled.

7    Q.  On cross-examination, Ms. Santillo asked you some questions

8    about the loan that Hope Cathedral had taken out to make its

9    negative balance positive.  Do you remember those questions?

10   A.  Yes.

11   Q.  And I believe that you said you wanted to explain something

12   to the jury with regard to that loan?

13   A.  Yes.

14   Q.  What was it that you wanted to explain?

15   A.  I think I already had mentioned that, that our normal

16   procedures for a credit union is to monitor negative accounts.

17   This is not a behavior of any member that is desired because it

18   may cause loss to the credit union if the member does not pay

19   it back, and there's not a loan, in general.  There is a rule

20   that if the account is negative for over 45 days, the credit

21   union needs to collect on this balance or turn it into a loan.

22   It is not a desired process to take a loan by the member that

23   already owes money to the credit union and use the proceeds of

24   the loan to bring the account balance back to positive.

25              At that point, I was asked if I knew if there were any

1   other assets that the Hope Cathedral had, so maybe that was

2   used for the underwriting of the loan that I have not seen the

3   loan papers.  However, if there were other proceeds or assets

4   that this company had, I don't see a reason to take a loan to

5   use the proceeds of the loan to bring the bonds to a positive

6   balance.

7   Q.  So did that loan -- taking out that loan by the church to

8   repay its negative balance make financial sense to you?

9   A.  It raises a lot of red flags.  It means that there is --

10  the company does not have sufficient asset or not sufficient

11  cash flows to be able to finance their operations what they're

12  doing because what we do, also, if we see negative balance in

13  the account and -- as we said before, we use the examination

14  quarter-end financials or quarter-end like a snapshot of a day,

15  we ask for financial statements for extended period of time to

16  see a pattern.  So, if there is, for some instance, a negative

17  balance once or twice, because this does happen of timing,

18  maybe a deposit that was not made on time and things happen,

19  that's one thing, but if you constantly see a business that is

20  overdrawing an account, for whatever reason, to finance the

21  operations, it does appear --

22          MS. SANTILLO:  Objection.

23  A.  -- their business does not have --

24          THE COURT:  Just a moment.  If you're saying

25  objection, I need to hear it.

1          MS. SANTILLO:  I'm just saying objection; foundation.

2          THE COURT:  All right.  Well, I'll overrule the

3     foundation, but, again, the question has been answered.

4          MR. NOBLE:  Yes, I believe so.  I'll move on, your

5     Honor.

6          THE COURT:  Yes.  Keep it moving, counsel.

7     BY MR. NOBLE:

8     Q.  Ms. Santillo asked you about your conversation with

9     Mr. Francis on December 1st when you returned to the credit

10    union.  Do you remember those questions?

11    A.  Yes.

12    Q.  And I believe you testified that Mr. Francis at that time

13    did not tell you that he was going to be paying the salary of

14    Mr. Blue; is that right?

15    A.  Correct.

16    Q.  Now, had he told you that, what, if any, concerns would

17    that raise?

18    A.  Well, very unusual for a member of the credit union to pay

19    for an employee of a credit union.

20    Q.  Why is it unusual?

21    A.  It's just unusual.  The credit union pays their own

22    expenses.  It doesn't have members paying for the employees of

23    the credit union.

24    Q.  What, if any, types of conflicts of interest would that

25    pose?

1          MS. SANTILLO:  Objection.

2          THE COURT:  Overruled.

3   Q.  You can answer.

4   A.  Favorism, maybe --

5          THE COURT:  You sound like you're speculating, so I'll

6   sustain the objection, and the jury will disregard.

7          MR. NOBLE:  Okay.  Let's bring up Government Exhibit

8   6028, one of the last exhibits you were asked about.  Can we

9   flip to the signature page of that document, of the appeal

10  letter.

11  Q.  Ms. Flok, Ms. Santillo asked you on cross-examination who

12  signed that letter.  Do you remember that?

13  A.  Yes.

14  Q.  Do you see any signatures on this page?

15  A.  No.  Just a typed-up name.

16         MR. NOBLE:  Can we go back to the first page.

17  Q.  Who emailed this letter to you?

18  A.  Mr. Gross.

19         MR. NOBLE:  No further questions.

20         THE COURT:  All right.  Thank you.

21         Mr. Creizman?

22         MS. MADRIGAL:  Nothing further, your Honor.

23         THE COURT:  All right.  Thank you.

24         Ms. Santillo.

25

1   RECROSS EXAMINATION

2   BY MS. SANTILLO:

3   Q.  I just have one question.

4        You did not review the loan files at HOPE FCU,

5   correct?

6   A.  Correct.

7        MS. SANTILLO:  Thank you.

8        THE COURT:  All right.

9        MR. NOBLE:  Nothing further.

10        THE COURT:  Nothing further?

11        Ms. Flok, you may step down.  You're excused.  Thank

12   you.

13        (Witness excused)

14        THE COURT:  The government may call its next witness.

15        MR. SHIN:  Your Honor, before we call our next

16   witness, we would seek to move in a few exhibits and publish

17   two of them.

18        THE COURT:  Okay.

19        MR. SHIN:  The government offers, pursuant to

20   stipulations with the defense, Exhibits 2310, 2311, 2312, 3570,

21   and 3744 into evidence.

22        THE COURT:  Without objection, counsel?

23        MS. MADRIGAL:  No objection.

24        MS. SANTILLO:  No objection.

25        THE COURT:  All right.  They're admitted.  Thank you.

1              (Government's Exhibits 2310, 2311, 2312, 3570, and

2     3744 received in evidence)

3              MR. SHIN:  Ms. Grant, could you please publish, for

4     the jury, 3744.

5              If you could actually zoom in on the bottom half.  I

6     think the bottom is cut off.  Thank you.

7              On February 6, 2015, Christine Carida, from an address

8     at kapitalinc.com wrote:  "Hi, Trevon.  Also, the (848)222-3358

9     tel number on our website is not in service.  Did you set that

10    number up for us?"

11             Trevon Gross responds:  "No.  Remember, that was done

12    by Anthony.  I thought you got a new number that you all

13    controlled."

14             Ms. Grant, if you could focus on the top email now.

15             And Ms. Carida responds:  "Hi.  We hadn't received the

16    number yet, but the 848 is now out of service.  I am working on

17    it as we speak.  Also, Kevin is setting up the New Jersey

18    company for us.  I am still waiting to hear back from him."

19             Ms. Grant, could you please publish 3570.  And if you

20    could zoom in on the bottom half, please.

21             On February 6, 2015, Christine Carida, from a

22    kapitalinc.com address writes:  "Hi, Trevon.  We just got a

23    call from Steven Valentine from the office of Congressman

24    Christopher Smith in regards to the HCU.  Mark will call them

25    back.  What should he say?"

 1          Trevon Gross responds:  "They are helping us deal with

 2   the NCUA.  Just reinforce that your U.S. headquarters are in

 3   Lakewood, New Jersey, and you don't know why the NCUA would

 4   want to kick you out of the CU."

 5          And, Ms. Grant, if you could zoom in on the top email.

 6          And Christine Carida responds:  "Mark called him back.

 7   If you need anything from Mark, he can be reached on his cell."

 8          The government calls Steven Valentine.

 9          THE COURT:  Thank you.  Thank you.

10          Mr. Valentine may come forward.

11    STEVEN VALENTINE,

12        called as a witness by the Government,

13        having been duly sworn, testified as follows:

14          THE COURT:  Please be seated.  Once you're seated,

15   pull up the microphone, state and spell your name for the

16   record.

17          THE WITNESS:  Steven Valentine, S-t-e-v-e-n,

18   V-a-l-e-n-t-i-n-e.

19   DIRECT EXAMINATION

20   BY MR. SHIN:

21   Q.  Good afternoon, Mr. Valentine.

22   A.  Good afternoon.

23   Q.  Where do you work?

24   A.  I work at the Department of Health and Human Services.

25   Q.  What do you do there?

H31KLFB5                    Valentine - Direct

1   A.  I am a special assistant handling policy work.

2   Q.  How long have you worked there?

3   A.  I've worked there since January of 2017.

4   Q.  Where did you work previously?

5   A.  I previously worked for Congressman Chris Smith, the

6   New Jersey's fourth district.

7   Q.  And where were you based?

8   A.  In Washington, D.C., in his D.C. office.

9   Q.  You mentioned the New Jersey fourth district.  What areas

10  does that cover?

11  A.  It has a little bit of Mercer County, a large part of

12  Monmouth County, and parts of Ocean County as well.

13  Q.  Does that include Lakewood, New Jersey?

14  A.  Yes, it does.

15  Q.  When did you work there?

16  A.  I worked there from September of 2011 until January of

17  2017.

18  Q.  What did you do there?

19  A.  When I started, I was a staff assistant, and in January of

20  2014, I became a legislative assistant.

21  Q.  What are your duties as a legislative assistant?

22  A.  As a legislative assistant, I would give kind of background

23  policy briefings for the congressman on my portfolio of

24  legislative issues, which included a lot of the economic

25  issues, health care issues, transportation, Hurricane Sandy

1    emergency management, those type of efforts, and banking, which

2    included credit unions, those sorts of things.

3    Q.  Did you have any responsibility with respect to

4    constituents?

5    A.  Yes.  The way the office was structured is usually anytime

6    a constituent has an issue that relates directly to the

7    government, if they need help resolving an issue or getting an

8    inquiry on their behalf, we classified that as casework where

9    we can intervene on behalf of the constituent.

10            Legislative assistants would usually get called into

11   casework issues if they felt there was an extra policy

12   expertise needed or thought that it might involve kind of an

13   issue that the caseworkers in our district office weren't used

14   to handling.

15   Q.  Did there come a time when you received -- when your office

16   received a constituent inquiry from Trevon Gross?

17   A.  Yes.  We did receive one in December of 2014.

18   Q.  How did that inquiry come into your office?

19   A.  It came into our office, to our chief of staff, and it came

20   in through David Christiansen.  I believe that a friend of

21   Pastor Gross had referred him to David, who knew our office,

22   and because he was a constituent, someone said, oh, well, we

23   can get in contact with Congressman Smith, and an email was

24   sent to David, who forwarded that to our chief of staff.

25            MR. SHIN:  Ms. Grant, if you could please publish

1   Exhibit 2310.  And if you could zoom --

2   Q.  First, Mr. Valentine, is this an email chain that you

3   received on December 17th, 2014?

4   A.  Yes.

5        MR. SHIN:  Ms. Grant, if you could zoom in on the

6   bottom half of the -- bottom email, please.

7   Q.  And this is an email from Trevon Gross dated December 17th

8   to the aforementioned David Christiansen; is that correct?

9   A.  Yes.

10  Q.  Now, I'll read the second paragraph there that Mr. Gross

11  wrote:  "We were able to have a business join our CU, which

12  would represent significant revenue for the CU and provide us

13  the ability to grow and make financial services available to

14  the unbanked and underbanked in our area.  The NCUA has told us

15  that this business cannot be a member of the CU because the

16  parent company is outside of our field of membership.  This

17  makes no sense at all.  Our charter states that a business in

18  our FOM can be in the CU.  It seems like they are invested in

19  us remaining small or forcing us to merge with another credit

20  union.  This CU was started by the African-American community

21  and has fought to remain open and helping the financially

22  challenged.  These actions seem arbitrary and punitive."

23        And then the next paragraph:  "We do acknowledge that

24  we needed to add better controls and compliance, which we have

25  done and are doing, but to say that a major source of revenue

1    now needs to go to another bank is not fair to us."

2          Now, Mr. Valentine, does this reflect the issue that

3    you understood was coming in from Mr. Gross?

4    A.   Yes.

5    Q.   Now, what happened after this constituent inquiry came into

6    your office?

7    A.   After it came into our office, our chief of staff sent it

8    to Jeff Sagnip, who's at the top of the email there.  He's our

9    district director, so he helps coordinate casework issues,

10   assign cases to caseworkers in the office, and he looped in Joe

11   Schloeder, Carol Weil, and I as a team to help get started on

12   the casework.

13   Q.   Those two people you mentioned, Carol Weil and Joe

14   Schloeder, who are they?

15   A.   Carol was a caseworker in the Ocean County office, and Joe

16   Schloeder was a caseworker in the Monmouth County office.

17   Q.   And why was it that you were signed in particular to this

18   case?

19   A.   My legislative portfolio included banking issues, and

20   this -- again, you know, this was the kind of casework where I

21   don't believe it was something that we typically received

22   inquiries on, and so Jeff thought, you know, it might as well

23   have Steven in case he needs to provide any input.

24   Q.   What initial steps did your case team take?

25   A.   Carol reached out to Pastor Gross to let him know that we

1  had received the inquiry and to receive a privacy authorization

2  form.

3  Q.  What is that form that you just referenced?

4  A.  The privacy authorization form, anytime we receive

5  casework, we request that a constituent fills it out, and that

6  gives our office the authority to go to the relevant government

7  agency and obtain documents that otherwise wouldn't be released

8  to us without the constituent's permission.

9  Q.  Did your office receive that form?

10 A.  Yes, we did.

11         MR. SHIN:  Ms. Grant, if you could publish 2311.  And

12 if you could go to page 2.  Actually, I apologize.  If you

13 could go back to page 1.

14 Q.  First, Mr. Valentine, is this an email chain that you

15 received on December 23rd, 2014?

16 A.  Yes.

17         MR. SHIN:  Now, page 2, please, Ms. Grant.  And if you

18 could zoom in on the top email.

19 Q.  Is this an email to Carol Weil from Trevon Gross?

20 A.  Yes.

21 Q.  Now, I'll just read portions of this.

22         Mr. Gross writes in the second paragraph:  "The

23 company that the NCUA is challenging is a U.S. company with a

24 TIN."

25         Mr. Valentine, do you have an understanding of what

1    TIN means?

2    A.   I believe it's tax identification number.

3    Q.   Okay.  Continuing:  "It is properly incorporated and has a

4    physical office in our field of membership.  The parent company

5    is in Canada, but we are dealing with the USA company.  They

6    have used a heavy hand against us for the past several months,

7    and we are tired of this approach that they have taken.

8            "Here is their specific language:  I cannot give you

9    the document of resolution without the NCUA's permission."

10           And then below that:  "After Keith and I review the

11   documentation you provided, as well as our discussions with

12   yourself and the individual from Kapcharge, we discussed HOPE

13   FCU's current activities, financial and operational capability,

14   as well as strategic direction with regional management.  We

15   also consulted with NCUA's Office of Consumer Protection in

16   relation to Kapcharge.

17           "We have come to the following conclusions:  (1)

18   Kapcharge, Inc. does not qualify for membership in your credit

19   union.  The company is based in Canada.  The officials of the

20   business are located in Canada.  Its books and records have

21   been audited based on Canadian accounting standards,

22   irrespective of the fact of a physical location, which cannot

23   be verified, and which at this time is unstaffed.  Even if it

24   were staffed, the business would not qualify.  It is the

25   opinion of the Office of Consumer Protection that the business

 1    does not qualify to open an account.

 2            "Therefore, Helping Other People Excel FCU is directed

 3    to close this account immediately and return all funds to

 4    Kapcharge, Inc."

 5            Now, Mr. Valentine, what, if anything, did you do

 6    after receiving this communication mentioning the name

 7    Kapcharge?

 8    A.  At that point, I had discussions with both Joe and Carol

 9    just about how to proceed, and I took to researching Kapcharge

10    to try and figure out more about Kapcharge just to get a

11    background of the type of issues we would be dealing with with

12    the information we were provided.

13    Q.  What research did you do?

14    A.  So I basically started on Google to see if I could find

15    Kapcharge.  I did find a website for Kapcharge.  There wasn't

16    much on it.  It didn't really provide much information to me

17    about, you know, what kind of services they were providing.  I

18    also went through -- because it was -- said that they were

19    incorporated in some fashion, I went to the New Jersey State

20    government website and went through a few different various

21    public searches they have where you can find to see what kind

22    of forms entities have filed for incorporation.  I couldn't

23    find anything for Kapcharge there.

24            I also just Googled the address that I found on the

25    website just to see -- you know, I think some of you are

 1   probably familiar with you doing street view.  You can click on

 2   an address and see if there's a campus there.  It would be good

 3   to see if there's a Kapcharge sign somewhere at that address.

 4   Q.  What did you find on street view?

 5   A.  It looked like a generic office park.  It looked like a big

 6   building that would probably have suites for several

 7   businesses, if it needed to.

 8   Q.  Now, Mr. Valentine, you referenced that you went to street

 9   view after having found an address on the website?

10   A.  Yes.

11   Q.  So, just to be clear, on what website did you find an

12   address?

13   A.  It was a Kapcharge website.  It was a -- I don't remember

14   the exact website address, but --

15   Q.  Did you see any other contact information on that website,

16   other than a physical address?

17   A.  Yeah.  There was a phone number as well.

18   Q.  Did you try to contact Kapcharge?

19   A.  I did.

20   Q.  And what did you do?

21   A.  I dialed the number, and it really wasn't to try to talk to

22   anyone, it was just to dial the number, see if anyone picked

23   up.  And I wasn't connected with anyone.  I don't remember if

24   it gave me an invalid operator message or if it just kind of

25   clicked, but I wasn't able to get through to anybody at that

1    point.

2              MR. SHIN:  Ms. Grant, if you could please publish

3    2312.

4    Q.  Mr. Valentine, is this an email that you received on

5    January 7, 2015?

6    A.  Yes.

7    Q.  Just looking at the bottom email from Carol Weil, she asks

8    Pastor Gross:  "Would it be possible to provide us the name and

9    contact information of whoever you deal with at Kapcharge?"

10   That email was sent on December 23rd, 2014.

11             MR. NOBLE:  And then if we could look at the email up,

12   please.

13   Q.  Trevon Gross responds on January 7, 2015, to Carol Weil:

14   "Happy New Year.  It was great talking with you yesterday.

15   Here is the information for Kapcharge USA, Inc., Kapcharge USA.

16   216 River Avenue, Lakewood, New Jersey 08701, telephone

17   number (848)222-3358.  If you ask for Christina, she is the

18   assistant to Mark Francis, who is the global president."

19             Now, Mr. Valentine, did you, in fact, contact --

20   actually, before I ask you that question:  Mr. Valentine, the

21   address here provided by Mr. Gross, was that the same address

22   or a different address from the one that you saw on the website

23   based on your own research?

24   A.  It was the same address.

25   Q.  Did you, in fact, attempt to contact Kapcharge as Mr. Gross

1    suggested in that email?

2    A.  At some point, we did.  I can't remember the exact date.

3    But Joe and I, Joe Schloeder in the district, we agreed to call

4    them together to try and reach Mark Francis.

5    Q.  And what happened when you made the call?

6    A.  We were connected to Christina, and we asked if we could --

7    we explained, you know, we were with congressman's office, we

8    were doing an inquiry on behalf of HOPE Federal Credit Union

9    and Kapcharge being the business involved in the case, and that

10   we wanted to speak to Mark Francis, his name was given to us.

11   Q.  Did Christina answer the phone Kapcharge or Kapcharge USA?

12   A.  No.

13   Q.  Did she -- during this conversation that you had with her,

14   did she mention where Kapcharge was located?

15   A.  Yes.  I believe that I had asked, you know, this was an 848

16   number, and, you know, is this Kapcharge's number, and it was

17   relayed to me that the call went through to Canada.  That's

18   where she was located.

19   Q.  So you mentioned that there was a follow-up call scheduled

20   with Mark Francis?

21   A.  Yes.

22   Q.  Were you given a different number for that call, or were

23   you just told to use the same number?

24   A.  Yes, we were given a different number.

25   Q.  Do you remember what that other number was?

 1   A.   I believe it was a 514 area code.

 2   Q.   Do you recognize the 514 area code as being within the

 3   fourth district of New Jersey?

 4   A.   No.

 5   Q.   So did you, in fact, have that follow-up call with Mark

 6   Francis?

 7   A.   Yes, we did.

 8   Q.   Who participated on that call?

 9   A.   From our office, it was myself and Joe Schloeder.  And then

10   on Kapcharge's side, it was Mark Francis and another gentleman

11   who was on speakerphone with Mark Francis.  I cannot remember

12   his name.

13   Q.   So what was discussed during this call?

14   A.   So we had -- I, myself, and Joe had prepared a few

15   questions just based on what we had garnered so far, which was

16   not much.  We saw an address, we saw a phone number.  We didn't

17   have really indication that they were there or at that number.

18   And we also just didn't know much about what Kapcharge actually

19   did.  So we kind of had questions prepared based off of those

20   findings.

21        So what we tried to ask Kapcharge is, you know, what

22   is it you do, do you have workers in New Jersey, do you have an

23   office in New Jersey at this address that was provided to us.

24   And the questions were kind of based around those issues, just

25   trying to learn the basics because if we were going to go back

1   to the NCUA, if we were going to advocate on behalf of our

2   constituent, we wanted to have the best facts available.

3   Q.  And what, if anything, did Mr. Francis say during this

4   call?

5   A.  He continually went back to the fact that they had started

6   Kapcharge, but they had run into various issues, implying that

7   the NCUA issue was one of them, and that once those issues

8   broadly were resolved, that they would begin to launch in

9   New Jersey, they were looking to hire employees, and -- but all

10  that was on hold until these issues were resolved.

11  Q.  Did Mr. Francis state whether or not Kapcharge currently

12  had any employees in Lakewood, New Jersey?

13  A.  He stated that there were no employees in Lakewood.

14  Q.  Did he say anything regarding whether Kapcharge was

15  incorporated in the State of New Jersey?

16  A.  He said they were in the process of incorporating at the

17  time.

18  Q.  Did you find Mr. Francis' answers during this call to be

19  forthcoming?

20  A.  No, I didn't.  Anytime we would ask a question and kind of

21  try to drill down, you know, follow up to our previous

22  question, it was always kind of pivoted back towards, oh, well,

23  you know, we have these issues, but once we get these resolved,

24  this is really going to go forward, and it's going to move

25  forward quickly, and we're going to hire a lot of employees,

1    and it's going to be a great business.  But that was -- usually

2    there was either a quick answer or no answer, and then get

3    these issues resolved, and we'll be good to go.

4    Q.  Just to be clear, do you recall when the date of this call

5    was?

6    A.  I believe it was in early February.

7    Q.  Of 2015?

8    A.  Yes, 2015.

9    Q.  So, after this call, did your office conduct any further

10   investigation into the matter?

11   A.  No.  Joe and I followed up with a phone call just to recap

12   what we had both heard from the call.  We like to compare notes

13   just to see, you know, what did you take away from that.  And

14   my takeaway was I didn't get much answers, nothing that I had

15   concerns about in terms of not finding much information about

16   Kapcharge had been answered at that point.  So my general

17   consensus with Joe was, you know, we should wait to hear back

18   further details from the NCUA before we take any further action

19   because we felt like we didn't have much -- we didn't gain

20   anything additional that would help in this case.

21   Q.  So, to be clear, did you recommend that the congressman's

22   office take any particular action?

23   A.  No.

24           MR. SHIN:  No further questions, your Honor.

25           THE COURT:  All right.

1              Mr. Creizman?

2              MR. CREIZMAN:  No questions, for Mr. Lebedev.

3              THE COURT:  Thank you.

4              Ms. Santillo?

5    CROSS-EXAMINATION

6    BY MS. SANTILLO:

7    Q.  Hi, Mr. Valentine.  How are you?

8    A.  Hi.  Good.  Thanks.

9    Q.  My name is Kristen Santillo, and I represent Pastor Trevon

10   Gross.

11             You worked for Congressman Chris Smith, correct?

12   A.  Yes.

13   Q.  And a request was made to your office to intervene on

14   behalf of HOPE FCU?

15   A.  Yes.

16   Q.  The concern was that this was a small credit union that

17   might be losing a valuable source of business?

18   A.  Yeah, that was our understanding.

19   Q.  And they were concerned about the tactics of the NCUA and

20   how aggressive they had been in their examination?

21   A.  Yes.

22   Q.  And they asked for Congressman Smith to intervene on their

23   behalf?

24   A.  Yes.

25   Q.  You said that's an unusual type of request?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

 1   A.  No, the request itself wasn't unusual.  In unusual, I more

 2   meant that we didn't -- this wasn't one that came across our

 3   desk all the time of a credit union specifically with an NCUA

 4   issue.

 5   Q.  So you're not extremely familiar with the NCUA?

 6   A.  I wouldn't say extremely familiar, but it was more, you

 7   know, this was an issue that hadn't been dealt with often.

 8   Q.  And one of the things you did as part of the

 9   information-gathering process was to get a Privacy Act notice

10   filed by Mr. Gross; is that correct?

11   A.  I personally did not.  That was Carol who did so.

12   Q.  Somebody in your office did?

13   A.  Yes.

14   Q.  And I would like to show you a document to see if this

15   reflects the Privacy Act notice that was signed by Mr. Gross --

16   A.  Okay.

17   Q.  -- that was filed by Mr. Gross.

18             THE COURT:  You marked this for identification?

19             MS. SANTILLO:  This exhibit has been marked for

20   identification as TG19.

21   Q.  If you could take a look at the document, Mr. Valentine.

22             Does that appear to be --

23   A.  Yeah, that appears to be our office's privacy authorization

24   form.

25   Q.  Can you read this request here?  You may not be able to

1  read it.

2  A.  Yeah.  Do you want me to read the whole request or just --

3  yeah, I can read it.

4  Q.  Okay.  Mr. Gross expressed his concern to -- or he sought

5  the congressman's assistance from your office, correct?

6  A.  Yes.

7  Q.  And by signing this document --

8        MS. SANTILLO:  Oh, I'm sorry, I'd like to introduce

9  this document as TG Exhibit 19.

10        THE COURT:  Without objection?

11        MR. SHIN:  No objection.

12        MR. CREIZMAN:  No objection.

13        THE COURT:  Thank you.  It's admitted.

14        (Defendants' Exhibit TG19 received in evidence)

15        THE COURT:  Publish to the jury.  Thank you.

16  BY MS. SANTILLO:

17  Q.  With respect to the Privacy Act portion of it, on the top,

18  it says, "Dear Congressman Smith:  Pursuant to the provisions

19  set forth in the Privacy Act, I am hereby authorizing you and

20  your staff to obtain personal information about me routinely

21  protected under the Privacy Act, so you may assist in the

22  matter outlined below."  And they ask your office specifically

23  to contact the NCUA on their behalf?

24  A.  Yes.

25  Q.  Are you familiar with ACH processing?

1   A.  I'm sorry, could you repeat the question?

2   Q.  Are you familiar with ACH processing?

3           MR. SHIN:  Objection, your Honor.

4           THE COURT:  State the grounds.

5           MR. SHIN:  Beyond the scope.

6           THE COURT:  Sustained.

7   Q.  You indicated that you did some research on Kapcharge's

8   business, correct?

9   A.  Yes.

10  Q.  And you went on Google and you tried to find out what they

11  do?

12  A.  Yes.

13  Q.  Did you learn anything about their business of being a

14  third-party payment processor?

15  A.  Their website alluded to some kind of financial processing,

16  but I was not explicitly familiar, based on what little

17  information was there, on what exactly they were doing as their

18  business.

19  Q.  Okay.  So, as part of your research that you were

20  authorized to do by Pastor Gross into this business

21  relationship with Kapcharge, you were given contact information

22  from Mark Francis?

23  A.  Yes.

24  Q.  And Pastor Gross asked you to call Mark Francis to help

25  facilitate this outreach to the NCUA?

1    A.  We asked -- I can't remember the exact member -- we asked

2    for the contact information from Kapcharge and who would be

3    appropriate to speak to there.

4    Q.  And he gave you Mark Francis' number?

5    A.  Yeah.  We were given Christina -- we were told Christina

6    was his assistant and that Mark would be the appropriate person

7    to talk to.

8    Q.  When Christina answered the phone, she told you she was in

9    Canada?

10   A.  It wasn't when she answered the phone but it was throughout

11   the course of the conversation.

12   Q.  And then she gave you Mr. Francis' contact information?

13   A.  She gave us a -- yeah, she gave us a phone number where she

14   said we would be able to reach him and schedule a call.

15   Q.  And Mr. Gross was not on the phone with Mr. Francis when he

16   spoke with your office?

17   A.  No.

18   Q.  And Mr. Francis indicated that they were having some

19   problems with their business that they were trying to operate

20   in New Jersey but they weren't able to do so at that particular

21   moment?

22   A.  Yes.

23   Q.  So you didn't quite understand exactly what it is they were

24   trying to accomplish in New Jersey?

25   A.  Yeah, my understanding was that they were trying to

1    actually, you know, hire and actually have a footprint in

2    New Jersey.

3    Q.  Yeah, they were in the process of hiring but because of

4    these issues with the NCUA, they just couldn't get there?

5    A.  Yeah.  And he alluded to other issues but, you know, he

6    focused on NCUA, with us.

7    Q.  And he was forthcoming about the fact that they didn't have

8    employees?

9    A.  We asked, and he told us that they did not.

10            MS. SANTILLO:  Thank you very much, Mr. Valentine.

11            THE WITNESS:  Thank you.

12            THE COURT:  Mr. Shin?

13            MR. SHIN:  No redirect, your Honor.

14            THE COURT:  Ms. Madrigal or Mr. Creizman?

15            MR. CREIZMAN:  No questions.

16            THE COURT:  All right, thank you.

17            Mr. Valentine, thank you.  You're excused.  You may

18    step down.

19            (Witness excused)

20            THE COURT:  The government may call its next witness.

21            MR. NOBLE:  Your Honor, at this time, the government

22    would like to publish for the jury what's in evidence as TG17.

23            THE COURT:  TG17?  And it's in?

24            MR. NOBLE:  It's a defense exhibit in evidence.

25            THE COURT:  All right.  You may.

1          MR. NOBLE:  This is a March 5, 2015, letter on HOPE

2     FCU letterhead, directed to Mr. Robert Leonard, the director of

3     the division of consumer access, the office of consumer

4     protection at the National Credit Union Administration,

5     regarding Helping Other People Excel field of membership

6     eligibility confirmation request.

7          "Dear Mr. Leonard:  Supervisory examiner Terrence Adam

8     has requested that we contact your office to confirm Kapcharge

9     USA, Inc.'s eligibility for our field of membership and that

10    they qualify to be a member with their credit union.  I'm

11    submitting the following facts and documents, already reviewed

12    and acknowledged by our examiners, in support of our conclusion

13    that this business entity is indeed eligible based on the

14    information provided as follows:

15         "Our charter states that our FOM includes persons who

16    live, work, worship or attend school in and businesses and

17    other legal entities in Lakewood, New Jersey; Kapcharge USA is

18    an IRS-recognized corporation with a TIN incorporated in

19    Delaware; Kapcharge USA, Inc. is a business entity in good

20    standing with the State of New Jersey; Kapcharge USA, Inc.

21    maintains its USA headquarters in Lakewood, New Jersey;

22    Kapcharge USA, Inc. maintains staffed offices in our field of

23    membership.

24         "We believe, based on our due diligence and our

25    examiner's review, that this is a business in our field of

1   membership and request immediate confirmation from your

2   office."

3           It's signed by Charles Blue, CEO of HOPE FCU, copying

4   various individuals, including Congressman Chris Smith, Kelly

5   Lay at the NCUA, Trevon Gross, the chairman of HOPE FCU, Terry

6   Adam and Len Siwak, examiners.  And then there are various

7   attachments.

8           At this time --

9           MS. SANTILLO:  Your Honor, I have a Rule 106

10  objection.  And could I please approach?

11          MR. NOBLE:  Well, I can publish the rest of the pages

12  but in the interests of time, this document is in evidence.

13          THE COURT:  You just asking to flip through the pages?

14          MS. SANTILLO:  Yes, and I have an objection to this

15  process.

16          THE COURT:  All right.  Overruled.  But you can have

17  the portions that you want published now indicated,

18  Ms. Santillo.

19          MS. SANTILLO:  If you could --

20          THE COURT:  Go ahead or just direct, either way.

21          MS. SANTILLO:  I'll come over.

22          This is a lease of the Riviera Executive Center Office

23  service agreement that includes basic services of -- base

24  services, Riviera's complete executive program, including the

25  use of executive offices, telephone-answering, and such other

 1    inclusive services as are defined in Schedule A.

 2              "Additional services:  Services that may be purchased

 3    as needed by the client, including secretarial, administrative,

 4    telecommunication support, and such other services as found in

 5    Schedule B."

 6              THE COURT:  Thank you.

 7              MR. NOBLE:  Just one more thing to note:

 8              Monthly base fee:  $300."

 9              At this time, the government calls Brian McDonough.

10              THE COURT:  Mr. McDonough may come forward.

11              Members of the jury, you're welcome to stand and

12    stretch while the witness comes forward.

13              Mr. McDonough, you may come forward.

14     BRIAN McDONOUGH,

15         called as a witness by the Government,

16         having been duly sworn, testified as follows:

17              THE COURT:  Please be seated.  Once you're seated,

18    pull up to the microphone and state and spell your name for the

19    record.

20              THE WITNESS:  Brian McDonough.  B-r-i-a-n

21    M-c-D-o-n-o-u-g-h.

22    DIRECT EXAMINATION

23    BY MR. NOBLE:

24    Q.  Good afternoon, Mr. McDonough.

25    A.  Good afternoon.

 1   Q.   Where do you work?

 2   A.   The National Credit Union Administration.

 3   Q.   What is your title there?

 4   A.   Supervisory examiner.

 5   Q.   How long have you worked for the NCUA?

 6   A.   Twelve years, this past January.

 7   Q.   What did you do before joining the NCUA?

 8   A.   I was a premium auditor for CNA Commercial Insurance.

 9   Q.   That's an insurance company?

10   A.   Yes.

11   Q.   How long did you do that for?

12   A.   Seven years.

13   Q.   Describe your educational background, for the jury.

14   A.   I have an Associates of arts degree from Nassau Community

15   College in liberal arts, humanities and social science.  I have

16   a Bachelors degree in hotel/restaurant management from the

17   State University of New York in Plattsburgh.

18   Q.   What positions have you held at the NCUA over your 12 years

19   there, Mr. McDonough?

20   A.   When hired, I was hired as a district examiner.  I was

21   promoted to principal examiner in 2008.  In 2010, I was

22   promoted to the problem case officer.  I then transferred in

23   2012 as a loss risk analysis officer, working for the central

24   office.  And in 2014, I became a supervisory examiner, in late

25   April.

1   Q.  Just generally, what are your duties and responsibilities

2   as a supervisory examiner at the NCUA?

3   A.  I am responsible for managing a group of examiners,

4   managing the workload, acting as a resource when they have

5   questions, providing -- completing quality control reviews on

6   their work, and ensuring our exam program gets completed.

7          MR. NOBLE:  Ms. Grant, can you please bring up, for

8   identification only, a series of exhibits beginning with

9   Government Exhibit 6021.

10  Q.  And, Mr. McDonough, if you could just take a look at each

11  of those exhibits as they pop up on your screen.  And at the

12  end, I'm going to ask you whether you recognize them and what

13  they are generally.

14  A.  Sure.

15         MR. NOBLE:  6022, please.  Make sure can we flip

16  through all the pages of the documents, if it's multiple pages,

17  Ms. Grant, thank you.

18         6045.  6046.  6047.  6048.  Thank you.  6048.  And

19  6049.

20  Q.  Mr. McDonough, do you recognize these documents?

21  A.  Yes, I do.

22  Q.  What are they, generally?

23  A.  Emails, generally, between myself and Mr. Gross.

24         MR. NOBLE:  The government offers Government's

25  Exhibits 6021, 6022, and 6045 through 6049.

1        MS. MADRIGAL:  No objection.

2        MS. SANTILLO:  No objection.

3        THE COURT:  All right, they are admitted.  Thank you.

4        MR. NOBLE:  Thank you, Judge.

5        (Government's Exhibits 6021, 6022, and 6045 through

6   6049 received in evidence)

7   Q.  Mr. McDonough, are you familiar with a credit union called

8   HOPE FCU in New Jersey?

9   A.  Helping Other People Excel FCU, yes.

10  Q.  How did you first hear of that credit union?

11  A.  When I became a supervisory examiner, in late April 2014,

12  there was -- that was a credit union that was assigned to my

13  group.

14  Q.  Did there come a time in or around August of 2014 when you

15  received some information from the regional office about HOPE?

16  A.  Yes.

17  Q.  And what, in general, was the information that you

18  received?

19  A.  I received information that our regional director received

20  communication that a consultant was contacted to ask to develop

21  a strategic plan for HOPE FCU, which involved some questionable

22  board members or strategic direction.  He raised that concern

23  with the regional director, who then asked the regional office

24  to do a background check on the credit union, review their

25  financials, review their credit union profile, and develop some

 1  other information.  They developed a list of questions.  They

 2  sent that question -- those questions to me.  I assigned them

 3  to examiners to investigate it.

 4  Q.  And what examiners did you assign to go into the credit

 5  union to look at those issues?

 6  A.  Examiners Mark Guberman and Keith Olsen.

 7  Q.  Now, did there come a time when those examiners did go in

 8  to HOPE?

 9  A.  Yes.

10  Q.  After that site visit, did there come a time when you asked

11  to set up a meeting with Trevon Gross?

12  A.  Yes.

13          MR. NOBLE:  Can we bring up Government Exhibit 6046 in

14  evidence.  Can we just blow that up.

15  Q.  Now, you see the email below, on September 12th, 2014, from

16  Mark Guberman?

17  A.  Yes.

18  Q.  He was one of the examiners who went in to HOPE?

19  A.  Yes.

20  Q.  And he wrote, "My supervisor, Brian McDonough, would like

21  to meet with you along with Keith and I on Friday,

22  September 19th, around 9:30 to discuss your FOM."

23          What is FOM?

24  A.  Field of membership.

25  Q.  And then manager responded:  "Hi, Mark.  Yes, I will make

 1   that time work."

 2            Did you participate in that meeting on the 19th?

 3   A.  Not in person, no.

 4   Q.  How, if at all, did you participate?

 5   A.  I believe we had a conference call.

 6   Q.  And what was the general purpose of that conference call?

 7   A.  To discuss the field of membership limitations of HOPE

 8   FCU's charter.

 9   Q.  And what, in general, were the limitations with respect to

10   the issues that you had been made aware of by the regional

11   office?

12   A.  I'm sorry?

13   Q.  Sure.  What issues regarding field of membership did you

14   discuss with Mr. Gross?

15   A.  The credit union was a community-chartered -- was a

16   community-chartered institution limited to those who live,

17   work, volunteer in the community of Lakewood, New Jersey.

18   There were individuals who were on the board of directors who

19   had physical addresses in Florida and Tennessee that did not

20   appear to qualify for membership in the credit union, based on

21   that criteria.

22   Q.  Were those individuals associated or affiliated with any

23   particular entity?

24   A.  They were affiliated with the Collectables Club.

25            MR. NOBLE:  You can take that down, Ms. Grant.  Thank

1   you.

2   Q.  Mr. McDonough, are you familiar with an office within NCUA

3   called the Office of Small Credit Union Initiatives?

4   A.  Yes.

5   Q.  Is that also sometimes referred to as OSCUI?

6   A.  Yes.

7   Q.  What is OSCUI?

8   A.  They are a division within our agency that is specifically

9   formed to assist small credit unions.

10  Q.  Did there come a time when Trevon Gross asked you to help

11  nominate the credit union for some assistance from OSCUI?

12  A.  Yes.

13          MR. NOBLE:  Can we bring up Government Exhibit 6047 in

14  evidence.  Ms. Grant, I'm sorry, can we just blow up the top

15  half so it's a little bit bigger.  Thank you.

16  Q.  So, Mr. McDonough, what is this document?

17  A.  This is an email from myself to Mr. Gross, copying several

18  others.  This top part, I mention OSCUI and that we would help

19  fill out the nomination form for him to get him the assistance

20  that he was asking for.  And I also offered him some

21  suggestions for other credit unions that he can contact for

22  assistance as well.

23  Q.  Let's go to the portion of the email titled "Field Of

24  Membership."  What did you write there?

25  A.  Would you like me to read it?

1   Q.   Sure.   Just read the first paragraph.

2   A.   "With regards to our discussion on your charter and field

3   of membership, as I stated in the conference call we had, I'm

4   available to speak to you this coming week in person.   Please

5   let me know what date works best for you.   However, as

6   promised, I have conferred with our Office of Consumer

7   Protection, who has confirmed my understanding of the

8   limitations of your community charter.   Your charter, which you

9   know, states that your field of membership is open to persons

10  who reside, live, work, worship or attend school in and

11  businesses and other legal entities in Lakewood, New Jersey."

12  Q.   We can stop there.

13  A.   Okay.

14  Q.   Thank you.

15          MR. NOBLE:   Can we zoom out, please.   And let's go

16  down to the portion of the email stating "OCP has confirmed

17  that."

18  Q.   Can you read what it states that -- can you remind the jury

19  or tell the jury what OCP is and what their responsibilities

20  are?

21  A.   OCP is short for the Office of Consumer Protection.   They

22  are a division within our agency which is charged with handling

23  field of membership, chartering issues, as well as handling

24  complaints.

25  Q.   Okay.   And can you go ahead and read what you wrote under

1   number 1?

2   A.  "OCP has confirmed that:  (1) volunteer means individuals,

3   not organizations such as HOPE.  Therefore, only individuals

4   who volunteer in Lakewood, New Jersey, in some capacity are

5   eligible for membership.  A person who is simply a congregant

6   of HOPE in Jackson, New Jersey, but does not otherwise live,

7   work, worship, attend school or volunteer in Lakewood, New

8   Jersey, themselves, are not eligible for membership."

9   Q.  And number 2 under "Businesses And Other Legal Entities,"

10  what did you write?

11  A.  "Businesses and other legal entities extends only to the

12  businesses or other legal entities themselves and not customers

13  or members, meaning the Collectors Club of Lakewood, New

14  Jersey."

15         MR. NOBLE:  Can we go to the next page, where it

16  continues, and blow up just to top portion, thank you.

17  Q.  Please continue.

18  A.  "Can become -- Collectables Club of Lakewood, New Jersey,

19  can become a member for purposes of a commercial or business

20  account, and all those who work at the Collectables Club are

21  eligible if they are located in Lakewood, New Jersey.

22  Membership does not extend to members of this club who do not

23  otherwise live, work, worship, attend school or volunteer in

24  Lakewood, New Jersey."

25  Q.  Thank you.

1          MR. NOBLE:  Can we go back to the previous page.  And

2     please up just the very bottom portion under number 2.  That's

3     fine.

4     Q.  Mr. McDonough, you see where you wrote in quotation marks

5     "Collectors Club"?

6     A.  Yes.

7     Q.  Do you know -- what did you mean by that?

8     A.  I meant the Collectables Club.

9     Q.  The Collectables Club?

10    A.  Yes.

11    Q.  Do you see where it you say "Collectors Club of Lakewood,

12    New Jersey"?

13    A.  Yes.

14    Q.  Why did you write that that club was of Lakewood, New

15    Jersey?

16    A.  They had an address in Lakewood, New Jersey.

17    Q.  How did you learn that Collectables Club had an address in

18    Lakewood, New Jersey?

19    A.  I reviewed their website.

20         MR. NOBLE:  Let's go to the next page.  Can you blow

21    up low-income designation, please.

22    Q.  Now, I'm not going to ask you to read this whole thing.

23         What, if any, effect does the fact that HOPE was a

24    low-income designated credit union have as to the types of

25    accounts that it can hold at the credit union?

1   A.  A low-income designated credit union can hold nonmember

2   deposits.  Any credit union can hold nonmember deposits.  Since

3   credit unions are chartered, you have to be a member in order

4   to be --

5   Q.  Mr. McDonough, we're both fast talkers but can you slow

6   down just a little bit for the court reporter.

7   A.  It's the Long Island in me.  I apologize.

8        Members can have accounts at credit unions.  You have

9   to be a member in order to have an account.  But we do

10  authorize credit unions to hold accounts from nonmembers.

11  Traditional credit unions, or nonlow-income designated credit

12  unions, can have nonmember composites but they are limited to

13  who they can get those funds from.  Low-income designated

14  credit unions can get nonmember deposits from any source,

15  meaning individuals, other credit unions or other entities as

16  well.

17  Q.  Now, the deposits that are held in the nonmember accounts,

18  can those be used in a way to conduct transactions?

19  A.  By the nonmember?

20  Q.  Yes.

21  A.  No.

22  Q.  Can you just read -- I do want you to read now a portion of

23  this.

24  A.  Okay.

25  Q.  Just beginning with the paragraph "It is important to

1   note."

2   A.   "It is important to note that an individual having a

3   nonmember deposit in your credit union does not create a member

4   relationship.  It simply allows them to deposit money in your

5   credit union.  It does not allow them to:  Receive loans, hold

6   board of director positions or serve as an official, receive

7   any other service or benefit that is otherwise granted to

8   members."

9   Q.   Where you wrote "any other service or benefit," would that

10  include ACH processing for the member?

11  A.   Yes.

12              MR. NOBLE:  You can zoom out and you can take that

13  down.

14  Q.   Mr. McDonough, did there come a time, following this email,

15  that you again consulted with the Office of Consumer Protection

16  regarding the eligibility of the Collectables Club to being

17  members of HOPE?

18  A.   Yes.

19  Q.   Why did you do that?

20  A.   A question arose as to whether or not employees of the

21  Collectables Club who worked part time in Lakewood, New Jersey,

22  would qualify for membership.

23  Q.   You said a question arose.  How did that question arise?

24  A.   Mr. Gross communicated to me that the Collectables Club had

25  employees that worked part time, two weeks out of the month, at

 1    their location in Lakewood, New Jersey, and he wanted to know

 2    if that qualified them for membership in the credit union.

 3    Q.  And what did you do after Mr. Gross told you that?

 4    A.  I contacted the Office of Consumer Protection, described

 5    the situation as I was told it, that there were individuals who

 6    worked for the Collectables Club on two weeks out of the month,

 7    and I asked OCP if that would qualify those individuals for

 8    membership in the credit union under their community charter.

 9             MR. NOBLE:  Can we bring up Government Exhibit 6021 in

10    evidence.

11    Q.  This is an email from Trevon Gross to you -- correct?

12    A.  Yes.

13    Q.  -- on October 17, 2014, that stated, "Hey, Brian.  I wanted

14    to follow up on the response you received from consumer

15    protection about employees who work in Lakewood part time.

16    Please advise."  Did I read that correctly?

17    A.  Yes.

18    Q.  Is this an email that Mr. Gross sent to you after you had

19    that conversation about Collectables Club members working in

20    Lakewood?

21    A.  Yes.

22    Q.  You said that after that, you did consult OCP, correct?

23    A.  That's correct.

24             (Continued on next page)

25

31HQGRE5                   McDonough - Direct

1   Q.  Did you get an opinion from OCP about whether, if

2   Collectables Club members worked in Lakewood part time, they

3   would qualify for membership in the credit union?

4   A.  I did.  And the answer I got was, yes, that they would.

5   Q.  Did you later convey that opinion to Trevon Gross?

6   A.  Yes, I did.

7        MR. NOBLE:  Can we bring up Government's Exhibit 6022

8   in evidence?

9   Q.  For the record, this is an exchange between you,

10  Mr. McDonough, Trevon Gross, and Mark Guberman, correct?

11  A.  That's correct.

12       MR. NOBLE:  Let's go down to the bottom email.  Next

13  page.

14  Q.  So this is just the email that we just looked at, right?

15  A.  That's correct.

16  Q.  Okay.  Let's go back up and see the response.  Can you read

17  what you wrote to Trevon Gross on October 17th, 2014?

18  A.  "Master Gross.  Based on our discussion and your

19  explanation that the employees of the Collectors Club or other

20  businesses work two weeks out of the month at the employer's

21  place of business, we are willing to accept that they are

22  eligible for membership as long as the owners of these

23  businesses provide written documentation stating that their

24  employees work two weeks out of the month in Lakewood, New

25  Jersey."

1          MR. NOBLE:  Zoom out.

2   Q.  And Trevon Gross responded, "With your permission, we would

3   ask that they also include two recent paystubs to verify

4   employment in addition to the statement on letterhead

5   certifying the employment status and location.  Please confirm

6   that this is suitable.  Thanks."

7          MR. NOBLE:  And then let's zoom out it your response.

8   Q.  How did you respond?

9   A.  "Master Gross.  Requiring two recent paystubs to verify

10  employment and therefore eligibility for membership is entirely

11  up to you.  If that is what you would like to do, I see no

12  problems with it."

13  Q.  Based on the email communications and your conversations

14  with Trevon Gross, what was your understanding at this time as

15  to whether Collectables Club had people who were working in

16  Lakewood, New Jersey?

17  A.  My understanding is that they did have employees working at

18  their office in Lakewood, New Jersey two weeks out of the

19  month.

20  Q.  And how, if at all, would that affect whether the NCUA

21  believed that those members would qualify in HOPE Federal

22  Credit Union?

23  A.  That means that those individuals would qualify for

24  membership in HOPE Federal Credit Union.

25  Q.  What if you were to learn that there were no employees, or

1   those employees did not actually work part time in Lakewood,

2   New Jersey?

3   A.  Then they would not qualify for membership in the credit

4   union.

5            MR. NOBLE:  You can take that down, Ms. Grant.

6            Can we bring up Government Exhibit 6048 in evidence?

7   This is another email chain between Mr. McDonough, Mr. Gross,

8   and Mr. Guberman.  Let's scroll to the last email in the chain.

9   Can you blow up the date and time, too, with that email?

10  Q.  This is email from Mark Guberman to Trevon Gross on

11  October 20th which stated, "Pastor Gross.  Just wanted to

12  forward draft copies of the examination overview, DOR, and

13  findings."

14           Do you know what Mr. Gonna be was sending to Mr. Gross

15  on October 20th, 2014?

16  A.  Draft copies of his examination report.

17  Q.  And in general, what did that examination report conclude

18  or ask the credit union to do?

19  A.  It asked the credit union to review its membership, ensure

20  that all board members and members who held accounts were

21  actually eligible for the credit union.

22  Q.  Okay.  And Trevon Gross then responded to Mr. Guberman,

23  "Based on the email from Brian, this DOR is not necessary.

24  Please advise."

25           MR. NOBLE:  Can you leave that blown up, please?

1  Q.  Mr. McDonough, Mr. Gross references an email from you.  Do

2  you know what email he was referring to?

3  A.  He was referring to the email exchange where I told him

4  that employees of Collectables Club that worked two weeks per

5  month at their location in Lakewood, New Jersey would qualify

6  for membership.

7            MR. NOBLE:  Let's zoom out.  That's good.  You don't

8  need to blow that up.

9  Q.  Mr. Guberman then forwards this response from Trevon Gross

10 to you, correct?

11 A.  That's correct.

12           MR. NOBLE:  And then let's blow up Mr. McDonough's

13 response.  Okay.

14 Q.  If you can, can you just kind of summarize how you

15 responded to Trevon Gross and why you responded in that way?

16 A.  To summarize, I told him that the document of resolution

17 was still necessary as we had not received any documentation to

18 show that those individuals actually worked part time in

19 Lakewood, New Jersey.  As per the earlier email exchange, I

20 stated that we needed to have a letter from the employer

21 stating that those people worked part time in Lakewood, New

22 Jersey.  We had not yet received that, so the DOR was still

23 necessary as that was still a question outstanding.

24           And also, since the credit union was physically

25 located outside of its field of membership, its community --

 1  the community it was chartered to serve, it was actually

 2  located outside of that community, so there were still

 3  questions as to whether or not the members that they had in the

 4  credit union were eligible.

 5  Q.  Okay.  And it said -- there's a reference to the camel

 6  rating?

 7  A.  Yes.

 8  Q.  What, if anything, did the NCUA do with respect to the

 9  credit union's camel rating at this time?

10  A.  We retained the same camel rating it had prior, which was a

11  camel rated 3.

12          MR. NOBLE:  Let's zoom out.  Can you go to the first

13  page?

14  Q.  So then, Mr. Gross, on October 20th, 2014, responds to you,

15  "I do not understand this and it is not fair to our CU.  The

16  only people who are at issue were the people who work for the

17  Collectables Club who were on the board.  The original finding

18  was based on incomplete and inaccurate information.  There is

19  no one on our board that does not live, work, worship, or

20  volunteer in Lakewood.  When you say "it is your

21  understanding", where did this understanding come from?  Every

22  board member has a long-standing connection, live, work,

23  worship, and volunteer to Lakewood in various capacities.  This

24  whole process seems punitive and I am not certain why.  Our CU

25  worked hard for the past year and a half to correct issues that

1    existed.  When our camel rating was lowered we understood it.

2    However, to retain an inaccurate item in a DOR and keep our

3    camel rating low is not fair to us as a CU.  We are ineligible

4    for needed grants because of this low rating.  I'd like to talk

5    to you further."

6              So based on this second paragraph about the camel

7    rating, what was your understanding of what Trevon Gross was

8    asking the NCUA to do with respect to the camel rating?

9    A.  He was asking us to upgrade the camel rating to a 2.

10   Q.  He wanted it to be upgraded?

11   A.  Yes, that was my understanding.

12             MR. NOBLE:  Let's zoom out.

13   Q.  In this email, you reference scheduling a conference call

14   to speak with Trevon Gross so that you can all be on the same

15   page; is that right?

16   A.  That's correct.

17   Q.  Now, did there come a time when you actually scheduled a

18   conference call with him?

19   A.  Yes.

20   Q.  What happened on that call?

21   A.  On the call, we just discussed the limitations of the

22   charter, again, and what the requirements are to qualify for

23   membership in the credit union.

24             MR. NOBLE:  Can you take that down, Ms. Grant, please?

25   Q.  Following the conference call, did there come a time when

1  you received some information concerning ACH processing at HOPE

2  FCU?

3  A.  Yes.

4  Q.  From whom?

5  A.  Our regional office.

6  Q.  And what was the general nature of that information you

7  received?

8  A.  We received information that Alloya Corporate Credit Union

9  was ceasing processing ACH transactions for Helping Other

10  People Excel Federal Credit Union because the volume of

11  transactions was inordinately high.

12  Q.  After you received that information -- I'm sorry.  Strike

13  that.

14          During the earlier exam that we've been talking about

15  regarding field of membership --

16  A.  Yes.

17  Q.  -- did ACH processing ever come up in that -- as part of

18  that exam?

19  A.  No, it did not.

20  Q.  After you received the information from the regional

21  office, what did you do?

22  A.  I assigned two examiners to go into Helping Other People

23  Excel Federal Credit Union and review their ACH activity.

24  Q.  Who did you assign?

25  A.  Magdalena Flok.

1   Q.  Anyone else?

2   A.  I believe on the first day Keith Olsen went in with her.

3   Q.  And what, if any, concerns did you have as an examiner

4   about the volume of ACH transactions being processed through

5   HOPE?

6   A.  The amount of ACH transactions was extremely high.  The

7   credit union was very small, very non-complex, and I was

8   concerned it did not have the structure to handle such

9   processing.

10  Q.  Now, as a result of Mag Flok's -- you said Magdalena Flok.

11  She also goes by Mag?

12  A.  Yes.

13  Q.  As a result of Ms. Flok's examination at HOPE, did there

14  come a time when the NCUA considered issuing what's called a

15  preliminary warning letter?

16  A.  Yes.

17  Q.  What is a preliminary warning letter?

18  A.  It is a letter -- it's a step up in the administrative

19  process.  The DOR that we've been referencing, a document of

20  resolution, is an informal administrative action which directs

21  the credit union to do something.  The preliminary warning

22  letter is a letter from our regional director which directors

23  the credit union to either cease doing something or to not do

24  something.

25  Q.  Did the NCUA issue the preliminary warning letter to the

1  credit union in or about December, 2014?

2  A.  No, we did not.

3  Q.  And instead, I believe you testified that a DOR was

4  ultimately issued?

5  A.  Yes.

6  Q.  During the examination, did there come a time when you

7  learned for whom HOPE was processing ACH transactions?

8  A.  Yes.

9  Q.  Who?

10  A.  Kapcharge Incorporated.

11  Q.  Did you ever learn what types of customers Kapcharge

12  processed ACHs for?

13  A.  Some research I did revealed that they were processing ACH

14  transactions for payday lenders.

15  Q.  Did there come a time when you instructed Ms. Flok to

16  obtain a lease for either the Collectables Club or Kapcharge?

17  A.  Yes, for Kapcharge, I believe.

18  Q.  Why did you do that?

19  A.  I had looked at the address for the Collectables Club, and

20  the address for the Collectables Club was the same as the

21  address in Lakewood, New Jersey as Kapcharge Incorporated.  We

22  had concerns that they actually did have a -- whether or not

23  they actually had a physical location there or whether they

24  were just stating that they did.  So I asked her to obtain a

25  lease, ask for a lease to prove that they actually had a

 1   physical location.

 2   Q.  Did you ever obtain a copy of the lease or see a copy of

 3   the lease?

 4   A.  No, I did not.

 5   Q.  And around what time did the NCUA issue the exam report

 6   regarding ACH processing at HOPE?

 7   A.  December the 16th.

 8   Q.  And following the issuance of that report -- oh, and what

 9   did that report instruct the credit union to do with respect to

10   ACH processing?

11   A.  It instructed them to cease processing ACH transactions for

12   any businesses or entities.

13   Q.  That would include for Kapcharge?

14   A.  That's correct.

15   Q.  Following the issuance of the exam report, did HOPE cease

16   processing ACH transactions for businesses?

17   A.  No, they did not.

18           MR. NOBLE:  Can you bring up Government's

19   Exhibit 6049?

20   Q.  Now, after the issuance of the examination report, did you

21   ever send Ms. Flok back into the credit union?

22   A.  Yes.

23   Q.  And this is an email from Mr. Gross to Mr. McDonough

24   copying Ms. Flok, Charles Blue, and Bernard Larkins dated

25   January 8, 2015 that states, "Dear Mr. McDonough.  We'd like to

 1   have a conference call with you to discuss what type of

 2   examination we are currently engaged in.  We have not received

 3   from Mag any formal examiner introduction that details the

 4   scope of this examination, the specific NCUA regulations that

 5   have been violated, and the timing for remediation."

 6          So do you recall receiving this email on January 8,

 7   2015?

 8   A.  Yes.

 9   Q.  After you received the email, did there ever come a time

10   when you had a conference call with Mr. Gross and Mr. Blue?

11   A.  Yes, that same day.

12          MR. NOBLE:  Let's take that down.

13   Q.  Can you just tell us what happened during the conference

14   call?

15   A.  We discussed the concerns we had with the credit union, the

16   ACH processing that they were doing, and that they cannot

17   continue to process ACH transactions.  It is not the kind of

18   activity that can be done while you're building an

19   infrastructure to do it.  You need to have the infrastructure

20   and policies and procedures in place prior to engaging in this

21   kind of activity, and that's why we were telling them to cease.

22   Q.  After the conference call, did you receive any additional

23   information concerning ACH processing at HOPE?

24   A.  Yes.  I received information that they were continuing to

25   process ACH transactions.

1   Q.   What did you do after you got that information?

2   A.   I communicated with Mr. Blue to cease all ACH activity --

3   Q.   Okay.

4   A.   -- per our discussion earlier in the day.

5         MR. NOBLE:   Can we bring up Government's Exhibit 6045

6   in evidence?

7   Q.   You said you communicated with Mr. Blue; is that right?

8   A.   That's correct.

9   Q.   Do you recognize this document?

10  A.   Yes.

11  Q.   What is this?

12  A.   It's an email from myself to Mr. Blue, copying Mr. Gross,

13  as well as Mag and Kelly, who was our associate regional

14  director of programs, and Terrance Adam, who is another

15  supervisory examiner.

16        MR. NOBLE:   You can zoom back out.

17  Q.   And generally, what did you write to the credit union in

18  this email?

19  A.   That our examination report dated December the 16th

20  instructed the credit union to cease processing all ACH

21  transactions and that it had come to my attention that they

22  were not following the intent of that examination report and

23  were continuing to do it.

24  Q.   Did you ever receive a response from anyone at the credit

25  union after you sent this email?

```
 1   A.   Yes.   Mr. Blue responded that he has directed staff to

 2   cease processing all ACH transactions as of close of business

 3   that day.

 4            MR. NOBLE:   You can take that down.

 5   Q.   Do you know whether HOPE Federal Credit Union continued its

 6   relationship with Kapcharge after you sent this email on

 7   January 8th?

 8   A.   No, I don't.

 9   Q.   Did you have any further involvement with HOPE Federal

10   Credit Union after this time?

11   A.   No, I did not.

12   Q.   Why not?

13   A.   I transferred to another supervisory examiner position in a

14   different region.

15            MR. NOBLE:   No further questions.

16            THE COURT:   Thank you.

17            Ms. Madrigal.

18            MS. MADRIGAL:   Thank you, your Honor.

19   CROSS EXAMINATION

20   BY MS. MADRIGAL:

21   Q.   Good afternoon.

22   A.   Good afternoon.

23   Q.   You're a supervisory examiner of the NCUA, correct?

24   A.   That's correct.

25   Q.   And that's for Region 2?
```

1  A.  At the time of this, it was for Region 2.  I'm currently in

2  Region 1.

3  Q.  Understood.  And how many regions are there in the entire

4  country?

5  A.  Five.

6  Q.  Five regions.  And which states fall under Region 2?

7  A.  Pennsylvania, New Jersey, Virginia, Delaware, West

8  Virginia, I think that -- North Carolina.

9  Q.  And approximately how many employees did you supervise when

10 you were the supervisory examiner of Region 2?

11 A.  Seven.

12 Q.  Seven?  Okay.  And you expect them to know the NCUA rules

13 and regulations?

14 A.  I expect them to -- not -- well, yes.  Not know all of the

15 NCUA rules and regulations.  We have resources available for

16 them to refer to the regulations.  As you can imagine, with

17 federal regulations, it's a voluminous document.

18 Q.  Understood.  And you yourself are expected to know the

19 rules or, in the event you don't know a rule, look up the rule.

20 A.  That's correct.

21 Q.  Now, in December of 2014, you were contacted by a lawyer

22 who represented former HOPE Credit Union members?

23 A.  That's correct.

24 Q.  And that lawyer was Jonathan Kudulis?

25 A.  Yes.

1    Q.   From the Trimmier law firm?

2    A.   Yes.

3    Q.   And that was an Alabama law firm?

4    A.   Yes.

5    Q.   And that lawyer told you that he believed the members of

6    the Collectables Club had been wrongfully removed from the

7    board; is that true?

8    A.   He was representing members of the board that believed that

9    they were wrongfully removed, that's correct.

10   Q.   And HOPE is designated as a low-income credit union,

11   correct?

12   A.   That's correct.

13   Q.   And when Attorney Kudulis contacted you, he actually told

14   you about a field of membership exception that you were

15   completely unaware of.

16   A.   That's correct.

17   Q.   And this exception actually qualified a member of an

18   association headquartered within a community as falling within

19   the field of membership.

20   A.   Yes.  Members -- the association -- the low-income

21   designated rule, which I was unaware of, permitted members of

22   an association within the low-income designated field of

23   membership to qualify for membership in the credit union

24   regardless of where they would live.

25   Q.   Understood.  And the lawyer actually cited an NCUA rule?

```
 1   A.  That's correct.

 2   Q.  And he also cited an opinion.

 3   A.  Yes.

 4   Q.  And after you spoke with the lawyer, did you confirm that

 5   what he was telling you was actually accurate?

 6   A.  Yes.  I confirmed with our Office of Consumer Protection

 7   and inquired about this particular obscure part of the field of

 8   membership rule.

 9   Q.  Understood.  So fair to say that with all of your

10   experience with the NCUA, you yourself don't know all of the

11   rules that apply to field of membership?

12   A.  No.  I'd get paid a lot more money if I did.

13   Q.  Thank you.

14           MS. MADRIGAL:  No further questions.

15           THE COURT:  Ms. Santillo.

16   CROSS EXAMINATION

17   BY MS. SANTILLO:

18   Q.  Hi, Mr. McDonough.

19   A.  Hi.

20   Q.  My name is Kristen Santillo and I represent Trevon Gross.

21   A.  Hi.

22   Q.  You are familiar with the HOPE Credit Union, correct?

23   A.  Yes.

24   Q.  And the HOPE Credit Union was located in Jackson, New

25   Jersey next door to Lakewood; is that correct?
```

3LHQLEE7                    McDonough - Cross

1    A.  That's correct.

2    Q.  And it had been located in Jackson, New Jersey from 2012 on

3    after Hurricane Sandy.

4    A.  I believe so, yes.

5    Q.  And all of the NCUA examinations of the Hope Credit Union

6    took place at the church in Lakewood, New Jersey.

7    A.  From 2012 on, I believe that's the case.

8    Q.  So the examiners would come for their examination and they

9    would go to the church.

10   A.  I would have to assume so.  I haven't reviewed prior

11   examinations.

12   Q.  Okay.  But typically, the NCUA examiners go to the credit

13   union itself to conduct the examination.

14   A.  That's correct.

15   Q.  Okay.  So if the NCUA examiners followed the typical

16   procedure, they would have gone to Jackson, New Jersey and gone

17   to the credit union to do the examination.

18   A.  That's correct.

19   Q.  Now, sometime in August, 2014, you received a communication

20   from Jerry Coursen regarding the Helping Other People Excel

21   Federal Credit Union.

22   A.  I was informed about a communication between Jerry Coursen

23   and our regional director.  I didn't receive the communications

24   from him directly.

25   Q.  Okay.  So what you heard about this communication was that

1   somebody contacted Mr. Coursen to create a strategic plan for

2   the HOPE Federal Credit Union.

3   A.  That's correct.

4   Q.  They were informed that the credit union's plan was to

5   replace the board members with four nationals from Eastern

6   Europe to who would place millions into the credit union in

7   order to achieve cheaper loan rates and earn a higher yield?

8              MR. NOBLE:  Objection.

9              THE COURT:  Grounds?

10             MR. NOBLE:  Hearsay.

11             THE COURT:  Sustained.

12  BY MS. SANTILLO:

13  Q.  You said that your investigation was prompted by a tip or

14  by a report of somebody having a strategic plan with respect to

15  the HOPE Credit Union.  Can you tell me what your understanding

16  of what that plan was for the credit union?

17  A.  I received communication from our regional office that they

18  were contacted by a consultant who had made a comment relative

19  to the strategic plan of the institution.  They subsequently

20  did some in-house research into the institution, developed a

21  list of questions that they asked us to -- myself, and

22  therefore my staff, to follow up on.

23  Q.  My question is, what specifically do you remember about the

24  strategic plan that was told to Mr. Coursen that prompted your

25  investigation of the HOPE FCU?

1          MR. NOBLE:  Objection.

2          THE COURT:  Sustained.

3   Q.  So based on information that you received about a strategic

4   plan with respect to HOPE FCU, you started an investigation

5   into HOPE FCU.

6   A.  Based on a list of questions prepared by our regional

7   office, we expanded the review that was currently under way at

8   Helping Other People Excel Federal Credit Union to include

9   those things.

10  Q.  And you started to look into the field of membership issues

11  at the HOPE Federal Credit Union.

12  A.  That's correct.

13  Q.  And one of the findings that the examiners came to with

14  respect to the HOPE Federal Credit Union was that the church

15  itself and its members were not within the field of membership.

16  A.  That's correct.

17  Q.  So even though the NCUA examiners had been coming to the

18  credit union for two and a half years to do the examinations,

19  it wasn't until you got this tip that you decided that the

20  church itself and its members were no longer part of the field

21  of membership.

22  A.  From my perspective, I would argue that this being the

23  first examination that I was involved in with Helping Other

24  People Excel Federal Credit Union, that that would have been an

25  issue that I would have raised irrespective of any

1    communication I received from the regional office.

2    Q.  Okay.  So you personally, if you had been the examiner at

3    the HOPE Credit Union, you would have raised the issue with the

4    field of membership for the church in 2012 when they came over

5    from Hurricane Sandy.

6    A.  Yes.

7    Q.  But other examiners had been coming to the credit union for

8    two and a half years and had not raised this issue with respect

9    to the field of membership.

10   A.  I am unaware of whether anybody else raised it or not.

11   Q.  And so with respect to the findings with respect to the

12   church, the NCUA's findings were that most of the members of

13   the credit union are congregants of the church and many do not

14   reside in Lakewood, New Jersey.  So they were instructed to --

15   the HOPE Credit Union was instructed to review its membership

16   files to determine how many members of the credit union who are

17   members of the church did not -- were not proper members of the

18   credit union.

19   A.  Who were members of the credit union irrespective of any

20   other criteria.  It wasn't just specifically the church --

21   people who were members of the church, it was to review their

22   membership files in total and to determine how many, if any,

23   members did not qualify for membership.

24   Q.  Okay.  So when you went in, you identified a couple of

25   problems with the field of membership.

 1    A.   Yes.

 2    Q.   The problem with the church being outside the -- being in

 3    Jackson, New Jersey, not in Lakewood, New Jersey.

 4    A.   The credit union.

 5    Q.   Yes.  Well, the church was not properly a member of the

 6    credit union because it was in Jackson, New Jersey, is that the

 7    finding?

 8    A.   The finding is the credit union itself was not located

 9    within its defined community area irrespective of the church,

10    but it was located on the church grounds, and it was affiliated

11    with the church tangentially, but as the purview of being a

12    standalone institution, I was concerned with the location of

13    the credit union.  The credit union is located outside of its

14    defined community area, and that in itself raises a concern

15    whether or not members of the credit union were permissible

16    under their community charter.

17    Q.   But there was also a concern raised that members of the

18    church -- the church had volunteers who worked or who

19    volunteered in Lakewood, New Jersey, correct?

20    A.   I am not aware of -- I'm not -- I don't know.

21    Q.   The church had members of the credit union who did not live

22    in Lakewood, New Jersey.

23    A.   That's correct.

24    Q.   And there was a previous understanding that, because the

25    church had volunteered in Lakewood, New Jersey, that all of the

 1   members of the church could be members of the credit union.

 2   A.  I don't recall that specific circumstance.

 3   Q.  Let's go back to your email.

 4              THE COURT:  Two minutes remaining on the day,

 5   Ms. Santillo.

 6              MS. SANTILLO:  How many?  Two?

 7              THE COURT:  Two.

 8              MS. SANTILLO:  Okay.  Could you pull up Exhibit

 9   No. 6022?  6048.  I'm sorry.

10   BY MS. SANTILLO:

11   Q.  So your concern in these emails in 6048 was not just with

12   members of the Collectables Club.

13   A.  That's correct.

14   Q.  So you asked them to do a comprehensive check of their

15   entire files.

16   A.  That's correct.  The membership at the time was, I believe,

17   less than 100 people.

18   Q.  Okay.

19              MS. SANTILLO:  So if we go back to 6022, please.

20   Q.  Now, if you look at your email at 11:45 on the bottom, if

21   we could open that up.  Pastor Gross' question with respect to

22   eligibility and membership was not just limited to the

23   Collectables Club, it says in the email that there are other

24   businesses that he was asking about.

25   A.  I did put that in parentheses, but I don't have a

1   recollection of any other specific businesses being mentioned.

2   Q.  Okay.  And so he was asking questions in a general manner

3   in order to inform his review of the board member files to

4   determine who was still in the field of membership.

5           MR. NOBLE:  Objection.

6           THE COURT:  Overruled.

7           THE WITNESS:  Could you repeat the question?

8   Q.  My question is, when he's asking this question, he's asking

9   how the Collectables Club or other businesses, where you're

10  responding to his questions about how the Collectables Club or

11  other businesses could qualify for membership based on their

12  part time employment status.

13  A.  Individuals who work for Collectables Club or other

14  businesses in Lakewood, New Jersey, yes.

15  Q.  To inform his review of the board member files.

16  A.  I would have to assume that that was his intent.

17          MR. NOBLE:  Objection.

18          THE COURT:  Overruled.

19          Ms. Santillo, that's the end of the day.  How much

20  time do you have left with the witness?

21          MS. SANTILLO:  10 minutes.

22          THE COURT:  Okay.

23          Members of the jury, it's 4:45, so I am letting you

24  go.  As we discussed, as you know, you're not here tomorrow and

25  you're not here Friday.  Obviously, we are heading into the

1    fourth week.  I don't have any additional updates on the

2    schedule.  The lawyers and I will continue to work the next two

3    days that you're gone.  If I have a further update on Monday,

4    obviously, I'll give it to you then.

5            Please do bear in mind over the extended break all of

6    my rules.  No discussions with each other or anyone else about

7    the case or anyone involved in the case, no research or

8    communication about the case through any means, continue to

9    keep an open mind as we head toward the end of the process.

10           I will see you at 9:30 on Monday.  Thank you very

11   much.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury not present)

2              THE COURT:  Mr. McDonough, you are excused.  You will

3    have to come back --

4              THE WITNESS:  Yay.

5              THE COURT:  -- on Monday.  You're on cross examination

6    now so the government lawyers can't talk to you.  If you would

7    be so kind as to be outside the courtroom and ready to go by a

8    little bit before 9:30 on Monday, I'd appreciate it.

9              THE WITNESS:  Okay.

10             THE COURT:  Thank you so much.  Have a nice weekend.

11             (Witness excused)

12             THE COURT:  Are there matters to take up, counsel?

13   Well, other than scheduling.  Might the government finish on

14   Monday?  How long is your summary witness, I think is

15   probably --

16             MS. CHOI:  It's going to be -- I think because the

17   summary witness is going through a bunch of the bank documents,

18   it's going to take some time.  That's why we're thinking

19   Tuesday is the likely outcome.  To be perfectly frank, we

20   thought that we could even get to some of the other exhibits

21   that we kind of need to publish to the jury to give context to

22   the bank fraud charges against Mr. Lebedev, but I think cross

23   examination for certain witnesses today went a little longer

24   than we would have expected, but we're still optimistic

25   Tuesday.

31HQLEB5

         1           But I would note, your Honor, I think one of the

         2   issues with regard to scheduling is obviously, the defense, at

         3   least with regard to Mr. Lebedev, has indicated to us that they

         4   will tell us by Friday who they intend to call and generally

         5   what types of exhibits that they intend to introduce and any

         6   related 3500 material.

         7           We have not gotten any representations from

         8   Ms. Santillo about when they would be able to do that.  I

         9   understand that she needs to consult with her partner, but in

        10   any event, I think by Friday, given that your Honor also is

        11   curious as to the length of what's going on, we need to have a

        12   firm list.

        13           And I'll flag one issue for your Honor which we've

        14   already had in briefing, which is obviously we gave notice to

        15   defense counsel that we don't intend to call any of the board

        16   members except for in a rebuttal case if necessary given the

        17   way that the evidence has come in to date, reserving that

        18   right.

        19           We don't know which defense witnesses amongst the

        20   board members would be called, but we did flag for your Honor a

        21   concern that the government has, a serious one, with regard to

        22   whether or not they have had sufficient independent counsel on

        23   some of these questions because, as you know, the church has

        24   been represented by -- the church has sponsored one counsel to

        25   represent all of the various ex-board members who have

1    differing interpretations of what happened, and there is a

2    serious conflict of interest potential problem that may arise

3    depending on who they decide to call, specifically because the

4    church has a pecuniary interest in the outcome of this case in

5    light of forfeiture issues that may arise if there is a

6    conviction of Mr. Gross.

7        There is a strong -- as you've seen evidence of now,

8    there are intermingled finances between the defendant himself

9    and the church, which you will see more of through the RSM

10    summary witness, and I think there are issues with regard to

11    who is paying the legal fees for whom in this case.

12        Obviously, if an individual decides to take the stand

13    despite the government having placed them on notice that they

14    may be exposing themselves to criminal liability, that is their

15    choice, but the government has concerns about this given that

16    it is an issue that we flagged from the getgo, it's the reason

17    that Ms. Santillo understood to be a problem for her, such that

18    she would accuse us of the selective immunization problem, and

19    I think the time may occur where the government would ask, in

20    an abundance of caution, that your Honor at least explore the

21    issues with regard to counsel with each of those witnesses

22    prior to their taking the stand.

23        If they choose to take the stand and inculpate

24    themselves or expose themselves in some way, obviously that is

25    their right, but the government does have concerns that they

 1    may not be getting totally independent counsel on those

 2    questions.

 3         And so I think, as a scheduling matter, even putting

 4    aside notice, I think your Honor should ask Ms. Santillo by

 5    Friday which of the board members she intends to call because I

 6    think there may be a situation in which these issues may arise

 7    and your Honor may have to take time to deal with that issue.

 8         THE COURT:  Do you know, Ms. Santillo?

 9         MS. SANTILLO:  Your Honor, we didn't learn until

10    yesterday that the government wasn't calling any board

11    witnesses.  We would anticipate that we would -- the reason I

12    would leave two days for our defense is that we would likely

13    call all of them, and we would maybe winnow it down over the

14    weakened in terms of trying to figure out who we would cut.

15    But we certainly have an intention of calling the board

16    members.

17         THE COURT:  What is your view of the conflict issue

18    that's been flagged now for several weeks?

19         MS. SANTILLO:  Well, my view is that the government

20    is, as I've stated in my papers, is trying to create a criminal

21    problem where they've never viewed it as a criminal problem

22    before in order to intimidate these witnesses from testifying.

23    Your Honor has obviously disagreed, but these people have --

24         THE COURT:  I don't understand.  What does that have

25    to do with the -- what does that have to do with the -- what is

1    it?  With what Ms. Choi just said.

2              MS. SANTILLO:  Well, they have counsel who have

3    advised them with respect to -- you know, I can't speak to what

4    their lawyer has said to them in confidence, but I know that

5    they have been given advice about whether or not they should

6    testify, and some of them may or may not testify.  So we need

7    to have those final conversations with them, and I can't give

8    them advice, and they have a separate lawyer.  So if you want

9    to bring that lawyer here to have those conversations, then we

10   can certainly do that, but --

11             THE COURT:  So I understood the scheduling point from

12   yesterday to be that, with the exception of board members,

13   you're going to inform the government by Friday of your

14   anticipated defense case so we can deal with reverse discovery

15   and 3500 and the like.

16             MS. SANTILLO:  Sure, we can do that.

17             THE COURT:  We may need to deal, over the next two

18   days, with this conflict issue, because I'm not stopping trial

19   next week.  We have two days, we have the weekend if we need

20   it, we're going to use that time to resolve whatever issues we

21   need to resolve so that there's no need to delay trial.

22             So I think I need to know -- I mean, what you're

23   saying is there's a possibility that you will call all members

24   of the board, right?

25             MS. SANTILLO:  Yes, and Charles Blue.

1          THE COURT:  So Charles Blue.  Who else?

2          MS. SANTILLO:  Bernard Larkins.

3          THE COURT:  Mm-hmm.

4          MS. SANTILLO:  Joe Lane.  Fred DeSilva, George Wyatt,

5     Delores Wyatt.

6          MR. NOBLE:  You're missing a few.  The Purrys.  Are

7     you going to call them?

8          MS. SANTILLO:  The Purrys, possibly.

9          THE COURT:  Well, I need a proposal as to how to

10    resolve this, and recognizing we have four days between now and

11    Monday to deal with it.

12          MS. CHOI:  Well, your Honor, it's obvious that defense

13    counsel hasn't even figured out which of the board members they

14    would call.  I would just note, this has come up in almost all

15    of my trials, but one of the things that can happen in pretty

16    short order is, if they're going to intend to call all of them,

17    which is sounds like they are at this point, we can get a

18    proffer -- I think the first step is getting a proffer from

19    Mr. Ashley about which of these individuals intends to invoke

20    5, because the biggest waste of time would be for each of them

21    to come up midway through their testimony when we start

22    impeaching them with their misstatements that were made to the

23    NCUA and criminal liability that they may be exposed to that

24    they start invoking 5 in the middle, which they're not allowed

25    to do.

1              THE COURT:  I don't know that that -- does that

2    resolve the conflict issue?

3              MS. CHOI:  It doesn't, but I think --

4              THE COURT:  Doesn't that come first before we get

5    representations from Mr. Ashley as to whether they're going to

6    invoke the 5th.

7              MS. CHOI:  It does.  I presume it does.  I think,

8    though, just as a -- I think that your Honor is right about

9    that.  As a pragmatic matter, though, it seems to me that if

10   they're going to invoke 5 and not testify, I don't see what

11   the -- I mean, I guess --

12             THE COURT:  How do they get to that decision with

13   conflicted counsel?

14             MS. CHOI:  I agree.  The pragmatic course may be to

15   just appoint them separate counsel, or at least deal with the

16   conflict of interest issue first.  So I don't know if you want

17   to -- how exactly you want to explore that issue.  We can give

18   you our interpretation of why we think there are conflicts

19   afoot.

20             I think a lot of them had been spelled out in our

21   previous -- in our previous submission, but really, I think

22   this is a -- these are questions that need to be directed to

23   Mr. Ashley, if your Honor has specific concerns that relate to

24   this issue, and an informed consent, or at least a Curcio type

25   situation, either with each of those witnesses being given

1   separate counsel if they are intending to testify on behalf of

2   Mr. Gross, and then your Honor ensuring that that in fact --

3   that they understand their rights, they understand that they

4   may be exposing themselves in this particular way, but

5   nevertheless, to make sure that they understand that risk when

6   taking the stand for Mr. Gross.

7        THE COURT:  Well, flesh it out a little bit more.

8   When?  How?  Where?

9        MS. CHOI:  If your Honor has time, we can do it on

10  Friday.  We don't know which witnesses they want.  They have

11  just given us all the board members, so have all the board

12  members show up, your Honor, on Friday and we can do these

13  conflicts issues.

14       THE COURT:  Yes.

15       MS. CHOI:  I don't know -- I mean, I think that, quite

16  frankly, you know, there's going to be a lot of repetition if

17  they're calling every single board member, so I think the onus

18  should be on defense counsel to figure out which of these

19  individuals they really intend on calling.  But if they're

20  going to call all of them, then we've got to go through this

21  with all of them, or at least the ones that have exposure,

22  which -- and as your Honor has seen, they have now -- it now

23  appears that there have been misstatements made by various

24  board members to the NCUA and to others over the course of the

25  evidence that you've seen, including you know -- and Mr. Blue

1    who is not a board member, who is the former CEO -- so these

2    are issues that are now ripe.

3              THE COURT:  All right.

4              I think, Ms. Santillo, you're not going to have --

5    given this issue, I can't give you the full luxury of time to

6    make these decisions.  We have to resolve this Friday.  So if

7    you want -- seems to me -- you tell me if you have a different

8    proposal or a basis for thinking this is unfair in some way --

9    that given the conflict issue that appears to exist, we have,

10   by representation of the government, a single lawyer who

11   represents HOPE?

12             MS. CHOI:  The cathedral, your Honor.

13             THE COURT:  The cathedral, which already may have

14   entanglements, conflict issues in light of Mr. Gross' potential

15   liability, and that that person, in addition, represents all of

16   these board members in their individual capacity, and that some

17   of them potentially -- and I think it's not inconsistent with

18   the evidence -- some of them could face difficult questions as

19   to whether or not they'll invoke the 5th.  We need to resolve

20   this.

21             I can have standby counsel -- I mean, we need to work

22   on it immediately, but I can have counsel here on Friday, and

23   anyone who is going to be called as a witness, or potentially

24   going to be called as a witness for the defense, I think needs

25   to be here to resolve these issues.

```
 1              MS. SANTILLO:  I could certainly try to make that
 2    happen.  Having not spoken to Mr. Ashley or them about any
 3    scheduling issues or anything like that, I just don't -- I will
 4    do my best to make that happen.
 5              THE COURT:  Okay.  Obviously, we have the charging
 6    conference.  I have a sentencing, I have conferences.  I'm not
 7    sure I can move the sentencing, but I'll look.  I'll move the
 8    other conferences if I have to.  We'll stay as late as we need
 9    to to get it done.  I can't recall what time I said we'd start
10    the charging conference on Friday, but we'll start at 9:00.
11              MS. CHOI:  9:00.
12              MR. CREIZMAN:  Your Honor, if I may.  If we could do
13    the charging conference at 10:00, or just after, whatever --
14              THE COURT:  This is not going to be resolved in an
15    hour.
16              MR. CREIZMAN:  No, but I'll be -- I have to be before
17    Judge Engelmayer again on a different case, so that's all that
18    it was.
19              THE COURT:  On Friday at 9:00.
20              MR. CREIZMAN:  Friday at 9:00.  It was -- I mean, I
21    can -- it's been scheduled for ages, for months.
22              MS. CHOI:  Your Honor, may I --
23              THE COURT:  So are the eight conferences I'm going to
24    move to make this happen.
25              MR. CREIZMAN:  I can have someone cover it.
```

1            THE COURT:  Great.

2            MR. CREIZMAN:  That's what I'm going to do.  Yeah.

3            MS. CHOI:  I was just going to make a suggestion,

4    which obviously you're free to reject it, but given it's going

5    to require some logistics, if your Honor's intention is to have

6    everyone get separate counsel on the CJA panel --

7            THE COURT:  I don't have an intention here, I'm

8    listening to your representations and your suggestions --

9            MS. CHOI:  Yes.

10            THE COURT:  -- which I appreciate.  All I want to do

11    is make sure that we're using the time that we have --

12            MS. CHOI:  Right.

13            THE COURT:  -- to resolve these issues in advance of

14    next week.

15            MS. CHOI:  This is what I was trying to suggest, your

16    Honor, is there is going to be -- as you recall at the

17    beginning of this trial, there is some time that needs to

18    happen with CJA counsel to get familiar -- if we go down this

19    road -- for CJA counsel to get familiar with the circumstances

20    and their individual -- and the individual person they are

21    going to speak to about these questions, that it may make sense

22    to do it sort of piecemeal in the sense that we can figure out

23    how we're going to deal with this, get people appointed

24    counsel, have them deal with it, we can deal with our charging

25    conference, and then come back and deal with the conflict issue

1    so that at that point they've all had an opportunity to speak

2    with their clients.  And obviously, we'll work with Ms. Nuñez

3    to make sure we get a list of people who are still on the CJA

4    panel that are not otherwise conflicted from this case, just so

5    we have it as backup, and we can give them a heads up, or your

6    Honor's chambers can give them a heads up that we may need to

7    call them in on Friday and figure out who's available that way.

8         I foresee that there needs -- that it may speed things

9    along if we can understand that there will be a chunk of time

10   during which they're going to have -- that they may have to

11   consult with these new clients of theirs and be brought up to

12   speed as to what the precise contours of the potential

13   conflicts are, especially with regard to the fact that a lot of

14   them do not know the evidence and why particular individuals

15   may be exposed.  That's going to take some time, and so I just

16   want to figure out if there's some way for us to be able to

17   help that along and streamline the situation.

18        I mean, I think step one is Ms. Santillo should figure

19   out if it's, in fact, the whole board or just some of the board

20   that she wants to call, but if that can happen before Friday,

21   and then we can -- understanding that the potential witnesses

22   be brought here or dealt with in that manner, then we can sort

23   of try to streamline the process in this fashion.

24        MS. SANTILLO:  Your Honor, I think it's also helpful

25   to figure out who they are saying has criminal exposure,

1    because at various times they said these are all going to be

2    their witnesses, and now all of a sudden they need lawyers.  So

3    I'd like to know who they're saying has criminal exposure here

4    so I can get a sense of how -- the logistics of getting these

5    people to court.

6                MS. CHOI:  Your Honor --

7                MS. SANTILLO:  I don't quite --

8                MS. CHOI:  -- at this point, I think we had

9    represented that the Wyatts would potentially not be exposed,

10   but I think given the evidence as its come in, it appears that

11   there are representations that were made by Mr. Wyatt to the

12   NCUA, both in letter and in oral form, which we obviously

13   learned of while we were prepping for the trial and during

14   trial, as well as the misrepresentations in the board minutes

15   where there is testimony that's in that says that the board

16   minutes were not accurate, each of those are certified by

17   Delores Wyatt.

18               The only one that we don't think at this point has any

19   exposure is DeSilva because, again, he didn't know anything

20   about his -- he has consistently said he doesn't know anything

21   about any of these donations, and we don't have any reason to

22   believe he was involved in any of the misrepresentations that

23   occurred to the NCUA.

24               THE COURT:  All right.  Well, now you have that,

25   Ms. Santillo.

1              MS. CHOI:  Your Honor, I just want to note that the

2      fact that Ms. Santillo wrote the selective immunization motion

3      in the first instance was a recognition of the fact that there

4      was this problem.  I want to make clear that this is the

5      government's position, and it's a good faith -- we have a

6      good faith basis for it.

7              THE COURT:  The selective immunization issue isn't

8      present because you're not immunizing anyone.

9              MS. CHOI:  Correct, your Honor.

10              THE COURT:  So that has gone away, and the only

11      question that remains is who does the defense wish to call, and

12      how does the Court ensure, in light of the conflict issue

13      that's been raised, that resources are available so that those

14      witnesses can potentially make informed decisions.

15              MS. CHOI:  I agree, your Honor.  I brought up the

16      motion simply to make the point that I think even defense

17      counsel agrees that there are actual serious Fifth Amendment

18      concerns that are afoot, otherwise, there would be no need for

19      her to even make the motion.

20              THE COURT:  We don't need to get into that debate.

21              I know what your answer is.

22              MS. SANTILLO:  Yes.  I would like to clarify whether

23      Loretta Larkins falls on this list.

24              MS. CHOI:  Yes, your Honor.

25              THE COURT:  So there are two, there's B Larkins and L.

1              MS. SANTILLO:  Who has no involvement with the credit

2    union whatsoever.

3              MS. CHOI:  Correct.

4              THE COURT:  You said Loretta.

5              MS. CHOI:  Oh, no.  Sorry, I'm getting confused.

6    Bernard Larkins.  Loretta Larkins is not a board member.

7              THE COURT:  All right.  So it's hard to know which

8    foot steps forward first.  I think it has to be the first

9    question -- well, if there are potential witnesses from the

10   Board, Ms. Santillo, who the defense may call, unless there's

11   some deep disagreement about this lurking conflict issue, I

12   think the best process forward is to have any of those people

13   present on Friday with CJA counsel available for them to speak

14   to so we know they'll have that opportunity and we can know

15   realistically who can be called next week.

16             MS. SANTILLO:  Yes, your Honor.  I mean, I don't know

17   who it makes sense to have contact Mr. Ashley about this,

18   but --

19             MS. CHOI:  Defense.

20             MS. SANTILLO:  -- we can call Mr. Ashley, and he's

21   their lawyer so --

22             THE COURT:  You have to call him to speak to these

23   people, which I presume you would do as you make your decision

24   about who to call.

25             MS. SANTILLO:  Yes.  I just can't represent his

1    availability or the logistics at this moment, though, as I have

2    stated I will do everything I can to try.

3         THE COURT:  Well, no.  I hear that, and I appreciate

4    it.  It's a necessity at this point, but I think still to be

5    determined is exactly how this gets operationalized.

6         MS. CHOI:  May I make a suggestion, your Honor?

7         THE COURT:  Go ahead.

8         MS. CHOI:  To the extent Ms. Santillo can identify to

9    us and the Court on Thursday who the individuals are that they

10   in fact intend or want to call for this practice, the

11   government can make sure -- whatever CJA counsel is available,

12   we can tell them specifically with regard to their client what

13   we think the exposure is, what statements were relevant to

14   them, et cetera, to give them context.  I think that's the most

15   streamlined approach to doing this, because each of them sit

16   separately and differently given their statements to us, given

17   their involvement with Mr. Gross, and given the documents that

18   have been -- obviously, subset of which -- but the documents

19   that have been entered into evidence to date, and we're happy

20   to help with that process.

21        THE COURT:  What I'll ask Ms. Nuñez to do is,

22   beginning tomorrow morning, work on getting five, six CJA

23   lawyers, seven?  You tell me.

24        MS. SANTILLO:  George Wyatt, Delores Wyatt, Charles

25   Blue, Joe Lane, and Bernard Larkins.  Five.

```
 1              THE COURT:  Actually, Ms. Nuñez is out tomorrow so we
 2    need to use the to go through Tracy Miller.
 3              MS. CHOI:  Sorry, we need to go through --
 4              THE COURT:  Tracy Miller, the CJA.
 5              MS. CHOI:  I don't think I've ever dealt with her.
 6    Tracy Miller.  So we'll contact the CJA office.
 7              THE COURT:  Right.  Ms. Nuñez will give you the
 8    contact info.
 9              MS. CHOI:  What should we tell them about -- we should
10    ask for CJA counsel that's available all day Friday, I think.
11              THE COURT:  I think we need -- sounds like we need a
12    half dozen, at least.
13              MS. CHOI:  Yes.  And I'll make sure that we go down
14    the list with Ms. Miller because there are lots of people
15    involved in this case, and the other case, and everything else,
16    that we get non-conflicted counsel.
17              THE COURT:  That process of getting hopefully up to
18    six or so, seven --
19              MS. CHOI:  Would you like seven, your Honor?  If you
20    say seven, I'll get you seven.
21              THE COURT:  Seven.
22              MS. CHOI:  All right.  The Court has ordered seven,
23    we'll get seven.
24              THE COURT:  So that non-conflicted CJA counsel who are
25    available Friday to potentially consult with witnesses,
```

1    potential witnesses, and then while that's happening,

2    Ms. Santillo, you'll reach out to Mr. Ashley, let him know

3    obviously that you're intending, or at least considering

4    calling some or all of these board members that the government

5    has raised a conflict concern in light of his representation of

6    multiple board members, as well as HOPE Credit Union, and that

7    the Court, in an abundance of caution, is going to want to

8    resolve this issue as to who might testify, and make sure that

9    they have non-conflicted counsel available to them should they

10   seek independent counsel, and then that the Court's requiring

11   this be resolved on Friday.

12             MS. SANTILLO:  Okay.  Will do.

13             THE COURT:  All right.

14             MS. CHOI:  Yes.  And your Honor, just to -- I mean,

15   obviously, this is a lot, but just to be clear, that we would

16   also get sort of clarity about the rest of the defense case

17   from Ms. Santillo on Friday.

18             THE COURT:  And the rest of the defense -- yes.  I

19   mean, I'm moving -- that deadline remains Friday.  And as

20   you've heard, to the extent we can get at least some

21   preliminary resolution of the board witness issues on Friday,

22   we can.

23             Ms. Santillo, any requests or concerns, other than the

24   logistic issues about the process that's been proposed?

25             MS. SANTILLO:  I mean, except for the concerns that

1    I've raised that these were their witnesses as of yesterday,

2    and all of a sudden they have criminal exposure --

3        THE COURT:  It's not all of a sudden, this is the

4    issue you briefed in your immunity motion.

5        MS. SANTILLO:  -- all of a sudden people have moved to

6    the other side, these were people the government was going to

7    call.

8        THE COURT:  But they're for what?  They shouldn't have

9    lawyers or what?  What's --

10        MS. SANTILLO:  No.  I understand the conflict process.

11    I'm going to work hard to do it.

12        THE COURT:  As I sit here, this is not, in my

13    perception, manipulative or a tactic of the government.  You

14    disagree?

15        MS. SANTILLO:  If your Honor has made that

16    conclusion --

17        THE COURT:  Well, all I can do is sit here and watch

18    as it occurs.  But if you have an application or some request

19    to proceed differently, you have to say so.  I'm trying to

20    resolve this so that this trial can proceed.

21        MS. SANTILLO:  I understand.  And I will reach out to

22    Mr. Ashley and try to work with him on a process to get people

23    here so that they can resolve these conflicts.

24        THE COURT:  All right, thank you.

25        In terms of what remains of the government's case, I

1    mean, I don't know about Terry Adams, but the others are short

2    witnesses with the exception of the summary witness, right?

3            MS. CHOI:  I hope so.  Your Honor, we're trying to

4    trim this down as much as possible, but yes.  We want them to

5    be as short as possible.

6            THE COURT:  All right.

7            MS. CHOI:  We think we are going to be done on

8    Tuesday.  We will make it short.

9            THE COURT:  My hope is, yeah, you're going to be done

10   on Tuesday.  No, I'm serious.

11           MS. CHOI:  I will say the only --

12           THE COURT:  The summary witness, you know, there are

13   variations of what that looks like, right?

14           MS. CHOI:  We'll cut down what we were going to put in

15   through him to make sure that it's the points that we need to

16   get through.  I think, assuming that there isn't extensive

17   cross, that the other witnesses will be very, very quick.

18           THE COURT:  Including the NCUA.

19           MS. CHOI:  Yes, your Honor.  Because, as you can tell,

20   we've cut the NCUA witnesses down to just small snippets of

21   Mr. Gross' misrepresentations as they come up.

22           THE COURT:  Right.  Okay.  So, I mean, I don't see

23   why -- we should get to the summary witness on Monday, it would

24   seem.

25           MS. CHOI:  We're going to try, your Honor.  You know,

1    the logistics of just getting the bodies up here, I don't know

2    how long the cross goes.  I think that if the crosses are as

3    short as we would expect them to be, and these are -- to be

4    clear, they're more witnesses that are affiliated with

5    Mr. Lebedev than they are with Mr. Gross -- but with regard to

6    those bank and wire fraud related witnesses, I can't imagine

7    their testimony is particularly controversial, so I'm hoping

8    that we'll be able to whiz right through them.

9          There will have to be -- I will place your Honor on

10   notice that there has to be some publishing of documents that

11   are already in evidence but have not been shown to the jury to

12   place in the context what the bank fraud allegations are with

13   regard to Mr. Lebedev, but we have streamlined that so it's

14   only, you know, a small subset of the evidence against

15   Mr. Lebedev to give context to why we're calling these

16   witnesses on the payment processing side.

17         THE COURT:  All right.  Well, we need to end now, but

18   I do think we need to -- obviously, we've got to, A, keep

19   moving, and B, folks need to make the proposal as to -- which

20   we can take up on Friday -- as to what I should tell the jury

21   come Monday.

22         MS. CHOI:  Understood, your Honor.

23         THE COURT:  Because they need to make plans.  I mean,

24   they have no expectation that they'll be here past Friday, so

25   if that's an impending reality, then we need to deal with that.

1    So we'll take that up on Friday.

2              Anything else?

3              I'll see you at 9:00 on Friday.

4              (Adjourned to March 3, 2017 at 9:00 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           INDEX OF EXAMINATION

2    Examination of:                                    Page

3    ROBYN GUYER

4    Direct By Mr. Shin . . . . . . . . . . . . . .2365
     Cross By Mr. Creizman  . . . . . . . . . . . .2394
5    Cross By Ms. Santillo  . . . . . . . . . . . .2395
     Redirect By Mr. Shin . . . . . . . . . . . . .2413
6    Recross By Ms. Santillo  . . . . . . . . . . .2416

7    MAGDALENA FLOK

8    Direct By Mr. Noble  . . . . . . . . . . . . .2442
     Cross By Ms. Santillo  . . . . . . . . . . . .2517
9    Redirect By Mr. Noble  . . . . . . . . . . . .2545
     Recross By Ms. Santillo  . . . . . . . . . . .2550

10   STEVEN VALENTINE

11   Direct By Mr. Shin . . . . . . . . . . . . . .2552
12   Cross By Ms. Santillo  . . . . . . . . . . . .2566

13   BRIAN McDONOUGH

14   Direct By Mr. Noble  . . . . . . . . . . . . .2574
     Cross By Ms. Madrigal  . . . . . . . . . . . .2599
15   Cross By Ms. Santillo  . . . . . . . . . . . .2602

16                         GOVERNMENT EXHIBITS

17   Exhibit No.                                   Received

18   807, 2300, 2301, 2302, 2303, 2304,  . . . . .2363
         2305, 3559, and 3704
19   717-A, 717-B, 1290-A, 1290-B, 1665, . . . . .2417
         3025, 3555 through 3558, 3560,
20       3561, 3563 through 3567,
         3568-B, 3571, and 3572
21   4005   . . . . . . . . . . . . . . . . . . . .2441

22   6152   . . . . . . . . . . . . . . . . . . . .2447

23   6024   . . . . . . . . . . . . . . . . . . . .2458

24   6025   . . . . . . . . . . . . . . . . . . . .2468

25   6026   . . . . . . . . . . . . . . . . . . . .2489

1   6028    . . . . . . . . . . . . . . . . . .2495

2   9   . . . . . . . . . . . . . . . . . . . .2501

3   6044    . . . . . . . . . . . . . . . . . .2507

4   2310, 2311, 2312, 3570, and 3744   . . . . .2551
    6021, 6022, and 6045 through 6049   . . . . .2577

5

6                      DEFENDANT EXHIBITS

7   Exhibit No.                           Received

8   TG15    . . . . . . . . . . . . . . . . .2396

9   TG17    . . . . . . . . . . . . . . . . .2418

10  TG19    . . . . . . . . . . . . . . . . .2568

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25