H33KLEB1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        15 Cr. 769 (AJN)

5   YURI LEBEDEV and TREVON GROSS,

6              Defendants.              Jury Trial

7   ------------------------------x

8                                       New York, N.Y.
                                        March 3, 2017
9                                       9:10 a.m.

10
    Before:
11
                   HON. ALISON J. NATHAN,
12
                                        District Judge
13                                      And A Jury

14                       APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    BY:  EUN YOUNG CHOI
17       DANIEL S. NOBLE
         WON S. SHIN
18       MICHAEL CHANG-FRIEDEN, Paralegal
         EMILY GRANT, Paralegal
19       Assistant United States Attorneys

20  CREIZMAN, PLLC
         Attorneys for Defendant Yuri Lebedev
21  BY:  ERIC M. CREIZMAN
         MELISSA MADRIGAL
22       JONATHAN MICHAELSON, Paralegal

23  KROVATIN KLINGEMAN, LLC
         Attorneys for Defendant Trevon Gross
24  BY:  KRISTEN M. SANTILLO
    BY:  HENRY E. KLINGEMAN

25

1          (In open court; jury not present)

2          THE COURT:  Good morning, everyone.

3          We'll do the charging conference.  If we're not done

4     by 10:00, we'll interrupt to deal, as we need to, with -- I

5     believe things stand at two witnesses, two potential defense

6     witnesses, who will be here to work through the representation

7     and potential conflicts issues.

8          Any updates on that?

9          MS. SANTILLO:  Yes, your Honor.  We are not going to

10    have any witnesses here, I just learned.

11         THE COURT:  Okay.  Then we can let the CJA lawyers

12    know that they're not needed.  They're not coming at all today?

13         MS. SANTILLO:  No, they're not.

14         THE COURT:  So none of the folks that this issue has

15    implicated will be testifying?

16         MS. SANTILLO:  That's correct, your Honor.

17         THE COURT:  All right.  Thank you for that update.  We

18    will relieve the CJA lawyers of appearing in court.

19         MS. CHOI:  Your Honor, can I just ask -- I'm sorry --

20    just for clarity, was that both Mr. Larkins and Mrs. Larkins

21    are not going to testify on behalf of Mr. Gross?

22         MS. SANTILLO:  No, Mrs. Larkins will be testifying.  I

23    was informed by the government that she had no issues.

24         MS. CHOI:  Well, your Honor, I think in an abundance

25    of caution, I think that you had indicated that you thought

H33KLEB1

| | |
|---|---|
| 1 | that it may make sense for even Mrs. Larkins to have the |
| 2 | inquiry, because if I -- |
| 3 | THE COURT:  Well, let me just start with one basic |
| 4 | question.  Is she represented by Mr. Ashley? |
| 5 | MS. CHOI:  Yes, she is. |
| 6 | THE COURT:  So, I think in my mind, it raises the |
| 7 | concern that was discussed on Wednesday as to whether there is |
| 8 | a conflict between Hope Cathedral, the entity that Mr. Ashley |
| 9 | represents -- |
| 10 | MS. CHOI:  Yes. |
| 11 | THE COURT:  -- and this witness. |
| 12 | MS. CHOI:  And for clarity, your Honor, this witness |
| 13 | is the director of finances at the church, so it does raise |
| 14 | particular concerns.  We'd just also note, she's the one who -- |
| 15 | it's our understanding she's the one who answered a trial |
| 16 | subpoena that we had regarding the finances of the church. |
| 17 | Defense counsel has represented she is the one who would know |
| 18 | the most about it, so she is differently situated than most, I |
| 19 | think, board members, who may be members of the church or may |
| 20 | attend the church from time to time.  What she does at the |
| 21 | church is inextricably intertwined with the finances, which is |
| 22 | the real crux of the conflict at issue. |
| 23 | THE COURT:  I think the question, then, is whether -- |
| 24 | Ms. Santillo, I think this still implicates the conflict issue, |
| 25 | at least as we discussed when we were last here. |

1          MS. SANTILLO:  Your Honor, I had specifically asked

2     which witnesses we thought were problematic, and I

3     understand --

4          THE COURT:  Well, just a moment.  Just a moment.

5     Let's use precision.  I think it's important.  What I had

6     understood was who had some potential criminal liability.  I

7     don't understand -- I think the government did say that they

8     had no reason to think that Ms. Larkins faces any potential

9     criminal liability.  Correct?

10         MS. CHOI:  Sorry?

11         THE COURT:  You had made that representation here?

12         MS. CHOI:  With regard to the charged conduct, yes.

13    Obviously -- she wasn't on the board with regard to HOPE FCU,

14    so it's not our understanding that she was involved in the

15    misrepresentations to the NCUA and the like.

16         We would caveat -- because we have been thinking

17    through these issues as they evolve -- your Honor, the

18    government will be putting in its case in chief evidence of the

19    taxes that Mr. Gross had paid or not paid in this matter.  It's

20    our understanding Ms. Larkins is involved in, for example,

21    making sure that W-2s are issued, making sure that they are

22    reporting the salary that is due to Mr. Gross.  I don't know,

23    sitting here today, whether or not she is aware of these facts,

24    about whether or not -- whether or not she is aware of certain

25    other money that Mr. Gross paid himself out of the coffers of

H33KLEB1

1    the church, and whether or not she's aware of precisely how

2    that gets reported to the IRS, but our understanding is that

3    she is involved.  And so as we're thinking about this, that is

4    one thing that we're just not sure about, but with regard to

5    the charged conduct in the case, we don't have any reason to

6    believe that she is implicated.

7         THE COURT:  So I think the question remains, based on

8    the issue raised last we were here, as to whether Mr. Ashley's

9    representation of Hope Cathedral and the potential

10   implications, financial and otherwise, to Hope Cathedral, if

11   Mr. Gross is convicted, raises a conflict question with respect

12   to Mr. Ashley's representation of that witness for purposes of

13   testimony at his trial.

14        MS. SANTILLO:  Well, I think that that could probably

15   be cured by having a CJA lawyer appointed for Ms. Larkins, who

16   can -- I think she would be perfectly -- I don't think

17   Mr. Ashley is going to take the position that he should

18   represent her as a witness at trial.  I don't think she would

19   take that position, and I think if a CJA lawyer was appointed

20   for her, and whom she could consult with on the phone, and make

21   that CJA attorney available to her for consultation, I think

22   that would be fine.

23        THE COURT:  Okay.

24        MS. SANTILLO:  However --

25        THE COURT:  Well, before -- are you moving into a

H33KLEB1

1    different point, or is it the same point?

2           MS. SANTILLO:  Well, I want to address some of the

3    things the government just said, but to resolve this issue, we

4    can stay focused.

5           THE COURT:  Okay.  Well, obviously, I wanted these

6    potential witnesses here.  I guess Ms. Larkins is just in a

7    different category, so there is some ambiguity.  But I think

8    the way forward is to have the number one CJA lawyer who had

9    been identified as available informed that he will likely be

10   representing Ms. Larkins as a potential witness in her capacity

11   as a witness here, and then get that attorney in touch with

12   Ms. Larkins and get that attorney the information that he or

13   she needs to prepare for those considerations.

14          MS. CHOI:  Yes, your Honor.  I just want to be totally

15   transparent about what happened yesterday with regard to the

16   two CJA attorneys.  The first person in line was Mr. Neuman,

17   the second person in line was Mr. Lee.  That's James Neuman and

18   Winston Lee, for the record.

19          Because we thought Mr. Larkins and Mrs. Larkins were

20   both showing up, we provided -- because, I don't know, maybe

21   alphabetical in my own mind, we said that Mr. Neuman, who is

22   the first CJA counsel, we sent him the 3500 with regard to

23   Mr. Larkins, not Mrs. Larkins.

24          THE COURT:  All right.

25          MS. CHOI:  It's up to your Honor.  I think --

H33KLEB1

1          THE COURT:  That's fine.  I just wanted it to be --

2          MS. CHOI:  Yes, right.  So that's how it was, and so I

3     guess the question just becomes since Mr. Neuman is still

4     number one, if you want Mr. Neuman to be the person who talks

5     to Ms. Larkins or if you want Mr. Lee to be the one talking to

6     Ms. Larkins.

7          THE COURT:  Was either of the two identified for

8     Mrs. Larkins yesterday?

9          MS. CHOI:  No, Mrs. Larkins does not know about either

10    of them.  They were to meet their witnesses this morning.  So,

11    Mr. Neuman has familiarity, he read the documents that we've

12    sent him.  He's also read Mr. Larkins' 3500.  And on the

13    conversation with them, we explained the issues that may

14    implicate both of them, including, for example --

15         THE COURT:  Well, then he shouldn't be appointed to

16    represent Mrs. Larkins.

17         MS. CHOI:  Right.  So then I think that it should be

18    Mr. Lee.  I just wanted to make sure that that was all clear.

19         THE COURT:  All right.  So I'll ask Ms. Nunez to let

20    Mr. Lee -- it's Wilson Lee?

21         MS. CHOI:  Yes, your Honor.

22         THE COURT:  -- know that he will be representing

23    Mrs. Larkins -- potentially taking on the representation of

24    Mrs. Larkins for purpose of her witness testimony in this

25    proceeding.

H33KLEB1

1          MS. CHOI:  Yes, your Honor.  And I don't mean to

2     overly complicate these things, but I just want to alert your

3     Honor that the CJA affidavit, we don't know -- she hasn't

4     filled it out yet.  These people are, you know, of well means.

5     It's obviously up to your Honor's discretion.  We have no

6     issue.  I just wanted to flag that.

7          THE COURT:  No, I will need to evaluate eligibility.

8     But in any event, we're going forward.

9          MS. CHOI:  Yes, your Honor.

10          THE COURT:  All right.  I think the only frustration

11     is that she's not here, which is what we'd anticipated.  When

12     we break from this conference, I'm going to ask -- Ms. Nunez

13     will let Mr. Lee know, but then I will ask the government to

14     provide the relevant information.  Do you have anything?

15          MS. CHOI:  Yes, your Honor.  We'll produce a 3500 for

16     Mrs. Larkins that we have, just so he has a fulsome

17     understanding of what's going on.  He already had the

18     background information with regard to the motions and the

19     issues that have been implicated.

20          THE COURT:  And then, Ms. Santillo, I guess just for

21     my own understanding, why isn't Mrs. Larkins here?

22          MS. SANTILLO:  I thought they were coming as of five

23     minutes ago, or as of right before court, I thought Bernard and

24     Mrs. Larkins were both coming.  He called me and told me that

25     he was not coming.  I have not spoken directly with her, but as

1    I understood it, she has -- and I actually need to confirm a

2    hundred percent, but because she didn't believe that there

3    was -- I guess we conflated this conflict issue and this issue

4    with the criminal exposure, and so if that was a

5    misunderstanding of the order, then my apologies.

6              THE COURT:  Okay.  But then to the extent -- I guess I

7    need both counsel, the government and counsel for Mr. Gross, to

8    get Mr. Lee the information that he needs to be able to work

9    today, over the phone or otherwise meeting, to help advise

10   Ms. Larkins as she goes forward in --

11             MS. CHOI:  Yes, your Honor, we can get the 3500 from

12   the government to Mr. Lee.  I just note, again, obviously, we

13   don't -- with regard to certain of the witnesses, we did

14   receive reverse Jencks in anticipation or in relation to that

15   motion.  We don't have the notes that Ms. Santillo might have,

16   and I think they may be relevant to this.  Also, at some point

17   today, we anticipate getting that stuff from defense counsel

18   with regard to all the witnesses they intend to call, as they

19   had previously agreed.

20             THE COURT:  Okay.  Let's turn to the charging

21   conference, but when we close today, the one instruction will

22   be to have Mr. Lee and Ms. Larkins connected and Mr. Lee with

23   whatever information he needs from the government in terms of

24   background for Ms. Santillo, in terms of what's anticipated for

25   testimony, so that Mr. Lee can have the information he needs

1    and quickly get up to speed.  Assuming independent counsel

2    representation, there is no need for any type of Curcio

3    proceeding.  The only remaining formality is getting the

4    financial affidavit from Ms. Larkins, so that I can assure

5    myself that she qualifies for appointment of counsel from the

6    Criminal Justice Act.  And then, obviously, if not, she's on

7    her own in terms of representation.  From the Court's

8    perspective, the only thing that would complicate the matter is

9    if she were to somehow return to Mr. Ashley for representation,

10   that would implicate the conflict issue, and I would need to do

11   some form of Curcio proceeding and have a CJA lawyer there,

12   et cetera.

13           So, for all of the reasons that we have discussed and

14   I have indicated in my order, I just want those eventualities

15   worked out now, today, rather than next week.

16           MS. CHOI:  Yes, your Honor.

17           THE COURT:  Thank you.

18           MS. SANTILLO:  Yes, your Honor.

19           THE COURT:  Go ahead.  You wanted to raise something?

20           MS. SANTILLO:  Yes.  I understand that Mr. Creizman

21   has a timing issue, so if we want to proceed to the charge

22   conference, I'll raise those issues afterward.

23           THE COURT:  All right.

24           MR. CREIZMAN:  I apologize to the Court for my

25   tardiness.

H33KLEB1

1          THE COURT:  We've grown accustomed.

2          MS. MADRIGAL:  I will vouch for Mr. Creizman on this

3     one occasion, it's actually not his fault.  I don't usually do

4     that.

5          MR. CREIZMAN:  Thank you.

6          THE COURT:  But, Ms. Madrigal, I've noticed you're

7     always here on time, so we're in good stead.

8          There are obviously a number of issues that came in

9     last night.  I have started consuming some of it.  I think some

10    of it may require counterbriefing before resolution.  The first

11    order of business will be the charging conference, and then, to

12    the extent I am able to take up any of the additional issues

13    that are on the table, I will, and, if not, I'll get briefing

14    and resolve those as soon as I've heard from both parties.

15         Mr. Creizman, I recognize you have a 10:45.  I don't

16    know if we'll be done.  So sort that as you see fit.

17         Let's turn to the charging conference.  You have my

18    draft charge, which was sent to you via ECF on March 2nd,

19    yesterday.  And as I indicated, what I'd like to do is, I'll

20    just ask what page the first issue that anyone wants to discuss

21    arises on, and we'll start there.

22         From the government's perspective?

23         MS. CHOI:  Your Honor, two things:  One is that we've

24    sort of all dealt with different legal issues as they've come

25    up over the course of the trial, and so we would just ask that

H33KLEB1

1  if one of the three of us needs to talk about a particular

2  instruction, we be allowed to do so.

3          THE COURT:  Okay.

4          MS. CHOI:  I apologize for that.  I know your rule.

5          THE COURT:  That's fine.  But on any legal issue, one

6  attorney.  That will be the application of my rule to this

7  situation.

8          MS. CHOI:  Okay.

9          The first thing I just wanted to note, which is not

10  really an issue with regard to the charge itself, but obviously

11  is implicated therein, is with regard to instruction number 9,

12  which is a summary of the indictment and the redacted

13  indictment that would go back to the jury.  I have never had to

14  deal with this before.  I have now consulted with Mr. Shin,

15  who's dealt with this before and others.  In the normal

16  course -- it should be up to your Honor how you'd like to do

17  this.  It seems as though the normal practice would be, you

18  take an indictment, a Word version of the indictment, and you

19  essentially rewrite it to eliminate references to other

20  defendants.  In our case, obviously it's a speaking indictment,

21  we would propose leaving in the references to Anthony Murgio

22  and other coconspirators, as they exist there, but eliminating

23  a reference to their being defendants, obviously amending the

24  caption to eliminate reference to Mr. Anthony Murgio --

25          THE COURT:  Let me pause you just to be efficient.

H33KLEB1

The proof is always in the pudding.  So I think the government

should make a specific --

MS. CHOI:  Redaction application.

THE COURT:  -- redaction proposal to defense counsel

and see if they agree.

MS. CHOI:  The one thing I wanted to flag, though,

just for your Honor's consideration is:  If we were to get rid

of the charges that don't implicate the two defendants here,

meaning like Count One and Count Two, that changes the

numbering of all the other counts, which obviously requires

some work on everyone's part to change the charge to make it

reflect the new redacted indictment, which is something I

didn't realize until thinking about this yesterday.

So I don't know if your Honor has a preference one way

or the other on that.  If the idea is to redact reference to

Mr. Murgio, I think the cleanest thing to do might be to

renumber the operative counts, but it is obviously much more

work to do that.  So that's the one thing I wanted to flag.

THE COURT:  I don't have a default view.

MS. CHOI:  Okay.  Then we'll work it out with defense

counsel.

THE COURT:  So, do it and propose it, and, hopefully,

you'll agree.

Just an update.  So Mr. Lee is on his way in, so we'll

have him come in, and I will inform him what we're doing, and

1    when he comes in, you can give him --

2               MR. NOBLE:  Judge, we actually have the 3500 material

3    for Loretta Larkins printed, which we can hand over to Mr. Lee

4    in person when he arrives.

5               THE COURT:  I don't know, Ms. Santillo, if you have

6    someone who can call Ms. Larkins and just -- she should come in

7    and meet with Mr. Lee.

8               MS. SANTILLO:  Your Honor, I think it might be helpful

9    to do the financial affidavit first, because it may be that

10   she's not eligible.

11              THE COURT:  Okay.  Well, she needs to do that, though.

12   So is that underway?

13              MS. SANTILLO:  Pardon?

14              THE COURT:  Is that underway?  Ms. Choi, or

15   Ms. Santillo, has she been provided --

16              MS. CHOI:  Your Honor, I think that the financial

17   affidavits were sent to CJA counsel, so CJA counsel has it.  I

18   don't think -- obviously, he hasn't been in contact with her,

19   so it's not underway from our understanding.

20              THE COURT:  So when he comes in, I'll tell him

21   basically what's going on.  I will ask you to provide

22   Ms. Larkins' contact information to Mr. Lee, so that he can at

23   least get the financial affidavit, and we can see where we are

24   with that and otherwise put him in touch with her for

25   representation purposes.

| | |
|---|---|
| 1 | MS. SANTILLO:  That's fine.  And I'm happy to call |
| 2 | her.  I just didn't know they were not coming until -- |
| 3 | THE COURT:  I understand. |
| 4 | So that's instruction 8, which I notice it should be |
| 5 | on a separate page, so my law clerk is going to track changes |
| 6 | to the draft charge.  On page 12, instruction number 8 is -- |
| 7 | for some reason, there should be a page break there. |
| 8 | Is there anything before page 12? |
| 9 | MR. CREIZMAN:  Yes. |
| 10 | THE COURT:  Go ahead, Mr. Creizman.  What page? |
| 11 | MR. CREIZMAN:  Page 5.  And it's lines 10 to 11. |
| 12 | THE COURT:  Pull up the microphone, please. |
| 13 | MR. CREIZMAN:  I'm sorry. |
| 14 | It's page 5, instruction number 2, "Role of the Jury," |
| 15 | lines 10 to 11.  I would request that it should say, "You |
| 16 | should bear in mind particularly that questions put to |
| 17 | witnesses, although they provide the context for answers, are |
| 18 | not themselves evidence.  It is only the answers that are |
| 19 | evidence." |
| 20 | THE COURT:  I'm just reading what you said, please. |
| 21 | Ms. Choi? |
| 22 | MS. CHOI:  No objection, your Honor.  That's the law, |
| 23 | so... |
| 24 | THE COURT:  I think I would just amend it to say, |
| 25 | "Although they can provide context." |

H33KLEB1

1              MR. CREIZMAN:  Okay.

2              THE COURT:  So the change we'll make here on page 5,

3         at line 11, the sentence that begins, "You should bear in mind

4         particularly that questions put to witnesses, although they can

5         provide the context for answers, are not themselves evidence.

6         It is only the answers that are evidence."

7              MR. CREIZMAN:  Thank you.

8              THE COURT:  Thank you.

9              Between page 5 and 12?  Don't be sheepish.  I don't

10        mind.

11             MR. CREIZMAN:  I'm sheepish a little on this one, but

12        it's something that I'd like to have in there.  On page 10,

13        instruction number 6, "Presumption of Innocence in the Burden

14        of Proof."  First of all, lines 7 through 9 are probably

15        necessary since we did put in evidence.  So that would be my

16        first request.  And then on line 11 --

17             THE COURT:  So I just want to make sure everyone

18        agrees that 7 through 9 is called for?

19             MS. CHOI:  No objection, your Honor.

20             MR. CREIZMAN:  Then --

21             THE COURT:  Ms. Santillo?

22             MS. SANTILLO:  Yes.  No objection.

23             THE COURT:  So, on line 7, we'll cut the bracket, if

24        necessary, colon and then cut the bracket at the end of line 9.

25             Go ahead, Mr. Creizman.

H33KLEB1

```
 1            MR. CREIZMAN:  Thank you.

 2            And then on line 11, after each of them, just add the

 3     words "into your deliberations."

 4            THE COURT:  "Presumption was with them when the trial

 5     began and remains with each of them into your deliberation"?

 6            MR. CREIZMAN:  Yes, I like saying that in my closing,

 7     if possible.  Not just that, I think it's true, it is the law.

 8            THE COURT:  "Into your," okay, I understand.

 9            Ms. Choi?

10            MS. CHOI:  Your Honor, I think it's just confusing,

11     given that you will give later instructions on how they should

12     deliberate.  It's not necessary.  I understand his point that

13     he wants to make it in closing, but he has other parts of the

14     charge that he can use for that.

15            MR. CREIZMAN:  I will cite authority.  Judge Rakoff,

16     in United States versus Lumiere, which the government should be

17     very excited about --

18            MS. CHOI:  Excited?

19            MR. CREIZMAN:  -- based on the result in that base.

20            MS. CHOI:  Was that your last trial, Mr. Creizman?

21            MR. CREIZMAN:  Yes, it was.

22            MS. CHOI:  Fair enough.

23            THE COURT:  Well, Ms. Santillo, do you have any

24     objection?

25            MS. SANTILLO:  No.
```

H33KLEB1

1          THE COURT:  I'll allow the change.  I think it's

2      correct.  So page 10, line 11, the sentence that begins, "The

3      presumption was with them when the trial began and remains with

4      each of them," insert "into your deliberations."

5          "Into your deliberations"?

6          MR. CREIZMAN:  Or "as you deliberate," something along

7      those lines.

8          THE COURT:  Well, what did you persuade Judge Rakoff

9      to use?

10         MR. CREIZMAN:  I didn't persuade Judge -- Judge Rakoff

11     had his instructions and -- I may have persuaded him on a

12     couple of things, but on that one, it just said "into your

13     deliberations," so I just used that.  In other cases, I think

14     I've seen "as you deliberate in the jury room," something along

15     those lines.  I can look up -- I think I have it on my phone --

16     Judge Oetken's charge in the Danilovich -- or I'm sorry, the

17     Zemlyansky case, and it said something similar.

18         THE COURT:  I think "as you deliberate" is a little

19     clearer, so "The presumption was with them when the trial began

20     and remains with each of them as you deliberate unless and

21     until you are convinced..."

22         MR. CREIZMAN:  Yes.

23         THE COURT:  Between pages 10 and 12?

24         Next page after 12?

25         MS. CHOI:  Your Honor, it's just a minor point, but on

H33KLEB1

1     page 18, I just wanted to flag one thing --

2          THE COURT:  Go ahead.

3          MS. CHOI:  -- for your Honor, which is that with

4     regard to certain of accounts, you do have in the elements the

5     times alleged in the indictment and not with regard to other

6     counts.  You, of course, then also have a separate instruction

7     about times, relevant times, with regard to the charge.  So I

8     just wanted to say, just with regard to consistency, it may

9     make sense to either have them in in all the places or not.

10          THE COURT:  I'm sorry, I'm not tracking.

11          MS. CHOI:  Your Honor, on page 18, you say, "Beyond a

12     reasonable doubt is that at the time of the events alleged in

13     the indictment."  I think with regard to some of the counts,

14     when you describe the counts, you have similar language in

15     there, but not with regard to others.  Like I don't think that

16     it's actually in the conspiracy charge.  And then you have a

17     separate charge with regard to relevant times in the

18     indictment.  So it's a minor point, but just for consistency, I

19     just wanted to flag that, that maybe it makes sense to either

20     have them in each portion of the charge that deals with an

21     independent count or just have that last charge.

22          THE COURT:  All right.  Well, let's leave this one as

23     it is, and then if there are places that you would encourage

24     inclusion for consistency, I'll take that request.

25          MS. CHOI:  Okay.

H33KLEB1

1              MR. NOBLE:  Judge?

2              THE COURT:  Yes.

3              MR. NOBLE:  Back one page, on 17, line 6, just

4    "Lebedev" is misspelled.

5              MR. CREIZMAN:  No objection.

6              THE COURT:  So page 17, line 6, which is instruction

7    number 13, correcting the spelling of "Lebedev."

8              Does defense counsel have anything before page 18?

9              MS. SANTILLO:  Yes, your Honor.  I wanted to raise an

10   issue with respect to page 13, the summary of the indictment.

11   As you are probably aware, last night there were several

12   filings with respect to sort of the scope of the conspiracy

13   that's alleged in the indictment.

14             THE COURT:  Could you pull the mic a little closer?

15             MS. SANTILLO:  Sorry.

16             THE COURT:  That's all right.  Thank you.

17             MS. SANTILLO:  We had several filings with respect to

18   the scope of the conspiracy that's alleged in the indictment,

19   and we think, given the fact that there has been so much

20   testimony about all of these other aspects of the conspiracy,

21   that it would be critical to include within the summary of the

22   indictment the specific conspiracy that has been charged.

23             Obviously, I think that we'll have debate about that

24   with the government, depending on the outcome of the Court's

25   rulings with respect to the motions and instructions that we

1    filed yesterday, but to the extent that we're going to have a

2    summary of the indictment, I think it's critical that whatever

3    resolution we reach should be included in that summary because,

4    otherwise, the objects of the conspiracy are viewed in a

5    vacuum, and I think it invites the jury to convict the

6    defendants based on things that were not charged in the

7    indictment.

8              THE COURT:  All right.  Ms. Choi?

9              MS. CHOI:  Your Honor, this is for Mr. Shin.

10              THE COURT:  Go ahead, Mr. Shin.

11              MR. SHIN:  Your Honor, just on this specific point, I

12    don't think that's necessary, your Honor.  The purpose of this

13    summary, clearly, is just to provide the very barebones

14    charges.  For example, for every other count other than

15    Count Three, there is no factual recitation underlying the

16    charge.  For example, Counts Six, Seven, and Eight just say

17    conspiracy to commit wire fraud and bank fraud, wire fraud,

18    bank fraud.  There's no specific factual recitation that

19    accompanies that, so that's not really the purpose of this

20    summary of the charges as I see it.

21              Maybe this is an appropriate time, also, your Honor:

22    In light of the filings that were made late last night and

23    obviously what's come before, it seems that there are several

24    issues that have been teed up that are all interrelated.  Two

25    of them, I think, are implicated in the charges.  One is the

H33KLEB1

1    withdrawal charge that was requested by the defense and which

2    the Court included over the government's objection.  Two is the

3    multiple conspiracies charge proposed by Mr. Creizman.

4                MR. CREIZMAN:  No.

5                MR. SHIN:  I'm sorry, I misspoke.  I misspoke.

6    Proposed by Defendant Gross.  And then Mr. Creizman's filing

7    late last night regarding a request for instructions on the

8    grounds that the failure to give such instructions would

9    constitute a constructive amendment of the indictment.

10               THE COURT:  Right.

11               MR. SHIN:  It seems to me those are all interrelated,

12   your Honor, and they're also related to the briefing that

13   Ms. Santillo and the government already submitted regarding her

14   request for a limiting instruction on the eCommerce PMA and the

15   post-November evidence.

16               It seems all those are interrelated.  So, what the

17   government would propose is that it may be time, perhaps over

18   the weekend, your Honor, for us to kind of have an all-in

19   briefing on these various interrelated issues because I think

20   it will help your Honor address them all in a consistent

21   sensible fashion, and it will also force the parties to really

22   lay out how those various issues interrelate and set forth our

23   positions on all of them.  Your Honor has only received

24   briefing from the parties on discrete subsets of those

25   interrelated issues, and so the government would suggest that

H33KLEB1

1    the Court defer any further ruling on the withdrawal charge, on

2    the multiple -- the proposed multiple conspiracies charge, and

3    on the constructive amendment claim until the Court has had the

4    opportunity to see briefing by the parties.  Perhaps the

5    parties can make simultaneous submissions by the end of the

6    weekend or something along those lines, given that there is

7    still time to adjust those specific charges, as necessary,

8    before the final instructions are given to the jury.

9              THE COURT:  All right.  I think that would be helpful.

10   I have not more than skimmed the new issues that came in last

11   night.  I had sort of thought that the withdrawal issue was

12   fully briefed, but became aware of the interrelatedness of the

13   new issues, and I think it would be helpful to me to get sort

14   of a single set of briefings from each side that deals with

15   them in an omnibus way.  I accept that suggestion, and we just

16   need the specifics of the proposal.

17             Let me pause for a moment.  I see Mr. Lee has come in.

18   Mr. Lee, thank you for being here.  Mr. Lee, I think what makes

19   sense is for me to just tell you briefly what's going on --

20             MR. LEE:  Yes, your Honor.

21             THE COURT:  -- and then let the lawyers connect you to

22   the potential witness client.

23             MR. LEE:  Yes, your Honor.

24             THE COURT:  The witness, who the defense intends to

25   call -- who, by our most recent information, is likely to be

H33KLEB1

1    called as a defense witness has up to this point been

2    represented by Cedric Ashley.  Mr. Ashley also represents Hope

3    Cathedral, which is the church that one of the defendants in

4    this case, Trevon Gross, is the pastor of, and that he is

5    connected to both that church as well as HOPE FCU, which is the

6    credit union that is at the center of many of the charges here.

7           I think that -- and the government has identified a

8    potential conflict because Mr. Ashley represents the entity,

9    Hope Cathedral, the church, which may face financial or other

10   ramifications if Mr. Gross is convicted, and so there appears

11   to be a conflict between Mr. Ashley's representation of the

12   church and Ms. Larkins, who is the --

13          Counsel, can you remind me of her position?

14          MS. SANTILLO:  She's the treasurer.

15          MS. CHOI:  Yes, she's the director of finances, she's

16   the pastor of finances, I think.  Pastor administration is the

17   way that it's written up.

18          THE COURT:  The pastor of administration at the

19   church?

20          MS. CHOI:  Yes, your Honor.  And in that capacity, for

21   instance, just so Mr. Lee can be aware, she deals with the

22   church's finances, she deals with the tax disclosures that are

23   necessary, and it appears, also, that she signed loan documents

24   on behalf of the church for loans that were taken out from HOPE

25   FCU.  (Continued on next page)

1              THE COURT:  I'll state first, Mr. Lee, I'm not certain

2      that she qualifies for appointment of counsel, so I think step

3      one is putting you in touch with her and I get the financial

4      affidavit information.  She is not here, which had been my hope

5      and expectation, and everyone's hope and expectation.  Counsel

6      for Mr. Gross learned five minutes before this conference began

7      that she wasn't going to be here, but we're still under the

8      impression that she will be testifying on behalf of Mr. Gross.

9      So I'm just trying to sort all of this out in advance of next

10     week when she may be called.

11             I think the next steps are, I've asked counsel, they

12     have materials to give you, further materials to situate you in

13     the case, and then contact information for Ms. Larkins, and I

14     think the first step will be a determination of whether she

15     qualifies for appointment of counsel.

16             MR. LEE:  Okay.

17             THE COURT:  Why don't we just pause.  Since she's not

18     here and we don't know exactly why, why don't I pause here so

19     that the contact information and other materials can be given

20     to Mr. Lee, and he can proceed to be in touch with Ms. Larkins.

21             MS. CHOI:  Yes, your Honor.  I presume Ms. Santillo

22     has her contact information readily available.  The 3500 we

23     have, Ms. Grant is running back to grab it, and we'll bring a

24     copy shortly, so I apologize for the delay.

25             THE COURT:  Go ahead, Ms. Santillo.

1          MS. SANTILLO:  Could I take a three-minute break and

2     tell her this is coming and give him the contact info?

3          THE COURT:  Yes.  Why don't I step down and I'll

4     return in a few minutes.

5          (Recess)

6          THE COURT:  I gather that we have the process of

7     Mr. Lee and Ms. Larkins under way?

8          MS. SANTILLO:  Yes, your Honor.  They're speaking on

9     the phone as we speak.  I think it's likely Ms. Larkins will

10    not qualify for a CJA lawyer and she's exploring further

11    options for counsel.

12         THE COURT:  Great, thank you.

13         Where were we?  Mr. Shin, you proposed bringing these

14    pieces that now seem to need to come together, together through

15    briefing.

16         MR. SHIN:  Yes, your Honor.  The government would

17    anticipate that its brief would address the withdrawal charge.

18    We had objected to it in the joint request of charge that was

19    submitted, but because we had an overall objection to it, we

20    didn't line edit it, so I anticipate that that portion of our

21    brief would lay out our position on the withdrawal charge

22    overall, and if the Court were to give it, propose particular

23    edits to the language, as well.  So this would all be one

24    issue.

25         We would also anticipate addressing the, ultimately,

multiple conspiracies charge that was proposed by Ms. Santillo.
And again, just in the hopes that this is kind of the last
brief on this topic, we'll give our position on it, and also
propose -- put together language if the Court were to decide to
give it.

         And finally, given that we've already addressed the
issues raised by Ms. Santillo and her request for a limiting
instruction, I think your Honor already has that from our
filing at 5:00 p.m. yesterday and Ms. Santillo's response.

         The last topic the government would anticipate
addressing would be Mr. Creizman's argument that his client
should be entitled to certain limiting instructions, and if he
were not given those instructions -- if the Court were not to
give those instructions, it would constitute a constructive
amendment.  So unless I hear other issues raised currently by
Mr. Creizman or Ms. Santillo, I would anticipate that that's
what our brief would address.

         And just in terms of efficiency, the government would
propose simultaneous briefing, let's say by 5:00 on Sunday, so
the Court would have -- I think that would give the Court time
to address -- because I don't think this is something that
needs to be addressed first thing on Monday morning.  The Court
would have it and could address it later in the week if need
be, and then the defendants could also -- I believe to address
those various topics, each of them would also need to address

H33OLEB2

1    some subset of those, and then your Court could have all that

2    in by Sunday.

3        THE COURT:  I think I'll probably push it earlier in

4    the day by Sunday so I have more time to address it, because

5    once Monday morning comes, I'm occupied.

6        MR. SHIN:  Understood, your Honor.  We would just

7    request that the submissions be made simultaneously, given that

8    we filed our response yesterday at 5:00 and --

9        THE COURT:  Yes.  I think everybody sees what the

10    others -- well, anyway, there's no time for anything other than

11    simultaneous.

12        Mr. Creizman.

13        MR. CREIZMAN:  I have no objection to the idea of

14    simultaneous briefing in principle, although we've already laid

15    out our argument.  I guess I can anticipate what the government

16    is going to respond, but that's --

17        THE COURT:  In a way, it just gives you another bite

18    at the apple.

19        MR. CREIZMAN:  That's true.  I'll take that as a hint

20    that you're not totally convinced.

21        And then, in addition, I mean -- but I will note that

22    the constructive amendment argument that we made actually is

23    the same reason we had posed the multiple conspiracies charge

24    that Mr. Gross has proposed.

25        THE COURT:  Yes, right.  That's the interrelation of

the issues, but --

          MR. SHIN:  Right.  And just I would note that I read
Mr. Creizman's letter this morning very quickly, as well, your
Honor, and I think the rationale of one of the limiting
instructions was essentially that a withdrawal argument --
because I believe Mr. Creizman argued that evidence post
November 24th -- or 22nd, 2014, essentially, the argument
you've been hearing from Mr. Gross, it sounded like some
version of that was raised by Mr. Creizman in his letter as a
reason for one of the limiting instructions that he requested.
So again, that just illustrates the interrelatedness of all of
these issues.

          THE COURT:  Right.  Okay.

          Ms. Santillo.

          MS. SANTILLO:  I just want to note two things.  One is
that I join in large part in Mr. Creizman's motion that he
filed last night.  The second is, I just question the
efficiency of the simultaneous briefing on this particular
issue given the fact that the defendants have teed up these
issues, and I just don't even know what the government's going
to say, so it just doesn't make -- to me, I don't know what to
respond to at this point given their representation that
they're going to be trying to challenge multiple things that
we've proposed and tie it altogether and, you know, I'm just
not really sure what I'm responding to.

H33OLEB2

|       |                                                                       |
|-------|-----------------------------------------------------------------------|
| 1     | THE COURT:  That's fair enough.  Why don't we do this.                |
| 2     | Why doesn't the government do its brief by noon on Sunday, and         |
| 3     | then let's say 3:30 or something, response brief by the                |
| 4     | defense.                                                               |
| 5     | MR. CREIZMAN:  That's fine.                                            |
| 6     | THE COURT:  Is that enough time?                                       |
| 7     | MR. CREIZMAN:  Yes.                                                    |
| 8     | THE COURT:  Ms. Santillo?                                              |
| 9     | MS. SANTILLO:  That's fine.                                            |
| 10    | THE COURT:  I mean, do some anticipating, I think, and                 |
| 11    | as you say, in a sense, this is a short opportunity for reply          |
| 12    | now that they're going to respond and take on the issues              |
| 13    | together.  I think that's the best we can do.                          |
| 14    | MR. SHIN:  Thank you, your Honor.                                      |
| 15    | THE COURT:  The other issue that came in, which I                      |
| 16    | think we should just give the government an opportunity to             |
| 17    | respond to -- written if they want, if not then we can take it         |
| 18    | up at the end -- is the request on behalf of Mr. Lebedev for          |
| 19    | information relating to the government's investigation of the          |
| 20    | statement by Agent Beyer to Mr. Freundt.                               |
| 21    | MS. CHOI:  We can take that up orally, your Honor.  I                  |
| 22    | don't think it's going to require additional briefing.  We can        |
| 23    | take it up at the end of the conference.                               |
| 24    | THE COURT:  All right.  I think that's plenty.                         |
| 25    | MR. SHIN:  So your Honor, before I propose this detour                 |

```
1    into these other issues, I think what was on the table was

2    Ms. Santillo's request on page 13.  And so just to close the

3    loop on that, I would just reiterate that the purpose of this

4    page clearly is not to lay out the factual basis for each one

5    of these counts, each of these descriptions appears to simply

6    essentially name the offense kind of in shorthand or --

7              THE COURT:  Would a compromise be to do less rather

8    than more so that, as to Count Three, Lebedev and Gross,

9    charged with conspiracy.  "Conspiracy charged in Count Three

10   has four objects that are described in the indictment," period?

11             MR. SHIN:  That would be acceptable to the government,

12   your Honor.

13             THE COURT:  And that way, I think I heard your

14   concern, Ms. Santillo, that given the additional information

15   about the objects and the potential confusion that that sets

16   into, it's sort of unfair to have added that factual material.

17   That's my compromise.  Is that agreeable?

18             MS. SANTILLO:  That sounds like a good compromise to

19   me, your Honor.

20             THE COURT:  Mr. Creizman?

21             MR. CREIZMAN:  Yes, your Honor.

22             THE COURT:  All right.

23             Page 13 then, instruction 9 beginning on line 7.  The

24   first sentence will remain, and then the second sentence, "The

25   conspiracy charged in Count Three has four objects or goals
```

H33OLEB2

1   that are described in the indictment," period, and then we'll

2   cut the remainder of that paragraph on lines 8 through 11.  All

3   right?

4           Next page.

5           MR. CREIZMAN:  My next page would be 20, but --

6           THE COURT:  Anything before 20?  All right, page 20.

7           MR. CREIZMAN:  Yes, your Honor.  What we request is

8   that the first -- that two sentences in the last paragraph be

9   moved to the end of the first paragraph, basically, and it

10  would go after -- I guess there's one sentence in the first

11  paragraph.  So it would say, "It is not necessary for the

12  government to prove that Trevon Gross" --

13          THE COURT:  I'm sorry.  Can you just point me to the

14  line?

15          MR. CREIZMAN:  Sure.  Line 7.

16          THE COURT:  Page 20?

17          MR. CREIZMAN:  Page 20, instruction number 16.

18          THE COURT:  Okay.  So right now line 7 --

19          MR. CREIZMAN:  Ends with "union".

20          THE COURT:  So you're proposing an addition there that

21  would read -- go ahead.

22          MR. CREIZMAN:  "It is not necessary for the government

23  to prove that Trevon Gross had the authority to perform the

24  acts allegedly sought to be influenced or rewarded.  Nor is

25  it" -- okay.  "Also, if you find that Yuri Lebedev acted with

1    the intent to reward Trevon Gross for a decision already made,

2    it does not matter that the payment was not made or offered

3    until after the decision was made."

4              THE COURT:  Are those lines from somewhere else or --

5              MR. CREIZMAN:  They're adopted from lines 18 through

6    23.

7              THE COURT:  Can we start with the question, before we

8    turn to editing it, so the first suggestion is to take the

9    material on lines 18 to 23 and move it to the first paragraph.

10             MR. CREIZMAN:  That's right.  And with a bit of

11   editing of the language.  Because what I find a bit concerning

12   about the language from 13 to 21 is that it sort of repeats,

13   like "If you find Yuri Lebedev is guilty", "If you find Yuri

14   Lebedev's intent to corruptly influence," it just seems that

15   the way it's worded in that paragraph necessarily is going to

16   have to include that type of language, whereas if you move the

17   language about what the government has to prove and doesn't

18   have to prove to the first paragraph, that seems more

19   appropriate in that context and it's less prejudicial, I think,

20   to Mr. Lebedev.  It's just a sensitivity I have in the way it's

21   worded, so it's easier -- meaning on line --

22             For example, on line 16, it says, "In order to find

23   Yuri Lebedev guilty, the government does not have to prove that

24   Trevon Gross had a corrupt intent" -- I'm sorry -- right -- and

25   so forth.  Whereas it would be easier if we didn't have to say,

"In order to find Yuri Lebedev guilty", we could move it to the
end of the first paragraph, because it seems like what the
government has to prove -- the elements that it has to prove
and doesn't have to prove, and then it would say, "It is not
necessary for the government to prove that Trevon Gross had the
authority to perform the acts allegedly sought to be influenced
or rewarded."

          And then even though -- on line 20, which is -- I'm
sorry.  So actually -- all right.  I guess -- okay.  Sorry.
I'm starting with line 18 through line 23.  Those are the lines
that I'm trying to move up to line 7.

          THE COURT:  Okay.  Let's start with that, and then we
can take on the editing part.

          MR. CREIZMAN:  Okay.

          THE COURT:  Ms. Choi?

          MS. CHOI:  Your Honor, I just think that the way in
which your Honor has proposed -- and I believe it's the way
that the parties originally proposed -- makes sense.  Because
it says very quickly at the top what the third element is, and
then it goes to defining what the specific portion is that's
the crux of the matter, which is the corruptly situation.

          I think the reason why lines 18 through 23 are at the
bottom of that page is because that's sort of a last thought in
the process, and I think moving it to the beginning just causes
confusion with regard to the logic in which this charge, and

1   all other charges relating to this case, lay out what the

2   charge is and what the charge means.

3            And that's putting aside the objections that we would

4   have with regard to Mr. Creizman trying to make the charge --

5   convert the charge from active voice to passive voice in a way

6   to make it more neutral.  This is a charge charging Yuri

7   Lebedev.  It would be confusing if we start going into

8   hypotheticals about who these actors are.  The active voice is

9   the clearest way to do this, not to try to make it passive and

10  confusing to the jury about who the relevant actors are.

11           This is a substantive charge, your Honor.  It needs to

12  be about the defendants' actions.

13           THE COURT:  All right.

14           MR. CREIZMAN:  My concern, though, is that is that you

15  have, starting on line -- I mean, my just concern was that it

16  keeps repeating over and over that "If you find that Yuri

17  Lebedev had the intent to do this, and if you find that Yuri

18  Lebedev had the intent to do this."  I mean, I'm fine -- I

19  guess I don't have -- there are other -- I guess there are

20  other changes that I would make -- that I would propose -- if

21  the Court is inclined to go along with what Ms. Choi proposes,

22  I still have additional changes.  So maybe --

23           THE COURT:  All right.  Well, I do think -- so this

24  came in as a joint proposal originally.  I think I've adopted

25  exactly what was proposed.  I'd be open to some different

1     specific suggestions, but Mr. Creizman, I think what you have

2     thus far suggested would add confusion and not clarity.

3                 MR. CREIZMAN:  Okay.  Then even if we keep the last

4     two sentences as they are --

5                 THE COURT:  Right.

6                 MR. CREIZMAN:  -- here's how I would change lines 13

7     through 18.  "The relevant question for your consideration with

8     respect to Count Four is Yuri Lebedev's intent, not Trevon

9     Gross' intent."  That seems simpler, and I don't know what the

10    need is for "the subsequent actions of Trevon Gross or HOPE

11    Federal Credit Union".

12                And then the next sentence, I would like to take out

13    "in order to find Yuri Lebedev guilty", and just start with

14    "the government does not have to prove that", and then I would

15    be fine with that formulation.

16                THE COURT:  Do you have that specific proposal in

17    mind, Ms. Choi?

18                MS. CHOI:  I mean, sort of.  I think --

19                THE COURT:  I want you to react to the specific

20    proposal, so let me see if I can restate it.

21                MS. CHOI:  Sure.

22                THE COURT:  It's alterations -- so not changing the

23    order as it's currently presented as already rejected by me,

24    but changing lines 13 through 17 to read -- 13 through 18, "The

25    relevant question for your consideration with respect to Count

1    Four is Yuri Lebedev's intent, not Trevon Gross' intent."  And

2    then cutting -- then just say, "In order to find Yuri Lebedev

3    guilty" -- actually, I can't make it out.

4            Why don't you -- I tried to get it from the -- if you

5    could just read straight through, Mr. Creizman, what you

6    propose as a substitute for lines 13 through 18.

7            MR. CREIZMAN:  Sure.  So I would strike "or the

8    subsequent actions of Trevon Gross or HOPE Federal Credit

9    Union".

10           THE COURT:  Let me ask you to just state in completion

11   rather than in sort of editing parlance of how you would like

12   13 to 18 to read.

13           MR. CREIZMAN:  Sure.  Okay.  "The relevant question

14   for your consideration with respect to Count Four is Yuri

15   Lebedev's intent, not Trevon Gross' intent.  The government

16   does not have to prove that Trevon Gross had a corrupt intent,

17   corruptly accepted any payment, or that a payment corruptly

18   influenced any business or transaction of HOPE Federal Credit

19   Union."

20           THE COURT:  And then it would pick up with, "nor is it

21   necessary"?

22           MR. CREIZMAN:  Yes.

23           THE COURT:  Seems okay.

24           What do you think, Ms. Choi?

25           MS. CHOI:  Yes, your Honor, I think that that's fine.

1    The one hesitation I have is, if I could just have a moment,

2    because I wouldn't want this to then -- I would want a parallel

3    instruction with regard to the receipt, I think, because I just

4    haven't thought about that in the abstract.  I think that the

5    point -- I don't think there's anything wrong with the

6    language, I just want to see how it would play out with regard

7    to the other count.

8              THE COURT:  All right.  Why don't we --

9              MR. CREIZMAN:  On that, I think I concur.  And on

10   that, I think we could accomplish that at least with deleting

11   one sentence starting on page 22, line 23, "Even if you find

12   that Yuri Lebedev acted with a corrupt intent, you may not find

13   Trevon Gross guilty unless you find that he also acted with a

14   corrupt intent."  That seems -- I mean, there's no

15   corresponding language in Yuri Lebedev's charge that says,

16   "Even if you find Trevon Gross acted with a corrupt intent, you

17   may not find Yuri Lebedev guilty unless you find that he also

18   acted with a corrupt intent."

19             MS. CHOI:  I think that's my concern, your Honor.  I

20   think the reason the language was the way that it was was so

21   that the jurors are not confused that their conclusion with

22   regard to one defendant on the payment of the bribe means

23   necessarily that the receipt of the bribe is also a conviction.

24   So my concern is just that, if we were to take out that

25   language from 22 and 23, and the reason it was in there was to

1    bring clarity to the fact that these are two separate counts

2    for which they have to make that evaluation independently, I

3    think there may be confusion from the jurors' perspective

4    about, well, if we've already concluded that Mr. Lebedev acted

5    corruptly to pay the bribes, then obviously, Mr. Gross, as the

6    object of the bribe, acted corruptly as well.  So that's why I

7    think that that language is necessary somewhere, either in both

8    places, or at least with regard to where it is presently,

9    because otherwise, I think -- I don't have any problem on its

10   face with the way that Mr. Lebedev has suggested amending page

11   20, but I think if we do that, and also take out that second

12   portion with regard to the receipts object, it will become

13   confusing to the jury.

14            MR. CREIZMAN:  May I just suggest, though, if you look

15   at page 22, lines 21 to 23, there is the sentence that precedes

16   "even if you find" which says, "Here, it is Trevon Gross'

17   intent in accepting the payments that is the relevant question,

18   not the intent of the person or persons offering or making the

19   payments."  So that seems to me to be symmetrical.

20            MS. CHOI:  Symmetry is not the issue, I think it's

21   that that last sentence goes that extra point to really bring

22   home to the jury that those two counts can't be done -- you

23   can't conclude one thing about one count and then necessarily

24   conclude that the recipient of that bribe is also guilty.  I

25   think that's important.

H33OLEB2

1          THE COURT:  So you're arguing that Mr. Creizman's

2     suggestion would prejudice the defendants?  Am I understanding

3     that?

4          MS. CHOI:  I think, yeah, I mean, I think -- it's not,

5     I think, prejudicing the defendants, it's more causing juror

6     confusion.

7          THE COURT:  But the confusion that you're expressing a

8     concern about is that they would sort of automatically conclude

9     the other's guilt from the others?

10          MS. CHOI:  Yes.  And that's why that language was

11     proposed and agreed upon, it's because you need to have that

12     analysis done separately.

13          MS. SANTILLO:  In Trevon Gross' count, can I weigh in

14     for a second?  I think that I tend to agree with Ms. Choi on

15     this one.  But I also think that part of it is also confusing

16     because before it was Anthony Murgio and Yuri Lebedev and there

17     were other people who were involved in the conspiracy who were

18     morphed into it.  So I don't know if maybe we could find

19     clarity for respect for Mr. Lebedev to say that it's only his

20     intent or something like that, but I don't want to lose sight

21     of the fact that the recipient of the bribe and the person who

22     was paying the bribe have to both have corrupt intent.

23          THE COURT:  That does seem important.

24          MR. CREIZMAN:  The only thing I would suggest is that

25     on lines 21 to 23 --

1              THE COURT:  Which page?

2              MR. CREIZMAN:  -- on page 22, I think that we have a

3      sentence there that actually accomplishes the points that

4      Ms. Choi and Ms. Santillo are making, which is, "Here, it is

5      Trevon Gross' intent in accepting the payments as the relevant

6      question, not the intent of the person or persons offering or

7      making the payments."  And we could restructure it to sound the

8      same way that the way I'm proposing Yuri Lebedev sounds, which

9      is, "For the purposes of Count Five, the relevant question for

10     your consideration is Trevon Gross' intent, not Yuri Lebedev's

11     intent or the parties who made the payments."

12              I mean, but the problem that I have with the sentence

13     afterwards is that it suggests almost to the jury that -- I

14     mean, it makes the same point again, but it makes it in a way

15     that is suggesting that you found Yuri Lebedev --

16              THE COURT:  Well, so it's not quite the same point,

17     and it seems to me a necessary -- it adds the additional point,

18     it's Mr. Gross' intent, and further, it's separating the intent

19     of the two defendants.  But I wonder if we couldn't just

20     accomplish what you're saying with some kind of comma clause.

21     So "Even if you find that Yuri Lebedev acted with a corrupt

22     intent, comma, and you may only do so pursuant to my earlier

23     instructions" or something along those lines, comma, that

24     reminds the jury that they have to -- they only get to that

25     point if they've gone through the full process of being

1    convinced beyond a reasonable doubt with respect to

2    Mr. Lebedev's intent.

3         MR. CREIZMAN:  That sounds -- and I may have a

4    proposal on that which would be, though, just -- that it would

5    make the same point, but we'd be less prejudicial to

6    Mr. Lebedev, which would be, "Even if you find that the persons

7    who made the payments acted with a corrupt intent, you may not

8    find Trevon Gross guilty unless you find that he also acted

9    with a corrupt intent."  Because it also -- again, I mean, I

10   just feel that it just sort of singles out Yuri Lebedev in this

11   situation, and I think that, you know, number one, when we all

12   had to work together amongst defense counsel, it was editing

13   back and forth and back and forth and --

14        THE COURT:  Well, you resubmitted.

15        MR. CREIZMAN:  Right.

16        THE COURT:  You resubmitted.

17        MR. CREIZMAN:  That's true.

18        THE COURT:  But so the specific suggestion is, this is

19   page 22, line 23, "Even if you find that," and instead of

20   saying Yuri Lebedev it says?

21        MR. CREIZMAN:  "The persons who made the payments"

22   or --

23        THE COURT:  How about, "Even if you find that payments

24   were made to Mr. Gross with a corrupt intent, you may not find

25   Trevon Gross guilty unless that you find he also acted with a

H33OLEB2

1    corrupt intent."

2            MR. CREIZMAN:  I think that's great.  I think that's

3    amazing.

4            THE COURT:  Ms. Santillo?

5            MS. SANTILLO:  I think that's fine.

6            THE COURT:  Ms. Choi?

7            MS. CHOI:  I don't think we have an issue with that.

8            THE COURT:  Let me just get that one in, and then we

9    can go back.

10           So page 22, instruction number 18, line 23 will now

11   read, "Even if you find that payments were made to Mr. Gross

12   with a corrupt intent, you may not find Trevon Gross guilty

13   unless you find he also acted with a corrupt intent."

14           I think we'll deal at the end with just uniformity of

15   addressing the defendants as "Trevon Gross" or "Mr. Gross" and

16   the like, because, as I was reading that sentence, there was

17   inconsistency.  But let's bracket that because it's not

18   important at the moment.

19           So returning to instruction 16, we had an agreed

20   proposal.  Does anyone recall what it was?  Do you have it?

21           MR. CREIZMAN:  On page 20.  My proposal -- I was

22   just -- I mean, I'm fine -- I would prefer if on line 16 it

23   didn't say "in order to find Yuri Lebedev guilty", just

24   starting with "the government does not have to prove", but I'm

25   not -- you know, it's not a critical point.  I don't think it's

1        that prejudicial, it's unduly prejudicial.

2                THE COURT:  So you're fine with instruction 16 as it

3        is?  We had talked about a change.  Everybody has kind of --

4        there was an edit of 18 through 23.  Everybody had kind of

5        agreed.

6                MR. CREIZMAN:  Oh, I'm sorry.  I thought line 16.  No.

7        The way I would like it still would be to say -- the first

8        sentence of the last paragraph, starting at line 13 should

9        read, "The relevant question for your consideration with

10       respect to Count Four is Yuri Lebedev's intent, not Trevon

11       Gross' intent.  In order to find Yuri Lebedev guilty, the

12       government does not have to prove that Trevon Gross had a

13       corrupt intent," and so on.  I'm fine with the rest of that.

14               THE COURT:  Ms. Choi?

15               MS. CHOI:  That's fine, your Honor.

16               THE COURT:  All right.  We'll make that change.

17               MS. CHOI:  Just to be clear, the only changes that are

18       happening then are with regards lines 13 through 16?  Just that

19       first sentence, and nothing else on that page, correct?

20               MR. CREIZMAN:  That's correct.

21               MS. CHOI:  Okay.

22               THE COURT:  Okay.

23               MR. NOBLE:  Judge, just one grammatical thing.

24       Line 10.

25               THE COURT:  Line 10.

H33OLEB2

 1              MR. NOBLE:  I think it's just, we're missing a "has".

 2      So "or as it sometimes been expressed" should be "or as it

 3      sometimes has been expressed" or "as it sometimes has been

 4      expressed".

 5              THE COURT:  This is on page 20.

 6              MR. NOBLE:  Line 10.

 7              THE COURT:  "This involves conscious wrongdoing or as

 8      it's" -- right -- "sometimes has been expressed"?

 9              MR. NOBLE:  Yes.

10              THE COURT:  Okay.

11              MR. CREIZMAN:  Just one actually additional point.

12      For the first sentence, "The relevant question for your

13      consideration with respect to Count Four is Yuri Lebedev's

14      intent, not the intent of Trevon Gross or any of Mr. Lebedev's

15      alleged coconspirators," if that makes sense.  If not, I'm fine

16      leaving it as the way I just left it.

17              MS. CHOI:  Yeah, I mean, I think it's fine as is.  I

18      know that this is also --

19              THE COURT:  Okay.  Fine as is.

20              MR. CREIZMAN:  Yes.

21              THE COURT:  Music to my ears.

22              MR. CREIZMAN:  I'm sorry.

23              THE COURT:  Next page.  So we've resolved the issues

24      on 20 and 22.  Next page after 22?

25              MS. SANTILLO:  I have a comment on instruction 23.  I

1    don't know if that's skipping ahead.  Page 31.

2              THE COURT:  That's page 31.  Anything before that?

3              All right.  Go ahead, Ms. Santillo.

4              MS. SANTILLO:  It's just getting back to this issue --

5    and I don't have to make those comments if we're not preserving

6    our rights with respect to this -- but with respect to the

7    false statements and the obstruction of NCUA investigation, I

8    would like clarity that they are only with respect to what was

9    charged in the indictment, depending on the outcome of the

10   briefing.

11             MR. SHIN:  Your Honor, I think what Ms. Santillo is

12   proposing in terms of the issues to be resolved, those would be

13   addressed in a limiting instruction to the jury if she were to

14   prevail in her arguments, I think they would be best with

15   addressed by a limiting instruction about what evidence can be

16   considered against who from what period.  And this is just

17   stating the law, this instruction, and so I don't see why this

18   needs to be -- I don't see why anything needs to be injected

19   into this instruction, which currently is purely legal.

20             THE COURT:  All right.  We'll bracket, Ms. Santillo, I

21   guess if you prevail in your motion, you'll ask me to return to

22   this page to see if there is something appropriately that

23   should be added or not.  Okay?

24             MS. SANTILLO:  Yes.  Thank you.

25             THE COURT:  All right.  But for now, I'm leaving it as

2681

H33OLEB2

1    is.

2              Next page.  Government's next page is?

3              MS. CHOI:  One moment, your Honor.

4              MR. CREIZMAN:  My next page would be 38.

5              THE COURT:  Anything before 38?

6              MS. CHOI:  No, your Honor.  I was also looking at 38.

7              THE COURT:  Ms. Santillo, anything before 38?

8              MS. SANTILLO:  No.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H33KLEB3

1              THE COURT:  Mr. Creizman?

2              MR. CREIZMAN:  Yes, your Honor.  This is kind of just

3     a little nit, but I think it's important somewhat.  On line 9,

4     instead --

5              THE COURT:  Let me just pause you.  I realize Mr. Lee

6     is here, and I don't want to keep him unnecessarily.

7              Any updates?

8              MR. LEE:  Yes, your Honor.

9              THE COURT:  Could I ask you to come up to a

10    microphone, Mr. Lee.

11             MR. LEE:  Sure.

12             THE COURT:  And if you'll just state your appearance.

13             MR. LEE:  Yes.  Winston Lee, L-e-e.

14             Your Honor, Ms. Santillo provided me the number for

15    Loretta Larkins.  I had a fairly comprehensive long

16    conversation with her out in the hallway just now.  The

17    substance is this:  She informs me that even prior to speaking

18    to me, it was her intention to seek private counsel, and as we

19    speak, she's seeking private counsel.  What I made sure to

20    impress upon her was the urgency that the Court is interested

21    in moving forward as quickly as possible, so she should

22    endeavor to do that.  I think she referred -- she had some

23    relative, perhaps a cousin, who was an attorney, and she would

24    begin the process to seek to retain counsel.

25             But just so we have as much information as possible, I

1    did ask her about her resources, her assets.  And without going

2    into detail, unless your Honor wants to know, it seems clear to

3    me that she would not qualify based on the assets that she

4    described to me.

5             Now, I have her number, she has my number.  I told her

6    I would convey all this information exactly as I've conveyed to

7    you.  I told her I would tell the Court this, and then I would

8    ask the Court's direction of what the Court wants me or anyone

9    to do.  She did state, also, she wanted to express that she was

10   not here today, she was under the understanding she did not

11   have to be here.  I'll leave it at that.  She was under the

12   impression she didn't have to be here today, and that's why she

13   was not.

14            Frankly, your Honor, I spoke to her on the phone.  I

15   don't know where she is physically, in New York or wherever, I

16   have no idea, I didn't ask her, but she is in the process of

17   seeking counsel, and whatever your Honor wants me to do at this

18   point, I'm at your disposal.

19            THE COURT:  All right.  Well, I think there may have

20   been some legitimate ambiguity as to whether she needed to be

21   here.  So I'm not holding that against anyone.  I had thought

22   she would be here, but I can see where the uncertainty arose.

23            I'm hopeful that she'll have consulted with private

24   counsel in time.  I think what I would suggest is, Mr. Lee,

25   that I keep you on standby so that in the event of an emergency

H33KLEB3

1    that might interfere with the schedule in the case in some way,

2    and out of the interests of justice, I might still ask for your

3    assistance with Ms. Larkins if she doesn't follow through with

4    what she needs to do.  But I think -- I'll hear from counsel if

5    anyone disagrees -- it sounds like the path that we're on is

6    that she doesn't qualify for appointed counsel, she understands

7    she's been informed of the urging to retain unconflicted,

8    private counsel for her own protection, and I think that's the

9    most I can do at this point to safeguard this process.

10            Anyone have any additional suggestions or requests?

11            MR. NOBLE:  Your Honor, the government agrees with

12   that approach.  We would just say that if she does retain

13   private counsel, the government is happy to turn over the 3500

14   material that we have in our possession, so that counsel can

15   review that in advising her about testifying.

16            We would note that there have been issues that have

17   arisen at trial regarding Ms. Larkins and her connections to

18   this case.  Again, she was not a former board member.  We don't

19   have reason to believe that she participated in the charged

20   conduct, but as Ms. Choi alluded to earlier, there are other

21   issues that have arisen.  One is that, as the director of

22   finance for the church, she had some role, we believe, in

23   helping prepare tax information, the W-2s, for instance, for

24   Mr. Gross that were submitted to the IRS, which the government

25   believes were incomplete.  Among other things, it omitted his

pastoral support that he allegedly received, some of which was
funded by the bribe money, and that was not reported income or
not reported to the IRS as potentially taxable income.  Another
issue is that she told us during an interview that Mr. Gross
was paid a 50- or 60-thousand-dollar housing allowance as a
clergyperson, which our understanding should have also been
reported to the IRS, but was not.  We spoke to Mr. Gross'
counsel, and it was not reported to the IRS.  To the extent
Ms. Larkins had some role in preparing the tax information that
went to the IRS, she could have exposure there separate from
the charges in this case.  She was interviewed by the
government, we have the notes in the 302.  It's possible she
was not completely forthcoming with the government in response
to some of our questions on these kind of tax matters.  We
don't know because we just don't know what's in her head
completely.  That's why we do strongly believe it's important
for her to get independent counsel, independent advice, because
these are things that she would likely be cross-examined about,
should she testify.

       As Ms. Choi alluded to earlier, in reviewing the loan
documents that came up on the cross-examination and direct
examination of Meg Flok, it appears that Loretta Larkins also
signed a loan that was taken out by the church from the credit
union, for which there was basically no underwriting.  We
haven't thought through all the potential exposure that that

1    might entail, but her name appears on that as the person who's

2    taking out this loan, for which there's basically no

3    documentation.

4            She also was aware that the church received these

5    payments from the Collectables Club, because she's on kind of

6    like the advisory board of the church, and she did tell us she

7    knew about these payments, and that the church used them, to a

8    certain extent, to help the church.  So, obviously, there are a

9    lot of issues out there, is the basic point, that independent

10   counsel should be aware of in advising her about whether she

11   should testify, or whether if she is called, whether she should

12   invoke her Fifth Amendment right not to incriminate herself.

13           MR. LEE:  Your Honor, Winston Lee.  Although I don't

14   represent her now, this potential I will be advising her, just

15   so I understand the jargon, when the government says without

16   the underwriting, are they saying it wasn't collateralized?

17   I'm not quite sure.  So if I have to advise her.

18           MR. NOBLE:  Sure.  So this was a loan that the church

19   took out from the credit union that Ms. Larkins signed the

20   application, the loan application, for.  The only documentation

21   that appears to have been submitted -- this was a loan taken

22   out in, I believe it was, November 2014.  The only

23   documentation that was provided was the loan application itself

24   and a statement of a profit and loss from the church for 2013.

25   And we anticipate that the testimony of Terry Adam, from the

1    NCUA, will be that this was wholly insufficient documentation

2    for this loan, and that it's an insider loan because Pastor

3    Gross is also the pastor of the church who's taking out the

4    loan, and he was involved, as the minutes showed, in the

5    approval of that loan that was extended by the credit union,

6    for which he served as the chairman of the board.

7              So, obviously, that loan posed a conflict of interest.

8    We'd have to suss out where Ms. Larkins kind of fits into that.

9    It's just that's an issue for her attorney to speak with her

10   about.  That's something we weren't really -- we were not aware

11   of at the time we interviewed her, so we did not speak with her

12   about that loan issue.

13             THE COURT:  Go ahead, Ms. Santillo.

14             MS. SANTILLO:  Your Honor, I just am flummoxed by the

15   fact that we are talking about insider loans, things that have

16   never been on the radar as prior bad acts, as any conduct that

17   has been alleged to have any relationship to the bribe in this

18   case.

19             I am renewing my motion about the unfair tactics to

20   try to get defense witnesses not to testify.  As of yesterday,

21   she had no criminal exposure, and all of a sudden, they're

22   going through a laundry list of things she did wrong in terms

23   of tax preparation to say she needs advice and might have to

24   invoke her Fifth Amendment right.  It is outrageous.

25             THE COURT:  I want to understand your specific

1    application.  You had made an argument based on selective

2    immunity previously, which I denied.  Is that the argument?

3           MS. SANTILLO:  Yes.  And I understand that your

4    Honor --

5           THE COURT:  So, no one has been immunized, and no

6    nonprosecution agreements have been offered.

7           MS. SANTILLO:  That is not the case.  There were

8    multiple nonprosecution agreements that were offered in

9    connection with the Coin.mx side of the business.  Jennifer

10   Wotherspoon received a nonprosecution agreement.  There have

11   been multiple instances where the people on the collectibles

12   side of the club, who were the people who allegedly had any

13   involvement with this Bitcoin exchange, were given

14   nonprosecution agreements.  The only people who are being, you

15   know, told that they have exposure and Fifth Amendment concerns

16   that is making them not testify are people who are on the HOPE

17   Credit Union side, who this woman had no knowledge of any of

18   the conduct that is alleged to be illegal in this case, and we

19   were told yesterday that she didn't have any exposure.

20   Suddenly, she's the only witness who is left who is going to be

21   testifying, and she has criminal exposure, too?  These are also

22   issues that were never raised as prior bad conduct, in terms of

23   taxes, in terms of insider loans.  Like where is that in the

24   indictment?  That is irrelevant to this case.  Why is the NCUA

25   examiner going to come and testify about insider loans?  It has

H33KLEB3

 1    no bearing on any issue in this case.  They are just trying to

 2    find little things to try to muddy up the waters here, and in

 3    doing so, they are preventing people, who clearly have no

 4    intent to commit crimes, from coming to court and telling the

 5    truth, and it is -- I'm just sick of it.

 6         Earlier this week, they were going to call the Wyatts.

 7    This woman is a board member who has no knowledge of the

 8    donation, has drafted board minutes.  They elicited testimony

 9    from a cooperating witness who said that something didn't

10    happen in the minutes, and they're now saying that she has

11    criminal exposure because she, what, maybe doctored the

12    minutes?  But they have presented evidence that show

13    contemporaneously that that event of moving the people to the

14    advisory board actually took place.

15         So, this is another example of them coming up with

16    little theories that create exposure to try to intimidate these

17    witnesses from coming to testify.

18         Ms. Wotherspoon stood up, and testified and said, I am

19    Coin.mx, and she got a nonprosecution agreement.  And Loretta

20    Larkins did his W-2s, and she has criminal exposure?  It is

21    gamesmanship, and I just need to make that record.

22         THE COURT:  Mr. Noble.

23         MR. NOBLE:  Judge, this is not gamesmanship.  We're

24    basically previewing potential lines of cross-examination of

25    Ms. Larkins.  She's an insider at the church, she's close to

Pastor Gross.  She was involved in the finances of the church.

The bribe money, we will show, went into the bank accounts, the

operating account, of the church, which Ms. Larkins was in

charge of controlling.  She came in, we met with her attorney,

Cedric Ashley, and she told us that the money, the bribe money,

was used to fund church operations, and to the extent Pastor

Gross received any personal benefit from it, it was reported --

or it was accounted for by the church as so-called back

pastoral support.  That back pastoral support, which we've

calculated is a hundred thousand dollars in the relevant time

frame, was never reported to the IRS, and that's clearly

income.

THE COURT:  I get that you're previewing your cross.

My only question is why yesterday there was no risk.

MR. NOBLE:  Well, Judge, I think we made clear she's

obviously not involved in -- she was not a board member of the

credit union.  She was aware of the payments because in her

capacity as a church member, as a finance person at the church,

so she knew that these payments were made.  She didn't know the

nature of them.  She doesn't have exposure on the Section 215

charge, on the bribery charge, because she wasn't involved, she

had no fiduciary duty as it related to the credit union.

It's similar with respect to false statements and

obstruction of the NCUA examination.  She wasn't involved with

the credit union.  What we're saying is -- and these are things

H33KLEB3

that have been disclosed through 3500 material for the NCUA

witnesses -- is that on cross-examination, she's going to be

asked some very difficult questions about the church's

finances, about loans that were taken out by the church, about

the way taxes were reported to the church, and all of this is

relevant evidence because it all goes to Mr. Gross' corrupt

intent.

So, we are trying to preview these lines of cross

because we think the government has an ethical obligation to

inform her counsel that these issues will arise, she may be

cross-examined about them, and she may incriminate herself on

these issues.  Even if they don't go to the heart of the

charges in this case, it's still relevant as to her credibility

as a witness.

So it's not gamesmanship.  I think we have a duty to

disclose this and be up front that these are issues that may

arise, we can foresee in her testimony, because the last thing

we want is for her to testify on direct, and then we cross her,

and these issues come up, and she invokes her Fifth Amendment

right not to incriminate herself, because then it's a potential

mistrial.

THE COURT:  Ms. Santillo, I take it you're not saying

that these areas are inappropriate for cross-examination?

MS. SANTILLO:  I think they're completely irrelevant

to the case, and we haven't had notice of them.  Taxes and

1   insider loans are not part of this case.

2           MR. NOBLE:  She cross-examined on the insider loans.

3           MS. SANTILLO:  That's because Ms. Flok brought it up.

4           THE COURT:  So they're part of the case.

5           MS. SANTILLO:  Well, I don't think --

6           THE COURT:  The question is whether, in light of

7   the -- maybe I need a proffer as to what Ms. Larkins' testimony

8   will go to, because I don't know.

9           MS. SANTILLO:  She is the bookkeeper for the church,

10  so the money comes into the church, and she is responsible for

11  allocating it.  She would just say how she managed the internal

12  books because the government is going to say that, you know,

13  money went to Pastor Gross, and she actually allocated money to

14  his personal account.  So if there was an expense, she would

15  charge it against his personal account.  So that's the nature

16  of it, for the most part.

17          THE COURT:  So her testimony will be --

18          MS. SANTILLO:  Just about how when the money comes

19  into the church, if there is anything that is spent -- so, for

20  example, a credit card, if there's anything spent personally

21  for Pastor Gross rather than having it actually be something

22  that he gets, it's charged against his personal account.

23          THE COURT:  Can you give me an example?

24          MS. SANTILLO:  Okay.  So if -- she keeps track --

25  okay, I'll say it.  So sometimes -- the church doesn't have a

1    credit card in its own name, so there are some expenses that

2    are allocated towards the church and some that are allocated

3    towards him personally.  And what she does is she says, okay,

4    that's a church expense, the church will cover it.  Okay,

5    that's a personal expense, you'll cover it.

6              THE COURT:  And what's the relevance of that?

7              MS. SANTILLO:  Because there is confusion in the

8    record about something that was on Pastor Gross' personal

9    account.  It says in the indictment that he used money from the

10   bribe to be spent on his personal expenses, and she is the one

11   who said, no, that's actually church expense.

12             THE COURT:  I think the only specific example we've

13   seen so far of that -- tell me if I'm wrong -- is the massage

14   charge?

15             MR. NOBLE:  Yes.  And there's going to be more of that

16   because the tracing analysis that our summary witness will

17   testify that he performed will show that some of the bribe

18   money flowed through to pay the credit card of Mr. Gross, which

19   was paid out of the church operating account.  And some of that

20   money went to pay expenses that had been charged on the card,

21   one of which was another massage, which is clearly a personal

22   expense.  But there are other examples of personal expenses

23   charged to that credit card that the church paid out of the

24   operating account using the funds that came from the

25   Collectables Club.

1          So, this is the whole purpose of the tracing analysis,

2     is it shows that at least some of the money, the $150,000, that

3     flowed into the church's operating account went to pay personal

4     expenses of Pastor Gross.

5          I think the testimony of Ms. Larkins is going to say,

6     no -- well, I don't know exactly what it's going to be, but

7     some of those personal expenses were actually church expenses.

8     I don't know how they're going to say a massage was a church

9     expense.  And we have other examples that appear to be clearly

10    personal in nature.  So maybe she's going to say that.  But our

11    understanding is, having spoken with her, when we confronted

12    her with these issues is she said, okay, yes, some of these

13    expenses on the credit card were for the church, some of these

14    expenses were clearly for Pastor Gross, but to the extent they

15    were personal expenses, it was back salary essentially, back,

16    quote-unquote, pastoral support that church members had donated

17    to the church that Pastor Gross was owed.  And so then the

18    question is, okay, if that's back pastoral support, back salary

19    that Pastor Gross was owed, why wasn't it reported on his W-2

20    to the IRS?  And that's the relevance of the tax evidence, the

21    tax records that we're going to be putting in, because Pastor

22    Gross, to the extent he received personal benefit from the

23    Collectables Club bribe money, Kapcharge bribe money, why

24    didn't he report it to the IRS?  That shows -- it's classic

25    consciousness-of-guilt evidence that you don't report to the

H33KLEB3

1    IRS your criminal proceeds.  So that's why this is all

2    relevant.

3            But to the extent Ms. Larkins was the bookkeeper, was

4    involved in preparing forms that were sent to the IRS, and knew

5    that Pastor Gross was receiving this back pastoral support,

6    that the church was paying his personal expenses, that's income

7    that she should have reported to the IRS on the W-2.  Not to

8    mention the housing allowance that should have been reported to

9    the IRS, but was not, which, again, she seemingly was

10   responsible for reporting since she knew about it, and she was

11   the one involved in preparing the tax forms.

12           Now, we haven't spoken to her, so we don't know if she

13   has an explanation on all these particular issues.  She might.

14   She may have a perfectly good explanation for them.  We are

15   just raising these, so that we're not doing it in the middle of

16   her testimony.

17           THE COURT:  Okay.  Well, there's just simply no basis

18   to conclude that the government is engaging in any kind of

19   outrageous conduct here.  There are people who are involved in

20   an issue -- involved, and present, and participants in this

21   matter at every level.  Now, the government did immunize, give

22   a nonprosecution agreement to, Jennifer Wotherspoon to get her

23   testimony, and you can look and say, well, why Ms. Wotherspoon,

24   but not everyone involved with the board.  But that's the mode

25   of analysis.  The government has proffered a legitimate basis

H33KLEB3

of cross-examination in light of the testimony that you've

indicated you'll elicit from Ms. Larkins, which seems relevant.

It's not exactly clear to me where it goes, but it seems

relevant.

        To the extent that the government has legitimate

avenues of cross-examination to follow with respect to that,

all that the Court can do is ensure that, both for her sake and

for the preservation of this trial process, is that she has

independent counsel that is advising her.  I'm not sure what

else can be done.

        To the extent that the application that's being made

is -- is what, Ms. Santillo?  What exactly is the application

that's being made?

        MS. SANTILLO:  Well, as I understood your Honor's

ruling with respect to what we said about tactical advantage,

one of the things that was suggested on the record was that it

was kind of a moot point because the government strategically

chose not to call the witnesses in their case, and they hadn't

immunized anybody.  I just want to make clear that our position

is that they have chosen not to prosecute certain people in

this case when it has benefited their case, and they are -- I

think they've progressively changed their position about

whether these witnesses have criminal exposure depending on

whether it was to their strategic advantage.

        As of earlier last week -- or earlier this week, the

H33KLEB3

1    Wyatts were their witnesses.  After they met with Ms. Larkins,

2    they said we're calling her as our witness.  And repeatedly,

3    they've said things like that, and then as soon as --

4              THE COURT:  I don't understand that last point.  After

5    they met with Ms. Larkins, they said they're calling her?

6              MS. SANTILLO:  I had a call with the government, and

7    they said we're going to call her as our witness.

8              THE COURT:  Ms. Larkins?

9              MS. SANTILLO:  Yes.

10             THE COURT:  Okay.

11             MS. SANTILLO:  And then five members of the board, as

12   of when we started this trial, were going to be testifying, but

13   suddenly, now they all have criminal exposure, so they can't

14   testify in Mr. Gross' behalf.  So I am just making my record

15   because I think that --

16             THE COURT:  You can make your record, and I welcome

17   the record.  I am still asking what your specific application

18   is because you have not answered.

19             MS. SANTILLO:  I'm renewing my motion.

20             THE COURT:  For what?

21             MS. SANTILLO:  For immunity for these witnesses.

22             THE COURT:  For Ms. Larkins?

23             MS. SANTILLO:  For Ms. Larkins, and for Charles Blue,

24   and the other board members.

25             THE COURT:  Okay.

1          Anything else, Mr. Noble?

2          MR. NOBLE:  No.  We would oppose that application,

3   obviously.

4          THE COURT:  That application is denied, for the

5   reasons that I have indicated on the record today and

6   previously.  Certainly, Charles Blue, as an example, I can see

7   all kinds of reasons that -- based on the evidence that's

8   developed, as to why the government would not call Mr. Blue.  I

9   can't, absent a very, very high standard force -- of

10  misconduct, and gamesmanship, and the like, force the conduct

11  to immunize witnesses.

12         So, for the reasons I've already indicated, and in

13  light of the discussion today, that application is denied.  I

14  do think the government -- they're preparing their

15  cross-examination for the person who now has indicated they're

16  a potential witness, and they have previewed legitimate bases

17  for that cross-examination, and that is what it is.  I don't

18  see any other way to understand it.

19         So, I think, to move on then, given that that is the

20  specific application, and it is denied, moving forward, I

21  think, Mr. Lee, just because you're still here, I think what I

22  would request, whatever is necessary in terms of a court order

23  for compensation of your time, even though there's not a

24  specific appointment, I'm happy to do.  I think it would

25  benefit this process to keep you sort of as someone who can

H33KLEB3

1    maybe check in with Mrs. Larkins later to see if she has

2    retained counsel and to facilitate whatever information that

3    attorney might need to consult with her.  That would be my

4    request to you.

5         MR. LEE:  Your Honor, if private counsel comes into

6    the case, what would be the best way to notify the Court that

7    that is expected?  I don't know who counsel is, how

8    knowledgeable they are about how to file, et cetera, but it may

9    be over the weekend, and I'd be willing to notify the Court.

10   How do you suggest I notify the Court, by email to your

11   chambers?  Whatever your Honor suggests.

12        THE COURT:  I think if you email to chambers, with a

13   copy to the government and the defense counsel --

14        MR. LEE:  Certainly.

15        THE COURT:  -- so everybody is aware.

16        MR. LEE:  I will certainly make sure I have good

17   contact information for the government.  I'll notify them, and

18   I am sure they will help me make sure the Court is aware of the

19   current situation, posture of this.

20        THE COURT:  Okay.

21        MR. LEE:  Thank you, your Honor.

22        THE COURT:  I appreciate it, Mr. Lee.

23        MR. LEE:  Thank you, your Honor.

24        THE COURT:  Even though it isn't anticipated, as I

25   say, that Ms. Larkins will be eligible, I think out of the

H33KLEB3

```
 1    interests of justice and protection of this process, I will ask

 2    for your continued assistance until we get through this

 3    transition moment, and certainly we'll sign whatever order or

 4    papers you need for your compensation for that effort.

 5              MR. LEE:  Thank you, your Honor.  You have my -- I'm

 6    on standby, I'm ready.  You have that, your Honor.

 7              THE COURT:  Thank you, Mr. Lee.  I appreciate that.

 8              Anything else on that?

 9              Back to the charge.  We were at page 38.

10              MS. MADRIGAL:  Yes, your Honor.  We have a proposal.

11              THE COURT:  Go ahead.

12              MS. MADRIGAL:  It relates to lines 8 through 11.  It

13    would actually just be removing on line 9 "a member of the

14    conspiracy" and changing it for different language.  I can read

15    that sentence as we propose it.

16              THE COURT:  Go ahead.

17              MS. MADRIGAL:  "If you find beyond a reasonable doubt,

18    that the specific defendant you are considering knowingly and

19    willingly participated in the conspiracy charged in the

20    indictment, then any acts done or statements made in

21    furtherance of the conspiracy by persons also..." the remainder

22    of the sentence stays the same.

23              THE COURT:  So it's adding that "knowingly and

24    willingly participated in the conspiracy"?

25              MS. MADRIGAL:  Yes, your Honor.
```

1          THE COURT:  Ms. Choi?

2          MS. CHOI:  Your Honor, I think we're fine in

3     principle, but I think it's not willingly, I think it's

4     willfully.  As long as it's knowingly and willfully

5     participated, we don't have a problem with that.

6          MS. MADRIGAL:  That's acceptable.

7          THE COURT:  Ms. Santillo?

8          MS. SANTILLO:  No objection.

9          THE COURT:  All right.  So the change will be that the

10    sentence that's now line 8, on page 38, would read, "If you

11    find beyond a reasonable doubt that the specific defendant you

12    are considering knowingly and willfully participated in the

13    conspiracy charged in the indictment..." the rest remains the

14    same?

15         MS. MADRIGAL:  Correct.

16         THE COURT:  All right.

17         Next page?

18         MS. CHOI:  Yes, your Honor.  Again, just for clarity

19    of the record, that we reserve on instruction 27 pending

20    further briefing.

21         THE COURT:  Yes.

22         MR. SHIN:  Your Honor, just I alluded to this charge

23    earlier as one of the topics we plan to address.

24         THE COURT:  No, I understand.  And you said you would

25    brief both the contention that it ought not be given at all,

1      and if I were to disagree with you on specific --

2               MR. SHIN:  We would propose line edits.  I can offer

3      you a preview, although it would be better written out, but I

4      think there is certain additional language that would make the

5      point that the withdrawal needs to be complete, that further

6      acts in support of the conspiracy after the purported

7      withdrawal -- I'm not saying it as eloquently as the Second

8      Circuit wrote it.

9               THE COURT:  Well, let's just wait, and you can make

10     your proposal.

11              MR. SHIN:  Exactly.  So we'll include it, and we'll

12     also include our case support for the proposed language as

13     well.  Thank you.

14              THE COURT:  I'll just say, I have difficulty seeing

15     how I wouldn't give this instruction, given what the defense

16     is.  I get that these are interrelated issues, and you're going

17     to brief it.  I get that you think the evidence is on your side

18     on this, but it seems to me this is a quintessential fact

19     question for the government to carry its burden and for the

20     jury to consider in light of the defenses being made.

21              MR. SHIN:  Understood, your Honor.  We'll obviously

22     take that into account and brief it accordingly.

23              THE COURT:  Thank you.

24              Next page?

25              Go ahead, Ms. Madrigal.

H33KLEB3

1              MS. MADRIGAL:  Page 53, your Honor, instruction number

2    37, "Conscious Avoidance."

3              THE COURT:  Anything before 53?  No?

4              MR. NOBLE:  No.

5              THE COURT:  Go ahead.

6              MS. MADRIGAL:  We don't believe that the government

7    has laid any factual predicate for the assertion that Yuri

8    Lebedev deliberately closed his eyes in this case.

9              MS. SANTILLO:  We have the same objection.

10             THE COURT:  So the defense's request is to not include

11   the instruction?

12             MS. MADRIGAL:  That's correct, your Honor.

13             THE COURT:  Go ahead, Ms. Choi.

14             MS. CHOI:  Your Honor, I think there has already been

15   discussion that the defense, in their lines of cross, are

16   attempting to establish that, for example, with regard to the

17   lawyers, that Mr. Lebedev clearly could not have been on notice

18   of what was going on because Mr. Murgio had alluded to the fact

19   that there were lawyers involved in some of the aspects of the

20   charged conduct.  I think that is going to be the crux of both

21   of the defendants' cases, that there were certain acts that

22   gave them comfort, so that they could go on with participating

23   in these corrupt acts and in this conspiracy.  Under those

24   circumstances, because that's -- because your Honor has allowed

25   that line -- even though we think that, as a matter of

1  affirmative defense of advice of counsel, it doesn't apply,

2  your Honor has allowed them to go down that route, and I think,

3  given that factual situation, this instruction is necessary, so

4  that the jurors understand that you can't simply assume at some

5  point that the defendants aren't culpable simply because they

6  turned a blind eye to all the other evidence.  For example, in

7  the case of the lawyer situation, that Mr. Murgio was telling

8  Mr. Lebedev and others if they were going to lie to certain

9  lawyers about certain aspects of what was going on and not tell

10 them about, for example, the fact that there were bribes.  All

11 of them knew, obviously, that the bribes were problematic from

12 a legal perspective.  The fact that there was even this debate

13 between Jose Freundt and Mr. Murgio that Mr. Lebedev was

14 witness to on those group chats on WhatsApp is all the reason

15 why we need to have the conscious avoidance charge here because

16 that will be their closing argument, that Mr. Lebedev relied on

17 Mr. Murgio, being a good friend of his, and engaging these

18 other individuals for advice.  When the evidence is to the

19 contrary about what precisely Mr. Lebedev knew, and they're

20 making these arguments of conscious avoidance, instruction is

21 not only necessary, but required.  I guess they're both

22 necessary and required.

23        And the same with regard to Mr. Gross.  He alludes to,

24 in cross-examination, that he never knew the true nature of the

25 Collectables Club, that he was never told.  Well, there are

1    emails that show they're openly talking about the virtual

2    currency issue that we will rely on.  And there was testimony

3    with regard to Rico Hill that he had not hid that fact from

4    Mr. Gross, that he had worked at Coin.mx, he understood what

5    Coin.mx -- and that it was his view that Mr. Gross understood

6    what Coin.mx was because he didn't seem shocked when they were

7    having these conversations.

8            So I think, given those two circumstances -- and,

9    sorry, one other example is just sort of the idea that

10   Mr. Murgio was changing plans midstream, but no one really

11   understood what the nature of the deal was -- the conscious

12   avoidance charge is necessary.

13          THE COURT:  Ms. Madrigal, why isn't what the

14   government just proffered reason in the evidence to give this

15   charge?

16          MS. MADRIGAL:  Your Honor, there has been no testimony

17   or line of cross-examination where we imply that Mr. Lebedev

18   relied on Mr. Murgio because they were friends, and they had

19   this kind of established relationship.  At least on behalf of

20   Mr. Lebedev, that has not been the line of cross-examination.

21   We have not called that into question.

22          In terms of the advice of counsel or any type of

23   reliance on counsel, that goes to Mr. Lebedev's good faith.

24   It's not that he deliberately closed his eyes because there

25   were lawyers involved, it's that he believed that -- this was

H33KLEB3

1    just one factor out of many that he looked at in his

2    relationship with Mr. Murgio.

3         I still don't believe, even based on what the

4    government just said, that there is any predicate that he

5    actually closed his eyes to what was happening.  In fact, the

6    evidence has been to the contrary, that he was involved in a

7    lot of aspects, that he knew what was going on.  It just seems

8    inconsistent with the evidence that the government has

9    presented to far.

10         THE COURT:  It doesn't seem inconsistent with how

11   Mr. Creizman opened, though.

12         MS. MADRIGAL:  I'm sorry?

13         THE COURT:  It doesn't seem inconsistent with how

14   Mr. Creizman opened, the arguments that were made in opening.

15   I would think it would be anticipated in closing, both with

16   respect to -- I think what I hear you saying is they go to good

17   faith, it goes to good faith, and the government's saying, no,

18   it goes to conscious avoidance.  And my resolution is to give

19   both charges because --

20         MS. MADRIGAL:  Understood.  That's fair.

21         THE COURT:  Which is what I've suggested.

22         Ms. Santillo, did you want to say anything in response

23   to the government or just renew --

24         MS. SANTILLO:  Yes.  With respect to the factual

25   predicate in our case, knowledge of Coin.mx generally and

virtual currency generally doesn't mean that there has been a

single drop of evidence that has been presented that Mr. Gross

was aware of anything that was unlawful about the workings of

Coin.mx.  There are certain things that have been alleged in

terms of whether it was properly licensed, whether or not

they're defrauding the banks, whether they filed false

paperwork with the banks, and those are the things that make it

unlawful.  There's not been a shred of evidence that he would

have had any knowledge of that, and that he turned a blind eye

to that.

MS. CHOI:  Right.  Your Honor, two points on that:

One is, they opened on the notion that Mr. Murgio changed the

deal -- the complexion of the deal at hand, and that he didn't

understand that Mr. Murgio basically took him for a ride, he

didn't understand what was going to end up happening.

Obviously, the evidence, all the red flags that have been

raised -- that were raised over the course of the ACH

processing, and even Mr. Gross' own admissions show that that's

clearly contrary to the evidence.  But to the extent that they

are going to argue that Mr. Murgio was hiding certain facts

about the quantity of -- the volume of the ACH, or who

Kapcharge was, or the nature of the relationship for Mr. Gross,

this is obviously a necessary charge on that front because

there are only so many times that you can turn a blind eye, and

they opened on the theory that there was a good-faith basis for

1    Mr. Gross to be operating under these conditions and continuing

2    forward in the ACH processing relationship with Kapcharge.  So

3    I think that in and of itself is problematic.

4         And second of all, if you recall, there was an email,

5    I believe, dated December 2nd or 3rd where Ms. Flok had asked

6    Mr. Gross what the Collectables Club was, and he gave --

7    knowing full well that there were these field of membership

8    issues that had arisen with regard to Collectables Club, gave

9    a, I think, evasive -- at best, evasive -- answer about what

10   the nature of that company was and what they were doing those

11   transactions for.  He said it was for payroll, which he knew

12   was not the case.  So, again, if the answer is -- if the idea

13   is, well, we just relied on Anthony Murgio, this guy who was a

14   hustler that swindled us all, the conscious avoidance

15   instruction is necessary.

16        MS. SANTILLO:  I take strong issue with that in terms

17   of what the defense would be with respect to ACH processing.

18   We're not talking about -- that's not the charge.  I mean, it

19   goes back to that fundamental issue.  A lot of ACH processing

20   has never been what he's charged with, it's with taking a

21   corrupt payment to turn over control of the board.

22        THE COURT:  Right.  Yes, I understand.

23        Go ahead.  I don't mean to interrupt you.

24        MS. SANTILLO:  I just don't see any factual predicate

25   they've laid with respect to his knowledge of anything unlawful

H33KLEB3

1    in that regard that he turned a blind eye to.

2              THE COURT:  These are clearly factual questions that

3    are to go to the jury.  The evidence is sufficient to give both

4    the conscious avoidance and the good-faith instruction.  So I

5    overrule those objections.

6              Go ahead.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              MR. NOBLE:  Judge, this may be a losing battle in

2     light of the Court's statements right now.

3              THE COURT:  Save your breath.

4              MR. NOBLE:  The government objects to the good faith

5     instruction as unnecessary.  And just to point the Court to law

6     to support that position, United States versus McElroy, 910

7     F.2d 1016 2d Cir. 1990, which was a Section 215 bribery case

8     where the district court did not include the good faith

9     instruction, and the Second Circuit upheld that decision saying

10    that, "As long as the Court properly instructs the jury as to

11    the knowledge and intent elements that are required to convict

12    the defendants, then there's no need for a good faith defense

13    instruction."  And the Second Circuit observed later on in

14    2003, it's an unreported case, but it's United States versus Al

15    Morshed, 69 Fed.App'x 13, and this is at page 16, that the

16    Second Circuit, "has long adhered to the view held by a

17    majority of the circuits that a district court is not required

18    to give a separate good faith defense instruction provided it

19    properly instructs the jury on the government's burden to prove

20    the elements of knowledge and intent because, in so doing, it

21    necessarily captures the essence of a good faith defense,"

22    again citing back to McElroy.

23              So we just note our legal objection to the good faith

24    charge as being unnecessary, and we believe it's in line with

25    the Second Circuit precedent.

1          THE COURT:  I couldn't tell from your opening papers

2     whether it was a disagreement to the standalone charge as

3     opposed to wanting it incorporated into the other, into the

4     specific charges.  I do, for the reasons I've said, I think the

5     sort of flip sides of the coin here and the core of the

6     defense, and in some level the crux of the prosecution, is

7     whether this was good faith and whether this was conscious

8     avoidance, and so as I have in previous cases, the balance, I

9     think, appropriate is to give both.

10          MR. NOBLE:  Understood.

11          THE COURT:  All right.

12          MR. NOBLE:  Thank you, Judge.

13          THE COURT:  Thank you.

14          Next.

15          MR. SHIN:  Your Honor, I believe the next instruction

16     at issue is instruction 40, which is on venue, which is on

17     page 58.

18          MS. MADRIGAL:  We actually have something before that,

19     instruction 39, aiding and abetting on page 56.  We would

20     propose keeping the first sentence, lines 1 through four, but

21     then eliminating the remainder of line 4 through 11.  We think

22     the rest of this paragraph is unnecessary.

23          MR. NOBLE:  Ms. Madrigal, which lines would you

24     delete?

25          MS. MADRIGAL:  We would just remove line 4, beginning

H33OLEB4

1    "as to each of those accounts" through line 11.

2                THE COURT:  Mr. Noble?

3                MR. NOBLE:  I'll take this one.  Your Honor, I think

4    it is necessary to make clear that either theory is --

5    liability is sufficient to convict, and I think the instruction

6    is legally correct, so we would object to the removal of that

7    language.

8                THE COURT:  I'm just trying to look back at my notes.

9    I think this is a standard aiding and abetting charge, or at

10   least it was what was jointly --

11               MR. NOBLE:  This was what was jointly submitted.  And

12   I believe we took this from a Judge Sullivan charge that Judge

13   Sullivan gave.

14               THE COURT:  I'm going to read the charge to myself

15   without that language.  Just a moment.

16               (Pause)

17               THE COURT:  Ms. Madrigal, what's the concern?

18               MS. MADRIGAL:  I just believe it's repetitive, your

19   Honor.  I think, to address Mr. Noble's concern, maybe leaving

20   in lines 4 through the beginning of line 7.  It's just, again,

21   then line 7 through 11 are just repeating lines 4 through 7.

22               THE COURT:  So the renewed proposal would be delete

23   lines 7 through 11?

24               MR. NOBLE:  I think that's an acceptable compromise.

25   It is a bit repetitive.

```
 1              THE COURT:  Ms. Santillo, any objection to eliminating
 2      lines 7 through 11?
 3              MS. SANTILLO:  No.
 4              THE COURT:  All right, so we'll do that.
 5              MS. MADRIGAL:  Thank you, your Honor.
 6              THE COURT:  Thank you.
 7              Next.  Anything before venue?
 8              MR. SHIN:  I believe venue is the next instruction,
 9      your Honor.
10              THE COURT:  You submitted something on this last
11      night.  What page was venue?
12              MR. SHIN:  58, your Honor.
13              THE COURT:  Go ahead, Mr. Shin.
14              MR. SHIN:  We laid this out in detail in our
15      submission, your Honor, but there are three sets of changes.
16      The first is just to make -- when examples are given of
17      communications, wires, emails, to make those singular, and we
18      believe that's consistent with your Honor's ruling in the
19      Parrilla case, which in turn relied on the Rommy case.  And as
20      your Honor is aware, that was about a single call or text being
21      sufficient for venue.  And so we propose some edits in the red
22      line that we included in our submission just to make those
23      singular.
24              It also keeps reference to the singular consistent
25      with the word "act", which is used in singular throughout the
```

H33OLEB4

1    rest of the charge, so that's one group of edits.

2            THE COURT:  Let's pause there.  On that point, I'll

3    hear from defense counsel.

4            MS. SANTILLO:  Your Honor, we got this submission last

5    night.  I would like an opportunity to research these issues in

6    terms of responding.  I anticipate objections definitely to the

7    substantive part on the bottom, and I don't have a definitive

8    position yet on that particular question.

9            THE COURT:  Well, we need to narrow as much as we can,

10   and this is just a reaction to my proposed charge and so the

11   specific request is --

12           MR. SHIN:  Right.  So starting on page 58, your Honor,

13   there are edits to the second half of that last paragraph.  So

14   starting --

15           THE COURT:  Okay.  I see Ms. Santillo's point, which

16   is that this ties into the later substantive point, which is to

17   add additional examples, I suppose, so maybe we'll pause for

18   the moment.

19           Your first point is just that you want to --

20           MR. SHIN:  Make things singular.

21           THE COURT:  -- make singular when examples are used,

22   emails --

23           MR. SHIN:  Communications, wires --

24           THE COURT:  -- communications -- you way to say "a

25   wire", "an email" --

1                MR. SHIN:  Correct, your Honor.

2                THE COURT:  Let's bracket that for the moment.

3                MR. SHIN:  That's the first one.

4                The second one was at the end of the paragraph on

5       page 58, starting at line 18, your Honor.  So the email example

6       is given from 18 through 22.  And I actually think our proposal

7       on this one is defendant favorable.  I just wanted to make

8       clear that reasonable foreseeability applies to each of the two

9       scenarios laid out there because there's currently only a

10      reference to knowledge right at the end of that paragraph.

11               And so my proposal, which I've included in track

12      changes in our submission, would simply include the "known or

13      reasonably foreseeable" language from the cases to both

14      scenarios in that sentence.  In other words, the two scenarios

15      are one when the defendant or conspirator is in the district

16      when they send or receive an email, and the second scenario is

17      when a defendant or conspirator is outside of the district and

18      sending or receiving an email into the district.  The purpose

19      is just to make clear that knowledge or reasonable

20      foreseeability applies to both scenarios so that the jury

21      doesn't elied that requirement.

22               THE COURT REPORTER:  Doesn't?

23               MR. SHIN:  Doesn't --

24               MS. CHOI:  Elied.

25               MR. SHIN:  Skip that part.  I'm not sure if I used the

H33OLEB4

1    word right, which is why --

2              MS. CHOI:  No, but that's what he said.

3              THE COURT:  Okay.

4              MS. MADRIGAL:  We have no problem with that, your

5    Honor.

6              THE COURT:  Okay.  With the same bracketed concern?

7              MS. SANTILLO:  I just plan to research the venue

8    issues, and I just want to -- it seems fine to me right now.

9    So I just -- I want to go back to the cases.

10             THE COURT:  Yes.  I can tell you you're not going to

11   find much.  What there is is Parrillo, which is up on appeal.

12             MR. SHIN:  Then the third -- the most substantive

13   change that we requested, it's actually a supplement, is, given

14   the evidence that's come into the case, your Honor, regarding

15   wire transactions, we've proposed that that be given as an

16   example, so we've proposed a paragraph describing how a

17   financial transaction, including a wire transfer, can establish

18   venue, and we've also proposed some language in that paragraph

19   regarding what the jury can consider in determining whether

20   such a transaction is reasonably foreseeable in terms of its

21   connection to the district.

22             And we've cited in our submission the cases which are

23   clear.  The Second Circuit cases which clearly say, one, that a

24   wire transfer can establish venue, and two, that reasonable

25   foreseeability can include the consideration of the defendant's

savvy, so savvy as an investor or savvy in business, as well as

considering whether the defendant has actually seen a document

indicating that the transaction passed through the district.

And we've cited the Ohle case and the Svaboda case in our

papers.  I understand that Ms. Santillo would like to research

and respond to that.

THE COURT:  Go ahead, Ms. Santillo.

MS. SANTILLO:  My concern is in some part related to

these issues with respect to what this conspiracy is and what

the essential conduct is.  Because they are talking about

evidence that they focused in on with respect to processing ACH

transactions with Kapcharge as establishing venue for this

conspiracy -- or I don't know if it's to the bribe as well --

but I take issue with that in terms of emphasizing that in a

jury instruction when I think it's not even properly a

consideration for what the essential elements of the conduct

are.  So that's one concern.

The other concern is the conflation of cases that

address things like wire fraud where the wire is the essential

nature of the conduct.  And in this case, we have a bribe

conspiracy case, and I want to make sure that it's crystal

clear to the jury that when they're considering the essential

conduct elements of bribery versus conspiracy -- or wire fraud,

that they're not, you know, getting an erroneous instruction to

suggest that a wire automatically gives venue.

H33OLEB4

1          MR. SHIN:  Your Honor.

2          THE COURT:  Yes.  I'll tell you my concern when I read

3     this suggestion was kind of like my reaction to whether to do

4     more in the summary, which is, there are examples in my

5     proposal which were what was used in Parrillo.  I don't know of

6     other examples of cases where those sort of examples were used.

7     Now, it's true, it's the law that got crafted in a compromised

8     situation specific to that case.  When I read your proposal for

9     an addition, I thought, well, this is too much.  This is the

10    government kind of putting its theory of venue into the

11    instruction, which is not something one would typically do.

12         My feeling, and I think this actually would eliminate

13    all of these issues, would be to -- with certainty as to the

14    reasonable foreseeability language, which I think everyone

15    agrees is appropriately included -- would be to extract all of

16    the examples and just make it a generic charge that's right on

17    the law and then you make your arguments as to venue.  That was

18    my feeling when I read it.  I got concerned that a specific

19    compromise that got crafted in a different context was starting

20    to bleed into something that, especially with the additional

21    examples which I think are in issue here, starts to bleed into

22    sort of the government's case of venue being made in the

23    instruction inappropriately.

24         MR. SHIN:  Your Honor, that sounds fine to the

25    government.  The only request we would make is that, to the

1    extent the Court were to strip out language from its existing

2    proposal, we would have a chance to look at it and respond to

3    that.

4            THE COURT:  Sure.  We worked on this this morning a

5    little bit.  I think you're going to want to look at it.  But

6    I'll read it to you.  The first paragraph is the same.  The

7    second paragraph is the same.  And then the third paragraph is

8    shortened as follows -- and you can see what I would do

9    similarly for the last paragraph -- but the third paragraph

10   would read, "As to the conspiracy charges, the government need

11   not prove that any crime was completed in this district or that

12   the defendants or any of their coconspirators were physically

13   present here, rather, venue is proper in this district if any

14   of the defendants or their coconspirators caused any act or

15   event to occur in this district in furtherance of the offense,

16   and it was reasonably foreseeable to the defendant that you are

17   specifically considering that the act would take place in the

18   Southern District of New York."  A much more standard venue

19   instruction, though it incorporates reasonable foreseeability,

20   which I think the law allows, and then a comparable truncated

21   instruction on the substantive accounts, and then you can make

22   your arguments that the evidence meets the standard, they can

23   make their arguments as to the evidence not meeting the

24   standard, and appropriately the jury decides.

25           MR. SHIN:  That sounds reasonable to the government,

H33OLEB4

```
 1    your Honor.

 2              MS. SANTILLO:  That sounds good.  Thank you.

 3              THE COURT:  Ms. Madrigal?

 4              MS. MADRIGAL:  We would agree with the Court's

 5    proposed instruction.

 6              THE COURT:  I'll let you take a look at the specifics.

 7    I think that then eliminates points one and two.

 8              MR. SHIN:  I think it does, your Honor.  And even

 9    though I put in -- we put in a submission with three points,

10    there was one additional -- this is very minor -- this is very

11    minor, your Honor.

12              So there's a reference here in the first paragraph --

13              THE COURT:  Let me pause and give my law clerk an

14    instruction.

15              (Pause)

16              THE COURT:  Mr. Rosen is going to email you basically

17    what I just read.  I just want to -- maybe you, like me, like

18    to look at things written down, so I'll give everybody another

19    chance to look at that.  But I think both that it's right, it's

20    not repeating what any -- as with any jury instruction, there

21    is compromise specific to a case, and I think this is a better

22    charge, and your request for an additional example has helped

23    me see why.

24              MR. SHIN:  Understood, your Honor.

25              THE COURT:  Go ahead.
```

1          MR. SHIN:  It's a very minor point.  In the first

2     paragraph, in lines 4 through 6, the charge gives a list of the

3     counties in the Southern District.

4          THE COURT:  Yes.

5          MR. SHIN:  As your Honor has already seen, much of our

6     evidence of venue relies on contacts, on acts, overt acts,

7     what's the connection to Manhattan, which the jury will

8     obviously know is in New York County.

9          We are planning to introduce, however, some documents

10    next week that establish overt acts with the connection to

11    Garrison, New York, which is in Putnam County, and Garrison,

12    which we expect many members of the jury may not be familiar

13    with, so we would request an instruction here simply stating

14    it's a fact -- I don't think there's any dispute -- that

15    Garrison, New York, is in Putnam County.

16         I haven't had a chance to discuss this with defense

17    counsel, but -- and because these are documents that we're

18    presenting, there's no specific witness from whom we would

19    elicit that testimony that Garrison is in Putnam County, unless

20    we were required to put on a summary witness for that specific

21    fact.

22         MS. SANTILLO:  Was this the list of things that we

23    were informed would be the basis for venue?

24         MS. CHOI:  It's not for you.

25         MS. SANTILLO:  Okay.

1          MS. CHOI:  It's for Lebedev.

2          MR. SHIN:  This is Tensor 2D, Melissa.

3          MS. MADRIGAL:  Great.

4          MS. CHOI:  Tensor 2D is headquartered in Garrison,

5     New York.

6          MS. MADRIGAL:  The one issue with that is it just

7     singles out --

8          THE COURT:  For the sames reason I don't want to --

9     why don't you work out a stipulation that Garrison is in

10    Putnam, and then you can tell the jury in your closing.

11         MR. SHIN:  Thank you.  Understood, your Honor.  Thank

12    you very much.

13         MS. CHOI:  On the question of the venue notice, I just

14    wanted to update your Honor.  So we followed your Honor's

15    instruction last week, we're still going through the evidence,

16    I've already informed defense counsel that we will be providing

17    them a list with the remaining government's exhibits that we

18    seek to introduce, one long list this weekend so that we can

19    just try to get it all in without having to do what we've --

20    you know -- the negotiations sort of seriatim in interest of

21    making sure that things are efficient.  And that as we noted

22    there, we reserve our right to add venue points and to narrow

23    the scope of what we argue with regard to venue either way.

24         THE COURT:  What's next?  Ms. Madrigal?

25         MS. MADRIGAL:  Instruction number 46 on page 68,

defendant's right not to testify.  And this might be a bit

premature at this point, but we have a concern with maybe one

defendant testifying and the other one not testifying, so I'm

not sure whether the Court would like to address this now.

THE COURT:  I think that we should plan for that

eventuality.  Do you have a proposal for that possibility?

MS. MADRIGAL:  We have a proposal in the event that

Mr. Gross testifies and Mr. Lebedev does not testify.

THE COURT:  Okay.

MS. MADRIGAL:  It would be to add -- I mean, I guess

we would have to change line 3, as well, but our proposal would

be to add, in line 9, after "witness stand", we would add the

following sentence:  "In addition, even if one defendant

testifies, no adverse inference may be considered against the

other defendant who did not testify."

MS. CHOI:  That's fine, your Honor.

THE COURT:  And I want to hear from Ms. Santillo, but

that could be used if -- so we're only giving this instruction

if any defendant testifies.  If one defendant testifies but the

other doesn't, that would be the proposed instruction.

MS. MADRIGAL:  Yes, your Honor.

THE COURT:  Ms. Santillo?

MS. SANTILLO:  I have no objection to that.

THE COURT:  All right.  So could you just give it

again?

H33OLEB4

1          MS. MADRIGAL:  Absolutely.  It would be after -- it

2     would be line --

3          THE COURT:  Line 9.

4          MS. MADRIGAL:  Line 9, after "witness stand".

5          THE COURT:  New sentence.

6          MS. MADRIGAL:  New sentence.  "In addition, even if

7     one defendant testifies, no adverse inference may be considered

8     against the other defendant who did not testify."

9          THE COURT:  And then continue with the last sentence.

10          MS. MADRIGAL:  Yes, your Honor.

11          THE COURT:  Yes.  We'll note in the current draft

12     that, as we have in other places, that this is if necessary,

13     and we'll make sure that we scrub for the final version.

14          MS. MADRIGAL:  And then, sorry, your Honor.  In the

15     event that that does happen and only one defendant testifies,

16     then we would also have to edit the first sentence.

17          THE COURT:  Okay.  So this is instruction number 47.

18     Go ahead.

19          MS. MADRIGAL:  No.  I was just still referring to

20     instruction number 46.

21          THE COURT:  I'm sorry.  What's the suggestion?

22          MS. MADRIGAL:  Just that obviously, in the event that

23     only one of the defendants testifies, we will have to edit the

24     first sentence of instruction number 46.

25          THE COURT:  I see.  Yes.  So that sentence would

1    change to "one of the defendants did not testify in this case".

2                   MS. MADRIGAL:  Yes.

3                   THE COURT:  All right, thank you.

4                   Next.  Any request to number 47 if we're faced with

5    the situation of one defendant testifying and one not?

6                   MS. MADRIGAL:  No, your Honor.  We're fine with that

7    instruction as drafted.

8                   THE COURT:  Next.

9                   MS. MADRIGAL:  Instruction number 49 on page 71,

10   accomplice/cooperating witness testimony.

11                  THE COURT:  Okay.

12                  MS. MADRIGAL:  We have two proposals.  The first

13   proposal would be to add a paragraph after -- on line 4, after

14   that sentence, and the proposed sentence would be the

15   following --

16                  THE COURT:  So this would be after where it ends

17   "immunity", period.

18                  MS. MADRIGAL:  Correct.

19                  THE COURT:  Go ahead.

20                  MS. MADRIGAL:  "Specifically, Ricardo Hill testified

21   under the terms of a cooperation agreement.  Jose Freundt also

22   testified under the terms of a cooperation agreement.  Jen

23   Wotherspoon testified under the terms of a non-prosecution

24   agreement."

25                  THE COURT:  I mean, I suppose just as a preliminary

H33OLEB4

1    matter that suggests maybe that the prior sentence should

2    include "non-prosecution agreement", right?

3          MS. CHOI:  Correct.

4          THE COURT:  So under the terms --

5          MS. CHOI:  Right.  It says "no one's been immunized".

6          THE COURT:  So we would change the prior sentence to

7    "of a cooperation agreement or non-prosecution agreement".

8          MS. MADRIGAL:  Yes, your Honor.

9          THE COURT:  And then the proposal to lay out

10   specifically who did what.

11         Ms. Choi?

12         MS. CHOI:  Your Honor, I think it's highly unusual for

13   any jury instruction to point out specific witnesses falling

14   into those categories.  Obviously, as a matter of fact those

15   are the witnesses that are implicated, but I've never seen that

16   happen in any of my trials.  Similarly, it's the same reason

17   why we don't have specific agents that are named in the parts

18   where we talk about law enforcement witnesses, or the specific

19   people from the NCUA, or about places where we talk about

20   government witnesses.  It just seems like for the same reasons

21   why you didn't want to single out other things with more

22   specificity on the venue counts, it just doesn't really make

23   sense to do that.

24         THE COURT:  What's your thinking, Ms. Madrigal?

25         MS. MADRIGAL:  The first thing I'd like to say is, we

1    actually took many parts of this proposal from Judge Rakoff's

2    instruction in our last case, United States versus Lumiere.

3              Now, I do agree with what Ms. Choi said in light of

4    the Court's previous edits to the jury to remove excess.

5              THE COURT:  There are examples in this charge in which

6    specific reference is made.  It's a compromise.  We're not

7    going to rehash the whole case in the jury instructions.

8              MS. MADRIGAL:  Understood, your Honor.

9              THE COURT:  But for clarity, it might be necessary.  I

10   think it may have been that I've given a charge that noted who

11   was being talked about for one reason or the other in this

12   case.  I'm not sure it's necessary, so I'd like to know what

13   your thinking is for asking for it.

14             MS. MADRIGAL:  We just think it makes it clearer for

15   the jury.  I mean, keeps the facts aligned.

16             MS. CHOI:  That's for argument, your Honor.  I mean,

17   we will make reference to these witnesses and they will make

18   references to these witnesses.  There's no need.

19             THE COURT:  I don't think it's necessary here.  And to

20   try to keep these for what's necessary for clarity and the

21   like, I'll overrule that request here.

22             MS. MADRIGAL:  But, your Honor, we are going to make

23   the change from the "grant of immunity" to "non-prosecution

24   agreement".

25             THE COURT:  Yes.

H33OLEB4

1           MS. CHOI:  Yes.

2           THE COURT:  I guess one question is, is there anywhere

3    else -- it doesn't seem like it.  That's the only change that's

4    necessary.  It seems like we can go ahead and cut on page 72

5    lines 1 through 4?

6           MS. CHOI:  Yes, your Honor.

7           THE COURT:  Okay.

8           MS. MADRIGAL:  We have one additional proposal.

9           THE COURT:  Go ahead.

10           MS. MADRIGAL:  It would be to eliminate lines 6

11   through 8, beginning with "the testimony of such accomplices is

12   properly considered by the jury, "eliminate that sentence.

13           MS. CHOI:  Sorry.  On which page?

14           MS. MADRIGAL:  Same instruction.  71.  Lines 6 through

15   8, beginning with "the testimony of such accomplices is

16   properly considered by the jury".

17           MS. CHOI:  You would get rid of that?

18           MS. MADRIGAL:  We would get rid of that and propose

19   different language.

20           THE COURT:  What's the proposal?

21           MS. MADRIGAL:  The proposal is a paragraph.  So it's a

22   bit long.

23           THE COURT:  It's what?

24           MS. MADRIGAL:  It's actually a new paragraph that we

25   would like to add.

1              THE COURT:  I'm listening.

2              MS. MADRIGAL:  Thank you, your Honor.  "The law

3     permits the use of testimony from such witnesses.  Indeed, such

4     testimony, if found truthful by you, may be sufficient in

5     itself to warrant conviction if it convinces you of the

6     defendant's guilt beyond a reasonable doubt.  However, the law

7     requires that the testimony and motives of such witnesses be

8     scrutinized with particular care and caution.  After carefully

9     scrutinizing the testimony of such witness, you may give that

10    testimony as little or as much weight as you deem appropriate."

11             THE COURT:  And that's a proposed substitution from

12    where you identified "on" through the paragraph.

13             MS. MADRIGAL:  That's a proposed substitution for

14    lines 6 through 8.  So eliminating "the testimony of such

15    accomplices is properly considered by the jury, but let me say

16    a few things that you should consider during your deliberations

17    on the subject of cooperating witnesses."

18             THE COURT:  Ms. Choi?

19             MS. CHOI:  One moment, your Honor.

20             (Pause)

21             MS. CHOI:  Your Honor, it's kind of hard because we

22    don't have the text.  Could I just see the text for a second?

23    Because I'm a little concerned about the suggestion that it

24    makes with regard to cooperating witnesses.  Is this your

25    handwriting?

H33OLEB4

1      MS. MADRIGAL:  No.

2      MS. CHOI:  Just checking.

3      (Pause)

4      MS. CHOI:  Your Honor, I don't think there's anything

5  wrong with it as a legal question.  I think the question is

6  really, is it necessary?  I know that when your Honor was

7  crafting this particular instruction in lieu of the competing

8  views of government and defense counsel and their proposed

9  instruction, that there was language along these lines that you

10  cut out.  But, I mean, as a legal matter, I don't think it's

11  incorrect.

12      THE COURT:  All right, then let's go with it.

13      MS. CHOI:  Okay.

14      MS. MADRIGAL:  Thank you, your Honor.

15      THE COURT:  Ms. Santillo, are you comfortable with it?

16      MS. SANTILLO:  Yes, your Honor.

17      THE COURT:  Do you have it on paper?

18      MS. MADRIGAL:  I do, but it's Mr. Creizman's

19  handwriting, so I'm happy to read it again.

20      MS. CHOI:  It's legible, it's just --

21      THE COURT:  Let me say that Mr. Rosen can make out my

22  handwriting.

23      (Pause)

24      THE COURT:  What's next?

25      MS. CHOI:  Your Honor, I think what's next is

1    Mr. Creizman's proposal to strike the investigative techniques

2    instruction which is on page 76.

3         THE COURT:  That's tied to the request for information

4    regarding the government's investigation of what Agent Beyer

5    said.

6         MS. CHOI:  Yes, your Honor.  I don't know if you want

7    to wait for Mr. Creizman.  I don't know when Mr. Creizman is

8    going to be back.  I would like to argue it verbally so as to

9    save paper, but maybe we should wait.  I don't know when he's

10   coming back, I guess.

11        MS. MADRIGAL:  I just have one additional comment on

12   instruction 53.  Regardless of what happens with the issue with

13   Agent Beyer, we still don't believe that there's -- we just

14   don't believe that the instruction is warranted in this case.

15   We haven't called into question, for example, Tate Jarrow's

16   investigative techniques or his undercover work with Coin.mx,

17   anything of that nature, we just don't think that the

18   instruction is necessary.

19        MS. SANTILLO:  In 55, either.

20        MS. CHOI:  Your Honor, these are standard

21   instructions --

22        THE COURT:  Well, let's take one at a time.  On

23   investigative techniques, I mean, that is an issue, right?

24   It's been put in issue through the -- setting aside other

25   aspects of why this instruction is given, Mr. Freundt was cross

1    examined on the interaction with Agent Beyer.

2              MS. MADRIGAL:  Yes, your Honor.

3              THE COURT:  So I'm not sure exactly -- I suppose one

4    question is for what purpose was that done, and what will you

5    do with it at closing?

6              MS. MADRIGAL:  Well, I think that's for Mr. Creizman

7    to speak to, unfortunately, but --

8              THE COURT:  Let's come back to that.

9              MS. CHOI:  I just note, besides the Ms. Beyer point,

10   if you recall, Mr. Creizman also cross examined Mr. Jarrow

11   about the vault and how certain pieces of evidence were dealt

12   with.  So I think irrespective of the question of *Agent Beyer,

13   there are implications with regard to the investigative

14   techniques.

15             Also, this is the standard language here because of,

16   in part, because of Mr. Jarrow's undercover work, not that

17   defense counsel necessarily made hey of that fact, but part of

18   the consideration and the reason we asked for this instruction,

19   and it's one of those things that we deal with, you know,

20   during jury selection is because it is important to the

21   government that this point be made that it doesn't matter --

22   there isn't a requirement that we do XYZ in terms of our

23   investigation, and that the presumption is that these

24   techniques are lawful if they're here, and they should not

25   speculate as to their lawfulness.  That's both with regard to

1    53 and 55.

2              THE COURT:  Right.  Okay.  I agree with that.  I'll

3    keep these standard instructions.  They're accurate and there

4    is evidence obtained from searches.  I think investigative

5    techniques is often given, and in any event is implicated here.

6    So I'll keep both of these.

7              Go ahead, Ms. Santillo.

8              MS. SANTILLO:  I think Mr. Creizman's concern was

9    about "law enforcement techniques are not your concern", and

10   they are in this case so --

11             THE COURT:  Well, we may need to take -- right.  We

12   may need to take that on that argument, but I'll bracket that

13   for the moment.

14             Anything else?

15             MS. CHOI:  Instruction 56, which is just that we

16   haven't reached agreement with defense counsel yet about

17   sending the transcripts back.

18             THE COURT:  Okay.

19             MS. CHOI:  But that might have to be changed depending

20   on what the actual agreement is.

21             THE COURT:  All right.  We'll note that.

22             I think it would be good if we can just make an agreed

23   list of open issues just so we don't lose any of those.  I

24   think I'll just ask my clerk to drop a footnote in the current

25   red line draft so we've got it in there.  So dropping a

H33OLEB4

1    footnote on instruction 56, sort of pending.

2              MS. CHOI:  Right.  And I think also with regard to

3    defendant's rights to testify or defendant's right not to

4    testify, and I think the singular, and what ends up happening

5    along those lines is another thing that's an open question.

6              THE COURT:  So those are instructions why --

7              MS. CHOI:  Yes.  Just if we're going to make a list.

8    So sorry.  Let me just look at the index.

9              Instructions 46 and 47, depending on what ends up

10   happening in the defense case.

11             THE COURT:  Right.

12             MS. CHOI:  The questions with regard to withdrawal and

13   multiple conspiracies.

14             THE COURT:  And those are implicated in what --

15             MS. CHOI:  Instruction 27 is withdrawal from the

16   conspiracy.  I don't think the multiple conspiracy instruction

17   is in there because that is what Ms. Santillo filed.  But

18   bracket 27.

19             THE COURT:  Okay.

20             MS. CHOI:  Also, I think -- and this is not an

21   outstanding issue -- I think that we can all agree that 58 and

22   59 will be applicable here, which are the summary exhibits and

23   the excerpts and redactions.

24             THE COURT:  Okay.  So we can cut the "if applicable"

25   from 58 and 59?

1          MS. CHOI:  Correct.  Because I think everyone agrees

2     that's already -- it's there.

3          THE COURT:  Yes.

4          MS. CHOI:  And then I think the only other issues that

5     are outstanding are, one, the issue that Mr. Creizman brought

6     up with regard to the instruction as to what is a crime versus

7     what is not a crime in the context of the NCUA regulations.  So

8     that's one outstanding issue.

9          THE COURT:  And that was number?

10         MS. CHOI:  That one, I think that this is -- and I'll

11    have Mr. Noble speak to this -- but I think that that's with

12    regard to his request for an additional instruction that I

13    guess is his version of what your Honor has already read to the

14    jury with regard to Mr. Curry's testimony from the NCUA.  So

15    that's Mr. Noble's bailiwick, I'm just making the laundry list.

16         THE COURT:  Okay.

17         MS. CHOI:  Then the last issue with regard to the

18    instructions is just the outstanding Creizman motion of this

19    morning regarding Ms. Beyer.

20         THE COURT:  Okay.  So if we get Mr. Creizman back

21    shortly, we'll take that up.  If not, we'll probably just break

22    for lunch and then take it up after lunch.

23         MS. MADRIGAL:  I can address the additional proposed

24    NCUA instruction.

25         THE COURT:  Okay.  This is the crimes defined by

H33OLEB4

1    criminal statutes only?

2              MS. MADRIGAL:  Yes, your Honor.

3              THE COURT:  Okay.  Go ahead.

4              MS. MADRIGAL:  So this is obviously in line with and

5    expands on your Honor's instruction to the jury.  After

6    Mr. Curry's testimony, we believe that it's necessary to also

7    have an instruction in the charge.  And this is what we would

8    propose what we submitted to the Court last night.

9              THE COURT:  Mr. Noble?

10             MR. NOBLE:  Judge, we oppose the request to charge.

11   We believe the first paragraph of the proposed charge is

12   sufficiently -- the thrust of it is sufficiently spelled out in

13   the existing charge.  Specifically, we point to page 4 of your

14   Honor's charge, lines 3 through 10 where your Honor will

15   clearly instruct the jury that they have to follow the law as

16   the Court instructs them on the law, and if any attorney states

17   a legal principle different from what the Court states the law

18   to be, then the jury is supposed to follow the Court's

19   instruction.

20             And then again at the end of the charge, in the

21   concluding remarks on page 85, the Court will again instruct

22   the jury that they are obligated to follow the law as the Court

23   instructs them, whether or not they disagree or agree with a

24   particular law in question.

25             And then it goes on to instruct the jury that they

should not be swayed by sympathy and guided solely by the

evidence without regard to the consequences of the jury's

decision, and again says "sympathy should not interfere with

your clear thinking".  We think that those charges will

adequately capture what Mr. Creizman and Ms. Madrigal have

requested, in addition to the instruction that the Court

already gave during Mr. Curry's testimony which, for the

record, is the transcripts on February 22nd, 2017 at page 1066,

lines 2 through 11 where the Court clearly instructed the jury

that "a violation of the NCUA laws or regulations is not a

crime in and of itself", and that the jury, in essence, could

not convict the defendants for the offenses with which they are

charged just based upon a violation of the NCUA laws or

regulations, and that evidence of any such violations is simply

more evidence that they can consider.

         We would consent, and we would request that the Court

reinstruct the jury as the Court previously instructed the jury

with respect to those two paragraphs -- I think I misstated it,

but it would be lines 2 through 18 on page 1066 -- at the time

of the Court's jury instructions.

         And then we would also request that the Court just

send back with the jury instructions the substantive law and

regulations that the Court read to the jury that the parties

agreed upon so that the jurors have that for their

deliberations along with the rest of the Court's charge.  We

H33OLEB4

think those instructions make it clear that the jury cannot

convict just based upon a finding of any violation of NCUA law

or regulations, and that they have to follow your Honor's legal

instructions, including the legal instructions on the crimes

and the elements thereof as charged throughout the rest of the

charge.

(Continued on next page)

1          THE COURT:  Let's separate this into component pieces.

2          The first is whether there is the need to include in

3     the jury instructions some reference and repetition of the

4     instruction that I gave around, for shorthand, regulations.

5          MR. NOBLE:  Sure.

6          THE COURT:  It sounds like there's agreement we should

7     do that.

8          MS. MADRIGAL:  Yes, your Honor.

9          MR. NOBLE:  Yes.

10         THE COURT:  So then the question is:  Do I give

11    essentially just what I gave before or do I do some different

12    version of it?  And the defense, Mr. Lebedev, has proposed what

13    came in last night.

14         MR. NOBLE:  Exactly.  And the government's position is

15    what I said.  We would propose the Court just do what it did

16    before.

17         THE COURT:  Okay.  So then the question is why not

18    just do what we did before.

19         MS. MADRIGAL:  Yes, your Honor.  This trial has been

20    replete with instances of witnesses testifying about NCUA

21    rules.  I don't think it's sufficient to send back -- this is a

22    really significant issue.  Probably three-fourths of the

23    testimony in this trial has been about NCUA regulations.  You

24    can't share results of an NCUA examination with nonboard

25    members, you have to follow all of the rules, all of the NACHA

1    rules, the ACH rules, you have to follow this under the NCUA

2    rules, this under the NCUA guidelines.  It's been a large part

3    of this trial, and I don't think the government's instruction

4    captures the importance of the jury being able to separate the

5    two things.  The jury can consider violations of the NCUA

6    guidelines in coming to a decision, but they can't solely

7    convict on that basis, and I think it's important that the jury

8    has a separate instruction on this issue just because there has

9    been so much testimony about the NCUA.

10          And we adopted this from Judge Oetken's instructions

11   in United States versus Zemlyansky, and we very closely tracked

12   that language.  So a very similar instruction has been given in

13   another case where the issues were -- you know, Mr. Noble's

14   aware -- where there was a lot of discussion about violation of

15   regulations, and this instruction was deemed appropriate in

16   that case as well.

17          THE COURT:  I have to say, I got the proposal as to

18   what to read regarding specific regulations, but I'm not sure

19   where that line was drawn, because there has been testimony

20   about specific regulations apart from those that I instructed

21   on.  Right?

22          MR. NOBLE:  Yes, your Honor.

23          THE COURT:  That line wasn't sort of kept clean

24   between what comes in via testimony and what comes in via

25   instruction.

1          MR. NOBLE:  And I think the relevance of that is, as

2     we've argued, and defendants haven't objected to that

3     testimony --

4          THE COURT:  No, they haven't, but I don't think that

5     answers the question of whether some further clarifying

6     instruction is appropriate in light of how that testimony has

7     come in.

8          MR. NOBLE:  Assuming the relevance of it -- and we

9     think it is highly relevant -- I still don't see why your

10    Honor's previous instruction doesn't fully capture what

11    Ms. Madrigal is requesting.

12         THE COURT:  Does anybody have it?  I'm not seeing it.

13         MR. NOBLE:  I have my one copy I can pass up.

14         THE COURT:  Let's start with the first paragraph,

15    Ms. Madrigal.  That seems a different point, right?

16         MS. MADRIGAL:  Yes.

17         THE COURT:  Which I think is captured in my earlier

18    instructions, so as not to confuse the issues.  I don't think

19    we need a repetition of that point.

20         MS. MADRIGAL:  Yes, your Honor.

21         THE COURT:  So I think it's just a question of whether

22    the version of the -- everyone agrees what I've given as a

23    limiting instruction, some version of that goes in, and the

24    only question is whether it's sufficient.  So I read as a

25    preliminary matter, "I'll now instruct you on certain

provisions of the Federal Credit Union Act and the NCUA

regulations.  I instruct you that a violation of any of these

laws or regulations is not a crime in and of itself; in other

words, the defendants are not charged with criminal violations

of the act or NCUA regulations, and you cannot find either

defendant guilty based solely upon a violation of the act or an

NCUA regulation.  If you hear evidence about any violations of

the Federal Credit Union Act or NCUA regulations, you may

consider it as you would any other evidence in this case."

MR. NOBLE:  Your Honor, you actually delivered it

slightly differently, and you said, going back to, "based

solely upon a violation of the Federal Credit Union Act or the

National Credit Union Administration regulations," you then

said let me say that again, and I'm going to abbreviate NCUA.

I'll just read that sentence again, and then you said, "In

other words, the defendants are not charged with criminal

violations of the Federal Credit Union Act or NCUA regulations,

and you cannot find either defendant guilty based solely upon a

violation of the Federal Credit Union Act or an NCUA

regulation."  And then you said:  "If you hear evidence about

any violations of the Federal Credit Union Act or NCUA

regulations, you may consider it as you would any other

evidence in this case."

I don't think there's a great dispute here.  I think

the way your Honor actually delivered it is basically what

Mr. Creizman and Ms. Madrigal are requesting in their proposed

charge.

          THE COURT:  And then I read the field of membership

and boards --

          MR. NOBLE:  Right.  Then you give the substance of

instructions.

          THE COURT:  And reports to the NCUA.

          Why doesn't that do it, Ms. Madrigal?

          MS. MADRIGAL:  Your Honor, there's been a lot of

testimony about the field of membership and about duties and

responsibilities that come with being a member of the board of

directors.  We just think that although --

          THE COURT:  I wonder if the point can be made by just

an adaptation of what I said, which is -- so I said I'll now

instruct you.  What if it's something like you have heard

testimony, and I have instructed you on certain provisions,

et cetera.

          MR. NOBLE:  Yes.

          THE COURT:  And then that kind of captures the body of

evidence, whether it's come in by instruction or otherwise.

          MR. NOBLE:  We would even consent to, you know, you've

heard evidence, and I have instructed you on certain laws and

regulations, including those related to field of membership,

the duties of board of directors, and reports that are made to

the NCUA by credit unions," like specific references to address

1    the issue that Ms. Madrigal is raising to allow the jury to

2    reference back to the particular evidence that they've heard.

3            MS. MADRIGAL:  That would address our concerns, your

4    Honor.

5            THE COURT:  Ms. Santillo?

6            MS. SANTILLO:  Yes, that sounds fine.

7            THE COURT:  Here's what I'll ask that you do:  If you

8    could just --

9            MR. NOBLE:  Draft it with defense counsel?

10           THE COURT:  Yes, pull the words.  I couldn't actually

11   tell the difference between what you said I read and what I

12   read other than I substituted -- I hate acronyms, so rather

13   than saying the act, I think I just said Federal Credit Union

14   Act" each time.  I think that's the only difference, but if

15   you'll just agree on what it sounds like is joint agreement and

16   put that in by letter, I'd appreciate it.

17           MR. NOBLE:  We'll do that.

18           MS. MADRIGAL:  Thank you, your Honor.

19           THE COURT:  Thank you.

20           MS. SANTILLO:  Your Honor, I know we're finishing up

21   the charge conference here, but I want to pick up on the point

22   the government made, which is we have testimony from another

23   examiner, and to the extent there's going to be any discussions

24   of regulations, that we should front the issue and make sure

25   that it's not the witnesses who are testifying about the law.

1           THE COURT:  Okay.  You'll discuss that, please.

2           MR. NOBLE:  Yes, Judge.

3           THE COURT:  Thank you, Ms. Santillo.

4           What else?

5           So, that's it for the charge.  As it stands, we have

6     Mr. Creizman now, so I think we have the Beyer and

7     investigative techniques issue, and then we have the verdict

8     form.  I think --

9           MS. CHOI:  And one other thing, your Honor:  The

10    DreamHost motion.

11          THE COURT:  Right.  And I do want to hear you.

12          I guess the question is should we take a short lunch

13    break and then return?  I think that's my suggestion.

14          (Pause)

15          THE COURT:  We're going to try to clear a few matters

16    that remain on my calendar.

17          Let's take a lunch break for a half an hour.  Is that

18    sufficient?  And we'll come back, and we'll address the motion

19    to compel/investigative techniques issue, the verdict form, and

20    the DreamHost email issue, which has been briefed, and I have a

21    few questions before resolution on that.

22          I think that deals with what we need to take up today,

23    with bracketing what I'm going to get briefing from everybody

24    on.

25          MS. SANTILLO:  If we're moving off of the charge

H33KLEB5

1    issues, I just want to say one thing, which is:  We're

2    narrowing down two or three character witnesses, so we would

3    just ask the Court's standard character witness charge.

4              THE COURT:  Okay.  We'll circulate over lunch my

5    standard character witness charge.

6              So we'll reconvene in a half an hour.

7              MR. NOBLE:  Okay.

8              THE COURT:  Thank you.

9              MR. NOBLE:  Thank you.

10             (Luncheon recess)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                              AFTERNOON SESSION

                                  1:06 PM

 3          THE COURT:  Picking up where we left off:  Go ahead.
 4   So, Ms. Choi, this is a response to the filing on behalf of
 5   Mr. Lebedev last night, or this morning, I'm not sure when,
 6   regarding --

 7          MS. CHOI:  I think it was this morning, your Honor.

 8          THE COURT:  This morning.

 9          -- regarding --

10          MS. CHOI:  Technically.

11          THE COURT:  -- a motion to compel information that the
12   government has about Agent Beyer suggesting to Mr. Freundt that
13   he extract a bonus from Coin.mx before it shuts down and then a
14   related request as to government investigative techniques.

15          MS. CHOI:  Yes, your Honor.  So, if I could deal with
16   in that turn, I think the first question is whether or not the
17   government has fulfilled its obligations with regard to
18   disclosure.  I think there is no dispute that we, well in
19   advance of trial, provided all voluminous 3500 both with regard
20   to Special Agent Jarrow and his interactions with Ms. Beyer, as
21   well as with regard to Mr. Freundt's statements, including that
22   April 2016 statement to the government regarding the statement
23   at issue.  As that 3500 revealed, Mr. Freundt has been
24   consistent about this representation, that he interpreted
25   whatever Ms. Beyer said to him as giving him the ability to pay

1    himself out of the Coin.mx coffers, at least with regard to the

2    backpay or whatever else he might have been owed.

3            So, with regard to that, as your Honor had already

4    ruled when we were dealing with this at sidebar, they have been

5    placed on notice.  They could have asked for follow-up.  In our

6    view, he's been consistent with this interpretation.  They

7    could have asked for follow-up at that point with regard to

8    what Ms. Beyer did or did not say.

9            THE COURT:  Wait, I'm sorry.  At what point?

10           MS. CHOI:  When they got the 3500 material.  They made

11   the choice, strategic or otherwise -- when the material makes

12   clear that this has been Mr. Freundt's position consistently,

13   they didn't ask us for follow-up with regard to what happened

14   to Ms. Beyer, have you interviewed her, have you talked to her,

15   or anything along those lines.  They made the decision,

16   strategic or otherwise, to at least take at face value what

17   Mr. Freundt had said in those prior statements to the

18   government.

19           THE COURT:  No, they made the decision not to take it

20   at face value.  They thought it so shocking, that it unlikely

21   to be true.  Now, you can call that a strategic decision, but

22   at least the representation as to the timing of this was that

23   they were surprised to have a government witness say that a

24   government agent had told him to help himself to $5,000, and it

25   was upon that moment of realizing that he was sticking to that

1  testimony here in court, that the issue took on a new light for

2  them.

3        Let me just say, I don't think waiver is where you

4  want to be going.

5        MS. CHOI:  It's not a waiver argument, your Honor.  I

6  think it's an argument about whether or not -- what should we

7  do now and what is the current testimony.

8        THE COURT:  Yes.

9        MS. CHOI:  With regard to our Giglio obligations, we

10 have no information that that statement was false, so we were

11 not obligated at that point to disclose or presently to

12 disclose because we were not aware of any information to the

13 contrary, and I think part of that goes to what I have alluded

14 to before, which is that this is an agent who took an extended

15 period of leave having nothing to do with her integrity or her

16 truthfulness, so we didn't have a Giglio obligation with regard

17 to that.

18        But having totally to do with personal circumstances,

19 we knew that we didn't have to call her, nor the dozens of

20 other witnesses that may have participated on the takedown day.

21 And we ran our normal Giglio checks, as we do, to see if there

22 would be anything else, and we did not get any positive hits

23 with regard to that while she was on this extended leave.

24        Now, the testimony, as it currently stands, is:  As

25 your Honor precluded us from clarifying, it is that there is a

H33KLEB5

```
1    special agent who was part of this investigation, who gave Jose
2    Freundt the ability to go and do this backpay, okay.  So this
3    is something that goes to the integrity of the investigation.
4    Your Honor precluded the government from clarifying her role
5    through that witness of whether or not he's even seen her
6    again.  So as of now, it is a law enforcement officer who has
7    in some way sanctioned this activity and participating in the
8    investigation.  The defense is free to argue from that.
9            Now, the relief that they seek, which is different
10   than what Mr. Klingeman --
11           THE COURT:  Well, one point on that:  If I wasn't
12   clear, the reason for precluding that testimony was that this
13   witness, though he can testify to his continuing contacts with
14   that agent, has no basis for knowing what the agent's -- and I
15   actually think this hooks back up to where we are -- has no
16   basis for knowing what the agent's role was.  And part of
17   Mr. Klingeman's motion in this regard was that from what the
18   government had represented, the government didn't much know or
19   fully investigate what her role was.
20           MS. CHOI:  Your Honor, I think it's two different
21   questions.  One is, I can make representations about what her
22   role was in the investigation of Coin.mx.  What I couldn't make
23   a representation about is what she told Jose Freundt.  That, I
24   cannot make any representations about at this point because we
25   have no information about that.
```

1              I can tell you what I know from -- as is the same as

2     what defense counsel knows because we've disclosed it, we've

3     disclosed the communications she had with Mr. Jarrow leading up

4     to the takedown, the fact that after she interviewed both

5     Mr. Freundt and Ms. Wotherspoon the day of the arrest on

6     July 21st, that there had to be follow-up reports of what those

7     conversations were that she sent back to Special Agent Jarrow.

8     And I can represent to you, your Honor, that, in combination

9     with this hard drive issue -- I'm not sure I can look at the

10    3500, but when the timing of the return of the hard drives

11    were, that's it.  She has not done anything else with regard to

12    the investigation, she has not interacted with any of the

13    government witnesses.  We don't view her as any different than

14    any other of the dozens of law enforcement officers that were

15    involved on the day of the arrest in multiple different

16    countries.

17             THE COURT:  I accept that, and, yet, my ruling on the

18    question of witnesses is that that witness would have no

19    insight into that information, and I was uncomfortable with the

20    suggestion that was being elicited by the proposed question

21    that he somehow could speak to what that agent's level of

22    involvement in the investigation was.

23             MS. CHOI:  Right.  And to be clear for the record, the

24    question the government posed was:  Have you ever dealt with

25    her after that date, and you precluded us from going down that

1    road.  Be that as it may, I think everyone agrees the present

2    state of play is there is purportedly a rogue special agent of

3    the Secret Service who suggested to Mr. Freundt that he should

4    take this money, and she had some role in the investigation,

5    right?  Those are sort of the predicate facts as to how they

6    presently are in the record.

7              THE COURT:  Yes.  And it's a cooperating testifying

8    witness who was encouraged by the state of facts as we have it

9    not at the time, but now --

10             MS. CHOI:  Correct.

11             THE COURT:  -- to take money from Coin.mx before it

12   shut down.

13             MS. CHOI:  Well, I think it's actually the inference,

14   your Honor, that he was not a cooperating witness at the time

15   when he was given that inference.

16             THE COURT:  Right, but he is now.

17             MS. CHOI:  Right.  Maybe I misinterpreted, I think you

18   maybe said the opposite.  But, yes, he was not a cooperating

19   witness at the time these statements were made, he is now, and

20   I think on redirect, it was established that we will be getting

21   that money back through the forfeiture and restitution.

22             But in any event, that's the state of play.  We are

23   all in agreement with what's going on.  The remedies that

24   Mr. Creizman are now seeking, the specific applications he's

25   now seeking, I think are now inadmissible for two different

H33KLEB5

1    reasons:

2            One is, it is of marginal relevance with regard to

3    that particular statement unless it is -- that they're going to

4    make the opposite point, which is that Mr. Freundt was lying

5    when he took the stand, in which case it's barred by Rule

6    608(b), because it would be extrinsic evidence in order to

7    prove that this particular law enforcement witness was lying.

8            So if we go down the road -- sorry, that this

9    particular cooperating witness -- I'm sorry, your Honor, I'm

10   feeling a little bit ill right now -- that the cooperating

11   witness was lying at that time, right?  That would be the only

12   reason for them to want to call Special Agent Beyer or to get

13   other further information with regard to that.  And that is

14   flatly barred by Rule 608(b).

15           Alternatively, they may call Ms. Beyer for some other

16   purpose, but to do so, you need to realize that -- and it's a

17   longstanding rule of common law -- that you can't simply call a

18   witness in order to impeach her own credibility.  So they would

19   have to establish some other relevance that Ms. Beyer would be

20   able to, in this eleventh hour, add to this particular case.  I

21   would posit, your Honor, that this is a sideshow.  It is not --

22   the point they wanted to make with regard to the investigation

23   has been made.  They are free to argue that with regard to

24   closing.  To now reopen this, to have Ms. Beyer take the stand

25   in order to impeach an external cooperating witness, is not

H33KLEB5

allowed under the rules.  It's -- that line of questioning

would not be allowed under the rules under Rule 608(b), or,

alternatively, simply to call her to make the further point

that this is a corrupt law enforcement agent and try to impeach

her would also not be allowed under the rules because you're

not allowed to call a witness in order to impeach her.

Quite frankly, if the defense is going to go down that

route, there are obligations they need to meet, which they

allude to because they understand in full -- understand full

well that there are certain regulations that they need to deal

with, which include their Touhy obligations.  They haven't sent

a Touhy letter.  Who knows what kind of delay this would create

with regard to this issue.  At best, either -- testimony that

is precluded, that would be precluded because it would simply

be to impeach Jose Freundt or is cumulative of the fact they

already have it in the record, which is that there are

questions with regard to Ms. Beyer.  And separately from that,

I think, given that the current record is what it is, and your

Honor has recognized this, that's why we need the investigative

techniques question because I think they can argue that there

is a problem with regard to Ms. Beyer, and they are obviously

going to be able to do that given your Honor's rulings, but I

think the jury should be instructed on some level not to

speculate writ large about what role that might be in the

bigger investigation.  If she is called to the stand, I think

1    it will be consistent with what I've said to your Honor, which

2    is that she did not play a large role in the investigation

3    beyond the ones that we have already identified.  There is no

4    evidence that's been admitted to date where her credibility

5    would be at issue, there's no chain of custody problems that

6    implicate her, there are no representations that were made by

7    her to law enforcement that we've relied on in any of the

8    evidence to date.

9            So it would simply be a sideshow on an issue of either

10   marginal relevance or one already established by the defense.

11   So, at this eleventh hour, I don't think that there is any

12   basis for the application.  I don't think it's necessary, and I

13   think it will create a sideshow about the government's entire

14   investigation being questioned when there really isn't a great

15   factual basis for it.

16           THE COURT:  The first half of the application, which

17   is to compel the government to turn over any materials related

18   to the investigation, I'm not sure I caught what your precise

19   response -- you said you've met your Giglio obligations.

20           MS. CHOI:  Yes, we don't have any further information

21   about what else happened with regard to investigating this

22   issue with regard to Ms. Beyer, I think in part because when it

23   first came up, again, she was gone for an extended period of

24   time.  I think she might be back at Secret Service, I'm not a

25   hundred percent sure of that, but she was gone for an extended

1    period of time for personal reasons, and so, as a result, I'm

2    not sure -- I don't know what the actual status is with regard

3    to that, but we are not aware of any information, one way or

4    the other, about whether she was questioned about this

5    particular issue.

6             THE COURT:  Is your response, then, to the specific

7    request to compel, that you don't have any additional

8    information?

9             MS. CHOI:  Correct.

10            THE COURT:  That you aren't saying they're not

11   entitled to it, you have nothing further?

12            MS. CHOI:  Well, I think under Giglio and Brady, it's

13   what information we have presently, and we don't have any other

14   information.  So I can't even represent that the question has

15   been posed to her because I don't know if that has, in fact,

16   happened, in part, because she was gone for this extended

17   period of time.

18            The obligation is only coextensive to the fact of the

19   material facts existing, and that it would be in our

20   possession.  We don't have either of those.

21            THE COURT:  Mr. Creizman?

22            MR. CREIZMAN:  Yes.  I think one aspect that the --

23            THE COURT:  Microphone.

24            MR. CREIZMAN:  Sorry.

25            I think one aspect that the government is ignoring is

the idea that a person who's coming in to cooperate would

reveal in a proffer session, and there's only notes of one

proffer session where this disclosure exists.  It's not that

we've seen that he consistently maintained that position until

the trial, but he expresses something that would sound to me

that would raise issues -- thoughts that either this person had

extreme skepticism by the government and would be a situation

where they would be pressing him very hard as to whether he was

telling the truth or not, and/or it would raise significant

concerns about the conduct of a special agent for the Secret

Service.  This would raise significant issues of misconduct.

          And it would seem to me whether she's on leave or not,

as long as she's still with the Secret Service especially, it

would seem a pretty easy -- it wouldn't be that hard for them

to reach out to Special Agent Beyer, whether it be the

government, the Secret Service, and say, hey, Special Agent

Beyer, what happened, did you tell him that he could withdraw

this money, you knew that this was a money-transmitting

business, you knew the whole background, and, again, we can

produce the 3500 material that would suggest this, and then

Special Agent Beyer would have an answer.

          So, what this raises is whether the government, in a

sense, consciously avoided finding out the truth, because if

they found out the truth that Special Agent Beyer had indeed --

that Freundt was lying, then they wouldn't be able to put

H33KLEB5

Freundt on as a witness, or they would admonish him very

significantly, or Special Agent Beyer would be questioned, and

there would be a whole issue with respect to that.  Why did

Special Agent Beyer let $5,000 -- it may very well be true that

Jose Freundt wouldn't have taken out $5,000 unless Special

Agent Beyer told her it was okay.  In that sense, there must

have been some sort of belief that Jose Freundt was -- whatever

he was doing was completely -- he was okay, whatever he was

doing, he didn't know, it was legal, and then for the

government then also, knowing that he took the $5,000, it's not

just a matter of forfeiture from your crimes, this is more, you

took $5,000, okay, this is an illegal money-transmitting

business, you better give that money back right now.  That

doesn't seem to have happened.

          So these are issues that I think are very probative of

the investigation of whether Jose Freundt was telling the truth

or not, what the government did to determine whether Jose

Freundt was telling the truth or not, were they happy to have a

cooperating witness just as long as, look, I don't want to

know -- if he's lying, I don't want to know.  That's the

concern.  That's the other aspect of this that I don't think

the government is recognizing here, and it's significant.

          THE COURT:  Well, I think there's still the question

of what -- so what is the specific application?  And what are

you going to do with it?  Obviously, when Freundt was on the

H33KLEB5

1   stand, you get to impeach, and you get to inquire about matters

2   that would go to his truthfulness.

3            MR. CREIZMAN:  That's correct.

4            THE COURT:  So then the question is now -- and you

5   might be right -- what is left to do that has relevance to the

6   case.

7            MR. CREIZMAN:  I think it would be relevant to -- I

8   think it's relevant to --

9            THE COURT:  So the first thing:  They say they don't

10  have anything more.  So you've sought to compel them to produce

11  whatever they have as to their investigation as to what

12  occurred.

13           MR. CREIZMAN:  But when I say "they," I would mean the

14  prosecution team, and that would include the Secret Service,

15  that would include some sort of office of professional

16  responsibility from the DOJ.  The U.S. Attorney's Office

17  sometimes would say narrowly we don't have it, the Secret

18  Service has it.  It's concerning to me.  The more I've thought

19  about this, the more it raises the issue, did the government

20  put on a witness that -- I would tend to think that -- they had

21  to be more skeptical than just saying that makes sense, let's

22  move on, oh, we'll check out with Special Agent Beyer, and then

23  Special Agent Beyer is on leave, so we'll leave her alone.

24  That doesn't sound --

25           THE COURT:  That's the representation -- well, I think

```
 1    it's slightly different.  This is my interpretation of the
 2    government's stance:  They think it's she said something to him
 3    that gave him the impression that he could do this, which is
 4    different than, Mr. Freundt, go help yourself to a nice bonus,
 5    so there's a gray area.  He interprets it as authorization to
 6    do this.  They were concerned, they've told me, they contacted
 7    Secret Service, they learn that she's out on leave for an
 8    unrelated matter, and they let it go.
 9              MR. CREIZMAN:  Right.  But that's the thing, they let
10    it go.  Meaning it probably was -- it could have been a
11    misunderstanding.
12              THE COURT:  What are you going to do with the fact
13    that they let it go?  Ultimately, where does this go?
14              MR. CREIZMAN:  The government is so desperate to
15    convict Yuri Lebedev, that they found a witness who said
16    something that would certainly result in an investigation of an
17    agent.  There was no investigation of any agent.  They chose to
18    be just willfully blind to knowing whether he said -- whether
19    he was being truthful or not.  No one seems to have been
20    punished for this.  There's been no explanation.  It would have
21    been a simple call.  All you had to do is call Ms. Beyer, but,
22    instead, rather than find out what the truth was, Jose Freundt
23    got on the stand and said what he said.  Who did you commit
24    your bribery with, which I find to be an objectionable question
25    because it's a conclusion, but who did you commit your bribery
```

with?  Yuri Lebedev.  Well, you took 5 -- either he lied about
the $5,000, and the government let it go, he lied about being
authorized to take it, or he was actually told that he could
take it, and the government is not doing anything about -- the
government still hasn't asked for the money back, and the
government still hasn't done anything to determine what the
status of Special Agent Beyer is, whether she should be fired,
or whether she should not have leave anymore, whether she
should be out.

That's the one area where it's not clear.  How much
due diligence did the government do in checking out Jose
Freundt and whether he was someone that they should offer to
the jury -- the testimony to the jury, because I think the
government probably believes there was a rogue agent.  I don't
know what the government believes.  Or that there was a
mistake, but that would be easy enough to figure out, what did
Ms. Beyer say?  Did she say -- I mean, it's important.  Then
that, too, would go to Jose Freundt's credibility, too, if the
jury heard that Ms. Beyer said -- I don't know how you get --
look --

THE COURT:  On that point, the point you just started
there making, that's where I think the government's 608
objection kicks in.

MR. CREIZMAN:  But I think that this is -- first of
all, I'm not so sure that it is a collateral issue, but even it

 1     were, I don't think 608(b) necessarily precludes -- I think

 2     that the Court has discretion to allow questioning on it.  And

 3     certainly I may not be able to prove something up with

 4     extrinsic evidence, but I could certainly ask a witness about

 5     it.

 6          THE COURT:  Right, you can ask -- that comes back to

 7     my first question.  I think, clearly, these are areas to have

 8     been, and were, explored with Freundt.  You gave Ms. Choi a

 9     hard time about the waiver argument, but maybe this is a

10     version of what she was saying.  There was an opportunity to

11     kind of pursue matters that go to this point that could have

12     appropriately been part of the cross-examination of Freundt.

13     At some level were.

14          MR. CREIZMAN:  I think I exhausted those points with

15     respect to Mr. Freundt.  The question is what did the

16     government do and what happened to Special Agent Beyer.

17          THE COURT:  To the extent you sort of say there are

18     those points, if they ultimately come back to impeaching

19     Mr. Freundt, right, then, yes, you could have inquired about

20     them, but to the extent you're trying to prove them up by

21     suggesting you might call Agent Beyer or the like, what's your

22     response to the contention that that just turns into a 403/608

23     problem?

24          MR. CREIZMAN:  But what if it turns out that the --

25     what if there is an argument that the government wasn't careful

H33KLEB5

enough about whose word they accepted as true and whose word
they offered to the jury?  And they weren't careful enough
because they didn't pursue this, they didn't pursue something
that you would expect the government to pursue if they found
out that an agent might have been involved in misconduct?  It
would have been -- it's not that complicated to call a person
and say what happened.  There are plenty of communications back
and forth between Tate Jarrow and Special Agent Beyer, and
there was no discussion of this particular $5,000, you know,
you're authorized, take a nice bonus for yourself.  So why not?
Why was there no -- or was there, and if there were, if there
was something, I think we should know.  And if there wasn't, we
should know, too, because it goes to whether the government is
putting on witnesses that -- look, this is who -- I mean, it
really -- the government's case is this weak, that they have to
put on someone who they don't want to find out whether it's
true or false.  That is the concern.

          (Continued on next page)

1           THE COURT:  Ms. Choi.

2           MS. CHOI:  Your Honor, that is precisely the question

3     of whether the government wasn't careful enough is -- with

4     regard to this particular issue is precisely what the jury is

5     here for.  Right?  I mean as it presently stands, they're going

6     to be able to argue, and I presume that's what they are going

7     to argue, that Special Agent Beyer is a rogue agent, it

8     undermines the entire integrity of the investigation.

9     Mr. Creizman's representation that we are so desperate as to

10    need Jose Freundt -- willing to bend over backward to have Jose

11    Freundt take the stand is belied by the clear documentary

12    evidence that Yuri Lebedev himself offered to pay the bribe,

13    not once but twice in that --

14          THE COURT:  I don't need to hear your summation.

15          MS. CHOI:  Fair enough.  I just don't understand -- at

16    bottom, your Honor always goes back to what is the application?

17    I don't know what the application is now, because if it's just

18    the jury should be able to question the government's integrity,

19    that's the record they have.  That is precisely the record they

20    have.  It's record that your Honor protected when you limited

21    line of redirect that we sought to introduce.  So they have

22    that argument.

23          I don't really know what the prejudice is with regard

24    to this other suggestion that's impugning what we did with

25    regard to trying to follow up on this question.  I can

represent to your Honor, when you were explaining to me -- or

explaining to Mr. Creizman that there could be this sort of

middle ground, that's I think where we find ourselves.

We have no information standing here to the contrary

of what Mr. Freundt said and what his belief was, which is

whatever she may have said to him that gave him authority.  And

they are free to argue that that undermines the government's

case.  And I don't see what --

I think your Honor has pointed out the crux of the

matter, which is, if it's not that, if it's going to be

something else, if it's not undermining the government's case

because of the integrity -- our integrity has been called into

question, that is all precluded by the rules.

MR. CREIZMAN:  The question is, we can argue that

Special Agent Beyer is a rogue agent.  We could argue that Jose

Freundt was clearly lying, what kind of special agent would let

someone take $5,000.

THE COURT:  I mean, you could even do the either/or.

Either Jose Freundt lied to you on the stand and told you that,

you know, an agent of the United States Secret Service told him

to take $5,000, or there's a rogue agent that the government

hasn't called here to testify -- well, anyway, I won't --

MS. CHOI:  Wait a second.

THE COURT:  -- I won't start that one.  I'm sustaining

my own objection.

1              MR. CREIZMAN:  But that is the point.

2              THE COURT:  Well, so then make your application.  Not

3      we want to call Agent Beyer to the stand to impeach Jose

4      Freundt, but Ms. Choi and I have invited you, what's the

5      application?  What are you asking for?

6              MR. CREIZMAN:  I would like to know whether any -- I

7      think that I would like to know whether anyone was assigned

8      from either the secret service, the Department of Justice

9      Office of Professional Responsibility, the U.S. Attorney's

10     Office, someone was assigned to investigate this claim.  I

11     can't imagine, once Jose Freundt walks into the U.S. Attorney's

12     Office with his lawyer, I could just imagine -- I mean, if I

13     heard a client say this to me, I would be very reluctant to

14     bring that client into the U.S. Attorney's Office for a proffer

15     without -- just to say something along those lines, 'the agent

16     told me to do it'.  And I would imagine that there would be

17     fierce questioning of that on Jose Freundt.  And maybe Jose

18     Freundt held up to it.  But then why shouldn't the jury know

19     that Special Agent Beyer is on leave, and that there was no

20     investigation done.  That the government basically says I

21     want -- you know, Mr. Freundt -- they know that Mr. Freundt

22     testified about this while he's saying "I think that I was able

23     to take $5,000 out because Special Agent Beyer told me I

24     could".

25              Now, the government assumes that maybe he

misunderstood it, and maybe that's what happened, but we don't even know because no one ever asked him.  Or maybe they did.  I don't know.

So I would like to know, at least at a minimum, I think that there are some documents, there must be some writeup, some 302s.  I noticed that in some of the 3500 there are redactions.  I don't know if the redactions include -- I'm sure that that's not true -- I'm not suggesting that that's what's redacted -- I'm just saying that there are words that could exist but I would like to see that.  I think we're entitled to that.

THE COURT:  If you're talking about what's already in the government's control, they've made multiple representations that you have everything relevant to Mr. Freundt's testimony.

MR. CREIZMAN:  They've made multiple representations that the U.S. Attorney's Office doesn't have it.  I'm wondering if they're making representations that the secret service doesn't have it, that they're totally unaware of the secret service internal investigation, that they're totally unaware of a Department of Justice Office of Professional Responsibility investigation.  I think that those would be -- that's information that I would like to know.

I mean, it's not as if we had -- you know, just in terms of the waiver argument just so that doesn't come back so quickly before I comment on it -- that I think it was maybe two

1    or three days before trial that we got Freundt 3500.  It may

2    have been more.  It may have been more.  I'm just saying, it

3    wasn't more than a week.  Okay?

4            MS. CHOI:  That's not true.

5            THE COURT:  It was two weeks, I think.

6            MS. CHOI:  Yes, your Honor.  It was two weeks.  It was

7    the 27th of January.

8            MR. CREIZMAN:  No.  There was NCUA materials that --

9            MS. CHOI:  No, that was on the 24th.

10           THE COURT:  One person at a time, even if you think

11    you're right.

12           MR. CREIZMAN:  Look, I may be wrong, that's my

13    recollection.  But look, even if it was two weeks, that's not

14    exactly a lot of time after you see it in one piece of -- and

15    there's 500 pages -- 500 different documents on Tate Jarrow so

16    you can piece the whole thing together.  And even then, when I

17    prepared my cross examination, I did not think that that was

18    what I was going to get.  And, I mean, thank God, that was

19    great.  But I say, I think that there's more to be -- I mean, I

20    think I'm doing a disservice to my client if I don't pursue

21    this additional material.

22           THE COURT:  Well, you've pursued.  That doesn't answer

23    what you're entitled to.

24           As the government sits here, do you have some sense

25    that the secret service or DOJ -- the sort of examples he's

1    listed -- that there's some body of material out there, or you

2    don't know, or what?

3           MS. CHOI:  This is what I can represent is that we ran

4    our standard Giglio checks, which our understanding is that

5    checks against whatever internal DOJ OPR investigations may be

6    going on -- although I need to doublecheck that -- but that's

7    my understanding is we run these checks so that we can do it

8    agency wide.

9           THE COURT:  So you ran Freundt through that system.

10          MS. CHOI:  No, I ran Beyer through that.

11          THE COURT:  I'm sorry, Beyer.

12          MS. CHOI:  Yeah, I don't think they would have

13   anything on Jose Freundt, your Honor.

14          And there were no potential checks, and I believe that

15   that was in the Fall of 2016 and sort of as we were preparing

16   for the first trial date that we -- or at least the original

17   trial that we had had.

18          THE COURT:  When did you communicate concern to the

19   secret service?

20          MS. CHOI:  The day that it happened.  Because we

21   pressed Jose Freundt -- sorry.  April, 2016.  Because when we

22   pressed him on this question --

23          THE COURT:  So is that before or after you ran Beyer

24   through the --

25          MS. CHOI:  Before.  So April, 2016 is when this

1    occurred, and we again --

2              THE COURT:  Sorry.  You're saying "when this occurred"

3    and I don't know what you mean.

4              MS. CHOI:  April, 2016 is the first time Jose Freundt

5    made that representation to the government.

6              THE COURT:  Okay.

7              MS. CHOI:  And I called Special Agent Jarrow and I

8    said -- he was not in town, he was on extended training

9    elsewhere in anticipation for his transition to his next part

10   of his job.  And I said, "We need to figure out what was going

11   on for this."

12             He made -- my understanding is he made several efforts

13   to try to follow up in that timeframe, which I've already

14   discussed with your Honor, and that's when we learned that she

15   was on extended leave for personal reasons for multiple -- and

16   that she was expected to be out for an extended period of time.

17             THE COURT:  So did Agent Jarrow speak to Beyer?

18             MS. CHOI:  I don't know.  I don't think -- I don't

19   know.  I can't -- I don't want to make a representation one way

20   or the other about speaking to her about this particular issue.

21             THE COURT:  Well, then I guess then I'm not sure

22   what -- so that confuses me a little.  Because what I had sort

23   of taken away what you said was, "We were concerned, we pursued

24   this, she was sort of unavailable for follow up because she was

25   out on leave on this unrelated issue."

1          MS. CHOI:  Correct.

2          THE COURT:  But now you're saying, "We told Agent

3    Beyer to check it out.  I don't know what he did."

4          MS. CHOI:  Jarrow.

5          THE COURT:  Do you know if he talked to her?

6          MS. CHOI:  I don't because I think -- I don't mean to

7    get the chronology confused here, but we made the decision we

8    weren't going to call her because we didn't need her testimony

9    because it's not related to the evidence that we had at hand.

10         THE COURT:  Why is that?

11         MS. CHOI:  Sorry, why?

12         THE COURT:  Yes.

13         MS. CHOI:  Why?  Because she doesn't -- because none

14   of the pieces of evidence we've introduced to the jury that

15   have anything to do with her, your Honor.

16         THE COURT:  No, I meant -- oh, okay.  I misinterpreted

17   "call".  I thought you meant you made a decision not to contact

18   her.

19         MS. CHOI:  No, I'm sorry.  Not to call her as a

20   witness, your Honor.

21         THE COURT:  Okay.

22         MS. CHOI:  But irrespective of that, we understand our

23   obligation to be that if there's anyone that's part of a

24   takedown day, that's on any of the reports that we've written,

25   we do a Giglio check.  And we did the Giglio check, and nothing

1    came back.  And I was under the impression she was still out

2    during this entire period of time.

3            But you're right, sitting here today, I can't make a

4    representation to you about whether or not at any point --

5            THE COURT:  How did you learn that she was out -- that

6    was from --

7            MS. CHOI:  Special Agent Jarrow trying -- multiple

8    times trying to get in contact with her and then being told

9    that she had -- I mean, again, that something had happened, and

10   she could not be -- she was not at the secret service

11   presently, and that she was expected to be out for an extended

12   period.

13           THE COURT:  So in that, you don't know whether he

14   spoke to her or not.

15           MS. CHOI:  Yes, your Honor.  I don't know ultimately

16   if that conversation happened about this particular issue.

17           THE COURT:  I mean, what do you understand would be

18   your obligation -- to the extent that Agent Jarrow might have

19   notes, for example, of a conversation with Beyer that suggests

20   what Freundt said was untrue, what would you understand the

21   government's obligation to be there?

22           MS. CHOI:  Correct.  That's why I don't think he -- if

23   that had happened, he would have told me, which is why I don't

24   think there -- I would presume that there wasn't such a

25   conversation, but I don't -- I also don't want to say one way

1    or the other.  I mean, because I can't -- I have not posed that

2    precise question to Special Agent Jarrow.  But I understand, if

3    there was a subsequent conversation in which she said, 'No, he

4    is a liar,' then we would have an obligation to disclose that,

5    but that's not my understanding of what has occurred.

6         THE COURT:  Do you think you have an obligation to ask

7    Agent Jarrow that?  I mean, you tell me.  If you think you

8    don't, I want to hear that, or do you think you do?

9         MS. CHOI:  We'll follow up with Special Agent Jarrow.

10   But I think as it presently stands, that I think is a separate

11   question from the nature of the application here.  I'm not

12   hearing from -- I'm not hearing from Mr. Creizman any

13   particular thing --

14        THE COURT:  I guess I think of it of at least a subset

15   of the application.  Right?  He wants to know what the

16   government learned, which -- and the reason he wants to know

17   that potentially, it goes to two things.  It goes to the

18   truthfulness of what Freundt said, and it may go to an argument

19   which may or may not be available, but an argument that he's

20   articulated as to government tactics in the investigation,

21   prosecution of this case.

22        So you've agreed to ask -- let me just make sure I

23   understand the scope of what you said you'll do.  You've agreed

24   to ask Agent Jarrow whether he -- I mean, is the question

25   whether he has anymore information from Beyer or anyone else as

1    to this conversation between Beyer and Freundt?

2              MS. CHOI:  Yes.  I think that we can do that.  And I

3    don't -- we will let you know, I'll let defense counsel know

4    what the answer is, but I think we can ask that one question to

5    Special Agent Jarrow.

6              THE COURT:  And then I guess the question is, is that

7    question any different from does the secret service have any

8    information from Agent Beyer as to this conversation between

9    Beyer and Freundt?  And that's a question.  Is it the same

10   thing or is it different?

11             MS. CHOI:  I guess -- I mean, I guess it's not.  At

12   least from our perspective, we'll ask that question to Special

13   Agent Jarrow and see if he knows of anything else.

14             THE COURT:  I'm sorry.  When you say "it's not", it's

15   not different?

16             MS. CHOI:  Right.  He's part of the secret service, so

17   I think his knowledge is part of this, so we will ask him the

18   question of if he knows of any follow up -- of whether or not

19   there is any evidence or, you know, information that would be

20   contrary to what we presently know to be the case, which is

21   that something was said by Special Agent Beyer.  I don't know

22   where that will go, but we can ultimately ask the question.

23             THE COURT:  Seems like we should know where that goes.

24             MS. CHOI:  Okay.

25             THE COURT:  Does that get at the core of the motion to

1    compel?

2              MR. CREIZMAN:  It does, because it would -- I mean, it

3    gets there because it would help -- I mean, I might want to

4    recall -- or I didn't call him in the first place -- but

5    Special Agent Jarrow, and I think this would be a legitimate

6    line of questioning.  What did the secret service do when it

7    found out that this person that you, you know, Special Agent

8    Jarrow, you advised -- you were in contact with Special Agent

9    Beyer, you advised Special Agent Beyer about all of this, you

10   found out that Freundt is saying that, you know, Special Agent

11   Beyer said, "Enjoy a nice bonus.  Take your salary and enjoy a

12   nice little bonus," which is in quotes in the 3500, and then

13   what did you do?  What did the secret service do?  Did you --

14   you know?  I think that that's important to show -- I mean,

15   look.  This is the investigation that was done.

16             MS. SANTILLO:  Your Honor, we join in the application.

17   And I just think that -- I don't want to -- I hear some sort of

18   artificial narrowing of Agent Jarrow's information to just what

19   Agent Jarrow knows --

20             THE COURT:  It's the secret service.  I mean,

21   that's --

22             MS. CHOI:  Yeah.

23             THE COURT:  -- that's Brady obligation.

24             MS. CHOI:  That's fine.  I'm just saying, that's how I

25   would figure out what the secret service knows is to ask

1     Special Agent Jarrow.

2              THE COURT:  I understand you to say there's no

3     distinction to what Agent Jarrow knows on this and what the

4     secret service knows on this.

5              MS. CHOI:  Right.  But I guess, you know, I think

6     we're getting ahead of ourselves a little bit, but I would

7     guard against again calling Special Agent Jarrow back to probe

8     on this question until we figure out what, if anything, is

9     really there.

10             THE COURT:  Well, if it turns out that the government

11    sort of -- and I'm not impugning -- but if the government, in

12    the sense of the prosecutors here, should have followed these

13    steps, which you're saying you'll do now, and didn't, and that

14    produces new material, then I think there is the question of --

15    then it is the question of what should be done with it.  I

16    mean, if you learn --

17             MS. CHOI:  See what the answer is.

18             THE COURT:  -- if you didn't ask Agent Jarrow the

19    question, "Did you speak to Beyer?"  And if you ask that now

20    and it comes back, "Yeah, and she says he's totally making that

21    stuff up" --

22             MS. CHOI:  Right.

23             THE COURT:  -- they can do something with Agent Jarrow

24    on that, I think.

25             MS. CHOI:  Yeah.  And if it comes back and it's not

1   that and it's that there's no new information, then we'll deal

2   with it -- which I think is the most likely outcome here --

3            THE COURT:  I hear you.

4            MS. CHOI:  -- then we'll deal with it then.  But I

5   think we're getting a little ahead of ourselves here, and we'll

6   ask that first question first.

7            THE COURT:  All right.

8            MR. CREIZMAN:  I think it would be fair just to

9   understand what Agent Jarrow did and the chronology of what he

10  did.  You know.  Who he reached out to, what happened.  And I'm

11  by no means -- and I want to be clear because I respect my

12  colleagues, Ms. Choi and Mr. Noble, Mr. Shin, and everyone at

13  that table very much -- so it's not impugning their integrity,

14  so I want to make that clear.

15           THE COURT:  I appreciate what you're saying.

16           MR. CREIZMAN:  I do.  Really, I do.  But at the same

17  time, you know, there's certain things that -- well, whatever.

18  I'm going to sit down.  Thank you.

19           THE COURT:  Okay.  So to the extent that the

20  application is as we've described, the government is going to

21  do that follow up, and if there is information to turn over, it

22  will be turned over.  If there is any such information, we'll

23  deal with that, and if there's not information, Mr. Creizman,

24  are we done?

25           MR. CREIZMAN:  If there's no new -- I mean, there's

1    going to be -- well, your Honor, I feel like there will be

2    information.  Whatever -- you know, Agent Jarrow did A, B, and

3    C.  This is what happened.  Agent Jarrow -- and this is how he

4    resolved the issue, or this is how the secret service resolved

5    the issue, then we can move from there.  I think that that

6    would be the next step.

7              THE COURT:  Ms. Choi?

8              MS. CHOI:  I mean, I think, again, we're getting ahead

9    of ourselves.

10             THE COURT:  But I think I just want agreement as to

11   what the process will be.

12             MS. CHOI:  Sorry.  If?

13             THE COURT:  So you're going to make these inquiries

14   and you'll report back --

15             MS. CHOI:  Whatever new information comes of it.  If

16   there is no new information, I guess is that the question

17   that's on the table?

18             THE COURT:  I mean, well, Mr. Creizman said, well, at

19   least we'll learn Agent Jarrow, for example, what, didn't --

20   you know, these are the steps he took, and no new information

21   was learned.

22             MS. CHOI:  Right.  We can say that.

23             THE COURT:  Okay.

24             MR. CREIZMAN:  Right.  But what I feel right now is

25   that there is a lack of information, there's a void.  Meaning,

1    we will have new information because we will know what Agent

2    Jarrow did --

3              THE COURT:  Okay.

4              MR. CREIZMAN:  -- and what the secret service did.

5              MS. CHOI:  Your Honor, I would like to make that, you

6    know -- that's fine.  We'll deal with this.

7              THE COURT:  So we'll get that, we'll learn what we

8    learn, and then we can take up what, if anything, can be done

9    with it.  All right.  Thank you.

10             That's the application that came in last night.  For

11   the purposes of the charge, it goes to -- I mean, I suppose the

12   government could give its position -- you know, let's put it

13   this way.  If the government and its investigative techniques

14   are in issue as part of the defense here, what then is an

15   appropriate alteration to that charge or exclusion of that

16   charge?  And to be clear --

17             MS. CHOI:  It's page 76, your Honor.

18             THE COURT:  Thank you.  I mean, I guess we know at

19   this point, no matter what, that part of the defense is to --

20   in light of the facts already in the record -- that part of the

21   defense is --

22             MS. CHOI:  Yes, your Honor.  To undermine the

23   integrity of the investigation.  Even in circumstances where

24   that's the case, we still get the instruction as you have laid

25   out in instruction number 53 for the simple purpose that, this

1   instruction simply says that there's no requirement that the

2   government has to use a particular type of technique, and that

3   they shouldn't speculate about which type of techniques the

4   government used.  That is a separate question from whether or

5   not the defense can argue the government's investigation writ

6   large is problematic, which happens many different cases

7   where -- including trials that I've had -- where this still

8   applies.

9           THE COURT:  And I've often had fighting over this

10  language so I don't want to -- I don't want to pretend it's

11  never uncontroversial.

12          But the specific language that they've raised and that

13  stands out is "law enforcement techniques are not your

14  concern".  That seems to me confusing to the jury in light of

15  what is --

16          MS. CHOI:  I think or -- so you would just get rid of

17  that one line that says "law enforcement techniques are not

18  your concern"?  I don't think -- that's fine.

19          THE COURT:  I mean, I think -- let me just read the

20  whole thing.  So maybe striking -- I mean, the points are that,

21  "The government doesn't have to prove its case through any

22  particular means."

23          MS. CHOI:  Correct.

24          THE COURT:  "You're not to speculate as to why the

25  government used techniques it did or why it didn't use other

```
 1   techniques."  So why it did not use other techniques I suppose
 2   if techniques includes -- I think there's probably an edit that
 3   kind of gets to the primary points without suggesting that the
 4   jury shouldn't consider something that isn't, by everyone's
 5   agreement, in evidence and in issue.  All right?
 6            MS. CHOI:  Maybe I have a different view of what
 7   "techniques" means.  I'm just confused as to --
 8            THE COURT:  There might be.  I've had fights over
 9   that, too.
10            "You've heard reference to the questioning to the fact
11   that certain investigative techniques were used or not used by
12   the government."
13            I mean, the way this often plays out, right, is, well,
14   you didn't --
15            MS. CHOI:  Get DNA.
16            THE COURT:  -- yes, you didn't get DNA, you didn't
17   make it look like a -- what's the show?  CSI --
18            MS. CHOI:  CSI.
19            THE COURT:  -- lab.  That's out of concern that the
20   jurors have some vision of how you prove certain things.
21            MS. CHOI:  Right.  And your Honor, just to be clear, I
22   think that that issue may still arise.  That issue may still
23   arise, depending on what -- as we've noticed defense counsel
24   and the Court on what the direct testimony will be and the
25   cross examination of Mr. Lebedev in particular.
```

1          THE COURT:  I think that might be right.  Let me just

2     say that I have no experience of a trial in which in evidence

3     is the fact that a government agent suggested that a

4     cooperating witness extract money from a company under

5     investigation.

6          MS. CHOI:  Fair enough.

7          THE COURT:  So as a result of that fact, I think we

8     need to tailor this instruction to what the defense might

9     justifiably argue from the evidence.

10          MS. CHOI:  So I think if you just got rid of the

11     sentence on line 7 that your Honor had identified, and then it

12     limits what they're supposed to consider as -- or it limits --

13     sorry -- what they're not supposed to speculate about to why

14     this and not that, but eliminates the question of, generally

15     speaking, whether or not they can call into question the

16     integrity of the government's investigation.  I think that's

17     fine.

18          THE COURT:  Mr. Creizman, do you have a response?

19          MR. CREIZMAN:  I think if we started on line 4, "While

20     you are to carefully consider the evidence introduced by the

21     government," until through line 7, "law enforcement techniques

22     are not your concern."

23          THE COURT:  So you would have the first two sentences,

24     "You've heard reference."

25          MR. CREIZMAN:  Yes.

H33OLEB6

1          THE COURT:  "There's no legal requirement that the

2     government prove its case through any particular means."  And

3     then, "Your concern is to determine whether on the evidence or

4     lack of evidence the defendant's guilt has been proven beyond a

5     reasonable doubt."

6          MR. CREIZMAN:  Yes.

7          THE COURT:  What do you think, Ms. Choi?

8          MS. CHOI:  I think that's fine, your Honor.

9          THE COURT:  All right.  I agree.  Thank you.

10          So we'll make that edit to this instruction, because I

11     think that captures the way in which legitimately the jury

12     should be informed and doesn't confuse them by telling them

13     they shouldn't concern themselves with something that is or may

14     be an issue.  All right?

15          Then that resolves Mr. Creizman's motion, and we'll

16     wait to hear from the government with any additional

17     information.

18          Next.  What's next?

19          MS. CHOI:  Dream Host, your Honor.

20          THE COURT:  Yes.  My basic read following the briefing

21     on this issue is that the points that Ms. Santillo is making on

22     behalf of Mr. Gross are weight points.  They go to the weight

23     of the evidence.  So my concern, though, is how does Mr. Gross

24     make those weight points in a way that doesn't send us off on a

25     403 tangent?  How does Mr. Gross have the ability to make the

1    points -- which seem to me readily available.  I mean, there

2    are things like that Mr. Gross' response was "here are the

3    active accounts", and the like.  There's additional points that

4    they want to make with respect to this.

5              MS. CHOI:  One moment, your Honor.

6              (Pause)

7              MS. CHOI:  Your Honor, he can still make those

8    arguments.  I mean, the way that we see this happening is

9    through the testimony of a witness that we've noticed, Terry

10   Adams, who is the person who was the one who sent the

11   conservatorship order to Mr. Gross that says "all records", and

12   then again reiterated "all email accounts", and that was the

13   individual to whom Mr. Gross responded to say "all active email

14   accounts", or "these are the active email accounts" and do the

15   sublist of the email accounts relating to HOPE FCU.

16             So that would be the first witness.  And obviously,

17   they can cross him on and get that point in that you didn't go

18   back to him and ask those questions.  So they can make the

19   weight point through him.

20             And then we also have a witness from Dream Host who

21   will say, in fact, they were all active accounts as of October,

22   2015, and that we anticipate that this is what he would say,

23   and that even as of March -- the only time in which Mr. Gross

24   would not have seen those particular email accounts when he

25   logged into Dream Host would have been as of March after his

1    arrest when he turned off the domain for HOPE FCU.  But until

2    that point, it's his understanding that, since the data still

3    exists here as of February, 2017, that he would have seen that

4    those email accounts existed when he logged into the back end

5    of Dream Host.

6              So I think you can make both of those points.  If

7    Ms. Santillo wants to make the point, well, you know, probe him

8    on what Mr. Gross would have or would not have seen, she could

9    also make that point through the Dream Host witness, but I

10   think that those two witnesses would provide them ample

11   opportunity to make their weight arguments.

12             MS. SANTILLO:  Can I see 3500 material?

13             MS. CHOI:  No, because he's coming and -- he's going

14   to get on the red eye and we'll talk to him and then we'll give

15   you the 3500.  But this is the conversation I had yesterday.

16   You're right, I haven't turned the 3500 on that one question.

17   We were waiting to see if we could even call the Dream Host

18   witness.

19             MS. SANTILLO:  Your Honor, my biggest concern here is

20   this failure of opportunity to cure the moment.  I feel like

21   they're creating this specter that he wasn't being responsive

22   when they could have replied in the email and just said "give

23   us the inactive accounts", too.  I mean --

24             THE COURT:  But I don't understand why that's not a

25   cross examination for Adams then.

1              MS. SANTILLO:  Because it's so irrelevant and then we

2        have to chiro --

3              THE COURT:  That what's so irrelevant?

4              MS. SANTILLO:  This little point that they're trying

5        to make.  The fact that these accounts still exist, they could

6        have just asked him for it, and now they're going bring a

7        forensic expert, and now we're going to have to bring a

8        forensic expert.  We haven't even gotten the 3500 material.

9        Our case starts on Tuesday.  I mean, this is --

10             THE COURT:  You keep saying "the forensic expert", but

11       just in response to what was said --

12             MS. SANTILLO:  Well, I don't know -- without having

13       seen any of the 3500 material, how am I going to know how he

14       viewed the screen to see if it was active or inactive?  How am

15       I going to know, you know, whether he has worked for those

16       people?  You know.  I don't know the answers to those questions

17       about how their system works.

18             MS. CHOI:  Your Honor, to be clear, we don't have the

19       answers to those questions, either.  The question I posed was,

20       "Could a user have seen all the email accounts that were active

21       as of October, 2015?"  And he said, "Yes, that these would have

22       been active accounts because the domain had not been shut

23       down."

24             That's literally -- that's the extent of our

25       conversation, and he's flying in so that we can have a further

1    debrief with him.  But those questions about, well, what did he

2    look at, what would he have looked at, the difference between

3    active or not active, are all of the questions she could pose

4    of her client, and she can inquire of that particular witness

5    on the stand.

6          But if the question is, you don't know what the

7    3500 is, well, that's literally the five-minute conversation I

8    had with him yesterday and I've proffered it.  I think all

9    those arguments go to weight.  It is not a collateral question.

10   When Mr. Gross understands that his whole -- that the whole

11   dance is up, as it were, and he is served with an order of

12   conservatorship that said "all records" and sent again an email

13   for all email accounts, and he does not produce that full

14   amount, all those emails -- all the email addresses for which

15   there was data at the time, that is a material fact that goes

16   to his state of mind, his culpability, his understanding that

17   there would be a problem if they were to look through all those

18   email accounts, and that's precisely why they're arguing about

19   this.

20         MS. SANTILLO:  Your Honor, that is not precisely why

21   I'm asking about this, I'm asking about it because it's wholly

22   unfair to go back in time to make that kind of argument when --

23         THE COURT:  I mean, the trials are only about going

24   back in time.

25         MS. SANTILLO:  Well, literally within that call he

asked for clarity.  And at the time --

THE COURT:  But nothing precludes you from making
those points to the fact finders.  So I'm sympathetic and,
frankly, I would do anything that I could to reduce the number
of witnesses in this trial, but it's relevant evidence.  The
arguments that you're making are cross points, they're good
cross points, you have the means to make them.

And I should say, I'm exaggerating when I say I would
do everything I could.  As you know, just genuinely -- I'm
serious, I'm genuinely concerned about the length of trial.  If
I thought there were a basis to exclude the government from
doing this, I would.  But it's relevant evidence, it's not --
I've explored, because it concerned me, that it would be a
sideshow to prove up what they're saying can be proven up from
this.  Based on what's been proffered to me and based on
everything that I've gotten in opposition, it's not.  What I
keep hearing from you, Ms. Santillo, are perfectly legitimate,
and in many ways effective, cross examination points.  To the
extent you have a basis or need to bring in, I don't know, some
additional witness based on something which you haven't
proffered to me yet as to why it isn't true what they're
saying, which is this is the request, this is the response, and
then the person who understands something about hosting this
material can say he gave a subset of what was available, you
can cross on that point, you can introduce a different witness,

1    if there's one that exists who knows something about this

2    system that's different.  I mean, I don't know -- I don't know

3    what a generic forensic expert would do.  I mean, it seems to

4    me it's what's in issue in this system.  But I just -- I've

5    given you multiple opportunities to make an argument other than

6    there are counterpoints to be made.  There are counterpoints to

7    be made, I will allow you fully to make them, but I can't

8    preclude relevant evidence for no reason.

9            MS. SANTILLO:  Your Honor, I would just note that

10    since I haven't seen the 3500 material, that's why I can't make

11    a representation about what would be required to rebut it.

12            THE COURT:  So you've had a proffer as to what it will

13    be, but let's nail this down.  When will existing and

14    soon-to-be-made 3500 material be produced?

15            MS. CHOI:  I can give her the three lines of notes

16    that I had from yesterday, I just didn't know we were going to

17    go down that road.  He's flying in tonight on a red eye.  When

18    I meet with him, I can turn them over as soon as I have them,

19    but we haven't had a full debriefing on this question.

20            THE COURT:  You haven't had a full debriefing on what

21    question?

22            MS. CHOI:  I haven't done a Q and A with him.  So as

23    it presently stands, the things that I know about this issue

24    from him, from Mr. Frye, his name is Carl Frye, the things that

25    I know about them have been fully disclosed.  I'll give you the

1    handwritten notes that are essentially the same thing.

2            She knows about the emails that Terry Adams has

3    because those are the emails that we put on as part of our

4    exhibits on the -- when this whole issue came up, which is when

5    they accused us of spoliation, which is how we got to where we

6    were.  When they made that spoliation argument, we found all

7    the other emails while we chased it down and we pieced it

8    together.

9            THE COURT:  And just without, remind me when that was?

10           MS. CHOI:  Weeks now.  I mean, that was during the

11   motions in limine practice.

12           MR. NOBLE:  Like a week or two before trial.

13           MS. CHOI:  Week or two before trial.  She had all

14   those emails then because we had produced them as exhibits to

15   our motion in response to her accusation that we had spoliated.

16           MS. SANTILLO:  And indeed, a lot of emails are gone,

17   but that's beside the point.

18           THE COURT:  But I don't understand.

19           MS. SANTILLO:  Ironically, every email that Pastor

20   Gross did give control to the NCUA to, all of those emails are

21   gone.  It's only the emails that he didn't give access to that

22   are still here.  So it's not even like they never had access to

23   the stuff.  He never destroyed them.

24           THE COURT:  You made that point in your papers.  I

25   don't see what that has to do with this.

1          MS. SANTILLO:  I was responding to her spoliation

2     point.

3          I do have one concern, and that is that I feel like

4     there has been a suggestion yesterday, and including in front

5     of the jury, that it's the defense that is wasting time in this

6     case, and that as we get to --

7          THE COURT:  Well, listen.  I've been -- A, I've

8     treated everyone the same in front of the jury as to time.  And

9     I've been very cautious about making sure my concerns about

10    that are expressed outside of the ears of the jury.

11         I think the one instance that you're pointing to was

12    when specifically you, despite my having said previously I

13    don't want lawyers saying in front of the jury -- I said this

14    expressly -- I don't want lawyers saying in front of the jury

15    "why don't we take a break now, Judge", because I don't like

16    the dynamic that creates where a lawyer is trying to get -- I'm

17    not saying that's what you were doing, that's the perception --

18    get on the good side of the jury, you did that despite my

19    direction not to, and I get that it's unintentional, but you

20    did it.  I then said, no, keep going, because I wasn't ready

21    for a break yet.  As the schedule as I had developed it, it

22    would have been another ten minutes before a break.

23         Nevertheless, I said proceed -- I told you to proceed.

24    There was then, I don't know how long, but a long gap in which

25    you were looking for something and not finding it.  And I said,

1  "You know what?  We'll take a break because this is wasting

2  time."

3          MS. SANTILLO:  Yes.

4          THE COURT:  And that is the only inclination of me

5  pressing the defense to move faster, and I have pressed the

6  government to move faster.  So with that clarity, you may

7  proceed.

8          MS. SANTILLO:  Okay.  And I understand that was a

9  unique situation, and I was not able to find the document after

10 our exchange as quickly as I could have.  However, afterwards,

11 there was also a suggestion by the government that somehow the

12 schedule was running long because our crosses were long.

13         THE COURT:  That is not in front of the jury.

14         MS. SANTILLO:  That was not in front of jury, but what

15 I'm worried about is, going into next week and having our

16 defense case on and having artificial time pressure put on us

17 when we had to sit through days and days and days of testimony

18 that --

19         THE COURT:  There will be no -- I can assure you,

20 there will be no artificial time pressure put on the defense.

21 I mean, I will guard against it.

22         Now, I have a schedule to protect, and I've been

23 riding the government as hard as I possibly can on this.  I

24 have not said a peep to the defense.  In fact, I said to the

25 contrary, I said you've been efficient in your cross

1    examinations, they've been some of the most efficient and

2    targeted cross examinations I've seen from both defense

3    counsel.  It's the only reason I think that we're, you know,

4    that we're on -- we have a hope of finishing within time.  So I

5    have not suggested anything -- I don't think, tell me if I'm

6    wrong -- that would tell the defense that they don't get to put

7    on their case.

8            MS. SANTILLO:  I just wanted to raise the concern in

9    light of the fact that we may now two kind of technical experts

10   next week that we weren't planned.

11           THE COURT:  I share that concern.  You'll get to

12   respond.  I mean, the government is going to have to make

13   choices, as I've made clear.  I want the government to close

14   tomorrow.  Not tomorrow --

15           MS. CHOI:  Monday.

16           THE COURT:  I do, actually.

17           MS. CHOI:  Not close.  I you mean rest, your Honor,

18   not close, but rest.

19           THE COURT:  In my wildest hopes and dreams.  I've been

20   doing whatever I can and will continue to do what I can, and I

21   think the government knows that they've got very little wiggle

22   room in terms of their continuing presentation in terms what

23   I'm going to allow with the summary witness and the like, and

24   it is a concern, but that won't affect your ability to counter

25   this evidence.  You will have it.  And we'll deal with it as it

1    comes.

2              And you've indicated the time you might need for the

3    defense case.  It's why I'm concerned -- you know, given where

4    we are in the schedule, it's why I want the government to

5    finish Monday -- to rest Monday, to make sure we can be done

6    next week, which is what we told the jury.

7              MS. CHOI:  Yes, your Honor.  And I think, again, I

8    think your Honor appreciates that we've been efficient about

9    the way in which we've done our presentations.  We haven't been

10   publishing as many exhibits as perhaps we would have liked to.

11             I have placed your Honor on notice that there will

12   have to be some exhibits that we have to publish to give sort

13   of a frame of reference with regard to the bank and wire fraud

14   charges against Mr. Lebedev.  We intend to streamline all of

15   the government's witnesses.

16             But again, I reiterate, your Honor, I think Tuesday is

17   the realistic possibility.  I don't want your Honor to be under

18   some other assumption with regard to that.  We have cut

19   something like eight or nine witnesses off of the list of the

20   one that defense counsel has had from the getgo.  We are

21   cognizant of that.

22             But your Honor knows, we have the burden, so we're

23   trying to work very hard to strike the correct balance between

24   making sure that we get the evidence that we need in, to argue

25   for purposes of the closing, but also not to be -- not to

1    somehow have a situation in which we're precluded from

2    introducing evidence that we think is crucial to our case.

3         THE COURT:  Well, within reason.  And part of the

4    reason that we're operating in is the schedule.

5         MS. CHOI:  I understand, your Honor.

6         THE COURT:  Ms. Santillo is 100 percent right.  What

7    we're not going to do is let you dot every I and cross every T

8    that pushes us into the fourth week.

9         MS. CHOI:  I understand, but I will say this.  We may

10   have to get to the fourth week even if we are as efficient as

11   possible with regard to Monday and Tuesday, and it's an

12   unfortunate -- it's unfortunate that we found ourselves in this

13   situation, but I think it's the reality.  If there are a series

14   of defense witnesses, which we still have not received notice

15   of who precisely that will be -- that could take up one to two

16   to three days of next week.  And then I would presume your

17   Honor would want us to have all of our closings -- all of our

18   summation on one day and then charge the jury.  I don't think

19   it's --

20        THE COURT:  Well, whether it's one or two days, we're

21   not wasting any time.

22        MS. CHOI:  Understood.

23        THE COURT:  So the moment everybody rests --

24        MS. CHOI:  Right.  And again, there may also have to

25   be a rebuttal case, depending on what the defendants do,

1    because we just don't know what that is.  So we're working very

2    hard, I just don't want to catch everyone by surprise that

3    there may be a government rebuttal case, which we've always

4    said may be at issue, and that that may mean that we spill into

5    that next week, depending.

6         THE COURT:  Well, I think what we can do now is, given

7    what the government's representations at the beginning were

8    about the length of the case, I think you need to really work

9    hard.  And, you know, places where I see -- I mean, I don't

10   know what you plan for the summary witness, but it's not going

11   to be summation.

12        MS. CHOI:  No, it's not.

13        THE COURT:  It's not going to be repetition of

14   anything that we've seen, and it's not going to be mindless

15   reading of items that are in evidence.  Because --

16        MS. CHOI:  No, your Honor.  These are documents they

17   haven't seen yet.  They haven't seen the tracing analysis at

18   all.  It's a very streamlined tracing analysis with regard to

19   the proceeds of all of Kapcharge and Collectables Club's

20   transfers of money and funds to the defendant and his church,

21   and then a very quick synopsis of the Coin.mx bank accounts.

22   Very, very short, just to sort of explain the total amount of

23   funds that have gone through, and then a location analysis,

24   which the defendants have all been on notice about, but where

25   was Anthony Murgio during these times in the Southern District

H33OLEB6

1    and elsewhere, and where was Trevon Gross during these

2    following times in the Southern District and elsewhere, to

3    address their venue argument, because clearly that's one of the

4    cruxes of their defense.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  It is an available defense.

2          MS. CHOI:  Yes, your Honor.  But I'm just saying

3     that's why we have the location analysis, which they have been

4     placed on notice of, because they have an earlier draft of what

5     this situation will be, and we're mindful of this.  We're

6     cutting a lot of slides that we would otherwise want to

7     introduce, but we're not going to be repetitive about what we

8     do.

9          MS. SANTILLO:  Could we have access to the latest --

10         MS. CHOI:  Yes, we're going to produce that later

11    today.  We don't have the finalized version yet, but we'll

12    produce the ones that we've got.

13         On that happy note --

14         THE COURT:  Just to be clear, I do try to let people

15    try their cases, I really do, but it's a very short -- for the

16    time remaining on the government's case, it's a short leash,

17    and it will be nonduplicative, entirely nonrepetitive, and

18    concise information because based on representations that

19    everybody made, the jury's expectation is that we finish by the

20    end of next week.  And I'm not going to in any way shorten what

21    the defense needs to do.

22         MS. CHOI:  Of course not.

23         THE COURT:  The only wiggle room that remains is,

24    after three nonfull weeks, but three weeks of the government's

25    case, with very disciplined cross-examination, the government's

H33KLEB7

1    time is limited.

2              MS. CHOI:  No, we understand, your Honor.  And I hope

3    the Court appreciates we understand that, and that we have been

4    working very diligently.  I don't think the NCUA examiner has

5    been duplicative.  We've narrowed the scope of a lot of the

6    witnesses to make sure we hit the high notes.  So, that's where

7    we are.

8              That being said, it would be -- I think today is

9    Friday, so I just wanted to know whether or not we would be

10   getting defense 3500 a list of the witnesses they intend to

11   call, exhibits, any expert witness disclosure.  And, also, we

12   have served both defendants with if-as-when subpoenas relating

13   to whether they take the stand and when we can anticipate

14   getting documents that are responsive.

15             THE COURT:  Mr. Creizman?

16             MR. CREIZMAN:  Well, I first just want to remind the

17   Court that in terms of the timing of the trial, I did raise a

18   Rule 29 motion that the government defaulted on, and I

19   reiterate that motion again, and that will save a lot of time

20   for next week.

21             On the second point --

22             THE COURT:  For the record, he's joking.

23             MR. CREIZMAN:  Yes.

24             THE COURT:  For the record, it's not funny.

25             MR. CREIZMAN:  Yes, for the record.

1          In terms of our witnesses, we've disclosed to the

2     government a potential witness being -- we've disclosed the

3     possibility of Yuri Lebedev testifying, although I think that

4     that is becoming more and more remote.  Very, very remote.

5          THE COURT:  Who is the potential witness you've

6     disclosed?

7          MR. CREIZMAN:  His name is Khang Trang, K-h-a-n-g,

8     Trang, T-r-a-n-g.  He's a developer and works for, I think, the

9     Murgio web of companies.  He's a technology guy.  But we

10    haven't spoken to him yet.  We intend to interview him today

11    and turn over our reverse 3500 on that witness.

12         And, of course --

13         THE COURT:  So that will be turned over today?

14         MR. CREIZMAN:  Yes.  And then potentially take Jarrow.

15         We also intend to turn over certain exhibits that we

16    intend to try to introduce in the defense case.  Although I

17    think that some portions of like WhatsApp, or emails, or, you

18    know, Gchats, those type of things, we're going to have to give

19    them on Saturday or Sunday just because it's --

20         MS. CHOI:  That's fine, your Honor.  And I think,

21    also, again, we were going to place the defense on notice again

22    that we were going to be giving a long list of the outstanding

23    government exhibits on the government exhibit list that we

24    haven't introduced yet that we'd like to have introduced in one

25    list, hopefully with the Court exhibits, so they don't have to

H33KLEB7

1    sit there.

2           THE COURT:  You promised me that by doing Court

3    exhibits in the beginning --

4           MS. CHOI:  I know it hasn't quite worked out that way,

5    but we'll do it for Monday, your Honor.

6           THE COURT:  So potentially Trang, potentially

7    Mr. Lebedev, but that seems less likely, and Agent Jarrow, to

8    the extent that that issue continues to present?

9           MR. CREIZMAN:  Yes, your Honor.

10          MS. CHOI:  Your Honor, to be clear, does he want

11   Special Agent Jarrow for anything other than the Beyer

12   question?

13          MR. CREIZMAN:  No.

14          MS. CHOI:  Okay.

15          THE COURT:  Thank you, Mr. Creizman.

16          Ms. Santillo?

17          MS. SANTILLO:  Well, there's been some flux with

18   respect to the defense witnesses, but at this moment, depending

19   on the outcome of her consultation with counsel, we would

20   anticipate calling Loretta Larkins, who the government has

21   already met with, and we can provide reverse Jencks for

22   tomorrow, and then possibly Mr. Gross, no decisions have been

23   made, and then some character witnesses, who were not on the

24   list.  We also plan on introducing exhibits, and we can provide

25   a cut of that on Sunday.

1              THE COURT:  Character witnesses, how many, and who are

2       they?

3              MS. SANTILLO:  I think, at this point, we have a

4       couple of names, and we're going to be interviewing them to cut

5       them down, but there's only going to be about three.

6              MS. CHOI:  Your Honor, we'd just like to know who they

7       are.

8              MS. SANTILLO:  When I know, I will disclose them.  And

9       we plan on having a call about it in the afternoon.

10             MS. CHOI:  If she's reluctant to give us the actual

11      names of those individuals, could we at least get a proffer as

12      to in what bucket of people they might be, like churchgoers or

13      whoever else?

14             MS. SANTILLO:  Well, your Honor, our case has changed

15      very much over the last couple of days based on the fact that

16      all the board members who were going to testify who have

17      knowledge of Mr. Gross and his character are no longer going to

18      be available to us.  So we are regrouping and trying to find

19      the right character witnesses who don't have connections to the

20      case.

21             THE COURT:  Well, I think at some point, we've got to

22      know who they are.

23             MS. SANTILLO:  And we will, by this afternoon.  It's

24      only been in the last three days that we learned that they're

25      not calling any witnesses from HOPE, and that suddenly Loretta

 1    Larkins has exposure, and so --

 2                THE COURT:  So you wouldn't use the HOPE witnesses as,

 3    in part, character witnesses?  Is that the idea?

 4                MS. SANTILLO:  It was the idea.

 5                THE COURT:  All right.

 6                MS. CHOI:  Later today is fine, your Honor.

 7                THE COURT:  Thank you, Ms. Santillo.

 8                MR. CREIZMAN:  Your Honor, Ms. Madrigal apparently is

 9    very shy.  I'm asking you if she can be excused for the day?

10                THE COURT:  Yes.

11                MS. MADRIGAL:  Thank you, your Honor.

12                THE COURT:  Okay.

13                So it sounds like we have our basic sense of the

14    potential defense case and a schedule for disclosures; is that

15    right?

16                MS. CHOI:  Yes, your Honor.

17                THE COURT:  Okay.

18                What does that leave?

19                MS. CHOI:  We can go through the rest of the witnesses

20    for the government again, if your Honor wants to know, but I

21    think it's the same as what we had said before.

22                THE COURT:  We're finishing with McDonough?

23                MS. CHOI:  Finishing with McDonough, Terry Adam from

24    the NCUA, and then --

25                THE COURT:  Hang on, hang on.

1           MS. CHOI:  Okay.

2           THE COURT:  Okay.

3           MS. CHOI:  I think our longest remaining witness would

4    be Terry Adam.  Then we have Christian Wilson from First Data,

5    the payment processor, and we'll be publishing the subsection

6    of the documents that are relevant to establish its relevance

7    with regard to Mr. Lebedev.  We're trying to narrow the scope

8    of Chase witnesses.  We're trying to get it to as short as

9    possible and not overlapping items with regard to the bank and

10   wire fraud victims in this case, or at least one example of

11   them.

12          And then we have the DreamHost witness, Carl Frey; the

13   IRS witness on the question of disclosures to Trevon Gross --

14   by Trevon Gross to the IRS; and then the summary witness --

15          THE COURT:  Who is the IRS witness?

16          MS. CHOI:  Rose Linton, L-i-n-t-o-n.

17          THE COURT:  And then who is the last one?

18          MS. CHOI:  And then the last person is John Rollins

19   from RSM.  It's a summary witness.  He is a forensic accountant

20   who has gone through the financials to establish where the

21   money went, which I think is clear from our other

22   representations about what his testimony will be.

23          THE COURT:  Did you hear that, Mr. Noble?

24          MR. NOBLE:  Yes, Judge.

25          THE COURT:  Because that was for you and not me, the

1     last piece there.

2               MS. SANTILLO:  With respect to Mr. Rollins, do we have

3     all the information we're going to get on his background?

4               MS. CHOI:  We are going to produce it all -- we will

5     produce all of the 3500 to you today.  He has a resume that

6     will be in there that you can take a look at.  And the backup

7     charts, we can give you the tracing as well.

8               All the underlying exhibits, obviously, have been

9     disclosed for many, many moons, and they're marked as

10    government exhibits.

11              THE COURT:  But you'll do what you just indicated --

12              MS. CHOI:  Today.

13              THE COURT:  Okay.

14              And how long do you anticipate for Adam?

15              MR. NOBLE:  Probably about an hour, hour and a half,

16    Judge.

17              THE COURT:  I know you bear the brunt of most of this,

18    Mr. Noble, but literally, I don't want them to even say what

19    the NCUA is, I don't want a single repetitive question.  The

20    jury --

21              MR. NOBLE:  The only thing I'm going to ask about the

22    NCUA is what branch of government it's in, because that has not

23    yet come out.  And then I won't even ask him about his training

24    or anything like that.  We'll move straight to the various

25    portions of his substantive testimony, which, your Honor, these

1    witnesses, we chose because they kind of cover the

2    chronological spectrum of the conduct, and Mr. Adam's testimony

3    is limited to stuff that happened in 2015.  He will pick up,

4    basically, where Brian McDonough and Meg Flok left off, but his

5    testimony will be not so much chronological as opposed to

6    topical, and he will just cover his knowledge of the various

7    relevant topics, like Kapcharge, ACH processing, the loans, and

8    then what happened in the conservatorship with respect to the

9    email issue.  Now that your Honor is going to allow us to put

10   that in, he'll testify about the email exchanges he had with

11   Mr. Gross and some other points on conservatorship.  So those

12   are kind of the basic topics.  I won't ask any background stuff

13   about the NCUA.

14            THE COURT:  No defining terms that they've already

15   heard.

16            MR. NOBLE:  Stripped out.

17            THE COURT:  Obviously, because of the introduction of

18   the email issue and the DreamHost, they get to cross-examine on

19   those issues, and --

20            MR. NOBLE:  Hundred percent.

21            THE COURT:  -- I'll give them all the time they want

22   to do that, but all the more reason that you've got to keep

23   everything pared down.

24            MR. NOBLE:  I will, Judge.

25            THE COURT:  And then how long for Rollins?

H33KLEB7

1          MS. CHOI:  We're cutting the deck, so we're going to

2     make it as tight as possible.  I just don't have an estimate

3     because we haven't gone through it in the testimony --

4          THE COURT:  More than an hour or less than an hour?

5          MS. CHOI:  More than an hour, I think.  Yeah, I think

6     it's going to have to be more than an hour, maybe a couple of

7     hours at most.  But the rest of these witnesses, the Chase

8     witnesses, if I don't have them on and off quickly, I'd be

9     shocked.

10          We'll see if we can reach stipulations as to some of

11     the stuff with Mr. Creizman.  It would mean that we wouldn't

12     have to call multiple Chase witnesses because part of the

13     problem is that they have people who know the debit side and

14     people who know the credit card side, and so it may be the case

15     that we could work something out with Mr. Creizman since it

16     really doesn't implicate Mr. Gross to narrow the scope, and

17     we're optimistic that once we have our exhibits marked this

18     weekend, we can reach that type of resolution.

19          MR. CREIZMAN:  Okay.  I'll be around.

20          THE COURT:  Thank you.

21          No, I think that would be helpful.  Even short

22     witnesses, if we don't need to go through the whole rigmarole.

23          Obviously, Mr. Creizman, you make your judgments.  I'm

24     not pressuring on the defense side, the pressure is on the

25     government side.

1          MS. CHOI:  I would say other than -- Mr. Wilson will

2      be more substantial just because he has to explain the payment

3      processing world to some extent, sort of similar to what

4      Ms. McDowell had to do with the ACH processing, but it will be

5      short.  And then --

6          THE COURT:  Wilson is from where?

7          MS. CHOI:  First Data, which is, just so your Honor

8      understands, the sort of entity that sits between merchants who

9      want to process credit card transactions and the banks that

10     have issued the credit cards that were used in those

11     transactions.  They transmit the data back and forth.  So,

12     they're the ones who can tell you what has been transmitted.

13         MR. CREIZMAN:  Are they called ISOs?

14         MS. CHOI:  No, they are not called ISOs, but they have

15     ISOs.

16         MR. CREIZMAN:  Okay.

17         THE COURT:  So he worked a little discovery in there.

18         MR. CREIZMAN:  I have to go back to the books.  I

19     thought --

20         MS. CHOI:  You have books?

21         MR. CREIZMAN:  Well, I had another trial.

22         MS. CHOI:  Oh, I see.  Okay.  Yes, this is not

23     complicated, but it's also new territory for the jurors, so

24     there needs to be a little background on him.  He'll be a

25     little longer.  I'm hoping once he sets the stage, the Chase

1    witnesses can just say these are the docs --

2              THE COURT:  What do you estimate for Mr. Wilson?

3              MS. CHOI:  An hour, maybe, at most.  I'm going to try

4    to pare it down.

5              THE COURT:  McDonough is on cross, right, so almost

6    done?

7              MS. CHOI:  Yes.  Ten minutes, I think.

8              THE COURT:  Ten minutes?  Okay.

9              Who is the Chase witness?

10             MS. CHOI:  Part of the issue is that we need to

11   potentially call two, unless we can stipulate out, because they

12   have records from the credit card side and records from the

13   debit card side, and they're separate Chase entities.  So I'm

14   hoping that if I can work with Mr. Creizman -- their testimony

15   will be similar.  I'm just hoping that we can work out a stip

16   as to one or the other, and then have the other one explain

17   sort of what information they get as an exemplar as it were.

18             THE COURT:  How long do you think for Frey?

19             MS. CHOI:  It's very short.  30 minutes, maybe, maybe.

20   I don't even think.  And Rose Lipton will also be very short

21   because it's literally this is the information you see here,

22   what's missing.

23             THE COURT:  Well, it seems to me if you can keep

24   paring down on Terry Adam and Rollins, I have a faint hope of

25   the government resting on Monday, and I'm going to keep that

H33KLEB7

1    hope.

2            MS. CHOI:  Hope springs eternal, your Honor.

3            MS. SANTILLO:  Your Honor, I wanted to address the

4    Terry Adam issue --

5            THE COURT:  Yes.

6            MS. SANTILLO:  -- especially in light of the motions

7    that we have been filing with respect to the indictment in this

8    case, and the scope of the alleged conspiracy, and the fact

9    that -- I feel like there's a real danger in this trial that

10   the government is trying to move that Mr. Gross was engaging in

11   negligent ACH processing and not the conspiracy that's been

12   charged in the indictment.  The whole scope of Mr. Adam's

13   testimony is from 2015, after he no longer had any relationship

14   with the Collectables Club.  It's cumulative, it's prejudicial.

15   There's nothing illegal about ACH processing.  There was no

16   unlawful purpose or -- and certainly not one that was charged

17   in the indictment, that is being established by this repetitive

18   evidence.

19           I just want to raise the issue because we have already

20   started briefing all of this stuff, and I think tomorrow, this

21   witness is focused exclusively on 2015, and Kapcharge, and ACH

22   processing.

23           THE COURT:  Monday.

24           MS. SANTILLO:  Monday.

25           THE COURT:  I will have briefing in advance of that,

1    but I hear you.

2              MS. CHOI:  Your Honor, just to be clear, I think your

3    Honor understands the relevance of this, especially given the

4    indictment has this time scope into 2015.  So this is all

5    relevant behavior.  Your Honor has already ruled that it's

6    not -- our claims are not that the negligence is what causes

7    the criminal liability.  The problem is the government

8    establishing that he has corrupt intent.  Running his credit

9    union to the ground through voluminous ACH processing into 2015

10   while he's making false statements to the NCUA about the status

11   of whether he stopped that ACH processing goes directly to his

12   corrupt intent.

13             And I think we are working hard to narrow what we

14   establish on that front, but this is not a case about negligent

15   ACH processing, it's a case about misstatements that her client

16   made to the NCUA to cover up the fact that he was running his

17   credit union in a way that was not safe and sound for the

18   benefit of Kapcharge.

19             MS. SANTILLO:  That's also not in the indictment.

20   This is about a bribe that took place in June 2014, and all the

21   evidence from 2015 is being introduced to show that in 2014,

22   when he didn't know that anything was going to happen with

23   respect to ACH processing, that he's corrupt.  So they're

24   trying to trace back his corrupt intent from June 2014 to

25   something that he did in 2015 that is not illegal, was with a

1    totally different party, and is not within the scope --

2              THE COURT:  How does that deal with the misstatements

3    and obstruction of the NCUA investigation?

4              MS. SANTILLO:  Because if you read our papers and the

5    indictment, it's very clear in the indictment that the only

6    misrepresentations that are charged are with respect to the

7    Collectables Club coming onto the board, and with respect to

8    the field of membership, and with respect to the health in

9    terms of shielding the fact that the Murgios and the other

10   members of the Collectables Club were on the board.  That's the

11   scope of the conspiracy that is alleged in the indictment.  And

12   once they severed ties, Mr. Gross, HOPE FCU, and Kapcharge

13   entered into an entirely separate business relationship where

14   there was no change in control of the board, and their unlawful

15   purpose had nothing to do with Bitcoins, had nothing to do with

16   Coin.mx, had nothing to do with the Murgios, it only had to do

17   with processing ACH transactions.

18             THE COURT:  Well, I guess one question is:  Are

19   there -- well, go ahead, Ms. Choi.

20             MS. CHOI:  Yes, your Honor.  Just to be clear,

21   although Ms. Santillo objected to this as a line of redirect,

22   the $150,000, the $120,000 payment that happened in 2014 as

23   well as the two $15,000 payments, all were ultimately funded by

24   Kapcharge.  Kapcharge continued to give them tens of thousands

25   of dollars in various so-called donation-type situations that

1    ultimately went to Mr. Gross and his coconspirators.  It is a

2    continuation of the charged conspiracy.  It will all be made

3    very clear in the last two days of the government's case that

4    that is, in fact, what's going on.

5             And I think your Honor hits it on the head, which is,

6    it's about obstruction and misstatements to the NCUA that

7    continued into 2015.  That is what is charged in the

8    indictment.  The indictment doesn't -- she is correct that the

9    indictment focuses in part on the Collectables Club because two

10   of the three defendants were Collectables Club members, but

11   that doesn't mean that it doesn't also cover into 2015, which

12   on its face is after her purported argument of withdrawal,

13   right, because it's after that November meeting when, according

14   to Ms. Santillo, everyone parted ways after a bad business

15   deal.  We charged the obstruction into 2015 because Mr. Gross

16   continued to hide the nature of his relationship with

17   Kapcharge.  We're entitled to prove that up as part of the

18   relevant charges at trial.

19            THE COURT:  Are there in evidence yet alleged

20   misrepresentations after November -- after the meeting that

21   relate to the covering up of the relationship with the

22   Collectables Club?

23            MS. CHOI:  Yes.  Like the Meg Flok email where Meg

24   Flok asks Trevon Gross who the Collectables Club is, and he

25   gives an answers like they do payroll -- yeah, Kapcharge

1    processes payroll for them is his statement, which he knows,

2    obviously, is not the case.

3         MS. SANTILLO:  There's a very simple explanation for

4    that.

5         THE COURT:  And, by all means, you get to make it.

6    That doesn't mean it's not covered in the indictment, and it

7    doesn't mean it's not in evidence in the trial.

8         MS. SANTILLO:  But that is not the reason that I'm

9    making the argument, because to the extent that they're

10   alleging that the conspiracy to cover up anything that happened

11   with the Collectables Club spanned into 2015, I think that,

12   depending on how it came out, might squarely go within the

13   scope of the indictment.  We're not talking about that.  We're

14   talking about 2015.  It's misstatements made to the NCUA with

15   respect to the relationship with Kapcharge that is entirely

16   unrelated to the conduct that is charged in the indictment.  If

17   you look at the indictment itself, in 2015, the only overt act

18   they've alleged is the Collectables Club sending a letter to

19   the NCUA trying to get back on the board, and that's after the

20   withdrawal.

21        So, it's very clear in the indictment, as Mr. Creizman

22   spelled out in his letter motion last night and as the point we

23   tried to make in our limiting instruction motion was, is that

24   they've charged a conspiratorial agreement between Anthony

25   Murgio, Yuri Lebedev, Trevon Gross with respect to seeking to

get control of the board at HOPE FCU to further an unlawful

Bitcoin exchange.  That is the charged conspiracy.  We are so

far afield from that at this point with insider loans, you

know, improper bookkeeping on the books of the HOPE FCU, it's a

distraction, it's cumulative, it's suggesting conviction on the

grounds of some technical violation of a regulation that is so

far away from the charged conspiracy.

THE COURT:  That argument does hinge, though, on the

withdrawal point, right?

MS. SANTILLO:  Well, it's hard for me --

THE COURT:  I think that's a simple question.

MS. SANTILLO:  Well, it hinges on withdrawal, but it

also hinges on -- because the Collectables Club wasn't even

involved with Kapcharge in 2015.

THE COURT:  I'm going to read the papers, and I am

going to read the new papers, but I started by saying isn't

there evidence after November 2014 -- is there evidence in the

record, but you said there's an easy response to it.  But isn't

there evidence in the record of misrepresentations by Mr. Gross

after November 2014 that goes to covering up misrepresentations

vis-a-vis Collectables Club?  And you said there's an easy

answer to that, but, and then you went to your Kapcharge point.

But they come together.

MS. SANTILLO:  I don't think they come together

because I think, to the extent that there are allegations that

| | |
|---|---|
| 1 | there is evidence that suggests a coverup of what happened in |
| 2 | 2014, that might fairly be within the scope of the conspiracy. |
| 3 | But what I am trying to say is that the relationship between |
| 4 | Kapcharge and Pastor Gross after that had nothing to do with |
| 5 | the charged conspiracy. |
| 6 | THE COURT:  Right.  But there's not withdrawal if |
| 7 | there's continued attempts to cover up the conspiracy, right? |
| 8 | Isn't that the law? |
| 9 | MS. CHOI:  Yes. |
| 10 | THE COURT:  Would you disagree with that as a legal |
| 11 | framework? |
| 12 | MS. SANTILLO:  I don't disagree with that as a legal |
| 13 | framework, but I disagree with the notion that there can't |
| 14 | be -- that if you meet somebody in a conspiracy, that |
| 15 | everything you do with that person from that point forward is |
| 16 | still the conspiracy.  Like if I met Mr. Creizman, and we |
| 17 | agreed to do something illegal, then we went out to have a |
| 18 | piece of pizza, what we did over there is not illegal.  Every |
| 19 | relationship that you enter into with somebody who was once a |
| 20 | coconspirator is not in furtherance of the conspiracy.  There |
| 21 | is a specific charged conspiracy, and the conduct that Pastor |
| 22 | Gross and Kapcharge were in had nothing to do with any of the |
| 23 | common goals of the conspiracy that has been alleged.  They |
| 24 | didn't do it with any of those coconspirators, they did it in |
| 25 | furtherance of a lawful purpose, which is ACH processing. |

1           So, to the extent that -- even if during that time

2     frame, the two were working to cover up something they had done

3     before, it doesn't mean that everything they did is that same

4     conspiracy that was charged in the indictment.  It's a

5     different fact pattern.  It's a different, like, purpose that

6     they were trying to achieve, and it's not an unlawful purpose,

7     and it's certainly not the charged unlawful purpose.

8           MS. CHOI:  We'll brief it, your Honor.  I don't think

9     it makes much sense to continue down this path right now.

10          THE COURT:  Okay.

11          MS. CHOI:  So one other matter to take up, which is a

12    special verdict form?

13          THE COURT:  Oh, yes, yes.

14          MS. CHOI:  I guess that's fine.

15          THE COURT:  I'll just start by saying, why do we need

16    a special verdict form?

17          MS. CHOI:  Or not even special verdict form, I just

18    meant verdict form.

19          THE COURT:  Yes.  Well, we need a verdict form,

20    although I'm ready to grant Mr. Creizman's unobjected to Rule

21    29.  Again, joking.

22          But, in that case, we wouldn't need a verdict form,

23    but we do need a verdict form, and the government suggests

24    needing interrogatories on the objects, right?

25          MS. CHOI:  Yes, to just ensure unanimity as to which

1      objects, but -- hold on one second.

2                  THE COURT:  Isn't that captured in the instruction?

3                  MS. CHOI:  It is.

4                  MR. NOBLE:  It is, Judge, but I think when it comes

5      time for sentencing, it would be very helpful to know which

6      objects the jury found the conspiracy comprised.  If anything,

7      I would think it would be the defendants who would want a

8      special verdict on the conspiracy because, otherwise we're

9      going to assume that the jury was unanimous as to all objects

10     of the conspiracy, which is fine, I guess, from the

11     government's perspective, but this is oftentimes an issue on

12     appeal.  So if the defendants don't object to a blanket

13     conspiracy verdict form that says guilty or not guilty as to

14     each defendant, yes, your Honor is right, the instructions, I

15     think, that your Honor will give on conspiracy are sufficient

16     because it makes clear that the jurors have to be unanimous as

17     to at least one of the objects of the charged conspiracy, but

18     then it's going to be a bit of a black box.

19                 THE COURT:  This all came in last night in the swirl

20     of things, but I had understood the request for the special

21     verdict form to be from the government and the specific request

22     from the defendants to be a general verdict form, looking at

23     them, is that correct?

24                 MR. CREIZMAN:  Yes.  I think so, yes.

25                 MS. SANTILLO:  Yes.

1        THE COURT:  There can be good reasons -- I'm trying to

2    think through what will guide the jury the most and provide the

3    information that is necessary.  I think those are the relevant

4    questions.

5        MS. SANTILLO:  Your Honor, with respect to our request

6    for not a special verdict form --

7        THE COURT:  Yes.

8        MS. SANTILLO:  -- it all ties back to this issue we've

9    been talking about because I feel like if you just have

10   conspiracy, and then you have the objects without the defined

11   conspiracy, it's inviting the jury to return a verdict against

12   Mr. Gross for these issues with respect to the Kapcharge

13   disclosures and not with respect to the charged conspiracy.

14   That's all part of my calculus.  I understand that there are

15   benefits to a special verdict form if it's properly drafted,

16   but in this case, I just don't think it gives enough protection

17   to him to hold the government to what they charge in the

18   indictment.

19       THE COURT:  So the defense -- counsel for both

20   defendants just requested a general verdict form.

21       MR. NOBLE:  That's fine for the government then.

22       The only thing we would object to, Judge, is

23   Ms. Santillo's suggestion that there should be additional

24   language defining the conspiracy.

25       THE COURT:  Well, I don't want to reinsert a

1   portion --

2           MR. NOBLE:  Right.

3           THE COURT:  I've just gone through the whole exercise

4   of reading the charge, and I can't see why we wouldn't just

5   ask -- just rephrase this, so Count Three is what,

6   conspiracy -- conspiracy.

7           MS. CHOI:  Yes.

8           MR. NOBLE:  We also wouldn't even list all the

9   objects, as Mr. Creizman does, because they will be instructed

10  on that in the jury instructions, and they'll have those with

11  them during their deliberations.

12          To the extent the Court is inclined to list all the

13  different objects, we believe the 1001 objects should all be

14  listed together because that's how it's charged in the

15  indictment, and that's what's correct under the law.

16          MR. CREIZMAN:  I have no problem with that.  I have no

17  problem with shortening that.  I think that with respect to

18  Counts Four, five, six, seven, eight, it describes what the

19  crime is, even conspiracy to commit wire fraud and bank fraud.

20  So I would rather -- at least it's a conspiracy with whatever

21  objects, and I don't mind reducing it to false statements.  I

22  don't need like six of them.

23          THE COURT:  But it sounds like Ms. Santillo, on behalf

24  of Mr. Gross, does object to inclusion of the objects; is that

25  right?

1          MS. SANTILLO:  I think, as Mr. Shin has pointed out, a

2    lot of these things are interwoven.  I've requested summary of

3    the indictment to have the conspiracy defined, and to the

4    extent it's adequate to sort of lay out what I think the

5    indictment -- basically what I think the government needs to

6    prove with respect to the actual charged conspiracy, then we

7    may have less concerns about having the shorthand objects, as

8    long as it's clear that there are bounds.

9          THE COURT:  Does anybody have a proposal?

10         MS. CHOI:  I'm not sure what -- I think we should just

11   propose conspiracy with a very short explanation of, like, the

12   objects, just to make clear that it's not the conspiracy to do

13   bank or wire fraud.  And I think that will solve these

14   problems.

15         THE COURT:  All right.  Why don't you see if you can

16   come to agreement on that and submit it or make a suggestion

17   now.

18         The other option -- frankly, there's always this

19   problem where you try to put some information in the verdict

20   form.  We've just given them the instruction.  The instructions

21   are the instructions.  We could say Count Three, Count Four,

22   Count Five, Count Six, right?

23         MS. CHOI:  Right.  That's fine.  As long as --

24         MR. NOBLE:  Because they will also have the

25   indictment, they will have heard all the instructions, it can

1    just be Count three, guilty or not guilty as to both

2    defendants.

3           MR. CREIZMAN:  And you can reference the jury

4    instructions, if you want to, or whatever.

5           THE COURT:  You mean you could say -- well --

6           MS. CHOI:  They'll know that.  They'll know that.

7    Look, if they don't know what Count Three is, and I am hoping

8    it will be Count One once we redo this, but if it's Count

9    Three, and they don't know what it is, I'm assuming after the

10   charge, they'll know where to look.

11          THE COURT:  Does anyone object to just a general

12   verdict form that says Count Three, Yuri Lebedev, guilty, not

13   guilty, Trevon Gross, guilty, not guilty; Count Four, Yuri

14   Lebedev, guilty, not guilty; Count Five, Trevon Gross, guilty,

15   not guilty; Count Six, Yuri Lebedev, guilty, not guilty; Count

16   Seven, Yuri Lebedev, guilty, not guilty; Count Eight, Yuri

17   Lebedev, guilty, not guilty?

18          MR. NOBLE:  No objection.

19          MR. CREIZMAN:  I have no objection.  It just seems my

20   client's name is mentioned more, and that's prejudicial, I

21   believe, but other than that...

22          MS. SANTILLO:  No objection.

23          THE COURT:  You're flying under the radar strategy is

24   no longer working.

25          I'll prep a verdict form that does just that.  We'll

1    send it to you.  Think about it, but let me know by end of the

2    day Sunday if you have any concerns, having reflected on it

3    once you see it.  Okay?

4            Obviously, if you do come to an agreement on a

5    renumbering of the charges in light of the --

6            MS. CHOI:  We'll fix it all.

7            THE COURT:  -- redacted indictment, you'll submit a

8    new version.

9            MS. CHOI:  Yes, your Honor.

10           THE COURT:  Have we addressed everything other than

11   what we've decided we can't address yet?

12           MS. CHOI:  Just one other issue.  This is just with

13   regards to me.  I'm feeling quite ill, I'm trying to go see the

14   doctor.  If I am, for some reason, not there on Monday or have

15   to leave in the middle, I hope your Honor would understand that

16   that's for my own health, and the government will move on and

17   continue to do what it's been doing.

18           THE COURT:  All right.  Mr. Noble will have to start

19   yelling at me, I guess.

20           MS. CHOI:  I don't think I yelled at you today, your

21   Honor.

22           THE COURT:  No, it may be true.

23           Well, I hope you feel better, and you do what you need

24   to do.  We'll proceed here.

25           MS. CHOI:  Thank you, your Honor.

1          MR. NOBLE:  Judge, I hate to beat my hobby horse even

2     more, but the NCUA law and regs, we'd requested that a copy of

3     those be sent back with the jury with the jury instructions,

4     but I'm not sure if we ever decided that.

5          THE COURT:  I don't think we did.

6          Mr. Creizman?

7          MR. CREIZMAN:  I'm inclined to object, but I'm not

8     sure just because I think there's got to be a reason they want

9     to do that.  But, no, seriously, I don't know.  I haven't

10    thought about it.  I guess I don't --

11         THE COURT:  How about this:  I haven't thought about

12    it either.  I think on your to-do lists -- included on your

13    to-do list is to confer on the specific charge, as we've

14    discussed it, that will be included in the jury instruction on

15    this in light of what I gave and in light of what we discussed

16    today, the alteration to include not only what I instructed

17    them, but testimony that they heard.  Why don't, in the process

18    of coming to rest on that, if you indicate what specific

19    provisions you're asking to go back, and then you'll let me

20    know if there is consent or objection.

21         I haven't thought about it.

22         MR. NOBLE:  Okay.  We'll confer.

23         MS. SANTILLO:  Last thing:  I understood -- maybe I'm

24    wrong -- that we would get disclosures on what this IRS witness

25    will say.  I will just say I've never heard any theory about

1    wrongdoing with the IRS, this is all new, and I may make an

2    application with respect to their argument.  Hopefully, I'll

3    have sufficient time to present it, but I don't know who this

4    witness is, whether it's an expert in tax law, you know, why

5    this hasn't been noticed before, and why we're injecting it

6    into the case at the last minute.

7              MR. NOBLE:  Judge, when we got the tax returns and

8    produced them to defense counsel --

9              THE COURT:  Which was when?

10             MR. NOBLE:  Well before trial.  We had a conversation

11   with Ms. Santillo when we explained the relevance of the tax

12   returns, which is what I explained before, that to the extent

13   Mr. Gross didn't report as personal income some of the proceeds

14   he received from these bribe payments, then that shows an

15   intent to conceal that income from the IRS, which goes to

16   consciousness of guilt, corrupt intent, et cetera.

17             We had told her about these tax returns when we were

18   having discussions with her about basically the subject of

19   Ms. Larkins' testimony, that they were going to claim that all

20   of this was legitimate, and we said that the tax information

21   tends to show that he hid this income from the IRS.  So we did

22   proffer the relevance of it.

23             The witness is essentially custodial.  She's a

24   testifying witness for the IRS who comes and says, these are

25   the tax returns, these are the relevant materials that were

1    submitted to the IRS for Mr. Gross for the relevant years, and

2    that's what she will testify to.  She may provide definitions

3    as to what is income, what should be reported if there are

4    categories of those income, but she's, by no means, going to be

5    testifying as an expert witness.

6           To the extent defense have objections to that witness

7    testifying, for instance, what is income, which is a pretty

8    basic question, it's a legal matter, and we could come to an

9    agreement on the Court instructing the jury as to what

10   constitutes income.  But we haven't met with this witness yet

11   to fully debrief her.  She's also flying in this weekend, and

12   we're meeting with her on Sunday.  We'll turn over the 3500

13   material, but they have had the underlying tax documents for

14   quite some time, and I'm being told we produced the IRS records

15   on January 16th.

16          MS. SANTILLO:  Your Honor, I took an entire class in

17   law school on income tax, and it's not a simple issue.  It's

18   especially not a simple issue in terms of there's a lot of

19   layers to it.  Did he have an accountant?  Did he get advice?

20   How was -- where did he get his understanding about what income

21   is?  To me, this is classic expert testimony.  How is she going

22   to be defining what he should have been reporting in his income

23   taxes if she's not an accountant who has a full knowledge of

24   his not-for-profit churches and how their books and records

25   should be kept?  It seems highly irregular to have somebody

1   come on and purport to say what he should be reporting as

2   income on his taxes.

3          MR. NOBLE:  Well, the evidence will speak for itself.

4   We can show he reported --

5          THE COURT:  This is an IRS custodial witness?

6          MS. CHOI:  Essentially.

7          MR. NOBLE:  A court testifying witness is what the IRS

8   calls them, and they have certain things that they're allowed

9   to testify to and that they're not allowed to testify to.  And

10  they can get in the IRS documents, they can testify as to what

11  was reported.  But I think it's fair game for us to put in

12  other evidence and argue that this is -- to the extent defense

13  counsel is going to try to use Ms. Larkins' or other evidence

14  to argue that these bribe payments, to the extent it went to

15  Mr. Gross, it was constituted backpay or back pastoral support,

16  that's clearly an admission that that is income to him and,

17  it's clear from the other evidence from the IRS records that he

18  did not report that as income.

19         THE COURT:  It sounds to me like this witness can

20  testify as to the existence of the documents --

21         MR. NOBLE:  And what was reported?

22         THE COURT:  -- what was reported.  What should be

23  reported?  No.  No, I don't think so.

24         MR. NOBLE:  We're not going to ask her should this

25  income -- like show her the documents -- yes, it's basically

1   the question of if somebody receives a personal benefit that

2   goes to them that's a financial benefit, is that something that

3   would have to be reported, whether it's a legal payment or an

4   illegal payment, is that something that has to be reported to

5   the IRS?  And the answer is an easy, yes, it should be reported

6   to the IRS as gross income.

7          To the extent they have an objection to this witness

8   testifying as to that basic principle, which is all I think we

9   need --

10         THE COURT:  What is the basic principle?

11         MR. NOBLE:  What constitutes personal income, what

12   falls into the category -- and there's a legal definition, what

13   falls into the category of what should be reported as gross

14   income on the 1040.  To the extent she testifies to that, I

15   don't think that's anything that's controversial.  But if they

16   have an objection --

17         THE COURT:  Is that legal definition part of the tax

18   instruction forms?

19         MR. NOBLE:  It quite possibly could be.  That's --

20         THE COURT:  Where would she be drawing her knowledge

21   as to what should be -- I'm just getting your language.

22         MR. NOBLE:  As to what constitutes income?

23         THE COURT:  Yes.

24         MR. NOBLE:  She works for the IRS.  She can testify as

25   to what income is and what has to be reported as gross income

1     or does not have to be reported as gross income.

2            It's a legal definition, if that's the concern, that

3     she's testifying as to like a point of law, then we would

4     request what we did with respect to the NCUA and just have the

5     Court instruct the jury as to what the definition of income is.

6            THE COURT:  You didn't notice her, I gather, as

7     someone who would testify not based on personal knowledge, but

8     based on her expertise working for the IRS as to what, as a

9     legal matter, constitutes income for purposes of tax filings,

10    right?

11           MR. NOBLE:  We did not notify her as an expert

12    witness.  She's not going to be opining that Mr. Gross should

13    have reported X, Y, and Z as personal income.  All she's going

14    to be testifying to is these are the documents, here's what he

15    reported, and this is what the definition of income is.

16           THE COURT:  So, that all sounds fine, and I think just

17    here's what the definition of income is, depending on what

18    that's drawn from.  If she's pointing basically to a provision

19    in the filing instructions or the like, that seems fine.  If

20    it's derived from accounting experience, or what has been

21    adjudicated as appropriately included in income and the like or

22    that sort of thing, then it seems to me it crosses over into

23    something I wouldn't allow.

24           Ms. Santillo.

25           MS. SANTILLO:  I also just have very big concerns

H33KLEB7

1    about this turning into a tax case.  You know, it was an ACH

2    processing case and violating regulations, and now it's a tax

3    case?

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  It's not a tax case, at least as I

2     understand it, and you've indicated the relevance of

3     Ms. Larkins.  You've already indicated the relevance, unless I

4     misunderstood.

5          MS. SANTILLO:  That's true.  But in terms of defending

6     a tax case --

7          THE COURT:  It's not a tax case.  She hasn't been

8     charged with tax violations of the tax laws, but it is often

9     the case that tax returns, I think in probably every financial

10    case I've seen tried, tax returns are often used as a form of

11    evidence of guilt and of guilty consciousness to the extent

12    that -- and corrupt intent to the extent that reporting is

13    inconsistent with income and the like.  If you have money in

14    and it's not reported on your tax forms, there's many

15    legitimate inferences that can be drawn.  You, yourselves, have

16    acknowledged the relevance of a distinction between personal

17    expenses and business expenses in a sense, so it's hard for me

18    to see how this isn't relevant.

19         MS. SANTILLO:  I think your point is well taken.  I

20    think the problem is, when a witness who is testifying about

21    just what's on the tax return and the definition of income, it

22    is much more complicated than that with a non-profit

23    organization, and with these issues with respect to, you know,

24    look, if something isn't booked properly, are we going to have

25    a tangential sideshow about -- the question is whether he had a

corrupt intent, and it's not about whether -- I'm just afraid

that they're going create this inference that there's one

straight definition for income that has to be met, when clearly

there's a whole industry around figuring out what income is.

And particularly with respect to --

THE COURT:  But I guess I'm wondering if it's in light

of my ruling.  So I'm going to let -- the custodial witness

from the IRS can say, "These are the tax forms.  These were

submitted to the IRS.  Here's what he filled out for income."

And then what remains a question, but to the extent they want

to say what's the IRS instructional definition of income, and

she can just read whatever that is.  Do you have an objection

to that?  I just can't -- I'm not making a judgment, I'm

genuinely asking if your objection is to that or something

else.

THE COURT:  MS. SANTILLO:  I don't know because having not seen

how she would testify about it, if it's derivative -- if

there's certain layers of, you know, you get income from, you

know, certain streams of income, and you have to make an

offsetting calculation, I just don't know how complex the

definition is and whether it has subjectivity embedded within

it such that it won't be fair to make an inference that he was

intentionally excluding something.

THE COURT:  I won't allow any embedded -- it might be

that there's ambiguity in the definition, but I'm allowing this

1   witness to testify, if there is a readily available

2   definition -- and it's almost to the middle of April so I

3   should have this firmly in mind -- but if there is a readily

4   available definition that she can simply read from the relevant

5   tax form, I'm not going to let questioning go beyond that.

6           MS. SANTILLO:  Thank you, your Honor.

7           THE COURT:  Thank you.  Anything else?  I have

8   something scratching the back of my head that I haven't

9   addressed, but I don't know what it is so we'll call it a day.

10          I'm not repeating, I'm not going back over what it is

11  that I've asked you to do, but you'll do it.

12          MR. NOBLE:  Yes.

13          THE COURT:  And pull the transcript if you need to

14  confirm what it is that I've asked you to do.  But to the

15  extent -- especially with respect to the charge, there are

16  outstanding items.  As soon as you get those to me, we'll

17  incorporate them into the red lined version, and then what I'd

18  like to do is to just send out the red lined version for

19  everybody to confirm that we've incorporated everything that

20  I've either ruled on or that you've agreed to today so at least

21  it can stand still with respect to that, and then we can save

22  what's left for the outstanding issues.

23          I think that's it.  I'll await your filings and I'll

24  see everybody 9:00 a.m. on Monday.  Thank you.

25          (Adjourned to March 6, 2017 at 9:00 a.m.)