H37KLEB1

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                          15 Cr. 769 (AJN)

 5   YURI LEBEDEV and TREVON GROSS,

 6              Defendants.                 Jury Trial

 7   ------------------------------x

 8                                          New York, N.Y.
                                            March 7, 2017
 9                                          8:53 a.m.

10
     Before:
11
                     HON. ALISON J. NATHAN,
12
                                          District Judge
13                                        And A Jury

14                        APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     BY:  EUN YOUNG CHOI
17        DANIEL S. NOBLE
          WON S. SHIN
18        MICHAEL CHANG-FRIEDEN, Paralegal
          EMILY GRANT, Paralegal
19        Assistant United States Attorneys

20   CREIZMAN, PLLC
          Attorneys for Defendant Yuri Lebedev
21   BY:  ERIC M. CREIZMAN
          MELISSA MADRIGAL
22        JONATHAN MICHAELSON, Paralegal

23   KROVATIN KLINGEMAN, LLC
          Attorneys for Defendant Trevon Gross
24   BY:  KRISTEN M. SANTILLO
     BY:  HENRY E. KLINGEMAN

25

H37KLEB1

1              (In open court; jury not present)

2              THE COURT:  When we ended last night, I had said,

3     because I anticipated matters to deal with, we would start at

4     8:30.  Maybe that message didn't get to --

5              MS. MADRIGAL:  My apologies to the Court.  Actually,

6     neither one of us heard.

7              THE COURT:  Well, why don't we see what we can take up

8     in Mr. Creizman's and Mr. Lebedev's absence, Ms. Madrigal, to

9     the extent that we can just deal with some preliminary logistic

10    matters.

11             MS. MADRIGAL:  Absolutely.

12             THE COURT:  Ms. Choi.

13             MS. CHOI:  Good morning, your Honor.

14             THE COURT:  How are you?

15             MS. CHOI:  Well, hanging in there.  I think everyone

16    else has been sort of in the same boat, too.  I wanted to let

17    your Honor know the status of various outstanding issues that

18    we had previously discussed.  And if counsel wants to pipe up,

19    because my list may be incomplete, it's only in my head at the

20    moment.

21             First off, obviously, the government intends to rest

22    today.  The two next witnesses that we have are the tracing

23    analysis -- the IRS witness that we discussed yesterday and the

24    tracing analysis by RSM, which will both establish which

25    payments were made to Mr. Gross and Mr. Lebedev as they relate

H37KLEB1

1    to the bribery scheme, as well as the Coin.mx scheme.

2              THE COURT:  I had thought there was -- I had just John

3    Rollins left.

4              MS. CHOI:  That's right.  No, no, there's the IRS

5    witness.

6              THE COURT:  The IRS witness?

7              MS. CHOI:  Yes, those two.

8              THE COURT:  Is that Rose Linton?

9              MS. CHOI:  That is, your Honor.  I was just going by

10   entity, not name.

11             THE COURT:  Oh, now I recognize that you said IRS.

12             MS. CHOI:  Okay.

13             THE COURT:  So the IRS witness and then Mr. Rollins?

14             MS. CHOI:  Yes, your Honor.

15             So, along those lines, with regard to the RSM,

16   Mr. Rollins' preparation, I think there are some issues from

17   Mr. Gross' camp that Mr. Noble will deal with because he is

18   going to put that particular witness on.  We have discussed it

19   with counsel for Lebedev, and they have no objections to our

20   approach.  So we will have to deal with that sort of first or

21   earlier on in the list of things that we need to do.

22             The second issue is exhibits that the government

23   wishes to move in.  I'm sad to report that although we provided

24   a list last night, a little tardy because we're all sort of

25   working on multiple things at once -- I know that defense

H37KLEB1

1    counsel has been working hard, we're all up to crazy hours --

2    they didn't have an opportunity to finish going through the

3    list, but we have agreed in principle on the following:  There

4    are certain exhibits that we need to move in for purposes of

5    the RSM analysis, the tracing analysis.  They have consented to

6    that list, so we were going to move those in in the morning.

7    We will have a brief publishing sequence, as we have, of a

8    certain small subsection of the emails for that purpose.  I've

9    talked to counsel for both parties.  They've agreed in

10   principle that they'll have the next two days, over the defense

11   case, to continue looking through the list and noting any

12   objections that they may have to the government's list of

13   emails and other documents they would like access to for

14   purposes of summation.  So there wouldn't be any prejudice to

15   the government were they to introduce this list for purposes of

16   its rebuttal case, if that makes sense.

17           So, these are documents we would have moved in in our

18   case in chief, but to accommodate defense counsel and make sure

19   that they can have adequate time to review them all, and

20   because your Honor has already alluded to the fact that you

21   would be willing to entertain specific objections to certain

22   emails, that would be our proposal, just to make sure that we

23   can move this case along in a timely fashion.

24           THE COURT:  All right.

25           Mr. Klingeman?

H37KLEB1

1          MR. KLINGEMAN:  Your Honor, I just want to make a

2     couple of things clear.

3          We agree with what counsel just said.  The government

4     produced its list in parts.  I stopped counting the number of

5     exhibits after I got to 200, but despite all that, I did review

6     them all, and I have no objections.  My co-counsel, who's been

7     busy doing other things, wants to look at them.  So we have

8     agreed with the government as to its proposal, but I want the

9     Court to know, I did exactly what I promised to do yesterday in

10    Court.

11         THE COURT:  Thank you, Mr. Klingeman.  I appreciate

12    that.  I know where we are.

13         MS. CHOI:  Near the end, your Honor.  Near the end.

14         So, that's that issue.  And I think the only other

15    issue with regard to logistics, for our purposes, is your

16    Honor's ruling with regard to the outstanding witness issue and

17    the government's efforts to date.  And I can describe to you --

18         THE COURT:  Yes, I wanted to begin with an update on

19    where we are.

20         MS. CHOI:  So, unfortunately, after we left court, we

21    got in motion attempting to contact Secret Service.  Overnight

22    we have received a contact of a particular Secret Service

23    general counsel individual, we've reviewed the contents of what

24    Mr. Klingeman has served upon the government, assuming FedEx

25    works the way that it works.  We also forwarded that along to

H37KLEB1

the agency.

I think I have the contact information for an individual who's supposed to reach out to me.  I tried to contact them before we got to court at 8:30 this morning, and they were not available as of yet.  I don't know if they have had an opportunity to review.  I would note this with regard to Mr. Klingeman's proposal, which is that he asks in the Touhy requests for two lines of questioning, one regarding the specifics of the conversation between Ms. Beyer and Mr. Freundt on July 21st, 2015, and, two, a line of inquiry along the lines of what, if anything, Secret Service did to investigate the matter afterwards.

I think with regard to Touhy -- and we haven't gotten your Honor's ruling, but I think as a logistical matter, it would be possible to get the witnesses here, I'm hoping, with regard to the first -- or at least Ms. Beyer with regard to the first question.  I think the second question is going raise some concerns from the agency's perspective because that strikes at the heart of what Touhy is meant to protect against, because it is an agency that makes its own decisions about how it deals with those internal matters.  And I think, given your Honor's inclination yesterday at least, to the extent that I was interpreting it correctly, I think your Honor rightly drew a distinction between the question of the specific impeachment material with regard to Mr. Freundt versus questions writ large

1    about the investigation and what Secret Service or Special

2    Agent Jarrow did or did not do, which would get to that second

3    point.

4           So I think as a practical matter, I would just seek

5    clarity.  The government's position would be if your Honor is

6    inclined to rule that way, that the real question is the line

7    of questioning regarding the specifics of the conversation and

8    not these other issues.  And I think if that were sort of what

9    the Court was inclined to do, I would be in a better position

10   to tell Secret Service that they should make this witness

11   available because it wouldn't implicate any of the underlying

12   Touhy concerns.

13          MR. KLINGEMAN:  I can certainly help with that.

14   Obviously, I drafted the Touhy request as broadly as the

15   scenario permitted, just so there would be no later complaints

16   that the government was not on notice.  When I say "the

17   government," obviously, in this case, the Secret Service.  As

18   we discussed yesterday in colloquy, I'm only interested in the

19   first line of questioning with these witnesses and not the

20   subsequent investigation.  And if counsel wants to convey that

21   directly to the Secret Service, I certainly have no objection.

22          MS. CHOI:  Your Honor, again, that's fine with the

23   government.  Obviously, your Honor still has reserved on that

24   particular question, but if that's your Honor's inclination, I

25   think we would be able to talk to Secret Service about this.

H37KLEB1

1              As a logistical matter --

2              THE COURT:  Just to pause, I will return to this when

3    Mr. Lebedev and Mr. Creizman are here, but I want to make sure,

4    because Mr. Lebedev was here yesterday when we took up this

5    issue but Mr. Creizman, I think, left for the final discussion

6    of it.  But, Ms. Madrigal, do you want to wait for Mr. Creizman

7    on this one, or do you have a view as to the scope?

8              MS. MADRIGAL:  I would like to wait for Mr. Creizman,

9    but I believe that Mr. Creizman would like to still, if

10   possible, call Agent Jarrow to discuss the steps that he took.

11             THE COURT:  We'll take that up.

12             MS. CHOI:  And, to be clear, we would object to that

13   line.

14             The other issue with regard to the Touhy matter is:

15   I've also had an agent from Secret Service reach out to

16   Ms. Beyer in anticipation of this incident occurring and seeing

17   what her availability is.  She, unfortunately, has a medical

18   procedure happening today, so she is not going to be able to

19   board a plane today.  I instructed the agent to tell her,

20   because I didn't have direct conversations with her, I

21   instructed the agent to tell her to make arrangements for first

22   thing Wednesday morning for her to arrive here.  I said, in

23   anticipation of whatever ruling the Court might have, it's

24   always easier to cancel the plan as opposed to create it last

25   minute.  So, my understanding is that instruction has been

H37KLEB1

1     relayed to Ms. Beyer, assuming that her chain approves of

2     whatever approach we end up taking and/or the Court ends up

3     ordering that particular appearance.  But I think, as a

4     logistical matter, that means she's not going to be here

5     until -- there are no direct flights from Tallahassee, so she's

6     not going to be here until early Wednesday afternoon at the

7     earliest.

8               THE COURT:  Let me pause for a moment.

9               Mr. Lebedev, on Ms. Madrigal's consent, we went ahead

10    this morning talking just around some logistical issues that

11    relate to the question of whether I will order, and, if so, how

12    it will proceed with Agent Beyer to appear.  We discussed

13    briefly, also, a process related to the exhibits that the

14    government is seeking to introduce that Mr. Klingeman has

15    indicated he's reviewed and Ms. Madrigal and Mr. Creizman are

16    still reviewing.

17              I had indicated we were starting at 8:30 today, but --

18              MS. LEBEDEV:  Sorry.  Thank you.

19              THE COURT:  -- I think that might have gotten lost in

20    the shuffle.

21              It is now five after 9:00, and we're still waiting for

22    Mr. Creizman.  But these things happen, but we do need to keep

23    on schedule.

24              So, Mr. Klingeman, do you want to respond to -- I

25    guess let's think through the timing question.

H37KLEB1

1          MR. KLINGEMAN:  We're prepared to continue with the

2    government's case, and then when the government rests, we hope

3    late this morning or first thing this afternoon -- I don't know

4    what Mr. Lebedev's plan is -- but we're prepared to start the

5    Gross case as soon as the Court indicates we should.

6          THE COURT:  Okay.

7          MR. KLINGEMAN:  We've got a small group of character

8    witnesses scheduled to arrive at the courthouse around

9    10:00 a.m.

10         Mr. Gross is prepared to proceed to testify, if he

11   makes that decision, as he's inclined to do.  We hope to have

12   another witness first thing tomorrow, but I'm not sure if that

13   witness is actually going to appear.  We've already produced

14   the reverse Jencks on that witness.  The government is ready if

15   and when that witness appears.

16         THE COURT:  Who is that?

17         MR. KLINGEMAN:  That is Loretta Larkins, who's been

18   consulting with counsel about whether to appear or not.

19         But I don't see Mr. Gross necessarily finishing his

20   testimony today, should he start it.  So I'm not worried about

21   holding up the Court or the jury in any way.  And if by that

22   time, we can have Special Agent Wozniak and Special Agent Beyer

23   here, as the government forecasts, early tomorrow afternoon,

24   that would be fine with us.  We'd certainly be happy to

25   conclude with their testimony and the defense case.

1          MS. CHOI:  Your Honor, to be clear, I have not reached

2     out to Special Agent Wozniak.  I took from yesterday's

3     conversation, maybe incorrectly, that the real witness that

4     Mr. Klingeman seeks is Ms. Beyer because Mr. Wozniak is not

5     going to be able to remember -- I mean his testimony is,

6     essentially, I don't remember this conversation at all.  She

7     didn't say that.

8          THE COURT:  I see no need for the two witnesses.  If

9     Ms. Beyer is here, it would become cumulative.  This is already

10     on the edge, and we'll do this with Beyer.

11          MS. CHOI:  I think part of this question about timing,

12     your Honor, really revolves around getting a sense of what the

13     defense case is going to be.

14          THE COURT:  We just got that --

15          MS. CHOI:  Right, from Mr. Gross.

16          But I think Mr. Lebedev goes first.

17          THE COURT:  Sure.

18          MS. CHOI:  But I don't know what the status is because

19     we haven't heard confirmation on that.

20          THE COURT:  Ms. Madrigal?

21          MS. MADRIGAL:  Sure.  Your Honor, I think Mr. Lebedev

22     this morning proposed defense exhibits to the government.

23     There are about ten or twelve maybe -- there aren't that

24     many -- and we indicated to the government last night that

25     Mr. Lebedev did not plan on testifying.  And I just spoke with

1     him this morning, and he still believes that that's the case.

2     So as of right now, that is our plan.  It would be a very short

3     defense case.

4               THE COURT:  Okay.  So a publication of exhibits that

5     are in by stipulation?

6               MS. MADRIGAL:  I am not sure if Mr. Creizman is going

7     to publish them or what exactly he's going to do.

8               THE COURT:  Okay.

9               MR. SHIN:  And we're reviewing the exhibits, your

10    Honor, and I think there will be time during the breaks to work

11    out any objections.

12              THE COURT:  All right.  So it sounds like, assuming we

13    finish, the government rests by lunch today -- is that

14    realistic?

15              MS. CHOI:  I would hope so, your Honor.

16              THE COURT:  -- then a short defense case at this point

17    is anticipated, obviously final decisions to be made by

18    Mr. Lebedev, and then into, at least it sounds like, a few

19    character witnesses, Mr. Klingeman, and then potentially

20    Mr. Gross, depending on his decision?

21              MR. KLINGEMAN:  That's our expectation.

22              THE COURT:  All right.

23              I think we will need Beyer by the morning.

24              MS. CHOI:  By Wednesday morning?

25              THE COURT:  Tomorrow morning, yes.

1          MS. CHOI:  Okay.  We'll try.  She has a medical

2     procedure this afternoon, and so I don't know whether or not

3     that's actually going to work.  We'll see what we can do.  I

4     think that -- I hope your Honor recognizes that some of these

5     things are beyond our control, and we're doing the best that we

6     can.  I can make that request of her, but, ultimately, I hope

7     your Honor will understand if that's not physically possible

8     because she has to have a medical procedure this afternoon.

9          THE COURT:  I'm just thinking through what our options

10    are if she can't be here tomorrow morning.  If the defense

11    rests --

12         MS. CHOI:  Well, I think, your Honor --

13         THE COURT:  I'm working backwards.

14         MS. CHOI:  Yes, I understand.

15         THE COURT:  Let's do it this way:  How long are your

16    anticipated closings?

17         MS. CHOI:  It's going to be several hours, your Honor.

18    And I think even if your Honor -- again, I don't know what the

19    flight schedules are.  Assuming that she gets here by Wednesday

20    afternoon, early afternoon, if it's going to be pretty short,

21    what we propose is that we wait for her to show up.  If there

22    is a rebuttal case that needs to be put on by the government or

23    if there are these evidentiary issues that we need to resolve

24    prior to the government resting its rebuttal case, we can do

25    that.  We can leave the question open to the jury, so that

1    they -- they may think it's a normal break while we deal with

2    these other things, and then that could be the last witness the

3    defense puts on.  But in the alternative, again, for purposes

4    of expediency, we've always said we would stipulate to those

5    facts, and I think that that would be a viable alternative, if

6    your Honor is concerned about delay with regard to this issue.

7            To be perfectly frank, your Honor, I think that if we

8    were to do this on Wednesday afternoon, we could still manage

9    to get all the summations done through Thursday, assuming -- I

10   don't know how long the defense intends to close, but I think

11   we could probably get it all in in one sitting day, and you

12   could charge the jury either Thursday afternoon or Friday

13   morning.  It doesn't create that much undue delay.  But that's

14   sort of the reality of the situation that we're dealing with

15   presently.

16           I also don't know, quite frankly, if Mr. Gross takes

17   the stand, we may be finding ourselves in Wednesday afternoon

18   territory anyways.

19           THE COURT:  Well, I do recognize that, and then we're

20   on a different schedule path --

21           MS. CHOI:  Right, right.

22           THE COURT:  -- without a problem.  I think we need to

23   prepare for the contingencies.  It's a big difference, the case

24   going to the jury on Thursday than the case going to the jury

25   on Friday.

1          MS. CHOI:  Your Honor, I understand that, and I

2    understand your Honor's concerns about timing and the like.  I

3    would say, again, I don't know what the defense witnesses will

4    ultimately end up being from Mr. Gross' perspective or what

5    defenses they may raise.  The government may have to put on a

6    rebuttal witness, a rebuttal case, depending, and if that were

7    to happen, plus Mr. Gross testifying, that will, I think, put

8    us in a situation where the closings would have to happen

9    starting Thursday morning, the most expedient situation.

10         So we're doing what we can.  I think that that's just

11    being realistic about the situation, though.  I don't think

12    anyone would disagree that the jury, at the very latest, would

13    be charged Friday morning, which gives them at least a

14    significant portion of Friday to deliberate.  It's not ideal,

15    but I don't really see, from a realistic standpoint, that that

16    will, in fact, happen.

17         THE COURT:  Mr. Klingeman?

18         MR. KLINGEMAN:  Yes, your Honor.  My only concern

19    about the summations is the fact that I go last, before the

20    rebuttal, and I just want to make sure I have enough time at

21    the end of the day.  So if we start first thing in the morning,

22    say, Thursday, I would anticipate everyone being finished,

23    including the rebuttal.  Customarily, the Court keeps the

24    rebuttal short.  My concern throughout the trial has been since

25    I go last, I don't want to be the one standing up at a quarter

H37KLEB1

1    of 5:00 with the Court and the jury.  So that's my only --

2              THE COURT:  Well, we do the best we can.

3              MR. KLINGEMAN:  I know.

4              THE COURT:  But my consistent rule is we use the time

5    that we have.

6              MR. KLINGEMAN:  Yes.  And I'm always willing to do

7    that.

8              (Pause)

9              THE COURT:  Well, we don't have an update on

10   Mr. Creizman.  I do want to hear from him before I rule on the

11   scope of the Beyer testimony issue.

12             Ms. Choi, my request is to have the scheduling process

13   with respect to Ms. Beyer continue even while you're here, if

14   someone from the office can continue to see how quickly she can

15   get here.

16             MS. CHOI:  Your Honor, I was actually expecting to --

17   as soon as things get underway here, and the argument is done,

18   I was expecting to go back to my office to try to deal with it

19   myself.

20             THE COURT:  I see.

21             MS. CHOI:  I hope you might want to let -- if your

22   Honor is inclined, if you could let the jury know that there's

23   nothing wrong with it again.  I'm just trying to deal with all

24   the issues at once.

25             THE COURT:  Yes, I'm happy to do that.

H37KLEB1

1              MS. CHOI:  Thank you, your Honor.

2              THE COURT:  We're going to wait for Mr. Creizman.

3     Maybe he didn't make it out of Judge Kaplan's courtroom.

4              MS. CHOI:  He was out, your Honor.  The emails prove

5     it.

6              THE COURT:  Let's turn to the slides issue, if we

7     could, Mr. Noble.

8              MR. NOBLE:  Yes, Judge.

9              We've had back-and-forth with defense counsel on these

10    slides, and they had some objections to some of the content on

11    some of the pages.  And I believe that we've stripped out the

12    portions of at least the content to which the defendants

13    objected and sent around a revised version of the slides early

14    this morning.

15             THE COURT:  Okay.

16             MR. NOBLE:  I think on content, in terms of graphics

17    and stuff like that, we're okay.  Defense counsel will correct

18    me if there's anything that we missed.

19             THE COURT:  Does the version that I have --

20             MR. NOBLE:  Yes, it's the same version.

21             THE COURT:  Okay.

22             MR. NOBLE:  It will be marked, for the record,

23    Government Exhibit 900.

24             THE COURT:  Thank you.

25             MR. NOBLE:  So, your Honor, we're seeking to admit

1    these as summary slides, summary exhibits, pursuant to Rule of

2    Evidence 1006.  Essentially what Mr. Rollins is going to

3    testify he did is that the government asked him, among other

4    things -- and this is the portion that I think is relevant to

5    the objection --

6              THE COURT:  And if you can remind me who Mr. Rollins

7    is?

8              MR. NOBLE:  Mr. Rollins is a consultant at RSM.  It's

9    an audit -- it used to be called McGladrey.  It's an audit

10   accounting consulting firm.  They do work for litigation.  They

11   represent defendant side, government side, in various

12   litigation.

13             He is going to be testifying that the government asked

14   him to analyze, with respect to Mr. Gross, ten financial

15   transactions, the ten payments which constitute the corrupt

16   payments that we say were paid by Collectables Club and

17   Kapcharge to Hope Cathedral, the various consulting payments

18   that were made to Mr. Gross and paid into Hope Cathedral's bank

19   account, the $50,000 payment that was made in November 2014,

20   which was subsequently reversed, as well as two transfers that

21   Hope Cathedral transferred between its accounts in 2015

22   relating to payments that were made by Kapcharge.  So there are

23   ten transactions that he is tracing.

24             I don't think defense counsel, Mr. Klingeman, has any

25   objection to the government's presentation of the sources of

1    those transactions.  I think his objection is on Mr. Rollins'

2    analysis of how those funds were used.  And to explain what

3    happened:  For instance, you take the $120,000 transfer, for

4    instance, that went into the church's operating account --

5                THE COURT:  Can I just pause you?

6                MR. NOBLE:  Yes.

7                THE COURT:  Are you explaining something that responds

8    to a pending objection, or has it been revolved?

9                MR. NOBLE:  No, no, no, this is something that is

10   pending.

11               THE COURT:  Okay.  I thought you started by saying you

12   worked it out.

13               MR. NOBLE:  The content in terms of like graphics, and

14   bullet points, and stuff like that, that we stripped out.

15               THE COURT:  Understood.

16               MR. NOBLE:  So there's a more fundamental --

17               THE COURT:  I'll pay attention then.

18               MR. NOBLE:  There's a fundamental underlying

19   objection, which I think is they have an objection to the

20   assumption that Mr. Rollins made using what's called first-in,

21   first-out.  It's an accounting methodology.  There are

22   alternatives, but that's the assumption that he used, and what

23   that says is --

24               THE COURT:  What are the common alternatives?

25               MR. NOBLE:  Last-in, first-out is another accounting,

3221

H37KLEB1

which is more in use for inventory purposes in accounting.
There is also another alternative of like average balance.
There are different ways of matching sources and uses.

In conversations with the government, he was told, he
was basically instructed, use first-in, first-out, because
that's a simplifying assumption to trace how proceeds are used
in a bank account.  The problem arises -- if there's a zero
balance in a bank account, and $120,000 goes in, and there are
no subsequent deposits, it's very easy to trace how the money
is used.  The problem arises when there's already a balance in
there or when there are subsequent deposits, then the question
is if you're tracing like how that money is used, what
assumptions do you make about which expenses are funded by
which deposits.

So, for instance, in the first-in, first-out
methodology, which he applied here as an assumption, the funds
that are already in the bank account are used to pay for the
first set of transactions when there's another deposit, even if
there's an intervening deposit, and then once those original
funds are used up, then the deposited funds are used to pay for
the subsequent expenses.  It's a simplifying assumption.  It's
not like he's exercising discretion.  He's not going to be
opining that this is the best methodology.  So we're not going
to be proffering him as an expert.  He's simply saying if you
make this assumption, this is how the proceeds were spent out

of the bank accounts and out of the credit cards, because some

of the credit cards were paid out of the church's operating

account, and it's the same assumption applied with respect to

the credit cards.

So, we have done this analysis, we had prepared the

slides and the underlying Excel spreadsheets, we had produced

that to defense counsel, pursuant to Mr. Klingeman's request,

the Friday -- I believe it was February 17th.  The first Friday

of trial, we produced the slides.  It included the simplifying

assumption, the methodology, FIFO, that Mr. Rollins relied upon

to create the slides, and we heard no objections until

Saturday.

Ms. Santillo --

THE COURT:  What was the timing?

MR. NOBLE:  So, we disclosed the slides to defense

counsel on February 17th.  And then just this Saturday,

Ms. Santillo sent me an email saying that they were going to

object to the use of FIFO, and they claimed that that requires

expert testimony for which the government did not provide

expert notice, and we did not do so because we don't think this

is expert testimony.  I wrote back to Ms. Santillo explaining

that we did not think it's expert testimony and the basis for

which we believe FIFO applying this simplifying assumption is

just a factual assumption upon which Mr. Rollins can be

cross-examined by defense counsel.  And I didn't hear anything

1    back until last night, after trial, Mr. Klingeman, and

2    Ms. Santillo, and I were speaking, and they said they're

3    renewing their objection to the FIFO, and that they think this

4    is expert opinion that should have been noticed.

5              THE COURT:  When you say "this," is it a subset of

6    these slides?

7              MR. NOBLE:  Yes.  It's basically the entire underlying

8    tracing analysis.  The government oftentimes uses a summary

9    witness, typically another FBI agent, somebody with an

10   accounting background, to look at the bank records, see what

11   the sources of the payments were, and trace the funds.  And

12   when there are commingled funds in a bank account, when there

13   are payments that are being made on credit cards, there has to

14   be some assumption made about what's paid first.

15             So defense counsel has long been on notice of this.

16   We never received any objection until Saturday.  Really,

17   they're springing this upon us after this whole analysis has

18   been done, after they have had all these slides, kind of on the

19   eve of the government resting.  That's just my complaint in

20   terms of the timing of this objection.  I wish they would have

21   raised it earlier, so we could have talked about it, briefed it

22   to the Court, and discussed this.

23             But underlying all of that, we don't believe that this

24   requires any kind of expert analysis.  If the Court disagrees,

25   we're prepared to offer Mr. Rollins as an expert.  We believe

3224

H37KLEB1

1    he's qualified.  We've disclosed his resume, his background,

2    his qualifications, his certifications.  We can seek to qualify

3    him as an expert.  But we do not think that's necessary because

4    this is the same type of tracing analysis that the government

5    uses in all sorts of cases - drug cases where there's money

6    flowing into a bank account, and somebody gets on the stand and

7    says I've looked at all the bank records, this is how the money

8    was spent, based on this assumption.  And defense counsel is

9    free to cross-examine about that assumption, to say, you know,

10   Mr. Rollins could have used a different assumption, that the

11   government directed him what payments to look at, the

12   government told him, yes, just use the FIFO methodology, all of

13   that goes to the weight that the jury should place on the

14   slides, on the analysis, but it doesn't go to its

15   admissibility.

16          Furthermore, your Honor, as we indicated to the Court

17   in our email last night, we're seeking a limiting instruction

18   that courts often give when dealing with summary exhibits such

19   as these, to tell the jury that the slides themselves are not

20   evidence, it's the underlying evidence, all the bank records,

21   which will have been admitted by the time Mr. Rollins

22   testifies, that's the evidence, and the jury can just use these

23   slides as an aid to the extent that they find that the

24   underlying evidence supports the analysis in these slides.

25          We don't think the objection has any merit.  It would

fundamentally alter Mr. Rollins' testimony.  I think it would

result in some delay of the trial because we would have to go

and rework the analysis.  I think it's fair game -- I don't

even know if we can rework the analysis.  I think it's fair

game for defense counsel to cross-examine on the points that

they've raised.  And to the extent they want to get into the

underlying bank exhibits that are all sourced here, Mr. Rollins

is prepared to bring out the underlying documents and talk

about them, if necessary, but at bottom, this is a simple

tracing analysis that applies an assumption of first-in, the

money that goes in first comes out first, and he's going to

explain that to the jury, and, as I said, they're free to

cross-examine on that assumption, they're free to examine on

what the government told Mr. Rollins to do, and courts have

held that summary exhibits -- a summary witness can present an

analysis that is favorable to one side because defense counsel

obviously had the opportunity to analyze the underlying records

and present a competing summary analysis, perhaps using a

different methodology, which would result in different results.

So we don't think there is a basis for the objection.

And they've had the underlying bank records for months, and

they've had these slides for at least two weeks, and we feel

like we're being sandbagged on the eve of resting.

MR. KLINGEMAN:  Your Honor, perhaps it would be

helpful if I explained what we're not objecting to.

1          We're not objecting to a summary that is supportive of

2     the government's theory.  And there's much in this exhibit that

3     is not objectionable.  There's a section in the exhibit,

4     including a classic summary chart on a single page, that lists

5     all the funds that came in from Collectables Club and Kapcharge

6     about which the government has elicited testimony and offered

7     exhibits to support their theory that these were bribe

8     payments.  We have no objection to that, even though we will

9     argue that they were not bribe payments.

10          Likewise, there's a whole section of the chart that

11     purports to document expenditures by Mr. Gross on personal

12     items, personal travel, things of that nature.  Your Honor

13     ruled in limine before the trial started that that was fair

14     game for the government.  We have no objection to that.

15          There are other aspects of the chart that have nothing

16     to do with, quote-unquote, tracing, but actually have to do

17     with the government's attempt to establish venue that purport

18     to list, in summary form, Mr. Gross' presence in the Southern

19     District of New York at various times during the time of the

20     conspiracy.  We have no objection to that.

21          What we object to is what the government calls the

22     assumption at the heart of the witness' purported tracing

23     analysis is FIFO, first-in, first-out, accounting methodology

24     that's distinct from a number of other accounting

25     methodologies.  And what FIFO does in this particular case is

1        it leads to the inevitable conclusion that the money that the

2        government identifies as source was used at the end of the day

3        by Mr. Gross to pay for various things.  And if one uses a

4        different accounting methodology, one may come to an entirely

5        different conclusion as to whether those source funds were the

6        same funds that were used by Mr. Gross.

7                And that analysis --

8                THE COURT:  Is that hypothetically speaking, or you're

9        proffering that that is the case here?

10               MR. KLINGEMAN:  The answer is, I don't know for the

11       precise reason I'm objecting.  This is an expert issue.  It's

12       indisputably an expert issue.

13               THE COURT:  But you were put on notice of --

14               MR. KLINGEMAN:  We were not.

15               THE COURT:  -- of the mode of analysis in

16       mid-February.

17               MR. KLINGEMAN:  Well, let me place that in context.

18       We asked for, under Rule 16, expert notice and disclosure, and

19       the government represented pretrial, there was no expert

20       testimony to be offered.  And they continue to say to this

21       moment that Mr. Rollins is not an expert despite his resume,

22       despite his use of particular accounting techniques, and

23       despite his obvious status as an expert.

24               So this is expert evidence, for which we requested

25       notice and were not given notice.  This is not Cape Fear where

H37KLEB1

1    I have to keep worrying about whether the government is going

2    to insert expert issues into the case after we've asked for the

3    notice, and it hasn't been given.  What we got in my request

4    pretrial for the government's final summary chart -- we can go

5    back to the pretrial conference transcript -- I asked for the

6    final version.  What we got on the eve of trial, and the

7    deadline imposed by the Court, was a 207-page exhibit that the

8    government marked as draft, and the government told us would be

9    changing as the trial proofs evolved.  So I put it aside, and

10   when this issue started to ripen, we got another version of the

11   same chart on Saturday, 144 pages.  Then we got a third

12   version, 128 pages, and now we have the current version that's

13   approximately 122 pages.

14        So we still, until literally 5:00 o'clock this

15   morning, did not have a final version of this chart.  We

16   notified the government last weekend that we objected to that

17   section of the chart that makes reference to FIFO analysis and

18   that leads to the conclusions that flow through a number of the

19   other slides.

20        There is no reason Mr. Rollins can't take the stand as

21   a summary witness, in the ordinary course, and testify as to

22   sources of funds, expenditures, travel, in other words, placing

23   Mr. Gross purportedly in the Southern District of New York

24   during relevant time periods, and a number of the other things

25   that the government is seeking to do in support of its case.

What the witness should not be permitted to do is testify,

essentially, as a summary witness or a lay witness by any other

name when he's, in fact, an expert witness and giving expert

testimony.  So we would ask that that portion of his direct

examination be precluded.  And I cited two cases, I apologize,

by email, and we would rely on those very recent authorities in

terms of this argument, and, for the record, I'll place the

citations in the transcript.

        The first case we cite is Estate of Jaquez against

Flores, 216 WL 1060841, Southern District of New York (KBF),

and in that case, which is very analogous to this case, the

Court rejected as expert testimony analysis that the government

was offering as nonexpert testimony when the expert was not

engaged in what the court in Jaquez referred to as a, quote,

rote nondiscretionary analysis by a nonexpert, unquote.

        And, likewise, we cited United States against

Blackwood, 366 F. App'x 207 at 2012 (2d Cir. 2010), for a more

typical example of a summary chart, examples of which are

included in the government's exhibit and to which we have no

objection.

        So we've identified for the government the specific

pages to which we object and the specific testimony to which we

object, and it would be relatively easy to preclude that, and

still the government would have free reign to assert, as it did

in its opening statement, that Mr. Gross solicited and accepted

H37KLEB1

over $150,000 of bribe money and then spent some of that money

on himself in the form of personal expenses.  All that evidence

is in the record.  This witness can summarize that evidence,

and the government can make its same argument in summation.

What we object to is the jury being fed an accounting

theory that leads to the inevitable and inculpatory conclusion

that that specific dollar-for-dollar tracing resulted in

Mr. Gross spending the bribe funds, the alleged bribe funds, on

himself.

(Continued on next page)

1            MR. NOBLE:  Judge, on that last point, what I'm not

2      hearing from Mr. Klingeman is there's anything wrong with the

3      analysis.  As he recognized, there are other alternatives, and

4      the defense could have done their own summary charts based on a

5      separate analysis.  And defense counsel opened on the fact that

6      the payments that were made to Mr. Gross went to the church,

7      they did not go to him personally.  So they were on notice that

8      the government was going to be proving up the fact that the

9      payments, although they were made to the church bank accounts,

10     inevitably flowed to Mr. Gross, and that's what Mr. Rollins's

11     analysis shows.

12            FIFO is not a complicated matter that requires expert

13     opinion, it's an assumption that shows that the first funds

14     into the account are the funds that were used to paid for the

15     first expenses that come out of the account.

16            As I said before, they can cross on that assumption,

17     they can cross that a different methodology could have been

18     used.  That's all fair game.  But this does not require expert

19     opinion, it's simply -- it's rote, non-discretionary

20     application of a FIFO assumption to the underlying bank

21     records.  And you can look at the bank records, and you can do

22     the analysis, and defense counsel could attack him on

23     improperly applying FIFO, or that a different assumption could

24     have been applied, but that doesn't render it expert opinion.

25            On the notice issue, we disclosed an initial draft of

1   the slides on February 17th that included the underlying

2   fundamental assumption that FIFO was going to be used, and we

3   heard nothing from defense counsel in objection to that

4   methodology until the email from Ms. Santillo over the weekend,

5   and then again last night from Mr. Klingeman.

6           This is something that they've been on notice about,

7   and they could have raised, and we could have flushed this out.

8           Mr. Klingeman cites a Second Circuit case and a Judge

9   Forrest opinion, neither on point here.  The Second Circuit

10  case simply states the basic rule of what a summary chart is,

11  and the Forrest case didn't involve the tracing of funds

12  through a bank account.  That is something that is done in

13  almost every criminal case that involves fraud or illegal

14  proceeds of narcotics trafficking.  This witness is simply

15  applying an assumption to the underlying records.  It's

16  reliable.  He can be cross examined about it.

17          In support of the FIFO assumption, it's the most

18  straightforward way to think about a bank account.  It's also

19  the most straightforward way to think about a credit card.

20  Because when you have charges on your credit card and you make

21  a payment or you have an outstanding balance on your credit

22  card, what the credit card company does is it takes your

23  payment and it applies to the oldest expenses first, the

24  expenses that have been sitting on your card for the longest

25  period of time.

H37OLEB2

So this is just -- it's a simplifying assumption.  I'm
not hearing that there's anything wrong with it.  There are
alternatives, of course, and he can be cross examined on that.
But this is not expert opinion.  He's not opining on anything

THE COURT:  All right.  Last word.

MR. KLINGEMAN:  Your Honor, there are half a dozen
slides in the exhibit alone purporting to explain FIFO.  So
it's far from simple, and it's far from something that the lay
jury would be presumed to know and understand without the
benefit of Mr. Rollins' expert explanation.

THE COURT:  So I think I have to take this as it comes
and make that assessment as it comes in.  Defense was on notice
of this February 17th, it's now March 7th -- 6th, 7th?  I could
have evaluated that contention exactly as you just stated with
time and argument, but the defense having waited until the
morning that this witness goes on, my only choice is to allow
the witness to take the stand, and I'll have to make an
assessment.

The jury is now here and it hasn't even been
identified to me what exhibits are objected to.  And based on
the failure, despite notice to raise this sooner, the best that
I can do is take it as it comes and, if I conclude in the flow
of the direct that there is expertise or technical knowledge or
non-readily-available lay assumptions being made, I'll sustain
specific objections to particular testimony.

1          MR. NOBLE:  Okay.  Understood, Judge.

2          THE COURT:  Mr. Creizman.

3          MR. KLINGEMAN:  I assume in that regard, Judge, then

4     the exhibits' admissibility should be addressed after the

5     witness concludes the testimony.  In other words, in the

6     ordinary course, the witness would take the stand and basic

7     foundation would be established and the exhibit would be

8     offered and published.  If your Honor is going to be taking

9     aspects of it on a question-by-question, slide-by-slide basis,

10    we would ask the admissibility and publication be delayed

11    until --

12         THE COURT:  We can do it a slide at a time.  So we

13    we'll just mark these -- they're page numbered, so why don't we

14    call them Government Exhibit 900-1, 900-2.

15         Do they all go in order?

16         MR. NOBLE:  Yes.

17         MS. CHOI:  Yes.

18         THE COURT:  Does that make sense?

19         MR. NOBLE:  That's fine.

20         THE COURT:  And as you want to show them, I guess

21    query -- you're not going through all of them.

22         MR. NOBLE:  Well, we are, your Honor.  It's like five

23    seconds on one slide.  I mean, the problem is, though, if we're

24    going to do this one by one, you know, we'll have to take it

25    down, you know, show the parties and then show the jury.  It's

H37OLEB2

1    going to really take a long time to get through this.  You

2    know?

3              THE COURT:  Well, where is the first exhibit you

4    object to, Mr. Klingeman?

5              MR. KLINGEMAN:  Beginning at page 7, your Honor.  And

6    forgive me for sitting.

7              THE COURT:  I can't hear you.  I forgive you for

8    everything, but not being able to hear you.

9              MR. KLINGEMAN:  Beginning at page 7, your Honor,

10   there's a discussion through page 13 of the first-in, first-out

11   methodology using the type of credit card example that the

12   government just mentioned.  And I note, of course, that the

13   credit card example bears no relationship to this case.

14             MR. NOBLE:  Judge, these are demonstratives to explain

15   the underlying assumption.

16             THE COURT:  So it sounds like when you get to page 7,

17   you lay some foundation as to what this witness will do with

18   this methodology, and I'll make an assessment at that point.  I

19   mean, I just have no basis.

20             I'll also say that the 11th hour, it's past that since

21   it's the morning and my jury is here, making this with nothing

22   but speculation as to whether there's any other set of

23   assumptions one could make that would produce a different

24   result, it's troubling, and all I can do is take it as it

25   comes.

H37OLEB2

1          So does that work, Mr. Noble?  You'll work with

2    slides --

3          MR. NOBLE:  Yes.

4          THE COURT:  When we get to that point --

5          MR. NOBLE:  I'll take it down, I'll ask him questions

6    about FIFO and --

7          THE COURT:  And then I'll make my assessment.

8          MR. NOBLE:  To be clear, this is an assumption that

9    he's going to say, 'The government told me just apply this

10   simplifying assumption.'

11         THE COURT:  Okay.

12         MR. NOBLE:  And then it's a rote application of that

13   assumption to his analysis of the bank records.

14         THE COURT:  Okay.

15         MR. NOBLE:  And they can cross on that.  They should

16   say, 'Well, the government told you to do this.'  You know?  I

17   mean, and then it's up to the jury to decide how much weight to

18   give this analysis given whatever they do on cross.

19         THE COURT:  Yes.  I think that you give someone an

20   assumption and that they can cross on it doesn't resolve the

21   expert question.

22         MR. NOBLE:  I mean, it's not --

23         THE COURT:  Do you have any authority for that notion?

24   I think it's a question of whether these are sort of steps in

25   an analysis that are readily available without specialized or

1     technical knowledge.

2               MR. NOBLE:  It absolutely is.  I mean, the jury could

3     do this analysis on their own.  We could walk through the bank

4     account, we could say 'this is the balance on this date, then

5     this deposit came in, and then given that there was already

6     money in the bank account, the next set of expenses were paid

7     for by the existing balance, and then the next set of expenses

8     were funded by that $120,000 deposit'.  He's going to explain

9     that that's the methodology that he applied.

10              The jury can look at the underlying exhibits

11    themselves.  We could have him walk through the underlying

12    exhibits themselves.  It would be very time-consuming, that's

13    why we're doing this as a summary witness, but we could do

14    that.  And he would be explaining as a lay witness what he did

15    and this is the result.

16              This is the same analysis that is done in every case

17    where there's criminal proceeds and the government has to do

18    some kind of tracing analysis to say what happened to the money

19    when it went into the bank accounts?  It's not expert

20    testimony.

21              And again, I just reiterate, it is relevant that they

22    can cross on this, it is relevant that they could have called

23    their own summary witness who they could have told 'use a

24    different assumption and that's are the results that you get'.

25    But they haven't done so, and they're not saying that the

1    analysis is incorrect in any way.

2              THE COURT:  All right.  Bring in the jury.

3              Mr. Creizman.

4              MR. CREIZMAN:  Yes, your Honor.  First of all, I

5    apologize to the Court.  I apologize.

6              There's one thing I just want to address.  We have

7    provided the government with defense exhibits this morning.

8    We're going to work out -- we're going to see if we can work

9    out, I think -- we don't intend on publishing any of this, I

10   just intend on standing up and saying 'the government and the

11   defense' -- whatever, 'the defense and the government stipulate

12   that these evidence are admitted into evidence', and then 'we

13   rest'.

14             MS. CHOI:  Your Honor, just to be clear, we're going

15   to need a little bit of time just because we got these very

16   early this morning.  We think that there are hearsay objections

17   we would raise to several of them.  Obviously, we don't have

18   authentication issues, but we would like to discuss that with

19   defense counsel.

20             MR. CREIZMAN:  That's fair.

21             MS. CHOI:  I don't think we're going to get to this

22   until after lunch anyway.  Your Honor, the one thing I would --

23             THE COURT:  Beyer.

24             MS. CHOI:  Yes.  We need to get some clarity on what's

25   going on and make sure that we make appropriate --

```
 1              THE COURT:  Mr. Creizman, briefly, I have indicated my
 2      inclination to allow Agent Beyer to be questioned in a very
 3      tailored and narrow way to get at what I think is relevant and
 4      appropriately for the jury to consider here, which is whether a
 5      key cooperating witness testified falsely, as we've discussed.
 6      What I'm not inclined to allow, because I don't think it
 7      appropriate for the jury to consider, is what steps were taken
 8      to diligently chase down what, in fact, Beyer had said.
 9              MR. CREIZMAN:  Okay.  Then certainly I won't -- if
10      that is your Honor's ruling, then I won't -- I don't need to
11      call Agent Jarrow because that would be the only reason I
12      would.
13              THE COURT:  So there's agreement on that on the scope
14      of what is appropriate here --
15              MR. CREIZMAN:  Right.
16              THE COURT:  -- under the limited exception?
17              MR. CREIZMAN:  But if I could just make some record.
18      I mean, I did want -- I do want to do that, but I do want to
19      call Agent Jarrow to ask him about the steps because I think
20      that that is relevant, but I accept the Court's --
21              THE COURT:  Well, what's the basis for what was done
22      to determine whether or not -- I mean, what we're going to be
23      left with is Freundt's statement as to what occurred and what's
24      been proffered as -- presumably what's been proffered as
25      Beyer's testimony, and it's now been chased down, and it's been
```

1    chased down in time to solve this issue.  And you can make an

2    argument to the jury that it's either this or that, but what

3    these lawyers did, what their level of diligence was in chasing

4    this down is 403 and irrelevant.

5            MR. CREIZMAN:  Understood.  I withdraw my objection.

6    I just want the opportunity to say the defense rests and that's

7    it.  That's nothing more dramatic than that after introducing

8    whatever evidence we stipulate to.

9            THE COURT:  Okay.  I don't know what that means.

10           MS. CHOI:  I don't know what just happened.

11           THE COURT:  You'll certainly get that chance to rest.

12           MR. CREIZMAN:  Meaning, yes, no need for Jarrow.

13           THE COURT:  Okay.  I think we're in agreement.  I'll

14   give my reasonings at the break, but I have come to the

15   conclusion that this is necessary and appropriate.

16           MS. CHOI:  That's fine, your Honor.

17           Again, I would just remind your Honor that if you

18   could give the instruction about lawyers coming in and coming

19   out.

20           THE COURT:  I will do that.

21           MS. CHOI:  Thank you very much.

22           THE COURT:  You're calling a witness?  Yes.

23           MS. CHOI:  Yes, your Honor.  But right before we call

24   the witness we just want to move in some evidence and then we

25   can call the witness, if that's okay?

1              THE COURT:  All right.  Let's bring in the jury.

2              You had indicated yesterday that you were in agreement

3    as to the transcripts going back to the jury in addition to the

4    recordings and the like.

5              MR. NOBLE:  Yes, your Honor.

6              THE COURT:  Were you going to work on an instruction

7    of some kind?

8              MR. NOBLE:  I believe there is an instruction already

9    in your Honor's jury instructions to say that the

10   transcripts were an aid.

11             MS. CHOI:  For this list of exhibits, should we mark

12   it as a government exhibit or should we mark it as a court

13   exhibit?

14             THE COURT:  It's marked for identification.

15             MS. CHOI:  Okay.  As Government Exhibit something?

16             THE COURT:  Yes.

17             MR. CREIZMAN:  Which exhibit?

18             MS. CHOI:  This is just a list of exhibits we're going

19   to enter into the 700 and 800 series.

20             THE COURT:  I'm sorry.  I misunderstood.

21             MS. CHOI:  I'm sorry.

22             THE COURT:  But yes, you should mark that as a

23   Government Exhibit.

24             MS. CHOI:  Okay.  Exhibit 4020.  They're basically

25   stipulated so --

H37OLEB2

1            (Jury present)

2            THE COURT:  Thank you very much, members of the jury.

3    You were here on time.  We had a few matters to work through to

4    keep things moving as efficiently as we can, but I thank you

5    for your patience.

6            Ms. Choi, the government may call its next witness, or

7    I think you said you were going to --

8            MS. CHOI:  Yes, your Honor.  Before calling our next

9    witness, the government would like to offer certain other

10   exhibits into evidence.

11           THE COURT:  Okay.

12           MS. CHOI:  I'm showing what's been marked by the

13   government as 4020, which is a list of exhibits the parties

14   stipulate may be entered into evidence.

15           THE COURT:  All right.  In lieu of reading that list,

16   4020 -- without objection, counsel -- is admitted?

17           MS. MADRIGAL:  Without objection.

18           MS. SANTILLO:  No objection.

19           THE COURT:  Thank you.  4020, which is the list of

20   stipulated-to exhibits, is admitted.

21           (Government's Exhibit 4020 received in evidence)

22           MS. CHOI:  The governments also offers at this time

23   Government Exhibit 4013, which is a stipulation between the

24   parties concerning wire records of PNC Bank.

25           THE COURT:  Without objection, 4013?

H37OLEB2

```
 1              MR. KLINGEMAN:  No objection.

 2              MR. CREIZMAN:  No objection.

 3              THE COURT:  Thank you.  It is admitted.

 4              (Government's Exhibit 4013 received in evidence)

 5              MS. CHOI:  Thank you, your Honor.

 6              Finally, the government offers Government Exhibit

 7   4014, another stipulation between the parties about Garrison,

 8   New York being located in the Southern District of New York.

 9              MR. CREIZMAN:  No objection.

10              MR. KLINGEMAN:  No objection.

11              THE COURT:  Thank you.  4014 is admitted.

12              (Government's Exhibit 4014 received in evidence)

13              MS. CHOI:  Thank you, your Honor.

14              At this time, the government would call Rose Linton to

15   the stand.

16              THE COURT:  Thank you.  Ms. Linton may come forward.

17              MR. SHIN:  Your Honor, while the witness is entering

18   the courtroom, may I place a binder on the witness stand so she

19   can refer to it?

20              THE COURT:  Yes.

21    ROSE LINTON,

22        called as a witness by the Government,

23        having been duly sworn, testified as follows:

24              THE WITNESS:  Rose Linton.  LINTON.

25              THE COURT:  You may proceed, Mr. Shin.
```

1            MR. SHIN:  Thank you, your Honor.

2    DIRECT EXAMINATION

3    BY MR. SHIN:

4    Q.  Good morning, Ms. Linton.

5    A.  Good morning.

6    Q.  Just if you could, try to pull the microphone as close as

7    possible.

8    A.  Okay.

9    Q.  Thank you.

10           THE COURT:  Mr. Shin, one moment.  I did want to

11   indicate to the jury, as I have at other times, that sometimes

12   the lawyers, for scheduling matters, to move the case

13   efficiently and for other reasons, are in and out of the

14   courtroom, and again, I just want you to note that that's

15   perfectly normal and you shouldn't take that to mean anything

16   other than it's part of the process here.  Thank you.

17           Go ahead, Mr. Shin.

18           MR. SHIN:  Thank you, your Honor.

19   Q.  Ms. Linton, where do you work?

20   A.  I work for the Internal Revenue Service Criminal

21   Investigation Division.

22   Q.  How long have you worked at IRS?

23   A.  14 years.

24   Q.  Have you had the same job the entire time at IRS?

25   A.  I have not.

1   Q.   Could you please describe for the jury the jobs you've had

2   at the IRS?

3   A.   I started out at the Cincinnati Service Center doing

4   correspondence audits.  Those were simple issues that could be

5   resolved through the mail.

6            From there I went to office audit where I worked for

7   five years doing face-to-face interviews with taxpayers and

8   small businesses.  I also worked in the automated call center,

9   and we took calls from people that received notices in the

10  mail, tried to set up installment agreements and helped them

11  resolve issues with the Internal Revenue Service.  From there I

12  was one with a revenue officer collection group.  I was the

13  group secretary.

14           Next I went into the Criminal Investigation Division

15  side as a tax fraud investigative assistant.  I did that

16  position for five years, and that is where I assisted special

17  agents in their research with search warrants and doing

18  interviews.  While I've been in the tax fraud investigative

19  assistant position, I also did a six-month detail as an

20  investigative analyst, and that's where we review documents,

21  tax returns as they were filed, looking for false items so that

22  we could set up packages to send to the local field offices to

23  be worked by agents.

24           Also, a collateral duty while I was in that position

25  was as a field office court witness assistant, which is what I

1  do now, only I do it now full time, and that's where we pull

2  the tax returns and any information filed by taxpayers, I

3  certify it that it is authentic documents presented in court

4  and then testify to it.  And I got a full-time position as a

5  court witness coordinator in December of this past year.

6  Q.  Now, Ms. Linton, before testifying today, did you have the

7  opportunity to review certain IRS records and documents to

8  prepare for your testimony?

9  A.  I did.

10  Q.  If you could take a look at the binder on your left, and if

11  you could flip through the documents that have been marked

12  Government Exhibits 601, 602 and 603.  Please take whatever

13  time you need to flip through those documents to see if you

14  recognize them.

15  A.  I recognize them.

16  Q.  Are these the documents you reviewed in preparation for

17  your testimony today?

18  A.  They are.

19  Q.  Generally speaking, what do you recognize 601, 602, and 603

20  to be?

21  A.  Exhibit 601 is account transcripts pulled based on the

22  taxpayer's social security number that gives a brief overview

23  of the account.  Exhibit 602, those are information returns,

24  that's information that's processed from the payors in the

25  taxpayer's name.  And Exhibit 603, those are the tax returns,

1    2013 through 2015 for the taxpayer.

2    Q.  And who, if any, taxpayer do these particular documents

3    relate to?

4    A.  Trevon Gross.

5    Q.  Are these documents that the IRS created or logged at or

6    near the time of the events reflected in those documents, and

7    by someone with knowledge about them?

8    A.  They are.

9    Q.  And are these documents that the IRS keeps in the course of

10   its regularly conducted business activity of collecting taxes

11   and keeping records of taxes?

12   A.  It is.

13   Q.  And is it the regular practice of the IRS to make and

14   create these records or to keep these records?

15   A.  It is.

16   Q.  And are these documents in your binder fair and accurate

17   copies of the records that were retrieved from the IRS?

18   A.  They are.

19   Q.  And how did you confirm that they were fair and accurate

20   copies?

21   A.  I logged into the different databases and researched based

22   on the taxpayer's name, social security number and tax year.

23            MR. SHIN:  The government offers 601, 602, and 603

24   into evidence.

25            MR. KLINGEMAN:  No objection.

1          THE COURT:  Without objection?

2          MR. CREIZMAN:  No objection.

3          THE COURT:  Thank you.  They're admitted.

4          (Government's Exhibits 601, 602, and 603 received in

5    evidence)

6          MR. SHIN:  Ms. Grant, could you please publish for the

7    jury Government Exhibit 603?

8    BY MR. SHIN:

9    Q.  Ms. Linton, you testified earlier that 603, they're the tax

10   returns for Trevon Gross for 2013, '14, and '15; is that

11   correct?

12   A.  Correct.

13         MR. SHIN:  Ms. Grant, could you please turn to page 12

14   of this document?

15   Q.  Ms. Linton, what is the particular document that starts on

16   this page?

17   A.  This is the front of the 1040, the initial page.

18   Q.  And for what tax year?

19   A.  For tax year 2014.

20         MR. SHIN:  Ms. Grant, if you could just get the top

21   half, so maybe include just further down than where you had

22   been.  Thank you.

23   Q.  Ms. Linton, could you read line 7, please?

24   A.  "Wages, salaries, tips, et cetera, attached forms W-2".

25   Q.  And what's the amount listed there?

1   A.  $125,416.

2   Q.  Ms. Linton, as you just noted, this tax return, it relates

3   to Trevon Gross, but is it only related to Trevon Gross?

4   A.  He filed married filing joint, so it includes his wife, as

5   well.

6   Q.  So we took a look at line 7.  What, if any, documents

7   underlie the number $125,416?

8   A.  It would be from forms W-2.

9           MR. SHIN:  Now, Ms. Grant, if you could turn to

10  page 26 of this document.

11  Q.  Ms. Linton, these are pages 15 to 18 of the printout in

12  your binder, if that's easier for you to look at.

13          MR. SHIN:  Ms. Grant, if you could just kind of page

14  through 26, 7, 8, and 9 of the document.

15  Q.  So Ms. Linton, are these the W-2s that you referred to?

16  A.  They are.

17          MR. SHIN:  Ms. Grant, if you could go back to 26.

18  Q.  Ms. Linton, just for the record, if you look at the screen

19  in front of you, could you please identify the payor and the

20  taxpayer for this particular W-2?

21  A.  The payor is Hope Cathedral International, and it was paid

22  to Trevon Gross.

23          MR. SHIN:  The next page, please, Ms. Grant.

24          THE WITNESS:  This one is also Hope Cathedral

25  International, paid to Dionne Gross.

1              MR. SHIN:  And the next page, please, Ms. Grant.

2              THE WITNESS:  This document was, the payor is

3    Summerset Christian College, paid to Trevon Gross.

4              MR. SHIN:  And the next page, please, Ms. Grant.

5              THE WITNESS:  The payor is ADP Total Source Company,

6    paid to Dionne Gross.

7    BY MR. SHIN:

8    Q.  Ms. Linton, apart from these four W-2s that we just looked

9    at and that you identified, were there any W-2s in the document

10   that are related to the 2014 tax year for Mr. Gross?

11   A.  You mean in addition to these?

12   Q.  Right, apart from these four.

13   A.  Apart from these four, no, these were the only four.

14   Q.  Just to be clear, did you identify in this set any W-2 from

15   a party known as the Collectables Club?

16   A.  I did not.

17   Q.  Or from an entity known as Kapcharge?

18   A.  No.

19   Q.  Before your testimony today, did you add up the wages that

20   were listed for each of these four W-2s?

21   A.  I did.

22   Q.  And did they add up to the number that we saw on line 7 of

23   the return?

24   A.  They did.

25              MR. SHIN:  Ms. Grant, if you could return to page 12

1    of the PDF.  If you could focus on the bottom half now.

2    Q.  Ms. Linton, could you read line 21, please?

3    A.  "Other income, list type and amount".

4    Q.  And what is the amount listed there?

5    A.  $9,235.

6            MR. SHIN:  Ms. Grant, if you could turn to page 22 of

7    this PDF now.  Zoom in on that text.

8    Q.  Ms. Linton, is this information that's related to that

9    amount that we just saw?

10   A.  It is.

11   Q.  So what type of income was this?

12   A.  This was considered other income.

13   Q.  And is there a particular description of this income here?

14   A.  It was canceled debt income.

15           MR. SHIN:  Ms. Grant, could you please publish

16   Exhibit 602?  And if you could please turn to page 8 of this

17   PDF.  Before we zoom in --

18   Q.  Ms. Linton, what is this document that we're looking at

19   here?

20   A.  This is an income information return that gets reported to

21   the Internal Revenue Service.  It's any type of wages or

22   payments that you make out, as well.  It gets reported, gets

23   keyed into the system by someone that is working with tax

24   returns and information coming in.

25           MR. SHIN:  Ms. Grant, if you could zoom in on the

1    bottom of the three entries there.  Yes, that one.

2    Q.  Does this correspond to the other income in the amount of

3    $9,235 that we saw on the return?

4    A.  It does.  It's amount debt cancellation.

5    Q.  What is the payor and what is the description of the income

6    listed for this document?

7    A.  The payor is BMW Financial Services NA, LLC.  Debt

8    description says "MV loan, amount debt cancellation, $9,235".

9               MR. SHIN:  You can take that down, please, Ms. Grant.

10   Could you please return to 603, page 12?  And if you could zoom

11   in on the bottom half.

12   Q.  Ms. Linton, could you please read the figure listed for

13   line 22 for "total income"?

14   A.  The amount is $134,651.

15   Q.  Is that just the sum of lines 7 and 21?

16   A.  It is.

17   Q.  Based on your review of this return prior to your

18   testimony, is there any income reported on this tax return

19   other than the wages in line 7 based on the W-2s and we looked

20   at and the canceled debt income listed in line 21?

21   A.  There is no other income.

22              MR. SHIN:  Could you turn to the next page, please,

23   Ms. Grant?  If you could just -- I'm sorry, the next page.  If

24   you could just zoom in on the top half, please.

25   Q.  Could you please read line 40 for "itemized deduction or

1   standard deduction"?

2   A.   The amount is $17,430.

3   Q.   If you could just explain the basic -- what is a deduction?

4   A.   Itemized deductions would be information filed on your

5   Schedule A.  It can consist of mortgage interest paid, real

6   estate taxes, contributions; the items that you pay throughout

7   the year and you're entitled to a deduction to.

8   Q.   So is the effect of a deduction that it reduces the income

9   that you have to pay taxes on?

10  A.   It does.

11  Q.   If you could read the amount in line 42, "exemptions".

12  A.   The amount on line 42 is $19,750.

13  Q.   Does an exemption also reduce the total taxable income?

14  A.   It does.

15  Q.   So could you please read line 43 for taxable income?

16  A.   The amount on line 43 is $7,471.

17          MR. SHIN:  Ms. Grant, if you could zoom in on the

18  bottom half of the document, please.

19  Q.   Ms. Linton, if you could read line 63 for "total tax".

20  A.   The amount is zero.

21  Q.   And line 75 for the "amount that was overpaid"?

22  A.   $9,312.

23  Q.   Is that the amount of the refund?

24  A.   It is.

25          MR. SHIN:  You can take that down, please, Ms. Grant.

1    Q.  Now, Ms. Linton, through your role at the IRS, have you

2    become familiar with instructions and publications that are

3    made available to taxpayers for use in completing their 1040

4    tax returns?

5    A.  I have.

6             MR. SHIN:  Ms. Grant, could you please show just for

7    the witness, the Court, and counsel Government Exhibit 608?

8    Q.  Ms. Linton, do you recognize that document?

9    A.  I do.

10   Q.  What is it?

11   A.  It's publication 525 "Taxable and non-taxable income for

12   use in preparing 2014 returns".

13            MR. SHIN:  Ms. Grant, could you please turn to page 31

14   of the document?  If you could zoom in in the middle column, in

15   the middle of the page, the section that says "Fees for

16   Services".

17   Q.  Ms. Linton, could you just please read the section for

18   "Fees for Services"?

19   A.  "Include all fees for your services in your income.

20   Examples of these fees are amounts you receive for services you

21   perform as a corporate director, an executor, administrator, or

22   personal representative of an estate, a manager of a trade or

23   business you operated before declaring Chapter 11 bankruptcy, a

24   notary public, or an election precinct official."

25            MR. SHIN:  You can take that down, please, Ms. Grant.

1           No further questions, your Honor.

2           THE COURT:  Thank you.

3           Mr. Creizman.

4           MR. CREIZMAN:  No, your Honor, no questions.

5           THE COURT:  Mr. Klingeman.

6           MR. KLINGEMAN:  Thank you.

7   CROSS EXAMINATION

8   BY MR. KLINGEMAN:

9   Q.  Good morning, ma'am.

10  A.  Good morning.

11  Q.  My name is Henry Klingeman and I represent the taxpayer.

12  A.  All right.

13  Q.  Do you still have that big binder in front of you?

14  A.  I do.

15  Q.  And you have the 1040s that the taxpayer submitted jointly

16  with his wife for 2013, '14, and '15?

17  A.  Correct.

18  Q.  Did those returns indicate whether the taxpayers used a

19  preparer to assist them?

20  A.  Tax year 2013, he did use a paid preparer.  There is a

21  signature on there with the information.

22  Q.  How about '14?

23  A.  Tax year 2014, there is also a paid preparer with the

24  information.  And tax year 2015, there is also a paid preparer.

25  Q.  Thank you for coming.

1            MR. KLINGEMAN:  No further questions.

2            THE COURT:  Thank you.

3            Mr. Shin.

4            MR. SHIN:  No redirect, your Honor.

5            THE COURT:  Thank you.

6            Ms. Linton, you're excused.  You may step down.

7            (Witness excused)

8            Government may call its next witness.

9            MR. NOBLE:  Your Honor, the government calls John

10    Rollins.

11            THE COURT:  Mr. Rollins may come forward.

12     JOHN ROLLINS,

13        called as a witness by the Government,

14        having been duly sworn, testified as follows:

15            THE WITNESS:  John Rollins.  JOHN, ROLLINS.

16            THE COURT:  When you're ready, Mr. Noble.

17            MR. NOBLE:  Thank you, Judge.

18    DIRECT EXAMINATION

19    BY MR. NOBLE:

20    Q.  Good morning, Mr. Rollins.

21    A.  Good morning.

22    Q.  Where do you work?

23    A.  Currently I work at a firm called RSM US, LLP.

24    Q.  Mr. Rollins, if you can make sure that you speak directly

25    into the microphone just so that everyone can hear you.  Thank

H37OLEB2                     Rollins - Direct

1   you.

2           What is RSM?

3   A.  RSM is an audit tax and consulting firm.

4   Q.  And what is your title there?

5   A.  My title is a director, and I also am the practice leader

6   for the dispute advisory practice in the Northeast region.

7   Q.  How long have you worked for RSM?

8   A.  Approximately six years.

9   Q.  And what are your general responsibilities there?

10  A.  Generally, it's to lead and generate new work, including

11  investigations, as well as assisting counsel on matters

12  involving disputes in litigation.

13  Q.  And what specifically do you consult on in terms of the

14  matters you work on for various parties?

15  A.  It's a combination of both assisting counsel that are

16  representing parties in litigation, as well as performing

17  forensic investigations and other types of matters.

18  Q.  Is it generally financial?

19  A.  Generally financial accounting, economics based.

20  Q.  Can you describe your educational background for the jury?

21  A.  Sure.  I studied undergrad at Georgetown University, and I

22  majored in linguistics, psychology, and studied business

23  finance, and then I studied for my MBA is the New York

24  University.

25  Q.  And what year did you graduate from NYU?

1   A.  NYU was 2016 and Georgetown was 2001.

2   Q.  What jobs have you held since graduating from Georgetown?

3   A.  When I left undergrad, I started off working at Thompson

4   Financial, which was a financial news and information

5   organization, as a financial analyst.  Was there for about two

6   and a half years.  Then I moved on to a firm called LECG, which

7   was a boutique litigation consulting and economic consulting

8   firm.

9   Q.  And then you moved to RSM in 2011?

10  A.  Then in 2011 I moved on to RSM.

11  Q.  What, if any, professional certifications do you have?

12  A.  I have a variety.  The first one is referred to as an ASA,

13  it's accredited senior appraiser.  It's a credential for a

14  valuation specialist.

15          Second one is CFE, which is certified fraud examiner

16  credential.

17          A third one is C-A-M-S, CAMS, which is certified anti

18  money laundering specialist.

19          Then a final one is MAFF, which is the master analyst

20  in financial forensics.

21  Q.  Have you ever testified in court before?

22  A.  I have not, no.

23  Q.  Have you ever been deposed under oath?

24  A.  I have, yes.

25  Q.  How many times?

1   A.   Three times.

2   Q.   Were those criminal or civil matters?

3   A.   Those were all civil matters.

4   Q.   Did you testify on behalf of private clients or the

5   government in those matters?

6   A.   A combination; so two of the matters I was testifying on

7   behalf of private clients, and then one was for the government.

8   Q.   And were the private clients on the plaintiff's side or the

9   defendant's side?

10  A.   In both cases they were on the defense side, although in

11  one of the matters there were counterclaims back.

12  Q.   Now, did there come a time when you were asked to examine

13  certain financial records in connection with an investigation

14  of Coin.mx and HOPE Federal Credit Union?

15  A.   Yes.

16  Q.   Who asked you to do that?

17  A.   Attorneys at the U.S. Attorney's Office.

18  Q.   What were you asked to do with respect to those records?

19  A.   Generally, I was asked to review the financial records and

20  then perform an analysis to identify the sources and uses of

21  funds in relation to particular deposits that were made into

22  those accounts that were pointed out to me by counsel.

23  Q.   Who provided you with the directions for your analysis?

24  A.   In terms of identifying the specific transfers to analyze,

25  that was counsel at the U.S. Attorney's Office.

1    Q.  Counsel for the government?

2    A.  Yes.

3    Q.  Did you work on that analysis by yourself or with others?

4    A.  No, I had a team of folks helping me at RSM.

5    Q.  Approximately how many people were helping you on your

6    team?

7    A.  A core group of probably about three or four people, and

8    occasionally I'd ask some folks to help with various tasks, but

9    generally speaking it was about three or four people that

10   helped me.

11   Q.  Since approximately when have you and your team been

12   working on that analysis?

13   A.  I believe it was since September of 2016.

14   Q.  Now, did there come a time during the course of your

15   analysis when you requested additional records from the

16   government?

17   A.  There were a number of different points, including at the

18   beginning when we began the work, we submitted a formal

19   document request list to ask for specific information that we

20   thought might be there, which included bank statements and

21   account opening and closing documents and things like that.

22          And then additionally, as the course of the

23   investigation and the work that we were doing ensued, I would

24   go back and forth asking for additional documents where I

25   thought it would be helpful.

1   Q.  Can you describe how you went about analyzing the various

2   records that you reviewed?

3   A.  Sure.  So generally speaking, I started with the bank

4   statements for the various accounts that had the deposits that

5   counsel asked me to look at and proceeded to first identify

6   where those deposits were actually reported on the statements,

7   and then I proceeded to look through the uses of funds that

8   followed those deposits.

9   Q.  Now, is RSM being compensated for the analysis that have

10  been performed in this case?

11  A.  They are, yes.

12  Q.  Who is compensating RSM?

13  A.  I believe it's the U.S. Government.

14  Q.  And approximately how much has RSM billed the government to

15  date?

16  A.  Approximately 240, $250,000, I believe.

17          MR. NOBLE:  Can we bring up just for the witness and

18  counsel and the Court what's been marked Government

19  Exhibit 900 for identification?

20  Q.  Mr. Rollins, do you see that on your screen?

21  A.  I do, yes.

22  Q.  Do you recognize what this is?

23  A.  Yes.

24  Q.  What is it?

25  A.  It appears to be the cover page of a set of exhibits that

1    I've prepared for today.

2    Q.  Would these exhibits assist you in your testimony today?

3    A.  Yes.

4    Q.  Did you use your analysis of the various bank records and

5    other records that the government provided to you to prepare

6    these slides?

7    A.  Yes, I did.

8              MR. NOBLE:  Your Honor, at this time the government

9    would offer as a summary exhibit Government Exhibit 900,

10   subject to the parties' and the Court's previous agreement

11   pursuant to Rule 1006 of the Federal Rules of Evidence.

12             MS. MADRIGAL:  No objection.

13             MR. KLINGEMAN:  Our objections have been noted.

14             THE COURT:  Okay.  We'll do them a page at a time?

15             MR. NOBLE:  Yes.  Pages in chunks, your Honor.

16             THE COURT:  Okay.  So 900-1 is admitted.

17             MR. NOBLE:  Thank you, Judge.  I believe we'd like to

18   go all the way to page 7.  I don't think there's an objection

19   to those pages.

20             THE COURT:  That's correct.  So 1 through 7 are

21   admitted.  1 through 6.  One through 6 are admitted.

22             (Government's Exhibits 900-1 through 900-6 received in

23   evidence)

24             MR. NOBLE:  If we could publish just page 1 for the

25   jury.  Let's flip to slide number 2.

H37OLEB2                         Rollins - Direct

1    BY MR. NOBLE:

2    Q.  Mr. Rollins, could you just provide the jury with an

3    overview of the presentation that you've prepared?

4    A.  Sure.  So what I prepared to speak with everyone about is

5    the sources and uses analysis.  So I first provided an

6    overview, then I go into some details about the methodology I

7    employed in order to do the analysis, and then I go into

8    talking about each of the specific deposits that I was asked to

9    look at.  I've listed the accounts that are involved in those

10   deposits.  Then I was asked by counsel to perform an additional

11   analysis related to bank account activity involving a series of

12   bank accounts related to Coin.mx.  Then I was asked to perform

13   an analysis looking at the location of payments and expenses

14   that were performed, both with respect to the accounts related

15   to Trevon Gross and accounts related to Anthony Murgio.

16          MR. NOBLE:  Let's go to the next slide.

17   Q.  Just generally, can you explain to the jury what your

18   analysis entailed in terms of the sources and uses analysis?

19   A.  Sure.  Generally, within any sort of bank statement or

20   credit card statement, as you know, there's sources of funds.

21   So those are deposits into a bank account or payments on credit

22   cards.

23          Then there's uses of funds, which are either credit

24   card expenses or debit card purchases or transfers to other

25   accounts or to other people, and those are considered uses of

1     the funds.

2              MR. NOBLE:  Let's go to the next slide, slide 4.

3     Q.  What transactions did the government ask you to analyze in

4     particular?

5     A.  So the government asked me to analyze ten different

6     transactions, and what I've done here is provided a summary of

7     information about those transactions.

8              In the column labeled "Amounts" you can see the

9     amounts of those transfers into those accounts.  And then in

10    the column labeled "Account Name" you can see which accounts

11    those were deposited into.

12    Q.  Can you just walk the jury through the various columns that

13    are depicted on this chart?

14    A.  Sure.  The first column is labeled "Transfer Reference".

15    So what I've done is I've simply numbered the transfers in

16    order from 1 to 10, and then in parenthesis I provided

17    information about the type of transfers.  So within a bank

18    account there's multiple types of ways to deposit money.  One,

19    for example, could be to go to an ATM and deposit money, one

20    could be to get a transfer from somebody else, from somebody

21    else's account.

22             Transfers of that type will sometimes be either a

23    Fedwire, which is a type of transfer on an ACH transaction,

24    which is another type of transfer from another account, and

25    then there's two different types of transfers at the HOPE FCU

1    bank accounts called a phone transfer or member transfer, and

2    that's a transfer between different accounts held all at the

3    same banking institution.

4    Q.  All of that information is reflected in the bank records

5    that you analyzed; is that right?

6    A.  That's correct.

7    Q.  Then go ahead and continue.

8    A.  And then the second column "Account Name", again, that

9    provides the name of the account into which these deposits were

10   made.  So you'll see there's a series of accounts that

11   references Hope Cathedral International operating account.  So

12   several of the transactions involved deposits into that

13   account.  And then you'll see the last three transfers involved

14   accounts held by HOPE FCU, the bank.

15   Q.  And then?

16   A.  And then the next column is the financial institution.  So

17   that's the name of the bank or other financial institution at

18   which the accounts were held.  So some of the accounts were

19   held at PNC Bank, some were held at HOPE FCU Federal Credit

20   Union, some were held at United Advantage Federal Credit Union,

21   and some were held at the Lakeland Bank, which was referred to

22   as Harmony Bank at the time the transfers were made, but now

23   it's Lakeland Bank.

24           And then the next column I have the "Account Numbers".

25   So these are the ending digits of the accounts into which the

1   deposits were made.

2          And then I have a column that has the "Date of the

3   Transactions".  So these are the dates of those deposits.

4          Again, the "Amount", which I've referenced earlier in

5   the next column.

6          And then the column following that "Received from

7   Counterparty".  So within the bank records there's information

8   provided that identifies who sent the funds, and these are the

9   entities that were referenced.

10         And then the next column I've provided information

11  about the balance within the accounts into which the deposits

12  were made just prior to those deposits going into the account,

13  and then finally, I provided a "Source Column".

14  Q.  And the sources refer to the underlying records that you

15  reviewed; is that correct?

16  A.  Those refer to the underlying bank statement.

17  Q.  Can you just walk the jury through the ten different

18  payments, the date and the amount that you analyzed?

19  A.  Sure.  So the first transfer, as you can see, was on

20  May 9th of 2014, and it was for an amount of $15,000.

21         The second transfer was dated May 21st, 2014 and it

22  was again for $15,000.

23         The third transfer, an ACH transfer dated June 23rd,

24  2014, and that was for $120,000.

25         And then transfer 4 dated August 22nd, 2014, and that

H37OLEB2                    Rollins - Direct

1    was for $3,500.

2                And all of the first four transfers, as you can see,

3    were deposited into the PNC Bank account held by Hope Cathedral

4    International.

5                Transfers 5 through 6 were all made to the Hope

6    Cathedral account at HOPE FCU.

7                The first one, transfer 5, is dated October 6, 2014

8    and for the amount of $1,500.

9                Transfer 6 is October 7th, 2014, and that's for

10   $3,000.

11               Transfer 7 is for $6,000, and it was dated

12   November 24th, 2014.

13               The next transfer, transfer 8, which is dated

14   December 2nd, 2014, was for $50,000.  And as I'll discuss

15   later, that amount was returned back to the sender, which is

16   where you see in the left most column it says "returned".

17               Then the final two transfers were made to the HOPE FCU

18   account held at Lakeland Bank, and those amounts were for

19   $50,000 and $30,000 with the dates May 5th, 2015 and

20   October 9th, 2015 respectively.

21               MR. NOBLE:  Let's go to the next slide.

22   Q.  Mr. Rollins, can you just walk the jury through your basic

23   approach to how you went about analyzing the source and the use

24   of these various transactions?

25   A.  Right.  So again, I started with the bank statements for

1    the accounts into which these transfers were deposited and

2    looked as to who the counterparty bank and counterparty entity

3    was identified as in those bank records for the incoming

4    transfers, and to identify the source of the funds.

5            And then for the uses of funds, I proceeded to look at

6    how funds were spent following those deposits, and generally

7    speaking, there were a variety of different categories or types

8    of uses of funds, and I've listed those on slide 5, the first

9    of which is "Transfers to Other Accounts".

10           So out of the operating account at PNC Bank, I

11   identified uses where funds were being transferred to other

12   accounts.  So, for example, the payroll account, there was a

13   bookstore account, and the Steadfast Ministries account.  Those

14   transfers then I continued to trace on further to identify the

15   uses of funds that were transferred into those accounts based

16   off of records that I had for them.

17           The next set includes withdrawals, checks, debit card

18   and loan payments.  So these I refer to largely as direct

19   payments out of the accounts.

20           And then the last are a series of payments that were

21   made from the bank accounts to pay off balances in various

22   credit cards.  And for those, I've again gone further to trace

23   to see what purchases those payments can be connected to.

24           (Continued on next page)

25

BY MR. NOBLE:

Q.  Let's turn to page 6.

What's summarized in this chart?

A.  So this chart is similar to the chart we looked at before, but, in this case, what I've done is I've provided information about the bank accounts themselves and about the periods of time for which I had bank statement records available.  So you'll see that in the first column, I've identified the account names, second is the financial institutions, third is the account number, and then the fourth and fifth columns provide the date range for which I had records.  Then I have a source column, so those are the sources of the bank statements themselves.

And then in the final two columns, what I've done is I've provided information from the account-opening and closing documents that I had available listing who was listed as either an account signer, or the credit card owner, or the owner of the account.

Q.  Directing your attention to the bottom four rows.  What's depicted on those rows?

A.  So, in addition to the bank accounts at the top of the chart, as I mentioned on the last slide, some of the funds that were deposited into these accounts were then used to make payments off of credit cards, and these included the credit cards listed at the bottom of the chart.

1    Q.  And then just focusing your attention on the column titled

2    "Account Signer Credit Card Holder," what did you observe with

3    respect to whether Trevon Gross was a signer on any of the

4    accounts that you were looking at?

5    A.  So, for the accounts for which I had account-opening and

6    closing information, I found Trevon Gross listed on the Hope

7    Cathedral PNC account, the Hope Cathedral payroll account at

8    PNC, the HOPE FCU member account at United Advantage, and then

9    all four of the credit card accounts listed at the bottom of

10   the chart.

11   Q.  And then for the entry rows number 3, 4, and 5, there's

12   nothing in those boxes for account signer or sources.  Can you

13   explain why?

14   A.  Yeah, that's correct.  I didn't have access to

15   account-opening documents for those accounts.

16            MR. NOBLE:  You can take that down for a moment.

17   Q.  Mr. Rollins, after you were asked by the government to

18   analyze these various transactions, and you received the

19   records, how did you go about conducting your analysis of how

20   the funds were used after you identified the sources?

21   A.  So, again, I went to the bank statements themselves, or the

22   credit card statements, and identified payments and other

23   transfers out of the account that occurred after those

24   deposits.

25   Q.  Was there any type of methodology or assumption that you

1    used, for example, to determine what money was used, what

2    deposits were used to pay for certain expenses?

3    A.  Yes.

4             MR. KLINGEMAN:  Objection.

5             THE COURT:  Overruled.  We'll see where it goes.

6             Go ahead.  You may answer.

7             THE WITNESS:  Yes, I -- yes.

8    BY MR. NOBLE:

9    Q.  What was the assumption that you used in conducting your

10   analysis?

11   A.  I used an assumption for most of the accounts called

12   first-in, first-out, or FIFO.

13   Q.  Okay.  How did you choose that account -- I mean that

14   methodology?

15   A.  I chose it both in discussions with counsel, but from a --

16   in thinking about how most people handle their finances, and

17   look at your bank statements, and how you make payments out of

18   your bank accounts intuitively, first-in, first-out makes

19   sense.

20            MR. KLINGEMAN:  Objection.

21            THE COURT:  Overruled.

22   Q.  Is there a difference when you apply the first-in,

23   first-out methodology to a bank account analysis versus a

24   credit card analysis?

25   A.  Yes, there is.  And that's just from the way information is

H37KLEB3                          Rollins - direct

1    presented on those two account statements.

2    Q.  On the documents themselves?

3    A.  On the documents themselves.  So, in the sense of a bank

4    account, typically, money is deposited into the account, and

5    then there is outflows or withdrawals from the account from

6    that balance.  On the other hand, on a credit card statement,

7    typically what happens is, you make the purchases, and then you

8    pay the balance in the account after you've already made the

9    purchases.  So, in that case, the sources will appear after the

10   uses.

11   Q.  To be clear, are there other assumptions or methodologies

12   that you could have applied?

13   A.  Yeah, there are.  So, for example, the base methodology

14   would be something to the effect that you can identify the

15   specific outflows or withdrawals that match up to specific

16   deposits.  But if you think about a bank account, typically

17   what happens is that you have a series of deposits in different

18   amounts, and for most people -- for myself, for example -- most

19   of the money that I deposit --

20           MR. KLINGEMAN:  Objection.

21   Q.  Can you perhaps --

22           THE COURT:  Are you withdrawing that?

23           MR. NOBLE:  I'll withdraw.

24           THE COURT:  Go ahead.

25   Q.  Can you just limit your responses to the particular bank

1    statements that you reviewed in this case --

2    A.   Sure.

3    Q.   -- in terms of explaining how the FIFO methodology works

4    with respect to those bank statements?

5    A.   Sure.  So, for example, in the bank accounts that I

6    analyzed, there were a series of different deposits of

7    different amounts, and then there were a series of withdrawals

8    and other uses of funds in amounts that didn't always line up

9    exactly with the amounts of the deposit.  So, for example, one

10   of the deposits I was asked to analyze the sources and uses for

11   is for $120,000.  Within the bank statement following that

12   deposit, there were a series of withdrawals and uses of funds,

13   but nothing of the exact amount of $120,000.  There was a

14   series of withdrawals of various smaller amounts that would add

15   up to $120,000.

16   Q.   I asked you earlier about other methodologies that could

17   have been used or assumptions that could have been made.

18   A.   Right.

19   Q.   What's your example of another assumption?

20   A.   So, again, the first example that I was explaining was, if

21   there was a deposit of, say, $120,000 into that account,

22   following that, if there was a withdrawal of $120,000, you

23   might be able to say that -- specifically identify that use as

24   being connected to the source of funds, but since in this case,

25   the withdrawals were of smaller amounts following that deposit,

1    that methodology was impossible.

2              So, in this case, what I used was the first-in,

3    first-out methodology.  An alternative method could have been

4    what's referred to as the last-in, first-out methodology.  So

5    in that case, if you have a series of deposits into a bank

6    account, you withdraw from the most recent deposit in tracing

7    out funds, as opposed to in the FIFO methodology, where you

8    draw from the earliest or the oldest deposit.  So you draw from

9    the cash that's been sitting in the account longest when you're

10   tracing out.

11   Q.  You testified earlier that you based that assumption, in

12   part, upon conversations with counsel for the government; is

13   that right?

14   A.  That's correct.

15   Q.  What was decided in those conversations?

16   A.  So we discussed the different methodologies that you could

17   use to apply --

18              MR. KLINGEMAN:  Objection.

19              THE COURT:  Overruled.  See where it goes.

20              THE WITNESS:  -- and we discussed that -- specifically

21   the LIFO methodology, and the FIFO methodology, and the reasons

22   why the specific identification methodology wasn't possible,

23   and based on the discussions, it was determined that the FIFO

24   was the methodology that counsel asked me to use.

25   Q.  Counsel asked you just to apply the FIFO methodology?

1    A.  That's correct.

2    Q.  Is that the methodology that you used to conduct your

3    analysis?

4    A.  That is, yes.

5    Q.  So that's the general underlying assumption that applies to

6    your analysis of the bank records in this case?

7    A.  Yes, that is.

8    Q.  Is that something that you could show to the jury in the

9    bank statements themselves, if I asked you to?

10   A.  That's something I could show to the jury, yes.

11              MR. NOBLE:  Your Honor, at this time, the government

12   would seek to introduce the remaining slides.

13              MR. KLINGEMAN:  Objection.

14              MS. MADRIGAL:  No objection.

15              THE COURT:  I'm going to give the jury a short break,

16   and it's slightly earlier than we normally do, but it will be a

17   short break, about ten minutes.

18              (Continued on next page)

19

20

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  You may step down and outside the

3    courtroom for the break, please.  Thank you.

4           (Witness temporarily excused)

5           THE COURT:  I need to take a two-minute break and

6    return in two minutes.

7           (Recess)

8           MR. KLINGEMAN:  Your Honor, if I could supplement my

9    objection based on the testimony, perhaps we'll be more

10   focused.

11          THE COURT:  Well, I'm focused.  The difficulty is -- I

12   have two competing concerns.  The testimony didn't come out as

13   predicted, so what the witness -- or as proffered, anticipated.

14   As to the selection of the method, what the witness said was

15   that he described it as what counsel suggested, and then he

16   added that it's what sort of makes sense, which, given his

17   expert background, suggests a vouching for a particular

18   methodology, and then when he specifically discussed counsel

19   giving it to him, he described it as in the course of a

20   colloquy and a conversation.  So it's not just a plug-and-play.

21   He testified to his qualifications.  It adds a level of

22   vouching to the methodology selected.  I think that's true.

23          The test is something close to a waiver issue, which

24   is, this is what should have been anticipated when this witness

25   was noticed as a summary witness and these slides were

1    provided, which just, hearing it now, causes a problem.  And

2    the absence of any specific suggestion that there is some

3    competing analogy -- you read Judge Forrest's decision -- the

4    concern was that it was disputed which methodology would be

5    better.  There's nothing here, just a hypothetical possibility

6    that because there are different methodologies that could be

7    chosen, that it somehow is unfair.

8         My basic view is, this is helpful testimony and

9    nonprejudicial, but this is an expert providing summary

10   testimony, and I am concerned, in light of how the testimony

11   came in, that it is a 701 problem.

12        MR. NOBLE:  Well, Judge, he testified that there are

13   different methodologies, that this one seemed to make sense.

14        THE COURT:  Which is, with his credentials, vouching

15   for this methodology.

16        MR. NOBLE:  But we discussed it with counsel.  I can

17   make it clear that the government -- we instructed him, apply

18   FIFO, because we discussed the various methodologies, and this

19   is the assumption.

20        And, Judge --

21        THE COURT:  That was not --

22        MR. NOBLE:  But he did say that.  And he did say --

23        THE COURT:  Yes, you cleaned up with a leading

24   question, but his answer during the testimony was, we discussed

25   it.  So it sounded like what do you think would be the best

1    methodology, here's what I think would be the best methodology,

2    okay, apply that methodology.

3              MR. NOBLE:  The government said apply this

4    methodology, that's the key point.  Because, Judge, if I can

5    just -- a little indulgence.

6              THE COURT:  Absolutely.  Go ahead.

7              MR. NOBLE:  If you take that assumption that has been

8    applied, defense counsel could cross-examine about that

9    assumption, whether it's appropriate or not, whether a

10   different assumption would result in a different analysis,

11   et cetera.  But if you take that assumption, all he's doing is

12   testifying to the facts of based upon the bank records.  So if

13   you assume FIFO, and you look at the bank records, here is my

14   summary of what you see, and that's what he's testifying to the

15   jury.

16             So what the jury can do in the deliberation room is

17   they can take that assumption, and they can look at the bank

18   records themselves and see, is what this person told me

19   accurately summarizing the results that you get when you look

20   at the bank records.  And that's all he's doing.  It's factual

21   testimony.  He's not opining that this is the best way to do

22   it.  He's opining --

23             THE COURT:  He did.

24             MR. NOBLE:  No, but he says this makes sense.  I think

25   that's fair, but then we're saying -- and I can make it even

1   clearer -- that this is an assumption that you applied, there

2   are other assumptions that you could have applied, but based on

3   that assumption, can you walk us through what you found when

4   you looked at the bank records, can you walk us through your

5   summary of the transactions, the sources, and how they were

6   used.

7           In large part, it would not make a difference because

8   if you look at slide 4, where we list the balances of the

9   accounts before the transfers go in, the balances in most of

10  the accounts are so small compared to the amount of the

11  transaction that comes in, that it doesn't really make a

12  difference as to which -- like if you choose LIFO versus FIFO.

13          I wasn't going to get into that, I think that's fair

14  game on cross, but I wasn't going to get into that with him.

15  You take the assumption, applying that assumption by looking at

16  the records, what do you get?  Here are the facts.  And the

17  jury can say, that's helpful or it's not helpful, we shouldn't

18  apply that assumption, we should apply that assumption.  They

19  can make that determination for themselves.

20          So this is helpful testimony, and it's based on a

21  pure, cold analysis of the record applying this assumption.

22  It's factual, it's lay, it's --

23          THE COURT:  It's not -- I'm sorry, Mr. Noble.  I'm

24  trying, because I'm deeply frustrated with how we're here and

25  why we're here now, but it's not lay.  It's not.  And you

H37KLEB3                    Rollins - direct

1    analogize it to what is frequently seen in cases where

2    investigators come and do a tracing analysis.

3             MR. NOBLE:  Yeah, as lay witnesses.

4             THE COURT:  But it's based on percipient knowledge and

5    not -- yes, it is, it frequently is, that you have people who

6    this is what they do or did in this investigation.  Again, my

7    concern is testimony is not as you proffered it.  I was

8    prepared -- I'm not saying you misled in any way, I'm just

9    saying it didn't play out as you had predicted, and I'm

10   concerned.  I'm concerned that there is a 701 issue, and you

11   may not, through summary witnesses, provide expert testimony.

12            MR. NOBLE:  Agreed, your Honor, a hundred percent.

13            THE COURT:  That's the law.

14            MR. NOBLE:  Agreed.  But I guess I take objection to

15   this depiction of this as an expert witness, because he did

16   testify that he had conversations with counsel, he explained to

17   us the different methodologies, he said this one makes sense --

18            THE COURT:  Have you ever worked with an expert

19   witness?

20            MR. NOBLE:  Have I?

21            THE COURT:  Yes.

22            MR. NOBLE:  Yes, your Honor.

23            THE COURT:  Any different than what happened here?

24            MR. NOBLE:  Oh, absolutely.  Because he's just taking

25   one assumption -- an assumption about, you know, one

1   methodology, and then he applies it to the cold record to --

2           THE COURT:  Again, you're ignoring the testimony.  You

3   are ignoring the testimony.  The testimony was, I picked this

4   assumption, there are others, but I picked this one, because in

5   discussions with counsel -- well, first, he started by saying,

6   counsel suggested it, and it's what makes sense, it's what --

7   it's how I think about my -- I think he said his credit card

8   accounts, his bank accounts.

9           MR. NOBLE:  He was talking about his personal bank

10  accounts, which we struck.

11          THE COURT:  Before that, though, when he talked

12  about -- I didn't sustain the objection, he talked about it

13  being consistent with what he thinks made sense because it's

14  essentially how he goes about thinking about it, looking at it,

15  and the like.  I'm not recalling exactly.  But then asked --

16  yes, you cleaned up the end, but before you got to that, how

17  did you come to it, I had discussions with counsel, and the

18  inference was, I explained that this was the method that makes

19  the most sense, and so that's what we came to.  And then you

20  said, and counsel told you to apply it?  Yes.

21          MR. NOBLE:  I can clean that up.  I can say it again

22  and make it very clear to the jury that, you know, yes, we had

23  discussions, he explained different options, mostly FIFO and

24  LIFO, and we said, choose FIFO.

25          Judge, just going back to the notice point, they have

1    had these for over two weeks.

2              THE COURT:  I'm hundred percent with you on the notice

3    point.  In my view, the objection, which is decidedly not made,

4    is that this is expert testimony.  The whole thing, it's not

5    just this particular piece.  I'm not saying the whole thing is,

6    I'm saying that in the course of testimony with this person's

7    credentials and the process that they used, it's an expert

8    providing summary testimony and in what's been identified for

9    objection purposes, it's not simply summary.

10             MR. NOBLE:  Well, Judge, I think it seems to me that

11   your Honor's concern is about the choice of FIFO versus another

12   methodology in terms of that being an expert opinion or not,

13   because once you make the assumption, then the application to

14   the bank records, it is what it is.  You take that methodology,

15   and you apply it, here are the facts, this is what I saw in the

16   bank records, right?

17             So, to the extent that your Honor believes that it

18   requires an expert to make the decision that there is some

19   leeway in the decision-making, some discretion that was left to

20   this witness to decide whether to do it, and he's proffered

21   testimony to that, I could clean that up to make it clear that

22   this is an assumption that the government enforced upon him, to

23   do it this way, or alternatively, we could seek to qualify him

24   as an expert.  He's obviously qualified to opine on these

25   things.  I can elicit more, I can lay a further foundation, we

1    can bring him in to do a colloquy outside the presence of the

2    jury to qualify him, because, Judge, at this point, the

3    government would be severely prejudiced if we're not able to

4    present this evidence.  And we think there's a good-faith basis

5    that this is not expert opinion.  It's been admitted -- tracing

6    analyses have been admitted in other cases.

7            THE COURT:  Can you cite me any case, any authority?

8            MR. NOBLE:  We did it in --

9            THE COURT:  Any case, any authority -- it's a genuine

10   question -- for the use of an accounting expert to do summary

11   exhibits that includes application of an accounting method

12   where there are options for others.

13           MR. NOBLE:  Well, Judge, I can't cite you a specific

14   case --

15           THE COURT:  Or something comparable.

16           MR. NOBLE:  -- but I can cite you, for example, in the

17   Zemlyansky matter before Judge Oetken and Danilovich before

18   Judge Oetken, we had a retired FBI agent who now works in the

19   FBI as a forfeiture analyst.  He took the stand to do the money

20   laundering tracing of where the money went, and then how it got

21   into the bank accounts of the defendants, and how those

22   proceeds were spent out of the bank accounts.  And inherent in

23   that were assumptions about what money, what sources were used

24   for what uses.  And he testified to that as a lay witness

25   before Judge Oetken in multiple trials.

H37KLEB3                        Rollins - direct

 1           So that's one example --

 2           THE COURT:  Was that over objection?

 3           MR. NOBLE:  No, there was no objection.  Mr. Creizman

 4   was there.

 5           MR. CREIZMAN:  I was.  I can tell you about some

 6   other --

 7           MR. NOBLE:  And they haven't objected to this either,

 8   your Honor.

 9           THE COURT:  I'm not dealing with their lack of

10   objection, I'm dealing with an objection, which I'm frustrated,

11   deeply frustrated.

12           MR. NOBLE:  Judge, I can also cite you a case from the

13   Eleventh Circuit, if I can find my notes.  I know it's not

14   Second Circuit, but there is an example of a similar situation

15   where an FBI analyst, it may have been an investigator from the

16   case, took the stand to do a bank account analysis and a

17   tracing analysis, and it was upheld on appeal as pure summary

18   testimony.  It's a published Eleventh Circuit case.

19           THE COURT:  What can you do now?  Is there a way to

20   skip --

21           MR. NOBLE:  Judge, this is --

22           THE COURT:  I understand your arguments.  I'm asking

23   whether there is a way at this point to not have the jury

24   sitting idly.  It's not your fault that we're dealing with it

25   while the jury is sitting idly.

1          MR. NOBLE:  Sure.

2          THE COURT:  It's Mr. Klingeman's fault.

3          MR. NOBLE:  We can seek to qualify him as an expert.

4    If that's the concern, we'll qualify him as an expert, defense

5    counsel can ask him any questions to try to probe whether he

6    should be qualified as an expert, and then there will be no

7    problem, if your Honor believes that his opinion that the FIFO

8    methodology is the best methodology to be applied injects some

9    expert testimony into what would otherwise just be summary

10   testimony.

11         THE COURT:  Mr. Klingeman?

12         MR. KLINGEMAN:  Your Honor, the witness did testify

13   about the appropriate --

14         THE COURT:  Respond, please, to the suggestion of

15   seeing if he can be qualified as an expert.

16         MR. KLINGEMAN:  We object to him testifying as an

17   expert.  There was no notice, and I didn't waive my right to

18   object by moving -- by requesting pretrial for notice that we

19   never got.  And I have --

20         THE COURT:  When you say never?

21         MR. KLINGEMAN:  I have made a specific objection to an

22   aspect of this testimony and this document.  I haven't

23   objected, I haven't laid in wait, and I haven't waived my

24   objection.  What I have done --

25         THE COURT:  Well, I'm not saying it was strategic, but

1   this could have been anticipated when you received these

2   materials and were informed that this witness would be

3   providing summary testimony.

4              MR. KLINGEMAN:  And we did object.

5              THE COURT:  This morning.

6              MR. KLINGEMAN:  No.  Days ago, we addressed this with

7   the government.  And we worked very carefully to try and narrow

8   the objection to the simple issue.  And if I could just have

9   the opportunity, now that we've heard the witness' testimony,

10  to explain the objection, I think it will be far clearer why

11  the objection is meritorious and how we can, nonetheless,

12  accommodate the government's need for this evidence.  This is

13  not a crisis.

14             The witness testified, essentially --

15             THE COURT:  I have a jury sitting idly.  It's not a

16  crisis, but it's a waste of time.

17             MR. KLINGEMAN:  I haven't had a chance to say a word.

18             THE COURT:  I'm going to give you a chance.  I don't

19  appreciate the description of my taking an objection seriously

20  and looking for a solution as a crisis.  Proceed.

21             MR. KLINGEMAN:  I'm referring to the government's

22  rhetoric about the position this might put them in.  They're

23  suggesting this is some kind of critical rupture in the

24  presentation, and I have a proposal, a proposal I've already

25  made -- I made it to them, and I made it again this morning to

1    your Honor -- to get through this, so that they can use

2    90 percent of what they're trying to do.  All I'm asking is an

3    opportunity to make that proffer.

4            This witness testified that there are, in fact, three

5    methodologies, not two, not just LIFO and not just FIFO, but

6    what he described as the specific identification of deposits

7    and expenditures.  And he described that as impossible in this

8    case.  And that gets to the heart --

9            THE COURT:  He did.

10           MR. KLINGEMAN:  -- of Mr. Gross' guilt.  The

11   government alleged in its opening statement that Mr. Gross took

12   these bribes and used the proceeds for personal reasons, and

13   they went through a litany of allegations.

14           This witness, the government's summary witness --

15           THE COURT:  Can you pull up the microphone?

16           MR. KLINGEMAN:  This witness, the government's summary

17   witness, and by all accounts an expert, has said that is

18   impossible to establish that connection between the receipts of

19   the alleged bribes and the expenditures that the government has

20   identified as part of Mr. Gross' corrupt use of those receipts.

21           So what the government has done, recognizing that it's

22   impossible to do that, they've hired an expert, they've given

23   him direction as to what alternative accounting method to use

24   so as to able to make that connection, artificially, to reach

25   the conclusion they want to reach, which is that the money that

H37KLEB3                       Rollins - direct

1      came in from the Collectables Club, for example, or Kapcharge,

2      for example, was ultimately spent by Mr. Gross personally.  The

3      way they do that is by FIFO because they can't do it by the

4      better method, which is the specific identification of deposits

5      and expenditures that the witness described.

6              But my point is:  One, they can't substitute an expert

7      opinion for that lack of connection, that impossibility.  But,

8      nevertheless, they're entitled, as the government is and as the

9      defendant would be, entitled to argue in opposition that

10     Mr. Gross was motivated to accept these bribes, so that he

11     would have access to more money that he could use for personal

12     expenditures.  That happens in every kind of financial fraud

13     case.  It's what the government forecasted it was going to do.

14     We objected pretrial.  Your Honor overruled our objection, and

15     we're arguing the consequences of that.

16             But depriving the government of the right to

17     substitute an accounting theory to breach that gap is

18     impermissible.

19             THE COURT:  Are you getting to the simple solution

20     that you suggested you had?

21             MR. KLINGEMAN:  Yes.

22             THE COURT:  Let's get to it.

23             MR. KLINGEMAN:  In the Government Exhibit 900, there

24     are a series of slides that don't do anything more than recite,

25     as slide number 6 did, the receipts, and the slides -- the rest

1    of the documents do the various expenditures that the

2    government has identified as Mr. Gross undertaking.

3            Your Honor has already said that that evidence comes

4    in.  So we're not arguing that those slides shouldn't come in.

5    That gives the opportunity -- that gives the government the

6    opportunity to stand up in summation, as we anticipated they

7    would, and say he took these bribes, and he spent this money on

8    himself.  That's the way every case works.  Every case doesn't

9    work with an expert coming in and talking about FIFO or LIFO.

10           So our objection was narrowly tailored, and the Court

11   can accommodate it and accommodate the government's need to

12   offer this testimony, offer this exhibit, and then make their

13   arguments.

14           THE COURT:  I can't say I understand what you're

15   proposing.

16           MR. NOBLE:  Judge, he's proposing that --

17           THE COURT:  I want to hear from him.  I want to

18   understand what he's proposing.

19           MR. NOBLE:  Sorry.

20           THE COURT:  Go ahead, Mr. Klingeman.

21           MR. KLINGEMAN:  As a summary witness, Mr. Rollins can

22   say that he examines bank records, credit card receipts, other

23   financial documents, other evidence, other exhibits, and based

24   on that, he has created various charts that are contained in

25   the slides, to which we have no objection, that list the

1    sources of funds --

2              THE COURT:  What slides?

3              MR. KLINGEMAN:  Well, the government's already

4    introduced one of them, to which we do not object, and that

5    would be Government Exhibit 900-4.

6              And there are additional slides that list the various

7    expenditures and uses of the funds, and we have no problem with

8    that either.  What we have a problem with is using an expert

9    accounting analysis to specifically link the sources of funds

10   to the expenditures, when he has admitted, or testified, that

11   to do that without the benefit of that accounting methodology

12   would be, quote, impossible, unquote.

13             MR. NOBLE:  Judge, I believe that everything that

14   Mr. Klingeman just argued is fair cross-examination for this

15   witness.  And defense counsel has been on notice, they could

16   have prepared their own summary exhibits using a different

17   methodology, hiring another forensic accountant, to say, I

18   applied LIFO, I applied the matching analysis, and these are

19   the results that I get.  This is factual testimony based on one

20   assumption about how funds are expended from an account.

21             And, your Honor, this really is going to prejudice the

22   government's case because what Mr. Klingeman is proposing is

23   that we strip out how we show the jury Mr. Gross used the

24   funds, and that it's pure facts, based on this assumption, that

25   the witness has testified the government told him to apply.

1   And I can reiterate that, or, alternatively, we can qualify him

2   as an expert.  We don't even need him to testify any further

3   about why he chose this methodology.

4            But, your Honor, to be sandbagged the night before

5   we're closing, with our last witness, that this is an expert

6   that should have been noticed weeks' ago, they could have

7   brought this up weeks ago, and we could have briefed it, we

8   could have argued it, we could have sought to qualify him as an

9   expert, they would have had more time to prepare to challenge

10  that qualification.  But to do this at the last minute is

11  extremely unfair, particularly given this is not expert

12  testimony.  This has been admitted in other cases.  It's a

13  tracing analysis based on one assumption of how you go about

14  doing the tracing.

15           I think everything that Mr. Klingeman was arguing and

16  pointing out about potential flaws in the analysis is all fair

17  game for cross.  It goes to the weight of the testimony that

18  should be given, to the summary.  It does not go to

19  admissibility.

20           Furthermore, your Honor, we requested a limiting

21  instruction to say that the jury is supposed to analyze the

22  underlying evidence, the evidence that's actually in evidence

23  for them to consider, not these charts, not these slides.  And

24  they're only to consider the witness' testimony and these

25  slides to the extent that they find that it's actually

1    supported by the evidence in the record.  They can apply that

2    assumption, they can reject that assumption, based on the

3    arguments made to them by counsel.

4            This is not expert testimony.  He opined that there

5    were various options.  I asked him about the various options,

6    essentially, to draw the sting because I know Mr. Klingeman is

7    going to ask him about what the other options were.  And I

8    think he clearly testified that at the end of the day, the

9    government told him, apply this methodology, see what results

10   you get, come to court, testify that these are the results

11   based on that assumption.  And I can reiterate that before we

12   restart the analysis.

13           THE COURT:  All right.  Here's what we're going to do:

14   I will give you an opportunity to probe further, and I will

15   make an assessment on that, but I'm essentially of the view

16   that the defense was on notice of this issue, failed to timely

17   raise the matter.  And I will give the defense a full

18   opportunity, even if it means delay of some kind, to counter

19   with an expert, or a summary witness, or a witness to dispute

20   the reliability of methodology or to make the methodology

21   points, Mr. Klingeman, that you made to me in your contention.

22           But I sit here, the day that I'm hearing of this

23   issue, after this witness was noticed in advance as a summary

24   witness, and the specific proposed summary slides, including

25   the reliance on this one assumption was made, without any

1    contention proffered that doing so suggests any unreliability.

2    So, to the extent that this is close to the line as to the use

3    of the methodology, I'll see what the witness says upon further

4    examination, I'll allow full opportunity for cross-examination,

5    and I will allow the defense, even if it means some delay in

6    the trial, to come forward with a counter summary witness of

7    comparable background and the like.

8           MR. NOBLE:  Judge, just to be clear, when the Court

9    says you'll make a ruling based upon further examination, what

10   I intend to do is ask him, who ultimately decided to apply the

11   FIFO methodology in this case?  And I believe his testimony

12   will be the government told me to do that.

13          THE COURT:  And if it's not?

14          MR. NOBLE:  That's my understanding based on

15   conversations --

16          THE COURT:  I'm just asking you to run the

17   hypothetical if it's not his answer.

18          MR. NOBLE:  That it wasn't ultimately the government's

19   decision?

20          THE COURT:  I don't know the answer, but if it's, I

21   told the government this was the best method, so they told me

22   to apply it.

23          MR. NOBLE:  No, I think his testimony is going to be,

24   as he said before, we discussed the various options, the

25   government told me apply this FIFO methodology to your

H37KLEB3                      Rollins - direct

1    analysis.  Let's use this one, let's use this assumption.

2              THE COURT:  And if it's not?

3              MR. NOBLE:  We would seek to qualify him as an expert,

4    if that's what's required.

5              THE COURT:  And how do you deal with the failure to

6    notice him as an expert?

7              MR. NOBLE:  I mean, there's no prejudice to any lack

8    of notice.  They have his resume, they've had these slides for

9    a couple of weeks, we told them long before we were going to

10   call a summary witness to summarize the bank and financial

11   records.  So they've been on notice that this was the

12   testimony, and if they had thought that this was actually

13   expert testimony, they could have raised it two weeks ago.

14             So I don't see what prejudice there would be if he

15   is -- can adequately be qualified under 702 as an expert

16   witness, which I think he can be based on the foundation that's

17   already been laid about his education, his work experience, his

18   certifications.  And I can probe further into other matters

19   that he's testified about --

20             THE COURT:  Well --

21             MR. NOBLE:  -- but I don't think we're going to have

22   to go there.

23             THE COURT:  All right.

24             Mr. Klingeman?

25             MR. KLINGEMAN:  I have made my objections.  I --

1           THE COURT:  And the government will live with its

2     decisions.

3           MR. KLINGEMAN:  And I respectfully disagree with the

4     discussion of notice.

5           But having said that, if the Court is inclined to

6     allow publication of the exhibit, I just want to note my

7     objection now, as opposed to popping up like a Jack In The Box.

8           THE COURT:  That's fair.

9           MR. KLINGEMAN:  So I'm not going to object based on

10    what the Court --

11          THE COURT:  I understand it to be a standing objection

12    for the reasons that we've discussed.

13          MR. KLINGEMAN:  Now, I may, obviously, your Honor, in

14    the course of the direct, have other objections, and if I do,

15    understand I'm not objecting on the original grounds, but I may

16    have some additional or different grounds.  I'll try to keep my

17    objections at a minimum.

18          THE COURT:  Okay.

19          Ultimately, it's a conclusion based on effectively a

20    late objection based on expert testimony and the lack of

21    prejudice based on what I understand to be proceeding in light

22    of the slides and the government's proffer as to the

23    anticipated testimony.

24          Get the witness and bring in the jury.

25          MR. NOBLE:  Judge, after the additional questions that

H37KLEB3                        Rollins - direct

1    I will ask, the foundational questions, I do intend to offer

2    the rest of the exhibit, just so that we can go through it.

3              THE COURT:  After the financial question?

4              MR. NOBLE:  Yes.

5              THE COURT:  Assuming it's as anticipated?

6              MR. NOBLE:  Yes.

7              THE COURT:  You can offer it.  I understand

8    Mr. Klingeman to object to that.  And if it's as you've

9    anticipated, I'm overruling the objection for the reasons I've

10   indicated.

11             MR. NOBLE:  Okay.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Members of the jury, my thanks again for

3    your patience.

4              Mr. Noble, you may proceed.

5              MR. NOBLE:  Thank you, Judge.

6    BY MR. NOBLE:

7    Q.  Mr. Rollins, before we broke, you were testifying about the

8    FIFO methodology.  Do you remember that?

9    A.  Yes, I do.

10   Q.  And I believe you testified that you had conversations with

11   counsel for the government about FIFO and other options that

12   could have been used for your analysis?

13   A.  That's correct.

14   Q.  Ultimately, whose decision was it to apply the FIFO

15   methodology in the analysis that you performed?

16   A.  Ultimately, it was counsel who instructed me to use FIFO.

17   Q.  Counsel for the government instructed you?

18   A.  The government, yes.

19             THE COURT:  I'm sorry, instructed you to?

20             THE WITNESS:  To use the FIFO methodology.

21             MR. NOBLE:  Your Honor, at this time we'd offer the

22   remaining exhibits in Government Exhibit 900.

23             THE COURT:  All right.  And as discussed, they are

24   admitted.

25             (Government's Exhibits 900 series received in

1    evidence)

2            MR. NOBLE:  Thank you, your Honor.

3    BY MR. NOBLE:

4    Q.  I'd now like to walk through, for the jury, an example of

5    how FIFO works and as you applied it in this case.

6    A.  Okay.

7            MR. NOBLE:  Can we bring up -- actually, I think I

8    have the clicker, so I'll just control.

9    Q.  Can you explain, using this example, of how FIFO works with

10   respect to a bank statement?

11   A.  Right.  So here what I provided on this slide 8 is an

12   example on bank statement just using some example information.

13   And what I've done is I've boxed out the sources and the uses

14   of funds.  So the first set of boxes, two lines, one is a

15   beginning balance of $500, and one is a deposit of $1,000,

16   which you see in the amount column.  Those are sources of money

17   that are in the account.

18           And then the last four rows of the statement contain

19   the uses, which includes a debit card -- three debit card

20   payments and a check payment.

21           So, in applying the first-in, first-out, or FIFO,

22   methodology in tracing the uses to the sources, the beginning

23   balance, which was in the account prior to the deposit, is used

24   to satisfy the first two payments made out of the account

25   following the deposit.  So, again, the first or the oldest

1   money in the account is used to satisfy the first payments out

2   of the account.

3   Q.   Slide 10?

4   A.   And then slide 10 shows that once the oldest money is used

5   up, then you turn to the deposit of $1,000, which is then used

6   to satisfy the next thousand dollars in payments out of the

7   account, which correspond to the last two rows, for 850 and

8   150.

9   Q.   And, to be clear, these are just made up bank statements

10  that you're using as a demonstrative --

11  A.   That's correct.

12  Q.   -- is that correct?

13  A.   That's correct.

14  Q.   Let's go to slide 11.  You testified earlier that there's a

15  difference in applying FIFO to bank statements versus credit

16  card statements, correct?

17  A.   That's correct.

18  Q.   Can you explain that to the jury, using this example?

19  A.   Right.  And, again, as I explained earlier, that's

20  typically due to the way it is presented on the bank record.

21  So, for a credit card statement, the charges occur, generally,

22  before card payments are made.  So, generally, people will pay

23  off balances in their account after making purchases.

24          So, in this example, you see that then the uses of

25  funds, which are the purchases, which are in the first box, so

1    there are four rows that are encompassed in that first box, and

2    then the sources of funds, which are the card payments that

3    occur after the uses of funds, are denoted in the second box.

4    Q.  Slide 12?

5    A.  So, in applying the first-in, first-out method, you apply

6    the first payment, which is the oldest money deposited into or

7    paid into the credit card statement.  The first card payment of

8    $500, which you see in the second box, is used to satisfy the

9    first $500 in purchases, which are those -- the first two rows

10   in the first box, for 100 and 400.

11   Q.  Slide 13?

12   A.  And then in carrying that methodology forward, the second

13   payment of $4,000 is used to satisfy the next $4,000 in

14   purchases.

15   Q.  So let's talk about the specific transactions that the

16   government asked you to analyze.

17   A.  Okay.

18   Q.  What was the first transaction you looked at?

19   A.  The first transaction was a $15,000 transfer into Hope

20   Cathedral's operating account at PNC Bank, and it was a Fedwire

21   transfer dated May 9th, 2014.

22   Q.  You see that little number 1 --

23   A.  Yes.

24   Q.  -- on the exhibit?

25            What does that indicate?

1    A.   What I've done throughout the report, to make it easier to

2    follow and to read the slides, is provide, in a circle, a

3    number corresponding to the number of the transfer.  So

4    transfer one has a small circle with a one in it, transfer two

5    has a small circle with a two in it.

6    Q.   Where did the first transfer come from?

7    A.   So, the first transfer came from a bank account associated

8    with Currency Enthusiasts, which you see an extract on slide

9    16.

10   Q.   And what was written in the memo line for that transfer?

11   A.   So, on the sender's bank statement, in the memo line,

12   there's a bunch of information, one word of which I highlighted

13   on the slide, and it's the word "donation."

14   Q.   Slide 17, what are we looking at here?

15   A.   Slide 17, we're looking at --

16        MR. KLINGEMAN:  Your Honor, could I just have one

17   moment, please?

18        THE COURT:  Yes.

19        (Pause)

20        MR. KLINGEMAN:  Thank you, your Honor.

21        THE COURT:  Thank you, Mr. Klingeman.

22        Go ahead, Mr. Noble.

23        MR. NOBLE:  Thank you, Judge.

24   BY MR. NOBLE:

25   Q.   Mr. Rollins, slide 17 what is the document that's depicted

1    here?

2    A.  So, slide 17 shows an excerpt from Hope Cathedral's PNC

3    account, account number 4632, and it's showing -- what I've

4    highlighted is the receipt of the $15,000 Fedwire on May 9th.

5    Q.  Slide number 18, what are we looking at?

6    A.  Slide number 18 is an excerpt from PNC Bank Fedwire

7    details.  So these are the details underlying the Fedwire

8    transaction that were provided by the bank, and it shows the

9    payment amount, the $15,000, as well as the recipient, Hope

10   Cathedral, and the sender, Currency Enthusiasts.

11   Q.  And what was the bank from which this wire transfer was

12   sent?

13   A.  Right.  And there's a box that shows that the bank that it

14   was sent from was Bank of America.

15   Q.  And where was that located?

16   A.  The document indicates New York, New York.

17   Q.  Let's go to the second transfer.  What was the second

18   transfer you analyzed on slide 19?

19   A.  So the second transfer was a $15,000 Fedwire transfer,

20   again to Hope Cathedral's operating account at PNC Bank, and it

21   was dated May 21st, 2014.

22   Q.  What's on slide 20?

23   A.  Slide 20 is the sender's bank statement, and, again, in

24   this case, it was Currency Enthusiasts' account at Bank of

25   America.

1   Q.  And what is in the memo line?

2   A.  The memo line, again, contains information with respect to

3   the transaction, but also the word "donation," which I've

4   highlighted.

5   Q.  What's on slide 21?

6   A.  Slide 21 is an excerpt from Hope Cathedral's bank statement

7   for the 4632 account, and I've highlighted the receipt of the

8   $15,000 Fedwire on May 21st, 2014.

9   Q.  And slide 22, what's depicted?

10  A.  And slide 22 are the Fedwire details, again from PNC Bank,

11  underlying this transaction, and I've highlighted the

12  recipient, indicated as Hope Cathedral, the sender, indicated

13  as Currency Enthusiasts, the amount, $15,000, as well as the

14  bank associated with the sender.

15  Q.  Where was that bank located?

16  A.  That was, again, Bank of America, indicated as located in

17  New York, New York.

18  Q.  Let's talk about transfer number three.  What was that

19  transfer that you analyzed?

20  A.  Transfer number three was in the amount of $120,000, and it

21  was an ACH transaction to Hope Cathedral's operating account at

22  PNC Bank, and it was dated June 23rd, 2014.

23  Q.  What's depicted on slide number 24?

24  A.  Slide number 24 shows the recipient's bank statement, so

25  this is Hope Cathedral's 4632 account, and it shows the receipt

of the ACH incoming transfer, and it indicates -- it's a

corporate ACH and provides the word Kapcharge in the

description.

Q.  What's depicted on slide 25?

A.  And slide 25 is PNC ACH transaction detail, and what I've

highlighted here is the amount, which is in the box to the

right, that is the $120,000, and then under the co-entry

descriptor, indicating the Kapcharge.

Q.  What was the fourth transfer you analyzed?

A.  And the fourth transfer was a $3,500 ACH transfer to Hope

Cathedral's operating account at PNC Bank, and it was dated in

August 22nd of 2014.

Q.  In the amount of 3500?

A.  In the amount of 3500.

Q.  What's depicted on slide 27?

A.  And 27 shows Hope Cathedral's bank account showing the

incoming ACH credit of $3,500, and it's dated August 22nd, and

it indicates in the description the words "Collectables CLU,"

and then "CONSRENT 070814."

Q.  What's depicted on slide 28?

A.  Slide 28 is an ACH item detail report for this transaction

for the ACH in which this transaction was part of, and it

indicates the sender's name as Collectables CLU; the date,

August 22nd, 2014; the amount of $3,500; and then under the

receive ID and receiver name, I've highlighted to the left that

1    it says, "CONSRENT 070814," and then Trevon Gross.

2              MR. NOBLE:  And just for the record, CONSRENT is

3    C-o-n-s-r-e-n-t.

4    Q.  Where did you find this document?

5    A.  This document was provided me by counsel for the

6    government, but it is indicated as being from Alloya Federal

7    Credit Union.

8    Q.  What is the name of the particular document that we're

9    looking at here?

10   A.  It's called ACH item detail.

11   Q.  What's depicted on slide 29?

12   A.  Slide 29 shows Hope Cathedral's operating account, 4632,

13   and it shows that on the same day that HOPE received the

14   $3,500, there was an outflow from the account back to

15   Collectables CLU in the amount of 7550, which was half of the

16   amount that had come in.

17   Q.  So 3500 comes in, and the same day, 1750, half of it, goes

18   back out?

19   A.  It goes back out.

20   Q.  So what are you summarizing on slide number 30?

21   A.  Slide number 30 is summarizing the first four transfers,

22   all of which were deposited into Hope Cathedral's account at

23   PNC Bank, the 4632 account.  So, on the left-hand side, I've

24   indicated the four transactions, the dates and the amounts, as

25   well as indicating that on the last transaction, as we just

spoke about, there was -- half of the amount was sent back.

And then on the right-hand side, what I've indicated is a

summary, the high-level summary of the uses of funds.

Q.  Can you just summarize for the jury the various categories?

A.  Sure.  So the first category is called direct payments, and

it's for $108,000 -- $108,473.54.  And that included check

payments, debit card payments, and other transfers, direct

transfers out of the operating account.

        The next category included credit card accounts.  So,

again, as I had indicated earlier, some of the money that was

transferred out of the Hope Cathedral operating account went to

pay off balances in credit card accounts, and I've identified

$20,922.06 that went to the credit card accounts.

        And then, finally, the last category is transfers to

other related bank accounts, which I had mentioned earlier as

the payroll, the bookstore, and the ministry's account, and

that totaled $20,604,40.

Q.  After you identified this level of transfers, were you able

to perform any other tracing?

A.  Yes.  So, for all of the categories, I was able to trace

further in various instances.  So, for the credit card

accounts, I went to the credit card statements themselves to

identify the purchases that those balances -- payments were --

the payments to the credit cards were paying off.

        For the related bank accounts, I went to the

H37KLEB3                          Rollins – direct

statements for those bank accounts and identified the uses of

funds following the transfers in of the amounts that were

transferred to those accounts.  And then for the direct

payments, that was a combination, so in some cases the direct

payments were, for example, debit card purchases, that was the

end of my tracing analysis, but in other cases, there were a

series of transactions that involved, for example, payments to

PayPal, and for those, I went further into the PayPal records

that I was provided to identify the ultimate use of the funds

in terms of what was purchased.

          (Continued on next page)

1   Q.  And the next series of slides that we're about to look at,

2   do those summarize the uses of these various payments as you

3   traced them based on the FIFO methodology?

4   A.  Yes.  I've summarized the uses, as well as provided some

5   examples to walk through some of the purchases.

6   Q.  So let's talk first about the -- just walk through the

7   credit card transfers.  Specifically, how much was transferred

8   from the church operating account to make payments on the

9   various credit cards you examined?

10  A.  So if you go back to the previous slide, I've totaled it as

11  $20,922.06, and then on this slide, I've broken down how much

12  went to each of the three credit card accounts.

13          So the first account, the American Express account,

14  account number 1009, $16,422.81 was traceable to that account.

15          For the second account, which is the Discover, 6282

16  account, $3,256.84 was traceable to that account.

17          And then the last account, which was a Chase account,

18  7624, I identified $1,242.41.

19  Q.  For the record, we're looking at slide 31; is that correct?

20  A.  Sorry, yes, slide 31.

21  Q.  Let's go to slide 32.  What information did you provide on

22  slide 32?

23  A.  So in slide 32, what I've provided is information that

24  indicates who held the American Express account.

25  Q.  Who was the account holder?

1   A.  The account holder as indicated on the record was Trevon

2   Gross.

3   Q.  Was any other entity listed on that account record after

4   the name Trevon Gross?

5   A.  Yes.  Under his name there is Hope Cathedral listed.

6   Q.  What is the address listed on the account records?

7   A.  And then on the account records the address is listed as 1

8   Sienna Drive, Jackson, New Jersey, 08527.

9   Q.  Slide 33, which credit card records is this for?

10  A.  And this is for the Discover card, 6282.

11  Q.  Who is the account holder?

12  A.  The account holder is Trevon Gross.

13  Q.  Slide 34, what credit card this?

14  A.  This is the Chase credit card, 7624.

15  Q.  Who is the account whored?

16  A.  Trevon Gross.

17  Q.  What is summarized on slide 35?

18  A.  So in the previous slide 31, I provided the overall amounts

19  that I traced to the three credit cards, and in this slide I've

20  provided the total number of transfers that I observed within

21  the bank records as being transferred to those accounts during

22  this time period, of which for the American Express there are

23  three that I identified as being traceable use the FIFO

24  methodology, and there were two transfers that were not

25  traceable.  Then for the Discover and Chase cards, I've

1    indicated that there was one transfer to each of the two

2    accounts during this time period.

3    Q.  To what transaction were these credit card payments on the

4    American Express traceable?

5    A.  For the traceable, the first three transactions, they were

6    all traceable back to the third, the deposit of $120,000.

7    Q.  And the Discover card and Chase credit card?

8    A.  And those both were also traceable back to the third

9    transfer.

10   Q.  Let's talk a little bit about the transfers to other bank

11   accounts from the PNC operating account.  Can you explain what

12   slide 36 summarizes?

13   A.  So as I had indicated earlier, some of the traceable funds,

14   or some of the uses of funds went through transfers or payments

15   to other related accounts held by Hope Cathedral, three

16   accounts in specific.  One was the bookstore account, the 4771

17   account at PNC Bank.  The second one was a payroll account, the

18   7367 account, also at PNC bank.  And then lastly was the Hope

19   Cathedral Ministries account, the 4755 account at PNC Bank.

20        What I've indicated on this slide is the amount of

21   traceable funds that I identified as being transferred from the

22   Hope Cathedral operating account at PNC Bank to those accounts.

23        And as you can see in the middle of the chart, I

24   identified traceable funds that were transferred to the

25   bookstore account, and then identified further traces of funds

1    that were transferred from the bookstore account to both the

2    payroll and the ministries account.

3    Q.  Let's talk a little bit about what you saw with respect to

4    payroll.  What does slide 37 summarize?

5    A.  So with respect to the traceable funds that I traced into

6    the payroll account, I then proceeded to look at the payroll

7    account records to identify who received payroll checks

8    following those transfers.  And this slide depicts a summary of

9    all of the individuals that I identified as being paid from

10   those funds.

11   Q.  Approximately how much did Trevon Gross receive in

12   traceable funds?

13   A.  In traceable funds, and again, this was in the period, as

14   you can see at the top of the slide, May through July, 2014.

15   $8,349.62.

16   Q.  What is summarized on slide 38?

17   A.  Slide 38 is an aggregate summary of the Hope Cathedral

18   sources and uses analysis that I performed.

19   Q.  For which transactions?

20   A.  This is for transfers 1 through 4.

21   Q.  And then what's depicted in the right column?

22   A.  So in the right column, what I've done is I provided a

23   summary of the uses of funds in which I've categorized the

24   transactions according to transaction type.

25   Q.  How much was used for cash withdrawals?

1    A.   So I identified $23,470.45 in cash withdrawals, which

2    included a combination of both ATM and teller withdrawals.

3    Q.   How much was used for meals, entertainment, and shopping?

4    A.   $21,448.35.

5    Q.   How much was used for travel?

6    A.   Travel, $12,976.52.

7    Q.   How much was used for payroll to Trevon Gross and family?

8    A.   $10,871.54.

9    Q.   How much was used for auto loan payments?

10   A.   Auto loan payments, $10,300.

11   Q.   How much was used for an ACH payment to Trevon Gross at

12   another bank?

13   A.   $3,954.46.

14   Q.   How much was used for health, spa, and skincare?

15   A.   Health, spa and skincare $2,535.24.

16   Q.   How much was used for gas, convenience stores, and auto

17   related?

18   A.   $2,267.58.

19   Q.   How much was used for college admissions?

20   A.   $308.75.

21   Q.   What is depicted in the next few slides that we're about to

22   look at?

23   A.   In the next few slides, I've provided examples of activity

24   that is included in the categories we just looked at.

25   Q.   So let's start with the example on slide 39.  Just to be

1   clear, are these all the sample transactions that you could

2   have drawn from or are these just some of them?

3   A.   These are just some of them.

4   Q.   Slide 39, what's depicted here?

5   A.   So on slide 39, I'm showing a transaction for $178, and it

6   was related to a purchase at Rosa Mexicano, which is a

7   restaurant, and the address given on the bank statement was

8   West 52nd Street.

9   Q.   Sorry.  What was the address?

10  A.   West 52nd Street in New York.

11  Q.   I believe it's 62nd?

12  A.   62nd Street.

13  Q.   Is that what you said?

14  A.   Yes.

15  Q.   I'm sorry, I thought you said 50.

16  A.   No, West 62nd.

17  Q.   Okay, thank you.  And to what source of funds was this

18  transaction traceable?

19  A.   This was traceable back to the third transfer, the $120,000

20  transfer.

21  Q.   Sorry.  I'm not sure if you said it.  What was the date of

22  this transaction?

23  A.   June 6th, 2014.

24  Q.   What's the transaction depicted on slide 40?

25  A.   Slide 40, it's a purchase at Havana Central, which the

1    address is 151 West 46th Street in New York, New York.

2    Q.   What was the date?

3    A.   June 8th, 2014.

4    Q.   To which transaction was this traceable?

5    A.   And again, this was traceable back to the $120,000,

6    transfer 3.

7    Q.   What's summarized on slide 41?

8    A.   Slide 41 summarizes sample activity from the PayPal.  So as

9    I had mentioned previously, some of the funds that I traced out

10   of the operating account went to pay payments for PayPal

11   purchases.

12   Q.   What was the source of funds for these transactions

13   depicted on slide 41 that you traced as going to PayPal?

14   A.   And these were payments that I traced as going to PayPal

15   that I was able to further identify who the third party was for

16   the PayPal expenses, and for those I've identified the first

17   two as being traceable back to the second transfer and, then

18   the next five transactions listed here as traceable back to the

19   third transfer, and then the last one as back to the fourth

20   transfer.

21   Q.   There is a green box to the left of the first dollar amount

22   listed.

23   A.   Yes.

24   Q.   What does that say?

25   A.   It says "example".  And what I've done is on the subsequent

1   slide I've provided more information about that as an example.

2   Q.  So let's go to that example.  What's depicted on slide 42?

3   A.  So slide 42 is additional information with respect to that

4   purchase, and it provides information that this was a purchase

5   made on e-Bay.  The seller was identified as Edit Building,

6   LLC, and it was for a purchase of an Apple Mac Pro, and the

7   shipping address was provided as 1 Sienna Drive, New Jersey.

8   Q.  What's depicted on slide 43?

9   A.  Slide 43 depicts a sample of check payments that were made

10  out of the account and that I was able to identify through the

11  documents who the third party was that the checks were made out

12  to.

13  Q.  What's depicted on slide 44?

14  A.  Slide 44 depicts one payment that was made out to a company

15  called Thrift Investment, and it was related to an auto loan

16  payment.

17  Q.  How much was the payment for?

18  A.  It was for $10,300.

19  Q.  Who was listed as the borrower on the loan documents?

20  A.  On the loan documents, Trevon Gross was listed.

21  Q.  And what was the loan for?

22  A.  It was a $19,000 loan for a Ford Excursion, year 2005.

23  Q.  What was the date of the $10,300 payment?

24  A.  It was June 24th, 2014.

25  Q.  And to which transaction was this traceable?

1    A.  The third.

2    Q.  What's depicted on slide 45?

3    A.  Slide 45 shows some examples of entertainment-related

4    expenses; three related to what appear to be movies, and then

5    one for Broadway show related.

6    Q.  And to which transactions were these?

7    A.  And all of these were traceable back to the third transfer.

8    Q.  Slide 46.  What is the sample activity depicted here?

9    A.  These depict a series of purchases made at a company called

10   Juice Basin, and this fell under the category health and

11   wellness.

12   Q.  To which transaction were these payments traceable?

13   A.  These were traceable back to the third transfer.

14   Q.  How much was traceable to the third transfer in terms of

15   juice?

16   A.  So shown on this slide, it's $1,154.41 in aggregate.

17   Q.  Slide 47, what's depicted here?

18   A.  This depicts another purchase that was traceable back to

19   the third transfer, and it's for a 90-minute Shiatsu massage at

20   Tao Massage in Asbury Park, New Jersey.

21   Q.  What date?

22   A.  June 27, 2014.

23   Q.  Who was the customer for the massage?

24   A.  Listed on the receipt, it's Trevon Gross.

25   Q.  What's depicted on slide 48?

A.  Slide 48 shows sample activity involving purchases from
Apple, and this includes both a physical Apple store, as well
as online purchases.

Q.  And how much in total were you able to trace to purchases
at Apple?

A.  I was able to trace $4,213.96.

Q.  And from what transactions were those funds traceable?

A.  Again, these were traceable to the third transfer.

Q.  What's depicted on slide 49?

A.  And slide 49, I provided excerpts from the invoice for one
of the purchases from Apple, and it shows some of the products
that were purchased.

Q.  And what were the products purchased on what's been labeled
invoice A?

A.  So the first $99 purchase is indicated as Apple Care for
iPad, the second one for $69 is indicated as a smart case black
for an iPad Mini, and the last entry for $829 indicates a
128-gigabyte gray iPad Mini wi-fi.

Q.  What's depicted on slide 50?

A.  Slide 50 shows another invoice for some of the other
purchases that were made at the Apple store.

Q.  Let's keep going.

A.  Okay.

Q.  What's depicted on slide 51?

A.  And slide 51 shows college admission related payments that

1    I was able to trace back.

2    Q.  How much did you trace back to college admissions?

3    A.  In total, $230.

4    Q.  And to which transaction were those traceable?

5    A.  These were the third transfer.

6    Q.  What's summarized on slide 52?

7    A.  Slide 52 summarizes the cash withdrawals that I identified

8    as traceable back to the transfers.

9    Q.  You testified earlier that there were some ATM withdrawals

10   and teller withdrawals; is that correct?

11   A.  That's correct.

12   Q.  How was that indicated on this slide?

13   A.  So on this slide in the bulleted list you see "ATM" or

14   "withdrawal" listed.  So the teller withdrawals are indicated

15   as a "withdrawal", and then ATM as "ATM".

16         And I've also, for all of the ATM withdrawals, I've

17   indicated with a key using the light blue boxes the address

18   indicated for the ATM from which those withdrawals were made.

19   Q.  For the ATM withdrawals, were you able to determine from

20   the records you had who made the ATM withdrawals?

21   A.  No, I was not.  There was not information.

22   Q.  How about for the teller withdrawals?

23   A.  For the teller withdrawals, I was.

24   Q.  So what's depicted on slide 53?

25   A.  So this is one of the teller withdrawals, and it was for

1    $1,355, and this slide depicts the withdrawal ticket from PNC

2    Bank for that withdrawal.

3    Q.   And who made the withdrawal?

4    A.   It was made by Trevon Gross, as indicated in the check that

5    it was made out to Trevon Gross -- in the ticket it was made

6    out to Trevon Gross.

7    Q.   And what was the date of the withdrawal?

8    A.   And the date was June 25th, 2014.

9    Q.   What's depicted on slide 54?

10   A.   And slide 54 depicts another purchase that was made for a

11   company called Seasonal World.

12   Q.   Did you ever see any invoices relating to Seasonal World?

13   A.   I did see some invoices related to Seasonal World.

14   Q.   From those invoices, did you observe what type of company

15   Seasonal World is?

16   A.   It appeared to be a company that services swimming pools.

17   Q.   Let's turn to the next set of transactions that you

18   analyzed.  Let's start with transfer number 5.  What was that

19   transaction?

20   A.   Transfer number 5 was what was called a phone transfer for

21   $1,500, and it was made to Hope Cathedral's member account at

22   HOPE FCU on October 6, 2014.

23   Q.   And this is a different account than the Hope Cathedral

24   operating account that we were just talking about with respect

25   to transactions 1 through 4?

1    A.   That's correct.

2    Q.   What's depicted on slide 57?

3    A.   Slide 57 shows an excerpt from the sender's bank statement,

4    and in this case the sender of the $1,500 was an account also

5    held at HOPE FCU in the name of Collectables Club, and it was

6    account number 6437.

7    Q.   And slide 58?

8    A.   Slide 58 shows the money being deposited into Hope

9    Cathedral's member account at HOPE FCU on October 6, 2014.

10   Q.   What was transfer number 6 that you analyzed?

11   A.   The sixth transfer was a $3,000 member transfer, also to

12   Hope Cathedral's member account at HOPE FCU, and the date was

13   October 7th, 2014.

14   Q.   What are we looking at in slide 60?

15   A.   Slide 60, what we're looking at is the bank record of the

16   sender, Collectables Club again, a Collectables Club account at

17   HOPE FCU.  And what I've shown here is the second line in the

18   excerpt is the transfer out to Hope Cathedral's member account,

19   and just prior to that there was an incoming transfer listed on

20   Collectables Club coming from a company called Kapcharge USA,

21   Inc.

22   Q.   What are we looking at in slide 61?

23   A.   Slide 61 shows Hope Cathedral's member account statement at

24   HOPE FCU, and it shows the receipt of the $3,000.

25   Q.   And then on October 8th, 2014, it appears that there was

1   some kind of transfer; is that right?

2   A.   That's correct.  So one day later, on October 8th, 2014,

3   there is a phone transfer from Hope Cathedral's savings account

4   to its sub -- the checking subaccount which, if you look at the

5   excerpt from the statement, the savings account is the portion

6   in the middle of the page, and then just above the first

7   excerpt box you can see there's a blue row that says "O30:

8   checking and scholarship", and then you see at the bottom I've

9   pulled out another except showing that the phone transfer in

10  fact was made to that subaccount.

11  Q.   So the money just went from the savings to the checking.

12  A.   Right.

13  Q.   What was the seventh transfer you analyzed.

14  A.   The seventh transfer was the $6,000 member transfer, again

15  made to Hope Cathedral's member account at HOPE FCU, and in

16  this case the date was November 24th, 2014.

17  Q.   What's depicted on slide 63?

18  A.   Slide 63 shows a Fedwire transfer out of an account held by

19  Collectables Club at Citibank, and it was wired to Helping

20  Other People Excel FCU in the amount of $6,000.

21  Q.   What was the date again?

22  A.   It was November 24th, 2014.

23  Q.   What's depicted on slide 64?

24  A.   Slide 64 depicts the recipient side of the incoming Fedwire

25  transfer for $6,000 on November 24th, and in this case it's

1    HOPE FCU's account at United Advantage.

2    Q.  Slide 65, what are we looking at here?

3    A.  And 65 shows the Fedwire details for this transaction.

4    Q.  What do the records show the incoming wire was supposed to

5    be -- where it was supposed to be sent?

6    A.  So you can see that I've pulled out some boxes indicating

7    the amount of $6,000, the sender, Collectables Club, the

8    recipient, Helping Other People Excel FCU, and then there's a

9    box on the right-hand side that says "with further credit to

10   account", and it gives the account number 6437000.

11   Q.  What are we looking at on slide 66?

12   A.  And then here we're looking at Collectables Club's member

13   account at HOPE FCU, which is the account number 6437, showing

14   an incoming wire on November 24th, 2014 in the amount of

15   $6,000.

16   Q.  So that series of transactions just shows a wire coming

17   from a Citibank account held in the name of -- I believe you

18   said Collectables Club; is that right?

19   A.  That's correct.

20   Q.  -- to ultimately the Collectables Club account at HOPE

21   Federal Credit Union?

22   A.  That's correct.

23   Q.  And what happened to the $6,000 after it went into the

24   Collectables Club account at the credit union?

25   A.  So what's depicted on slide 67 is that following the

1   deposit of the $6,000 into Collectables Club member account at

2   HOPE FCU, there is a series of transfers out of the account for

3   $6,000.  First, $6,000 was sent to a member account held in the

4   name of Trevon Gross, but that was sent back on the same day,

5   and then another transfer of $6,000 was made to Hope

6   Cathedral's member account at HOPE FCU.

7   Q.   And all of those transactions happened the same day?

8   A.   And all of them happened on November 24th, 2014.

9   Q.   What are we looking at at slide 68?

10  A.   Slide 68 is showing Hope Cathedral's member account at HOPE

11  FCU, and it's showing the receipt of the $6,000 on

12  November 24th, 2014, and it indicates, as you can see,

13  Collectables Club as the sender.

14  Q.   So transactions 5, 6, and 7, where did they all end up?

15  A.   They all ended up at Hope Cathedral's member account, 5170,

16  held at HOPE FCU.

17  Q.   And then what does slide 69 depict in terms of where the

18  funds went?

19  A.   And then the uses of those funds fell into three broad

20  categories which I've summarized on slide 69.

21          Direct payments, again that includes checks, debit

22  card purchases and other transfers out of the account, and that

23  totaled $4,617.73.

24          I also identified loan payments, and that totaled

25  $1,582.27.

1          Then I also identified a payment to reduce an

2     overdraft balance in one of the accounts, and that was for

3     $4,000 -- excuse me -- $4,300.

4     Q.  What are we looking at in slide 70?

5     A.  Slide 70 is showing one particular check that was made out

6     from this account at -- Hope Cathedral's account at HOPE FCU,

7     and it was made out to Trevon Gross for $2,000 on October 6th,

8     2014.

9     Q.  What's the check number?

10    A.  It's 3700.

11    Q.  What's depicted on slide 71?

12    A.  Slide 71 is an excerpt from Trevon Gross' account held at

13    PNC Bank, account number 1704, and it shows $2,000 being

14    deposited on October 6, 2014.

15    Q.  You said that this is Trevon Gross' account at PNC Bank?

16    A.  Yes.  So the records indicated that it was an account with

17    both Trevon Gross and, as you can see on the top left, Deon

18    Gross indicated as authorized account holders.

19    Q.  What was the transaction that occurred on October 6th that

20    you've highlighted here?

21    A.  So I've highlighted an ATM deposit in the amount of $2,000

22    on October 6th.

23    Q.  And was that the check that we saw on slide 70?

24    A.  Yes.

25    Q.  What are we looking at at slide 72?

1   A.   Slide 72 shows an excerpt from Hope Cathedral's bank

2   statement at HOPE FCU, and it shows the outgoing funds of

3   $2 million on October 7th, 2014.

4   Q.   What was the balance in the account prior to that check

5   being written?

6   A.   The balance in the account prior to the check being written

7   was -- I believe it's $1,288.19, but I'm --

8   Q.   It's pretty small, but I think that's --

9   A.   I think that's what it was.

10  Q.   Okay.  So was there enough money in the account to write

11  that check?

12  A.   So what happened is that on October 7th, 2014, two checks

13  were attempted to be processed; check 3700, which is the check

14  I just showed you, and then check 3101.  And what happened is

15  that the amounts of those checks were $2,000, and then $1,500,

16  and there was an insufficient funds problem for both checks,

17  and they were rejected initially.

18  Q.   What's depicted on slide 73?

19  A.   So slide 73 shows an excerpt from Hope Cathedral's member

20  account at HOPE FCU depicting what I was just describing where,

21  in particular, I'm highlighting the check 3700 and showing that

22  it attempted to clear on October 7th, 2014, but on the same day

23  it was reversed because the available balance was too low to

24  allow the check to clear.

25  Q.   Then what happened on October 8th, 2014?

1   A.  Then on one day later, on October 8th, it's reported that

2   there is a phone transfer in of $3,000.

3   Q.  And to what transaction was that $3,000 traceable?

4   A.  And that was traceable back to the transfer number 6.

5   Q.  And then what happened also on October 8th with respect to

6   check number 3700?

7   A.  And then what happened is that then, as you can see at the

8   bottom, and the reason why this is at the bottom is because it

9   was reported on the next page, so on the left-hand side, that's

10  the first page for that month's statement, and then on the

11  right-hand side, that's the second page, and it shows that the

12  check then went through on that day.

13  Q.  What's depicted on slide 74?

14  A.  Slide 74 shows details from Hope Cathedral's member account

15  at HOPE FCU, and it shows for transfer 7 the $6,000 coming in

16  on November 24th, 2014, and then it shows four days later, on

17  November 28th, 2014, two phone transfers withdrawing funds from

18  the account.

19  Q.  What was the balance in the account before the $6,000

20  deposit?

21  A.  So before the deposit it was $30.78, which you can see, I

22  believe it's the third row down on the right-hand side of the

23  slide.

24  Q.  What's depicted on slide 75?

25  A.  Slide 75 shows -- so the first phone transfer that was made

1   on November 28th went to a business loan account, subaccount,

2   560, and it shows the incoming phone transfer in the amount of

3   $1,613.05, and as you can see, that paid down the balance in

4   that loan.

5   Q.   To be clear, who did this loan belong to?

6   A.   This was listed under Hope Cathedral's account at HOPE FCU.

7   Q.   What's depicted on slide 76?

8   A.   Slide 76 shows that second phone transfer that I talked

9   about on November 28th, 2014, and it shows it going into the

10  030 checking scholarship subaccount, also at Hope Cathedral's

11  HOPE FCU member account, and it shows the deposit of the

12  $4,300.

13  Q.   What did the deposit of $4,300 do with respect to the

14  balance in that account?

15  A.   And you can see on the right-hand side of the excerpt, the

16  balance in the account was negative prior to that, and it

17  simply reduced -- or made the negative amount smaller.

18  Q.   What is summarized on slide 77?

19  A.   Slide 77 is a summary, a high-level summary of the sources

20  and uses for transfer 5 through 7, and on the left-hand side

21  I've indicated the three transfers, and on the right-hand side

22  I've again, similar to what I did for transfers 1 through 4,

23  I've categorized the uses and provided a summary of that here.

24  Q.   How much was traceable to reducing the overdraft balances

25  in the account?

1    A.  That was $4,300.

2    Q.  How much was traceable to checks to Trevon Gross?

3    A.  That was $2,000.

4    Q.  How much was traceable to cash withdrawal?

5    A.  $503.

6    Q.  How much was traceable to meals, entertainment, and

7    shopping?

8    A.  $248.92.

9    Q.  Let's talk about the eighth transfer.  What did that

10   involve?

11   A.  The eighth transfer involved -- and I believe I mentioned

12   this earlier -- it involved the $50,000 Fedwire transfer HOPE

13   FCU's credit union account at United Advantage on December 2nd,

14   2014, and that transfer was returned one day after the initial

15   transfer.

16   Q.  So we'll walk through these slides quickly.  What's on

17   slide 80?

18   A.  Slide 80 shows a sender's bank statement, in this case the

19   Collectables Club account held at Citibank.

20   Q.  Where was the money going to?

21   A.  And it shows $50,000.  It indicates it's wired to United

22   Advantage.

23   Q.  What's on slide 81?

24   A.  And then slide 81 is an excerpt from HOPE FCU's United

25   Advantage account, and it shows the incoming transfer of

1    $50,000.

2    Q.   Slide 82.

3    A.   And then slide 82 shows the Fedwire details for this

4    transaction, and it shows the $50,000, it shows the sender --

5    or originator as Collectables Club, and it shows the name of

6    the beneficiary as United Advantage NW FCU.

7    Q.   What's depicted on slide 83?

8    A.   And then slide 83 shows HOPE FCU's -- it shows an excerpt

9    from HOPE FCU's statement for its United Advantage account, and

10   it shows the incoming -- actually, it shows the return of the

11   $50,000.

12   Q.   And slide 84.

13   A.   And then slide 84 shows a Collectables Club account at

14   Citibank receiving the return of funds on December 3rd, 2000 --

15   Q.   What's depicted on slide 85?

16   A.   And then slide 85 shows the Fedwire confirmation for the

17   return of funds.  As I've highlighted in the excerpt on the

18   left side of the slide, it indicates that it was a return wire,

19   and it indicates the wire from December 2nd, 2014.

20   Q.   So did you trace any uses of this $50,000?

21   A.   I did not, no.

22   Q.   Let's go to the last two transactions that you traced

23   beginning with -- well, why don't we talk about both of them,

24   number 9 and number 10.  What were those transfers?

25   A.   So both were transfers made to HOPE FCU's business checking

1   account, and it was held at Lakeland Bank which was formerly

2   known at Harmony Bank.  The first transfer 9 was dated May 5th,

3   2015, and it was for $50,000, and the second transfer 10 was on

4   October 9th, 2015, and it was for $30,000.

5   Q.  Slide 88, what's depicted here?

6   A.  Slide 88 is showing a deposit of $50,000 into an account

7   held at HOPE FCU in the name of Kapcharge USA, Inc.

8   Q.  Slide 89?

9   A.  And then this is the same statement but it's -- I'm showing

10  a different part of the statement, showing that following that

11  deposit of $50,000, on April 28th, 2015, there are two ACH fees

12  charged by the credit union, both in the amount of $25,000.

13  Q.  So the $50,000 and then the two $25,000 payments in the

14  Kapcharge account net out to zero, is that fair to say?

15  A.  The two $25,000 ACH fees net out to the $50,000 ACH, yes.

16  Q.  And those all occurred on the same day?

17  A.  They all occurred on the same day.

18  Q.  So transfer number 9, when did that occur?

19  A.  So transfer number 9 occurred on May 5th, 2015, and it was

20  a Fedwire transfer to HOPE FCU's account at Lakeland Bank,

21  formerly Harmony Bank.

22  Q.  Approximately how long after the Kapcharge transfers that

23  we just looked at did transaction number 9 occur?

24  A.  I believe it was approximately a week.

25  Q.  So the date, this is May 5th, 2015?

1    A.  Yes, May 5th, 2015.

2    Q.  What was the date of the Kapcharge transfers?

3    A.  That was April 28th, 2015.

4    Q.  What's depicted on slide 91?

5    A.  Slide 91 shows an excerpt from HOPE FCU's account at

6    Lakeland Bank, formerly Harmony Bank, and it shows a wire in

7    from, and it's indicated as HOPE FCU for $50,000 on May 5th,

8    2015.

9    Q.  And what was the prior balance in the credit union's

10   account at Harmony Bank before this $50,000?

11   A.  And as I've blown up, it's a little blurry, but it says

12   $3,435.13.

13   Q.  What's depicted on slide 92?

14   A.  And slide 92 shows wire advice information for the $50,000

15   Fedwire, and it shows the sender as being HOPE FCU, and it

16   shows the beneficiary, and it shows an ID D11007994.

17   Q.  Now, is it fair to say this shows basically the credit

18   union moving money between accounts of the credit union?

19   A.  Well, this shows money being sent into HOPE FCU's Lakeland

20   Bank account from HOPE FCU, and the sender number, the

21   031289272 was the routing number for HOPE FCU.

22   Q.  Okay.  So it's HOPE FCU sending money to its account at

23   Lakeland Bank?

24   A.  Yes.

25   Q.  What was the tenth transaction you analyzed?

1    A.  The tenth transaction was a transaction on October 9th,

2    2015, and it was in the amount of $30,000, a Fedwire transfer

3    to, again, to HOPE FCU's account at Lakeland Bank.

4    Q.  What's depicted on slide 94?

5    A.  Slide 94 shows two transactions that I identified that

6    occurred shortly before that transfer, and it was two ACHs sent

7    to Kapcharge USA, Inc.'s member account at HOPE FCU in the

8    amount of 25,000 and $5,000 respectively, and both of those ACH

9    transactions were dated October 9th, 2015.

10   Q.  What's depicted on slide 95?

11   A.  So slide 95 shows an excerpt from HOPE FCU's account held

12   at Lakeland Bank, formerly Harmony Bank, and it shows the

13   incoming Fedwire of $30,000 from -- again this is indicating

14   that it's from HOPE FCU, and it's dated October 9th, 2015.

15   Q.  And what was the prior balance in the account?

16   A.  The prior balance is indicated as $611.96.

17   Q.  Slide 96, what does this show?

18   A.  This shows the wire advice information for this Fedwire,

19   and it shows the amount of $30,000, it shows the sender, again,

20   the number indicated there 031289272, and then HOPE FCU, and

21   after that -- as the routing number for HOPE FCU, and then it

22   provides the beneficiary, and it provides a number D11007994

23   and 7994 is the account number for HOPE FCU's account at

24   Lakeland Bank, and then it provides the address and the name

25   Helping Other People Excel FCU.

1    Q.   What are you summarizing on slide 97?

2    A.   And then slide 97 I'm summarizing for transfers 9 and 10,

3    again, the broad categories of how those funds were then used.

4    Q.   How was the $80,000 used?

5    A.   I identified four main categories here.  The first is

6    payments to a company called Blues Youth City in the amounts of

7    $30,743.87, professional services for $13,187.50, and then

8    other, which included a variety of other transfers and

9    transactions, for $15,600.38.

10             Then in this case, there was an unused balance in the

11   account that remained at the end of the period for which I had

12   bank records, and that balance was $20,458.25.

13   Q.   What is summarized on slide 98?

14   A.   And then slide 98 shows the overall summary of the sources

15   and uses.  On the left-hand side it shows the uses for 9 and 10

16   being the wires for the 50 and the $30,000, and then the uses

17   of the funds on the right-hand side by category.

18   Q.   We just walked through those on the previous slide, the

19   summary?

20   A.   Yes.

21   Q.   So let's switch gears a little bit.  In addition to

22   analyzing the ten transactions involving the Hope Cathedral

23   accounts, what, if anything, did the government ask you to do

24   with respect to this case?

25   A.   So one of the analyses that the government asked me to do

1    was to perform some analysis of activity involving bank

2    accounts held by Collectables Club, Collecting Club, and

3    Currency Enthusiasts.

4    Q.  What is depicted on slide 100?

5    A.  Slide 100 shows -- the information on the left-hand side

6    shows the various accounts that the government asked me to look

7    at with respect to this analysis for Currency Enthusiasts,

8    Collectables Club, and Collecting Club.  And you can see that

9    there's a number of accounts held at Bank of America, Citibank,

10   Chase, Tampa Bay Federal, and Regents Financial.  And it

11   provides a column that lists all the account numbers for those

12   accounts, and then the date range that I analyzed.

13          And then on the right-hand side of the chart I show

14   the total in-flows and out-flows, and then in some cases there

15   was an ending balance in the account.

16   Q.  What was the total in-flows into the various accounts

17   associated with Currency Enthusiasts, Collectables Club, and

18   Collecting Club?

19   A.  So altogether, as shown at the bottom of the chart on slide

20   100, there was an aggregate amount of in-flows during the

21   periods that I analyzed totaling $6,379,790.24.

22   Q.  And what was the period of time that was covered by your

23   analysis of the bank records that were available to you?

24   A.  So for each account, it varied depending on the period in

25   time in which there was activity and for which I had records.

Generally, it covered from -- if you look at the first row, it
starts April 30th, 2013, and if you look at the last row, the
last date is July 24th, 2015.

Q.  What was the total out-flow from those accounts during that
time period?

A.  Total out-flow was $6,309,840.71.

Q.  What's summarized on slide 101?

A.  So within that analysis I was asked to look for payments to
one particular company, and the company was named Intelligent
VR, LLC.

Q.  And how much did Intelligent VR receive out of the bank
accounts that we were just talking about?

A.  So I identified payments from Collectables Club account in
the amount of $17,390.36 and from Currency Enthusiasts in the
amount of $5,000.  And additionally, I identified payments to
Intelligent VR from Anthony Murgio in the amount of $5,722.36.

Q.  Were those, based on your separate examination of bank
records, associated with Anthony Murgio personally?

A.  That's correct.

Q.  And what's summarized on slide 102?

A.  So slide 101, I provided the aggregate amounts for each of
those senders that were sent to Intelligent VR, and in this
case, on slide 102, I provided details on the individual
transactions that comprised that summary.

Q.  And in conducting your analysis, did you review any other

1   records associated with these payments?

2   A.  Yes.  So many of these payments were ACH payments, so I

3   reviewed a series of ACH records that contained some of the

4   transactions.  And as I've indicated in the chart, you see that

5   there's four transactions; one on August 8th, 2014, another on

6   September 2nd, 2014, one on October 2nd, 2014, and then finally

7   on October 30th, 2014.

8          For those four transfers I identified in the ACH

9   records the recipient, instead of being identified as

10  Intelligent VR, it was identified with the name Yuri Lebedev.

11  Q.  Okay.  Let's switch gears again and go to the final part of

12  your presentation, I believe; is that right?

13  A.  That's correct, yes.

14  Q.  So you talked about at the beginning that you performed a

15  location analysis; is that right?

16  A.  That's correct.

17  Q.  Can you explain to the jury what you mean by "location

18  analysis".

19  A.  So what counsel for the government asked me to do is to

20  take a look at the records, both with respect to the Hope

21  Cathedral and Trevon Gross credit cards, as well as for the

22  accounts associated with the Currency Enthusiasts, Collectables

23  Club, and Collecting Club, to identify transactions for which

24  location information was reported.

25          So for example, if it's a credit card expense or

1    credit card purchase, if there's indications of the location of

2    the vendor for which that purchase was made.

3    Q.  Just backing up to slide 100, the summary of the various

4    bank accounts associated with Collectables Club and other

5    entities, did you find whether Anthony Murgio was a signer on

6    any of those accounts?

7    A.  I believe I did, but I don't recall which one.

8    Q.  You'd have to look at the underlying records?

9    A.  I'd have to look at --

10   Q.  The account opening records?

11   A.  Yes.

12   Q.  Sorry.  Okay.  So let's begin with the location analysis

13   relating to --

14          MR. KLINGEMAN:  Before we go there I have an objection

15   specifically to slide 104.

16          MR. NOBLE:  Can we take that down from the jury,

17   Ms. Grant?  I'll bring up 104 for just the parties.

18          THE COURT:  Grounds, Mr. Klingeman?

19          MR. KLINGEMAN:  There's no basis for the headline.

20          MR. NOBLE:  I can lay a foundation, your Honor.

21          MR. KLINGEMAN:  That's not true, your Honor, for the

22   subsequent slides, but it's true for this slide.

23          THE COURT:  Can Ms. Grant redact for this slide

24   given -- for this slide redact the --

25          MR. NOBLE:  Sure.  We'll move on, and we can redact

1     this one before it's published to the jury.

2              THE COURT:  All right.

3              MR. NOBLE:  Let's go to slide 105.  Can we bring that

4     back up for the jury?

5              THE COURT:  Which is before -- Mr. Klingeman, I

6     understand you to say you don't have the same objection for

7     this one.

8              MR. KLINGEMAN:  Your Honor, just to be clear, subject

9     to what we talked about earlier, I do not have an additional

10    objection to 105 through 112.

11             THE COURT:  Thank you.

12             Go ahead.  You may publish 105.

13    BY MR. NOBLE:

14    Q.  What were you asked by the government to do with respect to

15    the location analysis for Mr. Gross' transactions?

16    A.  So again, I was asked to look at the bank records for the

17    bank accounts that I had access to, as well as the credit cards

18    accounts that I had access to, which I had talked about earlier

19    in my testimony, and to look for transactions in which there

20    was location information provided in the descriptions.

21    Q.  Were you asked to limit the location to any particular

22    location?

23    A.  I was asked to look specifically with respect to

24    transactions where the information indicated New York,

25    New York.

1    Q.  So what did you find overall with respect to the analysis

2    of Mr. Gross' financial records?

3    A.  So in my analysis, there were transactions for which there

4    was location information, but then there were also a number of

5    transactions for which there wasn't location information.

6           So based off of the transactions for which there was

7    information provided that indicated location, I was able to

8    identify what appeared to be three periods of activity in

9    New York, and that's what I've depicted on the slide.  I'm

10   sorry, seven periods of activity.

11   Q.  Was your analysis limited to transactions that were

12   traceable to the ten transactions that you testified about

13   earlier?

14   A.  No, it was not.

15   Q.  So this was, to be clear, any transaction that you saw in

16   Mr. Gross' financial records for which there was location data

17   indicating a New York, New York connection.

18   A.  That's correct, which included both transactions relevant

19   to the traceable plus other transactions that weren't.

20   Q.  So let's begin with the first period.  What was the date in

21   that period?

22   A.  So the first period involves transactions where there's

23   location information in New York, and all of those transactions

24   were dated May 3rd, 2014.

25   Q.  What was the date of the second period?

1    A.  It was May 8th, 2014.

2    Q.  What were the transactions on that date?

3    A.  There is a $52 purchase at a Show Biz Parking, and there

4    was a $15 purchase at Imperial Theater.

5    Q.  What was the period covered by period number 3?

6    A.  Period number 3 was June 6, 2014 to approximately

7    June 13th, 2014.

8    Q.  Why do you say "approximately"?

9    A.  So from the records there were transactions that occurred

10   both on June 12th and June 13th where there's information that

11   indicated a location in New York.  However, based off of my

12   review of the records, it wasn't clear as to whether or not

13   those may have been delayed postings or delayed clearing of the

14   transactions.  I identified information that the card was used

15   on June 12th, 2014 to check into a hotel in New Jersey, which

16   indicated that it's possible that on the 13th the user was no

17   longer in New York.

18   Q.  So what transactions did occur during this time period?

19   A.  So during this time period, I identified hotel expenses for

20   Marriott Marquis, and those were dated June 7th through

21   June 10th, 2014; I identified meals, and the meals ranged in

22   dates from June 6th, 2014 to June 12th, 2014; and then I

23   identified two taxi expenses on June 7th and June 13th, 2014.

24   Q.  Let's just back up again.  You have in the bottom

25   right-hand side a couple bullets.  What is written there?

1    A.  So on the bottom right there it indicates that two of these

2    purchases, the Rosa Mexicano and Havana Central, if you recall,

3    were traceable back to the third transfer that I was asked to

4    look at.

5    Q.  What was the period of time covered in period 4?

6    A.  And period 4 was November 23rd to November 24th, 2014.

7    Q.  And what transactions did you see on those dates?

8    A.  As indicated on the slide, a series of purchases at

9    shopping stores.  So Thomas Pink, Apple, and Saks Fifth Avenue,

10   as well as meals on the 23rd and 24th, and hotel expenses on

11   the 23rd and 24th.

12   Q.  What period of time was covered in period 5?

13   A.  And period 5 was December 23rd, 2014.

14   Q.  And what transactions did you see on that date?

15   A.  I saw two purchases at what appeared to be stores, American

16   Eagle Outfitters and Niketown New York, as well as a taxi

17   charge on the 23rd.

18   Q.  What time period is covered in period 6?

19   A.  Period 6 is February 12th to February 14th, 2015, and

20   February 17th, 2015.

21   Q.  What transactions occurred on those dates?

22   A.  There were hotel expenses, meal expenses, taxi expenses,

23   and there was a cash withdrawal on February 17th, 2015.

24   Q.  What period of time is covered in period number 7?

25   A.  Period number 7 is April 24th to April 29th, 2015.

1    Q.  What transactions occurred in that period?

2    A.  There were purchases at Marriott Marquis Hotel, purchases

3    at B&H Photo Video, there was a meal purchase at Carmine's, and

4    there were a limo service on April 24th, 2015.

5    Q.  Let's switch to the location analysis that you performed

6    with respect to Anthony Murgio and the various bank accounts

7    associated with Collectables Clubs and the related entities.

8    Which accounts did you use to conduct this analysis?

9    A.  So for the Anthony Murgio analysis, there were five debit

10   cards in which I identified records that indicated location

11   information.

12   Q.  And those were summarized on slide 113?

13   A.  Those are summarized on slide 113.

14   Q.  Let me back up a second.  With respect to the location

15   analysis that you performed for Anthony Murgio, was that

16   limited to New York or did it include transactions that

17   occurred in other places?

18   A.  It included other locations, as well.

19   Q.  So let's start with New York.  How many periods of activity

20   on the debit card transactions that you looked at occurred in

21   New York?

22   A.  I'm sorry.  Can you repeat that?

23   Q.  I'm sorry.  That was a little convoluted.

24          For how many periods of time did you identify where

25   there was debit card activity in New York for Anthony Murgio?

1    A.  As shown on slide 114, I identified 14 separate periods.

2    Q.  14 or 15?

3    A.  I'm sorry, 15.  15 separate periods.

4    Q.  And those periods of time are summarized here on 114?

5    A.  Those periods are summarized on slide 114.

6    Q.  We're not going to walk through each one, but what were

7    some of the examples of transactions that you saw on those

8    dates?

9    A.  So what I provided here is just an overview of some

10   examples, not necessarily for each period, but just overall.

11           There was a large purchase, $5,181.50, at

12   Tiffany & Co., purchases at Stanton Social, various other

13   restaurants, there was a purchase at Macy's for $139.69, and

14   then, as you can see, various times taxi services were used.

15   Q.  Did you look at transactions that Anthony Murgio conducted

16   in Lakewood, New Jersey?

17   A.  Yes, I did.

18   Q.  And how many periods of activity did you identify?

19   A.  I identified what appeared to be one period.

20               (Continued on next page)

21

22

23

24

25

1    BY MR. NOBLE:

2    Q.  What was the period of time?

3    A.  November 25th, 2014, to December 1st, 2014.

4    Q.  What were some of the transactions you saw in that period

5    of time?

6    A.  That included hotel expenses at Best Western, the expense

7    at a restaurant, LIS Garden Restaurant, and a purchase at

8    7-Eleven.

9    Q.  How about any transactions in Moscow, Russia?

10   A.  I identified what appeared to be six periods of activity

11   involving purchases in Moscow, Russia.

12   Q.  Are those summarized on slide 118?

13   A.  Those are summarized on slide 118.

14   Q.  What are some of the examples of transactions you saw in

15   Moscow?

16   A.  And those examples included purchases at restaurants, bars,

17   hotels, and car rental purchases.

18   Q.  Any transactions that you identified as having occurred in

19   Montreal, Canada, for Anthony Murgio?

20   A.  Yes.

21   Q.  How many periods of time did you identify associated with

22   Montreal?

23   A.  I identified what appeared to be six periods of activity,

24   and I've summarized those on slide 120.

25   Q.  What were some of the examples of transactions you saw in

H37KLEB5                        Rollins - direct

1   Montreal?

2   A.  Some of the examples, again, included purchases at

3   restaurants, hotels, what appeared to be beauty or -- other

4   beauty salon or a beauty store, La Clinique, and taxi/limousine

5   services.

6   Q.  Any transactions identified in Tel Aviv, Israel, for

7   Anthony Murgio?

8   A.  Yes.

9   Q.  How many periods of time did you find?

10  A.  I identified what appeared to be two periods of activity,

11  and I have summarized those on slide 122.

12  Q.  In general, what type of transactions did you see there?

13  A.  Generally, food, hotel, and car services.

14          MR. NOBLE:  No further questions.

15          THE COURT:  All right.  There was one that we paused

16  on, Mr. Klingeman.  The jury's lunch is here, so we'll send

17  them to lunch, and then if we need to come back to that, we

18  can.

19          Members of the jury, your lunch is here.  I do want

20  to -- I think, realistically, both because counsel and I have

21  some matters to discuss, and I'm going to let them grab a

22  granola bar at least, I think, realistically, we'll get you

23  back in 45 minutes, and let you know you have that time.  Thank

24  you so much.  See you in 45.

25          (Continued on next page)

 1                (Jury not present)

 2                THE COURT:  Mr. Rollins, you may step down for the

 3     lunch break, and I will ask that you be outside the courtroom

 4     in 45 minutes, so that we can resume.  Thank you.

 5                THE WITNESS:  Thank you, your Honor.

 6                (Witness temporarily excused)

 7                THE COURT:  Mr. Klingeman, did you want to take up

 8     that one slide?

 9                MR. KLINGEMAN:  Yes, I have two points to make.

10                THE COURT:  Can you remind me of the number, please?

11                MR. KLINGEMAN:  Slide 104 in Government Exhibit 900.

12                THE COURT:  Thank you.

13                Go ahead.

14                MR. KLINGEMAN:  Your Honor, the headline on the slide

15     is "Location Analysis, Trevon Gross, New York, New York."  And

16     then there's a list of account types and other bank-related

17     information.  There is no indication how this information

18     relates in any way to placing Mr. Gross in New York, in

19     contrast to the slides that follow it.  What I infer is that

20     these banks or financial institutions have some presence in

21     New York, and perhaps that's what the government is suggesting

22     is the link, but I don't see it.  And it's certainly not clear

23     from either the testimony or the slide itself.

24                MR. NOBLE:  We'll redact the New York, New York.

25                THE COURT:  Okay.  Does that do it, Mr. Klingeman?

1              MR. KLINGEMAN:  I'd like the slide itself removed

2    because without the header line, it's utterly meaningless.

3              MR. NOBLE:  Well, what this is -- I can redirect on

4    this -- these are the account records from which the location

5    analysis was derived.  These are just the bank statements of

6    credit card statements that he looked at to conduct the

7    analysis that follows.

8              And --

9              MR. KLINGEMAN:  We certainly have testimony on that

10   point.

11             THE COURT:  Well, I assume that the underlying

12   exhibits, 800-B, 814, 811, 813-A, bear that out.  I see, it's

13   just that it's going to explain what follows?

14             MR. NOBLE:  Yes, exactly.

15             THE COURT:  Well, if there's testimony -- so, you can

16   show it to the witness and lay a foundation.

17             MR. NOBLE:  Should I reopen the direct just to lay the

18   foundation, or should I do it on redirect?

19             THE COURT:  Well, I actually was trying to stop you

20   before you ended.

21             MR. NOBLE:  Oh, sorry.

22             THE COURT:  Because you had proposed a limiting

23   instruction.

24             MR. NOBLE:  I think we can still deliver that when the

25   jury comes backs, perhaps before Mr. Klingeman starts his

 1    cross, or I can reopen my direct, and then I can lay the
 2    foundation for this slide, we can show it to the jury after
 3    it's been redacted, and then I can ask the Court to provide the
 4    limiting instruction that the parties have agreed upon at that
 5    time.
 6            THE COURT:  All right.
 7            Mr. Klingeman?
 8            MR. KLINGEMAN:  I just wanted to make one other point
 9    for the record.  Your Honor had made a finding, in support of
10    admitting the evidence, that there would be no prejudice to the
11    defense, the Defendant Gross.  I would specifically point to
12    slides 38, 77, and 98, in which this witness purports to make a
13    dollar-for-dollar correspondence between sources of funds and
14    the expenditure of funds, and that evidence is unduly
15    prejudicial, given the fact that it's based on this arbitrary
16    selection of the FIFO method instead of direct tracing method
17    he testified about.  So, I just want to make that point.
18            THE COURT:  Okay.
19            Mr. Noble, anything you want to say?
20            MR. NOBLE:  No.  Just we would rely on our prior
21    argument in support of -- that this is just an assumption that
22    he applied, and it's fair game for cross-examination for
23    defense to try to undermine the analysis.
24            THE COURT:  It certainly can be crossed on, and, as I
25    said earlier, I'm happy to hear if the defense would like to

1    bring in some comparable summary witness.

2             I wondered if, in the limiting instruction, the issue

3    might be further addressed, too.  So here's what I'll

4    suggest -- and it's derived from a Sixth Circuit -- it combines

5    what you had proposed and then is derived from a Sixth Circuit

6    case, I think I can get you the cite, but the instruction would

7    read -- or I would read:  "The slides prepared by Mr. Rollins

8    are not evidence, but, rather, an aid to the jury.  It is for

9    the jury to determine for itself whether the slides fairly and

10   accurately summarize the underlying evidence."  That's what you

11   had proposed this morning.  "Further, you heard the witness

12   testify that he applied a particular accounting method in

13   preparing some of these slides.  The witness testified that he

14   was instructed by the government to apply this method.  This is

15   an opinion witness, not an expert witness.  You should not in

16   any way rely on the witness' testimony to establish that the

17   accounting method was itself a proper one.  The witness was

18   offered solely to help the jury apply the method and not in any

19   way to determine whether this method, rather than others, is

20   the most helpful in understanding the evidence."

21             MR. NOBLE:  We have no objection to that, your Honor.

22             THE COURT:  Mr. Klingeman?

23             MR. KLINGEMAN:  I certainly don't have any objection

24   to it.  If I could --

25             THE COURT:  Look at it?

1           MR. KLINGEMAN:  -- respectfully request a hard copy.

2           THE COURT:  No, absolutely.  I have the same issue,

3     especially after a long trial, when I'm out in the world

4     talking to people, I look down as if there will be a LiveNote

5     there because I didn't catch what they say.  My clerk will

6     print copies.  And I'm open to suggestions on language.

7           I don't know that we need to do this right now.  I do

8     want to state my reasons for the order with respect to the

9     ruling with respect to Ms. Beyer.  I can do that when we come

10    back from lunch.  Are there -- maybe we can get an update in

11    the meantime?

12          MS. CHOI:  That's why I'm here, your Honor.

13          THE COURT:  Could you pull up the microphone?

14          MS. CHOI:  Okay.

15          So, I spoke this morning with general counsel at DHS,

16    who ran it up their internal chain in the counsel's office.

17    They indicated a few things I wanted your Honor to know in the

18    context of your ruling or your potential ruling, although I

19    think we know sort of the contours of it, generally speaking.

20          They made the point to me that I thought was one that

21    I should relay to the Court, which was that they believe that

22    if there had been an investigation, one way or the other, of

23    Ms. Beyer through the general course, that she would not have

24    been aware of that, because it's part of Secret Service's

25    general means to deal with disciplinary issues, that they don't

1    inform the person immediately that that's what's going on, they

2    try to do other types of analysis.  And I think given that

3    circumstance, and given your Honor's prior inclination, that

4    the efficacy of whatever the government or the Secret Service

5    may have done to follow up on this issue would be outside the

6    purview of the jury.  I think this is just another reason why

7    that witness would not have personal knowledge as to that.

8          So they saw no reason to have any problem with her

9    testimony with regard to the one limited function, which I

10   explained to the general counsel's office would be establish

11   the contours of what she did discuss with Jose Freundt, to the

12   best of her recollection, about his status as an employee, what

13   she does not recall, which is having a specific conversation

14   about the bank accounts or the past payments, and that she

15   would not have instructed him to go and take the money out of

16   the account.

17         So that's what I represented to general counsel that I

18   expected the contours of the testimony would be limited to.

19   Given that circumstance, they said they didn't see any issue

20   with it.  We've also talked to Ms. Beyer about her

21   availability, and by that I mean not myself, but a Secret

22   Service agent who has been helping in this process, and that

23   agent has reported back that she is attempting to get on a

24   5:45 a.m. flight tomorrow morning, which would land her in

25   Newark at approximately, I think, 11:00, so that she would come

1    straight to the courthouse afterwards.

2              She is having a medical procedure this afternoon, but

3    she hopes to be able to make that happen, and I think she

4    understands that it's the Court's wish that she get here as

5    quickly as possible.  She's making every effort for that to

6    occur.

7              THE COURT:  All right.

8              MS. CHOI:  I don't take, from what your Honor said

9    earlier, that we would need any other witnesses, either

10   Mr. Wozniak or Mr. Jarrow.  I note again that the government's

11   position with regard to Mr. Wozniak would be tangentially --

12   well, it would be relevant, but it would only add a little bit

13   more to what would already be well-established with Ms. Beyer

14   and would be otherwise cumulative.  And with regard to

15   Mr. Jarrow and with regard to any other questions they might

16   ask of Ms. Beyer, the government would note that its position

17   is that that would be beyond the scope of what it understands

18   the Court's inclination to be, and it has good-faith reasons to

19   assert that that would not be properly within the purview of

20   the jury.

21             THE COURT:  That sounds consistent with where I am.

22   I'll give, just in terms of the scope of what's anticipated, a

23   last opportunity to make an argument for something broader than

24   what we have now discussed.

25             MR. CREIZMAN:  No, your Honor.

1           THE COURT:  Mr. Klingeman?

2           MR. KLINGEMAN:  No, we're content with that, as I've

3     indicated.

4           THE COURT:  All right.

5           So I am here addressing what has come in as the

6     government's motion to preclude the defendants from admitting

7     extrinsic evidence to contradict a statement made by Jose

8     Freundt that a government agent told him that he could take,

9     quote, a nice little bonus, end quote, from the bank account of

10    Coin.mx before it was shut down for illegality activity.

11    That's the trial transcript at 2148.

12          The government contends that such extrinsic evidence

13    would not be admissible to impeach a witness' credibility

14    pursuant to Federal Rule of Evidence 608(b).  The government

15    did note that extrinsic evidence may be, "admissible for the

16    purpose of impeachment by contradiction," a rule -- and here

17    I'm quoting Ramirez -- "which operates as a limited exception

18    to Rule 608(b)."  And that's United States versus Ramirez, 609

19    F.3d 495 (2d Cir. 2010).

20          The government argued, however, that the exception is

21    not available here because, first, Freundt testified about the

22    agent's statement on cross-examination, not in direct, and,

23    second, that the issue is insufficiently material.  Docket

24    No. 424 at 4.  I do disagree.

25          First, though, it is true that the Second Circuit has

1    never extended the impeachment by contradiction doctrine to

2    statements made by a witness on cross-examination, it has

3    explicitly noted that the question is an open one.  See Ramirez

4    at 499.  See also United States versus Shoreline Motors, 413 F.

5    App'x 322 (2d Cir. 2011).

6            Explaining why a Court might not extend this doctrine

7    to statements made on cross-examination, one treatise has

8    explained that a cross examiner is more able to open the door

9    for himself than is a direct examiner, and, thus, that cross

10   examiners could use leading questions to put words into the

11   witness' mouth and thereby trap him into saying something that

12   can be contradicted or they can dredge up any embarrassing

13   conduct in the witness' life, which he would be prone to deny,

14   especially if irrelevant to the issues in the case.  That's 28

15   federal practice and procedure evidence at Section 6119.

16           In this case, none of the reasons for restricting the

17   availability of the impeachment by contradiction rule to direct

18   examination apply to Freundt's testimony or to the defendants'

19   motion to admit extrinsic evidence to impeach it.  First,

20   defense counsel did not trap the witness into a false

21   statement.  Defense counsel did no more than ask the witness

22   about a statement he had verbatim made to the government in

23   previous interviews.

24           Second, the subject was hardly irrelevant to the

25   issues in this case; that is, whether Mr. Freundt was induced

by a government agent or suggested to by a government agent to

take money out of a Coin.mx bank account prior to the

government shutting Coin.mx down, is relevant to Mr. Freundt's

insistence in cooperating with the government and potentially

to Freundt's own behalf as to the legality of Coin.mx, an issue

potentially probative of Yuri Lebedev's knowledge.

          Finally, and relatedly, the statement, though,

elicited in cross was highly interrelated material the

government brought up on direct and, indeed, would have been an

appropriate topic for direct.  See trial transcript at 2141 and

at 1959 to 60.  In fact, it's not clear to the Court why the

government didn't raise the issue on direct, given its general

questioning designed to air any potential motivations on the

part of the witness to testify truthfully or otherwise.

          In light of these considerations, there is not a

justification to refuse to apply the impeachment by

contradiction rule simply because the particular purported

false testimony was elicited not on direct, but on cross.

          Second, the Court disagrees with the government that

the issue in question is not material.  The government does

cite to cases outside the Second Circuit for the proposition

that testimony sought to be contradicted must be material to a

defendant's guilt or innocence for the impeachment by

contradiction rule to be successfully invoked.  Docket number

434 at 4.  As an initial matter, these cases use the term

material not to mean the truth or falsity of the fact in

question, but must itself be significant to the issues at

trial, but that the use of the evidence to impeach the witness'

credibility must be sufficiently important to justify the

introduction of the evidence.  See United States versus

Benedetto, 571 F.2d 1246 (2d Cir. 1978).  I'm quoting:  "Once a

witness, especially a defendant witness, testifies as to any

specific fact on direct testimony, the trial judge has broad

discretion to admit extrinsic evidence tending to contradict

the specific statement, even if such statement concerns a

collateral matter in the case."

         The cases on which the government relies for its

materiality requirement, thus, do no more than subject the

evidence to Rule 403.  See United States versus Fonseca, 435

F.3d 369 (D.C. Cir. 2006), affirming that impeachment by

contradiction is a well-recognized tool for exposing a witness'

lack of credibility, but noting that rule of evidence 403

imposes, as it does for all evidence, restrictions on

admission.  A similar cite can be found at the First Circuit

case, United States versus Perez-Perez, 72 F.3d 224.

         Applying principles of Rule 403 to the evidence the

defense seeks to introduce, the Court determines that the

evidence probative value is not outweighed by its potential to

cause unfair prejudice, confuse the issues, mislead the jury,

cause undue delay, waste time or result in the needless

1    presentation of cumulative evidence.

2         First, Mr. Freundt's testimony is highly significant

3    to the government's case and touches on the guilt of both

4    defendants.  Evidence showing not only that Freundt, a key

5    cooperating witness for the government, did not tell the truth

6    on the witness stand, but specifically that he said something

7    not true about government agents telling him it was appropriate

8    to raid the bank account of a company about to be shut down for

9    illegal activity is highly probative.  See Fonseca, 435 F.3d at

10   375.

11        The second introduction of the contemplated extrinsic

12   evidence will not be highly disruptive or cause undue delay.

13   The government represents that Ms. Beyer, interviewed by a

14   fellow Secret Service agent on March 4th, 2017, represented

15   that she did not remember Freundt discussing salary and stated

16   unequivocally that she did not instruct Jose Freundt to remove,

17   transfer, or take money or Bitcoin from any Coin.mx-related

18   accounts.  The Court sees little danger that the trial would

19   evolve into an extended investigation of any collateral matter,

20   given the clarity and brevity of Ms. Beyer's contradicting

21   testimony.

22        In short, because the contemplated extrinsic evidence

23   is admissible to impeach the contradictory statement by Jose

24   Freundt, because the evidence is not barred by Rule 403, I will

25   allow it to come in.  The contours of what the Court considers

1   appropriate within the four corners of this ruling are

2   specifically as discussed.  Ms. Beyer will be called, and the

3   questions to be asked are very limited to extracting what she

4   recalls and what she would say about whether she encouraged and

5   suggested to Mr. Freundt that he help himself to a nice little

6   bonus from the bank account of Coin.mx before it was shut down.

7        So, there's that.  We'll break for lunch.  Will there

8   be matters to discuss about the next segment before we've got

9   cross and then the government intends to rest?

10       Oh, and, Mr. Noble, it is as we've discussed, you'll

11  come back, deal with the one exhibit.

12       MR. NOBLE:  I'll ask to reopen my direct.

13       THE COURT:  And I'll do the limiting instruction that

14  we got agreement on it.

15       MS. CHOI:  Your Honor, I think the only issue is, I

16  just want to confirm, since we haven't had an opportunity to go

17  through the defense exhibits, there are a few things that are

18  at play right now.  One is we need to confer with Mr. Lebedev's

19  counsel.  I don't know if the representation is still that

20  Mr. Lebedev is not going to testify, but we just want to go

21  through the exhibits that we were given earlier this morning

22  and note our objections prior to the start of the defense case.

23       Second, we're still receiving documents from

24  Mr. Gross' counsel.  I believe that those are the ones that are

25  responsive to the if-as-when subpoena.  We have specific

1    concerns about certain of those documents, which we can raise

2    with you, but we wanted to flag that, and the nature of that

3    production, mainly because -- things are moving quickly, but we

4    just got a working password for some of it, so we haven't even

5    been able to download and review at least part of that

6    production.

7             So I would just want to get a sense from defense

8    counsel what the order of witnesses would be with regard to

9    Mr. Gross' case -- well, confirmation from Mr. Lebedev's side

10   that the exhibits that they had already previously noticed to

11   us were sufficient, some sort of understanding as to the order

12   of Mr. Gross' witnesses as they anticipate, and whether or not

13   there would be any documents that would be necessary for them,

14   and the status of the decision of whether or not Mr. Gross will

15   be testifying, with that last one, both with regard to

16   Mr. Gross and with regard to Ms. Larkins being wrapped up in

17   these documents that we have yet to even review because we just

18   downloaded them.

19            THE COURT:  All right.

20            Mr. Creizman?  I think the first question is just, the

21   exhibits that you've provided to the government, where you are

22   now as to what Mr. Lebedev's defense case will be?

23            MR. CREIZMAN:  Oh, Mr. Lebedev is not going to

24   testify.  We're going to confer with the government about those

25   exhibits, and, hopefully, we can come to a resolution.

1          THE COURT:  And no additional exhibits beyond what

2     you've already provided them?

3          MR. CREIZMAN:  No, your Honor.

4          THE COURT:  Okay.

5          MS. CHOI:  Are you going to plan -- the other issue is

6     just whether or not you plan to publish to the jury or just

7     argue --

8          MR. CREIZMAN:  I do not plan to publish.

9          MS. CHOI:  Okay.  So I guess as to Mr. Gross.

10         THE COURT:  Mr. Klingeman?  It sounds like we're going

11    to get to Mr. Gross' defense case fairly quickly, follow

12    cross-examination?

13         MR. KLINGEMAN:  Yes.  I do want to note, however, at

14    the conclusion of the government's case, I would like to place

15    on the record my intent to move for a motion under Rule 29,

16    and, obviously, I'd want to do that outside the presence of the

17    jury.

18         THE COURT:  Yes.  Wherever we are when the

19    government's rest, I'll give the jury a break, and bases for

20    any motions can be made then.

21         MR. KLINGEMAN:  May I ask of the Court:  I would

22    simply make the motion as a placeholder and then deal with it,

23    so we can continue with the jury, but --

24         THE COURT:  That's fine with me.

25         Everybody agree?

1          MS. CHOI:  Sure.

2          MR. KLINGEMAN:  And then once the jury is summoned for

3     the defense case --

4          THE COURT:  Just to go back, do you mean you want

5     to -- after the government rests, we'll do a sidebar, and

6     you'll just state your objection?

7          MR. KLINGEMAN:  Exactly.  Just a brief --

8          THE COURT:  I'm sorry, state your placeholder motion?

9          MR. KLINGEMAN:  Yes.

10         THE COURT:  And --

11         MR. KLINGEMAN:  Making the motion, and preserving

12    argument, and having the Court reserve.

13         THE COURT:  Right.

14         MR. KLINGEMAN:  Once we resume, I anticipate that

15    Mr. Lebedev will stand and offer his exhibits and then rest,

16    and then we'll be ready to call three character witnesses we've

17    identified to the government, and then go right into the

18    testimony of Mr. Gross.  We're still waiting on the witness,

19    Loretta Larkins, but we're not going to hold up Mr. Gross,

20    obviously, for that.  And if Mrs. Larkins were to testify, she

21    would follow Mr. Gross, and then we would conclude with

22    Ms. Beyer tomorrow.

23         THE COURT:  Okay.  Mr. Creizman?

24         MR. CREIZMAN:  I'm sorry, your Honor.  In terms of the

25    likely Rule 29 motion that I will be making at the close of the

1    government's case, when would we --

2              THE COURT:  When the government rests, I'll call a

3    sidebar.

4              MR. CREIZMAN:  Okay.

5              THE COURT:  And you can, as Mr. Klingeman indicated he

6    would do a placeholder motion, and I will reserve.

7              So, Ms. Choi, with respect to what Mr. Klingeman just

8    said, any follow-up?

9              MS. CHOI:  Well, I think the issue we have is simply I

10   don't know if defense counsel intends to walk through exhibits

11   with Mr. Gross.  I don't know -- they haven't been identified

12   to the government as such.  We still haven't had an ability to

13   even look at the if-as-when subpoena return.  So I think we're

14   a little concerned that depending on the speed of which this

15   happens, we're not going to be able to even digest the

16   materials that were given to us prior to the cross beginning of

17   Mr. Gross.  Some of them are being literally returned within

18   the hour from Ms. Santillo, and we haven't been able to even

19   look at them because the password that was sent wasn't active.

20             MS. SANTILLO:  Your Honor, I sent the exhibits last

21   night, and these are the defense exhibits.  They should be

22   pretty easy to get through.  We did --

23             Did you get the new password?

24             MS. CHOI:  Yes, and we've downloaded.  I'm just saying

25   we haven't been able to look at it since --

 1              THE COURT:  Well, look now, and when we return from

 2     lunch, you'll let me know.

 3              MS. CHOI:  Sure, your Honor.  I just want to put --

 4              THE COURT:  You flagged it.

 5              MS. CHOI:  It's not one or two documents.  They're

 6     entire -- it's like hundreds of documents that have just been

 7     dumped on us.  So, I just want to reserve the government's

 8     rights to be able to look through it, given that it's untimely.

 9     We also believe that they would have been responsive to prior

10     subpoenas that have been served upon Hope Cathedral.

11              THE COURT:  Well, look, as I've said to Mr. Klingeman,

12     look at them, we'll deal with them.  I don't want to deal in

13     the hypotheticals.  You flagged it.  Look at them.

14              MS. CHOI:  Sure.

15              THE COURT:  And you have them now.  You let me know

16     what is needed.  But on the theory you can look at them, and we

17     can take them as they come, let me know if you have a specific

18     objection.

19              I let the jury out -- does anybody know what time it

20     was?

21              MR. KLINGEMAN:  About a quarter of.

22              THE COURT:  So it's now 1:00.  So I'll see you in 20

23     minutes, please.  Thank you.

24              MS. CHOI:  Your Honor, we'll do our best to review.

25              THE COURT:  Cub Scouts' motto.  (Luncheon recess)

```
 1                        AFTERNOON SESSION

 2                             1:29 PM

 3            (In open court; jury not present)

 4            THE COURT:  Anything that needs to be taken up in the

 5   immediate?

 6            MR. KLINGEMAN:  No, your Honor.

 7            MS. CHOI:  Your Honor, just a status of our review, or

 8   even looking at the Trevon Gross' production, the second

 9   production:  We haven't been able to see the first production,

10   which happened late last night.  The second production appears

11   to be a 500 megabyte PST file that we were able to download,

12   but cannot load, meaning we haven't even been able to open it

13   as of yet.  We have IT working on it as of now.  For your

14   Honor's edification, 500 megabytes is quite a large amount.

15   With regard to emails, it's half of a gig.  It depends on how

16   it's actually stored in terms of whether or not it contains

17   attachments or not, that we can actually see what the size of

18   that volume would be.

19            So, given, I think, the combination of the tardiness

20   of that and the fact that we haven't even been able to review

21   it prior to the beginning of the defense case, the government

22   would just ask that if we get to a point where Mr. Gross is

23   about to cross, or we're supposed to start cross, that we would

24   be able to have the ability to spend tonight to go through

25   those materials to make sure that we've had an opportunity to
```

1    review them, especially given -- and I think as we've already

2    noted to your Honor -- that there is a concern from the

3    government's perspective that these were documents that should

4    have been responsive to the Hope Cathedral subpoena that we had

5    issued, and that was due returnable at the beginning of trial,

6    for which we have not gotten adequate supplemental materials.

7         So we're just double-checking to see what the

8    situation is with regard to that.

9         MR. NOBLE:  We've also reviewed at least some of the

10   proposed exhibits by Mr. Gross, and most of the emails, we

11   would have hearsay objections to.  They may have a nontruth

12   purpose that they might offer or they may have an exception to

13   the hearsay rule that might apply, but from the face of it, a

14   lot of these are just hearsay.  So we would object to the

15   admission of those exhibits during the examination.

16        THE COURT:  All right.  Do you want to address the

17   basic hearsay objection, Mr. Klingeman?

18        MS. SANTILLO:  I can certainly address them.  I don't

19   know what specific exhibit they're referring to at this moment,

20   but there is a series of emails that show sort of communication

21   between Anthony Murgio and Michael Murgio about whether

22   they're, you know, kind of hiding things from Trevon Gross.

23   And I am not introducing it for its truth, I'm introducing it

24   to show their motive and their intent.

25        THE COURT:  You're introducing it to show what?

1          MS. SANTILLO:  Their motive and their intent to

2     deceive Pastor Gross.

3          THE COURT:  What's the relevance of their motive and

4     intent to deceive Pastor Gross?

5          MS. SANTILLO:  Because they were trying to get onto

6     the board of the Hope Cathedral under false pretenses.

7          MR. NOBLE:  Well, Judge, I think she means the credit

8     union.  But to the extent that's the proffer, is to the

9     relevance, then it's being offered for its truth.  It doesn't

10    go to Pastor Gross' state of mind, or to his motive, or for

11    some other proper purpose.  It's going to a hearsay purpose of

12    proving up what Anthony Murgio and Michael Murgio were saying

13    to each other, that they had communications behind Trevon

14    Gross' back, and that's the only purpose for which they would

15    be relevant.  And that's for the truth.  It's pure hearsay,

16    it's coconspirator statements.

17         THE COURT:  Well, it is coconspirator statements, so

18    it doesn't get in under that.  The question is, is it excluded

19    from being admissible here as nonhearsay or under another

20    exception.

21         Let's do this.  I appreciate you flagging it.  Let's

22    bring in the jury, because I told them we would, we'll finish

23    this witness, with cross-examination, we'll break at that

24    point, at least for the sidebar on the Rule 29, we can do the

25    character witnesses, and kind of see where we are, and whether

we begin with Mr. Gross' testimony.  It may be that we can

still have tonight to work these out or we take them one at a

time as they come.

          Thank you.

          MR. SHIN:  Your Honor, one other thing.  Mr. Creizman,

and Ms. Madrigal, and I --

          THE COURT:  I can't hear you.

          MR. SHIN:  Sorry.  So Mr. Creizman, Ms. Madrigal, and

I, we conferred.  We objected to certain exhibits on hearsay,

privilege, and other grounds.  My understanding is that

Mr. Creizman has agreed to withdraw those particular exhibits.

And to the remaining exhibits, we have no objection.

          MR. CREIZMAN:  That's correct, your Honor.

          THE COURT:  Thank you so much.

          Mr. Noble, can you give me a couple of examples of

the -- you said -- do I have marked defense exhibits?

          MS. SANTILLO:  I have -- they're in the

government's -- everything that I sent them last night is in

the government's production, and then I have a separate set of

defendants' exhibits.  So I don't know which ones he's talking

about right now.

          MR. NOBLE:  I have in my mind what defense counsel

just handed us, which I think are copies of what was produced

last night, TG40 through TG50.  I don't know if that's the

universe.  Maybe defense counsel can clarify.

1          THE COURT:  Do I have those?

2          MS. SANTILLO:  I'm sorry, I'm getting copies for you

3     right now.

4          THE COURT:  Oh, I didn't know if I had it in the

5     exhibit binder or not.  I don't recall seeing it.

6          I'll consider the examples while we're -- I'll start

7     looking at them while we're going.  But TG40 through 50 are

8     what --

9          MR. NOBLE:  TG40 through TG50 are examples of what's

10    in my hand.  Because I looked at what they sent last night, and

11    there seems to be some differences.  So I looked at what they

12    sent last night over the lunch break, and now I'm seeing what

13    appear to be new ones and different ones.

14         To a certain extent, a lot of these are

15    communications -- some of these are communications between

16    Mr. Gross and other individuals.  There may be a proper

17    nonhearsay purpose or exception, but a lot of these appear to

18    be -- we would have hearsay objections to.

19         There is also a TG48, it's what appears to be just a

20    strategic plan from HOPE FCU.  I'm not sure of the source of

21    that document.

22         TG49 is also a strategic plan dated June 30th, 2012.

23    Again, we don't know the source of that document, or if it's

24    been authenticated, or what the foundation would be.

25         And then TG50 is an email between Trevon Gross and

H37KLEB5

1    Rico Hill, to which I think we would have hearsay objections.

2    They appear to be hearsay on their face.  Although defense

3    counsel may be able to proffer some relevance, some nonhearsay

4    purpose that would be relevant or an exception to the hearsay

5    rule, but we have just not had that conversation with defense

6    counsel yet.

7         THE COURT:  I'll look at examples as we get underway.

8         MS. SANTILLO:  Do you want them right now?

9         THE COURT:  Yes, if you would hand them up.

10        MR. NOBLE:  Judge, in the meantime, the government

11   intended to --

12        THE COURT:  Just one second.

13        (Pause)

14        MR. NOBLE:  -- intended to offer three documents,

15   which are certified records from the bankruptcy of Charles

16   Blue, which are stamped, signed, and certified by the Clerk of

17   Court for the District of New Jersey, and we believe these are

18   self-authenticating under Section 902.2, at the very least, and

19   in addition, we believe they are relevant because they tend to

20   show that Mr. Blue was not someone who should have been

21   operating or been hired by Mr. Gross to operate the credit

22   union, as Ms. Flok testified that individuals with a bankruptcy

23   in their past would raise red flags if they were installed as

24   the CEO of a federal credit union.  And we believe this goes

25   to, again, the lack of due diligence performed by Mr. Gross

1   when installing various individuals into the credit union to

2   operate it, not just Mr. Blue, but also Rico Hill, who had a

3   number of criminal convictions.

4          So we believe this is relevant, and these documents

5   are self-authenticating.  For the record, they have been marked

6   Government Exhibits 865, 866, and 867, specifically the

7   bankruptcy filing, the order discharging the debtor, and the

8   final bankruptcy decree respectively.

9          THE COURT:  And just so I understand the posture,

10  you're seeking to put those in as part of the government's

11  case?  This is not about --

12         MR. NOBLE:  Yes, this is part of the government's case

13  before we rest.  So I wanted to raise it now.

14         THE COURT:  Let me make sure I get it.  They're

15  bankruptcy records of Mr. Blue?

16         MR. NOBLE:  Yes.

17         THE COURT:  And the proffered relevance, again, is?

18         MR. NOBLE:  That Mr. Blue had a bankruptcy, and he was

19  installed as the CEO of the credit union, to operate the credit

20  union, by Mr. Gross, and the defense opened on the fact that

21  during at least some of the period of time that's relevant

22  here, where the credit union had a relationship with Kapcharge,

23  that it was Mr. Blue who was running the credit union, making

24  the decisions about whether to do business with Kapcharge, how

25  to do ACH processing, getting the credit union up to speed with

1   respect to ACH processing, so they could resume for Kapcharge,

2   and this goes to the level of diligence that Mr. Gross did or

3   did not do in selecting individuals who are operating the

4   credit union.

5           Another example is --

6           THE COURT:  But it's not all diligence that's

7   relevant, right?  It's just --

8           MR. NOBLE:  But the defense opened on this, that

9   Mr. Gross was going to rely that Mr. Blue was running the

10  credit union, and this was an arm's-length transaction with

11  Kapcharge, and so to the extent any nefarious activity was

12  going on at the credit union, Mr. Gross was unaware of it

13  because Mr. Blue was the person in charge.

14          And this goes to the fact that Mr. Gross didn't do any

15  due diligence on the people who he brought into the credit

16  union to operate it.  It doesn't shield him from the

17  relationship that he had with -- the ongoing relationship,

18  ongoing conspiracy with Kapcharge, to operate the credit union

19  in a way that was essentially a captive institution for

20  Kapcharge.

21          THE COURT:  Okay.

22          Mr. Klingeman?

23          MR. KLINGEMAN:  Your Honor, we object.  Mr. Blue's

24  bankruptcy 16 years before the activities in this case is

25  irrelevant.  It's excluded under Rule 404 as character evidence

1  for the first stated purpose that the government offered; that

2  is, Mr. Blue was not competent to run the credit union when he

3  was brought in to run it.  And, further, it's irrelevant.

4          With respect to Mr. Gross' due diligence, there is no

5  indication from the evidence being offered -- that is, the

6  public records of the bankruptcy -- that Mr. Gross was aware of

7  it.  It's certainly grounds, I'm asserting provisionally, for

8  cross-examination of Mr. Gross about the due diligence he did

9  or did not perform with respect to all of these various people

10  that we've heard so much about, but getting back to our debate

11  about impeachment by contradiction, the bankruptcy records

12  wouldn't even be admissible to impeach Mr. Gross unless there

13  was some indication that he was aware of them, and he denied

14  being aware of them.

15          So, for all of those reasons, we object to this

16  evidence.

17          MR. NOBLE:  Well, Judge, it's relevant either way.

18  Either Mr. Gross knew about it and still hired Mr. Blue to

19  operate the credit union or he didn't know about it, and he

20  didn't do proper due diligence.

21          THE COURT:  What testimony is there that proper due

22  diligence would have, (a), established that there was a

23  bankruptcy 16 years ago; and (b), that despite a bankruptcy 16

24  years ago, one isn't otherwise qualified for the position?

25          MR. NOBLE:  Ms. Flok, from the NCUA, testified that

1    bankruptcy would raise a red flag that the credit union

2    officials -- I believe it was Ms. Flok or another NCUA witness

3    who testified that there was an expectation that if you're

4    operating the credit union, if you're operating ACH processing,

5    which Mr. Blue was going to be in charge of, that the credit

6    union has an obligation to run a background check on these

7    individuals.  It was the testimony that was relevant to

8    Mr. Hill because he was installed in Florida to operate the ACH

9    processing.  The same relevance applies to Mr. Blue, that he

10   was installed as the CEO of the credit union to operate the

11   credit union, to operate the ACH processing.  And so it goes to

12   whether or not credit union officials, including Mr. Gross, the

13   chairman of the board, did any due diligence on people they're

14   bringing into the credit union.

15            THE COURT:  I think the connection is too tenuous and

16   too much risk of prejudice.  There are too many steps in that

17   analysis that I don't think are there.  So on 401/403 grounds,

18   I sustain the objection.

19            We'll bring in the jury.

20            MR. KLINGEMAN:  Did we need the witness?

21            THE COURT:  Oh, we do.

22            Oh, actually, the limiting instruction.  Did you

23   review the limiting instruction?

24            MR. NOBLE:  We're fine with it, your Honor.

25            MR. KLINGEMAN:  As am I.

H37KLEB5

1              THE COURT:  Mr. Creizman, are you fine with the

2      limiting instruction?

3              MS. MADRIGAL:  Yes.

4              THE COURT:  Thank you, Ms. Madrigal.

5              You may take your seat, Mr. Rollins.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Thank you so much, ladies and gentlemen of

3    the jury.  I hope you had a pleasant lunch.

4              Mr. Noble.

5              MR. NOBLE:  Thank you, Judge.

6              Yes, I neglected to ask one question or a couple of

7    questions of the witness, so I move to reopen my direct

8    examination.

9              THE COURT:  Without objection?

10             MR. CREIZMAN:  No objection.

11             MR. KLINGEMAN:  No objection.

12             THE COURT:  Go ahead.  You may.

13             MR. NOBLE:  Thank you, Judge.

14             Can we bring up slide 104 just for the Court, the

15   attorneys, and the witness.  And this is slide 104 of

16   Government Exhibit 900.

17    JOHN ROLLINS, resumed.

18   DIRECT EXAMINATION CONTINUED

19   BY MR. NOBLE:

20   Q.  Do you see that on your screen, Mr. Rollins?

21   A.  I do, yes.

22   Q.  What does this slide summarize?

23   A.  This summarizes the bank account and credit card accounts

24   that were relevant to the location analysis that I performed,

25   for which I found purchases with location information reported.

1    Q.   For whom was that location analysis?

2    A.   And this was for the Trevon Gross location analysis.

3    Q.   On the subsequent slides beginning at slide 105 and going

4    forward, was the information on those slides derived from the

5    account information that appears on slide 104?

6    A.   Yes.

7              MR. NOBLE:  Your Honor, at this time, the government

8    would offer and seek to publish slide 104 of Government Exhibit

9    900.

10             MR. KLINGEMAN:  No objection.

11             MS. MADRIGAL:  No objection, your Honor.

12             THE COURT:  Thank you.

13             104 is admitted and available for publication.

14             (Government's Exhibit 900-104 received in evidence)

15             THE COURT:  I said 104.  900-104.

16             MR. NOBLE:  900-104.

17   Q.   Mr. Rollins, can you explain to the jury what's depicted on

18   this slide?

19   A.   Sure.  So, what I've depicted is a summary of the relevant

20   accounts.  On the left-hand most column, I've indicated the

21   type of account.  So, the first one was the checking account,

22   but the other four were credit card-related accounts.

23             The accountholder is indicated in the second column,

24   so the first one was Hope Cathedral, and the last four were

25   Trevon Gross.

 1          The bank is the third column.  So the first was PNC,

 2     then there's Capital One, American Express, American Express,

 3     and then Chase.  And the account numbers are indicated in the

 4     fourth column, and then the fifth column has the sources.

 5          MR. NOBLE:  Let's flip to slide 105.  And go to slide

 6     106.

 7     Q.  So we previously, during your testimony, stepped through

 8     the various periods of time in which you found activity in

 9     New York; is that right?

10     A.  That's correct.

11     Q.  And that activity that you saw was on the bank statements

12     for the accounts that we looked at on slide 104?

13     A.  That's correct.

14          MR. NOBLE:  No further questions at this time.

15          Can we take that down.

16          And, your Honor, at this time, the parties would

17     request that the Court provide a limiting instruction that

18     we've agreed upon.

19          THE COURT:  All right.  Without objection?

20          MS. MADRIGAL:  Without objection.

21          MR. KLINGEMAN:  Yes, please.

22          THE COURT:  All right.

23          Ladies and gentlemen of the jury, the slides prepared

24     by Mr. Rollins are not evidence, but, rather, an aid to the

25     jury.  It is for the jury to determine for itself whether the

1    slides fairly and accurately summarize the underlying evidence.

2              Further, you heard the witness testify that he applied

3    a particular accounting method in preparing some of these

4    slides.  The witness testified that he was instructed by the

5    government to apply this method.  This is an opinion witness,

6    not an expert witness.  You should not in any way rely on the

7    witness' testimony to establish that the accounting method was

8    itself a proper one.  The witness was offered solely to help

9    the jury apply the method and not in any way to determine

10   whether this method, rather than others, is the most helpful in

11   understanding the evidence.

12             All right?

13             MR. NOBLE:  Thank you, Judge.

14             THE COURT:  Mr. Noble?

15             MR. NOBLE:  No further questions.

16             THE COURT:  Thank you.

17             Mr. Creizman?

18             MR. CREIZMAN:  No.

19             MS. MADRIGAL:  Thank you, your Honor.

20             THE COURT:  I'm sorry.  Ms. Madrigal?

21   CROSS-EXAMINATION

22   BY MS. MADRIGAL:

23   Q.  Good afternoon, Mr. Rollins.

24   A.  Good afternoon.

25   Q.  You work for RSM, correct?

1   A.  That's correct.

2   Q.  And RSM is an audit tax and consulting firm?

3   A.  That's correct.

4   Q.  And you're actually a director of RSM?

5   A.  That's correct.

6   Q.  And you worked -- testified that you worked with a core

7   team of four or five on this presentation?

8   A.  I thought I had said three or four, but --

9   Q.  Three or four?  I may have misheard that.  A core team of

10  three or four.

11          And the presentation you just reviewed with the

12  government was actually not your first draft?

13  A.  That's correct.

14  Q.  In fact, it was, I believe, your fifth or sixth draft?

15  A.  That's possible.  I'm not sure.

16  Q.  Okay.  You don't have a recollection?

17  A.  I don't have a recollection.

18  Q.  Understood.

19          And each time you created a new version of the

20  presentation, you sent it to the government?

21  A.  There may have been some interim changes that were made

22  that we didn't send a draft to the government, but we sent

23  drafts at various points to the government.

24  Q.  Okay.  So it's fair to say that the government provided its

25  comments to the presentation?

1    A.  Fair to say, yes.

2    Q.  And made suggestions as to edits?

3    A.  Fair to say, yes.

4    Q.  And fair to say this was not an independent presentation by

5    RSM?

6    A.  Can you --

7    Q.  Sure.

8    A.  -- specify what you mean by "independent"?

9    Q.  Sure.

10          In other words, you didn't just create your own

11   presentation based on the raw data you were provided?

12   A.  I myself and my team created it, then with comments, and

13   input from counsel, and instructions based off of what they

14   could have me conclude or not.

15   Q.  Understood.  So it involved some level of input, and

16   communication, and --

17   A.  Right.

18   Q.  -- working through the different drafts?

19   A.  Right.

20   Q.  I believe that you spent approximately 1,021 hours working

21   on this presentation; is that right?

22   A.  That's -- on this engagement, yes.  But not solely on this

23   presentation, no.

24   Q.  Okay.  And your work on this matter actually began in

25   August of 2016?

1  A.  I may have said September, but it was sometime in August or

2  September.

3  Q.  Okay.  Sometime between August and September of 2016?

4  A.  That's correct.

5  Q.  And to date, you have billed $393,085 related to your work

6  on this case?

7  A.  I believe we have incurred something around that.  I

8  believe what we have billed is closer to 250.

9  Q.  250.  But you have bills outstanding up to this $393,000

10  amount?

11  A.  I think there are bills that will be issued.  I'm not sure

12  when they will be.

13  Q.  Understood.  Thank you.

14       Now, in preparing this presentation, you reviewed

15  records for several bank accounts; is that right?

16  A.  That's correct.

17  Q.  And one of those accounts was Intelligent VR?

18  A.  That's correct.

19  Q.  And you reviewed one bank account, a Bank of America

20  account, associated with Intelligent VR?

21  A.  Okay.

22  Q.  Is that right?

23  A.  I believe so.

24       MS. MADRIGAL:  Mr. Michaelson, if you could pull up

25  Government Exhibit 863-A, already in evidence.  You can

1    actually go to page 1.

2    Q.  Do these represent Bank of America accounts for Intelligent

3    VR that you reviewed in relation to your analysis and

4    presentation in this case?

5    A.  I believe so, yes.

6            MS. MADRIGAL:  You can take down this exhibit.

7            Can you bring up Exhibit 900, Government Exhibit 900.

8    Q.  Now, Government Exhibit 900 is a presentation that you

9    prepared, correct?

10   A.  I believe so.

11   Q.  This is the final presentation you prepared?

12   A.  Yes.

13   Q.  It's March 7th, 2017?

14   A.  Yes.

15   Q.  And there are actually two slides in this presentation that

16   relate to Intelligent VR; is that right?

17   A.  That's correct.

18   Q.  I can actually --

19           MS. MADRIGAL:  We can scroll to 101.  This is the

20   first slide.  And 102 is the second slide.

21   Q.  Is that your understanding of the slides related to

22   Intelligent VR that you prepared in relation to this

23   presentation?

24   A.  Those two slides, yes.

25   Q.  Now, slide 102, these entries are not a sampling of

1   payments made to Intelligent VR, correct?

2   A.  Can you specify -- can you repeat that?

3   Q.  Sure.

4       Are these payments that you indicated on this page a

5   sampling, or are these actual -- all of the actual payments

6   that were made to Intelligent VR?

7   A.  These are the payments that I was able to identify from the

8   statements as paid to Intelligent VR.

9   Q.  From your review of the bank records?

10  A.  From the review of the bank records, yes.

11      MS. MADRIGAL:  Now, Mr. Michaelson, if you could pull

12  up slide number 1.

13      THE COURT:  Can you shut down the -- when you're

14  pulling up -- thank you.  Wait until it's up, and then you can

15  publish.

16  Q.  Now, in your presentation, you have two entries on

17  11/24/2014 that have been highlighted.  Do you see those?

18  A.  I see those highlights.

19      MS. MADRIGAL:  Mr. Michaelson, if you can pull up

20  slide number 2.

21  Q.  Now, if we take a look at the Intelligent VR bank records

22  for November, specifically looking at November 24th, 2014, we

23  only see one entry in the amount of $5,305.36; is that right?

24  A.  I see that.  That's correct.

25  Q.  So, as far as the bank records are concerned, there is

1    actually only one entry in the amount of $5,305.36 on

2    11/24/2014?

3    A.   That appears to be what's on this page.

4           MS. MADRIGAL:  Mr. Michaelson, if you could pull up

5    slide 7.

6    Q.   Now, slide 7 is actually a side-by-side comparison of your

7    slide 102 and the Intelligent VR bank records from Bank of

8    America, and they both relate to the November billings?

9           Do you understand?

10   A.   I see that.

11   Q.   So, is the first entry on your slide for 11/24/14 in the

12   amount of $5,305.36 actually just a duplicate entry?

13   A.   I think it may be.  It appears to be similar to what the

14   case with the ACH records were indicated a different name, but

15   it may be the same payment.

16   Q.   Okay.  So it appears to be a mistake?

17   A.   It appears to be, yes.

18          MS. MADRIGAL:  Can you please put up slide 3,

19   Mr. Michaelson.

20   Q.   And, here, the highlighted portion, which highlights two

21   transactions on December 9, 2014, recipient Intelligent VR in

22   the amount $417, do you see that?

23   A.   I see that.

24          MS. MADRIGAL:  And, Mr. Michaelson, if you can pull up

25   slide 4.

1    Q.   And looking at the bank records for the same time period,

2    how many entries do you see on 12/9/2014 in the amount of $417?

3    A.   Again, I see one.

4    Q.   Okay.  So the bank account only shows one wire in the

5    amount of $417 from Anthony Murgio?

6    A.   That's correct.

7             MS. MADRIGAL:  Now, Mr. Michaelson, if you could

8    please pull up slide 8.

9    Q.   And this is another side-by-side comparison of your slide,

10   and on the right-hand side, we have the Bank of America

11   records.  So, again, fair to say that the first entry of $417

12   just appears to be a duplicate entry?

13   A.   Right.  Again, I think what happened is on a separate bank

14   record, you'll see it reported as Collectables Club, and on

15   this one, it's Anthony Murgio, but it appears to be the

16   duplicate of the same transaction.

17            MS. MADRIGAL:  And if we can actually pull up slide

18   102.

19   Q.   So, the total amount of payments to Intelligent VR here is

20   shown as $28,112.72.  Do you see that?

21   A.   I see that.

22   Q.   And is that number correct?

23   A.   If those two are duplicates, it would be reduced by that

24   amount.

25   Q.   Okay.

H37KLEB5                    Rollins - Cross

1           MS. MADRIGAL:  Mr. Michaelson, if you could please

2      pull up slide 5.

3      Q.  Now, here on this slide, you see that we have actually

4      drawn a strike-through through the two entries that appear to

5      be duplicates.  If we take this $28,112.72 amount and reduce it

6      by the duplicative transactions, we will have to reduce it by

7      $5,305.36, correct?

8      A.  That's correct.

9      Q.  And then also by $417, correct?

10     A.  That's correct.

11     Q.  And if my math is correct, the amount of payments to

12     Intelligent VR is actually $22,390.36.  Does that sound like it

13     could be the correct number?

14     A.  That sounds -- yes.

15          MS. MADRIGAL:  And, Mr. Michaelson, if you could

16     please pull up slide number 6.

17     Q.  Because of the exercise we've just gone through, this means

18     that the summary by recipient that indicates that Intelligent

19     VR received $28,112.72 is actually incorrect; is that right?

20     A.  It would be the smaller number that takes out those two

21     duplicates.

22              (Continued on next page)

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    Q.  Very good.

2            MS. MADRIGAL:  No further questions.  Thank you.

3            THE COURT:  Thank you, Ms. Madrigal.

4            Mr. Klingeman.

5    CROSS-EXAMINATION

6    BY MR. KLINGEMAN:

7    Q.  Good afternoon, Mr. Rollins.

8    A.  Good afternoon.

9    Q.  We met out in the hall?

10   A.  Yes.

11   Q.  And just to remind you, my name is Henry Klingeman and I

12   represent Pastor Gross.

13           The tracing slides that you showed us earlier today

14   are the result of you using the FIFO method.

15   A.  That's correct.

16   Q.  First-in, first-out?

17   A.  First-in, first-out, yes.

18   Q.  And that's a specific accounting technique or method?

19   A.  Accounting, valuation method, yes.

20   Q.  And there are others?

21   A.  And there's others, yes.

22   Q.  LIFO?

23   A.  LIFO is one.

24   Q.  Last-in, first-out?

25   A.  Last-in, first-out, yes.

1   Q.   And what you described in your words as the specific

2   identification of sources of funds and corresponding

3   expenditures of funds, correct?

4   A.   That's correct, yes.

5   Q.   So for example, if I gave you a dollar -- a dollar bill

6   right now, and you took it from me and you went to the

7   cafeteria and you bought a yogurt for a dollar, we could say

8   that that dollar I gave you was used specifically to purchase

9   that yogurt, correct?

10  A.   That sounds fair, yes.

11  Q.   And what you're saying with respect to the much more

12  complicated transactions in this case, that sort of specific

13  tracing is, to use your word, "impossible"?

14  A.   It's not always possible.  In some circumstances it may be

15  possible.

16  Q.   Sure.  But you were asked by the government earlier today

17  about this particular case and these particular transactions,

18  and the word you used with the jury -- and I counted twice --

19  was "impossible".

20  A.   For the broader analysis, yes.

21  Q.   That you did in this case?

22  A.   In this case, yes.

23  Q.   Attempting to trace the more than $150,000 in source funds,

24  right?

25  A.   Correct.

1   Q.  To the various transactions that you list at the end of the

2   slide presentation.

3   A.  Correct.  Because there wasn't always a one-for-one

4   matching, and transaction sizes are the sources we used.

5   Q.  To establish the one-for-one transaction, the one-for-one

6   correspondence that you list on at least three summary slides

7   you have to use the FIFO method.

8   A.  That's the method I used, yes.

9   Q.  Okay.  But if you used a different method, you wouldn't be

10  able to generate that same dollar-for-dollar correspondence,

11  correct?

12  A.  If I used a different method, the amounts may change.

13  Q.  And the list of purchases or expenditures would change, as

14  well.

15  A.  Some of them may overlap, some of them may be different.

16  For example, if I used the LIFO method, some of the

17  transactions that were captured in FIFO may still be captured

18  and some may be different.

19  Q.  Some would be different?

20  A.  Some may be different, yes.

21  Q.  In terms of what actually happened, we're relying on an

22  accounting methodology rather than a direct tracing, correct?

23  A.  Well, what we're seeing is everything that was reported in

24  the bank statement, presuming that the bank statement's report

25  correctly what happened and it's just a matter of performing

1    the tracing analysis to identify, allocate, and attribute the

2    uses to a particular source, it's necessary to apply the

3    accounting methodology because within a bank account, all the

4    money is mixed together and commingled, and it's impossible, as

5    you've pointed out and as I've said, it's impossible to

6    directly link every single use with every single source on a

7    dollar-for-dollar basis.

8    Q.   Okay.  And you used the FIFO method as directed to use it

9    by the prosecutors?

10   A.   That's correct.

11   Q.   And in fact, the U.S. Attorney's Office has paid you, I

12   guess, nearly $250,000 to follow the directions in this regard

13   to do this work, correct?

14   A.   Again, the amount that we've been paid is partly related to

15   this aspect and partly related to other aspects of what they've

16   asked us to do.

17   Q.   And you've billed them an additional $150,000?

18   A.   I'm sorry?

19   Q.   I think you've said you billed them -- you're expecting to

20   get paid another $150,000 after this?

21   A.   We haven't billed -- we've billed $250,000 to date, yes.

22   Q.   But counsel asked you if the total expectation is $390,000?

23   A.   I think it may be close to that, yes.

24   Q.   Obviously, you're being paid to sit here today and give

25   this testimony.

1    A.  That's correct.

2    Q.  You would not be here if you weren't being paid.

3    A.  That's correct.

4    Q.  Now, as you said, if you would use the specific

5    identification method, then this analysis would be impossible,

6    correct?

7    A.  The full analysis would not be possible, that's correct.

8    Q.  And the slides would look vastly different if you had

9    attempted to use the specific identification method.

10   A.  Well, what I'm saying is that you can't -- you can't do the

11   tracing analysis as I've done it using a specific

12   identification because the data doesn't allow you to

13   specifically line up the uses -- the out-flows and the

14   in-flows.

15   Q.  In other words, you wouldn't even be able to generate some

16   of the slides you've generated using the FIFO method.

17   A.  Right.  You need to apply some sort of accounting method.

18            THE COURT:  Mr. Klingeman, can you pull the mic a

19   little bit closer, please?

20            MR. KLINGEMAN:  Yes, your Honor, of course.

21            THE COURT:  Thank you.

22            MR. KLINGEMAN:  If we could open government's 900 in

23   evidence.

24   BY MR. KLINGEMAN:

25   Q.  I just want to ask you a couple questions, Mr. Rollins,

1  about various slides.

2  A.  Sure.

3  Q.  So let's start with number 4.

4         Mr. Rollins, number 4, as you described it earlier

5  today, is a summary chart listing 10 transactions involving the

6  depositing of funds at various financial institutions related

7  to either Hope Cathedral or HOPE Federal Credit Union, correct?

8  A.  That's correct.

9  Q.  And I think you told us earlier that this final version of

10  government's 900 has gone through a number of various drafts

11  and iterations?

12  A.  That's correct.

13  Q.  And your analysis, needless to say, has been subject to

14  review by the prosecutors.

15  A.  That's correct.

16  Q.  And at different times they've pointed out errors or

17  oversights that your firm has committed?

18  A.  Largely, it's been to either ask for additional analysis

19  that in earlier drafts we hadn't performed yet or to -- where

20  we've asked for whether or not they have additional documents

21  that we identified would be useful, and then they've helped

22  provide that, and then they provided direction on -- as to

23  information that would be allowed to be included in the slides.

24  Q.  But you all have missed things as you've been preparing

25  this chart.

H37OLEB6                      Rollins - Cross

1    A.  I'm sorry.  Can you be more specific?

2    Q.  Sure.  Do you disagree with me or do you disagree with the

3    question that you've missed things?

4    A.  Well, I'm asking what do you mean by -- what have we

5    missed?

6    Q.  Well, to your recollection as you're sitting here now, do

7    you recall missing anything significant as you developed this

8    chart?

9              MR. NOBLE:  Objection.

10             THE COURT:  Sustained.

11   Q.  Specifically, item number 8, or transfer number 8,

12   Mr. Rollins, is a $50,000 wire transfer?

13   A.  Yes.

14   Q.  That was ultimately returned.

15   A.  Yes.

16   Q.  In December, 2014.

17   A.  Yes.

18             THE COURT:  We're looking at 900-4?

19             MR. KLINGEMAN:  Yes.

20             THE COURT:  Could we make it larger, please?  Thank

21   you.

22   Q.  Do you recall in December of last year your colleague,

23   Mr. Fitzgerald, acknowledging that your firm had missed this in

24   the analysis that your firm had prepared to date?

25   A.  I don't recall that, no.

1    Q.  If I showed you an email that you were on, would that help

2    refresh your recollection?

3    A.  That might, yes.

4    Q.  I'm going to show you what's been marked for identification

5    as defendant's TG51.

6              MR. KLINGEMAN:  Your Honor, I'm showing the witness

7    what's been marked for identification as TG51.

8    Q.  Just take a look at it, please.

9    A.  Okay.

10   Q.  Mr. Rollins, does TG51 for identification refresh your

11   recollection that in the analysis that your firm had done to

12   the date of mid December, 2016, you all had missed in your

13   analysis this transfer and subsequent reversal?

14   A.  Reading it, that's what it indicates.  It indicates that on

15   the bank record it didn't specifically identify HOPE FCU on the

16   record, and thus, we didn't identify it based off of looking at

17   that one bank statement alone, and it required using some

18   additional sources.

19   Q.  So you have a reason for missing it, but in fact you missed

20   it.

21   A.  It appears to be the case, yes.

22   Q.  That was a 50,000 transfer into HOPE Federal Credit Union

23   in December, 2014 that was subsequently returned to whomever

24   sent the 50,000.

25   A.  That's correct.

H37OLEB6                          Rollins – Cross

1   Q.  In other words, the money wasn't kept by HOPE Federal

2   Credit Union.

3   A.  It was sent back, yes.

4          MR. KLINGEMAN:  Let's go to page 18, if we could.

5   Q.  Page 18 is a PNC Bank wire transfer record that you've

6   analyzed?

7   A.  Yes.

8   Q.  You understand that this is not a bank statement from PNC?

9   A.  That's correct.

10  Q.  It's something that would have to be requested by a

11  customer, specifically, in order to view the information that's

12  contained on the document?

13  A.  It would have to be requested, yes.

14  Q.  And this is a document that makes reference to the fact

15  that the wire transfer of funds from an account in West Palm

16  Beach to an account in Jackson, New Jersey passed through the

17  Bank of New York in New York City, right?

18  A.  No, I think it indicates that it involved Bank of America

19  in New York.

20  Q.  Sorry?

21  A.  It involved Bank of America, which has a New York address.

22  Q.  I'm sorry.  Did I not say Bank of America?

23  A.  I thought you had said Bank of New York.

24  Q.  Sorry.  You are absolutely right.  Bank of America,

25  different institution, right?

1    A.   Yes.

2              MR. KLINGEMAN:   And then likewise, page 22, if we

3    could.

4    Q.   Same type of slide, Mr. Rollins?

5    A.   Yes.

6    Q.   In other words, a PNC Bank record for a wire transfer?

7    A.   That's correct.

8    Q.   It's not part of the account statement that's regularly

9    made available --

10   A.   It's not typically provided --

11             THE COURT:   One person needs to speak at a time, so

12   please do wait for the question.

13             Go ahead.

14   Q.   In other words, it's wire transfer record that's not made

15   available as part of the account statement that's given to the

16   customer on a monthly basis.

17   A.   Right.  It's not typically provided, but it may be provided

18   at request.

19   Q.   Upon request.

20   A.   Upon request.

21   Q.   The customer goes looking for it.

22   A.   If the customer or somebody else goes looking for it, yes.

23             MR. KLINGEMAN:   Slide 38, please.

24   Q.   Slide 38 is one of three slides in the exhibit, the other

25   two being pages 77 and 98, where you list on the left side of

1   the page sources of funds, right?

2   A.  That's correct.

3   Q.  And those sources of funds are among the various sources

4   listed on page 4 that list of series of deposits or transfers?

5   A.  That's correct.

6   Q.  And on the right side of the page, the purported uses of

7   those funds, right?

8   A.  By category, yes.

9   Q.  And on each of pages 38, 77, and 98, the numbers at the

10  bottom of each column match exactly, right?

11  A.  I believe so, yes.

12  Q.  And that's based on you using the FIFO method?

13  A.  That's on the basis of using the FIFO method, yes.

14  Q.  And then the specific items that are supposed to be used --

15  for which the funds were used to purchase, starting with cash

16  withdrawals, meals, mortgage and loan payments, those are all

17  correlated based on your use of the FIFO method.

18  A.  They're identified using the FIFO method, yes.

19  Q.  Well, do you understand what I mean when I say

20  "correlated"?

21  A.  So as being traceable to the -- so yes.

22  Q.  Traceable?

23  A.  Yes.

24  Q.  To use your word?

25  A.  Right.

1    Q.  If you used the LIFO method, you wouldn't necessarily have

2    that same list on the right-hand side of the page?

3    A.  Not necessarily, no.

4    Q.  Certainly, if you had the ability to trace directly the

5    various sources of funds to the various purchases, you either

6    couldn't do it at all because it was impossible --

7    A.  Right.

8    Q.  -- or it might be different if you could do it, right?

9    A.  Right.  If it was a bank account where you could do it, it

10   may be a different iteration, but I would expect some of these

11   would stay the same in terms of the categories.

12   Q.  Some would, but some wouldn't?

13   A.  Some may not.

14   Q.  And you're speculating about that?

15   A.  Well, in terms of some of the uses that I identified, there

16   was a large volume for those categories.

17   Q.  But again, that's speculation on your part.

18   A.  Given the -- no, because given the timing, some of the

19   payments that I know would have fit either in the FIFO or LIFO.

20   Q.  Well, for example, if there was no money in the account,

21   that would be one way to do it without resorting to FIFO,

22   right?

23   A.  If there was no money in the account?

24   Q.  Yeah.  Say, for example, you have an empty bank account.

25   A.  Right.

1    Q.   No balance.

2    A.   Right.

3    Q.   If you transfer into it $15,000.

4    A.   That's correct.

5    Q.   From that you purchase meals, you make a mortgage payment,

6    you pay a credit card bill.  You could say, without resorting

7    to FIFO, that those funds are directly traceable based on the

8    specific identification of the funds coming in and then the

9    funds being used to pay out, right?

10   A.   Absent any other information, so if there's not subsequent

11   deposits --

12   Q.   Right.

13   A.   -- then yes.  But if there's other deposits, which there

14   were in these accounts following the initial deposit that I'm

15   analyzing, that also requires the FIFO methodology.

16   Q.   Because you can't do it directly.

17   A.   Because you can't do a direct correlation, yes.

18            MR. KLINGEMAN:  Let's go to slide 52, please.

19   Q.   This is a list of approximately 15 withdrawals?

20   A.   Okay.

21   Q.   Well, is it?  It's your slide.  Right?  Doesn't it say

22   "cash withdrawal" at the very top?

23   A.   It may be 15 or 16.

24   Q.   I'm sorry.

25   A.   Approximately 15, yes.

1   Q.  Approximately, yes.  I think I said "roughly", but in any

2   event.

3               Approximately 15 or 16 withdrawals, right?

4   A.  Yes.

5   Q.  And in the lower left in the box labeled "Key", purportedly

6   the source of these funds are the various transactions listed

7   in the box, correct?

8   A.  Yes.  And the key at the bottom most key, yes.

9   Q.  Lower left corner.

10  A.  Yes.

11  Q.  The box that says "Key"?

12  A.  Yes.

13  Q.  Did you testify in answer to the initial questions about

14  this that these various withdrawals went to Trevon Gross?

15  A.  I did not, no.

16  Q.  Do you know where they went?

17  A.  Not for all of them.  I think I testified that, for

18  example, for the ATM withdrawals, I didn't have enough

19  information to identify who made the withdrawal.

20  Q.  Okay.  And the ATM withdrawals constitute the majority of

21  these, correct?

22  A.  The majority of the number of transactions, yes, but in

23  terms of dollar value, no.

24  Q.  So let's talk about the substantial dollar value amounts.

25  Do you know where the specific withdrawals went?

H37OLEB6                    Rollins – Cross

1   A.  I provided an example for the 1355.

2   Q.  Okay.

3   A.  And that was the withdrawal that had the withdrawal ticket

4   with Trevon Gross' name on it.

5   Q.  That's the very next slide --

6   A.  That's the --

7   Q.  -- number 53.

8   A.  I believe it starts --

9   Q.  So the one example that you cite to the jury is a

10  withdrawal that appears to be in the name of Trevon Gross.

11  A.  That's correct.

12  Q.  What about the $14,000?

13  A.  The $14,000, based on my analysis, appeared to be a

14  withdrawal that was then used to make a certified check.

15  Q.  And who made the withdrawal?

16  A.  I believe it was a person by the name of Loretta Larkins.

17  Q.  Not Trevon Gross.

18  A.  Not Trevon Gross.

19  Q.  And you mentioned that it was used to fund a certified

20  check or a cashier's check?

21  A.  As I recall, yes.

22  Q.  To whom was that check payable?

23  A.  I believe it was Joel Osteen Ministries, and there's some

24  additional information beyond that, but I don't recall exactly

25  what the words were.

1    Q.  Do you know that Joel Osteen is some kind of famous

2    religious figure?

3    A.  I'm aware of it, yes.

4           MR. NOBLE:  Objection.

5           THE COURT:  Overruled.

6           THE WITNESS:  I'm aware of him, yes.

7    Q.  And then, how about the $3,500 withdrawal?  Do you know who

8    made that withdrawal?

9    A.  I don't recall sitting here today.

10   Q.  But you looked into it?

11   A.  I looked into it, yes.

12   Q.  Do you know about the $750 withdrawal?

13   A.  I don't recall that, as well.

14   Q.  I'm going to show you, Mr. Rollins, what I've marked for

15   identification as Defendant's TG51.

16          MR. KLINGEMAN:  Your Honor, with apologies.  I'm going

17   to mark this one TG52.

18          THE COURT:  Okay.

19          MR. KLINGEMAN:  Your Honor, I'm showing the witness

20   TG52 for identification, and I'm going direct his attention to

21   the third and fourth pages.

22          THE WITNESS:  Okay.

23   BY MR. KLINGEMAN:

24   Q.  Does that document, Mr. Rollins, refresh your recollection

25   as to the disposition of the $3,500?

1    A.  Yes, it does.

2            MR. NOBLE:  Judge, just a quick objection to the

3    witness just reading from the document.

4            THE COURT:  Yes.  Sustained.

5            MR. KLINGEMAN:  You can lay that aside, Mr. Rollins.

6    Thank you.

7    Q.  Does that refresh your recollection as to who made the

8    withdrawal of the $3,500?

9    A.  Yes.

10   Q.  And who was that?

11   A.  It was somebody by the name of Julie -- actually, I believe

12   it was a cashier check to Julie Lipari, but --

13   Q.  Lipari?

14   A.  Lipari, Lipari.

15   Q.  Lipari?

16   A.  L-i-p-a-r-i.

17   Q.  You say Lipari, I say Lipari, but not Trevon Gross?

18   A.  Not Trevon Gross.

19   Q.  Does TG52 refresh your recollection as to the disposition

20   of the last withdrawal for $750?

21   A.  I would have to look again, but --

22   Q.  Please do.

23   A.  Yes, it does.

24   Q.  And who would that be?

25   A.  That again was Loretta Larkins.

1    Q.  Thank you.

2              MR. KLINGEMAN:  Finally, if we could just go to slide

3    67.

4              THE COURT:  Of government 900?

5              MR. KLINGEMAN:  Yes, please.

6    BY MR. KLINGEMAN:

7    Q.  This slide corresponds to what you refer to as transfer

8    number 7, Mr. Rollins, correct?

9    A.  That's correct.

10   Q.  And there are transfers prior to at 5 and 6, as well, about

11   which you testified?

12   A.  That's correct.

13   Q.  And with respect to each of the transfers, 5, 6, and 7 that

14   came into HOPE FCU, it was your testimony that those funds

15   were, in turn, transferred to the Hope Cathedral Church,

16   correct?

17   A.  What I had said is that the funds that came in on

18   November 24th, you see 7A, following that deposit, I saw a

19   transfer in the same amount to Trevon Gross' account, which was

20   reversed, and then a transfer in the same amount to Hope

21   Cathedral's account.

22   Q.  So first the money went to Trevon Gross' personal account.

23   A.  That appears the way it was depicted on the statement.

24   Q.  And then that transfer to Trevon Gross' personal account

25   was reversed.

1    A.  That appears to be the case, yes.

2    Q.  And in other words, the money was sent out of his personal

3    account.

4    A.  Back to the Collectables Club account.

5    Q.  Back to where it came from.

6    A.  Right.

7    Q.  And then subsequently, that same amount was sent to Hope

8    Cathedral?

9    A.  And then the same amount of money was sent to Hope

10   Cathedral, yes.

11   Q.  And in fact, if we could go to slide 4 of government's 900

12   one more time, the first seven transfers ultimately went to

13   Hope Cathedral, correct?

14   A.  That's correct.  Two different accounts, both of which were

15   held in Hope Cathedral's name.

16   Q.  At the church.

17   A.  One was at the PNC Bank and one was at HOPE FCU.

18   Q.  But they're accounts that belonged to the church.

19   A.  That were held in the name of Hope Cathedral, yes.

20   Q.  Not Trevon Gross.

21   A.  It's held in the name of Hope Cathedral.

22   Q.  Now, I take it from what you said this morning, the only

23   source of information for your chart was supplied to you by the

24   government.

25   A.  All of the documents that I reviewed were ultimately

H37OLEB6                         Rollins - Redirect

1   provided by the government, yes.

2   Q.  By the prosecutors.

3   A.  Right.

4   Q.  And you spoke to them on a number of occasions?

5   A.  Yes.

6   Q.  Many occasions?

7   A.  Yes.

8   Q.  And communicated with them by email?

9   A.  Yes.

10  Q.  On many occasions?

11  A.  On several occasions, yes.

12  Q.  Did you also communicate with any government agents?

13  A.  I believe so, yes.

14  Q.  But you never spoke to anyone at the Hope Cathedral, right?

15  A.  No, I did not.

16  Q.  Never spoke to anyone at HOPE Federal Credit Union, right?

17  A.  No, I did not.

18  Q.  Never spoke to Trevon Gross?

19  A.  I did not, no.

20          MR. KLINGEMAN:  No further questions.

21          THE COURT:  Thank you.

22          Mr. Noble.

23          MR. NOBLE:  Thank you, Judge.

24  REDIRECT EXAMINATION

25  BY MR. NOBLE:

1   Q.  Mr. Rollins, on cross examination, Mr. Klingeman asked you

2   some questions about what he called the specific identification

3   method.  Do you remember that?

4   A.  Yes.

5   Q.  Can you just explain to the jury how that method is

6   applied?

7   A.  Very high level, it means that, similar to the analogy he

8   provided, if I give you a physical dollar bill, and then you

9   use that physical dollar bill to buy a yogurt, you could say

10  that that was a specific identification of a use from the money

11  that I gave you.

12        And in a bank account, if there's no other funds in

13  the account and there's no deposits between the use of the

14  funds and the source of the funds, you could use a specific

15  identification method to apply the tracing on those uses.

16  Q.  So if a bank account didn't have any money in it, $10,000

17  comes in, then there are $10,000 of expenses, you could

18  attribute those expenses directly to that $10,000.

19  A.  That's correct.

20  Q.  Match them up one for one?

21  A.  That's correct, assuming there's no --

22  Q.  Intervening?

23  A.  -- intervening deposits, as well.

24  Q.  Why didn't you apply that method here, aside from the fact

25  that the government said to use FIFO?

1   A.   Right.  Also, because within the bank records there were a

2   number of accounts that had beginning balances, as well as the

3   intervening deposits into the account following the

4   transactions that I was asked to review and before other uses

5   of the funds.

6   Q.   Have you used the FIFO tracing analysis in any other

7   assignment that you've done for other clients?

8   A.   I have, yes.

9        MR. KLINGEMAN:  Objection.

10        THE COURT:  Sustained.

11        MR. NOBLE:  No further questions.

12        THE COURT:  Ms. Madrigal.

13        MS. MADRIGAL:  Nothing further, your Honor.

14        THE COURT:  Mr. Klingeman.

15   RECROSS EXAMINATION

16   BY MR. KLINGEMAN:

17   Q.   Mr. Rollins, you used the FIFO method because the

18   government told you to.

19   A.   That's correct.

20        MR. KLINGEMAN:  Nothing further.

21        MR. NOBLE:  Nothing further.

22        THE COURT:  Thank you.

23        Mr. Rollins you're excused.  You may step down.

24        (Witness excused)

25        THE COURT:  Ms. Choi.

1            MS. CHOI:  Your Honor, I don't know if this is the

2    time --

3            THE COURT:  It depends what you say.

4            MS. CHOI:  In light of the previous representations

5    that we had with regard to the government's rebuttal case, at

6    this time the government would rest.

7            THE COURT:  All right, thank you.

8            I'll see counsel at sidebar briefly.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (At sidebar)

2           THE COURT:  I thought that was what we had

3     anticipated.

4           MS. CHOI:  Yes.  I didn't know how you wanted to deal

5     with this.  Sometimes they do it before.

6           MR. KLINGEMAN:  Your Honor, given the close of the

7     government's case, the defendant, Trevon Gross, hereby moves

8     for judgment of acquittal pursuant to Rule 29.  And we'll take

9     direction from the Court as to the time for argument and

10    briefing and anything else the Court would need before making a

11    ruling.  But we want to preserve our right to make the motion,

12    and having done so, I would be prepared to move ahead with the

13    defendant's case.

14          THE COURT:  All right.  I will take that as a

15    placeholder motion and preserve with opportunity later for

16    argument.

17          Mr. Creizman.

18          MR. CREIZMAN:  Yes.  I also will do a placeholder

19    motion at this time, Rule 29, on all of the counts charged

20    against Yuri Lebedev.  But I might particularly note, though,

21    with respect to the bank wire fraud and the conspiracy, that I

22    don't believe that the government has presented sufficient

23    evidence that --

24          THE COURT:  Well, can I pause you?  I want to give you

25    both an opportunity to state your grounds for Rule 29, but I'm

1   comfortable if this is just a placeholder, and then once we let

2   the jury go home for the day, you can put what you would say

3   here now on the record.

4            MR. CREIZMAN:  Okay.

5            THE COURT:  Everybody agree with that process?

6            MS. CHOI:  That's fine.  And we would note as a

7   placeholder that we object.

8            THE COURT:  That's fine.

9            Mr. Creizman and Ms. Madrigal, you'll put in your

10  evidence and take it from there?

11           MR. CREIZMAN:  Yes.

12           MS. MADRIGAL:  We won't be publishing, your Honor.

13           THE COURT:  You're not publishing?

14           MR. CREIZMAN:  We're not.  We're just going to say

15  that -- I don't know exactly what the right language that you

16  guys used.  I want to be consistent.  But pursuant to a

17  stipulation with the government --

18           MS. MADRIGAL:  We have a stipulation?

19           MR. CREIZMAN:  -- we are introducing into evidence the

20  following exhibits:  Defendant's Exhibit -- yeah.

21           MS. CHOI:  The one issue that I would just raise is,

22  obviously, we believe that there are -- if they are being

23  offered for a non-hearsay purpose, we just want to have clarity

24  about that with regard to the document such that no point in

25  the future for the defendant argue that with regard to the

1    truth, it only goes to what Yuri Lebedev knew or whatever the

2    exception might be.

3              MR. CREIZMAN:  Right, yes.

4              MS. MADRIGAL:  Absolutely.

5              MR. CREIZMAN:  It's either non-hearsay or under an

6    exception.

7              MS. CHOI:  Right.  I just don't know if it's better to

8    articulate those grounds expressly, as we did for the other

9    exhibits, or if we just want to make the representation we

10   won't argue that they're for the truth, but rather going to the

11   state of mind of the defendant or --

12             MS. MADRIGAL:  I mean, it depends on the exhibit.

13             MS. CHOI:  Right.

14             THE COURT:  It seems like it depends on the exhibit.

15   Do you want a limiting instruction if it's coming in for

16   something other than the truth?

17             MR. CREIZMAN:  Yes.  Can I just take a brief moment to

18   just check so I can figure out which exhibit is which, and then

19   I can -- I mean --

20             MS. MADRIGAL:  Should we move on to Mr. Gross' case

21   and --

22             MR. CREIZMAN:  I mean, it shouldn't be that hard.  It

23   is for -- it can't be for a hearsay purpose.  The only question

24   is --

25             MS. CHOI:  What's the exception is?

 1                MR. CREIZMAN:  -- what the exception is.  So I can

 2     collect my -- I'm really good with the rules of evidence, so

 3     you give me two minutes, I'll get this thing done.  I mean, it

 4     won't be hard.

 5                THE COURT:  Let's see how good you are.

 6                MS. MADRIGAL:  His one rule of evidence is it's for

 7     non-hearsay purposes.

 8                THE COURT:  Can we just do them as they come in?

 9                MS. CHOI:  You want to publish them for just us, and

10     then you would offer your non-hearsay portion -- or your

11     non-hearsay reason, and then the Judge would instruct as to

12     certain exhibits.

13                MS. MADRIGAL:  Before the jury?

14                MS. CHOI:  That's what it's going to have to be.

15                MR. NOBLE:  You can either publish them after they

16     come in, and then the Judge can give a limiting instruction, or

17     we can go one by one, and she can give limiting instructions so

18     at least we have the limiting instruction on the record to each

19     exhibit.

20                MR. CREIZMAN:  I have an idea.  This should

21     actually -- under an agreement with the government, exhibits

22     whatever through whatever will be admitted for a non-hearsay

23     reason -- no.  Okay.

24                MS. CHOI:  So, your Honor --

25                THE COURT:  Try your case.  Let's go.

1              Mr. Creizman, I'll give the jury a short break while

2    you set up.

3              MR. CREIZMAN:  Thank you.

1             MR. KLINGEMAN:  Your Honor, may I be excused for a

2    moment.

3             THE COURT:  Yes.  I'm going to step down for two

4    minutes because that's all Mr. Creizman says he needs, so let's

5    do that.  We'll do ten minutes now.  Thank you.

6             (Recess)

7             THE COURT:  Where are we, folks?  Mr. Creizman?

8             MR. CREIZMAN:  Yes.

9             THE COURT:  Are you ready?

10            MR. CREIZMAN:  We are done.

11            THE COURT:  What's the plan?

12            MR. CREIZMAN:  I'm going to --

13            THE COURT:  Microphone, please.

14            MR. CREIZMAN:  I think I should go up -- I actually

15   could do this from here.  I can say the defense is -- I'll

16   stand up to the podium -- under a stipulation with the

17   government, the defense is introducing the following exhibits

18   not for the truth -- I'm going to write it down -- the exhibits

19   not for the truth of the matter asserted, but -- these

20   communications not for the truth of the matter asserted but for

21   their affect on the recipients.  Okay?

22            And then the other one would be, these exhibits are

23   offered not for their truth, but for the state of mind of

24   Mr. Lebedev, who is the one communicating.

25            And then the last one is a business record.

 1              MS. CHOI:  Your Honor, we agree with that approach,

 2      but we would just suggest that your Honor instruct the jury as

 3      to how they should be used.  But we do agree that it's three

 4      categories; business records, affect on the recipient, and

 5      state of mind of the defendant.

 6              MR. CREIZMAN:  I prefer that, too.

 7              THE COURT:  But I don't know which are which.  The

 8      first set of documents consist of what numbers?

 9              MR. CREIZMAN:  The first set of documents are Defense

10      Exhibits 21, 17, 18.

11              THE COURT:  Wait.  I'm sorry.  21, 17, 18?

12              MR. CREIZMAN:  No.  They were just out of order,

13      that's all.  17, 18, 19, 20, 21, 22, 23, 27, 28, and 26.

14      Sorry.  So it would be --

15              THE COURT:  So 17 through 23 and 26 through 28.

16              MR. CREIZMAN:  Correct.

17              THE COURT:  And that's category 1.

18              Tell me what the proposed limiting instruction is.

19              MR. CREIZMAN:  Effect on the listener.  State of mind

20      of the listener.

21              THE COURT:  So they're not being offered for the truth

22      but their affect on the state of mind of the --

23              MR. CREIZMAN:  Recipient.

24              THE COURT:  -- recipient.

25              MR. CREIZMAN:  Specific there, they're either email

1    communications or chats that are -- okay.

2               THE COURT:  Category 2?

3               MR. CREIZMAN:  And then category 2 is Exhibits 15 and

4    16, which are emails of Yuri Lebedev to show the state of mind

5    of Yuri Lebedev, offered for the state of mind of Yuri Lebedev.

6               THE COURT:  So not being offered for the truth but for

7    the state of mind of Mr. Lebedev.

8               MR. CREIZMAN:  Correct.

9               And Defendant's Exhibit 25 is a business order.

10              THE COURT:  Being offered for the truth.

11              MS. CHOI:  Correct, so I don't believe there needs to

12   be a limiting instruction.

13              THE COURT:  Okay.  And what exhibit number is the

14   third category?

15              MR. CREIZMAN:  25.  They're all DX.  Our exhibits are

16   prefixed DX.

17              THE COURT:  All right.

18              MS. CHOI:  Your Honor, I think that's fine.  I just

19   think the one question we have, just a logistically matter, I

20   believe this will go pretty quickly and then we'll go into

21   Mr. Gross' defense.  As we discussed we had some issues with

22   regard to the exhibits that have been proffered by Mr. Gross.

23   I don't think -- I mean, my understanding is that the character

24   witnesses are going to be first.

25              THE COURT:  Right.

1          MS. CHOI:  It doesn't seem as though any of those are

2     going to be offered through them, so hopefully we don't think

3     we have to --

4          THE COURT:  Are there exhibits anticipated coming in

5     through the character witnesses?

6          MR. KLINGEMAN:  No.

7          THE COURT:  How many character witnesses?

8          MR. KLINGEMAN:  Three, your Honor, and the direct

9     examination of each will be about five minutes.

10          THE COURT:  Okay.  And then what's anticipated?

11          MR. KLINGEMAN:  Pastor Gross.

12          THE COURT:  And estimation as to length of the direct

13     examination of Mr. Gross?

14          MS. SANTILLO:  Approximately a couple hours.

15          THE COURT:  Okay.  And in the first, let's say, two

16     hours, are documents anticipated to come in that the government

17     has not yet had a chance to review?

18          MS. SANTILLO:  No, I don't think for the first 30 to

19     40 minutes there will be documents.

20          THE COURT:  And after that, what documents are coming

21     in?

22          MS. SANTILLO:  Your Honor, I have a set that I can

23     review.

24          THE COURT:  And you've given it to them and

25     identified -- because what we're trying to do here,

 1    Ms. Santillo, maybe it's not clear, is since you were late, I
 2    gather, in turning these over, and they haven't had a chance to
 3    review them in light of that lateness, is to see how we can use
 4    our time efficiently today without needing to -- they have an
 5    opportunity to review and I can resolve any objections this
 6    evening after the jury goes home rather than while they're
 7    sitting here.  So is there a way to put off any materials until
 8    after 4:30 today?
 9            MS. SANTILLO:  Yes, your Honor, we can do that.
10            THE COURT:  Terrific.
11            Does that take care of it?
12            MS. CHOI:  Yes, your Honor, for now.
13            THE COURT:  Anything else?
14            MR. KLINGEMAN:  Is your Honor planning on any
15    additional breaks before 4:30?
16            THE COURT:  No.
17            MR. KLINGEMAN:  Thank you.
18            THE COURT:  I mean, if there's a request, let me know.
19    But it's an hour and a half, and I think in light of different
20    witnesses and the like, the jury can handle an hour and a half.
21    But if there's a need, let me know.  All right?
22            Let's get the jury.
23            (Continued on next page)
24
25

 1           (Jury present)

 2           THE COURT:  Thank you, members of the jury.

 3   Scheduling wise, just recall we will end at 4:30 today.

 4           The government has rested.

 5           Mr. Creizman, on behalf of Mr. Lebedev.

 6           MR. CREIZMAN:  Thank you, your Honor.  On behalf of

 7   Yuri Lebedev, under a stipulation with the government, the

 8   defense moves to admit three groups of evidence.  The first

 9   group are emails and chat communications marked DX17 through

10   DX23, and DX26 through DX28.

11           THE COURT:  All right, thank you.  The requested

12   limiting instruction with respect to those documents, correct?

13           MR. CREIZMAN:  Yes, we'd request a limiting

14   instruction.

15           THE COURT:  With respect to this first group of

16   defense exhibits, members of the jury, that's DX17 through 23

17   and DX26 through 28, I do instruct you that they are not being

18   offered for the truth but for their affect on the state of mind

19   of the recipient.

20           Second category of exhibits?

21           MR. CREIZMAN:  Yes, your Honor.  And these are emails

22   of Yuri Lebedev, and they're being also offered for a limited

23   purpose.  These are Exhibits DX15 and DX16.

24           THE COURT:  Thank you.

25           Members of the jury, I instruct you that these two

1    exhibits, DX15 and DX16, are not being offered for the truth

2    but for the state of mind of Mr. Lebedev.

3            MR. CREIZMAN:  And then the third category is offered

4    as a business record.  It's DX25.

5            THE COURT:  All right.  And without objection, the

6    aforestated exhibits -- Ms. Choi?

7            MS. CHOI:  No objection, your Honor.

8            MR. KLINGEMAN:  No objection.

9            THE COURT:  Thank you.  All of the three categories of

10   exhibits, including the last Exhibit 25, is admitted.  Thank

11   you.

12           (Defendant's Exhibits DX17 through 23 and DX26 through

13   28, DX15 and DX16, and DX25 received in evidence)

14           MR. CREIZMAN:  Thank you, your Honor.  And with that,

15   defense for Mr. Lebedev rests their case.

16           THE COURT:  Thank you.

17           Mr. Klingeman.

18           MR. KLINGEMAN:  Thank you, your Honor.  We'll begin

19   the case in the defense of Pastor Gross with a trio of

20   character witnesses pursuant to Rule 404, and at this time I'd

21   like to call to the stand Danelle Horvath.

22           THE COURT:  Ms. Horvath may come forward.

23    DANELLE HORVATH,

24        called as a witness by the Defendant Gross,

25        having been duly sworn, testified as follows:

1    DIRECT EXAMINATION

2    BY MR. KLINGEMAN:

3    Q.  Good afternoon, Ms. Horvath.

4    A.  Good afternoon.

5    Q.  Welcome to court.  Where do you live?

6    A.  I live in Jackson, New Jersey.

7    Q.  With whom do you live?

8    A.  I live with my daughter.

9    Q.  What do you do for work?

10   A.  I work in the behavioral health field.  I work in a group

11   home with the developmentally disabled adults.

12   Q.  How do you know Pastor Gross?

13   A.  I know Pastor Gross since I've been coming to Hope

14   Cathedral in December of 2013.

15   Q.  So would you say you've known him approximately three

16   years?

17   A.  Yes, a little over three years.

18   Q.  In that three-year period, how often would you say you see

19   him?

20   A.  I would say I see him every Sunday, I also see him when we

21   have church community events or we do outreach, and when he

22   hosts bible study, I attend that, as well.

23   Q.  On the occasions when you're with him, do you speak to him?

24   A.  Yes.

25   Q.  So do you feel like you've gotten to know him well enough

1   over the last three plus years to form an opinion about his

2   character?

3   A.  Yes.

4   Q.  So let me ask you specifically.  What is your opinion of

5   Pastor Gross' character for honesty and truthfulness?

6   A.  I would have to say that Pastor Gross is one of the honest

7   people -- most honest people I've ever met, a man of high

8   integrity, a man of his word, and a true man of God.

9   Q.  And similarly, what is your opinion for his character for

10  law-abidedness?

11  A.  I would say that he, as far as I know, plays by the rules.

12  And if anyone tries to step out of the line of the rules, he

13  gently reminds them of what the rules are.  I've never, you

14  know, seen him break a law.  He's just -- he's just a rule

15  follower.

16          MR. SHIN:  Objection, your Honor.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1              THE COURT:  Overruled.

2     BY MR. KLINGEMAN:

3     Q.  Finally, Ms. Horvath, what would be your opinion, or what

4     is your opinion of his character for generosity?

5     A.  I'd have to say that Pastor Gross is a man who is generous

6     beyond measure.  He is humble, he is giving.  He never wants to

7     take credit for anything he's done.  He just gives selflessly

8     of himself to his church, to his community, to his family, to

9     his friends.

10    Q.  Now, speaking of his family and his friends, in the three

11    and a half years you've been, of course, living in Jackson and

12    worshiping at Hope Cathedral, have you gotten to know the

13    members of that community?

14    A.  Yes.

15    Q.  Have you gotten to know the members of that community well

16    enough to form an understanding of Pastor Gross' reputation in

17    that community?

18    A.  Yes.

19    Q.  What, for the members of the jury, is Pastor Gross'

20    reputation for truthfulness and honesty?

21    A.  I would say Pastor Gross has a reputation as very truthful,

22    very honest, very generous, very giving, loving.  A man of

23    integrity, that's how everyone knows him.

24              MR. KLINGEMAN:  Thank you very much.  I have no

25    further questions.

1           THE COURT:  Thank you.  Mr. Shin?

2    CROSS-EXAMINATION

3    BY MR. SHIN:

4    Q.  Good afternoon, Ms. Horvath.

5    A.  Hi.

6    Q.  So you testified that you've known Mr. Gross for about

7    three and a half years?

8    A.  Yes.

9    Q.  Is it fair to say that you care about him?

10   A.  Yes.

11   Q.  You're loyal to him?

12   A.  Yes.

13   Q.  And you don't want anything bad to happen to him?

14   A.  No.

15   Q.  And you don't want him to be convicted of a crime, right?

16   A.  Not if he's innocent, no.

17   Q.  Ms. Horvath, would you agree that people running a bank

18   should operate the bank in the best interests of its customers?

19           MR. KLINGEMAN:  Objection.

20           THE COURT:  Sustained.

21   Q.  Ms. Horvath, would you agree that if you were contacted by

22   a federal government agency, you shouldn't lie to the

23   government?

24           MR. KLINGEMAN:  Objection.  I'd like to be heard on

25   this, if necessary.

1              THE COURT:  Sustained.

2              MR. SHIN:  I'll move on, your Honor.

3    BY MR. SHIN:

4    Q.  Now, Ms. Horvath, you didn't serve on the board of HOPE

5    Federal Credit Union between the summer of 2014 and late 2015,

6    did you?

7    A.  No.

8    Q.  And you weren't involved in conversations between Trevon

9    Gross and a federal regulator that supervises HOPE Federal

10   Credit Union?

11             MR. KLINGEMAN:  Objection.

12             THE COURT:  Overruled.

13             You need to be heard?

14             MR. KLINGEMAN:  Yes, your Honor.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1                (At the sidebar)

2                THE COURT:  I'll tell you the reason I allowed it, and

3       then I'll hear your case.  She testified, over the government's

4       objection, that she has never seen him break any law, and so I

5       understand the immediate question to be about her awareness of

6       his activity with respect to the crimes charged since she

7       testified specifically that -- the reason I allowed it is

8       because she said she has not seen him, which went to character

9       for law-abidingness, which was an unobjected to question, so

10      that's why I'm allowing this one.  I sustained the earlier

11      objections to the extent they don't go to character for

12      truthfulness and the like and weren't opened by direct.

13               MR. KLINGEMAN:  Okay.  Let me just say, I have one

14      general objection, depending on how much further the government

15      goes.  The Second Circuit prohibits guilt-assuming questions,

16      and to the extent that the government wants to suggest that

17      this witness' opinion or knowledge of the defendant's

18      reputation, either of which may be uninformed by her lack of

19      knowledge of what the government perceives to be his guilt,

20      should be forbidden.

21               To the extent that the Court has determined that the

22      witness opened the door to questions about whether she's

23      observed Mr. Gross commit any crimes, I certainly would object

24      to anything else the government might ask unless and until it

25      establishes a foundation that she's, in fact, witnessed him

1    commit crimes, because, clearly, she has no knowledge about the

2    matters in the case.  And I carefully prepared the witnesses by

3    determining whether they had any knowledge of the case, and,

4    therefore, there's no foundation for asking these questions

5    other than to get at the guilt-assuming hypothetical that the

6    circuit forbids.

7              MR. SHIN:  Your Honor, may I?

8              So, in addition to the opening of the door that your

9    Honor mentioned, the questions I have asked, none of them have

10   assumed guilt.  I asked if she's served as a board member on

11   HOPE Federal Credit Union during the relevant time period, so I

12   have a series of questions that are standard questions to

13   elicit the fact that she has no knowledge of the facts of this

14   case.  And so that the reputation and opinion testimony are not

15   based on any knowledge of what happened in the facts of the

16   case.  It's a pretty standard line of questioning for character

17   witnesses, your Honor.

18             THE COURT:  Yes, I won't allow guilt-assumption into

19   the questions.  I will allow appropriate cross in response to

20   the direct testimony that would allow the jury to draw -- to

21   make determinations as to the basis for awareness of the direct

22   testimony as provided.  Again, she said I never saw him break

23   any laws, and it's appropriate for the government to cross as

24   to her foundation of her knowledge without that question

25   embedding in it any -- it can be factually related to the case,

H37KLEB7                        Horvath – Cross

but it may not embed in it guilt assumption.

            MR. KLINGEMAN:  Thank you.

            THE COURT:  Thank you.

            MR. SHIN:  Thank you, Judge.

            (Continued on next page)

 1                  (In open court)

 2                  THE COURT:  Mr. Shin, you want to repeat the prior

 3      question?

 4                  MR. SHIN:  Yes, your Honor.

 5                  THE COURT:  Thank you.

 6      BY MR. SHIN:

 7      Q.  So, Ms. Horvath, you didn't serve on the board of HOPE

 8      Federal Credit Union between the summer of 2014 and late 2015?

 9      A.  No.

10      Q.  And you weren't involved in conversations between Trevon

11      Gross and the federal regulator that supervises HOPE Federal

12      Credit Union?

13      A.  No.

14      Q.  And you weren't involved in discussions with Trevon Gross

15      and others involving the board membership of HOPE Federal

16      Credit Union, were you?

17      A.  No.

18      Q.  And you weren't involved in discussions with Mr. Gross and

19      others about the processing of ACH transactions by HOPE Federal

20      Credit Union, were you?

21      A.  No.

22      Q.  Finally, Ms. Horvath, you weren't present at a meeting on

23      November 22nd, 2014, involving Mr. Gross, Yuri Lebedev, and

24      others, correct?

25      A.  No.

1              MR. SHIN:  No further questions, your Honor.

2              THE COURT:  Thank you.

3              Mr. Klingeman?

4              MR. KLINGEMAN:  Nothing.  Thank you, Ms. Horvath.

5              THE COURT:  Thank you, Ms. Horvath.  You're excused.

6    You may step down.

7              (Witness excused)

8              MR. KLINGEMAN:  The defense calls Barbara Floyd.

9              THE COURT:  Floyd?  Did you say Floyd, Mr. Klingeman?

10             MR. KLINGEMAN:  Yes.

11             THE COURT:  Ms. Floyd may come forward.

12    BARBARA FLOYD,

13        called as a witness by the Defendant Gross,

14        having been duly sworn, testified as follows:

15             THE COURT:  Once you're seated, please pull up to the

16    microphone, and state and spell your name for the record.

17             THE WITNESS:  My name is Barbara Floyd.

18    B-a-r-b-a-r-a, F-l-o-y-d.

19    DIRECT EXAMINATION

20    BY MR. KLINGEMAN:

21    Q.  Good afternoon, Ms. Floyd.

22    A.  Good afternoon.

23    Q.  Where do you live?

24    A.  3201 Pepperbush Court, Toms River, New Jersey.

25    Q.  With whom do you live?

1    A.  With my husband.

2    Q.  What do you do for work?

3    A.  I am a high school math teacher predominantly and a

4    part-time giraffe feeder.

5    Q.  How do you know Pastor Trevon Gross?

6    A.  I've been a member of Hope Cathedral for almost nine years.

7    Q.  And I take it during that nine-year period, you've known

8    Pastor Gross as the head of the church?

9    A.  I have.

10   Q.  And over that nine-year period, on average, how often do

11   you think you have seen him?

12   A.  I'm sorry, how often have I seen him over --

13   Q.  Over that nine-year period.  Is this a weekly, or a

14   monthly, or --

15   A.  At least weekly, sometimes more than that.

16   Q.  On the times that you've been in his presence, have you

17   spoken to him, interacted with him, spent time with him?

18   A.  Much, yes.

19   Q.  Based on that nine-year relationship, would you say you

20   know him well enough to form an opinion as to his character?

21   A.  Absolutely, yes.

22   Q.  Could you tell the members of the jury what your opinion of

23   Pastor Gross' character for truthfulness and honesty is?

24   A.  For both of those things, I would call him the epitome of

25   excellence, above reproach.

1    Q.  I'm sorry?

2    A.  Above reproach.

3    Q.  And as for his character for law-abidingness, how would you

4    describe him?

5    A.  The same way.  Complete excellence.  100 percent abides by

6    the law.

7    Q.  And, finally, as for his character for generosity, how

8    would you describe Pastor Gross?

9    A.  Perhaps one of the most generous people I've ever known.

10   Q.  Now, at the Hope Cathedral, you participate in worship

11   every week?

12   A.  I do worship there every week.

13   Q.  What other activities have you participated in over the

14   last nine years?

15   A.  I ran the summer camp for three summers, from 2010, '11,

16   and '12, which was under the church.  I am part of various

17   ministries at the church.

18   Q.  Are you familiar with something called HOPE Federal Credit

19   Union?

20   A.  I am.

21   Q.  Did you participate in any way in the administration of

22   HOPE Federal Credit Union?

23   A.  I worked for the church, for Hope Cathedral, summer of

24   2015.  While I was there working for the church, I did

25   occasionally help Charles Blue, who was running the credit

H37KLEB7                          Floyd - Cross

1   union at the time.  I ordered some pens for the people who

2   filled out applications.

3   Q.  Did you do any more substantive work than that?

4   A.  I really did not, no.

5   Q.  During this nine-year period, have you gotten to know the

6   other members of the Hope Cathedral community?

7   A.  Yes, very well.

8   Q.  Do you think you've gotten to know that community well

9   enough to form an opinion as to Pastor Gross' reputation in

10  that community?

11  A.  Yes.

12  Q.  Could you tell the members of the jury his reputation in

13  that community for truthfulness and honesty?

14  A.  The same.  He has a reputation for excellence.  We all feel

15  the same, I am confident in saying.

16          MR. KLINGEMAN:  Thank you very much.  No further

17  questions.

18          THE COURT:  Thank you.

19          Mr. Shin?

20  CROSS-EXAMINATION

21  BY MR. SHIN:

22  Q.  Good afternoon, Ms. Floyd.

23  A.  Good afternoon.

24  Q.  So you've known Mr. Gross for over nine years; is that

25  right?

1    A.  Just about nine years.

2    Q.  Is it fair to say that you care a great deal about

3    Mr. Gross?

4    A.  Absolutely.

5    Q.  And you're very loyal to him?

6    A.  Absolutely.

7    Q.  And you certainly wouldn't want anything bad to happen to

8    him?

9    A.  I certainly would not.

10   Q.  And you wouldn't want to see him be convicted of a crime,

11   would you?

12   A.  Certainly not.

13   Q.  Now, Ms. Floyd, you testified on questioning by

14   Mr. Klingeman that you had some involvement with HOPE Federal

15   Credit Union in 2015?

16   A.  Yes, sir.

17   Q.  Now, you didn't serve on the board of the HOPE Federal

18   Credit Union at any time, did you?

19   A.  No.  I did a few memberships.  Like I said, I ordered pens,

20   some sleeves.  I set up a table with balloons.

21   Q.  And you weren't present for any conversations between

22   Mr. Gross and any federal regulators of the credit union?

23   A.  No.

24   Q.  You weren't present during any discussions about processing

25   ACH transactions for the credit union?

H37KLEB7                          Floyd - Cross

1   A.  Not that I recall.

2   Q.  You weren't present at a November 22nd, 2014 -- excuse me,

3   November 22nd, 2014 meeting involving Mr. Gross, Yuri Lebedev,

4   and other individuals?

5   A.  I was not part of -- I wasn't even working for the church

6   then.  The only time I was there working was that summer of

7   2015, June, July, and August.  So, no, in 2014, I was not

8   around at all.

9           MR. SHIN:  No further questions, your Honor.

10          THE COURT:  All right.  Thank you.

11          MR. KLINGEMAN:  Thank you, your Honor.

12          THE COURT:  Anything further?

13          MR. KLINGEMAN:  Thank you, Ms. Floyd.

14          THE COURT:  All right.  Thank you, Ms. Floyd.  You may

15  step down.

16          MR. KLINGEMAN:  Your Honor, the defense calls Donald

17  Perrini.

18          THE COURT:  Perrini?  Mr. Perrini may come forward.

19   DONALD PERRINI,

20      called as a witness by the Defendant Gross,

21      having been duly sworn, testified as follows:

22          THE COURT:  Please be seated, and once you're seated,

23  please pull up to the microphone, and state and spell your name

24  for the record.

25          THE WITNESS:  My name is Donald Perrini,

1    P-e-r-r-i-n-i.

2    DIRECT EXAMINATION

3    BY MR. KLINGEMAN:

4    Q.   Thank you, Mr. Perrini.  And welcome.

5         Where do you live, sir?

6    A.   I live in Jackson, New Jersey.

7    Q.   With whom do you live?

8    A.   I'm by myself.  I'm a widower.

9    Q.   When did you lose your wife?

10   A.   Oh, 1992.

11   Q.   What do you do for work or that occupies your time?

12   A.   I'm retired.  I'm a disabled vet.

13   Q.   What did you used to do for work?

14   A.   I did fencing.  Fencing, chain link, stockade.

15   Q.   How do you know Pastor Trevon Gross?

16   A.   Trevon Gross?  I met him about a little over two years ago.

17   Q.   How did you meet him?

18   A.   Excuse me?

19   Q.   Where did you meet him?

20   A.   At church.

21   Q.   Hope Cathedral?

22   A.   Hope Cathedral, yes, sir.

23   Q.   How often have you seen him over those two years?

24   A.   I see him quite a bit.

25   Q.   Could you estimate for us on a weekly, or monthly, or

```
 1    yearly basis, how often you're in his presence?
 2    A.   Weekly, daily.
 3    Q.   And do you talk to him from time to time?
 4    A.   Yes, sir.
 5    Q.   By telephone as well?
 6    A.   Yes, sir.
 7    Q.   Do you feel like you've gotten to know him well enough over
 8    the past two years to form an opinion --
 9    A.   Oh, yes.
10    Q.   -- as to his personal character?
11    A.   Yes, sir.
12    Q.   So let me ask you:  What, in your estimation, is Pastor
13    Gross' character for truthfulness and honesty?
14    A.   Truthfulness and honesty?  It's good.  To me, it's
15    excellent.
16    Q.   How about for his character for law-abidingness?
17    A.   Also the same thing.
18    Q.   And, finally, his character for generosity?
19    A.   He's good -- very generous.  Very generous.
20    Q.   Now, in this two-year period when you've been a member at
21    Hope Cathedral, have you gotten to know the other congregants
22    and other people surrounding the church?
23    A.   Oh, yes.  Yes.
24    Q.   The church community?
25    A.   Yes.
```

H37KLEB7                          Perrini - Direct

1    Q.  Do you think you know the community well enough to

2    understand Pastor Gross' reputation in that community?

3    A.  Oh, sure.

4    Q.  And what would you say his reputation is for honesty and

5    truthfulness?

6    A.  He's a humble, loving man.

7    Q.  What would you say his reputation for law-abidingness is in

8    that same community?

9    A.  Very good.  Very good.

10   Q.  And, finally --

11   A.  I come from a law-abiding family, so...

12   Q.  Well, we're talking about Pastor Gross.

13   A.  Yes.

14   Q.  I take it it takes one to know one?

15   A.  Yes.

16   Q.  Finally, what would be your testimony to the jury as to

17   Pastor Gross' reputation for generosity?

18   A.  Well, if there's anything you need, I mean, he's there.  If

19   he has it, he'll help you.

20   Q.  Thank you, sir.  Thank you for coming.

21             MR. KLINGEMAN:  No further questions.

22             THE WITNESS:  Thank you.

23             THE COURT:  Thank you.

24             Mr. Shin?

25

H37KLEB7                    Perrini - Cross

CROSS-EXAMINATION

BY MR. SHIN:

Q.  Good afternoon, Mr. Perrini.

A.  Good afternoon.

Q.  So, having known Mr. Gross for over two years, is it fair
to say that you care about him?

A.  Oh, yes, sir.

Q.  And you're loyal to Mr. Gross?

A.  Yes, sir.

Q.  You certainly wouldn't want to see anything bad happen to
him, right?

A.  I wouldn't want to see anything happen to anybody bad.

Q.  Fair enough.

        And you wouldn't want to see Mr. Gross be convicted of
a crime, correct?

A.  Of course not.

Q.  And you didn't serve on the board of HOPE Federal Credit
Union?

A.  Oh, no, sir.

Q.  And you weren't involved in any conversations between
Mr. Gross and federal regulators of the credit union?

A.  No, sir.

Q.  And you weren't involved in any discussions with Mr. Gross
and others about who might serve on the board of that credit
union?

1     A.  No, sir.

2     Q.  Mr. Perrini, you weren't present at a November 22nd, 2014

3     meeting involving Mr. Gross, Yuri Lebedev, and other

4     individuals about the credit union, were you?

5     A.  No.  I wasn't at Hope Cathedral then.  I was not there.

6               MR. SHIN:  Nothing further, your Honor.

7               THE COURT:  Thank you.

8               MR. KLINGEMAN:  Thank you, your Honor.

9               THE COURT:  Thank you, Mr. Perrini.  You may step

10    down.  You're excused.

11              THE WITNESS:  Thank you, ma'am.

12              (Witness excused)

13              THE COURT:  Ms. Santillo?

14              MS. SANTILLO:  The defense calls Trevon Gross.

15              THE COURT:  All right.  Pastor Gross may come forward.

16     TREVON GROSS,

17         called as a witness by the Defendant Trevon Gross,

18         having been duly sworn, testified as follows:

19              THE COURT:  Please be seated, and if you would pull up

20    to the microphone, and state and spell your name for the

21    record.

22              THE WITNESS:  Trevon Gross.  T-r-e-v-o-n, G-r-o-s-s.

23    DIRECT EXAMINATION

24    BY MS. SANTILLO:

25    Q.  Good afternoon, Pastor Gross.

1           What is your profession?

2    A.   I'm a pastor.

3    Q.   And when did you first become a pastor?

4    A.   At the age of nine, I acknowledged that I was going to live

5    my life serving God, and then at the age of 14, I was licensed

6    and began the process of going to formal ministry.

7    Q.   What is your educational background?

8    A.   I earned my Bachelor of Arts in religion and classics at

9    the University of Virginia; my Master's of theological studies

10   at Duke University, and I was pursuing a Ph.D. at Harvard

11   University.

12   Q.   How did you come to be a pastor for the Hope Cathedral?

13   A.   In 2002, my wife and I pioneered Hope Cathedral in our

14   family room.  So with about 17 people, including children, we

15   founded the church.

16   Q.   How big is the church now?

17   A.   I'd say we probably have about 700 families that are part

18   of the congregation, and we see anywhere from 300 to 400 on the

19   weekend.

20   Q.   How many services do you have on a weekend?

21   A.   We have three services every weekend.

22   Q.   What role does your wife play at the church now?

23   A.   Well, as a cofounder, she's played a whole lot of roles

24   throughout the 14 years of the church's history.  So, she's

25   been our worship leader, she has been our children's ministry

1    leader.  Currently, she serves as our small group pastor.  So

2    our network of small groups in the church, she does that.

3    She's been our administrator.  So she's held a whole lot of

4    hats throughout the years.

5    Q.  Is your wife in the courtroom today?

6    A.  Yes, she is.

7    Q.  Point her out, please.

8    A.  Yes.  The beautiful lady in the gray.

9    Q.  What are your duties now as a pastor of Hope Cathedral?

10   A.  As lead pastor, my primary responsibility is to teach.  And

11   so the weekend services are my primary responsibility, as well

12   as shepherding the pastoral care aspect to make sure all the

13   members are cared for.

14   Q.  And what other services does the Hope Cathedral provide to

15   the community?

16   A.  We have a lot of activities that go on throughout the week

17   and throughout the month to serve people.  So we have, I

18   mentioned earlier, our small group ministry, which is really a

19   way for people to connect in relationship, so that people are

20   not alone, they go through life with people in real

21   relationships.  We have an outreach ministry where we feed

22   hungry people.  We take food out to homeless people who are

23   there.  We actually provide toiletries and even transitional

24   housing for people when they don't have places to live, things

25   like that.

1    Q.  Aside from your work at the Hope Cathedral, do you have any

2    other employment?

3    A.  I serve as an adjunct professor at Pillar College, which is

4    a four-year accredited Christian university in New Jersey.

5    Q.  Do you do any volunteer work?

6    A.  A whole lot.

7    Q.  Can you give us some examples?

8    A.  Yes.  I volunteer in helping people.  Writing is one of the

9    things that I do, it's a gift that I have, and so I've helped a

10   lot of people write books and volunteer to help people do

11   things like that.  But it's a whole host of things that I do.

12   Q.  Did there come a time when you became involved in working

13   with a credit union?

14   A.  Yes.

15   Q.  How did you become involved in working for a credit union?

16   A.  About ten years ago, a gentleman named George Wyatt invited

17   me to become a part of the advisory board of the credit union.

18   Q.  Where was the credit union located?

19   A.  It was located in Lakewood, New Jersey.

20   Q.  Had you known Mr. Wyatt before?

21   A.  He had been coming to the church for a while, and so it was

22   during one of those discussions where he talked about the

23   credit union, what it was all about, its history, and his

24   desire to have me as one of the kind of new leaders in town to

25   be connected with it.

1   Q.  So what was the credit union all about?

2   A.  Well, every credit union has a story.  In fact, it's --

3   credit unions are a collective of people, whether it is, as you

4   heard earlier, a single segment where it's around a group of

5   people that may be an organization or it's a community-based

6   charter, which is what the Lakewood Community Credit Union was.

7   It was founded in, I think, 1968, and by a small group of

8   people who wanted to provide economic advancement for that

9   community.

10  Q.  Can you tell me a little bit about the community of

11  Lakewood?  What members of the community the credit union

12  served?

13  A.  Yes.  So the credit union primarily targeted the unbanked,

14  and really those who are day laborers, and even undocumented

15  people in that community.

16  Q.  And why was this an audience that the credit union was

17  seeking to help?

18  A.  Well, because it's an underserved audience.  In our area,

19  because there are a lot of farms, during the seasons of

20  harvest, there are a lot of workers that come in, and they have

21  no access to -- really to the financial system.  So, when they

22  get their paychecks, you often see them standing in line at

23  check-cashing places, or even banks now have started charging

24  20, 30 dollars in order to get your check cashed at the end of

25  the week.  So, it's been a need ever since I've been in the

1    area, which is almost 17 years.  You just see that there's a

2    whole group of people who have no access to the traditional

3    banking system.

4    Q.  And what services did the credit union -- staying at a time

5    when the credit union was located in Lakewood, what services

6    did the credit union provide to the community?

7    A.  One of the ways that -- and the touchpoint that George

8    talked to me about was helping people with financial

9    management, the fact that those people who are normally low

10   income, undocumented, unbanked, really need help with managing

11   money, how to manage it properly, and we had a ministry in the

12   church where we specifically helped people learn how to budget,

13   how to manage your money, how to make sure that you live within

14   your means, those types of things.

15          And so that was the primary touchpoint that brought me

16   into the credit union, but the credit union itself offered

17   savings accounts, later on it offered checking accounts, and

18   then, of course, loans to the members.

19   Q.  How big was the credit union?

20   A.  When I first went to it, it was probably around a 30-,

21   40-thousand-dollar credit union with maybe 60 or so total

22   members.

23   Q.  And how successful was the credit union?

24   A.  Well, it continued to grow.  But the growth was very slow,

25   and it was painful growth, because whenever something grows,

1    there are always growing pains.  So, as the credit union grew

2    and more money came in, there was also a need for the credit

3    union to make more money.

4            So, what really ended up happening was all those who

5    served on the board or the advisory board, it actually came out

6    of their pockets, and we really committed every year personally

7    to give anywhere from like 250 to $500 a year just so the

8    credit union would have money on its balance sheet to be able

9    to support the bank accounts that it opened.

10   Q.  Did sometimes board members do anything else to help

11   financially support the credit union?

12   A.  Yes.  So when a person came in and really needed a loan,

13   but they did not meet the underwriting requirements, oftentimes

14   board members would basically cosign their loans for them to

15   ensure that they were able to get access to the capital that

16   they needed.

17           As I said, this is a low-income credit union, and the

18   types of loans we made were very nontraditional.  So, a single

19   mom who needs a security deposit because she needs a place to

20   live with her child, well, most places aren't going to lend you

21   money for a security deposit, or someone who's trying to take a

22   CPR class because they have been downsized, and they want to be

23   able to learn a skill that they can make some money from, we

24   would lend them the money to get the certification, that type

25   of thing.

H37KLEB7                           Gross - Direct

1    Q.   And what are the circumstances that led to the HOPE Federal

2    Credit Union coming to be located at the Hope Cathedral?

3    A.   So, in 2012, Superstorm Sandy hit, and right as that was

4    happening, the building we were in also was sold.  So we

5    thought we had a place where the credit union was going to move

6    to, but when Superstorm Sandy hit, that location really

7    disappeared because of the storm.  So the credit union

8    basically had no place to go.

9    Q.   How did it come that Hope Cathedral became the place that

10   it went?

11   A.   Well, over the years, really since I became associated with

12   the credit union, I moved from advisory board after a couple of

13   years to actually being a board member.  In fact, in 2007, I

14   was actually -- when the charter was changed for the credit

15   union to include those who volunteer in Lakewood, and that was

16   a charter change that enabled the church to formally get

17   involved in the credit union.  So that was around the time when

18   I also became a board member, when that charter change was

19   made.

20        So, that's when the church really took a more active

21   role in the credit union, supporting the credit union.  The

22   church itself then started underwriting loans for people in the

23   credit union.  So rather than the individuals cosigning loans,

24   the church itself would guarantee loans.  As well as people who

25   were in need, we would also send them to the credit union, so

1    that they could qualify for a loan.

2    Q.  Did you come to take a leadership role at the HOPE FCU?

3    A.  Over time, I moved from just being a board member, and then

4    right when the transition took place when we moved from

5    Lakewood to the church campus, that was when I was elected to

6    be chairman of the board.

7    Q.  When you became chairman of the board, did you intend to

8    stay in the position?

9    A.  No, I did not.  It was never my desire to be heavily

10   involved in banking, but it is my heart to help out, and the

11   credit union needed leadership.  The previous board in the

12   transition from Lakewood to Hope Cathedral, many of them

13   resigned, and the credit union pretty much needed a new board

14   and needed people to just support it with volunteer hours.  We

15   still had members that needed to be served, and work needed to

16   be done.  So, at that point it was really a rally cry to get

17   other people involved, so that we'd have all hands on-deck to

18   keep the credit union moving forward.

19   Q.  Were you able to get other people involved?

20   A.  Absolutely, yes.

21   Q.  How?

22   A.  Basically going to them and asking them, hey, this is the

23   vision of the credit union, this is what it's all about, we'd

24   really appreciate -- you have a certain skill set that would be

25   helpful, would you mind becoming a part of it.

 1   Q.   How many new board members were you able to recruit from
 2   your community?
 3   A.   Almost the whole board.  So except for the two original
 4   members, being George and Delores Wyatt, everybody else came in
 5   at my request.
 6   Q.   Were they affiliated with the church?
 7   A.   Yes, they're all active parts of the church.
 8   Q.   Now, in what other ways did the Hope Cathedral support the
 9   HOPE Federal Credit Union?
10   A.   A lot of ways.  In the early days, when there was a need --
11   you've heard that word capitalization used a lot.  When it was
12   coming to the end of a quarter, and it was short in its
13   capitalization, the church wrote a check to donate to the
14   credit union, so that it would meet its minimum requirement.
15            We talked about underwriting loans, and,
16   unfortunately, when you underwrite loans, there are some times
17   when people don't make good on those loans, and because we were
18   the cosigner, the church was a cosigner, that meant the church
19   paid for those loans, so that they would not become defaulted
20   loans.
21   Q.   Did the church provide any other financial support for the
22   credit union?
23   A.   Well, so when it was in Lakewood, and we were a part of it,
24   those were the primary ways.  When it moved from Lakewood to
25   Hope Cathedral, that entire transition process was paid for and

1  undergirded by the church.  So, the moving van, the movers, the

2  construction that was needed to actually renovate our offices

3  to accommodate the security for the credit union, the camera

4  system that had to be installed, the new alarm system that had

5  to be installed, all of those things were all paid for and

6  undergirded by the church.

7          In addition, when the credit union grew, and it needed

8  more than just what volunteers could offer, we actually paid

9  for teller services, we paid for computer equipment, all the

10 supplies for the credit union, telephone, website design.  The

11 church fully funded the credit union.

12         In fact, it used to be known as the Lakewood Community

13 Federal Credit Union, and in the transition from Lakewood over

14 to our campus, it actually was renamed, with permission by the

15 NCUA, to become Helping Other People Excel Federal Credit

16 Union, or the acronym HOPE FCU, because there was that now

17 stronger connection between the church and the credit union.

18 Q.  Did the HOPE Federal Credit Union, as a financial

19 institution, have challenges?

20 A.  Yes.  Yes, it did.

21 Q.  Could you describe some of those challenges?

22 A.  Well, it's all about growth.  So if you -- you've heard

23 capitalization talked about.  Every time you get money in a

24 member's account, it has to be offset with at least 7 percent

25 of revenue to the credit union.  So, here comes the math part.

But if you get a hundred dollars, then you have to have $7 of

income directed to the credit union's bottom line.  So, every

time someone deposited money, you had to have 7 percent, at

least, come in as profit.  And sometimes that just wasn't -- we

weren't making that much because the loans we put out, you

maybe, you know, got a couple of dollars a month in loan

interest, but that certainly did not offset the pace.

So what ended up happening was a stalemate because

there were people we actually had to say, you can't put any

money in here because we don't have enough revenue to support

these deposits.  And that was really the challenging position

we found ourselves in, was that we wanted to grow -- there was

a need to grow because, you know, the number of people who are

unbanked and unserved by the financial institutions continued

to grow, but our ability to help them was actually stymied

because we did not have the revenue to continue to grow the

credit union.

Q.  Did the credit union have a strategic plan for growth?

A.  Yes.  So, at some point around the time of 2011, 2012, we

did apply for a grant with the NCUA's Office of Small Credit

Union Initiatives, and they actually sent one of their

consultants out and worked with us to put together a strategic

plan to help us chart a path forward, so that we could actually

get to that growth that we desired.

Q.  What were some of the steps that the credit union thought

1    might be helpful in order to achieve the growth that you were

2    seeking?

3    A.   Well, chief among them -- there were several objectives,

4    but I know one of the first or second was about increasing fee

5    income, because, once again, we had to have revenue, we had to

6    have income in order for the credit union to grow.  And then

7    there were some that related to innovative ways to bring in

8    partnerships to, you know, generate more money.  So that was

9    working with other credit unions to do mortgages and auto

10   loans, used car loans, those types of things, in partnership

11   with other credit unions, so that there could be some kind of

12   revenue-sharing, which would cause the credit union to grow.

13   Q.   Did the credit union face any technological challenges?

14   A.   Well, yes.  The computers that we originally worked on were

15   dying, really fast.  In fact, they had come by way of a grant

16   that we had received years before, and so the technology was

17   failing.  The phone system, all those types of things were

18   needed.

19   Q.   Were there any limitations in the banking services you

20   could provide to the members of the credit union?

21   A.   Could you define what you mean by limitations?

22   Q.   In terms of services you would be able to offer to the

23   community to attract members.

24   A.   Well, everything is driven by revenue.  So, if you don't

25   have the revenue to be able to do the marketing, to support

1    your membership base, your options are limited.  So,

2    absolutely.

3    Q.  How did people get money out of the credit union?

4    A.  Well, initially, we only had savings accounts.  And in this

5    day and age, if you wanted to get money out of that savings

6    account, you had to come to the credit union when it was open,

7    on a day that it was opened, to request a check, that you would

8    then have to take to a bank to cash, so you could have access

9    to your money.  And I think you agree that that is a pretty

10   complicated way to get money out of your own account.

11           So that was a huge barrier, which really kept the

12   credit union from being attractive to people, even the people

13   we were trying to target, because who wants to go through that

14   process just to get some money out of your own account?

15   Q.  Were there plans to try to obtain more types of services

16   for people so it would be easier to bank at the credit union?

17   A.  Absolutely.  So, in the strategic plan, it talked about

18   looking at prepaid debit cards to ensure that -- prepaid credit

19   cards, rather, prepaid credit cards as well as debit cards,

20   because those of course give you access to your money wherever

21   you are.  And for the prepaid credit card, it also helps a

22   person whose credit may not be that good, give them an

23   opportunity to help build their credit so that they can become

24   creditworthy.

25   Q.  Was the credit union able to provide those services?

1    A.   No.  So those were wonderful goals in our strategic plan,

2    but when we researched what it cost to actually get into them,

3    for a debit card program, it was easily 12 to 15 thousand

4    dollars just to start up the process of getting the debit card

5    program, and then you had to pay per debit card and even

6    transaction fees and all those other types of things.  So we

7    actually tried, I would almost say, three years we struggled to

8    find a way to get to the resources to get the debit cards.

9             In fact, one of the hurdles was, we had to have at

10   least 100 active checking accounts, as a minimum, in order to

11   do that.  So we did membership drives to get more people into

12   the credit union, and we finally hit the 100 threshold.  We

13   still needed the exorbitant amount of money to try to even get

14   the debit card program implemented.

15   Q.   Did there come a time when you were approached by a group

16   about a potential partnership?

17   A.   Yes.  In late winter/early spring 2014, I got a couple of

18   messages through social media, saying, hey, interested in a

19   business partnership with you.  And I really ignored them.  So

20   I think one came through LinkedIn, another through Facebook.  I

21   pretty much ignored them because I didn't take them seriously.

22   And then at some point an email came to the church's general

23   email account, speaking of an association that had, I don't

24   know, over 10,000 members that was interested in partnering

25   with the credit union.

 1   Q.  What were your thoughts when you received that email?

 2   A.  I was very much intrigued, quite frankly.  Intrigued

 3   because at that point, in 2014, I think all of us, as a board,

 4   had become a little frustrated with the pace of growth, with

 5   the struggle to just cause -- you know, get the credit union to

 6   move forward, and we were really at that crucial point, what do

 7   we do with the credit union.

 8         And, for our sake, we had two decisions.  The first

 9   was, do we stay a community-based credit union, which of course

10   is in Lakewood even though we're in Jackson, and all that that

11   entails, or do we expand that charter to become Lakewood and

12   Jackson, or do we simply make it a single-segment credit union

13   that basically was a part of the church?  We didn't like the

14   latter option only because if it was only open to the church,

15   you really couldn't help the people that needed to be helped,

16   because they'd have to be a part of the church in order to get

17   the help.  So that was really where we were.  It was like what

18   do we do with our next step.

19         I guess there was a third option, which for us wasn't

20   a realistic option, which was to shut it down.  And that was

21   not an option for us, and here's why it wasn't an option:  The

22   gentleman who helped found that credit union actually was

23   active in the credit union, as an 80-some-year-old man, up

24   until about 2012, so he was still involved.  And his desire, as

25   he -- because of failing health and his wife passed away, his

1   kind of responsibility that he put really on me was, help this

2   thing keep living, don't let the investment that we put over

3   30-some years ago basically die with me.  So, for us, closing

4   down the credit union wasn't an option; we had to find a way

5   for this credit union to keep on going, for the sense of legacy

6   and history.

7            So, when this email came in, it was intriguing.  And

8   then when I really caucused with the other board members and we

9   had conference calls and that type of thing, that's when you

10  heard that word used earlier, it's a blessing.  That's when

11  that word initially emerged in our discussions, because here we

12  are trying to decide what do we do with this thing, how do we

13  make this credit union be what it needs to be.  And we saw this

14  new partnership with this organization as the answer to what we

15  were -- the problem we were trying to solve.

16  Q.  Was there a specific person who first approached you?

17  A.  I can't remember in the email who it was from, but I know

18  my initial discussions -- so we moved from the initial email to

19  a caucus with some board members about the possibilities, and

20  then I went and responded, hey, interested, you know, what's

21  this all about?  And as I recall, we scheduled, I think it was

22  a conference call, it may have been a Skype, but it was some

23  kind of meeting where we actually -- where they laid out their

24  vision.  At that point, it was Michael Murgio was the point

25  person.  He presented himself as the key decision-maker and the

1    kind of the one who was behind this vision.

2    Q.  What did he represent to be his vision?

3    A.  Well, so he said they had over 10,000 members in this

4    Collectables Club.  And he described the Collectables Club as a

5    group of high net-worth individuals who, through inheritances

6    and other things like that, had very valuable possessions that

7    they wanted to trade among themselves and that they did not use

8    things like eBay or whatever else, simply because these were

9    precious, rare types of commodities that only high-end types of

10   people would want to be involved in, and that they were looking

11   for a credit union to be a part of, because in the selling of

12   their collectibles, to have the option to have peer-to-peer

13   loans to one another as well as being able to do transactions

14   among the club members, that, for them, was very attractive.

15   Q.  What were your first impressions of Michael Murgio himself?

16   A.  He's been impressive person.  So, when we first met him --

17   he's a very warm type of individual -- he began to share his

18   story.  He actually is from Lakewood, and, you know, he talked

19   about his sister and how he comes through the area frequently

20   for family events and all those types of things.  He spoke

21   about how he was a teacher and then rose up through the ranks

22   to become a superintendent of schools, and even was at that

23   time on the school board.

24   Q.  What role did you think he played at the Collectables Club?

25   A.  From what he represented, he was the decision-maker, he was

1     the trustee, he was the primary person.  There were others who

2     were a part of it, but he was the leader.

3     Q.  Did you also meet his son, Anthony Murgio?

4     A.  Yes.  So, around that same time, some of the conversations

5     were with Michael alone, others were with Michael and Anthony.

6     And they were talking about the vision of the Collectables Club

7     and how it would work well with the credit union.  And they

8     talked about how, as high-net-worth individuals, they had a

9     concern to help people who didn't have resources, and what a

10    wonderful thing it would be for them to be able to take the

11    wealth that they had earned and be able to use it to help

12    people in need.  So, everything sounded like it was great.

13    Q.  Were you ever told that it was an unlawful Bitcoin

14    exchange?

15    A.  Never.

16    Q.  Why were you interested in the partnership?

17    A.  Well, here's the primary reason why we were interested in

18    the partnership:  They had over 10,000 members; we had a

19    hundred members.  If you're going to secure the future of a

20    credit union, you need members, because, as one of the previous

21    witnesses said, the people who control or own a credit union

22    are the members.  So, we have 107, I think, at the time, and

23    they're talking about over 10,000 members in their association.

24    So that, for us, was an amazing proposition, because if you're

25    going to secure the charter of the credit union, anything over

1   a thousand members, and let alone 10,000 members, is going to

2   give you a level of security that will cause you to grow.

3   Q.  Were they bringing anything else to the table?

4   A.  Absolutely.  So, in addition to just having a lot of

5   members, the people that they talked about being a part of this

6   initiative were, from their resumes, very qualified people.  So

7   you had technology, you had banking experience, you had

8   managerial experience, and even a lawyer.  So you had all of

9   these people, and they were skill sets that none of us had.

10  So, for us, it was tremendous because they offered not only

11  members but they offered expertise that we didn't have.

12          And the third point, just being candid, is they

13  offered diversity, which is one of the things we sorely needed,

14  because in our efforts to try to grow, to get business accounts

15  in and other things like that, we would offer great rates to

16  people, you know, lines of credit to businesses, small lines of

17  credit, but, you know, be able to offer them some way that they

18  could be enticed to become a part of the credit union and they

19  liked it until they came and sat down with us and then they

20  found reason why they didn't want to bank with us.

21          And this happened too many times.  So we realized, it

22  is what it is, we need the diversity, we need to have more

23  diversity in our leadership so when we go out to people, they

24  see that we serve everyone, and that they would feel

25  comfortable putting their money in this financial institution.

1          And the members being high net worth also was a plus

2     because they could obviously not only put money into the credit

3     union but also the annual maintenance fee that we charged, they

4     would actually pay, instead of a ten-dollar maintenance fee,

5     they could actually pay a more substantive annual maintenance

6     fee, which would of course be revenue right to the bottom line

7     of the credit union.

8     Q.  What was your understanding about what kind of partnership

9     they were interested in getting into with the credit union?

10    A.  When we first started talking, they came in saying, you

11    know, we know the business, we know, you know, banking, we know

12    all these types of things, we're ready to run, we want to come

13    in, we want to just get our members in, we want to serve our

14    members, we're ready to quote-unquote take over and really let

15    this credit union serve our association.  And as much as we

16    liked the concept of them coming in, we weren't in any way

17    excited about the idea of taking over.

18         Now, we recognized that if we have a hundred members

19    and they even bring in 200 members, at the next member meeting,

20    they have the votes to do whatever they want to do.  So, it was

21    our understanding that we needed to do something to ensure that

22    there wouldn't be this seismic change as soon as these new

23    members came into the credit union, because, literally, if 115

24    people come in and they're active, they outvote the current

25    people who are currently in the credit union.  So, we wanted to

1    form a formal partnership with them, to ensure that if they're

2    going to take over because they have the members, it's not

3    going to be some drastic change and it's not going to be

4    something where the core of who the credit union is, which is

5    to serve the unbanked and the underbanked and underserved

6    people, that they would still stay true to that commitment.

7    Q.  So, what kind of arrangement did you come to, in terms of

8    board control?

9    A.  Well, there was a lot of talk.  So, we talked a lot, they

10   proposed a lot of things, we countered with other things.  And

11   what we came up with was, because they were bringing the

12   expertise, that they would come in and partner on the board,

13   and they would have operational control to deal with the

14   day-to-day affairs, to ensure that the credit union was run,

15   obviously, to the higher standards and all those types of

16   things.

17   Q.  What was your impression of the people who were seeking to

18   join the board?

19   A.  From their resumes and the discussions we had, they all

20   seemed not only eager and qualified but really had a vision to

21   see the credit union grow.

22   Q.  Did you consult with other members of the board of the HOPE

23   FCU about the partnership?

24   A.  Absolutely.  There were a lot of conversations, individual,

25   group, you know, a lot of different iterations asking what do

1    you think about this, is it a good idea.  And we all felt this

2    is something that's good, we need to, of course, enter into it

3    wisely, which is why we did a memo of understanding, to lay out

4    the responsibilities, what we would do, what they would do.

5    And over this two-year period, we conceived of really walking

6    down the road together, to ensure that when it does change

7    hands, because all these members come in, that it's in good,

8    safe hands.

9    Q.  What diligence did you think the Collectables Club was

10   doing on their end?

11   A.  I'm not sure I understand.

12   Q.  What -- did you think the Collectables Club was -- what do

13   you think that they were doing on their end to ensure that the

14   partnership with the credit union was successful?

15   A.  I'm not sure I understand your question.

16   Q.  Okay.  We'll ask it in a slightly different way.

17   A.  Okay.

18   Q.  When the members of the Collectables Club came to the

19   board, what was your understanding about what they were looking

20   to accomplish?

21   A.  They were looking to build an infrastructure so that they

22   could serve their over 10,000 members in their association.

23   And so everything we talked about was building capacity,

24   looking at our current core processing system, which was CU

25   South at the time, and could that handle 10,000 members

1    actively working with the system.  We didn't have debit cards,

2    they knew we didn't have those kinds of functions there, so it

3    was all about how do we build the capacity of the credit union

4    to ensure that it can serve not just the members they were

5    bringing in but also expansion efforts to continue to grow.

6    Q.  Were there any specific things that they offered in terms

7    of growth of the credit union?

8    A.  Well, they were going to, in addition to bringing their

9    members in, they were also going to help bring in business

10   partners and business accounts to ensure that we had a solid,

11   diverse membership that was not just individuals but also

12   businesses.

13   Q.  What was your perception about whether this was a good idea

14   for the credit union?

15   A.  We thought it was a great idea.  They represented --

16   Michael Murgio in particular -- represented that their desire,

17   even though they were in Florida, that they were relocating

18   their headquarters to Lakewood because of all of his family

19   connections and all of those things, and that they were in the

20   process of relocating their headquarters to Lakewood because

21   they wanted to come back, quote-unquote come back home, and

22   that this would be an ideal place for them to do that.

23   Q.  Did you have any concerns that the Collectables Club was

24   not in the field of membership?

25   A.  Not based on what I just said, because it was our

1   understanding of the field of membership that as long as you

2   were low-income designated, which we were, that an association

3   that had an address in your field of membership was not only

4   qualified to be in the credit union but also its members, no

5   matter where they were.  That was our understanding, and that

6   was really how we proceeded.  So that, for us, was the

7   justification as to how we could see this partnership working.

8   Q.  Were you concerned that some of them had addresses in

9   Florida?

10  A.  I wasn't, simply because, based on our understanding of the

11  field of membership, as long as the headquarters was in our

12  field of membership, the members could be anywhere.

13  Q.  You talked about the memorandum of understanding.  Was that

14  a final agreement?

15  A.  No.  So, it was to be the first step in the process of

16  getting to an actual lawyer-reviewed legal agreement, which

17  would also include any money that was changing hands, being put

18  in escrow, as a way to, you know, signify the deal.

19  Q.  Did members of the HOPE Credit Union vote to allow the

20  Collectables Club to join the credit union?

21  A.  Yes, yes, they did.  So, we first voted on the partnership,

22  and I think, in one of the minutes you all have seen, there's a

23  resolution where we talk about the partnership and having

24  operational control and what that partnership meant.  That was

25  the vote that authorized me to actually go ahead and sign that

1   memo of understanding.

2   Q.  Can you tell me a little bit about the election process for

3   the new board members?

4   A.  Well, credit unions have an annual member meeting, where

5   those whose terms have expired or if there are any resignations

6   that have taken place, you fill your empty board slots or you

7   put up new people to be elected.  So, for us, that meeting took

8   place the third Saturday in June.  And so that was the time of

9   our annual meeting and our election.

10          Normally, our annual meeting was more like a lunch

11   where we would invite a lot of invited guests, but for

12   membership purposes, we had very few members really physically

13   show up, and it was mostly a lot of outside supporters who came

14   to support the annual meeting.

15          So, one of the things we talked about was, since we

16   now have new technology that was in the credit union and we had

17   the ability to allow online voting, since people don't

18   physically come to cast their vote, why don't we go ahead and

19   have the election be held online.  That way, people would have

20   a window to vote, they would vote online, and they wouldn't

21   have to be physically present in order to cast their ballot.

22   Q.  Was this new for the credit union?

23   A.  Yes.  That was the first time we did an electronic ballot.

24   Q.  Why did you decide to do it then?

25   A.  Well, for the reasons I just stated; because we wanted to

1    make sure that the greatest number of the membership had an

2    opportunity to not only vote but also see the people who were

3    being put up for election.

4                  (Continued on next page)

1  Q.  You talked about Michael Murgio being involved with the

2  initial discussions with respect to the Collectables Club.  Did

3  he stay involved with the Collectables Club?

4  A.  He did for the first portion of our time together.  We had

5  training sessions, I was walking him through the system,

6  helping him understand how the credit union worked,

7  understanding terminology and all that.  And my initial

8  interaction throughout the first months or so of this was with

9  Michael Murgio.  He was the de facto leader as far as I knew.

10         And then right after the election, he said that he was

11 going back to Italy for two months for his vacation, and he was

12 going to have his son really stand in for him while he was out

13 of the country, but as soon as he got back, he would be

14 reengaged.

15 Q.  Did that happen?

16 A.  Yes, it did.

17 Q.  We'll get there.

18 A.  Ha ha.

19 Q.  And what was your impression of Anthony Murgio?

20 A.  Seemed very eager, entrepreneurial, a lot of vision, lot of

21 big ideas, that type of thing.

22 Q.  What about the team that he was bringing?

23 A.  They all seemed energetic, very loyal and committed to

24 Anthony, but also they seemed to have competencies in their

25 various areas.  Whenever they talked about whatever their area

1    was, technology, banking, whatever else, they were -- they knew

2    what they were talking about.

3             MS. SANTILLO:  If we can go to Government

4    Exhibit 6085.

5             THE COURT:  You said --

6             MS. SANTILLO:  6085.

7             THE COURT:  Okay.

8             MS. SANTILLO:  I can move on if it'll take a minute.

9             MR. SHIN:  We've got it.

10            THE COURT:  Up to you.

11            THE WITNESS:  Okay.  It's here.

12   BY MS. SANTILLO:

13   Q.  Now, you had mentioned that there was a meeting where there

14   was a board discussion about the Collectables coming in and

15   taking control of the credit union.  Does this appear to be

16   minutes from one of those board meetings?

17   A.  Yes.  This is where it says strategic partnership update

18   there, that's where we talked about it and what our plans were

19   going forward.

20            MS. SANTILLO:  If you could blow that up.

21   Q.  During that meeting, it states that the Collectables Club

22   would take on the responsibility of running the entire credit

23   union, and you would continue to conduct and do credit union

24   business for customers and clients.  Do you recall that

25   meeting?

1    A.   Yes.

2    Q.   And what was the discussion?

3    A.   We had -- we had been talking about this for a while, so it

4    wasn't a new discussion because I think, you know, at least in

5    March and April, we had been having the discussions about this

6    partnership and what it looked like, what they brought to the

7    table.  There was a meeting where we looked at the resumes of

8    all the people who were involved, so this was an ongoing

9    discussion, and it evolved over those board meetings to the

10   point where we were ready to say this really looks like it's in

11   the best interest of the credit union.

12   Q.   And how did the partnership go?

13   A.   Initially, it went well.  So initially, it went well.

14   There was a lot of -- in the early days, I would say, if we go

15   back to the early days of just talking about the partnership,

16   there was a lot of back and forth, there were a lot of -- you

17   know, Michael Murgio in particular would, you know, offer,

18   "Hey, we can do this.  We can do this.  We can do this."  And

19   we would talk as board members, whether it's a subset or the

20   whole board, and we would say things like, "We're not ready to

21   go there yet," those types of things.

22        But once we locked into, "Okay, here's what we're

23   going to do.  We're going to partner together.  Here's how

24   we're going to partner together, here are the things you bring,

25   here are the things we're going to bring."  We at least locked

1  into a concept of how we were going to go forward, and it

2  started off going well.  Actually, very well.

3           Each -- each person was paired up with -- so each new

4  board member was paired up with an existing board member for

5  the purposes of being trained.  And we had talked about having

6  a strategic planning retreat where we would actually come

7  together and jointly craft a plan for how we go forward into

8  the future.  And so it started off a tremendous partnership.

9  Q.  Okay.  Did you come -- I guess we'll got to the part where

10  that changed, but --

11           MR. NOBLE:  Objection.

12           THE COURT:  Sustained.  The jury will disregard

13  comments of counsel.

14           Ms. Santillo, please stick to direct questions.

15           MS. SANTILLO:  Okay.

16  BY MS. SANTILLO:

17  Q.  Now, when you began the relationship with the Collectables

18  Club, was there ever an understanding about them making a

19  donation to the Hope Cathedral?

20  A.  Yes.  So initially, when they -- in the early conversations

21  with Michael Murgio and with Anthony, they had talked about

22  different ways to show their commitment to this partnership.

23  They said we can -- we can give money to all the board members,

24  we can give money to you and, you know -- or we can give it to

25  the church because -- and I never quite knew how they knew

1   this, but they actually said, "Because we know the church has

2   been underwriting the credit union."  I never knew to this day

3   how they knew that.  But it was clear in our early discussions

4   that they had done their homework on who we were as a credit

5   union and who we were as a church.

6            So they had offered all different kinds of ways to

7   demonstrate that they were committed to this deal.  And for me,

8   as well as for those who did know about the donation, we

9   thought the best place for that money to go was to the church

10  that had been financially supporting the credit union for all

11  these years.

12  Q.  And why was that?

13  A.  Well, because in our -- we saw it as a win/win.  We saw

14  this group coming in, and they wanted to really take the credit

15  union to a whole nother level that we hadn't even conceived of,

16  and it would also make the church whole for its financial

17  investment that it had put into the credit union for 10 years.

18  And so in the whole context of that --

19            MR. NOBLE:  Objection.

20            THE COURT:  I'll allow it.  Go ahead.

21            THE WITNESS:  So in the context of that, we had talked

22  about, as we were supposedly moving towards this legal

23  arrangement -- remember, we had the memo of understanding, we

24  did more talking to kind of flesh out what this partnership

25  would look like, and the donation, we got as far as putting

together an email which detailed all of the points around which

we were going to then do a legal agreement.

         And we had agreed that there were a bunch of different

points in that email, but towards the end of it, it was that

there would be the $150,000 donation to the church, as well as

an exit provision that if, for whatever reason, at the end of

this partnership we just couldn't work together, that there

would be $50,000 kind of seed money to start a new credit

union, and really, the old board at that point would take leave

and pioneer a new credit union to serve our intended audience.

Q.  So what was your understanding about whether this was

connected in any way to board control?

A.  That it was not.  And I want to be -- I don't want to be --

to just clarify that.  Because there was never any control of

the board, and the only way you control a credit union is

through its members.  And even at the time that we had the

vote, the members in the credit union were, quote/unquote, the

old legacy members, and none of the new members, except for the

ones who were on the board, had come in.  So there was never

any membership change that would say that the control or total

control of the credit union had changed.  It was our intention

that this would be a partnership, that we would share board

responsibilities so that they would understand all of the

fiduciary responsibilities around running a credit union,

compliance, all of those things, and at the same time, they

1    would be running the day-to-day operations, which, of course,

2    they would also be mentored in by the existing people who had

3    been serving.

4    BY MS. SANTILLO:

5    Q.   Did you get involved in training the new members?

6    A.   I did to a degree that I was involved.  Because a credit

7    union has a lot of moving pieces.  So every person who had a

8    responsibility trained their own counterpart in their duties.

9    So the person who served as board secretary was training the --

10   a board secretary.  The CFO was training an assistant

11   treasurer.  So everybody was paired up to actually help a new

12   counterpart learn how to run the credit union.

13   Q.   Did there come a time when you became involved with a

14   business called Kapcharge?

15   A.   Yes.  Somewhere around this May timeframe we created an

16   account -- and I say "we" because I'm not sure who did it

17   exactly -- but an account was created for Kapcharge, and they

18   were represented as kind of the first business that the

19   Collectables Club was bringing in to show that they were, you

20   know, that they could bring in serious business member

21   accounts.

22   Q.   Why were you interested in doing business with Kapcharge?

23   A.   Well, initially, I didn't know fully what -- what they were

24   beyond that they were -- they did ACH processing.  And I really

25   did not have any great knowledge of what -- you know, I knew

1    what ACH processing is, but what a payment processer or a money

2    service business or any of those other terms we've heard this

3    week, or the last three weeks, I didn't really know what they

4    were, but I knew they were a business, and they were a big

5    business that had worked in other banks.

6              And in fact, one of the things that, when we met with

7    the principals from Kapcharge, they talked about the other

8    banks that they worked with, and the processing, and the volume

9    of processing that they did through other US banks.

10   Q.  And what about their relationship with those banks did you

11   find to be interesting?

12   A.  Well, their concern -- their concern was that, with the

13   banks they worked with, which were the big 10 banks in America,

14   that they pretty much set their fees and there's no

15   negotiating, which means the money that a payment processer can

16   make on a margin is much smaller because the bank takes, from

17   their perspective, a larger portion of that.

18             So what they saw as attractive was being able to be in

19   a credit union where they could process, having better rates,

20   and it would be a win/win for them, as well as for the

21   financial institution, and that seemed very attractive.

22   Q.  Okay.  And what was the idea about how quickly the credit

23   union would get involved in ACH processing?

24   A.  Well, there was a whole need for infrastructure.  Because

25   ACH origination is very involved, and there was so much we did

1  not know about it that the idea was to go slow, to

2  incrementally grow this so it could ultimately be one of the

3  funding vehicles to cause the credit union to go to the next

4  level.

5  Q.  Did there come a time when -- let's see.

6         Did there come a time when the relationship with

7  Kapcharge changed?  I'm sorry.

8         Did there come a time when you started doing more ACH

9  processing for Kapcharge?

10  A.  Yes.  So around July I think we started to do the testing

11  of transactions and making sure that we understood, you know,

12  the whole process of transmitting and receiving files, and how

13  our system would account for them, and all the reports you

14  needed to run, and all those kinds of things.  And the idea was

15  really each month we would systematically increase, once we

16  knew more and also had the infrastructure to support it.  So

17  pretty much July and August it was test transactions, little

18  transactions here and there until we got to September.

19         And September is really when two things happened; the

20  relationship with the Collectables Club started to sour, as

21  well as the ACH transactions started to increase.

22  Q.  Why did the relationship with the Collectables Club start

23  to sour?

24  A.  Well, there were promises that were made in the beginning

25  parts of the relationship that just hadn't -- hadn't happened.

The initial discussions with Michael Murgio were that when --
before the summer was over, they would have their headquarters
in Lakewood.  And there were excuses given time after time why
that wouldn't happen, "Well, you know, Michael's not here, and
since Michael's not here, he has to pull the trigger and we
can't do it until he gets here."  And so a lot of just promises
that were made and commitments that were made, they just
weren't -- they weren't following through.  And then by the
"they", I want to be very clear, it was with Anthony.

        At this same time, all of those partnerships that I
talked about with old board members with new board members,
they were working together very well.  We were doing training
sessions, demos for new software, we were looking at a new core
processing system that we were going to use to be able to serve
this larger membership.  We were started the process of moving
to the Federal Reserve Bank, which for a credit union our size
was unheard of.

        So we were -- we had big dreams to do big things, and
all the pieces were falling into place, except there was this
wildcard called Anthony who was really making things messy.
Q.  Did you and Anthony have tension?
A.  To say the least, yes, we did.
Q.  Can you describe that tension?
A.  Well, there was -- as I said earlier, Anthony was very much
an entrepreneurial type of person.  Well, he's very aggressive

1   in his entrepreneurial endeavors, and he wanted to keep

2   pushing, keep pushing, keep pushing.  If the line were in one

3   place, he would want to push just a little bit beyond that

4   line.  And he was from the, you know, "ask for forgiveness

5   rather than permission" type of school, so it was really trying

6   to chase him -- you chase behind him to see kind of what he was

7   directing to have happen.

8   Q.  So did there come a time when --

9           I want to back up a little bit to the beginning of the

10  summer and talk a little bit more about the formation the

11  relationship.

12          DEFENDANT GROSS:  May I have some water?  Is that

13  possible?

14          THE COURT:  Yes.

15          Actually, it's about 4:20, Ms. Santillo, and I think,

16  given where we are, I was going to stop in about five minutes,

17  but we'll stop for the day now.

18          Ladies and gentlemen of the jury, I will send you home

19  a few minutes early with my thanks for your attention.  We will

20  resume at 9:30 tomorrow, and as you see, we're obviously in a

21  new phase of the case.  I just want to repeat my basic

22  instructions to you.

23          As we head toward the conclusion of the process,

24  please bear in mind all of the instructions, but no

25  communications with each other or anyone else through any means

H37OLEB8                          Gross - Direct

1    about the case, no research through any means about the case,

2    and please continue, as you have, to keep an open mind until

3    you begin your deliberations.

4              Thank you so much.  We'll see you at 9:30.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Jury not present)

 2              THE COURT:  You may step down.

 3              (Witness excused)

 4              THE COURT:  Matters to take up?

 5              Go ahead.

 6              MS. CHOI:  Your Honor, I'm sorry to ask.  Could we

 7      have a short break so we can run to the restroom?

 8              THE COURT:  Yes.  A couple minutes.  Thank you.

 9              (Recess)

10              THE COURT:  Matters to take up?

11              MR. NOBLE:  Judge, I spoke with Ms. Santillo regarding

12      the defendant's proposed exhibits.  We're going to review those

13      tonight, the government, and we'll send her an email if we have

14      any objections.  Hopefully, we'll be able to work those out

15      perhaps over email tonight.  Otherwise, if there are any

16      objections outstanding, we'll bring them up first thing with

17      the Court tomorrow when we come in.

18              THE COURT:  I appreciate that.

19              Ms. Santillo, I appreciate, to the extent you worked

20      around the documents in your direct, I do appreciate that.

21              Matters to take up?

22              MR. KLINGEMAN:  I have a question in terms of

23      scheduling.  I don't know how long the direct is going to be,

24      and I don't know how long the cross is going to be, but it's

25      conceivable that we could finish with this witness sometime
```

1   midday, and it's increasingly unlikely that Loretta Larkins

2   will be testifying.  And in fact, I'll try to let everybody

3   know whether that changes, but at this point I don't anticipate

4   that she's coming, in which case we'll be waiting on Special

5   Agent Beyer, and I would expect her testimony to be brief.

6           If we were to conclude the witness tomorrow, I

7   understand the government's going to offer some exhibits in the

8   so-called rebuttal, but we could be done midafternoon.

9           Is the Court going to have the government close at

10  that moment?

11          THE COURT:  Yes.

12          MR. KLINGEMAN:  Okay.

13          MS. CHOI:  Your Honor, would it be your Honor's

14  preference that, if the closing is going to last for some time

15  beyond what we have left, that we split it up so I start and

16  then finish?

17          THE COURT:  I mean, I don't like to do that, but my

18  consistent principle, given what I suspect are the -- at least

19  the government's length of closing, I mean, something's going

20  to --

21          MS. CHOI:  I understand.

22          THE COURT:  Yes.

23          MS. CHOI:  I just wanted to plan, and I wanted to put

24  the Court on notice that it is going to be a lengthy closing,

25  and that I think it would likely spill into the second day.

1   Which I understand your Honor's admonition to us that we move

2   forward at a quick pace, and we are happy to do that, I just

3   wanted to place your Honor on notice that that would be what is

4   likely going to occur.

5        THE COURT:  Given where we are, and everybody's been

6   working in unity, I think, toward the efficiency goals, I'll

7   take suggestions.  I don't want to not use an hour or two only

8   to then find ourselves the next day with me not being able to

9   give the charge and start deliberations.

10        MS. CHOI:  I know.  I totally understand that.  I

11   mean, lucky for us, in this particular circumstance, the case

12   obviously divides itself with regard to the bank and wire fraud

13   part of the case versus the rest of the case, so I think there

14   is a way we could structure closings so it would make sense to

15   take a break in between, but I think realistically, there will

16   have to be spillover into that next day is what I would

17   anticipate, given the pace and everything else that's come up.

18        The other issue is Special Agent Beyer is having -- is

19   trying to get her -- I have not gotten confirmation about what

20   flight she's going to take tomorrow morning.  She's getting a

21   flight tomorrow morning, and we anticipate her being here by

22   midday, hopefully, so that's the other question mark as I

23   haven't gotten an update to say confirmation about when she

24   will be here.  So once I get that, I think that will also

25   inform what we do.

1          I mean, obviously, if we've come to a break and the

2     defense doesn't have anything else to do, we could take an

3     early lunch to accommodate that.  I don't think that's going to

4     be an issue.  I wanted to flag that because I don't yet know

5     what her status is.

6          THE COURT:  Okay.  No, that's fine.  We'll work around

7     that.  It seems like it's sort of moving toward working out,

8     which is about the time -- I don't know if there will be --

9     obviously, there's documents anticipated for the rebuttal, but

10    if the government has anything further in rebuttal, if not, it

11    seems like we're heading toward finishing witnesses -- well, I

12    guess we need to do that first.

13         In any event, I think we could -- it sounds like given

14    when Ms. Beyer is getting here, it's close to working out

15    time-wise.

16         MS. CHOI:  Yes, your Honor.  The one other thing that

17    I would say -- I'm just thinking ahead about next steps -- we

18    still -- I don't know if we've gotten clarity or if your Honor

19    has made decisions about how it intends to charge the

20    conspiracy count.

21         THE COURT:  I have that.

22         MS. CHOI:  Okay.

23         THE COURT:  That's on my to-do list.

24         MS. CHOI:  All right.  I would just say, the one thing

25    I want to know, your Honor, is that that ruling will affect in

3484

1    some part how we close.

2              THE COURT:  The closing.  Absolutely.

3              MS. CHOI:  So the thing that I'm a little concerned

4    about is, if we were to start the government's closing

5    tomorrow, and we were to get to a point where we're

6    transitioning away from the bank and wire fraud into the heart

7    of the bribery, I like to talk about the law a little bit to

8    frame -- you know --

9              THE COURT:  We're going to resolve it tonight.

10             MS. CHOI:  Okay, that's fine.

11             THE COURT:  I'm ready to hear if there's any further

12   response to what the government submitted, and then I have

13   views.

14             MS. CHOI:  Okay.  And before we even get to that --

15             THE COURT:  And just want to finish that point.  What

16   we'll do is, I will resolve it tonight.  We'll put it into the

17   charge.  I think at that point I can do a scrub for any of the

18   "if applicable" remaining items, and then send out tonight what

19   I think is the, if not final, penultimate draft of the charge

20   for any final editing or incorporation issues for final review,

21   and you'll have that this evening as you prepare for your

22   closing.

23             MS. CHOI:  Understood, your Honor.  The one thing I

24   want to note is, we provided to your Honor a redacted

25   indictment which changes the count numbers, so I just wanted to

1   flag that for Mr. Rosen, I presume.

2            THE COURT:  So the conspiracy count is what?

3            MR. NOBLE:  Count One.

4            MS. CHOI:  One.

5            THE COURT:  Yes.  I think that came in this morning,

6   but I hadn't looked at it.

7            MS. CHOI:  Yes, your Honor.  I think that might be

8   right.  And the other issue we wanted to flag that would have

9   to be integrated into the charge would be the NCUA rules and

10  regulations charge, the one that we had agreed upon.

11           THE COURT:  You sent that in this morning, as well.

12           MS. CHOI:  Along with the indictment, I believe at the

13  same time.

14           THE COURT:  We have incorporated that in the current

15  draft, and that'll be part of what -- as I say, what will go

16  out tonight is the final with your opportunity to flag any

17  errors that have been introduced in the course of our editing.

18           MS. CHOI:  So one other thing to just note for the

19  record is the update on the production from the defense.  It's

20  about 2,000 emails, so we're going to endeavor to see what we

21  can do to get through those tonight.  You know, it's a little

22  late, but we'll do what we can.

23           THE COURT:  We did stop early.

24           MS. CHOI:  I guess the issue is whether or not defense

25  counsel -- if we could get a proffer as to whether or not

H37OLEB8                    Gross - Direct

 1    defense counsel believes that it will be introducing any

 2    evidence that it had produced in the if-as-when or beyond what

 3    the exhibits are that you've already noticed, and an estimate

 4    as to expected time with regard to how time you have left with

 5    Mr. Gross so that we can prepare adequately on timing issues.

 6             MS. SANTILLO:  We have no intention of reviewing those

 7    emails and, you know, putting emails that are in there into the

 8    production -- or into the examination process.  We've given you

 9    the exhibits that we intend to use.

10             MS. CHOI:  Okay.  Do you have an estimated proffer as

11    to length of continuing direct?

12             MS. SANTILLO:  An hour and a half, maybe.

13             MS. CHOI:  Okay.

14             THE COURT:  Okay.

15             MS. CHOI:  Yes.  If we could just get a proffer as to

16    when we will know about Ms. Larkins' status?

17             MS. SANTILLO:  I'll let you know as soon as I know.

18             THE COURT:  It sounds like you know what they know.

19             MS. CHOI:  Fair enough.

20             THE COURT:  All right.  Responses to the government's

21    submission -- was that last night?

22             MR. SHIN:  Yes, it was, your Honor.

23             THE COURT:  Last night.

24             MS. SANTILLO:  I think that the language the

25    government used broadens the conspiracy impermissibly and does

1   constitute the constructive amendment of the indictment.  I

2   think we should just track the language of the indictment.

3   They charged a specific conspiracy and they should be required

4   to prove it.  The language is there.

5            THE COURT:  So you mean just -- what would that

6   mean -- you mean don't do a description of the conspiracy

7   charge, just point them to what is now Count One?

8            MS. SANTILLO:  No.  I think that I would like to have

9   a description of what the conspiracy is as defined in the

10   indictment, and I think the way that the government

11   characterized it was, "influencing Trevon Gross in connection

12   with business decisions of the HOPE Credit Union," and that's

13   not how the indictment was charged, it was, "facilitating the

14   takeover the HOPE FCU in furtherance of an unlawful Bitcoin

15   exchange."  And I think those elements have to remain in order

16   for it to be the conspiracy that was charged.

17            THE COURT:  Mr. Creizman.

18            MR. CREIZMAN:  My concern about the government's

19   instruction basically goes to their point 3 and point 4, which

20   I do think --

21            THE COURT:  The limiting instructions?

22            MR. CREIZMAN:  No, not the limiting instruction, but

23   the instruction on the conspiracy.  I think that, you know, it

24   says Count Three -- where it's -- on the first page of their

25   letter, my issue -- I think it -- I think that -- sorry.

 1          THE COURT:  Max, yes.  My binder didn't get updated.

 2          MR. CREIZMAN:  They list four objectives, and two of

 3     the four objectives I think go beyond the scope of the

 4     conspiracy, broaden the basis of conviction, and I believe that

 5     that is a constructive amendment.

 6          Number 3, "to obstruct examinations of HOPE FCU by the

 7     NCUA and to make false statements to the NCUA in connection

 8     with the NCUA's examinations of HOPE FCU", I think -- I

 9     understand -- the limiting instructions follow, but to the

10     extent that -- again, I mean, this causes the same problem

11     whereas --

12          THE COURT:  Yes.

13          MR. CREIZMAN:  Yes.

14          THE COURT:  Okay.  I agree.  I think the way that the

15     government proposed didn't really alter what was expressed as

16     the concern.  I do agree with the limiting instructions, but I

17     have a proposal which I'll allow you to react to.  I was going

18     to put it out in an order, but -- this is not an order, it's a

19     draft, but it has the language.

20          I'll ask my clerk to pass out copies and I'll read it.

21          I won't characterize it.  "Count Three charges Yuri

22     Lebedev and Trevon Gross with conspiring with others from in or

23     about April, 2014 to in or about 2015 to achieve four unlawful

24     objectives in an effort to further the operations of Coin.mx or

25     the Collectables Club:

1              "1.  To make corrupt payments to Trevon Gross with the

2    intent to influence Gross' decision-making in connection with

3    the business of HOPE FCU.

4              "2.  To have Trevon Gross receive or agree to receive

5    corrupt payments with the intent to influence Gross'

6    decision-making in connection with the business of HOPE FCU.

7              "3.  To obstruct examinations of HOPE FCU by the NCUA.

8              "4.  To make false statements to the NCUA in

9    connection with the NCUA's examination of HOPE FCU."

10             MS. SANTILLO:  Your Honor, we would have an objection

11   to that because I think --

12             THE COURT:  I thought I was --

13             MS. SANTILLO:  -- because it's very clear in the

14   indictment that the conduct that is charged is trying to

15   facilitate the takeover the HOPE Credit Union, and the NCUA

16   obstruction is clearly cabined to making false statements to

17   facilitate their takeover.

18             THE COURT:  Wait.  I want to understand that point

19   because I think that's different from what I anticipated.  Say

20   that again.

21             MS. SANTILLO:  I'm just going to read from the

22   indictment, which I think is the appropriate place to define

23   the conspiracy.

24             THE COURT:  I mean, you keep saying that, but that's

25   the question, and we could just point the jurors to the

indictment.  If it's clear as that, point them to the

indictment.

MS. SANTILLO:  Sure.  I think that's fine.  I think

otherwise, broadening it to "business decisions" is too broad,

and it is opening up a whole area of conduct that was not

contemplated by the indictment and wasn't considered by the

grand jury.

THE COURT:  Go ahead.

MR. CREIZMAN:  Me?

THE COURT:  I'm sorry, yes.

MR. CREIZMAN:  Okay.  I approve your Honor's

instruction with two requested edits, additions, and that would

be to points 3 and 4.  After the word "NCUA" in point 3, it

would be "to further the operations of Coin.mx or the

Collectables Club".

THE COURT:  So I'm not rejecting it, but just to show

what I was trying to do, you see that the sentence before the

colon characterizes all four of these.

MR. CREIZMAN:  Except for number --

THE COURT:  So if you read it -- so "Count Three

charges -- to achieve four unlawful objectives in an effort to

further operations of Coin.mx or the Collectables Club:

"3.  To obstruct examinations of HOPE FCU by the

NCUA."

So it's meant to, and I suppose we could just repeat

it, but it's meant to have "in an effort to further the

operations of Coin.mx or the Collectables Club" to each of

these.

MR. CREIZMAN:  I actually think that that's right.

Now that I look at it again, I like it.  I think it works.  I

think that that captures -- to me, in my mind, as I understand

the conspiracy, that captures what I understand to be the

conspiracy.

THE COURT:  That is what I was going for.  And I

recognize I looked at this a lot longer than you did.  I

actually had thought I had taken where you were, Mr. Creizman,

and I thought I met halfway between where you were and where

Ms. Santillo was yesterday.  But it sounds like maybe

Ms. Santillo has a different point.

What's the government's view?

MR. SHIN:  Your Honor, so the government would be okay

with either approach, either the language proposed by the Court

here or the alternative offered by the Court of simply pointing

the jury to the indictment for the definition of conspiracy and

still giving the limiting instructions.  So we're fine with

either one.  I don't know that this is that far off from what

we had proposed yesterday, but we're fine with what your Honor

has offered here.

THE COURT:  Mr. Klingeman is trying to get your

attention.

1          Why don't you take a minute and look at the

2   instruction and I'm going to think about the indictment.

3          (Pause)

4          MR. CREIZMAN:  I actually prefer your Honor's charge

5   with no limiting instructions.  That is what we are advocating,

6   no limiting instructions.  I think your Honor's charge covers

7   it, and I'll have an Apple for your Honor in the courtroom

8   tomorrow morning.  No.

9          THE COURT:  Is that an iPad joke?

10          MR. CREIZMAN:  No, an Apple for the teacher.  Like --

11          THE COURT:  Wait.

12          MR. CREIZMAN:  I actually think that this is -- to me,

13   this -- I would not want -- I think that without -- the

14   limiting instructions, they are confusing.  This covers what I

15   think would be the contours of the conspiracy as charged in the

16   indictment.  I think a reference to the indictment would

17   need -- if we were to refer to the conspiracy in the

18   indictment, the limiting instructions would be necessary.  If

19   we refer to this paragraph that your Honor crafted, it would

20   not need limiting instructions.  In fact, I'd be opposed to

21   limiting instructions.  I either want your Honor's charge on

22   the conspiracy or a reference to the indictment with the

23   limiting instructions.  That's my position.

24          THE COURT:  I can't say I had anticipated that move.

25   Interesting.

1           MR. NOBLE:  Judge, so we can clarify.  Mr. Creizman's

2    position, is it you don't want -- you would take the Court's

3    definition of the conspiracy with no limiting instructions?

4           THE COURT:  That's what he said.

5           MR. NOBLE:  Or not --

6           THE COURT:  No, I'm only.

7           MR. NOBLE:  We were surprised by that, one thing, but

8    then the other option --

9           MR. CREIZMAN:  Why surprised?

10          MR. NOBLE:  -- so you're saying all the evidence that

11   has come in to prove up the conspiracy --

12          MR. CREIZMAN:  I see what you're saying.

13          MR. NOBLE:  -- against your client, against Mr. Gross

14   for all purposes --

15          MR. CREIZMAN:  Obviously -- I get what you're -- no,

16   I'm sorry.

17          MR. NOBLE:  We were wanting to clarify.

18          THE COURT:  I'm grateful because I thought --

19   Mr. Noble, I thought I had said the exact same thing and he

20   said yes, but somehow you have a power of persuasion.

21          MR. CREIZMAN:  He does.  He really does honestly with

22   me.  It's amazing.  But I guess I was focusing, though, on the

23   definition of the conspiracy.

24          THE COURT:  So what my --

25          MR. CREIZMAN:  I think what --

1           THE COURT:  What I had proposed -- and as I said, I

2     was going to just put out the order, but I'm taking your

3     reactions to it, was, this is the definition of the conspiracy

4     with the same four limiting instructions that had come in by

5     the government's letter, I don't know if you repeated it last

6     night, but your original four limiting instructions.

7           MR. CREIZMAN:  I'd prefer that.  I'd prefer that.  I

8     prefer your Honor's charge.

9           THE COURT:  With those limiting instructions.

10          MR. CREIZMAN:  Yes.  I mean, for the purposes of the

11    evidence, as long as we're not talking about when you can

12    convict.  I forgot what the limiting instructions were, quite

13    frankly.

14          THE COURT:  Can you take a look at them?

15          MR. CREIZMAN:  Yes.  I left early, unfortunately, and

16    then had -- yeah, I'll read this now.

17          THE COURT:  So Mr. Creizman's looking at it.  The

18    government, I think --

19          MR. SHIN:  Yes, your Honor.  So we're --

20          THE COURT:  -- you're not thrilled, but --

21          MR. SHIN:  Exactly.  The language we -- you know.  I

22    thought the language we proposed was pretty well-written,

23    but --

24          THE COURT:  What does "in favor of" mean?  Where did

25    that come from?

1          MR. SHIN:  All right.  So maybe we were wrong.  We

2     would be equally happy with either the Court's proposed

3     language in this draft order or the alternative of pointing the

4     jury to the indictment, and with either approach, using the

5     limiting instructions that we set forth in our letter filed

6     last night which -- the same four limiting instructions that we

7     filed in the prior letter.

8          THE COURT:  Understood.

9          Ms. Santillo.

10         MS. SANTILLO:  Yes, your Honor.  I just think that it

11    should track the indictment in the sense that it says, "as a

12    first object to make corrupt payments to Trevon Gross with the

13    intent to influence Gross' business decision-making in

14    connection with the business of HOPE FCU," I think that's much

15    too broad because the indictment --

16         THE COURT:  Well, I mean, again, I could repeat the

17    clause, but what's -- so repeating it would be, "to make

18    corrupt payments to Trevon Gross with the intent to influence

19    Gross' decision-making in connection with the business of HOPE

20    FCU in an effort to further the operations of Coin.mx or the

21    Collectables Club."

22         MS. SANTILLO:  I would just track the indictment to

23    say "to facilitate the takeover of HOPE FCU".

24         THE COURT:  I'm sorry.  So you are saying something

25    different.  So you want to change it to -- so in number 1 or

1    number 2?

2              MS. SANTILLO:  Number 1.  "To make corrupt payments to

3    Trevon Gross to facilitate the takeover of HOPE FCU", which it

4    says repeatedly in the indictment, "in furtherance of the

5    scheme to facilitate the takeover of HOPE FCU".  My fear is

6    that, if we leave it the way it is, it encompasses all this,

7    you know, processing activity by Kapcharge that is not charged.

8              THE COURT:  Let me just look at that language for just

9    a moment.  So you are okay with the way it's structured to have

10   the "in an effort to further the operations of Coin.mx or the

11   Collectables Club"?

12             MS. SANTILLO:  Yes, I'd like that very much.

13             THE COURT:  Cool.  That's what I was waiting for.

14             And then the one change you're proposing is to

15   number 1, changing "in connection with the business of HOPE

16   FCU" to "to facilitate the takeover of HOPE FCU".

17             MS. SANTILLO:  Yes, that's my proposal, which I think

18   is consistent with the indictment.

19             THE COURT:  Mr. Creizman.

20             MR. CREIZMAN:  I think that -- okay.  Again, I'm going

21   to stick with the Court's instruction on the conspiracy.  I

22   guess the way I look at the limiting instructions, I find them

23   to be somewhat confusing, and based on the definition of the

24   conspiracy, I think that how people can consider the evidence

25   is basically -- it naturally flows from that.  What the

1   limiting instructions say actually logically flows from the

2   Court's definition of the conspiracy.

3             But that being said, you know, so I'm okay with the

4   Court's order as is.  I didn't consider what Ms. Santillo just

5   said.  I'm sure if the Court is okay with that, I'm fine with

6   it.  I think that -- but I want the instruction grounded in the

7   Court's order.  That's the key.

8             THE COURT:  Mr. Shin.

9             MR. SHIN:  Your Honor, the government would have an

10  objection to Ms. Santillo's phrasing.  Your Honor's proposal

11  already narrows -- let me take a step back.

12            As we argued previously, the statutory allegations in

13  our indictment are, in fact, broader than the Court's proposal.

14  Obviously, there are other allegations in the indictment, as

15  well, but I think your Honor's preparatory clause right before

16  number 1 is an attempt, as I understand it, to capture the

17  speaking allegations from the indictment, that's why your Honor

18  put "in an effort to further the operations of Coin.mx or the

19  Collectables Club".

20            To then on top of that insert in clause 1, and

21  presumably in clause 2, "to facilitate the takeover of HOPE

22  FCU", in our view, would unduly narrow the indictment.  She's

23  just asking the Court to take a snippet -- to take snippets of

24  speaking language in the indictment, which are, as your Honor

25  put it yesterday, glossed in the indictment, and then insert

1     that into the very definition would be an undue narrowing of

2     the charge in the indictment, your Honor.

3                   (Continued on next page)

H37KLEB9

1          MR. SHIN:  (Continuing)  Ultimately, the grand jury

2     found -- they voted on this indictment that included the broad

3     statutory allegations, with the gloss, but it wasn't this

4     narrow proposed language that Ms. Santillo is proposing.

5          I think your Honor's proposal, as it's currently

6     written, captures as much narrowing as the indictment can

7     withstand without being distorted.

8          MS. SANTILLO:  Your Honor, to the extent we're varying

9     from language in the indictment, we would rather just rely on

10    the indictment because I think it is that narrowly framed.

11         THE COURT:  I think the difficulty -- the problem is,

12    we can't pick and choose isolated phrases.  A description for

13    the jury's benefit would have to capture the --

14         MR. KLINGEMAN:  Well, your Honor, if I could make a

15    suggestion.

16         THE COURT:  Go ahead, Mr. Klingeman.

17         MR. KLINGEMAN:  Your Honor is giving a copy of the

18    indictment to the jurors.  So, what I would suggest is at the

19    point in the instructions where your Honor makes reference to

20    the indictment, just simply note that you will be giving a copy

21    of the indictment to the jurors, and, if you want, if your

22    Honor prefers or thinks is appropriate, list the counts and

23    their titles, and indicate which defendant is listed in each

24    count, and then refer to the indictment for a more fulsome

25    description of each of those counts.  And then there's no

paraphrasing, there's no editorial judgments being imposed on

what's being provided to the jury.  They're just simply being

given the indictment.  And none of us can complain that they

have not received what is at issue in the case.

MR. SHIN:  So, I'm hearing now, I think, two of three

parties here that find that option acceptable.  I actually

can't remember how you came out, Mr. Creizman, on whether this

is an acceptable alternative, just referring to the indictment.

MR. CREIZMAN:  My first choice is the Court's

resolution, the way the Court has written it.  That actually is

mine, but that's where I stand.  And I'm going to stick with

that because that's what I believe.

THE COURT:  Well, here's my question if I do just

point to the indictment:  It would be pointing to the

indictment with the limiting instructions.  I want to make sure

we're not just kicking the can, and where, in argument, in

summation, might there be disputes.  I think, Ms. Choi, you

quite reasonably said you wanted to know the resolution to this

because it could affect the summation.

Now, maybe we all know what's appropriate in light of

the limiting instructions --

MR. CREIZMAN:  But the limiting instruction -- right,

but the limiting instruction actually -- again, I find the

limiting instructions confusing and a little bit just

long-winded, complex, byzantine.  That right over here, this

1    indictment right here, you have a basis to argue what the

2    conspiracy is to the jury, you know that if you're going

3    outside the bounds, you know if the government -- which they

4    never do -- is going outside the bounds, and there won't be

5    these kinds of -- we'll have a basis, so as we won't be

6    objected to, there won't be these kinds of disputes.  This is a

7    very -- I think it's an accurate instruction, and with the

8    indictment, it's the Wild West.  The government could argue

9    that Yuri Lebedev's involvement in Collectables Club after

10   January 2015 to form a federal credit union was -- could be a

11   basis for violating Count Three.  And with this, no, it's very

12   clear to me.  The indictment is not so clear.

13            THE COURT:  I'll tell you, I think my task is to try

14   to direct the jury in a way to prevent any kind of error and

15   make sure they have clarity.  I see very little difference

16   between the clause "in connection with the business of HOPE

17   FCU" and to "facilitate the takeover of HOPE FCU."  To the

18   extent there is light between them, it's a variance kind and

19   not an amendment kind.  That said, it's still the case that I

20   think we know what the relevance is of the kinds of categories

21   of evidence that are in post fallout and for what their

22   purposes are.  I'm just not sure it matters, and I'm not sure

23   it makes much difference.  Really, I'm not sure it matters.  I

24   do think -- I agree with Mr. Creizman.  He's reasonable.

25            MS. SANTILLO:  Your Honor, for the record, I just want

1    to state that the basis for my concern is the sheer volume and

2    repetitiveness of discussions about ACH processing that were

3    not charged in the indictment.  The indictment specifies

4    facilitating an unlawful Bitcoin scheme, and I do think that

5    that is prejudicial, and I think it's a constructive amendment,

6    and the language that is in there is broad enough to allow the

7    government to try to prove something it did not charge.  And

8    that's my concern.

9            MR. SHIN:  Your Honor, just to address your Honor's

10   last comment:  The reason why the government has an issue with

11   inserting "to facilitate the takeover of HOPE FCU" is we're

12   concerned that the jury will read that and think that that

13   means that only conduct that directly went to, for example, a

14   change of board membership, like literally things that go to

15   change of control of the credit union, that that is literally

16   the scope of the conspiracy.  We've argued at length why we

17   think the conspiracy, fairly read, actually encompasses not

18   just that change of control, but also then running the now

19   captive HOPE FCU.

20           "To facilitate the takeover of HOPE FCU," that

21   language, if that were inserted in clauses one and two, that

22   also -- we think it runs into some tension with the clause that

23   your Honor proposed to insert before the numbered clauses.  So,

24   if it was to achieve these objectives in an effort to further

25   the operations of Coin.mx or the Collectables Club, that

1     included, that did fairly include the other conduct that

2     happened after the change of control was effected.  So, that's

3     our concern, is that this potentially unduly narrows the jury's

4     consideration to just literally the change of the board

5     membership, the particular -- whether there was a majority or

6     not, those particular acts, while the indictment includes

7     allegations including the overt acts which go beyond that,

8     because we think that the scope is beyond that.  It includes,

9     for example -- this is why, your Honor, the overt acts, they go

10    past the June meeting.  The June meeting is arguably where the

11    change of control happened.

12          So, if that language is inserted, there's a risk that

13    the jury will say, okay, so the conspiracy is really just about

14    the June meeting, and, therefore, they'll incorrectly not

15    consider all the stuff that went around that, and after that,

16    including all of the overt acts that are listed in the

17    indictment that go beyond the June meeting, including the

18    additional payments, the events --

19          THE COURT:  And that's clear in the indictment, just

20    by time frame alone, among other things.

21          MR. SHIN:  Exactly, your Honor.  We charge April of --

22    I think the indictment says April of 2013.  That's a typo, we

23    concede, your Honor.  It should be April 2014 through 2015.

24    And so, again, that's our concern, your Honor.  I'll try not to

25    repeat myself.  But that's why we would object to the insertion

H37KLEB9

1    of that additional language, and we would suggest that your

2    Honor either go with the proposal as written or proceed with

3    the alternative that is now acceptable to Mr. Klingeman and

4    maybe is a second best option for Mr. Creizman.

5           THE COURT:  All right.  I think what makes sense, is

6    to go with what I proposed.  It's consistent with the Court's

7    fair reading of the indictment, it's an effort to provide

8    guidance to the jury, and, in light of the limiting

9    instructions, I don't share the concern as to the grand jury

10   issue.  So we'll do that.

11          MR. SHIN:  Thank you, your Honor.

12          THE COURT:  I think I said this, but to the extent

13   there is a distinction between the language proposed and what I

14   am going with, it's, at most, a variance, if that, and not -- I

15   can't see it as a constructive amendment.

16          Anything else?

17          MR. SHIN:  Just --

18          THE COURT:  So I will incorporate -- well, what is the

19   proposal as to where the definition of the conspiracy and the

20   limiting instructions go?

21          MR. SHIN:  Your Honor, I think it makes sense to put

22   the definition of the conspiracy in the introductory conspiracy

23   charge, where currently we just have the reference to the four

24   objects, it's kind of barebones language.  It seems like it

25   would make sense to insert that there, your Honor.

H37KLEB9

1            THE COURT:  What page?

2            MR. SHIN:  Your Honor, the Court currently has

3     instruction number 20, Count Three overview.  Obviously, the

4     count number will need to be renumbered in light of the

5     redacted indictment, but that instruction lays out the basics

6     of the fact that it's a conspiracy charge, and it currently

7     says in this case, "the government has charged the defendants

8     with what is called a multiobject conspiracy," and then below

9     that, it has the four objects.  So, the Court may be able to

10    insert the definition, perhaps, right in between -- right

11    before the four objects are specified.

12            THE COURT:  Okay.

13            Mr. Creizman?

14            MR. CREIZMAN:  I think that's fine.  That sounds

15    right.

16            THE COURT:  Ms. Santillo?

17            MS. SANTILLO:  Just preserving our strong objection to

18    the language, that placement is fine.

19            MR. SHIN:  Then in terms of the limiting instructions,

20    your Honor, the current Count Three instructions, your Honor,

21    instruction 26 is liability for acts and declarations of

22    coconspirators, and instruction number 27 is the withdrawal

23    charge that the government has objected to.  So, perhaps the

24    Court --

25            THE COURT:  Well, actually, I'm prepared to rule.  I'm

H37KLEB9

 1    going to give the withdrawal instruction and the

 2    multiple-conspiracy instruction.

 3              MR. SHIN:  So perhaps it makes sense to include --

 4    your Honor, is it the Court's intention to place the

 5    multiple-conspiracy charge after the withdrawal charge or did

 6    the Court have a proposal for where that would go?

 7              THE COURT:  I didn't have it in.  No, I'm open to a

 8    proposal.

 9              MR. SHIN:  So, your Honor, currently, instruction 27

10    is withdrawal.

11              THE COURT:  Right.

12              MR. SHIN:  It probably makes sense to include multiple

13    conspiracies after that, and then the limiting instruction can

14    go after, kind of a wrap-up, because it applies basically to

15    everything that comes before in terms of what the jury can

16    consider.

17              THE COURT:  I think that's logical.

18              Mr. Creizman?

19              MR. CREIZMAN:  Ms. Madrigal was whispering something

20    to me and, I'm sorry, I couldn't hear because Ms. Madrigal --

21    I'm sorry, I'm sorry, I had to --

22              THE COURT:  Ms. Santillo?

23              MS. SANTILLO:  I'm just wondering how necessary the

24    limiting instruction is in this context, and I just don't know

25    how it's going to look in terms of coming after the defined

1    conspiracy and then the withdrawal and the multiple

2    conspiracies.  So I'm just hesitating about my position.

3              THE COURT:  Okay.

4              MR. CREIZMAN:  That's what it was.  I'm fine with the

5    way that it's proposed, in terms of where it's placed.

6              THE COURT:  Ms. Santillo, I think it was you who had

7    requested the multiple-conspiracy instruction, right?

8              MS. SANTILLO:  Yes.

9              THE COURT:  So, it's not that you don't want it, it's

10   just a concern about putting the limiting instructions after

11   that --

12             MS. SANTILLO:  Yes.

13             THE COURT:  -- or the total ordering of the three?

14             MS. SANTILLO:  Yes, I just wanted it read all

15   together, and I had not focused closely on the limiting

16   instruction letter that Mr. Shin filed last night.

17             THE COURT:  Yes, it's the same instructions as from

18   the weekend.

19             We'll adopt the proposal of the government.  As I say,

20   we're going to incorporate it and I'll send it around again.  I

21   think I have now resolved all the open issues.

22             MR. SHIN:  Yes, your Honor.  And so we had obviously,

23   in our submission over the weekend, in which we opposed the

24   withdrawal and multiple-conspiracies charge, we had also

25   proposed some language changes, if the Court were to give those

1    charges and, rather than take them up, should we wait and see

2    what the Court issues?

3          THE COURT:  Yes, I'll look at those.  I haven't yet.

4          MR. SHIN:  I will just note, this is set forth in

5    detail in our papers but just given that -- I'm not attempting

6    to relitigate the withdrawal, whether it should be given at

7    all, your Honor, but it's a little hard to fathom how

8    withdrawal could be a complete defense in this case because

9    it's only a complete defense if it happens before any overt

10   acts happen, of any coconspirator, and their theory of

11   withdrawal is November 24th or so of 2014, when there were

12   months of overt acts that took place beforehand.

13         So, if the Court is going to give the withdrawal

14   instruction, our view is that the proposed language that we've

15   included is particularly important so that the jury is not

16   under the misimpression that by purportedly withdrawing months

17   into a criminal conspiracy, that somehow immunizes the

18   defendant from everything that came before.

19         So I would just make one last pitch for the requested

20   language to be added to the charge, as set forth in our letter

21   over the weekend.

22         THE COURT:  I will take a look.  I don't know if

23   Mr. Creizman or Ms. Santillo had a chance to look at it either.

24         How about --

25         MR. CREIZMAN:  I have not.

1          THE COURT:  You have not?

2          Ms. Santillo?

3          MS. SANTILLO:  I have not.

4          THE COURT:  So I'll take a look at it.  I'll

5   Cub-Scout -- my kids are Cub Scouts, so this is present in my

6   mind.  I'll do my best and either adopt the government's

7   language or not or some variation, and the defense can have an

8   opportunity to still react to that language, but it will be

9   this evening because I want to finalize the charge by the

10  morning.

11         MR. SHIN:  Thank you, your Honor.

12         THE COURT:  Anything else?

13         MS. CHOI:  Your Honor, this is just on behalf of our

14  paralegals:  Looking ahead, we wanted to get an understanding

15  of how you expect or prefer your jury to receive exhibits, what

16  your preferences are in terms of both when as well as format.

17         As your Honor knows, I think the parties had agreed

18  that, given that certain of these exhibits, such as the

19  WhatsApps, require a computer, we're going to prepare one, but

20  some of the exhibits we didn't print out because they're so

21  voluminous.  So I didn't know how your Honor wants to deal with

22  that.  Does your Honor expect that these exhibits be ready in

23  whatever form at the moment that the jury goes back?  Or how

24  you usually handle it?

25         THE COURT:  It depends a little bit on the timing.  At

base, what I do is have the parties come to agreement on what

can go back based on the list we have been developing

throughout the trial.  I do also seek agreement on the list,

the list of admitted exhibits, which I'll make a court exhibit.

So, ideally, as soon as the jury goes back, on the record you

agree to the sort of stack of materials and the exhibit list, I

get your on-the-record agreement that you've all looked through

that and agreed to it, and then it goes back to the jury.

          In the middle of that question is, how to handle

electronic material and voluminous exhibits.

          MS. CHOI:  Yes, your Honor.  I think it's also just a

timing issue, as your Honor recognized, because I think it

would be -- the paralegals could speak up if they disagree but

I think it would be --

          THE COURT:  Technically, they can't.

          MS. CHOI:  Well, they can speak up to me.

          But I think, and correct me if I am wrong, but at

least with regard to getting the exhibits in a timely fashion,

we can very quickly make sure, once the parties agree, to get

the electronic versions of everything loaded onto the hard

drive.  That shouldn't be a big issue.  And then I think it's

just a question of getting all the paper, because to

double-check that, have defense counsel double-check to make

sure they're all right, and I don't know how many copies your

Honor wants us to send back, if one is enough.

1           THE COURT:  One copy of the evidence unless there's

2     some specific request or need for something different.

3           MS. CHOI:  I just think that that's going to take a

4     little bit of time, and we wouldn't want to delay the jury

5     unduly.  So our proposal would be, in the first instance, to

6     send back an electronic copy of defense exhibits and the

7     government exhibits with the computer, and then we can work,

8     the paralegals can work, while the jury is in there

9     deliberating, on trying to get the paper copies together,

10    because I'm sure defense counsel would want an opportunity to

11    double-check our work.

12          THE COURT:  With the exception of the material that

13    has been bracketed for the government's case, that will go in

14    on the redirect, I presume you're in a good position to pull

15    together this evening -- the paralegals are.

16          MS. CHOI:  They're very sleep deprived, your Honor.

17    But, yes, we'll work on it, but it is a lot.  Obviously, this

18    has moved --

19          THE COURT:  It's not going to go to the jury tomorrow

20    but --

21          MS. CHOI:  Friday.

22          THE COURT:  It could go Thursday.

23          MS. CHOI:  Sorry, Thursday.  That's what I had in my

24    own mind.  I got the dates confused.

25          But, yes, it could go in the day after tomorrow.  So,

1   we'll work on it.

2          THE COURT:  I know everybody's tired, but we need to

3   push through so that we're in a position to give the jury what

4   they need and not delay that process.  So, yes, I think as soon

5   as possible.  At some point tomorrow, I think the government

6   should propose to the defense what constitutes the government's

7   evidence in the case, and then, as soon as the defense –– and

8   you can do that for Mr. Lebedev as well, obviously, since

9   that's done, and then it's just what remains outstanding with

10  respect to Mr. Gross and the redirect.  Okay?

11         MS. CHOI:  Yes, your Honor.

12         THE COURT:  I'm sorry, rebuttal.

13         MS. CHOI:  Yes, we understood.

14         THE COURT:  Anything else, Mr. Klingeman?  No?

15         All right, see you at 9:00.  But on-time 9:00.

16         (Adjourned to March 8, 2017 at 9:00 a.m.)

17                              * * *

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2    Examination of:                             Page

3    ROSE LINTON

4    Direct By Mr. Shin . . . . . . . . . . . . .3244

5    Cross By Mr. Klingeman . . . . . . . . . . .3255

6    JOHN ROLLINS

7    Direct By Mr. Noble  . . . . . . . . . . . .3256

8    Cross By Ms. Madrigal  . . . . . . . . . . .3378

9    Cross By Mr. Klingeman . . . . . . . . . . .3387

10   Redirect By Mr. Noble  . . . . . . . . . . .3406

11   Recross By Mr. Klingeman . . . . . . . . . .3408

12   DANELLE HORVATH

13   Direct By Mr. Klingeman  . . . . . . . . . .3422

14   Cross By Mr. Shin  . . . . . . . . . . . . .3425

15   BARBARA FLOYD

16   Direct By Mr. Klingeman  . . . . . . . . . .3431

17   Cross By Mr. Shin  . . . . . . . . . . . . .3434

18   DONALD PERRINI

19   Direct By Mr. Klingeman  . . . . . . . . . .3437

20   Cross By Mr. Shin  . . . . . . . . . . . . .3440

21   TREVON GROSS

22   Direct By Ms. Santillo . . . . . . . . . . .3441

23

24

25

```
 1                      GOVERNMENT EXHIBITS

 2    Exhibit No.                              Received

 3    4020     . . . . . . . . . . . . . . . . . .3242

 4    4013     . . . . . . . . . . . . . . . . . .3243

 5    4014     . . . . . . . . . . . . . . . . . .3243

 6    601, 602, and 603  . . . . . . . . . . . .3248

 7    900-1 through 900-6  . . . . . . . . . . .3262

 8    900 series . . . . . . . . . . . . . . . .3297

 9    900-104  . . . . . . . . . . . . . . . . .3376

10                      DEFENDANT EXHIBITS

11    Exhibit No.                              Received

12    DX17 through 23 and DX26 through 28,  . . . .3421

13           DX15 and DX16, and DX25
```