H38OLEB1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4             v.                        15 Cr. 769 (AJN)

 5   YURI LEBEDEV and TREVON GROSS,

 6             Defendants.               Jury Trial

 7   ------------------------------x

 8                                       New York, N.Y.
                                         March 8, 2017
 9                                       9:00 a.m.

10
     Before:
11
                    HON. ALISON J. NATHAN,
12
                                         District Judge
13                                       And A Jury

14                         APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     BY:  EUN YOUNG CHOI
17        DANIEL S. NOBLE
          WON S. SHIN
18        Assistant United States Attorneys
          MICHAEL CHANG-FRIEDEN, Paralegal
19        EMILY GRANT, Paralegal

20   CREIZMAN, PLLC
          Attorneys for Defendant Yuri Lebedev
21   BY:  ERIC M. CREIZMAN
          MELISSA MADRIGAL
22        JONATHAN MICHAELSON, Paralegal

23   KROVATIN KLINGEMAN, LLC
          Attorneys for Defendant Trevon Gross
24   BY:  KRISTEN M. SANTILLO
     BY:  HENRY E. KLINGEMAN

25
```

H38OLEB1

1             (Trial resumed; jury not present)

2             THE COURT:  Mr. Creizman.

3             MR. CREIZMAN:  Yes.

4             THE COURT:  You have a report on Mr. Lebedev?

5             MR. CREIZMAN:  That's what I'm trying to check.

6             MS. MADRIGAL:  Mr. Michaelson just went to go check if

7    he's in the line.

8             THE COURT:  If he's in a line?  All right.  Do you

9    want to take up what we can in his absence?

10            MS. SANTILLO:  Dan and I had our first agreement about

11   exhibits so we're okay.

12            MR. NOBLE:  Happy to report, defense counsel is only

13   going to use two exhibits with the direct examination of

14   Mr. Gross, and the government is not going to object to those.

15            THE COURT:  Thank you.

16            MS. SANTILLO:  Just to clarify, I will be using other

17   exhibits that are already in evidence.

18            MR. NOBLE:  Sure.  Two new exhibits.

19            MS. SANTILLO:  Actually, we may put a picture in that

20   I just got.  I'll show you.

21            THE COURT:  All right.  There was the other exchange

22   of exhibits.  This might be a question for Ms. Choi, but for

23   the government's case that I think were still being reviewed

24   and are going to come in.

25            MR. NOBLE:  On the rebuttal case.

H38OLEB1

1          THE COURT:  Quote/unquote rebuttal.

2          MR. NOBLE:  I'll have to check with Ms. Choi.  She's

3     working on finishing up the closing, because it looks like

4     we're going to move quickly in light of Ms. Larkins is not

5     going to testify, we've been informed.  So we'll check with her

6     just to make sure that defense has no objections to the

7     remaining email exhibits that the government wanted to put in

8     for purposes of use during closing.

9          THE COURT:  All right.

10          MR. NOBLE:  I do have an update as to Special Agent

11     Beyer.  We expect her to arrive around 10:30 a.m. so she will

12     be available.

13          THE COURT:  Great, thank you.  And thank you to

14     Ms. Choi for moving the things she had to move to do that.

15          I sent the jury charge -- we can take up the jury

16     charge, Mr. Creizman, since Mr. Lebedev had waived with respect

17     to the charging conference.

18          MR. CREIZMAN:  I'm waiving his appearance.

19          THE COURT:  Okay.  I docketed, but you were emailed as

20     well, the current version of the jury instructions which was

21     meant to capture everything we had done.

22          As I noted in my cover order, I did make a slight

23     change to the description of the conspiracy to track the

24     language in the indictment.

25          I know, Ms. Santillo, you had asked for that, not with

H38OLEB1

 1    this language, different language, but in part it was a

 2    reaction to that request.

 3            So the question is, are there issues and its

 4    objections to the version of the charge that was sent out?  And

 5    I don't need them now.  I know there was a lot going on last

 6    night.  I'll be doing the charge at some point tomorrow so I'll

 7    check in again later today, but if anybody has anything now

 8    they want to flag, they should do so.

 9            MR. CREIZMAN:  No, your Honor.

10            MR. SHIN:  Nothing from the government on that charge,

11    your Honor.

12            THE COURT:  All right.  Mr. Rosen caught this morning

13    that we needed to update the verdict form to reflect the

14    redacted indictment, so he's circulating a revised verdict form

15    which does that, but do take a look to make sure we've got it.

16            As I say, I'll check in at the other breaks today to

17    see if there's anything else on the jury charge, but it will be

18    finalized by the end of the day so we can have it ready for

19    tomorrow on the assumption that we'll get to the charge

20    tomorrow.

21            MR. SHIN:  Your Honor, just in our review of the

22    charge, there were a couple of conforming type edits that I

23    thought needed to be made.  Should I raise them now or --

24            THE COURT:  Yes.

25            I'll note Mr. Lebedev is here.  Good morning,

H38OLEB1

1     Mr. Lebedev.

2                DEFENDANT LEBEDEV:  Good morning.

3                THE COURT:  Go ahead, Mr. Shin.

4                MR. SHIN:  First, instruction 28, the multiple

5     conspiracies, which is on page 42 of the instructions.  There

6     were just a couple of spots in lines 13 and 17 where we refer

7     to the indictment, but those spots should refer to Count One,

8     as we did elsewhere in this charge, just because there's more

9     than one conspiracy in the indictment.

10               THE COURT:  You said it refers to "indictment", you

11    mean "conspiracy"?

12               MR. SHIN:  Right.  So in line 13 where it says

13    "conspiracy described in the indictment", I think just to be

14    consistent with the approach in the rest of the charge it

15    should say "conspiracy described in Count One".

16               THE COURT:  I was looking at page 28.  Instruction 28

17    you said.  I see it now.

18               MR. SHIN:  Yes, on page 42.

19               THE COURT:  Okay.  So the suggestion is --

20               MR. SHIN:  So on line 13 it should say "conspiracy

21    described in Count One".

22               THE COURT:  "Conspiracy described in Count One".

23    That's fine.

24               MR. SHIN:  And then similarly on line 17 of the same

25    page, "of the conspiracy for the purposes charged in Count

H38OLEB1

1    One."

2                  THE COURT:  Okay.

3                  MR. SHIN:  I think that may have been a relic of when

4    we submitted this version from Sand.

5                  THE COURT:  I guess embedded in that is an assumption

6    that the multiple conspiracy count doesn't apply to Count Four.

7                  MR. SHIN:  That is an assumption.  I've never heard

8    that being raised.  And I believe Mr. Creizman even opposed

9    this charge for Count One.  So I've never heard him proposing

10   this for Count Four.

11                 THE COURT:  Mr. Creizman, if you could focus on what

12   we're doing.

13                 MR. CREIZMAN:  Yes, absolutely.

14                 THE COURT:  Do you have a copy of the current charge?

15                 MR. CREIZMAN:  I do.

16                 THE COURT:  I think this might be right, but so the

17   multiple conspiracy charge is the one that the government

18   objected to.  Mr. Gross' counsel had requested it.  I can't

19   remember what your position was on it or not, but the

20   immediate -- I am going to give it.  The immediate question is,

21   since I'm giving it, is there any request to have the jury

22   consider the multiple conspiracy charge with respect to Count

23   Four?  I'll note that, as with your assumption, Mr. Shin, it's

24   structured as with respect to Count One at line 1 of the

25   instruction.

H38OLEB1

| | |
|---|---|
| 1 | MR. CREIZMAN:  No, I don't think so. |
| 2 | THE COURT:  Okay.  So you're comfortable with the |
| 3 | multiple conspiracy charge just referencing Count One. |
| 4 | MR. CREIZMAN:  That's right. |
| 5 | THE COURT:  All right.  We'll change "happens to be |
| 6 | the single conspiracy described in Count One of the |
| 7 | indictment"? |
| 8 | MR. SHIN:  Yes.  That's fine, your Honor. |
| 9 | THE COURT:  Okay. |
| 10 | MR. SHIN:  As long as it's just not generally |
| 11 | referring to the indictment, just to avoid any confusion. |
| 12 | THE COURT:  Right.  Other than line 13, does that |
| 13 | change need to be made elsewhere in the charge? |
| 14 | MR. SHIN:  Line 17. |
| 15 | THE COURT:  Okay.  "Charged in Count One of the |
| 16 | indictment"? |
| 17 | MR. SHIN:  Yes, your Honor. |
| 18 | THE COURT:  Okay.  Anywhere else? |
| 19 | MR. SHIN:  That's it, your Honor. |
| 20 | THE COURT:  Other conforming? |
| 21 | MR. SHIN:  On page 44, which is instruction 29, the |
| 22 | limiting instructions on the evidence of the charged |
| 23 | conspiracy.  I don't feel strongly about this, but I think the |
| 24 | general style throughout the rest of the these charges is that |
| 25 | when the defendants' names appear, to have them in all caps. |

1   Their names appear frequently in this, so to the extent there's

2   any concern about that, it might make sense --

3            THE COURT:  So we noted the inconsistency last night.

4   It's not just this charge it's inconsistent, so I wanted to

5   get, before changing it one way or the other, if anyone had a

6   preference.

7            MR. CREIZMAN:  I don't like the defendants' names

8   capitalized.  That's my personal preference.  I think it's

9   prejudicial.  I don't like it.

10           MR. KLINGEMAN:  Agreed.

11           THE COURT:  I would support just consistent use of

12  Mr. Lebedev and Mr. Gross, or, I mean, there are places where,

13  in this one it's both their names.

14           MR. CREIZMAN:  In terms of whether they're referred to

15  as Mr. or Yuri Lebedev?

16           THE COURT:  There's three questions.  There's the all

17  caps; defense has indicated their objection to that, which I'm

18  fine with, Mr. Shin.

19           MR. SHIN:  That's fine, your Honor.

20           THE COURT:  So then the question is, when their names

21  appear, as it does frequently throughout the charge, it will

22  not be in all caps, but there remains the question of whether

23  to refer to them by "Trevon Gross" and "Yuri Lebedev" or

24  "Mr. Gross" and "Mr. Lebedev" or "Gross" and "Lebedev".  I

25  don't have a preference.  I'd prefer consistency, if anybody

H38OLEB1

 1    does have a preference.

 2            MR. KLINGEMAN:  I think the defense, speaking on

 3    behalf of the defense, full name.

 4            THE COURT:  So in each place "Yuri Lebedev" and

 5    "Trevon Gross".

 6            MR. KLINGEMAN:  Agreed.

 7            MS. SANTILLO:  Although, it may be a little late to

 8    say this, but it's "Trevon".

 9            THE COURT:  I'm sorry, Mr. Gross.  That's good to note

10    because I have to read this thing.  Thank you for letting me

11    know.

12            MR. SHIN:  And the government has no view on that,

13    your Honor.

14            THE COURT:  I will set Mr. Rosen on the search and

15    replace mission, and he has no choice but to accept it.  So we

16    will add Trevon Gross and Yuri Lebedev in not all caps in every

17    place that their name appears.

18            Anything else?

19            MR. SHIN:  Yes, your Honor.  On page 64, the venue

20    charge.  I just wanted to say for the record, after our charge

21    conference the other day, chambers circulated this draft, so I

22    just wanted to note for the record that the government is fine

23    with it.  I think you had given us the opportunity to comment

24    on it, so I just wanted to reflect that, your Honor.

25            THE COURT:  Defense, I presume, is comfortable?

H38OLEB1

1          MR. CREIZMAN:  On behalf of Mr. Lebedev, yes.

2          THE COURT:  Thank you.

3          MR. KLINGEMAN:  Yes, your Honor.

4          THE COURT:  Thank you.

5          Anything else?

6          MR. SHIN:  Last comment, your Honor, is the character

7     evidence instruction, which is on page 79, instruction number

8     51.

9          THE COURT:  Okay.

10         MR. SHIN:  So this was our first opportunity, I

11    believe, to see this instruction, and so the government would

12    object to the sentence contained in lines 7 and 8, "Evidence of

13    good character may itself create a reasonable doubt."

14         I did some quick research this morning, your Honor,

15    and I have a couple of cases that I can hand up and also

16    provide to counsel.

17         THE COURT:  I think I got it from Sand.

18         MR. SHIN:  It is in Sand, your Honor, and I'll address

19    the point while I'm handing up the cases.

20         THE COURT:  All right.

21         MR. SHIN:  I've handed up two cases, your Honor.  The

22    first is United States v. Pujana-Mena, 949 F.2d 24, Second

23    Circuit 1991.  This case holds that -- that sentence, I think,

24    is commonly described, your Honor, as a standing alone charge

25    in the context of a character witness charge.  And so I'll

H38OLEB1

1    direct your Honor to -- there are various passages.  So first

2    at page 28 of the opinion, the Court holds that "such a

3    charge" --

4              THE COURT:  I'm sorry.  This is a Circuit decision?

5              MR. SHIN:  Yes, your Honor.  It's a 1991 Second

6    Circuit decision.

7              THE COURT:  Okay.  Page 28.

8              MR. SHIN:  Actually, the first thing that might be

9    helpful is if you look at page 27, your Honor, the actual

10   proposed language that's being addressed in this opinion as

11   quoted.

12             THE COURT:  I read that.  "That character evidence

13   alone may raise a reasonable doubt"?

14             MR. SHIN:  Right, your Honor.

15             So then at page 28, right above footnote 2, the Court

16   holds that, "Such a charge is not required."  The Court then,

17   at page -- there's a long discussion of why it's not required,

18   but we will point your Honor to page 30 of the opinion, which

19   is on page 4 of the printout, kind of on the lower right-hand

20   portion of the page, it describes "such an instruction as

21   threatening to interfere with one of the quintessential

22   functions of the jury to determine the relative weight, if any,

23   to be given to particular evidence," and then it goes on

24   instructing them to "focus on such evidence in isolation or

25   suggesting that they give it determinative weight usurps this

H38OLEB1

jury responsibility", and then there's more discussion.

I would point then, your Honor, to the next page of the printout, page 31 of the opinion, page 5 of the printout on the right side.  The Court says, "One of the primary problems with the standing alone charge is that this risks having the jury disregard all the other evidence in the case, not just other defense evidence."

And lastly, I would point your Honor to page 6 of the printout, which is the discussion on pages 31 to 32 of the opinion.  So just to again give context, this opinion says, "It's not required, it doesn't expressly prohibit that language."

THE COURT:  Right.

MR. SHIN:  But at pages 31 to 32, the Court gives further guidance.  "We find it appropriate to state that we believe such a hybrid charge would be less than ideal in most cases."  And again, it gives the same rationale that it's confusing to the jury -- first of all, it invades the weight given to particular evidence, and it's also confusing because then the instruction says "consider the weight to all the evidence together and you can also consider this evidence alone".

Then the other decision I handed up to the Court, your Honor, is a 2014 Second Circuit decision.  U.S. v. Gupta, 747 F.3d 111.  And the relevant portion of the opinion there is on

1    page 140, which is at the very end of the opinion.

2              So the way this was teed up in this case is that Judge

3    Rakoff declined to give that sentence.  And Judge Rakoff

4    acknowledged that this instruction is commonly given, but he

5    declined to give it because it artificially singles out one

6    aspect of the proof and gives it sort of prominence above all

7    others by implication.  And because he was not required to give

8    it, he declined to give it in light of that confusion.

9              And the Second Circuit reaffirmed Pujana-Mena, the

10   prior decision we've been discussing, and held that it affirmed

11   Judge Rakoff's decision not to provide that particular language

12   within the character evidence charge.

13             I think what the case law stands for, your Honor, is

14   it doesn't bar your Honor from giving that sentence, but I

15   think there's strong language in the 1991 decision that

16   suggests, in most cases, it would be less than ideal in most

17   cases.  That's what the Second Circuit says, and it gave a lot

18   of rationale as to why that is.

19             THE COURT:  Gupta was a fraud case?

20             MR. SHIN:  Yes, your Honor.  It was a securities fraud

21   case.

22             THE COURT:  Okay.  I'd like to take a look at these --

23             MR. SHIN:  Yes, your Honor.

24             THE COURT:  -- at the break, but I'm happy to hear

25   from defense counsel now, or you can take a look, as well.

H38OLEB1

1            MR. KLINGEMAN:  Your Honor, I've looked at the cases

2     quickly, but I'm also familiar with this issue.  And counsel

3     has accurately summarized the law, and your Honor's even

4     superficial reading of the cases will make it clear that that's

5     what counsel has done.  However, the bottom line is that the

6     Court has the discretion in particular cases, or to use the

7     phrase of the Court of Appeals, some cases, to employ the

8     instruction that your Honor has already inserted into the

9     proposed jury instructions, and we ask for it to be used in

10    this particular sum case.

11            THE COURT:  Just to note, I hadn't focused on this

12    issue, and I took it from Sand without awareness of the

13    question about the instruction, so I didn't yet pass judgment

14    on it.

15            MR. KLINGEMAN:  I'm not suggesting you have, I was

16    just referring to what's in the draft as opposed to what's

17    proposed by the government.  As I'm saying, this is one of the

18    sum cases in the sense that the character of the defendant goes

19    to the heart of the allegation.

20            As your Honor knows, essentially the three charges,

21    each of which underlie the conspiracy as well as the

22    substantive charge of bribery, all go to the defendant's

23    intent.  In the case of bribery, they go to his purported

24    corrupt intent, and in the case conspiracy with respect to the

25    NCUA, they go to his either having made false statements or

H38OLEB1

1      obstructing an investigation.  In sum and substance, they

2      involve his acting deliberately, knowingly, and intentionally

3      with a bad purpose.  And a person's character, based on the

4      evidence that we elicited yesterday, is central to those

5      intents corresponding to each of the counts and allegations in

6      the indictment.  And therefore, this is one of those sum cases

7      where that evidence is of such significance that this charge is

8      appropriate as opposed to the charge that the government

9      favors.

10             We'd ask your Honor to exercise your discretion and

11     include this particular charge as opposed to the charge that

12     may be more appropriate in other cases where character is not

13     of such centrality.

14             THE COURT:  Mr. Creizman.

15             MR. CREIZMAN:  I have no position in this other than I

16     think that -- I mean, this doesn't directly affect my client,

17     but I join -- I agree with codefendant's counsel in this

18     particular issue.

19             THE COURT:  I'll look at the cases and consider it.  I

20     hear the points Mr. Klingeman is making, and it's related to

21     why I asked if Gupta was a fraud case, so there's some overlap,

22     but I'll take a look at the break and let you know.

23             MR. SHIN:  Just on that point, your Honor.  I will

24     note that Pujana-Mena, the '91 decision, includes a lengthy

25     decision of why the standing alone charge is not required even

H38OLEB1

1    in a case where character evidence is the only evidence offered

2    by the defense.  So your Honor's going to read the cases, and

3    so I just wanted to note that.

4              THE COURT:  I will take a look.

5              Matters that need to be taken up before the next

6    segment?  If not, we did a placeholder on the Rule 29 motions,

7    and I did want to give counsel an opportunity to just state

8    their -- I had cut off Mr. Creizman and had asked Mr. Klingeman

9    to hold, as well, but I wanted to give you an opportunity to

10   state your grounds.

11             Mr. Creizman.

12             MR. CREIZMAN:  Yes.  Just briefly.  The government --

13   I move for a Rule 29 motion as to all of the counts against

14   Yuri Lebedev on the grounds that the government has not proven

15   sufficient facts that -- facts sufficient to establish beyond a

16   reasonable doubt to a rational jury that he's guilty of any of

17   the charges against him.

18             In particular, though, I want to focus on the bank and

19   wire fraud and conspiracy to commit bank and wire fraud

20   charges.  Aside from the fact that Mr. Lebedev -- there's no

21   evidence of his involvement in actually miscoding or lying to

22   banks directly, other than creating software that might have

23   been used for that purpose.

24             The government has failed to establish that the

25   financial institutions, who are the victims, were put at any --

H38OLEB1

1   had any risk -- there's certainly no -- no one established any

2   intent to harm, no contemplated harm to the banks to defraud

3   them of money or property, and in this case, also, I believe

4   that there's no -- there's not sufficient evidence of risk, and

5   I think that the Second Circuit case on this is -- well, I have

6   it.  I think it's -- that is my principal point, and I'll be

7   able to get the case cite in a moment.

8          But the witnesses who testified talked about vaguely a

9   reputational risk, vaguely that if there's an unlicensed money

10  exchanger, that somehow they might get fined from FinCEN or

11  there might be fines because they allowed an unlicensed money

12  transmitting business to operate.

13         I mean, given the circumstances here, they were

14  presented with an application from what appeared to be a

15  collectibles organization, and there was no indication that

16  this was an organization devoted to Bitcoins and money

17  exchange.  It seems to me that there was no real risk.  And the

18  government didn't establish that these banks were at any real

19  risk.  The banks certainly -- the second that they sensed, as

20  their usual course of -- per their usual practices, once they

21  recognized transactions that seemed to involve enough

22  chargebacks or questionable transactions, they immediately shut

23  the accounts down.  There was no losses to the banks, there was

24  no risk to the banks in this case, so that's essentially the

25  argument.

H38OLEB1

1          THE COURT:  All right, thank you.

2          MR. KLINGEMAN:  Your Honor.

3          THE COURT:  One question.  We do have all our jurors,

4     so the question is, do you want to just do a brief statement of

5     reasons, or if you want to sort of go into some brief

6     argumentation, I think I'll ask you to pause until the break.

7          MR. KLINGEMAN:  Here's my thought, your Honor.  We

8     made the motion at the close of the government's case as the

9     rule contemplates, but the rule also contemplates that the

10    Court may consider the motion at the close of all the

11    presentations.  So perhaps it would be appropriate, in light of

12    the fact that we've put on a substantive case, that I delay my

13    presentation until the close of the evidence, and I'm happy to

14    do that.

15         THE COURT:  All right.  Yes.  I want to make sure

16    there's no prejudice for failure to state them.

17         MR. KLINGEMAN:  Let me then place on the record

18    briefly the two principal arguments.

19         As your Honor knows -- and I'm going to refer to the

20    counts by their newly configured numbers -- Count One charges a

21    conspiracy involving Mr. Gross, and Count Three charges a

22    receipt of a corrupt payment by Mr. Gross.

23         With respect to both Counts One and Count Three, we

24    submit that there has been no evidence that Mr. Gross acted

25    "corruptly" as the statute and the indictment require.

H38OLEB1

1          And furthermore, with respect to Count One, which

2     includes as separate second and third objects of the conspiracy

3     the obstruction of an NCUA investigation and the making of

4     false statements to the NCUA, we submit that there's no

5     evidence that Mr. Gross deliberately and wrongfully obstructed

6     the NCUA investigation, and likewise, that he deliberately and

7     falsely made statements to the NCUA.

8          In this case, as you'll undoubtedly hear from me on

9     summation, there's very little dispute about what happened.

10    Most of the dispute is about why it happened and what motivated

11    Mr. Gross and what he intended in the language of criminal law.

12    And we submit that there is copious evidence of what happened

13    and no evidence of why or what was intended in the criminal

14    sense.

15          The second substantial argument we'd make with respect

16    to Rule 29 on both Counts One and Count Three is there is utter

17    absence of evidence establishing venue from the point of view

18    of Mr. Gross with respect to either count, and I'll take them

19    in reverse order.  With respect to Count Three, the bribery

20    count, as your Honor will instruct the jury, there has to be

21    some, what I would refer to as --

22          THE COURT:  I'm going to let you come back and fill

23    out the argument.  This is just to state the --

24          MR. KLINGEMAN:  Right.  There's got to be some

25    intentional conduct in connection with venue with respect to

H38OLEB1

1    the substantive count.  I'm not using the right language

2    because I've mislaid my notes, but I'll refer to the language

3    in the jury instruction.

4            And likewise, with respect to the conspiracy, there's

5    nothing that the government has established concerning

6    Mr. Gross' knowledge, the foreseeability, or certainly the

7    intention of Mr. Gross to conduct any of this conspiracy in the

8    Southern District of New York.

9            And so for both of those reasons, among others, we'd

10   ask for the Rule 29 motion to be granted, either now or in the

11   future.

12           MR. CREIZMAN:  I just wanted to fill in the case cite

13   that I think controls on the issue of --

14           THE COURT:  Risk.

15           MR. CREIZMAN:  -- risk.  Risk and intent to defraud

16   here with respect to the banks and the mail fraud count,

17   because the banks are -- the same victims are the financial

18   institutions.  It's United States versus Nkansah,

19   N-k-a-n-s-a-h.  It's the Second Circuit case, and the citation

20   is 699 Fed. 3d 743, and it's a 2012 case.

21           THE COURT:  All right, thank you.  You can place hold

22   your opposition, Mr. Shin, and depending on time, I'll give you

23   a chance to fill in your opposition.  Do you want to just state

24   your opposition?  Mr. Creizman wants you to default again

25   but --

H38OLEB1

| | |
|---|---|
| 1 | MR. SHIN:  Right. |
| 2 | MR. CREIZMAN:  I note for the record again. |
| 3 | MR. SHIN:  We oppose both motions.  In the interest of |
| 4 | the jury's time, we'll make arguments later, your Honor. |
| 5 | THE COURT:  Okay. |
| 6 | MR. SHIN:  One last thing to address before the jury |
| 7 | comes in. |
| 8 | THE COURT:  I'm reserving.  Go ahead. |
| 9 | MR. SHIN:  Thank you, your Honor.  Yesterday you may |
| 10 | recall that we had a list of exhibits that were admitted prior |
| 11 | to Mr. Rollins' testimony.  It was Exhibit 4020 and it had a |
| 12 | list of the number of documents. |
| 13 | THE COURT:  Yes. |
| 14 | MR. SHIN:  I think everyone has agreed that all the |
| 15 | documents listed in 4020 were admitted, and that's why |
| 16 | Mr. Rollins was permitted to testify to them. |
| 17 | We would just request that, for clarity of the record, |
| 18 | that your Honor direct the court reporter to make sure that the |
| 19 | transcript include as a list as the admitted documents, not |
| 20 | just 4020 itself, but also all the documents contained therein. |
| 21 | The Court has asked for your direction on this. |
| 22 | THE COURT:  I appreciate that.  I apologize for not |
| 23 | being clear.  4020 and all of the exhibits contained on 4020 |
| 24 | are admitted. |
| 25 | (Government's Exhibits Faceplates 2 and 4, Exhibits |

H38OLEB1

1    707 to 712, 715-A to 715-B, 716-A to 716-C, 717-A to 717-B, 718

2    to 720, 730 to 736, 740, 750, 751, 752-A, 752-B, 753, 761, 762,

3    76, 781 to 785, 787, 790-A, 790-B received in evidence)

4              MR. SHIN:  Thank you, your Honor.

5              THE COURT:  We'll get the jury.

6              Mr. Gross, you may come to the stand, sir.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H38OLEB1                        Gross - Direct

 1              (Jury present)

 2              THE COURT:  Good morning, ladies and gentlemen of the

 3     jury.  I am going to reswear Mr. Gross.

 4      TREVON GROSS,

 5          recalled as a witness by the Defendant,

 6          having been previously sworn, testified as follows:

 7              THE COURT:  Ms. Santillo, when you're ready, you may

 8     proceed.

 9              MS. SANTILLO:  Thank you.

10     DIRECT EXAMINATION (Continued)

11     BY MS. SANTILLO:

12     Q.  Good morning, Pastor Gross.

13     A.  Good morning.

14     Q.  As lead pastor of the Hope Cathedral, to whom do you

15     report?

16     A.  We have a board of elders which serves as like the board of

17     directors of the church, and they have the fiduciary

18     responsibility to hire me, evaluate me, and so they are my

19     bosses.

20     Q.  Okay.  Who sets your salary?

21     A.  The board of elders does.

22     Q.  And how was your salary set?

23     A.  They hire an outside consulting firm that does a study, a

24     compensation study, and that compensation study sends back a

25     recommendation.  They, without my participation, set what that

H38OLEB1                           Gross - Direct

1    salary is, and then they come and tell me, "This is your

2    salary."

3    Q.   Okay.   When was the last time you received a raise?

4    A.   Never.   Since it was set in the early days, my salary has

5    not changed.

6    Q.   In the early days, could you define what "the early days"

7    are?

8    A.   We founded the church in 2002, as I said, in our living

9    room, and I was not on salary because I was still actually

10   working in New York City at that time.   But when I became full

11   time at the church, which was probably in 2006, 2007, that was

12   when I got my salary, and it's been the same since then.

13   Q.   Who is in charge of the finances at the church?

14   A.   Well, the board of elders has a treasurer, a corporate

15   treasurer, and that person is Loretta Larkins, and she actually

16   also serves as the church's administrator.

17   Q.   What role, if any, do you play in the finances of the

18   church?

19   A.   None.

20   Q.   What role, if any, do you play in collecting envelopes on

21   Sundays?

22   A.   None.

23   Q.   What role, if any, do you play in paying church bills?

24   A.   None.

25   Q.   What role, if any, do you play in preparing tax forms like

1    W-2s or 1099s for the church or its employees?

2    A.   No role whatsoever.

3    Q.   Has there ever been an occasion when the church has been

4    unable to pay your salary?

5    A.   Unfortunately, yes.  There have been many years.  In fact,

6    2016 was the first year that I was able to get every one of my

7    paychecks without any delay.

8    Q.   So what happens if the church is not able to pay your

9    salary?

10   A.   So we have a payroll company that manages the church's

11   payroll, and they would cut checks for me, as they would all

12   the other employees of the church.  And when it came time to

13   cash the check, if the money wasn't there, they would ask me to

14   hold my check, and I would hold it.

15          Through some of the difficult times with the economy,

16   as you all know from 2008 until, you know, very recently, there

17   were a lot of months where I was not able to cash my check, and

18   I ended up giving back those net checks to the church, and they

19   added them to an account where, when the money became

20   available, I would be able to get that money.

21   Q.   Do you still have an outstanding balance in that account?

22   A.   I do.  I'm not sure what the total is, but there is an

23   outstanding balance, yes.

24   Q.   I want to talk a little bit about this donation to the

25   church.  The government claims that you personally benefited

```
 1   from the donation to the church.  What, if any, offers did the

 2   Collectables Club make to pay you directly in connection with

 3   this partnership?

 4   A.  Oh, as I said yesterday, when we first began the

 5   discussions with Michael and Anthony Murgio, they were making

 6   all kinds of financial pitches about, "We could do this for

 7   you.  We could do that for you, to you as an individual, the

 8   board members, or wherever you wanted."

 9           And then throughout the course of the relationship,

10   whenever things seemed to get tense or they seemed to feel that

11   I wasn't aligned with them or whatever, they would, you know,

12   they would say, "Well, you know, this is going to be very

13   profitable to you."  Even towards the end, before that big

14   meeting that you all heard the recording of, they were offering

15   me, you know, hundreds of thousands of dollars, and their

16   backers would, you know, give me whatever I wanted to live my

17   wildest dreams and none of that at all moved me because that

18   was not the purpose of this arrangement.

19           MS. SANTILLO:  I'd like to call up Government

20   Exhibit 1072-B.

21           THE COURT:  That's in evidence?

22           MS. SANTILLO:  Yes, it is in evidence.

23           THE COURT:  Thank you.

24           MS. SANTILLO:  If you can go down to the bottom.

25   Q.  This is an email from Michael Murgio?
```

1    A.   Yes.

2    Q.   Purports to be from Michael Murgio?   Okay.

3               MS. SANTILLO:   So if you move to the bottom.

4               THE COURT:   Ms. Santillo, can you pull your mic a

5    little closer?

6               MS. SANTILLO:   Sorry.

7               If you can zoom in on Option 2.

8    Q.   What does this represent?

9    A.   This represents an example of one of the offers that they

10   made in the early stages of our discussions where you see he's

11   saying that, "We would pay you and other officers a nice

12   monthly fee for a couple of years for the ability to take over

13   the credit union."

14   Q.   Instead of being paid directly, how did you settle on

15   having there be a $150,000 donation to the church?

16   A.   Well, we began to talk about the donation and what that

17   looked like, because from their perspective they wanted to

18   show, number one, that they were committed to doing this, and

19   number two, they also wanted to get the church disconnected

20   from the credit union.

21              As I said yesterday, the credit union had been the

22   underwriter for -- the church had been the underwriter for the

23   credit union for at least the last seven or so years, and every

24   time it needed things, the church was there for it.   So they

25   really wanted to disconnect that connection where the credit

1     union could stand on its own, and as they come in with their

2     members, it would then truly be an unencumbered credit union

3     without any ties at all to the church.

4          So I can't remember the exact numbers, but they

5     offered big numbers that they would give to the church and all

6     of that, and those larger numbers, quite frankly, sounded

7     unreasonable because that didn't in any way represent the

8     investment that the church had made in the credit union, so we

9     settled on the number of 150 as, from my sense, a rough

10    estimate of what I knew the church had been putting in over the

11    years to keep the credit union going.

12         MS. SANTILLO:  I'd like to call up Government

13    Exhibit 1081-D in evidence.  If you can zoom in on the second

14    paragraph, paragraph 2.  Paragraph 2 in the second email.

15    Actually, if you could scroll a little bit further down to the

16    bottom to the email below.  No, to the email below.  If you

17    could start with the whole "within one month of operation".

18    Yes, there we go.

19    Q.  What does this appear to be?

20    A.  This is -- this is their discussion of kind of how to set

21    up the giving of the donation, and also the activating of the

22    debit card program.

23    Q.  Okay.

24         MS. SANTILLO:  And if we could scroll up to your

25    response.

1    Q.  In paragraph 2, could you read that for me and tell me what

2    is happening here?

3    A.  Sure.  "I think that the smaller donation amount is too

4    small and the larger donation is too large.  I believe in being

5    fair on all things," and then --

6    Q.  That's good.  Yes.  And what were you trying to say to

7    Mr. Murgio in that situation?

8    A.  That we wanted to come up with a reasonable number that

9    really actualized what the church had invested in the credit

10   union and be fair to everybody involved.

11   Q.  When the money came into the church, how was the money from

12   the donation spent?

13   A.  It was spent to take care of the church's bills.

14   Q.  Okay.  Can you give some examples?

15   A.  All the bills.  I mean, any of the bills of the church.  So

16   their ongoing bills, whatever the church had need of that was

17   in this normal course of business, that money went towards it.

18           MS. SANTILLO:  I'd like to walk through some of the

19   expenses Mr. Rollins spoke about yesterday, so if we could turn

20   to the slide at -- if we could turn to GX900.  Go to page 38.

21   Q.  Yesterday, Mr. Rollins testified about using a method to

22   determine how these funds were spent, and I just want to walk

23   you through some of these expenses.

24           MS. SANTILLO:  So if we could go down to the next page

25   on 39.

1   Q.   There's a finding for Rosa Mexicano, on the next page for

2   Havana Central in June, 2014.   What were those expenses?

3   A.   We were here in New York City for a conference, and there

4   was a group of pastors who had come from all over the country

5   to be here for a conference that weekend.   And these expenses

6   represent us going out to eat as pastors.   The Rosa Mexicano,

7   as I recall, was actually some guacamole.   They actually have I

8   think some of the best guacamole.   And we used it as a full

9   reception for the pastors that night when they all arrived as

10  to way to welcome them in.

11  Q.   Was that considered to be a business function?

12  A.   Yes.   That was a business function at a business expense.

13  Q.   Would this have been a business expense that the church

14  would have paid for even before the donation was received?

15  A.   Absolutely.   This is a standard thing that we do when

16  pastors come in town or any kind of visiting guest, we would

17  host them in some way.

18          MS. SANTILLO:   Turning to page 41, please.

19  Q.   What, if any, personal expenses are listed on this page?

20  A.   None of them are personal.   This actually represents the

21  church's PayPal account, and each of these items were related

22  to the church's operation.

23          MS. SANTILLO:   If you could turn to the next page.

24  Q.   What is Edit Builder?

25  A.   Edit Builder was a company we found on e-Bay that actually

1   refurbished old MacIntosh computers, because we needed one to

2   operate our camera system at the church.  We needed one that

3   was open architecture -- that's probably a little too

4   technical -- but we needed a certain type of computer, and this

5   company rebuilt them for us, so we purchased this for our media

6   department.

7           MS. SANTILLO:  I'd like to show the witness a picture.

8           Mr. Michaelson, if you could display the picture for

9   the witness and for counsel.

10  Q.  Pastor Gross, do you recognize this picture?

11  A.  Yes, I do.

12  Q.  What is that?

13  A.  This is a picture on the inside of our media booth at the

14  church.

15          THE COURT:  Was this marked for identification?

16          MS. SANTILLO:  Yes, as TG54.

17          THE COURT:  Thank you.

18          MS. SANTILLO:  Your Honor, I'd like to introduce this

19  exhibit as TG54.

20          MR. NOBLE:  No objection, your Honor.

21          THE COURT:  Thank you.  It's admitted.

22          (Defendant's Exhibit TG54 received in evidence)

23          MS. SANTILLO:  May we publish it to the jury?

24          THE COURT:  You may.

25  BY MS. SANTILLO:

H38OLEB1                           Gross - Direct

1   Q.   And how is Edit Builders used at the church?

2   A.   This computer right there you see is the big silver box in

3   the middle, that is used to run or camera system for the

4   streaming that we do during our worship service, as well as

5   it's used to edit the videos after the service, and this

6   computer is also used to push the video images on the

7   televisions that we have throughout the building.

8            And this picture also shows some of the other

9   computers that we have that are Apple computers.  You see the

10  iMac there, there's another computer behind this other monitor

11  behind the audio board.  There are about four computers that

12  are right there in that media booth; one for our lights, one

13  for the audio, one for our stream, and one for our projection

14  screens.

15  Q.   Why do you need this technology for your services?  Can you

16  describe your services?

17  A.   Yes.  Well, we have a contemporary worship service, so we

18  have a live band, and the lights, and all of that in our

19  worship service, and so all this technology facilitates that.

20           MS. SANTILLO:  If you could turn to page 43.  Yes,

21  Ms. Grant.  Thank you.

22  Q.   Are any of the payments on this page personal expenses?

23           THE COURT:  I'm sorry.  Page 43 of Government 900?

24           MS. SANTILLO:  Yes.

25           THE WITNESS:  No, ma'am, none of these are personal.

H38OLEB1                           Gross - Direct

1     The first is the security system for the church, the second is
2     a cleaning service that we use to clean the church, the third
3     is an envelope printing company, if I recall, the fourth is an
4     electrician that was doing work at the church, this next one is
5     another cleaning service, Mill Pond Catering and the Bryan
6     Popin Ministries are expenses we had for our big Freedom Sunday
7     which we have around July 4th where we have a bunch of food and
8     we bring in a special guest artist to sing.  So that was the
9     catering for that event, as well as the special guest, and then
10    Airlin is an HVAC company that I think must have repaired our
11    air conditioning at the church.
12            MS. SANTILLO:  Moving to page 45 of Government
13    Exhibit 900.
14    Q.   Now, if we could look at the Broadway show on June 9th,
15    2014.  What can you tell us about that?
16    A.   This happened around the same time as that pastors'
17    conference, and as I recall, a couple of our kids went to see
18    one of the Broadway plays, and this is actually a personal
19    expense that is chargeable to me --
20    Q.   Okay.  Did what about --
21    A.   -- on my personal credit card.
22    Q.   What about the movies?
23    A.   The movies, I'm not quite sure about, but I know they
24    weren't personal to me.  We do have a student ministry where we
25    take kids out to the movie, or we give them gift cards to go to

1    movies because they've done things in church and that type of

2    thing.  So it may look strange to you, you know, movie charges

3    on a church account, but this past weekend with the new movie

4    Shaq coming out, we took 200 people to see that movie as a way

5    to do outreach and help them understand how to handle difficult

6    situations.  So this was -- these were in some way in

7    connection with I'm sure our student ministries.

8    Q.  Okay.

9         MS. SANTILLO:  Moving to page 46.

10   Q.  What can you tell me about these expenses?

11   A.  These are personal.  Juice Basin is for me.  It's a juice

12   spot that I go to, my wife and I go to, and this is on my

13   personal credit card, and I paid for it personally.

14   Q.  Well, what role does the American Express card play at the

15   church?

16   A.  Sure.  So when we founded the church as a new organization,

17   it had no credit, no history, no anything.  And so the people

18   who start something are often the ones who have to back the

19   organization when you start a personal business, or a church

20   for that matter.  And so everything the church has done from

21   the beginning really has been undergrided by my wife and I.

22   And so whenever the church needed something, whether it was a

23   copier or anything else, we had to serve as the people to make

24   sure that the church was able to get that.  So we got the

25   credit card to enable us to be able to handle our personal

H38OLEB1                          Gross - Direct

1   expenses, of course, but when I travel, because the church did

2   not have any credit cards, that card also served as a corporate

3   credit card, as well.

4   Q.  Who was responsible for keeping track of the American

5   Express card?

6   A.  So Loretta Larkins, who was the administrator, she gets the

7   bill every month, and she separates out what's personal and

8   what belongs to the church.  I'm responsible for anything

9   that's on there that's personal, and she's responsible for

10  anything that belongs to the church.

11  Q.  Turning to page 47, what can you tell me about this expense

12  at Tao Massage?

13  A.  Sure.  Tao Massage, you look at this and say massage as a

14  church?  What's that about?  I actually have two bulging discs,

15  two herniated discs in my neck, and I see a chiropractor two to

16  three times a week for that.  The chiropractor that I was going

17  to at this time did not have physical therapy, and so he

18  recommended that I go get a massage to decompress my neck,

19  because I was not getting any kind of lasting benefits.  And so

20  during the time that I was at that chiropractor, I was going to

21  this massage place, not for pleasure but to get some kind of

22  relief so my left hand wouldn't go numb.  And then after a

23  period of time, I moved to a new chiropractor that actually did

24  have physical therapy, which I still go to to this day.  So

25  this really is not a massage for pleasure, it is actually more

1    like physical therapy to decompress my neck, and it is a

2    medical expense, that's why you see it there.

3    Q.  Were you motivated to enter into a relationship with the

4    Collectables Club for this $145 massage?

5    A.  Absolutely not.

6    Q.  Okay.  And did you receive physical therapy both before and

7    after the donation?

8    A.  Absolutely.

9    Q.  Turning to page 51, with respect to college applications.

10   A.  Well, this is actually from January, 2014.  So this is

11   before any of the donations even came in, and this was on my

12   personal American Express, and it's something that I paid for

13   personally.

14   Q.  I think we may have skipped a slide, 49 or 50.  Apple?

15   A.  Yes.  So these are business expenses.  In fact, if you look

16   at the lower left-hand corner you'll see there where it says

17   "total invoice after business discounts".  So these were

18   purchases for the church, whether it's for the media booth, or

19   administration, or some other aspect of the church, but these

20   aren't personal.

21        MS. SANTILLO:  If you could turn to page 52, please.

22   Q.  This is a list of some cash withdrawals.  The largest

23   withdrawal we discussed yesterday was with respect to Joel

24   Osteen Ministries.  Would that expense occur regardless of the

25   donation?

H38OLEB1                          Gross - Direct

1   A.  Absolutely.  We've made donations to this ministry and

2   other ministries before this happened, and we continue to make

3   them since.

4   Q.  Without getting into every withdrawal, are there some

5   reasons why these cash withdrawals have taken place?

6   A.  Yes.  If you notice, a lot of them took place around 7/1 to

7   7/8, which was around that time we were planning for that big

8   Freedom Sunday celebration.  So more than likely a lot of those

9   were preparatory expenses, they forgot something at the store

10  and needed to run or give money to someone to run to the store

11  to grab something.  I don't know exactly, but they're not

12  personal to me is my point.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. SANTILLO:  If we could --

2     A.  If I just might complete the answer:  The one that is

3     there, the 1355 that was written out to me, I don't know all of

4     the details behind that, except that I know that that was in

5     response to an urgent request we received for someone who was

6     in some kind of financial distress.  I'm not sure what the

7     exact case was, but that specific check was me going to the

8     bank getting money to go help someone with some emergency they

9     had, and that sometimes happens.  Normally, Loretta takes care

10    of it, but if she's not there, and there's a need, then she'll

11    call me and say, hey, can you go do this.

12    Q.  What does the term "living legacy" mean at your church?

13    A.  So, we believe that if your life is meaningful, you're

14    going to leave a living legacy, that you're not waiting to be

15    remembered after you're gone.  So, for us, anything we do to

16    help people, we consider it living legacy.  So, the traditional

17    word you may hear is benevolence, but things like helping

18    people pay their rent or pay their electric bill, if it's going

19    to be shut off, any kind of giving, we do.  Our feeding

20    program, the clothes we give out, all those types of things,

21    are part of us leaving a living legacy.  So, that expense would

22    be a living legacy expense.

23          MS. SANTILLO:  If we could move to page 54.

24    Q.  What can you tell me about this expense?

25    A.  So, this is a swimming pool, and you all saw earlier in the

H38KLEB2                         Gross - Direct

1    trial, a picture of my house.  I don't know if you knew it was

2    my house, but there was a picture of a house with a pool.

3    That's our home there.  That's where we started the church, and

4    we do have a pool there.

5              And that pool has been used from the beginning as a

6    place for the students in the church to come, and hang out, and

7    to swim.  Barbara Floyd yesterday mentioned about our summer

8    camp.  They used to swim at our house as well.  So, this

9    expense is an expense to -- I don't know, it looks like an

10   opening fee or something for the pool.  And that would have

11   been on my American Express, and it is actually charged to me

12   as an expense, even though I don't use the pool, but the pool

13   is available for others to use.

14   Q.  So, to clarify, on the American Express card, was this

15   characterized as a personal expense or a church expense?

16   A.  This is a personal expense, absolutely.

17   Q.  Were you motivated to enter into a business partnership

18   with the Collectables Club as a result of any of these

19   payments?

20   A.  Absolutely not.

21   Q.  A witness from the IRS testified yesterday about your tax

22   returns.

23             MS. SANTILLO:  And I'd like to call up Exhibit 603 at

24   page 23, line 16.

25   Q.  That contains what appears to say, "Gifts to charity," and

H38KLEB2                        Gross - Direct

1   it has a number of $45,397.  Can you tell me what that
2   represents?
3   A.   That represents all the giving that my wife and I do
4   throughout the year to Hope Cathedral, as well as to other
5   organizations, like Compassion International and other things
6   like that.
7          MS. SANTILLO:  If we could --
8   Q.   Now, just to address your tax return, what role, if any,
9   did you play in preparing 1099s for your church?
10  A.   No role whatsoever.
11  Q.   And who, again, is responsible for that?
12  A.   That would be Loretta Larkins.
13          And we have a payroll company that does all of that,
14  so, really, they do it, they send it out.  All she does is
15  process the weekly payroll or biweekly payroll.
16  Q.   What, if any, accounting oversight do you have at the
17  church?
18  A.   None.
19  Q.   Not you personally, but does the church have in general?
20  A.   Oh, yes.  I have none, but the church, yeah, we have an
21  outside accountant that manages the books and in conjunction
22  with Loretta, and then they perform an operational assessment
23  once a year.
24  Q.   Who do they report to with that regard?
25  A.   To the board of elders.

H38KLEB2                          Gross - Direct

1    Q.  How are your personal taxes prepared?

2    A.  I pay a tax preparer.  So, since I've been in this area --

3    so that's about since 2000 -- actually, 1999 -- I have used the

4    same preparer to prepare our taxes ever since then.  So we pay

5    a preparer.

6    Q.  So, would you spend time reviewing IRS circulars to

7    interpret income?

8    A.  No, ma'am.

9    Q.  Now, I'd like to talk about -- in connection with the

10   relationship with the Collectables Club and HOPE FCU, did you

11   come to receive any consulting fees?

12   A.  Yes, ma'am.

13   Q.  And why were the consulting fees given to you?

14   A.  Well, what had happened, as I began to say yesterday, the

15   original arrangement with the Collectables Club was they would

16   come in and offer that operational support, that day-to-day

17   needed support for the credit union to handle all of the

18   various responsibilities.  And every time that date was set for

19   that to happen, it did not happen.  And my responsibility,

20   which was supposed to be decreasing, so that I could get back

21   to doing what I'm supposed to do, was actually increasing, and

22   I was ending up spending sometimes 50 hours a week doing things

23   in the credit union.

24          So, we had a real serious discussion about, you know,

25   that not being fair to the church and not being fair to me

1   because that's not what we agreed to.  And so, in one of our

2   meetings, we discussed about there being some form of

3   remuneration to the church to offset what was happening because

4   my -- the church was paying my salary, but all of my time was

5   being spent in the credit union.

6   Q.  Did the credit union itself pay any part of that fee?

7   A.  No, ma'am.

8   Q.  Who paid that fee?

9   A.  That was from the Collectables Club, and I think Kapcharge

10  had some role in the aggregate amount.

11          MS. SANTILLO:  I'd like to turn to Government Exhibit

12  900 at 67.

13  Q.  What does this exhibit represent?

14  A.  This looks like it is the Collectables Club account at the

15  credit union, where they took $6,000 and put it into my

16  personal account at the credit union, and then you see it being

17  reversed and then put into where it should have been placed,

18  which is the church's account.  And it was actually after this

19  transaction that Ricardo Hill's access to the system was

20  terminated.

21  Q.  Why is that?

22  A.  Well, because that was not what the agreed-upon process

23  was.  And this, to me, seemed like a sly way for them to mess

24  things up as they realized the relationship was coming to an

25  end because all the other payments had gone directly into the

1    church's account, as they were supposed to.

2    Q.  Now, you mentioned yesterday that one of the aspects of the

3    relationship between the HOPE Credit Union and the Collectables

4    Club was that you would be given -- the legacy board members of

5    the church would be given a $50,000 payment to start a new

6    credit union in the event that the relationship did not work

7    out.

8    A.  Yes, ma'am.

9    Q.  Do you recall that?

10            MS. SANTILLO:  If I could call up Government's Exhibit

11   1162-B, which is in evidence.  And if you could scroll to the

12   bottom, please.  Would you go to the top, please.  Okay.

13   Q.  Mr. Gross, if you could read to yourself that final

14   paragraph in the email that looks like it's signed by you, and

15   tell me what that represents.

16   A.  Okay.  This seems to be me talking about how we handle that

17   $50,000 set-aside payment so that we could start our own credit

18   union, and it also has me talking about, after some research

19   that I had done, that to charter a new credit union would cost

20   really around 71K for a full service CU and the plan to put

21   that full-service CU together.

22            MS. SANTILLO:  If you could scroll to the top, please,

23   Ms. Grant, the top of the email.  To the top of the first page.

24   If you could look at the second email in that page.  The third

25   email, I'm sorry.

1   Q.  Now, what was the agreement with respect to that $50,000?

2   A.  It would be put in escrow.  So, the idea was that it would

3   be placed in a secure, neutral location, and then, upon

4   agreement from both parties that we weren't going to be able to

5   work together or we were going to part ways, that that money

6   then would be able to pioneer a new credit union.

7   Q.  Did that money ever come to be placed into escrow?

8   A.  No, ma'am.

9   Q.  Why is that?

10  A.  They never kept their word.

11  Q.  Speaking of which, there came a time when you had a

12  falling-out with the Collectables Club, and we've heard

13  evidence about a meeting with respect to that.  From your

14  perspective, what happened in that meeting?

15  A.  So much happened in that meeting, but let me give you a

16  context around that whole time, because at that point, we had

17  had our board meeting where they were moved from the board to

18  an advisory board.  So, that automatically triggered something

19  on their side, because after that, they all wanted to come in

20  town to have a meeting, and they wanted to then try to keep all

21  the promises that they hadn't kept this whole time.  So it was

22  during that time where they talked about we're going to get an

23  apartment, we're going to move here, we're going to get

24  licenses, we're going to do all these things, but they hadn't

25  done them prior to that time, as they had agreed.

1          So, they were coming into town to try to figure out

2     how they could get this relationship back on track, and they

3     were -- you know, they were coming with a clear agenda.

4          So, by the time they got there, we did have a meeting,

5     and that's really where a lot of the -- we talked that Friday

6     morning.  That was when I started to see even more of their

7     deception, and things just weren't being the way that they were

8     supposed to be from the operational side.

9          So then we met that following morning, which is the

10    recording you all heard.  There were two parts to that meeting.

11    It probably was a total of about a three-hour meeting.  The

12    first part was about the fact that the examiner had come and

13    had basically accused us of being negligent in how we handled

14    all the ACH transactions and that type of thing.  And you heard

15    Ms. Flok testify to that.

16         So, on the eve of having her come in, that meeting

17    that Saturday morning was, what in the world is going on here.

18    The very thing that I had been warning against and trying to

19    stop you from doing, we're here.  That everything that I had

20    said was not supposed to happen has now come to pass, and now

21    we're left with how to clean this situation up.

22         So, it was in that first part of the meeting, which

23    was not recorded, where we talked about how we needed to have

24    capital in the credit union on the books, so that regardless of

25    the sense of risk, if you are well capitalized, and you have a

1   lot of money on your own bottom line as a credit union, that

2   way it would at least mitigate whatever sense of risk there was

3   with what happened in the past.

4           When we left, and we shook hands, no problem, we're

5   going to do it, we're in this together, and then as soon as

6   they were going out the door, Michael Murgio says, well, but we

7   have to get permission before we can do what we said.  And

8   that's when I -- I just couldn't take it anymore because we had

9   been through this, I make an agreement, and then I renegotiate

10  the agreement, I make an agreement, and so it was back and

11  forth, and I had finally had it.  I said enough of this.

12          And most of the people had already gone to their car,

13  and Michael and Anthony were still there, and I said, uh-uh,

14  everybody come back in because this is exactly the problem

15  we've been having in this relationship.  Every time we sit face

16  to face, and we agree on something, when we leave the table,

17  it's changed, and we can't keep doing this.

18          So what you then hear is -- in that recording is that

19  second part of the meeting, where, as you can tell, it wasn't

20  my best moment, but I was exercised, I was completely angry

21  that we'd gotten to this point, and the gist -- the bad place

22  the credit union was in because of their unkept promises.

23  Q.  You talk about things in the call like being tired and a

24  tap dance.  Can you describe what you mean by that?

25  A.  Yes.  In our normal operation as a credit union, I had been

1    with a credit union at that point, you know, almost ten years,

2    it was a very simple process with the NCUA.  They would notify

3    us, they'd come in, we'd have our examination, they'd come

4    back, they'd talk to us about things we needed to work on, we'd

5    work on them, all was well, we wouldn't see them till the next

6    year.

7              Ever since we got into this relationship with

8    Collectables Club, the NCUA was a permanent fixture in the

9    credit union, asking questions, asking for documents, and the

10   only one kind of there to make it happen were myself, Bernard

11   Larkins, and George Wyatt to try to answer all of these

12   questions, and it had just become a nightmare, and I was not

13   completely confident that the things that had been told me were

14   actually true.  And so I'm representing things that I've been

15   told, assuming that they are true, and now after the fact, I'm

16   finding out some of these things may not be accurate.

17   Q.  So, did you ever intentionally try to mislead the NCUA in

18   any way?

19   A.  Absolutely not.  No, ma'am.

20             So that is when you hear words like tap dancing, red

21   flags, those were words to simply say I've never had to do this

22   before, none of us have ever had to do this.  We're in

23   uncharted territory as a credit union to have this much, you

24   know, whether it's scrutiny, or discord, or all of that going

25   on.

H38KLEB2                         Gross - Direct

1    Q.   How many members had the credit union had before?

2    A.   Well, when I first got there, it was less than a hundred,

3    we moved up to a little bit over a hundred, and I think 170, I

4    don't know, somewhere around there, is what we had at around

5    that time.

6    Q.   How many business accounts did you have?

7    A.   Very few.  Not many.

8    Q.   Was this a new process for you, dealing with a big business

9    account?

10   A.   It was.  Two things happened.  It wasn't just dealing with

11   this big business account, we also started debit cards.  We had

12   finally got debit cards at the end of September.  But nobody

13   told us that we had to -- the way debit cards work on the back

14   end of a bank is a little bit different than how they work in

15   our own personal checking accounts.

16        So, one of the things that we learned at the end of

17   October, which was the first month we had debit cards, was that

18   there's a lot of reconciling that needs to be done, and, in

19   fact -- and we realized at the end of October, that the

20   back-end reconciling that needed to be done with every

21   transaction, literally every ACH -- rather, every debit card

22   transaction that came through the credit union, it had to be

23   reconciled, in addition to what had to be reconciled on the

24   bank statements.  It was a nightmare.  So, it wasn't just the

25   Kapcharge business, it was also just that we had now stepped

1    into a level of operating, which was a positive on one side,

2    but it way outdistanced what we really knew how to handle.

3    Q.  What were you referring to when you said in the meeting

4    that you had been negligent?

5    A.  So, when Ms. Flok came in, and she asked a lot of questions

6    that, quite frankly, I couldn't answer, her response was, well,

7    that's negligence, you should know these answers.  And, at that

8    point, I'm like I probably should, but I don't, I don't have

9    the answers to some of these things.  And part of that was

10   because I had been relying on information that was coming from

11   people that at that point, I was very suspect of what they were

12   saying was actually accurate.

13   Q.  What did you decide to do about that?  What happened at

14   this meeting in terms of the relationship?

15   A.  So, at that point, I was really -- I'd had it with the

16   dishonesty, I'd had it with this sense of, you know, you say

17   one thing, you do another, and you can hear me talking about,

18   you know, I believe that I kept my integrity throughout this

19   whole process and that they had not kept their integrity in

20   just keeping the words of what we had agreed to in our

21   agreement.

22        So, that was the point at which I said, okay, listen,

23   we had a provision in our agreement, $50,000, that's the exit

24   clause.  So, clearly, we cannot work together.  So, if you want

25   to handle this mess, more power to you, we'll move on.

1          And so, that was what that discussion was all about.

2     But I knew that they didn't have any money, and I knew that

3     they weren't going to keep their word, because that's what they

4     had always -- that's what had always happened.  So, the

5     provision was, three people resign, and then they were supposed

6     to send the money on Monday.  Well, it didn't happen, which we

7     knew wasn't going to happen.  And that was when I said, this is

8     over.

9     Q.   Were the members of the Collectables Club in a position to

10    take over or to join the board of the credit union at that

11    time?

12    A.   No, they weren't, no.  Because we had already, the previous

13    Saturday, moved them to an advisory board status, which gave

14    them no authority or control at all in the credit union.

15    Q.   What was your understanding, as of Monday, about the status

16    of the relationship between the Collectables Club and the HOPE

17    FCU?

18    A.   Oh, it was completely over.  We had hoped -- so we had

19    hoped that their newfound energy around complying with the

20    original agreement could mean we could still at least work with

21    them not on the board, but could at least still work with them,

22    and bring their members in, and grow the credit union.

23    Obviously, after this meeting that took place, that was not

24    even a possibility anymore.

25          MS. SANTILLO:  If we could go back to Government

1   Exhibit 900 at 79.

2   Q.   What does this slide represent?

3   A.   This represents their first attempt to send $50,000 to the

4   credit union.

5   Q.   Were there other attempts?

6   A.   There actually was a second attempt.  This attempt, because

7   we had just started working with United Advantage in Seattle in

8   Oregon, I think, and so the wire settled before we could reject

9   it.  That's why it hit, and then we returned it.  But there was

10  a second -- as I recall, there was a second wire that they

11  tried to send in as well that we told them up front, if you get

12  anything from this organization, just reject it out of hand,

13  you don't even have to ask us.  And that's what happened with

14  that -- with, I believe, that second wire that they tried to

15  send in.

16  Q.   Why did you return -- or why was the $50,000 returned?

17  A.   We wanted to have absolutely nothing to do with them.

18  Q.   Now, after the relationship with the Collectables Club was

19  terminated, why did you continue to do business with Kapcharge?

20  A.   Kapcharge, from every aspect that we had seen of them, was

21  a legitimate business that wanted to work with us, and help the

22  credit union grow, and become what we've envisioned for it to

23  be.  It was also in the midst of this November time frame,

24  where we learned that the initial donation didn't come from the

25  Collectables Club, as I had been told, it had actually come

H38KLEB2                          Gross - Direct

1    from Kapcharge.

2            So, we met with Mark, and he met some of our board

3    members, and we really talked about how do we go forward, and

4    they were very interested in continuing to process, and to work

5    with us, and to move forward in a relationship.  And that's

6    where we talked about the fee income that would be able to help

7    the credit union grow.

8    Q.  So, despite all the problems we've heard about in this case

9    with respect to ACH processing, why would you want -- continue

10   to want to do that as a business?

11   A.  Well, because there's nothing wrong with the business, it's

12   how the business is run.  And, unfortunately, the people who

13   were running that line of business for the credit union, we've

14   now learned to be completely dishonest and dishonorable people.

15   There's nothing wrong with ACH transactions, they're happening

16   through every financial institution in this country, but the

17   people who were running it were not running it the way they

18   represented to us that they were running it, and we knew that

19   if we did it properly, it would actually help the credit union

20   realize its financial goals.

21   Q.  What, if any, steps did you take to ensure that ACH

22   processing in the credit union would be done in compliance with

23   NCUA regulations?

24   A.  We started to learn.  So, we actually signed a contract a

25   couple of months earlier with United Advantage, and for them to

1     teach us how to do ACH origination, and show us, from a policy

2     standpoint and all those things, how do you do this business

3     properly because they're a $30 million credit union, and they

4     do ACH transactions.

5              We also contacted the New Jersey Credit Union League,

6     and they offer classes and help in consulting to help us

7     understand what needed to happen.

8              We also brought on Charles Blue, the name you've heard

9     a couple of times here.  We brought in Charles Blue, a

10    long-time member of the congregation, to actually manage the

11    day-to-day operation of the credit union.

12    Q.  What did you know about Charles Blue?

13    A.  He's been a faithful member of the congregation, a man

14    who's very well respected, teaches kids basketball, touched

15    hundreds of kids' lives with his basketball program.  He's an

16    extended parted of our family because we've known him so long.

17    Q.  What are his professional qualifications?

18    A.  He used to serve as the CFO for Bloomingdale's here in

19    New York, and I think when I met him, he was the CFO for a

20    major company in North Jersey, which I think had over half a

21    million -- half a billion dollar budget that he was responsible

22    for as CFO.

23    Q.  We've heard a lot about OFAC, and the PATRIOT Act, and all

24    of those things.  Were any steps taken to address some of the

25    concerns that had been raised with regard to those issues?

1    A.   Absolutely.  So, every year, per NCUA regulations, all

2    board members have to be trained in BSA, and OFAC, and

3    anti-money laundering policies, and every year we have to get

4    certified.  It's one of the things that they come in in the

5    annual audit, and they look at, and we had done that

6    certification for -- back then.

7         With this whole introduction of ACH origination, that

8    was a whole different animal that really required a whole lot

9    more knowledge than we had and really a whole lot more training

10   on the BSA, OFAC, and AML side that we don't possess.  So, once

11   Charles came on, he actually went and got certified.  So he

12   got -- there's a national certification that you can get in

13   BSA, anti-money laundering, and all of that.  He went and took

14   that class and became certified, and he really led the effort

15   to get the entire credit union compliant.

16   Q.   Was there a letter of understanding that was in place with

17   the NCUA?

18   A.   Yes.  So, as we were trying to dig ourselves out of this

19   madness that we were part of, the documents of resolution that

20   we had received were put into a letter of understanding,

21   basically saying this is what we want you do, and this is when

22   we want you to do it by, and that became the roadmap that

23   Charles followed to help get the credit union back on track.

24   Q.   Were you able to meet the obligations in the letter of

25   understanding?

1    A.  Yes, yes.  As I think Mr. Adam testified, every item that

2    they found that was deficient within five months or so, we got

3    them in order.

4    Q.  Did there come a time when HOPE FCU continued to process

5    ACH transactions for Kapcharge after the letter of

6    understanding was satisfied?

7    A.  Yes.  At some point -- I don't know the exact date, but at

8    some point, Charles believed that in a conversation with

9    Mr. Adam, that in order for him to come in at our annual review

10   and test whether or not we really have a true system in place,

11   that it was okay to start running through some transactions, so

12   that way, they could actually look at real data when they come

13   in as opposed to, well, here's our system, here are our

14   policies, here are our people, we could show them here's all

15   that stuff, and here are our reports to show you how we're

16   doing all of our compliance activity.  So, we restarted the ACH

17   transactions, and -- then we restarted them.

18   Q.  What was the NCUA's response?

19   A.  They said while they could understand how that could be a

20   misunderstanding, they did not want us doing anything until

21   they had finished our annual audit.

22   Q.  Was ACH processing stopped at that point?

23   A.  Oh, absolutely.

24   Q.  Now, the government has raised some allegations that you

25   made false statements to the NCUA, and I'd like to address each

1    of those statements.

2    A.  Okay.

3          MS. SANTILLO:  If we could turn to Government's

4    Exhibit 1111.  It's already in evidence.  Oh, no -- well, I

5    think that's the wrong exhibit.

6    Q.  With respect to the July 2014 call report, why did that not

7    contain the names of the members of the Collectables Club if

8    they were voted onto the board in June 2014?

9    A.  Okay.  So, whenever we have a board meeting -- which our

10   board meetings were always the third Saturday of every month.

11   So, whenever there was a board meeting, and action was taken,

12   none of those actions was official until the following meeting,

13   when those minutes were approved and accepted.  So, the way

14   we've always done it, whether there was an annual meeting or

15   anything else, we never acted on anything in that annual

16   meeting until that following meeting that month in order to

17   realize those changes.

18         The problem in this situation was, we tried to meet in

19   July, but we didn't have a quorum.  So we simply met, declared

20   we didn't have a quorum, and we went home.  So, it wasn't until

21   August that we actually organized the board, elected who was

22   going to be what position and serving what role, and then we

23   updated our website, and we proceeded to update the call

24   report -- the profile on the call report to represent who the

25   new officers were.

1              MS. SANTILLO:  If you could call up Government Exhibit

2     6088.  And if you could scroll to the bottom, please.  To the

3     next page, above it.  There we go.

4     Q.  What does this appear to be?

5     A.  This appears to be the -- what we call the board

6     organization, where you see you have this partnering taking

7     place among what we call the legacy members and the new

8     members, and that was really a way to get the training done.

9     So everyone was kind of partnered up, new with old, to ensure

10    that the new board members could have individual instruction

11    from someone who was experienced.

12             MS. SANTILLO:  If we can move to the top of this

13    exhibit.  If you could highlight the first paragraph, "Board

14    Members Present Resolution."

15    Q.  What does this appear to be?

16    A.  That's the resolution approving the minutes from that June

17    meeting, which we weren't able -- from the June meeting where

18    we elected the new members of the board and the July 19th

19    minutes where we basically said that, you know, we weren't able

20    to have a meeting.

21    Q.  Thank you.

22             MS. SANTILLO:  If we could call up Government Exhibit

23    6022.

24    Q.  Now, the prosecutors have claimed that you made false

25    statements to the NCUA when asking about how members of the

1    Collectables Club or other businesses who worked part-time in
2    the field of membership could qualify as members.  Why were you
3    asking Mr. McDonough those questions, about how individuals
4    could qualify for the field of membership?
5    A.  Well, we were asked -- and you heard Mr. McDonough say
6    this.  We were asked to recertify the entire membership of the
7    credit union.  So, part of this was trying to get some
8    understanding of what the qualifications were, because while we
9    were dealing with Collectables Club, the point at which we have
10   to look at every member, there were business accounts for
11   hairstylists who don't really have a physical location, but
12   they work in our field of membership, but they may live
13   someplace else.  So, we were trying to get clarity not just for
14   the Collectables Club, but also on what is the framework
15   whereby we make these decisions.
16        Now, specifically to this one, the question was posed
17   by, I think it was Anthony, what if our members or our
18   employees are coming through the area part-time and working,
19   would that still qualify?  And, so, in the midst of me asking
20   my questions, I posed that question to Mr. McDonough to try to
21   get clarity from him, would this satisfy, on your side, the
22   requirement that we would meet the requirements for our
23   charter.
24   Q.  Did there ever come a time when you actually submitted
25   paystubs or letters from employers to the NCUA in connection

1    with the Collectables Club?

2    A.   Not at all.

3    Q.   What did you do to respond to the issues that the NCUA

4    raised with respect to the field of membership for the

5    Collectables Club?

6    A.   Well, we ultimately removed them from the board and removed

7    them from the credit union.

8            MS. SANTILLO:   I'd like to show you an exhibit for the

9    Court and counsel.   It's marked for identification as TG53.

10   Q.   Do you recognize this document?

11   A.   Yes, I do.

12   Q.   What is this document?

13   A.   So, this was the ongoing discussion with Anthony about this

14   issue of their qualifying for the field of membership.   And I

15   went back to him and said, you said you could produce paystubs

16   of your people part-time working in the area, if you can do

17   that, great, but what the NCUA wants is they want a letter, an

18   affidavit, stating that these employees work here, et cetera,

19   et cetera, et cetera.

20           So, I responded to Anthony, and he was, you know,

21   doing his squirrely response, and my response at the top here

22   is me telling him what I advised him to do.

23           MS. SANTILLO:   I'd like to introduce this exhibit as

24   TG53.

25           MR. NOBLE:   No objection, your Honor.

H38KLEB2                         Gross - Direct

1           THE COURT:  Thank you.

2           It's admitted.

3           (Defendants' Exhibit TG53 received in evidence)

4           MS. SANTILLO:  Can I publish for the jury, please?

5           THE COURT:  You may.

6           THE WITNESS:  So this is really -- I think this is the

7    day before the board meeting where we actually vote them to the

8    advisory board.  And I tell him, honestly, I would move them --

9    talking about the Collectables Club members -- off the board

10   right now to an advisory board.  I certainly would not advise

11   signing a false affidavit.  Stability means our board needs to

12   be above scrutiny completely.

13          MS. SANTILLO:  If we could call up Government Exhibit

14   6091.

15   Q.  Through a cooperating witness, Rico Hill, the government

16   has suggested that members of the Collectables Club would never

17   actually move to an advisory board.  What does this represent?

18   A.  These are the actual minutes from the November 15th board

19   meeting where we did vote to move them to an advisory board.

20   Q.  And when, in time, was that meeting in connection with the

21   email that we just saw referencing moving them to the board --

22   to an advisory board?

23   A.  I think it was the -- this meeting took place the day after

24   that email.

25          MS. SANTILLO:  Turning to Government Exhibit 6026.

H38KLEB2                        Gross - Direct

1    Q.   Now, the government has suggested that you misled NCUA

2    Examiner Meg Flok when she asked you who members of the

3    Collectables Club were in this email.  What was your

4    understanding of what Ms. Flok was asking you here?

5    A.   Okay.  Well, as she said, her specific responsibility

6    coming to us was about ACH transactions and the risk associated

7    with them.  So when she says here in her email -- the way I

8    interpreted her email, she said that she had looked in the ACH

9    item detail, which means she's trying to figure out what is

10   this -- what is this company and what are they doing.  So, my

11   response was to ask -- I think I asked Kapcharge, give me

12   specifically what kind of ACH transactions you're doing for

13   them, because, as you learned throughout this trial, there are

14   PPD, CCD, IAT, all kinds of codes that are associated with

15   different types of processing, and that was information I did

16   not have.

17   Q.   I'd like to show you an exhibit that's been marked for

18   identification as TG46.  Do you recognize this document?

19   A.   Yes, ma'am, I do.

20              THE COURT:  I can't hear you.

21   Q.   Do you recognize this document?

22   A.   Yes, I do.

23   Q.   What does this appear to be?

24   A.   This appears to be an email chain between myself, Mark

25   Francis, and then further forwarded to Kevin Pepe.

H38KLEB2                        Gross - Direct

1            MS. SANTILLO:  I'd like to introduce this exhibit as

2     TG46.

3            MR. NOBLE:  No objection.

4            THE COURT:  It's admitted.

5            (Defendants' Exhibit TG46 received in evidence)

6            MS. SANTILLO:  Can we publish it for the jury, please?

7            THE COURT:  You may.

8     BY MS. SANTILLO:

9     Q.  What does this appear to be?

10    A.  So, what you're showing there is her actual email to me

11    asking about Collectables CLU, which is the abbreviated name

12    that's on the ACH detail report, and then I reached out to Mark

13    asking him advise me, so I know how to respond.

14           And then he asks me:  What type of ACH do you -- or

15    that's me asking him:  What type of ACH do you do for them?

16           And then he asks me:  If it's the ACH code, Kevin can

17    answer.

18           And then Kevin subsequently answers:  This is the kind

19    of ACH processing that they do for Collectables Club.

20           And I believe I forwarded that information on to

21    Ms. Flok.

22    Q.  If we could turn back to 6026 to see your response to

23    Ms. Flok.

24    A.  Yes.

25    Q.  Now, the government has claimed that you also made a

1    misrepresentation to the NCUA by claiming that the relationship

2    with Kapcharge was a blessing.  What, if any, recollection do

3    you have about whether you, or anyone else at the HOPE FCU,

4    told Ms. Flok that the relationship with Kapcharge was a

5    blessing?

6    A.   That statement actually was made by Mr. George Wyatt.  That

7    was his word, and that was the way he saw the relationship with

8    Kapcharge, that we had someone who was coming alongside us who

9    seemed to be authentic as opposed to what we had just gone

10   through, and that they were prepared to really keep their word,

11   and do what they said they were going to do, to help grow the

12   credit union.

13   Q.   Now, the government has claimed that you made a false

14   statement to the NCUA by stating that Kapcharge was a

15   faith-based group.  What, if anything, do you recall about such

16   statements?

17   A.   I do not recall ever saying they are a faith-based group.

18   I did say that Mark Francis was a man of deep faith, and, in

19   fact, he is.

20   Q.   How did you come to learn that?

21   A.   In our conversations, Mark is actually a very devout

22   Orthodox Christian, and in addition to maintaining his

23   commitment to the feasts of the year and that type of thing,

24   many of the conversations we had were about scripture, his

25   relationship with God, and that type of thing.

H38KLEB2                          Gross - Direct

1    Q.  The government has claimed that you and other members of

2    the HOPE FCU, including Charles Blue, deceived the NCUA by

3    claiming that Kapcharge had staffed offices in the field of

4    membership.  What was your understanding about what a staffed

5    office in the field of membership meant?

6    A.  The staffed office, to my understanding at that time, was

7    that they had upgraded from a virtual office in that office

8    suite that you all saw to an office that was a suite that

9    included staffing, that they -- clerical, receptionist, that

10   type of staffing.  So, our understanding was, in the lease that

11   they signed with that Riviera Suites, it included that

12   low-level staffing support.

13          In addition, Mark had had conversations about hiring

14   someone from the church who could actually work in that office

15   once ACH processing had restarted.  At that point, their

16   business had been cut off, so they weren't realizing any

17   revenue from the relationship, but they were still committed to

18   walking down the road because they wanted to ultimately get

19   this back up and going.  So we'd actually identified a young

20   lady who would serve in that role when things picked up, but

21   they never did.  In other words, we weren't able to restart the

22   ACH processing.

23   Q.  Okay.  Now, the government has identified some emails where

24   you asked about a lease at the Riviera Suites potentially being

25   dated as of May.  Why did you request that the lease be dated

1   as of May?

2   A.  We knew that they had purchased a virtual office, and we --

3   it was either Collectables Club or Kapcharge, we're not sure

4   which one, but anything that Anthony had touched at that point,

5   we knew was soiled, and we wanted everything set up properly.

6   Kapcharge did not have any documentation.  Even though they had

7   been paying for the office space, they had no documentation

8   that went all the way back to May.  And since they were now

9   paying to upgrade to a physical space with the staffing there

10  in that building, my question was, well, since you've been

11  there since May, would they let this contract show that you've

12  been there since that time.  And it never happened.  They dated

13  it as of whatever date they made the payment, and that was the

14  documentation that we submitted to the NCUA.

15  Q.  Was that documentation with the November lease the

16  documentation that was submitted in connection with the finding

17  that the NCUA -- or that Kapcharge was in the field of

18  membership?

19  A.  I believe so.

20  Q.  Now, what, if any, knowledge did you have about Anthony

21  Murgio's interest in Bitcoins or virtual currency?

22  A.  He had mentioned in an email where, in the early days, I

23  asked him kind of what -- where do you see this thing going,

24  what is your dream for the credit union.  And in one of the

25  bullet points, he talked about, I think, virtual currency or

1    something like that.  It was actually a term that I had never

2    heard of before, but that was probably the first time I'd heard

3    about it.  And it came up at different points throughout our

4    discussions, but that was generally it.  It was not certainly

5    the heart of whatever he said he was trying to do.

6    Q.  Were you ever aware that the Collectables Club was a sham

7    front company for an unlawful Bitcoin exchange?

8    A.  I never knew that until the summer of -- what's that --

9    July 2015, when the criminal complaint was unsealed, and my

10   life, as it were, changed.

11   Q.  What, if anything, did you know about Coin.mx?

12   A.  Once again, very limited.  At one time I received an email

13   from Ricardo, and it had Coin.mx as an email address, and I

14   asked him, hey, you know, what is this, and he said, oh, it's

15   another business that we're involved in.

16        And that was the sum total of my knowledge.

17   Q.  What, if anything, did you know about whether Coin.mx

18   should have been licensed?

19   A.  Absolutely nothing because I didn't even know what kind of

20   business it was.

21   Q.  What, if anything, did you know about members of Coin.mx

22   making three-way calls to banks to deceive them about

23   processing Bitcoin transactions?

24   A.  Absolutely nothing.

25   Q.  Did you intend to facilitate the operation of a Bitcoin

1    exchange at HOPE FCU?

2    A.  Absolutely not.

3          MS. SANTILLO:  Your Honor, can I have one moment,

4    please?

5          THE COURT:  Sure.

6          I'd invite the jury to take a standing stretching

7    break.

8          (Pause)

9          THE COURT:  All right.

10   BY MS. SANTILLO:

11   Q.  Now, did you ever meet with any members of the Collectables

12   Club in New York?

13   A.  No, ma'am, I did not.

14   Q.  Did you know, have any reason to believe, that any of the

15   wires from the Collectables Club would pass through New York?

16   A.  Absolutely not.

17   Q.  Did any aspects of your involvement with the Collectables

18   Club in this case center around New York?

19   A.  No, ma'am.

20   Q.  Did you think that there was anything wrong or improper

21   about taking a donation to your church?

22   A.  No, ma'am.

23   Q.  Did you think that there was anything wrong or improper

24   about letting a new group join the board of the HOPE Credit

25   Union?

H38KLEB2                        Gross - Direct

1   A.  No, I did not.

2   Q.  Did you think there was anything wrong or improper about

3   volunteer board members resigning their positions on the board

4   of the HOPE FCU?

5   A.  No, I did not.

6   Q.  Did you ever intentionally deceive the NCUA about anything?

7   A.  No, ma'am, I did not.

8           MS. SANTILLO:  Thank you.  No further questions.

9           THE COURT:  Thank you, Ms. Santillo.

10          Let's take our mid-morning break.

11          Members of the jury, we'll return in about ten

12  minutes.  Thank you.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 (Jury not present)

 2                 THE COURT:  You may step down for the break,

 3     Mr. Gross.

 4                 Matters to take up, counsel?

 5                 MR. NOBLE:  Not from the government.

 6                 MR. KLINGEMAN:  No, your Honor.

 7                 THE COURT:  We'll return in about ten minutes.  Thank

 8     you.

 9                 (Recess)

10                 THE COURT:  Matters to take up, counsel?

11                 MR. CREIZMAN:  I'll let Mr. Klingeman go first.

12                 MR. KLINGEMAN:  Your Honor, I can report that the next

13     witness, Special Agent Beyer, is waiting out in the hall to

14     testify.

15                 THE COURT:  Okay.

16                 MR. CREIZMAN:  Your Honor, I may have a brief

17     cross-examination of Mr. Gross, and I just wanted -- just in

18     case your Honor thought I might not, I just wanted to let your

19     Honor know, so that you can address me and say, Mr. Creizman,

20     any cross-examination.

21                 THE COURT:  Anyone want to think about the appropriate

22     scope or everybody's comfortable?

23                 MR. NOBLE:  I'm not sure what Mr. Creizman intends to

24     do.  I can confer with him briefly.

25                 THE COURT:  Okay.  Why don't you do that.
```

1              MR. CREIZMAN:  I don't think I'm going beyond the

2      scope of the direct or anything like that.

3              THE COURT:  Okay.

4              MR. CREIZMAN:  I think --

5              MR. NOBLE:  Okay.

6              MR. CREIZMAN:  I think the government can imagine what

7      I might ask.

8              MR. NOBLE:  We'll take him at his representation.

9              THE COURT:  All right.  Thank you, Mr. Creizman, for

10     alerting me.

11             Other matters to take up?

12             Mr. Gross, you may return to the stand.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

H38KLEB2                      Gross - Direct

1              (Jury present)

2              THE COURT:  Thank you so much, ladies and gentlemen of

3    the jury.  Everyone may be seated.  We will turn to the

4    cross-examination of Mr. Gross.

5              And, Mr. Noble, when you're ready.

6              MR. NOBLE:  Thank you, Judge.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CROSS EXAMINATION

2    BY MR. NOBLE:

3    Q.  Good morning, Mr. Gross.  Now, you testified on direct

4    examination that you began dealing with Anthony Murgio in late

5    Winter or early Spring of 2014, correct?

6    A.  Michael and Anthony Murgio, yes, sir.

7    Q.  And you testified that at the beginning of that

8    relationship, your partnership was tremendous.

9    A.  Yes, in those early days, yes, sir.

10   Q.  But my the Fall of 2014, your relationship with Anthony

11   Murgio had kind of soured somewhat.

12   A.  Yes, sir.

13   Q.  You agreed to meet with him and the other Collectables Club

14   board members at the credit union on November 22nd, 2014,

15   correct?

16   A.  Yes, sir.

17   Q.  And that included Yuri Lebedev?

18   A.  Clarity.  That's the Saturday meeting or the Friday?

19   Q.  I believe you met with them both days, correct?

20   A.  Correct, yes.  I just wanted to know which one.

21   Q.  And you met with Yuri Lebedev?

22   A.  Yes, he was there, as well.

23   Q.  He was present?

24   A.  Yes, sir.

25   Q.  And Ricardo Hill?

1    A.  Yes, sir.

2    Q.  And Jose Freundt?

3    A.  Yes, sir.

4    Q.  They were also on the board of the credit union at that

5    point?

6    A.  No, sir.

7    Q.  Now, one of the reasons for the meeting was that the NCUA

8    was questioning the eligibility of those board members to be

9    part of the credit union, correct?

10   A.  Are we talking about the Friday or the Saturday meeting?

11   Just to be clear.

12   Q.  The Saturday meeting.

13   A.  The purpose of that meeting was many fold.  One of them was

14   the FOM issue, the --

15   Q.  Sir, it's a yes or no question.

16   A.  I'm sorry.  Please repeat it.  I'm sorry.

17   Q.  Sure.  So one of the purposes of the meeting with the

18   Collectables Club board members was to deal with the issue of

19   their eligibility to be part of the credit union.

20   A.  Generally, yes, sir.

21   Q.  Now, one of the other reasons for the meeting is that the

22   NCUA had raised concerns about the ACH processing volumes at

23   the credit union, correct?

24   A.  Yes, sir.

25   Q.  Now, as you testified to on direct examination, there were

H38OLEB3                          Gross - Cross

1    two different portions of that meeting on November 22nd.

2    A.  Yes, sir.

3    Q.  At the end of the first portion, you thought that you had

4    reached an agreement with the Murgios about the capital

5    infusion that was going to be made into the credit union,

6    correct?

7    A.  Well, I thought I had reached agreement with that entire

8    group, not just those two.

9    Q.  Okay.  And they were going to inject $500,000 into the

10   credit union to sufficiently capitalize it so you could keep

11   processing the ACH transactions?

12   A.  Yes, sir.

13   Q.  In return, you were going to make sure that they had

14   control of the board.

15   A.  Can you rephrase that question, please?

16   Q.  Sure.  At the end of the first part of the meeting, you had

17   agreed that the Murgios and the Collectables Club would

18   continue to control the board.

19   A.  At the end of the first part of the meeting, that is not my

20   understanding.  The control part actually came up as a matter

21   of the second part of the meeting.

22   Q.  Well, at the end of the first meeting, you had come to some

23   agreement with the Murgios and the Collectables Club members,

24   correct?

25   A.  Yes, sir, that they would keep their word and that they

H38OLEB3                          Gross - Cross

1    would infuse the cash, as well as finally keep their word, as

2    they had not done in those last couple of weeks.

3    Q.   And then on the way out of the meeting they tried to change

4    the terms of the deal?

5    A.   Yes.  They said, "Well, we're not sure if we can really do

6    it.  We have to get approval."

7    Q.   It was about a timing issue, right?

8    A.   No, it didn't seem like timing, it seemed like approval,

9    like they needed to get a approval from someone for this deal,

10   which is really what caused the disconnect because my

11   understanding was the people who needed to make the decision

12   were in the room, which was all the Collectables Club

13   leadership.

14   Q.   And that frustrated you.

15   A.   Oh, yes, sir.

16   Q.   It angered you.

17   A.   A whole lot of emotions, sir.

18   Q.   And I believe you testified that that November 22nd

19   meeting, that second portion, was not your best moment; is that

20   right?  That's what you told this jury?

21   A.   Yes, sir.

22   Q.   That's because you agreed to accept $50,000 to turn over

23   control of the credit union to Murgios and the Collectables

24   Club?

25   A.   No, sir.  It was because of my uncharacteristic behavior

1    because I had become so angry and was actually raising my

2    voice, and you all hear it all on the tape, for which I did

3    have to apologize because I was incensed.

4    Q.  So we have a recording of what happened at that meeting.

5    A.  Yes, sir, we do.

6    Q.  We don't just have to just take your word for what

7    happened?

8    A.  Correct.

9    Q.  So let's listen to some portions of that meeting.

10   A.  Sure.

11            MR. NOBLE:  Let's bring up Government Exhibit 2506,

12   can we bring up the transcript, as well, 2506-T, and please

13   flip to page 38.

14            Ms. Grant, when you're ready, can you just press

15   "play"?  We're going to listen to a portion of the recording.

16            (Audio played)

17            DEFENDANT GROSS:  The transcript is not keeping up.

18            THE COURT:  Pause.

19            MR. NOBLE:  Can we realign the audio a little bit?

20   And please make sure we scroll with the audio so the jury can

21   follow along.

22            THE COURT:  As you did earlier, Ms. Grant, if you can

23   expand where it is so that it's larger, please.  Thank you.

24            (Audio played)

25            MR. NOBLE:  Can you pause it, please?  Can you please

1    scroll to the portion of the transcript where we are?  Thank

2    you, Ms. Grant.

3            (Audio played)

4            MR. NOBLE:  Let's restart this portion.  Let's go back

5    to the 58-minute mark, and please turn to page 38.  That way we

6    know exactly where it picks up.  You'll see the 58-minute

7    marker there in the black brackets.

8            (Audio played)

9            MR. NOBLE:  You can stop it there.  Can we go to the

10   transcript at page 39 there?  Can you scroll up a little bit?

11   BY MR. NOBLE:

12   Q.  Now, Mr. Gross --

13           MR. NOBLE:  Scroll up a little bit more, Ms. Grant.

14   BY MR. NOBLE:

15   Q.  -- where you say, "One thing I say Anthony is you and I

16   have been walking together since last spring."

17   A.  Yes, I see it.

18   Q.  You didn't say that to Michael Murgio, did you?

19   A.  No, because I was talking with Anthony.

20   Q.  And then later on you said, "But you and I have been

21   walking down this road together."  That was also directed at

22   Anthony Murgio?

23   A.  Yes, sir.

24   Q.  You guys had been involved together since the Spring of

25   2014 in this joint venture?

1    A.  In this conversation I was referencing his involvement,

2    yes.

3    Q.  Now, at the end of this meeting, you agreed to arrange the

4    resignations of all your board members except for you and

5    Mr. Larkins, Bernard Larkins, correct?

6    A.  I recall that being the case, yes.

7    Q.  And that was in exchange for $50,000?

8    A.  That was -- that was what would trigger the exit provision

9    from our original agreement, sir.

10   Q.  So the exit provision was going to allow the Collectables

11   Club to retain control of the board?

12   A.  Well, it would have allowed them -- it would have allowed

13   them to go forward with the credit union, and we would -- we

14   could pull out and go our own separate direction.

15   Q.  And in exchange for that, you were going to get $50,000?

16   A.  No, sir, I was not going to get $50,000.  The original --

17   Q.  I apologize.  Your church was going to get $50,000?

18   A.  Actually, no, sir.  It was to be escrowed, so when we were

19   ready to charter a new credit union, we would be able to do so.

20   Q.  But in this conversation you agreed -- you told them, "Pay

21   us $50,000 by Monday to the church and we'll give you control

22   of the credit union."  Isn't that what is reflected in this

23   transcript, in this conversation?

24   A.  I would need to be refreshed about --

25   Q.  Let's refresh your recollection.

H38OLEB3                          Gross - Cross

1            MR. NOBLE:  Can we go to page 28 of the transcript?

2    And let's go to the audio, I think it's going to be at about

3    approximately 43-minute mark.

4            (Audio played)

5            MR. NOBLE:  Ms. Grant, can we back up the audio a

6    little bit, maybe to like the 42-minute mark?  I believe

7    there's a minute marker on the transcript on the previous page.

8    Let's just start there so we listen to this portion of the

9    conversation in full.

10           (Audio played)

11           MR. NOBLE:  Let's stop there.  Can we scroll back up

12   to the previous page?

13   BY MR. NOBLE:

14   Q.  Mr. Gross, just directing your attention to the line where

15   you say, "Give us the 50K that's owed us."  You said that,

16   right?

17   A.  Yes, sir, I did.

18   Q.  And then you said, "All of us resign."

19   A.  Yes, sir, I did.

20   Q.  And at that point in time, Collectables Club would continue

21   to be in control of your credit union, correct?

22   A.  Well, let me just correct one thing, sir.

23   Q.  No.  Yes or no, they were going to continue --

24           MS. SANTILLO:  Objection.

25           MR. NOBLE:  -- to control the credit union or not?

1          THE COURT:  So you can answer that question, and then
2      to the extent you want to expand on it, you can.  Go ahead.
3          DEFENDANT GROSS:  Okay.  If you could repeat it for
4      me, please.
5      BY MR. NOBLE:
6      Q.  Sure.  So at that point in time, after you got the $50,000,
7      they would continue to control the credit union; is that right?
8      A.  No, sir.  At that point they would give the $50,000 and we
9      would walk away.  We were parting.  This was over.  We wanted
10     nothing to do with them.  So it was -- I think you hear me say
11     there, "I'm done with this.  Give us the 50,000 that we agreed
12     to that's owed to us and we walk away."
13     Q.  So you were selling your credit union for $50,000?
14     A.  No, sir.  In fact, your NCUA witness said that it's
15     impossible to sell a credit union.  So I can't do something
16     that's impossible, sir.
17     Q.  But in exchange for $50,000, you were going to walk away.
18     A.  In exchange for them honoring the agreement that we had
19     made earlier, that if we could not work together there would be
20     $50,000 set aside for us to move on.  And at this point, you
21     can tell from this meeting, there was no working together with
22     these people.  How could we work together after all of this?
23     And so it was our desire --
24         MR. NOBLE:  Your Honor, if you could direct the
25     witness just to answer the questions.

1          DEFENDANT GROSS:  I'm sorry.

2          THE COURT:  I'll direct the witness as I see fit.

3          I will ask you, Mr. Gross, to be directly responsive

4   to the questions.  I'll give you some opportunity when it's

5   necessary to expand, and your counsel will have an opportunity

6   for redirect.  Go ahead.

7          MR. NOBLE:  Thank you, Judge.  Now, if we can scroll

8   down to page 29.

9   BY MR. NOBLE:

10  Q.  Mr. Gross, do you see where you say that, "from your

11  perspective, from July 1st", and then you pick up later on,

12  "from July 1st Collectables Club has been calling the shots".

13  Do you see where you said that?

14  A.  Yes, sir, I do.

15  Q.  That was your view at the time.

16  A.  That they had been calling the shots as it related to all

17  of this ACH activity.  Because that, as you said earlier, that

18  was the context in which we were meeting, to deal with what had

19  gone awry with all this ACH processing.

20  Q.  So they had been operating the credit union since July 1st?

21  A.  They had been operating the ACH part of the credit union,

22  absolutely, sir.

23  Q.  The credit union that you were the chairman of the board

24  of?

25  A.  Yes, sir, I was the chairman of the board.

1    Q.  And that's why you kept saying "your credit union", "your

2    credit union", correct?

3    A.  We started off the relationship with them understanding

4    that they were going to take over the credit union.  There was

5    no doubt in our mind.  The whole process was how they would do

6    it.  And the process was you come in with your association and

7    your 14,000 members, and you get trained, you understand this

8    business, and we will resign, you run it because you outvote

9    us, and we will still serve our limited portion of the credit

10   union, and you'll serve your members.

11            MR. NOBLE:  You can take that down, Ms. Grant.

12   Q.  After this meeting, you upheld your end of the bargain that

13   you struck on November 22nd, correct?

14   A.  That three people would resign, yes, sir.

15   Q.  You arranged for Bernard Larkins to resign?

16   A.  I asked -- yes.

17   Q.  And you asked Joseph Lane to resign?

18   A.  Yes, sir.

19   Q.  And you asked Marvin Purry to resign?

20   A.  Yes, sir.

21   Q.  And they emailed in their resignations, correct?

22   A.  Yes, sir, they did.

23   Q.  Some of them did it right after that meeting or the same

24   night, correct?

25   A.  I think later that night, yes, sir.

H38OLEB3                          Gross - Cross

1   Q.  You forwarded those resignations to Ricardo Hill, the ones

2   you received.

3   A.  Yes, sir.

4   Q.  And that's because he was the secretary of the board at the

5   time.

6   A.  No, I forwarded it to show a good faith, that I did what I

7   said I was going to do, sir.

8   Q.  Okay.  But you testified that Anthony Murgio didn't pay you

9   the $50,000 by Monday as you had demanded.

10  A.  Can you say that again, please, sir?

11  Q.  Sure.  You testified that Anthony Murgio did not pay you

12  the $50,000 as you demanded by Monday.

13  A.  Anthony had not put up the $50,000 as we had agreed, that

14  is correct.

15  Q.  Now, we saw that transaction later on when he did wire the

16  $50,000 to the credit union's account at United Advantage,

17  correct?

18  A.  Yes, sir, they did try to wire it in.

19  Q.  And they also did pay you $6,000 in consulting fees after

20  this meeting, correct?

21  A.  I think it was -- yes, I think it was after this meeting.

22  Q.  They paid $6,000 into the church account at the credit

23  union for your consulting fees.

24  A.  Yes.  Honoring the agreement we had before, yes, sir.

25  Q.  You didn't return any of that money to Collectables Club,

H38OLEB3                         Gross - Cross

1   did you?

2   A.  No, because that was consulting fees, sir.

3   Q.  So when Anthony Murgio failed to pay the $50,000 on time,

4   you cut him and the other Collectables Club board members off

5   from the credit union.

6   A.  Yes, sir.

7   Q.  Okay.  You didn't cut off Mark Francis or Kapcharge,

8   though, did you?

9   A.  Because those were two separate relationships, sir.

10  Q.  Kapcharge processed ACH transactions for Collectables Club?

11  A.  Say that again, please.

12  Q.  Kapcharge processed ACH transactions for Collectables Club?

13  A.  Yes, they did.  They were one of their -- their businesses

14  that they transacted for, yes, sir.

15  Q.  And Anthony Murgio introduced you to Kapcharge, correct?

16  A.  Yes, sir.

17  Q.  So they were related.

18  A.  They were related in that I knew Anthony had brought them

19  to the credit union.  I later learned -- and that was all

20  around the same November timeframe -- that Anthony and

21  Kapcharge actually had this business relationship.  So that was

22  where all of my eyes were being opened as to what was going on

23  here in this relationship.  And -- I don't want to go too far

24  but --

25  Q.  No, go ahead.

1    A.   Okay.  So it was during this same period of time that we

2    learned that Anthony was not only on Kapcharge's payroll, but

3    that there was some kind of revenue agreement where he would

4    get some portion of the proceeds based on the amount of ACH

5    transactions.  So, but also -- what had happened was Anthony

6    had betrayed Mark and basically did his regular stuff that you

7    all have seen taking place throughout this trial, and had

8    betrayed them, as well.

9              So we saw them as two completely different

10   relationships.  Collectables Club did bring in Kapcharge, but

11   Kapcharge operated separately from whatever was going on with

12   the Collectables Club.

13   Q.   And one of the ways in which you were familiar with

14   Kapcharge is it was Kapcharge who paid your church $120,000?

15   A.   Yes, sir.  I learned that in that November timeframe, as

16   well.

17   Q.   Now, Mr. Gross, you testified that you're the pastor of

18   Hope Cathedral?

19   A.   That is correct.

20   Q.   And you were educated at the University of Virginia?

21   A.   That is correct.

22   Q.   And Duke?

23   A.   Yes, sir.

24   Q.   And Harvard?

25   A.   I didn't finish at Harvard, but I did attend.

H38OLEB3                          Gross - Cross

1   Q.   Okay.  And you would agree that those are pretty good

2   schools?

3   A.   Yeah.

4   Q.   Some of the best in the country?

5   A.   They're all right.

6            MR. KLINGEMAN:  Objection.

7            THE COURT:  Just a second.  You have an objection to

8   the question?

9            MR. KLINGEMAN:  To the characterization, yes.

10           MR. NOBLE:  I said some of the best.  I qualified,

11  your Honor.

12           THE COURT:  Let's --

13           MR. NOBLE:  I'm moving on.

14  BY MR. NOBLE:

15  Q.   So, but you'd consider yourself a pretty well-educated

16  person?

17  A.   About some things, yes.

18  Q.   And as a pastor, one of your jobs is preaching to your

19  congregation.

20  A.   Yes, sir.

21  Q.   You give sermons?

22  A.   Yes, sir.

23  Q.   You've been preaching, I think you said, since you were a

24  kid?

25  A.   That's correct.

1   Q.  Like something like nine years old?

2   A.  That's correct.

3   Q.  You've been practicing it for a very long time?

4   A.  Long time.

5   Q.  You've given a lot of sermons in your lifetime?

6   A.  Yes, sir, I have.

7   Q.  Now, when you're giving a sermon, it's helpful if you're

8   well-spoken.

9   A.  Yes.

10  Q.  If you're convincing.

11  A.  In a sermon context, yes.

12  Q.  And now, you testified you're the pastor of Hope Cathedral,

13  correct?

14  A.  Yes, sir.

15  Q.  You're the head pastor.

16  A.  Yes.

17  Q.  You --

18  A.  I'm not sure I understand what you're saying.

19  Q.  Let me ask it a different way.  You founded the church?

20  A.  Yes, my wife and I did, yes, sir.

21  Q.  And you set up -- I believe you set up the church in your

22  living room, later moved to this campus in Jackson, New Jersey.

23  A.  Our first worship services were held in our church,

24  correct, and then we actually moved to a local elementary

25  school for about seven years, and then we moved to the 46

1    Bennetts Mills Road address.

2    Q.  And you've built up this church over time?

3    A.  With God's help, absolutely.

4    Q.  And you've been fortunate enough to be able to hire other

5    employees who do work for you?

6    A.  Yes, sir.

7    Q.  And those employees report to you, or they report to your

8    wife?

9    A.  They report to different people in the church, actually.

10   Not all report to me.

11   Q.  Is it fair to say that you run the church, though?

12   A.  I have operational responsibilities to run the church under

13   the board's direction, but I don't have free reign, if that's

14   what you're suggesting, no, sir.

15   Q.  But you have one of the main leadership roles at the

16   church?

17   A.  No, sir.  Our main leadership role is our board of elders,

18   of which I am one, but I'm one of seven.

19   Q.  But you're the head pastor.

20   A.  I'm the pastor, yes, sir.

21   Q.  Okay.  Now, you testified that before you got involved with

22   the Collectables Club, your church had covered some of the

23   expenses for the credit union?

24   A.  Say that one more time, sir.

25   Q.  Sure.  I said, you testified that before you got involved

1    with the Collectables Club, your church had covered some of the

2    expenses of the credit union?

3    A.   Oh, yes, sir.

4    Q.   And helping run the credit union is part of your church's

5    mission.

6    A.   Helping the credit union, yes, was a part of our church's

7    mission.

8    Q.   A form of benevolence, as you said before?

9    A.   It can't be considered as a part of benevolence because

10   it's a separate corporation which has a separate purpose.  The

11   outgrowth of the credit union is a benevolent purpose because

12   we're targeting a group of people, but there's a business

13   process that's behind that credit union which it's a business.

14   Q.   But your church was not in the business of running the

15   credit union to make money.

16   A.   Correct.

17   Q.   Now --

18   A.   But we weren't in it to lose money, either, sir.

19   Q.   Okay.  But you said it's part of the mission of the church.

20   That implies that it's something you're doing as part of your

21   faith.

22   A.   I don't think you quite understand what if means to run a

23   ministry.  Because all ministry mission has to be paid for, and

24   as benevolent as you want to be, you can't be benevolent if you

25   have no resources.  So on our books, the credit union actually

1    was an expense line, it was not a part of benevolence mission

2    as it relates to that, it was an expense item.  We -- supplies,

3    paper, toner, payroll for the credit union, those are not

4    benevolence expenses, sir.

5    Q.  Okay.  So you testified about all those expenses on your

6    direct examination, all these things the church did to support

7    the credit union.

8    A.  Yes, sir.

9    Q.  Now, there's no actual written documentation to support any

10   of those expenses, is there?

11   A.  That's not accurate, sir.

12   Q.  Well, I believe your church was served with a subpoena

13   in --

14           MS. SANTILLO:  Objection.

15           THE COURT:  State your grounds.

16           MS. SANTILLO:  Personal knowledge.

17           THE COURT:  I'll sustain.  Lay a foundation.

18           MR. NOBLE:  Sure.

19   BY MR. NOBLE:

20   Q.  Well, Mr. Gross, you were also personally served with a

21   subpoena in this case, correct?

22           MS. SANTILLO:  Objection.  Could we meet at sidebar?

23           THE COURT:  Sure.

24           (Continued on next page)

25

```
 1              (At sidebar)
 2              THE COURT:  Go ahead.
 3              MS. SANTILLO:  Your Honor, first of all, there's a
 4     pretrial motion in limine related to subpoena responses where
 5     the Court ruled that they should not inquire into whether or
 6     not he properly complied with the subpoena.
 7              Second of all, there's a separate lawyer for the
 8     church who was responsible for the subpoena response.  And to
 9     the extent that there is a subpoena response to the if-as-when
10     subpoena, that should be -- comments about that should be
11     directed to counsel.  He shouldn't be questioned about his
12     personal role in the subpoena response because that's our role.
13              MR. NOBLE:  Well, he's the custodian of records for
14     the response to the if-as-when, which I believe called for
15     records relating --
16              MS. SANTILLO:  If you want records, ask me.
17              THE COURT:  One at a time.
18              MR. NOBLE:  Well, we served a subpoena, we get a
19     response.  And if we don't have documents, we assume that those
20     documents don't exist in response to the subpoena.  I mean, we
21     asked for a subpoena for documents relating to expenses that
22     were covered by the church for the credit union.  We've
23     received no documentation to support that claim.  I think it's
24     valid impeachment.
25              MS. SANTILLO:  The subpoena --
```

1            THE COURT:  So his response was that there are

2     documents, correct?

3            MS. SANTILLO:  Yes.

4            THE COURT:  And what was the description of the

5     documents was the question?

6            MR. NOBLE:  Backup documentation for these expenses

7     that he claims the church covered for the credit union.

8            THE COURT:  And that was subpoenaed?

9            MR. NOBLE:  Yeah.  We asked for --

10           MS. SANTILLO:  By the church.

11           MR. NOBLE:  No.  We asked for a subpoena from him, as

12    well.

13           MS. SANTILLO:  I'm sorry.  If we have an issue about

14    the scope of the subpoena, we should negotiate that as lawyers

15    and not have him on the stand.

16           THE COURT:  What is there to negotiate?  Because it's

17    appropriate if a witness testifies on direct, he says X, Y, and

18    Z happened, and on cross the question is, are there any

19    documents to support X, Y, and Z?  If the answer is yes and

20    those haven't been produced, what do you propose be done?

21           MS. SANTILLO:  Well, I would propose that under 403

22    any of that testimony be excluded because there was a subpoena

23    that was served on the church for those documents, and if they

24    didn't respond, that is not in his control.

25           THE COURT:  He's just said that the same request was

H38OLEB3                        Gross - Cross

1   made of Mr. Gross.  Now, if there are documents, if they were

2   turned over, there's some contention --

3             MS. SANTILLO:  I turned over the documents.

4             MR. NOBLE:  But there's no documents showing that they

5   support any backup documentation for these expenses that he's

6   testifying to, to the copier, to the lease, to all these other

7   expenses.

8             MS. SANTILLO:  I also produced reverse Jencks for

9   Loretta Larkins that has her QuickBook entries that tie to lots

10  of these expenses.  And that's my analysis of what is

11  responsive to the subpoena.  It's not fair to --

12            THE COURT:  Do you have documents?

13            MR. NOBLE:  No.

14            MS. SANTILLO:  I'll show you where they are.

15            MR. NOBLE:  I'll move on and we'll take this up.

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

H38OLEB3                          Gross - Cross

1            (In open court)

2            THE COURT:  When you're ready, Mr. Noble.

3            MR. NOBLE:  Yes, Judge.  I'll move on from this area.

4    BY MR. NOBLE:

5    Q.  Now, Mr. Gross, the credit union was open to more than just

6    church members, correct?

7    A.  It has a community charter, yes, so it was open to those

8    who live, work, worship in the Lakewood community.

9    Q.  That's the defined field of membership for the credit

10   union --

11   A.  Yes, sir.

12   Q.  -- that you just described?

13   A.  There's more to it.  I think it's voluntary, businesses,

14   legal entities, et cetera, et cetera.

15   Q.  Right.  We've seen the field of membership description

16   before.

17   A.  Yes, sir.

18   Q.  Now, you'd agree that it's important to tell the truth to

19   city officials of Jackson, New Jersey --

20   A.  Yes.

21   Q.  -- when they ask you questions.

22   A.  Yes.

23   Q.  Just like it's important for you to tell the truth under

24   oath to the jury today.

25   A.  Absolutely.

H38OLEB3                          Gross - Cross

1   Q.  Now, do you recall telling the Jackson City zoning officer

2   that the credit union was only for church members?

3   A.  Was only for church members.  I don't recall, but we did

4   have an interaction where we were going back and forth.  One of

5   the neighbors complained that we had a credit union in the

6   church, and they were querying me as to why would this credit

7   union be on the church's property.  And that was actually a

8   couple of weeks before October, 2015, so I'm not certain

9   exactly what I said, sir.

10  Q.  Okay.  Is there something I might show you that could

11  refresh your recollection?

12  A.  Absolutely, yes, sir.

13          MR. NOBLE:  Could we bring up just for identification

14  for the witness, the Court, and counsel Government

15  Exhibit 1693?  And actually, let's just scroll to the second

16  page.

17  BY MR. NOBLE:

18  Q.  Mr. Gross, I'm going to direct your attention to the email

19  from yourself dated October 14th, 2015.  If you could just read

20  that email to yourself and tell me whether it refreshes your

21  recollection as to whether you told the city zoning official

22  that the church was only -- I mean, the credit union was only

23  for church members?

24  A.  Yes, sir, it does clarify.

25          MR. NOBLE:  You can take that down.

H38OLEB3                          Gross - Cross

1    Q.  What is your recollection?

2    A.  As I said in that email -- well, can you pull it back up?

3    I'll read the exact words.

4    Q.  Sure.

5            MR. NOBLE:  Let's bring back up Government

6    Exhibit 1693.  Actually, if you're going to read from the

7    document, I'd like to move this into evidence as Government

8    Exhibit 1693.

9            DEFENDANT GROSS:  Well, I just want to see it, I

10   didn't necessarily need to read it.

11           MR. NOBLE:  That's all right.  I'd like to move it

12   into evidence as Government Exhibit 1693.

13           MS. SANTILLO:  No objection.

14           MR. KLINGEMAN:  No objection.

15           THE COURT:  All right.  1693 is admitted.

16           (Government's Exhibit 1693 received in evidence)

17           MR. NOBLE:  Can we just publish that for the jury?

18   Can we flip to the second page?  Let's blow up the bottom,

19   Ms. Grant.  The bottom portion, October 14th, 2015.

20   BY MR. NOBLE:

21   Q.  I'll read the portion of the city zone official,

22   Mr. Purpuro, Mr. Gross, and then I'll ask you to read what you

23   wrote back.

24           "Pastor Gross.  Per our phone conversation a short

25   while ago, you assured me that the credit union was for church

3611

1    members only and not being run from the church's site, but the

2    website still shows 46 Bennetts Mills as the credit union's

3    address.  Question.  If a member of the congregation wants to

4    open an account, and presuming they need to sit down with a

5    loan officer, where would such a meeting take place?  And if

6    not at 46 Bennetts Mills Road, please remove that address from

7    the site.  Thank you for your time, and hope all is well."

8         MR. NOBLE:  Let's zoom out.

9    Q.  Mr. Gross, if you would read your response to the jury.

10   A.  "Hey, Jeff.  I want to clarify.  The credit union is only

11   for our members and it is on our campus.  I apologize if I was

12   not clear.  It is a non-profit institution, just like the

13   church and all the other non-profit functions of our church.

14   It's not open to the general public.  Is this a problem?  We're

15   working to relocate the CU, but it has been on our campus for

16   three years."

17   Q.  So that was a lie.

18   A.  No, sir, it was not.  Because we were -- at that time we

19   were only serving our church.  That was the problem.

20   Q.  But the church --

21   A.  Only active people in the credit union were our church.

22   There were no other community members in it.  It did have a

23   community charter, but they weren't active.  The church members

24   were the only people who were using the credit union.  And that

25   was really the sense of what I was trying to say there.  We

1    were only serving the CU -- serving the members of the church,

2    sorry.

3            MR. NOBLE:  Let's scroll back up to the first page.

4    Q.  You again repeated on this page that, "The HOPE Federal

5    Credit Union, which is chartered and has a field of membership

6    that's open to all individuals residing, working, worshiping in

7    Lakewood, was only for your church members."

8    A.  Sir, as you can see right here, I say to Jeff, "I am not

9    certain how an organize which serves only our church members,"

10   which is exactly what the credit union was doing, it was only

11   serving our credit union -- our members, principally.  I mean,

12   I think there were other members in it, of course, but our

13   church was the active user of it, and we were trying to get it

14   off of our campus, per the NCUA's concern about being out of

15   the field of membership.

16   Q.  Now, as of this date, October 14th, 2015, Kapcharge was

17   still a member of your credit union, correct?

18   A.  Honestly, I'm not completely sure.

19   Q.  So do you recall those emails we saw between Kapcharge

20   representatives Mark Francis and Shoula Cohen that they

21   exchanged with Charles Blue around the time of the

22   conservatorship?

23   A.  Say that again.  I'm sorry.

24   Q.  Do you recall the emails that were exchanged between Mark

25   Francis and Shoula Cohen of Kapcharge and Charles Blue of the

1    credit union around the time of the conservatorship in October,

2    2015?

3    A.  Was I on them or --

4    Q.  No, but do you recall seeing those during the trial?

5    A.  Oh, yes, yes, yes.

6    Q.  Okay.  So Charles Blue, the CEO of the credit union, was

7    still communicating with Kapcharge basically on the same date

8    as this email, October 14th, 2015, correct?

9    A.  I'm not sure of the date, but they were communicating

10   around this time, yes, sir.

11   Q.  That's because Kapcharge was still a member of the credit

12   union.

13   A.  They were one of the members, as were a lot of other member

14   accounts that were also not in the church, but the credit union

15   was only serving our members, sir.  We were the primary user of

16   it.  Because Kapcharge had been cut off.  They weren't able to

17   process.  They had an account at the credit union, but as you

18   all have heard, the NCUA said they can't process transactions,

19   so they had an account, but it was doing nothing.  The only

20   people who were using their debit cards and coming in and

21   making deposits, it was 99 percent people in our congregation,

22   sir.  And that's why I said "serves only our church" because at

23   that point nobody else was really active in the credit union.

24        MR. NOBLE:  We can take that down.

25   Q.  Now, Mr. Gross, you testified on direct examination that

1    most of your communications concerning the Collectables Club

2    prior to the June, 2014 annual meeting was with Mike Murgio,

3    not Anthony Murgio, correct?

4    A.   It was a mixture.  It was sometimes both of them, it was --

5    I spent a lot of time with Michael because I was training him.

6    Because he was the one who stepped forward as the face of this

7    organization.  So I spent a lot of time -- time-wise more with

8    Michael because we did trainings and things like that.

9    Q.   But isn't it true you didn't meet Michael Murgio in person

10   until November, 2014?

11   A.   I vaguely recall meeting him, but I'm not sure.  That may

12   be accurate, but I'm just not 100 percent sure.

13   Q.   He was at that meeting on November 22nd, 2014 that we heard

14   the recording of?

15   A.   Yes, he was.  And he was also -- he came in in September,

16   as well.

17   Q.   Okay.  Now, you had met Anthony Murgio before that, right?

18   A.   Before what time?

19   Q.   Before September, 2014.

20   A.   Yes, I think -- yes, I believe --

21   Q.   In person to be clear?

22   A.   Yes, yes.

23   Q.   You also exchanged a lot of emails with Anthony Murgio?

24   A.   Yes.  In fact, the dad and son did come up before.  I met

25   them at the church before we -- we finalized everything.  So I

1    had met Michael, and I believe I had met Michael and Anthony at

2    the same time at the church.

3    Q.   You had exchanged a lot of emails with Anthony Murgio?

4    A.   And with Michael Murgio, yes, sir.

5    Q.   You spoke with Anthony Murgio by telephone pretty

6    frequently?

7    A.   Yes, sir.

8    Q.   You also spoke with Anthony Murgio by WhatsApp, didn't you?

9    A.   Yes, sir.

10   Q.   Now, you, in addition to the agreement between the credit

11   union and Collectables Club that has been the subject of your

12   testimony, you also entered into an agreement with Anthony

13   Murgio's company Currency Enthusiasts.

14   A.   I vaguely remember us approving at the board, they were

15   going to be our technology partner to help build up the

16   infrastructure of the credit union.  Something like that.

17              MR. NOBLE:  Let's bring up Government Exhibit 1184-B.

18   Let me just doublecheck to make sure that's in evidence.

19              THE COURT:  It is.

20              MR. NOBLE:  Thank you, Judge.

21              THE COURT:  Actually -- yes.

22              MR. NOBLE:  Okay.  Can we publish that for the jury

23   then?

24   BY MR. NOBLE:

25   Q.   Mr. Gross, this email shows that on June 20th, 2014, you

H38OLEB3                          Gross - Cross

1    sent back to Anthony Murgio this Currency Enthusiasts

2    agreement, correct?

3    A.   Right.  This technology agreement, yes, sir.

4            MR. NOBLE:  Let's flip to the attachment.

5    Q.   What is the name of this document?

6    A.   "Exclusive Services Agreement".

7    Q.   And what is the date of the document?

8    A.   June 16th.

9    Q.   Okay.

10           MR. NOBLE:  Let's scroll to the last page.

11   Q.   You signed this document, correct?

12   A.   Yes, sir.

13   Q.   And this was going to be an agreement between you and --

14           MR. NOBLE:  Can we scroll back out.

15   Q.   -- Anthony Murgio, correct?

16   A.   It was going to be between the Currency Enthusiasts, which

17   was supposed to be a technology implementation company.

18   Q.   That was Anthony Murgio's company.

19   A.   That I'm not certain of, sir.

20   Q.   Well, he was going to sign on behalf of Currency

21   Enthusiasts, correct?

22   A.   In the same way that Michael Murgio signed on behalf of

23   Collectables Club, sir.

24   Q.   But this wasn't an agreement between Michael Murgio and

25   you, it was an agreement between you and Anthony Murgio.

1    A.  Well, it was actually between the credit union and Currency

2    Enthusiasts, and I was authorized to sign, sir.

3    Q.  And Currency Enthusiasts, the name of that implies that

4    it's involved in some kind of currency, doesn't it?

5    A.  It has the word "currency" in it, yes, sir.

6    Q.  I believe you testified on direct examination that you were

7    aware that Anthony Murgio was involved with virtually

8    currencies.

9    A.  No, I did not testified to that.  I testified that he had

10   mentioned virtual currencies in his dream for the future of the

11   credit union.

12   Q.  But you would send him information about virtual currency

13   opportunities sometimes, correct?

14   A.  I sent him an email about BSA and compliance from the

15   Federal Reserve about virtual currencies, yes, sir.

16   Q.  So you knew he was involved with virtual currencies.

17   A.  Actually, I think I sent that to Yuri, because I knew that

18   he was the technology person.

19   Q.  Okay.

20   A.  So yes.

21          MR. NOBLE:  Let's bring that up.  For identification

22   only, Government Exhibit 1260-A.

23   Q.  Do you recognize this document?

24   A.  Yes.  Yes.

25   Q.  What is this?

1   A.  This is the email -- I received an email from the Federal

2   Reserve Bank about BSA, AML compliance issues related to

3   virtual currency.  There was a webinar that they were going to

4   hold to train people how to be compliant with virtual

5   currencies, and I forwarded on to Yuri and Jose saying to them,

6   "You might want to sign up for this.  It's about virtual

7   currency."

8              MR. NOBLE:  Okay.  Government offers Government

9   Exhibit 1260-A.

10             MS. SANTILLO:  No objection.

11             MR. CREIZMAN:  No objection.

12             THE COURT:  Thank you.  It's admitted.

13             (Government's Exhibit 1260-A received in evidence)

14             MR. NOBLE:  May we publish for the jury?

15             THE COURT:  You may.

16             MR. NOBLE:  We'll let the jury just take a look at

17   that.

18   BY MR. NOBLE:

19   Q.  Mr. Gross, you said you sent this email to Yuri and Jose,

20   correct?

21   A.  Yes, sir.

22   Q.  They were colleagues of Anthony Murgio?

23   A.  They were board members at HOPE FCU, and they had the

24   specific responsibility for -- at the time I believe to have

25   the specific responsibility for BSA and compliance, and so

1   that's why Yuri and Jose that were the two that were

2   identified.

3   Q.  So Yuri Lebedev was in charge of the BSA compliance program

4   for HOPE FCU?

5   A.  What I was told by Anthony was happening was that Ricardo

6   was doing the entry, Jose, as a person who has banking

7   experience, was leading the effort, and that Yuri was working

8   on the backend BSA compliance.  So that's why the two of them

9   were sent this email about a seminar, to teach them how to be

10  compliant with the Federal Reserve.

11  Q.  So it was important for you to be compliant with BSA

12  relating to virtual currencies?

13  A.  No, it was important to be compliant with everything.  So

14  to me, what caught my attention was really more the first part

15  of it about BSA and AML.

16  Q.  But it's specifically relating to BSA and AML, that's anti

17  money laundering provisions --

18  A.  Yes.

19  Q.  -- relating to virtual currency, correct?

20  A.  Yes.

21  Q.  And you forwarded to Anthony Murgio, Yuri Lebedev, Jose

22  Freundt and Ricardo Hill, correct?

23  A.  To Yuri and Jose, with a copy to Ricardo and Anthony, yes.

24  Q.  Correct.  And because they were running the credit union at

25  that time.

1    A.  I forwarded it to them because they had responsibilities

2    for BSA compliance, as I understood it, sir.

3                MR. NOBLE:  You can take that down, Ms. Grant.  Thank

4    you.

5    Q.  You testified you believe the Collectables Club fell within

6    the credit union's field of membership because it was an

7    association headquartered in Lakewood, New Jersey, correct?

8    A.  Yes, sir.

9    Q.  You would agree it's important to ensure that individuals

10   and entities that want to be members of your credit union

11   actually qualify?

12   A.  Yes, sir.

13   Q.  That they fall within the field of membership?

14   A.  Yes, sir.

15   Q.  Because that's the law?

16   A.  Yes, sir.

17   Q.  And it's also in the credit union's bylaws?

18   A.  The charter, yes.

19   Q.  Well, the bylaws, too, as well, correct?

20   A.  The bylaw repeats the language of the charter.  It's the

21   charter that establishes the field of membership.

22   Q.  And you're familiar with the credit union's bylaws.

23   A.  I can't say that I know all of them, but I'm generally

24   familiar, yes, sir.

25   Q.  Well, you were the chairman of the board of the credit

H38OLEB3                              Gross - Cross

1   union, correct?

2   A.   I sure was, sir, but I didn't -- just like the NCUA

3   examiners didn't know all the answers, I certainly don't,

4   either.

5   Q.   So your testimony is that, as the chairman of the board of

6   a federal credit union, you were not familiar with the credit

7   union's own bylaws?

8   A.   My testimony, sir, is that, as the voluntary chairman of

9   the HOPE Federal Credit Union, I did not know all of the bylaws

10  that were established.  I'm not going to represent that I did.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. NOBLE:

2    Q.  Well, you were familiar with the credit union's field of

3    membership, correct?

4    A.  Yes, sir, generally.

5    Q.  I believe you testified on direct examination that you were

6    involved in amending it, at least once, before you started

7    dealing with Anthony Murgio?

8    A.  No, actually, I was not involved.  That happened by

9    Mr. Wyatt on behalf of the church, but I wasn't -- except for

10   writing a letter of support for that process, I was not

11   involved in that process.

12   Q.  But you were, I believe you just testified, familiar with

13   the field of membership requirements?

14   A.  Yes, sir.

15            MR. NOBLE:  Can we bring up Government Exhibit 6150 in

16   evidence.  Can we just flip forward, please.  Sorry, go back.

17   And blow up the qualifications for membership section.

18   Q.  This is the field of membership requirements for the credit

19   union, correct?

20   A.  Yes, sir.

21   Q.  It doesn't include associations in Lakewood, New Jersey?

22   A.  We were a low-income designated credit union, and as a

23   low-income designated credit union, which took place after

24   these bylaws, that is what allowed us to have an association in

25   the credit union, and the association, quite frankly, is a

1   business.  So, that's one of the challenges with this whole

2   field of membership, is that it's not a science --

3              MR. NOBLE:  Your Honor.

4              THE COURT:  Thank you, Mr. Gross.

5              THE WITNESS:  I apologize.

6   Q.  You were here for Clayton Curry's testimony?

7   A.  Yes, sir.

8   Q.  And you remember receiving a letter from the NCUA that said

9   that because your charter did not include associations, the

10  Collectables Club would not have qualified for membership even

11  if they were headquartered in Lakewood, New Jersey?

12  A.  Was that from Mr. Curry?

13  Q.  Do you recall seeing that from Mr. Curry?

14  A.  I vaguely recall an email, but I thought it was actually

15  from the Region II director to the people who wanted to

16  start -- oh, to the Collectables Club members who had left the

17  board.  That's what I thought that was in --

18  Q.  Well, you were here were for Mr. Curry's testimony,

19  correct?

20  A.  Yes, sir, I was.

21  Q.  Do you recall him testifying that in response to that

22  letter that was received from the Collectables Club members,

23  including Mr. Lebedev, that the NCUA had determined that the

24  Collectables Club did not qualify because your charter did not

25  include associations in Lakewood, New Jersey?

1    A.   Yes.   And the first time I learned about that was during

2    this trial.

3    Q.   Now, when you first spoke to Anthony Murgio about

4    Collectables Club, you knew that that entity was an association

5    based in Florida?

6    A.   That was relocating their headquarters to New Jersey.

7    Q.   But they never did that?

8    A.   They did not do that, sir.

9    Q.   They never had a presence in Lakewood, New Jersey?

10   A.   No, they did have a virtual office that they never did

11   anything with, and they never kept their word to relocate, as

12   they had committed.

13   Q.   You knew that Mike Murgio lived in Florida?

14   A.   Yes, I did.

15   Q.   And that you opened an account for him at the credit union?

16   A.   Because he was a part of the Collectables Club, which was

17   moving their headquarters to our field of membership, yes, sir.

18   Q.   But they weren't in Lakewood, New Jersey, at the time you

19   opened up an account for the Collectables Club at the credit

20   union?

21   A.   As I recall, they did have their virtual office there.   As

22   I recall, I thought they had their virtual office there at that

23   time, sir.

24   Q.   And Anthony Murgio also lived in Florida?

25   A.   Yes, some part of Florida, I think.

1    Q.  None of Anthony Murgio's proposed board members, including
2    Mr. Lebedev, lived in Lakewood, New Jersey, at the time you
3    opened up accounts for them?
4    A.  No, but it was my understanding that as a part of an
5    association that was headquartered in our field of membership,
6    they had a right to be in the credit union because it did not
7    matter where you lived as long as the association was
8    headquartered in your field of membership, sir.
9    Q.  And you were mistaken in that understanding?
10   A.  Yeah, I was.
11   Q.  None of the Collectables Club members worked in Lakewood,
12   New Jersey, correct?
13   A.  No.
14   Q.  None of them worshiped in Lakewood, New Jersey?
15   A.  No.
16   Q.  So --
17   A.  Not that I know of.
18   Q.  When you nominated them to be board members, they weren't
19   eligible to be members of the credit union?
20   A.  No, sir.  As I just said to you, if an association is in
21   the field of membership, which is what they warranted they were
22   doing, that the members of that association could be members,
23   which then meant they could be board members, sir.
24   Q.  And you said that was because they had a, quote-unquote,
25   virtual office in Lakewood, correct?

H38KLEB4                        Gross - Cross

1   A.   That is correct, sir.   That was the beginning of what would

2   become a physical office, which is what was warranted to me.

3   Q.   So they didn't actually have anybody doing anything in

4   Lakewood, New Jersey?

5   A.   Well, that's one of the challenges in this process,

6   because --

7            MR. NOBLE:   Your Honor.

8            THE COURT:   As I've said, answer the question, and

9   then I'll give you some opportunity to respond.

10            THE WITNESS:   Okay.

11            THE COURT:   But for going beyond the scope of the

12   question, your counselor can redirect.

13            THE WITNESS:   I apologize.

14            Could you repeat that question, sir?

15   BY MR. NOBLE:

16   Q.   Sure.

17            So, the virtual office meant they didn't really have

18   anything doing anything in Lakewood, New Jersey, other than

19   having a mailing address?

20   A.   That's not how I understood the virtual office, because the

21   virtual office concept that I'm aware of is you actually pay

22   for carved-out time and space, and you can come through there

23   whenever you desire.   It's just that you're not paying for a

24   space that you are not going to use a hundred percent of the

25   time.   So, I'm not sure exactly what arrangement they had for

1   the virtual office, whether it was just a mailbox or a shared

2   conference room.  I don't know those details.

3   Q.  Kapcharge also had a virtual office, correct?

4   A.  Yes, and I think they may have been in the same building.

5   Q.  And at the time, you knew that Kapcharge was headquartered

6   in Montreal, Canada?

7   A.  That is correct, sir.

8   Q.  But you opened an account for Kapcharge, too?

9   A.  Because they had an address in our field of membership,

10  sir.

11  Q.  In fact, you told them just to get an address in Lakewood,

12  didn't you?

13  A.  To just get an address?

14  Q.  Yes.

15  A.  I'm not certain that that is my language.  But I know you

16  needed an address in our field of membership, and that was true

17  for anyone.  That was our concern, if you're going to be in the

18  community, you have to have an address.

19  Q.  And you told Anthony Murgio to just use the same address as

20  Kapcharge?

21  A.  That -- I may have said that, sir.

22  Q.  And you knew that both Kapcharge and Collectables Club was

23  using this virtual office space at 216 River Avenue in

24  Lakewood, New Jersey?

25  A.  Yes, sir, I did know they were using it.

1    Q.  You never visited that address?

2    A.  When we talked about it, George Wyatt had known the

3    building.  I think he even knew the person --

4               MR. NOBLE:  Your Honor?  Your Honor?

5               THE WITNESS:  I think I drove by it.

6               THE COURT:  Again, Mr. Gross, respond to the question,

7    and I will give you some room to explain, and then if more

8    context is needed, you can be redirected.  But begin with the

9    answer to the question.

10              THE WITNESS:  Okay.

11              THE COURT:  I'll give you some reason to explain.

12              THE WITNESS:  I apologize.

13              Could you repeat it, please?

14   Q.  Sure.  The question was:  You never visited 216 River

15   Avenue in Lakewood, New Jersey?

16   A.  I did drive by it once or twice.  I didn't go into the

17   building physically, but I did drive by the building, and I

18   noticed, oh, that's the 216 River Ave.

19   Q.  And that was all the due diligence that you did to confirm

20   that Kapcharge and Collectables Club were based in Lakewood,

21   New Jersey?

22   A.  We never, as a credit union, did any kind of verification

23   of a person.  When we came in, we took them as they were, sir.

24   So, we've never done leases, we've never done any of that kind

25   of stuff.  We've been around for 30-some years, so we never did

H38KLEB4                        Gross - Cross

1    that, and we didn't treat them any differently than --

2    Q.  You know that's a requirement of the Bank Secrecy Act, for

3    all financial institutions to know their customers?

4    A.  And we did know our customers, sir.

5    Q.  You just didn't to any due diligence on them?

6    A.  Well, no, sir, because if the people that you're opening

7    accounts for are people that you know, or you're getting to

8    know, and they've presented their licenses and things like

9    that, that was, as far as we knew, enough due diligence.

10   Q.  So, okay.  The board of HOPE Federal Credit Union was

11   responsible for managing the affairs of the credit union?

12   A.  As much as a board of directors should, yes, sir.

13   Q.  That's the law, correct?

14   A.  I guess my question is, what do you mean by manage?  I'm

15   not clear --

16   Q.  You oversee the affairs of the entire federal credit union,

17   correct?

18   A.  Yes, sir.  Yes, sir.

19   Q.  And that is a lot of responsibility, to oversee a federal

20   credit union?

21   A.  Yes, sir, it is.

22   Q.  There's a lot of laws and regulations that apply to that?

23   A.  Yes, sir, there are.

24   Q.  And you agree you should be familiar with those laws and

25   regulations?

1    A.  To the degree that it's humanly possible to be familiar,

2    yes, sir.

3    Q.  You also testified on direct examination that you were

4    aware of the fiduciary duties that board members have to a

5    credit union and its members, correct?

6    A.  I'm not sure I was asked a question about that.

7    Q.  I believe you gave an answer concerning fiduciary duties,

8    as it related to the Collectables Club board members, that you

9    wanted to make sure that they understood their fiduciary

10   duties.  Do you recall that?

11   A.  That's when they were coming on the board, their training,

12   is that what you're talking about?

13   Q.  It's your testimony.

14   A.  Okay.  Could you, then, repeat the question because --

15   Q.  Sure.  Well, let me just ask it this way:  You're aware of

16   the fiduciary duties that you held as the chairman of the board

17   of a federal credit union, correct?

18   A.  Yes, sir.

19   Q.  And it's important to uphold those fiduciary duties?

20   A.  Yes, sir.

21   Q.  To be beyond reproach?

22   A.  To the best of one's ability, yes, sir.

23   Q.  So, when selecting members of the credit union to serve on

24   the board, it's important to pick responsible people?

25   A.  Yes, sir.

H38KLEB4                          Gross - Cross

1   Q.  It's important to pick qualified people?

2   A.  Depending on what qualified means, yes.

3   Q.  You don't want to just put anyone on the board of your

4   federal credit union, do you?

5   A.  I'm not sure what you mean by anyone, because that seems

6   rather exclusive, so I would need to get clarity on what you

7   mean by anyone --

8   Q.  Sure.

9   A.  -- because the people who were currently serving on the

10  board were not financial experts, they weren't banking people.

11  They were people who were just willing to help out, which is

12  really the ethos of the credit union world.

13  Q.  Were they convicted felons?

14  A.  Honestly, I don't know, sir.

15  Q.  So, you didn't do any background checks on any of the

16  proposed Collectables Club board members?

17  A.  Unfortunately, I did not, sir.

18  Q.  So you never learned that Ricardo Hill had been convicted

19  of multiple felonies before you put him in charge of the credit

20  union?

21  A.  I did not, sir, until we came to this trial.

22  Q.  You didn't run any credit reports on any of the

23  Collectables Club board members?

24  A.  No, and we've never run them on any of us either, sir.

25  Q.  You never did anything to verify whether the information on

1    their resumes was truthful?

2    A.   Unfortunately, sir, we did not.

3    Q.   When you started doing a business with Anthony Murgio, you

4    never did a Google search of him, did you?

5    A.   I did not, sir, because I -- Michael was --

6              MR. NOBLE:  Your Honor?

7              THE COURT:  All right.  So, we have the answer, and to

8    the extent that your lawyers want to redirect, they can.

9              Go ahead.

10   Q.   So you never learned, before you gave control of the credit

11   union to Anthony Murgio, that he had been prosecuted in Florida

12   for failing to pay sales taxes for his restaurant?

13   A.   I did not know of that at all, sir.

14   Q.   You also didn't know that he had filed for bankruptcy in

15   Florida?

16   A.   I did not know that, sir.

17   Q.   You also didn't know that the bankruptcy court in Florida

18   had found that Anthony Murgio had lied to the federal court in

19   his own bankruptcy proceedings?

20   A.   No, sir, I had no idea.

21   Q.   But you still gave him control of the credit union?

22   A.   Because I did not know of any of those things, sir.

23   Q.   Because you didn't do a Google search?

24   A.   Because Michael Murgio was the face of the Collectables

25   Club, and we did look at Michael Murgio.  We looked, we even

1    called down to the board that he was on.  He's an elected

2    official, a superintendent, a schoolteacher.  He was the face,

3    and one of the board -- proposed board members was a lawyer.

4    Who puts a lawyer in the midst of a sham, a scheme like this?

5            So, it looked legitimate to us, and we didn't do the

6    due diligence we should have.

7    Q.  Now, you keep saying us and we in your testimony, don't

8    you?

9    A.  Yes, sir.

10   Q.  But there were never any other board members from the

11   credit union -- I'm talking the legacy board members -- on the

12   emails with Anthony Murgio or Michael Murgio when you were

13   setting up this deal?

14   A.  I'm not sure if they were on the emails, but we certainly

15   were talking an awful lot about this whole deal, including at

16   the board meeting, sir.

17   Q.  You also referenced this lawyer who was going to be on the

18   board that Anthony Murgio had proposed.  Do you remember that?

19   A.  Yes.

20   Q.  Do you know whether she was even a member of the

21   Collectables Club?

22   A.  They all represented they were members of the Collectables

23   Club, sir.

24   Q.  What's her name?

25   A.  Kendra, and her last name is Pannitti or --

1   Q.   So, you don't even know the names of the people that you

2   were going to put on your board?

3   A.   No, sir.  I did not know how to pronounce her last name.

4   Q.   How do you spell it?

5   A.   I won't even hazard a guess.  P-A-N-N-I-T-T-I, I think.

6   Q.   That's pretty close.

7   A.   Thank you.

8   Q.   I think you testified that you did visit a website for

9   Collectables Club?

10  A.   Yes.  In fact, when I first met with Michael and Anthony,

11  they pulled up the website, and showed it, and said they were

12  updating it, but this was their website, and they went through

13  the items and showed the various things that were on the

14  website, yes, sir.

15  Q.   And you're a pretty tech savvy person?

16  A.   No, sir.  I'm an enthusiast of technology, but I'm not a

17  tech savvy person.

18  Q.   Well, I believe we saw an email talking about how you are

19  aware and familiar with computer programming, correct?

20  A.   That was in high school, sir.

21  Q.   Well, you were the administrator for the websites for your

22  church and credit union, correct?

23  A.   No, sir.  I --

24  Q.   You were not the administrator for the website for the

25  church or the credit union?

1    A.   The terms are getting mixed up.  Because I owned the

2    account because I started the DreamHost account, but I am in no

3    way a technical administrator of websites or anything like

4    that.  I do know how to log in, I do know how to do minimal

5    things, but to suggest that somehow I'm a technical expert, I'm

6    just not.

7    Q.   It's your testimony that you didn't realize that the

8    Collectables Club website was a sham website; is that right?

9    A.   That is correct, sir.

10   Q.   You didn't realize that it wasn't functional, that you

11   couldn't even do anything on it?

12   A.   Well, that's not true because you could do things on it,

13   you just could not log in once you created a membership.  And,

14   in fact, I think the NCUA person, who went to the website, as

15   well as the Alloya BSA person went to that same website, and

16   they found it to be credible.

17   Q.   So you were aware at the time that you couldn't log into

18   the Collectables Club website?

19   A.   No, sir.  I just learned that during this trial.

20   Q.   But you were still willing to join the Collectables Club as

21   a member on behalf of the credit union, weren't you?

22   A.   No.  The credit union, as a part of this larger

23   partnership, became a part of the Collectables Club because

24   Anthony told us that that was their association, and they

25   wanted the association -- the credit union to be a part of

H38KLEB4                         Gross - Cross

1    their association.

2    Q.  So you allowed your federal credit union to become a member

3    of the Collectables Club, and you didn't even know that the

4    website didn't work?

5    A.  I'm not sure how the two are related.

6    Q.  You didn't know the website didn't work?

7    A.  No, I did not know the website -- well, it did work.  I did

8    not know that the Collectables Club was a fraud.  I did not

9    know that.  But as far as I knew, the website was functional.

10   Q.  I'm sorry, you said you knew the Collectables Club was a

11   fraud?

12   A.  I did not say that, sir.

13   Q.  No, I just didn't hear you.

14   A.  I did not know that the Collectables Club was a fraud until

15   the criminal thing happened in the summer of 2015.

16   Q.  But your understanding was that it was an association that

17   allowed people to trade collectibles, memorabilia, sports

18   cards, et cetera?  That's what your understanding was?

19   A.  Yes, sir.  Yes, sir.

20   Q.  And you had your federal credit union join that

21   association?

22   A.  As a part of this larger partnership where they were coming

23   in to take over this credit union and take it to its future.

24   So, yes, sir.

25   Q.  And, by the way, you let Ricardo Hill sign your name on

1    various documents, didn't you?

2    A.   That is untrue.  I did let him sign my name one time when I

3    was away and could not sign for myself.  And you saw an email

4    to that effect.

5            MR. NOBLE:  Let's bring up Government Exhibit 1184-C.

6    Q.   I believe you also joined the Currency Enthusiasts Private

7    Membership Association on behalf of the credit union, didn't

8    you?

9    A.   We signed an agreement with them, as I thought that was the

10   agreement we just saw, right?

11   Q.   You don't remember signing a document that made the credit

12   union a member of the Currency Enthusiasts Private Membership

13   Association run by Anthony Murgio?

14   A.   I remember signing that document we just saw before about

15   the technology partnership, sir.

16   Q.   Okay.  Well, let's see if Government Exhibit 1154-C

17   refreshes your recollection.

18            Who is this email from?

19   A.   From me.

20   Q.   Who is it to?

21   A.   To trustee@collectPMA.

22   Q.   Who used that email account?

23   A.   As I recall, it was Michael Murgio.

24   Q.   Well, you exchanged a lot of emails with Trustee

25   Collectables which were signed by Anthony Murgio, correct?

1   A.  That's possible, but when I see trustee, I think of Michael

2   because that's how he first started emailing me.

3   Q.  You never sought approval from your board of directors of

4   the credit union to enter into these agreements, did you?

5   A.  I didn't think we needed to.

6   Q.  You never told the board about these agreements?

7   A.  I don't think that's accurate because we talked about a lot

8   of this.  I just really don't recall.  I know we didn't vote on

9   them, but I can't say we did not have a discussion about them

10  because I do think the board meeting where we did talk about

11  the technology -- one with the Enthusiasts, we talked about

12  these -- you know, the partnership and what that meant.  But I

13  don't recall whether or not we actually -- I know we didn't

14  vote on it, so, no, sir.

15  Q.  But you'd agree if there was a discussion about it, it

16  would be in the minutes?

17  A.  No, sir.

18  Q.  You discussed things at your board meetings that you don't

19  put in the minutes?

20  A.  Yes, sir.

21  Q.  And you know that the NCUA relies on your board meeting

22  minutes when it does its examinations?

23  A.  Yes, sir.

24  Q.  Those minutes are supposed to be truthful, and accurate,

25  and complete?

1    A.   They can be truthful, accurate, and complete and still not

2    include every discussion.

3           MR. NOBLE:   Let's flip to the first attachment.  Let's

4    blow up the top part.

5    Q.   What is this document?

6    A.   The Currency Enthusiasts member contract.

7    Q.   Who is joining the Currency Enthusiasts?

8    A.   HOPE FCU.

9           MR. NOBLE:   Can we just scroll down to -- let's go to

10   the -- keep it there, I'm sorry, and blow up the very last

11   paragraph on the page.

12   Q.   Do you see where this agreement states that "The trustee

13   and members have chosen Anthony Murgio as the person best

14   qualified to perform services to members of the association and

15   entrust him to select other members to assist her" -- I think

16   that's a mistake -- in carrying out that service"?  Do you see

17   that?

18   A.   Yes, sir, I do.

19   Q.   Let's see.  You signed this document, right?

20   A.   I recall I did, yes, sir.

21   Q.   So, you agreed that Anthony Murgio was a qualified person

22   to perform services to HOPE Federal Credit Union?

23   A.   Based on this document, I believed that he was qualified to

24   select members of his association in carrying out this

25   organization's purpose.

1    Q.  Well, it also says to perform services to members of the

2    association, which HOPE Federal Credit Union became a member of

3    by signing this document?

4    A.  I'm not sure of the question.

5    Q.  Sure.  So, it says, "The members have chosen Anthony Murgio

6    as the best person qualified to perform services to members of

7    the association."  Do you see that?

8    A.  Yes.  Yes, I do.

9    Q.  And by signing this document, it made the credit union a

10   member of the association?

11   A.  Okay.  Yes, sir.

12           MR. NOBLE:  Let's keep flipping forward.  Next page.

13   Next page.  Next, please.  Can we just blow up the signature

14   line there.  No, the signature, please.

15   Q.  You signed this document, Mr. Gross?

16   A.  Yes, sir.

17   Q.  On June 23rd, 2014?

18   A.  Yes, sir.

19   Q.  That was right around the time that the Collectables Club

20   board members were elected to the board?

21   A.  Yes.  I think this may be the day before.

22           MR. NOBLE:  Let's take that down.

23           THE WITNESS:  Or sometime around the same time, yes,

24   sir.

25           MR. NOBLE:  Let's go to the next page.  Let's blow

1   this one up.  Just the top.

2   Q.  What is this document, Mr. Gross?

3   A.  This is a membership contract of Collectables Club Private

4   Membership Association.

5   Q.  And who is becoming a member of the Collectables Club here?

6   A.  HOPE FCU.

7          MR. NOBLE:  Let's scroll to the -- it's the next page

8   and pause there.  The second to last paragraph, if you can just

9   blow that one up.

10  Q.  So, here, you say that you agreed that the members have

11  chosen Ania Amador as the best person -- person best qualified

12  to perform services to the members of the association, of which

13  HOPE Federal Credit Union was going to become a member,

14  correct?

15  A.  Yes, that's what it says, sir.

16  Q.  Who's Ania Amador?

17  A.  I have -- well, I know her now because of this trial.

18  Q.  You didn't know who she was when you signed this document?

19  A.  No, sir.  I signed these documents as a part of the larger

20  partnership, and I can't honestly say I read every word of it,

21  but, obviously, my signature is on it.

22         MR. NOBLE:  Let's go to the last page, just so the

23  jury can see that.  You can blow that up.

24  Q.  That's your signature, Mr. Gross?

25  A.  Yes, sir, that is.

1          MR. NOBLE:  You can take that down.

2     Q.  Now, Mr. Gross, you testified on direct examination about

3     this deal, and you just referred to it -- that you negotiated

4     with Anthony Murgio, correct?

5     A.  With Michael and Anthony Murgio, yes, sir.

6     Q.  I believe you testified on direct examination that the

7     original deal did not include turning over control of the

8     credit union?

9     A.  Say that again, sir?

10    Q.  You testified that the original deal did not include

11    turning over control of the credit union to Anthony Murgio?

12    A.  I'm not certain what you're referencing.  I thought what I

13    had said was that this deal was that the Collectables Club was

14    coming in to take over the credit union.

15    Q.  And they were going to take over the credit union, and that

16    would occur as of the date of the annual meeting?

17    A.  No, I'm -- you're saying that's what I testified to?

18    Q.  No, I'm asking you.

19          So, the Collectables Club, the way they were going to

20    take over, is that they were going to have majority control of

21    the board as of the annual meeting, which was in June 2014,

22    correct?

23    A.  The way they were going to take over the whole organization

24    was because they were going to have a bunch of members that

25    were going to come in, and we were putting them on the board as

1    well, and -- so they were going to have control.  We knew we

2    were -- we knew they were taking this credit union completely

3    lock, stock, and barrel.  We did know that, sir.  But to say it

4    was going to happen on that date, I would not say that, sir.

5    Q.  Well, do you recall saying something like that before?

6    A.  That on that date, they would take full control?

7    Q.  As of the June annual meeting.

8    A.  I can be -- my recollection could be refreshed, but --

9            MR. NOBLE:  Well, let's bring up Government Exhibit

10   1142-A in evidence.

11   Q.  Do you recognize this document, Mr. Gross?

12   A.  Yes.

13           MR. NOBLE:  Let's go to the next page.  Can we just

14   blow up under "Recap of Next Steps."

15   Q.  Mr. Gross, this is an email that you sent to Anthony

16   Murgio, correct?

17   A.  It looks like it, yes, sir.

18   Q.  And it states, "At the conclusion of the June annual

19   meeting, current board members, except me, will tender their

20   resignations effective September 1st.  This date is set because

21   we have our annual examination on July 7th.  "They" -- meaning

22   the NCUA, correct?

23   A.  Yes, sir.

24   Q.  -- "would like to come back and meet with the board about a

25   month afterwards to discuss findings, and we don't want them to

1    see an entirely new board at that meeting.  That normally

2    happens in August.  All members have agreed to see this through

3    to September 1st.  After the June meeting, you all will have

4    majority vote on the board, so there is no turning back at that

5    point."

6            Does that refresh your recollection as to whether you

7    ever said that Collectables Club would control the credit union

8    after the June meeting?

9    A.  In this email, sir, that is what happened.  I think this is

10   a May 12th email, and there were a lot of conversations that

11   took place after that, because none of the board members

12   submitted resignations as of September 1st.  So there were a

13   lot of things that were happening during this time where there

14   was negotiations and changing.

15           But we did put them on the board, sir, absolutely.  We

16   followed our process to nominate them, and they were elected to

17   the board, and we thought it was going to be a great

18   partnership, which it turned out not --

19   Q.  Let's talk about that process a little bit.  So, the

20   process of getting members of a credit union onto the board of

21   directors involves the use of a nominating committee; is that

22   right?

23   A.  Not necessarily, because the board itself can sit as the

24   nominating committee, yes.

25   Q.  But that's part of your bylaws, your credit union bylaws,

1    it requires a nominating committee to nominate people to the

2    board for election?

3    A.   Right.  But if the board itself sits as its own nominating

4    committee, it has satisfied the bylaw requirements.

5    Q.   So is it your testimony -- go ahead, continue.

6    A.   So there's no provision that says it has to be a separate

7    nominating committee.  The board can become itself the

8    nominating committee to nominate and put names in office, which

9    is really how we'd been doing it.

10   Q.   So is it your testimony that the entire board nominated all

11   of the Collectables Club members for the election?

12   A.   It is my testimony, sir, that the board voted on the slate

13   of officers -- slate of board members to be put forward, yes,

14   sir.

15   Q.   Now, as part of your deal with Anthony Murgio, you agreed

16   to do certain things in exchange for the payments that we've

17   discussed at this trial, correct?

18   A.   No, sir.  I need clarity on what you're asking.  "Certain

19   things"?

20   Q.   Sure.

21          So, you agreed that you would take a payment of

22   $15,000 upfront to get this process started, correct?

23   A.   No, sir.  That was not what happened.

24          May I explain?

25   Q.   Well --

1           THE COURT:  Go ahead.

2           MR. NOBLE:  Judge, it might be helpful to bring up an

3     exhibit to anchor the testimony.

4           THE COURT:  All right.  So your response is, no,

5     that's not what happened, and you can follow with an exhibit,

6     and then I'll give you some room to explain, Mr. Gross, in

7     response to the question.

8           And, again, counsel can redirect, but I'll give the

9     witness a little bit of room.

10          MR. NOBLE:  Thank you, Judge.

11          Let's bring up Government Exhibit 1081-D, as in David,

12    in evidence.

13    BY MR. NOBLE:

14    Q.  So I believe this is an email that Ms. Santillo showed you

15    on your direct examination.

16          MR. NOBLE:  And let's blow up that bottom portion.

17    Q.  Now, she didn't have you read this part of the email, but

18    do you see under number 2, the second part of the paragraph,

19    "What I think is fair is 15K upfront"?  Did you write that?

20    A.  Yes.  But if you keep on going, it says, and 45 days of

21    operation, another 45, "then once we find you a CU."  So this

22    was all a part of the conversation, because initially when they

23    came to us, they came to us with options.  And this was

24    addressing the options that they gave us of us helping them,

25    them joining the credit union for a while, and then them

H38KLEB4                         Gross - Cross

1   starting their own credit union.  So it was like three

2   different options, and one of them was taking control of a

3   credit union.

4   Q.  Well, I believe -- it does state that you were going to

5   take $15,000 upfront, correct?

6   A.  Well, at this point in our discussions --

7   Q.  Mr. Gross, is that what this email says, "What I think is

8   fair is 15K upfront"?

9   A.  Those were the words, yes, sir.

10  Q.  Okay.  And then your next words were, "And then 45 days of

11  operation, another $15,000"?

12  A.  That's what it says, sir.

13  Q.  And then, "Once we find you a CU or take over ours," and

14  then in parentheses, "(this is still on the table), then

15  $120,000 would be made as a donation."  Do you see that?

16  A.  Yes, sir.

17  Q.  So there were various things that you were going to do as

18  these payments were made to you or to your church in exchange,

19  correct?

20  A.  The "once we find you a CU or take over ours" would be the

21  only thing in there that I would see as actions that I would

22  take.

23  Q.  So you were going to allow them to take over the credit

24  union for $150,000?

25  A.  That's not what this email says, but they were going to

1   make a donation to the church to reimburse the church for its

2   expenses to separate the church from the credit union, was our

3   ultimate understanding.

4   Q.  And then you were going to give them control of the credit

5   union?

6   A.  They were going to move forward with the whole credit

7   union.  They were going to do that when they brought their

8   members in, yes, sir.

9   Q.  You promised that the Collectables Club members would be

10  nominated to the board in exchange for these payments, correct?

11  A.  Could you say that again, please?

12  Q.  You promised that the Collectables Club members would be

13  nominated to the board in exchange for these payments, correct?

14  A.  We had a signed memo of understanding that I was honoring,

15  and the payment was a part of the understanding that we had,

16  that there would be a payment as a milestone.  The initial

17  agreement was, the money would go in an escrow account, and

18  then after everybody kept their word, the money would be

19  released to the church.  But that never happened.

20  Q.  And you guaranteed that the Collectables Club members would

21  be elected to the board in exchange for these payments?

22  A.  Say that again, please?

23  Q.  You guaranteed that the Collectables Club members would be

24  elected to the board in exchange for these payments?

25  A.  I don't think that's -- that's an accurate one-to-one

1  comparison, sir.

2  Q.  Well, you agreed with Anthony Murgio that you would

3  nominate and ensure the election of his board members to the

4  credit union after receiving these payments, correct?

5  A.  No.  I agreed that we would honor our agreement to partner

6  together, so that they would take control of the credit union,

7  and in return, the church would be paid back its -- paid back

8  the investment it had made of around $150,000, sir.

9  Q.  But the promises that you made to Anthony Murgio, in terms

10 of the actions that you were willing to take, were contingent

11 upon receiving the payments that he promised to make to your

12 church?

13 A.  No, because the election actually took place before the

14 120,000 even arrived.  So it couldn't be contingent.

15         MR. NOBLE:  Let's bring up Government Exhibit 1092-A

16 in evidence.  Let's blow up just --

17 Q.  This is an email from you to Anthony Murgio, correct?

18 A.  Yes, sir.

19 Q.  Now, you say, in the third paragraph --

20         MR. NOBLE:  Let's blow that up.  Blow up the third and

21 the fourth through fifth.  That's good.  Thanks.

22 Q.  You say, "Please ACH $15,000 to Hope Cathedral," and you

23 provide the routing and account number, "and then another 6,000

24 to the credit union," and you provide the routing and account

25 number, correct?

```
 1    A.  Yes, sir.
 2    Q.  And then you say, "Upon receiving these funds by Friday,
 3    May 9th, the executive board will meet and recommend for
 4    election to the board six people from your organization,"
 5    correct?
 6    A.  That is what it says, sir.
 7    Q.  That action was contingent upon receiving that $15,000 and
 8    $6,000 payment, correct?
 9    A.  Based on what this says, yes.  This was where our
10    discussion was at this point, yes, sir.
11    Q.  And then you go on to state, "These six seats will give you
12    the majority position on the board.  The whole board will"
13    then -- you don't say then.  "The whole board will ratify your
14    nomination on May 17th (by which time we would like to have
15    received the second $15,000 donation)."  Is that what you
16    wrote?
17    A.  That is correct, sir.
18    Q.  "And then once your names are placed in nomination, the six
19    people will be officially elected to the board at the June
20    annual meeting.  (This is the only time when we can change
21    board members)."  Do you see that?
22    A.  Yes, sir.
23    Q.  And then it says, "You have to designate various
24    positions," correct?
25    A.  You will have, yes.
```

1    Q.  And then the last sentence:  "The existing board members

2    will tender their resignations to be effective at your

3    choosing," meaning Anthony Murgio's choosing, correct?

4    A.  I think I was more talking about the organization.

5    Q.  Okay.

6    A.  So I can't necessarily say --

7    Q.  But you sent this email to Anthony Murgio, correct?

8    A.  I sent it to trustee, actually.  Yes, Anthony Murgio, he's

9    named at the top.

10   Q.  Well, you address it to Anthony Murgio?

11   A.  Yes.  Yes, sir.

12   Q.  You said, "Before this vote happens, the remainder of the

13   donation to assume control of the credit union would need to be

14   received."  That's what you wrote?

15   A.  Yes, that's what I said, sir, on May 6th.  Yes, sir.

16   Q.  Does this email refresh your recollection that the actions

17   you promised to take on behalf of Anthony Murgio were

18   contingent upon the receipt of these various payments?

19   A.  No, sir, it doesn't.  Because what actually happened was

20   they were elected, and something else -- and the order changed.

21   So, at this time, this is an accurate email.  I said all of

22   this, I'm not denying any of that, but there were a lot of

23   discussions that took place.

24   Q.  And your church still got the $150,000?

25   A.  Yes, sir.  We did receive the donation, yes, sir.

1  Q.  And the Collectables Club got control of the credit union?

2  A.  The Collectables Club came in and took operational control,

3  yes, sir.

4  Q.  So, it would be fair to say that these payments influenced

5  your decision-making at the credit union?

6  A.  No, sir.  They did not completely influence my

7  decision-making, sir.

8          MR. NOBLE:  You can take that down, Ms. Grant.

9  Q.  Do you recall, Mr. Gross, being interviewed by the FBI and

10  the U.S. Attorneys -- some of the AUSAs on or about

11  October 5th, 2015?

12  A.  Yes, sir.

13  Q.  And you were present with your counsel at that meeting,

14  correct?

15  A.  Yes, sir.

16  Q.  And you would agree that in meetings, interviews, with FBI

17  officials, agents, and prosecutors, it's important to tell the

18  truth?

19  A.  Yes, sir.

20  Q.  It's just as important to tell the truth to federal

21  officials as it is to tell the truth to this jury, as you sit

22  here under oath, correct?

23  A.  Yes, sir.

24  Q.  Now, do you recall that during your interview, you stated

25  that the $150,000 that the Murgios gave you had some influence

1   on your decisions to give Murgio control of the credit union?

2   Do you remember saying that?

3   A.  Yes, sir.  Yes, sir, it did have some influence.  Yes, sir.

4   Q.  So, that's different than your testimony today, correct?

5   A.  No, I think I said something very similar.  It didn't have

6   complete control over my decision, but it did have some

7   control.  I mean, they're making the church whole.  That's a

8   wonderful thing.  The credit union is getting a bright new

9   future with a new partnership.  That's a good thing.  And this

10  Collectables Club, which I thought was a real organization, was

11  going to have its dream fulfilled to have a financial

12  institution to work along with it.  So, to me, it was a

13  win-win-win.

14  Q.  Win-win because you got $150,000 for your church?

15  A.  Win-win because the church got reimbursed for its

16  investment in the credit union, sir.

17  Q.  Your church?

18  A.  It's not my church.

19  Q.  You're the head pastor of the church?

20  A.  I'm an employee of the church, yes, sir.

21  Q.  You get paid by the church?

22  A.  I'm an employee of the church, sir.

23  Q.  When the church has money, you get paid?

24  A.  I'm an employee of the church, yes, sir.

25  Q.  You also said to the FBI and prosecutors, "Of course, the

1   money played a part."  Do you remember saying that?

2   A.  Yes, which is exactly what I explained.  That's a wonderful

3   thing, that the church can get repaid.

4   Q.  Now, you testified that you discussed this agreement that

5   you had with the Collectables Club with other members of the

6   board of the HOPE Federal Credit Union?

7   A.  Yes, sir.

8   Q.  You said that sometimes those discussions occurred over the

9   telephone?

10  A.  Yes, sir.

11  Q.  No one took any minutes of those phone discussions, did

12  they?

13  A.  No, because they were discussions.  They weren't formal

14  meetings, they were plenary, as it were, to talk about this

15  issue or other issues, if they may have arisen.

16  Q.  So, we have no documentation of what was said on those

17  phone calls?

18  A.  I suspect the people who were on them could verify it, sir.

19  Q.  I mean documentation as in documents, like minutes, we

20  don't have any of those things?

21  A.  Because they weren't formal board meetings, no, sir.

22  Q.  You said that the board voted to enter into a partnership

23  with the Collectables Club, correct?

24  A.  Yes, sir.

25  Q.  And I believe Ms. Santillo showed you the board meeting

1    minutes from May 2014, that's Government Exhibit 6085?

2    A.  Yes, sir.

3    Q.  Those minutes don't mention the $15,000 in payment -- the

4    $15,000 initial upfront payment that you received from the

5    Collectables Club, do they?

6    A.  No, they don't, sir.

7    Q.  They also don't mention the second $15,000 payment from the

8    Collectables Club?

9    A.  No, they don't, sir.

10   Q.  They also don't mention the $120,000 payment from

11   Kapcharge?

12   A.  No, they don't, sir.

13   Q.  They also don't mention anything about you getting

14   consulting fees from the Collectables Club, do they?

15   A.  They weren't envisioned at that time, sir.

16   Q.  In fact, none of the board minutes for the HOPE Federal

17   Credit Union ever had any mention of the payments that were

18   made to your church?

19   A.  Unfortunately, they don't.  But they also don't have any

20   record of the church paying for the credit union's bills

21   either.

22   Q.  Right.  And there's no other documentation of that either?

23   A.  Yes, there is documentation, sir.

24   Q.  We haven't seen any of that during trial, have we?

25   A.  I don't know, sir.

1    Q.  You sat through the trial, though, haven't you?

2    A.  Oh, you mean as evidence?

3    Q.  Yes.

4    A.  I don't think anyone's --

5    Q.  There's nothing in evidence to show that the church paid

6    expenses on behalf of the credit union?

7    A.  That's a long evidence list.  So, I don't -- nothing that I

8    have seen has been published --

9    Q.  Well, Mr. Gross, it's been a long trial, you've sat through

10   the entire thing.

11   A.  Yes, sir.

12   Q.  And you're on trial, correct?

13           MS. SANTILLO:  Objection.

14           THE COURT:  Sustained.  Move on.

15   Q.  You pay attention to the evidence?

16   A.  Yes, sir.

17   Q.  Now, you never told the NCUA about any of the payments that

18   your church received from Collectables Club or Kapcharge, did

19   you?

20   A.  No, sir, I did not.

21   Q.  That's something that the NCUA would want to know?

22   A.  I don't know if they would want to know, sir.

23   Q.  Now, we talked a little bit about fiduciary duties and that

24   you understand what fiduciary duties are, correct?

25   A.  Yes, sir.

1    Q.  That as a member of the board and as a chairman of the

2    board of the credit union, you had fiduciary duties?

3    A.  Uh-huh.  Yes, sir.

4    Q.  You would agree that it's important for a member,

5    particularly a chairman of the board, to uphold his fiduciary

6    duties?

7    A.  To the best of his ability, yes, sir.

8    Q.  And, in fact, that requirement is in the bylaws of the

9    credit union?

10   A.  I believe so, sir.

11   Q.  It's also in the law?

12   A.  That, I'm not certain of.

13   Q.  Well, you heard the Judge's instruction on the law?

14   A.  I've heard a lot during this trial.  I just -- I'm not

15   doubting you, but if you're asking me do I have personal

16   knowledge, unfortunately, I don't, but I do know the board

17   bylaws do say that, sir.

18   Q.  Okay.

19           MR. NOBLE:  So, let's bring up the bylaws, Government

20   Exhibit 6150.  Can we flip -- let's go to the last page and

21   then go back up.  Go back up.  Keep going.  One more.

22           Let's blow up, under Article XVI of your bylaws,

23   Section 4.

24   Q.  Mr. Gross, do you see where it states, "No director" --

25   that would include you, correct?

1    A.  Yes, sir.

2    Q.  -- "committee member, officer, agent or employee of this

3    credit union may participate in any manner, directly or

4    indirectly, in the deliberation upon the determination of any

5    question affecting his or her pecuniary" -- and we know what

6    that means from Clayton Curry, correct?

7    A.  Well, I think he misdefined it, but I looked it up after

8    that.

9    Q.  You know what it means?

10   A.  It's something about -- I think it's about financial-- I

11   think.

12   Q.  So, "any question affecting his or her pecuniary or

13   personal interest or the pecuniary interest of any corporation,

14   partnership, or association other than this credit union in

15   which he or she is directly or indirectly interested."  Did I

16   read that correctly?

17   A.  Yes, sir.

18   Q.  Your church is an entity, a corporation, it's a nonprofit

19   corporation, in which you have a direct interest, correct?

20   A.  I don't have a pecuniary interest.

21   Q.  You don't get paid by the church?

22   A.  I do, but that's not how I read that.

23   Q.  So you're saying that you don't have any type of financial

24   interest in your church?

25   A.  To me, interest means that I'm an investor in something.

1   That's how I would read the word interest there, where I'm
2   going to personally benefit from this transaction.
3           In the church world, it's a different term, but, to
4   me, that's what it means, it's a private enurement.  So that's
5   what I thought -- when I read this, that's what I think of,
6   that I'm going to personally benefit from a decision, and
7   because I'm going to personally benefit, I should declare a
8   conflict.
9   Q.  Well, you were here yesterday when John Rollins testified,
10  correct?
11  A.  Yes, sir.
12  Q.  And your counsel showed you Government Exhibit 900?  Those
13  were the summary slides of --
14  A.  Yes, sir.
15  Q.  -- the payments that were traced?
16  A.  Yes, sir.
17  Q.  Do you recall the portion of that presentation that showed
18  that you received payroll checks that were directly traceable
19  to the proceeds that you received from the Collectables Club?
20  A.  I did see his inaccurate tracing of that, yes, sir.
21  Q.  But you don't deny that you get paid payroll checks out of
22  the payroll account, correct?
23  A.  Oh, no, I definitely get paid when they're able to pay
24  them, yes.
25  Q.  And sometimes money is transferred from the church's

1   operating account at PNC Bank into the payroll account at PNC

2   Bank?

3   A.  Yes, sir.

4   Q.  And the money that the Collectables Club paid the church

5   and that Kapcharge paid the church, you directed to be paid to

6   the operating account at PNC Bank, correct?

7   A.  That is correct.  I gave them the routing information, yes,

8   sir.

9   Q.  So the money goes into the operating account, then it goes

10  to the payroll account, and then from the payroll account, you

11  get paychecks, correct?

12  A.  That is the flaw in his approach, because the money went

13  into the account, but so did other money go into the account.

14  So, you can't tie the two together, sir, because I was getting

15  paid before this transaction, and I've been getting paid since

16  this transaction, to the best of the church's ability.

17  Q.  You also get a housing allowance from the church, don't

18  you?

19  A.  Yes, sir.  As a part of my package, yes, sir.

20  Q.  $60,000?

21  A.  I think that's about right, yes, sir.

22  Q.  You also get a travel allowance?

23  A.  Yes, sir.

24  Q.  They pay for your health insurance?

25  A.  Yes, sir.

H38KLEB4                          Gross - Cross

1    Q.  They pay for your car?

2    A.  No.  They pay for their car, and I drive it.

3    Q.  You use that car for personal reasons?

4    A.  I use it for everything I do, sir.  Yes, sir.

5    Q.  And the church pays for it?

6    A.  Yes, sir, they do.

7    Q.  The church pays your wife a salary?

8    A.  Yes, they do, sir.

9    Q.  Your church pays your son money?

10   A.  They used to when he worked for the church, absolutely, as

11   well as other employees.

12   Q.  Would you say it's a family business?

13   A.  Absolutely not, sir.

14             THE COURT:  Mr. Noble, what's your time estimate?

15             MR. NOBLE:  I have quite a bit to go, your Honor.

16             THE COURT:  We'll break for lunch here.  It's 12:40.

17             Ladies and gentlemen of the jury, we'll resume in an

18   hour.  Thank you so much.  Enjoy your lunch.

19             MR. NOBLE:  You can take that down, Ms. Grant.

20             (Continued on next page)

21

22

23

24

25

```
 1              (Jury not present)

 2              THE COURT:  You may step down, Mr. Gross.

 3              Matters to take up, counsel?

 4              MS. SANTILLO:  Yes, your Honor.  I'd like a curative

 5    instruction that the defendant never has a burden of proof in a

 6    criminal trial.  I think the line of questioning about

 7    Mr. Gross having to produce documents in this trial was

 8    prejudicial, and I'd like that to be read to the jury.

 9              THE COURT:  Is there a contemporaneous objection?

10              MS. SANTILLO:  I guess it is.

11              MR. NOBLE:  I believe your Honor sustained the

12    objection.

13              THE COURT:  I'll go back and look.  There was a set of

14    questions, I think, around it, and I don't recall when the

15    question occurred -- when the objection occurred.  I'll look at

16    the transcript.

17              What's your response?

18              MR. NOBLE:  Your Honor, I think it's a fair line of

19    cross-examination, given that this defendant was served with an

20    if-as-when subpoena, which called for the production of a

21    variety of documents relating to the expenses surrounding the

22    credit union that the church may have covered, his own

23    compensation by the church.  We can provide a copy of that

24    subpoena to your Honor, but I believe it's a fair line of cross

25    when the defendant testifies that there are these documents out
```

1    there, and the government asked for them, and we don't get the

2    documents, the backup documentation that shows that the church

3    did, in fact, pay for all of these expenses that he testified

4    about from the church or from him.

5          We interviewed Ms. Larkins, we sent multiple subpoenas

6    to the church asking for the backup documentation to show this.

7    Ms. Larkins even testified -- not testified, but when she was

8    interviewed, she told us that there are no documents, there are

9    no loan documents, there is nothing, there's no real backup

10   documentation, other than this, like, one-page spreadsheet that

11   either she or Mr. Gross created.  We asked for the backup

12   documentation that would underlie that analysis, and we never

13   received it.

14         THE COURT:  There are a couple of things.  There was

15   the earlier sidebar issue, which this is related to, and the

16   plan there was to discuss it --

17         MR. NOBLE:  Judge, I'm not going to pursue that line

18   of cross-examination.  I think there are plenty of other areas

19   to mine.

20         THE COURT:  That didn't happen.  The one objection

21   here I did sustain, I think there were -- there was some

22   related questioning for which there was no contemporaneous

23   objection.  Obviously, the jury will be instructed at the -- by

24   the charge as to who always bears the burden of proof.  I'll

25   look at the place where the contemporaneous objection was made.

1    You can submit a proposed instruction.  My concern is, we've

2    moved away from that.  They're going to get clear instruction

3    at the charge as to who bears the burden of proof, but why

4    don't you make a specific proposal over the break to the

5    government.  I'll review the LiveNote to see where the

6    objection was made.

7              Do I hear you that we're not going to return to this?

8              MR. NOBLE:  I'm not going to return to that area.

9              THE COURT:  Anything else?

10             About how much longer, Mr. Noble?

11             MR. NOBLE:  I have quite a bit, but let me take a look

12   at it and see if I can narrow it.  Some of the areas, I've

13   skipped around a little bit, so I'll have a better estimate

14   after the break.

15             THE COURT:  Okay.

16             Ms. Choi, I thought you were standing earlier to say

17   something.  I didn't know if anything --

18             MS. CHOI:  Maybe it's just natural instinct.  I don't

19   know if your Honor knows, or if everyone knows, that Ms. Beyer

20   is in the hallway.  She's ready to go.

21             Pursuant to your Court's admonition that we be

22   prepared to start our cross, that's what I was doing this

23   morning -- sorry, closing, that's how long the day has been --

24   I was wondering whether or not the defense now has objection to

25   certain exhibits that we have on our list for the rebuttal

H38KLEB4                        Gross - Cross

1   case.  I don't know the extent of those.  I was just told that

2   while the morning was proceeding, and so I'm here to deal with

3   those.  If there are issues, I presume -- I just wanted to flag

4   that for your Honor, because as your Honor said, there may be a

5   situation in which we would have to deal with those document by

6   document.

7               THE COURT:  Okay.

8               MS. CHOI:  So, that's another thing to add to the

9   to-do list.

10              THE COURT:  Thank you.  So, you'll continue

11   communicating about that over lunch.  We have Ms. Beyer here,

12   and I thank you for the efforts on that timing.

13              What I understand to be the schedule is:  Cross is

14   complete of Mr. Gross, Mr. Creizman anticipates a cross,

15   redirect, and then Ms. Beyer.  That's where we are, right?

16              MR. KLINGEMAN:  Yes.

17              THE COURT:  All right.  Anything else?

18              See you in about -- we'll have a couple of issues to

19   take up, so in 40 minutes from now, please.  Thank you.

20              (Luncheon recess)

21

22

23

24

25

                              AFTERNOON SESSION

                                 1:28 P.M.

          (Jury not present)

          THE COURT:  Matters to take up?

          MR. KLINGEMAN:  None from the defense for Mr. Gross.

          MR. CREIZMAN:  None from Mr. Lebedev.

          MS. CHOI:  Your Honor, Mr. Noble is in the restroom.
He should be here shortly.  I apologize.

          THE COURT:  I'm going to look at something.

          MR. NOBLE:  Sorry, Judge.

          THE COURT:  That's all right.

          So, Mr. Noble, anything to take up?

          MR. NOBLE:  There's one exhibit, your Honor, that is
not in evidence that I would like to use during my
cross-examination of Mr. Gross.  It was a -- it's Government
Exhibit 6142, if you can bring it up, please.

          This was, your Honor may recall, subject to the
testimony of Terry Adam who laid a foundation that this was a
document that the NCUA obtained from the credit union systems,
the general ledger specifically.  During the course of the
conservatorship, the defendants had an objection to Mr. Adam
testifying about this, but I would like to inquire about this
document with Mr. Gross.  And so the government intends to
offer this during our examination.

          I don't think there's any authenticity problem and the

H389LEB5

1   document is relevant because it pertains to, as we've

2   previously proffered at the time of Mr. Adam's testimony,

3   accounting and the church's checking account at the credit

4   union which Mr. Gross controlled.

5            THE COURT:  Ms. Santillo.

6            MS. SANTILLO:  Your Honor, I would object to the

7   extent it gets into issues about the forensic analysis of the

8   conservatorship because I think that's an area that has been

9   off limits.

10           MR. NOBLE:  Judge, this does not require any forensic

11  accounting.  I can inquire of Mr. Gross if he understands these

12  things.  He ran the credit union.  I think he would understand

13  what a general ledger is of the credit union.  And this goes to

14  corrupt intent.

15           MS. SANTILLO:  I'm not quite sure why.

16           MR. NOBLE:  I don't want to preview my entire line of

17  cross-examination.

18           THE COURT:  On that proffer I'll allow it.  If either

19  no foundation can be laid for it or its relevance is not made

20  clear, I'll sustain the objection.

21           But, if you have a basis to -- for the statement you

22  just made, then I'll allow it.

23           MR. NOBLE:  Thank you, Judge.  That was my only issue.

24           THE COURT:  Ms. Santillo, you had made a request for a

25  limiting instruction.

H389LEB5

1              MS. SANTILLO:  As long as we don't go down that path I

2      think since we're so close to closing -- time has already

3      passed a little bit, that we don't want to go down that road

4      right now.

5              THE COURT:  Okay.

6              MS. SANTILLO:  So as long as the issue doesn't come up

7      again.

8              MR. NOBLE:  I'm not going to bring that issue up

9      again.

10             THE COURT:  All right.  Thank you.  And you won't.

11             MR. NOBLE:  What's that?

12             THE COURT:  And you won't.

13             MR. NOBLE:  I will not, your Honor.

14             THE COURT:  Because I noted that when I went back and

15     looked at the transcript, the question was:

16             Well, Mr. Gross it's been a long trial you've sat

17     through the entire thing?

18             Objection.

19             You said:  Yes.  And then:  And you're on trial,

20     correct?

21             Objection.

22             I said:  Sustained.  Move on.

23             And then you said:  You've paid attention to the

24     evidence.

25             So you got one more in, but don't do it again.

H389LEB5

1              MR. NOBLE:  Sorry, Judge.

2              THE COURT:  On the character -- so I have looked at

3     it.  I've read the rationale of the cases, a number of cases

4     calling into question.  I think there's something persuasive

5     about the risk that -- there is some risk of the standing alone

6     instruction inviting attention to a single bit of evidence and

7     suggesting to the jurors that they analyze this evidence all by

8     itself.  But I think -- I actually think there's a sort of

9     middle ground which gets to the point a little bit further than

10    what's in the current instruction without going too far.  So

11    what I'm contemplating -- do you have the charge in front of

12    you, Mr. Klingeman?

13             MR. KLINGEMAN:  I do not have it.  Sorry.

14             THE COURT:  That's okay.  I'll read it.  So the

15    current version -- so the winding into this, the first couple

16    sentences and then, "The question is for you alone to

17    determine.  You should, however, consider this character

18    evidence, together with all of the other facts and all of the

19    other evidence in the case, in determining whether the

20    defendant is guilty or not guilty of the charge."

21             And then there is the standing alone sentence which

22    currently reads, "Evidence of good character may itself create

23    a reasonable doubt where without such evidence no reasonable

24    doubt would have existed."

25             What I'm contemplating would be changing that sentence

H389LEB5

```
 1    to, "Character evidence may be considered by you in determining
 2    whether the government has proven the defendant's guilt beyond
 3    a reasonable doubt."  And then into the next sentence,
 4    "Accordingly, if after considering..."
 5            So I will give that to you again, Mr. Klingeman.
 6            MR. KLINGEMAN:  Thanks.
 7            THE COURT:  So it would be a substitute for the
 8    sentence that beginnings on line seven, instead of that
 9    sentence it would read, "Character evidence may be considered
10    by you in determining whether the government has proven the
11    defendant's guilt beyond a reasonable doubt."
12            MR. KLINGEMAN:  Yes.
13            THE COURT:  I'm asking my clerk to print a couple
14    copies.
15            Mr. Shin.
16            MR. SHIN:  Your Honor, I don't think that sentence is
17    necessary in light -- the very next sentence, the
18    "accordingly," incorporates that very idea, right, because if
19    considering all of the evidence.
20            So I don't think it's necessary, but your Honor's
21    proposal does eliminate some of the, I think the core of the
22    offending nature of the language that we objected to.
23            THE COURT:  My clerk is handing you both copies.
24            MR. KLINGEMAN:  I would ask for this language as just
25    circulated by the Court.
```

H389LEB5

1          MR. SHIN:  Thank you, your Honor.

2          THE COURT:  We'll do that.

3          Anything else we can take up?

4          So I think with that the charge is final, although I

5     have invited, if there's anything else anyone notes over the

6     course of the day that they want to raise, they should do so.

7     By the time we finish for the day, I intend to put a lid on it

8     so we can start preparing copies for tomorrow.

9          All right.  I think we're on time.

10          Ms. Choi, anything further on -- I think the question

11     is to you -- anything further on the government's documents?

12          MS. CHOI:  Your Honor, I think this is the present

13     state of play.  Ms. Madrigal has handed to me a list of six or

14     seven that she has questions about or objections to.  I will go

15     through them and reply to her and figure out what we -- what

16     needs to be done with regard to those.

17          Ms. Santillo has indicated to the government that she

18     is not in a position to have -- to represent that she's gone

19     through the list.

20          THE COURT:  What's the quantity?

21          MS. CHOI:  It's substantial, your Honor.  I'm not

22     going to stay that it isn't.

23          THE COURT:  I understand.

24          MS. CHOI:  I don't know the number off the top of my

25     head.  We organized it by the source of the document, so which

1    e-mail account it came from and the like.

2         There's been very few changes.  I think I added four

3    documents since the version -- and cut down a bunch since the

4    version that Mr. Klingeman had initially gone through.

5         So I'm hoping that that won't -- that it wouldn't take

6    them very long to figure out -- for her to do that.  It's my

7    understanding Ms. Santillo just hasn't had the time to do that

8    as of yet, which obviously from our perspective is problematic

9    since we are relying on that list both incorporating these

10   documents into our closing as well as anticipating potential

11   defenses and insuring that we have the evidence to rebut that

12   for purposes of Mr. Noble's rebuttal.

13        So that's the current state of play.  I think

14   Ms. Santillo had indicated that she would be in a position

15   to -- that she would be in a position to get back to us later

16   today or early tomorrow morning about any individual documents

17   she might have, that she may have issue with from that list.

18        THE COURT:  I don't know that -- how tomorrow morning

19   will work.

20        MS. CHOI:  I understand, your Honor.  I guess this is

21   sort of the crossroads that we find ourselves in right now

22   which is simply if she were to have -- if Ms. Santillo were to

23   have the opportunity it would obviously slow -- it would

24   obviously make it an efficient process because we could winnow

25   down whatever concerns we might have.  On the other hand --

1          THE COURT:  So you might just have to move them in,

2     any ones that haven't been reviewed one at a time.  And if

3     there are objections, there are objections.  Or do you have

4     another suggestion?  Or is there anything the government could

5     do to assist the process?

6          Mr. Klingeman.

7          MR. KLINGEMAN:  Yes.  The government's list, your

8     Honor, contains over 250 exhibits.  So it's not what we

9     understood to be given to us the other day which was a much

10    smaller number.  I've gone through most of them and I don't

11    have any objections.

12         THE COURT:  Gone through most of the 250 or what was

13    originally --

14         MR. KLINGEMAN:  The original list that we agreed we

15    would review the night that it was circulated, but that list

16    has been supplemented and supplemented and supplemented.

17         The problem is we don't want to hold this process up.

18    I can't imagine there's any highly relevant evidence among

19    these documents that hasn't been offered -- that hasn't been

20    offered because we're at the end of the trial and just common

21    sense.

22         THE COURT:  Well they wanted to put it in on direct.

23         MR. KLINGEMAN:  I understand.  My point is this.  I

24    remain concerned about the following.  Once we sit down after

25    our closings we have no ability to address evidence that has

H389LEB5

1      not been the subject of testimony and not been the subject of

2      comment even.  And I worry about the rebuttal summation, I

3      worry about a long rebuttal summation that changes the

4      complexion of the case.

5              THE COURT:  Rebuttal will be rebuttal.

6              MR. KLINGEMAN:  I understand.

7          So my gut is telling me I'm not going to object.  I

8      haven't seen anything in what I've looked at, and I've looked

9      at a lot of them, that gives me cause.  They are very similar

10     to the literally thousands of other things we've accepted in

11     evidence.

12         So what I'd like is a moment to confer with

13     Ms. Santillo and if we can just agree.  I take it counsel for

14     the codefendant only has a handful of objections that probably

15     can be dealt with very quickly and perhaps with our consent we

16     can moot this.  What I don't want to do is carry this over

17     until tomorrow.  I'm already concerned that the government's

18     summation won't even start today and then I'll be standing up

19     at four o'clock and we won't get to a rebuttal much less the

20     Court's instructions until Friday and I don't want to be the

21     cause of that in any way, shape or form so I need a few minutes

22     with Ms. Santillo at an appropriate break to resolve this.

23             THE COURT:  Well let's get it resolved -- we'll keep

24     going but then -- we'll keep going now.  I think we'll be -- we

25     may get to the midafternoon break or we may be done in which

1    case it will just be -- we'll break briefly for you to consult

2    but then you can move them in and if you don't -- sounds like

3    there's some number of them, some subset of this that can come

4    in.  To the extent that you want to see each one as it comes,

5    we'll do it.  But, the jury is -- so you'll get that

6    opportunity, Mr. Klingeman.  It won't be an extended

7    opportunity, but certainly we'll find a few moments -- a few

8    minutes before we get to this point.

9              MR. KLINGEMAN:  Then what I would request is the

10   following.  I took seriously the procedure we talked about in

11   court when the document list came in, I believe at this point

12   it's Monday night at 8:30ish.  I promptly reviewed them.  I had

13   no objections to that group.

14             I'll just confirm with Ms. Santillo that she's

15   comfortable with me taking responsibility.

16             But I don't know what's come in since.  I haven't

17   looked at what's come in since.  It seems to me a lot has come

18   in since and that's what I want to be able to look at.

19             MS. CHOI:  Your Honor, all we have to do -- in fact,

20   we'll note that a lot of documents were taken out of that list

21   in order to try to facilitate this, but what we're going to do

22   is we're going to do a comparator list against whatever version

23   Mr. Klingeman is representing what he thinks is the operative

24   version in his mind, and we will get him a comparator list.

25   And once that happens, he and Ms. Santillo should be able to

H389LEB5

1    quickly go through them.

2              THE COURT:  Okay.  We'll get the jury.

3              (Continued on next page)

1                  TREVON GROSS, resumed

2                  (Jury present)

3                  THE COURT:  Thank you.  Everyone may be seated.

4                  Thank you, ladies and gentlemen of the jury, for your

5        continued diligence and attention.

6                  We will resume the cross-examination of Mr. Gross by

7        Mr. Noble.

8                  Mr. Gross, I remind you, you are under oath.

9                  When you're ready counsel.

10                 MR. NOBLE:  Thank you, Judge.

11       CROSS-EXAMINATION CONTINUED

12       BY MR. NOBLE:

13       Q.  Now, Mr. Gross, you testified that you turned over control

14       of the credit union to Anthony Murgio and the other

15       Collectables Club members, correct?

16       A.  I testified that we had a partnership, yes, sir, and that

17       they were to take over control of the credit union.

18       Q.  And that included control by Anthony Murgio?

19       A.  That included control by the Collectables Club, sir.

20       Q.  And he was part of the Collectables Club, correct?

21       A.  To my knowledge, yes.

22       Q.  Now, Anthony Murgio did not have any role on the board of

23       the credit union, correct?

24       A.  Correct.

25       Q.  He actually had no official role at the credit union at

H389LEB5                          Gross - cross

1    all, correct?

2    A.  Correct.

3    Q.  But you still allowed him to have control of the credit

4    union?

5    A.  As I said earlier, the Collectables Club as on organization

6    had the control, sir.

7    Q.  And the person who was negotiating on behalf of the

8    Collectables Club was Anthony Murgio?

9    A.  No, sir.  Michael Murgio.

10   Q.  So your testimony is that Anthony Murgio was not

11   negotiating with you on behalf of the Collectables Club?

12   A.  No, sir.  That's not what I said.

13          But the primary person that negotiated the original

14   agreement was the father, Michael Murgio.

15   Q.  Well do you remember the e-mail that we looked at before

16   lunch that showed you promising to do certain things by a

17   certain time -- in certain timeframes in exchange for payments?

18   Do you remember that e-mail?

19   A.  Yes, sir, I do.

20   Q.  That was with Anthony Murgio, correct?

21   A.  Yes, sir, that was.

22   Q.  Now, it was even before the Collectables Club members

23   became part of the board that you gave them access to the

24   credit union's financials, correct?

25   A.  Yes, sir.

1   Q.  And you gave them access to the credit union's website?

2   A.  I'm not certain what you mean.

3   Q.  Well you turned over control of the website for the credit

4   union to Anthony Murgio and Yuri Lebedev, correct?

5   A.  I'm not sure I turned it over to them but we were

6   redesigning the websites, yes, sir.

7   Q.  Do you recall sending instructions to Yuri Lebedev on how

8   to access and take control of the website?

9   A.  I recall giving them access so we could update the website,

10  yes, sir.

11          MR. NOBLE:  Let's bring up Government Exhibit 1157 in

12  evidence and turn to page two.

13  Q.  Now, Mr. Gross, you testified before lunch that you were

14  not a tech savvy person, correct?

15  A.  Yes, sir.  That is correct.

16  Q.  But you do understand websites?

17  A.  Generally, sir, yeah.

18  Q.  So you see on June 4, 2014 you wrote to Yuri Lebedev, among

19  other people, "The current site is on a customized CMS."

20          What does CMS mean?

21  A.  I think it means content management system.

22  Q.  "So the DNS points to their servers for hosting."

23          What does DNS mean?

24  A.  Domain name service.

25  Q.  "We have MX records so we can create our e-mail accounts."

1              What are MX records?

2    A.   That I'm not certain of.

3    Q.   But you were able to create your own e-mail accounts for

4    the HOPE Federal Credit Union?

5    A.   Yes.  But that's a simple add a name, password create

6    process.  There is no programming involved in that, sir.

7    Q.   And then you went on and said, "We can stop the DNS

8    redirect which will cause the site to go down and then you can

9    upload all the files because there is a word press bootstrap

10   framework available."

11             Do you see that?

12   A.   Yes, sir.

13   Q.   What's a word press bootstrap framework?

14   A.   I have no idea.  These are, more often than not, me copying

15   and pasting what a tech person told me with DreamHost.

16   Q.   But then you went on and said, "Just say the word and I can

17   do that part."

18   A.   Yes, sir.

19   Q.   So you were going to do something with the word press

20   bootstrap framework?

21   A.   Yes.  Contact the service at DreamHost and tell them here's

22   what I need you to do.  Because you can chat with them and

23   they'll walk you through the site.

24   Q.   And you are cable of doing that?

25   A.   Chatting with the DreamHost tech, absolutely.

```
 1                MR. NOBLE:  You can take that down.
 2   Q.  You also gave them back end access to the credit union's
 3   financial systems, correct?
 4   A.  I gave them -- additionally they had access to the back end
 5   system for training, yes, sir.
 6   Q.  Well and also to operate the credit union, correct?
 7   A.  Their initial passwords were limited only for the CU South
 8   University is what it's called where all the training was
 9   available.
10   Q.  Well at some point that you gave them access to the entire
11   system?
12   A.  Yes.  At some point we did, yes, sir.
13   Q.  Including Ricardo Hill?
14   A.  Yes, sir.
15   Q.  And that enabled people in the Collectables Club to have
16   access to all of your credit union's members' personal
17   information?
18   A.  Ricardo Hill, yes.
19   Q.  Well anybody in the Collectables Club who had access to
20   that user name and password?
21   A.  Ricardo Hill is the only one who I think had teller access
22   which gave him still limited access based on segregation of
23   duties but all of the -- all of those URLs -- all of those
24   log-ins did not have the same access to get them to see various
25   information.
```

1   Q.  But Mr. Hill could?

2   A.  As far as I recall, yes, sir.

3   Q.  And he was a convicted felon?

4   A.  What I learned during this trial, yes, sir.

5   Q.  That's because you never did due diligence on Ricardo Hill

6   before you allowed him to have access to your credit union's

7   back end?

8   A.  Unfortunately I did not do any due diligence on him.

9   Q.  You also arranged for a server and a router to be sent to

10  Florida for the Collectables Club, correct?

11  A.  For?

12  Q.  For the credit union?

13  A.  For the credit union, yes, sir.

14  Q.  You also arranged for a GUAPPLE to be sent to Florida?

15  A.  Yes.  Whatever that is.

16  Q.  That was so they could have access to the credit union's

17  back end system and process ACHs from Florida?

18  A.  Yes.  They could train as well as do the work that needed

19  to be done with the ACH process.  Correct.

20  Q.  They could not have done that without your authorization,

21  correct?

22  A.  Correct.

23  Q.  And you knew that Rico Hill was processing ACH transactions

24  for Kapcharge from Florida?

25  A.  He wasn't processing them.  He was inputting them into the

1    system from the return reports, but he was not processing.

2              The processing was taking place, as I understand it,

3    through a lawyer and then it was coming back into our back end

4    system as the ODRI I think is the term for that.

5    Q.  And you trained Rico Hill on how to do all those things?

6    A.  No that's why he had access to learn how to do those things

7    through the system itself.

8    Q.  You never visited the HOPE Federal Credit Union office in

9    Florida, did you?

10   A.  No, sir, because it wasn't supposed to be an office.  It

11   was supposed to be a temporary spot for Rico to learn and when

12   they came up that computer would end up going into Lakewood

13   with him.

14   Q.  Well he wasn't just learning on that system, was he?

15   A.  No.  He was functioning as a teller.  Absolutely.

16   Q.  He was processing millions and millions and millions of

17   dollars of ACHs in that system?

18   A.  No, sir.  He was not processing.  As I said earlier, the

19   processing of ACHs took place through a lawyer.  Rico's job was

20   simply to post what had already taken place into the system.

21   Q.  So he was uploading files into the system as part of the

22   ACH processing?

23   A.  No, sir.  He was manually typing in.  He even made

24   reference to how many entries he had to do during the day.  So

25   he was typing in the return reports into the system.

H389LEB5                       Gross - cross

1    Q.  Well that's part of the processing of ACH transactions

2    through the credit union, correct?

3    A.  No, sir.  That's actually the receipt side.  So that's --

4    so the processing had already taken place before that.  This

5    was the return of -- this is what happened.  So it's a

6    posttransaction that he was doing.

7    Q.  Okay.  But Rico -- it was Rico Hill who was doing all that

8    inputting, correct?

9    A.  As far as I know.

10   Q.  And he was using the credit union's back end system to do

11   that?

12   A.  There would be no other way to do it, sir.

13   Q.  And that's an essential part of doing ACH transactions as a

14   financial institution, correct?

15   A.  I don't know about the essential part but it is a part of

16   the process.

17   Q.  Okay.  Well if -- let's say this.  If Rico Hill did not

18   input that data into the system, the ACH processing could not

19   happen, correct?

20   A.  That's not accurate, sir.

21   Q.  It's not accurate?

22   A.  No.  Because, remember, I just said it's on the back end.

23   So the processing has already happened.

24           He was entering in the receipts of all the

25   transactions that had already happened.  So you can't say it

1    wouldn't happen when he's on the back end of it.

2    Q.  Well, Mr. Gross, the credit union has to keep track of all

3    the ACH transactions that it processes, correct?

4    A.  Correct.

5    Q.  On its own systems?

6    A.  They were on the systems.  Maybe you're not understanding

7    how it works.

8    Q.  Mr. Gross, just if you could just answer the question we'll

9    take this step by step.

10            Rico Hill was inputting ACH transactions into the

11   credit union's back end system, correct?

12   A.  No, sir.

13   Q.  No?

14   A.  May I explain?

15   Q.  Sure.

16   A.  The system received the ACH receipts automatically which is

17   CU South.  And they were our receipt function.  So those files

18   were already in the system, as I understood it.  What Rico was

19   doing was actually manually, after it is already settled,

20   typing each transaction into the appropriate account which was

21   Kapcharge's account so that each item would show up on their

22   statement, but that function was already completed.

23   Q.  And that's so that the credit union could keep track of all

24   the ACH transactions that it was processing on behalf of

25   Kapcharge?

H389LEB5                         Gross - cross

1   A.  No, sir.  That was so that Kapcharge could reconcile their

2   individual bank statement with every transaction that had

3   happened.  The credit union automatically received those files

4   into its system as I understood it to work.

5   Q.  Well let's say this.  If Rico Hill wasn't doing what he was

6   doing the ACH processing for Kapcharge wouldn't function,

7   correct?

8   A.  No, sir.  That is not accurate.

9   Q.  So no one would keep track of the ACH transactions at the

10  credit union?

11  A.  No.  What I'm saying is the transactions had already

12  happened by the time Rico touched them.  What Rico was doing,

13  and you saw e-mails so that effect, when the Kapcharge would

14  say how come these aren't posted to our account.  Those

15  transactions had already happened, they had already settled,

16  and Rico's job was to make sure that everything in Kapcharge's

17  one bank account was accurate.  But the transactions had

18  already taken place.

19  Q.  And that was their account at the credit union, correct?

20  A.  Yes.  Their one account at the credit union.

21  Q.  And the credit union was keeping track of the ACH

22  transactions on behalf of its member Kapcharge?

23  A.  That is correct.

24  Q.  And Rico Hill was playing an essential role in that?

25  A.  Rico Hill played a role in it.

H389LEB5                          Gross - cross

1   Q.  Well if Rico Hill didn't do it who did it?

2   A.  The system already had them.  So for the accounting

3   purposes, as I understand it, our system already captured them

4   and they showed up on our financials.  Where they did not show

5   up is in Kapcharge's individual account and that's why Shoula

6   would send the e-mail saying we can't break down the

7   transactions.  But that was still a post-ACH function.  They

8   had already settled.  The money was already in whoever's

9   account it needed to be in, and he was doing a paperwork

10  function.  He was not uploading files to my knowledge.

11  Q.  So he was performing a paperwork function, in your words,

12  for the credit union?

13  A.  Yes, sir.

14  Q.  On behalf of Kapcharge?

15  A.  On behalf of the credit union.

16  Q.  Now, you never told the NCUA that the credit union had this

17  office in Florida, did you?

18  A.  No, sir.

19  Q.  You never told them that Rico Hill was doing what he was

20  doing in Florida, did you?

21  A.  We talked about his function and what he was doing.

22  Q.  But you never told him that he was doing that from Florida?

23  A.  No, sir.

24  Q.  Now, you knew that the NCUA was concerned about the ACH

25  processing at the credit union that you were doing on behalf of

1   Kapcharge, correct?

2   A.  Yes, sir.

3   Q.  And you also knew that the NCUA was concerned about the

4   field of membership issues concerning Kapcharge and the

5   Collectables Club?

6   A.  And the church, yes, sir.

7   Q.  And your testimony today is that you did not tell a single

8   lie to the NCUA about Collectables Club's eligibility to be a

9   member of the credit union?

10  A.  I did not knowingly misrepresent anything to the NCUA, sir.

11  Q.  You didn't tell a single lie to the NCUA about Kapcharge?

12  A.  I did not intentionally misrepresent anything to the NCUA

13  concerning Kapcharge.

14  Q.  That's your testimony, Mr. Gross?

15  A.  Yes, sir.

16  Q.  Now, you testified that after the annual meeting the credit

17  union had filed a profile with the NCUA?

18  A.  Pardon?

19  Q.  After the annual meeting in June 2014.

20  A.  Okay.

21  Q.  The credit union filed a profile with the NCUA, correct?

22  A.  I didn't say that, sir.

23  Q.  Well Ms. Santillo asked you some questions on direct

24  examination about the profile that the credit union filed with

25  the NCUA, correct?

1    A.  Yes.

2    Q.  You're familiar with those profiles?

3    A.  Generally.  I don't do them but, yes, I know what they are.

4    Q.  You're the chairman of the board of the credit union?

5    A.  But I didn't do that function.

6    Q.  That was Mr. Bernard Larkins?

7    A.  I'm not sure.  There was a team that did it.  It was

8    Bernard, George, and our supervisor committee person Marvin

9    Purry, the three of them worked together.

10   Q.  And those are people that you worked with on the board of

11   the credit union?

12   A.  They're all board members, yes, sir.

13   Q.  And it's -- you'd agree that it's important to be truthful

14   in the filings that you make to the NCUA, correct?

15   A.  Yes, sir.

16   Q.  Now, the credit union filed a profile update after the

17   annual meeting in June, correct?

18   A.  No, we did not, sir.

19   Q.  You did not file one in July of 2014?

20   A.  No.  Because we didn't meet.

21          MR. NOBLE:  Can we bring up Government Exhibit 6111 in

22   evidence.

23          Can we blow up the certified by and the date, please.

24   Q.  Do you remember seeing this document during trial,

25   Mr. Gross?

H389LEB5                          Gross - cross

1    A.  I can't honestly recall that I do.

2    Q.  Does this refresh your recollection as to whether the

3    credit union filed a profile in July of 2014 after the annual

4    meeting?

5    A.  I can't see the top of it.  I see the certified by part but

6    I'm not sure what --

7             THE COURT:  Can you show the full document to

8    Mr. Gross, please.

9             THE WITNESS:  Yes.  I see it.  It's a certification

10   page.  I'm not sure what it's certifying, quite frankly, but I

11   do see the certification.

12   Q.  And it's dated July 25, 2014, correct?

13   A.  Yes, it is.

14   Q.  Certified by Bernard Larkins?

15   A.  That's what it says here.

16   Q.  And in this profile you did not report to the NCUA that the

17   Collectables Club board members had joined the board, did you?

18   A.  I don't know what's reported in here.

19   Q.  You don't remember looking -- going through that with

20   Mr. Purry?

21            THE COURT:  If you want to show the witness the full

22   document.

23            MR. NOBLE:  Sure.

24            THE COURT:  Then you can ask questions.  He said he

25   doesn't remembering seeing it.

1          MR. NOBLE:  Scroll to the back and then let's move up

2    to the portion beginning -- stop there.  Scroll back up to the

3    contacts.

4          Can we just blow up.  Just the first column.  You

5    don't need to go all the way across.  Just the names.

6    Q.  Now, Mr. Gross, do you recall Mr. Clayton's testimony that

7    this was the portion of the profile where the credit union is

8    supposed to report the members of its board?

9    A.  Yes, sir.  I do recall that.

10   Q.  Now, if we scroll through this document, I want you to take

11   a look to see whether you see any names of the Collectables

12   Club board members who had been elected in June of 2014.

13         MR. NOBLE:  And just if you can just scroll slowly so

14   Mr. Gross can take a look.

15         (Pause)

16         You can stop there.

17   Q.  Now, Mr. Gross, you didn't see any names of the

18   Collectables Club board members who had been elected in June of

19   2014?

20   A.  No.  But I also don't see some other names that were

21   elected as well.  There are a lot of old names there that

22   hadn't been on the board for a while, like the Bradshire name

23   at the top and -- so several of those names are not accurate,

24   sir.

25   Q.  So you'd agree that this report that was submitted to the

1  National Credit Union Administration on behalf of the credit

2  union was false?

3  A.  I'm not sure -- I'm not sure that it was submitted to be

4  false, sir.

5  Q.  Well it was inaccurate, correct?

6  A.  You're asking me to comment on something that I don't have

7  any basis to make a decision on --

8  Q.  Well, Mr. Gross --

9  A.  -- because I didn't file this.

10  Q.  Mr. Gross, you just testified that this list was

11  inaccurate, correct?

12  A.  It is inaccurate.  But to suggest that it was knowingly put

13  in as false I don't know, sir.

14  Q.  Well it's inaccurate and it was certified as being true,

15  correct?

16  A.  But you're asking me.  I didn't fill it out.  So how can I

17  say what somebody else certified.

18  Q.  This report also -- you can zoom out.

19        This report also did not report that the credit union

20  had that office in Florida, did it?

21  A.  I don't think it existed at this time but I don't know if

22  it does but I don't think it existed at that time.

23        MR. NOBLE:  Let's flip to the last page.

24        You can blow up the site section -- actually blow up

25  the first two rows, please.  The first two rows on the page.

1   Q.  Mr. Gross, you recall this or you see at the top of the

2   page -- well, can we zoom out please.

3          MR. NOBLE:  Can we just blow up the top of the page to

4   the bottom of the second row.

5          Stop.  That's fine.

6   Q.  So you see at the very top of the page, Mr. Gross, it says

7   sites?

8   A.  Yes, sir.

9   Q.  And it says:  Record on this page the credit union's hot

10  site, if applicable, all other locations where the credit union

11  maintains its books -- I mean maintains its records.

12         Do you see that?

13  A.  Yes, I do.

14  Q.  Or any future office locations?

15  A.  Yes.  I see that.

16  Q.  Now, there is no location in Tallahassee, Florida, listed

17  on this page, is there?

18  A.  I would say that based on what I'm reading here, I would

19  not say that that office would even qualify because it was not

20  intended to be a future office or anything.  It was intended to

21  be a temporary staging ground that was ultimately going to move

22  into Lakewood when the organization moved to Lakewood.

23         And, in fact, just as another note, the mailing

24  address here is also incorrect.  That's why I think that the

25  notion of something being incorrect or not updated does not

H389LEB5                         Gross - cross

1  necessarily mean that it's criminal.  That's just my opinion.

2  But I did not certify this.

3  Q.  Now you also, later on you testified that, I believe, that

4  there was subsequently another profile that was submitted in

5  October that did name the Collectables Club members?

6  A.  Yes.  When we organized the board in August, the next call

7  report after that would have been for the September time period

8  and that was -- and it was updated.

9  Q.  And that report also didn't list any location in

10 Tallahassee, Florida?

11 A.  I don't recall but based on my --

12         MR. NOBLE:  Let's bring up Government Exhibit 6112 and

13 flip to the last page.

14         Can we just blow up the top page to the bottom of the

15 second row.

16 Q.  Mr. Gross, there is no location for the credit union listed

17 here in Florida?

18 A.  I don't see it.  The mailing address is incorrect as well.

19 Q.  You recall Ms. Flok's testimony, though, that as an

20 examiner she would have wanted to know where the credit union

21 back office computers were located?

22 A.  Yes.  And that's listed on here.

23 Q.  Well there was also a computer that had back office access

24 in Florida, correct?

25 A.  Yes.  But the back office is listed here as CU South.

1   Those are dummy terminals.  That is a terminal.  It's not the

2   back office.

3   Q.  But you did -- your testimony was that Mr. Hill did have

4   access to the credit union's back office system where he could

5   see all the membership information from the computer that you

6   sent to the Collectables Club in Florida?

7   A.  Well I did not send this, sir.

8   Q.  Well you arranged for it to be sent, correct?

9   A.  Correct.

10  Q.  And Mr. Hill could access the back office of the credit

11  union from that location?

12  A.  As could other credit union people remotely using security

13  software.

14  Q.  And that was -- and you recall that was one of Ms. Flok's

15  concerns is that as an NCUA examiner the NCUA wants to

16  guarantee that the credit union's computer systems are secure,

17  correct?

18  A.  Yes.

19  Q.  Because the credit union has an obligation to protect the

20  personal information of its members?

21  A.  Absolutely.  And by the time she came that office was about

22  to be shut down.  And, in fact, two days later or three days

23  later their access was completely cutoff.  So when she came at

24  the end of November our relationship with them was ended.

25  Q.  You never visited that location though, correct?

H389LEB5                          Gross - cross

1   A.  You had asked me about that before.  No, sir.

2   Q.  So you don't know whether or not that computer system was

3   properly secured or not?

4   A.  They warrantied that it was.

5   Q.  Who did, Mr. Hill?

6   A.  Yes.  Mr. Hill.

7          MR. NOBLE:  You can take that down, Ms. Grant.

8   Q.  You told Brian McDonough that the Collectables Club had

9   part-time employees in Lakewood?

10  A.  I relayed what had been conveyed to me, yes, sir.

11  Q.  You never verified that that was true?

12  A.  We never verified what anybody told us in that regard.  We

13  didn't -- we had no basis to not believe people.  And so when

14  he said this is our model -- he had actually said that from the

15  beginning.  His father and Anthony said that we have people who

16  go all over the country visiting our 14,000 members and they

17  come through this area all the time.  So I had no reason to

18  believe that somehow that was not true.

19         But I did ask.  That's why I asked Mr. McDonough.

20  Q.  Well when you told that to Mr. McDonough, you knew that

21  none of the Collectables Club members had moved to New Jersey

22  as you said -- you had agreed they would do, correct?

23  A.  Right.  They had not physically relocated.  Correct.

24  Q.  And they were not spending two weeks out of the month in

25  Lakewood, New Jersey?

1    A.  No, sir.  I did not know what they were doing.  So I did

2    not keep up with them.  I knew they were getting paychecks from

3    the Collectables Club for the work that they were doing for the

4    Collectables Club.  I learned as I knew -- to somehow suggest

5    that I knew what their travel patterns were or were not, I did

6    not know.  But I was under the impression that those people who

7    were part of the Collectables Club were traveling a good deal

8    of time.

9    Q.  So, is it fair to say that you don't verify the information

10   that you provide to the NCUA?

11   A.  No.  Because Brian McDonough and I were actually going

12   through a conversation to understand what was permissible and

13   what was not permissible.  So I was not certifying anything to

14   him.  I was trying to get clarity what would qualify for this

15   group to be in our field of membership.

16   Q.  So you just testified that you were aware that the

17   Collectables Club's members were being paid for what they were

18   doing at the credit union?

19   A.  That is not what I said, sir.

20   Q.  Well you said they were aware they were being compensated?

21   A.  They were being compensated for the work they were doing

22   for the Collectables Club.  That's what I said, sir.

23   Q.  And part of that work that they were doing for the

24   Collectables Club was serving on the board of the credit union,

25   correct?

H389LEB5                    Gross - cross

1  A.  I did not know that was work they were doing for the
2  Collectables Club.  I thought they were working for the
3  Collectables Club and because of their work with the
4  Collectables Club they were serving on the credit union board.
5  Q.  And you yourself received compensation for the work that
6  you performed on behalf of the Collectables Club as consulting
7  fees, correct?
8  A.  No.  I received compensation for the work I was doing on
9  behalf of the credit union that they reimbursed the church for.
10 Q.  Okay.  But you and -- you know that it's not permissible
11 for a member of the board of directors to be compensated,
12 correct?
13 A.  That is not accurate, sir.  The regulation actually says
14 that no more than one person can be compensated.  And I was
15 both the chairman and the CEO.  And so that did allow me as
16 that one person to be compensated.  But I was not compensated
17 from the credit union.
18 Q.  But the credit union reported to the NCUA that you were a
19 volunteer, correct?
20 A.  I was the volunteer chairman.  I think -- yes, I was the
21 volunteer chairman.
22 Q.  So that means you're not compensated?
23 A.  That means I'm not -- I'm not sure what you're saying.
24 Q.  Well if you're a volunteer that means you're not
25 compensated, you're doing it pro bono, correct?

H389LEB5                       Gross - cross

1    A.  If that's what it said, yes.

2    Q.  No.  I mean that's what the definition of volunteer is?

3    A.  No.  I'm saying your saying what was reported to the NCUA

4    I'm not certain that I know what was reported to the NCUA.

5    Q.  You don't know what's reported to the NCUA on behalf of

6    your credit union?

7    A.  On behalf of those notes I saw under a person's name, I'm

8    not certain what was actually reported there.

9    Q.  So you never looked at the profiles that were being

10   submitted to the NCUA on behalf of your credit union?

11   A.  Sir, I never said that.

12   Q.  But you just said you didn't know what was in them?

13   A.  No.  That's not what I said, sir.

14          I said as it relates to how I was designated in that

15   report, I cannot recall what my designation was.

16   Q.  Well should we bring it up again?

17   A.  That would be helpful.

18          MR. NOBLE:  Let's bring up Government Exhibit 6112.

19   And let's flip to the back and then scroll backwards until we

20   get to the page that has Mr. Gross' name on it.

21          So scroll up a little bit.  Keep going.  Keep going.

22   Let's pause there.

23          Let's blow up the first row.

24   Q.  Does that refresh your recollection as to how your position

25   was reported to the NCUA?

H389LEB5                    Gross - cross

1    A.  It only lists that I'm the chairperson.  It does not list

2    that I'm also serving as the CEO.

3    Q.  Under employment type, what does it say?

4    A.  It does say volunteer as chairperson.

5    Q.  It also says your role is a volunteer?

6    A.  It does say volunteer as a chairperson, yes.

7            MR. NOBLE:  You can take that down.

8    Q.  Now, you discussed the NCUA's concerns about the ACH

9    processing at the credit union with both Kapcharge and Anthony

10   Murgio, correct?

11   A.  Yes.

12   Q.  And you were aware that given the amount of money in

13   Kapcharge's account in October 2014 the credit union was only

14   capitalized at about one percent?

15   A.  I think that's correct.

16   Q.  That's well below what's required for federal credit

17   unions, correct?

18   A.  Yes.

19   Q.  And you were aware of that?

20   A.  When they came in, yes, sir.

21   Q.  And you became concerned about that?

22   A.  Yes.

23   Q.  Because that's something that the NCUA would look at and

24   they would see that the credit union was not sufficiently

25   capitalized, correct?

1    A.  Yes.  There was a plan to recapitalize so we could get back

2    on track.

3    Q.  And part of that plan was that you were going to get

4    hundreds of thousands of dollars from Kapcharge to be injected

5    into the credit union, correct?

6    A.  Well, initially it was Collectables Club, then it became

7    Kapcharge.

8    Q.  Okay.  But hundreds of thousands of dollars to capitalize

9    the credit union?

10   A.  Yes, sir.  It would go into the credit union for it to be

11   well capitalized yes, sir.

12   Q.  And you were going to have a side agreement with Kapcharge

13   to say that that was actually prepaid ACH fees?

14   A.  To have a side deal -- can you show me something to

15   recollect my --

16   Q.  Well do you recall telling that to Kapcharge and Anthony

17   Murgio?

18   A.  I don't think that's exactly how it was said.  I think --

19   that's why I'd like something to refresh my memory on it.

20          MR. NOBLE:  Sure.  Let's bring up Government Exhibit

21   2279.

22          Let me just check to see if that's in evidence first,

23   please.  It is.

24          We can publish that for the jury.

25          Can we blow up the e-mail on November 6, 2014 that

1    Mr. Gross wrote.

2            Now move this down a little bit so we can see the

3    header information.

4    Q.  This is an e-mail exchange between Kevin Pepe of

5    Kapital/Kapcharge, Rico Hill, Anthony Murgio and yourself,

6    correct?

7    A.  Yes.

8    Q.  And then you wrote, "We cannot wait until we move to the

9    Federal Reserve Bank.  If the NCUA comes in to look at our

10   October books, they will see us with less than one percent

11   capitalization.  We should draw up an immediate agreement that

12   the $430,000 is an operational grant.  We can have a side

13   agreement that it gives them the ability to operate fee free

14   for X years."

15           When you wrote "gives them" you meant gives Kapcharge,

16   correct?

17   A.  I'm not sure of the context because there were two times in

18   which it was Collectables Club or Kapcharge.  I'm just not sure

19   unless the context can tell me a little bit better.

20   Q.  Sure.  It was Kapcharge who was paying the credit union ACH

21   fees, correct?

22   A.  Yes, they were.  Yes.

23   Q.  Kapcharge processed ACHs on behalf of Collectables Club?

24   A.  Pardon?

25   Q.  Kapcharge processed ACHs through the credit union on behalf

1  of Collectables Club?

2  A.  The largest organization they collected for or processed

3  for was Transferwise.

4  Q.  An also Payday Lenders?

5  A.  I think later on, yes.

6  Q.  And you were aware of that at the time?

7  A.  I became aware.  I'm not sure when.  But I did become

8  aware.  Yes.

9  Q.  You later state in this e-mail, "We cannot tie the two

10  together," meaning the agreements, correct?

11  A.  That would appear so.

12  Q.  The immediate agreement of an operational grant and the

13  side agreement for Kapcharge to operate fee free for several

14  years?

15  A.  I'm not sure what you're asking.

16  Q.  So that's what you mean by tying the two agreements

17  together, correct?  Those are the two agreements you're

18  referring to in the e-mail?

19  A.  That there would be an operational grant that was given and

20  then there would be an agreement that said this is an advance

21  in fees which would cover -- how am I saying it -- which would

22  allow them to operate X -- free for X number of years.

23  Q.  And if you had given just the operational grant to the

24  NCUA, that would be a misrepresentation, correct?

25  A.  If we did what?

H389LEB5                        Gross - cross

```
 1   Q.  If you only gave the NCUA the agreement about the

 2   operational grant, that would be a misrepresentation to the

 3   NCUA?

 4   A.  If -- I'm not certain what you're asking.

 5   Q.  So you said that you're going to have a side agreement

 6   though, correct?

 7   A.  Yes.  That's what it says, sir.

 8   Q.  That's a side agreement that you were not going to disclose

 9   to the NCUA?

10   A.  Absolutely not.  Where do I say that?

11   Q.  I'm asking you.

12   A.  Oh, no.  There was never an intention not to disclose

13   something.

14   Q.  But you said that you -- you could not tie those two

15   agreements together because they will say that only a portion

16   of it can be realized now and we'll have to post each year of

17   the agreement.

18              Do you see that?

19   A.  Yes.  I do see that.

20   Q.  Who is they will say that only a portion of it can be

21   realized now?

22   A.  I'm sure I'm acknowledging the NCUA.

23   Q.  So if you tied the two agreements together, the NCUA would

24   realize that only a portion of the money that Kapcharge was

25   going to inject into the credit union could be realized,
```

1    correct?

2    A.   No.   You're misreading and you're mischaracterizing what

3    the e-mail says.

4           What the e-mail is saying is that Kapcharge would

5    invest in the credit union an operational grant of $430,000.

6           Based on what I understood about accounting, if the

7    money comes into the credit union and it is for future years,

8    if it is for future years, you can't count it as income in the

9    year that it's there.  So it has to be posted in the future.

10   So the idea was we'd have two agreements.

11          But this never happened.  So that's why this is kind

12   of hypothetical because none of this ever happened.  This was a

13   discussion we had.  We never got the $430,000 operational

14   grant, and there was never any side deal to operate fee free.

15   So I'm -- that's why I'm having difficulty understanding your

16   questions.

17   Q.   Sure.  I'm just reading your e-mail.  You were proposing

18   having a side agreement with Kapcharge to allow it to operate

19   fee free for X years, correct?

20   A.   This was an idea, yes.  It was an idea that we never acted

21   on.

22   Q.   Now, in the next paragraph you say, "We have to be on the

23   same page about all this because I have been dancing with the

24   examiner since July.  Honestly, I am tired."

25          Correct?

H389LEB5                        Gross - cross

1    A.  Yes, sir.

2    Q.  And that meant that you were tired of jumping through all

3    these hoops when the NCUA came to the credit union asking

4    questions?

5    A.  You're interpreting it.

6    Q.  I'm asking you if that's what you meant by --

7    A.  What I meant --

8    Q.  -- dancing with the examiner?

9    A.  What I meant was since July we had had a lot of examiners

10   coming through.  And whenever an examiner comes they come

11   asking a bunch of questions.  And it was a tiring exercise to

12   have a barrage of question after question and a lot of it

13   unfortunately I could not give the answers to because it was

14   beyond my knowledge.

15   Q.  Well you're aware that the National Credit Union

16   Administration is a federal agency that is in charge of

17   protecting members of federal credit unions like HOPE Federal

18   Credit Union, correct?

19   A.  Yes.

20   Q.  And they also are in charge of protecting what's called the

21   National Credit Union Share Insurance Fund?

22   A.  Yes.

23   Q.  Because if your credit union collapsed and members lost

24   money, then the NCUA would have to dip into the insurance fund

25   to pay those members back to make them whole up to $250,000,

H389LEB5                          Gross - cross

```
 1   correct?
 2   A.  Yes.  And that's why I don't understand why when they got a
 3   credible tip about Anthony Murgio they never said anything to
 4   us about it.
 5            MR. NOBLE:  Your Honor, I would move to strike that
 6   response.
 7            THE COURT:  I'll grant that request as nonresponsive.
 8            And, again, Mr. Gross, if you respond to the question
 9   asked.  As I've said, I will give you some room to explain.  If
10   further inquiry is warranted, your counsel will ask you on
11   redirect.
12            So you can repeat the question.
13            Can try.
14            MR. NOBLE:  May I have the court recorder read back my
15   last question.  Yes, please.
16            (Record read)
17            THE WITNESS:  Yes.
18   Q.  And your credit union was, in fact, placed into
19   conservatorship in October of 2015, correct?
20   A.  Yes.
21            MR. NOBLE:  You can take that down, Ms. Grant.
22   Q.  Now, on November 21, 2014 examiner Meg Flok came to the
23   credit union to look into its ACH processing, correct?
24   A.  Can you give me the date again.
25   Q.  November 21, 2014.
```

H389LEB5                          Gross - cross

1    A.  Yes, sir.

2    Q.  She discovered that Kapcharge had over one million dollars

3    in its account as of October of 2014?

4    A.  I think something like that, yes.

5    Q.  That's because you handed her the October 2014 Aries

6    download instead of the September 2014 Aries download?

7    A.  By mistake, yes.

8    Q.  That was a mistake?  You didn't mean to give her the

9    information that showed that Kapcharge had over a million

10   dollars sitting in its account at the credit union?

11   A.  No.  I did not mean to give her October when it was

12   supposed to be September, because the way that report is run is

13   we -- we make a request to CU South.  CU South runs the report

14   and drops it on the computer.  I put it on a zip disk and give

15   it to the examiner.  So the wrong report was run and we

16   subsequently gave her the right report.

17   Q.  But the October report showed the million dollar plus

18   balance in Kapcharge's account, correct?

19   A.  Yes, it did.

20   Q.  The September report would not have shown that, correct?

21   A.  Right.

22          And it wouldn't have shown the overdrawn accounts on

23   the church either if I had given them them for September.

24   Q.  She told you during that exam on-site that the Kapcharge

25   balance had caused the credit union's net worth ratio to fall

1    to essentially a critical level, correct?

2    A.   Something like that.

3    Q.   And you yourself understood that it was capitalized, you

4    thought, at only one percent, correct, as of October, 2014?

5    A.   Somewhere around there, yes.

6    Q.   Now, when she saw that balance in the Kapcharge account,

7    Ms. Flok asked you to provide a copy of the Kapcharge member

8    file, correct?

9    A.   Yes, she did.

10   Q.   You told her that that file was in storage?

11   A.   That's where I believed it was because it was not where I

12   had left it the night before.

13   Q.   You didn't actually have the Kapcharge file in storage, did

14   you?

15   A.   No.  I didn't know where it was.  So when I told her that

16   it must be in storage, that was what I believed because how can

17   a file go missing that was there the night before that I put

18   there on the counter to be able to give to her when she came

19   in.

20   Q.   In fact, you knew that there were certain portions of that

21   file that were missing that should have been in that file?

22   A.   I knew the whole file was missing and I did not know where

23   it was.

24   Q.   Well you went to Anthony Murgio and Mark Francis to find

25   it, didn't you?

H389LEB5                         Gross - cross

1    A.  I first called to see if some other board members had taken

2    it ought offsite; then when I couldn't reach them, then we

3    proceeded to recreate the file as it had been the night before,

4    before it disappeared.

5    Q.  Now, Examiner Flok told you she would wait for you to get

6    that file, correct?

7    A.  Yes, she did.

8    Q.  And she waited a couple hours?

9    A.  She said about two hours which is about right.

10   Q.  And you spoke to Anthony Murgio and Mark Francis about

11   sending you certain things to put into the Kapcharge file,

12   correct?

13   A.  Yes.  To recreate the file that had gone missing.

14           MR. NOBLE:  Can we bring up Government Exhibit 4509 in

15   evidence and turn to line 3829.

16   Q.  So just backing up a little bit.  You had told Anthony

17   Murgio that the NCUA was coming to visit the credit union on

18   November 21, 2014?

19   A.  Yes.  I think Anthony was already -- he and his father I

20   think were already in town.

21           MR. NOBLE:  Can we scroll down?  Keep going.

22           Keep going.  Scroll until we get until the 21st.

23           Let's stop there.

24   Q.  So, on line 4093 you're talking to Anthony Murgio and you

25   say:  Did they change the website?  Correct?

H389LEB5                         Gross - cross

1    A.   Yes.

2    Q.   That's the website for Kapcharge?

3    A.   I believe so.

4    Q.   And that was to add the Lakewood, New Jersey address to the

5    Kapcharge website?

6    A.   Yes correct.

7    Q.   To make it look like Kapcharge had an address in New Jersey

8    if the NCUA examiner Meg Flok looked it?

9    A.   No.   To represent the fact that they did have an address in

10   Lakewood, New Jersey.

11   Q.   And you just happened to be sending that on the day that

12   the examiner was coming to the credit union?

13   A.   Because we wanted to make sure everything was in order,

14   sir.

15   Q.   And then you said in line 4097:   Okay.   I heard her on the

16   phone saying she checked their website?

17   A.   Yes.

18   Q.   That was Meg Flok checking the website for the Kapcharge?

19   A.   I suppose that's who that's referencing.

20            MR. NOBLE:   Let's scroll down.   Stop there.

21   Q.   And you told him that she had mentioned something about

22   Canada; is that right?

23   A.   Yes.   That's what I said.

24   Q.   That's where Kapcharge was located?

25   A.   That was where their headquarters is, yes.

H389LEB5                          Gross - cross

1   Q.  You were concerned that the NCUA was going to realize that

2   Kapcharge only had a location in Canada?

3   A.  No, sir.  Because the file had a Quebec driver's license in

4   it.  So it was very clear that they were in Canada.  Their

5   papers in the file said they were in Canada.

6           What I was concerned about was that the website did

7   not accurately reflect that they were not only in Canada but

8   they also had an address in our field of membership.

9   Q.  And you were concerned because the NCUA might ask questions

10  if you were opening up an account and processing millions and

11  millions of dollars for a company that was based in Canada,

12  correct?

13  A.  I think they would be concerned that they were not in the

14  field of membership because they only showed a Canadian address

15  when they did have a Lakewood address.

16  Q.  An address you never went to?

17  A.  There were a lot of addresses I did not go to for people in

18  the credit union.  And I did say I passed by it.  I did say I

19  passed by it two times.

20  Q.  You didn't see any signs for Kapcharge on the outside, did

21  you?

22  A.  I don't recall.

23          MR. NOBLE:  Let's scroll down.

24  Q.  Now you say here on line 4130:  Need Shoula's license

25  because she -- because side the account opening form.

H389LEB5                          Gross – cross

1    A.  Yes.

2    Q.  That's a reference to Shoula Cohen from Kapcharge, correct?

3    A.  That is correct.

4    Q.  You needed her driver's license for the file?

5    A.  Because the file was missing, yes.  I could not locate the

6    file that was there the night before.

7              MR. NOBLE:  Let's scroll down.

8    Q.  Now, later on that afternoon you told Anthony Murgio -- or

9    Anthony Murgio told you that he was coming back, right, on line

10   4176?

11   A.  Hold on.  41.

12   Q.  76.

13   A.  Yes.  Yes.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

H38KLEB6                         Gross - Cross

1    BY MR. NOBLE:

2    Q.   You wrote, "Just pass through and grab your stuff.  They

3    want Kapcharge cut off immediately until they say we can

4    process for them."  Do you remember that?

5    A.   I see it.

6    Q.   Now, you had that conversation with Meg Flok where she

7    asked you to stop processing ACHs for Kapcharge, right?

8    A.   Yes.

9    Q.   And you told her that the credit union would stop by the

10   following Monday?

11   A.   Yes, that sounds about right.

12   Q.   But you didn't stop?

13   A.   Say it again?

14   Q.   You didn't stop processing ACHs for Kapcharge after you

15   told Examiner Flok that you would do so as of the Monday after

16   her visit?

17   A.   No.  The way I understood this was to stop for

18   TransferWise, which was that millions, and millions, and

19   millions, and millions of dollars of transactions.  So, I

20   misunderstood and thought we cut off TransferWise, which is

21   what we did.  We completely cut off TransferWise and never did

22   another transaction for them.

23   Q.   Well, you were here for Ms. Flok's testimony, correct?

24   A.   Yes.

25   Q.   You recall her testifying that you told her that you were

1    going to stop processing for Kapcharge altogether, correct?

2    A.  Sir, reasonable people can disagree.  I thought it was

3    stopping this big TransferWise business because that was the

4    bulk.  That was the big problematic chunk of the tens of

5    million of dollars.

6    Q.  So, is it your testimony that Ms. Flok was mistaken when

7    she told this jury that you said Kapcharge would stop

8    processing ACHs through the credit union by the Monday

9    following her visit?

10   A.  No.  What I'm saying is, I misunderstood that that's what

11   she was directing me to do, and I only thought it was

12   TransferWise that she meant.  And that's why we did cut off

13   TransferWise, and they never processed another thing through

14   the credit union.

15   Q.  TransferWise didn't?

16   A.  From that -- I think after that Monday, I don't think we

17   did anything else for them.

18   Q.  But you kept processing for Kapcharge?

19   A.  Yes, because I mistakenly thought it was only concerning

20   TransferWise.

21   Q.  So the bulk of the processing that you did after you cut

22   off TransferWise was for payday lenders?

23   A.  I'm not sure about the bulk because that was also when the

24   leadership of the credit union was changing to Charles Blue.

25         MR. NOBLE:  Can we bring up Government Exhibit 1665 in

1    evidence.  Just blow up the top of that.

2    Q.  Mr. Gross, that's an email you sent to Kapcharge when Meg

3    Flok was at the credit union stating, "We need your and

4    Shoula's info and signature on this form ASAP," correct?

5    A.  That's what it says.

6    Q.  You said you need it back in ten minutes.  "Date from

7    May 23rd, 2014," correct?

8    A.  Yes, that's what it says.

9    Q.  The date you sent this email, though, was November 21st,

10   2014?

11   A.  But the date they opened their account, which is on the

12   original form, was May 23rd or somewhere around that May date.

13   Q.  So, that was a form that you didn't have at the credit

14   union for Meg Flok?

15   A.  No, that is a form we had, and had it since May.  We had it

16   when the examiners came in September, we had it when they came

17   again in late September, we had it the night before.  And then

18   when she arrives with these other Collectables Club people

19   there, the Kapcharge file disappears, and I had no idea where

20   it was.  I assumed a board member had taken it to put it away,

21   and only to find out no one knew where it was.  So we recreated

22   it to make sure she had exactly what was there.

23   Q.  Now, after Mark Francis and Shoula Cohen sent the

24   information back to you, that's the information you gave to Meg

25   Flok in the file, correct?

1    A.   Some of it, I had in email because they had already emailed

2    in it in from the original opening of the account, and so I was

3    able to just print that out.   The information like this -- the

4    signature card, they filled it out, I put it in the file, and I

5    did give it to Ms. Flok.

6    Q.   It's your testimony that that file was missing, correct?

7    A.   I could not find it, yes.

8    Q.   But that's not what you told Ms. Flok on the day of the

9    examination?

10   A.   Because I was trying to figure out where it was.

11   Q.   You told her that the file was in storage?

12   A.   Correct.   Because that's where I assumed it was, sir.

13   Q.   So that was a lie to Ms. Flok?

14   A.   Absolutely not.   It was where I assumed it had to be,

15   because how does a file go missing that's there the night

16   before, and then when you come in the next day to give it to

17   someone, it's missing?   For me, the only logical thing is that

18   someone took it and put it away, because we were packing to

19   move the credit union back into its field of membership.   So

20   that was the only logical explanation as to where this file

21   could be.   I learned later -- if I could finish my answer.

22   Q.   Sure.

23   A.   I learned later, based on that same WhatsApp chat that you

24   saw, that I firmly believe that Anthony took that file, because

25   after we did all that back-and-forth and got it finished, his

1    response to me was, hey, don't we make a good team, you should

2    really be in partnership with me, and don't deal with those

3    Kapcharge people.

4    Q.  Well, you guys did make a good team for a while, right?

5    A.  Not at all.

6    Q.  I thought you said the relationship was tremendous at the

7    beginning?

8    A.  With the members of the club, it was.

9             MR. NOBLE:  You can take that down, Ms. Grant.

10   Q.  Well, Meg Flok returned to the credit union on December 1st

11   to gather some additional documents; is that right?

12   A.  Sometime in early December, yes.

13   Q.  And after that, she asked you what the Collectables Club

14   was, by email?

15   A.  As I recall -- and I'd prefer if you could give me

16   something to refresh my recollection.  But as I recall, she was

17   asking about an ACH detail report and what kind of processing

18   we were doing for this Collectables CLU, which is the

19   designation on an ACH detail report.

20   Q.  That's a designation for Collectables Club?

21   A.  Yes.

22             MR. NOBLE:  Let's bring up Government Exhibit -- just

23   for identification, Government Exhibit 3705.

24   Q.  And this is the government's copy of the exhibit that I

25   believe Ms. Santillo showed you earlier of.

1           MR. NOBLE:  And at this time, the government would

2     offer Government Exhibit 3705.

3           MS. SANTILLO:  No objection.

4           MR. CREIZMAN:  No objection.

5           THE COURT:  All right.  It's admitted.

6           (Government's Exhibit 3705 received in evidence)

7           MR. NOBLE:  Can we publish that for the jury and

8     Mr. Gross.

9     BY MR. NOBLE:

10    Q.  Now, Mr. Gross, you see at the top -- well, first of all,

11    do you remember being asked questions about this on direct

12    examination?

13    A.  Yes, I do.

14    Q.  And Kapcharge told you --

15          THE COURT:  I'm sorry, this was TG46; is that right?

16          MR. NOBLE:  Ms. Santillo might be able to confirm.

17          THE COURT:  We'll move on.

18          MR. NOBLE:  Okay.  Can we blow up the top portion,

19    Ms. Grant.

20    Q.  Now, in response to your question about what Kapcharge did

21    for Collectables Club, Kevin Pepe told you that they're an

22    online digital wallet and exchange company, correct?

23    A.  Yes, that's what it says here.

24    Q.  He didn't tell you that they were a collectibles company,

25    right?  He didn't write that in the email?

1    A.  No, it's not here.

2    Q.  Do you know what a digital wallet is?

3    A.  No, sir.

4    Q.  You know what an exchange company is?

5    A.  No, sir.

6    Q.  Now, you didn't tell Ms. Flok that Collectables Club was a

7    digital wallet and exchange company, did you?

8    A.  Because that's not what I believed she was asking me.  I

9    believed she was asking me what is on the other side, ran

10   payroll and invoice payment transactions using PPD and CCD

11   codes.

12   Q.  Well, you didn't tell her those things either, did you?

13   You just said that Kapcharge processed payroll and invoice

14   payment transactions for Collectables Club?

15   A.  Right.

16   Q.  So you didn't give her the complete information?

17   A.  You're saying I should have copied it and pasted it in the

18   response?

19           MR. NOBLE:  Your Honor, I move to strike that

20   response.

21           THE COURT:  All right.  Motion granted.

22           The jury will disregard the witness' answer as

23   nonresponsive.

24           Mr. Gross, directing you, again, to answer the

25   question, and then I haven't stopped you from giving room to

1     explain, but you do have to answer the question.

2               THE WITNESS:  Yes, ma'am.

3               THE COURT:  Thank you.

4               MR. NOBLE:  Well, let's bring up Government Exhibit

5     6026 in evidence.

6     BY MR. NOBLE:

7     Q.  You see in the email from Ms. Flok on December 2nd, she

8     asked you, "Who are they," correct?

9     A.  Yes.  In relation to the ACH item detail, yes.

10    Q.  But you knew who Collectables Club was, correct?

11    A.  Yes.  That's why I knew she had to be asking more detail

12    about ACH processing, because I could have told her, as I told

13    everybody, they're a memorabilia and collectibles club that

14    trades high-end memorabilia.

15    Q.  Well, that would have been false in light of what Kapcharge

16    had just told you that they were a digital wallet and exchange

17    company, correct?

18    A.  But I would not have asked them the question because if I

19    assumed that she was asking me about who they were generally, I

20    wouldn't have needed to ask.  I needed to ask because I thought

21    that she was asking about what type of ACH processing Kapcharge

22    was doing for them, and I had no way of knowing that, which is

23    why I did ask them the question.

24    Q.  Well, she asks you, "Collectables Club," and she references

25    an ACH item detail report, but she asks you generally, "Who are

H38KLEB6                      Gross - Cross

1    they?"  Isn't that what she wrote?

2    A.  Well, you can't take --

3    Q.  Isn't that what she wrote?

4    A.  She did ask who are they.

5         MR. NOBLE:  You can take that down, Ms. Grant.

6    Q.  Now, you testified that after you had this falling-out with

7    Collectables Club and Anthony Murgio because you were failed --

8    you did not get the $50,000 in time, that you continued to

9    process ACHs and have a relationship with Kapcharge, correct?

10   A.  The credit union did, yes.

11   Q.  You knew, I believe you've testified, that it was Kapcharge

12   who had paid all that money to your church, correct?

13   A.  I learned that sometime in that November time frame.

14   Q.  From that point on, you started working with Mark Francis

15   of Kapcharge?

16   A.  Principally, Charles Blue worked with Mark, but I was in

17   and out of there in discussions and that type of thing.

18   Q.  In fact, Mr. Gross, you had been communicating with Mark

19   Francis behind Anthony Murgio's back before the November 22nd

20   meeting; isn't that true?

21   A.  Yes, I had been.

22   Q.  You and Mark Francis had agreed to cut off Anthony Murgio?

23   A.  Yes, we had agreed.

24   Q.  And it's because Kapcharge had been the one who had paid

25   you the $120,000?

H38KLEB6                          Gross - Cross

1   A.  No, sir.  It was because Anthony had proven himself to be a

2   dishonest person, and in light of his dishonesty, what he did

3   was he threw Kapcharge under the bus as if their membership did

4   not matter, and that was why we saw it was time to cut him off.

5   Q.  And the credit union continued to do business with Mark

6   Francis until the credit union was placed into conservatorship

7   in October 2015?

8   A.  Kapcharge -- pretty much their relationship --

9   Q.  Mr. Gross, it's a yes-or-no answer.

10  A.  Well, sir --

11  Q.  It would speed things up if you could just answer the

12  question yes or no.

13              MS. SANTILLO:  Objection.

14              THE COURT:  The objection is overruled.

15              MR. NOBLE:  If I could ask that question again?

16              THE COURT:  You can ask the question.  If you have an

17  objection to a nonresponsive answer, you'll state that --

18              MR. NOBLE:  Yes.

19              THE COURT:  -- and I will direct the witness.

20              Again, I'm reminding you, Mr. Gross, we can't just

21  keep doing more and more in every question.  We have to get

22  responses.  As I've said, I'll give you room to provide

23  context, but you do have to answer the question, and there will

24  be an opportunity for redirect.  If we can't do that, then I

25  will move to yes or no.  All right.

1            MR. NOBLE:  Thank you, Judge.

2    BY MR. NOBLE:

3    Q.  You continued to do business with Mark Francis until the

4    credit union was placed into conservatorship in October 2015?

5            MS. SANTILLO:  Objection.

6            THE COURT:  Just a moment.

7            Grounds?

8            MS. SANTILLO:  Can I be heard?

9            THE COURT:  Yes.

10            (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the sidebar)

2              MS. SANTILLO:  We had a pretrial ruling that we

3      weren't going to be talking about the conservatorship or

4      grounds for conservatorship.  They're deeply intertwined.  I

5      think continuing to suggest -- to bring up the conservatorship

6      in this context is very misleading.  It suggests that ACH

7      processing caused it, and there were numerous other factors,

8      including the criminal complaints in this case that caused it.

9      I've let it go a couple of times, but I don't think it's a fair

10     line of questioning.

11             MR. NOBLE:  Judge, the conservatorship is a fact

12     that's been established in this case.  I'm not asking him about

13     the underlying reasons for it.  To the extent Ms. Santillo

14     wants to redirect on the reasons for it on her redirect, that

15     would be fine.  But I think the jury already knows that the

16     fact of conservatorship happened, there's no dispute about

17     that, and I'm just using it as a time frame, a marker, as to

18     when the credit union stopped doing business both with

19     Kapcharge and everyone else because it was --

20             THE COURT:  Just ask using dates.

21             MR. NOBLE:  Okay.

22             (Continued on next page)

23

24

25

1             (In open court)

2    BY MR. NOBLE:

3    Q.  Mr. Gross, the credit union continued to do business with

4    Mark Francis and Kapcharge until about October 2015, correct?

5    A.  As far as I know, yes.

6    Q.  After the falling-out with Murgio, I believe you've

7    testified that the credit union also continued to process ACH

8    transactions for Kapcharge, right?

9    A.  I think so, until January.

10   Q.  And you opened up other accounts for Kapcharge-related

11   entities or customers?

12   A.  You asked me did I personally do it?

13   Q.  Yes.

14   A.  I don't recall that I did, no, sir.

15   Q.  Someone at the credit union did?

16   A.  Yes, but not me.

17   Q.  Customers like Wakpamni?

18   A.  You're asking me questions I don't really know the answer

19   to.

20   Q.  You don't know that Wakpamni was a payday lender based in

21   South Dakota?

22   A.  You asked me -- well, I thought you asked me did I know who

23   opened that account for them, and I don't know who opened the

24   account.

25   Q.  Oh, no.  You know who Wakpamni is, though?

H38KLEB6                          Gross - Cross

1   A.   I generally learned throughout the course of the discussion

2   that they were a payday lender that was, I think, on a

3   reservation in South Dakota.

4   Q.   They did not even have an address in Lakewood, New Jersey?

5   A.   That, I'm -- those details, I'm not completely sure of

6   because at that point, I was generally disconnected from the

7   day-to-day operations.

8   Q.   Is there something that might refresh your recollection as

9   to whether or not Wakpamni even had an address in Lakewood, New

10  Jersey?  Like the membership file maybe?

11  A.   But seeing it now won't tell me what I knew back then.  So,

12  you can show it to me, but I just don't recall whether or not

13  they did or didn't.

14  Q.   So you don't know where one of the member companies that

15  you processed ACH transactions for was located?

16  A.   I transferred out of the day-to-day responsibilities at

17  that point, so I'm really -- so, no, I did not know.

18  Q.   But a lot of Kapcharge's customers were payday lenders, you

19  knew that, right?

20  A.   I don't know -- no, I don't know what a lot is, but I know

21  their biggest was the TransferWise, which we had lost, which

22  was not a payday company.

23  Q.   The other customers were, though?

24  A.   I think some of them were, yes.

25  Q.   Now, you heard testimony that payday lenders oftentimes are

H38KLEB6                          Gross - Cross

1   predatory with respect to low-income individuals?

2   A.  Yes.

3          MS. SANTILLO:  Objection.

4          THE COURT:  Sustained.

5   Q.  Mr. Gross, is it your opinion that payday lenders sometimes

6   are considered predatory with respect to low-income members?

7          MS. SANTILLO:  Objection.

8          THE COURT:  Sustained.

9   Q.  When you met with Meg Flok on November 21st, you promised

10  that the credit union would stop processing ACHs, you say, for

11  TransferWise, she says for Kapcharge, correct?

12  A.  Yes.

13  Q.  You continued to process ACH transactions for Kapcharge

14  after that date, correct?  I believe you testified till

15  January?

16  A.  Can you repeat that, please?  I'm sorry.

17  Q.  Sure.  The credit union continued to process ACH

18  transactions for Kapcharge after the date that you told Meg

19  Flok that you would stop processing --

20  A.  Mistakenly, yes, we did continue to process, I think, until

21  January, early January.

22  Q.  And you continued to process ACH transactions for Kapcharge

23  after Meg Flok sent you the exam report and the document of

24  resolution on December 15, 2014?

25  A.  Repeat that, please.

1    Q.   Sure.   The credit union continued to process ACH

2    transactions for Kapcharge after the NCUA told it to stop on

3    December 15, 2014?

4    A.   Mistakenly, yes, we did.

5    Q.   That was just a mistake?

6    A.   Yes, because we misunderstood what she was directing us to

7    do.

8    Q.   Well, the document of resolution was pretty clear, wasn't

9    it?

10   A.   I don't recall.

11   Q.   The document of resolution told the credit union to stop

12   processing ACH transactions for Kapcharge?

13   A.   I don't recall, sir.   But if you want to show it to me, I

14   have no problem looking at it.

15   Q.   Well, you forwarded the email that you received from Meg

16   Flok with the document of resolution and the reasons that the

17   NCUA gave for stopping the processing to Mark Francis, correct?

18   A.   I believe so.

19   Q.   And even after that date, you continued to process ACH

20   transactions?

21   A.   Because I was operating on a mistaken understanding.

22   Q.   It wasn't until January 8th when Supervisory Examiner Brian

23   McDonough told you and Charles Blue that the credit union was

24   possibly in violation of the document of resolution because you

25   continued to process ACH transactions?

1    A.  Yes, he clarified that our understanding was mistaken, and

2    that they intended for us to stop everything, and we complied.

3    Q.  Now, you processed -- or your credit union processed, while

4    you were the chairman, over $60 million in ACH transactions for

5    Kapcharge in 2014, correct?

6    A.  Somewhere around that number, yes.

7    Q.  You've testified that Kapcharge was the main entity, but

8    there were kind of other businesses that Kapcharge was related

9    to that did ACH processing?

10   A.  I'm not certain I understand.

11   Q.  Well, you talked about TransferWise, we talked about

12   Wakpamni.  Those were related to Kapcharge's business, correct?

13   A.  I'm not sure how to answer.

14   Q.  Well --

15           THE COURT:  If you don't know the answer, you don't

16   know.

17           THE WITNESS:  Okay.

18           THE COURT:  Does that --

19           THE WITNESS:  Yeah, because I'm not sure -- I guess

20   I'm not sure exactly what the question is asking, so I'm not

21   sure how to answer.

22           THE COURT:  Are you able to rephrase?

23   Q.  Well, Kapcharge was the main entity, business entity, that

24   the credit union was processing ACHs for, correct?

25   A.  Kapcharge was the payment processor, yes.

1    Q.  And the credit union had an agreement that it would be paid

2    about 15 cents per transaction?

3    A.  I don't recall the amount, but there was a fee income

4    associated with the transactions.

5    Q.  And that was set -- that fee was set forth in the

6    agreement, the exclusive agreement that the Kapcharge and the

7    credit union had?

8    A.  I believe so.

9    Q.  Now, you testified on direct examination that Kapcharge was

10   interested in the credit union because it wanted to get a

11   better rate than it was getting at other banks; is that right?

12   A.  Yes.  That was my understanding, yes.

13   Q.  So that meant that the margins, in terms of the ACH

14   processing fees, would be lower for the credit union than it

15   normally would?

16   A.  Explain that.  Or can you ask that a different way, so I

17   can understand what you mean?

18   Q.  Sure.  You said Kapcharge wanted to come to the credit

19   union to process its ACH transactions because it thought it

20   could get a better deal?

21   A.  Yes.

22   Q.  And that meant lower fees than the credit union might

23   normally charge for ACH processing?

24   A.  No.

25   Q.  Well, Mr. Gross, you became concerned at some point that

 1    the credit union might actually lose money on processing ACH

 2    transactions for Kapcharge?

 3    A.   That we would lose?  I'm not certain.  There was a lot

 4    going on about the fee discussions, but we certainly -- our

 5    intention was for it to be profitable.

 6    Q.   Okay.

 7    A.   So it had to make money.

 8    Q.   Is there a document that might refresh your recollection --

 9    A.   Sure.

10    Q.   -- that you believed that it might lose money?

11    A.   Please, yes.

12          MR. NOBLE:  Let's bring up, for identification,

13    Government Exhibit 1259-C.

14    Q.   Do you recognize this document, Mr. Gross?

15    A.   Yes.

16    Q.   Is that an email chain that you were included on on or

17    about September 15th, 2014?

18    A.   Yes.

19          MR. NOBLE:  The government offers Government Exhibit

20    1259-C.

21          MS. SANTILLO:  No objection.

22          MR. CREIZMAN:  No objection.

23          THE COURT:  1259-C is admitted.

24          (Government's Exhibit 1259-C received in evidence)

25          MR. NOBLE:  May we publish for the jury?

1          THE COURT:  You may.

2          MR. NOBLE:  Ms. Grant, can you please blow up the

3   email that Mr. Gross sent on September 15, 2014.

4   Q.  Do you see there, Mr. Gross, you wrote, "Hey, are the fees

5   listed in here the Alloya fees?  If so, then we are not making

6   any money.  In fact, we are losing money because CU South

7   charges us fees for all this as well"?  Do you see that?

8   A.  Yes, I do.

9   Q.  Does that refresh your recollection that you were concerned

10  at some point that the credit union might actually lose money

11  on the ACH processing?

12  A.  Based on the fee schedule that had been attached to this

13  agreement, absolutely, because -- yes, yes.

14  Q.  Now, you said that you wanted to build the credit union by

15  allowing all this ACH processing to occur through it, correct?

16  A.  Yes.

17  Q.  You thought it was going to be a money maker?

18  A.  It was going to give us fee income, yes.

19  Q.  In 2014, your credit union processed over $60 million in

20  ACHs, correct?

21  A.  Somewhere in that vicinity, sir.

22  Q.  So, just taking September 2014, when you processed millions

23  of dollars of ACHs, the credit union earned approximately

24  $1,613 in fees, correct?

25  A.  That generally may be correct.

1   Q.  Well, let's not guess.

2            MR. NOBLE:  Let's bring up Government Exhibit 2192 in

3   evidence.  Can we blow up the bottom portion of the email, the

4   forwarded portion, from Christine Carida at Kapcharge.

5   Q.  This is an email sent to you, Mr. Gross, and Rico Hill,

6   copying Shoula Cohen, Kevin Pepe, and Anthony Murgio dated

7   September 30th, 2014, correct?

8   A.  Yes.

9   Q.  And Christine Carida tells you, "Please find attached the

10  fees calculation for September 1st through 29th, 2014.  Total

11  fees have been calculated at $1,613.25."  Do you see that?

12  A.  Yes.

13  Q.  So, after all of that ACH processing, the credit union

14  earned less than $2,000 in September?

15  A.  No.

16  Q.  That's not what the email says?

17  A.  No.  The email says that as of the end of September 2014,

18  we hadn't processed $60 million in transactions at the end of

19  September.  That actually happened in October.

20  Q.  Okay.  Well, let's talk about the fees for all of 2014.

21  A.  Sure.

22  Q.  The fees for all of 2014 were less than $7,000, correct?

23  A.  I'm not certain.

24  Q.  Is there a document that might refresh your recollection?

25  A.  Yes, sir.

1             MR. NOBLE:  Let's bring up, for identification,

2     Government Exhibit 3734.

3             I'm sorry, that might be the wrong one.  Let's try

4     3576-B.

5             THE COURT:  Mr. Noble, what's your time estimate?

6             MR. NOBLE:  Maybe another hour.

7             THE COURT:  We'll give the jurors their mid-afternoon

8     break.  See you in about ten minutes.

9             (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Jury not present)
 2              THE COURT:  You may step down, Mr. Gross.
 3              Matters to take up?
 4              We need to -- go ahead.
 5              MS. CHOI:  Sorry, your Honor.
 6              Your Honor, I just wanted to note one thing, a timing
 7    issue.  It is unorthodox, but the circumstance is Ms. Beyer is
 8    sitting in the hallway.  She has a 7:00 p.m. flight tonight.
 9    We would suggest at the end of the government cross-examination
10    of Mr. Gross, that we take a break, so that the defense can put
11    on this witness for the, I would presume, two or three minutes
12    of testimony she has, so she might be able to go home today.
13              MR. KLINGEMAN:  I have no objection to that.
14              MR. CREIZMAN:  I have no objection, so long as I get
15    my chance.
16              THE COURT:  That's fine.  And I'll give my standard
17    statement when we've done other scheduling accommodations.
18              I have some concern about time.  Mr. Gross, I don't
19    want to keep admonishing you the same way.  It is
20    cross-examination.  They are entitled to get direct responses.
21    I do let, more than other judges, context be given, and,
22    obviously, there will be a full opportunity for redirect by
23    counsel, but every answer can't be a nonresponsive -- I'm not
24    saying it's every one, but there are many, many answers, and we
25    need -- the government's entitled to responses to their
```

1   questions on cross-examination unless there's a feasible

2   objection.  Otherwise, you have to answer, and I'm directing

3   you to answer, and, as I say, if I think you're being unfairly

4   asked to answer in a way that takes your answer out of context,

5   I will protect your ability to provide that.

6           But it is their cross-examination, and you do have to

7   respond, sir.

8           MS. SANTILLO:  Your Honor, could I request a process?

9   Because I feel like some of the questions that are being asked

10  are not amenable to a yes-or-no answer, and I don't want him to

11  be admonished in front of the jury if he's being asked an

12  unfair question.

13          THE COURT:  I disagree with that assessment of where

14  we are.  If you have a specific objection to a question as

15  argumentative, or vague, or compound, or the like, I'd be happy

16  to hear it, but there have been many, many instances where it

17  has been a yes or no, and we've gotten a divergent

18  nonresponsive answer.  I've allowed it a lot, and it's time

19  to -- they're entitled to responsive answers.  So, if you have

20  a specific objection because something is, as an evidentiary

21  matter, unfair, I'm happy to hear it, but that's not what's

22  been going on.

23          I won't need to admonish further in front of the jury,

24  Mr. Gross.  I'll restrain you to yes or no with an opportunity

25  for redirect if we can't get through this process.

H38KLEB6                          Gross - Cross

1                    Thank you, sir.

2                    Anything else?

3                    All right.  See you in ten.

4                    MR. NOBLE:  Thanks, Judge.

5                    (Recess)

6                    THE COURT:  Matters to take up?

7                    No?  All right, we'll get our jury.

8                    And, Mr. Gross, are you ready?  Okay, please come to

9       the stand.

10                   (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Thank you, members of the jury.

3              Mr. Noble, you may proceed.

4              MR. NOBLE:  Thank you, Judge.

5    BY MR. NOBLE:

6    Q.  Now, Mr. Gross, before we broke, I was asking you about the

7    fees that the credit union had earned from ACH processing for

8    Kapcharge in 2014.  Do you remember that?

9    A.  Yes.

10   Q.  And it was less than $7,000, correct?

11   A.  That's what you had mentioned, yes.

12             MR. NOBLE:  Well, let's bring up Government Exhibit

13   3576-B for identification.  Can we blow up the bottom portion,

14   actually.

15   Q.  Mr. Gross, do you recognize that email?

16   A.  I'm not on it, so do you mean recognize it how?

17   Q.  Well, I'm sorry.  Does it refresh your recollection as to

18   whether the total revenue that Kapcharge generated for HOPE in

19   2014 was less than $7,000?

20             MS. SANTILLO:  Objection.

21             THE COURT:  Before the break, when you were asked if

22   there was something that would refresh your recollection, what

23   did you say?  I can't remember.

24             THE WITNESS:  I think I said, yes, if there was

25   something.

H38KLEB6                        Gross - Cross

1              THE COURT:  Does this refresh your recollection?

2              THE WITNESS:  I've never seen this before.

3              THE COURT:  All right.  Sustained.

4              MR. NOBLE:  You can zoom out.

5    BY MR. NOBLE:

6    Q.  Did you have conversations with Charles Blue about how much

7    in fees the credit union had earned from Kapcharge in 2014?

8    A.  I believe we had some conversations like that.

9              MR. NOBLE:  Actually, your Honor, the government would

10   offer this exhibit.  I believe it's been authenticated, and I

11   think we could proffer a basis for it.

12             THE COURT:  Remind me of the number?

13             MR. NOBLE:  It's 3576-B.

14             MS. SANTILLO:  I can't see the exhibit.

15             No objection.

16             THE COURT:  I'm sorry?

17             MS. SANTILLO:  I said no objection.

18             THE COURT:  Mr. Creizman?

19             MR. CREIZMAN:  No objection.

20             THE COURT:  All right.  It's admitted.  Thank you.

21             (Government's Exhibit 3576-B received in evidence)

22             MR. NOBLE:  May we publish that for the jury.

23             And, Ms. Grant, can you just blow up the bottom email

24   there.

25             This is an email from Christine Carida at Kapcharge to

1    Charles Blue, copying Kevin Pepe, Mark Francis, and Shoula

2    Cohen.  The first line states, "The total revenue that

3    Kapcharge generated for HOPE in 2014 was $6,890.75, calculated

4    as per the fees stipulated in our banking agreement with HOPE."

5            You can take that down.

6    BY MR. NOBLE:

7    Q.  Now, Mr. Gross, you processed over $60,000 -- I mean

8    $60 million in ACHs on behalf of Kapcharge in 2014?

9            MS. SANTILLO:  Objection; form.

10           MR. NOBLE:  I'll withdraw the question.

11           THE COURT:  Okay.

12   Q.  Your credit union processed over $60 million in ACH

13   transactions on behalf of Kapcharge in 2014, correct?

14   A.  Yes.

15   Q.  And for that, the credit union earned less than $7,000?

16   A.  Yes.

17   Q.  And that did not include the other fees that the credit

18   union had to pay in order to do that ACH processing, did it?

19   A.  I'm not sure.

20   Q.  Well, there were fees that the credit union had to pay to

21   place corporate credit unions like Alloya, correct?

22   A.  Yes.

23   Q.  I believe we saw that in one of your earlier emails,

24   correct?

25   A.  Correct.

1          THE COURT:  Mr. Gross, could you pull the mic up.

2     Thank you.

3     Q.  And all of this ACH processing was done without the proper

4     ACH policies, or procedures, or controls in place, correct?

5     A.  I don't believe that's accurate.

6     Q.  Well, on that recording in the transcript that we saw

7     earlier, you remember where you said you thought you had been

8     negligent?

9     A.  Yes.

10    Q.  And that was because the credit union had processed over

11    $50 million in ACH transactions without doing the proper

12    diligence to make sure something illegal wasn't passing through

13    the credit union, correct?

14    A.  No.

15          MS. SANTILLO:  Objection.

16          THE COURT:  Overruled.

17          The answer?

18          THE WITNESS:  No.

19          THE COURT:  Next question.

20    BY MR. NOBLE:

21    Q.  But you admitted that you had been negligent because of the

22    ACH processing that had been done on behalf of Kapcharge at the

23    credit union in 2014?

24    A.  No.

25    Q.  Okay.

1      MR. NOBLE:  So, if we bring up Government Exhibit

2   2506-T.

3   Q.  Your testimony is that you did not say that you were

4   negligent because of the ACH processing on behalf of Kapcharge?

5   A.  No, sir, that's not what I said.

6      MR. NOBLE:  Let's --

7   A.  What I'm saying is --

8   Q.  Go ahead and explain.

9      THE COURT:  Yes, go ahead.

10      THE WITNESS:  You asked me did I say we were negligent

11   because we didn't do all these things as relates to ACH

12   transactions.  In that meeting, I said we were negligent

13   because Ms. Flok came in the door saying we were negligent.

14   So, if an NCUA regulator says you're negligent, that's why I

15   repeated it.  We later learned what she meant by negligent, and

16   though there were things we needed to correct, it was not as

17   bad as I thought she meant when she first walked in the door.

18   So, I said the word negligent for that reason.

19   Q.  Well, we could find it in the transcript, but isn't there a

20   portion on this recording where you say, "I would have to say

21   we were negligent because we let $50 million in ACHs pass

22   through the credit union without the proper diligence"?

23   A.  And that's what she had said.  So I'm simply saying it was

24   because that's what she said, I'm repeating it.

25   Q.  And you agreed with that?

1    A.  At that time, yes.

2            MR. NOBLE:  We can take that down, Ms. Grant.

3    Q.  Now, you testified that you had hired Charles Blue to be

4    the new CEO for the credit union?

5    A.  The board did, yes.

6    Q.  Well, you signed the contract, correct?

7    A.  On behalf of the board, yes.

8    Q.  You spoke with Mark Francis about hiring Charles Blue to be

9    the CEO?

10   A.  Yes.

11   Q.  And Mark Francis agreed to pay for Charles Blue's $50,000

12   salary?

13   A.  In addition to other things, yes.  Yes, in addition to

14   other things.

15   Q.  He also agreed to pay $30,000 in professional fees for the

16   credit union?

17   A.  I'm not certain about all the different amounts, but there

18   were other amounts.

19   Q.  That Kapcharge paid to the credit union?

20   A.  Yes, to the credit union.

21   Q.  And $50,000 of that was to cover Charles Blue's salary?

22   A.  As I understand, yes.

23   Q.  You never told that to the NCUA?

24   A.  I don't recall them asking me, but -- because I was not

25   interacting with them closely, Charles was.

1    Q.  Well, you would agree that having one member of a credit
2    union pay the salary of the CEO of the credit union would
3    create a conflict of interest, correct?
4    A.  Not as I understand it, no.
5    Q.  Well, you were sitting in the courtroom when NCUA Examiner
6    Terry Adam testified, correct?
7    A.  Yes, sir.
8    Q.  And he testified that that would be a big red flag for the
9    NCUA?
10   A.  He did use that word, yes.
11   Q.  That's because one single member of the credit union might
12   be able to exert control over the management of the credit
13   union if they were paying management's salary?
14   A.  He said that was a possibility.
15   Q.  You would agree with that, though, right?
16   A.  Not necessarily.
17   Q.  But it creates at least an appearance of a conflict of
18   interest, you'd have to agree, right?
19   A.  An appearance that would need to be explained, absolutely.
20   Q.  Now, when you hired Charles Blue to run the credit union,
21   he didn't have any prior experience running a financial
22   institution like HOPE, did he?
23   A.  He had no credit union experience, that is correct.
24   Q.  He also wasn't familiar with ACH processing?
25   A.  I'm not certain about that.

1    Q.  You didn't run a background check before you hired Charles

2    Blue?

3    A.  I had known him for 12 years, so --

4    Q.  If you could just answer the question yes or no, please,

5    Mr. Gross.

6    A.  No, I did not.  No, I did not.

7    Q.  And you also never ran a credit report for Mr. Blue?

8    A.  No.

9             MS. SANTILLO:  Objection.  Prior ruling.

10            THE COURT:  Overruled.

11   Q.  So you never learned that Charles Blue had previously filed

12   for personal bankruptcy?

13   A.  No, sir, I did not.

14   Q.  Now, you testified that the $150,000 that was paid by

15   Collectables Club and Kapcharge was deposited into the church's

16   operating account at PNC Bank?

17   A.  Yes.

18   Q.  And I believe you testified that that was used -- all of

19   that was used to pay church bill's?

20   A.  Church obligations, yes.

21   Q.  You would agree that $150,000 was a lot of money for your

22   church?

23   A.  Yes.

24   Q.  None of that money was used to support the credit union,

25   correct?

1    A.  That's not -- no, that's not true.

2    Q.  Well, it wasn't a capital infusion into the credit union,

3    was it?

4    A.  No, it was into the church.

5    Q.  You're a signatory on the church's operating account at

6    PNC?

7    A.  Yes, I am one of them.

8    Q.  You have a debit card for that account?

9    A.  Yes, I do.

10   Q.  You can make withdrawals, cash withdrawals, from that

11   account?

12   A.  Yes.

13   Q.  You can make purchases with the debit card?

14   A.  Yes.

15   Q.  And you used the operating account of the church to pay for

16   your personal expenses, I believe you testified on direct

17   examination?

18   A.  Could you say that again, please?

19   Q.  You used the operating account of the church to pay for

20   your personal expenses, the operating account at PNC?

21   A.  I need more clarity on the question, please.

22   Q.  Well, Mr. Gross, you paid your credit cards out of the

23   church's operating account, correct?

24   A.  I don't understand the question.

25   Q.  You didn't pay down your credit cards, make payments on

1   your credit cards using the church's operating account?

2   A.  I paid the church's expenses on my personal credit card

3   from the church's account, yes.

4   Q.  Well, not all of the expenses on your credit cards were

5   church expenses, correct?

6   A.  No, there were personal expenses on my personal credit

7   card.

8   Q.  And then you used the church's operating account to make

9   payments on those credit cards?

10  A.  To pay the church expenses on that card, yes.

11  Q.  Now, I believe -- well, you testified earlier about the

12  compensation that you received from the church, correct?

13  A.  Yes.

14  Q.  You also received something called pastoral support; is

15  that right?

16  A.  No, sir.

17  Q.  You don't receive anything called pastoral support?

18  A.  There is a line on our offering envelope that is called

19  pastoral support.

20  Q.  Well, you testified that you had a lot of unpaid back

21  salary; isn't that right?

22  A.  Yes.

23  Q.  And the church keeps track of that, correct?

24  A.  Yes.

25  Q.  So when you make a personal charge to your credit card, for

1   instance, and then that credit card is paid by the church's

2   operating account, there's a deduction in the amount of money

3   that the church owes you, correct?

4   A.  Yes.

5   Q.  I believe you testified on direct examination that that

6   purchase for a swimming pool was a business expense, correct?

7   A.  No, I did not.

8   Q.  No?  It was a personal expense?

9   A.  Correct.  As I recall, yes.

10  Q.  I do believe that you testified that the Tao massage was a

11  medical expense paid for by the church because of your

12  herniated neck?

13  A.  I'm not sure where it was charged in that ledger, but it

14  was paid for from a church account, but I don't know where it

15  was credited to, whether it was credited against the money the

16  church owed me or as a medical expense.  I don't know the

17  answer to that.

18  Q.  So, if you testified on direct examination that that was a

19  church expense, you were mistaken?

20  A.  It was definitely a medical expense.  I just don't know how

21  it was classified.

22  Q.  A medical expense that the church paid?

23  A.  It is a medical expense the church should have paid, as it

24  has paid all of my other medical expenses, but I am not sure if

25  that charge was actually charged against me personally or to

H38KLEB6                          Gross - Cross

1    the church.

2    Q.  So, it wouldn't surprise you to learn that the charge was

3    charged against your personal account as being a personal

4    expense?

5    A.  It would not surprise me, no.

6    Q.  So when you testified earlier that the Tao massage payment

7    was a church expense, you were mistaken?

8    A.  No, it still is a medical expense, it just was charged

9    against my personal account, which I'm fine with.

10   Q.  So, to the extent that some of these payments from

11   Collectables Club and Kapcharge can be traced to personal

12   expenses that were accounted for by deducting the back salary

13   you were owed, that was income to you, correct?

14   A.  No, sir.

15   Q.  Well, you had a lot of unpaid salary in 2014, correct?

16   A.  Yes.

17   Q.  Okay.  And then every time that you incurred a personal

18   expense that the church covered, it would be deducted from the

19   amount of unpaid salary that you were owed, correct?

20   A.  I don't understand the question.

21        THE COURT:  Okay.  That's --

22   Q.  We'll walk through this more simply, maybe starting over a

23   little bit.

24        So, you said the church keeps track in a ledger of the

25   amount of salary that you're owed, the back salary, correct?

1    A.  That's where I need clarity, because the ledger keeps track

2    of the net amount after taxes had already been paid on what was

3    owed to me that I could not cash.  So that money, taxes have

4    already been paid on it because it was paid through payroll

5    tax.  So what's on that ledger is the net portion that I should

6    have been able to go to the bank and cash, but I couldn't

7    because the money wasn't there.

8    Q.  So you admit that these portions of unpaid back salary that

9    you realized were taxable?

10   A.  No, they were taxed.  They had already been taxed.

11   Q.  And how were those reported to the IRS?

12   A.  On my W-2.

13   Q.  And your W-2s just include your $50,000 in salary, correct,

14   for 2014?

15   A.  I don't think --

16            THE WITNESS:  Your Honor, I don't know how to respond.

17            THE COURT:  If the answer is I don't know or I don't

18   understand the question --

19            THE WITNESS:  I don't understand the question.

20   Q.  Okay.  So in 2014, you reported on your W-2 $50,000 in

21   income from the church?

22   A.  If that's what it says, yes.

23   Q.  That was your salary from the church, correct?

24   A.  Yes.

25   Q.  But in addition to that, you realized unpaid salary during

H38KLEB6                          Gross - Cross

1    2014?

2    A.   No.

3    Q.   You did not realize any unpaid salary in 2014?

4    A.   This is -- I don't understand your question, sir.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              MS. SANTILLO:  Objection.

2              THE COURT:  Well, it's fine.

3              Mr. Gross, if you don't understand, what I want you to

4     say is I don't understand.

5              Mr. Noble, you'll have to rephrase.

6              MR. NOBLE:  Sure.

7     Q.  Let's take a look and maybe you recognize this document.

8              MR. NOBLE:  Just bring this up for the witness and the

9     court.

10    Q.  Mr. Gross, do you recognize this document?

11    A.  Yes, I do.

12    Q.  What is it?

13    A.  This is the 2400 account where my expense -- where my

14    unpaid salary is kept.

15    Q.  Okay.

16             MR. NOBLE:  The government offers Government Exhibit

17    10,000.

18             MS. SANTILLO:  I'd like to have an opportunity to

19    review it.

20             THE COURT:  Okay.

21             MR. NOBLE:  Sure.

22             (Pause)

23             MR. NOBLE:  Judge, I'm going to move on.

24             THE COURT:  Thank you.

25    Q.  Now, Mr. Gross, in October you resigned from the board of

1    the credit union, correct?

2    A.  Yes.

3    Q.  But you still had control over the credit union's e-mail

4    accounts at that time?

5    A.  The church account did, yes.

6    Q.  And you were the administrator for the church account?

7    A.  It was my account, but I was not the only one who had

8    access.

9    Q.  Mr. Gross, you were the administrator for the church

10   account?

11   A.  Yes, I was.

12   Q.  And that means you were the administrator for the e-mail

13   accounts of HOPE Federal Credit Union?

14   A.  Yes.

15   Q.  And those included the accounts for the Collectables Club

16   members?

17   A.  Yes.

18   Q.  Those were e-mail accounts that you created for the

19   Collectables Club members?

20   A.  I'm not certain if I created them but I knew they were

21   created.

22   Q.  And during the conservatorship examiner Terry Adam asked

23   you for access to all of the HOPE Federal Credit Union e-mail

24   accounts, didn't he?

25   A.  That's what the e-mail said, yes.

H389LEB7                        Gross - cross

1   Q.  You remember receiving that e-mail?

2   A.  Yes.

3   Q.  You remember receiving the e-mail with the copy of the

4   order of conservatorship?

5   A.  Yes.  I think they were the same.

6   Q.  And that required the credit union to turn over all of its

7   records to the NCUA?

8   A.  I didn't read the conservatorship or a portion.

9   Q.  But Mr. Adam specifically asked you for all e-mail

10  accounts, correct?

11  A.  Yes, he did.

12  Q.  And you didn't turn over all e-mail accounts for the credit

13  union, did you?

14  A.  I turned over -- no, I did not.

15  Q.  You did not turn over the accounts specifically related to

16  the members of the Collectables Club who had served on the

17  board, correct?

18  A.  I don't understand.

19  Q.  You did not turn over to the NCUA the e-mail accounts that

20  you had created for the Collectables Club board members at HOPE

21  Federal Credit Union?

22  A.  I don't understand.

23  Q.  You did not provide Terry Adam access to the Collectables

24  Club e-mail accounts from HOPE Federal Credit Union?

25  A.  No, I did not.

```
 1   Q.  Mr. Gross, you had access, in addition to the PNC operating

 2   account that we were talking about, to the church's account at

 3   the credit union itself, correct?

 4   A.  Yes.

 5   Q.  And you would agree it's important not to overdraw a bank

 6   account?

 7   A.  Yes.  Generally.

 8   Q.  In fact, you testified yesterday that one of the ministries

 9   of your church is to help people to learn to manage their own

10   finances?

11   A.  Yes.

12   Q.  Now, you used the church's account at the credit union to

13   cover some church expenses, correct?

14   A.  That account was used for church expenses, yes.

15   Q.  You also used the account to pay for personal expenses?

16   A.  I don't understand the question.

17   Q.  You used the church's account at the credit union to pay

18   for personal expenses, correct?

19   A.  Yes.

20   Q.  You also often overdrew that account by writing checks to

21   yourself, correct?

22   A.  No.

23   Q.  Your testimony is that you didn't write checks to yourself

24   that overdrew the account?

25   A.  That's not what you asked me.  You said often.
```

1    Q.  Fair enough.

2          You wrote checks to yourself from the church's account

3    at the credit union that overdrew the account?

4    A.  Unfortunately, yes.

5    Q.  And you deposited those checks into your personal account

6    at PNC Bank?

7    A.  I think I did, yes.

8    Q.  And then to cover that up, the negative balance that is,

9    you took out loans from the credit union, correct?

10   A.  No.

11   Q.  Well, let's walk through something.

12   A.  Yes.

13   Q.  Let's bring up Government Exhibit 6206.

14          Do you recognize what this document is generally,

15   Mr. Gross?

16   A.  Yes.

17   Q.  What is it?

18   A.  It is the July statement -- July 2013 statement from Hope

19   Cathedral.

20   Q.  For the account at the credit union?

21   A.  At the credit union, yes.

22          MR. NOBLE:  Let's flip to the end of the document and

23   actually maybe toward the middle.  I'm looking for

24   September 2014.  Just page down from there.  That's May.

25          So can we blow up the checking account.

1    Q.  Now, Mr. Gross, you see on September 12, 2014 there was a

2    negative balance of $1,737.42 in the credit union's account?

3    A.  Yes.

4    Q.  And then on September 8 there was a check written 6502 for

5    $3,000 on the account, correct?

6    A.  Yes.

7    Q.  That was a check you wrote to yourself?

8    A.  I'm not sure but if you say so, okay.

9    Q.  You don't dispute that that was a check that you wrote to

10   yourself?

11   A.  No, sir, I do not.

12        MR. NOBLE:  And then let's just scroll down, just a

13   little bit.  That's fine.

14   Q.  You see there on September 30, 2014 there was a loan

15   disbursement in your name?

16   A.  Yes.  I do see it.

17   Q.  And that was for $11,500?

18   A.  Yes.

19   Q.  And that reduced the church's negative balance in its

20   account to $10,987.42, correct?

21   A.  Yes.

22   Q.  And then Bernard Larkins also took out a loan on the same

23   day in the same amount which brought the church's bank account

24   into the positive territory, correct?

25   A.  Yes.

1   Q.  And you did that again in November 2014, correct?

2   A.  I believe so, yes.

3   Q.  So when the church's bank account was overdrawn at the

4   credit union by thousands of dollars you took out a loan in the

5   name of the church to refill it?

6   A.  No.

7   Q.  You did not?

8   A.  No, sir.

9           MR. NOBLE:  Well, let's scroll down to November 2014.

10          Scroll down again, next page.

11  Q.  Do you see there on November 28, 2014 there was a negative

12  balance -- well, first of negative $22,320.32?

13  A.  Yes.

14  Q.  And then there was a checking deposit of $3,500.  And then

15  a phone transfer of $19,000.

16          Do you see that?

17  A.  Yes, I do.

18  Q.  That $19,000 was a loan that was taken out by the church to

19  cover that negative balance, correct?

20  A.  No.

21  Q.  It's not?

22  A.  If I could explain.

23          THE COURT:  Go ahead.

24          THE WITNESS:  This deposit was made on that day.  But

25  this loan had been approved in September and because of all the

H389LEB7                        Gross - cross

1   churn with reporting and everything else it was not funded

2   until this date.  But it was approved in September.

3         THE COURT:  Thank you.  Next question.

4   Q.  But you'd agree the loan proceeds replenished the negative

5   $18,820.32 balance in that account?

6   A.  No.

7   Q.  It did not?  I mean that's the $19,000 in proceeds,

8   correct?

9   A.  That is the 19,000.  But if it had been done in September

10  when it was supposed to have been done there wouldn't have been

11  a negative balance.

12  Q.  Now, the checks that we saw during trial were not the only

13  checks that you wrote from the church's bank account to

14  yourself, correct?

15  A.  Correct.

16  Q.  You -- in fact, you wrote quite a few checks from the

17  church's bank account to yourself, correct?

18  A.  I'm not certain but I did write checks to myself.

19        MS. CHOI:  Can we bring up Government Exhibit 810C in

20  evidence and please flip to page 343.

21  Q.  So, Mr. Gross, that's a check that you wrote to yourself

22  from the church's account on May 2, 2014 for $800?

23  A.  Yes.  It appears to be.

24        MR. NOBLE:  Let's go to page 362, please.

25  Q.  That's another check that you wrote to yourself for $500 in

1   May 2014?

2   A.   Yes.

3        MR. NOBLE:   Let's go to page 373.

4   Q.   That's another check that you wrote to yourself for a

5   thousand dollars on May 29, 2014?

6   A.   Yes.

7        MR. NOBLE:   Let's go to page 374.

8   Q.   That's a check you wrote to yourself for $500 the next day?

9   A.   Yes.

10       MR. NOBLE:   Go to page 388.

11  Q.   That's another check you wrote to yourself the next month

12  for $1,500?

13  A.   Yes.

14  Q.   And when you did this, the church often had a negative

15  balance in its account, correct?

16  A.   I'm not certain.  But these are checks I wrote.

17  Q.   Now, Mr. Gross, these were all checks that were drawn on

18  the account of the church at the credit union, correct?

19  A.   Yes.

20  Q.   And that's money that you put into your own bank account?

21  A.   For money that was owed me from the church, yes.

22  Q.   And it's your testimony that you did not have a financial

23  interest in the church?

24  A.   That is correct.  Yes.

25       MR. NOBLE:   No further questions.

1              You can take that down.

2              THE COURT:  All right.  Thank you.

3              We're at the point we discussed, correct?

4              MS. CHOI:  I hope so, your Honor.

5              THE COURT:  Mr. Gross, you may step down briefly.

6    We're going to -- ladies and gentlemen of the jury, we're, as

7    we have in other instances because of a scheduling matter,

8    we're going to take a break with Mr. Gross on the witness

9    stand.

10             And, Mr. Klingeman, you have a witness to --

11             MR. KLINGEMAN:  Yes, your Honor.  The defense calls

12   United States Secret Service Special Agent Emily Beyer.

13             THE COURT:  Agent Beyer, you may come forward.

14    EMILY BEYER,

15        called as a witness by the defendant Gross,

16        having been duly sworn, testified as follows:

17             THE COURT:  You may proceed, Mr. Klingeman.

18   DIRECT EXAMINATION

19   BY MR. KLINGEMAN:

20   Q.  Good afternoon, Ms. Beyer.  We have never met before this

21   afternoon when I introduced myself to you in the hall?

22   A.  That's correct.

23   Q.  What do you do for work?

24   A.  I'm a special agent with the United States Secret Service

25   in Tallahassee, Florida.

1   Q.  How long have you been a special agent for the Secret

2   Service?

3   A.  Approximately 22 years.

4   Q.  And you just mentioned you're assigned to Tallahassee,

5   Florida?

6   A.  Yes, sir.

7   Q.  As a special agent could you briefly summarize your duties?

8   A.  Most people are familiar with our duties as the protection

9   of the president, vice-president and other dignitaries as

10  appointed.

11          We also investigate financial crimes, credit card

12  fraud, bank fraud, counterfeit currency and things of that

13  nature.

14          MS. CHOI:  Your Honor, I object to the scope.

15          THE COURT:  I'll allow the question that was asked but

16  then you'll stay where we discussed.

17          MS. CHOI:  Yes, your Honor.

18          THE COURT:  Well that was to Mr. Klingeman.

19          MS. CHOI:  Sorry.  He should state that.  I just said

20  yes, your Honor.

21          THE COURT:  Go ahead, Mr. Klingeman.

22  Q.  Special Agent Beyer I'm going to confine my questions to

23  the --

24          THE COURT:  Go ahead, Mr. Klingeman.

25  Q.  -- the last portion of your answer.

1          What were you asked to do by the United States Secret

2     Service New York office in July of 2015 in connection with the

3     Coin.mx investigation?

4     A.   Initially I was asked to prepare to conduct a search

5     warrant that was going to take place at a business calls

6     Coin.mx in Tallahassee.

7     Q.   Are you familiar with an individual names Jose Freundt?

8     A.   Yes, I am.

9          MR. KLINGEMAN:  Could we bring up what's been marked

10    in evidence Government Exhibit 5, the faceplate or picture of

11    Mr. Freundt.

12         THE COURT:  It's in evidence?

13         MR. KLINGEMAN:  Yes, it is.

14         THE COURT:  You may publish -- are you asking to

15    publish?

16         MR. KLINGEMAN:  I'm asking it to be shown to the

17    witness and the jurors.

18         THE COURT:  Okay.  Go ahead.

19    Q.   Special Agent Beyer, this is Mr. Freundt as you recall him?

20    A.   Yes.

21    Q.   Are you aware that he testified in this trial?

22    A.   I am.

23    Q.   In July of 2015 did you speak to Mr. Freundt on a

24    particular occasion?

25    A.   Yes, I did.

H389LEB7                       Beyer - direct

1   Q.  Do you recall the date?

2   A.  There were actually two occasions in July.  I believe the

3   first one was July 15 of 2015 and the second one was July 21 of

4   2015, if I remember the dates correctly.

5            THE COURT:  Agent Beyer could you pull the microphone

6   right up to you, please.

7            Thank you.  Go ahead.

8   Q.  So what was that second date?

9   A.  July 21, 2015.

10  Q.  Let me ask you about that date and that conversation, okay?

11  A.  Okay.

12  Q.  Where did you speak to Mr. Freundt?

13  A.  At the business office of Coin.mx in Tallahassee, Florida.

14  Q.  Who else was present with you at the Coin.mx office on that

15  date?

16  A.  Initially it was just myself and another agent from

17  New York and Mr. Freundt.

18  Q.  Who was the special agent from New York?

19  A.  John --

20            MS. CHOI:  Objection.

21            THE COURT:  Sustained.

22  Q.  When you spoke to Mr. Freundt was anyone else present in

23  addition to the other special agent?

24  A.  Not at that time.

25  Q.  And do you recall Mr. Freundt asking you about what would

H389LEB7                          Beyer - direct

```
 1   happen to Coin.mx as a result of the search warrant you were
 2   executing?
 3   A.  I don't remember a specific question.  I remember
 4   discussions about Coin.mx in general.
 5   Q.  Do you recall him expressing any concern that Coin.mx would
 6   be shut down as a result of the investigation?
 7   A.  Yes.
 8   Q.  Do you recall him expressing concern that he would have to
 9   look for a new job?
10   A.  Yes.
11   Q.  How would you describe his emotional reaction to this?
12   A.  (No response).
13   Q.  Based on your observations of him?
14   A.  From what I observed emotionally, he wasn't traumatically
15   upset but he realized that this job that he had had for a
16   couple of years was now going to be going and he had a family
17   to provide for so he was concerned about finding a new job.
18   Q.  Do you recall whether he discussed with you his salary at
19   Coin.mx?
20   A.  I believe it was discussed.  I just don't recall specifics.
21   Q.  Do you recall if he discussed whether he was owed any back
22   salary at Coin.mx?
23   A.  I'm sorry.  I do not recall.
24   Q.  Did you authorize him to take salary from the Coin.mx bank
25   account?
```

H389LEB7                    Beyer - direct

1    A.  I would have never authorized to take specific salary.  We

2    would have discussed operations and the fact that we weren't

3    effectively shutting the business down, the business was still

4    free to operate if they were able to, but I never would have

5    said take money from the business if it wasn't actually his

6    money.

7    Q.  And would you ever had said to him "Give yourself a nice

8    little bonus"?

9    A.  No.  I would never say that.

10   Q.  And do you recall saying that on this occasion or not?

11   A.  I would have never said that so that would include that

12   specific occasion.

13   Q.  So you didn't suggest any -- make any similar type of

14   suggestion using other words or otherwise?

15   A.  (No response).

16   Q.  To Mr. Freundt?

17   A.  Again, not in regards to a bonus.  I would have told him to

18   continue -- we weren't effectively shutting the business down;

19   that is, the business operations could continue in whatever

20   manner they were continuing, that they could continue.

21   Q.  So are you testifying that you did authorize him to take

22   money out of the Coin.mx bank account or not?

23   A.  No.  What I'm saying is if part of his duties were to pay

24   payroll or salary I wouldn't have said don't do anything but I

25   would have never said do something that was against the

H389LEB7                          Beyer - direct

1   business regulations.

2   Q.  Would you have ever told him affirmatively to take the

3   money out and make the payroll?

4   A.  I wouldn't have specifically said make the payroll.  I

5   would have said we're not shutting your business down.  You can

6   effectively continue the business in any manner.

7         Again, this was a year-and-a-half ago.  I can't recall

8   the specific communication.  But based on my 22 years of being

9   an agent, I know how I speak to people when we do search

10  warrants and interviews.  If we don't shut the business down

11  they can continue to operate in whatever manner that they were

12  operating in.

13  Q.  Did the other special agent tell --

14        MS. CHOI:  Objection.

15        THE COURT:  Sustained.

16  Q.  In your presence, did the other special agent --

17        MS. CHOI:  Objection, your Honor.

18        THE COURT:  Sustained.

19  Q.  What, if anything, have you been told before coming to

20  court today about Mr. Freundt's testimony?

21        MS. CHOI:  Objection.

22        THE COURT:  Sustained.

23  Q.  Have you been told anything about Mr. Freundt --

24        MS. CHOI:  Objection.

25        THE COURT:  Sustained.  And you have covered the area

H389LEB7                        Beyer - direct

 1    we discussed so unless you want to make a motion for going

 2    beyond, that's the end.

 3                MR. KLINGEMAN:  I object.

 4                THE COURT:  I'm happy to hear you at sidebar.

 5                (Continued on next page)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (At the sidebar)

2            MR. KLINGEMAN:  Your Honor, I'm being unduly limited

3    in the questions I'm being permitted to ask this witness,

4    particularly based on the material I received.

5            THE COURT:  Just so I understand.  Are you asking to

6    go beyond what we discussed or are you saying --

7            MR. KLINGEMAN:  No.

8            THE COURT:  Are you saying that you -- let me finish

9    my question.

10           MR. KLINGEMAN:  That's exactly right.  I'm sorry.  I'm

11   waiting to hear.

12           THE COURT:  And listen to me.

13           MR. KLINGEMAN:  I'm listening.

14           THE COURT:  Because I want to know:  Are you saying

15   you want to go beyond what we discussed you would ask, because

16   you already have in multiple respects; or that there's

17   something that we discussed that you have not been able to ask?

18           MR. KLINGEMAN:  I don't want to go beyond what I

19   understood to be the parameters of this witness's testimony

20   because I'm adhering very carefully to the limited areas that

21   the Court has permitted us to direct.

22           THE COURT:  I'll start by disagreeing with that

23   because you asked background questions that you expressly

24   didn't say that you would do.  You asked who else was present,

25   what they said.

1          So you've already gone beyond that.  But if there is

2   something you feel is within the scope of what I expressly

3   permitted that you haven't yet asked, tell me what that

4   question is.

5          MR. KLINGEMAN:  Well, specifically the witness has

6   indicated that she may have had a discussion with Mr. Freundt

7   about allowing him to take salary.  She just said that.  And

8   that is directly at odds with the statements that she made over

9   the weekend to the interviewing agents that were put into

10  reports and provided to the court and the defense.  And I'll

11  quote from the FBI 302 that I've marked for identification as

12  TG91, dated March 4, 2017, "Beyer stated that she would not

13  have instructed Freundt to take any money from Coin.mx," period

14  full stop.  And I feel I'm entitled to question her further

15  about that.

16         THE COURT:  So you're asking to go beyond what we

17  discussed because something is different than that.  So that's

18  a conversation I'm happy to have.  I just don't want to pretend

19  like this is exactly what I agreed to, which is what you are

20  trying to do, which is why I asked you if you wanted a sidebar.

21  So here we are.

22         So you're saying that the testimony she provided about

23  something -- I'm going to go back and look at it, something

24  along the lines of if his job involved certain doing payroll

25  and the like, she wouldn't have told him to stop.  I'm going to

1    look at look at the testimony.

2              MR. KLINGEMAN:  Before you do, your Honor --

3              THE COURT:  I'm going do look at the testimony,

4    Mr. Klingeman.

5              (Pause)

6              THE COURT:  I have the testimony firmly in mind.

7              MR. KLINGEMAN:  I'd like to supplement my proffer,

8    your Honor.

9              The witness has, in addition, indicated that she does

10   not recall discussing with Mr. Freundt his fear that Coin.mx

11   was going to be shutdown by virtue of this search warrant.  In

12   fact, she insinuated during the direct testimony that I've

13   elicited that the opposite would be true that this -- they were

14   simply executing a search warrant and that it should be

15   business as usual; when, in fact, she told the FBI and, again,

16   referring --

17             THE COURT:  Is this a different point?

18             MR. KLINGEMAN:  No.  It's all part of the same point.

19             I think I'm being unduly limited in the questions.  I

20   have no interest -- what I agreed not to get into, and what I

21   continue to agree not to get into is what the Secret Service or

22   the FBI or the U.S. Attorney's Office did when Mr. Freundt

23   showed up in April of 2016 when he first reported this

24   incident.

25             What I never conceded was my inability to ask her

1    questions about this particular episode.  And I'm being

2    restrained from doing so unfairly after we've taken so much

3    effort to get her here and give what is at this point five

4    minutes worth of testimony.  So I'd like to be able to pursue

5    these things, particularly --

6              THE COURT:  Stop.  You get to ask questions along the

7    lines we have discussed.  If you have some basis for going

8    beyond it, I will hear it.  You've changed subjects.  You've

9    tried on direct to ask areas.  I'm not allowing gamesmanship.

10   I know you don't like me accusing you of that, but I'm not

11   allowing it.

12             But if there's a specific question, tell me what

13   question you'd like to ask; I'll give you a ruling.

14             MR. KLINGEMAN:  She told the FBI, as I quoted earlier,

15   that --

16             THE COURT:  What question would you like to ask?

17             MR. KLINGEMAN:  Whether she, in fact, had any

18   discussions with Mr. Freundt about taking money from Coin.mx in

19   contradiction of either what she just said or what she said to

20   the other agents on Sunday.

21             THE COURT:  It's not in contradiction so I won't allow

22   the question.  Objection sustained.  Any other questions?

23             MR. KLINGEMAN:  She also stated to the agent --

24             THE COURT:  What question would you like to ask?

25             MR. KLINGEMAN:  I need to be able to introduce the

1    subject.

2              THE COURT:  Just tell me what question.  I've read the

3    documents.

4              MR. KLINGEMAN:  Did you instruct Jose Freundt to

5    remove, transfer, or take any money from any Coin.mx related

6    accounts?

7              THE COURT:  Say it one more time.

8              MR. KLINGEMAN:  Did you instruct Jose Freundt to

9    remove, transfer, or take any money from any Coin.mx related

10   accounts?

11             MS. CHOI:  I believe that was asked and answered.

12             THE COURT:  I do too.  I'll let you ask it one more

13   time.

14             And then what other questions?

15             MR. KLINGEMAN:  In light of the Court's restriction of

16   my ability to ask questions, I don't have any other questions.

17             THE COURT:  The one question that you've asked to ask

18   I sustained the objection.  The one -- the second one that

19   you've asked to ask, I'm allowing you, even though you've

20   already asked and it's been answered.

21             Are there any other specific questions that you would

22   want to proffer to ask and I will give you a ruling?

23             MR. KLINGEMAN:  I'd like to know if -- I would like to

24   ask her if she told interviewing agents on Sunday, March 4 that

25   she would not have instructed Freundt to take any money from

H389LEB7                          Beyer - direct

1    Coin.mx.

2              MS. CHOI:  I object to that because by virtue of

3    asking the question in that manner it opens the door to the

4    jury's speculation of the exact area that your Honor has

5    guarded against which is -- and you sustained the government's

6    objections, despite repeated attempts by counsel to get into

7    this area about what happened after and outside of that

8    particular conversation with Freundt.

9              THE COURT:  Sustained.

10             Another question?

11             MR. KLINGEMAN:  I just want to submit that it's a

12   prior inconsistent statement and I ordinarily would be entitled

13   to confront her with it.

14             THE COURT:  There has not been a prior inconsistent

15   statement.

16             MR. KLINGEMAN:  Your Honor, she testified on direct

17   that she recalls telling him this was business as usual and

18   that he could have -- as a result could have taken a salary.

19   If that was his responsibility --

20             THE COURT:  Misrepresentation of the testimony.

21             MR. CREIZMAN:  May I make a brief point, because I

22   might have the opportunity to cross-examine her.

23             I mean it's my sense that she is making a statement

24   that she didn't -- she would never have told the witness --

25   she would never have told Freundt to take money from the

1    account.  At the same time, her understanding was that they

2    weren't shutting down Coin.mx.  So, the impression for the jury

3    is that there might have been some kind of misunderstanding.

4         Now, what I would like to do in terms of impeachment

5    on -- just on this subject is say:  First of all, she got

6    plenty of communications concerning what the engagement was and

7    that Coin.mx was considered a money transmitting business, an

8    unlawful money transmitting business.  She also understood that

9    there was no need to shutdown Coin.mx because Murgio was

10   already arrested and wasn't going to go on anyway.  And

11   third -- and she knew that Anthony Murgio was -- what he was

12   being indicted with or charged with because she said these guys

13   are going to be very helpful to us in the investigation.

14        So my point to her would be:  Look, you've got a lot

15   of experience.  You know this is a Coin.mx -- Coin.mx is a

16   money transmitting business.  And what I want to know is:

17   You're careful in your interviews.  You have someone there to

18   make sure that the witness doesn't say something that you

19   didn't say.  And essentially you wouldn't have told someone to

20   take money from an illegal business.  Period.

21        THE COURT:  The background stuff I won't allow for the

22   reasons I already discussed.  This is far afield from the

23   limited basis in which I granted this very unusual application.

24   She has answered the question that she would not -- she

25   doesn't -- she answered the question:  I don't recall the

```
 1    specifics, but I wouldn't have said it.  I never would have
 2    said it.  I wouldn't have said it here.
 3               MR. CREIZMAN:  The only point I just want to make is
 4    that I think that she's -- she recalls that they weren't
 5    shutting down Coin.mx and I don't know that she also recalls
 6    that Coin.mx was considered -- she knew that it was considered
 7    an unlawful money transmitting business.  And if she knew that,
 8    I think it's pretty clear that she wouldn't have -- knowing
 9    that fact, she wouldn't have given it.  And that's what I would
10    want to know.
11               THE COURT:  No.  I won't allow it.  I won't allow it.
12    It's far afield and from what we discussed and there's not been
13    a basis in her testimony to open up that direction.
14               MR. CREIZMAN:  Just one other thing.  If the
15    government in its cross-examination --
16               THE COURT:  Hang on a second.
17               (In open court) Jurors, I apologize for keeping you
18    waiting.  You may take a short break.  Thank you.
19               (Jury excused)
20               (At the sidebar)
21               MR. CREIZMAN:  If the government in its
22    cross-examination opens the proverbial door, may I then at
23    least inquire on those very limited subjects because I have --
24    I'm -- because my concern is that the government is going to
25    say -- because --
```

1          THE COURT:  If they open the door, I'll certainly

2      either allow it or at least reconsider it.

3          MR. CREIZMAN:  Okay.

4          MR. KLINGEMAN:  I'd like to know if the witness --

5      your Honor --

6          THE COURT:  We can return.

7          MR. KLINGEMAN:  Your Honor, I don't want to ask the

8      question in front of the witness.

9          THE COURT:  The jury is gone so I just -- it's a

10     public courtroom.  But you're right, the witness is still on

11     the stand.

12         MR. KLINGEMAN:  I'd like to know whether -- if whether

13     anyone has discussed Mr. Freundt's testimony with the witness

14     prior to her testifying.

15         THE COURT:  Why?

16         MR. KLINGEMAN:  Because it would be a violation of the

17     sequestration order.  And the testimony that she gave during

18     the direct examination is more fulsome than the answers that

19     she gave to the agents when they interviewed her three days

20     ago.  I'd simply like to know the answer.

21         THE COURT:  At violation of what?

22         MR. KLINGEMAN:  The sequestration order, your Honor,

23     that you entered before the case began; that people are not

24     allowed to discuss with prospective witnesses the testimony of

25     witnesses who have come to court and testified.  And I'd like

H389LEB7                          Beyer - direct

1    to know if anybody --

2              THE COURT:  Well, the task I put them on was to

3    determine whether this statement that Freundt stated was --

4    whether the statement that Freundt stated on the stand was true

5    or not since it seemed on its face unbelievable, so.

6              MR. KLINGEMAN:  I understand that.  But that's not the

7    question.  There's nothing wrong with going to a prospective

8    witness and asking the witness the fact question:  Is it true

9    that you told Mr. Freundt to give himself a nice little bonus?

10   That's perfectly appropriate witness prep.

11             What it's not appropriate to do is share with the

12   witness Mr. Freundt's testimony or that he said such a thing.

13   And I want to know whether any part of his testimony has

14   been --

15             THE COURT:  No, no.  Mr. Klingeman, you're being too

16   clever by half.  The witness's statement originally was that

17   she didn't recall.  They had to follow my direction, ask her if

18   this thing that he said was something that she would have said.

19   So, no.

20             MR. KLINGEMAN:  I'm not saying anything different than

21   that.

22             THE COURT:  No.  No.

23             (Continued on next page)

24

25

 1                (In open court)

 2                THE COURT:  Bring back the jury.

 3                MR. CREIZMAN:  Your Honor.

 4                THE COURT:  Mr. Creizman.

 5                MR. CREIZMAN:  Your Honor, just a brief point.  I

 6     don't think that --

 7                MS. CHOI:  The witness is still here, your Honor.

 8                MR. CREIZMAN:  But there is something that we just

 9     found that might be relevant.  That's all.

10                THE COURT:  Bring in the jury.

11                (Jury present)

12                THE COURT:  Thank you, everyone.  Please be seated.

13                As discussed, Mr. Klingeman.

14                MR. KLINGEMAN:  Thank you, your Honor.

15     BY MR. KLINGEMAN:

16     Q.  Ms. Beyer, on July 21, 2015 when you were speaking to

17     Mr. Freundt, did you instruct Mr. Freundt to remove, transfer,

18     or take any money from any Coin.mx related accounts for any

19     reason?

20     A.   It's not an easy yes-or-no answer that I can give, but if I

21     can explain?

22                THE COURT:  Go ahead.

23                THE WITNESS:  I don't recall exactly what was said.  I

24     know that I would have not -- I would not have told him to take

25     money if that was not part of his job responsibilities.  But if

H389LEB7                          Beyer - direct

1    the business -- we were not shutting down the business.  The

2    business was still there.  If the business could operate with

3    what was left, that was fine.  I would have told him to

4    continue with whatever his duties were.  If his duties were to

5    move money, I wouldn't have said anything about it but I would

6    have told him to continue with duties.  I would not have

7    directed him to do something that he normally not would have

8    done.

9    Q.  You discussed this matter --

10            MS. CHOI:  Objection, your Honor.

11            THE COURT:  Sustained.  Thank you, Mr. Klingeman.

12            MR. KLINGEMAN:  I'd like to be heard, your Honor.

13            THE COURT:  I heard you.  I'll hear you -- it's

14   Mr. Creizman's turn.

15            MR. KLINGEMAN:  But I do object.

16            THE COURT:  I'll be happy to hear you but it's

17   Mr. Creizman's turn and I heard you.

18            MR. CREIZMAN:  Your Honor, just so that I don't waste

19   any time I just thought that perhaps a sidebar first would be

20   of best -- would be best addressing -- because just to make

21   sure that my -- that I can proceed.

22            THE COURT:  All right.

23            (Continued on next page)

24

25

H389LEB7                        Beyer - direct

1            (At the sidebar)

2            THE COURT:  Mr. Creizman, I'm giving you a little bit

3    of leeway because you started this before the jury came in but

4    we were here at sidebar.  I sent the jury on a break.

5            This is turning into the sideshow that the government

6    feared and I'm going to allow what is reasonable and I'm not

7    going to turn little tit-tat issues into a sideshow.  I'm not

8    going to allow it.

9            MR. KLINGEMAN:  Okay.

10           THE COURT:  But I want to hear what your point is

11   because you started before the jury.

12           MR. CREIZMAN:  The reason -- two points.  And one was

13   which what I was -- I thought -- where I thought she was going,

14   which is we understood that this was -- we were not shutting it

15   down.  So it's not an easy yes-or-no question.

16           Now the fact is, if I could refresh her recollection

17   as to whether she knew that it was -- that the government was

18   indicting this case or was prosecuting these people for

19   operating an illegal money transmitting business, number one,

20   and that the government believed that; and number two, that

21   there was no need to shut it down, there was communications

22   between Mr. Jarrow and Ms. Beyer that there was no need to shut

23   it down because this business was going to be shutdown -- this

24   business was going to go out of business anyway, because

25   without Anthony there's nothing.  Under those circumstances,

1    knowing that it's an illegal money transmitting business, would

2    she have said it's okay to take the money.

3           And then, third, on Jose Freundt's testimony he

4    testified that he knew -- I can't see anymore but it says that

5    he knew -- in sum and substance he knew it was being shutdown.

6    That is what he said in his direct testimony.  So those three

7    points will leave the impression that -- that this was a mutual

8    mistake or misunderstanding when I don't think it really was.

9    I don't think that --

10          THE COURT:  That is now the impression that I have

11   based on the host of information and material so I'm not going

12   to allow that.  If you have a different point --

13          MR. KLINGEMAN:  I take your --

14          THE COURT:  Let me finish.

15          MR. KLINGEMAN:  I take your objection.

16          THE COURT:  Mr. Klingeman, when I am speaking you stop

17   speaking.  It's really reaching a point of disrespect for this

18   Court.

19          MR. KLINGEMAN:  I don't intend that.

20          THE COURT:  The court reporter writes down what I say

21   and what you say.  When I speak, you stop speaking.  Okay.

22          MR. KLINGEMAN:  Yes.

23          THE COURT:  Thank you.

24          If you have a point different than the one that you've

25   made before, you are welcome to make it now.

1          MR. KLINGEMAN:  Yes.  The point is the question I

2     asked the witness was a direct quotation from the report of

3     interview in which she is quoted as saying that unequivocally

4     she would not have done what I asked her word for word in that

5     last question.  And her answer was not no, or no unequivocally.

6     It was:  It's complicated, let me explain.  That is thoroughly

7     inconsistent with the statement she gave four days ago.  And I

8     just want that noted for the record.

9          THE COURT:  I find it not thoroughly inconsistent.  I

10    find it the gray area basically that the government had

11    anticipated.  And it makes sense.  It's reasonable, what's

12    occurred.  So I'm not allowing a sideshow.

13          But Mr. Creizman, I'll let you do your cross.

14          MR. CREIZMAN:  If I can get into that -- which is the

15    only -- the issue I would want to get into is simply is -- if

16    you knew that Coin.mx was an illegal money transmitting

17    business, would you have permitted him to take the funds.

18    That's -- I'm not going to.  I'm just going to say I'm not

19    asking any questions.

20          THE COURT:  All right.  Thank you.

21          (Continued on next page)

22

23

24

25

H389LEB7                          Gross - cross

1                    (In open court)

2                    THE COURT:  Go ahead, Mr. Creizman.

3                    MR. CREIZMAN:  No questions, your Honor.

4                    THE COURT:  Thank you, Mr. Creizman.

5                    Ms. Choi.

6                    MS. CHOI:  No questions, your Honor.

7                    THE COURT:  Thank you, Agent Beyer.  You may step

8       down.  You're excused.

9                    (Witness excused)

10                   THE COURT:  And Ms. Santillo -- Mr. Gross, you'll

11      return to the stand, please.

12                   And Mr. Creizman.

13                   MR. CREIZMAN:  Thank you.

14        TREVON GROSS, resumed

15                   THE COURT:  Thank you, Mr. Gross.

16                   And Mr. Creizman, you may proceed with your cross on

17      behalf of Mr. Lebedev.

18      CROSS-EXAMINATION

19      BY MR. CREIZMAN:

20      Q.  Good afternoon.

21      A.  Good afternoon.

22      Q.  Your first impression of Michael Murgio was that he was a

23      trustworthy person, correct?

24      A.  Yes.

25      Q.  And Mr. Murgio presented himself as a successful

H389LEB7                          Gross - cross

1   businessman?

2   A.  Yes.

3   Q.  And as active in community affairs?

4   A.  Yes.

5   Q.  Active in public service?

6   A.  Yes.

7   Q.  And he professed to share some of the same values that you

8   did, correct?

9   A.  Yes.

10  Q.  Including educating children?

11  A.  Yes.

12  Q.  Improving people's lives?

13  A.  Yes.

14  Q.  Entrepreneurship?

15  A.  Yes.

16  Q.  And helping the overall community?

17  A.  Absolutely, yes.

18  Q.  Now, your first impression of Anthony Murgio was a bit

19  different, fair to say?

20  A.  Not as strong, yes.

21  Q.  He's just not the same type of individual?

22  A.  Correct.

23  Q.  But, is it fair to say that he had some qualities that you

24  admired?

25  A.  Yes.

H389LEB7                              Gross - cross

1    Q.  His work ethic?

2    A.  Yes.

3    Q.  He had a great deal of enthusiasm.

4    A.  Absolutely.

5    Q.  Full of energy, right?

6    A.  Yes.

7    Q.  And he professed to be committed to the mission and goals

8    of the HOPE FCU, correct?

9    A.  Yes.

10   Q.  He brought an impressive team with him, right?

11   A.  Yes.  I thought so.

12   Q.  Provided you with their resumes?

13   A.  Yes.

14   Q.  Now, over time your impression of Mr. Anthony Murgio

15   changed?

16   A.  Yes.

17   Q.  And to paraphrase I think something -- an e-mail that you

18   sent to him that is in evidence, you basically found that

19   Anthony Murgio did whatever he wanted whenever he wanted?  Is

20   that a fair statement?

21   A.  Yes, it is.

22   Q.  Self-centered person?

23   A.  Yes.

24   Q.  Untruthful?

25   A.  Yes.

H389LEB7                          Gross - cross

1    Q.   Manipulative?

2    A.   Yes.

3    Q.   Now, you talked about the Collectables Club team in your

4    direct examination and cross-examination by the government,

5    correct?

6    A.   Yes.

7    Q.   Now, among the members of that team was Yuri Lebedev,

8    right?

9    A.   Yes.

10   Q.   Now, you're an educated man, fair to say?

11   A.   Yes.

12   Q.   You have multiple degrees?

13   A.   Yes.

14   Q.   And you have great respect for education?

15   A.   Absolutely.

16   Q.   And you looked at Yuri Lebedev's resume?

17   A.   Yes, I did.

18   Q.   And you saw that he had multiple degrees?

19   A.   Yes.

20   Q.   And you had some respect for his education?

21   A.   Yes.

22   Q.   And his expertise in IT?

23   A.   Yes.

24   Q.   Technology?

25   A.   Yes.

H389LEB7                         Gross - cross

```
1    Q.  Now, Yuri was given assignments for -- to work for the HOPE
2    FCU, correct?
3    A.  Yes.
4    Q.  And they were technology-related assignments?
5    A.  Yes, they were.
6    Q.  Now, you had to interact with him on occasion in connection
7    with his projects, right?
8    A.  Yes.
9    Q.  Now, you had a handful of communications with him?
10   A.  A handful, yes.
11   Q.  And these were business conversations, right?
12   A.  Generally, yes.
13   Q.  Not social discussions?
14   A.  Not really.  I think one time we had more of a pastoral
15   kind of conversation about direction for your life, but
16   generally they were business conversations.
17   Q.  You didn't know him that well?
18   A.  No.
19   Q.  Now, did you find Mr. Lebedev to be diligent in working on
20   these projects?
21   A.  Yes.
22   Q.  Did you find him to be responsive in working on these
23   projects?
24   A.  Yes.
25   Q.  And you found him to be respectful as well, correct?
```

1   A.  Yes.  Yes.  Absolutely.

2   Q.  Always referred to you as pastor?

3   A.  Yes, he did.

4   Q.  Now, I want to ask you a few questions about Yuri Lebedev's

5   projects.

6           Now, Yuri's -- is it accurate to say that Yuri's job

7   was to try to update HOPE FCU's technology?

8   A.  Yes.

9   Q.  Make it more efficient?

10  A.  Yes.

11  Q.  Modernize it?

12  A.  Yes.

13  Q.  Now, he worked on updating the HOPE FCU website; is that

14  right?

15  A.  Yes.

16  Q.  And he worked on updating the look of the website, correct?

17  A.  Yes.

18  Q.  And helped with the functionality of the website?

19  A.  Yes, sir, he did.

20  Q.  And you mentioned I believe on direct about the website

21  being run by WordPress, a program called WordPress, right?

22  A.  Yes.  Something like that.

23  Q.  And do you recall whether Mr. Lebedev tried to change that

24  program, to get rid of that particular program for the website?

25  A.  I vaguely recall something like that.

H389LEB7                          Gross - cross

1   Q.  Now, Yuri was also involved in automatic -- automating OFAC

2   streaming; is that right?

3   A.  Yes.  That was one of his projects.

4   Q.  That's anti money laundering compliance, correct?

5   A.  Yes.

6   Q.  And that's -- and in addition he worked on streamlining

7   account opening procedures for new members, right?

8   A.  Yes, yes.

9   Q.  Allowing new members to apply online?

10  A.  Yes.

11  Q.  Now, you recall some questions you were asked about, by

12  Mr. Noble about Rico Hill entering transactions that were

13  processed by Alloya?

14  A.  Yes.

15  Q.  These were transactions that had already been processed?

16  A.  Yes.

17  Q.  And it was a bookkeeping function basically?

18  A.  Yes.

19  Q.  And what Rico was doing was manually entering transaction

20  after transaction, right?

21  A.  Correct.

22  Q.  And Yuri Lebedev was tasked with creating a program to

23  automate those entries; is that right?

24  A.  That is correct.

25  Q.  You also recall that HOPE FCU worked with CU South?

H389LEB7                         Gross - cross

1   A.  Yes.

2   Q.  Now CU South was a -- provided some sort of technology

3   service to HOPE FCU?

4   A.  Yes.  They provided our back office technology.

5   Q.  So they provided the back office technology.  And

6   Mr. Lebedev was tasked with researching and identifying

7   potential alternatives, correct?

8   A.  Yes, he was.

9   Q.  That would be more cost efficient?

10  A.  Absolutely, yes.

11  Q.  And he -- and you talked to him about that, right?

12  A.  Yes.

13  Q.  And he did identify some potential alternatives?

14  A.  I believe he did, yes.

15  Q.  Now, in your dealings with him did you find Mr. Lebedev to

16  be dishonest?

17  A.  Not at all.

18  Q.  Now, you testified that Mike Murgio made a number of

19  misrepresentations about the Collectables Club, right?

20  A.  Yes.

21  Q.  Did Mr. Lebedev make any misrepresentations to you about

22  the Collectables Club?

23  A.  Not that I recall, no.

24  Q.  You testified that Anthony Murgio made misrepresentations

25  to you about a number of things, correct?

1    A.  Yes.

2    Q.  Did Mr. Lebedev make misrepresentations to you that you can

3    recall?

4    A.  No.

5    Q.  Now, you also discussed negotiating at the beginning an

6    arrangement between the Collectables Club and HOPE FCU.  Do you

7    recall that?

8    A.  Yes.

9    Q.  And the principal person you dealt with was Michael Murgio?

10   A.  Yes.

11   Q.  And in that process you also dealt with Anthony Murgio?

12   A.  Yes.

13   Q.  During that process you never dealt with Yuri Lebedev?

14   Fair to say?

15   A.  That's fair to say.  Not at all.

16   Q.  There were a number of in-person meetings about this

17   negotiation?

18   A.  There were a few, yes.

19   Q.  And Mr. Lebedev was not at those meetings?

20   A.  No, he was not.

21   Q.  Now, before you were charged in this case you met

22   Mr. Lebedev in person only once, right?

23   A.  Yes.  I think just one time.

24   Q.  And we've had a chance to hear some of that interaction,

25   correct, during the trial?

1    A.  Yes.

2    Q.  There is a tape and a transcript, in fact?

3    A.  Yes.

4    Q.  Now, since you were charged in this case your only meetings

5    with Mr. Lebedev have been court appearances, right?

6    A.  That's correct.

7    Q.  And the most you've discussed with him, exchanged some

8    pleasantries, right?

9    A.  Correct.

10   Q.  No social meetings with him?

11   A.  No.

12   Q.  No telephone calls?

13   A.  No.

14   Q.  No e-mails?

15   A.  No.

16   Q.  Now, by the way, before you were charged in this case you

17   never met me?

18   A.  No, sir.

19   Q.  Or Melissa Madrigal?

20   A.  No, sir.

21   Q.  Or even Jonathan Michaelson?

22   A.  No, sir.

23   Q.  Or even anyone in my firm, to your knowledge?

24   A.  No, sir.  To my knowledge.

25   Q.  Now, we've also met at court appearances?

1   A.  Yes.

2   Q.  And we've exchanged pleasantries?

3   A.  Yes.

4   Q.  And at this case I've even provided candy to the table,

5   correct?

6   A.  Yes, you have.

7   Q.  And you've called me the candy minister?

8             MR. NOBLE:  Objection.

9             THE COURT:  Sustained.

10            Mr. Creizman.

11            MR. CREIZMAN:  Okay.  I'll move on.

12  Q.  We'll go to the November 22, 2014 meeting.

13            You had a dispute with the Collectables Club at that

14  meeting?  That's obvious, right?

15  A.  Yes.

16  Q.  They made promises -- there were promises that you believed

17  they made to you, correct?

18  A.  Correct.

19  Q.  And promises they hadn't fulfilled; is that right?

20  A.  Yes.

21  Q.  Promises -- and those promises were made by Michael Murgio

22  and Anthony Murgio, right?

23  A.  Correct.

24  Q.  Not promises made by Yuri Lebedev?

25  A.  Not at all.

H389LEB7                        Gross - cross

1    Q.   Now, the Collectables Club for their part, regardless

2    whether you view it as right or wrong, they expressed some

3    concerns about assurances, right, they wanted assurances for

4    their part?  Is that fair to say?

5    A.   Correct.

6    Q.   And they expressed that they wanted to make Anthony

7    Murgio's financial backers comfortable; is that right?

8    A.   Yes.

9    Q.   Now, at that point -- during that meeting the trust between

10   the parties had broken down; is that right?

11   A.   Yes.  That's correct.

12   Q.   And by the end of the meeting the relationship had broken

13   down?

14   A.   Correct.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

H38KLEB6                       Gross - Cross

1    BY MR. CREIZMAN:

2    Q.  And from your perspective, it had broken down beyond

3    repair?

4    A.  That is correct.

5    Q.  From your perspective, at that meeting, the people who were

6    speaking on behalf of the Collectables Club were Anthony Murgio

7    and Michael Murgio; is that right?

8    A.  That's correct.

9    Q.  Yuri Lebedev, from your perspective, was he speaking on

10   behalf of the Collectables Club or not?

11   A.  He remained silent most of the time.

12   Q.  He did make a number of statements during the meeting; is

13   that right?

14   A.  I vaguely recall that, yes.

15   Q.  But you weren't too concerned about what he was saying,

16   right?

17   A.  No, I was not.

18   Q.  You didn't view him as a decision-maker for the

19   Collectables Club, did you?

20   A.  No, not at all.

21          MR. CREIZMAN:  Ms. Grant, if we can turn to

22   Exhibit 2506-T in evidence, at page 18.  If we look ten lines

23   from the bottom.  I'm going to read this just to make things go

24   faster.

25          Anthony Murgio says:  "But there was an incentive for

1   you not to do that because I was bringing a business to the

2   table so" --

3          And then from Mr. Gross:  "There was no -- what

4   incentive, Anthony?"

5          Anthony Murgio:  "No, no, no, no.  I'm just saying

6   that if the -- if the" --

7          Lebedev:  "Let's say" --

8          Anthony Murgio steps in:  "The opportunity and the

9   business is growing, uh, and you wouldn't -- if there wasn't

10  risk, you wouldn't want to cut it off.  You would want to keep

11  that, keep that growing."

12         Then Lebedev jumps in:  "For poker players, you know,

13  if it's a poker game, you know, something like that."

14  Q.  Do you recall that sitting here today, Mr. Lebedev saying

15  that?

16  A.  I really don't, but I read it here, so...

17  Q.  Okay.  And reading it even here, do you have any idea what

18  Mr. Lebedev was saying?

19  A.  Not a clue.

20  Q.  Now, let's turn -- well, actually, there was a discussion,

21  as you recall, later on by the end of the meeting about a

22  $50,000 donation, correct?

23  A.  Yes.

24  Q.  And the barrier was a lack of trust between the parties,

25  correct?

1    A.  Yes.

2    Q.  You had had it up to here with the Collectables Club's

3    promises?

4    A.  Yes.

5    Q.  And Murgio agreed to pay the $50,000 on a simultaneous

6    exchange, right?

7    A.  That was one of the proposals, yes.

8    Q.  Or at least he said he would do that, right?

9    A.  Yes.

10   Q.  But then you said -- you set a deadline of Monday, right?

11   A.  Yes.

12   Q.  Because is it fair to say you were tired of the Murgios

13   breaking their promises?

14   A.  That is correct.

15   Q.  And Murgio, all of a sudden, says at one point, well, maybe

16   not Monday, maybe Tuesday, right?

17   A.  Right.

18   Q.  And that upset you; is that right?

19   A.  Yes, it did.

20           MR. CREIZMAN:  If we can turn to page 37.  And this is

21   ten lines from the top.

22           I'm going to start with what Mr. Gross says.  "So I

23   don't -- I don't like all of this.  Oh, it may be Tuesday.

24   Let's -- let's" --

25           And then Lebedev says:  "I'll get 50, I'll give you.

1    It's fine."

2            And then Trevon Gross says:  "Let's make it happen.

3    See, see, here's the thing cuz" --

4            Lebedev:  "Don't worry about it.  I got."

5            Gross:  "I just want this to happen, so that I want

6    you can see -- I want you to all -- to feel the comfort."

7            And then this conversation continues.

8    Q.  Is it fair to say that you ignored Mr. Lebedev's comments?

9    A.  That's very fair to say.

10   Q.  Because Mr. Lebedev was pretty much missing the point,

11   wasn't he?

12   A.  Yes.

13   Q.  It wasn't a question?

14           MR. NOBLE:  Objection.  I'm sorry, as to the last

15   question.

16           THE COURT:  Sustained.

17           You may rephrase.

18   Q.  From your perspective, wasn't Mr. Lebedev missing the

19   point?

20   A.  Yes, he was.

21   Q.  Because the issue wasn't whether Anthony Murgio could get

22   the funds by Monday, the issue was the lack of trust at this

23   point, wasn't it?

24   A.  Correct.

25   Q.  You don't respond to Mr. Lebedev, and Anthony Murgio

1    doesn't respond to Mr. Lebedev, right?

2    A.  Right.

3    Q.  You don't jump in and say, hey, great, problem solved,

4    right?

5    A.  Not at all.

6    Q.  And Anthony Murgio doesn't get up and say, thanks, Yuri, we

7    got it covered, terrific, right?

8    A.  Right.

9    Q.  None of that happens?

10   A.  Right.

11   Q.  Now, I want to talk about what happened after the

12   November 22nd meeting.

13   A.  Okay.

14   Q.  Now, you've had it with the Collectables Club at that

15   point?

16   A.  Yes.

17   Q.  You didn't want to hear from any of them?

18   A.  None of them.

19   Q.  But a number of people reached out to you in the weeks

20   after that November 22nd meeting?

21   A.  I think that very next week.

22   Q.  Okay.  And the idea was to try to rescue this relationship,

23   right?

24   A.  Yes.

25   Q.  One of those people includes Anthony, right?

1   A.  I believe so, yes.

2   Q.  And do you recall Jose Freundt reaching out to you?

3   A.  Yes, I do.

4   Q.  You rebuffed their advances; is that fair to say?

5   A.  Most definitely.

6   Q.  Now, Yuri Lebedev didn't reach out to you during that time,

7   did he?

8   A.  I don't believe so.

9   Q.  Let's take it a few months later, to 2015, March or April.

10          You have a LinkedIn account, right?

11  A.  Yes.

12  Q.  That's a social networking site?

13  A.  Yes.

14  Q.  And it's actually more for professional networking; is that

15  fair to say?

16  A.  Yes.

17  Q.  You recall, in March or April of 2015, receiving a LinkedIn

18  message from Mr. Lebedev?

19  A.  I do.

20  Q.  In sum and substance, the message was basically, no hard

21  feelings?

22  A.  Generally, yes.

23  Q.  "I enjoyed working with you," do you recall that?

24  A.  I do.

25  Q.  "I hold you in the highest regard"?

H38KLEB6                         Gross - Cross

```
 1    A.  Yes.
 2    Q.  "I respect you and hope you don't take it personally"?
 3    A.  Yes.
 4    Q.  Now, you responded to Mr. Lebedev?
 5    A.  I believe I did.
 6    Q.  And said something along the same lines?
 7    A.  I believe so, yes.
 8    Q.  Now, you know that Mr. Lebedev was charged in July of 2015,
 9    right?
10    A.  Yes.
11    Q.  You were here for Agent Jarrow's testimony, were you not?
12    A.  Yes, I was.
13    Q.  And you understand from Special Agent Jarrow that this was
14    a secret operation, right?
15    A.  Yes.
16    Q.  And it was a surprise takedown, surprise arrest?
17    A.  Yes.
18    Q.  So, Mr. Lebedev's LinkedIn message to you was before those
19    July -- that 2015 arrest, right?
20    A.  Yes, it was.
21             MR. CREIZMAN:  Thank you, Pastor.  No further
22    questions.
23             THE COURT:  Ms. Santillo.
24             When you're ready.
25             MS. SANTILLO:  Yes.
```

1    REDIRECT EXAMINATION

2    BY MS. SANTILLO:

3    Q.  Hello, Pastor Gross.  Mr. Noble asked you some questions

4    about some overdrawn accounts.  I wanted to ask if you could

5    explain that for us?

6    A.  Yes.  Well, from time to time, accounts are overdrawn for

7    various reasons, and so there were times when checks were

8    written where the account was overdrawn, and it was brought

9    current.

10   Q.  I want to go back to Exhibit 3705.

11   A.  Okay.

12   Q.  Now, Mr. Noble asked you a question about this document,

13   correct, in connection with the Collectables Club and who they

14   were?

15   A.  Yes.

16           MS. SANTILLO:  If you could scroll --

17   Q.  Or, actually, if you could just read on the bottom what

18   Mr. Francis' first response to you was about who the

19   Collectables Club -- or who about who the Collectables Club

20   was?

21   A.  "They deal with collectible items."

22   Q.  Can you just note the date of that email?

23   A.  December 2nd.

24   Q.  In 2014?

25   A.  2014, yes.

H38KLEB8                    Gross - Redirect

1    Q.  Now, prior to this email, you had had multiple

2    conversations with the NCUA about the Collectables Club,

3    correct?

4    A.  That is correct, yes.

5    Q.  Indeed, there was a document of resolution --

6            MS. SANTILLO:  Can I switch the ELMO?

7            Referring now to --

8            THE COURT:  I can't hear you, Ms. Santillo.

9            MS. SANTILLO:  I'm referring now to TG30.

10           THE COURT:  TG30, you said?

11           MS. SANTILLO:  Yes.

12           THE COURT:  Which is in evidence?

13           MS. SANTILLO:  Yes.

14           THE COURT:  All right.  Thank you.

15   BY MS. SANTILLO:

16   Q.  This is a document of resolution from the NCUA specifically

17   addressing the Collectables Club, correct?

18   A.  Correct.

19   Q.  So when you were speaking with Ms. Flok, were you trying to

20   hide anything from her about the Collectables Club?

21   A.  Absolutely not.

22   Q.  What did you think the real issue was?

23   A.  I thought the real issue was identifying what type of ACH

24   processing Kapcharge was doing for the Collectables Club.

25   Q.  As of December 2nd, 2014, was there any ongoing

H38KLEB8                        Gross - Redirect

1   relationship between the Collectables Club and HOPE FCU?

2   A.  Not at all.

3   Q.  Mr. Noble asked you some questions about emails with

4   Mr. Adam about email accounts?

5   A.  Correct.  Yes.

6   Q.  What did you tell Mr. Adam when you were providing him with

7   access to the email accounts?

8   A.  As I recall, he had asked for all of the email accounts,

9   and I responded meaning that I wanted clarity.  We had also

10  given the authorization code to him which would allow him to

11  transfer full access to their possession, and then I think I

12  said -- and I -- here are all of the passwords for all of the

13  active email accounts.

14  Q.  Why did you not provide them with the Collectables Club's

15  account when you were giving them the active accounts?

16  A.  At that time, they were inactive, and I thought he only

17  needed all of the active ones because I understood his purpose

18  to be no one carrying on business in the name of the credit

19  union once it had been conserved.  So only the active ones

20  could transact business.

21  Q.  What led you to believe that these were inactive accounts?

22  A.  Because they had been deactivated when we cut them off.

23  So, back in 2014, almost a year before, we had cut off all of

24  their access and deactivated all of their email accounts and

25  everything else.

1   Q.  Mr. Noble asked you some questions about the fees from

2   Kapcharge for 2014 being $7,000.  Can you put that in the

3   context of the credit union, the HOPE Credit Union, prior to

4   the relationship with Kapcharge?

5   A.  Yes.  That $7,000 represented a little more than seven

6   years of income in one year for us.

7   Q.  What kind of revenue could you get from $500 loans that you

8   might have been putting out?

9   A.  In a year's time?  Maybe $15 worth of interest.

10  Q.  What did you think about the possibilities of ACH

11  processing as a growth strategy?

12  A.  That it would certainly grow the credit union, as it is

13  doing in any financial institution that's using ACHs.

14  Q.  What is your view of the relationship between the role of a

15  consultant, as you were for the Collectables Club, and the role

16  as chairman at the credit union?

17  A.  Well, they're two different roles.  So one is a -- the

18  chairman role is the chairman of the board, it is a volunteer

19  position for which you cannot be paid.  And the consultant

20  piece is exactly that, it is working, it is being compensated

21  for work that you're doing.

22          In this case, of course, we were more concerned about

23  the fact that I was already being paid, but my time was being

24  taken from where I was being paid and put into the credit

25  union.  So it was to make sure the church was reimbursed for my

1    time that the credit union was taking up.

2    Q.  What kinds of projects had been taking place in the credit

3    union during that time?

4    A.  Everything.  Any and everything was happening as it relates

5    to technology projects.  We were doing demos for new system

6    software, Yuri was leading that endeavor.  We were learning

7    more about the whole ACH processing.  We were looking at

8    different ways to upgrade all of our infrastructure, how to

9    onboard members electronically.  There was a whole host of

10   things that were going on, in addition to all the compliance

11   things that we talked about earlier.

12   Q.  Was this a more burdensome process than being the chairman

13   of a 107-person credit union?

14   A.  Most definitely.

15   Q.  What led you to believe that Mr. Blue was qualified to be

16   the CEO of the credit union?

17   A.  We've known Charles for well over 12 years, and he had

18   worked in various positions within the congregation to help the

19   church administratively.  I knew from his work background, as I

20   said earlier, that he had worked for, as a CFO, for

21   Bloomingdale's, as well as, I think, another company in North

22   Jersey as well.  It was a significant financial institution --

23   a significant business that had a huge bottom line, I think

24   like a half a billion dollar corporation.

25   Q.  Did he express a willingness to learn about ACH processing?

1   A.   Absolutely.  And it was my understanding, really, that the

2   work he had done -- because this was a sales company that he

3   had worked for in Northern Jersey, and it was my understanding

4   that in the whole sales process, there was some ACH processing

5   that he at least oversaw as it related to the financial

6   operations.  And, of course, he was not aware of it from a

7   credit union or banking perspective, because he had not been in

8   banking, but he most definitely, as a CFO of a half a billion

9   dollar corporation, understood what ACH processing was.

10  Q.   Now, Mr. Noble asked you a question about Pascal.  What is

11  Pascal?

12  A.   It is a programming language that I learned when I was in

13  my junior year of high school.

14  Q.   Is it still the cutting edge?

15  A.   I would hope not.

16  Q.   Now, Mr. Noble also asked you about Kapcharge and when Meg

17  Flok came to the credit union to ask about Kapcharge's file?

18  A.   Yes.

19  Q.   Now, you noted that Kapcharge had already previously had a

20  file?

21  A.   That is correct.

22          MS. SANTILLO:  Ms. Grant, pull up Exhibit 1147,

23  please.  It's in evidence.

24  Q.   What does this appear to be?

25  A.   This is an email acknowledging the account being created

1    for Kapcharge.

2    Q.  Could you read the date, please?

3    A.  The date is May 23rd, 2014.  And it includes a subject line

4    of "Kap driver's license."

5             MS. SANTILLO:  If you could also pull up Government

6    Exhibit 1146-A.

7    Q.  And what does that appear to be?

8    A.  An email from Trustee Collectables to myself, subject:

9    "Kap driver's license," and it has two JPEGs attached to it.

10   Q.  So when you were seeking to recreate the Kapcharge file,

11   were you trying to create a file that was inconsistent with the

12   history of the account?

13   A.  Not at all.

14   Q.  Were you, in fact, in the process of moving and putting

15   things into storage?

16   A.  Yes, we were.  As you recall, Mr. McDonough mentioned how

17   it was a problem that the credit union was not in its field of

18   membership, and one of the things we were committed to doing to

19   deal with that issue on our document of resolution was to get

20   back into our field of membership.  So we were packing up the

21   credit union to find someplace to put it in the field of

22   membership.

23             MS. SANTILLO:  If you could turn to Government's

24   Exhibit 6150.

25   Q.  Mr. Noble quoted you some sections from the bylaws of the

1   credit union?

2   A.  Yes.

3   Q.  How many pages are the bylaws?

4          MS. SANTILLO:  If you could scroll through them,

5   please.  Thank you.

6   Q.  How often were you called upon to read and interpret the

7   bylaws?

8   A.  Very infrequently, but about once a year, I think, we

9   revisit them in some form or used to revisit them in some form.

10  Q.  Mr. Noble discussed with you Mr. Curry's testimony about

11  how a member of an association couldn't automatically be in the

12  field of membership, correct?

13  A.  Yes, I do recall that.

14  Q.  Do you also recall Mr. McDonough's testimony?

15  A.  Yes, I do.

16  Q.  And what did he testify to about an association being in

17  the field of membership?

18  A.  Mr. McDonough said it was allowable.  It was an obscure --

19  I think was the word he used -- rule that allowed low-income

20  credit unions to have associations in their field of

21  membership.

22  Q.  Mr. Noble asked you about some checks that had been written

23  to you?

24  A.  Yes.

25  Q.  And why were those checks written?

H38KLEB8                         Gross - Redirect

1    A.   Those checks were written for me to get money that was owed

2    to me by the church.  As I said earlier, when I was supposed to

3    be able to cash my check, I wasn't able to for many, many

4    months.  And after a certain period of time, when you collect

5    paper, I would give them back to the church, they would take

6    whatever that net amount was, on which taxes had already been

7    paid, and they would put it on a ledger for me.  So the payroll

8    taxes had already been paid on those checks, I just couldn't

9    cash them to get my net portion.

10          So, even though my W-2 said $50,000, it didn't

11   necessarily mean that I got the 50,000, it meant that 50 had

12   flowed through payroll, but I wasn't able to always cash my

13   check.

14   Q.   So it was your understanding that taxes had already been

15   paid on the accounts?

16   A.   Correct.  Because our accountant -- years ago, when this

17   started happening, our accountant actually said the best way to

18   do this was to take the amount that was owed me and actually

19   add it as a liability, and I had a right to even get interest

20   on that money since it was earned by me, but the church

21   couldn't pay it to me.

22          MR. NOBLE:  Objection.  Move to strike.

23          THE COURT:  Grounds?

24          MR. NOBLE:  Hearsay.

25          MS. SANTILLO:  It goes to intent.

1            THE COURT:  Yes.  Overruled.

2    BY MS. SANTILLO:

3    Q.  You can finish your answer.

4    A.  Yes.  But I was never charged interest like that to the

5    church, but I did want to at some point be able to get the

6    money that I had earned.  And we're talking some years, I would

7    go six months without getting paid, so much so, that our house

8    went into foreclosure.

9    Q.  Now, when the credit union -- or when the church received a

10   donation of $150,000, you might have -- did you ever consider

11   taking that money for yourself, given all the outstanding money

12   that was owed to you?

13   A.  No, ma'am.  About that -- at around that time, the church

14   owed me, I'm sure, over $80,000 in back salary that I had not

15   been able to cash checks for.

16   Q.  Did any of the money that came from the Collectables Club

17   go to any back salary for you?

18   A.  No, ma'am.

19   Q.  Mr. Noble suggested that there had not been a capital

20   infusion into the credit union from the Collectables Club.  But

21   were there certain items that the Collectables Club undertook

22   to pay for on behalf of the credit union?

23   A.  They did, yes.

24   Q.  What were those items?

25   A.  The one I remember explicitly was the debit card program.

1              The Collectables Club, correct?

2    Q.  Yes.

3    A.  Yes, the debit card program.

4    Q.  And were there any other type of technological advancements

5    that they were bringing to the credit union?

6    A.  Yes.  They had planned to do some software development on

7    various items, but they really were never realized.

8              The length of the partnership went from, like, July to

9    November, so that's the length of time we're talking about.

10   We're not talking about years.  So, there were a lot of

11   promises and a lot of things on the table, but the relationship

12   disintegrated before anything substantive could really happen.

13   Q.  Now, you noted -- we've had a lot of discussions about the

14   NCUA examiners, and the scope, and the vigorous nature of their

15   examination.

16             Were you ever made aware that the NCUA had received a

17   tip in August 2014 that somebody was going to be putting

18   millions of dollars into the credit union from Eastern Europe?

19   A.  No, I did not.

20             MR. NOBLE:  Objection.

21             THE COURT:  Just a second.

22             Grounds?

23             MR. NOBLE:  Calls for hearsay.

24             THE COURT:  Overruled.

25             THE WITNESS:  Could you ask the question again,

3814

1    please?

2    BY MS. SANTILLO:

3    Q.  Were you ever made aware that the NCUA received a tip that

4    people from Eastern Europe were looking to put millions of

5    dollars into the HOPE Credit Union?

6    A.  No.  Sorry.

7    Q.  Go ahead.

8    A.  No, I was never informed.

9    Q.  Were you ever informed that that's what prompted their

10   investigation into HOPE FCU?

11   A.  I was never informed.

12   Q.  What was your understanding about why the NCUA was being so

13   aggressive in their examination?

14           MR. NOBLE:  Objection.

15           THE COURT:  Grounds?

16           MR. NOBLE:  Argumentative.

17           MS. SANTILLO:  There's a lot of evidence that --

18           THE COURT:  Counsel.

19           If argumentative is the grounds, overruled.

20   A.  Could you repeat the question, please?

21           MS. SANTILLO:  Could you read back the question?

22           THE COURT:  How about this:  Rephrase the question.

23   And it should be nonleading.

24           MS. SANTILLO:  Okay.

25   Q.  What was your understanding about why the NCUA was coming

1    to the credit union so often?

2    A.   They were coming because the field of membership issues,

3    and that's when they, of course, talked about the church not

4    being in the field of membership as well as the Collectables

5    Club not being in the field of membership.  And they asked us

6    to revalidate our entire membership file.

7    Q.   What was your reaction?

8    A.   We were not happy, because we had never been asked to do

9    that before, and particularly suggesting that the church now,

10   after seven years, was no longer eligible to be in the credit

11   union, when it had been in the credit union for that period of

12   time, seemed bizarre to us.

13   Q.   How did you respond to that?

14   A.   We were very upset, and we of course did what we were asked

15   to do, but we did it very grudgingly because it seemed like a

16   waste of time to go back and validate every account that had

17   been in the credit union and to validate why the church

18   members, in particular, were in the credit union.

19   Q.   Had you had an understanding about the reasons that they

20   were scrutinizing the credit union so much, would that have

21   changed your view about their examination?

22   A.   Could you rephrase that?

23   Q.   Sure.  If you had known why the NCUA came in to do such a

24   vigorous investigation, would it have changed your view about

25   the investigation?

1    A.  Oh, absolutely, yes, yes.

2    Q.  How?

3    A.  If they had told us about the tip that they had received

4    concerning our credit union, we would have shut everything

5    down.  There would have been nothing else to discuss, nothing

6    else to move forward on.

7              THE COURT:  Ms. Santillo, can you give me a time

8    estimate?

9              MS. SANTILLO:  Three minutes.

10             THE COURT:  Okay.

11   Q.  You testified for Mr. Noble, when Mr. Noble was

12   cross-examining you, about the financial backers for the

13   Collectables Club.  When did you learn that the Collectables

14   Club had financial backers?

15   A.  Sometime around that Saturday meeting, that you all have

16   heard the audio for, Michael Murgio, in particular, when we

17   were going around looking at locations in Lakewood, kept

18   saying, "our backers, our backers, our backers."  And that was

19   the first time I had heard that term, but he kept saying their

20   backers have so much money and it was going to make everybody

21   wealthy beyond their wildest dreams.

22   Q.  Was that a surprise to you?

23   A.  Yes, it was.

24   Q.  Had you ever heard of Unit Test --

25   A.  No.

H38KLEB8                        Gross - Redirect

1    Q.   -- prior to this trial?

2    A.   No, ma'am, I have not.

3    Q.   Had you ever heard of Vlad?

4    A.   No, I have not.

5    Q.   Mr. Noble suggested that the Hope Cathedral is a family

6    business.  What can you tell me about the Hope Cathedral?

7    A.   Hope Cathedral is a nonprofit organization, recognized by

8    the federal government as a 501(c)(3) religious organization.

9    We have a functioning board, we're up to date with all of our

10   business filings.  Yes, my wife and I are the founders, but we

11   have accountability in place throughout the whole ministry, up

12   to and including, when these charges were brought against me,

13   limiting my administrative abilities within the church and

14   limiting me to just being the teacher, not really attending

15   board meetings of the church, because we wanted to make sure

16   that there's accountability around this whole situation.

17   Q.   And what kind of oversight does the board of elders of the

18   church give to the church?

19   A.   The board of elders, they run the church, they're

20   ultimately responsible for everything, and that's their

21   responsibility.  And I'm thankful that some of them are here.

22   Q.   What financial control do they have over the church?

23   A.   They have complete financial control over the church.

24              MS. SANTILLO:  Thank you.  No further questions.

25              MR. NOBLE:  Just very briefly, your Honor?

1          THE COURT:  Very briefly.

2     RECROSS EXAMINATION

3     BY MR. NOBLE:

4     Q.  Mr. Gross, Ms. Santillo was just asking about

5     accountability at the church.  Do you recall that?

6     A.  Yes, sir.

7     Q.  Who was accountable when you were withdrawing thousands and

8     thousands of dollars from the church's bank account at the

9     credit union?

10    A.  Who was accountable?

11    Q.  Yes.  Who was accountable for that?

12    A.  Every expenditure that goes through the church is accounted

13    for and put in our chart of accounts and reported to the board.

14    Q.  So, it's your testimony that the board of elders approved

15    of you overdrawing the church's account at the credit union?

16    A.  Could you say that again, please?

17    Q.  Is it your testimony that the board of elders at the church

18    approved of you overdrawing the account at the credit union,

19    the church's account at the credit union, and putting that

20    money into your own personal account?

21    A.  I didn't testify to that.

22    Q.  But you said that it's the board of elders that's in charge

23    of the church's finances and they oversee the church's

24    finances, correct?

25    A.  I did say that, yes.

H38KLEB6                    Gross - Recross

1   Q.  So, they were aware that you were overdrawing the church's
2   bank account by thousands of dollars?
3   A.  What I am sure that they were aware of is that any
4   overdraft charge that the church ever got charged --
5   Q.  Mr. Gross, I didn't ask you about overdraft charges.  I
6   asked you about overdrawing the account.
7             MS. SANTILLO:  Objection, objection.
8             THE COURT:  Sustained.  Why don't you start your
9   question over.
10            MR. NOBLE:  Okay.
11            THE COURT:  And when you say "very brief," how much?
12            MR. NOBLE:  I have one question after this, if I can
13   get through this.
14            THE COURT:  Go ahead.
15  BY MR. NOBLE:
16  Q.  Mr. Gross, who approved, if anyone, of you overdrawing the
17  church's bank account by thousands of dollars and depositing
18  that money into your own personal bank account?
19  A.  Ultimately, the board of elders approved because they
20  looked at all the finances.
21  Q.  So your board of elders of your church allows you to
22  overdraw the church's own bank account at the credit union by
23  over $20,000?
24  A.  I didn't say that, sir.
25  Q.  Well, you testified that they would have been responsible

1    for that, right?

2    A.  No, I --

3              THE COURT:  Go ahead.

4    A.  No, I testified that that account would not have been

5    overdrawn by $19,000 if the loan that had been approved by the

6    board of elders had been funded when it was approved.

7    Q.  Okay.  But we put up, during my cross-examination earlier,

8    check after check after check that you wrote to yourself when

9    the church's bank account was in the negative, correct?

10   A.  You showed me checks that were written.  You didn't showed

11   me that they had overdrawn the account, sir.

12   Q.  Well, I believe you testified that there were other checks

13   that were drawn on the church's account, that you wrote to

14   yourself when the church's account was in the negative,

15   correct?

16   A.  I did say that, but I don't know --

17   Q.  Because we can go through each and every one if you would

18   like.

19   A.  No, I'm saying I did not know if all of those represented

20   that.  But most definitely --

21   Q.  But it was more than --

22             THE COURT:  Mr. Noble, don't interrupt the witness.

23             MR. NOBLE:  I apologize.

24   Q.  It was more than one?

25   A.  I believe so, yes.

H38KLEB6                         Gross - redirect

1    Q.  It wasn't just the one example?

2    A.  No, no, no, no, sir, it was not.

3    Q.  Okay.  Now, you --

4              THE COURT:  Is this the last question?

5              MR. NOBLE:  Yes, your Honor.

6              THE COURT:  All right.

7    Q.  Now, Mr. Gross, Ms. Santillo asked you about the $7,000

8    that the credit union earned in ACH fees in 2014.  You remember

9    that?

10   A.  Yes.

11   Q.  And you testified that that was a lot of money for the

12   credit union?

13   A.  Yes.

14   Q.  But your church that year received over $150,000 from

15   Kapcharge and Collectables Club, correct?

16   A.  Yes, it did.

17   Q.  That's a lot more than the $7,000 that the credit union

18   got?

19   A.  Yes, it is.

20             MR. NOBLE:  No further questions.

21             THE COURT:  Thank you.

22             MR. CREIZMAN:  No questions, your Honor.

23             THE COURT:  Ms. Santillo, all set?

24   REDIRECT EXAMINATION

25   BY MS. SANTILLO:

H38KLEB6

1    Q.  Mr. Gross, who paid the overdraft fees from those accounts?

2    A.  Any account that the church has that has any overdraft fee

3    is charged against that account that has my unpaid salary,

4    because I believe, as the leader, if the church doesn't have

5    the money it needs, that the church shouldn't pay that.  So any

6    of those $35 fees you get for insufficient funds, those were

7    charged against my unpaid salary.  And the board is very much

8    aware of that.

9                MS. SANTILLO:  Thank you.

10               THE COURT:  All right.  Thank you.

11               Mr. Gross, you're excused.  You may step down.

12               (Witness excused)

13               THE COURT:  Ladies and gentlemen of the jury, it's a

14   couple minutes after 5:00 -- I apologize -- but we'll resume at

15   9:30 in the morning.  I'll see you then.  Thank so much.

16               (Continued on next page)

17

18

19

20

21

22

23

24

25

H38KLEB6

```
 1              (Jury not present)
 2              THE COURT:  Matters to take up?
 3              MS. CHOI:  Your Honor, I just wanted to note that
 4    there are sort of two outstanding issues with regard to what
 5    might go forward.
 6              I presume that there aren't any further defense
 7    witnesses or any other things that you're planning to do?
 8              THE COURT:  Ms. Santillo?
 9              MS. SANTILLO:  No, your Honor.
10              THE COURT:  So when we come back, the first order of
11    business is, you'll rest, on behalf of Mr. Gross?
12              MS. SANTILLO:  When we come back when?  Tomorrow?
13              THE COURT:  Yes.
14              MS. SANTILLO:  Yes, yes, yes, your Honor.
15              MS. CHOI:  We seem to all be confused about when to
16    rest but --
17              THE COURT:  We've done some out of order and --
18              MS. CHOI:  Fair enough.
19              THE COURT:  I had a moment where I couldn't remember
20    where we were, in direct or cross.
21              Okay, so the first order of business will be resting
22    on behalf of Mr. Gross.  And then?
23              MS. CHOI:  I think there are two potential issues.
24    One is simply I hope that we can work out the outstanding
25    document issue, now that there's time.
```

H38KLEB6

```
 1              THE COURT:  Yes, there's time.  So let me set a
 2     deadline.
 3              Ms. Santillo, you tell me -- or I'm not sure, I think
 4     this might be Mr. Klingeman's -- we need to pick a time by
 5     which there will either be resolution or something for me to
 6     consider that's in dispute.
 7              MS. SANTILLO:  That's fine.  I will review them right
 8     now.
 9              THE COURT:  Okay.
10              How about this:  Let me just hear from you tonight if
11     there's a lot of work to do before 9:30, and then we can come
12     in early and get it done.  Tell me what's reasonable,
13     Ms. Santillo, a time I'll hear from you tonight indicating
14     there are no issues or there's 15 minutes' worth of issues or
15     an hour worth of issues and the like.  And then I'll put out an
16     order what time to be here.
17              MS. SANTILLO:  How about 8:30?  That's our --
18              THE COURT:  That's the magic number.  Okay?  Is that a
19     reasonable plan?
20              MS. CHOI:  That's fine.
21              THE COURT:  If it's a substantial amount of time,
22     we'll have the jury at 9:30 ready to go, so we'll meet as early
23     as we need to.
24              MS. CHOI:  Just to be clear, I want to understand:
25     The 8:30 is because -- is that an assumption about how long we
```

1   would need to go through the evidentiary issues?

2           THE COURT:  No, no, no.  She's saying 8:30 tonight.

3   She's going to review them now.

4           MS. CHOI:  Perfect.

5           THE COURT:  She'll let me and everyone know by 8:30

6   tonight if there is a substantial basis for disagreement that

7   we need to work through before 9:30 tomorrow, in which case,

8   we'll come in at 7:30 or 8:00 in the morning; and if there's

9   not, then we'll meet as usual at 9:00.

10          MS. CHOI:  Your Honor, I think the one thing the

11  government wants to note is:  We may want to call one short

12  rebuttal witness.  We still haven't figured that out as of yet.

13  We're going to go back to the transcript and see if it's really

14  necessary, and we'll let the parties know if that's our

15  intention.

16          THE COURT:  Who might it be?

17          MS. CHOI:  We haven't figured that out yet.  I think

18  the only question might be whether or not we want to put on a

19  very quick summary witness with regard to certain of the checks

20  that were testified about today but that's in Mr. Gross'

21  testimony.  But that would basically be it, just to sort of

22  summarize as opposed to have me sit there walking it through

23  during closing.  I think it would be more efficient to do it

24  that way.

25          THE COURT:  Go ahead, Mr. Klingeman.

1          MR. KLINGEMAN:  We object to that.  The fact is, the

2     government put on yesterday a witness for this very purpose,

3     who testified extensively and submitted a 128-page summary that

4     included the checks or at least reference to the checks.  And

5     today the government invited this testimony through its

6     cross-examination and opened the door to it, and Mr. Gross was

7     very clear.  And now the government's planning to let us know

8     at some point between now and tomorrow, when we're supposed to

9     be giving our closing statements, if they're going to call

10    another witness for which we'll have to prepare, for which we

11    have received no Jencks material.

12         I strenuously object.  I want to get on with the

13    closing, which is what I thought we were going to do.

14         THE COURT:  Well, they get a rebuttal but --

15         MS. CHOI:  It's not about that issue, your Honor.

16    It's about the fact that it would be about Mr. Gross'

17    representations about his income with the church, which is a

18    separate question than what was going on --

19         THE COURT:  I think what I'm unlikely to do is allow

20    anything in the summary expert area that I permitted --

21         MS. CHOI:  The RSM witness?

22         THE COURT:  Right, Mr. Rollins.

23         -- which I permitted under, as explained under a

24    number of circumstances, including advance notice, both of the

25    witness and as to what he would specifically testify to, a lack

1    of prejudice and ability for the defense to call someone.  So,

2    if it's anything in that regard, no, no.

3         MS. CHOI:  Right, understood.  It would be very

4    simple.  It would be:  Here's the checks, here is a chart, end

5    of story, these are the checks, and when they were cashed.

6         MR. KLINGEMAN:  The government's entitled to do that

7    with a demonstrative through the closing argument.  There's no

8    restriction on their ability to do that.

9         MS. CHOI:  That's fine.  Usually, defense counsel

10   objects to having demonstratives in the closing that aren't in

11   evidence, which we have been --

12        THE COURT:  Well, if you want to suggest a

13   demonstrative and run it by Mr. Klingeman and see if there's no

14   objection to it as a demonstrate for closing, then I think that

15   will take care of that.  If there is an objection, then you'll

16   need an alternative proposal on how to get something in.

17        MS. CHOI:  Understood, your Honor, and we will.  And I

18   think that's it.

19        I guess the only other thing with regard to planning

20   is, I presume your Honor, given that we have ended later than

21   we had expected, would continue through all of the closings

22   until 5:00 o'clock, even if that would mean to stop halfway

23   through someone's summation, correct?

24        THE COURT:  Yes.  I think if we're five minutes away

25   from being done, I'll go over, maybe up to ten to fifteen

H38KLEB6

1    minutes.  But I think I made a promise to the jury and they set

2    their lives around that promise, so I won't keep them past

3    5:15.

4              MS. CHOI:  Understood, your Honor.  Thank you.

5              THE COURT:  Ms. Madrigal?

6              MS. MADRIGAL:  Your Honor, we have worked through this

7    12-page list of exhibits with the government.  I am just

8    concerned with what the government plans to actually publish

9    during its rebuttal case, because I don't know if it's going to

10   raise issues as to 106 issues or the order, the presentation of

11   the exhibits.  So I would just like the government to give us a

12   list of what they actually intend to publish and in what order.

13             MS. CHOI:  I mean the problem is, we don't know.  The

14   whole reason we had this chart, went through this exercise, to

15   begin with is because we'd like to have available to us

16   evidence to undermine various defenses that may be raised or

17   arguments that may be raised over the course of defense's

18   closing.  So I can't represent what exhibit would be published

19   in rebuttal.  I think part of the exercise that your Honor

20   asked the defendants to go through was to determine if they

21   thought if there was any potential prejudice based on the

22   availability of witnesses.  I have not heard that

23   representation from Ms. Madrigal, I have not heard that

24   representation from Mr. Klingeman --

25             THE COURT:  So you're --

1          MS. CHOI:  Sorry, do you mean --

2          THE COURT:  Ms. Choi.  Ms. Choi.

3          MS. CHOI:  Sorry, your Honor.

4          THE COURT:  They're done.  So it's just a question of

5    when you'll tell them what you're going to publish.

6          MS. CHOI:  I misheard.  I thought she meant rebuttal

7    as in the closing as opposed to rebuttal case.  When you said

8    rebuttal, that's what I heard.  So that's totally understood.

9    We will tell you if we're going to publish anything.  We're not

10   going to.  That's our understanding.

11         THE COURT:  Your current plan is not to publish --

12         MS. CHOI:  Correct.

13         THE COURT:  -- during the government's rebuttal case?

14         MS. CHOI:  Correct.

15         THE COURT:  By when will you tell?

16         MS. CHOI:  8:30.

17         THE COURT:  8:30?  Thank you, Ms. Madrigal.

18         Anything else?

19         MR. CREIZMAN:  Yes, your Honor.  I'd note that I was

20   the first attorney in the court today and strenuously object to

21   any idea of 7:30 or 8:00 o'clock appearance or even an 8:30, if

22   that's okay.  Thank you very much.  Melissa has been on time

23   every single time.  So thank you.

24         THE COURT:  Anything else?

25         I invited a couple times if there's anything

1    additional in terms of the charge.  I think I have a few just

2    final typo-related matters.  Not typo but --

3                MR. CREIZMAN:  On a serious point, just in case this

4    might be the time, because I'm not used to a rebuttal case, but

5    I renew my Rule 29 motion that I made earlier, after the

6    defense case.  That's all.

7                THE COURT:  Okay, all right, thank you.

8                MR. KLINGEMAN:  As do I.

9                THE COURT:  Thank you.  I reserve.

10               Did anyone else have anything additional on the

11   charge, so I can finalize it tonight?

12               MR. SHIN:  Nothing else, from the government, your

13   Honor.

14               THE COURT:  All right.

15               MS. SANTILLO:  No, your Honor.

16               THE COURT:  The typos, I think, I can send you but

17   there's one I wanted to discuss.

18               The withdrawal from the conspiracy charge, instruction

19   number 27, it is phrased in the singular, "the defendant."  And

20   I just wanted to make sure that's what folks were comfortable

21   with or if there was a request to put it in the plural.

22               Mr. Creizman?

23               MR. CREIZMAN:  No request.  I don't think there's any

24   evidence that --

25               MS. SANTILLO:  Could we put it in Trevon Gross' name?

H38KLEB6

```
1                THE COURT:  Mr. Shin?

2                MR. SHIN:  Your Honor, just for the sake of

3    consistency, I think there are other instructions that also

4    apply only to one and I think what we've done is just to say "a

5    defendant."  And what I am thinking of is --

6                THE COURT:  So changing from "the defendant" to "a

7    defendant"?

8                MR. SHIN:  Yes.

9                MS. SANTILLO:  Your Honor, I think, it only makes

10   sense if they're going to evaluate the issue, to evaluate it

11   vis-a-vis Mr. Gross.

12               THE COURT:  I agree.  I think it's just a consistency

13   question.  It will be clear in closing whose argument it is.

14   As I sit here, I'm not sure if there are others that would need

15   to change.  Can you think of any?

16               MR. SHIN:  I'm just thinking of whether the

17   defendant -- a defendant has testified.  That's one that

18   applies to one versus the other.

19               THE COURT:  Right.

20               MR. CREIZMAN:  I think your Honor updated it.

21               THE COURT:  I did update it to reflect that, but I

22   don't say Mr. Gross has testified but Mr. Lebedev hasn't.  So

23   it's a neutral charge for the jury to apply in light of your

24   arguments.

25               MR. CREIZMAN:  I guess I prefer the neutral language
```

1    but I don't hold a strong view on it.

2              MR. KLINGEMAN:  The difference is, it's self-evident

3    to the jury that Mr. Gross --

4              THE COURT:  I have a one-lawyer rule.  Ms. Santillo?

5              MS. SANTILLO:  I'm sorry, I didn't hear the question.

6              THE COURT:  Mr. Creizman has indicated he prefers the

7    neutral, and there are other areas where the charges are in the

8    neutral, but --

9              MS. SANTILLO:  My preference would be for the Trevon

10   Gross name to be in the withdrawal instruction, and I think it

11   will be pretty clear in the other instructions.  So if it has

12   to follow, then I want to to go in other places but I have no

13   strong view in other places.

14             THE COURT:  For consistency -- and it can be clearly

15   brought out in summation -- I'll change it, I'll make the

16   change throughout this instruction, to say "a defendant" rather

17   than "the defendant," which is confusing.  I'll say "a

18   defendant" throughout it.

19             MR. CREIZMAN:  No objection.

20             THE COURT:  I think the rest are some typographical.

21   I'll enter that, I'll do a final version that I will send out

22   shortly, and I'll redline the changes since you've last seen

23   it.  You'll put in a letter by 8:30, indicating if there are

24   any final not-discussed or otherwise could-have-been

25   discussed -- any not-discussed issues based on the final

3834

H38KLEB6

1    changes.

2              Anything else?

3              MS. CHOI:  Not from the government, your Honor.

4              THE COURT:  No?

5              MS. SANTILLO:  No, your Honor.

6              THE COURT:  All right.  So I'll presume 9:00 a.m.

7    unless, Ms. Santillo, you indicate that we have to go through

8    a -- and it's fine if that's the case, despite Mr. Creizman's

9    application, but I do want to make sure that we get through

10   whatever we need to get through before the jury is here at

11   9:30.

12             All right, thank you.  See you in the morning.

13             (Adjourned to March 9, 2016 at 9:00 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

3835

```
 1                       INDEX OF EXAMINATION
 2   Examination of:                            Page
 3   TREVON GROSS
 4   Direct By Ms. Santillo . . . . . . . . . . .3537
 5   Cross By Mr. Noble . . . . . . . . . . . . .3586
 6    EMILY BEYER
 7   Direct By Mr. Klingeman  . . . . . . . . . .3762
 8    TREVON GROSS
 9   Cross By Mr. Creizman . . . . . . . . . . .3785
10   Redirect By Ms. Santillo . . . . . . . . . .3804
11   Recross By Mr. Noble . . . . . . . . . . . .3819
12   Redirect By Ms. Santillo . . . . . . . . . .3822
13                       GOVERNMENT EXHIBITS
14   Exhibit No.                             Received
15    Faceplates 2 and 4, Exhibits 707 to . . . .3535
16              712, 715-A to 715-B, 716-A to
17              716-C, 717-A to 717-B, 718 to
18              720, 730 to 736, 740, 750,
19              751, 752-A, 752-B, 753, 761,
20              762, 76, 781 to 785, 787,
21              790-A, 790-B
22    1693    . . . . . . . . . . . . . . . . . .3610
23    1260-A   . . . . . . . . . . . . . . . . . .3618
24    3705    . . . . . . . . . . . . . . . . . .3719
25    1259-C   . . . . . . . . . . . . . . . . . .3732
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
1    3576-B    . . . . . . . . . . . . . . .3740
2                      DEFENDANT EXHIBITS
3    Exhibit No.                        Received
4    TG54    . . . . . . . . . . . . . . .3545
5    TG53    . . . . . . . . . . . . . . .3574
6    TG46    . . . . . . . . . . . . . . .3576
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```