H39KLEB1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          15 Cr. 769 (AJN)

5    YURI LEBEDEV and TREVON GROSS,

6              Defendants.                 Jury Trial

7    ------------------------------x

8                                          New York, N.Y.
                                           March 9, 2017
9                                          8:50 a.m.

10
     Before:
11
                     HON. ALISON J. NATHAN,
12
                                           District Judge
13                                         And A Jury

14                      APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     BY:  EUN YOUNG CHOI
17        DANIEL S. NOBLE
          WON S. SHIN
18        MICHAEL CHANG-FRIEDEN, Paralegal
          EMILY GRANT, Paralegal
19        Assistant United States Attorneys

20   CREIZMAN, PLLC
          Attorneys for Defendant Yuri Lebedev
21   BY:  ERIC M. CREIZMAN
          MELISSA MADRIGAL
22        JONATHAN MICHAELSON, Paralegal

23   KROVATIN KLINGEMAN, LLC
          Attorneys for Defendant Trevon Gross
24   BY:  KRISTEN M. SANTILLO
     BY:  HENRY E. KLINGEMAN

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

H39KLEB1

1              (In open court; jury not present)

2              THE COURT:  Matters to take up?

3              Ms. Choi?

4              MS. CHOI:  Your Honor, last night we received two

5     emails, one from Ms. Santillo indicating that she wanted to

6     introduce the defense exhibits that we had already discussed,

7     which I believe Mr. Noble was in charge of.  He just went to

8     the restroom quickly.  I don't think there's an issue with

9     that.

10             THE COURT:  Okay.

11             MS. CHOI:  I don't know if you have the other

12    document, the decision to allow Kapcharge into the field of

13    membership document, but if you could just hand that over

14    because I'm not familiar with it.  And maybe Dan knows, but I

15    don't.

16             THE COURT:  Okay.  So the set of documents that

17    Ms. Santillo was reviewing and that the government had wanted

18    to put in on direct but by agreement are putting it in --

19             MS. CHOI:  Right.  I think I just wanted to deal with

20    Ms. Santillo's first since this is her case, technically, I

21    think.

22             THE COURT:  So this is a different --

23             MS. CHOI:  Yes.  I'm sorry, your Honor.  I was just

24    trying to go in order.  Can I wait for Dan to come back, he can

25    take a look?  So that's with regard to Ms. Santillo's case.

H39KLEB1

1          Your Honor, Mr. Creizman rested, I believe, yesterday.

2     He indicated to us that after reviewing our list, I think we've

3     worked out most of the issues that were initially identified,

4     but that he wanted to add certain documents to under Rule 106

5     for completeness grounds, and he objects to one document on 403

6     grounds.

7          We haven't had a chance to confer because I think

8     we're all running a little late this morning.  I have

9     objections to two of the 106 grounds.  I note for the record I

10    don't think that they're completeness issues.  I don't think

11    it's a rule of completeness problem because they're independent

12    emails, and I'm not sure how they can provide context to other

13    documents, but, nevertheless, I don't have a problem with it.

14         So I'm okay with three of them.  For two of them, I

15    believe one, I object on hearsay grounds, and one, because I

16    don't know what the document is.  And we will object -- well,

17    we don't concede that -- the document to which Mr. Creizman

18    indicated he believes it's prejudicial, we don't agree with

19    that assessment.

20         THE COURT:  Mr. Creizman, can I look at what we're

21    discussing?

22         MR. CREIZMAN:  Yeah.  I think that would probably be

23    helpful.

24         MS. CHOI:  So the two that I have issue with are

25    1618-C.

1           Michael just needs a moment.  I'm sorry, your Honor.

2      1618-C.

3           THE COURT:  It's coming up?  Okay.

4           So 1618-C is --

5           MR. CREIZMAN:  It's an email.  There's an email --

6      okay, there's an email from Jen Wotherspoon -- this is a chain

7      of emails.  There's an email from Jen Wotherspoon to Anthony

8      talking about someone who -- there's a $2,700 chargeback based

9      on a purchase, and she sends it to Anthony, noting:  Look at

10     the problem here.  What happened is, I called the customer, he

11     said it was a legitimate transaction, he said he didn't charge

12     it back, he called the credit card company -- do you need me

13     to --

14          THE COURT:  Go ahead.  I'm half reading while you're

15     talking.

16          MR. CREIZMAN:  Sorry.  I didn't know if you were -- if

17     this was extraneous.

18          So she says to Anthony Murgio:  Look, this customer, I

19     called him directly, he said he didn't charge it back.  He saw

20     that it came from mytoysextreme.com or something like that and

21     called the credit card company, and when he explained that it

22     was a legitimate purchase for Bitcoin, the credit card company

23     says, no, we don't do that, and so we're charging it back.

24          So, then, Anthony forwards this to Vlad, otherwise

25     known as Test, the financial backer.  And so Vlad said to him,

H39KLEB1

1   you see what I told you, you need to miscode these things,

2   otherwise you're going to get chargebacks, but you can't

3   miscode them too much.  And that's where it's left.

4          What I would like to be added is Anthony Murgio's

5   response to it, because otherwise -- I think that it's

6   necessary to put everything into context here.  Anthony

7   Murgio's response is, essentially, I understand about basically

8   the miscoding, what I'm trying to tell you is that even if I

9   miscode, if one customer calls and says something, the credit

10  card companies are going to charge everything back, so that

11  this idea of miscoding may not be such a great idea.  I want

12  you to see how difficult this problem is.  That's basically why

13  I want it added.  Without it, it gives the context like, hey,

14  this is your charge, you must miscode everything, you must --

15  this is the only way to handle it, by miscoding, but not by

16  miscoding that much.  And if you don't have Anthony Murgio's

17  response, which is I'm sending it to you for a different

18  reason, I don't think it gives the true meaning of what

19  happened here.

20          THE COURT:  Is the document that I'm looking at the

21  email the government wants to get in, and there's some further

22  part of the chain that you're seeking, or is this what

23  you're --

24          MR. CREIZMAN:  The top one is the one I'm seeking to

25  get in.  The other two are the ones below.  The other ones the

H39KLEB1

1    government wants to get in is the yep, and the government wants

2    to get in everything below the Test email.

3              MS. CHOI:  Now I'm confused.

4              THE COURT:  I need to look at the whole document.

5              MS. CHOI:  Michael, do we have a paper copy?

6              THE COURT:  I should have it here.

7              MS. CHOI:  I guess I'm confused.  It's on the list,

8    which I think is an oversight.  I don't intend to introduce

9    this.  So that would absolve this issue.

10             MR. CREIZMAN:  If you don't have any intention to

11   introduce it, then that would absolve it.

12             MS. CHOI:  Okay.  I didn't realize --

13             MR. CREIZMAN:  But if you're going to introduce B and

14   A, then I would like C, the third email, Anthony's email.  I

15   just feel --

16             MS. CHOI:  That's fine.  We'll get rid of all of them.

17             MR. CREIZMAN:  Okay.

18             MS. CHOI:  Done.

19             MR. CREIZMAN:  Done.

20             THE COURT:  Thank you.

21             MS. CHOI:  I just didn't understand what you were

22   saying.

23             MR. CREIZMAN:  It's certainly not the most important

24   piece of evidence for --

25             MS. CHOI:  No, that's why I was confused.  1947-C, I

H39KLEB1

1     think, is the next one.  I just don't have it.  I don't know

2     what it is or I couldn't pull it up.

3                MR. CREIZMAN:  1947-B.

4                MS. CHOI:  Okay.  Your email said 1947-C.

5                MR. CREIZMAN:  Oh.

6                MS. CHOI:  1947-B, which is on our list.

7                THE COURT:  So that's on the government's list?

8                MS. CHOI:  Yes.

9                THE COURT:  And you're objecting to it, Mr. Creizman,

10     or you're seeking to add something else pursuant to 106?

11                MR. CREIZMAN:  Oh, I only saw -- so this is kind of

12     funny because I only saw 1947-A on the list, I didn't see

13     1947-B.  If 1947-B is in, then that's fine.  Then we solved

14     that problem.

15                MS. CHOI:  Okay.  Done.

16                And then, I think, 5014 is the only other one.

17                MR. CREIZMAN:  You don't have a problem with the

18     2212-B --

19                MS. CHOI:  I don't.  I think it's a little awkward

20     because I guess we could add them to the government's exhibit

21     list, but they're really documents that you want, so I don't

22     know logistically how we want to deal with that.  I don't

23     object to including them.  I just think they're your documents,

24     and I don't know if you want to use them.  So if you want to --

25                MR. CREIZMAN:  I don't know if I want to, but if the

H39KLEB1

1    other ones might be used, I would like that.

2                MS. CHOI:  Right.  Then I think they should be marked

3    as defense exhibits.  I don't know if your Honor is okay with

4    reopening the case just for the limited purpose of introducing

5    these documents that he may want to rely on.  I don't have any

6    objection to that.

7                THE COURT:  Is that what you're asking, Mr. Creizman?

8                MR. CREIZMAN:  Well, if I may, for a second, just

9    refresh my recollection on --

10               THE COURT:  Are they essentially the equivalent of

11   cross-exam documents to the government's documents on rebuttal?

12               MR. CREIZMAN:  That's what it --

13               THE COURT:  So we could mark them as the defendants'

14   exhibits, and after the government's rebuttal --

15               MS. CHOI:  Fair enough.

16               THE COURT:  -- he can ask to move in some documents

17   for cross purposes.

18               MS. CHOI:  That's fine with us.

19               And then --

20               MR. CREIZMAN:  The only thing that I would say is that

21   I think that these are parts of chains of emails, and,

22   therefore, Rule 106 would apply.  But I'm fine with it being

23   marked as defense exhibits.  I don't mind.  I'm just saying.

24               THE COURT:  Either is fine.  We can just put them in

25   as government exhibits in the batch or --

H39KLEB1

1          MS. CHOI:  Do you want me to add them?  I don't care

2     either way, really.  So let's just add them.  I can handwrite

3     them in.

4          MR. CREIZMAN:  Okay.

5          THE COURT:  If they're coming in unobjected to as

6     pursuant to 106, then I think that's the appropriate approach.

7          MR. CREIZMAN:  Thank you.

8          MS. CHOI:  I guess two of them are already maybe on

9     this list.  I'm confused.  5069?  Okay, I'll add 5069.

10          THE COURT:  Anything else, Mr. Creizman?

11          MR. CREIZMAN:  Well, there's the issue of --

12          MS. CHOI:  5014 is the last one.

13          THE COURT:  5014?

14          MR. CREIZMAN:  Yes.

15          THE COURT:  So you're objecting to or what you want to

16     add?

17          MR. CREIZMAN:  No, I'm objecting to it on 403 grounds.

18          THE COURT:  Okay.  May I see it, please?

19          This is from Anthony to Test, and it says, "Please

20     send out an email letting all know Anthony and Yuri have all

21     authority for hiring, firing, managing, organizing, giving

22     raises, giving bonuses.  Please follow their instructions,

23     something along these lines.  This is very important."  So

24     Anthony is telling Test to send this message.  Okay.

25          Go ahead.

1          MR. CREIZMAN:  My first problem with it is that there

2     is absolutely, of course, no context to this email.  Number

3     two, it's a fact that Yuri certainly had no authority for

4     hiring, firing, managing, organizing, giving raises, giving

5     bonuses to anyone.  I'm assuming that the email to Test would

6     be to the Russian development team for Coin.mx, which

7     Mr. Lebedev didn't have access to the service, he didn't

8     control that team.  The government knows he didn't control that

9     team.  I think that this leaves an impression that is

10    absolutely incorrect and prejudicial.  For it to come in the

11    rebuttal case, it doesn't mean anything happened, it's just

12    totally out of context.

13         Whether Anthony was approved or rejected is left to

14    the minds of everyone in the jury, and it's not even sure what

15    he's saying.  I don't even know what he's referring to, but I

16    do know that Yuri had no authority -- Yuri Lebedev had no

17    authority for hiring, firing, managing or organizing anything

18    in that group.  He had to answer to the people -- if he even

19    was given access to the Russian development team, they were the

20    people who had the control.  They gave Mr. Lebedev whatever

21    access they wished to give him.

22         That's an actual fact.  This is not just argument.

23    There was never a situation where Yuri had any kind of control

24    like that over anybody.

25         THE COURT:  Okay.

1          MS. CHOI:  Your Honor, I would disagree with some of

2     the things that Mr. Creizman said.  We're not going to argue

3     Mr. Lebedev ran Coin.mx or had complete control over everything

4     that happened in Russia, but there is evidence to the contrary

5     that to the assertion that he had nothing to do with the

6     Russian programmers and that he didn't play a role -- a

7     critical role with regard to interfacing with them.  There are

8     multiple occasions in which -- in other pieces of evidence in

9     which he discusses issues that he has with the Russian

10    programmers.  He and Anthony then go to Vlad and discuss

11    whether or not they should keep on certain other people.

12    Mr. Lebedev also interviewed various people to potentially head

13    up the Russian side of the programming, especially someone who

14    was an English speaker who could interface well with both

15    sides.  And he did participate in interviews, including ones

16    that we've produced in discovery, about potential Russian

17    programmers.

18          If the objection is --

19          THE COURT:  From other emails, do you know what the

20    context of this is?

21          MS. CHOI:  The context is that there was an issue in

22    which Anthony and Yuri were trying to deal with the Russian

23    programmers, and they wouldn't listen to them.  And so they

24    wanted to tell -- Anthony wanted Vlad to tell them, hey, these

25    are critical people that you need to listen to, that their

1    opinions matter, and that you shouldn't just assume that

2    because they're in America, they have nothing to do with this.

3    That's the reason of it.

4          Now, I don't know, and I'm not aware of whether or not

5    Unit Test ends up sending this email to his Russian

6    programmers, because we don't have access to his email or the

7    Russian programmers' emails, we just have this one email, but

8    that is definitely the context in which this occurs.

9          I will say this:  Mr. Creizman has maintained, or at

10   least maintained, that Mr. Lebedev had nothing to do with the

11   Russian programmers after a falling-out that happened prior to

12   this email in the April time frame.  He's now, I think,

13   realized that the evidence is to the contrary, and he hasn't

14   pressed that with the government because initially he really

15   wanted to introduce a lot of evidence of how there was a

16   falling-out between Mr. Lebedev and Unit Test.  That's clearly

17   not the case, as has been shown by the evidence that we've

18   presented.

19         I think Mr. Creizman has revised that view of the

20   case, but I have a good-faith basis to introduce this piece of

21   evidence as evidence that Mr. Lebedev participated in the

22   Coin.mx conspiracy, especially when Mr. Creizman alluded to, in

23   his opening, that he is someone who is spontaneous, and just

24   blurts things out, and doesn't really know what he's doing.

25   No, he played a critical role in Coin.mx.  Was he the leader,

3849

1   was he number one or number two?  No, but he definitely had a

2   role in what was going on over there, and for him to assert

3   otherwise would be contrary to the record evidence.

4           MR. CREIZMAN:  I don't think I said all of those

5   things, but I will say that, yes, there is evidence of

6   Mr. Lebedev corresponding with the Russian programmers and

7   talking about various technological issues, which are already

8   in evidence, which happened later on.  I think there's an email

9   chain months later, I think in August or September, where

10  Anthony says, Yuri Lebedev and Dmitry Papushka, whose name has

11  come up in this case, he's the lead technology guy for Coin.mx

12  in Russia, I think Anthony says, hey, why don't you, Yuri, work

13  with them, and Yuri says something along the lines of, I'm

14  happy -- I look forward to being able to work with you, and

15  Dmitry Papushka says, pleasure.  So, certainly the later emails

16  show that this was never -- if Test, who is the boss of the

17  Russian group, wanted this to be in effect, there would have

18  been no need for those later emails.

19          There was a falling-out at one time because Yuri and

20  Anthony went to Russia, Yuri said something to Test that was --

21  that Test found offensive, his -- Test's business partner was

22  arrested for something, and Yuri called just decided to say it,

23  and then Anthony got angry at him, and then he wasn't going to

24  work on anything with Coin.mx, but then he ended up doing

25  things for Coin.mx.  So we're not going to shrink from that,

H39KLEB1

1    we're not going to back off of that, we're not going to

2    challenge the government on that.

3            But leaving this email here is exactly what Rule 403

4    is about, especially without context.  It's confusing, and I

5    think it's misleading.  I think that it doesn't really -- the

6    government has plenty of other evidence that shows that Yuri

7    Lebedev interacted with the Russian developers and interacted

8    with them later on, and we're not seeking to exclude that

9    evidence.

10           THE COURT:  All right.

11           MS. CHOI:  If Mr. Creizman's representation is he's

12    not going to now assert that Mr. Lebedev had no role in

13    Coin.mx, I'm okay with not introducing 5014, but I just wanted

14    to make sure that that was his representation, because I think

15    that this was necessary evidence in light of Mr. Creizman's

16    previous assertion to the government about his client's role.

17           MR. CREIZMAN:  I think that's fair.  I will not assert

18    that.  I will not.  I will be careful not to.

19           THE COURT:  All right.  Great.  Thank you.  So the

20    government's withdrawing this.

21           Anything else, Mr. Creizman?

22           MR. CREIZMAN:  No.  I'm just -- look how chipper I am

23    this morning.  At 8:45.

24           THE COURT:  Mr. Klingeman?

25           MR. KLINGEMAN:  Good morning.

```
 1                 THE COURT:  Good morning.
 2                 MR. KLINGEMAN:  One of the issues that's outstanding
 3    is our position with respect to the exhibits.
 4                 THE COURT:  That's what we're doing now, right?
 5                 MR. KLINGEMAN:  Yes.
 6                 Ms. Santillo is to address that.  She's ill, acutely
 7    ill, and has left the courtroom.
 8                 THE COURT:  Oh.  Just now?
 9                 MR. KLINGEMAN:  Yes.  And I don't know what the
10    problem is, but I'm not in a position to address the issue that
11    she's supposed to address.
12                 THE COURT:  Well, let's wait till we see.  I didn't
13    even see her leave, so we'll wait to see what is going on
14    there.
15                 MR. KLINGEMAN:  Yeah.  And I'd like to go pursue that
16    in a moment.
17                 But I will pursue another issue, which is the issue of
18    the demonstratives.  Your Honor issued an order last evening --
19                 THE COURT:  Yes.
20                 MR. KLINGEMAN:  -- respecting demonstratives,
21    presumably both in the potential rebuttal case, as well as the
22    summation.  We've received no demonstratives with respect to
23    the rebuttal case, so I presume that that test balloon that was
24    floated yesterday is moot, and I'm going to proceed on that
25    basis.
```

1              Second, the government --

2              THE COURT:  Just a moment.

3              Ms. Choi, no demonstratives?

4              MS. CHOI:  Yes, we're not going to publish anything in

5      our rebuttal case.  I'm trying to make sure I get case and

6      rebuttal, summation, correct today.

7              THE COURT:  So we're clear there.

8              MR. KLINGEMAN:  And with respect to the offering of

9      exhibits in the rebuttal case, it's my perception, based on the

10     fact that we got the list of the vast majority of exhibits

11     before the defense case began, that this is not a true rebuttal

12     case, so much as it is supplementing the evidence that the

13     government has introduced throughout the course of the trial.

14     So I --

15             THE COURT:  Well, my understanding was that the

16     government wanted to move the documents in during the direct,

17     that Ms. Santillo had indicated she didn't have time to review

18     them, and so, as an accommodation of that, they agreed to put

19     them in, though part of the direct, in the rebuttal.

20             MR. KLINGEMAN:  Yes.  What I'm asking is that when

21     they're offered, they're offered as evidence in support of the

22     government's case in chief as opposed to characterizing them as

23     rebuttal evidence.

24             THE COURT:  That's fine.

25             MS. CHOI:  That's fine.  I wasn't going to make the

1     distinction before the jury.  I was just going to offer them.

2     I don't know if that distinction is necessary or even if it's

3     within the purview of what the jury would understand about how

4     it goes.  But if there's a specific instruction that

5     Mr. Klingeman wishes to have, I'm happy to have the Judge

6     instruct the jury accordingly.

7               THE COURT:  Do you have a request?

8               MR. KLINGEMAN:  I would just ask the Court to explain

9     to the jury that you're permitting the government to reopen its

10    case in chief to permit them to introduce additional evidence,

11    and the government can proceed to list the various exhibits,

12    and we will not object.

13              MS. CHOI:  Yes, your Honor, I'm not even going to list

14    them.  I'm just going to say the exhibits that are in are

15    government exhibits.  I guess I should mark this exhibit.

16              THE COURT:  Okay.  So I'd say something like pursuant

17    to an agreement of the parties, and as an accommodation to the

18    schedule, the government is now permitted to reopen its case in

19    chief for the moving in of additional documents.

20              MR. KLINGEMAN:  Perfect.

21              THE COURT:  Mr. Creizman, agreeable?

22              MR. CREIZMAN:  I'm sorry.  I heard the argument.

23    So --

24              THE COURT:  I want to just instruct -- if I'm talking,

25    could folks at least listen --

H39KLEB1

1            MR. CREIZMAN:  Absolutely.  I do.

2            THE COURT:  -- so that I don't have to say things

3       again?

4            MR. CREIZMAN:  Yes.  Sorry.

5            THE COURT:  The documents are coming in as part of the

6       government's case in chief.

7            MR. CREIZMAN:  Fair enough.  I actually am not taking

8       a position.

9            THE COURT:  Thank you.

10            MR. KLINGEMAN:  With respect to demonstratives to be

11       used in closing, the government has told me verbally that they

12       have demonstratives, but they weren't prepared to show them to

13       me when we arrived at court because they hadn't arrived in the

14       courtroom.  I want the opportunity to see them before the

15       closing argument has begun.  I'm sure I'll have no problems,

16       but I haven't had the opportunity to look at them.

17            MS. CHOI:  That's fine.  I have them right here.  So

18       if you want to come take a look now.

19            MR. KLINGEMAN:  Yes.

20            And I'd ask, your Honor, if the government ultimately

21       uses the demonstratives, that they be referred to for

22       identification on the record, one, in case there are any

23       objections, but, more importantly, I want to be able to refer

24       to them in my closing, and I'll keep track of the enumeration,

25       and then I can refer to government demonstrative 12 or however

1    they're designated, then they will be ready for the record.

2              MS. CHOI:  Your Honor, they're just PowerPoints.  It's

3    similar to any other closing we routinely do.  I have a little

4    bit of placeholder in terms of part one and part two in terms

5    of headers to describe what the testimony is beneath it in

6    terms of sign posting for the jury.  I don't have anything

7    beyond that in text.  With regard to the corruption portion,

8    when we get into describing what corruption means, which is

9    obviously going to be a large issue between the parties, I do

10   have a quotation from your Honor's jury instruction, to give

11   them context, and instruct them at the time that you should

12   listen to whatever the Judge says, but I expect her to instruct

13   you as follows.

14             And then the rest of it is just exhibits where we blow

15   up certain things.  I've never marked such things before.  It's

16   no different than putting exhibits before the jury using

17   TrialDirector, and I don't really see the need to mark them,

18   especially since Mr. Chang-Frieden is double-checking at least

19   one of them just to make sure that everything is in order.  We

20   were working around the clock the last two days to try to get

21   this together.

22             So, I think he can take a look at what we have for

23   now.  I don't think he'll find any of it objectionable.  I

24   don't see there being a need to mark them for identification

25   purposes.  If he wants to refer to a specific slide, we're

1    happy to pop that up in the middle of his closing, if that's

2    what he wants to do, but I don't see the need to mark them in

3    any particular way.

4            MR. KLINGEMAN:  All I want to be able to do is to

5    refer to them and not have any confusion as to what I'm

6    referring to.  So if there's a number attached to it or some

7    other headline, then --

8            MS. CHOI:  Yes.  There are just exhibit numbers in the

9    bottom left-hand corner.  If you can tell us before your

10   closing -- there will probably be a break before his closing.

11   If he knows which ones, after he's seen ours, he wants to put

12   in, he can tell us, and we can make sure we'll make them

13   available, but I don't have them numbered in any particular way

14   to make that an easy task without some signpostage from him.

15           THE COURT:  It sounds like as long as Mr. Klingeman

16   can readily refer to them, these are not going back to the

17   jury, and Mr. Chang-Frieden will assist Mr. Klingeman during

18   his closing to the extent he's asking for them to be called

19   back up.

20           Mr. Noble.

21           MR. NOBLE:  One other issue, Judge.  I'll be giving

22   the government's rebuttal summation, and Mr. Klingeman has

23   brought up concerns about timing and ending the day.

24   Hopefully, we're going to get through all the arguments today.

25   I would just ask that we be given at least 40 minutes for our

rebuttal summation.  Twenty minutes for each defendant after a

four-week trial, I think, is a reasonable amount of time for a

rebuttal, and so I just wanted to raise that with the Court to

make sure we have enough time to address what we want to

address, what we expect we'll need to address, from defense

counsel's arguments.

MR. KLINGEMAN:  My only concern with the schedule is

that the government not be afforded the overnight, which is a

substantial advantage for preparation.

THE COURT:  What do you propose?

MR. KLINGEMAN:  I just propose we all make an effort

to keep it moving.  When I say "we all," not the Court, the

lawyers.

THE COURT:  I'll join in any way that I can in that

effort.  I would be delighted if I could get to the charge

today.

MR. NOBLE:  I think we all would, Judge.  I don't know

how long their closings are going to be, and --

THE COURT:  Ms. Choi.

MR. NOBLE:  -- we don't want to be prejudiced either.

THE COURT:  Ms. Choi, how long do you estimate?

MS. CHOI:  I actually don't have a great estimate.  I

would probably assume between three to four hours, but I hope

to be done before lunch.  And if it becomes tiresome, I have

places where I'm going to cut things out.  I don't think that

H39KLEB1

1    there is going to be any issue, because if your Honor is taking

2    normal lunch breaks, then we can always -- I think that would

3    leave plenty of time to finish everyone else's closings.

4                THE COURT:  Mr. Creizman, what's your prediction?

5                MR. CREIZMAN:  My prediction is an hour and 15

6    minutes.

7                THE COURT:  And Mr. Klingeman?

8                MR. KLINGEMAN:  Depending on the length and strength

9    of the government's closing, one to two hours.

10               THE COURT:  If the government finishes before lunch,

11   we should be fine.

12               MR. NOBLE:  Yes.

13               THE COURT:  All those places that you're considering

14   cutting, I assure you, it's to your benefit to cut.

15               MS. CHOI:  I also don't know if I could physically do

16   more than before lunch, so I think we're going to be okay.

17               THE COURT:  Look, you want it to be effective, and you

18   want them to be listening.

19               MS. CHOI:  Right.

20               THE COURT:  That's all that matters at this point.

21   The human ability to follow this kind of information for

22   extended periods of time is just limited.

23               MR. NOBLE:  Judge, I need at least 15 minutes on NCUA

24   regulations in my rebuttal, so that's why I'm asking for 40

25   minutes.  I'm just kidding.

1                    THE COURT:  I know, I know.

2                    Ms. Santillo, are you okay?

3                    MS. SANTILLO:  There is a small chance I may have to

4       run out.  I'm really not feeling well and possibly might faint,

5       but --

6                    THE COURT:  Seriously, why don't you sit while you're

7       talking?

8                    MS. SANTILLO:  Okay.

9                    One thing I want to raise:  The government has never

10      squarely articulated what precise misstatements it intends to

11      rely on in terms of the conspiracy charge.  And I don't want to

12      interrupt the close, but I just want to say for the record that

13      to the extent they're relying on representations that are

14      outside the period of -- in connection with our discussions

15      about the scope of the indictment, to the extent they're

16      relying on representations related to Kapcharge in 2015, we

17      object to those.  We think that it's a constructive amendment

18      of the indictment to rely on those.  And I want to note our

19      objection for the record and not interrupt the proceeding.

20                   THE COURT:  Okay.  Mr. Shin, do you want to address

21      that?

22                   MR. SHIN:  Well, I think your Honor has already

23      addressed that category of evidence in category four of the

24      limiting instruction, although it's not numbered in the final

25      instruction.  And so I take Ms. Santillo's comment merely to be

1    to note her objection for the record, her continued objection,

2    but unless the Court wishes to revisit the ruling, I think it's

3    already been resolved.

4              MS. SANTILLO:  I think there's a difference between

5    saying it can be relevant evidence of things and to be the

6    misstatement they're relying on to secure the conviction.  And

7    that is the issue that we are raising right now.

8              THE COURT:  Can you give me an example of a

9    phraseology that --

10             MS. SANTILLO:  Sure.

11             THE COURT:  Let me just say, I appreciate you raising

12   this in advance of the closing.

13             -- a certain phraseology that you would object to in

14   closing, so I can just give my ruling?

15             MS. SANTILLO:  Well, to the extent they say it's a

16   conspiracy to make a false statement, and they rely on a

17   statement that was made between -- from Charles Blue in 2015,

18   then we think that's outside the scope of the indictment,

19   absolutely.  But to the extent that -- if they talk about

20   things -- representations were made vis-a-vis the Collectables

21   Club, and they use that as evidence that is somehow other

22   relevant evidence, it's not the material misstatement, then I

23   don't know, depending how that comes in, we would not have an

24   objection.

25             THE COURT:  Go ahead, Mr. Shin.

1            MR. SHIN:  Your Honor, we spent many, many pages and

2     words discussing the proposed limiting instructions.  And what

3     was approved, what the Court ruled was that in that last

4     category, acts and statements by Trevon Gross, Charles Blue,

5     and other individuals affiliated with HOPE and Mark Francis,

6     Shoula Cohen, and other individuals affiliated with Kapcharge

7     that occurred after the date of the falling-out between Gross

8     and the Collectables Club may be considered against Trevon

9     Gross.

10            So I don't understand how what she's saying is

11     different from what we previously discussed, and heard argument

12     about, and what the Court ruled on.

13            THE COURT:  Are you making a slightly different point,

14     Ms. Santillo, or is it a continuing objection?

15            MS. SANTILLO:  Well, it's not a continuing objection.

16     We've talked about ways in which evidence can be relevant to

17     what the conspiracy is, the identity of conspirators, and

18     things like that.  That's a different thing than to say what is

19     the charged conduct.  So as I understood that limiting

20     instruction, it was to say that that can be considered as

21     relevant evidence because it relates to other members of the

22     conspiracy, it talks about other issues, but in terms of what

23     the material misrepresentations were and whether they're in the

24     scope of the indictment, that's my specific application that

25     I'm making right now.

H39KLEB1

1          MR. SHIN:  Your Honor, the defense also got a

2    withdrawal instruction and a multiple conspiracies instruction,

3    and so if the jury is permitted to consider that category of

4    evidence per the limiting instruction, and the jury

5    instructions include both a proposed definition of the

6    conspiracy, the one we talked about the other night, points to

7    the indictment, I think that's sufficient, your Honor.  And the

8    withdrawal and multiple-conspiracies instructions that were

9    included over the government's objection, I think both

10   capture -- they permit the defense to make those arguments,

11   that what we're doing is beyond the scope of the conspiracy

12   and, therefore, is something different.  Those are the

13   instructions, and they can make that argument, and we can make

14   the contrary argument in our closing.

15          So I think the combination of all of the instructions

16   that were included in the final charge permit both sides the

17   flexibility to make their respective arguments.

18          MS. SANTILLO:  I am just making crystal clear for the

19   record that we would view them relying on misstatements related

20   to Kapcharge as a constructive amendment of the indictment that

21   would require reversal of the convictions.  Just so it doesn't

22   seem like the --

23          THE COURT:  That's a broader statement than what you

24   were saying before.  Relying on it, that's rehashing the

25   admissibility argument and relevance argument.

1          MS. SANTILLO:  Well, as the misstatement.  Relying on

2     it as the misstatement that is the subject of the conspiracy.

3          MS. CHOI:  Your Honor, I can represent that that's not

4     going to be in the closing.

5          THE COURT:  Okay.

6          MS. CHOI:  I'm tired, but I think that the only

7     representation that we have with regard to Mr. Blue's -- or any

8     reference to Mr. Blue is, quite frankly, an email in which

9     Mr. Blue finds out from Kapcharge they didn't pay taxes in the

10    United States in 2014 because they had no physical address

11    there or employees.  Mr. Blue then confronts Trevon Gross about

12    this and asks what's going on.  Mr. Gross says, why are you

13    pushing this?  And Mr. Blue said, well, because we've been

14    representing to the regulators that they've been here for this

15    period, so I want to know what's going on.

16          We're not going to say that's a misstatement by

17    Mr. Gross.  We're not relying on --

18          THE COURT:  That's not the overt act?

19          MS. CHOI:  Correct, it's not the overt act.  It's

20    evidence that Mr. Gross was in on the lies.

21          THE COURT:  Okay.  That's the admissibility.

22          MS. CHOI:  The earlier lies.

23          THE COURT:  So I don't hear you objecting to that form

24    of argument, right, Ms. Santillo?  Other than your earlier

25    objection, but not the specific objection you're making now?

1          MS. SANTILLO:  Yeah, because I've never heard them

2     clearly articulate what the misrepresentation is.  I just don't

3     know how it's going to come out, and I want to make clear that

4     that is my position, and not objecting during the course of it

5     is not going to waive my objection.

6          THE COURT:  Well, here's what I'll say:  What Ms. Choi

7     has just represented, if that's true, then I don't understand

8     what you're saying now to be an available objection.  In other

9     words, I do want to know if you think the line she just stated

10    has been crossed because if you just have a general objection

11    to the essentially looking at this, at the evidence of what

12    Mr. Blue said as relevant to the charged conspiracy, you can

13    certainly make that objection, and it stands, and I don't need

14    to know the specific point, but I understood you to be making a

15    much narrower specific objection now, and I think I agree with

16    you, and Ms. Choi has said that line won't be crossed.

17         MS. CHOI:  Sorry, so I will say this:  We also -- now

18    that I'm thinking about it, because I'm trying to understand

19    the contours of Ms. Santillo's objection, so thinking back, the

20    other sort of postfalling-out, wherever that might be,

21    statements, we do make reference to the series of misstatements

22    that were made to Congressman Smith's office where Mr. Gross

23    urges Mark Francis to tell them that everything's okay, and

24    that they are in New Jersey, and that Mr. Valentine's testimony

25    was they weren't satisfied with the answers they got, and, in

1    fact, Mr. Valentine tried calling the number that was on the

2    website and couldn't get through on the first instance.  Now,

3    we're not arguing that that is a misstatement to the NCUA.

4    We're clearly putting it in the fabric of the general lies that

5    were told to the NCUA and other lies that were told to other

6    people which show the corrupt intent.

7            I think the way in which we describe -- just so your

8    Honor understands, the way in which we have the closing set up

9    is, part one is just bank and wire fraud, part two is bribery,

10   so it's about corruption, and part three is the lies that were

11   told, focusing on the NCUA lies, but interspersed in there are

12   obviously lies to other parties in order to establish the NCUA

13   lies.

14           And there are NCUA lies post the falling-out.  And

15   your Honor has already ruled on the fact that -- and we don't

16   focus on them, quite frankly.  We're really focused on the core

17   of the prefalling-out conspiracy, but I think it is fair game,

18   for example, for either the closing or the rebuttal summation

19   to make reference to the fact that Mr. Gross harangued -- I

20   don't know if maybe they would object to that interpretation,

21   but harassed Mr. Francis to make sure that they finally got the

22   registration that they needed, and that didn't happen till

23   February 2015 with regard to a presence in New Jersey, and that

24   that was an -- that, ultimately, I believe that they're going

25   to make a large deal about the fact that ultimately the NCUA

H39KLEB1

1    found them within the field of membership.  And I think that

2    happened in 2015.  Mr. Noble has every right to go and point

3    out that that was in reliance of changes that they had made,

4    that Kapcharge had actually tried to have a presence afterwards

5    because they realized that they had been lying to the NCUA, and

6    they couldn't get away with it.

7            THE COURT:  And I have concluded, I continue to

8    conclude -- and I think the evidence has only, as the evidence

9    has come in more, only further established -- that is all

10   relevant, arguably relevant.  It will be up to the jury to

11   decide what to do with it, but as an evidentiary matter, it's

12   relevant to establishing the existence of and participation in

13   the conspiracy, as charged, as we've discussed it in that

14   paragraph; that is, "in an effort to further the operations of

15   Coin.mx or the Collectables Club."

16           And so, in my mind, it's appropriate and permissible

17   to be argued in that way, and evidence that can be used to be

18   in furtherance of that conspiracy is in and available.

19           The narrower point I think I hear is just an effort to

20   argue that the Kapcharge related materials are themselves overt

21   acts --

22           MS. CHOI:  Your Honor, I don't even get into the weeds

23   about overt acts in our closing.  Obviously, I don't think

24   Mr. Noble would assert that that is an overt act in furtherance

25   of the conspiracy given that the defense's theory is that no

1    overt acts happened; thus, withdrawal is likely.  We're not

2    going to start emphasizing overt acts that happened after the

3    withdrawal.

4           So we're not doing that.  I think we're going to be

5    okay.

6           THE COURT:  Okay.

7           MS. SANTILLO:  It sounds to me like they're going to

8    be relying on misrepresentations to the NCUA in 2015, and

9    that's my objection.

10          THE COURT:  Well, as an evidentiary matter, they can

11   point to those because those are available to the jury and

12   relevant for determination as to the existence and

13   participation in the conspiracy, as I've defined them.

14          That's how I've defined the conspiracy.  I think

15   that's certainly a fair reading of the indictment.  I think

16   there's an argument that could be read more broadly than that,

17   but that's how I've defined it, and it's important that the

18   government doesn't suggest to the jury that a statement or act

19   that's not in furtherance of that conspiracy may constitute an

20   overt act, but it is -- or imply it, but it is available for

21   relevance arguments as to the existence of and participation in

22   the charged conspiracy, including misstatements in furtherance

23   of that conspiracy.

24          MS. CHOI:  Yes, your Honor.  And, again, I don't

25   really talk about overt acts except in the context of venue.  I

1    think we're not going to have this problem.

2              THE COURT:  Okay.

3              MS. CHOI:  And if we do, obviously, Ms. Santillo -- we

4    understand that because Ms. Santillo is not going to be --

5    doesn't want to interrupt closing, if she wanted to do a

6    sidebar in the middle, and there needs to be a limiting

7    instruction, because maybe -- I can't say that I'm not going to

8    blurt out overt act by accident, I'm going to try not to, but

9    if there's some way in which I cross that line, obviously, the

10   government thinks it would be appropriate to have a sidebar and

11   a limiting instruction, if that's necessary.

12             THE COURT:  All right.

13             MR. SHIN:  Your Honor, for the record, I object to any

14   consideration of further limiting instructions on this issue.

15             MS. CHOI:  All right.  Sorry, sorry, Won.

16             MR. SHIN:  I'm joking, your Honor, kind of.

17             THE COURT:  All right.  Ms. Santillo, I think with my

18   appreciation for trying to avoid objections during the closing,

19   I think I will ask if you think this line has been crossed, I

20   will ask you to make the contemporaneous objection, so I can

21   consider it.

22             MS. SANTILLO:  My concern is that it's so nebulous in

23   terms of whether they're going to be -- I just don't know how

24   it's going to come out, but I don't want to be obstructive.

25             THE COURT:  No, I appreciate that, and I understand

H39KLEB1

1     it.

2          And I do think that the charge, in multiple ways,

3     safeguards against any confusion on this point.  That was the

4     exercise in defining the conspiracy.  That was the exercise in

5     the limiting instructions and the like.  That's the exercise in

6     the substantially similar overt act language.  So I think we're

7     guarded against it.  But, again, I can't say anything other

8     than I appreciate you trying not to be obstructive.  And I may

9     not need sidebar, it just might be stating my objection here,

10    and if I think it's clear to me that they're on the side of the

11    line that I'm comfortable with --

12         MS. SANTILLO:  Okay.

13         THE COURT:  -- I'll simply overrule, as discussed,

14    with appreciation.  If I think the government has crossed this

15    line based on your objection, then we'll have to do a brief

16    sidebar and consider whether a limiting instruction is needed.

17         Thank you.

18         We do have all our jurors.  Ms. Santillo -- or I think

19    Mr. Klingeman had earlier said Mr. Santillo would take the

20    question of any objections to the government's documents.

21         MR. KLINGEMAN:  Before she does, I just wanted to

22    close the loop on the demonstratives.  I've looked at the

23    government's proposed demonstratives, and I have no objection.

24    I would request a hard copy, if possible, if there's an extra

25    one.

H39KLEB1

1          MS. CHOI:  We have them.  I note that

2     Mr. Chang-Frieden is adding a few as we speak, but this is

3     basically --

4          MR. KLINGEMAN:  I'll keep that in mind.  I appreciate

5     it.

6          MS. CHOI:  Do you want a copy?

7          THE COURT:  Ms. Santillo?

8          MS. SANTILLO:  I reviewed the exhibits that

9     Mr. Klingeman hadn't reviewed, and I think we don't have

10    objections.

11         THE COURT:  All right.  Thank you.

12         You had stepped out.  I do hope you're feeling better.

13    To the extent you need anything that the Court can assist with

14    in light of that.

15         MS. SANTILLO:  I just may have to duck out, which is

16    another reason why I don't want to -- I don't want to let the

17    train run away on the statements, but in terms of --

18         THE COURT:  Well, I'll be mindful of it.  I feel like

19    I have a good sense of what this line is, but if you can't -- I

20    think we'll have to accommodate if you're not feeling well.

21         MS. SANTILLO:  Okay.

22         THE COURT:  That's just a reality.  If you need to

23    leave, we'll pause.

24         MS. SANTILLO:  For our defense case, we are just going

25    to introduce two exhibits, but can we just do it by

1    stipulation?

2              MR. NOBLE:  Yes.  The government has no objection to

3    those two exhibits.

4              THE COURT:  Okay.  So when we bring the jury in, those

5    two exhibits will come in by stipulation.

6              Publishing or not publishing?

7              MS. SANTILLO:  No, we're not going to publish.

8              THE COURT:  And the defense, on behalf of Mr. Gross,

9    will rest.  I'll indicate that -- I understand what I said --

10   that there are documents that have been accommodated that are

11   coming in as part of the government's case in chief, and then

12   the government rests.

13             MS. CHOI:  Yes, your Honor.

14             THE COURT:  Okay.

15             MS. CHOI:  And then I presume we can have a moment to

16   just make sure it's all set up okay?

17             THE COURT:  Yes.

18             MS. CHOI:  And, sorry, one other thing, just to

19   signpost.  I don't mean to steal Ms. Santillo's thunder, but

20   I'm very sleep-deprived.  I'm trying my best.  If I need to

21   take a comfort break in the middle of sections, I hope your

22   Honor would accommodate that.

23             THE COURT:  I'll accommodate.  I think the jurors may

24   need a couple of minutes, if they don't turn into extended

25   breaks.  I know everybody --

H39KLEB1

1          MS. CHOI:  You are, too, I'm sure.

2          THE COURT:  Mr. Rosen, and Ms. Nunez, and I are there

3   with you.

4          MS. CHOI:  We're almost there, your Honor.

5          THE COURT:  But I didn't have the night last night

6   that you all had.  Other nights, I did, but not last night.

7          So you folks will let me know.  I trust that you will

8   make the request when it's necessary.

9          MS. CHOI:  Thank you.

10         THE COURT:  And I will gladly accommodate.

11         Let's get our jury.

12         I'll flag this.  We'll deal with it at the break:

13  Ms. Nunez sent me a note that several jurors are worried we may

14  not be done by tomorrow and asked her to relay to me that one

15  juror has a medical appointment on Monday afternoon, one juror

16  has a work issue, one has a very important exam that they need

17  to study for, et cetera.  We'll take up how to deal with it at

18  the break.

19         Go ahead.  Let's get the jury.

20         (Continued on next page)

21

22

23

24

25

H39KLEB1

1          (Jury present)

2          THE COURT:  Good morning, everyone.

3          JURY MEMBERS:  Good morning.

4          THE COURT:  Thank you so much, ladies and gentlemen of

5    the jury.  Everyone may be seated.

6          Ms. Santillo.

7          MS. SANTILLO:  Good morning.

8          THE COURT:  Good morning.

9          MS. SANTILLO:  On behalf of Trevon Gross, we

10   introduce, on stipulation with all the parties, Government

11   Exhibit 1253-B and TG60.

12         And with that, on behalf of Trevon Gross --

13         THE COURT:  Before you do.

14         Without objection?

15         MS. CHOI:  Without objection.

16         THE COURT:  Okay.  They are admitted.

17         MR. CREIZMAN:  No objection.

18         (Government's Exhibit 1253-B received in evidence)

19         (Defendants' Exhibit TG60 received in evidence)

20         THE COURT:  Go ahead, Ms. Santillo.

21         MS. SANTILLO:  With that, on behalf of Trevon Gross,

22   the defense rests.

23         THE COURT:  Thank you, Ms. Santillo.

24         Ms. Choi, as we discussed, there are some documents

25   that the government is introducing as part of its case in chief

H39KLEB1

1      that will be moved at this time?

2                  MS. CHOI:  Yes, your Honor.  At this time the

3      government moves the exhibits that are listed in Government

4      Exhibit 1001 into evidence.

5                  THE COURT:  Okay.  So, on stipulation and without

6      objection, Mr. Creizman and Ms. Santillo?

7                  MR. CREIZMAN:  No objection.

8                  MS. SANTILLO:  No objection.

9                  THE COURT:  All right.  Then 1001 and all of the

10     documents listed in that exhibit are hereby admitted in the

11     government's case in chief.

12                 (Government's Exhibit 1001 received in evidence)

13                 THE COURT:  Ms. Choi.

14                 MS. CHOI:  Thank you.  The government rests its case

15     in chief.

16                 THE COURT:  Ladies and gentlemen of the jury, we're

17     now at the close of the evidentiary portion of the trial.

18                 MS. CHOI:  Oh, no, that's right, your Honor.  I'm

19     sorry.

20                 THE COURT:  Okay.

21                 Which means that we turn to summations, or closing

22     arguments.  And we will begin with the government.  Ms. Choi is

23     going to just take a minute to get set up.

24                 MS. CHOI:  Yes, your Honor.

25                 May I proceed, your Honor?

1          THE COURT:  You may.

2          MS. CHOI:  Thank you.

3          This is a case about the lies that were told to banks

4    to allow an unlicensed Bitcoin exchange named Coin.mx and its

5    owners and operators, like Yuri Lebedev, to process millions of

6    dollars of illegal transactions for its customers.

7          This is also a case about the lies of a group of men,

8    including Trevon Gross and Yuri Lebedev, who agreed to pay and

9    receive bribes in exchange for taking over and running a credit

10   union.

11         This is also a case about a scheme in which Gross

12   helped Lebedev and his cronies get elected to the board of

13   directors of HOPE Federal Credit Union, so long as Gross'

14   church got over $150,000 in corrupt payments, a scheme which

15   Lebedev joined, so that Coin.mx could use HOPE FCU as a captive

16   credit union to process its financial transactions without

17   having to use any banks, and a scheme that allowed for

18   Kapcharge, a Canadian-based processing company, to run tens of

19   millions of dollars in ACH transactions, including for Coin.mx,

20   through that small credit union.

21         And this is also a case about the lies that were told

22   by Lebedev and by Gross to cover up their tracks, including

23   lies to the federal regulators.

24         Make no mistake:  The defendants knew precisely what

25   they were doing.  Gross started handing over control of HOPE

 1   FCU to Anthony Murgio, Lebedev, and their motley crew within

 2   weeks of hatching this plan, and then Gross and Lebedev

 3   together helped Kapcharge run those ACH transactions, which put

 4   HOPE FCU, and its operations, and its members, whose interests

 5   Gross was supposed to protect, at risk with little reward

 6   except to Gross himself.

 7        Ladies and gentlemen, in this closing statement, the

 8   government will walk you through the evidence that you've seen

 9   and heard for yourselves over the past few weeks.  And that

10   evidence proves that Yuri Lebedev is guilty of bank fraud, wire

11   fraud, and a conspiracy to commit both, that Yuri Lebedev is

12   guilty of making corrupt payments to an officer of a financial

13   institution, and that Trevon Gross is guilty of receiving

14   corrupt payments as an officer of a financial institution, and

15   that both defendants conspired together and with others to make

16   corrupt payments, to receive corrupt payments, and to both

17   obstruct an examination of the National Credit Union

18   Administration and make false statements in connection with the

19   NCUA's examination of HOPE FCU.

20        First, I'm going to spend some time discussing

21   Lebedev's role in Coin.mx's scheme to defraud the banks by

22   lying about the true nature of the business and the

23   transactions that were flowing through Coin.mx.

24        Second, I'm going to talk about the evidence that

25   Trevon Gross asked for and received over $150,000 in bribe

1    payments in exchange for handing over control of the credit

2    union to Lebedev and others.

3         And, third, I'm going to walk you through the lies,

4    the lies that Gross told and the lies that Lebedev told to the

5    NCUA to hide from them what was really going on at the credit

6    union.

7         So, let's start with what brought Yuri Lebedev and

8    Trevon Gross together in the first place.  That's Coin.mx and

9    the lies that it took to run that unlicensed Bitcoin exchange.

10        Now, most of what I'm about to say is not and cannot

11   seriously be in dispute.

12        First, Coin.mx is a Bitcoin exchange where customers

13   exchanged their U.S. dollars for Bitcoin and their Bitcoin for

14   U.S. dollars.

15        And as the employees of Coin.mx explained to you, they

16   understood that banks were reluctant to do business with

17   Coin.mx.  They knew this to be true because Coin.mx was having

18   difficulty keeping their bank accounts open for use and to get

19   credit card processors to process these transactions for its

20   customers.  And because of this, Coin.mx lied when they engaged

21   in those three-way calls with the credit card companies to get

22   the customers' transactions approved.  Coin.mx told the

23   customers to lie and say that this was about memorabilia and

24   not about Bitcoins.

25        And you know why businesses like Coin.mx pose economic

1    harm in the form of risk to financial institutions.  You heard

2    about that from several witnesses, including the witnesses from

3    Chase, the witnesses from Alloya, and the witness from First

4    Data, that payment processing company.

5         First, Bitcoin is an anonymous cryptocurrency where

6    transactions are made with only a wallet address.  That's why,

7    for example, it's favored by criminals who want to access the

8    dark market who purchase drugs, fake identification documents,

9    and weapons.  And it's also why it's favored by those

10   Ransomware hackers that you may recall from Special Agent

11   Jarrow and Jen Wotherspoon's testimony.

12        And it's that anonymity that causes economic risk to

13   the banks because it's difficult to know precisely who is using

14   the Bitcoin and what they're doing with it.  And, thus, Bitcoin

15   is difficult for banks to protect against because it poses a

16   fraud risk.

17        Second, Bitcoin exchanges work as money services

18   businesses, or MSBs, specifically, money transmitters sending

19   Bitcoin and dollars from one person to another, just like

20   TransferWise, that international company that Kapcharge was

21   doing ACH processing for.  Money services businesses pose

22   economic risk as well because they require additional scrutiny

23   to make sure, among other things, that a financial institution

24   is not conducting money laundering on behalf of their clients.

25   And those Chase witnesses described this as regulatory risk

H39KLEB1                        Summation – Ms. Choi

1    which could ultimately result in fines and penalties to Chase.

2            So, it's that anonymity, coupled with the

3    money-transmitting that poses economic and financial harm to

4    the banks in the form of regulatory risk from the government,

5    reputational risk to its customers, and financial risk in the

6    form of fraud and reversed transactions.

7            So, what did Coin.mx do to keep afloat?  They lied to

8    the banks over and over again.  They created a sham company

9    called the Collectables Club in order to hide what they were

10   truly doing.  The very existence of Collectables Club, as you

11   know, was a fraud.  It was an effort by the people at Coin.mx

12   to hide the most important or the most material fact about

13   their business, the true nature of what they were doing.  In

14   other words, it was a fraud that went to the core of what

15   Coin.mx is, that Coin.mx was a Bitcoin exchange not licensed by

16   the Financial Crimes Enforcement Network, which meant that they

17   were running as a money-transmitting business transmitting

18   Bitcoin dollars between accounts without following any of the

19   regulations that were required to potentially mitigate money

20   laundering risks that such a company poses.

21           (Continued on next page)

22

23

24

25

1          MS. CHOI:  (Continuing) And they lied about being a

2     collectibles club whose members traded in items like Elvis

3     memorabilia and stamps with one another.  They lied about the

4     very essence of what they were doing; maintaining the sham of

5     being a collectibles membership group.  They created

6     Collectables Club, the website, www.CollectPMA.com, a website

7     designed specifically to carry out this fraud against the bank.

8     It was a website that was designed to look like it had members

9     who traded in baseball cards and antiques but was not, in fact,

10    functional.

11         That much was obvious to anyone who visited the

12    website.  Remember that there is a spelling error right there

13    on the front page.  And anyone who tried to actually join the

14    Collectables Club or purchase any items from the website, that

15    was explained to you, for instance, by the Coin.mx employees

16    themselves and by Special Agent Jarrow who showed you at the

17    beginning of the case that when he tried to purchase any items

18    from the Collectables Club website he could never succeed

19    because he would try to log in and he would get an error

20    message every time.

21         And it was the Collectables Club website that Coin.mx

22    gave to the banks when Coin.mx opened those accounts.  And it

23    was also a Collectables Club website that they gave to the

24    merchant processing companies like First Data and

25    Authorized.net as a website for the company when they tried to

1    open those merchant processing accounts for their credit card

2    and debit card transactions.  And Coin.mx lied to the banks

3    through those merchant processing companies like First Data and

4    authors dot necessity about what the business truly was because

5    they miscoded.

6         Those merchant category codes that the witnesses from

7    First Data and Chase discussed, that's that MCC code, that

8    four-letter code, also known as a SIC code, that is a sign to

9    every single transaction, every single merchant that accepts

10   credit and debit card purchases.  It's supposed to accurately

11   describe the true nature of the merchant's business.

12        And what both Mr. Wilson from First Data and

13   Ms. Heinrich from Chase explained to you, the MCC is one of the

14   key pieces of information that credit card brands and banks

15   rely on to determine the risk of those particular transactions,

16   and what the banks use specifically to determine whether or not

17   to approve of a transaction or to decline it.

18        Knowing all this, what did Coin.mx do?  Well, quite

19   simply engaged in payment processing fraud.  It pretended to be

20   other entities like the Collectables Club, a country or

21   membership club with that MCC code 7997, the low risk MCC code,

22   which was interested in trading collectible items.  And that

23   was a material lie that was transmitted with credit and debit

24   card purchases made on Coin.mx every single time.

25        And as a result, Coin.mx was able to process debit and

H399LEB2                        Summation - Ms. Choi

1    credit card transactions for its customers through this

2    fraudulent scheme.  Every single one, every single credit or

3    debit card payment that was made by a Coin.mx customer caused

4    that series of wires that information transmitted through the

5    payment networks to be sent through Visa and MasterCard

6    directly to those banks, wires that contained false information

7    about who the merchant was and what the merchant was doing,

8    including this miscoding.

9              And some of these transactions were made right here in

10   the Southern District of New York.  As you recall from Special

11   Agent Tate Jarrow's testimony, when he did his undercover

12   purchases at Coin.mx of Bitcoin and putting U.S. dollars into

13   his account, he funded those accounts and purchases through his

14   undercover account at Coin.mx while he was just sitting here in

15   Manhattan.

16             And you've also seen from the Chase documents that

17   there are transmissions that were made from Chase customers who

18   reside in this district.  This is just a portion of those.  You

19   can see them at Government Exhibits 871 and 872.

20             As the parties have stipulated, Chase Bank had its

21   deposits insured at the Federal Deposit Insurance Corporation

22   or the FDIC, as you probably already know.

23             So in sum, it can't be in serious dispute that the

24   people who created and operated Coin.mx engaged in a conspiracy

25   to cheat and defraud banks.  The only question for you to

1    decide is whether Yuri Lebedev participated in that fraud,

2    whether Yuri Lebedev knew that when he worked for Coin.mx he

3    made any act or took any step to help Coin.mx defraud a host of

4    different financial institutions.  Those financial institutions

5    include every single credit card customer's independent credit

6    card banks.  And having sat through this trial, you know that

7    the answer to this question is yes.  Yuri Lebedev undoubtedly

8    was in on the crimes.

9         He was a knowing participant in this scheme to defraud

10   the banks by tricking them and the payment processors into

11   allowing Coin.mx to process these transactions.  Indeed, Yuri

12   Lebedev didn't just know and participate in these frauds, he

13   played a crucial role because he was the one who helped Anthony

14   Murgio set up these sham websites and the payment processing

15   infrastructure to make sure Coin.mx could keep fooling the

16   banks.

17        How do we know that?  Well, there are many reasons.

18        First, Yuri Lebedev knew that the very reason Anthony

19   Murgio started Coin.mx was to avoid the normal regular banking

20   system.  That's evident from Lebedev's own words in his own

21   chats with Anthony Murgio in the early days of Coin.mx back in

22   November of 2013.

23        Anthony explained to Lebedev that when you work as a

24   money transmitter with Bitcoins, large scale transactions lead

25   to a shutdown of bank accounts real quick.  And how did Yuri

1     respond?  He replied:  Banks are good, just too greedy these

2     days.

3            And what else proves that Lebedev understood the fraud

4     Coin.mx was engaging in?  Well, Lebedev knew when he was

5     helping run the tech side of Coin.mx that there were issues

6     with the bank accounts because he had received e-mails like

7     Government Exhibit 5017 from Anthony Murgio to the Russian

8     programmers and Yuri Lebedev saying that they had to limit the

9     size of cash deposits into Coin.mx's accounts because it throws

10    red flags to the bank if any larger.

11           And this one where an IT guy from Russia, Sergey,

12    tells Lebedev that they can't accept cash or wire deposits

13    today, since yesterday, and asking Lebedev to fix the problem.

14           And most importantly, Yuri Lebedev was the man that

15    Anthony Murgio turned to in order to make sure that the Coin.mx

16    and Collectables Club servers were set up in such a way that

17    they could continue the charade with the payment processors and

18    the banks, to hide the true nature of Coin.mx so that they

19    could continue to process these transactions.

20           How do we know this?  Well, for one, Yuri Lebedev was

21    the man that Anthony Murgio forwarded his information to when

22    he first received the First Data merchant registration

23    information and confirmation for that Collectables Club

24    account.  This is in GX 1623-B.

25           Murgio forwards this information to Lebedev,

obviously, because Lebedev was working on making sure that the

integration between Coin.mx and First Data for purposes of

credit and debit card transactions worked smoothly.

          And from the beginning, back in late 2013 Yuri Lebedev

was responsible for helping Murgio setup separate computer

servers with separate IPs between Coin.mx and Collectables Club

so that they could continue to trick people into thinking

Collectables Club had nothing to do with Coin.mx.

          You remember what IP addresses were from Special Agent

Jarrow.  That's that unique identifying number that serves as

an address for every device that's connected to the internet

and tells you, supposedly, where the true location is of that

particular computer.  And it was important to keep those

servers separate so that no one, not the banks, not First Data,

could link Coin.mx to Collectables Club.

          And Lebedev continued to help Murgio trick payment

processors into believing that they were processing credit card

transactions for Collectables Club, not Coin.mx.

          Like in GX 5152, which is an e-mail dated January 5,

2015, when Murgio tells a group of those Russian programmers

for Coin.mx, Vlad, who has tested Coin.mx and Lebedev.  And the

subject line:  Important for processing.  PayLeap pulling from

Collect PMA server.

          So what does Murgio say?  "Is this product being

wrapped within the Collect PMA website?  The issue from our

H399LEB2                    Summation - Ms. Choi

1    last merchant account that I got setup is that it was not

2    showing that it was coming from the website that I listed and

3    registered.  I warned about this prior to us launching it and I

4    was told that the IP is masked, and they won't to know where

5    the processing is from.  I wanted to show that it's processing

6    from Collect PMA.com.  How do we achieve this from here on

7    out?"

8              So what does this e-mail mean, ladies and gentlemen?

9              Well, you might recall Mr. Wilson who told you that

10   PayLeap is a partner with First Data which helps board those

11   merchant accounts.  So why do they care so much about the IPs

12   being masked?

13             Well, again, as Special Agent Jarrow described to you,

14   those IP addresses give information about the location of a

15   computer and where it's connected to the internet.  So it's one

16   of those things, for example, that a payment processor or a

17   bank might use to make sure that the person who is logging into

18   their servers is authorized and really who they say they are so

19   that they can detect fraud.

20             And as the First Data witness explained to you, they

21   have risk teams, for instance, who would make efforts to review

22   the information on file with the merchants and see if there are

23   links between the websites and the e-mails that they put on

24   those applications and other domains.  And they do research on

25   who is hosting these domains, who is hosting these websites and

1   these servers as part of the assessment.

2           So think about this for a second.  Say you've

3   represented to First Data or a payment processing company or a

4   bank that your company is just a country club located in West

5   Palm Beach, Florida or a restaurant delivery service located in

6   Tampa.  You've listed on your merchant processing account a

7   very specific website, such as Collect PMA.com or MyXtreme

8   Delivery.com.  And the domain names for those particular

9   websites, they're hosted on servers that are based in the

10  United States.  Then all of a sudden the credit card companies

11  and the payment processors see that you're sending credit card

12  transaction data from a computer server located in Russia

13  because you didn't mask your IP or the true location of where

14  you're sitting and the data that was coming from a website that

15  was not listed or registered with the company's merchant

16  account.  Obviously, ladies and gentlemen, that's going to

17  raise some red flags with the banks and red flags with the

18  processors.

19          Like here in Government Exhibit 5154.  It's no

20  surprise that on January 14, 2015 Anthony e-mails two

21  programmers at Coin.mx in response to an e-mail that they sent

22  to him earlier that day.

23          The e-mail that was sent by Anton says, "We need to

24  generate transaction key for a PayLeap account but PayLeap

25  shows message your account is locked on attempt to sign in."

1          And Anthony responds, "It's locked because you did not

2     mask your IP," meaning the payment processor detected that the

3     Russian programmers were connecting from their true location,

4     Russia, instead of somewhere in the United States.  And that

5     caused a red flag.

6          You also know that from Government Exhibit 2024.  Who

7     does Anthony turn to that very day?

8          This portion is critical, ladies and gentlemen.

9     Anthony relies on Yuri to tell the Russian programmers at

10    Coin.mx what to do.

11         Anthony writes an e-mail to Yuri, at the very bottom,

12    January 14, 2015 at 9:45 a.m. "Yuri, please give the guys what

13    they need to run our payment systems through Collect PMA so it

14    does not throw any flags."

15         And Yuri responds, "Most definitely, regards."

16         And in case there's any confusion about what they're

17    talking about, you should look at the subject line of that

18    e-mail.  "Using Collect PMA to run payments for CMX" or

19    Coin.mx.

20         And Anthony has expressed about what he wants Yuri and

21    those Russian Coin.mx programmers to do.  He says at the very

22    top of that chain, "We will need the Authorized.net to look as

23    if it's coming from MyXtreme Delivery.com and PayLeap to come

24    from Collect PMA.com.  Let's get on the PayLeap integration and

25    make sure it's done first."

H399LEB2                        Summation - Ms. Choi

1              And as the First Data records show, from Government

2      Exhibit 750 at page 19, Collectables Club PMA was using PayLeap

3      for its credit card processing.

4              And as the First Data witness explained to you,

5      Authorize.net is another payment processing company.  And you

6      know from the Authorize.net records that are in evidence,

7      that's at Government Exhibit 766, on page four, that not only

8      did they have a Collectables Club PMA merchant account using

9      Anthony's dad's name, Michael Murgio, they also registered two

10     URLs for that, Collect PMA.com and Lightning Payments.com.

11             What's Lightning Payments.com?  Well, that's Lebedev's

12     company.

13             For example, in this e-mail this is Lebedev

14     registering the domain under Anthony Murgio's name with

15     Namecheap but using his own e-mail account, which you can see

16     at the "to" line.  It says Anthony Murgio but it's being send

17     to Y. Lebedev at Hotmail.com.

18             And this e-mail, GX 1411, where Lebedev is explaining

19     to the Coin.mx team, including Vlad, Anthony and other

20     programmers, about how Lightning Payments can integrate with

21     Coin.mx.

22             And this.  Again, back to the Authorized.net records.

23     You see, in fact, that they also applied through Authorize.net

24     for a merchant account in the maim of MyXtreme Delivery.com,

25     pretending to be a restaurant delivery service using Anthony

1   brother's name, Joe Murgio, at the bottom in Tampa, Florida.

2              Ladies and gentlemen, these e-mails and documents are

3   powerful evidence of Lebedev's guilt.  They establish not only

4   what his job was at Coin.mx but more importantly that Lebedev

5   knew what was happening; that for Coin.mx to operate they

6   needed to hide from the payment processors where they were

7   operating from and what kinds of transactions they were engaged

8   in.  These e-mails standing alone is sufficient evidence for

9   you to convict Yuri Lebedev of participating in bank and wire

10  fraud.  But there's even more communications like them.

11             For example, let's go to Yuri's WhatsApp.  The very

12  next day, January 15, 2015, at PK16477 Murgio again turns to

13  Yuri Lebedev to help Coin.mx avoid detection by the bank.

14  Murgio asks Lebedev if Lebedev has figured out a way that

15  they're going to do the MyXtreme Delivery and Authorized.net

16  integration.  "Are we just going to get our own server and move

17  the files because we don't need it to do actually work.  It

18  just needs to be populated and be on a server and then have a

19  BPN or whatever."

20             So let's think about that, for example.  This is

21  another website, MyXtreme Delivery, that they don't actually

22  need to work.  They just need to make it look as though it is a

23  functioning company in case anyone tries to figure that out,

24  the same as what they did with Collect PMA.com.  And they want

25  to make sure that they have it on a VPN.

1          What's a VPN?  That's that Virtual Private Network

2     that Special Agent Jarrow explained to you.  It's a way that

3     you can tunnel two computers together on the internet, but it's

4     also a way in which you can mask the true IP address because

5     those two computers would talk to one another and make it seem

6     as though the computer that's really in Russia is somewhere in

7     Kansas.

8          And they keep talking about this.  Later on, on the

9     Yuri WhatsApp.  Starting at 16478.  Anthony asks, "Are you

10    going to do them both from the same server in Kansas?  And what

11    files do we need to get from BigTree to be on that server to

12    make it look legit because I'd like to get that -- that

13    Authorized.net."

14         And Yuri responds, "Yes.  What we decided in a meeting

15    this morning is that step one, you run it from the IP from

16    Kansas."  And then he says, "No, we're not going to move any

17    files over.  We're just going to originate with the IP address

18    that's the Kansas IP address."

19         And, again, why are Murgio and Lebedev going through

20    this trouble?  They're doing so because they want to

21    intentionally fool and mislead the credit card processors and

22    the banks into thinking that the company is really engaged in

23    some sort of restaurant delivery service in the United States

24    which is not what they're actually doing.

25         Now, again, you've heard a lot about Collect PMA and

the Collectables Club over the course of this trial, which is

just one of the sham companies that Coin.mx has used.  But as

you heard from the First Data witness, Coin.mx was having

difficulty using Collectables Club with the payment processors

because ultimately they started to detect that that was not the

true nature of the business and, in fact, Coin.mx, which was

the Collectables Club, was a Bitcoin exchange.  So Murgio had

to get a little creative.  MyXtreme Delivery was the other

entity that Coin.mx set up for credit card processing.  How do

we know this?

          Well, first we know this because Anthony tells Jen

Wotherspoon about this.  In the What's App to Jen Wotherspoon

starting at 15278.

          Anthony says, "The Authorize.net account that we have

set up is what we call miscoded which means I have it coded

like it's a restaurant delivery service called MX delivers or

something, MyXtreme Delivery, and it will show up on the

statement as MX Management."

          And he explains to Ms. Wotherspoon that they're going

to use this for their best customers so that -- because they

know, like if one member gets a call and says it's for Bitcoin,

they'll shut it down right away.

          That's how you know that they're using MyXtreme

Delivery for Coin.mx.

          You also know this because of the -- the Yuri

WhatsApps.  It's expressed on April 9, 2015 Murgio says to

Lebedev, "Yo that is for processing for Coin.mx, what we were

going to do before.  I think the website is called MyXtreme

Delivery.  We're going to do uncoded processing," which, if you

recall, Mr. Wilson explained to you is just another way to say

that they were miscoding.  "Which means we're going to set it

up on one server and then set it up so we can process for

Coin.mx but it's going to look like it's from My and then X and

then Xtreme Delivery.com."

        Now when Anthony says that Yuri doesn't walk away.  He

says, "Got you.  So I work with Greshia, those Russian

programmers, on this."

        And Anthony responds, "I've got to try to figure out

how we're going to make it work.  We can't let this guy from

Cardinal Commerce know what we're doing or anything like that,

but we need to utilize, it needs to be able to process from

Coin.mx."

        And Yuri again doesn't walk away.  He acknowledges he

understands what's going on.  He says, "Okay.  Let's discuss

later."

        But unlike the guy from Cardinal Commerce, Yuri

Lebedev knew what he was doing when he was helping Murgio with

the miscoding because Murgio explained the whole scheme to him.

        And he acknowledges he understands the whole scheme

later on in their conversation when Yuri says, "By the way, I

1    got your plan with MyXtreme, just like Collect PMA with that

2    API."  Remember, that's just the interfacing documentation so

3    that two websites can talk to one another just like Special

4    Agent Jarrow explained to you.  "So with that API of a

5    collectible auction to get processor.  Same idea with food."

6    And he called it "brilliant."

7            Yuri then further explains, "Take what -- take what

8    worked well and multiply."

9            Murgio responds, "Yes, sir."

10           Yuri says, "Main point to learn is not to get screwed

11   along.  Right, Pastor."

12           And Anthony says, "Yup."

13           Now, what else proves that Lebedev had this knowledge

14   and intent?

15           Well, you know that Lebedev, as much as Murgio, fully

16   appreciates that everything that they were doing for Coin.mx

17   was designed to hide the true nature of that business from

18   banks by hiding to be a purported collectibles club and to

19   mislead those banks and credit card companies.  And for those

20   reasons, ladies and gentlemen, he's charged in four counts --

21   three counts:  Count Four, conspiracy to commit wire and bank

22   fraud; Count Five, wire fraud; and Count Six, bank fraud.

23           Now we call Counts Five and Six substantive counts --

24   that means the actual wire and bank fraud -- and Count Four

25   would be the conspiracy count.  And after the parties'

H399LEB2                    Summation - Ms. Choi

1    summations, Judge Nathan will instruct you on the law and what

2    this all means.  And we'd ask that you listen carefully to what

3    she says because what she says about the law should govern your

4    deliberations.  And they will guide you to what is important

5    and relevant in this case and what is not.

6          But let's just briefly discuss what I expect Judge

7    Nathan will tell you about the bank and wire fraud counts.

8          I expect that the judge will tell you that in order to

9    find Lebedev guilty of the bank and wire fraud counts the

10   government does not need to prove that he is a leader or an

11   organizer or an initiator of that fraud.  All that the

12   government needs to prove with regard to Count Five, the wire

13   fraud, is that Lebedev knowingly and willfully participated in

14   the fraudulent scheme with specific intent to defraud.  And

15   with regard to Count Six, the substantive bank fraud charge,

16   the government only needs to prove that Lebedev executed or

17   attempt to execute a scheme with the intent to defraud.  And,

18   finally, with regard to Count Four, the conspiracy, all the

19   government needs to prove is that Lebedev knowingly and

20   willingly participated in Coin.mx's scheme to trick the banks.

21         Now, there is one point that I think is left ought

22   from the slides, and it's also in Yuri's WhatsApp.  You should

23   go ahead and take a look at that afterwards if you have any

24   doubts about what's going on here, because there is an

25   expressed conversation in July of 2015 in which Lebedev states

H399LEB2                    Summation - Ms. Choi

to Murgio that he needs to switch those GoDaddy servers from
MyXtreme Delivery over to make sure that everything is deployed
properly so they can test to make sure that the website makes
sense and that they will be able to successfully trick the
payment processing companies.

        But he notes to Anthony that he has concerns that if
the CC processors, meaning the credit card processors, notice
that this is a sham website when they're trying to deploy that
switch to try the testing, that everything would be undermined,
that the jig would be up because then they would realize that
MyXtreme Delivery is just the same as Collect PMA.

        Now, ladies and gentlemen, the government has proven
that Yuri Lebedev was a significant and critical part of the
Coin.mx's fraud.  But, as I just described to you, you don't
need to draw the conclusion to find him guilty because there
certainly can't be any reasonable doubt that he joined in that
scheme to fool the banks to commit wire fraud; his assistance
in hiding the true IPs of those specific servers that Coin.mx
was using for those transactions is more than enough evidence
on that front.

        The same goes with his helping Anthony expressly to
set up that MyXtreme Delivery website, that new sham website
that they could use so Coin.mx could pretend to be a restaurant
delivery service run by Anthony Murgio's father instead of what
it really was.

1           So let me be perfectly clear.  Yuri Lebedev knew that

2      for Coin.mx to function he had to continue to lie to banks, but

3      he also knows that it's hard to keep up that charade.  He knew

4      that because he was instrumental in making sure that that

5      charade continued in setting up the servers and the websites to

6      continue to lie to companies.  So that's why Yuri Lebedev

7      decided to join Anthony Murgio's plan to take over HOPE Federal

8      Credit Union, because it would be a lot easier to run your own

9      financial institution than to continue to trick other ones.

10     You could just sidestep all the scrutiny and the regulations

11     that banks imposed if you simply owned your own credit union.

12     It's precisely because Lebedev knew about all of these lies

13     that were required to keep Coin.mx afloat that he decided to

14     help bribe Trevon Gross.  In other words, a final way that you

15     know that Lebedev is guilty of bank and wire fraud is because

16     he knew he had to bribe Gross to get that credit union.

17           So let's turn to part two, the bribery scheme.

18           On Saturday, November 22, 2014, Yuri Lebedev, Trevon

19     Gross and others met at HOPE Federal Credit Union and at that

20     meeting, as you know, Gross demanded that Lebedev and Anthony

21     Murgio pay him a final $50,000, a bribe, to illegally complete

22     the transfer of power over for Gross's credit union.

23           Gross said, on that transcript that we've seen many

24     times throughout the course of the trial, "Just so we're clear,

25     Monday, by Monday, there will be e-mails sent in to the

1    secretary of the board, who right now is Ricardo, stating

2    resignations from the board.  Correct.  And upon receipt of

3    those.  Monday, the 50K that the church is due will be sent

4    in."

5             And when Anthony noted that he didn't know if he could

6    get the wire, that money fast enough since this was happening

7    on a Saturday and the deadline was Monday, Lebedev said, "I'll

8    get 50.  I will give to you.  It's fine."

9             He also said later on, "Don't worry about it.  I got

10   it."  That's all in the transcript at page 37 of 2506-T.

11            Now, as you know, Gross and Lebedev had no idea that

12   this meeting was recorded and the defendant's own words during

13   that conversation, words that they never expected that this

14   jury would ever hear, are powerful and indisputable evidence of

15   their guilt.  Even yesterday Mr. Gross took that stand and

16   described his conduct and his words at that meeting as not his

17   best moment.

18            Ladies and gentlemen, Mr. Gross' demand for $50,000 in

19   exchange for his credit union was not merely a bad moment for

20   Gross and Lebedev.  It was a criminal moment.  It is a window

21   for you into exactly how both Gross and Lebedev were operating

22   and what they were thinking at the very same time that they

23   were committing this scheme.

24            And you didn't just hear these defendants at this

25   meeting.  Throughout the trial you also heard and saw their

1    words on recorded phonecalls, in their WhatsApp messages and in

2    their own e-mails speaking about the scheme to bribe Gross and

3    hide it through lies at the NCUA.

4         And after having sat through this trial and seen the

5    evidence, you know that the scheme was pretty simple, for the

6    Collectables Club members from Florida to bribe Gross so that

7    he could join HOPE FCU, a small credit union in New Jersey, to

8    take over control of that credit union so that they could use

9    it to process their own transactions through a Canadian-based

10   payment processing company called Kapcharge.

11        So what's not in serious dispute?  A lot of the

12   details about this scheme seriously just are obvious.  They

13   can't seriously be disputed, and I'm going to spend a little

14   time talking about some of those details just so we can orient

15   ourselves.

16        First HOPE FCU was a small credit union in New Jersey;

17   small in assets and in member size.  And in 2014 it was run by

18   Gross who served both as its chairman and its CEO and, thus,

19   was both an officer and a director of HOPE FCU.

20        Second, you know that HOPE FCU qualifies as a

21   financial institution for purposes of this case because its

22   share accounts are insured by the National Credit Union Share

23   Insurance Fund, as Clayton Curry from the NCUA told you.  He

24   was the first witness from the NCUA that we called several

25   weeks ago.

1          In addition, in April 2014 Anthony Murgio reached out

2     to Trevon Gross, a man that he never met before, and sent him

3     an e-mail.  Anthony Murgio wanted to have control over the

4     credit union to run Coin.mx, his unlicensed Bitcoin exchange.

5     So he set out to find a small credit union where he could take

6     control over the board and run that credit union.

7          Third, Kapcharge, that payment processor that was

8     based in Montreal, Canada, and its president, that's Mark

9     Francis, were involved in the scheme from the very beginning.

10    And here is their attempt to open an account at the credit

11    union dated May 23, 2014.

12         How else do you know that they're involved in this

13    scheme?

14         Well, Kapcharge is the one who sent that $120,000 to

15    Gross' church just days after the election of the Collectables

16    Club board members, a fact that Gross knew about at the time

17    because he was forwarded that donation confirmation.  You can

18    see that in Government Exhibits 1317-E and 1317-F.

19         And one of the main thinks that Gross, Lebedev, and

20    Murgio did while operating the credit union was to process lots

21    of ACH transactions for Kapcharge.

22         Fourth, you know that Anthony Murgio, Yuri Lebedev and

23    the Collectables Club members arranged for a series of

24    payments, the so-called donations and supposed consulting fees,

25    to be made to Trevon Gross's church, Hope Cathedral, which

1     totaled over $161,000.  These include two wire transfers of

2     $15,000 on May 9 and May 21 of 2014; that $120,000 in an ACH on

3     June 23, 2014 just days after the election, and a series of

4     payments that were made as so-called consulting fees to Trevon

5     Gross in August, October, and November of 2014.

6          Now, there can't be any real serious dispute that

7     Anthony Murgio intended these payments to be bribes to Trevon

8     Gross.  They were bribes to get Trevon Gross to handover

9     control of HOPE FCU to the Collectables Club.

10         Those are seven payments that are made before they

11    ultimately parted ways.

12         And you know that ultimately, fifth, in return for

13    those payments, Gross agreed to give control of the board of

14    directors to the credit union and, thus control over operation

15    of the credit union, to the Collectables Club and its members,

16    none of whom he had met before, most of whom who lived in

17    Florida, and none of whom lived, worked, worshiped or

18    volunteered in Lakewood, New Jersey.

19         So, in a nutshell, ladies and gentlemen, there can't

20    be any serious dispute that Anthony Murgio arranged for

21    payments of over $160,000 to bribe Trevon Gross and that in

22    return for these payments Gross agreed to give Murgio --

23         THE COURT:  Just a moment.

24         MR. KLINGEMAN:  Serious dispute.

25         THE COURT:  Overruled.

1          MS. CHOI:  There can't be any serious dispute that

2     Anthony Murgio arranged for payments of over $160,000 to bribe

3     Trevon Gross and that in return for the payments Gross agreed

4     to give Murgio precisely what he wanted.

5          So, what's in dispute?  It really boils down to a

6     simple question for both defendants.  Did Yuri Lebedev

7     corruptly participate in offering that money to Trevon Gross

8     and did Gross act with corrupt intent when he agreed to accept

9     that money?  The evidence is overwhelming that both defendants

10    acted with corrupt intent.

11         So, what does corrupt mean?  Well, again, Judge Nathan

12    will instruct you on the law and you should listen to what she

13    says and abide accordingly.  But, I expect that Judge Nathan

14    will instruct you that to act corruptly means precisely what

15    you think it means.  To act corruptly basically means to act

16    with a bad purpose of accomplishing either an unlawful end or

17    result or a lawful end and result by some unlawful method or

18    means.  In other words, acting corruptly means to act with a

19    purpose of doing something illegal.  And it also means acting

20    with a purpose of doing something legal so long as it's with

21    illegal means.  And I also expect that Judge Nathan will

22    instruct you that the motive to act corruptly is ordinarily a

23    hope of either financial gain or some benefit to oneself or

24    some profit or benefit to another.

25         So the key issue with respect to Lebedev is whether

H399LEB2                    Summation - Ms. Choi

Lebedev agreed to give that money to Gross with the corrupt

intent to influence Gross.  And the key issue with regard to

Gross is whether he agreed to accept that money, $160,000, to

his church with the corrupt intent to be influenced or

rewarded.

          Now, as I've already said there really can't be a

serious dispute that Anthony Murgio agreed to pay that money to

Trevon Gross with corrupt intent because he wanted that credit

union as a captive financial institution for Coin.mx.  And you

have seen and heard a mound of evidence that also proves that

Yuri Lebedev joined in the criminal scheme to bribe Gross and

that Gross corruptly agreed to receive that bribe money.

          Ladies and gentlemen, this was not a complicated

arrangement.  Cash in exchange for control of a credit union.

Your common sense tells you that Anthony Murgio, Yuri Lebedev,

and their Florida-based Collectables Club friends never could

have gained control of HOPE FCU, a New Jersey-based credit

union, absent those payments that Anthony Murgio arranged for

Trevon Gross's church, Hope Cathedral.  And you know that this

was a corrupt business deal from the get-go.

          Starting with the testimony from Clayton Curry -- that

was that first witness from the NCUA during week one -- when

Judge Nathan instructed you at the time regarding how credit

unions function and the rules that apply to the board of

directors of credit unions.

1          Now, we've all learned a lot about how credit unions

2     function and what they are over the course of the last few

3     weeks.  You know that they are nonprofit, cooperative

4     organizations that are owned by their members; that each member

5     gets the same say, unlike a bank, the same vote in how that

6     credit union should act and how that credit union should be run

7     regardless of how much money they have in their accounts at the

8     credit union.  And it's precisely because a credit union works

9     as a nonprofit cooperative that, unlike a bank, a credit union

10    cannot be bought and sold.  Every member has its own voice and

11    they are all equal in a credit union.

12         And you learned about how credit union boards are

13    supposed to function.  The board of directors has a fiduciary

14    duty to their members, the individuals that bank with that

15    particular credit union.

16         Now whether or not you were already familiar with the

17    term fiduciary duty prior to this trial or not, what that

18    phrase really means is pretty straightforward and it's

19    precisely what you would expect from a board of directors.

20         Directors are supposed to act to further the best

21    interests of the membership of the credit union, as a whole,

22    and with care.  Directors are not supposed to put their own

23    interests or the interests of specific members, such as

24    Collectables Club or Kapcharge, ahead of all the other members

25    of the credit union.  And no member of the board is supposed to

H399LEB2                    Summation - Ms. Choi

1    be compensated.  They should only be volunteers.

2              And you remember seeing the bylaws of HOPE FCU and not

3    being surprised that they expressly talk about conflicts of

4    interest, because conflicts of interest generally should be

5    guarded against in all credit unions.

6              And what does the conflict of interest prohibition say

7    at page 17 of 6510?  Well, it essentially boils down to this.

8    Directors are not supposed to put their own personal financial

9    interests, whether they be direct interests or indirect

10   interests, ahead of the interests of all of their other

11   members.  And if a director has such a financial interest in a

12   particular business deal, he's not supposed to deliberate or

13   vote on that issue.  But that's precisely what Trevon Gross and

14   Yuri Lebedev did.

15             So what establishes corruption and corrupt intent in

16   this case?  Well let's just start off with the motivation of

17   the two defendants.  Lebedev to join Murgio in the scheme and

18   Gross to accept these payments.

19             Yuri Lebedev cared about Coin.mx getting its own

20   credit union so that Coin.mx could run without having to deal

21   with the bank accounts constantly closing.

22             You saw those e-mails where he's setting up the ACH

23   transactions, for Coin.mx through the credit union and where

24   he's getting paid to do so as a consultant from Intelligent VR.

25   That's his own consulting company where he made over $20,000 on

H399LEB2                    Summation - Ms. Choi

1   work that he did in this deal.

2           So, he joined Anthony Murgio and the rest of the

3   Collectables Club in taking over control of the board and thus

4   the credit union itself in exchange for payments to Hope

5   Cathedral.

6           Lebedev clearly understood that if it wasn't for these

7   payments, the Collectables Club would never have been able to

8   even join HOPE FCU, would never have been able to be members of

9   the board of directors of that credit union in the first place.

10  And it's because he understood that these so-called donations

11  were designed to influence Gross and convince him to let these

12  Floridians into the credit union you know he was acting

13  corruptly.

14          You know this in part because, as is evident from his

15  own texts on his WhatsApp, the Government Exhibit 4510 at

16  PK2652 to 56.  In mid-November when Gross first tells the

17  Collectables Club that the NCUA had issues about whether or not

18  they were qualified to even be members of that credit union and

19  whether they fell within the field of membership of that credit

20  union.  Yuri says to Anthony, "How convenient for Trevon."

21          Murgio responds, "Yeah."

22          Yuri says, "I'm sure he have known that before he

23  agreed for 'donation.'  I think your idea will work.  Rent an

24  apartment.  How do they know if you're only there once."

25          You know what they're talking about, ladies and

1    gentlemen.  They're talking about whether or not Collectables

2    Club even exists in Lakewood, New Jersey.

3            You also know that Yuri acted with corrupt intent

4    because, as I'll describe to you in a bit, once he was a member

5    of the board of directors, Lebedev cared about the interests of

6    the Collectables Club and placed those interests ahead of the

7    safety and soundness of that credit union.

8            So let's talk about Trevon Gross for a second.  With

9    regard to Trevon Gross, you know that Gross took money from

10   Collectables Club and Kapcharge, those payments to his own

11   church, because he put the interests of his church and himself

12   over the interests of the credit union.  You know that because

13   of the way in which Anthony Murgio lays out the deal to Trevon

14   Gross in Government Exhibit 1081-D.

15           Anthony Murgio says, "As far as a large donation we

16   would be willing to do this upon our ability to have full

17   control of a CU.  We will then donate a large amount for your

18   guidance along the way.  New credit union or takeover existing

19   credit, Hope or another union, with full control.  Result in a

20   large donation of 150K to an organization of your choice."

21   Whose choice?  Trevon Gross's.

22           And we saw how Trevon Gross responded.

23           "What I think is fair is 15K upfront and 45 days of

24   operation another 15K.  Then, once we find you a CU, or take

25   over ours (this is still on the table) then 120K would be made

1    as a donation."

2          And you know how Anthony responded, "We just wanted to

3    get another business account and personal account set up and do

4    some test transactions with ACH."

5          Why does he care so much about test transactions with

6    ACH?  Well that's because that's the reason they wanted to take

7    over the credit union in the first place.

8          "And transfer of money in and out.  Once we do this,

9    but can pay the 15K."

10         And we also know this from Government Exhibit 1167-A.

11   The reason Trevon Gross handed over the keys to the credit

12   union to Anthony Murgio, Yuri Lebedev and the Collectables Club

13   in the first instance was because of the promise of payments to

14   Hope Cathedral.  That's on June 17, 2014.  And he says, "I will

15   do what you ask because Saturday this is your credit union."

16   That's Trevon Gross to Anthony Murgio on June 17, 2014.

17         Now, Trevon Gross admitted such to you yesterday on

18   the witness stand.

19         He said not only that money influenced his decision to

20   allow those Collectables Club members to join the board, but

21   also that he arranged for the board election because he got

22   those payments.

23         Ladies and gentlemen, this is extremely important.

24   Trevon Gross took that stand yesterday and essentially admitted

25   to his guilt.  He admitted that the money promised by Murgio,

1    Lebedev, and others influenced his decisionmaking with regard

2    to the credit union.

3          You don't need to know what a fiduciary duty is under

4    the law or chapter and verse of the NCUA's rules and

5    regulations to know that the arrangement we proved at trial

6    reeks of corruption.  Bad faith from the very start.  Everyone

7    involved in the deal understood that this was a classic quid

8    pro quo arrangement or tit for tat; $160,000 bankrolled by the

9    Collectables Club and Kapcharge for complete control of a

10   credit union.  That's all the evidence you need to establish

11   that both defendants, Lebedev and Gross, acted corruptly,

12   because that money was designed to influence Gross to make a

13   deal that he never otherwise would have made.  And the money,

14   in fact, did influence Gross.  But you know that that's not

15   where the story ends.  You know the government presented all

16   sorts of other evidence establishing corrupt intent.

17         First, the facts of what Gross did once Murgio

18   approached him with the corrupt deal; and second, the layers

19   and layers of lies that Gross, Murgio, and Lebedev and others

20   had to tell to hide the corrupt core of what they had done.

21         So, first, let's turn to what Gross did once he was

22   approached by Anthony Murgio.

23         Let's begin with a quick timeline from start to finish

24   of how long it takes Gross to give up the reigns of his credit

25   union once he was approached.

1           April 2 is the date that Anthony first sends that

2    e-mail to Gross, as we just saw above in Government Exhibit

3    1071.

4           And on April 3, 2014, Gross and Anthony first speak on

5    the phone.

6           And April 8 Gross tells the Murgios that he wants to

7    finalize the MOU -- that's that memorandum of understanding --

8    but that he'll need the organization's name and address.  You

9    can see that at Government Exhibit 1074-B.

10          And on that day Anthony responds with the

11   organization's name as Collectables Club PMA with an address

12   11618 Riverchase Run, West Palm Beach, Florida.  Gross is

13   finalizing that memorandum of understanding without even

14   knowing the name or the address of the organization that he's

15   seeking to join the credit union.

16          April 14, 2014.  Government Exhibits 1057 and 2510-A.

17   Gross updates that MOU and the parties sign, Gross on behalf of

18   the credit union and Michael Murgio on behalf of the

19   Collectables Club.

20          Two weeks, ladies and gentlemen, from the date that

21   the Murgios approached Gross until that MOU was signed.

22          And then on April 25, 2014, at Government Exhibit

23   1083, Gross tells the Murgios, "We can do whatever we like in

24   this arrangement."

25          And on April 29, Michael Murgio tells Anthony Murgio,

1    "We need to get the names of five board members to give to

2    Trevon."

3          Shortly thereafter Yuri Lebedev joins, after Anthony

4    Murgio approaches him.  Says, "I went to New Jersey to met with

5    him, very nice guy.  Pastor of a church.  We came to an

6    agreement that we would be able to have control of a credit

7    union."

8          And at Government Exhibit 1093-B.  On May 7, Trevon

9    demands the 15,000 that he believes he's due because he's

10   already kept up his part of the bargain.

11         Ladies and gentlemen, you don't even have to guess as

12   to what the contours of this corrupt deal are because Trevon

13   Gross expressly lays them out in the e-mails that you've seen

14   over the course of this trial.  That includes Government

15   Exhibit 1092-B which is on May 6, 2014.

16         "Hey, Anthony, I met with our board last night and

17   though they are intrigued by your offer, they will not proceed

18   unless we have satisfied the initial terms of our MOU, which

19   called for your organization to make a donation in the amount

20   of 15K and to cover the expenses.  To date, we've had two

21   training sessions, given complete back office access to your

22   organization and created e-mail accounts for the clubs and

23   officers."

24         And then at the bottom he says, "Please ACH 15K to

25   Hope Cathedral with a routing and an account number."

1          You know that that $15,000 is what Trevon Gross says

2     is due to him, that donation to the church.  And you know that

3     those -- that that payment is linked to what he's been doing on

4     behalf of Collectables Club.  May 6, 2014, before there even is

5     a board election, he's given complete back office access for

6     the members of the Collectables Club.

7          And he continues.  "Upon receiving these funds by

8     Friday, May 9, the executive board will meet and recommend for

9     election to the board six people from your organization.  These

10    six seats will give you the majority position on the board.

11    The whole board will ratify your nomination on May 17 (by which

12    time, we would like to have received that second 15K donation).

13    Once your names are placed in nomination the six people will

14    officially be elected to the board at the June annual meeting.

15    This is the only time we can change board members.  You will

16    have to designate who among your board members will serve as

17    chairman, secretary, treasurer, and supervisory committee

18    chair.  The existing board members will tender their

19    resignations to be effective at your choosing.  Before this

20    vote happens, the remainder of the donation to assume control

21    of the CU would need to be received.  I will be the only board

22    member to remain to assist in the transition as a consultant to

23    interface was the NCUA examiner, set up your local office, as

24    well as establish a branch in Florida.  We believe this is the

25    prudent way.  Please advise."

1          Now, a few things about this.  Note, Trevon Gross

2     doesn't do any due diligence at this point about who these

3     board members are going to be.  He just asks Anthony to give

4     him the six names because he doesn't much care who those people

5     ultimately are.  So long as he gets those six names, he can

6     place them into nomination.

7          And you know that that's another sign of corrupt

8     intent, ladies and gentlemen, because you heard Clayton Curry

9     explain to you how elections are supposed to work.  There is

10    supposed to be a nominating committee on the board of

11    directors.  There's supposed to be some sort of review about

12    who these proposed board members would be.  None of that

13    happened.  All Trevon Gross asked of Anthony Murgio was just to

14    designate who these people would be and what roles they would

15    play at the credit union.  So long as he got those fifteen

16    thousand dollar payments and ultimately that bigger $120,000 to

17    the church, he didn't really care.

18         How else do you know that they gave up control?  Well

19    aside from backdoor access to all of the personal sensitive

20    information for each of the credit union members, on May 9 he

21    also makes note to Anthony, "Got it.  We will also make

22    provision to transfer the domain to you all," meaning the

23    website itself, for HOPE FCU.

24         Now I note here Trevon's only e-mailing with Anthony

25    Murgio at this point.  It's an e-mail between Trevon and

H399LEB2                    Summation - Ms. Choi

 1    trustee at Collect PMA and he knows at this point that that's
 2    Anthony Murgio.
 3           How else do you know that there's corrupt intent?
 4    Well Government Exhibit 1106.  Later that day.  Anthony Murgio
 5    sends a list of his six friends that he'd like to serve on the
 6    board.  Gross asks for resumes.  Not because he wants to do due
 7    diligence, just resumes at some point for the file because
 8    examiner likes to see this.
 9           At Government Exhibit 1108A on May 12, 2014 Gross
10    tells Anthony Murgio, "The executive board has placed in
11    nomination the six names.  This Saturday they will be confirmed
12    to be placed on the ballot for the June annual meeting.  A
13    couple of things need to happen ASAP including the final
14    installment on current MOU wired to PNC Bank."  That's the bank
15    where Hope Cathedral has its operating account and its payroll
16    account.
17           "Recap of next steps.  Final nomination and
18    ratification of the change of the board will happen this
19    Saturday.  We'll then have one month to put all the pieces in
20    place as to the operations, setting up a branch in Florida,
21    establishing a presence in Lakewood."  Note.  Establishing a
22    presence in Lakewood.  He's already ratifying this deal knowing
23    full well they have no presence in Lakewood.  "Approving new
24    policies as it relates to the fees, etc., so we can program
25    into the system and get ready for new members."

1            "At the conclusion of the June annual meeting current

2       board members -- will tender their resignations effective

3       September 1.  That date is set because we have our annual

4       examination July 7.  If you'd like to come back and meet with

5       the board about a month afterwards to discuss findings, and we

6       don't want them to see an entirely new board at that meeting.

7       That normally happens in August.  All members have agreed to

8       see this through to September 1.  After the June meeting, you

9       all will have majority vote on the board.  So there is no

10      turning back at that point."

11          Now, let's be perfectly clear, ladies and gentlemen,

12      right here, Trevon Gross's own words in 1108-A, he says that

13      the reason that they're not going to effect -- to resign

14      immediately is because they know that the NCUA would not want

15      to see an entirely new board at that meeting, an entirely new

16      board would set red flags off in the NCUA's mind, especially if

17      it was comprised of people who weren't even in Lakewood,

18      New Jersey, didn't work there, didn't live there, didn't

19      volunteer there.  And you know that this is a deal that's

20      supposed to be solid for complete control because he says there

21      is no turning back at this point.

22          And on May 15, 2014.  When Murgio notes that

23      nominations don't really mean anything if they actually have to

24      be elected, that that's what's important to him, Gross replies,

25      "There are no nominations from the floor, only those nominated

H399LEB2                    Summation - Ms. Choi

1   can be elected so once nominated this election is assured."

2           Again, you remember what Clayton Curry said.  You

3   can't have a rigged election that is assured.  But that's

4   precisely what Trevon Gross did.

5           And they waste no time setting up that branch in

6   Florida.  At Government Exhibit 1167-A.  That's Trevon Gross on

7   June 17, 2014, before there even is a vote for the board of

8   elections, to make sure that the board of directors has

9   changed, he's sending the router to the Florida branch of the

10  new HOPE FCU place in Tallahassee.  Remember that reference to

11  the GUAPPLE that Ricardo Hill talked about.  That's the server

12  he used to process those ACH transactions.

13          And what does Anthony Murgio say once Trevon Gross

14  indicates he wants to get that Tallahassee branch set up?

15  Well, he sends the Collectables Club address, 2940 East Park

16  Avenue in Tallahassee.

17          And then Trevon responds.  "Okay.  Do you plan on

18  using that Lakewood address for the Collectables Club that

19  Kapcharge is using?  If you can, that would be great.  Also

20  please fund your account so that you can vote before Friday

21  night.  The other new board members won't be able to vote until

22  their deposits have hit and they have satisfied par."

23          So a few things about this, ladies and gentlemen.

24  First off, he knows that they don't have a Lakewood address.

25  It's Trevon Gross who is suggesting that they use the Kapcharge

address, that virtual office that you heard Trevon Gross talk

about on the stand.  He knew very well that there was no

Lakewood address that was legitimate for either of these two

companies and he was worried that there wasn't a Lakewood

address for the Collectables Club.  So he's the one who

suggests that they both use that 216 River Avenue address that

you've heard about.

         Another thing about this.  "Please fund your account

so you can vote before Friday night."  Why does this matter?

Because these board members that he's going to insure get

elected to the board don't even have money in their accounts at

this point and he's concerned because he knows that he can't

get these people elected under the rules if they haven't even

funded their accounts.  They're not actually even members of

the credit union as of June 17.

         And he continues.  "No, all the records will go to the

Jackson address -- that's the one in New Jersey -- or the

Florida address.  Just to have all of our bases covered you all

should be able to point to a Lakewood address if asked."

         Why is he saying that?  Because he knows that the NCUA

is going to ask them whether or not they fall within the field

of membership.

         And he expresses some concern to Anthony at this

point.  "Do you believe this CU?  $175 to set up an account

that's just to make sure that they're funded so that they can

actually be members.  That $25 per account.  That's not a vote

of confidence from those who would be board members.  For our

low income members, we require $30 minimum.  But I will do what

you ask because Saturday this is your credit union, but I don't

think this sends the right message."

So, ladies and gentlemen, as of June he knew that

there was something up with this, at the very least.  He wanted

to make sure, however, that they had their bases covered with

the NCUA with the fake address in Lakewood and that he actually

had the bare minimum amount of funds because by Saturday,

regardless of whether or not he thought there was an issue in

June, that board would be Anthony Murgio's and Yuri Lebedev's.

And Government Exhibit 1189.  When they discuss what's

going on with regard to the voting system.  Trevon Gross notes,

"I just want to get as many votes in that system, that online

voting system since it's the first time we've used online

voting.  I want to make certain that this election is

incontestable."

And you know ultimately what happened, ladies and

gentlemen.  That's in the board minutes of the June 21, 2014.

They get elected to the board.  They get elected, every single

member of that Collectables Club handpicked by Anthony Murgio,

including Yuri Lebedev.

So let's turn to the second reason why we know there

was corrupt intent here.  There was absolutely no due

1    diligence, not even the bare minimum to figure out who these

2    people were from Trevon Gross.

3              Now you might recall that Ms. Flok -- she was the NCUA

4    examiner that took the stand probably about two weeks ago

5    now -- well, she told you that she was the one who was focused

6    on those ACH transactions when she first went to the credit

7    union on November 21 of 2014.  And in that context she

8    explained the reasons why the NCUA cares about new members

9    every time they go in for an examination.  She told you that

10   Gross and others at the credit union were obligated to make

11   sure that the people he was inviting into his credit union to

12   run the credit union and to be board officers were bonded and

13   that if they were to run properly to get bonded those

14   Collectables Club members would have had to have undergone a

15   background check.  The reason for this is obvious, as she

16   explained to you.  You need to make sure there aren't any

17   concerns regarding the people who have sensitive financial

18   information about the members of the credit union and make

19   decisions about how the credit union should function.

20             And you know that he didn't do the bare minimum that

21   was required because if he had he would have known that Ricardo

22   Hill, that witness, the cooperating witness who took the stand

23   as well, was a convicted felon; not one felony, but several.

24             He did absolutely no background checks, Mr. Gross.  He

25   allowed Ricardo Hill to have complete access to the back end of

1    the systems and then helped process those tens of millions of

2    dollars of ACH transactions daily on behalf of Kapcharge.

3              Now, what else do you know?  You also know that had

4    Gross Googled Anthony Murgio, the man who first reached out to

5    him, he would are have realized that Anthony Murgio had not

6    only been arrested for tax charges in Florida but also that he

7    had bankruptcy issues.  It wasn't just Jen Wotherspoon who

8    testified to that fact about doing a simple Google search on

9    Anthony Murgio, but also Ricardo Hill.  Googling these facts.

10   That would have been pretty easy to do, ladies and gentlemen.

11             According to the testimony of Ms. Wotherspoon, it's

12   fair to say that Gross could have done a simple Google search

13   at the time that Anthony Murgio approached him and he would

14   have even seen a video of the arrest.  Gross, however, took the

15   stand in this case and confirmed he didn't even do that bare

16   minimum.  And the excuse that he gave to you was because, as a

17   general policy of the credit union, he didn't do any due

18   diligence on any of its members because in his view he wasn't

19   obligated to do so.

20             Now, let me be perfectly clear here.  Neither

21   defendant has any burden to put on evidence or any witnesses on

22   their behalf.  The burden of proof in criminal trials always

23   rests with the government to prove that the defendants are

24   guilty beyond a reasonable doubt.  That burden never shifts to

25   the defendants.

H399LEB2                     Summation - Ms. Choi

1           But when defense counsel makes to you opening

2    statements or chooses to cross-examine witnesses or chooses to

3    introduce to you evidence or in this instance when a defendant

4    takes the stand, you're permitted and, in fact, obligated to

5    weigh that evidence and to examine and assess those arguments

6    just as you should assess the evidence that the government has

7    presented and the arguments the government makes to you.  And

8    you should ask yourself whether that evidence and those

9    arguments make any sense in light of all of the other evidence

10   that you've seen.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. CHOI:  (Continuing)  In this case, Trevon Gross

2    took the stand, just yesterday.  He took an oath, and then he

3    gave you a series of excuses for his behavior, for all the

4    decisions that he made where he put the interests of himself,

5    and his church, and the Collectables Club, and Kapcharge first

6    and the credit union second.

7          Again, one of the excuses Gross gave to you is that he

8    never looked deeply into any credit union members.  So he

9    treated people, who handed him driver's licenses, none of which

10   said New Jersey, like any other person who wanted to join the

11   credit union.  These strangers from Florida were fine.  Or a

12   man with a driver's license that wasn't even written in

13   English, that clearly says he's from Montreal, in French, also

14   fine.

15         But you know that that's just an excuse.  Because when

16   Gross is trying to explain his behavior, why he let the

17   Collectables Club members in in the first instance, his

18   explanation on the witness stand was that he thought he was

19   dealing with Michael Murgio.

20         First of all, you know that was a lie.  You've seen

21   all the evidence.  Gross dealt extensively with Anthony Murgio

22   from day one.  You've seen in the evidence that we just

23   presented to you about the speed at which the transition

24   happened.  The emails that were driving that ship weren't from

25   Michael Murgio, they were from Anthony Murgio.  And you also

1    saw plenty of evidence in the form of emails and communications

2    over WhatsApp, where it was just the two of them, just the two

3    of them, not Michael Murgio whatsoever.

4            So that's why Gross in that November 22nd meeting,

5    when he was arranging to receive those final bribe payments,

6    that's why he used the phrase that he was "walking together

7    with Anthony," with Anthony Murgio.  That was his own words,

8    ladies and gentlemen, on November 22nd, 2014.  But here in this

9    courtroom, when he took the stand, Gross did everything he

10   could to distance himself from Anthony Murgio.

11           Now, your own common sense tells you why Gross claimed

12   he thought he was working with Michael Murgio.  After all

13   you've learned about Anthony Murgio, Gross knew he had to

14   distance himself when he testified, distance himself from the

15   man who was driving the ship of this corruption.

16           Gross even claimed on the stand that he had done some

17   due diligence on Michael Murgio, that he had read things about

18   him on the Internet, that he even called down to Florida to

19   confirm what he thought were the good credentials of the

20   father.  That doesn't make any sense, ladies and gentlemen.

21   Gross can't have it both ways.

22           On the one hand, he said he conducted extensive due

23   diligence on Michael Murgio, who seemed like an upstanding

24   individual, a school board leader, a principal.  And then, on

25   the other hand, he can't claim then that he didn't even Google

1    Anthony Murgio, the bare minimum that all of us do even when we

2    want to go figure out what delivery we want for an evening on

3    Yelp or do any basic customer diligence.

4            MR. KLINGEMAN:  Objection.

5            THE COURT:  Sustained.

6            The jury will disregard the prosecutor's comments

7    about what we would do with respect to Yelp.

8            MS. CHOI:  On the other hand, he didn't even do basic

9    know your own customer diligence that you heard that all of the

10   other financial institutions do, that Alloya does, that United

11   Advantage Northwest Credit Union does, that Chase does.  Basic

12   questions about who these real customers were.  Even after

13   receiving, for example, a driver's license in French.

14           So you should ask yourself this question:  If Gross

15   relied on the fact that Michael Murgio appeared to be an

16   upstanding model citizen as the reason why he never looked

17   further into Anthony Murgio's background, or the fact of his

18   arrests, or the fact of his bankruptcy, then why was he dealing

19   with Anthony Murgio on a daily basis?  Anthony wasn't even a

20   member of the proposed board of directors.  You know why.

21   Because Jen Wotherspoon explained it to you at the very

22   beginning of trial, he was worried that if someone found out

23   about the legal issues in his background, like the illegal

24   issues in Jen Wotherspoon's background, it wouldn't work out

25   for him on that board of directors.

H39KLEB3                          Summation – Ms. Choi

1          And ask yourself this question:  Why is Trevon Gross,

2     for example, in Government Exhibit 1222, sending along

3     sensitive information about his credit union to Anthony Murgio,

4     a man who isn't even on the board of directors, which is the

5     reason why he has to forward it to Anthony Murgio in the first

6     place?  Gross would have you believe that someone of his

7     obvious intelligence would not have stopped once to think,

8     well, it's odd that Anthony and Michael Murgio, the purported

9     leaders of the Collectables Club, aren't even serving on this

10     board, but that's okay because I'm going to continue to let

11     Anthony Murgio call the shots about this credit union.

12          So why did he do this, ladies and gentlemen?  Money.

13     Because he wanted, expected, and demanded, and received over

14     $160,000 to his church.

15          Your Honor?

16          THE COURT:  Yes.

17          I was about to break us here.  It's our mid-morning

18     break, ladies and gentlemen.  See you in about ten minutes.

19     Thank you.

20          (Continued on next page)

21

22

23

24

25

1           (Jury not present)

2           THE COURT:  Why don't we take a couple of minutes, and

3     then I do want to address a few issues just to make sure we

4     have everything in place once closings are finished and to hear

5     if there are matters.  So, let's use the facilities and join

6     back together in a couple of minutes.  Thank you.

7           (Recess)

8           THE COURT:  Matters to take up?

9           MR. KLINGEMAN:  Yes, your Honor.

10          THE COURT:  Go ahead.

11          MR. KLINGEMAN:  The Court will note that I objected

12    the first time during counsel's summation to the three times

13    when counsel indicated to the jury that there, quote, can be no

14    serious dispute that Trevon Gross took a bribe.  I argue that

15    that treads on his not-guilty plea, his disputing that very

16    allegation, the presumption of innocence, the burden of proof

17    falling on the government, and the burden of proof falling on

18    the government beyond a reasonable doubt.

19          Obviously, the not-guilty plea itself, not to mention

20    the cross-examination by defense counsel of the government

21    witnesses, and the defendant's very testimony seriously dispute

22    that very contention, and to say otherwise -- just to say that

23    there is no serious dispute implies otherwise and treads on all

24    of the rights that I mentioned.  And I would ask that that

25    reference, the jury be instructed to disregard that reference,

1    because, in fact, as the Court points out in the instructions,

2    this trial represents the resolution of that dispute.

3         THE COURT:  The specific application is to instruct

4    the jury that where the prosecutor used the phrase "serious

5    dispute" should not be interpreted by the jury to suggest that

6    the government has anything other than a burden of beyond a

7    reasonable doubt, and that, as I'll instruct them, the

8    presumption of innocence remains with the defendants.

9         MR. KLINGEMAN:  Yes.  But specifically not merely the

10   phrase "serious dispute," but the phrase "there can be no

11   serious dispute," which is what counsel said.

12        MS. CHOI:  Your Honor, a few things:  One is obviously

13   that's couched in terms of argument.  What I did not say is

14   there is no dispute that.  So I think I was very careful in

15   saying there cannot be any serious dispute because it is the

16   government's view that there is overwhelming evidence, which

17   I've said on other occasions within the context of the closing

18   argument, which Mr. Klingeman didn't object to.  It's part of

19   the argument, your Honor.

20        And I think, also, the other thing that I think needs

21   to be noted is in certain contexts, it was because I was

22   talking about specific facts that his client actually admitted

23   to.  For example, that he was influenced by these payments.

24   There's no serious dispute that he was influenced by these

25   payments, I believe is one of the times I said that.  So I

1    think given that context, given that your Honor will be

2    instructing them that this is argument, not evidence, that the

3    government was very careful in making sure that they understood

4    expressly that the burden never shifts even when the defendant

5    takes the stand.  I think given that context, there is no risk

6    of confusion on the jurors' part that the constitutional rights

7    of the defendants are somehow impugned by the argument of the

8    government.

9                MR. KLINGEMAN:  First of all, your Honor, there is no

10   objection to the government discussing the evidence as

11   overwhelming or otherwise.  I'm not objecting to that or asking

12   for an instruction on that.

13               Second, there's no objection to the government

14   indicating there is no serious dispute with matters about which

15   there is no serious dispute.  But when the government says, as

16   it said no less than three times, there is no serious dispute

17   that the defendant took a bribe, that goes to the heart of the

18   dispute.  And to say that --

19               THE COURT:  All right.  I hear you.

20               I think this is utterly prophylactic, given what will

21   be as my instructions on the reasonable doubt, and Ms. Choi's

22   full embrace of the burden and the like, but I'll act

23   prophylactically to make sure that they're not confused and

24   adopt some version of the proposed limiting instruction.

25               So I'll hear from each of you as to any suggestions as

1   to something different, but it will be something like:  The

2   prosecutor used the phrase "there can be no serious doubt" --

3            MS. CHOI:  I think it's dispute, your Honor.

4            THE COURT:  Thank you.

5            -- "No serious dispute."  Mr. Klingeman, you objected

6   specifically to "there can be no serious dispute."  What came

7   after?

8            MR. KLINGEMAN:  That Trevon Gross took a bribe.

9            THE COURT:  Trevon Gross --

10           MS. CHOI:  Your Honor.

11           THE COURT:  Hang on a second.

12           MS. CHOI:  Okay.

13           THE COURT:  "I instruct you, and I will instruct you,

14  that the government -- that there is a presumption of

15  innocence, and that the government bears the burden of

16  establishing the elements of the offenses beyond a reasonable

17  doubt."

18           MS. CHOI:  That's fine, your Honor.  I think the one

19  thing I would --

20           THE COURT:  Just one second.

21           Mr. Klingeman?

22           MR. KLINGEMAN:  Yes.  Thank you, your Honor.

23           THE COURT:  Okay.

24           MS. CHOI:  The one thing I wanted to bring up is I'm

25  not actually sure that I said --

1                THE COURT:  Yes, I'll look.

2                MS. CHOI:  I think what I said was there was no

3       serious dispute that there were payments, that there was

4       accepting payments, which I think is, in fact, not in dispute

5       since that's what Mr. Gross testified to.

6                MR. KLINGEMAN:  I would defer to the transcript, but I

7       listened very carefully because I would not dispute the issue

8       of payments.  What I will dispute is the characterization of

9       those payments as a bribe, since the issue of acting corruptly

10      is at the heart of this, which is why the government spent 45

11      minutes talking about it, and I intend to spend a similar

12      amount of time talking about it.

13                (Pause)

14                THE COURT:  The language "There can't be any serious

15      dispute that Anthony Murgio arranged for payments of over

16      $160,000 to bribe Trevon Gross, and that in return for these

17      payments, agreed to," and that was the moment of objection,

18      Mr. Klingeman said "serious dispute," and I overruled it.

19                I'm going to give the limiting instruction that I

20      suggested as a prophylactic.

21                Go ahead.

22                MS. CHOI:  Your Honor, I just think that -- that's

23      your Honor's ruling, obviously, but I will just note for the

24      record, I don't think that it's necessary given that, again, as

25      your Honor is going to instruct the jury, whether or not

1   Anthony Murgio bribed Trevon Gross is not determinative on

2   either whether or not Mr. Lebedev had corrupt intent or

3   Mr. Gross had corrupt intent.  I think we made that point

4   pretty clear.

5          THE COURT:  I'm going to do it as a prophylactic.  As

6   you have, you'll continue to embrace the government's burden.

7          MS. CHOI:  Yes, your Honor.

8          THE COURT:  So, here's what we agreed to:  The

9   prosecutor used the phrase, "There can't be any serious dispute

10  that Anthony Murgio arranged for payments of over $160,000 to

11  bribe Trevon Gross."  The prosecutor used the phrase, "There

12  can't be any serious dispute that Anthony Murgio arranged for

13  payments of over $160,000 to bribe Trevon Gross.  I instruct

14  you and I will instruct you that there is a presumption of

15  innocence, and that the government bears the burden of

16  establishing the elements of the offenses beyond a reasonable

17  doubt."

18         Okay?

19         MR. KLINGEMAN:  Yes.

20         THE COURT:  Thank you.

21         Other matters to take up?

22         So, first, Mr. Shin sent in one note about the charge

23  last night.  I just want to make sure everybody saw that and

24  agreed, and there is nothing further, because I'm going to

25  start printing it.

1          MR. CREIZMAN:  Yes, yes.  Okay, I'm fine with it.  I

2     just want to make sure, I thought that was the note.  I know

3     what the note is, and I'm fine with it.

4          MR. KLINGEMAN:  No objection.

5          THE COURT:  So we'll make that change, and then that's

6     it for the charge.

7          Have you figured out what goes back -- physically goes

8     back to the jury?

9          MS. CHOI:  One moment, your Honor.

10         (Pause)

11         MS. CHOI:  I've been told that Ms. Grant is working on

12    getting a hard copy of all the documents presently, and that

13    she anticipates being done by the time that the jury is

14    charged.

15         THE COURT:  Are you at least agreed -- are you agreed

16    on the list of exhibits that we'll update as to what came in

17    this morning?

18         MS. CHOI:  Your Honor, I don't think that we have had

19    the opportunity to update that list as of yet, but that's one

20    of the things that Ms. Grant is working on, and that we will

21    confer with the parties before, obviously, deciding upon --

22         THE COURT:  All right.  At the close of lunch, I'd

23    like to see if we can get agreement as to what will go back, so

24    there's no delay.

25         MS. CHOI:  Understood, your Honor.

1      THE COURT:  So the government will confer with defense

2  counsel, make sure everybody -- so there's no issue -- the hard

3  copies means there's no issue -- there had been discussion of a

4  laptop going back?

5      MS. CHOI:  I believe that we're preparing that.  We're

6  preparing that.  I think the one thing with regard to that,

7  your Honor, that we'd ask at the time, is that just sort of

8  explain to them how to pull up the WhatsApp because you have to

9  do it in Chrome, if they want to look at it.  That's the only

10  instruction that I think is necessary.  Otherwise --

11      THE COURT:  You'll confer with defense counsel over

12  the lunch break.

13      MS. CHOI:  Okay.

14      THE COURT:  And if you have a specific additional

15  requested instruction, run it by them.  If there's agreement,

16  I'll consider it, and, if not, I'll hear your dispute.

17      MS. CHOI:  Okay.

18      THE COURT:  But that's an instruction for the

19  government and defense counsel.  I want to get agreement, so

20  that we can give the jury what they need.  If I do finish the

21  charge today, which seems -- I don't know, Ms. Choi, you seem

22  to be moving like you'll be done before lunch, no?

23      MS. CHOI:  As I had indicated to the Court, I think

24  that's about right.  I think I'm a little less than halfway

25  through, but I think we're on a good pace.

1            THE COURT:  The last issue to raise:  As I indicated,

2   a few jurors indicated to Ms. Nunez concerns about Monday and

3   beyond.  We still have our alternates at this point, so I want

4   to make sure we're taking that full on, so that we're not in

5   the position -- if they're not finished deliberating this week,

6   we can preemptively deal with that rather than any contention

7   that somehow they're being rushed or forced into something

8   because they don't have time.  So I want to hear proposals for

9   addressing it now, while we still have all our alternates, so

10  if there's somebody who can't be here Monday or beyond, we're

11  dealing with it.

12          MS. CHOI:  Your Honor, I take from what Ms. Nunez had

13  indicated to your Honor on the record, that these were not

14  necessarily dispositive conflicts, and that your Honor, as you

15  did during the selection of the jury, could obviously

16  inquire -- and during the course of the trial -- could

17  obviously inquire as to the immutability of these particular

18  conflicts.

19          I take it some of these things may be able to be

20  accommodated, as they have been in the past, and they may

21  become moot issues because the conflict exists perhaps later in

22  the week next week.  So the government's proposal would simply

23  be for your Honor to further inquire of the people who have

24  brought this issue to Ms. Nunez's attention, again as a

25  prophylactic matter, not necessarily because we think there was

1    any concern at this point.

2              THE COURT:  Any suggestions?  In my mind, the open

3    question is, how to approach it, because the case will go to

4    them tomorrow, if not today, so that I think, entails -- and as

5    I've said repeatedly, the only thing they've been told is to

6    plan through this week, so they have no further information.

7    So, obviously, they see where we are in the case, but I don't

8    want to suggest one way or the other expectations around length

9    of deliberations and the like.

10             MS. CHOI:  Nor should you, your Honor.  I think the

11   only issue really is if the conflict is because of something

12   that is approaching, but is not quite here --

13             THE COURT:  I know.  It's just a question of how to do

14   it in a way that everybody is comfortable with.

15             Mr. Klingeman?

16             MR. KLINGEMAN:  I don't know, of course, from the

17   individual juror's perspectives, whether it's self-evident that

18   the prediction that the case would be concluded by tomorrow is

19   in no way, shape or form a deadline of any sort, and that they

20   must reach their conclusion and finish their part of the job by

21   the end of the day tomorrow.  And I think they should be told,

22   in the terms the Court chooses, that the trial isn't truly

23   finished until the deliberations are concluded, and those

24   deliberations must take place, according to your instructions,

25   with all due time, and consideration, and so forth.  And then,

1    as counsel has suggested, inquire or invite from the jurors who

2    have made an indication that they have scheduling conflicts, a

3    further inquiry as to how acute those conflicts are and whether

4    we can accommodate them, either by starting a little bit late,

5    or finishing a little bit early, or excusing a particular juror

6    in favor of an alternate.

7              You did say at the outset of the voir dire, your

8    Honor, that this was a prediction and not a guarantee.

9              THE COURT:  Of course.

10             (Pause)

11             THE COURT:  Here's what I propose:  Something along

12   the lines of, "As you can see, we are now at closing arguments.

13   After that, I will instruct you as to the law, and you will

14   begin your deliberations.  Once your deliberation are complete,

15   your work will be finished, but exactly when that will be, I,

16   of course, can't know," something along those lines.  "A few of

17   you have indicated potential scheduling issues if the process

18   were to continue until next week.  In the event the process

19   continues into next week, if any of you have unmovable

20   conflicts that may interfere with this schedule, please let

21   Ms. Nunez know at the lunch break, so that I can address it."

22             MR. KLINGEMAN:  My only suggestion would be to the

23   point where your Honor says something to the effect of, "When

24   your deliberations end, I do not know," I would suggest you

25   tell the jury that as to the length of the deliberations, it's

1    up to them, and there's no deadline of Friday, March 10th, at

2    5:00 p.m., whatever.  Just something that conveys that tomorrow

3    is not a drop-dead --

4              THE COURT:  That's what I'm working on.  That's what

5    I'm shooting for.  And I am happy to hear any actual specific

6    suggestions.

7              I think you said something like, "The length of your

8    deliberations are up to you."  Is that what you propose?

9              MR. KLINGEMAN:  What I would say is -- and I'm going

10   to adopt your voice, your Honor -- "I gave you the parties'

11   best prediction that the case would be concluded by tomorrow.

12   However, your deliberations may begin tomorrow, and you should

13   take as long or as short as necessary to conclude them,

14   according to the instructions I'll give you."

15             THE COURT:  Ms. Choi, do you have a reaction?

16             MS. CHOI:  I defer to Mr. Shin, your Honor.

17             THE COURT:  Mr. Shin, you're the law guy.

18             MR. SHIN:  I've done some quick research on this issue

19   while we were -- no.

20             THE COURT:  That would be helpful.

21             MR. SHIN:  The government has no objection to the

22   proposed language by Mr. Klingeman.

23             THE COURT:  "As you see, we're at closing arguments.

24   After that, I'll instruct you as to the law, and you will begin

25   your deliberations.  Once your deliberations are complete, your

1    work will be finished.  At the outset of trial, I gave you the

2    parties' best prediction that the case would be concluded by

3    tomorrow.  You should take as long or as short as necessary to

4    conclude your deliberations according to the instructions I'll

5    give you.  A few of you have indicated potential scheduling

6    issues if the process were to continue until next week.  In the

7    event the process continues into next week, if any of you have

8    unmovable conflicts that may interfere with this schedule,

9    please let Ms. Nunez know at the lunch break, so I can address

10   it."

11            MR. KLINGEMAN:  The only suggestion I would make, just

12   for clarity, is to substitute the word "using" for the word

13   "according."  It was actually my initial suggestion, and I'm

14   thinking twice about it.

15            THE COURT:  I actually don't see that, the word

16   "using."  Is it the sentence that you should take as long or

17   short as necessary to conclude your deliberations according to

18   the instructions I'll give you?

19            MR. KLINGEMAN:  Right.  I would change according to

20   using, just so you're not suggesting that the instructions give

21   them some kind of schedule.

22            THE COURT:  I see.  I see.  All right.

23            MR. SHIN:  No objection.

24            THE COURT:  Mr. Creizman?

25            MR. CREIZMAN:  No objection.

H39KLEB3                    Summation – Ms. Choi

1           THE COURT:  So I'll do that at the beginning of the

2   lunch break.  Let's get our jury, and we'll break in an hour or

3   hour and 15.

4           MS. CHOI:  Okay.  So at 1:00 o'clock, your Honor?

5           THE COURT:  Get it done.

6           MS. CHOI:  I'm trying, your Honor.  I'm trying.

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Ms. Choi, you may continue.

3              MS. CHOI:  Thank you, your Honor.

4              MR. KLINGEMAN:  Your Honor?

5              THE COURT:  Yes.  Thank you, Mr. Klingeman.

6              One instruction, ladies and gentlemen:  Before the

7    break, the prosecutor used the phrase, "There can't be any

8    serious dispute that Anthony Murgio arranged for payments of

9    over $160,000 to bribe Trevon Gross."  I instruct you, and I

10   will instruct you, that there is a presumption of innocence,

11   and that the government bears the burden of establishing the

12   elements of the offenses beyond a reasonable doubt.

13             Ms. Choi, when you're ready.

14             MS. CHOI:  Thank you, your Honor.

15             So how else do you know that Gross and Lebedev acted

16   with corrupt intent?  Well, a third reason.  In addition to the

17   money that benefited Gross and his utter failure to make sure

18   that the individuals at the Collectables Club, including

19   Lebedev, were suited to run the credit union, Gross permitted

20   Murgio and Lebedev to use the credit union for a huge volume of

21   risky ACH transactions.  As the witnesses from Alloya described

22   to you, HOPE FCU had never done any ACH origination before the

23   Collectables Club and Kapcharge joined their credit union.  But

24   as soon as the Collectables Club members entered HOPE FCU,

25   Lebedev and Gross worked together to start the spigots running

1    for ACH transactions.

2              How do we know that?  Well, starting with Government

3    Exhibit 1177, when Anthony, two days before the election, tells

4    Yuri Lebedev that they need to get ACH up and running "because

5    this shit, we need to have done ASAP to get money."

6              And you saw Gross receive a daily email from Kapcharge

7    listing the total ACH volume Kapcharge was processing through

8    HOPE FCU.  And you heard all the times that Trevon Gross was

9    warned repeatedly by various parties that the ACH origination

10   that Collectables Club and Kapcharge sought to put through this

11   small credit union were going to place the credit union at risk

12   for three different reasons:

13             First, the size of the donations -- the size of the

14   transactions.  As you heard from the Alloya witnesses, both the

15   number of ACH transactions and the volume of transactions, both

16   the debit and the credit, were unprecedented.  And there are

17   risks that were imposed to HOPE FCU by the volume of ACH

18   transactions at issue, both the dollar amounts and the number

19   of ACH transactions every day.  As the witnesses from the other

20   credit unions told you, the witnesses from Alloya and Ms. Guyer

21   from United Advantage, when you do ACH transactions, like any

22   other financial transaction, there's always a risk of something

23   going wrong, a risk of returns.  Those transactions could be

24   rejected, and then HOPE FCU, or Alloya, the corporate credit

25   union, would be on the hook for them.  That's why you can't

1   simply run tens of millions of dollars of transactions for ACH

2   through a tiny credit union, because if for some reason a large

3   portion of those transactions came back on any given day, that

4   amount would dwarf all of the assets the credit union had.  All

5   of those members' share accounts, all of those deposits for its

6   customers, they were all at risk.

7            The second reason that the ACH transactions were risky

8   and put the HOPE Credit Union at its peril was the net worth

9   ratio, the impact of those ACH transactions on the net worth

10  ratio and capitalization.  You know that Gross and Murgio were

11  monitoring the net worth ratio very carefully because they

12  understood that the NCUA requires the ratio to be above

13  7 percent -- that's something that Ms. Flok explained to you --

14  in order for the credit union to be well capitalized.  And if

15  the net worth ratio drops below that number of 7 percent, the

16  examiners would come calling and start increasing their

17  oversight of HOPE FCU to make sure that the share number

18  accounts were safe.

19           And you know from the call reports, those quarterly

20  financial reports that are sent, you know from the NCUA

21  testimony, and the Alloya witnesses' testimony, and from seeing

22  the underlying documents yourself that all credit unions are

23  required to make disclosures, both about their financial

24  condition at quarter's end, as well as the composition of their

25  board of directors in their profile.  And those disclosures

1    happen every quarter, every financial quarter, including in

2    this example, the third quarter for 2014 in Government Exhibit

3    6103, which should have the financial condition of HOPE FCU as

4    of September 30th, 2014.

5          There it is on page 14, the calculation that's

6    necessary to determine what the net worth would be, where the

7    numerator is the total net worth, and the denominator is total

8    assets, which should include, for example, cash that's on hand

9    by HOPE FCU at places like Alloya.

10          So, what's the third way in which HOPE FCU was placed

11    in peril because of these ACH transactions?  Well, when that

12    spike occurred back in mid-September of 2014, you know from the

13    testimony and from the telephone calls that were recorded that

14    there was absolutely no Bank Secrecy Act policies or procedures

15    in place at the credit union when Gross, Lebedev, and others

16    were letting $1.3 million in Kapcharge transactions go through

17    HOPE FCU on a daily basis.

18          Gross was letting these high-risk transactions for

19    Kapcharge customers run right through HOPE FCU because Yuri

20    Lebedev and Anthony Murgio wanted them to.  And these are ACH

21    transactions for Coin.mx's anonymous Bitcoins, for

22    TransferWise's international money-transmitting businesses, and

23    for Wakpamni payday lending, all three things which pose a risk

24    to HOPE FCU.

25          And HOPE FCU was doing this without even checking

1    against that OFAC list.  That's the Office of Foreign Asset

2    Control, the list of individuals and entities that U.S.

3    financial institutions are barred from transacting with due to

4    terrorism concerns, sanctions, or narcotics trafficking.  They

5    ran these transactions even though, as Mr. Kumar explained to

6    you and you see in the contract that HOPE FCU signed with

7    Alloya when they started these originations, that they, HOPE

8    FCU, was the originating financial institution, and, thus,

9    under the contract and under the NACHA rules, they were

10   obligated to do the OFAC scrub.

11            And you heard Gross in his own words at the

12   November 22nd meeting stating he knew why these were all

13   issues, that they weren't compliant with basic anti-money

14   laundering laws, that he can't even certify that he knows where

15   all that money went through.  And you see that on page 14 of

16   the transcript.  They're looking at the volumes, these

17   examiners are, they're running percentages based on the amount

18   of money moving, and what I want to make sure of is when they

19   look and say, hey, you did not do your BSA like you should have

20   on all these transactions that went through your credit union,

21   and, as a result, you know, we're concerned that you have

22   exposure of money laundering, he says -- and he understands --

23   "The point is we don't know that all the people -- we can't

24   certify that all the people we let money pass through this

25   credit union to go to weren't doing something illegally with

1    the money."

2              And you heard what Ms. McDowell said from Alloya, that

3    HOPE FCU first came to her attention because when she was

4    reviewing the new requests that were coming in to start

5    originations as part of her job at Alloya, she examined the

6    circumstances and noted that she had never seen a credit union

7    that small with such limited assets and with such a small line

8    of credit attempt a business so large.  And so Alloya made

9    exceptions to the normal rules that it put in place for credit

10   unions in order to make sure that HOPE could try these ACH

11   transactions.

12             First, they made an exception to their normal line of

13   credit rule and allowed HOPE to do transactions so long as the

14   daily total was less than the total amount of cash they had on

15   hand at the Alloya Credit Union on that day.  And you remember

16   what their normal line of credit was, it was somewhere between

17   5,000 and 10,000 dollars, far less than the volume of average

18   daily transactions.

19             But after that didn't work, they made a second

20   exception to their normal rules at Alloya.  They created an

21   entirely new program just for HOPE FCU, the ACH prefund

22   account, where they would allow HOPE FCU to do daily volumes of

23   ACH transactions well above the amount of money it had on

24   deposit at Alloya so long as those transactions were funded

25   ahead of time in what they described to you as a sterile

1    account, where they would move the money into the account, so

2    that HOPE could not touch those funds until all the ACH

3    transactions were cleared.

4            And you saw that at 790-T –– 791-T on the top of page

5    4, you know Gross was acting corruptly because he expressed

6    these concerns right back to Alloya.  He understood on that

7    phone call when Alloya was talking through these issues with

8    him in trying to find a solution so as to mitigate the risks

9    that were imposed by these ACH transactions while allowing them

10   the opportunity to try to do so.  Ms. McDowell expressly asked

11   him what are you doing about these issues because, quote, the

12   amount of volume that you have is going to blow up your balance

13   sheet.  And she asked Mr. Gross what he was doing about it and

14   whether or not he was having conversations with the NCUA.

15           And this was Mr. Gross' response:  He understood that

16   the main concern of the NCUA was the net worth, to make sure

17   that they are capitalized, and that he –– that the NCUA worried

18   that from a BSA perspective, they had someone watching the

19   transactions from HOPE.  And he said, of course, so it's a net

20   worth issue, making sure that they've done enough due diligence

21   on Kapcharge, and that there would just be enough BSA testing

22   to make sure that these transactions be safe.

23           But you know none of the things that Gross said to

24   Alloya were true in terms of what HOPE was actually doing.  If

25   you recall, when the Alloya witnesses were on the stand, you

1   saw that the transactions, despite Gross saying that there was

2   nothing close to $10,000, there were plenty of transactions,

3   they were much larger than $10,000.  And I'm not talking about

4   total volume, I'm talking about single transactions, $30,000,

5   $20,000, going through.

6           And you know, of course, that this did have an impact

7   on the net worth because you heard from Ms. Flok, who explained

8   to you that when she went in and examined the credit union, she

9   found them capitalized at approximately 3 percent after all of

10  these transactions had gone through.  And you also know that

11  they weren't doing any BSA testing or policies or had any

12  policies or procedures in place.  At best, they were thinking

13  about putting some through, but they never did by the time that

14  those transactions spiked.  And you know that because of what

15  the Alloya witnesses told you and what Ricardo Hill told you.

16  Ricardo Hill, the only employee who was working on ACH

17  transactions.

18          And you recall that each of the corporate credit union

19  witnesses expressed how expensive and how difficult it is to

20  make sure that they have adequate BSA in place for this type of

21  volume.  That was not happening at HOPE FCU.  When these

22  transactions were going through, they didn't have any of these

23  policies in place.

24          So then what happens?  Well, in Government Exhibit

25  1446-L, you'll see that, finally, as the Alloya witnesses

 1    testified, they had to cut off the ACH transactions, because

 2    even if they could accommodate some of the risks, they couldn't

 3    accommodate the capitalization concerns, because they knew,

 4    ultimately, that if HOPE FCU was properly reporting its

 5    financial condition to the regulators, they would shut it down.

 6    That would be much less than the 7 percent that was required to

 7    be well capitalized and much less than just sheer

 8    capitalization period.  It would be placing the entire credit

 9    union at risk, and they did not want to go along with that as a

10    result.

11              You also know, after Alloya sends that letter on

12    November 10th after numerous discussions with Trevon Gross

13    about the risk, Trevon Gross says, in 1446-L, that they were

14    just being spiteful, that there wasn't any risk.  You should

15    look at that piece of evidence, ladies and gentlemen, because,

16    specifically, Anthony Murgio is the one who said, well, I guess

17    we tricked them for enough time, but obviously there was risk

18    involved.  Gross knows there's risk.  Gross continued anyways.

19              And in 1447-A:  Alloya letter comes in on

20    November 10th, and then their backup solution, which is Magic

21    Wrighter, cuts them off the last day -- the next day, the very

22    next day.  But what do Gross and Lebedev do?  They don't decide

23    to shut down ACH processing.  They just start looking for

24    another credit union.  You've seen the evidence where they try

25    to reach out to other places, where they try to convince, for

1    example, and, ultimately, Gross does convince for some short

2    period of time, Robyn Guyer, from United Advantage to take on

3    those ACH transactions.  What did he tell her?  They would only

4    be small transactions for the members of the credit union, and

5    they'd be limited in size.  But when she saw the volume, that

6    one wire that came in over a million dollars, she knew that

7    that wasn't true.  She knew something was wrong.  And she said,

8    "I won't do it for you."

9            Now, I want to be perfectly clear about something.

10   The government is not claiming that Gross or Lebedev are guilty

11   of a crime or the crimes that they're charged with simply

12   because they violated the NCUA regulations of how a credit

13   union should be governed or any of the NACHA rules on ACH

14   transactions.  But as Judge Nathan has explained to you, the

15   fact that both Gross and Lebedev ignored those rules and, thus,

16   undermined the safety and soundness of HOPE FCU as board

17   members so that they could enrich themselves is evidence that

18   you can consider in determining whether or not they acted

19   corruptly.  For Yuri Lebedev, that he could take over a credit

20   union he and his friends had no business running, so that they

21   could run their Bitcoin exchange transactions through it.  And

22   for Trevon Gross, that he would sacrifice the credit union that

23   he was charged to run, so that his church could receive a

24   sizeable donation.

25           So how else do we know that there's corruption here?

1   Well, with regard to Mr. Gross, you know that he acted

2   corruptly because, ultimately, it was he who benefited from

3   those payments to the Collectables Club -- from the

4   Collectables Club and Kapcharge that went to the church.  You

5   saw the analysis yourself from Mr. Rollins, who analyzed the

6   flow of transactions and the influx of funds that went to the

7   church and ultimately where they went.  And you saw that they

8   went to pay for personal expenses on some of Trevon Gross'

9   personal credit cards.

10          You also saw the total amount of funds that went

11  through and all the various uses.  These weren't just uses

12  simply for church funds.  They were uses for himself as well,

13  and he went through several examples with you.

14          Ladies and gentlemen, the numbers don't lie.  Trevon

15  Gross benefited from this bribe money.  It's plain and simple.

16  And, of course, again, Gross tried to distance himself on the

17  stand from the real facts when he testified.  He tried to claim

18  that all sorts of expenses weren't personal, but they were

19  church expenses, like that massage at Tao, which he said was a

20  medical expense that was covered by the church.  But you don't

21  have to rely on the fact that Trevon Gross made personal

22  purchases that flowed through from those bribe payments that

23  were paid to the church to know that he was acting corruptly.

24  You don't have to go through the accounting exercise that

25  Mr. Rollins did to see where every last dollar went.  As

1    Mr. Noble illustrated in his cross-examination of the

2    defendant, it is obvious and evident that Mr. Gross' finances

3    depended on the finances of Hope Cathedral.  It's simple:

4    Mr. Gross doesn't get paid unless there's enough in the coffers

5    at the church to pay him.

6           And, here, there's an important point to be made,

7    ladies and gentlemen, and it's as follows:  As I said a moment

8    ago before the break, I expect that Judge Nathan will explain

9    to you that the motive to act corruptly is ordinarily, again,

10   simply a hope or expectation of some gain, profit, or benefit

11   to either yourself or to another.  So it does not matter

12   whether the payments at issue went to buy something illegal, or

13   went towards a lavish spending spree, or went to charity,

14   because, ultimately, that's not the question before you.  The

15   question is the effect of the payment, the effect on the

16   payment of the recipient and the intention of the payment from

17   the person who paid it.  Did that payment serve to accomplish

18   either an unlawful end or result or a lawful end or result by

19   some unlawful means or methods?

20          And it makes sense to you why the law is written this

21   way.  For example, there is obviously nothing unlawful for your

22   senator to decide to vote for any particular bill.  Maybe it's

23   a bill that will do a lot of good for the community, maybe lots

24   of senators are going to vote for that bill.  There is nothing

25   inherently wrong with a senator deciding that he is going to

vote or she is going to vote for a particular bill.  But what
is wrong is when the senator has been influenced, at least in
part, to vote for a piece of legislation because $150,000 was
sent to his reelection campaign by someone who really wants
that bill to pass.

          MR. KLINGEMAN:  I object to the analogy on legal
grounds.

          THE COURT:  Sustained.

          The jury will disregard the analogy to the bill
passage.

          You'll move on, Ms. Choi.

          MS. CHOI:  The point is:  It doesn't matter where that
money went.  It could have gone directly to Mr. Gross, it could
have gone to a charity, it could have gone to buy drugs.  None
of those things matter.  What you need to focus on is the
effect that it had on Mr. Gross, which means you shouldn't take
into account necessarily the defendant's claims of good faith
because, ultimately, the church did some good as well.

          Now, I expect that defense counsel will argue to you
that there's nothing inherently wrong with deciding, for
example, to process ACH transactions, that there's nothing
inherently illegal to do so on behalf of the international
money-transmitting businesses, that there's nothing inherently
illegal, for example, with processing for payday lenders who
target the underbanked and the poor.  And the government's not

1    saying that there is inherently illegal with any of those

2    things, but what is illegal is when at least one reason Gross

3    decided to process those tens of millions of dollars of

4    transactions was because the church that he was the lead pastor

5    for received over $160,000 in money from two members of the

6    credit union -- that's Collectables Club and Kapcharge -- who

7    wanted those ACH transactions to happen.

8            And, here, you know that the evidence shows that Gross

9    allowed for these transactions to happen precisely because he

10   expected a benefit to both his church and to himself.

11           And I note the transcript at 3659-60 is where Trevon

12   Gross does not deny he has personal benefit that is linked to

13   the financial condition of his church.

14           So the fifth reason you know that there is corrupt

15   intent here:  Well, you heard from two former board members of

16   HOPE FCU, Ricardo Hill and Jose Freundt.  So let me speak a

17   minute about these cooperating witnesses.

18           These people were among the group of friends, mainly

19   from Florida, that Anthony Murgio hand picked to serve on this

20   New Jersey-based credit union.  They were the same rank as Yuri

21   Lebedev on that newly elected board.  And Ricardo Hill worked

22   side by side with Yuri Lebedev, who was the head of technology,

23   to try to set up these ACH transactions through Alloya for

24   Kapcharge.

25           In fact, Hill was the one who actually processed the

1   batches of ACH transactions on a daily basis for the

2   Montreal-based Kapcharge, oddly enough from that Florida office

3   of Coin.mx, the supposed, quote, HOPE FCU Tallahassee branch,

4   using the GUAPPLE server in that office closet.  You remember

5   those pictures.

6       I expect that the defense will argue to you that you

7   can't rely on their testimony because they're lying to you,

8   because they had every incentive to lie and that they were

9   falsely pointing the finger at both Yuri Lebedev and Trevon

10   Gross when they testified to you that they, along with the

11   defendants, were in on the bribery scheme.  But you know that's

12   not true for two reasons:

13       First, you know that from all of the evidence that is

14   presented having nothing to do at all with the cooperator's

15   testimony, the documents that speak for themselves, the

16   witnesses from the NCUA and the other credit unions.  You don't

17   need to rely on a cooperator's testimony to know what they say.

18       But, second, you also know to reject that argument

19   because you've been paying very close attention the entirety of

20   the trial, including when they testified.  You saw Ricardo Hill

21   and Jose Freundt yourself.  You had an opportunity to assess

22   their demeanor and whether or not you believe that they were

23   credible.  They took the witness stand right over there, and

24   they told you what their roles were in this bribery scheme, for

25   which they pleaded guilty, and what Trevon Gross and Yuri

1   Lebedev told them over the course.

2          So, evaluate for yourselves about what they said.  And

3   you can review those details that they gave to you about

4   precisely what Trevon Gross and Yuri Lebedev did as it relates

5   to the bribery scheme.  And when you view the testimony of

6   Ricardo Hill and Jose Freundt against the emails, the financial

7   documents, the WhatsApp chats, and the recorded conversations

8   in the case, the record of what happened at the time, you will

9   clearly see that their testimony makes sense and is

10  corroborated and supported by all the other evidence.

11         So, they both testified about what you already know to

12  be true, which is that Gross gave complete control to Murgio,

13  Lebedev, and their motley crew, and the only reason that Gross

14  gave that control was because of the so-called donations to

15  Hope Cathedral.  And you know why that's wrong as well.  It's

16  not only because of what Clayton Curry told you from the NCUA,

17  but it's because it's right there in the HOPE FCU charter, in

18  their bylaws, that if a decision is being made about the

19  business of the credit union, and a board member has a

20  pecuniary interest or really any interest in the outcome of

21  that deal, then they're not supposed to be play any role in the

22  board's determination of whether they should approve the act.

23  They're not supposed to deliberate, and they're not supposed to

24  vote.

25         But that's precisely what Gross did and precisely what

H39KLEB3                          Summation - Ms. Choi

1    Lebedev did.  They not only deliberated on the question, but

2    Gross, by his own admission when he took the stand, he was the

3    one that brought the Collectables Club, Kapcharge, and small

4    credit union together.  And you know he was influenced to do so

5    because of those payments that the Collectables Club and

6    Kapcharge paid to the church.

7            Now, look, these are two companies who had no business

8    even being members of a credit union in New Jersey.  And Gross

9    knew within a week of having been shown this potential deal,

10   his first email contacts with the Murgios, that the

11   Collectables Club was based in West Palm Beach, and Gross also

12   knew, from the emails that he got in May, when Kapcharge

13   attempted to open an account at HOPE FCU, that they were based

14   in Montreal.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1        MS. CHOI:  (Continuing) But nevertheless Gross

2   welcomed the Collectables Club and Kapcharge into his little

3   credit union in New Jersey with open arms.  He would never have

4   done so without that $150,000 bankrolled from Kapcharge going

5   to Hope Cathedral.

6        And you also know that Yuri Lebedev had a financial

7   interest in the plan.  See, on top of a $417 a month that each

8   Collectables Club's member was making for serving on the board

9   that was paid from the Collectables Club, payments that you

10  know that they weren't supposed to have under the rules of the

11  NCUA, Lebedev was also getting paid as a consultant to setup

12  that technical interface between Coin.mx's systems, their

13  payment processing, their financial transactions and HOPE FCU.

14  And he wasn't paid a small sum either.  And he knew that the

15  more NCUA clientele that HOPE FCU could bring in with

16  Kapcharge, the more would be needed to be built out for the

17  credit union, the more consulting work he would have, and

18  ultimately the more he would get paid.

19       You saw the bank documents and you've seen documents

20  such as this one, 1243, Lightning Support and Development,

21  $2,500.  It's from Intelligent VR, which we know to be Yuri

22  Lebedev.  And it's being sent to evite Coin.mx and Anthony at

23  Coin.mx which is how you know that Lightning Payments is the

24  interface that allows for those financial transactions to occur

25  and that Yuri Lebedev is the consultant who is setting that up.

1    That's $2,500 for one month's worth of work.

2              Now, you also know that Lebedev knew that the

3    so-called donations to the church were really just bribes to

4    Gross.  Why do you know that Lebedev understood this?  Well,

5    you know that he knowingly participated in the scheme

6    understanding the whole of the deal because on the November 22

7    meeting he's the one who offered to pay that final $50,000 to

8    make sure Anthony could meet that Monday deadline.

9              "I'll get you 50.  I will give you.  It's fine.  Don't

10   worry about it.  I got it."

11             And you know that Lebedev -- you know that Lebedev

12   understood that these were bribes because you know in GX 4501

13   that's the CU strategy WhatsApp.  On that WhatsApp Jose Freundt

14   calls it what it is, bribery, with that little dollar sign.

15   You remember that chat, that chat that was happening right at

16   the end of November when all of these issues were coming to a

17   head.

18             You know from the testimony that you heard about how

19   WhatsApp worked and the fact that Mr. Priest went and checked

20   to make sure that each of those WhatsApps were received; that

21   Yuri Lebedev received that chat.  He did not do anything about

22   it but continue on in offering to pay that $41,000 towards the

23   $50,000 bribe which you know from his own WhatsApps.

24             And you know that Lebedev continued with Murgio and

25   Collectables Club members to try to get HOPE FCU back with that

false letter to the NCUA in January of 2015, which we'll get to

in a bit.

Lebedev knew what Ricardo Hill told you on the stand

to be the case and what Jose Freundt told you on the stand to

be the case; expressly, also, Jose Freundt when he called it a

bribe back in November 2014.  These were bribes.  Lebedev knew

they were bribes, and he continued on.

What's the sixth reason that you know that there's

corrupt intent?  Well, when Trevon Gross realized that it

wasn't Anthony Murgio who really had the deep pockets and

instead that it was Kapcharge, the Canadian entity who

bankrolled the bulk of the so-called donation to the church.

Well, he made the decision to cut Murgio and the Collectables

Club out.

Even before the November 22 meeting when Alloya and

Magic Wrighter are shutting did the ACH processing you'll see

in the record that it was Anthony Murgio who wanted Kapcharge

to stop processing through HOPE because he knew that it was

undermining the stability of credit union.

So what does Gross do?  He goes behind Anthony's back

and straight to Mark Francis.  He tells Francis there's a

serious disconnect to Anthony's thinking and that, in

Government Exhibit 3564, on Monday 24, 2014, take a look at

that evidence, ladies and gentlemen, and the e-mails that

happened in that timeframe in the government exhibit list in

1    the 3500 series.  You'll see that it was Trevon Gross who went

2    with Kapcharge and said, "Then lets roll.  Let's do the ACH

3    transactions just as you wanted without Anthony Murgio involved

4    at all."

5           What's the seventh reason you know that there's

6    corrupt intent?  Well you've heard their own words and how they

7    describe what was going on.  You can look at the Yuri WhatsApps

8    yourself.  You can see how he describes them as so-called

9    donations and that he's the one who says, "Money do things to

10   people, even pastors."

11          There it is.  Government Exhibit 4509.  Yuri says,

12   "Sitting on cash waiting for it to drop then send to you again.

13   Again, how convenient for Trevon."  Remember that conversation

14   from mid November.  Then after the November 22 meeting Yuri, at

15   4949, says, "Money do unbelievable things to people, even

16   pastors."

17          And what's the eighth way that you know that there's

18   corruption?  Well because the key details of this deal were

19   never documented beyond the e-mails that you saw between Gross

20   and Anthony Murgio.

21          Now you've heard a lot about how board meetings are

22   supposed to function at a credit union.  This includes some

23   basic principles like you're supposed to take meeting minutes

24   every time the board meets and write down all the important

25   business decisions the board makes regarding the credit union.

And you've also heard testimony from the various NCUA witnesses

about how one of the things that they examine when they go in

to a credit union to do their examinations on-site are the

board minutes to see generally what's going on, the significant

developments that have been happening at the credit union since

the last time they were there.

So let's take a look at the board minute during this

timeframe, like Government Exhibit 6084.  Note.  These are the

board minutes for April 17, 2014.  So this is after that

memorandum of understanding was signed between Gross and

Murgio.  And look at the company that they note.  Collection

Club PA.  "Collection Club PA would like to partner with the

credit union to offer some new opportunities such as debit

cards."

Needless to say, not only did the board minutes not

get the name right, but the minutes also neglect to mention

that the donations were going to be paid to the Gross's church

which is, again, a totally separate entity from the credit

union in relation to this agreement.

You can look at the board minutes.  There is no MOU in

there.  They just don't exist.

As the NCUA witnesses testified, they never saw the

MOU or any other document, for that matter, that memorialized

this so-called business deal between HOPE FCU and Collectables

Club whereby the church is the one that benefits.

1          So ask yourself this question:  If this is a

2     legitimate business deal and on the up and up, why are there no

3     documents to show what it really is?

4          So, finally.  How else do you know that Gross and

5     Lebedev were acting with corrupt intent?  Well because of all

6     the lies that they told; lies to other credit unions through

7     which they are trying to do business with those ACH

8     transactions such as Alloya and United Advantage; lies to

9     Congressman Smith's office; and most importantly here, lies and

10    omissions directly to the NCUA, the regulator that's charged

11    with overseeing the safety and soundness of all federal credit

12    unions.

13         So why did they provide this mountain of false

14    information to all these folks?  Because they wanted to keep

15    the arrangements of their deal secret.  They wanted to keep the

16    bribery scheme hidden so that they could put the money in all

17    of their pockets.

18         So how do you know that Gross and Lebedev and their

19    coconspirators were concealing from the NCUA the true nature of

20    this relationship?  Well because of all of the defendants' own

21    words.

22         You should look at Government Exhibit 2279 when on

23    November 6, 2014 Gross tells Anthony Murgio, Ricardo Hill and

24    Kapcharge that, "We have been on the same page about all of

25    this because I have been dancing with the examiners since July

1    and, honestly, I am tired."  Tired of all the lies they had to

2    tell to keep the NCUA from figuring out how they had run their

3    credit union to a three percent net worth and tired of keeping

4    all their deceptions straight.

5            So what are all the different lies that Gross and

6    Lebedev have told?

7            Well, the most fundamental set of lies that Gross,

8    Lebedev and HOPE FCU told to the NCUA is what we're just

9    talking about now, their lies covering up the fact of

10   160,000 -- $160,000 in payments to Hope Cathedral that were the

11   reason that Gross put the Collectables Club members on the

12   board.

13           And as I explained to you a moment ago, this

14   arrangement, this quid pro quo whereby the donations were tied

15   to the election in June 2014 are, again, found nowhere in the

16   board minutes of HOPE FCU despite this passing reference in the

17   April minutes to the strategic partnership.

18           So why are those glaring omissions a problem?  Well

19   because, as the NCUA examiners told you, it would be a red flag

20   to them to find out that, one, or, in fact, in this case two

21   members of the credit union, Kapcharge and Collectables Club,

22   were paying large sums of money to influence decisions that

23   were being made at the HOPE FCU including decisions about the

24   composition of the board of directors.

25           So for the same reasons that we discussed before,

1    those fiduciary duties that the board had, it would be a

2    serious concern if those payments had been known to the NCUA,

3    that the NCUA knew that those payments were there and that they

4    influenced the decision of the board to favor the interests of

5    some of their members such as Kapcharge and Collectables Club

6    above all the rest.  But you know that's exactly what happened

7    here.

8         And by Gross's own admission on the stand he explains

9    he never disclosed these payments to the NCUA.  That wasn't an

10   oversight, ladies and gentlemen.  Trevon Gross and Yuri Lebedev

11   didn't simply forget to tell the NCUA about those bribe

12   payments.  They hid them.

13        What else did Gross, Lebedev, and HOPE FCU fail to

14   tell the NCUA?  Well they failed to tell the NCUA that it was

15   Anthony Murgio who was calling the shots at that credit union,

16   that some random man from Florida with a criminal background

17   and a bankruptcy in his past was somehow making major decisions

18   about how that business, the credit union, should be run

19   including whether or not it should be processing those huge

20   volumes of risky ACH transactions, with who they should be

21   processing those transactions, and at what pace.  And this is

22   all despite the fact that he's not even a board member.  That's

23   not an oversight either.

24        You know that this was a lie to the regulators because

25   you saw what was happening behind the scenes when Meg Flok was

there on November 21, 2014.  Anthony and his crew had already

arrived for that November 22 meeting and they needed to get

together at the office to show the examiner certain documents

for the examination.  But here is Gross instructing Anthony to

leave and not to come back to the credit union until after

Ms. Flok leaves.

GX4509, which is the Gross WhatsApps between Trevon

Gross and Anthony Murgio, starting at line 4187.

"Murgio:  She is still here.

"Trevon Gross:  I know.  Get out of there.  I'm

heading back.  Waiting on a doc from Mark."

Who is Mark?  Mark Francis.

Trying to get financials from them so that they can

make sure they have a file for Meg Flok.

Anthony asks:  "When should we come back?  After she

leaves?"

Trevon Gross says, "Yes."

Gross was hiding from the NCUA the fact that Anthony

Murgio was calling the shots.  Just more lies.  Lies connected

to lie number three.  Whether Collectables Club and its members

were even qualified to be part of HOPE FCU.

Now from the get-go, as you've seen, Gross knew that

these Collectables Club members weren't qualified to be members

of his New Jersey-based credit union.  He knew this because he

knew where Anthony and Michael Murgio lived.  He also knew this

from the account opening applications they saw for each of the

new members when they had to open those accounts so they could

actually qualify to serve on the board, none of which said

Lakewood, New Jersey.

Gross also knows this from these purported resumes

that he reviewed that were so important to him because he knew

that the examiners would look at them.

So let's just look at one example.  On June 17, just

days before the election, Gross asked Anthony Murgio if the

Collectables Club, again, plans on using that Lakewood address

for the Collectables Club that Kapcharge is using.  We've gone

through this.

"We could also use that address, no problem," says

Anthony, "but are you going to send stuff there?"

Trevon, "No our records will go to the Jackson address

or the Florida address.  Again just to have our bases covered

you all should be able to point to a Lakewood address if

asked."

Why do they care about this?  Again, because Trevon

knows that if the NCUA figured out these new members weren't

from New Jersey and didn't even have a New Jersey address based

in Lakewood, that would be a serious problem with the

regulators.

And, again, what else does this e-mail show?  Despite

what Gross testified to yesterday, he knows that that Lakewood

1   address was just for show and not a real address.

2           He sat there on the stand and said that the Lakewood

3   address was important to him because he understood that's the

4   only way to qualify for the field of membership, but you know

5   really that all Gross really cared about is making sure that

6   the NCUA didn't suspect that there was anything going on at the

7   credit union.

8           Like at 1216-A, August 15, 2014, when the NCUA starts

9   asking questions about Collectables Club and Kapcharge.  Gross

10  complains to Murgio that, "Clearly all of this activity has

11  gotten the attention of the NCUA, the exact thing that we did

12  not want to happen.  I have been with the CU for more than

13  seven years and they have never come back a second time.  And

14  they are asking for the new member information."

15          And this example.  Government Exhibit 1242-A.  Here's

16  Yuri Lebedev at 3:49 a.m. August 28, 2014 trying to get his

17  paperwork together to establish an account with the credit

18  union.  Ladies and gentlemen, that's over two months after

19  Lebedev is elected to the board of directors.

20          And Lebedev signs the application with the correct

21  date.  August 28, 2014.  And he sends over a copy of his

22  Florida-based ID at 1242-C.  But Gross knows that's not going

23  to work for the NCUA because Lebedev has to date that

24  application for May 17, 2014 before he was elected to the

25  board, the date that Gross opened Lebedev's account, perhaps,

H399LEB4                      Summation - Ms. Choi

1   without an actual application.

2           So he tells Murgio that Lebedev should backdate that

3   application.  "This form will not work.  You need to date it as

4   of when he opened his account.  Here is the original form."

5           And then Trevon Gross at 1242-E says, "The account was

6   opened on May 17."

7           You know why he did that.  He told Lebedev to backdate

8   that application so the examiners wouldn't get suspicious.

9           And you know from looking at those online profiles

10  that were certified by Bernard Larkins that those profiles

11  didn't even mention the new board members in that June 30, 2014

12  certification.  If you read the certification language closely

13  at GX-6111, it says specifically that they're supposed to make

14  changes to the profile within a timely timeframe if there is a

15  new change in the board.  That's just on the first page of that

16  particular exhibit.  They didn't do that.  They didn't do that.

17          They just had all of the old board members that had

18  always been there.  And you've seen the evidence, ladies and

19  gentlemen, they did that because they knew that there would be

20  a lot of red flags, that the entire composition of the board

21  and the complexion of the people who ran that credit union had

22  changed suddenly.

23          Now, Gross knows that these people aren't living and

24  working in Lakewood.  He admitted as much when he testified on

25  the stand and complained about Anthony Murgio and when he was

1    blaming Anthony Murgio as an excuse for how he found himself in

2    this position.

3            He said that Anthony Murgio had promised that they

4    would move to New Jersey but ultimately the Collectables Club

5    never did and its employees never did.  But, yet, by stating

6    that he was, quote, under the impression that those people who

7    were part of the Collectables Club were traveling a good deal

8    of the time is not sufficient.  It's not an excuse that makes

9    any sense to you.  He could have at any point in time said:

10   No, this doesn't make sense, I know you're not in Lakewood,

11   this isn't going to work.  But, nevertheless, he doesn't choose

12   to do that.  Instead, he chooses to lie and tell lies to the

13   NCUA, including in Government Exhibit 6022, which you heard

14   about when Brian McDonough from the NCUA took the stand.  On

15   October 17, 2014, when they're having discussion, and McDonough

16   writes, "Pastor Gross, based on our discussion and your

17   explanation that the employees of the Collectors Club or other

18   businesses work two weeks out of the month at the employers

19   place of business that they would be eligible for membership."

20   But Gross knew that that was just a lie too.  He just said it

21   to the NCUA so that they would get off of his case.

22           Lie number four, a related lie.  Where is Kapcharge

23   based?  Now in May of 2014 Gross opens an account for Kapcharge

24   under Mark Francis's name.  And you know, because you've seen

25   the actual documents, Government Exhibits 1146A and 1147.  At

1    the time the account was opened all that Mark Francis sent in

2    with this Canadian driver's license permis de conduire in

3    French with a Montreal-based address.  But yet Gross lied to

4    the NCUA about their presence in Lakewood.  And you heard it

5    from Meg Flok when the explanation that they gave was that it

6    was simply a blessing that they came together.

7              You know that this was a lie because when he opened

8    the Kapcharge account in May 2014 and received just this one

9    item, that e-mail, specifically 1147, shows that they don't

10   even have a charter date; they don't even have background

11   documents for Kapcharge; they don't even have the main

12   telephone number.  Nevertheless, Gross opens the account and

13   tells Anthony that Mark should be able to log in.

14             Another good example of this.  Government Exhibits

15   1202A and 1202B.  These are letters that were sent on July 11,

16   2014.  Trevon Gross is signing letters on behalf of HOPE FCU to

17   certify that Kapcharge has an account in good standing with the

18   credit union even though at the very top of these letters that

19   he's attaching it says very plainly that Kapcharge USA, Inc.

20   has a Wilmington, Delaware address; not one based in Lakewood

21             You also know this from the testimony of Meg Flok.

22   You know that when she went to the credit union in November 21,

23   the day before that big meeting, that the day that the

24   Collectables Club members had already traveled from Florida to

25   meet for the very first time in person at HOPE FCU that she was

there examining the books and records and she did what

examiners do routinely in all of their examinations.  She asked

for basic information about this new account called Kapcharge

for which there were millions of dollars on deposit at the

credit union.

And you heard what she said Gross told her; that

somehow these files happened to be offsite because the credit

union was in the midst of moving at the time.  You know that's

a lie, ladies and gentlemen.  Because when Trevon Gross took

the stand he made all sorts of excuses for why he told that lie

to Meg Flok.

He testified, first, that he had put the file out and

it was just there the night before and then somehow it

mysteriously disappeared.  So he assumed that someone must have

picked it up and taken it to offsite storage where they were

keeping some items because potentially they were looking to

move the credit union; not that they ever did.

Well, first of all, this explanation makes absolutely

no sense.  Trevon Gross put the file aside the night before,

came in the next morning, to the credit union, saw that it was

gone and just assumed someone had picked it up and moved it

offsite for the purposes of moving?  A move that they never

did?

Well if that was, in fact, the truth, then all Gross

was doing was simply recreating the Kapcharge account opening

1   documents as they existed in May.  Why didn't he just tell Meg

2   Flok that?  Why didn't he just say that he had misplaced at the

3   files at the moment?  Why didn't he specifically tell her that

4   fact, his own description of what had happened?

5          Well it's because, ladies and gentlemen, you know that

6   when Gross took that stand he was just making a series of

7   excuses.  This one makes no sense.

8          Let's review the tape of what actually was happening

9   at the time.  Starting at Government Exhibit 4510.  That's a

10  Gross WhatsApp.  Remember, they had a discussion on November 20

11  between Anthony Murgio and Trevon Gross where Trevon Gross

12  says, "Just got an e-mail from NCUA examiner saying they will

13  be here tomorrow morning at 9:30 to insure our compliance."

14         And Anthony Murgio responds, "Okay.  I can have

15  everyone here tonight.  So they are here.  I think could be

16  good."

17         And Trevon asks, "Why?  They can't answer any

18  questions that the examiner asks.  Yuri needs to be here

19  because he's involved with the files."

20         Murgio says, "Okay.  Great.  You don't think it could

21  be good for them to at least show face?"

22         Trevon, "Anthony, you're going to do whatever you

23  want."

24         Anthony, "No.  I'm asking you.  If you think just

25  Yuri, then fine."

1          Trevon, "I've already answered.  Ricardo should

2     probably be here."

3          Ask yourself:  Why did Trevon Gross respond in this

4     way?  Well, because he doesn't want the entire new board to

5     show up, people who have absolutely nothing to do with

6     Lakewood.  That would raise a huge red flag.  So that's why he

7     tried to stop Anthony Murgio from having everyone show up.

8          Let's look at the Mark Francis WhatsApps from this

9     timeframe too, Government Exhibit 4506.  Murgio goes, "Put

10    Lakewood address on weapon side ASAP."

11         Mark Francis, "Okay.  Just add it or it or --

12         Murgio, "No add."

13         Mark Francis, knowing how important it is, within a

14    minute says, "Being done right now as we speak.  Okay."

15         Murgio asks for confirmation.  Mark Francis sends that

16    image of the website that we've seen before with that 216 River

17    Avenue address.

18         And Anthony instructs him, "Call and get an office.  I

19    will go pay."

20         Mark Francis responds, "Tina is calling now."

21         Why would they decide on November 21 all of a sudden

22    they need to actually get an office.  Because they didn't have

23    an office to begin with, and they knew that Meg Flok was asking

24    questions about that

25         Murgio continues, "We need to put it on a page that

1   has a small link," and then he has an audio response.  "The

2   lady already said she checked the website, I guess, so you guys

3   need to put like a link on the bottom that says US address and

4   have a separate page and like have it pop down or something."

5              And Mark Francis asks for him to call.

6              Who is the lady?  Meg Flok.

7              They continue.  They talk about the Kapcharge website.

8   Because they mentioned Canada.

9              Who is they?  The examiners.

10             Anthony instructs them to put a number (848)222-3358

11  on it to confirm.

12             Mark Francis, "Phone number?"

13             And Anthony goes, "Also answer phones today as

14  Kapcharge USA.  Yes.  Put that number.  It forwards to you."

15             "Okay," says Mark Francis

16             Well why would they care about answering the phone

17  today as Kapcharge USA?  Again, November 21, 2014, they're

18  worried that the examiners on-site are going to do some basic

19  Googling and call Kapcharge, and they need to make sure that

20  they have their stories right about where Kapcharge is and that

21  they're based in the USA.

22             Again, Government Exhibit 4506.  That same day Murgio

23  says, "Need Shoula's address."

24             Mark Francis, "Driver's?"

25             And they're talking about Shoula Cohen, of course.

1          Murgio, "She signed account.  Yes."

2          Mark Francis, "Okay.  Send it to Trevon?

3          "Yes.  Done.  Site."

4          Mark Francis, "Address is there.  Phone number being

5  added now, and phone being answered properly."

6          And then at the bottom, Mark Francis, "You can tell

7  her that Capital Solutions has different productions, Kapcharge

8  being one of them, so the address is on the Kapcharge link

9  while the other address is on the other solutions that have

10  nothing to do with it."

11          Why the scramble to get new documents, to add a phone

12  number, to change an address on the website?  Meg Flok.

13          "I think she just called here probing George with

14  questions.  She asked about personal accounts and if she gives

15  that info."

16          Here's Meg Flok probing asking her about –– asking

17  about the address.  And there is concern here.  Murgio says,

18  "Uh oh, they could maybe go to that River Avenue address and

19  then they'll realize that there's nothing going on at that

20  place."

21          And later that day Mark Francis saying, "Still need

22  the office space?"

23          And Murgio, being upset that he hasn't actually gotten

24  it yet.  They're doing a last minute scramble for Christine

25  Carida to actually set up some sort of lease, 50 square feet

1    for $300 a month.

2         Murgio asks, "Did the agents go there?  Does she know

3    the regulators?"

4         Mark Francis said, "I don't think so.  She asked this

5    morning for the office right away and told them we wanted $300

6    per month option.  They're getting back to her now with a

7    one-year lease for it."

8         Again, they're concerned that the NCUA is actually

9    going to do -- to figure out that this is all a charade.

10        How else do we know that this is a charade?  E-mails

11   from August 27, 2014.  What is this?  Trevon Gross sending to

12   Anthony Murgio an actual application for HOPE FCU membership at

13   Kapcharge.  Again, that date is curious.  August 27.  Well,

14   that's after they've already started processing, already

15   started test ACHs.  And this membership application is both

16   unsigned and dated from May 23, 2014.

17        And you know that this is just what they had in the

18   file unsigned because in the bottom right-hand corner there's a

19   date there, may 23, 2014, probably automatically generated in

20   their systems.  All they did was print it out, never even

21   bothered to get a signature

22        So then the scramble.  Government Exhibit 1665 at 1.

23   November 21, 2014.  Trevon directly to Mark Francis, "Hey, we

24   need your and Shoula's info and signature on this form ASAP,

25   need this back in ten mins.  Date's from May 23, 2014.  Scan

1    and send back via e-mail."

2              Again, if the truth was that they just misplaced the

3    file, they could have just told Meg Flok that.  But you know

4    that that's not what happened because you can actually look at

5    the business account agreement that they sent, Government

6    Exhibit 1665 at 2, the attachment to that previous frantic

7    e-mail that Trevon had sent to Mark Francis.  You'd realize

8    that strangely enough that business account agreement isn't

9    even for HOPE FCU, it's for United Advantage Northwest Federal

10   Credit Union.

11             They screwed up, ladies and gentlemen.  They sent an

12   application to Kapcharge to execute not even for their own

13   credit union.

14             Government Exhibit 3565 at 1.  That day Christine

15   Carida sent back to Trevon Gross the documents.  Here it is

16   executed.  3565 at 2.  You can see that there's a signature at

17   the bottom.  The account says that it was opened on May 23,

18   2014 by Bernard Larkins.  And in the middle, again, it says

19   that they agree to the bylaws of United Advantage Northwest

20   Credit Union.

21             And the next page.  Here are the signatures.  And the

22   information for Shoula Cohen and Mark Francis and perhaps of

23   interest to you at the bottom Mark Francis certifying that this

24   is a business that is not one of the following, business

25   located outside the United States.

1           How do you know that this is all a lie?  Well, because
2      we also have the due diligence file for Kapcharge that the NCUA
3      got, that Ms. Flok talked about in Government Exhibit 6131.
4      And you can compare what they had on file at the credit union
5      once they finally found the file offsite, two or three hours
6      after it was originally asked for by Meg Flok.  You saw a bunch
7      of documents again if French about Kapcharge in Montreal.  And
8      you saw that this a business account agreement at 6131 at 9.

9           Why is this interesting, ladies and gentlemen?  Well,
10     remember that mistake that they made when they send over the
11     United Advantage application documentation in a frantic hurry.
12     Now, they've typed over it to say Helping Other People Excel
13     Federal Credit Union because they knew that they didn't have
14     enough time to actually get the real documents in order.  They
15     just papered it up.  They papered up the fact they didn't have
16     the documents to begin with.  They papered up the fact that
17     they were trying to get them at the last minute because Meg
18     Flok asked for it.  And they papered up the fact that this was
19     all a total sham.

20          There it is.  The second page, the same as the version
21     that you saw had been emailed over except this time at the
22     bottom there's credit union membership officer, Cynthia Purry,
23     who signs it.

24          But they forgot to cover up the second mistake on the
25     second page.  That's how you know that this is just a

1   fictitious document.  They kept the United Advantage Northwest

2   Federal Credit Union there because they didn't bother to look

3   close enough to cover up their first lie with the other set of

4   lies they needed for the scam.

5          So now we come to Lebedev's lies because it wasn't

6   just Trevon who was telling these lies to the NCUA, it was also

7   Lebedev who was helping out.

8          First way, Government Exhibit 1291.  This e-mail might

9   look a little sparse but there's some important information

10  there.  If you recall from Special Agent Jarrow's testimony to

11  you he explained that Twilio is one of these online companies

12  where you can do things like text messages or phone forwarding.

13         So there's the subject Twilio from Anthony Murgio to

14  Yuri Lebedev, November 20, 2014, two days before the meeting,

15  the day before the examiners show up, after Meg Flok tells them

16  that she's arriving the next day.  He gives him, Anthony gives

17  Yuri the Twilio account log-in information and information

18  about how to use Twilio and then two instructions at the

19  bottom.  Number Cap forward (848)222-3358.  That's that 848

20  number that you saw in the previous WhatsApp chats that they

21  wanted to frantically change Kapcharge's website to include to

22  make sure that the number gets forwarded to the 514 exchange,

23  the true number for Kapcharge up in Montreal.

24         And then the other false statement, Collectables Club

25  forward.  Another 848 number.  Forward to the Coin.mx number

1   on-site.  This is just another example of Yuri Lebedev knowing

2   the true nature of Collectables Club and making sure that they

3   have their stories straight.

4           Then we go to the Rico WhatsApp, Government Exhibit

5   4507.  Here's Anthony and Rico trying frantically to make sure

6   that they have minutes so that they can show it to the

7   examiners.

8           Murgio, "Hey do you have any of these minutes in Word

9   so I can try to keep the formatting the same or should I just

10  copy and paste from PDF?"

11          Ricardo, "PDF only."

12          Murgio, "Did you or Delores write these up?"  Delores

13  Wyatt who was the board secretary at the time.

14          Rico responds, "I only did the one for October.  Yes.

15  She did the rest."

16          Murgio, "Do you have the one from October?"

17          Rico, "I have the notes.  Have not completed it."

18          And, again, Murgio explains why they are frantic right

19  now.  "Well, we're going to need to have that.  If you want to

20  keep it in Word, that's fine.  We don't have the time.  It's

21  okay.  Send it to me and I'll handle it if you just give me the

22  notes, but we need to have that for the inspection tomorrow.

23  So just let me know."

24          And what else are they doing that day?

25          Murgio, "Hey, when you get the time could you also

1   send me Capital's legal name in the system and their address

2   and everything please, and we just switched their phone number

3   in the system. So just e-mail me that stuff and I'll e-mail

4   you back the phone number."

5          And then Rico says, "Also Cap has no number on their

6   account."

7          Do you remember that earlier e-mail from May when

8   Trevon opened the account but notes that they didn't have a

9   main number. Well from May to the time of the examination in

10  November they never had a number on file at the credit union.

11         So Rico asks, "What number do you want me to use

12  there?"

13         And Murgio explains (848)222-3358, that Twilio

14  forwarding number to hide the fact that it was in Montreal that

15  Yuri Lebedev helped setup on the website.

16         Now, this is a little interesting. You've also seen

17  this particular phone number in another place. Well, if you

18  recall, Steven Valentine testified he used to be a legislative

19  assistant for the congressman who had the district that Trevon

20  Gross was in. And you remember that he testified about efforts

21  that Trevon Gross and members of HOPE FCU -- well, really,

22  Trevon Gross and Mark Francis had, to try to get the

23  congressman to help them out with the issue that they had with

24  the NCUA about whether or not Kapcharge was truly eligible to

25  be in the field of membership.

1          Well here it is.  Trevon Gross.  January 7, 2015 to

2   Carol Weil, who is another person who worked in the

3   congressman's office, "Happy New Year.  It was great talking to

4   you yesterday.  Here is information on Kapcharge USA, Inc."

5   Kapcharge USA, the fake River Avenue address in Lakewood

6   New Jersey and, lo and behold, the telephone number.

7          Now, this is kind of funny.  You remember that Steven

8   Valentine said that when he was doing some basic research on

9   Kapcharge to try to figure out if they should help out their

10  constituent, something that he took seriously, something that

11  his congressman took seriously, it was odd to him because he

12  tried the number on the website and it wasn't connected.

13         You know it wasn't connected, as well, because

14  Government Exhibit 3744, on February 6, 2015, here's Christine

15  Carida from Kapcharge saying, "Trevon the 848 number on our

16  website is not in service.  Did you set that number up for us?"

17         You know who set that number up:  Anthony Murgio and

18  Yuri Lebedev and because they couldn't keep their lies straight

19  they didn't even realize that after the Collectables Club

20  members were no longer involved in these shenanigans that that

21  telephone number went down, that it no longer works, they just

22  had it up on the website anyways.

23         Here's another lie that Yuri Lebedev helped tell on

24  November 4, 2014, Government Exhibit 1389-C.  Subject:  Collect

25  PMA site from Yuri to Anthony Murgio.  This is a conversation

1    the two of them have in early December right when they're

2    trying to gain back control of HOPE FCU.  They want to make

3    sure that they're not disqualified based on lack of membership

4    or lack of being within New Jersey.  So Anthony asks, "Yuri,

5    need you to put on Collect PMA site somewhere, on footer or

6    something, as well as contact us page the headquarters, 216

7    River Avenue, Lakewood, New Jersey," the same address that

8    Trevon Gross suggested way back when that they use, the one

9    that Kapcharge had that virtual office at.  And Yuri Lebedev

10   responds on December 4, "Taking care of it now."

11        And you know that that's actually what they did on the

12   website because you heard the testimony of Special Agent Jarrow

13   that after he had already done some undercover work on Collect

14   PMA and realized it was a phony site, he went back in the

15   middle of December and realized that, lo and behold, that there

16   was a Lakewood, New Jersey address he had never seen before,

17   and that that was strange to him because he was investigating

18   these people from Florida.  Well, it was Yuri who put that lie

19   up on the website.

20        And here on Government Exhibit 6121 is that letter

21   dated January 7, 2015 that was sent to Jane Walters at the NCUA

22   stating, "We are all members of an association headquartered in

23   the Lakewood, New Jersey.  And based on the rules that are

24   eligible for membership as voting members of Helping Other

25   People Excel Federal Credit Union."  This is after all the

 1    bribes had been paid.  This is after they had been elected to

 2    the board.  It was after that November 22 meeting where Trevon

 3    threw down the gauntlet and said you need to make this payment

 4    by Monday our we're out.

 5            So they have a dispute and they try to get back

 6    control of the board.  Who signs that letter?  Yuri Lebedev,

 7    one of the three people who signs it, along with Ricardo Hill.

 8            And it's not here on the slide, ladies and gentlemen,

 9    but if you go to Government Exhibit 6121 there is another

10    interesting fact that's there.  There is a Lakewood address

11    that's listed, not the 216 River Avenue, but one that says 10

12    La Quinta Lane.

13            How do you know that address?  Well there's a

14    stipulation between the parties.  Frank Oswald, the cousin of

15    Anthony Murgio, lives at that address.  And in that stipulation

16    it says that the Collectables Club was never headquartered

17    there, never had any operations there.  In fact, it was just

18    another lie to the NCUA.  And because they knew that the 216

19    River Avenue wasn't really their address, it was just a sham

20    virtual office that they shared with Kapcharge until they did

21    that frantic move when Meg Flok was there.  They knew that they

22    couldn't get mail sent there.  So, instead, they put their

23    cousin's name, Anthony Murgio's cousin's name and address on

24    this document so if the NCUA responded they would actually get

25    the mail.

1          Your Honor I have some left and I think --

2          THE COURT:  We'll break for lunch, ladies and

3     gentlemen.  We will start back up promptly in an hour.  I do

4     want to make a note about the schedule.  As you can see, we're

5     at closing arguments.  After each side presents their closing

6     arguments I will instruct you as to the law and you'll begin

7     your deliberations.  And that means your deliberations will

8     begin by tomorrow morning.  Once your deliberations are

9     complete your work will be finished.

10          Now at the outset of the trial I gave you the parties'

11    best prediction that the case would be concluded by tomorrow.

12    You should take as long as or as short as necessary to conclude

13    your deliberations using the instructions that I will give you.

14    A few of you have indicated to Ms. Nunez potential scheduling

15    issues if the process were to continue until next week.  In the

16    event that the deliberation process continues into next week,

17    if any of you have unmoveable conflicts that may interfere with

18    this schedule, please let Ms. Nunez know as you go into your

19    lunch break so that I can address it.  See you back at -- it's

20    12:55.  We'll see you at 1:55.  Thank you so much.  Enjoy your

21    lunch.

22          (Jury excused)

23          (Continued on next page)

24

25

1           (In open court)

2           THE COURT:  Matters to address?

3           MR. KLINGEMAN:  I just have a request, your Honor.  If

4  the Court staff at some point during the lunch hour could

5  provide me with page 23 of the final jury instructions.  It's

6  the jury instruction number 18.  I just --

7           THE COURT:  Sure.

8           MR. KLINGEMAN:  I'm missing a hard copy other than the

9  one I've marked up.

10          THE COURT:  Sure.  Happy to do that and I will be

11  doing the production of the charge with copies for everyone

12  during the lunch break but happy to do that now.

13          Anything else?

14          Let's meet back in 45 minutes so that if we do have

15  scheduling issues we can address them and I'll ask again for --

16  I'll ask for confirmation of agreement as to the exhibit

17  list -- actually I guess we can do that -- we can do that

18  tonight given we're -- I guess that's right.

19          So you'll finalize the exhibit list and the set of

20  materials that will go to the jury since -- no matter what, I'm

21  not going to get through the charge today, even if I start it.

22          See you in 45.  Thank you.

23          (Luncheon recess)

24

25

H39KLEB5

AFTERNOON SESSION

1:47 PM

(In open court; jury not present)

THE COURT:  Matters to take up?  Nothing?

What we learned from the jurors:  There's one juror who is asking me to contact her supervisor.  I'll do that if we don't finish tomorrow, I think.

One juror who needs to leave 20 minutes early tomorrow.  And one who has a medical appointment on Monday and would need to leave by 4:00 p.m.  That, I think, we can accommodate.

MR. NOBLE:  Yes.

MS. CHOI:  Your Honor, just so your Honor is aware, I have taken the opportunity during the lunch break to significantly shorten what I have left in an attempt for us to all be able to finish today.  So I think I don't have that much longer.  It's still a little bit, but it's not nearly as much as I had anticipated.

So I do think that your Honor is correct that, at best, we're going to start the charge, but probably not finish it.

THE COURT:  You think you have like 15, 20?

MS. CHOI:  Probably between 20 and 30, but not more than that.  And I am going to try to shorten it as I go.

THE COURT:  That's 2:30.  Mr. Creizman thinks about an

1    hour and 15, so maybe we get to the mid-afternoon break at

2    3:15, back at 3:30.  Mr. Klingeman had said one to two hours.

3    And then a short rebuttal.

4             MR. CREIZMAN:  Your Honor, would it be too much to ask

5    for like a short five-minute break between the government's

6    closing and mine, just to get set up and organized?

7             THE COURT:  Yes, we can do that.  All of these

8    things --

9             MR. CREIZMAN:  I will be as efficient as possible.

10            THE COURT:  There won't be time for the afternoon

11   break.

12            MR. CREIZMAN:  Right, that's the thing.  Even a

13   short --

14            THE COURT:  How much time do you need to set up?

15            MR. CREIZMAN:  I mean, really like two, three minutes.

16   I just want to make sure I have everything together, that's

17   all.  And the people who might do the slides, that's all.

18            THE COURT:  You're asking me to send the jury out of

19   the courtroom for that?

20            MR. CREIZMAN:  No, no.  If they want to step up and --

21            THE COURT:  All right.

22            MR. CREIZMAN:  Yes, that will be fine, a stretch

23   break.

24            THE COURT:  Okay.  That's where we are.  It sounds

25   like realistically, Mr. Klingeman, I think if you're at an

1   hour -- you had said one to two.  If you're at an hour, we get

2   to the rebuttal.  If you're at two, we don't.  That isn't in

3   any way to put pressure on you, I just know it's something

4   you've been concerned about.  That's where we are.

5           Ms. Choi, I can't say strongly enough, cut where you

6   can.  You'll be more effective if you focus here as much as you

7   can.

8           MS. CHOI:  Your Honor, I think I've done that going

9   forward, so we'll see.

10          THE COURT:  Mr. Creizman, do you still estimate an

11  hour and 15 or so?

12          MR. CREIZMAN:  I think that's probably correct.  Maybe

13  less.

14          THE COURT:  As I say, there's a juror who's asked me

15  to contact her supervisor.  It's one of the people whose

16  supervisors I spoke to previously.  And then we have a juror

17  that needs to leave 20 minutes early tomorrow, which I think on

18  that one, we'll have to plan to end -- I'm bringing in lunch

19  for them anyway, so there's no issue around that, they will

20  deliberate over lunch, and I will tell them that we will end

21  tomorrow at 4:40.  Okay?

22          Let's get them, if they're all here.

23          (Continued on next page)

24

25

1          (Jury present)

2          THE COURT:  Ms. Choi, you may proceed.

3          MS. CHOI:  Thank you, your Honor.

4          So, before the break, we went through a substantial

5     amount of material, and I just wanted to briefly summarize what

6     we've been through so far.

7          So, as you recall, we began with the evidence against

8     Yuri Lebedev relating to bank and wire fraud, and that has to

9     do with his role in maintaining the sham websites and the

10    servers that were necessary to trick the banks and the payment

11    processors.

12         The second category, what we discussed, was the

13    evidence of corruption.  Eight different categories of

14    corruption, ways that you know that both Lebedev and Gross

15    acted with the requisite intent, corrupt intent.

16         So we're on the lies.  And there are two reasons why

17    you should care about the lies that were told to the NCUA.

18         First, because, as you will hear from Judge Nathan,

19    the defendants are charged in a conspiracy with four objects:

20    Making corrupt payments, receiving corrupt payments, and false

21    statements to the NCUA, as well as obstructing the NCUA's

22    examination.  And it's because of those lies, the lies that

23    were told to the NCUA, that the two of the four objects are

24    relevant in your deliberations.

25         But the other reason why you know that the lies are

1   important here is because it's evidence of what is at the core,

2   which is that these defendants and their coconspirators acted

3   with corrupt intent.

4        So lie number five, the Tallahassee branch.  You

5   recall the Tallahassee branch of HOPE FCU, a fact that

6   Mr. Gross knew everything about because he's the one who made

7   the arrangements for that server to be sent for Ricardo Hill to

8   deal with the ACH processing there.  And you also know from the

9   testimony of Ms. Flok from the NCUA about how it's important

10  for the NCUA to know all the branches of the credit union and

11  where things like ACH transactions are actually being

12  processed, because they need to make sure, for example, that

13  there is adequate network security to protect the sensitive

14  information of the credit union and also to make sure that the

15  people who are accessing the back end have the qualifications

16  and are doing so with authorization.

17       Now, her testimony didn't even make reference to the

18  existence of a Florida branch because it's so outlandish on its

19  face, that there would be no reason for her to suspect, when

20  she was there in November of 2014, that it even existed.

21       But you know it existed, ladies and gentlemen, because

22  you saw in Government Exhibit 58 that string, that wire that

23  went from the closet on the left-hand side with the server to

24  the operating area of Coin.mx, where Ricardo Hill sat there

25  every day, and manually typed in all of those ACH transactions,

1    and made sure that they were adequately processed, and showed

2    up in the system.

3          Now, that's precisely what's going on.  ACH

4    transaction work in an unauthorized and undisclosed location in

5    Florida.

6          Mr. Gross took the stand about this question, and

7    what's his excuse this time?  Well, upon stating on direct

8    examination that he was no expert in ACH, he lectured Mr. Noble

9    on cross-examination at great length about how Ricardo Hill,

10   whatever he was doing on that GUAPLLE server in Florida, was

11   not actually work in furtherance of processing the ACH

12   transactions, but only to reconcile the transactions against

13   the HOPE FCU system.

14         Well, you should reject that excuse, ladies and

15   gentlemen, because at bottom, whatever the precise contours of

16   what Ricardo Hill was doing, you know that he was the only

17   person working full time on these ACH transactions for HOPE

18   FCU.  He was the only person ensuring that the millions of

19   dollars of transactions came in, that Kapcharge's

20   million-dollar wires on a daily basis were processed and posted

21   to the accounts at Alloya so that the transactions could

22   happen, and he was doing that work because Kapcharge had asked

23   for it.  It was done in relation to the ACH processing that

24   Kapcharge wanted to do at HOPE FCU.

25         And you've seen throughout the course of this trial

1    all of the emails that show that Gross was intimately involved

2    in the process, all the while never disclosing on Government

3    Exhibit 7111 or 7112 on the certifications that were made by

4    HOPE FCU -- sorry, 6111 and 6112, never disclosing on the last

5    page of those certifications, where they tell the NCUA who all

6    the board members are and where all the locations are that they

7    do business, never once mentioning the existence of the

8    Tallahassee office.

9              So then we get to lie number six, the net worth ratio.

10   And we've talked a lot about this over the course of the trial.

11   I'm not going to bore you with the ins and outs of accounting,

12   but I'm going to hit the highlights, what you actually need to

13   know about what happened here.  If you recall, Ms. McDowell

14   took the stand and explained to you that she had told -- and

15   it's in the phone call with Alloya in September -- where she

16   told Mr. Gross that her concern and Alloya's concern was this

17   was going to blow up their balance sheet.

18             What did they mean by that?  Well, as you know, the

19   5300 Call Reports say what the financial situation is as of the

20   end the quarter, as of the end of September 30th, 2014.  And

21   they're supposed to actually accurately depict the financial

22   situation of the credit union because that's what both NCUA

23   examiners and NCUA employees rely on in assessing the

24   well-being of a credit union, but also people like Alloya,

25   people that work at corporate credit unions or interact with

1    them, interact with places like HOPE FCU, they're supposed to

2    be able to rely on that data to be accurate.

3            Well, ladies and gentlemen, this is a classic case of

4    cooking the books.  You know this because on the HOPE FCU

5    statement, at GX 790-A, as of the beginning of September 30th,

6    2014, at page 15, you'll see that the balance on the books for

7    the Kapcharge account, 6527, was $2.75 million.  Now, if they

8    had disclosed that amount on their call report, you know that

9    they wouldn't be adequately capitalized.  Well, how?  Because

10   of what Meg Flok told you, which we'll get to in a second.  But

11   this is how you know that that's intentional, and that this is

12   not just some sort of error on the part of HOPE FCU, because

13   they're a small credit union, you know it's intentional because

14   Mr. Gross knew precisely what he was doing.

15           If you recall, there was -- one of the many phone

16   calls that you listened to was Government Exhibit 2502, with a

17   transcript 2502-T, and in this call, it was the people from

18   Kapcharge, and Gross, and people from the Collectables Club.

19   And on that call, they discuss their concern about the

20   September 30th date, because they know if they actually reflect

21   the true nature of Kapcharge's business, the capitalization

22   ratio will be totally out of whack.  You'll also see on that

23   call, that they come up with a plan.  The plan is suggested by

24   Mr. Gross, which is that they'll just move some money out of

25   Kapcharge's account temporarily so that they don't have to

1    report it to the NCUA, and then they will reverse course.

2              Now, that doesn't sound right to you, ladies and

3    gentlemen, does it?  And it didn't sound right to the people at

4    Kapcharge either.  If you look at that transcript, Shoula

5    Cohen, Mark Francis' right-hand woman, is the one who said I

6    don't think this looks very clean, I'd rather come up with a

7    better plan.  But she agrees to it, because they find

8    themselves in mid-September with millions of dollars of wires

9    going through on a daily basis.

10             So what do they do?  Well, Government Exhibit 2166.

11   There, on September 30th, they say that they sent in -- that

12   is, Kapcharge has sent in a wire for $2.25 million.  Obviously,

13   given what the balances are that you just saw, that would cause

14   a huge problem if they were to post it that day.

15             So what did they do?  Trevon Gross asks Ricardo Hill:

16   Did you post the wire transfer?  Ricardo says:  No.  You said

17   not to.  And Trevon Gross said:  Our balance was still high

18   last night.

19             When does he say that?  October 1st, 2014, at

20   9:46 a.m., because he's concerned about what the balances are

21   going to look like in that Kapcharge account.

22             And you also heard Ricardo Hill explain to you why he

23   was doing that, and that it was Trevon Gross who had instructed

24   him not to post that wire the day that it actually came in

25   because they were worried about the capitalization ratio.

1          Here it is.  That wire came in on September 30th,

2     $2.25 million.

3          So what do they come up with?  Well, they hatch a

4     plan.  2163, Government Exhibit, first, they decide not to post

5     the wire that day.  That definitely went into the account of

6     Kapcharge, it should have been there.  Second, they decide that

7     they're going to play some hanky-panky with the numbers.

8     Trevon Gross:  We're not going to post anything to the account

9     today, meaning on September 30th at 3:19 p.m. mid-afternoon

10    when they know that the financials are going to close at the

11    end of the day, so we will only work with that 919K and bring

12    it down to 300K.

13         And then Kevin Pepe says:  We just need to make sure

14    that we have enough funds in Alloya to cover the 1.5 million

15    going out tonight, and we aren't sure how your journal entry,

16    will it affect that balance?

17         So they're trying to both make sure that there's

18    enough money to cover those ACH transactions, but also trying

19    to make sure that they bring it down to 300K from 919K.

20         So what does that really mean?  Well, let's take a

21    look.

22         End of the day September 30th, 2014, you see that the

23    balance should be 91,926,059 cents, almost exactly what they

24    predicted it would be in the previous exhibit at the end of the

25    day.  So, lo and behold, what happens?  There's a phone

1    operator check.  What's that?  Well, instead of a paper check,

2    they just decide to have a phone operated check as if someone

3    had dialed in and asked for that money to be moved.

4    Conveniently how much?  $319,000, thus dropping the ending

5    balance to $300,000 -- sorry, $619,000 -- I'm sorry, I guess

6    I'm having difficulty with numbers -- dropping the number down

7    to $300,000.

8            And that's important because that's the number, ladies

9    and gentlemen, that they can rely on in coming up with their

10   net worth ratio in that call report.

11           And what do they do with that incoming wire that came

12   in on September 30th?  Well, look at page 17 of the statements.

13   It gets posted.  Not on September 30th, but two days later,

14   just as Trevon Gross instructed Ricardo Hill.

15           And here is the evidence that this is manipulation:

16   In conjunction with the transcript of a call that you listened

17   to on Tuesday, September 30th, 2014, at 3:37 p.m., Kevin Pepe

18   starts the plan that they had all agreed to:  "Hello, Trevon.

19   Please cut Kapcharge a check for $619,240.59 for their account

20   today."

21           Well, what happens?  That check goes through.  And

22   then what happens?  Shoula Cohen, on October 6th, 2014, again

23   in Government Exhibit 2173, asks for the cancelation of that

24   check request.  It's a large amount, it's a convenient amount,

25   and it was canceled conveniently after the September 30th

1  deadline.  And what does Trevon respond?  By tomorrow morning,

2  it will be reversed.

3          And, lo and behold, the next morning, October 7th,

4  2014, there is a reversal of that check that shouldn't even

5  have been taken out, just to make sure that the balance wasn't

6  reflected accurately of $3.7 million.  Instead of the $300,000,

7  $3.7 million.

8          So I'm not going to bore you with actually doing the

9  calculations, but this is what I will say:  You remember that

10  Ms. Flok testified that when she was on the campus, she asked

11  for the September 30th financials from the Aries download, and

12  the reason she asked for that was because that was quarter-end,

13  but that she received instead from Mr. Gross the end of October

14  of 2014.  And she thought it was a mistake.

15          Well, Mr. Gross, on the stand, did tell one truth.  He

16  said, yeah, it was a messup.  He didn't intend to give it on

17  that date, he didn't intend to give them the snapshot as of

18  October, the end of October, he wanted to give them the

19  snapshot as of the end of September.

20          What did that mean?  Well, all of this careful

21  planning that he had done with Kapcharge, to make sure that

22  they had that voided phone check of $619,000, the careful

23  planning with Rico Hill to post that wire after the

24  September 30th date, that was all for naught because Meg Flok

25  saw the real financials at Kapcharge as of October, the end of

1   October, and she realized, when she did that

2   back-of-the-envelope calculation, that capitalization was at

3   3 percent.

4           Ladies and gentlemen, this is deliberate.  This is a

5   deliberate lie on the part of Trevon Gross, that required

6   deliberate action on the part of him and others at Kapcharge,

7   to manipulate the books, to keep from the NCUA the truth of

8   what was going on at HOPE Federal Credit Union.

9           So what did Meg Flok do when she did that

10  back-of-the-envelope calculation?  Well, you heard her.  She

11  told Trevon to stop all ACH processing.  Why?  Because they

12  were thoroughly uncapitalized at this point.  She knew that

13  because she had seen the real books, because Trevon had screwed

14  up and not given her what she had asked for.  And so she said

15  that on November 21st, 2014, Trevon agreed that they would stop

16  ACH processing on November 24th, 2014.  But as you heard the

17  other NCUA witnesses and Ms. Flok say, they continued to

18  process ACH after that date.  So another lie from Trevon Gross.

19          How did Mr. Gross come up with an excuse for this one?

20  Again, sorry, Government Exhibit 6103, for that net worth

21  ratio.  Well, after concluding or testifying on

22  cross-examination that this was a mistake, his excuse was that,

23  I only thought she meant TransferWise.  I didn't think she

24  meant Kapcharge entirely, so we just cut off TransferWise.

25          Well, that's a little convenient, ladies and

1   gentlemen, I think, because let's go to the record.  What

2   happens at GX 4509, contemporaneous to the time that she is on

3   campus at HOPE FCU.  We're coming back.  Cool.

4           Trevon Gross:  "Just pass through and grab your stuff.

5   They want Kapcharge cut off immediately until they say we can

6   process for them."

7           "Okay.  They still there?"

8           "Yes.  She wanted to stay later, but I said we were

9   closing."

10          "Is she coming back?"

11          That's corroboration of Ms. Flok's testimony, if you

12   recall, because she said, all of a sudden, they said that they

13   needed to leave early, and so she couldn't complete her

14   examination, which is why she had to come back later.  And this

15   is evidence from the time frame.  Trevon Gross doesn't say they

16   want to cut off TransferWise.  He understood that when Meg Flok

17   said that there were concerns on the ACH transactions, they

18   wanted Kapcharge to be cut off immediately, and you know that

19   that's not what they did.

20          Now, one last example of how you know all of these

21   lies were intentional.  I suspect the defense counsel is going

22   to make some -- spend some time explaining how, after December,

23   HOPE FCU went and hired this totally separate CEO, Charles

24   Blue.  And if you recall in the opening statements,

25   Ms. Santillo said this was all an arm's-length transaction

1    there on out, Charles Blue had nothing to do with the 2014 --

2    the earlier 2014 transactions, and he was making all of his

3    decisions about the business of HOPE FCU totally independently.

4          Well, let's look at what happened when Charles Blue

5    did that.  In Government Exhibit 3025, Christine Carida writes

6    to Charles Blue in April of 2015, saying:  "Attached please

7    find the completed questionnaire along with completed due

8    diligence requirements.  We have attached the 2014 income tax

9    returns and employee screening forms for your reference."

10         So, Mr. Blue takes a look at that and asks:  "Please

11   explain to me how your U.S. tax return reflects no revenue or

12   taxable income."

13         Christine Carida tells him the truth:  "Hi Charles.

14   The tax return for 2014 is at zero because we didn't have a

15   physical location in the United States at the time, and we were

16   processing with another bank.  For this reason, the revenues

17   have been reflected in Kapcharge, Inc., our Canadian

18   corporation."

19         So that's curious.  Charles Blue responds:

20   "Christine, I am still not sure I understand.  We had over

21   $80 million of ACH flow through our CU in 2014.  I don't think

22   having a physical location in the U.S. (note:  We indicated to

23   the NCUA that we did have a Lakewood, New Jersey location in

24   2014 and it was on your account application) is a determining

25   factor on if the revenue generated from these transactions are

1    taxable in the U.S.  I don't want to raise any red flags with

2    the examiners, so I want to understand thoroughly before I pass

3    the information along."

4         So what does Trevon say?  He writes back just to

5    Charles Blue:  "Why are you pushing this?"  And Charles Blue

6    tells him the honest answer:  "Because I have to give their tax

7    returns to examiners, and they will ask the same questions."

8         That's how you know there's corrupt intent, ladies and

9    gentlemen, because Trevon Gross knew there was no physical

10   location, and once Charles Blue came in and was examining the

11   books himself, he realized that he had been told a series of

12   lies about what was happening in 2014 by Trevon Gross and

13   Kapcharge.  They were never in Lakewood, New Jersey, and, yet,

14   he repeatedly said that to the NCUA.

15        So one point I want to make here is about those wire

16   transfers I was just talking about that Rico Hill helped make

17   sure went through the pipes for the ACH origination to occur.

18        Now, if you recall, when he was on the stand, in

19   Government Exhibit 2142-2-2, you saw -- and just generally all

20   the government exhibits that start in 2142, you see that there

21   are a series of emails where Kapcharge would send Trevon Gross

22   and Ricardo Hill previous-day originations and incoming wire.

23   And if you actually look at the wire and details, they say that

24   the intermediary bank that was used to get those wires from

25   Canada to the United States was HSBC Bank USA National

1  Association in New York City, or the Southern District of New

2  York.

3          So why does this matter?  Well, because one other

4  thing the government needs to prove, I expect Judge Nathan will

5  inform you, is that with regard to all of the counts that we

6  have in this case, we have to prove that some part of those

7  crimes happened here in the district.  Ladies and gentlemen,

8  with respect to the wire fraud and bank fraud charges of Yuri

9  Lebedev, you've already seen that the Coin.mx transactions

10  touched upon the Southern District of New York because Special

11  Agent Jarrow was in the Southern District of New York when he

12  did his credit and debit card transactions, and you saw from

13  the Chase documents that there were plenty from New York City

14  and Scarsdale, New York, also in the Southern District of New

15  York, transactions that happened on behalf of Chase customers

16  through this miscoding.

17          Now, venue is also clear on the bribery counts as

18  well.  First, each of these daily wires from Kapcharge were

19  necessary for it to fund the ACH transactions, which is the

20  whole point of this corruption to begin with, were sent using

21  this HSBC account in the Southern District of New York.  This

22  one example is sufficient, but if you care, you can look at the

23  entire series of 2142 and see that they all had wire transfer

24  confirmations.  And you can also look at Government Exhibit

25  862, which is the data from HSBC Bank, and Government Exhibit

808-B, which is Alloya's data about the wires that went

through, and they all followed the same pattern:  Bank of

Montreal's Kapcharge account through an intermediary bank, HSBC

Bank USA, in the Southern District of New York, straight to

HOPE FCU.

          Second, you heard from the Bank of America witness,

and you will also see a stipulation in evidence between the

parties, that, well, first, there were two transfers of wires,

the first two $15,000 payments that went through the Fedwire

using Bank of America's Federal Reserve account in the Southern

District of New York, the first wire May 19th, 2014, and the

second one on May 21st, 2014.  You can go to the underlying

documents about that.  They were processed the exact same way.

          Now, I suspect that for these wires, that

Mr. Klingeman may make the argument to you that it's not

reasonable to expect Mr. Gross to foresee that these wires

would pass through the Southern District of New York.  But ask

yourself if that makes sense to you.  He's the chairman and CEO

of a federal credit union.  You saw him testify.  He's a

sophisticated individual.  He knows how the finances work.

He's a lot more savvy at banking than most, and he received

frequent emails from Kapcharge attaching wire transfers from

Kapcharge indicating that these wires were transferred through

Manhattan, an address there.  So ask yourself whether or not it

was reasonably foreseeable to him.  He could have gotten those

1     wire transfer records himself.  It was part of his bank

2     account.  He knew what was going on.

3             Third, you can see that Tensor 2D, which is one of

4     Lebedev's companies that was doing a bunch of work for HOPE

5     FCU, as you see it, for example, in Government Exhibit 1995-03,

6     was headquartered in Spring Valley, New York.  Spring Valley,

7     ladies and gentlemen, is in Rockland County, which Lebedev

8     knows, because Government Exhibit 1995, he received himself.

9     It's an invoice that was emailed to him and Anthony Murgio

10    relating to HOPE website work, and that's just one example of

11    many invoices that Tensor 2D have in this case.

12            Finally, the last way that you know that there was

13    venue here is if you go to the summary witness -- that's

14    Mr. Rollins' testimony -- and his slides, Government Exhibit

15    900 at 105, he did a location analysis to figure out when

16    Trevon Gross was in the Southern District of New York.  You

17    just have to find one example of one email that he either

18    received or sent when he was in the Southern District of New

19    York.  The evidence is replete with them.  You can look at the

20    exhibit list yourself, if you're curious, but I'll give you

21    just two examples:  One, Government Exhibit 1157, when Trevon

22    Gross discusses the HOPE FCU website with Mr. Lebedev and

23    Mr. Murgio on June 6, 2014, and two, Government Exhibit 1158,

24    when Ricardo Hill sends his picture for account opening on

25    June 7, 2014, to Trevon Gross while he was in the Southern

District of New York.

There are hundreds of documents in this case.  Dozens upon dozens of the emails were sent and received while Trevon Gross was in the Southern District of New York.  Obviously, it's reasonably foreseeable to him that he was in Manhattan.

Now, I'm going to sit down in a few minutes, but I'd like to share a few final thoughts.

This is an important case.  It's important for the defendants for obvious reasons, but it's also important to the government.  And I know from the close attention that you've paid over the last few weeks and the notes that you've taken, that it's also important to you as well.  But make no mistake, ladies and gentlemen:  This is not a close case.  This is a simple case.  If you apply your common sense, you know that the defendants are guilty, that both Yuri Lebedev and Trevon Gross acted with corrupt intent, and that Yuri Lebedev knew precisely what he was doing when he was tricking banks about the true nature of Coin.mx.

The evidence is overwhelming.  Hundreds of emails, WhatsApp messages from Anthony Murgio's phone to both of the defendants, the documents from the NCUA, the recordings, and the witnesses, and the financial records, including those of Trevon Gross, Hope Cathedral, and the other entities involved.

Now, you've listened closely to the evidence, and once closing arguments are finished, you'll be instructed by Judge

1    Nathan on the law, but your job will be to apply your common

2    sense to determine whether or not the evidence makes sense in

3    light of the law.  And we're confident that once you deliberate

4    on what you've seen and heard over the last few weeks, and you

5    apply that, your common sense, you'll return the only verdict

6    that is consistent with the evidence - that both defendants,

7    Yuri Lebedev and Trevon Gross, are guilty on all counts.

8           THE COURT:  Thank you, Ms. Choi.

9           Mr. Creizman, if you want to take a few minutes to get

10   set up at the podium?

11          MR. CREIZMAN:  Yes.  Thank you, your Honor.

12          THE COURT:  While he's doing that, ladies and

13   gentlemen, I'll just invite you to stand and stretch.

14          (Pause)

15          THE COURT:  Thank you, Mr. Creizman.  When you're

16   ready, closing argument on behalf of Mr. Lebedev.

17          MR. CREIZMAN:  Good afternoon, everyone.  It's nice to

18   actually be able to talk directly to you again.  And I want to

19   thank you, on behalf of my client, on behalf of my team,

20   Ms. Madrigal, Mr. Michaelson, for being so attentive during

21   trial, for putting up with us for about four weeks, and we

22   appreciate it.  And I know you listened carefully, and I know

23   that you are going to do what you promised to do, and that is,

24   deliberate with an open mind, put the government to its proof,

25   and give Mr. Lebedev a fair trial.

1      I listened to Ms. Choi's presentation, which was very

2   impressive.  But I didn't remember a lot of this at trial, and

3   the reason why I didn't remember a lot of this at trial is

4   because most of the materials that Ms. Choi relied upon to say

5   that Mr. Lebedev committed the crimes he's charged with, well,

6   they're all in some documents, they're in texts, they're in

7   emails, that were never addressed by any witness.  No one gave

8   these things context, no one talked about them.  Anytime a

9   witness actually got on the stand -- and you've heard each of

10   them yourself, you've heard Jose Freundt, you've heard Jen

11   Wotherspoon, and you heard Rico Hill -- each and every one of

12   them said at the time -- and, by the way, you will be able to

13   have the cross-examinations, you'll be able to have the direct

14   examinations read back to you, but the point is that each of

15   them said at the time, when I was actually working for Coin.mx,

16   I didn't think I was committing crimes, I didn't think this was

17   an illegal business.

18      Rico Hill and Jose Freundt, they're at the same

19   meeting.  They didn't think this was a crime.  They were

20   sitting at the same November 22nd meeting, and they didn't

21   think there was a bribe.  They didn't think they were doing

22   anything wrong.  Each and every one of them said that.  No one

23   got up there and said -- other than point at Yuri Lebedev at

24   the beginning of each direct examination and said he did a

25   crime with me, right?  None of them.  None of them whatsoever.

1    None of them, to a person, said any facts that would suggest

2    that they knew Yuri Lebedev or saw Yuri Lebedev commit a crime.

3    Other than Jose Freundt, none of them even really knew Yuri

4    Lebedev.  None of them met Yuri Lebedev more than maybe a

5    handful of times.  None of them communicated with Mr. Lebedev.

6           And with Mr. Freundt, who on the witness stand, said

7    when Anthony Murgio came to him with this idea for HOPE FCU,

8    what does he say, who does he reach out to?  Not Rico Hill, not

9    anyone but Yuri Lebedev.  Why?  Because Yuri Lebedev is a

10   straight shooter, because he knows -- he wants to make sure

11   this is legitimate.  And who does he call?  Yuri Lebedev,

12   because I can trust that guy, right?  I knew him from college,

13   and I can trust him.

14          Now, what we've seen in this case is precisely what I

15   predicted in my opening statement.  It was a hodgepodge of

16   texts, chats, emails, recordings, business records,

17   photographs, some of them having to do with my client, some of

18   them having nothing to do with him, most of them involving

19   other people.  And they're all arranged in an order and

20   presented in a manner to maximize all of this smoke around Yuri

21   Lebedev.  But if you look beyond the smoke, if you dig beneath

22   the surface, there's no fire here.  There's no fire with

23   respect to Mr. Lebedev.

24          The government's case is marked by overreaching and

25   reliance on evidence that's designed to prejudice, but has no

1   substance.

2          I'd like to -- Mr. Michaelson, if you could show slide

3   1, please.

4          I'm about to show you exhibits that are in evidence.

5   This is Government Exhibit 79.  It's a map of Azerbaijan.  Why?

6   Because Coin.mx used an Azerbaijani credit card processor.  And

7   so how problematic -- how visceral is it to see a map of

8   Azerbaijan?  What in the world does this have to do with Yuri

9   Lebedev?  Absolutely nothing.  Yuri Lebedev had nothing to do

10  with credit card processing at Coin.mx, he had nothing to do

11  with Azerbaijani credit card processors, he had nothing to do

12  with Baku, and I want to call the government on this kind of

13  stuff.  When you go through the exhibits, look for this, look

14  and see what you -- see if this is really necessary to prove

15  the government's case to you.  Or is this something that

16  screams out, hey, we don't have enough of a case, let's point

17  to Azerbaijan, and show a map of Azerbaijan, and what kind of

18  Azerbaijani credit card processors, so everyone who was

19  involved or even touched Coin.mx is guilty.  But Mr. Lebedev

20  didn't know about Azerbaijani credit card processors, he didn't

21  look at a map of Azerbaijan.

22          Not relevant.

23          Let's go to slide 2.  That is Michael Murgio's house

24  in Florida.  It's a nice looking house.  There are palm trees

25  out there.  It looks like the man lives pretty well.  Does it

have anything to do with Yuri Lebedev?  No, it doesn't.  What

are the interactions that Mr. Lebedev had with Michael Murgio

other than with respect to dealing with the NCUA?  But what

does the government show?  Does the government show Mr. Lebedev

living high on the hog?  No, because they can't because he

isn't.  Because what do they have to show for it?  Michael

Murgio's nice house.

          And then the next slide, please.

          His Corvette.  Well, I didn't see Mr. Lebedev drive

around in his Corvette.  And what does this have to do with the

case, but that was what we spent the first couple of days on,

these kinds of exhibits.

          Let's go to the next slide.

          That's a nice home in Israel of Gery Shalon, whom

there's been no evidence in this case whatsoever because there

is no relationship -- of any relationship between Mr. Lebedev

and Gery Shalon, and there is no relationship.  Mr. Lebedev --

there's no evidence that Mr. Lebedev traveled to Israel and

hung out at Gery Shalon's house, or did anything with Gery

Shalon, or had any idea what Gery Shalon did.  But this is what

the government showed you in this case.

          The government's case, it's a huge, impressive

production with hundreds of exhibits maybe, weeks of witness

testimony, but in order to prove Mr. Lebedev guilty of the

crimes that he's charged with, they need to come up with the

1    evidence that implicates Mr. Lebedev, that shows that he had

2    the state of mind sufficient to commit a crime, and they have

3    to prove that to you unanimously beyond a reasonable doubt.

4              The Judge is going to instruct you on the law, and I'm

5    not going to do that for you.  But I do say that -- and the

6    Judge instructed you this at the beginning:  From the beginning

7    of trial through the end of trial and through your

8    deliberations, you are to presume Mr. Lebedev is innocent, and

9    the government has to prove this case beyond a reasonable

10   doubt.  The government's burden of proof, that's why they sit

11   closer to you.  The government's burden of proof, that's why

12   they get to come on after I do, after Mr. Klingeman does, and

13   get to deliver their final rebuttal summation.  And the reason

14   is because they have the burden that they have to meet.

15             And I'm sure the government is going to say that they

16   embrace this burden.  Well, let them embrace it, but you, as

17   jurors, have an obligation to listen to the government and put

18   them to the test, because I'm not going to be able to answer --

19   I'm not going to be able to get up and defend Mr. Lebedev or

20   answer their arguments.  But it's your job to do that because

21   that is what reasonable doubt is all about.

22             I want to talk about style over substance, which is

23   what I'm trying to get at in the government's presentation

24   here, the government's evidence here.

25             The government talked to you during its initial

1   summation, which you just heard from Ms. Choi, that Lightening

2   Payments, it's a payment processor, Yuri Lebedev processed

3   payments.  For what, Coin.mx, for HOPE FCU?  It's not --

4   Lightning Payments was not the payment processor.

5           The same exhibit the government showed you, Government

6   Exhibit 1411.

7           If you can bring that up.

8           You see there is no -- there's a complete lack of

9   evidence.

10          Here we go.  If we can -- I'm sorry, blow up -- I'm

11  sorry, I'm very tired, but let's blow up that first page.

12  Okay.

13          So, what is Lightning Payments?  Lightning Payments is

14  an ID verification system.  And how do you know that?  Because

15  take a look at what the subject line says.  Let's even look at

16  the subject line.  We don't even have to go that deep.

17  "Verification API."  API stands for application something

18  interface, right?  We all know that.  I'm not a genius at

19  computers, but API means application processing interface,

20  okay?  And then here we go.  We have verification API.

21          And if we go down a little bit.  Okay, that's good.

22  Thank you.

23          The convention is first call, begin verify to start

24  the verification status.  Provide customer request object.  And

25  we can go on and on.  This is not exactly exciting stuff.

1          If we can go to the second page for a second.  Yes.

2     And actually go --

3          You see there's address line, there's city, there's

4     state/province.

5          If we can go up one page.

6          It goes to date of birth, tax ID.  What you have here

7     is the problem that Coin.mx people talked to you about every

8     single day that they had.  They were having an issue with

9     chargebacks.  People would purchase Bitcoins or do a

10    transaction and then claim we never made that purchase, and

11    then they would call the credit card companies, and they would

12    say, hey, you know, we never made a purchase.  And what ends up

13    happening?  Who loses out?  Coin.mx loses out.  And this was

14    something that was very concerning to Anthony Murgio.

15         I'm sorry, you can take it down.

16         But this was something that concerned Anthony Murgio

17    greatly.  Why did it concern him greatly?  Because the

18    chargebacks cost him money, and chargebacks -- the more

19    chargebacks, the more the banks started paying attention, the

20    more they started closing down his accounts, the more they

21    stopped processing payments.

22         So what they wanted to do, they went through a whole

23    elaborate system.  Any customer at Coin.mx had to get on and

24    verify himself, and it was kind of odd.  You held up a -- I

25    think their ID, their government-issued ID, and they took a

H39KLEB5                    Summation - Mr. Creizman

1   photo of themselves, and, you know, they would get on with the

2   bank, they'd identify themselves if they wanted to purchase

3   more.  This would be a whole process.  And the purpose of this

4   was to confirm for the banks, so that if anyone challenged a

5   charge, Coin.mx would be able to go back and say, hey, this is

6   verified, we know that this customer bought it, the customer is

7   not telling the truth because there's a lot of fraud in this

8   area.

9          And that's what this was for.  This was a much more

10  elegant way of doing it than taking a picture of someone

11  holding up a credit card, like they had been taken hostage or

12  something.

13         It's clear, by the way -- and you can go through the

14  evidence, and you know what, the government is going to have a

15  chance on its rebuttal summation, they're going to have a

16  chance to show you that Lightning was a payment processor.  I'd

17  like to see him do it.  I would like to see him do it because

18  the most that you're going to see is a website that shows an

19  idea about Lightning Payments becoming a payment processor.

20  There's no evidence it was ever -- it ever processed any

21  payments whatsoever for Coin.mx, because it didn't.  It just

22  didn't.  And so check it out, and let's see if the government

23  can come through with that challenge.  Even if they do, that

24  doesn't mean this case is over.  Far from it.  But I'm just

25  saying I would like to see the government come up with that on

H39KLEB5                    Summation - Mr. Creizman

1    rebuttal.

2         The government just simply looks at things and sees a

3    crime where there is not a crime.  There are crimes here.  As I

4    said at the beginning, there was wrongdoing in this case.

5    There was wrongdoing at Coin.mx, and Anthony Murgio was

6    involved in that wrongdoing, but not everything about the

7    business had wrongdoing, and it was not obvious to everyone,

8    even the people who were there every single day, day in and day

9    out who worked there, didn't even realize it.  Yuri Lebedev

10   didn't work there.  He never visited it.  He wasn't in contact

11   with the people who worked there.

12        The government is like shooting and asking questions

13   later, except even worse, they're just not asking questions.

14   This is -- Lightning is a payment -- Lightning Payments,

15   payment processor, Yuri Lebedev processed payments for Coin.mx.

16   Not true, and there's no evidence of that.

17        Actually, my colleague, Melissa Madrigal, her

18   cross-examination of the government's summary witness,

19   Mr. Rollins, there's a slide there that she showed him that

20   basically encapsulates what I think is the government's

21   investigation here.

22        It's slide 6, if you have it.  Okay.  That's fine.

23        This is what it is.  Okay?  It's simple, but this is

24   the government's case in a nutshell.  They see one payment,

25   530536, from Anthony Murgio or Collectables Club, they count it

1   twice.  They see one payment for 417 to Intelligent VR, they

2   count it twice, one for Collectables Club, one for Anthony

3   Murgio.  And there's $6,000 more that they figured into Yuri

4   Lebedev's profits from this crime, right, his earnings from

5   this crime, $6,000 more than they even thought.  This is the

6   kind of investigation the government did.  But there's more to

7   it than that because Yuri Lebedev is not guilty of any of the

8   crimes the government charged him with.

9            You can take that down, whoever put that up.

10           Let's talk about bribery and bribery conspiracy.  Yuri

11  Lebedev made no payments to Trevon Gross or to HOPE FCU.  We

12  know that.  So that's part of a substantive crime of bribery.

13  There's also aiding and abetting.  And I'm going to argue to

14  you, and you're going to go through the evidence, but the

15  evidence is going to show he didn't facilitate the making of

16  any payments to HOPE FCU or to Mr. Gross.  And there's no

17  corrupt bribery conspiracy.  He didn't agree with the Murgios

18  to make corrupt payments to HOPE FCU or Trevon Gross.

19           Let me just be clear:  I don't agree that there were

20  corrupt payments that were made to HOPE FCU or Trevon Gross.  I

21  disagree.  But I'm saying, just Mr. Lebedev's involvement in

22  that, he did not make those payments.

23           Let's focus, though, on the corrupt intent because

24  that is what's important.  The government's theory:  The

25  government told you a number of reasons why there's corrupt

 1    intent in this case.  One of them is that the reason the

 2    Collectables Club -- and I'm going to call that -- use that

 3    term loosely, as the people who took over the -- like were

 4    going to be board members on HOPE FCU, because, otherwise, it's

 5    going to take me a while to say Murgios, Rico Hill, I'm just

 6    going to say Collectables Club, okay?  So when the Collectables

 7    Club wanted to integrate with the HOPE Federal Credit Union,

 8    the purpose was so that they could operate their unlawful,

 9    unlicensed money-transmitting business, Coin.mx.

10            So let's start off with, as far as Yuri Lebedev, there

11    was no corrupt intent because he didn't know Coin.mx was

12    unlawful.  And, as I said, every witness who testified, who

13    worked at Coin.mx, said to you that Anthony Murgio persuaded

14    them that this was a legal and lawful arrangement.  He didn't

15    have to get a license or he was licensed, he had dealings with

16    attorneys because this was a private-member association, okay.

17    Rico Hill said in his testimony, Murgio assured him multiple

18    times it was legitimate.

19            And you remember from my examination of Mr. Hill,

20    Mr. Hill had a very tough childhood.  He had to serve

21    significant jail time.  And when he got out, I asked him, you

22    weren't looking to go start committing crimes, you didn't want

23    to go back again?  And he didn't.  He actually tried to

24    rehabilitate himself.  We talked about this.  He became a

25    manager at Anthony Murgio's restaurant.  He was trying to do

1   good with his life.  All of a sudden -- he wasn't going out to

2   try to take a job to try to commit crimes for Anthony Murgio, a

3   job that wasn't that lucrative to begin with.

4           Jen Wotherspoon testified she drilled -- Murgio

5   drilled into us, like it was boot camp, that the setup as a

6   private membership association didn't -- made it not necessary

7   to obtain a license.

8           And if you remember, Jen Wotherspoon also testified --

9   I asked her about, there's an address on the Coin.mx website,

10  Frisco, Texas, right?  What's Frisco, Texas?  And what does she

11  say?  She says, I think that's where the lawyer who helped set

12  this whole thing up lived.

13          So Anthony Murgio convinced a number of people that

14  there was no issue with this being an unlawful

15  money-transmitting business.

16          And you had Jose Freundt.  He had a job, okay?  He was

17  working.  He actually had a job.  And he talked to Anthony

18  about this, and he says in his testimony:  I thought Anthony

19  Murgio found a way around the system.  I didn't know that you

20  could obtain basically a -- I didn't know that you could just

21  run this sort of Coin.mx business, but I didn't think there was

22  anything wrong.  Anthony Murgio persuaded me that this was

23  okay.

24          And while there were lies to banks, as we know,

25  there's evidence of that.  Coin.mx wasn't shy about advertising

 1    itself all over the place.  We watched a YouTube video, which I

 2    won't bore you with, but it had Ania Amador or Ania Asset at

 3    the Bitcoin conference, which was very exciting, okay, talking

 4    about Coin.mx, reporting from the Bitcoin conference, everyone

 5    could see that.  There were Facebook reviews.  And these are

 6    Defense Exhibits 2 through 8.  And you remember how proud Jen

 7    Wotherspoon was when she talked about these reviews, when she

 8    talked about getting a good review, when she talked about

 9    delivering good customer service.

10          There's no corrupt intent here.  There is no reason

11    for these people to take over the HOPE Federal Credit Union

12    because they thought they were operating an unlicensed unlawful

13    business.  That's not what this was about.

14          By the way, how about this one:  Jose Freundt

15    contacted the Secret Service to report a fraud, and not a fraud

16    that was even against Coin.mx, this was a fraud that was an

17    identity fraud scheme that he claimed happened.  He just

18    thought it was his duty to report it, and he said he was going

19    to quit his job if Anthony Murgio didn't let him report this

20    crime.

21          And Special Agent Beyer, who we heard from yesterday,

22    she came to the office, and Jose Freundt says -- and I asked

23    Jose Freundt, didn't you feel you needed a lawyer?  No, I

24    didn't need a lawyer.  I was telling Special Agent Beyer what

25    happened.

1          Why?  Because he wasn't afraid that this was a

2     criminal enterprise.  He thought that -- why would you call the

3     Secret Service?  You weren't even ripped off.  Because he felt

4     it was his duty to report it.

5          Now, you heard from Jen Wotherspoon, and you heard

6     from Rico Hill about customers who were involved using the

7     Darknet or the dark web and using Bitcoin to get those

8     transactions, and they knew about it because they talked to

9     him.  But there's no evidence at any time, anywhere, that Yuri

10    Lebedev had any idea that Coin.mx was involved in dark web,

11    Darknet, you know, that anyone was using Bitcoin to do that

12    from that website.  He was not involved with that, he did not

13    know anything about it, he had no conversations with anybody

14    about it, and no one testified that he did, and there's no even

15    documentary evidence, there's no evidence that you could look

16    at and say maybe that happened.  No, nothing.  He was never on

17    any calls with the banks or the credit card companies where

18    lies were made, not once.

19         So, what's another theory of corrupt intent?  The

20    government's theory about the corrupt intent for the payment to

21    HOPE FCU is that the Murgios wanted a credit union because all

22    of the problems they were having processing transactions,

23    right?  They were having trouble processing transactions

24    because each time a credit card company or a bank found out

25    that this involved Bitcoin, they'd shut it down.

H39KLEB5                    Summation - Mr. Creizman

1              So the government's theory is that if they took over

2       their own credit union, problem solved.  But that doesn't make

3       sense.  You heard from Christian Wilson from First Data, and

4       you heard from the two Chase witnesses.  And they testified

5       about merchant account processing, and chargebacks, and

6       merchant coding, and know your customer and risk levels.  HOPE

7       FCU didn't have enough money to process credit card

8       transactions for Bitcoins.  They didn't have the ability to do

9       that.  Coin.mx would still have to go to the same outlets they

10      went to before, and they would have to miscode the same way

11      they did before.  This doesn't change anything.  This doesn't

12      help things.

13             And where is the evidence of the government ever

14      showing that Coin.mx transactions went up significantly and

15      without any problems over the time that they were involved with

16      HOPE FCU?  There isn't any evidence of that.

17             The credit union was struggling.  They didn't even

18      have debit cards.  There's no processing of Bitcoin

19      transactions.  This is not a safe haven for them to process

20      that.  They still needed outside payment processors.  That

21      doesn't involve Lightning, by the way.

22             The next idea was they were trying to harm HOPE FCU.

23      That was one of the slides in Ms. Choi's presentation.  Think

24      about it.  You know, Ms. Choi argued that the Collectables Club

25      group didn't have any business working in a federal credit

1   union, they had no experience, one of them had criminal

2   records, Michael Murgio -- I mean Anthony Murgio had a criminal

3   record.  But the people who worked for the credit union didn't

4   have a ton of financial experience.  These were volunteers.

5   This was a small credit union.

6           And you heard from Pastor Gross, what this team

7   represented was a team that had specialized knowledge and

8   expertise in various areas.

9           So you had Yuri Lebedev, who had specialized

10  experience, and a lot of experience, and education in the area

11  of information technology, and that's why he was there.  And

12  the hope was that, bring these people into HOPE Federal Credit

13  Union, you're going to have a modernized credit union, you're

14  going to have something that's attractive to the members,

15  you're going to give them debit cards, you're going to be able

16  to give them better loans.

17          And Anthony Murgio sold this group, the Collectables

18  Club group, on a vision that he had.  And it wasn't a vision,

19  at least the way he -- whatever his intentions were, the way he

20  sold it to the group to get onto the board was not, hey, this

21  is a great way for us to process illegal Bitcoin transactions.

22  No.  What they wanted to do was actually do something for this

23  credit union, and Yuri was excited about the technology that

24  this offered.

25          I'd like to show Defense Exhibit 18, if we can.

H39KLEB5                     Summation - Mr. Creizman

1              There it is.  May 9th, 2014.  This is an email about

2      the proposed board.  And Anthony describes, Anthony Murgio

3      describes, the people on this board:  Jose Freundt, trustworthy

4      friend, CFO of his restaurant; Rico Hill, manager, doer, gets

5      things done; Yuri Lebedev, technical genius, architect on many

6      of my tech projects; Kendra Pannitti, a lawyer in New Jersey,

7      frequent 101er back in the day.  It goes on.  There's Tim

8      Ellrich and Kevin Tomasso.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. CREIZMAN:  (Continuing) And if you go to
2  Defendant's Exhibit 13.  "Here's what I envision the goals of
3  this CU to achieve in the near future.  Peer to peer lending."
4  This is Defendant's Exhibit 13.  You can look at this.  I'm not
5  going to spend a lot of time on this.  But, "Micro payments.
6  Endorse and provide banking platform for system to integrate
7  currencies and other transmission protocol, in other words
8  Bitcoin.  Be the first credit union to approve and issue
9  wallets for digital money protocol Bitcoin, icoin or whatever.
10 Help underbanked low credit individuals by providing them the
11 tools they need to succeed."
12         This is all stuff that this group was sold on and
13 that's how they -- and that's why they joined it.  There was no
14 intent to harm HOPE FCU there was an intent to help HOPE FCU.
15         You recall Pastor Gross's testimony yesterday.  You
16 know that, and you've heard it from -- and you've seen it from
17 the documents too.  This is backed up by the documents.
18         Yuri Lebedev did projects to improve the credit union.
19 He did work on those projects.  And the government can say what
20 it wants about Rico Hill's criminal record, about Michael
21 Murgio's criminal record, about the due diligence that anyone
22 did.
23         But Yuri Lebedev was the real deal.  The government
24 doesn't say he lied on his resume.  The resume that was
25 provided to Pastor Gross was accurate.  He had the tech

 1    experience.  He had the education.  He had been an IT architect

 2    at a financial institution.  He was diligent, responsive,

 3    respectful, according to Pastor Gross.

 4         And what are the projects that he worked on?  He

 5    worked on automating bookkeeping entries.  Because that

 6    happened after ACH transactions were processed.

 7         If you recall, Rico Hill would be writing down one by

 8    one manually.  He'd be sitting in an office.  And what did

 9    Mr. Lebedev work on?  Mr. Lebedev worked on trying to automate

10    that process.

11         Now, that reminds me.  Just another example of just

12    the government's not understanding what was happening in this

13    case.  You remember the back and forth between Mr. Noble

14    yesterday and Pastor Gross.  Mr. Noble insisted about Rico Hill

15    processing ACH transactions.  And Pastor Gross over and over

16    again had to correct him saying:  No.  When Rico Hill was

17    writing things, down he was writting things down after the ACH

18    transaction had happened.  This was bookkeeping.  That's what

19    he did.

20         What else did Yuri Lebedev do?  He updated the

21    website.  It was using a program called WordPress.  It was a

22    little bit slow.  It didn't look professional.  Yuri Lebedev

23    tried to update the look and the functionality of the website.

24    He tried to streamline account opening procedures for new

25    members.  There was this issue with CU South, the back end

1   system.  They provided back end services to HOPE FCU.  Yuri

2   Lebedev researched and identified more cost efficient

3   alternatives for HOPE FCU.

4          And the government talks about no one doing

5   compliance.  Yuri Lebedev was working on getting -- on batch

6   processing, automating NACHA files for OFAC compliance.  That's

7   what he worked on.  And there's evidence of that and you can

8   see that in the testimony and in the documents.

9          Now, there are a couple of documents, a couple of

10  slides that I want to show you that are not being brought --

11  they were not offered for their truth but offered for

12  Mr. Lebedev's state of mind as to what kinds of things he was

13  going to be doing at HOPE FCU.  And that would be Defendant's

14  Exhibits 15, 16, 17, and 24.

15         THE COURT:  Mr. Creizman, what's your estimate?

16         MR. CREIZMAN:  Not so much longer; 20 minutes longer,

17  30 minutes longer.

18         THE COURT:  We'll break probably before the end but

19  not quite yet.

20         MR. CREIZMAN:  Okay.  So, here you have Defendant's

21  Exhibit 15.  Yuri Lebedev to Anthony Murgio.  It's a list of

22  items that appear to be -- looks like a to-do list.  I can't

23  explain what each of these things are but I mean I think

24  there's "HOPE site, affirmative tech document to make sure my

25  OFAC specs are sufficient.  Crew's connect document.  Continue

1    with API integration."

2              This is just important because you don't see Yuri

3    Lebedev writing Anthony Murgio:  Let's figure out a way to

4    process payments and do something and fool banks or anything

5    like that.  This is what he was planning on doing at HOPE FCU.

6              Let's go to DX16.  OFAC specs.  "I am attaching the

7    specs."  Again, more of -- this is not the exciting kind of

8    case that the government wants you to believe it is.  This is

9    not an exciting crime.  This is the kind of day-to-day stuff

10   that Yuri Lebedev was working on for HOPE FCU.

11             Let's look at Defense Exhibit 17.

12             Again, more -- this is Anthony Murgio talking to

13   everybody about OFAC products.

14             And then go to -- if we go to Exhibit 24.  So here

15   this is a registration for:  Ask the Feds.  BSA/AML compliance

16   issues."  You see Pastor Gross writing to Yuri and Jose

17   Freundt, "You may want to sign up for this.  It's about virtual

18   currency response.  How do I get in?  Good find, Trevon.  I

19   would love to talk.  There are big plans for us in this in the

20   future." That's the response from Anthony Murgio, who is

21   talking about having these two go to a -- Ask the Feds lecture

22   presentation.

23             Now, let's talk -- so there is no corrupt intent.

24   There is no evidence of corrupt intent beyond a reasonable

25   doubt.  There is no evidence of corrupt intent on the part of

1    Yuri Lebedev whatsoever.

2              But let's go to the payment side of this situation.

3    There was -- let's talk about when Yuri Lebedev entered into

4    this whole so-called bribery scheme.  There was an agreement.

5    You heard from Pastor Gross yesterday.  There was an agreement

6    hashed out between the Collectables Club and HOPE FCU.  There

7    was a series of negotiations in person, over the phone.  These

8    were lawful negotiations.  Whatever the government

9    characterizes them as, the agreement as to how these payments

10   would be arranged and how the Collectables Club would be

11   integrated with HOPE FCU, all of that was done outside of Yuri

12   Lebedev's presence.  He wasn't at meetings.  He wasn't involved

13   in the negotiations.  He wasn't involved in strategizing.  He

14   wasn't involved in setting the terms.

15             You might see evidence, by the way, take a look --

16   there are WhatsApp chats from some of the other people who were

17   on the Collectables Club, like Jose Freundt or Rico Hill.  And

18   you can see if they were involved at all or be -- or were

19   appraised at all during that period of time before Anthony

20   reaches out to everybody about:  Hey, there's a Collectables

21   Club -- there's going to be a credit union opportunity, why

22   don't you come join.

23             Yuri walks into the November 22, 2014 meeting

24   completely cold.  He knows that there are problems between HOPE

25   FCU, between Trevon Gross and Anthony Murgio.  He understands

1    from Anthony Murgio who is telling the whole crew that he's

2    concerned that Trevon Gross and the Kapcharge are going to work

3    together and cut Anthony out of the deal.  We all know that.

4    That's part of the entire discussion.  And Anthony -- and we

5    know that there are problems with regulatory issues, right.

6    Because every single -- because the NCUA is at the door of HOPE

7    FCU and that's what Pastor Gross is reporting to the

8    Collectables Club individuals.  That's what he's saying to

9    them.

10         And so Anthony says we need to have this meeting and

11   we need to hash things out.  And they're at the meeting.  And

12   there seems to be some kind of agreement.  Everyone goes back

13   to their van.  And all of a sudden you hear yelling and

14   screaming and everyone comes back in and that's when Anthony

15   Murgio starts to tape the conversations.

16         So if we can bring up Government Exhibit 2506-T.

17         Now, you're going to be able to review the transcript

18   as an aid.  It's going to be the tape that is the evidence.

19   But I'm going to use this right now to talk about what's on

20   this tape and Yuri Lebedev's understanding of this meeting and

21   his view of this meeting is that actually it's just -- it shows

22   the lack of understanding of what this was all about.  I mean

23   you've got to look at what Yuri Lebedev says and blurts out

24   here and there.  Each and every time he says things, either he

25   repeats things that Anthony Murgio says or he just says

1    something that makes not much sense like at page 18, if you can

2    go there.

3            There is a heated discussion right down here between

4    Pastor Gross and Anthony Murgio.  And Yuri Lebedev decides to

5    come in and inject the following non sequitur, "Let's say, for

6    poker players, you know, if it's a poker game, you know,

7    something like that."

8            Now, no one pays any attention to that and people just

9    keep going on with the conversation because what Yuri Lebedev

10   has to say during this meeting is not particularly important or

11   helpful.  And this is no knock on Mr. Lebedev.  He's very

12   talented.  But in this particular situation he was not critical

13   to what was going on at this particular meeting.

14           And then the issue -- then we can turn to page 37.

15   The reason why no one listens to him and the reason why he

16   doesn't even know what this thing is really all about is

17   because he's got no say, and he really has no stake in this,

18   right.  This is some work for him, some contracting work that

19   he gets and this is $417 a month that he gets.  But this is not

20   his life and this is not his career.

21           He says -- he's there, he's there because -- like some

22   of the other people on that board, like Tim Ellrich who comes

23   in out of nowhere, they meet for the first time at this

24   meeting.  I think Yuri and Rico meet basically for one of the

25   few times they've ever met.

1          This is a meeting where people who are not that

2     involved, who didn't invest so much into this whole effort,

3     they're here for the first time and they're watching what's

4     going on.  Yuri sometimes feels the need to help out and talk.

5          But we've heard from several witnesses, okay.  And

6     this was something that went on cross-examination.  You can

7     look back with Jose Freundt, and you could look back with Rico

8     Hill who are witnesses to this very event, and with Pastor

9     Gross.  The issue, the dispute here is trust.  Anthony Murgio

10    didn't want to turn over the whatever funds, either for cash

11    reserves for ACH transactions or the $50,000 donation.  He

12    didn't want to turn it over without any assurance that he would

13    control the board.  Because that's -- because otherwise his

14    financial backers wouldn't back him.  You heard that Jose

15    Freundt got on the phone actually with Anthony Murgio and Vlad

16    who was the main financial backer.  And there was no issue with

17    money, right.  They could pay the money.  They wanted to make

18    sure that they had control of the credit union.  All right.

19         So, now, from Pastor Gross's side he was tired of

20    Anthony Murgio's -- what he saw as Anthony Murgio's excuses and

21    delays and not coming through with promises.  At one point in

22    this conversation Anthony says I'm going to give -- okay, we'll

23    give the $50,000 donation, and Pastor Gross -- everyone is

24    going to resign and walk away.  And then Anthony -- and then so

25    Trevon Gross says, very clearly:  Hey, it's got to be by

1    Monday.  Right.  I don't want anymore of this nonsense.

2              And Anthony says:  Well, who knows maybe the funds

3    will come in a little later.

4              And Pastor Gross didn't want to hear anything like

5    that.  And that was the dynamic that was going on there.

6    Because it wasn't an issue of getting Pastor Gross the money,

7    and it wasn't an issue whether Anthony Murgio had the money.

8    Because -- and we know that because all of a sudden Yuri

9    Lebedev steps in and says:  Don't worry.  I have $50,000 I can

10   give you, that you can use to pay the donation.

11             Here it is, "I'll get 50.  I will give you.  It's

12   fine."

13             No one pays attention.  Shouldn't that have solved the

14   problem if that's what the issue was?  Of course it would.

15   Anthony Murgio would be saying:  Great.  This is it.  This is

16   all we need for you to resign from the board.  And Pastor Gross

17   would be saying.  Great.  This is all we needed.  Fine.  Done.

18   We're all done

19             No one takes it from Anthony Murgio.  No one takes it

20   from Yuri Lebedev because Yuri Lebedev doesn't get it, because

21   he didn't agree to bribe anyone, because he didn't agree to

22   make any corrupt payments to anyone, because he thought this

23   was a legitimate transaction.  And, by the way, he had no stake

24   in this and he had no say in it.

25             And so this is a red herring.  This is a statement and

it doesn't show that he agreed to make any sort of unlawful

payment.  He didn't understand what was going on.  He was

missing the entire point, missing the entire dynamic.

        And by the way, other people agreed with Mr. Lebedev.

Other people had the same view.  I mean you heard from Jose

Freundt and you heard from Rico Hill.  None of them saw this at

the time as a bribe.  None of them viewed it as such, okay.

And the reason why is because this was a transaction that was

long in the way, it was coming.  And there were things that

they were going to do, that the Collectables Club was going to

do for HOPE FCU, that they thought would improve the

organization, and that HOPE FCU at the beginning thought would

improve the organization.  It didn't work out that way.

        All that we see here, when Yuri Lebedev offers $50,000

to Anthony Murgio is a continuing conversation, people talking

over him, and no one paying attention.

        And what happens afterwards?  How do we know that what

I'm saying is right?

        Let's go to Defense Exhibit 14.

        THE COURT:  Excuse me, Mr. Creizman.  While we're

pulling that up it's time for our midafternoon break.  So we'll

break for ten minutes and return.  Thank you.

        (Jury excused)

        (Continued on next page)

1          (In open court)

2          THE COURT:  Matters to take up?

3          So, Mr. Creizman, it has been an hour and fifteen.

4          MR. CREIZMAN:  Really?  I'm going to try to move

5    along.  I'm almost done.  I'm really, truthfully, I don't have

6    much more to go.

7          THE COURT:  All right.  So five to ten, or what's

8    your --

9          MR. CREIZMAN:  Fifteen maybe, at most; maybe less, ten

10   to fifteen.

11         THE COURT:  So I guess during the break if there's

12   anything Mr. Klingeman that would sort of facilitate the

13   getting set up process, I'd urge you to do it.

14         I'll step down for a few minutes and we'll return in

15   about six or seven minutes.  Thank you.

16         (Recess)

17         (Jury not present)

18         THE COURT:  Matters to take up?

19         MR. CREIZMAN:  Just one point, your Honor.  I think I

20   went on for only 50 minutes, not an hour and fifteen.  But I'm

21   not really keeping time, but my understanding is that that is

22   accurate.

23         THE COURT:  I had marked that we started at 2 but

24   maybe that's not right.

25         MR. KLINGEMAN:  That was with the end of the

1   government.

2                THE COURT:  Oh, you're absolutely right.  Thank you.

3   I apologize.

4                MR. KLINGEMAN:  No.  I apologize.

5                MS. SANTILLO:  Your Honor I just wanted to address

6   what the proper protocol might be because I'm going to have to

7   run out.  I don't know what makes sense.  I don't want the jury

8   to think it has anything to do with my client's case, but I

9   just may have to run out.

10               THE COURT:  I understand.

11               MS. SANTILLO:  I don't want to interrupt the

12   presentation or anything like that.

13               THE COURT:  Well you tell me if you want me to -- my

14   suggestion would be to just go in and out, but if you'd like a

15   specific instruction I'm happy to do it.

16               I gather Mr. Klingeman will continue to handle

17   objections if anything occurs.

18               MS. SANTILLO:  Yes.

19               THE COURT:  And I was glad you did make it through

20   the -- you were here I think for all of the government's

21   closing.  So I am sorry that you're not feeling well and do

22   what you need to do.  If something occurs that you think does

23   need to be addressed with the jury, just let me know.

24               MR. CREIZMAN:  I have a suggestion which would be it's

25   normal for lawyers at times to get sick and have to leave the

1    courtroom.

2            Sorry.  I just thought that would be fine.

3            THE COURT:  Get the jury.

4            MS. CHOI:  We're almost there, Judge.

5            MR. CREIZMAN:  I can stick around though for bar

6    mitzvahs.

7            MS. CHOI:  You should be an emcee.

8            THE COURT:  Mr. Klingeman, are you comfortable with

9    getting set up with the jury just standing instruction, or do

10   you think you need --

11           MR. KLINGEMAN:  No.  I'm ready.

12           THE COURT:  Great.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Please take your seats as you come in.

3    Thank you.  Everyone may be seated.

4          MR. CREIZMAN:  Thanks.

5          THE COURT:  All right Mr. Creizman.

6          MR. KLINGEMAN:  Thank you, your Honor.

7          So, I was about to show you how we know that

8    Mr. Lebedev was not in the loop -- he was not part of this

9    payment.  If this was a payment conspiracy, he was not part of

10   it.

11         Here we go to Defense Exhibit 14.  This is the

12   back-and-forth between Jose Freundt and Yuri Lebedev.  And it's

13   November 24.  And this is two days after the November 22

14   meeting.  And Jose's e-mail is, "Shit keeps hitting the fan,

15   kid."

16         And Yuri Lebedev's response is, "What do you mean?"

17         Next page.  "Anthony sent e-mail last night changing

18   the agreement.  Trevon canceled everything.  Now I'm left

19   trying to clean everything up.

20         Yuri Lebedev, "I didn't get any e-mail."

21         Jose Freundt, "He sent it to Trevon."

22         Yuri Lebedev, "Call me."

23         And it goes on.  "This is all very shady, what do you

24   think."  And they go on.  We could take this down.

25         The point after this is just that Jose Freundt

1    actually -- he says basically it's time to look for a new

2    credit union, if that's the way we're going to go.

3            And Jose Freundt invites him onto a chat, which I went

4    through with Mr. Freundt in my cross-examination, and I don't

5    have -- and you can find what I went through with him in the

6    evidence.  I don't need to delay that.  I think you all

7    remember that.  But the point being there is that Mr. Lebedev

8    came on and said, "What is going on?  Did you end up paying the

9    50,000?  It's good you didn't."  Wasn't part of it.  Wasn't in

10   the loop.  Didn't make any decisions.  Not his agreement.  Not

11   his agreement to pay anything.

12           Now, I want to move on to the object of the conspiracy

13   that has to do -- the charged conspiracy that has to do with

14   lies to the NCUA because there were no lies to the NCUA by Yuri

15   Lebedev.  Yuri Lebedev did not intentionally, knowingly lie to

16   the NCUA.

17           What happens after this falling out between

18   Collectables Club and HOPE FCU?

19           What happens, you see what happens.  You see that

20   there is frantic decisionmaking.  What are we going to do about

21   getting ripped off, as they saw it, by Pastor Gross and

22   getting -- you know, he's done an end around with Kapcharge.

23   He's working with them.  This is not right.  We can't let them

24   get away with this.

25           And the key is everyone says:  Let's go and what we're

1    going to do is we're going to hire a lawyer, we're going to

2    hire two lawyers, one lawyer for the Collectables Club, one for

3    HOPE FCU.  You guys remember that.  That was part of the -- the

4    question was what do we tell this lawyer for Collectables Club

5    and what do we tell the lawyer for the HOPE FCU.  But we're

6    going to get back on.

7             And they talked about -- and there's Defense Exhibit

8    28 which we introduced, not, of course, for its truth but for

9    the effect on the state of mind of the recipients.  And Jose

10   Freundt is -- said something along the lines of, on 11-25-2014,

11   you don't see this but you will be able to see this:  Anthony,

12   did you retain a lawyer?  Yup, largest in the country.  They

13   will be on meeting tomorrow.  PerkinsCoie.com.  Phenomenal.

14            So you see there that this was a -- this was something

15   that Anthony Murgio and Michael Murgio were running.  They were

16   going to lawyers.  They were going to -- they were going to

17   address this.  There was no -- I mean the -- and I don't

18   know -- look, I can't speak for Michael Murgio or Anthony

19   Murgio.  They're not here to testify.  But all I can say is

20   from the -- when I read these chats, I'm convinced that they

21   believed for some reason that they had the right to be on this

22   board, that they had the right; that they could go to the

23   NCUA -- I mean they were talking about going to the NCUA and

24   complaining.

25            So I mean where is Yuri Lebedev in all of this?  Yuri

1   Lebedev is not leading the charge.  He's following what people

2   are doing.  He's involved in the discussions.  There is no

3   intent to lie to the NCUA by Yuri Lebedev.  Yuri Lebedev is

4   acting in good faith like he did with everything else that's at

5   issue in this case.

6           Just -- there was testimony that you heard about the

7   HOPE Federal Credit Union being an underserved, basically a low

8   income credit union.  And there were greater -- there's greater

9   latitude for field of membership in those circumstances.

10          Now, I'm not saying that that -- that they honored the

11  rules, because they clearly didn't.  I mean, right.  The NCUA

12  made a determination, and I think the regulations might show

13  you that they didn't follow the regulations of the NCUA.  But

14  that is not the crime here.  It's not a crime to not follow the

15  regulations of the NCUA.  And, like any crime, what you're

16  going to need is intent.  And the intent here, the criminal

17  intent, the need to -- mental state to act with a bad purpose

18  is not present here.

19          Yuri Lebedev, certainly -- if Anthony Murgio and

20  Michael Murgio had different goals here and had different ideas

21  about lying to the NCUA about what the organization was about,

22  Yuri Lebedev wasn't a part of that.  And he signs -- Yuri

23  Lebedev signs a letter, at least there's a signature on a

24  letter that purports to be Yuri Lebedev's.  And the question

25  you have to ask is:  If Yuri Lebedev got that letter, did he

H399LEB6                    Summation - Mr. Creizman

1    intend to make all the representations in there, that he

2    believed that they were false, or did he think that he was

3    basically being guided by people who were consulting with

4    counsel, who were doing the right thing, who were ready to go

5    to the NCUA themselves and complain about Pastor Gross and the

6    issue that happened.

7         Before this all started -- and you can go back to the

8    testimony about this -- Anthony Murgio told everyone who was on

9    the team -- and I think this comes through the testimony of

10   Jose Freundt:  Your financial responsibility is zero.  Your

11   liability is zero unless you knowingly take part in something

12   that's illegal.  This is what he tells the group.  You don't

13   have anything to risk here.  We've got it all figured out.

14   And, in fact, our board member, Kendra Pannitti, who is a

15   lawyer, she's gone through the documents.  This is all there

16   for you to see and this is corroborated by the government's own

17   witnesses.

18        What's not corroborated by the government's own

19   witnesses is the materials which the government relies upon to

20   talk about why Yuri Lebedev is guilty supposedly of bank fraud,

21   of wire fraud, of conspiracy to commit both of them.  What they

22   rely on -- you haven't heard a single witness talk about Yuri

23   Lebedev participating in bank fraud.  Why is that?  The

24   witnesses who participated in the bank fraud, they told you

25   Yuri Lebedev wasn't a part of it.  They called the banks.  They

H399LEB6                    Summation - Mr. Creizman

1    got on the phone with the banks.  They lied to them.  They told

2    the customers to lie about the nature of the transactions they

3    were involved in.  Yuri Lebedev wasn't a part of that.

4              All the government has to offer you are isolated

5    pieces of chats or texts or e-mails that -- interspersed, by

6    the way, with discussions between Anthony Murgio and Jen

7    Wotherspoon, which together may make it seem like Yuri Lebedev

8    should know something where he's not a part of these

9    conversations.  You have to really -- and I told you this right

10   at the beginning, right in my opening.  I predicted this.  And

11   I said you need to be very careful.  You need to look closely.

12   You need to make sure that what you're -- you need to be very

13   cognizant of what Yuri Lebedev was likely to know, what he was

14   not likely to know; what he was a part of, what he was not

15   likely to be a part of.

16             What you have here are conversations about this

17   MyXtreme Delivery, things you never heard any testimony about

18   during trial but you got to see a bunch of e-mails out of

19   context.  And here -- I don't know if they're out of context or

20   not.  I don't know what the context of them are.  Right.  And

21   the government interprets them for you in their closing.

22             But, it's not clear.  This is what they want you to

23   rely on.  Okay.  And I say you need to reject that.  That is

24   not reasonable -- that is not beyond a reasonable doubt.

25             December 9, 2014, Government Exhibit 1481.  There's an

1   e-mail between Anthony and his brother Joe saying set up

2   MyXtreme Delivery website in which I can process Coin.mx

3   transactions basically.  Yuri Lebedev is not on that particular

4   conversation.

5          There are conversations -- there are texts where the

6   idea is process -- help -- I want to process transactions

7   through MyXtreme Delivery.  I want to create MyXtreme Delivery.

8   All of this -- you look closely at it.

9          I mean if this is the caliber of proof that the

10  government has to meet the standard of beyond a reasonable

11  doubt, fine.  But I say to you:  Is there doubt given

12  everything that we've seen in this case?  Given every single

13  witness that the government has brought before you in this case

14  and has come before you and has said Yuri Lebedev did this with

15  me and then after cross-examination you learn that they didn't

16  even think they were doing anything wrong at the time.  If Yuri

17  Lebedev didn't think he was doing anything wrong at the time,

18  he should not -- he's not guilty of a crime.  He's not guilty

19  of a crime.

20          Interestingly enough, I mean I'm going to start to try

21  to interpret something myself.  But this whole thing with

22  MyXtreme Delivery, I didn't hear one witness from Coin.mx

23  testify that anything was processed under the name MyXtreme

24  Delivery.  I heard about something about toys.  I heard by Jose

25  Freundt said everything that he saw came down as -- I think it

H399LEB6                    Summation - Mr. Creizman

was everything came down as Coin.mx.  But, clearly, there were

other names, there were other businesses.

        But where is MyXtreme Delivery?  I didn't see it.  It

may be out there.  It may be among the thousands of documents

that the government is going to show you without a witness.

But I didn't see it.

        And I also don't -- and while this idea is raised in

December of 2014, the last thing the government showed you is a

text from Yuri to Anthony in July of 2015 -- July of 2015,

okay.  Long past -- that's almost before Coin.mx is shutdown,

right.  And in July of 2015 Yuri says, "BTW, I got your plan

with MyXtreme.  Just like Collect PMA with that API of

collectible auction to get processor.  Same idea with food.

Brilliant.  And then maybe not so brilliant.

        I don't know what that means.  But if it means:  By

the way, I got your plan, I just understand your plan, it's the

same kind of plan that you had before dealing with, I don't

know, processing things through Collect PMA.  I don't know.  I

don't know.  But is that what he's saying here?  Did Yuri come

to this revelation in July of 2015?  Did Yuri Lebedev do

anything to further any miscoding of transaction knowingly?

        All we know is that Yuri Lebedev worked on projects,

tech projects for the Murgio line of business.  There's

testimony about BigTree Solutions.  There's testimony about

Coin.mx.  He did things -- he certainly did tech projects for

H399LEB6                       Summation - Mr. Creizman

1    all of these companies.  He did tech projects for HOPE FCU.

2    There's nothing out there that shows that he did tech projects

3    with the intent of defrauding anybody, financial institutions,

4    committing crimes, anything.

5         Mr. Lebedev spent -- he worked very hard to get where

6    he is, to get a Ph.D., to have two master degrees, to get the

7    expertise that he's basically gained and obtained and worked so

8    hard for in his life, just to what, commit crime for nothing?

9    Like for $22,000?  I mean, you know, it makes no sense.

10        The government asks you to take your common sense with

11   you.  Ask yourself:  Is it common sense -- am I convinced

12   beyond a reasonable doubt that Yuri Lebedev had the intent to

13   commit the crimes charged in the indictment?  I submit to you,

14   you need to go through the exhibits, not just those that I

15   outlined.  You need to be comfortable with what you do in your

16   deliberations and you need to deliberate and listen -- and keep

17   an open mind and look closely at the evidence and put the

18   government to its proof because that is -- that's what beyond a

19   reasonable doubt means.

20        I'm not going to be able to answer their questions.

21   I'm not going to be able to cross-examine anybody.  After I sit

22   down, that's it.  That's why the burden of proof still remains

23   with the government, even into the deliberations room.

24        I believe, I submit to you, you review the testimony

25   from trial, you review the exhibits submitted by the government

1   and by the defense and you look, you look and determine whether

2   the government has proved its case against Yuri Lebedev on any

3   of the counts beyond a reasonable doubt.  I submit to you if

4   you do that the only result you can come up with is one that is

5   that of not guilty.  Thank you.

6               THE COURT:  Thank you, Mr. Creizman.

7               Mr. Klingeman.

8               MR. KLINGEMAN:  Thank you, your Honor.

9               THE COURT:  Just invite the jury to stand and stretch

10  as you get setup at the podium.

11              MR. KLINGEMAN:  Yes, please.

12              THE COURT:  When you're ready, Mr. Klingeman.

13              MR. KLINGEMAN:  Good afternoon, ladies and gentlemen.

14              Good afternoon.  I'm going to begin where the

15  government ended and I may surprise you by telling you that

16  there are two points that the government made at the end with

17  which I completely agree.  The first is this is not a close

18  case.  There is no evidence based on which you can look each

19  other in the eye when you begin deliberations and convince

20  yourselves that Pastor Trevon Gross acted corruptly.

21              Second, the government told you that the case is

22  overwhelming, the evidence specifically is overwhelming.  I

23  also agree with that sentiment and I hope I can spend some time

24  with you this afternoon giving you some suggestions as to how

25  to wade through that evidence and come to the correct and the

1   just conclusion that the judge is going to direct you to

2   deliberate upon.

3        THE COURT:  Mr. Klingeman, I'm sorry.  Can you pull

4   the mic closer.  I can't hear you.

5        MR. KLINGEMAN:  Sorry, your Honor.

6        THE COURT:  That's much better.  Thank you.

7        MR. KLINGEMAN:  Now, as I was listening to the

8   government's presentation this morning and early afternoon I

9   wrote down a series of questions that one might ask the

10  government and certainly you may ask each other in the course

11  of your deliberations.

12       If Trevon Gross is a bribe taker, why did he turn down

13  the money when it was offered directly to him by Anthony and

14  Michael Murgio?

15       If Trevon Gross is a bribe taker, why did he turn down

16  so much more money that they offered him initially in the

17  spring of 2014?

18       If Trevon Gross is a bribe taker, why did he ask the

19  Murgios to donate the money to a church?

20       If Trevon Gross is a bribe taker, why would he, in the

21  phrase of the government, be so quick to deal with someone he

22  did not know?  In other words, why would he enter a criminal

23  conspiracy with someone he did not know and, of course, did not

24  trust, could not have trusted even at that early stage?

25       If Trevon Gross is a bribe taker, why did he give back

1    in early December 2014 $50,000 that he received?

2              If Trevon Gross is a bribe taker, why did he invite

3    his U.S. congressman to investigate the regulatory agency that

4    was looking into the HOPE Federal Credit Union?

5              If Trevon Gross is a bribe taker -- excuse me.  If

6    Trevon Gross is obstructing an NCUA investigation and lying to

7    the NCUA about whatever the government submits to you he is

8    lying about, again, why does he complain to his congressman and

9    seek an investigation of that same regulatory agency's handling

10   of the HOPE Federal Credit Union?

11             If Trevon Gross did these things, why did he talk to

12   the FBI?  Why did he take the witness stand and testify before

13   you?

14             Because he never thought at the time these things were

15   happening that he was doing anything illegal, that he was

16   acting corruptly in any way, shape, or form, that he was making

17   false statements deliberately, that he was trying to obstruct

18   regulators with whom he had worked successfully for more than

19   ten years.  That is why he did these things.

20             Now, the second thing I told you that the government

21   said with which I agree is that the evidence is overwhelming.

22   You've heard from 25 witnesses.  You've been here for four

23   weeks.  The trial transcript to which you'll have access if you

24   need read backs of various testimony runs in the thousands of

25   pages.  The government has marked and offered in evidence,

1    often without the benefit of witness testimony, literally

2    hundreds of exhibits that ultimately number in the thousands

3    and run to the thousands of pages.  You have audio recordings

4    and transcripts.  You have WhatsApp chats all of which run in

5    the hundreds of pages.  The evidence is, indeed, overwhelming.

6            If you are truly attempting to sift through every

7    aspect of the testimony and every aspect of the exhibits that

8    you have been given it may not take you a day, it may not take

9    you a week, it could take you a month.  It took us a month to

10   present it to you.

11           So, how do you work your way through this challenging

12   task ahead of you?  Well, you can start with the indictment.

13   You'll have the indictment.  And the judge has cautioned you,

14   instructed you, advised you that the indictment itself is

15   evidence of nothing; that even with the indictment Trevon Gross

16   is presumed innocent; that the government bears the burden of

17   proof and that they must meet that burden of proof by proof

18   beyond a reasonable doubt.

19           But nevertheless the indictment is of great aid to

20   Pastor Gross in this case because as you work your way through

21   the indictment, you will see how little in the indictment

22   relates directly to him.  And you will see how little the

23   government has proved in terms of any wrongful conduct.  In

24   fact, you will note the utter absence of criminal corrupt

25   deceitful wrongful conduct by Pastor Gross.  That's how he was

1    able to take the stand a day-and-a-half ago through yesterday

2    and answer every single question he was asked by the

3    prosecutor.

4           Now, the government started its presentation this

5    morning by citing a couple of things that you've heard over and

6    over and over, one of which is that the Murgios, at least

7    Anthony Murgio, Jen Wotherspoon, Rico Hill operated Coin.mx as

8    an unlicensed and thus illegal --

9           JUROR:  Excuse me.

10          MR. KLINGEMAN:  -- bitcoin exchange.

11          And, indeed, in the indictment that you'll have the

12   government asserts, "Murgio, Lebedev and their coconspirators

13   operated HOPE FCU as a captive bank for their unlawful Bitcoin

14   exchange until at least late 2014."

15          That's the central allegation.  The government has

16   attributed as a motive for the Murgios' desire to capture HOPE

17   Federal Credit Union to run their unlawful Bitcoin exchange.

18          As you comb through the record, as you've listened to

19   the government for over three hours this morning and this

20   afternoon, as you listen to the government again tomorrow or

21   whenever the rebuttal summation is given, you will never hear

22   any proof that Pastor Gross had any idea that Coin.mx was an

23   unlawful Bitcoin exchange or that the Murgios were attempting

24   to infiltrate HOPE Federal Credit Union, to use HOPE FCU as a

25   captive bank, in the words of the indictment, because there is

1   no such evidence.  He had no idea what they were doing.

2           And in addition, the indictment, as the government

3   referred to this morning, includes allegations of bank and wire

4   fraud.  And I'll leave that to Mr. Lebedev and his counsel.

5           But, surely, according to the testimony of Jennifer

6   Wotherspoon, Rico Hill, Jose Freundt, there was bank and wire

7   fraud occurring at Coin.mx.  But, again, another allegation

8   that the government took great pains to prove that has nothing

9   to do with Pastor Gross, because, again, no matter how many

10  witnesses the government offered, how much proof the government

11  offered on various issues in this case, they never offered any

12  proof that Pastor Gross had any idea about these crimes going

13  on at Coin.mx and, therefore, he bears no responsibility for

14  those crimes.

15          So, use the indictment as a guide.  And I'll alert you

16  to one particular aspect of the indictment and the instructions

17  that the judge will give you probably in the morning about the

18  indictment.  But first I just want to say one thing.

19          My name is Henry Klingeman.  Along with my colleague,

20  Kristen Santillo, it's been our privilege to represent

21  defendant Pastor Trevon Gross.  This is the one and only time I

22  have a chance to speak directly to you, the Members of the

23  Jury, based on the way trials are conducted.  So I've been

24  looking forward to this and I intend to make the most of my

25  time.  So, let me thank you in advance for your attention, your

1    patience, and most importantly your consideration on behalf of

2    Pastor Gross.  His life shortly will be in your hands.

3           Now, the government started the conversation this

4    morning by talking about the definition of corrupt intent.  And

5    the government in the slide they presented to you quoted what

6    the judge is going to quote to you; that to act with a corrupt

7    intent is, "To act voluntarily and deliberately with a bad

8    purpose of accomplishing either an unlawful end or result or a

9    lawful end or result by some unlawful method or means."

10          You'll parse through that, no doubt.  The judge will

11   explain it to you tomorrow.  But, as with so many things in

12   this case, that narrow definition is without context.  It's

13   without meaning unless you understand what else you need to

14   know that goes on around, that is built around that definition.

15          And one of the first things that her Honor will tell

16   you is that what is not a bribe is what are called bona fide

17   payments, ordinary personal or commercial transactions that

18   people engage in every minute of everyday, buying a cup of

19   coffee, for example.

20          (Continued on next page)

21

22

23

24

25

1          MR. KLINGEMAN:  (Continuing)  And what her Honor will

2     tell you is that the corrupt payment statute charged in Counts

3     Two and Three does not criminalize legitimate commercial and

4     business practices.  It only applies to payments made with a

5     corrupt intent.  Thus, the statute does not apply to bona fide

6     salary, wages, fees, or other compensation paid, or expenses

7     paid or reimbursed in the usual course of business.  A

8     consulting fee, a donation to a church, those are perfectly

9     normal daily activities that take place and that are not

10    criminal in and of themselves unless they're done with what's

11    called a corrupt intent.

12          So the Judge will go on to explain that bona fide

13    means in good faith or without deceit or fraud.  So, if you

14    find that either of the defendants made or accepted or offered

15    or agreed to make or accept bona fide payments without corrupt

16    intent, you must find that defendant not guilty on the counts

17    you are considering.

18          So what this means is that the church donation alone,

19    without corrupt intent, is perfectly legal.  That the

20    consulting fees that Pastor Gross received, without corrupt

21    intent, is perfectly legal.  That the legal acts of electing

22    board members, of resigning from a board of directors, of

23    giving operational control of the credit union to one group of

24    employees versus another, all of those perfectly legal acts

25    only become illegal if they're performed with this corrupt

1    intent.  And without corrupt intent, as the Judge will tell

2    you, the defendant, Pastor Gross, is not guilty.

3           So, if I could put up on the screen the four elements

4    of the crime of accepting corrupt payments, I'd like to talk

5    you through it.

6           You're going to hear directly from the Judge tomorrow,

7    but the Judge has instructed the attorneys that these are the

8    elements of the offense contained in Count Three of the

9    indictment, which is accepting corrupt payments as an officer

10   of a financial institution.  Obviously, the allegation in this

11   case is Pastor Gross accepted the donation as a corrupt

12   payment, and the government asserts that he is the officer of a

13   financial institution.

14          So, let's look at the first element.  First, that

15   Trevon Gross was an officer, or director, or employee of a

16   financial institution.  He was.  So you can make that finding.

17          Second, that Trevon Gross solicited, demanded,

18   accepted, or agreed to accept something of value either for his

19   own benefit or benefit of another.  He did, we agree.  He

20   agreed to accept a donation to the church that was to benefit

21   the church.  So element two, satisfied.

22          I'm going to skip to element four.  That the thing of

23   value solicited, demanded, accepted, or agreed to accept had a

24   value greater than $1,000.  You've heard that the donation was

25   $150,000.  Element four, satisfied.

1        The focus of your attention necessarily is going to be

2   element three:  That Trevon Gross did knowingly, and corruptly,

3   and with the intent to be influenced or rewarded in connection

4   with any business or transaction of HOPE Federal Credit Union,

5   did the other things described in this count of the indictment.

6   And, again, as we began this case with our opening statement,

7   and as we conclude it today, the whole focus is on the word

8   "corruptly," because, obviously, as he told you, he told you

9   that money mattered to him as he made decisions about what to

10  do with HOPE Federal Credit Union.  Why did it matter to him?

11  He explained that to you.  He was tired, he was frustrated, he

12  wanted to get out of the credit union business, he hoped these

13  folks from Florida with their purported expertise would help

14  them accomplish that goal, and he also knew that they were

15  willing to make a donation to the church that itself had funded

16  the credit union in various ways over the years and would be a

17  chance for the church to be made at least somewhat whole.

18        So, again, you have to ask yourself, having done all

19  of those things, did he do it corruptly, or did he do it in

20  good faith?  And the government has to prove beyond a

21  reasonable doubt, to the exclusion of all other reasonable

22  possibilities or scenarios, that he did so corruptly.

23        So, as you listened to all the evidence, and you

24  listened to the direct examination and the cross-examination,

25  you listened to the attorneys argue about the significance of

H39KLEB7              Summation - Mr. Klingeman

1    the same exhibits, as you listened to Pastor Gross testify

2    about what he really meant, what he really intended, what he

3    really did, and you begin to think, well, maybe what the

4    defense is saying has some merit, has some validity, none of us

5    were there, none of us can be sure, but the defense has

6    something to it, on that basis alone, you must acquit Pastor

7    Gross.  That's the very essence of reasonable doubt.  Unless

8    you're convinced, to the exclusion of all other reasonable

9    possibilities, that he acted corruptly, you can't convict him.

10   And as I stood up and said, this is an easy case, because

11   whatever you may think of what went on here, whether you think

12   it was a hundred percent righteous, whether you think it was

13   negligent, even if you think there's some possibility of

14   criminal conduct lurking in the case, unless you're convinced

15   beyond a reasonable doubt that Pastor Gross acted corruptly,

16   acted with an intent to deceive as to the NCUA, you have to

17   acquit him.  It's your duty as jurors.  It's your duty given

18   the instructions that you will receive tomorrow.  It's your

19   duty under the Constitution.  And I'm confident you'll fulfill

20   that duty, but we need to talk about things.

21            Now, I'd like to display for the members of the jury

22   Government Exhibit 1092-A in evidence.

23            I promise you, I am not going to display a long list

24   or a large group of emails, but this email is important.  It's

25   a government exhibit.  It was offered by the government, and

1    it's an email that is dated May 6, 2014, from Trevon Gross at

2    HOPE FCU, and it's directed to Trustee Collectables,

3    specifically Anthony Murgio.  And I'll just read the first

4    paragraph from Pastor Gross:  "I met with our board last night,

5    and though they are intrigued by your offer, they will not

6    proceed until we have satisfied the initial terms of our MOU,

7    which called for your organization to make a donation in the

8    amount of $15,000 and cover the expenses for debit cards."

9         And then at the very bottom, the second to last

10   paragraph, Pastor Gross says:  "I will be the only board member

11   to remain to assist in the transition as a consultant to

12   interface with the NCUA examiner.  Set up your local office,

13   and as well establish a branch in Florida, so you can have

14   teller terminals and printers, et cetera.  We believe this is

15   the prudent way.  Please advise."

16        Now, the government spent a good deal of its

17   presentation with respect to bribery this morning, talking

18   about how Pastor Gross did these very things.  And the question

19   is:  Did he do them corruptly?  And I ask you, would someone

20   with corrupt intent, at the very formation of this agreement

21   with the Murgio group, put the entire arrangement in an email

22   and ask if it's prudent?  How many bribery schemes end up in an

23   email?  Well, this one did, apparently.  And that tells you why

24   it's not a bribery scheme.  It didn't take place in the secret

25   confines of the back booth at a diner involving a brown bag

1    full of cash.  What took place here was open and obvious to

2    anyone who was paying attention.  And we now have the email to

3    prove it.

4            Now, in addition, if we could call up Government's

5    Exhibit 6085 in evidence.

6            About 10 days after this email, 11 days after this

7    email that I just showed you, the HOPE board met, and the

8    meeting minutes were recorded, and they were later adopted.

9    And you're going to have this with you, if you choose to look

10   up the meeting minutes.  I presume you'll have some kind of

11   exhibit list, and you can find the exhibits.  But, in any

12   event, this is a board of directors meeting that occurred on

13   May 17, 2014, again at the same time that this bribery

14   conspiracy was supposedly being hatched, or, as we view it, a

15   business transaction for the benefit of everyone involved.

16           And what does Pastor Gross say in the center of the

17   document, under "Chairman's Report"?  "Our NCUA," or our NUCA

18   examiner, as it's written here, "Mark Guttman, visited the HOPE

19   FCU in April 2014, and our reports were positive with a strong

20   first marking period.  The 5300 report was submitted by CFO and

21   CEO and finishing with a good position with the examiner

22   report."

23           Now, that first paragraph has significance.  Why?

24   Because it reflects how HOPE FCU was interacting with the NCUA

25   at the outset of this relationship with the Murgio group.  In

1   other words, before the Murgios showed up, this was the kind of

2   NCUA report that Pastor Gross testified about – the examiner

3   would come in periodically, the examiner would ask questions,

4   the HOPE folks would respond, and then there would be an A plus

5   report or a positive report, shall we say, at the end, and this

6   is the way it had gone on for years before the Murgio folks

7   showed up.  So it's the baseline that Pastor Gross was running

8   a credit union credibly, within the bounds of the law, until

9   the Murgio group showed up and started to do the things they

10  started to do that disrupted everything.  That wasn't on Pastor

11  Gross.  That wasn't any intent of his.  It was something that

12  resulted from the fact that the Murgios deceived him after they

13  enticed him into entering into this business arrangement.

14          The second paragraph reads:  "Strategic partnership

15  update:  Chairman Gross gave an updated report on the new

16  partnership leadership with the HOPE FCU.  They will take on

17  the responsibility of running the entire credit union.  We

18  would continue to conduct and do our credit union business for

19  our customers and clients.  The board will nominate six new

20  board members to work with HOPE's FCU."  And attached to the

21  board meeting minutes are the resumes for the people we've

22  heard so much about, the resumes which you'll have a chance in

23  deliberations to review, and determine whether on their face

24  they present credible and impressive credentials and whether

25  Pastor Gross had a right to rely on them in terms of the due

1    diligence about which the government has been so critical, or,

2    reading these resumes, did he have some duty to go into Google

3    and try and figure out what the real story was.

4         But, in any event, you'll have all this material.  You

5    can make these evaluations.  The point is, again, this is the

6    bribery scheme that the government has told you was hatched, a

7    conspiracy to commit very serious crimes, and, yet, it's laid

8    out in board minutes, for all the world to see, including the

9    NCUA, and in your case, a jury two years after the fact --

10   excuse me, three years after the fact.

11        Now, in our opening statement, we asked you to keep an

12   eye on the good-faith.  And you're going to hear a jury

13   instruction about that tomorrow, and I just want to bring it to

14   your attention specifically because it's so critical to the

15   defense of the case, as we've outlined it through our initial

16   presentation and through the questioning of the witnesses.  The

17   Judge will tell you, a defendant's good faith is a complete

18   defense to all of the charges in the case.  If a defendant

19   believed in good faith that he was acting properly, even if he

20   was mistaken in that belief, and even if others were ultimately

21   injured by his conduct, contrary to his intention, there would

22   be no crime, and the burden of establishing criminal intent and

23   lack of good faith rests upon the government.  The government

24   must prove he's not acting in good faith.  The defendant is

25   under no burden to prove his good faith.  Rather, as to each

1    count in the indictment, the government must prove bad faith as

2    to each defendant beyond a reasonable doubt.

3            So, what is the government's proof of bad faith here?

4    They asserted to you at the beginning of the case -- and I'm

5    quoting their opening statement -- Pastor Gross was lining his

6    own pockets.  We're going to talk in a few minutes about the

7    financial information you got over the last two days, but ask

8    yourself:  Have you been convinced beyond a reasonable doubt

9    that Pastor Gross accepted this donation to the church, so he

10   could line his own pockets?

11           Maybe I can ask the question in a more appropriate

12   way.  Do you have some doubt about that?  Because if you do,

13   you must acquit him.

14           MR. NOBLE:  Objection.

15           THE COURT:  Overruled.

16           MR. KLINGEMAN:  Likewise, the government's proof of

17   Pastor Gross' bad-faith at least depends in part on the copious

18   evidence about what's called ACH processing.  Read the

19   indictment.  There's a single mention of ACH processing in the

20   indictment.  It relates to Anthony Murgio.  It has absolutely

21   nothing to do with Pastor Gross, but beyond that, there's no

22   allegation in the indictment concerning ACH processing.

23   Nevertheless, the government offers the evidence to somehow

24   prove Pastor Gross' corrupt intent, his bad faith.  He wanted

25   to make $7,000 a year for the credit union by doing these

H39KLEB7            Summation - Mr. Klingeman

1   millions of dollars of transactions?  No.

2            What is the evidence of bad faith?  The government has

3   suggested this was an unlawful -- that Coin.mx was an unlawful

4   Bitcoin exchange, it was a criminal enterprise, was being used

5   to commit bank and wire fraud, we've already talked about that.

6   Pastor Gross had knowledge of that.  We asked each of the

7   Coin.mx witnesses, did Pastor Gross have any knowledge of that,

8   and they each said to a person, no.

9            Then, of course, what is the evidence of good faith?

10  What is the proof of good faith?  It's not fair to offer you

11  nothing.  So the defendant himself, Pastor Gross, took the

12  stand and answered a lot of questions from his attorneys, and

13  then he answered all the questions posed by the government.

14  His words, his deeds, the good character.  If you want to know

15  who a person is, don't you talk to his family and his friends?

16  Well, you heard from three of his friends, you heard from three

17  of his congregants, people who know and believe in him.  And

18  you're going to hear from the Judge that you can consider that,

19  and you should consider that evidence, just as you should

20  consider all the evidence in the case.  And if you decide,

21  after hearing all the evidence in the case, including the

22  character evidence, that a man of good character would not have

23  committed crimes involving corrupt intent and bad faith, you

24  can and you should acquit him.  And that's what we're asking

25  you to do.

1          The government started its review of the evidence in

2     the same place I'd like to begin the review of the exculpatory

3     evidence.  And by exculpatory evidence, I mean evidence that

4     shows that the defendant is, in fact, innocent.  The most

5     important piece of evidence in that regard with respect to

6     corrupt intent is, yes, the November 22nd, 2014 meeting at the

7     HOPE Federal Credit Union involving the Collectables Club

8     people and Pastor Trevon Gross.

9          Now, let's place this in context.  The government,

10    when it pointed to that conversation in this morning's

11    presentation, they talked about Pastor Gross demanding $50,000

12    and demanding an additional bribe to do what the Collectables

13    Club wanted him to do.  So, just keep in mind:  He does indeed

14    say, I want the $50,000, and we'll resign.  He says it.  You

15    can listen to his voice, you can read his words.  But there's

16    nothing wrong with that.  Because why?  He wants the 50,000 as

17    a donation to the church.  He wants it in fulfillment of the

18    basic agreement that the parties had back in the spring of 2014

19    that if this deal began to fall apart, then the church would

20    get 50,000, that it could set aside and start a new credit

21    union, and he wanted the Murgios to fulfill their end of the

22    bargain.

23         But when it became clear, just days later, that they

24    were never going to fulfill their end of the bargain, what

25    happened?  The Murgios sent him the money.  They sent him the

1   $50,000 that the government terms a bribe.  And if it were a

2   bribe, what would happen?  He would line his pockets with it.

3   Right?  But what did he actually do?  The $50,000 hits the

4   account, he controls the account, he sends the money back to

5   where it came from.

6        If you're accepting a bribe, if you're soliciting a

7   bribe, if you're acting with corrupt intent, do you turn away

8   $50,000, an amount almost equal to a full year's salary, salary

9   that some years he never received?  $50,000, by any measure, is

10  a lot of money.  It can be a corrupting amount of money to

11  people, and, yet, he turned it down.  What does that tell you

12  about corrupt intent, bad faith, or his good faith?

13       Now, the most significant thing about the context of

14  this recording is that only one person in the room apparently

15  knows it's being made.  Not Trevon Gross.  Anthony Murgio is

16  secretly recording people.  And when you're being secretly

17  recorded, when Trevon Gross is being secretly recorded, he's

18  not putting on an act, he's not putting on a voice, he's not

19  saying things for the benefit of the recording.  As the

20  government pointed out, he had no idea that two years later,

21  this very recording would be played aloud for jurors in a

22  federal case.

23       But the recording is a form of truth.  Not for Anthony

24  Murgio, necessarily, because he knows that he's being recorded,

25  and who knows what's motivating him to say what he says.  But

1   for the people who aren't being recorded -- who don't know

2   they're being recorded, as counsel pointed out, Mr. Lebedev has

3   no idea, so he's just blurting out strange things, for Pastor

4   Gross, he's talking the way he's been talking.

5          Now, the conversation is bookended by a pair of very

6   funny or ironic comments, I should say, by Jose Freundt.  Jose

7   Freundt, of course, is at the meeting, he's a witness who

8   testified for the government.  And the very first thing that

9   Freundt says at the beginning of the recording is:  I'm not

10  saying it's -- not we have a conspiracy here.  This is a

11  meeting, according to the government, of the conspirators in

12  this bribery conspiracy talking secretly among themselves about

13  the conspiracy, about the conspiracy to accept bribes and

14  subvert the NCUA by falsifying where they live, and where

15  they're working, and all that stuff.  And the first thing one

16  of the coconspirators says is, well, it's not like we have a

17  conspiracy.

18         So, if that doesn't tell you the state of mind of Jose

19  Freundt, for example, and harking back to counsel's comment, he

20  has no idea at the time, Jose Freundt, that he is involved in

21  some kind of illegal activity, other when he gets to Coin.mx

22  and starts to do the bank and wire fraud we've heard so much

23  about that has nothing to do with Pastor Gross.  But what we

24  really ought to focus on with respect to this conversation is

25  the things that Pastor Gross says because he doesn't know he's

1   being recorded, and you're having the benefit of what he has to

2   say, so you can consider that in determining if he's acting

3   with corrupt intent.

4           He says at page 5:  "We have stayed to protect the

5   integrity of the organization," meaning the HOPE Federal Credit

6   Union.  Now, the government asserted this morning, as it has

7   attempted to establish through the proof, that, in fact, Pastor

8   Gross didn't give a concern about the credit union, that he was

9   basically subverting the credit union for his own personal gain

10  by entering into this so-called bribery conspiracy.  But here

11  he is, unguarded, unscripted, unknowing that he's being

12  recorded, and what does he say?  "We have stayed to protect the

13  integrity of the organization."

14          And then he goes on to talk about the specific issues

15  that are so disturbing to him and subsequently to the NCUA –

16  the field of membership issue, the amount of ACH processing

17  that the credit union is not capable of handling, and he

18  describes how we've been talking about these things for two

19  months –– he yells at Anthony Murgio, we've been talking about

20  these things for two months, and we haven't resolved them, and

21  then he goes on to say that we've been negligent.  Well, of

22  course, he's been negligent, because he's allowed these people

23  to come in, who he believed were good people, good in the moral

24  sense, but certainly good in the competent sense, in the

25  banking sense, in the ability to run things, and they've run

1  roughshod over the credit union, running these millions of

2  dollars of ACH transactions through the credit union that is

3  woefully unable to handle them, and it's poisoned the

4  relationship with the NCUA, it's poisoned the relationship with

5  Alloya, one of the banks with which HOPE Federal Credit

6  Union -- one of the credit unions with which HOPE Federal

7  Credit Union did business, and Pastor Gross, as he says, "Is

8  frustrated.  Well, who wouldn't be?  Because none of this is

9  working out the way it's supposed to.

10         So he reminds everyone -- and this is on page 26 --

11 "We gotta show -- we gotta show we have an infrastructure, not

12 that we're borrowing an infrastructure."  In other words, not

13 that we're faking our way through this, but we really have to

14 get these things right.

15         And because it's clear to him that they're never going

16 to get things right with this crew, he says, "What I want is

17 for you to give the donation to the church, the $50,000

18 donation to the church."  He says it right in the transcript,

19 when he's unguarded, unscripted, and has no idea he's being

20 recorded.  Why?  Because he has nothing to hide.  This is not a

21 bribe.

22         Now, at this meeting of the alleged conspirators,

23 recorded without their knowledge, or at least without anyone's

24 knowledge, but Anthony Murgio, there is no mention of bribe or

25 bribery.  There's no mention of Bitcoins.  There's no mention

H39KLEB7          Summation - Mr. Klingeman

1    of the Bitcoin exchange.  There's no mention of Coin.mx.

2    Instead, the talk is of compliance, ACH processing, field of

3    membership, who will actually live and work in the Lakewood

4    area.

5              So, I strongly suggest that among the important

6    exhibits that you review, you listen to the recording and read

7    the transcript of this meeting.  There is no more powerfully

8    exculpatory evidence in the case than this.

9              Now, the government went next this morning, after the

10   transcript of the recording, to the next important piece of

11   evidence, one that you received two days ago from the witness,

12   Rollins, the so-called tracing slides, Government Exhibit 900.

13   And the government cited this analysis, these slides, as

14   evidence of Mr. Gross', Pastor Gross', corrupt intent.  In

15   other words, his receiving a personal benefit.  This is where

16   the lining of the pockets comes in.

17             I want to start by reminding you of what the Judge

18   said about this exhibit in terms an instruction to you about

19   how to consider it before we begin to talk about it, because I

20   don't want it to take on the kind of significance that a piece

21   of actual evidence takes on, like that recording, which is

22   actual evidence.  The Judge said to you:  "The slides prepared

23   by Mr. Rollins are not evidence, but, rather, an aid to you,

24   the jury.  That it's for the jury to determine for itself

25   whether the slides fairly and accurately summarize the

1    underlying evidence.

2              "Further, you heard the witness, Mr. Rollins, testify

3    that he applied a particular accounting method in preparing

4    some of these slides.  The witness testified that he was

5    instructed by the government to apply this method.  This is an

6    opinion witness, not an expert witness.  You should not in any

7    way rely on the witness' testimony to establish that the

8    accounting method was itself a proper one.  The witness was

9    offered solely to help the jury apply the method and not in any

10   way to determine whether this method, rather than others, is

11   the most helpful in understanding the evidence."

12             Now, I want you to note a couple of things before we

13   talk about a couple of these slides.  The government has

14   apparently spent close to three times more in money to obtain

15   these slides from this consultant, or this witness, I should

16   say, than Mr. Gross is accused of taking.  This is a $390,000

17   nonpiece of evidence.

18             The chart itself is rife with errors and baseless

19   assumptions.  And we're going to talk about a few of them.  You

20   heard about some of them earlier from counsel for Mr. Lebedev,

21   and, of course, you learned about them through the

22   cross-examination.

23             I want you to reflect on those errors as you're

24   reflecting on the type of errors that the government is

25   accusing Pastor Gross of committing.  For example, yesterday

1    there was a long cross-examination about these NCUA profiles

2    that the HOPE Federal Credit Union would submit to the NCUA

3    periodically, and they were sworn and certified by an

4    individual named Bernard Larkins.  And the government

5    cross-examined Mr. Gross at length about whether there were

6    aspects of the profile that were accurate, and, for instance,

7    Pastor Gross noted that the fact that the address on the

8    profile, as late as 2014, was the old address, the pre-Sandy

9    address, was wrong.  It was an innocent mistake.  And, yet, the

10   government questioned whether it was an innocent mistake,

11   questioned Pastor Gross extensively about it.  And, so, as you

12   think about that type of nitpicking at Pastor Gross' attempt to

13   comply with the NCUA, I want you to think about the errors in

14   this document that you received two days ago.

15         First of all, the tracing analysis that Mr. Rollins

16   engaged in depends, as he testified, entirely on using

17   something called FIFO.  It's an accounting method, first-in,

18   first-out.  It was an accounting method that Mr. Rollins was

19   directed to follow by the prosecutors -- they picked it --

20   among the other accounting methods that might be available to

21   do this analysis.

22         And, of course, they had paid Mr. Rollins an

23   extraordinary sum of money to do what they directed him to do,

24   and he did say that he would not be here doing it if he hadn't

25   been paid that money.  So, when you weigh the credibility of

1    that analysis, consider its cost.

2          Now, I asked him, after he volunteered, about

3    something called the specific identification method, an

4    alternative to FIFO, where you try to trace the dollar coming

5    in to the dollar being spent on whatever, and he said that in

6    this circumstance, given the complexity of the records, and the

7    transactions, and the time involved, that such a direct tracing

8    analysis would likely be impossible.  That was his word,

9    "impossible."

10         Well, in a criminal case where Pastor Gross is being

11   accused of acting with corrupt intent, and the government must

12   prove his guilt beyond a reasonable doubt, that he acted with

13   corrupt intent, that he lined his pockets, in the words of the

14   government, don't we owe it to Pastor Gross to do that direct

15   tracing before we accuse him of lining his pockets?  Or is it

16   appropriate to resort arbitrarily to an accounting method that

17   leads to the result that the government desires?

18         These slides would be much different if Mr. Rollins

19   had used an alternative accounting method he described as LIFO,

20   last-in, first-out.  Some would be the same, some would be

21   different, it would be impossible to predict how it would line

22   up.  But what the government has done is taken these slides and

23   said, this is where the money ended up, but their own witness

24   is saying, well, not exactly.  If we use the direct tracing

25   method, the specific identification method, I can't even tell

1    you that that's the case, but if I use LIFO, just another

2    accounting method, the slides would look different.

3              So how can you rely on this evidence beyond a

4    reasonable doubt?  You can't.

5              Remember, as we go through this -- and you'll have

6    this exhibit with you in the jury room.  And, again, along with

7    that transcript and that recording of the November 22nd, 2014

8    meeting, this is an excellent place to go.  And you'll learn at

9    slide number 4, the various donations and consulting fees that

10   were paid.  They're all in one place, and you will be able to

11   find that very, very easily.

12             But I want to point out a couple of things that you

13   should give some attention to.

14             If we could go to slide 30, please.  I'm sorry,

15   Government Exhibit 900, slide 30.

16             This is based on the FIFO method, and it purports to

17   show how the money came in, ended up paying certain expenses

18   associated with Pastor Gross.  And all the slides that follow

19   in this subject area purport to do the same thing.  But, again,

20   to prove corrupt intent, the government promised to prove that

21   Pastor Gross lined his pockets.  The government has to prove

22   corrupt intent beyond a reasonable doubt.  They have to prove,

23   thus, that Pastor Gross used these donations for his own

24   personal reasons.  And what would you expect to do?  You'd

25   expect to determine whether the money that came in was used for

1    the expenditures made at the end of the case.

2          The witness says that's impossible.  And in a criminal

3    case, that should be the end of the discussion, because,

4    otherwise, you're being asked to speculate, to hypothecate, to

5    use an arbitrary selected accounting method chosen by the

6    prosecutor in order to do that tracing analysis.

7          Now, it's clear, from the testimony itself, that the

8    witness was acting at the behest of the government, acting at

9    the direction of the government, and that he made a series of

10   mistakes.  Counsel for Mr. Lebedev pointed out a few mistakes,

11   I pointed out some mistakes that were made as this thing was

12   being drafted.

13         But I wanted to show you one slide in particular that

14   shows you just unfair, how manipulative, this chart is.  And if

15   we could go to page 51, please, slide 51.  This is some sample

16   activity, college admissions organizations, presumably related

17   to the pastor's children.  And the money that the witness

18   claims was used to pay these various expenses was the

19   June 23rd, 2014, $120,000 donation to Hope Cathedral that came

20   from Kapcharge.  You see that in the lower left corner of the

21   chart.  It's number 3, with a green circle around it.

22         And then the various expenses, they're modest.  We're

23   talking about almost $400, which is a lot of money but in the

24   scope of 150,000 -- excuse me, $120,000, is obviously a small

25   fraction.  But what is the challenge here?  What are the dates

1    of the purported expenditures?  They're all listed as

2    January 1st, 2014.  In other words, this witness, the

3    government's witness, the government's witness acting at the

4    government's direct, is saying that Pastor Gross used $400 --

5    excuse me, $300 of the $120,000 that was paid in on June 23rd,

6    2014, to make college application expenditures six months

7    before that money was ever donated.  It's impossible,

8    obviously, to spend money you don't have, and yet that's the

9    government's proof.  That's just one example.

10            So if we could go on to slide number 52.  And I just

11   want to remind you, ladies and gentlemen, that this is a slide

12   that I went over with the witness because it purports to

13   reflect cash withdrawals, again, that are traceable to the

14   donations that were made to Hope Cathedral.  And by

15   implication, it purports to attribute those cash withdrawals to

16   Pastor Gross.

17            But, obviously, we learned from the witness, who

18   admitted he can't trace any of the ATM withdrawals to Pastor

19   Gross, because no one knows who made those ATM withdrawals.

20   And then, without telling you on his direct testimony, I

21   brought out that, for instance, the largest check, $14,000, was

22   withdrawn by a woman named Loretta Larkins and paid to

23   something called Joel Osteen Ministries.  It had nothing to do

24   with Pastor Gross.  It didn't go to line his pockets or benefit

25   him in any way.

1        And the same thing is true for the second largest

2   withdrawal, the $3,500.  That's attributable to a woman named

3   Julie Lapari, whoever she may be, not Pastor Gross or his

4   family.

5        And, finally, the third withdrawal that the government

6   didn't mention in its questioning of the witness is the $750

7   withdrawal.  Again, it went to Loretta Larkins.  So this is

8   money that is listed in a chart talking about money that

9   supposedly went to Pastor Gross, and it really didn't.  And who

10  brought that out?  We brought that out.  We got the witness to

11  tell you that.  The witness didn't tell you that.  We told you

12  that.

13       The rest of the chart, as we've noted, depends on the

14  use of this FIFO method.  And in a criminal case, where you're

15  required to consider proof beyond a reasonable doubt, that

16  speculative use of a specific accounting method, chosen by the

17  prosecution, is utterly unsupported.

18       Two witnesses in this case testified longer than

19  anybody else, with the exception of Pastor Gross:  Rico Hill

20  and Jose Freundt.  The government mentioned them this morning

21  but said virtually nothing about their testimony.  And I'd like

22  to believe that therefore I don't have to say anything about

23  their testimony.  But as you've heard from the Court and from

24  counsel for Mr. Lebedev, I do not have the last word and I do

25  not know what the government may say tomorrow, so I do want to

H39KLEB7            Summation - Mr. Klingeman

1    spend a moment talking about Rico Hill and Jose Freundt,

2    although the government said very little about them in its main

3    closing.

4            Rico Hill testified that he knows nothing about Pastor

5    Gross taking a bribe, in the sense that he had nothing to do

6    with the negotiations, he doesn't know anything about how the

7    donation was made, or why it was made, or who made it, that he

8    only learned about it after the fact.  So he doesn't offer

9    direct testimony that implicates Mr. Gross in any kind of

10   bribery scheme.  He's here to add other details to the

11   narrative that the government is offering you.

12           So, I asked him a series of questions to probe if he

13   did know anything about Pastor Gross' intent here, corrupt or

14   otherwise.  And he admitted to me, Mr. Hill, that he did not

15   tell Pastor Gross about the crimes that were going on at

16   Coin.mx in Florida even though he was down there committing

17   those crimes at the same time he was in touch with Pastor Gross

18   and occasionally coming to New Jersey to actually meet Pastor

19   Gross in person.  He did not tell Pastor Gross that

20   Collectables Club was a sham.  They knew it was a sham, down in

21   Florida.

22           But as the special agent from the Secret Service

23   testified, it was a functional-appearing website and unless you

24   attempted to actually register and log in, as the agent did in

25   an undercover capacity, you'd never know that it was a phony

 1    website.  So if you merely visited it and scrolled through it,

 2    it gave every appearance of being a real website.  Rico Hill

 3    never told Pastor Gross that it was a fake website, nor did Jen

 4    Wotherspoon, nor did Jose Freundt, who himself didn't know at

 5    the time that it was a sham website but only learned it later.

 6         Rico Hill told Pastor Gross -- he didn't tell Pastor

 7    Gross about Rico Hill's criminal history.  He didn't volunteer

 8    it, naturally; he wanted a job.  He wanted to continue working

 9    where he was working; he's not going to run around telling

10    people about his past.

11         And, I suppose, in the eyes of the Government, shame

12    on Pastor Gross for not asking, shame on him for not doing a

13    more thorough background check, shame on him for not jumping on

14    Google and trying to find out more about Rico Hill, shame on

15    him for thinking better of his fellow man.  But while you can

16    certainly fault him -- and the government does -- it's not a

17    crime to have failed to learn about Rico Hill's criminal

18    history.

19         Rico Hill testified that he did not discuss with

20    Pastor Gross that the Murgio people wanted to take over HOPE

21    Federal Credit Union to process Coin.mx Bitcoin transactions.

22         So what does Rico Hill do that's helpful to you?

23    Well, the most important thing Rico Hill did is he testified

24    about an email that he sent very late in the game.  It's an

25    email that I showed to him that I offered in evidence, that --

excuse me, that the government showed him and that the
government offered in evidence but didn't read the whole email
at the time that it was presented to you.  And I read the whole
email or had Mr. Hill read the whole email, and I wanted to
bring it to your attention.

It's Government Exhibit 2279, Government Exhibit 2279.
And it's an email that begins in early November 2014,
November 6, 2014, and I want to go to the end of the chain,
please, what is the beginning, actually.  Yes.

Rico Hill, addressing the Murgio group, and he says:
"Gentlemen:  Why am I being requested to do things that may or
may not be okay for me to do?????  If we are aware of our
capitalization requirements, why am I being instructed to
authorize $100 million to pass through the CU??"

Then he goes on to list some additional problems and
then he concludes at number 5, "Do we not care???"

And then he says the most compelling thing in his
email:  "Just because this is legal, does not mean it is
encouraged to be operating outside such parameters.  From what
I understand, the ratio we must maintain is very important and
it seems that only Trevon is attempting to ensure that we
remain compliant."

This is the same Trevon the government accuses of
actually deliberately and intentionally being noncompliant.
This is a coconspirator, alleged, talking in an email, in early

1    November 2014, after everything that's gone on, saying, Trevon

2    is attempting to ensure we remain compliant, only Trevon is

3    attempting to ensure we remain compliant.

4         That's the most significant thing about Rico Hill --

5    not what he says on the witness stand but what he said back

6    when this whole craziness was occurring.

7         Rico Hill was a very interesting witness.  He talked

8    about how he threatened Anthony Murgio to lie to the FBI on

9    Hill's behalf.  He talked about how he would have taken money

10   to testify -- to speak to the media in a certain way or he

11   would have taken money to talk to Anthony Murgio's lawyer.

12   It's not surprising that the government talks so little about

13   him in their closing argument.

14        So let's talk about Jose Freundt.  Jose Freundt is the

15   one person who uses the word "bribery" in the case.  As I sat

16   here this morning, I didn't hear the government talk about

17   this.  I think it's highly important.  I think you will

18   undoubtedly talk about it, if you recall his testimony.  It's

19   Government Exhibit GX 4501.  It's a WhatsApp chat.

20        If we can call it up, Government Exhibit 4501.

21        You'll have this in a hard copy form, ladies and

22   gentlemen.  And if we could go to entry 5245.  This is where

23   Freundt is talking to Rico and Anthony Murgio, among others.

24   Critically, he's not talking to Trevon Gross.  Trevon Gross is

25   not on this WhatsApp chat, needless to say.  And they're

1    talking about how they're going to try and entice Trevon Gross

2    into reengaging with them, because this is right after the

3    November 22nd, 2014, meeting, when Trevon Gross has said no

4    more, no mas.

5              And Freundt says:  "We shouldn't mention $$ (bribery)

6    in the resignation email."  Of course, I asked him, you know,

7    when Anthony Murgio, a few lines later, says donation, is he

8    correcting you?  And Freundt says: He could have been.  He

9    doesn't know.  This is susceptible to any number of meanings.

10   Like so many things in the case, it's susceptible to

11   interpretation.  And, again, I submit to you, if something's

12   susceptible to reasonable interpretation that gives rise to

13   reasonable doubt, it's another reason why you should and must

14   vote to acquit Pastor Gross.  But this is just one of many

15   examples.

16             I asked Mr. Freundt -- this was after the

17   November 22nd, this is after he had attempted to talk to Pastor

18   Gross about reengaging.  And Freundt said that he never

19   discussed bribery with Pastor Gross, he never discussed

20   whether, from Pastor Gross' perspective, this is bribery.  And

21   this gets to a very critical aspect of what the judge will tell

22   you tomorrow.

23             The judge is going to tell you tomorrow that even if

24   the Murgio group, Jose Freundt for example, thought that they

25   were bribing Pastor Gross, that they were acting with corrupt

1    intent, that they were intent on taking over the HOPE Federal

2    Credit Union for a bad purpose -- that is, to operate an

3    illegal and unlicensed -- excuse me, to run Bitcoin

4    transactions through the HOPE Federal Credit Union -- even if

5    that's true, even if you're convinced of that, that doesn't

6    mean Pastor Gross had the same intent and the same corrupt

7    intent and is guilty; that he has to form his own corrupt

8    intent, on the other side of the transaction, to be guilty.

9           So, in other words, legally speaking, factually

10   speaking, a bribe-payer can be guilty at the same time the

11   bribe-taker is not guilty, if there's no shared purpose of

12   corrupt intent.  And, here, despite Mr. Freundt using the word

13   "bribery," he in no way, shape or form ever attempted to

14   connect from this witness stand to any conversations he had

15   with Pastor Gross or any actions that he undertook with Pastor

16   Gross.

17          Let me just talk about the NCUA part of the case

18   because, as you know, the conspiracy has three components as

19   respects Pastor Gross:  One, that he received a bribe, and

20   we've talked a lot about that, and I hope I have nothing much

21   more to say about it because I hope, as the government said,

22   this is an easy case in that regard.  But there are two

23   additional objects of that conspiracy that involve the NCUA.

24   One is obstructing the NCUA investigation; the other is lying

25   to the NCUA.

1          Just make sure you keep in your mind, as you're

2    mulling this over, that dealing with the NCUA and getting the

3    regulations wrong, or not complying with those regulations,

4    acting negligently in the words of Pastor Gross, none of that

5    is criminal.  And the judge has told you -- and she'll tell you

6    again tomorrow or you'll receive as part of the evidence in the

7    case, I should say, in the Court's instruction -- that

8    violation of NCUA regulations alone is not a crime, and Pastor

9    Gross is not accused of a crime in that regard.  You, of

10   course, can consider it for the rest of all the evidence you

11   hear, the character evidence and everything else you've heard,

12   but you can't go back and say, well, you really did a terrible

13   job with ACH processing, therefore, I'm voting guilty.  God

14   forbid.

15          But this is where the evidence is overwhelming.  This

16   is where the evidence would threaten to overwhelm anyone trying

17   to make sense of it.  And when you go back to the jury room and

18   you're handed in paper form, or perhaps in digital form, these

19   hundreds of exhibits, these thousands of pages, the NCUA

20   regulations, the testimony of the half dozen NCUA and other

21   credit union people who came in, it may be overwhelming to try

22   to make sense of all this.  So, my suggestion to you is, you

23   look everywhere you can for evidence of good faith versus

24   evidence of criminal intent, evidence of a bad purpose,

25   evidence of bad faith, evidence of deception, evidence of

1    fraud.

2         In other words, when Pastor Gross is scrambling, in

3    his words, when he's tapdancing, is he trying to deceive people

4    or is he simply trying to get to the next day and try to make

5    this right?  And that's when you can go back to the

6    November 22nd conversation and you can hear him talking about

7    how frustrated he is:  I've been talked about this for two

8    months, we've got to get it right, we can't pretend to have an

9    infrastructure, we have to have an actual infrastructure.

10        Things of that nature would show, even at the end of

11   what the government claims is a conspiracy, he's trying to get

12   it right.  And, of course, if it really was a conspiracy, where

13   he was sacrificing the well-being of HOPE Federal Credit Union,

14   he wouldn't care about getting it right, because he's getting

15   the money and he's getting out of the business.  But that's not

16   the way he operated, and that's why he says, in that same

17   conversation:  The reason I stuck around was for the integrity

18   of the organization.

19        So, a couple of examples:  The witness Magdalena Flok,

20   Ms. Flok from the NCUA, testified about how she asked Mr. Gross

21   for a file folder related to Kapcharge.  And he couldn't

22   produce it when she asked for it, and he produced it several

23   hours later.  And you heard him describe how he put it down one

24   place and when he came back to that same place, it was missing.

25   The government wants you to speculate as to what happened,

H39KLEB7                Summation - Mr. Klingeman

1     above and beyond what Mr. Gross said.  There's no evidence

2     other than what he said, for you to rely upon.

3            So if you want to just imagine something completely

4     different happened based on the government inviting you to

5     speculate about something else that happened, that's utterly

6     improper.  The only competent evidence before you is what

7     Pastor Gross said, which is, he put it in one place, he went

8     back and it was gone.  And did he think it had been moved to

9     storage or did he think it had been misplaced?  You heard him

10    testify, but the point is, he struggled in the intervening

11    hours to put a version of the file together and got all the

12    information from Kapcharge in Montreal, among other places, to

13    do so.

14           And among other things that will become clear to you

15    as you review the various evidence is that, in fact, Kapcharge

16    had a lease, had a lease in Lakewood, as far back as May of

17    2014, even though this controversy was occurring in the fall of

18    2014; and in fact in November of 2014, late fall, Kapcharge had

19    the lease back in May.  They had a stake, a physical geographic

20    stake, in Lakewood, six months earlier.

21           Clayton Curry, the NCUA witness who testified about

22    certain field of membership issues, testified he wasn't sure --

23    even he wasn't sure -- whether a virtual office, in other

24    words, some kind of workstation in Lakewood that was available

25    to Kapcharge even though they were based primarily in Montreal,

1    was appropriate.  So it's very possible what Kapcharge

2    established in Lakewood, New Jersey, in May of 2014 was

3    perfectly within the regulations.  There was no scrambling

4    necessary in November to try and backfill some problem with

5    field of membership.

6         And then subsequently Ms. Flok told how she met Mark

7    Francis, the Kapcharge representative; not in Montreal, of

8    course, she met him in Lakewood.  She met him at the credit

9    union.  And he told her flat out, he was Canadian, he didn't

10   have employees in New Jersey, and that he planned to establish

11   a footprint there, as this business relationship with HOPE

12   Federal Credit Union was developing.

13        No one should expect, for instance, when this deal

14   begins, that someone like Rico Hill is going to wake up on a

15   Saturday morning and suddenly move to Jackson, New Jersey, from

16   Tallahassee, Florida, or that Mark Francis is going to be able

17   to establish, overnight, a business presence in Lakewood, New

18   Jersey, when he's based in Montreal, Canada.  Like any business

19   relationship or personal move, this takes time and these were

20   all works in progress.

21        Under the government's theory, it wasn't done fast

22   enough, it wasn't done precisely enough in compliance with the

23   regulations; and, therefore, this is evidence of bad faith.  In

24   fact, the opposite is true.  And this Kapcharge file is just

25   another example, because, as we know, all the account documents

1    that end up in the file that was given to Ms. Flok show that

2    the Kapcharge folks were indeed from Canada.  There was no

3    effort to get them a New Jersey driver's license in a short

4    period of time and give that to Ms. Flok to fool her into

5    thinking that this Shoula Cohen or Mark Francis lived in

6    New Jersey.  Pastor Gross gave her the document from these

7    people, that showed that they were Canadian.

8              And, finally, after all the talk of due diligence,

9    NCUA visited the physical location of Kapcharge in Lakewood and

10   determined that it was a bona fide office and ultimately found

11   that Kapcharge was in the field of membership.  So, in fact,

12   instead of a deception, instead of being an obstruction of the

13   NCUA, this is something that satisfied the NCUA at the end of

14   the day.

15             I'm not going to go through each and every NCUA,

16   obviously, with a limited amount of time and I am already

17   probably over it, but I want to cite a couple of examples.  One

18   of the things that the government has alleged as a false

19   statement is the profile that was submitted in mid-2014 that

20   reflects the membership of the board of directors of the HOPE

21   Federal Credit Union.  And in that profile that was submitted

22   in July of 2014, the names of the so-called Collectables Club

23   folks were not listed.  And the government has asserted that

24   that's a false statement, it was a certified misstatement by

25   Bernard Larkins, and it's a false statement, and Pastor Gross,

1   in his capacity as the CEO of the credit union, is somehow

2   facilitating that false statement.

3          But you heard, not only from a variety of witnesses

4   about how the adoption of board meeting minutes affects the

5   process of whom is elected and when they're elected, you heard

6   that from Meg Flok.  Remember?  The NCUA witness herself said,

7   look, if a board action is taken in a particular month, say,

8   June, it's not considered official until those board minutes

9   are ratified at the next meeting.

10          Well, in the case of this June election of these NCUA

11   board members, that election wasn't ratified until several

12   months later; not July, not the next month.  So, by the time

13   the profile was submitted to the NCUA, in July, reflecting the

14   previous composition of the board, it was actually -- it was

15   accurate in the sense that it was the present composition of

16   the board, and it was only after the board meeting minutes from

17   June were adopted, that the board election became official.

18          There are a whole host of other issues and in the

19   interests of time, I'm not going to review them all.  But

20   suffice to say, as Pastor Gross testified yesterday, as you

21   heard through the various NCUA witnesses, he made an effort --

22   most importantly, HOPE Federal Credit Union made an effort --

23   to be compliant.  Were they at all times?  Absolutely not.  The

24   reason NCUA has examinations is to regularly monitor the

25   activities of their credit unions, and that's what they did

1    with HOPE Federal Credit Union.  And never once was there a

2    finding of Pastor Gross having made a false statement in 2014.

3              Now, I just want to add one last thing, to add some

4    color to this whole NCUA thing:  The government, before they

5    called the NCUA, called representatives of Alloya, Alloya being

6    a larger credit union, a corporate credit union, that offered

7    services to smaller credit unions like HOPE Federal Credit

8    Union.  And remember what the Alloya folks said ultimately?

9    The ACH processing that HOPE Federal Credit Union was

10   attempting in mid-2014 was way beyond HOPE's capacity, there

11   were a lot of problems, lot of compliance issues, failure to do

12   this OFAC review for foreign money coming in, so there's always

13   a danger, you know, you can have something criminal going on --

14   all legitimate concerns, and Alloya said, we're just not going

15   do it anymore.

16             And it was, as you read through the emails, very

17   disruptive to HOPE's business to have Alloya cut them off.  And

18   so they scrambled to go to Magic Wrighter, and there were other

19   options pursued -- they wanted to go to the Federal Reserve

20   Board at one point -- but the point about Alloya is Alloya's

21   takeaway.  The Alloya witnesses described how they had the duty

22   to report what's called suspicious activity, what they

23   perceived to be potential illegal activity.  And they do it all

24   the time.  Financial institutions like Alloya, as the Alloya

25   witnesses testified, are obligated to do this, and they do this

1    all the time.  They never once filed a suspicious activity

2    report about HOPE Federal Credit Union.  They cut them off from

3    ACH processing, yes, but never a suspicious activity report.

4           What else did they do?  They continued to do business

5    with HOPE on a number of different service fronts.  So it's not

6    like they thought there was something fundamentally wrong or

7    even criminal, much less criminal, at HOPE Federal Credit

8    Union.  And neither should you.

9           THE COURT:  Mr. Klingeman, it's 5:00.

10          MR. KLINGEMAN:  I'm ready to stop.

11          THE COURT:  But your estimate is about 15?

12          MR. KLINGEMAN:  I would say 15 or 20.

13          THE COURT:  All right, thank you.

14          Ladies and gentlemen, it is 5:10.  We'll break for the

15   evening.  There is a little bit remaining of this closing.

16   There will be a brief government rebuttal, and then I'll

17   instruct you, and you will begin deliberations.

18          I know, in response to my earlier instruction

19   regarding scheduling, a few people mentioned some accommodation

20   requests to Ms. Nunez.  I will accommodate those, as needed.

21          As you can see, we are at the end of this process,

22   with deliberations to begin tomorrow morning.  So I just do ask

23   you to please continue to bear in mind my instructions, even

24   though we are at this final stage.

25          I send you home, with my thanks for your attention and

H39KLEB7              Summation - Mr. Klingeman

1    diligence.  We'll see you tomorrow at 9:30.  And lunch will be

2    provided.  You'll be deliberating before lunch, so lunch will

3    be provided during deliberations.

4                 Thank you.  Have a good night.

5                 (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          THE COURT:  Matters to take up?

3          MR. KLINGEMAN:  For some reason, your Honor, I thought

4     you said 5:15.  I don't know why I had that in my head.

5          THE COURT:  No, I understand.  The question was if we

6     were sort of on the cusp of finishing, and I maybe

7     misinterpreted that to mean all of the closings; I would let it

8     go, you know, maybe 15 minutes beyond.  But in the absence of

9     that, I don't want to keep them later than I promised.

10          Matters to take up?

11          So, my request:  We'll meet at 9:00 and I will get on

12     the record agreement as to the list of admitted exhibits and

13     the exact content of material that's going back to the jury.

14          Ms. Nunez sort of mentioned in briefing, there had

15     been some question about the list of exhibits that were on the

16     document that came in as an exhibit at the end.  She doesn't

17     have the answer to that, and I have not seen that document.  So

18     just make sure there's agreement between the parties as to that

19     and everything else, and I will get that on the record at 9:00.

20          All right.

21          MR. NOBLE:  Okay.

22          THE COURT:  Thank you.  See you tomorrow.

23          MR. NOBLE:  Thank you, Judge.

24          (Adjourned to March 10, 2017 at 9:00 a.m.)

25                              *  *  *

H39KLEB7

GOVERNMENT EXHIBITS

Exhibit No.                                        Received

  1253-B   . . . . . . . . . . . . . . . .3873

  1001     . . . . . . . . . . . . . . . .3874

DEFENDANT EXHIBITS

Exhibit No.                                        Received

  TG60     . . . . . . . . . . . . . . . .3873