H3A9LEB1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          15 Cr. 769 (AJN)

5    YURI LEBEDEV and TREVON GROSS,

6              Defendants.                 Jury Trial

7    ------------------------------x

8                                          New York, N.Y.
                                           March 10, 2017
9                                          9:03 A.M.

10
     Before:
11
                        HON. ALISON J. NATHAN,
12
                                           District Judge
13                                         And A Jury

14                           APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     BY:  EUN YOUNG CHOI
17        DANIEL S. NOBLE
          WON S. SHIN
18        Assistant United States Attorneys
          MICHAEL CHANG-FRIEDEN, Paralegal
19        EMILY GRANT, Paralegal

20   CREIZMAN, PLLC
          Attorneys for Defendant Yuri Lebedev
21   BY:  ERIC M. CREIZMAN
          MELISSA MADRIGAL
22        JONATHAN MICHAELSON, Paralegal

23   KROVATIN KLINGEMAN, LLC
          Attorneys for Defendant Trevon Gross
24   BY:  KRISTEN M. SANTILLO
     BY:  HENRY E. KLINGEMAN

25

H3A9LEB1

1              (Trial resumed; jury not present)

2              THE COURT:  Good morning everyone.  Matters to take

3     up?

4              MR. KLINGEMAN:  Your Honor, I just need about five

5     minutes between now and when the jury is brought in to make

6     sure I can display a single exhibit on the screen.  So we're

7     trying to coordinate that but otherwise I'm ready to go; and

8     I've timed myself to stay within the parameters that the Court

9     imposed -- not imposed but strongly recommended yesterday,

10    fifteen to twenty minutes.  I timed it out and I'm good to go.

11             THE COURT:  Thank you.  Yes.  Not imposed.  I have --

12    I don't -- can't really restrict closings in any non-reasonable

13    way and you've certainly been reasonable.

14             Matters to take up?

15             Ms. Choi?

16             MS. CHOI:  Your Honor, I think there's one discrepancy

17    with regard to the exhibits that Mr. Chang-Frieden was about to

18    describe to me.

19             THE COURT:  Good.

20             (Pause)

21             MS. CHOI:  It appears that there is one defense

22    exhibit that has not -- that was inadvertently not admitted but

23    I don't know what the details of that are.  Maybe Ms. Madrigal

24    is aware.

25             MS. MADRIGAL:  My understanding is that it's DX-24.

H3A9LEB1

1    And I believe -- I'm not sure whether Mr. Creizman moved that

2    into evidence or not but I believe that the government moved

3    that into evidence during Mr. Gross's cross.

4              THE COURT:  As a different number?

5              MS. MADRIGAL:  As a government exhibit.

6              MS. CHOI:  I see.  There's two versions.

7              MR. NOBLE:  I think Ms. Santillo put it in evidence

8    the first time we put in our version of it.

9              MS. CHOI:  What do you guys want?  If it's in --

10             THE COURT:  You could cross-reference it on the

11   exhibit list.

12             MS. MADRIGAL:  I think that would be reasonable.

13             THE COURT:  Do you know what the government exhibit

14   is?

15             MR. CREIZMAN:  I know what it is.

16             MS. MADRIGAL:  We can easily find out by looking at

17   the transcript, your Honor.

18             MS. CHOI:  If you have a hard copy I can search by

19   text or Michael can search by text.  I don't know.

20             Do you know how to do it?

21             THE COURT:  You can go off the record.

22             (Discussion off the record)

23             MS. CHOI:  There is a version of this but it's

24   slightly different.  The version that the government

25   admitted --

H3A9LEB1

1          THE COURT:  And the "this" is?

2          MS. CHOI:  DX-24.

3          The version the government admitted is I believe

4    120-A.  And as is the case in many of these exhibits there are

5    chains of e-mails.  So the bottom two e-mails which is, to

6    describe it, it's an e-mail chain on September 15.  The first

7    e-mail is an advertisement for this virtual currency BSA/AML

8    compliance conference or training.  And then that gets

9    forwarded by Trevon Gross to Yuri Lebedev and Jose Freundt and

10   Anthony Murgio.

11         So those two bottom e-mails are reflected in the

12   government exhibit.  The issue is at the top e-mail chain.  The

13   version the defense -- in the defense exhibit includes a

14   response from Anthony Murgio and the version that the

15   government has admitted I believe is a version in which that --

16   the lower two e-mails are simply forwarded to Unit Test.  So

17   the defense's exhibit, the two lines of Anthony Murgio's

18   statement back are not actually in evidence.

19         So I mean I don't know what the solution should be

20   then.

21         THE COURT:  Are you relying on it for that top e-mail,

22   Ms. Madrigal.

23         MS. MADRIGAL:  I know we were supposed to abide by

24   your one-lawyer rule.

25         THE COURT:  Mr. Creizman is here now.

H3A9LEB1

1            MR. CREIZMAN:  Yes.  I was the one who entered, who

2    entered it.  Obviously, I didn't realize -- I thought that it

3    had been admitted into evidence because it had a Defendant's

4    Exhibit sticker on it.  So I'm -- I don't think -- just in

5    terms of -- just as a rule could we -- we could either make it

6    the government exhibit -- no one saw the defendant's exhibit,

7    right?

8            MS. CHOI:  Right.

9            MR. CREIZMAN:  So could we make -- it's either the

10   government exhibit could be the one with the top e-mail.  It

11   doesn't really matter.

12           MS. CHOI:  You don't care about the top e-mail?

13           MR. CREIZMAN:  I don't.  But I did read from it.  I'm

14   pretty sure I read from it in closing.  Yeah.

15           MS. CHOI:  You read from the top e-mail.

16           MR. CREIZMAN:  I did.  I read the whole -- I read the

17   whole thing.  I mean I don't know.

18           MS. CHOI:  Your Honor, this, I mean --

19           MR. CREIZMAN:  All the e-mails -- right.

20           MS. CHOI:  The government has no problem -- I mean the

21   only issue is, is that obviously we're in a procedural

22   situation which I've not been in before.  But we don't have any

23   problem with somehow reopening for the purpose of just getting

24   this exhibit in because it's one that we have no objection to.

25   At this point, if Mr. Creizman had already relied on it in

H3A9LEB1

1   closing, although obviously under other circumstances there may

2   be issue with that, we don't have issue with that fact.

3            So I don't -- as a pragmatic matter, I think maybe the

4   easiest thing to do is simply -- it's awkward, but I don't know

5   if there's some way that we can just reopen the case and put

6   this in.  Because my concern is he's made reference to a

7   specific defense exhibit by number and the jury goes looking

8   for it and they can't find it and then they go to the

9   government exhibit and he read from the first two lines, I mean

10  it's not going to make sense to them and I'd rather it just be

11  clean.

12           THE COURT:  Did you -- you noted it as DX-24 when you

13  read from it?

14           MS. CHOI:  Why don't we just check.

15           MR. CREIZMAN:  The transcript I never got the

16  transcript last night.

17           THE COURT:  It came through last night.

18           MR. CREIZMAN:  I don't know why.

19           THE COURT:  Let me make a suggestion.  That we put it

20  in as DX-24.  I'll say to the jury as a housekeeping matter I

21  am reopening the case for the admission of DX-24 which was

22  inadvertently not moved into evidence.  Everybody agree with

23  that?

24           MS. CHOI:  Yes, your Honor.

25           And he did make reference to -- well, hold on.

H3A9LEB1

1          Yes.  He did make reference to the first two lines so

2     I think that's the best way to go.

3          THE COURT:  I thank the government for its flexibility

4     on that one.

5          MR. CREIZMAN:  Thank you.

6          MS. CHOI:  No worries.

7          THE COURT:  So with that included on the -- so

8     Mr. Chang-Frieden will include DX-24 on the list, that separate

9     agreement will be included in the pile.  Do we have agreement

10    as to what physically is going in?

11         MS. CHOI:  One moment, your Honor.

12         (Discussion off the record)

13         MS. CHOI:  So it appears that -- the government has a

14    hard copy of exhibits ready to go.  It also has the electronic

15    copy of all of its exhibits and most of the defense exhibits

16    with two or three exceptions which we're going to deal with.

17    So our proposal is it doesn't seem as if defense counsel would

18    like to go through the government hard copies to doublecheck.

19    We would propose sending back the computer with all of the

20    exhibits, both the government and defense exhibits and then

21    hard copies as well so that the jury can choose which versions

22    they would like to look at.

23         I think the one exception, again, to that would be

24    that -- we could send -- I mean do we have hard copies of the

25    WhatsApp chats?

H3A9LEB1

1          We can printout hard copies of the WhatsApp chats if

2     that's what they would like.  That's the one thing that may

3     require a little instruction if they want to look at them

4     because they have to be open in a particular program, Chrome as

5     the browser and not Internet Explorer, in order for them to be

6     able to be played and integrated the way that they were

7     displayed at trial.

8          So that's the one issue with regard to the electronic.

9     But, otherwise, I think the parties are in agreement that both

10    are ready, and defense counsel doesn't seem to intend to go

11    through the government hard copies so we can send them back.

12         THE COURT:  So the agreement is the laptop will go

13    back.  It will have on it all exhibits, government and defense

14    exhibits.

15         The government's exhibits can also go back in paper.

16         MS. CHOI:  Yes.  And the defense exhibits as well.

17         THE COURT:  So we give them both papers copies and

18    electronic copies.

19         The only thing that they either need something printed

20    or further instruction are the WhatsApp chats.

21         MS. CHOI:  Correct, your Honor.

22         THE COURT:  What does it take to print them?

23         MS. CHOI:  It doesn't take long.

24         Again, because I think the agreement was the

25    transcripts go back, but they're aids, they're not actually in

H3A9LEB1

1   evidence, if they want to look at the underlying evidence is

2   our only concern, but it doesn't take long to print them if

3   your Honor would like as well.

4            THE COURT:  I see you have the audio.

5            MS. CHOI:  The audio, to be clear, because as your

6   Honor may have seen there's that little triangle that sometimes

7   we played, but sometimes we just read from the transcript.  And

8   to the extent that the jurors would actually like to hear their

9   voices or whatever else, they can't easily find the audio in

10  the disk versions.  They have to use this sort of Chrome

11  situation where if they open it up in one particular browser it

12  will be obvious to them, they can just click play and go.

13           MR. CREIZMAN:  Can I confer with you.

14           THE COURT:  Sure.

15           (Discussion off the record)

16           THE COURT:  Back on the record.

17           MS. CHOI:  I think we all agree.  I think we can just

18  rely on -- we can send back a hard copy too, but I think that

19  we should have the instruction to the jurors about just with

20  regard to the WhatsApp chats.  And the instruction simply with

21  regard to the WhatsApp chats which are -- and we can tell you

22  the government exhibits, it's 45 something to something.  And

23  we'll look that up in a moment, your Honor.

24           With regard to the WhatsApp chats, the parties would

25  like to instruct or the government or whomever would like to

H3A9LEB1

1    instruct the jurors that to access those chats they should open

2    the folder for the exhibit, and then open the HTML file in a

3    Chrome browser.  And I know that juror number four or five will

4    be able to figure that out.  In the Google Chrome browser.

5             THE COURT:  So what I'll propose is I'll say that I'm

6    sending back a laptop that contains digital -- an electronic

7    version of all admitted government and defense exhibits.  I'm

8    also sending back paper copies of all admitted government and

9    defense exhibits.  For the WhatsApp chats, to hear the audio,

10   they need to follow an instruction, and I think I'll just ask

11   you, Ms. Choi, to provide that.  And I'll tell them that if

12   they have any difficulty with that, then once they select their

13   foreperson they should send a note and I can -- we can either

14   play portions in the courtroom that they want to hear or

15   provide further instructions.

16            MS. CHOI:  That works.  Thank you, your Honor.

17            THE COURT:  Everybody agree with that?

18            MR. CREIZMAN:  Yes, your Honor.

19            MR. KLINGEMAN:  Yes, your Honor.

20            THE COURT:  Thank you.

21            I also just want to get the exhibit list then which

22   sounds like it's complete.  Agreed -- everybody look at it and

23   agree on it and I'll mark it as a court exhibit and a copy will

24   go back to the jury unless anyone has any concerns with that.

25            MS. CHOI:  Your Honor I just wanted confirmation that

H3A9LEB1

```
 1    it's your Honor's practice to only send back numbers and the
 2    date that they were admitted.  Is that, in fact, the case?
 3              THE COURT:  What do you mean?
 4              MS. CHOI:  With regard to an exhibit list.
 5              THE COURT:  Only admitted exhibits.
 6              MS. CHOI:  Correct.  Right.
 7              For admitted exhibits, that the exhibit list should
 8    contain no descriptors of what the exhibits are.
 9              THE COURT:  Correct.
10              MS. CHOI:  So it will literally just be a string of
11    numbers and the date that it was admitted, I believe.
12              THE COURT:  Yes.
13              MS. CHOI:  Okay.
14              THE COURT:  Because I don't want to get into debates
15    about every description.
16              MS. CHOI:  Fair enough.  I just wanted to make sure
17    that that was the practice.
18              THE COURT:  So do you have that?
19              MS. CHOI:  Yes, your Honor.  I believe that's
20    prepared.  The last paralegal is coming over, Ms. Grant is on
21    her way over with those.  And those were circulated, I believe,
22    or at least the lists were circulated last night.  It would
23    just be stripping out titles.
24              THE COURT:  Including DX-24?
25              MS. CHOI:  Yes.  We will include that for sure.
```

H3A9LEB1

1          THE COURT:  Otherwise everybody agrees to the list?

2          MS. MADRIGAL:  Yes.  We have our individual lists.

3          MR. KLINGEMAN:  Yes.

4          THE COURT:  So once I actually see that, I'll mark --

5     I'll have Ms. Nunez mark it as a court exhibit and then it can

6     go to the jury.

7          I think everybody has the -- I'll have Mr. Rosen hand

8     out copies of the -- the final copy of the jury charge for you

9     to read along with me and then I have -- I'll send one verdict

10    form back with the jury and I will enter on ECF the final jury

11    instructions that Mr. Rosen is handing out now and the blank

12    verdict form that will all be in the docket.

13         Anything else?  Give Mr. Klingeman his time to set up.

14    Anything else to take up?

15         MR. SHIN:  Your Honor, your Honor mentioned this at

16    the end of the day yesterday that, again, yesterday we have

17    this list of exhibits to come in by stipulation.  And I think

18    your Honor mentioned on the record that Ms. Nunez didn't have

19    the list and the court reporter I think should have the list so

20    that the court reporter can enter the actual numbers of all the

21    exhibits that are contained on the list.

22         THE COURT:  Right.

23         MR. SHIN:  So we have that and we can hand that to the

24    court reporter for use of entering the exhibit numbers into the

25    record as well.

H3A9LEB1

1           THE COURT:  Okay.  Thank you.

2           (Government's Exhibits 10,001; 1000s:

3   amurginc@gmail.com Emails, 1015, 1017, 1063, 1065-C, 1194-A,

4   1194-B, 1194-C, 1194-D, 1195, 1202-A, 1202-B, 1204-A, 1204-B,

5   1209, 1214, 1216-A, 1216-B, 1218-A, 1219, 1222, 1224-E, 1228,

6   1231-B, 1232, 1233, 1235, 1238, 1241, 1242-A, 1242-C, 1242-D,

7   1242-E, 1243, 1248-B, 1248-C, 1255, 1257-A, 1257-B, 1259-C,

8   1259-D, 1260-A, 1266-A, 1266-B, 1275, 1291, 1316-A, 1316-B,

9   1317-B, 1317-E, 1317-F, 1317-H, 1321, 1324-D, 1327-A,

10   1327-A-Link, 1327-E, 1329, 1331-B, 1331-C, 1343-D, 1347-A,

11   1347-B, 1351-B, 1356-A, 1356-B, 1358, 1359, 1367-F, 1370,

12   1389-B, 1404, 1407-A, 1407-C, 1410, 1411, 1412-A, 1415, 1432-D,

13   1440-F, 1442-B, 1482-A, 1482-B, 1482-C, 1483-A, 1483-B, 1483-C,

14   1483-F, 1483-H, 1483-J, 1483-L, 1483-T, 1488, 1489-B, 1491-B,

15   1495, 1521, 1522-A, 1531, 1533-A, 1551, 1552, 1553, 1554, 1556,

16   1557, 1558, 1560, 1561, 1562, 1575, 1583, 1586-A, 1586-B,

17   1586-C, 1586-D, 1586-E, 1587, 1588-A, 1588-B, 1588-C, 1611-A,

18   1611-B, 1613, 1614, 1615, 1616-A, 1616-B, 1616-C, 1616-D,

19   1616-E, 1617, 1618-A, 1618-B, 1618-C, 1621, 1623-A, 1646-1668:

20   trevongross@me.com Emails, 1652-1, 1652-1-A, 1652-2, 1652-3,

21   1666, 1786-1817: jmfreundt@hotmail.com Emails, 1793, 1860-2049:

22   Ylebedev@gmail.com Emails, 1912, 1913, 1933, 1938, 1939, 1940,

23   1947-A, 1947-B, 1949, 1950, 1958, 1959, 1962, 1970, 1972, 1995,

24   2016, 2019, 2020, 2021, 2022, 2024, 2027, 2029, 2047-1,

25   2050-2120:  Ylebedev@hope-fcu.com Emails, 2061, 2073, 2089,

H3A9LEB1

1    2104, 2108, 2109, 2110, 2143-2254:   rhill@hope-fcu.com Emails,

2    2145, 2146, 2148, 2157, 2161, 2163, 2165, 2167, 2173, 2178-B,

3    2178-C, 2178-D, 2184, 2198, 2201, 2203, 2206, 2208, 2212-A,

4    2212-B, 2218, 2230-A, 2230-B, 2232, 2234, 2236, 2236-1A,

5    2236-1C, 2238, 2244, 3000: HOPE FCU Documents, 3000, 3500s:

6    Kapcharge Documents, 3504, 3506, 3511, 3512, 3513, 3516, 3522,

7    3523, 3524-A, 3524-B, 3524-C, 3524-D, 3528, 3529-A, 3529-B,

8    3534, 3537, 3538, 3539-A & 3539-B, 3541, 3543, 3544, 3573-A,

9    3573-B, 3575-A, 3575-B, 3576-A, 3580, 3583-D, 3587-A, 3587-B,

10   3588, 3611, 3613, 3520, 3690, 3701, 3704, 3705, 3708, 3568-A,

11   3719, 3721, 3725, 3740, 4000s:  Stipulations, 4015, 5000-5180:

12   Anthony Murgio's Computer, 5002, 5003, 5007, 5009, 5011, 5017,

13   5041, 5069, 5083, 5095, 5102, 5102-Link, 5115, 5127, 5139,

14   5148, 5149, 5152, 5153, 5154, 5155, 5156, 5157, 5158, 5159,

15   5160 received in evidence)

16            THE COURT:  One last point and then I'll step down

17   until we get our jurors.  Just in case this rearises, I don't

18   want to have to do a sidebar.

19            There was an objection during Mr. Klingeman's closing

20   which I did overrule and I can -- I believe I know what the

21   objection was.  It was when Mr. Klingeman asked if the

22   government hasn't proved beyond a reasonable doubt that

23   Mr. Gross lined his pockets, then you have to acquit.  And you

24   objected, which I presume was in light of the instruction on

25   accepting corrupt payments and the specific instruction that

1    the government does not have to prove that Mr. Gross received

2    the payments directly if he corruptly solicited, demanded,

3    accepted or agreed to accept a payment on behalf of another

4    person or entity with the intent to be influenced or rewarded

5    that is sufficient to find him guilty.  Is that the basis for

6    the objection?

7             MR. NOBLE:  Judge, it's funny.  I don't think I

8    actually objected to that.  I was going to.  But I had

9    previously objected to Mr. Klingeman's description of the

10   burden of proof as proving beyond no doubt as opposed to a

11   reasonable doubt.  And I objected and you overruled my

12   objection.  So kind of as a strategic matter I did not object

13   to his misstatement of the law with respect to the burden of

14   proving corrupt intent.  I would have because I think it was

15   incorrect.

16            THE COURT:  So the reason I overruled it in the

17   context in which it was being given was it was in the context

18   of good faith.  And I was interpreting the implication in what

19   Mr. Klingeman was arguing is to remind the jury that it is

20   still the government's burden with respect to good faith.  But,

21   and then I -- there was a later -- so I did misinterpret your

22   objection and nevertheless overruled you and there was a later

23   moment where it reemerged.  And I didn't know and the

24   government didn't object and I wasn't sure.  Basically, I'm

25   comfortable with my ruling yesterday and I just want to make

H3A9LEB1

1   sure that this is not -- if this is something we need to flesh

2   out for the remainder of Mr. Klingeman's closing?

3          MR. KLINGEMAN:  Your Honor, I don't recall saying you

4   must find there is no doubt.  I'm obviously aware of the

5   standard since I quoted the jury instruction.  And I'd like to

6   be shown in the transcript where I said no doubt because I'm

7   confident I didn't say it.

8          MR. NOBLE:  I may have misspoken.  I think you said

9   some doubt as opposed to reasonable doubt.

10         It's on --

11         THE COURT:  4062.

12         MR. NOBLE:  It's line 11.

13         THE COURT:  Do you have some doubt about that?  So

14  this is in the context of --

15         MS. CHOI:  Lining his own pockets.

16         THE COURT:  Right.  It's in the context of good faith.

17  "Pastor Gross was lining his own pockets.  We're going to talk

18  in a few minutes about the financial information.  But ask

19  yourself:  Have you been convinced beyond a reasonable doubt

20  that Pastor Gross accepted this donation to the church so he

21  could line his own pockets?  Maybe I can ask the question in a

22  more appropriate way:  Do you have some doubt about that?

23  Because if you do, you must acquit him."  And that's where the

24  objection was.

25         MR. NOBLE:  Right.  My reasoning was I don't think

H3A9LEB1

1    it's correct to say that if they have some doubt that they

2    should acquit or they must acquit because it's reasonable

3    doubt.  And it's further incorrect because he doesn't have to

4    have lined his own pockets with the bribe money in order to be

5    convicted.  The money could have gone to the church for any

6    number of reasons and he could still be convicted.

7              So I think Mr. Klingeman is misstating the law to the

8    jury.  That was the basis for my objection.  And I'm not -- I

9    don't think we're seeking any kind of instruction, your Honor,

10   but we would like to make sure that he doesn't mislead the jury

11   through legal argument to them by misstating the law.

12             MR. KLINGEMAN:  I haven't misstated the law and I'm

13   responding directly to the government's argument that, in the

14   government's own words, Mr. Gross "lined his own pockets."

15             And the court will instruct the jury on the precise

16   law.  But I need to meet the government's argument.

17             THE COURT:  There are ways of meeting the government's

18   argument without contradicting the jury charge and I don't need

19   to do a correction but you'll bear in mind the -- it is true,

20   is it not, that the government does not need to prove beyond a

21   reasonable doubt that Mr. Gross lined his own pockets in order

22   to acquit.  That is what they've attempted to show.  But it is,

23   I think, that version of it is not a correct statement of the

24   law.  Do you agree with that?

25             MR. KLINGEMAN:  I don't disagree that the law does not

1    require the government to prove specifically that Mr. Gross

2    lined his own pockets.  What I do believe is that the

3    government has indicted the case and prosecuted the case to --

4    in an attempt to establish corrupt intent by demonstrating that

5    Mr. Gross lined his own pockets; in other words, that's the

6    specific evidence that the government has pointed to to

7    establish corrupt intent among other things.  And that's why I

8    believe I'm permitted to respond to it in that context.  But in

9    no way do I want to suggest to the jury that the government --

10   well, I agree with the Court.

11            THE COURT:  You're certainly -- absolutely permitted

12   to respond so long as it doesn't move over into a misstatement

13   of what is necessary.

14            I think we have clarity.  I think -- I don't think --

15   I think Mr. Klingeman will be cautious of not overstating the

16   government's heavy burden.  But it's obviously appropriate to

17   remind at any point the jury of that standard and I don't -- I

18   think it sounds like we're clear on not crossing the line with

19   respect to what will be my legal instruction as to how to prove

20   accepting a bribe payment.

21            MR. NOBLE:  Yes, Judge.

22            THE COURT:  Thank you.

23            I'll step down.  I think we're missing one juror, and

24   Mr. Klingeman needs to get a document up, so I'll step down for

25   a moment.

H3A9LEB1

1          (Recess)

2          THE COURT:  Please be seated.  We have all our jurors.

3          Mr. Klingeman, did you have a chance to set up what

4     you needed to?

5          MR. KLINGEMAN:  Ready to go, your Honor.

6          THE COURT:  All right.  Let's bring in our jurors.

7          Are you squarely in front of the microphone,

8     Mr. Klingeman?

9          MR. KLINGEMAN:  I am, your Honor.  I was told that a

10    few people in the back couldn't hear me so I'm going to do my

11    best to speak up this morning.

12         THE COURT:  Thank you.

13         MR. KLINGEMAN:  I just hope the people in front of me

14    heard me.

15         THE COURT:  You started out a little soft because the

16    mic was far away but it did get better.

17         MR. KLINGEMAN:  Thank you.

18         THE COURT:  Mr. Noble, you've kept it short, right?

19         MR. NOBLE:  Well I believe I'd asked for 40 minutes,

20    20 for each defendant which is typical.  So I'm going to try to

21    keep it within 40; maybe shorter if I talk fast.

22         Depending on what else Mr. Klingeman has to say.

23         (Continued on next page)

24

25

1          (Jury present)

2          THE COURT:  Good morning.  Thank you so much, ladies

3    and gentlemen of the jury.

4          Mr. Klingeman, you may return to the podium for the

5    remaining of the closing on behalf of Mr. Gross.

6          MR. KLINGEMAN:  Good morning, ladies and gentlemen.

7          When I concluded yesterday afternoon we had just

8    finished talking about the allegations in the indictment that

9    Pastor Gross obstructed an NCUA investigation and made false

10   statements to the NCUA.  And as I noted the government recited

11   for you in its closing argument and then throughout the trial,

12   by my count, seven so-called lies that Pastor Gross

13   participated in telling that both constitute an obstruction of

14   an investigation as well as false statements in and of

15   themselves.  And most of them, as you heard throughout the

16   trial, have been addressed by us not as lies but, in fact, as

17   truthful statements, in many cases; mistaken statements in

18   other cases; immaterial statements in yet another way.  And,

19   therefore, in no way, shape, or form deliberate efforts to

20   obstruct or lie to the NCUA.

21         But, as with so many aspects of this case, I don't

22   want you to form a false impression of the evidence based on

23   something you're hearing out of context.

24         Let me talk about the very last so-called lie that the

25   government cited yesterday in its closing argument.

H3A9LEB1                     Summation - Mr. Klingeman

1          You heard lie number six.  Lie number six, net worth

2     ratio.  And there are 31 slides of government exhibits and

3     testimony and argument that the government would have you

4     consider now to determine that Pastor Gross lied about net

5     worth ratio and obstructed a NCUA examination by lying about

6     the net worth ratio.

7          Let's be clear.  I don't know who can recall or recite

8     this net worth argument because you only heard it for the first

9     time yesterday.  And what do I mean by that?

10          The net worth ratio is an accounting issue that a

11     financial institution, a bank, a credit union, needs to address

12     and place in the call report, which is the report that goes

13     from the credit union to the NCUA.  And, obviously, if it's

14     deliberately falsified it can constitute a lie and it can

15     constitute an obstruction.  And, therefore, it can't be

16     falsified, at least not deliberately.

17          So the government is suggesting that -- to use the

18     government's phrase -- that Mr. Gross was cooking the books.

19     They said this is a classic example of cooking the books.  And

20     then they cited a $619,000 check from Kapcharge that was used

21     to purportedly manipulate the net worth ratio, lead to the

22     falsification of the call report and thus lead to an

23     obstruction of a NCUA examination and a lie to the NCUA.

24     That's the argument as it was presented yesterday.

25          But this is the very first mention in the trial in any

H3A9LEB1                    Summation - Mr. Klingeman

1    significant way of this issue.  There were no witnesses called

2    about this issue.  There was no effort to explain this issue

3    during the course of the trial.  Pastor Gross wasn't confronted

4    about this when he testified and wasn't given an opportunity to

5    explain.

6            But, be that as it may, what the government did do is

7    call no less than four -- four examiners at various supervisory

8    levels from the NCUA, and not a single one of them indicated

9    that this was a false statement or that the call report was

10   false or that the NCUA was misled in this regard.  This is

11   something the government has presented to you, the prosecutor

12   has presented to you at the end of the case in the hopes that

13   somehow it will make up for the utter lack of evidence that

14   Pastor Gross acted with corrupt intent, that he deliberately

15   deceived the NCUA and that he deliberately obstructed their

16   investigation.

17           So, again, as with so many issues in the case, so many

18   technical financial complex issues in the case there are two

19   sides to this story.  And remember what I said to you

20   yesterday.  In other words, if there are two sides to this

21   story, two reasonable sides, or at least a reasonable argument

22   from the defense, a reasonable explanation from Pastor Gross,

23   then you must acquit him because that's the very essence of

24   reasonable doubt; two reasonable sides to a story.

25           The government can make an argument.  They can make it

H3A9LEB1                    Summation - Mr. Klingeman

1    forcefully.  They can make it eloquently, but that doesn't make

2    it the truth.  And that doesn't make it the only argument.

3              And if Pastor Gross or the witnesses as we've

4    questioned them have given you a reason to think otherwise, as

5    long as it's reasonable, as long as it's plausible, as long as

6    it's credible, you must acquit him.  That's how the system

7    works.  That's how this jury trial functions.

8              So, please keep that in mind as you review all of

9    these disagreements about what the false statements might be,

10   what the obstructive conduct might be, or whether it was

11   entirely made and done in good faith.

12             When her Honor instructs you on the law later today,

13   one of the instructions she's going to give you is about the

14   defendant's character.  And I'm speaking here about Pastor

15   Gross naturally, but the instruction applies with equal force

16   to Mr. Lebedev and the things you've heard about him, the

17   positive things you've heard about him throughout the trial

18   including some of the positive things that Pastor Gross said

19   about them in their very limited interactions.  But my focus on

20   the comments is on the character of Pastor Gross.

21             I haven't had much to say about his testimony, both

22   his direct testimony and his testimony on cross-examination.

23   And the reason I haven't had much to say is because it stands

24   on its own.  I am not going to sit here and tell you that you

25   should believe Pastor Gross.  He's a man.  He took the witness

1    stand.  He took the oath.  He answered all the questions we

2    asked.  And then he answered all the questions they asked.  And

3    you'll have to judge if what he said is credible.  Because if

4    you find it credible, if you find it reasonable that the things

5    he said were true, could be true, then, again, you have to

6    acquit him to the extent that testimony touches on the basic

7    elements of the offenses in this case.

8            And you heard him deny that he acted with corrupt

9    intent.  You heard him explain what his true intent was.  You

10   heard him deny that he made any deliberate false statements to

11   the NCUA and give his explanation, at least as to those with

12   which he was confronted up to that point.

13           You heard him deny that he acted with obstructive

14   intent with the NCUA and what he was really trying to do in

15   light of the long history of compliance with NCUA regulations.

16   And if you find his testimony credible, if you find it

17   reasonable, then, again, despite what the government may argue

18   to the contrary, you must acquit him if that testimony touches

19   on the essential elements of the case.

20           So, I don't want to say anything else about his direct

21   testimony.  It is here for you to consider.  And I know you

22   will.

23           What I will say is that you can contrast the testimony

24   that he offered with that of some of the other government

25   witnesses.  And you can contrast his character with what was

1   revealed about some of the other government witnesses.

2           You heard Pastor Gross, a man who's led an unblemished

3   life up to the point of this case, who has devoted himself to

4   his flock, his church, his community, and you can judge whether

5   that type of thing, which human beings ordinarily consider in

6   evaluating the character of other people, is sufficient.

7           I want you to judge the character of the witnesses

8   called by the government:  Mr. Freundt, for example, Mr. Hill.

9   Frankly those witnesses don't incriminate Pastor Gross.  So

10  whether you believe or disbelieve them or not is almost beside

11  the point.  And it may be one of the reasons the government

12  talked little -- said little or nothing about them in its

13  closing argument.  But, again, the government has another

14  chance to stand up and you may hear a great deal about

15  Mr. Freundt and Mr. Hill.  If you don't, of course, what does

16  that tell you about what the government thinks of its own

17  witnesses.  But contrast Mr. Gross's character with the things

18  you learned about the government's own witnesses.

19          Frankly, we're talking here in this case in large

20  measure about Mr. Gross accepting an alleged bribe.  But, who

21  has been seeking a benefit by testifying in this case?  Who is

22  seeking a benefit?  Well, obviously, Jennifer Wotherspoon.

23  She's seeking not to be prosecuted.  Obviously, Rico Hill.

24  He's seeking a reduced sentence for the bank fraud and wire

25  fraud and other crimes to which he pled guilty.  Obviously,

H3A9LEB1                    Summation - Mr. Klingeman

1    Jose Freundt, for the same reason, he's seeking a reduced

2    sentence.

3            And, interestingly, who is seeking a benefit or who

4    has obtained a benefit?  Obviously, Mr. Rollins, the

5    government's summary witness who got up here and said he

6    expects to be paid nearly four hundred thousand dollars for

7    that piece of work that he produced to you, that slide show

8    that is so deeply flawed and certainly not a basis for you to

9    conclude beyond a reasonable doubt any aspect of this case.

10           So, I just want to say one thing in terms of this

11   character issue.  And it's illustrative of this case and how

12   you can't possibly rely on the government's presentation to

13   establish guilt beyond a reasonable doubt.  And it relates to

14   two aspects of Jose Freundt.

15           I told you yesterday, I brought up yesterday this fact

16   that he used the word "bribery" in one of the WhatsApp chats

17   after Mr. Gross had kicked all the Collectables Club people out

18   of the credit union.  And I explained to you why that use of

19   the word "bribery" in no way shape or form implicates Pastor

20   Gross because what it reflects only is Mr. Freundt's thinking

21   when he wrote that WhatsApp text.  It doesn't reflect what

22   Pastor Gross was thinking.  And the judge is going to tell you

23   what matters is what Pastor Gross was thinking, not what

24   somebody else was thinking when it comes to corrupt intent.

25           Remember what else Mr. Freundt said at the same time

H3A9LEB1                          Summation - Mr. Klingeman

he used the word bribery.  He said, among other things, that

Pastor Gross was entitled to the consulting free, that he

earned it.  He says this to Anthony Murgio repeatedly in the

WhatsApp chats.  And then he goes on to tell you from the

witness stand that those consulting fees were not bribes; they

were earned by Mr. Gross for the consulting that he did.

        So who are you going to believe, the government

prosecutors or the government prosecutors' witnesses when they

tell you -- with he tells you, Mr. Freundt, that it's not a

bribe.  It puts their own witnesses at odds with their own

theory, their own allegations in this case.  And how do you

reconcile that?  You reconcile it in one way, in two words, not

guilty.

        What else does Mr. Freundt tell you surrounding that

conversation; that he thinks that there's a legal argument to

be made to enforce this agreement, this agreement that the

government now says is a bribery arrangement.  Mr. Freundt

keeps saying over and over and over:  Let's go to a lawyer,

let's file a lawsuit, let's make a demand of some kind, a legal

demand by a lawyer.

        Who tries to enforce a bribery agreement by going to a

law firm and asking a law firm to get involved?  Someone who

doesn't think it's a bribe to begin with.  That's who.

        And then in addition -- this is not an attempt at

humor -- but Mr. Freundt actually suggests involving his own

mother, Mrs. Freundt, whatever her name may be, to get involved

in this.  And, again, I ask you:  Who invites their own mother

to get involved in a bribery scheme unless he doesn't believe

it's a bribery scheme at the time he's making these statements.

So, again, more reasonable doubt, more arguments that

the government has failed to confront, more witness testimony

from the mouths of their own witness that they failed to

reconcile with their theory.

And, finally, with respect to Mr. Freundt, one of the

stranger aspects of the case was when he told you that on

July 21, 2015 when Anthony Murgio was arrested and the Coin.mx

office was raided, that he encountered a Secret Service agent,

Emily Beyer, who was here two days ago and testified for the

defense or called as a defense witness, I should say.  And he

says that Ms. Beyer told him that he could take money from the

Coin.mx account to pay himself.  And according to Mr. Freundt,

Ms. Beyer, the sworn agent of the United States Secret Service,

said to him "and give yourself a nice little bonus."  That's

Mr. Freundt, unshaken on the stand, unchallenged by the

government.  This is something that was brought out on

cross-examination, brought out by the defense, shown to you not

by the government but by the defense.  And then subsequently we

bring Ms. Beyer from Tallahassee to New York to testify that

she did not tell him "give yourself a nice little bonus."  She

gave sworn testimony that directly contradicts the government's

H3A9LEB1                      Summation - Mr. Klingeman

1    witness, the government's witness, the only government's

2    witness who uses the word bribery.  And the government

3    nonetheless is asking you to believe Jose Freundt.  That is

4    unreasonable.  That should give you the very doubt you need to

5    acquit in this case.

6           At the end of the government's presentation the

7    government made reference to something called venue.  Venue is

8    another word for place.  The place we are in is New York.  The

9    venue is New York, the Southern District of New York

10   specifically; and the judge will give you an instruction on

11   venue.

12          And the government noted that a number of things in

13   the case occurred in New York.  Wire transfers pass through a

14   bank in New York on their way from Florida to New Jersey, that

15   e-mails were sent to or from New York.  But as you know, this

16   case really took place in New Jersey.  It really took place in

17   Florida.  And so among the issues you have to decide in

18   addition to guilt or innocence, guilt or not guilty, is venue.

19   And I urge you to consider the jury instruction because if you

20   have doubts about the case, this issue of venue should give you

21   doubts about the case.  Because what the government has to

22   prove is that it was foreseeable, foreseeable to Pastor Gross

23   that he ought to know that, for instance, these bank wires were

24   going to pass through New York on their way from either Florida

25   to New Jersey or other places to New Jersey where the HOPE

H3A9LEB1                  Summation - Mr. Klingeman

1    Federal Credit Union is noted.

2            Ask yourselves:  Has the government proved that it's

3    more likely than not that Pastor Gross -- that it was

4    foreseeable to Pastor Gross that these things would occur when

5    this case has nothing to do with New York.

6            As you'll read -- as you'll see and hear from the

7    judge and you'll read when you get the jury instructions, you

8    can acquit Pastor Gross on this basis and this basis alone

9    without consideration of the rest of the case, and I urge you

10   to do so.

11           The government did say at the end of its presentation

12   that the evidence is overwhelming, a point with which I agree.

13   Don't be overwhelmed.  There's too much evidence to try and

14   parse through every aspect of it unless you are going to budget

15   yourselves the same amount of time we spent here in trial.  In

16   no, way, shape or form am I suggesting you rush your

17   deliberations.  You make those decisions.  That's not for me to

18   say.

19           But I will tell you this.  If you focus on issues like

20   corrupt intent, if you focus on issues like obstruction,

21   deliberate obstruction, if you focus on issues like false

22   statements, deliberate lies, the analysis in the case, the

23   answer to this case, the verdict in this case becomes instantly

24   clear.  And why do I say that?

25           The fact that there are lots of evidence is no

H3A9LEB1                         Summation - Mr. Klingeman

1    substitute for the lack of incriminating evidence.  Repeating

2    things over and over and over about the ACH transactions and

3    how they were not properly handled is not a substitute for

4    incriminating evidence that the ACH transactions were

5    orchestrated by Pastor Gross in any criminal sense.

6              Changing the subject from corrupt intent to ACH

7    transactions is nothing more than a mask for the fact that the

8    government doesn't have sufficient evidence of corrupt intent

9    to convince you beyond a reasonable doubt that Pastor Gross

10   possessed corrupt intent.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           MR. KLINGEMAN:  (Continuing)  And the lack of

2    evidence, as you'll hear in the jury instructions, is

3    sufficient to acquit as well when it comes to the critical

4    issues and the elements of the case.

5           So, shortly I'm going to sit down, in another two or

6    three minutes, and the government is going to have its chance

7    to do what's called the rebuttal.  The government gets the last

8    word.  Those are the rules.  Once I sit down, I am silent,

9    Pastor Gross is silent, with nothing else we can say to you.

10   But I ask you, when you listen to the government's rebuttal, to

11   keep two things in mind:  One, if the government says anything

12   new to you that you have not heard before, ask yourselves why

13   is that, why am I hearing something for the first time after

14   the defense has been silenced?

15          And I urge you to consider two things if the

16   government says anything new:  One, we have an answer, as we've

17   had an answer for everything in the case; and, two, if you hear

18   something new, is it fair at this point to introduce it to you?

19   And that's for you to decide.

20          Now, the second thing is the government may say

21   nothing new.  They may repeat the things they have been saying

22   since the opening statement, through the various witnesses,

23   through their three-hour summation yesterday.  Again, if

24   there's nothing new, I've done my best to respond to what I can

25   in the time I've taken.  God knows, I'm not a perfect lawyer,

H3AKLEB2                          Closing – Mr. Klingeman

1    and if I failed somehow to address something that matters to

2    you, that concerns you, that gives you pause about Pastor

3    Gross, whatever you do, don't hold it against Pastor Gross.

4    You can hold it against me, but don't hold it against him.

5          I want to end where I began.  I showed you an email

6    from May of 2014 in which Pastor Gross lays out what the

7    government purports to be a bribery scheme.  He lays it out in

8    an email, an email that you have, and that you can read that

9    was introduced by the government of all things in this case.

10   But what happened at the end of the case?  Right after the

11   November 22nd, 2014 meeting and right after Pastor Gross threw

12   the Collectables Club out of the HOPE Federal Credit Union,

13   what did he do?  He wrote his congressman.

14         And if we could have Defense Exhibit TG19 published

15   for the jury.

16         I want to end with this.  Ladies and gentlemen, the

17   government said yesterday that the point of this conspiracy,

18   the point of the motive that Pastor Gross had, among other

19   things, was to keep the bribery scheme hidden.  Those are the

20   words they used, "keep it hidden."

21         So, on December 19th, 2014, at a time when Pastor

22   Gross is supposedly keeping it hidden, he makes a request to

23   his own congressman to investigate the situation.  He makes a

24   request that requires him, as the headline in this form

25   indicates, Privacy Act request, he waives his right to privacy,

H3AKLEB2                        Closing - Mr. Klingeman

he waives his right to keep things secret, to keep things

hidden, and he makes the following request of the

congressman -- and this is in the words of Pastor Gross -- "We

need our congressman's assistance.  I sit on the board of a

local credit union that is 35 years old and founded in the

Lakewood area.  Over the past several years, we have attempted

to grow, and at each point, the NCUA has come in and stopped us

using their enforcement powers.  We have not challenged them

until recently.  We were able to have a business join our CU,

which would represent significant revenue for the CU and

provide us the ability to grow and make financial services

available to the unbanked and underbanked in our area.  The

NCUA has told us that this business cannot be a member of the

CU because the parent company is outside of our field of

membership.  This makes no sense at all.  Our charter states

that a business in our FOM can be in the CU.  It seems like

they are invested in us remaining small" and "forcing us to

merge with another credit union" -- "or forcing us to merge

with another credit union.

          "This CU was started by the African-American community

and has fought to remain open in helping the financially

challenged.  These actions seem arbitrary and punitive.  We do

acknowledge that we needed to add better controls and

compliance, which we have done and are doing, but to say that a

major source of revenue now needs to go to another bank is not

1    fair to us.  This is the situation in a nutshell.  Is there a

2    liaison that we can speak to?  Because we are appealing their

3    decision."

4              It's signed Pastor Trevon Gross.

5              Now, again, as I started:  Who engages in a bribery

6    scheme, an obstruction of federal regulatory agency, lies to a

7    federal regulatory agency, and simultaneously invites their

8    member of Congress to conduct an investigation?  Someone who's

9    not taking bribes, someone who's not obstructing, someone who's

10   not lying.

11             So, there's been much debate about the evidence, and I

12   submit to you a reasonable debate about the evidence is enough

13   to give rise to reasonable doubt.  If both sides rely on the

14   same evidence, then what does that tell you?  That the evidence

15   is debatable.  If evidence is debatable, that's reasonable

16   doubt.

17             Use the power that we all have given you, by selecting

18   you as jurors in this case, to right the wrong of this

19   allegation, this indictment of Pastor Gross.  Let Pastor Gross

20   return to his flock and his family.  Find him not guilty.

21             Thank you.

22             THE COURT:  Thank you, Mr. Klingeman.

23             Mr. Noble?

24             MR. NOBLE:  Thank you, Judge.

25             Good morning, ladies and gentlemen.  Now, Mr. Creizman

and Mr. Klingeman spoke for several hours, and I don't have

time to respond to everything that they told you, but I don't

have to because the evidence makes clear what the responses are

to those arguments.

Ladies and gentlemen, when you go back to the jury

room to deliberate, it's important that you focus on the right

things, and that's the evidence and the law as Judge Nathan

will instruct you.

Now, most of what you heard from defense counsel was

designed to distract you, to invite you to speculate, and to

make findings that go against the evidence and your own common

sense.  Defense counsel wants you to be thinking about anything

and everything other than the evidence because that's their

only hope.  Because when you focus on the evidence, and you

apply the law, there is no question that the defendants are

guilty.

So I'm just going to respond to a few of the arguments

that they raised, some of the most important points.  And,

remember, it's your recollection of the evidence and your

assessment of it that matters.  And whatever I miss, I'm going

to rely on you to use your common sense when you consider the

defense's arguments.

Now, both Mr. Creizman and Mr. Klingeman talked to you

a lot about the burden of proof that the government has.  But

to hear defense counsel describe the burden of proof, proof

beyond a reasonable doubt, you'd think that it's an impossible

standard to meet.  It's not, and it's not meant to be.

The standard is not guilty beyond all doubt, it's

beyond a reasonable doubt.  And Judge Nathan will instruct you

on the precisely what that means.  But keep this in mind:  It's

the same standard that is used every day in courtrooms across

this country.  It's the same standard that has been applied

since the founding of our country.

And with that, let's talk about some of the defense's

arguments.

Now, one thing that both Mr. Creizman and

Mr. Klingeman talked to you about was the government's

cooperating witnesses, Jose Freundt and Ricardo Hill.  They

noted that Ms. Choi had not spent a lot of time during her

closing argument talking to you about their testimony.  They

even seemed to suggest that these cooperators' testimony was

somehow helpful to their own clients.  There could be nothing

further from the truth.

The reason Ms. Choi did not have to spend a lot of

time speaking about what Mr. Freundt and Mr. Hill testified to

you about is because there is a mountain of documentary

evidence in this case showing that the defendants are guilty.

It includes the defendants' emails, their Gchats, their

WhatsApp messages, and their recorded statements that you

heard, all the written agreements that you saw, and the bank

1    records, and credit card records.

2            Defense counsel even argued that Mr. Freundt and

3    Mr. Hill did not think that they had done anything wrong.  I

4    wonder if they were listening to the same testimony as the rest

5    of us.

6            Now, let's be clear:  Defense counsel desperately

7    wants you to believe that Mr. Freundt and Mr. Hill didn't do

8    anything illegal.  Now, take a minute to ask yourselves why.

9    Why did the defense spend so much time trying to convince you

10   of that?  Because the defendants are similarly situated to

11   Mr. Hill and Mr. Freundt.

12           Who was working right alongside Jose Freundt and

13   Ricardo Hill to pay bribes and keep control of the credit

14   union?  Yuri Lebedev.

15           And who was the person demanding, and receiving, the

16   bribes from them?  Trevon Gross.

17           Ladies and gentlemen, let's be clear:  Mr. Freundt and

18   Mr. Hill are criminals.  Both of them got up on that witness

19   stand and told you that themselves.  They admitted that they

20   had committed crimes with the defendants.  They told you that

21   they have pled guilty, they've taken responsibility, and they

22   told you that they're hoping for leniency from the Court for

23   their cooperation.

24           But keep this in mind:  It wasn't the government who

25   selected these witnesses.  The defendants did.  It was Lebedev

who chose to work with them at Coin.mx and to pay bribes with

them.  It was Gross who put them on the board of the credit

union and turned over the keys to that institution to them.

        The reason why defense counsel wants you to believe

that Mr. Freundt and Mr. Hill didn't do anything wrong is

because they know that the cooperators' testimony is

devastating.  Let's talk about a few examples.

        Ricardo Hill told you about those conference calls

that he had with Lebedev, and Anthony Murgio, and the others

where Murgio told them about the bribes.  He told them about

the payments that they were making to Trevon Gross to take over

the credit union.

        Freundt also testified about that WhatsApp CU strategy

session that they had after the November 22nd, 2014 meeting,

the one that Freundt invited Lebedev to join.  Why would

Mr. Freundt invite Mr. Lebedev to join a conversation where he

then talked about the bribe scheme if Mr. Lebedev wasn't

involved?

        Take a look at that chat.  You'll see that after

Lebedev joined, Mr. Freundt talked about how he wasn't going to

mention the corrupt payments that had been made to Mr. Gross in

the letter that they were going to send to him.  Freundt

explicitly states that he didn't want to mention, quote,

bribery in the letter.  What was he referring to?  He was

referring to all of the payments that had been made to Trevon

H3AKLEB2                      Rebuttal - Mr. Noble

1    Gross.

2            Now, ask yourselves:  Did Lebedev chime in at that

3    point in the conversation and say, hey, what are you talking

4    about?  We're not engaged in bribery.  Of course not, because

5    he knew that that was what they were doing.

6            Ricardo Hill also told you that he gave Mr. Lebedev

7    and Murgio free rein over HOPE Federal Credit Union, that it

8    was Mr. Gross who taught Hill how to process the ACH

9    transactions and gave him back-end access to the credit union.

10           Mr. Hill told you that even after Gross realized that

11   millions and millions of dollars in ACHs were passing through

12   the credit union when they didn't have proper controls in

13   place, Mr. Gross never put a stop to it.  In fact, it was

14   Mr. Gross who approved increasing the limits on ACH processing

15   to a hundred million dollars a month.  Ask yourselves:  Is that

16   evidence of Trevon Gross acting in good faith, trying to remain

17   compliant with the NCUA's regulations?

18           And remember the telephone call that Trevon Gross had

19   with Jose Freundt after the November 22nd meeting.  Freundt

20   told you that on that call, all that Mr. Gross was interested

21   in was the money, the $50,000 additional bribe and the $6,000

22   in consulting fees that he was owed.  Mr. Freundt told you that

23   it became crystal clear to him, at that moment, that Mr. Gross

24   was only in it for the money.

25           Now, defense counsel also wants to have it both ways

H3AKLEB2                       Rebuttal - Mr. Noble

```
 1    when it comes to these witnesses.  They told you that the
 2    cooperating witnesses were telling the truth when it helps
 3    their clients, but they also suggested that the same witnesses
 4    were lying when they told you about the crimes that they
 5    committed with Yuri Lebedev and Trevon Gross.  The defendants
 6    wanted you to pick and choose what to believe from these
 7    cooperating witnesses.  They want you to believe them, but only
 8    when it's about something that helps their clients.  They
 9    cannot have it both ways.
10           You have to take the good and the bad in these
11    witnesses' testimony.  And don't you think that if they were
12    lying for the government, they would have done a better job?
13    That they would have testified in a more incriminating way,
14    about more incriminating conduct that the defendants engaged
15    in?  But they didn't.  They limited their answers to what they
16    knew.
17           And that brings me back to a very important point:  At
18    the end of the day, you don't even have to rely upon these
19    cooperators' testimony to convict the defendants.  That's
20    because their testimony is corroborated and supported by all
21    the other evidence that you've seen and heard.  You should
22    consider that evidence and whether the evidence matches up to
23    the cooperators' testimony.  We submit to you that it does.
24    And when you consider it in context, you'll see that all of the
25    evidence supports it.
```

1          Now, Mr. Klingeman raised an issue about Mr. Freundt
2      that I'd like to address concerning his testimony about what
3      Special Agent Beyer told him.  He argues that you can't trust
4      Mr. Freundt's testimony because of those statements that he
5      said Special Agent Beyer made to him.  This is a total
6      distraction.  It's a sideshow.
7          You heard Special Agent Beyer's testimony.  The
8      defense called her as a witness.  And she told you that
9      although she doesn't have a specific recollection, she would
10     have told Freundt that he could carry out transactions that he
11     would have done in the normal course of business.  Mr. Freundt
12     interpreted that, apparently, as authorization to pay himself
13     the salary he was owed.  But in the end, this doesn't matter,
14     because whether Freundt paid himself out of the bank account or
15     not, and whether the agent told him that it was okay to do so
16     or not, doesn't tell you anything about Mr. Gross' guilt or
17     Mr. Lebedev's guilt.
18         It also doesn't matter, as Mr. Klingeman suggested,
19     whether Jose Freundt thought that Mr. Gross deserved the
20     consulting fees that he was owed or thought that they should
21     consult a lawyer.  Read the rest of Jose Freundt's statements.
22     You'll see him talking to Anthony Murgio about whether to
23     consult lawyers.  You'll see Mr. Freundt asks, hey, should we
24     tell the lawyers about the payments that we made to Mr. Gross?
25     What does Anthony Murgio say?  No, of course not.  Of course

H3AKLEB2                        Rebuttal - Mr. Noble

1    they're not going to tell the lawyers about the illegal bribe

2    payments.  That argument is just another distraction.

3           Now, both defense lawyers have spent a lot of time

4    arguing that the defendants didn't act corruptly.  And,

5    obviously, that's a key issue in this case.  They've argued

6    that the defendants engaged in the credit union deal in good

7    faith, that the bribes that Lebedev helped Murgio pay to Gross

8    were so-called bona fide payments for services.  But you know

9    that isn't true.

10          Yesterday, Ms. Choi walked you through no less than

11   eight different ways in which this bribery scheme was corrupt

12   from the outset.  I'm not going to go through all of those

13   eight ways, but I do want to address some of the defense

14   lawyers' arguments.

15          And before I do, I want to say something about the

16   meaning of corruption, because Mr. Klingeman talked to you

17   about it yesterday.  Ms. Choi also explained to you the meaning

18   of corruption, and Judge Nathan is going to instruct you on the

19   legal definition.  But let's not lose the forest for the trees.

20   There is a legal definition of corruption, but it's not

21   difficult to understand.  Corruption permeated this case.  It

22   permeated the deal between the Collectables Club and Trevon

23   Gross.  Gross, and Lebedev, and Murgio all lied about this

24   scheme.  They lied to the NCUA, they lied to other financial

25   institutions, they even lied to each other.  You know

1   corruption when you see it.

2          Now, Mr. Klingeman started his argument yesterday by

3   suggesting that the government should answer some questions

4   about Mr. Gross being a bribe-taker.  I'm happy to do so.

5          Ladies and gentlemen, I'm about to give you some

6   responses, but you already know what the answers are because

7   the evidence is clear.  As Mr. Klingeman and Ms. Choi told you,

8   this isn't a close case.

9          Now, Mr. Klingeman first asked:  If Trevon Gross is a

10  bribe-taker, why did he turn down the money when it was offered

11  to him directly by Anthony Murgio?  Why did he instead direct

12  Anthony Murgio to pay the bribes to his church?

13         As you have learned by now, there is no distinction

14  between Trevon Gross and Hope Cathedral.  A dollar in the

15  church's pocket is a dollar in Gross' pocket.  It's as simple

16  as that.  You saw that when the church got paid, Trevon Gross

17  got paid.  Gross used the church's accounts to write himself

18  and his wife paychecks, to pay his personal expenses, like for

19  his SUV and his pool, and the juices, and the massages, to pay

20  off his personal credit cards, to write himself checks out of

21  the church's bank account, even when there wasn't any money in

22  it.

23         Gross also told Anthony Murgio to pay the bribes to

24  the church accounts to make them look legitimate, so he could

25  take that witness stand and tell you, oh, no, those payments

1    weren't for me, those payments were for the church.

2            But you know, it didn't make any difference if the

3    bribes went to the church's account or Gross' own pockets.

4    They ended up in the same place.

5            Now, Mr. Klingeman also argued that Gross' statements

6    in that secretly recorded November 22nd meeting somehow proves

7    he is innocent, and that befuddles me.  You should reject that

8    argument and think about it.  Mr. Klingeman would have you

9    believe that at that meeting, Gross was so fed up with Anthony

10   Murgio, and Lebedev, and their coconspirators, that he decided

11   to demand another $50,000 payment for his church because the

12   group wasn't doing what they said they were going to do.  That

13   just doesn't make any sense.

14           When you look at the evidence, and you look at the

15   chronology, you'll see he demanded that $50,000 payment because

16   he was going to let them keep control of the credit union.  As

17   he testified, as he admitted on the witness stand, he did his

18   end of the bargain, he got the existing board members to

19   resign, those three resignation letters you saw.  Does that

20   make sense, if it wasn't corrupt?

21           Now, Mr. Klingeman also asked:  If Trevon Gross is a

22   bribe-taker, why did he return that $50,000 to Anthony Murgio

23   in November 2014?  You now know why - because at that point,

24   Trevon Gross had already struck another deal behind Anthony

25   Murgio's back to work directly with Kapcharge, the company that

Gross had learned at that point had paid him the $120,000 bribe

back in June.  Did Gross return that payment, the $120,000

payment, or the other $30,000 that Mr. Murgio had already paid

him, or the thousands more in so-called consulting fees?

That's the real question you should be asking yourselves.

And it brings me to the last set of questions that

Mr. Klingeman had for the government.  If Trevon Gross is a

bribe-taker and lied to the NCUA, why did he talk to the FBI?

Why did he enlist the help of his congressman, as Mr. Klingeman

just pointed out again?  Why did he take the witness stand?

Mr. Klingeman suggested to you that his client is

innocent because he took that witness stand.  Nothing could be

further from the truth.  A defendant, ladies and gentlemen, has

no obligation to testify.  Indeed, it is his right not to do

so.  But when a defendant testifies, you have to scrutinize his

testimony just like any other witness.  And, like any other

witness, you have to think about the defendant's motivation to

lie.

Trevon Gross took the witness stand because he thought

he could explain his way out of the crimes.  You saw him

testify.  He is smart, he's well educated, and he's well

spoken.  Trevon Gross talked to the FBI because he thought he

could fool the FBI.  He thought he could fool his own

congressman.  And he took that witness stand because he thought

that he could fool you, to pull the wool over your eyes.  Just

like he fooled the NCUA about the Collectables Club and

Kapcharge, just like he fooled Alloya and United Advantage into

processing ACHs for the credit union, just like he fooled that

city zoning inspector about the credit union only being open to

church members.

Remember when I asked him about that on

cross-examination, how he tried to wriggle away from his own

emails?  You remember that cross-examination.  Gross had an

explanation for everything.  But you know what gross and his

attorneys can't explain away?  The mountain of incriminating

evidence.  They can't explain why Gross never told the NCUA

about the arrangement that he had with the Collectables Club or

the bribes that he received.

Now, Mr. Klingeman also asked why Gross would write

about the bribery scheme in the emails with Anthony Murgio.

Why didn't they do the deal in the back booth at a diner, he

said.  Well, first of all, Trevon Gross never thought that his

emails would end up in evidence at trial.  Criminals, as you

know, often put things in writing or even record their own

conversations when they don't think anyone is going to see what

they wrote and don't think anyone is going to hear what they

say.

MR. KLINGEMAN:  Objection.  Move to strike.

THE COURT:  Overruled.

MR. NOBLE:  Anthony Murgio is Exhibit A for that.  He

H3AKLEB2                        Rebuttal – Mr. Noble

documented a lot of his criminal conduct.  And Trevon Gross,

and his attorneys don't deny, that Anthony Murgio committed

crimes.  The real question that you should be asking is why

didn't Gross put all the details in writing for the NCUA?  If

this were truly a legitimate business deal, if these were truly

bona fide payments, why not be open and honest with the NCUA?

Why not record the details of the payments or the memorandum of

understanding with the Collectables Club in the board meeting

minutes?  Why go to such great lengths to lie to Meg Flok about

the Kapcharge file?  Why enter into side agreements with

Kapcharge and cook the books to make it look like this credit

union was well capitalized?  Why tapdance with the examiners

for six months to the point of exhaustion?

          Ladies and gentlemen, Trevon Gross has no explanation

for those things, because he's guilty.

          Now, both Mr. Creizman and Mr. Klingeman suggested

that their clients intended for this deal to help the credit

union.  This deal did not benefit the credit union or its

members at all.  This was Gross selling out the credit union

and its members to Lebedev, and Murgio, and the others, so that

they could use it to process transactions for Coin.mx.

          But, ladies and gentlemen, even if the relationship

with Coin.mx and Kapcharge somehow helped the members of the

credit union, the $150,000 in donations and thousands of

dollars in consulting fees were still bribes.  The defendants

H3AKLEB2                        Rebuttal - Mr. Noble

are still guilty.  And why is that?  Because you don't need to

find that the bribes hurt the credit union in any way.  All you

need to find is that these corrupt payments were intended to

influence Trevon Gross.  And there can be no doubt that they

did.

You heard Gross admit on the witness stand that the

payments influenced his decision-making.  In fact, you can find

that the defendants' conduct was intended to help the credit

union as long as they were motivated, at least in part, by a

corrupt purpose.  And for Lebedev, the purpose was to help

Murgio make money for Coin.mx by processing credit card

transactions that would have been rejected by other banks.  And

for Gross, it was also about the money, to secretly make money

for himself and his church by selling out the credit union.

Now, defense counsel also argued that there is nothing

inherently illegal about nominating people to the board of a

federal credit union, that there's nothing inherently illegal

about processing ACH transactions.  Of course, there's not.

That's besides the point.  Standing alone, those are perfectly

legal activities, but you have to look at all the

circumstances.  You have to look at all the facts about why

Trevon Gross and Yuri Lebedev did what they did.

What makes the defendants' conduct illegal is that the

decisions were being made concerning the ACH processing and the

board nominations as a result of the bribes.  Lebedev, Murgio,

H3AKLEB2                        Rebuttal - Mr. Noble

 1   Hill, and Freundt all paid bribes to Trevon Gross to gain and

 2   keep control of the credit union that they had no business

 3   being involved in.

 4          Now, Mr. Creizman told you that Lebedev didn't have a

 5   stake in the credit union.  And that really befuddled me

 6   because if Yuri Lebedev truly intended to help the credit

 7   union, why didn't he have a stake in the venture?  Lebedev was

 8   the vice chairman of the board.  He was Trevon Gross' deputy.

 9   He was supposed to be the chief technology and security officer

10   for the credit union.  And he helped Murgio, Kapcharge, and

11   Gross process over $60 million worth of ACHs through it.  But

12   he didn't have a stake?  That just shows Lebedev's intent in

13   getting involved in the credit union wasn't pure.  It was

14   corrupt.  And in return for the bribes that were paid by

15   Lebedev and the others, Gross gave them control, even though he

16   knew they didn't qualify for membership and even though he had

17   no idea what they were doing.  Gross didn't care, as long as it

18   helped him and his church.

19          Mr. Klingeman suggested to you that Gross is innocent

20   because he didn't know that Lebedev and Murgio wanted to use

21   the credit union to process those illegal Bitcoin transactions

22   for Coin.mx.  This is a red herring.  It doesn't matter whether

23   Gross knew why Lebedev and Murgio wanted to control the credit

24   union or if he understood the nature of the transactions that

25   they were pumping through it.  As long as Gross accepted the

H3AKLEB2                    Rebuttal - Mr. Noble

1    bribes from Lebedev and Murgio with a corrupt intent, he's
2    guilty.
3              And contrary to Mr. Klingeman's suggestion, the
4    evidence shows that Gross did know that Murgio and Coin.mx were
5    engaged in virtual currency.  Rico Hill told you about that.
6    He told you he had spoken to Trevon Gross about Coin.mx.  And
7    there's also the email when Trevon Gross forwards a Federal
8    Reserve seminar about virtual currency and the Bank Secrecy Act
9    to Murgio and Lebedev.  Why would you do that if you had no
10   idea that these guys were involved in Bitcoin?  Mr. Klingeman
11   didn't address that point.
12             Now, Mr. Klingeman also told you that the payments
13   that the Collectables Club and Kapcharge made to Hope Cathedral
14   didn't even benefit Trevon Gross personally.  I mean, that
15   should be rejected on its face.  You should also reject
16   Mr. Gross' testimony to the same effect.  You should reject the
17   notion that these payments were only meant to benefit the
18   church.
19             Now, Trevon Gross told you that the church had paid
20   credit union expenses.  There's no evidence of that.  There is
21   no documentary evidence, not a shred, to support Gross'
22   testimony that the church had paid $150,000 in expenses for the
23   credit union.  All you have is the word of Trevon Gross.  And,
24   as you saw in his answers that he gave on cross-examination,
25   you can't trust a single word that man says.

1          You also know that Gross' testimony is not true

2     because it's contradicted by the documentary evidence that you

3     have seen, by the bank records that were summarized by John

4     Rollins, the records showing that thousands and thousands of

5     dollars from the bribe payments did flow directly to Trevon

6     Gross' pockets in the form of payroll checks, cash withdrawals,

7     car loan payments, movie tickets, various meals, and those

8     massages.

9          Mr. Klingeman suggested that you have to acquit if you

10    don't like the accounting method that Mr. Rollins used.  He

11    talked to you a lot about FIFO, versus LIFO, versus direct

12    tracing.  It's another distraction.  You can look at the bank

13    records yourselves.  You can look at Trevon Gross' credit card

14    statements.  You'll see the bribe payments going into the

15    church's accounts and then going to pay Trevon Gross' personal

16    expenses.

17         Now, let's talk a little bit about his credit cards

18    for a moment.  Mr. Klingeman pointed out that one of the

19    expenses that Mr. Rollins had traced to the bribe payments were

20    those college admission expenses for Gross' children.  Remember

21    those?  Mr. Klingeman said that Mr. Rollins' analysis is

22    obviously wrong because those expenses were incurred in

23    January 2014, before the bribe payments were made.  But take a

24    look at the underlying credit card records.  You'll see that

25    Mr. Rollins was able to trace some of the bribe money to the

1    credit card that Gross had paid off, the credit card that he

2    had used back in January to pay for his children's college

3    applications.

4           Mr. Rollins explained to you that when you properly

5    applied the FIFO methodology to credit cards, it's the payments

6    that are attributed to the oldest expenses first, not the most

7    recent payments.  So, Mr. Rollins isn't mistaken, Mr. Klingeman

8    is.

9           But setting all of that aside, even if all the bribe

10   money did go to benefit the church, it wouldn't make a

11   difference.  Certainly, when it came to money, the church was

12   Gross, and Gross was the church.  There was no difference

13   between giving money to the church and giving money directly to

14   Gross.  And, more importantly, Gross cannot escape the law

15   against bribing a bank official for merely requesting that his

16   coconspirators pay the bribe payments to a third party.

17          When Mr. Klingeman told you that the government had to

18   prove that Mr. Gross lined his own pockets, he was wrong.  We

19   don't have to prove that.  It's what the evidence shows, but we

20   don't have to prove it.  Listen very carefully to Judge

21   Nathan's instructions on this point.  As long as Gross agreed

22   to accept the corrupt payments with the intent to be

23   influenced, he is guilty of bribery, whether or not he got the

24   money directly, whether the church got it, or whether the money

25   was sent to his favorite basketball team or baseball team.  If

anything, having the bribe money flow through the church, as I

previously explained, is just more evidence that he attempted

to hide the illegal scheme and the purpose of the corrupt

payments.

         Now, Mr. Klingeman, in his closing, and Ms. Santillo,

in her opening, told you that you'd find evidence of good faith

throughout this case.  This is wishful thinking on their parts.

Ask yourselves:  Was Gross acting in good faith when he

violated the credit union's field of membership requirements by

opening accounts for Collectables Club, and Kapcharge, and

Wakpamni, that payday lender that was based in South Dakota,

even though he knew they had no connection whatsoever to

Lakewood, New Jersey?  Was he acting in good faith when he

admitted under oath that the credit union did not do any due

diligence on any of the entities or Anthony Murgio, even though

Gross allowed them to control and operate the credit union?

Was he acting in good faith when he gave them back-end access,

even though they hadn't even opened up accounts or funded them,

and they hadn't even been elected to the board?  Was he acting

in good faith when he suggested that the credit union enter

into a side agreement with Kapcharge to hide the fact that the

money Kapcharge was going to put into the credit union wasn't

really revenue to the credit union, but rather prepaid fees?

Was he acting in good faith when he went behind Anthony

Murgio's back and cut a side deal with Mark Francis at

H3AKLEB2                          Rebuttal - Mr. Noble

1   Kapcharge?

2           Remember those emails we showed you?  What did Trevon

3   Gross say to Mark Francis after they decided to cut out Anthony

4   Murgio and keep processing the ACHs through the credit union

5   for Kapcharge?  Trevon Gross said:  Let's roll.

6           Was Trevon Gross acting in good faith when he failed

7   to turn over the Collectables Club member email accounts to the

8   National Credit Union Administration, even though he knew he

9   was supposed to turn over and had been asked to turn over all

10  of the email accounts?  What did he have to hide in those email

11  accounts if this were truly a legitimate business deal?

12          Was Trevon Gross acting in good faith when he wrote

13  checks to himself for thousands and thousands of dollars out of

14  the church's account at the credit union, even though he knew

15  there was no money in it?  And was he acting in good faith when

16  he testified on direct examination that the so-called donations

17  to his church were not related to his decision to turn over the

18  control of the board of the credit union, but then admitted on

19  cross-examination, when confronted with the prior statements he

20  had made to the FBI, that the payments had, in fact, influenced

21  him?

22          I could go on, but you get the point.  The actions

23  that Trevon Gross took do not reveal good faith, they show

24  corruption, the corruption that goes to the heart of this case,

25  the corruption that led Gross to accept the bribes in the first

1   place in exchange for control of the credit union.

2            Now, earlier this morning, Mr. Klingeman claimed that

3   it was in the government's summation that you first heard about

4   net worth ratio.  That's not true.  Ricardo Hill told you about

5   the scheme to manipulate the net worth ratio, about moving the

6   money in and out of the accounts toward the end of the month.

7   And you heard Trevon Gross himself talking about it with

8   Kapcharge on that recorded call.  And the reason why you didn't

9   hear about it from the NCUA examiners, that Mr. Klingeman

10  pointed out testified, is because they didn't know.  Gross' lie

11  worked.  He tricked the NCUA.

12           And just think about this point made by Mr. Klingeman.

13  He made a big deal about the fact that Ms. Choi walked you

14  through this very carefully in her summation.  But what didn't

15  Mr. Klingeman do?  He didn't tell you that the evidence is

16  wrong, that Ms. Choi was wrong.

17           I've talked a lot about Mr. Klingeman's argument

18  regarding his clients, and I'd like to address some of the

19  other arguments that Mr. Creizman raised about his client, Yuri

20  Lebedev.  Mr. Creizman didn't spend a lot of time yesterday

21  talking about the evidence against his client.  And to the

22  extent he did, Mr. Creizman's essential argument was down to

23  this:  The evidence against Lebedev is confusing.  It's not

24  confusing.  You don't have to have a Ph.D. in bank fraud to

25  understand what Lebedev and Murgio were doing here, ladies and

1   gentlemen.

2           Don't get confused by Mr. Creizman's own confusion and

3   his confusing arguments regarding various things like Lightning

4   Payments.  The government never said that Lightning Payments

5   was a payment processing company.  It's just one of Lebedev's

6   companies that he used to help Anthony Murgio in the processing

7   of the transactions for Coin.mx.  The payment processors, as

8   you heard, are First Data and authorized.net.  Focus on the

9   evidence and the testimony relating to those entities.

10          You saw in the text messages between Lebedev and

11  Murgio that Lebedev clearly understood what he was doing, even

12  if Mr. Creizman did not.  Lebedev knew that he was helping

13  Murgio hide the fact that Coin.mx was processing illegal

14  Bitcoin transactions from the banks using those phony websites,

15  like collectPMA.com and My Extreme Delivery.  And why were they

16  lying to the banks?  To convince the banks to process the

17  credit and debit card transactions for Coin.mx that would make

18  them money.  They were getting money from the banks by lying to

19  the banks.  It's as simple as that.

20          And look at Lebedev's Gchats and WhatsApp messages

21  with Anthony Murgio.  Ms. Choi walked through them yesterday.

22  What did he tell Murgio about setting up My Extreme Delivery to

23  process the Coin.mx transactions?  That it was brilliant, that

24  it was just like Collect PMA.  Ladies and gentlemen, that shows

25  that Lebedev knew what he was doing.  He knew he was helping

1    Anthony Murgio trick the banks.

2              Now, Mr. Creizman argued that the government is also

3    taking Mr. Lebedev's comments out of context.  But you had the

4    context, ladies and gentlemen, and it helps us.  It's precisely

5    the context in which Lebedev makes his statements, that shows

6    he's guilty.  Let's take a few examples.

7              Listen, again, to the recording of the November 22nd,

8    2014 meeting.  When does Lebedev offer to give Anthony Murgio

9    the $50,000?  After it's clear from the context of the

10   conversations what they're all talking about.  They're talking

11   about making an additional $50,000 bribe to keep control of the

12   credit union.  Lebedev makes the comment after it's clear

13   they're talking about a quid pro quo.

14             Now, Mr. Creizman also pointed out that, in his mind,

15   nobody was paying attention to Mr. Lebedev at that time.  It

16   doesn't matter.  The point is that Lebedev said that he would

17   pay the $50,000.  It doesn't matter whether Anthony Murgio

18   accepted the offer on the spot or not.  Lebedev's own statement

19   shows that he knew what was going on, and he was willing to pay

20   the $50,000.

21             And look at the WhatsApp discussion between Lebedev

22   and Murgio a few days later.  Mr. Creizman didn't talk to you

23   about that piece of evidence.  In that conversation, Lebedev

24   again offers to give Anthony Murgio his own money to pay the

25   bribe.

1              And then there's the CU strategy WhatsApp that I

2    mentioned earlier with Jose Freundt where Jose Freundt uses the

3    word bribery to describe what they're all engaged in.  Again,

4    did Lebedev chime in at that point and say what are you talking

5    about?  No.  He knew that this was bribery.

6              And how else do you know that Lebedev's intent was

7    corrupt?  From all the other incriminating statements that he

8    made in his discussions with Murgio.  And I'd like to show you

9    just a couple examples from his own WhatsApp.

10             Can we bring up Government Exhibit 4510, please, and

11   flip to line 4949.

12             What does Yuri say to Anthony Murgio on November 24th,

13   2014, just a couple days after that meeting we were talking

14   about?  "Money does unbelievable things to people, even

15   pastors."  He's talking about corruption, he's talking about

16   how they corrupted Trevon Gross and paid bribes to him.

17             Let's flip to line 10209.

18             What does Yuri Lebedev say here, the next month?  "So

19   I was thinking, if I can get in with these banks or credit

20   unions here, then it should help you once we get your credit

21   union, and I'll have all the ropes, man."  And then Anthony

22   Murgio says, "Big time."  Yuri Lebedev responds, "And software.

23   Legally or other way."

24             Ladies and gentlemen, that shows you that Yuri Lebedev

25   was willing to do things legally or the other way.  What's the

H3AKLEB2                        Rebuttal - Mr. Noble

1   other way?  Through criminal activity.

2          Now, Mr. Creizman also told you that Lebedev was

3   simply in the wrong place, at the wrong time, with the wrong

4   people, that Mr. Lebedev didn't have any idea what was going on

5   around him, that crimes were being committed around him left

6   and right, but he had no idea.  I submit to you that Lebedev

7   has an uncanny knack of being involved in some of the most

8   incriminating conversations that you saw at this trial.  He was

9   smack-dab in the middle of the criminal conversations over and

10  over again.  Do you seriously believe he didn't know what was

11  going on?

12         Mr. Creizman himself has told you repeatedly how smart

13  Yuri Lebedev is, that he has two Master's, one in computer

14  science and one in physics, and a Ph.D. in mathematics.

15  Lebedev is no dummy.  He knew exactly what he was doing and

16  exactly who he was dealing with.

17         Now, don't get me wrong, the government is by no means

18  saying that Lebedev was the mastermind of these schemes.  Far

19  from it.  But it doesn't matter.  Different people can play

20  different roles in criminal conspiracies, some large, some

21  small.  Some people are in the conspiracy for a long time, some

22  people are in the conspiracy for a short time.  Under the law,

23  it doesn't matter if they were organizers or leaders.  Just

24  because Yuri Lebedev was not as involved as Anthony Murgio or

25  Trevon Gross in the conspiracies, it doesn't mean he isn't

1    guilty.

2            So the question for you is not how much of a role in

3    the conspiracy Lebedev had, but whether he knowingly

4    participated in them, whether he helped Anthony Murgio commit

5    the crimes that they did together, regardless of the extent of

6    his participation.

7            THE COURT:  Mr. Noble?

8            MR. NOBLE:  Yes, Judge.

9            THE COURT:  How much time?  You're over the estimate.

10           MR. NOBLE:  Not too much longer.

11           THE COURT:  Quickly.

12           MR. NOBLE:  Okay.

13           And don't forget:  Yuri Lebedev played a key part in

14   each of these conspiracies.  He was the architect of the

15   back-end of Coin.mx, the payment processing system, and he was

16   on the board of the credit union.  He helped process the ACH

17   transactions through the credit union, and he offered to help

18   pay the additional bribes.

19           And you know that Yuri Lebedev was well compensated

20   for all of this.  You saw the records showing that Anthony

21   Murgio transferred over $20,000 to Mr. Lebedev's company,

22   Intelligent VR.  Mr. Creizman said that that's not a lot of

23   money.  I disagree.  And what's more, it was easy money for

24   Yuri Lebedev.

25           Ladies and gentlemen, Yuri Lebedev was not a bit

1    player in the crimes with which he's charged.  The evidence

2    shows that he knew exactly what he was doing, and that he's

3    guilty.

4            Now, Mr. Klingeman, in his argument this morning,

5    talked to you about venue.  And there, I just point you to

6    Ms. Choi's presentation on these points.  But ask yourselves

7    this:  Do you really believe that it was not reasonably

8    foreseeable for a well-educated, tech savvy chairman and CEO of

9    a federal credit union that a wire transfer from an

10   out-of-state company might pass through a bank in Manhattan?

11   Use your common sense.  It's completely foreseeable.

12           Now, I'd like to just make a few concluding remarks.

13           Defense counsel suggested to you that the consequences

14   of the defendants' crimes are now your responsibility, that the

15   fate of the defendants is in your hands.  That's simply not the

16   case.  The defendants alone are responsible for the

17   consequences of their actions.  They were the ones who

18   conspired to pay bribes and receive bribes in connection with

19   the takeover of HOPE Federal Credit Union.  They were the ones

20   who agreed to lie to the NCUA and obstruct its examination.

21   And it was Yuri Lebedev who helped Anthony Murgio trick the

22   banks into processing credit and debit card transactions for

23   Coin.mx.  It was the defendants' greed that landed them in this

24   courtroom, nothing else.

25           Now, I know that that doesn't diminish the difficult

1    task that you have before you today.  You have a very serious

2    duty.  But it's your job, as jurors, to examine the evidence

3    dispassionately and apply the law that you're about to hear.

4    You cannot let whatever sympathy that you might have or not

5    have for the defendants or for the government's witnesses

6    interfere with your duty, because at the end of the day, it

7    doesn't matter whether you like the defendants or you don't

8    like them.  We're not asking you to judge whether they are good

9    people or not.  Even if the defendants have otherwise lived

10   exemplary lives, even if they've done all sorts of good things,

11   it doesn't mean they're not guilty.  Good people can still

12   commit crimes.

13           Now, because of the careful attention that you've paid

14   over the last four weeks to the evidence in this case and the

15   arguments that the attorneys have made to you, the defendants

16   have had a fair trial, and the government has had a fair trial.

17   They've had their day in court, and now it's time for you to do

18   your duty.  Go back to that jury room and decide this case on

19   the principles of law that Judge Nathan is about to explain to

20   you.  Decide this case without fear, without favor, without

21   prejudice, and without sympathy.  Decide this case based on all

22   of the evidence that you have seen and that you have heard over

23   the last four weeks.

24           If you do all of that, and if you use your common

25   sense, there's only one verdict to reach, one verdict that fits

1    with all the law and the evidence that you've seen – that the

2    defendants are guilty as charged.

3         THE COURT:  Thank you, Mr. Noble.

4         Ladies and gentlemen, what I'm going to do is begin

5    giving you the instruction in about -- I'll start, I'll do

6    about 15 minutes, and we'll take break, and then come back and

7    finish it with the rest of the instructions.

8         For deliberations, each of you will have a copy of

9    these instructions, but I do want to make sure you hear it

10   once, and so I'm going to give it to you, and I appreciate your

11   continued attention.

12        Counsel, any reason to speak to me before the charge

13   begins?

14        MR. KLINGEMAN:  No, your Honor.

15        MS. CHOI:  Your Honor, the issue with regard to the --

16        THE COURT:  Yes, thank you.  One housekeeping matter

17   point?  Yes.

18        There was one exhibit that was meant to be moved into

19   evidence and agreed to be moved in, but didn't technically get

20   moved in, so I have allowed a reopening of the evidence, so

21   that DX, Defendants', 24, which was moved by Mr. Creizman, will

22   be admitted.

23        (Defendant's Exhibit 24 received in evidence)

24        MR. CREIZMAN:  Thank you, your Honor.

25        THE COURT:  And with that, anything further before the

1    charge, counsel?

2              MS. CHOI:  No, your Honor.

3              MR. KLINGEMAN:  No.

4              THE COURT:  Mr. Creizman?

5              MR. CREIZMAN:  No, your Honor.

6              THE COURT:  All right.  Thank you.

7              As I say, I'll charge for about 15 minutes, and then

8    we'll take a quick break, and then I'll give you the rest of

9    the instructions.

10             You've now heard all of the evidence in the case, as

11   well as the final arguments of the lawyers for the parties.  It

12   is my duty at this point to instruct you as to the law, and it

13   is your duty to accept these instructions of law and apply them

14   to the facts as you determine them.

15             On these legal matters, you must take the law as I

16   give it to you regardless of any opinion that you may have as

17   to what the law may be or ought to be.  It would violate your

18   sworn duty to base a verdict upon any other view of the law

19   than that which I give you.

20             If an attorney or anyone else at trial has stated a

21   legal principle different from any than I state to you in my

22   instructions, it is my instructions that you must follow.

23             You should not single out any instruction as alone

24   stating the law, but you should consider my instructions as a

25   whole when you retire to deliberate in the jury room.  You may

H3AKLEB2                          Charge

1    take a copy of these instructions with you into the jury room.

2    As I said, I'll provide each of you with a copy.

3              Your role is to decide the fact issues that are in the

4    case.  You are the sole and exclusive judges of the facts.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  (Continuing)  You pass upon the weight of

2     the evidence or lack of evidence; you determine the credibility

3     of the witnesses; your resolve such conflicts as there may be

4     in the testimony; and you draw whatever reasonable inferences

5     you decide to draw solely based on the evidence and from the

6     facts as you have determined them.  You must determine the

7     facts based solely on the evidence received in this trial.

8          In determining the facts, you must rely upon your own

9     recollections of the evidence.  What the lawyers have said --

10     for instance, in opening statements, in closing arguments, in

11     objections, or in questions -- is not evidence.  You should

12     bear in mind particularly that questions put to witnesses,

13     although they did provide the context to answers, are not

14     themselves evidence.  It's only the answers that are evidence.

15          I remind you also that nothing I have said during the

16     trial or will say during these instructions is evidence.

17     Similarly, the rulings I have made during the trial are not any

18     indication of my views of what your decision should be.

19          The evidence before you consists of the answers given

20     by witnesses, the exhibits, and the stipulations that were

21     received in evidence.  If I have sustained an objection to a

22     question or told you to disregard testimony, the answers given

23     by a witness are no longer part of the evidence in this case

24     and may not be considered by you.

25          As I have said, you must determine the facts by

1   relying upon your own recollection of the evidence.  This case

2   is not to be decided on the rhetoric of either the attorneys

3   for the government or the attorneys for the defendants.  The

4   lawyers' arguments are intended to convince you to draw certain

5   conclusions from the evidence or lack of evidence.  Those

6   arguments are important.  You should weigh and evaluate them

7   carefully.  But you should not confuse them with the evidence.

8   If your recollection of the evidence differs from the

9   statements of the lawyers, follow your recollection.

10          You should draw no inference or conclusion for or

11  against any party by reasons of lawyers making objections or my

12  rulings on such objections.  Counsel have not only the right

13  but the duty to make legal objections that they think are

14  important.  You should not be swayed against the government or

15  either defendant simply because counsel for either side has

16  chosen to make an objection.  Similarly, statements made by

17  counsel when arguing the admissibility of evidence are not to

18  be considered as evidence.

19          If I comment on the evidence during my instructions,

20  do not accept my statements in place of your recollection.

21  Again, it is your recollection that governs.

22          Do not concern yourself with what was said at sidebar

23  conferences or during my discussions with counsel.  Those

24  discussions related to rulings of law, which are my duty, and

25  not to matters of fact, which are your duty to determine.

1          At times I may have admonished a witness or directed a

2     witness to be responsive to questions, to keep his or her voice

3     up, or to repeat an answer.  My instructions were intended only

4     to clarify the presentation of evidence.  You should draw no

5     inference or conclusion of any kind, favorable or unfavorable,

6     with respect to any witness or party in the case, by reason of

7     any comment, question, or instruction of mine.  Nor should you

8     infer that I have any view as to the credibility of any

9     witness, as to the weight of the evidence, or as to how you

10    should decide any issue that is before you.  That is entirely

11    your role.

12         Your verdict must be based solely upon the evidence

13    developed at trial or the lack of evidence.  It would be

14    improper you to consider any personal feelings you have about

15    the defendants' race, ethnicity, religion, national origin,

16    sex, age or other similar factor.  Similarly, it would be

17    improper for you to consider any personal feelings you may have

18    about the race, ethnicity, religion, national origin, sex, age,

19    or any other similar factor of any other witness or anyone else

20    involved in this case.  It would be equally improper for you to

21    allow any feelings you might have about the nature of the crime

22    charged to interfere with your decision-making process.  The

23    defendants are entitled to a trial free from prejudice and our

24    judicial system cannot work unless you reach your verdict

25    through a fair and impartial consideration of the evidence.

H3A9LEB3                       Charge

1          You are to perform the duty of finding the facts

2    without bias or prejudice as to any party.  You are to perform

3    your final duty in an attitude of complete fairness and

4    impartiality.

5          The fact that the prosecution is brought in the name

6    of the United States of America entitles the government to no

7    greater consideration than that given to any other party to

8    this litigation.  By the same token, the government is entitled

9    to no less consideration.  All parties, whether government or

10   individuals, stand as equals at the bar of justice.

11         Yuri Lebedev and Trevon Gross have each pleaded not

12   guilty to the charges against them.  As a result of a plea of

13   not guilty, the burden is on the government to prove guilt

14   beyond a reasonable doubt.  This burden never shifts to a

15   defendant for the simple reason that the law never imposes upon

16   a defendant in a criminal case the burden or duty of

17   testifying, or calling any witness, or locating or producing

18   any evidence.

19         Even if either defendant has presented evidence in his

20   defense, it is not his burden to prove himself innocent.  It is

21   always the government's burden to prove each of the elements of

22   the crimes charged beyond a reasonable doubt.

23         Furthermore, the law presumes that the defendants --

24   the law presumes the defendants to be innocent of the charges

25   against them.  This presumption was with them when the trial

1    began and remains with each of them as you deliberate unless

2    and until you are convinced that the government has proven that

3    specific defendant's guilt beyond a reasonable doubt.

4         I have said that in order to convict either of the

5    defendants on any of the charges in the indictment, the

6    government is required to prove that charge as to that

7    defendant beyond a reasonable doubt.  The question that

8    naturally arises is:  What is a reasonable doubt?  The words

9    almost define themselves.  It is doubt based in reason and

10   arising out of the evidence in the case, or the lack of

11   evidence.  It is a doubt that a reasonable person has after

12   carefully weighing all of the evidence in the case.

13        Reasonable doubt is a doubt that appeals to your

14   reason, your judgment, your experience, and your common sense.

15   If, after a fair and impartial consideration of all the

16   evidence, you can candidly and honestly say that you do have an

17   abiding belief of either defendant's guilt as to any crime

18   charged in this case, such a belief as a prudent person would

19   be willing to act upon in important matters in the personal

20   affairs of his or her own life, then you have no reasonable

21   doubt, and under such circumstances it is your duty to convict

22   that defendant of the particular crime in question.

23        On the other hand, if, after a fair and impartial

24   consideration of all of the evidence, you can candidly and

25   honestly say that you are not satisfied with the guilt of

1   either defendant as to any charge, that you do not have an

2   abiding belief of that defendant's guilt as to that charge --

3   in other words, if you have such a doubt as would reasonably

4   cause a prudent person to hesitate in acting in matters of

5   importance in his or her own affairs -- then you have a

6   reasonable doubt, and in that circumstance it is your duty to

7   acquit that defendant of that charge.

8          One final word on this subject.  Reasonable doubt is

9   not whim or speculation.  It is not an excuse to avoid the

10  performance of an unpleasant duty.  Nor is it sympathy for

11  either of the defendants.

12         The law does not require that the government prove

13  guilt beyond all possible doubt.  Proof beyond a reasonable

14  doubt is sufficient to convict.

15         The defendants, Yuri Lebedev and Trevon Gross, have

16  been formally charged in what is called an indictment.  As I

17  instructed you as the outset of this trial, the indictment is

18  simply a charge or accusation.  It is not evidence.  Each

19  defendant begins trial with an absolutely clean slate and

20  without any evidence against him.  You must give no weight to

21  the fact that an indictment has been returned against the

22  defendants.  What matters is the evidence that has been

23  presented at the trial and the lack of evidence.

24         I will next summarize the charges in the indictment

25  and then explain in detail the elements of each offense.

H3A9LEB3                        Charge

1          The defendants, Yuri Lebedev and Trevon Gross, are

2    charged in a six-count indictment, although both defendants are

3    not charged in every count.  You will have a copy of the

4    indictment with you in the jury room and you can read each

5    count in its entirety.  I'm going to provide only a brief

6    summary now.

7          Count One charges Yuri Lebedev and Trevon Gross with

8    conspiracy.  The conspiracy charged in Count One has four

9    objects or goals that are described in the indictment.

10         Count Two charges Yuri Lebedev with making and

11   attempting to make corrupt payments with the intent to

12   influence an officer of a financial institution.

13         Count Three charges Trevon Gross with accepting

14   corrupt payments as an officer of a financial institution with

15   the intent to be influenced.

16         Count Four charges Yuri Lebedev with conspiracy to

17   commit wire fraud and bank fraud.

18         Count Five charges Yuri Lebedev with wire fraud.

19         Count Six charges Yuri Lebedev with bank fraud.

20         The indictment names as defendants Yuri Lebedev and

21   Trevon Gross, who are on trial together.  In reaching a

22   verdict, however, you must bear in mind that guilt is

23   individual.  Your verdict as to each defendant must be

24   determined separately with respect to him solely on the

25   evidence, or lack of evidence, presented against him without

H3A9LEB3                         Charge

1    regard to the guilt or innocence of anyone else.  Whether you

2    find a particular defendant guilty or not guilty as to one

3    offense should have no bearing on your verdict as to the other

4    offenses charged.

5          In addition, some of the evidence in this case was

6    limited to one defendant.  Let me emphasize that any evidence

7    admitted solely against one defendant may be considered only as

8    against that defendant and may not in any respect enter into

9    your deliberations as to the other defendant.

10         As I mentioned, the indictment contains six counts and

11   charges two defendants.  Both defendants are not named in every

12   count.

13         You must, as a matter of law, consider each count of

14   the indictment and each defendant's involvement in that count

15   separately.  You must return a separate verdict on each

16   defendant for each count in which he is charged.

17         In reaching your verdict, bear in mind again that

18   guilt is personal and individual.  Your verdict of guilty or

19   not guilty must be based solely upon the evidence against each

20   defendant.  The case against each defendant, on each count in

21   which he is charged, stands or falls upon the proof or lack of

22   proof against that defendant alone, and your verdict as to any

23   defendant on any count should not control your decision as to

24   any other defendant or any other count.

25         I'm going to break at this point before getting to the

H3A9LEB3                          Charge

1   descriptions of the counts beyond the summary that I've given.

2   Take about a ten-minute break and return for the remainder of

3   the charge.

4               Thank you so much.

5               (Jury excused)

6               (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  I'm ready to get the final exhibit list

3    marked as a court exhibit.  Do you have it?  Ms. Choi, has it

4    there.  And, Ms. Nunez, what court exhibit number are we on?

5          Two, we believe.  Court Exhibit 2.

6          Hand that to Ms. Nunez.  I just want to get agreement

7    from counsel that what's been handed to Ms. Nunez as the

8    exhibit list is what's been agreed upon.

9          Ms. Choi.

10         MS. CHOI:  Yes, your Honor.

11         THE COURT:  Ms. Santillo.

12         MS. SANTILLO:  I'm sorry.  Could you repeat.

13         THE COURT:  Sure.  What's been handed to Ms. Nunez as

14   the agreed-upon exhibit list is -- we're going to mark as a

15   court exhibit.  Do you agree to it?

16         MS. SANTILLO:  Yes.

17         THE COURT:  And Mr. Creizman.

18         MR. CREIZMAN:  I do agree.

19         THE COURT:  So we're marking that as Court Exhibit 2

20   and that is a court exhibit and will upon agreement go to the

21   jury.

22         The laptop and materials that are going back.

23         MS. CHOI:  We're finishing that right now.  We're

24   waiting for defense counsel to send us one e-mail.

25         I just note for the record, in case there's ever any

H3A9LEB3                    Charge

1    confusion with regard to DX-24.  It's marked on the defense's

2    exhibit list for the March 7 date, which is when the rest of

3    the exhibits went in.  But, obviously, we've all consented to

4    it.  I just wanted to note that for the record.

5              THE COURT:  Thank you.  So we'll take five minutes.

6    I'll come back.  I'll get agreement on the actual material so

7    that as soon as -- let me just state what I'll do.  I'll

8    complete the charge.  I'll call you to the sidebar to make sure

9    if I've read anything wrong or something went haywire in

10   reading the charge you have a final opportunity to request a

11   correction of some kind.

12             Assuming not, I will come back to the jurors.  I will

13   thank and bid farewell to our four alternates and send them

14   to -- and tell them to gather their belongings, say good-bye

15   without discussing the case, and then be on their way.  I will

16   tell them that they remain part of the case with all of my

17   instructions applying until they receive a call from Ms. Nunez

18   on the chance that they could need to be called back so I'll be

19   clear that they are not dismissed -- they are not excused, they

20   are not done with the case until they hear from Ms. Nunez

21   because we might still need them.  But we'll, obviously, send

22   them on their way before the jury begins its deliberations.

23             MR. CREIZMAN:  I guess your Honor will give regular

24   instructions, keep an open mind, don't look up the case.

25             THE COURT:  To the alternates, yes.  I will tell them

H3A9LEB3                        Charge

1      and do the truncated version -- I will tell them all of the

2      instructions continue to apply until they hear from Ms. Nunez.

3                  MS. CHOI:  Your Honor, just for our own purposes I

4      think today is an early day, is it 4:40?

5                  THE COURT:  It may not need to be.  The juror who has

6      the issue, the weather might mean that she doesn't need to

7      leave at 4:40.  So Ms. Nunez is going to extract her cellphone,

8      have her check her messages to find out, and then take her

9      cellphone back.

10                 Let's clarify.  Assuming, if it's 4:40, I tell them

11     we'll bring them back in at 4:40 if they haven't completed

12     their task and then dismiss them until Monday.

13                 What I would suggest is otherwise to tell them that

14     they should deliberate until they send a note indicating if

15     they're continuing with their deliberations when they would

16     like to stop.  I do want to give them the option to continue

17     should they want to.

18                 Everybody comfortable with that?

19                 MS. CHOI:  Yes, your Honor.

20                 MR. KLINGEMAN:  Yes, your Honor.

21                 MR. CREIZMAN:  Yes.

22                 THE COURT:  Somebody can tell you later what I said.

23                 MR. CREIZMAN:  No, I know.

24                 MS. CHOI:  It was very emphatic, though.

25                 THE COURT:  Let's take a couple minutes.  I'll see you

H3A9LEB3                       Charge

1    shortly.

2           Sorry, one more thing for prep purposes.  Sorry.  I

3    came back.

4           You don't need to have done this yet but as soon as

5    the jury starts deliberating I will ask for folks -- for some

6    effort to prepare the testimony in the event that portions of

7    the testimony -- so I think what that means is -- well what we

8    want to be able to do is to do whatever you do electronically.

9    But to the extent that we get a request for a particular

10   individual's testimony, my general practice, unless there's

11   objection, is to have you agree upon the testimony that's being

12   requested, print it, and send it in.

13          MS. CHOI:  So the only thing you would want to strip

14   out is objections and sidebar conferences.

15          THE COURT:  Right.

16          MS. CHOI:  We can do that.  And you want them by each

17   witness separately?

18          THE COURT:  What you might want to do is just

19   anticipate the more likely requests and start on that in terms

20   of redactions because sometimes there are disputes about what

21   gets redacted.  But I think to facilitate -- they'll come and

22   they'll ask for testimony and then two hours later we send them

23   the testimony --

24          MS. CHOI:  So, we'll start with the cooperating

25   witnesses, I presume, and the defendant, and then we'll work

H3A9LEB3                      Charge

1     our way.

2                THE COURT:  I think that makes sense.

3                Unless anybody has any objection, it is my practice,

4     rather than coming in and doing a read back, to send the

5     printed testimony.

6                MS. CHOI:  Okay.  We'll get the paralegal started on

7     that.

8                THE COURT:  Thank you.

9                (Recess)

10               (Jury not present)

11               THE COURT:  We now have conclusion on the materials?

12               MS. CHOI:  No, your Honor.  We just got an e-mail that

13    was of an electronic copy of a document that needs to be loaded

14    on the computer.  The paralegals have gone back to deal -- oh,

15    you mean the list, sorry.

16               The paralegals went back to deal with that.  So they

17    are getting it ready -- they're getting it ready during the

18    charge.  And they're starting on the redaction project.

19               THE COURT:  We'll, they won't delay bringing back --

20               MS. CHOI:  Correct.  No.  Michael knows.  He

21    understands that.  They'll bring it back.

22               THE COURT:  We're probably 30 minutes away or so from

23    wanting to send it back.

24               MS. CHOI:  No.  She's talking about the exhibits.

25               The paralegals understand.  That's why one of them is

1    back there dealing with it, so.

2           THE COURT:  Because I've now asked both by order and

3    orally four or five times for this moment to happen and it

4    still hasn't happened.

5           MS. CHOI:  Yes, your Honor.  We're just dealing with

6    the defense exhibits right now.  It will happen.  It will

7    happen.

8           THE COURT:  I want to be totally clear.  It is my hope

9    and expectation that when I finish reading this charge I can

10   say to the jury, after the CSO is sworn in, that we will send

11   back to them --

12          MS. CHOI:  Your Honor, I will go back and deal with it

13   myself.

14          We'll make sure that the -- I'll e-mail if there's an

15   issue.

16          Do you guys have a sense of -- I mean I think we're

17   going to start with the defendant's testimony and the two

18   cooperating witnesses.  Are there other witnesses that we

19   should do after that in order?

20          I know that's not part of the deadline.

21          THE COURT:  We're going to bring in the jury.

22          MR. KLINGEMAN:  Your Honor I just want to note that

23   Ms. Santillo is still not feeling well.  She has come and gone

24   as she needs to.  I just want to advise the Court.

25          THE COURT:  Thank you.

H3A9LEB3                          Charge

1                (Continued on next page)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                (Jury present)

2                THE COURT:  Thank you.  We will return to the charge.

3        I'll now instruct you on the elements of the crimes

4   with which the defendants are charged in the indictment.  I'll

5   first instruct you on the elements of the corrupt payment

6   offenses charged in Counts Two and Three, which are two of the

7   objects, or goals, of the conspiracy offense charged in Count

8   One.  I will then instruct you on the elements of conspiracy.

9                Count Two charges Yuri Lebedev with making or offering

10  to make corrupt payments to an officer of a financial

11  institution, specifically the defendant Trevon Gross, with the

12  intent to influence him in connection with the business of a

13  financial institution, specifically HOPE Federal Credit Union.

14  In order to find Yuri Lebedev guilty of this crime, the

15  government must prove the following elements beyond a

16  reasonable doubt:

17                First, that Trevon Gross was an officer or director or

18  employee of a financial institution as that term is defined

19  under federal law;

20                Second, that the defendant gave or agreed to give or

21  offered or promised something of value to Trevon Gross;

22                Third, that the defendant acted corruptly and with the

23  intent to influence or reward Trevon Gross's decision in

24  connection with any business or transaction of HOPE Federal

25  Credit Union; and

H3A9LEB3                    Charge

1      Fourth, that the thing of value paid by the defendant

2  had a value greater than $1,000.

3      The first element the government must prove beyond a

4  reasonable doubt is that, at the time of the events alleged in

5  the indictment, Trevon Gross was an officer or director or

6  employee of a financial institution.  In order to satisfy this

7  element, the government must prove that HOPE Federal Credit

8  Union was a credit union with accounts insured by the National

9  Credit Union Share Insurance Fund, and that Trevon Gross was an

10 officer or director or employee of HOPE Federal Credit Union.

11     The second element the government must prove beyond a

12 reasonable doubt is that Yuri Lebedev gave or agreed to give or

13 offered or promised something of value to Trevon Gross as

14 alleged in the indictment.

15     The law makes no distinction between offering,

16 promising, or actually giving a corrupt payment.  The mere

17 offer or promise of such a payment is just as much a violation

18 of the statute as the actual giving of one.

19     It is not necessary that the government prove that the

20 payment was made directly to Trevon Gross.  If the payment was

21 made corruptly, or was offered or promised to be made

22 corruptly, to a third party, such as another person or entity,

23 with intent to influence or reward Trevon Gross, that is

24 sufficient to satisfy this element.

25     The third element the government must prove beyond a

1    reasonable doubt is not just that Yuri Lebedev gave or agreed

2    to give or offered or promised something of value to Trevon

3    Gross, but that he did so knowingly and corruptly and with the

4    intent to influence or reward Trevon Gross in connection with

5    any business or transaction of HOPE Federal Credit Union.

6          To act corruptly means to act voluntarily and

7    deliberately with the bad purpose of accomplishing either an

8    unlawful end or result, or a lawful end or result by some

9    unlawful method or means.  This involves conscious wrongdoing,

10   or as it sometimes has been expressed, a bad or evil state of

11   mind.  The motive to act corruptly is ordinarily a hope

12   expectation of either financial gain or some other benefit to

13   oneself or some profit or benefit to another.

14         The relevant question for your consideration with

15   respect to Count Two is Yuri Lebedev's intent, not Trevon

16   Gross's intent.  In order to find Yuri Lebedev guilty, the

17   government does not have to prove that Trevon Gross had a

18   corrupt intent, corruptly accepted any payment, or that a

19   payment corruptly influenced any business or transaction of

20   HOPE Federal Credit Union.  Nor is it necessary for the

21   government to prove that Trevon Gross had the authority to

22   perform the act that Yuri Lebedev allegedly corruptly sought

23   for him to undertake.  Also, if you find that Yuri Lebedev

24   acted with the intent to reward Trevon Gross for a decision

25   already made, it does not matter that the payment was not made

1    or offered until after the decision was made.

2            The fourth element the government must prove beyond a

3    reasonable doubt is that the thing of value given or agreed to

4    or offered or promised by Yuri Lebedev had a value greater than

5    $1,000.  The government need not prove the exact value of the

6    thing of value as long as there is proof beyond a reasonable

7    doubt that the value exceeded $1,000.

8            Now, Count Three of the indictment charges Trevon

9    Gross with corruptly soliciting, demanding for the benefit of

10   any person, accepting, or agreeing to accept payments as an

11   officer of a financial institution with intent to be influenced

12   or rewarded.  In order to find Trevon Gross guilty of this

13   crime, the government must prove the following elements beyond

14   a reasonable doubt:

15           First, that Trevon Gross was an officer or director or

16   employee of a financial institution;

17           Second, that Trevon Gross solicited, demanded,

18   accepted, or agreed to accept something of value, either for

19   his own benefit or the benefit of another;

20           Third, that Trevon Gross did so knowingly and

21   corruptly, and with the intent to be influenced or rewarded in

22   connection with any business or transaction of HOPE Federal

23   Credit Union; and

24           Fourth, that the thing of value solicited, demanded,

25   accepted or agreed to accept, had a value greater than $1,000.

1            I have already instructed on the meaning of these

2     elements in discussing Count Two, and you should follow those

3     instructions with respect to this count, Count Three.

4            With respect to the third element of Count Three,

5     corrupt intent, remember that to act corruptly means to act

6     voluntarily and deliberately with the bad purpose of

7     accomplishing either an unlawful end or a result, or a lawful

8     end or result by some unlawful method or means.  Here, it is

9     Trevon Gross's intent in accepting the payments that is the

10    relevant question, not the intent of the person or persons

11    offering or making the payments.  Even if you find that

12    payments were made to Trevon Gross with a corrupt intent, you

13    may not find Trevon Gross guilty unless you find that he also

14    acted with a corrupt intent.

15            Remember that it is Trevon Gross's intent -- remember

16    that it is Trevon Gross's intent to be influenced or rewarded

17    that matters, not the subsequent actions he undertook

18    concerning HOPE Federal Credit Union or the subsequent actions

19    of HOPE Federal Credit Union.  In order to find Trevon Gross

20    guilty, the government does not have to prove that the payment

21    or offer of payment actually influenced any of Trevon Gross's

22    decisions concerning HOPE Federal Credit Union.  Also, if you

23    find that Trevon Gross acted with the intent to be rewarded for

24    a decision already made, it does not matter that the payment

25    was not made or offered until after the decision was made.

1          Also, remember that in order to find Trevon Gross

2     guilty, the government does not have to prove that Trevon Gross

3     received the payments directly.  If Trevon Gross corruptly

4     solicited, demanded, anticipated or agreed to accept a payment

5     on behalf of another person or entity with the intent to be

6     influenced or rewarded, that is sufficient to find him guilty.

7          The corrupt payments statute charged in Counts Two and

8     Three does not criminalize legitimate commercial and business

9     practices.  It only applies to payments made with a corrupt

10    intent.  Thus, the statute does not apply to bona fide salary,

11    wages, fees, or other compensation paid, or expenses paid or

12    reimbursed, in the usual course of business.  Bona fide means

13    in good faith or without deceit or fraud.  If you find that

14    either of the defendants made or accepted, or offered or agreed

15    to make or accept, bona fide payments without corrupt intent,

16    you must find that defendant not guilty on the count you are

17    considering.

18          I'll now turn to the conspiracy offense charged in

19    Count One.

20          Count One charges Yuri Lebedev and Trevon Gross with

21    conspiring to violate certain federal laws.  A conspiracy is a

22    kind of criminal partnership -- an agreement or understanding

23    between two or more persons to accomplish some unlawful

24    purpose.  The crime of conspiracy to violate federal law is an

25    independent offense from the actual violation of any specific

1    federal law.  Indeed, you may find either of the defendants

2    guilty of conspiring to violate federal law even if you find

3    that the crimes which were the objects of the conspiracy were

4    never actually committed.

5         Count One charges Yuri Lebedev and Trevon Gross with

6    conspiring with others, from in or about April 2014 to in or

7    about 2015, to achieve four unlawful objectives in an effort to

8    further the operations of Coin.mx or the Collectables Club:

9    Number one, to make corrupt payments to Trevon Gross with the

10   intent to influence Trevon Gross in connection with the

11   business of HOPE FCU; number two, to have Trevon Gross receive

12   or agree to receive corrupt payments with the intent to be

13   influenced in connection with the business of HOPE FCU; number

14   three, to obstruct an examination of HOPE FCU by the NCUA; and

15   number four, to make false statements to the NCUA in connection

16   with the NCUA's examinations of HOPE FCU.

17        As is clear from the indictment, the government has

18   charged the defendants with what is called a multiobject

19   conspiracy, that is, a conspiracy with more than one objective.

20        The first objective of the alleged conspiracy was to

21   make corrupt payments to Trevon Gross with the intent to

22   influence Trevon Gross in the business of HOPE Federal Credit

23   Union, in violation of Title 18, United States Code, Section

24   215(a)(1).

25        The second object of the alleged conspiracy was to

have Trevon Gross receive or agree to receive the corrupt

payments with the intent to be influenced in the business of

HOPE Federal Credit Union, in violation of Title 18, United

States Code, Section 215(a)(2).

The third object of the alleged conspiracy was to

obstruct an examination of HOPE Federal Credit Union by the

National Credit Union Administration, the NCUA, in violation of

Title 18, United States Code, Section 1517.

The fourth object of the alleged conspiracy was to

make false statements to the NCUA, in violation of Title 18,

United States Code, Section 1001.

In order to find Yuri Lebedev or Trevon Gross guilty

on Count One, you must find that the government has proven each

of the following elements beyond a reasonable doubt as to that

defendant:

First, that there was an agreement between two or more

persons to commit one or more of the crimes that were the

objects of the conspiracy charged in the indictment;

Second, that the defendant you are considering

knowingly and willfully became a member of the conspiracy

charged; and

Third, that any of the coconspirators knowingly

committed at least one overt act in furtherance of the

conspiracy.

I will now discuss each of these elements in more

H3A9LEB3                          Charge

1   detail.

2               The first element which the government must prove

3   beyond a reasonable doubt is that two or more persons entered

4   the unlawful agreement charged in Count One of the

5   indictment -- that is, that two or more persons agreed to

6   commit at least one of the four criminal objects charged in the

7   indictment.

8               As I previously stated, a conspiracy is an agreement

9   or undertaking between two or more persons to accomplish some

10  unlawful purpose.  To establish the existence of a conspiracy,

11  however, the government is not required to show that two or

12  more people sat around a table and entered into a formal

13  contract.  It's sufficient if two or more persons in any matter

14  came to a common understanding to violate the law.  Express

15  language or specific words are not required to indicate

16  agreement to or membership in a conspiracy.  As I've already

17  told you, it's not necessary that a conspiracy actually succeed

18  in its purpose for you to conclude that it existed.

19  Nevertheless, in determining whether two or more individuals

20  have agreed to commit a crime, you may look at all of their

21  conduct, including any acts done to carry out an apparent

22  criminal purpose, and determine whether that conduct reflects

23  an intent to carry out a common criminal purpose.  The old

24  saying, "Actions speak louder than words" applies here.

25              If, upon consideration of all of the evidence, direct

H3A9LEB3                         Charge

1    and circumstantial, you find that the government has proven

2    beyond a reasonable doubt that there was a meeting of the minds

3    or agreement between two more persons to commit one or more of

4    the crimes that are the objects of the conspiracy charged in

5    Count One, then proof of the existence of a conspiracy is

6    established.  Mere discussions about crimes or mere knowledge

7    of crimes without an agreement to commit them is not a

8    conspiracy.  Further, an agreement to achieve a lawful goal is

9    not the same as a criminal conspiracy -- two or more

10   individuals must have agreed to commit a crime.

11          It is also not necessary for the government to prove

12   that two or more individuals agreed to commit all four criminal

13   objects of the conspiracy as charged in Count One of the

14   indictment.  An agreement to accomplish any one of the alleged

15   objects is sufficient.  But if you do not unanimously find

16   beyond a reasonable doubt that all of the objects of the

17   conspiracy were proven, you must be unanimous as to which

18   object you do find proven.  In other words, to return a verdict

19   of guilty on Count One, you must reach agreement as to at least

20   one object of the alleged conspiracy and find that the

21   defendant in question knowingly and intentionally entered into

22   an agreement to achieve that unlawful objective.

23          I have instructed you on the elements of the

24   substantive bribery offenses charged in Counts Two and Three,

25   which are the first two alleged objects of the conspiracy

1    charged in Count One.  You should follow those instructions

2    here.

3            I will now instruct you on the elements of the

4    substantive offenses that are the third and fourth objects of

5    the alleged conspiracy.

6            The third object of the conspiracy charged in Count

7    One is to corruptly obstruct an examination of a financial

8    institution, specifically, HOPE Federal Credit Union, by an

9    agency of the United States with jurisdiction to conduct an

10   examination, specifically, the National Credit Union

11   Administration, NCUA, in violation of Title 18, United States

12   Code, Section 1517.  This crime has three elements:

13           First, that on or about the dates set forth in the

14   indictment, an agency of the United States with jurisdiction to

15   conduct an examination, in this case the NCUA, was, in fact,

16   conducting an examination of a financial institution,

17   specifically HOPE Federal Credit Union.  In order to establish

18   that HOPE Federal Credit Union was a financial institution, the

19   government must prove that HOPE Federal Credit Union was a

20   credit union with accounts insured by the National Credit Union

21   Share Insurance Fund.  I instruct you that the NCUA is an

22   agency of the United States with jurisdiction to conduct an

23   examination of a credit union with accounts insured by the

24   National Credit Union Share Insurance Fund.

25           Second, that a defendant or a coconspirator knew that

1    the NCUA was conducting an examination of HOPE Federal Credit

2    Union; and

3            Third, that a defendant or a coconspirator corruptly

4    obstructed or attempted to obstruct the NCUA's examination.

5            The success of the endeavor to obstruct the NCUA's

6    examination is not an element of the crime.  Thus, it is

7    sufficient if you find that a defendant or a coconspirator

8    corruptly made any effort or did any act for the purpose of

9    obstructing the NCUA's examination, even if the examination was

10   not, in fact, obstructed.  The word "corruptly" as used in the

11   statute means simply having the improper motive or purpose of

12   obstructing the examination.

13           The fourth object of the conspiracy charged in Count

14   One is knowingly and willfully making materially false

15   statements to the executive branch of the government of the

16   United States, specifically, the National Credit Union

17   Administration, NCUA, in violation of Title 18, United States

18   Code, Section 1001.  The crime has five elements:

19           First, that on or about the dates set forth in the

20   indictment, a defendant or a coconspirator did one or more of

21   the following:

22           Falsify, conceal, or cover up a fact.  As used in the

23   statute, the term "falsify" means to make an untrue statement

24   which is untrue at the time made and is known to be untrue at

25   the time made.  To "conceal" means to withhold from another.

1   It requires some act to prevent detection of some fact the

2   defendant was required to reveal.  And to "cover up" means to

3   hide from another.  The government must prove, beyond a

4   reasonable doubt, that the defendant had a legal duty to

5   disclose the fact concealed or covered up.  That was (a).

6        (b).  Make a statement or representation.  In this

7   regard, the government need not prove that the defendants or a

8   coconspirator physically made or otherwise personally prepared

9   the statement in question.  It is sufficient if the defendants

10  or a coconspirator caused the statement to have been made.

11  Under this statute, there is no distinction between written and

12  oral statements.

13       (c).  Use a writing or document.  In this regard, the

14  government need not prove that the defendants or a

15  coconspirator personally prepared the writing or document.  It

16  is sufficient to satisfy this element if you find that the

17  defendants or a coconspirator caused the writing or document to

18  be used.

19       Second, if the defendant or a coconspirator did one or

20  more of the acts in the first element, that the act or acts

21  were done as follows:

22       (a).  Falsify or conceal or cover up by trick, scream

23  or device.  This language is almost self-explanatory.  A scheme

24  is a plan for the accomplishment of an object.  A trick or

25  device is a deceptive act or strategy calculated to deceive

1     other persons.

2              (b).  Make a statement or representation that was

3     false, fictitious or fraudulent.

4              (c) use a writing or document containing a statement

5     or entry that was false, fictitious or fraudulent.

6              A statement or representation or entry is "false" or

7     "fictitious" if it was untrue when made, and known at that time

8     to be untrue by the person making it or causing it to be made.

9     A statement or representation or entry is "fraudulent" if it

10    was untrue when made and was made or caused to be made with the

11    intent to deceive the NCUA.

12             Third, that the fact falsified or concealed or covered

13    up, or the false, fictitious, or fraudulent statement or

14    representation, or the false, fictitious or fraudulent

15    statement or entry contained in a writing or document was

16    material.  A fact or statement or representation or entry is

17    "material" if it has a natural tendency to influence or is

18    capable of influencing the NCUA's decisions or activities.

19    However, proof of actual reliance on the fact or statement or

20    representation or entry by the NCUA is not required.

21             Fourth, that a defendant or a coconspirator acted

22    knowingly and willfully.  An act is done knowingly if it is

23    done purposely and voluntarily as opposed to mistakenly or

24    accidentally.  An act is done willfully if it is done with

25    intention to do something the law forbids, a bad purpose to

H3A9LEB3                      Charge

1    disobey the law, and only with respect to concealment with

2    specific intent to fail to do something the law requires to be

3    done.

4           Fifth, and finally, that the falsification,

5    concealment or coverup was with respect to a matter within the

6    jurisdiction of the government of the United States.  I charge

7    you that the NCUA is a department of the United States

8    government.  To be within the jurisdiction of the government of

9    the United States means that the statement must concern an

10   authorized function of that federal department or agency, in

11   this case, the NCUA.  It is not necessary for the government to

12   prove that the defendants had actual knowledge that the false

13   statement was to be utilized in a matter that was within the

14   jurisdiction of the NCUA.  It is sufficient to satisfy this

15   element if you find that the false statement was made with

16   regard to a matter within the jurisdiction of the NCUA.

17          I instruct you that under the false statements

18   statute, it is not necessary for the government to prove that

19   the NCUA was, in fact, misled as a result of the action of the

20   defendants.  It does not matter that the NCUA was not misled,

21   or even that it knew of the misleading or deceptive act, should

22   you find that the act occurred.  These circumstances would not

23   excuse or justify a concealment undertaken, or a false,

24   fictitious or fraudulent statement made, or a false writing or

25   document submitted willfully and knowingly about a matter

1    within the jurisdiction of the NCUA.

2              If you find the government has proven beyond a

3    reasonable doubt that the conspiracy alleged in Count One

4    existed, you must then determine whether the government has

5    proven beyond a reasonable doubt that Yuri Lebedev and Trevon

6    Gross knowingly and willfully joined that conspiracy.

7              In determining whether either defendant became a

8    member of the conspiracy, you must determine not only whether

9    he participated in it, but also whether he did so with

10   knowledge of its illegal objective.  Did the specific defendant

11   join the conspiracy with an awareness of its aim and purpose

12   and with the specific intent of furthering that purpose?

13   Knowledge is a matter of inference from facts proved.  To have

14   guilty knowledge, a defendant need not know the full extent of

15   the conspiracy or even who all of the coconspirators are.

16   Similarly, a defendant need not know all of the activities of

17   the conspiracy.  Indeed, a single act may be enough to bring

18   one -- to bring one within the membership of the conspiracy,

19   provided that the defendant was aware of the conspiracy and

20   knowingly associated himself with its criminal aims.  It does

21   not matter whether a given defendant's role in the conspiracy

22   may have been more limited than or different in nature from the

23   roles of his coconspirators, provided he was himself a

24   participant.

25              Of course, mere presence at a scene of a crime, or

H3A9LEB3                    Charge

1    mere association with one or more members of a conspiracy, even

2    coupled with awareness that those other people are acting

3    unlawfully, does not make a defendant a member of the

4    conspiracy.  Further, the fact that the acts of the defendant,

5    without knowledge, merely happen to further the purposes or

6    objectives of the conspiracy does not make the defendant a

7    member of the conspiracy.  Nor is knowledge of or acquiescence

8    in a conspiracy without participation sufficient.  As I have

9    stressed, what is necessary is that the defendant in question

10   participate in a conspiracy with knowledge of its unlawful

11   purpose and with intent to aid in the accomplishment of that

12   end.

13           It's also not necessary that the defendant receive or

14   even anticipate any financial benefit from participating in a

15   conspiracy as long as he participated in it in the way I have

16   explained.  That said, while proof of a financial interest in

17   the outcome of a scheme is not essential, if you find that the

18   defendant had such an interest, that is a factor which you may

19   properly consider in determining whether or not he was a member

20   of the conspiracy charged in the indictment.

21           Finally, as I have said before, you must separately

22   determine, as to each defendant, whether he was a member of the

23   conspiracy.

24           Let me now turn to the third element of the conspiracy

25   charged in Count One, the requirement of an overt act.

1          Count One requires the government to prove beyond a
2    reasonable doubt that at least one coconspirator knowingly
3    committed at least one overt act in furtherance of the
4    conspiracy.  The overt act element requires the government to
5    show something more than mere agreement; it must show that some
6    overt step or action was taken by at least one of the
7    conspirators in furtherance of the conspiracy.  In other words,
8    the government must show that the agreement went beyond the
9    mere talking stage.  It must show that at least one of the
10   conspirators actually did something in furtherance of the
11   conspiracy.

12         In order for the government to satisfy the overt act
13   requirement, it is not necessary for the government to prove
14   any of the specific overt acts alleged was committed.  Nor does
15   the government have to prove that it was Yuri Lebedev or Trevon
16   Gross who committed the overt act.  It is sufficient for the
17   government to show that any of the members of the conspiracy
18   knowingly committed some overt act in furtherance of the
19   conspiracy.  Further, the overt act need not be one that is
20   alleged in the indictment.  Rather, it can be any overt act
21   that is substantially similar to those acts alleged in the
22   indictment, if you are convinced beyond a reasonable doubt that
23   the act occurred while the conspiracy was still in existence
24   and that it was done in furtherance of the conspiracy as
25   described in the indictment.  In addition, you need not be

H3A9LEB3                         Charge

1   unanimous as to which overt act you find to have been

2   committed.  It is sufficient as long as all of you find that at

3   least one overt act was committed by one of the conspirators in

4   furtherance of the conspiracy.

5           Finally, you should bear in mind that the overt act,

6   standing alone, may be an innocent lawful act.  Frequently,

7   however, an apparently innocent act sheds it harmless character

8   if it is a step in carrying out, promoting, aiding, or

9   assisting the conspiratorial scheme.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              THE COURT:  (Continuing)  When people enter into a

2      conspiracy to accomplish an unlawful end, they become agents or

3      partners of one another in carrying out the conspiracy.

4      Accordingly, the reasonably foreseeable acts, declarations,

5      statements, and omissions of any member of the conspiracy and

6      in furtherance of the common purpose of the conspiracy are

7      deemed under the law to be the acts of all of the members.  All

8      of the members are responsible to such acts, declarations,

9      statements, and omissions.

10             If you find beyond a reasonable doubt that the

11     specific defendant you are considering knowingly and willfully

12     participated in the conspiracy charged in the indictment, then

13     any acts, done or statements made in furtherance of the

14     conspiracy by persons also found by you to have been members of

15     that conspiracy may be considered against that defendant.  This

16     is so even if such acts were done and statements were made in

17     the defendant's absent and without his knowledge.  However,

18     before you may consider the statements or acts of a

19     coconspirator, in deciding the issue of a defendant's guilt,

20     you must first determine that the acts and statements were made

21     during the existence and in furtherance of the unlawful scheme.

22     If the acts were done or the statements made by someone whom

23     you do not find to have been a member of the conspiracy at the

24     time of the acts or statements, or if they were not done or

25     said in furtherance of the conspiracy, they may be considered

1    by you as evidence only against the member who said or did

2    that.

3            A defendant has raised the defense that he was not a

4    member of the conspiracy because he withdrew from the

5    conspiracy prior to the commission of the first overt act in

6    furtherance of the conspiracy.  Once a person joins a

7    conspiracy, that person remains a member until he withdraws

8    from it.  Any withdrawal must be complete, and it must be done

9    in good faith.  But it is a defense to the charge of conspiracy

10   that the defendant withdrew from the conspiracy before the

11   commission of the first overt act in furtherance of the

12   conspiracy.  A person can withdraw from a conspiracy by taking

13   some affirmative steps to terminate or abandon his

14   participation in, and efforts to promote, the conspiracy.  In

15   order to withdraw from the conspiracy, a defendant must take

16   some definite, decisive, and affirmative action to disavow

17   himself from the conspiracy or to defeat the goal or purpose of

18   the conspiracy.

19           Merely stopping activities or cooperation with the

20   conspiracy or merely being inactive for a period of time is not

21   sufficient to constitute the defense of withdrawal.  In

22   deciding if the defendant took a step to disavow or defeat the

23   conspiracy, you may consider whether he told others in the

24   conspiracy that his participation had ended, whether the

25   defendant took steps to correct prior assistance to the group,

1   and whether he attempted to remedy any past act or attempted to

2   prevent any further progress of the conspiracy.

3           It is not sufficient to constitute the defense of

4   withdrawal for a defendant to sever ties with some, but not all

5   members of the conspiracy.  Furthermore, a defendant must not

6   take any subsequent acts to promote the conspiracy, such as

7   steps to conceal the conspiracy, and must not receive any

8   additional benefits from the conspiracy.  The defendant has the

9   burden of proving that he withdrew from the conspiracy by a

10  preponderance of the evidence.

11          To prove something by a preponderance of the evidence

12  means to prove that it is more likely true than not true.  It

13  is determined by considering all of the evidence and deciding

14  which evidence is more convincing.  In determining whether a

15  defendant has proven that he withdrew from the conspiracy, you

16  may consider all relevant, admissible evidence.  If the

17  evidence appears to be equally balanced, or if you cannot say

18  upon which side it weighs heavier, you must resolve this

19  question against the defendant.  It is important to remember,

20  however, that the fact that a defendant has raised this defense

21  does not relieve the government of its burden of proving that

22  there was an agreement that the defendant knowingly and

23  voluntarily joined the conspiracy and that an overt act was

24  committed in furtherance of the conspiracy.  Those are things

25  that the government still must prove beyond a reasonable doubt

1    in order for you to convict the defendant of the crime of

2    conspiracy.

3           In this case, the defendants contend that as to Count

4    One, the government's proof fails to show the existence of only

5    one overall conspiracy.  Rather, they claim that there were

6    actually several separate and independent conspiracies with

7    various groups of members.  Whether there existed a single

8    unlawful agreement, or many such agreements or indeed no

9    agreement at all is a question of fact for you, the jury, to

10   determine in accordance with the instructions I'm about to give

11   you.

12          When two or more people join together to further one

13   common unlawful design or purpose, a single conspiracy exists.

14   By way of contrast, multiple conspiracies exist when there are

15   separate unlawful agreements to achieve distinct purposes.

16          Proof of several separate and independent conspiracies

17   is not proof of the single overall conspiracy charged in Count

18   One unless one of the conspiracies proved happens to be the

19   single conspiracy described in Count One of the indictment.

20          You may find that there was a single conspiracy

21   despite the fact that there were changes in personnel by

22   additions of new members, or loss of old members, or changes in

23   activities or both, so long as you find that some of the

24   coconspirators continued to act for the entire duration of the

25   conspiracy for the purposes charged in Count One of the

1   indictment.  The fact that the members of a conspiracy are not

2   always identical does not necessarily imply that separate

3   conspiracies existed.

4         On the other hand, if you find that the conspiracy

5   charged in Count One did not exist, you cannot find any

6   defendant guilty of the single conspiracy charged in Count One.

7   This is so even if you find that some conspiracy other than the

8   one charged in Count One existed, even though the purposes of

9   both conspiracies may have been the same, and even though there

10  may have been some overlap in membership.

11        Similarly, if you find that a particular defendant was

12  a member of another conspiracy and not the one charged in Count

13  One, then you must acquit the defendant of the conspiracy

14  charged in Count One.

15        Therefore, what you must do is determine whether the

16  conspiracy charged in Count One existed.  If it did, you must

17  then determine the nature of the conspiracy and who were its

18  members.

19        You have seen and heard evidence that sometime after a

20  meeting involving Trevon Gross, Yuri Lebedev, and other members

21  of the Collectables Club, held on or about November 22nd, 2014,

22  there was a falling-out between Trevon Gross on the one hand

23  and the Collectables Club members on the other hand.  It is up

24  to you to determine, based on all of the evidence, when

25  precisely that falling-out occurred.

1              You may consider against both Yuri and Trevon Gross

2    evidence of acts and statements by the defendants and

3    individuals affiliated with HOPE FCU, the Collectables Club,

4    and Kapcharge that occurred before the date of the falling-out

5    between Trevon Gross and the Collectables Club.  Evidence of

6    acts and statements by various individuals that occurred after

7    the date of the falling-out between Trevon Gross and the

8    Collectables Club may be considered in the following ways:

9              Acts and statements by the defendants and members of

10   the Collectables Club regarding the November 22nd meeting or

11   the relationship between Trevon Gross and the Collectables Club

12   that occurred after the date of the falling-out between Trevon

13   Gross and the Collectables Club may be considered against both

14   Yuri Lebedev and Trevon Gross.

15             Acts and statements by Yuri Lebedev and other members

16   of the Collectables Club regarding the NCUA about HOPE FCU that

17   occurred after the date of the falling-out between Trevon Gross

18   and the Collectables Club may be considered against both Yuri

19   Lebedev and Trevon Gross.

20             Acts and statements by Yuri Lebedev and other members

21   of the Collectables Club regarding efforts to take control of

22   credit unions other than HOPE Federal Credit Union and starting

23   a new credit union of their own, including eCommerce PMA

24   Federal Credit Union, that occurred after the date of the

25   falling-out between Trevon Gross and the Collectables Club: (a)

1    may be considered against Yuri Lebedev only for whether the

2    conspiracy charged in Count One existed and who its members

3    were, but not for whether Yuri Lebedev knowingly participated

4    in the conspiracy; and (b) may not be considered against Trevon

5    Gross.

6          Acts and statements by Trevon Gross, Charles Blue, and

7    other individuals affiliated with HOPE FCU, and Mark Francis,

8    Shoula Cohen, and other individuals affiliated with Kapcharge

9    that occurred after the date of the falling-out between Trevon

10   Gross and the Collectables Club: (a) may be considered against

11   Trevon Gross; and (b) may be considered against Yuri Lebedev

12   only for whether the conspiracy charged in Count One existed

13   and who its members were, but not for whether Yuri Lebedev

14   knowingly participated in that conspiracy.

15         Now, to Count Four.  Count Four alleges that Yuri

16   Lebedev conspired to commit wire and bank fraud.  Counts Five

17   and Six allege that Yuri Lebedev committed the substantive

18   crimes of wire fraud and bank fraud respectively.  Trevon Gross

19   is not charged in Counts Four through six.

20         I have already explained the elements of conspiracy

21   when I discussed Count One, and you should follow those

22   instructions with respect to the conspiracy charged in Count

23   Four with one exception.  Unlike the conspiracy charged in

24   Count One, you do not have to find that any overt act was

25   committed by any conspirator in furtherance of the conspiracy

H3AKLEB4                       Charge

1    charged in Count Four.  In other words, the law does not

2    require the government to prove that any overt act was

3    committed in order to prove a conspiracy to commit wire fraud

4    or bank fraud.  I remind you, however, that if you do not

5    unanimously find that both wire fraud and bank fraud were

6    objects of the conspiracy, in order to convict Yuri Lebedev on

7    Count Four, you must unanimously agree that either wire fraud

8    or bank fraud was an object of the conspiracy.

9              I will now explain the elements of wire fraud and bank

10   fraud, which are the two objects of the conspiracy charged in

11   Count Four.

12             So wire fraud, Count Five, charges Yuri Lebedev with

13   wire fraud.  In order to find the defendant guilty of this

14   crime, the government must prove the following elements beyond

15   a reasonable doubt:

16             First, that the scheme or artifice to defraud others

17   of money or property by materially false and fraudulent

18   pretenses, which is charged in Count Five of the indictment,

19   existed in or about the times alleged in the indictment;

20             Second, that the defendant knowingly, willfully, and

21   with the specific intent to defraud participated in the scheme

22   or artifice with knowledge of its fraudulent nature;

23             And, third, that in execution of the scheme, the

24   defendant used or caused the use by others of interstate or

25   international wires.

1          The first element the government must prove beyond a

2     reasonable doubt is the existence of a scheme or artifice to

3     defraud others of money or property by means of false or

4     fraudulent pretenses, representations, or promises.  I will now

5     define some of these terms for you.

6          A scheme or artifice is simply a plan that is designed

7     to accomplish an objective.

8          Fraud is a broad term.  It includes all the possible

9     means by which a person seeks to gain some unfair advantage

10    over another by false representations, false suggestion, false

11    pretenses, concealment of the truth, or deliberate disregard

12    for the truth.  Thus, a scheme or artifice to defraud is any

13    plan, device, or course of action to deprive another of money

14    or property by means of false or fraudulent pretenses,

15    representations, or promises.  It is a plan to deprive another

16    of money or property by trick, deceit, or swindle.

17         Here, the government alleges that the scheme to

18    defraud was carried out by making false and fraudulent

19    statements and representations to financial institutions.  A

20    statement or representation is false if it is untrue when made

21    and was then known to be untrue by the person making it or

22    causing it to be made.  A representation or statement is

23    fraudulent if it was false and the defendant made it with the

24    intent to deceive.

25         The false or fraudulent representation or concealment

in a wire fraud scheme must relate to a material fact or
matter.  A material fact is one you would reasonably expect to
be of concern to a reasonable and prudent person in relying
upon the representation or statement in making a decision.
This means that if you find a particular statement of fact to
have been false, you must also determine whether the statement
was one that a reasonable person would have considered
important in making his or her decision.  To find an unlawful
statement or representation material, you must conclude that
the statement or representation was one that was capable of
influencing the decision-maker to whom it was directed, here a
financial institution, and was intended by the defendant to
influence the financial institution's decision.  It does not
matter whether the financial institution actually relied on the
misrepresentation.  However, the misrepresentation had to be
capable of influencing the financial institution and intended
by the defendant to influence the financial institution,
whether it influenced the financial institution or not.

         The government is not required to establish that
anyone actually relied on any false or fraudulent statement or
representation.  Rather, the statement or representation merely
had to be capable of influencing the financial institution.
Whether the financial institution was actually influenced or
not is of no moment.

         In order to establish a scheme to defraud, the

1   government must also prove that the alleged scheme contemplated

2   depriving the financial institution of money or property.  In

3   this regard, a person is not deprived of money or property only

4   when someone directly takes money or property from the person,

5   although that is obviously one way that a person or entity can

6   be so deprived.

7          A person can also be deprived of money or property

8   when that person is provided false or fraudulent information

9   that, if believed, would prevent the person from being able to

10  make informed economic decisions about what to do with his or

11  her money or property.  In other words, a person is deprived of

12  money or property when that person is deprived of the right to

13  control the money or property.

14         Because the government need only show that a scheme to

15  defraud existed, not that it succeeded, it is not necessary for

16  the government to prove that the financial institutions

17  actually lost money or property as a result of the scheme.  For

18  you to find Yuri Lebedev guilty, however, the government must

19  prove that such a loss was contemplated by the defendant.  That

20  is, to carry its burden, the government must prove that the

21  defendant contemplated and intended doing harm to a victim –

22  that he intended to do something more than merely deceive the

23  financial institutions.

24         In considering whether contemplation of the required

25  loss was proved by the government, keep in mind that the loss

1    of the right to control money or property constitutes

2    deprivation of money or property only when the scheme, if it

3    were to succeed, would result in economic harm to the victim.

4    If all the government proves is that under the scheme, it was

5    contemplated that the financial institutions would enter into

6    transactions they would otherwise not have entered into,

7    without proving that the financial institutions would thereby

8    have suffered economic harm, then the government will not have

9    met its burden of proof.

10          A scheme to defraud need not be shown by direct

11   evidence, but may be established by all the circumstances and

12   facts in the case.

13          Finally, it does not matter whether the financial

14   institutions might have discovered the fraud had they probed

15   further.  If you find that a scheme existed, it's irrelevant

16   whether you believe that the victim was careless, gullible, or

17   even negligent.

18          The second element the government must prove beyond a

19   reasonable doubt is that Yuri Lebedev participated in a scheme

20   to defraud knowingly, willfully, and with specific intent to

21   defraud.  To participate in a scheme means to engage in it by

22   taking some affirmative step to help it succeed.  I've already

23   instructed you on the meaning of knowingly and willfully, and

24   you should follow those instructions here.

25          To act with intent to defraud means to act knowingly

1    and with the specific intent to deceive for the purpose of

2    causing some financial harm or deprivation of property to

3    another.  The government need not prove that any intended

4    victim was actually harmed, only that such harm was

5    contemplated.

6         The question of whether a person acted knowingly,

7    willfully, and with the intent to defraud is a question of fact

8    for you to determine like any other fact question.  This

9    question involves one's state of mind.

10        Science has not yet invented a way for us to look

11   inside someone's head to see what he is thinking, and

12   intending, and knowing.  Direct proof of knowledge, willfulness

13   and fraudulent intent is almost never available.  Rarely is it

14   the case that a person wrote or stated that as of a given time

15   in the past, he committed an act with fraudulent intent.  Such

16   direct proof is not required.

17        The ultimate facts of knowledge and criminal intent,

18   though subjective, may be established by circumstantial

19   evidence based upon a person's outward manifestations, words,

20   conduct, and acts taken in light of all of the surrounding

21   circumstances that are disclosed by the evidence, together with

22   the rational or logical inferences that may be drawn from them.

23        What is referred to as drawing inferences from

24   circumstantial evidence is no different from what people

25   normally mean when they say, "use your common sense."  Using

1   your common sense means that when you come to decide whether

2   the defendant possessed or lacked an intent to defraud, you

3   need not limit yourself to just what the defendant said, but

4   you may also look at what the defendant did and what others did

5   in relation to the defendant, and, in general, to everything

6   that occurred.

7           Circumstantial evidence, if believed, is of no less

8   value than direct evidence.  In either case, the essential

9   elements of the crime must be proven beyond a reasonable doubt.

10          In order to sustain the charges against Yuri Lebedev,

11  the government must prove beyond a reasonable doubt that the

12  defendant participated in the alleged scheme with an

13  understanding of its fraudulent or deceptive character and with

14  the intent to help it succeed.

15          That said, there are certain things that the

16  government need not prove in order to meet its burden.  It need

17  not prove that the defendant participated in or even knew about

18  all of the operations of the scheme.  It need not prove that

19  the defendant originated or invented the scheme or participated

20  in it from its inception.  A person who begins to participate

21  in a scheme after it begins is just as guilty as a person who

22  participates from the beginning, as long as the person who

23  joins at a later point becomes aware of the scheme's general

24  purpose and operation and acts intentionally to further its

25  unlawful goal or goals.  Finally, the government need not prove

1    that the defendant participated in the scheme to the same

2    degree as other participants.

3          The third element the government must prove beyond a

4    reasonable doubt is the use of an interstate or international

5    wire communication in furtherance of the scheme to defraud.

6    The wire communication must pass between two or more states as,

7    for example, an email sent from New York to Florida, or it must

8    pass between the United States and a foreign country as, for

9    example, an email sent from New York to London.  A wire

10   communication also includes a wire transfer of funds between

11   banks in different states or between a bank in the United

12   States and a bank in a foreign country.

13         The use of wires need not itself be a fraudulent

14   representation.  It must, however, further or assist in the

15   carrying out of the scheme to defraud.  It is not necessary for

16   Yuri Lebedev to be directly or personally involved in the wire

17   communication, as long as the communication was reasonably

18   foreseeable in the execution of the alleged scheme to defraud

19   in which Yuri Lebedev is accused of participating.

20         In this regard, it is sufficient to establish this

21   element of the crime if you find that Yuri Lebedev caused the

22   wires to be used by others.  This does not mean that the

23   defendant must specifically have authorized others to make the

24   telephone call, send the email, or transfer the funds.  When

25   one does an act with knowledge that the use of the wires will

1   follow in the ordinary course of business, or where such use of

2   the wires can reasonably be foreseen, even though not actually

3   intended, then a person causes the wires to be used.

4            Count Six charges Yuri Lebedev with bank fraud.  In

5   order to find the defendant guilty of this crime, the

6   government must prove the following elements beyond a

7   reasonable doubt:

8            First, that there was a scheme to obtain money or

9   property owned by or under the custody or control of a bank by

10  means of materially false or fraudulent pretenses,

11  representations, or promises as charged in the indictment;

12           Second, that the defendant executed or attempted to

13  execute the scheme with the intent to obtain money or property

14  owned or under the control or custody of the bank;

15           And, third, that at the time of the execution of the

16  scheme, the bank had its deposits insured by the Federal

17  Deposit Insurance Corporation.

18           The first element that the government must prove

19  beyond a reasonable doubt is that there was a scheme to obtain

20  money or property owned by or under the custody or control of a

21  bank by means of false or fraudulent pretenses,

22  representations, or promises, as described in the indictment.

23           I have instructed you on the meaning of scheme, and

24  you should follow that instruction here.

25           A representation is fraudulent if it were falsely made

1    with the intent to deceive.  Deceitful statements of

2    half-truth, the concealment of material facts, and the

3    expression of an opinion not honestly entertained may

4    constitute false or fraudulent representations under the

5    statute.

6           The deception need not be premised upon spoken or

7    written words alone, however.  The arrangement of the words or

8    the circumstances in which they are used may convey a false and

9    deceptive appearance.  If there is intentional deception, the

10   manner in which it is accomplished does not matter.

11          In addition, the fraudulent representation must relate

12   to a material fact or matter.  I have previously instructed you

13   on the meaning of material, and you should follow that

14   instruction here.

15          The second element the government must prove beyond a

16   reasonable doubt is that the defendant executed or attempted to

17   execute the scheme knowingly, and willfully, and with the

18   intent to obtain money or funds owned by or under the custody

19   or control of the bank.

20          I have already instructed you on the meaning of

21   knowingly and willfully, and you should follow those

22   instructions here.

23          I remind you that the ultimate facts of knowledge and

24   criminal intent, though subjective, may be established by

25   circumstantial evidence, based upon a person's outward

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    manifestations, his words, his conduct, his acts, and all the

2    surrounding circumstances disclosed by the evidence, and the

3    rational or logical inferences that may be drawn therefrom.

4              Circumstantial evidence, if believed, is of no less

5    value than direct evidence.  In either case, the essential

6    elements of the crime charged must be established beyond a

7    reasonable doubt.

8              The last element the government must prove beyond a

9    reasonable doubt is that the relevant bank was insured by the

10   Federal Deposit Insurance Corporation at the time of the

11   execution of the alleged scheme to defraud.  As to this last

12   element, there is no issue, since a stipulation was entered

13   into and read to you in which the parties agreed that the

14   relevant banks were insured by the Federal Deposit Insurance

15   Corporation at the time in question.

16             Furthermore, it is not necessary for the government to

17   prove that the defendant knew the identity of a particular bank

18   or that the defendant knew that the bank was insured by the

19   FDIC.  It must only prove that the defendant intended to obtain

20   money or funds owned by or under the custody or control of a

21   bank by means of false or fraudulent pretenses,

22   representations, or promises.

23             This concludes my instructions on the crimes charged

24   in the indictment, but before I move on to my remaining

25   instructions, I want to now instruct you on the concept of

1   conscious avoidance.

2           I instructed that in order to find the defendants

3   guilty on the counts in which they are charged, you must find

4   that they acted knowingly in various respects.  In determining

5   whether a particular defendant acted knowingly, you may

6   consider whether that defendant deliberately closed his eyes to

7   what otherwise would have been obvious to him.  That is what

8   the phrase "conscious avoidance" refers to.

9           As I told you before, acts done knowingly must be a

10  product of a person's conscious intention.  They cannot be the

11  result of carelessness, negligence, or foolishness.  A

12  defendant may not, however, willfully and intentionally remain

13  ignorant of a fact material and important to his own conduct in

14  order to escape the consequences of criminal law.  We refer to

15  this notion of intentionally blinding yourself to what is

16  staring you in the face as conscious avoidance.

17          An argument by the government of conscious avoidance

18  is not a substitute for proof.  It's simply another factor that

19  you, the jury, may consider in deciding what a defendant knew.

20  Thus, if you find beyond a reasonable doubt that a particular

21  defendant was aware that there was a high probability that a

22  fact was so, but that the defendant deliberately avoided

23  confirming this fact, such as by purposely closing his eyes to

24  it or intentionally failing to investigate it, then you may

25  treat this deliberate avoidance of positive knowledge as the

1    equivalent of knowledge.

2           However, if you find that the defendant had an actual

3    good-faith belief that the particular fact was true, he may not

4    be convicted.

5           With respect to the conspiracy counts, you must also

6    keep in mind that there is an important difference between

7    intentionally participating in the conspiracy on the one hand

8    and knowing the specific object of the conspiracy on the other.

9    You may consider conscious avoidance in deciding whether a

10   defendant knew the objective of a conspiracy; that is, whether

11   a defendant reasonably believed that there was a high

12   probability that a goal of the conspiracy was to commit the

13   crime charged as the object of that conspiracy and deliberately

14   avoided confirming that fact, but participated in the

15   conspiracy anyway.

16          But conscious avoidance cannot be used as a substitute

17   for finding that a defendant intentionally joined the

18   conspiracy in the first place.  It is logically impossible for

19   a defendant to intend and agree to join a conspiracy if he does

20   not actually know it exists, and that is the distinction I am

21   drawing.

22          In sum, if you find that a particular defendant

23   believed there was a high probability that a fact was so, and

24   that the defendant deliberately and consciously avoided

25   learning the truth of that fact, you may find that the

1    defendant acted knowingly with respect to that fact.

2              However, if you find that the defendant actually

3    believed the fact was not so, then you may not find that he

4    acted knowingly with respect to that fact.

5              As to each count, I have instructed you as to what

6    state of mind the government must prove each defendant had to

7    be guilty of that crime.  You are to assess each count and

8    defendant separately, and in each case, review the instructions

9    as to that specific count.

10             Nevertheless, let me advise you that a defendant's

11   good faith is a complete defense to all of the charges in the

12   case.  If a defendant believed in good faith that he was acting

13   properly, even if he was mistaken in that belief, and even if

14   others were ultimately injured by his conduct, contrary to his

15   intention, there would be no crime.

16             The burden of establishing criminal intent and lack of

17   good faith rests upon the government.  A defendant is under no

18   burden to prove his good faith; rather, as to each count in the

19   indictment, the government must prove bad faith as to each

20   defendant beyond a reasonable doubt.

21             In connection with the substantive crimes charged in

22   Count Two, Five, and Six, Yuri Lebedev is charged with

23   committing certain criminal acts and also with aiding and

24   abetting the commission of those acts.  As to each of those

25   counts, the defendant can be convicted either if he committed

1    the crime himself, or if the government proves beyond a

2    reasonable doubt that he aided and abetted the commission of

3    the crime by one or more other persons.

4            A person who aids and abets another in committing an

5    offense is just as guilty of that offense as if he had

6    committed it himself.  Therefore, if you find that the

7    government has proven beyond a reasonable doubt that another

8    person actually committed a crime with which Yuri Lebedev is

9    charged in the indictment and proved that Yuri Lebedev aided

10   and abetted that person in the commission of the offense, then

11   you may find him guilty of that crime.

12           In order to convict on an aiding and abetting theory,

13   you must first find that another person has committed the crime

14   charged.  Obviously, the defendant cannot be convicted of

15   aiding and abetting a criminal act of another if no crime was

16   actually committed by the other person.

17           In other words, if you find that no one committed the

18   crimes listed in the indictment under Counts Two, five, and

19   six, then you cannot consider the possibility that the

20   defendant aided or abetted in the commission of any of those

21   offenses.

22           But if you do find that a crime was committed, then

23   you must consider whether the government has proved that the

24   defendant aided or abetted the commission of that crime.

25           In order to aid and abet another in committing a

crime, it is necessary that the government prove that the

defendant willfully and knowingly associated himself in some

way with the crime, and that he willfully and knowingly sought

by some act to help make the crime succeed.  The intent

necessary to support a conviction for aiding and abetting goes

beyond mere knowledge by the defendant that his action would

tend to advance some nefarious purpose of the principal.

Rather, the government must prove that the defendant engaged in

some affirmative conduct or overt act for the specific purpose

of bringing about the crime described in the indictment.

In sum, to determine whether Yuri Lebedev aided and

abetted the commission of the crime you are considering, the

government must prove that the defendant:  (1) participated in

the crime charged as something he wished to bring about; (2)

associated himself with the criminal venture knowingly,

deliberately, and willfully; and, (3) intended by his actions

to make the criminal venture succeed.

If the government has proved these three things beyond

a reasonable doubt, then the defendant is an aider and abettor

and guilty of the crime charged.

If the government's proof has failed to prove these

three things, then the defendant is not an aider and abettor,

and you must find him not guilty of the crime charged.

In addition to the foregoing elements I've described

for you, it is also necessary for you to decide, as to each

1    count, whether any part of the offense reached within this

2    district, the Southern District of New York.  The Southern

3    District of New York comprises the following counties:

4    Manhattan, the Bronx, Westchester, Dutchess, Putnam, Rockland,

5    Orange, and Sullivan.  This is called venue.  Venue means place

6    or location.

7            Venue must be examined separately for each count in

8    the indictment.  Venue on one count does not establish venue on

9    another count, though if applicable, you may rely on the same

10   evidence to establish venue on multiple counts.

11           As to the conspiracy charges, the government need not

12   prove that any crime was completed in this district or that the

13   defendants or any of their coconspirators were physically

14   present here.  Rather, venue is proper in this district if any

15   of the defendants or coconspirators caused any act or event to

16   occur in this district in furtherance of the offense, and it

17   was reasonably foreseeable to the defendant that you are

18   specifically considering that the act would take place in the

19   Southern District of New York.

20           As to the substantive counts; that is, the

21   nonconspiracy counts, the government again need not prove that

22   any crime was completed in this district or that the defendant

23   in question was physically present here.  Rather, venue is

24   proper in this district provided that any act in furtherance of

25   the essential conduct of the crime took place in the Southern

District of New York.  Again, the defendant you are considering
need not have physically intended to cause an act or event to
happen in this district or even know that he was causing an act
or event to happen here as long as it was reasonably
foreseeable to that specific defendant that such act would
occur in this district, and it, in fact, occurred.

On the issue of venue, and this alone, the government
need not prove venue beyond a reasonable doubt, but only by a
preponderance of the evidence.

A preponderance of the evidence means more likely than
not.  The government, which does bear the burden of proving
venue, has satisfied that burden as to venue if you conclude
that it is more likely than not that some act or communication
in furtherance of each charged offense occurred in the Southern
District of New York, and it was reasonably foreseeable to each
defendant that the act would so occur.

If, on the other hand, you find the government has
failed to prove the venue requirement as to a particular
offense, then you must acquit the defendant of that offense,
even if all other elements of the offense are proven.

The indictment alleges that certain conduct occurred
on or about various dates or during various time periods.  It's
not necessary, however, for the government to prove that any
conduct alleged occurred exactly on such dates or throughout
any such time periods.  As long as the conduct occurred around

1   any dates or within any specific time periods the indictment

2   alleges it occurred, that is sufficient.

3          I turn now to some general instructions.  There are

4   two types of evidence that you may properly use in reaching

5   your verdict.  One type of evidence is direct evidence.  One

6   kind of direct evidence is a witness' testimony about something

7   the witness knows by virtue of her or his own senses, something

8   the witness has seen, felt, touched, or heard.  Direct evidence

9   may also be in the form of exhibit.

10          The other type of evidence is circumstantial evidence.

11   Circumstantial evidence is evidence that tends to prove one

12   fact by proof of other facts.  Now, there's a simple example of

13   circumstantial evidence that is often used in this courthouse.

14          Assume that when you came into the courthouse this

15   morning, the sun was shining, and it was a nice day.  Assume

16   that there are blinds on the courtroom windows that are drawn,

17   and that you can't look outside.  As you're sitting here,

18   someone walks in with an umbrella that's dripping wet, and

19   someone else walks with a raincoat that's also dripping wet.

20          Now, you can't look outside the courtroom, and you

21   can't see whether or not it's raining, so you have no direct

22   evidence of that fact, but on the combination of the facts that

23   I've asked you to assume, it would be reasonable and logical

24   for you to conclude that between the time you arrived at the

25   courthouse and the time these people walked in, it had started

1   to rain.

2           That's all there is to circumstantial evidence.  You

3   infer on the basis of reason, and experience, and common sense,

4   from an established fact, the existence or nonexistence of some

5   other fact.

6           Many facts, such as a person's state of mind, can only

7   rarely be proved by direct evidence.  Circumstantial evidence

8   is of no less value than direct evidence.  It is a general rule

9   that the law makes no distinction between direct and

10  circumstantial evidence, but simply requires that before

11  convicting the defendant, you, the jury, must be satisfied of

12  the defendant's guilt beyond a reasonable doubt from all of the

13  evidence in the case.

14          During the trial, and as I've given these

15  instructions, you've heard and will hear the term "inference."

16          For instance, in their closing arguments, the

17  attorneys have asked you to infer, based on your reason,

18  experience, and common sense, from one or more established

19  facts, the existence of some other fact.  I have instructed you

20  on circumstantial evidence and that it involves inferring a

21  fact based on other facts, your reason, and common sense.

22          What is an inference?  What does it mean to infer

23  something?  An inference is not a suspicion or a guess.  It is

24  a reasoned, logical decision to conclude that a disputed fact

25  exists based on another fact that you're satisfied exists.

1          There are times when different inferences may be drawn

2     from facts, whether proven by direct or circumstantial

3     evidence.  The government asks you to draw one set of

4     inferences while the defense asks you to draw another.  It is

5     for you, and you alone, to decide what inferences you will

6     draw.

7          The process of drawing inferences from facts in

8     evidence is not a matter of guesswork or speculation.  An

9     inference is a deduction or conclusion that you, the jury, are

10    permitted, but not required to draw, from the facts that have

11    been established by either direct or circumstantial evidence.

12         In drawing inferences, you should exercise your common

13    sense.  Therefore, while you're considering the evidence

14    presented to you, you may draw, from the facts that you find to

15    be proven, such reasonable inferences as would be justified in

16    light of your experiences.

17         Some inferences, however, are impermissible.  You may

18    not infer that a defendant is guilty of participating in

19    criminal conduct if you find merely that he was present at the

20    time the crime was being committed and had knowledge that it

21    was being committed.  Nor may you use evidence that I've

22    instructed you was admitted for a limited purpose for any

23    inference beyond that limited purpose.

24         In addition, you may not infer that a defendant is

25    guilty of participating in criminal conduct merely from the

1    fact that he associated with other people who were guilty of

2    wrongdoing or merely because he has or had knowledge of the

3    wrongdoing of others.

4            Here, again, let me remind you that whether based upon

5    direct or circumstantial evidence or upon the logical,

6    reasonable inferences drawn from other evidence, you must be

7    satisfied of the guilt of each defendant you are considering

8    beyond a reasonable doubt before you may convict that defendant

9    of any of the crimes charged.

10           You have had the opportunity to observe the witnesses.

11   It is your job to decide how believable each witness was in his

12   or her testimony.  You are the sole judges of the credibility

13   of the witnesses.

14           How do you evaluate the credibility or believability

15   of the witnesses?  The answer is that you use your common

16   sense, judgment, and experience.

17           Common sense is your greatest asset as a juror.  You

18   should ask yourself:  Did the witness impress you as honest,

19   open, and candid?  Or did the witness appear evasive as though

20   the witness was trying to hide something?  How responsive was

21   the witness to the questions asked on direct examination and on

22   cross-examination?  Consider the witness' demeanor, manner of

23   testifying, and accuracy of the witness' recollection.  In

24   addition, consider how well the witness recounted what was

25   heard or observed, as the witness may be honest, but mistaken.

1             If you find that a witness is intentionally telling a

2    falsehood, that's always a matter of importance that you should

3    weigh carefully.  If you find that any witness has lied under

4    oath at this trial, you should view the testimony of such a

5    witness cautiously and weigh it with great care.

6             You may reject the entirety of the witness' testimony,

7    part of it, or none of it.  It's for you to decide how much of

8    a witness' testimony, if any, you wish to credit.

9             A witness may be inaccurate, contradictory, or even

10   untruthful in some respects, and, yet, entirely believable and

11   truthful in other respects.  It is for you to determine whether

12   such untruths or inconsistencies are significant or

13   inconsequential and whether to accept or reject all or to

14   accept some and reject the balance of the testimony of any

15   witness.

16            In evaluating the credibility of witnesses, you should

17   take into account any evidence that the witness who has

18   testified may benefit in some way from the outcome of this

19   case.  Such an interest in the outcome creates a motive to

20   testify falsely and may sway the witness to testify in a way

21   that advances his or her own interests.  Therefore, if you find

22   that any witness whose testimony you're considering may have an

23   interest in the outcome of this trial, then you should bear

24   that factor in mind when evaluating the credibility of his or

25   her testimony and accept it with great care.  This is not to

1    suggest that any witness who has an interest in the outcome of

2    the case would testify falsely.  It is for you to decide what

3    extent, if at all, the witness' interest has affected or

4    colored his or her testimony.

5           You are not required to accept testimony even though

6    the testimony is not contradicted and the witness' testimony is

7    not challenged.  You may decide, because of the witness'

8    bearing, or demeanor, or because of the inherent improbability

9    of the testimony, or for other reasons sufficient to

10   yourselves, that the testimony is not worthy of belief.  On the

11   other hand, you may find, because of a witness' bearing and

12   demeanor, and based upon consideration of all of the other

13   evidence in the case, that the witness is truthful.

14          Thus, there is no magic formula by which you can

15   evaluate this testimony.  You bring to this courtroom all your

16   experience and common sense.  You determine for yourselves in

17   many circumstances the reliability of statements that are made

18   by others to you and upon which you are asked to rely and act.

19   You may use the same tests here that you use in your everyday

20   lives.  You may consider the interest of any witness in the

21   outcome of this case and any bias or prejudice of any such

22   witness, and this is true regardless of who called or

23   questioned the witness.

24          You have heard evidence that a witness made a

25   statement on an earlier occasion which counsel argues is

1    inconsistent with the witness' trial testimony.  Evidence of a

2    prior inconsistent statement is not to be considered by you as

3    affirmative evidence bearing on either defendant's guilt.

4    Evidence of the prior inconsistent statement was placed before

5    you for the more limited purpose of helping you decide whether

6    to believe the trial testimony of the witness who contradicted

7    himself.  If you find that the witness made an earlier

8    statement that conflicts with his trial testimony, you may

9    consider that fact in deciding how much of his trial testimony,

10   if any, to believe.

11          In making this determination, you may consider whether

12   the witness purposely made a false statement or whether it was

13   an innocent mistake, whether the inconsistency concerns an

14   important fact or whether it had to do with a small detail,

15   whether the witness had an explanation for the inconsistency,

16   and whether that explanation appealed to your common sense.

17          It is exclusively your duty, based on all the evidence

18   and your own good judgment, to determine whether the prior

19   statement was inconsistent, and, if so, how much, if any,

20   weight to be given to the inconsistent statement in determining

21   whether to believe all or part of the witness' testimony.

22          One of the defendants did not testify in this case.

23   Under our Constitution, a defendant has no obligation to

24   testify or to present any evidence, because it is the

25   government's burden to prove the defendant guilty beyond a

 1    reasonable doubt.  That burden remains with the government

 2    throughout the entire trial and never shifts to a defendant.  A

 3    defendant is never required to prove that he is innocent.  You

 4    may not attach any significance to the fact that the defendant

 5    did not testify.  No adverse inference against him may be drawn

 6    by you because he did not take the witness stand.  In addition,

 7    even if one defendant testifies, no adverse inference may be

 8    considered against the other defendant who did not testify.

 9    You may not consider this against the defendants in any way in

10    your deliberations.

11         A defendant in a criminal case never -- as I said,

12    never has any duty to testify or come forward with any

13    evidence.  This is because, as I told you, the burden of proof

14    beyond a reasonable doubt remains on the government at all

15    times, and the defendant is presumed innocent.  In this case,

16    however, a defendant did testify, and he was subject to

17    cross-examination, like any other witness.  You should,

18    therefore, examine and evaluate the defendant's testimony just

19    as you would the testimony of any other witness with an

20    interest in the outcome of the case.

21         You have heard the testimony of law enforcement

22    agents.  The fact that a witness may be employed as a law

23    enforcement official by the United States Government or by a

24    foreign government does not mean that his or her testimony

25    deserves any more or less considerations or greater or lesser

 1   weight than that of an ordinary witness.  At the same time, it

 2   is legitimate for defense counsel to try to attack the

 3   credibility of a law enforcement witness on the ground that

 4   their testimony may be colored by a personal or professional

 5   interest in the outcome of the case.

 6          It is your decision, after reviewing all of the

 7   evidence, whether to accept the testimony of the law

 8   enforcement or government employee witness, as it is with every

 9   other type of witness, and to give that testimony the weight

10   you find it deserves.

11          You've heard from witnesses who testified that they

12   committed certain of the crimes charged in the indictment or

13   other crimes.  Some of these witnesses have testified under the

14   terms of a cooperation agreement or a nonprosecution agreement.

15   There's been a great deal said about these so-called

16   cooperating witnesses in the summations of counsel and whether

17   or not you should believe them.  The law permits the use of

18   testimony from such witnesses.  Indeed, such testimony, if

19   found truthful by you, may be sufficient in itself to warrant

20   conviction if it convinces you of the defendant's guilt beyond

21   a reasonable doubt.  However, the law requires that the

22   testimony and motives of such witnesses be scrutinized with

23   particular care and caution.

24          After carefully scrutinizing the testimony of such a

25   witness, you may give that testimony as little or as much

weight as you deem appropriate.  Cooperating witness testimony

should be given such weight as it deserves in light of the

facts and circumstances before you, taking into account the

witness' demeanor, candor, the strength and accuracy of the

witness' recollection, the witness' background, the extent to

which the testimony is or is not corroborated by other evidence

in the case, and the witness' personal interest in testifying.

I've given you some general considerations on

credibility, and I will not repeat them all here, nor will I

repeat all of the arguments made on both sides.  However, let

me say a few things that you may want to consider during your

deliberations on the subject of accomplices.

In evaluating the testimony of a cooperating witness,

you should ask yourselves whether the witness would benefit

more by lying or by telling the truth.  Was the witness'

testimony made up in any way because she believed or hoped that

she would somehow receive favorable treatment by testifying

falsely?  Or did she believe that her interests would be best

served by testifying truthfully?  If you believe that the

witness was motivated by hopes of personal gain, was the

motivation one which would cause her to lie, or was it one

which would cause her to tell the truth?  Can this motivation

color her testimony?

I used her there.  It could be her or his.

As with any witness, if you find that the testimony

1    was false, you should reject it.  However, if, after cautious

2    and careful examination of the cooperating witness' testimony

3    and demeanor upon the witness stand, you are satisfied that the

4    witness told the truth, you should accept it as credible and

5    give the testimony whatever consideration you think it

6    deserves.

7         As with any witness, the issue of credibility need not

8    be decided in an all-or-nothing fashion.  Even if you find that

9    a witness testified falsely in one part, you may still accept

10   his or her testimony in other parts, or you may disregard all

11   of it.  This determination is entirely for you, the jury.

12        A defendant has called witnesses who have given their

13   opinion of the defendant's character.  This testimony is not to

14   be taken by you as the witness' opinion as to whether the

15   defendant is guilty or not guilty.  That question is for you

16   alone to determine.  You should, however, consider this

17   character evidence, together with all of the other facts and

18   all of the other evidence in the case, in determining whether

19   the defendant is guilty or not guilty of the charge.  Character

20   evidence may be considered by you in determining whether the

21   government has proven the defendant's guilt beyond a reasonable

22   doubt.

23        Accordingly, if, after considering all of the

24   evidence, including testimony about the defendant's good

25   character, you should find a reasonable doubt has been created,

1   you must acquit him of the charge.

2           On the other hand, if, after considering all of the

3   evidence, including that of the defendant's character, you are

4   satisfied beyond a reasonable doubt that the defendant is

5   guilty, you should not acquit the defendant merely because you

6   believe him to be a person of good character.

7           You may not draw any inferences, favorable or

8   unfavorable, towards the government or the defendants, from the

9   fact that certain persons were not tried as defendants in this

10  case.  The fact that these persons are not on trial here must

11  play no part in your deliberations.

12          You have heard the names of several people during the

13  course of the trial who did not appear here to testify, and one

14  or more of the attorneys may have referred to their absence.

15  You should not draw any inferences or reach any conclusions as

16  to what these persons would have testified to had they been

17  called.  Their absence should not affect your judgment in any

18  way.

19          Remember my instruction, however, that the law imposes

20  no duty on the defendant in a criminal case to call any

21  witnesses or produce any evidence.

22          You have heard evidence during the trial that

23  witnesses have discussed facts of the case and their testimony

24  with the government lawyers, the defense lawyers, or their own

25  lawyers before the witnesses appeared in court.

1           Although you may consider that fact when you are

2    evaluating a witness' credibility, I instruct you that there is

3    nothing either unusual or inherently improper about a witness

4    meeting with the government lawyers, the defense lawyers, or

5    his or her own lawyers before testifying, so that the witness

6    can be aware of the subjects he or she will be questioned

7    about, focus on those subjects, and have the opportunity to

8    review relevant exhibits before being questioned about them.

9    Such consultation helps conserve your time and the Court's

10   time.  In fact, it would be unusual for a lawyer to call a

11   witness without such consultations.

12           Again, the weight you give to the fact or the nature

13   of the witness preparation for his or her testimony and what

14   inferences you draw from such preparation are matters

15   completely within your discretion.

16           You've heard reference through the questioning to the

17   fact that certain investigative techniques were used or not

18   used by the government.  There is no legal requirement,

19   however, that the government must prove its case through any

20   particular means.  Your concern is to determine whether, on the

21   evidence or lack of evidence, the defendants' guilt has been

22   proven beyond a reasonable doubt.

23           Some of the evidence in this case has consisted of

24   electronic communications seized from computers or electronic

25   accounts.  There is nothing illegal about the government's use

1    of such electronic communications in this case, and you may

2    consider them along with all the other evidence in the case.

3    Whether you approve or disapprove of the seizure of these

4    communications may not enter your deliberations.

5         You may, therefore, regardless of any personal

6    opinions, consider the evidence along with all the other

7    evidence in the case in determining whether the government has

8    proved beyond a reasonable doubt the guilt of the defendants.

9    However, as with the other evidence, it is for you to determine

10   what weight, if any, to give such evidence.

11        During the trial, you heard evidence about certain

12   provisions of the Federal Credit Union Act, the National Credit

13   Union Administration regulations, including those relating to

14   field of membership, the duties and responsibilities of a

15   credit union's board of directors, and reports that are

16   submitted to the National Credit Union Administration.  I

17   instruct you that a violation of any of these laws or

18   regulations, should you find any to have occurred, is not a

19   crime in and of itself.

20        In other words, the defendants are not charged with

21   criminal violations of the Federal Credit Union Act or the

22   National Credit Union Administration regulations, and you

23   cannot find either defendant guilty based solely upon a

24   violation of the Federal Credit Union Act or the National

25   Credit Union Administration regulations.  You may, however,

1    consider any evidence about any violation of the Federal Credit

2    Union Act or National Credit Union Administration regulations

3    as you would any other evidence in the case.

4         You have heard testimony about evidence seized in

5    connection with certain searches conducted by law enforcement

6    officers.  Evidence obtained from these searches was properly

7    submitted in this case and may be properly considered by you.

8    Such searches were appropriate law enforcement actions.

9    Whether you approve or disapprove of how the evidence was

10   obtained should not enter into your deliberations because I

11   instruct you that the government's use of the evidence is

12   entirely lawful.  You must, therefore, regardless of your

13   personal opinions, give this evidence full consideration, along

14   with all the other evidence in the case, in determining whether

15   the government has proven each defendant's guilt beyond a

16   reasonable doubt.  As with all evidence, it is for you to

17   determine what weight, if any, to give such evidence.

18        In connection with the recordings that were introduced

19   into evidence during the trial, you were provided with

20   transcripts of the conversations to assist you while listening

21   to the recordings.  I instructed you during the trial, and I

22   remind you now, that the transcripts are not evidence.  The

23   transcripts were provided only as an aid to you in listening to

24   the recordings.  It is for you to decide whether the

25   transcripts correctly present the conversations recorded on the

1   recordings that you heard.  If you wish to hear any of the

2   recordings again, or see any of the transcripts, they will be

3   made available to you during your deliberations.

4           You have heard evidence in the forms of what are

5   called stipulations.  A stipulation of fact is an agreement

6   among the parties that a certain fact is true.  You must regard

7   such agreed facts as true.

8           A stipulation of testimony is an agreement among the

9   parties that, if called, a witness would have given certain

10  testimony.  You must accept as true the fact that the witnesses

11  would have given the testimony.  However, it is for you to

12  determine the effect or weight to give that testimony.

13          Some of the exhibits presented in this case were

14  charts, tables, or other forms of summary exhibits.  These

15  exhibits are not direct evidence.  They are graphic

16  representations or other ways of summarizing more voluminous

17  information that was either described in the testimony of a

18  witness or reflected in documents admitted into evidence.

19          It's often easier and more convenient to use charts,

20  tables, and summaries as opposed to placing all of the

21  underlying documents in front of you, but it is up to you to

22  decide whether the summary exhibits fairly and correctly

23  reflect the underlying testimony and documents they purport to

24  summarize.

25          To the extent that the summary exhibits conform to

1    your understanding of the underlying evidence, you may accept

2    them.  To the extent they do not, you should set them aside and

3    rely on the underlying evidence instead.  But one way or the

4    other, realize that the summary exhibits are not in and of

5    themselves direct evidence.

6          Some of the exhibits admitted into evidence consist of

7    excerpts of longer documents that were not admitted into

8    evidence in their entirety.  There's nothing unusual or

9    improper about the use of such excerpts, and you are not to

10   speculate from the use of such excerpts that any relevant

11   portion of a document has been omitted.

12         Similarly, some of the exhibits admitted into evidence

13   include redactions of certain information.  Again, there's

14   nothing unusual or improper about such redactions, and you are

15   not to speculate from the use of such redactions that any

16   relevant portion of a document has been removed.

17         The question of possible punishment of the defendants

18   is of no concern to you, the members of the jury, and should

19   not in any sense enter into or influence your deliberations.

20   The duty of imposing sentence rests exclusively upon the Court.

21         Your function is to weigh the evidence in this case

22   and determine whether or not the government has proved that the

23   defendants are guilty beyond a reasonable doubt solely upon the

24   basis of such evidence.

25         Ladies and gentlemen, you're about to go into the jury

 1   room and begin your deliberations.  The documentary evidence

 2   will be sent back with you.  And what the parties have done is

 3   you'll be sent back with paper copies of all the exhibits.

 4   You'll also be sent back with a laptop that contains electronic

 5   copies of all of the exhibits, and the laptop contains nothing

 6   else.  And you'll also be provided with a full exhibit list.

 7   Those will go back to you in the jury room.

 8              There was one explanation, Ms. Choi, that you were

 9   going to give regarding access to the WhatsApp chats.

10              MS. CHOI:  Yes, your Honor.

11              If we could have a moment just to -- I don't know if

12   it would be okay to show it on the screen?  Because it might be

13   easier.

14              THE COURT:  Let me get through the rest of the

15   instruction, and then we'll get to it.

16              MS. CHOI:  Okay.

17              THE COURT:  But, as I say, all of the evidence that's

18   been admitted will go back in paper form, as well as accessible

19   electronically on a laptop.

20              If you want any of the testimony read to you, that can

21   be arranged.  Please remember that it's not always easy to

22   locate what you might want, so be as specific as you probably

23   can in requesting portions of the testimony that you might

24   want.

25              Any such request will be made through a note, which

1    I'll explain in a moment.

2            Your first task as a jury will be to choose your

3    foreperson.  The foreperson has no greater voice or authority

4    than any other juror, but it is the person who will communicate

5    with the Court through written note when questions arise and to

6    indicate when you have reached a verdict.

7            Upon reaching your verdict, the foreperson should

8    simply write a note saying we have reached our verdict.

9            Your requests for testimony, in fact, any

10   communication with the Court, should be made to me in writing,

11   as I said, signed by your foreperson, and given to one of the

12   marshals who will guard your deliberations.

13           I will respond to any questions or requests you have

14   as promptly as possible, either in writing or by having you

15   return to the courtroom, so I can speak with you in person.  In

16   any communication, please do not tell me or anyone else how the

17   jury stands on the issue of the jury's verdict until after a

18   unanimous verdict is reached.

19           For those of you who took notes during the course of

20   the trial, you should not show your notes to or discuss your

21   notes with any other juror during your deliberations.

22           (Continued on next page)

23

24

25

1          THE COURT:  (Continuing)  Any notes you've taken are

2     to assist you and you alone.  The fact that a particular juror

3     has taken notes entitles the juror's views to no greater weight

4     than those of any other juror.

5          Finally, your notes are not to substitute for your

6     recollection of the evidence in this case.  If you have any

7     doubt as to any testimony, as I've said, you may request that

8     the official trial transcript that has been made of these

9     proceedings be read or otherwise provided to you.

10         The most important part of this case, Members of the

11    Jury, is the part that you as jurors are now about to play as

12    you deliberate on the issues of fact.  It is for you, and you

13    alone, to weigh the evidence in this case and to determine

14    whether the government has proved beyond a reasonable doubt

15    each of the essential elements of the crime with which each

16    defendant is charged.  If government has succeeded, your

17    verdict should be guilty as to that defendant and that charge.

18    If it has failed, your verdict should be not guilty as to that

19    defendant and that charge.

20         You must base your verdict solely on the evidence or

21    lack of evidence and these instructions as to the law, and you

22    are obliged under your oath as jurors to follow the law as I

23    have instructed you, whether you agree or disagree with the

24    particular law in question.

25         Under your oath as jurors, you are not to be swayed by

1    sympathy.  You should be guided solely by the evidence

2    presented during the trial and the law as I gave it to you,

3    without regard to the consequences of your decision.  You've

4    been chosen to try the issues of fact and reach a verdict on

5    the basis of the evidence or lack of evidence.  If you let

6    sympathy interfere with your clear thinking, there is a risk

7    you'll not arrive at a just verdict.

8            As you deliberate, please listen to the opinion of

9    your fellow jurors, and ask for an opportunity to express your

10   own views.  Every juror should be heard.  No one juror should

11   hold center stage in the jury room and no one juror should

12   control or monopolize the deliberations.  If, after listening

13   to your fellow jurors and if, after stating your own view, you

14   become convinced that your view is wrong, do not hesitate

15   because of stubbornness or pride to change your view.  On the

16   other hand, do not surrender your honest convictions and

17   beliefs solely because of the opinions of your fellow jurors or

18   because you are outnumbered.

19           Your final vote must reflect your conscientious belief

20   as to how the issues should be decided.  Thus, the verdict must

21   represent the considered judgment of each juror.  In order to

22   return a verdict, it is necessary that each juror agree to it.

23   Your verdict must be unanimous.

24           If at any time you are divided, do not report how the

25   vote stands; and if you have reached a verdict, do not report

H3A9LEB5                         Charge

1   what it is until you are asked in open court.

2              Finally, I say this not because I think it's

3   necessary, but because it is the custom in this courthouse to

4   say this.  You should treat each other with courtesy and

5   respect during your deliberations, and I know that you will.

6              In conclusion, ladies and gentlemen, I am sure that if

7   you listen to the views of your fellow jurors, and if you apply

8   your own common sense, you will deliberate fairly.

9              Members of the Jury, I do ask for your patience for a

10  few minutes longer.  It is necessary for me to spend a few

11  moments with counsel and the reporter at the sidebar.  I will

12  ask you to remain patiently in the jury box, without speaking

13  to each other, and we will return in just a moment to submit

14  the case to you.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1                  (At the sidebar)

2                  THE COURT:  Any final objections based on my reading

3       of the instructions?

4                  MR. CREIZMAN:  I have two -- actually one.  This is

5       just -- I was confused because your Honor had said that you

6       return -- if they want testimony to return transcripts back and

7       not read backs.  So I mean -- so my thought is that maybe --

8                  THE COURT:  I'll just tell them.

9                  MR. CREIZMAN:  If you could clarify that, this way

10      they don't --

11                 THE COURT:  Everybody agree with that?

12                 MR. NOBLE:  That's fine, Judge.

13                 THE COURT:  Anything else?

14                 MS. SANTILLO:  Your Honor, I just want to note that I

15      made prior objections about the limiting instructions and what

16      evidence could be considered post withdrawal, and that I'm not

17      waiving those objections in terms of the legal arguments we've

18      made in the past by accepting the charge.

19                 THE COURT:  Anything else?

20                 MR. NOBLE:  No, Judge.

21                 MS. CHOI:  Logistical issue.  So all the hard copies

22      are ready including the WhatsApp -- five minute delay -- we'll

23      just send it in afterwards.  It shouldn't be an issue because

24      they can start with the paper documents that are all there.

25      There's a hard drive issue, your Honor.  We need five minutes.

H3A9LEB5                        Charge

1    That's it.

2            MR. KLINGEMAN:  I have a request in terms of the

3    WhatsApp demonstration and that be that whatever page from the

4    WhatsApp that's going to be displayed to the jury be neutral.

5            MS. CHOI:  Jen Wotherspoon.  It doesn't matter to me.

6    You guys want to take a look and pick one.

7            MR. KLINGEMAN:  Sure.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4244

1          (In open court)

2          THE COURT:  One quick clarifying remark.  I indicated

3    if there is any testimony that you want read back, I'm putting

4    in quotes, if there's testimony that you want to see, I would

5    say here but, in fact, what we'll do if you want testimony is

6    to ask for specific testimony in a note by the foreperson.  We

7    will print the pages of the transcript and send that back.  So

8    it won't be an oral read back.  If there's something that you

9    request, it will be the written transcript sent back to you.

10          I believe we're about to get clarity, a quick

11    demonstration, explanation as to how to access any of the

12    WhatsApp calls.

13          Also my law clerk will hand out to each of you copies

14    of the instruction as you go into the jury room.  And I have

15    the verdict form, final verdict form which will also go back

16    with you with the instructions.

17          Ready?

18          MS. CHOI:  So you'll be getting an electronic copy of

19    all the government and defense exhibits.  So, it will be on a

20    folder on your laptop that you'll be getting.  There is a

21    log-in on the bottom left-hand side that will give you the

22    password.  Just don't log out otherwise it will take a while to

23    get the user name put back in.  Then when you go to that

24    desktop there will be one folder for government exhibits and

25    one folder for defense exhibits.  It will be pretty

1    straightforward.

2              With regard to the government exhibits, were you to

3    ask for a WhatsApp chat, we're going to show you what you would

4    have to do in order to see the audio or see any of the images

5    that are linked.  We also have hard copies of those if you'd

6    like to see them in paper form as well.

7              Mr. Chang-Frieden, if you could display for the screen

8    what will be seen on theirs.

9              So you should just pick the government exhibit that

10   you're looking at.  We're going to do Jennifer Wotherspoon's

11   WhatsApp.  Find the Jennifer Wotherspoon HTML file.  Take a

12   right click on that.  Although on your computer I think Chrome

13   is the default so it should be fine.  So it should be right

14   click, open with, Google Chrome.  It will only work in Google

15   Chrome and not Microsoft Explorer.  And then for you to play

16   any of the audio you just have to click the triangle that

17   appears in the box.  So if you want to just click that.  And it

18   will play.

19             THE COURT:  All right.  Thank you.

20             That is all going back.  A few final instructions.

21   The first, as you know doubt realize, is that we have

22   alternates, the twelve jurors, the first twelve jurors, jurors

23   one through twelve, will deliberate.

24             Jurors 13, 14, 15, and 16 are alternate jurors who

25   will not participate in the deliberations unless we call you

1    back to participate in the deliberations.  So here's what that

2    means.  When I send you back to the jury room you'll, jurors

3    13, 14, 15, and 16, you'll gather your belongings -- I think

4    your lunch is here which you can take with you -- and you'll

5    say quick good-byes to your fellow jurors.

6           Ms. Nunez, will call you if we need you back or if you

7    are finished with your responsibilities.  That means until

8    Ms. Nunez calls you, you're free to go about your lives and do

9    as you need.  But, all of my instructions continue to apply.

10   That means no communications with each other or anyone else

11   about the case.  No gathering information through any means

12   about the case.  And continuing to keep an open mind.  And just

13   obviously as part of that when you do say good-bye to your

14   fellow jurors please no communications with each other about

15   your views as to the case.

16          You do remain, as you have been throughout this

17   process, an absolutely necessary part for us to get to where we

18   are and where we need to go to complete the case.

19          I, therefore, send you home at this point with the

20   enormous thanks of the parties, the lawyers, and this Court.

21   You have -- you've done your duty and I know, no doubt, will

22   continue to do your duty well.

23          So, we will just in a moment send everyone back into

24   the jury room with those instructions.

25          As to timing, I know that there is an open issue.

1   There's a juror who we're determining whether the weather means

2   they don't -- we don't need to end early.  Obviously

3   deliberations can only happen with all twelve jurors in the

4   room.  So if this early -- this accommodation is necessary to

5   make, we'll bring you back into the courtroom if you haven't

6   completed your task at 4:40 and then I would dismiss you until

7   Monday.

8              If it turns out that we learn that that accommodation

9   doesn't need to be made, then I will leave it to the twelve

10  jurors to send me a note when you would like to finish; that is

11  to say, at five we're ready to go home if you haven't completed

12  your deliberations or you could stay later if that's what you

13  chose.  So we would wait to hear from you back.  But if the --

14  I know Ms. Nunez is working to determine with the one juror if

15  this accommodation is needed; and if so, we'll make it if

16  deliberations are not yet complete.

17             So with that, Members of the Jury, we'll send you

18  back.  Your lunch is there.  As soon as it is just the twelve

19  of you, you may begin your deliberations.

20             First we need the marshal to please come forward and

21  be sworn in to safeguard the jurors' deliberations.

22             (Marshal sworn)

23             THE COURT:  Counsel anything further before I send the

24  jury back?

25             MR. KLINGEMAN:  No, thank you.

1              MR. CREIZMAN:  No, your Honor.

2              MR. NOBLE:  No, Judge.

3              THE COURT:  All right.  We'll send them back.

4              (At 1:09 p.m., the jury retired to deliberate)

5              MS. CHOI:  Your Honor, we just need a few more minutes

6    with the electronic copy.  We can send back the paper copies

7    for now.  I'm sure they're saying their good-byes.  If we could

8    have five to ten minutes, Mr. Chang-Frieden will complete this

9    task and then we can send back the computer or we can send back

10   the computer now and then ask for it back to load the rest of

11   them.

12             THE COURT:  No.  No.  Let's just do it all at once.  I

13   just want -- let me just get everybody's agreement that what

14   is -- what you have -- everybody agrees what is going back?

15             MR. KLINGEMAN:  Yes.

16             MR. CREIZMAN:  Yes.

17             THE COURT:  And Ms. Choi?

18             MS. CHOI:  Okay.

19             THE COURT:  Ms. Choi?

20             MS. CHOI:  Yes.

21             THE COURT:  I'll take that as a yes.

22             MS. CHOI:  Yes.

23             THE COURT:  We -- I invite everybody to go get lunch.

24   I do need Ms. Nunez to be able to have everybody back -- know

25   where you are, have everybody back in here should we get any

1    notes because we want to address those promptly.  So either be

2    in the courtroom or let Ms. Nunez know where you are in the

3    courthouse so she can find you quickly.

4             Anybody have any matters they need me to address?

5             MR. KLINGEMAN:  No.

6             THE COURT:  All right.  Let me say I'll take just this

7    moment to thank counsel for their hard work and zealous

8    advocacy throughout this process.  I want to also thank -- I

9    want to thank everyone for helping facilitate the process and a

10   special thanks to the paralegals and other administrative staff

11   who really aided the process and always grateful to see the

12   government being willing to have the paralegals work as the

13   defense needs them throughout their case and to do it in such a

14   professional and generous way.  So I do thank you.  I thank

15   everyone, all of the folks who put in no doubt tireless hours

16   to make this process go.  So thank you everyone.

17            We'll see you if we hear from the jury.

18            (Recess pending verdict)

19            (Continued on next page)

20

21

22

23

24

25

1                (In open court; jury not present)

2                THE COURT:  As to the open issue, as to whether the

3      juror who had indicated she needed to leave at 4:40, unless

4      something got canceled, Ms. Nunez has been monitoring that

5      question and there's no indication it's canceled.  So my

6      assumption is that she needs to leave at 4:40, and so my

7      proposal is to retrieve the jury, bring them in, tell them that

8      I understand someone needs to leave at 4:40, remind them of the

9      instructions, and ask them to return Monday at 9:30, to resume

10     their deliberations once everyone is present.

11               MS. CHOI:  Your Honor, I just wanted to get clarity

12     about -- I'm sure Ms. Nunez has been monitoring it, so it's

13     pretty definitive that it was not canceled?

14               THE COURT:  Since the juror is in there and there's

15     nothing she can do, all we could do is what Ms. Nunez was able

16     to check; and that indication is that it's not canceled.  The

17     only remaining possibility -- we have a note?

18               MS. CHOI:  Or a note?

19               THE COURT:  We have a note.

20               Oh, this is very helpful:  "We would like to confirm

21     that" -- they name the juror, Juror No. 9 -- "does not need to

22     leave early today at 4:40 p.m. to pick up her daughter from

23     school.  Upon confirmation, we would request to be dismissed at

24     5:00 p.m. today, as we plan to continue our deliberations of

25     the -- I can't make out a word -- "deliberations of the,"

1    something "into Monday, March 13th."  Oh, it's "counts."  "We

2    plan to continue our deliberation of the counts into Monday,

3    March 13th.  Please enjoy your weekend."

4              MS. CHOI:  They're very polite and on time.  That is a

5    very nice note.

6              THE COURT:  Here's what I propose:  The only

7    additional step we could take is if the juror were able to

8    check her messages.  Let's think.  We could send in a note,

9    rather than bringing them out, send in a note just saying they

10   should pause their deliberation, for Juror No. 9 to come check

11   her messages, to make a final determination.  Ms. Nunez could

12   communicate to the juror what she knows, and then send them

13   back in with the instruction to send out a note when they're

14   ready.  It's complicated.

15             MS. CHOI:  Yes.  I guess my only concern is that it's

16   already 4:43, so it seems as though if they're going to leave

17   at 5:00 anyways, I don't know if it makes that much of a

18   difference, as it were.  It seems like they're very inclined to

19   come back on Monday.  They have made up their minds to do that.

20             THE COURT:  Since she knows what Ms. Nunez was looking

21   at, I think, based on that, it's a fair assumption that she

22   needs to do this childcare issue.

23             MS. CHOI:  Right.

24             THE COURT:  So let's just stick to the original

25   plan -- I think that's a good suggestion -- and bring them back

H3AKLEB6

 1    and dismiss them till Monday.  Everybody agree?

 2              MR. CREIZMAN:  Yes, your Honor.

 3              MR. KLINGEMAN:  Yes, your Honor.

 4              THE COURT:  We will mark this first note as Court

 5    Exhibit 3.

 6              (Jury present)

 7              THE COURT:  Thank you so much, ladies and gentlemen of

 8    the jury.  I received your note and was on the cusp of getting

 9    you.  We have no additional information for the juror who had

10    the time issue, so I think that means that she does need to

11    leave now.  And so, in light of that, I'm going to send you

12    home.

13              All of the instructions that I've given you apply.  Of

14    course, you've begun your deliberations and you've discussed it

15    with each other.  For the weekend, I just ask for, as I'm sure

16    you know, no discussions with each other or anyone else about

17    the case, no research about the case through any means or any

18    sources, and continue to keep an open mind as you continue your

19    deliberations with your fellow jurors.

20              What I'll do is ask you to return at 9:30 for your

21    deliberations on Monday.  You won't be coming into the

22    courtroom.  You'll go straight into the jury room.  My

23    instruction is:  Don't start deliberating until everyone is

24    there.  Once everyone is there, you are charged to continue

25    your deliberations pursuant to all of the instructions that

H3AKLEB6

1   you've received.  There will be breakfast there for you when

2   you arrive.  Lunch will be brought in, to the extent you

3   haven't completed your deliberations, and we will proceed as we

4   did today.

5            Thank you so much, ladies and gentlemen.

6            JUROR:  Thank you.

7            THE COURT:  Have a good weekend.

8            (Jury not present)

9            THE COURT:  Any matters to take up?

10           MR. KLINGEMAN:  Just one, your Honor.

11           THE COURT:  Go ahead.

12           MR. KLINGEMAN:  I will be back here Monday, as we all

13   will be.  You may recall, pretrial I told the Court that I have

14   an out-of-state commitment next week.  I'm going to try to

15   honor that partially but I have a very early flight back Monday

16   morning.  It's scheduled to get me into LaGuardia in time to

17   get me to court.  So I'll be here as soon as those travel

18   arrangements work out.  In the meantime, obviously,

19   Ms. Santillo will be here full time in any event.  And I've

20   reviewed this with Mr. Gross, who's copasetic with what I plan

21   to do.  So I'm asking the Court for that same indulgence?

22           THE COURT:  I'm copasetic.

23           MR. CREIZMAN:  No objection.

24           THE COURT:  Thank you.

25           To my copaseticness?

H3AKLEB6

1          MR. CREIZMAN:  To everything.

2          THE COURT:  Thank you, Mr. Klingeman.

3          Anything else?

4          MS. CHOI:  Not from the government, your Honor.

5          THE COURT:  Have a good weekend.  See you Monday.

6          COUNSEL:  Thank you.

7          (Adjourned to March 13, 2017 at 9:30 a.m.)

8                                    *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

H3AKLEB6

```
 1                       GOVERNMENT EXHIBITS

 2    Exhibit No.                                Received

 3     10,001; 1000s:   amurginc@gmail.com . . . . .4106

 4              Emails, 1015, 1017, 1063,

 5              1065-C, 1194-A, 1194-B,

 6              1194-C, 1194-D, 1195, 1202-A,

 7              1202-B, 1204-A, 1204-B, 1209,

 8              1214, 1216-A, 1216-B, 1218-A,

 9              1219, 1222, 1224-E, 1228,

10              1231-B, 1232, 1233, 1235,

11              1238, 1241, 1242-A, 1242-C,

12              1242-D, 1242-E, 1243, 1248-B,

13              1248-C, 1255, 1257-A, 1257-B,

14              1259-C, 1259-D, 1260-A,

15              1266-A, 1266-B, 1275, 1291,

16              1316-A, 1316-B, 1317-B,

17              1317-E, 1317-F, 1317-H, 1321,

18              1324-D, 1327-A, 1327-A-Link,

19              1327-E, 1329, 1331-B, 1331-C,

20              1343-D, 1347-A, 1347-B,

21              1351-B, 1356-A, 1356-B, 1358,

22              1359, 1367-F, 1370, 1389-B,

23              1404, 1407-A, 1407-C, 1410,

24              1411, 1412-A, 1415, 1432-D,

25              1440-F, 1442-B, 1482-A,
```

H3AKLEB6

```
 1                  1482-B, 1482-C, 1483-A,

 2                  1483-B, 1483-C, 1483-F,

 3                  1483-H, 1483-J, 1483-L,

 4                  1483-T, 1488, 1489-B, 1491-B,

 5                  1495, 1521, 1522-A, 1531,

 6                  1533-A, 1551, 1552, 1553,

 7                  1554, 1556, 1557, 1558, 1560,

 8                  1561, 1562, 1575, 1583,

 9                  1586-A, 1586-B, 1586-C,

10                  1586-D, 1586-E, 1587, 1588-A,

11                  1588-B, 1588-C, 1611-A,

12                  1611-B, 1613, 1614, 1615,

13                  1616-A, 1616-B, 1616-C,

14                  1616-D, 1616-E, 1617, 1618-A,

15                  1618-B, 1618-C, 1621, 1623-A,

16                  1646-1668: trevongross@me.com

17                  Emails, 1652-1, 1652-1-A,

18                  1652-2, 1652-3, 1666,

19                  1786-1817:

20                  jmfreundt@hotmail.com Emails,

21                  1793, 1860-2049:

22                  Ylebedev@gmail.com Emails,

23                  1912, 1913, 1933, 1938, 1939,

24                  1940, 1947-A, 1947-B, 1949,

25                  1950, 1958, 1959, 1962, 1970,
```

H3AKLEB6

```
1            1972, 1995, 2016, 2019, 2020,

2            2021, 2022, 2024, 2027, 2029,

3            2047-1, 2050-2120:

4            Ylebedev@hope-fcu.com Emails,

5            2061, 2073, 2089, 2104, 2108,

6            2109, 2110, 2143-2254:

7            rhill@hope-fcu.com Emails,

8            2145, 2146, 2148, 2157, 2161,

9            2163, 2165, 2167, 2173,

10           2178-B, 2178-C, 2178-D, 2184,

11           2198, 2201, 2203, 2206, 2208,

12           2212-A, 2212-B, 2218, 2230-A,

13           2230-B, 2232, 2234, 2236,

14           2236-1A, 2236-1C, 2238, 2244,

15           3000: HOPE FCU Documents,

16           3000, 3500s:  Kapcharge

17           Documents, 3504, 3506, 3511,

18           3512, 3513, 3516, 3522, 3523,

19           3524-A, 3524-B, 3524-C,

20           3524-D, 3528, 3529-A, 3529-B,

21           3534, 3537, 3538, 3539-A &

22           3539-B, 3541, 3543, 3544,

23           3573-A, 3573-B, 3575-A,

24           3575-B, 3576-A, 3580, 3583-D,

25           3587-A, 3587-B, 3588, 3611,
```

4258

H3AKLEB6

1                3613, 3520, 3690, 3701, 3704,

2                3705, 3708, 3568-A, 3719,

3                3721, 3725, 3740, 4000s:

4                Stipulations, 4015, 5000-5180:

5                Anthony Murgio's Computer,

6                5002, 5003, 5007, 5009, 5011,

7                5017, 5041, 5069, 5083, 5095,

8                5102, 5102-Link, 5115, 5127,

9                5139, 5148, 5149, 5152, 5153,

10               5154, 5155, 5156, 5157, 5158,

11               5159, 5160

12                           DEFENDANT EXHIBITS

13    Exhibit No.                                Received

14     24     . . . . . . . . . . . . . . . . . .4157

15

16

17

18

19

20

21

22

23

24

25