**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **HON. ALISON J. NATHAN U.S.D.J.** |
| **v.** | **Criminal No. 15-CR-769 (AJN)** |
| **TREVON GROSS,** | |
| **Defendant.** | |

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT TREVON GROSS'S**
**RULE 29 AND RULE 33 MOTIONS**

---

**KROVATIN KLINGEMAN LLC**
60 Park Place, Suite 1100
Newark, New Jersey 07102
(973) 424-9777
Attorneys for Defendant
Trevon Gross

**On the Brief:**

HENRY E. KLINGEMAN, ESQ.
KRISTEN M. SANTILLO, ESQ.

## PRELIMINARY STATEMENT

The government obtained convictions against Trevon Gross for conspiracy and bribery under a theory that appears nowhere in the Indictment in a jurisdiction with no venue. Because the Indictment was constructively amended and the government failed to establish venue in the Southern District of New York, Mr. Gross's convictions cannot stand.

The government also failed to proffer sufficient evidence from which a reasonable jury could find Mr. Gross guilty of conspiracy or bribery under the theory that was actually charged in the Indictment. For these and other reasons set forth below, Mr. Gross seeks an order vacating the verdict in this case and granting an acquittal pursuant to Federal Rules of Criminal Procedure 29 and 33.

## PROCEDURAL AND FACTUAL BACKGROUND

I. **The Indictments**

a. **The S3 Indictment**

On March 1, 2016, Trevon Gross was charged in a nine-count Indictment with co-defendants Anthony Murgio and Yuri Lebedev. *See* S2 Indictment. Although Anthony Murgio and Mr. Lebedev were initially charged with a conspiracy to bribe Trevon Gross, Mr. Gross was not charged in this conspiracy. Mr. Gross was charged with only one count of receiving corrupt payments as an officer of a financial institution with an intent to be influenced in violation of 18 U.S.C. § 215. Michael Murgio was later added to the Indictment as a co-conspirator of Anthony Murgio and Lebedev. *See* S3 Indictment at Dkt. No. 87.

According to the S3 Indictment, defendant Anthony Murgio, with the assistance of Yuri Lebedev, operated an unlawful Bitcoin exchange scheme. S3 Indictment ¶¶ 3, 5. They operated through phony companies, including the "Collectables Club," a Florida based company. *Id.* ¶ 3.

1

The government alleged that Anthony Murgio, Lebedev and their co-conspirators deceived the financial institutions with which they did business in a variety of ways.  They operated phony websites.  *Id.* ¶ 5.  They "sought to trick the financial institutions through which Coin.mx operated and processed transactions into believing their unlawful Bitcoin exchange business was simply a members-only association of individuals who discussed, bought, and sold collectable items, such as stamps and sports memorabilia."  *Id.*  They also opened bank accounts at U.S. financial institutions and "knowingly and falsely represented" that they were opened to operate a members-only association of collectables and memorabilia enthusiasts, when in fact they were operating an unlawful Bitcoin exchange business, "deceived banks and credit card issuers into authorizing credit and debit card payment and [ACH] transaction to purchase Bitcoins through Coin.mx," and "knowingly instructed customers of Coin.mx to lie to credit card issuing banks about [their] Bitcoin transactions…."  *Id.* ¶¶ 6-8.

The S3 Indictment also contained a heading entitled "The Bribery Scheme."  Specifically, it was alleged that:

> In approximately 2014, in an effort to evade scrutiny from financial institutions and others about the nature of Coin.mx, and to facilitate the operation of the unlawful Bitcoin exchange, ANTHONY R. MURGIO, MICHAEL J. MURGIO and YURI LEBEDEV, the defendants, and their co-conspirators acquired control of HOPE FCU, a federal credit union in New Jersey with primarily low-income members.  TREVON GROSS, the defendant, who was the Chairman of the Board of HOPE FCU, allowed and assisted ANTHONY R. MURGIO, MICHAEL J. MURGIO, LEBEDEV, and their co-conspirators to take control of HOPE FCU in exchange for bribes, which GROSS directed ANTHONY R. MURGIO and MICHAEL J. MURGIO to pay to bank accounts under GROSS's control.  In furtherance of this bribery scheme, LEBEDEV offered to pay $41,000 of his own money in bribes to GROSS.  In total, ANTHONY R. MURGIO and his co-conspirators, at GROSS's direction, paid over $150,000 in bribes to bank accounts under GROSS's control.  GROSS, in turn, spent proceeds from the bribes on personal expenses, including payments on his personal credit cards.  Thereafter, and with GROSS's assistance, ANTHONY R. MURGIO installed his co-conspirators, including LEBEDEV, on the Board of HOPE FCU and transferred Coin.mx's banking operations to HOPE FCU.  ANTHONY R. MURGIO, LEBEDEV, and their co-conspirators operated HOPE FCU as a captive bank for their unlawful Bitcoin exchange until at least late 2014.

*Id.* ¶ 10.

2

In Count Three of the S3 Indictment, defendants Anthony Murgio, Michael Murgio and Yuri Lebedev were charged in a conspiracy.  Among the overt acts in furtherance of the conspiracy to make corrupt payments to Mr. Gross, it was alleged that Anthony Murgio and Michael Murgio communicated with Mr. Gross "in an effort to take over control of the Board of HOPE FCU in furtherance of Coin.mx's operations."  *Id.*  ¶ 19(a).  In an order on motions to dismiss the S3 Indictment, the Court characterized the bribery scheme in the S3 Indictment as an "alleged scheme to bribe Gross, the chairman of the board of a federal credit union, in order to obscure the illegal nature of Coin.mx."  See Dkt. No. 198 at 1.

On March 4, the Court held a hearing to arraign the defendants on the S2 Indictment, at which the government promised to bring any charges that "change[d] the scope of the case in any way within six weeks" while reserving the right to do a "clean up…not bring new charges" 30 days before trial.  *See* Dkt. No. 317 at 26.  The Court then set a trial schedule based on an October 31, 2016 trial date.  The S3 Indictment followed approximately 6 weeks later, on April 21, 2016, adding Michael Murgio but not Trevon Gross to the conspiracy count.  Due to late-produced discovery, at the request of counsel for Anthony Murgio, the trial was adjourned until February 6, 2017.  Despite promising to bring any new charges within six weeks of the March 4, 2016 hearing, the government filed a superseding indictment, the S6 Indictment on December 22, 2016, approximately six weeks before trial.

### b.  The S6 Indictment

The S6 Indictment added new charges against defendants Anthony Murgio and Yuri Lebedev, added Trevon Gross to the bribery conspiracy, and added additional objects to the conspiracy.  The defendants moved to dismiss the S6 Indictment as a belated expansion of the charges after the government had made promises to the Court and defense counsel that no further charges that changed the scope of the case would be filed.  The government responded that the

new conspiracy charge did not "significantly expand the scope of the charges against which the defendants must defendant at trial." *See* Dkt. 321 at 10. The Court, agreeing with the government, declined to dismiss the S6 Indictment.

Despite adding Trevon Gross as an alleged co-conspirator, the description of the "Bribery Scheme" remained largely unchanged. Under the heading, the "Bribery Scheme," paragraphs 12-14 of the S6 Indictment[1] reads as follows:

> In or about 2014, in an effort to evade scrutiny from financial institutions and others about the nature of Coin.mx, and to facilitate the operation of the unlawful Bitcoin exchange, ANTHONY R. MURGIO and YURI LEBEDEV, the defendants, and their co-conspirators acquired control of HOPE FCU, a federal credit union in New Jersey with primarily low-income members. TREVON GROSS, the defendant, who was the Chairman of the Board of HOPE FCU, assisted MURGIO, LEBEDEV, and their coconspirators in taking control of HOPE FCU in exchange for bribes, which GROSS directed MURGIO and his co-conspirators to pay to bank accounts under GROSS's control.
>
> In furtherance of this bribery scheme, YURI LEBEDEV, the defendant, offered to pay $41,000 of his own money in bribes to TREVON GROSS, the defendant. In total, ANTHONY R. MURGIO, the defendant, and his co-conspirators, at GROSS's direction, paid over $150,000 in bribes to bank accounts under GROSS's control. GROSS, in turn, spent proceeds from the bribes on personal expenses, including payments for his personal credit cards. Thereafter, and with the assistance of TREVON GROSS, the defendant, ANTHONY R. MURGIO, the defendant, installed his co-conspirators, including YURI LEBEDEV, the defendant, on the Board of HOPE FCU and transferred Coin.mx's banking operations to HOPE FCU. MURGIO, LEBEDEV, and their co-conspirators operated HOPE FCU as a captive bank for their unlawful Bitcoin exchange until at least late 2014.

With only minor changes, including removing Michael Murgio as a co-conspirator as he had pled guilty, this language mirrors the S3 Indictment. The S6 Indictment went on to add additional language in paragraph 15 as follows:

> In or about 2014, in furtherance of the scheme to facilitate the takeover of HOPE FCU by ANTHONY R. MURGIO and YURI LEBEDEV, the defendants, and their co-conspirators, MURGIO, LEBEDEV, and TREVON GROSS, the defendant, obstructed and attempted to obstruct an examination of HOPE FCU by the National Credit Union Administration ("NCUA"). For example:

---

[1] Citations to the S6 Indictment are to the Indictment returned by the grand jury at December 22, 2016 at docket number 308, and not to the redacted indictment submitted to the jury.

   a. MURGIO, LEBEDEV, and GROSS made material misrepresentations to, and withheld material information from, the NCUA <u>concerning the installation of LEBEDEV and other Board members selected by MURGIO on the Board of HOPE FCU</u>.

   b. MURGIO and GROSS attempted to mislead the NCUA concerning <u>the financial health of HOPE FCU and the eligibility of LEBEDEV and the other Board members selected by MURGIO to serve as Board members of HOPE FCU</u>.

   c. In or about January 2015, MURGIO and LEBEDEV caused a letter to be drafted and sent to the NCUA, which was signed by LEBEDEV and two other co-conspirators not named as defendants herein, which falsely stated that the "Collectables Club" was "headquartered" in Lakewood, New Jersey.

*See* S6 Indictment ¶ 15 (emphasis added).

In Count Three, the statutory conspiracy allegation, paragraphs 12-15 of the Indictment set forth above were incorporated by reference. *See* S6 Indictment ¶ 21. The Indictment then alleged that "[f]rom at least in or about April 2013 to at least in or about 2015, in the Southern District of New York and elsewhere, ANTHONY R. MURGIO, YURI LEBEDEV, and TREVON GROSS, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, to violate Title 18, United States Code, Sections 215 (a) (1), 215 (a) (2), 1001, and 1517" and cited the language of these statutes as objects of the conspiracy. *See* S6 Indictment ¶ 23-26. In paragraph 27, as overt acts in furtherance of the Conspiracy, the government alleged as follows:

   a. In or about April 2014, ANTHONY R. MURGIO, the defendant, and a co-conspirator not named herein ("CC-2"), communicated with TREVON GROSS, the defendant, <u>in an effort to take over control of the Board of HOPE FCU in furtherance of Coin.mx's operations</u>.

   b. In or about April 2014, CC-2 executed an agreement on behalf of "Collectables Club" with GROSS, on behalf of HOPE FCU, stating, among other things, that individuals chosen by the "Collectables Club" would be nominated for positions on the Board of HOPE FCU.

c.  On or about May 9, 2014, at the request of GROSS, MURGIO caused $15,000 to be transferred via wire through the Southern District of New York to a particular bank account ("Bank Account-1").

d.  On or about May 21, 2014, MURGIO caused $15,000 to be transferred to Bank Account-1.

e.  On or about June 20, 2014, MURGIO caused $120,000 to be transferred to Bank Account-1.

f.  From in or about November 2014, through at least in or about December 2014, MURGIO exchanged numerous emails from the Southern District of New York with individuals outside the Southern District of New York, including YURI LEBEDEV, the defendant, CC-2, and other individuals whom MURGIO had installed on the Board of HOPE FCU with the assistance of GROSS, in furtherance of the efforts of MURGIO, LEBEDEV, and their coconspirators to acquire and maintain control of HOPE FCU.

g.  On or about November 22, 2014, MURGIO, LEBEDEV, and other individuals met with GROSS and discussed the payment of an additional $50,000 bribe to induce GROSS to relinquish control of HOPE FCU.

h.  On or about November 24, 2014, at the request of GROSS, MURGIO caused $6,000 to be transferred to a particular bank account ("Bank Account-2").

i.  On or about November 24, 2014, LEBEDEV offered MURGIO approximately $41,000 to be used to pay the additional bribe to GROSS.

j.  On or about December 2, 2014, MURGIO caused $50,000 to be transferred to Bank Account-2.

k.  In or about January 2015, LEBEDEV signed a letter that was sent to the NCUA, which falsely stated that the Collectables Club was "headquartered" in Lakewood, New Jersey.

*See* S6 Indictment ¶ 15 (emphasis added).

Nowhere in the Indictment was Kapcharge, a Canadian based payment processor, mentioned.  There was also only one mention of ACH processing that had nothing to do with the "Bribery Scheme" as set forth in the Indictment.  *See* S6 Indictment ¶ 8 (mention of ACH processing in connection with the "Coin.MX Scheme.")  The "Bribery Scheme" did not make any reference to processing millions of dollars of ACH transactions for a Kapcharge client

named Transferwise, a company with no affiliation to Coin.mx or Bitcoins that witnesses at trial testified was "like Paypal." Tr. 1155-56. The Indictment also made no reference to Kapcharge processing transactions for payday lenders. The Indictment did not contain any allegations about any misrepresentations made about Kapcharge, its location, its business, its bank accounts, the volume of its ACH transactions, or any failures to comply with NACHA requirements, the Bank Secrecy Act, the Patriot Act or any other regulations or controls.

## II.   <u>The Trial</u>

Despite the absence of any allegations about Kapcharge or ACH processing in the Indictment, the vast majority of the evidence against Trevon Gross at trial was about processing ACH transactions for Kapcharge. The evidence failed to show that Trevon Gross had any knowledge that the Collectables Club was a sham front-company for an unlawful Bitcoin exchange, or that the Collectables Club ever used the Hope FCU as a captive bank for its unlawful Bitcoin exchange.

### a.  The Opening Statements

In opening statements, the government outlined its theory, and expressly argued that the "quid pro quo" of the bribery scheme was not just accepting payments from the Collectables Club in exchange for board control of the Hope FCU as charged in the Indictment. It also included Kapcharge paying money to Mr. Gross and his church in return for processing large volumes of ACH transactions:

> Kapcharge was in on the bribery scheme, too. It actually funded most of the bribe payments and consulting fees to Gross. Now, in return for paying for all that corruption, Kapcharge was going to run tens of millions of dollars in transactions through the credit union. Gross and Lebedev helped make this happen, even though Kapcharge was not eligible to even have an account at the credit union.
>
> And Gross and Lebedev did this even though it was incredibly risky for the credit union. Here was a tiny credit union with only a hundred or so members and under $100,000 in assets, and, suddenly, it started processing tens of millions of dollars in transactions

without following the rules for making sure those millions in transactions were safe and sound.

Tr. 336-337.

When describing how the "bribery scheme worked," the government explained that Gross and Lebedev "worked to implement the plan to have the credit union process tens of millions of dollars in risky transactions for Kapcharge." Tr. 341-42. (emphasis added). *See also id.* at 342 (explaining that a Kapcharge employee would testify to "tell you about how Kapcharge funded most of the corrupt payments that went to Gross and his church, and how in return, the credit union had to process large volumes of Kapcharge's high-risk transactions." Tr. 342 (emphasis added).

In describing Mr. Gross's alleged "lies" to regulators, in addition to alleged misstatements about the Collectables Club, the government argued that Mr. Gross lied "about what Kapcharge was, whether it was based in New Jersey, and what all those millions of dollars in transactions were for." Tr. 338.

### b.  The Trial Evidence

#### i.  The Voluminous Kapcharge/ACH Processing Testimony

At trial, 20 witnesses testified against both Trevon Gross and Yuri Lebedev. Some of these witnesses, including 3 witnesses from Chase and First Data, Special Agent Tate Jarrow, Jen Wothersoon and Cody Priest, testified primarily or exclusively about the charges against Yuri Lebedev, the operation of Coin.mx or other technical issues. Of the remaining 14 witnesses, 10 testified about the Hope FCU processing ACH transactions for Kapcharge.

Cooperator Rico Hill testified extensively about posting ACH transactions for Kapcharge, the volume of transactions, and the relationship between Hope FCU and Alloya and Magic Wrighter. Jose Freundt testified about his concerns about whether ACH transactions were properly being scrubbed against Office of Foreign Asset Control ("OFAC") lists. Tr. 1996-1997.

8

Two witnesses from Alloya, Michelle McDowell and Neil Kumar, and one witness from United Advantage Northwest Federal Credit Union, Robyn Guyer, testified exclusively about processing ACH transactions for Kapcharge, particularly on behalf of Kapcharge client Transferwise.  *See* also GX 791-T (call among Trevon Gross, Michelle McDowell, Neil Kumar and other representatives from Alloya discussing ACH processing for Transferwise and in particular the Transferwise account.)  Steven Valentine also testified about communications between Trevon Gross, the office of Congressman Chris Smith and the NCUA related to processing ACH transactions for Kapcharge in 2015.

Four NCUA examiners also testified extensively about ACH processing for Kapcharge. *See* Testimony of Clayton Curry, Tr. 1072-74 (discussing rules and regulations related to ACH processing, including National Automated Clearinghouse Association ("NACHA") regulations, the Bank Secrecy Act, OFAC regulations and the Financial Crimes Enforcement Network "Fincen" regulations.); Tr. 1077-78 (discussing impact of ACH processing on net worth ratio); Re. 1154- 1157 (discussing Kapcharge processing ACH transactions for Transferwise, Precash and payday lenders.).  *See also* Testimony of Magdalena Flok, 2/28/17-3/1/17 (testifying primarily about the volume of ACH processing and Kapcharge); Tr 2531 (when asked about Document of Resolution related to the Collectables Club and the Field of Membership, testifying:  "I wasn't at the credit union to follow up on the previous exam, I was at the credit union for one specific thing, that was ACH processing.")  *See also* Testimony of Brian McDonough, Tr. 2593-99 (discussing concerns about high volume of ACH processing, Kapcharge processing ACH transactions for payday lenders, and a document of resolution related to ACH processing.).  *See also* Testimony of Terence Adam, Tr. 2894-98 (testifying about examinations related to ACH processing in 2015, concerns about Kapcharge paying Charles Blue's salary, whether Kapcharge was in the field of membership, and Kapcharge

processing ACH transactions for payday lenders.); *id*. at 2898-900 (discussing risks of "predatory" payday loans); *id*. at 2901-09 (testifying about Kapcharge qualifying for field of membership); Tr. 2918-26 (discussing 2015 Letter of Understanding related to ACH processing and subsequent decision by Hope FCU to resume ACH processing.); Tr. 2949 (testifying about 2015 conversation with Mark Francis from Kapcharge).

The government also introduced voluminous exhibits related to ACH processing.

### ii.  The Collectables Club/Coin.mx Evidence

The evidence failed to show that Trevon Gross had any knowledge that Coin.mx was an unlawful bitcoin exchange, or that the Collectables Club was a sham front company for an unlawful Bitcoin exchange.  While there was evidence that Trevon Gross had heard of Coin.mx and generally knew that Anthony Murgio had an interest in virtual currency, even Jose Freundt, a friend of Anthony Murgio who would later work for Coin.mx, testified that, when he was involved with the credit union in 2014, he did not know that Coin.mx and the Collectables Club were the same thing.  *See* Tr. 2270.  He therefore never told Trevon Gross that the Collectables Club was a phony front company for an unlawful Bitcoin exchange.  2246.  Mr. Freundt also testified that he was not aware of any criminal activity at Coin.mx when he worked at Hope FCU, so he would not have been in a position to tell Trevon Gross about any such criminal activity.  Tr. 2246.

Similarly, Ricardo Hill never told the jury that he ever told Trevon Gross about the crimes he was committing at Coin.mx, that the Collectables Club was a sham front company for Coin.mx, or that the purpose of Coin.mx taking control of the Hope FCU was to process Bitcoin transactions.  Tr. 1596-97.

Despite the allegations in the S6 Indictment that the Collectables Club joined the Hope FCU to use it as "a captive bank for their unlawful Bitcoin exchange until at least late 2014," not

a single witness testified that any Bitcoin transactions passed through the Hope FCU.  While in argument, the government contended that Kapcharge processed ACH transactions for "Coin.mx's anonymous Bitcoins" in addition to Transferwise's international money-transmitting businesses and payday lenders, see Tr. 3943, the evidence at trial showed that 92% of the Kapcharge ACH transactions were on behalf of Transferwise, which NCUA examiner Clayton Curry likened to Paypal.  *See* Ex. A, GX 781 (Summary Chart of Kapcharge ACH transactions processed through Hope FCU.); Tr. 1155-56.  ACH transactions for the Collectables Club accounted for approximately 1.5% of the total volume of ACH transactions processed by Kapcharge.  *See* Ex. A.

The evidence also showed that these ACH transactions for the Collectables Club were primarily invoice and payroll payments, and not Bitcoin transactions for Coin.mx.  In a chat between Michael Murgio and Anthony Murgio on September 12, 2014, Anthony Murgio told his father that the ACH processing was:  "Not for cmx, For other clients, Guys in Montreal."  Ex. B, GX 2587 at 15.  Rico Hill, who worked for Coin.mx and was intimately familiar with its Bitcoin business and also posted Kapcharge's ACH transactions for the Hope FCU, testified that the only types of ACH transactions he was aware of were direct deposits from an employer to an employee.  Tr. 1376.  The transactions for the Collectables Club were also in small dollar amounts and the records show repeat payments to employees like Jen Wotherspoon and Rico Hill, consistent with payroll transactions.  GX 781.

Additionally, the defense introduced an email from Trevon Gross to Mark Francis of Kapcharge dated December 2, 2014, which post-dated the falling out between the Collectables Club and Hope FCU, in which Trevon Gross had to ask Kapcharge what kind of ACH transactions Kapcharge was processing for the Collectables Club.  *See* Ex. C, TG 46.  Kevin Pepe responded that they "mainly ran payroll and invoice payment transactions through the CU."

*Id.* Thus, the evidence showed that Kapcharge processed only a small volume of ACH transactions for the Collectables Club, and it was mostly for payroll and invoice payments, and not Bitcoins.

The evidence also showed that Kapcharge and Coin.mx were entirely separate businesses. Rico Hill, a Coin.mx employee from 2013-2015, did not know what kind of companies Kapcharge was processing debits and credits for. Tr. 1379-80. He only knew that the individuals who worked for Kapcharge used to be colleagues or friends of Anthony Murgio. Tr. Tr. 1376-1377. Similarly, Jose Freundt, who also worked at Coin.mx, did not know who the owners of Kapcharge were. He thought they were friends of Anthony Murgio, and he thought Mark Francis's last name might be Ingram. Tr. 1994, 2088. The fact that the Hope FCU continued to work with Kapcharge to process ACH transactions after the falling out with the Collectables Club also demonstrates that Kapcharge and Coin.mx were independent businesses.

### c.  The Trial Objections and Jury Instructions

Counsel for Mr. Gross raised issues with the difference between the charges in the Indictment and the case the government was seeking to prove multiple times pre-trial and throughout the trial. *See*, *e.g.*, Dkt. No. 390 at 3 (Opposing the government's pre-trial motion *in limine*: "The conspiracy the government describes in its motion *in limine* is much different than the one described in the indictment, and it is in essence a conspiracy to process ACH transactions for Kapcharge. This is not the charged conspiracy….); Tr. 1480-1481 ("we have already had testimony from Clayton Curry about ACH processing, we had testimony from Rico Hill yesterday about ACH processing, and we're going to hear a recorded meeting today where Pastor Gross admits that he was negligent with respect to ACH processing. So that's already three pieces of evidence that go to this issue. We think this kind of piling on about this issue about ACH processing raises serious 403 issues….Mr. Gross is not charged with negligently

processing ACH transactions."); (Tr. 2810 "there's a real danger in this trial that the government is trying to [prove] that Mr. Gross was engaging in negligent ACH processing and not the conspiracy that's been charged in the indictment. The whole scope of Mr. Adam's testimony is from 2015, after he no longer had any relationship with the Collectables Club. It's cumulative, it's prejudicial. There's nothing illegal about ACH processing. There was no unlawful purpose…and certainly not one that was charged in the indictment, that is being established by this repetitive evidence.")

Counsel also sought to have the conspiracy defined in the jury instructions to make clear that the conspiracy did not extend to processing ACH transactions for Kapcharge. Specifically, counsel requested that the conspiracy be defined as a conspiracy: "to facilitate the takeover of HOPE FCU by the Collectables Club in order to facilitate the operation of an unlawful Bitcoin exchange." Tr. 3175. Alternatively, counsel requested that the Court simply direct the jury to the Indictment when defining the conspiracy. *See* Tr. 3499 ("to the extent we're varying from language in the indictment, we would rather just rely on the indictment because I think it is that narrowly framed.")

The government advocated for a much broader reading of the charged conspiracy, characterizing it as an "agreement among Lebedev, Gross, and their co-conspirators to make corrupt payments to Gross (and for Gross to receive such corrupt payments) in exchange for influencing the decision making of Gross in connection with the business of HOPE FCU, and to obstruct and make false statements to the NCUA in connection with the NCUA's examinations of HOPE FCU." *See* Dkt. 430 at 7. At the Court's request, the government was asked to propose a more narrow formulation of the conspiracy, and suggested the following: Count Three charges Yuri Lebedev and Trevon Gross with conspiring with others, from in or about April 2014 to in or about 2015, to achieve four unlawful objectives: (1) to make corrupt payments to

Trevon Gross with the intent to influence Gross's decision making in connection with the business of HOPE FCU in favor of members of Coin.mx and the Collectables Club and other individuals; (2) to have Trevon Gross receive or agree to receive corrupt payments with the intent to influence Gross's decision making in connection with the business of HOPE FCU in favor of members of Coin.mx and the Collectables Club and other individuals; (3) to obstruct examinations of HOPE FCU by the NCUA; and (4) to make false statements to the NCUA in connection with the NCUA's examinations of HOPE FCU.  Dkt. No. 438 at 1.

Resolving the dispute between counsel for Mr. Gross and the government by broadening defense counsel's definition and narrowing the government's definition, the Court defined the conspiracy as follows:  **"**Count One charges Yuri Lebedev and Trevon Gross with conspiring with others, from in or about April 2014 to in or about 2015, to achieve four unlawful objectives in an effort to further the operations of Coin.mx or the Collectables Club."  Tr. 4182.

### d.  The Closing Arguments

Despite the Court's definition of the conspiracy as a conspiracy to "achieve four unlawful objectives in an effort to further the operations of Coin.mx or the Collectables Club," in closing arguments, the government continued to focus on Kapcharge and ACH processing.  The government stated:

> This is also a case about a scheme in which Gross helped Lebedev and his cronies get elected to the board of directors of HOPE Federal Credit Union, so long as Gross' church got over $150,000 in corrupt payments, a scheme which Lebedev joined, so that Coin.mx could use HOPE FCU as a captive credit union to process its financial transactions without having to use any banks, and a scheme that allowed for Kapcharge, a Canadian-based processing company, to run tens of millions of dollars in ACH transactions, including for Coin.mx, through that small credit union.

Tr. 3875 (emphasis added).  *See also* Tr. 3900 ("one of the main thin[g]s that Gross, Lebedev, and Murgio did while operating the credit union was to process lots of ACH transactions for Kapcharge.")  The government also continued to describe the processing of ACH transactions as

part of the *quid pro quo* of the bribery scheme.  The government argued:  "What makes the defendants' conduct illegal is that the decisions were being made concerning the ACH processing and the board nominations as a result of the bribes."  Tr. 4142.  *See also* Tr. 3953 ("what is illegal is when at least one reason Gross decided to process those tens of millions of dollars of transactions was because the church that he was the lead pastor for received over $160,000 in money from two members of the credit union -- that's Collectables Club and Kapcharge – who wanted those ACH transactions to happen."); *Cf.* Tr. 4154 ("Yuri Lebedev played a key part in each of these conspiracies...he helped process the ACH transactions through the credit union and he offered to help pay the additional bribes.") (emphasis added).

In summation, the government also argued that Gross "permitted Murgio and Lebedev to use the credit union for a huge volume of risky ACH transactions."  The government explained that the ACH transactions were "high risk" and placed the credit union in peril because the dollar amount and the volume of transactions was "unprecedented," they impacted the credit union's net worth ratio, and because:

> there was absolutely no Bank Secrecy Act policies or procedures in place at the credit union when Gross, Lebedev, and others were letting $1.3 million in Kapcharge transactions go through HOPE FCU on a daily basis.  Gross was letting these high-risk transactions for Kapcharge customers run right through HOPE FCU because Yuri Lebedev and Anthony Murgio wanted them to.  And these are ACH transactions for Coin.mx's anonymous Bitcoins, for TransferWise's international money-transmitting businesses, and for Wakpamni payday lending, all three things which pose a risk to HOPE FCU.
>
> And HOPE FCU was doing this without even checking against that OFAC list. That's the Office of Foreign Asset Control, the list of individuals and entities that U.S. financial institutions are barred from transacting with due to terrorism concerns, sanctions, or narcotics trafficking. They ran these transactions even though, as Mr. Kumar explained to you and you see in the contract that HOPE FCU signed with Alloya when they started these originations, that they, HOPE FCU, was the originating financial institution, and, thus, under the contract and under the NACHA rules, they were obligated to do the OFAC scrub.

Tr. 3940-3943.  *See also* Tr. 4133 ("Mr. Hill told you that even after Gross realized that millions and millions of dollars in ACHs were passing through the credit union when they didn't have proper controls in place, Mr. Gross never put a stop to it. In fact, it was Mr. Gross who approved increasing the limits on ACH processing to a hundred million dollars a month. Ask yourselves: is that evidence of Trevon Gross acting in good faith, trying to remain compliant with the NCUA's regulations?")

The government also relied upon alleged misrepresentations to the NCUA related to Kapcharge to establish the false statement and obstruction objects of the charged conspiracy. *See* Tr. 3969-70 (arguing, over 10 transcript pages, that Mr. Gross lied to NCUA examiner Magdalena Flok about Kapcharge's presence in Lakewood.); Tr. 4141 ("Why go to such great lengths to lie to Meg Flok about the Kapcharge file? Why enter into side agreements with Kapcharge and cook the books to make it look like this credit union was well capitalized?"); Tr. 4147 ("Was he acting in good faith when he suggested that the credit union enter into a side agreement with Kapcharge to hide the fact that the money Kapcharge was going to put into the credit union wasn't really revenue to the credit union, but rather prepaid fees?"); Tr. 4147 ("Was Gross acting in good faith when he violated the credit union's field of membership requirements by opening accounts for Collectables Club, <u>and Kapcharge, and Wakpamni</u>, that payday lender that was based in South Dakota, even though he knew they had no connection whatsoever to Lakewood, New Jersey?") (emphasis added); *id.* at 4002 ("once Charles Blue came in and was examining the books himself, he realized that he had been told a series of lies about what was happening in 2014 by Trevon Gross and Kapcharge. They were never in Lakewood, New Jersey, and, yet, he repeatedly said that to the NCUA.")

At length, the government also relied upon an alleged "lie" with respect to the net worth ratio of Hope FCU relating to the volume of transactions for Kapcharge, describing the alleged

lie as "cooking the books." *See* Tr. 3993-3999; *Id*. At 3993 ("they know if they actually reflect

the true nature of Kapcharge's business, the capitalization ratio will be totally out of whack.")

Id. At 3995 ("he's concerned about what the balances are going to look like in that Kapcharge

account."); i*d*. at 3998 (all of this careful planning that he had done with Kapcharge, to make

sure that they had that voided phone check of $619,000, the careful planning with Rico Hill to

post that wire after the September 30th date, that was all for naught because Meg Flok saw the

real financials at Kapcharge as of October."); *id*. at 3999 ("This is a deliberate lie on the part of

Trevon Gross, that required deliberate action on the part of him and others at Kapcharge, to

manipulate the books, to keep from the NCUA the truth of what was going on at HOPE Federal

Credit Union.")

### III.    The Venue Evidence

At trial, the government argued that venue was proper for the bribery counts because

"each of the daily wires from Kapcharge were necessary for it to fund the ACH transactions,

which is the whole point of this corruption to begin with" and those wires were sent using an

HSBC account in the Southern District of New York.  Tr. 4003.  The exhibit upon which the

government relied, GX-808-B, showed wires routed through HSBC from Kapcharge beginning

on August 13, 2014, nearly two months after the $120,000 payment to the Hope Cathedral in

June 2014.

The government also relied upon two transfers of wires from Bank of America on May

19, 2014 and May 21, 2014 that passed through New York.  Tr. 4004.  A Bank of America

witness testified at trial that these two particular wires went through the Federal Reserve Bank of

New York.  Tr. 1253-54.  He also acknowledged on cross-examination that the wire was sent

from a customer with an address in Florida to a customer with an address in New Jersey, and that

it was simply a product of Bank of America's wiring system that the wire passed through new

York.  Tr. 1256.  He also testified that there was no indication on the record whether the person

who sent the wire saw that the wire passed through New York.  Tr. 1258.  The witness gave no

testimony about the prevalence of wires passing through New York or the practices of any other

financial institutions.  The parties also entered into a stipulation with regard to PNC bank

records, in which it was stipulated that the wires were transferred from an account in Florida to

the Hope Cathedral account in New Jersey, and was routed by Bank of America, N.A. in New

York to New Jersey.  *See* GX. 4013.  It was also stipulated that the wire transfer records were

available to PNC customers at their request at a PNC branch.  *Id*.

To argue that it was reasonably foreseeable to Mr. Gross that the wires would pass

through New York, the government argued that he was "a sophisticated individual," he was

"savvy at banking" and he had seen Kapcharge send wires through New York, so the wires

passing through New York must have been reasonably foreseeable to him.  Tr. 4004.

The government also relied on the summary slides of John Rollins, and invited the jury to

match up the location analysis of John Rollins with any of the emails in the government's exhibit

list to find an email that was received or sent when Trevon Gross was in the Southern District of

New York.  Specifically, the government relied upon two examples, GX 1157 and 1158.  *See* Tr.

4005-4006.  GX 1157 was an email from Trevon Gross to Yuri Lebedev, Jose Freundt and

Anthony Murgio at 12:19 p.m. on June 6, 2014 relating to the Hope FCU server, and GX 1158

was an email from Rico Hill to Jose Freundt and Trevon Gross on June 7, 2014 with a picture of

Rico Hill.  Neither email discussed any payments to the Hope Cathedral.

In rebuttal, the government also argued that, because Mr. Gross was a well-educated and

savvy chairman of a federal credit union, he should have known that a wire transfer from an out-

of-state company might pass through a bank in Manhattan.  Tr. 4155.  But the government

offered no evidentiary support for its argument.  It never supplied any data or evidence on the

frequency of wire communications through New York, or how serving as the volunteer

Chairman of a 104-person credit union would make it reasonably foreseeable that a wire would

inevitably pass through New York.

During jury deliberations, the jurors asked two questions about venue.  First, the jury

asked for "clarification on the definition of reasonably foreseeable as it relates to venue."  Tr.

4272.  The Court directed the jury as follows:

> As to the conspiracy counts, venue can be established either by showing that the
> defendant had actual knowledge of an act in furtherance of the conspiracy occurring in
> the Southern District of New York or that the defendant reasonably could have known or
> contemplated that an act in furtherance of the conspiracy would occur in the Southern
> District of New York.
>
> In assessing what the defendant knew or reasonably could have known or contemplated,
> you may consider all facts including any experience or background of the defendant that
> you may determine relevant. As to the substantive counts, venue can be established either
> by showing that the defendant had actual knowledge of an act in furtherance of the
> essential conduct of the crime occurring in the Southern District of New York or that the
> defendant reasonably could have known or contemplated that an act in furtherance of the
> essential conduct of the crime would occur in the Southern District of New York. In
> assessing what the defendant knew or reasonably could have known or contemplated, you
> may consider all facts including any experience or background of the defendant that you
> may determine relevant.  Tr. 4298-4299.
>
> For the second questions, the jury asked:  "with regards to establishing 'venue' as it

relates to both substantive and conspiracy charges. Is where the money is spent or where it could

be spent, based upon previous spending habits, a fair measure in establishing venue?"  In

response to the Court's inquiry about how to respond, counsel for Mr. Gross stated:  "I would

submit that the spending of bribe proceeds is not an act in furtherance of either the act of bribery

or the crime of bribery or a conspiracy to participate in bribery. And, therefore, I would answer

the question in the negative" and read the initial round of venue jury instructions.  Tr. 4324.

The court denied that request, and after consultation with the government and defense

counsel, read the following:

As to the substantive counts, I remind you that on page 64, line 18 to page 65, line 2, I instructed you that venue is proper in this district provided that any act in furtherance of the essential conduct of the crime took place in the Southern District of New York. Again, the defendant you are considering need not have specifically intended to cause an act or event to happen in this district or even known that he was causing an act or event to happen here as long as it was reasonably foreseeable to that specific defendant that such act would occur in this district and it, in fact, occurred. Tr. 4332-33.

## IV.    The Post-Trial Press Release

Following trial, the government issued a press release to announce the convictions of Mr. Gross and Mr. Lebedev.  *See* Ex. E, In the press release, the government pointed to "the Indictment, other filings in Manhattan federal court, and evidence admitted at trial."  *Id*.  Under the heading the "Federal Credit Union Scheme," the government described the case it presented to the jury, with the portions that diverge from the Indictment underlined below:

In 2014, in an effort further to evade scrutiny from financial institutions about the nature of the business engaged in by Coin.mx, LEBEDEV, Murgio, and their co-conspirators gained control of HOPE FCU, a federal credit union in New Jersey with primarily low-income members.  After making more than $150,000 in illegal bribes at GROSS's direction to bank accounts in the name of a church where GROSS served as the pastor, Murgio, LEBEDEV, and their co-conspirators took control of HOPE FCU.  With GROSS's assistance, Murgio installed LEBEDEV and various co-conspirators on HOPE FCU's Board of Directors and transferred Coin.mx's banking operations to HOPE FCU. GROSS also ceded operational control of the credit union to the board members installed by Murgio, including LEBEDEV.  Thereafter, GROSS, LEBEDEV, and others worked to run tens of millions of dollars of ACH (Automated Clearing House) transactions through the credit union without adequate controls, thus putting its financial condition at risk.

GROSS, LEBEDEV, Murgio, and their co-conspirators also obstructed an examination of HOPE FCU by the National Credit Union Administration ("NCUA") and made false statements to the NCUA in order to perpetuate LEBEDEV and Murgio's control of the credit union.  These included deliberately failing to disclose the bribe payments; misrepresenting the location of Coin.mx-affiliated businesses, including the "Collectables Club," so as to claim that they were eligible to be members of the credit union and to serve as Board members; and manipulating the accounting at HOPE FCU so as to hide its true financial condition and the fact that it was processing tens of millions of dollars of transactions without adequate controls. HOPE FCU was operated as a captive bank by MURGIO and his co-conspirators until the end of 2014.

## LEGAL STANDARDS

Under Federal Rule of Criminal Procedure 29(a), "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. "  The Court may reserve decision on the motion, but if the Court reserves decision, it "must decide the motion on the basis of the evidence at the time the ruling was reserved."  Fed. R. Crim. P. 29(b).  At the close of the government's case, Mr. Gross moved for a judgment of acquittal pursuant to Rule 29, and the Court reserved decision, and thus the Court must decide the motion on the basis of the evidence at the close of the government's case-in-chief.  Tr. 3532-3534.

The relevant inquiry is "whether, after viewing the evidence in the light most favorable to the [government], any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (citations omitted).   A defendant bringing a motion under Rule 29 bears a heavy burden, but "this burden is not an impossible one."  *United States v. Kapelioujnyj*, 547 F.3d 149, 152–53 (2d Cir. 2008).  A "conviction based on speculation and surmise alone cannot stand. "  *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994).  *See also Langston v. Smith*, 630 F.3d 310, 320 (2d Cir. 2011) (reversing conviction where "the jury would have had to rely on pure conjecture to establish an element of the offense").

Under Federal Rule of Criminal Procedure 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33.  The rule "by its terms gives the trial court broad discretion to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice."  *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (citing *United States v. Sanchez,* 969 F.2d 1409, 1413 (2d Cir.1992)).  "In the exercise of its discretion, the court may weigh the evidence and credibility of witnesses.  At the same time,

21

the court may not wholly usurp the jury's role."  *United States v. Autuori*, 212 F.3d 105, 120 (2d

Cir. 2000)  "It is only where exceptional circumstances can be demonstrated that the trial judge

may intrude upon the jury function of credibility assessment."  *Id.*  (citing *Sanchez,* 969 F.2d at

1413).  "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be

a manifest injustice."  *Ferguson*, 246 F.3d at 134.

## ARGUMENT

### I.    <u>There Was a Constructive Amendment of the Indictment</u>

The evidence and the government's arguments at trial constructively amended the

Indictment, which mandates reversal of Mr. Gross's convictions.

#### a.  Legal Standard

Under the Fifth Amendment to the United States Constitution, "a defendant has the right

to be tried only on charges contained in an indictment returned by the grand jury." *United States

v. Wozniak*, 126 F.3d 105, 109 (2d Cir. 1997); *see also* U.S. Const. amend. V ("[n]o person shall

be held to answer for a capital, or otherwise infamous crime, unless on a presentment or

indictment of a Grand Jury …").  The purpose of this constitutional right it to "limit [a

defendant's] jeopardy to offenses charged by a group of his fellow citizens acting independently

of either prosecuting attorney or judge.<sup>"</sup> *Stirone v. United States*, 361 U.S. 212, 218 (1960).

"When the trial evidence or the jury charge operates to 'broaden[ ] the possible bases for

conviction from that which appeared in the indictment,' the indictment has been constructively

amended." *United States v. Milstein*, 401 F.3d 53, 65 (2d Cir. 2005) (*citing United States v.

Miller,* 471 U.S. 130, 138, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985); *see also United States v.

Roshko*, 969 F.2d 1, 5 (2d Cir. 1992) (an indictment is constructively amended where the proof

adduced at trial "broadens the basis of conviction beyond that charged in the indictment.")  A

constructive amendment "is a per se violation of the Grand Jury Clause of the Fifth Amendment

that requires reversal even without a showing of prejudice to the defendant." *Milstein*, 401 F.3d at 65 (2d Cir. 2005). *See also United States v. McKee*, 506 F.3d 225, 229 (3d Cir. 2007) ("a constructive amendment is an exceptional category of error because it violates a basic right of criminal defendants, the grand jury guarantee of the Fifth Amendment."); "To prevail on a constructive amendment claim, a defendant must demonstrate that either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." *Milstein*, 401 F.3d at 65 (*quoting United States v. Salmonese*, 352 F.3d 608, 620 (2d Cir.2003).

Whereas "an indictment drawn in more general terms may support a conviction on alternate bases," "an indictment with specific charging terms will not." *United States v. Zingaro*, 858 F.2d 94, 99 (2d Cir.1988). Particularly when conspiracies are charged, courts must be "vigilant to ensure that the government does not attempt to broaden the already pervasive and widesweeping nets of conspiracy prosecutions." *United States v. Roshko*, 969 F.2d 1, 4–5 (2d Cir. 1992) (citation omitted); *see also United States v. Mollica*, 849 F.2d 723, 729 (2d Cir. 1988) (warning that "[i]n order to avoid amending an indictment in violation of the Fifth Amendment, the government in fraud cases should think through the nature of the crime it wishes to allege and then spell out the offense in a carefully drafted indictment.")

### b.  The Indictment Was Constructively Amended

While Mr. Gross raised objections to the Court's formulation of the conspiracy in the jury instructions as an overly broad amendment of the Indictment, and will continue to raise that issue on appeal if it becomes necessary, even under the Court's definition of the conspiracy as "Yuri Lebedev and Trevon Gross…conspiring with others, from in or about April 2014 to in or about 2015, to achieve four unlawful objectives in an effort to further the operations of Coin.mx or the

Collectables Club," the government constructively amended the Indictment through the evidence and its arguments.  Since the evidence and arguments at trial broadened the basis of conviction beyond that charged in the S6 Indictment in multiple respects, there is great uncertainty as to whether Mr. Gross was convicted of conduct that was the subject of the grand jury's indictment. The constructive amendment thus mandates reversal.

### i.   The Nature of the *Quid Pro Quo* Bribery Scheme Was Broadened

First, in the S6 Indictment, the government charged a specific *quid pro quo* bribery scheme – payments by members of the Collectables Club to Trevon Gross to facilitate taking over the board of Hope FCU.  *See* S6 Indictment at 12-15.  Yet at trial, in both its opening and closing statements and through multiple witnesses, the government argued that the bribery scheme consisted both of taking payments from the Collectables Club in exchange for board control of Hope FCU, and of taking payments from Kapcharge in exchange for influencing ACH processing.  *See* Tr. 336-337 ("Kapcharge was in on the bribery scheme, too.  It actually funded most of the bribe payments and consulting fees to Gross.  Now, in return for paying for all that corruption, Kapcharge was going to run tens of millions of dollars in transactions through the credit union.") (emphasis added); Tr. 342 ("Kapcharge funded most of the corrupt payments that went to Gross and his church and…in return, the credit union had to process large volumes of Kapcharge's high-risk transactions.")(emphasis added).  *See also* 3875 (describing a scheme "so that Coin.mx could use HOPE FCU as a captive credit union to process its financial transactions without having to use any banks, and a scheme that allowed for Kapcharge, a Canadian-based processing company, to run tens of millions of dollars in ACH transactions, including for Coin.mx, through that small credit union.").

The government also maintained unequivocally in closing arguments that the alleged bribe payments by Kapcharge in exchange for processing ACH transactions were at the core of

the criminality the government was alleging.  *See* Tr. 4142 ("What makes the defendants'
conduct illegal is that the decisions were being made concerning the ACH processing <u>and</u> the
board nominations as a result of the bribes."); *See also* Tr. 3953 ("what is illegal is when at least
one reason Gross decided to process those tens of millions of dollars of transactions was because
the church that he was the lead pastor for received over $160,000 in money from two members
of the credit union – that's Collectables Club and Kapcharge – who wanted those ACH
transactions to happen.")  This alternative *quid quo pro bribery* scheme appeared nowhere in the
Indictment.

The distinction between these two *quid pro quo* bribery schemes is not "trivial, useless,
nor innocuous."  *Stirone*, 361 U.S. 212, 217.  There is a substantial difference between alleging
that Mr. Gross accepted a donation from the Collectables Club to the Hope Cathedral in
exchange for board control of Hope FCU and alleging that he accepted a donation from
Kapcharge, a payment processing business, in exchange for processing ACH transactions.  While
the government devoted days to establishing that the Collectables Club was a phony front
company for Coin.mx, and Coin.mx's sole business was to operate as an unlawful Bitcoin
exchange, multiple witnesses testified that ACH processing is perfectly legal.  Indeed, while Mr.
Hill testified that he committed crimes at Coin.mx, he testified that he believed that processing
ACH transactions at Hope FCU was "perfectly legal:"

> Q. So can we presume….that you thought that what you were doing here was legal?
> A. Processing ACH transactions? Yes.
> Q. Perfectly legal, right?
> A. Yes.
> Q. It's just the ratios may have been out of whack?
> A. Yeah.
> Q. Or other requirements, regulatory requirements, may not be being satisfied, right?
> A. Yes.
> Q. There was no crime?
> A. Not with ACH processing.

Tr. 1676.

Witnesses testified that the only issue with processing ACH transactions at the Hope FCU was the volume of ACH transactions and the inadequacy of the compliance procedures at the Hope FCU given the volume.  But the evidence was also clear that there was never a plan by Trevon Gross to process such a substantial volume of ACH transactions in June 2014, the time by which Mr. Gross had agreed to accept the $150,000 in donations to his church.  Indeed, Kapcharge did not begin processing ACH transactions until August 2014, and the vast majority of the processing activity took place between September and November 2014.  *See* Ex. 781.  The evidence was also clear that, as late as September 2014, Trevon Gross did not know the volume of ACH transactions Kapcharge intended to process.  *See* Ex. D, GX 791-T at 5 (in a September 18, 2014 call with Alloya, Ms. McDowell asking "do you have any…analysis on what your expected transaction count in dollar values are, once you get fully ramped up on debits and credits" for Transferwise, and Trevon Gross responding "we don't know yet.")  The evidence also showed that Michael Murgio, who initially approached Mr. Gross about a potential deal with the Collectables Club, did not know about Kapcharge processing ACH transactions through the Hope FCU as late as September 2014.  *See* Ex. B.

There is thus is a legal flaw and a logical disconnect in the government's allegation that Trevon Gross agreed to accept the June 2014 donation in exchange for allowing Kapcharge to process "tens of millions of dollars" in transactions for Kapcharge, when he had no knowledge that such a volume of transactions would be processed through the credit union at the time the payment was accepted.   The grand jury should have been permitted to pass on whether the government properly alleged an unlawful *quid pro quo* in the acceptance of a donation to a church in June 2014 when Kapcharge's intention of processing such a large volume of transactions in September-November 2014, if it actually existed in June 2014, was unknown to Trevon Gross.

Kapcharge also conducted business with the credit union, but no representatives of Kapcharge ever assumed a board position at Hope FCU.  Thus in processing transactions for Kapcharge, both before and after the fallout between members of the Collectables Club and the Hope FCU, Kapcharge never sought to "take over" the credit union.  The government's evidence and arguments thus substantially broadened the *quid pro quo* bribery scheme charged in the Indictment.

> ### ii.  The Nature of the Alleged Improper Business Transactions at the Credit Union Was Broadened

In the Indictment, the government alleged that the Collectables Club conspired to take over the Hope FCU in an effort to evade scrutiny from financial institutions about the nature of Coin.mx and to facilitate the operation of Coin.mx, an unlawful Bitcoin exchange.  S6 Indictment at 12 (emphasis added.).  The Indictment also alleged that "Murgio, Lebedev and their co-conspirators operated Hope FCU as a captive bank for their unlawful Bitcoin exchange."  But at trial, the government argued that there were improprieties with respect to three distinct lines of business for which Kapcharge processed ACH transactions, "Coin.mx's anonymous bitcoins,…Tranferswise's international money-transmitting businesses,…and Wakpamni payday lending, all three things which pose a risk to Hope FCU."  Tr. 3943 (emphasis added).  None of these businesses, or any allegations about any regulatory violations with respect to these businesses, appeared anywhere in the S6 Indictment.

While the Indictment centered on unlawful Bitcoin transactions, 92% of Kapcharge's ACH processing activity at Hope FCU, was related to Transferwise, a lawful business the government's own witness compared to Paypal.  Approximately 1.5% of the processing activity was for Coin.mx, and, as discussed above, not a single witness testified that any of these transactions were unlawful Bitcoin transactions.

Critically, the processing activity for Transferwise, the international money-transmitting business, is what drove the volume and dollar amounts of the ACH transactions at Hope FCU, creating the risks that were the subject of voluminous evidence at trial.  Kapcharge processed approximately $1 million dollars of ACH transactions for the Collectables Club at Hope FCU over the course of three months before Trevon Gross severed all ties with them, while Kapcharge processed $58 million of ACH transactions for Transferwise between September and November 2014.  The government's repeated refrain at trial that Trevon Gross allowed Kapcharge to process "tens of millions of dollars" of ACH transactions at Hope FCU thus only related to Transferwise, another name and business that appears nowhere in the Indictment.

The ACH processing for Transferwise was also what raised concerns from the NCUA about the Bank Secrecy Act, the Patriot Act, and the need to check transactions against the OFAC list.  While the government placed the processing of "tens of millions of dollars" of ACH transactions at the core of Mr. Gross's alleged corruption, there is nothing about these transactions in the Indictment.  *See, e.g.*, Tr. 3953 ("what is illegal is when at least one reason Gross decided to process those tens of millions of dollars of transactions was because the church that he was the lead pastor for received over $160,000 in money from two members of the credit union – that's Collectables Club and Kapcharge – who wanted those ACH transactions to happen.")

The government also made arguments and presented evidence that Kapcharge was processing ACH transactions for payday lenders, another business that was entirely distinct from the Bitcoin transactions at Coin.mx and governed by different regulatory and reputational risks than Bitcoins.  Again, there was no mention of payday lending in the Indictment.

### iii.   The Nature of the Misrepresentations Relating to the Field of Membership Was Broadened

In the Indictment, the government alleged that, "in furtherance of the scheme to facilitate the takeover of Hope FCU," Murgio, Lebedev and Gross made material misrepresentations to the NCUA about "the installation of Lebedev and other Board members selected by Murgio on the board of Hope FCU," "and the "eligibility of Lebedev and other Board members to serve as Board members of Hope FCU."  S6 Indictment at 15(a)-(b).  But at trial, the government also argued that Mr. Gross lied "about what Kapcharge was, whether it was based in New Jersey, and what all those millions of dollars in transactions were for."  *See also* Tr. 338.  Indeed, in closing arguments, the government discussed in detail Gross's "lie[] to the NCUA about [Kapcharge's] presence in Lakewood" over 10 transcript pages.  Tr. 3969-79.  In rebuttal, the government also alleged misrepresentations about a payday lender not referenced in the Indictment:  "Was Gross acting in good faith when he violated the credit union's field of membership requirements by opening accounts for Collectables Club, <u>and Kapcharge, and Wakpamni, that payday lender that was based in South Dakota</u>, even though he knew they had no connection whatsoever to Lakewood, New Jersey?" (emphasis added).  Tr. 4147.  These arguments and the evidence from which they were drawn impermissibly broadened the misrepresentations alleged in the Indictment.

### iv.   The Government's Allegations About "Cooking the Books" Appear Nowhere in the Indictment

One of the most prominent alleged "lies" to the NCUA presented in closing arguments was the allegation that Trevon Gross "cooked the books" by manipulating the net worth ratio with respect to Kapcharge's accounts.  The Indictment makes an allegation about misrepresenting the "financial health" of the Hope FCU, but the allegation is made as an "example" of a misrepresentation made by Anthony Murgio and Trevon Gross "in furtherance of

the scheme to facilitate the takeover of Hope FCU."   S6 Indictment ¶ 15(b).  The allegation

does not mention Kapcharge or ACH processing for Transferwise, and there are no overt acts

that mention this alleged misrepresentation.

Yet the evidence and arguments solely relate to Kapcharge's ACH processing activity for

Transferwise.  Transferwise's business drove the volume of ACH transactions at Hope FCU, and

it was the volume of these transactions that raised concerns about the net worth ratio.  Simply

put, these allegations have nothing to do with the operations of Coin.mx or the Collectables

Club.  *See* Tr. 3993 ("they know if they actually reflect the true nature of Kapcharge's business,

the capitalization ratio will be totally out of whack."); *id*. at 3995 ("he's concerned about what

the balances are going to look like in that Kapcharge account."); *id*. at 3998 (all of this careful

planning that he had done with Kapcharge, to make sure that they had that voided phone check

of $619,000, the careful planning with Rico Hill to post that wire after the September 30th date,

that was all for naught because Meg Flok saw the real financials at Kapcharge as of October.");

*id*. at 3999 ("This is a deliberate lie on the part of Trevon Gross, that required deliberate action

on the part of him and others at Kapcharge, to manipulate the books, to keep from the NCUA the

truth of what was going on at HOPE Federal Credit Union.")

Notably, the first time the government referenced the voided $619,000 phone check was

in closing arguments.  Thus, not only was this alleged misrepresentation not in the Indictment, it

was not even the subject of witness testimony, and the government never even questioned Mr.

Gross about the issue during his cross-examination.  This prevented Mr. Gross from being able

to respond to this uncharged allegation in any meaningful way.

### v.  Conclusion

Given the number of ways in which the evidence and arguments at trial broadened the

allegations in the Indictment, Mr. Gross's case falls squarely in line with those Supreme Court

and Second Circuit cases where a *per se* violation of the Fifth Amendment grand jury clause mandates reversal.  *See e.g.*, *Stirone v. United States*, 361 U.S. 212, 217-18 (finding "fatal error" because it could not "be said with certainty that with a new basis for conviction added, *Stirone* was convicted solely on the charge made in the indictment the grand jury returned."); *United States v. Zingaro*, 858 F.2d 94, 98 (2d Cir. 1988) (finding constructive amendment when "admission of evidence concerning a loan not specified in the indictment allowed the jury to find predicate acts of loansharking and unlawful debt collection that were not embraced by the specific charges of the indictment."); *United States v. Milstein*, 401 F.3d 53, 65 (2d Cir. 2005) (indictment "charging Milstein with misbranding due to his repackaging of the drugs, was constructively amended when the Government alleged that the drugs were misbranded because they were not sterile.")

As the government's post-trial press release demonstrates, had the government wished to succinctly present its theory of criminal liabilty against Trevon Gross to the grand jury, it could have done so.  Whether for strategic reasons, because of promises to the Court not to substantially change the charges after April 2016, or for other reasons, the government did not.  The government's decision to subject Mr. Gross to a four week trial on theories that it never presented to the grand jury violates his Fifth Amendment rights.  Since the nature of the *quid pro quo* bribery scheme and the conspiracy were impermissibly broadened, both Mr. Gross's bribery and his conspiracy convictions must be vacated.

## II.    Alternatively, There Was a Prejudicial Variance

While the government broadened the Indictment through its evidence and arguments to such a degree that the Indictment was constructively amended and no prejudice must be shown to obtain relief, in the event the Court deems the broadening a variance, Mr. Gross has indeed suffered prejudice.

"A variance occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *United States v. Salmonese*, 352 F.3d 608, 621 (2d Cir. 2003). A variance requires "substantial prejudice" to warrant reversal. *Id*. That standard has been met here.

As set forth above, the evidence offered at trial proved facts materially different from those alleged in the indictment. The divergence in evidence is of such a degree that Mr. Gross suffers a risk that he could be prosecuted again for the same offense. Taking the language from the government's own press release alone, he could be charged with taking corrupt taking payments from Kapcharge in exchange for running tens of millions of dollars of ACH transactions through the Hope FCU without adequate controls, thus putting its financial condition at risk, for misrepresenting the nature of Kapcharge's business and its location, and for manipulating the accounting at Hope FCU to hide the fact that it was processing tens of millions of dollars of transactions without adequate controls. *See* Ex. E. Mr. Gross has already been on trial under these theories, yet traces of them appear nowhere in the Indictment.

Mr. Gross was also misled at trial. As set forth above, the government did not reveal the nature of its theory against Mr. Gross for "cooking the books" relating to Kapcharge's bank accounts until closing arguments, depriving him of the opportunity to confront the evidence in any meaningful way. Mr. Gross also raised objections to the introduction of prejudicial evidence related to payday lending, for which he had received no notice. *See* Dkt. 518.

Finally, while the government presented evidence at trial to establish what was in essence a conspiracy to process ACH transactions, Mr. Gross suffered enormous spillover prejudice from allegations that he was in a conspiracy to facilitate an unlawful Bitcoin exchange scheme. There were days of prejudicial evidence related to illegal activities at Coin.mx that had nothing to do with Mr. Gross's own conduct, but undoubtedly prejudiced the jury against Mr. Gross for

engaging in business with the members of the Collectables Club.  The mischarged conspiracy also opened the door to the admission of numerous "co-conspirator" statements against Mr. Gross that were not made in furtherance of the conspiracy the government actually sought to prove at trial.[2]  For these reasons, even under a variance standard, Mr. Gross's convictions must be reversed.

### III.     The Government Failed To Present Sufficient Evidence of Venue

The Constitution requires that "(t)he Trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed . . . ." Art. III, s 2, cl. 3.  The Sixth Amendment to the Constitution provides that the accused in a criminal prosecution has the right to be tried in the "district wherein the crime shall have been committed."  Venue must be considered separately with respect to each defendant on each count.  *Cf. United States v. Mittal*, No. 98 CR. 1302 (JGK), 1999 WL 461293, at *2 (S.D.N.Y. July 7, 1999) ("Where there is more than one count charged in an indictment, venue must be proven with respect to each count.")

In determining proper venue, the district court "must ascertain both the nature of the offense and the location of the acts constituting it."  *United States v. Chestnut*, 533 F.2d 40, 46 (2d Cir. 1976).  Venue is proper only where the acts constituting the offense—the crime's "essential conduct elements"—took place.  *United States v. Ramirez*, 420 F.3d 134, 138 (2d Cir. 2005).  When evaluating venue for substantive offenses, courts look to the "key verbs" of the elements in this statute.  *United States v. Stephenson*, 895 F.2d 867, 874 (2d Cir. 1990).  For the substantive bribery offense, the "key verbs" of the statute are "solicit or demand" and "accept or agree to accept."  *See* 18 U.S.C. § 215(a).

For a conspiracy charge, "venue is proper in any district in which an overt act in furtherance of the conspiracy was committed.'"  *United States v. Tzolov*, 642 F.3d 314, 319–20

---

[2] Mr. Gross objected to the Court's limiting instructions with respect to those alleged co-conspirator statements, and preserves those objections.

(2d Cir. 2011).  "An overt act is any act performed by any conspirator for the purpose of accomplishing the objectives of the conspiracy."  Additionally, "venue must not only involve some activity in the situs district but also satisfy the 'substantial contacts' test,….which requires consideration of such factors as "the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of the [venue] for accurate factfinding."  *United States v. Royer*, 549 F.3d 886, 895 (2d Cir. 2008); *United States v. Parrilla*, No. 13-CR-360 AJN, 2014 WL 7496319, at *16 (S.D.N.Y. Dec. 23, 2014) (recognizing uncertainty as to whether "substantial contacts test" applies when there is an overt act in the district, but applying the test "for the avoidance of doubt.")

    **a.   The Government Presented Insufficient Evidence of Venue on the Substantive Bribery Count**

While the government must only prove venue by a preponderance of the evidence, in this case, the government has presented insufficient evidence from which a reasonable juror could find that the government met even this lower standard of proof.  The government relied upon several pieces of evidence to establish venue, none of which are sufficient, whether standing alone or considered together.

First, the government alleged that venue was proper for the bribery counts because "each of the daily wires from Kapcharge were necessary for it to fund the ACH transactions," and those wires were sent using an HSBC account in the Southern District of New York.  Tr. 4003. This is insufficient to confer venue for multiple reasons.  First, the daily wire from Kapcharge has no connection to the "essential conduct" of the bribery offense, which is "soliciting or demanding" or "accepting or agreeing to accept" a corrupt payment.

Additionally, the evidence showed that Kapcharge did not route any wires through HBSC to Hope FCU until August 13, 2014, nearly two months after the $120,000 payment was made to

the Hope Cathedral, and thus Kapcharge's routing of wires through HSBC in New York was not reasonably foreseeable to Trevon Gross when the June 2014 payment was made.

The government also relied upon two transfers of wires from Bank of America on May 19, 2014 and May 21, 2014 that passed through New York. Tr. 4004. But the evidence showed that these wires were sent from a customer account in Florida to a customer account in New Jersey, and the customers would have to request access to the records showing that the wire passed through New York. No evidence was introduced that this access was in fact requested. Moreover, the routing of the wire through New York was a product of the Bank of America routing system and not the volitional conduct of the sender or the recipient. *See* Tr. 1256; GX. 4013.

To argue that it was reasonably foreseeable to Mr. Gross that the wires would pass through New York, the government argued that he was "a sophisticated individual," he was "savvy at banking," and thus he should have known that a wire would pass through Manhattan. But the government's argument is not supported by any evidence. The government did not introduce any evidence to establish why a full-time pastor who was a part-time volunteer at a 100 person credit union should have known that Bank of America routes its wires through Manhattan. The government did not introduce any evidence about the frequency of wires for big banks passing through New York and it never introduced any evidence to show the types of wire transactions that would typically pass through a much smaller credit union. The government simply invited the jury to speculate that because Trevon Gross was well-educated and savvy, he must have known. This is precisely the sort of speculation and conjecture upon which a conviction cannot rest. *United States v. D'mato*, 39 F.3d 1249, 1256 (2d Cir. 1994) ("conviction based on speculation and surmise alone cannot stand."); *Langston v. Smith*, 630 F.3d 310, 320

(2d Cir. 2011) (reversing conviction where "the jury would have had to rely on pure conjecture to establish an element of the offense").

Moreover, the government's own evidence undercuts its argument. The government introduced evidence that shows that a wire transfer confirmation from the Collectables Club Citibank account to the United Advantage NW FCU in fact does not show the wire passing through New York. *See* Ex. F. This demonstrates that no fair inference can be drawn that, simply because Trevon Gross volunteered at a credit union, he must have known that a wire would pass through New York.

The government also relied on the summary slides of John Rollins, and invited the jury to match up the location analysis of John Rollins with any of the emails in the government's exhibit list to find an email that was received or sent when Trevon Gross was in the Southern District of New York. Specifically, the government relied upon two examples, Ex. G, GX 1157 and Ex. H, GX 1158. *See* Tr. 4005-4006. GX 1157 was an email from Trevon Gross to Yuri Lebedev, Jose Freundt and Anthony Murgio on June 6, 2014 relating to the Hope FCU server, and GX 1158 was an email from Rico Hill to Jose Freundt and Trevon Gross on June 7, 2014 with a picture of Rico Hill. Neither email discussed any payments to the Hope Cathedral. Since these emails did not have any connection to the "essential conduct" of the bribery offense, "soliciting or demanding" or "accepting or agreeing to accept" a corrupt payment, they are also insufficient to confer venue.

The jury in this case struggled with venue, and rightfully so. The Hope FCU was based in New Jersey and served members of the community in Lakewood, New Jersey. Nearly all of the critical events in the case took place in New Jersey or Florida. The tenuous evidence the government relied upon to confer venue is insufficient for any reasonable juror to conclude that venue on the substantive bribery count was established by a preponderance of the evidence.

**b.  The Government Presented Insufficient Evidence of Venue on the Conspiracy Count**

While venue for a conspiracy count can be established by any overt act in furtherance of the conspiracy, in this case, venue is still not proper.

First, the government relies upon evidence related to Kapcharge processing ACH transactions through New York to confer venue, but as set forth above, the conspiracy charged in the Indictment was not to process ACH transactions for Kapcharge.  It was to make and accept corrupt payments, obstruct an examination and make false statements in furtherance of the scheme by the Collectables Club to take over the Hope FCU to facilitate an unlawful Bitcoin exchange.  Accordingly, Kapcharge's wires were not overt acts in furtherance of the conspiracy charged in the Indictment and do not suffice to confer venue.

Since, as set forth above, there was insufficient evidence to establish that the passage of the May 2014 wires through the Southern District of New York was reasonably foreseeable to Mr. Gross, or indeed to any alleged co-conspirator, those wires also do not confer venue.

While emails that Trevon Gross might have received while he was in the Southern District of New York could potentially be characterized as overt acts in furtherance of the charged conspiracy, "venue must not only involve some activity in the situs district but also satisfy the 'substantial contacts' test,….which requires consideration of such factors as "the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of the [venue] for accurate factfinding."  *Royer*, 549 F.3d at 895.  None of these factors support a finding of venue in this case.  Trevon Gross's actions relating to all of the essential conduct in this case took place in New Jersey. The credit union is in New Jersey, all of Mr. Gross's actions relating to the negotiation of the agreement with the Collectables Club took place in New Jersey, and the NCUA examinations that are the subject of the alleged obstruction and misrepresentations took place in New Jersey.  Any actions or Mr.

Gross or co-conspirators that took place in New York were tangential or remote to the offense, or they were unforeseeable to Mr. Gross, and thus there is thus insufficient evidence to establish venue in New York by a preponderance of the evidence.  *See also* U.S. Const. amend. VI (providing that the accused in a criminal prosecution has the right to be tried in the "district wherein the crime shall have been committed.")

### IV.    The Government Failed To Present Sufficient Evidence To Sustain A Conviction For the Charged Conspiracy

The evidence adduced at trial was plainly insufficient to sustain Mr. Gross's conviction for the charged conspiracy.  Under the bribery scheme as alleged in the Indictment, Anthony Murgio, Yuri Lebedev and their co-conspirators entered into an agreement with Trevon Gross that they would bribe him in order takeover the Hope FCU "in an effort to evade scrutiny from financial institutions and others about the nature of Coin.mx and to facilitate the operation of an unlawful Bitcoin exchange." *See* S6 Indictment at12.  The Indictment also alleged that Anthony Murgio, Mr. Gross and Mr. Lebedev obstructed and attempted to obstruct an examination of Hope FCU by the NCUA "in furtherance of the scheme to facilitate the takeover of Hope FCU." and alleged overt acts undertaken "in furtherance of Coin.mx's operations."  *Id*. at ¶ 27.

A conspiracy is an "agreement among the conspirators" and a "meeting of minds" is required.  *United States v. Rosenblatt*, 554 F.2d 36, 38 (2d Cir. 1977).  To sustain a conspiracy conviction, the government must present "some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *United States v. Rodriguez*, 392 F.3d 539, 545 (2d Cir. 2004) (citations omitted).  "In order to prove a single conspiracy, the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal.  The coconspirators need not have agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan."

*United States v. Chavez*, 549 F.3d 119, 125 (2d Cir. 2008) (citation omitted).

In this case, there was insufficient evidence from which any reasonable juror could find beyond a reasonable doubt that Trevon Gross ever had a meeting of the minds with members of the Collectables Club or agreed on the "essential nature" of any plan.  There was no evidence that Trevon Gross had any knowledge that the Collectables Club was a sham front company for Coin.mx, or that Coin.mx was an unlawful Bitcoin exchange engaged in illegal activity.  There was also no evidence that Trevon Gross had any knowledge of any plan to use the Hope FCU as a "captive bank" for an unlawful Bitcoin exchange, or any intention of furthering any such plan. Since there was no evidence of any knowledge of the essential nature of the plan, there is no evidence from which a reasonable juror could have concluded that Mr. Gross agreed to join the conspiracy or further its unlawful objectives.

Since the evidence failed to show that Mr. Gross had any knowledge of the unlawful objectives of the conspiracy, the government also failed to present sufficient evidence that Mr. Gross had a corrupt intent in accepting payments from members of the Collectables Club to permit them to become members of the Hope FCU.

To the extent that the government argued that Mr. Gross's personal benefit from the donations to his church established corrupt intent, the government failed to present sufficient evidence from which a reasonable juror could conclude beyond a reasonable doubt that he personally benefited from the payments to the Hope Cathedral.  In order to establish personal benefit, the government introduced the testimony of John Rollins.[3]  Mr. Rollins testified that it would be impossible to use the "specific identification" method to directly correlate a particular expense with the alleged corrupt payments.  Tr. 3274.  For purposes of his testimony, Mr. Rollins used a "tracing analysis" dictated by the government's own choice of an accounting

---

[3] Defense counsel objected to the introduction of the testimony of Mr. Rollins as unnoticed expert testimony and maintains the objection.

method, but according to Mr. Rollins's own testimony, the correlation of the payments to specific purchases was a hypothetical exercise.  Since Mr. Rollins was engaging in pure conjecture, the jury could not appropriately find personal benefit from this evidence.  *Langston v. Smith*, 630 F.3d 310, 320 (2d Cir. 2011) (reversing conviction where "the jury would have had to rely on pure conjecture to establish an element of the offense").

The government also failed to establish the materiality of any alleged misstatements to the NCUA relating to the Collectables Club.  The NCUA was on notice from the Hope FCU board minutes that the Hope FCU was entering into a strategic partnership with the Collectables Club, the NCUA could inspect the resumes and drivers licenses of Collectables Club members to see that they lived in Florida, and the names of the new board members were on the website and in the minutes.  While Mr. Gross asked questions about what documents it would be necessary to submit to establish part-time work in the field of membership, the evidence is clear that Mr. Gross never in fact submitted any false documentation to the NCUA relating to the Collectables Club and there was no evidence that he agreed with anyone to do so.

For these reasons, no reasonable juror could have found beyond a reasonable doubt that Mr. Gross was guilty of conspiracy.

## V.     The Government Failed to Present Sufficient Evidence of Venue to Sustain A Conviction For Bribery

For the same reasons discussed above that the government failed to present sufficient evidence to sustain a conviction on the corrupt payment object of the charged conspiracy, the government failed to present sufficient evidence of a corrupt intent to support Mr. Gross's substantive bribery conviction and it must be reversed.

## <u>CONCLUSION</u>

For the foregoing reasons, we respectfully request that the Court grant Mr. Gross's

motions pursuant to Rule 29 and 33.

Respectfully submitted,

**KROVATIN KLINGEMAN LLC**
<u>*/s/ Kristen M. Santillo*</u>
Kristen M. Santillo, Esq.
60 Park Place Suite 1100
Newark, New Jersey 07102
(973) 424-9777
ksantillo@krovatin.com

Dated:  April 21, 2017