UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

UNITED STATES OF AMERICA

  - v. -                                    S6 15 Cr. 769 (AJN)

TREVON GROSS,

                       Defendant.

----------------------------------------------------------------x

## GOVERNMENT'S RESPONSE TO DEFENDANT TREVON GROSS'S MOTIONS FOR A JUDGMENT OF ACQUITTAL AND A NEW TRIAL

JOON H. KIM
Acting United States Attorney for the
Southern District of New York
Attorney for the United States of America

Eun Young Choi
Daniel S. Noble
Won S. Shin
Assistant United States Attorneys
    *Of Counsel*

**Table of Contents**

I. Background ..................................................................................................... 2

    A.    Procedural History .................................................................................. 2

        1.    The S2 and S3 Indictments, Pretrial Discovery, and Motions................... 2

        2.    The S6 Indictment................................................................................ 4

    B.    The Trial.................................................................................................. 6

        1.    Opening Statements ............................................................................. 6

        2.    The Government's Case in Chief............................................................. 8

            a.    The Bribe Plan and Bribe Payments ................................................. 8

            b.    Gross's Corrupt Intent................................................................... 11

            c.    The Lies Told by Gross and Others to the NCUA........................ 18

            d.    Venue ......................................................................................... 25

        3.    The Defense Case ................................................................................ 26

        4.    Summations......................................................................................... 26

        5.    The Jury Charge .................................................................................. 30

II. Generally Applicable Law ............................................................................. 32

    A.    Federal Rule of Criminal Procedure 29 ................................................. 32

    B.    Federal Rule of Criminal Procedure 33 ................................................. 33

III. Argument...................................................................................................... 34

    A.    The Trial Proof Did Not Constructively Amend or Prejudicially Vary from the Indictment ..................................................................................... 34

        1.    Applicable Law................................................................................... 34

            a.    Constructive Amendment .............................................................. 34

            b.    Prejudicial Variance...................................................................... 35

        2.    Discussion .......................................................................................... 36

            a.    The Indictment's Core of Criminality............................................ 36

            b.    The Government's Trial Proof and Arguments Regarding the Bribery Scheme Were Consistent with the S6 Indictment. ................................................................................................. 37

c.     The Government's Trial Proof and Argument Regarding Misrepresentations to the NCUA Were Consistent with the S6 Indictment. ................................................................ 43

d.     The Cases Cited by Gross Fail to Support His Constructive Amendment Claim. ........................................................ 46

e.     Gross Was Not Substantially Prejudiced by Any Variance .......... 49

B.     There Was Sufficient Evidence to Support Venue in this District ...................... 50

1.     Applicable Law ..................................................................... 51

2.     Discussion ............................................................................. 53

a.     Count Five:  Substantive Section 215(a)(2) Violation ................. 53

b.     Count Three:  Conspiracy ........................................... 64

C.     Sufficient Evidence Supported the Conspiracy and Substantive Bribery Convictions ............................................................................... 69

IV. Conclusion ................................................................................................. 72

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
                                                      :
UNITED STATES OF AMERICA                              :
                                                      :
    - v. -                                            :          S6 15 Cr. 769 (AJN)
                                                      :
TREVON GROSS,                                         :
                                                      :
                        Defendant.                    :
                                                      :
-----------------------------------------------------------------x

### GOVERNMENT'S RESPONSE TO DEFENDANT TREVON GROSS'S MOTIONS FOR A JUDGMENT OF ACQUITTAL AND A NEW TRIAL

The Government respectfully submits this memorandum of law in response to defendant Trevon Gross's motions, pursuant to Federal Rules of Criminal Procedure 29 and 33, for a judgment of acquittal and a new trial. The jury found Gross guilty after a trial on two offenses: receiving a bribe while he was an official of HOPE Federal Credit Union ("HOPE FCU") and conspiring to pay bribes, to receive bribes, and to obstruct and make false statements to the National Credit Union Administration ("NCUA"). In his post-trial motions, Gross advances four claims, none of which have merit: (1) that the S6 Indictment was constructively amended; (2) that there was a prejudicial variance of the S6 Indictment; (3) that there was insufficient evidence of venue; and (4) that there was insufficient evidence to support his convictions on the conspiracy and substantive bribery counts. The evidence at trial proved the conspiracy and bribery offenses alleged in the S6 Indictment and overwhelmingly established both venue and Gross's guilt on both counts. Because Gross cannot approach the high bars for relief under Rules 29 and 33, this Court should deny Gross's motions in their entirety.

I.      **Background**

      A.      **Procedural History**

            1.      **The S2 and S3 Indictments, Pretrial Discovery, and Motions**

On March 1, 2016, a grand jury returned a nine-count second superseding indictment (the "S2 Indictment") against Anthony Murgio, Yuri Lebedev, and Trevon Gross.  The S2 Indictment charged Gross with one count of soliciting and accepting corrupt payments from Murgio, Lebedev, and their co-conspirators, as an officer of a financial institution, in violation of 18 U.S.C. § 215(a)(2).  The S2 Indictment also contained a conspiracy charge as against Murgio and Lebedev: Count Three, which alleged that they had conspired to make corrupt payments to Gross, in violation of 18 U.S.C. § 215(a).  (ECF No. 57).

On March 4, 2016, Gross was arrested and the Government began producing discovery to Gross.  Among other things, pretrial discovery materials included emails and other documents demonstrating that Kapcharge and its officers, including Mark Francis and Shoula Cohen, were involved in the bribery scheme.  Not only did Kapcharge fund the bulk of the bribes to Gross, but it was also the payment processing company used by Collectables Club to process Coin.mx's ACH transactions.  By May 2016, the discovery materials produced to Gross included the following:

- Bank records, including from Bank of America and PNC Bank, showing the payment of the bribes at issue and that Kapcharge funded them;

- WhatsApp conversations in which Murgio, Gross, Francis, and others discussed the corrupt payments, the operations of HOPE FCU, Kapcharge's voluminous ACH transactions, and the means by which the co-conspirators sought to conceal their actions from the NCUA;

- Emails and other electronic files, including (i) GX 2506, the recording of the November 22, 2014 meeting at HOPE FCU between Gross and Anthony Murgio, Michael Murgio, Lebedev, and others, during which the terms of the bribery arrangement were discussed at great length, including Kapcharge's role; and (ii) GX 2502, a recording of a September 15, 2014 conversation between Murgio, Gross, and Ricardo Hill from HOPE FCU and Mark Francis, Shoula Cohen, and Kevin Pepe from Kapcharge;

- Emails and other documents produced by Kapcharge, including emails between Francis, Cohen, and others at Kapcharge with Anthony Murgio, Trevon Gross, Yuri Lebedev, and other Collectables Club individuals;

- Materials produced by HOPE Federal Credit Union ("HOPE FCU"), which contained emails to and from Gross and Charles Blue, as well as correspondence and documents regarding Kapcharge, Collectables Club, and the NCUA; and

- Documents produced by the NCUA, which included correspondence and documents specifically related to Kapcharge's clients Transferwise and Wakpamni.

On April 14, 2016, a grand jury returned a third superseding indictment (the "S3 Indictment"), which added Michael Murgio as an additional co-conspirator of Murgio and Lebedev. (ECF No. 87).

On September 12, 2016, the Government filed a motion *in limine* to introduce certain records of the NCUA at trial. (ECF No. 191). In its brief, the Government outlined its theory of the case: that "in 2014, in an effort to facilitate Coin.mx's operations and further evade scrutiny by financial institutions," Anthony Murgio and his co-conspirators paid over $150,000 in bribes to Gross, "[t]o obtain control of HOPE FCU," including one $120,000 payment made by Kapcharge. (*Id.* at 18). The Government noted that after Anthony Murgio had arranged for bribes to be paid by himself and Kapcharge to Gross's church, "Gross facilitated Anthony Murgio's takeover of the leadership and operations of HOPE FCU, including by arranging for the Board of Directors to nominate and elect Lebedev and a slate of other individuals hand-picked by Murgio to the Board." (*Id.*). Further, the Government proffered that "Gross gave Anthony Murgio and his co-conspirators operational control of the credit union, including access to HOPE FCU's premises and computer systems. In particular, Gross permitted Kapcharge to open a business account at HOPE FCU, which Kapcharge began using to process millions of dollars' worth of ACH transactions for, among other businesses, payday lending companies," noting that, between September and November of 2014, HOPE FCU was processing as much as $3.8 million a day in

ACH, "without sufficient capital reserves or adequate Bank Secrecy Act ("BSA") and Anti-Money Laundering ("AML") controls." (*Id.*). The Government also stated it would introduce evidence at trial that "Gross was aware of this high volume of ACH activity and the insufficient BSA/AML controls, but nevertheless continued to permit Anthony Murgio and Kapcharge to process the ACH transactions through HOPE FCU," and went one step further to "conspire with Anthony Murgio and individuals at KapCharge to try to manipulate HOPE FCU's net-worth ratio at the end of the quarter to trick the NCUA into believing that the credit union was adequately capitalized for the volume of ACH transactions it was processing." (*Id.* at 19-20). In his opposition to the Government's motion, Gross did not assert that these facts were irrelevant to the charged bribery scheme. (*See generally* ECF No. 203).

On October 6, 2016, counsel for Anthony Murgio moved for a continuance of the trial, which this Court granted. Trial was adjourned to February 6, 2017. (*See* ECF Nos. 237, 238).

### 2. The S6 Indictment

On December 22, 2016, a sixth superseding indictment (the "S6 Indictment") was filed against Murgio, Lebedev, and Gross. (ECF No. 308). The S6 Indictment expanded the objects of the conspiracy charged in Count Three of the S3 Indictment. Specifically, Count Three in the S6 Indictment (1) added Gross as a co-conspirator; and (2) added three additional objects: (a) to receive corrupt payments as an officer of a financial institution with intent to be influenced, in violation of 18 U.S.C. § 215(a)(2); (b) to obstruct an examination of a financial institution by the NCUA, in violation of 18 U.S.C. § 1517; and (c) to make material false statements in a matter within the jurisdiction of the NCUA, in violation of 18 U.S.C. § 1001.

The S6 Indictment described Gross's role in the conspiracy as having "assisted MURGIO, LEBEDEV, and their co-conspirators in taking control of HOPE FCU in exchange for bribes, which GROSS directed MURGIO and his co-conspirators to pay banks under GROSS's control,"

4

and that "[i]n total, ANTHONY R. MURGIO . . . and his co-conspirators, at GROSS's direction, paid over $150,000 in bribes to bank accounts under GROSS's control," which "GROSS, in turn, spent . . . on personal expenses, including payments for his personal credit cards." (S6 Indictment ¶¶ 12, 13). "Thereafter, and with the assistance of TREVON GROSS, . . . ANTHONY R. MURGIO, the defendant, installed his co-conspirators, including YURI LEBEDEV, . . . on the Board of HOPE FCU and transferred Coin.mx's banking operations to HOPE FCU," whereupon Murgio and the Collectables Club co-conspirators operated HOPE FCU "as a captive bank for their unlawful Bitcoin exchange." (S6 Indictment ¶ 14).

With regard to the obstruction and false statements objects, the S6 Indictment alleged that "in furtherance of the scheme to facilitate the takeover of HOPE FCU by ANTHONY R. MURGIO and YURI LEBEDEV, . . . . and their co-conspirators, MURGIO, LEBEDEV, and TREVON GROSS, the defendant, obstructed and attempted to obstruct [the NCUA's] examination of HOPE FCU," by, "[f]or example":

- Murgio, Lebedev, and Gross having "made material misrepresentations to, and withheld material information from, the NCUA concerning the installation of LEBEDEV and other Board members selected by MURGIO on the Board of HOPE FCU";

- Murgio and Gross having "attempted to mislead the NCUA concerning the financial health of HOPE FCU and the eligibility of LEBEDEV and other Board members selected by MURGIO to serve as Board members of HOPE FCU"; and

- Murgio and Lebedev having "caused a letter to be drafted and sent to the NCUA, which was signed by LEBEDEV and two other co-conspirators not named as defendants herein, which falsely stated that the 'Collectables Club' was 'headquartered' in Lakewood, New Jersey."

(S6 Indictment ¶ 15).

### B.    The Trial

#### 1.    Opening Statements

Consistent with its prior descriptions of its proof at trial, the Government's opening statement explained the case as follows:  "This is a case about bribes and lies.  That man, Yuri Lebedev, was part of a group of people who paid bribes, so they could take control of a federal credit union.  And that man, Trevon Gross, is the one who accepted those corrupt bribes and handed over control of that credit union."  (Tr. 329-30).[1]  The Government went on describe the bribery scheme as having "involved Lebedev and others paying bribes to Gross to take control of a credit union, and then Gross, Lebedev, and others lying to cover it up."  (Tr. 330).  After explaining the bank and wire fraud schemes involving Coin.mx—in which Coin.mx had to continue to lie to financial institutions about the true nature of their business in order to trick them into processing transactions for their illicit Bitcoin exchange (Tr. 330-33)—the Government argued that Anthony Murgio "came up with an idea to take over a credit union" (Tr. 333) instead of continuing its charade with banks.  The Government then explained the "terms of the backroom deal" that Murgio reached with Gross:  "the Collectables Club would make large so-called donations to Gross' church, and in return, Gross would deliver control of the credit union to Murgio."  (Tr. 334-35). The Government explained that, after the Collectables Club members were elected to the Board of HOPE FCU, Gross, Lebedev, and others worked "to implement a plan for the credit union to help Kapcharge, a Canadian company that processed payments for other businesses."  (Tr. 336). Kapcharge  was described as "having funded most of the bribe payments" to Gross, so that it could "run tens of millions of dollars in transactions through the credit union," and that "Gross and Lebedev helped make this happen, even though Kapcharge was not eligible even to have an

---

[1] References to "Tr." herein are to the Trial Transcript in this case.

account at the credit union," and "even though it was incredibly risky for the credit union." (Tr. 337). For this scheme to succeed, the Government explained that "Gross lied to the government to the federal regulator of credit unions, over and over again," including about the fact that the new board members had been elected; whether any of the new board members were based in New Jersey; what Collectables Club was and whether it was based in New Jersey; that the credit union was actually being run out of Florida; and what Kapcharge was, whether it was based in New Jersey, and what all of those millions of dollars of transactions were for. (Tr. 337-38). The Government, however, emphasized that Gross hid the "most fundamentally damning facts" of the scheme": "that he had agreed to accept huge, corrupt bribe payments for himself and his church, and in return, he had given control of the credit union to Murgio, someone who was not a direct of the credit union, not an officer of the credit union, and, in fact, had no position in the credit union at all." (Tr. 338).

At the beginning of her opening statement to the jury, counsel for Gross argued that "[w]hat the government has called a bribe to Pastor Gross was actually a business transaction that started with the best of intentions, took a lot of unexpected turns, and was ended by Pastor Gross himself." (Tr. 368). The theme of Gross's opening argument was that the Government would not be able to prove that Gross acted with the requisite corrupt intent, explaining that "[i]t's not a bribe to take a payment if you're doing it with good intentions or for legitimate purposes." (Tr. 368). Gross asserted that he was tricked by Michael Murgio and Anthony Murgio into thinking that Collectables Club was a "legitimate . . . memorabilia association" that would bring to the credit union additional members, which would "give them the critical mass that they needed, to have more assets, to give more loans" so as to grow the credit union. (Tr. 371-72). Gross argued that there was "nothing wrong with the donation"—the euphemism Gross and his co-conspirators used

to describe the bribe payments—and that, in fact, it was a "sign of [Gross's] good faith" that he had the money sent to his church.  (Tr. 376).  Gross asserted that it was to his "credit" that he and the other board members got "rid of Anthony Murgio" within six months of the start of their relationship, because in their view, it was not the excessive ACH processing or Kapcharge that caused any problems, rather "Anthony Murgio was the problem, and they got rid of" him.  (Tr. 382-83).  Gross argued that after the end of its relationship with Anthony Murgio, HOPE FCU wanted to generate "enough fees to be able to give loans to the disadvantaged, which is their purpose," so they decided "to continue building an ACH processing business," but because they wanted to "do it right," Gross and HOPE FCU "hired a full-time compliance officer, named Charles Blue" with a  "finance background" who was going to "devote full time to try to put in the appropriate policies and procedures in place at the credit union, to make this [ACH] business safe and sound for the credit union."  (Tr. 383).  Gross described the NCUA's examination as one of a "mismatching of information, information between [what the] NCUA knew and what Pastor Gross" and others knew, emphasizing that Gross, Blue, and others at HOPE FCU "were doing everything right to comply with the rules."  (Tr. 384).  Gross dismissed the alleged false statements made to the NCUA as simply "not false," but rather "misunderstandings" or statements that were "taken out of context."  (Tr. 385).

### 2.   The Government's Case in Chief

Consistent with the S6 Indictment, the evidence at trial established beyond a reasonable doubt that Gross had conspired to commit, and did commit, the bribery and obstruction counts charged.

### a.   The Bribe Plan and Bribe Payments

The evidence at trial established that, because of the difficulties Coin.mx was having in using traditional bank and credit card accounts to process its Bitcoin-related transactions, Anthony

Murgio sought to take over control of a credit union:  HOPE Federal Credit Union, located in New Jersey.  (*See* Tr. 1280-82 (Hill Testimony); *see also* Tr. 514-20, 530 (Wotherspoon Testimony); Tr. 1968-70 (Freundt Testimony)).  As was described by Anthony Murgio's co-conspirators at trial, the "plan" was for "friends or colleagues of Anthony Murgio . . . to make payments to Trevon Gross and Hope Cathedral, and in [re]turn take full control of the credit union." (Tr. 1283-84 (Hill Testimony); *see also* Tr. 1953-54 (Freundt Testimony)).

At Gross's direction, Anthony Murgio had arranged for a series of payments (referred to the co-conspirators as "donations") totaling $150,000 to be made into Hope Cathedral's bank accounts, which were controlled by Gross, in exchange for operational and Board control of HOPE FCU.  Consistent with witness testimony as to the terms of the arrangement, email communications between Anthony Murgio and Trevon Gross on April 22, 2014 established the broad strokes of the deal:  that this "[l]arge donation of $150k to the organization of [Gross's] choice" was contingent on "full control" of the credit union, with "$15k up front and 45 Days of operation another $15K," and the remaining $120,000 to be paid once Murgio and his contingent took over the credit union. (GX 1081-D).  Gross explained that, upon receiving the initial $15,000 by Friday, May 9, the executive board would meet to recommend members from the Collectables Club to be elected to the Board of Directors, to give Murgio the majority position on the Board, with full Board ratification of the proposed Collectables Club members after receipt of the second $15,000 payment.  (GX 1092-B; *see also* GX 1108-A).  Gross made clear to Murgio that after the annual election, HOPE FCU "is your credit union" (GX 1167-A), guaranteed in part because there would be "no nominations from the floor," so that once Murgio's hand-picked Board members were nominated, "the[ir] election is assured."  (GX 1142-I; *see also* GX 1189 (Gross telling Murgio that he wanted to "make certain that this election is incontestable.")).

Pursuant to this corrupt arrangement with Gross, Anthony Murgio made two $15,000 wire transfers on or about May 9 and May 21, 2014 (*see* S6 Indictment ¶ 19(c) and 19(d)), from a Bank of America account used by Murgio into Hope Cathedral's operating account at PNC Bank through New York, New York (*see* GX 800-B, 800-H, 853-B, 900 at 15-22), for which Murgio and the Collectables Club were later reimbursed by Kapcharge (*see* GX 1316-A, 1316-B, 1321, 1324-C, 1326-B, 1326-C, 1330-A, 2153, 2175, 2177, 2180, 2183, 2189, 2265, 2227, 2280; Tr. 1321-24, 1330-45). And, as promised, upon the June 21, 2014 election of Collectables Club members to HOPE FCU's Board (GX 6086), the final $120,000 payment was made the same Hope Cathedral account at PNC Bank (S6 Indictment ¶ 19(e)). Specifically, on or about June 23, 2014, Anthony Murgio arranged for Kapcharge to make a $120,000 payment via ACH to Hope Cathedral. (*See* GX 1317-B, 1317-E, 1317-F, 1317-H), on or about June 23, 2014 (*see* GX 800-B; 800-D, 900 at 23-25).[2] Thereafter, Murgio and his co-conspirators made over $12,000 in additional payments to Hope Cathedral bank accounts for Gross's so-called "consulting fees."[3]

---

[2] Despite Gross's testimony that he did not know that Kapcharge was behind these payments or had a business relationship with Anthony Murgio until November 2014 (*see* Tr. 3598-99), the Government's evidence at trial established that Gross knew at the time the June 21, 2014 $120,000 payment was made that it came from Kapcharge, both because Gross had had direct discussions with Murgio and Mark Francis of Kapcharge about the donation (*see, e.g.*, GX 1171-A (June 18, 2014 email from Murgio to Gross, cc'ing Mark Francis, stating "We would like to have a call tomorrow to discuss the donation we are going to make to the church. We would like to discuss some other opportunities with you as well moving forward.")), but also because Anthony Murgio forwarded to Gross confirmation of the $120,000 payment from Kapcharge to HOPE FCU. (GX 1317-E, 1317-F (email from Kapcharge dated June 20, 2014 for payment of $120,000 forwarded by Anthony Murgio to Gross)).

[3] These payments included (1) an August 22, 2014 net transfer of $1,750 from Collectables Club, processed through Kapcharge via ACH, to the Hope Cathedral PNC account (see GX 800-B, GX 900 at 26-29); (2) an October 6, 2014 transfer of $1,500 from Collectables Club's HOPE FCU account to Hope Cathedral's HOPE FCU account (GX 900 at 56-58, 6202), which was paid for by Kapcharge (*see* Tr. 1328-29; GX 1322, 1324-C,1658, 2177, 2180, 2183); (3) an October 7, 2014 transfer of $3,000 from Kapcharge's HOPE FCU account to Hope Cathedral's HOPE FCU account (GX 790-B, 900 at 59-61, 6206), which was split between Collectables Club and Kapcharge (*see* GX 1322, 1324-C, 1324-D, 2175, 2177, 2180, 2183; Tr. 1334-35); and (4) a November 24, 2014

### b.     Gross's Corrupt Intent

The evidence at trial established that, from its inception, the arrangement of payments in exchange for board and operational control of HOPE FCU was corrupt.  Murgio chose the individuals to be on the Board, and after Gross ensured they were elected, the plan was for the legacy board members to "eventually resign" months later (Tr. 1284-85 (Hill Testimony); Tr. 1970-72 (Freundt Testimony)).  Perhaps stating the obvious, as Ricardo Hill testified, "[m]aking payments to an individual in a church to take over a credit union . . . was obviously not a legitimate business deal," especially because none of the proposed board members qualified to be members of the credit union, as none of the Collectables Club members "lived, worked, or worshipped in Lakewood, New Jersey," as was required to even be a member of HOPE FCU.  (Tr. 1287-89; *see also* Tr. 1689 (Hill Testimony); Tr. 1978-79 (Freundt Testimony)).  Similarly, Jose Freundt explained that the arrangement was not a legitimate business transaction, because "you can't buy a credit union.  The only way to have control—in essence, ownership—of a credit union . . . would be to control the board and control the employees."  (Tr. 1972).

The very contours of this deal between Gross and the Collectables Club were in blatant contravention of Gross's duties as the Chairman and CEO of HOPE FCU.  Analysts and examiners at the NCUA explained the nature and function of credit unions, and the NCUA's supervisory function over credit unions.  In particular, credit unions are member-owned, not-for-profit institutions designed to serve members that fall within their field of membership, and generate

---

$6,000 wire transfer from Anthony Murgio to Trevon Gross as "payment owned for consulting" (GX 1329; *see also* GX 1324-C, 1324-D, 1326-B, 1326-C, 1327-A, 1330-A), from a Collectables Club account at Citibank to its account at HOPE FCU, and then ultimately to Hope Cathedral's HOPE FCU account (GX 790-B, 807, 856-B, 900 at 62-68, 6206).

revenue primarily through loan and investment income, but also through fee income (Tr. 1054-57 (Curry Testimony)).  Moreover, all federally insured credit unions are subject to a variety of rules and regulations, including the Federal Credit Union Act, the NCUA's rules and regulations, and the Bank Secrecy Act, as well as laws and regulations enforced by the Office of Foreign Asset Control, the Financial Crimes Enforcement Network, and other consumer compliance-related regulations.  (Tr. 1057 (Curry Testimony)).  Unlike banks, credit unions cannot be bought and sold (*see id.*); rather, the affairs of a credit union are managed its board of directors, who are nominated from the members of the credit union through a nominating committee, and then elected at a credit union's annual meeting (Tr. 1059-60 (Curry Testimony)).  Moreover, HOPE FCU's bylaws prohibit any directors, officers, or agents from "participat[ing] in any manner, directly or indirectly, in the deliberation upon or the determination of any question affecting his or her pecuniary or personal interest or the pecuniary interest of any corporation . . . or association . . . in which he or she is directly or indirectly interested."  (GX 6150 at 17).  Consequently, Gross's guarantee to Murgio that the Collectables Club members' election would be assured upon delivery of the payments to Hope Cathedral—an association in which he by his own admission had a pecuniary interest (*see* Tr. 3659-60)—was contrary to both his duties to the credit union, but also to the rules and regulations governing the management and operation of credit unions generally and HOPE FCU in particular.

Further establishing Gross's corrupt intent in handing over control of his credit union to Collectables Club, Gross and the legacy board members did nothing to vet the qualifications of either Anthony Murgio, or the proposed board members.  For example, although Anthony Murgio himself did not seek to be a member of the board in light of his past bankruptcy and arrest on tax charges (*see* Tr. 531-33 (Wotherspoon Testimony))—facts that were readily available to anyone

who sought to Google them (*see id.; see also* Tr. 1270-71 (Hill Testimony); Tr. 1965-66 (Freundt Testimony))—Gross apparently did nothing to investigate Anthony Murgio's background prior to agreeing to this arrangement, which allowed Anthony Murgio functional control over HOPE FCU. Similarly, despite the fact that HOPE FCU was required to ensure that each employee was properly bonded, which required a background check (Tr. 2318-20 (Flok Testimony)), at no time was Hill ever asked by Gross or anyone else from the credit union about his qualifications or background (Tr. 1293). Nevertheless, Hill was not only elected to the board, but given full access to the backend of the credit union's operations, and was paid for his work as a board member of the credit union. (*See* Tr. 1298-1301; 1345-47; GX 2143). Hill was responsible for all of HOPE FCU's functions, not only "account creation, to approving the deposit[s] or withdrawals, to changing passwords for customers of the credit union, to ensuring debit cards were mailed to the correct address," (Tr. 1349), but also for processing ACH transactions for HOPE FCU (*see* Tr. 1345-47, 1354-55, 1380).

In furtherance of Collectables Club and Coin.mx's operations, Murgio was focused from the beginning on ensuring that ACHs transactions for the Bitcoin exchange could be processed through HOPE FCU, through the use of Kapcharge.[4] After the election of Collectables Club members to the Board, Gross, Murgio, and others made efforts to grow the volume of Kapcharge's

---

[4] Although Gross maintains that he did not know that the Collectables Club had anything to do with Bitcoin, the record evidence was to the contrary. Ricardo Hill testified that he initially was introduced to Trevon Gross on a conference call during which Murgio openly talked about the Collectables Club as having a platform where members could "buy, sell, and trade digital currency and digital assets" about his plan of the credit union. (Tr. 1291-93). Hill further testified that he described to Gross the work that he had done on the backend systems of Collectables Club and Coin.mx (Tr. 1355-56). And email evidence establishes that as early as June 18, 2014, the Collectables Club members and Gross openly discussed integrating Bitcoin into the credit union's banking infrastructure. (*See*, *e.g.*, Tr. 1556-58; DX 13).

ACH transactions, both for Coin.mx as well as for other companies, such as Transferwise, an international money transfer business, and a variety of payday lenders.  Hill, who was a Coin.mx employee, processed ACH transactions for Kapcharge through its account at HOPE FCU on a daily basis from Coin.mx's office in Tallahassee Florida (Tr. 1345-47, 1354-55, 1380), without a "thorough understanding of what ACH was" (Tr. 1352), and without any rudimentary compliance efforts, including efforts to comply with BSA or OFAC requirements (Tr. 1506).

The volume of ACH transactions that Gross allowed drew scrutiny from Alloya, the corporate credit union that processed all financial transactions for HOPE FCU.[5]  As a result of Kapcharge depositing over a million dollars a day into Alloya accounts to process its ACH transactions, Alloya raised concerns about the impact of the volume of transactions on the capitalization requirements to Gross, which Gross sought to alleviate. (GX 1427-D, 2155; Tr. 1409-11).  Specifically, in a September 18, 2014 phone conversation between Gross and Alloya,[6] Michelle McDowell, a manager who oversaw Alloya's ACH and Wire products, noted to Gross that HOPE's anticipated increased volume of ACH transactions, and the necessary cash influx to HOPE FCU that would be required to cover that volume, risked "blow[ing] up [HOPE FCU's] balance sheet, once you have to go and do your next [5300] call report," and thus asked Gross what, if anything, HOPE FCU was doing in conjunction with the NCUA to mitigate this capitalization risk to the credit union. (See GX 791, 791-T at 4; Tr. 1771, 1848-50).  Gross responded that the NCUA's main concern was that HOPE FCU maintain its net worth ratio above

---

[5] Despite the fact that, at the time, no other member credit union at Alloya was attempting to execute daily ACH transaction volumes above their line of credit, Alloya made exceptions for HOPE FCU in an effort to accommodate their desire to grow their ACH business.  (See Tr. 1804-06 (McDowell Testimony)).

[6] The September 18, 2014 phone call with Alloya was introduced by the Government at the defendant's request. (See Tr. 1476-80, 1735-36, 1809).

7%, and represented that the credit union was at 10.7% at the time.  (GX 791, 791-T at 4).  Aside from capitalization, Alloya also expressed to Gross its concerns about whether HOPE FCU was doing adequate due diligence on both Kapcharge and Kapcharge's customers, as well as properly coding the ACH transactions (*see* Tr. 1845-46), as well as whether HOPE FCU had implemented adequate BSA and compliance policies and procedures (*see* Tr. 1846-50, 1911-22).

Despite these warnings, Gross—who had both the responsibility to assess the consequences of the ever increasing volume of ACH upon the credit union, as well as the ability to stop the transactions if he saw fit (*see* Tr. 1441-42)—approved ever increasing requests for increased volume of ACH transactions at Murgio and Kapcharge's request, including up to $100 million a month (*See* Tr. 1423-1426; GX 2215; *see also* Tr. 1431-33; GX 4507).  Gross made these decisions about ACH transactions in consultation with Murgio, Hill, and Kapcharge affiliated individuals, such as Mark Francis, Shoula Cohen, and Kevin Pepe, electing not to discuss these concerns with the Board as a whole (*See* Tr. 1435).  In light of the volume processed, and the inability of HOPE FCU to adequately mitigate the risks that its ACH transactions posed, on November 10, 2014, Alloya ceased processing ACH transactions for HOPE FCU.  (Tr. 1428-30, 1433-34 (Hill Testimony); Tr. 1850-85 (McDowell Testimony); GX 2228, 4502).  Nevertheless, Gross convinced the CEO of United Advantage Northwest Credit Union ("UANW"), Robyn Guyer, to process ACH transactions for HOPE FCU shortly thereafter, by misleading her as to the volume and nature of the anticipated ACH transactions; when Gross attempted to process up to $3 million in one day, Guyer refused to process ACH at the volume that Gross had requested.  (*See* Tr. 1439, 2373-77; GX 2300, 2375, 3559).

Gross also requested that Kapcharge pay an additional $430,000 to the credit union to deal with its inadequate capitalization issue.  However, Gross wanted to ensure that this payment was

recorded as an "operational grant" for the NCUA, with a  "side agreement that . . . gives [Kapcharge] the ability to operate fee-free" for an extended period of time; such an arrangement would allow them to continue "dancing with the examiner," which Gross explained was what they had been doing "since July.  Honestly I am tired." (GX 2279; Tr. 1498-1500 (Hill Testimony)).

On November 22, 2014, Gross, Anthony Murgio, and the Collectables Club members reached one final agreement for one last $50,000 payment, in exchange for the resignations of the legacy board members.  (Tr. 1510; *see also* GX 2506; GX 2506-T).  Gross arranged for the resignations to be made, but because Anthony Murgio made the final payment in an untimely fashion, Gross decided to pair with Kapcharge, and forced the Collectables Club members out of HOPE FCU.  (Tr. 1523-33; GX 2245, 2246, 2247, 2252).

In addition to the evidence establishing the corrupt arrangement between Gross and his co-conspirators, the Government also presented a summary witness, John Rollins, who had performed a tracing analysis of the funds that were paid to Hope Cathedral by Anthony Murgio, Collectables Club, and Kapcharge, in order to establish that Gross had a pecuniary interest in the finances of Hope Cathedral and the so-called "donations" made by Murgio and Kapcharge.  That analysis established that proceeds of the bribery funds eventually flowed to personal expenses and payments to Trevon Gross (*see* GX 900 at 38, 77), including payments to Gross's personal credit cards (*see* GX 900 at 30-35); transfers to Hope Cathedral payroll account, which resulted in payments to Gross and his family (*see* GX 900 at 36-37; *see also* Tr. 3539, 3659-60 (Gross testifying that he was only paid if the Hope Cathedral payroll account could cover the check at issue)); meals, juices, entertainment, and shopping for Gross (*see* GX 900 at 39-42, 45-50); improvements on Gross's personal swimming pool (*see* GX 900 at 54); payments of college

admission fees for his children (*see* GX 900 at 51); and a variety of cash withdrawals (*see* GX 900 at 52-53).

The Government also introduced evidence to rebut the arguments made by Gross's counsel in opening. To begin, contrary to her argument that Gross believed this arrangement to process ACH was a legitimate business deal in the best interests of HOPE, the Government established that in fact, the total fee income to HOPE FCU was negligible, as compared to the payments Gross received to HOPE Cathedral as a result of the bribes. For instance, for the month of September, HOPE FCU processed over $10 million in ACH transactions for Kapcharge, which resulted in only $1,613 in fees—an amount less than the $2,000 that Hill made that month for processing the transactions (GX 2168, 2192; Tr. 1414, 1418-19). And total, for all of 2014, for the over $60 million in ACH transactions that HOPE FCU processed, it received $6890.75 in income. (*See* GX 3576-A, 3576-B). In addition, the Government introduced evidence to rebut Gross's counsel's assertion that the hiring of Charles Blue as a CEO and compliance officer by HOPE FCU was evidence the ACH transactions were a legitimate business venture, and that Gross sought to ensure that ACH processes were properly implemented by hiring Blue. This evidence included that Blue had no background in managing financial institutions, no prior experience with ACH processing, and no familiarity with the Bank Secrecy Act or compliance issues in general (Tr. 2501-02; Tr. 2895-96), as well as that Gross had undertaken no due diligence into Blue's background prior to hiring him, and thus was unaware of Blue's prior personal bankruptcy (Tr. 3745-46 (Gross Testimony)), a fact that would call into question his ability to run a financial institution (Tr. 2502 (Flok Testimony)). Further, the Government established that, despite the fact that HOPE FCU's contract with Blue was for a salary of $50,000 per year (*see* GX 6126; Tr. 2504)—which raised concerns for the NCUA since it was a sum greater than the credit union's net income of $38,735

for 2014—Gross and HOPE FCU never disclosed that Kapcharge was going to pay for the salary of Charles Blue. (Tr. 2505-06; Tr. 2896).[7]  A witness from the NCUA testified that the fact of this arrangement for Kapcharge to pay Blue's salary would have been of serious concern for the NCUA because large payments from one member of the credit union would risk "undue influence amongst the official of the credit union."  (Tr. 2897 (Adam Testimony)).

### c.    The Lies Told by Gross and Others to the NCUA

In order to move forward with the criminal arrangement between himself and the Collectables Club, Gross and his co-conspirators undertook significant efforts to lie to the NCUA and others so as to obfuscate the true nature of their bribery deal.  Not only did Gross never disclose to the NCUA the fact that Hope Cathedral had received payments as a result of the deal he had struck with Anthony Murgio, the Collectables Club, and Kapcharge, but Gross and his co-conspirators also engaged in a series of lies and misrepresentations about the Collectables Club and Kapcharge's relationship with HOPE FCU in order to avoid further scrutiny from the NCUA, lest their corrupt arrangement be discovered.

To begin, Gross misrepresented the location of the Collectables Club and its membership from the NCUA, because he understood the NCUA would have concerns regarding the eligibility of the new board members—based in Florida, Tennessee, and elsewhere—to be members of HOPE FCU, whose field of membership was limited to ties to Lakewood, New Jersey.  For instance, it was Gross's idea to time the resignation of legacy board members for a period of time after the

---

[7] To support the assertion that Kapcharge in fact paid for Blue's salary, the Government introduced bank and financial documents related to two wire payments, one in May 2015 for $50,000 and one in October 2015 for $30,000, from Kapcharge to HOPE FCU's bank account at Harmony Bank. Although the proceeds of these wires were represented to be "ACH Fees" (*see* GX 900 at 89; 790-A), they were in fact used in large part to pay Charles Blue through his charity, Blue's Youth City LLC.  (*See* GX 900 at 87-98).

Collectables Club members took control of the board of directors, because Gross understood that it "wouldn't look good" to the NCUA and their examiners if they were to "return a month later" to report the findings of their annual examination "and see a whole new board." (Tr. 1284-85 (Hill Testimony); GX 1108-A). Consequently, Gross and his co-conspirators undertook efforts to hide Collectables Club's control over HOPE FCU from the NCUA. These efforts included HOPE FCU's failure to disclose the change of composition of the Board in its NCUA profile for June 30, 2014 (filed on July 25, 2014) (GX 6111), or disclose the fact that its ACH transactions were being processed out of a branch office in Tallahassee Florida either in its NCUA profile for September 30, 2014 (filed on October 24, 2014) (*see* GX 6112 at 27), or to NCUA examiner Meg Flok at the time of her visit in November 2014 (*see* Tr. 2317-19).[8]  Nevertheless, the NCUA began to ask questions about the eligibility of Collectables Club, Kapcharge, and the other new members to the credit union, which caused concern from Gross, as he expressed to Anthony Murgio in an August 15, 2014 email: "Clearly all this activity has gotten the attention of the NCUA, the exact thing we did not want to happen. I have been with the CU for more than seven years and they have never come back a second time. And they are asking for new member information." (GX 1216-A).

It was only after the NCUA raised issues with regard to whether the Collectables Club board members fell within the field of membership in mid-September (*see* Tr. 2577-79; GX 6046) that HOPE FCU updated its profile to reflect the new board. (*See* GX 6112). As the Government established, although both Collectables Club and Kapcharge represented that they were both located at "virtual addresses" at 216 River Avenue, Lakewood, New Jersey, that building was not

---

[8] This is despite the fact that the NCUA requires certifications as to the accuracy of the profile, and that changes be made "within 10 days after the election or appointment of senior management or volunteer officials, or within 30 days of any change of the information in the profile." (GX 6111 at 1; GX 6112 at 1).

a functioning office for Collectables Club, Coin.mx, or Kapcharge, nor did any of their employees work at that location.  (*See, e.g.,* Tr. 495, 1491-92, 1505-06, 2461-63, 2521-22).  Gross was aware of the fiction of this office (*see* Tr. 3624-28) because it was he who suggested to Anthony Murgio prior to the June election that the Collectables Club use Kapcharge's Lakewood address "to have our bases covered . . . to point to a Lakewood address if asked" by the NCUA.  (GX 1167-A (email between Gross and Anthony Murgio discussing HOPE FCU's Tallahassee branch address); *see also* GX 1389-C (Anthony Murgio instructing Lebedev to change Collectables Club website to reflect sham Lakewood address)).  Gross, Anthony Murgio, and their co-conspirators continuously relied on this sham Lakewood "virtual address," shared by both Collectables Club and Kapcharge, as the basis to qualify the Collectables Club, its members, and Kapcharge for membership at HOPE FCU.[9]

The Government also presented evidence that Gross undertook efforts to create documentation to support these lies to the NCUA regarding both the Collectables Club and Kapcharge.  For instance, in August 2014, after the NCUA began to ask questions about the new members (*see* GX 1216-A), Gross instructed Collectables Club members, including Yuri Lebedev, to send in application paperwork and supporting documents that were backdated for May 17, 2014—prior to their election to the Board of Directors—for the NCUA at their next examination

---

[9] For instance, in September 2014, the NCUA expressly told Gross that even if Collectables Club was headquartered in Lakewood, New Jersey, an individual's membership in Collectables Club would not confer eligibility to be a member of HOPE FCU or to serve on its board if that individual did "not otherwise '[l]ive, work, worship, attend school, or volunteer' in Lakewood, New Jersey (GX 6047; Tr. 2580-85).  In October 2014, Gross represented to the NCUA that the Collectables Club employees worked at that location two weeks out of the month, which the NCUA stated would be sufficient so long as there was written documentation to that effect (Tr. 2585-89; GX 6022).  Nevertheless, Gross did nothing to rectify the fact that Collectables Club members were not in fact working part time out of the Lakewood location, instead waiting until mid-November to bring this concern of the NCUA's to Anthony Murgio's attention. (TG 53).

visit.  (*See* GX 1242-A, 1242-C, 1242-E).  Knowing that the NCUA might request of HOPE FCU documents regarding the new board members, Gross, Hill, and Murgio also worked in August and September 2014 to paper their lies with backdated application files and other documents in anticipation of the examiners' onsite visits.  (*See* Tr. 1443-47 (Hill traveled to New Jersey in September 2014 to put together new board member files in case the NCUA examiners sought to review them, despite the fact that "[a]ll of us should have done this in June," prior to their election); *see also* Tr. 1452-55, GX 2269, 2613 (creation of certified Board resolution designating Hill as having signatory power on behalf of the Board, even though the Board never so approved).  Among the efforts that the Gross, Murgio, and the Collectables Club members undertook to hide their corrupt arrangement was the creation of a false document stating that Collectables Club had been located at 216 River Avenue in Lakewood since April 2014, and changing the Collectables Club address in HOPE FCU's systems from West Palm Beach to the sham Lakewood address.  (GX 1352-C, 1352-D; Tr. 1490-95).

In November 2014, when NCUA examiner Meg Flok asked for the account opening documents for Kapcharge, Gross lied to her by stating the file was offsite at a storage facility (Tr. 2329 (Flok Testimony), when in reality he, Anthony Murgio, Mark Francis and the Collectables Club members were working to manufacture the supporting documentation to establish Kapcharge's eligibility in the credit union.  Gross, Murgio, and others orchestrated the backdating of application documents for May 23, 2014 for Mark Francis and Shoula Cohen's signatures,[10]

---

[10] These efforts to backdate documents were necessary because, contrary to Trevon Gross's explanation that the Kapcharge file mysteriously went missing at the time the NCUA asked for it and thus he needed to recreate the file (Tr. 3716-18), the record evidence established that there was no proper account opening file in November 2014.  At the time that Gross opened Kapcharge's operating account at HOPE FCU in May 2014, he did so only after receiving a Canadian driver's license for Mark Francis, without any other documents (GX 1146-A, 1146-B, 1147; *see also* GX 1235 (Gross asking Anthony Murgio in August 2014 for a filled out and executed application for

and changing Kapcharge's website to reflect the Lakewood "virtual office" and a phone number that would forward to Mark Francis if the NCUA were to call.  (*See* GX 4506 at PK 4083-4212 (WhatsApp conversation between Anthony Murgio and Mark Francis about efforts to trick NCUA examiner); GX 1665, 3565 (Gross asking for executed application from Mark Francis and Shoula Cohen, and executed copies sent back to Gross from Kapcharge); GX 6131 (Kapcharge account file provided to NCUA by HOPE FCU); GX 1291 (Lebedev setting up phone number to forward to Kapcharge's Canadian phone number)).   Anthony Murgio and Ricardo Hill also worked frantically to prepare board minutes for Meg Flok's visit, and to change Kapcharge's legal name and information in HOPE FCU's system to the sham Lakewood address and forwarding phone number.   (GX 4507 at PK 3925-38 (Hill WhatsApp)).   And despite the fact that the entire Collectables Club board was in town to meet in person with Gross, Gross and Anthony Murgio agreed that the Collectables Club should not stop by HOPE FCU lest the examiner ask questions about their operations.  (*See* GX 4510 at PK 3829-3848 (Gross WhatsApp)).   Because Gross knew that at no time did Kapcharge actually operate in Lakewood, New Jersey during all of calendar year 2014, he later instructed Charles Blue—the new CEO of HOPE FCU—to stop "pushing" the issue when Blue subsequently raised concerns upon his realization that HOPE FCU had been perpetually lying to the NCUA about that crucial fact.  (GX 3025; *see also* Tr. 1447-48 (Hill testifying that Gross represented to NCUA that Hill would be moving to New Jersey soon, even though he had no intention to do so).

---

Kapcharge, backdated to May 23, 2014, which was never provided)).  Thus, in Gross's haste to manufacture supporting documentation to provide to Flok, Gross mistakenly sent to Kapcharge application documents for United Advantage Northwest Federal Credit Union, not HOPE FCU, and then erred in correcting the executed version by whiting out certain references to UANW and changing them to reference HOPE FCU instead, but inadvertently failing to correct other references to UANW. (GX 1665, 3565, 6131).

Gross also understood that the NCUA would scrutinize the net worth ratio of HOPE FCU, which became severely undercapitalized as a result of the volume of ACH transactions for Kapcharge that Murgio and the new board had brought to the credit union, and the millions of dollars of daily wires that had to be transferred into HOPE FCU's accounts in order to cover that volume.  As a result, he undertook substantial efforts to ensure that, on the last day of the month of September 2014, the assets on the books of the credit union were lower than the true number. (GX 2166; Tr. 1395-97 (Hill Testimony)).   In a recorded phone conversation on or about September 15, 2014, between Gross, Murgio, Hill, and Mark Francis, Shoula Cohen, and Kevin Pepe from Kapcharge, Gross explained that as of September 30, they would have to move significant amount of funds out of Kapcharge's account into the HOPE FCU operating account, booked as income to the credit union, in order to show to the NCUA that the credit union would be adequately capitalized at the fiscal quarter's end.  At Gross's suggestion, the parties agreed that the plan was then to move those funds back into the Kapcharge account after the end of quarter, a plan about which Shoula Cohen voiced concerns about but ultimately agreed.[11]

 (GX 2502; 2502-T at 9-18).   And Gross, Ricardo Hill, and Kapcharge executed their plan. Kapcharge's account balance on HOPE FCU's books on September 30, 2014 was over $2.75 million dollars—which rendered HOPE FCU inadequately capitalized.  (*See* GX 709-A, at 7, 15 (Kapcharge 6527 statement)).   Gross told Kapcharge and Hill that they are not going to post

---

[11] Contrary to Gross's assertion that the Government's reliance of the phone transfer of $619,000 in its summation was somehow prejudicial to him, the phone transfer simply reflected the implementation of the plan to manipulate the September 2014 month-end financials that had been previously discussed between Gross, Murgio, Hill, and Kapcharge in the September 15, 2014 phone call.  Moreover, as the Court correctly ruled, defense counsel was on notice about evidence and arguments relating to the manipulation of the net worth ratio, in light of the documents and the discovery, including 3500 materials, for the Alloya witnesses in this case, (*See, e.g.*, Tr. 1749-50, 1760), as well as the Government's September 2016 motion *in limine*.

Kapcharge's incoming wire of $2.25 million that day, but wait until early October (GX 2163, 2166; *see also* GX 709-A at 16), and then after adjustments to ensure that the ACH transactions at Alloya would be covered, Gross noted that "we will work only with the 919k balance and bring it down to $300k." (GX 2163, *see also* GX 790-A at 15).  So, just as had been previously agreed in their mid-September phone call, at 3:37 PM on September 30, Kevin Pepe of Kapcharge requests that Gross and Hill transfer of $619,240.59 out of the Kapcharge account, and then on October 6, 2014—after the financial quarter's end—Shoula Cohen asks for that check to be canceled, which Gross responds will be done by the next morning.  (*See* GX 2173).  Thus, although the Kapcharge account as of September 30, 2014 should have reflected an additional $2.87 million dollars (representing the incoming wire transfer that was deliberately booked days later and the reversed check request), it instead reflected $300,020.59, which allowed HOPE FCU to falsely report to the NCUA in its 5300 Call Report that it was adequately capitalized at 12.03%. (GX 6103 at 14).

Nevertheless, because Gross mistakenly gave Meg Flok the October 2014 financials instead of the September 2014 during her November site visit (GX 6023, 6151 (October 31, 2014 Aries download); Tr. 2312-13, 2320-23 (Flok Testimony), *see also* Tr. 3708 (Gross Testimony)), Flok did a back-of-the envelope calculation and determined that the credit union was severely undercapitalized, at approximately 3.62% (Tr. 2323-26.  And despite the fact that she instructed Gross to cut off all of Kapcharge's ACH transactions on November 21 (Tr. 2506-07), a fact that Gross understood (*see* GX 4509 at PK 4176-81 (Gross explaining to Murgio on November 21, 2014 that NCUA "want Kapcharge cut off immediately until they say we can process for them")), Gross continued to allow ACH transactions through Kapcharge until mid-December, when the

NCUA reviewed statements and documents and realized HOPE FCU had been continuing to process ACH transactions for Kapcharge (Tr, 2506-07; *see also* Tr. 2597-99; Tr. 3714-15).[12]

### d.    Venue

For purposes of establishing venue, the Government called Andrew Levy, a witness from Bank of America, explained that both of the two initial $15,000 wire transfers that were sent from Murgio to the Hope Cathedral's account at PNC were made through the use of an account at the Federal Reserve Bank of New York, located in Manhattan (Tr. 1252-1254; GX 864), and that this information would be available to customers upon their request (Tr. 1250, 1259-60).  The parties also agreed upon a stipulation regarding the fact that a customer from PNC could have requested the same information establishing that the wire transfers had gone through the Southern District of New York.  (GX 4013).

The Government also introduced evidence regarding daily wire transfers that were sent by Kapcharge to HOPE FCU.  Specifically, in order ensure that there were sufficient funds to process ACH transactions, Kapcharge would wire funds into its HOPE FCU account on a daily basis. These wires would be sent through the use of HSBC Bank USA's account in New York, New York, and a daily wire confirmation was emailed to Gross, Murgio, Hill, and various Kapcharge employees (*See, e.g.*, GX 862, 2142-2, 2142-21; Tr. 1387-92).

John Rollins also testified as to a location analysis for both Gross's and Anthony Murgio's physical whereabouts during the relevant timeframe.  Rollins conducted an analysis of when Gross and Anthony Murgio were in the Southern District of New York, based on the locations listed for

---

[12] Although Gross testified that he misinterpreted Ms. Flok's instruction to end ACH processing to be limited to TransferWise processing (*see* Tr. 3714-15), that assertion is belied by Gross's contemporaneous communications to Anthony Murgio, indicating that the NCUA had instructed HOPE FCU to end all Kapcharge transactions, for all of its clients (including Transferwise) (*see* GX 4509 at PK 4176-81).

purchases and transactions each had made as reflected in bank and credit card statements, as well as documents from various businesses where the transactions were made.  Rollins stated that, as a result, he had determined that Gross was in the Southern District New York on at least seven different occasions between May 2014 and April 2015.  ((GX 900 at 104-112; *see also* GX 800-B, 811, 813-A, 814 (underlying bank and credit card statements); GX 761 (records from Marriott Hotels)).  Similarly, Rollins concluded that Antony Murgio was in the Southern District of New York on at least 15 different occasions.  (*See* GX 900 at 113-15; *see also* GX 850-B, 853-B, 855-B, 856-B, 857-B (underlying bank statements).

### 3.    The Defense Case

In addition to rigorous cross-examination, Gross put on an affirmative defense case.  He called U.S. Secret Service Special Agent Emily Beyer as a witness to impeach Freundt.  (*See* Tr. 3762-84).  And Gross himself testified.  Gross's defense was simple:  that he had been deceived by Michael Murgio and Anthony Murgio into thinking that this arrangement was a legitimate business deal, that he had forced Anthony Murgio out of the credit union upon realizing Murgio's true character, and that he had acted without corrupt intent throughout.  (*See generally* Tr. 3441-3585).  Gross also called several witnesses, each of which had no knowledge as to the underlying facts of the case but testified generally as to Gross's good character (*see generally* Tr. 3422-41), and introduced several exhibits in his defense.

### 4.    Summations

The Government in its summation framed its case as one that revolved around the operations of Coin.mx, and the agreement between Gross and the Collectables Club members to cede control of HOPE FCU in exchange for payments to HOPE Cathedral.  It began its summation as follows:

26

This is a case about the lies that were told to banks to allow an unlicensed Bitcoin exchange named Coin.mx and its owners and operators, like Yuri Lebedev, to process millions of dollars of illegal transactions for its customers.

This is also a case about the lies of a group of men, including Trevon Gross and Yuri Lebedev, who agreed to pay and receive bribes in exchange for taking over and running a credit union. This is also a case about a scheme in which Gross helped Lebedev and his cronies get elected to the board of directors of HOPE Federal Credit Union, so long as Gross' church got over $150,000 in corrupt payments, a scheme which Lebedev joined, so that Coin.mx could use HOPE FCU as a captive credit union to process its financial transactions without having to use any banks, and a scheme that allowed for Kapcharge, a Canadian-based processing company, to run tens of millions of dollars in ACH transactions, including for Coin.mx, through that small credit union.

And this is also a case about the lies that were told by Lebedev and by Gross to cover up their tracks, including lies to the federal regulators.

(Tr. 3875-76). The Government continued to describe the bribery scheme consistently that at its core was about the receipt of bribe payments at the request of Gross in exchange for handing over control of the credit union to the Collectables Club, in furtherance of its operations. For instance, it explained that the reason "Yuri Lebedev decided to join Anthony Murgio's plan to take over HOPE Federal Credit Union, because it would be a lot easier to run your own financial institution than to continue to trick other ones," as Lebedev did by participating in the bank and wire fraud schemes with which he was charged: "You could just sidestep all the scrutiny and the regulations that banks imposed if you simply owned your own credit union. It's precisely because Lebedev knew about all of these lies that were required to keep Coin.mx afloat that he decided to help bribe Trevon Gross." (Tr. 3897; *see also, e.g.*. Tr. 3876-77, 3897-88 ("Mr. Gross' demand for $50,000 in exchange for his credit union was not merely a bad moment for Gross and Lebedev. It was a criminal moment"); Tr. 3899 ("the scheme was pretty simple, for the Collectables Club members from Florida to bribe Gross so that he could join HOPE FCU . . . to take over control of that credit union so that they could use it to process their own transactions through a Canadian-based payment processing company called Kapcharge"); Tr. 3955 ("Gross gave complete control to Murgio,

Lebedev, and their motley crew, and the only reason Gross gave that control was because of the so-called donations to Hope Cathedral.").

The Government described Gross and HOPE FCU's involvement with Kapcharge's ACH risky transactions, and Gross's decision to allow HOPE FCU to continue to process these transactions, as the third reason to prove Gross's corruption as it related to the bribery charge.  (*See* Tr. 3940-50).  The Government explained that it was "not claiming that Gross or Lebedev are guilty of a crime or the crimes that they're charged with simply because they violated the NCUA regulations of how a credit union should be governed or any of the NACHA rules on ACH transactions.  But . . . the fact that both Gross and Lebedev ignored those rules and, thus, undermined the safety and soundness of HOPE FCU as board members so they could enrich themselves is evidence you can consider in determining whether they acted corruptly . . . [F]or Trevon Gross, that he would sacrifice the credit union that he was charged to run, so that his church could receive a sizeable donation."  (Tr. 3949).   The Government also explained that there was "nothing inherently wrong with deciding, for example, to process ACH transactions . .. on behalf of the international money transmitting business . . . processing for payday lenders who target the underbanked and the poor," but "what is illegal is when at least one reason Gross decided to process those tens of millions of dollars of transactions was because the church that he was the lead pastor for received over $160,000 in money from two members of the credit union—that's Collectables Club and Kapcharge—who wanted those ACH transactions to happen."  (Tr. 3952-53).

The Government further argued that Gross's corruption could be established because of "all the lies that they told; lies to other credit unions through which they were trying to do business with those ACH transactions such as Alloya and United Advantage; lies to Congressman Smith's

office; and most importantly here, lies and omissions directly to the NCUA." (Tr. 3962). The Government then went through a litany of lies that Gross told to the NCUA, including (1) lies covering up the fact of "the $160,000 in payments to Hope Cathedral that were the reason that Gross put the Collectables Club members on the board" (Tr. 3963-64); (2) lies about Anthony Murgio's control over HOPE FCU, despite not being on the board (Tr. 3964); (3) lies about Collectables Club's location; and relatedly (4) lies about Kapcharge's location—both at the same sham Lakewood address (*see* Tr. 3965-84); (5) lies about the fact that HOPE FCU was operating its ACH processing out of the Collectables Club/Coin.mx office in Tallahassee, Florida (Tr. 3991-93); and (6) lies to the NCUA about HOPE FCU's net worth ratio and capitalization (Tr. 3993-4000). The Government's summation included, to support its argument about these categories of lies, an explanation of the behind the scenes actions that Gross, Anthony Murgio, and Collectables Club members undertook when NCUA Examiner Meg Flok was onsite at HOPE FCU in November 2014 (including creating documents, editing websites, and having the Collectables Club members avoid being onsite at the same time as Flok), which was an effort on Gross and his co-conspirators part to avoid the NCUA's scrutiny regarding the true nature of the deal between the Collectables Club, Kapcharge, and HOPE FCU (Tr. 3970-79).

Gross's counsel, in his summation, argued that the Government had failed to establish Gross's corrupt intent. Gross began with directing the jurors to the S6 Indictment itself, emphasizing that it alleged that "Murgio, Lebedev, and their coconspirators operated HOPE FCU as a captive bank for their unlawful Bitcoin exchange," and asserting that there was no corrupt intent on Gross's part because there was no evidence that Gross knew Coin.mx was an unlicensed Bitcoin exchange (Tr. 4050-52). The crux of the defendant's summation essentially focused on whether the Government had adequately established corrupt intent, or rather whether instead the

evidence was consistent with Gross's "good faith," (Tr. 4054-62), and pointed to Gross's concerns about the ACH volume in the November 2014 meeting as evidence of that good faith (Tr. 4067-69).  Gross counsel also spent considerable effort to undermine the testimony of Rollins and his tracing analysis (Tr. 4069-76), to attack the credibility of the Government's cooperating witnesses (Tr. 4078-82), to attempt to reconcile Gross's actions and statements vis-à-vis the NCUA with his purported good faith (Tr. 4083-91, 4113-16), and to argue that venue had not been adequately established (Tr. 4122-23).

####  5.  The Jury Charge

In charging the jury,[13] the Court first explained both Counts Four and Five—the substantive bribery charges, and two of the four objects of the conspiracy charged in Count Three—and then proceeded to explain Count Three, the conspiracy count.  Specifically, the Court instructed, in the context of Count Four, that the offer or promise of something of value to Trevon Gross must have been made by Lebedev "knowingly and corruptly and with the intent to influence or reward Trevon Gross in connection with any business or transaction of HOPE Federal Credit Union."  (Tr. 4177-78).  Specifically, the Court stated that "[t]o act corruptly means to act voluntarily and deliberately with the bad purpose of accomplishing either an unlawful end or result, or a lawful end or result by some unlawful method or means.  This involves conscious wrongdoing, or as it sometimes has been expressed, a bad or evil state of mind.  The motive to act corruptly is ordinarily a hope or expectation of either financial gain or some other benefit to oneself or some profit or benefit to

---

[13] The Court charged the jury using a redacted S6 Indictment, which renumbered certain of the charges to reflect only those counts as against Gross and Lebedev.  (*See generally* ECF No. 442). As is relevant here, the jury charge thus referenced the conspiracy charge as Count One (originally Count Three in the S6 Indictment); the making of corrupt payments charge as Count Two (originally Count Four); and the receipt of corrupt payments charge as Count Three (originally Count Five).  References to the charges contained herein refer to the counts as numbered in the S6 Indictment.

another." (Tr. 4178). The Court referred to this formulation as well in instructing the jury as to Count Five. (Tr. 4179-80).

The Court then proceeded to charge the jury with regard to Count Three—the conspiracy charge—as follows:

> Count [Three] charges Yuri Lebedev and Trevon Gross with conspiring with others, from in or about April 2014 to in or about 2015, to achieve four lawful objections in an effort to further the operations of Coin.mx or the Collectables Club: Number one, to make corrupt payments to Trevon Gross with the intent to influence Trevon Gross in connection with the business of HOPE FCU; number two, to have Trevon Gross receive or agree to receive corrupt payments with the intent to be influenced in connection with the business of HOPE FCU; number three, to obstruct an examination of HOPE FCU by the NCUA; and number four to make false statements to the NCUA in connection with the NCUA's examinations of HOPE FCU.

(Tr. 4182). The Court went on to explain that the four objects of the alleged conspiracy were: (1) "to make corrupt payments to Trevon Gross with the intent to influence Trevon Gross in the business of HOPE Federal Credit Union, in violation of Title 18, United States Code, Section 215(a)(1)"; (2) "to have Trevon Gross receive or agree to receive the corrupt payments with the intent to be influenced in the business of HOPE Federal Credit Union, in violation of Title 18, United States Code, Section 215(a)(2)"; (3) "to obstruct an examination of HOPE Federal Credit Union by the National Credit Union Administration (NCUA), in violation of Title 18, United States Code, Section 1517"; and (4) "to make false statements to the NCUA, in violation of Title 18, United States Code, Section 1001." (Tr. 4182-83).

Finally, the Court instructed as to venue. The Court explained to the jury that it must decide "as to each count, whether any part of the offense reached within . . . the Southern District of New York" by a "preponderance of the evidence." (Tr. 4217-19). It further explained that, as to the conspiracy charges, "the government need not prove that any crime was completed in this district or that the defendants or any of their coconspirators were physically present here. Rather, venue

is proper in this district if any of the defendants or coconspirators caused any act or even to occur in this district in furtherance of the offense, and it was reasonably foreseeable to the defendant that you are specifically considering that the act would take place" in the district.  (Tr. 4218).  As to the substantive counts, the Court instructed that the "government again need not prove that any crime was completed in this district or that the defendant in question was physically present here. Rather, venue is proper in this district provided that any act in furtherance of the essential conduct of the crime took place" in the district, noting that "the defendant you are considering need not have physically intended to cause an act or event to happen in this district or even know that he was causing an act or event to happen here as long as it was reasonably foreseeable to that specific defendant that such act would occur in this district."  (Tr. 4218-19).

## II.    Generally Applicable Law

### A.    Federal Rule of Criminal Procedure 29

"Under Rule 29, a district court will grant a motion to enter a judgment of acquittal on grounds of insufficient evidence if it concludes that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt."  *United States* v. *Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (citing Fed. R. Crim. P. 29(a), (c); *United States* v. *Reyes*, 302 F.3d 48, 52 (2d Cir. 2002)).  "A defendant who challenges the sufficiency of the evidence to support his conviction 'bears a heavy burden.'"  *Id.* (quoting *United States* v. *Finley*, 245 F.3d 199, 202 (2d Cir. 2001)). "Not only must the evidence be viewed in the light most favorable to the Government and all permissible inferences drawn in the Government's favor, but the jury verdict must be upheld if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *Id.* (quoting *Jackson* v. *Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original) (internal citation and quotation marks omitted)).  "In other words, a court may grant a judgment

of acquittal only if the evidence that the defendant committed the crime alleged was nonexistent or . . . meager." *Id.* (internal quotation marks omitted; ellipses in original).

The Second Circuit has "emphasized that courts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal." *Id.* "Rule 29(c) does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States* v. *Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (internal quotations omitted). "Indeed, it is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence." *Jackson*, 335 F.3d at 180 (citing *United States* v. *Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995)). "The traditional deference accorded to a jury's verdict 'is especially important when reviewing a conviction for conspiracy . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'" *Id.* (quoting *United States* v. *Pitre*, 960 F.2d 1112, 1121 (2d Cir. 1992) (ellipses in original)).

**B.     Federal Rule of Criminal Procedure 33**

Motions for a new trial pursuant to Rule 33 "are disfavored in [the Second] Circuit." *United States* v. *Figueroa*, 421 F. App'x 23, 24 (2d Cir. 2011) (quoting *United States* v. *Gambino*, 59 F.3d 353, 364 (2d Cir. 1995)). Accordingly, "[t]he ultimate test [on a Rule 33 motion] is whether letting a guilty verdict stand would be a manifest injustice." *United States* v. *Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (quoting *United States* v. *Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)). This Court—after examining the totality of the evidence and considering objectively all of the facts and circumstances—must exercise its authority under Rule 33 "sparingly" and in "the most extraordinary circumstances." *United States* v. *Padilla*, 511 F. App'x 8, 10 (2d Cir. 2013) (quoting *United States* v. *Ferguson*, 246 F.3d at 134). Put another way, a motion pursuant to Rule

33 should only be granted if the Court finds "a real concern that an innocent person may have been convicted." *United States* v. *Aguiar*, 737 F.3d at 264 (quoting *Ferguson*, 246 F.3d at 134).

## III.  Argument

### A.  The Trial Proof Did Not Constructively Amend or Prejudicially Vary from the Indictment

Gross contends that the evidence presented at trial establishing Kapcharge's role in the conspiracy and HOPE FCU's processing of ACH transactions for Kapcharge resulted in a constructive amendment of, or in the alternative, a prejudicial variance from, the S6 Indictment. This claim has no merit. Such evidence was fairly encompassed by the S6 Indictment, which charged a single broad scheme alleging, among other things, that Gross received corrupt payments from co-conspirators to influence his decisionmaking in connection with HOPE FCU's business. To the extent there was any variance from the S6 Indictment, Gross was not prejudiced because the Government disclosed months before trial that it planned to offer such evidence at trial.

#### 1.  Applicable Law

##### a.  Constructive Amendment

"To prevail on a constructive amendment claim" under the Fifth Amendment's Grand Jury Clause, "a defendant must demonstrate that the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment." *United States* v. *D'Amelio*, 683 F.3d 412, 416 (2d Cir. 2012) (emphasis in original and internal quotation marks omitted); *see also United States* v. *Mollica*, 849 F.2d 723, 729 (2d Cir. 1988). So long as "the defendant was given notice of the core of criminality to be proven at trial," the Second Circuit "has consistently permitted significant

flexibility in proof." *United States* v. *D'Amelio*, 683 F.3d at 417.  As "proof at trial need not, indeed cannot, be a precise replica of the charges contained in an indictment," *United States* v. *Heimann*, 705 F.2d 662, 666 (2d Cir. 1983), it is well established that "not all modifications constitute constructive amendments." *United States* v. *Salmonese*, 352 F.3d 608, 621 (2d Cir. 2003).  The "core of criminality" of which a defendant must have notice is defined as "the essence of a crime, in general terms," and not "the particulars of how a defendant effected the crime." *D'Amelio*, 683 F.3d at 417-18.  Thus, "there is no constructive amendment when the proof at trial does no more than supply the particulars." *United States* v. *Daugerdas*, 837 F.3d 212, 225 (2d Cir. 2016).

An indictment has not been constructively amended where the allegations in the indictment and the proof at trial both relate to a "single set of discrete facts," or form "part of a single course of conduct" with the same "ultimate purpose." *D'Amelio*, 683 F.3d at 419-21.  In contrast, an indictment may be found to have been constructively amended when there is a "substantial likelihood" that "the jury convicted based on a complex of facts distinctly different from that which the grand jury set forth in the indictment." *Id.* at 416, 419.

### b.      Prejudicial Variance

In contrast to a constructive amendment error, a variance occurs "when the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment." *D'Amelio*, 683 F.3d at 417 (citing *United States* v. *Salmonese*, 352 F.3d at 621).  The "relevant inquiry" in determining whether there has been such a variance focuses on whether "the evidence adduced at trial established facts different from those alleged in the indictment." *United States* v. *Heimann*, 705 F.2d at 667.

"A defendant alleging variance must show 'substantial prejudice' to warrant reversal." *United States* v. *Rigas*, 490 F.3d 208, 226 (2d Cir. 2007) (quoting *United States* v. *McDermott*,

918 F.2d 319, 326 (2d Cir. 1990)).   A variance is prejudicial only when it "infringes on the 'substantial rights' that indictments exist to protect—to inform an accused of the charges against him so that he may prepare his defense and to avoid double jeopardy."   *United States* v. *Dupre*, 462 F.3d 131, 141 (2d Cir. 2006) (citation and internal quotation marks omitted); *see also United States* v. *Mucciante*, 21 F.3d 1228, 1236 (2d Cir. 1994) ("A variance is immaterial—and hence not prejudicial—where the allegation and proof substantially correspond, where the variance is not of a character that could have misled the defendant at the trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." (citation and internal quotation marks omitted)).

Although "the analysis of a constructive amendment and the analysis of a variance in proof differ to an extent," *D'Amelio*, 683 F.3d at 417, and the line between the two may be hard to draw, *United States* v. *Rigas*, 490 F.3d at 228, "the constitutional concerns underlying both are similar," *D'Amelio*, 683 F.3d at 417, namely to ensure that the defendant receives proper "notice" of the charges against him and to guard against "double jeopardy."  *Id.*

### 2.   Discussion

Gross's constructive amendment and prejudicial variance claims fall into two categories. First, Gross complains that the Government proved a different bribery scheme than the one charged in the Indictment by introducing evidence of Kapcharge's role in the bribe payments and evidence of the ACH processing that HOPE FCU did for Kapcharge and its clients.   Second, Gross complains that the Government established different misrepresentations than those set forth in the Indictment.   Neither of Gross's theories has any merit.

### a.   The Indictment's Core of Criminality

As noted above, the core of criminality of an offense "involves the essence of a crime, in general terms; the particulars of how a defendant effected the crime falls outside that purview."

*D'Amelio*, 683 F.3d at 418.  Here, as it pertains to Gross, the S6 Indictment sets out a broad core of criminality.  The S6 Indictment describes the participants in the scheme to include Murgio, Lebedev, Gross—and repeatedly, "their co-conspirators" or "others known and unknown." (Indictment ¶¶ 12-15, 22-24, 27(f)).[14]  The S6 Indictment alleges that from April 2014 to 2015, Gross and his co-conspirators agreed that corrupt payments would be made to (and received by) Gross with the intent to influence Gross (or with the intent for Gross to be influenced) "in connection with a business and transaction" of HOPE FCU; that the NCUA's examination of HOPE FCU would be obstructed; and that false statements would be made to the NCUA. (Indictment ¶¶ 23-26).

Thus, the core of criminality in the S6 Indictment is a scheme among Murgio, Lebedev, Gross, and their co-conspirators, from in or about April 2014 to in or about 2015, to have corrupt payments made to Gross (and for Gross to receive such corrupt payments) in exchange for influencing the decisionmaking of Gross in connection with the business of HOPE FCU, and to obstruct and make false statements to the NCUA in connection with the NCUA's examinations of HOPE FCU.

####   b.    The Government's Trial Proof and Arguments Regarding the Bribery Scheme Were Consistent with the S6 Indictment.

Gross principally argues that the S6 Indictment was constructively amended by the extensive proof at trial that Gross received "payments from Kapcharge in exchange for influencing

---

[14] The S6 Indictment was not constructively amended merely because the trial established that individuals affiliated with Kapcharge were among those unnamed co-conspirators.  *See United States* v. *Millar*, 79 F.3d 338, 345 (2d Cir. 1996) (no constructive amendment to conspiracy charge where overt act could not have been committed by any defendant named in the indictment, because indictment charged conspiracy with "others unknown"); *Fama* v. *United States*, 901 F.2d 1175, 1177 (2d Cir. 1990) (no constructive amendment to continuing criminal enterprise count where the defendant's plea allocution identified persons he managed, none of whom were named in the indictment, because the indictment referenced "other persons" and "others known and unknown").

ACH processing." (Gross Mot. 24). According to Gross, this proof established "an alternative *quid pro quo* bribery scheme [that] appeared nowhere in the Indictment." (Gross Mot. 25). Contrary to Gross's claim, both halves of this purportedly separate *quid pro quo*—the payments from Kapcharge and the ACH processing for Kapcharge—fall within the S6 Indictment's core of criminality.

First, proof of Kapcharge's specific role in funding the bribe payments to Gross is encompassed by the S6 Indictment. The S6 Indictment includes an explicit allegation that Murgio "*and his co-conspirators*, at GROSS's direction, paid over $150,000 in bribes to bank accounts under GROSS's control." (S6 Indictment ¶ 13 (emphasis added)). The Indictment also identifies, among the overt acts in furtherance of the conspiracy, several specific bribe payments that Murgio "caused . . . to be transferred" to Gross. (S6 Indictment ¶ 27(c)-(e), (h), (j)). Nothing in these allegations precludes Kapcharge's involvement in the payments (such as if the S6 Indictment said that Murgio alone paid the bribes or that only co-conspirators affiliated with Collectables Club or who served on the HOPE FCU board were involved in paying the bribes). And indeed, the very bribe payments shown at trial to have been funded by Kapcharge are among the payments identified in the S6 Indictment (S6 Indictment ¶ 27(c)-(e)) and documentation for which was produced in pretrial discovery. Thus, the proof at trial that Kapcharge funded the bribe payments "d[id] no more than supply the particulars" of the S6 Indictment's allegations regarding those payments. *United States* v. *Daugerdas*, 837 F.3d at 225.

To be sure, the Government also offered evidence that after the falling out between Gross and the Collectables Club in late 2014, Kapcharge sent HOPE FCU additional payments that largely went to pay Charles Blue's salary. That evidence likewise is encompassed within the allegation that Murgio "*and his co-conspirators*, at GROSS's direction, paid over $150,000 in

bribes to bank accounts under GROSS's control."  (Indictment ¶ 13 (emphasis added)).  But in any event, the Government did not rely on the additional Kapcharge payments for Blue's salary to establish a separate *quid pro quo*.[15]  The Government instead offered proof of these payments, in conjunction with evidence that they were concealed from the NCUA, to help prove Gross's corrupt intent—and in particular to rebut the assertion during defense counsel's opening statement that the hiring of Blue as CEO of HOPE FCU showed Gross's non-corrupt intent.  Thus, the evidence of these additional payments from Kapcharge to Gross does not support Gross's constructive amendment claim.  *See United States* v. *Writers & Research*, 113 F.3d 8, 13 (2d Cir. 1997) (no constructive amendment where, although the indictment alleged distribution of an unapproved drug, evidence of mislabeling permitted because it "went to [the defendant's] intent in light of his proffered defense that he had purely philanthropic motives and lacked any intent to defraud").

Second, evidence adduced at trial that HOPE FCU processed ACH transactions for Kapcharge—and that Gross was involved in that processing—is likewise encompassed by the S6 Indictment.  As discussed above, the core of criminality of the S6 Indictment is a scheme to pay Gross bribes to influence his decisionmaking with respect to HOPE FCU's business.  It cannot be disputed that HOPE FCU's processing of ACH transactions for Kapcharge was part of HOPE FCU's business.  Thus, evidence that Gross was making decisions regarding HOPE FCU's ACH business, after having entered into the bribery scheme, was direct proof of the core of criminality of the S6 Indictment.  *See United States* v. *Skelly*, 442 F.3d 94, 99 (2d Cir. 2006) (no constructive amendment where the indictment generally alleged that the defendant employed a variety of fraudulent sales practices but did not specify the particular sales practice proved at trial).

---

[15] For example, in its summations, the Government did not include the value of Kapcharge's payment of Blue's salary when discussing the total bribe payments.

Put another way, ACH processing activities for Kapcharge were overt acts in furtherance of the charged conspiracy.  Under "well-established" law, the jury was free to rely on evidence of overt acts not specified in the S6 Indictment.  *United States* v. *Milstein*, 401 F.3d 53, 70-71 (2d Cir. 2005) (noting that the defendant had notice of such evidence more than five months before trial—and thus could make no claim of prejudice).  Such reliance on uncharged overt acts does not give rise to constructive amendment.  *See United States* v. *Stitsky*, 536 F. App'x 98, 102, 103 n.3 (2d Cir. 2013) (fraudulent acts "not specifically identified in the indictment as overt acts in furtherance of the scheme" nevertheless "fall squarely within the charged scheme"—and thus are admissible as direct evidence of the conspiracy and do not give rise to constructive amendment (internal quotation marks and brackets omitted)); *United States* v. *Salmonese*, 352 F.3d at 621 (no constructive amendment where Government proved "unalleged overt acts" in furtherance of charged scheme).

Gross seeks to avoid that conclusion by arguing that the core of criminality is much narrower:  namely, a scheme to exchange corrupt payments for something more specific—the takeover of the HOPE FCU board—rather than to influence Gross's decisionmaking about HOPE FCU's business more generally.  (Gross Mot. 24).  But the S6 Indictment's allegations undermine Gross's claim.  The S6 Indictment alleges that after Gross helped install Murgio's co-conspirators (including Lebedev) onto the HOPE FCU board, Gross and his co-conspirators made misrepresentations to the NCUA about the new board members and about the financial health of HOPE FCU, and Murgio, Lebedev, and others continued to make efforts to acquire control from Gross.  (S6 Indictment ¶¶ 14, 15(a)-(b), 27(f)-(g)).  These allegations necessarily imply that even after Murgio's associates were elected to the board, Gross was continuing to act and make decisions on behalf of HOPE FCU.  *Rigas*, 490 F.3d at 229 ("[W]e must read an indictment to

include facts which are necessarily implied by the specific allegations made." (quotation marks omitted)).   The S6 Indictment thus put Gross on notice that the core of criminality involved a scheme to influence Gross's decisionmaking regarding HOPE FCU's business generally, and not merely to take over the board.

Furthermore, in determining what is "encompassed in the 'core of criminality' charged in the indictment," the Court may consider whether the defendant was actually "surprised" by the disputed evidence at trial.  *D'Amelio*, 683 F.3d at 422 (while rejecting constructive amendment claim, relying on the fact that "there is no evidence, much less any argument, that [the defendant] was 'surprised' by [the disputed] evidence . . . introduced against him").   For the reasons set forth below in the discussion of prejudicial variance, Gross cannot claim to have been "surprised" by the evidence of ACH processing for Kapcharge.

Gross offers an alternative theory, arguing that because the S6 Indictment "centered on unlawful Bitcoin transactions," it was constructively amended by proof that HOPE FCU processed ACH transactions for Kapcharge that specifically involved Transferwise and Wakpamni (or other payday lenders) rather than Coin.mx.  (Gross Mot. 27).   But the S6 Indictment's discussion of Coin.mx as it relates to the bribery scheme is best understood as background on why the Collectables Club approached HOPE FCU and an explanation of the motive that drove Murgio and Lebedev (and their co-conspirators on the paying side of the bribery scheme) to acquire control of HOPE FCU.   They sought "to evade scrutiny" about, and "to facilitate the operation of," Coin.mx.  (S6 Indictment ¶ 12).   But the S6 Indictment nowhere alleges that Murgio, Lebedev, and their co-conspirators sought to acquire and maintain control of, and to operate, HOPE FCU *solely* in furtherance of Coin.mx.

Nor is the motivation to further Coin.mx an essential part of the alleged scheme: indeed, some paragraphs reiterate that the bribe payers sought to acquire control of HOPE FCU in order to further Coin.mx (S6 Indictment ¶¶ 14, 27(a)), while other paragraphs omit that motive (S6 Indictment ¶¶ 27(f)-(g)).  The S6 Indictment alleges, moreover, that Gross acted with a different motive: financial gain.  For example, it alleges that Gross helped the others take control of HOPE FCU "in exchange for bribes" that he "directed . . . to bank accounts under [his] control."  (S6 Indictment ¶ 12).  The very next paragraph reiterates Gross's financial motivation:  "GROSS, in turn, spent proceeds from the bribes on personal expenses, including payments for his personal credit cards." (*See* S6 Indictment ¶ 13).

As the Second Circuit has recognized, "'allegations in an indictment that go beyond the essential elements which are required for conviction do not increase the Government's burden.'" *United States* v. *Jespersen*, 65 F.3d 993, 1001 (2d Cir. 1995) (no constructive amendment for charge of obstructing a grand jury investigation; indictment's allegation that the defendant "created" a false document in response to subpoena need not be proved).[16]  Because the motive to further Coin.mx is not an essential element of the charged conspiracy, the allegations concerning that motive do not narrow the scope of the conspiracy.  The Government was free to offer evidence of ACH transactions involving entities other than Coin.mx (such as Transferwise and Wakpamni

---

[16] *See also United States* v. *Mucciante*, 21 F.3d 1228, 1235 (2d Cir. 1994) (no constructive amendment for charge of uttering counterfeit obligations; proof of a victim different from the one specified in the indictment did "not modify an 'essential element' of the crime"); *United States* v. *Rosenthal*, 9 F.3d 1016, 1022-23 (2d Cir. 1993) (no constructive amendment for charge of bribing a benefit plan official; indictment's allegation that the bribe was "false and fraudulent" need not be proved); *United States* v. *Helmsley*, 941 F.2d 71, 92 (2d Cir. 1991) (indictment's allegation that the defendant fraudulently omitted "substantial" items of income was "surplusage without legal significance" because substantiality is not an element); *United States* v. *Attanasio*, 870 F.2d 809, 816 (2d Cir. 1989) (holding, with respect to a conspiracy to defraud the United States, that allegations of money laundering in the "means" portion of an indictment "add nothing but gloss to the alleged conspiracy, and they need not be proved").

or other payday lenders), and there was no constructive amendment.  *See United States* v. *Banki*, 685 F.3d 99, 119 (2d Cir. 2011) (no constructive amendment where the indictment alleged one motive for a false statement and at trial the Government "suggested an additional motive for the false statement").  Put another way, even without the motive to further Coin.mx, it is clear that Gross "'was convicted of *conduct* that was the subject of the grand jury's indictment.'"  *Id.* (quoting *Milstein*, 401 F.3d at 65) (emphasis in *Banki*).  Nor can Gross claim surprise.  *See D'Amelio*, 683 F.3d at 422 (while rejecting constructive amendment claim, relying on the fact that "there is no evidence, much less any argument, that [the defendant] was 'surprised' by [the disputed] evidence . . . introduced against him").

Finally, it was appropriate for the jury to consider proof of Gross's involvement in HOPE FCU's processing of high volumes of risky ACH transactions for Kapcharge for independent reasons, including as evidence of the change in control of HOPE FCU that was explicitly described in the S6 Indictment and as proof of Gross's corrupt intent.  At bottom, ACH processing for Kapcharge was part of the "same elaborate scheme" that was charged in the Indictment, and there was no constructive amendment.  *United States* v. *Dupre*, 462 F.3d 131, 140-41 (2d Cir. 2006).

### c.    The Government's Trial Proof and Argument Regarding Misrepresentations to the NCUA Were Consistent with the S6 Indictment.

Gross also claims that the Government "impermissibly broadened the misrepresentations alleged in the Indictment."  (Gross Mot. 29).  Specifically, Gross contends that while the S6 Indictment alleged "material misrepresentations to the NCUA about the installation of Lebedev and other Board members selected by Murgio on the board of Hope FCU, and the eligibility of Lebedev and other Board members to serve as Board members of Hope FCU," at trial the Government also argued that Gross "lied about what Kapcharge was, whether it was based in New Jersey, and what all those millions of dollars in transactions were for", that Gross made alleged

misrepresentations about whether a payday lender (Wakpamni) was in the field of membership, and that Gross "cooked the books by manipulating the net worth ratio with respect to Kapcharge's accounts." (Gross Mot. 29). Once again, Gross's claim has no merit.

The S6 Indictment charges Gross with conspiring with others to, among other things, obstruct an examination of HOPE FCU by the NCUA, in violation of 18 U.S.C. § 1517, and make false statements to the NCU, in violation of 18 U.S.C. § 1001. (S6 Indictment ¶¶ 25-26). "When the crime charged involves making false statements, the core of criminality is not the substance of the false statements but rather that knowing falsehoods were submitted." *United States* v. *Rigas*, 490 F.3d 208, 229 (2d Cir. 2007) (quotation marks omitted). Specific misstatements are simply "the means by which the offense was committed," *United States* v. *Bernstein*, 533 F.2d 775, 787 n.9 (2d Cir. 1976), and therefore the indictment is "not required to specifically denominate the substance of what was concealed," *United States* v. *Sindona*, 636 F.2d 792, 797 (2d Cir. 1980). When the Government offers evidence of different false statements than those alleged in the indictment, it does not "alter[] an essential element of the charge," and there is no constructive amendment. *United States* v. *Kaplan*, 490 F.3d 110, 129 (2d Cir. 2007) (quotation marks omitted). Thus, for example, where the trial evidence concerned seven false statements, only one of which was specified in the indictment as clarified by the bill of particulars, the Second Circuit rejected a constructive amendment claim "because the Government proved the essential elements of the crime charged in Count Seven—albeit with different proof." *Id.*

Here, the S6 Indictment alleges that "in furtherance of the scheme to facilitate the takeover of HOPE FCU by" Murgio, Lebedev, and their co-conspirators, Murgio, Lebedev, and Gross obstructed an examination of HOPE FCU by the NCUA. (Indictment ¶ 15). The S6 Indictment then offers several "example[s]" of such obstruction, including material misrepresentations and

omissions about "the installation of LEBEDEV and other Board members selected by MURGIO on the Board of HOPE FCU"; attempts to mislead the NCUA about "the financial health of HOPE FCU and the eligibility of LEBEDEV and the other Board members selected by MURGIO to serve as Board members of HOPE FCU"; and false statements that "the 'Collectables Club' was 'headquartered' in Lakewood, New Jersey." (Indictment ¶ 15(a)-(c)). The Government was not required to limit its proof of Gross's obstruction and false statements to those specific examples, because "the core of criminality is not the substance of th[ose] false statements" in particular, but rather the very fact "that knowing falsehoods were submitted." *United States* v. *Rigas*, 490 F.3d at 229 (quotation marks omitted). Thus, the Government was entitled to prove the charge "with different proof," including the additional misrepresentations about which Gross complains. *See United States* v. *Kaplan*, 490 F.3d at 129.

Furthermore, Gross should not be heard to complain about any purported lack of notice with respect to these misrepresentations. All of them are encompassed within the S6 Indictment's general allegation that Gross and his co-conspirators obstructed the NCUA's examination of HOPE FCU "in furtherance of the scheme to facilitate the takeover of HOPE FCU by" Murgio, Lebedev, and their co-conspirators. (S6 Indictment ¶ 15). In addition, several of the complained-of misrepresentations are either encompassed by or similar to the specific examples of misrepresentations set forth in the S6 Indictment. For example, the S6 Indictment's allegations of misrepresentations regarding the "eligibility" of individuals to serve as HOPE FCU board members and about whether the Collectables Club was "'headquartered' in Lakewood, New Jersey" (S6 Indictment ¶¶ 15(b)-(c)) put Gross on notice of similar misrepresentations about the eligibility of Kapcharge and Wakpamni—especially given that the misrepresentations involved the same field of membership issue and (in the case of Kapcharge) the same "virtual office" address

45

in Lakewood that Gross himself suggested that Collectables Club use.   In addition, the Indictment's allegation of misleading statements about "the financial health of HOPE FCU" (S6 Indictment ¶ 15(b)) put Gross on notice of misrepresentations about the high volume of ACH transactions the credit union processed for Kapcharge (and the consequent effect on net worth ratio)—because those transactions were risky and therefore put the credit union at risk.

> **d.    The Cases Cited by Gross Fail to Support His Constructive Amendment Claim.**

Two leading constructive amendment decisions that Gross cites in support of his claim (Gross Mot. 30-31) illustrate how extreme the difference must be between an indictment and the proof at trial to sustain a constructive amendment claim.   The claimed deviation between the Indictment and the proof in this case falls far short of the standard set in those decisions.

In *Stirone* v. *United States*, 361 U.S. 212 (1960), the indictment alleged that the defendant extorted the owner of a concrete manufacturing plant and thereby interfered with the importation into the state of sand that was used to manufacture concrete at the plant, in violation of the Hobbs Act.  *Id.* at 213.  The indictment also alleged that the plant owner had a contract to supply concrete to be used to build a steel mill, but it did not allege any interference with commerce in steel.  *Id.* These allegations could not "fairly be read" to charge interference with shipping of steel out of the state.  *Id.* at 217.   Nevertheless, the proof at trial included not only evidence of sand importation but also evidence that the steel mill would produce steel to be shipped to other states.  *Id.* at 214. And the jury was instructed that it could find the interstate commerce element of the offense based on either the importation of sand into the state to make concrete or the use of the concrete to construct a steel mill that would manufacture "articles of steel" to be shipped in interstate commerce.  *Id.*  This constituted a constructive amendment because there was no way to know whether the grand jury "would have been willing to charge that [the defendant's] conduct would

interfere with interstate exportation of steel from a mill later to be built with [the concrete plant's] concrete." *Id.*; *see also id* at 219 (observing that the steel shipping theory depended on "a nonexistent steel mill"). Furthermore, the indictment's allegation regarding the importation of sand could not be treated as mere "surplusage" because it went to an "essential element" of the Hobbs Act: interference with interstate commerce. *Id.* at 218.

*United States* v. *Zingaro*, 858 F.2d 94 (2d Cir. 1988), is similar. In *Zingaro*, the defendant was charged with, among other things, a RICO conspiracy based on loansharking and unlawful debt collection in connection with illegal gambling at Yonkers "social clubs." *Id.* at 96. With respect to loansharking, the indictment was "drawn very specifically to cover only loans made in connection with the Yonkers social club gambling activities." *Id.* at 100. With respect to unlawful debt collection, the indictment similarly "detail[ed] the Yonkers social club debt collections." *Id.* at 101. These "highly specific allegations" left "no room" for the defendant to be convicted based on loans "unrelated to the Yonkers gambling business." *Id.* at 100-01; *see also id.* at 103 (the indictment gave "no inkling that [the defendant] was charged with extortions unrelated to the activities of the Yonkers social clubs"). But the trial featured evidence of a loan made by the defendant for the purpose of renovating the borrower's diner, even though "[t]here was no evidence that this loan was in any way connected to the Yonkers social clubs and gambling operations." *Id.* at 96. Because this loan "fell *entirely outside* the criminal scheme alleged against [the defendant]," there was a constructive amendment. *Id.* at 103 (emphasis added; quotation marks omitted). The Second Circuit acknowledged, however, that this proof may have been permitted had the indictment been "'drawn in general terms.'" *Id.* at 99 (quoting *Stirone*, 361 U.S. at 218).

The Second Circuit has recognized that "the differences between the indictment and proof" in *Stirone* and *Zingaro* "were *extreme*."  *See D'Amelio*, 683 F.3d at 421 (emphasis added).  In both cases, the differences "concerned behavior *entirely separate* from that identified in the indictment."  *United States* v. *Danielson*, 199 F.3d 666, 670 (2d Cir. 1999) (emphasis added); *see also D'Amelio*, 683 F.3d at 420 n.5 (explaining that the Second Circuit has "consistently construed *Stirone* narrowly" (quotation marks omitted)); *United States* v. *Patino*, 962 F.2d 263, 267 (2d Cir. 1992) (explaining that *Zingaro* hinged on the fact that the diner loan "was neither mentioned in the indictment *nor related to the activities of the social clubs*" that were detailed in the indictment (emphasis added)).  In the ordinary case, however, the Government is given considerable leeway in proving its case,[17] and a constructive amendment will be found only if the proof at trial is "distinctly different" from or "wholly unrelated" to the indictment.  *D'Amelio*, 683 F.3d at 419-20 (quotation marks omitted).

This case is a far cry from the "extreme" constructive claims sustained in *Stirone* and *Zingaro*.  In *Zingaro*, loans made to patrons of an illegal gambling social club were obviously wholly unrelated to a loan made to someone who did not attend the club—they did not involve any of the same people other than the defendant.  Here, unlike *Zingaro*, the same people and entities were involved in both the board takeover explicitly described in the Indictment and the ACH processing putatively omitted from the S6 Indictment:  members of the Collectables Club (*e.g.*, Murgio, Lebedev, Hill, Freundt); individuals from HOPE FCU (*e.g.*, Gross); and representatives of Kapcharge (*e.g.*, Francis, Cohen).  In *Stirone*, the relationship between the sand importation and

---

[17] For example, the Second Circuit has recognized that "*Stirone*'s outcome would have been different if, in addition to interference with shipments of sand, the additional proof at defendant's trial had included interference with gravel and cement shipments, *i.e.*, past shipments of other materials necessary for the victim's production of ready-mixed concrete."  *D'Amelio*, 683 F.3d at 421.

steel exportation was so attenuated and speculative—the sand would be turned into concrete that would then be used to build a steel mill that would then ship steel—that they could only be considered distinctly different from each other.  Here, unlike *Stirone*, there is a direct temporal and causal connection between the board takeover and the ACH processing.  Thus, ACH processing for Kapcharge is unquestionably "related to the activities" explicitly described in the S6 Indictment—and is far from "entirely separate" from the scheme in the S6 Indictment.

### e.   Gross Was Not Substantially Prejudiced by Any Variance

As demonstrated above, the S6 Indictment was not constructively amended by the proof at trial.  But to the extent the proof varied from the Indictment, any such variance did not substantially prejudice Gross.  Thus, the prejudicial variance claim must fail.

All of Gross's variance claims are based on trial proof regarding Kapcharge and ACH processing.  But Gross knew long before trial that the Government planned to introduce such evidence at trial.  For example, the Government produced voluminous discovery on those subjects between March and May 2016—nearly a year before trial.  Furthermore, in multiple pretrial motions and conferences—including as early as a motion in limine filed in September 2016 (ECF No. 191)—the Government described the evidence regarding Kapcharge and ACH processing that it planned to offer at trial.  Finally, the Government began producing to the defense marked trial exhibits, including exhibits relating to Kapcharge and ACH processing, four weeks prior to trial. Tellingly, none of these disclosures gave rise to a defense request for an adjournment, likely because there could be no credible claim of surprise and prejudice.  *See D'Amelio*, 683 F.3d at 417 n.3 (no prejudice where the Government "disclosed its intent to offer [the disputed] evidence" eighteen months before trial); *United States* v. *Kaplan*, 490 F.3d at 130 (no prejudice where, among other factors, the Government disclosed evidence prior to trial and defense counsel did not request a continuance).

Nor will any putative variance in this case substantially prejudice Gross by subjecting him to double jeopardy in a future prosecution.  A court in a potential future prosecution against Gross will be able to determine what is barred based on the S6 Indictment and the entire trial record.  *See United States* v. *Jaswal*, 47 F.3d 539, 542-43 (2d Cir. 1995) (no constructive amendment and observing that the defendant will not be subject to double jeopardy "because the court may refer to entire of the prior proceeding and [will] not be bound by the indictment alone" (alteration in original)); *see also United States* v. *Olmeda*, 461 F.3d 271, 282 (2d Cir. 2010) (double jeopardy determination "will require examination of the plain language of the indictments in the two prosecutions, as well as the entire record of the proceedings" (quotation marks omitted)); *United States* v. *Walsh*, 194 F.3d 37, 45 (2d Cir. 1999) ("a court may look to the record as a whole in determining whether the defendant is protected from double jeopardy in a subsequent prosecution").

Finally, proof of ACH transactions on behalf of Transferwise and payday lenders (rather than just for Coin.mx) did not substantially prejudice Gross, for an independent reason.  At the defense's request, the Court defined Count Three for the jury as a conspiracy to achieve the four charged objects "in an effort to further the operations of Coin.mx or the Collectables Club." (Instruction No. 20).  This instruction remedied any potential prejudice caused by proof of ACH transactions for entities other than Coin.mx or the Collectables Club.

## B.      There Was Sufficient Evidence to Support Venue in this District

Gross challenges the sufficiency of the evidence establishing venue on Count Three, the multi-object conspiracy count, and Count Five, the substantive bank bribery charge.  Viewing the evidence in the light most favorable to the Government, as this Court must, there was ample evidence to support the jury's conclusion that acts in furtherance of these crimes occurred in the Southern District of New York and, therefore, venue was proper here.

### 1.    Applicable Law

A defendant in a criminal case has the right to be tried in the district where the crime was "committed."  U.S. Const. amend. VI; *see also* Fed. R. Crim. P. 18 ("Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed.").  Where a defendant is charged with multiple crimes in a single indictment, the government must satisfy venue with respect to each charge.  *See United States* v. *Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1188 (2d Cir. 1989).

"When a federal statute defining an offense does not specify how to determine where the crime was committed, '[t]he *locus delicti* must be determined from the nature of the crime alleged and the location of the act or acts constituting it.'"  *United States* v. *Tzolov*, 642 F.3d 314, 318 (2d Cir. 2011) (quoting *United States* v. *Cabrales*, 524 U.S. 1, 6-7 (1998)).  This requires a court "first to 'identify the conduct constituting the offense,' and then to 'discern the location of the commission of the criminal acts.'"  *United States* v. *Davis*, 689 F.3d 179, 185 (2d Cir. 2012) (quoting *United States* v. *Rodriguez–Moreno*, 526 U.S. at 279-80 (1999)).  "Although statutory language necessarily informs the first step of the analysis, the Supreme Court has rejected a rigid 'verb test' that 'unduly limits the inquiry into the nature of the offense and thereby creates a danger that certain conduct prohibited by statute will be missed.'"  *Id.* (quoting *Rodriguez–Moreno*, 526 U.S. at 280) (internal quotation marks omitted).

"Similarly, at the second step, the law recognizes that not all crimes consist of a single, non-continuing act, so as to locate venue in a single district."  *Id.*; *see also United States* v. *Reed*, 773 F.2d 477, 480 (2d Cir. 1985) (stating that where "the acts constituting the crime and the nature of the crime charged implicate more than one location," the Constitution "does not command a single exclusive venue.").  Instead, in cases of continuing offenses, "[v]enue is proper in any district in which an offense was 'begun, continued or completed.'"  *United States* v. *Lange*, 834

F.3d 58, 69 (2d Cir. 2016) (quoting 18 U.S.C. § 3237(a)) (internal quotation marks omitted); *see also Davis*, 689 F.3d at 185 ("The commission of some crimes can span several districts." (internal quotation marks omitted)).

While the above legal principles apply to substantive offenses, "conspiracy charges . . . require a different analysis." *Tzolov*, 642 F.3d at 319. "In a conspiracy prosecution, venue is proper in any district in which an overt act in furtherance of the conspiracy was committed by any of the coconspirators. The defendant need not have been present in the district, as long as an overt act in furtherance of the conspiracy occurred there." *United States* v. *Smith*, 198 F.3d 377, 382 (2d Cir. 1999) (internal quotation marks and citation omitted); *see also Lange*, 834 F.3d at 70 ("Venue is proper for conspiracy charges in any district in which an overt act in furtherance of the conspiracy was committed.") (internal quotation marks omitted).

"An overt act is any act performed by any conspirator for the purpose of accomplishing the objectives of the conspiracy. The act need not be unlawful; it can be any act, innocent or illegal, as long as it is done in furtherance of the object or purpose of the conspiracy." *Tzolov*, 642 F.3d at 320. Moreover, "the law does not require a defendant to have actual knowledge that an overt act will occur in a particular district to support venue at that location. At most, it asks that the overt act's occurrence in the district of venue have been reasonably foreseeable to a conspirator." *United States* v. *Rommy*, 506 F.3d 108, 123 (2d Cir. 2007); *accord United States* v. *Parrilla*, No. 13 Cr. 360 (AJN), 2014 WL 7496319, at *12 (S.D.N.Y. Dec. 23, 2014). Furthermore, "[t]he Government is not restricted to the overt acts charged in the indictment in justifying its choice of venue." *Lange*, 834 F.3d at 70 (internal quotation marks omitted).

On occasion, the Second Circuit has "supplemented [its] venue inquiry with a 'substantial contacts' test that takes into account a number of factors." *United States* v. *Rutigliano*, 790 F.3d

389, 399 (2d Cir. 2015) (internal quotation marks omitted); *accord Lange*, 834 F.3d at 71.  "Those factors include the site of the defendant's acts, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of the venue for accurate factfinding." *Lange*, 834 F.3d at 71 (internal quotation marks and brackets omitted).  The Second Circuit has recently made clear, however, that the "substantial contacts" inquiry "is made only if the defendant argues that his prosecution in the contested district will result in a hardship to him, prejudice him, or undermine the fairness of his trial." *Rutigliano*, 790 F.3d at 399 (internal quotation marks omitted).  "Otherwise, prosecution for a continuing offense, 'committed in more than one district,' may occur 'in any district in which such offense was begun, continued, or completed.'" *Id.* (quoting 18 U.S.C. § 3237(a)).

The government bears the burden of proving venue.  *See Beech–Nut Nutrition Corp.*, 871 F.2d at 1188.  Because venue is not an element of a crime, the government need establish it only by a preponderance of the evidence.  *See Smith*, 198 F.3d at 384.  "Courts 'review the sufficiency of the evidence as to venue in the light most favorable to the government, crediting every inference that could have been drawn in its favor.'" *Parrilla*, 2014 WL 7496319, at *14  (quoting *Tzolov*, 642 F.3d at 318 (internal quotation marks omitted)).

### 2.    Discussion

#### a.       Count Five:  Substantive Section 215(a)(2) Violation

Count Five of the S6 Indictment charged Gross with agreeing to accept and receiving corrupt payments as an officer of HOPE Federal Credit Union from in our about May 2014 through in or about 2015, in violation of 18 U.S.C. § 215(a)(2).  Section 215 makes it a crime for any "officer, director, employee, agent, or attorney of a financial institution" to "corruptly solicit[] or demand[]" or "corruptly accept[] or agree[] to accept" "anything of value from any person" while "intending to be influenced or rewarded in connection with any business or transaction of such

institution."  18 U.S.C. § 215(a)(2).  The Second Circuit has acknowledged that the essential elements of a Section 215 violation are not limited to the negotiation and receipt of the corrupt payments at issue, but rather include acts that are "intricately bound up" with the payment or receipt of the bribes.  *United States* v. *Carrizo*, 104 F.3d 356, 1996 WL 692512, at *2 (2d Cir. 1996) (summary order) ("[V]erbal solicitations and physical acceptance of cash did not alone amount to the acts constituting the crime. Rather, the verbal requests and acceptance of money were intricately bound up with acts committed within the Southern District of New York.").

Although the Second Circuit does not appear to have addressed the question of whether Section 215 constitutes a continuing offense for the purpose of determining venue, the court has treated analogous bribery offenses as continuing offenses and, therefore, analyzed venue for such crimes under the continuing offense venue statute, 18 U.S.C. § 3237(a).  *See United States* v. *Stephenson*, 895 F.2d 867, 874 (2d Cir. 1990) (analyzing public official's receipt of bribes, in violation of 18 U.S.C. § 201(b)(2)[18], as a continuing offense under 18 U.S.C. § 3237(a)); *United States* v. *Ellenbogen*, 365 F.2d 982, 989 (2d Cir. 1966) (same).  Other circuit courts have treated bribery offenses in the same manner.  *See, e.g.*, *United States* v. *Niederberger*, 580 F.2d 63, 69-70 (3d Cir. 1978) (holding that a public official's illegal receipt of a gratuity, in violation of 18 U.S.C. § 201, can constitute a continuing offense under 18 U.S.C. § 3237(a)); *accord United States* v. *Baxter*, 884 F.2d 734, 736 (3d Cir. 1989); *see also United States* v. *Johnson*, 337 F.2d 180, 194 (4th Cir. 1964) (holding that both the "giving" and "receiving" of bribe payments "can be considered a continuous act"); *Goodloe* v. *United States*, 188 F.2d 621 (D.C. Cir. 1950) (holding

---

[18] Section 201 provides, in pertinent part:  "Whoever being a public official or person selected to be a public official, directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity, in return for being influenced in the performance of any official act [shall be guilty of a crime]."  18 U.S.C. § 201(b)(2)(A).

that venue was proper "if the evidence showed that the attempt to bribe was commenced, continued or completed [in the district of prosecution], even though most of the acts relied upon to constitute the crime were committed in [another district]"); *accord United States* v. *North*, 910 F.2d 843, 912 (D.C. Cir. 1990).

Here, the bank bribery scheme that was the basis for Gross's conviction on Count Five was plainly a continuing offense.  Although Gross was charged with only one substantive count of violating Section 215(a)(2), the S6 Indictment alleged, and the evidence adduced at trial overwhelmingly proved, that the charged bribery scheme involved Gross's solicitation, agreement to accept, and actual and attempted acceptance of numerous discrete bribe payments over a period of several months in exchange for turning over governance and operational control of HOPE FCU to Anthony Murgio and his co-conspirators.  Further, Gross discussed the contours of this corrupt *quid pro quo* arrangement in numerous emails, chats, and by telephone with Murgio and others over the course of the ongoing scheme.  (*See, e.g.*, GX 1081-D, 1092-B, 1108-A).  Such negotiations between Gross and Murgio concerning the specifics of the corrupt arrangement occurred in multiple locations, including Florida (where Murgio was generally located), New Jersey (where Gross was generally located), Montreal (where Mark Francis and Shoula Cohen of Kapcharge were located), and, as discussed further below, Manhattan (where Murgio and Gross were located during certain discussions in furtherance of the bribery scheme).  Gross's solicitation and acceptance of the bribe payments also triggered a flow of funds that originated from and/or flowed through bank accounts in various locations, including, as discussed further below, Manhattan.  As such, the evidence established that the bribery offense with which Gross was charged was committed in multiple locations and, therefore, could properly "be inquired of and

prosecuted in any district in which such offense was begun, continued, or completed."  18 U.S.C. § 3237(a).

Moreover, there was sufficient evidence adduced at trial to support the jury's finding by a preponderance that venue for Count Five was appropriate in the Southern District of New York because the bribery scheme began, continued, or was completed in this District.   First, Gross's agreement to accept, and ultimate acceptance, of at least two of the bribe payments involved the transfer of funds from and through bank accounts in Manhattan.  Specifically, wire transfer receipts showed that the first two $15,000 bribe payments that Gross solicited and accepted from Anthony Murgio were wire transferred on or about May 9, 2014 and May 21, 2014 from a Currency Enthusiasts account held at Bank of America in Manhattan to a HOPE Cathedral account held at PNC Bank in New Jersey.  (GX 800-H (PNC wire transfer records); GX 864 (Bank of America wire transfer records).  In addition to these wire receipts, Andrew Levy from Bank of America testified that these two wire transfers passed through Bank of America's account at the Federal Reserve Bank of New York in Manhattan.  (*See* Tr. 1253).   Thus, Gross's solicitation and acceptance of these two bribe payments necessarily involved acts that occurred in the Southern District of New York—namely, the transfer of funds from Murgio's bank account in Manhattan, through Bank of America's Federal Reserve account in Manhattan, to Gross's bank account in New Jersey—that go to the essence of the bribery scheme itself.

Unsurprisingly, the Second Circuit has acknowledged that such a payment of a bribe from one district to another constitutes an essential element of a bribery scheme.  In *United States* v. *Ellenbogen*, the court held a $3,000 bribe that was paid by the defendant via a check sent from Manhattan to a federal official in New Jersey was sufficient to establish venue for the Section 201 bribery prosecution in the Southern District of New York.  *See Ellenbogen*, 365 F.2d at 989.   The

Court of Appeals recognized that the sending of the bribe funds from Manhattan was essential to the bribery scheme because, simply put, "[t]here was no bribery until [the defendant] made the payment by mailing the check from New York." *Id.*  To be sure, the defendant in *Ellenbogen* was the bribe *payer*, whereas in this case, Gross was the bribe *recipient*.  But this distinction does not alter the analysis given that Section 215 is a continuing offense.  As another district court aptly observed in holding that venue over a bribe recipient was appropriate in the district where the bribe payment originated, "it would defeat the purpose of Congress in acting 18 U.S.C. § 3237" if venue lay only in the district where the defendant received the bribe "since such an interpretation of the statute might require two trials"—one in the district where the defendant received the bribe, and one in the district where the bribe payment originated.  *United States* v. *Baxter*, No. 88 Cr. 271 (RJB), 1989 WL 11209, at *2 (E.D. Pa. Feb. 8, 1989), *aff'd* 884 F.2d 734 (3d Cir. 1989).[19]  Such a result would defeat the substantial judicial economy achieved in trying the bribe payer and bribe recipient jointly, a significant Government interest that this Court explicitly acknowledged in denying Gross' pretrial severance motion.  *See United States* v. *Murgio*, 102 Fed. R. Evid. Serv. 545, 2017 WL 365496102, at *20, *22 (S.D.N.Y. Jan. 20, 2017).

In analogous bribery cases involving the flow of funds via check that implicated multiple districts, other circuit courts have held that venue properly lies in the district where the bribe check was "paid," *i.e.*, cleared by the drawee bank, even though the defendant was located in a different district and physically received the bribe check in that other district.  *See, e.g.*, *Baxter*, 884 F.2d at 736-37 (holding that venue was proper in Eastern District of Pennsylvania where the bank through which the bribe checks cleared was located, even though the defendant was located in Virginia,

---

[19] Notably, in *Ellenbogen*, both the defendant bribe payer and the bribe recipient were prosecuted in the Southern District of New York, although the latter pleaded guilty before trial.  *See Ellenbogen*, 365 F.2d at 984.

received the bribe checks in Virginia, and deposited the checks at a bank in Virginia); *United States* v. *Johnson*, 337 F.2d 180, 194 & n.22  (4th Cir. 1964) (holding that venue was proper either in Maryland, where certain bribe checks were deposited, or Florida, where the bribe checks were "paid" by the drawee bank, even though the defendant was located, and received the bribe checks in, Washington, D.C.).  Although these cases concerned the payment of bribes by check, their holdings equally support the conclusion that a proper venue for a defendant, such as Gross, who receives bribes via wire transfer includes the district where the bank that funded the transfer, or through which the wired funds passed, is located.  In this case, because the bank account from which the two $15,000 bribe payments originated and through which the wires were transferred to Gross were located in Manhattan, venue was appropriate in the Southern District of New York.

The same result obtains notwithstanding the fact that Gross largely negotiated the bribe payments with Anthony Murgio from New Jersey and received the wire transfers in the HOPE Cathedral account at PNC Bank in New Jersey.  The Second Circuit has explicitly held that venue is proper in the Southern District of New York for bribery offenses where the bribe recipient negotiated and received the bribe in another district, as long as the bribe recipient caused other acts to occur within this District.  *See, e.g.*, *Carrizo*, 1996 WL 692512, at *2 (holding that venue over Section 215(a)(2) bribery offense was proper in the Southern District of New York—even though the defendant solicited and physically received the $5,000 cash bribe in Colorado—where the defendant caused the loan application at issue to be submitted in, and used the loan proceeds as leverage to obtain the bribes from, New York); *Stephenson*, 895 F.2d at 874 (holding venue was appropriate over bribery charge in the Southern District of New York where defendant—who was physically located and attempted to obtain the bribes in Washington D.C.—made telephone calls into the Southern District to contact the victims of his bribery scheme) (internal citations omitted)).

If the processing of loans and phone calls into the District were sufficient to support venue in *Carrizo* and *Stephenson*, respectively—even though the defendants in those cases were physically located and received the bribes in another district—then surely venue is proper in this case, where at least two of the bribe payments originated in and were transferred to Gross through a bank account in Manhattan.

Gross argues that it was not "reasonably foreseeable" to him "that the wires would pass through New York" and that "the routing of the wire[s] through New York was a product of the Bank of America routing system and not the volitional conduct of the sender or the recipient." (Gross Mot. 35). Gross's argument is unavailing. In cases involving continuing offenses under 18 U.S.C. § 3237(a), it is well established that "venue is proper in a district where (1) the defendant intentionally or knowingly causes an act in furtherance of the charged offense to occur in the district of venue or (2) it is foreseeable that such an act would occur in the district of venue." *United States* v. *Svoboda*, 347 F.3d 471, 483 (2d Cir. 2003) (holding that venue was reasonably foreseeable and proper where defendant "either knew, or could reasonably foresee, that his trades would be executed in the Southern District of New York"); *accord United States* v. *Rommy*, 506 F.3d 108, 123 (2d Cir. 2007).

Here, there was sufficient evidence to support the jury's finding that it was reasonably foreseeable to Gross that the wire transfers of the bribe payments would pass through New York. The evidence established that Gross was a savvy credit union official who was familiar with the processes for transferring funds between and among financial institutions in different states via the Federal Reserve Bank wire transfer and ACH systems. Gross served as the Chairman and CEO of HOPE FCU, a federally chartered credit union based in Lakewood, New Jersey—not far from Manhattan—that provided checking and savings accounts, loans, ACH, wire transfers, and other

financial services to its members.  (GX 1072-B; Tr. 3449).  HOPE FCU, whose day-to-day banking operations Gross oversaw, maintained and transferred funds between multiple bank accounts held at financial institutions in different states.  (GX 806-A through 806-F (HOPE FCU account at Harmony Bank in New Jersey); 808-A through 808-D (HOPE FCU account at Alloya Corporate Federal Credit Union in Illinois).  Gross was also well aware that Anthony Murgio was interested in gaining control of the credit union in order to facilitate funds transfers via ACH among the purported "members" of Collectables Club, banking functions that necessarily required use of the Federal Reserve Bank system.  (GX 1092-A (May 6, 2014 email from Gross to Murgio stating that "ACH transactions have been tested" and requesting initial $15,000 bribe); GX 1149 (May 27, 2014 email discussing application to establish direct connection between HOPE FCU and the Federal Reserve Bank system for ACH); Tr. 3459).  In emails with Murgio—including in advance of at least one of the $15,000 bribes paid from Murgio's bank account in Manhattan—Gross demonstrated his familiarity with these ACH and wire transfer processes, including the use of ABA routing numbers to direct funds through HOPE FCU's various financial institutions.  (GX 1142-L (May 16, 2014 email from Gross to Murgio with detailed wire transfer instructions for moving funds into HOPE FCU member accounts)).  In addition, Gross's own testimony also showed that he was sophisticated and well versed in HOPE FCU's banking operations, including its ACH processing.  (*E.g.*, Tr. 3442 (educational background); 3474-75, 3682-87 (ACH processing)).

Record evidence also supports the reasonable inference that by soliciting and accepting bribes from Anthony Murgio via wire transfer and ACH, it was foreseeable to Gross that his conduct would cause an interstate transfer of funds that could flow through a New York bank. While operating HOPE FCU in New Jersey, Gross solicited bribes from the Collectables Club,

which Gross knew was an out-of-state association based in Florida (*see* GX 1074-B) with members

"all over" the country (GX 1081-D).  Gross specifically instructed Murgio to transfer the bribe

payments via ACH and wire, and provided Murgio with the ABA routing number for the HOPE

Cathedral account—a number that Gross would reasonably know be used to transfer the funds

from Murgio's or the Collectables Club's bank account, through the Federal Reserve Bank system,

to the HOPE Cathedral account at PNC Bank.  (GX 1092-A, 1108-A; Tr. 3649).  As such, Gross

could reasonably have contemplated that such an interstate transfer of funds via wire or ACH

would implicate the use of a Federal Reserve Bank account of a bank in New York.

Moreover, the PNC Bank wire transfer records for the HOPE Cathedral account—which

the parties stipulated would have been available to Gross (GX 4013)—indicate on their face that

the two $15,000 bribes were sent from the Currency Enthusiasts account at Bank of America in

Manhattan (GX 800-H).  It can be reasonably inferred—based upon a May 9, 2014 email from

Murgio to Gross, which stated, in part: "Glad the donation money hit the account" (GX 1107-A)—

that Gross accessed the HOPE Cathedral bank account details to confirm the receipt of the first

$15,000 bribe payment.  But even if Gross did not have actual knowledge that the two $15,000

bribe payments would be wired from a bank account in Manhattan, the evidence was sufficient for

the jury to find that it was more likely than not that such a possibility was reasonably foreseeable

to Gross as a savvy credit union official familiar with the Federal Reserve Bank system and

processes for transferring funds interstate.  *See, e.g.*, *Svoboda*, 347 F.3d at 483 ("[T]he fact that

Robles was a savvy investor means that he could reasonably foresee that his trades would likely

be executed on either NYSE or AMEX."); *United States* v. *Rowe*, 414 F.3d 271, 279 (2d Cir.2005)

(holding that, in prosecution for electronically advertising to distribute child pornography in

violation of 18 U.S.C. § 2251(d), even though defendant posted advertisement from home in

Kentucky, venue was proper in Southern District of New York because defendant "must have known or contemplated that the advertisement would be transmitted by computer to anyone the whole world over who logged onto the site" (internal quotation marks omitted)); *United States* v. *Riley*, No. 13 Cr. 339 (RPP), 2014 WL 53440, at *4 (S.D.N.Y. Jan. 7, 2014) (holding that defendants' "experience[] in securities trading" alone was "sufficient under Second Circuit law" to establish venue in Southern District of New York because it was reasonably foreseeable to defendants that their acts would cause trading to occur in this District, even though the defendants did not themselves conduct the trades).

In any event, these wire transfers are not the only basis for venue in the Southern District of New York.  Gross also committed acts while he was physically located in this District that "were intricately bound up with" his solicitation and acceptance of bribes from Anthony Murgio and his co-conspirators.  *Carrizo*, 1996 WL 692512, at *2.  Specifically, the evidence adduced at trial showed that Gross engaged in the following email and other communications while in the Southern District of New York:

- On June 6 and 7, 2014, while in the Southern District of New York (GX 900, at 108), Gross exchanged emails with Anthony Murgio concerning the individuals whom Murgio was seeking to have Gross place onto the Board of HOPE FCU in exchange for the bribes (GX 1155-B, 1793).  More specifically, Murgio and Gross discussed whether Gross had received "all proper info" needed in advance of the HOPE FCU Annual Meeting at which Murgio's designees were to be elected, thereby giving Murgio control of the credit union, in exchange for an additional $120,000 bribe to Gross.  In addition, on June 7, while Gross was still in this District, Ricardo Hill emailed his identification information to Gross as Gross had requested.  (GX 1158).

- On June 11, 2014, while in the Southern District of New York (GX 900, at 108), Gross exchanged emails with Anthony Murgio and Yuri Lebedev concerning HOPE FCU's website, to which Gross had provided Murgio access (GX 1105) as part of the process of turning over operational control of the credit union to Murgio in exchange for the bribe payments.  (GX 1912).

- On November 23 and 24, 2014, while in the Southern District of New York (GX 900, at 109), Gross communicated with Anthony Murgio via email and PrivNote

concerning the additional bribes that Gross solicited during the recorded meeting in New Jersey on November 22 (GX 2506), specifically the $6,000 in past-due "consulting fees" and the additional $50,000 payment that Gross had solicited in order to arrange the resignation of the remaining HOPE Cathedral board members and relinquish all remaining control over the credit union.  (GX 1666).  On November 23, Gross forwarded one such resignation email from Bernard Larkins to Ricardo Hill, who subsequently forwarded it to Anthony Murgio (GX 2247).  Gross also received a resignation email from Marvin Purry the same day.  (GX 2246).  On November 24, Gross again communicated with Murgio while still in this District via WhatsApp concerning Gross's "receipt of the past consulting fees" and the fact that November 24 was "the deadline" by which Anthony Murgio was supposed to have paid the additional $50,000 bribe (GX 4509, at 4972-5002).

Gross's communications with Murgio while Gross was in the Southern District of New York go to the heart of the charged *quid pro quo* arrangement and "constituted essential, and not merely preparatory, steps" in the bribery scheme.  *Carrizo*, 1996 WL 692512, at *2.  Thus, in June 2014—after Murgio had paid Gross the two initial $15,000 bribes, but before Murgio and Kapcharge paid Gross the $120,000 bribe—Gross and Murgio discussed having "all proper info" in place to ensure Murgio's designated members could be elected to the Board of HOPE FCU.  Notably, this email exchange was part of an ongoing series of communications between Gross and Murgio about the process for placing Murgio's designees on the Board.  (*See, e.g.*, GX 1108-A (May 12, 2014 email between Gross and Murgio concerning requirements and process for giving Murgio control of the HOPE FCU Board)).  Around the same time, Murgio and Gross discussed the HOPE FCU website, control of which Gross turned over to Murgio, Lebedev, and their other co-conspirators.  Contrary to Gross's contention that such emails "did not have any connection to the 'essential conduct' of the bribery offense" (Gross Mot. 36), these communications plainly relate to the details of the corrupt *quid pro quo* arrangement that Gross had with Murgio, that is, Gross's handing over control of the credit union to Murgio and his co-conspirators in exchange for bribes.

Gross also fails to address the pertinent communications that Gross had with Anthony Murgio in November 2014—just after the recorded meeting at HOPE FCU on November 22, but before the final breakdown of the relationship between Gross and Murgio.  At the November 22 meeting, Gross and Murgio agreed that Murgio would pay Gross the $6,000 in "consulting fees" that Gross was owed, plus an additional $50,000 bribe in exchange for Gross relinquishing control of the credit union.  Notably, Murgio was supposed to pay the $50,000 bribe by Monday, November 24.  (GX 2506; Tr. 3597-98).  As outlined above, on November 23 and 24—while Gross was in Manhattan—he exchanged emails and WhatsApp messages with Murgio concerning these payments, the resignation of the legacy HOPE FCU board members, and Murgio's failure to meet the deadline for paying Gross the additional $50,000 bribe.  Under the Second Circuit's holdings in *Carrizo* and *Stephenson*, Gross's highly pertinent communications with Murgio while physically present in this District—which Gross cannot claim were not reasonably foreseeable to him—are plainly sufficient, even standing alone, to confer venue over the substantive bribery charge.

**b.      Count Three:  Conspiracy**

Gross's challenge to the sufficiency of the evidence establishing venue in the Southern District of New York for the conspiracy charged in Count Three is also wholly without merit.  As Gross acknowledges, venue for the conspiracy charge can be established "by any overt act in furtherance of the conspiracy" that occurred in this District.  (Gross Mot. 37).  Thus, venue for the conspiracy charge is established by the same evidence of the overt acts that support venue for the substantive bank bribery offense charged in Count Three.  As set forth above, both the $15,000 bribe payments that were wired to Gross from a bank account in Manhattan and Gross's own communications with Murgio while Gross was physically located in this District were in furtherance of the conspiracy.  Specifically, the bribe payments were made in furtherance of the

two bribery objectives, *i.e.*, the payment and receipt of bribes to influence Gross's decision-making concerning HOPE FCU.  Gross's communications with Murgio were also in furtherance of the bribery objects of the conspiracy, as well as the objective of obstructing the NCUA's examination of HOPE FCU insofar as they pertained to the conspirators' efforts to ensure that there was "all proper info" in HOPE FCU's files concerning Murgio's designated Board members.  This evidence alone is sufficient to reject Gross's challenge to venue for the conspiracy count.

But there was also evidence adduced at trial showing that Gross's co-conspirators, in particular Anthony Murgio, engaged in overt acts in the Southern District of New York in furtherance of the conspiracy.  For example, the evidence showed that while Murgio was physically located in the Southern District of New York, he engaged in the following communications in furtherance of the conspiracy:

- On April 7 and 8, 2014, while Anthony Murgio was in the Southern District of New York (GX 900, at 114), Anthony Murgio, Michael Murgio, and Gross exchanged emails concerning a prior meeting and the "Memorandum of Understanding" between HOPE FCU and the Collectables Club, whose contact details Murgio provided to Gross in the same exchange.  (GX 1074-B). On April 11 and April 14, while Murgio was still in this District, Gross emailed drafts of the Memorandum of Understanding to Anthony Murgio.  (GX 1074-D, 1075).

- On June 13, 2014, while Anthony Murgio was in the Southern District of New York (GX 900, at 114), Anthony Murgio sent an email to Gross addressed to Mark Francis in which Murgio expressed his and Gross's desire not "to draw up any red flags" prior to the upcoming NCUA examination of HOPE FCU in July.  (GX 1161-A).  In other emails, Gross explained that Murgio and Francis should keep Kapcharge's ACH activity "limited" for the rest of the year so as not to attract the attention of the NCUA during its examination of HOPE FCU.  (GX 1160-B).  Later that same day, Gross and Murgio exchanged several emails concerning "the final payment" contemplated in the bribery scheme.  (GX 1162-B).

- On June 17, 2014, while Anthony Murgio was in the Southern District of New York (GX 900, at 114), Gross and Murgio exchanged emails about "using that Lakewood address for the Collectables Club that Kapcharge is using," which would make it appear to the NCUA that Collectables Club and Kapcharge fell within HOPE FCU's field of membership.  (GX 1167-A).   Gross also sent Murgio an email outlining the remaining steps of the *quid pro quo* arrangement, including Gross's request that

Murgio pay the $120,000 bribe "at the conclusion of the Annual Meeting" and "the final donation . . . by January 1st." (GX 1170).

- On June 18, 2014, while Anthony Murgio was still in the Southern District of New York (GX 900, at 114), Murgio sent an email to Gross stating that he "would like to have a call tomorrow to discuss the donation [*i.e.*, the $120,000 bribe] we are going to make to the church" and "other opportunities with you as well moving forward." (GX 1171-A). Gross responded the same day that he could do the call at 9am the next day. (GX 1171-B).

- On August 27, 2014, while Anthony Murgio was in in the Southern District of New York (GX 900, at 114), Murgio forwarded to Gross an account application and several corporate documents for Kapcharge's business account at HOPE FCU. (GX 1235, 2264). Notably, Murgio sent this email around the time of the NCUA onsite examination of HOPE FCU concerning HOPE FCU's compliance with its field of membership requirements. (*See, e.g.*, Tr. 2577-79 (Testimony of Brian McDonough)).

Based upon the content of these communications, as well as the proximity of Lakewood, New Jersey, to the Southern District of New York, it was reasonably foreseeable to Gross that Anthony Murgio would engage in communications in furtherance of the conspiracy while in this District. Although Murgio lived in Florida and sometimes worked from Montreal, the evidence shows that he traveled to Manhattan and New Jersey on several occasions, including to meet with Gross at HOPE FCU, during the course of the conspiracy. (*E.g.*, GX 1162-A (June 13, 2014 email from Murgio to Gross thanking Gross for "taking the time out to meet with us yesterday"); GX 2506 (recording of in-person November 22, 2014 meeting at HOPE FCU)). On June 2, 2014, Gross and Murgio discussed the possibility of meeting up in Manhattan the following weekend, *i.e.*, June 7 and 8. (GX 1152-B). Although there is no evidence that such a meeting between Gross and Murgio occurred, this email supports the fair inference that Gross knew that Murgio was going to be traveling to Manhattan around the time that they exchanged the emails set forth above and met in person in mid-June 2014. (GX 1162-A). Based upon this evidence, a local jury could reasonably infer that Gross was aware that Murgio was in this District while he exchanged emails

66

with Gross in furtherance of the conspiracy.  *See, e.g.*, *United States* v. *Boruch*, 550 F. App'x 30, 33 (2d Cir. 2013) ("The proximity of Manhattan to Brooklyn and Queens and the conspirators' transfer of hundreds of thousands of dollars in cash admitted a preponderance finding that Boruch could reasonably have foreseen that his coconspirators transported at least some of the money at issue to Brooklyn and Queens from Manhattan."); *Davis*, 689 F.3d at 188–89 (noting proximity of Long Island robbery target to Southern District of New York, combined with coconspirators' prior robberies of drug dealer in the Bronx, to support venue in Southern District based upon foreseeable effect on commerce in that district).

Gross argues that even if there were overt acts in furtherance of the conspiracy in the Southern District of New York that were reasonably foreseeable to him, venue was still inappropriate because there were not "substantial contacts" in this District.  This argument fails. As noted above, the Second Circuit has limited the "substantial contacts" inquiry to cases where a defendant's "prosecution in the contested district will result in a hardship to him, prejudice him, or undermine the fairness of his trial."  *Rutigliano*, 790 F.3d at 399 (internal quotation marks omitted).  Gross does not advance such an argument—nor could he.  As this Court observed in denying Gross's pretrial motion to transfer his trial to the District of New Jersey, "the factors that Gross cite[d] in favor of transfer are insufficient to tip the balance" against a joint trial of Gross and his co-conspirators in this District.  *Murgio*, 2017 WL 365496, at *22.  This Court's prior ruling—which implicitly recognized the suitability of this District and the lack of any undue prejudice or hardship that trial in this venue would pose for Gross—forecloses any claim by Gross that trial in this District resulted in any "hardship" or "prejudice" to him or "undermine[d] the fairness of his trial."  *See Rutigliano*, 790 F.3d at 400 ("Here, 'we need not be concerned about jeopardizing the values underlying the substantial contacts tests because [the defendants cannot]

argue that being prosecuted in the Southern District imposed an additional hardship on [them], prejudiced [them], or undermined the fairness of [their] trial.'" (quoting *United States* v. *Ramirez*, 420 F.3d 134,143 (2d Cir. 2005) (brackets in original)).[20]

In any event, even if the "substantial contacts" test applied, it is satisfied here.  First, Gross and Murgio engaged in overt acts in furtherance of both the conspiracy and the substantive bribery scheme while they were physically present in the Southern District of New York, including the email and other communications set forth above.  In addition, by soliciting and accepting the bribe payments from Murgio, Gross caused the two $15,000 bribe payments to be wire transferred from a bank account in Manhattan.  Second, the communications between Gross, Murgio, and others, as well as the bribe payments themselves, had a direct impact on the interstate facilities, such as the wires and the Federal Reserve Bank system, located in multiple districts, including the Southern District of New York.  Additional impact was felt in this District as a result of the millions of dollars sent by Kapcharge via wire transfer to fund its ACH activity at HOPE FCU—including the ACH payments it processed for Murgio and Coin.mx—that passed through an HSBC account in Manhattan.  (*See* GX 862 (spreadsheet detailing HSBC wires); GX 2142-2, 2142-21).  Although Gross tries to downplay the significance of such wire transfers (*see* Br. 34), many of the material misrepresentations that Gross and his co-conspirators made to the NCUA pertained to Kapcharge

---

[20] In urging application of the "substantial contacts" test in this case, Gross points to this Court's use of the "substantial contacts" test in *Parrilla*, 2014 WL 7496319.  (Gross Mot. 34).  In *Parrilla*, this Court observed "that there is some confusion as to whether a 'substantial contacts' test is required when there is a showing that an act in furtherance of the conspiracy actually occurred in the district of venue," *id.* at *15 (citing cases), but nevertheless applied the substantial contacts test "[f]or the avoidance of doubt," *id.*  Notably, this Court's decision in *Parrilla* predated the Second Circuit's decisions in *Rutigliano* and *Lange*, which made clear that the "substantial contacts" test only applies where a defendant argues that a chosen venue would "result in a hardship to him, prejudice him, or undermine the fairness of the trial."  *Rutigliano*, 790 F.3d at 399; *accord Lange*, 834 F.3d at 75.

and its ACH activity at HOPE FCU.   Furthermore, the effects of Gross's corruption and

misrepresentations to the NCUA were felt not only in New Jersey, as he asserts (Gross Mot. 37),

but in multiple locations, including New York, Florida, and Virginia, where the NCUA is based.

Finally, the Southern District of New York was plainly no less suitable for accurate factfinding

than any other district upon which the conspiracy and substantive bribery scheme touched.   "While

another venue may have been more convenient for [Gross], 'where the acts constituting the crime

and the nature of the crime charged implicate more than one location, the Constitution does not

command a single exclusive venue.'"  *Lange*, 834 F.3d at 75 (quoting *Reed*, 773 F.2d at 480

(brackets omitted)).   Accordingly, Gross had substantial contacts with this District and conducting

the trial here was not unduly prejudicial to him.

### C.   Sufficient Evidence Supported the Conspiracy and Substantive Bribery Convictions

Gross challenges the sufficiency of the evidence to support his convictions on Count Three,

the multi-object conspiracy count, and Count Five, the substantive bank bribery count.   Both

claims are wholly without merit and should be swiftly rejected.

With respect to the conspiracy count, Gross first argues that there was insufficient evidence

"that Trevon Gross ever had a meeting of the minds with members of the Collectables Club or

agreed on the 'essential nature' of any plan."  (Gross Mot. 39 (quoting *United States* v. *Chavez*,

549 F.3d 119, 125 (2d Cir. 2008)).   In essence, Gross's claim boils down to an assertion that he

could not have had a "meeting of the minds" with Murgio or his co-conspirators because Gross

was not aware of Murgio's plan to use HOPE FCU in furtherance of Coin.mx's operations.   (Gross

Mot. 39).   As this Court recognized in denying Gross's pretrial motion to dismiss the substantive

bribery charge, this argument is a "red herring."  *United States* v. *Murgio*, 209 F.Supp.3d 698, 717

(S.D.N.Y. 2016).   As this Court succinctly explained, "Gross need not have known the precise

reasons for the alleged conspirators' interest in HOPE FCU to have known that he was accepting bribes in exchange for abusing his position as an officer of a federal credit union." *Id.*   Moreover, there was overwhelming evidence adduced at trial, as detailed in the facts section above, to support the jury's unanimous conclusion that Gross knowingly participated in a conspiracy to turn over control of HOPE FCU to Anthony Murgio and his co-conspirators in exchange for bribes.

Gross next argues that there was insufficient evidence to support the jury's findings (1) that he acted with the requisite "corrupt" intent, and (2) that he conspired to make "material" misstatements to the NCUA concerning the Collectables Club.   (Gross Mot. 39-40).   These arguments, too, are unavailing.   As detailed in the facts section above, there was overwhelming evidence adduced at trial to support the jury's unanimous conclusion that Gross acted corruptly and conspired to make material misrepresentations and omissions to the NCUA.

To the extent Gross challenges the jury's reliance upon the testimony of John Rollins and his use of the FIFO methodology to trace Gross's use of the bribe payments to pay for personal expenses (*see* Br. 39-40 and n.3), this argument amounts to an improper invitation for this Court to question the weight that the jury gave to Rollins's testimony and summary slides.   *See Guadagna*, 183 F.3d at 129; *see also, e.g.*, *United States* v. *Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997) ("'The weight is a matter for argument to the jury, not a ground for reversal on appeal.'" (quoting *United States* v. *Roman*, 870 F.2d 65, 71 (2d Cir. 1989)).   In any event, as the Court properly instructed the jury, Rollins's testimony and summary slides (GX 900) were admitted only as an aid to the jury in analyzing the underlying voluminous bank account and credit card records. (Tr. 3377-78).   Thus, to the extent the jury found that Gross personally profited from the bribe payments—a finding, it should be noted, that is not necessary to support the conclusion that Gross

acted corruptly—then such a finding was necessarily based upon the underlying financial records themselves, and not Rollins's testimony or summary slides, as Gross contends.

It also bears noting that Gross's argument concerning the materiality of his misstatements and omissions implicitly and improperly narrows the scope of the false statements object of the conspiracy.  In addition to misstatements concerning the eligibility of Collectables Club and its members to join HOPE FCU, this object also encompassed material misstatements and omissions that Gross and his co-conspirators made to the NCUA concerning other matters, including: (1) the payments that Gross and HOPE Cathedral received from Anthony Murgio and his co-conspirators; (2) the existence of a "Florida Branch" of HOPE FCU in Tallahassee; (3) the election of Murgio's designated members the Board of HOPE FCU at the annual meeting in June 2014; (4) the origins of HOPE FCU's relationship with KapCharge and its eligibility to be a member of HOPE FCU; (5) the financial health of HOPE FCU, including its true net-worth ratio; and (6) the existence of email accounts for former Collectables Club board members, access to which the NCUA requested from Gross at the time of the conservatorship.  In any event, as outlined in the facts section above, there was sufficient evidence adduced at trial to support a finding by a reasonable jury that Gross conspired to make material misrepresentations to, and conceal material facts from, the NCUA concerning the Collectables Club.

In short, Gross falls far short of meeting his heavy burden of demonstrating that there was insufficient evidence to support his convictions on Counts Three and Five.  Accordingly, Gross's Rule 29 motion should be denied.

**IV.     Conclusion**

For the reasons set forth above, this Court should deny Gross's Rule 29 and Rule 33

motions in their entirety.

Dated: New York, New York
          June 6, 2017

Respectfully submitted,

JOON H. KIM
Acting United States Attorney

By:     /s/_____
Eun Young Choi / Daniel S. Noble / Won S. Shin
Assistant United States Attorneys
(212) 637-2187 / 2239 / 2226