UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

:

UNITED STATES OF AMERICA,

:

    - v. -                                  S6 15 Cr. 769 (AJN)

:

ANTHONY R. MURGIO,

:

               Defendant.

:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING SUBMISSION FOR
## ANTHONY MURGIO

JOON H. KIM
Acting United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Eun Young Choi
Daniel S. Noble
Won S. Shin
Assistant United States Attorneys
   -- Of Counsel --

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in connection with the sentencing of Anthony Murgio ("Murgio" or the "defendant"), which is scheduled for June 27, 2017, at 10:00 a.m.  Application of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") yields an advisory term of imprisonment of 121 to 151 months' imprisonment. For the reasons discussed herein, the Government respectfully requests that the Court impose a sentence within the Guidelines range.  As the evidence at trial of Murgio's co-defendants, Yuri Lebedev and Trevon Gross, definitively established, Murgio was the creator and operator of Coin.mx, an unlicensed online Bitcoin exchange that systematically defrauded banks over an extensive period of time in order to trick them into processing Bitcoin transactions.  Lies conceived and deployed by Murgio permeated every aspect of Coin.mx's operation, including its use of front companies, like Collectables Club and Currency Enthusiasts, to try to conceal the illicit nature of the operation.  When banks shut down Coin.mx's operating accounts, Murgio orchestrated a scheme to bribe Trevon Gross, the Chairman and CEO of HOPE Federal Credit Union ("HOPE FCU") in New Jersey, to gain control of and operate the credit union.  After Gross turned over control, Murgio, Gross, and their co-conspirators opened accounts for Coin.mx and processed over $60 million in ACH transactions—including for Coin.mx—through the credit union even though it was incapable of handling such volume.  Further, to avoid detection from the National Credit Union Administration ("NCUA"), Murgio conspired with Gross, Lebedev, and others to obstruct the NCUA's examination of HOPE FCU and make false statements to the NCUA.

In his sentencing submissions, Murgio incredibly suggests that his crimes amount to little more than flawed business decisions of a "fiercely competitive man with a love of business and

entrepreneurship," whose enterprise was merely "overwhelmed by shoddy decisions and judgments" due to "overzealous corner-cutting." (Def. Submission at 1, 7). This self-serving gloss on Murgio's criminal conduct blinks reality. As the evidence adduced at trial demonstrated, Murgio—while fully cognizant of the laws and regulations governing Coin.mx and HOPE FCU—put his own ambition and greed above all else in order to make money. In the process, Murgio took advantage of the trust and loyalty of individuals closest to him, made corrupt payments to a pastor, repeatedly lied to banks and the NCUA, and ultimately contributed to the collapse of a federal credit union. Such blatant criminal conduct cannot be condoned or dismissed as the work of an overzealous and misguided entrepreneur. Indeed, Murgio has a history of persistently disobeying the law and lying in furtherance of his "fledgling venture[s]," *id.* at 1, including lying to a federal bankruptcy court and failing to pay state sales taxes. As such, the seriousness of Murgio's instant crimes, the need to achieve specific and general deterrence, and the need to promote respect for the rule of law compel a sentence that includes a substantial term of incarceration.

## **BACKGROUND**

### A.    **Counts of Conviction**

Superseding Indictment S6 15 Cr. 769 (AJN) charged Murgio in ten counts. Counts One and Two charged Murgio with conspiracy to operate and operation of an unlicensed money transmitting business, in violation of Title 18, United States Code, Sections 371 and 1960, respectively, based upon his operation of Coin.mx, an online Bitcoin exchange that was not registered or licensed by either federal or Florida authorities. Count Three charged Murgio with a four-object conspiracy, in violation of Title 18, United States Code, Section 371: (1) to make corrupt payments to an officer of a financial institution, in violation of Title 18, United States

Code, Section 215(a)(1); (2) to corruptly receive payments as an officer of a financial institution, in violation of Title 18, United States Code, Section 215(a)(2); (3) to make false statements to the NCUA, in violation of Title 18, United States Code, Section 1001; and (4) to obstruct the NCUA's examination of a financial institution, in violation of Title 18, United States Code, Section 1517.   Count Four charged Murgio with making corrupt payments to an officer of a financial institution, in violation of Title 18, United States Code, Section 215(a)(1).   Counts Six, Seven, and Eight charged Murgio with conspiracy to commit wire fraud and bank fraud, wire fraud, and bank fraud, in violation of Title 18, United States Code, Sections 1349, 1343, and 1344, respectively.   Counts Nine and Ten charged Murgio with conspiracy to commit money laundering and money laundering, in violation of Title 18, United States Code, Sections 1956(h) and 1956(a)(2)(A), respectively.   Finally, Count Eleven charged Murgio with aggravated identity theft, in violation of Title 18, United States Code, Section 1028A.

On January 9, 2017, Anthony Murgio pleaded guilty, pursuant to a plea agreement with the Government, to a lesser included offense of Count One (the objects of failure to register Coin.mx with federal and state authorities, in violation of Title 18, United States Code, Section 1960(b)(1)(A) and (B)); a lesser included offense of Count Three (the object of obstruction of an examination of a financial institution, in violation of Title 18, United States Code, Section 1517); and Count Six (conspiracy to commit bank and wire fraud).   The parties do not dispute the accuracy of the Guidelines range of 121 to 151 months' imprisonment calculated by the Probation Office in the Presentence Investigation Report ("PSR"), which matches the parties' Stipulated Guidelines Range in the plea agreement.   (*See* PSR ¶¶ 14, 43-58).

### B.      Offense and Relevant Conduct

Although Murgio pleaded guilty to a subset of the crimes with which he was charged in the S6 Indictment, an appropriate sentence for Murgio can only be fashioned by examining both Murgio's offense conduct and relevant conduct during his operation of Coin.mx.[1]  This Court is well-versed in the facts of this case from the parties' pretrial motion practice and the trial of Lebedev and Gross.  Accordingly, what follows is a summary of the facts relevant to the sentencing of Murgio.

### 1.      Coin.mx

In or about March 2013, Murgio began operating Coin.mx, an online Bitcoin exchange that allowed users to purchase Bitcoins over the internet using several different payment methods, including cash deposit, credit card, and ACH.  Coin.mx was headquartered in Florida, where Murgio was located, but also had operations overseas, most notably in Russia.  Despite being aware of federal and state registration requirements for money transmitters like Coin.mx,

---

[1]      It is well-established that a district court may rely upon evidence and testimony presented at trial in determining the sentence of a co-defendant.  *See*, *e.g.*, *United States* v. *Falco*, 101 F.3d 1393, 1996 WL 414466 at *2 (2d Cir. July 25, 1996) ("The trial court was entitled to consider evidence from the related trial of other window-installation conspirators, at which Judge Dearie himself presided." (internal citations omitted)).  Furthermore, in exercising its recognized "broad sentencing discretion, informed by judicial factfinding," *Alleyne v. United States*, 133 S.Ct. 2151, 2163 (2013), "[a] sentencing court is free to consider hearsay evidence, evidence of uncharged crimes, dropped counts of an indictment and criminal activity resulting in acquittal" in determining a just sentence, *United States* v. *Gomez*, 580 F.3d 94, 105 (2d Cir. 2009), so long as that conduct is proven by a preponderance of the evidence and does not increase the statutory minimum or maximum available punishment.  *United States* v. *Ulbricht*, No. 15-1815, 2017 WL 2346566, at *35, 38 (2d Cir. May 31, 2017); *United States* v. *Stevenson*, 834 F.3d 80, 85 (2d Cir. 2016); *United States* v. *Ryan*, 806 F.3d 691, 693-94 (2d Cir. 2015); 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); *United States* v. *Lee*, 818 F.2d 1052, 1055 (2d Cir. 1987) ("Any circumstance that aids the sentencing court in deriving a more complete and true picture regarding the convicted person's . . . behavior is properly considered.").

Murgio purposely failed to register Coin.mx with FinCEN or obtain a license in Florida.  Instead, Murgio tried to set-up Coin.mx as a purported "Private Membership Association" in an attempt to skirt the anti-money laundering regulations and avoid scrutiny of Coin.mx.

Indeed, Murgio went to great lengths to conceal the illegal nature of Coin.mx.  Most notably, Murgio repeatedly lied to banks and other third-party service providers, such as credit card payment processors, about the nature of Coin.mx's business.  For example, Murgio used phony front companies, such as "Collectables Club," "Currency Enthusiasts," and "Collecting Club," to open bank accounts for Coin.mx because Murgio understood that banks would not knowingly conduct business with a Bitcoin exchange.  Murgio also created phony websites, such as collectpma.com for Collectables Club, and supplied false Merchant Category Codes ("MCCs"), which were used to open and maintain bank and payment processing accounts.  With the assistance of Yuri Lebedev and computer programmers in Russia, Murgio arranged for computer servers with different IP addresses to be associated with Coin.mx transactions in order to disguise the fact that Coin.mx's servers were located in Russia, which would have drawn suspicion.  On several occasions, Murgio used his father's and brother's names—sometimes without their knowledge—to open accounts for Coin.mx so that third-parties would not be alerted to Murgio's personal bankruptcy and other legal issues, which would have drawn even more scrutiny to Coin.mx.

Murgio also instructed employees of Coin.mx to lie to financial institutions and to have their customers lie as well.  Thus, Murgio directed customer service representatives, including Jennifer Wotherspoon, Ricardo Hill, and Jose Freundt, never to mention to any financial institution that Coin.mx was a Bitcoin exchange and to coach Coin.mx customers to do the same during three-way calls with the banks to seek approval of particular Coin.mx transactions.  In

addition, because Coin.mx's comparative advantage over other Bitcoin exchanges was that it allowed customers to purchase Bitcoin using credit cards, it was imperative that Coin.mx be able to continue to process credit cards through payment processors.  When certain customers called their credit card companies to challenge unrecognizable transactions (which were actually Coin.mx transactions, but disguised), Murgio feared that a high volume of chargebacks would not only negatively impact Coin.mx's bottom line, but also lead to the termination of Coin.mx's merchant processing accounts.  To address this threat, Murgio engaged in identity theft by causing numerous false affidavits authorizing the transactions to be executed using RightSignature (a website that allows users to electronically sign documents).  The false affidavits contained the name and address of customers and were backdated to appear that they had been executed by the customers before the challenged transactions.

In furtherance of Coin.mx's operations and further to conceal its illegal nature, Murgio and his co-conspirators used various foreign bank accounts to move funds used to support Coin.mx's operations.  For example, Murgio used bank accounts in Cyprus, including those in the names of shell companies Oz Trading Limited and Woryem Trading Limited, to move money between operating accounts controlled by his co-conspirators abroad and Coin.mx's domestic accounts.  Analysis of domestic bank account records establish that from January 2014 to December 2014, domestic bank accounts for Coin.mx received approximately $2,564,864.14 from a Woryem Trading account and $34,935.29 from an Oz Trading account, both based in Cyprus.  During the same period of time, approximately $1,746,484.13 was sent from Coin.mx's domestic bank accounts to the Oz Trading Limited account.  Furthermore, the wire transfers between these accounts were supported by false invoices describing the payments as being for "IT services" and "Search Engine Optimization services."   Murgio and his co-conspirators also

used overseas payment processing companies, including processors in Baku, Azerbaijan, to process Coin.mx credit card transactions.  Typically, such transactions were disguised as relating to children's toys or wedding fashion in order to conceal their true Bitcoin nature.

Murgio's operation of Coin.mx facilitated other criminal activity.  Indeed, the bulk of Bitcoin distributed by Coin.mx was used by customers in connection with other illicit activity.  Thus, approximately half of Coin.mx's customers purchased Bitcoin from Coin.mx for use in ransomware schemes.  Murgio and Wotherspoon regularly discussed the fact that their customers were victims of such schemes.  (*See*, *e.g.*, Tr. 477-411; GX 5135).[2]  Moreover, because Murgio understood ransomware victims would typically be one-time customers of Coin.mx, and to take advantage of such customers' desperation, Murgio increased the processing fees that Coin.mx charged ransomware victims.  (*See*, *e.g.*, PSR at 25).  In addition, approximately 30-40% of customers of Coin.mx were using Bitcoin to make illicit purchases on Darknet market websites that sold drugs, guns, and fake identities, among other contraband.  (Tr. 401-02, 480-81).  Murgio was also aware of his facilitation of this illegal activity.  For example, in January 2014, after the arrest of Charlie Shrem, the CEO of BitInstant, who had facilitated customers' purchase of Bitcoin for use on SilkRoad, Murgio noted:  "They are prob coming after me next.  we prob did that."  According to Wotherspoon, Murgio nevertheless continued to operate Coin.mx, selling Bitcoin to customers for use on other Darknet sites such as Evolution and Agora.

## 2.    HOPE FCU Bribery Scheme

In early 2014, because of the difficulties Coin.mx was experiencing in using traditional bank and credit card accounts to process Bitcoin transactions, Murgio sought to take over control

---

[2]    References herein to "Tr." and "GX" are to the trial transcript and Government Exhibits presented at trial, respectively.

of and operate a bank or credit union.  Murgio identified HOPE FCU in New Jersey as a

potential takeover target.  As described by Murgio's co-conspirators at trial, the "plan" was for

"friends or colleagues of Anthony Murgio . . . to make payments to Trevon Gross and Hope

Cathedral, and in [re]turn take full control of the credit union."  (Tr. 1283-84 (Hill Testimony);

*see also* Tr. 1953-54 (Freundt Testimony).  From its inception, the deal between Murgio and

Gross was corrupt.  As Ricardo Hill testified, "[m]aking payments to an individual in a church to

take over a credit union . . . was obviously not a legitimate business deal," especially because

none of the proposed board members qualified to be members of the credit union, as none of the

Collectables Club members "lived, worked, or worshipped in Lakewood, New Jersey," as was

required to even be a member of HOPE FCU.  (Tr. 1287-89; *see also* Tr. 1689 (Hill Testimony);

Tr. 1978-79 (Freundt Testimony)).

   As part of the quid pro quo, Murgio arranged for a series of "donations" totaling over

$150,000 to be made to Gross's church.  Murgio and his co-conspirators later made over $12,000

in additional payments to Gross for so-called "consulting fees."  In exchange, Gross gave Murgio

and his co-conspirators operational and Board control of the credit union, including access to

HOPE FCU's premises and computer systems.  Among other things, Gross permitted

Kapcharge—the Canadian payment processing company with which Murgio was affiliated and

which processed ACH transactions for Coin.mx—to open a business account at HOPE FCU even

though Kapcharge did not qualify for membership in the credit union.  Kapcharge used this

account to process over $60 million dollars' worth of ACH transactions for, among other

businesses, Coin.mx, an international money transmitting business, and several payday lending

companies.  Gross and Murgio helped facilitate this processing activity even though they were

aware that the credit union was not adequately capitalized and lacked adequate anti-money laundering controls.

### 3. Obstruction of, and False Statements to, the NCUA

To prevent the NCUA from discovering the corrupt arrangement between Murgio and Gross, and to perpetuate Murgio's control of, and processing of transactions through, HOPE FCU, Murgio, Gross, and their co-conspirators made numerous lies and misrepresentations to the NCUA. Not only did they never disclose to the NCUA any of the bribe payments or Murgio's role in the credit union, but they also lied about the Collectables Club and Kapcharge's relationship with HOPE FCU in order to avoid further scrutiny from the NCUA. For example, Murgio misrepresented the location of the Collectables Club and its membership to the NCUA because he understood the NCUA would have concerns regarding the eligibility of the new board members—based in Florida, Tennessee, and elsewhere—to be members of HOPE FCU. Although both Collectables Club and Kapcharge represented that they were both located at 216 River Avenue in Lakewood, New Jersey, that was not a functioning office of either Collectables Club, Coin.mx, or Kapcharge. Murgio, Gross, and their co-conspirators continuously relied on this sham "virtual address" to trick the NCUA into believing that Collectables Club and Kapcharge qualified for membership in HOPE FCU.

Evidence adduced at trial also showed that Murgio and his co-conspirators created documentation to support the lies told to the NCUA regarding the Collectables Club and Kapcharge. For instance, in August 2014, after the NCUA began to ask questions about the new Board members, Murgio, Hill, and Gross worked to paper-over their lies with backdated application files and other documents in anticipation of the NCUA examiners' onsite visits. (*See* Tr. 1443-47 (Hill traveled to New Jersey in September 2014 to put together new board member

files in case the NCUA examiners sought to review them, despite the fact that "[a]ll of us should

have done this in June," prior to their election); *see also* Tr. 1452-55, GX 2269, 2613 (creation of

certified Board resolution designating Hill as having signatory power on behalf of the Board,

even though the Board never so approved).  For example, Murgio caused the creation of a

document that falsely stated that Collectables Club had been located at 216 River Avenue in

Lakewood since April 2014.  Murgio also changed the Collectables Club address in HOPE

FCU's systems from an address in West Palm Beach in Florida to the sham Lakewood address.

(GX 1352-C, 1352-D; Tr. 1490-95).  In November 2014, when NCUA examiner Meg Flok asked

for the account opening documents for Kapcharge, Murgio, Gross, and others worked to

manufacture supporting documentation to establish Kapcharge's eligibility in the credit union.

These efforts included the backdating of application documents for Mark Francis and Shoula

Cohen's signatures, and changing Kapcharge's website to reflect the Lakewood "virtual office"

address and a phone number that forwarded to Kapcharge in Montreal.  (*See* GX 4506 at PK

4083-4212 (WhatsApp conversation between Anthony Murgio and Mark Francis about efforts to

trick NCUA examiner); GX 1665, 3565 (Gross asking for executed application from Mark

Francis and Shoula Cohen, and executed copies sent back to Gross from Kapcharge); GX 6131

(Kapcharge account file provided to NCUA by HOPE FCU); GX 1291 (Lebedev setting up

phone number to forward to Kapcharge's Canadian phone number)).  Murgio and Hill also

worked frantically to prepare fake board minutes during Flok's visit and to change Kapcharge's

legal name and information in HOPE FCU's system to the sham Lakewood address and

forwarding phone number.  (GX 4507 at PK 3925-38 (Hill WhatsApp)).

 Murgio, Gross, and their co-conspirators also understood that the NCUA would

scrutinize the net worth ratio of HOPE FCU, which became severely undercapitalized as a result

of the high volume of ACH transactions being processed through the credit union. As a result, Murgio and his co-conspirators agreed to move a significant amount of funds out of Kapcharge's account at month-end so that the credit union's assets would appear lower than the true number. (GX 2502, 2502-T at 9-18, 2166; Tr. 1395-97 (Hill Testimony)). Thus, although Kapcharge's account balance on HOPE FCU's books on September 30, 2014 was over $2.75 million dollars—which rendered HOPE FCU inadequately capitalized (*see* GX 709-A, at 7, 15 (Kapcharge 6527 statement))—Gross and Hill worked with members of Kapcharge to manipulate the financials so that the account balance instead reflected $300,020.59, which allowed HOPE FCU to falsely report to the NCUA that it was adequately capitalized. (*See* GX 790-A at 15, 2163, 2166, 2173, 6103 at 14; *see also* Tr. 2323-26).

In January 2015, after the fallout between the Collectables Club and Gross, Murgio attempted to regain control of the credit union by having his father draft a letter sent to the NCUA, signed by Yuri Lebedev, Ricardo Hill, and Timothy Ellrich. (GX 6121). The letter falsely stated that the Collectables Club was headquartered in Lakewood, New Jersey, purportedly at an address where Murgio's aunt and cousin lived. When his efforts to regain control of HOPE FCU failed, Murgio drafted, with the help of his father, additional documents containing numerous misrepresentations, which Murgio caused to be sent to the NCUA in an attempt to charter a new credit union for "eCommerce Private Membership Association." (*See*, *e.g.*, GX 2287, 2030, 2031, 2035; Tr. 1537-39, 2103-16, 2123-28). Among other things, Murgio misrepresented to the NCUA that the proposed eCommerce PMA credit union would have nothing to do with Bitcoin, when in fact "the whole purpose of the credit union was to facilitate the Bitcoin transactions." (Tr. 2127-28; GX 2035).

11

### C.    The Presentence Investigation Report

In its Presentence Report, the Probation Office, consistent with the parties' plea

agreement, finds that Murgio's adjusted offense level under the United States Sentencing

Guidelines is 32, calculated as follows:

- the base offense level is 7;

- a 20-level enhancement is warranted because the loss amount was between $9.5 million and $25 million;[3]

- a 2-level enhancement is warranted because the offense involved 10 or more victims;

- a 2-level enhancement is warranted because a substantial part of the fraudulent scheme was committed from outside the United States and the offense involved sophisticated means in which Murgio intentionally engaged or that he cause;

- a 4-level enhancement is warranted because Murgio was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive; and

- a 3-level reduction is warranted for acceptance of responsibility.

(PSR ¶¶ 47-58).  The Probation Office agrees with the parties that Murgio has no criminal

history points and is in criminal history category I.  (PSR ¶ 61).  Based on an offense level of 32

and a criminal history category of I, Murgio's Guidelines range is 121 to 151 months'

imprisonment.  (PSR ¶ 111).

The Probation Office recommends a Guidelines sentence of 96 months' imprisonment, to

be followed by 5 years of supervised release.  (PSR at 26).

---

[3]    The loss amount represents a conservative estimate of the funds that passed through the accounts of the domestic banks that Murgio defrauded in furtherance of Coin.mx's operations. The Government did not include figures for credit card and debit card transactions that were made through the Azerbaijani-based payment processing accounts on the theory that the bulk of those transactions (and corresponding funds) would be accounted for in the influx of funds into the domestic bank accounts.

## DISCUSSION

### A.    The Governing Legal Framework

The Guidelines still provide strong guidance to the Court in light of *United States* v. *Booker*, 543 U.S. 220 (2005) and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005).  Although *Booker* held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  543 U.S. at 264.  As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range": that "should be the starting point and the initial benchmark."  *Gall* v. *United States*, 55 U.S. 38, 49 (2007).  The Guidelines range is thus "the lodestar" that "'anchor[s]'" the district court's discretion.  *Molina-Martinez* v. *United States*, 136 S. Ct. 1338, 1345-46 (2016) (quoting *Peugh* v. *United States*, 133 S. Ct. 2072, 2087 (2013)); *accord Beckles* v. *United States*, 137 S. Ct. 886, 894 (2017) ("The Guidelines thus continue to guide district courts in exercising their discretion by serving as 'the framework for sentencing.'" (quoting *Peugh*, 133 S. Ct. at 2083)).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see* 18 U.S.C. § 3553(a)(2); "the kinds of sentences available," 18 U.S.C. § 3553(a)(3); the Guidelines range itself, *see* 18 U.S.C. § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see* 18 U.S.C. § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," 18 U.S.C. § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7).  In determining the appropriate sentence, the statute

directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the

purposes" of sentencing, which are:

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)    to afford adequate deterrence to criminal conduct;
>
> (C)    to protect the public from further crimes of the defendant; and
>
> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within Guidelines

range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines

supports the premise that district courts must begin their analysis with the Guidelines and remain

cognizant of them throughout the sentencing process." *Gall* v. *United States*, 552 U.S. at 50 n.6.

Their relevance throughout the sentencing process stems in part from the fact that, while the

Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the

Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S.

338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical

evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S.

at 46; *see also Rita* v. *United States*, 551 U.S. at 349.  To the extent a sentencing court varies from

the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the

justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

### B.      The Court Should Impose a Sentence Within the Guidelines Range of 121 to 151 Months' Imprisonment

A Guidelines sentence of 121 to 151 months' imprisonment is sufficient, but not greater than necessary, to comply with the purposes of sentencing.  The Section 3553(a) factors most applicable in this case include the nature and circumstances of the offense of conviction, the seriousness of the offense, the need to provide just punishment, the need to promote respect for the law, the need to afford adequate deterrence to criminal conduct, and the history and characteristics of the defendant.  None of these factors militates for Murgio receiving a below-Guidelines sentence.

### 1.      The Nature, Circumstances, and Seriousness of the Offense, and the Need to Provide Just Punishment

The nature, circumstances, and seriousness of Murgio's offenses and the need for just punishment warrant a Guidelines sentence.  Together with his co-conspirators, Murgio flouted state and federal law governing money transmitting business in order to operate Coin.mx—a business that fueled illegal ransomware schemes and the purchase of narcotics and other contraband on Darknet market websites.  Murgio and his co-conspirators lied to banks and other financial institutions to make them unwitting and unwilling participants in risky Bitcoin transactions.  Murgio and his co-conspirators bribed the head of HOPE FCU to take control of and operate that federal credit union, including to process tens of millions of dollars of risky ACH transactions.  Finally, Murgio and his co-conspirators repeatedly lied to the NCUA to obstruct that federal regulator's examination of HOPE FCU.

Murgio's offenses are particularly serious in light of the important federal interests at stake, as embodied in the various federal statutes Murgio violated.

_Unlicensed Money Transmitting Business_.  Section 1960, the statute prohibiting the operation of an unlicensed money transmitting business, "was enacted in order to combat the growing use of money transmitting businesses to transfer large amounts of the monetary proceeds of unlawful enterprises."  _United States_ v. _Velastegui_, 199 F.3d 590, 593 (2d Cir. 1999).  One of Congress's chief targets was "the movement of funds in connection with drug dealing."  _United States_ v. _Bah_, 574 F.3d 106, 112 (2d Cir. 2009).  Congress was "concerned that drug dealers would turn increasingly to 'nonbank financial institutions' to 'convert street currency into monetary instruments' in order to transmit the proceeds of their drug sales."  _United States_ v. _Faiella_, 39 F. Supp. 3d 544, 545-46 (S.D.N.Y. 2014).  But Section 1960 was meant to address all manner of money launderers' "new avenues of entry into the financial system.'"  _United States_ v. _Murgio_, 209 F. Supp. 3d 698, 708 (S.D.N.Y. 2016) (quoting S. Rep. No. 101–460 (1990)).  Congress accordingly worded Section 1960 broadly "to keep pace with . . . evolving threats."  _United States_ v. _Faiella_, 39 F. Supp. 3d 544, 546 (S.D.N.Y. 2014).  Thus, "[f]rom its inception," Section 1960 "sought to prevent innovative ways of transmitting money illicitly."  _Murgio_, 209 F. Supp. 3d at 708.

Here, Murgio's unlicensed money transmitting business facilitated both traditional crimes (narcotics and other contraband trafficking) and new frontiers of criminal conduct (ransomware schemes) by offering criminals a financial platform beyond the view and scrutiny of banks and regulators.  Approximately 80-90% of transactions on Coin.mx were for individuals seeking to make purchases of illegal and dangerous items on the dark web and victims of ransomware.  Murgio understood that he would not be able to freely profit from these pools of customers if he were required to follow the regulations governing licensed money transmitting businesses (including the Bank Secrecy Act and anti-money laundering procedures) because he would be

required to report such suspicious activities to the government.  Murgio deliberately chose not to register Coin.mx with regulators, and as a result, he supported both underground markets for illegal goods as well as the continued monetization of malware for cybercriminals.  This is serious criminal conduct that supports a Guidelines sentence.

Murgio attempts to minimize the seriousness of this offense by arguing that Coin.mx helped ransomware victims.  (Def. Submission at 15-17).  This argument suffers from several flaws.  As an initial matter, to the extent that Murgio believes that the conduct is not covered by the statute, the statutory text conclusively forecloses the argument.  Section 1960 criminalizes the operation of a money transmitting business that "involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity."  18 U.S.C. § 1960(b)(1)(C).[4]  The evidence establishes that Murgio knew that Bitcoin purchased on Coin.mx was being used not only to buy illegal drugs and other items on the dark web, but also to pay hackers that victimized individuals through the spread of ransomware.

The Court should also reject Murgio's policy argument that he should not be punished for helping ransomware victims pay their ransoms.  Murgio mischaracterizes the FBI's position on paying ransoms based on an extemporaneous statement of a single agent.  As a matter of official policy, the FBI "does not support paying a ransom to the adversary," for two important reasons.  FBI Public Service Announcement, Alert No. I-091516-PSA (Sept. 15, 2016), *available at*

---

[4]    Murgio's counsel has publicly stated he understands that Section 1960 criminalizes behavior such as his client's as a matter of law.  *See, e.g.*, Michael del Castillo, "Lawyers Argue Bitcoin Needs Change in Money-Transmitting Laws" (May 4, 2016), *available at* http://www.coindesk.com/anthony-murgios-lawyer-argues-for-change-of-law-during-regulatory-panel/); *see also* Brian Klein, "Does 18 U.S.C. § 1960 create felony liability for bitcoin businesses?," *available at* https://coincenter.org/entry/does-18-u-s-c-1960-create-felony-liability-for-bitcoin-businesses (July 21, 2015) (published the day of Murgio's arrest).

https://www.ic3.gov/media/2016/160915.aspx).  First, "[p]aying a ransom does not guarantee the

victim will regain access to their data; in fact, some individuals or organizations are never

provided with decryption keys after paying a ransom."  *Id.*  Second, "[p]aying a ransom

emboldens the adversary to target other victims for profit, and could provide incentive for other

criminals to engage in similar illicit activities for financial gain."  *Id.*  For similar reasons, other

expert commentary opposes the payment of ransoms.[5]

Furthermore, the Court should reject, as a matter of fact, that Murgio had pure motives in

selling Bitcoin to ransomware victims.  Murgio instructed his employees to charge victims of

ransomware higher fees than other customers, understanding full well that he was taking

advantage of their desperation.  Murgio calls this "help" and "assistance."  One of Murgio's

supporters, the Digital Currency and Ledger Defense Coalition, describes this euphemistically as

a "distasteful act."  (*See* Def. Ex. E, Letter from Grant Fondo at 1).  Shorn of any self-serving

gloss, Murgio's treatment of ransomware victims should be seen for what it really was:

"profiteering" and "exploitation."

*Bank Fraud and Wire Fraud*.  Congress enacted the bank fraud statute, 18 U.S.C. § 1344,

"because of the 'strong federal interest in protecting the financial integrity of [federally insured

financial] institutions.'"  *United States* v. *Nkansah*, 699 F.3d 743, 759 (2d Cir. 2012) (Lynch, J.,

---

[5]      For example, Europol advises individuals not to pay ransoms because by doing so "you
will be supporting the cybercriminals' business.  Plus, there is no guarantee that paying the fine
will give you back the access to the encrypted data."  *See* Press Release, "No More Ransom:
Law Enforcement and IT Security Companies Join Forces to Fight Ransomware (July 25, 2016),
*available at* https://www.europol.europa.eu/newsroom/news/no-more-ransom-law-enforcement-
and-it-security-companies-join-forces-to-fight-ransomware.  To take another example,
statements from the Council of Foreign Relations assert that the act of paying ransoms itself
should be illegal.  *See* Robert K. Knake, Paying Ransom on Ransomware Should Be Illegal,
*available at* https://www.cfr.org/blog/paying-ransom-ransomware-should-be-illegal?cid=soc-
twitter-in-paying_ransom_on_ransomware_should_be_illegal-022916.

concurring in part and concurring in the judgment in part) (quoting S. Rep. No. 98-225, at 377

(1983)); *see also Loughrin* v. *United States*, 134 S. Ct. 2384, 2392 (2014) (Congress intended

Section 1344 to "expand federal criminal law's scope" and "fill th[e] gap" left by narrow judicial

constructions of the mail and wire fraud statutes). Here, the entire Coin.mx business created by

Murgio relied on lying to banks and credit card processors about the nature of the Coin.mx

transactions. These transactions imposed material economic and regulatory risk, as illustrated by

the trial testimony of Chase witnesses Erika Heinrich and Kimberly Hett, as well as Christian

Wilson from First Data. Financial institutions relied upon the representations of their customers

and merchants when conducting business, and they knew that Bitcoin, with its anonymity and

consequent frequent use in criminal activities, posed enormous risks—reputational and

economic. Murgio nevertheless devised a series of schemes to trick those financial institutions

into allowing him to conduct his business, thus forcing them to unwittingly absorb those risks

with every transaction. This widespread, repeated fraud further supports a Guidelines sentence.

 *Financial Institution Bribery*. It cannot be disputed that eliminating the bribery of

financial institution officers—and thus ensuring the integrity of financial institutions

themselves—is of the utmost importance. *See United States* v. *Kelly*, 973 F.2d 1145, 1152 (5th

Cir. 1992) (Congress intended "to remove from the path of bank officials the temptation of self

enrichment at the borrower's or bank's expense"); *United States* v. *Denny*, 939 F.2d 1449, 1454

(10th Cir. 1991) (Congress intended to criminalize "conduct that involves an effort to undermine

an employee's fiduciary duty to his or her [bank] employer"); *United States* v. *Foster*, 566 F.2d

1045, 1048 (6th Cir. 1977) ("If there is any part of the national economy that society in general is

interested in, it is the banks. The concern is that the banks be operated honestly and without

failures."). Here, Murgio and Gross were the two linchpins of a bribery scheme that involved the

election of a slate of ineligible directors hand-picked by Murgio to the board of HOPE FCU, and the continued operation of the credit union by Murgio and Gross (with the help of unqualified individuals like Hill). And together, Murgio and Gross agreed to process tens of millions of dollars of ACH transactions through HOPE FCU, at great risk to the credit union and its members—resulting ultimately in the credit union's conservation and liquidation.

Shockingly, nowhere in his sentencing submission does Murgio attempt to explain his decisions to bribe Gross or partner with Kapcharge to run tens of millions of dollars of ACH transactions through the credit union. Although Murgio did not plead guilty to the bribery charges, these crimes were proven beyond a reasonable doubt at trial and are properly considered by the Court in fashioning an appropriate sentence. Standing alone, Murgio's orchestration of this corrupt scheme cries out for a substantial term of incarceration.

*Obstruction/False Statements*. Making false statements to a federal regulator to obstruct the examination of a financial institution is a serious crime meriting serious punishment. *See Brogan* v. *United States*, 522 U.S. 398, 405 (1997) (observing that in enacting 18 U.S.C. § 1001, Congress "has decreed the obstruction of a legitimate investigation to be a separate offense, and a serious one"). Furthermore, the obstruction of the examination of a financial institution can obscure the examining agency's view of the financial institution's health. This potentially puts at risk not only the federal fund that insures the financial institution's deposits, but many third parties, including the financial institution's customers, employees, and counterparties. In this case, Murgio's obstructive conduct (along with that of his co-conspirators, particularly Gross) ultimately led to the insolvency, conservatorship, and liquidation of HOPE FCU. Murgio's role in the repeated lies to, and obstruction of, the NCUA further supports a Guidelines sentence.

The seriousness the offenses is further amplified here by Murgio's outsized role in them. Murgio was an organizer and leader of several conspiracies that involved at least five participants (including Gross, Lebedev, Michael Murgio, Hill, Freundt, and Wotherspoon, among others).  Murgio initiated each of the schemes in which he participated—money laundering, bank and wire fraud, bribery, and obstruction—and personally recruited his family members and his close friends alike to execute these schemes.  Murgio decided what lies needed to be told to financial institutions to keep Coin.mx afloat, in what ways, and what documentation, websites, and other internet infrastructure had to be fabricated and created to prop up these lies.  Murgio trained his staff—whom he recruited from those closest to him—to lie to financial institutions, to teach their customers to lie, and to perpetuate those lies. Moreover, it was Murgio's idea to attempt to find a small credit union that he could corruptly take over through bribes—not by placing himself on the Board, but instead by installing those he could trust to operate the credit union.  Thereafter, because he stood to profit on the volume of the transactions, Murgio arranged for Kapcharge to run ACH transactions through the credit union, with the consent of Gross, and then was instrumental in hiding the true nature of this arrangement from the NCUA.  Murgio's additional culpability for a larger role in the conspiracies increases the need for just punishment.  *See* U.S.S.G. § 3B1.1 application note background (recognizing that "persons who exercise a supervisory or managerial role in the commission of an offense tend to profit more from it and present a greater danger to the public and/or are more likely to recidivate").

Relying on *United States* v. *Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012), and *United States* v. *Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006), Murgio argues that a downward variance is warranted.  (Def. Submission at 13).  But both cases are distinguishable.  In *Gupta*,

the offense level under the insider-trading Guideline was driven largely by the gain resulting

from the insider trading, even though the defendant "did not in any direct sense receive one

penny" of those gains.  904 F. Supp. 2d at 350.  Here, in contrast, the most significant contributor

to the offense level is the volume of Coin.mx transactions that financial institutions were

fraudulently induced to process by Murgio and his co-conspirators.  Those transactions presented

significant risks to the financial institutions.  And Murgio stood to gain from those transactions.

Not only did Coin.mx collect fees from the transactions, but the business itself would grow and

be more successful the more such fraudulent transactions it processed.

Adelson is likewise inapposite.  There, the defendant "did not participate in the [multi-

year] fraudulent conspiracy until its final months," and was only "sucked into the fraud" because

"he feared the effects of exposing what he had belatedly learned was the substantial fraud

perpetrated by others."  441 F. Supp. 2d at 513.  The Court thus likened Adelson to "an

accessory after the fact, a position that has historically been viewed as deserving lesser

punishment."  Id.  Here, in stark contrast, Murgio was the linchpin of each criminal scheme.

### 2.    The Need to Promote Respect for the Law and to Afford Adequate Deterrence

The need for the sentence to afford adequate deterrence and to promote respect for the

law further supports imposition of a Guidelines sentence.  Although Murgio has no criminal

history points, the defendant's previous encounters with the judicial system demonstrate the need

in this case for specific deterrence and the need to promote Murgio's own respect for the law.

In January 2013, the defendant was arrested for failure to pay state sales taxes related to

his operation of Tapas Lounge in Tallahassee, Florida.  After his arrest, he was released on a

$10,000 bond.  The criminal tax case continued until February 2015 upon entry of a deferred

prosecution agreement, and the charges were nolle prosequi in April 2015 after Murgio paid over

$25,000 in restitution and costs.  (*See* PSR ¶¶ 68-69).  Thus, while these charges were pending and he was released on bond—when he should have been deterred from future criminal activity while under court supervision—Murgio instead jumped headfirst into running an illegal Bitcoin exchange, and participated in several interlocking schemes involving money laundering, bank and wire fraud, bribery, and obstruction.

During the pendency of his criminal state tax charges, Murgio was also found to have lied to a federal bankruptcy court.  Specifically, in April 2012, Murgio filed a voluntary petition for Chapter 7 relief in the Northern District of Florida.  During his bankruptcy proceedings, Murgio failed to disclose significant rental income that he was receiving as a result of leasing condominiums, for which he had instructed the lessees to pay a company he owned (Droid Marketing) in lieu of himself directly.  Murgio insisted to the bankruptcy court that he had unintentionally omitted this substantial monthly income.  But in a September 2013 order, the court concluded that Murgio had "made false statements under oath as to material facts with the requisite fraudulent intent," and denied Murgio's discharge because his "actions, taken together, are sufficient to prove his intent to hinder, delay or defraud creditors."  (*See* PSR ¶ 109; *In re Anthony Robert Murgio*, No. 12-40231, (N.D. Fla. Bankr. Sept. 23, 2013)).  Thus, even after a federal judge found that he had lied to the court, Murgio was not deterred from perpetuating other lies in furtherance of his various criminal schemes.  A Guidelines sentence would do what these prior brushes with the law failed to do—deter Murgio from committing crimes again in the future and instill in him an appropriate respect for the law.

A Guidelines sentence would also serve general deterrence and promote respect for the law in the public.  A lenient sentence would diminish respect for the law and undermine general deterrence, as it would be seen as a slap on the wrist for a defendant who repeatedly lied to

financial institutions, bribed an officer of a federal credit union, and repeatedly lied to the federal government.  A lenient sentence would have a particularly negative effect here because it would send a message to entrepreneurs, and businessmen and businesswomen more generally, that they can engage in criminal conduct without facing the most serious consequences, which would in turn infect entire business cultures.  *See United States* v. *DeRiggi*, 72 F.3d 7, 8 (2d Cir. 1995) ("[A] corrupt executive who is seen to be corrupt by subordinates leads by example.").  A Guidelines sentence, on the other hand, would send an important message that even successful entrepreneurs and businessmen and businesswomen cannot defraud financial institutions, bribe credit union officers, and obstruct the federal government with impunity because they will be subject to serious federal penalties, including significant prison time.  *See United States* v. *Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (noting that legislative history of Section 3553(a) supports conclusion that "Congress viewed deterrence as 'particularly important in the area of white collar crime,'" and that "[b]ecause economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence"); *United States* v. *Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress").

### 3.      The History and Characteristics of the Defendant

Two aspects of "the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), are most pertinent here.  The first is the instant crimes, which demonstrate Murgio's willingness to lie, cheat, bribe, and steal—as well as his sheer greed, as he saw the desperation of others as an opportunity to line his pockets.  The second is Murgio's criminal history, which demonstrates that even while he had criminal charges pending, he committed the instant crimes.  For the reasons discussed above, Murgio's criminal history supports a Guidelines sentence because

previous encounters with the law failed to deter Murgio from criminal conduct and failed to instill in him a respect for the law.

Murgio submits letters from friends and family describing his prior entrepreneurial endeavors and the support and generosity he has shown to others over the years. Such factors may be considered as part of the history and characteristics of the defendant. Nevertheless, a defendant's employment history and "prior good works" are discouraged bases for departure. *See* U.S.S.G. § 5H1.5 ("Employment record is not ordinarily relevant in determining whether a departure is warranted."); § 5H1.11 ("Civic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a departure is warranted"). The Guidelines recommend that courts balance the permissible consideration of factors under Section 3553(a) with policy statements discouraging consideration of those same factors by deeming such factors "not ordinarily relevant to the determination of whether a sentence should be *outside* the applicable guideline range," except in "exceptional cases." U.S.S.G. ch. 5, pt. H intro. cmt. (emphasis added).

Here, Murgio's history as a self-professed entrepreneur and his generosity do not support a significant downward variance. Supportive letters commenting on the defendant's successes are standard in white-collar cases. *See United States* v. *McClatchey*, 316 F.3d 1122, 1135 (10th Cir. 2003) ("[E]xcellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her."). In any event, whatever Murgio's reputation was previously, or in the eyes of those who were not involved in these crimes, that reputation must be discounted by the fact that he committed the instant offenses. Finally,

although Murgio's past generosity is "to be commended," he "should not be allowed to treat charity as a get-out-of-jail card."  *United States* v. *Vrdolyak*, 593 F.3d 676, 682 (7th Cir. 2010).

In short, Anthony Murgio orchestrated, fueled, and personally engaged in a series of elaborate frauds and schemes over multiple years, while a state criminal tax case was pending against him, and after a federal bankruptcy court concluded he had made false statements under oath.  The history and circumstances of the offense, as well as the history and characteristics of the defendant set forth above and illuminated by the evidence at trial, warrant a Guidelines sentence.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Court should sentence Anthony Murgio to a term within the Guidelines range of 121 to 151 months' imprisonment.

DATED:      June 20, 2017
                New York, New York

                             Respectfully submitted,

                             JOON H. KIM
                             Acting United States Attorney

                  By: ___/s/_____
                      Eun Young Choi
                      Daniel S. Noble
                      Won S. Shin
                      Assistant U.S. Attorneys
                      Tel. (212) 637-2187/2239/2226